**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | ) | Civ. No. 1:19-02443 (RDM) |
| *Plaintiffs*, | ) | |
| *v.* | ) | **DEFENDANTS' MOTION TO DISMISS** |
| JONES DAY, *et al.*, | ) | |
| *Defendants.* | ) | |

## DEFENDANTS' MOTION TO DISMISS

Defendants Jones Day, Stephen J. Brogan, and Beth Heifetz respectfully move for an order dismissing Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6). The grounds for this motion are set forth in the attached memorandum of law. A proposed order is attached.

*<u>/s/ Traci Lovitt</u>*
Traci Lovitt (Bar No. 467222)
Terri L. Chase (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Mary Ellen Powers (Bar No. 334045)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

*Plaintiffs*,

*v.*

JONES DAY, *et al.*,

*Defendants.*

Civ. No. 1:19-02443 (RDM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Traci Lovitt (Bar No. 467222)
Terri L. Chase (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Mary Ellen Powers (Bar No. 334045)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ALLEGATIONS ..... 3

A. Jones Day's Leave Policies ..... 3

B. Savignac's Threats and Termination ..... 4

C. Sheketoff's Reviews and Compensation ..... 5

LEGAL STANDARD ..... 7

ARGUMENT ..... 8

I. JONES DAY'S LEAVE POLICIES DO NOT DISCRIMINATE BASED ON SEX (COUNTS I-III) ..... 8

A. Jones Day's Policies Are Gender-Neutral ..... 8

B. Plaintiffs' Objections Lack Merit ..... 11

II. SAVIGNAC'S COMPLAINTS ABOUT JONES DAY'S LAWFUL LEAVE POLICIES WERE NOT "PROTECTED ACTIVITY" (COUNTS VII-IX) ..... 15

III. AS THE COMPLAINT ITSELF ADMITS, SAVIGNAC WAS NOT TERMINATED FOR TAKING OR REQUESTING FMLA LEAVE (COUNTS X-XI) ..... 19

IV. SHEKETOFF HAS NOT ALLEGED PLAUSIBLE DISCRIMINATION CLAIMS (COUNTS IV-VI) ..... 21

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Marriott Int'l, Inc.*,
No. 09-cv-2402, 2011 WL 1231029 (D. Md. Mar. 29, 2011) ....................28

*Amos v. Hous. Auth. of Birmingham Dist.*,
927 F. Supp. 416 (N.D. Ala. 1996) ....................17

*Arban v. W. Pub'g Corp.*,
345 F.3d 390 (6th Cir. 2003) ....................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................7, 25, 27

*Ashraf-Hassan v. Embassy of France in U.S.*,
878 F. Supp. 2d 164 (D.D.C. 2012) ....................21

*Banawis-Olila v. World Courier Ground, Inc.*,
No. 16-cv-982, 2016 WL 4070133 (N.D. Cal. July 29, 2016) ....................27

*Barcher v. N.Y. Univ. Sch. of Law*,
993 F. Supp. 177 (S.D.N.Y. 1998) ....................17

*Barrett v. Forest Labs., Inc.*,
39 F. Supp. 3d 407 (S.D.N.Y. 2014) ....................28

*Bass v. World Wrestling Fed. Ent't, Inc.*,
129 F. Supp. 2d 491 (E.D.N.Y. 2001) ....................28

*Becknell v. Univ. of Ky.*,
383 F. Supp. 3d 743 (E.D. Ky. 2019) ....................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................7

*Bermudez v. TRC Holdings, Inc.*,
138 F.3d 1176 (7th Cir. 1998) ....................13

*Bones v. Honeywell Int'l, Inc.*,
366 F.3d 869 (10th Cir. 2004) ....................20

*Brown v. Dist. of Columbia*,
919 F. Supp. 2d 105 (D.D.C. 2013) ....................22

*Burley v. Nat'l Passenger Rail Corp.*,
801 F.3d 290 (D.C. Cir. 2015) ....................25, 26

*Burnette v. Northside Hosp.*,
342 F. Supp. 2d 1128 (N.D. Ga. 2004) ....................17

*Bush v. Raymond Corp.*,
No. 96-cv-302, 1996 WL 732558 (N.D.N.Y. Dec. 19, 1996) ....................15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
479 U.S. 272 (1987)....................13, 14, 18

*Chubb v. City of Omaha*,
424 F.3d 831 (8th Cir. 2005)....................20, 21

*Clover v. Total Sys. Servs., Inc.*,
176 F.3d 1346 (11th Cir. 1999)....................17

*Commodore-Mensah v. Delta Air Lines, Inc.*,
842 F. Supp. 2d 50 (D.D.C. 2012)....................3

*Crawford-El v. Britton*,
523 U.S. 574 (1998)....................18

*Curry v. Town of Islip*,
No. 13-cv-3597, 2017 WL 6947742 (E.D.N.Y. Dec. 8, 2017)....................15

*Daye v. Potter*,
380 F. Supp. 2d 718 (M.D.N.C. 2005)....................21

*Easaw v. Newport*,
253 F. Supp. 3d 22 (D.D.C. 2017)....................22

*EEOC v. Port Auth. of N.Y. & N.J.*,
768 F.3d 247 (2d Cir. 2014)....................28

*Faison v. Dist. of Columbia*,
664 F. Supp. 2d 59 (D.D.C. 2009)....................23

*Fed. Express Corp. v. Holowecki*,
552 U.S. 389 (2008)....................11

*Feng v. Sandrik*,
636 F. Supp. 77 (N.D. Ill. 1986)....................15

*Fowler v. Dist. of Columbia*,
404 F. Supp. 2d 206 (D.D.C. 2005)....................16

*Frasier v. Gen. Elec. Co.*,
930 F.2d 1004 (2d Cir. 1991)....................27

*Geduldig v. Aiello*,
417 U.S. 484 (1974)....................12

*Gen. Elec. Co. v. Gilbert*,
429 U.S. 125 (1976)....................9, 12, 14

*George v. Leavitt*,
407 F.3d 405 (D.C. Cir. 2005)....................16

*Grosdidier v. Broad. Bd. of Govs.*,
709 F.3d 19 (D.C. Cir. 2013)....................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gupta v. Oklahoma City Pub. Sch.*,
No. CIV-18-317-G, 2019 WL 896295 (W.D. Okla. Feb. 22, 2019)....................................24

*Hodges v. Dist. of Columbia*,
959 F. Supp. 2d 148 (D.D.C. 2013)....................................19

*Holbrook v. Reno*,
196 F.3d 255 (D.C. Cir. 1999)....................................25

*Howard Univ. v. Green*,
652 A.2d 41 (D.C. 1994)....................................15

*Hughes v. Xerox Corp.*,
37 F. Supp. 3d 629 (W.D.N.Y. 2014)....................................28

*Iannone v. Frederic R. Harris, Inc.*,
941 F. Supp. 403 (S.D.N.Y. 1996)....................................17

*Jackson v. Deen*,
959 F. Supp. 2d 1346 (S.D. Ga. 2013)....................................13

*Johnson v. Angels*,
125 F. Supp. 3d 562 (M.D.N.C. 2015)....................................22

*Johnson v. Univ. of Iowa*,
431 F.3d 325 (8th Cir. 2005)....................................9, 10, 12, 14

*King v. Jackson*,
487 F.3d 970 (D.C. Cir. 2007)....................................16, 18

*Lehman v. Bergmann Assocs., Inc.*,
11 F. Supp. 3d 408 (W.D.N.Y. 2014)....................................28

*Macon v. J.C. Penney Co.*,
17 F. Supp. 3d 695 (N.D. Ohio 2014)....................................24, 25

*Marshall Cty. Health Care Auth. v. Shalala*,
988 F.2d 1221 (D.C. Cir. 1993)....................................7

*McBride v. Mass. Comm'n Against Discrimination*,
677 F. Supp. 2d 357 (D. Mass. 2009)....................................26

*Muldrew v. Joseph McCormick Constr. Co.*,
Civ. No. 14-27, 2014 WL 3890336 (W.D. Pa. Aug. 8, 2014)....................................27

*Nev. Dep't of Human Res. v. Hibbs*,
538 U.S. 721 (2003)....................................12

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
462 U.S. 669 (1983)....................................9

*Pendleton v. Rumsfeld*,
628 F.2d 102 (D.C. Cir. 1980)....................................15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Pitt v. Dist. of Columbia*,
491 F.3d 494 (D.C. Cir. 2007) .......... 17

*Rafferty v. Nynex Corp.*,
60 F.3d 844 (D.C. Cir. 1995) .......... 18, 19

*Risley v. Fordham Univ.*,
No. 99 Civ. 9304, 2001 WL 118566 (S.D.N.Y. Feb. 13, 2001) .......... 17

*Rumble v. Convergys*,
No. C-1-07-979, 2010 WL 812775 (S.D. Ohio Mar. 9, 2010) .......... 25

*Sarnowski v. Air Brooke Limousine, Inc.*,
510 F.3d 398 (3d Cir. 2007) .......... 20

*Schwabenbauer v. Bd. of Educ. of City Sch. Dist. of City of Olean*,
667 F.2d 305 (2d Cir. 1981) .......... 12

*Scott v. Dist. Hosp. Partners, L.P.*,
60 F. Supp. 3d 156 (D.D.C. 2014) .......... 4, 5

*Sherrod v. Prairie View A & M Univ.*,
Civ. No. H-10-1858, 2011 WL 843936 (S.D. Tex. Mar. 8, 2011) .......... 27

*Sloan v. Am. Brain Tumor Ass'n*,
901 F.3d 891 (7th Cir. 2018) .......... 16

*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*,
298 F.3d 955 (10th Cir. 2002) .......... 20

*Spencer v. Va. State Univ.*,
224 F. Supp. 3d 449 (E.D. Va. 2016) .......... 28

*Spencer v. Va. State Univ.*,
919 F.3d 199 (4th Cir. 2019) .......... 28

*Spiteri v. AT&T Holdings, Inc.*,
40 F. Supp. 3d 869 (E.D. Mich. 2014) .......... 17

*Suzuki v. State Univ. of N.Y. Coll.*,
No. 08-cv-4569, 2013 WL 2898135 (E.D.N.Y. June 13, 2013) .......... 27

*Taylor v. Union Inst.*,
30 F. App'x 443 (6th Cir. 2002) .......... 25

*Thomas v. City Coll. of S.F.*,
No. 15-CV-05504, 2016 WL 6393508 (N.D. Cal. Oct. 28, 2016) .......... 25

*Thomas v. Dist. of Columbia*,
227 F. Supp. 3d 88 (D.D.C. 2016) .......... 19, 20

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011) .......... 13, 15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Throneberry v. McGehee Desha County Hosp.*,
403 F.3d 972 (8th Cir. 2005) ....................20

*Townsend v. United States*,
236 F. Supp. 3d 280 (D.D.C. 2017) ....................24

*Volberg v. Pataki*,
917 F. Supp. 909 (N.D.N.Y. 1996) ....................17, 18

*Wienke v. Haworth, Inc.*,
No. 92-1021, 1993 WL 6830 (6th Cir. 1993) ....................26

**STATUTES**

29 U.S.C. § 206 ....................8, 27

29 U.S.C. § 215 ....................15

29 U.S.C. § 2612 ....................21

29 U.S.C. § 2615 ....................19

42 U.S.C. § 2000e-2 ....................8

42 U.S.C. § 2000e-5 ....................13

D.C. Code § 2-1402.11 ....................8

D.C. Code § 32-502 ....................21

## INTRODUCTION

Plaintiffs Mark Savignac and Julia Sheketoff are former Jones Day associates who assert four sets of claims against the Firm.  All are legally meritless and should be dismissed.

*First*, Plaintiffs challenge Jones Day's leave policies on the ground that they discriminate against men.  But they do not.  Through its family leave policy, Jones Day offers birth parents who are primary caregivers 10 weeks of paid leave—regardless of gender.  Adoptive parents who are primary caregivers are afforded 18 weeks of paid leave—regardless of gender.  And all secondary caregivers obtain 4 weeks of paid leave—regardless of gender.  Those generous leave policies are sex-neutral on their face and entirely lawful.  Plaintiffs object that birth mothers alone may also request eight weeks of paid leave under the Firm's Short Term Disability policy.  But, as both the EEOC and the only court to address this issue have agreed, that is not discriminatory either, since there is a key difference between birth mothers and fathers: Only the former undergo pregnancy and childbirth.  And the law in fact *requires* employers to treat disabilities arising from pregnancy and childbirth on at least equal terms as any other disabilities.  Plaintiffs thus resort to complaining that Jones Day's disability policy does not force new mothers to provide medical certification of their disability.  Nothing in the law requires imposing that pointless, intrusive burden.  Nor does this conceivably amount to discrimination *against Savignac*, who was not disabled and thus was not eligible for any disability leave, with or without medical certification.

*Second*, Plaintiffs allege that Jones Day fired Savignac for complaining about the policies.  Actually, Jones Day fired him for the poor judgment and immaturity reflected by his extortionate threat to harm the Firm in the "court of public opinion" unless it acceded to his unreasoned demand for the same disability leave afforded to women who give birth.  For present purposes, however, what matters is that a reasonable lawyer in Savignac's position could not have believed Jones Day's policies were unlawful.  Savignac, a supposedly sophisticated attorney, cannot invoke

retaliation provisions that protect complaints about *unlawful* practices—even if those statutes also protect reasonable mistakes—when agency guidance, judicial precedent, first principles, and common sense all establish that the policies here are non-discriminatory.  On its face, Savignac's complaint was objectively *unreasonable*—and therefore legally unprotected.

*Third*, Savignac asserts that Jones Day unlawfully interfered with his protected leave under the Family Medical Leave Act ("FMLA") and its D.C. equivalent by firing him while he was out on leave.  That misunderstands the scope of these statutes.  An employer is forbidden to fire an employee *because* he has taken or will take protected leave.  But there are no allegations, much less plausible ones, that Jones Day terminated Savignac in order to interfere with his protected leave.  Instead, Savignac alleges that he was terminated because of his email demanding benefits *well beyond* what the FMLA and its D.C. equivalent guarantee.  An employee is not immunized from termination on other grounds simply because he happens to be on leave.  These claims therefore also fail as a matter of law.

*Finally*, Sheketoff alleges unrelated claims of sex discrimination in violation of Title VII, the Equal Pay Act (EPA), and D.C. law.  She claims one male partner gave her a negative review because she is a woman.  And she attributes, to that one review, her compensation of $440,000 in 2017 and $525,000 in 2018.  These claims fail on multiple grounds.  The Title VII claim is time-barred because Sheketoff filed her EEOC charge more than 180 days after leaving the Firm.  The D.C. claim (as well as the Title VII claim) fails because Sheketoff has not alleged facts that give rise to a plausible inference that the review stemmed from sex-based animus.  She *speculates* that a man would have received a better review for the same work, but that is not enough to unlock the gates of discovery.  Her EPA claim is not viable for the same reasons, and also because Sheketoff does not adequately allege that a specific male associate was paid more for "equal work."

## BACKGROUND ALLEGATIONS

### A.    Jones Day's Leave Policies

Jones Day has three relevant leave policies.  This Court may consider the written policies because Plaintiffs appended them to their complaint.  *See Commodore-Mensah v. Delta Air Lines, Inc.*, 842 F. Supp. 2d 50, 52 (D.D.C. 2012).

*First*, parents "of a newly born child" can take "paid family leave": ten weeks for primary caregivers and four weeks for secondary caregivers.  Compl. Add. at 3.  This policy is sex-neutral.  "[I]f the mother is the primary caregiver," the Firm will provide "ten weeks of paid family leave," and likewise, if "the father is the primary caregiver, the Firm will provide ten weeks of paid family leave." *Id.*  By the same token, "if the mother is the secondary caregiver," the Firm offers "four weeks of paid family leave," and "if the father is the secondary caregiver, the Firm will provide four weeks of paid family leave." *Id.*  Beyond this ten-week period of paid parental leave, primary caregivers (whether mothers or fathers) may request another "six weeks of unpaid leave." *Id.*

*Second*, "[i]n the case of a newly adopted child," the Firm offers "paid adoption leave": "18 weeks ... to the primary caregiver" and "four weeks" for the secondary caregiver. *Id.*  As with birth parents, the primary caregiver of an adoptive child may also seek approval for an additional "six weeks of unpaid leave." *Id.*  The Firm's adoption leave policy does not mention or distinguish between mothers and fathers, or between men and women. *See id.*

*Third*, Jones Day's "Short Term Disability policy" offers paid leave "in the event of a major illness or medical condition, including pregnancy, childbirth or related medical conditions." *Id.* at 4.  An employee must submit a formal "application" to request this leave. *Id.* at 5.  As to childbirth, "[u]nless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Caesarean-section births)." *Id.* at 5.  Thus, in the event of a newly born child, Jones Day "will provide mothers

eight weeks of paid leave under the Firm's Short Term Disability policy." *Id.* at 3. Disability leave serves a different purpose and is separate from family leave, and is available to women who give birth regardless of whether they will be the primary or secondary caregiver. *See id.* The disability leave must be taken prior to any period of family leave. *See id.*

**B. Savignac's Threats and Termination**

In August 2018, shortly before her scheduled, voluntary departure from the Firm, Sheketoff asked Defendant Beth Heifetz, the Issues & Appeals practice leader, if the Firm, upon the birth of the couple's child, would grant Savignac "18 weeks paid [leave]"—*i.e.*, 8 weeks *more* family leave than primary caregivers receive— "and 24 weeks total leave." Compl. ¶ 140. Heifetz referred the request to the Firm's HR Director, who denied it. Compl. ¶ 142. Savignac, who had started at the Firm just over a year earlier (Compl. ¶ 40), responded: "I oppose your practice, which is made illegal by Title VII." Compl. ¶ 144. The HR Director promptly sent Savignac legal citations that demonstrated the legality of Jones Day's policies. Compl. ¶ 145; Ex. A.[1]

Five months passed without response. Jones Day took no action against Savignac. In January 2019, shortly after Sheketoff gave birth, Savignac emailed the HR Director, demanding: "Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win." Compl. ¶ 146. Savignac acknowledged the caselaw and EEOC guidance that the Firm had previously cited, but maintained (without explanation) that they "do not support Jones Day's discriminatory policy." *Id.*

[1] Because the Complaint references and thereby incorporates this email exchange (Compl. ¶¶ 139-145), it may be considered on a motion to dismiss. *Scott v. Dist. Hosp. Partners, L.P.*, 60 F. Supp. 3d 156, 161 (D.D.C. 2014).

Jones Day fired Savignac six days later. Compl. ¶ 149. Plaintiffs allege that the Firm did so "because of the January 16 email's challenge to its parental leave policy." Compl. ¶ 153. They also contend that, in retaliation for Savignac's email, the Firm authorized only "a single reference" (from the three he requested) to speak with "potential employers." Compl. ¶¶ 171, 174.

**C. Sheketoff's Reviews and Compensation**

Sheketoff joined Jones Day in October 2014, and voluntarily left in August 2018 to pursue a career in the public sector. Compl. ¶¶ 57, 137, 210. In the Complaint, Sheketoff alleges that she suffered sex discrimination in her compensation from July 2017 until her departure.

Sheketoff's discrimination claim is centered on a review she received from "Partner A" for work she performed in 2016. She alleges that she "wrote an initial draft" of a client memorandum "and Partner A edited it." Compl. ¶ 73. In response to her "suggesting further edits and explaining to Partner A why she believed that he should not implement all of his edits," Partner A allegedly "sent Julia an email scolding her for second-guessing his edits." Compl. ¶¶ 77-78. He then allegedly wrote a "severely negative performance evaluation for being insufficiently deferential to him." Compl. ¶ 85. The Complaint alleges that this evaluation "influenced Julia's consensus statement for her 2016 work" and, in turn, led to a raise in 2017 of only "$15,000," "resulting in a salary of $440,000." Compl. ¶¶ 88-89. Sheketoff alleges that this reduced raise also caused her 2018 salary—$525,000—to be lower than it otherwise would have been. Compl. ¶¶ 93-95.

Partner A's email did not "scol[d]" Sheketoff "for second-guessing his edits" or say she was insufficiently deferential. He made two "general comments." Ex. B at 2.[2] Specifically, he advised her to "avoid making style edits"—like changing "'as well as' to 'and'"—"to the writing

[2] Because the Complaint references and thereby incorporates Partner A's email and review as well as Sheketoff's assessment statement, this Court may consider those materials on a motion to dismiss. *See Scott*, 60 F. Supp. 3d at 161. These materials have been redacted to protect client confidences and personal identities and to exclude materials not referenced in the Complaint.

of the person whose name goes first on the memo" and "when the person whose name goes first on the memos makes an edit, you should not change it back to the way you had it." *Id.* When Sheketoff responded that she "didn't mean to impugn or undermine our hierarchy by suggesting edits," Partner A responded: "No worries. I did not presume you were trying to impugn or undermine anything. You undoubtedly made the memo much better." *Id.* at 1. "My point is that I want you to be cognizant of time, and changing something back to the way you had it (after someone else took the time to change it) is not efficient." *Id.* The better course, he suggested, would be to "leave the more senior person's edit and ask about it in person or on the phone." *Id.*

Partner A's review was also not "severely negative." It stated that, in light of Sheketoff's "superior academic credentials," learning the "complicated" issues "presented no problems" for her. Ex. C. It also rated her "3" or "4" (out of 5) on every metric. And the review said nothing about Sheketoff's supposed lack of deference or her revisions to the memo. *See id.* Instead, it criticized other aspects of Sheketoff's performance on the matter: (1) that "her initial drafts were far more academic / pure legal analysis than helpful advice to the client," although this "improved in subsequent drafts"; (2) that she "exhibit[ed] little-to-no initiative" on the project, doing only "what is asked of her"; and (3) that "her availability seems to be whatever is convenient for her." *Id.* Sheketoff does not allege in her Complaint that any of those criticisms were false.

Turning to the 2016 assessment statement, it included one clause referencing Partner A's critique that Sheketoff's writing was overly academic—alongside similar criticisms from two other reviewers. *See* Ex. D. It stated that Sheketoff's "writing is generally very strong" but "at times her drafts need to be better tailored to their intended audiences." *Id.* For example, "some of her writing was viewed as complicated for a judge who might not be as immersed in the law and facts; *a client memo was too focused on pure legal analysis without accompanying advice*; and a motion

did not read enough like an advocacy piece." *Id.* (emphasis added). The statement also noted that Sheketoff "shows passionate commitment to some matters … but in other matters does not take initiative and seems to be protecting her time." *Id.* And "[s]he is perceived as often absent from the office during the weekday." *Id.* Again, Sheketoff does not allege that any of this is false.

In claiming that Partner A's review was motivated by animus toward her sex, Sheketoff alleges the following: that Partner A was not as "fraternal and ingratiating" toward her as he was with men at "the Jones Day cafeteria," and that when Savignac "was assigned to work on a brief for Partner A, Partner A deferred to [him] on both substance and style." Compl. ¶¶ 72, 82-84.

As discussed below, these allegations fail as a matter of law to state a discrimination claim. But if this claim proceeded to discovery, the facts would show that Partner A's review of Sheketoff had nothing to do with her gender. Partner A has submitted 28 substantive associate evaluations, for 12 female associates and 8 male associates. With the exception of Sheketoff, his evaluations of female associates have been uniformly positive, which is not true of his reviews of men.

## LEGAL STANDARD

To survive a motion to dismiss and proceed to discovery, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must allege sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* And those factual allegations, if true, must "raise a right to relief above the speculative level," meaning they must render the claim not just "conceivable," but "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557, 570 (2007). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the court should dismiss. *Iqbal*, 556 U.S. at 679. Of course, "a court can fully resolve any purely legal question on a motion to dismiss." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

# ARGUMENT

## I. JONES DAY'S LEAVE POLICIES DO NOT DISCRIMINATE BASED ON SEX (COUNTS I-III)

In Counts I-III, Plaintiffs challenge Jones Day's "parental leave policy," claiming that the policy, on its face, "discriminates on the basis of sex" in violation of federal and D.C. law. Compl. ¶¶ 184, 195. As Plaintiffs have correctly observed, that claim presents purely "a question of law." Dkt. 12 at 1. Specifically, do the Firm's leave policies, by their terms, "discriminate against any individual ... because of such individual's ... sex"? 42 U.S.C. § 2000e-2(a)(1); *see also* D.C. Code § 2-1402.11(a) (prohibiting discrimination "based upon ... sex").[3] As explained below, the policies at issue do not discriminate based on sex. The question is not even a close one.

### A. Jones Day's Policies Are Gender-Neutral

There are actually three distinct policies at issue. *First*, Jones Day offers paid *family* leave to birth parents: 10 weeks to a primary caregiver and 4 weeks to a secondary caregiver. *Second*, Jones Day offers paid *adoption* leave to adoptive parents: 18 weeks to a primary caregiver and 4 to a secondary caregiver. *Third*, Jones Day's Short Term Disability policy entitles birth mothers to apply for 8 weeks of paid *disability* leave based on the disabilities that arise from pregnancy and childbirth. *See supra* at 3-4. None of these policies discriminates on the basis of sex.

**1.** The *family leave* policy is sex-neutral in every respect. The "primary caregiver" of a newly born child is entitled to "ten weeks of paid family leave"; that applies equally by its terms to a "mother" and a "father." Compl. Add. at 3. Likewise, the "secondary caregiver" of a newly born child is entitled to "four weeks of paid family leave," and that policy too governs both "the mother" and "the father." *Id.* The only disparate treatment here is between primary and secondary caregivers—regardless of gender. That does not (and is not alleged to) violate the law.

---

[3] Likewise, if the policies do not discriminate because of sex, any resulting disparity is "based on" a "factor other than sex" and so does not violate the EPA. 29 U.S.C. § 206(d)(1).

The *adoption leave* policy is also sex-neutral. Indeed, the adoption leave policy does not refer to mothers or fathers at all. It simply provides for "18 weeks of paid adoption leave to the primary caregiver" and "four weeks" of paid leave to the secondary caregiver. *See id.*

Finally, the *disability leave* policy does not discriminate based on sex by affording women who undergo childbirth the same benefits available for every other "major illness or medical condition." *Id.* at 4. From the perspective of disability leave, fathers are not similarly situated to postpartum mothers. Only the latter incur disabilities from pregnancy and childbirth. If a father suffered a heart attack while in the delivery room, he too would be entitled to disability leave.

Notwithstanding Plaintiffs' "opposition to archaic gender roles" (Compl. ¶ 5), it remains true that, biologically, men cannot undergo childbirth. But that does not mean offering disability leave for childbirth is discrimination based on sex. Quite the opposite: It is *failure* to afford disability leave to women who give birth that would violate Title VII as amended by the Pregnancy Discrimination Act (PDA). In the PDA, Congress made "clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983). That Act superseded *General Electric Co. v. Gilbert*, which had held that excluding "pregnancy-related disability benefits" from a benefit plan is not unlawful sex discrimination. 429 U.S. 125, 128 (1976). Jones Day does not, therefore, unlawfully discriminate against men by offering disability leave to women who become unable to work by virtue of undergoing childbirth. The Firm is legally *required* to do so.

    **2.**    The only Court of Appeals decision to have confronted a similar claim rejected it. In *Johnson v. University of Iowa*, the employer gave six weeks of leave to biological mothers for "temporary disability," and one week to adoptive parents of either sex—but *no* leave to biological fathers. 431 F.3d 325, 327 (8th Cir. 2005). The court held that these policies did not violate Title

VII or its state equivalent: "Allowing biological mothers pregnancy-related disability leave on the same terms as employees with other disabilities is not only permissible, but is required by the Pregnancy Discrimination Act of 1978." *Id.* at 329. In other words, favoring biological mothers (who incur disabilities) over biological fathers (who do not) with respect to disability leave is not discrimination *based on sex*. *Id.* As for the adoption policy, it "provides exactly the same benefits to adoptive fathers as to adoptive mothers," and therefore "does not discriminate on the basis of gender" either. *Id.* at 331. To be sure, it favors *adoptive* fathers over *biological* fathers, but that type of discrimination—which the Eighth Circuit deemed "reasonable" given the greater "demands on [adoptive parents'] time and finances"—does not implicate Title VII. *See id.*

Jones Day's leave policies are far more generous than those in *Johnson*—for mothers *and* fathers—but, in material terms, these cases are on all fours. Like the disability policy in *Johnson*, Jones Day's disability policy grants leave only to "biological mothers," because only they (unlike biological fathers) undergo childbirth. That "is not only permissible, but is required by the [PDA]." *Id.* at 329. And, like the adoption policy in *Johnson*, Jones Day's adoption policy provides more leave for *adoptive* fathers who are primary caregivers than for *biological* fathers who are primary caregivers. But that is not discrimination "on the basis of gender." *Id.* at 331.

No court has called *Johnson*'s analysis into question. Meanwhile, the EEOC has embraced it. In its *Enforcement Guidance on Pregnancy Discrimination and Related Issues* (issued in June 2015), the EEOC cites *Johnson* and advises that "[l]eave related to pregnancy, childbirth, or related medical conditions can be limited to women affected by those conditions." Ex. E, § I(C)(3). It is only "parental leave"— "for purposes of bonding with a child and/or providing care for a child"—that "must be provided to similarly situated men and women on the same terms." *Id.* The EEOC then gives an example (*id.*, Example 14) of a policy that presents "No Disparate Treatment":

> An employer offers pregnant employees up to 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance. The employer also offers new parents, whether male or female, six weeks of parental leave. A male employee alleges that this policy is discriminatory as it gives up to 16 weeks of leave to women and only six weeks of leave to men. The employer's policy does not violate Title VII. Women and men both receive six weeks of parental leave, and women who give birth receive up to an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

Again, the details of Jones Day's policies are slightly different—it offers *less* disability leave to biological mothers, and *more* parental leave to primary caregivers regardless of sex—but the principle is the same. Per EEOC's enforcement guidance—which earns *Skidmore* deference due to the agency's "experience and informed judgment," *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399-400 (2008)—Jones Day's policy "does not violate Title VII."

**B. Plaintiffs' Objections Lack Merit**

Plaintiffs do not seriously dispute that Jones Day is entitled—indeed, required—to afford disability leave to biological mothers. And that disability leave must be *beyond* any sex-neutral family leave, or else the policies would unlawfully discriminate against women. Instead, Plaintiffs object that the eight weeks of disability leave that Jones Day offers is not really "disability leave," because that period is presumed without any particularized medical review of a particular female associate's postpartum ability to work. Compl. ¶¶ 110-116. Plaintiffs also object that adoptive parents who are primary caregivers obtain more paid leave than biological fathers. Compl. ¶ 117. These arguments are without merit. They do not establish any unlawful discrimination.

**1.** In their Complaint, Plaintiffs argue that the eight weeks of disability leave that the Firm provides to biological mothers is not genuine "disability leave," because it is afforded "to all biological mothers without regard for how long they are disabled from performing legal work." Compl. ¶ 112. They admit that "some mothers are disabled from performing legal work for eight weeks after childbirth," but allege that "others are not." Compl. ¶ 118. Plaintiffs' argument thus

ultimately turns on whether it is legitimate to *presume* an eight-week disability period when a birth mother files an application for such disability leave. On Plaintiffs' view, employers must demand individual medical certification from all mothers before authorizing *any* disability leave, or else they are discriminating against biological fathers. That contention fails.

As the Eighth Circuit has recognized, "it is not unreasonable" for an employer "to establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth." *Johnson*, 431 F.3d at 329. The employer in *Johnson* took the same approach; the male employee raised the same challenge; and the court squarely rejected it. *See id.* After all, pregnancy is an observable condition with predictable physical consequences that, in the ordinary course, do not require medical confirmation. And courts and doctors have long observed that childbirth is a disabling condition that necessitates a recovery period in the range of eight weeks. *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 731 (2003) (citing "typical 4- to 8-week period of physical disability due to pregnancy and childbirth"); *Geduldig v. Aiello*, 417 U.S. 484, 500 n.4 (1974) ("The usual duration of such disability [from labor and puerperium] is approximately six to eight weeks.'" (quoting Am. Coll. of Obstetricians and Gynecologists)); *Gilbert*, 429 U.S. at 130 (describing trial court's findings that "normal pregnancy" is "disabling for a period of six to eight weeks"); *Schwabenbauer v. Bd. of Educ. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981) (assuming "that disability due to pregnancy, without complications, normally extends for a period of six to eight weeks"). Even Plaintiffs do not deny that childbirth renders women unable to work for *some* period. In light of that reality, presuming an eight-week disability period from a birth mother's application for disability leave makes the plan less burdensome for the Firm, its administrator, its associates, and their doctors. It also avoids unnecessary intrusion into the details of a new mother's childbirth and the medical conditions that

can result (*e.g.*, excessive bleeding, post-partum depression, incontinence, severe breast pain, etc.). In short, this is not a *gender-based* distinction. It is a *medical* distinction based on the observability of the underlying condition and the well-documented disability it causes.

Relatedly, the identified "discrimination," if any, is discrimination in favor of pregnant women and against both men and women *who incur other disabilities*: Only the former are exempt from medical certification and so some might obtain more disability leave than they would be able to medically justify. But Plaintiffs do not have standing to challenge that "discrimination." Savignac does not claim that he was ever disabled. Nor was he ever required to provide medical certification of a disability. It would make no difference to him—and certainly would not redress his "injury"—if the Firm began to demand medical certification from birth mothers (or ceased requiring it for all disabled employees). In other words, the fact that the Firm's policy imposes a requirement on disabled men (and many disabled women) that it does not impose on pregnant women does not amount to discrimination *against Savignac*, because he has no entitlement to disability leave in any event. (And Sheketoff's purported standing is derivative of his. *See* Compl. ¶¶ 187, 198.) In Title VII's terms, Plaintiffs are not "aggrieved" by the Firm's disability policy, 42 U.S.C. § 2000e-5(f)(1), and therefore cannot challenge it, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176 (2011); *see also Jackson v. Deen*, 959 F. Supp. 2d 1346, 1354 (S.D. Ga. 2013) (Title VII does not confer "a cause of action to remedy … discrimination directed toward third parties"); *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179-80 (7th Cir. 1998).

Moreover, even setting all of that aside, the Supreme Court has held that Title VII and the PDA do not prohibit "preferential treatment" for pregnancy. *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 287 (1987). In *Guerra*, the Court upheld a state statute that required employers to provide up to four months of unpaid disability leave for pregnancy or childbirth, even

if the employer did not provide analogous benefits to similarly situated men. *Id.* at 275-76, 279-80. In doing so, the Court treated the PDA as a "floor," not a "ceiling," for pregnancy protections. *Id.* at 285. Thus, to the extent that Jones Day's Short Term Disability policy "discriminates" by presuming an eight-week disability period for pregnant women while requiring other disabled associates to prove their inability to work with medical evidence, that preference is lawful.[4]

**2.** Plaintiffs also contend that, because Jones Day grants 18 weeks of paid leave to primary-caregiver adoptive parents, "biological fathers" are "the only parents who do not receive 18 weeks of paid leave when they act as primary caregivers." Compl. ¶ 108. That is mistaken. If a female same-sex couple has a baby and the primary caregiver is not the birth mother, she would also receive 10 weeks of paid leave. In any event, even if Plaintiffs' premise were correct, it still would not be discrimination *based on sex*. Adoptive *fathers*, too, are entitled to 18 weeks of leave if they act as primary caregiver. *See* Compl. Add. at 3. The "discrimination" is thus between *biological* fathers and *adoptive* fathers—which is not proscribed. And, as *Johnson* observed, it is reasonable to grant adoptive parents extra leave, as they "face demands on their time and finances that may be significantly greater than those faced by biological parents." 431 F.3d at 331.

*            *            *

For these reasons, Jones Day's leave policies do not impermissibly disfavor men. They offer generous periods of paid family leave to male and female caregivers alike, and also afford biological mothers the short-term disability leave to which they are entitled under the PDA. There

[4] Of course, if an employer *prohibited* women from working for a period after childbirth, based on "archaic or stereotypical notions about pregnancy and the abilities of pregnant workers," that would violate Title VII by discriminating against women. *Guerra*, 479 U.S. at 290; *see also Gilbert*, 429 U.S. at 149 n.1 (Brennan, J., dissenting) (addressing "forced maternity leave"). But there is no allegation that Jones Day *forces* any female associates to apply for disability leave, or to take all eight weeks. And men who wish to "enable their wives to prioritize their careers over childcare" (Compl. ¶ 122) are free to take "primary caregiver" leave.

is no support in the law for Plaintiffs' theory that employers cannot offer a standardized, medically reasonable period of presumptive disability leave for employees who undergo childbirth, and must instead demand doctors' notes certifying the intimate details of a mother's delivery and recounting the resulting physical and emotional consequences that render her unable to work for a period of time. Nor should this Court adopt such a rule. Counts I-III should be dismissed.

## II. SAVIGNAC'S COMPLAINTS ABOUT JONES DAY'S LAWFUL LEAVE POLICIES WERE NOT "PROTECTED ACTIVITY" (COUNTS VII-IX)

Plaintiffs' next set of claims alleges that Defendants unlawfully retaliated against Savignac for opposing practices made unlawful by Title VII, the EPA, and D.C. law.[5] Actually, Plaintiffs suffered no adverse consequences when they asserted in August 2018 that Jones Day's policies were unlawful. Compl. ¶¶ 140-145. Jones Day terminated Savignac five months later, only after his intemperate, unreasoned threat in January 2019 to wage a public relations campaign to damage the Firm if he did not receive the extra paid leave he demanded.[6] Terminating Savignac for "the improper manner of [his] opposition"—rather than for "the opposition itself"—is not unlawful retaliation. *Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C. Cir. 1980).

[5] Sheketoff does not allege that Defendants took any adverse action against *her*; rather, she purports to assert retaliation claims based on her derivative injuries from the adverse action against Savignac. Compl. ¶¶ 228, 236, 246. But "[s]pouses of alleged victims of discrimination are not entitled to sue for damages under Title VII." *Curry v. Town of Islip*, No. 13-cv-3597, 2017 WL 6947742, at *3 (E.D.N.Y. Dec. 8, 2017). Spouses "cannot be said to fall within the class of persons Title VII was intended to protect." *Feng v. Sandrik*, 636 F. Supp. 77, 82 (N.D. Ill. 1986); *see also, e.g.*, *Bush v. Raymond Corp.*, No. 96-cv-302, 1996 WL 732558, at *2 (N.D.N.Y. Dec. 19, 1996). They therefore do not qualify as "aggrieved" persons with standing to sue. *See Thompson*, 562 U.S. at 176. And the same result obtains under the DCHRA, because D.C. courts generally follow Title VII caselaw, *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994); and under the EPA, which forbids retaliation only against "employee[s]" themselves, 29 U.S.C. § 215(a)(3). For that reason, Sheketoff's retaliation claims should be dismissed. In any event, because Sheketoff's claims are derivative of Savignac's, they also fall for the same reasons as his.

[6] Notably, Savignac did not request in that email that the Firm change its policy. He made an extortionate demand for paid leave for *himself*, suggesting he would drop any challenge to the Firm's policies if he was paid off for his silence. *See* Compl. ¶ 146.

More importantly for current purposes, Savignac's retaliation claims also fail as a matter of law. The anti-retaliation provisions protect only *objectively reasonable* complaints of unlawful activity. No reasonable lawyer in Savignac's position could have believed that Jones Day's sex-neutral policies—perfectly consistent with on-point appellate precedent and EEOC guidance, and in fact compelled by the PDA—constituted unlawful discrimination.

**A.** Complaining about an *unlawful* employment practice constitutes protected activity that triggers the protections of anti-retaliation provisions under Title VII, the EPA, and D.C. law. "[O]pposition activity" may also garner protection "even though the employer's practices do not amount to a violation of Title VII." *Grosdidier v. Broad. Bd. of Govs.*, 709 F.3d 19, 24 (D.C. Cir. 2013). In those circumstances, however, the employee "must have a good faith *and reasonable* belief that the practices are unlawful." *Id.* (emphasis added).

"Not all complaints are protected under this framework." *Id.* In *King v. Jackson*, the D.C. Circuit affirmed the dismissal of a retaliation claim by an employee who had complained about the cessation of an affirmative action plan. 487 F.3d 970, 973 (D.C. Cir. 2007). The court held that "failure to renew an affirmative action plan" is not an "unlawful employment practice" under Title VII—even if it violates *other* parts of the statute—and that it was "unreasonable" to believe otherwise. *Id.* Since the law was "unambiguous," not "unsettled," the complaint was unprotected. *Id.* In *George v. Leavitt*, the Court of Appeals likewise rejected a retaliation claim because the plaintiff's complaints—about "insulting and demeaning statements," including telling her to "go back to Trinidad"—were "isolated incidents" that "could not reasonably be thought to constitute ... [a] violation of Title VII." 407 F.3d 405, 408, 417 (D.C. Cir. 2005).[7]

[7] D.C. law is the same on this point. *See Fowler v. Dist. of Columbia*, 404 F. Supp. 2d 206, 210 (D.D.C. 2005). And EPA retaliation claims are governed by the same rule. *See Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 895 (7th Cir. 2018) (requiring "objectively reasonable" belief

"The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). And, at least where the underlying dispute is purely legal, so is the question of objective reasonableness. *Cf. Pitt v. Dist. of Columbia*, 491 F.3d 494, 509-10 (D.C. Cir. 2007) (describing "whether an objectively reasonable officer would have believed his conduct to be lawful" as "question of law").

Evaluating the objective reasonableness of an employee's belief requires an assessment of his "legal sophistication." *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 410 (S.D.N.Y. 1996). Specifically, "an attorney ... will be held to a higher standard of expertise about Title VII than a layperson." *Id.* Thus, in *Volberg v. Pataki*, the court dismissed a retaliation claim on the papers because the plaintiff was a lawyer and "a reasonable *attorney* in plaintiff's position would not have believed that defendants' proposed downsizing violated the law," in light of statutory and judicial authority insulating *bona fide* seniority systems from Title VII attack. 917 F. Supp. 909, 914-16 (N.D.N.Y. 1996); *see also Barcher v. N.Y. Univ. Sch. of Law*, 993 F. Supp. 177, 185 (S.D.N.Y. 1998) ("[N]o reasonable person, much less an attorney, could have had a *reasonable* belief that she had a [v]alid Title VII claim."); *Amos v. Hous. Auth. of Birmingham Dist.*, 927 F. Supp. 416, 422 (N.D. Ala. 1996) (rejecting retaliation claim by plaintiff "trained to defend EEOC charges" because her underlying complaint of unlawful activity had "no logical basis"); *Risley v. Fordham Univ.*, No. 99 Civ. 9304, 2001 WL 118566, at *7 (S.D.N.Y. Feb. 13, 2001) (finding that, because plaintiff had "the assistance of an attorney," his assertion of unlawful conduct was "even less reasonable") .

---

of unlawful conduct); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1134 (N.D. Ga. 2004) ("As under Title VII and other employment discrimination statutes, the complaining employee must have an objectively reasonable, good-faith belief that the employer's conduct is unlawful[.]"); *see also Spiteri v. AT&T Holdings, Inc.*, 40 F. Supp. 3d 869, 876 (E.D. Mich. 2014) (same).

**B.**     Savignac's 2019 complaint was objectively unreasonable and thus not protected by the applicable statutes.  Savignac is a highly educated lawyer who alleges that he was poised for partnership in a major law firm.  Compl. ¶¶ 36, 55.  No reasonable lawyer, much less one with Savignac's background, could believe, in light of the sex-neutral terms of Jones Day's parental leave policies, that those policies facially discriminate based on sex.  No reasonable lawyer could believe, in view of the PDA, that offering short-term disability leave to women who undergo childbirth is anything other than *legally required*.  No reasonable lawyer could believe, given the EEOC guidance, that offering disability leave in addition to sex-neutral parental leave is unlawful.  No reasonable lawyer could believe, after having been pointed to the only appellate precedent on point, that it is forbidden to presume an eight-week disability period when a birth mother applies for leave.  No reasonable lawyer could believe, given basic standing principles, that the remedy for such a presumption, even if it were unlawful, would be to give *non-disabled men* eight weeks of disability leave.  No reasonable lawyer could believe, in view of *Guerra*, that Title VII forbids a disability plan's preferential treatment for pregnant women.  And no reasonable lawyer could believe, under the statutory text and on-point precedent, that a birth parent is entitled to the same leave as an adoptive parent.  Indeed, at no point did Savignac identify *any* authority supporting his claims, even after Jones Day identified its own.  This is not a case where the law is "unsettled." *King*, 487 F.3d at 973.  Instead, Savignac "could not have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Volberg*, 917 F. Supp. at 916.

Plaintiffs are, undoubtedly, clever and creative lawyers with aspirational views of the law.  And the Court need not go so far as to deem their challenge "frivolous" in the sanctionable sense. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).  Rule 11 protects arguments "for the extension, modification or reversal of existing law." *Rafferty v. Nynex Corp.*, 60 F.3d 844, 852 (D.C. Cir.

1995). That is evidently what Plaintiffs are trying to effectuate. Under the applicable retaliation provisions, however, their complaints constitute protected activity only if it was reasonable to believe that the Jones Day leave policies *were* unlawful—not that they *should be* unlawful. The former belief clearly was not reasonable, and Plaintiffs therefore cannot invoke these retaliation provisions to avoid the adverse consequences of their law-reform project.[8]

## III. AS THE COMPLAINT ITSELF ADMITS, SAVIGNAC WAS NOT TERMINATED FOR TAKING OR REQUESTING FMLA LEAVE (COUNTS X-XI)

In Counts X and XI, Savignac claims that the Firm "interfered" with his protected family leave "by terminating his employment while he was on leave." Compl. ¶¶ 251, 256. But he has not pleaded an "interference" claim under either the FMLA or its D.C. equivalent. Savignac does not allege that Jones Day fired him *because* he requested or took leave guaranteed by the FMLA. In fact, Savignac claims the Firm fired him for *other* reasons—namely, for his email demanding paid leave *beyond* the FMLA's guarantees. Compl. ¶¶ 10, 153. That defeats his claims. Simply *being on* family leave does not immunize an employee from termination for other reasons.

**A.** "To state an FMLA interference claim, a plaintiff must allege facts sufficient to show... that (1) he was entitled to take [FMLA] leave . . ., (2) he gave his employer adequate notice of his intention to take leave and (3) his employer denied or otherwise interfered with his right to take leave." *Hodges v. Dist. of Columbia*, 959 F. Supp. 2d 148, 155 (D.D.C. 2013); *see also Thomas v. Dist. of Columbia*, 227 F. Supp. 3d 88, 98 (D.D.C. 2016) (claims under the D.C. FMLA are analyzed "under th[is] same legal framework"); 29 U.S.C. § 2615(a)(1).

But "the right to non-interference with [FMLA] leave is not absolute." *Arban v. W. Pub'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). In particular, "the FMLA does not provide employees

[8] Whatever the merits (or lack thereof) of Plaintiffs' policy arguments, they are misdirected. The regime they seek—to deprive birth mothers of disability pay so as to ensure that mothers and fathers spend exactly equal time with their babies—requires legislative action.

with a right against termination for a reason *other* than interference with rights under the FMLA." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007) (emphasis added). Federal courts (including this one) have thus uniformly held that an employee has no FMLA claim if he is terminated "for a reason unrelated to his intention to exercise his rights under the FMLA." *Id.*; *see*, *e.g.*, *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) ("The FMLA simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave"); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002) (same); *Thomas*, 227 F. Supp. 3d at 110 (recognizing that FMLA claim cannot succeed where "the employee would have been terminated regardless of the request for FMLA leave").

In short, if Savignac alleges that his termination was *not* related to his request for, or taking of, unpaid FMLA leave, he has not stated a claim that the Firm interfered with his FMLA rights—and his claims fail "as a matter of law." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877-78 (10th Cir. 2004); *see also Diffee*, 298 F.3d at 961.

**B.** That is precisely what Savignac alleges. By his own account, he was not terminated for a "request for or taking of FMLA leave." *Diffee*, 298 F.3d at 961. Instead, he alleges that he was fired because he demanded that Jones Day grant him additional paid leave beyond anything he would have been entitled to under the FMLA. *See* Compl. ¶ 10 ("Jones Day fired Mark because of the January 16 email"); *id*. ¶ 153 (same).

Importantly, Savignac does not contend that his email requested any substantive right to which he is entitled under the FMLA, or that Jones Day's policies fall short of FMLA obligations. After all, he demanded eighteen weeks of *paid* leave (Compl. ¶ 146)—and the FMLA "does not require employers to provide paid leave." *Chubb v. City of Omaha*, 424 F.3d 831, 833 (8th Cir.

2005); *see also Becknell v. Univ. of Ky.*, 383 F. Supp. 3d 743, 757 (E.D. Ky. 2019); *Daye v. Potter*, 380 F. Supp. 2d 718, 722 (M.D.N.C. 2005) (plaintiff "was not entitled to paid leave under the FMLA"); 29 U.S.C. § 2612(a)(1)(A), (c); D.C. Code § 32-502(a)(1), (e)(1). Jones Day's policies entitled Savignac, if he served as primary caregiver, to 10 weeks of paid leave plus six weeks of unpaid leave, which is fully compliant with the federal and D.C. laws. *See* 29 U.S.C. § 2612(d)(1) (allowing paid leave to be supplemented with unpaid leave); D.C. Code § 32-502(e)(2).

Accordingly, judged by his own Complaint, there is no plausible inference that Savignac was terminated for requesting or exercising his FMLA leave rights. These claims must therefore also be dismissed as a matter of law.

## IV. SHEKETOFF HAS NOT ALLEGED PLAUSIBLE DISCRIMINATION CLAIMS (COUNTS IV-VI)

In Counts IV-VI, Plaintiff Sheketoff presses an unrelated set of claims, alleging that one male partner gave her a bad review because she is a woman. Sheketoff claims this review caused her annual compensation—which was set at $440,000 on July 1, 2017, and $525,000 on July 1, 2018—to be lower than it otherwise would have been. She asserts sex discrimination claims under Title VII, the EPA, and the D.C. Human Rights Act (DCHRA).

**A.** To start, the Title VII claim (Count IV) is time-barred. "An individual seeking to challenge an unlawful employment practice under Title VII must file a charge with the EEOC within 180 days 'after the alleged unlawful employment practice occurred.'" *Ashraf-Hassan v. Embassy of France in U.S.*, 878 F. Supp. 2d 164, 170 (D.D.C. 2012) (quoting 42 U.S.C. § 2000e–5(e)(1)). Sheketoff voluntarily left Jones Day in August 2018. Compl. ¶ 210. Even assuming that each of Sheketoff's paychecks until her departure constituted a separate discriminatory act, the last such act occurred no later than August 2018. Yet Sheketoff did not file her sex-discrimination charge with the EEOC until June 18, 2019. Compl. ¶ 22. Because that is a gap of well over 180 days, Count IV must be dismissed. *See Ashraf-Hassan*, 878 F. Supp. 2d at 171.

**B.** The DCHRA claim (Count VI) also fails.[9] To state a claim for disparate treatment, a plaintiff must show "that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination, that is, *an inference that her employer took the action because of her membership in the protected class*." *Brown v. Dist. of Columbia*, 919 F. Supp. 2d 105, 115 (D.D.C. 2013) (emphasis added). If a plaintiff does not allege "sufficient facts giving rise to an inference of discrimination," her claim must be dismissed. *Easaw v. Newport*, 253 F. Supp. 3d 22, 29-31 (D.D.C. 2017).

Sheketoff is a woman, and she alleges an "adverse employment action"—specifically, "a disingenuous, severely negative performance evaluation" that allegedly caused her to receive a raise to a salary of only "$440,000." Compl. ¶¶ 85, 89. Sheketoff has not, however, alleged sufficient facts to create a plausible inference that the review (or the allegedly resulting pay decision) was the result of discrimination. "A sheer possibility" that the review was based on sex "is insufficient to withstand a Rule 12(b)(6) challenge." *Johnson v. Angels*, 125 F. Supp. 3d 562, 567 (M.D.N.C. 2015). Sheketoff's allegations go no further than that.

It makes sense to start with the incident Sheketoff says led to the review. Sheketoff claims that, in an email, Partner A "scold[ed]" her for changes she made to a memo and for not being deferential to him. Compl. ¶ 78. But the email was not scolding and did not accuse her of being insufficiently deferential. The email, which was professional in tone, simply stated that she should not spend time making stylistic edits to a senior lawyer's work and should not reverse changes that the lead lawyer makes to a memo. The exchange that followed that initial email confirmed that Partner A was not chiding Sheketoff for any lack of acquiescence. He praised her work, saying she "undoubtedly made the memo much better." Ex. B at 1. His "point" was just that Sheketoff

[9] This is also an independent ground for dismissal of the Title VII claim.

should be "cognizant of time, and changing something back to the way you had it (after someone else took the time to change it) is not efficient." *Id.* Partner A was thus focused on working efficiently, not chastising Sheketoff for any failure of deference. The exchange demonstrates that Sheketoff was actually the one who raised the specter of "undermin[ing] our hierarchy." *Id.*

Partner A's subsequent review also contradicts Sheketoff's allegations. Sheketoff claims that Partner A's "severely negative" review attacked her for "being insufficiently deferential to him." Compl. ¶ 85. But the review—which actually gave Sheketoff acceptable or above-average ratings ("3" or "4" out of 5 on every metric) and praised certain aspects of her work—says nothing, explicitly or implicitly, about lack of deference. Ex. C. Rather, it shows that Partner A's critique was focused entirely on other aspects of Sheketoff's performance, including: (1) that "her initial drafts [of the memo] were far more academic / pure legal analysis than helpful advice"; (2) that she "exhibit[ed] little-to-no initiative"; and (3) that "her availability seems to be whatever is convenient for her." *Id.* Sheketoff thus has alleged no link between the (imagined) criticism she speculates was rooted in sexism (that she was "insufficiently deferential") and the actual review.

And, notably, Sheketoff does not allege that the critiques *actually* contained in the review are false or unwarranted. *Cf. Faison v. Dist. of Columbia*, 664 F. Supp. 2d 59, 68 (D.D.C. 2009) (noting that "false reason" for adverse action could be suggestive of pretext and discrimination). Indeed, Sheketoff's assessment statement—which she does not challenge, other than based on its reliance on Partner A's review—recounts multiple examples of the same or related performance criticisms coming from different reviewers. *See* Ex. D. Although "an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss," it is also true that when a complaint "contains fulsome factual context for the challenged adverse

employment action, those allegations must be considered collectively in evaluating the reasonableness and plausibility of the inferences urged by the plaintiff." *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017). Here, the review and assessment statement—both incorporated by reference into the Complaint—"provided multiple details" about Partner A's "proffered rationale" for his review and the Firm's "proffered rationale" for its pay determination. *Id.* at 301. Sheketoff does not deny those rationales or plausibly assert them to be pretextual. That is enough—at least in the absence of any other facts suggesting sex-based animus—to defeat any reasonable inference of discriminatory motive.

And Sheketoff offers no facts suggesting sex-based animus. She does not allege that Partner A "made any discriminatory comments about [her] or engaged in any overt discriminatory conduct toward" her. *Gupta v. Oklahoma City Pub. Sch.*, No. CIV-18-317-G, 2019 WL 896295, at *4 (W.D. Okla. Feb. 22, 2019) (dismissing complaint). Instead, she alleges only that Partner A was not as "fraternal and ingratiating" toward her as with male associates at lunch, and that Partner A "deferred to [Savignac] on both substance and style." Compl. ¶¶ 72, 82-84. These points are not nearly enough to raise a plausible inference that Partner A's criticisms were discriminatory.

*First*, the allegation that Partner A was not as "ingratiating" or "self-deprecating" toward Sheketoff as he was toward men does not raise an inference of discrimination. Sheketoff does not allege that Partner A treated *women generally* less favorably than men—only that he treated *her* less favorably. Compl, ¶ 72 ("Partner A's manner toward Julia was different from the manner he adopts toward similarly situated male associates."). There could be any number of reasons Partner A treated Sheketoff differently, including that—as he explicitly indicated—he was unhappy with aspects of her performance. *See Macon v. J.C. Penney Co.*, 17 F. Supp. 3d 695, 698 (N.D. Ohio 2014) ("While Macon alleges she was treated differently from other terminated JCPenney

employees, she offers no factual allegations to support the discriminatory inference she draws from this different treatment.").  This observation alone cannot "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

Moreover, Partner A's alleged manner toward associates in the "cafeteria" (Compl. ¶ 83) is too attenuated from the context of a performance review to support the inference that his review of Sheketoff was discriminatory.  Even if a supervisor is friendlier *socially* with men, that does not reasonably imply that his *professional reviews* of women would be discriminatory.  *Rumble v. Convergys*, No. C-1-07-979, 2010 WL 812775, at *8 (S.D. Ohio Mar. 9, 2010) ("[A] plaintiff's opinion that a supervisor is friendlier and less critical of male employees does not evidence sex discrimination."); *Taylor v. Union Inst.*, 30 F. App'x 443, 450-51 (6th Cir. 2002) ("[G]eneralized allegations about the comparative warmth with which a few individuals treat non-minorities are not sufficient to raise a genuine issue of fact regarding [defendant's] discriminatory intent.").

*Second*, the allegation that Partner A "deferred" to Savignac does not permit the Court to make the "unsupported and unreasonable inferenc[e]" that his differing treatment of Savignac and Sheketoff was based on sex discrimination.  *Thomas v. City Coll. of S.F.*, No. 15-CV-05504, 2016 WL 6393508, at *1 (N.D. Cal. Oct. 28, 2016).  While a plaintiff can allege discrimination by showing "that the employer treated other employees of a different [sex] … more favorably in the same factual circumstances," the more-favored employees must have been "similarly situated." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).  That means showing that "all of the relevant aspects of her employment situation were nearly identical to those of the male employee." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).  Sheketoff has not alleged that she was similarly situated to Savignac.  In particular, Plaintiffs do not allege that Savignac's performance was criticized in the ways Sheketoff's was.  They do not allege, for instance, that his

drafts were too academic or that he was often unavailable.  *See Burley*, 801 F.3d at 302 (finding

no discrimination, in part, because plaintiff was "unable to demonstrate either that other white

employees were found to have committed offenses of comparable seriousness").  In fact, they

allege the opposite: "Mark's performance evaluations and consensus statement were very positive,

reflecting his excellent performance for numerous partners across a range of cases."  Compl. ¶ 44.

Sheketoff makes no analogous allegation about her own evaluations or assessment statements,

even apart from Partner A's review.  And while the Complaint boasts about Savignac's billable

hours and how they prove his "commitment to Jones Day and its clients" (Compl. ¶ 49), it tellingly

alleges nothing comparable about Sheketoff's hours or commitment.  *Cf.* Ex. D (reporting 1066

client billable hours, and 461 pro bono hours, for Sheketoff in 2016).

Moreover, while Plaintiffs allege that Savignac worked with Partner A, they do not allege

that Partner A ever reviewed Savignac's performance.  (He did not.  *See* Compl. ¶ 46.)  Savignac

is thus, by definition, not similarly situated to Sheketoff.  *See Burley*, 801 F.3d at 302 (finding no

discrimination, in part, because plaintiff was "unable to demonstrate … that [white employees]

were differently disciplined by the same supervisors who disciplined" plaintiff).

Beyond those factual allegations, Sheketoff baldly asserts that had a man done work similar

to her, Partner A would have given that male associate a positive review.  *See* Compl. ¶ 87.  But

"[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of ...

discrimination."  *McBride v. Mass. Comm'n Against Discrimination*, 677 F. Supp. 2d 357, 362 (D.

Mass. 2009); *see also Wienke v. Haworth, Inc.*, No. 92-1021, 1993 WL 6830, at *4 (6th Cir. 1993)

("The allegation that Wienke would not have been fired if she had been male is, of course,

conclusory and plainly insufficient to raise a triable issue of pretext.").

At bottom, Sheketoff has alleged only that Partner A criticized her performance on grounds she does not allege to be false, whereas he seemed happy with Savignac's work and was chummier with male associates at lunch than with her. That does not "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Sheketoff's sex discrimination claims do not deserve to proceed to discovery, and must be dismissed on the papers.

**C.** Finally, Sheketoff's EPA claim (Count V) also fails for much the same reason. The EPA forbids employers to "discriminate … on the basis of sex by paying wages to employees … at a rate less than the rate at which [they] pay[] wages to [similarly situated] employees of the opposite sex." 29 U.S.C. § 206(d)(1). But the Act allows such differentials where "such payment is made pursuant to … a differential based on any other factor other than sex." *Id.* Sheketoff has pleaded that defense for Jones Day: She alleges that her pay disparity is attributable exclusively to Partner A's review. Compl. ¶ 212. Yet, as just discussed, she does not allege facts that plausibly suggest that Partner A's review was motivated by discriminatory animus. Thus, on Sheketoff's own allegations, her disparate pay was based "on a factor other than sex"—her reviews.

In addition, the EPA claim also fails because Sheketoff does not identify a male comparator who earned more than she did for "equal work." To state a plausible EPA claim, it is not enough for a plaintiff to allege simply that she was paid less than men. *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1007-08 (2d Cir. 1991). "Bald allegations that male employees were paid more than female employees … will not survive a motion to dismiss." *Suzuki v. State Univ. of N.Y. Coll.*, No. 08-cv-4569, 2013 WL 2898135, at *4 (E.D.N.Y. June 13, 2013).[10] Instead, a plaintiff must allege

[10] *See also Banawis-Olila v. World Courier Ground, Inc.*, No. 16-cv-982, 2016 WL 4070133, at *3 (N.D. Cal. July 29, 2016); *Muldrew v. Joseph McCormick Constr. Co.*, Civ. No. 14-27, 2014 WL 3890336, at *7 (W.D. Pa. Aug. 8, 2014); *Sherrod v. Prairie View A & M Univ.*, Civ. No. H-10-1858, 2011 WL 843936, at *9 (S.D. Tex. Mar. 8, 2011).

facts making it plausible that the employer paid a man more for "work 'virtually identical' (or the apparent synonym, 'substantially equal') to the plaintiff's." *Spencer v. Va. State Univ.*, 919 F.3d 199, 203-04 (4th Cir. 2019). Alleging equal work "is a demanding threshold requirement," *id.* at 203, "typically shown by comparison to a specific male comparator, which must be pled with specificity," *Spencer v. Va. State Univ.*, 224 F. Supp. 3d 449, 456 (E.D. Va. 2016). When a plaintiff does not "offer a male counterpart with a higher salary," courts routinely dismiss. *Bass v. World Wrestling Fed. Ent't, Inc.*, 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001).[11]

Here, Plaintiffs—who know full well what Savignac, who was in the same practice group, was earning at Jones Day—fail to identify any male associate who performed "equal" work yet was paid more than her in 2017-2018.[12] Instead, she alleges, "on information and belief," that her salaries in those years were "below the salaries of male Issues & Appeals associates whose salaries had been the same as Julia's prior to 2017." Compl. ¶ 95. That is nothing more than a "formulaic recitation of the elements of an unequal pay claim." *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 645 (W.D.N.Y. 2014). "[C]ourts routinely dismiss EPA claims pled in this formulaic fashion." *Lehman v. Bergmann Assocs., Inc.*, 11 F. Supp. 3d 408, 420 (W.D.N.Y. 2014).

Moreover, because she fails to identify a male comparator, Sheketoff necessarily also fails to allege that she performed "equal work" as him. Instead, she implies that every associate in the Issues & Appeals practice performs the same work. *See* Compl. ¶ 211. Courts have rejected that premise on the pleadings. *Port Auth.*, 768 F.3d at 257 (rejecting claim that "all lawyers perform

---

[11] *See also, e.g.*, *Alexander v. Marriott Int'l, Inc.*, No. 09-cv-2402, 2011 WL 1231029, at *5 (D. Md. Mar. 29, 2011) (dismissing due to "improper comparator"); *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255-59 (2d Cir. 2014) (dismissing where comparators appeared "random"); *cf. Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 439, 452 (S.D.N.Y. 2014) (denying motion to dismiss as to ten plaintiffs who each alleged "an identified male comparator").

[12] The reason is obvious: Sheketoff was earning more than her husband.

the same or similar function[s]" and noting that such a "generalization" would "permit lawsuits against any law firm ... that does not employ a lockstep pay model"). Particularly in the context of a law firm, where work must be judged both by quality (reviews) and by quantity (hours), it is telling that Sheketoff (unlike Savignac) does not allege anything about the strength of her reviews (other than Partner A's) or the number of hours she billed. Without alleging those facts about her work, and how they compare to male comparators, Sheketoff has not pleaded an EPA claim.

**CONCLUSION**

For these reasons, the Court should dismiss Plaintiffs' Complaint.

September 27, 2019

Respectfully submitted,

*/s/ Traci Lovitt*
Traci Lovitt (Bar No. 467222)
Terri L. Chase (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Mary Ellen Powers (Bar No. 334045)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*