# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

      v.

JONES DAY, STEPHEN J. BROGAN,
and BETH HEIFETZ,

    *Defendants*.

Case No. 1:19-cv-02443-RDM

Oral Argument Requested

## OPPOSITION TO MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.    Jones Day's family leave policy violates the civil rights laws (Counts I-III).................... 2

        A.   Jones Day's policy is illegally discriminatory as a matter of law.................................. 3

        B.   Jones Day's own citations confirm the illegality of its sexist policy............................. 8

    II.   Jones Day's arguments against the retaliation claims are frivolous (Counts VII-IX) ...... 23

        A.   Plaintiffs' complaint of sex discrimination was reasonable ........................................ 23

        B.   Julia is a proper retaliation plaintiff........................................................................... 27

    III.  Jones Day interfered with Mark's protected family leave (Counts X and XI) ............. 31

    IV.  Julia's pay discrimination claims should proceed to discovery (Counts IV-VI).......... 34

        A.   Julia's EEOC charge was timely because it was filed within 300 days....................... 34

        B.   The Complaint states a claim under Title VII and the Human Rights Act .................. 34

        C.   The Complaint states a claim under the Equal Pay Act............................................... 42

CONCLUSION...................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) .................................. 40, 41

*Bones v. Honeywell International, Inc.*, 366 F.3d 869 (10th Cir. 2004)...................................... 32

*Burley v. National Passenger Rail Corp.*, 801 F.3d 290 (D.C. Cir. 2015) ............................. 35, 38

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) ............................. 28

\* *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272 (1987) .............. passim

*Carter v. George Washington University*, 387 F.3d 872 (D.C. Cir. 2004).................................. 34

*Chambers v. District of Columbia*, 389 F. Supp. 3d 77 (D.D.C. 2019)...................................... 34

*Clayton v. District of Columbia*, 374 F. Supp. 3d 119 (D.D.C. 2019) ...................................... 27

*Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974) ........................................ 4, 7, 19

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)................................................................ 42

*Edgar v. JAC Products, Inc.*, 443 F.3d 501 (6th Cir. 2006) ........................................................ 32

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015) .......................................... 25

*EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988)................................................. 34

*EEOC v. Port Authority*, 768 F.3d 247 (2d Cir. 2014) ................................................................ 44

*Epps v. Potomac Electric Power Co.*, No. 18-cv-1423 (D.D.C. Sept. 20, 2019) ........................ 34

*Faison v. District of Columbia*, 664 F. Supp. 2d 59 (D.D.C. 2009)............................................ 39

*George v. Leavitt*, 407 F.3d 405, 416-17 (D.C. Cir. 2005)......................................................... 26

*Goines v. Valley Community Services Board*, 822 F.3d 159 (4th Cir. 2016) .............................. 41

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) ............................................................................ 35

*Griffin v. Administrator*, 690 F. Supp. 52 (D.D.C. 1988)....................................................... 4, 21

*Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999)................................................................. 35, 38

*Holmes v. University of the District of Columbia*, 244 F. Supp. 3d 52 (D.D.C. 2017) .... 33, 35, 38

*Howard R.L. Cook & Tommy Shaw Found. v. Billington*, 737 F.3d 767 (D.C. Cir. 2013).... 29, 30

\* *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005)............................................... passim

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ...................................................................... 40

*King v. Jackson*, 487 F.3d 970 (D.C. Cir. 2007)......................................................................... 26

*Knussman v. Maryland*, 272 F.3d 625 (4th Cir. 2001) ................................................................. 5

*Love v. Pullman Co.*, 404 U.S. 522 (1972)................................................................................... 34

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ....................................................... 35

*McDonough v. Anoka County*, 799 F.3d 931 (8th Cir. 2015) ........................................ 35

*Miles v. University of the District of Columbia*, 2013 WL 5817657 (D.D.C. 2013) .................... 32

*Musgrove v. District of Columbia*, 458 F. App'x 1 (D.C. Cir. 2012) ............................ 43

\* *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) ........................... passim

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) ..................... 14, 15

*Orr v. Orr*, 440 U.S. 268 (1979) .................................................................. 5

*Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012 (D.C. Cir. 1981) .............................. 23

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ................................................... 31

\* *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir. 1990) ...................................... 19, 21

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .................................................... 17

*Skrynnikov v. FNMA*, 226 F. Supp. 3d 26 (D.D.C. 2017) ........................................ 32

*Spearman v. Elizondo*, 230 F. Supp. 3d 888 (N.D. Ill. 2016) ..................................... 35

*Spencer v. Virginia State University*, 919 F.3d 199 (4th Cir. 2019) ............................. 35

*Stewart v. International Union*, 271 F. Supp. 3d 276 (D.D.C. 2017) .............................. 42, 43, 45

*Taylor v. Union Institute*, 30 F. App'x 443 (6th Cir. 2002) ................................... 35

*Thomas v. District of Columbia*, 227 F. Supp. 3d 88 (D.D.C. 2016) ............................ 33

\* *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011) ............................ 28, 29, 30, 31

*Throneberry v. McGehee Desha County Hospital*, 403 F.3d 972 (8th Cir. 2005) ...................... 33

*Washington Convention Center Authority v. Johnson*, 953 A.2d 1064 (D.C. 2008) ........ 31, 32, 33

*Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142 (1980) ................................. 6

*Wienke v. Haworth, Inc.*, 983 F.2d 1071 (6th Cir. 1993) ........................................ 35

**Statutes**

29 U.S.C. § 206 .................................................................................. 42, 45

29 U.S.C. § 215 .................................................................................. 28

29 U.S.C. § 216 .................................................................................. 31

29 U.S.C. § 2601 ................................................................................ 8, 22

29 U.S.C. § 2612 ................................................................................ 8

42 U.S.C. § 2000e ............................................................................... 3, 12

42 U.S.C. § 2000e-12 ........................................................................... 34

42 U.S.C. § 2000e-5 ............................................................................ 29

D.C. Code § 2-1403.16 .......................................................................... 29

**Other Authorities**

EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues ................ passim

**Rules**

Federal Rule of Civil Procedure 8 ................................................................................................. 35

**Regulations**

29 C.F.R. § 1601.13 ...................................................................................................................... 34

## INTRODUCTION

Defendants Jones Day, Stephen Brogan, and Beth Heifetz attacked Plaintiffs Mark Savignac and Julia Sheketoff, along with their two-week-old son, by firing Mark while he was on leave with the baby and then sabotaging his search for a new job.  As the Complaint (Dkt. 1) describes in greater detail, Defendants took these illegal actions because Julia and Mark challenged Jones Day's sexist parental leave policy.

Jones Day is one of the world's preeminent employment law firms.  It boasts on its website that "[e]mployers' needs in complex employment law" matters "are met by decades of experience from 150 lawyers in our top-ranked practice," and that 12 of the firm's partners are among the "nation's most powerful employment lawyers."  Brogan is the firm's dictatorial managing partner, while Heifetz commands its elite Issues & Appeals group of 41 former Supreme Court clerks.  And their point person in receiving Plaintiffs' challenge to their parental leave policy, Sarah McClure, had 20 years of experience in Jones Day's "top-ranked" employment law practice before becoming the firm's Global Counsel and its Director of Human Resources.  *See* Dkt. 15-1; Compl. ¶¶ 2, 15-17, 141-48.

Considering their vast legal experience and virtually limitless legal resources, there can be no doubt that Defendants knew after reviewing Plaintiffs' challenge to Jones Day's discriminatory policy that the challenge was meritorious—and that, even if some lawyers might consider the policy itself defensible, firing Mark in retaliation for that challenge was a flagrant violation of the civil rights laws.

Jones Day has asked the Court to dismiss this case.  Some of its arguments are frivolous, some are founded on mischaracterizations of Plaintiffs' position and the case law, and others are just plain wrong.  All should be rejected, and the case should move forward to discovery.

## ARGUMENT

### I.     Jones Day's family leave policy violates the civil rights laws (Counts I-III)

Jones Day's family leave policy (Dkt. 1-1 at 2-3) gives eight more weeks of paid leave to new mothers than to new fathers.  The policy labels the extra eight weeks "disability leave," but the label is a sham: Jones Day gives the extra eight weeks to all mothers regardless of disability, simply because they are mothers rather than fathers.  It even gives an extra eight weeks to adoptive parents, who incur no disability whatsoever.  As Jones Day's own citations—and other cases that Jones Day does not mention—confirm, that is illegal discrimination on the basis of sex.

Unable to defend its discriminatory policy, Jones Day attacks strawmen.  Most glaringly, it says that Plaintiffs want Jones Day to "demand doctors' notes certifying the intimate details of a mother's delivery" before granting disability leave.  MTD 15.  Not so.  The law does not require employers to demand medical disclosures from new mothers, and Plaintiffs have never suggested that it does.  Jones Day made up that false claim for Brogan's Facebook-and-Twitter response to this litigation (Dkt. 12-1), to shore up the (implausible) public relations narrative that Jones Day is somehow a champion for women while Plaintiffs are the misogynists.  That explains why Jones Day offers no citations for its claim.

Jones Day's other strawmen are easily brushed aside:

- Plaintiffs do not object (and never have objected) to the gender-neutral components of Jones Day's policy.

- Plaintiffs do not deny (and never have denied) that employers should give disability leave to new mothers and other employees for however long they are disabled.

- Plaintiffs do not claim (and never have claimed) that Mark was entitled to *disability* leave, or that Jones Day discriminates in favor of disabled mothers relative to other disabled employees.

- Plaintiffs do not claim (and never have claimed) that Jones Day discriminates in favor of adoptive parents and against birth parents—though Jones Day's treatment of adoptive parents confirms that its policy illegally discriminates *on the basis of sex*.

Plaintiffs' sole objection is (and always has been) to Jones Day's policy of giving eight more weeks of leave to mothers than to fathers. That discriminatory policy violates the civil rights laws.

## A.    Jones Day's policy is illegally discriminatory as a matter of law

Plaintiffs laid out their challenge to Jones Day's family leave policy in their first email on the subject, sent to Heifetz just before Julia left to become a public defender. Julia wrote:

> Jones Day gives women 18 weeks of paid leave (and 24 weeks total [including six weeks of unpaid leave]) while it gives men 10 weeks of paid leave (and 16 weeks total [including unpaid leave]). Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled. Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled. That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory.

Compl. ¶ 140.

This litigation raises the same issue as Julia's email: May Jones Day give eight more weeks of paid leave to mothers than to fathers, where the extra eight weeks "are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled" but merely on whether they are women? Compl. ¶ 140; *see* Compl. ¶¶ 110-46, 184. Under the civil rights laws (the parties do not distinguish among the three statutes at issue), the answer is no.

**1.**    This case involves two well-established principles. *First*, a policy that gives a new mother more time off than a new father *because she is a woman* discriminates on the basis of sex, and that is illegal. *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 739 n.12 (2003) ("granting more family-leave time to women than to men … would run afoul of … Title VII"). *Second*, a policy that gives a new mother time off *because she is disabled from doing her job* does *not* discriminate on the basis of sex—indeed, Title VII *requires* that employers give time off for pregnancy-related disabilities to the same extent as for other disabilities. 42 U.S.C. § 2000e(k).

Plaintiffs' challenge does not implicate bona fide disability leave, which employers can and should provide to their employees (especially new mothers) "for as long as [the employee is] disabled." Compl. ¶ 133.  Rather, the issue is Jones Day's policy of giving eight more weeks of paid leave to mothers than to fathers purely on the basis of sex.  Under the "Primary Caregiver" section of Jones Day's family leave policy, "mothers" are entitled to "18 weeks of paid leave," while "fathers" receive "ten weeks of paid leave." Compl. ¶ 106; Dkt. 1-1 at 3.  The "Secondary Caregiver" section likewise gives eight more weeks to "mothers" than to "fathers." Dkt. 1-1 at 3. The policy thus discriminates on the basis of sex.

The policy labels the eight weeks given only to women "disability leave." Compl. ¶ 110; Dkt. 1-1 at 3.  But that label has no legal significance: The civil rights laws are "designed to serve justice and will not tolerate any elevation of form over substance." *Griffin v. Administrator*, 690 F. Supp. 52, 57 (D.D.C. 1988).

Although the extra eight weeks are *labeled* disability leave, as a matter of substance they are not *in fact* disability leave.  They are given categorically to *every* new mother simply for being a woman, regardless of whether she is disabled for eight weeks from working at Jones Day.  Dkt. 1-1 at 3; Compl. ¶¶ 110-19.  Indeed, Jones Day admits that, under its policy, "some [new mothers] might obtain more disability leave than they would be able to medically justify."  MTD 13.

In short, Jones Day's policy is based on a *generalization* about women: Jones Day *acts* as if something that is true of *some* women is true of *all* women; it *deems* all new mothers disabled from office work for eight weeks, even though many are not.  Compl. ¶¶ 118-19; *cf. Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 644 (1974) (rejecting, under the Constitution, an employer's "irrebuttable presumption of physical incompetency" for women in the third trimester of pregnancy because it "applie[d] even when the medical evidence as to an individual woman's

physical status might be wholly to the contrary"); *id.* at 649 (applying same critique to irrebuttable presumption of disability for the first three months after childbirth); *Knussman v. Maryland*, 272 F.3d 625, 635-37 (4th Cir. 2001) (discussing constitutional case law supporting the proposition that "classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection" (quoting *Orr v. Orr*, 440 U.S. 268, 283 (1979))).   As Julia's email explained at the outset, "the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave."  Compl. ¶ 140.

Jones Day's treatment of adoptive parents confirms that its policy is to give all new mothers 18 weeks of paid leave regardless of disability—subject to Jones Day's caveat that it actually treats some gay women worse (MTD 14).  It is no coincidence that adoptive primary caregivers get the same 18 weeks of leave as biological mother primary caregivers, even though adoptive parents do not give birth and are not disabled.  Compl. ¶¶ 108, 117 140; Dkt. 1-1 at 3.  (Nor is it a coincidence that adoptive secondary caregivers get only the same four weeks given to biological father secondary caregivers.)  Jones Day's policy would be illegally discriminatory regardless of its treatment of adoptive parents, but the adoption policy provides further confirmation that the "disability leave" label is a sham and that the policy simply gives eight more weeks of paid leave to all new mothers than to biological fathers.  Compl. ¶ 117.

By providing nearly two additional months of leave to women than to men, Jones Day's policy reflects and imposes sex-based stereotypes and archaic gender roles.  Compl. ¶¶ 121-35, 140.  "Stereotypes about women's domestic roles" and "parallel stereotypes presuming a lack of domestic responsibilities for men" combine to "create[] a self-fulfilling cycle of discrimination

that force[s] women to continue to assume the role of primary family caretaker, and foster[s] employers' stereotypical views about women's commitment to work and their value as employees." *Hibbs*, 538 U.S. at 736.  Jones Day's policy hurts both women and men (not to mention their children) and violates the civil rights laws.

    **2.**      Jones Day gives two excuses for basing its policy on a generalization about women. *First*, it reduces paperwork: "presuming an eight-week disability period from a birth mother's application for disability leave makes the plan less burdensome for the [f]irm, its administrator, its associates, and their doctors." MTD 12.  *Second* (and relatedly), Jones Day says that the sex-based generalization is needed to avoid an "unnecessary intrusion into the details of a new mother's childbirth and the medical conditions that can result." MTD 12-13.

    These excuses are unavailing.  For one thing, Jones Day offers no legal support for the notion that reducing paperwork and medical disclosures could justify sex discrimination.  Nor could it.  *Cf. Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 151-52 (1980).

    More importantly, Jones Day's rule giving mothers eight more weeks of leave than fathers does nothing to advance its purported interest in paperwork reduction and privacy.  Rather, those values could justify exempting new mothers from having to *prove* their continuing disability to Jones Day through burdensome paperwork and intrusive medical disclosures.  But Plaintiffs have never challenged such an exemption (to the contrary, they would support it).

    Jones Day's attempt to defend its policy thus confuses two distinct (and familiar) concepts: the *substance* of a rule and the *evidentiary procedure* used to implement that rule.  Take the example of a high school that requires healthy students to attend class each day, but permits students to stay home when they are sick.  The substance of the rule is simple enough: The student must come to class unless he is sick.  But how does the school determine whether an absent student

is indeed sick?  That is up to the school.  It might accept a call from the student's parent, or it might demand more—perhaps a doctor's note, or even a full examination by the school nurse.

Regardless of the evidentiary standard, though, the substance of the rule is the same: The student is entitled to miss school if and only if he is in fact sick.  The school could even adopt as its evidentiary standard the "honor system," allowing the student himself to call in sick and taking his word for it.  Of course, such a low evidentiary bar would create the risk that some healthy but unscrupulous students would call in sick and spend the day at the arcade.  But the substantive rule would still be unchanged—the deceitful students would simply be *breaking the rule*.

So the substantive rule and the evidentiary standard are two separate things.  If the school wants to avoid administrative hassle, invasion of its students' medical privacy, and the insinuation that the students are liars, then it will apply a low evidentiary bar like the honor system—and accept the risk that a few dissembling truants will escape punishment.  If the school cares more about preventing unjustified absences, or if it just does not trust its students, then it might apply a more demanding evidentiary standard.  The school can choose whatever standard it likes.

Contrary to Defendants' unsupported assertions (Dkt. 12-1; MTD 1, 12-13, 15), Plaintiffs have never expressed *any* opposition to the evidentiary standard that Jones Day uses for disability leave.  They have only ever challenged Jones Day's substantive rule giving mothers eight extra weeks of sex-based leave regardless of actual disability.  That substantive rule is distinct from whatever evidentiary standard Jones Day chooses to implement it.  And the substantive rule does nothing to reduce paperwork or protect women's privacy.  *Cf. LaFleur*, 414 U.S. at 641-42 (irrebuttable presumption that women are disabled during third trimester did not advance stated rationale of administrative convenience).  Rather, any paperwork or intrusion into privacy results from the evidentiary standard that Jones Day selects.  If Jones Day chooses to trust women to

7

refrain from taking disability leave when they are not in fact disabled—that is, if it uses an honor system rather than demanding intrusive medical disclosures—then it can avoid burdensome paperwork and protect women's privacy.  Or Jones Day could achieve the same end by making family leave gender-neutral, just as Congress did with the FMLA.  Compl. ¶ 107; 29 U.S.C. §§ 2601(b)(4), 2612(a)(1).  But it cannot give eight weeks more leave to mothers than to fathers merely by labeling it "disability leave."

The reality is that Jones Day is not especially concerned with women's privacy or paperwork.  Its disability policy requires every woman who is disabled for more than eight weeks after giving birth, as well as other people with disabilities, to  "authorize … her health care provider to discuss [her] medical condition with the [f]irm and its representatives," "authorize the release of any and all medical records related to the leave," and (upon request) submit to "a second certification from a health care provider designated and paid for by the [f]irm."  Dkt. 1-1 at 5.

While Plaintiffs would have chosen a standard that shows more trust in women and respect for their medical privacy, the evidentiary standard is (to repeat) up to Jones Day.  Plaintiffs have never challenged the chosen standard—and they certainly have never claimed that it discriminates "against both men and women *who incur other disabilities*," as Jones Day outlandishly suggests. MTD 13.  Plaintiffs' position is and always has been simply that Jones Day may offer sex-based "disability" leave only for the period of actual disability.

### B.      Jones Day's own citations confirm the illegality of its sexist policy

Jones Day's defense of its discriminatory policy comes down to a handful of citations. Those citations deserve more serious attention than Jones Day gives them.  But far from supporting Jones Day, a review of its own authorities actually confirms Plaintiffs' position as set forth above. And so does the on-point Third Circuit decision that Jones Day never addresses.

1.      Jones Day principally purports to rely on *Johnson v. University of Iowa*, 431 F.3d

325 (8th Cir. 2005).  *See* MTD 9-10, 12; Dkt. 15-1 at 2.  But that case supports Plaintiffs.

The leave policy at issue in *Johnson* provided:

(a) Biological mothers are entitled to leave for any period of pregnancy-related temporary disability, to be charged against accrued sick leave.  Based on current medical practice, a leave of six weeks or less would not require the employee to provide disability documentation. … Any request for absence beyond the period of disability is considered as leave of absence without pay or as vacation.

(b) A newly adoptive parent, including a domestic partner, is entitled to one week (5 days) of paid adoption leave to be charged against accrued sick leave.

431 F.3d at 327 (quoting the policy).  The policy did not provide any other paid leave for new

parents.  The plaintiff was a biological father whose request to take paid sick leave to care for his

new baby had been denied.  He argued that the policy was discriminatory "because it allows

biological mothers and adoptive parents to use accrued sick leave after the birth or arrival of a new

child without extending a similar benefit to biological fathers."  *Id.* at 327-28.

The Eighth Circuit framed the dispositive question as follows:

If the leave given to biological mothers is granted due to the physical trauma they sustain giving birth, then it is conferred for a valid reason wholly separate from gender.  If the leave is instead designed to provide time to care for, and bond with, a newborn, then there is no legitimate reason for biological fathers to be denied the same benefit.  Thus, *the primary question for us to consider is whether the leave given to biological mothers is in fact disability leave.*

*Id.* at 328 (emphasis added).  In other words, while it was undisputed that the employer *labeled*

the leave that it offered to mothers but not fathers "disability" leave, it fell to the court to determine

whether it was "in fact" disability leave.  And if it was not, then there would be "no legitimate

reason for biological fathers to be denied the same benefit."  *Id.*

The court concluded that "the leave granted to biological mothers is disability leave" in

fact as well as in name.  *Id.* at 332.  It explained that the policy "*does not allow* mothers to use

accrued sick leave *after their period of disability has ended.  Thus, the period away from work*

9

constitutes disability leave, even though mothers are likely caring for their newborns during the period." *Id.* at 329 (emphases added). Since it provided leave only during a mother's actual "period of disability," the substantive rule was simply "[a]llowing biological mothers pregnancy-related disability leave on the same terms as employees with other disabilities." *Id.* That "is not only permissible, but is required by the Pregnancy Discrimination Act." *Id.*

The plaintiff also challenged the policy's evidentiary standard, asserting that the leave for new mothers "cannot be interpreted as disability leave because the [employer] does not require *proof* of a disability when the leave taken after giving birth is six weeks or less." *Id.* (emphasis added). But the Eighth Circuit, having concluded that the employer's substantive rule limited leave to the new mother's "period of disability," saw no legal basis to quibble with the evidentiary standard: The employer was entitled to "establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth." *Id.*

So *Johnson* upheld two distinct components of the policy. *First*, it upheld a substantive rule providing "leave for *any period* of pregnancy-related disability" (up to accrued sick leave) but not "after the[] period of disability has ended." Because the substantive rule gave paid leave only for the actual "period of pregnancy-related disability," it did not discriminate on the basis of sex.

*Second*, the decision upheld an evidentiary standard that exempted new mothers from having to "provide disability documentation" for the first six weeks after giving birth. The plaintiff did not argue that the honor system was a sham, with everyone involved understanding that mothers would take the whole six weeks even if they recovered earlier. And the evidentiary standard did not discriminate against healthy new fathers like the plaintiff, who was not claiming disability and so was not required to provide any sort of documentation. The standard did treat

new mothers favorably relative to persons of both sexes disabled by other causes, but the plaintiff made no attempt to challenge *that* disparate treatment (which was perfectly lawful).[1]

Jones Day says that *Johnson* is "on all fours" with this case.  MTD 10.  That would be true if, as Jones Day tells the Court, "the employer [in *Johnson*] gave six weeks of leave to biological mothers" regardless of disability (as Jones Day does with the eight weeks at issue here).  MTD 9. But Jones Day is mischaracterizing *Johnson*.  The employer there gave leave for "any period of pregnancy-related temporary disability" (431 F.3d at 327), but "d[id] not allow mothers to use accrued sick leave after their period of disability has ended" (*id.* at 329).  The reference to "a leave of six weeks or less" was not part of the substantive rule; it was just an exemption from the *evidentiary* requirement to "provide disability documentation."  A mother was *not* permitted to take the full six weeks of leave if she recovered sooner.  *Id.* at 327-29.  Plaintiffs have never challenged *any* period of bona fide disability leave for new mothers (that is, leave limited to the period of actual disability), and they have never challenged Jones Day's evidentiary standard.  In short, nothing in *Johnson* supports Jones Day.

Rather, *Johnson* strongly supports Plaintiffs.  The Eighth Circuit made clear that, when an employer's policy giving so-called "disability leave" to new mothers is challenged as sex discrimination, the court must decide "whether the leave given to biological mothers is *in fact* disability leave."  *Id.* at 328 (emphasis added).  The court also made clear that such leave is "in

---

[1] The Eighth Circuit also upheld the employer's policy of giving one week of leave to adoptive parents.  431 F.3d at 331-32.  That ruling was correct; the civil rights laws do not prohibit discrimination on the basis of adoption status.  And whereas Plaintiffs observe that Jones Day's policy of giving adoptive parents the exact same 18 weeks of paid leave as birth mothers further confirms that its policy is to give 18 weeks of paid leave to all new mothers regardless of disability, the Eighth Circuit rightly declined to consider the employer's treatment of adoptive parents as shedding light on its treatment of birth mothers because the employer was providing "two different sets of benefits to two different groups": one week for adoptive parents and "any period of pregnancy-related temporary disability" for birth mothers.  *Id.* at 328.

fact" disability leave only if the policy "does not allow mothers to use [disability] leave after their period of disability has ended." *Id.* at 329. That is *exactly* what Plaintiffs challenge about Jones Day's policy. In the Eighth Circuit, at least, Jones Day's policy is illegal under settled law.

**2.** Jones Day also points to *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272 (1987). *Guerra* did not address parental caregiving leave; it dealt with a claim of discrimination in favor of new mothers vis-à-vis *other disabled employees*. Nonetheless, it deserves more serious attention than the scant three sentences that Jones Day devotes to it. MTD 13-14; *see also* Dkt. 15-1 at 2. And it too supports Plaintiffs.

Procedurally, *Guerra* was a federal preemption challenge to a California statute, but the real question was whether Title VII, as amended by the Pregnancy Discrimination Act, prohibits an employer from giving unpaid leave for pregnancy-related disability without offering disability leave to employees of either sex with any other disability. 479 U.S. at 274-75, 283-84. The PDA says that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes … as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Despite this textual requirement that new mothers be "treated the same," the five-Justice majority concluded that Title VII permits some policies that favor women with pregnancy-related disabilities over other disabled workers, and they therefore rejected the preemption challenge to the California law. 479 U.S. at 284-90.

Unlike the eight weeks of sham "disability leave" that Jones Day provides, the leave at issue in *Guerra* was *in fact* disability leave. The California law required employers to provide "unpaid pregnancy disability leave for *up to* four months." *Id.* at 276 (emphasis added). More specifically, it required employers to provide "leave on account of pregnancy for a reasonable period of time; provided, such period shall not exceed four months." *Id.* at 275 n.1 (quoting the

California statute).  And it specified that "[r]easonable period of time means *that period during which the female employee is disabled* on account of pregnancy, childbirth, or related medical conditions."  *Id.* (emphasis added).  By contrast to Jones Day's policy, the California law did not provide sex-based leave beyond the period of *actual* disability; it did not deem all mothers to be disabled for a fixed period based on a generalization about women.  Rather, it provided leave only for "that period during which the female employee is disabled"—while permitting employers to *cap* the leave at four months even if a particular worker was disabled for longer than that.  *Id.*

> This was crucial to the outcome, as the Court made clear near the end of its opinion:
>
> > We emphasize the limited nature of the benefits [that the California law] provides. The statute is narrowly drawn to cover only the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions.  Accordingly, unlike the protective labor legislation prevalent earlier in this century, [the California law] does not reflect archaic or stereotypical notions about pregnancy and the abilities of pregnant workers.  A statute based on such stereotypical assumptions would, of course, be inconsistent with Title VII's goal of equal employment opportunity.

*Id.* at 290 (emphasis in original; footnote omitted).

Two points are salient here.  *First*, the Court was clear that the leave at issue was, as *Johnson* would later put it, *in fact* disability leave.  The law was "narrowly drawn to cover only the period of *actual physical disability*"—the Court even italicized that phrase.  *Guerra* confirms Plaintiffs' position that Jones Day violates Title VII because it gives women sex-based leave that "is *not* dependent upon whether women are actually disabled."  Compl. ¶ 140 (emphasis added); *see also* Compl. ¶ 112.

*Second*, the Court made clear that its consciously atextual, purposive reading of the PDA would not protect leave policies that "reflect archaic or stereotypical notions" or are "inconsistent with Title VII's goal of equal employment opportunity."  Nothing in *Guerra* (or any other authority) supports the notion that giving women more caregiving leave than men is consistent

with equal employment opportunity.  To the contrary, doing so perpetuates archaic breadwinner vs. caregiver gender roles, causes discrimination against female employees by casting them as less dedicated and reliable workers, and prevents Jones Day's male employees from supporting their wives' careers to the same degree that its female employees can support their husbands' careers. Compl. ¶¶ 121-35; *see also Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 676 (1983) (invalidating employer's insurance policy for employees' spouses "because the protection it affords to married male employees is less comprehensive than the protection it affords to married female employees").  Both Congress and the Supreme Court have expressly recognized this reality.  *See* Compl. ¶¶ 125-29.

By contrast, the California law upheld in *Guerra* merely put women on a more nearly level playing field with men by reducing the impact of disability caused by pregnancy and childbirth (which only affect women) on a new mother's ability to stay in the workforce.  479 U.S. at 289. Giving women extra leave that is not based on physical disability (that is, extra *caregiving* leave) hurts mothers, fathers, and children.  *See* Compl. ¶¶ 121-35.

Jones Day gloms onto *Guerra*'s statement that, "subject to certain limitations, we agree with the [Ninth Circuit's] conclusion that Congress intended the PDA to be 'a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise.'"  479 U.S. at 285 (quoting the decision below).  This language explains the Court's holding that, despite the PDA's text, an employer may give unpaid disability leave for pregnancy-related disability without offering equal leave to workers with comparable disabilities from other causes.  It also means that Jones Day is free to offer disability leave to all workers but set a lower evidentiary standard for new mothers—which, again Plaintiffs, do not dispute and never have disputed.

But *Guerra*'s floor-not-ceiling language assuredly does *not* justify the part of Jones Day's policy that Plaintiffs do challenge: its substantive guarantee of eight weeks of sex-based leave to all new mothers without regard for "actual physical disability." *First*, the floor-not-ceiling passage was not referring to *all* favorable treatment of new mothers, but only to "pregnancy disability benefits," a concept that the Court expressly defined as limited to "actual physical disability" and that therefore does not encompass Jones Day's policy. *Second*, the Court made clear that the floor-not-ceiling language was "subject to certain limitations." *Id.* While the Court did not offer an exhaustive list of those limitations, it did give as one example the principle that employers cannot favor pregnant women "based on stereotypes and generalizations about their needs and abilities." *Id.* at 285 n.17. As discussed above, Jones Day's eight-week guarantee is nothing if not a "generalization" about the "needs and abilities" of new mothers: Jones Day deems all new mothers unable to perform light office work for at least eight weeks after giving birth. *Third*, Jones Day's policy reflects and imposes sex stereotypes and archaic gender roles. *See* Compl. ¶¶ 121-35. *Fourth*, the Court was interpreting the PDA's language about pregnancy-related disability; it was not calling into question the general rule under Title VII that sex discrimination is illegal. *See Newport News*, 462 U.S. at 684-85 ("By making clear that an employer could not discriminate on the basis of an employee's pregnancy, Congress did not erase the original prohibition against discrimination on the basis of an employee's sex."). *Finally*, Jones Day's reading of the floor-not-ceiling language proves too much: It would allow an employer to give new mothers (but not new fathers) a decade of sex-based leave. That cannot be right.

Justice Stevens, who provided the crucial fifth vote in *Guerra*, also made clear that Jones Day's unbounded reading is wrong. He endorsed the majority's view that "the PDA allows some

preferential treatment of pregnancy," rather than mandating strict neutrality between new mothers and other disabled workers.  479 U.S. at 294 (partial concurrence).  He continued:

> This is not to say, however, that all preferential treatment of pregnancy is automatically beyond the scope of the PDA.  Rather, as with other parts of Title VII, preferential treatment of the disadvantaged class is only permissible so long as it is consistent with "accomplish[ing] the goal that Congress designed Title VII to achieve."  That goal has been characterized as seeking "to achieve equality of employment opportunities and to remove barriers that have operated in the past to favor an identifiable group of … employees over other employees."

*Id.* at 294-95 (footnote omitted) (quoting *Steelworkers v. Weber*, 443 U.S. 193, 204 (1979), and *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971)); *see also* 29 U.S.C. § 2601(a)(6).  Justice Stevens joined the majority only because "the California statute meets this test."  479 U.S. at 295.

In a footnote, Justice Stevens addressed the floor-not-ceiling language directly:

> I do not read the Court's opinion as holding that Title VII presents no limitations whatsoever on beneficial treatment of pregnancy.  Although the opinion does make some mention of the "floor" but "not a ceiling" language employed by the [Ninth Circuit], the Court also points out that there are limitations on what an employer can do, even when affording "preferential" treatment to pregnancy.

*Id.* at 294 n.3.

For all these reasons, the floor-not-ceiling language is not the blank check that Jones Day needs it to be.  *See* MTD 13.  *Guerra* permits some degree of preferential treatment of employees with pregnancy-related disabilities.  But it is expressly cabined to leave based on "*actual physical disability*."  And it dealt only with discrimination in favor of new mothers as compared to other disabled workers of both sexes; *Guerra* nowhere condones preferential treatment of new mothers *relative to new fathers*.  Moreover, an employer invoking *Guerra*'s purposivist departure from the PDA's text must explain how its policy advances "Title VII's goal of equal employment opportunity."  *Id.* at 290; *see also id.* at 294-95 (Stevens, J.).  Jones Day makes no effort to do so, and both Congress and the Supreme Court have made clear that it cannot.  *See* Compl. ¶¶ 125-30.

**3.**      Jones Day also claims the support of an example from the EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues.  MTD 10-11; Dkt. 15-1 at 2.  The parties agree that the guidance does not receive *Chevron* deference but is entitled to weight to the extent that it has "power to persuade."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see* MTD 11.  The page-long section of the guidance that addresses parental leave cites *Johnson* and *Guerra* and is consistent with those decisions.  Dkt. 15-5 at 5-6.  So it is no surprise that the guidance also supports Plaintiffs.

The guidance begins by saying that "employers should carefully distinguish between leave related to any physical limitations imposed by pregnancy or childbirth (described in this document as pregnancy-related medical leave) and leave for purposes of bonding with a child and/or providing care for a child (described in this document as parental leave)." Dkt. 15-5 at 5.  "Leave related to pregnancy, childbirth, or related medical conditions can be limited to women affected by those conditions," whereas "parental leave must be provided to similarly situated men and women on the same terms." *Id.* (citing *Johnson*, 431 F.3d at 328).

Jones Day purports to read this to mean that employers are free to give mothers additional leave on the basis of sex so long as they *label* it "disability leave."  MTD 11; Dkt. 15-1 at 2.  But the next sentence refutes that reading.  It says: "If, for example, an employer extends leave to new mothers *beyond the period of recuperation from childbirth*," then "it cannot lawfully fail to provide an equivalent amount of leave to new fathers." Dkt. 15-5 at 5 (emphasis added).  In other words, like the two decisions it cited, the guidance agrees that leave can be "limited to women" only to the extent that it is "drawn to cover only the period of *actual physical disability*," *Guerra*, 479 U.S. at 290—that is, to the extent that it "is in fact disability leave," *Johnson* 431 F.3d at 328.

The guidance then sets forth Example 14.  Jones Day purports to place its greatest reliance on that example, which is typed out in full in its email denying Plaintiffs' request for equal treatment.  Dkt. 15-1 at 2.  The example says:

> An employer offers pregnant employees *up to* 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance.  The employer also offers new parents, whether male or female, six weeks of parental leave.  A male employee alleges that this policy is discriminatory as it gives *up to* 16 weeks of leave to women and only six weeks of leave to men.  The employer's policy does not violate Title VII.  Women and men both receive six weeks of parental leave, and women who give birth receive *up to* an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

Dkt. 15-5 at 5-6 (emphases added).

Jones Day asserts that "the details of Jones Day's policies are slightly different … but the principle is the same."  MTD 11.  Not so.  The employer in the example gives "*up to* 10 weeks" of disability leave—that is, leave for the duration of the "period of recuperation from childbirth," but with a 10-week *cap*.  It does *not* give every new mother 10 weeks of sex-based leave even if she is not disabled for 10 weeks, which is what the example would have to say for it to help Jones Day.  To the contrary, the example carefully uses that key phrase "up to" each of the three times that it references the sex-based disability leave, while omitting it when referencing the six weeks of gender-neutral leave, since every employee is indeed given those six weeks in full.

Jones Day itself understands the implications of the phrase "up to."  Its own parental leave policy carefully distinguishes between "*the eight weeks* of paid disability leave" that are given to all women and the "*up to* an additional six weeks of unpaid leave" that new parents may take "with approval" from Jones Day.  Dkt. 1-1 at 3 (emphases added).

In short, the EEOC guidance provides zero support for Jones Day's policy of giving all new mothers the same eight weeks of sex-based leave without regard for disability.  Instead, it supports Plaintiffs' view that giving sex-based leave is illegally discriminatory where, as here, the

leave is not "in fact disability leave" (*Johnson*, 431 F.3d at 328) because it is not "drawn to cover only the period of *actual physical disability*" (*Guerra*, 479 U.S. at 290).

4.      Citing four other cases, Jones Day says that courts "have long observed that childbirth is a disabling condition that necessitates a recovery period in the range of eight weeks." MTD 12.  Jones Day would have been better off without these citations.[2]  For one thing, none of the four cases addresses the typical period of disability from the sort of light office work that Jones Day associates perform.   More damningly, Jones Day's own cherrypicked quotations simply confirm that (a) standard periods of disability resulting from a normal pregnancy and childbirth vary widely, making generalization inappropriate, and (b) the eight weeks that Jones Day gives to every woman is the *top end* of the ranges of disability cited by any of its four handpicked cases. Jones Day is simply highlighting that it gives most new mothers sex-based leave beyond the period of actual disability.   And other, equally weighty authorities undercut Jones Day's position even further.   *E.g.*, *LaFleur*, 414 U.S. at 649 n.15 (new mothers "may return to 'full activity or employment' if course of progress up to fourth or fifth week is normal" (citing Handbook of Obstetrics & Gynecology)).  So even if Title VII permitted sex-based generalizations, Jones Day could not possibly justify its *eight weeks* of leave.  Anyway, none of the cited cases endorsed sex-based generalizations in parental leave policies.  Jones Day has not found a single case doing that.

5.      Jones Day assures the Court that *Johnson* is "the only appellate precedent on point." MTD 18; *see also* MTD 9.  That is incorrect.  Also relevant is the Third Circuit's decision in *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir. 1990).

---

[2] Incredibly, two of the four are Supreme Court decisions from the 1970s that *upheld* discrimination against pregnant women and were superseded by the Pregnancy Discrimination Act—a dubious refuge for a sex discrimination defendant in 2019.  Another, from 1981, just repeats one of those dated rulings.  And the only one of the four decided in this millennium, *Hibbs*, eviscerated Jones Day's attack on the Family and Medical Leave Act.  *See* Compl. ¶¶ 126-28.

The policy at issue in *Schafer* gave every female employee a year of unpaid maternity leave, but did not give the same to male employees. *Id.* at 244-45. As here, the employer contended that "the PDA, as interpreted by the Supreme Court in *Guerra*, permits favorable treatment of pregnant females." *Id.* at 247. The Third Circuit disagreed: "In *Guerra*, the Court emphasized the limited nature of the benefits at issue and noted that the statute would allow benefits to 'cover only the period of *actual physical disability* on account of pregnancy.'" *Id.* at 248 (quoting *Guerra*, 479 U.S. at 290) (emphasis in original). Unlike the California law in *Guerra*—but just like Jones Day's policy—the policy challenged in *Schafer* included "no requirement … that the female be disabled in order to obtain the unpaid leave." *Id.* The Third Circuit held that omission to be fatal to the policy:

> We hold as a matter of law that [the challenged policy] contravenes Title VII and is thus per se void *for any leave granted beyond the period of actual physical disability* on account of pregnancy, childbirth or related medical conditions.

*Id.* (emphasis added).

The year of unpaid leave at issue in *Schafer* was much longer than the eight weeks of paid leave at issue here. But *Schafer* cannot be distinguished on that *factual* basis, for the Third Circuit's *holding* was simply that "*any* leave granted beyond the period of actual physical disability" violates Title VII. *Id.* Under that holding, Jones Day's policy is likewise void "as a matter of law."

\*          \*          \*

To recap: The civil rights laws prohibit employers from giving more leave to new mothers than to new fathers on the basis of sex. *Hibbs*, 538 U.S. at 739 n.12; *Johnson*, 431 F.3d at 328; Dkt. 15-5 at 5 (EEOC Guidance). But they permit employers to offer a new mother leave on the basis of disability to the extent that she is actually disabled from working. *Johnson*, 431 F.3d at 328-29; Dkt. 15-5 at 5 (EEOC Guidance). When an employer offers more leave to mothers than

to fathers, the employer's decision to label that sex-specific leave "disability leave" is not controlling; it is the substance of the policy that matters, not its form. *E.g.*, *Griffin*, 690 F. Supp. at 57. That means that a court weighing a discrimination challenge must determine whether the leave offered only to women is "in fact disability leave." *Johnson*, 431 F.3d at 328.

Sex-specific leave is "in fact" disability leave if it is "drawn to cover only the period of *actual physical disability*." *Guerra*, 479 U.S. at 290 (emphasis in original); *see Johnson*, 431 F.3d at 329 (leave was in fact disability leave because the "policy language does not allow mothers to use accrued sick leave after their period of disability has ended"); *Schafer*, 903 F.2d at 247-48; Dkt. 15-5 at 5 (EEOC Guidance) (if "an employer extends leave to new mothers beyond the period of recuperation from childbirth," then "it cannot lawfully fail to provide an equivalent amount of leave to new fathers"). Accordingly, a policy granting more leave to mothers than to fathers "contravenes Title VII and is thus per se void for any leave granted beyond the period of actual physical disability." *Schafer*, 903 F.2d at 248.

Jones Day guarantees every new mother (or, at least, every heterosexual new mother) eight weeks more paid leave than it gives to any biological father. The leave is labeled "disability leave." But it is not in fact disability leave. To the contrary, it is given to every new mother without regard for disability and purely on the basis of sex. Even adoptive parents, who suffer no disability, receive an extra eight weeks, which confirms that Jones Day's policy is to offer every new mother 18 weeks of paid parental leave while limiting biological fathers to a maximum of 10 weeks. Nor can the extra leave be defended on the ground that it promotes administrative efficiency and medical privacy. Those policy considerations merely favor a lower *evidentiary* standard—not Jones Day's unlawful substantive rule. So long as an employer's substantive policy is in fact nondiscriminatory, the civil rights laws do not dictate the evidentiary standard that the employer

must use.  *See Johnson*, 431 F.3d at 329 (upholding six-week exemption from requirement to submit medical evidence of disability).

Disabled workers should not be required to work while they are disabled from doing so. Compl. ¶ 133.  And new mothers should be given leave beyond the period of actual disability to care for and bond with their children.  Compl. ¶ 132.  But such caregiving leave cannot be given to mothers only.  Offering more caregiving leave to mothers than to fathers hurts women by imposing archaic gender roles that assign them the bulk of domestic responsibilities and by encouraging employers to discriminate against them.  *Hibbs*, 538 U.S. at 736; 29 U.S.C. § 2601(a)(6), (b)(4); *see also Guerra*, 479 U.S at 285 n.17 (Title VII prohibits "special treatment of pregnant workers based on stereotypes and generalizations about their needs and abilities").  It also hurts families, like Plaintiffs' family, that seek a more equal distribution of parental responsibilities, parent-child bonding, and career opportunities.  Compl. ¶ 135.  For the foregoing reasons, Jones Day's policy is illegally discriminatory as a matter of law.[3]

---

[3] Even if the policy were not illegal in and of itself, dismissal would be inappropriate because the Complaint raises the inference that the policy was motivated by Jones Day's desire to give mothers more time than fathers *to care for babies*, in accord with archaic sex stereotypes.  *See* 42 U.S.C. § 2000e-2(m) (an employment practice is illegal if sex was a motivating factor in its adoption); *see also*, *e.g.*, Compl. ¶¶ 58-65 (Jones Day objectifies women), 97-100 (prominent partner's views about parental leave), 103 (Jones Day presumes that fathers are secondary caregivers), 104-35 (content and effects of policy), 107 (many peer firms give 18 weeks of sex-neutral leave), 109 (Jones Day is more willing to grant unpaid caregiving leave to mothers than fathers), 108, 117 (all primary caregiver mothers, including adoptive mothers, get the same 18 weeks of leave), 136-82 (retaliation against Julia and Mark for demanding equal leave for Mark), 184-85, 190-91, 195-96 (sex discrimination claims); Dkt. 1-1 at 3 (artificial rule that fathers lose parental leave unless they begin leave within eight weeks of baby's birth); *id.* (disability leave deemed to be used before parental leave, guaranteeing mothers weeks of caregiving time before they begin to use the sex-neutral part of their leave).  If the Court deems it necessary, then Plaintiffs will request leave to amend the Complaint to challenge Defendants' discriminatory intent more explicitly.

## II.     Jones Day's arguments against the retaliation claims are frivolous (Counts VII-IX)

### A.     Plaintiffs' complaint of sex discrimination was reasonable

Jones Day's argument that it was entitled to fire Mark for opposing its family leave policy is frivolous.  As discussed above, the policy is illegally discriminatory.  And even if Jones Day could find some lawyers who would say that the policy is defensible, no attorney could believe that Plaintiffs' position falls beyond the realm of reasonable legal disagreement.  In other words, as Defendants have always known, Plaintiffs' challenge was objectively reasonable and therefore protected from retaliation by the civil rights laws.  Defendants' firing of a hardworking associate with a two-week-old baby was a willful violation of those laws.

1.     When an employee opposes alleged discrimination under the civil rights laws, those same laws prohibit the employer from retaliating against her.  Indeed, the employer is prohibited from retaliating even if the employee's opposition was legally or factually in error, so long as her position was reasonable.  *Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012, 1019-20 (D.C. Cir. 1981).  That is because "[t]he enforcement scheme Congress chose for Title VII relies heavily on the initiative of aggrieved employees, whose efforts in the public interest would be severely chilled if they bore the risk of discharge whenever they were unable to establish conclusively the merits of their claims."  *Id.* at 1019.

2.     Jones Day's argument is confined to a single page (MTD 18).  It may be dismantled point by point.

*First*, Jones Day says that "[n]o reasonable lawyer … could believe, in light of the sex-neutral terms of Jones Day's parental leave policies, that those policies facially discriminate based on sex."  MTD 18.  It is odd to speak of the policy's "sex-neutral terms"—the English language contains few terms less "sex-neutral" than "mothers" and "fathers."  Dkt. 1-1 at 3.  It is also not

clear why the question should be limited to *facial* discrimination; Plaintiffs' opposition was not limited to a facial challenge and was protected so long as one could reasonably believe that Jones Day's policy is unlawfully discriminatory (for instance, because of discriminatory intent or disparate impact). *See* Compl. ¶ 140 (Julia's email, explaining that the policy "seems to reflect the traditional notion that women should bear most of the burden of childcare," that "in this case [Jones Day] goes too far in imposing [its] values on its employees," and that "this will have a pretty big impact on my life" and "the effects of the policy are similar for other women"). Anyway, the policy is explicitly discriminatory: It expressly gives eight more weeks of paid leave to new mothers than to new fathers, not based on disability but solely because of sex. A reasonable attorney could view that as sex discrimination. Indeed, many do.

*Second*, Jones Day says that "[n]o reasonable lawyer could believe, in view of the PDA, that offering short-term disability leave to women who undergo childbirth is anything other than *legally required*." MTD 18. With some qualifications, that statement could be true. But Plaintiffs have never said that new mothers should not be given leave for however long they are disabled; Jones Day provides no citations for that smear. *See* Compl. ¶¶ 133, 140. And even Jones Day never argues that the PDA requires the one thing that Plaintiffs *do* challenge: giving all new mothers a fixed period of sex-based leave extending *beyond* the period of actual disability.

*Third*, Jones Day says that "[n]o reasonable lawyer could believe, given the EEOC guidance, that offering disability leave in addition to sex-neutral parental leave is unlawful." MTD 18. Plaintiffs have never said that; again, Jones Day offers no citation. And the guidance in no way supports Jones Day's policy. But suppose that it squarely blessed that very policy. It would still be incredible to assert that no reasonable lawyer can ever disagree with the EEOC (especially considering Jones Day's concession that the guidance lacks the force of law). Jones Day is itself

a frequent foe of the EEOC. *E.g.*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015) (rejecting Jones Day's position and siding with the EEOC). Indeed, Jones Day is opposed to the EEOC in this very case, as addressed in Part IV.A below.

*Fourth*, Jones Day says that "[n]o reasonable lawyer could believe, after having been pointed to the only appellate precedent on point, that it is forbidden to presume an eight-week disability period when a birth mother applies for leave." MTD 18. Actually there are three appellate precedents on point—*Guerra*, *Schafer*, and *Johnson*—and they all support Plaintiffs. But even if *Johnson* were the only one and squarely favored Jones Day, it is not true that no reasonable D.C. attorney could disagree with a panel of the Eighth Circuit. Jones Day's assertion that, when there is "only [one] appellate precedent on point," any position inconsistent with that one decision is ipso facto beyond the bounds of reasonable legal disagreement misconceives our entire legal system, in which the existence of just a single appellate ruling in another circuit means that the law *is* "unsettled." MTD 18. There are lawyers at Jones Day who understand that.

*Fifth*, Jones Day's unsupported assertion that Plaintiffs were asking that Mark be given disability leave, rather than opposing Jones Day's abuse of that label, is false. *See* Compl. ¶ 140.

*Sixth*, Jones Day says that "[n]o reasonable lawyer could believe, in view of *Guerra*, that Title VII forbids a disability plan's preferential treatment for pregnant women." MTD 18. If Jones Day really thought that *Guerra* helped its case, it would have devoted more than three sentences to that decision. *But see id.* at 13-14. Anyway, Jones Day's statement is true inasmuch as *Guerra* upheld one particular type of preferential treatment for pregnant women vis-à-vis persons with other disabilities. But Plaintiffs have never said anything in tension with that holding. And *Guerra* made clear that it did not go beyond "*actual physical disability*" (479 U.S. at 290 (emphasis in original)), whereas Plaintiffs' complaint has always been that Jones Day's policy does just that.

Compl. ¶ 140.   Also, as discussed above, both the majority opinion and Justice Stevens in concurrence made clear that not all preferential treatment of pregnant women and new mothers is lawful.

*Finally*, Jones Day says that "no reasonable lawyer could believe, under the statutory text and on-point precedent, that a birth parent is entitled to the same leave as an adoptive parent." MTD 18.  As Jones Day is well aware, Plaintiffs have never said that.  Plaintiffs' position is that Jones Day's provision to adoptive primary caregivers of the same 18 weeks of paid leave that it gives to birth mothers is no mere coincidence but, rather, further confirmation that the "disability leave" label is a sham and that Jones Day's policy is to give *all* new mothers 18 weeks of leave (again, subject to Jones Day's assertion that it actually treats some gay women worse).

**3.**     Jones Day does briefly describe two cases applying the "objectively reasonable" standard, but they are not analogous to this one (and Jones Day does not say that they are).

*King v. Jackson* held that a federal agency's *failure to renew* its affirmative action plan cannot reasonably be thought to violate Title VII.  487 F.3d 970 (D.C. Cir. 2007).  That was not a close question; the law was "entirely unambiguous."  *Id.* at 973.

*George v. Leavitt* held that an employee's complaint about a supposedly hostile work environment was unreasonable because it was based on "isolated incidents" of offensive remarks by co-workers.  407 F.3d 405, 416-17 (D.C. Cir. 2005).  Hostile work environment cases are poor guides to the application of the "objectively reasonable" standard in other contexts, because those cases turn on the "well-established principle[]" that the bar for an unlawfully hostile work environment is exceptionally high: "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  *Id.* at 416 (quoting

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  No similar "extreme conduct" standard applies to claims that an employer's paid leave policy discriminates on the basis of sex.

**4.**     Defendants complain that "at no point did [Mark] identify *any* authority supporting his claims, even after Jones Day identified its own."  MTD 18; *see also* MTD 4.  This is passing strange.  Plaintiffs expressly pointed to Title VII—the supreme authority in matters of workplace discrimination.  Compl. ¶ 146.  Anyway, Defendants do not contend that the civil rights laws require the employee to offer legal citations, even if she is a lawyer.  And of course Defendants *never asked* Plaintiffs to brief their legal position.  MTD 4.  Why not?  Because Defendants— sophisticated attorneys with virtually limitless access to expert legal advice whose own chosen citations confirmed their policy's illegality—knew that their leave policy is discriminatory but were committed to retaliating against Plaintiffs anyway.  Compl. ¶¶ 146-82.

### B.     Julia is a proper retaliation plaintiff

Jones Day's argument that Julia's retaliation claims should be dismissed even if Mark's go forward is mistaken.  *See* MTD 15 n.5.  Julia is a proper retaliation plaintiff for either of two independently sufficient reasons.

**1.**     Defendants' treatment of Julia satisfies all three elements of a retaliation claim: (1) She opposed unlawful conduct (by challenging Jones Day's parental leave policy, including by writing and sending the January 16 email with Mark); (2) she suffered adverse actions (Defendants' termination of Mark and attempts to sabotage his search for a new job); and (3) there was a causal connection (Defendants took the adverse actions because of the January 16 email). *See Clayton v. District of Columbia*, 374 F. Supp. 3d 119, 130 (D.D.C. 2019) (elements of retaliation claim).  In seeking dismissal, Jones Day addresses only the "adverse action" element. But Mark's firing was inarguably an adverse action for Julia as well as for Mark.

Jones Day starts from the premise that Julia "does not allege that Defendants took any adverse action against *her*." MTD 15 n.5. But even a cursory reading of the Complaint refutes that premise: Julia expressly claims that Defendants retaliated *against her* by firing her husband and then going out of their way to stop him from finding a new job. *See, e.g.*, Compl. ¶¶ 146-47, 153, 158, 170, 180, 223-27, 232-33, 240-41. To support its premise, Jones Day just cites three paragraphs alleging that Julia was *harmed* by Defendants' conduct. MTD 15 n.5 (citing Compl. ¶¶ 228, 236, 246). Its decision to ignore the Complaint's other, directly relevant allegations is inexplicable.

As the Supreme Court has made clear, firing an employee's husband constitutes an "adverse action" *against that employee*. Title VII's retaliation provision applies to all "employer actions that would have been materially adverse to a reasonable employee"—that is, employer actions that are "harmful to the point that they could well dissuade a reasonable worker from" engaging in protected activity. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006). And it is "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Thompson v. North American Stainless, LP*, 562 U.S. 170, 174 (2011); *see also id.* at 175 ("firing a close family member will almost always meet the *Burlington* standard"). So much for that.[4]

2.      Even if Defendants had not committed adverse actions against Julia herself, she could still sue them for retaliating against Mark. Both Title VII and the Human Rights Act confer a cause of action not merely on the worker who is discriminated or retaliated against but also on

---

[4] Jones Day does not urge a different result under the Fair Labor Standards Act (which makes it unlawful "to discharge *or in any other manner discriminate against* any employee," 29 U.S.C. § 215(a)(3)) or Human Rights Act (which "generally follow[s] Title VII case law," MTD 15 n.5).

any "person claiming to be aggrieved … by the alleged unlawful employment practice."  42 U.S.C. § 2000e-5(f)(1); *see also* D.C. Code § 2-1403.16.  Julia fits the bill.

The Supreme Court authoritatively (and unanimously) interpreted that "aggrieved person" language in *Thompson*, holding that "the term 'aggrieved' in Title VII incorporates" the "'zone of interests' test" familiar from the Administrative Procedure Act context.  562 U.S. at 178.  Title VII thus "enabl[es] suit by any plaintiff with an interest 'arguably [sought] to be protected by the statute,' while excluding plaintiffs who might technically be injured in the Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII."  *Id.* (quoting *NCUA v. First National Bank & Trust Co.*, 522 U.S. 479, 495 (1998)).

The other authoritative precedent is then-Judge Kavanaugh's opinion in *Howard R.L. Cook & Tommy Shaw Foundation v. Billington*, 737 F.3d 767, 771-72 (D.C. Cir. 2013).  *Billington* explains that "the zone of interests requirement poses a low bar.  A plaintiff with Article III standing satisfies the requirement unless his 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Id.* at 771 (quoting *Thompson*, 562 U.S. at 178).  In short, "the zone of interests requirement 'is not meant to be especially demanding.'"  *Id.* (quoting *Match-E-Be-Nash-She-Wish Band v. Patchak*, 567 U.S. 209, 225 (2012)).

How, then, can Jones Day tell the Court that Julia "do[es] not qualify as [an] 'aggrieved' person[] with standing to sue" (MTD 15 n.5)?  Only by ignoring the authoritative cases and pointing to three opinions saying that spouses of discrimination victims are not aggrieved persons.  Jones Day's three citations are remarkable: Two of the three are out-of-circuit rulings handed down decades before *Thompson* and *Billington* and manifestly inconsistent with those binding

precedents, while the third is an out-of-circuit magistrate judge's report and recommendation, which cites the two earlier rulings but not *Thompson* or any post-*Thompson* case law.  *Id.*

Jones Day's outdated and nonbinding cases are wrong: Under *Thompson* and *Billington*, the spouse of an illegally fired worker *is* an "aggrieved person."  There is no basis to say that such a spouse is not even arguably among the people whom the workplace discrimination laws were intended to protect.  *See Billington*, 737 F.3d at 771.  The family or household is the fundamental economic unit in our society, and most spouses of workers depend on the worker's employment as one source of support for the spouse and their children (if any).  It would be artificial to say that Congress in 1964 was seeking to protect (for instance) black workers from being fired because of their race, but did not even "arguably" seek to protect their families from the effects of that discrimination—in other words, that the families' "interests are unrelated to the statutory prohibitions in Title VII."  *Thompson*, 562 U.S. at 178.  And if Congress thought that only workers should be entitled to sue, then it would have conferred a cause of action only on "an *employee* claiming to be aggrieved."  *See id.* at 177 ("if that is what Congress intended it would more naturally have said 'person claiming to have been discriminated against' rather than 'person claiming to be aggrieved'").  The actual statutory text—"*person* claiming to be aggrieved"—surely encompasses spouses of illegally fired workers, particularly considering that the aggrieved person standard "poses a low bar" and "'is not meant to be especially demanding.'"  *Billington*, 737 F.3d at 771 (quoting *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225).

But the Court need not reach the spouse question, because Julia is not just Mark's spouse— she was herself a Jones Day employee.  *Thompson* and *Billington* make clear that a retaliating employer's *employees* are "within the zone of interests protected by Title VII" because, if nothing else, "the purpose of Title VII is to protect employees from their employers' unlawful actions."

*Thompson*, 562 U.S. at 178.   Then-Judge Kavanaugh was definitive on this point: "Title VII[] gives injured employees a right to sue.  As employees, the individual plaintiffs' interests obviously cannot be deemed 'marginally related to or inconsistent with' the purposes of Title VII." *Billington*, 737 F.3d at 772 (holding that employees had a cause of action to complain about their employer's alleged discrimination against an outside group).  And though Julia had left Jones Day by the time that Defendants fired Mark, it is settled law that former employees are "employees" for retaliation purposes.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

The Fair Labor Standards Act does not contain the same "aggrieved person" language.  But its "right of action" provision authorizes "[a]n action … against any employer … *by any one or more employees*."  29 U.S.C. § 216(b) (emphasis added).  That includes Julia.

### III.     Jones Day interfered with Mark's protected family leave (Counts X and XI)

While Mark was on leave caring for his two-week-old son, Jones Day fired him in retaliation for the January 16 email, which violated Title VII, the Fair Labor Standards Act, and the Human Rights Act.  Compl. ¶¶ 223-48.

The Family and Medical Leave Act of 1993 and its D.C. equivalent entitle new parents to job-protected family leave.  And they "recognize[] two theories for recovery—'the retaliation or discrimination theory and the entitlement or interference theory.'" *Washington Convention Center Authority v. Johnson*, 953 A.2d 1064, 1075-76 (D.C. 2008) (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)).  Mark does not claim that Jones Day *retaliated* against him *for exercising his FMLA rights*.  But he does claim that Jones Day illegally *interfered* with his FMLA leave by firing him.  Compl. ¶¶ 249-59.  "Under the interference theory, if an employer interferes with an employee's FMLA-created right to a medical leave, it has violated the

FMLA regardless of its intent." *Bones v. Honeywell International, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004).

Jones Day asserts a single defense: It says that Mark's termination was not FMLA interference because (as the Complaint alleges) Defendants' reason for firing him was retaliation for the January 16 email, not retaliation for his taking of FMLA leave. MTD 19-21. Again, Mark claims FMLA interference, not FMLA retaliation, which is a separate theory. But it is true that "interference with an employee's FMLA rights does not constitute a violation if the employer has a *legitimate* reason unrelated to the exercise of FMLA rights." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (emphasis added). The sole question presented, then, is whether an employer may mount a successful defense to an FMLA interference claim by showing that it fired the employee during his leave in violation of other civil rights laws—an *illegitimate* reason.

The answer is no: "the law is clear that while there is no right to reinstatement upon a *lawful* termination of employment, an *unlawful* termination cannot serve as a defense to an FMLA or DCFMLA claim." *Miles v. University of the District of Columbia*, 2013 WL 5817657, at *12 (D.D.C. 2013) (emphases in original). Thus, "[f]or an employer lawfully to deny an employee's restoration rights, it must show that the termination for other reasons would have been lawful." *Skrynnikov v. FNMA*, 226 F. Supp. 3d 26, 37 (D.D.C. 2017) (quoting *Washington Convention Center*, 953 A.2d at 1077). As discussed above, Jones Day cannot make that showing.

*Washington Convention Center* addressed this very issue. The plaintiff was fired while out on leave, and he claimed that the firing was unlawfully motivated *by his age*; the jury agreed with that age discrimination claim. 953 A.2d at 1078. The plaintiff also pursued an interference claim. The Court of Appeals explained that the fact that the defendant had illegally fired the plaintiff because of his age was no defense to the interference claim: "For an employer lawfully to deny an

employee's [FMLA] restoration rights, it must show" not merely that it would have fired him even if he had not taken the protected leave, but also "that the termination for other reasons *would have been lawful*." *Id.* (emphasis added).   Having "already upheld the jury's finding that Johnson's termination was unlawful because it was based on age," the Court of Appeals held: "We cannot conclude that the same, unlawful, termination establishes a defense to the DCFMLA claim." *Id.*

So Jones Day cannot defend against Mark's interference claims simply by pointing out that it illegally fired him for the January 16 email.  Its own cited cases do not support its position; none dealt with an *unlawful* termination, and none says that an employer can beat an interference claim by giving an unlawful reason for interfering with FMLA leave.  *See, e.g.*, *Throneberry v. McGehee Desha County Hospital*, 403 F.3d 972, 977-78 (8th Cir. 2005) (addressing "whether the FMLA condones *lawful* interference with FMLA rights," and concluding that "the FMLA does not shield an employee on FMLA leave from … *lawful* discharge" (emphases added)); *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 110 (D.D.C. 2016) ("the FMLA does not 'protect an employee's job against a *legitimate*, unrelated, reason for separation" (emphasis added) (quoting *Hopkins v. Grant Thornton International*, 851 F. Supp. 2d 146, 155 (D.D.C. 2012))).[5]

---

[5] By the way: Jones Day says that its "policies entitled Savignac, if he served as primary caregiver, to 10 weeks of paid leave plus six weeks of unpaid leave, which is fully compliant with the federal and D.C. laws." MTD 21.  That is incorrect.  The policy gives new fathers who are primary caregivers 10 weeks of paid leave, but it does *not* "entitle[]" them to the additional six unpaid weeks.  To the contrary, it says that fathers may take "up to" six weeks of unpaid leave "*with approval*." Dkt. 1-1 at 3 (emphasis added).  Elsewhere, Jones Day acknowledges that the policy only entitles fathers to "request" the additional six weeks (MTD 3), leaving Jones Day to decide whether to approve.  That violates the federal and D.C. FMLAs, which entitle new parents to 12 and 16 weeks of caretaking leave respectively.  *Hibbs*, 538 U.S. at 724; *Holmes v. University of the District of Columbia*, 244 F. Supp. 3d 52, 58 (D.D.C. 2017).

**IV.**  **Julia's pay discrimination claims should proceed to discovery (Counts IV-VI)**

**A.**  **Julia's EEOC charge was timely because it was filed within 300 days**

Jones Day says that Julia filed her EEOC charge too late because she filed it more than 180 days (but not more than 300 days) after the clock began to run.  MTD 21.  The question here (which Jones Day does not explain) is whether a Title VII plaintiff in the District of Columbia has 300 days to file with the EEOC or just 180.  Jones Day offers no legal argument; it just cites a single case going its way.  *Id.*  But the weight of authority holds that "a plaintiff, in the District of Columbia, has 300 days to file a charge with the EEOC," *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 87 (D.D.C. 2019)—and the EEOC agrees.[6]  That is significant, because the EEOC's views on *procedural* Title VII matters *do* have the force of law.  42 U.S.C. § 2000e-12(a).  It may well be that the author of Jones Day's one cited case would reconsider his position if given the opportunity and adequate briefing; another judge of this District did so in September.  *See* Order, *Epps v. Potomac Electric Power Co.*, No. 18-cv-1423 (D.D.C. Sept. 20, 2019), Dkt. 23.

**B.**  **The Complaint states a claim under Title VII and the Human Rights Act**

Partner A gave Julia a "disingenuous" and "unfairly critic[al]" performance review because of her sex, and that review caused her salary to be lower than it would otherwise have been from July 2017 onward.  Compl. ¶¶ 66-95, 200-22.  Jones Day's sole argument for dismissal is that the Complaint's allegations do not support an inference that Partner A submitted his dishonestly critical review *because of Julia's sex*.  MTD 22-27.  Rather, Jones Day insists, "[t]here could be

---

[6] *E.g.*, *Carter v. George Washington University*, 387 F.3d 872, 879 (D.C. Cir. 2004); *Epps v. Potomac Electric Power Co.*, No. 18-cv-1423 (D.D.C.), Dkt. 17-1 (EEOC affidavit); *Chambers*, 389 F. Supp. 3d at 86-87 & n.10; 29 C.F.R. § 1601.13(a)(4)(ii)(A); *see also EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988); *Love v. Pullman Co.*, 404 U.S. 522, 525-26 (1972).

any number of reasons Partner A treated [Julia] differently" from "similarly situated male associates." MTD 24.

Jones Day's argument has many shortcomings, but two deficiencies tower above the rest. *First*, Jones Day relies heavily on cases decided at the summary judgment stage.[7] But the standard at summary judgment—after the plaintiff has had an opportunity for discovery—is more demanding than Rule 8's requirement of just "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Jones Day has built its case on the dubious foundation of irrelevant authorities—a practice that this Court has criticized before. *Holmes*, 244 F. Supp. 3d at 60-61 & n.2 (summary judgment cases are inapposite at 12(b) stage).

*Second*, it is well established that "[t]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *McDonough v. Anoka County*, 799 F.3d 931, 946 (8th Cir. 2015). After all, "a jury, in assessing whether there was impermissible discrimination[,] … would be entitled to view the evidence as a whole." *Gregory v. Daly*, 243 F.3d 687, 699 (2d Cir. 2001). Yet Jones Day ignores this basic principle, instead "examin[ing] each of the allegations individually and argu[ing] that none of them is sufficient" on its own. *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 892 (N.D. Ill. 2016). "This divide and conquer mode of argument is unpersuasive and runs afoul of the firmly established requirement that complaints be read as a whole." *Id.*; *see, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (a court must "[v]iew the allegations of the complaint as a

---

[7] *See* MTD 20-28 (citing *Burley v. National Passenger Rail Corp.*, 801 F.3d 290 (D.C. Cir. 2015); *Spencer v. Virginia State University*, 919 F.3d 199 (4th Cir. 2019); *Taylor v. Union Institute*, 30 F. App'x 443 (6th Cir. 2002); *Wienke v. Haworth, Inc.*, 983 F.2d 1071 (6th Cir. 1993); *Rumble v. Convergys*, 2010 WL 812775 (S.D. Ohio 2010)); *see also Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999) (affirming grant of judgment as a matter of law after the plaintiff's case at trial).

whole").   Taken together, the Complaint's allegations are more than sufficient to support the inference that Partner A wrote Julia an unfairly critical review because she is a woman.

1.      Partner A's scolding email to Julia supports the inference that Partner A, a powerful man, got upset because Julia, as a woman, failed to show him sufficient deference when she second-guessed his edits to their memorandum.  Compl. ¶ 78.  The fact that his response tracked well-recognized sex stereotypes—men are dominant and assertive; women should be meekly submissive—contributes to the inference that he was motivated by sex, even if it does not compel that inference on its own.  The Complaint also points out that Julia has often suggested revisions to male partners and judges without receiving similar responses, which precludes any inference that Julia is an aggressive or unpleasant person.  Compl. ¶ 79; *see also* Dkt. 15-4 at 2 (Jones Day's 2017 consensus statement, conceding that "Julia is an extremely smart and pleasant lawyer").

More importantly, the Complaint identifies two male subordinates whom Partner A treated differently.  When Mark worked for him, Partner A was deferential to Mark on both substance and style.  Compl. ¶ 84.  And the male attorney whom Julia asked for advice about whether to question Partner A's edits (and who had worked for Partner A in the past) advised Julia to speak up and then was surprised by Partner A's response to her feedback, implying that Partner A had been deferential to that male attorney, too.   Compl. ¶¶ 75-77, 80.  Partner A even feels comfortable making self-deprecating remarks to other male Issues & Appeals associates about how his intelligence compares to theirs.  Compl. ¶¶ 72, 82-83.  By contrast, "he was patronizing toward Julia."  Compl. ¶ 72; *see also, e.g.*, Dkt. 15-2 at 4 (instructing Julia to run a comparison of her version of the draft against his "for your own edification").   Taken together, these allegations surely support the requisite inference: If Julia had been a man, then Partner A would not have been upset by her perceived lack of deference.

Jones Day responds that, actually, Partner A's email cannot be read to show that he was upset about Julia's feedback.  MTD 22-23.  Jones Day alleges that the email "was not scolding" but "professional in tone," and it (impermissibly) points to later emails between Julia and Partner A that are not referenced in the Complaint as supposedly "confirm[ing] that Partner A was not chiding [Julia] for any lack of acquiescence."  MTD 22.  But Partner A's email was absolutely "scolding": Twice referring to himself by the patronizing moniker "the person whose name goes first on the memo" to establish his higher status, Partner A proceeded to explain to Julia that her behavior was out of line for the subordinate attorney on the project.  Dkt. 15-2 at 3.  And to the extent that tone can be difficult to perceive from an email read in isolation, the understanding of those who were familiar both with the usual behavior of Jones Day partners and with Partner A himself sheds further light on the matter.  Julia perceived the email as scolding; her allegation to that effect must be taken as true at this stage, and it is confirmed by the reply email in which she apologizes for potentially "undermin[ing] our hierarchy."  MTD 23; Compl. ¶ 78.  Other attorneys who saw the email were also "shocked by its content and harshly critical tone."  Compl. ¶¶ 80-81.  And Partner A's later communications can hardly unring the bell and render implausible the inference that Partner A was indeed upset by Julia's perceived lack of deference.

Jones Day also argues that "Partner A's alleged manner toward associates in the 'cafeteria' is too attenuated from the context of a performance review to support the inference" of discrimination, because "[e]ven if a supervisor is friendlier *socially* with men, that does not reasonably imply that his *professional reviews* of women would be discriminatory."  MTD 25.  But the fact that a man is *socially* sexist surely contributes to the inference that he is *professionally* sexist as well.  Anyway, the Complaint does not get into Partner A's relationships outside the workplace.  It says that he is "ingratiating" and "deferential" with male *colleagues* who are "similar

to Julia aside from their sex," so much so that he is comfortable "making self-deprecating remarks to the effect that the male associates are more intelligent than" he is.  Compl. ¶¶ 72, 82-83.  These allegations are directly relevant to the matter at hand: Partner A's differential treatment of male and female Issues & Appeals associates *in intellectual matters*.  That the self-deprecating remarks were made in the cafeteria—"the *Jones Day* cafeteria" (Compl. ¶ 83 (emphasis added))—rather than elsewhere in the workplace is of no moment.

Finally, Jones Day says that Mark's experience with Partner A is irrelevant because the Complaint does not allege that "all of the relevant aspects of [Julia's] employment situation were nearly identical to" Mark's.  MTD 25 (quoting *Holbrook*, 196 F.3d at 261).  But *Holbrook* was reviewing a district court's grant of judgment as a matter of law after the plaintiff had presented her case *at trial*; it says nothing about the standard of review applicable at the pleading stage. Jones Day places even more reliance on *Burley*, 801 F.3d 290, a summary judgment decision. MTD 25-26 (citing *Burley* three times).  And Jones Day's suggestion that Julia and Mark were not similarly situated because "Plaintiffs do not allege that [Mark's] performance was criticized in the ways [Julia's] was" (MTD 25) is just baffling: Julia's claim is that Partner A "unfairly criticized" her because she is a woman (Compl. ¶¶ 85-86), so Partner A's deferential treatment of Mark *supports* her claim, whereas it would *hurt* her claim if Mark had been criticized as she was.  The fundamental point, though, is that Mark's experience with Partner A contributes at the pleading stage to the inference that Partner A's treatment of Julia was motivated by her sex.  A complaint need not plead a perfectly analogous comparator.  *Holmes*, 244 F. Supp. 3d at 60-61, 63.

**2.**     Partner A got back at Julia for her perceived lack of deference by writing her a negative performance review.  Compl. ¶ 85.  Jones Day rightly concedes that a "'false reason' for an adverse action could be suggestive of pretext and discrimination."  MTD 23 (quoting *Faison v.*

*District of Columbia*, 664 F. Supp. 2d 59, 68 (D.D.C. 2009)).   But Jones Day blunders when it asserts that Julia "does not allege that the critiques *actually* contained in the review are false or unwarranted."  *Id.*  In fact, the Complaint plainly alleges that "because Julia is a woman, Partner A wrote her a disingenuous, severely negative performance evaluation for being insufficiently deferential to him," and that "[t]he evaluation unfairly criticized Julia's work and her dedication to the project."  Compl. ¶¶ 85-86.  It is not clear what daylight Jones Day perceives between its chosen formulation ("false or unwarranted") and the Complaint's terms ("disingenuous" and "unfair[]").  As Jones Day has itself conceded, then, Partner A's disingenuous and unfair review further supports the inference of discrimination.

Jones Day's blunder appears to stem from its misreading of the Complaint.  Jones Day says that Julia alleges "that Partner A's 'severely negative' review attacked her for 'being insufficiently deferential to him.'"  MTD 23 (quoting Compl. ¶ 85).  Not so.  The Complaint says that he wrote her a "disingenuous, severely negative performance evaluation for being insufficiently deferential"—that is, he wrote the dishonest review *because* of her lack of deference.  Compl. ¶ 85.  The Complaint does *not* say that the review criticized her lack of deference, or that it alluded to deference at all (though it does rate Julia a "3" out of 5 on the "subordinate" trait, Dkt. 15-3 at 2).

Jones Day overreaches again when it suggests that Julia's 2017 consensus statement corroborates Partner A's allegations such that the Court should disregard the Complaint's allegations and treat Partner A's negative statements about Julia as true.  MTD 23-24.  The consensus statement hardly suggests that Julia would be apt to provide (as Partner A claimed) "little-to-no advice or direction to the client" where she should have done so, or that she would "exhibit[] little-to-no initiative."  Dkt. 15-3 at 2.  To the contrary, the statement calls Julia "extremely smart"; extols her writing as "very strong," "excellent," and "skillful"; and praises her

"passionate commitment" and drive to "take on responsibility." Dkt. 15-4 at 2.  To be sure, it also says one reviewer viewed something Julia wrote as too "complicated for a judge," while another believed that "a motion did not read enough like an advocacy piece." *Id.*  But at most that reflects that Julia and those partners had different perspectives on writing *style* (and judges' capabilities)— not that Julia would drop the ball on the *substance* of the work she was expected to provide. Further, viewed in the light most favorable to Plaintiffs, the consensus statement reflects that it was only Partner A who complained about Julia's lack of "initiative."  And finally, the consensus statement says that Julia "often" worked remotely—a common practice for lawyers, including Issues & Appeals associates at Jones Day.  That does not support Partner A's criticisms by any stretch.

In any event, the consensus statement is not referenced in the Complaint and is not properly before the Court.  A document not attached to a complaint may nonetheless be considered at the pleading stage only if it is "referred to in the complaint and … integral to [the plaintiff's] claim." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  And even if some parts of a document are incorporated, "it may not be appropriate for the court to treat the entire document as incorporated"—particularly where "[i]t was commissioned by a defendant and its reliability is unknown." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1132-34 (D.C. Cir. 2015).  Here, the Complaint merely alleges that Partner A's review "influenced" Julia's consensus statement, and that it thus affected her raise.  Compl. ¶¶ 88-90.  At most, then, the parts of the consensus statement attributable to Partner A are incorporated—not the entire thing. *Banneker Ventures*, 798

F.3d at 1134.  Moreover, the Court cannot take the consensus statement as true.  *Id.* at 1133; *Goines v. Valley Community Services Board*, 822 F.3d 159, 168 (4th Cir. 2016).[8]

Venturing even farther outside the Complaint, Jones Day points to Julia's hours for 2016. MTD 26 (admitting that "the Complaint alleges nothing … about [Julia's] hours"); Dkt. 14-4 (1667 hours).  The improper disclosure is apparently intended to embarrass Julia in retaliation for suing Jones Day, Brogan, and Heifetz, and to deter other Jones Day employees from speaking out.  But even if they could be considered, Julia's hours would be legally irrelevant, particularly given that Jones Day offers no context by which they could be evaluated.  Plaintiffs allege, and discovery will confirm, that Jones Day frequently promotes and gives large raises to Issues & Appeals attorneys who work far less than most peer firms expect—including Julia, who received substantial raises for her work in 2014, 2015, and 2017 (at the end of her four years at Jones Day) despite logging fewer billable hours (and more pro bono hours) than she did in 2016.  Compl. ¶¶ 39, 50, 68-69, 93.  Indeed, Jones Day's Issues & Appeals group accurately advertises itself to prospective employees as offering a far lighter workload than peer practice groups, which largely explains why so many Supreme Court clerks choose to work there.  Compl. ¶ 50.

Anyway, the only thing at issue is why Partner A wrote his critical review.  His "guess" that Julia "did not bill 2000 hours last year" (which would be high for an Issues & Appeals associate) shows that he did not know what her hours were when he wrote it.  Dkt. 15-3 at 2.

Finally, Jones Day promises that "discovery … would show" that "Partner A has submitted" reviews for "12 female associates and 8 male associates," and that "[w]ith the exception of [Julia's], his evaluations of female associates have been uniformly positive, which is not true of

---

[8]  Similarly, Partner A's follow-up email (Dkt. 15-2 at 2) is not incorporated because the Complaint does not mention or rely upon it.  Jones Day makes no attempt to explain how that unreferenced "exchange" could nonetheless be "incorporated."  MTD 4 n.1.

his reviews of men."  MTD 7.  At most, that carefully crafted assertion just means that Partner A gave one less-than-"uniformly positive" review to one man.  The Complaint does not allege that Partner A gives negative reviews to female associates who *do* show him the deference he expects from women.  And Jones Day cagily refrains from making any assertion about what a review of Partner A's emails to (or about) women will reveal, or what the women who have worked for him (including those no longer under Jones Day's dominion) will say about their experiences.

*          *          *

When the Complaint's allegations are viewed as a whole, as the law requires, they are more than sufficient to support the inference that Partner A discriminated against Julia because of her sex.

### C.      The Complaint states a claim under the Equal Pay Act

**1.**      The Equal Pay Act allows a defendant to assert, as an affirmative defense, that the challenged pay disparity is actually "based on any factor other than sex."  29 U.S.C. § 206(d)(1); *see Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974).  Jones Day's contention that Julia "has pleaded that defense for Jones Day" betrays confusion over basic legal principles.  MTD 27.  "[A]n affirmative defense" may "'be raised by pre-answer motion under Rule 12(b),' but only if 'the facts that give rise to the motion are clear from the face of the complaint.'"  *Stewart v. International Union*, 271 F. Supp. 3d 276, 280 (D.D.C. 2017) (quoting *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)).  Even assuming (counterfactually) that Julia "does not allege facts that plausibly suggest that Partner A's review was motivated by discriminatory animus" (MTD 27), a plaintiff's failure to allege a fact does not mean that the *opposite* of that fact (here, that the review was based on something other than sex) is "clear from the face of the complaint."  Indeed, if the failure to adequately plead a fact conclusively established the opposite

of that fact, then every affirmative defense would become an element of the claim—for instance, every complaint would have to plead its own timeliness. *But see Stewart*, 271 F. Supp. 3d at 280.

**2.**      To state a claim under the Equal Pay Act, a plaintiff must allege that the defendant "paid her male counterparts more money 'for equal work'—that is, for jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'" *Musgrove v. District of Columbia*, 458 F. App'x 1, 2 (D.C. Cir. 2012). Relying on inapposite out-of-circuit cases, Jones Day says that the Complaint fails to "identify" a "specific male comparator" whom Jones Day illegally paid more than it paid Julia. MTD 27-29. That is wrong.

The Complaint alleges that, in the wake of Partner A's discrimination, Julia's salary "was … below the salaries of male Issues & Appeals associates whose salaries had been the same as Julia's prior to 2017," and that "[t]he jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Compl. ¶¶ 95, 209-12. That is more than enough for pleading purposes.

Jones Day's contention that Julia must *name* in her court filings the male Issues & Appeals associates of her level of seniority—who have done nothing wrong—should be rejected, particularly given that the Complaint avoids identifying *anyone* at Jones Day (including wrongdoers like Partner A) other than Defendants themselves.

Jones Day also says that Julia has failed to identify a comparator because, in its view, her allegation that her salary in the wake of Partner A's discrimination was "below the salaries of male Issues & Appeals associates whose salaries had been the same as Julia's" is "nothing more than a formulaic recitation of the elements of an equal pay claim." MTD 28. But the Complaint pleads Julia's salary for each year (Compl. ¶¶ 68-69, 89, 93) and then alleges that she was given a lower

raise than she would have otherwise received in 2017 because of her sex. Compl. ¶¶ 66-95. The corollary inference is that male Issues & Appeals associates, whose salaries were previously the same as Julia's (Compl. ¶ 95), received a larger raise that year. So Julia was paid less. Indeed, it can be reasonably inferred that those male associates were paid $500,000 when Julia was paid $440,000: Mark was a D.C. Issues & Appeals associate one year behind Julia in seniority (Compl. ¶¶ 3, 38; Dkt. 15-4 at 2), and the Complaint alleges that his salary in 2018—when he was the same level of seniority as Julia was in 2017—was $500,000. Compl. ¶ 45. The fact that Julia's $15,000 raise in 2017 was far below the trajectory of her other three annual raises (which were $60,000, $65,000, and $85,000) also strongly supports the inference that her male colleagues received raises larger than $15,000 (and probably around $75,000) in 2017. Compl. ¶¶ 68-69, 93.[9]

Jones Day takes issue with the Complaint's allegation that Issues & Appeals associates within the D.C. office at the same level of seniority perform equal work. MTD 28-29. But the one case they cite rejected only the far more "sweeping generalization" that "*all lawyers* perform the same or similar function(s)"; the complaint there "provide[d] no guidance as to whether the attorneys handled complex commercial matters or minor slip-and-falls." *EEOC v. Port Authority*, 768 F.3d 247, 257 (2d Cir. 2014) (emphasis added). Here, by contrast, the Complaint pleads that Julia and the comparators had been assigned (by Jones Day itself) to a particular practice group, and it explains that Issues & Appeals is Jones Day's "Supreme Court and appellate practice group," which more than adequately specifies for pleading purposes the equal work performed by associates in that group of the same class year. Compl. ¶¶ 2-3, 91, 95. And the fact that Jones Day paid Julia and her male colleagues the same salary prior to the discrimination (Compl. ¶ 95)

---

[9] Jones Day's claim that Julia "was earning more than her husband," while literally true, is calculated to deceive. MTD 28 n.12. Mark was paid *$60,000 more* than Julia was at the same level of seniority, which supports her claim of discrimination rather than undercutting it.

confirms that Jones Day itself—which pays most associates far less (*e.g.*, Dkt. 12-1 at 3)—viewed their work as equal.   *See also* Compl. ¶¶ 39 (above-market salaries for Issues & Appeals associates), 50 (Issues & Appeals associates receive "large raises after working substantially fewer hours").

Finally, Jones Day alleges that its black-box system sets attorney pay "both by quality (reviews) and by quantity (hours)."  MTD 29; *but see* Compl. ¶ 34.  The Equal Pay Act indeed gives defendants an affirmative defense that pay disparities result from "a system which measures earnings by quantity or quality of production."  29 U.S.C. § 206(d).  But Jones Day cannot possibly establish that affirmative defense with its motion to dismiss.  *See Stewart*, 271 F. Supp. 3d at 280. Jones Day's black-box system will be a matter for discovery.[10]

## CONCLUSION

The Court should deny the motion to dismiss in its entirety.


/s/ Julia Sheketoff
Julia Sheketoff (pro se)
1112 M St. NW #411
Washington, D.C. 20005
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

October 10, 2019

/s/ Mark C. Savignac
Mark C. Savignac (pro se)
1112 M St. NW #411
Washington, D.C. 20005
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367

---

[10] Jones Day has declined to seek dismissal of Julia's disparate impact challenge to its black-box compensation system, so discovery is inevitable.  Compl. ¶¶ 7, 25-34, 203-05, 218-20.