# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | ) ) ) ) | Civ. No. 1:19-02443 (RDM) |
| *Plaintiffs*, | ) ) | |
| *v.* | ) ) ) | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| JONES DAY, *et al.*, | ) ) | |
| *Defendants*. | ) | |

Traci Lovitt (Bar No. 467222)
Terri L. Chase (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

I.      The Firm's Leave Policies Are Lawful ...................................................... 1

II.     Savignac's Unreasonable Demand Was Not Protected Activity ......................... 6

III.    The Firm Did Not Interfere with Savignac's Protected Leave .............................. 9

IV.    Sheketoff's Discrimination Claims Are Not Legally Viable ............................. 10

CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. City of Indianapolis,*
  742 F.3d 720 (7th Cir. 2014) ..............................................................15

*Ambrose v. Twp. of Robinson,*
  303 F.3d 488 (3d Cir. 2002)..................................................................8

\*   *Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)......................................................................12, 13

*Ashraf-Hassan v. Embassy of France,*
  878 F. Supp. 2d 164 (D.D.C. 2012) .....................................................11

*Bowers v. Dist. of Columbia,*
  883 F. Supp. 2d 1 (D.D.C. 2011) .........................................................11

*Carrillo Hernandez v. Constructora Santiago II,*
  No. CV 16-2600, 2017 WL 721985 (D.P.R. Feb. 23, 2017) ..............8, 9

*Carter v. George Washington University,*
  387 F.3d 872 (D.C. Cir. 2004)..............................................................11

*Chambers v. District of Columbia,*
  389 F. Supp. 3d 77 (D.D.C. 2019) .......................................................11

*Cleveland Bd. of Educ. v. LaFleur,*
  414 U.S. 632 (1974).............................................................................4

*Cooper v. Henderson,*
  174 F. Supp. 3d 193 (D.D.C. 2016) .....................................................11

*Echostar DBS Corp. v. Gemstar–TV Guide Int'l, Inc.,*
  No. 05-cv-8510, 2007 WL 438088 (S.D.N.Y. Feb. 8, 2007) ................13

*Edgar v. JAC Prods., Inc.,*
  443 F.3d 501 (6th Cir. 2006) ...............................................................10

*Eib v. Marion Gen. Hosp., Inc.,*
  No. 1:17-cv-277, 2019 WL 1545175 (N.D. Ind. Apr. 8, 2019)................8

*Epps v. Potomac Elec. Power Co.,*
  No. 18-cv-1423, Dkt. 23 (D.D.C. Sept. 20, 2019)................................11

*Griffin v. Acacia Life Ins. Co.,*
  925 A.2d 564 (D.C. 2007) ....................................................................12

*Hughes v. Xerox Corp.,*
  37 F. Supp. 3d 629 (W.D.N.Y. 2014) ...................................................15

\*   *Johnson v. Univ. of Iowa,*
  431 F.3d 325 (8th Cir. 2005) .........................................................4, 5, 7

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lunts v. Rochester City Sch. Dist.*,
No. 07-cv-6272, 2011 WL 4074574 (W.D.N.Y. Sept. 13, 2011)............................................9

*Major v. Plumbers Local Union No. 5*,
370 F. Supp. 2d 118 (D.D.C. 2005) .....................................................................................11

*Moorer v. Baptist Memorial Health Care Sys.*,
398 F.3d 469 (6th Cir. 2005) ..........................................................................................9, 10

*Patton v. United Parcel Serv., Inc.*,
910 F. Supp. 1250 (S.D. Tex. 1995) ......................................................................................9

*Renstrom v. Nash Finch Co.*,
787 F. Supp. 2d 961 (D. Minn. 2011) ..................................................................................15

*Rumble v. Convergys*,
No. C-1-07-979, 2010 WL 812775 (S.D. Ohio Mar. 9, 2010) ..............................................14

*Sarnowski v. Air Brooke Limousine, Inc.*,
510 F.3d 398 (3d Cir. 2007)..................................................................................................9

*Schafer v. Bd. of Pub. Educ.*,
903 F.2d 243 (3d Cir. 1990)..................................................................................................5

*Simpkins v. Wash. Metropolitan Area Transit Auth.*,
No. 96-7188, 1997 WL 702349 (D.C. Cir. Oct. 10, 1997) (unpublished).............................11

*Smith v. City of Jackson*,
544 U.S. 228 (2005)............................................................................................................15

*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*,
298 F.3d 955 (10th Cir. 2002) ..............................................................................................9

*Stephens v. Erickson*,
569 F.3d 779 (7th Cir. 2009) ................................................................................................8

\* *Throneberry v. McGehee Desha Cty. Hosp.*,
403 F.3d 972 (8th Cir. 2005) ..............................................................................................10

*Turner v. Shinseki*,
824 F. Supp. 2d 99 (D.D.C. 2011)..........................................................................................8

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989)............................................................................................................15

*Wash. Convention Ctr. Auth. v. Johnson*,
953 A.2d 1064 (D.C. 2008) .................................................................................................10

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

STATUTES

29 U.S.C. § 206 ........................................................................................................14

42 U.S.C. § 2000e-5 .................................................................................................11

OTHER AUTHORITIES

Phila. Bar Ass'n, Model Policy 1 ...............................................................................4

I.    **THE FIRM'S LEAVE POLICIES ARE LAWFUL**

Plaintiffs' opposition brief (Dkt. 18, "Opp.") proves that their challenge to Jones Day's leave policies is an insubstantial semantic quibble that fails even on its own terms.  Plaintiffs' theory is that the short-term disability leave that Jones Day affords to birth mothers is a "sham"—nothing more than extra family leave, which must be provided to fathers on equal terms.  Plaintiffs justify this conclusion on the ground that, instead of offering leave to birth mothers equal to the length of their post-partum disability and then excusing them from providing *evidence* of a disability for the first eight weeks after the birth, Jones Day offers eight weeks of disability leave as the *benefit itself*.  Since those two regimes are identical in all relevant and practical respects, it is hard to imagine that federal civil-rights liability would hinge on this distinction of mere implementation.  Certainly Plaintiffs cite no supporting authority.  In any event, the operative terms of Jones Day's disability policy—which Plaintiffs ignore in favor of shorthand—actually track the policy they acknowledge is lawful: It offers leave only for the period of actual disability and then adopts a rebuttable presumption that the birth mother's doctor has certified an eight-week post-partum disability period.  Counts I-III of the Complaint must therefore be dismissed.

A.    Plaintiffs concede that Jones Day's *family leave* policy (*viz.*, ten weeks for primary caregivers and four weeks for secondary caregivers, regardless of sex) is sex-neutral and lawful.  Opp. 2.  Plaintiffs also concede that Jones Day's *adoption leave* policy (*viz.*, eighteen weeks for primary caregivers and four weeks for secondary caregivers, regardless of sex) is lawful too.  *Id.*  Plaintiffs concede that, beyond any period of sex-neutral family leave, employers *must* "give time off for pregnancy-related disabilities to the same extent as for other disabilities."  Opp. 3.  Plaintiffs agree, as they must, that this disability leave must be limited to birth mothers, who actually undergo childbirth, and cannot be extended to fathers like Savignac, who do not.  Opp. 2.  Plaintiffs further

concede that routine childbirth results in a "standard period[] of disability" that courts have described as ranging from four to five weeks at the low end to eight weeks at the high end.  Opp. 19.  Finally, Plaintiffs concede that it is lawful, as an evidentiary matter, to "exempt[] new mothers from having to *prove* their continuing disability . . . through burdensome paperwork and intrusive medical disclosures," even if other disabled employees must provide medical evidence.  Opp. 6.

What, then, is Plaintiffs' objection to Jones Day's policies?  Plaintiffs appear to claim that there is a fundamental distinction between the following two regimes:

> (A) Birth mothers are entitled to leave while they are disabled—but no medical evidence is needed to prove disability for the first eight weeks after childbirth; and

> (B) Birth mothers are entitled to eight weeks of disability leave after childbirth.

Plaintiffs characterize Policy A as "bona fide" disability leave enforced through an "evidentiary standard," but they reject Policy B as "sham" disability leave because its eight-week entitlement is supposedly baked into a "substantive rule."  Opp. 2, 4, 6-8.

If there is any practical daylight between these formulations, however, Plaintiffs do not identify it, and Jones Day does not see it.  To use Plaintiffs' analogy (comparing pregnant women to schoolchildren), it makes no difference whether a school says "you can stay home if you are sick, and we will assume you are sick if your parent says so" or "you can stay home if your parent says you are sick."  Opp. 6-7.  Either way, the student can stay home if the parent makes the phone call; either way, this is "bona fide" sick leave, not a "sham."  The same is true of the disability policies set forth above.  Both are genuine disability leave; any distinction is metaphysical and semantic, not substantive or material.  To maintain that a policy's legality turns on this illusory distinction is an odd position for Plaintiffs who purport to reject the "elevation of form over substance."  Opp. 4 (quoting *Griffin v. Administrator*, 690 F. Supp. 52, 57 (D.D.C. 1988)).  These are angels dancing on the head of a pin—not the stuff of a federal civil-rights violation.

Anyway, and even more importantly, to the extent that there is any legal difference between these two regimes, Jones Day's Short Term Disability policy tracks the one that Plaintiffs admit is *lawful*.  One need only review its operative terms.  *See* Dkt. 1-1 at 4-5.  The "substantive rule," to use Plaintiffs' terminology, is that a mother is entitled to leave only while she is actually disabled from performing her job.  Under the heading "Description of Benefit & Eligibility Requirements," the policy provides for "salary continuation . . . in case of a short term disability."  Dkt. 1-1 at 4.  An employee is "considered disabled for purposes of this policy if he or she is unable to perform the material and substantial duties of his or her regular occupation," among other requirements.  *Id.*  There is no artificial minimum or maximum period of entitlement to this benefit.

Separately, the policy sets forth what Plaintiffs call an "evidentiary standard."  Under the heading "Certifying Length of Short Term Disability & STD Application Process," there are rules governing the *administration* of the benefit to eligible employees.  *Id.* at 5.  Respecting childbirth, the policy provides as follows: "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Caesarean-section births)."  *Id.*  The Firm's policy thus does exactly what Plaintiffs say it should.  It affords leave when employees are disabled, and adopts an evidentiary presumption to determine the length of disability from a "routine childbirth."

Moreover, this administrative presumption is rebuttable; it applies "[u]nless the Firm is notified otherwise."  *Id.*  That means that, if the birth mother's doctor certifies that she will be unable to work for a *longer* period of time, the leave continues beyond eight weeks.  Plaintiffs admit as much (Opp. 8) and thus confirm that the policy's "substantive rule" is indeed tethered to actual disability, with the eight weeks serving only as a presumption of certification.  By the same token, if the birth mother is cleared to return to work after a *shorter* period of time, she can

"notif[y]" the Firm that its default assumption is incorrect.  *Contra Cleveland Bd. of Educ. v.*
*LaFleur*, 414 U.S. 632, 644 (1974) (rejecting "irrebuttable presumption of physical incompetency"
for pregnant women); Opp. 4-5.  Nothing in Jones Day's policy bars a birth mother from returning
to work before the expiration of eight weeks if she is not disabled.  And nothing guarantees paid
leave for the entire eight weeks if a birth mother's doctor certifies a shorter period.

Importantly, the Firm's presumption is admittedly *reasonable* from the perspective of
medical science.  Plaintiffs admit that birth mothers are disabled for at least some period of time,
and they acknowledge that eight weeks is within the range of post-partum recovery time that courts
have described as "standard," albeit toward the "top end" (with four or five weeks at the low end).
Opp. 19.  That concession belies any suggestion that Jones Day's policy is a "sham."  By contrast,
offering mothers "a decade" of disability leave, as Plaintiffs purport to fear (Opp. 15), would not
be reasonable as a presumption of disability (particularly under a *short-term* disability policy), and
a court could readily say so.[1]

Plaintiffs refrain from quoting the Short Term Disability policy itself, and instead cite and
base their challenge on the family leave policy's shorthand description: that "the Firm will provide
mothers eight weeks of paid leave under the Firm's Short Term Disability policy."  Dkt. 1-1 at 3;
*see* Opp. 2, 4, 18.  But that shorthand expressly cross-references the Short Term Disability policy
that includes the more precise eligibility criteria and administrative presumptions discussed above,
and it is "the operative language of th[at] policy" that controls its facial validity.  *Johnson v. Univ.*

---

[1] Insofar as Plaintiffs imply that eight weeks is too generous because lawyers perform only
"light office work" (Opp. 19), it is notable that the Philadelphia Bar Association's model disability
policy for law firms provides as follows: "Given the demands of the job and the high expectations
for performance placed on all attorneys, *the firm presumes disability for a period of twelve weeks
following the birth of a child*, and grants paid disability leave for this period, without the need for
independent medical verification of disability."   Phila. Bar Ass'n, Model Policy 1,
http://www.philadelphiabar.org/page/MPParenting1?appNum=1 (emphasis added).

*of Iowa*, 431 F.3d 325, 328-29 (8th Cir. 2005).  As shown, the "operative language" is lawful and non-discriminatory, even accepting Plaintiffs' incorrect view of the law.

**B.**      For the same reasons, Plaintiffs fail to distinguish Jones Day's policy from the one the Eighth Circuit upheld.  The policy in *Johnson* afforded leave for "temporary disability," and provided that, in the case of childbirth, no "documentation" was needed for "a leave of six weeks or less."  431 F.3d at 327.  Jones Day likewise offers salary continuation for "short term disability," and presumes, in the event of childbirth, that the doctor "has certified an eight-week, post-partum disability period."  Dkt. 1-1 at 5.  Both policies are lawful because "it is not unreasonable," much less discriminatory, "to establish a period of presumptive disability."  *Johnson*, 431 F.3d at 329.  *Johnson* is directly on-point and confirms the legality of Jones Day's policy.

Meanwhile, the only case Plaintiffs cite is inapposite.  The policy in *Schafer v. Board of Public Education* offered pregnant teachers "two options: (1) a period of sick leave combined with an unpaid leave for childbearing or childrearing for a maximum of one year, or (2) maternity leave not exceeding one year."  903 F.2d 243, 248 (3d Cir. 1990).  By its terms, that policy guaranteed leave beyond the "period of sick leave" and was designed to facilitate "childrearing," not to accommodate disability.  For that reason, and because there was no evidence that disability after childbirth "extends to one year," the court rejected the notion that this one-year period "related to the conditions of pregnancy, childbirth or related medical conditions."  *Id.*  By contrast, the Firm's Short Term Disability policy provides salary continuation only in the case of actual disability; it is distinct from the (generous) additional family-leave benefits that the Firm provides to mothers *and* fathers on a sex-neutral basis to facilitate childrearing; and it presumes a disability period that Plaintiffs concede is within the relatively narrow range that courts and medical authorities have recognized for decades as standard for recovery from a routine childbirth.

\*          \*          \*

Plaintiffs admit that their challenge hinges on Jones Day's disability leave for birth mothers being a "sham." Opp. 2. But nothing in Jones Day's policy—including its use of a medically reasonable, rebuttable presumption that birth mothers have been certified disabled for eight weeks post-partum—would permit such a conclusion. Plaintiffs' claims therefore fail as a matter of law.[2]

## II.   SAVIGNAC'S UNREASONABLE DEMAND WAS NOT PROTECTED ACTIVITY

Plaintiffs admit that their three retaliation claims can proceed only if Savignac's January 2019 objection and demand—insisting that the Firm was obligated to provide him with 18 weeks of paid leave, and threatening to harm the Firm in the "court of public opinion" if it did not accede to that demand—was "objectively reasonable." Opp. 23. They admit that this inquiry must be considered from the perspective of a "reasonable D.C. attorney," not a layperson. Opp. 25. And they appear to accept that reasonableness, in this context, presents a question of law. The question for the Court at this stage is therefore whether a reasonable attorney in Savignac's position could have believed that he was legally entitled to the eight weeks of paid leave that a birth mother may presumptively obtain under Jones Day's Short Term Disability policy. The answer is no.

For one thing, as explained above, Plaintiffs' challenge to the Firm's policies rests on both a *legally* unreasonable distinction and a *factually* unreasonable premise. A sophisticated attorney

---

[2] Retreating from their prior position that their challenge presents purely a question of law (Dkt. 12 at 1), Plaintiffs now argue in a footnote that, even if the policy is lawful on its face, their Complaint "raises the inference" that it was adopted with discriminatory *intent*. Opp. 22 n.3. But the Complaint alleges *nothing* about the adoption of the policy (who, when, or why), and certainly does not support a plausible inference that it was motivated by animus against men. Actually, the aspect of the policy that Plaintiffs challenge—the presumption of an eight-week disability period for routine childbirth—originated with the Firm's third-party plan administrator, which allowed its (thousands of) customers to choose among a six-week presumption, an eight-week presumption, or a hybrid presumption of six weeks for vaginal births and eight weeks for Caesarean-section births (known in the insurance industry as 6/6, 8/8, and 6/8 policies, respectively). Jones Day's role was limited to selecting one of the three industry-standard options.

could not reasonably maintain that a disability policy is a "sham" simply because it incorporates a medically reasonable presumption into its "substantive rule" instead of using the presumption only as an "evidentiary standard."  The characterization makes no evident difference and, either way, the presumption is admittedly medically reasonable.  Such presumptions, as the Eighth Circuit left no doubt, are legitimate and lawful.  *Johnson*, 431 F.3d at 329.  Moreover, any reasonable attorney who actually read the operative language of Jones Day's Short Term Disability policy—the policy that Plaintiffs challenge—would readily recognize that it does indeed use the assumption of an eight-week disability period merely as an evidentiary default rule, with eligibility itself turning on whether the employee is capable of performing her job duties.  Dkt. 1-1 at 4-5.  Plaintiffs' argument thus rests on a legal principle they invent and a fact they mischaracterize.

Moreover, even if Plaintiffs were correct on the law and the facts, Savignac's demand for 18 weeks of paid leave was *still* objectively unreasonable.  The reason is simple: Savignac provides no basis for extending eight weeks of disability leave to all fathers.  If Savignac were somehow legally entitled to the most favorable treatment given any woman, that would mean he should have received disability leave for the period of his disability (which for him is zero).  Plaintiffs' novel legal theory and misguided account of Jones Day's policy would compel only the following "remedy": The policy must be clarified to confirm (as it already says) that disability leave is limited to the period of actual disability, but that no medical evidence is needed to support a leave period of up to eight weeks after childbirth.  That in no way translates into giving Savignac 18 weeks of paid leave, when he *admits* (Opp. 2) that he was neither disabled nor entitled to any disability leave.  In short, there is no universe in which Savignac would be entitled to 18 weeks of paid leave.  Demanding that, as he did (Compl. ¶ 146), was unreasonable.

Finally, Plaintiffs make light of Jones Day's reliance on the text of the PDA, the EEOC's

guidance, and the only on-point appellate precedent, arguing that it is not unreasonable to disagree with the conclusions of courts and agencies. Opp. 24-25. These, however, are the standard tools of a lawyer. And while it may not be unreasonable to disagree with a particular court's conclusion, it is unreasonable to disregard the unanimous views of every decision-making body to have considered a question; to base a challenge on the wording of a summary of a plan rather than the terms of the plan itself; to argue that civil rights liability hinges on the supposed difference between presuming disability for a period of time and granting leave for the same period without requiring proof of disability; and to claim that an industry-standard eight week period of pregnancy disability is so out-of-touch with the typical period of recovery from childbirth that it gives rise to an inference that the policy is a sham. No reasonable lawyer could reach that conclusion.

For these reasons, even if Jones Day terminated Savignac for the substance of his email (rather than for the immaturity and disrespect that its tone and manner reflected), that email was not protected activity, and the retaliation claims must therefore be dismissed.[3]

---

[3] At minimum, Sheketoff's retaliation claims must be dismissed. She insists that she has standing for two reasons, but both are incorrect. *First*, Sheketoff claims that Defendants retaliated against *her* by firing her husband. Opp. 27-28. But Sheketoff is not the one who engaged in the (allegedly) protected activity; it was Savignac who sent the January 2019 email. Compl. ¶ 146. Sheketoff had left the Firm months earlier. Compl. ¶ 210. And although Sheketoff claims to have written the January 2019 email with Savignac, she does not (and could not) allege that Jones Day had knowledge of her involvement. *See Turner v. Shinseki*, 824 F. Supp. 2d 99, 121 (D.D.C. 2011) ("As a matter of law, there can obviously be no retaliation if the [alleged] retaliator did not know about the protected activity."); *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009); *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). It is thus not plausible to characterize *Savignac's* termination, based on *Savignac's* email, as constituting retaliation against *Sheketoff*.

*Second*, Sheketoff argues that she is an "aggrieved person" under Title VII, because, as Savignac's spouse, she falls within the "zone of interests" protected by the statute. Opp. 28-30. That is the correct legal question—*viz.*, whether a plaintiff falls within the "zone of interests" protected by the statute—but no court has held that Title VII's zone of interests encompasses employees' spouses. Meanwhile, multiple courts have held the opposite—both before and after the 2011 Supreme Court decision that Plaintiffs cite. *E.g.*, *Eib v. Marion Gen. Hosp., Inc.*, No. 1:17-cv-277, 2019 WL 1545175, at *15 (N.D. Ind. Apr. 8, 2019), *reconsideration on other grounds*, 2019 WL 3774234 (Aug. 12, 2019); *Carrillo Hernandez v. Constructora Santiago II*,

### III.   THE FIRM DID NOT INTERFERE WITH SAVIGNAC'S PROTECTED LEAVE

Savignac alleges that Jones Day fired him because of his email threat, not because he was taking leave under the FMLA.  Opp. 32.  But Savignac tries to shoehorn his FMLA claims into his retaliation claim: Because Jones Day "illegally fired him" while he happened to be out on leave, Savignac claims, the firing also constituted FMLA interference.  Opp. 32-33.  To begin with, Jones Day did not illegally fire Savignac.  *See* Part II, *supra*.  On his own theory, then, Savignac's FMLA claims are derivative of his retaliation claims and therefore fail with them.

In any event, it would make no sense to allow every plaintiff who happens to be on leave when he is fired to tack on an FMLA interference claim—based solely on allegations that his termination was illegal under some unrelated statute.  And, indeed, that is not the law.  "[T]he FMLA does not provide employees with a right against termination for a reason *other than interference with rights under the FMLA*."  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007) (emphasis added).  "A plaintiff can prevail" on an interference claim only "if she was denied her substantive rights under the FMLA *for a reason connected with her FMLA leave*."  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002) (emphasis added).  To be sure, if an employee is fired unlawfully, the employee may challenge the termination under the statute that was violated—but he cannot advance an FMLA interference claim just because he happens to have been "on FMLA leave when he was improperly fired for other reasons."  *Moorer v. Baptist Memorial Health Care Sys.*, 398 F.3d 469, 491 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part); *see also Diffee*, 298 F.3d at 961.

Savignac's handful of authorities do not compel a different conclusion.  Opp. 32-33.  He

---

No. CV 16-2600, 2017 WL 721985, at *4 (D.P.R. Feb. 23, 2017); *Lunts v. Rochester City Sch. Dist.*, No. 07-cv-6272, 2011 WL 4074574, at *3 (W.D.N.Y. Sept. 13, 2011), *aff'd*, 515 Fed. Appx. 11 (2d Cir. 2013); *Patton v. United Parcel Serv., Inc.*, 910 F. Supp. 1250, 1278 (S.D. Tex. 1995).

notes that some courts have required an employer to show "a lawful reason" for the termination—but the complete quotation is instructive: "As long as an employer can show a lawful reason, *i.e.*, *a reason unrelated to an employee's exercise of FMLA rights*," the employee has no FMLA claim. *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005) (emphasis added). In other words, courts refer to "lawful" reasons simply to distinguish them from intent to interfere with FMLA rights—not to suggest that any termination that violates any statute is somehow also a violation of the FMLA.  "Lawful" means lawful *for purposes of the FMLA.  Accord Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citing the *Throneberry* formulation with approval).  Savignac also cites a decision from the D.C. Court of Appeals, but that court relied exclusively on its interpretation of *federal law* to conclude that a plaintiff can bring an interference claim if his termination is unlawful under some other statute.  *See Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1077-78 (D.C. 2008) (relying on "federal FMLA" and federal caselaw "for guidance").  As explained, that reading of federal law is incorrect and makes no sense.

There is no reason to think that Congress intended for all claims arising from a termination to be litigated under the FMLA simply because an employee alleges he was fired illegally under some other statute while he happened to be on FMLA leave.  Savignac admits that his termination had nothing to do with his FMLA leave, and does not allege that the Firm would have acted any differently had he *not* been on leave when he sent his ill-advised email.  *Cf. Moorer*, 398 F.3d at 490.  As such, and based on his own allegations, Savignac's termination was "lawful" for FMLA purposes.  *See Throneberry*, 403 F.3d at 979.  His interference claims must be dismissed.

## IV.   SHEKETOFF'S DISCRIMINATION CLAIMS ARE NOT LEGALLY VIABLE

A.   Sheketoff does not dispute that she filed her Title VII charge with the EEOC more than 180 days after the alleged unlawful employment practice.  She claims, however, that she had 300 days to file her charge.  Opp. 34.  Title VII's text is clear that she had only 180.  The statute

10

mandates that a charge of discrimination "shall be filed [with the EEOC] within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The only exception is for an unlawful practice "with respect to which the person aggrieved has initially instituted proceedings with a State or local agency"; in that event, the charge must be filed "within three hundred days after the alleged unlawful employment practice occurred." *Id.* As a matter of plain text, the 300-day period therefore applies only if the plaintiff "initially instituted proceedings with a State or local agency." *Id.* Sheketoff does not allege that she filed any charge with D.C.'s agency. She thus had only 180 days. Numerous decisions within this circuit (including the D.C. Circuit in an unpublished opinion) have applied this simple rule.[4]

Sheketoff's cases are inapposite. Opp. 34 & n.6. Most applied the 300-day limitations period because the plaintiff provided some evidence that her claim had been cross-filed with the D.C. agency. *E.g.*, *Epps v. Potomac Elec. Power Co.*, No. 18-cv-1423, Dkt. 23, at 2 (D.D.C. Sept. 20, 2019) (explaining that plaintiff provided evidence that her charge was cross-filed).[5] Sheketoff has not even *alleged* that her charge was cross-filed. And it could not have been: In addition to her Title VII claim, Sheketoff brought a claim under the DCHRA. But "[t]he DCHRA's election of remedies provision states that a person seeking relief must choose between filing a complaint

---

[4] *See Simpkins v. Wash. Metropolitan Area Transit Auth.*, No. 96-7188, 1997 WL 702349, *3-4 (D.C. Cir. Oct. 10, 1997) (unpublished); *Ashraf-Hassan v. Embassy of France*, 878 F. Supp. 2d 164, 170-71 (D.D.C. 2012); *Cooper v. Henderson*, 174 F. Supp. 3d 193, 202-03 (D.D.C. 2016); *Bowers v. Dist. of Columbia*, 883 F. Supp. 2d 1, 7 (D.D.C. 2011); *Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, 126 (D.D.C. 2005).

[5] The discussion of the 300-day period in *Chambers v. District of Columbia*, 389 F. Supp. 3d 77 (D.D.C. 2019), was entirely gratuitous. The defendant did not contest that the 300-day period applied and the Court dismissed on the merits the only claim filed within 300 days. *Id.* at 86, 90. Moreover, *Chambers* misinterpreted the D.C. Circuit's opinion in *Carter v. George Washington University*, 387 F.3d 872 (D.C. Cir. 2004). *Carter* did not suggest that a plaintiff need not prove (or at least allege) that she has cross-filed, particularly where (as here) it appears that she has expressly disclaimed cross-filing. *See id.* at 879.

with the [D.C. Office of Human Rights] and filing a complaint in court." *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 572 (D.C. 2007). By taking the latter course, Sheketoff has effectively conceded that she did not cross-file her charge with the D.C. agency. Thus, she only had 180 days to act. Because she missed that deadline, her Title VII claim should be dismissed.

**B.**      Timing aside, Sheketoff's federal and D.C. claims fail because she does not allege "well-pleaded facts" that permit this Court to "infer more than the mere possibility of misconduct," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)—in this case, that Partner A's review of her work in 2016 was motivated by sex discrimination.

Sheketoff makes two principal arguments. *First*, she complains that out of the more than two dozen cases Jones Day cited on this issue, a few were summary judgment opinions. Opp. 35. Jones Day of course understands the difference between a Rule 12 motion and a Rule 56 motion. The Firm cited those cases to explain legal concepts, not for their standard of proof. In any event, Sheketoff's critique carries less weight here, given that the two most critical facts bearing on her claims—the email exchange and the review—were incorporated into the Complaint and are not disputed.

*Second*, Sheketoff argues that the sum of her allegations is greater than its parts. Opp. 35-36. But the parts simply do not add up to a plausible inference of discriminatory motive. Taking the broadest possible view, Sheketoff's proffered inference of sex discrimination is based on two facts: (1) Partner A's email exchange that supposedly criticized Sheketoff for not being deferential; and (2) Partner A's allegedly friendlier interactions with certain men than with Sheketoff.

The email takes her nowhere because, on its face, it does not suggest even a hint of sexism. Sheketoff argues that the email was "scolding" and "tracked well-recognized sex stereotypes— men are dominant and assertive; women should be meekly submissive." Opp. 36. But, Sheketoff's

perceptions notwithstanding, the email is before the Court, speaks for itself, and did nothing of the sort. *See Echostar DBS Corp. v. Gemstar–TV Guide Int'l, Inc.*, No. 05-cv-8510, 2007 WL 438088, at *4 (S.D.N.Y. Feb. 8, 2007) ("[I]f the allegations of a complaint are contradicted by documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true.")  The Court can see in black and white that Partner A's comments—a mix of praise and constructive criticism—do not remotely give rise even to a "mere possibility," much less a plausible inference, of sex discrimination. *Iqbal*, 556 U.S. at 679.  Sheketoff perceives sex stereotyping in Partner A's reference to himself as "the person whose name goes first on the memo." *Id.*  There is no sex stereotyping in that phrase.  Even if it implies that deference is due, that is because "the person whose name goes first on the memo" is more senior—a partner at the Firm and, unlike Sheketoff, directly accountable to the client—not because of his gender. Sheketoff's strained eisegesis does not render her claim plausible.

Beyond the email, Sheketoff claims that Partner A's discriminatory motive can be inferred because she claims he treated Savignac better than he treated her.  Opp. 38.  But the Complaint does not allege that Sheketoff and Savignac were similarly situated.  It does not allege that Savignac tried to reverse Partner A's edits, as Sheketoff did, or that Savignac's work was deficient in the ways identified in Partner A's review of Sheketoff.  If anything, the Complaint alleges the opposite.  Compl. ¶ 45 (alleging that Savignac got "rave reviews"); *id.* ¶ 49 (alleging that he worked over 1900 hours); Dkt. 15-4 (reflecting mixed reviews and much lower hours for Sheketoff).  Nor did Partner A ever review Savignac.[6]

---

[6] Sheketoff also claims that another male attorney "was surprised by Partner A's response to her feedback, implying that Partner A had been deferential to that male attorney, too." Opp. 36. That supposed implication is unreasonably attenuated.  This attorney's response does not suggest that Partner A had been "deferential" to him, or even that he had ever found himself in a similar interaction vis-a-vis Partner A.

Finally, Sheketoff points to the allegation that Partner A was self-deprecating with certain male associates in the cafeteria.  Opp. 37-38.  But she inflates her own contention.  She now says "the fact that a man is *socially* sexist surely contributes to the inference that he is *professionally* sexist as well."  Opp. 37.  But the Complaint does not allege that Partner A is socially sexist.  It says he was friendlier with *certain* men than with *her*.  And even if Partner A were friendlier with men than women *in general*, that would not support an inference of sex discrimination.  *Rumble v. Convergys*, No. C-1-07-979, 2010 WL 812775, at *8 (S.D. Ohio Mar. 9, 2010).

Even at the pleading stage, Sheketoff must point to some facts that, taken as true, raise a plausible inference that Partner A's review was motivated by discriminatory animus.  That could be, for example, inappropriate behavior, or disparate treatment of employees who are truly similarly situated, or a pattern of hostility toward women, or something else; there is no fixed formula.  But Sheketoff has none of this.  And the allegations that she does make, whether taken individually or in combination, do not reasonably imply that Partner A's review was driven by Sheketoff's gender rather than her work performance.  Consequently, there is no basis for the wide-ranging discovery that Sheketoff threatens to seek (Opp. 42); these claims should be dismissed.

**C.**     The EPA permits pay differentials if they are based on any factor "other than sex." 29 U.S.C. § 206(d)(1).  Because Sheketoff asserts that her alleged pay differential was dictated by her reviews (Compl. ¶¶ 88-90), she cannot state a viable EPA claim without alleging that those reviews were tainted by sex discrimination.  As explained, she has not plausibly alleged as much. Sheketoff's EPA claim thus fails along with her Title VII and DCHRA claims.

Even setting that aside, Sheketoff has not adequately pleaded an EPA claim.  She says it is enough to allege that she earned less than unidentified male Issues & Appeals associates and "that the jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of

which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Opp. 43. That is merely a "formulaic recitation of the elements of an unequal pay claim," which does not suffice. *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 645 (W.D.N.Y. 2014). And even if it were fair to presume that "Issues & Appeals associates within the D.C. office at the same of seniority" (Opp. 44) all perform the same *type* of work (and they do not), Sheketoff offers no well-pleaded factual basis to infer that she performed the same *quantity* or *quality* of work as these associates. Yet those are the two criteria by which law firms must evaluate their associates, as the Complaint concedes by making allegations about *Savignac's* hours and reviews. Without such allegations about her own work, Sheketoff has no viable EPA claim. *See Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961, 970 (D. Minn. 2011) (skill, effort, and responsibility are "separate tests, each of which must be met in order for the equal pay standard to apply").[7]

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Complaint in its entirety.

---

[7] In a footnote, Sheketoff argues that Jones Day does not seek dismissal of her disparate-impact challenge. Opp. 45 n.10. Although the Firm moved to dismiss the Complaint in its entirety, it is true that Jones Day did not understand Sheketoff to be asserting a disparate-impact claim. Her theory is that one partner intentionally gave her a bad review because of her gender, causing her to earn a lower raise in one of her four years at the Firm. *See* Compl. ¶¶ 67-95. That does not sound in disparate impact. To state a disparate-impact claim, a plaintiff must identify a facially neutral employment practice that causes a disparate impact on a protected group. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-67 (1989); *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Sheketoff has not alleged facts satisfying any of those elements. She has not alleged either a specific employment practice or a disparate impact on women as a group, much less a causal link between the two. Her vague reference to a "black-box compensation system" (Compl. ¶ 204), combined with Sheketoff's dissatisfaction with her above-market $440,000 salary, is nowhere near sufficient to state a claim. *See, e.g.*, *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (explaining that a plaintiff must set forth "some factual content in the complaint tending to show that the [employment practice] caused a relevant and statistically significant disparity").

October 17, 2019

Respectfully submitted,

*/s/ Traci Lovitt*
Traci Lovitt (Bar No. 467222)
Terri L. Chase (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*