IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

   *Plaintiffs*,

       v.

JONES DAY, STEPHEN J. BROGAN,
and BETH HEIFETZ,

   *Defendants*.

Case No. 1:19-cv-02443-RDM

Oral Argument Requested

**SURREPLY IN OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ............................................................................................................................ 1

    I.    Jones Day's family leave policy violates the civil rights laws (Counts I-III) ..................... 1

    II.    Jones Day's arguments against the retaliation claims are frivolous (Counts VII-IX) ........ 6

        A.    Plaintiffs' complaint of sex discrimination was reasonable ........................................... 6

        B.    Julia is a proper retaliation plaintiff ............................................................................. 11

    III.    Jones Day interfered with Mark's protected family leave (Counts X and XI) ............. 13

    IV.    Julia's pay discrimination claims should proceed to discovery (Counts IV-VI) .......... 14

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

\* *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987) ..................... 5, 6, 9, 12

\* *City of Los Angeles v. Manhart*, 435 U.S. 702 (1978) ............................................................... 4, 5

*Eib v. Marion General Hospital, Inc.*, 2019 WL 1545175 (N.D. Ind. 2019) ............................... 13

*Epps v. Potomac Electric Power Co.*, No. 18-cv-1423 (D.D.C.) .................................................. 14

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) ......................................................... 10

*Griffin v. Acacia Life Insurance Co.*, 925 A.2d 564 (D.C. 2007) .................................................. 14

\* *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005) ................................................ 6, 9, 12

*Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004) ............................................................................ 4

\* *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) ..................................... 5

*Payne v. D.C. Government*, 722 F.3d 345 (D.C. Cir. 2013) ......................................................... 13

*Porfiri v. Eraso*, 121 F. Supp. 3d 188 (D.D.C. 2015) .............................................................. 12, 15

\* *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir. 1990) .............................................. 6

*Stewart v. International Union*, 271 F. Supp. 3d 276 (D.D.C. 2017) ........................................... 14

\* *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011) ............................................... 12

*Washington Convention Center Authority v. Johnson*, 953 A.2d 1064 (D.C. 2008) .................... 13

**Statutes**

29 U.S.C. § 206 ......................................................................................................................... 10, 15

29 U.S.C. § 2601 ............................................................................................................................. 5

D.C. Code § 2-1403.16 ................................................................................................................. 14

D.C. Code § 32-501 ...................................................................................................................... 13

**Other Authorities**

EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues ......................... 6

**Rules**

29 C.F.R. § 1620 ........................................................................................................................... 15

**ARGUMENT**

**I.    Jones Day's family leave policy violates the civil rights laws (Counts I-III)**

**A.**    In full retreat from its opening brief, Jones Day now stakes its case on two brand-new contentions. Both are as meritless as the now-abandoned arguments they replace.

**1.**    Rather than defend its policy directly, Jones Day declares itself blind to the "practical daylight" between a lawful parental leave policy ("(A) Birth mothers are entitled to [disability] leave while they are disabled") and its own unlawful policy ("(B) Birth mothers are entitled to eight weeks of disability leave after childbirth"). Reply 2. Jones Day offers up this new lead argument without even a single legal citation. Reply 1-2.

Jones Day's position is perplexing, for the difference between the two policies is clear. As Plaintiffs have explained (with a good deal of "supporting authority" (*contra* Reply 1)), Policy A is *in fact* disability leave, while Policy B is "disability" leave in name only—because the full eight weeks are given to every new mother *regardless of disability*. Opp. 2-22. Under Policy A, once a new mother is no longer actually disabled from working at Jones Day, she is no longer entitled to disability leave; she will either return to work or take caretaking leave (which must be offered equally to fathers). Some women will take eight weeks of disability leave, while others will take six, or four, or two. By contrast, under Policy B, every new mother will take the same eight weeks, even if she is able to work at Jones Day much sooner than that. This "practical daylight"—weeks of paid parental leave given to mothers who are not disabled, purely because they are mothers rather than fathers—is more than enough to invoke the civil rights laws.[1]

---

[1] Jones Day's formulation of Policy A also includes an evidentiary standard ("no medical evidence is needed to prove disability"). Reply 2. But that is irrelevant. It does not affect Policy A's *substantive rule*, which—unlike Jones Day's policy—entitles mothers to take sex-based leave only until they are recovered. Opp. 6-8.

Consider, by way of analogy, the "practical daylight" between these two scenarios:

(A) A client offers Jones Day its hourly rates for work actually performed—but, for the first $10 million in fees, no proof is needed to establish that the hours billed were actually worked; and

(B) A client offers Jones Day $10 million, regardless of hours worked.

Again, the difference should be clear enough: In Scenario B, Jones Day is sure to get $10 million, while in Scenario A the amount that Jones Day receives will depend on the number of hours it actually puts in, so it could be much less than $10 million. Jones Day dismisses the distinction as "angels dancing on the head of a pin." Reply 2. But its clients might take a different view.

By contrast, Jones Day's schoolchild analogy is off base. Reply 2. The proper analogy is to the distinction between "you can stay home today if you are sick (and if you say you are sick we will take your word for it)" and "you can stay home today." The latter policy is not in fact sick leave. And Jones Day's policy is not in fact disability leave.

2.      Jones Day also contends (for the first time ever) that "Plaintiffs' challenge to the [f]irm's policies rests on … a *factually* unreasonable premise": the premise that Jones Day gives every new mother eight weeks of so-called "disability leave" regardless of actual disability. Reply 6; *see* Reply 3-6. If that premise really were mistaken, Jones Day would have said so in response to Julia's first email, which pointed out that the firm's "disability leave" for new mothers "is not dependent on whether women are actually disabled." Compl. ¶ 140. And it would have said so in its opening brief, in response to the Complaint's allegation that the firm "provides 'the eight weeks' of 'disability leave' … to all biological mothers without regard for how long they are disabled from performing legal work." Compl. ¶ 112. So it is surprising, to say the least, that Jones Day now says that its actual "'substantive rule' … is that a mother is entitled to leave only while she is actually disabled from performing her job." Reply 3. But despite what Jones Day now tells the Court, Plaintiffs continue to believe that discovery will confirm that Jones Day

2

actually does offer every new mother eight weeks of sex-based leave, regardless of whether she "is actually disabled from performing her job" for eight weeks.

Anyhow, Jones Day's new argument is both forfeited and meritless. A motion to dismiss must assume the truth of the complaint's factual allegations. And Plaintiffs have squarely alleged that Jones Day gives all women eight weeks of sex-based leave regardless of disability. *E.g.*, Compl. ¶¶ 110-16.

Jones Day cannot circumvent those allegations with its artful parsing of its short-term disability policy (which Plaintiffs have never challenged) and its disavowal of its family leave policy (which plainly gives all new mothers a substantive entitlement to eight weeks of sex-based leave, but which Jones Day now implausibly says is just inoperative "shorthand"). This is not a contract or statutory interpretation case. The case does not turn on how Jones Day's written policy *could* be read, or even on the "best" reading. A discriminating employer cannot escape the civil rights laws by arguing that its policy could be read to be nondiscriminatory when in reality it is not. What matters here is Jones Day's *actual* policy. That means that, while Jones Day's written policies are relevant as Jones Day's admissions (though not its only admissions) about its actual policy, they are not controlling here. To the contrary, at this stage of the litigation, Plaintiffs' allegations are controlling. Jones Day must answer the Complaint.

B.  Jones Day says that its eight-week "presumption is admittedly[2] reasonable from the perspective of medical science." Reply 4. Jones Day's frequent use of the ambiguous term "presumption"—which does not appear in its policy—is unhelpful. *E.g.*, Reply 7 (using the term in two distinct senses). If it refers to the *evidentiary* exemption from providing proof of disability

---

[2] Jones Day's reply attributes to Plaintiffs a slew of bogus "admissions" and "concessions," but Plaintiffs' filings speak for themselves.

3

for eight weeks, then the point is irrelevant; Plaintiffs do not challenge the evidentiary standard. Opp. 6-8.  But if Jones Day means to refer to its *substantive* grant of eight weeks of sex-based leave to all mothers regardless of disability, then it is wrong.  If anything, the fact that an eight-week period is at or above the top end of the recovery periods mentioned by courts proves that it is *unreasonable* as a generalization—and especially so for Jones Day lawyers, whose jobs are among the least physically demanding in the country.  *See* Opp. 19.

But even if the assumption that the average woman is disabled from office work for eight weeks after giving birth were "reasonable from the perspective of medical science," an employer's decision to enact that generalization into a categorical rule would still be *illegal from the perspective of the civil rights laws*:

> [Title VII] precludes treatment of individuals as simply components of a racial, religious, sexual, or national class.  If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. *Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.*

*City of Los Angeles v. Manhart*, 435 U.S. 702, 708 (1978) (emphasis added).

By the same token, even a true generalization about a class is an insufficient reason for *favoring* an individual to whom the generalization does not apply.  If physical strength is required for a job, the employer may not subject female applicants to a test of strength while hiring male applicants sight unseen, thereby granting favorable treatment to less-than-strapping male individuals simply because men, as a class, are brawnier than women.  "[T]he antidiscrimination laws entitle individuals to be evaluated as individuals rather than as members of groups having certain average characteristics."  *Lust v. Sealy, Inc.*, 383 F.3d 580, 583 (7th Cir. 2004).  It is no answer to a charge of employment discrimination to say that the line drawn on the basis of sex is "reasonable" by reference to average or typical characteristics of the class.

4

Just as an employer cannot favor men as a class simply because *most* men are burlier than most women, it cannot favor women as a class with eight weeks of sex-based paid leave simply because *some* women (not even "most," according to Jones Day's own cherrypicked figures) are disabled for eight weeks after giving birth.  Rather, "the existence or nonexistence of 'discrimination' is to be determined by comparison of … individual characteristics," not "class characteristics."  *Manhart*, 435 U.S. at 708.  So even if Jones Day were right that an eight-week disability period is a "reasonable" generalization about the needs and abilities of women, it would still deserve to lose this case.  Indeed, the Supreme Court has said in no uncertain terms that Title VII prohibits "special treatment of pregnant workers based on stereotypes or generalizations about their needs and abilities."  *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 285 n.17 (1987).

And with good reason: "Practices that classify employees in terms of … sex tend to preserve traditional assumptions," *Manhart*, 435 U.S. at 709—such as the traditional assumption that "men are breadwinners and women are caretakers" (Compl. ¶ 123).  Giving women extra family leave on the basis of sex-based generalizations thereby harms not only fathers and children but women as well.  *See, e.g.*, *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 736 (2003); 29 U.S.C. § 2601; Compl. ¶¶ 121-35, 140.

That is why, as Plaintiffs have shown, the law requires that sex-based leave be limited to the *individual's* period of *actual* disability—not the *class's* period of average, standard, or typical disability.  Opp. 9-21.  "The statute's focus on the individual is unambiguous."  *Manhart*, 435 U.S. at 708.  It is no surprise that Jones Day still has not uncovered even a single case endorsing the use of sex-based generalizations in allocating family leave.  *See* Opp. 19.

**C.** Both in responding to Julia's initial email and in its opening brief urging dismissal, Jones Day rested its case on legal citations that supposedly "confirm[ed] the propriety of Jones Day's approach" and even proved that "[n]o reasonable lawyer" could credit Plaintiffs' position. Dkt. 15-1 at 2; MTD 9-14, 18. Plaintiffs' opposition brief explained that Jones Day had mischaracterized the authorities, each of which actually supports Plaintiffs. Opp. 8-20.

In the face of that painstaking discussion, Jones Day has fallen silent. It walks away from *Guerra* and the EEOC guidance without a word. And while it briefly mentions *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005), it does so only to say that *Johnson* would support its policy *if*, as Jones Day now improperly asserts, a new mother at Jones Day were "entitled to leave only while she is actually disabled from performing her job." Reply 3; *see* Reply 5. Jones Day does not dispute that, if its policy is as Plaintiffs allege, then *Johnson* condemns that policy rather than "confirm[ing] [its] propriety." Dkt. 1-1 at 2.

Finally, Jones Day tries to confine *Schafer v. Board of Public Education* to its facts (Reply 5) while ignoring its holding that, under *Guerra*, sex-based leave policies are "per se void for any leave granted beyond the period of actual physical disability." 903 F.2d 243, 248 (3d Cir. 1990); *see* Opp. 19-20.

**II.    Jones Day's arguments against the retaliation claims are frivolous (Counts VII-IX)**

**A.    Plaintiffs' complaint of sex discrimination was reasonable**

Jones Day's new arguments in defense of its policy fail on the merits; a fortiori they fail to show that Plaintiffs' opposition to that policy was beyond the bounds of reasonable legal disagreement.

**1.** As Plaintiffs have explained, there is an important legal and practical difference between offering disability leave for the individual's period of actual disability and giving every

6

woman eight weeks of leave purely on the basis of sex. Opp. 2-22. Jones Day's assertion that *no reasonable attorney* could agree with that position (Reply 6-8) is unserious.

**2.** Doubling down on its improper (and forfeited) factual assertion that it "does indeed use the assumption of an eight-week disability period merely as an evidentiary default rule, with eligibility itself turning on whether the employee is capable of performing her job duties," Jones Day now says that "any reasonable attorney who actually read the operative language of Jones Day's Short Term Disability policy" would conclude that it does *not* give all new mothers a fixed eight-week period of sex-based leave without regard for disability. Reply 7. But Plaintiffs have never challenged the short-term disability policy (Dkt. 1-1 at 4-6). The substantive entitlement to eight weeks of sex-based leave for all new mothers is set forth in Jones Day's family leave policy (Dkt. 1-1 at 2-3). That is what Plaintiffs challenge.

Jones Day replies that "it is unreasonable … to base a challenge on the wording of a summary of a plan rather than the terms of the plan itself." Reply 8. The proposition is dubious on its own terms: When an employer undertakes to summarize its policy for its employees, it is eminently reasonable for the employees to rely on the employer's summary rather than second-guessing it. More importantly, Jones Day's family leave policy cannot possibly be read as just an inaccurate "summary" (or "shorthand" (Reply 1, 4)) of the short-term disability policy. It categorically (and repeatedly) indicates that *all* new mothers receive eight weeks of "disability" leave: "In the case of a newly born child, the [f]irm will provide mothers eight weeks of paid leave under the [f]irm's Short Term Disability policy." Dkt. 1-1 at 3; *see also id.* ("if the mother is the primary caregiver, the [f]irm will provide an additional ten weeks of paid family leave after the eight weeks of paid disability leave"); *id.* (referring to "the 18 weeks of paid leave" for female

7

primary caregivers and using the same language with reference to adoptive parents, who concededly receive the full 18 (Reply 1)).

Jones Day now purports to read this language as shorthand that actually means that it will provide mothers paid leave under the short-term disability policy only while the mother is incapable of performing her job duties. *See* Reply 1, 3, 7. But that reading is irreconcilable with the words that Jones Day chose to use, which plainly entitle every new mother to a fixed eight-week period of sex-based leave. No reasonable attorney would write "the [f]irm will provide mothers eight weeks of paid leave" if the true policy were that the length of the disability leave "turn[s] on whether the employee is capable of performing her duties" (Reply 7), giving many women less than eight weeks. Any mother-to-be reading the family leave policy would understand that she would receive "the 18 weeks of paid leave" regardless of how long she is actually disabled. And reading the short-term disability policy would not change her mind, for nothing in that policy purports to override the terms of the family leave policy. Plaintiffs were entitled to take the family leave policy at face value.

This is all the more true—and Jones Day's newfound reading is particularly brazen—because Jones Day has confirmed Plaintiffs' understanding of its policy time and again. Plaintiffs' understanding was central to and clearly expressed in Julia's initial email. Compl. ¶ 140 ("Jones Day gives women 18 weeks of paid leave …. Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled. Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks"). Heifetz forwarded that email to Jones Day's firm-wide Human Resources Director, Sarah McClure (a long-time Jones Day employment lawyer and presumably the author of its family leave policy), who wrote a lengthy legal defense of the policy without casting any doubt on

8

the key premise that Jones Day now derides as unreasonable. Indeed, her defense rested on her mischaracterizations of *Guerra* and *Johnson* as upholding policies that entitled every new mother to a fixed four- or six-week leave period—mischaracterizations that only make sense if Jones Day also provides a fixed period of leave to all mothers and was seeking to justify its decision to do so. Dkt. 15-1 at 2. McClure also "acknowledged to Julia that Jones Day provides the full eight weeks of 'disability leave' to all biological mothers without regard to disability." Compl. ¶ 116; *see also* Compl. ¶¶ 142-43. And Heifetz told Julia to advertise the policy to prospective employees accordingly. Compl. ¶ 115.

In any event, Plaintiffs have squarely alleged that Jones Day's true policy is to give every new mother eight weeks of sex-based leave regardless of disability. *E.g.*, Compl. ¶¶ 110-16. At the motion-to-dismiss stage, those allegations are controlling and dispositive, with respect to the reasonableness of Plaintiffs' opposition as well as to their underlying challenge to Jones Day's leave policy. And Plaintiffs are confident that discovery will show that their understanding of Jones Day's policy (which Jones Day now tells the Court is not just wrong but "unreasonable") is in fact the truth—as everyone involved had always acknowledged up until the day when Jones Day filed its reply.

**3.**     Jones Day also says that, even if Plaintiffs are right on the facts and law, "there is no universe in which [Mark] would be entitled to 18 weeks of paid leave," and so the demand for that amount of leave was unreasonable. Reply 7. This late-breaking argument is misguided.

Jones Day gives all new mothers an extra eight weeks of sex-based leave, regardless of disability and solely because they are women. Thus, female primary caregivers receive 18 weeks of paid leave, whereas Mark (as a male primary caregiver) was entitled to 10. To say that this is illegal sex discrimination is to say that it was illegal for Jones Day to deny Mark, because he is a

9

man rather than a woman, the 18 weeks of paid leave that it gives to all new mothers. So it was eminently reasonable for Plaintiffs to demand, as the remedy for that illegal discrimination, that Jones Day give Mark the amount of leave that it would have given him (regardless of disability) if he were a woman rather than a man. And it does Jones Day no good to say that Mark "provides no basis for extending eight weeks of disability leave to all fathers" (Reply 7), for Plaintiffs' entire point is that the eight weeks are *not in fact disability leave*. Jones Day elsewhere concedes that it understands this: "Plaintiffs' theory is that the short-term disability leave that Jones Day affords to birth mothers is a 'sham'—nothing more than extra family leave, which must be provided to fathers on equal terms." Reply 1.

It is true that defendants in discrimination cases often can choose to remedy the violation, on a prospective basis, by "equalizing down" rather than up. That appears to be what Jones Day means when it says that it could "remedy" the violation by limiting the sex-based leave "to the period of actual disability." Reply 7. But it is not *unreasonable* for a discrimination victim to ask that the discriminator equalize up and grant him the benefit that was illegally withheld; an employee complaining of discrimination surely is not limited to seeking only the remedy (equalizing down) that would do him no good. Anyway, the Equal Pay Act *requires* violators to equalize up rather than down. 29 U.S.C. § 206(d)(1).

4.      Jones Day now concedes that "it may not be unreasonable to disagree with a particular court's conclusion," but declares it "unreasonable to disregard the unanimous views of every decision-making body to have considered a question." Reply 8. Not so. A reasonable attorney analyzes the legal issues in search of the right answer; she does not just count noses. *E.g.*, *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014) (unanimously rejecting the position adopted by all seven courts of appeals to consider the question). More importantly,

Plaintiffs have explained in great detail that Jones Day mischaracterizes *all* of its cited authorities, which in fact support Plaintiffs. Opp. 8-19; *see also* Compl. ¶ 146 (Plaintiffs' January 16 email, explaining to Jones Day that "[w]e have closely reviewed the case law" and "[y]our cases do not support Jones Day's discriminatory policy"). In reply, Jones Day rightly declines to contest *any* of those explanations.

Finally, Jones Day says that no reasonable attorney could believe that an "eight week period of pregnancy disability is so out-of-touch with the typical period of recovery from childbirth that it gives rise to an inference that the policy is a sham." Reply 8. That is not Plaintiffs' argument. Jones Day's policy is a "sham" because the fixed eight-week period labeled "disability" leave is not in fact disability leave—it is given to every new mother regardless of disability and purely on the basis of sex. Opp. 2. No "inference" is involved.

### B. Julia is a proper retaliation plaintiff

Julia is entitled to seek redress for the cruel treatment that Brogan and Heifetz inflicted on her family for two independently sufficient reasons. Opp. 27-31. Defendants' brand-new counterarguments do not overcome either one. *See* Reply 8 n.3.

**1.** Julia has a cause of action because she independently satisfies the three elements of a retaliation claim: (1) protected conduct (the January 16 email), (2) adverse action (Mark's termination and Defendants' ensuing malicious actions), and (3) causation. Opp. 27-28. In its opening brief, Jones Day contested only the *second* element. MTD 15 n.5. Plaintiffs explained that firing an employee's husband is an adverse action for that employee. Opp. 28. Apparently conceding the point, Jones Day's reply contests the *first* element, arguing that Julia "is not the one who engaged in the … protected activity." Reply 8 n.3. But a reply brief is not the place to argue for the first time that a complaint fails to adequately plead an element. *E.g.*, *Porfiri v. Eraso*, 121

11

F. Supp. 3d 188, 195 (D.D.C. 2015). And even if Jones Day had not forfeited the argument, it would still fall flat: The Complaint says that "Julia and Mark sent the … email" (Compl. ¶ 146), and Jones Day admits that Julia "claims to have written" the email with Mark (Reply 8 n.3).

Turning its focus to the *third* element, Jones Day says that Julia "does not (and could not) allege that Jones Day had knowledge of her involvement," so her protected activity could not have *caused* the adverse action. *Id.* Actually, the more plausible inference by far is that Defendants *did* understand that the January 16 email represented Julia's opposition as well as Mark's. It was Julia who first raised Plaintiffs' objection to the leave policy in her email to Heifetz; Julia's email made clear that Plaintiffs opposed the unlawful policy for the harm that it would do *to Julia* (and other women); the January 16 email is part of the same email chain as Julia's initial email to Heifetz, refers back to that "prior request," and copies Julia's email account; and the January 16 email is largely phrased in the first-person plural, indicating (among other things) that Mark and Julia together had "closely reviewed the case law, including the two cases [Jones Day] rel[ied] on" (*Guerra* and *Johnson*) and "discussed the matter with other competent attorneys." Compl. ¶ 146. It is inconceivable that Defendants understood the email as the opposition activity of Mark acting alone rather than a couple jointly opposed to Jones Day's sexist leave policy. True, the email was *sent* from Mark's account rather than Julia's, but Jones Day does not say that that is significant. After all, every email is sent from just a single account—such is the nature of email.

**2.** Even if Defendants had not retaliated against Julia, she would be entitled to sue as an "aggrieved person." Opp. 28-31. Jones Day argues only that the spouse of a retaliation victim is not a person aggrieved by the retaliation. Reply 8 n.3. That is wrong, and not one of the cases that Jones Day belatedly cites actually applies the leading Supreme Court decision—*Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011)—to hold that spouses cannot be aggrieved

parties.  Indeed, the only one of their cited cases that even *mentions* that controlling authority answers (incorrectly) the distinct question of whether threatening a spouse constitutes "*adverse action*."  See *Eib v. Marion General Hospital, Inc.*, 2019 WL 1545175, at *15 (N.D. Ind. 2019).

Anyway, Plaintiffs made clear that "the Court need not reach the spouse question, because Julia is not just Mark's spouse—she was herself a Jones Day employee."  Opp. 30.  That entitles her to sue under the three civil rights laws at issue here.  Opp. 30-31.  Jones Day never even tries to argue otherwise.  *See* MTD 15 n.5; Reply 8 n.3.

**III.     Jones Day interfered with Mark's protected family leave (Counts X and XI)**

The only question is whether an employer can defeat a claim for interference with FMLA-protected family leave by establishing, as an affirmative defense, that it illegally fired the plaintiff in violation of some *other* civil rights law.  Jones Day concedes that the highest court of the District of Columbia has squarely addressed this question and "conclude[d] that a plaintiff can bring an interference claim if his termination is unlawful under some other statute."  Reply 10; *see* Opp. 32-33; *Washington Convention Center Authority v. Johnson*, 953 A.2d 1064, 1078 (D.C. 2008).  Jones Day claims that *Washington Convention Center* "relied exclusively on its interpretation of *federal* law" (Reply 10), but that (irrelevant) claim is untrue.  The D.C. Court of Appeals was interpreting the *D.C.* FMLA (D.C. Code § 32-501 et seq.), and while it noted that it could look to cases under the federal equivalent "for guidance," the key paragraph cites a D.C. precedent.  *See* 953 A.2d at 1077-78.  The D.C. court's undisputed interpretation of the D.C. FMLA is binding here and precludes dismissal.  *Payne v. D.C. Government*, 722 F.3d 345, 353 (D.C. Cir. 2013).

 Courts in this circuit have applied *Washington Convention Center* to the D.C. FMLA's federal equivalent.  *See* Opp. 32.  And while Jones Day cites general language from out-of-circuit cases addressing the federal equivalent, it points to only one opinion that actually grappled with

13

the question presented here: a Sixth Circuit judge's separate opinion *dissenting* in relevant part. Reply 9.  Jones Day also opines that "it would make no sense" to recognize an FMLA interference claim here (*id.*), but Jones Day's policy views on what "makes sense" are surely not a proper guide to the interpretation of the FMLA.  Indeed, Jones Day does not dispute that its leave policy violates both FMLAs.  *See* Opp. 33 n.5.

## IV. Julia's pay discrimination claims should proceed to discovery (Counts IV-VI)

In arguing that Julia's EEOC charge was untimely, Jones Day now complains that Julia "has not even *alleged* that her claim was cross-filed," whereas "[m]ost" of Julia's cited cases supposedly "applied the 300-day limitations period [instead of just 180 days] because the plaintiff provided some evidence that her claim had been cross-filed with the D.C. agency."  Reply 11.  But Julia has already explained that a complaint need not plead the facts necessary to rebut an affirmative defense such as untimeliness.  Opp. 42-43 (citing *Stewart v. International Union*, 271 F. Supp. 3d 276, 280 (D.D.C. 2017)).

Jones Day also says that, by filing a D.C. Human Rights Act claim in this lawsuit, Julia "has effectively conceded that she did not cross-file her charge with the D.C. agency," because the Human Rights Act's election-of-remedies provision generally requires plaintiffs to choose between filing with the agency and filing in court.  Reply 12.  As Jones Day's weasel word "effectively" indicates, Julia has conceded no such thing.  And though no allegation is required at this stage, the truth of the matter is that the charge *was* cross-filed.[3]

---

[3] Jones Day asserts that "it could not have been" cross-filed.  Reply 11.  But the one case it cites to support that mistaken assertion actually *reversed* a trial court for adopting *the precise position* that Jones Day now urges upon this Court.  *See Griffin v. Acacia Life Insurance Co.*, 925 A.2d 564, 572-74 (D.C. 2007) (discussing D.C. Code § 2-1403.16(a)); *see also Epps v. Potomac Electric Power Co.*, No. 18-cv-1423 (D.D.C.), Dkt. 17-1 at 1-3 (the EEOC's explanation of the automatic cross-filing process in the District of Columbia).

Turning to the merits, Jones Day does not even address one of the principal facts supporting Julia's pay discrimination claims: Partner A lied about Julia in her performance review. As Jones Day has admitted (MTD 23), Partner A's pretextual reasons for his negative review strongly support the inference of discrimination. *See* Opp. 38-39.

As for Julia's Equal Pay Act claim: Jones Day does not deny that, even if Julia's lower pay had been the result of the "quality" of her actual performance or the "quantity" of hours she logged (Reply 15), that would merely enable Jones Day to assert an affirmative defense after discovery—not prevail on a motion to dismiss. *See* Opp. 45; 29 U.S.C. § 206(d); 29 C.F.R. § 1620.13-.18.[4]

## CONCLUSION

The Court should deny the motion to dismiss in its entirety.


| /s/ Julia Sheketoff | /s/ Mark C. Savignac |
|---|---|
| Julia Sheketoff (pro se) | Mark C. Savignac (pro se) |
| 1112 M St. NW #411 | 1112 M St. NW #411 |
| Washington, D.C. 20005 | Washington, D.C. 20005 |
| (202) 567-7195 | (217) 714-3803 |
| sheketoff@gmail.com | marksavignac@gmail.com |
| D.C. Bar No. 1030225 | D.C. Bar No. 995367 |

October 28, 2019

---

[4] In a footnote to its reply brief, Jones Day for the first time asks the Court to dismiss Julia's disparate impact challenge to its black-box compensation system. Reply 15 n.7. That is too little, too late. *Porfiri*, 121 F. Supp. 3d at 195. The reply also says that "Jones Day did not understand [Julia] to be asserting a disparate-impact claim." Reply 15 n.7. But the Complaint says in plain terms that "Jones Day discriminated against Julia … by intentionally maintaining uniform, firm-wide policies and procedures that had a disparate impact on her because of her sex"—particularly its "black-box compensation system," including "its reliance on highly subjective evaluations by the firm's heavily male partnership and its prohibition on associates disclosing their salaries to one another." Comp. ¶¶ 203-04; *see also* Compl. ¶¶ 7, 25-34, 205, 218-20. Jones Day is also wrong to fault Julia for making just a "vague reference to a 'black-box compensation system'" (Reply 15 n.7). *See* Compl. ¶¶ 25-34.

15