IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK C. SAVIGNAC and<br>JULIA SHEKETOFF,<br><br>    *Plaintiffs*,<br><br>              v.<br><br>JONES DAY, STEPHEN J. BROGAN,<br>BETH HEIFETZ, and JOHN DOES 1-10,<br><br>    *Defendants*. | Case No. 1:19-cv-02443-RDM |

**SUPPLEMENTAL COMPLAINT**

1.     On August 13, 2019, Plaintiffs Mark C. Savignac and Julia Sheketoff filed their complaint in this action for violations of the civil rights laws by Defendants Jones Day, Stephen Brogan, and Beth Heifetz.  Dkt. 1.  Plaintiffs incorporate here the allegations in that complaint.

2.     This supplemental complaint advances additional claims based on Jones Day's illegal retaliation against Julia and Mark for filing that civil rights lawsuit.

3.     The retaliation took the form of a press release posted to the Jones Day website and widely disseminated on social media soon after Julia and Mark filed their complaint.

4.     In the press release, Jones Day leadership launches a slew of highly personal and malicious attacks apparently intended to destroy Plaintiffs' reputations and legal careers.

5.     The press release's malicious statements are knowingly false, disingenuous, willfully misleading, and calculated to deceive the reader.

6.     Such retaliation against Plaintiffs for filing a civil rights complaint is illegal.

## PARTIES

7. Plaintiffs advance claims here against Jones Day, Brogan, and unknown individuals designated as John Doe Defendants.

8. The John Doe Defendants are Jones Day partners who participated in the retaliation described here, such as by writing the press release for Jones Day to disseminate, and are liable for that illegal conduct. At all relevant times, they acted in the interest of Jones Day. Plaintiffs anticipate that discovery will reveal their identities.

9. Heifetz may or may not be among them, but Plaintiffs lack information or belief sufficient to name her as a defendant with respect to the press release at this time.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action because it arises under federal law.

11. This Court has supplemental jurisdiction over Plaintiffs' D.C. law claims because they form part of the same case or controversy as Plaintiffs' federal claims.

12. This Court has personal jurisdiction over Defendants because they are subject to the jurisdiction of the courts of the District of Columbia, both because they maintain their principal place of business in the District of Columbia and because Plaintiffs' claims arise out of Defendants' conduct of business in the District of Columbia.

13. Venue lies in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.

## FACTUAL ALLEGATIONS

**I.   When Julia and Mark sued Jones Day for civil rights violations, the firm's leadership retaliated by smearing them in a press release disseminated to thousands of people.**

14. On August 13, 2019, Julia and Mark filed this lawsuit against Jones Day, Brogan, and Heifetz.

15. Their complaint asserts civil rights claims under Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the Fair Labor Standards Act, the D.C. Human Rights Act, and the federal and D.C. Family and Medical Leave Acts.

16. Within a day, Jones Day leadership retaliated by posting to the Jones Day website a press release titled "Jones Day Responds to Litigation Challenging Leave Policy" and ostensibly penned by Brogan himself.

17. The press release states:

> Today, two former associates—Mark Savignac and Julia Sheketoff—sued Jones Day claiming that the ten weeks of paid leave and six weeks of unpaid leave Mr. Savignac was offered when he and Ms. Sheketoff had a child constituted gender discrimination because he was not eligible for the paid disability leave offered to birth mothers.  Ignoring both the law and biology, Mr. Savignac and Ms. Sheketoff complain that this generous family leave policy, which is fully consistent with guidance of the Equal Employment Opportunity Commission, perpetuates gender stereotypes because the [f]irm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them sufficient to justify disability leave.  Neither the law nor common sense requires such intrusive disclosures. …
>
> Mr. Savignac's claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent.  In August 2018, Mr. Savignac and Ms. Sheketoff raised questions about the legal basis for the leave policies, and the [f]irm responded to those questions.  No adverse actions were taken against either of them in response to their inquiries.  Five months later, Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff and in the complaint itself.  Mr. Savignac exhibited open hostility to the [f]irm, demanding that he be given what he wants "or else" and claiming hardship under circumstances that no reasonable person would view as anything but exceptionally generous.

> The gratuitous allegation that Ms. Sheketoff, who voluntarily left the [f]irm in August 2018, was a victim of gender pay discrimination is false and was not made in good faith. Ms. Sheketoff was a highly paid associate who made more than her husband despite the fact that her reviews from multiple partners were mixed, her contribution to billable client representations was below expectations, and her attention was focused on idiosyncratic concerns. Reflecting the frivolousness of her claims, Ms. Sheketoff resorts to the sensationalized allegation that the [f]irm doctored her website photo "to conform to the firm's Caucasian standards of female beauty." Jones Day never altered any photographs of Ms. Sheketoff, and in fact, Ms. Sheketoff personally selected the precise photo that was used on the [f]irm's website.
>
> Jones Day intends to try this case in court, not in the media, and will have no further comment beyond the pleadings and proofs in this case.

18.  The press release remains posted on Jones Day's website to this day.

19.  Jones Day also took to social media to promote the press release to its tens of thousands of followers on Facebook and Twitter, where it also remains posted to this day.

20.  The press release is one of the top internet search results for Plaintiffs' names, ensuring that any current or prospective employer or client, or anyone else who takes an interest in Plaintiffs, will encounter Jones Day's malicious statements in perpetuity.

**II.   The press release is loaded with false and negative assertions about Plaintiffs.**

21.  The press release makes a slew of negative assertions about Julia and Mark that are false, disingenuous, willfully misleading, and calculated to deceive the reader.

**A.   The press release falsely asserts that Julia and Mark filed suit to compel women to make "intrusive disclosures" of medical information to Jones Day.**

22.  The assertion that Julia and Mark challenged Jones Day's family leave policy as discriminatory "because the [f]irm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them" is willfully false and malicious.

4

23. Jones Day and its leadership were well aware that Julia and Mark had never complained about Jones Day's requirements regarding submission of medical evidence of disability by new mothers or anyone else.

24. Indeed, neither Plaintiffs' complaint nor any of their communications with Jones Day regarding its family leave policy (all of which are set out in the complaint) even referred to those evidentiary requirements.

25. Jones Day leadership apparently intended to smear Plaintiffs as anti-woman ideologues suing to compel women to make "intrusive disclosures" of sensitive "medical evidence" to Jones Day's male-dominated partnership.

26. False accusations of hostility to women can seriously damage the target's reputation with current and prospective employers and clients.

**B.     The press release makes false and malicious statements about Mark.**

27. The next paragraph of the press release falsely asserts that Jones Day did not fire Mark "for espousing his legally indefensible view of Jones Day's family leave policy," calling Plaintiffs' claim that Mark was fired for challenging that policy "false and self-indulgent."

28. To prove its point, the press release states that Mark was fired "[f]ive months" after espousing that challenge, supposedly for serious personal failings that the press release casts as unconnected to Plaintiffs' challenge to the policy.

29. The truth is that Jones Day fired Mark just three business days after Plaintiffs first explained that Jones Day's legal defense of its family leave policy was deficient and indicated that Mark would file an EEOC charge of discrimination and a federal civil rights lawsuit if Jones Day did not grant equal treatment.

5

30. Thus, while Jones Day did not immediately fire Mark for "rais[ing] questions about the legal basis for the leave policies" in August 2018, it did immediately fire him for expressing his intention to challenge the policy with the EEOC and in court. Contrary to the press release, Mark *was* "retaliated against for espousing his … view of Jones Day's family leave policy."

31. The press release further says that "Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff."

32. This malicious language is calculated to deceive the reader in several respects.

33. *First*, the language indicates that Jones Day had factual bases beyond the supposedly "intemperate email" for "conclud[ing]" that Mark showed "poor judgment," "lack of courtesy to his colleagues," "personal immaturity," and "disinterest in pursuing his career at Jones Day." It also suggests that these factual bases were so egregious that it decided to fire Mark on the spot.

34. That is false. Jones Day fired Mark because of the January 16 email that is set forth below and at paragraph 146 of Plaintiffs' complaint.

35. As evinced by his performance evaluations and salary, Mark showed excellent judgment, courtesy to his colleagues, maturity, and commitment to his career at Jones Day.

36. Moreover, Jones Day does not generally fire attorneys for showing poor judgment or being intemperate. For instance, Brogan and other Jones Day leaders have publicly flaunted their poor judgment and hotheadedness in their retaliation against Julia and Mark.

37. Nor are "personal immaturity" and "lack of courtesy to … colleagues" grounds for termination at Jones Day, which has admitted to keeping on a male associate (perhaps he is a partner by now) despite knowing that he called several female colleagues "cunts" at a firm event.

38. "[D]isinterest in pursuing [a] career at Jones Day" is similarly no basis for terminating a Jones Day employee. Quite the contrary, Heifetz aggressively recruits attorneys who clearly convey their intention of leaving the firm after (or even before) their signing bonuses vest. Even attorneys who inform the firm that they will be leaving in a few months—the clearest possible indication of "disinterest in pursuing [a] career at Jones Day"—are not fired for doing so.

39. Moreover, while Jones Day routinely pushes out partners and associates who do not satisfy its leadership, these attorneys are given months on the firm's payroll in which to seek new employment without an interruption in pay or the need to explain a termination to prospective employers. On information and belief, Jones Day does not fire its attorneys on the spot except for the most egregious misconduct—or for exercising their civil rights, as Julia and Mark did.

40. Indeed, with the exception of a female partner who was allegedly fired days after Jones Day learned that she had retained counsel to sue it for sex discrimination, Plaintiffs are unaware of a single other Jones Day attorney who was fired on the spot.

41. To Plaintiffs' knowledge, Jones Day's peer law firms likewise avoid immediate terminations of their attorneys except for egregious misconduct.

42. In context, then, Jones Day's claim that Mark was fired for "poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day" is a false and malicious public accusation of extraordinary shortcomings.

43. *Second*, the paragraph asserts that these extraordinary shortcomings were "apparent in" (though supposedly not limited to) "an intemperate email."

44. Jones Day does not provide or describe this supposedly "intemperate email," leaving the reader to accept Jones Day's negative characterization and judge Plaintiffs accordingly.

45. Jones Day also falsely implies that the email did not "espous[e]" Plaintiffs' "view of Jones Day's family leave policy."

46. Actually, the email in question is a pre-suit demand letter expressing Plaintiffs' view that Jones Day's family leave policy is discriminatory and their intention to file a lawsuit unless granted equal treatment. Plaintiffs set it out at paragraph 146 of their complaint. Again, it states in full:

> Sarah,
>
> We have closely reviewed the case law, including the two cases you rely on. We have also discussed the matter with other competent attorneys. Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.
>
> Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S.Ct. 1338, 1351-52 (2015).
>
> Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win.
>
> I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation. We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman. As you know, Title VII prohibits retaliation for opposition to sex discrimination.

47. The email is not "intemperate."

48. The email does not evince "personal immaturity."

49. The email is as collegial (and as free from "open hostility") as a letter claiming illegal discrimination and threatening legal action could reasonably be expected to be.

50. The email shows "poor judgment" and "disinterest in pursuing [Mark's] career at Jones Day" only in the sense that, as Plaintiffs have now learned, a person with a better understanding of Jones Day's culture and leadership would have known that Jones Day would respond to the threat of a discrimination lawsuit by breaking the law and firing Mark.

51. *Third*, the passage in question says that the supposedly "intemperate email" was "sent to a member of [Jones Day's] professional staff."

52. The email was sent to just two individuals at Jones Day: Heifetz (a prominent partner and Mark's boss) and Sarah McClure.

53. McClure is a senior employment law attorney who was (and may still be) a partner at Jones Day and is now the firm's "Global Counsel and Director of Human Resources" (and is presumably paid much more than associates like Mark). She is the person to whom Heifetz referred Julia and Mark when they raised questions about Jones Day's discriminatory policy. She is the person who provided Jones Day's legally inaccurate response to those questions. And she is designated in the Jones Day employee handbook as one of the handful of individuals to whom employees should take complaints about discrimination.

54. Regardless of whether a high-ranking attorney like McClure can reasonably be referred to as "staff," the obvious effect and apparent intent of the press release's wording is to falsely insinuate that Mark treated subordinate staff members such as secretaries and paralegals poorly.

55. In fact, Mark was very kind to secretaries, paralegals, and other associates, even going out of his way to mitigate unkind treatment by a prominent Jones Day partner.

56. Finally, the press release states that Mark "claim[ed] hardship" over the firm's discriminatory family leave policy, apparently in an attempt to further harm Mark's reputation by casting him as a "whiner."

57. The statement is false: Mark never said that the policy would cause him hardship.

**C.   The press release makes false and malicious statements about Julia.**

58. Jones Day's press release also attacks Julia in retaliation for alleging in the complaint that a Jones Day partner, Partner A, gave her a more negative review than he otherwise would have because of her sex, leading to a lower raise than she would have otherwise received for that year.

59. *First*, the press release asserts that Julia's claim of "gender pay discrimination is false and was not made in good faith."

60. Jones Day's willfully false and malicious assertion—in a public and permanent format that Jones Day went out of its way to circulate to tens of thousands of people—that Julia intentionally lied to this Court in her complaint is an extraordinarily serious accusation that threatens her career, her reputation, and her livelihood.

61. If Jones Day's charge were believed, it would subject Julia to sanctions as well as disbarment, ending her career as an attorney.

62. Jones Day has no basis for its assertion that Julia does not believe that Partner A's review was more negative than it would have been if she were a man or that the discriminatory review affected her salary.

63. To the contrary, as Jones Day leadership would know from an investigation in support of their press release, prominent Jones Day partners are aware that Julia has long believed that Partner A discriminated against her because of her sex.

64. Though neither Julia nor Jones Day can know with absolute certainty what is inside Partner A's mind, the factual narrative in Plaintiffs' complaint (which Jones Day could readily confirm) constitutes sufficient basis to believe that he discriminated against Julia and that her pay was negatively affected.

65. *Second*, the press release goes on to say that Julia "was a highly paid associate who made more than her husband."

66. This statement is calculated to deceive the reader to support Jones Day's assertion that Julia's claim of discrimination is dishonest and to imply that Mark was a subpar attorney who received a subpar salary under Jones Day's ostensibly merit-based black box system.

67. In reality, Julia's higher salary was purely a result of her being a year senior to Mark (she graduated from law school in 2010 and he graduated in 2011), a fact that Jones Day disingenuously suppresses.

68. Class year is a principal determinant of salary for Jones Day associates, at least for Issues & Appeals associates within a single office, like Julia and Mark.

69. When Mark was at the same level of seniority as Julia had been following Partner A's evaluation (when she was paid $440,000), Mark's salary was $500,000—a full $60,000 higher.

70. Contrary to the press release's insinuation, Mark's $500,000 salary at the time of his termination was, on information and belief, not less than the salary of any other Jones Day associate in his class year.

71. At any rate, the point that Brogan chose to pay Julia more than most lawyers in her class year is not responsive to her claim of discrimination. Even a "highly paid" woman has a right to a salary unaffected by sex discrimination.

72. Indeed, the fact that Brogan—applying an ostensibly merit-based standard—repeatedly chose to pay Julia a very high salary *supports* her claim of discrimination, by demonstrating that Brogan and Jones Day viewed her as an excellent attorney and thus supporting the inference that Partner A's negative evaluation of her performance was the product of his sexism rather than an actual deficiency in Julia's work. In other words, Julia's high salary is just further confirmation that her claim of discrimination was brought in good faith.

73. *Third*, the press release says that Julia's "contribution to billable client representations was below expectations."

74. The assertion is apparently intended to embarrass Julia in retaliation for her claim of sex discrimination.

75. It is not responsive to Julia's claim, which is simply that Partner A gave her a more negative performance evaluation because of her sex and that the evaluation affected her salary.

76. In any event, the press release's comment does nothing to explain why Julia received an atypically low raise for 2016 when her other three annual raises were far higher.

77. As set forth in Plaintiffs' complaint, Jones Day revises each associate's salary around June of each year based (ostensibly) on her performance during the previous calendar year.

78. Julia began working at Jones Day on October 27, 2014, and recorded approximately 58 hours on billable client representations during the remainder of 2014, implying an annualized billable hours amount of about 322 hours. She received a $60,000 raise the next summer, to a salary of $360,000.

79. In 2015, Julia recorded approximately 179 hours on billable client representations. She received a $65,000 raise the next summer.

80. In 2016, Julia recorded approximately 1066 hours on billable client representations. That is also the year that she worked for Partner A. She received a $15,000 raise the next summer, after Partner A submitted his negative review.

81. In 2017, Julia recorded approximately 573 hours on billable client representations. She received an $85,000 raise the next summer, leaving her salary at $525,000. (During her time at Jones Day, Julia also worked thousands of hours on non-billable client pro bono representations.)

82. Thus, while Julia's hours on billable client representations were never high by the standards of other law firms, they were highest by far in the year when she worked for Partner A, leading to the negative review and the low raise. Indeed, her billable hours for 2016 alone were far more than for 2015 and 2017 *combined*. Yet her raises for 2015 and 2017 (which took effect in July 2016 and July 2018, respectively) were several times as high as her raise for 2016 (which took effect in July 2017).

83. In short, as Jones Day itself suggests when it observes that Julia was "a highly paid associate" despite her contributions to billable client representations, billable hours simply do not appear to be a principal determinant of associate salaries at Jones Day.

84. Jones Day says that it "rewards and advances lawyers based on their individual merit." Its observation that Julia was "a highly paid associate" is thus an admission that she displayed considerable merit in that role.

85. *Fourth*, the press release says, without explanation, that Julia's "attention was focused on idiosyncratic concerns." This is the sort of highly-negative-but-deliberately-vague

statement that is often used to explain away gender-based pay gaps at male-dominated companies like Jones Day. Jones Day has no basis for that insult.

86. *Finally*, the press release concludes by accusing Julia of lying with her supposedly "sensationalized allegation that the [f]irm doctored her website photo 'to conform to the firm's Caucasian standards of female beauty.'"

87. The un-doctored and doctored versions of the photograph are included in Plaintiffs' complaint (Dkt. 1 at 9) and speak for themselves.

88. The press release asserts that, "in fact, Ms. Sheketoff personally selected the precise photo that was used on the [f]irm's website."

89. This statement is disingenuous and calculated to deceive.

90. The truth is that Jones Day expressed its intent to post to its website the offensive doctored photograph (which appears on the right in Plaintiffs' complaint), Julia responded by objecting to the doctored version and asking that an un-doctored version be used, and Jones Day then accommodated her objection by reverting to the un-doctored version (which appears on the left in Plaintiffs' complaint) and posting it to the website. Julia has never complained about the un-doctored photo that was in fact posted, but only about the doctored version that Jones Day would have posted if Julia had not spoken up to object.

91. Discovery will show that Julia was not the only woman at Jones Day whose website photo was radically altered.

**III.    Jones Day admits that it did not investigate before publishing the press release.**

92. Days *after* posting to its website and social media accounts the press release titled "Jones Day Responds to Litigation Challenging Leave Policy," Jones Day filed with this Court a motion titled "Motion for Extension of Time to Respond to Complaint." Dkt. 11.

93. In that motion, Jones Day informed the Court that it "require[d]" a 30-day "extension of time in order to respond to the Complaint" because, among other reasons, "some of [Plaintiffs'] factual allegations require internal investigation." *Id.* at 1.

94. Jones Day's malicious statements as set forth above are all the more egregious in light of this admission that Jones Day made them without first investigating.

95. Jones Day and its leadership apparently intend their retaliatory press release to destroy Plaintiffs' reputations; to provide current and prospective employers, other members of the legal profession, and prospective clients with permanently available false and misleading negative information to deter them from hiring, promoting, or doing business with Julia or Mark; and to deter other victims of illegal discrimination at Jones Day from coming forward by demonstrating Jones Day leadership's eagerness to destroy the career and reputation of anyone who does so.

## COUNT XII
### RETALIATION IN VIOLATION OF TITLE VII
### OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.*
**(on behalf of Julia and Mark against Jones Day)**

96. Plaintiffs re-allege and incorporate every allegation in this complaint.

97. Julia and Mark engaged in protected activity by filing their lawsuit.

98. Jones Day retaliated with the press release.

99. As a result, Julia and Mark have suffered and continue to suffer harm.

100. Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Plaintiffs' rights.

101. Plaintiffs are entitled to all remedies available for violations of Title VII.

## COUNT XIII
### RETALIATION IN VIOLATION OF THE FAIR LABOR STANDARDS ACT, AS AMENDED BY THE EQUAL PAY ACT, 29 U.S.C. § 215
**(on behalf of Julia and Mark against Jones Day, Brogan, and John Does 1-10)**

102. Plaintiffs re-allege and incorporate every allegation in this complaint.

103. Julia and Mark engaged in protected activity by filing their lawsuit.

104. Defendants retaliated with the press release.

105. As a result, Julia and Mark have suffered and continue to suffer harm.

106. Defendants' conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Plaintiffs' rights.

107. Plaintiffs are entitled to all remedies for violations of the Fair Labor Standards Act.

## COUNT XIV
### RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT, D.C. Code § 2-1401 *et seq.*
**(on behalf of Julia and Mark against Jones Day, Brogan, and John Does 1-10)**

108. Plaintiffs re-allege and incorporate every allegation in this complaint.

109. Julia and Mark engaged in protected activity by filing their lawsuit.

110. Defendants retaliated with the press release.

111. As a result, Julia and Mark have suffered and continue to suffer harm.

112. Defendants' conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Plaintiffs' rights.

113. Plaintiffs are entitled to all remedies for violations of the Human Rights Act.

### PRAYER FOR RELIEF

Plaintiffs request the following relief for the violations set forth above:

a. A declaratory judgment that Jones Day's press release constituted illegal retaliation against Julia and Mark in violation of federal and D.C. law;

b. A permanent injunction requiring Jones Day to cease illegal retaliation;

c. Compensatory, liquidated, and punitive damages;

d. An imposition of penalties available under applicable laws;

e. Litigation costs and expenses, including reasonable attorneys' fees;

f. Pre-judgment and post-judgment interest; and

g. Any other relief that the Court deems just and proper.

### JURY TRIAL DEMANDED

| | |
|---|---|
| /s/ Julia Sheketoff | /s/ Mark C. Savignac |
| Julia Sheketoff (pro se) | Mark C. Savignac (pro se) |
| 2207 Combes Street | 2207 Combes Street |
| Urbana, IL 61801 | Urbana, IL 61801 |
| (202) 567-7195 | (217) 714-3803 |
| sheketoff@gmail.com | marksavignac@gmail.com |
| D.C. Bar No. 1030225 | D.C. Bar No. 995367 |

June 30, 2020