```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
    MARK C. SAVIGNAC, et al.,
 3                                             Civil Action
                  Plaintiffs,                  No. 1:19-cv-2443
 4
           vs.                                 Washington, DC
 5                                             August 4, 2020
    JONES DAY, et al.,
 6                                             10:10 a.m.
                  Defendants.
 7    _____/

 8                  TRANSCRIPT OF TELEPHONIC MOTION HEARING
                    BEFORE THE HONORABLE RANDOLPH D. MOSS
 9                      UNITED STATES DISTRICT JUDGE

10  APPEARANCES:
    For the Plaintiffs:      MARK C. SAVIGNAC
11  (Pro Se)                 JULIA SHEKETOFF
                               2207 Combes Street
12                             Urbana, IL 61801

13
    For the Defendants:      TRACI L. LOVITT
14                           TERRI L. CHASE
                               Jones Day
15                             250 Vesey Street
                               New York, NY 10281
16
                             ANDERSON BAILEY
17                             Jones Day
                               One Mellon Bank Center
18                             500 Grant Street, Suite 4500
                               Pittsburgh, PA 15219
19
                             CHRISTOPHER DiPOMPEO
20                             Jones Day
                               51 Louisiana Avenue, NW
21                             Washington, DC 20001

22
    Reported By:             JEFF M. HOOK
23                             Official Court Reporter
                               U.S. District & Bankruptcy Courts
24                             333 Constitution Avenue, NW
                               Room 4700-C
25                             Washington, DC 20001
```

1               **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  This is civil action 19-2443, Mark

3     C. Savignac, et al., versus Jones Day, et al.  Plaintiffs

4     are appearing pro se and are on the telephone, Mark Savignac

5     and Julia Sheketoff.  Appearing for defendants, Anderson

6     Bailey, Christopher DiPompeo, Terri Chase and Traci Lovitt.

7          **THE COURT:**  Well, welcome everyone.  My apologies

8     for being a little late this morning, my apologies for

9     keeping you waiting.  Before we get going, some of you have

10    heard this before, but I'll repeat it for everyone.  Under

11    the Court's rules and the Chief Judge's standing order, it's

12    forbidden to record or to rebroadcast today's proceeding.

13    I'll ask that you all mute your microphones when you're not

14    speaking so we don't get feedback, to speak into the handset

15    when are you speaking so we can hear you clearly, and to

16    introduce yourself by name each time you speak so the record

17    is clear.

18         So who is going to speak today on behalf of the

19    plaintiffs?

20         **MR. SAVIGNAC:**  This is Mark Savignac.  We will

21    each address the issues raised by our claim.  To the extent

22    that there are issues raised by both of our claims, I will

23    address those.

24         **THE COURT:**  Okay.  And then who's speaking on

25    behalf of Jones Day today?

1          **MS. LOVITT:**  Traci Lovitt.

2          **THE COURT:**  All right.  So since this is the

3     defendants' motion, why don't we start with Ms. Lovitt.

4          **MS. LOVITT:**  Thank you, your Honor.  If you would

5     indulge me please, Judge Moss, in first a little bit of

6     housekeeping, I want to state on the record the defendants

7     no longer oppose plaintiffs' motion to file a surreply.  In

8     our view, the surreply wasn't warranted.  But in it for the

9     first time, plaintiffs expressly state that they are not

10    challenging Jones Day's short-term disability policy.  We

11    think this is an important concession in our view to us and

12    helpful to the Court, so accordingly we are withdrawing our

13    opposition.

14         **THE COURT:**  Okay.  In that case, I will grant that

15    motion.

16         **MS. LOVITT:**  Great.  So with that housekeeping out

17    of the way, I'd like to start with the leave policy, and

18    then touch very briefly on retaliation and end with

19    Ms. Sheketoff's discrimination claim.  I do not plan on

20    separately covering the FMLA claim, because the parties

21    agree that, at a minimum, it rises and falls with

22    retaliation.  Obviously, I'm happy to reorder the argument

23    or reallocate time if the Court has a different view of how

24    these arguments should be addressed.

25         **THE COURT:**  That sounds fine to me, I'm happy to

1    hear the argument as you think best.

2         MS. LOVITT:  Great, thank you.  So with respect to

3    the leave policy, I'm going to spend some time discussing

4    the actual terms of Jones Day's policy.  So it might be

5    helpful if you have those handy.  Obviously if we were in

6    person, I'd ask to approach and hand you a nice clean copy

7    of them, but instead I have to ask you to have them handy.

8    They are at the addendum to the plaintiffs' complaint.

9         THE COURT:  Hold on, let me just open up the

10   docket and I will do that.

11        Okay, I've got the addendum here.  All right, it's

12   in front of me.

13        MS. LOVITT:  Great.  If you wouldn't mind turning

14   to page three of the addendum, it's the page that starts at

15   the Arabic four, and the label short-term disability leave.

16        THE COURT:  Okay.

17        MS. LOVITT:  Great, thank you.  Well, it might be

18   counterintuitive to start with the policy that plaintiffs

19   aren't challenging.  This case comes down to a sentence in

20   the family leave policy that cross-references this

21   short-term disability policy.  So in our view, you have to

22   understand the short-term disability policy to understand

23   the reference to it in the family leave policy.

24        Basically, the short-term disability policy has

25   four components.  The first is its first paragraph under

1    subsection A.  This is a paragraph that defines the

2    substantive disability leave benefit available to all

3    non-partner lawyers.  And that benefit is salary

4    continuation in the event of a major illness or medical

5    condition, including pregnancy and childbirth, at

6    100 percent for up to the first 13 weeks of continuous

7    disability, and 75 percent for up to the 14th through 26

8    weeks of continuous disability.  So this is the actual

9    disability leave benefit.

10          Second, if you go down to the fourth full

11   paragraph, the one that starts, "Determinations of

12   eligibility for salary continuation," this is the part of

13   the short-term disability policy that defines what qualifies

14   as a disability.  And it requires an inability to perform

15   the material and substantial duties of his or her regular

16   occupation.

17          Third, the --

18          **THE COURT:**  I'm sorry, where in the --

19          **MS. LOVITT:**  Yeah, I'm sorry, it's kind of hidden

20   in the middle.  So if you go to the second sentence that

21   starts, "And of counsel, counsel associate or senior staff

22   attorney."

23          **THE COURT:**  Oh, I see, you're in the fourth

24   paragraph.

25          **MS. LOVITT:**  Yes.

1          **THE COURT:**  Yes, okay.

2          **MS. LOVITT:**  Second sentence.  So it says, "And of

3     counsel, counsel associate will be considered disabled for

4     purposes of this policy," and then that's -- the key

5     language that follows is what qualifies as a disability

6     under our policy.

7          **THE COURT:**  Okay.

8          **MS. LOVITT:**  So the third key feature, if you flip

9     the page, is under subsection B.  And this is the

10    paragraph -- the first paragraph describes the medical

11    certification requirements that one needs to obtain a

12    disability benefit.  And the key language in this is the

13    second sentence that starts, "Unless the firm is notified

14    otherwise."  And what this says is unless we're notified

15    otherwise, the firm will assume that a lawyer's medical

16    provider has certified an eight-week postpartum disability

17    period for routine childbirth, including Cesarean section

18    birth.

19          Now, I'm going to pause here for a minute, because

20    this provision explains where the eight-week language around

21    birth-related disability leave comes from.  When a birth

22    mother seeks short-term disability leave, the firm's

23    starting assumption is that the birth mother has, from her

24    medical provider, an actually certified eight-week

25    postpartum disability.  To get more leave time -- like I

1    did -- or to get less paid leave time, the firm must receive

2    some affirmative contrary notification.  So absent some

3    affirm contrary notification, the operation of this

4    certification assumption means that the firm will provide

5    birth mothers eight weeks of paid disability leave.

6          Fourth, the remainder of this B is describing

7    administrative requirements, things like you have to submit

8    a completed application, you have to give notice to HR.  But

9    all of those kinds of administrative requirements are

10   exclusively within the short-term disability policy.

11         Now if you wouldn't mind flipping forward to the

12   first page of the addendum, the very first page that has a

13   Gmail top.

14         **THE COURT:**  Yes.

15         **MS. LOVITT:**  This is the family leave policy.  It

16   starts at the very bottom of this e-mail with the number

17   Arabic five and family leave.

18         **THE COURT:**  Yes.

19         **MS. LOVITT:**  This little bit at the bottom is

20   actually the table of contents for the family leave policy.

21   And it's notable, because the family leave policy is policy

22   number five.  The policy we just looked at, the short-term

23   disability policy, was policy number four.  So in the firm's

24   HR policy and benefit manual, if you're flipping through it

25   online or if you actually printed the materials and you're

1    looking at it seriatim, you're going to read the short-term

2    disability policy before you read the family leave policy.

3    And that can inform how you interpret some of these

4    provisions.

5         But if you turn to the next page, to the actual

6    language of the family leave policy, it has several notable

7    features.  The first is its very first sentence under Arabic

8    one.  That sentence shorthands how that certification

9    assumption we just discussed in the immediately preceding

10   policy operates.  It is, "In the case of a newly born child,

11   the Firm will provide mothers eight weeks of paid leave

12   under the Firm's short-term disability policy."

13        The policy also provides ten weeks of family leave

14   on a gender-neutral basis for primary caregivers, and four

15   weeks on a gender-neutral basis to secondary caregivers.

16   The policy also contains a separate benefit of paid adoptive

17   leave that is entirely gender-neutral:  Eighteen weeks for

18   the primary caregiver, four for the secondary caregiver.

19        Finally --

20        **THE COURT:**  Can I ask you about that, though?

21        **MS. LOVITT:**  Sure.

22        **THE COURT:**  Why is that 18 weeks?  Because it

23   might be read, and perhaps plaintiffs read, the fact that in

24   cases of adoption, that the primary caregiver gets 18 weeks

25   essentially to say that we're going to give one parent or

1      the other 18 weeks, and we think that 18 weeks paid leave is

2      an appropriate amount of paid leave.  In the case where it's

3      not -- where there's not an adoption, we're going to give

4      the 18 weeks as well, but it's always the mother who gets

5      the 18 weeks.

6              So the question I suppose I have is why is it 18

7      weeks in the case of adoption, but only -- if in fact the

8      eight weeks of disability leave -- or the additional eight

9      weeks that mothers get is really disability leave and is not

10     another form of parental leave, why is it the case that in

11     adoptions, one parent gets the full 18 weeks when the

12     baseline seems to be 10 weeks if it's not about disability?

13         **MS. LOVITT:**  Well, it's because adoptive parents

14     are not similarly situated to birth parents.  There are

15     unique administrative burdens that come with adoption.  It

16     frequently involves foreign travel.  It frequently

17     involves -- frankly, I don't know how to say this, unique

18     attachment issues.  The attachment process between a birth

19     parent and a birth child is different from an adoptive

20     parent and an adopted child, and that may take longer.

21             So adoptive parents, the reasons for their leave

22     are completely different from the leave policies for birth

23     parents.  It's an entirely different rationale.  I don't

24     think you can say that one informs the other.

25         **THE COURT:**  This is jumping ahead of the motion to

1    dismiss stage, but assuming we get beyond that and that we

2    are at some point in discovery or at summary judgment, is

3    there in fact evidence that that was the rationale or is

4    your argument more sort of in the nature that one might deal

5    with with respect to legislative analysis where that is a

6    reasonable reading or understanding that one might have, but

7    it's not necessarily where there are going to be documents

8    that the law firm has that says, you know, this is why we

9    adopted that -- or witnesses who would say that?

10       **MS. LOVITT:**  Well, this was the same issue that

11   was in the Johnson case.  And in the Johnson case, there was

12   evidence of these issues requiring a longer period of time

13   for adoptive leave, and different periods of time for

14   adoptive leave.  So if you look to Johnson, this is a

15   reasonable rationale, and one for which there is evidence.

16       You know, I have not -- I can't speak to what the

17   facts are -- would show in this case, but it's reasonable on

18   its face to say you would have -- that adoptive parents are

19   not similarly situated to birth parents, and there's reasons

20   why.  Johnson tells you that you would need longer leave for

21   adoptive parents.

22       **THE COURT:**  Or maybe I should put my question a

23   different way, which I think was maybe more appropriate for

24   the motion to dismiss stage, is that at this stage of the

25   proceeding, without evidence one way or the other on that

question, why shouldn't the Court draw reasonable inferences

in plaintiffs' favor and conclude that at least it is

plausible to allege that the reason that adoptive parents

get -- or that an adoptive parent gets 18 weeks is that

there really is a presumptive policy of getting 18 weeks of

parental leave; and that the goal is to provide it only to

one of the two parents; and that in the case of -- where you

have a mother and father, the mother always gets the 18?

Whereas in adoption, among other things, you might have same

sex couples, and you're just going to give the 18 weeks to

the primary caregiver.

So that's a long way of asking why shouldn't I

just, at this point in the process, draw all inferences in

favor of the plaintiff and say that that does seem to be

some support -- they may not win in the end, but may be some

support for their contention?

**MS. LOVITT:**  Because the question here is a legal

one of whether the policy discriminates.  As a matter of

law, adoptive parents and birth parents aren't similarly

situated.  You can't draw an inference of treatment to one

group to say something about a different group.

**THE COURT:**  But that's not -- I mean, you're right

about the fact that they are not similarly situated.  But

the argument here isn't that there's discrimination between

adoptive parents and birth parents.  The argument here is

1    that the policy with respect to adoption is some evidence to

2    which plaintiffs refer to support their contention that the

3    additional eight weeks they provide to birth mothers is not

4    really disability leave, but is a form of additional

5    parental leave.

6         **MS. LOVITT:**  Well, that is --

7         **THE COURT:**  They're not saying there's

8    discrimination with the adoption, they're saying that's

9    evidence of what's going on.

10        **MS. LOVITT:**  That's not a reasonable inference I

11   think that you can draw from this given the fact that there

12   is -- it's a different group of people who are not similarly

13   situated.  I don't see how you can draw an inference about

14   birth mothers with respect to the policy for adoptive

15   parents, because there are very different reasons why you'd

16   give leave to each group.  And if you --

17        **THE COURT:**  Which may or may not be the case.  At

18   the pleadings stage, we just don't know whether that's true

19   or not, right?  I mean, it's also possible -- I mean, you're

20   right -- and you may be right in the end, but it's for

21   entirely different reasons.  But the plaintiffs also might

22   be right that it's some evidence that the firm has a

23   presumptive period of eight weeks of leave -- paid leave

24   that it provides to one parent or the other.  And at the

25   pleadings stage, I can't really decide who's right about

1    that question.

2          MS. LOVITT:  Well, at the pleadings stage, you're

3    looking at the face of the policy.  And that's what they've

4    alleged that you should look to.  So you should look to the

5    short-term disability -- I mean, honestly we should be

6    looking to the short-term disability policy, because that's

7    the policy that's at issue as opposed to isolated provisions

8    in the family leave policy about groups that aren't

9    similarly situated.  And this short-term disability policy

10   is so clear that not even plaintiffs object to it.  It's

11   clearly tied to a disability.  So that in the case of the

12   birth mother, this eight weeks of disability leave without

13   question is tied to the disability in and of itself.  So I'm

14   not sure where you're looking at the face of the policy.

15          In the whole of the policy, you're really looking

16   at the short-term disability policy instead of the family

17   leave policy.  So again, I'm not sure how any inferences you

18   draw about family leave would impact disability leave and

19   the short-term disability policy.  It's not plausible to

20   draw that inference from the leave policy and say the

21   short-term disability policy, which is expressly and

22   directly tied to the disability of childbirth, is

23   discriminatory.  You're looking at the face of the policy.

24          THE COURT:  Okay.  I mean, I guess I'm not

25   entirely sure also about sort of the premise of your

1    argument that I need to limit my analysis at this point to

2    the face of the policy.  So if you had a policy, for

3    example, that on its face said that birth mothers are

4    entitled to two years of disability leave, and where they

5    assume that birth mothers are not in a -- are not able to

6    return to work for two years unless otherwise certified,

7    wouldn't you agree that under those circumstances, the Court

8    could say, well, wait a second, is that what's really going

9    on here or is this really just giving the mothers two years

10   of paid leave; and then at some point in time -- at some

11   point in the process, you can look behind the policy I

12   assume?

13          **MS. LOVITT:**  Right, well, that goes to the

14   question of whether or not eight weeks of disability leave

15   is reasonable.  And that's also a question that we believe

16   can be determined as a matter of law.  Because we're not

17   granting two years of disability leave, we're granting

18   eight.  And there are numerous cases that identify six to

19   eight weeks as a reasonable period of disability.  Even in

20   the Nevada vs. Hibbs case, which plaintiffs cite, the U.S.

21   Supreme Court recognized that the typical period, the four

22   to eight period -- sorry, the typical four- to eight-week

23   period of physical disability is due to pregnancy and

24   childbirth.  They cite -- the Court cites for support the

25   House report on the Pregnancy Discrimination Act

1      establishing that four to eight weeks is the typical medical

2      recovery period.  Guerra involved a state statute requiring

3      four months, the EEOC guidance says 10 weeks, and the FMLA

4      grants 12 weeks.

5             So while I agree with your premise that there

6      could be cases where on its face the amount of disability

7      leave can be unreasonable and require factual discovery,

8      that's not this case.  You know, in this case, on the face

9      of the policy, there's no discrimination, and the eight

10     weeks is reasonable as a matter of law.

11            THE COURT:  Is there any case that you can point

12     me to where a court has reached that conclusion as a matter

13     of law without any sort of factual inquiry into whether

14     that's going on?  I mean, is there another case in this

15     posture where a court dismissed a complaint saying, look,

16     the complaint alleges that eight weeks was -- eight weeks or

17     ten weeks or six weeks was really a form of parental leave

18     and it was just dressed up as disability leave, but we

19     conclude that it's reasonable on its face and therefore

20     we're just going to dispose of the matter on the pleadings?

21            MS. LOVITT:  Johnson is the closest case we have.

22     I mean, in all candor, there's not an overwhelming number of

23     cases on this issue.

24            THE COURT:  Right.

25            MS. LOVITT:  So the closest case is Johnson, and

1    Johnson was decided on summary judgment.  My understanding

2    is there was a motion to dismiss filed earlier on abstention

3    grounds, and so there might have been some strategic

4    decision as to why they didn't file on the motion to

5    dismiss.

6          Our position is there's enough in the case law,

7    including the U.S. Supreme Court's decision in Hibbs, that

8    recognizes eight weeks as a reasonable period of physical

9    disability due to pregnancy and childbirth, that this

10   particular period can be decided on the face of the

11   complaint.  If you get to two months, then I think it

12   becomes -- sorry, not two months, two years, this becomes a

13   different case.  But it's not that case, and I don't think

14   you have to go that far.

15       **THE COURT:**  What do you say to the plaintiffs'

16   contention that Jones Day itself has at times referred to 18

17   weeks parental leave and sort of has advertised it in that

18   manner to lawyers?

19       **MS. LOVITT:**  Well, I think that's understandable

20   given the way the short-term disability policy works.  Birth

21   mothers receive an eight-week certification assumption.  So

22   the firm's starting assumption is that the birth mother's

23   medical provider has certified an eight-week disability.

24   That results, in virtually every case, in birth mothers

25   taking an eight-week disability leave.

1          So it's understandable that when people talk about

2    the disability leave policy, that they shorthand it in

3    exactly the same way that the family leave policy does and

4    describe it as eight weeks.  Because otherwise, you have to

5    say the firm has a certification assumption of eight weeks

6    of a medical disability, and unless you provide contrary

7    evidence you will get eight weeks.  That's just not the way

8    humans speak.

9          So I think that what these allegations are sort

10   of -- are actually proving the way the certification

11   assumption works in the same way that the sentence in the

12   family leave policy is merely shorthand for how the

13   short-term disability policy works, and it's not in and of

14   itself any sort of guarantee or benefit.  Really, the

15   challenge here rises and falls with the language of the

16   policy on the face of the policy.

17          As I read -- go ahead, sorry.

18          **THE COURT:**  I want to go back to your argument

19   about the clause in the short-term disability policy that

20   says unless that the firm is notified otherwise, it will

21   assume that a lawyer's medical provider had certified an

22   eight-week postpartum period -- disability period for

23   routine childbirth.

24          And your contention is that that really is a

25   two-way ratchet, it's not a one-way ratchet.  It doesn't

1  mean that you get eight weeks, and if you had a more serious

2  condition and you obtained medical certification you can get

3  a longer period of time.  You read that to say that if the

4  firm is notified otherwise, it will give you six weeks, is

5  that right?

6  **MS. LOVITT:**  Yes.  And I want to -- I think it's

7  important to point out here that plaintiffs aren't

8  challenging the use of an assumption in and of itself.  They

9  aren't challenging the fact of the certification assumption.

10  That follows from the opposition at pages two, seven, eight

11  and 14, and the surreply at four.  So the validity of that

12  assumption is not at issue.

13  But to directly answer your question, yes, it is a

14  two-way ratchet.  I myself personally brought forward

15  evidence of a near 10-week disability policy.  And if a

16  woman wants to come back earlier because she wants to

17  participate in a trial or something like that and her doctor

18  says okay, I'm going to certify a shorter disability period

19  for you, I think you can do it, it's a two-way ratchet.

20  You're not going --

21  **THE COURT:**  I'm sorry, on that, I assume that you

22  wouldn't require the doctor's certification under those

23  circumstances for a woman who wanted to come back earlier?

24  If she just said, "I feel up to it and want to go to trial,"

25  I assume that the firm wouldn't say to them, "Well, get us a

1    doctor's note and we'll let you come back sooner," right?

2         MS. LOVITT:  I'm sure you're right on that.  I

3    can't --

4         THE COURT:  So I'm trying to figure out what this

5    means or whether it really is reasonably construed the way

6    you're suggesting so that -- I mean, you know, if the firm

7    heard, for example, that you had a woman lawyer who had had

8    a child and was taking the 18 weeks of leave, and you were

9    told or maybe that lawyer said, "Oh yeah, I'm training to do

10   a triathlon during some of my time off.  I've got a man

11   who's coming in, and I need some of this time to train to do

12   a triathlon."

13        I assume that under those circumstances also, the

14   firm wouldn't say, "Wait a second, if you're up to doing a

15   triathlon, you're certainly up to going back to work.  Your

16   leave is terminated at this point"?

17        MS. LOVITT:  We've never had that.  I don't know

18   of that circumstance happening.  You know, this is a

19   benefit.  And if people are taking it fraudulently, I think

20   that would raise some questions as to whether or not you're

21   really disabled.  I mean, if --

22        THE COURT:  Well, I guess that's my question, is

23   whether you would really -- whether the firm would really

24   regard that as fraudulent or not if a woman were to do that

25   or whether it's just the presumption is you get the 18

1    weeks?

2            **MS. LOVITT:**  You know, again, I don't know of a

3    case, of an instance of this happening in my mind.  But I'd

4    have to believe if after two weeks someone is training for a

5    marathon and can handle the stress of that, that that's a

6    wrongful taking of the disability leave and the disability

7    at that point has ended.  And the family leave policy in its

8    last sentence says you have to start -- your family leave

9    commences when the disability ends.

10           I think if there is affirmative proof and notice

11   that the disability has ended, you're on your family leave

12   time; it's coming out of your family leave time.  But again,

13   I don't know of a specific instance of this, because in

14   virtually all cases the eight-week assumption isn't

15   challenged and it's taken by most moms.

16           So that's -- and that's, I think, another reason

17   why it doesn't make sense to decide this on anything other

18   than the written policy.  Because if you take discovery, all

19   you're -- you know, if you get evidence that a lot of women

20   are taking eight weeks of disability leave, all that does is

21   prove that we're applying the certification assumption

22   regularly and routinely.  There's really sort of nothing

23   left to prove when you get outside of the face of the

24   documents.

25           And I do want to address --

1      **THE COURT:**  I guess let me put it this way:  Would

2    you agree that the plaintiffs would be entitled to prevail

3    on this claim if they were able to prove by a preponderance

4    of the evidence that in fact the eight weeks of leave was

5    provided to all mothers regardless of their physical

6    condition?

7      **MS. LOVITT:**  No, because the eight-week assumption

8    is an assumption that a doctor has certified a disability,

9    right.  And we're entitled to apply that assumption.  So if

10   you have evidence of people taking leave when they're --

11   still on their leave when they're no longer disabled, you

12   know, the firm doesn't have notice of it, I'm not sure what

13   that proves.

14      I want to make the point here, too, that because

15   we're talking about a medical certification as opposed to a

16   disability, medical certifications are by their nature

17   projections.  They're by their nature a medical provider's

18   exercise of judgment, right.  And whether you're talking

19   about childbirth or an open heart surgery, it's always

20   theoretically possible that a birth mother will receive an

21   eight-week certification, recover before then, not tell the

22   firm and take the full eight weeks of disability.

23      It's similarly theoretically possible that a

24   doctor will certify an eight-week disability for an open

25   heart surgery patient.  The employee recovers before that

1    time, doesn't say anything and stays on the leave.  Medical

2    certifications are by their nature projections, and the

3    medical provider is certifying the period using judgment.

4    But the fact that a medical judgment might not always be

5    100 percent accurate does not render Jones Day's policy a

6    sham, because we're assuming that the certification is

7    there, and we're allowed to rely on that.

8            **THE COURT:**  Okay.  Do you want to address --

9            **MS. LOVITT:**  Yeah, I want to just address really

10   quickly what plaintiffs are challenging, right.  Because my

11   best reading of the surreply is that plaintiffs view the

12   first sentence of the family leave policy as creating the

13   discriminatory benefit, and it's encouraging the Court to

14   look at the face of the family leave policy, and only the

15   family leave policy, to determine whether it is

16   discriminatory.  But you can't read the policies that way

17   for numerous reasons.

18           First, there's all sorts of principles of

19   construction -- whether it's specific over general, reading

20   multiple parts as an integrated whole, avoiding rendering an

21   entire short-term disability policy superfluous -- that

22   compel reading the short-term disability policy, not the

23   family leave policy, as defining the benefit.  That's also

24   what Johnson tells you.  Because in the Johnson case, the

25   plaintiff was arguing from language in a different policy

1    and in different provisions that it was discriminatory.  And

2    the Johnson court said no, as a matter of law, you look at

3    the document you're talking about.  And the document we're

4    talking about is the short-term disability policy.  The

5    Court should limit its analysis to that.  And on its face,

6    it's perfectly lawful and isn't even challenged here.

7           But even on its own terms, the family leave policy

8    cannot be read as establishing its own sort of paid leave

9    benefits.  Because it's expressly described as -- the

10    disability leave is expressly described as, quote, under the

11    firm's short-term disability policy.  So you have to review

12    the short-term disability policy to understand what the

13    family leave policy is talking about.  The short-term

14    disability policy is the only policy that documents the full

15    substantive benefit that's provided to disabled workers, the

16    eligibility requirements, the certification requirements and

17    the administrative requirements for those benefits.

18           Third, and relatedly, the family leave policy

19    doesn't actually state the full disability leave benefit.

20    The substantive guarantee under the short-term disability

21    policy is up to 13 weeks at 100 percent salary, and up to 26

22    weeks at 75 percent salary.  That's the benefit.  If you

23    read the family leave in isolation, you actually don't

24    understand what the disability benefit is or can be.  So it

25    cannot be read as establishing a benefit.

1          Here again, I think to read this opening sentence

2    in the family leave policy as a shorthand for the eight-week

3    certification assumption is reasonable.  There are instances

4    where mothers recover before the certification's expiration.

5    But whether or not birth mothers recover early or later than

6    the time their doctors think they need doesn't make Jones

7    Day's policy discriminatory.  That's just the projection

8    nature of certifications.

9          And finally -- and I really want to make sure that

10   this sentence is clear.  To the extent there's any doubt of

11   what the family leave policy is doing, that last sentence in

12   the family leave -- in the first paragraph of the family

13   leave policy expressly ties the disability leave to

14   disability.  It says -- this is the last sentence of the

15   first paragraph under primary caregiver:  "Mothers will

16   commence this family leave immediately after the short-term

17   disability" -- not the disability leave, but the disability,

18   "for the pregnancy and childbirth ends."

19          And that's the hook where if in fact the

20   disability has ended early and it does appear to be some

21   sort of sham, that's the language which tells you you should

22   start counting your family leave and stop counting the

23   disability leave.

24          With that, I can move to retaliation.

25          **THE COURT:**  Yes.

1        **MS. LOVITT:**  I'm going to be brief here, because I

2    think we all recognize that the retaliation claim is

3    intertwined with the arguments on the leave policy.  But I

4    think there are two points of important -- two important

5    points of agreement between the parties.

6        The first is that both sides agree that

7    Mr. Savignac's demand, which is paragraphs 146 -- paragraph

8    146 of the complaint, must be objectively reasonable.  And I

9    read both sides as agreeing that objective reasonableness

10    should be evaluated from the perspective of an attorney, not

11    a lay person.  It's our position that objective

12    reasonableness should also be measured against the then

13    existing substantive law, otherwise you lose the objectivity

14    component altogether.

15        On these principles, our view is Mr. Savignac's

16    retaliation claim fails as a matter of law.  Because on its

17    face, he's demanding that he receive eight weeks of paid

18    disability leave that's extended to birth mothers.  On its

19    face, this demand is unreasonable.  Mr. Savignac was not

20    pregnant.  He did not go through childbirth.  He admits he

21    was not disabled.  He had no entitlement whatsoever to

22    birth-related disability leave.  His claim -- this claim

23    that he's entitled to short-term disability leave was

24    objectively unreasonable based on the facts alleged in the

25    complaint.

1    **THE COURT:** Well, but his contention is that the

2    policy is unlawful to the extent it provides the leave to

3    the mothers and not fathers. He wasn't arguing that he was

4    a mother, which would presumably be objectively

5    unreasonable, he was arguing that the policy was unlawful.

6    So the question is whether it was objectively

7    unreasonable for him to take the position that the policy

8    was unlawful?

9    **MS. LOVITT:** Well, I think that -- I think you can

10   and should look at the demand. We could not do what

11   Mr. Savignac was asking us to do. But even Mr. Savignac

12   would agree that birth mothers are disabled for at least

13   some of that eight-week period, and they are legally

14   entitled to leave for some of that disability period. The

15   demand was the entire policy's illegal, you should get no --

16   all of this disability leave that's being given to women

17   should be given to men too. That cannot be the law, because

18   you would violate the Pregnancy Discrimination Act. You

19   have to have a leave period for childbirth.

20   So even if you look at his demand that way, it's

21   still problematic, because it would have required to us

22   violate the Pregnancy Discrimination Act to give the leave

23   equally to men and women. It also had no basis in fact.

24   The reality is the short-term disability policy controls

25   here. Any reasonable lawyer, upon seeing the short-term

1    disability policy specifically cross-referenced in the

2    family leave policy, would have read it and understood the

3    eight-week reference.  Mr. Savignac did not apply this

4    principle of construction and go back to the short-term

5    leave policy to determine what it meant.

6              **THE COURT:**  Okay.

7              **MS. LOVITT:**  With respect to the FMLA, I don't

8    plan to separately address that claim because it's fully

9    briefed.  Under plaintiffs' articulation of the claim, it

10   rises and falls with retaliation.  So I don't think it's

11   necessary to spend time there.

12             Also briefly with Ms. Sheketoff's retaliation

13   claim, for all the reasons Mr. Savignac's claim fails,

14   Ms. Sheketoff's claim does as well.  We also think she lacks

15   standing for her claim.  Again, here the protected activity

16   is the January e-mail that is at complaint paragraph 146.

17   In our view, there's no way to read that e-mail as a demand

18   by Ms. Sheketoff.  On its face, the e-mail is written by

19   Mr. Savignac.  He refers to himself as I and Julia as Julia.

20   And he emphasizes that he is the one engaged in the

21   protected activity.  He says "I will be a named plaintiff";

22   "I write to say"; "I will file a charge."  And he makes the

23   demand for himself, "Give me the treatment."  Julia could

24   not --

25             **THE COURT:**  Was she still employed -- at the time

1    he made that demand, was he still employed at the law firm?

2            **MS. LOVITT:**  No, she was a former employee at that

3    point, so she could not make that same demand.  The only

4    person who --

5            **THE COURT:**  But when she was still employed at the

6    law firm, she made a demand or a request that he receive it

7    as well, right, before she left?

8            **MS. LOVITT:**  She -- let me find that e-mail.  She

9    said that she thought the policy was unlawful.  But for

10   whatever reason, as I'm reading the complaint, the parties

11   have not pointed to that e-mail as the protected activity

12   that gave rise to retaliation.  My guess is that's because

13   about eight months passed between the time that e-mail was

14   sent and the termination, and so it's -- there's not the

15   timeliness element that you get from the January e-mail.

16   But as I understand it, they're not calling that the

17   protected activity.

18           If you look on the one e-mail that they're

19   pointing to, which is at complaint 146, it's clearly from

20   Mark.  The demand is his.  This is not a case where a former

21   employee files an EEOC charge, and the day she files herself

22   is suddenly fired.  This is a case where the spouse is

23   sending an e-mail, he's making the objection using personal

24   terms like I, and the complaint he's filed since fired long

25   after the former employee had left and well after any

1    e-mails she sent.  The mere fact that --

2            **THE COURT:**  How much time passed between her

3    sending the e-mail requesting that he receive the leave and

4    when he was fired?

5            **MS. LOVITT:**  They don't put that in the complaint,

6    but I believe it was August, August to January.

7            **THE COURT:**  So she made the request you think in

8    August, and that he was fired in January?

9            **MS. LOVITT:**  Right.  She makes the request, that's

10   at paragraph 140 of the complaint.  Mark sends an e-mail to

11   HR in the same period.  The HR director responds, and that

12   e-mail is attached as Exhibit A to our motion to dismiss.

13   She responds on August 24th -- that is dated, and she says

14   we don't agree with your legal interpretation, and here's

15   why.  And she cites the Johnson decision and the EEOC

16   guidance.  And nothing happens, that's the end of it -- or

17   we think that's the end of it until January.

18           So I think because of that chronology -- again, I

19   can't speak for plaintiffs and I don't purport to, that's

20   the reason why they're looking at the January e-mail as the

21   protected activity.

22           **THE COURT:**  Okay.

23           **MS. LOVITT:**  Finally, Ms. Sheketoff's claims.  I'm

24   going to spend a little bit more time on these claims.  And

25   for these, it may be handy to have the exhibits to the

1   motion to dismiss.

2           THE COURT:  Give me a minute to pull those up.

3   Anything in particular or do you want me to open up all the

4   exhibits?

5           MS. LOVITT:  Probably B would be the most helpful,

6   Exhibit B.

7           THE COURT:  Exhibit B, okay.

8           MS. LOVITT:  In our view, Ms. Sheketoff has not

9   plausibly alleged discrimination based on sex by partner A.

10  And to us, this e-mail -- this Exhibit B, partner A's e-mail

11  is really the beginning and the end of the claims given the

12  way the complaint has been alleged.  The only, only alleged

13  cause of Mr. Sheketoff's supposedly lower pay was partner

14  A's evaluation.  That's a complaint at paragraph 90, but for

15  partner A's negative evaluation, Julia's raise would have

16  been larger.  That same allegation, or a similar allegation,

17  is repeated in each and every individual claim at paragraphs

18  205, 212 and 220 of the complaint.  Importantly, plaintiffs

19  allege that partner A wrote the negative review because

20  Ms. Sheketoff was insufficiently deferential to him in this

21  e-mail exchange.  That's at complaint paragraphs 78 and 85.

22           So as alleged, it all comes down to this e-mail

23  exchange, which is incorporated in the complaint.  And the

24  Court can read for itself and determine whether or not

25  partner A is having a sexist reaction to being -- to not

1    having the deference that Ms. Sheketoff thought he was

2    demanding.  And this e-mail -- you know, the Court can read

3    the e-mail and determine on the face -- on its face whether

4    paragraph 78 is accurate.  But the e-mail speaks for itself

5    in terms of tone and content.  But I do think there's a few

6    things that are notable about this e-mail exchange.

7         The first is actually at page three of the e-mail

8    at the very bottom.  The last paragraph that's not actually

9    blacked out, it says, "For your own edification, run a black

10   line against version eight.  Your legal research is very

11   strong, as anyone would expect given your background.  But I

12   want you to learn to write more like an advocate and an

13   adviser to a general counsel and corporate boards.  That

14   means at least less one could argue and more definite

15   statements."

16        This feedback finds its way into partner A's

17   evaluation, and it's untainted.  This feedback comes before

18   the e-mail that Ms. Sheketoff claims triggered a sexist

19   response.  So even on plaintiffs' reading of the e-mail,

20   it's untainted and it's fair.

21        And the second --

22        **THE COURT:**  Is this all appropriate for a motion

23   to dismiss versus a motion for summary judgment?

24        **MS. LOVITT:**  It is, because it's incorporated.

25   I'm trying to find the references.  Let me find exactly

1    where it's incorporated.  It's expressly incorporated in I

2    want to say paragraphs 78 and 79.  So in 78 -- hang on, I'm

3    going to go back to the complaint.  Please excuse me for

4    just a second.

5         At paragraph 78, plaintiffs allege, "In response,

6    partner A sent Julia an e-mail scolding her for

7    second-guessing his edits.  According to partner A, it was

8    inappropriate for Julia to suggest that his work could be

9    improved or clarified.  Her role was simply to defer to

10   him."  And then in paragraph 85, they allege that, "Partner

11   A wrote a disingenuous negative performance evaluation for

12   being insufficiently deferential."  So the e-mail is not

13   only referenced in the complaint, but it's necessary to the

14   claim.  Their argument is that this e-mail is the trigger

15   for the discriminatory response due to lack of deference.

16        So under a lot of -- there's a lot of case law

17   that you can consider these e-mails that are specifically

18   incorporated into the complaint.  Let me see if I can grab

19   you a cite real fast.

20        THE COURT:  No, no, no, believe me, you can find

21   50 cites or opinions I've written saying that.  The question

22   I really have, though, is whether I still need to be drawing

23   all inferences in favor of the plaintiffs at the motion to

24   dismiss stage or whether I'm really starting to sort of step

25   beyond the role of a judge on a motion to dismiss if I start

1    evaluating whether the e-mails should be construed one way

2    or the other.

3         **MS. LOVITT:**  I mean, sure, you're allowed to draw

4    inferences, but the inferences must be plausible.  And to

5    determine if the inference is plausible, you're allowed to

6    look at the e-mail which is incorporated into the complaint.

7    You know, is it plausible -- is it a plausible inference

8    that partner A was angry and scolding.  To me, you read the

9    e-mail, and it's not an angry, scolding e-mail.  In fact,

10   the next thing I was about to point out to you -- which is

11   on page -- you know, the first --

12        **THE COURT:**  The e-mail that you were just talking

13   about now is page -- it's docket 15-2 at two you're talking

14   about?

15        **MS. LOVITT:**  Yeah, so it starts at the bottom

16   of -- well, it actually starts at the top of page two.  And

17   he says -- you know, there's the two comments, and then he

18   says, "See specific comments," in bold.  So then you have to

19   go below to see what his comments are on specific edits.

20   And these are positive, you know, "Very good edit except for

21   the first sentence"; you know, "Change the first sentence to

22   be more of a statement of the rule";  "Those look great";

23   "That's fine."  So he's actually going through the

24   substantive edits and saying this is great, yeah, let's do

25   this.

1    And then he says for making style edits, "Stick

2    with my style, not your style."  And in the first page of

3    the e-mail, he explains why that matters, which is he's

4    making style -- he's making -- he's writing in his style.

5    Ms. Sheketoff is changing it.  He's going and changing it

6    back, and then she's changing it back, and it's leading to a

7    lot of inefficiency in getting this brief done.  On its face

8    this, this e-mail exchange isn't scolding, it's not

9    demanding deference because someone is a woman, and it's

10    completely reasonable in its tone.  Again, I think you can

11    read it and say an inference that this partner is so

12    required deference from Ms. Sheketoff that you can infer a

13    discriminatory animus.  That's not a plausible inference

14    based on the exhibit itself.  I don't think you're getting

15    far afield of the Rule 12(b)(6) standards, because at the

16    end of the day, you have to have a fair and plausible

17    inference.

18    With that, I think the only thing I want to -- I

19    think we've covered all of the points I wanted to make about

20    this e-mail exchange and the questioning.  So with that, I'm

21    happy to answer any further questions you have or allow

22    plaintiffs to speak.

23    **THE COURT:**  Well, why don't we do this, then.  Why

24    don't we take just a -- I would like to take a little bit of

25    a break here and give the court reporter a chance to rest

1    his fingers.  So why don't we take a 10-minute break.  It's

2    11:00 o'clock now, so why don't we just reconvene --

3    everyone can just stay on the line, but you can mute your

4    phones until 11:10.  Thank you.

5            (Off the record at 11:00 a.m.)

6            (Back on the record at 11:11 a.m.)

7            **THE COURT:**  Do you want to go ahead and start,

8    Mr. Savignac?

9            **MR. SAVIGNAC:**  Sure.  So I'll start by addressing

10   Jones Day's family leave policy.  In the Garrett case, the

11   Supreme Court said that Title VII allows employers to give

12   new mothers disability leave that is, quote, narrowly drawn

13   to cover only the period of actual physical disability on

14   account of pregnancy or childbirth.  And the Court also made

15   clear that Title VII prohibits, quote, special treatment to

16   pregnant workers based on stereotypes or generalizations

17   about their needs and abilities.

18            The Third and Eighth Circuits have also held that

19   sex-based leave for new mothers is permissible only if the

20   leave is in fact disability leave, limited to the new

21   mother's period of actual physical disability.  And these

22   decisions are in line with the other authorities like the

23   Manhart case, and the arguments from first principles that

24   we lay out in our brief.  Jones Day has not offered a single

25   authority pointing in the other direction.

1          Under this law, Jones Day's leave policy for birth

2    parents is clearly illegal.  Jones Day gives all birth

3    mothers eight more weeks of paid leave than it gives to

4    birth fathers.  The eight weeks is a fixed minimum

5    entitlement given to all birth mothers regardless of how

6    long they are disabled.  So certainly a particular woman

7    could obtain more than eight weeks of leave if she is

8    disabled for more than eight weeks.  A woman who is disabled

9    for less than eight weeks is still entitled to the full

10   eight weeks of sex-based leave.

11         Jones Day's counter-argument is that the policy is

12   based on a reasonable generalization about women, because

13   some judicial opinions in other contexts have said the

14   typical periods of disability from pregnancy range from four

15   to eight weeks.  The argument fails even on its own terms.

16   The physical demands of working at Jones Day are pretty

17   minimal relative to other jobs, so the reasonable

18   generalization surely would not be at the very top of the

19   range as the courts have mentioned, and well above the top

20   of the four- to five-week range that the Supreme Court

21   pointed to in the LaFleur case.

22         But I think the more crucial point is that even a

23   reasonable sex-based generalization is still an illegal

24   basis for sex discrimination in employment.  That's the

25   heart of the Supreme Court's decision in Manhart.  And

1    again, Garrett says that Title VII prohibits special

2    treatment of pregnant workers based on generalizations about

3    their needs and abilities.

4           Now, for the first time in its reply brief, Jones

5    Day raised the argument that we're just factually mistaken

6    about how it treats new mothers, and our allegations are

7    incorrect.  So they forfeited that argument by not raising

8    it in their opening brief or in response to Julia's initial

9    e-mail, which would have been the natural time to raise it

10   if it were true.  Whether they forfeited it or not, it's a

11   factual question for discovery.

12          We have plausibly alleged that they give a six- to

13   eight-week period of sex-based leave to all new mothers that

14   is denied to fathers.  We expect the discovery will confirm

15   that.  I don't understand Ms. Lovitt to disagree that

16   discovery will confirm that.  So the question now before the

17   Court is simply whether the law permits discrimination, and

18   we've explained that it clearly does not.

19          **THE COURT:**  Okay.

20          **MR. SAVIGNAC:**  Well, I'm happy to take questions

21   if you have any.

22          **THE COURT:**  What do you say to Ms. Lovitt's

23   contention that under the Pregnancy Discrimination Act, that

24   the law firm is required to give some period of leave to

25   birth mothers?  And there may be a question of how long they

1    should give, but in fact, under the Pregnancy Discrimination

2    Act, it is unlawful for them to treat men and women the

3    same.

4         MR. SAVIGNAC:  Well, I think that we don't dispute

5    that the Pregnancy Discrimination Act requires that women

6    who are disabled from pregnancy or childbirth be given leave

7    on the same terms as other people who have disabilities.

8    But nothing in that act, or in any other law that anyone has

9    pointed to, blesses a fixed period of eight weeks or 10

10   weeks or whatever.

11        THE COURT:  Well, how would you suggest, though,

12   that the law firm should go about deciding -- I take it in

13   your view on a case by case basis -- whether it's two weeks,

14   four weeks, six weeks, eight weeks, ten weeks?  Is every

15   woman who is returning to work after giving birth required

16   to go to their doctor and get a certification or a letter

17   from their doctor every two weeks saying now they can go

18   back or now they can't go back to work?  As a practical

19   matter, how would it work in your view?

20        MR. SAVIGNAC:  I think that's really up to the

21   employer.  So what Jones Day does beyond the eight weeks

22   that it gives to all women is -- according to its short-term

23   disability policy, it has some pretty Draconian requirements

24   about you have to open your medical records up to the firm,

25   you have to submit to a second examination if the firm wants

1    you to do that.  But I don't think any of that's required.

2    A firm could just say -- the same way that Jones Day does

3    for sick leave, you know, if you aren't up for coming to

4    work, if you're still disabled from working, then you don't

5    have to come in.  I don't see that they need to demand any

6    sort of proof.

7         THE COURT:  Oh, I see.  So in your view, though,

8    this would all be fine as long as it said up to eight weeks,

9    and that it was up to each individual woman to make a

10   judgment for themselves as to whether they felt up to coming

11   in or not?

12        MR. SAVIGNAC:  I think that's right.  If the rule

13   is that women have disability leave for however long they're

14   disabled, but no longer, then that would be an acceptable

15   rule.  I don't think that there's any need to demand

16   certifications or any proof.

17        THE COURT:  Well, so why isn't that in fact what

18   at least Jones Day says now that its policy is, and that it

19   says you don't -- you in your surreply waived any challenge

20   to the short-term disability policy.  The short term

21   disability policy is in fact expressly referenced in the

22   parental leave policy.  And that policy says unless the firm

23   is noticed otherwise, it will assume a certification of

24   eight weeks.  But that it's up to the -- if you want to go

25   beyond the eight weeks, you have to go to your doctor and

1    get a certification.  And they'll assume that you have the

2    certification otherwise.  But if you're better before that,

3    you can return before that, you're required to under the

4    short term disability policy?

5         **MR. SAVIGNAC:**  Well, I don't think that the text

6    of the policy supports that reading.  But I also think more

7    fundamentally, at least at this stage, I think that we're

8    focusing -- or Ms. Lovitt is focusing too much on how one

9    might interpret the words in Jones Day's employee handbook.

10   The question is what Jones Day actually does.  I think that

11   the written family leave policy is consistent with what they

12   actually do.

13        But regardless of how you could read these written

14   policies, we've alleged in many places that what they

15   actually do is they give women a minimum of eight sex-based

16   weeks of leave regardless of how long they're disabled.  In

17   other words, that women are not told, well, if you are

18   better in under eight weeks, then you have to switch over to

19   the sex-neutral ten weeks of family leave.

20        I mean, just as an example, Jones Day's handbook

21   also says something along the lines of like Jones Day does

22   not condone retaliation for complaints about discrimination.

23   The fact that their handbook says that does not mean that no

24   one can ever file a retaliation claim against them.  In a

25   situation where the facts are inconsistent with the language

1    in the handbook, you know --

2         THE COURT:  But do you allege -- I mean, the

3    question is what you allege in your complaint; whether you

4    allege in your complaint that the policy on its face is

5    unlawful or whether you say that the facts are such that

6    it's applied in a way that is unlawful; and that you allege

7    specific facts about circumstances where women were able to

8    return earlier but declined to do so, for example.

9         MR. SAVIGNAC:  Well, so we have a lot of those

10   factual allegations.  We certainly wrote the complaint on

11   the understanding -- which I still think is the correct

12   understanding -- that what Jones Day actually does and what

13   its family leave policy says are the same thing, which is

14   that women get the 18 weeks of paid leave.  Not up to 18

15   weeks, the 18 weeks.  So the -- part of the set of facts

16   that the complaint refers to, in arguing that their policy

17   is what we say it is, is that written policy saying that

18   women get 18 weeks.  But it also points to other facts.

19        So paragraph 113 says that, "Pregnant female

20   associates can arrange to take 18 weeks of paid leave even

21   before they give birth and thus before they know how long

22   they will be disabled."  114, Jones Day advertises to

23   prospective employees that it gives 18 weeks.  115, the same

24   points.  116, "Jones Day's Director of Human Resources

25   acknowledged to Julia that Jones Day provides the full eight

1    weeks of 'disability leave' to all biological mothers

2    without regard to disability."

3           Maybe the strongest factual thing is at paragraph

4    140.  This is Julia's initial e-mail to Defendant Heifetz

5    where she says, "Jones Day gives women 18 weeks of paid

6    leave while it gives men 10 weeks.  Eight of the weeks for

7    women are labeled as disability leave, but the leave is not

8    dependent upon whether women are actually disabled.  Most

9    women aren't physically disabled from office work for such a

10   long period and yet still get the full eight weeks of

11   disability leave."

12          Now, if that is not a correct --

13          THE COURT:  That was Julia's e-mail that said

14   that?

15          MR. SAVIGNAC:  Yes, that's Julia's, yes.

16          THE COURT:  Okay.  And so what was the response --

17          MR. SAVIGNAC:  So if Julia were mistaken -- I'm

18   sorry?

19          THE COURT:  What was the response to that e-mail?

20          MR. SAVIGNAC:  Yeah, that's my point.  If Julia

21   were mistaken, you would expect them to have said that.  So

22   at paragraph 142, the next week after she sent this e-mail,

23   the HR director called Julia and informed her that Jones Day

24   was requesting -- sorry, rejecting her request for equal

25   treatment.  During the call, the HR director acknowledged

1    that Jones Day's policy is to grant all new mothers 18 weeks

2    of paid leave regardless of how long they are actually

3    disabled.  So that's the understanding of both sides.

4            It's also clear from the HR director Sarah

5    McClure's e-mail response which Jones Day filed as an

6    attachment to its motion to dismiss, that's docket 15-1.

7    That's the understanding that the case was -- also that it

8    was litigated on through our opposition briefs until --

9            **THE COURT:**  Can I ask you to pause just for a

10   second.  I heard we lost one person on the line, I just want

11   to make sure it was not the court reporter.

12           Jeff, are you still there?

13           **COURT REPORTER:**  Yes, Judge, I'm still here.

14   Thank you.

15           **THE COURT:**  Okay.  And Ms. Lovitt, are you still

16   there?

17           **MS. LOVITT:**  Yes, I'm still here.

18           **THE COURT:**  Okay.  My apologies, Mr. Savignac, you

19   can continue.

20           **MR. SAVIGNAC:**  Well, I was just saying I think

21   that the question at this stage is not how could you read

22   the disability policy, the question is does Jones Day

23   discriminate or not.  And we've alleged that what they do is

24   that they give all women eight additional weeks of leave.

25   So at this stage, you just have a question of law, are they

1  allowed to give this fixed extra eight weeks to women that

2  they deny to men.

3         **THE COURT:**  If the policy were two weeks

4  automatically, would that be lawful?

5         **MR. SAVIGNAC:**  I would not concede that that would

6  be lawful.  I can't imagine I would be challenging that

7  policy.  You know, the law is that the period has to be

8  individualized, that you can't treat women as just members

9  of a group sharing statistical similarities.  The Manhart

10  decision --

11         **THE COURT:**  Do you have --

12         **MR. SAVIGNAC:**  -- is the main case that --

13         **THE COURT:**  Do you have any idea how sweeping the

14  consequences are of the proposition of law that you're

15  asking the Court to adopt here?  So, for example, if I were

16  to rule that way and the D.C. Circuit were to agree with me,

17  would that mean that thousands and thousands of policies

18  would be unlawful or is this an unusual policy?

19         **MR. SAVIGNAC:**  I don't know the answer to that.

20         **THE COURT:**  All right.  You can continue, then, if

21  you want to move to the next issue.

22         **MR. SAVIGNAC:**  Well, I just wanted to say that

23  since -- you know, to the extent that we do focus on the

24  written policies, I think we've also explained in detail,

25  especially in the surreply, why the reading that makes the

1    most sense is the one that takes the family leave policy at

2    face value when it says that women get these eight extra

3    weeks and it says that they get the 18 weeks.  So I won't

4    repeat that now, because I don't really think that that's

5    the issue.  But we have briefed it.

6          So on retaliation, as Ms. Lovitt said, it's

7    basically the same question as the discrimination question

8    except that the question is now not whether we're right, but

9    just whether our view, our legal view, is so unreasonable

10   that no reasonable attorney could take such a view, could

11   believe that Jones Day's policy is illegal.  So we think

12   that --

13         **THE COURT:**  Well, what Ms. Lovitt says with

14   respect to that, she says that your position was clearly

15   unreasonable because you were saying that men should be

16   treated equally with women, and should get the same amount

17   of time as women; and that under the Pregnancy

18   Discrimination Act, that would have been unlawful; and

19   therefore, at a minimum what you were seeking was too broad.

20         **MR. SAVIGNAC:**  So to take a step back, Jones Day's

21   policy is that all women get 18 weeks of leave.  And they

22   can get more if they are disabled for longer than eight

23   weeks.  Both sides agree that a woman who is in fact

24   disabled for more than eight weeks can get leave in excess

25   of the 18 weeks that are given as a minimum to all women.

1    And men just get ten weeks.

2              So our argument is that giving all women eight

3    more weeks just because they're women, not because of any

4    particular women's disability period, is illegal

5    discrimination.  And the remedy for that discrimination

6    against me would be to give me the 18 weeks that all women

7    receive.

8              **THE COURT:**  Wouldn't that be unlawful for them to

9    do that?  Because if they gave every man like you 18 weeks,

10   then they would not be providing any disability leave to

11   mothers returning after giving birth, and that would violate

12   the Pregnancy Discrimination Act?

13             **MR. SAVIGNAC:**  Well, I don't think that that's

14   true.  Like I said, their policy gives all women a minimum

15   of 18 weeks, but it gives -- you know, each woman gets at

16   least as much disability leave as she is disabled for.  So

17   if a woman is disabled for, say, 10 weeks, then she would

18   get under the policy 20 weeks.  I'm just asking for the 18

19   that is given categorically to all women.

20             I'm not sure that it would be illegal to say

21   everyone gets 18 weeks of leave as a minimum for parental

22   leave, and women who are disabled past that period get more.

23   I don't know of any case that says that.

24             **THE COURT:**  Well, that may be right, but I think

25   it clearly would be lawful for them to say everyone gets 18

1    weeks, and women who are -- except for some disability

2    relating to childbirth get more.  That's clearly okay.  But

3    I think sort of what you were proposing was that you get the

4    presumptive eight weeks that the women get, and then -- so

5    if you had a woman who had an eight-week disability, you

6    would get the same amount of leave as a woman with an

7    eight-week disability.  If there was a woman with a ten-week

8    disability, she would get two weeks more.  But that would

9    violate the Pregnancy Discrimination Act, because you would

10   be -- the firm would then be denying women who have

11   pregnancy-related disabilities the leave that relates to

12   that disability.

13        MR. SAVIGNAC:  So the first thing that I would say

14   is this argument is a new argument, so it's a forfeited

15   argument, the idea that what I was asking for -- what I

16   suggested was the remedy for the discrimination is illegal.

17   I don't know that -- I guess what you're saying is that any

18   period of disability has to be given leave that is in

19   addition to the period of family leave time.

20        THE COURT:  That's what I understood Ms. Lovitt to

21   be saying.

22        MR. SAVIGNAC:  I don't know what the support for

23   that is.  The rule is that if an employer gives disability

24   leave, then it has to give disability leave to new mothers

25   on the same terms that it gives disability leave to other

1    people who are disabled.

2              THE COURT:  Can I ask you to pause just for one

3    second again.  I want to confirm, Jeff, are you still on the

4    line?

5              COURT REPORTER:  Yes, Judge, I'm here.  I think

6    there's people calling in for the 11:30.

7              THE COURT:  I see, okay.  So I do have another

8    matter at 11:30, so I think we better move this along.  So

9    why don't you move to the next issue, Mr. Savignac.

10              MR. SAVIGNAC:  To the next issue, well, I guess

11    the next issue is Julia's pay discrimination issue.

12              THE COURT:  Okay.

13              MR. SAVIGNAC:  So Julia will address that.

14              THE COURT:  Okay, thank you.  Ms. Sheketoff.

15              MS. SHEKETOFF:  Good morning, your Honor.

16              THE COURT:  Good morning.

17              MS. SHEKETOFF:  Partner A discriminated against me

18    by giving me a worse performance review than he otherwise

19    would have because of my sex, and this affected my annual

20    raise.  The only argument Jones Day makes is that isn't

21    plausible that he discriminated on the basis of sex, and it

22    traces that entirely to its argument about the e-mail

23    exchange.  But the inference is surely plausible for three

24    main reasons.

25              First, the complaint alleges that partner A lied

1   about his reasons for his negative review of me.  That is,

2   in his review, he makes specific factual assertions about my

3   supposed lack of initiative, delays in turning drafts

4   around, work outside of business hours and the quality of my

5   work.  And these are untrue.  The complaint specifically

6   alleges this at paragraphs 85 and 86.  It describes the

7   review as disingenuous and unfair.  As the D.C. Circuit has

8   made clear, showing that an employer's stated reason for an

9   adverse action is false, and deliberately so, is generally

10  enough to create a genuine dispute of material fact and go

11  to a jury.  It obviously suffices at the pleadings stage.

12          Second, the complaint raises the inference that

13  partner A was upset when I suggested revisions to his edits.

14  And it alleges that according to the head of the issues and

15  appeals group, he was a terrible writer, which raises the

16  inference that associates often had to suggest revisions to

17  his writing.  That the complainant says that partner A did

18  not get upset with two similarly situated men who worked

19  with him.  Also, his hostile responses to my revisions

20  track traditional sex stereotypes that women --

21          **THE COURT:**  What is the --

22          **MS. SHEKETOFF:**  -- should be deferential.

23          **THE COURT:**  I'm sorry, what is the evidence or

24  your allegations with respect to his hostile response?

25  Ms. Lovitt points to the e-mails and says these aren't

1    hostile.  So is there something beyond the e-mails that you

2    think shows his hostile response?

3         **MS. SHEKETOFF:**  Oh, I would say two things.

4    Number one, the review of me is a hostile response.  It is

5    filled with false statements suggesting that indeed he was

6    upset by our prior interaction, because the stated reasons

7    he gives for his low view of me are made up.  But in --

8         **THE COURT:**  Your argument is that those are

9    pretextual?

10        **MS. SHEKETOFF:**  That's correct.

11        **THE COURT:**  And what is the basis for believing

12   they're pretextual?

13        **MS. SHEKETOFF:**  Well, like I said, they make

14   specific factual assertions about my behavior and my -- the

15   quality of my work that are false.  I mean, I experienced

16   them and they're not correct.  And discovery will show that.

17        **THE COURT:**  What are those assertions?  What are

18   the assertions?  The reason I'm asking the question --

19        **MR. OSBORNE:**  This is Lawrence Osborne.  Am I on

20   the wrong line?

21        **THE COURT:**  I'm sorry, who is this?

22        **MR. OSBORNE:**  This is Lawrence Osborne.  I'm

23   listening to somebody else.

24        **THE COURT:**  Mr. Osborne, this is Judge Moss.

25   We're finishing up on another matter before we turn to your

1    matter.

2                **MR. OSBORNE:**  Oh, okay, all right.

3                **THE COURT:**  But thank you.  I apologize for making

4    you wait.  We've still got a little bit more time to go.

5                **MR. OSBORNE:**  Oh, not a problem, not a problem.

6                **THE COURT:**  Thank you, Mr. Osborne.

7                **MS. SHEKETOFF:**  So his review says that I

8    displayed little to no initiative -- these are factual

9    assertions; that I did only what was asked of me; that I was

10   tied up on other things on multiple occasions when he asked

11   for the next version of the memo; that I didn't work on the

12   weekend; and that I wrote initial drafts of our memo that

13   contained insufficient, unhelpful advice to our client,

14   though subsequent drafts were better.  Now, these are false,

15   and discovery will show that they're false.  And at the

16   pleadings stage, of course, when I allege that the review is

17   false or disingenuous and unfair, the Court should accept

18   that allegation as true.

19                Now with respect to the e-mail chain, I wanted to

20   say a few things about that.  So number one, Ms. Lovitt

21   points to other e-mails in the e-mail chain that are not

22   referenced in the complaint.  Those are not properly

23   incorporated.  Under Banneker, they need to be referenced

24   and essential to the complaint.  And certainly things that

25   aren't even mentioned in the complaint are not incorporated.

1    So I don't think that this new argument that she makes about

2    partner A's saying, "For your edification, I want you to

3    learn to write more like an advocate," I don't think that

4    that has any place at this stage.

5         But even if you did want to consider it, I think

6    at most -- or at worst, it simply shows that -- or it just

7    buttresses the allegation in the complaint that he took a

8    patronizing tone with me, and that he did not take such a

9    tone with similarly situated male applicants.  And actually,

10   the tone of the e-mail as a whole I think -- you know,

11   Ms. Lovitt says that she reads it without a hostile tone.

12   Maybe it's possible to do so, but I certainly didn't.  I

13   don't think that it's possible for the Court to say it

14   doesn't have a hostile or scolding tone at the motion to

15   dismiss stage, especially given the complaint's allegation

16   that not just I perceived it that way, as my e-mail

17   responding to partner A confirms, but that other people who

18   worked at Jones Day and were familiar with attorneys'

19   conduct and e-mails there also interpreted it to have a

20   hostile tone.

21        THE COURT:  Let me ask you a question about the

22   exhaustion argument.  One of the things you say with respect

23   to exhaustion is that it is not properly raised on a motion

24   to dismiss, and it should be raised instead at summary

25   judgment.

1          Is there any reason the Court shouldn't just, if

2   necessary, treat the exhaustion argument as a motion for

3   summary judgment under Rule 12(d) I think it is, and if

4   there's some additional evidence that you'd like to offer

5   with respect to exhaustion, to give you the opportunity to

6   do that?

7          **MS. SHEKETOFF:**  I think to the extent that we had

8   the opportunity to conduct discovery as necessary, that

9   would be fine.  But I think --

10         **THE COURT:**  What discovery would you need on

11  exhaustion?  You know what you did and what you didn't do

12  for exhaustion purposes.

13         **MS. SHEKETOFF:**  Yeah, I think the only question is

14  simply about if the Court were to require us to get the work

15  sharing agreement from the EEOC.  But --

16         **THE COURT:**  I mean, I've seen that in other cases

17  before.  I mean, I suppose I could --

18         **MS. SHEKETOFF:**  That's correct.

19         **THE COURT:**  I could request --

20         **MS. SHEKETOFF:**  Right.

21         **THE COURT:**  -- that you submit it to me, but I

22  think I've seen copies.  I suspect it's available just

23  online somewhere, but I think I've probably seen it in other

24  cases.  It probably would be helpful for the parties to

25  submit that to me.

1              So why don't I direct that the parties do go ahead

2       and submit to me the work sharing agreement with the EEOC,

3       if you think that's the only factual question that's at play

4       with respect to the exhaustion question.

5              **MS. SHEKETOFF:**  I think that is likely the only

6       factual question, but I suppose I would want to talk to Mark

7       and have a chance to consider it further since I hadn't

8       considered the conversion to summary judgment.

9              **THE COURT:**  Well, why don't I then -- I'll direct

10      that -- why don't I direct, then, that a week from today, so

11      by the 11th, that you file something with the Court

12      indicating whether there's any reason that I should not

13      treat the motion as one for summary judgment with respect to

14      exhaustion, and if so, what the reasons are.  And then if

15      you agree that it's appropriate for me to treat it as a

16      motion for summary judgment, if there's any evidence or

17      additional facts that you wanted to submit, consider on

18      that.  And I'll also direct that Jones Day, also by the

19      11th, if it wants to submit any additional -- any factual

20      material in support of the exhaustion argument, that it do

21      so.

22             **MS. SHEKETOFF:**  Okay.  Might I address the

23      exhaustion argument, then?

24             **THE COURT:**  Yes, please.

25             **MS. SHEKETOFF:**  So I think the law is quite clear

1    that the correct answer is that I have 300 days to file.

2    Our position is the one adopted in Epps, discussed in --

3    it's also discussed in the D.C. Circuit's opinion in Carter.

4    And the Supreme Court's opinion in EEOC v. Commercial Office

5    Products further confirms that we're correct.  The

6    applicable statute gives the plaintiff 300 days to file

7    unless the charge is initially instituted with a local or

8    state agency.  I'm just going to pull up --

9         THE COURT:  Doesn't the word "initially" suggest

10   something that's sequential?  And there was nothing

11   sequential here, it was done, if anything, at the same time.

12        MS. SHEKETOFF:  Well, the applicable work sharing

13   agreement with the EEOC, which is described by Acting

14   Director Weinstein in the Epps affidavit and attached there,

15   is -- explains how the process works.  And basically under

16   the work sharing agreement, the EEOC and the local agency

17   designate each other as their agents for purposes of

18   receiving charges.  And so when a charge is filed with the

19   EEOC, under that agreement the EEOC acting as the agent for

20   the state agency initially files that charge with the state

21   agency.  And that work sharing agreement, my understanding

22   is, is in effect in D.C. under Carter.  And as the D.C.

23   Circuit explained in Carter, that's why in D.C. you have 300

24   days because of this work sharing agreement.

25             The EEOC has also adopted a regulation codifying

1    the work -- you know, basically codifying this rule, which

2    is that where there is a work sharing agreement on the face

3    of a complaint -- or sorry, of a charge, it's something that

4    should be cross-filed or would be cross-filed, you get 300

5    days.  And again, this regulation has been cited by the D.C.

6    Circuit and applied in Carter.

7            In EEOC v. Commercial Office Products, the Supreme

8    Court specifically -- oh, I'm sorry, in Love v. Pullman, the

9    Supreme Court explicitly said that it's a permissible

10   practice for the EEOC to initiate a charge for the state

11   agency -- or that they can accept or forward on a charge and

12   be the instigator of that.  So the practice that the EEOC

13   has adopted here has been upheld, and is one that hundreds

14   of thousands of claimants across the country rely on.

15           In EEOC v. Commercial Office Products, also the

16   Court said that -- in that case, the plaintiff had filed at

17   290 days with the EEOC, which had by virtue of its work

18   sharing agreement initially instituted the case -- or the

19   charge with the local agency, and the Court held that was

20   timely filed.  Now, the question there was slightly

21   different about whether the state agency could waive -- it's

22   called its exclusive processing time, and the Court said it

23   did.  But the facts are identical.

24           And again, just to be clear, this is something

25   that the EEOC has adopted by regulation.  Those regulations

1       and procedural matters have the force of law, because

2       Congress has specifically delegated that authority to the

3       EEOC.  And hundreds of thousands of people over the decades

4       have relied on these regulations.

5                   I wanted to briefly address --

6                   **THE COURT:**  Okay.  Anything further?

7                   **MS. SHEKETOFF:**  Not on that, your Honor.  I wanted

8       to briefly address the statutory standing question.

9                   **THE COURT:**  Okay.

10                  **MS. SHEKETOFF:**  Jones Day's current argument is

11      that I don't have standing to pursue the retaliation claim

12      because the e-mail came from Mark.  But there are a couple

13      of reasons why that argument should fail.  Number one, that

14      argument was raised only in Jones Day's reply brief, and the

15      law is clear that that's too late.  But on the merits, the

16      complaint clearly alleges that I wrote the e-mail together

17      with Mark, so that satisfies that joint protected activity

18      element of the statute.  I engaged in a protected activity,

19      there really can't be any question about that.

20                  **THE COURT:**  Doesn't the recipient have to hear it

21      as coming from you in some way for them to retaliate against

22      you?

23                  **MS. SHEKETOFF:**  Well, two things, your Honor.  The

24      first is that as a matter of law, I don't think that's

25      actually correct.  I think that they need to know of the

1    protected activity, and the protected activity needs to have

2    caused the adverse action.  The complaint certainly alleges

3    plausibly that the protected activity, i.e., the

4    January 16th e-mail, caused the adverse action here.  But as

5    a plausibility matter, I think we have definitely plausibly

6    alleged that in fact Jones Day did know or should know --

7    did know in fact that I was involved in the protected

8    activity.

9          Not only does the e-mail come after -- in

10   reference -- you know, it's part of the same e-mail chain as

11   my earlier August e-mail.  But it refers to me, it CCs my

12   account which was, again, quite the tip off that I was

13   involved.  It refers -- it speaks in the first person plural

14   at many points in the e-mail.  And again, just taking --

15         THE COURT:  So let me ask you this:  At that point

16   in time, you were a former employee, right?

17         MS. SHEKETOFF:  That's correct.  And under

18   Robinson vs. Shell Oil, it's clear that a former employee

19   counts as an employee.

20         THE COURT:  Well, for purposes --

21         MS. SHEKETOFF:  For purposes of retaliation.

22         THE COURT:  Retaliation against you by then taking

23   an action against your husband?

24         MS. SHEKETOFF:  That's correct.  So again, we have

25   two theories here for why -- two independently sufficient

1    bases for why I have statutory standing, or cause of action

2    if you want to call it that.  The first is, again, that

3    these three elements were met:  That I have -- that I

4    engaged in a protected activity; that Jones Day committed an

5    adverse action against me by firing my husband, which

6    obviously had an enormous effect on me; and that there was a

7    causal connection between the protected activity and the

8    causation.

9            But even setting that aside -- and that's all

10   Jones Day's even arguing at this point.  But even setting

11   that aside, my husband surely was the victim of retaliation.

12   And I have a cause of action to complain about that, because

13   I'm a person aggrieved by that.  Jones Day --

14           **THE COURT:**  So let me ask you this question.  In

15   all of my retaliation cases from now on, is it your view,

16   then, that the spouse of anybody who suffers an act of

17   retaliation could be joined as a plaintiff in all those

18   cases to the extent that they suffer as a result of either

19   the firing or the lower salary or so forth in all these

20   retaliation cases?

21           **MS. SHEKETOFF:**  I think that probably is --

22           **THE COURT:**  The same would be true for

23   discrimination cases as well, I guess the analysis would be

24   the same.  And so spouses could sue in all these cases?

25           **MS. SHEKETOFF:**  I think that probably is the best

1    reading of the Supreme Court's unanimous opinion in

2    Thompson, and Judge -- now Justice Kavanaugh's opinion, but

3    then Judge Kavanaugh's opinion in Billington.  But that's --

4    you don't have to reach that question.  As we make clear in

5    our brief, there's a separate basis for why I have statutory

6    standing as an aggrieved person here even if I'm not the

7    victim of retaliation, which I am.  And that's because I am

8    a former employee.

9           Now, it's clear that this -- that Billington and

10   Thompson -- I mean, every case recognizes that of course

11   employees are -- their interests are at the heart of what

12   this statute -- what Title VII was designed to protect, and

13   so of course they can bring a claim.  And like I said, under

14   Robinson vs. Shell Oil, former employees are employees.  And

15   certainly their interests, therefore, cannot be cast as not

16   even arguably protected by the statute or so unrelated to

17   the statutory scheme that Congress would have been totally

18   uninterested in their injuries.

19           THE COURT:  Okay.

20           MS. SHEKETOFF:  And Mark wanted to say an

21   additional thing, if it's okay?

22           THE COURT:  Yeah.  Just another minute or so, then

23   I'm going to give Jones Day two minutes, and then I've got

24   to get to Mr. Osborne who's been very patiently waiting for

25   me on the line here.

1          So go ahead, Mark.

2          **MR. SAVIGNAC:**  I just wanted to say -- I just

3     wanted to add something about the PDA claim, because it took

4     me by surprise because I hadn't heard the argument before.

5     You seem to be saying that Ms. Lovitt's view is that if an

6     employer gives new fathers N weeks of leave, then it must

7     give new mothers N weeks of leave plus however long they are

8     disabled.  I have never seen any law supporting that.  But

9     even if that's true, that's not in any way inconsistent with

10    our e-mail.

11         Our e-mail says you give women 18 weeks off

12    regardless of disability.  You know, you call it disability

13    leave, but it's not really disability leave, it's just their

14    entitlement for being mothers rather than fathers.  Under

15    the anti-discrimination laws, you can't discriminate on

16    sex -- on the basis of sex like that, so I'm entitled to

17    those 18 weeks too.  Now, as part of that remedy, they could

18    give women 18 weeks plus however long they're actually

19    disabled for.  There's nothing in the e-mail telling them

20    what they can or can't do as far as giving bona fide

21    disability leave to women.  So the PDA illegality argument

22    fails even under Jones Day's unsupported view of what the

23    PDA does and doesn't require.

24         **THE COURT:**  Okay, thank you.  Ms. Lovitt, let me

25    just give you two minutes for a reply so that I can get to

1    Mr. Osborne.

2         **MS. LOVITT:**  Appreciated, your Honor, thank you.

3    To accept plaintiffs' position, you have to completely

4    ignore our short-term disability policy which is the policy

5    that grants the disability leave.  It shows that plaintiffs

6    are wrong to say that we give a fixed benefit to all women.

7    It's not fixed, it requires a medical certification, and it

8    can vary up to 26 weeks depending on the certification.

9    Plaintiffs claim it's sex-based.  It's not sex-based.  What

10   we have is a certification assumption about a disability.

11   Sure, the disability correlates with gender.  But just

12   because you're a woman you don't get disability leave.  You

13   get disability leave because you've had a child and you've

14   been disabled by childbirth.

15         So the question is -- really, the question boils

16   down to can we assume a medical certification, are we

17   allowed to do that.  And the answer to that is yes, it has

18   to be.  Because plaintiffs -- first, they agree, and second,

19   that's the only way to operate a business.  I think the

20   Court was asking the right question, which was what would a

21   lawful policy look like.  And plaintiffs candidly

22   acknowledged come back when you feel better.

23         But you have to do that -- to keep disability for

24   pregnancy and all disabilities on the same playing field,

25   you have to do that as an employer for every single

1    disability.  It's not a workable rule, and it's certainly

2    not anything that the law requires.  So we're allowed to

3    have medically -- or disability periods turn on the medical

4    certification -- medically certified disability period, and

5    we're allowed to assume that.  That's clear from plaintiffs,

6    what they're saying, and that's what we're doing on the face

7    of the short-term disability policy.  And on its face it's

8    fine.

9         Now, your Honor suggested that maybe we could add

10   some up to language, that you could take up to eight weeks

11   of disability leave.  But that would misstate the disability

12   policy.  You can actually take up to 26 weeks depending on

13   the scope and severity of your disability.  So that language

14   doesn't work either, and it doesn't accurately reflect the

15   disability policy.  What we've done, again, is make a

16   certification assumption, and no one is challenging that we

17   can do that; that we can assume you've been certified

18   disabled for eight weeks so that the disability leave is

19   directly and expressly tied to the disability itself.

20        With respect to why don't we take a little bit of

21   discovery and figure out what the policy is and practice,

22   three points briefly on this.  First, the plaintiffs are

23   alleging the opposite.  Complaint paragraphs 104 to 110 make

24   clear that plaintiffs are challenging the actual written

25   policies.  In particular, paragraph 104 says that Jones

1    Day's family leave policies are sexist.  And paragraph 105

2    specifically identifies that sexist policy as the one being,

3    quote, appended to this complaint.  So as alleged, this is a

4    facial challenge to the policies themselves.

5          Second, you know, none of plaintiffs' well-pled

6    factual allegations suggest any divergence between the real

7    policy and the written policy.  Plaintiffs allege that women

8    routinely get eight weeks of paid disability leave.  But we

9    acknowledge that virtually all birth mothers are paid eight

10   weeks of disability leave, but that's due to the operation

11   of the certification assumption, not due to sex or gender.

12         And there's really nothing to be gained by

13   discovery here.  We acknowledge that we're applying this

14   assumption, and that results in birth mothers taking eight

15   weeks of disability leave in virtually all cases.  So --

16         **THE COURT:**  I suppose the question then boils down

17   to whether as a matter of law an employer may lawfully

18   assume that all women are disabled for eight weeks where

19   that under some -- that in some circumstances may be

20   overinclusive.

21         **MS. LOVITT:**  Correct, although I would say it's

22   may we assume that they have a doctor who certifies that.

23   Johnson says yes, you can do that.  And plaintiffs actually

24   aren't challenging our ability to certify, to assume the

25   certification.  They're saying that's, quote, you know, the

1    evidentiary rule, and the evidentiary rule doesn't matter;

2    and in fact, you can have women bring you nothing and stay

3    out for as long as they want.

4            So that's not the challenge here, and there's

5    nothing wrong -- in fact, it's the only way that you can

6    operate in an efficient manner.  That's what Johnson tells

7    you, is that there are administrative reasons why you assume

8    this.  I mean, births are the most common short-term

9    disability.

10           **THE COURT:**  Do you have any idea, Ms. Lovitt, how

11   common or uncommon the formulation is that Jones Day has?

12   And by the formulation, what I mean is a policy in which

13   women presumptively are entitled to eight weeks, but can get

14   more than eight weeks if they can demonstrate a continuing

15   medical need.

16           **MS. LOVITT:**  So I don't want to suggest that you

17   need to go to the record to understand this point, but my

18   understanding is when you're dealing with a benefits

19   provider, they give you -- you know, it's -- you can get six

20   weeks, eight weeks; six weeks of routine childbirth, eight

21   weeks Cesarean.  So this is a very common type of option

22   that's given to all employers.

23           **THE COURT:**  I'm just curious as to how broad the

24   implications are of the decision in this case.

25           **MS. LOVITT:**  The implications that eight weeks is

1    unreasonable is going to have many employers reducing the

2    amount of disability leave provided to women, and I don't

3    think that's what the law is requiring.  And I don't think

4    that's even what plaintiffs are asking you to do.

5         Finally, I just want to make one point on

6    Julia's -- I'm sorry, Ms. Sheketoff's claims.  Ms. Sheketoff

7    suggested that -- or maybe Mr. Savignac, that there was no

8    response to Julia's e-mail.  There was a response from HR,

9    that's Exhibit A to the motion to dismiss.  And it lays out

10   Jones Day's legal case.  There's been no subsequent

11   communication by plaintiffs until January.

12        Finally, just very briefly on Julia's -- I'm

13   sorry, Ms. Sheketoff's pay discrimination claim.  This is

14   sort of a new configuration of her claim as pretext.  But

15   the pretext argument won't work because of the sequence of

16   the e-mails.  The criticism of Ms. Sheketoff's writing is

17   coming before the evaluation, and even before what she

18   alleges is the discriminatory animus.  That's on page three

19   of the e-mail.

20        Ms. Sheketoff says, well, we didn't incorporate

21   that unhelpful bit.  But when you're talking about a written

22   instrument, you don't get to pick and choose the portions of

23   the written instrument you're going to incorporate.  That

24   would lead to a misleading presentation of the written

25   instrument.  And there's a lot of cases in contract law that

1    say -- dealing with contracts that say when you incorporate

2    one bit of the written instrument, you actually incorporate

3    all pertinent parts.

4         THE COURT:  And so what is the instrument here

5    you're talking about, is it the evaluation or --

6         MS. LOVITT:  The e-mail, the e-mail.

7         THE COURT:  But if there was an e-mail from

8    before -- I mean, how is the e-mail expressing concerns

9    about her work part of the same instrument as the e-mail

10   that followed?  Is it all in the same e-mail chain?

11        MS. LOVITT:  Yeah, it's all one string.

12        THE COURT:  I see, okay.

13        MS. LOVITT:  And that's what we've attached as

14   Exhibit B to the motion to dismiss.  It's all one single

15   string.

16        THE COURT:  Okay.

17        MS. LOVITT:  Finally, to the extent that the

18   argument is that the review is in and of itself

19   discriminatory, keep in mind that the allegation is that the

20   assessment statement was what impacted Ms. Sheketoff's

21   compensation.  That's paragraph 89 of the complaint.  And

22   that assessment statement does not reflect everything that's

23   in the evaluation.  It's actually fair and balanced in terms

24   of what it includes.  And it corroborates the aspects of the

25   evaluation that do make it into the assessment statement by

1    showing that many reviewers were criticizing Ms. Sheketoff's

2    writing, and many reviewers were criticizing her practice of

3    not coming to the office.  And it shows that her hours were

4    very low.  So it's actually a corroborating document.

5          Last points on waiver.  There's a little bit of --

6    nothing that we've argued in reply is new.  I think a fair

7    presentation of the briefs is that we began to understand

8    plaintiffs' position a little bit better with the

9    opposition, and we -- but our basic principle is that our

10   policies are gender-neutral and they are not discriminatory.

11   That is our primary argument.  We've of course replied to

12   their arguments as they've changed.

13         But in any event, I don't think you have to decide

14   that, because you've granted the motion on the surreply and

15   the surreply makes any forfeiture eliminated.  That's the

16   Wultz decision, 755 F.Supp.2d 1.  That says that if you

17   allow the surreply, there's no reason for forfeiture because

18   the other side has had an ability to reply.

19         And with that, I think I did that in 10 minutes,

20   sorry.

21         **THE COURT:**  Well, thank you all, I appreciate

22   this.  I will take all of this under consideration and will

23   get you a decision in due course.  But thank you, this was

24   helpful to me.

25         (Proceedings adjourned at 11:59 a.m.)

1                    **C E R T I F I C A T E**

2

3              I, **Jeff Hook, Official Court Reporter**,

4     certify that the foregoing is a true and correct transcript

5     of the remotely reported proceedings in the above-entitled

6     matter.

7                    **PLEASE NOTE:**  This hearing occurred during

8     the COVID-19 pandemic and is therefore subject to the

9     technological limitations of court reporting remotely.

10

11

12

13      **August 7, 2020**                _____

14           **DATE**                          **Jeff M. Hook**

15

16

17

18

19

20

21

22

23

24

25

**'**

**'disability [1]**
42/1

**1**

**10 [6]** 9/12 15/3
38/9 42/6 46/17
68/19
**10-minute [1]** 35/1
**10-week [1]** 18/15
**100 [1]** 23/21
**100 percent [2]** 5/6
22/5
**10281 [1]** 1/15
**104 [2]** 63/23 63/25
**105 [1]** 64/1
**10:10 [1]** 1/6
**110 [1]** 63/23
**113 [1]** 41/19
**114 [1]** 41/22
**115 [1]** 41/23
**116 [1]** 41/24
**11:00 [1]** 35/2
**11:00 a.m [1]** 35/5
**11:10 [1]** 35/4
**11:11 a.m [1]** 35/6
**11:30 [2]** 48/6 48/8
**11:59 a.m [1]** 68/25
**11th [2]** 54/11
54/19
**12 [3]** 15/4 34/15
53/3
**13 [2]** 5/6 23/21
**14 [1]** 18/11
**140 [2]** 29/10 42/4
**142 [1]** 42/22
**146 [4]** 25/7 25/8
27/16 28/19
**14th [1]** 5/7
**15-1 [1]** 43/6
**15-2 at [1]** 33/13
**15219 [1]** 1/18
**16th [1]** 58/4
**18 [35]** 8/22 8/24
9/1 9/1 9/4 9/5 9/6
9/11 11/4 11/5 11/8
11/10 16/16 19/8
19/25 41/14 41/14
41/15 41/18 41/20
41/23 42/5 43/1
45/3 45/21 45/25
46/6 46/9 46/15
46/18 46/21 46/25
61/11 61/17 61/18
**19 [1]** 69/8
**19-2443 [1]** 2/2
**1:19-cv-2443 [1]**
1/3

**2**

**20 [1]** 46/18
**20001 [2]** 1/21 1/25
**2020 [1]** 1/5
**205 [1]** 30/18
**212 [1]** 30/18
**220 [1]** 30/18
**2207 [1]** 1/11
**2443 [2]** 1/3 2/2
**24th [1]** 29/13

**250 [1]** 1/15
**26 [4]** 5/7 23/21
62/8 63/12
**290 [1]** 56/17

**3**

**300 [4]** 55/1 55/6
55/23 56/4
**333 [1]** 1/24

**4**

**4500 [1]** 1/18
**4700-C [1]** 1/24

**5**

**50 [1]** 32/21
**500 [1]** 1/18
**51 [1]** 1/20

**6**

**61801 [1]** 1/12

**7**

**75 percent [2]** 5/7
23/22
**755 [1]** 68/16
**78 [5]** 30/21 31/4
32/2 32/2 32/5
**79 [1]** 32/2

**8**

**85 [3]** 30/21 32/10
49/6
**86 [1]** 49/6
**89 [1]** 67/21

**9**

**90 [1]** 30/14

**A**

**A's [5]** 30/10 30/14
30/15 31/16 52/2
**a.m [4]** 1/6 35/5
35/6 68/25
**abilities [2]** 35/17
37/3
**ability [2]** 64/24
68/18
**able [3]** 14/5 21/3
41/7
**above [2]** 36/19
69/5
**above-entitled [1]**
69/5
**absent [1]** 7/2
**abstention [1]** 16/2
**accept [3]** 51/17
56/11 62/3
**acceptable [1]**
39/14
**according [3]** 32/7
38/22 49/14
**accordingly [1]**
3/12
**account [2]** 35/14
58/12
**accurate [2]** 22/5
31/4
**accurately [1]**
63/14

**acknowledge [2]**
64/9 64/13
**acknowledged [3]**
41/25 42/25 62/22
**across [1]** 56/14
**act [11]** 14/25
26/18 26/22 37/23
38/2 38/5 38/8
45/18 46/12 47/9
59/16
**acting [2]** 55/13
55/19
**action [9]** 1/3 2/2
49/9 58/2 58/4
58/23 59/1 59/5
59/12
**activity [13]** 27/15
27/21 28/11 28/17
29/21 57/17 57/18
58/1 58/1 58/3 58/8
59/4 59/7
**actual [6]** 4/4 5/8
8/5 35/13 35/21
63/24
**actually [24]** 6/24
7/20 7/25 17/10
23/19 23/23 31/7
31/8 33/16 33/23
40/10 40/12 40/15
41/12 42/8 43/2
52/9 57/25 61/18
63/12 64/23 67/2
67/23 68/4
**add [2]** 61/3 63/9
**addendum [4]** 4/8
4/11 4/14 7/12
**addition [1]** 47/19
**additional [8]** 9/8
12/3 12/4 43/24
53/4 54/17 54/19
60/21
**address [10]** 2/21
2/23 20/25 22/8
22/9 27/8 48/13
54/22 57/5 57/8
**addressed [1]** 3/24
**addressing [1]** 35/9
**adjourned [1]** 68/25
**administrative [5]**
7/7 7/9 9/15 23/17
65/7
**admits [1]** 25/20
**adopt [1]** 44/15
**adopted [6]** 9/20
10/9 55/2 55/25
56/13 56/25
**adopted that [1]**
10/9
**adoption [7]** 8/24
9/3 9/7 9/15 11/9
12/1 12/8
**adoptions [1]** 9/11
**adoptive [13]** 8/16
9/13 9/19 9/21
10/13 10/14 10/18
10/21 11/3 11/4
11/19 11/25 12/14
**adverse [4]** 49/9
58/2 58/4 59/5
**advertised [1]**

**16/17
advertises [1]**
41/22
**advice [1]** 51/13
**adviser [1]** 31/13
**advocate [2]** 31/12
52/3
**affected [1]** 48/19
**affidavit [1]** 55/14
**affirm [1]** 7/3
**affirmative [2]** 7/2
20/10
**afield [1]** 34/15
**again [16]** 13/17
20/2 20/12 24/1
27/15 29/18 34/10
37/1 48/3 56/5
56/24 58/12 58/14
58/24 59/2 63/15
**against [9]** 25/12
31/10 40/24 46/6
48/17 57/21 58/22
58/23 59/5
**agency [7]** 55/8
55/16 55/20 55/21
56/11 56/19 56/21
**agent [1]** 55/19
**agents [1]** 55/17
**aggrieved [2]** 59/13
60/6
**agree [11]** 3/21
14/7 15/5 21/2 25/6
26/12 29/14 44/16
45/23 54/15 62/18
**agreeing [1]** 25/9
**agreement [10]** 25/5
53/15 54/2 55/13
55/16 55/19 55/21
55/24 56/2 56/18
**ahead [5]** 9/25
17/17 35/7 54/1
61/1
**al [4]** 1/2 1/5 2/3
2/3
**allegation [6]**
30/16 30/16 51/18
52/7 52/15 67/19
**allegations [5]**
17/9 37/6 41/10
49/24 64/6
**allege [10]** 11/3
30/19 32/5 32/10
41/2 41/3 41/4 41/6
51/16 64/7
**alleged [11]** 13/4
25/24 30/9 30/12
30/12 30/22 37/12
40/14 43/23 58/6
64/3
**alleges [7]** 15/16
48/25 49/6 49/14
57/16 58/2 66/18
**alleging [1]** 63/23
**allow [2]** 34/21
68/17
**allowed [2]** 22/7
33/3 33/5 44/1
62/17 63/2 63/5
**allows [1]** 35/11
**along [2]** 40/21

**A**

along... [1]   48/8
although [1]   64/21
altogether [1]
  25/14
always [4]   9/4 11/8
  21/19 22/4
among [1]   11/9
amount [5]   9/2 15/6
  45/16 47/6 66/2
analysis [4]   10/5
  14/1 23/5 59/23
ANDERSON [2]   1/16
  2/5
angry [2]   33/8 33/9
animus [2]   34/13
  66/18
annual [1]   48/19
anti [1]   61/15
anti-discrimination [1]
  61/15
apologies [3]   2/7
  2/8 43/18
apologize [1]   51/3
appeals [1]   49/15
appear [1]   24/20
APPEARANCES [1]
  1/10
appearing [2]   2/4
  2/5
appended [1]   64/3
applicable [2]   55/6
  55/12
applicants [1]   52/9
application [1]   7/8
applied [2]   41/6
  56/6
apply [2]   21/9 27/3
applying [2]   20/21
  64/13
appreciate [1]
  68/21
Appreciated [1]
  62/2
approach [1]   4/6
appropriate [4]   9/2
  10/23 31/22 54/15
Arabic [3]   4/15
  7/17 8/7
arguably [1]   60/16
argue [1]   31/14
argued [1]   68/6
arguing [5]   22/25
  26/3 26/5 41/16
  59/10
argument [32]   3/22
  4/1 10/4 11/24
  11/25 14/1 17/18
  32/14 36/11 36/15
  37/5 37/7 46/2
  47/14 47/14 47/15
  48/20 48/22 50/8
  52/1 52/22 53/2
  54/20 54/23 57/10
  57/13 57/14 61/4
  61/21 66/15 67/18
  68/11
arguments [4]   3/24
  25/3 35/23 68/12

**A** (continued)

around [2]   6/20
  49/4
arrange [1]   41/20
articulation [1]
  27/9
aside [2]   59/9
  59/11
aspects [1]   67/24
assertions [5]   49/2
  50/14 50/17 50/18
  51/9
assessment [3]
  67/20 67/22 67/25
associate [2]   5/21
  6/3
associates [1]
  41/20 49/16
assume [16]   6/15
  14/5 14/12 17/21
  18/21 18/25 19/13
  19/23 40/1 62/16
  63/5 63/17 64/18
  64/22 64/24 65/7
assuming [2]   10/1
  22/6
assumption [20]
  6/23 7/4 8/9 16/21
  16/22 17/5 17/11
  18/8 18/9 18/12
  20/14 20/21 21/7
  21/8 21/9 24/3
  62/10 63/16 64/11
  64/14
attached [3]   29/12
  55/14 67/13
attachment [3]   9/18
  9/18 43/6
attorney [3]   5/22
  25/10 45/10
attorneys' [1]
  52/18
August [6]   1/5 29/6
  29/6 29/8 29/13
  58/11
August 24th [1]
  29/13
authorities [1]
  35/22
authority [2]   35/25
  57/2
automatically [1]
  44/4
available [2]   5/2
  53/22
Avenue [2]   1/20
  1/24
avoiding [1]   22/20

**B**

back [14]   17/18
  18/16 18/23 19/1
  19/15 27/4 32/3
  34/6 34/6 35/6
  38/18 38/18 45/20
  62/22
background [1]
  31/11
BAILEY [2]   1/16 2/6
balanced [1]   67/23
Bank [1]   1/17

Bankruptcy [1]   1/23
Banneker [1]   51/23
based [13]   25/24
  30/9 34/14 35/16
  35/19 36/10 36/12
  36/23 37/2 37/13
  40/15 62/9 62/9
baseline [1]   9/12
bases [1]   59/1
basic [1]   68/9
basically [4]   4/24
  45/7 55/15 56/1
basis [9]   8/14 8/15
  26/23 36/24 38/13
  48/21 50/11 60/5
  61/16
be read [1]   8/23
becomes [2]   16/12
  16/12
began [1]   68/7
beginning [1]   30/11
behalf [2]   2/18
  2/25
behavior [1]   50/14
behind [1]   14/11
believing [1]   50/11
below [1]   33/19
benefit [16]   5/2
  5/3 5/9 6/12 7/24
  8/16 17/14 19/19
  22/13 22/23 23/15
  23/19 23/22 23/24
  23/25 62/6
benefits [3]   23/9
  23/17 65/18
best [3]   4/1 22/11
  59/25
better [6]   40/2
  40/18 48/8 51/14
  62/22 68/8
beyond [5]   10/1
  32/25 38/21 39/25
  50/1
Billington [2]   60/3
  60/9
biological [1]   42/1
birth [35]   6/18
  6/21 6/21 6/23 7/5
  9/14 9/18 9/19 9/22
  10/19 11/19 11/25
  12/3 12/14 13/12
  14/3 14/5 16/20
  16/22 16/24 21/20
  24/5 25/18 25/22
  26/12 36/1 36/2
  36/4 36/5 37/25
  38/15 41/21 46/11
  64/9 64/14
birth-related [2]
  6/21 25/22
births [1]   65/8
bit [10]   3/5 7/19
  29/24 34/24 51/4
  63/20 66/21 67/2
  68/5 68/8
black [1]   31/9
blacked [1]   31/9
blesses [1]   38/9
boards [1]   31/13
boils [2]   62/15

64/16
bold [1]   33/18
bona [1]   61/20
born [1]   8/10
both [5]   2/22 25/6
  25/9 43/3 45/23
bottom [4]   7/16
  7/19 31/8 33/15
break [2]   34/25
  35/1
brief [7]   25/1 34/7
  35/24 37/4 37/8
  57/14 60/5
briefed [2]   27/9
  45/5
briefly [6]   3/18
  27/12 57/5 57/8
  63/22 66/12
briefs [2]   43/8
  68/7
briefs until [1]
  43/8
bring [2]   60/13
  65/2
broad [2]   45/19
  65/23
brought [1]   18/14
burdens [1]   9/15
business [2]   49/4
  62/19
buttresses [1]   52/7

**C**

call [3]   42/25 59/2
  61/12
called [2]   42/23
  56/22
calling [2]   28/16
  48/6
came [1]   57/12
can [51]   2/15 8/3
  8/20 9/24 12/11
  12/13 14/11 14/16
  15/7 15/11 16/10
  18/2 18/19 20/5
  23/24 24/24 26/9
  30/24 31/2 32/17
  32/18 32/20 34/10
  34/12 35/3 35/3
  38/17 40/3 40/24
  41/20 43/9 43/19
  44/20 45/22 45/24
  48/2 56/11 60/13
  61/20 61/25 62/8
  62/16 63/12 63/17
  63/17 64/23 65/2
  65/5 65/13 65/14
  65/19
candidly [1]   62/21
candor [1]   15/22
caregiver [5]   8/18
  8/18 8/24 11/11
  24/15
caregivers [2]   8/14
  8/15
Carter [4]   55/3
  55/22 55/23 56/6
case [41]   3/14 4/19
  8/10 9/2 9/7 9/10
  10/11 10/11 10/17

**C**

case... [32]   11/7
12/17 13/11 14/20
15/8 15/8 15/11
15/14 15/21 15/25
16/6 16/13 16/13
16/24 20/3 22/24
28/20 28/22 32/16
35/10 35/23 36/21
38/13 38/13 43/7
44/12 46/23 56/16
56/18 60/10 65/24
66/10
cases [14]   8/24
14/18 15/6 15/23
20/14 53/16 53/24
59/15 59/18 59/20
59/23 59/24 64/15
66/25
cast [1]   60/15
categorically [1]
46/19
causal [1]   59/7
causation [1]   59/8
cause [3]   30/13
59/1 59/12
caused [2]   58/2
58/4
CCs [1]   58/11
Center [1]   1/17
certainly [8]   19/15
36/6 41/10 51/24
52/12 58/2 60/15
63/1
certification [27]
6/11 7/4 8/8 16/21
17/5 17/10 18/2
18/9 18/22 20/21
21/15 21/21 22/6
23/16 24/3 38/16
39/23 40/1 40/2
62/7 62/8 62/10
62/16 63/4 63/16
64/11 64/25
certification's [1]
24/4
certifications [4]
21/16 22/2 24/8
39/16
certified [8]   6/16
6/24 14/6 16/23
17/21 21/8 63/4
63/17
certifies [1]   64/22
certify [4]   18/18
21/24 64/24 69/4
certifying [1]   22/3
Cesarean [2]   6/17
65/21
chain [4]   51/19
51/21 58/10 67/10
challenge [4]   17/15
39/19 64/4 65/4
challenged [2]
20/15 23/6
challenging [9]
3/10 4/19 18/8 18/9
22/10 44/6 63/16
63/24 64/24

chance [2]   34/25
54/7
Change [1]   33/21
changed [1]   68/12
changing [3]   34/5
34/5 34/6
charge [9]   27/22
28/21 55/7 55/18
55/20 56/3 56/10
56/11 56/19
charges [1]   55/18
CHASE [2]   1/14 2/6
Chief [1]   2/11
child [5]   8/10 9/19
9/20 19/8 62/13
childbirth [15]   5/5
6/17 13/22 14/24
16/9 17/23 21/19
24/18 25/20 26/19
35/14 38/6 47/2
62/14 65/20
choose [1]   66/22
CHRISTOPHER [2]
1/19 2/6
chronology [1]
29/18
Circuit [4]   44/16
49/7 55/23 56/6
Circuit's [1]   55/3
Circuits [1]   35/18
circumstance [1]
19/18
circumstances [5]
14/7 18/23 19/13
41/7 64/19
cite [3]   14/20
14/24 32/19
cited [1]   56/5
cites [3]   14/24
29/15 32/21
civil [2]   1/3 2/2
claim [23]   2/21
3/19 3/20 21/3 25/2
25/16 25/22 25/22
27/8 27/9 27/13
27/13 27/14 27/15
30/17 32/14 40/24
57/11 60/13 61/3
62/9 66/13 66/14
claimants [1]   56/14
claims [6]   2/22
29/23 29/24 30/11
31/18 66/6
clarified [1]   32/9
clause [1]   17/19
clean [1]   4/6
clear [14]   2/17
13/10 24/10 35/15
43/4 49/8 54/25
56/24 57/15 58/18
60/4 60/9 63/5
63/24
clearly [9]   2/15
13/11 28/19 36/2
37/18 45/14 46/25
47/2 57/16
client [1]   51/13
closest [2]   15/21
15/25
codifying [2]   55/25

56/1
COLUMBIA [1]   1/1
Combes [1]   1/11
coming [7]   19/11
20/12 39/3 39/10
57/21 66/17 68/3
commence [1]   24/16
commences [1]   20/9
comments [3]   33/17
33/18 33/19
Commercial [3]   55/4
56/7 56/15
committed [1]   59/4
common [3]   65/8
65/11 65/21
communication [1]
66/11
compel [1]   22/22
compensation [1]
67/21
complain [1]   59/12
complainant [1]
49/17
complaint [38]   4/8
15/15 15/16 16/11
25/8 25/25 27/16
28/10 28/19 28/24
29/5 29/10 30/12
30/14 30/18 30/21
30/23 32/3 32/13
32/18 33/6 41/3
41/4 41/10 41/16
48/25 49/5 49/12
51/22 51/24 51/25
52/7 56/3 57/16
58/2 63/23 64/3
67/21
complaint's [1]
52/15
complaints [1]
40/22
completed [1]   7/8
completely [3]   9/22
34/10 62/3
component [1]   25/14
components [1]   4/25
concede [1]   44/5
concerns [1]   67/8
concession [1]   3/11
conclude [2]   11/2
15/19
conclusion [1]
15/12
condition [3]   5/5
18/2 21/6
condone [1]   40/22
conduct [2]   52/19
53/8
configuration [1]
66/14
confirm [3]   37/14
37/16 48/3
confirms [2]   52/17
55/5
Congress [2]   57/2
60/17
connection [1]   59/7
consequences [1]
44/14
consider [4]   32/17

52/5 54/7 54/17
consideration [1]
68/22
considered [2]   6/3
54/8
consistent [1]
40/11
Constitution [1]
1/24
construction [2]
22/19 27/4
construed [2]   19/5
33/1
contained [1]   51/13
contains [1]   8/16
content [1]   31/5
contention [6]
11/16 12/2 16/16
17/24 26/1 37/23
contents [1]   7/20
contexts [1]   36/13
continuation [2]
5/4 5/12
continue [2]   43/19
44/20
continuing [1]
65/14
continuous [2]   5/6
5/8
contract [1]   66/25
contracts [1]   67/1
contrary [3]   7/2
7/3 17/6
controls [1]   26/24
conversion [1]   54/8
copies [1]   53/22
copy [1]   4/6
corporate [1]   31/13
correlates [1]
62/11
corroborates [1]
67/24
corroborating [1]
68/4
could request [1]
53/19
counsel [5]   5/21
5/21 6/3 6/3 31/13
counter [1]   36/11
counter-argument [1]
36/11
counterintuitive [1]
4/18
counting [2]   24/22
24/22
country [1]   56/14
counts [1]   58/19
couple [1]   57/12
couples [1]   11/10
course [5]   51/16
60/10 60/13 68/11
68/23
court [35]   1/1 1/23
3/12 3/23 11/1 14/7
14/21 14/24 15/12
15/15 22/13 23/2
23/5 30/24 31/2
34/25 35/11 35/14
36/20 37/17 43/11
44/15 51/17 52/13

**C**

court... [11]   53/1
53/14 54/11 56/8
56/9 56/16 56/19
56/22 62/20 69/3
69/9
Court's [5]   2/11
16/7 36/25 55/4
60/1
courts [2]   1/23
36/19
cover [1]   35/13
covered [1]   34/19
covering [1]   3/20
COVID [1]   69/8
COVID-19 [1]   69/8
create [1]   49/10
creating [1]   22/12
criticism [1]   66/16
criticizing [2]
68/1 68/2
cross [4]   4/20 27/1
56/4 56/4
cross-filed [2]
56/4 56/4
cross-referenced [1]
27/1
cross-references [1]
4/20
crucial [1]   36/22
curious [1]   65/23
current [1]   57/10
cv [1]   1/3

**D**

D.C [7]   44/16 49/7
55/3 55/22 55/22
55/23 56/5
DATE [1]   69/14
dated [1]   29/13
day [33]   1/5 1/14
1/17 1/20 2/3 2/25
16/16 28/21 34/16
35/24 36/2 36/16
37/5 38/21 39/2
39/18 40/10 40/21
41/12 41/22 41/25
42/5 42/23 43/5
43/22 48/20 52/18
54/18 58/6 59/4
59/13 60/23 65/11
Day's [19]   3/10 4/4
22/5 24/7 35/10
36/1 36/11 40/9
40/20 41/24 43/1
45/11 45/20 57/10
57/14 59/10 61/22
64/1 66/10
days [5]   55/1 55/6
55/24 56/5 56/17
DC [3]   1/4 1/21
1/25
deal [1]   10/4
dealing [2]   65/18
67/1
decades [1]   57/3
decide [3]   12/25
20/17 68/13
decided [2]   16/1

16/10
deciding [1]   38/12
decision [8]   16/4
16/7 29/15 36/25
44/10 65/24 68/16
68/23
decisions [1]   35/22
declined [1]   41/8
Defendant [1]   42/4
defendants [4]   1/6
1/13 2/5 3/6
defendants' [1]   3/3
defer [1]   32/9
deference [4]   31/1
32/15 34/9 34/12
deferential [3]
30/20 32/12 49/22
defines [2]   5/1
5/13
defining [1]   22/23
definite [1]   31/14
definitely [1]   58/5
delays [1]   49/3
delegated [1]   57/2
deliberately [1]
49/9
demand [13]   25/7
25/19 26/10 26/15
26/20 27/17 27/23
28/1 28/3 28/6
28/20 39/5 39/15
demanding [3]   25/17
31/2 34/9
demands [1]   36/16
demonstrate [1]
65/14
denied [1]   37/14
deny [1]   44/2
denying [1]   47/10
dependent [1]   42/8
depending [2]   62/8
63/12
describe [1]   17/4
described [3]   23/9
23/10 55/13
describes [2]   6/10
49/6
describing [1]   7/6
designate [1]   55/17
designed [1]   60/12
detail [1]   44/24
Determinations [1]
5/11
determine [5]   22/15
27/5 30/24 31/3
33/5
determined [1]
14/16
different [14]   3/23
9/19 9/22 9/23
10/13 10/23 11/21
12/12 12/15 12/21
16/13 22/25 23/1
56/21
DiPOMPEO [2]   1/19
2/6
direct [4]   54/1
54/9 54/10 54/18
direction [1]   35/25
directly [3]   13/22

18/13 63/19
director [6]   29/11
41/24 42/23 42/25
43/4 55/14
disabilities [2]
38/7 47/11 62/24
disability [140]
disabled [28]   6/3
19/21 21/11 23/15
25/21 26/12 36/6
36/8 36/8 38/6 39/4
39/14 40/16 41/22
42/8 42/9 43/3
45/22 45/24 46/16
46/17 46/22 48/1
61/8 61/19 62/14
63/18 64/18
disagree [1]   37/15
discovery [12]   10/2
15/7 20/18 37/11
37/14 37/16 50/16
51/15 53/8 53/10
63/21 64/13
discriminate [2]
43/23 61/15
discriminated [2]
48/17 48/21
discriminates [1]
11/18
discrimination [25]
3/19 11/24 12/8
14/25 15/9 26/18
26/22 30/9 36/24
37/17 37/23 38/1
38/5 40/22 45/7
45/18 46/5 46/5
46/12 47/9 47/16
48/11 59/23 61/15
66/13
discriminatory [10]
13/23 22/13 22/16
23/1 24/7 32/15
34/13 66/18 67/19
68/10
discussed [3]   8/9
55/2 55/3
discussed in [1]
55/2
discussing [1]   4/3
disingenuous [3]
32/11 49/7 51/17
dismiss [14]   10/1
10/24 16/2 16/5
29/12 30/1 31/23
32/24 32/25 43/6
52/15 52/24 66/9
67/14
dismissed [1]   15/15
displayed [1]   51/8
dispose [1]   15/20
dispute [2]   38/4
49/10
DISTRICT [4]   1/1
1/1 1/9 1/23
divergence [1]   64/6
docket [3]   4/10
33/13 43/6
doctor [7]   18/17
21/8 21/24 38/16
38/17 39/25 64/22

doctor's [2]   18/22
19/1
doctors [1]   24/6
document [3]   23/3
23/3 68/4
documents [3]   10/7
20/24 23/14
done [3]   34/7 55/11
63/15
doubt [1]   24/10
down [5]   4/19 5/10
30/22 62/16 64/16
Draconian [1]   38/23
drafts [3]   49/3
51/12 51/14
draw [8]   11/1 11/13
11/20 12/11 12/13
13/18 13/20 33/3
drawing [1]   32/22
drawn [1]   35/12
dressed [1]   15/18
due [6]   14/23 16/9
32/15 64/10 64/11
68/23
during [3]   19/10
42/25 69/7
duties [1]   5/15

**E**

e-mail [64]   7/16
27/16 27/17 27/18
28/8 28/11 28/13
28/15 28/18 28/23
29/3 29/10 29/12
29/20 30/10 30/10
30/21 30/22 31/2
31/3 31/4 31/6 31/7
31/18 31/19 32/6
32/12 32/14 33/6
33/9 33/9 33/12
34/3 34/8 34/20
37/9 42/4 42/13
42/19 42/22 43/5
48/22 51/19 51/21
52/10 52/16 57/12
57/16 58/4 58/9
58/10 58/11 58/14
61/10 61/11 61/19
66/8 66/19 67/6
67/6 67/7 67/8 67/9
67/10
e-mails [8]   29/1
32/17 33/1 49/25
50/1 51/21 52/19
66/16
earlier [5]   16/2
18/16 18/23 41/8
58/11
early [2]   24/5
24/20
edification [2]
31/9 52/2
edit [1]   33/20
edits [5]   32/7
33/19 33/24 34/1
49/13
EEOC [18]   15/3
28/21 29/15 53/15
54/2 55/4 55/13
55/16 55/19 55/19

**E**

EEOC... [8]   55/25
  56/7 56/10 56/12
  56/15 56/17 56/25
  57/3
effect [2]   55/22
  59/6
efficient [1]   65/6
eight [81]
eight-week [18]
  6/16 6/20 6/24
  14/22 16/21 16/23
  16/25 17/22 20/14
  21/7 21/21 21/24
  24/2 26/13 27/3
  37/13 47/5 47/7
Eighteen [1]   8/17
Eighth [1]   35/18
either [2]   59/18
  63/14
element [2]   28/15
  57/18
elements [1]   59/3
eligibility [2]
  5/12 23/16
eliminated [1]
  68/15
else [1]   50/23
emphasizes [1]
  27/20
employed [3]   27/25
  28/1 28/5
employee [9]   21/25
  28/2 28/21 28/25
  40/9 58/16 58/18
  58/19 60/8
employees [4]   41/23
  60/11 60/14 60/14
employer [5]   38/21
  47/23 61/6 62/25
  64/17
employer's [1]   49/8
employers [3]   35/11
  65/22 66/1
employment [1]
  36/24
encouraging [1]
  22/13
end [7]   3/18 11/15
  12/20 29/16 29/17
  30/11 34/16
ended [3]   20/7
  20/11 24/20
ends [2]   20/9 24/18
engaged [3]   27/20
  57/18 59/4
enormous [1]   59/6
enough [2]   16/6
  49/10
entire [2]   22/21
  26/15
entirely [5]   8/17
  9/23 12/21 13/25
  48/22
entitled [9]   14/4
  21/2 21/9 25/23
  26/14 36/9 61/16
  65/13 69/5
entitlement [3]

25/21 36/5 61/14
Epps [2]   55/2 55/14
equal [1]   42/24
equally [2]   26/23
  45/16
especially [2]
  44/25 52/15
essential [1]   51/24
essentially [1]
  8/25
establishing [3]
  15/1 23/8 23/25
et [4]   1/2 1/5 2/3
  2/3
evaluated [1]   25/10
evaluating [1]   33/1
evaluation [8]
  30/14 30/15 31/17
  32/11 66/17 67/5
  67/23 67/25
even [21]   13/10
  14/19 23/6 23/7
  26/11 26/20 31/19
  36/15 36/22 41/20
  51/25 52/5 59/9
  59/10 59/10 60/6
  60/16 61/9 61/22
  66/4 66/17
event [2]   5/4 68/13
everyone [5]   2/7
  2/10 35/3 46/21
  46/25
evidence [15]   10/3
  10/12 10/15 10/25
  12/1 12/9 12/22
  17/7 18/15 20/19
  21/4 21/10 49/23
  53/4 54/16
evidentiary [2]
  65/1 65/1
exactly [2]   17/3
  31/25
examination [1]
  38/25
example [5]   14/3
  19/7 40/20 41/8
  44/15
except [3]   33/20
  45/8 47/1
excess [1]   45/24
exchange [6]   30/21
  30/23 31/6 34/8
  34/20 48/23
exclusive [1]   56/22
exclusively [1]
  7/10
excuse [1]   32/3
exercise [1]   21/18
exhaustion [10]
  52/22 52/23 53/2
  53/5 53/11 53/12
  54/4 54/14 54/20
  54/23
exhibit [7]   29/12
  30/6 30/7 30/10
  34/14 66/9 67/14
Exhibit A [2]   29/12
  66/9
Exhibit B [4]   30/6
  30/7 30/10 67/14

exhibits [2]   29/25
  30/4
existing [1]   25/13
expect [3]   31/11
  37/14 42/21
experienced [1]
  50/15
expiration [1]   24/4
explained [3]   37/18
  44/24 55/23
explains [3]   6/20
  34/3 55/15
explicitly [1]   56/9
expressing [1]   67/8
expressly [8]   3/9
  13/21 23/9 23/10
  24/13 32/1 39/21
  63/19
extended [1]   25/18
extent [7]   2/21
  24/10 26/2 44/23
  53/7 59/18 67/17
extra [2]   44/1 45/2

**F**

F.Supp.2d [1]   68/16
face [25]   10/18
  13/3 13/14 13/23
  14/2 14/3 15/6 15/8
  15/19 16/10 17/16
  20/23 22/14 23/5
  25/17 25/19 27/18
  31/3 31/3 34/7 41/4
  45/2 56/2 63/6 63/7
facial [1]   64/4
fact [23]   8/23 9/7
  10/3 11/23 12/11
  18/9 21/4 22/4
  24/19 26/23 29/1
  33/9 35/20 38/1
  39/17 39/21 40/23
  45/23 49/10 58/6
  58/7 65/2 65/5
facts [9]   10/17
  25/24 40/25 41/5
  41/7 41/15 41/18
  54/17 56/23
factual [12]   15/7
  15/13 37/11 41/10
  42/3 49/2 50/14
  51/8 54/3 54/6
  54/19 64/6
factually [1]   37/5
fail [1]   57/13
fails [4]   25/16
  27/13 36/15 61/22
fair [4]   31/20
  34/16 67/23 68/6
falls [3]   3/21
  17/15 27/10
false [6]   49/9 50/5
  50/15 51/14 51/15
  51/17
familiar [1]   52/18
family [40]   4/20
  4/23 7/15 7/17 7/20
  7/21 8/2 8/6 8/13
  13/8 13/16 13/18
  17/3 17/12 20/7
  20/8 20/11 20/12

22/12 22/14 22/15
  22/23 23/7 23/13
  23/18 23/23 24/2
  24/11 24/12 24/12
  24/16 24/22 27/2
  35/10 40/11 40/19
  41/13 45/1 47/19
  64/1
far [3]   16/14 34/15
  61/20
fast [1]   32/19
father [1]   11/8
fathers [5]   26/3
  36/4 37/14 61/6
  61/14
favor [3]   11/2
  11/14 32/23
feature [1]   6/8
features [1]   8/7
feedback [3]   2/14
  31/16 31/17
feel [2]   18/24
  62/22
felt [1]   39/10
female [1]   41/19
few [2]   31/5 51/20
fide [1]   61/20
field [1]   62/24
figure [2]   19/4
  63/21
file [7]   3/7 16/4
  27/22 40/24 54/11
  55/1 55/6
filed [8]   16/2
  28/24 43/5 55/18
  56/4 56/4 56/16
  56/20
files [3]   28/21
  28/21 55/20
filled [1]   50/5
finally [6]   8/19
  24/9 29/23 66/5
  66/12 67/17
find [4]   28/8 31/25
  31/25 32/20
finds [1]   31/16
fine [5]   3/25 33/23
  39/8 53/9 63/8
fingers [1]   35/1
finishing [1]   50/25
fired [4]   28/22
  28/24 29/4 29/8
firing [2]   59/5
  59/19
firm [25]   6/13 6/15
  7/1 7/4 8/11 10/8
  12/22 17/5 17/20
  18/4 18/25 19/6
  19/14 19/23 21/12
  21/22 28/1 28/6
  37/24 38/12 38/24
  38/25 39/2 39/22
  47/10
firm's [5]   6/22
  7/23 8/12 16/22
  23/11
first [29]   3/5 3/9
  4/25 4/25 5/6 6/10
  7/12 7/12 8/7 8/7
  22/12 22/18 24/12

**F**

first... **[16]**   24/15
25/6 31/7 33/11
33/21 33/21 34/2
35/23 37/4 47/13
48/25 57/24 58/13
59/2 62/18 63/22
five **[3]**   7/17 7/22
36/20
five-week **[1]**   36/20
fixed **[5]**   36/4 38/9
44/1 62/6 62/7
flip **[1]**   6/8
flipping **[2]**   7/11
7/24
FMLA **[3]**   3/20 15/3
27/7
focus **[1]**   44/23
focusing **[2]**   40/8
40/8
followed **[1]**   67/10
follows **[2]**   6/5
18/10
For the Defendants **[1]**
1/13
forbidden **[1]**   2/12
force **[1]**   57/1
foregoing **[1]**   69/4
foreign **[1]**   9/16
forfeited **[3]**   37/7
37/10 47/14
forfeiture **[2]**
68/15 68/17
form **[3]**   9/10 12/4
15/17
former **[7]**   28/2
28/20 28/25 58/16
58/18 60/8 60/14
formulation **[2]**
65/11 65/12
forth **[1]**   59/19
forward **[3]**   7/11
18/14 56/11
four **[13]**   4/15 4/25
7/23 8/14 8/18
14/21 14/22 15/1
15/3 18/11 36/14
36/20 38/14
fourth **[3]**   5/10
5/23 7/6
frankly **[1]**   9/17
fraudulent **[1]**
19/24
fraudulently **[1]**
19/19
frequently **[2]**   9/16
9/16
front **[1]**   4/12
full **[8]**   5/10 9/11
21/22 23/14 23/19
36/9 41/25 42/10
fully **[1]**   27/8
fundamentally **[1]**
40/7
further **[4]**   34/21
54/7 55/5 57/6

**G**

gained **[1]**   64/12

Garrett **[2]**   35/10
37/1
gave **[2]**   28/12 46/9
gender **[6]**   8/14
8/15 8/17 62/11
64/11 68/10
gender-neutral **[4]**
8/14 8/15 8/17
68/10
general **[2]**   22/19
31/13
generalization **[3]**
36/12 36/18 36/23
generalizations **[2]**
35/16 37/2
generally **[1]**   49/9
genuine **[1]**   49/10
gets **[8]**   8/24 9/4
9/11 11/4 11/8
46/15 46/21 46/25
given **[13]**   12/11
16/20 26/16 26/17
30/11 31/11 36/5
38/6 45/25 46/19
47/18 52/15 65/22
gives **[13]**   36/2
36/3 38/22 41/23
42/5 42/6 46/14
46/15 47/23 47/25
50/7 55/6 61/6
giving **[6]**   14/9
38/15 46/2 46/11
48/18 61/20
Gmail **[1]**   7/13
goal **[1]**   11/6
goes **[1]**   14/13
good **[3]**   33/20
48/15 48/16
grab **[1]**   32/18
grant **[3]**   1/18 3/14
43/1
granted **[1]**   68/14
granting **[2]**   14/17
14/17
grants **[2]**   15/4
62/5
great **[6]**   3/16 4/2
4/13 4/17 33/22
33/24
grounds **[1]**   16/3
group **[6]**   11/21
11/21 12/12 12/16
44/9 49/15
groups **[1]**   13/8
guarantee **[2]**   17/14
23/20
Guerra **[1]**   15/2
guess **[7]**   13/24
19/22 21/1 28/12
47/17 48/10 59/23
guessing **[1]**   32/7
guidance **[2]**   15/3
29/16

**H**

hand **[1]**   4/6
handbook **[4]**   40/9
40/20 40/23 41/1
handle **[1]**   20/5
handset **[1]**   2/14

handy **[3]**   4/5 4/7
29/25
hang **[1]**   32/2
happening **[2]**   19/18
20/3
happens **[1]**   29/16
happy **[4]**   3/22 3/25
34/21 37/20
head **[1]**   49/14
hear **[3]**   2/15 4/1
57/20
heard **[4]**   2/10 19/7
43/10 61/4
hearing **[2]**   1/8
69/7
heart **[4]**   21/19
21/25 36/25 60/11
Heifetz **[1]**   42/4
held **[2]**   35/18
56/19
helpful **[5]**   3/12
4/5 30/5 53/24
68/24
here's **[1]**   29/14
herself **[1]**   28/21
Hibbs **[2]**   14/20
16/7
hidden **[1]**   5/19
himself **[2]**   27/19
27/23
Hold **[1]**   4/9
honestly **[1]**   13/5
Honor **[6]**   3/4 48/15
57/7 57/23 62/2
63/9
HONORABLE **[1]**   1/8
hook **[4]**   1/22 24/19
69/3 69/14
hostile **[8]**   49/19
49/24 50/1 50/2
50/4 52/11 52/14
52/20
hours **[2]**   49/4 68/3
House **[1]**   14/25
housekeeping **[2]**
3/6 3/16
HR **[8]**   7/8 7/24
29/11 29/11 42/23
42/25 43/4 66/8
Human **[1]**   41/24
humans **[1]**   17/8
hundreds **[2]**   56/13
57/3
husband **[3]**   58/23
59/5 59/11

**I**

i.e **[1]**   58/3
idea **[3]**   44/13
47/15 65/10
identical **[1]**   56/23
identifies **[1]**   64/2
identify **[1]**   14/18
ignore **[1]**   62/4
IL **[1]**   1/12
illegal **[7]**   26/15
36/2 36/23 45/11
46/4 46/20 47/16
illegality **[1]**
61/21

illness **[1]**   5/4
imagine **[1]**   44/6
immediately **[2]**   8/9
24/16
impact **[1]**   13/18
impacted **[1]**   67/20
implications **[2]**
65/24 65/25
important **[4]**   3/11
18/7 25/4 25/4
Importantly **[1]**
30/18
improved **[1]**   32/9
inability **[1]**   5/14
inappropriate **[1]**
32/8
includes **[1]**   67/24
including **[3]**   5/5
6/17 16/7
inconsistent **[2]**
40/25 61/9
incorporate **[4]**
66/20 66/23 67/1
67/2
incorporated **[8]**
30/23 31/24 32/1
32/1 32/18 33/6
51/23 51/25
incorrect **[1]**   37/7
indeed **[1]**   50/5
independently **[1]**
58/25
indicating **[1]**
54/12
individual **[2]**
30/17 39/9
individualized **[1]**
44/8
indulge **[1]**   3/5
inefficiency **[1]**
34/7
infer **[1]**   34/12
inference **[12]**
11/20 12/10 12/13
13/20 33/5 33/7
34/11 34/13 34/17
48/23 49/12 49/16
inferences **[6]**   11/1
11/13 13/17 32/23
33/4 33/4
inform **[1]**   8/3
informed **[1]**   42/23
informs **[1]**   9/24
initial **[3]**   37/8
42/4 51/12
initially **[4]**   55/7
55/9 55/20 56/18
initiate **[1]**   56/10
initiative **[2]**   49/3
51/8
injuries **[1]**   60/18
inquiry **[1]**   15/13
instance **[2]**   20/3
20/13
instances **[1]**   24/3
instead **[3]**   4/7
13/16 52/24
instigator **[1]**
56/12
instituted **[2]**   55/7

**I**

instituted... [1]
56/18
instrument [6]
66/22 66/23 66/25
67/2 67/4 67/9
insufficient [1]
51/13
insufficiently [2]
30/20 32/12
integrated [1]
22/20
interaction [1]
50/6
interests [2]   60/11
60/15
interpret [2]   8/3
40/9
interpretation [1]
29/14
interpreted [1]
52/19
intertwined [1]
25/3
into [6]   2/14 15/13
31/16 32/18 33/6
67/25
introduce [1]   2/16
involved [3]   15/2
58/7 58/13
involves [2]   9/16
9/17
isolated [1]   13/7
isolation [1]   23/23
issue [10]   10/10
13/7 15/23 18/12
44/21 45/5 48/9
48/10 48/11 48/11
issues [5]   2/21
2/22 9/18 10/12
49/14

**J**

January [8]   27/16
28/15 29/6 29/8
29/17 29/20 58/4
66/11
January 16th [1]
58/4
JEFF [5]   1/22 43/12
48/3 69/3 69/14
jobs [1]   36/17
Johnson [13]   10/11
10/11 10/14 10/20
15/21 15/25 16/1
22/24 22/24 23/2
29/15 64/23 65/6
joined [1]   59/17
joint [1]   57/17
JONES [50]   1/5 1/14
1/17 1/20 2/3 2/25
3/10 4/4 16/16 22/5
24/6 35/10 35/24
36/1 36/2 36/11
36/16 37/4 38/21
39/2 39/18 40/9
40/10 40/20 40/21
41/12 41/22 41/24
41/25 42/5 42/23

43/1 43/5 43/22
45/11 45/20 48/20
52/18 54/18 57/10
57/14 58/6 59/4
59/10 59/13 60/23
61/22 63/25 65/11
66/10
judge [8]   1/9 3/5
32/25 43/13 48/5
50/24 60/2 60/3
Judge's [1]   2/11
judgment [12]   10/2
16/1 21/18 22/3
22/4 31/23 39/10
52/25 53/3 54/8
54/13 54/16
judicial [1]   36/13
JULIA [12]   1/11 2/5
27/19 27/19 27/23
32/6 32/8 41/25
42/17 42/20 42/23
48/13
Julia were [1]
42/17
Julia's [9]   30/15
37/8 42/4 42/13
42/15 48/11 66/6
66/8 66/12
jumping [1]   9/25
jury [1]   49/11
just taking [1]
58/14
Justice [1]   60/2

**K**

Kavanaugh's [2]
60/2 60/3
keep [2]   62/23
67/19
keeping [1]   2/9
key [3]   6/4 6/8
6/12
kind [1]   5/19
kinds [1]   7/9

**L**

label [1]   4/15
labeled [1]   42/7
lack [2]   32/15 49/3
lacks [1]   27/14
LaFleur [1]   36/21
language [10]   6/5
6/12 6/20 8/6 17/15
22/25 24/21 40/25
63/10 63/13
larger [1]   30/16
last [5]   20/8 24/11
24/14 31/8 68/5
late [2]   2/8 57/15
later [1]   24/5
law [30]   10/8 11/19
14/16 15/10 15/13
16/6 23/2 25/13
25/16 26/17 28/1
28/6 32/16 36/1
37/17 37/24 38/8
38/12 43/25 44/7
44/14 54/25 57/1
57/15 57/24 61/8
63/2 64/17 66/3

66/25
lawful [5]   23/6
44/4 44/6 46/25
62/21
lawfully [1]   64/17
Lawrence [2]   50/19
50/22
laws [1]   61/15
lawyer [3]   19/7
19/9 26/25
lawyer's [2]   6/15
17/21
lawyers [2]   5/3
16/18
lay [2]   25/11 35/24
lays [1]   66/9
lead [1]   66/24
leading [1]   34/6
learn [2]   31/12
52/3
least [6]   11/2
26/12 31/14 39/18
40/7 46/16
leave [155]
leave' [1]   42/1
left [3]   20/23 28/7
28/25
legal [5]   11/17
29/14 31/10 45/9
66/10
legally [1]   26/13
legislative [1]
10/5
less [3]   7/1 31/14
36/9
letter [1]   38/16
lied [1]   48/25
likely [1]   54/5
limit [2]   14/1 23/5
limitations [1]
69/9
limited [1]   35/20
line [7]   31/10 35/3
35/22 43/10 48/4
50/20 60/25
lines [1]   40/21
listening [1]   50/23
litigated [1]   43/8
little [10]   2/8 3/5
7/19 29/24 34/24
51/4 51/8 63/20
68/5 68/8
local [3]   55/7
55/16 56/19
long [13]   11/12
28/24 36/6 37/25
39/8 39/13 40/16
41/21 42/10 43/2
61/7 61/18 65/3
longer [8]   3/7 9/20
10/12 10/20 18/3
21/11 39/14 45/22
look [13]   10/14
13/4 13/4 14/11
15/15 22/14 23/2
26/10 26/20 28/18
33/6 33/22 62/21
looked [1]   7/22
looking [7]   8/1
13/3 13/6 13/14

13/15 13/23 29/20
lose [1]   25/13
lost [1]   43/10
lot [6]   20/19 32/16
32/16 34/7 41/9
66/25
Louisiana [1]   1/20
Love [1]   56/8
LOVITT [15]   1/13
2/6 3/1 3/3 37/15
40/8 43/15 45/6
45/13 47/20 49/25
51/20 52/11 61/24
65/10
Lovitt's [2]   37/22
61/5
low [2]   50/7 68/4
lower [2]   30/13
59/19

**M**

mail [64]   7/16
27/16 27/17 27/18
28/8 28/11 28/13
28/15 28/18 28/23
29/3 29/10 29/12
29/20 30/10 30/10
30/21 30/22 31/2
31/3 31/4 31/6 31/7
31/18 31/19 32/6
32/12 32/14 33/6
33/9 33/9 33/12
34/3 34/8 34/20
37/9 42/4 42/13
42/19 42/22 43/5
48/22 51/19 51/21
52/10 52/16 57/12
57/16 58/4 58/9
58/10 58/11 58/14
61/10 61/11 61/19
66/8 66/19 67/6
67/6 67/7 67/8 67/9
67/10
mails [8]   29/1
32/17 33/1 49/25
50/1 51/21 52/19
66/16
main [2]   44/12
48/24
major [1]   5/4
makes [7]   27/22
29/9 44/25 48/20
49/2 52/1 68/15
making [5]   28/23
34/1 34/4 34/4 51/3
male [1]   52/9
man [2]   19/10 46/9
Manhart [3]   35/23
36/25 44/9
manner [2]   16/18
65/6
manual [1]   7/24
many [5]   40/14
58/14 66/1 68/1
68/2
marathon [1]   20/5
MARK [12]   1/2 1/10
2/2 2/4 2/20 28/20
29/10 54/6 57/12
57/17 60/20 61/1

**M**

material [3]   5/15
49/10 54/20
materials [1]   7/25
matter [16]   11/18
14/16 15/10 15/12
15/20 23/2 25/16
38/19 48/8 50/25
51/1 57/24 58/5
64/17 65/1 69/6
matters [2]   34/3
57/1
may [12]   9/20 11/15
11/15 12/17 12/17
12/20 29/25 37/25
46/24 64/17 64/19
64/22
maybe [7]   10/22
10/23 19/9 42/3
52/12 63/9 66/7
McClure's [1]   43/5
mean [22]   11/22
12/19 12/19 13/5
13/24 15/14 15/22
18/1 19/6 19/21
33/3 40/20 40/23
41/2 44/17 50/15
53/16 53/17 60/10
65/8 65/12 67/8
means [3]   7/4 19/5
31/14
meant [1]   27/5
measured [1]   25/12
medical [20]   5/4
6/10 6/15 6/24 15/1
16/23 17/6 17/21
18/2 21/15 21/16
21/17 22/1 22/3
22/4 38/24 62/7
62/16 63/3 65/15
medically [2]   63/3
63/4
Mellon [1]   1/17
members [1]   44/8
memo [2]   51/11
51/12
men [8]   26/17 26/23
38/2 42/6 44/2
45/15 46/1 49/18
mentioned [2]   36/19
51/25
mere [1]   29/1
merely [1]   17/12
merits [1]   57/15
met [1]   59/3
microphones [1]
2/13
middle [1]   5/20
might [11]   4/4 4/17
8/23 10/4 10/6 11/9
12/21 16/3 22/4
40/9 54/22
mind [4]   4/13 7/11
20/3 67/19
minimal [1]   36/17
minimum [7]   3/21
36/4 40/15 45/19
45/25 46/14 46/21
minute [4]   6/19

30/2 35/1 60/22
minutes [3]   60/23
61/25 68/19
misleading [1]
66/24
misstate [1]   63/11
mistaken [3]   37/5
42/17 42/21
moms [1]   20/15
months [4]   15/3
16/11 16/12 28/13
more [22]   6/25 10/4
10/23 18/1 29/24
31/12 31/14 33/22
36/3 36/7 36/8
36/22 40/6 45/22
45/24 46/3 46/22
47/2 47/8 51/4 52/3
65/14
morning [3]   2/8
48/15 48/16
MOSS [3]   1/8 3/5
50/24
most [6]   20/15 30/5
42/8 45/1 52/6 65/8
mother [8]   6/22
6/23 9/4 11/8 11/8
13/12 21/20 26/4
mother's [2]   16/22
35/21
mothers [32]   7/5
8/11 9/9 12/3 12/14
14/3 14/5 14/9
16/21 16/24 21/5
24/4 24/5 24/15
25/18 26/3 26/12
35/12 35/19 36/3
36/5 37/6 37/13
37/25 42/1 43/1
46/11 47/24 61/7
61/14 64/9 64/14
motion [23]   1/8 3/3
3/7 3/15 9/25 10/24
16/2 16/4 29/12
30/1 31/22 31/23
32/23 32/25 43/6
52/14 52/23 53/2
52/13 54/16 66/9
67/14 68/14
move [4]   24/24
44/21 48/8 48/9
Mr. [17]   25/7 25/15
25/19 26/11 26/11
27/3 27/13 27/19
30/13 35/8 43/18
48/9 50/24 51/6
60/24 62/1 66/7
Mr. Osborne [4]
50/24 51/6 60/24
62/1
Mr. Savignac [9]
25/19 26/11 26/11
27/3 27/19 35/8
43/18 48/9 66/7
Mr. Savignac's [3]
25/7 25/15 27/12
Mr. Sheketoff's [1]
30/13
Ms. [33]   3/3 3/19
27/12 27/14 27/18

29/23 30/8 30/20
31/1 31/18 34/5
34/12 37/15 37/22
40/8 43/15 45/6
45/13 47/20 48/14
49/25 51/20 52/11
61/5 61/24 65/10
66/6 66/6 66/13
66/16 66/20 67/20
68/1
Ms. Lovitt [12]   3/3
37/15 40/8 43/15
45/6 45/13 47/20
49/25 51/20 52/11
61/24 65/10
Ms. Lovitt's [2]
37/22 61/5
Ms. Sheketoff [10]
27/18 30/8 30/20
31/1 31/18 34/5
34/12 48/14 66/6
66/20
Ms. Sheketoff's [9]
3/19 27/12 27/14
29/23 66/6 66/13
66/16 67/20 68/1
much [3]   29/2 40/8
46/16
multiple [2]   22/20
51/10
must [4]   7/1 25/8
33/4 61/6
mute [2]   2/13 35/3
myself [1]   18/14

**N**

name [1]   2/16
named [1]   27/21
narrowly [1]   35/12
natural [1]   37/9
nature [5]   10/4
21/16 21/17 22/2
24/8
near [1]   18/15
necessarily [1]
10/7
necessary [4]   27/11
32/13 53/2 53/8
need [12]   10/20
14/1 19/11 24/6
32/22 39/5 39/15
51/23 53/10 57/25
65/15 65/17
needs [4]   6/11
35/17 37/3 58/1
negative [4]   30/15
30/19 32/11 49/1
neutral [5]   8/14
8/15 8/17 40/19
68/10
Nevada [1]   14/20
new [14]   1/15 35/12
35/19 35/20 37/6
37/13 43/1 47/14
47/24 52/1 61/6
61/7 66/14 68/6
newly [1]   8/10
next [8]   8/5 33/10
42/22 44/21 48/9
48/10 48/11 51/11

nice [1]   4/6
non [1]   5/3
non-partner [1]   5/3
none [1]   64/5
notable [3]   7/21
8/6 31/6
note [2]   19/1 69/7
notice [3]   7/8
20/10 21/12
noticed [1]   39/23
notification [2]
7/2 7/3
notified [4]   6/13
6/14 17/20 18/4
number [7]   7/16
7/22 7/23 15/22
50/4 51/20 57/13
numerous [2]   14/18
22/17
NW [2]   1/20 1/24
NY [1]   1/15

**O**

o'clock [1]   35/2
object [1]   13/10
objection [1]   28/23
objective [2]   25/9
25/11
objectively [4]
25/8 25/24 26/4
26/6
objectivity [1]
25/13
obtain [2]   6/11
36/7
obtained [1]   18/2
obviously [4]   3/22
4/5 49/11 59/6
occasions [1]   51/10
occupation [1]   5/16
occurred [1]   69/7
off [4]   19/10 35/5
58/12 61/11
offer [1]   53/4
offered [1]   35/24
office [5]   42/9
55/4 56/7 56/15
68/3
official [2]   1/23
69/3
often [1]   49/16
oil [2]   58/18 60/14
one [38]   1/17 5/11
6/11 8/8 8/25 9/11
9/24 10/4 10/6
10/15 10/25 11/7
11/18 11/20 12/24
17/25 27/20 28/18
31/14 33/1 40/8
40/24 43/10 45/1
48/2 50/4 51/20
52/22 54/13 55/2
56/13 57/13 63/16
64/2 66/5 67/2
67/11 67/14
one-way [1]   17/25
online [2]   7/25
53/23
only [20]   9/7 11/6
22/14 23/14 28/3

**O**

only... [15]   30/12
30/12 32/13 34/18
35/13 35/19 48/20
51/9 53/13 54/3
54/5 57/14 58/9
62/19 65/5
open [5]   4/9 21/19
21/24 30/3 38/24
opening [2]   24/1
37/8
operate [2]   62/19
65/6
operates [1]   8/10
operation [2]   7/3
64/10
opinion [5]   55/3
55/4 60/1 60/2 60/3
opinions [2]   32/21
36/13
opportunity [2]
53/5 53/8
oppose [1]   3/7
opposed [2]   13/7
21/15
opposite [1]   63/23
opposition [4]   3/13
18/10 43/8 68/9
option [1]   65/21
order [1]   2/11
Osborne [6]   50/19
50/22 50/24 51/6
60/24 62/1
otherwise [10]   6/14
6/15 14/6 17/4
17/20 18/4 25/13
39/23 40/2 48/18
out [10]   3/16 18/7
19/4 20/12 31/9
33/10 35/24 63/21
65/3 66/9
outside [2]   20/23
49/4
over [3]   22/19
40/18 57/3
overinclusive [1]
64/20
overwhelming [1]
15/22
own [4]   23/7 23/8
31/9 36/15

**P**

PA [1]   1/18
page [12]   4/14 4/14
6/9 7/12 7/12 8/5
31/7 33/11 33/13
33/16 34/2 66/18
pages [1]   18/10
paid [17]   7/1 7/5
8/11 8/16 9/1 9/2
12/23 14/10 23/8
25/17 36/3 41/14
41/20 42/5 43/2
64/8 64/9
pandemic [1]   69/8
paragraph [22]   4/25
5/1 5/11 5/24 6/10
6/10 24/12 24/15

25/7 27/16 29/10
30/14 31/4 31/8
32/5 32/10 41/19
42/3 42/22 63/25
64/1 67/21
paragraphs [6]   25/7
30/17 30/21 32/2
49/6 63/23
parent [6]   8/25
9/11 9/19 9/20 11/4
12/24
parental [7]   9/10
11/6 12/5 15/17
16/17 39/22 46/21
parents [15]   9/13
9/14 9/21 9/23
10/18 10/19 10/21
11/3 11/7 11/19
11/19 11/25 11/25
12/15 36/2
part [5]   5/12 41/15
58/10 61/17 67/9
participate [1]
18/17
particular [5]
16/10 30/3 36/6
46/4 63/25
parties [5]   3/20
25/5 28/10 53/24
54/1
partner [19]   5/3
30/9 30/10 30/13
30/15 30/19 30/25
31/16 32/6 32/7
32/10 33/8 34/11
48/17 48/25 49/13
49/17 52/2 52/17
parts [2]   22/20
67/3
passed [2]   28/13
29/2
past [1]   46/22
patient [1]   21/25
patiently [1]   60/24
patronizing [1]
52/8
pause [3]   6/19 43/9
48/2
pay [3]   30/13 48/11
66/13
PDA [3]   61/3 61/21
61/23
people [9]   12/12
17/1 19/19 21/10
38/7 48/1 48/6
52/17 57/3
perceived [1]   52/16
percent [5]   5/6 5/7
22/5 23/21 23/22
perfectly [1]   23/6
perform [1]   5/14
performance [2]
32/11 48/18
perhaps [1]   8/23
period [31]   6/17
10/12 12/23 14/19
14/21 14/22 14/23
15/2 16/8 16/10
17/22 17/22 18/3
18/18 22/3 26/13

26/14 26/19 29/11
35/13 35/21 37/13
37/24 38/9 42/10
44/7 46/4 46/22
47/18 47/19 63/4
periods [3]   10/13
36/14 63/3
permissible [2]
35/19 56/9
permits [1]   37/17
person [7]   4/6
25/11 28/4 43/10
58/13 59/13 60/6
personal [1]   28/23
personally [1]
18/14
perspective [1]
25/10
pertinent [1]   67/3
phones [1]   35/4
physical [6]   14/23
16/8 21/5 35/13
35/21 36/16
physically [1]   42/9
pick [1]   66/22
Pittsburgh [1]   1/18
place [1]   52/4
places [1]   40/14
plaintiff [6]   11/14
22/25 27/21 55/6
56/16 59/17
plaintiffs [31]   1/3
1/10 2/3 2/19 3/9
4/18 8/23 12/2
12/21 13/10 14/20
18/7 21/2 22/10
22/11 29/19 30/18
32/5 32/23 34/22
62/5 62/9 62/18
62/21 63/5 63/22
63/24 64/7 64/23
66/4 66/11
plaintiffs' [9]   3/7
4/8 11/2 16/15 27/9
31/19 62/3 64/5
68/8
plan [2]   3/19 27/8
plausibility [1]
58/5
plausible [10]   11/3
13/19 33/4 33/5
33/7 33/7 34/13
34/16 48/21 48/23
plausibly [4]   30/9
37/12 58/3 58/5
play [1]   54/3
playing [1]   62/24
pleadings [6]   12/18
12/25 13/2 15/20
49/11 51/16
please [4]   3/5 32/3
54/24 69/7
pled [1]   64/5
plural [1]   58/13
plus [2]   61/7 61/18
point [18]   10/2
11/13 14/1 14/10
14/11 15/11 18/7
19/16 20/7 21/14
28/3 33/10 36/22

42/20 58/15 59/10
65/17 66/5
pointed [3]   28/11
36/21 38/9
pointing [2]   28/19
35/25
points [10]   25/4
25/5 34/19 41/18
41/24 49/25 51/21
58/14 63/22 68/5
policies [9]   9/22
22/16 40/14 44/17
44/24 63/25 64/1
64/4 68/10
policy [128]
policy's [1]   26/15
portions [1]   66/22
position [7]   16/6
25/11 26/7 45/14
55/2 62/3 68/8
positive [1]   33/20
possible [5]   12/19
21/20 21/23 52/12
52/13
postpartum [3]   6/16
6/25 17/22
posture [1]   15/15
practical [1]   38/18
practice [4]   56/10
56/12 63/21 68/2
preceding [1]   8/9
pregnancy [18]   5/5
14/23 14/25 16/9
24/18 26/18 26/22
35/14 36/14 37/23
38/1 38/5 38/6
45/17 46/12 47/9
47/11 62/24
pregnancy-related [1]
47/11
pregnant [4]   25/20
35/16 37/2 41/19
premise [2]   13/25
15/5
preponderance [1]
21/3
presentation [2]
66/24 68/7
presumably [1]   26/4
presumption [1]
19/25
presumptive [3]
11/5 12/23 47/4
presumptively [1]
65/13
pretext [2]   66/14
66/15
pretextual [2]   50/9
50/12
pretty [2]   36/16
38/23
prevail [1]   21/2
primary [6]   8/14
8/18 8/24 11/11
24/15 68/11
principle [2]   27/4
68/9
principles [3]
22/18 25/15 35/23
printed [1]   7/25

**P**

prior [1]   50/6
pro [2]   1/11  2/4
probably [5]   30/5
53/23 53/24 59/21
59/25
problem [2]   51/5
51/5
problematic [1]
26/21
procedural [1]   57/1
proceeding [2]   2/12
10/25
proceedings [2]
68/25 69/5
process [4]   9/18
11/13 14/11 55/15
processing [1]
56/22
Products [3]   55/5
56/7 56/15
prohibits [2]   35/15
37/1
projection [1]   24/7
projections [2]
21/17 22/2
proof [3]   20/10
39/6 39/16
properly [2]   51/22
52/23
proposing [1]   47/3
proposition [1]
44/14
prospective [1]
41/23
protect [1]   60/12
protected [14]
27/15 27/21 28/11
28/17 29/21 57/17
57/18 58/1 58/1
58/3 58/7 59/4 59/7
60/16
prove [3]   20/21
20/23 21/3
proves [1]   21/13
provide [5]   7/4
8/11 11/6 12/3 17/6
provided [3]   21/5
23/15 66/2
provider [6]   6/16
6/24 16/23 17/21
22/3 65/19
provider's [1]
21/17
provides [4]   8/13
12/24 26/2 41/25
providing [1]   46/10
proving [1]   17/10
provision [1]   6/20
provisions [3]   8/4
13/7 23/1
pull [2]   30/2 55/8
Pullman [1]   56/8
purport [1]   29/19
purposes [5]   6/4
53/12 55/17 58/20
58/21
pursue [1]   57/11
put [3]   10/22 21/1

**Q**

qualifies [2]   5/13
6/5
quality [2]   49/4
50/15
quickly [1]   22/10
quite [2]   54/25
58/12
quote [5]   23/10
35/12 35/15 64/3
64/25

**R**

raise [4]   19/20
30/15 37/9 48/20
raised [6]   2/21
2/22 37/5 52/23
52/24 57/14
raises [2]   49/12
49/15
raising [1]   37/7
RANDOLPH [1]   1/8
range [3]   36/14
36/19 36/20
ratchet [4]   17/25
17/25 18/14 18/19
rather [1]   61/14
rationale [3]   9/23
10/3 10/15
reach [1]   60/4
reached [1]   15/12
reaction [1]   30/25
read [20]   8/1 8/2
8/23 8/23 17/17
18/3 22/16 23/8
23/23 23/25 24/1
25/9 27/2 27/17
30/24 31/2 33/8
34/11 40/13 43/21
reading [9]   10/6
22/11 22/19 22/22
28/10 31/19 40/6
44/25 60/1
reads [1]   52/11
real [2]   32/19 64/6
reality [1]   26/24
reallocate [1]   3/23
really [26]   9/9
11/5 12/4 12/25
13/15 14/8 14/9
15/17 17/14 17/24
19/5 19/21 19/23
19/23 20/22 22/9
24/9 30/11 32/22
32/24 38/20 45/4
57/19 61/13 62/15
64/12
reason [9]   11/3
20/16 28/10 29/20
49/8 50/18 53/1
54/12 68/17
reasonable [18]
10/6 10/15 10/17
11/1 12/10 14/15
14/19 15/10 15/19
16/8 24/3 25/8
26/25 34/10 36/12
36/17 36/23 45/10

reasonableness [2]
25/9 25/12
reasonably [1]   19/5
reasons [12]   9/21
10/19 12/15 12/21
22/17 27/13 48/24
49/1 50/6 54/14
57/13 65/7
rebroadcast [1]
2/12
receive [7]   7/1
16/21 21/20 25/17
28/6 29/3 46/7
receiving [1]   55/18
recipient [1]   57/20
recognize [1]   25/2
recognized [1]
14/21
recognizes [2]   16/8
60/10
reconvene [1]   35/2
record [6]   2/12
2/16 3/6 35/5 35/6
65/17
records [1]   38/24
recover [3]   21/21
24/4 24/5
recovers [1]   21/25
recovery [1]   15/2
reducing [1]   66/1
refer [1]   12/2
reference [3]   4/23
27/3 58/10
referenced [5]   27/1
32/13 39/21 51/22
51/23
references [2]   4/20
31/25
referred [1]   16/16
refers [4]   27/19
41/16 58/11 58/13
reflect [2]   63/14
67/22
regard [2]   19/24
42/2
regardless [6]   21/5
36/5 40/13 40/16
43/2 61/12
regular [1]   5/15
regularly [1]   20/22
regulation [3]
55/25 56/5 56/25
regulations [2]
56/25 57/4
rejecting [1]   42/24
related [3]   6/21
25/22 47/11
relatedly [1]   23/18
relates [1]   47/11
relating [1]   47/2
relative [1]   36/17
relied [1]   57/4
rely [2]   22/7 56/14
remainder [1]   7/6
remedy [3]   46/5
47/16 61/17
remotely [2]   69/5
69/9
render [1]   22/5
rendering [1]   22/20

reorder [1]   3/22
repeat [2]   2/10
45/4
repeated [1]   30/17
replied [1]   68/11
reply [5]   37/4
57/14 61/25 68/6
68/18
report [1]   14/25
reported [2]   1/22
69/5
reporter [1]   1/23
34/25 43/11 69/3
reporting [1]   69/9
request [5]   28/6
29/7 29/9 42/24
53/19
requesting [2]   29/3
42/24
require [4]   15/7
18/22 53/14 61/23
required [6]   26/21
34/12 37/24 38/15
39/1 40/3
requirements [7]
6/11 7/7 7/9 23/16
23/16 23/17 38/23
requires [4]   5/14
38/5 62/7 63/2
requiring [3]   10/12
15/2 66/3
research [1]   31/10
Resources [1]   41/24
respect [13]   4/2
10/5 12/1 12/14
27/7 45/14 49/24
51/19 52/22 53/5
54/4 54/13 63/20
responding [1]
52/17
responds [2]   29/11
29/13
response [12]   31/19
32/5 32/15 37/8
42/16 42/19 43/5
49/24 50/2 50/4
66/8 66/8
responses [1]   49/19
rest [1]   34/25
result [1]   59/18
results [2]   16/24
64/14
retaliate [1]   57/21
retaliation [19]
3/18 3/22 24/24
25/2 25/16 27/10
27/12 28/12 40/22
40/24 45/6 57/11
58/21 58/22 59/11
59/15 59/17 59/20
60/7
return [3]   14/6
40/3 41/8
returning [2]   38/15
46/11
review [10]   23/11
30/19 48/18 49/1
49/2 49/7 50/4 51/7
51/16 67/18
reviewers [2]   68/1

**R**

reviewers... [1]
68/2
revisions [3]   49/13
49/16 49/19
right [26]   3/2 4/11
11/22 12/19 12/20
12/20 12/22 12/25
14/13 15/24 18/5
19/1 19/2 21/9
21/18 22/10 28/7
29/9 39/12 44/20
45/8 46/24 51/2
53/20 58/16 62/20
rise [1]   28/12
rises [3]   3/21
17/15 27/10
Robinson [2]   58/18
60/14
role [2]   32/9 32/25
Room [1]   1/24
routine [3]   6/17
17/23 65/20
routinely [2]   20/22
64/8
rule [11]   33/22
34/15 39/12 39/15
44/16 47/23 53/3
56/1 63/1 65/1 65/1
rules [1]   2/11
run [1]   31/9

**S**

salary [5]   5/3 5/12
23/21 23/22 59/19
same [23]   10/10
11/9 17/3 17/11
28/3 29/11 30/16
38/3 38/7 39/2
41/13 41/23 45/7
45/16 47/6 47/25
55/11 58/10 59/22
59/24 62/24 67/9
67/10
Sarah [1]   43/4
satisfies [1]   57/17
SAVIGNAC [14]   1/2
1/10 2/3 2/4 2/20
25/19 26/11 26/11
27/3 27/19 35/8
43/18 48/9 66/7
Savignac's [3]   25/7
25/15 27/13
saying [15]   12/7
12/8 15/15 32/21
33/24 38/17 41/17
43/20 45/15 47/17
47/21 52/2 61/5
63/6 64/25
scheme [1]   60/17
scolding [5]   32/6
33/8 33/9 34/8
52/14
scope [1]   63/13
se [2]   1/11 2/4
second [15]   5/10
5/20 6/2 6/13 14/8
19/14 31/21 32/4
32/7 38/25 43/10

48/3 49/12 62/18
64/5
second-guessing [1]
32/7
secondary [2]   8/15
8/18
section [1]   6/17
seeing [1]   26/25
seeking [1]   45/19
seeks [1]   6/22
seem [2]   11/14 61/5
seems [1]   9/12
sending [2]   28/23
29/3
sends [1]   29/10
senior [1]   5/21
sense [2]   20/17
45/1
sent [4]   28/14 29/1
32/6 42/22
sentence [15]   4/19
5/20 6/2 6/13 8/7
8/8 17/11 20/8
22/12 24/1 24/10
24/11 24/14 33/21
33/21
separate [2]   8/16
60/5
separately [2]   3/20
27/8
sequence [1]   66/15
sequential [2]
55/10 55/11
seriatim [1]   8/1
serious [1]   18/1
set [1]   41/15
setting [2]   59/9
59/10
seven [1]   18/10
several [1]   8/6
severity [1]   63/13
sex [17]   11/10 30/9
35/19 36/10 36/23
36/24 37/13 40/15
40/19 48/19 48/21
49/20 61/16 61/16
62/9 62/9 64/11
sex-based [7]   35/19
36/10 36/23 37/13
40/15 62/9 62/9
sex-neutral [1]
40/19
sexist [4]   30/25
31/18 64/1 64/2
sham [2]   22/6 24/21
sharing [9]   44/9
53/15 54/2 55/12
55/16 55/21 55/24
56/2 56/18
SHEKETOFF [12]   1/11
2/5 27/18 30/8
30/20 31/1 31/18
34/5 34/12 48/14
66/6 66/20
Sheketoff's [10]
3/19 27/12 27/14
29/23 30/13 66/6
66/13 66/16 67/20
68/1
Shell [2]   58/18

60/14
short [39]   3/10
4/15 4/21 4/22 4/24
5/13 6/22 7/10 7/22
8/1 8/12 13/5 13/6
13/9 13/16 13/19
13/21 16/20 17/13
17/19 22/21 22/22
23/4 23/11 23/12
23/13 23/20 24/16
25/23 26/24 26/25
27/4 38/22 39/20
39/20 40/4 62/4
63/7 65/8
short-term [37]
3/10 4/15 4/21 4/22
4/24 5/13 6/22 7/10
7/22 8/1 8/12 13/5
13/6 13/9 13/16
13/19 13/21 16/20
17/13 17/19 22/21
22/22 23/4 23/11
23/12 23/13 23/20
24/16 25/23 26/24
26/25 27/4 38/22
39/20 62/4 63/7
65/8
shorter [1]   18/18
shorthand [3]   17/2
17/12 24/2
shorthands [1]   8/8
show [3]   10/17
50/16 51/15
showing [2]   49/8
68/1
shows [4]   50/2 52/6
62/5 68/3
sick [1]   39/3
side [1]   68/18
sides [4]   25/6 25/9
43/3 45/23
similar [1]   30/16
similarities [1]
44/9
similarly [9]   9/14
10/19 11/19 11/23
12/12 13/9 21/23
49/18 52/9
simply [4]   32/9
37/17 52/6 53/14
single [3]   35/24
62/25 67/14
situated [8]   9/14
10/19 11/20 11/23
12/13 13/9 49/18
52/9
situation [1]   40/25
six [7]   14/18 15/17
4/8 37/12 38/14
65/19 65/20
slightly [1]   56/20
somebody [1]   50/23
someone [2]   20/4
34/9
somewhere [1]   53/23
sooner [1]   19/1
sorry [15]   5/18
5/19 14/22 16/12
17/17 18/21 42/18
42/24 49/23 50/21

56/3 56/8 66/6
66/13 68/20
sort [13]   10/4
13/25 15/13 16/17
17/9 17/14 20/22
23/8 24/21 32/24
39/6 47/3 66/14
sorts [1]   22/18
sounds [1]   3/25
speak [7]   2/14 2/16
2/18 10/16 17/8
29/19 34/22
speaking [3]   2/14
2/15 2/24
speaks [2]   31/4
58/13
special [2]   35/15
37/1
specific [7]   20/13
22/19 33/18 33/19
41/7 49/2 50/14
specifically [6]
27/1 32/17 49/5
56/8 57/2 64/2
spend [3]   4/3 27/11
29/24
spouse [2]   28/22
59/16
spouses [1]   59/24
staff [1]   5/21
stage [14]   10/1
10/24 10/24 12/18
12/25 13/2 32/24
40/7 43/21 43/25
49/11 51/16 52/4
52/15
standards [1]   34/15
standing [6]   2/11
27/15 57/8 57/11
59/1 60/6
start [8]   3/3 3/17
4/18 20/8 24/22
32/25 35/7 35/9
starting [3]   6/23
16/22 32/24
starts [7]   4/14
5/11 5/21 6/13 7/16
33/15 33/16
state [9]   3/6 3/9
15/2 23/19 55/8
55/20 55/20 56/10
56/21
stated [2]   49/8
50/6
statement [4]   33/22
67/20 67/22 67/25
statements [2]
31/15 50/5
STATES [2]   1/1 1/9
statistical [1]
44/9
statute [5]   15/2
55/6 57/18 60/12
60/16
statutory [4]   57/8
59/1 60/5 60/17
stay [2]   35/3 65/2
stays [1]   22/1
step [2]   32/24
45/20

**S**

stereotypes [2]
35/16 49/20
Stick [1]   34/1
still [17]   21/11
26/21 27/25 28/1
28/5 32/22 36/9
36/23 39/4 41/11
42/10 43/12 43/13
43/15 43/17 48/3
51/4
still employed [1]
27/25
stop [1]   24/22
strategic [1]   16/3
Street [3]   1/11
1/15 1/18
stress [1]   20/5
string [2]   67/11
67/15
strong [1]   31/11
strongest [1]   42/3
style [5]   34/1 34/2
34/2 34/4 34/4
subject [1]   69/8
submit [7]   7/7
38/25 53/21 53/25
54/2 54/17 54/19
subsection [2]   5/1
6/9
subsequent [2]
51/14 66/10
substantial [1]
5/15
substantive [5]   5/2
23/15 23/20 25/13
33/24
suddenly [1]   28/22
sue [1]   59/24
suffer [1]   59/18
suffers [1]   59/16
suffices [1]   49/11
sufficient [1]
58/25
suggest [6]   32/8
38/11 49/16 55/9
64/6 65/16
suggested [4]   47/16
49/13 63/9 66/7
suggested that [1]
66/7
suggesting [2]   19/6
50/5
Suite [1]   1/18
summary [8]   10/2
16/1 31/23 52/24
53/3 54/8 54/13
54/16
superfluous [1]
22/21
support [6]   11/15
11/16 12/2 14/24
47/22 54/20
supporting [1]   61/8
supports [1]   40/6
suppose [4]   9/6
53/17 54/6 64/16
supposed [1]   49/3
supposedly [1]

**T**

table [1]   7/20
talk [2]   17/1 54/6
talking [9]   21/15
21/18 23/3 23/4
23/13 33/12 33/13
66/21 67/5
technological [1]
69/9
telephone [1]   2/4
TELEPHONIC [1]   1/8
telling [1]   61/19
tells [4]   10/20
22/24 24/21 65/6
ten [6]   8/13 15/17
38/14 40/19 46/1
47/7
ten-week [1]   47/7
term [39]   3/10 4/15
4/21 4/22 4/24 5/13
6/22 7/10 7/22 8/1
8/12 13/5 13/6 13/9
13/16 13/19 13/21
16/20 17/13 17/19
22/21 22/22 23/4
23/11 23/12 23/13
23/20 24/16 25/23
26/24 26/25 27/4
38/22 39/20 39/20
40/4 62/4 63/7 65/8
terminated [1]
19/16
termination [1]
28/14
terms [8]   4/4 23/7
28/24 31/5 36/15
38/7 47/25 67/23
TERRI [2]   1/14 2/6
terrible [1]   49/15
that women [1]
49/20
theoretically [2]
21/20 21/23
theories [1]   58/25
therefore [4]   15/19
45/19 60/15 69/8
third [4]   5/17 6/8

30/13
Supreme [9]   14/21
16/7 35/11 36/20
36/25 55/4 56/7
56/9 60/1
sure [12]   8/21
13/14 13/17 13/25
19/2 21/12 24/9
33/3 35/9 43/11
46/20 62/11
surely [3]   36/18
48/23 59/11
surgery [2]   21/19
21/25
surprise [1]   61/4
surreply [9]   3/7
3/8 18/11 22/11
39/19 44/25 68/14
68/15 68/17
suspect [1]   53/22
sweeping [1]   44/13
switch [1]   40/18

23/18 35/18
Thompson [2]   60/2
60/10
though [5]   8/20
32/22 38/11 39/7
51/14
thought [2]   28/9
31/1
thousands [4]   44/17
44/17 56/14 57/3
three [6]   4/14 31/7
48/23 59/3 63/22
66/18
thus [1]   41/21
tied [5]   13/11
13/13 13/22 51/10
63/19
ties [1]   24/13
timeliness [1]
28/15
timely [1]   56/20
times [1]   16/16
tip [1]   58/12
Title [4]   35/11
35/15 37/1 60/12
today [3]   2/18 2/25
54/10
today's [1]   2/12
together [1]   57/16
told [2]   19/9 40/17
tone [8]   31/5 34/10
52/8 52/9 52/10
52/11 52/14 52/20
took [2]   52/7 61/3
top [4]   7/13 33/16
36/18 36/19
totally [1]   60/17
touch [1]   3/18
traces [1]   48/22
TRACI [3]   1/13 2/6
3/1
track [1]   49/20
track traditional [1]
49/20
traditional [1]
49/20
train [1]   19/11
training [2]   19/9
20/4
transcript [2]   1/8
69/4
travel [1]   9/16
treat [5]   38/2 44/8
53/2 54/13 54/15
treated [1]   45/16
treatment [5]   11/20
27/23 35/15 37/2
42/25
treats [1]   37/6
trial [2]   18/17
18/24
triathlon [3]   19/10
19/12 19/15
trigger [1]   32/14
triggered [1]   31/18
true [7]   12/18
37/10 46/14 51/18
59/22 61/9 69/4
trying [2]   19/4
31/25

turn [3]   8/5 50/25
63/3
turning [2]   4/13
49/3
two [29]   11/7 14/4
14/6 14/9 14/17
16/11 16/12 16/12
17/25 18/10 18/14
18/19 20/4 25/4
25/4 33/13 33/16
33/17 38/13 38/17
44/3 47/8 49/18
50/3 57/23 58/25
58/25 60/23 61/25
two-way [3]   17/25
18/14 18/19
type [1]   65/21
typical [4]   14/21
14/22 15/1 36/14

**U**

U.S [3]   1/23 14/20
16/7
unanimous [1]   60/1
uncommon [1]   65/11
under [32]   2/10
4/25 6/6 6/9 8/7
8/12 14/7 18/22
19/13 23/10 23/20
24/15 27/9 32/16
36/1 37/23 38/1
40/3 40/18 45/17
46/18 51/23 53/3
55/15 55/19 55/22
58/17 60/13 61/14
61/22 64/19 68/22
under some [1]
64/19
understandable [2]
16/19 17/1
understood [2]   27/2
47/20
unfair [2]   49/7
51/17
unhelpful [2]   51/13
66/21
uninterested [1]
60/18
unique [2]   9/15
9/17
UNITED [2]   1/1 1/9
unlawful [10]   26/2
26/5 26/8 28/9 38/2
41/5 41/6 44/18
45/18 46/8
unless [7]   6/13
6/14 14/6 17/6
17/20 39/22 55/7
unreasonable [8]
15/7 25/19 25/24
26/5 26/7 45/9
47/15 66/1
unrelated [1]   60/16
unsupported [1]
61/22
untainted [2]   31/17
31/20
untrue [1]   49/5
unusual [1]   44/18
up [27]   4/9 5/6 5/7

**U**

up... [24]   15/18
18/24 19/14 19/15
23/21 23/21 30/2
30/3 38/20 38/24
39/3 39/8 39/9
39/10 39/24 41/14
50/7 50/25 51/10
55/8 62/8 63/10
63/10 63/12
upheld [1]   56/13
upon [2]   26/25 42/8
upset [3]   49/13
49/18 50/6
Urbana [1]   1/12
use [1]   18/8
using [2]   22/3
28/23

**V**

validity [1]   18/11
value [1]   45/2
vary [1]   62/8
version [2]   31/10
51/11
versus [2]   2/3
31/23
Vesey [1]   1/15
victim [2]   59/11
60/7
view [18]   3/8 3/11
3/23 4/21 22/11
25/15 27/17 30/8
38/13 38/19 39/7
45/9 45/9 45/10
50/7 59/15 61/5
61/22
VII [4]   35/11 35/15
37/1 60/12
violate [4]   26/18
26/22 46/11 47/9
virtually [4]   16/24
20/14 64/9 64/15
virtue [1]   56/17

**W**

wait [3]   14/8 19/14
51/4
waiting [2]   2/9
60/24
waive [1]   56/21
waived [1]   39/19
waiver [1]   68/5
wants [4]   18/16
18/16 38/25 54/19
warranted [1]   3/8
Washington [3]   1/4
1/21 1/25
way [29]   3/17 10/23
10/25 11/12 16/20
17/3 17/7 17/10
17/11 17/25 17/25
18/14 18/19 19/5
21/1 22/16 26/20
27/17 30/12 31/16
33/1 39/2 41/6
44/16 52/16 57/21
61/9 62/19 65/5
week [23]   6/16 6/20

6/24 14/22 16/21
16/23 16/25 17/22
18/15 20/14 21/7
21/21 21/24 24/2
26/13 27/3 36/20
37/13 42/22 47/5
47/7 47/7 54/10
weekend [1]   51/12
weeks [124]
Weinstein [1]   55/14
welcome [1]   2/7
well-pled [1]   64/5
what's [2]   12/9
14/8
whatsoever [1]
25/21
Whereas [1]   11/9
who's [4]   2/24
12/25 19/11 60/24
whole [3]   13/15
22/20 52/10
win [1]   11/15
withdrawing [1]
3/12
within [1]   7/10
without [5]   10/25
13/12 15/13 42/2
52/11
witnesses [1]   10/9
woman [16]   18/16
18/23 19/7 19/24
34/9 36/6 36/8
38/15 39/9 45/23
46/15 46/17 47/5
47/6 47/7 62/12
women [44]   20/19
26/16 26/23 36/12
38/2 38/5 38/22
39/13 40/15 40/17
41/7 41/14 41/18
42/5 42/7 42/8 42/9
43/24 44/1 44/8
45/2 45/16 45/17
45/21 45/25 46/2
46/3 46/6 46/14
46/19 46/22 47/1
47/4 47/10 49/20
61/11 61/18 61/21
62/6 64/7 64/18
65/2 65/13 66/2
women's [1]   46/4
word [1]   55/9
words [2]   40/9
40/17
work [24]   14/6
19/15 32/8 38/15
38/18 38/19 39/4
42/9 49/4 49/5
50/15 51/11 53/14
54/2 55/12 55/16
55/21 55/24 56/1
56/2 56/17 63/14
66/15 67/9
workable [1]   63/1
worked [2]   49/18
52/18
workers [3]   23/15
35/16 37/2
working [2]   36/16
39/4

works [4]   16/20
17/11 17/13 55/15
worse [1]   48/18
worst [1]   52/6
write [3]   27/22
31/12 52/3
writer [1]   49/15
writing [4]   34/4
49/17 66/16 68/2
written [13]   20/18
27/18 32/21 40/11
40/13 41/17 44/24
63/24 64/7 66/21
66/23 66/24 67/2
wrong [3]   50/20
62/6 65/5
wrongful [1]   20/6
wrote [5]   30/19
32/11 41/10 51/12
57/16
Wultz [1]   68/16

**Y**

years [5]   14/4 14/6
14/9 14/17 16/12
York [1]   1/15
you don't [1]   39/19