## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK C. SAVIGNAC *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 19-2443 (RDM) |
| JONES DAY *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants Jones Day, Stephen Brogan, and Beth Heifetz move to dismiss Plaintiffs Mark Savignac and Julia Sheketoff's complaint alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Equal Pay Act of 1963, 29 U.S.C. § 206(d); the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*; and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215,  as well as interference with the right to take protected leave in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the D.C. Family and Medical Leave Act ("DCFMLA"), D.C. Code § 32-501 *et seq.*

For the reasons that follow, the Court will **GRANT** in part and **DENY** in part Defendants' motion.

## I.  BACKGROUND

### A.    Factual Background

For purposes of resolving the pending motion to dismiss, the Court accepts the following factual allegations as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1.    *The Parties*

Jones Day is a large, international law firm.  Dkt. 1 at 1 (Compl. ¶ 2).  Stephen Brogan is the firm's managing partner, and Beth Heifetz heads the firm's "Issues & Appeals" practice group.  *Id.* at 1–2 (Compl. ¶ 2).  Mark Savignac and Julia Sheketoff are attorneys who formerly worked as associates in the Issues & Appeals group in Jones Day's Washington, D.C. office.  *Id.* (Compl. ¶¶ 1–3).  Both Savignac and Sheketoff joined Jones Day after serving as law clerks for a federal district court, a federal appellate court, and the Supreme Court of the United States.  *Id.* at 6, 8 (Compl. ¶¶ 36, 56).  Sheketoff joined the firm in 2014, and Savignac joined in 2017.  *Id.* (Compl. ¶¶ 37, 57).  They married in 2017 and have one child, who was born in January 2019, *id.* at 1 (Compl. ¶ 1), several months after Sheketoff had left the firm, *id.* at 29 (Compl. ¶ 210).

2.   *Jones Day's Employee Evaluation and Salary-Setting Practices*

Jones Day determines the size of annual salary adjustments for each associate based in part on reviews submitted by the partners who worked with the associate during the relevant period.  Dkt. 1 at 5 (Compl. ¶ 25–29).  These reviews are compiled by the partnership into a "consensus statement" for the associate, and Jones Day's managing partner, Stephen Brogan, approves each associate's salary change based on his or her consensus statement.  *Id.* (Compl. ¶ 28–29).  Associates are not provided copies of their consensus statements or evaluations, and they are not permitted to discuss their salaries with others at the firm.  *Id.* (Compl. ¶ 30–31).  Plaintiffs allege that this "black-box compensation system . . . enables and conceals sex discrimination" because salary raises are made at the discretion of the predominantly male partnership and because associates are not permitted to share their salaries with others.  *Id.* at 28, 30 (Compl. ¶¶ 204, 219).

3.  *Sheketoff's Evaluation and Salary Determination*

During her third year at Jones Day, Sheketoff was assigned to work on a memorandum with a partner in another practice group, Partner A.[1]  Dkt. 1 at 10 (Compl. ¶ 70).  Before Sheketoff began this project, Heifetz warned Sheketoff that Partner A was a "terrible writer."  *Id.* (Compl. ¶ 71).  Partner A edited Sheketoff's initial draft of the memorandum, and she believed that some of his edits were misguided.  *Id.* (Compl. ¶¶ 73–74).  She asked a male associate in her practice group who had worked with Partner A in the past for advice on how she should handle this situation.  *Id.* (Compl. ¶ 75).  The male associate advised her to "speak up about the problems introduced by Partner A's edits and try to improve the memorandum."  *Id.* (Compl. ¶ 76).  Sheketoff followed this advice and suggested "further edits and explain[ed] to Partner A why she believed that he should not implement all of his edits."  *Id.* (Compl. ¶ 77).  The partner responded with an email, which Plaintiffs characterize as "scolding her for second-guessing his edits."  *Id.* at 11 (Compl. ¶ 78).  He provided "specific comments" on Sheketoff's draft "in **bold**" and conveyed the following "general comments" in his email, which is attached to the complaint:

> 1.  you should avoid making style edits to the writing of the person whose name goes first on the memo (e.g., the first sentence on p. 2 under exec summary . . . where you changed "as well as" to "and")
>
> 2.  when the person whose name goes first on the memos makes an edit, you should not change it back to the way you had it (e.g., on p. 4 when describing the district court case . . . the citation alerts the reader to the specific court).

Dkt. 15-2 at 3 (emphasis in original).  Sheketoff alleges that she had not received this type of reaction in the past when she had suggested edits to male supervisors, and the male associate who had recommended that she raise her concerns about the edits with Partner A was surprised

---

[1]  Plaintiffs refer to all individuals who are not Defendants throughout the complaint by their title only.  Because there are multiple partners referenced, Plaintiffs differentiate between them by assigning them each a letter.

that he reacted this way.  Dkt. 1 at 11 (Compl. ¶ 79–80).  Plaintiffs further allege that Partner A is "deferential" to similarly situated male associates and has stopped by the "male" Issues & Appeals associates' table in the cafeteria to make "self-deprecating remarks" that those associates are smarter than he is.  *Id.* (Compl. ¶¶ 82–83).

Plaintiffs allege that, after this interaction with Sheketoff, Partner A wrote a "disingenuous, severely negative" review of Sheketoff's work that was then factored into her 2016 consensus statement.  *Id.* at 11–12 (Compl. ¶¶ 85, 88).  They further claim that he made this negative review "because Julia is a woman" and that the review "unfairly" criticized her work.  *Id.* at 11 (Compl. ¶¶ 85–86).  Sheketoff's 2017 raise was based on her 2016 consensus statement, and, according to Plaintiffs, "[b]ut for Partner A's negative evaluation," her 2017 raise would have been higher.  *Id.* at 12 (Compl. ¶¶ 88–90).  Sheketoff's 2017 raise was one fifth as large as the raise she had received the previous year.  *Id.* (Compl. ¶ 89).  Plaintiffs assert "on information and belief" that the raise Sheketoff received "was smaller than the raises received by male associates in the Issues & Appeals group the same year."  *Id.* (Compl. ¶ 91).

4.  *Jones Day's Parental Leave Policies*

In 2018, Plaintiffs learned that they were expecting their first child, and their son was born in early January 2019.  Dkt. 1 at 17, 19 (Compl. ¶¶ 136, 146).  Savignac and Sheketoff desired to care for their son equally, while equally maintaining focus on their careers.  *Id.* at 2 (Compl. ¶ 5).  To this end, Plaintiffs sought to maximize the length of paid leave that Savignac could take after the birth of their son.  Jones Day's leave policy for new parents consists of three parts, as follows:

*First*, "the [f]irm . . . provide[s] mothers [with] eight weeks of paid leave under the [f]irm's Short Term Disability policy," and, "if the mother is the primary caregiver, the [f]irm . .

. provide[s] an additional ten weeks of paid family leave after the eight weeks of paid disability leave." Dkt. 1-1 at 3. "[W]ith approval," the firm also provides "up to an additional six weeks of unpaid leave" to new mothers. *Id.* The firm's Short Term Disability policy, in turn, provides that, "[u]nless the [f]irm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Cesarean-section births)." *Id.* at 5. "Except for leave for routine childbirth," however, "the specific period of approved [short term disability] leave is subject to certification from professional medical personnel that specifies the appropriate length in a manner satisfactory to the [f]irm or its [t]hird [p]arty [a]dministrator." *Id.*

*Second*, the policy for biological fathers provides that, "if the father is the primary caregiver, the [f]irm will provide ten weeks of paid family leave and, with approval, up to an additional six weeks of unpaid leave." *Id.* at 3. "Fathers must commence this family leave within eight weeks after the birth of the child." *Id.*

*Finally*, although not directly applicable here, the policy for parents of newly adopted children "provide[s] 18 weeks of paid adoption leave to the primary caregiver and, with approval, up to an additional six weeks of unpaid leave." *Id.* "Primary caregivers must commence this family leave within eight weeks after the adoption of the child." *Id.*

Under these policies, biological mothers (and adoptive parents) who are primary caregivers may take a total of eighteen weeks of paid leave, while biological fathers who are primary caregivers may take only ten weeks of paid leave. Dkt. 1 at 13–14 (Compl. ¶ 106, 108); Dkt. 1-1 at 3. In Defendants' view, this makes perfect sense because, unlike biological fathers, biological mothers experience the physical effects of childbirth. Dkt. 15 at 9. Plaintiffs, for their part, allege that Jones Day gives eight-weeks of "disability leave" to all biological mothers,

regardless of how long they are actually disabled after giving birth.  Dkt. 1 at 14–15 (Compl. ¶¶

112, 114–16).  They also allege that Jones Day "advertises its parental leave policy to

prospective employees as allotting 18 weeks of paid leave to mothers and 10 weeks of paid leave

to fathers, omitting mention of any requirement that the mother be disabled."  *Id.* at 14 (Compl. ¶

114).  Plaintiffs maintain that, considered in this light, use of the term "disability leave" for the

eight-week paid-leave period for biological mothers is "just a label" and that, in practice, it

constitutes an additional period of parental leave provided to mothers but not fathers.  *Id.*

(Compl. ¶¶ 110–11).

5.   *Sheketoff's and Savignac's Requests for Leave*

In 2018, Sheketoff decided to leave the firm for another job.  Dkt. 1 at 18 (Compl. ¶ 137).

In her penultimate week at the firm, Sheketoff emailed Heifetz asking that the firm "treat Mark

equally to female primary caregivers and grant him 18 weeks paid and 24 weeks total leave"

after the birth of their child.  *Id.* (Compl. ¶ 140).  She asserted that the eight-week disability leave

that Jones Day grants all new biological mothers "is not dependent upon whether women are

actually disabled" and noted that adoptive parents receive eighteen paid and twenty-four total

weeks of leave, but biological fathers receive only ten paid weeks and sixteen total weeks of

leave.  *Id.*  Because Savignac would be their child's primary caregiver, Sheketoff explained, she

would have to take off from work the extra eight weeks if he could not, which she would "rather

not do" for career reasons.  *Id.*  Heifetz replied, informing Sheketoff that she had passed the

message along to Jones Day's Human Resources Director.  *Id.* (Compl. ¶ 141).  The Director

called Sheketoff the next week, denying her request.  *Id.* at 19 (Compl. ¶ 142).

After Sheketoff's conversation with the Human Resources Director, Savignac sent an

email to the Human Resources Director and Heifetz.  He informed them that he was aware of

6

their exchange with Sheketoff and added: "Needless to say, I oppose your practice, which is made illegal by Title VII.  You may know that it is also illegal to retaliate against an employee who opposes discrimination." *Id.* (Compl. ¶ 144).  The Human Resources Director responded by sending Savignac the "legal citations that Jones Day ostensibly relied on in rejecting [her] request." *Id.* (Compl. ¶ 145).

On January 16, 2019, after Sheketoff had left the firm and their son was born, Sheketoff and Savignac emailed Heifetz and the Human Resources Director, stating that they had read the cases sent to them by the Director and that the cases did not, in their view, support the legality of Jones Day's policy. *Id.* (Compl. ¶ 146).  Although neither party has provided the Court with a copy of the actual email, the parties seem to agree that it was sent from Savignac's email account.  Dkt 15 at 10; Dkt. 18 at 32. Plaintiffs allege, however, that the email was from both of them, Dkt. 1 at 19 (Compl. ¶ 146), and that allegation finds some support in the text of the email, which at times uses first-person plural pronouns (although, at other times, it uses first-person singular pronouns).

As quoted in the complaint, the email asserted as follows:

We have closely reviewed the case law, including the two cases you rely on.  We have also discussed the matter with other competent attorneys.  Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.

Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention.  Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them.  *E.g.*, *Young v. UPS*, 135 S. Ct. 1338, 1351–52 (2015).

Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court

of public opinion.  We are very familiar with the D.C. Circuit and confident that
we will win.

I am aware that Jones Day's black-box compensation system and its attempts to
keep associate salaries secret are tailor-made to enable sex discrimination,
including retaliation.  We ourselves experienced this when Julia's salary was cut
in relative terms based on a negative review from a firm partner who, in
hindsight, clearly treated her worse because she is a woman.  As you know, Title
VII prohibits retaliation for opposition to sex discrimination.

*Id.* at 19–20 (Compl. ¶ 146).

6. *Savignac's Termination*

No one from Jones Day ever responded to the January 16, 2019 email, and three business

days after Plaintiffs sent it, Jones Day fired Savignac. Dkt. 1 at 20 (Compl. ¶¶ 150–52).

Plaintiffs allege that Savignac was terminated in retaliation for his email challenging Jones Day's

parental leave policy. *Id.* at 21 (Compl. ¶ 153).  They further allege "on information and belief"

that Defendant Brogan made the final decision to fire Savignac. *Id.* (Compl. ¶ 154).

Following his termination, Savignac asked three Jones Day partners (Partner C, Partner

D, and Partner E) to serve as employment references for him. *Id.* (Compl. ¶ 159).  At first,

Partner C enthusiastically agreed. *Id.* at 22 (Compl. ¶ 160).  Plaintiffs allege, however, that

Heifetz told the three partners that they could not serve as references for Savignac because of a

Jones Day policy, but, as an exception to this purported policy, the firm would allow Partner D

(and only Partner D) to serve as a reference. *Id.* at 22–23 (Compl. ¶¶ 162–71).  Partner D

explained in an email to Savignac that he was permitted to "speak only about the work [that he

and Savignac] did together." *Id.* at 23 (Compl. ¶ 171).  Plaintiffs claim that the firm selected

Partner D, who was a "Jones Day insider," to serve as a reference for Savignac because he would

not discuss the circumstances surrounding Savignac's termination. *Id.* (Compl. ¶¶ 174, 178).

Plaintiffs further allege that it is not Jones Day's usual policy to preclude partners and employees

8

from serving as references, and, indeed, Sheketoff herself served as a reference for outgoing employees while still working at Jones Day. *Id.* at 22 (Compl. ¶¶ 163–64, 166).

**B.     Procedural Background**

Plaintiffs filed this action on August 13, 2019.  Dkt. 1.  Their complaint includes several distinct groups of claims.  *First*, the complaint alleges that Jones Day's parental leave policy discriminates on the basis of sex in violation of Title VII (Count I), the Equal Pay Act (Count II), and the DCHRA (Count III).  *Id.* at 25–27.  *Second*, it alleges that Jones Day discriminated against Sheketoff on the basis of her sex in violation of Title VII (Count IV), the Equal Pay Act (Count V), and the DCHRA (Count VI). *Id.* at 28–30.  In Plaintiffs' view, Sheketoff received an unfavorable review and was subsequently paid less because she is a woman and because Jones Day "maintain[ed] uniform, firm-wide policies and procedures that had a disparate impact on her because of her sex." *Id.* at 28, 30 (Compl. ¶¶ 203, 218).  *Third*, the complaint alleges that Jones Day retaliated against both Savignac and Sheketoff for engaging in protected activity by firing Savignac and by preventing two Jones Day partners from serving as references for him in violation of Title VII (Count VII) and the FLSA (Count VIII), *id.* at 31–32 (Compl. ¶¶ 225–27, 233–35), and that all three Defendants retaliated against them in violation of the DCHRA (Count IX), *id.* at 33 (Compl. ¶¶ 241–45).  *Finally*, the complaint alleges that Jones Day interfered with Savignac's taking of protected leave by firing him when he was on family leave in violation of the FMLA (Count X) and the DCFMLA (Count XI).  *Id.* at 34–35 (Compl. ¶¶ 250–51, 255–56).

Defendants move to dismiss all counts for failure to state a claim, and they also move to dismiss Sheketoff's Title VII discrimination claim for failure to timely exhaust her administrative remedies, Dkt. 15 at 9, 29.  The Court heard oral argument on August 4, 2020.

Dkt. 29.  At oral argument, the Court inquired whether the component of Defendants' motion arguing that Sheketoff's Title VII discrimination claim is barred for failure to exhaust her administrative remedies should be treated as a motion for summary judgment.  *Id.* at 52–53. After hearing from the parties, the Court directed that they submit supplemental briefs addressing whether that portion of the motion should be treated as a motion for summary judgment and, if so, providing any supplemental materials they deemed appropriate to aid the Court in resolving the motion.  *Id.* at 54. On August 11, 2020, the parties each filed a supplemental memorandum and supporting exhibits concerning the Title VII exhaustion issue.  Dkt. 30; Dkt. 31.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6) Motion to Dismiss

A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed factual allegations" are not necessary, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  Rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (citations omitted).  Although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" *id*. at 556 (citation omitted), the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.  In

considering a Rule 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997)).

**B.       Summary Judgment**

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if that party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A fact is "material" if it is capable of impacting the outcome of a suit. *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, (1986)).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson,* 477 U.S. at 248).

### III.  ANALYSIS

**A.       Disparate Treatment**

1.       *Sheketoff's Review and Salary*

a.       Title VII and DCHRA (Counts IV & VI)

Defendants argue that Sheketoff's Title VII claim based on the unfavorable review that she received from Partner A fails for two reasons:  she did not timely exhaust her administrative remedies and, in any event, she has not alleged facts sufficient to give rise to a plausible inference that she suffered an adverse employment action because of her sex.  Dkt. 15 at 29–30.

Defendants further contend that Sheketoff's related DCHRA claim also fails for the second of these reasons.

i.     Administrative Exhaustion

First, Defendants argue that the Court should dismiss Sheketoff's Title VII claim because she did not exhaust her administrative remedies—that is, she did not file a charge with the EEOC within 180 days of the alleged discrimination and did not file a charge with the D.C. equal employment agency. Dkt. 15 at 29. Plaintiffs concede that Sheketoff did not file her EEOC complaint within 180 days of the alleged discriminatory act, but they assert that under a "Worksharing Agreement" that the Equal Employment Opportunity Commission ("EEOC") has with the District of Columbia Office of Human Rights ("DCOHR")—which is the local Fair Employment Practices Agency ("FEPA") for purposes of Title VII—Sheketoff had 300 days to file her EEOC complaint, and she met that deadline.[2] Dkt. 18 at 39; Dkt. 31 at 6–8; *see also Payne v. Dep't of Youth Rehabilitation Servs.*, No. 18-562, 2019 WL 804898, at *4–5 (D.D.C. Feb. 21, 2019) (DCOHR is the local FEPA). As explained below, the Court agrees with Plaintiffs that Sheketoff timely filed her charge with the EEOC.

---

[2] Plaintiffs also argued that failure to exhaust is an affirmative defense, which may be raised at the motion to dismiss stage only if factually supported by the complaint itself. Dkt. 21-1 at 17; *see also Smith-Haynie v. Dist. of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). According to Plaintiffs, because their complaint does not support Defendants' defense, and because Defendants must go beyond the pleadings to press their exhaustion argument, Defendants' motion to dismiss fails as a matter of law. As noted above, however, at oral argument the Court indicated that it might treat this portion of Defendants' motion as a motion for summary judgment, and it allowed the parties to file any supplemental materials pertinent to such a motion. The Court will therefore treat the failure-to-exhaust portion of Defendants' motion as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

The Court starts with the statutory text.  *See Pharm. Mfg. Research Servs., Inc. v. FDA*, 957 F.3d 254, 260 (D.C. Cir. 2020).  Under 42 U.S.C. § 2000e–5(e)(1), a claim asserting a violation of Title VII

> shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which *the person aggrieved has initially instituted proceedings with a State or local [FEPA] . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred*, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier.

42 U.S.C. § 2000e–5(e)(1) (emphasis added).  The question, then, is whether the time to file with the EEOC was extended to 300 days in this case because, when Sheketoff filed her charge with the EEOC, she checked the box indicating that she "want[ed] th[e] charge [to be] filed with both the EEOC and the State or local Agency."  Dkt. 31-8 at 2.  The answer to that question turns on the meaning and application of the "Worksharing Agreement" between the EEOC and the DCOHR.

Under that agreement, the EEOC and the DCOHR have mutually

> [d]esignate[d] [each] other as [their] agent[s] for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges.  The EEOC's receipt of charges on the [DCOHR's] behalf will automatically initiate the proceedings of both the EEOC and the [DCOHR] for the purposes of Section 706(c) and (e)(1) of Title VII.

Dkt. 31-2 at 3; *see Schuler v. PricewaterhouseCoopers LLP*, 514 F.3d 1365, 1372–76 (D.C. Cir. 2008) (explaining the Worksharing Agreement).  The Worksharing Agreement further explains that

> [f]or charges originally received by the EEOC and/or to be initially processed by the EEOC, the [DCOHR] waives its right of exclusive jurisdiction to initially process such charges for a period of 60 days for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day.

Dkt. 31-2 at 4.

The relevant EEOC regulation contemplates the existence of such worksharing

agreements and state or local FEPAs' waivers of exclusive jurisdiction to process such charges.

29 C.F.R. § 1601.13(a)(4)(ii)(A) provides that

> [w]here [a document received by the EEOC] on its face constitutes a charge
> within a category of charges over which the [FEPA] has waived its rights to the
> period of exclusive processing referred to in paragraph (a)(3)(iii) of this section,
> the charge is deemed to be filed with the Commission upon receipt of the
> document.

The regulation continues: "Such filing is timely if the charge is received within 300 days from the

date of the alleged violation." *Id.* § 1601.13(a)(4)(ii)(A).

Finally, Plaintiffs have submitted the declaration of EEOC Acting Director of the

Washington Field Office Mindy Weinstein, which was originally submitted in support of a

motion for reconsideration in *Epps v. Potomac Elec. Power Co.*, No. 18-1423, 2019 WL

7902976 (D.D.C. Sept. 20, 2019). The declaration explains the functioning of the Worksharing

Agreement as follows:

> when an individual submits a charge to the Washington Field Office [of the
> EEOC] alleging . . . discrimination . . . in D.C. . . . , three things automatically
> happen. First, the EEOC, acting as the [DCOHR's] agent, initially institutes a
> FEPA proceeding on behalf of the individual. Second, the [DCOHR] terminates
> that proceeding pursuant to its waiver of the 60-day exclusive processing period.
> Third, the EEOC deems the charge to be filed and institutes an EEOC
> proceeding. In such circumstances, because the Commission has initially
> instituted proceedings with the [DCOHR] on the individual's behalf, and
> because the [DCOHR] has automatically terminated its proceedings the same
> day, the Commission treats the 300-day limitations period set forth in 42 U.S.C.
> § 2000e-5(e)(1) as the applicable limitations period.

Dkt. 31-5 at 4 (Weinstein Decl. ¶ 7).

The approach set forth in the Worksharing Agreement, EEOC regulations, and Weinstein

declaration comports with the Supreme Court's reading of 42 U.S.C. § 2000e–5(e)(1) in *EEOC*

*v. Commercial Office Prods. Co.*, 486 U.S. 107 (1988).  In that case, the complainant filed a charge of discrimination with the EEOC 290 days after she was allegedly fired because of her sex in violation of Title VII.  *Id.* at 112–13.  Pursuant to a worksharing agreement, the EEOC sent a copy of the charge to the FEPA, and the FEPA waived the 60-day exclusive processing period.  *Id.* at 113.  Even though the FEPA did not conduct, much less complete, an investigation during the 60-day period, the Supreme Court held that the EEOC charge was timely.  As the Court explained, the EEOC construed the term "terminate" to include a "declar[ation] that [the FEPA] will not proceed," and the EEOC's reading of the statute was entitled to deference.  *Id.* at 115.  And, as the Court further opined, the extended 300-day filing period applied even though the complainant did not file a charge with the FEPA within 180 days (*i.e.*, within the state limitations period), and did not file with the EEOC until the 290th day.  *Id.* at 122–25.

In one narrow respect, however, this case is not on all fours with *Commercial Office Prods. Co.*—in that case, the complainant filed her charge with the EEOC, the EEOC then sent the charge to the FEPA, and the FEPA "returned the transmittal form to the EEOC, indicating on the form that [it] waived its right under Title VII to initially process the charge," 486 U.S. at 113, while in this case Sheketoff simultaneously filed her charge with the EEOC and the DCOHR. That arguably matters because, under *Mohasco Corp. v. Silver*, a claim filed with the EEOC before the 60-day deferral period runs is held in "'suspended animation'" pending termination of the FEPA proceeding, 447 U.S. 807, 817 (1980) (quoting *Love v. Pullman Co*., 404 U.S. 522, 526 (1972)), and, thus, one might argue that the charge at issue in *Commercial Office Prods. Co.* was "initially"—that is, first—filed with the FEPA.  Under the D.C. Worksharing Agreement, in contrast, the DCOHR waived the 60-day deferral period in advance, leaving open the possibility that Plaintiffs' charge was deemed filed with the EEOC at the same moment it was deemed filed

15

with the DCOHR.  And because the extended filing period is available only when the

complainant "has *initially* instituted proceedings with a" FEPA, 42 U.S.C. § 2000e–5(e)(1)

(emphasis added), one might argue that the simultaneous institution of proceedings is not

enough.

 Although theoretically possible, this reading of the statute fails for two reasons.  First, the

word "initially" does not foreclose simultaneous actions.  Rather, it means "at the beginning" or

"outset," *Initially*, Oxford English Dictionary Online,

https://www.oed.com/view/Entry/96060?redirectedFrom=initially (accessed September 1, 2020),

and, under the Worksharing Agreement, the EEOC acts as the DCOHR's agent in receiving a

charge subject to the agencies' overlapping jurisdiction, Dkt. 31-2 at 3.  Second, any ambiguity

regarding this question is resolved by the deference the Court must accord the EEOC's

reasonable interpretations of ambiguous provisions of Title VII.  *See Commercial Office Prods.*

*Co.*, 486 U.S. at 115.  Here, that deference is dispositive because the governing regulations

provide that, when a charge falls "within a category of charges over which the [FEPA] has

waived its rights to the period of exclusive processing[,] . . . the charge . . . is timely if [received

by the EEOC] within 300 days from the date of the alleged violation."  29 C.F.R. §

1601.13(a)(4)(ii)(A); *see also Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141, 141 n.20 (1976)

(distinguishing EEOC procedural regulations, which Title VII expressly authorizes, from EEOC

substantive guidelines, which receive only *Skidmore* deference); *Epps v. Potomac Elec. Power*

*Co.*, 2019 WL 7902976, at *3 (noting that the statutory language was "ambiguous" and

interpreting it to allow 300 days for filing "[b]ased on symbiotic effects of" Title VII's language,

the interpretive EEOC regulation, and the Worksharing Agreement).

Finally, the Court is unpersuaded by Defendants' contention that Plaintiff Sheketoff is not entitled to rely on the expanded 300-day filing period because she did not "file[] any charge with D.C.'s" FEPA, Dkt. 19 at 16, or because she failed to notarize her administrative complaint, Dkt. 30 at 1. Sheketoff checked the box affirming that she wanted her charges to be "filed with both the EEOC and the State or local agency, if any," Dkt. 31-8 at 2; and she "declare[d] under penalty of perjury" that her charges were "true and correct." *Id.* Defendants do not dispute that Sheketoff's claims fall within the jurisdiction of the DCOHR, and they cite no authority for the proposition that an unnotarized charge is treated as a nullity as a matter of D.C. law or that, even if defective as a matter of D.C. law, that defect would preclude application of the 300-day extended filing period, *cf. Commercial Office Prods. Co.*, 486 U.S. at 124 ("the words 'authority to grant or seek relief' refer merely to enabling legislation that establishes state or local agencies, not to state limitations requirements") (quoting 42 U.S.C. § 2000e-5(e)).

The Court, accordingly, concludes that Plaintiff Sheketoff timely filed her claim with the EEOC and denies Defendants' motion for summary judgment with regard to her Title VII discrimination claim on grounds of administrative exhaustion.

ii.     Failure to State a Claim

Defendants also argue that Sheketoff has failed to allege facts sufficient to support a plausible inference that Partner A negatively evaluated her work because of her sex or that Defendants gave her a smaller raise than she would have otherwise received because of that allegedly inaccurate, negative performance evaluation. Dkt. 15 at 30. Under both Title VII and the DCHRA,[3] a plaintiff must allege a prima facie case of discrimination, which requires

---

[3] In addressing DCHRA claims, courts are guided by Title VII case law. *See Brown v. Dist. of Columbia*, 919 F. Supp. 2d 105, 115 (D.D.C. 2013), *aff'd in part, rev'd in part and remanded sub nom. Brown v. Sessoms*, 774 F.3d 1016 (D.C. Cir. 2014).

pleading facts sufficient plausibly to establish that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (citation omitted).

Defendants concede that Sheketoff is a member of a protected class and that she has adequately alleged an adverse employment action, "specifically, 'a disingenuous, severely negative performance evaluation' that allegedly caused her to receive" a smaller raise in her salary. Dkt. 15 at 30 (quoting Dkt. 1 at 11–12 (Compl. ¶¶ 85, 89)). Defendants argue, however, that Sheketoff has not alleged facts sufficient to support a plausible inference that she received the negative performance review because of her sex. *Id.* Assuming the truth of all factual allegations in the complaint and drawing all reasonable inferences in her favor, as the Court is required to do at this threshold stage of the proceeding, *see Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018), the Court is unpersuaded that Sheketoff's disparate treatment claim fails as a matter of law.

Defendants first take issue with Sheketoff's factual allegations regarding Partner A's behavior by urging the Court to consider the email and review from Partner A, which they contend are both "incorporated in the complaint," *Trudeau*, 456 F.3d at 183, and devoid of any indicia of "sex stereotyping," Dkt. 19 at 18. In Defendants' view, the email is far from "scolding" in tone. Dkt. 15 at 30. But that is not the point of Plaintiffs' allegation. They, instead, compare Partner A's email to Sheketoff to his interactions with male associates in the Issues & Appeals group to suggest that Partner A took offense at Sheketoff's pushback in a way that he would not have done were she a man. They then contend that, based on this unwarranted (and disparate) offense, he gave Sheketoff an evaluation that was both harshly critical and false.

Defendants also disagree with Sheketoff's contention that Partner A's evaluation was "severely negative." *Id.* at 14.  They note, for example, that he referred to her "'superior academic credentials'" and the fact that "learning the 'complicated' issues 'presented [her with] no problems.'" *Id.* (quoting Dkt. 15-3 at 2).  But the evaluation does not stop there.  It goes on to set forth myriad criticisms of Sheketoff: "her initial drafts were far more academic/pure legal analysis than helpful advice to the client;" her drafts included "little-to-no advice or direction to the client;" it was Partner A's "impression," that Sheketoff was "not long for firm life" and "[s]he's just not that into us;" "[s]he exhibits little-to-no initiative;" "her availability seems to be whatever is convenient for her;" "[w]orking on a weekend does not seem to be in her vocabulary;" and Partner A "guess[ed] . . . that she will soon leave to become Professor Sheketoff."  Dkt. 15-3 at 2.  In short, she was overly academic and not invested in the firm, and, presumably, for those reasons the firm should not be invested in her.

In addition, Defendants contend that Sheketoff has not plausibly alleged that Partner A acted with "sex-based animus" because another motivation explains his actions—his dissatisfaction with her work and effort.  Dkt. 15 at 32.  Defendants respond to Sheketoff's allegations that "Partner A's manner toward [her] was different from the manner he adopt[ed] toward similarly situated male associates," Dkt. 1 at 10 (Compl. ¶ 72), by positing that this different treatment could be explained by the fact that he was unsatisfied with her performance, not by her sex.  Dkt. 15 at 31.  Defendants also challenge Sheketoff's proffer of Savignac as a male comparator to whom Partner A "deferred . . . on both substance and style," Dkt 1 at 11 (Compl. ¶ 84), by arguing that Savignac was not "similarly situated" to Sheketoff.  Dkt. 15 at 33 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)).  Defendants maintain that because Savignac did not have the same work-related performance issues that they

claim Sheketoff had—as evidenced by Partner A's review of Sheketoff itself—he is not a similarly situated employee.  Dkt. 15 at 33–34.  Finally, they contend that, even if the "self-deprecating remarks" that Partner A made to male associates in the Jones Day cafeteria reflect a *social* preference for interacting with men, they do not indicate that his "*professional reviews* of women would be discriminatory."  *Id.* at 32–33 (emphasis in original).

These factual assertions might (or might not) all be true.  But they are not the stuff of a motion to dismiss, which merely tests the legal sufficiency of the pleadings and requires the Court to accept the plaintiff's allegations as true and to draw all reasonable inferences in the plaintiff's favor.  *See Owens*, 897 F.3d at 272.  With that standard in mind, the Court concludes that Plaintiffs have plausibly alleged that Sheketoff's work and commitment to the project did not merit the negative review she received.  Dkt. 1 at 11–12 (Compl. ¶¶ 85–86, 88–89).  At the motion to dismiss stage, a plaintiff's burden to support this inference of discrimination is "not onerous."  *Townsend v. United States*, 236 F. Supp. 3d 280, 297 (D.D.C. 2017) (citation omitted).  Where, as here, the defendant has proffered a legitimate non-discriminatory rationale for its actions—such as poor work performance—the plaintiff can survive a motion to dismiss by alleging "that the employer's proffered reasons for the adverse employment actions [were] false," *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 90 (D.D.C. 2009), or that "she was treated differently from similarly-situated employees outside the protected class," *Nichols v. Vilsack*, No. 13-01502, 2015 WL 9581799, at *10 (D.D.C. Dec. 30, 2015).  Because Plaintiffs have carried that modest burden, and because it is premature for the Court to assess whether Plaintiffs' allegations are supported by the factual record, Defendants are not entitled to prevail on the pleadings.

For these reasons, the Court will deny Defendants' motion to dismiss Sheketoff's Title VII and DCHRA sex discrimination claims.

        b.    <u>Equal Pay Act (Count V)</u>

Defendants also argue that Sheketoff has not stated a claim under the Equal Pay Act ("EPA") because she (1) has not sufficiently pled that her pay differential was because of her sex and (2) has "not identif[ied] a male comparator who earned more than she did for 'equal work.'" Dkt. 15 at 35. At the motion to dismiss stage, the only question is whether Plaintiff has alleged sufficient facts to state a prima facie case under the EPA. *See EEOC v. George Washington Univ.*, No. 17-1978, 2019 WL 2028398, at *4 (D.D.C. May 8, 2019). To do so, a plaintiff must allege that "(1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower wage than those members of the opposite sex." *Tolton v. Jones Day*, No. 19-945, 2020 WL 2542129, at *28 (D.D.C. May 19, 2020) (quoting *Cornish v. Dist. of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014)). The "equal work" requirement does not mean that the plaintiff's job and that of the comparator need to be identical, but they must be "substantially equal." *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 448–49 (D.C. Cir. 1976). Although many of Defendants' arguments are unpersuasive, the Court ultimately agrees with Defendants that Sheketoff has failed to state an EPA claim.

To begin, Defendants' argument that Sheketoff has not alleged facts sufficient to show that the negative review was motivated by her sex fails. Unlike Title VII, the EPA does not require a plaintiff to plead or prove discriminatory intent. *Lavin-McEleney v. Marist College*, 239 F.3d 476, 483 (2d Cir. 2001). Although employers have an "affirmative defense[]" under

the EPA if the pay differential is due to a "factor other than sex" such as "a seniority system," "a

merit system," or "a system which measures earnings by quantity or quality of production,"

*Morris v. U.S. Dep't of Justice*, 298 F. Supp. 3d 187, 194 (D.D.C. 2018) (quoting 29 U.S.C. §

206(d)(1)), a plaintiff need not anticipate and fend off such a defense in her complaint, *Baker-*

*Notter v. Freedom Forum, Inc.*, No. 18-2499, 2019 WL 4601726, at *8 (D.D.C. Sept. 23, 2019).

Defendants contention that Sheketoff's smaller-than-usual pay increase was the product of poor

performance and not her sex, moreover, also fails for the reasons discussed above—the Court

cannot, at this stage of the proceeding, disregard or reject Plaintiffs' allegation that Partner A's

evaluation was biased.

Defendants further argue that Sheketoff has not plausibly identified a male comparator

who earned more than her for equal work.  Dkt. 15 at 35.  They cite a number of out-of-circuit

cases to support their contention that Sheketoff was required to plead more specific facts in order

to identify a male comparator who performed equal work.  *Id.* at 36–37.  Although a close

question, the Court is persuaded that Sheketoff has alleged facts sufficient to plausibly identify

male comparators.  She alleges that the raise that she received in 2017 "was smaller than the

raises received by male associates in the Issues & Appeals group the same year," Dkt. 1 at 12

(Compl. ¶ 91); that, on information and belief, her 2018 salary "was below the salaries of male

Issues & Appeals associates whose salaries had been the same as [hers] prior to 2017," *id.*

(Compl. ¶ 95); that, on information and belief, "beginning not later than July 2017 and

continuing until [her] departure in August 2018, Jones Day paid [Sheketoff] a lower annual

salary than it pays to male associates of the same level of seniority in the Issues & Appeals group

in the D.C. office," *id.* at 29 (Compl. ¶ 210); and, "[t]he jobs of Issues & Appeals associates of

22

the same level of seniority are jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," *id.* (Compl. ¶ 211).

To be sure, the complaint does not identify any comparators by name, but it does identify a discrete and focused group of comparators and thereby provides Defendants with clear notice of the substance of Sheketoff's EPA claim: she alleges that she was paid less than the male associates of the same level of seniority who worked in Jones Day's Issues & Appeals group in the D.C. office from July 2017 through August 2018.  Her allegation that she was paid less than her male counterparts, moreover, is plausible; most notably, she alleges that, in prior years, both she and her male counterparts had received similar, large raises but that, unlike her male counterparts, she received a substantially smaller raise for 2018.  *Id.* at 12 (Compl. ¶¶ 89–95).

Sheketoff's EPA claim, however, ultimately fails because it does not adequately allege that she was "doing substantially equal work" to her comparators.  *Tolton*, 2020 WL 2542129, at *28 (citation omitted).  The Court can reasonably infer from Sheketoff's allegation that Partner A's evaluation was "unfair" and that the quality of her work was allegedly on par with her male peers.  But she fails to allege that she worked as many hours or otherwise worked as hard as those who were paid more than she was.  The fact that Jones Day has "substantially lower billable hours expectations than peer firms," Dkt. 1 at 6 (Compl. ¶ 39), says nothing about whether Skeketoff did "substantially equal work" to her comparators.   Sheketoff comes closer to the mark in alleging that "[t]he jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  *Id.* at 29 (Compl. ¶ 211).  But "[t]hreadbare recitals of the elements of a cause of action . . . supported by mere conclusory statements . . . do not suffice" to state a claim, *Iqbal*, 556 U.S. at 678.  More importantly, there is a difference

between alleging that a plaintiff and her comparators' jobs *require* "equal . . . effort" and

alleging that the plaintiff and her comparators, in fact, *performed* "substantially equal work."

Because Sheketoff fails to allege that she actually performed work "substantially equal" to the

work performed by her male comparators during the relevant period, she fails to state an EPA

claim.

The Court will, accordingly, dismiss Sheketoff's EPA claim without prejudice to replead

within 14 days.[4]

2.   *Parental Leave Policy*

a.   Title VII, Equal Pay Act, and DCHRA (Counts I, II & III)

The next issue, and in many respects the heart of the dispute between the parties, focuses

on the legality of Jones Day's leave policies for new parents.  In Plaintiffs' view, the policy

provides eight more weeks of paid leave to new mothers than it provides to biological fathers,

and that disparate treatment violates Title VII, the Equal Pay Act, and the DCHRA.  Plaintiffs

acknowledge that the eight additional weeks are labeled as "disability leave," as opposed to

"parental leave," but they contend that not all women are, in fact, disabled for eight weeks after

giving birth and that the label cannot disguise an over-generalization that, in practice, accords

many non-disabled women associates a benefit that is denied to their male counterparts.  The

"disability leave" label, in other words, is a "sham," Dkt. 18 at 7, which "*deems* all new mothers

---

[4]  The parties battle in the footnotes about whether Sheketoff has asserted (or has even attempted
to assert) a disparate impact claim.  *See* Dkt. 18 at 50 n.10; Dkt. 19 at 20 n.7.  For present
purposes, the Court simply notes that Sheketoff has alleged that "Jones Day discriminated
against [her] with respect to the terms of her employment by intentionally maintaining uniform,
firm-wide policies and procedures that had a *disparate impact* on her because of her sex," and
that "Jones Day's black-box compensation system . . . enables and conceals sex discrimination,"
Dkt. 1 at 28 (Compl. ¶¶ 203–04) (emphasis added).  Because Defendants' motion to dismiss does
not target Sheketoff's asserted disparate impact claim, the Court will leave for another day the
question of whether the quoted allegations suffice to plead such a claim.

disabled from office work for eight weeks, even though many are not," *id.* at 9, thereby "reflect[ing] and impos[ing] sex-based stereotypes and archaic gender roles," *id.* at 10.

Defendants disagree.  In their view, the policies are just what they say they are.  Men and women who are biological parents are equally entitled to ten weeks of parental leave for primary caregivers; men and women who are adoptive parents are equally entitled to eighteen weeks of parental leave for primary caregivers; and women who give birth are entitled to eight weeks of disability leave without producing medical documentation (and more if medically necessary and properly documented).  Because biological fathers are not similarly situated to birth mothers following the birth of a child, Defendants assert, the eight-week disability leave for birth mothers is non-discriminatory.  Dkt. 15 at 17–18.  The presumptive period of eight weeks, without requiring proof of disability, moreover, is justified in Defendants' view in order to "make[] the plan less burdensome for the [f]irm, its administrator, its associates, and their doctors" and to "avoid[] unnecessary intrusion into the details of a new mother's childbirth and the medical conditions that can result."  *Id.* at 20–21.  Finally, Defendants maintain that Savignac lacks standing to challenge the waiver of the documentation requirement because, if it discriminates against anyone, it does so against individuals suffering non-pregnancy related disabilities, which he did not.  *Id.* at 21.

Title VII prohibits discrimination in the terms and conditions of employment on the basis of sex.  42 U.S.C. § 2000e *et seq.*  In 1976, the Supreme Court held that Title VII's protection against sex discrimination did not reach exclusions of disabilities arising from pregnancy from otherwise comprehensive disability plans.  *Gen. Elec. Co.*, 429 U.S. at 145–46.  In response, Congress enacted the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k).  Title VII has long declared that it is "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *Id.* § 2000e-2(a)(1). The PDA added a definition of "because of sex" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions," and clarified that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.* § 2000e(k).

In *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 274–77 (1987), the Supreme Court considered whether the PDA preempted a California law that mandated (with some exceptions) reinstatement for pregnant women after they had taken pregnancy-based disability leave because the California law privileged pregnant women workers over other disabled workers who were not guaranteed the same right to reinstatement. Reasoning that Congress intended the PDA to establish "a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise," the Court held that Title VII did not preempt the California law, even though it provided disabled pregnant employees a benefit that other disabled employees did not receive. *Id.* (citation and quotation marks omitted).

In *Guerra*, the Supreme Court recognized that certain policies benefiting pregnant workers, but not other disabled workers, might violate Title VII. The scope of such a rule, however, was not implicated by the California law at issue in *Guerra*, which the Supreme Court characterized as bestowing a "limited" benefit for pregnant women that was "narrowly drawn to cover only the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions." *Id.* at 290. Most importantly, the law at issue, "unlike the protective labor legislation prevalent earlier in this century, . . . [did] not reflect archaic or stereotypical notions

about pregnancy and the abilities of pregnant workers." *Id.*  Of relevance here, the Supreme

Court cautioned (albeit in dicta) that "[a] statute based on such stereotypical assumptions would,

of course, be inconsistent with Title VII's goal of equal employment opportunity." *Id.*  In other

words, "a State could not mandate special treatment of pregnant workers based on stereotypes or

generalizations about their needs and abilities." *Id.* at 285 n.17.

According to Defendants, only one post-*Guerra* appellate decision has confronted a fact

pattern similar to that at issue here, and that case supports their view that it is permissible for an

employer to provide new mothers, but not fathers, with several weeks of disability leave

following childbirth without requiring evidence of disability.  Dkt. 15 at 17–18.  In that case,

*Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005), the Eighth Circuit considered the

University of Iowa's family leave policy, which allowed biological mothers to take disability

leave "for any period of pregnancy-related temporary disability, to be charged against accrued

sick leave." *Id.* at 327.  The policy further provided that "a leave of six weeks or less would not

require the employee to provide disability documentation," and it granted adoptive parents one

week of leave to be charged against the employee's accrued sick leave.  *Id.*  Biological fathers, in

contrast, were not permitted to charge any leave to accrued sick leave.  *Id.* at 327, 331.  Arguing

that the policy was discriminatory, the plaintiff brought a challenge under the Equal Protection

Clause of the Fourteenth Amendment, Title VII, and state law.  *Id.* at 326.  The district court

granted summary judgment in favor of the defendants on all claims, and the Eighth Circuit

affirmed.  *Id.*

The Eighth Circuit framed the question presented in much the same manner as the parties

frame the question at issue in this case:  "If the leave given to biological mothers is granted due

to the physical trauma they sustain giving birth, then it is conferred for a valid reason wholly

separate from gender." *Id.* at 328.  But, "[i]f the leave is . . . designed to provide time to care for, and bond with, a newborn, then there is no legitimate reason for biological fathers to be denied the same benefit." *Id.*  In other words, the court was required to decide whether the leave was, in fact, disability leave or whether it was actually a form of parental leave provided to new mothers alone.

In the Eighth Circuit's view, the district court correctly granted summary judgment in favor of the defendants because the University had offered a non-discriminatory rationale for extending the benefit to the plaintiff's spouse, but not to the plaintiff, and the burden then shifted to the plaintiff to offer evidence that would permit a reasonable jury to find that the University's stated rationale was pretextual.  *Id.* at 330.  The Eighth Circuit held that the plaintiff failed to meet this burden for two reasons: he failed to show that he was similarly situated with his wife, who (unlike the plaintiff) was a part-time employee, and the plaintiff's evidence that his spouse was able to work "ten hours per week" from home after a month of sick leave did not show that she had fully recovered from "the physical trauma of labor" and was ready to return to work after "only a month removed from childbirth."  *Id.*

Nor was the Eighth Circuit persuaded by the plaintiff's argument that the absence of any requirement of "proof of disability" for the first six weeks of leave showed "that the University's paid maternity leave" was not, in fact, a disability policy.  *Id*. at 329.  The court rejected that argument on the ground that it was "not unreasonable for the University to establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth."  *Id.*  As the court explained, the University offered "testimony that a six-week period of disability after childbirth is supported by medical evidence," and the plaintiff

failed to offer his own "medical evidence indicating that the general period of recovery is less than six weeks." *Id.*

According to Defendants, "the EEOC has embraced" the Eighth Circuit's analysis in its *Enforcement Guidance on Pregnancy Discrimination and Related Issues*, which is entitled to "*Skidmore* deference due to the agency's 'experience and informed judgment.'" Dkt. 15 at 18–19. In that guidance, the EEOC admonishes employers to "carefully distinguish between leave related to any physical limitations imposed by pregnancy or childbirth . . . and leave for purposes of bonding with a child and/or providing care for a child." Dkt. 15-5 at 5. The guidance further explains that "[l]eave related to pregnancy, childbirth, or related medical conditions can be limited to women affected by those conditions," but "parental leave must be provided to similarly situated men and women on the same terms." *Id.* As a result, when "an employer extends leave to new mothers beyond the period of recuperation from childbirth . . . it cannot lawfully fail to provide an equivalent amount of leave to new fathers for the same purpose." *Id.* The guidance then provides the following example, upon which Defendants rely:

> An employer offers pregnant employees *up to* 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance. The employer also offers new parents, whether male or female, six weeks of parental leave. A male employee alleges that this policy is discriminatory as it gives up to 16 weeks of leave to women and only six weeks of leave to men. The employer's policy does not violate Title VII. Women and men both receive six weeks of parental leave, and women who give birth receive *up to* an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

*Id.* at 5–6 (emphasis added).

Plaintiffs, for their part, disagree that *Johnson* is the only relevant precedent and disagree that *Johnson* or the EEOC guidance helps Defendants on the facts of this case. In Plaintiffs' view, a second precedent, *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir. 1990),

also bears on the question presented.  That decision, like *Johnson*, arose from a district court's

grant of summary judgment in favor of the defendant, but, unlike in *Johnson*, the court of

appeals reversed.  The policy at issue in *Schafer* provided mothers, but not fathers, with unpaid

"childrearing leave" of up to a year.  *Id.* at 244.  Although the policy was facially discriminatory,

the defendants "argue[d] that the PDA, as interpreted . . . in *Guerra*, permit[ted] favorable

treatment of pregnant females."  *Id.* at 247.  The Third Circuit disagreed, holding that neither the

PDA nor *Guerra* "allows preferential treatment to employees who have recently given birth to a

child without a simultaneous showing of a continuing disability related to either the pregnancy or

to the delivery of the child."  *Id.* at 248.  Because the record was devoid of evidence even

"suggest[ing] that the normal maternity disability due to 'pregnancy, childbirth, or related

medical conditions' extends to one year," the Third Circuit held that the policy violated Title VII

and was "void for any leave granted beyond the period of actual physical disability on account of

pregnancy, childbirth or related medical conditions."  *Id.*  *Schafer*, in Plaintiffs' view, supports

their contention that Title VII and the PDA permit employers to provide new mothers with more

leave than new fathers only when the new mothers are, in fact, suffering from a pregnancy or

child-birth related disability.

Plaintiffs further contend that the EEOC guidance does not help Defendants because

there is a fundamental distinction between a policy, like that described by the EEOC, that

provides "up to" ten (or eight) weeks of disability leave and policy, like that adopted by Jones

Day, that provides for at least eight (or ten) weeks of disability leave and that requires no proof

of disability for the first eight (or ten) weeks.  Defendants, for their part, contend that *Johnson*

establishes that there is nothing wrong with relieving new mothers (and administrators) of the

burden and intrusiveness of documenting the specific medical conditions requiring a disability

leave. Dkt. 15 at 20–21. But that is not what this case is about according to Plaintiffs. As they explain it, they are not challenging the policy's failure to require proof of disability, and, indeed, they favor non-intrusive disability policies for new mothers. What they are challenging, instead, is a "substantive rule" that they contend "giv[es] mothers eight extra weeks of sex-based leave *regardless of actual disability*." Dkt. 18 at 12 (emphasis added). *Johnson*, *Guerra*, and the EEOC guidance, in Plaintiffs' view, all limit divergent leave policies for biological mothers and fathers to the period of the mother's actual disability. *Id.* at 11–13, 15. Finally, Plaintiffs fault Defendants with making a last-minute shift in their defense by arguing for the first time in reply that the firm's "substantive rule . . . is that a mother is entitled to leave only while she is actually disabled from performing her job," Dkt. 19 at 8, and that the eight-week presumptive period is "reasonable from the perspective of medical science," *id.* at 9. According to Plaintiffs, that defense comes too late and, in any event, discovery will show that it is pretextual. Dkt. 21-1 at 4–7.

Accepting Plaintiffs' factual allegations as true and drawing all inferences in their favor, *see Iqbal*, 556 U.S. at 678, the Court is persuaded that Plaintiffs have stated a claim. Starting with the argument raised in Defendants' reply brief, the language of the disability policy upon which they hang their hat is subject to different interpretations, which the Court cannot resolve on the pleadings. The policy asserts that, "[u]nless the [f]irm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Caesarean-section births)." Dkt. 1-1 at 5. On one reading, one might conclude—as Defendants contend—that the firm will shorten or lengthen the presumptive eight weeks of disability leave depending on information provided to the firm. Thus, for example, if an associate tells her supervisor that she feels 100% after four or six weeks, her

disability leave would come to an end.  On the other reading, one might conclude—as Plaintiffs

urge—that the ratchet turns only one way.  *All* birth mothers receive *at least* eight weeks, and

they are entitled to more if "the [f]irm is notified" that the "lawyer's medical provider has

certified" that a longer period of "post-partum disability" exists.  *Id.*  The Court cannot determine

which side has the better view without some factual development.

Even beyond the difficulties with Defendants' textual argument, the Court cannot resolve

on the pleadings the central question raised by Plaintiffs' claim:  Although a portion of the eight

weeks undoubtedly qualifies as disability leave, is some portion of the leave untethered to actual

disabilities?  *Johnson* and *Schafer* were both decided on summary judgment, and for good

reason.  Without providing the parties with some opportunity for discovery and to offer

evidentiary submissions, the Court cannot determine whether the policy was adopted and

operates, in whole or in part, as a substitute for an extended period of parental leave for birth

mothers.  Defendants point to various precedents suggesting that the "period of physical

disability due to pregnancy and childbirth" "typical[ly]" lasts four to eight weeks, *Nevada*

*Department of Human Resources, v. Hibbs*, 538 U.S. 721, 731 (2003); *see also Geduldig v.*

*Aiello*, 417 U.S. 484, 500 n.4 (1964) (six to eight weeks); *Schwabenbauer v. Bd. of Educ.*, 667

F.2d 305, 314 (2d Cir. 1981) (six to eight weeks).  Dkt. 15 at 20.  But, even accepting that

premise, four weeks is very different than eight weeks, and substantial ground for difference of

opinion may exist about whether many (or most) of the associates who benefit from Jones Day's

maternal disability policy are, in fact, disabled for the entire eight-week period.

Plaintiffs, moreover, contend that the evidence will eventually show that Jones Day

advertised and treated the eight-week period of "disability" leave as a form of parental leave

available only to female associates.  They allege, for example, that "Jones Day's Director of

Human Resources acknowledged to [Sheketoff] that Jones Day provides the full eight weeks of 'disability leave' to all biological mothers without regard to disability," Dkt. 1 at 15 (Compl. ¶ 116), and that Heifitz "instructed" Sheketoff to tell recruits that Jones Day "provides 18 weeks of paid leave to mothers and 10 weeks of paid leave to fathers, without further elaboration," *id.* at 14 (Compl. ¶ 115).  Plaintiffs also point to the eighteen weeks of paid leave provided to adoptive parents and contend that it shows that the eight weeks of "disability" leave provided to biological mothers (which, when added to the ten weeks of "parental" leave totals the same eighteen weeks) is, in truth, nothing more than parental leave by a different name.

Defendants disagree with all of this.  They argue, for example, that the eighteen weeks of leave for adoptive parents serve a different purpose than the parental leave provided to biological parents and the disability leave provided to biological mothers.  But this back-and-forth is beside the point for present purposes.  The only question for the Court is whether Plaintiffs have alleged plausible claims under Title VII, the Equal Pay Act, and the DCHRA challenging the lawfulness of Jones Day's leave policy for new parents.  *See Twombly*, 550 U.S. at 570.  Without expressing any view on the ultimate merits, the Court concludes that they have and that they are entitled to develop a record and to attempt to make their case.

Finally, Defendants argue that Savignac (and, by implication, Sheketoff) lacks standing to challenge Jones Day's leave policies for new parents.  In Defendants' view, that challenge turns on the premise that the policies—and, in particular, the presumptive period of disability for new mothers—discriminate between new mothers and other Jones Day associates who incur disabilities and who, unlike new mothers, are not entitled to a presumptive period of disability. Dkt. 15 at 21.  Because Savignac did not suffer from a disability, Defendants reason that he

could not have been the victim of the alleged discriminatory treatment.  *Id.*  Consequently, he

lacks standing, as does Sheketoff, whose standing derives from Savignac's.  *Id.*

The problem for Defendants is that Plaintiffs are entitled to define their own claim, and

they do not challenge the policies on the ground that Defendants posit.  Like the plaintiffs in

*Johnson*, 431 F.3d at 327, and *Schafer*, 903 F.2d at 244–45, Savignac alleges that the policies

discriminate against him as a new father, who sought the same amount of paid leave provided to

*all* new mothers, regardless of whether they are *actually* disabled.  Plaintiffs' claims do not rest

on the allegation that new mothers who are, in fact, disabled receive leave without documents,

while other associates who are disabled must document their need for leave.  Nor do their claims

rest on the allegation that new mothers who are not, in fact, disabled receive leave, while other

associates who are not disabled do not.  Rather, their claim alleges that at least a portion of the

eight weeks of presumptive disability leave afforded to new mothers is not disability leave at all;

it is, instead, additional parental leave provided to new mothers and not to new fathers.

Whether that contention is meritorious is, once again, for another day.  For present

purposes, it suffices to recognize that it is the argument that Plaintiffs press and that Savignac—

as a father who contends that he was denied a benefit based on his sex—has standing to press

that contention.  Sheketoff has also alleged enough to establish Article III standing.  *See*, *e.g*.,

Dkt. 1 at 25 (Compl. ¶ 187) ("As a result of Jones Day's discriminatory policy, Julia had to take

a longer period of parental leave from her own job than the husband of a female Jones Day

employee would have to take from his job, and she has suffered and continues to suffer harm,

including but not limited to financial loss and psychological harm.").  Although Defendants

challenge her prudential standing to raise a retaliation claim, *see* Part B.2 *infra*, they do not

challenge her prudential standing to join in Savignac's discrimination claims, and the Court need not consider that non-jurisdictional question sua sponte.

The Court will, accordingly, deny Defendants' motion to dismiss Plaintiffs' sex discrimination claims based on the parental leave policy.

## B.    Retaliation (Counts VII, VIII & IX)

Defendants also contend that Plaintiffs have failed to state claims for retaliation under federal and D.C. law because (1) Savignac's opposition to Jones Day's leave policies was not objectively reasonable and therefore did not constitute protected activity, and (2) Sheketoff is not a proper retaliation plaintiff. Dkt. 15 at 23–27. Because Defendants do not differentiate between the standards applicable under Title VII, the FLSA, and the DCHRA, and, instead, focus exclusively on Title VII precedent, the Court will consider Defendants' arguments through that lens.[5]

"To establish a prima facie case of retaliation" under Title VII, the plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006). For present purposes, Defendants do not dispute that Savignac was subjected to an adverse employment action—they acknowledge that he was fired—or that Plaintiffs adequately allege a causal connection between

---

[5] Courts look to Title VII case law in interpreting analogous provisions of the DCHRA, including the DCHRA's anti-retaliation provision. *See Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994); *Ingram v. Dist. of Columbia Child and Family Servs. Agency*, 394 F. Supp. 3d 119, 124–25 (D.D.C. 2019); *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 97 (D.D.C. 2012); *Fowler v. Dist. of Columbia*, 404 F. Supp. 2d 206, 209 (D.D.C. 2005), *aff'd*, 210 Fed. App'x 4 (D.C. Cir. 2006); *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3 (D.D.C. 1989). Although the relevant statutory language contained in the FLSA does not mirror Title VII, *compare* 29 U.S.C. § 215(a)(3) *with* 42 U.S.C. § 2000e-3(a), Defendants do not press any arguments unique to the FLSA.

his termination and the January 16, 2019 email.  Rather, Plaintiffs' retaliation claims fail as a matter of law, in Defendants' view, because (1) neither Savignac nor Sheketoff engaged in a "protected activity" and (2) Sheketoff was not subjected to an adverse employment action.

 1. <u>Protected Activity</u>

 "Protected activity," for purposes of Title VII's anti-retaliation rule, includes "oppos[ing] any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. As the D.C. Circuit has explained, "this phrase . . . extend[s] to a practice that the employee reasonably and in good faith believed was unlawful under the statute." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (emphasis omitted).  The reasonableness of a plaintiff's belief that an employer's actions violate Title VII depends in part on whether the governing law is "unambiguous" or "unsettled." *King v. Jackson*, 487 F.3d 970, 973 (D.C. Cir. 2007).  In *King v. Jackson*, for example, the D.C. Circuit considered whether it was reasonable for an employee to believe that the Department of Housing and Urban Development's failure to renew its affirmative action employment program violated Title VII. *Id*. at 972–73.  In that case, the plaintiff argued that, under *Parker v. Baltimore & Ohio Railroad*, 652, F.2d 1012, 1019 (D.C. Cir. 1981), "Title VII protects opposition to employer conduct that the plaintiff incorrectly— though reasonably—believes falls within the statute's definition of an 'unlawful employment practice.'" *King*, 487 F.3d at 973.  The court agreed with that description of the governing law but was unpersuaded that the plaintiff's opposition to the Department's failure to renew its affirmative action program met even that modest standard.  As the court explained, "nothing [was] unsettled" regarding the plaintiff's mistaken view of the law and "the legal principles at issue . . . [,] unlike in *Parker*, [were] entirely unambiguous." *Id*.  In particular, nothing in Title VII equated an agency's failure to renew its affirmative action plan with an "unlawful

employment practice," which Congress defined as a refusal "'to hire . . . any individual . . . because of such individual's race.'"  *Id.*  (quoting 42 U.S.C. § 2000e-2(a)(1)).  The D.C. Circuit, accordingly, concluded that "it [was] quite unreasonable for King to have believed that" the agency's inaction "qualified as an unlawful employment action."  *Id.*

Relying on out-of-circuit precedent, Defendants argue that the reasonableness of Plaintiffs' belief must be considered through the lens of his "legal sophistication."  Dkt. 15 at 25 (quoting *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 410 (S.D.N.Y. 1996)).  In their view, moreover, "[n]o reasonable lawyer, much less one with Savignac's background," could believe that Jones Day's leave policies for new parents violated Title VII or the DCHRA.  Dkt. 15 at 26.  Plaintiffs, for their part, acquiesce in Defendants' use of a reasonable-attorney standard but argue that even a sophisticated attorney could reasonably believe that the policies were unlawful.  Dkt. 18 at 30.

The Court need not decide whether Savignac's status as an attorney requires application of a more demanding reasonableness standard because, even if it does, Defendants have yet to show that his belief was unreasonable.  Among other things, Defendants have not shown that the text of Title VII, the FLSA, or the DCHRA or any precedent (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's leave policy was unlawful.  Defendants' reliance on *Johnson* is unavailing at this point in the litigation because that decision turned on the plaintiffs' failure to offer any *evidence* of pretext, the University's showing "that a six-week period of disability after childbirth [was] supported by medical evidence," and the plaintiff's failure to offer any controverting "medical evidence indicating that the general period of recovery is less than six weeks."  431 F.3d at 329.  Without a factual record in this case, *Johnson* provides little guidance.  Similarly, Defendants' reliance on the EEOC

guidance is of little help because that document stresses that employers may not extend "leave to new mothers beyond the period of recuperation from childbirth" without providing "an equivalent amount of leave to new fathers," and the hypothetical contained in the guidance merely approves the provision of "*up to* 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of [a] short-term *disability* insurance" program.  Dkt. 15-5 at 5 (emphases added).  Again, without factual development, the Court cannot determine whether Savignac reasonably believed that the Jones Day policy provided leave to new mothers "beyond the period of recuperation" and reasonably believed that the additional eight weeks of leave provided to birth mothers was not "part of" a bona fide disability policy.  *Id.*

Accordingly, the Court concludes that Plaintiffs have plausibly alleged that Savignac reasonably believed that Jones Day's leave policies for new parents were unlawful under Title VII and the DCHRA.

2.     Adverse Action Against Sheketoff

In a footnote in their motion to dismiss, Defendants argue that Sheketoff lacks prudential standing to assert her own retaliation claim based on Savignac's termination.  As they explain it, Sheketoff "does not allege that Defendants took any adverse action against *her*; rather, she purports to assert retaliation claims based on her derivative injuries from the adverse action against Savignac."[6]  Dkt. 15 at 23 n.5.  Defendants further argue that spouses of employees "cannot be said to fall within the class of persons Title VII was intended to protect."  *Id.* (quoting

---

[6]  Defendants assert in a single sentence in that same footnote that Sheketoff's retaliation claims under the DCHRA and FLSA should also be dismissed, relying primarily on their similarity to the Title VII retaliation claim.  Dkt. 15 at 23 n.5.  Because the Court will deny Defendant's motion to dismiss Sheketoff's Title VII retaliation claim and because Defendants have offered only a bare-bones challenge to the DCHRA and FLSA claims, the Court will also deny their motion to dismiss those claims.

*Feng v. Sandrik*, 636 F. Supp. 77, 82 (N.D. Ill. 1986)).  Plaintiffs respond that Sheketoff has

prudential standing under two theories: (1) Jones Day's decision to fire Savignac constituted an

adverse action against Sheketoff and (2) even if the adverse action was not taken against her, she

was "aggrieved" by her husband's firing.  Dkt. 18 at 32–36.  Because the first theory offers a

sufficient response to Defendants' contention that "Sheketoff does not allege that Defendants

took any adverse action against *her*," Dkt. 15 at 23 n.5, the Court need address only it.

Plaintiffs rely on two Supreme Court decisions, *Thompson v. North American Stainless,*

*LP*, 562 U.S. 170, 174 (2011) and *Burlington Northern & Santa Fe Railway Co. v. White*, 548

U.S. 53, 57 (2006), to establish that "firing an employee's husband constitutes an 'adverse

action' *against that employee.*"  Dkt. 18 at 33.  In *Thompson*, the Supreme Court considered

whether an employer violated Title VII by firing one of its employees, the plaintiff, in order to

retaliate against his fiancée (who worked at the same company) after she filed a charge of

discrimination with the EEOC.  562 U.S. at 172–73.  The Court concluded that this type of third-

party retaliation claim was viable under Title VII because it met the "broad" standard set forth in

*Burlington*:  "Title VII's antiretaliation provision prohibits any employer action that 'well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Thompson*, 562 U.S. at 174 (quoting *Burlington*, 548 U.S. at 68).  The Court considered it

"obvious that a reasonable worker might be dissuaded from engaging in protected activity if she

knew that her fiancé would be fired."  *Id.*  Although the Court declined to generalize about a

"fixed class of relationships for which third-party reprisals are unlawful," it observed that "firing

a close family member will almost always meet the *Burlington* standard."  *Id.* at 175.

The Court went on to consider whether the plaintiff was a "person claiming to be

aggrieved" to whom the statute provided a cause of action, *id.* (quoting 42 U.S.C. § 2000e-

5(f)(1)), and rejected the employer's argument that the only person aggrieved under the statute was "the employee who engaged in the protected activity," *id.* at 177.  In the Court's view, that reading of the statute was "artificially narrow," and the Court thus declined to limit the cause of action "to the person who was the subject of unlawful retaliation." *Id.*  Instead, the Court imported the Administrative Procedure Act's "zone of interests" test to determine who may sue under Title VII—that is, anyone who "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 883 (1990)).  This forgiving standard "den[ies] a right of review [only] 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 178 (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)).  Applying this standard, the Court held that the fired plaintiff satisfied the zone-of-interests test because he was an employee of the defendant, "and the purpose of Title VII is to protect employees from their employers' unlawful actions." *Id.*  Even more to the point, the plaintiff was "not an accidental victim of the retaliation" because "injuring him was the employer's intended means of harming" his fiancée due to her oppositional activity.  *Id.*

Defendants' reply brief does not argue that Sheketoff falls outside the "zone of interest" because she was a former employee at the time the January 16, 2019 email was sent or when Savignac was fired,[7] and it does not take issue with the premise that firing someone's spouse

---

[7]  At least where a former employee suffers retaliation for bringing discrimination charges related to her employment or termination, the former employee is "included within" the coverage of 42 U.S.C. § 2000e-3(a).  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).  Because Defendants do not move to dismiss on the ground that Sheketoff was a former employee on January 16, 2019, the Court need not consider whether the protection afforded to former employees applies in the present context.  *Cf. Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 330

"will almost always meet the *Burlington* standard," 562 U.S. at 175.  Instead, again in a footnote, Defendants take aim at the factual premise of Sheketoff's claim.  Dkt. 19 at 13 n.3.  They assert that "Sheketoff is not the one who engaged in the (allegedly) protected activity;" that "it was Savignac who sent the January 2019 email;" and that, even though "Sheketoff claims to have written the January 2019 email with Savignac, she does not (and could not) allege that Jones Day had knowledge of her involvement."  *Id.*  But, reading the complaint in the light most favorable to Plaintiffs, *see Iqbal*, 556 U.S. at 678, Sheketoff has plausibly alleged that she engaged in protected activity by jointly sending an email opposing Jones Day's alleged sex discrimination, Dkt. 1 at 19 (Compl. ¶ 146) ("Julia and Mark sent the following email to the Human Resources Director and Heifetz").  Moreover, again drawing all inferences in Plaintiffs' favor, the recipients of the email could have known that the email was sent by both Savignac and Sheketoff.  Indeed, although the email at times uses the first-person singular to refer to Savignac alone, it begins in the first-person plural:  "We have closely reviewed the case law" and "We have . . . discussed the matter with other competent attorneys."  *Id.*  Although it is possible that the recipients believed that the email came from Savignac alone, that is not the standard that governs at this stage of the proceeding.

The Court, accordingly, will deny Defendants' motion to dismiss Sheketoff's claims alleging that Defendants retaliated against her for opposing an allegedly discriminatory policy by firing her husband.

---

(D.C. Cir. 1991) (explaining that the statutory term "employee" "includes a former employee as long as the alleged discrimination is related to or arises out of the employment relationship" (quoting *EEOC v. Cosmair, Inc*., 821 F.2d 1085, 1088 (5th Cir. 1987))).

## C.       Interference with Family Leave (Counts X & XI)

Defendants also contend that Savignac has failed to state an interference claim under the FMLA or the DCFMLA.  Dkt. 15 at 27–29.  They argue that Savignac's claim fails because he alleges that he was fired for requesting "paid leave beyond anything he would have been entitled to under the FMLA," and Plaintiffs do not allege that he was terminated for requesting or taking "unpaid FMLA leave."  *Id.* at 28.  Plaintiffs respond that Defendants cannot "mount a successful defense to an FMLA interference claim by showing that [Jones Day] fired [Savignac] during his leave in violation of *other* civil rights laws."  Dkt. 18 at 37 (emphasis added).  Defendants disagree and argue that, even if Savignac's termination was retaliatory under another statute, termination made unlawful by a statute other than the FMLA does not give rise to a cause of action for interference under the FMLA.  Dkt. 15 at 27.

Under the FMLA, employees have the right "to a total of 12 workweeks of [unpaid] leave during any 12-month period for . . . the birth of a son or daughter."  29 U.S.C. § 2612(a)(1)(A).  The DCFMLA is even more protective and entitles employees "to a total of 16 workweeks of [unpaid] family leave during any 24-month period for . . . [t]he birth of a child of the employee."  D.C. Code § 32-502(a)(1).  "With certain exceptions," both statutes require that "an employee returning from authorized leave be reinstated to the same position or an equivalent position as the one she had at the time that her leave commenced."  *Miles v. Univ. of the Dist. of Columbia*, No. 12-378, 2013 WL 5817657, at *10 (D.D.C. Oct. 30, 2013) (citing 29 U.S.C. § 2614(a); D.C. Code § 32–505(d)).

Under both the FMLA and the DCFMLA, a plaintiff may bring a claim for interference with the rights provided under the statute.[8]  29 U.S.C. § 2615(a)(1); D.C. Code § 32–507; *see also Williams v. Verizon Washington, D.C. Inc*., 304 F. Supp. 3d 183, 189 (D.D.C. 2018); *Miles*, 2013 WL 5817657, at *12.  "To prevail on an FMLA [or DCFMLA] interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA [or DCFMLA] rights, and (2) prejudice arising from the interference."  *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020); *see also* 29 U.S.C. § 2615(a)(1); *Williams*, 304 F. Supp. 3d at 189 (citations and internal quotation marks omitted); *Elzeneiny v. Dist. of Columbia*, 195 F. Supp. 3d 207, 217 (D.D.C. 2016) (quoting *Pagel v. TIN Inc*., 695 F.3d 622, 627 (7th Cir. 2012)); *Miles*, 2013 WL 5817657, at *12 (discussing DCFMLA).

The D.C. Circuit has yet to decide whether the FMLA's prohibition on interference permits a plaintiff to recover if he is fired while on FMLA leave but the firing is in violation of a different civil rights statute—here the statutes that protect employees from retaliation for complaining about alleged sex-based discrimination.  For present purposes, all agree that Savignac was not terminated because he exercised his FMLA rights, Dkt. 18 at 36, and that "the FMLA does not 'protect an employee's job against a legitimate, unrelated, reason for separation,'" *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 110 (quoting *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 155 (D.D.C. 2012); *see also* Dkt. 18 at 37.  The parties disagree, however, about whether an employee who is fired in violation of an unrelated civil

---

[8]  Because both acts have almost identical interference provisions, Defendants and Plaintiffs discuss them together, and the Court does the same except as noted below.

rights law—that is, the employee is fired for illegitimate but unrelated reasons—may recover for interference with his FMLA (or DCFMLA) rights.

Even outside the D.C. Circuit, the case law provides limited guidance on this question. No federal court seems to have addressed the issue head-on, and snippets found in the various decisions can be used to support either Plaintiffs' or Defendants' position. Plaintiffs, for their part, point to decisions asserting that "interfere[nce]" with FMLA leave is unlawful, "regardless of [the employer's] intent," Dkt. 18 at 36–37 (quoting *Bones v. Honeywell Int'l, Inc*., 366 F.3d 869, 877 (10th Cir. 2004), and that the sole exception to this rule occurs when the employer "'has a *legitimate* reason unrelated to the exercise of FMLA rights'" to remove the employee from his current position, *id.* at 37 (quoting *Edgar v. JAC Products, Inc*., 443 F.3d 501, 508 (6th Cir. 2006) (emphasis added); *see also Bond v. Sterling, Inc*., 77 F. Supp. 2d 300, 304 (N.D.N.Y. 1999) ("The FMLA does not immunize an employee from *legitimate* disciplinary action by her employer for reasons unrelated to the employee's FMLA leave.") (emphasis added).

Defendants, in contrast, feature cases that more directly connect the interference cause of action with the substantive rights created by the FMLA. They point, for example, to a decision explaining that "[t]he FMLA does not provide employees with a right against termination for a reason *other than interference with rights under the FMLA*," Dkt. 19 at 14 (quoting *Sarnowski v. Air Brooke Limousine, Inc*., 501 F.3d 398, 403 (3d Cir. 2007)), and to another explaining that "'[a] plaintiff can prevail' on an interference claim only 'if she was denied her substantive rights under the FMLA *for a reason connected with her FMLA leave*,'" *id.* (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc*., 298 F.3d 955, 961 (10th Cir. 2002)); *cf. Seeger v. Cincinnati Bell Tel. Co. LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (stating that "[t]he interference theory has its roots in the FMLA's creation of substantive rights"); *King v. Preferred Tech. Grp.*, 166 F.3d

44

887, 891 (7th Cir. 1999) (explaining that "[w]hen an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate . . . only entitlement to the disputed leave").

On balance, the weight of authority is best understood as holding that an employee who requests FMLA leave is not protected from a "dismissal [that] would have occurred regardless of the employee's request for or taking of FMLA leave." *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 488 (6th Cir. 2005) (quoting *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)); *see also Smith*, 298 F.3d at 960; *Santos v. Knitgoods Workers' Union, Local 155*, 252 F.3d 175, 178–79 (2d Cir. 2001). An employee "terminated for reasons not related to his or her FMLA request" or leave, accordingly, lacks an interference claim, even if termination "effectively denie[s] [an] FMLA leave request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998); *see also Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 722 (1st Cir. 2014) (finding that the FMLA only "protects [an employee] from discharge because she requests or takes FMLA leave," not from discharges on other grounds that interrupt leave). Under this standard, a termination that does not arise from an employee's request for or taking of FMLA leave—but rather from *other* considerations, including impermissible ones—does not give rise to an FMLA cause of action because the termination is "not related" to the employee's FMLA request.

Other sources provide further support for this conclusion. The FMLA grants the Secretary of Labor authority to "prescribe such regulations as are necessary to carry out" the statute. 29 U.S.C. § 2654. One such regulation, 29 C.F.R. § 825.216(a), establishes that

> [a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an

employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.

In other words, if the employee would have been fired regardless of whether he was on FMLA leave—presumably, even for an illegitimate reason unrelated to the FMLA—the employee cannot recover under the FMLA.

The legislative purpose of the FMLA points in the same direction.  In explaining the "need for family leave," for example, the House Report describes situations in which employees returned from family leave to find their positions eliminated without reason, H.R. Rep. No. 103-8, pt. 1, at 24–25 (1993), were threatened with loss of employment if they took leave, *id.* at 25, or lost their jobs when they took needed time off to care for family members, *id.* at 25–26.  In each case, the employee lost his or her position—or was threatened with termination—based solely on the need to take time to care for a family member or to attend to a serious health condition.  The detailed committee report does not contain even a hint that Congress intended to create a new (and likely redundant) cause of action for those who are wrongfully terminated while on leave but for reasons unrelated to the protections afforded by the FMLA.  As the committee report explains, the substantive provisions of the FMLA mean, "for example, that if, but for being on leave, an employee would have been laid off, the employee's right to reinstatement is whatever it would have been had the employee not been on leave when the layoff occurred."  *Id.* at 42.

Creating a cause of action for those who lose their jobs while on FMLA leave, but for reasons unrelated to the FMLA, moreover, risks creating duplicative federal claims for the same alleged wrong, creating federal question jurisdiction for garden-variety employment disputes, and miring FMLA litigation in a host of issues unrelated to the FMLA or even to federal law.  Nor is the logic of Plaintiffs' position—that the FMLA creates a cause of action for those terminated for any "illegitimate" reason while on FMLA leave—limited to civil rights claims;

for purposes of the FMLA there is no discernible difference, for example, between "illegitimate" terminations in retaliation for filing Title VII complaints and "illegitimate" terminations in violation of employment contracts or collective bargaining agreements.  In short, if Plaintiffs were right, almost any employment dispute involving an employee who has requested or is on FMLA leave could give rise to FMLA litigation.  Had Congress intended such a sweeping result, one would expect to see some evidence of it.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  The Court will, accordingly, grant Defendants' motion to dismiss Savignac's FMLA interference claim for failure to state a claim.

Savignac's DCFMLA claim, however, survives because this Court must defer to the D.C. Court of Appeals's interpretation of D.C. law.  In *Washington Convention Center Authority v. Johnson*, the D.C. Court of Appeals held the "unlawful" termination based on age discrimination of an employee who was on FMLA leave did not "establish[] a defense to [a] DCFMLA claim." 953 A.2d 1064, 1078 (D.C. 2008).  This Court is bound to apply that interpretation of D.C. law. *Payne v. Dist. of Columbia Gov't*, 722 F.3d 345, 353 (D.C. Cir. 2013) ("[O]ur analysis of the applicable District of Columbia statutes recognizes the District of Columbia Court of Appeals's interpretation as binding.").  Because Savignac has alleged that Jones Day unlawfully interfered with his right to reinstatement under the DCFMLA by terminating him based on his protected opposition to sex-based discrimination, the Court will deny Defendants' motion to dismiss Savignac's DCFMLA claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, Dkt. 15, is hereby **GRANTED** in part and **DENIED** in part.  Defendants' motion to dismiss Sheketoff's Title VII and DCHRA claims (Count IV and VI) is **DENIED**; their motion to dismiss Sheketoff's EPA claim (Count V)

is **GRANTED**, and that claim is hereby **DISMISSED** without prejudice; their motion to dismiss

Sheketoff's and Savignac's challenges to Jones Day's leave policy under Title VII, the EPA, and

DCHRA (Counts I, II, & III) is **DENIED**; their motion to dismiss Sheketoff's and Savignac's

retaliation claims under Title VII, the FLSA, and the DCHRA (Counts VII, VIII, and IX) is

**DENIED;** their motion to dismiss Savignac's FMLA interference claim (Count X) is

**GRANTED**, and that claim is hereby **DISMISSED**; and their motion to dismiss Savignac's

interference claim under the DCHRA (Count XI) is **DENIED**.

      **SO ORDERED**.

          /s/ Randolph D. Moss
          RANDOLPH D. MOSS
          United States District Judge

Date:  September 4, 2020