# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

     *Plaintiffs*,

        v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and JOHN DOES 1-10,

     *Defendants*.

Case No. 1:19-cv-02443-RDM

## REPLY IN SUPPORT OF PLAINTIFF JULIA SHEKETOFF'S
## MOTION FOR RECONSIDERATION[1]

---

[1] Jones Day's opposition brief purports to incorporate by reference the far longer brief that its *Tolton* team filed in response to Julia's amica brief.  Dkt. 36 at 9.  This brief therefore replies to both that *Tolton* response (*Tolton* Dkt. 166) and the brief filed by Jones Day's *Savignac* team.

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument .............................................................................................................. 3

    I.   The Court should exercise its "broad discretion" to resolve this motion on the merits ...... 3

    II.  The Court should reinstate Julia's EPA claim ................................................. 6

        A.  As Jones Day practically concedes, the reading of the EPA that it persuaded the Court to adopt is foreclosed by Supreme Court and D.C. Circuit case law ............ 7

        B.  Jones Day obfuscates with attacks on strawman versions of Julia's position ............. 11

        C.  A difference between two workers in productivity or in effort exerted does not show that their jobs require different skill or effort .................................... 18

Conclusion ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Brown v. District of Columbia*,
    2019 WL 1924245 (D.D.C. 2019) ................................................................5

*California Ass'n of Private Postsecondary Schools v. DeVos*,
    2019 WL 6117418 (D.D.C. 2019) ................................................................5

*Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*,
    630 F.3d 217 (D.C. Cir. 2011) ....................................................................5

*Carter v. Welles-Bowen Realty, Inc.*,
    736 F.3d 722 (6th Cir. 2013) ................................................................24, 25

*Chiaramonte v. Animal Medical Center*,
    677 F. App'x 689 (2d Cir. 2017) ....................................................15, 16, 20

*Christianson v. Colt Industries Operating Corp.*,
    486 U.S. 800 (1988).................................................................................3, 4

*Clark v. Martinez*,
    543 U.S. 371 (2005).....................................................................................25

\* *Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974)....................................................8, 17, 18, 23, 24, 25

*Cobell v. Jewell*,
    802 F.3d 12 (D.C. Cir. 2015) ......................................................................5

*EEOC v. Port Authority*,
    768 F.3d 247 (2d Cir. 2014)................................................................15, 16

*Estate of Klieman v. Palestinian Authority*,
    923 F.3d 1115 (D.C. Cir. 2019) ..................................................................4

*Filebark v. DOT*,
    555 F.3d 1009 (D.C. Cir. 2009) ..............................................................3, 4

*Goodrich v. International Brotherhood of Electrical Workers*,
    815 F.2d 1519 (D.C. Cir. 1987) ..................................................................8

*Hodgson v. Corning Glass Works*,
    474 F.2d 226 (2d Cir. 1973).......................................................................17

*Ilhardt v. Sara Lee Corp.*,
    118 F.3d 1151 (7th Cir. 1997) ...................................................................11

*Jones v. Bernanke*,
  557 F.3d 670 (D.C. Cir. 2009) .......................................................................................4

*Keepseagle v. Perdue*,
  856 F.3d 1039 (D.C. Cir. 2017) .....................................................................................4

*King v. U.S. Department of Justice*,
  292 F. Supp. 3d 182 (D.D.C. 2017) ...............................................................................5

\* *Laffey v. Northwest Airlines, Inc.*,
  567 F.2d 429 (D.C. Cir. 1976) ...................................................................8, 9, 17, 25

*Langevine v. District of Columbia*,
  106 F.3d 1018 (D.C. Cir. 1997) ..................................................................................4, 5

\* *Musgrove v. District of Columbia*,
  458 F. App'x 1 (D.C. Cir. 2012) ...............................................................................1, 8, 13

*Public Citizen, Inc. v. Trump*,
  361 F. Supp. 3d 60 (D.D.C. 2019) .................................................................................4

*Renstrom v. Nash Finch Co.*,
  787 F. Supp. 2d 961 (D. Minn. 2011) .........................................................................20

*Schultz v. Department of Workforce Development*,
  2011 WL 13359148 (W.D. Wis. 2011) .........................................................................20

*Spencer v. Virginia State University*,
  919 F.3d 199 (4th Cir. 2019) ......................................................................................9, 15

*Tolton v. Jones Day*,
  2020 WL 2542129 (D.D.C. 2020) ...........................................................................17, 23

*Washington County v. Gunther*,
  452 U.S. 161 (1981) .......................................................................................................8

**Statutes, rules, and regulations**

29 U.S.C. § 206(d)(1) ........................................................................................... *passim*

29 U.S.C. § 216(b) ............................................................................................................4

29 C.F.R. § 1620.14(a) ...............................................................................................23, 25

Federal Rule of Civil Procedure 1 ....................................................................................5

Federal Rule of Civil Procedure 54(b) .............................................................................4

## INTRODUCTION

The closely related questions before the Court are whether to adhere to the dismissal of Julia's Equal Pay Act claim for failure to "allege that she worked as many hours or otherwise worked as hard as those who were paid more" (Dkt. 32 at 23), and whether to grant summary judgment on EPA claims where the plaintiffs billed fewer hours than male comparators. In both cases, the EPA claims should be allowed to move forward.

An EPA plaintiff need only show that she was paid less than men who held "jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'" *Musgrove v. District of Columbia*, 458 F. App'x 1, 2 (D.C. Cir. 2012). And "there is a difference between alleging that a plaintiff and her comparators' jobs *require* 'equal … effort'" and alleging that the plaintiff "worked as hard as those who were paid more." Dkt. 32 at 23-24. The EPA's prima facie inquiry does not demand a showing about the latter issue. It asks about the *requirements* of the job, not how particular workers measure up. A plaintiff may plausibly allege that she and her comparators held jobs requiring equal skill, effort, and responsibility without alleging that she was as productive, hardworking, or skillful as they. Julia's allegations suffice.

Parallel reasoning applies at summary judgment. Productivity is not part of the prima facie case, so a plaintiff may prove that she and her comparators held equal jobs without showing equal productivity. And an employer cannot prove unequal jobs simply by showing unequal productivity. Indeed, it is common for two workers with the same job to differ in productivity, or in skill or effort exerted, so such a difference cannot itself show that the two actually have different jobs. Jones Day's cases show only that such differences may sometimes provide *evidence* supporting a finding that the workers hold different jobs. It has no case granting summary judgment (much less a motion to dismiss) based solely on unequal productivity or exerted effort.

Jones Day wastes much of its space conjuring up and knocking down strawman arguments that Julia has never made and has no reason to make.  It attributes to her the view that the EPA's "inquiry into job similarity" considers only "job requirements *on paper*" while ignoring "job requirements *in practice*" (*Tolton* Dkt. 166 at 10), and the related view that the "equal jobs" inquiry should be conducted at a high level of generality, such that all "associates" or all "professors" are deemed to have the same job for EPA purposes.  Julia does not hold either view, as her motion makes clear.  She simply urges that, when an employer groups a small number of employees sharing a specialized background and other similarities into a narrow category and pays them in lockstep, it is a plausible inference that they hold jobs requiring equal skill, effort, and responsibility.  Jones Day does not offer a serious response to this point.

Beneath its strawmen and rhetorical flourishes, Jones Day makes two arguments in its most recent pair of briefs (Dkt. 36; *Tolton* Dkt. 166).  One argument is old, the other brand new.

First, Jones Day renews its longstanding argument that the EPA "requires a plaintiff to identify a pay disparity with a comparator who (i) holds the same 'job' *and* (ii) performed 'equal work.'" *Tolton* Dkt. 166 at 7 (emphasis added).  But Jones Day has no answer to Julia's point in her motion that this "two-element" view is foreclosed by the decisions of the Supreme Court and the D.C. Circuit, which define "equal work" to mean that the plaintiff and her comparators hold the same job, not as a separate element on top of that "equal jobs" element.  Indeed, Jones Day does not point to a single case *from any court* that treats "equal jobs" and "equal work" as separate elements.  Even if Jones Day's blank-slate textual arguments were better than they are, the binding case law foreclosing its position (and the lack of cases supporting it) would be dispositive.

That brings Jones Day to its novel second argument.  Contradicting its longstanding two-element view, it now says that the statutory phrase "equal work" actually *is* superfluous: "one

could reach the same practical result [as under the two-element view] by eliminating the 'equal work' element." *Tolton* Dkt. 166 at 7. According to this argument, the "equal jobs" requirement—that is, the requirement that the plaintiff and her comparators hold "jobs the performance of which requires equal skill, effort, and responsibility"—itself demands a comparison of the plaintiff and her male coworkers on various "measures of productivity," such as billable hours, cars sold, papers published, and so on. *Id.* at 13-14. Jones Day's view appears to be that any given worker's job *requires* exactly the amount of skill and effort that particular worker happens to *exert*, such that two workers who differ in productivity (and therefore, presumably, in skill or effort exerted) ipso facto have different jobs. But this circular argument has no support in the text or the case law. And it is self-refuting on any ordinary understanding of the key statutory terms "jobs" and "requires"—which explains why Jones Day has never made the argument before, and why it now focuses more on attacking strawman versions of Julia's views than on supporting its own.

## ARGUMENT

**I.     The Court should exercise its "broad discretion" to resolve this motion on the merits.**

Jones Day's lead argument is that the Court should adhere to its ruling even if it was wrong. Dkt. 36 at 4-6. It relies mainly on *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988), the only appellate decision it cites. *See* Dkt. 36 at 4-6. But it fails to disclose that *Christianson* says nothing about the standard for reconsideration of interlocutory orders. It addresses the law-of-the-case doctrine, which limits "agitation of settled issues" "in subsequent stages in the same case." 486 U.S. at 816. One would never know it from Jones Day's brief, but "interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment." *Filebark v. DOT*, 555 F.3d 1009, 1013 (D.C. Cir. 2009).[2]

---

[2] Jones Day could hardly have overlooked the cases explaining that "the law-of-the-case doctrine

Jones Day also complains that "nowhere does Sheketoff even acknowledge the demanding standard for reconsideration—instead conflating it with the test for whether a court should allow an *amicus* filing." Dkt. 36 at 5. The complaint is ironic: It is Jones Day that botches the reconsideration standard, confusing it with the law-of-the-case standard from *Christianson*. The complaint is bizarre: Julia cited the standard for amicus filings in her motion *for leave to file an amica brief*; she never suggested that the same standard governs reconsideration. And the complaint is false: Julia's reconsideration motion invokes the controlling legal provision, Federal Rule of Civil Procedure 54(b), and observes that Julia raised the same points in opposition to the motion to dismiss and that the Court did not address or reject them in its ruling. Dkt. 33 at 5, 6 n.2. These observations directly address the reconsideration standard in this Court's standing order.

The rest of Jones Day's argument on the reconsideration standard contends that Julia has failed to establish the sort of "extraordinary circumstances" ("clear error and manifest injustice") that *Christianson* describes as exceptions to *the law-of-the-case doctrine*. Dkt. 36 at 5-6. Because Jones Day is mistaken about the applicable standard, this is ink spilled in vain.[3]

In rulings that Jones Day studiously ignores, this Court has set forth the standard it applies to motions to reconsider interlocutory orders. "Under Federal Rule of Civil Procedure 54(b), orders entered by a district court 'may be revised at any time before the entry of [final] judgment.'" *Public Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 76 (D.D.C. 2019) (quoting Rule 54(b)). Thus,

---

does not apply to interlocutory orders." *Keepseagle v. Perdue*, 856 F.3d 1039, 1048 (D.C. Cir. 2017); *see also, e.g.*, *Estate of Klieman v. Palestinian Authority*, 923 F.3d 1115, 1121 (D.C. Cir. 2019), reinstated in relevant part per 2020 WL 5361653 (D.C. Cir. 2020); *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009); *Filebark*, 555 F.3d at 1013; *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997).

[3] Jones Day's sole argument under *Christianson*'s (inapplicable) "manifest injustice" exception (Dkt. 36 at 6) betrays its ignorance that the EPA alone provides for "additional" liquidated damages equal to the amount by which the plaintiff was underpaid. 29 U.S.C. § 216(b).

"'interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment.'" *Id.* (quoting *Langevine*, 106 F.3d at 1023). "District courts have broad discretion to hear a motion for reconsideration brought under Rule 54(b), but should grant motions for reconsideration 'only as justice requires.'" *California Ass'n of Private Postsecondary Schools v. DeVos*, 2019 WL 6117418, at *3 (D.D.C. 2019) (quoting *Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011)); *see also Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015). Courts should exercise their broad discretion upon a showing of "good reason," judged in light of the court's "obligation … 'to secure the just, speedy, and inexpensive determination of every action and proceeding.'" *King v. DOJ*, 292 F. Supp. 3d 182, 188 (D.D.C. 2017) (quoting Fed. R. Civ. P. 1). "Failing to consider … an important argument is, to be sure, a proper ground for reconsideration." *Brown v. District of Columbia*, 2019 WL 1924245, at *3 (D.D.C. 2019).

Prompt reconsideration here would promote justice, speed, and efficiency. The Court's ruling created an additional hurdle, not intended by Congress or the Supreme Court, for discrimination victims seeking relief under a major civil rights law. It will likely be cited by other litigants and may be followed by other courts. It deprived Julia of her substantive rights under a remedial statute. Because the EPA alone provides for liquidated damages, the ruling has economic implications even though the other causes of action survived. Jones Day does not dispute Julia's assertion (Dkt. 33 at 6 n.2) that she raised her reconsideration arguments in her opposition to the motion to dismiss and that the Court did not consider or reject them in its ruling or at oral argument. Any potential appeal lies far in the future and, if successful, could require a second trial. By contrast, reconsideration should not create meaningful cost or delay: Jones Day admits that Julia will "obtain full discovery" either way, because her other claims survived. Dkt. 36 at 6. Finally,

if the Court adopts Julia's reading of the EPA in *Tolton*—where the same issue is before the Court and the reconsideration standard does not apply—then it should surely apply the same law here. For these reasons, Julia submits that the Court should consider the briefing on the merits and rule in accord with what it determines to be the correct statement of the law.[4]

## II.      The Court should reinstate Julia's EPA claim.

Jones Day persuaded the Court that an EPA plaintiff must plead and prove not merely that she and higher-paid men hold "jobs requiring equal skill, effort, and responsibility" but also that they did "equal work" in the sense of *exerting* equal skill and effort (or being equally productive— which comes to the same thing, since productivity is a function of skill and effort). But Julia's motion explained that Supreme Court and D.C. Circuit case law is to the contrary: The phrase "equal work" is defined by the "equal jobs" requirement; it is not a separate element. Jones Day offers no answer to these cases, and no rulings from any court embracing its "two-element" view (e.g., by finding that the plaintiff and comparators had "equal jobs" but did not do "equal work").

Seeing the writing on the wall for its two-element view, Jones Day merely offers a halfhearted textual defense of that view (without reference to the case law) and then moves on to a brand-new theory of the EPA's prima facie case. Here, its dominant strategy is obfuscation. It tries to cast Julia as advocating an expansive reading of the EPA that is contradicted by the case law, but her views are entirely consistent with those cases. Instead, it is Jones Day that seeks an innovation with no basis in six decades of EPA case law. It argues for the first time that the effort and skill *required* to perform a job should be equated with the effort and skill that a given worker *exerts* (and the degree of productivity that he thereby attains), such that two otherwise identical

---

[4] Julia agrees that litigants should not "rehash arguments previously made and rejected." Dkt. 36 at 5. If she understood the Court's ruling to consider and reject her reading of the EPA, then she would not have moved for reconsideration.

workers must be deemed to have different jobs if one is more hardworking or productive.  As Jones Day candidly admits, this is just an attempt to read into the statutory language "jobs the performance of which requires equal skill, effort, and responsibility" what its two-element view read into the phrase "equal work."  The new argument would nullify the key statutory language—"jobs" and "requires"—and create a new focus on comparing the qualities of workers that has no basis in the text, purpose, or case law.  Indeed, Jones Day has not found a single case granting summary judgment or a motion to dismiss based solely on a difference in productivity or in skill or effort exerted.  The Court should reject Jones Day's new and old arguments alike.

**A.      As Jones Day practically concedes, the reading of the EPA that it persuaded the Court to adopt is foreclosed by Supreme Court and D.C. Circuit case law.**

Jones Day's longstanding argument focuses on the words "equal work" in the EPA's phrase "equal work on jobs the performance of which requires equal skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).[5]  As expressed in its own words, "Jones Day's view is that the Act requires a plaintiff to identify a pay disparity with a comparator who (i) holds the same 'job' and (ii) performed 'equal work'" (*Tolton* Dkt. 166 at 7), with the "equal work" element requiring the plaintiff to show that she and her comparators performed roughly equally on relevant "measures of productivity" or (in another of Jones Day's formulations) that "she performed the same *quantity* or *quality* of work" as the higher-paid men (*id.* at 14; Dkt. 19 at 20).  Julia's opening brief showed that this "two-element view" is wrong as a matter of text, purpose, case law, and EEOC guidance: The prima facie case requires only a showing that the plaintiff and higher-paid men held substantially the same "job," and "equal work" is defined by this "equal jobs" requirement.  Dkt. 33 at 6-16.  On some of these fronts, Jones Day offers weak responses.  But it hardly even *attempts*

---

[5] The EPA also requires "similar working conditions," but neither party relies on that, so this brief generally omits the additional language for the sake of brevity.

to explain away the Supreme Court and D.C. Circuit authorities that confirm Julia's understanding of "equal work." By its silence, it practically concedes that those authorities are dispositive.

The authorities are discussed at greater length in Julia's motion (Dkt. 33 at 10-16, 19-23), but here are some highlights. In *Corning Glass Works v. Brennan*, the Supreme Court discussed the legislative history of the EPA in great detail, focusing on the development of "the Act's *definition of equal work*," and made clear that "equal work" means work on "jobs the performance of which requires equal skill, effort, and responsibility"—that is, exactly what Jones Day refers to as "equal *jobs*." 417 U.S. 188, 199 (1974) (emphasis added); *see id.* at 199-201. In *Washington County v. Gunther*, the Court again made clear that the EPA's "equal work standard" *is* what Jones Day calls the "equal jobs" standard—the requirement that the plaintiffs work in "jobs [that are] substantially equal to those of the male [comparators]." 452 U.S. 161, 165 (1981).

More recently, the D.C. Circuit showed the same understanding of "equal work" when it explained that a plaintiff must show that the defendant "paid her male counterparts more money 'for equal work'—*that is*, for jobs requiring 'equal skill, effort, and responsibility.'" *Musgrove*, 458 F. App'x at 2 (quoting *Corning Glass Works*, 417 U.S. at 195) (emphasis added); *see also, e.g.*, *Goodrich v. International Brotherhood of Electrical Workers*, 815 F.2d 1519, 1523 (D.C. Cir. 1987) (the "initial burden" is simply "to prove wage disparity and job equality"). In short, "the phrase 'equal work' … *mean[s]* that *the jobs* … must be 'substantially equal.'" *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 449 (D.C. Cir. 1976) (emphases added).

These authorities foreclose Jones Day's two-element view. Jones Day barely argues otherwise. The section of its brief that purports to defend the two-element view is titled "The Statutory Text and Purpose Confirm Jones Day's Interpretation." *Tolton* Dkt. 166 at 10. Consistent with that title, it offers only a dubious blank-slate reading of the statutory text, a few

hypotheticals, and what Jones Day deems to have been Congress's purpose.  *See id.* at 10-14.
Conspicuously absent is any discussion of the case law.  Rather, Jones Day buries that discussion
near the end of its brief, in the section attacking its strawman version of Julia's reading (rather than
defending Jones Day's own two-element view).  *See id.* at 20-22.  Even there it does not pretend
that the cases can be reconciled with the two-element view, but merely that they "do[] not advance
Sheketoff's theory" (as it mischaracterizes her theory).  *Id.* at 20; *see id.* at 7-8, 21.  And Jones
Day practically concedes that the authorities doom its view when it weakly asserts that "the issue
here is not really whether 'equal work' is defined by 'equal jobs' or imposes an additional
requirement."  *Id.* at 21.  That was always the issue before.  Indeed, Jones Day's primary argument
is *still* that "equal work" imposes an "additional requirement."  *Id.* at 7, 21.[6]

Jones Day's own (out-of-circuit) rulings themselves treat the phrase "equal work" as
requiring an inquiry into the similarity of the *jobs*, not a comparison of productivity.  *See, e.g.*,
Dkt. 33 at 18-23 (discussing Jones Day's cases); *Spencer v. Virginia State University*, 919 F.3d
199, 203-06 (4th Cir. 2019).  Jones Day has failed to uncover *a single case from any court*
declaring "equal work" to be a distinct element on top of the "equal jobs" requirement.

Indeed, Jones Day notes that "some courts call [the prima facie analysis] an 'equal work'
analysis while others call it 'equal jobs.'"  *Tolton* Dkt. 166 at 14; *see also, e.g.*, *Laffey*, 567 F.2d
at 449 ("if in the aggregate *the jobs* require substantially similar skills, efforts, and responsibilities,

---

[6] Jones Day offers a footnote asserting that one phrase in one of the cases "supports Jones Day's
position that the EPA requires *both* equality of work and equality of jobs."  *Tolton* Dkt. 166 at 20
n.3.  But the phrase at issue—"performing equal work on essentially the same job" (*Laffey*, 567
F.2d at 449)—is just a paraphrase of the statute ("equal work on jobs requiring …").  Jones Day
gloms onto the phrase's "two-element structure," but the statutory text itself has the identical
"structure"; the case's use of that parallel structure is not an endorsement of any particular
interpretation.  It must be understood in light of the great weight of authority establishing that the
statutory text actually imposes only a single element.  Anyway, Jones Day admits that *Laffey*'s
legal analysis does not distinguish between the "two" elements.  *Tolton* Dkt. 166 at 20 n.3.

*the work* will be adjudged equal despite minor variations" (emphases added)).  And it notes that the EEOC likewise uses "'jobs' and 'work' interchangeably."  *Tolton* Dkt. 166 at 23.  That courts and the agency treat the terms as fungible simply confirms that "equal work *means* "equal jobs."

Jones Day's textual arguments also fail.  It says that the "equal jobs" element considers the job "at a high level of generality" while "equal work" "accounts for material differences in job content and performance."  *Id.* at 6-7.  But if "equal work" already calls for a free-wheeling inquiry into "material differences in job content and performance," then Congress's decision to include the much more detailed language defining the "equal jobs" element—"jobs the performance of which requires equal skill, effort, and responsibility"—appears to add nothing, making that key phrase entirely superfluous.  Why refer specifically to the "skill, effort, and responsibility" that "the performance of" the "jobs … requires" if the phrase "equal work" itself calls for an analysis not only of the *required* skill and effort but also of the skill and effort actually *exerted* by the plaintiff and better-paid men?

As for the affirmative defenses, Jones Day concedes that they demand the same sort of productivity comparison that it sees as implicit in the prima facie case.  *Id.* at 11.  But that does not make the defense for "quantity or quality of production" superfluous, Jones Day says, because the prima facie case only asks whether the plaintiff's productivity was in the right "ballpark," while "the defenses then allow the employer to take a finer cut."  *Id.* at 7, 11.  Elsewhere, Jones Day says that the prima facie case demands a showing that the plaintiff's and comparators' work is "virtually identical."  Dkt. 15 at 36.  Combining its two propositions yields a theory that renders the affirmative defense "virtually" superfluous—which is not much better than totally superfluous.  Nothing about the words that Congress chose in allocating the "quantity … of production" defense to the employer suggests that the employee must show that she was *virtually* as good as her

colleagues before the employer must show that she was not *exactly* as good.  Nor does Jones Day contend that any court has ever endorsed its "ballpark"/"finer cut" theory.[7]

Jones Day's blank-slate text arguments (and its question-begging purpose argument) need not detain the Court, however, because the slate is not blank.  The case law disposes of the two-element view.  The phrase "equal work" simply refers to the requirement that the plaintiff and her comparators hold "jobs the performance of which requires equal skill, effort, and responsibility."

**B.     Jones Day obfuscates with attacks on strawman versions of Julia's position.**

The centerpiece of Jones Day's briefing is not a legal argument at all.  It is a strawman version of Julia's view of the "equal jobs" inquiry.  Jones Day's felt need to obfuscate betrays its recognition that its own arguments are indefensible.

**1.     The "part-time" strawman.**  Jones Day opens both of its briefs by asserting that Julia "maintains that a *part-time* worker can establish a claim simply by identifying a *full-time* worker who earned more."  Dkt. 36 at 4; *Tolton* Dkt. 166 at 6; *see also id.* at 8-9.  Not true.

To recap, *Jones Day* asserted in its *Tolton* EPA brief that "it is generally inappropriate to compare part-time and full-time employees."  *Tolton* Dkt. 127 at 20 (citing *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997)).  Julia responded by pointing out that *Ilhardt*—the only case that Jones Day has *ever* cited on the part-time/full-time issue—is a Title VII decision with nothing to say about the EPA's prima facie case.  Dkt. 33 at 18-19.  Jones Day appears to concede that it blundered in relying on *Ilhardt*, for while it led off its summary judgment argument on this issue with that case, the case makes no appearance in this latest pair of briefs.  In a footnote, Julia added that "[t]he EEOC's position is that … an employee's part-time versus full-time status"

---

[7] Notably, Jones Day does not renew its pseudo-textualist arguments based on the statutory terms "effort" and "rate."  *See* Dkt. 33 at 16, 18 (rebutting these arguments).

does not go to the EPA's "prima facie case." *Id.* at 19 n.7.  She also observed that "Jones Day identifies no other cases suggesting that part-time and full-time positions are unequal jobs under the EPA," meaning that "Jones Day's starting point—that 'a formal full-time/part-time dichotomy' would play into the prima facie case—is without support." *Id.* (quoting *Tolton* Dkt. 127 at 20).

Unlike Jones Day and the EEOC, Julia did not "maintain[]" anything about whether part-time workers can be compared to full-time workers for EPA purposes.  Nor do her arguments imply anything about the question; one could easily argue, consistent with everything that Julia has said, that a person required to work 40 hours a week has a job that *requires* more effort than a person required to work 20 hours (Jones Day argues it both ways, *see Tolton* Dkt. 166 at 8).  Julia's point was that the proper treatment of part-time versus full-time workers is irrelevant here: While Jones Day sometimes allows associates to work part-time, the plaintiffs and comparators here were full-time workers.  Dkt. 33 at 19.  Jones Day does not dispute that, and it has not pointed to any EPA case addressing the "full-time/part-time dichotomy."  Its assertions about Julia's views on that issue are false and irrelevant distractions.

**2.      The "on paper" strawman.**  Jones Day also attributes to Julia the view that the EPA's "inquiry into job similarity" considers only "job requirements *on paper*" while ignoring "job requirements *in practice*." *Tolton* Dkt. 166 at 10.  It says that her "theory is that a court evaluating 'equal work' is limited to the generalized requirements of the 'job' (perhaps defined by job description or title) but must ignore actual job content." *Id.* at 14.  It then devotes roughly half of its principal brief to knocking down that "theory" by showing that courts often do consider "the job requirements *in practice*" rather than limit themselves to the job "on paper." *See id.* at 14-24.

The "on paper" theory is a strawman.  Julia agrees that the question whether a plaintiff and her male coworkers hold "jobs the performance of which requires equal skill, effort, and

responsibility" concerns the actual job requirements, not just how the jobs are described in formal job titles and descriptions.  That is what courts mean by "actual job performance and content."  *Tolton* Dkt. 166 at 15.  Since the parties agree, Jones Day's heap of citations is beside the point.

In its order, the Court distinguished "between alleging that a plaintiff and her comparators' jobs *require* 'equal … effort' and alleging that the plaintiff and her comparators, in fact, *performed* 'substantially equal work.'"  Dkt. 32 at 23-24.  It dismissed Julia's claim for "fail[ure] to allege that she actually performed work 'substantially equal'" to that of better-paid men because she did not "allege that she worked as many hours or otherwise worked as hard."  *Id.*  The Court was agreeing with Jones Day's argument that Julia needed to plead "that she performed the same *quantity* or *quality* of work as these associates."  Dkt. 19 at 20; *see also* Dkt. 15 at 37 (arguing that the claim failed because it did not "allege anything about the strength of her reviews … or the number of hours she billed").  Thus, Jones Day argued that the EPA has an "equal work" element separate from its "equal jobs" requirement that compels the plaintiff to plead and prove that her performance was as qualitatively and quantitatively strong as her comparators'.  The Court agreed.

Julia's motion explains why that is wrong: "Equal work" is defined by the "equal jobs" inquiry, so a plaintiff establishes a prima facie case by showing that the defendant "paid her male counterparts more money 'for equal work'—that is, for jobs requiring 'equal skill, effort, and responsibility.'"  *Musgrove*, 458 F. App'x at 2.  Julia does not dispute that courts can look to facts about the worker's real-world job performance (not just paper titles and descriptions) *for the purpose of determining what the job actually requires*.  Her motion makes clear that courts can do so,[8] as Jones Day ultimately acknowledges, *Tolton* Dkt. 166 at 18.

---

[8] *E.g.*, Dkt. 33 at 22 (quoting with approval statement that "it is the actual requirements of the job that control," and distinguishing Jones Day's view that "level of productivity on paying work" controls); *id.* at 19-23 (discussing with approval cases that examine actual job content).

So a plaintiff's relative job performance is not a separate *element* of the prima facie case (as Jones Day contends), but it might be *evidence* of what the job actually requires (as Julia has explained, *see* Dkt. 33 at 19-23).  There is a world of difference between these propositions. Consider, for example, a personal injury lawsuit.  If the defendant shows that he was wearing his glasses when he crashed into the plaintiff, that might be one piece of *evidence* weighing against the negligence claim (practically any fact can serve as evidence under the right circumstances). But it hardly follows that the plaintiff must plead in her complaint, or prove at summary judgment, anything about whether the defendant was wearing glasses; that is not an *element*.  Indeed, even if the defendant can prove that he was wearing glasses, that fact could not support summary judgment on its own.  A plaintiff must establish the elements of her claim (e.g., that the defendant was negligent, that she and her comparator hold jobs requiring equal skill, effort and responsibility). But she is under no obligation to establish anything about every fact that might, under certain circumstances, weigh against or in favor of her on an element (e.g., that the defendant was not wearing his glasses, that she put in as much effort as her comparator).  There may be many other allegations (at the pleading stage) or facts (at summary judgment) that the plaintiff can rely on to support her claims (e.g., that the defendant was speeding, that the defendant's equal treatment of her and her comparators shows that it viewed them as holding equal jobs).  If the allegations or evidence meets the applicable standard, then the case should move forward.

Here, even if a difference in productivity between a plaintiff and comparator could theoretically be a piece of *evidence* weighing against a claim that their jobs *require* equal skill and effort, it would not follow that a claim is implausible absent an allegation of equal productivity, or that a showing of unequal productivity standing alone requires summary judgment.  And that is the crux of this dispute: What the parties disagree about is not whether courts can consider facts

that illuminate "the job requirements *in practice*" (*Tolton* Dkt. 166 at 10), but whether a disparity in hours billed or effort exerted shows, standing alone, that two associates had different job requirements.  As discussed below, that one associate does not bill "as many hours or otherwise work[] as hard as" another (Dkt. 32 at 23) cannot show on its own that they hold different jobs.

3.     **The level-of-generality strawman.**  Jones Day's next strawman concerns a related issue: Just how similar do a plaintiff's and her comparators' jobs have to be to meet the EPA's requirement of *substantially* equal jobs?  By definition, all "veterinarians" provide medical treatment to animals; practically all "professors" teach classes.  Despite this core of similarity, though, courts rightly reject the notion that all veterinarians (or all professors, or all lawyers, etc.) hold the same job.  *E.g.*, *Spencer*, 919 F.3d at 204 (professors); *Chiaramonte v. Animal Medical Center*, 677 F. App'x 689, 691 (2d Cir. 2017) (veterinarians); *EEOC v. Port Authority*, 768 F.3d 247, 257 (2d Cir. 2014) (lawyers).  The EPA requires more similarity than such broad categories.

Julia acknowledged and endorsed this principle in her reconsideration motion.  *E.g.*, Dkt. 33 at 20-21.  Yet Jones Day pretends that she would deem all "associates" to hold the same job.  Dkt. 36 at 8; *Tolton* Dkt. 166 at 9, 21; *but see id.* at 19.  This is another strawman.  Julia has never sought to compare herself to all Jones Day associates or any similarly general category.  To the contrary, as the Court said in its order, Julia has "identif[ied] a discrete and focused group of comparators."  Dkt. 32 at 23; *see* Dkt. 33 at 23-25 (discussing Julia's allegations in detail).  That comparator group is far narrower and more specific than the ones rejected in Jones Day's cited cases, which are presumably the best support it could find for a stringent view of the required degree of similarity.  *See Spencer*, 919 F.3d at 204-05 (plaintiff and comparators "taught in

different departments"); *Chiaramonte*, 677 F. App'x at 691; *EEOC v. Port Authority*, 768 F.3d at 257 (rejecting EEOC's "sweeping generalization" that "an attorney is an attorney is an attorney").[9]

Finally, Jones Day attributes to Julia the view that "[a]ll associates 'with the same title, practice group, office, and level of seniority' … have the same 'job.'" *Tolton* Dkt. 166 at 8 (quoting Dkt. 33 at 22); *see also, e.g.*, *id.* at 14, 19.  This is yet another strawman.  Julia's position is simply that, even though jobs that the employer treats the same "on paper" are *sometimes* different in reality, employers *generally* intend formal classifications to reflect reality, so a sufficient degree of commonality in how the employer treats the workers supports a plausible inference that the jobs are indeed the same.  When an employer groups a small number of employees together in a way that suggests that the employer views them as holding the same job— by giving them the same title, assigning them the same class year, grouping them into a relatively small practice group, paying them the same salary, and so forth—then it is a plausible inference that they in fact hold substantially similar jobs.  Of course, it is *conceivable* that they actually have very different job requirements, and that the many ways that the employer treats them alike reflect incompetent management or a series of flukes.  But the likelier thing is that the employer's identical treatment of the workers reflects the reality that their jobs are substantially equal.[10]

---

[9] The EEOC's position in *Port Authority*—that all nonsupervisory lawyers at the Port Authority had the same job because "an attorney is an attorney is an attorney"—confirms that it does not view a lawyer's billables as going to the prima facie case (*contra Tolton* Dkt. 166 at 24).

[10] Strangely enough, Jones Day faults Julia for identifying an *overly* focused comparator group by "limiting her pool of comparators to 'former Supreme Court clerks.'" *Tolton* Dkt. 166 at 22 n.4.  It is not clear how narrowing the pool could "benefit" Julia; it is usually the *defendant* that advocates the narrower comparison.  And Jones Day's suggestion that the credential is irrelevant to a lawsuit about how Jones Day treats its attorneys (*id.* at 22 & n.4) is profoundly hypocritical. Jones Day famously treats the Supreme Court clerkship credential as a crucial differentiator, boasting to the press each year that it has recruited more clerks than any other firm and paying them $400,000+ signing bonuses.  It also pays them higher salaries: Its answer suggests that it paid Julia and the five other Supreme Court clerks of the same office and seniority in lockstep while

In short, the employer's decision to classify and pay workers as if they held equal jobs is strong circumstantial evidence that they do indeed, and allegations to that effect certainly suffice at the pleading stage. Jones Day itself concedes that, though an associate's seniority is a "formality" rather than direct evidence of what her job is in practice, it still "can be probative of the equality of work or jobs." *Tolton* Dkt. 166 at 12, 19. And this Court observed in its pleading-stage ruling in *Tolton* that "factual allegations that could support the plausible inference" of equal work "might include that the plaintiff and her alleged comparators worked in the same department, held the same level of seniority, or their job descriptions substantially matched." *Tolton v. Jones Day*, 2020 WL 2542129, at *29 (D.D.C. 2020). In so acknowledging, the Court was in good company. *See, e.g.*, *Corning Glass Works*, 417 U.S. at 202-03 ("[W]hile Corning now argues that night inspection work is not equal to day inspection work, all of its own job evaluation plans … have consistently treated them as equal in all respects … [I]t is Corning which asks us to differentiate between jobs which the company itself has always equated."); *Hodgson v. Corning Glass Works*, 474 F.2d 226, 234 (2d Cir. 1973) (Friendly, C.J.) ("job descriptions … are particularly significant here since they demonstrate Corning's own view of the content of the jobs before its perspective was changed by the filing of this litigation").[11]

---

paying another Issues & Appeals associate who was otherwise similarly situated less. Dkt. 35 at ¶ 95. And it recently highlighted to this Court that that "[f]ive of the 18" male Jones Day associates who "work[ed] fewer hours" than one of the *Tolton* plaintiffs "were former Supreme Court clerks in the Washington Office." *Tolton* Dkt. 169 at 19. In other words, Jones Day itself views that as a discrete group expected to work less and earn more than its other associates. (Notably, *four* of the seven Jones Day lawyers who have appeared in this case or *Tolton* were Supreme Court clerks, while Jones Day trusts only *one* of the 130 attorneys in its Labor & Employment group to do so.)

[11] Historically, EPA lawsuits often challenged "a disparity between salaries paid men and women for similar positions bearing different titles such as pursers and stewardesses." *Laffey*, 567 F.2d at 449; *see Tolton* Dkt. 166 at 20 (making this point). In such cases, where the defendant creates sex-segregated titles with similar job content but higher pay for men, the different titles are the defendant's self-serving statements and do little to show actual differences between the jobs. By

C.    **A difference between two workers in productivity or in effort exerted does not show that their jobs require different skill or effort.**

That should be the end of the matter.  But Jones Day offers a novel fallback argument.  It says that "eliminating the 'equal work' element" changes nothing, because applying the "equal jobs" element alone will necessarily lead to "the same practical result," making the two-element view and the one-element view "indistinguishable in practice."  *Tolton* Dkt. 166 at 7-8.  Jones Day is contradicting itself: It claims that its two-element view is the best reading of the statutory text because it gives separate meaning to the phrase "equal work" (*id.* at 10), yet it also claims that eliminating that phrase would leave the EPA "indistinguishable in practice" (*id.* at 8)—meaning that the phrase "equal work" actually does no work after all.  And the notion that the "equal jobs" requirement will always lead to the same result that Jones Day has long sought to draw from a freeform inquiry into whether the plaintiff and comparators did "equal work," in the sense of "the same *quantity* or *quality* of work" (Dkt. 19 at 20), is also deeply counterintuitive.  After all, asking whether two workers hold "jobs the performance of which requires equal skill, effort, and responsibility" is, on any ordinary understanding of those words, very different from asking whether they were equally hardworking or productive or performed "the same *quantity* or *quality* of work."  As every employer or manager from Wal-Mart to Google to Jones Day knows, workers with the same job requirements often differ in productivity and work quality.

---

contrast, where the employer categorizes men and women together in a specific and focused grouping—e.g., as "seventh-year Issues & Appeals associates," as opposed to a broad, generic title like "professor" or "associate"—the formal classification is an admission by the defendant that it views the jobs as substantially equal.  A court should be loath to "differentiate between jobs which the company itself has always equated."  *Corning Glass Works*, 417 U.S. at 203.  The absurdity of Jones Day's contrary position comes to the fore when it says that Julia's allegation that she "'was an associate in Jones Day's Issues & Appeals practice group' … says nothing about the *work she performed*."  Dkt. 36 at 7.  As everyone at Jones Day knows (and as its website confirms), membership in the firm's appellate group says a great deal about the work one does.

Jones Day's central argument for the practical equivalence of the two-element and one-element views appears to be that the "equal jobs" requirement entails consideration of "actual job performance and content" (that is, what the jobs actually require in practice, as distinct from "on paper"), and "quantity and quality of work" are part of "job performance," so they must be just as critical to the equal jobs analysis as they would be under Jones Day's (illusory) "equal work" element. Again, Julia agrees that courts applying the "equal jobs" test ask what the job requires in reality, not just on paper. But looking to facts about a worker's experience on the job for the purpose of determining the actual *requirements of her job* is very different from considering that same evidence to determine whether she performed "the same *quantity* or *quality* of work" as better-paid men; the *evidence* may be the same in both scenarios, but the *legal question* that it is being used to answer is very different. Because a difference between two workers in productivity (or, equivalently, in the degree of skill or effort that they actually exert) does not, on its own, show that they do not have the same job requirements, Jones Day cannot win summary judgment simply by showing that the plaintiffs billed fewer hours than certain comparators. It follows a fortiori that an EPA plaintiff need not plead that she was as productive or worked as hard as her comparators (which would often require information about the comparators that the plaintiff could not access without discovery, *see* Dkt. 33 at 9).[12] Julia's claim should therefore be reinstated.

---

[12] While Jones Day's summary judgment motion in *Tolton* focuses on the hours logged by certain male comparators, Jones Day has been conspicuously silent about how Julia's hours compared with those of similarly situated men. Julia has no access to that information; Jones Day has it but keeps it secret. All it has said is that "[f]ive of the 18 [male] lawyers" who "work[ed] fewer hours" than one of the *Tolton* plaintiffs "were former Supreme Court clerks in the Washington Office." *Tolton* Dkt. 169 at 19. That shows that male lawyers similarly situated to Julia had some of the absolute lowest hours at Jones Day. But the names and practice groups are redacted from the publicly filed version of the relevant exhibit. Other plaintiffs in many industries would be likewise unable to meet this Court's requirement that they offer pre-discovery allegations about how productive or hardworking their male coworkers were. Dkt. 32 at 23.

Jones Day has not cited a single case endorsing its contrary view. As Julia discussed in her motion, it has simply found a handful of rulings that consider the plaintiff's lower hours as one of many pieces of evidence corroborating the employer's argument that more effort, skill, and/or responsibility was actually *required* of the male comparators. *See* Dkt. 33 at 19-23. The cases provide no support for Jones Day's contention that a difference in productivity (e.g., billables) between the plaintiff and her comparators proves *on its own* that they have different jobs.[13]

Consider, for instance, *Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961 (D. Minn. 2011), upon which Jones Day so heavily relies. The plaintiff and two comparators were "head grocery buyers" for distribution centers, but one comparator was the head buyer for "*two*" such centers, giving him "double the responsibility," while the other was in charge of a center for a region "nearly twice as large" as the plaintiff's and also "served 18 military facilities." *Id.* at 968 (emphasis added). It was in this context that the court observed that the plaintiff had "no evidence that, as a result of her added responsibilities, she routinely worked more than 40 hours per week," whereas the two comparators worked "an average of 50 hours" and "an average of 60 or more hours." *Id.* at 969-70. The court concluded: "In light of the undisputed evidence that both [comparators] had essentially 'double work'—[the first] because he handled military installations, and [the second] because he handled two distribution centers—Renstrom cannot meet her burden to show that the jobs *required equal effort*." *Id.* at 970 (emphasis added).

---

[13] Indeed, the most Jones Day can muster about these cases is that, "[i]f *Renstrom*, *Schultz*, and *Chiaramonte* inferred differences in job requirements and effort from differences in hours, even for employees who shared the same formal title and overlapped in duties, then the same inference *can be drawn* about law-firm associates." *Tolton* Dkt. 166 at 19 (emphasis added). That an inference "can be drawn" does not mean that it *must be drawn*, which is what Jones Day needs to establish. Anyway, the key point is that the inferences in those cases were based on numerous other facts not present here, not on a difference in hours standing alone. *See* Dkt. 33 at 19-23.

Now suppose that the employer had identified only a single difference between Renstrom and her comparators: The comparators logged 50 or 60 hours each week while Renstrom worked 40.  The court would not have granted summary judgment.  The fact that one worker logs more hours than another, or is more productive in some other way, may suggest that he is more hardworking, or more skilled (or perhaps *less* skilled and thus less efficient).  But it would not show that his job *requires* more skill or effort than the other worker's.  Again, it is commonplace for a given worker to bring to bear more (or less) skill or effort than his job requires.

Jones Day responds that Julia's view that its cases "were just evaluating what the [hours] comparisons revealed about the relative *requirements of the jobs*" is "sleight of hand that exposes the artificiality and arbitrariness of [her] position."  *Tolton* Dkt. 166 at 18.  But how so?  Julia agrees with its next point, that "the cases … look behind formal job duties to examine actual performance."  *Id.*  But that does not make the universally recognized distinction between a job's requirements and a given worker's productivity or effort exerted a "sleight of hand" or an "artificial dichotom[y]" (*id.* at 24).  Every lawyer understands the statement "A and B have the same job at Jones Day, but A bills more hours."  By contrast, no one would say, "While A's job is generally identical to B's, A bills far more hours, so actually they have different jobs after all."  The same goes for other measures of "productivity" that Jones Day says it would import into the "equal jobs" inquiry.  *E.g.*, *id.* at 13 (whether a worker "shirk[s] her duties"); *id.* at 7 (professor's number of "publications").  The fact that one salesperson "sell[s] materially fewer cars" than another (*id.* at 13) may show that she is an inferior employee, but it hardly proves that she has different job requirements.

There is no reason to believe that Congress intended terms like "jobs" and "requires" to sweep more broadly than their ordinary meanings.  Had it intended Jones Day's interpretation, it

would have left those words out and prohibited unequal pay "for equal skill, effort, and responsibility." Instead, it put the focus on what the "jobs … require[]." 29 U.S.C. § 206(d)(1).

Jones Day next asserts: "One associate's 'job' of working on a few *pro bono* matters at a leisurely pace with no evening or weekend work is not the same—in effort or responsibility—as another associate's job of working around the clock on high-pressure, billable client files." *Tolton* Dkt. 166 at 19; *see also id.* ("An associate could do perfectly acceptable work on one low-stress matter—but that 'job' still does not require 'equal skill, effort, and responsibility' as stressful nights-and-weekends work on a bevy of high-stakes deals."). These conclusory statements beg the question, which is whether a difference in billables shows that two jobs have unequal *requirements*. As its repeated use of scare quotes around "job" indicates, Jones Day does not suggest that anyone involved here had a pro bono job requiring her to work on just a few matters at a leisurely pace while her better-paid male coworkers were required to work around the clock on high-pressure cases (nor would those be fair characterizations of the underlying facts here). Indeed, Jones Day has *never* actually argued that it actually required more of Julia's better-paid coworkers than it required of her. And that would be a surprise, given that they were paid in lockstep with her for most of her time at Jones Day. Dkt. 1 at ¶ 95; Dkt. 35 at ¶ 95.

Ultimately, Jones Day admits that its argument is that every worker should be deemed to hold a "job" that "requires" however much skill and effort that particular worker exerts: "At least in a professional context like a law firm, one cannot meaningfully define the 'job,' or the 'skill, effort, and responsibility' that its performance requires, without reference to the particular work the associate actually performed." *Tolton* Dkt. 166 at 19. Again, Julia agrees that the equal jobs inquiry can look to "the particular work the [plaintiff and her comparators] actually performed" as evidence of what their jobs *required*. *See id.* at 18 (admitting that this is Julia's view). But the

notion that the number of hours that an associate bills is the best or only evidence of the effort that his job requires is absurd. Evidence of the "skill, effort, and responsibility" that are "require[d]" for "the performance" of a given "job[]" could be derived from countless sources, including:

- the testimony of the plaintiff and her colleagues as to what their jobs required;

- the judgment of similarity or dissimilarity expressed by the employer through its internal categorizations of workers (*see Tolton*, 2020 WL 2542129, at *29);

- the judgment expressed by the employer's decisions about pay—if a plaintiff and her comparator were long paid the same salary, it is likely that their employer viewed their jobs as equal (*see* 29 C.F.R. § 1620.14(a));

- the public statements of the employer and its managers in hiring materials and the like;

- internal documents such as direct statements of job requirements (e.g., billable hours targets), performance evaluations (which often express job requirements when evaluating whether workers meet them), and informal documents like emails; and

- the testimony of the plaintiff's manager and the employer's Rule 30(b)(6) deponent about the workers' job requirements (*see Corning Glass Works*, 417 U.S. at 203 (relying on testimony of Corning's Manager of Job Evaluation)).

There is no basis for privileging evidence (or allegations) about a worker's productivity, or skill or effort *exerted*, over all of these more direct forms of evidence about the skill or effort *required*. There is certainly no basis for granting summary judgment based on a difference in hours alone.

Here, for example, there is already far better evidence of the effort that the jobs of the plaintiffs and comparators *required* than the numbers of hours billed. Jones Day's answer avers that it "does set hours targets for associates and communicates those targets to associates." Dkt. 35 at ¶ 48. If that is true, it would seem that the target that Jones Day sets for an associate is the better indicator of the effort that her job requires, and that the number of hours that she actually bills simply indicates whether she met, fell short of, or surpassed that requirement. Again, the prima facie case only asks what the job requirements are, not whether the plaintiff measures up.

Or consider Jones Day's statement in its *Tolton* EPA brief that "the [f]irm … *requires* a reasonable level of productivity on paying work—a level that [the plaintiff] never approached." *Tolton* Dkt. 127 at 22 n.8 (emphasis added).  If Jones Day truly believed, as it now pretends, that "one cannot meaningfully define the 'job,' or the 'skill, effort, and responsibility' that its performance requires, without reference to the particular work the associate actually performed," then this statement would make no sense.  But it *does* make sense.  Every employer understands that it can impose uniform requirements (including billable hour targets) on a group of workers without regard for whether any given worker meets, exceeds, or falls short of those requirements.  If it does so, then they are proper comparators under the plain text of the EPA.  *See also* Dkt. 35 at ¶ 91 (averring that Julia's "billable hours were consistently below expectations," and thus conceding the distinction between the amount of effort exerted and the amount required).[14]

Jones Day claims that it "has one job classification—associate—and pays each associate an *individualized* salary," as if this suggests that all associates with different salaries should be deemed to have different jobs.  *Tolton* Dkt. 166 at 21.[15]  The claim is false.  As Jones Day elsewhere

---

[14] The Congress that enacted the EPA likewise understood that "jobs" and their "require[d] … skill, effort, and responsibility" exist separate and apart from any individual worker.  It drew the "four separate factors [that] determin[e] job value—skill, effort, responsibility and working conditions"—from "formal, systematic job evaluation plans" used by "most of American industry," in which "point values are assigned to each of the subcomponents of a given job, resulting in a total point figure representing a relatively objective measure of the job's value." *Corning Glass Works*, 417 U.S. at 199; *see id.* at 200-03 (applying this understanding).

[15] Julia's motion observed that an individualized showing of how hardworking or productive each plaintiff was relative to better-paid men "would hardly be possible in cases … where a large group of female workers … challenge a systematic pay disparity."  Dkt. 33 at 11.  Jones Day responds that no such showing would be required in *those* cases, only in suits against employers that (purportedly) set "pay … on an individualized basis."  *Tolton* Dkt. 166 at 20-21.  But the text of the EPA does not distinguish between the two types of case (nor does Jones Day point to case law doing so), and its "equal work" language must mean the same thing in all cases.  After all, "a statute is not a chameleon.  Its meaning does not change from case to case.  A single law should have one meaning, and the 'lowest common denominator, as it were, must govern' all of its

admits, it categorizes its associates by practice group, office, and seniority—resulting in a set of much narrower *employer-defined* groupings of associates.

And Jones Day hardly pays "individualized" salaries.  Its answer reveals that, before July 2017 (when Julia's pay suffered from Partner A's discrimination), it paid Julia in lockstep with the five other former Supreme Court clerks in the Issues & Appeals group in the Washington office in the class of 2010 ("two male associates and three female associates").  Dkt. 35 at ¶ 95.  By the time their pay diverged, Julia and her female coworkers had been at the firm for close to three years (and had received two prior raises), and the two men had been there for close to five.  Yet Jones Day saw *no basis for distinguishing among them* until Partner A filed his review.  As Julia's motion explains, the EEOC has recognized that such a history of equal pay further "support[s] the conclusion that … the jobs [are] equal."  Dkt. 33 at 17, 24 (quoting 29 C.F.R. § 1620.14(a)).  Jones Day offers no response.  In short, "it is not [Julia] who is trying to look behind [Jones Day's internal treatment] to require equal pay for jobs which [Jones Day] has historically viewed as unequal work.  Rather, it is [Jones Day] which asks [the Court] to differentiate between jobs which the [firm] itself has always equated."  *Corning Glass Works*, 417 U.S. at 203.

## CONCLUSION

If jobs "require equal 'skill, effort, and responsibility,'" then they "command equivalent salaries" unless an affirmative defense applies.  *Laffey*, 567 F.2d at 445.  Jones Day has never pointed to another ruling, in nearly six decades of EPA case law, that dismissed a claim for failure to plead that the plaintiff "worked as hard as those who were paid more" (Dkt. 32 at 23), whether measured by billable hours or any other metric.  The Court should reinstate Julia's EPA claim.

---

applications."  *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring) (quoting *Clark v. Martinez*, 543 U.S. 371, 380 (2005) (Scalia, J.)).  The Court should not adopt a novel interpretation that would make a large class of important lawsuits impracticable.

/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
October 19, 2020                              D.C. Bar No. 1030225

26