**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC *et al.*,

        *Plaintiffs*,

    v.

JONES DAY *et al.*,

        *Defendants*.

Civil Action No. 19-2443 (RDM)

<u>**MEMORANDUM OPINION AND ORDER**</u>

The pending motion raises a question of first impression—or, more accurately, a question of second impression, since Plaintiff Julia Sheketoff asks the Court to reconsider its earlier opinion, which implicitly decided the question that Sheketoff now raises. That question is whether a prima facie case under the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), has two or three elements. In Sheketoff's view, EPA plaintiffs bear the initial burden of pleading (and later showing) that they were (1) paid less than employees of the opposite sex, (2) for work on jobs requiring "equal skill, effort, and responsibility" that are "performed under similar working conditions." *Id.* The burden then shifts to the employer to show that any pay differential was the product of a bona fide seniority or merit system, "a system which measures earnings by quantity or quality of production," or "any . . . factor other than sex." *Id.* An employer might prevail, for example, if it can show that the plaintiff was paid less because she worked fewer hours or produced work of a lesser quality, but the employer bears the burden of proof on such a defense. In Defendants' view, by contrast, EPA plaintiffs bear the additional burden of pleading (and later showing) that they (3) actually performed "equal work" on the equivalent job. That is, in Defendants' view, EPA plaintiffs bear the burden of pleading (and

showing) both that their jobs and their comparators' jobs *required* equal efforts *and* that they and their comparators actually *performed* substantially equal work.

In the Court's earlier opinion, it at least implicitly adopted Defendants' view, holding that Sheketoff failed to state an EPA claim because she did not "allege that she actually performed work 'substantially equal' to the work performed by her male comparators during the relevant period" of time.  *Savignac v. Jones Day*, 486 F. Supp. 3d 14 (D.D.C. 2020) ("*Savignac I*").  After reviewing the parties' thorough briefs on reconsideration, the Court is now convinced that this reading of the statute is incorrect.  As Justice Frankfurter famously observed:  "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."  *Henslee v. Union Planters Nat'l Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).  Bearing that aphorism in mind, the Court will **GRANT** in part and **DENY** in part Sheketoff's motion for reconsideration.  The Court will grant her motion for reconsideration with respect to the applicable legal standard for pleading an EPA claim but will deny reinstatement of her EPA claim because she has not alleged facts sufficient to meet that standard.  The Court will, however, grant Sheketoff leave to file an amended complaint addressing this deficiency within 14 days of this decision.

## I. BACKGROUND

Because the Court has previously described Plaintiffs' allegations at length, the Court will only briefly describe those allegations relevant to the pending motion.  Plaintiffs, Mark Savignac and Julia Sheketoff, are married and both worked as associates for Jones Day's Issues & Appeals group from 2017 to 2019 (Savignac) and 2014 to 2018 (Sheketoff) in the firm's Washington, D.C. office.  Dkt. 1 at 3 (Compl. ¶¶ 13–14); *Savignac I*, 486 F. Supp. 3d at 19. Sheketoff alleges that she experienced multiple forms of sex discrimination during her time at

the firm. *See* Dkt. 1 at 8–17 (Compl. ¶¶ 58–135). As relevant to the pending motion, she claims that "beginning not later than July 2017 and continuing until [her] departure in August 2018, Jones Day paid [her] a lower annual salary than it pa[id] to male associates of the same level of seniority in the Issues & Appeals group in the D.C. office." *Id.* at 29 (Compl. ¶ 210). Accordingly, Sheketoff argues, "Jones Day discriminated against [her] on the basis of sex by paying her less than it paid male employees in its D.C. office for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," contravening the EPA. *Id.* (Compl. ¶ 209).

The Court granted in part and denied in part Defendants' motion to dismiss. *Savignac I*, 486 F. Supp. 3d at 45. With respect to Sheketoff's EPA claim, the Court started by rejecting several of Defendants' arguments. The Court held, for example, that "the EPA does not require a plaintiff to plead or prove discriminatory intent" and that EPA plaintiffs are not required to "anticipate and fend off" affirmative defenses, such as an employer's purported reliance on a bona fide seniority or merit pay system. *Id.* at 30. The Court also rejected Defendants' contention that Sheketoff was paid less based on her poor performance, noting that at the motion to dismiss stage a plaintiff's factual allegations must be accepted as true. *Id.* Nor was the Court persuaded that Sheketoff had failed to identify "a male comparator who earned more than" she did, explaining that she had alleged "that the raise that she received in 2017 'was smaller than the raises received by male associates in the Issues & Appeals group the same year;'" that "her 2018 salary 'was below the salaries of male Issues & Appeals associates whose salaries had been the same as [hers] prior to 2017;'" and that "'[t]he jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working

conditions.'" *Id.* at 31.

The Court nonetheless dismissed Sheketoff's EPA claim because she had "not adequately allege[d] that she was 'doing substantially equal work' to her comparators." *Id.* Most notably, the Court explained, Sheketoff had "fail[ed] to allege that she worked as many hours or otherwise worked as hard as those who were paid more than she was." *Id.* The nub of the Court's holding, and the nub of the issued presented by Sheketoff's motion for reconsideration, then appears in the next two sentences of the Court's opinion:

> More importantly, there is a difference between alleging that a plaintiff and her comparators' jobs *require* "equal . . . effort" and alleging that the plaintiff and her comparators, in fact, *performed* "substantially equal work." Because Sheketoff fails to allege that she actually performed work "substantially equal" to the work performed by her male comparators during the relevant period, she fails to state an EPA claim.

*Id.* at 31–32. The Court, accordingly, dismissed Sheketoff's EPA claim, but granted her leave to file an amended complaint adding allegations regarding the comparability of the work that she and her comparators actually performed during the relevant time period. *Id.* at 32.

Rather than accept that invitation, Sheketoff filed a motion for reconsideration, arguing that while the Court correctly concluded that there is "a distinction between the requirements of a job (such as the skill, effort, and responsibility that the job requires) and any particular employee's personal performances in that job (such as her 'quantity . . . of production)," it erred in treating both considerations as part of the plaintiff's prima facie case. Dkt. 33 at 5 (emphases omitted). Instead, in Sheketoff's view, "only the former is part of the EPA's prima facie case," while the latter must be raised, if at all, as an affirmative defense. *Id.* Defendants have opposed that motion, Dkt. 36, and Sheketoff has filed a reply, Dkt. 40. Sheketoff also filed an amicus brief in a separate case against Jones Day pending in this Court, *see Henderson*

*v. Jones Day*, No. 19-cv-945 (ECF No. 162), and Jones Day responded to that brief as well, *see id.* (ECF No. 166).  The question is now ripe for decision.

## II.  ANALYSIS

### A.     Rule 54(b)

Before addressing the merits of the question presented, Defendants argue that Sheketoff has not satisfied the demanding standard for seeking reconsideration.  For support, Defendants point to the Supreme Court's decision in *Christianson v. Colt Industries Operating Corp.*, which held that "courts should be loathe to" revisit issues already decided "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"  486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 619 n.8 (1983) (subsequent history omitted)).  But Defendants fail to note that *Christianson* dealt with the law-of-the-case doctrine—not reconsideration of an interlocutory order under Rule 54(b)—or that *Christianson* itself recognized that "[a] court has the power to revisit prior decisions of its own . . . in any circumstance."  *Id.*

The Court agrees with Defendants that a motion for reconsideration is not the opportunity to relitigate issues that have been briefed and decided, and that a party seeking reconsideration must clear a high bar.  *See Pilkin v. Sony Interactive Enter. LLC*, No. 17-cv-2501, 2020 WL 7339920, at *2 (D.D.C. Dec. 14, 2020) (listing the specific showings a movant generally must make to prove that justice requires reconsideration); *Am. Waterways Operators v. Wheeler*, No. 18-cv-2933, 2020 WL 7024195, at *5 (D.D.C. Nov. 30, 2020) (explaining that the movant must show that "reconsideration is necessary"); *Stewart v. Panetta*, 826 F. Supp. 2d 176, 177 (D.D.C. 2011) (listing the showings a movant for reconsideration must make).  But "Federal Rule of Civil Procedure 54(b) provides that 'any order or other decision, however designated, that adjudicates

fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims.'" *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (quoting Fed. R. Civ. P. 54(b)).  As a result, a district court may "reconsider an interlocutory order 'as justice requires.'" *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22–23 (1st Cir. 1985)).

Here, "justice requires" reconsideration for several reasons.  First, as Sheketoff acknowledges, the parties "devoted little space in their [initial] briefs to the issue of whether an associate's hours [or other work demands] are part of her prima facie case," although Sheketoff did briefly raise the issue.  Dkt. 33 at 6 n.2.  To be sure, both parties have now mustered authorities and arguments not previously presented.  But the Court cannot conclude that Sheketoff forfeited her argument merely because she did not cite to the key authorities and did not present the more nuanced analysis than she now presses.  Second, the issue is potentially dispositive, and judicial efficiency counsels in favor of resolving the question now, rather than later.  Little would be gained by postponing the question for appeal, only to require a remand to this Court many months from now to permit the parties to take discovery and to file summary judgment briefs on a question that is not appropriately resolved on the pleadings.  Third, the question presented is a novel and important one, which the parties have now thoroughly briefed.  And finally, after reviewing the parties' briefs and the authorities that they cite, the Court is now convinced that it applied the incorrect standard in assessing Sheketoff's EPA claim.  Justice would be ill-served by ignoring that conclusion.

B.      **Equal Work Requirement**

Sheketoff's motion for reconsideration requires the Court to identify the essential

elements of an EPA plaintiff's prima facie case.  Consistent with the Court's prior decision,

Defendants argue that the prima facie case includes three elements: (1) unequal pay,

(2) substantially equal work, and (3) substantially equal job requirements.  Sheketoff, in contrast,

would collapse the second and third elements—in her view, "equal work" means holding a job

that requires equal skill, effort, and responsibility.  An employee's actual effort and performance

is not irrelevant under Sheketoff's reading of the statute, but those considerations are not part of

an EPA plaintiff's prima facie case.  Instead, once the plaintiff carries her burden of showing that

she was paid less than employees of the opposite sex for working in a job with substantially

equal requirements, the burden shifts to the employer to show that the pay differential resulted

from some nondiscriminatory consideration, such as seniority, merit, or quantity or quality of

work.

To resolve this dispute, the Court starts, as it must, with the language of the statute.  *See*

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  The EPA provides in relevant

part that:

> No employer . . . shall discriminate . . . between employees on the basis of sex by
> paying wages to employees . . . at a rate less than the rate at which he pays wages
> to employees of the opposite sex . . . for equal work on jobs the performance of
> which requires equal skill, effort, and responsibility, and which are performed
> under similar working conditions, except where such payment is made pursuant to
> (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings
> by quantity or quality of production; or (iv) a differential based on any other factor
> other than sex[.]

29 U.S.C. § 206(d)(1).  In *Savignac I*, the Court read this language to require (1) the payment of

wages "at a rate less than the rate at which [the employer] pays wages to employees of the

opposite sex," (2) "for equal work," (3) on a job "the performance of which requires equal skill,

effort, and responsibility, and which [is] performed under similar working conditions." 29 U.S.C. § 206(d)(1); 486 F. Supp. 3d at 30–32. Although Sheketoff concedes that this construction tracks the language of the statute, she maintains that it is not the only plausible reading of the plain language; that Supreme Court and D.C. Circuit precedent support an alternative reading; and that the alternative reading that she proposes makes better sense of the statute, which permits unequal pay based on a seniority or merit system, "a system which measures earnings by quantity or quality of production," or any "factor other than sex." 29 U.S.C. § 206(d)(1).

The key premise in Sheketoff's argument is that the EPA treats "equal work" and "jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" as equivalent. 29 U.S.C. § 206(d)(1). That is, in Sheketoff's view, Congress defined "equal work" as jobs that "require equal skill, effort, and responsibility, which are performed under similar working conditions." *Id.* For purposes of stating a prima facie case, then, the question is not how the employee performed—that question arises only after the plaintiff has stated a prima facie case and the employer offers a nondiscriminatory reason for the pay differential—but, instead, what the job requires.

Although Sheketoff's reading of the statute is not obvious from the text alone, it is the reading that follows from the Supreme Court's decision in *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974). That case addressed whether employer Corning Glass Works violated the EPA "by paying a higher base wage to male night shift inspectors than it paid to female inspectors performing the same tasks on the day shift, where the higher wage was paid in addition to a separate night shift differential paid to all employees for night work." *Id.* at 190. Corning argued that the plaintiff, the Secretary of Labor, who sued to enjoin the pay differential, had

failed to satisfy his burden of showing that the the "day shift work [was] 'performed under similar working conditions' as [the] night shift work." *Id.* at 197.  The Supreme Court rejected Corning's argument, holding that the time of day that the work was performed did not constitute a "working condition" for purposes of the prima facie case, for which the Secretary bore the burden of proof.  *Id.* at 195, 202.  Instead, it was up to Corning to assert any "psychological [or] physiological impacts making [night work] less attractive than" day work as an affirmative defense under the proviso, which permits pay differentials based on seniority or merit systems, systems which measure earnings by quantity or quality of productions, or "'any other factor other than sex.'"  *Id.* at 204 (quoting 29 U.S.C. § 206(d)(1)).  Because the district court had correctly held "that Corning had not sustained its burden of proof," the Supreme Court concluded the Secretary was entitled to summary judgment.  *Id.* at 204–05.

Two aspects of this decision support Sheketoff's reading of the EPA.  First, the Court's holding that Corning—and not the Secretary—bore the burden of proof parallels Sheketoff's argument here.  To be sure, a difference in the shift that an employee works is not the same thing as a difference in the number of hours the employee works.  But both go to the demands of the job, and there is no reason to conclude that the phrase "equal work," 29 U.S.C. § 206(d)(1), encompasses equal hours but not equal "psychological and physiological impacts," *Corning Glass Works*, 417 U.S. at 204.  The Supreme Court's conclusion that a "shift differential[]" is not a "working condition," moreover, does not change this result.  As explained above, Defendants contend that the prima facie case has three elements—different pay, for unequal work, for a substantially equal job.  Defendants do not dispute that the third element addresses the job's requirements, and not the individual employee's job performance.  Instead, they argue that the phrase "equal work" requires the plaintiff to show that she *performed* equally—and not just that

9

the job "*require[d]* equal skill, effort and responsibility," 29 U.S.C. § 206(d)(1) (emphasis

added).  But, if right, that reading of the statute would cast doubt on the Supreme Court's

conclusion in *Corning Glass Works*, since equal performance could just as easily include equal

"psychological and physiological" toil, *Corning Glass Works*, 417 U.S. at 204, as it could equal

hours.

     Second, *Corning Glass Works* supports Sheketoff's core argument that (1) "equal work"

and (2) "jobs the performance of which requires equal skill, effort, and responsibility, and which

are performed under similar working conditions" are not two distinct elements but, rather, are

(1) an operative phrase and (2) the statutory definition of that phrase.  29 U.S.C. § 206(d)(1).

*Corning Glass Works* starts by observing that Congress wrestled with how to translate the

concept of "equal pay for equal work" into statutory text that "would be meaningful to

employers and workable across the broad range of industries covered by the Act."  *Corning

Glass Works*, 417 U.S.  at 198–99.  The decision then explains how Congress worked to refine

the "definition of equal work" by "incorporat[ing] the language of job evaluation into the bill."

*Id.* at 200.  Congress did so by amending the original text of the bill, which required equal pay

"for 'equal work on jobs the performance of which require[d] equal skills,'" *id.* at 199, to take its

present form, requiring equal pay "for equal work on jobs the performance of which requires

equal skill, effort, and responsibility, and which are performed under similar working

conditions," 29 U.S.C. § 206(d)(1).

     At each step in this analysis, the Supreme Court left little doubt that Congress sought to

define the phrase "equal work" and did not intend for that phrase to operate independently of the

remainder of the clause.  With respect to the original version of the bill, the Court wrote:  "In

both the House and Senate committee hearings, witnesses were highly critical of the Act's

*definition* of equal work and of its exemptions," and that "the *definition* of equal work used in the first drafts of the Equal Pay bill was criticized as unduly vague and incomplete." *Id*. at 199–200 (emphases added). The Court then observed that, "in amending the bill's *definition* of equal work to its present form, the Congress acted in direct response to these pleas." *Id.* at 200 (emphasis added). It explained "that the Act's amended *definition* of equal work incorporated the specific language of the job evaluation plan described at the hearings . . . — that is, the concepts of 'skill,' 'effort,' 'responsibility,' and 'working conditions.'" *Id.* at 201 (emphasis added). The Court concluded that the statutory terms should be accorded the "special meaning within the field regulated by the statute" because those terms were adopted in response to industry objections that the prior "statutory *definitions* were vague and incomplete." *Id.* at 202 (emphasis added). And it rejected Corning's argument regarding "working conditions" as inconsistent with the concept of "'equal work' as that term is *defined* in the Act." *Id.* at 203 (emphasis added). The Court's repeated description of the "equal skill, effort, and responsibility" clause as defining "equal work," and the Court's explanation that Congress defined the phrase to provide a test that "would be meaningful to employers and workable across [a] broad range of industries," *id.* at 198, is dispositive of the present dispute. "Equal work" and work on a job requiring "equal skill, effort, and responsibility . . . performed under similar working conditions" are not two separate requirements but, rather, an operative term and its definition.

Although the D.C. Circuit has not addressed this question in depth, three D.C. Circuit opinions describe the elements of an EPA prima facie case in this same manner. First, in *Laffey v. Northwest Airlines, Inc.*, the D.C. Circuit observed that "equal work" means "that the jobs . . . must be 'substantially equal'"—that is, they must involve comparable "skill, effort, or

responsibility."  567 F.2d 429, 449 (D.C. Cir. 1976).  Second, in *Goodrich v. International Brotherhood of Electrical Workers, AFL-CIO*, the D.C. Circuit observed that "[t]he initial burden to prove wage disparity and job equality is on the plaintiff" and that the job-equality inquiry "focuses on the primary duties of each job."  815 F.2d 1519, 1523–24 (D.C. Cir. 1987).  In both of these decisions, "equal work" and "jobs [that] require[] equal skill, effort, and responsibility" are treated as one and the same.  Finally, in *Musgrove v. District of Columbia*, the D.C. Circuit described an EPA plaintiff's burden as follows: she must "show that . . . [her employer] paid her male counterparts more money 'for equal work'—that is, for jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'"  458 F. App'x 1 (D.C. Cir. 2012) (quoting *Corning Glass Works*, 417 U.S. at 195).

In response, Defendants argue that these Supreme Court and D.C. Circuit cases dwell on job comparisons only because the "cases involved claims that different jobs, compensated using different wage scales, actually involved substantially equal work" and that "[n]obody argued that there were any relevant differences in job content or performance at an individual level."  Dkt. 36-1 at 21.  But that ignores the reasoning of those decisions.  Most notably, the Supreme held in *Corning Glass Works* (1) that the plaintiff bears the burden of showing that the employer "pays workers of one sex more than workers of the opposite sex for equal work," 417 U.S. at 196; (2) that "equal work" is defined using "the specific language of the job evaluation plan described at the [congressional] hearings . . . —that is, [using] the concepts of 'skill,' 'effort,' 'responsibility,' and 'working conditions,'" *id.* at 201; and (3) that, "once the [plaintiff] has carried [her] burden, . . . the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions," *id.* at 196.  This framework was not dicta but, rather, controlled the result in the case.  It thus binds this Court, even if *Corning Glass Works* did not

pose the precise question posed here and involved a class of employees, as opposed to an "individual" employee.

The parties also spar over whether Sheketoff's or Defendants' reading of the statute results in surplusage—or more or less surplusage than the competing construction. Sheketoff, for her part, concedes that, under her reading of the statute, "the word 'equal' in the phrase 'equal work' does no real work of its own" and that "[t]he EPA would have the same meaning if it merely referred to a sex-based disparity in pay 'for ~~equal~~ work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Dkt. 33 at 7. But that "difficulty" is not fatal, in Sheketoff's view, because Defendants' reading of the statute would result in even greater surplusage: "If the plaintiff must show that her quantitative productivity equaled that of her male co-workers to make out a prima facie case, then the affirmative defense that the employer paid men more 'pursuant to . . . a system which measures earnings by quantity or quality of production' would never come into play." *Id.* at 8. Defendants disagree, arguing that their construction of the statute gives all of its terms meaning. Dkt. 36-1 at 11. Under their reading, "[a] plaintiff must first show disparate pay for equal work[] and [must] make enough of an equal-work showing to get into the ballpark." *Id.* Once she does so, "the burden shifts and the employer can seek to explain the differential in non-sex based terms, which may involve a more fine-grained parsing of the employees' relative hours, reviews, seniority, or other factors." *Id.*

On balance, Sheketoff has the better of the arguments. Defendants can give the quantity-or-quality-of-production affirmative defense meaning only by imposing a threshold in the "ballpark" requirement, which then shifts the burden to the employer. But Defendants point to no statutory text that even hints at this allocation of the relevant burdens, and Defendants fail to

offer any guidance—textual or otherwise—about how the "ballpark" standard would apply. That lack of certainty, moreover, is at odds with the congressional goal of adopting a standard that is not "vague and incomplete." *Corning Glass Works*, 417 U.S. at 202. And, even more to the point, the Court is not troubled by the "surplusage" that Sheketoff concedes results from her reading of the statute. Once again returning to *Corning Glass Works*, the Court notes that the phrase "equal work" is a term that is defined by the clause that follows it. The fact that the defined term and the definition overlap (and use similar language) is neither surprising nor uncommon. Definitions are—by definition—redundant.

Finally, the Court is unpersuaded by Defendants' contention that the EEOC's regulations conflict with Sheketoff's reading of the statute. The regulations provide in relevant part:

> Job content controlling. Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance. . . . For example, the job title "clerk" may be applied to employees who perform a variety of duties so dissimilar as to place many of them beyond the scope of comparison under the Act. Similarly, jobs included under the title "stock clerk" may include an employee of one sex who spends all or most of his or her working hours in shifting and moving goods in the establishment whereas another employee, of the opposite sex, may also be described as a "stock clerk" but be engaged entirely in checking inventory. In the case of jobs identified by the general title "retail clerk", the facts may show that equal skill, effort, and responsibility are required in the jobs of male and female employees notwithstanding that they are engaged in selling different kinds of merchandise. In all such situations, the application of the equal pay standard will have to be determined by applying the terms of the Act to the specific facts involved.

29 C.F.R. § 1620.13(e). In Defendants' view, this regulation "cannot be squared with [Sheketoff's] position that '*performance* of the job' is irrelevant." Dkt. 36-1 at 24.

Although the premise of Defendants' argument is correct—the Court must consider both "actual job requirements and performance"—the conclusion that Defendants urge does not follow. Performance matters at the prima facie stage, not because an employee who works less hard fails to engage in "equal work," but because both the formal requirements of the job and the

14

work that those employed in the job actually perform are relevant to the job classification. Indeed, that is precisely the point made in the regulation that Defendants invoke. Two groups of "stock clerks" who perform very different functions might hold very different "jobs" for purposes of the EPA, while a retail canned-goods clerk might perform substantially the same job as a retail paper-goods clerk. *Cf. Musgrove*, 458 F. App'x at 1 (high school principal failed to carry her burden of showing that "the *duties* of other principals were 'performed under similar working conditions'" (emphasis added)).

The Court, accordingly, concludes that a prima facie EPA claim has two elements— unequal pay and working in a "substantially similar" (*i.e.*, substantially equal) job, *Goodrich*, 815 F.2d at 1524.[1]

## C.   Sufficiency of Sheketoff's Allegations

This leaves the question whether Sheketoff has alleged a prima facie case under the EPA—that is, whether Sheketoff has alleged that she and her comparators worked in "jobs the performance of which require[d] equal skill, effort, and responsibility, and which [were]

---

[1]  This conclusion is consistent with the Court's recent holding in *Henderson v. Jones Day*, No. 19-cv-945, 2021 WL 1209209 (D.D.C. Mar. 31, 2021). In that case, the plaintiff had done no client work during the period in question but had, instead, devoted her time to searching for a new job. *Id.* at *1. The Court granted summary judgment in favor of Jones Day on Henderson's EPA claim on the ground that she did not engage in any "work" within the meaning of the statute. Indeed, both parties agreed that, for purposes of the EPA, "work" means an effort which is undertaken predominantly for the benefit of the employer, and the Court concluded that, at the relevant time, Henderson failed to engage in any effort predominantly for the benefit of Jones Day. *Id.* at *4. In other words, *Henderson* stands for the unremarkable proposition that if a plaintiff cannot establish that she performed "work" for an employer, she cannot make the more demanding showing of "equal work," which requires showing that she held a substantially similar job to her comparators. In the alternative, moreover, the Court concluded that Henderson did not hold the same job as associates working on client work after she ceased all client work and devoted her efforts solely to finding a new job. *Id.* at *6. That conclusion is also consistent with the Court's holding in this case that job comparability is a fact-intensive inquiry that turns on the duties assigned to the employees.

performed under similar working conditions." 29 U.S.C. § 206(d)(1). In addressing that question, the Court must consider the relevant stage of the proceeding. Because Sheketoff seeks reconsideration of the Court's order dismissing her EPA claim under Rule 12(b)(6), the Court must determine whether the complaint contains "enough factual matter (taken as true) to" establish a "plausible" claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must allege sufficient factual matter to "nudge[] [her] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

With respect to the comparable job element of the prima facie case, Sheketoff alleges that "[t]he jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of which requires equal skill, effort, responsibility, and which are performed using similar working conditions." Dkt. 1 at 29 (Compl. ¶ 211). To the extent this allegation merely tracks the statutory text, it fails to satisfy the requirements of Federal Rules of Civil Procedure 8 and 12(b)(6). *See Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do[.]") (citation omitted). Beyond this, the complaint offers only a handful of additional allegations relating to job requirements: it alleges that Sheketoff and her comparators worked as associates with the same level of seniority in Jones Day's Issues & Appeals group, Dkt. 1 at 29 (Compl. ¶ 210); that, prior to 2017, she received the same salary as "male Issues & Appeals associates," *id.* at 12 (Compl. ¶ 95), at least suggesting that Jones Day treated the jobs as substantially equivalent, Dkt. 33 at 24; and that "Jones Day does not impose any billable[-]hours requirements on its associates," Dkt. 1 at 7 (Compl. ¶ 48), at least suggesting that the "job" at issue is not defined by an hours-based level of "effort." These allegations,

16

however, are too thin to support a plausible inference that Sheketoff and the male comparators she identifies worked in jobs "the performance of which require[d] equal skill, effort, and responsibility, and which [were] performed under similar working conditions."  29 U.S.C. § 206(d)(1).

Most notably, Sheketoff has not alleged facts that meaningfully define the "job" at issue in terms of the actual requirements of the "job" or functions "perform[ed]" by those employed in that role.  The concept of "equal work" requires a showing of common performance requirements, yet the complaint says little about what associates who work in Jones Day's Issues and Appeals practice actually do.  True, the complaint alleges that "Issues & Appeals associates frequently draft Supreme Court briefs under the supervision of Jones Day partners," Dkt. 1 at 7 (Compl. ¶ 52); that Beth Heifetz heads the group, *id.* at 2 (Compl. ¶ 2); and that "many . . . Supreme Court clerks" join the group "enticed by Jones Day's offer of an above-market salary, a hefty signing bonus, interesting work, substantially lower billable hours expectations than peer firms, and virtual certainty" of making partner, *id.* at 6 (Compl. ¶ 39).[2]  But the complaint does not allege that Sheketoff and her comparators drafted Supreme Court briefs during the relevant period of time; it says nothing about Sheketoff's predominant responsibilities during the relevant period of time; and it does not identify the predominant or essential responsibilities of Issues & Appeals associates in general.  Without a description of the common qualifications and duties of associate working in the Issues & Appeals group, Sheketoff cannot establish that, by virtue of

---

[2]  In her motion for reconsideration, Sheketoff supplements the complaint's allegations in this respect.  She seems to suggest, for example, that Heifetz centrally assigned work to all Issues & Appeals group associates.  Dkt. 33 at 23.  But a plaintiff cannot amend her complaint in opposition to a motion to dismiss.  *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).

these commonalities, she and male comparators performed "equal work" within the meaning of the EPA.

To be clear, Sheketoff need not establish that every associate in the Issues & Appeals group performs identical duties; she need only allege that, as a general matter, such individuals hold jobs with similar performance requirements.  Nor must Sheketoff establish, as part of her prima facie case, that she in fact performed equally to her comparators.  Finally, the Court does not mean to suggest that Sheketoff's job title—here, presumably, an Issues & Appeal associate—is irrelevant.  Although courts have often observed that "[i]n assessing a plaintiff's claim of substantial equality between jobs, a court should rely on actual job performance and content rather than job descriptions, titles, or classifications," *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir. 1988); *see also*; *EEOC v. Port Auth.*, 768 F.3d 247, 256 (2d Cir. 2014); *Fallon v. State of Ill.*, 882 F.2d 1206, 1208 (7th Cir. 1989); *Gunther v. Wash. Cnty.*, 623 F.2d 1303, 1309 (9th Cir. 1979), *aff'd*, 452 U.S. 161 (1981), those cases have typically involved situations where women and men held jobs with different titles, and the plaintiffs had to show that the jobs were nonetheless "equal" as a practical matter.[3]  Understood in this context, these

---

[3]  The court in *Forsberg*, for example, considered whether predominantly female "maintenance administrators" were "substantially equal" to a former, predominantly male role, "test desk technicians."  840 F.2d at 1411–12.  In *Brennan v. Prince William Hospital Corp*., the court analyzed whether "male hospital orderlies and female nurses' aides" were "substantially equal." 503 F.2d 282, 284–85 (4th Cir. 1974).  And in *Christopher v. Iowa*, the court considered whether a "Supervisor of the Chemistry Department Stockroom" held a substantially similar job to a "Supervisor of the Central Stores Stockroom" at the same university.  559 F.2d 1135, 1135 (8th Cir. 1977); *see also Merillat v. Metal Spinners, Inc*., 470 F.3d 685, 687–88 (7th Cir. 2006) (comparing a "Purchase Manager" and "Senior Buyer" to a "Vice President of Procurement and Materials Management");  *Fallon*, 882 F.2d at 1207 (comparing male "Veterans Service Officer[s]" with female "Veterans Service Officer Associate[s]"); *Gunther*, 623 F.2d at 1307 (comparing female "jail matrons" in the female section of jail to male guards in the male section of jail); *Brennan v. Owensboro-Daviess Cnty. Hosp*., 523 F.2d 1013, 1014 (6th Cir. 1975) (comparing "male nursing assistants" to female "nurse assistants").

cases sensibly stand for the proposition that employers cannot avoid liability under the EPA by assigning women and men similar jobs with different titles or by drafting job descriptions that differ on paper but not in reality.  *See Prince William Hosp.*, 503 F.2d at 288 ("Job descriptions and titles . . . are not decisive.  Actual job requirements and performance are controlling."); *see also Merillat*, 470 F.3d at 695 (explaining that title is not decisive in a case comparing jobs with different titles); *Fallon*, 882 F.2d at 1208 (same); *Christopher*, 559 F.2d at 1136 (same); *Owensboro-Daviess*, 523 F.2d at 1017 (same).  That said, as Chief Judge Friendly observed in the Second Circuit's panel decision in *Corning Glass Works*, an employer's "own view of the content of [a] job[] before its perspective [is] changed by the filing of [a] litigation" can provide probative evidence of the job's requirements.  474 F.2d 226, 234 (2d Cir. 1973).

Even with these qualifications in mind, however, the Court is unpersuaded that Sheketoff has alleged sufficient facts to plead a prima facie case or to put Defendants on reasonable notice of the substance of her claim, as required by Federal Rule of Civil Procedure 8.  Most significantly, Defendants are entitled to know what skills, efforts, and responsibilities Sheketoff contends define the "equal work" that, in her view, required equal pay.  Was it preparing first drafts of Supreme Court briefs or editing drafts prepared by other associates?  Was it drafting other appellate briefs or briefs in trial courts focusing on legal issues?  Was it working with partners in other practice groups to draft memoranda for firm clients?  *See* Dkt. 1 at 10 (Compl. ¶ 70).  What set of skills, experience, or effort did the job require?  Did it demand a specific level of responsibility?  Did the work differ from the work of other firm associates or did all firm associates with a similar level of experience hold the same "job"?  And did Sheketoff engage in the defining type of work during the relevant period of time?  Sheketoff need not answer all of these questions, to be sure, and her burden at this stage is not a demanding one.  But, where the

19

equivalence is not obvious on the face of the job, the complaint must say something about the "skill, effort, . . . responsibility" and "working conditions" that define the "job" at issue.

Finally, although the Court concludes that the complaint does not state a prima facie case, the Court does not embrace Defendants' view that any effort to compare Jones Day associates for such a claim would be futile.  Defendants stress that Jones Day "pays each associate an *individualized* salary," "because the work of an associate can vary widely in type, quality, and quantity, and in the skill, effort, and responsibility required."  Dkt. 36-1 at 22.  But, as Sheketoff notes, Dkt. 40 at 29, Defendants undermine this argument by acknowledging that, prior to 2017, Sheketoff's salary had been equal to "two male associates and three [other] female associates" in the Issues & Appeals group, Dkt. 35 at 16–17 (Ans. ¶ 95).  And, more importantly, Defendants' contention proves too much to the extent it suggests that no two jobs at Jones Day are equivalent—and thus, that Jones Day could *never* be liable under the EPA—or that an EPA plaintiff is required to allege facts identifying a comparator whose actual performance, in terms of the "quality[] and quantity" of output or "merit" of work, was equivalent.  The Court recognizes that while the line dividing an EPA plaintiff's prima facie case from a defendant's affirmative defenses may at times be hazy, such a pleading requirement would wholly eviscerate the distinction between an EPA plaintiff's prima facie case and her employer's affirmative defenses; it would far exceed anything required by *Twombly*, 550 U.S. at 547, and *Iqbal*, 556 U.S. at 678; and it would erect an almost unsurmountable hurdle to stating a claim, given the limited access that EPA plaintiffs have (before discovery) to information relating to the day-to-day performance of their peers.  It is thus not surprising that almost all of the cases Defendants cite arise at the summary judgment or judgment post-trial stages of the case.

For present purposes, the Court merely holds that Sheketoff must allege the minimal facts necessary for Defendants and the Court to identify the "skill, effort, . . . responsibility," and "working conditions" that she contends define the "equal work" forming the nucleus of her EPA claim. Sheketoff must, in other words, describe the common duties and qualifications of the relevant comparator group with sufficient detail to "give . . . fair notice of what [her] . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although this case involves the practice of law, a field in which judges often have familiarity, it is not the Court's role to fill gaps in a plaintiff's complaint based on its own experience outside the confines of the case.

The Court, accordingly, will not reinstate Sheketoff's EPA claim but will allow her to file an amended complaint on or before May 12, 2021.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part Sheketoff's motion for reconsideration, Dkt. 33. The Court **GRANTS** her motion for reconsideration as to the legal standard applicable for alleging "equal work" pursuant to the EPA, but it **DENIES** her motion to reinstate Count V of Plaintiffs' complaint, Dkt. 1 at 29 (Compl. ¶¶ 208–14). Plaintiffs may file an amended complaint on or before May 12, 2021 addressing the pleading deficiency described in this opinion.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 28, 2021