1               IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    MARK C. SAVIGNAC, et al.,
                                          Civil Action
4               Plaintiffs,              No. 1:19-cv-2443

5          vs.                            Washington, DC
                                          June 4, 2021
6    JONES DAY, et al.,
                                          3:04 p.m.
7               Defendants.
     _____/
8

9            TRANSCRIPT OF TELEPHONE CONFERENCE
           BEFORE THE HONORABLE RANDOLPH D. MOSS
10             UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12

     For the Plaintiffs:    MARK C. SAVIGNAC
13   (Pro Se)               JULIA SHEKETOFF
                             2207 Combes Street
14                           Urbana, IL 61801

15
     For the Defendants:    ANDERSON BAILEY
16                           Jones Day
                             One Mellon Bank Center
17                           500 Grant Street, Suite 4500
                             Pittsburgh, PA 15219
18
                            TERRI L. CHASE
19                           Jones Day
                             250 Vesey Street
20                           New York, NY 10281

21

22

     Reported By:           JEFF M. HOOK
23                           Official Court Reporter
                             U.S. District & Bankruptcy Courts
24                           333 Constitution Avenue, NW
                             Room 4700-C
25                           Washington, DC 20001

1                    **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  This is civil action 19-2443, Mark

3    Savignac, et al., versus Jones Day, et al.  Both pro se

4    plaintiffs are on the telephone.  Appearing by phone for the

5    defendants, Anderson Bailey and Terri Chase.

6          **THE COURT:**  Thank you.  So we're here today

7    because there's a discovery dispute between the parties.

8    I'll start by reminding everybody that it's not permitted to

9    record or to rebroadcast today's proceeding, and I'll order

10   that nobody do so.  In addition, I'll remind everybody to

11   mute your microphones when you're not speaking, please speak

12   into the microphone when it is your turn, and please

13   introduce yourself by name each time you speak so we have a

14   clear record.

15          I have been through the parties' submissions with

16   respect to their dispute.  It's unfortunate that the parties

17   haven't been able to work these things out.  This is the

18   sort of thing that counsel is usually able to work out.  But

19   given their inability to do so, I will resolve the dispute.

20   So let me start off by hearing from the plaintiffs.

21          Who's speaking on behalf of plaintiffs today?

22          **MS. SHEKETOFF:**  This is Julia Sheketoff.  I'm

23   going to be speaking about two of the issues, and then Mark

24   will be speaking about the other two.

25          **THE COURT:**  Okay.

1          **MS. SHEKETOFF:**  I'd like to start -- I'm sorry?

2          **THE COURT:**  Yeah, go ahead.

3          **MS. SHEKETOFF:**  I'd like to start by talking about

4     whether plaintiffs should be permitted to use the discovery

5     platform Logikcull.  Logikcull is a program for viewing

6     documents turned over in discovery.  It's an affordable

7     alternative to Relativity, which is a very expensive program

8     that Jones Day and other big firms use.  Like Relativity,

9     Logikcull is a cloud computing service which means that

10     instead of downloading the program onto a computer and

11     writing it on the documents there, we upload the documents

12     to Logikcull's secure servers which is where the program is

13     installed and rests.

14          Like other internet companies that offer

15     affordable processing, storage and communication services to

16     normal people like Google or Microsoft or Dropbox,

17     Logikcull's not in the business of reviewing or signing

18     individual protective orders or other bespoke contracts for

19     its retail customers.  It's hard to see how putting money

20     into doing that would make business sense for a company that

21     seeks to provide an affordable service to large numbers of

22     individuals other than an expensive service limited to the

23     wealthy, like law firm partners and corporations.  So Jones

24     Day's certification requirement would be a prohibition on

25     using Logikcull or Dropbox or Gmail and so forth.  Jones Day

1    hasn't shown good cause for that prohibition, which would be

2    very harmful to us.

3            Before Jones Day raised this issue, I put a ton of

4    time into selecting and learning how to use Logikcull,

5    somewhere in the order of a hundred hours.  I can't -- or we

6    can't possibly litigate this case without a discovery

7    platform, and being forced to find and learn a new one at

8    this stage would be very difficult and prejudice our ability

9    to complete discovery on the agreed schedule.  There's

10   also --

11           **THE COURT:**  How many pages of discovery are we

12   talking about?

13           **MS. SHEKETOFF:**  I don't know because we haven't

14   received any production yet, but I'm anticipating hundreds

15   of thousands of pages.  I mean, I could be wrong, Jones Day

16   will correct me.  But we've --

17           **THE COURT:**  Hundreds of thousands in this case,

18   that seems excessive and sort of shocking to me given --

19           **MS. SHEKETOFF:**  I could be wrong.  I could be

20   wrong.  But my understanding was that in the Tolton case,

21   for example, just the plaintiffs' e-mails were in the

22   millions.  And we've asked for our e-mails, so just that

23   alone could be many, many documents.  But we have to, for

24   example, prove the substance of what the policy was and

25   things like that, which again we didn't know was the --

1          **THE COURT:**  Why are all your e-mails relevant to

2     this case?

3          **MS. SHEKETOFF:**  They may or may not be.  But we've

4     requested them mostly because we thought it would be easiest

5     to produce them in that way rather than require Jones Day to

6     do a relevance review seemed easiest.  My understanding was

7     from the Tolton case it was easiest to produce them in that

8     fashion.

9          **THE COURT:**  The other question is what -- I mean,

10    if you're talking about producing to you not just business

11    proprietary information from Jones Day, but sensitive,

12    privileged communications from -- involving Jones Day's

13    clients, what assurances does Jones Day and its clients have

14    that the material that is loaded onto Logikcull will

15    maintain its privileged status and will not -- the privilege

16    will not be somehow inadvertently waived?  And that could be

17    catastrophic for a law firm like Jones Day if someone were

18    to have access to all of your client e-mails in a way in

19    which it waived the privilege with respect to every matter

20    you worked on when you were an attorney at that law firm.

21         **MS. SHEKETOFF:**  I'm sorry, you're asking whether

22    if allowing us to put it on a remote server would itself

23    waive the privilege?

24         **THE COURT:**  No.  I'm asking you what assurances do

25    they have that it really is secure; and that if no one is

1    signing something saying they're not going to disclose, how

2    do you know that whoever's doing maintenance for the server

3    isn't going to go in and take a look at what's on there?  I

4    mean, I assume in your research with respect to Logikcull,

5    you investigated what they do to maintain the security of

6    the materials that are uploaded to the site.

7            MS. SHEKETOFF:  Right, we do.  So I think there

8    are a couple of answers there.  Number one, insofar as

9    you're talking about inadvertent disclosures like hacking

10   and breaches, like the one that Jones Day recently had, I

11   don't think there's any dispute that Jones -- that Logikcull

12   is an extremely technically savvy company that is not using

13   below reasonable care standards like the one the order

14   requires to be implemented.

15           But if you're talking about other kinds of

16   disclosures -- or regardless, I do just want to make clear

17   that there's -- that federal law would prohibit Logikcull

18   from disclosing this information.  So that's one extremely

19   clear --

20           THE COURT:  -- law is that?

21           MS. SHEKETOFF:  That's the Stored Communications

22   Act.  And I think it's quite clear that it would cause -- it

23   would prohibit --

24           THE COURT:  The Stored Communications Act I know

25   precludes them from disclosing it to the Government.  Does

1    the Stored Communications Act preclude them --

2            **MS. SHEKETOFF:**  Yes, it does.

3            **THE COURT:**  -- from disclosing it to third

4    parties?

5            **MS. SHEKETOFF:**  Yes, it does, and that's section

6    2702 of the Stored Communications Act.

7            **THE COURT:**  Hold on a second, let me just take a

8    look at that.

9            **MS. SHEKETOFF:**  It's 18 U.S.C. 2702.  It says, "A

10   person or entity" -- well, there are two provisions.  "A

11   person or entity providing an electronic communications

12   service to the public shall not knowingly divulge to any

13   person or entity the contents of a communication while in

14   electronic storage by that company" -- "by that service,"

15   I'm sorry.  And two, "A person or entity providing remote

16   computing service to the public shall not knowingly divulge

17   to any person or entity the contents of any communication

18   which is carried or maintained on that service."  I can keep

19   going, "On behalf of, and received by means of electronic

20   transmission from (or created by means of computer

21   processing of communications received by means of electronic

22   transmission from), a subscriber or customer of such

23   service; solely for the purpose of providing storage or

24   computer processing services to such subscriber or customer,

25   if the provider is not authorized to access the contents of

1    any such communications for purposes of providing any

2    services other than storage or computer processing."

3              So I think that that is -- that the protective

4    order would be entirely duplicative of federal law.  Federal

5    law is occupying this space.  But beyond that, just as a

6    purely practical matter, Logikcull -- there's just no basis

7    to think Logikcull would release confidential information.

8    Storing and practicing -- sorry, storing and processing

9    confidential data is Logikcull's business.  We're not aware

10   that it's ever failed to meet its confidentiality

11   obligations, you know, in contrast to Jones Day which we'll

12   talk about.

13             But Logikcull is used by sophisticated entities

14   that just aren't as rich as Jones Day, like the cities of

15   New York and Chicago, non-profits, smaller firms, employment

16   law firms.  Logikcull knows that a failure to maintain

17   confidentiality would destroy its business, so it has the

18   absolute strongest incentive to keep data secure.  And

19   unlike Jones Day, it's a technologically sophisticated

20   company with the ability to keep data secure.  I want to be

21   clear, this is not a random company that's providing six

22   people with services.  This is a widely used company

23   throughout the legal industry.  This is something that has

24   major incentives to keep the data secure.  And like I said,

25   I don't know of any instance where it hasn't done that.

1          **THE COURT:**  Okay, let me ask you to pause here

2     then.  Let me hear from Mr. Bailey or Ms. Chase about that

3     and get an answer to the question of why isn't the

4     prohibition contained in the Stored Communications Act --

5     it's a criminal statute that Ms. Sheketoff indicates

6     precludes a company like Logikcull that is engaged in the --

7     is in electronic communications service, from disclosing the

8     materials?  So why isn't that a sufficient?

9          **MR. BAILEY:**  Sure.  Thank you, Judge.  This is

10    Anderson Bailey.  As far as the SCA goes, the statute that

11    Ms. Sheketoff pointed to contains a number of exceptions.  I

12    am not going to go through each one, but to say that it

13    broadly prohibits Logikcull from doing anything to disclose

14    this information --

15         **THE COURT:**  Well, I mean, the exceptions, though,

16    are -- maybe you should go through the exceptions, because

17    the exceptions are with the lawful consent of the customer.

18    So that would require Mr. Savignac and Ms. Sheketoff to

19    consent which seems unlikely.  And if they did so, they

20    would be in violation of the protective order, and certainly

21    would be subject to sanctions if they did that.  Incident to

22    the rendition of services for the protection of the rights

23    of the property, that's presumably just servicing the

24    network which any provider's going to have to do.  To a

25    government entity, the response to either lawful process or

1    an emergency involving danger of death or serious physical

2    injury, that seems improbable to apply here.  To the

3    National Center for Missing and Exploited Children, that's

4    going to be if there's like child porn or something in those

5    materials, which again seems improbable in this case.

6         **MR. BAILEY:**  Well, subsection (b)(4), your Honor,

7    I think is a little bit more vague than those other

8    provisions.

9         **THE COURT:**  Okay, so let me see.  I actually

10   wasn't even reading the right provision there, so let me

11   take a look at (b)(4).  That also -- that doesn't seem like

12   that's going to come into play here.  Maybe you could

13   explain to me how (b)(4) would come into play.

14        **MR. BAILEY:**  Well, unfortunately I can't, because

15   I don't know what Logikcull is going to do with any of this

16   data.  I think (b)(4) would certainly give it the right to

17   make the information available to anyone who falls within

18   these fairly broad categories.  The Logikcull terms and

19   conditions that apply to use of its service similarly allow

20   for disclosure to its vendors, its contractors, its agents.

21   So we don't have a -- either under the SCA or under the

22   terms of service that Logikcull applies to anyone using its

23   software or its platform, we don't have any assurance as to

24   who is going to be able to access the data.

25             But we know for certain that whoever it is, they

1    will not be bound by the protective order, and they will not

2    be subject to the Court's jurisdiction to enforce those

3    terms.   That's where I think the problematic disconnect

4    arises from.   And what we're talking about here is a great

5    deal of information that is subject to the attorney-client

6    privilege.   We're talking about a great deal potentially of

7    personnel information, including medical and health

8    information of third parties.   So there is --

9         **THE COURT:**   Let me ask you about this.   Does Jones

10   Day use any services like this that it doesn't -- where it

11   stores client data, that it doesn't require the company to

12   sign a non-disclosure?

13        **MR. BAILEY:**   I don't -- we certainly use outside

14   vendors to store data.   We have agreements in place that

15   make use of those services appropriate.   I can't speak to

16   the details of each of those agreements, but I can tell you

17   that our vendor has agreed to subject itself to the terms of

18   the protective order and to the Court's jurisdiction with

19   respect to the data being disclosed in this case.

20        So I think that provides an amount of appropriate

21   assurance when it comes to Rule 26 and the Court's

22   protective order that the information will be appropriately

23   treated.   But also that in the event of any kind of

24   inadvertent disclosure or whatever else may happen, there is

25   a means of enforcement, the Court has jurisdiction over its

1    order.

2        And to the extent either side feels that the other

3    has acted inappropriately or inconsistent with the terms of

4    the order, there's a remedy there and there's something that

5    can be done about it.  That's the advantage of the

6    certification.  That's the purpose, frankly, of Rule 26 and

7    the entire protective order that we've been negotiating, is

8    that the information that we're disclosing will be

9    appropriately protected and subject to the Court's

10   jurisdiction.  We can't give over the type of information

11   that the plaintiffs are requesting when we know they are

12   going to turn it around and hand all of it off to a third

13   party who's not subject to the order and not subject to the

14   Court's jurisdiction.

15       Now I want to address a couple of other points

16   that came up there.  We have agreed to produce plaintiffs'

17   e-mail accounts in full.  I don't have an exact number, but

18   the number of documents there is probably going to be in the

19   tens of thousands.  I don't know that discovery is going to

20   be significantly beyond that, but I think that does create a

21   particular need for some assurance such as what the

22   certification would provide.

23       **THE COURT:**  So maybe instead what you need to do

24   is go through them e-mail by e-mail and produce only those

25   that are relevant to this case.

1    **MR. BAILEY:**  That may be, your Honor, but we would

2    still be faced with these same issues, right, because some

3    of those are going to contain attorney-client privileged

4    information.

5    **THE COURT:**  But at the end of the day -- I mean, I

6    don't know how many you're talking about, but I would think

7    given my understanding of the issues in this case that

8    you're talking about a handful that would involve

9    attorney-client communications.  And if you did that, there

10   wouldn't be a need to use one of these cloud service

11   providers.

12   **MR. BAILEY:**  We are certainly happy to revisit the

13   concept.  I think it may frankly make a lot of sense, given

14   the discussion here, if we go back and kind of reconsider

15   that approach.  Because we could be much more tailored if we

16   were being targeted in discovery and not disclosing the

17   entire inboxes.

18   **THE COURT:**  Right, I can understand that.

19   **MS. SHEKETOFF:**  Your Honor, this is Julia

20   Sheketoff.  Could I say something about that?

21   **THE COURT:**  Yes.

22   **MS. SHEKETOFF:**  I just want to be clear, it's not

23   simply the volume of data that would require us to use a

24   discovery review platform.  I don't think anyone could

25   litigate a case with any significant amount of e-discovery,

1    whether it's tens of thousands or 5,000 documents, without a

2    platform for multiple reasons.  But number one, the data is

3    going to be produced -- or at least under the ESI protocol

4    that we were previously negotiating, in a manner that

5    doesn't allow us -- that is basically not viewable

6    appropriately without a discovery review platform.

7         So, for example, there's lots and lots of -- okay.

8    So, for example, with an e-mail, a native format of an

9    e-mail includes -- you know, is basically how it would

10   appear in your Microsoft Outlook application.  And that can

11   be sorted in various ways.  It can be sorted by time, it can

12   be sorted by sender, et cetera.  The way that parties often

13   produce, and the way that Jones Day prefers to produce in

14   this case, is by changing that format from the native

15   application to an image format, a PIF or a PDF.  That strips

16   all the metadata out of it, and then that metadata is

17   produced in a load file that accompanies the image.  And

18   that just cannot be viewed without a discovery review

19   platform.

20        So even if there were only 50 documents, it would

21   be very difficult for us and just not putting us on the same

22   playing field as Jones Day to not have a discovery review

23   platform.  There are many other reasons that we would need

24   one, including to be able to tag the documents to annotate

25   them properly.  And I just -- I don't think it is realistic

1    to think that this is a kind of case where it's going to be

2    only 5,000 documents, I think there are going to be many

3    thousands.

4         THE COURT:  So let me say with respect to the

5    proposition that this can't be done without a discovery

6    electronic platform.  I can tell you I litigated many cases,

7    pretty substantial cases, before such a thing ever existed,

8    so that's a little hard to get my head around.

9         MS. SHEKETOFF:  We're also pro se litigants.

10        THE COURT:  What's that?

11        MS. SHEKETOFF:  Just we're also pro se litigants,

12   and so it would substantially ease our ability to

13   process this stuff.  I mean, we're doing this nights and

14   weekends largely and in time off from our jobs.  So it's --

15   it would be really difficult to do that without sort of the

16   technological tools that law firms rely on these days.  I'd

17   also say I don't --

18        THE COURT:  I'm sorry, just to interrupt just for

19   a second here.  What I'm trying to get my head around here

20   is what the discovery is going to look like in this case.

21   And so what I'm most concerned about are the attorney-client

22   communications where Jones Day has an ethical obligation to

23   its clients to make sure that it's doing everything it can

24   to protect the privilege.  So that's one group.

25             There are also going to be materials relating to

1    Jones Day's parental leave policy, and that may be actually

2    what the bulk of the materials are there.  Those may be

3    sensitive documents but don't involve the same risks with

4    respect to waiver of attorney-client privilege.  And then

5    there may be payroll data of some type, which again is

6    sensitive, but may not involve the same risks with respect

7    to the attorney-client privilege.

8            I guess what I'm finding it hard to understand is

9    why there needs to be anything voluminous with respect to

10   the attorney-client privileged materials.  Because as I

11   understand it -- and maybe you need to correct this, but my

12   understanding is that your principal claim of -- your

13   principal disparate treatment claim is that you were working

14   on a particular project where a particular partner working

15   on that project treated you unfairly and gave you an unduly

16   and improperly harsh evaluation that you allege was based on

17   your sex.  But that's going to be a handful of documents

18   that Jones Day could just print out and give to you.

19           So are there additional attorney-client

20   communications or documents that relate to the

21   attorney-client privilege that are at issue here, and if so,

22   what are they?

23           **MR. SAVIGNAC:**  Hi, Judge.  This is Mark Savignac.

24   As far as attorney-client documents, one of the big issues

25   in this case is but for being illegally fired, I would be a

1    partner at Jones Day now.  And our understanding is that

2    Jones Day intends to contest that.  Now, probably -- so the

3    sort of information that would be relevant to that I guess

4    would be looking at all the people who made partner or

5    didn't make partner, looking at their evaluations; for

6    example, how high is the bar.  You know, 50 people made

7    partner this year, how hard is it to make partner.  My

8    understanding is that they would claim that all those

9    evaluations are full of attorney-client information.

10            **THE COURT:**  I see.

11            **MR. SAVIGNAC:**  The e-mails are relevant because --

12    well, they could be relevant for many reasons.  And to be

13    honest, I wasn't -- we weren't prepared for this line of

14    questioning, because no one at Jones Day has ever suggested,

15    oh, we think that this can be done with a small amount of

16    disclosures or we want to keep the number of documents

17    disclosed low.  I think that they prefer, and they preferred

18    in the Tolton case, to produce I think it was -- I think it

19    was something like a million just e-mails from the parties

20    rather than go through them.  There are lots of documents

21    that will have attorney-client implications.

22            Now, in a perfect world where someone at Jones Day

23    goes through everything and just picks out the 300 pages

24    that are most supportive of the plaintiffs' case, I'm sure

25    that those 300 pages would be all we need for summary

1    judgment and trial.  But I don't see any way of doing that.

2    And so for us to search through the voluminous materials

3    that they're going to give us, I think doing this with two

4    very young children on nights and weekends requires that we

5    be allowed to use the sort of technology that in 2021 is

6    considered standard even if at some earlier point,

7    especially with a large number of associates, that's not how

8    it was done.

9         MR. BAILEY:  Your Honor, this is Anderson Bailey.

10   I mean, we have agreed as an -- as a matter of frankly the

11   burden involved to produce the inboxes from plaintiffs'

12   e-mail accounts.  We do not think that the overwhelming

13   majority of that information will have any relevance at all

14   to the claims and defenses in this case.

15        THE COURT:  And in what format are you going to

16   produce that?

17        MR. BAILEY:  At plaintiffs' request, we had agreed

18   to make all productions in PDF format.  So they should be

19   able to review all of the documents we've produced without

20   any kind of platform.  These are simply Adobe documents that

21   anybody can open up on their computer.  As far as metadata,

22   you know, a lot of it appears on the face of e-mails or

23   other documents.  There's certainly accommodations that

24   could be made where metadata for a particular document is

25   relevant but not apparent from the face of the document.

1        I think there is a much -- if the hang up here is

2   that we can't produce documents given the vendor they're

3   going to use, and they are not going to go get a new vendor

4   who will agree to actually abide by the protective order,

5   then I do believe there is another way that we could conduct

6   discovery that would make for a vastly smaller amount of

7   documents that are ultimately exchanged.

8        **THE COURT:**  And that would be just to go through

9   and review the documents for relevance.

10       **MR. BAILEY:**  And what I would ask, of course, is

11  that the plaintiffs make sort of targeted requests, right.

12  We're more than happy to go and look for things.  I don't

13  know that the burden of doing a linear review of every

14  single e-mail that either of them ever sent or received

15  during their time at Jones Day is proportional to the needs

16  of the case.  But we could certainly go and look for

17  documents relating to a specific matter or a specific issue

18  that came up.  If that would solve the impasse here, then

19  that's something the defendants would consider doing.

20       **THE COURT:**  Ms. Sheketoff, what do you say to

21  that?

22       **MS. SHEKETOFF:**  Well, I have several responses.

23  But the first of which is I don't think that would be

24  sufficient.  Again, I think we would like to be able to use

25  the technological tools that all law firms are using.  We

1      are already at an enormous disadvantage as two people

2      litigating pro se against a law firm that has 2,500

3      attorneys, and probably 30 attorneys on this actual case

4      whether or not they've entered an appearance.  And it just

5      seems extremely unfair to us to say that we can't use a tool

6      that would make our lives much simpler and would -- is the

7      tool that defendants get to use.

8           **THE COURT:**  Are you willing to personally

9      indemnify Jones Day should there be any leak from this site

10     or anything that would cause damage?  So if client

11     information were released and Jones Day were sued over that,

12     would you personally indemnify the firm?

13          **MS. SHEKETOFF:**  No, your Honor, I don't think that

14     would be fair.  And I don't think that Jones Day is going to

15     indemnify us when they're demanding our personal information

16     and have an enormous --

17          **THE COURT:**  No, stop for a second.  I don't have a

18     firm enough grip on the question of how much risk is at

19     stake here.  Jones Day tells me there are lots of

20     exceptions, you say there are not.  I don't really have a

21     great sense under the Stored Communications Act of how big a

22     risk there is.  I mean, I understand your point about

23     business interests in doing so.  But there's a difference

24     where you are asking to disclose confidential information to

25     a vendor that is then not subject to the Court's

1      jurisdiction and to the protective order in the case.

2              And it may be that that's not a problem, because

3      the Stored Communications Act would make it illegal for them

4      to disclose any of this under any circumstances, in which

5      case obviously there wouldn't be a risk to you to

6      indemnifying.  Or it may be that Jones Day is right and that

7      there is a big risk involved in doing that.  The reason I

8      asked the question was not because I actually thought that

9      was a remedy, but to get my mind around how big the risk is

10     and whether you actually think there's a risk or not that

11     the information's going to get out there.

12             MS. SHEKETOFF:  Well, a couple of things.  First,

13     I would be happy to brief the Stored Communications Act and

14     show you that it is applicable here.  Number two, I think

15     that --

16             THE COURT:  Well, stop, stop, stop.  There's no

17     dispute that it's applicable here, the question is how broad

18     the exceptions are.

19             MS. SHEKETOFF:  Right, and I would be happy to

20     brief that there's no exception that applies.  But to get to

21     your point about the large risk or whether we don't know

22     that there's a risk, that's sort of part of our part which

23     is that Jones Day has the burden of showing good cause here.

24     And it has -- especially where there's going to be an

25     enormous burden on our ability to litigate this case.  They

1    need to point to facts suggesting that there is a problem

2    here, an actual risk, and they haven't done that.

3           And I do want to just be clear about what the

4    certification would do.  The certification is simply

5    agreeing to abide by the protective order.  And what the

6    protective order says is, A, I'm not going to intentionally

7    disclose information to third parties, and B, I'm going to

8    use reasonable care to protect against inadvertent

9    disclosures.  Now, I don't think there can be any question

10   whatsoever that Logikcull is going to use reasonable care.

11   It's promised to do that in its terms of service.  It

12   obviously has the greatest incentives in the world to use

13   reasonable care.  That's not a terribly high standard.  And

14   then so all we're really talking about is the advertent, the

15   intentional disclosures.  And again, that's --

16           THE COURT:  What does the company's terms of

17   service say?

18           MS. SHEKETOFF:  The company promises not to -- it

19   promises to provide the services and to -- let's see.  It

20   says, "Both parties agree to hold confidential

21   information" -- and confidential information is defined as

22   anything I put up there, "in confidence, and protect such

23   confidential information from disclosure to any third party

24   other than as expressly set forth in this agreement."  And

25   the agreement basically says that -- the agreement then

1    earlier says that you can disclose to provide the services

2    which is -- and services is defined to mean the storage,

3    sharing and processing of files on their site.  And that is

4    against the background of the SCA, they're clearly doing

5    this against that background.  So there's no --

6        **THE COURT:**  Mr. Bailey, why is that not

7    sufficient, then, if there's a contractual undertaking not

8    to disclose this information?

9        **MR. BAILEY:**  I am just looking for the terms.  But

10   there is another provision in the terms of service that

11   allows Logikcull, notwithstanding the language Ms. Sheketoff

12   just read, to provide the information to its agents,

13   subcontractors, suppliers and/or consultants.  So it has the

14   right under those terms to give the information out.  There

15   are, moreover --

16       **THE COURT:**  I'm sorry, I assume what that means is

17   that they can have somebody come in and work on their

18   network, their consultants and people who work on the

19   network, not that they can just release the information

20   publicly.

21       **MR. BAILEY:**  Well, it means however broadly those

22   terms can be read.  So I don't know that Logikcull is going

23   to go out and create a website and put all this information

24   on it to be accessed by anyone in the public.  But it does

25   have the right to give the information and make it available

1    to subcontractors, suppliers and consultants of whatever

2    stripe those may be.

3            Putting that aside, there's all sorts of

4    limitations on liability of warranty disclaimers throughout

5    these terms of service.  The terms themselves are actually

6    susceptible to I believe unilateral amendment by Logikcull

7    without any opportunity for Jones Day to object or to ask

8    that those terms remain in place.  So there's just --

9    there's not a lot of reassurance for us in those terms of

10   service with respect to the care and maintenance of this

11   information, and any prohibitions on it not being disclosed

12   beyond Logikcull itself.  And seeing the nature of the

13   information that we're talking about, that is of great

14   concern.  And certainly with respect to the confidential

15   information and the privileged information, but also with

16   respect to medical files of our employees and compensation.

17           THE COURT:  Do you have reason to believe that it

18   would violate HIPAA to put any of this up on Logikcull?

19           MR. BAILEY:  You know, I don't have a reason to

20   believe one way or another.  HIPAA is a very complicated

21   statute.  It's got business agreement requirements where

22   people are holding this kind of data.  So I don't have

23   enough background on Logikcull to know one way or another or

24   the plaintiffs' relationship with Logikcull to know whether

25   or not those requirements will have been met.

1          **THE COURT:**  Are you aware of any occasion in which

2     Logikcull has ever leaked any confidential material?

3          **MR. BAILEY:**  No.

4          **THE COURT:**  Do you know how long they've been in

5     business?

6          **MR. BAILEY:**  I do not.

7          **THE COURT:**  Do you know --

8          **MS. SHEKETOFF:**  They've been in business since

9     2004, so 17 years.

10         **THE COURT:**  I mean, I have to say, Mr. Bailey, it

11    seems to me the risk here is pretty low.  But if you want to

12    brief this issue, you're welcome to do so.  It does strike

13    me that you're talking about a pretty remote risk here, but

14    I understand the sensitivity, particularly with client

15    information.  So if you want to brief it to the Court, you

16    can do so.

17         **MR. BAILEY:**  Let me -- thank you, your Honor.  If

18    I could have the opportunity just to confer with my clients

19    about that, and I can circle back with plaintiffs and your

20    Honor just to confirm one way or another whether we'd like

21    to put something in writing.

22         **THE COURT:**  I mean, I suppose if you do want to

23    brief it, it probably makes sense for Ms. Sheketoff to go

24    first so that she can then explain why she thinks this is

25    secure.  And then you can answer why you don't think it's

1      secure in doing so.  But my reaction to this is I understand

2      why your antenna are up and why you're concerned.  It does

3      strike me as though the risk here is quite remote.  And it

4      may be that you think that there's a handful of documents

5      that you want to designate.  And I suppose maybe this is one

6      way to do it, you can designate up to a thousand pages of

7      documents as highly sensitive that should not be posted to

8      the site where it would not be all that hard for

9      Ms. Sheketoff and Mr. Savignac to go through them by hand.

10     But for the garden variety of documents, they can go up on

11     the site.

12             But I'll let the parties talk about it.  If you

13     want to -- when we're done with this, I may just require a

14     joint status report where we can figure out the schedule.

15     So let's talk about the other issues and come back to it.

16     But my reaction to this is I think the risk is remote, but I

17     understand your concern.  It may be that one way to resolve

18     it would be to have a category of particularly sensitive

19     documents that would not go up on that site.  But if the

20     parties want to brief the issue, you're welcome to do so.

21             So Ms. Sheketoff, what's the second issue?

22             **MS. SHEKETOFF:**  The second issue Mark is going to

23     talk about.

24             **MR. SAVIGNAC:**  Hi, Judge.  So I guess the second

25     issue is Jones Day seeks -- so the agreed protective order,

1    of course like most protective orders, allows the party

2    who's compelled to produce a document to designate that

3    document as confidential.  And if that designation is valid,

4    that puts restrictions on the receiving party's ability to

5    use that document for purposes other than litigating the

6    case.

7            Jones Day seeks an additional protective order

8    that would allow Jones Day to designate documents that we

9    produce to them and impose a sort of gag order on us with

10   respect to those documents even though we received them in

11   discovery.  And since Jones Day's the proponent of that

12   protective order and has the burden of showing good cause,

13   it might make sense to allow Mr. Bailey to present his case

14   on that first.

15           **THE COURT:**  If you can, I'd be happy to hear from

16   Mr. Bailey.  I have to say, when I read this, I was a little

17   bit baffled as to what documents you all would have that

18   would fall into this category, things that you would have

19   that would be particularly sensitive materials that Jones

20   Day doesn't also itself have.

21           Mr. Bailey, do you want to address this?

22           **MR. BAILEY:**  Sure.  Let me start by correcting

23   what the issue is here.  We are not asking for a term that

24   allows us to designate documents that they've produced and

25   thereby unilaterally restrict what plaintiffs can do with

1    those documents.  What we are asking for is a process by

2    which either side can assert that a document produced by the

3    other party or by a third party should be subject to the

4    order.  The term then requires a meet and confer, and if the

5    parties are unable to resolve the issue, the requesting

6    party can then seek an additional protective order from the

7    Court concerning that document.  The only thing that our

8    proposed language does is prevent any party from filing the

9    document at issue publicly before the issue is resolved.

10   This is a --

11        **THE COURT:**  But Mr. Bailey, you would agree with

12   me, wouldn't you, that this is an unusual provision?  It's

13   not something that I typically see in protective orders.  I

14   doubt it's something you typically see in protective orders,

15   is that fair?

16        **MR. BAILEY:**  I don't agree with that, your Honor.

17   This is something that I routinely see in protective

18   orders -- well, let me step back for a second.  The ability

19   to designate a document that another party has produced is

20   something that I routinely see in protective orders.  It

21   was -- this language that we started with here was actually

22   taken from the Tolton protective order.  I have seen courts,

23   even over objection, enter these kinds of protective orders.

24        **THE COURT:**  So what is it that you're trying to

25   get at?  What are you worried about that they have that

1    you --

2              **MR. BAILEY:**  There are two categories, your Honor.

3    First is documents that a third party produces, because

4    there may be subpoenas here.  Those subpoena may be for

5    health information, they may be for comp information.  I

6    don't know what a third party's going to do with respect to

7    acceding to the jurisdiction of the protective order.  They

8    may or may not designate things.  I would like the ability

9    to designate that stuff if I find that it otherwise would

10   warrant protection under the protective order.  That's

11   category one.

12             The second category is documents that are in

13   plaintiffs' possession by virtue of their having spent over

14   four years as employees of this law firm that contain

15   information that, were Jones Day producing it, we would

16   designate under the protective order.  I don't know what

17   plaintiffs have, so --

18             **THE COURT:**  I think -- so here's my reaction to

19   this issue which is, I have to say, I'm not terribly worried

20   about this issue with respect to third parties if it's

21   another law firm or another individual that's producing

22   materials.  I mean, I -- well, let me put it this way:  I

23   guess I'm not terribly concerned about this issue unless the

24   documents or the records at issue are or reflect Jones Day

25   information.

1    **MR. BAILEY:**  And that's exactly what our concern

2    is.  I'm sorry, your Honor, go ahead.

3    **THE COURT:**  If plaintiffs have with them any

4    materials that they acquired or summaries of materials from

5    Jones Day, I'm in agreement with you and this should apply.

6    If they subpoena former -- some other former associates of

7    the law firm who have similar files, I get it and I think

8    it's appropriate to apply.  So I think that you're all just

9    going to have to draft this in a way to refer to any Jones

10   Day proprietary information regardless of who is in

11   possession of it.  But if it's Jones Day information, then I

12   agree with you this should apply, otherwise I don't think

13   it's necessary.

14   **MS. CHASE:**  Your Honor, this is Ms. Chase.  I'm

15   sorry just to add one more point.  I do believe there could

16   be subpoenas of, for example, insurance carriers, I don't

17   know.  But it's possible that current or former Jones Day

18   associates' medical leave files associated with their

19   disability leave when they had a child could be produced

20   from a third party.  And I don't have any assurances that

21   the third party would designate that as confidential under

22   the protective order.

23   **THE COURT:**  It seems unlikely that they would just

24   produce it without some confidentiality.  If you're dealing

25   with medical -- an insurer producing medical information,

1    that would be pretty shocking to me if they did that without

2    requesting some type of confidential treatment.

3         So why don't I leave it for present purposes with

4    the Jones Day information.  But if subpoenas go out for

5    information, Ms. Chase, that you think calls for this and

6    raises an issue, you should confer with plaintiffs about it.

7    And if you can't work it out, you can come back to me on

8    short order, and I may order that that information not be

9    disclosed.  But I'd rather do it with a concrete issue in

10   mind rather than a maybe.  So if they are sending out

11   subpoenas to insurers that are requesting health

12   information, yes, come back to me.  And if you can't work it

13   out amongst the parties, I'm happy to designate and direct

14   that that information be treated as confidential.

15        **MR. SAVIGNAC:**  Judge, this is Mark Savignac.  I

16   have a degree of confusion about the ruling.  So you're

17   saying that if we have information that can be described as

18   Jones Day information -- so that could be, I don't know,

19   text messages discussing Jones Day that say things that are

20   embarrassing about Jones Day, and Jones Day says, well, we

21   don't -- you know, we don't want anyone to know about this,

22   that they can designate it and then it would be covered by

23   this protective order.  So we would be prohibited from

24   sharing it with anyone except as allowed by the protective

25   order, and also from filing it on the docket except for

1    filing it under seal.  Is that what you're suggesting?

2            **THE COURT:**  Well, it may be some variation of

3    that.  I think your example is kind of a vague one.  If

4    there is a text message that says, "Even though I understand

5    that Jones Day treats this as confidential information, here

6    is what my comp was for these years.  I spoke to the people

7    in the office who are next to me and next to them, and this

8    is what their comp was during those years," that sounds to

9    me like Jones Day confidential information.  If it's a text

10   message that says, "A Jones Day partner was really rude to

11   me and called me a jerk," I don't think that's confidential

12   information.

13           So you may have to work that out in some

14   reasonable fashion.  What I'm talking about is proprietary

15   information, not anything that mentions or refers to Jones

16   Day.

17           **MR. SAVIGNAC:**  Well, your Honor, I have --

18           **THE COURT:**  Okay, fine, you've convinced me.  I

19   think I should just go with the broader rule, and you should

20   have to disclose everything and work it out first.  You're

21   right, there is a vagueness, that's where the line is drawn.

22   You're right, and therefore I think you do need to work this

23   out.  I'm not saying it doesn't get produced, but you have

24   to flag it for Jones Day if there's any question about this.

25   And then you can just bring it to me if you have to.

1      **MR. SAVIGNAC:**  I'm sorry, I'm just not sure that I

2   understand what you're asking us to rule out.  Can I say,

3   I'm looking at a D.C. Circuit case that I think pretty

4   clearly says that what we're talking about now is

5   unconstitutional.  I could summarize the case for you or

6   send it to you.  I don't want to make an argument, but I

7   just want to be clear that we know what we're talking about.

8      **THE COURT:**  Well, I thought I tried to come up

9   with something that was a reasonable accommodation for you,

10  and you seemed to be highly resistant to doing that.  I

11  mean, I'm talking about --

12     **MR. SAVIGNAC:**  No, no.

13     **THE COURT:**  -- Jones Day proprietary information.

14     **MR. SAVIGNAC:**  I'm not trying to resist anything,

15  I truly just don't understand what the -- I mean, I think we

16  can all agree that we will produce information.  And Jones

17  Day can say, "We think that this piece of information meets

18  the good cause standard, and we will seek a protective order

19  on it," and that that could go forward.  But other than

20  that, I just don't understand what the ruling is.

21     **THE COURT:**  What is the D.C. Circuit case?

22     **MR. SAVIGNAC:**  Sure.  The D.C. Circuit case is In

23  Re: Rafferty, 864 F.2d 151.

24     **THE COURT:**  I'm sorry, give me the citation again.

25     **MR. SAVIGNAC:**  864 F.2d 151.

1          **THE COURT:**  And is there a jump cite?

2          **MR. SAVIGNAC:**  Well, I mean, it's a short opinion.

3     You could start at the beginning, "Petitioner challenges a

4     District Court ruling that placed under a protective order."

5     But then for a jump cite, I mean, you could look at the

6     paragraph that begins -- the paragraph on page 155 that

7     begins, "In Seattle Times Co. v. Rhinehart."

8          **THE COURT:**  Give me a second here.

9          Let me ask you, Mr. Savignac, do you have in your

10    possession Jones Day e-mails and/or e-mails that were

11    created or exchanged while you were a Jones Day associate?

12         **MR. SAVIGNAC:**  Well, I don't believe so, with the

13    exception of standard things.  Like if they sent me the

14    health insurance plan, I might have forwarded it.  You know,

15    information that is supposed to be private to me.  Yeah,

16    parental leave e-mail.  I mean, if you're asking if I've

17    like stolen a bunch of client information, the answer to

18    that is no.  So in this In Re: Rafferty case --

19         **THE COURT:**  I'm just trying to figure out whether

20    we're fighting about anything where there's any "there"

21    there here, and whether you have --

22         **MR. SAVIGNAC:**  But there on my side is the First

23    Amendment.

24         **THE COURT:**  What's that?

25         **MR. SAVIGNAC:**  I don't know that there is.  I

1    don't think that there's any particular reason for that, for

2    this sort of order, and we've made that clear.  They have to

3    show good cause.  And they haven't said, oh, we think that

4    the plaintiffs have X sort of information, and that the

5    Court would be -- would have the authority to enter a

6    protective order on that information.  That's their burden.

7           **MR. BAILEY:**  Your Honor, if I can --

8           **THE COURT:**  I'm sorry, let me just -- I just want

9    to try and get to the bottom of this question first of all.

10          So Mr. Savignac, I think what you're telling me is

11   that the only Jones Day proprietary information or documents

12   that you have in your possession or that Ms. Sheketoff has

13   in her possession are possibly documents or e-mails relating

14   to family leave policies?

15          **MR. SAVIGNAC:**  I think that -- I would say -- I

16   cannot speak for Julia.  We have defendants in this case

17   trying to breach the spousal privilege.  I would say on

18   behalf of myself, that the documents I would have from Jones

19   Day are a small number of documents that are the sort of

20   thing that you would expect anyone to have.  For example,

21   letters where they tell me your salary for this year will be

22   so and so, the letter where they gave me an offer to join

23   Jones Day, things like that.

24          **THE COURT:**  Ms. Sheketoff, same question for you?

25          **MS. SHEKETOFF:**  I also have similar e-mails.  And

1    then I think that the thing that we're focused on to some

2    extent is communications about Jones Day.  You know, I

3    certainly have communications about Jones Day with former

4    and current employees of Jones Day.  To the extent any of

5    that -- I'm sorry?

6              THE COURT:  Any of that that includes Jones Day

7    proprietary information or information that Jones Day might

8    think is proprietary like salary information, information

9    that Jones Day treats as confidential information?

10             MS. SHEKETOFF:  I don't -- there might be some

11   about salary, but probably minimal stuff about salary.  I

12   guess -- I think this is what Mark was getting at, I'm just

13   not sure exactly what proprietary means.  I think that there

14   is information that Jones Day would find potentially

15   embarrassing that relates to Jones Day, but I would not call

16   anything about it proprietary.  But, you know, it's possible

17   that I'm not understanding exactly the scope of that word.

18             THE COURT:  Can you give me an example of what

19   you're talking about then?

20             MS. SHEKETOFF:  You know, for example, there are

21   text messages about Partner A and how incompetent he was,

22   and how he was a horrible writer, and how he -- it's things

23   like that.

24             THE COURT:  I mean, I don't think that that is

25   proprietary information.  What I'm talking about is -- I'm

1    not talking about people's opinions of other people.  But if

2    that e-mail instead said, "I worked with partner so and so

3    on this particular matter, which is a confidential client

4    matter.  I worked with him on that matter, and he did a

5    really bad job on that matter.  And as a result of that, the

6    SEC is now looking into the client's" -- "is conducting a

7    confidential investigation of that client now," that would

8    be proprietary and the sort of thing that involves

9    privileged communications, and you ought not simply be just

10   disclosing that.  Obviously you shouldn't be disclosing it

11   not just because of a protective order, but it would violate

12   your ethical duties as well as a lawyer.  That's what I'm

13   trying to get at is, you know, what's here.

14          If it's how much you and Mark were paid or what

15   your benefits were, I don't see a problem.  If it's people's

16   opinions about Jones Day partners or others who were working

17   at Jones Day, I don't see a problem.  If it's about

18   allegations of mistreatment that don't touch on confidential

19   information like client communications, I don't see a

20   problem.  But if it's anything that deals with -- anything

21   certainly that is subject to the attorney-client privilege,

22   I do see a problem.  And I think that that was something

23   that would have to be aired in advance before there was any

24   disclosure.

25          And if it's -- and I'm not accusing you or

1    Mr. Savignac of anything wrong, but if as you were leaving

2    you took the list of -- or somehow someone sent you --

3    without you even requesting it, someone sent you secretly

4    the list of compensation of all associates at Jones Day and

5    you have that, I don't think you should just be publicly

6    releasing that without some discussion.  That's what I'm

7    trying to get at here.

8            MS. SHEKETOFF:   That makes sense, and I don't have

9    that.  I do think that I have some communications that do

10   contain attorney-client privilege.  But I do want to be

11   clear that of course I understand that my ethical

12   obligations would prohibit me from disclosing that on the

13   public docket.  And to the extent that Jones Day tells me,

14   "We believe that this is attorney-client privileged

15   information," I would certainly take that very seriously.

16   And we could definitely err on the side of redacting more

17   rather than less information that seems to be

18   attorney-client information.

19            And if the protective order were limited to

20   attorney-client information, I think that would be one

21   thing, you know, if they had the ability to raise that.  But

22   it's much broader than that.  I mean, the categories in the

23   protective order are extremely broad and include personal,

24   confidential -- you know, basically I would guess it's

25   actually going to be the vast majority of what Jones Day

1    produces is going to have some kind of confidentiality

2    designation.  And so my concern is largely that we're going

3    to have this gag order on potentially huge amounts of stuff

4    that we think is not appropriate and not consistent with the

5    First Amendment.  But yes, I completely --

6            THE COURT:  The First Amendment point, though, is

7    a different one.  I mean, if you're talking about Jones Day

8    over designating confidential information, you have a remedy

9    and you can just come to the Court if they over designate.

10   I think what Mr. Savignac was raising and saying was that to

11   the extent that you have information -- that one or both of

12   you have information that you would like to make public,

13   that Jones Day and the Court ought not be able to impose a

14   gag order on information that you obtained before this

15   litigation started and was not received in the course of

16   discovery.

17           All I'm saying as to that is that he may be right,

18   except I don't think he's right with respect to anything

19   that is attorney-client related or where I think you better

20   pause long and hard with anything that is proprietary.  I

21   think you both are talented lawyers and have some

22   understanding of what it means to be proprietary.  If

23   someone has sent you what the -- a document that says

24   confidential pay of all associates at Jones Day and someone

25   secretly sent that to you, I think you would want to pause

1    before you released that and make sure that it was

2    appropriate to do so.  If it's just e-mails and texts that

3    you've exchanged with people that is saying that someone was

4    a jerk, that's a different matter.

5        **MR. BAILEY:**  This is Anderson Bailey, your Honor.

6    Just to be clear, that is the kind of information that we're

7    concerned about along with the productions potentially of

8    health information related to third parties that Ms. Chase

9    spoke about a moment ago.  But what we're seeking here is

10   not a gag order on anyone.  It is a way to preserve the

11   status quo in the event there is disagreement between the

12   parties as to the nature of that kind of information, and

13   whether or not it should be subject to the protective order.

14        As it stands, plaintiffs' version of the order

15   allows us to raise an issue and flag a document that we

16   think ought to be protected.  But they are allowed to

17   publicly file that document while that dispute plays out;

18   such as an exhibit to an opposition to a motion for a

19   protective order.  All our language does is prevent that

20   from happening so that we can have an orderly process and

21   have a ruling on any sort of confidentiality objection

22   before the document is publicly filed.

23        In Re: Rafferty does not speak to the Court's

24   ability to regulate filings in matters before the Court in

25   that nature.  It specifically recognizes that the Court has

1    the power to regulate the manner in which materials are used

2    in litigation pending before it.  That's what we're invoking

3    here.  All we're saying is we would like -- where we flag an

4    issue and where we see something that we believe should be

5    subject to the order, we would like that issue to play out

6    through meet and confers and, if necessary, motion practice

7    before anybody can file the document publicly.  Because that

8    lets the cat out of the bag, and it frankly undercuts the

9    Court's ability to ever order any kind of remedy that it

10   might deem appropriate.

11         **THE COURT:**  How do you anticipate this working?

12   Do you anticipate that you will seek in discovery everything

13   that they have in their possession, and then you will then

14   designate certain items based on what you receive from them

15   in discovery?

16         **MR. BAILEY:**  So with respect to first party

17   discovery -- and some of these terms are laid out in the

18   language we've proposed, we've served document requests.

19   They are not as broad as that, they are more targeted.

20   We're not seeking everything they have in their possession.

21   But they will produce documents to us under the terms that

22   we propose.  We then have I think 30 days to review the

23   documents to see if there is anything in there that the

24   defendants feel is proprietary or should be subject to the

25   protective order.  We then flag those specific documents to

1    the plaintiffs.  There's a meet and confer requirement, and

2    it goes from there.  If there's motion practice, all the

3    order does is prohibit any party from filing the documents

4    at issue until the motion is resolved.

5            But it plays out then in the context of specific

6    documents after the parties have had a chance to meet and

7    confer about them.  And there's no gag order, there's simply

8    just a prohibition on a public filing until the Court has

9    ruled.

10           **THE COURT:**  Well, I have to say, I think we may be

11   struggling over what is a non issue or is a very narrow

12   issue.  Maybe the better way to proceed with respect to this

13   question is for you to serve your discovery, get your

14   discovery responses.  If there is something in there that

15   concerns you -- you know, you say, "Wait a second, you've

16   got Mr. Smith's personal medical files.  I don't know how

17   you got them, but you've got his personal medical files and

18   it refers to some highly embarrassing information.  You

19   ought not be filing that on the public docket."  So you pick

20   up the telephone and you call Ms. Sheketoff or Mr. Savignac

21   up and you say, you know, "You've got so and so's documents

22   here, you're not thinking of filing those things on the

23   public docket?"  And they say, "No, no, of course we

24   wouldn't do that," and there's not an issue.  Or they say,

25   "Well, actually we are," in which case if that conversation

1    occurs, then you say, "Well, we've got to call the Judge."

2    And you call me up, and I get on the phone within 24 hours

3    with you.  And you say, "Look, Judge, they want to file so

4    and so's personal medical records."  But it may be just

5    easier to deal with this issue if and when a question

6    actually comes up in the discovery process.

7              I am -- I mean, I'm somewhat sympathetic to what

8    may be the plaintiffs' concern here is that this could just

9    be used as an opportunity to sort of tie their hands with

10   respect to filings in ways that it's just excluding

11   embarrassing information instead of information that's

12   attorney-client privileged or medical records of another

13   individual or the sort of proprietary information belonging

14   to the law firm that I'm talking about.

15             I guess my inclination on this one is just to say

16   I get the point.  If you look at something in discovery that

17   you get from them and it causes you concern, try and work it

18   out.  And if you can't, you can call me.

19        **MR. BAILEY:**  I appreciate that, your Honor.  I do

20   agree that that's the process that should play out.  My

21   concern is that that's the process I proposed to plaintiffs

22   and they refused to agree with it.

23        **THE COURT:**  Well, Mr. Savignac, any problem with

24   having it work that way?

25        **MR. SAVIGNAC:**  I don't have a problem with

1    working -- with having it work that way.  I think we'll just

2    have to see what happens if it indeed ever comes up.

3            **THE COURT:**  Well, I prefer to avoid resolving

4    issues that may never come up.

5            What's the next issue?

6            **MR. SAVIGNAC:**  So the next issue is Jones Day

7    seeks a protective order -- or to expand the protective

8    order to prevent us from using certain materials, which are

9    basically personnel files like performance evaluations, pay

10   information and medical information; to preclude us from

11   asking deponents about those documents unless the deponent

12   already has the information or the document.  Of course, we

13   wouldn't necessarily have any way of knowing whether they do

14   or not before the deposition.  And there again, it might

15   make sense for Mr. Bailey to start since he has to show good

16   cause for that.

17           **THE COURT:**  Mr. Bailey.

18           **MR. BAILEY:**  Sure.  There is a category of

19   confidentiality under the protective order for highly

20   confidential experts and counsel only information.  It's

21   compensation information, it's medical information, it's

22   personnel files.  So with respect to use of those kinds of

23   documents at a deposition, the defendants have agreed that

24   plaintiffs can use those documents in the deposition of

25   anyone who is identified on the document as having received

1    or authored it or who otherwise has access to the

2    information.  We've also agreed to meet and confer with them

3    to the extent they want to disclose the document more

4    broadly than that or if they have questions about the use of

5    a particular document with a particular witness.

6        So the only category of people that this dispute

7    relates to are deponents who would not otherwise have ever

8    had access to this kind of information -- which is, again,

9    compensation and medical health information, and to whom the

10   defendants object to the disclosure of the information.  So

11   the plaintiffs have not identified a scenario in which they

12   would want to use documents that are under this category of

13   confidentiality with a specific witness.  But given the

14   nature of the documents at issue, I think it's important to

15   tow the line a little here and limit the use of the

16   deposition to those people who would otherwise have access

17   to the information or have already accessed the information.

18   Because what we're talking about, again, is personnel files,

19   comp information and medical health information.

20       I don't think the plaintiffs should be able to

21   take a medical leave file for one witness -- for one

22   associate, and then use that in the deposition of a

23   different associate.  That's highly intrusive of the first

24   associate's medical information.  The same thing with comp.

25   As your Honor knows, this is generally considered

1    confidential information within Jones Day.  We don't want

2    the plaintiffs, if they are able to take discovery of other

3    associates' compensation, to then use that with deponents

4    who never would have otherwise seen that information.  So

5    this is again --

6          **THE COURT:**  I have to say, I'm much more

7    sympathetic to the concerns about medical records than I am

8    about compensation.  I mean, I know Jones Day keeps that

9    information -- tries to keep that information confidential,

10   but it doesn't strike me as raising sort of the same grave

11   issues that medical information raises, you know, unless it

12   were being done in sort of an abusive -- disclosed just

13   abusively.  But if there's a legitimate question to ask

14   about someone's compensation -- I mean, I suppose I don't

15   really see a whole lot of purpose to be served by saying to

16   associate A, "Were you aware that associate B was paid X

17   dollars?"  I mean, I don't see how that actually advances

18   discovery in any way.

19         **MR. BAILEY:**  I think abusive is the only word that

20   would describe that kind of questioning.  My point being,

21   your Honor, that if there is reason to ask a witness of a

22   specific document, it is almost certainly because the

23   witness has seen the document, has authored the document or

24   is personally aware of the information reflected in the

25   document.  So whatever scope of questioning they have

1    relevant to a particular document or a particular witness,

2    those two things are going to be linked.  We're only talking

3    about instances where there is no link between the document

4    and the witness, and the document contains information

5    that's confidential under one of these three specific

6    categories.  Even then, the plaintiffs can come and ask us

7    about it, right.  I mean, this is, again, a bit more of a

8    process point: what is the default right for plaintiffs to

9    do, and what is not the default right.

10           As plaintiffs would have it, they have a default

11   right to show any piece of information to any witness

12   regardless of any other circumstances, and regardless of the

13   level of confidentiality under the protective order.  We

14   would like to limit that.  They still have every opportunity

15   they could reasonably need to ask any witness a question

16   related to a document that witness may have seen.  And they

17   can also ask us, again, to expand the use of a particular

18   document in certain instances.

19           But we ought to -- we think the default ought to

20   be limited to that, and not give them carte blanch to ask

21   any witness any question about any document no matter what

22   the nature of the document is.

23           **THE COURT:**  Mr. Savignac.

24           **MR. SAVIGNAC:**  Sure.  I have three points that are

25   directly responsive.  First, to a large degree, they're just

1    asking for the right to review ahead of a deposition the

2    documents that we want to use at that deposition, which I

3    believe is not traditionally the right of a side defending a

4    deposition.  It's not a right that I expect them to give to

5    us.  We don't have any way of knowing, generally speaking,

6    whether they would deem a particular deponent to have the

7    information that is in a document other than by telling them

8    ahead of time, you know, "I'd like to use this document at

9    the deposition, is that okay?"  And then they can go, you

10   know.

11          Second, the people we'll be deposing in this case

12   would almost certainly all be people who --

13          **THE COURT:**  I'm sorry, just to interrupt you just

14   for a second there.  Does it really have to work that way

15   where they would have to call you in advance -- where you'd

16   have to call them in advance and say, "Here's the list of

17   documents we intend to use in this deposition"?  I mean,

18   perhaps if there's a big stack, maybe that's the case.  But

19   I don't know why you couldn't sort of at the deposition pass

20   the document to Mr. Bailey, who's defending the deposition,

21   and say, "I'd like to use this document, any objection to me

22   doing so?"  And then he can -- before you show it to the

23   witness, he can just say whether he has an objection to it

24   or not.  And if you have to step out of the room together or

25   the witness has to step out of the room together to resolve

1    something, you can do so.

2        **MR. SAVIGNAC:** Sure, that was going to be my third

3    point.  If we try to use the document during a deposition

4    and they have a basis for objecting to the use of it, then

5    we can have a discussion then, they can seek a protective

6    order then.  Certainly if we're doing anything -- you know,

7    it's not permissible to conduct a deposition abusively.  And

8    we would expect that if we tried to do that, then you would

9    be very unhappy with us.  I don't think that anyone is

10   proposing doing that.

11       The other thing I was going to say --

12       **THE COURT:** So let me just go back and ask

13   Mr. Bailey that.  The only thing I would clarify,

14   Mr. Savignac, about what you're saying is with at least this

15   designated group of documents, you would have to at least

16   pass it to Jones Day's counsel before you used it at the

17   deposition for them to look at it in the same way in court

18   you would publish an exhibit to the Court before you publish

19   it to the jury.  So you might have to pass it to the lawyer

20   defending the deposition rather than simply putting it in

21   front of the witness and waiting for Jones Day's lawyer to

22   say, "Wait a second," and pull it back and say, "you

23   shouldn't be showing that to that person."

24       A minor refinement on what you're saying, but with

25   that refinement, let me ask Mr. Bailey what his view is as

1    to whether that's workable?

2         **MR. BAILEY:**  I don't think it's frankly dissimilar

3    to what we proposed.  I think the concern I have in that

4    specific scenario is that it's playing out in the context of

5    a deposition.  And so if there is a disagreement about that

6    document, it's going to necessitate either a call to the

7    Court at that particular moment, it's going to necessitate

8    stopping the deposition.  I just don't know if that's the

9    ideal scenario in which it plays out.

10        But that said, so long as the document is not

11   being used with the witness until there is agreement or a

12   ruling, then that is no different than what the language is

13   that we proposed and that plaintiffs objected to.

14        **THE COURT:**  So here's what I'm going to say with

15   respect to this:  With this designated group of documents, I

16   think that the documents should be shown to the Jones Day

17   lawyer before it is displayed in front of the witness to

18   provide you with the opportunity to object.  And I will

19   leave it up to Mr. Savignac and Ms. Sheketoff to decide

20   whether they think for efficiency's sake they're better off

21   shipping you the documents the day before so as to expedite

22   things in the deposition or whether they'd rather just do it

23   in the course of the deposition.

24        Again, I would be very surprised if we're talking

25   about a large quantity of records that fall into this

1    category.  Like you, Mr. Bailey, I suspect just from my

2    experience in depositions that it's -- most of the documents

3    you're showing a witness in a deposition is a document the

4    witness has in fact seen before or is about that particular

5    witness and not about some third party.  I can imagine there

6    are circumstances where that comes up, but I just don't

7    think we're talking about a large quantity of documents.

8           So I think it's probably workable in the course of

9    the deposition.  But if for some reason Ms. Sheketoff or

10   Mr. Savignac think that there's going to be a large quantity

11   and they don't want to get bogged down on this in the course

12   of the deposition, they're welcome to ship it to you in

13   advance to try and sort things out beforehand to expedite

14   the deposition.

15         **MR. BAILEY:**  And some of these conversations can

16   be had more generically than with respect to a specific

17   document.  I mean, if they wanted to ask us whether or not

18   our HR director can view leave files, then there's a pretty

19   easy answer to that.  I say that just by way of example in

20   the hopes of facilitating a little cooperation.

21         **THE COURT:**  I understand.  So what's the next

22   issue?

23         **MS. SHEKETOFF:**  The last issue, your Honor, is the

24   attorney's eyes only provision for discovery that we believe

25   that is known to Jones Day leadership would cause them to

1    seek reprisals against third parties.  And so we have the

2    burden on that, so if it's okay with you, I would start.

3        THE COURT:  Okay.

4        MS. SHEKETOFF:  So I acknowledge that courts don't

5    enter these kinds of orders lightly.  But at the same time,

6    the law is clear that the Court should enter such an order

7    where the applicable standard is met.  That standard is a

8    three-factor standard that was set out in the D.C. Circuit's

9    opinion in Doe v. District of Columbia, which is 697 F.2d

10    1115.  And it says that a -- such attorney's eyes only

11    provision is appropriate when the harm posed by the

12    disclosure would be substantial and serious; the restraining

13    order is narrowly drawn and precise; and there's no

14    alternative means of protecting the public interest which

15    intrudes less directly on the attorney-client relation.

16        So here, the harm posed is serious and

17    substantial.  We're talking about harm to people's careers.

18    And this is not hypothetical, Jones Day specifically said in

19    writing to us that they may seek reprisals based on our

20    discovery data.  And as you know --

21        THE COURT:  I'm sorry, back up a second there.

22    Jones Day said that they were going to seek reprisals

23    against witnesses -- what did they say to you?

24        MS. SHEKETOFF:  They said that they would not --

25    that they would not agree to any anti-reprisal provision

1    based on data in our discovery.  In other words, they

2    specifically said that they think it is appropriate that if

3    some -- if we have data that suggests, for example, that a

4    current or former employee -- or I guess a current employee

5    did something that they didn't like, that they specifically

6    reserved the right to take reprisals against that person.

7         **THE COURT:**  I suppose it depends on the

8    circumstances.  If you have data that showed that there was

9    someone who was stealing from the law firm and disclosed it,

10   then it would be appropriate for the law firm to act on

11   that.  If, on the other hand, you simply had somebody who

12   was assisting you in your case, it would not be appropriate

13   for the firm to take a reprisal against them.  So I guess it

14   depends on the circumstances.

15        **MR. BAILEY:**  Your Honor, I'm sorry to interrupt

16   here, but I do want to take umbrage to this a little bit.

17   Because the example I used with Ms. Sheketoff was that they

18   disclosed information indicating that a current Jones Day

19   attorney was violating attorney-client confidence.  An

20   anti-reprisal provision would stop us even from asking that

21   attorney to take additional CLE courses on the

22   attorney-client privilege.

23        **THE COURT:**  Okay, fair enough.

24        **MS. SHEKETOFF:**  I do want to take this

25   opportunity, Judge, I think it might be helpful for you to

1    review some of the materials -- a very small subset of the

2    materials in camera just so you get a sense of what we're

3    talking about, and that might provide more context.  I'm not

4    disagreeing that in certain circumstances it might be

5    appropriate, but I think in many circumstances it wouldn't.

6    And I think at a bare minimum, it makes sense to have a

7    provisional -- have a designation that obviously could

8    potentially be challenged, but that provides some measure of

9    protection for Jones Day current and former employees.

10         THE COURT:  One of the problems you have here is

11   that Mr. Brogan is a defendant in the case, and it's got to

12   be a pretty high standard to say that a party to a case is

13   not entitled to see the evidence against him.

14         MS. SHEKETOFF:  It is a high standard, your Honor,

15   and that's the standard I'm quoting from Doe v. District of

16   Columbia, that this is specifically for an attorney's eyes

17   only provision.  And you see these provisions really

18   routinely in -- I'm sorry?

19         THE COURT:  I guess all I meant by that was it

20   strikes me as even more of a concern where you're dealing

21   with an individual who's a defendant versus a corporate

22   defendant.

23         MS. SHEKETOFF:  That may be, and I do think that

24   we meet the standard in either case.  And again, I think it

25   might be helpful to the Court if we could make a submission

1    of some materials that we're talking about so that the Court

2    could see for itself whether that standard would be met.

3    And I do just want to say, this is in a context where we

4    think it's really unlikely or again hypothetical or

5    speculative that Jones Day would take severe action against

6    someone.

7             What happened in this case is that Jones Day fired

8    Mark illegally.  And again, we don't think these are just

9    allegations, we are ready to prove that at any point.  The

10   Court didn't want to hear the summary judgment motion a few

11   months ago when we offered it, but if you think that that is

12   relevant to this dispute, we are ready to prove what

13   happened.

14            The second factor is that --

15            **THE COURT:**  I'm sorry, just to back up for a

16   second.  When you asked for an in camera review, are you

17   okay with sharing the material that you're talking about

18   with Mr. Bailey and Ms. Chase so that it's not ex parte, but

19   it would only be shared with them for the purpose -- just

20   for purposes of the Court review so I'm not proceeding ex

21   parte?

22            **MS. SHEKETOFF:**  If both Mr. Anderson and Ms. Chase

23   would agree that they would not disclose those beyond the

24   two of them, you know, without a ruling from the Court that

25   it was appropriate to do so, then I think that would be

1    appropriate and we would agree to that.  But my

2    understanding from --

3         THE COURT:  Let me ask Mr. Bailey, any objection

4    to Ms. Sheketoff sharing the materials that she's talking

5    about with the Court?  She can just e-mail them to me,

6    providing a copy to you and to Ms. Chase, and that the Court

7    would order that the two of you not further disclose those

8    documents pending the Court's resolution of this issue?

9         MR. BAILEY:  That process I have no objection to.

10   I have a lot of objections to the language and to the

11   concept that they're proposing here.  So I frankly don't

12   think the Court really even needs to go to look at the

13   documents, because they still can't meet any of the other

14   elements of the test.  And I'll also note that under the

15   language they've proposed, it would actually prohibit

16   Ms. Chase from seeing the documents.  So I'm a little

17   confused as to --

18        THE COURT:  Oh, so Ms. Chase is one of the

19   individuals that's covered?

20        MR. BAILEY:  Correct, as well as an extraordinary

21   number of Jones Day partners.  But I think frankly your

22   Honor doesn't need to get that point, because the test is

23   clear cut.  There's a number of cases that apply the test.

24   The plaintiffs can't meet the basic elements here, including

25   whether or not there's any sort of concrete showing of harm;

1    whether or not the terms they've proposed are narrowly drawn

2    and precise -- they're vastly overbroad; and the extreme

3    intrusion on the attorney-client privilege that we're

4    talking about here and our ability to consult with the

5    defendants.  And even counsel of record's ability to consult

6    with each other is significantly hampered here based on

7    nothing more than rank speculation.  And the idea that

8    defendants retaliated against plaintiffs is heavily and

9    genuinely contested here.

10          And so what the plaintiffs are saying is that

11    while we think Jones Day might take reprisals against anyone

12    else, they have absolutely no evidence of that.  They have

13    nothing more than their own speculation.  So that in and of

14    itself has been reason for courts in this district to deny

15    these kinds of provisions.  And that's without even looking

16    at the actual language they've proposed, which as I've said,

17    would prohibit both of the individual defendants from seeing

18    any of this information, would prohibit any Jones Day

19    leadership from reviewing the information on behalf of the

20    firm's defense, and would actually preclude disclosing the

21    information to three of the five attorneys that have entered

22    an appearance in this case on defendants' behalf.

23          So the provision is vastly overbroad.  It can't

24    meet that test of being narrowly drawn and precise under

25    Doe, and there is absolutely nothing more than a vague

1    prospect or hypothetical idea of reprisals, which in and of

2    itself has been held in this district not to be enough to

3    warrant an attorney eyes only provision.

4         **MS. SHEKETOFF:**  Your Honor, may I respond?

5         **THE COURT:**  Please.

6         **MS. SHEKETOFF:**  I think a couple of things.  The

7    first is I think if you were to take a look at, again, just

8    a small subset of the materials we have, you would see that

9    it is not a speculative harm.  And I think that could really

10   inform your assessment.  Again -- I'm sorry, beyond that,

11   this is not a case where I think -- or that it's unrelated

12   to the kind of harm that we're contending would happen here.

13   Again, Mark was fired.  Jones Day is not contesting that

14   they fired him for his e-mail.

15        You know, we can debate as a legal matter whether

16   it was a protected e-mail or not a protected e-mail.  But we

17   certainly think that the law is very clear, and that's just

18   a blatant violation of the law.  And we are very concerned

19   about that for third parties -- or about similarly -- or

20   about termination for third parties.  And this is not a harm

21   that can be remedied.  Once Jones Day sees this information,

22   they can't unlearn it -- or once Jones Day leadership sees

23   this information, they can't unlearn it.  Theirs is a very

24   subjective process for making compensation decisions.  That

25   could certainly influence that.  People could be terminated.

1    People could be refused the opportunity to return to Jones

2    Day.  So I think these are not speculative harms, and I

3    think the Court would see that to some extent if it were

4    willing to take a look at some of the materials.

5              But to go onto to the second factor --

6              **THE COURT:**  Let me go back to what I had asked

7    before.  Is it okay with you if it's shared with Ms. Chase

8    if I order that she not --

9              **MS. SHEKETOFF:**  Yes.

10             **THE COURT:**  -- and Mr. Bailey, if I order that

11   they not share it with anyone else until we resolve this

12   issue?

13             **MS. SHEKETOFF:**  Yes, your Honor.  And in terms of

14   the broader protective order, we made clear to Jones Day, we

15   proposed this language.  We don't know exactly how many

16   people fall within the class of individuals that are covered

17   by it because it's an opaque structure.  But we've made

18   clear that we're very willing to negotiate about the scope

19   of the order, that we want the purpose -- that it just needs

20   to be effective in protecting third parties.  And so we are

21   certainly open to Ms. Chase, to the extent she promises not

22   to use that information to take reprisals against anyone,

23   we're open to her being within the sphere of people who

24   could see it.

25             Would it be appropriate for me to move on to the

1    second factor?

2            THE COURT:  Sure.

3            MS. SHEKETOFF:  Okay.  The second factor is

4    whether the proposed provision is narrow and precise.  We

5    think we've crafted it as narrowly -- you know, the

6    substantive protection as narrowly as possible, which is it

7    only reaches information that's likely to materially impair

8    a current or former employee's relationship with Jones Day.

9    And then the third factor is, is there an alternative means

10   to protect third parties that's less restrictive.  And like

11   I was referring to earlier, I don't think that there is.

12   Once you see something, you can't unsee it.  Once you've

13   been hired, your career is, you know, not over dramatically

14   changed.  I don't want to see that happen to anyone else.

15   Like I said, Jones Day is not disavowing that it will seek

16   reprisals.

17            And I just also want to make the point, this is

18   not --

19            THE COURT:  Let me pause there.  I think that's an

20   unfair argument based on what I've heard.  I mean, what

21   Jones Day is saying is that they can't make any promises not

22   knowing what's in these documents they're not going to act

23   on it.  And as Mr. Bailey said, if there's an e-mail that

24   says -- you know, that reveals attorney-client information

25   to somebody who's not associated with the law firm, it may

1    be that the firm does need to do something about that and

2    has an obligation.  And it may be under the bar rules, that

3    the firm might have an obligation to do something about

4    that.

5          So I'm not sure it's fair to be sort of suggesting

6    that Jones Day is holding out the possibility of punishing

7    somebody merely because they're saying something that Jones

8    Day doesn't like.  I think that's not -- you may convince

9    the Court ultimately that that's what happened here in this

10   case, but I think it's just not a fair characterization of

11   what Mr. Bailey has said about this dispute.

12         **MS. SHEKETOFF:**  What I mean to say is that

13   Mr. Bailey hasn't disavowed seeking reprisals in general.

14   It's not -- they haven't said what they would limit those --

15   or the context in which they would limit it to.  They

16   haven't actually said, "Well, we promise we won't take

17   reprisals against someone just because they say something

18   that we don't like."  They haven't said anything about what

19   they would do.

20         **THE COURT:**  Well, would that be sufficient if they

21   said that?

22         **MS. SHEKETOFF:**  I don't think that would be

23   sufficient, but that would be beyond where we are now.

24   Again, I do think it would be helpful for the Court to first

25   take a look at, like I said, a subset of documents.

1      **THE COURT:**  I think maybe that's the thing to do.

2  So I'm going to direct then that you can send the materials

3  to the Court by e-mail.  You can copy Ms. Chase and

4  Mr. Bailey with that.  I'm going to order right now that

5  Mr. Bailey and Ms. Chase not further disclose the

6  information they receive until we've had a chance to have

7  further discussion with respect to those materials.

8      **MS. SHEKETOFF:**  Thank you, your Honor.

9      **THE COURT:**  But it may be there's not much

10  point -- I'm happy to hear if Mr. Bailey has anything

11  further he wants to add on that.  I'm not sure there's much

12  point in discussing it further until I see what we're

13  talking about.

14      **MR. BAILEY:**  The only thing I would add, your

15  Honor, is that whatever those documents say isn't going to

16  change what the plaintiffs have proposed, and whether or not

17  that language that they're seeking can meet the standard

18  under Doe v. District of Columbia.  So it does strike me

19  that we're putting the cart a little bit before the horse

20  here.

21      **THE COURT:**  Fair enough.  I think seeing the

22  documents may help me with the issue because -- you know,

23  and just to give you an example.  If a document says,

24  "Mr. Brogan threatened to fire me if I said anything bad

25  about the firm ever in a private conversation that I had

1    with him," you know, to me that's going to be an easy

2    question.  Because I don't see how you can possibly litigate

3    this case and make use of that document without showing it

4    to him so he can say that's not true, that never happened.

5            On the other hand, if it's a document that simply

6    says, "I really support you in bringing this lawsuit, I

7    think you're doing a brave thing.  I think you're wonderful

8    for doing it, I really think that Jones Day is awful," then

9    I don't actually think it's a relevant document in the case.

10   And I'm not sure that it makes a difference whether that's

11   shown to any of the individuals that they're concerned about

12   or not, because it's not going to carry -- that sort of just

13   conclusory assertion is not going to carry any weight with

14   the judge anyway.

15           So for that reason, I think it would be helpful

16   for me to see the documents just to see if there really is

17   an issue here or not.

18           **MS. CHASE:**  Your Honor, this is Ms. Chase.  I hear

19   you on this, and obviously we will -- your directive will

20   fully be complied with, and Mr. Bailey and I will not

21   disclose the information to anyone else.  But I do want to

22   say I find this to be highly unusual.  I litigate employment

23   discrimination retaliation claims all the time.  And

24   essentially what plaintiffs are arguing is if we allege that

25   the employer retaliated against us, if we think that there

1   is evidence that other people don't like the firm or say bad

2   things about the firm, that it's going to somehow be

3   protected from being seen by the defendants just because

4   we've made allegations of retaliation.  They don't have

5   anything more than that.

6          And so we're creating this potential that the

7   defendants, some of the counsel of record, the leadership of

8   the organization may not be able to see categories of

9   documents simply because of the claim involving allegations

10  of retaliation.  I find that kind of a shocking proposition

11  that we might be going down that path.  But it seems like

12  that's what's being proposed by plaintiffs.  And the fact

13  that you're going to look at the documents seems to give

14  some credence to the idea that there could be a category of

15  documents just in a retaliation claim that are somehow going

16  to be protected from some counsel of record and some

17  leadership of the organization.

18          **THE COURT:**  Well, fair enough, Ms. Chase.  I have

19  to say, I am sympathetic to what you say.  And I want to be

20  completely clear I am not suggesting in any way that Jones

21  Day's leadership cannot be trusted with this information.

22  And I think it's a very high standard for it not to be

23  provided in any event for the reasons you say.  The reason I

24  want to see the documents is it just -- it will make it

25  easier for the Court to figure out what the right answer is

1    here.  Because it may be when I look at the documents, I

2    realize they don't even raise a serious concern and

3    therefore it's just not a hard question at all; or that

4    there are other ways to deal with the issue short of

5    precluding senior management at the firm from seeing the

6    documents.  So I'm sympathetic to what you say.

7            I do want to make clear for the record I am not by

8    any means by saying I want to see the documents casting any

9    aspersions on the firm leadership or suggesting that they

10   can't be trusted with these materials, or that the standard

11   is one that would be by any means a routine matter.  For me,

12   just seeing what we're talking about may make it easier to

13   resolve the question.

14           **MR. BAILEY:**  Your Honor, this is Anderson Bailey.

15   We may also ask to submit something in writing.  I mean,

16   once we have some context here, it may be worth having

17   submissions from the parties.

18           **THE COURT:**  Okay, that's fine.  And after you see

19   that, you're welcome to do that.  So I'm wondering if

20   maybe -- I think we're at the end of the process now, and

21   I'm wondering if the right thing to do is just to require

22   that the parties submit a joint status report, maybe a week

23   from today.  I'm hopeful that this issue with respect to the

24   platform for the discovery can be resolved among the

25   parties.  And if not, you can just propose a briefing

1    schedule to me with respect to that issue.  And if you think

2    further briefing on this issue is necessary, you can just

3    propose a briefing schedule on that, and I'm happy to review

4    any briefs that you may want to submit with respect to this

5    issue.

6             MR. BAILEY:  Thank you, that's good for

7    defendants.

8             THE COURT:  Okay.  And Ms. Sheketoff, is that

9    acceptable for you as well?

10             MS. SHEKETOFF:  Yes, that sounds great.  Just one

11    logistical question.  Should we send the e-mail you said to

12    Ms. Thompson?

13             THE COURT:  Yes, that's fine to do that.

14             MS. SHEKETOFF:  Okay, thank you.

15             THE COURT:  Anything further, Ms. Sheketoff or

16    Mr. Savignac, today?

17             MS. SHEKETOFF:  No, your Honor.

18             THE COURT:  All right.  And Mr. Bailey and

19    Ms. Chase, anything further you want to raise?

20             MR. BAILEY:  No, your Honor.

21             MS. CHASE:  This is Ms. Chase, just one question.

22    The e-mail that's coming with the documents, did we have a

23    timing on that as to when it was going to be becoming, which

24    is when the joint status report needs to be submitted?

25             THE COURT:  I don't know whether that's something

1    that you could send tonight still, Ms. Sheketoff, or whether

2    you'd need until Monday to send it?

3            **MS. SHEKETOFF:**  I would probably need until

4    Monday, your Honor.

5            **THE COURT:**  So I'll direct that you just send it

6    by Monday at noon.

7            **MS. SHEKETOFF:**  Okay.

8            **THE COURT:**  Anything else from anyone else?  Okay,

9    thank you.

10        (Proceedings adjourned at 4:38 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2


3            I, **Jeff Hook, Official Court Reporter**,

4    certify that the foregoing is a true and correct transcript

5    of the remotely reported proceedings in the above-entitled

6    matter.

7                    **PLEASE NOTE:**  This hearing occurred during

8    the COVID-19 pandemic and is therefore subject to the

9    technological limitations of court reporting remotely.

10

11

12

13     __June 11, 2021__                    _____

14            **DATE**                          **Jeff M. Hook**

15

16

17

18

19

20

21

22

23

24

25

**1**

10281 [1] 1/20
1115 [1] 52/10
151 [2] 33/23 33/25
15219 [1] 1/17
155 [1] 34/6
17 [1] 25/9
18 [1] 7/9
19 [1] 68/8
19-2443 [1] 2/2
1:19-cv-2443 [1] 1/4

**2**

2,500 [1] 20/2
20001 [1] 1/25
2004 [1] 25/9
2021 [2] 1/5 18/5
2207 [1] 1/13
24 [1] 43/2
2443 [2] 1/4 2/2
250 [1] 1/19
26 [2] 11/21 12/6
2702 [2] 7/6 7/9

**3**

30 [2] 20/3 41/22
300 [2] 17/23 17/25
333 [1] 1/24
3:04 [1] 1/6

**4**

4500 [1] 1/17
4700-C [1] 1/24
4:38 [1] 67/10

**5**

5,000 [2] 14/1 15/2
50 [2] 14/20 17/6
500 [1] 1/17

**6**

61801 [1] 1/14
697 [1] 52/9

**8**

864 [2] 33/23 33/25

**A**

abide [2] 19/4 22/5
ability [12] 4/8 8/20 15/12 21/25 27/4 28/18 29/8 38/21 40/24 41/9 57/4 57/5
able [10] 2/17 2/18 10/24 14/24 18/19 19/24 39/13 45/20 46/2 64/8
above [1] 68/5
above-entitled [1] 68/5
absolute [1] 8/18
absolutely [2] 57/12 57/25
abusive [2] 46/12 46/19
abusively [2] 46/13 49/7
acceding [1] 29/7
acceptable [1] 66/9
access [6] 5/18 7/25 10/24 45/1 45/8 45/16
accessed [2] 23/24 45/17
accommodation [1] 33/9
accommodations [1] 18/23
accompanies [1] 14/17
accounts [2] 12/17 18/12
accusing [1] 37/25
acknowledge [1] 52/4
acquired [1] 30/4
act [10] 6/22 6/24 7/1 7/6 9/4 20/21 21/3 21/13 53/10 60/22
acted [1] 12/3
action [3] 1/3 2/2 55/5
actual [3] 20/3 22/2 57/16
actually [15] 10/9 16/1 19/4 21/8 21/10 24/5 28/21 38/25 42/25 43/6 46/17 56/15 57/20 61/16 63/9
add [3] 30/15 62/11 62/14
addition [1] 2/10
additional [4] 16/19 27/7 28/6 53/21
address [2] 12/15 27/21
adjourned [1] 67/10
Adobe [1] 18/20
advance [4] 37/23 48/15 48/16 51/13
advances [1] 46/17
advantage [1] 12/5
advertent [1] 22/14
affordable [3] 3/6 3/15 3/21
again [20] 4/25 10/5 16/5 19/24 22/15 33/24 44/14 45/8 45/18 46/5 47/7 47/17 50/24 54/24 55/4 55/8 58/7 58/10 58/13 61/24
against [15] 20/2 22/8 23/4 23/5 52/1 52/23 53/6 53/13 54/13 55/5 57/8 57/11 59/22 61/17 63/25
agents [2] 10/20 23/12
ago [2] 40/9 55/11
agree [11] 19/4 22/20 28/11 28/16 30/12 33/16 43/20 43/22 52/25 55/23 56/1
agreed [8] 4/9 11/17 12/16 18/10 18/17 26/25 44/23 45/2
agreeing [1] 22/5
agreement [6] 22/24 22/25 22/25 24/21 30/5 50/11
agreements [2] 11/14 11/16
ahead [4] 3/2 30/2 48/1 48/8
aired [1] 37/23
al [4] 1/3 1/6 2/3 2/3
allegations [4] 37/18 55/9 64/4 64/9
allege [2] 16/16 63/24
allow [4] 10/19 14/5 27/8 27/13
allowed [3] 18/5 31/24 40/16
allowing [1] 5/22
allows [4] 23/11 27/1 27/24 40/15
almost [2] 46/22 48/12
alone [1] 4/23
along [1] 40/7
alternative [3] 3/7 52/14 60/9
amendment [4] 24/6 34/23 39/5 39/6
among [1] 65/24
amongst [1] 31/13
amount [4] 11/20 13/25 17/15 19/6
amounts [1] 39/3
and/or [2] 23/13 34/10
ANDERSON [7] 1/15 2/5 9/10 18/9 40/5 55/22 65/14
annotate [1] 14/24
antenna [1] 26/2
anti [2] 52/25 53/20
anti-reprisal [2] 52/25 53/20
anticipate [2] 41/11 41/12
anticipating [1] 4/14
apparent [1] 18/25
appear [1] 14/10
appearance [2] 20/4 57/22
APPEARANCES [1] 1/11
Appearing [1] 2/4
appears [1] 18/22
applicable [3] 21/14 21/17 52/7
application [2] 14/10 14/15
applies [2] 10/22 21/20
apply [6] 10/2 10/19 30/5 30/8 30/12 56/23
appreciate [1] 43/19
approach [1] 13/15
appropriate [14] 11/15 11/20 30/8 39/4 40/2 41/10 52/11 53/2 53/10 53/12 54/5 55/25 56/1 59/25
appropriately [3] 11/22 12/9 14/6
arguing [1] 63/24
argument [2] 33/6 60/20
arises [1] 11/4
around [4] 12/12 15/8 15/19 21/9
aside [1] 24/3
aspersions [1] 65/9
assert [1] 28/2
assertion [1] 63/13
assessment [1] 58/10
assisting [1] 53/12
associate [5] 34/11 45/22 45/23 46/16 46/16
associate's [1] 45/24
associated [2] 30/18 60/25
associates [4] 18/7 30/6 38/4 39/24
associates' [2] 30/18 46/3
assume [2] 6/4 23/16
assurance [3] 10/23 11/21 12/21
assurances [3] 5/13 5/24 30/20
attorney [28] 5/20 11/5 13/3 13/9 15/21 16/4 16/7 16/10 16/19 16/21 16/24 17/9 17/21 37/21 38/10 38/14 38/18 38/20 39/19 43/12 52/15 53/19 53/19 53/21 53/22 57/3 58/3 60/24
attorney's [3] 51/24 52/10 54/16
attorney-client [24] 11/5 13/3 13/9 15/21 16/4 16/7 16/10 16/19 16/21 16/24 17/9 17/21 37/21 38/10 38/14 38/18 38/20 39/19 43/12 52/15 53/19 53/22 57/3 60/24
attorneys [3] 20/3 20/3 57/21
authored [2] 45/1

**A**

authored... [1]
46/23
authority [1]   35/5
authorized [1]   7/25
available [2]   10/17
23/25
Avenue [1]   1/24
avoid [1]   44/3
aware [4]   8/9 25/1
46/16 46/24
awful [1]   63/8

**B**

back [11]   13/14
25/19 26/15 28/18
31/7 31/12 49/12
49/22 52/21 55/15
59/6
background [3]   23/4
23/5 24/23
bad [3]   37/5 62/24
64/1
baffled [1]   27/17
bag [1]   41/8
BAILEY [30]   1/15
2/5 9/2 9/10 18/9
23/6 25/10 27/13
27/16 27/21 28/11
40/5 44/15 44/17
48/20 49/13 49/25
51/1 55/18 56/3
59/10 60/23 61/11
61/13 62/4 62/5
62/10 63/20 65/14
66/18
Bank [1]   1/16
Bankruptcy [1]   1/23
bar [2]   17/6 61/2
bare [1]   54/6
based [6]   16/16
41/14 52/19 53/1
57/6 60/20
basic [1]   56/24
basically [5]   14/5
14/9 22/25 38/24
44/9
basis [2]   8/6 49/4
becoming [1]   66/23
beforehand [1]
51/13
beginning [1]   34/3
begins [2]   34/6
34/7
behalf [5]   2/21
7/19 35/18 57/19
57/22
belonging [1]   43/13
below [1]   6/13
benefits [1]   37/15
bespoke [1]   3/18
better [3]   39/19
42/12 50/20
beyond [6]   8/5
12/20 24/12 55/23
58/10 61/23
big [6]   3/8 16/24
20/21 21/7 21/9
48/18

bit [5]   10/7 27/17
47/7 53/16 62/19
blanch [1]   47/20
blatant [1]   58/18
bogged [1]   51/11
both [6]   2/3 22/20
39/11 39/21 55/22
57/17
bottom [1]   35/9
bound [1]   11/1
brave [1]   63/7
breach [1]   35/17
breaches [1]   6/10
brief [6]   21/13
21/20 25/12 25/15
25/23 26/20
briefing [1]   65/25
66/2 66/3
briefs [1]   66/4
bring [1]   32/25
bringing [1]   63/6
broad [4]   10/18
21/17 38/23 41/19
broader [3]   32/19
38/22 59/14
broadly [3]   9/13
23/21 45/4
Brogan [2]   54/11
62/24
bulk [1]   16/2
bunch [1]   34/17
burden [7]   18/11
19/13 21/23 21/25
27/12 35/6 52/2
business [9]   3/17
3/20 5/10 8/9 8/17
20/23 24/21 25/5
25/8

**C**

call [8]   36/15
42/20 43/1 43/2
43/18 48/15 48/16
50/6
called [1]   32/11
calls [1]   31/5
came [2]   12/16
19/18
camera [2]   54/2
55/16
can [63]   7/18 11/16
12/5 13/18 14/10
14/11 14/11 15/6
15/23 17/15 18/21
22/9 23/1 23/17
23/19 23/22 25/16
25/19 25/24 25/25
26/6 26/10 26/14
27/15 27/25 28/2
28/6 31/7 31/17
31/22 32/25 33/2
33/16 33/17 35/7
36/18 39/9 40/20
41/7 43/18 44/24
47/6 47/17 48/9
48/22 48/23 49/1
49/5 49/5 51/5
51/15 51/18 56/5
58/15 58/21 62/2
62/3 62/17 63/2

63/4 65/24 65/25
66/2
care [5]   6/13 22/8
22/10 22/13 24/10
career [1]   60/13
careers [1]   52/17
carried [1]   7/18
carriers [1]   30/16
carry [2]   63/12
63/13
cart [1]   62/19
carte [1]   47/20
case [43]   4/6 4/17
4/20 5/2 5/7 10/5
11/19 12/25 13/7
13/25 14/14 15/1
15/20 16/25 17/18
17/24 18/14 19/16
20/3 21/1 21/5
21/25 27/6 27/13
33/3 33/5 33/21
33/22 34/18 35/16
42/25 48/11 48/18
53/12 54/11 54/12
54/24 55/7 57/22
58/11 61/10 63/3
63/9
cases [3]   15/6 15/7
56/23
casting [1]   65/8
cat [1]   41/8
catastrophic [1]
5/17
categories [5]
10/18 29/2 38/22
47/6 64/8
category [9]   26/18
27/18 29/11 29/12
44/18 45/6 45/12
51/1 64/14
cause [9]   4/1 6/22
20/10 21/23 27/12
33/18 35/3 44/16
51/25
causes [1]   43/17
Center [2]   1/16
10/3
certain [5]   10/25
41/14 44/8 47/18
54/4
certainly [16]   9/20
10/16 11/13 13/12
18/23 19/16 24/14
36/3 37/21 38/15
46/22 48/12 49/6
58/17 58/25 59/21
certification [5]
3/24 12/6 12/22
22/4 22/4
certify [1]   68/4
cetera [1]   14/12
challenged [1]   54/8
challenges [1]   34/3
chance [2]   42/6
62/6
change [1]   62/16
changed [1]   60/14
changing [1]   14/14
characterization [1]
61/10

CHASE [19]   1/18 2/5
9/2 30/14 31/5 40/8
55/18 55/22 56/6
56/16 56/18 59/7
59/21 62/3 62/5
63/18 64/18 66/19
66/21
Chicago [1]   8/15
child [2]   10/4
30/19
children [2]   10/3
18/4
circle [1]   25/19
Circuit [3]   33/3
33/21 33/22
Circuit's [1]   52/8
circumstances [7]
21/4 47/12 51/6
53/8 53/14 54/4
54/5
citation [1]   33/24
cite [2]   34/1 34/5
cities [1]   8/14
civil [2]   1/3 2/2
claim [5]   16/12
16/13 17/8 64/9
64/15
claims [2]   18/14
63/23
clarify [1]   49/13
class [1]   59/16
CLE [1]   53/21
clear [18]   2/14
6/16 6/19 6/22 8/21
13/22 22/3 33/7
35/2 38/11 40/6
52/6 56/23 58/17
59/14 59/18 64/20
65/7
clearly [2]   23/4
33/4
client [32]   5/18
11/5 11/11 13/3
13/9 15/21 16/4
16/7 16/10 16/19
16/21 16/24 17/9
17/21 20/10 25/14
34/17 37/3 37/7
37/19 37/21 38/10
38/14 38/18 38/20
39/19 43/12 52/15
53/19 53/22 57/3
60/24
client's [1]   37/6
clients [4]   5/13
5/13 15/23 25/18
cloud [2]   3/9 13/10
Co [1]   34/7
COLUMBIA [4]   1/1
52/9 54/16 62/18
Combes [1]   1/13
coming [1]   66/22
communication [3]
3/15 7/13 7/17
communications [21]
5/12 6/21 6/24 7/1
7/6 7/11 7/21 8/1
9/4 9/7 13/9 15/22
16/20 20/21 21/3
21/13 36/2 36/3

**C**

communications... [3]
  37/9 37/19 38/9
comp [5]   29/5 32/6
  32/8 45/19 45/24
companies [1]   3/14
company [9]   3/20
  6/12 7/14 8/20 8/21
  8/22 9/6 11/11
  22/18
company's [1]   22/16
compelled [1]   27/2
compensation [8]
  24/16 38/4 44/21
  45/9 46/3 46/8
  46/14 58/24
complete [1]   4/9
completely [2]   39/5
  64/20
complicated [1]
  24/20
complied [1]   63/20
computer [5]   3/10
  7/20 7/24 8/2 18/21
computing [2]   3/9
  7/16
concept [2]   13/13
  56/11
concern [10]   24/14
  26/17 30/1 39/2
  43/8 43/17 43/21
  50/3 54/20 65/2
concerned [6]   15/21
  26/2 29/23 40/7
  58/18 63/11
concerning [1]   28/7
concerns [2]   42/15
  46/7
conclusory [1]
  63/13
concrete [2]   31/9
  56/25
conditions [1]
  10/19
conduct [2]   19/5
  49/7
conducting [1]   37/6
confer [6]   25/18
  28/4 31/6 42/1 42/7
  45/2
CONFERENCE [1]   1/9
confers [1]   41/6
confidence [2]
  22/22 53/19
confidential [26]
  8/7 8/9 20/24 22/20
  22/21 22/23 24/14
  25/2 27/3 30/21
  31/2 31/14 32/5
  32/9 32/11 36/9
  37/3 37/7 37/18
  38/24 39/8 39/24
  44/20 46/1 46/9
  47/5
confidentiality [8]
  8/10 8/17 30/24
  39/1 40/21 44/19
  45/13 47/13
confirm [1]   25/20

confused [1]   56/17
confused as [1]
  56/17
confusion [1]   31/16
consent [2]   9/17
  9/19
consider [1]   19/19
considered [2]   18/6
  45/25
consistent [1]   39/4
Constitution [1]
  1/24
consult [2]   57/4
  57/5
consultants [3]
  23/13 23/18 24/1
contain [3]   13/3
  29/14 38/10
contained [1]   9/4
contains [2]   9/11
  47/4
contending [1]
  58/12
contents [3]   7/13
  7/17 7/25
contest [1]   17/2
contested [1]   57/9
contesting [1]
  58/13
context [6]   42/5
  50/4 54/3 55/3
  61/15 65/16
contractors [1]
  10/20
contracts [1]   3/18
contractual [1]
  23/7
contrast [1]   8/11
conversation [2]
  42/25 62/25
conversations [1]
  51/15
convince [1]   61/8
convinced [1]   32/18
cooperation [1]
  51/20
copy [2]   56/6 62/3
corporate [1]   54/21
corporations [1]
  3/23
correcting [1]
  27/22
counsel [6]   2/18
  44/20 49/16 57/5
  64/7 64/16
couple [4]   6/8
  12/15 21/12 58/6
course [9]   19/10
  27/1 38/11 39/15
  42/23 44/12 50/23
  51/8 51/11
courses [1]   53/21
court [31]   1/1 1/23
  11/25 25/15 28/7
  34/4 35/5 39/9
  39/13 40/24 40/25
  42/8 49/17 49/18
  50/7 52/6 55/20
  55/1 55/10 55/20
  55/24 56/5 56/6

56/12 59/3 61/9
  61/24 62/3 64/25
  68/3 68/9
Court's [9]   11/2
  11/18 11/21 12/9
  12/14 20/25 40/23
  41/9 56/8
courts [4]   1/23
  28/22 52/4 57/14
covered [3]   31/22
  56/19 59/16
COVID [1]   68/8
COVID-19 [1]   68/8
crafted [1]   60/5
create [2]   12/20
  23/23
created [2]   7/20
  34/11
creating [1]   64/6
credence [1]   64/14
criminal [1]   9/5
current [7]   30/17
  36/4 53/4 53/4
  53/18 54/9 60/8
customer [3]   7/22
  7/24 9/17
customers [1]   3/19
cut [1]   56/23
cv [1]   1/4

**D**

D.C [4]   33/3 33/21
  33/22 52/8
damage [1]   20/10
danger [1]   10/1
data [17]   8/9 8/18
  8/20 8/24 10/16
  10/24 11/11 11/14
  11/19 13/23 14/2
  16/5 24/22 52/20
  53/1 53/3 53/8
DATE [1]   68/14
day [103]
Day's [7]   3/24 5/12
  16/1 27/11 49/16
  49/21 64/21
days [2]   15/16
  41/22
DC [2]   1/5 1/25
deal [4]   11/5 11/6
  43/5 65/4
dealing [2]   30/24
  54/20
deals [1]   37/20
death [1]   10/1
debate [1]   58/15
decide [1]   50/19
decisions [1]   58/24
deem [2]   41/10 48/6
default [4]   47/8
  47/9 47/10 47/19
defendant [3]   54/11
  54/21 54/22
defendants [15]   1/7
  1/15 2/5 19/19 20/7
  35/16 41/24 44/23
  45/10 57/5 57/8
  57/17 64/3 64/7
  66/7
defendants' [1]

57/22
defending [3]   48/3
  48/20 49/20
defense [1]   57/20
defenses [1]   18/14
defined [2]   22/21
  23/2
definitely [1]
  38/16
degree [2]   31/16
  47/25
demanding [1]   20/15
deny [1]   57/14
depends [2]   53/7
  53/14
deponent [2]   44/11
  48/6
deponents [3]   44/11
  45/7 46/3
deposing [1]   48/11
deposition [24]
  44/14 44/23 44/24
  45/16 45/22 48/1
  48/2 48/4 48/9
  48/17 48/19 48/20
  49/3 49/7 49/17
  49/20 50/5 50/8
  50/22 50/23 51/3
  51/9 51/12 51/14
depositions [1]
  51/2
describe [1]   46/20
described [1]   31/17
designate [14]   26/5
  26/6 27/2 27/8
  27/24 28/19 29/8
  29/9 29/16 30/21
  31/13 31/22 39/9
  41/14
designated [2]
  49/15 50/15
designating [1]
  39/8
designation [3]
  27/3 39/2 54/7
destroy [1]   8/17
details [1]   11/16
difference [2]
  20/23 63/10
different [4]   39/7
  40/4 45/23 50/12
difficult [3]   4/8
  14/21 15/15
direct [3]   31/13
  62/2 67/5
directive [1]   63/19
directly [2]   47/25
  52/15
director [1]   51/18
disability [1]
  30/19
disadvantage [1]
  20/1
disagreeing [1]
  54/4
disagreement [2]
  40/11 50/5
disavowed [1]   61/13
disavowing [1]
  60/15

**D**

disclaimers [1]
24/4
disclose [13]   6/1
9/13 20/24 21/4
22/7 23/1 23/8
32/20 45/3 55/23
56/7 62/5 63/21
disclosed [7]   11/19
17/17 24/11 31/9
46/12 53/9 53/18
disclosing [10]
6/18 6/25 7/3 9/7
12/8 13/16 37/10
37/10 38/12 57/20
disclosure [7]
10/20 11/12 11/24
22/23 37/24 45/10
52/12
disclosures [5]   6/9
6/16 17/16 22/9
22/15
disconnect [1]   11/3
discovery [31]   2/7
3/4 3/6 4/6 4/9
4/11 12/19 13/16
13/24 13/25 14/6
14/18 14/22 15/5
15/20 19/6 27/11
39/16 41/12 41/15
41/17 42/13 42/14
43/6 43/16 46/2
46/18 51/24 52/20
53/1 65/24
discrimination [1]
63/23
discussing [2]
31/19 62/12
discussion [4]
13/14 38/6 49/5
62/7
disparate [1]   16/13
displayed [1]   50/17
dispute [9]   2/7
2/16 2/19 6/11
21/17 40/17 45/6
55/12 61/11
dissimilar [1]   50/2
district [10]   1/1
1/1 1/10 1/23 34/4
52/9 54/15 57/14
58/2 62/18
divulge [2]   7/12
7/16
docket [4]   31/25
38/13 42/19 42/23
document [43]   18/24
18/25 27/2 27/3
27/5 28/2 28/7 28/9
28/19 39/23 40/15
40/17 40/22 41/7
41/18 44/12 44/25
45/3 45/5 46/22
46/23 46/23 46/25
47/1 47/3 47/4
47/16 47/18 47/21
47/22 48/7 48/8
48/20 48/21 49/3
50/6 50/10 51/3

51/17 62/23 63/3
63/5 63/9
documents [73]
Doe [4]   52/9 54/15
57/25 62/18
dollars [1]   46/17
done [8]   8/25 12/5
15/5 17/15 18/8
22/2 26/13 46/12
doubt [1]   28/14
down [2]   51/11
64/11
downloading [1]
3/10
draft [1]   30/9
dramatically [1]
60/13
drawn [4]   32/21
52/13 57/1 57/24
Dropbox [2]   3/16
3/25
duplicative [1]   8/4
during [4]   19/15
32/8 49/3 68/7
duties [1]   37/12

**E**

e-discovery [1]
13/25
e-mail [17]   12/17
12/24 12/24 14/8
14/9 18/12 19/14
34/16 37/2 56/5
58/14 58/16 58/16
60/23 62/3 66/11
66/22
e-mails [12]   4/21
4/22 5/1 5/18 17/11
17/19 18/22 34/10
34/10 35/13 35/25
40/2
earlier [3]   18/6
23/1 60/11
ease [1]   15/12
easier [3]   43/5
64/25 65/12
easiest [3]   5/4 5/6
5/7
easy [2]   51/19 63/1
effective [1]   59/20
efficiency's [1]
50/20
either [7]   9/25
10/21 12/2 19/14
28/2 50/6 54/24
electronic [6]   7/11
7/14 7/19 7/21 9/7
15/6
elements [2]   56/14
56/24
else [7]   11/24
57/12 59/11 60/14
63/21 67/8 67/8
embarrassing [4]
31/20 36/15 42/18
43/11
emergency [1]   10/1
employee [2]   53/4
53/4
employee's [1]   60/8

employees [4]   24/16
29/14 36/4 54/9
employer [1]   63/25
employment [2]   8/15
63/22
end [2]   13/5 65/20
enforce [1]   11/2
enforcement [1]
11/25
engaged [1]   9/6
enormous [3]   20/1
20/16 21/25
enough [6]   20/18
24/23 53/23 58/2
62/21 64/18
enter [4]   28/23
35/5 52/5 52/6
entered [2]   20/4
57/21
entire [2]   12/7
13/17
entirely [1]   8/4
entities [1]   8/13
entitled [2]   54/13
68/5
entity [6]   7/10
7/11 7/13 7/15 7/17
9/25
err [1]   38/16
ESI [1]   14/3
especially [2]   18/7
21/24
essentially [1]
63/24
et [5]   1/3 1/6 2/3
2/3 14/12
ethical [3]   15/22
37/12 38/11
evaluation [1]
16/16
evaluations [3]
17/5 17/9 44/9
even [14]   10/10
14/20 18/6 27/10
28/23 32/4 38/3
47/6 53/20 54/20
56/12 57/5 57/15
65/2
event [3]   11/23
40/11 64/23
everybody [2]   2/8
2/10
evidence [3]   54/13
57/12 64/1
ex [2]   55/18 55/20
exact [1]   12/17
exactly [4]   30/1
36/13 36/17 59/15
example [14]   4/21
4/24 14/7 14/8 17/6
30/16 32/3 35/20
36/18 36/20 51/19
53/3 53/17 62/23
except [3]   31/24
31/25 39/18
exception [2]   21/20
34/13
exceptions [6]   9/11
9/15 9/16 9/17
20/20 21/18

excessive [1]   4/18
exchanged [3]   19/7
34/11 40/3
excluding [1]   43/10
exhibit [2]   40/18
49/18
existed [1]   15/7
expand [2]   44/7
47/17
expect [3]   35/20
48/4 49/8
expedite [2]   50/21
51/13
expensive [2]   3/7
3/22
experience [1]   51/2
experts [1]   44/20
explain [2]   10/13
25/24
Exploited [1]   10/3
expressly [1]   22/24
extent [8]   12/2
36/2 36/4 38/13
39/11 45/3 59/3
59/21
extraordinary [1]
56/20
extreme [1]   57/2
extremely [4]   6/12
6/18 20/5 38/23
eyes [4]   51/24
52/10 54/16 58/3

**F**

F.2d [3]   33/23
33/25 52/9
face [2]   18/22
18/25
faced [1]   13/2
facilitating [1]
51/20
fact [2]   51/4 64/12
factor [6]   52/8
55/14 59/5 60/1
60/3 60/9
facts [1]   22/1
failed [1]   8/10
failure [1]   8/16
fair [7]   20/14
28/15 53/23 61/5
61/10 62/21 64/18
fairly [1]   10/18
fall [3]   27/18
50/25 59/16
falls [1]   10/17
family [1]   35/14
far [3]   9/10 16/24
18/21
fashion [2]   5/8
32/14
federal [3]   6/17
8/4 8/4
feel [1]   41/24
feels [1]   12/2
few [1]   55/10
field [1]   14/22
fighting [1]   34/20
figure [3]   26/14
34/19 64/25
file [5]   14/17

## F

file... [4]  40/17
41/7 43/3 45/21
filed [1]  40/22
files [10]  23/3
24/16 30/7 30/18
42/16 42/17 44/9
44/22 45/18 51/18
filing [7]  28/8
31/25 32/1 42/3
42/8 42/19 42/22
filings [2]  40/24
43/10
find [5]  4/7 29/9
36/14 63/22 64/10
finding [1]  16/8
fine [3]  32/18
65/18 66/13
fire [1]  62/24
fired [4]  16/25
55/7 58/13 58/14
firm [21]  3/23 5/17
5/20 20/2 20/12
20/18 29/14 29/21
30/7 43/14 53/9
53/10 53/13 60/25
61/1 61/3 62/25
64/1 64/2 65/5 65/9
firm's [1]  57/20
firms [5]  3/8 8/15
8/16 15/16 19/25
first [15]  19/23
21/12 25/24 27/14
29/3 32/20 34/22
35/9 39/5 39/6
41/16 45/23 47/25
58/7 61/24
five [1]  57/21
flag [4]  32/24
40/15 41/3 41/25
focused [1]  36/1
For the Defendants [1]
1/15
forced [1]  4/7
foregoing [1]  68/4
format [5]  14/8
14/14 14/15 18/15
18/18
former [7]  30/6
30/6 30/17 36/3
53/4 54/9 60/8
former employee [1]
53/4
forth [2]  3/25
22/24
forward [1]  33/19
forwarded [1]  34/14
four [1]  29/14
frankly [7]  12/6
13/13 18/10 41/8
50/2 56/11 56/21
front [2]  49/21
50/17
full [2]  12/17 17/9
fully [1]  63/20
further [8]  56/7
62/5 62/7 62/11
62/12 66/2 66/15
66/19

## G

gag [5]  27/9 39/3
39/14 40/10 42/7
garden [1]  26/10
gave [2]  16/15
35/22
general [1]  61/13
generally [2]  45/25
48/5
generically [1]
51/16
genuinely [1]  57/9
given [5]  2/19 4/18
13/7 13/13 19/2
45/13
Gmail [1]  3/25
goes [3]  9/10 17/23
42/2
good [7]  4/1 21/23
27/12 33/18 35/3
44/15 66/6
Google [1]  3/16
government [2]  6/25
9/25
Grant [1]  1/17
grave [1]  46/10
great [5]  11/4 11/6
20/21 24/13 66/10
greatest [1]  22/12
grip [1]  20/18
group [3]  15/24
49/15 50/15
guess [10]  16/8
17/3 26/24 29/23
36/12 38/24 43/15
53/4 53/13 54/19

## H

hacking [1]  6/9
hampered [1]  57/6
hand [4]  12/12 26/9
53/11 63/5
handful [3]  13/8
16/17 26/4
hands [1]  43/9
hang [1]  19/1
happen [3]  11/24
58/12 60/14
happened [4]  55/7
55/13 61/9 63/4
happening [1]  40/20
happens [1]  44/2
happy [8]  13/12
19/12 21/13 21/19
27/15 31/13 62/10
66/3
hard [7]  3/19 15/8
16/8 17/7 26/8
39/20 65/3
harm [7]  52/11
52/16 52/17 56/25
58/9 58/12 58/20
harmful [1]  4/2
harms [1]  59/2
harsh [1]  16/16
have that [1]  28/25
have to [1]  48/15
head [2]  15/8 15/19
health [7]  11/7

29/5 31/11 34/14
40/8 45/9 45/19
hear [5]  9/2 27/15
55/10 62/10 63/18
heard [1]  60/20
hearing [2]  2/20
68/7
heavily [1]  57/8
held [1]  58/2
help [1]  62/22
helpful [4]  53/25
54/25 61/24 63/15
here's [3]  29/18
48/16 50/14
Hi [2]  16/23 26/24
high [5]  17/6 22/13
54/12 54/14 64/22
highly [6]  26/7
33/10 42/18 44/19
45/23 63/22
HIPAA [2]  24/18
24/20
hired [1]  60/13
hold [2]  7/7 22/20
holding [2]  24/22
61/6
honest [1]  17/13
Honor [30]  6/10
13/1 13/19 18/9
20/13 25/17 25/20
28/16 29/2 30/2
30/14 32/17 35/7
40/5 43/19 45/25
46/21 51/23 53/15
54/14 56/22 58/4
59/13 62/8 62/15
63/18 65/14 66/17
66/20 67/4
HONORABLE [1]  1/9
HOOK [3]  1/22 68/3
68/14
hopeful [1]  65/23
hopes [1]  51/20
horrible [1]  36/22
horse [1]  62/19
hours [2]  4/5 43/2
HR [1]  51/18
huge [1]  39/3
hundred [1]  4/5
hundreds [2]  4/14
4/17
hypothetical [3]
52/18 55/4 58/1

## I

idea [3]  57/7 58/1
64/14
ideal [1]  50/9
identified [2]
44/25 45/11
IL [1]  1/14
illegal [1]  21/3
illegally [2]  16/25
55/8
image [2]  14/15
14/17
imagine [1]  51/5
impair [1]  60/7
impasse [1]  19/18
implemented [1]

6/14
implications [1]
17/21
important [1]  45/14
impose [2]  27/9
39/13
improbable [2]  10/2
10/5
improperly [1]
16/16
inability [1]  2/19
inadvertent [3]  6/9
11/24 22/8
inadvertently [1]
5/16
inappropriately [1]
12/3
inboxes [2]  13/17
18/11
incentive [1]  8/18
incentives [2]  8/24
22/12
Incident [1]  9/21
inclination [1]
43/15
include [1]  38/23
includes [2]  14/9
36/6
including [3]  11/7
14/24 56/24
incompetent [1]
36/21
inconsistent [1]
12/3
indeed [1]  44/2
indemnify [3]  20/9
20/12 20/15
indemnifying [1]
21/6
indicates [1]  9/5
indicating [1]
53/18
individual [5]  3/18
29/21 43/13 54/21
57/17
individuals [4]
3/22 56/19 59/16
63/11
industry [1]  8/23
influence [1]  58/25
inform [1]  58/10
information [118]
information's [1]
21/11
injury [1]  10/2
insofar [1]  6/8
installed [1]  3/13
instance [1]  8/25
instances [2]  47/3
47/18
instead [4]  3/10
12/23 37/2 43/11
insurance [2]  30/16
34/14
insurer [1]  30/25
insurers [1]  31/11
intend [1]  48/17
intends [1]  17/2
intentional [1]
22/15

**I**

intentionally [1]
22/6
interest [1]   52/14
interests [1]   20/23
internet [1]   3/14
interrupt [3]   15/18
48/13 53/15
into [8]   2/12 3/20
4/4 10/12 10/13
27/18 37/6 50/25
introduce [1]   2/13
intrudes [1]   52/15
intrusion [1]   57/3
intrusive [1]   45/23
investigated [1]
6/5
investigation [1]
37/7
invoking [1]   41/2
involve [3]   13/8
16/3 16/6
involved [2]   18/11
21/7
involves [1]   37/8
involving [3]   5/12
10/1 64/9
is again [1]   46/5
issue [40]   4/3
16/21 19/17 25/12
26/20 26/21 26/22
26/25 27/23 28/5
28/9 28/9 29/19
29/20 29/23 29/24
31/6 31/9 40/15
41/4 41/5 42/4
42/11 42/12 42/24
43/5 44/5 44/6
45/14 51/22 51/23
56/8 59/12 62/22
63/17 65/4 65/23
66/1 66/2 66/5
issues [7]   2/23
13/2 13/7 16/24
26/15 44/4 46/11
it to [1]   49/19
items [1]   41/14

**J**

JEFF [3]   1/22 68/3
68/14
jerk [2]   32/11 40/4
job [1]   37/5
jobs [1]   15/14
join [1]   35/22
joint [3]   26/14
65/22 66/24
JONES [109]
judge [9]   1/10 9/9
16/23 26/24 31/15
43/1 43/3 53/25
63/14
judgment [2]   18/1
55/10
JULIA [4]   1/13 2/22
13/19 35/16
jump [2]   34/1 34/5
June [1]   1/5
jurisdiction [7]

11/2 11/18 11/25
12/10 12/14 21/1
29/7
jury [1]   49/19

**K**

keep [6]   7/18 8/18
8/20 8/24 17/16
46/9
keeps [1]   46/8
kind [14]   11/23
13/14 15/1 18/20
24/22 32/3 39/1
40/6 40/12 41/9
45/8 46/20 58/12
64/10
kinds [5]   6/15
28/23 44/22 52/5
57/15
know was [1]   4/25
knowing [3]   44/13
48/5 60/22
knowingly [2]   7/12
7/16
known [1]   51/25
knows [2]   8/16
45/25

**L**

laid [1]   41/17
language [11]   23/11
28/8 28/21 40/19
41/18 50/12 56/10
56/15 57/16 59/15
62/17
large [7]   3/21 18/7
21/21 47/25 50/25
51/7 51/10
largely [2]   15/14
39/2
last [1]   51/23
law [21]   3/23 5/17
5/20 6/17 6/20 8/4
8/5 8/16 15/16
19/25 20/2 29/14
29/21 30/7 43/14
52/6 53/9 53/10
58/17 58/18 60/25
lawful [2]   9/17
9/25
lawsuit [1]   63/6
lawyer [4]   37/12
49/19 49/21 50/17
lawyers [1]   39/21
leadership [7]
51/25 57/19 58/22
64/7 64/17 64/21
65/9
leak [1]   20/9
leaked [1]   25/2
learn [1]   4/7
learning [1]   4/4
least [3]   14/3
49/14 49/15
leave [9]   16/1
30/18 30/19 31/3
34/16 35/14 45/21
50/19 51/18
leaving [1]   38/1
legal [2]   8/23

58/15
legitimate [1]
46/13
less [3]   38/17
52/15 60/10
lets [1]   41/8
letter [1]   35/22
letters [1]   35/21
level [1]   47/13
liability [1]   24/4
lightly [1]   52/5
likely [1]   60/7
limit [4]   45/15
47/14 61/14 61/15
limit those [1]
61/14
limitations [2]
24/4 68/9
limited [3]   3/22
38/19 47/20
line [3]   17/13
32/21 45/15
linear [1]   19/13
link [1]   47/3
linked [1]   47/2
list [3]   38/2 38/4
48/16
litigants [2]   15/9
15/11
litigate [5]   4/6
13/25 21/25 63/2
63/22
litigated [1]   15/6
litigating [2]   20/2
27/5
litigation [2]
39/15 41/2
little [8]   10/7
15/8 27/16 45/15
51/20 53/16 56/16
62/19
lives [1]   20/6
load [1]   14/17
loaded [1]   5/14
Logikcull [27]   3/5
3/5 3/9 3/25 4/4
5/14 6/4 6/11 6/17
8/6 8/7 8/13 8/16
9/6 9/13 10/15
10/18 10/22 22/10
23/11 23/22 24/6
24/12 24/18 24/23
24/24 25/2
Logikcull's [3]
3/12 3/17 8/9
logistical [1]
66/11
long [3]   25/4 39/20
50/10
look [16]   6/3 7/8
10/11 15/20 19/12
19/16 34/5 43/3
43/16 49/17 56/12
58/7 59/4 61/25
64/13 65/1
looking [6]   17/4
17/5 23/9 33/3 37/6
57/15
lot [5]   13/13 18/22
24/9 46/15 56/10

lots [4]   14/7 14/7
17/20 20/19
low [2]   17/17 25/11

**M**

mail [17]   12/17
12/24 12/24 14/8
14/9 18/12 19/14
34/16 37/2 56/5
58/14 58/16 58/16
60/23 62/3 66/11
66/22
mails [12]   4/21
4/22 5/1 5/18 17/11
17/19 18/22 34/10
34/10 35/13 35/25
40/2
maintain [3]   5/15
6/5 8/16
maintained [1]   7/18
maintenance [2]   6/2
24/10
major [1]   8/24
majority [2]   18/13
38/25
makes [4]   25/23
38/8 54/6 63/10
making [1]   58/24
management [1]   65/5
manner [2]   14/4
41/1
many [10]   4/11 4/23
4/23 13/6 14/23
15/2 15/6 17/12
54/5 59/15
MARK [11]   1/3 1/12
2/2 2/2 2/23 16/23
26/22 31/15 36/12
37/14 55/8 58/13
material [3]   5/14
25/2 55/17
materially [1]   60/7
materials [22]   6/6
9/8 10/5 15/25 16/2
16/10 18/2 27/19
29/22 30/4 30/4
41/1 44/8 54/1 54/2
55/1 56/4 58/8 59/4
62/2 62/7 65/10
matter [13]   5/19
8/6 18/10 19/17
37/3 37/4 37/4 37/5
40/4 47/21 58/15
65/11 68/6
matters [1]   40/24
may [43]   5/3 5/3
11/24 13/1 13/13
16/1 16/2 16/5 16/6
21/2 21/6 24/2 26/4
26/13 26/17 29/4
29/4 29/5 29/8 29/8
31/8 32/2 32/13
39/17 42/10 43/4
43/8 44/4 47/16
52/19 54/23 58/4
60/25 61/2 61/8
62/9 62/22 64/8
65/1 65/12 65/15
65/16 66/4
maybe [11]   9/16

**M**

maybe... **[10]**    10/12
  12/23  16/11  26/5
  31/10  42/12  48/18
  62/1  65/20  65/22
mean **[30]**    4/15  5/9
  6/4  9/15  13/5  15/13
  18/10  20/22  23/2
  25/10  25/22  29/22
  33/11  33/15  34/2
  34/5  34/16  36/24
  38/22  39/7  43/7
  46/8  46/14  46/17
  47/7  48/17  51/17
  60/20  61/12  65/15
means **[13]**    3/9  7/19
  7/20  7/21  11/25
  23/16  23/21  36/13
  39/22  52/14  60/9
  65/8  65/11
meant **[1]**    54/19
measure **[1]**    54/8
medical **[17]**    11/7
  24/16  30/18  30/25
  30/25  42/16  42/17
  43/4  43/12  44/10
  44/21  45/9  45/19
  45/21  45/24  46/7
  46/11
meet **[11]**    8/10  28/4
  41/6  42/1  42/6  45/2
  54/24  56/13  56/24
  57/24  62/17
meets **[1]**    33/17
Mellon **[1]**    1/16
mentions **[1]**    32/15
merely **[1]**    61/7
message **[2]**    32/4
  32/10
messages **[2]**    31/19
  36/21
met **[3]**    24/25  52/7
  55/2
metadata **[4]**    14/16
  14/16  18/21  18/24
microphone **[1]**    2/12
microphones **[1]**
  2/11
Microsoft **[2]**    3/16
  14/10
might **[14]**    27/13
  34/14  36/7  36/10
  41/10  44/14  49/19
  53/25  54/3  54/4
  54/25  57/11  61/3
  64/11
million **[1]**    17/19
millions **[1]**    4/22
mind **[2]**    21/9  31/10
minimal **[1]**    36/11
minimum **[1]**    54/6
minor **[1]**    49/24
Missing **[1]**    10/3
mistreatment **[1]**
  37/18
moment **[2]**    40/9
  50/7
Monday **[3]**    67/2
  67/4  67/6

money **[1]**    3/19
months **[1]**    55/11
more **[16]**    10/7
  13/15  19/12  30/15
  38/16  41/19  45/3
  46/6  47/7  51/16
  54/3  54/20  57/7
  57/13  57/25  64/5
moreover **[1]**    23/15
MOSS **[1]**    1/9
most **[4]**    15/21
  17/24  27/1  51/2
mostly **[1]**    5/4
motion **[5]**    40/18
  41/6  42/2  42/4
  55/10
move **[1]**    59/25
Mr. **[40]**    9/2  9/18
  23/6  25/10  26/9
  27/13  27/16  27/21
  28/11  34/9  35/10
  38/1  39/10  42/16
  42/20  43/23  44/15
  44/17  47/23  48/20
  49/13  49/14  49/25
  50/19  51/1  51/10
  54/11  55/18  56/3
  59/10  60/23  61/11
  61/13  62/4  62/5
  62/10  62/24  63/20
  66/16  66/18
Mr. Bailey **[24]**    9/2
  23/6  25/10  27/13
  27/16  27/21  28/11
  44/15  44/17  48/20
  49/13  49/25  51/1
  55/18  56/3  59/10
  60/23  61/11  61/13
  62/4  62/5  62/10
  63/20  66/18
Mr. Brogan **[2]**
  54/11  62/24
Mr. Savignac **[13]**
  9/18  26/9  34/9
  35/10  38/1  39/10
  42/20  43/23  47/23
  49/14  50/19  51/10
  66/16
Mr. Smith's **[1]**
  42/16
Ms. **[35]**    9/2  9/5
  9/11  9/18  19/20
  23/11  25/23  26/9
  26/21  30/14  31/5
  35/12  35/24  40/8
  42/20  50/19  51/9
  55/18  55/22  56/4
  56/6  56/16  56/18
  59/7  59/21  62/3
  62/5  63/18  64/18
  66/8  66/12  66/15
  66/19  66/21  67/1
Ms. Chase **[17]**    9/2
  30/14  31/5  40/8
  55/18  55/22  56/6
  56/16  56/18  59/7
  59/21  62/3  62/5
  63/18  64/18  66/19
  66/21
Ms. Sheketoff **[17]**

9/5  9/11  9/18  19/20
  23/11  25/23  26/9
  26/21  35/12  35/24
  42/20  50/19  51/9
  56/4  66/8  66/15
  67/1
Ms. Thompson **[1]**
  66/12
much **[9]**    13/15  19/1
  20/6  20/18  37/14
  38/22  46/6  62/9
  62/11
multiple **[1]**    14/2
mute **[1]**    2/11
myself **[1]**    35/18

**N**

name **[1]**    2/13
narrow **[2]**    42/11
  60/4
narrowly **[5]**    52/13
  57/1  57/24  60/5
  60/6
National **[1]**    10/3
native **[2]**    14/8
  14/14
nature **[5]**    24/12
  40/12  40/25  45/14
  47/22
necessarily **[1]**
  44/13
necessary **[3]**    30/13
  41/6  66/2
necessitate **[2]**
  50/6  50/7
need **[13]**    12/21
  12/23  13/10  14/23
  16/11  17/25  22/1
  32/22  47/15  56/22
  61/1  67/2  67/3
needs **[5]**    16/9
  19/15  56/12  59/19
  66/24
negotiate **[1]**    59/18
negotiating **[2]**
  12/7  14/4
network **[3]**    9/24
  23/18  23/19
new **[4]**    1/20  4/7
  8/15  19/3
next **[5]**    32/7  32/7
  44/5  44/6  51/21
nights **[2]**    15/13
  18/4
nobody **[1]**    2/10
non **[3]**    8/15  11/12
  42/11
non-disclosure **[1]**
  11/12
non-profits **[1]**
  8/15
noon **[1]**    67/6
normal **[1]**    3/16
note **[2]**    56/14  68/7
notwithstanding **[1]**
  23/11
number **[11]**    6/8
  9/11  12/17  12/18
  14/2  17/16  18/7
  21/14  35/19  56/21

56/23
numbers **[1]**    3/21
NW **[1]**    1/24
NY **[1]**    1/20

**O**

object **[3]**    24/7
  45/10  50/18
objected **[1]**    50/13
objecting **[1]**    49/4
objection **[6]**    28/23
  40/21  48/21  48/23
  56/3  56/9
objections **[1]**
  56/10
obligation **[3]**
  15/22  61/2  61/3
obligations **[2]**
  8/11  38/12
obtained **[1]**    39/14
obviously **[5]**    21/5
  22/12  37/10  54/7
  63/19
occasion **[1]**    25/1
occupying **[1]**    8/5
occurred **[1]**    68/7
occurs **[1]**    43/1
off **[4]**    2/20  12/12
  15/14  50/20
offer **[2]**    3/14
  35/22
offered **[1]**    55/11
office **[1]**    32/7
Official **[2]**    1/23
  68/3
often **[1]**    14/12
once **[5]**    58/21
  58/22  60/12  60/12
  65/16
one **[34]**    1/16  4/7
  5/25  6/8  6/10  6/13
  6/18  9/12  13/10
  14/2  14/24  15/24
  16/24  17/14  24/20
  24/23  25/20  26/5
  26/17  29/11  30/15
  32/3  38/20  39/7
  39/11  43/15  45/21
  45/21  47/5  54/10
  56/18  65/11  66/10
  66/21
only **[17]**    12/24
  14/20  15/2  28/7
  35/11  44/20  45/6
  46/19  47/2  49/13
  51/24  52/10  54/17
  55/19  58/3  60/7
  62/14
onto **[3]**    3/10  5/14
  59/5
opaque **[1]**    59/17
open **[3]**    18/21
  59/21  59/23
opinion **[2]**    34/2
  52/9
opinions **[2]**    37/1
  37/16
opportunity **[7]**
  24/7  25/18  43/9
  47/14  50/18  53/25

opportunit... [1]  Proceedings

**O**

opportunity... [1]
59/1
opposition [1]
40/19
order [62]  2/9 4/5
6/13 8/4 9/20 11/1
11/18 11/22 12/1
12/4 12/7 12/13
19/4 21/1 22/5 22/6
26/25 27/7 27/9
27/12 28/4 28/6
28/22 29/7 29/10
29/16 30/22 31/8
31/8 31/23 31/25
33/18 34/4 35/2
35/6 37/11 38/19
38/23 39/3 39/14
40/10 40/13 40/14
40/19 41/5 41/9
41/25 42/3 42/7
44/7 44/8 44/19
47/13 49/6 52/6
52/13 56/7 59/8
59/10 59/14 59/19
62/4
orderly [1]  40/20
orders [8]  3/18
27/1 28/13 28/14
28/18 28/20 28/23
52/5
organization [2]
64/8 64/17
others [1]  37/16
otherwise [6]  29/9
30/12 45/1 45/7
45/16 46/4
ought [6]  37/9
39/13 40/16 42/19
47/19 47/19
ought to [1]  47/19
out [33]  2/17 2/18
14/16 16/18 17/23
21/11 23/14 23/23
26/14 31/4 31/7
31/10 31/13 32/13
32/20 32/23 33/2
34/19 40/17 41/5
41/8 41/17 42/5
43/18 43/20 48/24
48/25 50/4 50/9
51/13 52/8 61/6
64/25
Outlook [1]  14/10
outside [1]  11/13
over [10]  3/6 11/25
12/10 20/11 28/23
29/13 39/8 39/9
42/11 60/13
overbroad [2]  57/2
57/23
overwhelming [1]
18/12
own [1]  57/13

**P**

p.m [2]  1/6 67/10
PA [1]  1/17
page [1]  34/6

pages [5]  4/11 4/15
17/23 17/25 26/6
paid [2]  37/14
46/16
pandemic [1]  68/8
paragraph [2]  34/6
34/6
parental [2]  16/1
34/16
part [2]  21/22
21/22
parte [2]  55/18
55/21
particular [14]
12/21 16/14 16/14
18/24 35/1 37/3
45/5 45/5 47/1 47/1
47/17 48/6 50/7
51/4
particularly [3]
25/14 26/18 27/19
parties [24]  2/7
2/16 7/4 11/8 14/12
17/19 22/7 22/20
26/12 26/20 28/5
29/20 31/13 40/8
40/12 42/6 52/1
58/19 58/20 59/20
60/10 65/17 65/22
65/25
parties' [1]  2/15
partner [9]  16/14
17/1 17/4 17/5 17/7
17/7 32/10 36/21
37/2
partners [3]  3/23
37/16 56/21
party [15]  12/13
22/23 27/1 28/3
28/3 28/6 28/8
28/19 29/3 30/20
30/21 41/16 42/3
51/5 54/12
party's [2]  27/4
29/6
pass [3]  48/19
49/16 49/19
path [1]  64/11
pause [4]  9/1 39/20
39/25 60/19
pay [2]  39/24 44/9
payroll [1]  16/5
PDF [2]  14/15 18/18
pending [2]  41/2
56/8
people [19]  3/16
8/22 17/4 17/6 20/1
23/18 24/22 32/6
37/1 40/3 45/6
45/16 48/11 48/12
58/25 59/1 59/16
59/23 64/1
people's [3]  37/1
37/15 52/17
perfect [1]  17/22
performance [1]
44/9
perhaps [1]  48/18
permissible [1]
49/7

permitted [2]  2/8
3/4
person [7]  7/10
7/11 7/13 7/15 7/17
49/23 53/6
personal [5]  20/15
38/23 42/16 42/17
43/4
personally [3]  20/8
20/12 46/24
personnel [4]  11/7
44/9 44/22 45/18
Petitioner [1]  34/3
phone [2]  2/4 43/2
physical [1]  10/1
pick [1]  42/19
picks [1]  17/23
piece [2]  33/17
47/11
PIF [1]  14/15
Pittsburgh [1]  1/17
place [2]  11/14
24/8
placed [1]  34/4
plaintiffs [30]  1/4
1/12 2/4 2/20 2/21
3/4 12/11 19/11
25/19 27/25 29/17
30/3 31/6 35/4 42/1
43/21 44/24 45/11
45/20 46/2 47/6
47/8 47/10 50/13
56/24 57/8 57/10
62/16 63/24 64/12
plaintiffs' [9]
4/21 12/16 17/24
18/11 18/17 24/24
29/13 40/14 43/8
plan [1]  34/14
platform [11]  3/5
4/7 10/23 13/24
14/2 14/6 14/19
14/23 15/6 18/20
65/24
play [4]  10/12
10/13 41/5 43/20
playing [2]  14/22
50/4
plays [3]  40/17
42/5 50/9
please [4]  2/11
2/12 58/5 68/7
point [15]  18/6
20/22 21/21 22/1
30/15 39/6 43/16
46/20 47/8 49/3
55/9 56/22 60/17
62/10 62/12
pointed [1]  9/11
points [2]  12/15
47/24
policies [1]  35/14
policy [2]  4/24
16/1
porn [1]  10/4
posed [2]  52/11
52/16
possession [7]
29/13 30/11 34/10
35/12 35/13 41/13

41/20
possibility [1]
61/6
possible [3]  30/17
36/16 60/6
possibly [3]  4/6
35/13 63/2
posted [1]  26/7
potential [1]  64/6
potentially [5]
11/6 36/14 39/3
40/7 54/8
power [1]  41/1
practical [1]  8/6
practice [2]  41/6
42/2
practicing [1]  8/8
precise [4]  52/13
57/2 57/24 60/4
preclude [3]  7/1
44/10 57/20
precludes [2]  6/25
9/6
precluding [1]  65/5
prefer [2]  17/17
44/3
preferred [1]  17/17
prefers [1]  14/13
prejudice [1]  4/8
prepared [1]  17/13
present [2]  27/13
31/3
preserve [1]  40/10
presumably [1]  9/23
pretty [7]  15/7
25/11 25/13 31/1
33/3 51/18 54/12
prevent [3]  28/8
40/19 44/8
previously [1]  14/4
principal [2]  16/12
16/13
print [1]  16/18
private [2]  34/15
62/25
privilege [13]  5/15
5/19 5/23 11/6
15/24 16/4 16/7
16/21 35/17 37/21
38/10 53/22 57/3
privileged [8]  5/12
5/15 13/3 16/10
24/15 37/9 38/14
43/12
pro [5]  1/13 2/3
15/9 15/11 20/2
probably [7]  12/18
17/2 20/3 25/23
36/11 51/8 67/3
problem [8]  21/2
22/1 37/15 37/17
37/20 37/22 43/23
43/25
problematic [1]
11/3
problems [1]  54/10
proceed [1]  42/12
proceeding [2]  2/9
55/20
proceedings [2]

**P**

proceedings... [2]
67/10 68/5
process [11]    9/25
15/13 28/1 40/20
43/6 43/20 43/21
47/8 56/9 58/24
65/20
process this [1]
15/13
processing [6]    3/15
7/21 7/24 8/2 8/8
23/3
produce [15]    5/5
5/7 12/16 12/24
14/13 14/13 17/18
18/11 18/16 19/2
27/2 27/9 30/24
33/16 41/21
produced [8]    14/3
14/17 18/19 27/24
28/2 28/19 30/19
32/23
produces [2]    29/3
39/1
producing [4]    5/10
29/15 29/21 30/25
production [1]    4/14
productions [2]
18/18 40/7
profits [1]    8/15
program [4]    3/5 3/7
3/10 3/12
prohibit [7]    6/17
6/23 38/12 42/3
56/15 57/17 57/18
prohibited [1]
31/23
prohibition [4]
3/24 4/1 9/4 42/8
prohibitions [1]
24/11
prohibits [1]    9/13
project [2]    16/14
16/15
promise [1]    61/16
promised [1]    22/11
promises [4]    22/18
22/19 59/21 60/21
properly [1]    14/25
property [1]    9/23
proponent [1]    27/11
proportional [1]
19/15
propose [3]    41/22
65/25 66/3
proposed [12]    28/8
41/18 43/21 50/3
50/13 56/15 57/1
57/16 59/15 60/4
62/16 64/12
proposing [2]    49/10
56/11
proposition [2]
15/5 64/10
proprietary [15]
5/11 30/10 32/14
33/13 35/11 36/7
36/8 36/13 36/16

36/25 37/8 39/20
39/22 41/24 43/13
prospect [1]    58/1
protect [4]    15/24
22/8 22/22 60/10
protected [6]    12/9
40/16 58/16 58/16
64/3 64/16
protecting [2]
52/14 59/20
protection [4]    9/22
29/10 54/9 60/6
protective [43]
3/18 8/3 9/20 11/1
11/18 11/22 12/7
19/4 21/1 22/5 22/6
26/25 27/1 27/7
27/12 28/6 28/13
28/14 28/17 28/20
28/22 28/23 29/7
29/10 29/16 30/22
31/23 31/24 33/18
34/4 35/6 37/11
38/19 38/23 40/13
40/19 41/25 44/7
44/7 44/19 47/13
49/5 59/14
protocol [1]    14/3
prove [3]    4/24 55/9
55/12
provide [7]    3/21
12/22 22/19 23/1
23/12 50/18 54/3
provided [1]    64/23
provider [1]    7/25
provider's [1]    9/24
providers [1]    13/11
provides [2]    11/20
54/8
providing [6]    7/11
7/15 7/23 8/1 8/21
56/6
provision [11]
10/10 23/10 28/12
51/24 52/11 52/25
53/20 54/17 57/23
58/3 60/4
provisional [1]
54/7
provisions [4]    7/10
10/8 54/17 57/15
public [9]    7/12
7/16 23/24 38/13
39/12 42/8 42/19
42/23 52/14
publicly [6]    23/20
28/9 38/5 40/17
40/22 41/7
publish [2]    49/18
49/18
pull [1]    49/22
punishing [1]    61/6
purely [1]    8/6
purpose [5]    7/23
12/6 46/15 55/19
59/19
purposes [4]    8/1
27/5 31/3 55/20
put [7]    4/3 5/22
22/22 23/23 24/18

25/21 29/22
puts [1]    27/4
putting [5]    3/19
14/21 24/3 49/20
62/19

**Q**

quantity [3]    50/25
51/7 51/10
quite [2]    6/22 26/3
quo [1]    40/11
quoting [1]    54/15

**R**

Rafferty [3]    33/23
34/18 40/23
raise [4]    38/21
40/15 65/2 66/19
raised [1]    4/3
raises [2]    31/6
46/11
raising [2]    39/10
46/10
RANDOLPH [1]    1/9
random [1]    8/21
rank [1]    57/7
rather [7]    5/5
17/20 31/9 31/10
38/17 49/20 50/22
Re [2]    33/23 40/23
Re: [1]    34/18
Re: Rafferty [1]
34/18
reaches [1]    60/7
reaction [3]    26/1
26/16 29/18
read [3]    23/12
23/22 27/16
reading [1]    10/10
ready [2]    55/9
55/12
realistic [1]    14/25
realize [1]    65/2
really [15]    5/25
15/15 20/20 22/14
32/10 37/5 46/15
48/14 54/17 55/4
56/12 58/9 63/6
63/8 63/16
reason [9]    21/7
24/17 24/19 35/1
46/21 51/9 57/14
63/15 64/23
reasonable [6]    6/13
22/8 22/10 22/13
32/14 33/9
reasonably [1]
47/15
reasons [4]    14/2
14/23 17/12 64/23
reassurance [1]
24/9
rebroadcast [1]    2/9
receive [2]    41/14
62/6
received [7]    4/14
7/19 7/21 19/14
27/10 39/15 44/25
receiving [1]    27/4
recently [1]    6/10

recognizes [1]
40/25
reconsider [1]
13/14
record [5]    2/9 2/14
64/7 64/16 65/7
record's [1]    57/5
records [5]    29/24
43/4 43/12 46/7
50/25
redacting [1]    38/16
refer [1]    30/9
referring [1]    60/11
refers [2]    32/15
42/18
refinement [2]
49/24 49/25
reflect [1]    29/24
reflected [1]    46/24
refused [2]    43/22
59/1
regardless [4]    6/16
30/10 47/12 47/12
regulate [2]    40/24
41/1
relate [1]    16/20
related [3]    39/19
40/8 47/16
relates [2]    36/15
45/7
relating [3]    15/25
19/17 35/13
relation [1]    52/15
relationship [2]
24/24 60/8
Relativity [2]    3/7
3/8
release [2]    8/7
23/19
released [2]    20/11
40/1
releasing [1]    38/6
relevance [3]    5/6
18/13 19/9
relevant [9]    5/1
12/25 17/3 17/11
17/12 18/25 47/1
55/12 63/9
rely [1]    15/16
remain [1]    24/8
remedied [1]    58/21
remedy [4]    12/4
21/9 39/8 41/9
remind [1]    2/10
reminding [1]    2/8
remote [5]    5/22
7/15 25/13 26/3
26/16
remotely [2]    68/5
68/9
rendition [1]    9/22
report [3]    26/14
65/22 66/24
reported [2]    1/22
68/5
Reporter [2]    1/23
68/3
reporting [1]    68/9
reprisal [3]    52/25
53/13 53/20

**R**

reprisals [10]    52/1
52/19 52/22 53/6
57/11 58/1 59/22
60/16 61/13 61/17
request [1]    18/17
requested [1]    5/4
requesting [5]
12/11 28/5 31/2
31/11 38/3
requests [2]    19/11
41/18
require [6]    5/5
9/18 11/11 13/23
26/13 65/21
requirement [2]
3/24 42/1
requirements [2]
24/21 24/25
requires [3]    6/14
18/4 28/4
research [1]    6/4
reserved [1]    53/6
resist [1]    33/14
resistant [1]    33/10
resolution [1]    56/8
resolve [6]    2/19
26/17 28/5 48/25
59/11 65/13
resolved [3]    28/9
42/4 65/24
resolving [1]    44/3
respect [25]    2/16
5/19 6/4 11/19 15/4
16/4 16/6 16/9
24/10 24/14 24/16
27/10 29/6 29/20
39/18 41/16 42/12
43/10 44/22 50/15
51/16 62/7 65/23
66/1 66/4
respond [1]    58/4
response [1]    9/25
responses [2]    19/22
42/14
responsive [1]
47/25
restraining [1]
52/12
restrict [1]    27/25
restrictions [1]
27/4
restrictive [1]
60/10
rests [1]    3/13
result [1]    37/5
retail [1]    3/19
retaliated [2]    57/8
63/25
retaliation [4]
63/23 64/4 64/10
64/15
return [1]    59/1
reveals [1]    60/24
review [14]    5/6
13/24 14/6 14/18
14/22 18/19 19/9
19/13 41/22 48/1
54/1 55/16 55/20

66/3
reviewing [2]    3/17
57/19
revisit [1]    13/12
Rhinehart [1]    34/7
rich [1]    8/14
right [26]    6/7
10/10 10/16 13/2
13/18 19/11 21/6
21/19 23/14 23/25
32/21 32/22 39/17
39/18 47/7 47/8
47/9 47/11 48/1
48/3 48/4 53/6 62/4
64/25 65/21 66/18
rights [1]    9/22
risk [13]    20/18
20/22 21/5 21/7
21/9 21/10 21/21
21/22 22/2 25/11
25/13 26/3 26/16
risks [2]    16/3 16/6
room [3]    1/24 48/24
48/25
routine [1]    65/11
routinely [3]    28/17
28/20 54/18
rude [1]    32/10
rule [4]    11/21 12/6
32/19 33/2
ruled [1]    42/9
rules [1]    61/2
ruling [6]    31/16
33/20 34/4 40/21
50/12 55/24

**S**

sake [1]    50/20
salary [4]    35/21
36/8 36/11 36/11
same [9]    13/2 14/21
16/3 16/6 35/24
45/24 46/10 49/17
52/5
sanctions [1]    9/21
SAVIGNAC [18]    1/3
1/12 2/3 9/18 16/23
26/9 31/15 34/9
35/10 38/1 39/10
42/20 43/23 47/23
49/14 50/19 51/10
66/16
savvy [1]    6/12
saying [14]    6/1
31/17 32/23 39/10
39/17 40/3 41/3
46/15 49/14 49/24
57/10 60/21 61/7
65/8
SCA [3]    9/10 10/21
23/4
scenario [3]    45/11
50/4 50/9
schedule [4]    4/9
26/14 66/1 66/3
scope [3]    36/17
46/25 59/18
se [5]    1/13 2/3
15/9 15/11 20/2
seal [1]    32/1

search [1]    18/2
Seattle [1]    34/7
SEC [1]    37/6
second [19]    7/7
15/19 20/17 26/21
26/22 26/24 28/18
29/12 34/8 42/15
48/11 48/14 49/22
52/21 55/14 55/16
59/5 60/1 60/3
secretly [2]    38/3
39/25
section [1]    7/5
secure [7]    3/12
5/25 8/18 8/20 8/24
25/25 26/1
security [1]    6/5
seeing [6]    24/12
56/16 57/17 62/21
65/5 65/12
seek [8]    28/6 33/18
41/12 49/5 52/1
52/19 52/22 60/15
seeking [4]    40/9
41/20 61/13 62/17
seeks [4]    3/21
26/25 27/7 44/7
seem [1]    10/11
seemed [2]    5/6
33/10
seems [10]    4/18
9/19 10/2 10/5 20/5
25/11 30/23 38/17
64/11 64/13
sees [2]    58/21
58/22
selecting [1]    4/4
send [6]    33/6 62/2
66/11 67/1 67/2
67/5
sender [1]    14/12
sending [1]    31/10
senior [1]    65/5
sense [9]    3/20
13/13 20/21 25/23
27/13 38/8 44/15
54/2 54/6
sensitive [6]    5/11
16/3 16/6 26/7
26/18 27/19
sensitivity [1]
25/14
sent [6]    19/14
34/13 38/2 38/3
39/23 39/25
serious [4]    10/1
52/12 52/16 65/2
seriously [1]    38/15
serve [1]    42/13
served [2]    41/18
46/15
server [2]    5/22 6/2
servers [1]    3/12
service [17]    3/9
3/21 3/22 7/12 7/14
7/16 7/18 7/23 9/7
10/19 10/22 13/10
22/11 22/17 23/10
24/5 24/10
services [10]    3/15

7/24 8/2 8/22 9/22
11/10 11/15 22/19
23/1 23/2
servicing [1]    9/23
set [2]    22/24 52/8
several [1]    19/22
severe [1]    55/5
sex [1]    16/17
shall [2]    7/12 7/16
share [1]    59/11
shared [2]    55/19
59/7
sharing [4]    23/3
31/24 55/17 56/4
SHEKETOFF [21]    1/13
2/22 9/5 9/11 9/18
13/20 19/20 23/11
25/23 26/9 26/21
35/12 35/24 42/20
50/19 51/9 53/17
56/4 66/8 66/15
67/1
ship [1]    51/12
shipping [1]    50/21
shocking [3]    4/18
31/1 64/10
short [3]    31/8 34/2
65/4
show [5]    21/14 35/3
44/15 47/11 48/22
showed [1]    53/8
showing [6]    21/23
27/12 49/23 51/3
56/25 63/3
shown [3]    4/1 50/16
63/11
side [5]    12/2 28/2
34/22 38/16 48/3
sign [1]    11/12
significant [1]
13/25
significantly [2]
12/20 57/6
signing [2]    3/17
6/1
similar [2]    30/7
35/25
similarly [2]    10/19
58/19
simpler [1]    20/6
simply [9]    13/23
18/20 22/4 37/9
42/7 49/20 53/11
63/5 64/9
single [1]    19/14
site [6]    6/6 20/9
23/3 26/8 26/11
26/19
six [1]    8/21
small [4]    17/15
35/19 54/1 58/8
smaller [2]    8/15
19/6
Smith's [1]    42/16
so's [2]    42/21 43/4
software [1]    10/23
solely [1]    7/23
solve [1]    19/18
somebody [4]    23/17
53/11 60/25 61/7

**S**

somehow [4]   5/16
38/2 64/2 64/15
someone [10]   5/17
17/22 38/2 38/3
39/23 39/24 40/3
53/9 55/6 61/17
someone's [1]   46/14
somewhat [1]   43/7
somewhere [1]   4/5
sophisticated [2]
8/13 8/19
sorry [18]   3/1 5/21
7/15 8/8 15/18
23/16 30/2 30/15
33/1 33/24 35/8
36/5 48/13 52/21
53/15 54/18 55/15
58/10
sort [22]   2/18 4/18
15/15 17/3 18/5
19/11 21/22 27/9
35/2 35/4 35/19
37/8 40/21 43/9
43/13 46/10 46/12
48/19 51/13 56/25
61/5 63/12
sorted [3]   14/11
14/11 14/12
sorts [1]   24/3
sounds [2]   32/8
66/10
space [1]   8/5
speak [5]   2/11 2/13
11/15 35/16 40/23
speaking [5]   2/11
2/21 2/23 2/24 48/5
specific [9]   19/17
19/17 41/25 42/5
45/13 46/22 47/5
50/4 51/16
specifically [5]
40/25 52/18 53/2
53/5 54/16
speculation [2]
57/7 57/13
speculative [3]
55/5 58/9 59/2
spent [1]   29/13
sphere [1]   59/23
spoke [2]   32/6 40/9
spousal [1]   35/17
stack [1]   48/18
stage [1]   4/8
stake [1]   20/19
standard [15]   18/6
22/13 33/18 34/13
52/7 52/7 52/8
54/12 54/14 54/15
54/24 55/2 62/17
64/22 65/10
standards [1]   6/13
stands [1]   40/14
start [8]   2/8 2/20
3/1 3/3 27/22 34/3
44/15 52/2
started [2]   28/21
39/15
STATES [2]   1/1 1/10

status [5]   5/15
26/14 40/11 65/22
66/24
statute [3]   9/5
9/10 24/21
stealing [1]   53/9
step [3]   28/18
48/24 48/25
still [4]   13/2
47/14 56/13 67/1
stolen [1]   34/17
stop [5]   20/17
21/16 21/16 21/16
53/20
stopping [1]   50/8
storage [5]   3/15
7/14 7/23 8/2 23/2
store [1]   11/14
Stored [8]   6/21
6/24 7/1 7/6 9/4
20/21 21/3 21/13
stores [1]   11/11
storing [2]   8/8 8/8
Street [3]   1/13
1/17 1/19
strike [4]   25/12
26/3 46/10 62/18
strikes [1]   54/20
stripe [1]   24/2
strips [1]   14/15
strongest [1]   8/18
structure [1]   59/17
struggling [1]
42/11
stuff [4]   15/13
29/9 36/11 39/3
subcontractors [2]
23/13 24/1
subject [14]   9/11
11/2 11/5 11/17
12/9 12/13 12/13
20/25 28/3 37/21
40/13 41/5 41/24
68/8
subjective [1]
58/24
submission [1]
54/25
submissions [2]
2/15 65/17
submit [3]   65/15
65/22 66/4
submitted [1]   66/24
subpoena [2]   29/4
30/6
subpoenas [4]   29/4
30/16 31/4 31/11
subscriber [2]   7/22
7/24
subsection [1]   10/6
subset [3]   54/1
58/8 61/25
substance [1]   4/24
substantial [3]
15/7 52/12 52/17
substantially [1]
15/12
substantive [1]
60/6
sued [1]   20/11

sufficient [5]   9/8
19/24 23/7 61/20
61/23
suggested [1]   17/14
suggesting [5]   22/1
32/1 61/5 64/20
65/9
suggests [1]   53/3
Suite [1]   1/17
summaries [1]   30/4
summarize [1]   33/5
summary [2]   17/25
55/10
suppliers [2]   23/13
24/1
support [1]   63/6
supportive [1]
17/24
suppose [4]   25/22
26/5 46/14 53/7
supposed [1]   34/15
sure [15]   9/9 15/23
17/24 27/22 33/1
33/22 36/13 40/1
44/18 47/24 49/2
60/2 61/5 62/11
63/10
surprised [1]   50/24
susceptible [1]
24/6
suspect [1]   51/1
sympathetic [4]
43/7 46/7 64/19
65/6

**T**

tag [1]   14/24
tailored [1]   13/15
talented [1]   39/21
talk [4]   8/12 26/12
26/15 26/23
talking [33]   3/3
4/12 5/10 6/9 6/15
11/4 11/6 13/6 13/8
22/14 24/13 25/13
32/14 33/4 33/7
33/11 36/19 36/25
37/1 39/7 43/14
45/18 47/2 50/24
51/7 52/17 54/3
55/1 55/17 56/4
57/4 62/13 65/12
targeted [3]   13/16
19/11 41/19
technically [1]
6/12
technological [3]
15/16 19/25 68/9
technologically [1]
8/19
technology [1]   18/5
telephone [3]   1/9
2/4 42/20
telling [2]   35/10
48/7
tells [2]   20/19
38/13
tens [2]   12/19 14/1
term [2]   27/23 28/4
terminated [1]

58/25
termination [1]
58/20
terms [19]   10/18
10/22 11/3 11/17
12/3 22/11 22/16
23/9 23/10 23/14
23/22 24/5 24/5
24/8 24/9 41/17
41/21 57/1 59/13
TERRI [2]   1/18 2/5
terribly [3]   22/13
29/19 29/23
test [4]   56/14
56/22 56/23 57/24
texts [1]   40/2
the Stored [1]   7/1
Theirs [1]   58/23
thereby [1]   27/25
therefore [3]   32/22
65/3 68/8
thinking [1]   42/22
third [20]   7/3 11/8
12/12 22/7 22/23
28/3 29/3 29/6
29/20 30/20 30/21
40/8 49/2 51/5 52/1
58/19 58/20 59/20
60/9 60/10
Thompson [1]   66/12
though [5]   9/15
26/3 27/10 32/4
39/6
thought [3]   5/4
21/8 33/8
thousand [1]   26/6
thousands [5]   4/15
4/17 12/19 14/1
15/3
threatened [1]
62/24
three [4]   47/5
47/24 52/8 57/21
three-factor [1]
52/8
throughout [2]   8/23
24/4
tie [1]   43/9
Times [1]   34/7
timing [1]   66/23
today [4]   2/6 2/21
65/23 66/16
today's [1]   2/9
together [2]   48/24
48/25
Tolton [4]   4/20 5/7
17/18 28/22
ton [1]   4/3
tonight [1]   67/1
took [1]   38/2
tool [2]   20/5 20/7
tools [2]   15/16
19/25
touch [1]   37/18
tow [1]   45/15
traditionally [1]
48/3
transcript [2]   1/9
68/4
transmission [2]

**T**

transmission... [2]
7/20 7/22
treated [3]    11/23
16/15 31/14
treatment [2]    16/13
31/2
treats [1]    32/5
36/9
trial [1]    18/1
tried [2]    33/8 49/8
tries [1]    46/9
true [2]    63/4 68/4
truly [1]    33/15
trusted [2]    64/21
65/10
try [4]    35/9 43/17
49/3 51/13
trying [7]    15/19
28/24 33/14 34/19
35/17 37/13 38/7
turn [2]    2/12 12/12
turned [1]    3/6
two [11]    2/23 2/24
7/10 7/15 18/3 20/1
21/14 29/2 47/2
55/24 56/7
type [3]    12/10 16/5
31/2
typically [2]    28/13
28/14

**U**

U.s [1]    1/23
U.S.C [1]    7/9
ultimately [2]    19/7
61/9
umbrage [1]    53/16
unable [1]    28/5
unconstitutional [1]
33/5
under [20]    10/21
10/21 14/3 20/21
21/4 23/14 29/10
29/16 30/21 32/1
34/4 41/21 44/19
45/12 47/5 47/13
56/14 57/24 61/2
62/18
undercuts [1]    41/8
undertaking [1]
23/7
unduly [1]    16/15
unfair [2]    20/5
60/20
unfairly [1]    16/15
unfortunate [1]
2/16
unfortunately [1]
10/14
unhappy [1]    49/9
unilateral [1]    24/6
unilaterally [1]
27/25
UNITED [2]    1/1 1/10
unlearn [2]    58/22
58/23
unless [3]    29/23
44/11 46/11

unlike [1]    8/19
unlikely [3]    9/19
30/23 55/4
unrelated [1]    58/11
unsee [1]    60/12
unusual [2]    28/12
63/22
up [21]    12/16 18/21
19/1 19/18 22/22
24/18 26/2 26/6
26/10 26/19 33/8
42/20 42/21 43/2
43/6 44/2 44/4
50/19 51/6 52/21
55/15
upload [1]    3/11
uploaded [1]    6/6
Urbana [1]    1/14
use [34]    3/4 3/8
4/4 10/19 11/10
11/13 11/15 13/10
13/23 18/5 19/3
19/24 20/5 20/7
22/8 22/10 22/12
27/5 44/22 44/24
45/4 45/12 45/15
45/22 46/3 47/17
48/2 48/8 48/17
48/21 49/3 49/4
59/22 63/3
used [7]    8/13 8/22
41/1 43/9 49/16
50/11 53/17
using [5]    3/25 6/12
10/22 19/25 44/8
usually [1]    2/18

**V**

vague [3]    10/7 32/3
57/25
vagueness [1]    32/21
valid [1]    27/3
variation [1]    32/2
variety [1]    26/10
various [1]    14/11
vast [1]    38/25
vastly [3]    19/6
57/2 57/23
vendor [4]    11/17
19/2 19/3 20/25
vendors [2]    10/20
11/14
version [1]    40/14
versus [2]    2/3
54/21
Vesey [1]    1/19
view [2]    49/25
51/18
viewable [1]    14/5
viewed [1]    14/18
viewing [1]    3/5
violate [2]    24/18
37/11
violating [1]    53/19
violation [2]    9/20
58/18
virtue [1]    29/13
volume [1]    13/23
voluminous [2]    16/9
18/2

**W**

Wait [2]    42/15
49/22
waiting [1]    49/21
waive [1]    5/23
waived [2]    5/16
5/19
waiver [1]    16/4
wants [1]    62/11
warrant [2]    29/10
58/3
warranty [1]    24/4
Washington [2]    1/5
1/25
way [24]    5/5 5/18
14/12 14/13 18/1
19/5 24/20 24/23
25/20 26/6 26/17
29/22 30/9 40/10
42/12 43/24 44/1
44/13 46/18 48/5
48/14 49/17 51/19
64/20
ways [3]    14/11
43/10 65/4
wealthy [1]    3/23
website [1]    23/23
week [1]    65/22
weekends [2]    15/14
18/4
weight [1]    63/13
welcome [4]    25/12
26/20 51/12 65/19
weren't [1]    17/13
what's [9]    6/3
15/10 26/21 34/24
37/13 44/5 51/21
60/22 64/12
whatsoever [1]
22/10
who's [6]    2/21
12/13 27/2 48/20
54/21 60/25
whoever's [1]    6/2
whole [1]    46/15
widely [1]    8/22
willing [3]    20/8
59/4 59/18
within [5]    10/17
43/2 46/1 59/16
59/23
without [15]    4/6
14/1 14/6 14/18
15/5 15/15 18/19
24/7 30/24 31/1
38/3 38/6 55/24
57/15 63/3
witness [19]    45/5
45/13 45/21 46/21
46/23 47/1 47/4
47/11 47/15 47/16
47/21 48/23 48/25
49/21 50/11 50/17
51/3 51/4 51/5
witnesses [1]    52/23
wonderful [1]    63/7
wondering [2]    65/19
65/21
word [2]    36/17

46/19
words [1]    53/1
work [13]    2/17 2/18
23/17 23/18 31/7
31/12 32/13 32/20
32/22 43/17 43/24
44/1 48/14
workable [2]    50/1
51/8
worked [3]    5/20
37/2 37/4
working [5]    16/13
16/14 37/16 41/11
44/1
world [2]    17/22
22/12
worried [2]    28/25
29/19
worth [1]    65/16
writer [1]    36/22
writing [4]    3/11
25/21 52/19 65/15
wrong [4]    4/15 4/19
4/20 38/1

**Y**

year [2]    17/7 35/21
years [2]    25/9
29/14 32/6 32/8
York [2]    1/20 8/15
young [1]    18/4