# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

      v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and JOHN DOES 1-10,

    *Defendants*.

Case No. 1:19-cv-02443-RDM

**Oral Argument Requested**

## PLAINTIFFS' BRIEF IN SUPPORT OF "ATTORNEYS' EYES ONLY" ORDER TO PROTECT JONES DAY EMPLOYEES

## TABLE OF CONTENTS

Introduction.................................................................................................................1

Argument ...................................................................................................................2

    A.  Serious harm might well result from disclosure ........................................3

    B.  The proposed order is narrowly drawn and precise ...................................17

    C.  There is no less restrictive means of protecting third parties .......................18

Conclusion ................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Berg v. La Crosse Cooler Co.*,
   612 F.2d 1041 (7th Cir. 1980) ..................................................................12

*Burlington Northern & Santa Fe Railroad Co. v. White*,
   548 U.S. 53 (2006)................................................................................4

*California Federal Savings & Loan Ass'n v. Guerra*,
   479 U.S. 272 (1987)..............................................................................9

*City of Los Angeles v. Manhart*,
   435 U.S. 702 (1978)..............................................................................9

*Cleveland Board of Education v. LaFleur*,
   414 U.S. 632 (1974)..............................................................................9

\* *Doe v. District of Columbia*,
   697 F.2d 1115 (D.C. Cir. 1983) ......................................2, 3, 4, 17, 18, 19, 21

*EEOC v. L.B. Foster Co.*,
   123 F.3d 746 (3d Cir. 1997)...................................................................10

*Gifford v. Atchison, Topeka & Santa Fe Railway Co.*,
   685 F.2d 1149 (9th Cir. 1982) ...............................................................10

*In re Halkin*,
   598 F.2d 176 (D.C. Cir. 1979) .................................................................2

*Nevada Department of Human Resources v. Hibbs*,
   538 U.S. 721 (2003)..............................................................................9

\* *Parker v. Baltimore & Ohio Railroad Co.*,
   652 F.2d 1012 (D.C. Cir. 1981) ........................................................3, 4, 11

*Savignac v. Jones Day*,
   486 F. Supp. 3d 14 (D.D.C. 2020) ..................................................6, 8, 9, 10

*Schafer v. Board of Public Education*,
   903 F.2d 243 (3d Cir. 1990)....................................................................9

*Sias v. City Demonstration Agency*,
   588 F.2d 692 (9th Cir. 1978) .................................................................12

*Thompson v. North American Stainless*,
   562 U.S. 170 (2011)..............................................................................4

**INTRODUCTION**

The record in this case proves that Jones Day—through Defendant Steven Brogan and other members of the firm's leadership—willfully violated the civil rights laws by firing Plaintiff Mark Savignac in retaliation for a protected complaint about sex discrimination.  Having learned firsthand what it is like to be fired without warning just weeks after the birth of their son, Plaintiffs hope to protect other current and former Jones Day employees (including Jones Day partners) from similar harm.  Plaintiffs therefore submit this brief in further support of their request that the Court enter an "attorneys' eyes only" protective order to protect current and former Jones Day employees from reprisals by Jones Day leadership motivated by discovery material produced in this case.[1]

The enforcement of the civil rights laws would be severely chilled if discovery became an occasion for defendants who have shown themselves unwilling to follow the law to identify and take action against other employees who provide evidence and other support for the plaintiffs. Because that harm might well result in this case, the attached proposed protective order would allow a party to designate as "attorney's eyes only" any discovery material it produces that it "reasonably believes contains information about current or former Jones Day employees … that, if known to Jones Day leadership, would be likely to materially impair the employees' relationship with Jones Day," such as by motivating Jones Day to fire or "push out" (or simply underpay) an employee or to refuse to rehire a former employee who had expected to return.  The Court should enter the order.

---

[1] At the June 4 conference, the Court indicated that mere statements of support for Plaintiffs are not discoverable: "[I]f it's a document that simply says, 'I really support you in bringing this lawsuit, I think you're doing a really brave thing.  I think you're wonderful for doing it, I really think that Jones Day is awful,' then I don't actually think it's a relevant document in the case." Tr. 63.  Plaintiffs therefore will not produce such communications.

**ARGUMENT**

Upon a showing of "good cause," a court may enter a protective order "forbidding the disclosure" of discovery material "to protect a party or person from … oppression."  Fed. R. Civ. P. 26(c)(1).  In *Doe v. District of Columbia*, the D.C. Circuit set forth the standard applicable to an "attorneys' eyes only" protective order—that is, "a protective order forbidding … disclosure by counsel to their clients of information of specified sorts obtained during discovery."  697 F.2d 1115, 1119 (D.C. Cir. 1983).  *Doe* was a conditions-of-confinement suit brought by prison inmates against officials at the prison.  *Id.* at 1117.  The plaintiffs were concerned that "information they provided [in discovery] would somehow be transmitted to correctional officers inside [the prison] and thence to other prisoners," which could "expose them to serious risk of violent reprisal."  *Id.* at 1118.  To reduce that risk, the plaintiffs sought and received a protective order prohibiting the defendants' counsel from sharing certain discovery information with their clients.  *Id.* at 1118-19.

On appeal, the D.C. Circuit held that a court should "evaluate such a restriction on three criteria":

> [1] the harm posed by disclosure must be substantial and serious; [2] the restraining order must be narrowly drawn and precise; and [3] there must be no alternative means of protecting the public interest which intrudes less directly on attorney-client relations.

*Id.* at 1120 (quoting *In re Halkin*, 598 F.2d 176, 191 (D.C. Cir. 1979)).  The D.C. Circuit made clear that it "d[id] not intend these guidelines to be prohibitive in practice."  *Id.* at 1120.  To the contrary, "when serious harm to a party or to the community cannot be avoided without either forbidding discovery altogether or curtailing communication between one of the litigants and his attorney regarding discovered materials, the court should issue such a protective order."  *Id.*  Plaintiffs' proposed order meets *Doe*'s three requirements.

2

**A.     Serious harm might well result from disclosure.**  In *Doe*, the D.C. Circuit found that the first of the three factors was met: "Affidavits submitted by [the plaintiffs], detailing the danger of retaliation to which they would be exposed if persons inside the prison learned of allegations they made in the course of discovery, were more than sufficient to show that 'substantial and serious harm' might well have resulted from the dissemination of the information in question." *Id.* at 1120-21.  Here, too, Plaintiffs can show that (1) "substantial and serious harm" to third parties' careers and livelihoods (2) "might well [] result[]"  in the absence of the Court's protection.

**1.     Type of harm**.  The harm at issue in *Doe*—"violent reprisal" against inmates in a prison (*id.* at 1118)—was more severe than the harm to an individual's career and livelihood that is at issue here.  Nonetheless, it is clear that the law deems the latter type of harm sufficiently "serious" to deserve substantial protection.  The many federal, state, and local laws prohibiting employers from firing or otherwise harming employees for a range of reasons (including in retaliation for opposing discrimination) leave no doubt that termination, refusal to hire, and other material changes in working conditions are serious harms.  And, indeed, "attorneys' eyes only" protective orders "have frequently been issued" in trade secret cases to protect a company's confidential commercial information from a competitor.  *Id.* at 1120 n.8.  If the "harm" that might result in such cases—lost revenues for a corporation—is serious enough to justify such a protective order, then harm to individuals' careers and livelihoods surely passes the same threshold.

Protecting the third parties at issue here would also protect the public interest by avoiding a chilling effect on the enforcement of the federal antidiscrimination laws.  "The enforcement scheme Congress chose for Title VII relies heavily on the initiative of aggrieved employees." *Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981).  Congress

prohibited retaliation against such employees "to protect the employee who dares to speak out," lest such employees' "efforts in the public interest … be severely chilled." *Id.* A profound chilling effect would occur if an employer that has violated Title VII were free to fire ███████████ based on evidence that it obtains solely as a result of her lawsuit. In short, there is a serious federal interest in ensuring that discovery in civil rights lawsuits does not become an occasion for the defendant to fire or otherwise harm ████████████ or other employees who provide evidence or other support for the plaintiff's claim of discrimination.

Some such acts would even constitute Title VII violations in and of themselves. "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. North American Stainless*, 562 U.S. 170, 174 (2011) (quoting *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 68 (2006)). It is "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired. … [F]iring a close family member will almost always meet the *Burlington* standard, [though] inflicting a milder reprisal on a mere acquaintance will almost never do so." *Id.* at 174-75. While the Court did not directly address the question, it seems clear that firing ███████████ would meet the *Burlington* retaliation standard: There can be little doubt that a reasonable worker might be dissuaded from engaging in protected activity if she knew that ██████████ would be fired.

    **2.**    **Likelihood of harm**. As in *Doe*, the harm at issue here "might [] well result[] from dissemination of the information in question." 697 F.2d at 1121. Jones Day's leadership blatantly violated the civil rights laws by firing Mark in retaliation for a protected complaint of sex discrimination. That hotheaded, malicious, and willfully illegal action shows that they might well

take similarly harsh measures against third parties who provided Plaintiffs with support and with evidence for the suit.

     **a.**     To be clear, courts should not enter "attorneys' eyes only" orders routinely. But this is not a routine case, and Plaintiffs do not base their request that the Court protect third parties on mere allegations, but rather on proof of a blatant violation of the law. The central question in this case—whether Jones Day illegally fired Mark in retaliation for complaining about sex discrimination—is legally and factually straightforward. That is why Plaintiffs sought to move for summary judgment before discovery (Dkt. 41), and it is why Jones Day strenuously opposed Plaintiffs' request to file such a motion (Dkt. 44). The Court declined Plaintiffs' request, and Plaintiffs will respect that decision and refrain from presenting a full argument here (though they stand ready to do so at any time). Even an abbreviated account shows that Jones Day, Brogan, and Brogan's collaborators willfully broke the law.

     In January 2019, Plaintiffs emailed Jones Day a pre-suit demand reiterating their view that Jones Day's paid leave offerings for new parents illegally discriminate on the basis of sex. The email states:

> Sarah,
>
> We have closely reviewed the case law, including the two cases you rely on. We have also discussed the matter with other competent attorneys. Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.
>
> Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S.Ct. 1338, 1351-52 (2015).
>
> Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-

> action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion.  We are very familiar with the D.C. Circuit and confident that we will win.
>
> I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation.  We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman.  As you know, Title VII prohibits retaliation for opposition to sex discrimination.

App'x A7.  Three business days later, Jones Day fired Mark.  Jones Day's position is that it fired Mark for the "threat" of a civil rights lawsuit in the email's third paragraph: "Jones Day fired Savignac for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his demand."  Dkt. 35 at 5 (Answer ¶ 10).

Jones Day's statement is a confession of illegal retaliation.  An employer commits retaliation if (1) an employee engages in "protected activity," (2) the employer takes an "adverse action" against the employee, and (3) the adverse action was "causally related" to the protected activity.  *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 38 (D.D.C. 2020).  Since firing an employee is the quintessential "adverse action," Jones Day violated the law *under its own version of the facts* if the January email was "protected activity."  And opposition to discrimination is "protected activity" when the employee has a reasonable, good-faith belief that the challenged practice is illegal, even if a court later decides that she was mistaken.  *Id.*  Here, Plaintiffs are not mistaken: Jones Day illegally discriminates on the basis of sex by giving eight more weeks of paid leave to a new mother than a new father without regard to whether the mother is actually disabled during that time.  But regardless of whether Plaintiffs are *correct* on the merits of that underlying discrimination complaint, the complaint was plainly *reasonable* and therefore protected.

*First*, Plaintiffs' complaint was based on an accurate (or, at least, reasonable) understanding of Jones Day's paid leave offerings.  Julia laid out this understanding when she first raised Plaintiffs' concerns about discrimination in an August 2018 email:

> I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total) while it gives men 10 weeks of paid leave (and 16 weeks total).  Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave ….

App'x A5.  Julia's email asserted that it is "unfairly discriminatory" to give new mothers an extra eight weeks of paid leave that are "labeled as disability leave, but … not dependent on whether women are actually disabled," such that women who "aren't physically disabled from office work for such a long period … still get the full eight weeks."  *Id.*

Plaintiffs' understanding that Jones Day offers every new mother eight more weeks of paid leave than it offers new fathers, without regard for whether she is actually disabled from working at Jones Day for that period, is correct.  At minimum, it is eminently reasonable.  For one thing, "virtually all birth mothers" at Jones Day take the full eight weeks, as Jones Day itself admits (Aug. 4, 2020 Tr. 64), which would not be the case if the leave were limited to the woman's period of actual disability.  Plaintiffs' understanding is also based on the plain terms of Jones Day's written Family Leave policy, which says that "the [f]irm will provide mothers eight weeks of paid leave under the [f]irm's Short Term Disability policy" plus "an additional ten weeks of paid family leave after *the eight weeks* of paid disability leave."  App'x A3 (emphasis added).  Adding eight plus 10, the written policy describes the total paid leave entitlement for new mothers as "the 18 weeks of paid leave."  *Id.*  Any woman who read the written policy would have the same takeaway as Julia had: If she had a baby, she would be entitled to (at least) "the 18 weeks of paid leave"

without regard for her ability to work.  It is no surprise, then, that virtually all women take the full

eight weeks—as, again, Jones Day itself admits (Aug. 4, 2020 Tr. 64).

   In its reply in support of its motion to dismiss, Jones Day asserted (for the first time ever)

that these explicit statements in its written Family Leave policy are just inaccurate "shorthand" for

the terms of its written Short Term Disability policy, which, it says, limit each woman's extra leave

to her period of actual physical disability—which could (and often would) be less than eight weeks.

Actually, the written Short Term Disability policy says nothing of the sort; it nowhere contradicts

the clear statements in the written Family Leave policy.  Any mother-to-be who read the two

written policies together would understand that she could take the full 18 weeks of paid leave

regardless of how long she was actually disabled.  (Again, it is no surprise that virtually all women

take the full amount.)  This Court has already pointed to the "difficulties with Defendants' textual

argument" about the disability policy, holding that "the language of the disability policy upon

which they hang their hat is subject to different interpretations."  486 F. Supp. 3d at 36.  That

forecloses any argument that the text of the disability policy is so clear as to render Plaintiffs'

understanding unreasonable.

   Even more compellingly, Julia laid out Plaintiffs' understanding explicitly in her August

2018 email (quoted above).  *See* App'x A5-6.  That email went to Sarah McClure, the firm's

Director of Human Resources and longtime employment lawyer.  *Id.* at A5.  McClure would surely

have corrected Julia—and thereby defused Plaintiffs' complaint of discrimination at the outset—

if Julia's stated understanding of the firm's HR policy were incorrect.  That is McClure's job.  But,

far from offering any correction, McClure responded with a lengthy legal analysis that is premised

on that same understanding.  *See id.* at A7-A8.  At a minimum, then, Plaintiffs' belief that Jones

Day offers all women an extra eight weeks of paid leave regardless of disability was reasonable.

*Second*, Plaintiffs' belief that Jones Day's leave offerings are illegal is also eminently reasonable (and, indeed, correct).  The civil rights laws prohibit sex discrimination in employment. The Supreme Court has said that employers cannot "grant[] more family-leave time to women than to men."  *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 739 n.12 (2003).  The Court has upheld bona fide disability leave for new mothers that is "narrowly drawn to cover only the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions," while emphasizing that the law prohibits "special treatment of pregnant workers based on … generalizations about their needs and abilities."  *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 285 n.17, 290 (1987) (emphasis in original).  A blanket rule treating all women as disabled for a minimum of eight weeks after childbirth is nothing if not a "generalization[]."  The Supreme Court has also reaffirmed that even "true" sex-based generalizations are off-limits to employers.  *E.g.*, *City of Los Angeles v. Manhart*, 435 U.S. 702, 704, 707-08 (1978).  And it has made clear that eight weeks of "disability" leave for office workers is not a "true" generalization in any event.  *E.g.*, *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 649 n.15 (1974).

The Third Circuit has expressly held that leave given to new mothers but not fathers is "per se void for any leave granted beyond the period of actual physical disability."  *Schafer v. Board of Public Education*, 903 F.2d 243, 248 (3d Cir. 1990).  The Eighth Circuit and the EEOC also support Plaintiffs' position.  *See* Dkt. 18 at 13-27 (detailed analyses of the parties' legal authorities).  By contrast, no court has ever endorsed Jones Day's indefensible position.  As this Court held after considering the parties' cited authorities, "Defendants have not shown that the text of Title VII, the FLSA, or the DCHRA or *any precedent* (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's leave policy was unlawful."  486

F. Supp. 3d at 39 (emphasis added).  Even if Plaintiffs' view of the law were mistaken (and it is not), the civil rights laws' protection for *mistaken but reasonable* legal positions means nothing if it does not apply here.

Plaintiffs' view that Jones Day's paid leave offerings are illegally discriminatory was (at a minimum) reasonable, and the civil rights laws protected their January 2019 complaint. Defendants' statement that "Jones Day fired Savignac for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his demand" (Dkt. 35 at 5 (Answer ¶ 10)) is thus an admission of a blatant violation of the civil rights laws.  Those laws protect complaints about what the employee reasonably believes to be discrimination, and they include no carve-out for complaints that advise—in Defendants' words, "threat[en]"—that the employee will pursue his rights through litigation, as Plaintiffs did in the January email: "I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion."  App'x A7.  There is "no legal distinction to be made between the filing of a charge[,] which is clearly protected, and threatening to file a charge."  *Gifford v. Atchison, Topeka & Santa Fe Railway Co.*, 685 F.2d 1149, 1156 n.3 (9th Cir. 1982) (citation omitted); *see also, e.g.*, *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997).

Jones Day responds that it fired Mark because of the "manner" of the email, not because he "oppos[ed] application of the leave policy [and] indicat[ed] his intention to sue."  Dkt. 44 at 5; *see id.* at 5-6; ████████████████████████████████████.  That argument— for which Jones Day has never offered a shred of evidence, though it admits that any such "evidence is already in Defendants' hands" (Dkt. 44 at 6)—is obviously false as a matter of fact: Brogan and his collaborators fired Mark because they prize submission to Brogan over compliance

with the civil rights laws.  Again, Jones Day itself has elsewhere stated that it fired Mark for what it calls his "extortionate threat to harm the [f]irm in the 'court of public opinion'" by filing suit. Dkt. 35 at 5 (Answer ¶ 10).

Even if its factual premise were true, Jones Day's "manner" argument would fail as a matter of law because the "manner" of the email was protected along with its substance (which makes any factual dispute about Jones Day's motive immaterial).  Jones Day has never pointed to any authority so much as hinting that a pre-suit demand letter sent to the appropriate people—here, Mark's boss (Defendant Heifetz) and the Human Resources Director designated by Jones Day's own employee handbook as a person to whom employees should bring complaints of discrimination (McClure)—could somehow lose the law's protection as a result of its "manner." And even assuming arguendo that this could happen in egregious circumstances, the January email is hardly egregious.  Indeed, it is not clear how a letter expressing the view that the recipient is illegally discriminating and an intention to sue over that discrimination could be much more "collegial" or "temperate," at least without risking appearing sarcastic (in which case Jones Day would now be arguing that the email was unprotected because of its sarcastic, faux respectful tone).

There is no support for Jones Day's argument (*e.g.,* ▮▮▮▮▮) that courts should subject complaints like the January email to heightened scrutiny, parsing them for "maturity" or good "judgment" before treating them as protected.  The D.C. Circuit has recognized that, "by extending protection to employees who oppose discriminatory practices without resort to the EEOC, Congress encouraged voluntary internal attempts to remedy discrimination.  The remedial purposes of Title VII would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal EEOC filings, and that internal opposition, though encouraged, is undertaken at the accuser's peril."  *Parker*, 652 F.2d at 1019

(quotation marks omitted).  Jones Day's argument that it was entitled to fire Mark for the "manner" of the January email is the sort of "accuser's peril" argument that would "not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation or informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).  After all, if a plaintiff cannot be assured that a relatively conventional demand email like the one at issue here is protected, then why would she ever try to resolve a discrimination concern internally?  "[T]he elimination of employment discrimination by informal means" is "Title VII's central purpose," and "the frank and nondisruptive exchange of ideas between employers and employees" is "one of the chief means of achieving that purpose."  *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980).  Jones Day's argument—in effect, that Mark should have gone straight to court rather than give Jones Day a final chance to stop discriminating and thereby avoid this lawsuit—runs directly contrary to the purposes of the ban on retaliation and of Title VII as a whole.

   **b.**  ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
      ████████████████████████████████████████
████████████████████████████████████████████████







**B.      The proposed order is narrowly drawn and precise.**  *Doe*'s second requirement

calls for "attorneys' eyes only" protective orders to be "narrowly drawn and precise."  697 F.2d at

1120.  This requirement appears to refer to the scope of the information subject to the protective

order; the order's other terms are addressed by the third requirement, discussed below.  The D.C.

Circuit held that the second requirement was satisfied in *Doe* because "[t]he order was limited to

designated 'areas of inquiry'; and information or charges of the specific sorts identified likely

would have provoked retribution."  *Id.* at 1121 (footnote omitted).  The order there applied to

discovery material concerning "class members' … knowledge of other persons' participation in"

illegal activity and the "identities [of] correctional officers who … violate regulations." *Id.* at 1118 n.3.

Plaintiffs' proposed order would allow them to designate material that they "reasonably believe[] contains information about current or former Jones Day employees (other than a Party) that, if known to Jones Day leadership, would be likely to materially impair the employees' relationship with Jones Day." Because the scope of the proposed order is defined in terms of the likely effect of disclosure of the material, it is true by definition that "information … of the specific sorts identified likely would have provoked retribution" if known to Jones Day leadership. *Id.* at 1121. And, if any dispute were to arise as to the propriety of designating a given document and if the parties were unable to resolve that dispute in the ordinary course, then the Court could quickly resolve it by reviewing the document in question in camera. Unlike in *Doe*, where the protected material appears to have included a very large proportion of the plaintiffs' own testimony about the allegedly unlawful conduct, the total amount of material that would be covered by the proposed order here is small both in absolute terms and relative to the case as a whole.

**C.** **There is no less restrictive means of protecting third parties.** Although it found that the first and second requirements were met, the D.C. Circuit rejected the protective order in *Doe* because "[t]he District Court could have formulated a decree that would have been equally effectual in preventing retaliation and would not have inhibited consultation between [the defendants] and their attorneys." 697 F.2d at 1121. The equally effectual alternative that the D.C. Circuit pointed to was "a ban on communication (concerning matters learned through discovery) between the defendant prison officials and any of the prison guards or inmates." *Id.* In other words, though the plaintiffs had legitimate fears of reprisals from *guards or other inmates*, those guards and other inmates were not the defendants in the case. To reach the guards and other

inmates, the sensitive information would have had to travel from the plaintiffs to the defendants' counsel then on to the defendant prison officials themselves and then, through them, to guards and other inmates.  The protective order cut this chain of communication by severing the link between the defendants' counsel and their clients.  But there was no indication that it would have been any less effective to instead sever the final link in the chain, between the defendant prison officials and the guards and inmates who might have actually carried out the reprisals.  And that "equally effectual" alternative would not have implicated the defendants' "interest in being able to … consult freely with [their] attorney[s]."  *Id.* at 1119, 1121.

Here, there is no less restrictive means that would be equally effectual.  Whereas the fear in *Doe* was potential reprisals by third parties who might learn the sensitive information from the defendants, the concern here is *the defendants themselves*—specifically, Jones Day acting through its top leadership and Brogan.  The only way to prevent them from learning the information that could lead to harm against third parties is to restrict communications of the relevant information between them and their attorneys.  No less restrictive means would be effective.  That includes an order that merely prohibits reprisals while permitting Jones Day leadership to view the documents in question.  Even if the firm's leadership did not willfully violate the order, their knowledge would surely have a negative impact on their treatment of the employees who would be protected by the proposed order.

Jones Day observes that, because it has chosen certain members of the firm's leadership to enter appearances in this case, the proposed order would restrict certain of its counsel from viewing designated documents.  But some such restriction is both necessary to effectuate the purpose of the proposed order and unlikely to impose a meaningful burden on Jones Day.  Five Jones Day partners have entered appearances in this case.  Two of them—Anderson Bailey and Chris

DiPompeo—do not appear to be part of the firm's leadership under any definition.  And Plaintiffs have already agreed that Terri Chase may view designated material, even though she apparently is a member of something called the Advisory Committee.  Jones Day also has well over a hundred attorneys in its Labor & Employment group (only one of whom, Chase, has appeared in this case), and it could afford to hire any firm in the country to defend it.

The remaining two partners who have entered appearances are Mary Ellen Powers and Traci Lovitt.  Powers is understood to be one of the firm's most powerful partners; she oversees (from her office in Washington) all of its offices and attorneys in Europe, and she also participates in domestic management.  *See* App'x A11.  She also does not appear to be actively involved in this case.  Her name appeared on Jones Day's motion to dismiss, which was filed in September 2019 (Dkt. 15 at 1), but it is absent from the firm's reply in support of that motion, which was filed the following month (Dkt. 19 at 1).  She does not appear to have participated in any filing or hearing in this case since September 2019.  By contrast, her name continues to appear on briefs in the related *Tolton* (now *Henderson*) action, including one filed just last month.  *See Henderson* Dkt. 192 at 6.

That leaves Traci Lovitt.  The order could not be effective if it did not apply to her.  She has replaced Defendant Heifetz as the head of Issues & Appeals, giving her direct control over the careers of Jones Day's appellate attorneys. ███████████████████████████████████ ███████████  For Jones Day to insist on her reviewing the materials that would be subject to the proposed order would be analogous to a defendant in a trade secret case designating its lead product developer as one of its five counsel of record and insisting that no protective order should prevent him from viewing trade secrets, even though this would render the order wholly ineffectual because his product development work would inevitably be influenced by what he learned.  It is

not plausible that a restriction preventing Lovitt from viewing and acting upon a small amount of the discovery produced in this case would meaningfully prejudice Defendants. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

## CONCLUSION

While "attorneys' eyes only" protective orders should not be entered lightly, the D.C. Circuit also "d[id] not intend [the standard addressed above] to be prohibitive in practice. Indeed, when serious harm … cannot be avoided without either forbidding discovery altogether or curtailing communication between one of the litigants and his attorney regarding discovered materials, the court should issue such a protective order." *Doe*, 697 F.2d at 1120. Plaintiffs respectfully submit that the Court should enter their proposed order.

/s/ Julia Sheketoff

Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

June 16, 2021

/s/ Mark C. Savignac

Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367