# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

      *Plaintiffs*,

*v.*

JONES DAY, *et al.*,

      *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 1:19-02443 (RDM)

**MEMORANDUM REGARDING PLAINTIFFS' REQUESTS FOR DISCOVERY ON PARTNERSHIP INFORMATION AND PUNITIVE DAMAGES**

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

ARGUMENT .......................................................................................................... 7

I.     PARTNERSHIP DISCOVERY IS DISPROPORTIONATE TO THE
NATURE AND NEEDS OF THIS CASE........................................................... 9

     A.    The Relevance of the Partnership Information Is, At Best, Marginal
and Attenuated in This Case ...................................................................... 9

     B.    The Partnership Discovery Is Highly Intrusive, Burdensome, and Expensive.......... 19

     C.    Damages Discovery Is, At Best, Premature............................................... 22

II.    DISCOVERY REGARDING DEFENDANTS' FINANCIAL RESOURCES
IS NOT RELEVANT...................................................................................... 25

CONCLUSION..................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Banks v. Perdue,*
  No. 07-cv-01807, 2019 WL 147445 (D.D.C. Jan. 9, 2019)..............................................10, 14

*Barbour v. Medlantic Mgmt. Corp.,*
  952 F. Supp. 857 (D.D.C. 1997) ................................................................................. *passim*

*Barbour v. Merrill,*
  48 F.3d 1270 (D.C. Cir. 1995) ....................................................................................18

*Barbour v. Merrill,*
  132 F.3d 1480 (D.C. Cir. 1997) ..............................................................................10, 12

*Bell v. Clackamas Cnty.,*
  341 F.3d 858 (9th Cir. 2003) ......................................................................................27

*Biondo v. City of Chicago,*
  382 F.3d 680 (7th Cir. 2004) ......................................................................................14

*Bolden v. Winter,*
  602 F. Supp. 2d 130 (D.D.C. 2009) ...........................................................................18

*Bostic v. Vasquez,*
  No. 15-cv-429, 2018 WL 4026287 (N.D. Ind. Aug. 23, 2018) ...................................25

*Brennan v. Loc. Union No. 639, Int'l Bhd. of Teamsters Chauffers,*
  *Warehousemen & Helpers of Am.,*
  494 F.2d 1092 (D.C. Cir. 1974) ..................................................................................22

*Chavous v. D.C. Fin. Resp. & Mgmt. Assistance Auth.,*
  201 F.R.D. 1 (D.D.C. 2001)..................................................................................7, 22

*Coulibaly v. Pompeo,*
  No. 14-cv-712, 2020 WL 1536185 (D.D.C. Mar. 31, 2020) ...............................14, 24

*D'Onofrio v. SFX Sports Grp., Inc.,*
  247 F.R.D. 43 (D.D.C. 2008)................................................................................26, 27

*Daka, Inc. v. McCrae,*
  839 A.2d 682 (D.C. 2003) ..........................................................................................27

*Davis v. Ross,*
  107 F.R.D. 326 (S.D.N.Y. 1985) ................................................................................26

*Dotson v. Pfizer, Inc.,*
  558 F.3d 284 (4th Cir. 2009) ......................................................................................15

*Duke v. Uniroyal, Inc.,*
  928 F.2d 1413 (4th Cir. 1991) ....................................................................................10

*EEOC v. Lawler Foods, Inc.,*
  128 F. Supp. 3d 972 (S.D. Tex. 2015) ........................................................................23

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*EEOC v. Nebco Evans Distrib., Inc.*,
    No. 96-cv-00644, 1997 WL 416423 (D. Neb. June 9, 1997) .................................................23

*Estes v. Georgetown Univ.*,
    231 F. Supp. 2d 279 (D.D.C. 2002).................................................................................18

*Glenn v. Williams*,
    209 F.R.D. 279 (D.D.C. 2002)...........................................................................................8

*Goss v. Exxon Off. Sys. Co.*,
    747 F.2d 885 (3d Cir. 1984)..............................................................................................12

*Hardrick v. Legal Servs. Corp.*,
    96 F.R.D. 617 (D.D.C. 1983).............................................................................................9

*Hartman v. Wick*,
    678 F. Supp. 312 (D.D.C. 1988)......................................................................................11

*Holbrook v. Reno*,
    196 F.3d 255 (D.C. Cir. 1999)..........................................................................................18

*Hopkins v. Price Waterhouse*,
    737 F. Supp. 1202 (D.D.C. 1990) ........................................................................11, 12, 16

*Hunter v. Town of Mocksville*,
    201 F. Supp. 3d 750 (M.D.N.C. 2016) ............................................................................11

*Hutchinson v. Stuckey*,
    952 F.2d 1418 (D.C. Cir. 1992).......................................................................................27

*Intervet, Inc. v. Merial Ltd.*,
    252 F.R.D. 47 (D.D.C. 2008)............................................................................................8

*Jefferson v. Milvets Sys. Tech., Inc.*,
    986 F. Supp. 6 (D.D.C. 1997)..........................................................................................14

*John Does I-VI v. Yogi*,
    110 F.R.D. 629 (D.D.C. 1986).........................................................................................28

*Joy v. Bell Helicopter Textron, Inc.*,
    999 F.2d 549 (D.C. Cir. 1993).........................................................................................18

*Kemezy v. Peters*,
    79 F.3d 33 (7th Cir. 1996) ...............................................................................................25

*Lamaute v. Power*,
    No. 19-cv-3702, 2021 WL 1978971 (D.D.C. May 18, 2021)................................................8

*Leo T. Thibodeau Gen. Contractors, Inc. v. Brault, Graham, Scott & Brault*,
    No. 90-cv-0533, 1991 WL 255940 (D.D.C. Nov. 15, 1991)..............................................28

*Lewis v. Fed. Prison Indus., Inc.*,
    953 F.2d 1277 (11th Cir. 1992) .......................................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mathie v. Fries*,
  121 F.3d 808 (2d Cir. 1997) .................................................... 27

*McKnight v. Gen. Motors Corp.*,
  973 F.2d 1366 (7th Cir. 1992) ................................................ 11, 13, 16

*McVeigh v. Cohen*,
  996 F. Supp. 59 (D.D.C. 1998) .............................................. 10

*Meschino v. Int'l Tel. & Tel. Corp.*,
  661 F. Supp. 254 (S.D.N.Y.1987) ......................................... 18

*Miniex v. Houston Hous. Auth.*,
  400 F. Supp. 3d 620 (S.D. Tex. 2019) ................................... 15

*Morgan v. Spivey*,
  No. 16-cv-365, 2019 WL 4463299 (E.D.N.C. Sept. 17, 2019) ............... 27

*Ollie v. Titan Tire Corp.*,
  336 F.3d 680 (8th Cir. 2003) .................................................. 12

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
  322 F.R.D. 1 (D.D.C. 2017) .................................................. 8

*Pasternak v. Dow Kim*,
  275 F.R.D. 461 (S.D.N.Y. 2011) ........................................... 24, 26

*Peskoff v. Faber*,
  230 F.R.D. 25 (D.D.C. 2005) ................................................ 28

*Peyton v. DiMario*,
  287 F.3d 1121 (D.C. Cir. 2002) ............................................. 13, 18

*Pleasants v. Allbaugh*,
  208 F.R.D. 7 (D.D.C. 2002) .................................................. 9

*Quarrie v. Wells*,
  No. 17-cv-350, 2020 WL 1514798 (D.N.M. Mar. 30, 2020) ............... 19

*Rivera v. Baccarat, Inc.*,
  34 F. Supp. 2d 870 (S.D.N.Y. 1999) ..................................... 18

*Rupert v. Sellers*,
  48 A.D.2d 265 (N.Y. App. Div. 1975) .................................... 25, 28

*Schaub v. VonWald*,
  638 F.3d 905 (8th Cir. 2011) ................................................ 27

*Stafford v. Elec. Data Sys. Corp.*,
  749 F. Supp. 781 (E.D. Mich. 1990) ..................................... 13

*Staples v. Parkview Hosp., Inc.*,
  No. 07-cv-327, 2010 WL 780204 (N.D. Ind. Mar. 3, 2010) ............ 10, 15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)...................................................................................................26

*Taylor v. D.C. Water & Sewer Auth.*,
  205 F.R.D. 43 (D.D.C. 2002).....................................................................................23

*Wash. Convention Ctr. Auth. v. Johnson*,
  953 A.2d 1064 (D.C. 2008) .......................................................................................10

*Williams v. Pharmacia, Inc.*,
  137 F.3d 944 (7th Cir. 1998) .....................................................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 1 ...............................................................................................................9

Fed. R. Civ. P. 26 ...................................................................................................3, 8, 19

8A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2040 (3d ed. 2010).......................23

## INTRODUCTION

Discovery in this case has so far been—in the Court's words—"strikingly extensive." 7/20 Tr. at 61:7.  Plaintiffs have served a total of 117 document requests and 19 interrogatories in four installments, the most recent of which was served two days ago.  Most requests are excessively broad and contain multiple subparts, and the majority seek information bearing at best only a tenuous and dubious connection to the issues in this case.  Moreover, with each new set of requests, Defendants must pause their ongoing discovery efforts, reassess their collection and review, reassert objections, attend to meet-and-confers and follow-up from Plaintiffs, and litigate any disputes raised with the Court.  Nevertheless, Defendants have already produced over 3,700 pages of internal Firm documents, including emails, manuals and other policy documents, and communications and work product related to Sheketoff's work with Partner A.  Defendants have also served verified interrogatory responses; produced data from four separate databases; are preparing to produce compensation and other employment data related to over 90 alleged comparators; are in the midst of a nationwide hard-copy collection related to the implementation of parental leave policies; and are reviewing tens of thousands of additional documents for responsiveness and potential production.  In contrast, Plaintiffs have thus far produced six documents—five W2s and a pay stub—comprising a total of seven pages.

Of Plaintiffs' 117 document requests, many pertain solely to damages questions.  These requests—including those listed on Exhibit A to this Memorandum, which seek information regarding the Jones Day partnership, partner compensation, and the financial resources of Defendants—present some of the broadest, and most intrusive, of all Plaintiffs' document requests.  The information requested—much of which is not even made available to partners in the Firm—is highly confidential and would reveal detailed personnel files, evaluations, demographics, and compensation information for almost 1,000 current and former Jones Day partners.

When presented with these requests—which Plaintiffs acknowledged pertain only to their particularly aggressive damages theories—Jones Day initially objected on the ground that the requests were neither relevant nor proportional.  But in an effort to compromise and focus the discovery process, Jones Day proposed that the parties target merits discovery first, and address damages discovery, if necessary, later in the case.  Plaintiffs refused, and instead sought a conference with the Court to compel production at this juncture.

As explained more fully below, the discovery sought by Plaintiffs is plainly disproportional to the needs of this case, and should be denied on that basis.

<u>First</u>, Savignac's extensive requests regarding the promotion of lawyers to the partnership and partnership compensation bear no reasonable relationship to the needs of this case.  Savignac was an associate when he was terminated and acknowledges he would not even have been *eligible* for consideration for promotion to partner for at least two more years.  He apparently wants to try, if he prevails on the merits of his retaliation claim, to convince this Court to grant many years (or even decades?) of front-pay on the predicate that he would have been promoted to the partnership and, in that role, earned higher compensation than he could obtain elsewhere.  Courts, however, rarely grant forward-looking damages for more than 1-2 years, and then only when the unique facts are such that the plaintiff is unable to obtain comparable employment.  Savignac not only *could* obtain comparable employment, he already did so—in the appellate practice at another large law firm in the same city, just a few months after his termination from Jones Day.  Under these circumstances, there is no reasonable likelihood that this Court will exercise its equitable discretion to grant back-pay or front-pay that extends into Savignac's putative partnership years.  And that is especially true given the unduly speculative nature of the exercise, both in analyzing Savignac's

partnership prospects based on a tenure of just 18 months at Jones Day, and in predicting the individualized compensation he would supposedly have earned in this hypothetical scenario.

Meanwhile, even though this discovery is highly unlikely to have any relevance or value to the case, it would be extremely intrusive and burdensome for both Jones Day and third parties. Plaintiffs, again, are seeking information on partnership promotions and compensation decisions for almost 1,000 current and past partners worldwide—information that Jones Day treats as highly confidential, even internally, and that implicates privacy concerns for all of these individuals. Nor could this discovery stop at Jones Day's files. If the Court were really going to indulge speculation about how Savignac would have been compensated, years into the future, had he made partner at Jones Day, that same analysis would require setting-off Savignac's projected income at his new firm (Steptoe & Johnson) or elsewhere, necessitating a subpoena to that firm for all the equivalent information that Savignac seeks from Jones Day. If discovery goes down this road, it will quickly spiral out of control. Rule 26's proportionality standard calls for cutting it off at the pass.

<u>Second</u>, Plaintiffs' request for information regarding the financial resources of Jones Day is similarly focused solely on damages questions—namely, the appropriate amount of punitive damages, if any, that might be imposed if Plaintiffs are able to establish liability on their claims. This information is unlikely ever to become relevant and, at a minimum, is premature. The D.C. Circuit has been clear that the relevance of this information depends on whether the *defendants* choose to argue that punitive damages should be limited based on their ability to pay. Jones Day has not done so, and will not do so. And, given the limited compensatory damages potentially available in this case, no constitutionally sustainable amount of punitive damages could possibly implicate Jones Day's financial resources anyway.

Even if the Court concludes that some limited portion of the damages discovery sought by Plaintiffs may become relevant at some point in the future, it is not relevant *now*. The scope of discovery sought by Plaintiffs has delayed the parties' ability to move toward resolution of the real substantive questions in the case, and nothing would be gained by allowing the parties to divert attention to full-blown and highly attenuated damages discovery at this time. At a minimum, if any of Plaintiffs' requested discovery is deemed potentially permissible, the Court should postpone that discovery at least until the Court has had an opportunity to consider the merits of Plaintiffs' claims. Courts within this Circuit and elsewhere often take this approach in Title VII cases. And such an approach here would allow the parties to focus discovery on merits issues and potentially avoid the expense and burden of third party discovery.

## BACKGROUND

Discovery in this case began in late April 2021. On April 28, Plaintiffs served their first set of discovery demands, which included 47 document requests and 13 interrogatories. Plaintiffs served another 47 document requests and 2 more interrogatories on July 5, and an additional 20 document requests and 4 interrogatories on July 25. And just two days ago, on August 1, Plaintiffs served an additional 3 document requests, bringing the total number of document requests to 117, plus 19 interrogatories, that have been propounded over the three months of discovery. Even this number undersells the amount of information sought by Plaintiffs, as these 117 requests are phrased in exceedingly broad terms, and most contain multiple subparts.

Among the document requests and interrogatories served by Plaintiffs are several broad requests that explicitly seek information regarding Jones Day's partnership and partners, as well as additional requests with subparts that encompass similar information. These requests seek a remarkably broad amount of information about the admission of lawyers to the Firm's partnership, the compensation of partners, the process for setting partner compensation, and the financial

4

relationship between Jones Day and its partners.

In particular, these requests (a representative list of which is included in Exhibit A to this Memorandum), seek the following:

- "Documents showing the following information with respect to **each Jones Day partner**: name, sex, any special title or role that the partner holds with the firm, **compensation as of April 2021**, JD deemed year, the month and year when the partner became a partner, practice group(s), office, law school attended, month and year of law school graduation, whether the individual served as a Supreme Court clerk, billable and non-billable client hours for calendar year 2020, and **any quantitative information that influenced the partner's most recent compensation adjustment**." Ex. A at Plaintiffs' First Requests for Production No. 30 (emphasis added).

- "Documents showing the following information with respect to **each partner, counsel, or of counsel affiliated with Issues & Appeals**: name, sex, any special title or role that the attorney holds with the firm, JD deemed year, office, law school attended, month and year of law school graduation, month and year of becoming a Jones Day partner (or counsel or of counsel), whether the attorney served as a Supreme Court clerk, billable and non-billable client hours for each calendar year since 2014, **compensation as of the date(s) that compensation adjustments took effect for each year since 2014**, and **any quantitative or narrative information that influenced the attorney's compensation for each year since 2014**." Ex. A at Plaintiffs' First Requests for Production No. 31 (emphasis added).

- "Documents showing the following information with respect to **all attorneys promoted to partner effective January 2021**: name, sex, JD deemed year, practice group(s), office, law school attended, month and year of law school graduation, month and year of becoming a Jones Day associate, whether the individual served as a Supreme Court clerk, the position that the attorney held in 2020 (e.g., associate, of counsel, counsel), billable and non-billable client hours for each calendar year since 2017, **compensation as of the date(s) that compensation adjustments took effect for each year since 2017**, and **consensus statement and all quantitative ratings or rankings for each year since 2017**." Ex. A at Plaintiffs' First Requests for Production No. 27 (emphasis added).

- "**All documents** relating to the determination of compensation for **any partner affiliated with Issues & Appeals or who clerked at the Supreme Court**, including documents reviewed or generated during the compensation-setting process and **communications among the decisionmakers**." Ex. A at Plaintiffs' First Requests for Production No. 32 (emphasis added).

- "Documents sufficient to show **all factors** material to partner compensation and the relative weight of each factor." Ex. A at Plaintiffs' Third Requests for Production No. 8 (emphasis added).

- "**All documents** relating to Jones Day's **general policies with respect to partners**, including policies relating **to retirement or de-equitization**."  Ex. A at Plaintiffs' Second Requests for Production No. 19 (emphasis added).

- "**All documents** relating to the promotion to partner of **any attorneys affiliated with Issues & Appeals or who clerked at the Supreme Court**, including: any statement regarding the promotion, eligibility, suitability, or prospects for promotion of such attorneys (either in general or with reference to one or more individuals); any communications stating or implying that any such attorney should seek other employment or was unlikely to be promoted; and **all documents reviewed or generated during the process of considering such an attorney for being put up for partner or promoted to partner**."  Ex. A at Plaintiffs' First Requests for Production No. 26 (emphasis added).

In other words, Plaintiffs have asked Jones Day to disclose the current compensation, titles, billable and non-billable client hours, and any quantitative information used to determine the compensation *for each of the more than 850 current partners in the Firm*.  For more than 50 current and former partners in the Issues & Appeals group, the request is even broader, seeking this same information for all years *since 2014*, plus "*[a]ll documents* relating to the determination of compensation" for these partners.  For the 50 lawyers worldwide who were promoted to partner in 2021, Savignac has requested compensation, consensus reviews, practice rankings, and demographics *since 2017*.  And for any Issues & Appeals partners or partners who clerked at the Supreme Court, Savignac has requested "[a]ll documents relating to the promotion to partner" of any of these lawyers, including "*all documents reviewed or generated during the process of considering such an attorney for being put up for partner or promoted to partner*," and "all documents relating to the determination of compensation" for these partners, including all "*documents reviewed or generated during the compensation-setting process and communications among the decisionmakers*."

In addition to this partnership discovery, Plaintiffs have also sought discovery regarding the financial condition of the Defendants.  In particular, Plaintiffs are seeking:

Documents showing the financial resources of each Defendant, including: the annual income for each year since 2018 and the present net worth of each individual Defendant; the annual revenues and profits for each year since 2018 and the present assets and liabilities of Jones Day; and any valuation of Jones Day.

Documents showing the annual revenues and profits for each year since 2018 and the present assets, liabilities, and valuation associated with Jones Day's office and presence in the District of Columbia.

Ex. A at Plaintiffs' First Requests for Production Nos. 39 and 40.

In discussions between the parties regarding Plaintiffs' requests, Defendants objected to both the partnership-related and financial-related document requests. Defendants explained that all of these requests were overbroad; that partnership information is not relevant or proportional because Savignac was years away from even being considered for partner at Jones Day; that information regarding Defendants' financial resources was intrusive and not relevant; that the scope and burden of this discovery was completely out of proportion to the needs of this case; and that all of this information was, at best, premature. Defendants, as a compromise, offered to bifurcate merits and damages discovery so as to focus the parties' efforts on the most immediately important issues.

Plaintiffs rejected this compromise and instead sought a conference with this Court to compel production immediately. At that conference, the Court observed that "this case is generating excessive amounts of discovery and excessive disputes for a case of this nature," and expressed concern that it was preventing the parties from litigating the merits of Plaintiffs' claims. 7/20 Tr. at 43:22-23. The Court reserved ruling on the partnership and financial discovery sought by Plaintiffs, and instead invited briefing on both these issues to aid in the Court's resolution.

## **ARGUMENT**

"It has long been recognized that trial courts are vested with broad discretion to manage the conduct of discovery." *Chavous v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 201 F.R.D. 1,

2 (D.D.C. 2001).  "Under Rule 26(b)(1) of Federal Rules of Civil Procedure, '[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . .'"  *Lamaute v. Power*, No. 19-cv-3702, 2021 WL 1978971, at *2 (D.D.C. May 18, 2021) (quoting Fed. R. Civ. P. 26(b)(1)).  The party seeking discovery "bears the initial burden of 'explaining how the requested information is relevant.'"  *Id.* (quoting *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 5-6 (D.D.C. 2017)).  "Once relevance has been established, the burden shifts to the party opposing discovery to show why the discovery should not be permitted."  *Id.*

"The consideration of proportionality involves balancing the six factors identified in Rule 26(b)(1), where '[n]o single factor is designed to outweigh the other factors in determining whether the discovery sought is proportional.'"  *Id.* (quoting *Oxbow*, 322 F.R.D. at 6 (internal quotation mark and citation omitted)).  The factors include "[1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id.*; *see also* Fed. R. Civ. P. 26(b)(1).

"[A]ll discovery is subject to the balancing test in Rule 26(b)(C)(iii) of the Federal Rules of Civil Procedure that requires a court to limit the discovery otherwise allowed by these rules if the burden outweighs its likely benefit . . . ."  *Intervet, Inc. v. Merial Ltd.*, 252 F.R.D. 47, 49 (D.D.C. 2008) (internal quotation marks omitted).  Thus, "[c]ourts may exercise discretion in discrimination cases by placing reasonable limits in discovery in order to balance the needs and rights of both plaintiff and defendant."  *Lamaute*, 2021 WL 1978971, at *2 (citing *Glenn v. Williams*, 209 F.R.D. 279, 282 (D.D.C. 2002)).  In such cases, "courts remain concerned about

'fishing expeditions, discovery abuse, and inordinate expenses involved in overbroad and far-ranging discovery requests' and have therefore limited discovery to the issues involved in the particular case." *Pleasants v. Allbaugh*, 208 F.R.D. 7, 9 (D.D.C. 2002) (quoting *Hardrick v. Legal Servs. Corp.*, 96 F.R.D. 617, 618 (D.D.C. 1983)).  And, above all, the Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

As explained below, the partnership and financial discovery sought by Plaintiffs is plainly disproportionate to the needs of the case and should be denied, or, at a minimum, delayed.

## I.    PARTNERSHIP DISCOVERY IS DISPROPORTIONATE TO THE NATURE AND NEEDS OF THIS CASE

Plaintiffs' partner-related discovery requests seek an enormous amount of information. According to Plaintiffs, this discovery is necessary to prove "what Mark's pay as a Jones Day partner would be" *if* he had stayed at the Firm and *if* he had been promoted to partner.  Dkt. No. 60, at 1.  That is, Plaintiffs believe they need detailed personnel records and compensation information for almost 1,000 current and former Jones Day partners in order for them to submit speculative testimony about the compensation a single individual plaintiff might have received years hence in the hypothetical scenario that he might have been promoted to partner two or more years after his termination.  These requests are overbroad on their face, are highly unlikely to have any relevance, and the cost and burden of compliance (on both Jones Day and third parties) makes them obviously disproportionate to the needs of the case.

### A.    The Relevance of the Partnership Information Is, At Best, Marginal and Attenuated in This Case

The value of the partnership information to this case is, at best, marginal and attenuated. Savignac does not claim that the partnership information he seeks is relevant to the merits of any claim; he argues instead that it is relevant to establish *damages* for lost future pay in the event he

succeeds in his retaliation claim.  He wants to try to prove that had he not been terminated, he would have become a partner at Jones Day, and that his earnings as a partner would be higher than he anticipates at his new firm or elsewhere, presumably over the course of his lifetime.  That theory is not going to work, and the Court should make that clear now.

Even if Savignac is able to establish liability and some amount of damages, those damages should not extend beyond the period which, by his own admission, he would have been an associate.  Courts considering Title VII remedies have authority to award equitable relief for lost earnings, including in the form of front pay for future earnings in appropriate cases.  *Barbour v. Medlantic Mgmt. Corp.*, 952 F. Supp. 857, 863 (D.D.C.), *aff'd sub nom. Barbour v. Merrill*, 132 F.3d 1480 (D.C. Cir. 1997); *cf. Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1080 (D.C. 2008).  However, "[b]ecause of the potential for windfall, [the] use [of front pay] must be tempered," and there are important limitations on its use.  *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992); *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991); *see also Lewis*, 953 F.2d at 1281 ("Front pay remains a special remedy, warranted only by egregious circumstances.").

Just as Title VII requires plaintiffs receiving back pay for lost earnings to mitigate their damages, "an employee receiving front pay in lieu of reinstatement is entitled to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment."  *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998).  This is because, "[i]n general, front pay ends when the sting of discrimination has passed and the victim has had a reasonable amount of time to secure comparable employment."  *Barbour*, 952 F. Supp. at 866.  Comparable employment is employment that is "*roughly equivalent* in pay, benefits, status, and responsibility."  *Banks v. Perdue*, No. 07-cv-01807, 2019 WL 147445, at *1 (D.D.C. Jan. 9,

2019) (emphasis added) (quoting *McVeigh v. Cohen*, 996 F. Supp. 59, 61 (D.D.C. 1998)); *Staples v. Parkview Hosp., Inc.*, No. 07-cv-327, 2010 WL 780204, at *8 (N.D. Ind. Mar. 3, 2010) ("[Defendant] cites no authority, nor could the court find any, to support [Defendant's] apparent argument that a 'comparable position' means one offering exactly the same amount of pay.").

Importantly, it is not necessary that a plaintiff *actually* secure comparable employment. This is an objective, not subjective, inquiry. Thus, if a plaintiff chooses not to secure comparable employment, that does not entitle him/her to ongoing damages. *See Barbour*, 952 F. Supp. at 864-65. This is because "[f]ront pay is intended to serve as restitution for the victim, not to punish an employer. It is certainly not 'intended to insure a plaintiff's future financial success.'" *Id.* at 863 (quoting *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992)). For this reason, even when a front pay award is granted, "it should be reduced by the amount that the victim actually earned *or could reasonably have earned* during the front pay period." *Barbour*, 952 F. Supp. at 863 (emphasis added). "What a plaintiff must show, and what will be imputed to each plaintiff, is a reasonable effort to find a position 'substantially equivalent' to the one denied her, and the reasonableness of that effort will depend upon the individual characteristics of the plaintiff, the type of job, and the job market." *Hartman v. Wick*, 678 F. Supp. 312, 338 (D.D.C. 1988). "If the plaintiff has the skill set and qualifications to secure comparable employment through reasonable effort moving forward, then this weighs against a long term front pay award." *Hunter v. Town of Mocksville*, 201 F. Supp. 3d 750, 758 (M.D.N.C. 2016).

For example, in *Hopkins v. Price Waterhouse*, 737 F. Supp. 1202 (D.D.C. 1990), *aff'd*, 920 F.2d 967 (D.C. Cir. 1990), the Court denied damages for lost wages (in that case in the form of back pay) because the plaintiff failed to pursue a job at another large accounting firm "when opportunities elsewhere clearly existed." *Id.* at 1213. The Court noted that "after [the plaintiff]

left the firm, there was a significant demand both locally and nationwide for management consultants at Big Eight and other accounting firms, management consulting firms, and within large businesses." *Id.* at 1213-14. According to the Court, "[g]iven her extensive successful experience in the management consulting area, . . . [the plaintiff] would have been a solid candidate for a high-paying position at many such firms." *Id.* at 1214. Noting that the plaintiff rejected opportunities at comparable firms because they did not offer to bring her in as a partner, the Court explained that "[a] reasonable effort to obtain a position would have included a willingness to enter as an employee, so long as partnership consideration in the reasonable future was promised." *Id.* Ultimately, the Court held that "Price Waterhouse cannot be held fully responsible for the lost back pay that accumulated as a result of [the plaintiff's] personal decision to assume the risks and benefits of a solo business without making any reasonable effort even to consider alternatives by seriously seeking to obtain high-paying employment in her field." *Id.* at 1215. The Court therefore denied back pay because the plaintiff's "prior experience at Price Waterhouse and her success in her own business put her in a position to obtain a management consultant position that paid substantially more. For whatever reason, she simply chose not to seek such a position." *Id.*

Finally, because the remedies for lost earnings are not designed to provide a "windfall," *Hopkins*, 737 F. Supp. at 1211, front pay—when it is awarded—is typically limited to a short period of time—usually months or 1-2 years at most. *See, e.g.*, *Barbour*, 132 F.3d 1480 (affirming award of one year of front pay); *Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 889 (3d Cir. 1984) (awarding four months of front pay). "Longer terms of front pay are usually awarded when it is unlikely that the plaintiff will ever be able to achieve the level of income and responsibility that he enjoyed in his earlier position or when it would take the plaintiff a significant number of years to gain the level of seniority and responsibility equivalent to the job lost." *Ollie v. Titan Tire*

*Corp.*, 336 F.3d 680, 688 (8th Cir. 2003) (affirming award of two years of front pay).  Even then, however, courts are wary because "[t]he longer a proposed front pay period, the more speculative the damages become."  *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002) (quoting *McKnight*, 973 F.2d 1372).

Applying these principles here shows that Savignac's requested partnership discovery is of dubious relevance because Savignac will not be able to obtain damages that extend into years when he speculates he might have been elevated to partner.  Plaintiffs appear to believe that if they prevail on the merits, they will be entitled to recover some sort of lifetime earnings differential, but that is simply not how the law works. *See, e.g.*, *id.* at 1130 ("To award Peyton front pay based on the assumption that she will continue in an allegedly low-paying job . . . for a full career, when she is only 34 years old and not incapacitated, is to give her a tremendous windfall rather than to make her whole."); *Stafford v. Elec. Data Sys. Corp.*, 749 F. Supp. 781, 789 (E.D. Mich. 1990) ("[C]ourts seem to agree that plaintiffs in their forties are too young for lifetime front pay awards.").

It is undisputed that Savignac was an associate when he was terminated and, by his account, he had only been at Jones Day for a relatively short period and was still two years away from even being eligible for partnership consideration.  Jones Day has already agreed to provide Savignac with extensive information regarding the compensation of his peer associates, including what they earned during the two years after Savignac's termination.  This includes anonymized compensation information for a seven-year period, through 2020, related to more than 90 Issues & Appeals associates throughout the United States.  This additional information is more than sufficient for Savignac to demonstrate the quantum of any damages he may claim to have suffered in the two years after his January 2019 termination.

13

Moreover, Savignac cannot recover front pay on these facts.  An award for lost earnings is an equitable remedy to be determined by the Court.  *See Coulibaly v. Pompeo*, No. 14-cv-712, 2020 WL 1536185, at *10 (D.D.C. Mar. 31, 2020) ("Our Circuit has been clear that such remedies under Title VII are left to the equitable discretion of the trial court.").  Front-pay damages exist to allow the plaintiff sufficient time to search for and obtain "comparable employment."  *Barbour*, 952 F. Supp. at 866.  Here, within months of his termination, Savignac—who was 31 years old at the time—obtained comparable employment as an associate in the appellate group at Steptoe & Johnson, where he "focuses on appeals and dispositive motions in cases presenting complex legal issues."  *See* Steptoe & Johnson LLP, *Mark C. Savignac*, https://www.steptoe.com/en/lawyers/mark-savignac.html (last visited Aug. 3, 2021).   This is the very position Savignac held at Jones Day before his termination.  Savignac's initial disclosures, moreover, indicate that his compensation at Steptoe was "roughly equivalent" to his compensation at Jones Day.  *Banks*, 2019 WL 147445, at *1.  And if Savignac claims he had the requisite qualities to be admitted to the partnership at Jones Day, there is no reason why he would not enjoy similar prospects at Steptoe or elsewhere.

Savignac obviously has not claimed that his new law firm, a highly respected AmLaw100 firm, is somehow inferior or not comparable to Jones Day.  But even if the employment Savignac chose to accept was not "comparable employment," because of earning potential, partnership prospects, or some other perceived differences—which seems unlikely—this does not entitle him to a longer period of front-pay.  *Jefferson v. Milvets Sys. Tech., Inc.*, 986 F. Supp. 6, 8 (D.D.C. 1997) ("[The] duty to mitigate also applies to 'underemployed' Title VII claimants").  The question for the Court when assessing damages is simply whether the plaintiff *has had sufficient time* to secure comparable employment because "front pay cannot extend past the time a reasonable person

needs to achieve the same or an equivalent position in the absence of discrimination." *Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004).

Here, given Savignac's resume and Supreme Court clerkship, as well as his claims regarding his own talents, it is difficult to believe that he could not have found comparable employment (and reasonably equivalent partnership prospects) within two years at any of dozens of law firms in Washington, be it Steptoe, Hogan Lovells (where Savignac worked before Jones Day), or any of the many other global firms and litigation boutiques with a similar practice. That is not to say that Savignac was required to accept any one of those comparable positions; he was certainly entitled to accept a position at Steptoe if that presented him with the best mix of opportunities, personality and practice fit, compensation, and hours requirements. But the fact that Savignac chose to pursue a career at Steptoe is not a justification for awarding him the "windfall" that would result from a long-term front-pay award based on a partnership at Jones Day that Savignac can only speculate he might have been offered, as courts around the country have recognized in analogous circumstances. *Barbour*, 952 F. Supp. at 865; *see also Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620, 657 (S.D. Tex. 2019) ("[G]iven [plaintiff's] credentials and the jury's vindication of her in this lawsuit, the Court finds it unlikely that she [will] be unable to mitigate her damages in the future by obtaining more lucrative employment [in less than two years]."); *Staples*, 2010 WL 780204, at *10 (awarding two years of front pay where nurse accepted new position at a lower rate of pay because, "[g]iven [plaintiff's] highly specialized training and years of experience as a nurse, it is not unreasonable to assume that she will have employment opportunities . . . that will enable her to be in an improved financial situation within a two-year period following the trial in this case, i.e., financially equivalent to where she would have been if she had continued her employment with [defendant]."); *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300

(4th Cir. 2009) (affirming district court denial of front pay where plaintiff had secured employment making $65,000 less than prior salary because "he had secured comparable, if not precisely equivalent, work" at another company).

To put it in the terms of an analogy suggested by the Court:  This is not a case where the plaintiff was the shortstop of the Yankees and was forced by discrimination to take a job selling hot dogs at substantially reduced compensation.  This is a case where, after the plaintiff left the Yankees, there is no reason to believe he could not have played for any number of teams for the same (or higher) pay, and instead chose to accept the same position with the Red Sox at "roughly equivalent" pay.  Title VII does not require the employer "to insure a plaintiff's future financial success" through the award of long term front pay, and courts do not order such awards.  *McKnight*, 973 F.2d at 1371; *see also Hopkins*, 737 F. Supp. at 1213-14 (denying back pay where plaintiff did not pursue comparable employment at a large accounting firm even though she "would have been a solid candidate for a high-paying position at many such firms").  For that reason, the partnership discovery that Savignac seeks is highly unlikely to bear any relevance to this case.

Beyond the equitable limits on front pay awards—but reinforcing the same conclusion—Savignac's argument that information regarding Jones Day's partnership and partners will be relevant to damages rests on a tenuous chain of assumptions that are simply too *speculative* to support a claim for damages.  Specifically, partnership information will become relevant only *if* Savignac establishes that he is entitled to damages extending beyond the two years he claims it would have taken for him to become eligible for partnership, *if* he establishes that he would have stayed at Jones Day for those additional years and sought to become a partner in a firm which, by his and his wife's (unsupportable) account, "systematically discriminates," *if* he can show that his future performance would have been sufficient to allow him to be considered for partnership as of

January 2021, and *if* he then made partner.  And after all of that, the theory would require speculation about how Jones Day would have set Savignac's individualized compensation as a partner.  It is very unlikely that Savignac will be able to establish every link on this chain of speculative assumptions, as he must.

Savignac appears to believe that simply because he was a former Supreme Court clerk, he would automatically have been admitted to the Jones Day partnership at his earliest opportunity in 2021.  There is no basis for that claim.  Savignac was a 2011 law graduate who joined the Firm in May 2017.  His offer letter did not specify when he would be eligible for partnership consideration, and his short tenure at Jones Day made it highly unlikely he would have been admitted in January 2021.  Indeed, no lawyer with a J.D. graduation year of 2011 was promoted to partnership in January 2021 who had been with the Firm for as short a period as Savignac would have been, even if he had stayed at Jones Day.  *See* Declaration of Michael R. Shumaker, attached hereto as Exhibit B.

Regardless of *when* Savignac might have become eligible for consideration, the contention that he would ever have been admitted to the partnership is unprovable speculation.  At the time of his termination, Savignac had been at Jones Day only 18 months and had been through only one evaluation cycle which covered only his first 8 months with the Firm.  Savignac's performance during that brief period provided no basis to conclude that he had the qualities required for partnership.[1]  It is utter speculation to assume, based on Savignac's slim performance record, that his future performance in the years more critical to the partnership decision would have justified his promotion.

---

[1]  Although not material to this discovery dispute, the conduct that led to his termination showed that he did *not* possess the qualities required of a Jones Day partner.

Nor can Savignac, with such a slim record, prove that he would have made partner by pointing to Jones Day's partnership decisions with respect to other lawyers.  Partners are not fungible widgets; decisions regarding partnership admissions are highly individualized, and Savignac will not be able to establish that he would have been admitted to the partnership by reference to decisions regarding others whose experience, skills, performance, and future prospects are not "nearly identical."  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999); *see also Bolden v. Winter*, 602 F. Supp. 2d 130, 140 (D.D.C. 2009) ("To be similarly situated a 'plaintiff . . . must demonstrate that all of the relevant aspects of [his] employment situation were "nearly identical" to those of [his comparables].'") (quoting *Holbrook*, 196 F.3d at 261).  Even if Savignac took discovery regarding the personal qualities and legal abilities of each of his 2011 classmates, he would still lack the necessary predicate to compare himself to any of those individuals in arguing that he would have made partner—a multi-year record of demonstrated performance at Jones Day and a sufficiently comprehensive evaluation by his colleagues.  Savignac cannot fill that gap through speculation about how he would have done.

The speculative nature of Savignac's claim for partner compensation precludes those damages as a matter of law.  *See Peyton*, 287 F.3d at 1128 ("Certain considerations 'including whether an award of front pay would be unduly speculative, may in some circumstances limit the court's discretion [to award front pay].'" (quoting *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995)) (internal quotation marks omitted); *Estes v. Georgetown Univ.*, 231 F. Supp. 2d 279 (D.D.C. 2002) (rejecting claim for damages based on future promotions because such promotions were too speculative); *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 878 (S.D.N.Y. 1999) ("[U]nder no circumstances can the award be based on undue speculation."); *Meschino v. Int'l Tel. & Tel. Corp.*, 661 F. Supp. 254, 258 (S.D.N.Y.1987) (assumption that plaintiff would have been promoted

18

based on praise of former supervisor who had been replaced was too speculative); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567-68 (D.C. Cir. 1993) (lost earnings projection based on possible lines of work was too speculative).  For this reason too, discovery regarding the partnership is not relevant.

### B.    The Partnership Discovery Is Highly Intrusive, Burdensome, and Expensive

Turning to the other side of the Rule 26 balancing, Savignac's partnership discovery would—despite its minimal, dubious value—impose enormous costs and burdens on Jones Day, its partners, and third parties.  Indeed, despite this Court's admonition that discovery in this case should be focused and limited, discovery to date has been anything but.  Savignac's broad partnership discovery requests, in particular, are so overbroad and disproportionate to the needs of this case as to suggest they are motivated primarily by a desire to burden and harass.

For one, the expansive discovery Savignac seeks implicates significant privacy concerns for both Defendants and for nonparties to the litigation.  As Savignac is well aware, the information he seeks regarding individual partner compensation is considered highly sensitive and is not even available to Jones Day partners.  Savignac's requests, moreover, not only implicate Jones Day's confidentiality concerns, but also the confidentiality of hundreds of current and former Jones Day partners who are not parties to or remotely relevant to this dispute.  As courts have recognized, "particularly in cases where a third party's sensitive information is requested, the court may consider the privacy interests at stake in determining whether the discovery is proportional to the needs of the case." *E.g.*, *Quarrie v. Wells*, No. 17-cv-350, 2020 WL 1514798, at *6 (D.N.M. Mar. 30, 2020).  This type of information should be subject to production only if there is a very strong reason why it is relevant, and certainly not based on the hypothetical speculation here.

Moreover, Savignac's partnership discovery, if allowed, will also require extensive discovery of third parties, such as Savignac's current employer and the other firms to which he

applied for employment.  This is because any damages award based on the compensation he could have expected to receive at Jones Day "should be reduced by the amount that the victim actually earned or could reasonably have earned during the front pay period." *Barbour*, 952 F. Supp. at 863.  Thus, to the extent Savignac takes discovery to prove both that he would have made partner at Jones Day and the amount of his theoretical partner earnings at Jones Day for some forward-looking or indefinite period of time, Defendants will need to take mirroring discovery from Steptoe (and potentially other firms where Savignac sought employment) about its evaluations of Savignac, its partnership selection process, and the compensation of its partners in order to investigate both Savignac's likelihood of being promoted to partner and his likely future earnings. It is unlikely Steptoe will be willing to voluntarily turn over detailed information regarding these topics, and additional discovery disputes are therefore to be expected.  Undertaking all of this delay, cost, and burden in this case—particularly when it would be folly to expect the Court to ascertain with the requisite certainty that Savignac's partnership prospects and future earnings are lower at Steptoe than they would have been at Jones Day—would be truly unreasonable.[2]

Third, despite the breadth of Savignac's discovery requests, Savignac's claim for retaliation is actually a narrow one based on a specific set of facts unique to him.  This is not a class action, and the retaliation claim raised by Savignac should not justify class-like discovery regarding every partner currently at Jones Day and every partner who has been affiliated with Issues & Appeals—regardless of seniority—within the last seven years.  Indeed, the discovery sought by Savignac goes far beyond the discovery sought in the *Tolton* case, which *was* a putative

---

[2] If Plaintiffs actually obtained the massive amount of partnership data they are demanding, they would also need an expert to analyze it, which will further add to the cost and delays in resolving the case.  Yet expert testimony about Savignac's future earnings at Jones Day and Steptoe (or some other unidentified future firm) would be entirely speculative and inadmissible.

class action and involved several named plaintiffs, including one who was more senior than Savignac was at the time of Savignac's termination.

In addition, the amount in controversy for Savignac's retaliation claim is simply not large enough to justify his expansive and burdensome discovery requests. Savignac's compensatory damages will be limited to the five months in which he was out of work, plus—at most—the differential, if any, between his compensation at Steptoe and Jones Day for the limited period of time it would have taken for him to obtain comparable employment. The amount in controversy on this claim is unlikely to exceed six-figures, at an absolute maximum. In attorney time alone, the cost of all of the partnership discovery and third-party discovery that Plaintiffs' requests necessitate would almost certainly exceed Savignac's maximum possible damages.

Finally, denial of this discovery will have a minimal impact on Savignac. Savignac was an associate when he was terminated, and Defendants have *already* agreed to produce seven years of compensation information regarding associates, including information for the two years after Savignac was terminated. That information is more than sufficient for Savignac to determine his alleged damages, if any, for up to two years, and beyond that, Savignac's damages claim becomes highly speculative for reasons previously discussed. But even in the highly improbable scenario in which Savignac could claim lost pay for a brief period as a partner, he cannot justify his sweeping demands for years' worth of detailed personnel and compensation records for hundreds of Jones Day partners. Savignac was an Issues & Appeals associate in Washington, D.C., yet he requests, among other things, current information regarding all Jones Day partners, in all practice groups throughout the world, and historical information regarding all Issues & Appeals partners regardless of seniority. Savignac's requests for detailed information regarding all new partners is similarly overbroad, lacking any limitation even by practice group or geography. Simply put,

neither the compensation of a transactional partner in Sydney, nor that of a 20-year Issues & Appeals partner in San Francisco is relevant to Savignac's potential compensation as a senior associate or even as a first-year partner in the Issues & Appeals practice in Washington.

In short, there is simply no plausible argument that litigation of Savignac's narrow retaliation claim, which can be decided on the merits without *any* of the partnership information Savignac seeks, reasonably and proportionally justifies the production of personnel records and compensation data for all Jones Day partners across all offices for a multi-year period.  Plaintiffs are targeting what they know to be highly confidential Firm information, and the facial overbreadth of these requests suggests that Plaintiffs' discovery demands are not designed to establish their claims or damages theories, but are instead intended to burden and harass Defendants or to extort a settlement.  Because the purported relevance of this discovery is highly speculative, the demands on Defendants of the discovery are highly burdensome, and the nature of this discovery will significantly deepen the intrusion on third parties, Plaintiffs' request for partnership information should be denied.

### C.   Damages Discovery Is, At Best, Premature

As explained above, the Court should deny the partnership discovery altogether.  Jones Day has already agreed to produce compensation information for associates through the end of 2020, which would provide Savignac with pay data for seven years—including two full years following his termination.  Plaintiffs have more than enough information to assess damages through a reasonable period for Savignac to find "comparable employment," which he did.

But at a minimum, there is no reason to conduct this discovery now.  "It has long been recognized that trial courts are vested with broad discretion to manage the conduct of discovery." *Chavous*, 201 F.R.D. at 2 (citing *Brennan v. Loc. Union No. 639, Int'l Bhd. of Teamsters Chauffers, Warehousemen & Helpers of Am.*, 494 F.2d 1092, 1100 (D.C. Cir. 1974)).  Here, if the Court does

not deny the discovery outright, there is good cause at least to bifurcate discovery regarding liability and damages until after consideration of the merits of Savignac's claims, consistent with precedent within and outside this Circuit in Title VII cases.

Suits alleging pattern or practice discrimination, for example, are "typically divided into two phases, a liability phase and a damages phase." *Taylor v. D.C. Water & Sewer Auth.*, 205 F.R.D. 43 (D.D.C. 2002). In *Keepseagle v. Veneman*, for instance, the case was split into a liability and damages phase. In opposing a motion to compel certain income-related documents, Plaintiffs argued that those documents were "not central to assessing [the] allegations of discrimination and, thus, the damages and income documents requested here are not relevant," William Whiting's Resp. to Def.'s Mot. to Compel Doc. Produc., No. 99-cv-03119 (D.D.C. Sept. 5, 2008), 2008 WL 4277662, and the Court denied the motion to compel in a minute order "[s]ubstantially for the reasons advanced by the [P]laintiffs." Minute Order, *Keepseagle*, No. 99-cv-03119 (D.D.C. Nov. 13, 2008). *See also EEOC v. Nebco Evans Distrib., Inc.*, No. 96-cv-00644, 1997 WL 416423, at *2 (D. Neb. June 9, 1997) ("By limiting the scope of the first phase to liability, there is no need to conduct extensive discovery relating to the individual applicants' damages until the need for such evidence has proved necessary.").

For good reason: These cases recognize that putting off expensive, burdensome, and intrusive discovery until necessary allows the parties to avoid discovery into issues that may never become relevant and also moderates the intrusiveness of discovery into highly sensitive information. *See, e.g.*, *EEOC v. Lawler Foods, Inc.*, 128 F. Supp. 3d 972, 974 (S.D. Tex. 2015) (bifurcating discovery because "'when one issue may be determinative of a case, the court has discretion to stay discovery on other issues until the critical issue has been decided'") (quoting 8A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2040 (3d ed. 2010)); *Nebco Evans*

*Distrib*, 1997 WL 416423, at *2 (bifurcating discovery in Title VII case to determine whether extensive discovery on damages was necessary); *Pasternak v. Dow Kim*, 275 F.R.D. 461, 463 (S.D.N.Y. 2011) (production of highly confidential financial information to establish punitive damages was premature before a finding of liability).  Bifurcating discovery is the most efficient way forward here, for several reasons.

First, it is clear in this case that there is no need for this information *now*—Plaintiffs will be fully able to litigate the merits of their claims without the requested partnership discovery.  And, in fact, there is a good chance this discovery will *never* become relevant.  Information regarding Savignac's likelihood of being promoted to partner if he had remained at Jones Day requires Savignac at least to establish that his termination was unlawful and that relief beyond two years is appropriate.  Information regarding partner *compensation* is even more remote.  If any one of the issues in Savignac's chain of assumptions is resolved in Defendants' favor, it will eliminate the need for partnership information entirely.  And because front pay determinations are "left to the equitable discretion of the trial court," *Coulibaly*, 2020 WL 1536185, at *10, delaying damages discovery until it is necessary will not interfere with the progress of this case.

In addition, as explained, the partnership discovery Savignac seeks will necessarily require the involvement of third parties, including Savignac's current employer and the firms to which he applied.  Involving these third parties will only further delay resolution of this case, as a new scope of production must be negotiated and this Court must resolve disputes regarding access to highly confidential third party information.  Given the strong likelihood that partnership information will *never* be relevant, it makes little sense to impose the burden and expense of this discovery on these third parties now, when the Court's consideration of the merits of Savignac's claim and his entitlement to front pay could obviate the need for it altogether.

24

Finally, full-blown damages discovery now is particularly ill-suited for the current posture of this case, as it will further distract the parties from the resolving the critical and immediate questions of whether Plaintiffs' substantive claims have merit.  Plaintiffs are already seeking massive discovery into those questions, and merits discovery is not close to complete.  Plaintiffs have produced virtually no documents responsive to Jones Day's demands, the parties are still meeting-and-conferring over Plaintiffs' *first* set of discovery requests (with three more sets of written requests to Defendants still to be discussed), and Defendants have raised substantial concerns with the scope of Plaintiffs' responses to written discovery (which discussions also are ongoing).  There is substantial work already to be done just to close document discovery and get to the deposition phase.  The parties' time and resources would be far better spent by focusing on the merits issues now, rather than diverting efforts to damages issues that may ultimately prove unnecessary.

## II.   DISCOVERY REGARDING DEFENDANTS' FINANCIAL RESOURCES IS NOT RELEVANT

In addition to the partnership discovery discussed above, Plaintiffs have also sought discovery regarding the financial condition of the Defendants.[3]  This discovery also should not be allowed as it will never become relevant to any issue in the case and is, at best, premature.

Courts have recognized that discovery regarding a defendant's financial resources is intrusive and raises special concerns of privacy.  *See, e.g., Rupert v. Sellers*, 48 A.D.2d 265, 271-

---

[3] Plaintiffs' requests seek information regarding the financial resources of all Defendants. However, because the individual defendants are entitled to indemnification, the only even arguably relevant financial information is that of Jones Day.  *See Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996) ("When the [individual] defendant is to be fully indemnified, [evidence of the individuals' net worth], far from being required, is inadmissible."); *Bostic v. Vasquez*, No. 15-cv-429, 2018 WL 4026287, at *1 (N.D. Ind. Aug. 23, 2018) ("[W]hen an individual defendant is to be fully indemnified, evidence of the defendant's net worth is inadmissible for purposes of calculating punitive damages.").

72 (N.Y. App. Div. 1975); *Pasternak*, 275 F.R.D. at 463; *Davis v. Ross*, 107 F.R.D. 326 (S.D.N.Y. 1985); *D'Onofrio v. SFX Sports Grp., Inc.*, 247 F.R.D. 43, 53 (D.D.C. 2008).  And Plaintiffs acknowledge that Jones Day's financial resources would only be relevant, if at all, for punitive damages, which requires a finding of liability and a right to compensatory damages.

But even if Plaintiffs do establish these predicates, the Firm's financial resources will still not be relevant to the amount of those damages.

For one, the constitutional limit on punitive damages pursuant to the Due Process Clause will preclude any award high enough to make Defendants' financial resources relevant.  In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003), the Supreme Court made clear that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  Even in the best-case scenario for Plaintiffs, compensatory damages will be low:  Sheketoff alleges damages only based on one smaller-than-expected increase in compensation one year before she voluntarily left Jones Day.  And, as explained above, Savignac's damages would be limited to the five months in which he was out of work, plus any differential to the extent his compensation at Steptoe was not roughly approximate to his Jones Day salary, limited to the period of time it would have taken Savignac to obtain comparable employment.  Even if Plaintiffs were to establish compensatory damages in the mid-six-figures—the absolute outer limit of any conceivable damages—due process would limit the punitive award to an amount that would not even remotely implicate the Firm's ability to pay.

Moreover, because Jones Day has not, and does not intend to, put its ability to pay in issue, its financial condition is not relevant even to punitive damages.  The D.C. Circuit has recognized that while a defendant's financial condition *may* become relevant to punitive damages, "the weight of authority places on *the defendant* the burden of producing evidence of his own financial

condition if he wishes it considered by the jury." *Hutchinson v. Stuckey*, 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992); *see also Schaub v. VonWald*, 638 F.3d 905, 926 (8th Cir. 2011) (same); *Bell v. Clackamas Cnty.*, 341 F.3d 858, 868 (9th Cir. 2003) (reduction of punitive damages award based on ability to pay available only if record substantiates defense); *Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997) ("Under well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the [punitive damages] award.'"). Thus, "[d]efendants may decline to place ability to pay in issue, and financial condition becomes irrelevant to the issue of calculating an appropriate amount of punitive damages." *Morgan v. Spivey*, No. 16-cv-365, 2019 WL 4463299, at *1 (E.D.N.C. Sept. 17, 2019); *see also D'Onofrio*, 247 F.R.D. at 53 (delaying discovery of financial information because "a defendant may never put its financial condition at issue").[4]

In any event, like the partnership information sought by Plaintiffs, discovery of Jones Day's financial information is premature, at best. Because of the confidential nature of financial information and the uncertainty of a punitive damages award, courts within this District have denied discovery regarding a defendant's financial condition until its relevance has been established. *See, e.g.*, *D'Onofrio*, 247 F.R.D. at 53 (considering it "prudent to postpone the production of such information in the event that the jury does not consider punitive damages or

---

[4] Cases applying the D.C. Human Rights Act have similarly recognized that "evidence of a corporate defendant's net worth is not always a prerequisite to an award of punitive damages." *See Daka, Inc. v. McCrae*, 839 A.2d 682, 694 (D.C. 2003). The D.C. Court of Appeals has held that, in some circumstances, plaintiffs have the burden of introducing evidence on a defendant's "net worth." *Id.* at 694-95 ("[O]ur decisions have reserved the requirement that a plaintiff firmly establish the defendant's net worth—i.e., the amount by which its assets exceed its liabilities at the time of trial—to cases specifically where a plaintiff invokes the defendant's wealth, and even then net worth is only one of several considerations relevant to a punitive damages consideration." (internal quotation marks and citations omitted)). But that standard also counsels for at least delaying this discovery until after Plaintiffs have established "liabilities at the time of trial."

the defendants do not place their financial condition at issue"); *Leo T. Thibodeau Gen. Contractors, Inc. v. Brault, Graham, Scott & Brault*, No. 90-cv-0533, 1991 WL 255940, at *1 (D.D.C. Nov. 15, 1991) (holding that "[t]he discovery of financial information appropriate to a punitive damage claim is premature" before compensatory damage phase was completed); *John Does I-VI v. Yogi*, 110 F.R.D. 629, 633 (D.D.C. 1986) (same); *Peskoff v. Faber*, 230 F.R.D. 25, 30 (D.D.C. 2005) (same).  Indeed, some courts have refused to allow discovery regarding a defendant's finances until a jury returns a special verdict permitting punitive damages.  *See Rupert*, 48 A.D.2d at 272.

Even if the Court is not ready to rule that Jones Day's financial resources will never be relevant, it should at least adopt the approach of the other courts in this District and postpone production until the information becomes necessary.  Defendants regard the Firm's financial information as highly sensitive information that it does not disclose publicly.[5]  This information, moreover, will never become relevant—Plaintiffs may not establish liability; even if liability is established, a jury may not find punitive damages appropriate; and even if a jury would find punitive damages appropriate, the permissible amount of punitive damages will certainly never be high enough to put Defendants' financial condition at issue.

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' requests to take discovery regarding the Jones Day partnership, partner compensation, and the financial resources of Defendants, or, in the alternative hold that damages discovery, if any, should not occur until after the Court considers the merits of Plaintiffs' claims.

---

[5] In addition, *even if* financial information were to become relevant (which it will not), Plaintiffs' demand for three years of financial information is unnecessarily broad.

Dated: August 3, 2021

Respectfully submitted,

*/s/ Terri L. Chase*
Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Ph: (305) 714-9700
Email: tlchase@jonesday.com

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939
Email: tlovitt@jonesday.com

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Ph: (202) 879-3939
Email: cdipompeo@jonesday.com

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Ph: (412) 391-3939
Email: atbailey@jonesday.com

*Attorneys for Defendants*