# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

      v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and JOHN DOES 1-10,

    *Defendants*.

Case No. 1:19-cv-02443-RDM

## PLAINTIFFS' BRIEF IN SUPPORT OF DISCOVERY ON
## LOST WAGES AND PUNITIVE DAMAGES

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ..................................................................................................................5

Argument ....................................................................................................................9

    I.  Jones Day has not shown that the Court should bar or delay partnership discovery ..........9

        A.  A court awarding lost wages for employment discrimination must exercise
            its wide equitable authority to make the victim whole ..................................................9

        B.  Jones Day's premature merits arguments fail on both the law and the facts ..............13

            1.  Mark's new, lower-paying job does not preclude an award of lost wages ............13

            2.  Jones Day has no basis to suggest that Mark failed to mitigate...........................19

            3.  Fear of "speculation" is no basis to deny discovery ..............................................21

        C.  Jones Day has not shown that partnership discovery is disproportional....................33

        D.  Jones Day's proposed bifurcation would unduly delay this litigation, but
            Plaintiffs would agree to a more limited phasing that would not ...............................36

    II.  Jones Day has not shown that the Court should bar or delay punitives discovery ..........39

        A.  Plaintiffs are entitled to discover and present evidence of Defendants' wealth .........39

        B.  The Court should compel responses to Plaintiffs' other punitives requests ...............42

    III.  Jones Day's bickering about discovery is both irrelevant and deceptive ........................43

Conclusion ..................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Adenariwo v. Federal Maritime Commission,*
   808 F.3d 74 (D.C. Cir. 2015) ........................................................................21

\* *Albemarle Paper Co. v. Moody,*
   422 U.S. 405 (1975) ...............................................................9, 10, 11, 14, 34

*Association of Battery Recyclers, Inc. v. EPA,*
   208 F.3d 1047 (D.C. Cir. 2000) ..................................................................16

*Avitia v. Metropolitan Club of Chicago, Inc.,*
   49 F.3d 1219 (7th Cir. 1995) .......................................................................18

*Banks v. Perdue,*
   2019 WL 147445 (D.D.C. 2019) .............................................................15, 16

*Barbour v. Medlantic Management Corp.,*
   952 F. Supp. 857 (D.D.C. 1997) .............................................................15, 16

\* *Barbour v. Merrill,*
   48 F.3d 1270 (D.C. Cir. 1995) ..................1, 3, 4, 9, 10, 11, 12, 13, 14, 15, 21, 32, 33

*Berger v. Iron Workers Reinforced Rodmen,*
   170 F.3d 1111 (D.C. Cir. 1999) ..................................................................13

*Bigelow v. RKO Radio Pictures,*
   327 U.S. 251 (1946) ................................................................................12, 26

*Biondo v. City of Chicago,*
   382 F.3d 680 (7th Cir. 2004) .......................................................................18

*BMW of North America, Inc. v. Gore,*
   517 U.S. 559 (1996) ................................................................................42, 43

*Chatman v. Lawlor,*
   831 A.2d 395 (D.C. 2003) ...........................................................................41

*City of Los Angeles v. Manhart,*
   435 U.S. 702 (1978) .......................................................................................10

*City of Newport v. Fact Concerts, Inc.,*
   453 U.S. 247 (1981) .......................................................................................40

*Collazo v. Bristol-Myers Squibb Manufacturing, Inc.,*
   617 F.3d 39 (1st Cir. 2010) ...........................................................................36

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,*|
    532 U.S. 424 (2001) ............................................................................... 39

*Cortez v. Trans Union, LLC,*
    617 F.3d 688 (3d Cir. 2010) .................................................................. 40

*Daka, Inc. v. Breiner*,
    711 A.2d 86 (D.C. 1998) ....................................................................... 39

*Daka, Inc. v. McCrae*,
    839 A.2d 682 (D.C. 2003) ..................................................................... 41

*Day v. Mathews*,
    530 F.2d 1083 (D.C. Cir. 1976) ........................................................ 1, 12

*Donlin v. Phillips Lighting North America Corp.*,
    581 F.3d 73 (3d Cir. 2009) .................................................................... 32

*Dotson v. Pfizer, Inc.*,
    558 F.3d 284 (4th Cir. 2009) ................................................................ 19

*Eastman Kodak Co. v. Southern Photo Materials Co.*,
    273 U.S. 359 (1927) .............................................................................. 26

*EEOC v. MacMillan Bloedel Containers, Inc.*,
    503 F.2d 1086 (6th Cir. 1974) .............................................................. 37

*EEOC v. University of Pennsylvania*,
    850 F.2d 969 (3d Cir. 1988) .................................................................. 37

*Ford Motor Co. v. EEOC*,
    458 U.S. 219 (1982) .............................................................................. 34

*Fraenkel v. Islamic Republic of Iran*,
    892 F.3d 348 (D.C. Cir. 2018) .............................................................. 40

*Grubbs v. Butz*,
    514 F.2d 1323 (D.C. Cir. 1975) ....................................................... 36, 38

*Hackley v. Roudebush*,
    520 F.2d 108 (D.C. Cir. 1975) .............................................................. 36

*Hamen v. Islamic Republic of Iran*,
    407 F. Supp. 3d 1 (D.D.C. 2019) .......................................................... 40

*Hardenbrook v. UPS, Inc.*,
    490 F. App'x 45 (9th Cir. 2012) ........................................................... 32

*Harrison v. Dole*,
  643 F. Supp. 794 (D.D.C. 1986) .......................................................................27

*Holbrook v. Reno*,
  196 F.3d 255 (D.C. Cir. 1999) ........................................................................31

*Hopkins v. Price Waterhouse*,
  737 F. Supp. 1202 (D.D.C. 1990) ......................................................19, 20, 21

*Hukkanen v. International Union of Operating Engineers*,
  3 F.3d 281 (8th Cir. 1993) ...............................................................................32

*Hutchinson v. Stuckey*,
  952 F.2d 1418 (D.C. Cir. 1992) ......................................................................39

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939)..........................................................................................22

*Jonathan Woodner Co. v. Breeden*,
  665 A.2d 929 (D.C. 1995) ...............................................................................41

*Kemezy v. Peters*,
  79 F.3d 33 (7th Cir. 1996) ...............................................................................41

*Kolstad v. American Dental Ass'n*,
  527 U.S. 526 (1999) .........................................................................................39

*Lamaute v. Power*,
  2021 WL 1978971 (D.D.C. 2021) ...................................................................33

*Lewis v. Federal Prison Industries, Inc.*,
  953 F.2d 1277 (11th Cir. 1992) .......................................................................11

*Mota v. University of Texas*,
  261 F.3d 512 (5th Cir. 2001) ...........................................................................32

*NLRB v. Madison Courier, Inc.*,
  472 F.2d 1307 (D.C. Cir. 1972) ......................................................................13

*North Dakota Fair Housing Council, Inc. v. Allen*,
  298 F. Supp. 2d 897 (D.N.D. 2004)..................................................................42

*Oil, Chemical & Atomic Workers International Union v. NLRB*,
  547 F.2d 598 (D.C. Cir. 1976) ........................................................................13

*Ollie v. Titan Tire Corp.*,
  336 F.3d 680 (8th Cir. 2003) ...........................................................................33

*Padilla v. Metro-North Commuter Railroad*,
    92 F.3d 117 (2d Cir. 1996) .......................................................................................32

*Peyton v. DiMario*,
    287 F.3d 1121 (D.C. Cir. 2002) .................................................................3, 12, 32, 33

*Pierce v. Atchison, Topeka & Santa Fe Railway Co.*,
    65 F.3d 562 (7th Cir. 1995) .....................................................................................32

*Pollard v. E.I. du Pont de Nemours & Co.*,
    532 U.S. 843 (2001) .................................................................................................11

*Proctor v. Consolidated Freightways Corp.*,
    942 F.2d 793 (9th Cir. 1991) ...................................................................................32

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) .................................................................................................16

*Selgas v. American Airlines*,
    104 F.3d 9 (1st Cir. 1997) ........................................................................................12

*Sponer v. Wells Fargo Bank, N.A.*,
    842 Fed. App'x 156 (9th Cir. 2021) .........................................................................40

*Staples v. Parkview Hospital, Inc.*,
    2010 WL 780204 (N.D. Ind. 2010) .....................................................................16, 17

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
    538 U.S. 408 (2003) .................................................................................................42

*TXO Production Corp. v. Alliance Resources Corp.*,
    509 U.S. 443 (1993) ............................................................................................40, 42

*Williams v. Pharmacia, Inc.*,
    137 F.3d 944 (7th Cir. 1998) ...................................................................................18

*Wulf v. City of Wichita*,
    883 F.2d 842 (10th Cir. 1989) .................................................................................32

**Statutes, rules, and regulations**

42 U.S.C. § 2000e-5 ..............................................................................13, 15, 19, 20, 36, 37

Federal Rule of Civil Procedure 26 .........................................................................4, 33, 37

Federal Rule of Civil Procedure 37 .....................................................................................2

## INTRODUCTION

Under Title VII, "[t]he district court should fashion [equitable] relief so as to provide a victim of employment discrimination the most complete make-whole relief possible." *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995). The principal form of "equitable relief" in employment discrimination cases is lost wages, comprising "back pay" from the discriminatory act through judgment and "front pay" from the date of judgment forward. *See id.* at 1277-80. The "presumption [is] that back pay will extend through the date of judgment." *Id.* at 1279. That presumption "derives from the related presumption that the employer will then rectify the discrimination by hiring or reinstating the employee. When that preferred remedy is unavailable, front pay is appropriate." *Id.* (citation omitted). "As with back pay, the purpose of front pay is to make a victim of discrimination 'whole' and to restore him or her to the economic position he or she would have occupied but for the unlawful conduct." *Id.* (quotation marks omitted).

"Certain considerations, including whether an award of front pay would be 'unduly speculative,' may in some circumstances limit the court's discretion" to award it. *Id.* at 1280. "But a district court should not refuse to award front pay merely because *some* speculation about future earnings is necessary, or because parties have introduced conflicting evidence. Indeed, in other contexts, such as when valuing lost earning capacity in a personal injury case, courts (or juries) routinely engage in some speculation, based on the factual record the parties have established. Courts are equally capable of resolving similar uncertainties when awarding front pay to victims of employment discrimination." *Id.* (citations omitted). And, in discrimination cases like this one, certainty "is impossible precisely because of the employer's unlawful action; it is only equitable that any resulting uncertainty be resolved against the party whose action gave rise to the problem." *Day v. Mathews*, 530 F.2d 1083, 1086 (D.C. Cir. 1976).

Plaintiffs have contended throughout this case that, but for his illegal firing, "Mark would have been promoted to partner in 2020—just like every Supreme Court clerk since at least 2014 who has remained at Jones Day until becoming eligible for promotion." Dkt. 1 at 8 (Compl. ¶ 55). If that is correct, then the back pay and front pay necessary to "restore [Mark] to the economic position he … would have occupied but for the unlawful conduct" of his employer (*Barbour*, 48 F.3d at 1279) is, from January 2021 onward, equal to the pay that Mark would have earned as a Jones Day partner minus his actual earnings. With the possible exception of punitive damages, Mark's lost partnership pay is the central item of damages in this case. Plaintiffs therefore "seek discovery to show (a) that Mark would now be a partner at Jones Day but for the unlawful termination; and (b) what Mark's pay as a Jones Day partner would be." Dkt. 60 at 1.

Jones Day asks that the Court "deny Plaintiffs' requests to take discovery" on the ground that Plaintiffs' damages "theory is not going to work, and the Court should make that clear now." Dkt. 66 at 16, 34. In other words, Jones Day is effectively seeking early summary judgment on the main item of damages—which may be why its brief is as long as its motion to dismiss was— but without allowing Plaintiffs the discovery needed to oppose summary judgment, and without submitting evidence showing that there is no genuine dispute of material fact (which it cannot do).

Jones Day pitches the ruling it requests as a sort of extraordinarily punitive sanction for what it deems to be generally excessive discovery requests by Plaintiffs. But it offers no legal support for this argument, which rests on a one-sided and misleading account of discovery and seeks to circumvent Rule 37's prerequisites for discovery-related sanctions. In an attempt to conserve the Court's time from the parties' irrelevant bickering about discovery matters that, in the ordinary course, would never come before the Court, Plaintiffs will confine their response on this point to the final section of this brief.

The rest of Jones Day's submission reads like a trial brief of the sort that a defendant might file asking the judge to deny lost wages "based on the factual record the parties have established." *Barbour*, 48 F.3d at 1280. That should raise a red flag, since what Jones Day is actually requesting is that the Court prohibit Plaintiffs from establishing any factual record in the first place. While Jones Day insists (contrary to the binding authorities that it conspicuously ignores) that lost wages are disfavored in discrimination cases, it does so by reference to (non-binding and inapposite) cases decided *after full discovery and a bench trial*. Jones Day does not even try to point to cases holding, as it would have this Court hold, that an award of lost wages is so obviously inappropriate that the Court need not even permit discovery into the facts bearing on the appropriate award.

Even taken on its own terms, as a sort of trial brief, Jones Day's filing is a loser on both the law and the facts. *First*, Jones Day renews its argument that a discrimination victim who mitigates his damages (as Title VII requires) and obtains a new, lower-paying job thereby loses any claim to be made whole through recovery of the difference between what he would have made at his old job and what he in fact makes at the new one. Not a single case supports this proposition. Jones Day's own cited cases refute it. So does the D.C. Circuit's repeated instruction that "[t]he district court should fashion [equitable] relief so as to provide a victim of employment discrimination *the most complete make-whole relief possible*." *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002) (emphasis added) (quoting *Barbour*, 48 F.3d at 1278).

*Second*, Jones Day insinuates that Mark could surely obtain an equally remunerative job if he wanted to and must have made a deliberate decision not to do so, which would be a failure to mitigate. Wrong. Mark sought employment from more than 40 firms and received just one offer— hardly a surprising outcome for an eighth-year appellate associate whose firm fired him without warning and prohibited his supervisors from acting as references.

*Third*, Jones Day warns that the Court would have to *speculate* to find that Mark would have made partner and what he would have earned.  But the law is clear that a degree of speculation is not just permissible but *required* in cases like this.  *E.g.*, *Barbour*, 48 F.3d at 1280.  That is why the D.C. Circuit decided in *Barbour* to *reverse* the district court's denial of front pay—even though that denial came after full discovery and trial, and not through the sort of extraordinary pre-discovery ruling that Jones Day seeks here.  The substantive law makes clear that Jones Day should be compelled to provide partnership discovery.

A glance at the procedural law governing discovery confirms that conclusion.  Jones Day admits that it bears the burden of showing that the requested discovery is disproportionate under the Rule 26(b)(1) factors.  Dkt. 66 at 14.  Yet it never even addresses most of those factors.  And it is not plausible that the requested information—mostly pay- and evaluation-related records that any competent business would keep in accessible electronic form—would be costly to produce.  In the end, Defendants' argument boils down to this: Jones Day and its constituent partners *really, really want* to keep the requested information secret from Plaintiffs, despite the broad protective order in this action.  If that were the standard, then civil discovery would cease to exist.

Likewise deficient are Jones Day's arguments against discovery on punitive damages.  Jones Day does not even address the legal standards governing the availability of such damages, which Plaintiffs will easily meet in this case.  It argues that Plaintiffs cannot discover Defendants' net worth because the decision whether to introduce that evidence rests solely with Defendants.  But the authorities are to the contrary.  And Jones Day offers no objection to Plaintiffs' other punitive damages requests, which seek discovery into Jones Day's punitive damages defenses and its pattern of similar retaliation against others.  The Court should compel Jones Day to produce the requested discovery.

**BACKGROUND**

**A.      Facts.**  Mark joined Jones Day in May 2017 with an associate salary of $375,000.

By the time Jones Day fired him in January 2019, his salary had increased to $500,000.  Associate

salaries are adjusted each July, and Plaintiffs believe that Mark's salary would have been raised to

around $600,000 in July 2019, with another large increase in July 2020.  Jones Day has yet to

provide discovery that would confirm or cast doubt on Plaintiffs' beliefs.

Jones Day has a one-tier partnership: All partners are equity partners.  Plaintiffs understand

that an associate is eligible after he has both (1) been out of law school for nine-and-a-half years

and (2) worked at Jones Day for three years.  Jones Day concedes that Mark (who graduated in

2011) "would have been eligible" in 2020.  July 20 Tr. 15:16-21.  Plaintiffs will prove that he

would have been considered in 2020 and promoted effective January 1, 2021.[1]  This should not be

difficult to prove, both because Jones Day appears to promote all Supreme Court clerks who meet

the "nine-and-three" requirement and because Mark's ability and performance—as evidenced by,

among other things, his years of formal evaluations and the top-end $500,000 salary that Jones

Day set through its ostensibly merit-based process—exceed any standard that Jones Day could

claim to apply.  Jones Day's brief does not argue otherwise.  After all, Jones Day promoted 50

attorneys to partner effective January 2021.  The 50 included all four former Supreme Court clerks

eligible under the nine-and-three rule.  And two of the four had joined Jones Day *after* Mark did.

---

[1] Jones Day misrepresents the timeline.  *See* Dkt. 66 at 8 ("he would not even have been *eligible* for consideration for promotion to partner for at least two more years"); *id.* at 13 ("Savignac was years away from even being considered for partner"); *id.* at 15 ("might have been promoted to partner two or more years after his termination").  Mark started at Jones Day on May 8, 2017, and was fired more than 20 months later, on January 22, 2019.  He would have been promoted to partner effective January 1, 2021, less than two years after his termination.  The actual process of considering him and deciding to promote him would have played out during the second half of 2020, meaning that he was some 18-22 months away from consideration when he was fired.

After he was fired, Mark sought employment with more than 40 firms, including every D.C. firm with a comparable Supreme Court practice.  He received just one offer, to be an associate in the appellate practice of Steptoe & Johnson.  (To accept that offer, he withdrew his two remaining live applications, with the firms MoloLamken and Potomac Law Group.)  Mark's job search was impeded by (1) the fact that Jones Day had fired him; (2) Jones Day's retaliatory decision to prohibit the well-connected partners with whom Mark had worked most the prior year (█████████████████████████) from acting as references; and (3) the reality that the top law firms have little interest in hiring a senior appellate associate from a peer firm.

In June 2019, Mark joined Steptoe ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████

████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



, pay at Jones Day varies widely and appears to be weighted heavily in

---

[2] *See* Wikipedia, "List of largest United States-based law firms by profits per [equity] partner."

7

favor of Supreme Court clerks in Issues & Appeals.  This is certainly the case with associate pay, as shown (for example) by Jones Day's admission that Julia and a few other former Supreme Court clerks were the firm's five highest paid 2010 law school graduates as of July 2016.  Dkt. 49 at 13 (Answer ¶ 67).  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨.

The natural inference is that the hierarchy for partner pay is similar.

**B.    Discovery requests.**  The partnership discovery at issue here falls into three buckets.  *First*, to prove that Mark would indeed have made partner, Plaintiffs seek documents showing (a) the policies and practices that guide partnership decisions (including practices with respect to Supreme Court clerks), (b) how partners who worked with Mark in 2018 assessed his performance, (c) Jones Day's ostensible basis for disputing that Mark would have made partner, (d) Jones Day's assessment of and the attributes of the attorneys that it promoted or did not promote around the time that Mark would have been eligible, and (e) documents from the actual process by which partnership decisions are made.  This discovery would allow Plaintiffs to show where Jones Day sets the bar for partnership and prove that Mark would have cleared it.

*Second*, to show what Mark's compensation as a partner would have been, Plaintiffs seek documents showing (a) how Jones Day sets partner pay (including standard annual compensation, plus the pay of the subset of partners who share in the firm's profits), (b) general policies bearing on partner income, and (c) the pay history and related attributes of those partners who appear to be most similarly situated: U.S.-based partners in the Issues & Appeals practice or who clerked at the Supreme Court.  Jones Day, most of whose offices are abroad, repeatedly complains that Plaintiffs seek "worldwide" data, but that is not true; Plaintiffs' requests state that they "do not seek information relating solely to Jones Day's non-U.S. operations and employees."  Plaintiffs do

seek pay data for all U.S. partners, but Plaintiffs would forgo the request if Jones Day would stipulate that Issues & Appeals partners are the best comparators for compensation purposes and that it would not use pay data from other practices in this case or argue that Issues & Appeals partners provide too small a data set to reliably project Mark's pay.  Absent that stipulation, the request is appropriate; Jones Day does not suggest that it would be costly to produce pay records and has given Plaintiffs no reason to be confident that data about other partners is not relevant.

*Third*, Plaintiffs seek information about how long attorneys remain at Jones Day after being promoted to partner.  The D.C. Circuit has said that this is important to setting the front pay period.

## ARGUMENT

I.  **Jones Day has not shown that the Court should bar or delay partnership discovery.**

A.  **A court awarding lost wages for employment discrimination must exercise its wide equitable authority to make the victim whole.**

The leading case on lost wages in workplace discrimination lawsuits is *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975).  In this Circuit, the leading case on the front pay standard is *Barbour*, 48 F.3d 1270.  Yet while Jones Day's table of authorities runs to 57 decisions, it never mentions *Albemarle*; its whole brief only includes one Supreme Court case, which addresses punitive damages, not lost wages.  And it mentions the *Barbour* precedent only in a "quoting" parenthetical, preferring to cite the district court decision on remand there and the later one-paragraph order affirming it.  The dispute at the conference was over the basic framework for lost wages awards, so these omissions are unfortunate.  Here is a brief account of that framework.

**Lost wages.**  The "primary objective" of Title VII is to end employment discrimination. *Albemarle*, 422 U.S. at 417.  Lost wages awards have "an obvious connection with this purpose," because they give employers a monetary "incentive to shun practices of dubious legality."  *Id.* This deterrence rationale looms large in this case, where Jones Day argues (frivolously) that "[t]he

9

amount in controversy on this [retaliatory termination] claim is unlikely to exceed six-figures, at an absolute maximum." Dkt. 66 at 27. A six-figure award would have zero deterrent effect on either Jones Day (with annual revenues over $2 billion) or the culpable individuals.

"It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination. This is shown by the very fact that Congress took care to arm the courts with full equitable powers. For it is the historic purpose of equity to 'secure complete justice.'" *Albemarle*, 422 U.S. at 418. *Barbour* echoes the point that, "under Title VII, a district court has wide discretion to award equitable relief." 48 F.3d at 1278. Of course, "discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Albemarle*, 422 U.S. at 416 (citation omitted).

*Albemarle* and *Barbour* are explicit about the guiding legal principle: "Title VII deals with legal injuries of an economic character," and "where a legal injury is of an economic character, … *[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed*." *Id.* at 418-19 (emphasis added; quotation marks omitted). "The district court should fashion [lost wages] relief so as to provide a victim of employment discrimination the most complete make-whole relief possible." *Barbour*, 48 F.3d at 1278.

**Back pay.** "Back pay" refers to lost wages covering the time from the act of discrimination (here, Mark's firing) through final judgment. *Albemarle* held that "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole." 422 U.S. at 421. Thus, the "presumption [is] that back pay should extend through the date of judgment." *Barbour*, 48 F.3d at 1279. "The *Albemarle* presumption in favor of retroactive liability can seldom be overcome." *City of Los Angeles v. Manhart*, 435 U.S. 702, 719 (1978).

10

**Front pay.** "The presumption that back pay will extend through the date of judgment derives from the related presumption that the employer will then rectify the discrimination by hiring or reinstating the employee. When that preferred remedy is unavailable, front pay is appropriate." *Barbour*, 48 F.3d at 1279 (citation omitted). "[F]ront pay is simply money awarded for lost compensation … in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). "Courts recognized that reinstatement was not always a viable option, and that an award of front pay as a substitute for reinstatement in such cases was a necessary part of the 'make whole' relief mandated by Congress and by this Court in *Albemarle*." *Id.* at 850. Thus, "[a]s with back pay, the purpose of front pay is to make a victim of discrimination 'whole' and to restore him or her to the economic position he or she would have occupied but for the unlawful conduct." *Barbour*, 48 F.3d at 1279 (quotation marks omitted).[3]

**Speculation.** "Certain considerations, including whether an award of front pay would be 'unduly speculative,' may in some circumstances limit the court's discretion" to award front pay. *Barbour*, 48 F.3d at 1280. Such "undue speculation may exist in cases in which the plaintiff provides no basis for calculating an appropriate award." *Id.* But the D.C. Circuit has held that:

> a district court should not refuse to award front pay merely because *some* speculation about future earnings is necessary, or because parties have introduced conflicting evidence. Indeed, in other contexts, such as when valuing lost earning capacity in a personal injury case, courts (or juries) routinely engage in some speculation, based on the factual record the parties have established. Courts are equally capable of resolving similar uncertainties when awarding front pay to

---

[3] Jones Day's brief paints a picture that is irreconcilable with D.C. Circuit law. For instance, it quotes the Eleventh Circuit's statement that "[f]ront pay remains a special remedy, warranted only by egregious circumstances." Dkt. 66 at 16 (quoting *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992)). If that were a fair account of that court's position, then this Court would have to reject it in favor of the D.C. Circuit's. In fact, though, *Lewis* addressed the rare case where the defendant offers reinstatement, the victim rejects it, and yet the victim is still entitled to collect front pay *while not working at all* (which the Eleventh Circuit held was the right outcome in *Lewis*). *See* 953 F.2d at 1279-81. *Lewis* was not addressing the typical case where front pay is needed to compensate a victim for the lower salary earned from an alternate employer.

victims of employment discrimination.

*Id.* (citations omitted).  Other courts agree that "an award of front pay, constituting as it does, an estimate of what a plaintiff might have earned had s/he been reinstated at the conclusion of trial, is necessarily speculative.  However, this speculative aspect should not deter courts from fashioning awards that accomplish Title VII's goals." *Selgas v. American Airlines*, 104 F.3d 9, 14 n.6 (1st Cir. 1997).  Speculation is unavoidable in lost wages cases because they deal in counterfactuals.  It is "impossible for an individual discriminatee to recreate the past with exactitude." *Day*, 530 F.2d at 1086 (quotation marks omitted).  Speculation is also appropriate, because "[s]uch a showing is impossible precisely because of the employer's unlawful action; it is only equitable that any resulting uncertainty be resolved against the party whose action gave rise to the problem." *Id.*  Here, any uncertainty about Mark's future with Jones Day results from its illegal decision to fire him.  "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

Whereas back pay covers a definite period, from the discriminatory act to judgment, the time period covered by a front pay award is committed to the district court's equitable discretion and determined on the facts of the case.  "The longer a proposed front pay period, the more speculative the damages become." *Peyton*, 287 F.3d at 1128 (quotation marks omitted).  The D.C. Circuit has identified some "[f]actors that the court may wish to consider" in "determin[ing] the amount and duration of [front pay] relief that will make [a plaintiff] whole," including the plaintiff's age, the length of time that other individuals typically hold the position in question (here, Jones Day partner), "the length of time persons in similar positions at other companies generally hold those positions," other evidence bearing on how long the plaintiff would have remained in the position in question, and the plaintiff's "efforts at mitigation (including consideration of the

current job market and industry conditions, as well as the amount of time reasonably required for [the plaintiff] to secure comparable employment)." *Barbour*, 48 F.3d at 1280.

**Mitigation.** Title VII provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). "This creates a statutory duty to minimize damages on the part of Title VII claimants, which requires them 'to use reasonable diligence in finding other suitable employment.'" *Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111, 1133 (D.C. Cir. 1999). This "duty of mitigation" is not demanding: "The victim of discrimination … is 'merely required to make "reasonable efforts" to mitigate his loss of income, and only unjustified refusals to find or accept other employment are penalized under this rule.'" *Id.* (quoting *Oil, Chemical & Atomic Workers International Union v. NLRB*, 547 F.2d 598, 603 (D.C. Cir. 1976)). In short, "[t]he employee is held … only to reasonable exertions in this regard, not the highest standard of diligence." *Id.* (quoting *NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1318 (D.C. Cir. 1972)). The D.C. Circuit has thus "held that 'courts must be careful when applying' the mitigation doctrine, and that 'it would not be unreasonable … to resolve doubts in this area in favor of the innocent discriminatee.'" *Id.* at 1134 (quoting *Madison Courier*, 472 F.2d at 1321). "'[T]he burden of establishing facts in mitigation of the back pay liability' is therefore upon the violator." *Id.* (quoting *Madison Courier*, 472 F.2d at 1318).

**B.    Jones Day's premature merits arguments fail on both the law and the facts.**

**1.    Mark's new, lower-paying job does not preclude an award of lost wages.**

Jones Day's lead argument is that, because Mark mitigated his damages by taking an appellate associate position with another law firm, he is not entitled to any back pay or front pay after he started in that position in June 2019—even though his wages at the new firm are much

lower than they would have been at Jones Day.  As the Court stated at the July 20 conference when

granting Jones Day's request to allow briefing:

> To my mind, the question [for briefing] is going to be … whether one who is
> terminated unlawfully from a position [and] mitigates by obtaining a similar
> position, but who is able to show had they stayed at the original position would
> have been promoted in a way in which they would have received substantially more
> compensation, is entitled to that type of compensation.

July 20 Tr. 16:12-18.  The Court offered the correct answer at the conference: "So wouldn't you

agree that if he were able to prove that had he not been terminated, had he stayed at the firm and

had made partner, that he would be entitled to damages based on the considerably higher

compensation he would have received as a partner at Jones Day than he's receiving as an associate

at his current firm?"  *Id.* at 8:22-9:2.  Jones Day's counsel disagreed, but quickly fell back to "we

would really want briefing on this because I don't know that I specifically have looked at this."

*Id.* at 9:3, 9:21-23.  Just as Jones Day came to the conference with no legal authority for its lead

argument, it has found none for its brief.  The law is clear that the Court was right all along.

First, as the Supreme Court and D.C. Circuit have held, "[t]he district court should fashion

[lost wages] relief so as to provide a victim of employment discrimination the most complete

make-whole relief possible."  *Barbour*, 48 F.3d at 1278; *see also id.* at 1279 ("As with back pay,

the purpose of front pay is to make a victim of discrimination 'whole' and to restore him or her to

the economic position he or she would have occupied but for the unlawful conduct of his or her

employer.").  Again, "Title VII deals with legal injuries of an economic character," and "where a

legal injury is of an economic character, … [t]he injured party is to be placed, as near as may be,

in the situation he would have occupied if the wrong had not been committed."  *Albemarle*, 422

U.S. at 418-19 (quotation marks omitted).  This fundamental principle forecloses Jones Day's

argument that a victim who obtains a supposedly "comparable" position but makes substantially

less than he did in his prior job actually is *not* entitled to be made whole.  That is why Jones Day

has not found a single case endorsing its made-up exception to the rule requiring "the most complete make-whole relief possible" (*Barbour*, 48 F.3d at 1278).

Second, Jones Day's position is inconsistent with the text of Title VII: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."  42 U.S.C. § 2000e-5(g)(1).  In other words, the plaintiff's recovery of the pay that he would have earned with the defendant but for the discrimination should be *reduced* by the amount that he has in fact earned (or could have earned through "reasonable diligence") in a new job.  The statutory text takes for granted that a victim who finds another job but whose salary is lower than it would have been at his old job should be able to recover the shortfall—that is, the amount that would make him economically whole.

Rather than grapple with the authorities, Jones Day strings together quotations about "comparable employment" from very different contexts.  It says that "front pay ends when the sting of discrimination has passed and the victim has had a reasonable amount of time to secure comparable employment" (Dkt. 66 at 16 (quoting *Barbour v. Medlantic Management Corp.*, 952 F. Supp. 857, 866 (D.D.C. 1997))), and that "[c]omparable employment is employment that is 'roughly equivalent in pay, benefits, status, and responsibility'" (*id.* (quoting *Banks v. Perdue*, 2019 WL 147445, at *1 (D.D.C. 2019)).  According to Jones Day, this means that front pay ends when the victim finds a job that is "roughly equivalent" in pay to his old job.

Jones Day's argument is built on word play.  Workplace discrimination cases speak of "comparable employment" (and the like) in several contexts.  First, the duty to mitigate requires a victim to make reasonable efforts to find comparable employment, but does not require the victim to take employment that is not comparable.  Second, when a court orders that the victim be reinstated but the position that the plaintiff would have held with the defendant is unavailable, the

court may require that the defendant offer another job that is sufficiently comparable to the one unlawfully denied.  Third, because the purpose of front pay is to put the victim in the economic position that he would have been in but for the discrimination, the front pay period should be limited to the time that it can reasonably be expected to take the victim to find a comparable job.

Jones Day's sleight of hand lies in quoting decisions from these three contexts interchangeably.[4]  The *Barbour* case it quotes (the decision on remand from the leading D.C. Circuit decision) was a front pay case, but its statement that "front pay ends when the sting of discrimination has passed" (Dkt. 66 at 16 (quoting 952 F. Supp. at 866)) does not help Jones Day, since the sting of discrimination has not passed while the victim earns less than he would have absent that discrimination.  Jones Day's next case, *Banks*, is a *reinstatement* case where "[t]he parties agree[d]" that the "applicable standard" in addressing "whether Plaintiff's present position satisfies the reinstatement remedy" is "whether the positions are roughly equivalent in pay, benefits, status, and responsibility."  2019 WL 147445, at *1 (D.D.C. 2019).  Setting aside the fact that "[t]he parties agree[d]" on that standard and the plaintiff "d[id] not challenge the equivalency of her pay" (*id.*), leaving the court no occasion to decide, the fact is that *Banks* simply was not a front pay case.  *See id.* at *2 ("Plaintiff expressly stated that front pay would *not* be an issue").

And the statement in Jones Day's next cited case, *Staples v. Parkview Hospital, Inc.*, that "Parkview cites no authority … that a 'comparable position' means one offering exactly the amount of pay," was made in the context of a dispute about the duty to mitigate.  2010 WL 780204, at *8 (N.D. Ind. 2010); *see* Dkt. 66 at 17.  Staples "was a nurse at Parkview and worked in the

---

[4] When Congress uses the same words in different parts of a statute, it generally intends for them to bear the same meaning.  But "the language of an opinion is not always to be parsed as though we were dealing with language of a statute."  *Association of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1052 (D.C. Cir. 2000) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)).

Neonatal Intensive Care Unit.  Six weeks after her termination, she accepted a nursing position at Dupont in its Newborn Nursery unit."  2010 WL 780204, at *8.  Parkview argued that she had failed to show mitigation because "no evidence was submitted as to her continued efforts to find employment comparable to her … position at Parkview."  *Id.*  The court explained: "Apparently, because Staples made a lower wage at Dupont than she had at Parkview (a fact that is not disputed), Parkview considers her job at Dupont to be *not* comparable to her job at Parkview" and thus not adequate mitigation.  *Id.*  The court disagreed: "It would be difficult to imagine a more comparable position" to Staples' nursing job at Parkview than her nursing job at Dupont.  *Id.*

On Jones Day's theory, of course, the court's ruling (in the mitigation context) that Staples *had* obtained a "comparable position" at Dupont just six weeks after Parkview fired her would necessarily foreclose any award of front pay.  Jones Day relies on *Staples* to support that very argument.  Dkt. 66 at 17.  But the court took the opposite view, for it proceeded to grant "a two-year front pay award" to account for the fact that, "[w]hile Staples was able to obtain similar employment at Dupont Hospital about six weeks after her termination from Parkview, *she was hired into her new position at a lower rate of pay*."  2010 WL 780204, at *10 (emphasis added). Staples sought "a front pay award for a period of two to three years," which the court took to indicate that she was "confident that she can reach a level of compensation equivalent to what she would have received if she had remained at Parkview within two or three years from the date of trial."  *Id.* at *9.  But because she "d[id] not indicate what opportunities she might have in her present job at Dupont for promotions, raises or other positive employment actions," the court found it "an exercise in speculation to try to determine the length of time it will take for Staples to make *the same amount of money she was making at Parkview*."  *Id.* at *10 (emphasis added).  "With all of these rather ethereal factors in mind," the court awarded two years of front pay.  *Id.*

That decision, while contrary to Jones Day's argument, was consistent with the law of that Circuit.  In *Avitia v. Metropolitan Club of Chicago, Inc.*, the Seventh Circuit explained that "when reinstatement is infeasible, the plaintiff is free to seek … an award of 'front pay,' designed to *put him in the identical financial position that he would have occupied had he been reinstated*."  49 F.3d 1219, 1231 (7th Cir. 1995) (Posner, C.J.) (emphasis added).  "Front pay is the difference (after proper discounting to present value) between what the plaintiff would have earned in the future had he been reinstated at the time of trial and what he would have earned in the future in his next best employment."  *Id.*  "The goal of front pay is to put the victim in the financial position he should have enjoyed."  *Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004) (Easterbrook, J.).  In short, the Seventh Circuit takes the same commonsense view that this Court suggested at the conference.  There is no rule that a plaintiff loses his entitlement to front pay if he gets a job that is in some sense comparable to his previous job but pays less.  To the contrary, that is the paradigmatic case where front pay is appropriate.  *See also Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998) ("the front pay award gives the employee the present value of the earnings from her old job less the earnings from her new (or expected) job").

Of course, if the victim's new job pays as much as the job with the defendant would have, then front pay is unnecessary to make the victim whole.  That follows from the rule that front pay equals the amount that the victim would have earned with the defendant during a given period minus the amount that he can be expected to earn through substitute employment during the same period: Once that number reaches zero, no further front pay is appropriate.  That is all that Jones Day's cited cases mean when they say things like "an employee … is entitled to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment."  *Id.*  In many sectors of the economy, an employee can expect to find a

new job that will pay the same as her previous job within a couple of years or less, as with the
nurse in *Staples*. Since that is not true for senior appellate associates at top law firms, the same
principle calls for a longer period of front pay here.[5]

Even if Jones Day's proposition were right, it would not apply here. Mark's pay now is
far below where it would be at Jones Day. Jones Day's claim that his initial disclosures "indicate
that his compensation at Steptoe was 'roughly equivalent'" (Dkt. 66 at 20) is either a brazen lie or
proof that Jones Day partners are so highly paid that the ones who produced its brief see a six-
figure difference as trivial. Nor is the question whether Mark's "new law firm, a highly respected
AmLaw 100 firm, is somehow inferior or not comparable to Jones Day." *Id.* The relevant
comparison is between jobs, not between employers. For the reasons given above, *Mark's position*
is not comparable to his Jones Day position in the relevant (economic) sense.

### 2. Jones Day has no basis to suggest that Mark failed to mitigate.

Jones Day asserts that "if a plaintiff chooses not to secure comparable employment, that
does not entitle him/her to ongoing damages." Dkt. 66 at 17. No one denies that a discrimination
plaintiff has a duty to make reasonable efforts to mitigate. The statute commands that "amounts
earnable with reasonable diligence … shall operate to reduce the back pay otherwise allowable"—
even if the victim does not in fact exercise reasonable diligence and earn those amounts. 42 U.S.C.
§ 2000e-5(g)(1). Thus, in *Hopkins v. Price Waterhouse*, upon which Jones Day principally relies,
the court detailed the facts that led it to reduce back pay based on the plaintiff's failure to mitigate:

> Price Waterhouse introduced evidence from job search specialists and principals at
> various firms that in 1984, after Ms. Hopkins left [Price Waterhouse], there was a
> significant demand both locally and nationwide for management consultants [like
> Hopkins] at Big Eight and other accounting firms, management consulting firms,

---

[5] Jones Day misstates the holding in *Dotson v. Pfizer, Inc.*, 558 F.3d 284 (4th Cir. 2009). *See*
Dkt. 66 at 21-22. The basis for denial of front pay was not that the jobs paid "comparably"
($65,000 apart), but that the request "was simply too speculative." 558 F.3d at 300.

and within large businesses. Given her extensive successful experience in the management consulting area, it appears that Ms. Hopkins would have been a solid candidate for a high-paying position at many such firms. … There is ample proof that Ms. Hopkins failed to make a reasonable, conscientious effort to work at her calling at a level available to her … She simply was not interested in the private sector except as a principal and found no immediate or guaranteed partnership available among those who had more remunerative work to offer in her field. … A reasonable effort to obtain a position [with another big firm] would have included a willingness to enter as an employee, so long as partnership consideration in the reasonable future was promised.

Ms. Hopkins never formally applied for a management consulting job at any firm. She did not send her resume around town or around the country. She made almost no effort to work with executive search firms to locate a suitable position. She rejected at least two offers of employment with smaller firms … Price Waterhouse cannot be held fully responsible for the lost back pay that accumulated as a result of Ms. Hopkins' personal decision to assume the risks and benefits of a solo business without making any reasonable effort even to consider alternatives by seriously seeking to obtain high-paying employment in her field.

737 F. Supp. 1202, 1213-15 (D.D.C. 1990). The court concluded from the record that "with reasonable effort Ms. Hopkins could have earned during each subsequent fiscal year an average of $100,000. Accordingly, her back pay award for each fiscal year shall be determined by subtracting from the average Price Waterhouse partnership salary for her class as stipulated, $100,000, or her actual earnings, whichever is greater." *Id.* at 1215 (footnote omitted). In short, consistent with § 2000e-5(g)(1), the court reduced her award for each year by the greater of the amount that she actually earned and the $100,000 amount that she could have earned with reasonable diligence.[6]

Jones Day apparently wants to imply that, like Hopkins, Mark would have been a strong candidate for high-paying positions with many firms in his practice area but chose not to pursue them. It asks the Court to conjecture that "if Savignac claims he had the requisite qualities to be admitted to the partnership at Jones Day, there is no reason why he would not enjoy similar

---

[6] Jones Day says that the court "denied back pay." Dkt. 66 at 18. That is false. Per § 2000e-5(g)(1), it *reduced* back pay to account for the $100,000 that Hopkins could have made each year with reasonable diligence. The result was a back pay award of $371,175. 737 F. Supp. at 1217.

prospects at Steptoe or elsewhere." Dkt. 66 at 20. It muses that, "given Savignac's resume and Supreme Court clerkship, as well as his claims regarding his own talents, it is difficult to believe that he could not have found comparable employment (and reasonably equivalent partnership prospects) within two years at any of dozens of law firms in Washington … with a similar practice." *Id.* at 21. But the Court cannot deny discovery based on an incorrect conjecture, for which Jones Day offers no basis, that senior appellate associates can readily lateral to parallel positions at peer firms. If Jones Day wants to argue that Mark, like Hopkins, failed to mitigate by making reasonable efforts to find higher-paying employment, then, like Price Waterhouse, it must carry that burden with facts, for "[f]ailure to mitigate damages is an affirmative defense." *Adenariwo v. Federal Maritime Commission*, 808 F.3d 74, 79 (D.C. Cir. 2015). Mark sought employment with more than 40 firms and received only one offer, so that burden will be heavy.

### 3. Fear of "speculation" is no basis to deny discovery.

Jones Day asks the Court to hold, without any facts, that Mark's claim is "too *speculative*" for discovery. Dkt. 66 at 22; *see id.* at 22-25. Again, "a district court should not refuse to award front pay merely because *some* speculation about future earnings is necessary." *Barbour*, 48 F.3d at 1280. Rather, the Court "should fashion this relief so as to provide a victim of employment discrimination the most complete make-whole relief possible." *Id.* at 1278.

Whether Mark would have made partner boils down to two questions: What bar does Jones Day set for partnership? And would Mark have cleared the bar or fallen short? Mark argues that the bar is low—and that "every Supreme Court clerk since at least 2014 who has remained at Jones Day until becoming eligible for promotion" was in fact promoted (Dkt. 1 at 8 (Compl. ¶ 55)). Mark would easily have cleared the bar along with the 50 other attorneys promoted in 2021.

One might have expected Jones Day to respond that, actually, the bar is high and Mark would have fallen short.  *See* July 20 Tr. 13:21-23 (The Court: "And you're going to say, 'That wasn't going to happen.  He actually had some significant faults, and the firm was aware of those faults.'").  But Jones Day says nothing about what its standard for making partner is.  And it does not suggest that Mark had *any* faults, besides opposing sex discrimination (Dkt. 66 at 23 n.1).  The tepid arguments it offers are far too thin to avoid discovery.  This is especially significant because practically all of the evidence is in Jones Day's possession.  "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939).  So it is here.

a.      It is undisputed that Mark "would have been eligible" "in 2020" to be promoted effective January 1, 2021.  July 20 Tr. 15:14-20.  And Jones Day's brief does not dispute that every Supreme Court clerk since at least 2014 who has remained at the firm until becoming eligible was in fact promoted at the earliest opportunity.  The omission is conspicuous, since the Court referred at the conference to Plaintiffs' allegation "that all, or virtually all, of the associates in the appellate practice at Jones Day—at least those who had clerked on the Supreme Court and who made it to the time of the partnership evaluation, were in fact promoted to partner." *Id.* at 10:20-11:1. Plaintiffs are entitled to discovery to prove that allegation.  At the conference, Jones Day's lawyer represented that "the evidence will show that there are a number of issues and appeals associates who, for a variety of reasons, are counseled that they will not make partner." *Id.* at 12:2-5. Notably, though, she said nothing about *Supreme Court clerks*.  (It does appear that some Issues & Appeals associates who were *not* Supreme Court clerks are indeed treated less favorably.)

Nor does Jones Day's brief provide the promised "evidence."  Instead, it points out that Mark's "short tenure at Jones Day made it highly unlikely he would have been admitted in January

2021" because "no lawyer with a J.D. graduation year of 2011 was promoted to the partnership in January 2021 who had been with the [f]irm for as short a period as Savignac would have been." *Id.* Jones Day omits that two Supreme Court clerks promoted effective January 2021 (██████ █████████████) had joined the firm *after* Mark, in late 2017. They had graduated from law school before Mark, but Jones Day does not say that it needs a longer record of performance at Jones Day for those who graduated more recently than for those who graduated earlier. Such a policy would make little sense, and, notably, Jones Day's affidavit states only that Mark would have been the shortest-tenured 2011 graduate—not that this would actually have played into Jones Day's decisionmaking. Absent evidence that it would have, the whole argument is just a bit of deceitful gerrymandering. And the evidence is to the contrary. For instance, ██████████ graduated from law school in 2009, █████████████████████████████ ████████████, joined Jones Day █████████ in late 2015, and was promoted to partner effective January 2019—at which point her time out of law school was equal to Mark's as of 2021 and her time at Jones Day was months *shorter* than Mark's would have been.

The three Supreme Court clerks referenced in the prior paragraph were promoted at the earliest opportunity after satisfying the "nine-and-three" rule. Jones Day does not point to any such clerk who was "held back" and promoted a year *after* satisfying that rule. Nor are Plaintiffs aware of one. Plaintiffs are entitled to discovery. (Anyhow, it hardly matters whether Mark would have been promoted in 2021 or in 2022; the same discovery would be appropriate either way.)

  **b.**  Jones Day also argues that it would be unduly speculative to say that Mark would have made partner because he "had been at Jones Day only 18 months [actually more than 20] and had been through only one evaluation cycle," leaving him with a "slim performance record." Dkt. 66 at 23. Realistically, Mark's first set of formal evaluations, together with his law school and

clerkship credentials and Jones Day's treatment of people with similar (or worse) credentials and evaluations, are more than enough to establish that Mark would have made partner when he became eligible.  And it is conspicuous that Jones Day—whose partners wrote those formal evaluations—declines to say anything about them in its brief.  Regardless, Jones Day's framing of the question is wrong.  The ultimate question (though, again, this is a dispute about whether Mark is entitled to *discovery* to make a showing on the ultimate question) is whether Mark would have made partner at Jones Day if he had not been illegally fired, and the evidence relevant to answering that question is not limited to Mark's evaluations at Jones Day.  An employer cannot illegally deprive a victim of the chance to prove himself and then maintain that, without that opportunity, it is impossible to say whether he would have done so.  Rather, the Court should look to all evidence that is probative of whether Mark would have cleared the bar for partnership.

Start with credentials.  Jones Day itself claims that Mark's "resume and Supreme Court clerkship" should carry a lot of weight with "law firms in Washington."  Dkt. 66 at 21.  Mark graduated magna cum laude from Harvard Law School, served as an Articles Editor on the Harvard Law Review, and clerked for Judge Posner, Judge Feinerman, and Justice Breyer.  Like other firms, Jones Day prominently features each attorney's law school, Latin honors, law review membership and position, and clerkships on his website bio throughout his career, presumably because Jones Day thinks that its clients care a great deal about this information (or that they ought to care).  And Jones Day's special obsession with Supreme Court clerks is addressed above.

Mark's performance during the years leading up to the date when he would have made partner is also highly probative—and amply documented in his formal evaluations.  Jones Day produced the following "consensus statement" about Mark's 2017 performance:





App. 2a.  Mark's 2017 formal evaluations by individual Jones Day partners were similarly positive.

All are in the Appendix.  Here is a sample, mainly from partners with an appellate background.

Yaakov Roth is Jones Day's most prominent partner under 40.  He clerked for Judge Boudin and Justice Scalia and argued the "Bridgegate" case in the Supreme Court.  He wrote:



*Id.* at 8a.

Shay Dvoretzky, who clerked for Judge Luttig and Justice Scalia, was Jones Day's main Supreme Court litigator and is now head of Skadden's Supreme Court practice.  He wrote:



*Id.*

Steve Cottreau, who clerked for Judge Wilkinson and Justice Thomas, wrote:



*Id.* at 9a.

Tina Tabacchi, head of Jones Day's Chicago office, wrote: 

And Mike Carvin, perhaps Jones Day's best-known Supreme Court advocate, wrote:

Jones Day fired Mark just after its computer system started accepting evaluations for 2018 work. It may well be that Jones Day's reason for acting so quickly was to prevent its partners from submitting positive evaluations that could be used in this lawsuit. Presumably for the same reason (among others), Jones Day also prohibited the three partners with whom Mark had worked most in 2018 ▮▮▮▮▮▮▮▮▮▮ from acting as references, and directed the one partner who was allowed to do so that he could only do so orally (Dkt. 48 at 32 (FAC ¶ 215)). The risk of any resulting uncertainty should be borne by Jones Day, for "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927). "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265.

Fortunately, one partner—Ben Mizer—turned in his evaluation before Jones Day could fire Mark. Mizer clerked for Judge Rogers and Justice Stevens, served as Solicitor General of Ohio, and led DOJ's Civil Division, among other high-level government roles. He wrote:



Jones Day asserts, without explanation or support, that Mark's performance "provided no basis to conclude that he had the qualities required for partnership." Dkt. 66 at 23. It is difficult to believe that a comparison of the evaluations above with (e.g.) those for the 50 lawyers promoted in 2020 would bear that out. The Court should allow discovery to enable that comparison.

Mark's Steptoe evaluations provide further confirmation that he would have made partner. While Jones Day appears to believe that only its own evaluations could be probative, it offers no authority for that belief, and common sense says otherwise—especially considering Jones Day's statements that Steptoe is "comparable employment" where Mark holds "the very position [he] held at Jones Day." Dkt. 66 at 20. In a case where the plaintiff (unlike Mark) had "negative[]" evaluations from the defendant, she "argue[d] that her career experience at [the similar employer she joined after the defendant] is the best evidence [for lost wages] of what she would have done at [the defendant] absent discrimination." *Harrison v. Dole*, 643 F. Supp. 794, 795 (D.D.C. 1986). The court agreed that the plaintiff's "reliance on her actual experience is far more persuasive than [the defendant's] extrapolation from preliminary evaluations. … [I]t is difficult to imagine more compelling evidence of what [the plaintiff] would have done, than the evidence here of what she did" with the second employer. *Id.* at 796. Just so. Here are excerpts from Mark's 2019 and 2020 evaluations, focused on appellate-oriented partners; the full evaluations are in the Appendix.







These evaluations, along with the wider range of similar evaluations in the Appendix, cover Mark's performance from the time he joined Jones Day in May 2017 through the time he would have been considered for partner there in late 2020.  Together with Mark's credentials, they form the core of a solid record that can be set alongside Jones Day's standard for partnership—as

illustrated by the 50 attorneys promoted to partner effective January 2021—and that shows, with little need for speculation, that Mark would easily have made partner.

Jones Day responds that Mark cannot compare himself to those 50 attorneys because his "experience, skills, performance, and future prospects are not 'nearly identical'" to theirs.  Dkt. 66 at 24 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)).  The argument is frivolous.  As Jones Day's own cited cases make clear, the "nearly identical" requirement applies when a plaintiff who has taken discovery but does not have direct evidence of discriminatory intent seeks, under the *McDonnell Douglas* framework, to avoid summary judgment on liability by pointing to a coworker who is "nearly identical" to her except that the coworker is not a member of the protected class and was not subjected to the adverse action.  *See Holbrook*, 196 F.3d at 261-62.  There is no "nearly identical" requirement when a plaintiff is seeking discovery relevant to the Court's equitable authority (and obligation) to provide make-whole relief.  The records of the 50 new partners are highly probative in determining where Jones Day in fact sets the bar for partnership and thus whether Mark would have cleared that bar or not.

**c.**     Jones Day's pay records for other partners will be similarly probative in determining how Jones Day sets pay and, thus, what Mark would likely have made as a partner.  Jones Day says that an award of lost wages "would require speculation about how Jones Day would have set Savignac's individualized compensation as a partner."  Dkt. 66 at 23.  But it offers no evidence that this would be particularly difficult, or even that partner compensation there is "individualized" in a meaningful sense.  It may well be that Issues & Appeals partners who clerked at the Supreme Court are paid roughly the same at a given level of seniority, as apparently is generally the case with the same attorneys when they are associates.  And even if there are uncertainties, the guiding star for the analysis would remain the D.C. Circuit's admonition that

31

courts "routinely engage in some speculation" "when valuing lost earning capacity" and "are equally capable of resolving similar uncertainties when awarding front pay to victims of employment discrimination." *Barbour*, 48 F.3d at 1280.

Nor would it be right to restrict discovery to the pay of more junior partners based on a prejudgment about the proper front pay period. Jones Day says that front pay "is typically limited to a short period of time—usually months or 1-2 years at most" after judgment, though it cites just two cases with short awards, from 1997 and 1984, in support of its sweeping assertion. Dkt. 66 at 18.[8] But "every case must be considered on its particular facts," and courts of appeals have affirmed many much longer awards. *Donlin v. Phillips Lighting North America Corp.*, 581 F.3d 73, 88 (3d Cir. 2009) (collecting cases and affirming 10-year award).[9] The only question now is whether Plaintiffs will be denied the opportunity to discover the "particular facts" upon which the Court will exercise its equitable discretion. Jones Day does not point to any case where a court restricted front pay *discovery* on the ground that it could be known ex ante that any award would be limited to a certain period. And discovery is crucial to determining the appropriate period. For

---

[8] To be clear, front pay accrues from judgment forward, so even if Mark recovered just 1-2 years of front pay, the award would include several years of partner pay (back pay from January 1, 2021, through judgment plus the 1-2 years of front pay) and discovery would be necessary.

[9] *See also, e.g.*, *Peyton*, 287 F.3d at 1128-30 (vacating 26-year award as "unduly speculative" based on specified record deficiencies, but without saying that such a period could not be awarded on stronger facts); *Hardenbrook v. UPS, Inc.*, 490 F. App'x 45, 46 (9th Cir. 2012) (affirming "twenty-seven years of front pay"); *Mota v. University of Texas*, 261 F.3d 512, 526-27 (5th Cir. 2001) (affirming 15-year award based in part on defendant's retaliatory public statement "attempting to present [the plaintiff] in the worst professional light possible"); *Padilla v. Metro-North Commuter Railroad*, 92 F.3d 117, 125-26 (2d Cir. 1996) (affirming award of "well over 20 years" and noting that "[t]his Court and other circuits previously have affirmed awards of front pay for substantial periods of time when necessary to provide whole relief for victims of employment discrimination"); *Pierce v. Atchison, Topeka & Santa Fe Railway Co.*, 65 F.3d 562, 574-75 (7th Cir. 1995) (affirming 10-year award); *Hukkanen v. International Union of Operating Engineers*, 3 F.3d 281, 285-86 (8th Cir. 1993) (affirming 10-year award); *Proctor v. Consolidated Freightways Corp.*, 942 F.2d 793, at *4-5 (9th Cir. 1991) (unpublished) (affirming 17-year award); *Wulf v. City of Wichita*, 883 F.2d 842, 873-74 (10th Cir. 1989) (affirming 8-year award).

instance, "*Barbour* specifically suggests that the district court consider the length of time employees in similar positions stay at the defendant employer," so Plaintiffs seek discovery into how long Jones Day partners tend to remain in that position. *Peyton*, 287 F.3d at 1129. It seems likely that the answer is much more than two years. (Anyway, pay records of more senior partners are also relevant to projecting the trajectory of pay at lower seniority levels.)

And Jones Day itself quotes the Eighth Circuit's statement that "[l]onger terms of front pay are usually awarded … when it would take the plaintiff a significant number of years to gain the level of seniority and responsibility equivalent to the job lost." Dkt. 66 at 18 (quoting *Ollie v. Titan Tire Corp.*, 336 F.3d 680, 688 (8th Cir. 2003)). The question in every case is how long it will take "to achieve compensation comparable to the higher paying job" that the plaintiff was illegally denied (*Ollie*, 336 F.3d at 688)—in other words, "to make a victim of discrimination 'whole' and to restore him or her to the economic position he or she would have occupied but for the unlawful conduct'" (*Barbour*, 48 F.3d at 1279). At trial, the parties will present their positions on the appropriate front pay period. Plaintiffs are entitled to establish a factual record for trial.

### C. Jones Day has not shown that partnership discovery is disproportional.

Jones Day argues that "partnership discovery is disproportionate to the nature and needs of the case." Dkt. 66 at 15. As it concedes, "[o]nce relevance has been established, the burden shifts to the party opposing discovery to show why the discovery should not be permitted." *Id.* at 14 (quoting *Lamaute v. Power*, 2021 WL 1978971, at *2 (D.D.C. 2021)). It cannot carry its burden on proportionality, which turns on "[1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

33

1.      **The importance of the issues at stake.**  Workplace discrimination is always an important issue, and this case in particular is important because it concerns willful violations by the top leadership of one of the nation's largest and most influential legal employers.  "In tailoring a Title VII remedy a court 'has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'"  *Ford Motor Co. v. EEOC*, 458 U.S. 219, 233 n.20 (1982) (quoting *Albemarle*, 422 U.S. at 418).  Allowing the discovery necessary for lost wages is important both to providing Mark the make-whole relief required by precedent and to deterring Jones Day from future violations.

2.      **The amount in controversy.**  The discovery at issue is necessary to come to a definite estimate, but, even on a conservative estimate, Mark's lost wages will be in the millions—more than enough to justify the discovery at issue here.

3.      **The parties' relative access to relevant information.**  Without discovery, Plaintiffs have little access to admissible information about Jones Day's standards for making partner and virtually no access to information about Jones Day partnership pay.  Practically all such information is in Jones Day's hands.  But most of it presumably is centrally stored in electronic form and thus readily accessible to Jones Day.

4.      **The parties' resources.**  Jones Day is one of the wealthiest legal employers.  According to the National Law Journal's 2021 rankings, it has 2490 attorneys, making it America's seventh-largest firm.  It has 41 offices.  Its $2.2 billion in revenue put it in 10th place on the 2021 AmLaw ranking.  Since it is representing itself, it can provide discovery and other legal services to itself at cost rather than paying the hourly rates that companies like Wal-Mart or JPMorgan must pay to the firms that represent them.  In short, few Title VII defendants have greater resources.  And while Plaintiffs' resources have no obvious relevance to this dispute, they are far more limited.

5.      **The importance of the discovery in resolving the issues.**  Jones Day does not even argue that Mark can establish his entitlement to lost partnership wages without the requested discovery.  To the contrary, it is asking the Court to definitively resolve that issue in its favor without allowing the discovery necessary for Plaintiffs to make their case.

6.      **Whether the burden or expense of the discovery outweighs its likely benefit.** The likely benefit of the discovery is clear: It will almost certainly allow Mark to prove that he would have made partner and recover the substantial lost wages award required by the deterrence and make-whole purposes of the antidiscrimination laws.  As for "burden or expense," Jones Day—which bears the burden of showing disproportionality and has all the relevant information— has hardly attempted to show that partnership discovery will subject it to real burden or expense. Most or all of the information sought (mainly formal personnel records, plus certain communications) would be centrally maintained by any sophisticated business in readily accessible electronic form.  Jones Day has already admitted that analogous pay, evaluation, and related information for associates is maintained in electronic databases and agreed to produce it.

Jones Day says that the discovery would intrude on its privacy interests, those of its constituent partners, and those of associates who did not make partner.  Any such intrusion would be slight, since the information would be covered by a strong protective order that specifically provides for a special "Highly Confidential" designation for pay and evaluation data.  The information is already known to certain partners; it is not the sort of private information that one shares only with one's spouse or priest or doctor.  Anyway, Jones Day readily agreed to produce analogous data for Issues & Appeals associates.  The partner data is at least as important, and it is not clear why the supposed privacy harms to partners count for more than parallel "harms" to associates.  Jones Day also points to no case saying that discovery of relevant financial information

under a protective order should be disallowed on privacy grounds.  In short, the interests protected by the civil rights laws outweigh any privacy interest implicated here.

Unable to show why the Court should deny Plaintiffs' requested discovery, Jones Day resorts to threatening that, if the Court allows that discovery, then Jones Day will pursue mirroring discovery against third parties.  But the discovery allowed against Defendants would not be dispositive of the appropriate scope of discovery from third parties.  The Court can address any disputes that may (or may not) arise regarding third-party discovery in the ordinary course.

At the end of the day, the sole reason for this dispute is that Jones Day views pay data as very secret and really wants to avoid producing it.  The same could be said for much of what is produced in civil discovery.  Jones Day already has a broad protective order.  Its desire not to produce information of central importance to this case is entitled to little (if any) weight.

> **D.    Jones Day's proposed bifurcation would unduly delay this litigation, but Plaintiffs would agree to a more limited phasing that would not.**

**1.**      Jones Day proposes that the Court postpone damages discovery until after it has ruled on the parties' summary judgment motions.  Such delay would be inappropriate.  As the D.C. Circuit has observed, Title VII "directs the District Judge assigned to a Title VII case 'to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.'"  *Hackley v. Roudebush*, 520 F.3d 108, 121 (D.C. Cir. 1975) (quoting 42 U.S.C. § 2000e-5(f)(5)); *see also Grubbs v. Butz*, 514 F.2d 1323, 1331 (D.C. Cir. 1975) ("an incentive for the trial court to delay its proceedings … would threaten the statute's express aim of '[causing] the [judicial proceedings] to be in every way expedited'").  "This explicit Congressional desire for expedition" (*Grubbs*, 514 F.2d at 1328) is irreconcilable with Jones Day's requested bifurcation.[10]

---

[10] *See also, e.g.*, *Collazo v. Bristol-Myers Squibb Manufacturing, Inc.*, 617 F.3d 39, 54 (1st Cir. 2010) ("we remind the court upon remand of its duty to cause the case to be 'in every way

Delaying damages discovery until the Court rules on cross-motions for summary judgment would mean opening up a second full round of discovery—documents, depositions, and experts— that would add many months to the case. Yet Jones Day makes no effort to point to facts or law that could possibly allow it to win summary judgment on Plaintiffs' termination claim (as to which *Plaintiffs* sought to move for summary judgment pre-discovery); its proposed bifurcation would merely delay the inevitable. And it was Jones Day itself that proposed the language (which the parties agreed to and submitted to the Court under Rule 26(f)) stating that, aside from separating fact and expert discovery, "the parties agree that discovery should not be phased." Dkt. 46 at 2.

**2.** While Plaintiffs object to any bifurcation that would protract this case contrary to § 2000e-5(f)(5), they recognize that the Court and the parties have a strong interest in prioritizing liability discovery so that contested damages discovery does not delay summary judgment, where Plaintiffs will prove that Jones Day broke the law. *See* Dkt. 41. Plaintiffs would therefore consent to alter the existing schedule to prioritize summary judgment and postpone certain damages discovery until summary judgment is fully briefed and pending with the Court, as follows:

*First*, document discovery would close by September 3 and fact discovery would close by December 3, consistent with the Court's July 7 Order. Plaintiffs' discovery into partnership-related and punitive damages would be excluded from this phase, but Defendants would complete all of their fact discovery to avoid needlessly duplicative discovery.[11] *Second*, expert discovery would be postponed and summary judgment briefing moved up, with the parties' pre-motion

---

expedited'"); *EEOC v. University of Pennsylvania*, 850 F.2d 969, 978 (3d Cir. 1988) ("Title VII requires the prompt resolution of claims. … District judges are duty-bound 'to cause the case to be in every way expedited.'"); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974) ("The importance that Title VII attaches to the avoidance of delay is evident from the language of the statute.").

[11] Jones Day apparently accepts that bifurcation would require Plaintiffs to depose some of its people a second time after receiving documents at issue here, but the reverse is not true.

statements due in early December and the pre-motion conference occurring soon thereafter. Plaintiffs anticipate that expert discovery will focus on damages (primarily partnership-related damages) and do not see a need to submit expert evidence for summary judgment purposes; if Defendants wish to do so, discovery relating to that expert and any necessary rebuttal expert could be conducted alongside fact depositions. *Third*, after summary judgment briefing is complete and while the cross-motions are pending with the Court, Plaintiffs would resume fact discovery relating to the postponed damages topics, followed by any expert discovery. *Finally*, after the completion of that discovery and the Court's ruling on summary judgment, any remaining issues to be tried would proceed to trial in the ordinary course.

This proposal assumes that the Court first resolves the present dispute so that the discovery can proceed when the time comes. This alternative schedule has the merit of prioritizing liability discovery and summary judgment over certain discovery (including expert discovery) that is not necessary for summary judgment, but, because the postponed discovery would occur while the Court considers the summary judgment motions, it is unlikely to delay resolution of the case. Plaintiffs are also happy to adhere to the existing schedule. But Plaintiffs object to any bifurcation that would materially protract this litigation and "threaten the statute's express aim of '[causing] the [judicial proceedings] to be in every way expedited.'" *Grubbs*, 514 F.2d at 1331.[12]

---

[12] If the Court grants Jones Day's bifurcation, it should postpone expert discovery until after fact discovery on damages and commence summary judgment proceedings with pre-motion statements in December. The main relevance of expert testimony is to damages, and Plaintiffs cannot participate in that expert discovery until after fact discovery on damages. Thus, if the Court postpones damages discovery, then the currently scheduled expert discovery period would be three months of dead time, and a duplicative period of expert discovery would be necessary later.

## II.    Jones Day has not shown that the Court should bar or delay punitives discovery.

Under the relevant standards, Plaintiffs are entitled to punitive damages for Defendants'

willful violations of the civil rights laws.  *See Kolstad v. American Dental Ass'n*, 527 U.S. 526,

536 (1999) (punitive damages available if employer "discriminate[s] in the face of a perceived risk

that its actions will violate federal law"); *Daka, Inc. v. Breiner*, 711 A.2d 86, 98-99 (D.C. 1998).

Jones Day never addresses those standards, and it does not seriously dispute that Plaintiffs would

easily meet them.  Rather, its sole argument is that the Court should bar or delay one facet of

punitive damages discovery: discovery of Defendants' financial resources.  *See* Dkt. 66 at 31-34.

That argument fails on the law.  The Court should therefore compel Defendants to produce

discovery regarding their financial resources.  It should also compel them to respond to Plaintiffs'

other punitive damages-related requests, which Jones Day does not even address.

### A.    Plaintiffs are entitled to discover and present evidence of Defendants' wealth.

Jones Day's sole argument on punitive damages is that Plaintiffs cannot obtain discovery

on Defendants' financial resources because *Defendants* do not plan to introduce such evidence in

order to "plead poverty" and beg the jury to award only a *small* amount of punitive damages.

Dkt. 66 at 32-33; *see, e.g.*, *Hutchinson v. Stuckey*, 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992)

(defendant bears "burden of producing evidence of his own financial condition if *he* wishes it

considered" (emphasis added)).  If the only relevance of wealth to punitive damages is as a ground

to *reduce* the amount awarded, then Defendants' resources are indeed irrelevant.

But that is not the only reason why a defendant's wealth would be relevant.  Punitive

damages are "intended to punish the defendant and to deter future wrongdoing."  *Cooper*

*Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001); *accord Daka*, 711 A.2d

at 98.  Just as an impecunious defendant may argue that his *low* wealth calls for a lower award, a

plaintiff may argue that a defendant's *high* wealth calls for a *higher* award to have a meaningful

punitive and deterrent effect on a defendant too rich to be moved by a smaller award. Thus, as the Court noted at the conference, Defendants' resources are relevant "to the extent that the plaintiffs want to argue that in order to carry a sufficient message of wrongdoing to a large institution, that the damages award has to be—the punitive damages award has to be sufficiently large that the entity will feel the consequence of that." July 20 Tr. 41:13-22.

The Court was right. "Under well-settled law, … factors such as" "the evidence of [the defendant's] impressive net worth … are typically considered in assessing punitive damages." *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n.28 (1993) (plurality op. of Stevens, J.).[13] This Court applied that "well-settled law" in *Hamen v. Islamic Republic of Iran*: "In determining the amount of punitive damages to award, courts typically consider four factors: '(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" 407 F. Supp. 3d 1, 10 (D.D.C. 2019). The Court noted Iran's "substantial wealth" and awarded $168,579,896. *Id.* at 10-11.

Jones Day itself admits that D.C. law permits a plaintiff to introduce evidence of the defendant's financial resources when seeking punitive damages. Dkt. 66 at 33 n.4. "Because the purpose of punitive damages is to punish a tortfeasor and deter future conduct, the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of

---

[13] *See also, e.g., City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981) ("evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded"); *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 362 (D.C. Cir. 2018) (affirming award of punitive damages where "[t]he District Court … determined that punitive damages were warranted based on [inter alia] the wealth of the defendants"); *Sponer v. Wells Fargo Bank, N.A.*, 842 Fed. App'x 156, 157 (9th Cir. 2021) ("consideration of wealth in imposing punitive damages is both lawful and appropriate"); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 n.37 (3d Cir. 2010) ("A jury can consider the relative wealth of a defendant in deciding what amount is sufficient to inflict the intended punishment.").

punishment and lead to bankruptcy." *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 941 (D.C. 1995).  "[A] plaintiff seeking to recover punitive damages based upon the wealth of the defendant … *must* establish the defendant's net worth at the time of trial."  *Chatman*, 831 A.2d at 402 (quoting *Jonathan Woodner*, 665 A.2d at 940); *see also id.* ("Courts place this burden on the plaintiff").  Jones Day notes that "evidence of a corporate defendant's net worth is not always a prerequisite to an award of punitive damages."  Dkt. 66 at 33 n.4 (quoting *Daka, Inc. v. McCrae*, 839 A.2d 682, 694 (D.C. 2003)).  But it *is* a prerequisite "where 'a plaintiff invokes the defendant's wealth.'"  *Id.* (quoting *Daka*, 839 A.2d at 694-95).  Plaintiffs intend to do so here, and so they are required to provide the jury with the relevant evidence.  They are entitled to discover it.

Jones Day also argues that "because the individual defendants are entitled to indemnification, the only even arguably relevant financial information is that of Jones Day."  Dkt. 66 at 31 n.3.  The factual premise is questionable: Jones Day offers no evidence of an ironclad obligation that will force it to pick up the tab for Heifetz and Brogan's willful violations.  Even if they would indeed be indemnified, however, Jones Day offers no authority for the notion that a defendant who has insurance is thereby entitled to preclude the plaintiff from submitting evidence of his wealth.  Its cited cases just say that an insured defendant cannot *himself* introduce evidence of his *low* wealth to seek a *smaller* punitive damages award: "The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab."  *Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996) (Posner, C.J.).  That is not this case.

Finally, Jones Day asks that the Court postpone financial resources discovery and protract this litigation because "Defendants regard the [f]irm's financial information as highly sensitive information that it does not disclose publicly."  Dkt. 66 at 34.  But the discovery would not be "disclose[d] publicly"; it would be produced subject to a broad protective order.  And Jones Day's

suggestion that the discovery should be delayed until sometime *during trial* is especially improper, given the likelihood that the discovery and related disputes would unacceptably delay conclusion of the trial and inconvenience the jurors.  The thoughtful analysis in *North Dakota Fair Housing Council, Inc. v. Allen*, 298 F. Supp. 2d 897, 899-900 (D.N.D. 2004), is instructive here.

> **B.     The Court should compel responses to Plaintiffs' other punitives requests.**

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).  Because "repeated misconduct is more reprehensible than an individual instance," Supreme Court "holdings reflect that a recidivist may be punished more severely than a first offender."  *Id.* at 577.  In short, "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine [in the form of higher punitive damages] is required to cure the defendant's disrespect for the law."  *Id.* at 576-77.  "[C]ourts should look to 'the existence and frequency of similar past conduct'"; "evidence of other acts need not be identical to have relevance in the calculation of punitive damages." *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 423 (2003) (quoting *TXO*, 509 U.S. at 462 n.28).

Plaintiffs have therefore sought discovery into Jones Day's treatment of others who oppose discrimination.  Requests 37 and 38 seek employee communications opposing alleged unlawful conduct by Jones Day and documents relating to Jones Day's dispute with Wendy Moore.  According to the complaint that Moore filed before settling with Jones Day (App. 39a-62a), the firm's treatment of her was strikingly similar to its treatment of Mark.  Like Mark, she complained to Jones Day that it was engaged in sex discrimination and was fired just six days later on Brogan's orders, and Jones Day argued that she deserved to be fired because she supposedly "threatened to make false claims against the [f]irm." *Id.* at 53a-54a (Moore Compl. ¶¶ 55-56, 58).  Interrogatory

12 seeks information about Jones Day's reaction to others who informed it that they had hired counsel or might file a charge or lawsuit. Such "evidence that [Jones Day] has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for [Plaintiffs'] argument that strong medicine is required to cure [Jones Day's] disrespect for the law." *BMW*, 517 U.S. at 576-77. The requests are also appropriate on causation: Defendants' propensity for firing those who complain of discrimination is highly probative of whether they fired Mark for that reason or for others concocted post hoc. Additionally, Requests for Production 34-36 seek documents relating to Jones Day's asserted defenses, some of which are directed to punitive damages. The Court should compel production of the requested discovery.

## III.    Jones Day's bickering about discovery is both irrelevant and deceptive.

Jones Day's framing of its brief suggests that it knows its legal arguments are flimsy and believes that its best shot is to persuade the Court that discovery into the key damages issues should be wholly precluded on the ground that Plaintiffs' discovery requests are excessive in general. Such a severe sanction—in effect, summary judgment on most of the damages in the case—would be improper. Jones Day offers no law to support it. And its account of discovery is deceptive.

*First*, Jones Day complains that Plaintiffs have served 117 document requests. Dkt. 66 at 7. But it has served 62, though no one could believe that Plaintiffs have anywhere near half as many documents to produce (or half the resources): The central fact issues are what *Jones Day's* leave offerings are, why *Jones Day* fired Mark, and how *Jones Day* selects and pays its partners. Anyway, a party should not be faulted for covering an issue with several more targeted requests as opposed to a single very broad one, as Jones Day has done by demanding (for example) "All other documents … that … relate to any communications relating to the allegations set forth in the Complaints."

Moreover, the great majority of Plaintiffs' document requests imposed no meaningful burden on Jones Day, because Jones Day flatly refused to provide any documents or conduct any search in response to more than 60 of the 94 that it has responded to thus far.  A junior associate could have pasted each of these refusals (which are mostly boilerplate) in minutes.  Jones Day is a sophisticated litigant.  If it believes that a request is excessive, then, as its conduct in this case shows, it will simply object and refuse to conduct a responsive search.  Doing so takes little effort, and that is the end of the matter unless Plaintiffs elect to pursue it with the Court.  So far, Plaintiffs have presented six issues to the Court.  Dkt. 60.  They prevailed on three (that is, the Court found that Jones Day's intransigence was improper), and two of the other three are the subject of this briefing.  If Plaintiffs prevail on these two as well, that 5-1 record would strongly suggest that Plaintiffs are reasonably pursuing discovery while Jones Day is unduly obstructing it.

*Second*, Jones Day says that it has produced many pages of documents.  Dkt. 66 at 7.  Plaintiffs have produced 2159 pages, while Jones Day has produced 2428 pages to Plaintiffs.[14]  Of those 2428 pages, around 1900 (78%) are excerpts from many versions of its employee manual, which are maintained in an easily accessible electronic folder and could have been collected and produced in under an hour.  More absurdly, around 1350 of these pages (55% of the *total*) are fully redacted placeholders for pages that Jones Day chose to withhold—each just says "Nonresponsive Material Redacted."  Nor can it have been burdensome to find, review, and produce the other 500 or so pages, including Plaintiffs' hardcopy personnel files (168 pages), Defendants' insurance documents (35 pages), and certain time records (68 pages).

---

[14] Jones Day has also produced 1346 pages to Julia alone regarding her pay claim.  Mark is not allowed to see them.  Around 900 of the 1346 are versions of Julia's memos with Partner A, which could have been collected from Jones Day's document storage system in a matter of minutes.

Meanwhile, Jones Day is improperly withholding or delaying production of the key documents in this case, most of which Plaintiffs requested on April 28.  It has not produced *any* documents from the six-day period between the January email and Mark's termination, though it must have collected and reviewed all such documents when this case was filed more than two years ago, if not before.  Nor has it produced documents relating to its prohibition on ██████████ ██████ acting as references for Mark, or the retaliatory press release that is the subject of the supplemental complaint.   Incredibly, Jones Day has not even provided the handful of straightforward interrogatory responses that this Court compelled over a month ago, on July 20.

Plaintiffs have virtually no prior experience with civil discovery.  They do not believe that their requests are disproportionate to the needs of this multimillion-dollar action over willful discrimination by the top leadership of one of the world's wealthiest and most influential law firms. If Plaintiffs are mistaken, however, then they sincerely regret their error.  It would nonetheless be unjust to sanction such an error by barring the crucial discovery at issue here.

## CONCLUSION

The Court should compel Jones Day to provide the requested discovery.


/s/ Julia Sheketoff                                  /s/ Mark Savignac
Julia Sheketoff (pro se)                    Mark C. Savignac (pro se)
2207 Combes Street                           2207 Combes Street
Urbana, IL 61801                               Urbana, IL 61801
(202) 567-7195                                  (217) 714-3803
sheketoff@gmail.com                       marksavignac@gmail.com
D.C. Bar No. 1030225                       D.C. Bar No. 995367

August 21, 2021