# APPENDIX

[App. 2a-38a redacted]

David Sanford (*pro hac vice* forthcoming)
Russell L. Kornblith (CA Bar # 289329)
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
Email: dsanford@sanfordheisler.com
Email: rkornblith@sanfordheisler.com

Deborah K. Marcuse (*pro hac vice* forthcoming)
SANFORD HEISLER SHARP, LLP
400 East Pratt Street, 8th Floor
Baltimore, MD 21202
Telephone: (410) 834-7420
Facsimile: (410) 834-7425
Email: dmarcuse@sanfordheisler.com

Danielle Fuschetti (CA Bar # 294064)
SANFORD HEISLER SHARP, LLP
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021
Email: dfuschetti@sanfordheisler.com

*Attorneys for Plaintiff*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO
UNLIMITED JURISDICTION**

| | |
|---|---|
| WENDY MOORE, On Behalf of Herself and Other Aggrieved Employees<br><br>Plaintiff,<br><br>v.<br><br>JONES DAY, and DOES 1—100,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR PENALTIES AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Wendy Moore ("Plaintiff" or "Ms. Moore"), individually and on behalf of all other aggrieved employees, brings this Complaint against Defendant Jones Day ("Defendant," "Jones Day," or the "Firm") and DOES 1—100 (collectively, "Defendants"). Plaintiff alleges upon knowledge as to herself and her own acts, and otherwise upon information and belief, as follows:

## I.     INTRODUCTION

1.      Plaintiff Wendy Moore brings this action under the California Private Attorneys General Act ("PAGA") against Jones Day for violations of the California Equal Pay Act, as amended by the Fair Pay Act of 2015, and for violations of the California Labor Code, in Jones Day's treatment of Ms. Moore and other current and former female attorneys. Acting as a private Attorney General, Ms. Moore seeks to enforce the State of California's strong public policy of wage equality set forth in the Fair Pay Act of 2015 and to redress Jones Day's systematic gender discrimination in compensation. Ms. Moore also seeks redress for retaliation that she and others suffered as a result of their efforts to discuss their own and others' compensation and working conditions as well their efforts to report, protest, and remedy violations of, *inter alia*, the California Equal Pay Act and the California Labor Code internally at Jones Day. Ms. Moore invokes the PAGA to enforce these essential rights, including the right to be paid at rates equal to similarly situated male Jones Day attorneys and the right to freely discuss compensation and other terms and conditions of employment. On behalf of the State of California, Ms. Moore seeks to recover civil penalties for violations that affect her and other current and former female attorneys.

2.      Jones Day operates as a fraternity. Male senior partners mentor male associates and assist them in climbing the ranks to partnership. They pass the Firm's business through male-centered social events focused on athletics. Female attorneys are treated as second-class citizens. They are not, nor can they be, full members in the fraternity.

3.      Jones Day's fraternity system extends to its compensation scheme: a "black box" compensation structure that all but ensures that female attorneys are paid less than their male counterparts. For example, when a male ***sixth-year associate*** recently joined the Trump administration, his federally mandated disclosures revealed that in 2015 he had been compensated $810,000. This sum approximately equaled Ms. Moore's compensation as an ***eighth-year partner***

(and was well above her starting salary of $740,000 when she joined Jones Day as a sixth-year partner in 2013). For much of its existence, Jones Day has ensured that these disparities continue unabated by forbidding attorneys from discussing their compensation. Jones Day has enforced this policy by retaliating against female attorneys who have sought to address—or even openly discuss—disparities in compensation.

4.      The subjective performance review system at Jones Day facilitates and exacerbates the gender disparity in pay by providing cover for male partners to ensure that male associates receive top compensation. That this performance review system ensures male associates at Jones Day receive the highest compensation was in fact confirmed for Ms. Moore during a conversation with Jones Day's Northern California Partner-in-Charge David C. Kiernan.

5.      Only in the last few months has the Firm edited its written guidelines to comply with California law. Now, instead of saying outright that associates are forbidden to discuss their pay, the Firm's guidelines merely say that they are strongly discouraged from doing so. In person, however, and at every opportunity—from performance reviews to conversations about pay—partners reiterate the true message: Pay at Jones Day is and must remain confidential, even between partners.

6.      When Ms. Moore had the courage to speak up against Jones Day's discriminatory pay policies in an attempt to vindicate her rights under the California Labor Code and the California Equal Pay Act, she experienced harsh and swift retaliation. On February 22, 2018, Ms. Moore notified Jones Day that she asserted claims of gender discrimination against the Firm. Just six days later, on February 28, 2018, Jones Day sent Ms. Moore a letter stating that her partnership was terminated effective immediately.

7.      By pretextually terminating Ms. Moore, Jones Day inflicted severe financial penalties against Ms. Moore: Jones Day refused to return $337,500 of capital to her and withheld more than $200,000 in previously-earned compensation that was lawfully owed to her under the Firm's partnership agreement. At the same time, without explanation or justification, on February 28, 2018, the normal payday for partners, Jones Day paid $43,000 to Ms. Moore's bank account for her February work *and then immediately revoked and refunded the payment*.

8.      To make matters worse, in April 2018, Jones Day sent Ms. Moore and Ernst & Young (the tax accountant for Ms. Moore and for Jones Day) a materially incorrect K-1 for Ms. Moore that overstated her received earnings in 2017 by the exact amount Jones Day refused to pay her. By filing this tax return, Jones Day essentially asked the Internal Revenue Service to require Ms. Moore to pay taxes on compensation that she had never received because of the Firm's retaliatory and discriminatory decision. Jones Day did this despite knowing that Ms. Moore was unemployed at the time and had no means to pay these taxes.

9.      The Firm's message could not be clearer: Women who seek to vindicate the right to equal pay guaranteed under the California Labor Code, the California Equal Pay Act, and the Fair Pay Act of 2015 will face harsh sanction.

**II.     JURISDICTION AND VENUE**

10.     This Court has jurisdiction because Defendant has offices in California, has appointed a California agent for service of process, regularly conducts business in California, has partners who work and reside in California, and committed and continues to commit the unlawful acts alleged herein in California.

11.     Venue is proper under California Code of Civil Procedure Sections 395 and 395.5 because Jones Day is a general partnership, some of whose members—including David C. Kiernan—reside in San Francisco, and a substantial part of the actions alleged occurred and continue to occur in this county.

**III.    THE PARTIES**

12.     **Plaintiff Wendy Moore** is a California resident. Ms. Moore worked for Jones Day as a partner in California from February 1, 2013 through her termination on February 28, 2018. Plaintiff joined Jones Day as a lateral partner, bringing with her more than fourteen years of relevant experience at other elite firms.

13.     In 2015, the Firm promoted Ms. Moore to Hiring Partner for Silicon Valley, and then to Hiring Partner for both Silicon Valley and San Francisco. She thrived in the role and recruiting an associate class that Firm leaders in California have called one of the best classes Jones Day (NorCal) has ever had.

14.     At Jones Day, throughout the Silicon Valley legal community, and beyond, Ms. Moore has earned a reputation for excellence. As recently as January 2018, Brian Selden, the Partner-in-Charge of the Firm's Silicon Valley office, acknowledged Ms. Moore's exceptional value to the Firm, telling Ms. Moore, repeatedly, that her "ceiling for success" at Jones Day was higher even than her noteworthy achievements to date. Jones Day regularly insisted that Ms. Moore design and present a continuing education panel at the Firm's annual client education day each January, including in January 2018. National legal organizations regularly ask Ms. Moore to join panels to deliver speeches and webcasts to nationwide audiences, and news journals with nationwide circulation regularly solicit her contributions. Premier legal directory Chambers & Partners has recognized Ms. Moore every year since 2009.

15.     **Defendant Jones Day** is one of the world's largest international business and litigation firms. According to its website, Jones Day is a general partnership with offices on five continents. Jones Day transacts substantial business in California, including through its San Francisco Office, which boasts 74 attorneys, including David C. Kiernan, Partner-in-Charge of the Firm's substantial California operations. The Firm employs approximately 300 attorneys in the state of California alone. Of the 2,500 attorneys Jones Day employs worldwide, approximately 900 possess the title of "Partner." At all relevant times, Jones Day has been an "employer" under the California Labor Code and the California Equal Pay Act.

16.     Plaintiff is unaware of the true identities of those Defendants sued herein as **DOES 1 through 100**, inclusive, and therefore sues such Defendants by pseudonym. Plaintiff is informed and believes and thereon alleges that each of the John Doe Defendants is responsible in some manner for the injuries and damages suffered by Plaintiff. Plaintiff will seek leave of Court to amend this Complaint to include the true names and capacities of the John Doe Defendants if and when they have been ascertained.

17.     Plaintiff is informed and believes that Defendant Jones Day and each of the DOE Defendants are legally responsible for all of the unlawful conduct, policies, practices, acts and omissions as described in each and all of the following paragraphs as the employer of Plaintiff and other aggrieved employees.

18.     On information and belief, Plaintiff alleges that all of the DOE Defendants are participants in the above identified single integrated enterprise, are Plaintiff's and aggrieved employees' employer(s), and/or agents, servants, employees, partners, joint ventures, alter egos, aiders and abettors, and/or co-conspirators of one or more of their co-Defendants, and in committing the acts alleged herein, were acting within the course and scope of said agency, employment, partnership, joint venture, and/or conspiracy, or were aiding and abetting their co-Defendants.

IV.     **FACTUAL ALLEGATIONS**

    **A. Jones Day Cultivates a Boys' Club Fraternity Culture in Which Male Partners Define and Dominate the Firm's Culture**

19.     Men dominate Jones Day's leadership and management. Although Jones Day employs roughly the same number of male and female associates, male partners outnumber female partners three to one. Rather than attempting to rectify the substantial underrepresentation of women in its partnership, Jones Day continues to promote or laterally hire men into partnership at roughly twice the rate of women. As with its partnership, men dominate the Firm's leadership, accounting for 80% of its Partner Review Committee and leading 34 of the Firm's 39 practice groups.

20.     This male-dominated environment fosters a fraternity culture that centers on male attorneys, their clients, their relationships, and their female conquests. Male partners often initiate happy hours and pub nights, where conversations center around sporting events, sports stories, and tales of bad-boy behavior at Jones Day's offices. As part of the Firm's fraternity culture, the Firm's male leaders often make sexist comments and rate the attractiveness of female attorneys, paralegals, staff, and officers of the Firm's clients. Business development events, too, often center on degrading stereotypes of femininity and cater to a preference for sports and alcohol. Within this environment, female attorneys are undervalued and marginalized.

21.     Jones Day's "boys' club" culture functions as a patronage system, in which the success of female attorneys depends on their value to influential male partners. Male attorneys receive greater support from the Firm in developing relationships both with clients and with their

colleagues. Business development events accommodate and prioritize male attorneys and their clients. Female attorneys must seek out male partners for work, mentorship, and support. When women do generate business, men often co-opt their clients and ideas, interfering further with their ability to generate business or receive recognition and billing credit, the credit on which pay decisions are based.

22.     Only through the grace of a male "champion" do female attorneys receive opportunities on par with those ordinarily available to male attorneys.  This dependence promotes quid-pro-quo harassment of female attorneys by the male partners on whom they rely.

**B. Jones Day's Fraternity Patronage System Results in Women Being Paid Less than Men**

23.     The compensation of Jones Day attorneys is also determined by its fraternity system: A small number of influential male partners determine the compensation of all attorneys at the Firm. This system lacks sufficient quality controls, implementation metrics, transparency, and oversight. Unsurprisingly, the outcome of this system is that these male leaders systematically undervalue female attorneys, pay them less than their male counterparts, and provide no avenues to female attorneys to inquire about their pay, much less learn how to increase it.

24.     Unlike other major law firms, Jones Day does not pay associates in lock step based on their years of experience. Compensation is instead determined by subjective perceptions of attorneys' worth. Male partners control the flow of work in the Palo Alto and San Francisco offices. These male attorneys provide female attorneys with fewer opportunities to work on high billable matters, instead reserving those matters for male associates with whom they prefer to spend longer hours working in the "boys' club" atmosphere. Female attorneys are put on non-billable projects or on projects where male partners tell them not to record significant blocks of their time. Accordingly, although female attorneys work as hard as male attorneys, their reported objective statistics that drive compensation—chiefly, billable hours—lag behind their male peers. The result is systematic underpayment of female associates.

25.     Partner pay is even more subjective, decided by a single male partner—Managing Partner Steve Brogan—with input supposedly given by the Partnership Committee, one's "office,"

practice leaders, and a selection of mostly male partners hand-picked by Mr. Brogan to make presentations to the Partnership Committee. Given the limited objective information provided to Mr. Brogan, all of which is filtered through his male deputies, this process unsurprisingly penalizes female partners.

26.    The subjective performance review system at Jones Day, in which reviews by members of the "boys' club" dominate, facilitates and exacerbates the gender disparity in pay by providing cover for male partners to ensure that male associates receive top compensation.

27.    The result of this biased, procedurally flawed, and entirely secretive compensation and performance review system is that female attorneys are compensated at a lower rate than male attorneys who perform substantially similar work. That the performance review system does in fact ensure that male associates at Jones Day receive the highest compensation was confirmed for Ms. Moore during a conversation with Mr. Kiernan during her tenure as Hiring Partner. During this conversation, Mr. Kiernan reviewed the associate pay scales and rankings for Northern California, reading out to Ms. Moore from his computer screen the names of associates deemed "high performers" in each associate class in the San Francisco and Silicon Valley offices. Only associates so designated received market salaries or "Cravath pay"; all of them were men. Female associates, absent from Mr. Kiernan's list, received less. Indeed, Plaintiff is aware of several female associates and partners who have been paid less than male associates and partners performing substantially similar work.

28.    Jones Day perpetuates this inequity through an enforced code of silence around pay, associate productivity, and other terms and conditions of employment. Attorney hours, too, remain shrouded in mystery: They are not provided to partners as a general practice, and Ms. Moore did not receive this information as Hiring Partner, even though she needed to write the memoranda seeking Firm authorization for compensation offers to candidates. As a result, most partners in Northern California do not know how much any associate bills. This stranglehold on information leaves partners ill-equipped to rectify uneven billable workload distributions or identify gender-biased decision making. Even when Ms. Moore was Hiring Partner for all of Northern California, she was given no information about the pay levels offered to candidates she was responsible for

recruiting. There was not a single female partner in Northern California with access to pay information or responsibility for the oversight of pay decisions, so far as Plaintiff is aware. Thus, not a single female partner or associate in Northern California was in a position to question the statements by male partners that pay was being distributed fairly and without gender bias.

29.    This secrecy extends to partner pay as well: To ensure that female partners do not learn of pay inequities among partners, the Firm still requires partners to maintain confidentiality regarding their own and other partners' compensation. This confidentiality about pay prevents female attorneys from discovering and seeking to equalize their compensation relative to their male peers.

30.    As a result of Jones Day's policies, the Firm has hemorrhaged female partners in California. When Plaintiff joined Jones Day, only nine (9) of the approximately 50 partners in Northern California, including herself, were female. By 2017, this number had dwindled to five (5). Furthermore, the Firm's attempts to create female partners from within proved futile. Between 2014 and 2018, the Firm promoted five (5) women in Northern California to partner, but only two of these promoted women are still with the Firm. And many of the female partners and associates who have left the Firm have done so because the Firm refused to raise their compensation to an appropriate level. Female partner attrition is but one more indication of Jones Day's discriminatory treatment of women.

**C. Plaintiff Moore Suffered Discrimination, Including Pay Discrimination, as a Result of Jones Day's Fraternity System**

31.    Plaintiff's experience at Jones Day typified these systematic issues. Throughout her employment, Plaintiff earned less than male partners performing substantially similar work. For example, for several years, Plaintiff herself earned less than the amount Jones Day paid a male sixth-year associate, James Burnham, who has since left to work with the Trump administration. Plaintiff is informed and believes that a number of other male partners earned more than she for performing substantially similar work throughout her time with the Firm.

32.    Plaintiff began to experience pay discrimination—and the secrecy that protects and enshrines it—even before she received an offer to join Jones Day. After she interviewed with the

Firm, Greg Lanier, the then-partner in charge of Palo Alto, told Ms. Moore that an offer was waiting for her once she decided to accept it. Until she decided to accept the offer, however, the Firm would not tell her what her compensation would be. Mr. Lanier told Ms. Moore that no one ever rejected an offer after learning of the associated compensation; an attorney who would do such a thing would not fit into the Jones Day culture. Mr. Lanier stated that anyone who asked for more pay was equivalent to a terrorist, adding, "Jones Day does not negotiate with terrorists." Ms. Moore accepted the offer, only to learn she would be paid approximately $100,000 less than what her prior firm had offered her in compensation for 2013. Nevertheless, Ms. Moore did not protest or reject her offer, for fear of ruining her reputation within her new Firm. Later, however, Ms. Moore learned that male lateral partner candidates regularly discussed compensation as part of their offer negotiations.

33.     For five years, on the rare occasions when Ms. Moore dared ask the partners in charge of her office or her region about when she might be paid fairly, she was reminded not to discuss pay. She was instead instructed that she should "feel" she was being "fairly compensated." She was also told not to escalate her concerns so as to avoid reputational damage; rather, she should "trust the system" because "the money will come." The money did not come. In fact, Ms. Moore did not reach the pay level she had left behind at her prior firm to move to Jones Day until her fourth year of work at the Firm.

34.     Plaintiff's experience also reflects the Firm's patronage system, in which male attorneys mentor and guide each other to successful careers while leaving their female colleagues behind. Upon joining the Firm, Ms. Moore received minimal support in developing her own book of business. Instead, Jones Day frequently deployed Ms. Moore as a token female, tasking her alone to represent Jones Day's diversity at West Coast recruiting and corporate business development events.

35.     For example, in 2013 and 2014, Ms. Moore was required to help organize and to participate in an event called "Women's Spa Day," in which male partners invited their female clients to a spa. During the event, Ms. Moore and other female partners were expected to disrobe in front of the clients and to serve as "hostesses." The Firm's all-male business development

committee chose to host this event year after year, over the repeated oral and written objections of Ms. Moore and other female partners. These female partners repeatedly notified the Firm of the event's degrading nature and relayed direct and unambiguous feedback from female general counsel that the Firm's clients found the event inappropriate, gender-stereotypical, and offensive.

36.     To succeed in this environment, Ms. Moore was forced to seek male mentors who could help her cultivate her business and her career.  Her relationship with these men in power, however, was fundamentally unequal from the outset because Ms. Moore depended professionally on these male partners to advocate for her advancement and compensation. This dependence was a byproduct of the culture at Jones Day, which valued Ms. Moore only to the extent that she had the support of one or more powerful male partners. Ms. Moore's professional success at Jones Day became entangled with her willingness to tolerate its fraternity system.

37.     Ms. Moore, however, would not remain silent in the face of the Firm's mounting culture of subjugation and discrimination. Ms. Moore raised serious concerns about the Firm's misogynist culture and its impact on her career, as well as the Firm's support for now President Donald Trump, a former Firm client who has boasted about "grab[bing women] by the pussy," only to defend this comment as "locker room talk." Ms. Moore's complaints of gender discrimination were ultimately the cause of Jones Day's decision to terminate her.

### D. When Ms. Moore Complained of Gender Discrimination, the Firm Harshly Retaliated

38.     Rather than take measures to address the Firm's systemic discrimination against women, Jones Day retaliated against Ms. Moore for voicing her complaints. In or about the summer of 2016, Ms. Moore, as Hiring Partner, raised concerns about the difficulties of recruiting female attorneys in the Firm's Silicon Valley office. She explained to the Firm's Northern California leadership that female law students were unambiguously stating in their interviews with Jones Day that the Firm's express support for Mr. Trump and its black-box compensation model left female attorneys behind. As a result, Ms. Moore informed the Firm that women did not want to risk the adverse impact on their careers by joining a Firm that proudly supported Mr. Trump and black-box compensation. In response, the Firmwide Chair of Recruiting and a member of the Firm's Diversity

& Inclusion Task Force, Sharyl Reisman, directed Ms. Moore to tone down her criticism, lest she provoke a negative response from Firm management.

39.    Ms. Moore was shocked at this Firm message and asked Greg Lanier, the then-Partner-in-Charge of the Firm's Silicon Valley office, to permit her to resign from her role as Hiring Partner. Because of her complaints, the Firm never again invited Ms. Moore to an administrative partners' meeting or other events that granted access to senior partners and management. These exclusions were a clear penalty exacted for Ms. Moore's refusal to toe the party line.

40.    In early October 2017, Ms. Moore responded to a request from Firm management that she provide a proposal for a female-centered business development event. Ms. Moore sent the proposal to Mr. Kiernan, Mr. Selden, and Craig Waldman, the head of business development for Northern California. Mr. Kiernan stated that research on the event's likely return on investment was necessary, and he tasked Mr. Waldman with performing it. Mr. Waldman, however, did not perform the research, and the women's event proposal was rejected.

41.    On December 7, 2017, frustrated by Mr. Kiernan's refusal to support a women's business development event, Ms. Moore emailed Brian Selden, then-Partner-in-Charge of the Firm's Silicon Valley Office, to express that Mr. Kiernan's disregard for women was yet another indicator of the Firm's comprehensive lack of support, mentorship, and opportunities for female partners. Ms. Moore wrote that she believed the event would have received full support if it were catering to men's interests, as the Firm regularly found money and backing for last-minute sporting events like Warriors' playoff boxes.

42.    On December 9, 2017, Mr. Selden requested that Ms. Moore meet with him and Mr. Kiernan to discuss her December 7 email. Ms. Moore prepared for this December 11 meeting by drafting an email about the "boys' club" culture at Jones Day and its impact on women at the Firm. In that email, Ms. Moore cited a Bloomberg Law news article about why successful women leave Big Law firms, survey statistics, and accounts from other female attorneys regarding some of the specific policies and practices that allowed Jones Day's culture of discrimination to flourish unchecked.

43.    At the December 11 meeting, Mr. Kiernan focused exclusively on Ms. Moore's

interactions with a male partner who formed the primary source of Ms. Moore's billable work and was Ms. Moore's primary champion within the Firm. Ms. Moore repeatedly sought to return the conversation to the Firm's discriminatory environment and practices. Ms. Moore also offered specific examples of the Firm's "boys' club" culture, such as trips to strip clubs that included Mr. Selden. In response, Mr. Kiernan informed Ms. Moore that he could never trust or work with her again.

44.     Mr. Kiernan demanded that Ms. Moore have no further contact with the male partner who provided Ms. Moore with the majority of her work. Mr. Kiernan's edict that Ms. Moore could not work with this male partner was essentially a death sentence for her career at Jones Day. Nearly 600 hours of Ms. Moore's billable time in 2017 came from work originated by this male partner. To be sure, Ms. Moore had been trying to diversify her workload since 2016, fearing that retaliation like this might occur. She had taken on significant oil/gas M&A and start-up client work out of other offices. Ms. Moore had also sought out and secured approximately $400,000 in new business from three new clients to demonstrate her ability and desire to continue to contribute to the Firm's success. Nonetheless, Ms. Moore would need additional support to develop replacement business and to succeed without access to the male partner's deals.

45.     She received no such assistance. Mr. Selden's only suggestion was that Ms. Moore should travel to other offices to build business there. But the Firm provided no assurance of financial or other support to conduct such business generation efforts.

46.     In the matters that she retained, Ms. Moore continued to provide excellent client service while also seeking to create business development opportunities for others. Ms. Moore again received Chambers & Partners recognition for her work in 2017, based on the interviews given by her clients to Chambers.

47.     At the same time, Ms. Moore continued to raise concerns respectfully about gender discrimination at Jones Day. These complaints, however, only accelerated the Firm's campaign of discrimination and retaliation.

48.     On December 18, 2017, Ms. Moore sent an email to Mr. Selden about gender pay disparities; the male leadership's unfair lack of support for, and marginalization of, female

attorneys, including Ms. Moore; the unfair scrutiny to which female attorneys were subjected (particularly those with caretaker responsibilities); the Firm's sexist culture; and the ways in which Jones Day's male leadership creates barriers to advancement for female attorneys.

49.     On December 22, 2017, after watching the mandatory sexual harassment training video that all partners are required to watch every two years, Ms. Moore sent an email stating that she was experiencing discrimination and retaliation. Mr. Kiernan responded that he would answer her email after the Christmas holiday. He did not reply. Instead, he and other Firm leaders prepared a pretext aimed at catalyzing Ms. Moore's departure from the Firm.

50.     On January 30, 2018, Ms. Moore participated in an internal Firm conference call with three male partners, one female partner, and two male associates. During the call, the three male partners repeatedly interrupted or spoke over Ms. Moore. Ms. Moore pointed out to the male partners that they were speaking over her, repeatedly and aggressively, but not doing so to each other. Ms. Moore noted that this conduct was plainly gendered and was diminishing her contributions. In response, the male partners became so aggressive that Ms. Moore stopped speaking and muted her line.

51.     The behavior of these male partners was so aggressive that one male partner, Erik Lundgren, emailed Ms. Moore immediately after the call to apologize for talking over her. Adam Braun, one of the male associates who was on the call, texted Ms. Moore words of support immediately after the call and followed up two days later in person to affirm that the male partners had been out of line.

52.     The following week, Ms. Moore echoed her complaints of discrimination to Evan Miller, the co-head of the Employee Benefits and Executive Compensation group. Mr. Miller ignored these complaints.

53.     Rather than acknowledge the discriminatory conduct by male partners, the Firm escalated its campaign of retaliation. During the second week of February 2018, Mr. Selden directed Ms. Moore to meet with him and Sarah McClure, Director of Human Resources. During this meeting, for which Ms. McClure flew to California from Ohio, Ms. McClure and Mr. Selden reprimanded Ms. Moore for asking the male partners on the January 30, 2018 internal conference

call to stop talking over her and for daring to complain of gender discrimination with two male associates on the phone. Mr. Selden and Ms. McClure accused Ms. Moore of acting "unhinged" and "hostile toward the men of Jones Day." Both repeatedly pressured Ms. Moore to admit that her behavior was inappropriate and hostile. Ms. Moore, however, defended her actions. Ms. Moore raised several contrary, provable facts regarding the conference call, including the email apology she received from Mr. Lundgren and the text sent by Mr. Braun. Nonetheless, neither Mr. Selden nor Ms. McClure interviewed either Mr. Lundgren or Mr. Braun before reprimanding Ms. Moore. The Firm then flatly refused to conduct any further investigation into the event.  Unsurprisingly, the Firm also took no action punish Ms. Moore's male aggressors.

54.     There was, however, one tangible punishment meted out because of Ms. Moore's complaints of unlawful gender discrimination: During their meeting, Mr. Selden and Ms. McClure instructed Ms. Moore to stay home during the upcoming all-partner meeting in Orlando the following week. This meeting—held only every other year—was a central and critical place for partners to gather and discuss Firm business and create opportunities for advancement. Mr. Selden and Ms. McClure instead instructed Ms. Moore to think about whether she "could be successful" at Jones Day. Ms. Moore asked why she was not deemed successful despite billing close to 1800 hours in 2017 (more than most partners in Silicon Valley and San Francisco), bringing in significant business in 2017, running business development events for Northern California, actively mentoring the Firm's junior associates, and giving client presentations as requested by the Firm. Neither Mr. Selden nor Ms. McClure responded. Instead, Mr. Selden unambiguously told Ms. Moore to find a new job and pursue any "irons" she had "in the fire." Mr. Selden informed Ms. Moore that if she found a new job, left by February 28, 2018 (less than 17 days later), and signed a release of claims, she could leave Jones Day with her retained earnings from 2017 and her capital. The Firm's intention to drive Ms. Moore from Jones Day for her complaints about the Firm's frat house culture could not have been clearer.

55.     On February 19, 2018, after the partner retreat Ms. Moore was prohibited from attending, Ms. Moore retained undersigned counsel to advise her of her rights. On February 22, 2018, Ms. Moore further exercised her statutory rights by raising concerns, through her counsel,

about discriminatory behavior at Jones Day.

56.     The Firm's retaliatory response was emphatic and unmistakable. On February 28, 2018, just six days after Ms. Moore's counsel communicated with Jones Day, Jones Day sent Ms. Moore a letter, signed by Managing Partner Steve Brogan and sent from Mr. Kiernan's secretary, stating that the Advisory Committee had voted to terminate her partnership effective immediately and had made the "finding, which I have approved" that the termination is for "cause," without any explanation of the nature of the "cause." Under the partnership agreement, a decision of termination for "cause" resulted in Ms. Moore forfeiting her retained earnings and capital.

57.     In a final coup de grace, on February 28, 2018, the very day of Ms. Moore's termination, the Firm clawed back Ms. Moore's February wages—$43,000—moments after depositing such funds in her bank account. The Firm offered no cogent explanation for its decision to retroactively reclaim these wages—paid for work that Ms. Moore had already performed and from which Jones Day profited. As with most payroll systems, Jones Day's payroll information—including who is owed what—is submitted to the system at least 10 days prior to the payday. The fact that the pay was deposited into Ms. Moore's account as scheduled on February 28, 2018 indicates that as of the day the payroll was released—which was prior to her counsel announcing his representation of Ms. Moore to the Firm—the Firm had no intention of terminating her "for cause." This fraudulent determination of "cause" is further evidence of how Jones Day uses its gender-biased pay practices to prevent female attorneys from exercising their rights under California law.

58.     Now, in an arbitration filed June 18, 2018, the Firm appears to concede that Moore's complaints of discrimination were "cause" for her termination, characterizing them as supposed breaches of her duties to the Firm—albeit, nonsensically, only *after* Ms. Moore's termination. Specifically, the Firm states, in part:

> Moore has breached these duties. First, after she was removed from the partnership, Moore has threatened to make false claims against the Firm and its partners  .  .  .   These claims relate solely to matters and events that occurred during Moore's tenure as partner, including the following: Jones Day's culture and confidential evaluation and compensation information; the conduct and actions of certain of the Firm's partners; the reasons why

women are successful at Jones Day; and the reasons for her disassociation from the Firm.

59.     This stunning admission confirms what Plaintiff has been saying all along: Men benefit from Jones Day's black box compensation system and its highly subjective review system. The Firm's fraternity culture demands allegiance to the men who run the Firm. And women who complain about this system suffer swift retaliation.

**CLAIM FOR RELIEF**

**CIVIL PENALTIES UNDER THE PAGA**

**(Cal. Lab. Code § 2698 et seq.)**

**(On Behalf of Herself and Others Similarly Aggrieved)**

60.     Plaintiff re-alleges and incorporates each and every allegation contained in this Complaint.

61.     Plaintiff brings this claim on behalf of herself and other current and former female attorneys who worked for Jones Day in California at any time on or after the date that is one year prior to the filing of this Complaint.

62.     The California Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, et seq., gives any employee aggrieved by an employer's violation of the Labor Code the right to file an action to recover civil penalties for Labor Code violations.

63.     The California Equal Pay Act ("CEPA"), Cal. Lab. Code § 1197.5(a), prohibits employers from "pay[ing] . . . employees at wage rates less than the rates paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions," subject to certain affirmative defenses. "Prior salary shall not, by itself, justify any disparity in compensation." Cal. Lab. Code § 1197.5(a)(3).

64.     The CEPA further provides that "[a]n employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, inquiring about another employee's wages, or aiding or encouraging any other employee to exercise his or her rights under this section." Cal. Lab. Code § 1197.5(k)(1).

65.     California Labor Code Section 204(a) provides that "[a]ll wages, other than those mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays . . . ." It provides further that "salaries of executive, administrative, and professional employees . . . may be paid once a month on or before the 26th day of the month during which the labor was performed if the entire month's salaries, including the unearned portion between the date of payment and the last day of the month, are paid at that time." *Id.*

66.     Labor Code Section 204.2 provides that "[s]alaries of executive and professional employees . . . earned for labor performed in excess of 40 hours in a calendar week are due and payable on or before the 26th day of the calendar month immediately following the month in which such labor was performed."

67.     The California Labor Code requires that employers pay employees wages earned and unpaid at the time of discharge or within 72 hours of an employee's quitting. Cal. Lab. Code §§ 201-02.

68.     Labor Code Section 226 requires employers to provide wage statements that accurately state the amount of gross and net wages earned.

69.     Labor Code Section 432.5 prohibits an employer or agent, manager, superintendent, or officer thereof, from "requir[ing] . . . any employee . . . to agree, in writing, to any term or condition which is known by such employer, or agent, manager, superintendent, or officer thereof to be prohibited by law."

70.     Labor Code Section 1102.5(a) prohibits an employer or person acting on behalf of an employer from preventing an employee from disclosing information "to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

71.     Labor Code Section 1102.5(b) prohibits an employer or person acting on behalf of

an employer from retaliating against an employee "for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

72.    Labor Code Section 1102.5(c) prohibits an employer or person acting on behalf of the employer from retaliating against an employee for "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

73.    Labor Code Section 1102.5(d) prohibits an employer or person acting on behalf of the employer from retaliating against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

74.    Labor Code Section 98.6 provides that "[a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee . . . caused to be instituted any proceeding under or relating to his or her rights that are under the jurisdiction of the Labor Commissioner, made a written or oral complaint that he or she is owed unpaid wages, or because the employee has initiated any action or notice pursuant to Section 2699 . . . or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her."

75.    Jones Day has violated the California Labor Code by:

a. Paying women a wage rate less than that paid to men for performing equal or substantially similar work when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions, in violation of the

California Equal Pay Act, Cal. Lab. Code § 1197.5(a), as amended by the California Fair Pay Act of 2015.

b.  As a result of pay discrimination, failing to pay all wages due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays, in violation of Labor Code § 204(a).

c.  As a result of pay discrimination, failing to pay all wages due and payable on the 26th day of the calendar month in which the labor was performed in violation of Labor Code § 204.

d.  As a result of pay discrimination, failing to pay all wages due and payable on the 26th day of the calendar month immediately following the month in which such labor was performed, in violation of Labor Code § 204.2.

e.  As a result of pay discrimination throughout employment, failing to pay female employees their rightful wages earned and unpaid at the time of discharge or within 72 hours of the day they quit, in violation of Labor Code §§ 201-02.

f.  As a result of pay discrimination, failing to provide wage statements that accurately state the rightful amount of gross and net wages earned, in violation of Labor Code § 226(a).

g.  Prohibiting women from disclosing information about their own wages, including the components of these wages, in violation of Labor Code § 1197.5(k).

h.  Prohibiting and preventing women from disclosing the amount of their and others' wages, including components of pay such as revenue generation, in violation of Labor Code § 1197.5(k).

i.  Prohibiting an employee's aiding or encouraging any other employee to exercise his or her rights under the CEPA, in violation of Labor Code § 1197.5(k).

j.  Preventing Plaintiff and other women from disclosing information regarding terms and conditions of employment that they have reasonable cause to believe discloses a violation of, *inter alia*, the aforementioned laws, in addition to the California Fair

Employment and Housing Act, Title VII, and the Federal Equal Pay Act, in violation of Labor Code § 1102.5(a).

k. Imposing the foregoing unlawful policies, patterns, and practices involving unequal pay, secrecy concerning terms and conditions of employment, and discouragement of actions that vindicate or assist others to vindicate rights under the CEPA, which Jones Day knew or had reason to know are illegal, through contracts and other signed documents, in violation of Labor Code § 432.5.

l. Retaliating against Plaintiff, including by, *inter alia*, restricting Plaintiff's professional opportunities, terminating Plaintiff's employment, and engaging in other adverse actions, because Plaintiff disclosed information that she reasonably believed constituted a violation of the aforementioned laws, as well as the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, and the Federal Equal Pay Act, all of which are actions that are themselves violations of Labor Code § 1102.5(b).

m. Retaliating against Plaintiff because she opposed and refused to participate in conduct that would have constituted a violation of the aforementioned laws, in addition to the California Fair Employment and Housing Act, Title VII, and the Federal Equal Pay Act, in violation of labor Code § 1102.5(c), including by, *inter alia*, restricting Plaintiff's professional opportunities, terminating Plaintiff's employment, and engaging in other adverse actions.

n. Retaliating against Plaintiff for exercising her right to speak out against violations of the law, in violation of labor Code § 1102.5(d), including by, *inter alia*, restricting Plaintiff's professional opportunities, terminating Plaintiff's employment, and engaging in other adverse actions.

o. Retaliating against Plaintiff for invoking her and other women's rights under the California Equal Pay Act to receive equal pay for substantially similar work and to discuss their own and others' compensation, in violation of Labor Code § 1197.5(k).

p.   Retaliating against Plaintiff, in violation of Labor Code Section 98.6(a), for exercising her right to speak out against violations of the law, for taking steps to institute proceedings related to her rights that are under the jurisdiction of the Labor Commissioner, including the aforenoted rights, for complaining that she is owed unpaid wages as a result of the discrimination she faced, for engaging in conduct delineated under Labor Code §§ 1102, 1102.1 and 1102.5, and for exercising the rights afforded to her (1) to receive equal pay pursuant to the Equal Pay Act, 29 U.S.C. 206, and the California Equal Pay Act, Cal. Lab. Code 1197.5; (2) to be free from sex-based discrimination with respect to compensation and other terms and conditions of employment, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and the California Fair Employment and Housing Act, Cal. Gov. Code § 12940 *et seq.*; (3) to disclose her own wages, to discuss her own and others' compensation, and to discuss working conditions pursuant to Labor Code §§ 232, 232.5, and 1197.5; (4) to oppose and to disclose facts that Plaintiff has reason to believe disclose violations of state, federal, and local laws, including Title VII, the Equal Pay Act, and the Labor Code Sections identified in this charge, pursuant to Labor Code § 1102.5.

76.    In addition to Plaintiff, there are hundreds of employees who have experienced one or more of these violations as of this filing. This number will continue to grow with each new female attorney that Jones Day employs while it fails to rectify these violations.

77.    The above-referenced violations are willful, intentional, and ongoing. Plaintiff, as a private attorney general, seeks to recover the maximum civil penalties for all violations.

78.    On the date this Complaint is being filed, Moore is filing notice of her PAGA claims for these violations with the California Labor and Workforce Development Agency and is serving that notice on Jones Day via certified mail.

79.    Plaintiff seeks to recover the maximum civil penalties available for each of these violations. This includes, for wages owed as a result of gender-based pay inequity, "(1) for any initial violation, one hundred dollars ($100) for each failure to pay each employee. (2) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each

1  failure to pay each employee, plus 25 percent of the amount unlawfully withheld." Cal. Lab. Code

2  § 210.

3         80.    In addition, Plaintiff seeks costs and attorneys' fees under Labor Code § 2699(g).

4  **PRAYER FOR RELIEF**

5      WHEREFORE, Plaintiff requests the following relief:

6      A.    Recovery of penalties as provided by the California Private Attorneys General Act

7  of 2004, and California Labor Code § 210;

8      B.    Declaratory and injunctive relief;

9      C.    Reasonable attorneys' fees pursuant to California Labor Code § 2699(g);

10      D.    Costs of this suit;

11      E.    Pre- and post-judgment interest; and

12      F.    Such other and further relief as the Court may deem just and proper.

13

14  **JURY DEMAND**

15  Plaintiff requests a jury on all causes of action triable by jury.

16

17                  Respectfully submitted,

18  Dated: 6/19/2018          SANFORD HEISLER SHARP, LLP

19

20                By:    _____

                       Danielle Fuschetti (CA Bar # 294064)

21                         SANFORD HEISLER SHARP, LLP

                       111 Sutter Street, Suite 975

22                         San Francisco, CA 94104

                       Telephone: (415) 795-2020

23                         Facsimile: (415) 795-2021

                       Email: dfuschetti@sanfordheisler.com

24

25                         David Sanford (pro hac vice forthcoming)

                       Russell L. Kornblith (CA Bar # 289329)

26                         SANFORD HEISLER SHARP, LLP

                       1350 Avenue of the Americas, 31st Floor

27                         New York, NY 10019

                       Telephone: (646) 402-5650

28                         Facsimile: (646) 402-5651

COMPLAINT FOR PENALTIES AND INJUNCTIVE RELIEF      23

Email: dsanford@sanfordheisler.com
Email: rkornblith@sanfordheisler.com

Deborah K. Marcuse (pro hac vice forthcoming)
SANFORD HEISLER SHARP, LLP
400 East Pratt Street
8th Floor
Baltimore, MD 21202
Telephone: (410) 834-7420
Facsimile: (410) 834-7425
Email: dmarcuse@sanfordheisler.com

*Attorneys for Plaintiff*