# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | ) ) ) ) | Civ. No. 1:19-02443 (RDM) |
| *Plaintiffs*, | ) ) | |
| *v.* | ) ) ) | **REPLY REGARDING PLAINTIFFS' REQUESTS FOR DISCOVERY ON PARTNERSHIP INFORMATION AND PUNITIVE DAMAGES** |
| JONES DAY, *et al.*, | ) ) | |
| *Defendants.* | ) | |

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.   BIFURCATION OF LIABILITY AND DAMAGES DISCOVERY IS THE
     MOST EFFICIENT WAY FORWARD IN THIS CASE .......................................... 2

II.  PARTNERSHIP DISCOVERY IS DISPROPORTIONATE TO THE
     NATURE AND NEEDS OF THIS CASE .................................................................. 4

     A.   The Court Should Foreclose Discovery on Unsupportable Damages
          Theories ........................................................................................................... 5

          1.   Plaintiffs Will Not Be Entitled to a Long-Term Front Pay Award .................... 6

          2.   Plaintiffs' Lost Wages Theory Is Unduly Speculative ..................................... 10

     B.   Plaintiffs' Discovery Requests Are Extremely Burdensome ..................................... 15

III. DISCOVERY REGARDING DEFENDANTS' FINANCIAL RESOURCES
     IS NOT RELEVANT NOW AND LIKELY NEVER WILL BE ...................................... 20

     A.   Defendants' Wealth Is Not Relevant in This Case ................................................... 20

     B.   The Discovery Plaintiffs Seek Is Not Appropriate At This Time ............................. 21

     C.   Plaintiffs' Other Damages Issues Are Beyond the Scope of This Dispute ............... 23

CONCLUSION .................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Banks v. Perdue,*
 No. 07-cv-01807, 2019 WL 147445 (D.D.C. Jan. 9, 2019)....................................10

\* *Barbour v. Medlantic Mgmt. Corp.,*
 952 F. Supp. 857 (D.D.C. 1997) .......................................................................7, 8

\* *Barbour v. Merrill,*
 48 F.3d 1270 (D.C. Cir. 1995).........................................................................5, 11

*Barbour v. Merrill,*
 132 F.3d 1480 (D.C. Cir. 1997) .............................................................................7

*Bell v. Clackamas Cnty.,*
 341 F.3d 858 (9th Cir. 2003) ................................................................................20

*BMW of N. Am., Inc. v. Gore,*
 517 U.S. 559 (1996)..............................................................................................24

*Cassino v. Reichhold Chems., Inc.,*
 817 F.2d 1338 (9th Cir. 1987) ................................................................................7

*Chadwick v. District of Columbia,*
 56 F. Supp. 2d 69 (D.D.C. 1999) ...........................................................................3

*Chatman v. Lawlor,*
 831 A.2d 395 (D.C. 2003) .....................................................................................21

*D'Onofrio v. SFX Sports Grp., Inc.,*
 247 F.R.D. 43 (D.D.C. 2008).................................................................................21

*Daka, Inc. v. McCrae,*
 839 A.2d 682 (D.C. 2003) .....................................................................................20

*Davis v. Combustion Eng'g, Inc.,*
 742 F.2d 916 (6th Cir. 1984) ..................................................................................7

\* *Dotson v. Pfizer, Inc.,*
 558 F.3d 284 (4th Cir. 2009) ...............................................................7, 9, 10, 12

*Gotthardt v. Nat'l R.R. Passenger Corp.,*
 191 F.3d 1148 (9th Cir. 1999) ................................................................................8

*Hardrick v. Legal Servs. Corp.,*
 96 F.R.D. 617 (D.D.C. 1983)..................................................................................5

*Hutchinson v. Stuckey,*
 952 F.2d 1418 (D.C. Cir. 1992).............................................................................20

*Intervet, Inc. v. Merial Ltd.,*
 252 F.R.D. 47 (D.D.C. 2008)..................................................................................5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Jonathan Woodner Co. v. Breeden*,
  665 A.2d 929 (D.C. 1995) ...................................................................................22

*Lamaute v. Power*,
  No. 19-CV-3702-RCL, 2021 WL 1978971 (D.D.C. May 18, 2021)........................5

*Lin v. Darren Beavers, Hi-Tech Testing Serv., Inc.*,
  No. 08-CV-4033, 2009 WL 361247 (W.D. Ark. Jan. 30, 2009) ...........................22

*Mason v. Okla. Tpk. Auth.*,
  182 F.3d 1212 (10th Cir. 1999) ...........................................................................20

*McKnight v. Gen. Motors Corp.*,
  973 F.2d 1366 (7th Cir. 1992) ..........................................................................7, 8

*Peskoff v. Faber*,
  230 F.R.D. 25 (D.D.C. 2005) ...............................................................................21

\* *Peyton v. DiMario*,
  287 F.3d 1121 (D.C. Cir. 2002)...........................................................6, 8, 10, 11

*Salinas v. Procter & Gamble Co.*,
  No. 19-CV-06794-RGK-AS, 2020 WL 8455187 (C.D. Cal. Dec. 4, 2020)............5

*Schaub v. VonWald*,
  638 F.3d 905 (8th Cir. 2011) ...............................................................................20

*Smith v. Lightning Bolt Prods., Inc.*,
  861 F.2d 363 (2d Cir. 1988)................................................................................22

*Stafford v. Elec. Data Sys. Corp.*,
  749 F. Supp. 781 (E.D. Mich. 1990).......................................................................6

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)..............................................................................................21

*Tyco Int'l Ltd. v. Walsh*,
  No. 02 Civ. 4633, 2010 WL 3000179 (S.D.N.Y. July 30, 2010) ..........................20

*United Paperworkers Int'l Union, AFL–CIO, Loc. 274 v. Champion Int'l Corp.*,
  81 F.3d 798 (8th Cir. 1996) ....................................................................................7

*United States v. Maddux*,
  No. 14-CR-20-DLB-EBA, 2019 WL 362264 (E.D. Ky. Jan. 29, 2019)...................5

*Williams v. Pharmacia, Inc.*,
  137 F.3d 944 (7th Cir. 1998) ..................................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26............................................................................................. *passim*

Std. Civ. Jury Instrs. for the District of Columbia § 16.03 (2021 ed.)...........................21

## <u>INTRODUCTION</u>

Plaintiffs seek to obtain sweeping discovery (highly confidential promotion and compensation data about *hundreds* of Jones Day partners) to support a far-fetched and speculative damages theory that the facts and law would never countenance:  that Savignac, who was terminated at age 31 after spending less than two years at Jones Day, should be entitled to the lifetime differential in earnings between a partner at Jones Day and a partner at Steptoe.  This is exactly the type of disproportionate frolic that Rule 26 is meant to foreclose.

If Savignac were to prevail on his retaliation claim, he would be entitled to recover only for the few months he spent between jobs, and perhaps the delta between his Jones Day associate salary and his Steptoe associate salary for a limited period of time (likely 1-2 years).  Partnership promotion and compensation data would never enter the picture.  Even indulging Savignac's faulty premise that he would have been invited to join the Jones Day partnership effective January 2021, he now boasts about the glowing reviews putting him on track for partnership ████████████ █████████████████████████████████████████████████████.  Under these circumstances, it is inconceivable that the Court would exercise its discretion to award front-pay extending beyond 2022, particularly given the number of speculative leaps such an exercise would inevitably entail.  That reality is wildly out of step with the enormous volume of information Plaintiffs are demanding from Jones Day, let alone the corresponding parallel information Defendants would need from Steptoe to complete the equation (a point Plaintiffs cannot dispute and therefore urge the Court to ignore).  The Court should take this opportunity to impose a realistic outer boundary on Plaintiffs' lost-wages dreams, so the parties and the Court do not spend the next year-plus litigating over how Steptoe's revenues in 2030 will compare to Jones Day's, or whether Savignac would face greater odds of being de-equitized at one firm versus the other as he approaches retirement.

Of course, now that Plaintiffs have belatedly agreed that bifurcation of damages discovery makes sense, the Court could simply defer the issue.  That course is prudent, especially because the facts relevant to Savignac's damages theory continue to develop (through, *e.g.*, his reviews and partnership consideration at Steptoe ███████████████ ) and because all of this would go, at most, to an equitable remedial determination the Court would make *after trial*.  But the Court should not accept Plaintiffs' inefficient proposal that damages discovery resume once summary judgment motions are *filed*.  Liability should be *resolved* before any far-afield damages inquiries are pursued; at that point, if necessary, the Court will be in a better position to determine what facts are truly relevant to its equitable front-pay analysis.

Much the same is true of Plaintiffs' demand for years' worth of sensitive information about Defendants' finances.  That information will never be relevant, because Defendants do not intend to put their financial resources at issue in defending against a punitive damages demand, and because the Constitution would preclude any punitive award within several orders of magnitude of Jones Day's revenues.  At minimum, courts in this District have routinely and consistently held that this type of punitive-damages discovery should be deferred until it becomes necessary—and this case is a long ways off from that point.

## **ARGUMENT**

## I.   **BIFURCATION OF LIABILITY AND DAMAGES DISCOVERY IS THE MOST EFFICIENT WAY FORWARD IN THIS CASE**

As an initial matter, Plaintiffs now appear to agree with Defendants that bifurcation of liability and damages discovery would be appropriate, thus allowing the Court to defer ruling on the latter's disputed scope.  "[R]ecogniz[ing] that the Court and the parties have a strong interest in prioritizing liability discovery so that contested damages discovery does not delay summary judgment," Pls' Br. 37, Plaintiffs disagree only with the specifics of Defendants' *schedule* for

bifurcation.  Specifically, Defendants proposed that lost-wages discovery be postponed until after liability is *resolved*; Plaintiffs propose instead that lost-wages discovery be deferred until liability summary judgment motions are *filed*.  *Id.* at 37-38.  For several reasons, Defendants' proposal offers the most efficient way to manage discovery in this case.

For one, Plaintiffs' discovery proposal does not achieve any real benefits for the parties, the Court, or third parties.  Plaintiffs' proposal simply *delays* lost-wages discovery in the short term, with no potential for this discovery to be avoided if it proves to be unnecessary based on merits resolution.   In contrast, Defendants' bifurcation proposal has the benefit of potentially avoiding lost-wages discovery altogether if Savignac's retaliation claim is rejected on the merits. This would save the parties, the Court, and third parties significant time, expense, and burden. Plaintiffs' only objection is that deferral would cause delay, but they have identified no prejudice or time sensitivity that would justify restarting discovery while summary judgment motions are *sub judice* and being considered by the Court.

Even if Plaintiffs' lost-wages discovery does eventually become necessary, postponing it would be the most efficient way forward.  *First*, the facts relevant to lost wages will continue to develop in real time over the next 18 months.  Savignac included his Fall 2020 reviews from Steptoe as an appendix to his brief; presumably, additional reviews will become available in Fall 2021. ███████████████████████████████████████████████████████.  The continued development of facts relevant to the requested front-pay counsels in favor of postponing that discovery until later in the litigation.  Indeed, because "front pay [is] an equitable remedy to be considered by the Court," the earliest any of this information would be used is *after a trial*—so there is certainly no need for expedition.  *Chadwick v. District of Columbia*, 56 F. Supp. 2d 69, 72 (D.D.C. 1999).

*Second*, Plaintiffs' lost-wages document requests will likely become more focused after they depose Jones Day partners involved in the partnership admission and compensation decisions. For example, Plaintiffs apparently intend to tease out the characteristics that Jones Day looks for in a successful partner candidate not by asking a competent witness, but by requesting—and trying to draw inferences from—every piece of information about the 50 lawyers admitted to the partnership in January 2021 and the more than 50 additional lawyers associated with the Issues & Appeals practice or who clerked at the Supreme Court. Given the highly individualized assessment of each individual candidate, this will be a burdensome, time-consuming, and fruitless exercise. The only effective means of ascertaining the relevant characteristics is to depose those individuals who are responsible for these decisions. Those depositions would, at minimum, crystallize the issues in dispute regarding whether and when Savignac might have been promoted to partner. Plaintiffs' belief that open-ended document discovery about *other* attorneys is the *only* way to gain information relevant to their claims reflects their admitted inexperience with civil discovery and has obstructed meaningful discovery on the issues that matter.

Rather than distracting the parties and the Court with hotly disputed damages discovery now, the Court should postpone discovery about Savignac's entitlement to lost wages until it becomes necessary—at minimum, after summary judgment motions are resolved, if not after trial.

## II.   PARTNERSHIP DISCOVERY IS DISPROPORTIONATE TO THE NATURE AND NEEDS OF THIS CASE

If the Court does not bifurcate discovery and instead allows Plaintiffs to pursue lost-wages discovery now, the Court should impose reasonable limits on that discovery, because the requests Plaintiffs have made are overbroad and disproportionate. At most, lost-wages discovery should be targeted and tailored to *plausible* damages theories, extending *at most* four years from the date of Savignac's termination (*i.e.*, from January 2019 through the end of 2022).

4

### A.   The Court Should Foreclose Discovery on Unsupportable Damages Theories

"[A]ll discovery is subject to the balancing test in Rule 26(b)[(1)] . . . that requires a court to limit the discovery 'otherwise allowed by these rules' if the burden outweighs its likely benefit . . . ." *Intervet, Inc. v. Merial Ltd.*, 252 F.R.D. 47, 49 (D.D.C. 2008).  Thus, "[c]ourts may exercise discretion in discrimination cases by placing reasonable limits in discovery in order to balance the needs and rights of both plaintiff and defendant." *Lamaute v. Power*, No. 19-CV-3702-RCL, 2021 WL 1978971, at *2 (D.D.C. May 18, 2021).  Courts must act to prevent "'fishing expeditions,' discovery abuse[,] and inordinate expense[s] involved in overbroad and far-ranging discovery requests." *Hardrick v. Legal Servs. Corp.*, 96 F.R.D. 617, 618 (D.D.C. 1983).  This dispute involves a textbook example of the latter.

Plaintiffs' first and most frequent argument in favor of their wide-ranging discovery project is that they are simply seeking discovery to support their damages theory, and that the Court should not "prejudge" that theory by denying them information now.  But this misses the point of the proportionality requirement, which exists to ensure that the scope of discovery is tailored to the needs of the case and the importance of the issues.  *See* Fed. R. Civ. P. 26(b)(1).  The discovery rules do not permit Plaintiffs to pursue expansive, intrusive discovery into every attenuated theory. *See Hardrick*, 96 F.R.D. at 618 (holding that discovery rules do not permit "fishing expeditions"); *Salinas v. Procter & Gamble Co.*, No. 19-CV-06794-RGK-AS, 2020 WL 8455187, at *1-2 (C.D. Cal. Dec. 4, 2020) (affirming denial of discovery based on "speculative" theory for recovery of indirect profits); *United States v. Maddux*, No. 14-CR-20-DLB-EBA, 2019 WL 362264, at *8 (E.D. Ky. Jan. 29, 2019) (affirming denial of discovery for theory that was "speculative at best").

Importantly, as Plaintiffs acknowledge, whether to award lost wages (and the amount of those lost wages) is an equitable determination to be made by the Court, not a jury.  *See* Pls' Br. 9-10; *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) ("[U]nder Title VII, a district court

has wide discretion to award equitable relief" in the form of lost wages). Thus, whether the Court decides this issue now or later, the determination will be the same. For several reasons, the Court should set some outer bounds now on Plaintiffs' sweeping damages theories. It makes little sense for the parties to engage in open-ended, wide-ranging discovery on topics the Court will ultimately rule are foreclosed as a matter of law or equitable discretion, as this Court has previously recognized. *See* 7/20 Tr. at 48:25-50:8 (denying discovery regarding associate behavior on the basis of "significant doubt" that such evidence would be admissible because it is more prejudicial than probative).

Here, Plaintiffs contend that if Savignac prevails on his retaliation claim, he will be entitled to recover a long-term, potentially lifetime differential between what he supposedly would have earned as a partner at Jones Day and what he expects to earn as a partner at Steptoe. As a result, according to Plaintiffs, they need broad-brush discovery of years' worth of compensation information for all Jones Day partners (regardless of seniority), in order to allow an expert to construct a model of what Savignac's compensation would have looked like if he had stayed at Jones Day for the rest of his career. This is an unprecedented and illogical theory. The law and undisputed facts could never support such a long-term front pay award. Consequently, expansive discovery (including third-party discovery) regarding this theory would be a waste of time and effort, and certainly would be disproportionate to the needs of the case.

### 1.    Plaintiffs Will Not Be Entitled to a Long-Term Front Pay Award

As an initial matter, courts, including the D.C. Circuit, have been exceptionally clear that a lifetime-differential front-pay award is not appropriate for someone like Savignac, who is early in his career and has already found comparable employment. As the D.C. Circuit succinctly put it, "'courts seem to agree that plaintiffs in their forties are too young for lifetime front pay awards.'" *Peyton v. DiMario*, 287 F.3d 1121, 1130 (D.C. Cir. 2002) (quoting *Stafford v. Elec.*

*Data Sys. Corp.*, 749 F. Supp. 781, 789 (E.D. Mich. 1990)) (collecting cases); *see also United Paperworkers Int'l Union, AFL–CIO, Loc. 274 v. Champion Int'l Corp.*, 81 F.3d 798, 805 (8th Cir. 1996) (expressing "grave doubt" about 24-year front pay award because "[i]nstead of warranting a lifetime of front pay, [plaintiff's] relatively young age should improve his future opportunities to mitigate through other employment"); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984) (noting that front pay "may not be available in all cases" because, "[f]or example, the award of front pay to a discriminatorily discharged 41 year old employee until such time as he qualifies for a pension might be unwarranted"); *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009) (affirming rejection of lifetime front-pay award where plaintiff was "a relatively young age when terminated" and "highly educated and experienced"); *Barbour v. Medlantic Mgmt. Corp.*, 952 F. Supp. 857, 866 (D.D.C.), *aff'd sub nom. Barbour v. Merrill*, 132 F.3d 1480 (D.C. Cir. 1997) ("Since the plaintiff had, and still has, reasonable prospects for obtaining comparable employment within a reasonable timeframe (should he exert reasonable efforts), it would be punitive and unduly speculative to award him front pay until his intended retirement date in 2005.").

This is because "front pay is intended to be temporary in nature." *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987). "In general, front pay ends when the sting of discrimination has passed and the victim has had a reasonable amount of time to secure comparable employment." *Barbour*, 952 F. Supp. at 866. Thus, "an employee receiving front pay in lieu of reinstatement is entitled to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998). Front pay "is certainly not 'intended to insure a plaintiff's future financial success.'" *Barbour*, 952 F. Supp. at 863 (quoting *McKnight v. Gen.*

*Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992)).  And, as the D.C. Circuit has observed, "'[t]he longer a proposed front pay period, the more speculative the damages become.'"  *Peyton*, 287 F.3d at 1128 (quoting *McKnight*, 973 F.2d 1372).

For these reasons, a typical award of front-pay lasts less than two years, as Defendants explained.  To be sure, there are some "unique circumstances," *id.* at 1130, where the "sting of discrimination," *Barbour*, 952 F. Supp. at 866, continues and a longer period of front-pay is appropriate.  Thus, in rejecting a 26-year front pay award for a plaintiff in her 30s, the D.C. Circuit distinguished *Gotthardt v. National Railroad Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999), which upheld an 11-year award.  *Peyton*, 287 F.3d at 1130.  The Court noted the Ninth Circuit's observation that "'an eleven-year front pay award seems generous,'" but explained that it was appropriate in *Gotthardt* because of the "unique circumstances": the plaintiff was "a 59 year-old employee approaching retirement who had been truly incapacitated by the employer's wrongful conduct and could not enter another career."  *Id.* at 1129-30 (quoting *Gotthardt*, 191 F.3d at 1157).

It is already sufficiently clear that this is not one of those unique cases that justifies a long-term front pay award.  To the contrary, all indications are that any "sting," *Barbour*, 952 F. Supp. at 866, has *already* passed.  Indeed, Plaintiffs devote several pages of their reply to a series of glowing reviews from Steptoe lawyers ███████████████████████████████████████.  Pls' Br. 29.  Far from having *lost* opportunities by moving from Jones Day to Steptoe, Savignac appears to have gained *more* opportunities ████████████████████████████ at Steptoe ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Pls' Br. 7, 29-30.  And, in any event, the notion that in a competitive industry like private law practice, a lawyer with Savignac's credentials and (self-described) skill will never be able to

recover from being terminated at age 31 is inconceivable.  *See Dotson*, 558 F.3d at 300 (affirming denial of any front pay as too speculative where plaintiff was "relatively young," "highly educated and experienced," and had already "secured comparable, if not precisely equivalent, work at another major drug company" making $65,000 less than his previous $232,000 salary).

Savignac's own analysis of the law and facts suggests that the *maximum* amount of lost wages he could obtain is 4 years.  Savignac concedes that Steptoe is a comparable firm to Jones Day; that his position as an appellate associate at Steptoe is comparable to his position as an associate at Jones Day; that he will be eligible for partnership consideration at Steptoe ████ ████████████████████████████████████████████████████████████████████ Pls' Br. 7, 18.  Based on these concessions, *even if* the Court determines that Savignac's pay differential as an associate between his termination (January 2019) and the time he is considered for partner at Steptoe ████████████ renders his current employment not comparable to his employment at Jones Day, that difference will end when Savignac is considered for partner at a peer firm ██████████████████████████████.  At that point, Savignac will have received precisely the opportunity he says he was denied at Jones Day, and no further remediation will be justified.[1]

In fact, it is likely Savignac has *already* obtained a sufficiently comparable position that no award of front pay will be appropriate.  Plaintiffs dispute this on the ground that the *only* relevant question is whether the new position pays as much as the old position.  *See id*. at 13-19.  Courts, however, have not employed such a myopic focus when using their equitable discretion.  Rather, "comparable" employment is employment that is "roughly equivalent in pay, benefits,

---

[1] The difference between equity and non-equity partnership is a red herring; what matters for a lost-wages theory is how much the plaintiff would have earned compared to how much he will earn, not whether that compensation is technically paid from the firm's profits.

status, and responsibility." *Banks v. Perdue*, No. 07-cv-01807, 2019 WL 147445, at *1 (D.D.C. Jan. 9, 2019). Thus, in *Dotson v. Pfizer*, the Fourth Circuit rejected the plaintiff's claim that "since he has not found a position as remunerative as the one he held with Pfizer, he will not be 'made whole' unless he receives compensation to make up the difference, starting at the date of his termination and looking more than a decade into the future." *Dotson*, 558 F.3d at 300. The Fourth Circuit explained that, "[a]t the time the court ruled on Dotson's request for front pay, Dotson had secured full-time employment in the pharmaceutical services industry, making approximately $65,000 less than the approximately $232,000 in salary and benefits he made prior to his termination. Thus, he had secured comparable, if not precisely equivalent, work at another major drug company." *Id.* Noting that "the determination of front pay is inherently speculative," the Court affirmed the District Court's decision not to award any front pay, emphasizing the plaintiff's "relatively young age" and that he was "highly educated and experienced." *Id.* The same is true here.

At bottom, "[t]o award [Savignac] front pay based on the assumption that [he] will continue in an allegedly low-paying job (compared to a [position at Jones Day]) for a full career, when [he] is only 34 years old and not incapacitated, is to give [him] a tremendous windfall rather than to make [him] whole." *Peyton*, 287 F.3d at 1130. A long-term front-pay award is not plausibly on the table in this case, and the Court should make clear that discovery aimed at supporting a long-term front pay award is disproportionate. Any lost-wages discovery should be constrained by an outer boundary of (*at most*) four years, with the ultimate decision on any such remedial question reserved for this Court to make, if necessary, after trial.

## 2.      Plaintiffs' Lost Wages Theory Is Unduly Speculative

As Defendants explained in their opening brief, Savignac's lost wages theory is also far-fetched and implausible because it rests on a speculative series of assumptions, all of which must

be true for Savignac to prevail.  In particular, Savignac must establish that Defendants are liable; that he is entitled to damages extending beyond the two years he claims it would have taken for him to become eligible for partnership; that he would have stayed at Jones Day (a Firm that he supposedly believes discriminates on an institutional level) for those additional years, rather than, say, entering government, public service, academia, or another pursuit like Sheketoff and many other Issues & Appeals associates; that his future performance, experience, and tenure with Jones Day would have been sufficient to allow him to be considered for partnership as of January 2021; and that he would have been admitted to the partnership.  Even after all of that, Savignac's theory would require speculation about how Jones Day would have set Savignac's individualized compensation as a partner and how that compensation would compare to his future earnings in the real world.  It is unlikely that Savignac will be able to establish every link on this chain of speculative assumptions, as he must, and allowing the scorched-earth discovery Plaintiffs seek to support this theory would therefore be disproportionate and unreasonable, and materially distract from the discovery that is actually important to litigating this case.

Plaintiffs' first argument in response is that "[f]ear of 'speculation' is no basis to deny discovery," Pls' Br. 21, citing the D.C. Circuit's opinion in *Barbour*, 48 F.3d at 1280.  However, as explained above, this Court has an obligation under Rule 26 to ensure that discovery is proportional to the needs of the case.  This includes the obligation to ensure that the kind of open-ended discovery at issue here is not allowed, when the only purpose of that discovery is to support an attenuated theory that is very unlikely to ever matter in the case.  Moreover, *Barbour* also makes clear that "whether an award of front pay would be 'unduly speculative,' may in some circumstances limit the court's discretion," *id*; *see also Peyton*, 287 F.3d 1128-29.  Because Savignac's claim to compensation as a partner rests on an excessively tenuous chain of

assumptions, this is such a case.  *See, e.g.*, *Dotson*, 558 F.3d at 300-01 (denying front pay based on speculative assumptions).

Savignac nonetheless argues that the assumption he would have made partner in 2021 is not unduly speculative because the "bar [for partnership at Jones Day] is low—and that 'every Supreme Court clerk since at least 2014 who has remained at Jones Day until becoming eligible for promotion' was in fact promoted."  Pls' Br. 21.  And Plaintiffs hypothesize that Jones Day must agree that he would have made partner in 2021 because it did not offer a point-by-point rebuttal.  There are several problems with Plaintiffs' analysis, which Defendants point out solely to demonstrate just how far-reaching and speculative Plaintiffs' theory truly is.

For one, the supposed concession that Plaintiffs imagine is fantasy.  Defendants could not have been more clear in their opening brief that "[t]here is no basis for [Savignac's] claim" that "simply because he was a former Supreme Court clerk, he would automatically have been admitted to the Jones Day partnership at his earliest opportunity."  Defs' Br. 17.  But more importantly, Plaintiffs again miss the point.  Defendants' point was that Savignac's brief stay at Jones Day and thin performance record make it *impossible to say* whether he would have been considered for, or admitted to, the partnership at any point.   Moreover, because partnership decisions are individualized, it is impossible to rely on partnership decisions for other associates who had different backgrounds, experience, and skills to say whether or when Savignac would have been admitted to the partnership.

To suggest a more routine and formulaic process, Plaintiffs invent what they call a "nine-and-three requirement,"  under which lawyers are considered for partnership when they have been out of law school for 9 years and at the Firm for 3 years.  Pls' Br. 5.  This "nine-and-three" rule does not exist at Jones Day.  While there is a minimum threshold of 9 years' post-J.D. legal

experience, the majority of lawyers promoted to partnership in January 2021 had 10 or more years of legal experience.  *See* Supplemental Declaration of Michael R. Shumaker ¶ 4, attached hereto as Exhibit A ("Supp. Shumaker Decl.").  The minimum tenure at the Firm varies depending on the lawyer's seniority, prior experience, and performance.  Lateral associates, such as Savignac, generally require longer tenure than more senior lawyers who join as Of Counsel because the lateral associates do not arrive with an established track record of performance at a senior level. No one with only nine years of legal experience and only three years at Jones Day was promoted to partner in January 2021.  *Id*. ¶ 5.

If and when associates are considered for promotion to partnership depends on the extent to which they have demonstrated the professional accomplishment, leadership, commitment to the Firm, and respect for the Firm's culture that make them a viable candidate for partnership.  In addition to these criteria, Jones Day takes into account many different variables in its partnership decisions on individual candidates, which are driven by the facts presented that year—such as the number of other more deserving candidates, the business needs for partner expertise in a practice or office, and strategic priorities for expanding offices and practices.  *Id*. ¶ 8.  Jones Day's Washington office already has two dozen Issues & Appeals partners with outstanding brief-writing and appellate skills, so none of these additional factors would weigh in Savignac's favor.  *Id*. at ¶¶ 8, 10.  It is unduly speculative—and simply wrong—to believe that the decisions reached by the Firm on other associates in other years can be reduced to a formula that will dictate whether or when Savignac would have been admitted to the partnership.

Indeed, it is *not* "undisputed that Mark 'would have been eligible' 'in 2020' to be promoted [to partner at Jones Day] effective January 1, 2021."  Pls' Br. 22.  In fact, Defendants said precisely the opposite:  "Savignac was a 2011 law graduate who joined the Firm in May 2017.  His offer

letter did not specify when he would be eligible for partnership consideration, and his short tenure at Jones Day made it highly unlikely he would have been admitted in January 2021." Defs' Br. 17.  In addition, although Savignac had been out of law school for six years when he joined Jones Day, he had practiced law for only *seven months* at Hogan Lovells, spending the remainder of his time at three clerkships and 22 months as a Supervisory Financial Analyst at the Federal Reserve, ███████████████████████████████████████.  *See* Exhibit B (Savignac resume); https://www.linkedin.com/in/marksavignac/.  As of January 2021, Savignac thus did not have the nine years of legal experience he concedes was required in order to be considered for promotion. Given the record-sized class of 50 lawyers promoted to partnership in January 2021 (including four Issues & Appeals associates, three in D.C., all with longer tenure at the Firm and/or more legal experience) it is inconceivable that the Firm would have admitted Savignac to the partnership as of January 2021.  Supp. Shumaker Decl. ¶ 8.  And, although predicting "what ifs" is inherently speculative, it is questionable whether Savignac would have been viewed as meeting the 9-year legal experience threshold even by the end of 2021.  Indeed, Savignac's Steptoe reviews show ███ ██████████████████████████████████████████████████████████████████████, all of which are relevant factors in evaluating an Issues & Appeals candidate for admission to partnership.  *See* Pls' App. 23a-25a.  During Savignac's brief tenure at Jones Day, his lack of stand-up experience commensurate with his seniority, his quiet demeanor, and his lack of presence were identified as concerns with respect to his potential to serve in a client-facing role.  Supp. Shumaker Decl. ¶ 7.  He had not held any associate leadership role, and his conduct in January 2019 showed disrespect for staff, lack of commitment to the Firm, and disdain for its culture and values—all relevant to potential partnership consideration.  *Id*.

Finally, Savignac is also wrong to infer that Jones Day automatically makes all Supreme

14

Court clerks partner at the earliest opportunity.  Plaintiffs ignore that Jones Day counsels all associates—including Supreme Court clerks—about their partnership prospects as they progress in seniority.  *Id.* ¶ 9.  Associates—again, including Supreme Court clerks—for whom partnership is unlikely are advised of their performance deficiencies and are encouraged to seek other employment opportunities.  Thus, it is not surprising that a high percentage of those Supreme Court clerks who are still at the Firm when eligible for partnership consideration are ultimately admitted to the partnership—but that does not mean that every such clerk makes it to the consideration stage, or that Savignac would have.  Indeed, after receiving counseling about performance deficiencies, ▮▮▮▮▮▮ Issues & Appeals associates have left the Firm.  *Id.*[2]

The inherently speculative nature of Savignac's lost-wages theory confirms that a long-term pay-differential award is not plausible here.  Defendants believe two years is the outer bound, but even on Plaintiffs' account, it is inconceivable that the Court would exercise its discretion to award lost wages for a period exceeding four years from Savignac's termination, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Either way, if damages discovery is to proceed now, the Court should ensure that discovery is proportionate by making clear that a long-term front-pay award is not plausible.

### B.    Plaintiffs' Discovery Requests Are Extremely Burdensome

On the other side of the Rule 26 balance, Defendants argued in their opening brief that

---

[2] Plaintiffs' suggestion that Savignac would have stayed at Jones Day for a lengthy period of time (potentially the rest of his career) is also unduly speculative.  Plaintiffs argue that they need discovery regarding the length of time partners stay at Jones Day in order to determine how long Savignac would have stayed at Jones Day.  *See* Pls' Br. 33.  But statistics are worthless to predict inherently personal choices made by hundreds of current or former partners.  And far more probative is the fact that Savignac has never remained at a single employer for more than 26 months and that he joined Jones Day after having spent only 7 months employed by Hogan Lovells.  *See* Exhibit B; https://www.linkedin.com/in/marksavignac/.  The claim that Savignac would have settled down for a lifetime career at Jones Day after previously changing positions every few years is highly dubious, and no discovery would show otherwise.

Plaintiffs' discovery would—despite its minimal, dubious value—impose enormous costs and burdens on Jones Day, its partners, and third parties like Steptoe.  Defendants included in their brief the text of many of Plaintiffs' most intrusive requests, and specifically highlighted the fact that the requests unreasonably sought detailed and personally identifiable personnel, partnership, and compensation information for all of the Firm's 850-plus partners, historical information for partners admitted in 2021 and/or affiliated with Issues & Appeals, and, in many cases, all documents related to the determination of these partners' compensation and/or admission to the partnership.  Defendants argued that these requests for highly confidential information would seriously impair the privacy of Jones Day's partners, and that the lost-wages damages discovery sought by Plaintiffs would necessarily have to be duplicated against third parties like Savignac's current firm, Steptoe.  Weighed against the minimal value of this information, Defendants argued that the discovery was not proportional as required by Rule 26.

In response, Plaintiffs do not seriously attempt to defend the scope of their document requests.  Plaintiffs do not, for example, explain why they need compensation information for all Issues & Appeals lawyers, regardless of seniority and location; they do not explain why they need seven years' compensation information, even though Savignac concedes he could not have been a partner until 2021 at the earliest; they do not explain why they need "[a]ll documents relating to the determination of compensation" for Issues & Appeals partners or former Supreme Court clerks; they do not explain the relevance of their broad request for "[a]ll documents relating to Jones Day's general policies with respect to partners;" and they do not explain why they need personally identifiable compensation information, as opposed to anonymized data.  In fact, Plaintiffs do not even quote the text of a single one of their expansive document requests or explain the requests' proportionality.  Instead, apologizing for their lack of experience with civil discovery and any

16

overbreadth in their document requests, Plaintiffs' actually propose (for the first time) to narrow the scope of their requests, abandoning their demand for compensation data for all 850-plus Jones Day partners in exchange for an agreement from Jones Day that only Issues & Appeals lawyers are Savignac's relevant comparators. *See* Pls' Br. 8-9, 45.

What Plaintiffs do make clear in their brief, however, is that the lost-wages discovery they envision will be a massive undertaking that only begets more discovery and more discovery disputes. For example, Plaintiffs make clear that the goal of their discovery is to allow Plaintiffs to hire an expert who could supposedly create a model to extrapolate Savignac's potential earnings over the course of his career if he had remained employed by Jones Day. *See id.* at 38 ("Plaintiffs anticipate that expert discovery will focus on damages (primarily partnership-related damages) . . . ."). As Plaintiffs acknowledge, however, that model will necessarily require Plaintiffs' expert to conduct the same extrapolation for the earnings Savignac could expect to achieve as a partner at Steptoe. *See id.* at 2 (explaining Plaintiffs' position that the appropriate amount of lost wages from January 2021 onward is "equal to the pay that Mark would have earned as a Jones Day partner minus his actual earnings [at Steptoe]"). If allowed, Plaintiffs' long-term lost wages theory will therefore necessarily require expansive discovery not only of Jones Day, but also of Steptoe, which will undoubtedly resist producing confidential business information.

Plaintiffs have no real response to this problem. They say simply that "the discovery allowed against Defendants would not be dispositive of the appropriate scope of discovery from third parties," and that "[t]he Court can address any disputes that may (or may not) arise regarding third party discovery in the ordinary course." *Id.* at 36. That is hardly a reassuring statement, even on its own terms. But Plaintiffs are also wrong that the scope of their discovery from Jones Day is irrelevant to the scope of discovery from Steptoe. Partnership admission and compensation data

from Jones Day will be meaningless without corresponding data from Steptoe.  Not only would plaintiffs' "model" require that data, but it would be grossly unfair to refuse to allow Jones Day to take the discovery necessary to challenge whatever assumptions Plaintiffs' experts incorporate into the model about Steptoe compensation.  And Defendants are confident that Steptoe will not easily turn over confidential personnel, partnership admission, and compensation documents pertaining to its partners, meaning that disputes over this discovery are sure to come.

Plaintiffs further argue that the burden of production is minimal based on their erroneous assumptions that the qualitative personnel information on which partner admission and compensation decisions are based is easily produced and is comparable to what was produced in the *Tolton* case.  *See id.* at 35.  In fact, the requested materials contain extensive confidential personnel material and privileged client information, redaction of which would be burdensome.  Supp. Shumaker Decl. ¶ 11.  As a consequence, in *Tolton*, such materials were produced (in redacted form) only for a very limited number of specifically named comparators—not, as plaintiffs here demand, for hundreds of identifiable partners.  *Id.*

Plaintiffs are also wrong in arguing that the protective order is adequate to address the significant personal privacy and Firm confidentiality concerns relating to its partners' personnel files, partnership admission decisions, and compensation information.  Disclosure of identifiable and personally sensitive information to anyone, including Plaintiffs, is an intrusion on those individuals' privacy interests.  The protective order is also no guarantee against further intrusions.  Plaintiffs presumably will want to use the information in the future in some public filing or at trial.  The media that follows this case continues to offer speculative and frequently erroneous interpretations of partially redacted language in the filings, and such statements have the potential to cause reputational harm (*e.g.*, by speculating about the qualifications or contributions of various

partners).  And others within Jones Day will be able to identify even anonymized information on the public docket.  None of these individuals—whether they be recently promoted partners or long-tenured Issues & Appeals partners—should be subject to such an intrusion.

Plaintiffs have provided no reason why they need to have compensation information that identifies each partner by name.  The only conceivable reason is that Plaintiffs hope to argue that, in the future, Savignac would have performed the same as or better than a particular partner did in years past, and that his future compensation must therefore be comparable.  That is a wildly speculative argument that would require a series of mini-trials about individuals' relative partnership contributions and the internal and external business factors that influenced partner compensation in dissimilar time periods.

This has been Plaintiffs' approach to discovery more broadly in this case, leading to the Court's observation that "this case is generating excessive amounts of discovery and excessive disputes for a case of this nature."  7/20 Tr. at 43:22-23.  Jones Day agreed to produce the core discovery about the family leave policy, and the evaluation, termination, reference, and press statement decisions that are actually at issue.  But Plaintiffs also demand broad discovery on any evaluator who criticized Sheketoff's performance, the cases Plaintiffs worked on, and cases that other Jones Day attorneys (but not Plaintiffs) worked on.  Their approach has already turned what should be a relatively straightforward two-party discrimination case into a massive and time-consuming discovery process, with the parties continuing to meet and confer about Plaintiffs' various sets of written requests and reaching impasse on a number of additional issues that Plaintiffs undoubtedly will present to the Court in the coming weeks.

In short, the burden and intrusiveness of Plaintiffs' partnership discovery is undeniable. When balanced against the exceedingly small likelihood that Plaintiffs will persuade the Court to

award the implausibly long-term front pay award this discovery is designed to support, there can

be no question that it is not proportional to the needs of the case, and it should be denied.

## III.   DISCOVERY REGARDING DEFENDANTS' FINANCIAL RESOURCES IS NOT RELEVANT NOW AND LIKELY NEVER WILL BE

Plaintiffs concede that discovery regarding Defendants' financial resources is relevant only

to the calculation of punitive damages.  Pls' Br. 40.  The Court should decline to allow that

discovery, as it will never become relevant to this case and is, at best, premature.

### A.   Defendants' Wealth Is Not Relevant in This Case

Plaintiffs cite authority for the proposition that a defendant's financial resources may be

relevant to assessing punitive damages.  But the D.C. Circuit has held that this is true only if the

defendant puts its financial condition at issue in defending against such an award.  "[T]he weight

of authority places on *the defendant* the burden of producing evidence of his own financial

condition if he wishes it considered by the jury."  *Hutchinson v. Stuckey*, 952 F.2d 1418, 1422 n.4

(D.C. Cir. 1992).  Other federal courts have similarly held that financial resources of a defendant

are relevant to punitive damages only if the defendant chooses to defend on that basis.  *See, e.g.*,

*Schaub v. VonWald*, 638 F.3d 905, 926 (8th Cir. 2011); *Bell v. Clackamas Cnty.*, 341 F.3d 858,

868 (9th Cir. 2003); *Mason v. Okla. Tpk. Auth.*, 182 F.3d 1212, 1215 (10th Cir. 1999); *Tyco Int'l*

*Ltd. v. Walsh*, No. 02 Civ. 4633, 2010 WL 3000179, at *1 (S.D.N.Y. July 30, 2010).  Jones Day

has not, and does not, intend to place its financial condition at issue, and therefore there is no

reason to think that Defendants' financial resources will *ever* become relevant.

In contrast to federal law, D.C. law imposes on the plaintiff the burden to introduce

evidence of a defendant's wealth at the time of trial "where 'a plaintiff invokes the defendant's

wealth.'"  Pls' Br. 41 (*citing Daka, Inc. v. McCrae*, 839 A.2d 682, 694-95 (D.C. 2003)).  Even if

that rule applies in federal court, however, this case does not present any opportunity for Plaintiffs

to argue that Defendants' "high wealth calls for a higher award" (*id.* at 39), because no award that comes close to implicating Defendants' financial resources would be constitutionally sustainable. Under the Due Process Clause, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Given the modest compensatory damages in dispute here, Defendants' financial resources are irrelevant. In all events, if Plaintiffs want to argue that a particular award is necessary to "inflict punishment" (Pls' Br. 40), that can be more easily resolved by a stipulation that the Defendants' net worth is above a particular amount, without the need for intrusive financial discovery.

###  B.   The Discovery Plaintiffs Seek Is Not Appropriate At This Time

At minimum, the Court should defer the punitive-damages discovery until such time as that issue becomes relevant. That is the typical practice in this District. *See, e.g.*, *D'Onofrio v. SFX Sports Grp., Inc.*, 247 F.R.D. 43, 53 (D.D.C. 2008) (calling it "prudent to postpone the production of such information in the event that the jury does not consider punitive damages or the defendants do not place their financial condition at issue"); *Peskoff v. Faber*, 230 F.R.D. 25, 30 (D.D.C. 2005) (delaying discovery of defendant's personal financial information "until necessary," finding that "[s]uch protection is particularly appropriate in this case, where there is no other basis for the release of the information and its absence does not prevent the plaintiff from making otherwise relevant discovery"). Indeed, Plaintiffs make no effort to distinguish the numerous decisions within this circuit that have held that punitive-damages discovery can be deferred until *after* a determination that punitive damages are appropriate. *See* Pls' Br. at 27-28.

In all events, as Plaintiffs themselves note, punitive damages based on the wealth of the defendant should be established based on the "defendant's net worth *at the time of trial*." *Id.* at 41 (emphasis added) (citing *Chatman v. Lawlor*, 831 A.2d 395, 402 (D.C. 2003)). *See also* Std. Civ.

Jury Instrs. for the District of Columbia § 16.03 (2021 ed.) ("[T]o determine the amount of the award you may consider the [net worth] relative wealth of the defendant *at the time of trial* . . . ." (emphasis added) (bracket in original)); *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 940 (D.C. 1995) (vacating punitive damages award based on historical financial information rather than current net worth at time of trial). Thus, Plaintiffs' requests for three years of information regarding Defendants' prior (or even current) net worth is not relevant to the inquiry of punitive damages even under Plaintiffs' assumptions regarding relevance.

Plaintiffs identify no prejudice from delaying discovery on financial resources; to the contrary, they seem to believe they already know the approximate revenues of Jones Day. Pls' Br. 10. Particularly because punitive damages trials are often bifurcated due to the potential prejudice a defendant's net worth may have on jury deliberations, there is no reason to insist on undertaking this discovery now, before liability has been determined. *See, e.g.*, *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 373-74 (2d Cir. 1988) ("Since it often would be prejudicial to a defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages, the preferred method of accommodating the various interests is to delay trial as to the amount of an award of punitive damages until the usual issues of liability and compensatory damages have been tried, along with the matter of whether the defendant's conduct warrants any award of punitive damages at all."); *Lin v. Darren Beavers, Hi-Tech Testing Serv., Inc.*, No. 08-CV-4033, 2009 WL 361247, at *1 (W.D. Ark. Jan. 30, 2009) (granting motion to bifurcate the punitive damages phase of trial because "[w]hile evidence of both Defendants' net worth is relevant to issues concerning the claim for punitive damages, this evidence could have a prejudicial or confusing effect on jury deliberations concerning liability and compensatory damages." (internal citation omitted)).

### C.     Plaintiffs' Other Damages Issues Are Beyond the Scope of This Dispute

Finally, Plaintiffs' opposition raises for the first time several discovery requests that are outside the scope of the instant dispute and appear to have been raised as a basis to put into the record false and inflammatory allegations that have no legitimate connection to their punitive damages claim.  Pls' Br. 42-43; *see generally* 7/20 Tr.; Notice Regarding July 20 Conference on Discovery Disputes (identifying scope of dispute regarding punitive damages in sealed filing).

In particular, Plaintiffs seek to compel production of "employee communications opposing alleged unlawful conduct by Jones Day and documents relat[ed] to Jones Day's dispute with Wendy Moore." Pls' Br. 42.  In support of their request, Plaintiffs make the inflammatory assertion that Moore "complained to Jones Day that it was engaged in sex discrimination and was fired just six days later on Brogan's orders."  *Id.* (citing Moore complaint).  Moore, a former *partner*, is not a comparator to Savignac, and Jones Day properly limited its discovery responses to exclude disputes with partners.



Nothing about the Moore case is either relevant or helpful to Plaintiffs other than as an attempt to turn this into tabloid litigation.  The Court already refused to allow Plaintiffs to use this tactic once before, and it should do so again.  7/20 Tr. at 49:4-7 (explaining that it will not "be appropriate if we get to trial in this case for [Plaintiffs] to just in essence put Jones Day on trial by showing all of the bad things that associates may have done over the years").[3]

Regardless, the principal case Plaintiffs cite in support of this discovery is inapposite.  The Supreme Court has recognized that "repeated misconduct is more reprehensible than an individual instance of malfeasance."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996).  But, because there was "no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful on even one occasion," the Court was thus "persuaded that BMW's conduct was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award."  *Id*.

---

[3] Moore's counsel, Sanford Heisler, widely publicized the initial filing of Moore's suit and used that publicity to troll for associates to serve as parties in their putative class action (*Tolton*).  As the Court is aware, again after massive publicity trumpeting their claims, the *Tolton* plaintiffs voluntarily dismissed their class claims because their experts could not find evidence of pay discrimination in the 7 years of associate compensation data produced to them.

at 579-80.  Here, too, there has been no finding of misconduct by any arbitrator, court, or other adjudicator with respect to the allegations made by Moore or the *Tolton* plaintiffs.  Plaintiffs—despite their frequently angry rhetoric about Defendants and accusations about imperious Firm management—have only pointed to allegations that either failed on their merits or were proven to be outright false.  They have not and cannot point to even one past adjudication that would establish anything close to a course of conduct.

Unadjudicated allegations of wrongdoing—and certainly *disproven* allegations of wrongdoing—are irrelevant to punitive damages and not properly the subject of discovery.  Absent an adjudication of wrongdoing, allegations are just that—allegations.  The Court would not be able to determine whether there was admissible evidence of "repeated misconduct" without conducting a trial-within-a-trial of allegations that have never been proven.  Allowing discovery into such collateral issues would be a time-consuming sideshow that would invade the privacy of third parties who have no interest in having their highly sensitive personal affairs and now-abandoned claims become the subject of this litigation.

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' requests to take discovery regarding the Jones Day partnership, partner compensation, and the financial resources of Defendants, or, in the alternative should hold that damages discovery, if any, should not occur until after the Court resolves the merits of Plaintiffs' claims.

Dated: August 27, 2021

Respectfully submitted,

*/s/ Terri L. Chase*
Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Ph: (305) 714-9700
Email: tlchase@jonesday.com

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939
Email: tlovitt@jonesday.com

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Ph: (202) 879-3939
Email: cdipompeo@jonesday.com

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Ph: (412) 391-3939
Email: atbailey@jonesday.com

*Attorneys for Defendants*