IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK C. SAVIGNAC and<br>JULIA SHEKETOFF,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>JONES DAY, STEPHEN J. BROGAN,<br>BETH HEIFETZ, and JOHN DOES 1-10,<br><br>    *Defendants*. | Case No. 1:19-cv-02443-RDM |

**PLAINTIFFS' SURREPLY IN SUPPORT OF DISCOVERY ON
LOST WAGES AND PUNITIVE DAMAGES**

**SURREPLY**

Jones Day's reply raises many new factual and legal arguments. Those new arguments are forfeited, and Plaintiffs will not further protract this briefing with an exhaustive rebuttal of forfeited points. *See MBI Group, Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010). Instead, this brief addresses only Jones Day's novel request that the Court hold now that Mark cannot recover more than four years of lost wages—and cannot recover any front pay at all ██████████████████████████████████████████████████ ████████. Because Jones Day's brand-new argument, if adopted, would be practically dispositive of this action from an economic perspective, Plaintiffs respectfully submit this surreply.

Jones Day does not hide that it is seeking a *substantive* ruling as to the maximum relief available on the facts of this case: "The Court should take this opportunity to impose a realistic outer boundary on Plaintiffs' lost-wages dreams." Reply 1.[1] It says that "[a]ny lost-wages discovery should be constrained by an outer boundary of (at most) four years, with the ultimate decision on any such remedial question reserved for this Court to make, if necessary, after trial." *Id.* at 10. In other words, the Court would hold *now* that Mark can never recover lost wages beyond 2019-2022—no matter what the facts turn out to be—and the only question left for trial would be where to draw the line between zero years and four. Since this case is unlikely to reach final judgment before the end of 2022, Jones Day's proposal would have the Court commit now to *denying front pay altogether*. Jones Day does not even pretend to have found a single case in which a court issued such an extraordinary prejudgment ahead of discovery. Even the cases that it (wrongly) claims support it on the substantive law were decided after full discovery and trial.

---

[1] Citations to sealed filings are to the pagination at the bottom of the page.

It should be clear that, on the one-sided and undeveloped record currently before it, the Court cannot possibly find either that Mark would not have made partner at Jones Day or that his income will ever equal what it would have been had he not been illegally fired (much less that it will do so anytime soon).[2]  Seeking to circumvent these difficulties, Jones Day invites the Court to declare now that it will *not even try* to make Mark whole from an economic perspective and, instead, will deem him to "have received precisely the opportunity he says he was denied at Jones Day" ███████████████████████████████████████████████████. Reply 9.  It asserts that Mark's current job is similar in certain *non-financial* respects to his old one. *Id.*[3]  And it faults Plaintiffs for the supposedly "myopic" view that the central question for lost wages purposes is "whether the new position pays as much as the old position." *Id.*

To begin, it is absurd for Jones Day to suggest ███████████████████████████████  ██████████████████████████ he will at that time have "precisely" what he lost when he was fired. *Id.*  Though Jones Day's practices make clear—and Plaintiffs will be able to prove after discovery—that Mark would be a partner there by now ████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████ The Court made that point at the conference: "It may be that

---

[2] Jones Day's reply and the supplemental declaration of Michael Shumaker offer a slew of late-breaking fact arguments that Mark would not have been promoted effective January 2021.  Jones Day and Shumaker could easily have raised those arguments in their opening brief and declaration—and surely would have, if the arguments were true.  For present purposes, the new "facts" are forfeited. *MBI Group*, 616 F.3d at 575.  And Jones Day's ever-shifting factual position simply confirms that Plaintiffs should be allowed discovery to disprove it.

[3] Jones Day claims that Mark "concedes … that his position [now] is comparable to his position as an associate at Jones Day" (Reply 9), but Plaintiffs' brief actually says (at 19) that "Mark's position is *not* comparable to his Jones Day position in the relevant (economic) sense."  This is just one of several bogus "concessions" that Jones Day points to.  Plaintiffs' brief speaks for itself.

2

there's just fewer opportunities to make partner at Steptoe than there are at Jones Day because their appellate practice is not as large at Steptoe as it is at Jones Day, for example." July 20 Tr. 9:24-10:2. ████████████████████████████████████████
████████████████████████

Jones Day also goes astray in accusing Plaintiffs of "myopia" for focusing on the financial harms caused by its illegal conduct. Any "myopia" lies with the Supreme Court and the D.C. Circuit. The leading case (which Jones Day still refuses to address) makes clear that "Title VII deals with legal injuries of an economic character" and "where a legal injury is of an economic character, … [t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975) (quotation marks omitted). "As with back pay, the purpose of front pay is to make a victim of discrimination 'whole' and to restore him or her to the *economic* position he or she would have occupied but for the unlawful conduct." *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C. Cir. 1995) (quotation marks omitted; emphasis added). Even Jones Day concedes (perhaps inadvertently) that "what matters for a lost-wages theory is how much the plaintiff would have earned compared to how much he will earn." Reply 9 n.1. In short, while "a district court has wide discretion to award equitable relief" in the form of lost wages, it would be a clear abuse of that discretion to disregard the rule that "[t]he district court should fashion this relief so as to provide a victim of employment discrimination the most complete make-whole relief possible." *Barbour*, 48 F.3d at 1278 (reversing denial of front pay); *see* Plaintiffs' Br. 1, 9-11.[4]

---

[4] Rather than address the leading cases, Jones Day sticks to its misreadings of non-binding rulings. Plaintiffs have already refuted those misreadings. *See* Plaintiffs' Br. 14-19 & n.5. And Jones Day ignores that, as Plaintiffs explained (*id.* at 16-17), its own cited case refutes its position: In *Staples v. Parkview Hospital, Inc.*, the court held that "[i]t would be difficult to imagine a more

3



[5] Second, there are compelling reasons to believe that Jones Day's *average* profits per equity partner severely understate what it

---

comparable position" to the plaintiff's old job as a Parkview nurse than the (lower-paying) nursing job she found with Dupont six weeks after being illegally fired, but it still awarded her two years of front pay based on "the length of time it will take for Staples to make *the same amount of money she was making at Parkview*." 2010 WL 780204, at *8-10 (N.D. Ind. 2010) (emphasis added).

[5] Thus, in another of Jones Day's cited cases, *Hopkins v. Price Waterhouse*, the court awarded the plaintiff six years of back pay based on the income of Price Waterhouse partners and ordered her reinstated as a partner there with retroactive seniority to the year when she would have made partner but for the discrimination. 737 F. Supp. 1202, 1215-16 (D.D.C. 1990).

pays former Supreme Court clerks who are partners in major markets like New York and D.C. *See* Plaintiffs' Br. 7-8. Indeed, Jones Day has most of its domestic offices outside of top-tier markets (it also has most of its total offices abroad); partners there are presumably are paid less (on average) than partners in New York or D.C., meaning that the former group of partners drags down the firm-wide average while the latter group tends to be above it. And Jones Day has a uniquely strong policy of favoring attorneys who clerked at the Supreme Court with top compensation for their level of seniority. For all the insults it aims at Julia, for example, Jones Day admits that as of July 2016 Brogan was paying her more than he paid to any non-Supreme Court clerk who graduated law school in 2010. Dkt. 49 at 13 (Answer ¶ 67). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Public financial disclosures by D.C.-based partners who were Supreme Court clerks and who took administration jobs in recent years point to pay far in excess of Jones Day's average profits per equity partner.

       Finally, Jones Day declares it "inconceivable" that Mark will be unable to reach the same income elsewhere because law is "a competitive industry." Reply 8-9. Actually, as Mark's own job search following his firing suggests, it seems unlikely that senior appellate associates (or appellate partners) at top-tier firms actually can readily lateral to comparably paying positions at peer firms—unlikely, for instance, that many of Jones Day's appellate partners or senior associates could find similarly remunerative appellate jobs at other firms. If Jones Day wants to argue the contrary, it can present evidence to that effect, such as testimony from legal recruiters or the heads of top-tier appellate practices that such lateral moves are common or easy. *See Hopkins*, 737 F. Supp. at 1213-14 (limiting lost wages where the defendant "introduced evidence from job search specialists and principals at various firms that … there was a significant demand" for consultants).

5

Jones Day also argues at length that "a lifetime-differential front-pay award is not appropriate for someone like Savignac." Reply 6; *see id.* at 6-9. Even if it would not be appropriate to award Mark front pay through his retirement, that would not be an argument for foreclosing front pay altogether by limiting lost wages to 2019-2022. Anyway, there is no rule that an award of front pay through retirement is impermissible if the record supports it. In *Peyton v. DiMario*, for instance, the D.C. Circuit addressed an award of front pay through retirement to a victim who was 34 years old, as Mark is now. 287 F.3d 1121, 1125 (D.C. Cir. 2002). The D.C. Circuit vacated the award, but it did so based on a lengthy factual analysis of the particular record developed through discovery in that case, culminating with a determination that "[t]he record does not support such a speculative conclusion." *Id.* at 1130; *see id.* at 1128-30. And while it observed that "*other* courts seem to agree that plaintiffs in their forties are too young for lifetime front pay awards," *id.* at 1130 (emphasis added to the word that Jones Day chose to omit, *see* Reply 6), the D.C. Circuit did not invoke any numerical limit on front pay awards.

Even so, it may well be that the Court would decline to award Mark front pay through retirement. It may well be that Plaintiffs, who cannot determine how much front pay to seek without the discovery at issue here, will not request such an award. Regardless, the Court's task in exercising its equitable discretion is to choose the most equitable place to draw the line in light of the factual record and applicable law—not merely to choose one or the other of the dichotomous alternatives offered by the parties. *E.g.*, *Barbour*, 48 F.3d at 1280 ("We therefore remand the front-pay issue to the district court for it to determine the amount and duration of relief that will make Barbour whole."). Plaintiffs are entitled to the discovery necessary to argue for a longer period, just as Jones Day is already arguing for an extraordinary front-pay period of *zero* years.

\*         \*         \*

Jones Day has now consumed dozens of hours of the parties' time and, presumably, substantial judicial resources advancing meritless arguments, as Plaintiffs showed in their previous brief.  What justification does it point to for this waste and for the extraordinary substantive ruling it now requests?  Not vast monetary costs, or any very compelling invasion of privacy.  Just a powerful law firm's desire to withhold financial information vital to the determination of make-whole relief in this civil rights case—and its threat to create new discovery headaches for the Court if it does not get its way.  The Court should compel Jones Day to provide the requested discovery.


| /s/ Julia Sheketoff | /s/ Mark Savignac |
|---|---|
| Julia Sheketoff (pro se) | Mark C. Savignac (pro se) |
| 2207 Combes Street | 2207 Combes Street |
| Urbana, IL 61801 | Urbana, IL 61801 |
| (202) 567-7195 | (217) 714-3803 |
| sheketoff@gmail.com | marksavignac@gmail.com |
| D.C. Bar No. 1030225 | D.C. Bar No. 995367 |

September 1, 2021