# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

 *Plaintiffs*,

  v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and JOHN DOES 1-10,

 *Defendants*.

Case No. 1:19-cv-02443-RDM

## PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS ON DEFENDANTS' FIRST PRIVILEGE LOG

# TABLE OF CONTENTS

Background ........................................................................................................................1

Argument .........................................................................................................................7

   I.  Jones Day has not proved that the withheld communications are privileged......................8

      A.  Governing law.............................................................................................9

      B.  Application...............................................................................................12

          1.  Termination..................................................................................12

          2.  Employment references ...............................................................17

          3.  Press release ................................................................................17

          4.  ███████.................................................................................20

   II.  The withheld communications are also unprotected under the crime-fraud exception.....20

      A.  Governing law...........................................................................................21

      B.  Application...............................................................................................24

          1.  Termination..................................................................................25

          2.  Employment references ...............................................................27

          3.  Press release ................................................................................29

   III.  The Court should reject Jones Day's atypical procedures for in camera review.............31

      A.  Referral to a different decisionmaker............................................................31

      B.  Ex parte submissions................................................................................33

Conclusion ......................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Allen v. CIA,*
    636 F.2d 1287 (D.C. Cir. 1980) ................................................................................33, 34

*ANSWER Coalition v. Jewell,*
    292 F.R.D. 44 (D.D.C. 2013) ...............................................................................................9

*Armstrong v. Executive Office of the President,*
    97 F.3d 575 (D.C. Cir. 1996) .............................................................................................34

*Boca Investerings Partnership v. United States,*
    31 F. Supp. 2d 9 (D.D.C. 1998) .........................................................................................10

*Calvin Klein Trademark Trust v. Wachner,*
    198 F.R.D. 53 (S.D.N.Y. 2000) ...................................................................................18, 19

*Center for Public Integrity v. Department of Energy,*
    234 F. Supp. 3d 65 (D.D.C. 2017) ......................................................................................9

*City of Springfield v. Rexnord Corp.,*
    196 F.R.D. 7 (D. Mass 2000) ..............................................................................................7

*Clark v. United States,*
    289 U.S. 1 (1933) ...............................................................................................................21

*Coastal States Gas Corp. v. Department of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ..........................................................................................11

*Fisher v. United States,*
    425 U.S. 391 (1976) ...........................................................................................................21

*Florida v. Harris,*
    568 U.S. 237 (2013) ...........................................................................................................23

*FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.,*
    180 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................................34

*Guerrero v. Vilsack,*
    134 F. Supp. 3d 411 (D.D.C. 2015) ..................................................................................25

*Haines v. Liggett Group Inc.,*
    975 F.2d 81 (3d Cir. 1992) ................................................................................................32

*Hayden v. NSA,*
    608 F.2d 1381 (D.C. Cir. 1979) ........................................................................................33

*Hickman v. Taylor*,
    329 U.S. 495 (1947) .............................................................................................11

*In re Grand Jury Subpoena Duces Tecum*,
    731 F.2d 1032 (2d Cir. 1984) ..............................................................................23

\*   *In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998) ...................................................8, 9, 10, 13, 18, 19

*In re Johnson & Johnson*,
    2021 WL 3144945 (D.N.J. 2021) .........................................................................19

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982) ...............................................................................9

*In re Sealed Case*,
    737 F.2d 94 (D.C. Cir. 1984) ...........................................................................9, 10

\*   *In re Sealed Case*,
    754 F.2d 395 (D.C. Cir. 1985) ...................................................................22, 23, 24

*In re Sealed Case*,
    29 F.3d 715 (D.C. Cir. 1994) ................................................................................8

*In re Sealed Case*,
    124 F.3d 230 (D.C. Cir. 1997) .............................................................................24

*In re Sealed Case*,
    146 F.3d 881 (D.C. Cir. 1998) .............................................................................11

*In re Sealed Case*,
    223 F.3d 775 (D.C. Cir. 2000) .......................................................................21, 22

*Jinks-Umstead v. England*,
    232 F.R.D. 142 (D.D.C. 2005) .............................................................................24

*Jinks-Umstead v. England*,
    233 F.R.D. 49 (D.D.C. 2006) ...............................................................................24

*Kaley v. United States*,
    571 U.S. 320 (2014) .............................................................................................23

*Klayman v. Judicial Watch, Inc.*,
    2008 WL 11394175 (D.D.C. 2008) .......................................................................9

*Kolstad v. American Dental Ass'n*,
    527 U.S. 526 (1999) .............................................................................................25

*Linde Thompson Langworthy Kohn & Van Dyke, P.C. v. RTC*,
  5 F.3d 1508 (D.C. Cir. 1993) ........................................................................12

*Lykins v. DOJ*,
  725 F.2d 1455 (D.C. Cir. 1984) ....................................................................33

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988) ......................................................................................25

*McNamee v. Clemens*,
  2013 WL 6572899 (S.D.N.Y. 2013) .............................................................19

*Minebea Co. v. Papst*,
  228 F.R.D. 13 (D.D.C. 2005) ..........................................................................9

*National Association of Criminal Defense Lawyers v. DOJ*,
  844 F.3d 246 (D.C. Cir. 2016) ......................................................................11

*New York Times Co. v. Department of Defense*,
  499 F. Supp. 2d 501 (S.D.N.Y. 2007) ...........................................................19

*Padgett v. City of Monte Sereno*,
  2007 WL 4554322 (N.D. Cal. 2007) .............................................................19

*Passer v. American Chemical Society*,
  935 F.2d 322 (D.C. Cir. 1991) ................................................................28, 30

*Phillippi v. CIA*,
  546 F.2d 1009 (D.C. Cir. 1976) ..............................................................33, 34

*Rattner v. Netburn*,
  1989 WL 223059 (S.D.N.Y. 1989) ..........................................................18, 19

*Recycling Solutions, Inc. v. District of Columbia*,
  175 F.R.D. 407 (D.D.C. 1997) ......................................................................24

*Sai v. TSA*,
  315 F. Supp. 3d 218 (D.D.C. 2018) ...............................................................21

*Saint-Jean v. District of Columbia*,
  2016 WL 10829005 (D.D.C. 2016) ...............................................................25

*Savignac v. Jones Day*,
  486 F. Supp. 3d 14 (D.D.C. 2020) .................................................................25

*SEC v. Gulf & Western Industries, Inc.*,
  518 F. Supp. 675 (D.D.C. 1981) ......................................................................8

*Swidler & Berlin v. United States*,
   524 U.S. 399 (1998) ...................................................................................24

\* *United States v. Zolin*,
   491 U.S. 554 (1989) ...............................................8, 21, 22, 23, 25, 30

*Universal Standard Inc. v. Target Corp.*,
   331 F.R.D. 80 (S.D.N.Y. 2019) ...............................................................19

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ...................................................................................21

*Wachtel v. Health Net, Inc.*,
   482 F.3d 225 (3d Cir. 2007) .......................................................................9

**Statutes and rules**

28 U.S.C. § 636 ...............................................................................................32

29 U.S.C. § 215 ...............................................................................................24

29 U.S.C. § 216 ...............................................................................................24

Federal Rule of Civil Procedure 26 .....................................................11, 12

Federal Rule of Civil Procedure 53 .............................................................32

Federal Rule of Civil Procedure 72 .............................................................32

Federal Rule of Evidence 104 ...............................................................31, 32

Federal Rule of Evidence 403 .......................................................................32

Plaintiffs respectfully request the Court's in camera review of communications among Jones Day's top managers and business advisors during the times when those individuals were admittedly engaged in the acts of alleged retaliation at issue in this lawsuit. Plaintiffs further request an order compelling production of all documents improperly withheld.

## BACKGROUND

On January 16, 2019, Plaintiffs Mark Savignac and Julia Sheketoff emailed Jones Day a pre-suit demand reiterating that Jones Day's paid leave offerings for new parents illegally discriminate on the basis of sex. App. 14a-15a. On January 22, Jones Day fired Mark. *Id.* at 43a. Jones Day then interfered with Mark's search for a new job by prohibiting the well-connected partners with whom Mark had worked most over the prior year from acting as references for him, and placing restrictions on the one Jones Day partner who was authorized to provide a reference. On August 13, Plaintiffs filed this lawsuit, which challenges those acts of retaliation. On August 14, Jones Day responded by publishing and widely disseminating a press release made up of false and malicious attacks apparently crafted to destroy Plaintiffs' reputations and careers. *Id.* at 32a-33a. That press release is the subject of Plaintiffs' supplemental complaint (Dkt. 43).

This motion concerns discovery with respect to the three acts of retaliation just described: (1) Mark's termination; (2) interference with Mark's reference requests; and (3) the press release. These acts took place over a seven-month period in 2019 (January 16 through August 14).

Discovery so far on the acts of retaliation is as follows. *First*, Defendants have provided responses to Plaintiffs' Interrogatory 1 that ██████████████████████████████ ████████████████. App. 18a-20a. *Second*, Defendants have "substantially completed" their production of documents relating to the acts of retaliation. *Third*, Defendants have served a log of documents withheld from that production based on claims of privilege. *Id.* at 2a-12a.

**A.    Interrogatory 1.**  Plaintiffs' Interrogatory 1 asks Defendants to identify the people involved in the acts of retaliation and describe their roles.  Defendants have responded as follows.

**1.    Mark's termination.** ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Defendants state that "[Jones Day's] decision to terminate Savignac was a collaborative decision." Dkt. 49 at 29 (Answer ¶ 198).

**2.    Reference requests.**  On January 27, five days after his termination, Mark sought employment references from several Jones Day partners.  *See* App. 27a-29a. ████████████████

████████████████████████████████████████████████████████████████████

were involved in Jones Day's response to Mark's reference requests.  *Id.* at 18a-19a.  They prohibited ████████████████████████████████ from providing references for Mark.  *Id.*

**3.    Press release.** ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



**B.    Document production.**  Defendants state that they have substantially completed their production of documents relating to the alleged retaliation.  The production is most notable for what it does *not* contain.  Aside from the heavily redacted document described below, it lacks *any* communications and other documents showing the admittedly "collaborative" decisionmaking processes of the individuals named above with respect to the business decisions at issue here: the personnel decisions about firing Mark and restricting his references and the public relations decisions involved in drafting and disseminating the press release.  By contrast, the production does include documents showing the *implementation* of those decisions once they had been made, such as ████████████████████████████████.  In short, the documents create the impression that the group of individuals responsible for the retaliation, aware that this lawsuit was coming, did all their "collaborative decision[making]" and even the drafting and revising of the press release by phone or in person rather than putting anything in writing.

**C.    Privilege log.**  Defendants' privilege log refutes that impression.  *See* App. 2a-12a.

████████████████████████████████████████████



1.    **Mark's firing.**



*Id.* at 13a-14a. 

**2.      The press release.**

is between Lovitt and David Petrou, who is Jones Day's spokesman/public relations person and apparently coordinated Lovitt's provision of the press release to and interview with the New York Times.  App. 35a.

---



**ARGUMENT**

Plaintiffs respectfully request in camera review of the documents described above.  The available facts show a high likelihood that many or all of the documents include unprivileged material of central relevance to the claims and defenses in this action.  In camera review would be the most efficient and accurate means—and probably the only means—of ensuring that crucial evidence is not improperly withheld.

Plaintiffs' request for in camera review is principally based on two independent concerns. *First*, it is almost certain that many or all of the documents described above consist of *business discussions*, which are not protected by the attorney-client privilege or the work-product doctrine, regardless of whether the participants hold law degrees or expect to be sued.  The participants in the relevant communications are ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.  And the communications took place among ████████████████████████████████████ ██████████████████████████████.  While it is conceivable that some of the communications actually do include requests for or provision of bona fide legal advice, it seems certain that they are not limited to bona fide legal communications.  This is especially true given that Defendants' productions contain *no* documents about the making of the challenged business decisions (████████████████████████████████████████████████████), creating a strong inference that such documents have been withheld.

Even assuming that Defendants' privilege calls were made in good faith, the circumstances here practically guarantee that many of those calls are highly contestable, falling within a wide range in which attorneys of good faith reach differing conclusions on the proper application of law to fact.  *See, e.g.*, *City of Springfield v. Rexnord Corp.*, 196 F.R.D. 7, 9 (D. Mass. 2000) ("an in-

7

house lawyer may wear several other hats (e.g., business advisor, financial consultant) and because the distinctions are often hard to draw, the invocation of the attorney-client privilege may be questionable in many instances").  Throughout this litigation, Defendants' counsel have zealously advocated for their clients by advancing many legal positions that the Court has rejected.  Just as with the other legal questions in the case, the legal questions of the application of privilege law to the highly relevant communications at issue here should be answered by the Court, not by Defendants and their counsel.  *See In re Sealed Case*, 29 F.3d 715, 718 (D.C. Cir. 1994) ("remand[ing] to the district court so that it can conduct an *in camera* review" where the privilege question "cannot be answered without knowing the contents of the Lawyer's files").

*Second*, it appears certain that many or all of the communications at issue were in furtherance of the illegal acts that Defendants were engaged in (or preparing to engage in) during the relevant time periods, meaning that they are unprivileged by virtue of the crime-fraud doctrine without regard for whether they would otherwise be bona fide legal communications or work product.  In the crime-fraud context, "before a district court may engage in in camera review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." *United States v. Zolin*, 491 U.S. 554, 574-75 (1989).  That standard is met here.

## I.      Jones Day has not proved that the withheld communications are privileged.

"It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998).  "The proponent must conclusively prove each element of the privilege." *Id.* (quoting *SEC v. Gulf & Western Industries, Inc.*, 518 F. Supp. 675, 682 (D.D.C. 1981)).  Jones Day has utterly failed to meet that burden with respect to the documents at issue here.

A.      **Governing law**

"The 'attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Lindsey*, 158 F.3d at 1272 (quoting *In re Sealed Case*, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982)).  "As oft-cited definitions of the privilege make clear, only communications that seek 'legal advice' from 'a professional legal adviser in his capacity as such' are protected." *Id.* at 1270 (quoting 8 Wigmore on Evidence § 2292).  In the "formulation [that the D.C. Circuit] ha[s] adopted, the privilege applies only if the person to whom the communication was made is 'a member of the bar of a court' who 'in connection with the communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *Id.* (quoting *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984) (R.B. Ginsburg, J.)).

It follows that, "[w]here a lawyer provides non-legal business advice, the communication is not privileged." *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 231 (3d Cir. 2007); *see also Center for Public Integrity v. Department of Energy*, 234 F. Supp. 3d 65, 77 (D.D.C. 2017) (contrasting "privileged legal services" with "non-privileged business advice"); *ANSWER Coalition v. Jewell*, 292 F.R.D. 44, 48 (D.D.C. 2013) ("communications made by and to an in-house lawyer with respect to business matters, management decisions or business advice are not protected by the attorney-client privilege." (quoting *Minebea Co. v. Papst*, 228 F.R.D. 13, 21 (D.D.C. 2005))); *Klayman v. Judicial Watch, Inc.*, 2008 WL 11394175, at *1 (D.D.C. 2008) ("communications that address business matters or business advice are not protected").

Courts often confront this issue when a corporation asserts privilege over communications with an in-house lawyer.  Of course, "[t]hat status alone does not dilute the privilege." *In re Sealed Case*, 737 F.2d at 99.  But it does call for heightened scrutiny of the claim of privilege, as then-

Judge Ginsburg explained: "We are mindful, however, that C was a Company vice president [as well as the company's general counsel], and had certain responsibilities outside the lawyer's sphere.  The Company can shelter C's advice only upon a *clear showing that C gave it in a professional legal capacity*."  *Id.* (emphasis added); *see also, e.g.*, *Boca Investerings Partnership v. United States*, 31 F. Supp. 2d 9, 12 (D.D.C. 1998) ("Because an in-house lawyer often has other functions in addition to providing legal advice, the lawyer's role on a particular occasion will not be self-evident as it usually is in the case of outside counsel.").

The need for scrutiny is even greater here.  At many companies, high-ranking lawyers in the general counsel's office have "other functions in addition to providing legal advice" (*id.*), but their role is still principally to advise the company's non-lawyer managers in their capacities as "professional legal advisor[s]" (*In re Lindsey*, 158 F.3d at 1270). ▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨.  In such cases:

> A court must examine the circumstances to determine whether the lawyer was acting as a lawyer rather than as a business advisor or management decisionmaker. One important indicator of whether a lawyer is involved in giving legal advice or in some other activity is his or her place on the corporation's organizational chart. There is a presumption that a lawyer in the legal department or working for the general counsel is most often giving legal advice, while the opposite presumption applies to a lawyer … who works for … some other seemingly management or business side of the house.

*Boca Investerings*, 31 F. Supp. 2d at 12; *see also id.* (the company must make a "clear showing' that the lawyer acted "in a professional legal capacity").





Business decisions and advice are also not shielded from discovery by the work-product doctrine.  The Supreme Court created that doctrine because "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  The doctrine thus "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories."  *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980).  The doctrine protects preparation for and analysis of anticipated or actual litigation, but it provides no more protection for business advice and business decisions than does the attorney-client privilege.  Indeed, Rule 26(b), which partially codifies the doctrine, refers to work product as "trial-preparation materials," and its protection of so-called "opinion work product" applies to "mental impressions … *concerning the litigation*."  Fed. R. Civ. P. 26(b)(3)(B), (b)(5); *see also National Association of Criminal Defense Lawyers v. DOJ*, 844 F.3d 246, 255 (D.C. Cir. 2016) ("materials serving no cognizable adversarial function, such as policy manuals, generally would not constitute work product"); *In re Sealed Case*, 146 F.3d 881, 887 (D.C. Cir. 1998) ("the [work-product] privilege has no applicability to documents prepared by

lawyers 'in the ordinary course of business or for other nonlitigation purposes'" (quoting *Linde Thompson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1515 (D.C. Cir. 1993))); Fed. R. Civ. P. 26, 1970 Advisory Committee Notes ("Materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision.").

If a party's decisionmaking on business matters such as personnel decisions and public relations initiatives could be protected as work product, then discovery into many wrongful acts (e.g., workplace discrimination, defamatory statements) would be impossible, at least in the most egregious cases—that is, those where the defendants-to-be knew that they were breaking the law and thus expected to be sued for it. After all, work-product protection applies to protect materials created by or for *the party*; there is no requirement that a lawyer be involved. *See* Fed. R. Civ. P. 26(b)(3). Needless to say, however, discovery into the actions and thoughts of parties during the period when they foresaw litigation is both commonplace and necessary where that discovery relates to business decisions and similar matters.

### B. Application

Jones Day has not met its burden of establishing that the communications at issue here are in fact privileged under the attorney-client privilege or work-product doctrine.

1. **Termination.** The decision to fire an employee is a business decision, and business advice relating to such a decision is not privileged from discovery. Jones Day made the decision to fire Mark between January 16, 2019, when it received the demand email, and January 22, when it implemented the termination.





It seems clear that the redacted material ████████████ is not "'legal advice' from 'a professional legal adviser in his capacity as such.'" *In re Lindsey*, 158 F.3d at 1270 (quoting 8 Wigmore § 2292). ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ In camera review is necessary and appropriate.

The same goes for the other withheld communications from the same period that are described in the Background above. Nearly all of those communications are among ██████████ ████████████████████████████████████████ ██████. Jones Day has long admitted that its "decision to terminate Savignac was a *collaborative* decision, which included consultation with Brogan." Dkt. 49 at 29 (Answer ¶ 198) (emphasis added). That is not a plausible description of a decision in which ████████████████████████

13



▧▧▧▧▧▧▧▧▧▧.  Their communications participating in that admittedly "collaborative"

*business* decision are not privileged—yet they have been withheld.

▧▧▧▧▧▧▧▧▧▧.  Any communications among the unnamed participants in

the "collaborative decision" to fire Mark are likely unprivileged, yet all have been withheld.

The baselessness of Jones Day's claims of privilege over all documents showing the

business motivation for its business decision to fire Mark is especially glaring in light of Jones

Day's insistence that the decision was driven by an assortment of *business* motivations.  While

Jones Day's story shifts with every telling (presumably because the story is fabricated), it has

denied throughout this litigation that it fired Mark for "opposing application of the leave policy or

indicating his intention to sue over it" (*see* Dkt. 44 at 5-6) and has insisted that it fired him for a

grab bag of other reasons:

- The Press Release (August 14, 2019): "Jones Day terminated Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day."  App. 33a.

14

- Motion to dismiss (September 27, 2019): "Actually, Jones Day fired him for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his unreasoned demand … Terminating Savignac for the improper manner of his opposition—rather than for the opposition itself—is not unlawful retaliation."  Dkt. 15 at 9, 23 (brackets and quotation marks omitted).

- Letter to the EEOC (July 28, 2020): "In an industry where Jones Day distinguishes itself by the talent, judgment, and legal acumen of its attorneys, Savignac's unreasoned rejection of both explicit EEOC guidance and federal precedent was far below the standards expected of associates for legal analysis.  His attitude toward McClure was also unacceptable, and the [f]irm fired Savignac shortly thereafter. His termination was not retaliation for any protected conduct.  Indeed, Savignac had first accused the [f]irm of discrimination and demanded favorable treatment nearly five months earlier, and Jones Day took no adverse action in response.  Only after Savignac displayed both immature behavior in the workplace and disrespectful treatment of staff, and continued to demonstrate serious deficiencies in his legal reasoning and judgment, did the [f]irm sever his employment." App. 46a.

- Answer (September 18, 2020): "Mark … was fired because of his poor judgment, behavior toward colleagues, and intemperate, unreasoned threat to wage a public relations campaign to damage Jones Day."  Dkt. 35 at 23 (Answer ¶ 152).

- Filing on February 23, 2021: "Savignac's termination was attributable to his unacceptable manner."  Dkt. 44 at 6.

- Interrogatory Response on June 11, 2021



If these representations to the Court, the EEOC, Plaintiffs, and Jones Day's thousands of social media followers are truthful—that is, if Jones Day fired Mark for the many (constantly evolving) reasons quoted above rather than simply because he expressed his intent to file this civil rights lawsuit—then documents relating to Mark's termination would not be privileged from

discovery. There is nothing conceivably privileged, for example, about a statement that an employee should be fired because he (supposedly) "displayed both immature behavior in the workplace and disrespectful treatment of staff" or an "unacceptable manner" or "intemperate tone." There is nothing privileged about a (false) assertion that ▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨ There is nothing privileged about a statement that an employee should be fired for supposedly "threat[ening] to wage a public relations campaign to damage Jones Day." And there is nothing privileged about a statement that an associate should be fired because his "legal reasoning and judgment" supposedly fell "far below the standards expected of associates for legal analysis," either—even if such an assertion requires legal *judgment*, it is the sort of personnel evaluation routinely made by employers that employ attorneys and does not amount to privileged legal *advice* from an attorney acting in his professional legal capacity.

In sum, Jones Day has asserted that it fired Mark for a great many unprivileged business reasons, it has acknowledged that the termination decision was "collaborative," it has claimed privilege over many email chains among ▨▨▨▨▨▨▨▨▨ during the relevant six-day period, it has produced ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨, and it has produced not a shred of paper from the relevant time showing why it decided to fire Mark. These facts and assertions do not add up. In camera review is necessary to ensure that Plaintiffs receive the documents showing the business reasons given by business personnel in their non-legal capacity for the business decision to fire Mark—regardless of whether those documents support Jones Day's claims about its reasons or (more likely) belie those claims.

2.      **Employment references.**  A similar analysis applies to Jones Day's decision, in the week following Mark's termination, to prohibit ████████████████████████████████ from acting as employment references for him and to authorize ███████ to do so under artificial restrictions.  *See* App. 27a-29a.  Whether to allow employment references is a business decision, yet Jones Day has produced no communications documenting the making or implementation of that decision.  Because ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

3.      **Press release.**  Just after Plaintiffs filed the original complaint in this action, Jones Day retaliated by issuing and widely disseminating a press release that makes numerous false and malicious statements about Plaintiffs that are apparently intended to destroy their reputations and legal careers.  *See* App. 32a-33a.  That retaliatory press release is the subject of Plaintiffs' supplemental complaint (Dkt. 43).  In its responses to Plaintiffs' Interrogatory ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████  Jones Day is withholding all communications and other materials that document the ███████ creation of the press release by ████████████████.  That is clearly inappropriate.

"It may be that the modern client comes to court as prepared to massage the media as to persuade the judge; but nothing in the client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status."  *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).  After all, "the privilege governs the performance of duties by the attorney as legal counselor, and if he chooses to undertake additional duties on behalf of his client that cannot be so characterized, those activities and communications in furtherance of them are not privileged."  *Rattner v. Netburn*, 1989 WL 223059, at *5 (S.D.N.Y. 1989).  The press release and any drafts, revisions, or other relevant communications presumably "reflect[] work ordinarily performed by a press agent, and it is clear that such services do not constitute legal work and thus are not protected by an attorney-client privilege."  *Id.*  "Thus the preparation of a press release in this context does not meet the applicable test."  *Id.*

To be sure, an attorney *could* provide bona fide legal advice with respect to a client's proposed press release, just as with any other contemplated course of action.  *See Rattner*, 1989 WL 223059, at *5 ("It is not ordinarily a part of the attorney's legal advice function to prepare public announcements for the client, although he may well be called upon to review proposed announcements *for legal implications*." (emphasis added)).  But it is implausible that much (if any) of the material being withheld falls into that bucket.  Indeed, while Jones Day makes the dubious assertion that ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████, the D.C. Circuit's discussion in *In re Lindsey* is on point:

> We take notice that … the word "advice" is not preceded by the word "legal."
> According to the Restatement, consultation with one admitted to the bar but not in

> that other person's role as a lawyer is not protected.  Where one consults an attorney
> not as a lawyer but as a friend or as a business adviser or banker, or negotiator …
> the consultation is not professional nor the statement privileged.  Thus Lindsey's
> advice on political, strategic, or policy issues, valuable as it may have been, would
> not be shielded from disclosure by the attorney-client privilege.

158 F.3d at 1270 (citations and quotation marks omitted).  Jones Day is clearly withholding

documents relating to the creation of the press release under untenable claims of privilege.

Nor does the drafting of a press release to respond to anticipated litigation fall within the

work-product protection.  As Judge Rakoff explained:

> [I]t is obvious that as a general matter public relations advice, even if it bears on
> anticipated litigation, falls outside the ambit of protection of the so-called 'work-
> product' doctrine embodied in Rule 26(b), Fed. R. Civ. P.  That is because the
> purpose of the rule is to provide a zone of privacy for strategizing about the conduct
> of litigation itself, not for strategizing about the effects of the litigation on the
> client's customers, the media, or on the public generally.

*Calvin Klein*, 198 F.R.D. at 55 (ordering production of documents); *see also In re Johnson &*

*Johnson*, 2021 WL 3144945, at *8 (D.N.J. 2021) ("General public relations advice, even if it bears

on litigation, does not qualify for work-product protection.  A media campaign is not a litigation

strategy."); *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 93 (S.D.N.Y. 2019) (denying

work-product protection to emails that "relate to Universal Standard's decision whether to

publicize the litigation through a press release"); *McNamee v. Clemens*, 2013 WL 6572899, at *8

(S.D.N.Y. 2013) (denying work-product protection for "communications predominately focused

on public relations and media strategy"); *New York Times Co. v. Department of Defense*, 499

F. Supp. 2d 501, 517 (S.D.N.Y. 2007) (denying work-product protection for documents that "seem

to have been drafted for public relations purposes"); *Padgett v. City of Monte Sereno*, 2007 WL

4554322, at *2 (N.D. Cal. 2007) ("the Court finds the draft press release is not entitled to attorney-

work product protection"); *Rattner*, 1989 WL 223059, at *6 (ordering production of draft public

statement) ("If counsel chose in this case to perform a publicist's function, the documents prepared in that connection cannot be shielded by the work-product rule.").

4.  ▓▓▓▓▓. Jones Day's privilege log reveals that ▓▓▓▓▓▓▓



While this is hardly the most glaring issue with Jones Day's claims of privilege, unless Jones Day can substantiate its claims of privilege with respect to communications shared with ▓▓▓ the Court should order Jones Day to produce all such communications.

## II.  The withheld communications are also unprotected under the crime-fraud exception.

Under the crime-fraud exception to the attorney-client privilege and work-product doctrine, communications and other documents made in furtherance of a crime are unprivileged without regard for whether they include otherwise-protected legal advice.  For the following reasons, in camera review is necessary to determine the extent to which Jones Day's claims of privilege are undermined by the crime-fraud exception.

## A.       Governing law

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."  *Fisher v. United States*, 425 U.S. 391, 403 (1976).  "The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—'ceases to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*.'" *Zolin*, 491 U.S. at 562-63 (quoting 8 Wigmore § 2298).  Courts therefore recognize "the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime."  *Id.* at 563 (quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)) (some quotation marks omitted).

The D.C. Circuit has formulated the crime-fraud exception to the attorney-client privilege and work-product protection as follows:

> To establish the crime-fraud exception to the attorney-client privilege, the court must consider whether the client made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act, and establish that the client actually carried out the crime or fraud.  To establish the exception to the work-product privilege, courts ask a slightly different question, focusing on the client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication: Did the client consult the lawyer or use the material for the purpose of committing a crime or fraud?

*Sai v. TSA*, 315 F. Supp. 3d 218, 259 (D.D.C. 2018) (quoting *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000)) (citations and quotation marks omitted).  Here, as in *In re Sealed Case*, the

"slight[]" differences between the two standards currently appear "immaterial," for Plaintiffs have no basis at this time to distinguish between "the client's general purpose in consulting the lawyer" and "his intent regarding the particular communication."   223 F.3d at 778.   Because their application is straightforward, this brief will not distinguish between the formulations further.

A party asserting the crime-fraud exception generally begins by seeking in camera review of the suspected crime-fraud documents.  In *Zolin*, the Supreme Court blessed that procedure and set the standard that the party must meet to obtain such review:

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

491 U.S. at 572 (quotation marks omitted).

The Supreme Court declined to address "the quantum of proof necessary ultimately to establish the applicability of the crime-fraud exception."  *Id.* at 563.  But the D.C. Circuit has done so as follows:

> To overcome a claim of privilege, the [party asserting the crime-fraud exception] need not prove the existence of a crime or fraud beyond a reasonable doubt.  Rather, the [party] must first make a prima facie showing of a violation sufficiently serious to defeat the privilege, and second, establish some relationship between the communication at issue and the prima facie violation.  A prima facie violation is shown if it is established that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme.  The [party] satisfies its burden of proof if it offers evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud [at the time of the communication].

*In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) (citations and footnotes omitted).  The D.C. Circuit observed that the Second Circuit "has framed the test in terms of probable cause to believe that a crime or fraud has been committed and that the communications were in furtherance thereof" and agreed that "there is little practical difference between the two tests" ("prima facie" and

"probable cause").  *Id.* at 399 n.3.  "Both require that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof."  *Id.* (quoting *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984)).  Needless to say, "[p]robable cause … is not a high bar: It requires only the 'kind of fair probability on which reasonable and prudent people, not legal technicians, act.'"  *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

In short, the cases create a two-step process for challenging claims of privilege under the crime-fraud exception.  *First*, in camera review is appropriate upon "a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *Zolin*, 491 U.S. at 572.  *Second*, the exception is established and the privilege destroyed if the record before the Court, including the documents submitted for in camera review, would give "a prudent person … a reasonable basis [or 'probable cause'] to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance therefore."  *In re Sealed Case*, 754 F.2d at 399 n.3.  To condense even further: The privilege is destroyed upon probable cause to suspect that the communications were in furtherance of a crime, and in camera review is appropriate upon a showing that such review "may" show that the probable cause standard is met.

It is the purpose of this brief to show a factual basis that could support a reasonable and good-faith belief that in camera review "may" show that Jones Day committed crimes and that the logged communications were in furtherance of those crimes.  Plaintiffs anticipate that in camera review would meet the higher "probable cause" standard to defeat the claim of privilege.

### B.    Application

The crime-fraud exception is not limited to acts that are literally criminal or fraudulent. "Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, *or other misconduct*."  *In re Sealed Case*, 754 F.2d at 399 (emphasis added); *see also, e.g.*, *In re Sealed Case*, 124 F.3d 230, 234 (D.C. Cir. 1997) ("the exception applies not only to crimes and fraud, but to other intentional torts"), *reversed on other grounds by Swidler & Berlin v. United States*, 524 U.S. 399 (1998); *Jinks-Umstead v. England*, 233 F.R.D. 49, 51 (D.D.C. 2006) ("The crime-fraud exception is no longer limited to just criminal or fraudulent conduct.").  Courts in this District have suggested that at least some forms of discrimination are sufficient to trigger the crime-fraud exception even if they are not technically criminal or fraudulent.  *See, e.g.*, *Jinks-Umstead v. England*, 232 F.R.D. 142, 145 (D.D.C. 2005); *Recycling Solutions, Inc. v. District of Columbia*, 175 F.R.D. 407, 409 (D.D.C. 1997).  Retaliation against a person who complains of discrimination is plainly a serious wrong.

In any event, Jones Day, ██████████████████████████████████████ did commit federal crimes against Plaintiffs.  Plaintiffs claim retaliation in violation of the Fair Labor Standards Act, which makes it "unlawful … to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(c); *see* Dkt. 48 at 41 (FAC ¶¶ 275-282); Dkt. 43 at 16 (Supp. Compl. ¶¶ 102-07).  The FLSA provides, under the heading "Fines and imprisonment," that "[a]ny person who willfully violates any of the provisions of section 215 of this title shall upon conviction thereof be subject to a fine of not more than $10,000, or to imprisonment for not more than six months, or both."  29 U.S.C. § 216(a).  In other words, FLSA retaliation is a crime if done "willfully."  *Id.*  And an FLSA violation is "willful" if

"the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).[2]

"To establish a prima facie case of retaliation under Title VII or the FLSA, a plaintiff must show that she engaged in a protected activity, that she was subjected to an adverse action by her employer, and that there is a causal link between the protected activity and the adverse employment action." *Saint-Jean v. District of Columbia*, 2016 WL 10829005, at *8 (D.D.C. 2016); *see also Guerrero v. Vilsack*, 134 F. Supp. 3d 411, 428 (D.D.C. 2015). The law and facts now before the Court are more than sufficient to "support a good faith belief by a reasonable person that *in camera* review of the materials *may* reveal evidence to establish" (under the applicable "probable cause" standard) that, at the time the materials were created, Jones Day and at least some of the relevant individuals were committing or about to commit the crime of violating the FLSA's antiretaliation provision in reckless disregard for whether their conduct was prohibited and that the withheld communications were in furtherance of that crime. *Zolin*, 491 U.S. at 572 (emphasis added).

1.   **Termination.**  Plaintiffs filed complaints of sex discrimination within the meaning of the FLSA when, in August 2018 and on January 16, 2019, they told Jones Day in writing that its paid leave offerings for new parents are illegally discriminatory. *See* App. 37a-41a.[3]  The January 16 email stated that Mark would sue Jones Day if it persisted in discriminating. *Id.* at 40a. On January 22, just six days after McClure and Heifetz received that email, Jones Day fired Mark.

---

[2] This formulation is similar to the standard for punitive damages. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999) ("an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages").

[3] Plaintiffs have explained in detail why the leave offerings are illegally discriminatory. *See, e.g.*, Dkt. 18 at 7-32 (opposition to motion to dismiss); Dkt. 21-1 at 4-14 (surreply). While the Court has not squarely decided the issue, it did hold that "Plaintiffs have alleged plausible claims" and noted that "Defendants have not shown that the text of Title VII, the FLSA, or the DCHRA or any precedent (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's policy was unlawful." 486 F. Supp. 3d 14, 37, 39 (D.D.C. 2020).

*See id.* at 42a-43a.  Jones Day fired Mark

because of the January 16 email.  *See id.* at 13a-16a.  In an email to ███████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████

   These facts conclusively establish that Jones Day ████████████ committed a

federal crime by firing Mark in willful violation of the FLSA's antiretaliation provision.  It is

enough for present purposes, though, that in camera review of the withheld documents "may"

establish probable cause to believe that Jones Day committed that crime.  Notably, Jones Day has

sought to avoid responsibility by asserting that it did not fire Mark because of the email's threat of

litigation but, rather, because it deemed the email to show "poor judgment, a lack of courtesy to

his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day."

App. 33a (Jones Day's press release).  These defenses are *legally* invalid; firing Mark because of

the January 16 email was illegal regardless of what aspect(s) of that email motivated the decision.

That said, in camera review would almost certainly show that the defenses are also *factually*

baseless—that Jones Day actually did fire Mark because the email indicated that he would pursue

his rights in court, and not because it supposedly found the email immature or uncollegial (the

email is neither).

   There can be no doubt that the violation was "willful"—that is, that it was done with, at

least, "reckless disregard" for whether it violated the law.  Every employer knows that it is illegal

---

[4] Jones Day has repeatedly *denied* Plaintiffs' allegation that "the final decision to fire Mark was
made by Brogan."  *See* Dkt. 48 at 30 (FAC ¶ 198); Dkt. 49 at 29 (Answer ¶ 198).

to fire an employee for complaining of discrimination—or, at least, that firing such an employee necessarily entails a substantial risk of illegality.  Jones Day is a sophisticated law firm with over 100 employment lawyers.  The firm has been sued multiple times for sex discrimination and retaliation, and McClure and ████████ appear to be key players in those matters.  And all of the relevant individuals are both attorneys and managers who must have some knowledge of antidiscrimination law.  Anyhow, it suffices here to say that in camera review "may" establish probable cause to believe that Jones Day knew that firing Mark might be illegal but did it anyway in reckless disregard of that risk.

Finally, in camera review "may" show that the withheld communications were in furtherance of the crime.  In truth, it is all but certain that they are.  As discussed above, Jones Day admits that its "decision to terminate Savignac was a collaborative decision, which included consultation with Brogan."  Dkt. 49 at 29 (Answer ¶ 198).  ██████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████.  It is a fair surmise that their relevant communications during the period when they were preparing to commit the crime were in furtherance of that crime.  ████████████████████████████████████████
██████████████████████████████████████████.

2.    **Employment references.**   In the week after it fired Mark, Jones Day also prohibited three well-connected partners with whom Mark had done a lot of work ████████

XXXXXXXXXXXXXXXX from acting as employment references for him.  Of course, "it is well established that efforts by an employer to scuttle a former employee's search for a new job, such as by withholding a letter of recommendation or by providing negative information to a prospective employer, can constitute illegal retaliation within the meaning of ADEA and parallel anti-retaliation provisions" including Title VII and the FLSA.  *Passer v. American Chemical Society*, 935 F.2d 322, 331 (D.C. Cir. 1991) (collecting cases).  Jones Day's defense with respect to the reference denials focuses on causation: Jones Day says that it prohibited XXXXXXXXXXX XXXXX from providing references not because of Plaintiffs' complaint but merely because it has a generally applicable policy prohibiting employment references.

The available evidence proves that Jones Day and the relevant individuals committed crimes by interfering with Mark's reference requests—or, at the least, that in camera review "may" yield facts sufficient to establish probable cause that they did so.  First, Jones Day does *not* have a neutral, generally applicable policy prohibiting employment references.  XXXXXXXXXXXX XXX



XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXX This is confirmed by XXXXXX email response to Mark's reference request:

Jones Day's policy is not to provide substantive recommendations, and only to

confirm dates of employment.  Despite that, I (and only I) have been authorized to speak with potential employers and to provide a reference by phone.  I will be able to speak only about the work we did together; I won't be able to answer any other questions.  If you'd like me to do that, please feel free to give out my contact information.

*Id.* at 28a.

Discovery to date has confirmed that the Jones Day individuals principally responsible for prohibiting ███████████████ from providing references and for placing artificial restrictions on ███████ ability to do so are ███████████. *See, e.g.*, *id.* at 18a-19a. According to Jones Day's interrogatory responses, ███████████████████



But it is enough for now to say that in camera review of withheld communications from the relevant period "may" establish probable cause to believe that their interference with Mark's reference requests was indeed caused by the January 16 email and therefore illegal.  Review also "may" establish that the communications were in furtherance of that criminal retaliation.  Indeed, it appears almost certain that the communications that Jones Day is withholding under claims of attorney-client privilege and work-product protection are actually the communications through which the retaliation was effectuated, in which case they were definitionally in furtherance of it.

**3.    Press release.**  The supplemental complaint (Dkt. 43) claims that Jones Day, Brogan, and yet-to-be-named "John Doe" defendants violated the FLSA and other laws by issuing and widely disseminating a press release containing malicious and false assertions about Plaintiffs in retaliation for their filing of the original complaint in this action.  *See* Dkt. 42 at 1-2 (order granting leave to file the supplemental complaint).  It is beyond dispute that the original complaint (which advanced three FLSA claims) was a protected complaint within the meaning of the FLSA

and that the press release (which is titled "Jones Day responds to litigation challenging leave policy" and was issued immediately after the complaint was filed) was caused by that protected complaint. *See* App. 32a-33a (press release). When it opposed the supplemental complaint, Jones Day argued that the press release did not amount to an adverse action and that "Jones Day's statements were factually true." Dkt. 26 at 2 & n.1. The Court rejected these arguments, holding that Plaintiffs had stated a legally viable claim and that, "[t]o the extent Defendants contend that all of their assertions were true, that contention is both disputed and premature." Dkt. 42 at 5-6.

Again, the D.C. Circuit has recognized that "it is well established that efforts by an employer to scuttle a former employee's search for a new job, such as … by providing negative information to a prospective employer, can constitute illegal retaliation within the meaning of ADEA and parallel anti-retaliation provisions" like the FLSA. *Passer*, 935 F.2d at 331. Plainly, publishing such "negative information" and disseminating it to tens of thousands of people—including but not limited to prospective employers and clients—is not *less* illegal. As this Court explained, "[t]here is no reason to believe, for example, that an employee would have no recourse if her employer published career-damaging 'opinions' about her because the employer was angry that the employee had filed an equal employment opportunity complaint and wanted to dissuade other employees from doing so." Dkt. 42 at 5.

In camera review of the withheld communications and other documents created by the individuals admittedly responsible for the press release is appropriate under *Zolin* because such review "may" establish probable cause to believe that Jones Day and the relevant individuals committed the crime of willful FLSA retaliation. Review would likely show, for example, those individuals' motives and knowledge, whether they had sufficient factual bases for the malicious statements they chose to make and publicize, and whether they carefully crafted certain statements

to convey false and damaging implications to the reasonable reader.  In camera review also "may" establish probable cause showing that the withheld documents were in furtherance of the crime—which is almost certainly true, since they must be the communications by which the press release was planned and drafted.

## III.   The Court should reject Jones Day's atypical procedures for in camera review.

During the parties' meet-and-confer and at the September 29 conference with the Court, Defendants urged that two atypical procedures should apply to in camera review of the documents at issue here.  First, Defendants urge that the review should be assigned to a decisionmaker other than the judge presiding over this action, on the ground that the decisionmaker who reviews the documents will not be able to "un-see" them.  Second, Defendants intend to submit materials in addition to the logged documents themselves on an ex parte basis in an effort to persuade the decisionmaker while avoiding adversarial presentation.  Neither of these special procedures is warranted.

### A.      Referral to a different decisionmaker.

There is no basis for Defendants' assertion that the review should be assigned to a different decisionmaker.  Defendants have yet to point to any authority calling for such reassignment on the ground that the presiding judge should not see evidence that he may determine is not a legally proper basis for deciding the case.  It would also be a departure from the usual practice, in which the judge overseeing discovery in general typically performs any in camera review.  It is true, of course, that the typical practice in other districts is for district judges to assign *all* discovery matters to a magistrate judge, but that division of labor is not motivated by a belief that it is improper for the presiding judge to perform an in camera review.

Evidence Rule 104(a) states that "*[t]he court* must decide any preliminary question about whether a witness is qualified, a *privilege* exists, or evidence is admissible" (emphases added).

While the presiding judge has discretion to assign such matters to a magistrate judge or special master for initial decision, the text makes clear that there is nothing objectionable about the presiding judge's deciding such "preliminary question[s]."  To the contrary, under Rule 104, the judge presiding over a case frequently sees material that he may ultimately determine is privileged or otherwise inadmissible.  This includes inflammatory material that the judge excludes as irrelevant or as unduly prejudicial under Rule 403, and, in a criminal case, even proof of guilt that the judge suppresses under the Fourth Amendment or *Miranda v. Arizona*.  The judge is trusted to disregard excluded material, including where the judge is the trier of fact (which is not true with respect to liability in this case).  And if exceptions are to be made to the bedrock principle that judges are trusted to set aside knowledge that must not affect their rulings, a privilege dispute in a routine civil case where liability is a jury question would hardly have the strongest claim to such an exception.

Moreover, as the Court observed at the September 29 conference, the Rules do not provide for the sort of "firewall" between the presiding judge and the in camera documents that Defendants seek.  The Rules authorize the presiding judge to refer non-dispositive matters to a magistrate judge (Rule 72) or a special master (Rule 53) for initial decision.  Absent consent of both parties to treat that decisionmaker's action as final, however, the Article III judge must consider any objection raised by the parties and review the initial decision as to both law and fact.  *See* Fed. R. Civ. P. 53(f), 72(a); 28 U.S.C. § 636(b)(1)(A).  Review on questions of law is de novo.  *See* Fed. R. Civ. P. 53(f)(4); *Haines v. Liggett Group Inc.*, 975 F.2d 81, 91 (3d Cir. 1992).  Had Congress or the drafters of the Rules wished to enable Defendants' "firewall" approach, they presumably would have done so—for instance, by authorizing or even directing the presiding judge to refer in camera reviews to another judge of the same district.  Apparently, however, no one saw a need to

enable such a firewall, presumably for the reason given above: This situation is no different from the many others where federal judges are trusted to act in accordance with law and disregard material that the law declares irrelevant at a given juncture.

      **B.**    **Ex parte submissions.**  Plaintiffs object to any ex parte submission of arguments or facts beyond the logged documents themselves.  "Although *in camera* review of withheld documents is permissible (and even encouraged), [the D.C. Circuit has] held that a trial court should not use *in camera* affidavits unless necessary and, if such affidavits are used, it should be certain to make the public record as complete as possible."  *Lykins v. DOJ*, 725 F.2d 1455, 1465 (D.C. Cir. 1984); *see also Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980) ("Such affidavits … should be employed only where absolutely necessary").  While the D.C. Circuit has not "limited the use of *in camera* affidavits to national security cases," it "ha[s] expressed reservations about such use in cases which do not involve national security."  *Id.*  "When a trial court does make use of *in camera* affidavits, it must see to it that such use is justified to the greatest extent possible on the public record, and must then make available to the adverse party as much as possible of the *in camera* submission."  *Id.* (citations omitted).

      These limitations on ex parte submissions "arise from the judicial system's interest in an effective adversary system" that "can function effectively in assisting the trial court to make a determination and producing a record that is susceptible to appellate review."  *Id.*  Thus, such submissions "are only permissible if 'the interests of the adversary process are outweighed' by other crucial interests."  *Id.* (quoting *Hayden v. NSA*, 608 F.2d 1381, 1385 (D.C. Cir. 1979)).  Even in a FOIA case about a CIA "secret operation," the D.C. Circuit called for "the Agency to provide a public affidavit explaining in as much detail as is possible the basis for its claim" and stated that "[t]he Agency's arguments should then be subject to testing by appellant, who should be allowed

to seek appropriate discovery when necessary to clarify the Agency's position." *Phillippi v. CIA*, 546 F.2d 1009, 1010, 1013 (D.C. Cir. 1976); *see also, e.g.*, *Armstrong v. Executive Office of the President*, 97 F.3d 575, 580-81 (D.C. Cir. 1996) ("Case law in this Circuit is clear that when a district court uses an in camera affidavit, it must both make its reasons for doing so clear and make as much as possible of the in camera submission available to the opposing party" to "ensure that the use of such affidavits has the smallest possible negative impact on the effective functioning of the adversarial system.").

In this routine employment discrimination case raising (presumably) routine and straightforward questions about the application of the attorney-client privilege and work-product protection, Jones Day cannot possibly show that an ex parte submission is "absolutely necessary." *Allen*, 636 F.2d at 1298. There is thus no justification for abandoning the adversarial system here. *See, e.g.*, *FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 180 F. Supp. 3d 1, 20-23 (D.D.C. 2016) (denying company's motion to file ex parte affidavit "to support its privilege claims"). Indeed, if this type of routine dispute justified ex parte submissions, it is difficult to see what would be left of the D.C. Circuit's strong presumption against such submissions. If Jones Day does submit ex parte materials but fails to show that the submission is "absolutely necessary," the Court should order disclosure of the submission (or any portions with respect to which secrecy is not "absolutely necessary") to Plaintiffs.

**CONCLUSION**

The Court should review in camera the following entries from Jones Day's First Privilege Log and compel the production of all documents improperly withheld: JD_PRIV_0003, 0005-0006, 0008, 0010-0028, 0031-0050, 0052-0096, and 0098-0115.  Plaintiffs reserve the right to challenge the withholding of other documents if the Court's review of those listed above reveals substantial over-claiming of privilege.

/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

/s/ Mark Savignac
Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367

October 13, 2021