**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civ. No. 1:19-02443 (RDM) |
| *v.* | ) ) | |
| JONES DAY, *et al.*, | ) ) | |
| *Defendants.* | ) ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Ph: (305) 714-9700
Email: tlchase@jonesday.com

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939
Email: tlovitt@jonesday.com

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Ph: (202) 879-3939
Email: cdipompeo@jonesday.com

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Ph: (412) 391-3939
Email: atbailey@jonesday.com

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.     Events Leading to the Litigation ................................................................................ 2

II.    The Current Discovery Dispute ................................................................................. 5

ARGUMENT ...................................................................................................................... 6

I.     Defendants Have Properly Asserted Attorney-Client and Work-Product Privilege ............. 6

     A.    The Attorney-Client Privilege and Work-Product Doctrine Apply to
           Documents Where Legal Advice Is "One of the Significant Purposes"
           of the Communication ................................................................................. 7

     B.    The Documents on Defendants' Privilege Log Are Protected by
           the Attorney-Client Privilege and Work-Product Doctrine .......................... 11

          1.    Documents Regarding Savignac's Termination ................................ 11

          2.    Communications Regarding Savignac's Reference Requests ........................ 15

          3.    Jones Day's Public Statement and Response to New York Times Inquiry ....... 15

     C.    Plaintiffs Have Not Established a Basis for *In Camera* Review ................................ 19

II.    The Crime-Fraud Exception Does Not Apply ......................................................... 22

     A.    Jones Day Obtained Privileged Legal Counsel ............................................ 24

     B.    Plaintiffs Fail to Meet Their Burden in Seeking *In Camera* Review ......................... 28

     C.    Entertaining Plaintiffs' Crime-Fraud Argument Would Be Terrible Policy ............. 32

III.   The Court Should Refer Any *In Camera* Review To A Magistrate Judge ......................... 33

CONCLUSION .................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. FBI,*
198 F.R.D. 306 (D.D.C. 2000)..................................................................19

*Armouth Int'l, Inc. v. Dollar Gen. Corp.*,
No. 14-0567, 2015 WL 6696367 (M.D. Tenn. Nov. 2, 2015)...............31

*Billings v. Stonewall Jackson Hosp.*,
635 F. Supp. 2d 442 (W.D. Va. 2009) ....................................................13

*Calvin Klein Trademark Trust v. Wachner,*
198 F.R.D. 53 (S.D.N.Y. 2000) .........................................................17, 18

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,*
40 F.R.D. 318 (D.D.C. 1966).................................................................20

*Coleman v. Am. Broad. Cos.*,
106 F.R.D. 201 (D.D.C. 1985)................................................................32

*Criswell v. City of O'Fallon*,
No. 06CV01565, 2008 WL 250199 (E.D. Mo. Jan. 29, 2008)...............29

*Dir., Off. of Thrift Supervision v. Vinson & Elkins, LLP*,
124 F.3d 1304 (D.C. Cir. 1997).............................................................17

*EEOC v. Kelley Drye & Warren LLP*,
No. 10 Civ. 655, 2011 WL 280804 (S.D.N.Y. Jan. 20, 2011)................9

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
180 F. Supp. 3d 1 (D.D.C. 2016)...........................................................14

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
892 F.3d 1264 (D.C. Cir. 2018)..................................................... *passim*

*Graham v. Mukasey*,
247 F.R.D. 205 (D.D.C. 2008).................................................................20

*Guerrero v. Vilsack*,
134 F. Supp. 3d 411 (D.D.C. 2015) ........................................................24

*Henry v. Champlain Enters., Inc.*,
No. 01-CV-1681, 2003 WL 27383465 (N.D.N.Y. June 16, 2003)........17

*Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*,
850 F. Supp. 255 (S.D.N.Y. 1994).........................................................9

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) ...................................................... *passim*

*In re Neurontin Antitrust Litig.*,
801 F. Supp. 2d 304 (D.N.J. 2011) ........................................................31

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Richard Roe, Inc.*,
  168 F.3d 69 (2d Cir. 1999)..................................................................................26

*In re Sealed Case*,
  107 F.3d 46 (D.C. Cir. 1997)..........................................................................27, 30

*In re Sealed Case*,
  146 F.3d 881 (D.C. Cir. 1998).........................................................................7, 8

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982)..............................................................................32

*In re Sealed Case*,
  737 F.2d 94 (D.C. Cir. 1984)..................................................................................9

*In re Sealed Case*,
  754 F.2d 395 (D.C. Cir. 1985).............................................................28, 29, 31, 32

*Jinks-Umstead v. England*,
  232 F.R.D. 142 (D.D.C. 2005)..............................................................................32

*Khatchadourian v. Def. Intel. Agency*,
  453 F. Supp. 3d 54 (D.D.C. 2020) ........................................................................20

*Kilpatrick v. King*,
  499 F.3d 759 (8th Cir. 2007).................................................................................29

*Lama Holding Co. v. Shearman & Sterling*,
  No. 89 Civ. 3639, 1991 WL 115052 (S.D.N.Y. June 17, 1991)................................9

*Laser Indus., Ltd. v. Reliant Techs., Inc.*,
  167 F.R.D. 417 (N.D. Cal. 1996)..........................................................................21

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988).............................................................................................24

*Mischler v. Novograf Grp. BV*,
  No. 18-cv-2002, 2019 WL 11322509 (D.D.C. Oct. 1, 2019) .................................19

*Motley v. Marathon Oil Co.*,
  71 F.3d 1547 (10th Cir. 1995) .............................................................................32

*Nishika, Ltd. v. Fuji Photo Film Co., Ltd.*,
  181 F.R.D. 465 (D. Nev. 1998).............................................................................19

*NLRB v. Jackson Hosp. Corp.*,
  257 F.R.D. 302 (D.D.C. 2009)..............................................................................20

*Passer v. Am. Chem. Soc'y*,
  935 F.2d 322 (D.C. Cir. 1991)..............................................................................24

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Pendleton v. Rumsfeld,*
    628 F.2d 102 (D.C. Cir. 1980)................................................................30

*Pub. Citizen, Inc. v. U.S. Dep't of Educ.,*
    388 F. Supp. 3d 29 (D.D.C. 2019).............................................................8

*Rattner v. Netburn,*
    No. 88 CIV.2080, 1989 WL 223059 (S.D.N.Y. June 20, 1989)................5

*Recycling Sols., Inc. v. District of Columbia,*
    175 F.R.D. 407 (D.D.C. 1997)................................................................32

*Sahakian v. STATS ChipPAC, Inc.,*
    No. 08-cv-0241, 2009 WL 10673430 (D. Ariz. Sept. 14, 2009) ............33

*SAI v. Transp. Sec. Admin.,*
    315 F. Supp. 3d 218 (D.D.C. 2018) (Moss, J.) ..................................31, 32

*Saint-Jean v. District of Columbia,*
    No. 08-cv-1769, 2016 WL 10829005 (D.D.C. Sept. 12, 2016)..............24

*SEC v. Tex. Int'l Airlines, Inc.,*
    1979 WL 184774 (D.D.C. Aug. 3, 1979) ............................................8, 19

*Tri-State Hosp. Supply Corp. v. United States,*
    238 F.R.D. 102 (D.D.C. 2006)................................................................32

*U.S. ex rel. Landis v. Tailwind Sports Corp.,*
    No. 10-cv-00976, 2015 WL 13711121 (D.D.C. July 13, 2015) ............29

*United Invs. Life Ins. Co. v. Nationwide Life Ins. Co.,*
    233 F.R.D. 483 (N.D. Miss. 2006).........................................................21

*United States v. Deloitte LLP,*
    610 F.3d 129 (D.C. Cir. 2010) .......................................................7, 8, 16

*United States v. White,*
    887 F.2d 267 (D.C. Cir. 1989)....................................................26, 28, 29

*United States v. Zolin,*
    491 U.S. 554 (1989)...................................................................28, 31, 34

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981).........................................................................8, 11, 26

*Victor Stanley, Inc. v. Creative Pipe, Inc.,*
    250 F.R.D. 251 (D. Md. 2008)................................................................20

**STATUTES**

18 U.S.C. § 875...........................................................................................23

D.C. Code § 22-3252 ..................................................................................23

# <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

**OTHER AUTHORITIES**

Familydoctor.org Editorial Staff, *Recovering from Delivery (Postpartum Recovery)*
(Aug. 28, 2020) ............................................................................................................25

10 Fed. Proc., L. Ed. § 26:19 (Sept. 2021 update) .........................................................34

Fed. R. Civ. P. 26 ..............................................................................................................7

Fed. R. Civ. P. 53 ............................................................................................................34

Fed. R. Civ. P. 72 ............................................................................................................34

Claire Cain Miller, *The World 'Has Found a Way to Do This':
The U.S. Lags on Paid Leave*, N.Y Times (Oct. 25, 2021) ......................................25

Stanford Children's Health, *The New Mother: Taking Care of Yourself After Birth* ...................25

Lorraine Tulman DNSc, FAAN & Jacqueline Fawcett PhD, FAAN,
*Recovery from childbirth: Looking back 6 months after delivery*,
12 Health Care for Women Int'l 341 (1991) ...........................................................25

## PRELIMINARY STATEMENT

Plaintiffs broadly contest Defendants' assertions of attorney-client privilege and work-product protection with respect to three subjects:  Savignac's termination, his request for an employment reference, and Jones Day's press statement in response to the Complaint.  Plaintiffs do not identify particular documents that they believe lack privilege protection, nor do they point to specific aspects of Defendants' privilege log that they believe are insufficient.  Instead, Plaintiffs argue that nothing related to these three topics is privileged, or, if any are privileged, they fall within the crime-fraud exception.  Plaintiffs thus ask the Court to conduct a broad *in camera* review of nearly all 114 documents identified as privileged on Defendants' privilege log.  Plaintiffs' categorical challenges should be denied, for several reasons.

First, Defendants' assertions of privilege and work-product protection are appropriate.  As the information disclosed on Defendants' privilege log shows, each of the logged documents involves lawyers who have been tasked with providing legal advice to, or otherwise assisting in defending, Jones Day in connection with Plaintiffs' claims.  And the timing of the challenged documents reveals that they relate to events where legal advice and documents prepared for litigation would be expected.  Plaintiffs' only real argument is that because some of the Jones Day lawyers also hold business roles within the firm and some aspects of the events in question might involve business considerations, it must be the case that some of the communications involve business matters rather than legal advice.  Plaintiffs, however, ignore governing D.C. Circuit precedent, which provides that a communication is privileged as long as legal advice was a primary purpose of the communication, even if other primary purposes are also intended.

Second, there is no basis to Plaintiffs' effort to extend the crime-fraud exception to the attorney-client privilege to this context.  This case involves, as Plaintiffs acknowledge, routine employment matters on which employers regularly seek counsel.  The law encourages and protects

their ability to do so.  Plaintiffs have zero evidence—circumstantial or otherwise—to support their speculation that Jones Day or anyone at the firm was executing a premeditated scheme to violate federal law and using attorney-client communications to advance that scheme.  Adopting Plaintiffs' extreme application of the crime-fraud exception would eviscerate the attorney-client privilege in routine employment cases.  Indeed, although countless employment discrimination cases raising retaliation claims are filed every day, Plaintiffs are unable to cite even one such case in which a court applied the crime-fraud exception.

Finally, Plaintiffs have not established a basis for *in camera* review of any—much less nearly all—documents on the privilege log.  Plaintiffs appear to believe that *in camera* review is a routine step in civil discovery, that the Court should conduct on the basis of guesswork or curiosity about what the privileged documents could possibly show.  But that is not the standard any court applies, because *in camera* review is not costless.  It is burdensome to the Court, and intrusive on the privilege of Defendants, and it should not be allowed absent some specific reason to mistrust Defendants' assertions of privilege.

## BACKGROUND

### I.    Events Leading to the Litigation

In August 2018, Plaintiff Julia Sheketoff emailed Defendant Beth Heifetz to assert that Jones Day's leave policy was unfairly discriminatory because it provided male primary caregivers with ten weeks of paid leave but allowed birth mothers to take up to eight additional weeks of paid disability leave that was not available to her husband.  *See* Am. Compl. ¶ 184.  In that email, Sheketoff requested that Savignac be given an additional eight weeks of paid leave—equivalent to the full period of disability leave available to birth mothers.  *Id.*  Jones Day declined that request and, in a subsequent email to Savignac, the firm's Director of Human Resources and Counsel— Sarah McClure—provided case law and other legal support for the policy and rejecting the request.

Five months later, on January 16, 2019, Savignac emailed Heifetz and McClure, again claiming that he was entitled to the same leave as birth mothers. *See id.* ¶ 190. In his January email, Savignac rejected the legal support McClure had provided to Sheketoff in defense of Jones Day's leave policies, asserting without any explanation or legal citations that Plaintiffs had "closely reviewed the case law," had "discussed the matter with other competent attorneys," and had concluded that "[y]our cases do not support" Jones Day's policy. *Id.* Savignac further claimed that "Jones Day's policy is also inconsistent with the EEOC enforcement guideline [McClure] mention[ed]," and, "[r]egardless, [Jones Day's] reliance on the guideline example [was] misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference." *Id.* Savignac then demanded that Jones Day give him 18 weeks of paid leave—which included the equivalent of birth mothers' eight weeks of disability leave, despite the fact that he was admittedly not disabled—"or else" he would "file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion." *Id.* Claiming that he was "aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation"— apparently a reference to the now dismissed but then active litigation in the *Tolton* case—Savignac asserted that Sheketoff believed "in hindsight" that she had previously been a victim of pay discrimination. *Id.* Finally, Savignac concluded with a warning that "Title VII prohibits retaliation for opposition to sex discrimination." *Id.*

Upon receiving Savingac's January 2019 email, Jones Day reasonably began to anticipate litigation. As is common for law firms, Jones Day relied on its own counsel, Michael Shumaker, the Firm Administrative Partner, ████████████████████████████████ ████████████████████████████████████████████ In that role, Shumaker assessed the

legal issues and risks raised by Savignac's email.  Shumaker ultimately recommended to Jones Day's Managing Partner—Defendant Stephen Brogan—that Jones Day terminate Savignac's employment, effective immediately.  Pls. App. 18a.  Brogan authorized Savignac's termination on January 21, 2019 and Savignac was terminated on January 22, 2019.  Pls. App. 13a; Am. Compl. ¶ 193.

A few days later, Savignac reached out to several partners, including Shay Dvoretzky—then one of the most prominent Supreme Court advocates at Jones Day—to seek an employment reference.  Pls. App. 27a–29a. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████  Given the reasonable prospect of litigation, Shumaker, McClure, Heifetz, and Dvoretzky engaged in privileged communications to discuss the legal risks involved with the firm's response to Savignac's reference request.  Pls. App. 18a–19a.  Ultimately, Jones Day authorized one person (Dvoretzky) to provide a reference for Savignac.

Several months later, in June 2019, the firm received charges filed by Plaintiffs with the U.S. Equal Employment Opportunity Commission (EEOC) against Jones Day.  Defs. App. 5–2021.  Soon thereafter, on July 11, 2019, Defendant Heifetz received a letter from Plaintiffs' counsel, Heller, Huron, Chertkof & Salzman, attaching a draft complaint.  Defs. App. 21–50.  Upon receiving these documents, Defendants began to do what any potential defendant in a lawsuit would do—investigate factual allegations and research legal claims in preparation for mounting a defense.  Shumaker and McClure were actively involved in this process, as were several other Jones Day lawyers who would ultimately make an appearance in this litigation, including Mary

Ellen Powers, Traci Lovitt, and Terri Chase.  Pls. App. 5a–8a.  As part of those efforts, these lawyers—along with others, including Brogan—also prepared to address Plaintiffs' announced intent to "litigate" their claims in the media.

On August 12, 2019—one day before the Complaint was filed—a New York Times reporter contacted both Jones Day and Heifetz, seeking comment on Plaintiffs' as-yet-unfiled lawsuit, thereby making it clear that Plaintiffs had followed through on their threat to orchestrate a negative media campaign against the firm if their demands were not met.  *See* Defs. App. 51. The lawyers who had been working on the defense to the EEOC charge and draft complaint— namely, Shumaker, Powers, Lovitt, Chase, and others—finalized a press statement to respond to Plaintiffs' complaint and the media inquiries which Plaintiffs had instigated.  Because any statement needed to align with positions to be taken in the litigation, communications regarding the draft statement necessarily involved analysis of Plaintiffs' claims and potential defenses, legal advice on risks associated with its dissemination, and the development of counsel's initial mental impressions and theories regarding the issues in dispute, all of which became intertwined in evolving drafts.[1]

## II.    The Current Discovery Dispute

Consistent with their obligations under the Federal Rules, Defendants conducted an extensive search for documents responsive to Plaintiffs' document requests, and have produced 1,103 documents, totaling 7,438 pages.  Defendants also identified 114 documents that are

---

[1] The Firm's Global Public Communications Manager, who was also liaising with the New York Times, appears on only a very small number of documents on the log, and only then in exchanges with counsel for the firm.  Thus, none of the withheld documents "'reflect[] work ordinarily performed by a press agent'" or strategizing with non-lawyers regarding public relations issues.  Pls. Mot. 18 (quoting *Rattner v. Netburn*, No. 88 CIV.2080, 1989 WL 223059, at *5 (S.D.N.Y. June 20, 1989)).

protected by the attorney-client privilege and/or the work-product doctrine, and they produced a detailed privilege log identifying these documents consistent with the parties' ESI protocol. Plaintiffs have issued a blanket challenge to the privilege claims over *nearly all* 114 documents and ask the Court to conduct its own *in camera* review for Plaintiffs' benefit.

Meanwhile, Plaintiffs have asserted blanket claims of marital privilege and work-product protection over whole categories of unidentified documents.  For example, on the ground that Plaintiffs anticipated litigation over the leave claims in "mid-2018"—before even Sheketoff first informed Jones Day of her concerns—Plaintiffs have claimed a broad work-product privilege over virtually all documents related to their email demands of Jones Day.  On the basis of this blanket work-product claim, Plaintiffs have refused even to search for those documents or (to the extent they are privileged) log them in a privilege log.  Consistent with these positions, on October 1, 2021—nearly five months after receiving Defendants' discovery—Plaintiffs produced their first privilege log, which remarkably included *only two entries*.  Defendants have moved to compel Plaintiffs to comply with their obligations under the Federal Rules and conduct reasonable searches for documents withheld under blanket claims of privilege, logging any withheld documents on a competent privilege log.

## ARGUMENT

## I.      Defendants Have Properly Asserted Attorney-Client and Work-Product Privilege.

Plaintiffs first argue that, as a categorical matter, the documents on Defendants' privilege log do not qualify for the attorney-client privilege or work-product protection.  According to Plaintiffs, "the circumstances here practically guarantee that many of [Defendants' privilege] calls are highly contestable" because "it is almost certain that many or all of the documents described above consist of *business discussions*, which are not protected by the attorney-client privilege or the work-product doctrine."  Pls. Mot. 7.  Noting that "[t]he participants in the relevant

communications are high-level Jones Day decisionmakers, nearly all of whom have formal business roles at the firm," Plaintiffs argue that "[w]hile it is conceivable that some of the communications actually do include requests for or provision of bona fide legal advice, it seems certain that they are not limited to bona fide legal communications." *Id.*

Plaintiffs' speculative claims are wrong on both the law and the facts:  Contrary to Plaintiffs' premise, a communication need not involve *only* legal advice to be privileged; rather, the law in this Circuit is clear that a communication is privileged if legal advice is *one* of the significant reasons for the communication, even if the communication was also motivated by business or other purposes.  Moreover, Plaintiffs present no evidence that relevant lawyers were acting in a business capacity in relation to the communications at issue; indeed, they mischaracterize positions and cite irrelevant business roles that could not possibly undermine the evidence that these lawyers were acting as counsel to the firm.  And, in any event, the information disclosed on Defendants' privilege log regarding the timing, recipients, and nature of the communications establishes that attorney-client and work-product protections apply.  Because Plaintiffs have provided no concrete basis for believing that Defendants' privilege assertions are improper, *in camera* review of nearly all 114 privileged documents is not appropriate.

A.    **The Attorney-Client Privilege and Work-Product Doctrine Apply to Documents Where Legal Advice Is "One of the Significant Purposes" of the Communication.**

The attorney work-product doctrine "protects written materials lawyers prepare 'in anticipation of litigation.'"  *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (quoting Fed. R. Civ. P. 26(b)(3)); *see also United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010). In ascertaining whether a document was prepared in anticipation of litigation, the Court "ask[s] 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of

litigation.'" *Deloitte*, 610 F.3d at 137 (quoting *In re Sealed Case*, 146 F.3d at 884).  Under this test, "material generated in anticipation of litigation *may also be used for ordinary business purposes* without losing its protected status." *Id.* at 138 (emphasis added).  Thus, "a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation." *Id.*

The attorney-client privilege, for its part, "applies to a confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).  Indeed, "information that would reveal the substance of a client's request for legal advice remains privileged." *Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 388 F. Supp. 3d 29, 42 (D.D.C. 2019).  Also privileged are draft documents screened by attorneys prior to being made public in their final form including, for instance, disclosure statements and press releases.  *See, e.g.*, *SEC v. Tex. Int'l Airlines, Inc.*, 1979 WL 184774, at *1 (D.D.C. Aug. 3, 1979) (finding that privilege is not waived where documents later made public are screened by attorneys because "when a client sends a draft to an attorney for review, his intention is to make public only such information as appears appropriate for publication in the context of and according to the lawyer's advice.").

"In the corporate context, the attorney-client privilege applies to communications between corporate employees and a corporation's counsel made for the purpose of obtaining or providing legal advice." *FTC v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267–68 (D.C. Cir. 2018).  The attorney-client privilege applies "regardless of whether the attorney is in-house

counsel or outside counsel." *Id.* at 1268.  Thus, "the general rule, which this Court has adopted, is that a lawyer's status as in-house counsel 'does not dilute the privilege.'" *In re Kellogg*, 756 F.3d at 758 (quoting *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984)).  And that principle extends to in-house lawyers providing legal advice to their own law firms.  Thus, courts have long recognized that "[n]o principled reason appears for denying a comparable attorney-client privilege to a law partnership which elects to use a partner or associate as counsel of record in a litigated matter." *Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*, 850 F. Supp. 255, 255 (S.D.N.Y. 1994); *see also Lama Holding Co. v. Shearman & Sterling*, No. 89 Civ. 3639, 1991 WL 115052, at *1 (S.D.N.Y. June 17, 1991) ("It is undisputed that an attorney-client relationship can exist within a law firm."); *EEOC v. Kelley Drye & Warren LLP*, No. 10 Civ. 655, 2011 WL 280804, at *1 (S.D.N.Y. Jan. 20, 2011) (holding memorandum addressed to firm's in-house counsel and member of its Executive Committee was protected under scope of attorney-client privilege in connection with in-house counsel's role in advising firm on ethical issue).

Importantly, the D.C. Circuit has made clear that the attorney-client privilege applies whenever "obtaining or providing legal advice was *one of* the significant purposes of the attorney-client communication." *In re Kellogg*, 756 F.3d at 760 (emphasis added).  That is, while the privilege does not apply to communications that solely relate to business matters, if a communication involves both legal advice and business matters, the privilege will protect the communication as long as one of the primary reasons for it was the provision of legal advice. *Id.*

*In re Kellogg* is the D.C. Circuit's leading case on the applicability of the attorney-client privilege to documents involving both legal and non-legal advice.  In that case, the Court used the "drastic and extraordinary" remedy of issuing a writ of mandamus to correct the District Court's error in holding that documents were not protected under the attorney-client privilege because the

purpose of the company's internal investigation "was to comply with [] regulatory requirements rather than to obtain or provide legal advice." *Id.* at 758–60.  The D.C. Circuit found this analysis rested upon a "false dichotomy" between legal and non-legal purposes.  The Court instead held that "[s]o long as obtaining or providing legal advice was one of the significant purposes of the internal investigation, the attorney-client privilege applies, even if there were also other purposes for the investigation and even if the investigation was mandated by regulation rather than simply an exercise of company discretion." *Id.*

Moreover, recognizing the need to clarify this "primary purpose test" given the "evident confusion" in some cases, the court clarified:

> [W]e also think it important to underscore that the primary purpose test, sensibly and properly applied, cannot and does not draw a rigid distinction between a legal purpose on the one hand and a business purpose on the other.  After all, trying to find the one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task.  It is often not useful or even feasible to try to determine whether the purpose was A or B when the purpose was A and B.  It is thus not correct for a court to presume that a communication can have only one primary purpose.  It is likewise not correct for a court to try to find the one primary purpose in cases where a given communication plainly has multiple purposes.  Rather, it is clearer, more precise, and more predictable to articulate the test as follows: Was obtaining or providing legal advice a primary purpose of the communication, meaning one of the significant purposes of the communication?

*Id.* at 759–60.

The D.C. Circuit later applied this standard in *Boehringer*, holding that documents serving both a legal and business purpose remained protected under the attorney-client privilege.  *See Boehringer*, 892 F.3d at 1267–68.  The Court explained that "[a]ll of those communications are protected by the attorney-client privilege because one of the significant purposes of the communications was 'obtaining or providing legal advice.'"  *Id.*  Acknowledging that "[t]o be sure, the communications at issue here also served a business purpose," the Court nonetheless

explained that "as we stated in *Kellogg*, what matters is whether obtaining or providing legal advice was one of the significant purposes of the attorney-client communications." *Id.*   As the Court explained, the primary purpose test "helps to reduce uncertainty regarding the attorney-client privilege" which is "important in the privilege context because, as the Supreme Court has stated, an 'uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'"   *Id.* at 1268 (quoting *Upjohn*, 449 U.S. at 393).

Surprisingly, Plaintiffs do not even cite *Kellogg* or *Boehringer*, despite their obvious importance to the issues raised in Plaintiffs' motion.   Instead, Plaintiffs rely on a series of older cases and cases that stand for the unremarkable proposition that communications which involve *only* a business purpose, even when made by lawyers, are not protected by the attorney-client privilege.   The D.C. Circuit's rule, however, substantially narrows the scope of Plaintiffs' argument.   Under *Kellogg*, in order for Plaintiffs' categorical challenge to succeed, the communication must not simply have been motivated in part by a business purpose (as Plaintiffs principally contend).   Rather, it must be apparent that the communication was not intended at all to provide legal advice.   Because of the intensely legal nature of Savignac's email demand, and the obvious need for Jones Day lawyers to analyze Savignac's claims, Plaintiffs' categorical arguments fail when analyzed under *Kellogg*.

**B.     The Documents on Defendants' Privilege Log Are Protected by the Attorney-Client Privilege and Work-Product Doctrine**

1.     <u>Documents Regarding Savignac's Termination</u>

On their privilege log, Defendants logged approximately 38 documents dating between January 16, 2019—the day Savignac sent his email—and January 23, 2019—the day after Savignac was terminated.   (JD_PRIV_003 to JD_PRIV_041).   The communications involve

several Jones Day lawyers, but the most frequent participants were Michael Shumaker and Sarah McClure—one or both of these lawyers is a sender or recipient on all but 2 of the 38 privileged communications.  This is no coincidence—Shumaker is the Firm Administrative Partner, and the person ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████   And McClure is the Firm Director of Human Resources and Counsel, having spent decades practicing law as a labor and employment lawyer. Pls. App. 18a, 37a–39a.  She is also the person who was designated by Jones Day to respond to Plaintiffs' August 2018 allegations of discrimination, providing the legal basis and precedential support for the leave policies.  *Id.*  Other Jones Day lawyers appearing on the privilege log with respect to these documents include Kevyn Orr, the Partner-in-Charge of the Washington Office, and Adrian Wager-Zito, the Administrative Partner for the Washington Office, and several lawyers who have made appearances as counsel in this case, including Mary Ellen Powers, Traci Lovitt, and Terri Chase.  And beyond the 38 documents withheld as privileged, Defendants have produced dozens of non-privileged emails from these same individuals relating to Savignac's termination.

Given the nature of Savignac's email—which involved a threatened lawsuit, rejection of case law and legal analysis previously provided to him by McClure, and allegations of historical pay discrimination against Sheketoff—Defendants' need to obtain legal advice is not surprising. And, as Defendants' privilege log clearly shows, the vast majority of the logged communications involve two lawyers designated by the firm to serve as counsel with respect to personnel matters (Shumaker and McClure).  It is therefore apparent from the context of these communications that providing legal advice was at least "*one of* the significant purposes of the attorney-client communication."  *In re Kellogg*, 756 F.3d at 760 (emphasis added).

12

Similarly, all of these communications occurred within one week after Savignac threatened to sue Jones Day.  It is therefore apparent from the circumstances that these documents were "prepared in anticipation of litigation" and trigger the attorney-work product protection.  Indeed, while Defendants have produced non-privileged communications and individually logged privileged communications during this period, Plaintiffs have claimed work-product protection over substantially all documents related to their August 2018 and January 2019 email demands, and they assert that the application of the work-product protection is so clear that they do not even need to search for or log these communications.

Plaintiffs do not make any specific challenges to Defendants' privilege log.  Instead, they assert a single broad-brush challenge to all documents related to Savignac's termination, arguing that "[t]he decision to fire an employee is a business decision, and business advice relating to such a decision is not privileged from discovery."  Pls. Mot. at 12.  Plaintiffs assert that because these privilege calls are so inherently questionable, *in camera* review is the only means for ensuring that Defendants are not improperly withholding key documents.  Plaintiffs are wrong.

As discussed above, Plaintiffs' argument is significantly constrained by *Kellogg*, which protects communications where legal advice was *one of* the primary motivations for the communication.  Thus, even if Plaintiffs were correct that the decision to terminate Savignac was "a business decision," the communications will still be privileged if they also involved legal advice.  Plaintiffs, moreover, cite no authority for their claim that the decision to fire an employee is solely a business decision.  Rather, the decision to terminate an employee can and often has involved the need to seek legal advice.  *See Billings v. Stonewall Jackson Hosp.*, 635 F. Supp. 2d 442 (W.D. Va. 2009) (holding attorney-client privilege clearly applied to communications between Human Resources consultant and corporate attorney regarding decision to terminate employee due

to her disability).  As courts have recognized, "[c]ontext matters" when determining applicability of privilege.  *FTC v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 33 (D.D.C. 2016), *aff'd*, 892 F.3d 1264 (D.C. Cir. 2018).  Here, Savignac's termination came on the heels of an email in which he asserted (baseless) legal claims, threatened litigation, and suggested he would view any termination as illegal retaliation for his complaint.  It is implausible to believe that a firm receiving Savignac's email would not have evaluated and discussed the legal bases for Savignac's demands and the legal implications of terminating or continuing his employment when considering whether to take action against him.

In addition, although Plaintiffs place particular focus on an email chain between Shumaker and Brogan in which Shumaker recommended Savignac's termination, Plaintiffs have no basis for claiming that this communication is not protected by both the attorney-client privilege and work-product doctrine.  Plaintiffs' principal argument appears to be that Shumaker's title—Firm Administrative Partner—suggests he was acting purely in a business role when he communicated with Brogan.  But this is simply not true.  ███████████████████████████████

████████████████████████████████████████████████████████

████████████████  And Shumaker actively serves that role, both as counsel of record in court or arbitration proceedings or, as in this case, as internal counsel for the firm.  Plaintiffs provide no basis beyond their own conjecture for their claim that Shumaker serves a role comparable to a COO in typical corporations, or that he was operating in any such role in relation to the issues in this litigation.  Given the circumstances of Savignac's legal demands and threats, it is natural that a communication about the matter from the firm's designated counsel to the Managing Partner would include legal advice with respect to the claims and demands and would have been prepared in anticipation of litigation.  Plaintiffs' hypothesis that the email must have focused only on

business matters is implausible given the overall context.  Because obtaining legal advice was at least one of the primary reasons for these communications, and because they were prepared in anticipation of litigation, they are protected by the attorney-client privilege and work-product doctrine.  *Boehringer*, 892 F.3d at 1267–68; *In re Kellogg*, 756 F.3d at 758–59.

### 2.   Communications Regarding Savignac's Reference Requests

Plaintiffs challenge Defendants' assertion of privilege with respect to one entry on Defendants' privilege log that pertains to Savignac's request for employment references (JD_PRIV_0042).  This entry involves communications between Shumaker, McClure, Heifetz (then the head of the Issues & Appeals practice), and Dvoretzky (who had been asked by Savignac for an employment reference).  As noted above, Shumaker and McClure were designated to serve as counsel to the firm on personnel matters and had been providing legal advice to Jones Day specifically relating to Plaintiffs' demands.  Pls. App. 18a–19a.  These communications are attorney-client privileged because one of their primary purposes was to weigh the legal risks of providing a reference for a lawyer who had been terminated for misconduct and was threatening suit.  *See In re Kellogg*, 756 F.3d at 758–59.  Plaintiffs provide no real argument to the contrary.

### 3.   Jones Day's Public Statement and Response to New York Times Inquiry

Defendants have identified 66 documents (JD_PRIV_0049–0115) that involve attorney-client communications, work-product, or both in connection with Jones Day's development of its public statement.  As the privilege log makes clear, the first of these communications occurred after Defendants first received Plaintiffs' EEOC charges.  The privilege log further discloses that, at that point, Defendants assembled a broader team of lawyers that included several of the lawyers who have appeared for Defendants in this case, including Traci Lovitt, Terri Chase, and Mary Ellen Powers.  Other senior Jones Day lawyers also provided legal advice, including Timothy Finn

and former Firm Administrative Partner Hugh Whiting.[2]  Having received the EEOC charges and, a short time later, a letter from Plaintiffs' counsel which attached a draft complaint, the lawyers began developing their legal strategy for responding to the charges/complaint.  And because Plaintiffs had threatened in January 2019 to litigate their claims in the media, Jones Day also began developing a public statement that could be issued if the complaint were filed.  The privilege log further reveals that 44 of the 66 logged documents were created between August 12, 2019, and August 14, 2019.  These dates are significant because it was on August 12, 2019, that a New York Times reporter contacted Jones Day and Heifetz seeking comment on Plaintiffs' "impending" complaint, Defs. App. 51; August 13, 2019, was the date Plaintiffs filed their complaint; and on August 14, 2019, the New York Times ran a lengthy story featuring a photo shoot of Plaintiffs and their baby and Jones Day publicly issued its press release on the litigation.

Based on this information, there can be no reasonable doubt that the withheld communications are protected against disclosure.

For one, the many documents withheld under the work-product protection clearly satisfy its requirements.  Given the timing, there can be little doubt that the documents were created by a party (Jones Day) in anticipation of litigation.  *See Deloitte*, 610 F.3d at 137.  And the circumstances under which the documents were created also confirm their nature as work product. The media response was to be Jones Day's first public statement on the litigation, and work on the

---

[2] Plaintiffs claim that Whiting was once "the head of one of [Jones Day's] offices in Texas" but ignore his subsequent lengthy tenure as the Firm Administrative Partner, during which he had the same responsibility later assumed by Shumaker for providing legal advice on personnel matters and assisting with litigation.  Pls. Mot. 20.  Although Whiting retired as a partner, he continues to work on firm matters and was consulted as counsel because of his long experience representing the firm in connection with personnel matters and other claims.  Finn, likewise, is a senior litigation partner who is regularly consulted by the Managing Partner for legal advice on firm matters, including potential litigation.

matter necessarily reflected mental impressions and legal assessment of potential factual and legal defenses. *See Henry v. Champlain Enters., Inc.*, No. 01-CV-1681, 2003 WL 27383465, at *11 (N.D.N.Y. June 16, 2003) ("[w]ithout question" document which "seems to be a work in progress on a press release relative to the litigation" was work-product protected). Moreover, because— as the privilege log reveals—the press statement was being developed in real time as the lawyers were analyzing the EEOC charges and complaints, counsel's communications and drafts ultimately intertwined with counsel's analysis of litigation defenses and counter-arguments. Thus, drafts of the public statement were not only prepared by a party in anticipation of litigation but also reflected attorney thoughts and mental impressions regarding Plaintiffs' claims. These documents therefore contain "virtually undiscoverable" opinion work product because they reflect the developing legal theories and mental impressions of counsel. *See Dir., Off. of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997).

Plaintiffs' only argument in response is that "'public relations advice'" is generally not protected work product because the work-product doctrine is meant to "'provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally.'" Pls. Mot. 19 (quoting *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 54 (S.D.N.Y. 2000)). Unlike Plaintiffs' cases, however, Defendants were not crafting a general "public relations" strategy but were developing in real time a response and potential defenses to specific legal claims, which would ultimately be reflected in and inform their litigation strategy. Because these documents necessarily contain Defendants' developing legal theories, litigation strategies, and mental impressions, they are more like the documents *protected* by the court in Plaintiffs' lead case, *Calvin Klein*—those which disclosed "the attorney's strategy" and where the "public relations impact bears . . . on the

17

attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself"—than the "routine suggestions from a public relations firm" the court ordered produced. *Calvin Klein*, 198, F.R.D. at 54–55.  In any event, Defendants *have* produced documents regarding the development of the press release which do not contain protected work-product.

In addition, many of the documents also contain attorney-client communications, as disclosed on the privilege log.  As noted above, the lawyers involved in communications about the press statement are the same lawyers who are actively representing Defendants before this Court. And given the nature of the exercise—analyzing complaints and developing a substantive response—it is implausible to contend that seeking and providing legal advice was not one of the primary purposes of these conversations.  Indeed, it was essential for counsel to screen these drafts to determine what was legally appropriate for publication given active litigation was "impending."

In response, Plaintiffs admit that an attorney could provide legal advice with respect to a proposed press release but claim it is "implausible" that much of the material in Defendants' documents qualifies.  *See* Pls. Mot. at 18.  Plaintiffs offer no support for this assertion except speculation that the Jones Day attorneys' roles as counsel to the firm were "dubious" and that it was unlikely their roles included reviewing, proposing revision to, *and* offering legal advice with respect to the statement.  *See id.*  This argument makes no sense.  For one, the lawyers who appear in the privilege log with respect to these communications—Lovitt, Chase, Powers, etc.—are *the same lawyers* who have been representing Defendants in this litigation and—at the time of these communications—some were also representing Jones Day in the then-ongoing *Tolton* litigation.[3]

_____

[3] Grasping at straws, Plaintiffs claim (at 10–11) that because Chase, the lead defense lawyer on this matter, is a member of the 50+ lawyer Advisory Committee, her role in this matter might have been in a capacity other than as counsel to the firm, but they fail to identify any role that the Advisory Committee (or Chase, as a single member of that committee) had with respect to this litigation.  (It had none.)  Similarly, they argue that Powers must not be acting as counsel because

And it is hardly surprising that counsel would engage in all three of these tasks in the context of developing a public statement to be issued at the commencement of litigation. Such a statement can be an important part of the legal strategy, and it was critical to ensure that the statement aligned with what Defendants would ultimately assert in an answer.

Moreover, Plaintiffs again fail to grapple with the D.C. Circuit's "primary purpose test," which provides that the attorney-client privilege protects documents where *one* of their primary purposes is legal. *See In re Kellogg*, 756 F.3d at 760. Thus, Jones Day counsel's provision of "legal advice about that statement" brings these documents within attorney-client privilege protection. *See* Pls. App. 19a–20a. In addition, "[d]rafts of documents that are prepared with the assistance of counsel for release to a third party are protected under attorney-client privilege." *Alexander v. FBI*, 198 F.R.D. 306, 312 (D.D.C. 2000). *See also Tex. Int'l Airlines*, 1979 WL 184774, at *1 (draft documents screened by attorneys prior to being made public in their final form, including press releases, were attorney-client privileged).

### C.    Plaintiffs Have Not Established a Basis for *In Camera* Review

It should be clear from the above that Plaintiffs have not established a basis for their request for *in camera* review. As courts within and outside of this District have recognized, *in camera* review is a "last resort," that should not be used simply because Plaintiffs claim that Defendants' "claims of privilege cannot be trusted." *Mischler v. Novograf Grp. BV*, No. 18-cv-2002, 2019 WL 11322509, at *2 (D.D.C. Oct. 1, 2019); *see also Nishika, Ltd. v. Fuji Photo Film Co., Ltd.*, 181

---

she is the Partner-in-Charge of Jones Day Europe, but they cannot identify any issue in this case that has even a remote connection to Powers' management responsibilities in Europe. And they allege that, because Lovitt had previously been the head of the Boston office (which has no relevance to this case) and recently became head of the Issues & Appeals practice, she must have been acting in a business capacity in the intervening period when she held neither role. As the Court is aware, both Chase and Lovitt have argued motions in this matter. Powers, a senior litigation partner, has likewise spent hundreds of hours on the firm's defense in this litigation.

F.R.D. 465, 467 (D. Nev. 1998) ("*In Camera* review is not generally favored . . . the court should not conduct such a review solely because a party begs it to do so.").  "Without some reason to doubt the veracity or accuracy of the defendants' claims of privilege and protection, there is no need for in camera review of the documents."  *Graham v. Mukasey*, 247 F.R.D. 205, 207 (D.D.C. 2008).  *See also Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 332 (D.D.C. 1966) ("The ultimate question is whether, in the circumstances of the case, the occasion for assertion of the privilege is appropriate . . . The court may be able to satisfy itself, without conducting an examination, that the privilege is sufficiently well founded, and if it does, divulgence even in camera is both unnecessary and improper.").  As set forth above, Plaintiffs have provided no reason to doubt the accuracy of Defendants' privilege claims, they persistently ignore all of the context and circumstances that make those claims self-evident, and they fail to identify any specific documents that could plausibly be non-privileged or any specific problem with Defendants' privilege log.  To the contrary, Plaintiffs assert only broad-brush categorical arguments that are at odds with D.C. Circuit law and unsupported by the context revealed in Defendants' privilege log.

Plaintiffs appear to believe that *in camera* review of all documents over which privilege has been claimed is a routine occurrence that can be sought upon mere guesswork.  *In camera* review, however, is not costless.  As courts have routinely recognized, *in camera* review should be the exception, not the norm, "because of the burden it places on the Court."  *NLRB v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 308 (D.D.C. 2009) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 265–66 (D. Md. 2008)).  For this reason, courts frequently decline to conduct *in camera* reviews due to the fact that such a document-by-document review is too burdensome of an undertaking.  *See, e.g.*, *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 84 (D.D.C. 2020) (agreeing with magistrate analysis that in camera review of 66 records was inappropriate in

light of burden presented by number and length of documents); *United Invs. Life Ins. Co. v. Nationwide Life Ins. Co.*, 233 F.R.D. 483, 486 (N.D. Miss. 2006) (denying request for an in camera review of "potentially hundreds, perhaps thousands, of documents"); *Laser Indus., Ltd. v. Reliant Techs., Inc.*, 167 F.R.D. 417, 421 n.6 (N.D. Cal. 1996) (burden associated with in camera review "consume[s] finite judicial resources, resources that judges could otherwise be committing to other pressing obligations, like presiding at trials, ruling on substantive motions, and helping parties negotiate settlements.").   Indeed, the review sought by Plaintiffs here would be particularly burdensome because Plaintiffs have simply asked the Court to review nearly all documents withheld as privileged by Defendants (including, presumably, any additional documents Defendants identify).  The Court should not have to do Plaintiffs' work for them.

An unjustified *in camera* review would also be intrusive of Defendants' privilege.  While some of the material in the logged communications will involve factual matters for which the Court will not be the ultimate decisionmaker, many of the communications involve the development of legal theories and analyses of the strength and weaknesses of Plaintiffs' claims and Defendants' legal and factual defenses.  Given that this Court will eventually be called upon to resolve summary judgment and other motions raising these very same legal theories, Plaintiffs should be required to show some significant basis for believing that particular documents may not be privileged before they tilt the record with an *in camera* review of just one side's work product.  Plaintiffs should not be permitted to infringe Defendants' privilege simply by conclusory, blanket claims that whole categories of documents *might* not be privileged and must therefore be reviewed by the Court.

Finally, the disproportionality between Defendants' efforts to fulfill their discovery obligations and Plaintiffs' efforts is staggering, and is an additional reason not to indulge Plaintiffs' desire to have the Court disregard Defendants' good faith privilege claims.  While Defendants

have been busy conducting searches for responsive documents, making individualized privilege designations, and logging documents withheld on an email-chain basis, Plaintiffs have been asserting blanket claims of privilege and refusing even to conduct searches for responsive documents. Plaintiffs' two-entry privilege log is insufficient on its face, and their refusal to search for or log responsive documents makes it impossible for Defendants to seek *in camera* review, if they thought it appropriate. Plaintiffs' failure to comply with their discovery obligations in good faith should not be condoned.

## II.  The Crime-Fraud Exception Does Not Apply

Plaintiffs' crime-fraud argument is now the third time they have sought relief on the basis of conclusory rhetoric while ignoring the actual record. Plaintiffs initially asked to file an early summary judgment motion because Jones Day's Answer was an "admission of a blatant violation of the civil rights laws" and the firm "is liable [for retaliation] under its own version of the facts." ECF 41 at 2, 5. The Court denied that request so that discovery could proceed. Tr. of March 2, 2021 Conference. Plaintiffs then sought to preclude Defendants from seeing some of that discovery on the grounds that Jones Day's Answer was an "admission of a blatant violation of the civil rights laws," the firm had made "a confession of illegal retaliation," and Defendants' "hotheaded, malicious, and willfully illegal action shows that they might well take similarly harsh measures" again. ECF 55 at 4–5, 6, 10. The Court was "unpersuaded" by Plaintiffs' "unduly speculative" concerns. July 16, 2021 Minute Order. Now, Plaintiffs assert that discovery has "conclusively establish[ed] that Jones Day . . . committed a federal crime by firing Mark." Pls. Mot. at 26. On that basis, they ask the Court to assume the truth of their unsupported and hotly disputed narrative and review nearly every document on Defendants' privilege log on the grounds that the crime-fraud exception precludes Defendants from asserting the attorney-client privilege.

The Court should deny this request as well.  Plaintiffs' alleged *prima facie* case—that Savignac was terminated because he engaged in good faith in protected conduct—is contradicted by their own admissions and conduct.  Savignac has admitted that the demand he made in his January 2019 email had no legal basis by acknowledging to this Court that birth mothers are entitled to disability leave and that he is not.  08/04/2020 Tr. 37:22–38:7.  It is impossible to reconcile that admission with his demand in January 2019 that the firm pay him for taking the same leave as birth mothers—"or else" he would try the case in the "court of public opinion."  Am. Comp. ¶ 190.  That admission not only destroys any claim that he was acting in good faith, but it also conclusively establishes that Savignac was himself engaged in criminal conduct[4] and behavior that justified his termination—behavior that is appropriately characterized as "intemperate," "extortionate," and reflecting "poor judgment," "personal immaturity," "serious deficiencies in his legal reasoning" and a "disinterest in pursuing his career at Jones Day."[5]  So too, Plaintiffs' claim that Jones Day's press statement constituted criminal retaliation—as opposed to a proper exercise of First Amendment rights to counter the harm Plaintiffs sought to inflict on the firm's reputation through a media strategy that *they*, not Jones Day, initiated to support their extortionate demands.

To be sure, Jones Day is not asking the Court, tit-for-tat, to apply the crime-fraud exception to pierce Plaintiffs' vague blanket privilege claims, even though Defendants' undisputed *prima*

---

[4] Among other statutes, Savignac violated 18 U.S.C. § 875(d) ("[w]hoever, with intent to extort . . . any money . . . transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee") and D.C. Code § 22-3252(a)(2)–(3) ("A person commits the offense of blackmail when that person, with intent to obtain property of another . . . threatens to:  (2) . . . publicize an asserted fact, whether true or false, tending to subject another person to . . . embarrassment[] or other injury to reputation" or (3) [i]mpair the reputation of another person.").

[5] Plaintiffs' claim that Jones Day has presented shifting rationales for Savignac's termination is false.  There are many words in the English language that can be used to characterize the same reprehensible conduct, all of which are fully consistent.  Simply reading Plaintiffs' chosen quotes (at 14–15) shows that Plaintiffs' argument is spurious.

23

*facie* case for doing so is far stronger than Plaintiffs' hotly contested allegations. To invoke the crime-fraud exception in a "routine employment discrimination case"—using Plaintiffs' words (at 34)—would stretch the bounds of the exception beyond recognition and would destroy the ability of litigants to seek legal advice on even the most routine matters. Plaintiffs cite no employment case in which a court has ever adopted such a far-fetched theory, and the consequences of going down that slippery slope are dangerous for all litigants.

The circumstances at issue here involve routine employment matters on which employers regularly seek counsel. The law encourages and protects their ability to do so. Plaintiffs have presented zero evidence—circumstantial or otherwise—to support their rank speculation that Jones Day or anyone at the firm was instead executing a premeditated scheme to violate federal law and using attorney-client communications to advance that scheme. Plaintiffs cannot meet their burden for *in camera* review, and holding otherwise would eviscerate the attorney-client privilege in routine employment cases. Indeed, countless FLSA, Title VII, and other employment discrimination cases alleging retaliation are filed every day. But Plaintiffs do not cite a single one that credits the extreme argument they ask this Court to adopt.[6]

### A.      Jones Day Obtained Privileged Legal Counsel.

The Court need not look beyond the chronology to reject Plaintiffs' crime-fraud exception. In August 2018, Sheketoff and Savignac informed Jones Day that they believed the firm's leave policies relating to childbirth were discriminatory. Pls. App. 38a. In response, Jones Day did what any reasonable employer would do. It considered the question, commissioned research into the

---

[6] The employment cases that Plaintiffs cite do not involve the crime-fraud exception at all. *See* Pls. Mot. at 25, 28 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), *Passer v. Am. Chem. Soc'y*, 935 F.2d 322 (D.C. Cir. 1991), *Saint-Jean v. District of Columbia*, No. 08-cv-1769, 2016 WL 10829005 (D.D.C. Sept. 12, 2016), and *Guerrero v. Vilsack*, 134 F. Supp. 3d 411 (D.D.C. 2015)).

legal issues in a series of privileged communications, and responded to Savignac in writing, citing EEOC guidance and other legal authority.  Pls. App. 37a.  The firm did not fire Savignac, lower his pay, change his job title or responsibilities, or alter the terms and conditions of his employment.

On January 16, 2019, Savignac contacted the firm again.  He criticized the firm for relying on EEOC guidance because it does "not receive *Chevron* deference"—a puzzling basis for suggesting that employers should ignore the EEOC.  Pls. App. 15a.  He again demanded that the firm provide him not just the ten weeks of paid family leave to which primary caregivers were entitled, but also eight additional weeks of paid leave that is available to help birth mothers recover from childbirth.  *Id*.  Savignac did not deliver a baby and admits he had no disability from which to recover.[7]  Savignac threatened to pursue Jones Day both in court and "in the court of public opinion" unless it met his demand.  *Id*.

---

[7] Savignac's concession that birth mothers are entitled to disability leave and that he is not cannot be reconciled with his January 2019 demand for the full 18 weeks of leave available to birth mothers.  Savignac's demand rested on the proposition that all birth-related disability leave was nothing more than gender-based "bonding leave" a position he knows has absolutely no support in law, medicine or reality.  *See, e.g.*, Stanford Children's Health, *The New Mother: Taking Care of Yourself After Birth* ("The postpartum period begins after the delivery of your baby and ends when your body has nearly returned to its pre-pregnant state.  This period often lasts six to eight weeks."),  https://www.stanfordchildrens.org/en/topic/default?id=the-new-mother---taking-care-of-yourself-after-birth-90-P02693 (last visited Oct. 27, 2021); Lorraine Tulman DNSc, FAAN & Jacqueline Fawcett PhD, FAAN, *Recovery from childbirth: Looking back 6 months after delivery*, 12 Health Care for Women Int'l 341 (1991) (observing that 25% of women did not feel physically recovered from childbirth six months after delivery); Familydoctor.org Editorial Staff, *Recovering from Delivery (Postpartum Recovery)* (Aug. 28, 2020), https://familydoctor.org/recovering-from-delivery/ ("Fully recovering from pregnancy and childbirth can take months. While many women feel mostly recovered by 6–8 weeks, it may take longer than this to feel like yourself again."); Claire Cain Miller, *The World 'Has Found a Way to Do This': The U.S. Lags on Paid Leave*, N.Y Times (Oct. 25, 2021), https://www.nytimes.com/2021/10/25/upshot/paid-leave-democrats.html?referringSource=articleShare (survey of global family leave policies; "[f]or birth mothers, recovery typically takes at least six to eight weeks").  In litigation, Savignac has tried to re-characterize his claims as a challenge to "any excess over verified disability" but that is not the bad faith demand he made in January 2019 (give me 18 weeks "or else").

It should surprise no one that Jones Day obtained legal counsel in response to Savignac's demands.  Jones Day was faced with legally indefensible demands by an employee who was making extortionate threats to pursue both litigation and a media campaign seeking to publicly embarrass the firm.  In an apparent attempt to exert additional pressure, he threw in gratuitous accusations of gender-based pay discrimination against his wife and tried to immunize his bad faith claims by suggesting that any action the Firm might take—other than granting him extra paid leave to which he was not entitled—could be grounds for an additional retaliation claim.[8]  Of course the firm sought legal counsel, just as any employer would.

The law protects a client's right to obtain privileged advice from counsel.  Indeed, the justifications for shielding attorney-client communications are "strongest … where a client seeks counsel's advice to determine the legality of conduct *before* the client takes any action," and waiver claims are "not appropriately invoked when a 'client has gone to his attorney in good faith, seeking an opinion as to the legality of certain conduct in an area where legal boundaries may be difficult . . . to discern.'"  *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989) (Ginsburg, J.).  No exception to the privilege undermines that foundational principle.  "Given that the attorney-client privilege and work product immunity play a critical role in our judicial system, the limited exceptions to them, should not be framed so broadly as to vitiate much of the protection they afford."  *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) (internal citations omitted); *see also Upjohn*, 449 U.S. at 393 ("An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.").

---

[8] In asserting their work product claims, Plaintiffs have stated they did not anticipate litigation on the pay discrimination claim at the time they added it to their January 2019 email.  *See* ECF 89 (Defs.' Motion to Compel), Ex. D at 2.  This is further evidence that this baseless claim was not made in good faith and instead was thrown in only in an (unsuccessful) effort to increase pressure on the firm to meet his demand for 18 weeks of paid leave.

The story is no different with respect to Savignac's request for a job reference.  On January 27, 2019, Savignac contacted three Jones Day attorneys to ask if they would provide an employment reference.  Pls. App. 27a–29a.  Virtually all written communications in Defendants' possession, custody, or control concerning that request have been produced.  One document was withheld:  a communication dated January 29, 2019, between Shumaker and McClure, in their role as counsel, Heifetz, then the head of the Issues & Appeals practice, and Dvoretzky, who had been asked by Savignac to provide a reference.  *See* Pls. App. 5a (JD_PRIV_0042).  After consulting with the firm's counsel, Dvoretzky responded to Savignac's request.  Pls. App. 28a.  Given that Savignac had been terminated and was at the same time asking Jones Day lawyers for an employment reference, any responsible employer would have sought legal counsel before deciding how to respond, just as Jones Day did here.

So, too, with respect to privileged communications regarding the firm's statement about this litigation.  Plaintiffs have presented no evidence that the press release was issued in retaliation for protected conduct, much less that Jones Day sought legal advice in furtherance of a criminal scheme.  They rely only on mere allegations in their Supplemental Complaint, which cannot satisfy their evidentiary burden to demonstrate the application of the crime-fraud exception.  *See In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997) (explaining that "the party seeking to overcome the privilege" has the "burden of showing that the crime-fraud exception applie[s]").  That alone is sufficient to deny their motion.

But the contextual evidence also undermines their claim.  It is undisputed that Savignac had threatened in January 2019 to try to harm the firm's reputation if it did not accede to his legally indefensible demands—threats that were not protected conduct and, in fact, violated multiple criminal statutes.  *See supra* note 4.  When Jones Day received the EEOC complaint in June 2019,

it prepared to address this potential threat.  When the New York Times contacted Jones Day to seek comments about Plaintiffs' not-yet-filed claims on August 12, 2019 (Defs. App. 51), it became clear that Plaintiffs were following through on their threat to orchestrate a media campaign against the firm trumpeting their false claims.  Counsel's privileged communications regarding a possible draft press statement were inextricably intertwined with their analysis of legal strategy and preparation for litigation.  Plaintiffs have made no evidentiary showing that any such legal advice was in furtherance of a crime.

### B.      Plaintiffs Fail to Meet Their Burden in Seeking *In Camera* Review

Plaintiffs ignore the D.C. Circuit's opinion in *White* and the record set forth above.  They also present no evidence to suggest anything untoward about Jones Day's consultation with counsel.  Instead, their first response is to dilute to the point of meaninglessness their burden of proof for seeking *in camera* review.  Throughout their brief—ten times, to be exact—Plaintiffs ask the Court to almost review every privileged document because it "may" establish probable cause of a crime, "may" show some illegality, or "may" show that communications were in furtherance of that crime.  Pls. Mot. at 23, 26, 27, 28, 29, 30, 31.  That is the kind of "groundless fishing expedition[], with the district courts as their unwitting (and perhaps unwilling) agent" that the Supreme Court warned against.  *United States v. Zolin*, 491 U.S. 554, 571 (1989).  *Zolin* requires "a showing of a factual basis" to support Plaintiffs' speculation before a court can undertake *in camera* review.  *Id*. at 572 (citation omitted).  And, this "factual basis" must demonstrate why a reasonable person could in good faith believe that Jones Day was "engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme."  *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985).

Plaintiffs come nowhere close.  On the termination claim, they note that Shumaker forwarded Savignac's January 16 email to Brogan when recommending termination.  Pls. Mot. at

26.   That does not support any reasonable, good-faith belief in some ongoing "criminal or fraudulent scheme."  No competent counsel would withhold from his client the message where an employee threatens to sue and preemptively claims retaliation.

Plaintiffs try to subvert this by arguing that because Savignac's termination was allegedly unlawful, then any advice given prior to that termination must mean that Jones Day was "engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme."  *In re Sealed Case*, 754 F.2d at 399.  This, of course, ignores the D.C. Circuit's opinion in *White*, where then-Judge Ginsburg recognized that the attorney-client privilege is "strongest[]" where the client seeks advice "*before* the client takes any action."  *White*, 887 F.2d at 272.

But Plaintiffs are ignoring Jones Day's undisputed evidence about why it terminated Savignac in favor of their own narrative, according to which the firm has done nothing since this litigation began but admit unlawful retaliation—an obviously distorted argument that the Court has consistently rejected.  *See supra* at 22.  In routine employment cases, courts do not prejudge the merits of an employment decision in the context of a crime-fraud dispute.  *See Criswell v. City of O'Fallon*, No. 06CV01565, 2008 WL 250199, at *4 (E.D. Mo. Jan. 29, 2008) (concluding the plaintiff failed to "support the application of the exception" where the alleged misconduct "is the exact activity which is the subject of the pending suit" and determining "whether the advice of the [defendant's] attorneys was sought in furtherance of that alleged illegal [retaliatory termination] requires a finding on the ultimate question").  The mere possibility of unlawfulness—which Defendants vigorously dispute—does not warrant waiving the attorney-client privilege.  *See id.*; *see also Kilpatrick v. King*, 499 F.3d 759, 766 (8th Cir. 2007) (rejecting crime-fraud claim without in camera review where there was no factual basis for saying that the client "obtained advice . . . in furtherance of any alleged retaliation against [plaintiff]"); *U.S. ex rel. Landis v. Tailwind Sports*

*Corp.*, No. 10-cv-00976, 2015 WL 13711121, at *2 (D.D.C. July 13, 2015).  Nor does "temporal proximity between the communication and [alleged] crime."  *In re Sealed Case*, 107 F.3d at 50. Plaintiffs must put forth evidence demonstrating "that the Company sought the legal advice with the intent to further its illegal conduct."  They have none.

Plaintiffs' real argument is just a legal conclusion:  that Jones Day's stated reasons for terminating Savignac "are *legally* invalid; firing Mark because of the January 16 email was illegal regardless of what aspect(s) of that email motivated the decision."  Pls. Mot. at 26.  Plaintiffs cite no authority to support that assertion, which is wrong as a matter of law.  *See Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C. Cir. 1980) (termination for "the improper manner of … opposition" rather than for "the opposition itself" is not unlawful retaliation).  The remainder of Plaintiffs' argument concerning Savignac's termination is just buzz words and sophistry.  Pls. Mot. at 27.  Plaintiffs declare that "[i]n truth, it is all but certain that" the withheld communications were in furtherance of a crime; that mid-January 2019 was "the period [Defendants] were preparing to commit the crime"; that those acting in a counsel capacity were the "the collaborators in that crime"; and that it "is a fair surmise" that communications between these individuals were in furtherance of that crime.  *Id*. (cleaned up).  None of that is supported with evidence.

Plaintiffs' brief is even more threadbare on the claims about an employment reference and Jones Day's public statement.  They offer no factual basis to establish a *prima facie* case that Jones Day ever sought any advice on these matters in furtherance of a criminal or fraudulent scheme. Plaintiffs simply recount their skewed narrative and boldly announce in conclusory fashion that it "proves that Jones Day . . . committed crimes."  Pls. Mot. at 28.  That is outlandish, but also irrelevant.  The point is that Plaintiffs have no factual basis for reasonably believing that Jones Day ever sought advice in *furtherance* of a crime.  At best, Plaintiffs can only argue that—as would

be expected—some of the same individuals were involved in these underlying events, and that Plaintiffs have alleged retaliation.  Pls. Mot. at 27–31.  Courts would have no time for anything else if *in camera* review of all privileged documents depended solely on whether there was an allegation of unlawfulness.  As a matter of law, allegations are not a sufficient factual basis for a reasonable, good-faith belief that Jones Day was "engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme."  *In re Sealed Case*, 754 F.2d at 399; *see also In re Neurontin Antitrust Litig.*, 801 F. Supp. 2d 304 (D.N.J. 2011) (mere allegations do not satisfy the *Zolin* standard); *Armouth Int'l, Inc. v. Dollar Gen. Corp.*, No. 14-0567, 2015 WL 6696367 (M.D. Tenn. Nov. 2, 2015) (unsupported speculation does not provide the factual basis that *Zolin* requires).

Moreover, Plaintiffs fail to allege "the type of serious misconduct necessary to abrogate any of the privileges at issue."  *SAI v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 258–59 (D.D.C. 2018) (Moss, J.) (rejecting plaintiff's "imaginative" crime-fraud argument with "only cursory discussion").  For instance, Plaintiffs offer no evidence of any cognizable harm from Jones Day (1) acting consistent with the firm's pre-existing policy about employment references *and providing Savignac with a reference, including to the firm that hired him*, ECF 35 ¶ 171, and (2) responding to media inquiries that Plaintiffs instigated by taking this dispute to the "court of public opinion" before they even filed their lawsuit.  Plaintiffs also cite no case that ordered *in camera* review on the basis of an allegedly retaliatory employment termination.  Their conclusory claims of illegality are "a far cry from 'felony obstruction of justice'" and other conduct that has

supported waiver. *SAI*, 315 F. Supp. 3d at 259; *see also In re Sealed Case*, 754 F.2d at 400

("scheme of evidence destruction and the ensuing cover-up" triggered waiver).[9]

### C.      Entertaining Plaintiffs' Crime-Fraud Argument Would Be Terrible Policy

Plaintiffs—reversing themselves—finally acknowledge that this is a "routine employment

discrimination case." Pls. Mot. at 34; *compare* ECF 55 at 5 ("[T]his is not a routine case."). That

is all the more reason to hold Plaintiffs to their burden and require more than conclusory allegations

of illegality and hypothesized attorney smokescreens for criminal and fraudulent schemes. The

job of counsel—in-house or outside—is to advise on legal issues. When an employer is extorted

for money unless it provides disability leave to the non-disabled, it should consult with counsel;

that counsel should assess legal risks; and the employer should consider counsel's guidance. In

the employment context, terminations commonly involve legal counsel in some fashion. That is a

good thing. "Especially in the employment area, a rapidly developing and changing area of the

---

[9] Courts in other jurisdictions have held that "the crime-fraud exception does not extend to tortious conduct generally, but is limited to attorney advice in furtherance of a crime or fraud." *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir. 1995). Although the D.C. Circuit has not explicitly limited the doctrine to crime and fraud, courts in this Circuit still usually decide not to extend the exception, concluding the party failed to show "misconduct warranting the application of the crime-fraud exception." *Tri-State Hosp. Supply Corp. v. United States*, 238 F.R.D. 102, 104-05 (D.D.C. 2006); s*ee Jinks-Umstead v. England*, 232 F.R.D. 142, 145–46 (D.D.C. 2005) (similar); *Coleman v. Am. Broad. Cos.*, 106 F.R.D. 201, 209 (D.D.C. 1985) (similar). Indeed, Plaintiffs point to only a single contrary example: *Recycling Sols., Inc. v. District of Columbia*, 175 F.R.D. 407 (D.D.C. 1997). And in that case, the alleged misconduct was a far cry from the alleged misconduct in this "routine employment case." Pls. Mot. at 34; *see Recycling Sols.*, 175 F.R.D. at 408–09 (alleging that the attorneys "facilitate[d] unconstitutional racial or ethnic discrimination" by filing a frivolous appeal of the D.C. Contract Appeals Board's decision to delay the awarding of a government contract to the plaintiff so another entity could "continue to perform the contract as a sole source provider" while the litigation was pending). What is more, the court's conclusion in *Recycling Solutions* rested on a mistaken view of D.C. Circuit precedent. The *Recycling Solutions* court recognized that courts generally have not applied the crime-fraud exception to "a civil wrong or tort," but concluded that the D.C. Circuit had approved such an extension, quoting Page 812 of *In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982). 175 F.R.D. at 409. But in that part of the opinion in *In re Sealed Case*, Judge Wright was writing for himself only; no other member of the panel joined that section of the opinion.

law, it is critical that employers have the protection of the attorney-client privilege so that . . . the employer can speak freely and candidly with counsel for purposes of ascertaining how to deal with employee problems legally." *Sahakian v. STATS ChipPAC, Inc.*, No. 08-cv-0241, 2009 WL 10673430, at *1 (D. Ariz. Sept. 14, 2009). It would eviscerate the attorney-client privilege if courts were to entertain crime-fraud claims solely because a former employee thought some alleged employment action was unlawful.

### III.    The Court Should Refer Any *In Camera* Review To A Magistrate Judge

If the Court does order *in camera* review, it should refer the matter to a magistrate judge, for three primary reasons. *First, ex parte* proceedings on privilege disputes are common. They are potentially more likely here, where Plaintiffs' objections raise factual question about, for instance, the primary purposes of a communication. Any question about the content or meaning of a document over which Defendants have asserted privilege can only be addressed in full outside of Plaintiffs' view. The possibility of *ex parte* proceedings counsels for a separate decisionmaker so that this Court is not engaging directly with either side without the other.[10]

*Second*, particularly with respect to Defendants' work-product claims, the documents at issue involve discussion of legal strategy in anticipation of Savignac's lawsuit. *In camera* review will encompass communications between defense counsel who are assessing the case after they received notice of Plaintiffs' claims. Whether or not it is the finder of fact on any claim, the Court will be the decider of law. It will be reviewing the parties' briefs, assessing their arguments, and

---

[10] Plaintiffs object to the possibility of ex parte review, but seem to recognize that there is no other way to address question about any specific document without prematurely divulging the content. Naturally, any record initially submitted on an ex parte basis would be disclosed to Plaintiffs to the same extent as any of the underlying documents.

drawing legal conclusions, and the better course is to do that without having been privy to how one side—but not the other—initially began to assess the case.

*Third*, while Plaintiffs seem to have already resolved in advance that they will appeal any adverse rulings by a magistrate to the Court, that only further counsels for appointing a magistrate. In that scenario, the Court presumably would have the benefit of the magistrate's reasoning and determinations—including on factual questions like purpose. To the extent the Court is able to resolve objections without conducting its own *in camera* review, the entire process will be more efficient and streamlined.

Plaintiffs assert that appointing a magistrate for any *in camera* review has no basis and would "be a departure from the usual practice." Pls. Mot. at 31. Not so. Referral to a magistrate is permitted under the Federal Rules, and is consistent with ample precedent leaving the decision of whether and how to conduct an *in camera* review to the court's sound discretion. *See, e.g.*, Fed. R. Civ. P. 53, 72; *see also* 10 Fed. Proc., L. Ed. § 26:19 (Sept. 2021 update) ("With certain enumerated exceptions, a magistrate judge may be designated to hear and determine any pretrial matter pending before the court, including discovery motions."); *cf. Zolin*, 491 U.S. at 572 ("[T]he decision whether to engage in *in camera* review rests in the sound discretion of the district court."). Although Defendants do not believe *in camera* review is appropriate, if the Court disagrees, it should exercise its discretion to appoint a magistrate judge to oversee it.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to compel an *in camera* review of privileged documents should be denied.

October 27, 2021

Respectfully submitted,

*/s/ Terri L. Chase*
Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Ph: (305) 714-9700
Email: tlchase@jonesday.com

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939
Email: tlovitt@jonesday.com

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Ph: (202) 879-3939
Email: cdipompeo@jonesday.com

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Ph: (412) 391-3939
Email: atbailey@jonesday.com

*Attorneys for Defendants*