# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

 *Plaintiffs*,

  v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and JOHN DOES 1-10,

 *Defendants*.

Case No. 1:19-cv-02443-RDM

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS ON DEFENDANTS' FIRST PRIVILEGE LOG**

# TABLE OF CONTENTS

Introduction ........................................................................................................................1

Argument ...........................................................................................................................2

   I.   Jones Day has not proved that the withheld communications are privileged......................2

      A.   Business advice is not privileged ..................................................................2

          1.   Attorney-client privilege .................................................................2

          2.   Work product .................................................................................9

          ██████████████████████████ ...........................................................11

   II.   The withheld communications are also unprotected under the crime-fraud exception.....12

      A.   Jones Day does not dispute Plaintiffs' statement of the governing law......................12

      B.   Plaintiffs have satisfied the *Zolin* standard .................................................13

          1.   Good faith ......................................................................................14

          2.   The communications were plainly "in furtherance" of the retaliatory acts ..........22

          3.   Plaintiffs' prima facie case is neither speculative nor conclusory ........................23

      C.   Jones Day's other arguments are irrelevant and meritless ...........................................23

Conclusion .........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. FBI*,
    193 F.R.D. 1 (D.D.C. 2000) ............................................................................13

*California Federal Savings & Loan Ass'n v. Guerra*,
    479 U.S. 272 (1987) ........................................................................................18

*Calvin Klein Trademark Trust v. Wachner*,
    198 F.R.D. 53 (S.D.N.Y. 2000) .................................................................10, 11

*Chandler v. Berlin*,
    2020 WL 5593905 (D.D.C. 2020) ..................................................................15

*City of Los Angeles v. Manhart*,
    435 U.S. 702 (1978) ........................................................................................18

*Clark County School District v. Breeden*,
    532 U.S. 268 (2001) ........................................................................................19

*Clark v. United States*,
    289 U.S. 1 (1933) .....................................................................................24, 25

*Criswell v. City of O'Fallon*,
    2008 WL 250199 (E.D. Mo. 2008) ...........................................................24, 25

*FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
    180 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................7

*FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
    892 F.3d 1264 (D.C. Cir. 2018) ...................................................2, 6, 7, 8, 9

*George v. Leavitt*,
    407 F.3d 405 (D.C. Cir. 2005) ..................................................................14, 19

*Grosdidier v. Broadcasting Board of Governors*,
    709 F.3d 19 (D.C. Cir. 2013) ....................................................................14, 19

*Henry v. Champlain Enterprises, Inc.*,
    2003 WL 27383465 (N.D.N.Y. 2003) .............................................................11

*In re Doe*,
    551 F.2d 899 (2d Cir. 1977) ............................................................................22

*In re Grand Jury Subpoena Duces Tecum*,
    731 F.2d 1032 (2d Cir. 1984) ..........................................................................12

*In re Grand Jury Subpoena (Mr. S.)*,
  662 F.3d 65 (1st Cir. 2011) ..................................................................................25

*In re Kellogg Brown & Root, Inc.*,
  756 F.3d 754 (D.C. Cir. 2014) ..............................................2, 3, 4, 5, 6, 7, 8, 9

\* *In re Lindsey*,
  158 F.3d 1263 (D.C. Cir. 1998) ................................................................2, 3, 5, 11

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982) ..............................................................................13

\* *In re Sealed Case*,
  737 F.2d 94 (D.C. Cir. 1984) ..................................................................2, 3, 5, 9, 11

\* *In re Sealed Case*,
  754 F.2d 395 (D.C. Cir. 1985) ..............................................................................12

*In re Sealed Case*,
  877 F.2d 976 (D.C. Cir. 1989) ................................................................................7

*In re Sealed Case*,
  124 F.3d 230 (D.C. Cir. 1997) ..............................................................................23

*Kaley v. United States*,
  571 U.S. 320 (2014) ..............................................................................................24

*Kilpatrick v. King*,
  499 F.3d 759 (8th Cir. 2007) ................................................................................25

*King v. Jackson*,
  487 F.3d 970 (D.C. Cir. 2007) ........................................................................14, 19

*McGrath v. Clinton*,
  666 F.3d 1377 (D.C. Cir. 2012) ............................................................................19

*Parker v. Baltimore & Ohio Railroad Co.*,
  652 F.2d 1012 (D.C. Cir. 1981) ............................................................14, 19, 21, 22

*Pendleton v. Rumsfeld*,
  628 F.2d 102 (D.C. Cir. 1980) ..............................................................................20

*Rattner v. Netburn*,
  1989 WL 223059 (S.D.N.Y. 1989) ........................................................................10

*Sai v. TSA*,
  315 F. Supp. 3d 218 (D.D.C. 2018) ................................................................23, 24

*Savignac v. Jones Day,*
    486 F. Supp. 3d 14 (D.D.C. 2020) ..................................................................18

*Schafer v. Board of Public Education,*
    903 F.2d 243 (3d Cir. 1990)...........................................................................18

*Tri-State Hospital Supply Corp. v. United States,*
    226 F.R.D. 118 (D.D.C. 2005)................................................................12, 13

*United States v. Deloitte LLP,*
    610 F.3d 129 (D.C. Cir. 2010) .............................................................5, 6, 10

*United States v. Ivers,*
    967 F.3d 709 (8th Cir. 2020) ..........................................................................6

*United States v. White,*
    887 F.2d 267 (D.C. Cir. 1989) ................................................................22, 23

\* *United States v. Zolin,*
    491 U.S. 554 (1989)................................................................................12, 13

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981)..............................................................................3, 4, 5

**Statutes and rules**

29 U.S.C. § 206......................................................................................................21

Federal Rule of Civil Procedure 26 ......................................................................11

## INTRODUCTION

When Plaintiffs raised their concern that Jones Day was improperly withholding business discussions about the three retaliatory acts at issue here, its lead counsel responded: "we agree that business advice provided by lawyers is not privileged and we did not withhold (and then log) business advice." App. 24a.[1]  Its position on both points has evolved.  Now, it effectively admits that the logged documents include business advice, but it says that a document relaying business advice is privileged in its entirety unless it is "apparent that the communication was not intended at all to provide legal advice." Opp. 11.  That is not the law.  The two D.C. Circuit cases on which Jones Day relies do not discuss business advice at all, and they certainly do not overrule the cases cited in Plaintiffs' motion for the well-established understanding—which, obviously, was shared by Jones Day's own lawyer when she sent the email quoted above—that "business advice provided by lawyers is not privileged."  The two cases simply hold that attorney-client communications through which the attorney gathers relevant facts for the purpose of providing legal advice are privileged even if the same facts will also be used for business purposes.

As for the crime-fraud exception, Jones Day does not dispute most of the points in Plaintiffs' motion, preferring instead to offer faulty policy pleas and the irrelevant argument that a company that receives a pre-suit demand can be expected to seek legal advice.  Jones Day's sole argument on the merits of the claims is that Plaintiffs made their demand for equal treatment in bad faith.  That argument is baseless.  Likewise baseless is Jones Day's bizarre contention that the communications at issue were not "in furtherance" of the three retaliatory acts.  They are the very communications through which Jones Day planned and performed those acts.[2]

---

[1] "App." is the appendix to the motion.  "SA" is the supplemental appendix to this reply.

[2] Jones Day's baseless complaints about Plaintiffs' privilege log are irrelevant here and will be addressed in Plaintiffs' response to Jones Day's own motion to compel.

## ARGUMENT

### I.   Jones Day has not proved that the withheld communications are privileged.

"[T]the party claiming the privilege bears the burden of proving that the communications are protected" and "must conclusively prove each element of the privilege." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998).  Jones Day has failed to meet its burden.

#### A.   Business advice is not privileged.

**1.   Attorney-client privilege.**  Jones Day effectively admits that the logged documents contain business advice.  But it now says that business advice actually is privileged if the same email chain also contains legal advice: "if a communication involves both legal advice and business matters, the privilege will protect the communication as long as one of the primary reasons for it was the provision of legal advice."  Opp. 9.  Jones Day disregards Plaintiffs' authorities, which explain that the privilege applies only to a communication with a lawyer who "in connection with the communication is *acting as a lawyer*" and quotes then-Judge Ginsburg's statement that a company claiming privilege over a dual-hatted executive's advice "can shelter [that] advice only upon a *clear showing* that [the executive] *gave it in a professional legal capacity*."  Mot. 9-12 (emphases added) (quoting *Lindsey*, 158 F.3d at 1270, and *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984)).  Jones Day brushes these "older cases" aside and stakes its claim of privilege on the theory that they were silently overruled by *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014), and *FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 892 F.3d 1264 (D.C. Cir. 2018).  But those cases do not say what Jones Day thinks they say.

Jones Day declares *Kellogg* "the D.C. Circuit's leading case on the applicability of the attorney-client privilege to documents involving both legal and non-legal advice."  Opp. 9.  Actually, as discussed below, *Kellogg* has nothing to do with such documents and never mentions

"non-legal advice" (or "business advice").[3]  It certainly does not silently overrule precedents like

*Lindsey* and *Sealed Case* holding that the privilege protects a dual-hatted lawyer's advice only

where the lawyer "is acting as a lawyer" and "gave it in a professional legal capacity."  *Kellogg*

focused on another element of the privilege standard: the requirement that privileged

communications be made "for the purpose of securing primarily either (i) an opinion on law or

(ii) legal services or (iii) assistance in some legal proceeding."  *Lindsey*, 158 F.3d at 1270 (quoting

*Sealed Case*, 737 F.2d at 98-99).  *Kellogg* holds that this "primary purpose" test does not require

that obtaining legal advice be *the* primary purpose of a communication—the test is satisfied if it is

*a* primary purpose.  That does not mean that the privilege protects business advice.[4]

   *Kellogg* follows from *Upjohn Co. v. United States*, 449 U.S. 383 (1981), which "held that

the attorney-client privilege protects confidential employee communications made during a

business's internal investigation led by company lawyers."  756 F.3d at 756.  A KBR employee

accused KBR of fraud.  *Id.*  The employee (Barko) requested "documents related to KBR's prior

---

   [3] The sole exception is a parenthetical quotation making the unremarkable point that "[h]elping a corporation comply with a statute or regulation—although required by law—does not transform quintessentially legal advice into business advice."  756 F.3d at 760.  Plaintiffs agree, of course, that "quintessentially legal advice" is not business advice.  The briefs in *Kellogg* and *Boehringer* further confirm that the cases were not about whether business advice is privileged.

   [4] *Kellogg* does not purport to state the full privilege standard.  In *Sealed Case*, though, then-Judge Ginsburg provided a fuller statement of the standard:

   The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

737 F.2d at 98-99 (quotation marks omitted).  The "primary purpose" test is just a small part—part (3)(c)—of the full standard.

internal investigation into the alleged fraud," which KBR's lawyers "had conducted … pursuant to [KBR's] Code of Business Conduct." *Id.*  KBR objected that documents created in the course of an internal investigation into alleged unlawful acts are privileged under *Upjohn*. *Id.*  But the district court reasoned that KBR failed the "primary purpose" test because it "had not shown that the communication would not have been made 'but for' the fact that legal advice was sought." *Id.* The district court held that the investigation "was undertaken pursuant to regulatory law and corporate policy rather than for the purpose of obtaining legal advice." *Id.*; *see also id.* at 758.

The D.C. Circuit granted KBR's mandamus petition. *Id.* at 756.  It held that "KBR's assertion of the privilege in this case is materially indistinguishable from Upjohn's assertion of the privilege in that case," where "the communications were made by company employees to company attorneys during an attorney-led internal investigation that was undertaken to ensure the company's 'compliance with the law.'" *Id.* at 757 (quoting *Upjohn*, 449 U.S. at 392).

As relevant here, the D.C. Circuit rejected the district court's view that the internal investigation documents were not created for the primary purpose of obtaining legal advice because the investigation was required by regulation and so the documents would have been created even absent any desire for legal advice regarding the alleged fraud. *See id.* at 758-60.  The D.C. Circuit held: "So long as obtaining or providing legal advice was one of the significant purposes of the internal investigation, the attorney privilege applies, even if there were also other purposes" (i.e., business purposes). *Id.* at 758-59.  The D.C. Circuit did not suggest that it was breaking new ground.  To the contrary, it called the district court's approach "novel" and stated that "[w]e are aware of no Supreme Court or court of appeals decision that has adopted a test of this kind in this context." *Id.* at 759.  If adopted, the district court's "novel approach would eradicate the attorney-client privilege for internal investigations conducted by businesses that are

4

required by law to maintain compliance programs," with the result that "businesses would be less likely to disclose facts to their attorneys and to seek *legal advice*." *Id.* (emphasis added).

In the passage that Jones Day block-quotes, the D.C. Circuit explains that the district court's "sole primary purpose" test is nonsensical, because communications often have multiple purposes, and "trying to find *the* one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task." *Id.* at 759. "It is thus not correct for a court to presume that a communication can have only one primary purpose." *Id.* "[I]f one of the significant purposes of the internal investigation was to obtain or provide legal advice, the privilege will apply." *Id.* at 760.

Jones Day's heavy reliance on *Kellogg* is misplaced. *Kellogg* does not purport to overrule or even qualify *Lindsey*, *Sealed Case*, or the other cases discussed in Plaintiffs' motion that state the long-accepted proposition that business advice is unprivileged. *See* Mot. 9-11. To the contrary, *Kellogg* cites both *Lindsey* and *Sealed Case*. *See* 756 F.3d at 757. More importantly, *Kellogg* has *nothing to do with business advice at all*. Jones Day declares it the "leading case on the applicability of the attorney-client privilege to documents involving both legal and non-legal advice" (Opp. 9), but the documents actually at issue in *Kellogg* were "internal investigation documents" like those in *Upjohn*, which the D.C. Circuit described as "communications … by company employees to company attorneys during an attorney-led investigation." 756 F.3d at 757.

The D.C. Circuit was not suggesting that an email containing some legal advice and some business advice is privileged in its entirety simply because providing legal advice could be said to be "a" primary purpose of the email when viewed as a whole. Judges reviewing such emails routinely separate privileged matter (like legal advice) from unprivileged matter (like business advice) and order that the latter be produced. *See, e.g.*, *United States v. Deloitte LLP*, 610 F.3d

129, 139 (D.C. Cir. 2010) (remanding "so that the district court can examine the document *in camera* to determine whether it is entirely work product," or "whether a partial or redacted version of the document could have been disclosed"); *United States v. Ivers*, 967 F.3d 709, 717 (8th Cir. 2020) ("Ivers's argument concerning the predominant-motivation and sole-motivation tests is based on the incorrect assumption that the entire [call with his lawyers] was privileged.  But courts routinely decide which specific communications between a client and his attorneys are privileged, and they often segregate privileged and non-privileged communications in particular conversations or documents.").  The D.C. Circuit was not putting an end to that practice; it was addressing *factual* questions and responses generated during an internal investigation, which are not themselves "advice" of any kind (legal or business), but which can serve as an input into either legal advice or business decisions.  *See, e.g.*, *Boehringer*, 892 F.3d at 1267 ("privilege covers both (i) communications in which an attorney gives legal advice; and (ii) those communications in which the client informs the attorney of facts that the attorney needs").

By contrast to an email containing discrete and segregable pieces of business and legal advice, the facts contained in KBR's internal investigations documents were unitary—they were all potentially useful for both legal and business purposes, not just for one or the other.  That is why the D.C. Circuit said that it "can be an inherently impossible task" to determine whether a communication has a business purpose or a legal purpose—it could well have both.  The D.C. Circuit was not casting doubt on the longstanding practice of redacting legal advice while producing business advice—a practice that judges and attorneys (including in this case) continue to perform as they did before *Kellogg*.[5]

---

[5] The principle that non-privileged material should be separated from privileged advice and produced is also reflected in the rule that "attachments to privileged communications are not

Indeed, Jones Day has produced . Surely Jones Day would not accept the consequences of its own legal position.[6]

*Boehringer* adds little to the analysis. Boehringer and a competitor reached a patent litigation settlement that raised antitrust concerns for the FTC. 892 F.3d at 1266-67. The FTC subpoenaed documents created by Boehringer employees for its general counsel. *Id.* at 1267. "The documents allowed [the general counsel] to analyze and navigate the treacherous antitrust issues surrounding [patent] settlements." *Id.* The district court "reviewed *in camera* all the documents at issue," *id.* at 1270 (Pillard, J., concurring), and held that the documents were privileged under *Kellogg*, *id.* at 1267 (opinion of the Court).

---

thereby automatically privileged." *FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 180 F. Supp. 3d 1, 31 (D.D.C. 2016), *aff'd* 892 F.3d 1264 (D.C. Cir. 2018). Yet Jones Day is withholding entire email *chains* along with their attachments on the ground that some email within the chain supposedly had a primary purpose of providing legal advice.

[6] 

7

The D.C. Circuit affirmed.  It began by explaining that "[t]he privilege covers both (i) communications in which an attorney gives legal advice; and (ii) those communications in which the client informs the attorney of facts that the attorney needs to understand the problem and provide legal advice."  *Id.*  Like *Kellogg*, *Boehringer* deals with the second type of communications.  The "primary purpose" issue arose in *Boehringer* because "the communications had a legal purpose: to help the company ensure compliance with the antitrust laws and negotiate a lawful settlement.  But the communications also had a business purpose: to help the company negotiate a settlement on favorable financial terms."  *Id.*  Applying *Kellogg*, the D.C. Circuit held that "obtaining or providing legal advice was one of the significant purposes of the communications."  *Id.* at 1268.  As in *Kellogg*, the communications were *facts* sought for the purpose of providing legal advice: "The relevant communications consist primarily of the transmission of factual information from Boehringer's employees to the general counsel, at the general counsel's request, for the purpose of assisting the general counsel in formulating her legal advice regarding a possible settlement."  *Id.*[7]

Like *Kellogg*, *Boehringer* casts no doubt on the rule that business advice from a lawyer is unprivileged.  Neither decision addresses communications that provide business advice at all.  Both address situations where a company's lawyers collect from its employees factual information for the purpose of using it to provide legal advice but the identical information is also to be used for "business" purposes.  That is not the issue here.  And a holding that a document containing facts useful both for providing legal advice and for business purposes is privileged is a far cry from a

---

[7] The decision refers in passing to "[o]ther communications … between the general counsel and the corporation's executives regarding the settlement."  *Id.*  The opinion does not suggest that those communications involved business advice.  Rather, the general counsel was formulating "legal advice regarding a possible settlement."  *Id.*

holding that business advice is itself privileged when provided in an email (or an email chain) that also offers legal advice. That is why "Plaintiffs d[id] not even cite *Kellogg* or *Boehringer*." Opp. 11. Jones Day's lead counsel had it right the first time: "business advice provided by lawyers is not privileged." App. 24a. Nothing in *Kellogg* or *Boehringer* uproots that settled rule.

In any event, in camera review would be appropriate even if Jones Day's view of the law were correct. Jones Day argues that providing legal advice must have been a primary purpose of every withheld email because the participants were lawyers who sometimes provide legal advice and the emails were sent during times when Jones Day could have been expected to seek legal advice. But the same participants are business advisors and managers, and the emails were sent during times when Jones Day was making business decisions and would surely have sought business advice. Jones Day has hardly made the requisite "clear showing" that providing legal advice was even "a" primary purpose of every withheld email and attachment. *Sealed Case*, 737 F.2d at 99. That line is sure to be hard to draw under these circumstances. It should be drawn by the Court. *See Boehringer*, 892 F.3d at 1269-70 (Pillard, J., concurring) (joining affirmance of privilege finding because the district court "engaged extensively with the disputed documents and the bases for the privilege claims" and, "having personally reviewed *in camera* all the documents at issue," "credited Boehringer's contention that obtaining legal advice was a significant purpose animating each communication" (quotation marks omitted)).[8]

    **2.**    **Work product.** Jones Day observes that "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protection." Opp. 8

---

[8] Jones Day says that it has produced "dozens of non-privileged emails" relating to its retaliatory acts. Opp. 12. But as noted in Plaintiffs' motion (at 3, 7, 14, 16-17), aside from ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, nothing documenting the decisionmaking process (as distinct from the implementation of the decisions once made) has been produced.

(quoting *Deloitte*, 610 F.3d at 137).  But Plaintiffs do not suggest that Jones Day generated bona fide work product and then later waived the protection by using it for "ordinary business purposes." Plaintiffs' point is that business communications about issues like terminations and press releases are not work product at all—the protection never attaches in the first place.  Jones Day seems to think that non-work-product materials, like press release drafts, can be cloaked in work-product protection if they are useful in later litigation (e.g., as a model for a defendant's answer).  But that is the opposite of the situation described in *Deloitte*.

Plaintiffs' motion cited numerous cases holding that materials documenting the drafting of a litigation-related press release are not work product.  *See* Mot. 19-20.  Jones Day does not dispute Judge Rakoff's statement that "it is obvious that as a general matter public relations advice, even if it bears on anticipated litigation, falls outside" the work-product rule, "because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally."  *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000). Instead, Jones Day attempts to distinguish Plaintiffs' citations on the ground that "Defendants were not crafting a general 'public relations' strategy but were developing in real time a response and potential defenses to specific legal claims, which would ultimately be reflected in and inform their litigation strategy."  Opp. 17.  That is what every lawyer who chooses "to perform a publicist's function" by drafting a litigation press release would say.  *Rattner v. Netburn*, 1989 WL 223059, at *6 (S.D.N.Y. 1989).  Plaintiffs' cited cases likewise dealt with press releases *about litigation*, not "general public relations strategy" in the abstract.  This case is not distinguishable.[9]

---

[9] Jones Day invokes (at 17-18) the passage in *Calvin Klein* saying that "an otherwise valid assertion of work-product protection is [not] waived with respect to an attorney's own work-

Nor is it legally relevant whether some withheld documents might be said to "reflect the developing legal theories and mental impressions of counsel."  Opp. 17.  The special protection that such "mental impressions" receive (under the label of "opinion work product") applies only when they appear in materials that are work product in the first place.  *See* Fed. R. Civ. P. 26(b)(3)(A)-(B).  But press release drafts and related communications are not work product.[10]



---

product simply because the attorney provides the work-product to a public relations consultant." 198 F.R.D. at 55.  Again, that is not the issue here: Plaintiffs do not argue that Jones Day created bona fide work product but waived the protection by sharing it.  The issue is that the assertion here is not "otherwise valid."

Jones Day also cites two cases saying that the attorney-client privilege over communications about drafts of documents intended for publication is not waived by the ultimate publication of the final draft.  *See* Opp. 19.  That is irrelevant.  Plaintiffs do not contend that the press release's publication waived the privilege over otherwise-privileged communications or drafts of the press release.  The drafts and communications about them are not privileged in the first place.

[10] Plaintiffs acknowledge that Jones Day has found one ruling, *Henry v. Champlain Enterprises, Inc.*, that says that a draft press release was work product.  2003 WL 27383465, at *11 (N.D.N.Y. 2003).  The ruling provides no reasoning or citations, is wrong, and should not be followed.

**II.     The withheld communications are also unprotected under the crime-fraud exception.**

**A.     Jones Day does not dispute Plaintiffs' statement of the governing law.**

As Plaintiffs explained (Mot. 21-23), the crime-fraud exception destroys privilege upon a prima facie showing "that [1] the client was engaged in or planning a criminal or fraudulent scheme [2] when it sought the advice of counsel to further the scheme." *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). The D.C. Circuit has described the "prima facie" showing in terms of "probable cause" or "'a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'" *Id.* at 399 n.3 (quoting *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984)). And in camera review is appropriate upon "a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotation marks omitted). In short: "The privilege is destroyed upon probable cause to suspect that the communications were in furtherance of a crime, and in camera review is appropriate upon a showing that such review 'may' show that the probable cause standard is met." Mot. 23.

Jones Day does not deny that Plaintiffs have correctly stated these legal standards. It does complain that Plaintiffs use the word "may" in their motion. Opp. 28. But that is the term that the Supreme Court used—twice—when it established the standard for in camera review in *Zolin*. *See* 491 U.S. at 572, 574-75. Indeed, Jones Day itself cites *Tri-State Hospital Supply Corp. v. United States*, where the court quoted *Zolin*'s standard and reasoned:

> Clearly, the information sought is related to Tri-State's allegations of misconduct, and plaintiff has shown some evidence to support these allegations and justify the application of the crime-fraud exception. However, it is impossible to know, without reviewing the documents *in camera*, whether the government consulted with attorneys with the intent to further any unlawful or fraudulent acts or whether its general purpose in consulting with attorneys was to commit a fraud. Accordingly, the government must submit all responsive documents, along with a

reasonably detailed privilege log, to chambers for an *in camera* review.

226 F.R.D. 118, 134 (D.D.C. 2005) (footnote omitted).  The same course is appropriate here.[11]

### B.      Plaintiffs have satisfied the *Zolin* standard.

Plaintiffs' motion explains why the *Zolin* standard is met here, and Jones Day offers no real response.  *See* Mot. 24-31.  The communications at issue here were created while Jones Day was committing or preparing to commit three acts of alleged retaliation (Mark's termination, denial of Mark's reference requests, and the dissemination of the press release).  It is undisputed that the Jones Day personnel on the communications are the same ones responsible for the acts of retaliation—the participants in the "collaborative decision" to fire Mark (Dkt. 49 at 29 (Answer ¶ 198)), the individuals who decided on Jones Day's response to Mark's reference requests (Opp. 4), and the individuals who participated in the creation and dissemination of the press release (Opp. 4-5, 15-16).  It is undisputed that the logged communications pertain to those three acts of alleged retaliation.  *See* Opp. 11-12 ("approximately 38 documents" pertaining to Mark's termination); *id.* at 15 ("one entry on Defendants' privilege log that pertains to Savignac's request for employment references"); *id.* ("66 documents … in connection with Jones Day's development of its public statements").  Finally, it is undisputed that a willful violation of the FLSA is criminal; that a violation is willful if done with "reckless disregard" for the law; and that the elements of a claim are protected activity, adverse action, and a causal link between the two.  *See* Mot. 24-25.

Jones Day argues that Plaintiffs' January demand email was not protected because Plaintiffs were in bad faith; that the communications were not "in furtherance" of the retaliation; and that Plaintiffs offer only allegations and speculation.  These arguments fail.

---

[11] "[O]nce a sufficient showing of a crime has been made, … 'the privilege vanishes as to all material related to the ongoing violation.'"  *Alexander v. FBI*, 193 F.R.D. 1, 9-10 (D.D.C. 2000) (footnote omitted) (quoting *In re Sealed Case*, 676 F.2d 793, 812 n.74 (D.C. Cir. 1982)).

1.      **Good faith.**  The closest Jones Day comes to an argument that it did not violate the FLSA is its assertion that Plaintiffs' demand email was in bad faith and therefore was not protected.  Opp. 23, 25 n.7.  Assuming arguendo that the FLSA ever requires a showing of good faith, Jones Day has itself noted that a plaintiff must show "a good faith and reasonable belief that the [defendant's] practices are unlawful" only if "the employer's practices do not amount to a violation."  Dkt. 15 at 24 (quoting *Grosdidier v. Broadcasting Board of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013)).  Jones Day's leave offerings do violate the law—and, in any event, there is certainly probable cause to believe that Plaintiffs were in good faith.  Jones Day argues otherwise only by misconstruing the law and distorting Plaintiffs' straightforward and longstanding position.

Start with the law.  Jones Day's opposition cites no case on good faith.  But its own motion to compel points to *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005).  Dfts' Mot. 7.  *George* says that "an employee seeking the protection of [Title VII's] opposition clause must demonstrate a good faith, reasonable belief that the challenged practice violates Title VII."  407 F.3d at 417 (quoting *Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981)).  *George* held that the plaintiff there fell short on objective reasonableness.  *Id.*  To the extent that "good faith" is distinct from reasonableness, *George* does not address it or define it.  Jones Day points to no decision throwing out workplace discrimination claims on "good faith" grounds, and it does not say what it thinks "good faith" means.  At most, *George*'s statement that the employee needs "a good faith, reasonable belief that the challenged practice violates Title VII" would appear to require that the employee actually believe that the practice is discriminatory ("good faith") and that the belief be reasonable.  *See also King v. Jackson*, 487 F.3d 970, 972-73 (D.C. Cir. 2007) ("Title VII protects opposition to employer conduct that the plaintiff incorrectly—though reasonably—believes falls within the statute's definition of an 'unlawful employment practice'").

**a.**     Julia's August 2018 email lays out the challenge to Jones Day's leave offerings:

> Jones Day gives women 18 weeks of paid leave (and 24 weeks total [including available unpaid leave]) while it gives men 10 weeks of paid leave (and 16 weeks total).  Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled.  That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory. … Would the firm treat Mark equally to female primary caregivers and grant him 18 weeks paid and 24 weeks total leave?

App. 39a.  The January 2019 demand email repeats the request that Jones Day "treat Mark equally to female primary caregivers," who all receive 18 weeks of paid leave regardless of disability (including in cases of adoption): "Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave." *Id.* at 40a.[12]

At the argument on the motion to dismiss, the Court asked Jones Day's counsel about the 18 weeks for adoptive primary caregivers:

> The Court:     Why is that 18 weeks?  Because it might be read, and perhaps plaintiffs read, that the fact that in cases of adoption, that the primary caregiver gets 18 weeks essentially to say that we're going to give one parent or the other 18 weeks, and we think that 18 weeks paid leave is an appropriate amount of paid leave.  In the case where it's not—where there's not an adoption, we're going to give the 18 weeks as well, but it's always the mother who gets the 18 weeks.
>
> So the question I suppose I have is why is it 18 weeks in the case of adoption, but only—if in fact the eight weeks of disability leave—or the additional eight weeks that mothers get is really disability leave and is not another form of parental leave, why is it the case that in adoptions, one parent gets the full 18 weeks when the baseline seems to be 10 weeks if it's not about disability?
>
> Ms. Lovitt:     Well, it's because adoptive parents are not similarly situated to birth parents.  There are unique administrative burdens that come with adoption.  It frequently involves foreign travel.  It frequently involves—

---

[12] Jones Day calls the demand email "criminal."  Opp. 23 & n.4.  If that were true, every pre-suit demand would be criminal.  *But see Chandler v. Berlin*, 2020 WL 5593905, at *4-5 (D.D.C. 2020).

> frankly, I don't know how to say this, unique attachment issues. The attachment process between a birth parent and a birth child is different from an adoptive parent and an adopted child, and that may take longer.
>
> So adoptive parents, the reasons for their leave are completely different from the leave policies for birth parents. It's an entirely different rationale. I don't think you can say that one informs the other.

The Court: This is jumping ahead of the motion to dismiss stage, but assuming we get beyond that and that we are at some point in discovery or at summary judgment, is there in fact evidence that that was the rationale … there are going to be documents that the law firm has that says, you know, this is why we adopted that—or witnesses who would say that? …

Aug. 4, 2020 Tr. 8-10. We can now answer the Court's question.



SA 6a. Brogan approved the new policy, which was announced in an email to all associates—including Julia—on January 22, 2015. *See* SA 16a.

A few points are salient here. *First*,



*Second*,

16



the policy announced on January 22, 2015, was openly and blatantly discriminatory: *All* birth mothers received 18 weeks of paid leave, while *all* birth fathers were limited to just *four*.

Jones Day partially addressed the last point in mid-2015, after an associate who had discussed the matter with Julia and a third associate—observed that the policy was obviously illegal and violated the EEOC's guidance.  ████████.  The mid-2015 change allowed fathers to take 10 weeks of primary caregiver leave (compared to 18 weeks for mothers and adoptive primary caregivers) or four weeks of secondary caregiver leave.  That remains the policy.  App. 51a.

In January 2015, Julia shared with Mark part of her discussion with the other two associates.  Mark's response, which was sent more than two years before Mark married Julia or started at Jones Day, is not privileged and has been produced to Jones Day.  Mark wrote: "It does seem pretty clearly illegal …. Presumably the 8-week disability leave is also illegal (if not, they could just say the first 14 are for disability)."  SA17a.  In short, Mark believed—years before he married Julia, worked at Jones Day, had a child, or anticipated litigation—that Jones Day's policy of giving all new mothers eight extra weeks of leave is illegally discriminatory, because while the

---

13 ████████████████████████████████████████████

eight weeks are "labeled as disability leave, … the leave is not dependent upon whether women are actually disabled."  App. 39a.  Plaintiffs were obviously in good faith.

Plaintiffs explained in detail the legal basis for their view that Jones Day's leave offerings are discriminatory at the motion-to-dismiss stage.  *See* Dkt. 18 at 7-32; Dkt. 21-1 at 4-14.   To repeat: The civil rights laws "preclude[] treatment of individuals as simply components of a racial, religious, sexual, or national class" and therefore prohibit employers from imposing differential treatment based on "[e]ven a true generalization" about women.  *City of Los Angeles v. Manhart*, 435 U.S. 702, 708 (1978) (Title VII prohibits requiring female employees to pay more into pension fund despite "unquestionably true" generalization that "[w]omen, as a class, do live longer than men" and thus receive more money from the pension fund during retirement).  "The statute's focus on the individual is unambiguous."  *Id.*  Thus, the civil rights laws prohibit "special treatment of pregnant workers based on stereotypes *or generalizations* about their needs and abilities." *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 285 n.17 (1987) (emphasis added).  Paid leave offered to mothers but not fathers must be "narrowly drawn to cover only the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions."  *Id.* at 290 (emphasis in original); *see also Schafer v. Board of Public Education*, 903 F.2d 243, 247 (3d Cir. 1990) ("as a matter of law," leave offered to mothers but not fathers "contravenes Title VII and is thus per se void for any leave granted beyond the period of actual physical disability on account of pregnancy, childbirth or related medical conditions").  As this Court observed, "Defendants have not shown that the text of Title VII, the FLSA, or the DCHRA or any precedent (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's policy was unlawful."  486 F. Supp. 3d 14, 39 (D.D.C. 2020).

18

**b.**     Jones Day's bad-faith argument focuses not on Plaintiffs' charge of illegality, but rather on the particular settlement sought in their January 2019 pre-suit demand email.  Again, that email sought "the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave."  App. 40a.  Jones Day's argument appears to be that every birth mother is disabled from office work for at least some period of time, that Mark was not disabled at all, and that it was unreasonable for Mark to ask for the "full" 18 weeks given to mothers.  *See* Opp. 23, 25 & n.7.  Thus, Jones Day concludes, the civil rights laws afforded Mark no protection.  The flaws in this argument are myriad.

*First*, opposition to discrimination is protected if based on "a good faith, reasonable belief that *the challenged practice*" is illegal.  *George*, 407 F.3d at 417 (emphasis added).  The challenged employment practice is distinct from the proposed settlement or remedy.  The cases speak of a good-faith belief that the challenged practice is illegal; they do not apply the "good faith, reasonable belief" formula to the settlement offer that an employee makes to resolve the challenge to the practice, or suggest that her opposition must be "good faith and reasonable" in some abstract, free-floating sense.[14]  Jones Day has never cited any case holding that a workplace discrimination complaint was unprotected because the employee proposed a "bad-faith" (or "unreasonable") settlement.  A worker engaged in protected opposition to what she reasonably believes is illegal discrimination plainly does not lose the protection if she seeks a remedy (or settlement) for the

---

[14] *See, e.g.*, *Clark County School District v. Breeden*, 532 U.S. 268, 270 (2001) ("practices that the employee could reasonably believe were unlawful"); *Grosdidier*, 709 F.3d at 24 ("Although opposition activity may be protected even though the employer's practices do not amount to a violation of Title VII, the employee-plaintiff must have a good faith and reasonable belief that the practices are unlawful"); *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) ("if the practice the employee opposed is not one that could reasonably and in good faith be regarded as unlawful under Title VII, this element is not satisfied"); *King*, 487 F.3d at 972-73 ("employer conduct that the plaintiff incorrectly—though reasonably—believes" is illegal); *Parker*, 652 F.2d at 1020 ("a good faith, reasonable belief that the challenged practice violates Title VII").

illegal discrimination that is not itself mandated by Title VII.  For instance, it would be protected opposition if a woman who reasonably perceived her workplace as a hostile workplace demanded that the employer provide sexual harassment training—even though the civil rights laws do not require any employer to provide such trainings.

*Second*, Jones Day's argument hinges on the notion that Mark sought "the full 18 weeks of leave available to birth mothers."  Opp. 25 n.7; *see id.* at 2, 23.  That is false.  Eighteen weeks is the *minimum* entitlement conferred *automatically* on *all* new mothers (including adoptive mothers), without regard for disability.  The *maximum* leave available to a mother with a longer period of actual disability is *up to 26 weeks* under Jones Day's generally applicable disability policy.  App. 54a.  Lovitt explained this at the argument: Saying "that you could take up to eight weeks of disability leave … would misstate the disability policy.  You can actually take up to 26 weeks depending on the scope and severity of your disability."  Aug. 4, 2020 Tr. 63; *see also id.* at 5 (up to 26 weeks "is the actual disability leave benefit"), 23.  Plaintiffs have never challenged the individualized, disability-based entitlement—just the purely sex-based, automatic 18 weeks.[15]

*Third*, while Jones Day has given many reasons for firing Mark (*see* Mot. 14-15), it has never said that he was fired for of the specific number of weeks he sought (which is implausible).  If the settlement offer was *not* the cause of the termination, then whether the particular offer was protected is irrelevant.  Anyway, in camera review will show why Jones Day really fired Mark.[16]

---

[15] In its reply in support of its motion to dismiss and at the argument on that motion, Jones Day asserted that a new mother is not actually entitled to eight weeks of "disability" leave under its policy unless she is actually disabled for eight weeks.  Discovery has confirmed that Jones Day's assertion was utterly frivolous.  *E.g.,* SA 4a, 16a.  It wisely declines to renew that assertion here.

[16] Jones Day says that an employee may be fired for "the improper manner of" her opposition.  Opp. 30 (quoting *Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C. Cir. 1980)).  As *Pendleton* makes clear, though, the Court (not the defendant) decides whether the manner of opposition is so egregiously "improper" as to lose the law's protection.  As a matter of law, the January email was

*Fourth*, the 18 weeks that Plaintiffs requested *is* the relief that a court would likely award for the violation.  Jones Day gives all new mothers (including adoptive mothers) an extra eight weeks of sex-based leave, regardless of disability and solely because they are women.  Thus, female primary caregivers receive 18 weeks of paid leave, whereas Mark (as a male primary caregiver) was entitled to 10.  To say that this is illegal sex discrimination is to say that it was illegal for Jones Day to deny Mark, because he is a man rather than a woman, the 18 weeks of paid leave that it automatically gives to all new mothers.  So it was eminently reasonable for Plaintiffs to ask, to settle their discrimination claim, that Jones Day give Mark the amount of leave that it would have given him (regardless of disability) if he were a woman rather than a man.  Indeed, that is the remedy required by the FLSA.  29 U.S.C. § 206(d)(1) (employers must equalize up).

*Fifth*, Plaintiffs' settlement offer was modest in light of the total remedy available to Plaintiffs in litigation over the discriminatory leave policy, which would include not just the wrongfully denied leave but also compensatory damages for the emotional harm of being subjected to discrimination as well as punitive damages.  The D.C. Circuit has said that "by extending protection to employees who oppose discriminatory practices without resort to the EEOC, Congress encouraged voluntary internal attempts to remedy discrimination.  The remedial purposes of Title VII would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal EEOC filings, and that internal opposition, though encouraged, is undertaken at the accuser's peril."  *Parker*, 652 F.2d at 1019 (quotation marks omitted).  Denial of protection from retaliation based on a worker's colorable settlement offer would be a grotesque subversion of "[t]he remedial purposes of Title VII."  *Id.*

---

not improper.  *See also* Dkt. 55 at 13-15.  Anyway, the demand for eight weeks was not "manner."  And in camera review will reveal whether the email's "manner" truly motivated the termination.

In short: Plaintiffs' settlement offer was not in "bad faith," it was not the reason Jones Day fired Mark, and the notion that Jones Day *could* have lawfully fired him for that offer is absurd.[17]

2.     **The communications were plainly "in furtherance" of the retaliatory acts.**

Jones Day's argument that, even if it committed illegal retaliation, the withheld communications were not *in furtherance* of that retaliation is baffling.  As Plaintiffs explained, *these were the very communications in which Jones Day actually engaged in the retaliation* (deciding to fire Mark, prohibiting employment references, and drafting the press release).  *See* Mot. 27, 29, 31.  This case is a far cry from *United States v. White*, which says that the crime-fraud exception does not apply where a "client has gone to his attorney in good faith, seeking an opinion as to the legality of certain conduct."  887 F.2d 267, 272 (D.C. Cir. 1989) (R.B. Ginsburg, J.) (quoting *In re Doe*, 551 F.2d 899, 902 (2d Cir. 1977)).  Here, the attorneys were managerial officers who were actively advocating and bringing about the retaliation, by (in Jones Day's own words) participating in the "collaborative decision" to fire Mark (Dkt. 49 at 29 (Answer ¶ 198)), ██████████████████ ████████████████████████, and "developing a public statement that could be released" on social media (Opp. 16).  In camera review is appropriate.[18]

---

[17] Jones Day's bad-faith argument is also irrelevant to documents about the press release.  The protected activity there was a court complaint, and court filings enjoy absolute immunity from retaliation.  *Cf. Parker*, 652 F.2d at 1019.

Jones Day says that "[i]t is undisputed that Savignac had threatened in January 2019 to try to harm the firm's reputation if it did not accede to his legally indefensible demands."  Opp. 27.  That assertion *is* disputed and has no basis in reality.  Jones Day is simply mischaracterizing this sentence from the January 2019 email: "Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion."  App. 40a.  In any event, in camera review will show whether Jones Day actually perceived the supposed threat when it fired Mark or only made up that perception during this litigation (after issuing the press release, which never mentions it).

[18] In camera review may show ██████████████████████████████████████ ████████████████████████████████████████████████████████

**3.      Plaintiffs' prima facie case is neither speculative nor conclusory.**   Without

pointing to specific examples, Jones Day argues that Plaintiffs based their motion on mere

allegations and speculation.  Not so. The motion is based on the facts developed through discovery

and on undisputed facts.  As the motion explains in detail, those facts are more than sufficient to

establish probable cause to believe that Jones Day broke the law with each of the three retaliatory

acts—and they certainly suffice to show that in camera review "may" establish probable cause.

**C.      Jones Day's other arguments are irrelevant and meritless.**

Jones Day's main argument, judging by the space devoted to it, is that the crime-fraud

exception should not apply because there is nothing  improper about consulting counsel in response

to an impending lawsuit: "It should surprise no one that Jones Day obtained legal counsel."

Opp. 26; *see id.* at 24-28, 32-33.  This is irrelevant.  Plaintiffs are not arguing that it is improper

or surprising for an employer to consult counsel.  The exception applies to advice *in furtherance

of illegal acts*; it does not turn on any notion that merely seeking advice is sometimes improper.

Jones Day suggests that the crime-fraud exception is limited to acts that are actually

criminal or fraudulent.  Opp. 32 at 9.  But the D.C. Circuit has expressly stated that "the exception

applies not only to crimes and fraud, but to other intentional torts."  *In re Sealed Case*, 124 F.3d

230, 234 (D.C. Cir. 1997).  Indeed, even the *White* case that Jones Day points says that the

exception applies to "communications between the client and his lawyer [that] further a crime,

fraud *or other misconduct*."  887 F.2d at 271 (emphasis added).  Again, though, the point is moot

here because Jones Day et al. did commit federal crimes under the FLSA.  *See* Mot. 24-25.

Jones Day says that Plaintiffs "fail to allege 'the type of serious misconduct necessary to

abrogate any of the privileges at issue.'"  Opp. 31 (quoting *Sai v. TSA*, 315 F. Supp. 3d 218, 259

(D.D.C. 2018)).  Willfully violating the civil rights laws by firing the father of a two-week-old baby and spreading to tens of thousands of social media followers malicious falsehoods to destroy his and his wife's careers is "serious misconduct," and, indeed, criminal.  *Sai*, by contrast, dealt with the TSA's alleged delays in processing administrative complaints.  315 F. Supp. 3d at 259.

Jones Day also suggests that applying the crime-fraud exception would mean "prejudg[ing] the merits" of this action.  Opp. 29.  There is no exception to the exception for cases where "the alleged criminal or fraudulent activity[] is the exact activity which is the subject of the pending suit" (as is often true).  *Criswell v. City of O'Fallon*, 2008 WL 250199, at *4 (E.D. Mo. 2008). Jones Day's sole cited case, *Criswell*, does not refuse to apply the exception on that ground, but because the plaintiff "failed to provide a sufficient factual basis to support the application of the exception."  *Id.*  And the crime-fraud standard is much lower than the preponderance standard that governs on the merits.  *See Kaley v. United States*, 571 U.S. 320, 338 (2014) (probable cause "is not a high bar").  A finding that the standard is met would no more "prejudge" the merits than does a probable cause finding in a criminal case, or the denial of summary judgment.

Finally, Jones Day asks the Court to adopt a "[p]olicy"-based presumption against applying the crime-fraud exception to employment discrimination cases because Plaintiffs have not cited an employment discrimination case that found the exception applicable and because employers should be encouraged to seek legal advice.  Opp. 24, 29, 32-33.  The social value of encouraging companies to seek legal advice—which is not uniquely great in the employment law context—is not in question and not threatened by the exception.  The exception will only "eviscerate the attorney-client privilege" where a court examines the communications and finds probable cause to believe that they were in furtherance of illegal acts.  That has long been the law and has not chilled legitimate consultations with counsel.  *See Clark v. United States*, 289 U.S. 1, 15-16 (1933) ("A

privilege surviving until the relation is abused and vanishing when abuse is shown to the satisfaction of the judge has been found to be a workable technique for the protection of the confidences of client and attorney.").  And Plaintiffs have no reason to look for crime-fraud cases arising in the employment context in particular.  The crime-fraud exception, like the attorney-client privilege itself, is transsubstantive.  Plaintiffs could just as well argue that *Kellogg* and *Boehringer* are irrelevant unless Jones Day can point to rulings applying them to an employment case.[19]

## CONCLUSION

"[T]he very purpose of conducting an in camera review is to determine which, if any, of a group of documents are privileged.  Given this prudential purpose, in camera reviews should be encouraged, not discouraged.  In that spirit, federal courts commonly—and appropriately— conduct such reviews to determine whether particular documents are or are not privileged."  *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 70 (1st Cir. 2011).  For the reasons given above and in Plaintiffs' motion, the Court should review the following entries from Jones Day's First Privilege Log and compel the production of all documents improperly withheld: JD_PRIV_0003, 0005-0006, 0008, 0010-0028, 0031-0050, 0052-0096, and 0098-0115.[20]

---

[19] Jones Day cites at least two employment cases that discuss the crime-fraud exception: *Criswell* and *Kilpatrick v. King*, 499 F.3d 759, 766 (8th Cir. 2007).  While both rulings reject application of the exception, they do so on the ground that the plaintiff failed to meet the transsubstantive standard.  Neither ruling suggests that the exception applies any differently to employment cases.

[20] On October 29, following the close of document discovery Jones Day served its Second Privilege Log.  It includes 10 entries from the same times and among the same people as the entries at issue here, which doubtless raise the same issues (Entries 0117, 0145-0153).  The most efficient course would be for Jones Day to submit those 10 documents for review along with the others.

/s/ Julia Sheketoff

Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

November 3, 2021

/s/ Mark Savignac

Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367