## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

    v.

JONES DAY, STEPHEN J. BROGAN,
~~and~~ BETH HEIFETZ, and MICHAEL
SHUMAKER,

    *Defendants*.

Case No. 1:19-cv-02443-RDM

JURY TRIAL DEMANDED

### ~~FIRST~~SECOND AMENDED COMPLAINT[1]

1.    Plaintiffs Mark C. Savignac and Julia Sheketoff are attorneys.  They met while serving as law clerks at the Supreme Court of the United States.  They married in 2017, and their son was born in 2019.

2.    Defendant Jones Day is one of the largest, most politically influential law firms in the world.  Defendant Stephen J. Brogan is Jones Day's Managing Partner, exercising "autocratic power[2] as "the final decision-maker on virtually every matter of significance."[3]  At the relevant times, Defendant Beth Heifetz was the head of Jones Day's Supreme Court and appellate practice group, which Jones Day calls the "Issues & Appeals" group.

---

[1] ~~Plaintiffs file this Amended Complaint pursuant to the Court's order requiring Julia to allege additional facts defining the job of an associate in Jones Day's Issues & Appeals group (Dkt. 47).~~  Defendants have consented to the filing of this Second Amended Complaint, which adds a new Defendant, Michael Shumaker.

[2] "Legal Eagles: Stephen Brogan," *Washington Life Magazine* (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan/ (as of August 8, 2019).

[3] https://www.jonesday.com/principlesandvalues/clientservices/ (as of July 5, 2019).

3.      Julia and Mark worked as associates in the Issues & Appeals group.

4.      Jones Day's parental leave policy discriminates on the basis of sex and imposes archaic gender roles by giving eight more weeks of leave to all women than to men.

5.      In opposition to these archaic gender roles, Julia and Mark wish to share equally in the responsibility of raising their son and to have equally close relationships with him, while also maintaining equal focus on their respective careers.

6.      On January 16, 2019—shortly after their son was born, and after Julia had left Jones Day for another job—Julia and Mark emailed Jones Day to say that its leave policy discriminates on the basis of sex and to demand equal treatment for Mark.

7.      In the same email, Julia and Mark stated that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, that Julia and Mark had experienced such discrimination when Julia's salary was affected by a discriminatory evaluation, and that it would be illegal for Jones Day to retaliate against Julia and Mark because of their opposition to sex discrimination.

8.      Julia and Mark were referring to Jones Day's having given Julia a raise that was smaller than it would otherwise have been (and smaller than the raises that her male colleagues received) because a male partner gave her a poor performance review for not showing him the degree of deference that he demands from female (but not male) attorneys.

9.      Three business days later, Jones Day fired Mark.

10.     Jones Day fired Mark because of the January 16 email.

11.     Defendants then continued to retaliate by prohibiting well-connected Jones Day partners who had worked closely with Mark and would have spoken highly of him from providing references in support of his search for a new job.

12.     Julia and Mark suffered significant emotional and economic harm from Defendants' retaliatory attacks, which occurred when Julia and Mark's son was just two weeks old.

**PARTIES**

13.     Plaintiff Mark C. Savignac is an appellate attorney ~~in the District of Columbia.~~.  He was an associate in Jones Day's Issues & Appeals practice group from 2017 until he was fired in January 2019.

14.     Plaintiff Julia Sheketoff is an appellate attorney ~~in the District of Columbia.~~.  She was an associate in Jones Day's Issues & Appeals practice group from 2014 until 2018.

15.     Defendant Jones Day is a general partnership with its principal place of business in the District of Columbia.  Jones Day has more than 250 employees in the District of Columbia and more than 500 employees in the United States.  All U.S.-based Jones Day partners, including the partners referenced in this Complaint, are equity partners and general partners of Jones Day.

16.     Defendant Stephen J. Brogan is Jones Day's Managing Partner.  He works out of Jones Day's office in Washington, D.C.  At all relevant times, he acted in the interest of Jones Day.

17.     Defendant Michael Shumaker is Jones Day's firm-wide Administrative Partner.  He works out of Jones Day's office in Washington, D.C.  At all relevant times, he acted in the interest of Jones Day.  He is Brogan's chief business adviser on personnel and other administrative matters.

~~17.~~18.     At all relevant times, Defendant Beth Heifetz was the leader of Jones Day's Issues & Appeals practice group.  She works out of Jones Day's office in Washington, D.C.  At all relevant times, she acted in the interest of Jones Day.

## JURISDICTION AND VENUE

~~18.~~19.  This Court has jurisdiction over this action because it arises under federal law.  28 U.S.C. § 1331.

~~19.~~20.  This Court has supplemental jurisdiction over Plaintiffs' D.C. law claims because they form part of the same case or controversy as Plaintiffs' federal claims.  28 U.S.C. § 1367.

~~20.~~21.  This Court has personal jurisdiction over Defendants because they are subject to the jurisdiction of the courts of the District of Columbia, both because they maintain their principal place of business in the District of Columbia and because Plaintiffs' claims arise out of Defendants' conduct of business in the District of Columbia.  Fed. R. Civ. P. 4(k)(1); D.C. Code §§ 13-422, 13-423.

~~21.~~22.  Venue lies in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.  28 U.S.C. § 1391(b).

~~22.~~23.  Julia filed a timely charge with the EEOC on June 18, 2019.

~~23.~~24.  Mark filed a timely charge with the EEOC on June 19, 2019.

## FACTUAL ALLEGATIONS

I.   **Jones Day's Issues & Appeals Practice Group and Black-Box Compensation System**

A.   **The job of an associate in Jones Day's Issues & Appeals practice group**[4]

~~24.~~25.  The practice of law consists mainly of advising clients on how the law applies to their activities, drafting and negotiating legal documents like contracts and wills on behalf of clients, and helping clients who have disputes with other parties to resolve those disputes in court through litigation.

----

[4] ~~Consistent with the Court's admonition that "it is not the Court's role to fill gaps in a plaintiff's complaint based on its own experience outside the confines of the case," this added section assumes no special familiarity with "the practice of law."  Dkt. 47 at 21.~~

25.26.  Jones Day's main area of legal practice, at least as it relates to this case, is litigation, and the following allegations address attorneys who work mainly in that area.

26.27.  The concept of litigation can be divided into "the facts" and "the law."  A party who brings a lawsuit must convince the court both that certain facts are true and that those facts amount to a violation of a law.  For example, a plaintiff who claims that his boss fired him for being gay must convince the court both that the boss in fact fired him for that reason and that the law prohibits employment discrimination based on sexual orientation.  Therefore, each party to a lawsuit will, through its attorneys, advance a view of both the facts and the law.

27.28.  In theory, the factual disputes between the parties in a lawsuit are generally decided by a jury following trial.  While judges decide the facts in certain contexts, a judge's role in factual disputes is usually limited to overseeing the parties' fact-gathering efforts, ensuring that a genuine factual dispute exists, and refereeing the parties' presentations of the facts to the jury at trial.

28.29.  The job of an attorney with respect to factual disputes entails developing an overall view of the facts of the case, gathering facts through informal investigation (such as interviews of the client), gathering facts through formal discovery (such as depositions of witnesses), responding to the discovery efforts of other parties, and attempting to persuade the jury about the facts at trial.

29.30.  The legal disputes in a lawsuit are decided by judges, who (unlike jurors) are usually experienced attorneys.  The losing party to a dispute about the law can generally ask appeals court judges to reconsider the trial judge's decision, and the party that loses in the appeals court can ask the Supreme Court to reconsider the appeals court's decision.

30.31.  The job of an attorney with respect to legal disputes entails developing an overall view of the law relevant to the case, researching the law by reading statutes and judicial opinions, formulating arguments to persuade the court of the client's view of the law, expressing those legal

arguments in written briefs submitted to the court, and sometimes answering judges' questions about the legal arguments live at an oral argument.

~~31.~~32.   Many litigators devote substantial time to both factual and legal disputes, but some specialize in one or the other.

~~32.~~33.   Like many similar firms, Jones Day has a practice group made up of litigators who specialize in legal disputes and spend little or no time on the fact-related tasks described above.

~~33.~~34.   Such practice groups are generically referred to as appellate groups (or Supreme Court and appellate groups if they regularly practice in the Supreme Court).

~~34.~~35.   Despite that generic name, most "appellate" lawyers at large law firms also spend substantial time on legal disputes in trial-level courts such as the federal district courts.

~~35.~~36.   That makes sense, because the meaningful dividing line in litigation is between facts and law, not between trial courts (which do both) and appellate courts (which deal mostly with issues of law).  While legal disputes on appeal are often more complex and more important to the outcome of the case than are legal disputes in the district courts, many issues litigated in district courts are more complex and important than many litigated in appellate courts.   And, regardless of the court, litigating a legal question involves the same tasks and skills: researching law, formulating legal arguments, laying out the arguments in written briefs, and (at the court's option) delivering oral argument.

~~36.~~37.   Apparently in recognition of this reality, Jones Day calls its group of attorneys who specialize in legal disputes the "Issues & Appeals" group.  According to Jones Day's Issues & Appeals website, "appeals are only half of what we do.  We also work with trial teams to develop legal strategy, lead motions practice, and ensure a clean record for appeal."

37.38.  Like many similar firms, Jones Day classifies the great majority of its attorneys as either partners or associates.

38.39.  The core of the job of an associate in Jones Day's Issues & Appeals group is to analyze legal questions, develop legal arguments on disputed legal questions, and write briefs advancing those legal arguments.  While most of this work is done in the context of active litigation, Issues & Appeals associates sometimes advise on how courts could be expected to decide legal questions that have yet to come before them: According to the Issues & Appeals website, "We help clients solve difficult problems outside the courtroom and help them anticipate and mitigate legal risk."  Writing a memorandum analyzing a question of law is materially similar to litigating the same question.

39.40.  The vast majority of Plaintiffs' work during their time at Jones Day (and practically all of their work during the relevant time) consisted of the tasks described in the preceding paragraph.  For example, in 2017 and 2018, Julia was assigned to draft party briefs in two merits cases in the Supreme Court, brief and argue a case in the U.S. Court of Appeals for the D.C. Circuit, brief cases in the Third and Fifth Circuits, draft motions to dismiss and for summary judgment, and write a memorandum for a firm client, among other things.

40.41.  The vast majority of the work of the other associates in the Issues & Appeals group similarly consisted of the tasks described above.

41.42.  Issues & Appeals associates also help partners to prepare for oral arguments, such as by helping to anticipate questions that judges might ask and formulate answers to them. Associates themselves rarely argue cases for paying clients (especially in the federal appeals courts or Supreme Court), but they can take on pro bono appeals to gain argument experience.  Julia argued two appeals in the D.C. Circuit while she was a Jones Day associate, Mark argued one in

the Seventh Circuit, and both Julia and Mark helped partners prepare for oral arguments on multiple occasions, including for arguments before the Supreme Court.

42.43.   While Issues & Appeals associates specialize in litigating questions of law (as opposed to questions of fact), they generally do not heavily specialize in a single area of substantive law.   Instead, they are expected to be fast learners and generalists, like the judges to whom their briefs are directed.   For instance, Mark drafted briefs in areas including antitrust, ERISA, constitutional law, and federal criminal law, while Julia drafted briefs in areas including constitutional law, federal criminal law, consumer protection, and the Freedom of Information Act. And the Issues & Appeals associate who was most specialized during Plaintiffs' time at Jones Day—a former Supreme Court clerk who specialized in bankruptcy law—is now representing Defendants in this employment discrimination case.   That said, as a result of Jones Day's business model, Issues & Appeals associates rarely work in areas of law such as personal injury, divorce, and child custody.

43.44.   Issues & Appeals associates are expected to be the very best that Jones Day has to offer to its clients, at least with respect to questions of law rather than fact.

44.45.   In practice, Issues & Appeals associates are required to have judicial clerkship experience on an appellate court or, more commonly, at the Supreme Court.   Indeed, in hiring Issues & Appeals associates, Jones Day's leadership prizes one criterion far above all others: service as a law clerk at the Supreme Court.   Jones Day pays the Supreme Court clerks that it hires high salaries along with a hiring bonus that was $300,000 when Julia joined the firm in 2014 and has now risen to at least $400,000.   On information and belief, except in a handful of cases involving extraordinary circumstances, all Supreme Court clerks who apply to be an Issues & Appeals associate are given offers.   And, on information and belief, except for a handful of

candidates, all lawyers who have not clerked on the Supreme Court and who apply to be an Issues & Appeals associate are denied admission to the group.

45.46.  The overwhelming majority of Issues & Appeals associates that Jones Day has hired since at least 2014 (when Julia was hired) have been Supreme Court clerks.

46.47.  The minority of Issues & Appeals associates who did not clerk at the Supreme Court had strong academic records and clerked for federal appeals court judges.

47.48.  With the possible exception of the minority who did not clerk at the Supreme Court, Issues & Appeals associates of a given level of seniority (measured in years since law school graduation) perform jobs the performance of which requires equal skill, effort, and responsibility, and that are performed under similar working conditions.

48.49.  Even associates of substantially different levels of seniority have substantially the same job.  For example, Mark worked on one very large case with an associate two years junior to him and another three years senior to him—a range of five years, which would be considered very significant in nearly any other law firm context—but tasks were assigned among them with no apparent regard for seniority, and none acted as a supervisor for or had more accountability than any other.  And Heifetz often parceled out assignments by emailing associates of widely differing levels of seniority to ask whether any was available to take on the assignment.

49.50.  Indeed, all Issues & Appeals associates have the same official title (Associate) and practice group (Issues & Appeals), confirming that Jones Day views them as holding the same job.

50.51.  Issues & Appeals associates receive assignments in two ways.  Frequently, another Jones Day partner goes to the head of Issues & Appeals (who is now Traci Lovitt but was Heifetz at the relevant times) and asks her if she can find an Issues & Appeals associate to handle a task that the partner believes would be best handled by an Issues & Appeals associate.  If she agrees

that the task is appropriate for an Issues & Appeals associate, the head of Issues & Appeals then asks one or more associates if they are able to take on the assignment.  At other times, a partner (either in Issues & Appeals or in another group) connects directly with an Issues & Appeals associate.  Plaintiffs received assignments through both channels.  Neither channel systematically leads to work requiring more skill, effort, or responsibility than the other.

51.52.  Jones Day imposes no formal or informal "tracking" or other distinction among Issues & Appeals associates for purposes of determining the work that they are required to do.  For example, Jones Day does not systematically assign some Issues & Appeals associates to only trial-level work while giving others exclusively Supreme Court work.  Supreme Court clerks are prohibited under ethics rules from working on cases in the Supreme Court for two years after the ends of the clerkships, but, beyond that point, Jones Day generally offers such associates a substantially equal mix of Supreme Court, appellate, and trial-level work.  The particular mix that an associate in fact takes on depends on chance and on his or her interests and relationships with particular partners, not on any top-down segregation of Issues & Appeals associates into different lines of work (e.g., "Supreme-Court-brief associates" vs. "motion-to-dismiss associates").

52.53.  This is not to say that all Issues & Appeals associates are in fact equally skilled, or that any given partner views them all as equally skilled.  But any such differences are merely commonplace differences in the abilities (or perceived abilities) of workers having the same job—not indications that they actually have different jobs.

53.54.  Consistent with the high level of skill that Jones Day perceives them to have, Issues & Appeals associates are assigned those legal tasks whose combination of complexity and importance to the case or client (or, with respect to Supreme Court cases, to the firm's reputation) calls for the most skilled associates.

54.55.  Because legal tasks are assigned to Issues & Appeals associates (rather than other Jones Day associates) *because of* the high degree of skill they require, in light of their high degree of complexity or importance, those tasks require substantially equal skill.

55.56.  Thus, while it may be true that (for example) motions to dismiss tort claims generally require less skill than merits cases in the Supreme Court, Jones Day's decision to give an assignment of the former type to an Issues & Appeals associate reflects its judgment that that *particular* motion to dismiss *does* call for substantially the same degree of legal skill as a Supreme Court case.

56.57.  As one illustration, Jones Day assigned at least four Issues & Appeals partners who clerked at the Supreme Court to handle the questions of law in this case and in the *Tolton* putative class action.

57.58.  In any event, like most Issues & Appeals associates, Plaintiffs were assigned a significant amount of Supreme Court work.  Julia worked at Jones Day for just about two years beyond the end of her two-year Supreme Court bar period in August 2016, and during that time she was assigned to draft party briefs in two merits cases in the Supreme Court (in 2017 and 2018). Mark worked at Jones Day for just under two years, during which he was assigned to draft party briefs in one merits case (in 2018), two petitions for certiorari (though he was fired before he could draft the second), and two briefs in opposition to petitions for certiorari.

58.59.  Although some Issues & Appeals associates log more hours than others within a given year (and a given associate logs more hours in some years than others), they do not have different jobs requiring different numbers of hours per year (or pages written per year or cases handled per year or any other metric).  Jones Day does not require some Issues & Appeals associates to work more than others.

59.60.  Jones Day does appear to expect associates in other practice groups to work much more than Issues & Appeals associates.  For instance, it recently told the Court that "[f]ive of the 18" male Jones Day associates who "work[ed] fewer hours" than one of the *Tolton* plaintiffs "were former Supreme Court clerks in the Washington Office."  *Tolton* Dkt. 169 at 19.

60.61.  To the extent that one can compare the amount of "effort" than an hour of legal work on one project versus another project requires, Issues & Appeals associates are required to exert substantially equal effort.  The work of an Issues & Appeals associate requires practically no physical effort.  The mental "effort" required is subjective and probably says more about the person performing the task than the task itself.  Yet to the extent that some assignments could be deemed to require more mental effort than others—for instance, because they involve novel issues requiring creative thought rather than routine issues requiring rote repetition—Jones Day offers Issues & Appeals associates substantially equal mixes of higher- and lower-effort work, with most of that work being on the higher-effort, "novel issues" end of the spectrum.  Thus, Issues & Appeals associates hold jobs requiring substantially equal effort.

61.62.  Issues & Appeals associates of a similar level of seniority have jobs requiring equal responsibility.  To the extent that cases that are more important or complex require greater responsibility, differences in responsibility average out because Jones Day does not systematically give some such associates more important or complex cases than it gives to others.  In any event, almost all of the matters that Plaintiffs handled were important or complex, with an individual's liberty, a large amount of money, or Jones Day's reputation for Supreme Court advocacy at stake.

62.63.  Issues & Appeals associates, including Plaintiffs, generally research the law and draft briefs (or portions of briefs) themselves rather than directing or revising the work of others,

though they sometimes supervise more junior associates' work.  Jones Day does not systematically assign some Issues & Appeals associates of similar seniority to more supervisory roles than others.

63.64.  Issues & Appeals associates are nearly always supervised by partners.  While some partners supervise associates more closely than others, Jones Day does not systematically assign Issues & Appeals associates to work with more or less involved supervisors, and any such differences among supervisors generally ~~averages~~average out over time.  The work of Issues & Appeals associates of similar seniority requires roughly equal accountability.

64.65.  All Issues & Appeals associates have materially identical working conditions.  Each has his or her own office with heating and air conditioning, and each performs virtually all of his or her work in that office except to the extent that he or she chooses to work from home.  A given associate's selection of his or her office from among those allocated to Issues & Appeals associates is based on tenure with the firm, but none is much better or worse than any other.  Each associate has access to office furnishings such as desks, office chairs, armchairs, and sofas, and has discretion to arrange a comfortable workspace.  Issues & Appeals associates rarely travel and are rarely (perhaps never) required to remain away from home for an extended period.  Because most of their assignments are longer-term and because they work with a high degree of autonomy, Issues & Appeals associates generally have broad flexibility in when to do their work within the day (and within the week).  They receive four weeks of vacation each year and are generally able, if they wish, to take the vacation without much interference from work.

65.66.  On information and belief, Jones Day generally pays Issues & Appeals associates who clerked at the Supreme Court in lockstep, with pay determined by seniority (and, in certain cases, geographical location) and not by any supposed differences in what is required of them,

further confirming that such associates have jobs requiring substantially equal skill, effort, and responsibility.

66.67.  Before July 2017, Jones Day paid the same salary to Julia and the five other Issues & Appeals associates in the D.C. office who also clerked at the Supreme Court and graduated from law school in 2010.

67.68.  On information and belief, as of July 1, 2016, Jones Day paid Julia and other Issues & Appeals associates who had clerked at the Supreme Court and graduated from law school in the same year she did higher salaries than it paid any other associates who graduated from law school that year.

68.69.  On information and belief, as of January 1, 2019, Jones Day paid no other associate who graduated from law school the same year as Mark a higher salary than it paid Mark.

70.  In other words, just prior to Mark's termination, his $500,000 salary had him tied for highest-paid associate in the Class of 2011 at Jones Day.

**B.    Jones Day's black-box compensation system enables discrimination**

69.71.  Jones Day states that its "associate evaluations and compensation adjustments [are] based upon the subjective quality of each person's overall contribution."[5]

70.72.  During the first half of each year, Jones Day ostensibly determines "the subjective quality of each person's overall contribution" during the previous year, which is used to set his or her salary through Jones Day's "black-box" compensation system.

71.73.  First, the partners with whom the associate worked during the previous year write evaluations of the associate's performance.

---

[5] https://www.jonesday.com/principlesandvalues/associates/ (as of July 5, 2019).

72.74.  Then, the Jones Day partnership writes a "consensus statement" for each associate that ostensibly reflects those performance evaluations.

73.75.  Finally, Brogan approves each associate's salary, which ostensibly is based on the associate's consensus statement.  The new salary takes effect in July.

74.76.  Associates are not provided with copies of their evaluations or consensus statements.

75.77.  Jones Day prohibits associates from discussing their salaries with one another or with anyone else.

76.78.  The purpose of Jones Day's salary confidentiality policy is to enable Jones Day to pay some attorneys less than others while keeping the lower-paid attorneys unaware of the disparate treatment.

77.79.  In short, whereas most peer law firms set associate pay based on objective criteria, Brogan sets widely varying salaries for attorneys of the same class year through a secretive process based on subjective evaluations.

78.80.  Because Jones Day prevents associates from learning whether they are being paid as well as similarly situated coworkers, this black-box compensation method enables discrimination by both the managing partner who sets the salaries and the individual partners whose evaluations feed into the consensus statements used to set the salaries.

## II.   Before He Opposed Sex Discrimination, Mark Had a Bright Future at Jones Day

79.81.  Before he challenged Jones Day's discriminatory parental leave policy, Mark had a successful career and a bright future there.

80.82.   Mark graduated *magna cum laude* from Harvard Law School, where he was an Articles Editor on the Harvard Law Review.  Following law school, Mark served as a law clerk at a federal court of appeals, a federal district court, and the Supreme Court of the United States.

81.83.   In 2017, Jones Day offered Mark a position as an Issues & Appeals associate with a starting salary of $375,000 and a $350,000 Supreme Court clerkship bonus.

82.84.   The offer confirmed that Mark would be "considered a member of the Class of 2011" (the year in which he finished law school), making him eligible for partner in 2020.

83.85.   Like many other Supreme Court clerks who join Jones Day's Issues & Appeals group, Mark was enticed by Jones Day's offer of an above-market salary, a hefty signing bonus, interesting work, substantially lower billable hours expectations than peer firms, and virtual certainty that he would make partner if he so desired.

84.86.   Mark began work at Jones Day in May 2017.

85.87.   In July 2017, Mark's salary was raised to $405,000.

86.88.   Mark's 2017 performance was evaluated during the first half of 2018.

87.89.   During his performance review meeting, Heifetz read to Mark, word-for-word, each of his performance evaluations and his consensus statement.

88.90.   Mark's performance evaluations and consensus statement were very positive, reflecting his excellent performance for numerous partners across a range of cases.

89.91.   Consistent with these rave reviews, Brogan approved a $95,000 raise, increasing Mark's salary to $500,000 effective July 2018.

90.92.   With the exception of a formal evaluation from one partner, Mark's 2018 performance was ~~never~~not formally evaluated because he was fired in January 2019, before ~~the evaluation process unfolded~~other partners submitted formal evaluations.

91.93.  Based on feedback from partners, Mark's 2018 performance was consistent with his excellent 2017 performance.

92.94.  Jones Day does not impose any billable hours requirement on its associates.

93.95.  Yet Mark worked more than 1900 hours in 2018, demonstrating his commitment to Jones Day and its clients.

94.96.  Mark did so even though a number of Issues & Appeals associates have been promoted or given large raises after working substantially fewer hours, and even though Heifetz instructs Issues & Appeals associates meeting with Supreme Court clerks who interview with Jones Day to tout the firm's superior work-life balance as compared to peer firms.

95.97.  In one telling indication of the esteem in which Mark was held before he challenged Jones Day's parental leave policy, Heifetz entrusted him in mid-2018 with taking the lead in briefing a case in the Supreme Court of the United States.

96.98.  While Issues & Appeals associates frequently draft Supreme Court briefs under the supervision of Jones Day partners, this request was out of the ordinary: Heifetz explained that the partner on this case did not have her confidence, that she had suggested to Jones Day leadership that the case be taken away from him, and that she needed an associate who could ensure the quality of the firm's Supreme Court filings.

97.99.  Mark led the briefing, and the Supreme Court issued a very favorable ruling for Jones Day's client.

98.100.      If not for his challenge to Jones Day's parental leave policy, Mark would likely have received a six-figure raise effective in July 2019.

99.101.        Consistent with his excellent performance, Mark would have been promoted to partner in 2020—just like every Supreme Court clerk since at least 2014 who has remained at Jones Day until becoming eligible for promotion to partner.

### III.    Julia Faced Sex Discrimination at Jones Day

100.102.       Julia graduated *magna cum laude* from New York University School of Law, where she was an Articles Editor on the New York University Law Review.  Julia then served as a law clerk at a federal court of appeals, a federal district court, and the Supreme Court of the United States.

101.103.       Julia joined Jones Day in October 2014.

### A.    Jones Day doctored Julia's photograph to make her more "attractive"

102.104.       Soon after Julia began work, she encountered sexism at Jones Day.

103.105.       After her photograph was taken for Jones Day's website, Julia, who is biracial, noticed that Jones Day had doctored the photograph.

104.106.       The photograph was edited to lighten Julia's skin and narrow her nose.

105.107.       The apparent purpose of the alterations was to make Julia appear more Caucasian and (in the opinion of the editor) more attractive.

106.108.       The photograph on the left is the original version, and the one on the right is the doctored version:



107.109.    On information and belief, Jones Day also doctored the photographs of at least two of Julia's female friends at the firm.

108.110.    On information and belief, Jones Day does not edit the photographs of its male employees to make them appear more Caucasian or more attractive.

109.111.    Jones Day's doctoring of Julia's photograph reflects the archaic gender norms discussed throughout this Complaint.

**B.    Jones Day discriminated against Julia in setting her salary**

110.112.    The impact of Julia's gender on her treatment by Jones Day was not limited to objectification.  It also had an economic impact.

111.113.    In three of her four years at Jones Day, Julia received substantial raises following the annual review process.

112.114.    After her first annual evaluation, her salary was raised from $300,000 to $360,000.

113.115.    After her second annual evaluation, her salary was raised to $425,000.

114.116.    However, in Julia's third year at Jones Day, she was assigned to work with a partner in another practice group, Partner A, to draft a memorandum for a Jones Day client.

115.117.    In discussing the matter with Julia, Heifetz warned that Partner A is a "terrible writer."

116.118.    Partner A's manner toward Julia was different from the manner he adopts toward similarly situated male associates.  While Partner A adopts a fraternal and ingratiating demeanor with male associates, he was patronizing toward Julia.

117.119.    Julia wrote an initial draft of the memorandum, and Partner A edited it.

118.120.    Upon reviewing Partner A's edits, Julia found that some of the edits rendered the memorandum misleading or unclear.

119.121.    Unsure of how to respond but mindful of her obligation to Jones Day's client, Julia consulted a well-respected male attorney in the Issues & Appeals group who had worked with Partner A in the past.

120.122.    That male attorney advised Julia to speak up about the problems introduced by Partner A's edits and try to improve the memorandum.

121.123.    Julia followed his advice, suggesting further edits and explaining to Partner A why she believed that he should not implement all of his edits.

122.124.    In response, Partner A sent Julia an email scolding her for second-guessing his edits.  According to Partner A, it was inappropriate for Julia to suggest that his work could be improved or clarified; her role was simply to defer to him.

123.125.     Julia has not received similar reactions from other male supervisors to whom she has suggested revisions, including other partners, two federal judges, and a Justice of the Supreme Court of the United States.

124.126.     The male attorney whom Julia had consulted told her that he was surprised by Partner A's reaction and apologized for giving Julia what had turned out to be bad advice for her.

125.127.     Other attorneys with whom Julia shared Partner A's email were shocked by its content and harshly critical tone.

126.128.     In contrast to Julia's experience, Partner A is deferential to male associates who are similar to Julia aside from their sex (that is, former Supreme Court clerks in the Issues & Appeals group).  He does not demand or expect deference from such male associates.

127.129.     Indeed, Partner A has stopped by the male Issues & Appeals associates' table in the Jones Day cafeteria to make self-deprecating remarks to the effect that the male associates are more intelligent than Partner A.

128.130.     When Mark was assigned to work on a brief for Partner A, Partner A deferred to Mark on both substance and style.

129.131.     But because Julia is a woman, Partner A wrote her a disingenuous, severely negative performance evaluation for being insufficiently deferential to him.

130.132.     The evaluation unfairly criticized Julia's work and her dedication to the project.

131.133.     If a male Issues & Appeals associate had performed as Julia did, Partner A would not have scolded him or written a negative review; to the contrary, he would have written a positive review.

132.134.     Partner A's negative evaluation influenced Julia's consensus statement for her 2016 work.

133.135.     Julia's 2017 raise, which was based on that consensus statement, was $15,000—less than a fifthfourth of her raise the previous year—resulting in a salary of $440,000.

134.136.     But for Partner A's negative evaluation, Julia's raise would have been larger than $15,000.

135.137.     On information and belief, Julia's raise was smaller than the raises received by male associates in the Issues & Appeals group the same year.

136.138.     Julia did not work with Partner A during her fourth year at Jones Day.

137.139.     After her fourth and final annual evaluation, Julia received an $85,000 raise, leaving her with a salary of $525,000.

138.140.     Julia continued to feel the effects of Partner A's discriminatory evaluation throughout the rest of her time at Jones Day.

139.141.     Julia's 2018 salary was lower than it would have been if not for her smaller 2017 raise, and, on information and belief, it was below the salaries of male Issues & Appeals associates whose salaries had been the same as Julia's prior to 2017.

**C.     Sexism at Jones Day extends to the topic of parental leave**

140.142.     Julia also encountered sexism at Jones Day concerning the issue of parental leave.

141.143.     On at least one occasion when Julia was present, Partner B—one of Jones Day's most prominent partners—asked rhetorically: What would a man do on parental leave—watch his wife unload the dishwasher?

142.144.     Partner B also needled a male associate on one of his cases for taking leave to care for a new child.

143.145.     Another attorney has referred to Partner B as a "walking Title VII violation."

144.146.     Heifetz was well aware of Partner B's penchant for expressing such views.

145.147.     When Julia was slated to be the sole woman at a recruiting dinner for Supreme Court clerks that Partner B was hosting on behalf of the Issues & Appeals group, Heifetz told Julia that she should correct Partner B if he "misstated" Jones Day's policy or attitude on parental leave.

146.148.     On information and belief, Heifetz did not tell the male associates attending the dinner that their role was to contradict Partner B's statements concerning parental leave.

147.149.     Reflecting the same attitudes displayed by Partner B, Jones Day's human resources staff presume that male associates who request parental leave are secondary caregivers and scrutinize their requests to be treated as primary caregivers.

**IV.   Jones Day's Parental Leave Policy Discriminates on the Basis of Sex**

148.150.     Jones Day's parental leave policy imposes sexist stereotypes and archaic gender roles.

149.     The policy for associates is appended to this Complaint.

150.151.     The policy for primary caregivers provides "18 weeks of paid leave" for biological mothers, but only "ten weeks of paid leave" for biological fathers.

151.152.     By contrast, many peer law firms offer 18 weeks of paid leave to all primary caregivers on a gender-neutral basis.

152.153.    Jones Day also grants adoptive parents who are primary caregivers "18 weeks of paid leave," making biological fathers the only parents who do not receive 18 weeks of paid leave when they act as primary caregivers.

153.154.    Primary caregivers of either sex may also take an additional six weeks of unpaid leave with Jones Day's approval.   On information and belief, Jones Day looks more favorably upon such requests when they come from female employees.

154.155.    Jones Day labels the additional eight weeks of leave given to biological mothers but not biological fathers "disability leave."

155.156.    But that is just a label.

156.157.    The reality is that Jones Day provides "the eight weeks" of "disability leave," and (for primary caregivers) a total of "18 weeks of paid leave," to all biological mothers without regard for how long they are disabled from performing legal work.

157.158.    In line with this policy, pregnant female associates can arrange to take 18 weeks of paid leave even before they give birth and thus before they know how long they will be disabled from performing legal work.

158.159.    Jones Day also advertises its parental leave policy to prospective employees as allotting 18 weeks of paid leave to mothers and 10 weeks of paid leave to fathers, omitting mention of any requirement that mothers be disabled.

159.160.    For instance, Heifetz instructed Julia to tell Supreme Court clerks interviewing with Jones Day that the firm provides 18 weeks of paid leave to mothers and 10 weeks of paid leave to fathers, without further elaboration.

160.161.    Jones Day's Director of Human Resources acknowledged to Julia that Jones Day provides the full eight weeks of "disability leave" to all biological mothers without regard to disability.

161.162.    Moreover, adoptive mothers are not disabled as a result of childbirth, yet Jones Day gives adoptive primary caregivers the same 18 weeks of paid leave that biological mothers receive, further confirming that Jones Day's policy is to give every female associate who is a primary caregiver 18 weeks of paid parental leave regardless of disability.

162.163.    While some mothers are disabled from performing legal work for eight weeks after childbirth, many others are not.

163.164.    Indeed, within eight weeks of giving birth—during the period in which Jones Day deems all women disabled from performing legal work—Julia argued a case in the U.S. Court of Appeals for the D.C. Circuit, a more physically demanding task than the office work that Jones Day associates typically perform.

164.165.    Serving as the primary caregiver during the first eight weeks after a new baby's birth is also more physically demanding than performing office work as a Jones Day associate.

165.166.    Jones Day's discriminatory policy gives mothers more time to care for and bond with their babies than fathers receive.

166.167.    Jones Day's discriminatory policy gives female associates more time to enable their husbands to prioritize their careers over childcare than it gives to male associates to enable their wives to prioritize their careers over childcare.

167.168.    Jones Day's discriminatory policy thus reflects and reinforces archaic gender roles and sex-based stereotypes: men are breadwinners and women are caretakers.

168.169.     The premise underlying Jones Day's policy—that all women should be deemed physically disabled from performing legal work for a full eight weeks after giving birth—also reflects and reinforces the demeaning stereotype that women need special protection and reduced expectations from male-dominated institutions like Jones Day.

169.170.     Jones Day's discriminatory policy hurts women by encouraging discrimination against them.

170.171.     In enacting the Family and Medical Leave Act—which entitles both mothers and fathers to 12 weeks of leave to care for a newborn child—Congress determined that "denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second." *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 736 (2003).

171.172.     Jones Day litigated an unsuccessful constitutional challenge to the Family and Medical Leave Act.

172.173.     When it rejected Jones Day's challenge, the Supreme Court added:

> Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave. These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees.

*Id.*

173.174.     In short, when it comes to family leave, "standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees … of that gender." 29 U.S.C. § 2601(a)(6).

174.175.    On information and belief, this fear is realized at Jones Day, where mothers claim to have faced discrimination from partners who doubt their commitment to the firm because they are seen as domestic caretakers, while fathers are viewed as reliable hard workers who will not be burdened with domestic caretaking responsibilities because their wives will perform those tasks.

175.176.    Moreover, because the parent who performs most caretaking responsibilities for a baby often becomes the default primary caretaker going forward, parental leave policies that position women as caretakers and men as breadwinners perpetuate stereotypical gender roles according to which women are responsible for the bulk of domestic duties, whether or not they also work outside the home.

176.177.    Plaintiffs believe that generous parental leave is desirable as a means of ensuring that new children are well cared for and creating time for parent-child bonding.

177.178.    Plaintiffs also believe that employees who are disabled from working should receive disability leave for as long as they are disabled.

178.179.    But there is no legitimate basis for giving new mothers more time than new fathers to care for and bond with their children, nor for giving the husbands of female associates more time to focus on their own careers than the wives of male associates receive, nor for giving sex-based disability leave to employees who are not disabled.

179.180.    Jones Day's discriminatory policy hurts families—like Julia and Mark's family—that seek to adopt an equal distribution of parental responsibilities, parental bonding, and career opportunities.

**V.    Julia and Mark Challenged Jones Day's Discriminatory Parental Leave Policy, and Defendants Retaliated by Firing Mark**

180.181.    In 2018, Julia and Mark learned that they were expecting their first child.

181.182.    Also in 2018, Julia decided to leave Jones Day to serve as an appellate public defender.

182.183.    In opposition to the stereotypes imposed by Jones Day's parental leave policy, Julia and Mark planned to share equally in the responsibilities of parenthood while also remaining equally dedicated to their careers.

183.184.    Julia and Mark requested that Jones Day treat their family equally by giving Mark the same amount of parental leave as it would give to a female associate.

184.185.    During her second-to-last week at Jones Day, Julia emailed Heifetz:

> I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total [including six weeks of unpaid leave]) while it gives men 10 weeks of paid leave (and 16 weeks total). Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled. Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled. That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory. I don't object that the firm is socially conservative as a general matter, or that its selection of cases promotes those values, but in this case I think it goes too far in imposing those values on its employees.

> For me, since Mark will be the primary caregiver, this will have a pretty big impact on my life, because I'll end up staying out of work for the extra eight weeks that Mark cannot. For career reasons, I'd rather not do that. I would guess that the effects of the policy are similar for other women. Is there anything that I can do here? Would the firm treat Mark equally to female primary caregivers and grant him 18 weeks paid and 24 weeks total leave?

> I'd be happy to discuss further. Thanks very much.

185.186.    Heifetz responded: "I have passed this along to [Jones Day's Human Resources Director] who will get back to you next week."

186.187.      The next week, the Human Resources Director called Julia and informed her that Jones Day was rejecting her request for equal treatment.

187.188.      During the call, the Human Resources Director acknowledged that Jones Day's policy is to grant all new mothers 18 weeks of paid leave regardless of how long they are actually disabled.

188.189.      Fearing that Jones Day might retaliate, Mark emailed the following to the Human Resources Director and Heifetz:

> Julia let me know that you decided to reject our request that Jones Day amend its discriminatory parental leave policy.  Thank you for your consideration.
>
> Needless to say, I oppose your practice, which is made illegal by Title VII.  You may know that it is also illegal to retaliate against an employee who opposes discrimination.

189.190.      The Human Resources Director responded by providing legal citations that Jones Day ostensibly relied on in rejecting Julia's request.

190.191.      On January 16, 2019, shortly after their son was born, Julia and Mark sent the following email to the Human Resources Director and Heifetz:

> We have closely reviewed the case law, including the two cases you rely on. We have also discussed the matter with other competent attorneys. Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.
>
> Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S.Ct. 1338, 1351-52 (2015).
>
> Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or

else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win.

I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation. We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman. As you know, Title VII prohibits retaliation for opposition to sex discrimination.

191.192.      Julia and Mark sent this email in good faith.

192.193.      Heifetz and the Human Resources Director did not respond.

193.194.      Three business days later, on January 22, 2019, Jones Day fired Mark.

194.195.      Jones Day fired Mark without warning or explanation by emailing him the

following letter:

Please be advised that effective 5:00 p.m. today, January 22, 2019, your at-will employment as an associate with Jones Day is terminated.

We will return any personal belongings that are in your office to you at your home address as soon as practicable.  Please return all Firm property that is in your possession immediately.

Enclosed is the Firm's check in the sum of $2,655.65 in full payment for the earnings due to you for the period from January 16 to January 22.

Please direct any questions regarding employment benefits to Human Resources Manager, Saundra Madyun at 202-879-3921.

195.196.      Minutes after the termination email was sent, as Julia and Mark cradled their

newborn son and absorbed the news that Mark was now unemployed, a Jones Day representative

knocked on their door and delivered the same letter by hand.

196.197.     Jones Day's termination letter is the only response to the January 16 email that Julia and Mark ever received.

197.198.     Jones Day fired Mark because of the January 16 email's challenge to its parental leave policy.

198.199.     On information and belief, the final decision to fire Mark was made by Brogan, who (according to Jones Day's own website as of the time Mark was fired) wields ultimate authority "to make all management decisions"[6] and "is the final decision-maker on virtually every matter of significance for the Firm."[7]

199.200.     Mark was on leave from the day his son was born until he was terminated.

200.201.     As Defendants anticipated, Mark's sudden termination was shocking and psychologically harmful to Julia and Mark.

201.202.     As Defendants further anticipated, Mark's sudden termination was also harmful to Julia and Mark's two-week-old son, as a result of its psychological effects on his caretakers.

## VI.   Defendants Continued To Retaliate Even After Firing Mark

202.203.     Defendants' retaliation against Julia and Mark did not end when they fired Mark.

203.204.     Mindful of the need to convince prospective employers that his termination from Jones Day was not based on his performance, Mark emailed three well-connected partners he had worked with—Partner C, Partner D, and Partner E—to request that they serve as employment references for him.

---

[6]  https://www.jonesday.com/principlesandvalues/firmhistory/managingpartnersystem/ (as of July 5, 2019).

[7]  https://www.jonesday.com/principlesandvalues/clientservices/ (as of July 5, 2019).

204.205.    Partner C immediately responded: "I have been out this week and was not aware you'd left.  Gosh!  I would be very happy to serve as a reference, of course.  Just let me know how I can help."

205.206.    Unfortunately, Heifetz caught wind of Mark's reference requests and worked quickly to prevent him from obtaining references that would help him get a new job.

206.207.    She reached out to Partner C, Partner D, and Partner E and asserted that Jones Day policy prohibited them from providing a reference for Mark.

207.208.    That is not Jones Day's true policy.

208.209.    Rather, Jones Day lawyers routinely provide references for outgoing and former Jones Day employees who seek other positions.

209.210.    Heifetz was well aware that this is Jones Day's true policy.

210.211.    Indeed, Heifetz had previously given Julia express authorization to write a letter of recommendation for an outgoing Jones Day employee who was applying to law school.

211.212.    In a separate incident, Heifetz again expressly authorized Julia to write a reference letter recommending a former Jones Day employee to a prospective employer.

212.213.    On information and belief, in other instances Heifetz has learned that Jones Day attorneys were serving or intended to serve as references for other current or former Jones Day employees but has not acted to prevent them from doing so.

213.214.    On information and belief, Heifetz has herself served as a reference for outgoing or former Jones Day employees.

214.215.    Heifetz went out of her way to prevent partners from providing references for Mark—contrary to her prior practice—because Julia and Mark had challenged Jones Day's parental leave policy.

215.216.    After Heifetz' interference, Mark received the following by email from Partner D:

> Jones Day's policy is not to provide substantive recommendations, and only to confirm dates of employment.  Despite that, I (and only I) have been authorized to speak with potential employers and to provide a reference by phone.  I will be able to speak only about the work we did together; I won't be able to answer any other questions.

216.217.    Partner D's email confirms that Jones Day's true policy actually is to "provide substantive recommendations" whenever Jones Day chooses to do so.

217.218.    On information and belief, the individuals who authorized only Partner D to speak to prospective employers were Brogan and/or Heifetz.

218.219.    Defendants sabotaged Mark's job search by allowing him only a single reference, who would be forbidden from either discussing Mark's reputation among other lawyers at Jones Day or answering the key question of whether Mark's departure from Jones Day was performance-based.

219.220.    Defendants did not choose Partner D because he had the most experience with Mark's work.

220.221.    To the contrary, both Partner C and Partner E have done more (and more recent) work with Mark than has Partner D.

221.222.    But, on information and belief, Defendants did not trust Partner C or Partner E to support their illegal decision to fire Mark.

222.223.    Partner D was a Jones Day insider and Heifetz' heir apparent for leadership of the Issues & Appeals group.

223.224.    Partner C and Partner E recently joined Jones Day from the Obama Administration.

224.225.    Defendants' decision to deviate from Jones Day's ordinary practice by authorizing only Partner D to provide a reference for Mark and by limiting the topics that he could address was further retaliation for Julia and Mark's challenge to Jones Day's parental leave policy.

225.226.    Mark's attempts to find a new job were gravely impeded by the absence of the strong references from well-connected partners that he would have received but for Defendants' retaliation.

226.227.    As a result of the unlawful retaliation recounted above, Julia and Mark have suffered and will continue to suffer psychological harm and economic loss.

**SEX DISCRIMINATION: PARENTAL LEAVE (COUNTS I-III)**

**COUNT I**
**SEX DISCRIMINATION IN VIOLATION OF TITLE VII**
**OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e** *et seq.*
**(on behalf of Julia and Mark against Jones Day)**

227.228.     Plaintiffs re-allege and incorporate every allegation in this Complaint.

228.229.     Jones Day's parental leave policy discriminates on the basis of sex by giving eight more weeks to female as compared to male associates to care for and bond with their new children.

229.230.     Jones Day's parental leave policy imposes and reinforces harmful stereotypes and archaic gender roles.

230.231.     As a result of Jones Day's discriminatory policy, Mark has suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, and psychological harm.

231.232.     As a result of Jones Day's discriminatory policy, Julia had to take a longer period of parental leave from her own job than the husband of a female Jones Day employee would have had to take from his job, and she has suffered and continues to suffer harm, including but not limited to financial loss and psychological harm.

232.233.     Julia and Mark are entitled to all remedies available for violations of Title VII.

## <u>COUNT II</u>
## SEX DISCRIMINATION IN VIOLATION OF THE EQUAL PAY ACT OF 1963,
## 29 U.S.C. § 206(d)
## (on behalf of Mark against Jones Day)

233.234.    Plaintiffs re-allege and incorporate every allegation in this Complaint.

234.235.    Jones Day pays women who are primary caregivers for 18 weeks of leave, but pays men who are primary caregivers for only ten weeks of leave.

235.236.    Jones Day denied Mark the amount of paid leave provided to female Issues & Appeals associates of the same level of seniority in the D.C. office, even though those associates perform work which requires equal skill, effort, and responsibility, and which is performed under similar working conditions.

236.237.    Jones Day's denial of equal paid leave to Mark violated the Equal Pay Act.

237.238.    Mark is entitled to all remedies available for violations of the Equal Pay Act.

## COUNT III
## SEX DISCRIMINATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
### D.C. Code § 2-1401 *et seq.*
### (on behalf of Julia and Mark against Jones Day)

238.239.    Plaintiffs re-allege and incorporate every allegation in this Complaint.

239.240.    Jones Day's parental leave policy discriminates on the basis of sex by giving eight more weeks to female as compared to male associates to care for and bond with their new children.

240.241.    Jones Day's parental leave policy imposes and reinforces harmful stereotypes and archaic gender roles.

241.242.    As a result of Jones Day's discriminatory policy, Mark has suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, and psychological harm.

242.243.    As a result of Jones Day's discriminatory policy, Julia ~~had to take a longer period of parental leave from her own job than the husband of a female Jones Day employee would have had to take from his job, and she~~ has suffered and continues to suffer harm, including but not limited to financial loss and psychological harm.

243.244.    Julia and Mark are entitled to all remedies available for violations of the Human Rights Act.

**SEX DISCRIMINATION: JULIA'S SALARY (COUNTS IV-VI)**

**COUNT IV**
**SEX DISCRIMINATION IN VIOLATION OF TITLE VII**
**OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.***
**(on behalf of Julia against Jones Day)**

244.245.    Plaintiffs re-allege and incorporate every allegation in this Complaint.

245.246.    Jones Day paid Julia less than she would otherwise have received because Partner A wrote her a negative performance evaluation because she is a woman.

246.247.    Jones Day thereby discriminated against Julia with respect to her compensation because of her sex.

247.248.    Jones Day discriminated against Julia with respect to the terms of her employment by intentionally maintaining uniform, firm-wide policies and procedures that had a disparate impact on her because of her sex.

248.249.    Jones Day's black-box compensation system—including its reliance on highly subjective evaluations by the firm's heavily male partnership and its prohibition on associates disclosing their salaries to one another—enables and conceals sex discrimination.

249.250.    Julia experienced such discrimination when Jones Day paid her less because Partner A wrote her a negative performance evaluation because she is a woman.

250.251.    As a result of Jones Day's discrimination, Julia has suffered and continues to suffer harm, including but not limited to financial loss, humiliation, and psychological harm.

251.252.    Julia is entitled to all remedies available for violations of Title VII.

## COUNT V
## SEX DISCRIMINATION IN VIOLATION OF THE EQUAL PAY ACT OF 1963,
## 29 U.S.C. § 206(d)
### (on behalf of Julia against Jones Day)

252.253.    Plaintiffs re-allege and incorporate every allegation in this Complaint.

253.254.    Jones Day discriminated against Julia on the basis of sex by paying her less than it paid male employees in its D.C. office for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

254.255.    On information and belief, beginning not later than July 2017 and continuing until Julia's departure in August 2018, Jones Day paid Julia a lower annual salary than it pays to male associates of the same level of seniority in the Issues & Appeals group in the D.C. office.

255.256.    The jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

256.257.    Because Partner A wrote Julia a negative performance evaluation because she is a woman, Jones Day paid her less than male Issues & Appeals associates.

257.258.    As a result of Jones Day's denial of equal pay, Julia has suffered and continues to suffer harm, including but not limited to financial loss, humiliation, and psychological harm.

258.259.    Julia is entitled to all remedies available for violations of the Equal Pay Act.

## <u>COUNT VI</u>
### SEX DISCRIMINATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
### D.C. Code § 2-1401 *et seq.*
### (on behalf of Julia against Jones Day)

259.260.　　　Plaintiffs re-allege and incorporate every allegation in this Complaint.

260.261.　　　Jones Day paid Julia less than she would otherwise have received because Partner A wrote her a negative performance evaluation because she is a woman.

261.262.　　　Jones Day thereby discriminated against Julia with respect to her compensation because of her sex.

262.263.　　　Jones Day discriminated against Julia with respect to the terms of her employment by intentionally maintaining uniform, firm-wide policies and procedures that had a disparate impact on her because of her sex.

263.264.　　　Jones Day's black-box compensation system—including its reliance on highly subjective evaluations by the firm's heavily male partnership and its rule that associates are prohibited from disclosing their salaries to one another—enables and conceals sex discrimination.

264.265.　　　Julia experienced such discrimination when Jones Day paid her less because Partner A wrote her a negative performance evaluation because she is a woman.

265.266.　　　As a result of Jones Day's discrimination, Julia has suffered and continues to suffer harm, including but not limited to financial loss, humiliation, and psychological harm.

266.267.　　　Julia is entitled to all remedies available for violations of the Human Rights Act.

## RETALIATION (COUNTS VII-IX)

### COUNT VII
**RETALIATION IN VIOLATION OF TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.*
(on behalf of Julia and Mark against Jones Day)**

267.268.    Plaintiffs re-allege and incorporate every allegation in this Complaint.

268.269.    Julia and Mark engaged in protected activity by opposing sex discrimination made unlawful by Title VII and expressing their intention to file a charge with the EEOC and a lawsuit.

269.270.    Jones Day fired Mark because of this protected activity.

270.271.    Heifetz prohibited other Jones Day lawyers from providing employment references for Mark, in a departure from her prior practice and the practice followed by Jones Day attorneys, because of the protected activity described above.

271.272.    On information and belief, Brogan and Heifetz selectively authorized only Partner D to provide a limited employment reference for Mark and prohibited other well-connected partners from doing so because of the protected activity described above.

272.273.    As a result of Defendants' conduct, Julia and Mark have suffered and continue to suffer harm, including but not limited to financial loss, impairment to their name and reputation, humiliation, and psychological harm.

273.274.    On information and belief, Defendants' conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages.

274.275.    Plaintiffs are entitled to all remedies available for violations of Title VII.

## COUNT VIII
### RETALIATION IN VIOLATION OF THE FAIR LABOR STANDARDS ACT,
### AS AMENDED BY THE EQUAL PAY ACT, 29 U.S.C. § 215
### (on behalf of Julia and Mark against ~~Jones Day~~all Defendants)

~~275.~~276.　　　Plaintiffs re-allege and incorporate every allegation in this Complaint.

~~276.~~277.　　　Julia and Mark engaged in protected activity by complaining about sex discrimination made unlawful by the Equal Pay Act and conveying their intent to file a charge with the EEOC and a lawsuit.

~~277.~~278.　　　Jones Day fired Mark because of this protected activity.

~~278.~~279.　　　Heifetz prohibited other Jones Day lawyers from providing employment references for Mark, in a departure from her prior practice and the practice followed by Jones Day attorneys, because of the protected activity described above.

~~279.~~280.　　　On information and belief, Brogan and Heifetz selectively authorized only Partner D to provide a limited employment reference for Mark and prohibited other well-connected partners from doing so because of the protected activity described above.

~~280.~~281.　　　As a result of Defendants' conduct, Julia and Mark have suffered and continue to suffer harm, including but not limited to financial loss, impairment to their name and reputation, humiliation, and psychological harm.

~~281.~~282.　　　On information and belief, Defendants' conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages.

~~282.~~283.　　　Plaintiffs are entitled to all remedies for violations of the Fair Labor Standards Act, including liquidated damages.

<u>COUNT IX</u>
### RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
**D.C. Code § 2-1401** *et seq.*
**(on behalf of Julia and Mark against all Defendants)**

283.284.     Plaintiffs re-allege and incorporate every allegation in this Complaint.

284.285.     Julia and Mark engaged in protected activity by opposing sex discrimination made unlawful by the Human Rights Act and stating their intent to file an EEOC charge and a lawsuit.

285.286.     Jones Day fired Mark because of this protected activity.

286.287.     On information and belief, Brogan ordered or approved Mark's termination because of the protected activity described above.

287.288.     On information and belief, Heifetz ordered, recommended, or otherwise sought to procure Mark's termination because of the protected activity described above.

288.289.     Heifetz prohibited other Jones Day lawyers from providing employment references for Mark, in a departure from her prior practice and the practice followed by Jones Day attorneys, because of the protected activity described above.

289.290.     On information and belief, Brogan and Heifetz selectively authorized only Partner D to provide a limited employment reference for Mark and prohibited other well-connected partners from doing so because of the protected activity described above.

290.291.     As a result of Defendants' conduct, Julia and Mark have suffered and continue to suffer harm, including but not limited to financial loss, impairment to their name and reputation, humiliation, and psychological harm.

291.292.     On information and belief, Defendants' conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Plaintiffs' rights under the Human Rights Act, entitling Plaintiffs to punitive damages.

292.293.       Plaintiffs are entitled to all remedies for violations of the Human Rights Act.

## FAMILY AND MEDICAL LEAVE ACT INTERFERENCE (COUNTS X and XI)

### COUNT X
### INTERFERENCE IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
### OF 1993, 29 U.S.C. § 2611 *et seq.*
### (on behalf of Mark against Jones Day)

293.   Plaintiffs re-allege and incorporate every allegation in this Complaint.

294.   The Family and Medical Leave Act (FMLA) provides twelve weeks of job-protected family leave to care for a new baby.

295.   Jones Day interfered with Mark's taking of protected family leave by terminating his employment while he was on leave.

296.   As a result of Jones Day's conduct, Mark has suffered and continues to suffer harm, including financial loss, impairment to his name and reputation, humiliation, and psychological harm.

297.   Mark is entitled to all remedies available for violations of the FMLA.

294.   The Court has dismissed Count X.

**COUNT XI**
**INTERFERENCE IN VIOLATION OF THE DISTRICT OF COLUMBIA**
**FAMILY AND MEDICAL LEAVE ACT,**
**D.C. Code § 32-501 *et seq.***
**(on behalf of Mark against Jones Day)**

~~298.~~295.    Plaintiffs re-allege and incorporate every allegation in this Complaint.

~~299.~~296.    The D.C. FMLA provides sixteen weeks of job-protected family leave to care for a new baby.

~~300.~~297.    Jones Day interfered with Mark's taking of protected family leave by terminating his employment while he was on leave.

~~301.~~298.    As a result of Jones Day's conduct, Mark has suffered and continues to suffer harm, including financial loss, impairment to his name and reputation, humiliation, and psychological harm.

~~302.~~299.    On information and belief, Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted with an evil motive and in callous disregard of Mark's rights under the D.C. FMLA.

~~303.~~300.    Mark is entitled to all remedies available for violations of the D.C. FMLA.

**PRAYER FOR RELIEF**

Plaintiffs request the following relief for the violations set forth in this Complaint:

a. A declaratory judgment that Jones Day's parental leave policy is unlawful;

b. A declaratory judgment that Jones Day violated Title VII, the Equal Pay Act, the Human Rights Act, the Fair Labor Standards Act, ~~the FMLA,~~ and the D.C. FMLA;

c. A permanent injunction against Defendants from engaging in the unlawful practices described in this Complaint;

d. Reinstatement, or front pay in lieu of reinstatement;

e. Back pay, lost benefits, recovery of penalties, and other lost compensation;

f. Compensatory, liquidated, and punitive damages;

g. An imposition of penalties available under applicable laws;

h. Litigation costs and expenses, including reasonable attorneys' fees;

i. Pre-judgment and post-judgment interest; and

j. Any other relief that the Court deems just and proper.

**JURY TRIAL DEMANDED**

Dated: ~~May 12, 2021~~January 19, 2022

/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

/s/ Mark C. Savignac
Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367