IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

    v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and MICHAEL
SHUMAKER,

    *Defendants*.

Case No. 1:19-cv-02443-RDM-ZMF

**PLAINTIFFS' RESPONSE TO JONES DAY'S PRE-MOTION STATEMENT
REGARDING ITS MOTION FOR SUMMARY JUDGMENT**

About an hour before submitting its pre-motion statement, Jones Day informed the Court that it required a full *five weeks* to re-evaluate its responses to Plaintiffs' longstanding allegations "in light of the facts learned in discovery since Defendants' last answer." Dkt. 175 at 1-2. Despite its admittedly shaky grasp of the record, however, Jones Day intends to move for summary judgment on all claims *and* for Rule 11 sanctions on nearly all of them. *See* Ex. A. Its arguments are meritless, and its Rule 11 motion (which should presumably be briefed and decided along with summary judgment) will itself violate both Rule 11 and the antiretaliation statutes.

1. **Leave offerings.** Jones Day asserts that its leave offerings are lawful because it supposedly adopted them for "legitimate reasons" and because they supposedly are "medically reasonable and consistent with prevailing standards of care, so there is no basis to infer pretext." Dkt. 176 at 2. Even if those assertions were true, the offerings would be illegal as a matter of law for the reasons in Plaintiffs' statement. *See* Dkt. 177 at 2-3. Anyway, the assertions are false.

*First*, giving every new mother eight weeks of sex-based disability leave is not medically reasonable. It is undisputed that physicians typically certify *six* weeks of disability for uncomplicated vaginal births (which are the majority of births). Plaintiffs' medical expert testified that there is no medical basis to deem those women disabled for eight weeks. Jones Day's own expert testified: "I have never said that I—that vaginal delivery needs more than six weeks." Jones Day's argument that it is reasonable to treat all women as though they gave birth through Caesarian section—an operation that slices through the abdomen and uterus and for which doctors typically certify eight weeks of disability—is absurd on its face. And Jones Day's statements that its plan administrator "standardly recognizes eight-weeks [sic] of disability for all routine deliveries" and that following the civil rights laws would create "turmoil" are legally irrelevant and unsupported by the record. In fact, Jones Day's administrator (Unum) generally approves six weeks.

*Second*, though no further evidence of "pretext" is necessary when an employer openly discriminates between mothers and fathers, discovery has shown that Jones Day adopted and maintained its policy to enforce traditional gender roles by giving mothers much more time to care for and bond with new children. Jones Day recognizes that if its policy is unreasonable or departs from "prevailing" practice, that would suggest "pretext." Those conditions are met: It is undisputed that Jones Day gives mothers 33 percent more sex-based leave than doctors typically certify, Plaintiffs' expert testified that that is *not* medically defensible, and Jones Day's expert acknowledged that uncomplicated vaginal births do not need more than six weeks.

Moreover, Jones Day *admits* that its purpose in establishing its eight-week rule in 1994 was "[t]o decide how much paid leave Jones Day would offer new *fathers*" (emphasis added)—with an unreasonably *long* "disability" rule for new mothers resulting in a concomitantly *short* family leave for fathers. Until 1994, Jones Day gave mothers 12 weeks of paid leave (without distinguishing "disability" from family leave) and gave fathers *no leave at all*. It is beyond dispute that this policy reflected sexist stereotypes and had been illegal for the preceding three decades. In 1994, Jones Day apparently determined that the 1993 FMLA required it to give fathers as much family leave as it gave mothers. It decided to keep mothers' leave at 12 weeks and to decide how much of that 12 weeks would be deemed "disability" as a way of determining how much was family leave that would be offered also to fathers. Its aggressively long choice of eight weeks of disability had no effect on mothers (who would continue to receive 12 weeks regardless), but resulted in a short four-week leave period for fathers. That choice of an atypically long disability period for the purpose of setting a concomitantly short leave for fathers is strong evidence of "pretext"—all the more so considering that Jones Day previously had an extraordinarily discriminatory policy, which it modified only because it believed that the FMLA required it to.

Further confirmation of sexist motivation comes from Jones Day's 2015 change to its leave policy, which gave birth mothers and adoptive primary caregivers 18 weeks of paid leave while keeping fathers at just four.  The internal memo on which this glaringly discriminatory policy was based expressly refers to women as "primary caregivers" and men as "secondary caregivers"—the very stereotype that Jones Day has always sought to impose through its leave policies.  And it was no coincidence that it gave adoptive parents and birth mothers the same 18 weeks ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Further, Jones Day partially mitigated its extraordinary discrimination—reducing the sex-based differential from 14 weeks to eight—only after an associate who had discussed the issue with Julia questioned the policy's legality.  In short, Jones Day's preference is to discriminate *even more starkly* than in the policy at issue here, because it views women as primary caregivers and men as secondary caregivers and wants to impose those traditional stereotypes on its employees.

Even on its own view of the law, Jones Day cannot possibly win summary judgment.

**2.     Retaliatory termination.**  As with the leave policy, Mark's termination was illegal as a matter of law for the reasons given in Plaintiffs' statement (*see* Dkt. 177 at 3-6), and Jones Day's arguments for summary judgment fail on their own terms regardless.

*First*, Jones Day's lead argument—that Mark has somehow "admitted" that his claim should fail—is frivolous.  While Mark acknowledges that a disabled employee should receive disability leave while actually disabled (including on account of childbirth) and that Mark was not disabled when Plaintiffs' son was born, there is no tension between those acknowledgments and Plaintiffs' view that a leave policy that depends not on actual disability but merely on sex is

3

illegally discriminatory. Jones Day does have a true disability policy that allows leave for as long as an employee is actually disabled (up to 26 weeks), and Plaintiffs have never disputed that new mothers are entitled to take advantage of that policy for as long as they are actually disabled. More importantly, Defendant Brogan testified that the number of weeks that Mark sought was *not* among his reasons for firing Mark. The specific number of weeks that Plaintiffs sought to settle their claim is legally irrelevant.[1]

*Second*, Jones Day obviously cannot establish as a matter of law that it fired Mark because of the "manner" of Plaintiffs' email rather than its "substance," even if Defendants' self-serving and contradictory testimony supported that position (it does not). Jones Day's point that it did not fire two female associates who questioned its policies but said nothing about litigation is plainly insufficient for it to win summary judgment on causation. And, in fact, Brogan testified that he fired Mark because he disagreed with the *substance* of Mark's claim of discrimination. That is precisely what the antiretaliation provisions were created to prevent.

*Third*, in any event, nothing in the "manner" of Plaintiffs' email deprives it of the law's protection. Jones Day's assertion that the email "threat[ened] to smear it to the press" is baseless. The language in question—"I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion"—threatens *litigation* while acknowledging that litigation on matters of public concern is public, meaning that the public can evaluate both sides' positions for itself. Nor could the Court find that Jones Day even interpreted Plaintiffs' email as a threat to "smear" it at the relevant time. To the contrary,

---

[1] To be clear, Plaintiffs have not "shift[ed] gears" to argue that "the eight-week assumption is too long." Plaintiffs' position has always been that the civil rights laws prohibit employers from drawing sex-based distinctions based on generalizations about women. But *even if* some generalizations were allowed, Jones Day's policy would still be discriminatory because eight weeks is too long. Regardless, Plaintiffs' position is, at a minimum, a legally reasonable one.

4

Jones Day said nothing about any supposed threat to "smear" it in its August 2019 press release explaining why it supposedly fired Mark, confirming that it did not begin pretending to interpret Plaintiffs' email in that way until its litigators examined this case more carefully. Finally, the antiretaliation laws protect an employee's right to complain of discrimination to the public or the press in any event.[2]

While courts sometimes find that the extreme "manner" of a worker's complaints renders them unprotected where the worker broke the law or seriously disrupted the productivity of the workplace, Plaintiffs' formal written complaint to the relevant manager came nowhere close to meeting that standard. Jones Day's argument that the complaint was unprotected because Mark sought equal treatment for himself (rather than "for the benefit of others") and "demanded extra money" (i.e., paid leave to care for his child) is frivolous. No authority suggests that the law's protection turns on whether an employee complains of discrimination against himself versus others, or seeks equal pay rather than some non-monetary form of equal treatment.

**3.      Retaliatory denial of employment references.**  Under Jones Day's policy, Defendant Shumaker decides whether to allow employment references for former and outgoing employees. He has broad discretion in making that decision. Here, he prohibited two partners who had a lot of experience with Mark from providing references, while allowing a single partner to provide a reference only orally and limited to his own work with Mark (without addressing

---

[2] *See, e.g.*, *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 647 (6th Cir. 2015) ("protected activity includes complaints to co-workers, reporters, and managers, and therefore to whom [the plaintiff] made statements opposing discrimination is immaterial to the viability of his retaliation claim"); *Sumner v. USPS*, 899 F.2d 203, 209 (2d Cir. 1990) (Title VII protects "writing critical letters to [the employer's] customers"); *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008 (9th Cir. 1983) (same); EEOC Enforcement Guidance on Retaliation and Related Issues § II.A.2.b (Aug. 25, 2016) (protected opposition includes "informal or public protests against discrimination, including … writing critical letters to customers, … provided it is not done in so disruptive or excessive a manner as to be unreasonable" (quotation marks omitted)).

either Mark's general reputation at Jones Day or the non-merit-based nature of his termination). More glaringly, the one partner whom Shumaker approved to provide a reference was, unbeknownst to Mark, one of the participants in Jones Day's "collaborative decision" to illegally fire him. A jury could find that Shumaker chose to restrict Mark's references because of the same protected activity that had led him to procure Mark's illegal termination the week before. A jury could certainly find Shumaker's testimony that he limited Mark to one reference because he believed that it would help Mark more to have one rather than three to be a bald-faced lie. Heifetz retaliated separately by directing colleagues not to help Mark, contrary to her usual practice.

4. **Retaliatory press release.** Jones Day repeats the same baseless legal arguments—in effect, that a defendant is absolutely privileged to make false and malicious out-of-court statements about a plaintiff—that the Court rejected at the pleading stage. And if Plaintiffs must show that Jones Day acted with "actual malice"—a term of art that just means "with knowledge that the statement was false or with reckless disregard as to whether or not it was true," *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)—then they can easily do so.

5. **Julia's pay claim.** Partner A was upset that Julia failed to show the deference that he expects of women (but not men). So he reacted with an aggressive email that two prominent Jones Day partners recognized was shockingly inappropriate and out of character. Then he followed up with a negative evaluation of her that, as discovery has confirmed, makes objectively false assertions about her—a classic basis for finding pretext and discrimination.

A jury would also find that Julia would have been paid more but for the discriminatory evaluation. The point of evaluations is to set pay. Jones Day notes that Brogan set Julia's pay without reading the evaluation. But he simply adopted the joint pay recommendation made by Shumaker and Traci Lovitt—and they both read the evaluation.

<table>
<tr><td>

/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

September 30, 2022

</td><td>

/s/ Mark Savignac
Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367

</td></tr>
</table>