# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and       )
JULIA SHEKETOFF,              )

          )

       *Plaintiffs*,          )

          )

*v.*                       )

          )

JONES DAY, *et al.*,         )

          )

       *Defendants.*       )

Civ. No. 1:19-02443 (RDM)

**DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Defendants Jones Day, Stephen Brogan, Michael Shumaker, and Beth Heifetz respectfully move for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth in the attached memorandum, the undisputed facts make it impossible for Plaintiffs to prevail on any of their remaining claims. The Court should therefore grant summary judgment to Defendants.

December 2, 2022

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Respectfully submitted,

*/s/ Terri L. Chase*

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

   *Plaintiffs*,

*v.*

JONES DAY, *et al.*,

   *Defendants*.

)
)
)
)
)
)
)
)
)
)

Civ. No. 1:19-02443 (RDM)


**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 3

    A.    Jones Day's Leave Policies For Childbirth ............................................................ 3

    B.    Sheketoff's Employment At Jones Day ................................................................ 3

    C.    Sheketoff's And Savignac's Challenges To Jones Day's Policies ........................ 4

    D.    Plaintiffs' Media Attacks In The New York Times And Other Publications ........... 5

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

I.    JONES DAY'S DISABILITY POLICY DOES NOT DISCRIMINATE
    BASED ON SEX ....................................................................................................... 6

    A.    Jones Day's Policy Reflects Legitimate Administrative And
        Privacy Concerns And Is Consistent With Prevailing Medical
        And Insurance Practices ..................................................................................... 7

    B.    Plaintiffs' Alternative Theory Is Factually Erroneous, Legally
        Misguided, And Administratively Untenable ...................................................... 13

II.    DEFENDANTS DID NOT RETALIATE AGAINST SAVIGNAC ................................. 17

    A.    Savignac's January 2019 Email Is Not Protected Activity ..................................... 18

        1.    Savignac had no reasonable, good-faith basis for his
            discrimination claim ............................................................................. 18

        2.    There was no pending investigation, proceeding, or hearing ........................... 21

    B.    Savignac's Termination Was Caused By The Myriad Unprotected
        Aspects Of His Unprofessional And Extortionate Demand ................................. 22

    C.    Plaintiffs Fail To State A Retaliation Claim Based On The Number
        Or Scope Of Employment References Jones Day Provided Savignac ..................... 28

    D.    Sheketoff Lacks Standing To Assert Retaliation Claims ...................................... 31

II.    SHEKETOFF WAS NOT SUBJECT TO DISCRIMINATION ...................................... 31

    A.    There Is No Evidence Of Discriminatory Animus .................................................... 31

    B.    Partner A's Review Was Not A Motivating Factor In Sheketoff's
        2017 Compensation Adjustment ......................................................................... 34

    C.    Sheketoff's EPA Claim Fails Due To The Lack Of A Higher-Paid
        Male Comparator .............................................................................................. 37

    D.    Sheketoff Cannot Establish Disparate Impact ........................................................ 38

i

**TABLE OF CONTENTS**
(continued)

**Page**

II.   JONES DAY'S PRESS RELEASE DOES NOT CONSTITUTE
RETALIATION ................................................................................................ 38

    A.   Plaintiffs Cannot Establish The Elements Of Retaliation ......................... 38

    B.   The First Amendment Bars Any Liability For The Press Release ............. 41

CONCLUSION ....................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aka v. Wash. Hosp. Ctr.*,
156 F.3d 1284 (D.C. Cir. 1998) (en banc) ............................................................... 33

*Allen v. Johnson*,
795 F.3d 34 (D.C. Cir. 2015) ......................................................................... 32, 33

*Ambrose v. Twp. of Robinson*,
303 F.3d 488 (3d Cir. 2002) ............................................................................... 31

*Ames v. Nielsen*,
No. 13-CV-01054, 2018 WL 5777391 (D.D.C. Nov. 2, 2018) ............................. 33

*Ames v. Wolf*,
820 F. App'x 1 (D.C. Cir. 2020) ......................................................................... 33

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................................. 6

*Baird v. Gotbaum*,
888 F. Supp. 2d 63 (D.D.C. 2012) ..................................................................... 41

*Baker-Notter v. Freedom Forum, Inc.*,
No. 18-cv-2499, 2019 WL 4601726 (D.D.C. Sept. 23, 2019) .............................. 17

*Baker-Notter v. Freedom Forum, Inc.*,
No. 18-cv-2499, 2022 WL 798382 (D.D.C. Mar. 15, 2022) ................................... 7

*Baloch v. Kempthorne*,
550 F.3d 1191 (D.C. Cir. 2008) ......................................................................... 29

\* *Barnes v. Small*,
840 F.2d 972 (D.C. Cir. 1988) .............................................................. 23, 24, 26

\* *Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004) ...................................................................... 41, 44

*Bonnette v. Shinseki*,
907 F. Supp. 2d 54 (D.D.C. 2012) ..................................................................... 40

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ....................................................................................... 14

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ............................................................................................ 41

\* *Brady v. Off. of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008) ........................................................... 7, 31, 32, 33

*Brady v. U.S. Capitol Police*,
200 F. Supp. 3d 208 (D.D.C. 2016) ................................................................... 22

## TABLE OF AUTHORITIES
(continued)

Page(s)

\* *Burley v. Nat'l Passenger Rail Corp.*,
  801 F.3d 290 (D.C. Cir. 2015)............................................................32, 35

\* *Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006)..................................................................................40

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
  479 U.S. 272 (1987)................................................................................17

*Chambers v. Burwell*,
  824 F.3d 141 (D.C. Cir. 2016)..................................................................6

*Coats v. DeVos*,
  232 F. Supp. 3d 81 (D.D.C. 2017)..........................................................32

*Coleman v. Am. Broad. Cos.*,
  No. 84-cv-1594, 1985 WL 365 (D.D.C. June 18, 1985)......................40, 42

*Duncan v. Johnson*,
  213 F. Supp. 3d 161 (D.D.C. 2016)........................................................37

*EEOC v. Port Auth. of N.Y. & N.J.*,
  768 F.3d 247 (2d Cir. 2014)....................................................................38

*Egei v. Johnson*,
  192 F. Supp. 3d 81 (D.D.C. 2016)......................................................21, 24

*Forkkio v. Powell*,
  306 F.3d 1127 (D.C. Cir. 2002)..............................................................40

*Francis v. Perez*,
  970 F. Supp. 2d 48 (D.D.C. 2013)..........................................................32

\* *George v. Leavitt*,
  407 F.3d 405 (D.C. Cir. 2005)......................................................18, 19, 33

*Glover v. City of N. Charleston*,
  942 F. Supp. 243 (D.S.C. 1996)..............................................................30

\* *Gogel v. Kia Motors Mfg. of Ga., Inc.*,
  967 F.3d 1121 (11th Cir. 2020) (en banc) ..........................................23, 24, 27

*Gonzalez v. Bolger*,
  486 F. Supp. 595 (D.D.C. 1980)..........................................................23, 27

*Grosdidier v. Broad. Bd. of Governors*,
  709 F.3d 19 (D.C. Cir. 2013)..................................................................18

*Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*,
  599 F. Supp. 2d 23 (D.D.C. 2009)..........................................................41

*Hanson v. McBride*,
  No. 18-cv-524, 2018 WL 10230024 (M.D. Tenn. July 18, 2018)..........30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Hogan v. Hayden*,
    406 F. Supp. 3d 32 (D.D.C. 2019) ................................................................33

\* *Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ....................................................................40

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) .................................................................................41

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988) ..................................................................................41

*Iannone v. Frederic R. Harris, Inc.*,
    941 F. Supp. 403 (S.D.N.Y. 1996) ........................................................19, 20

*Jackson v. St. Joseph State Hosp.*,
    840 F.2d 1387 (8th Cir. 1988) ....................................................................24

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ....................................................................42

*Jimenez v. McAleenan*,
    395 F. Supp. 3d 22 (D.D.C. 2019) ..............................................................37

*Johnson v. Univ. of Iowa*,
    408 F. Supp. 2d 728 (S.D. Iowa 2004) ........................................................20

\* *Johnson v. Univ. of Iowa*,
    431 F.3d 325 (8th Cir. 2005) ................................................................13, 20

*Joyner v. Sibley Mem'l Hosp.*,
    826 A.2d 362 (D.C. 2003) .........................................................................30

*King v. Triser Salons, LLC*,
    815 F. Supp. 2d 328 (D.D.C. 2011) ............................................................30

*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*,
    No. 18-cv-1702, 2021 WL 4033071 (D.D.C. Sept. 3, 2021) .............................37

*Mansfield v. Billington*,
    432 F. Supp. 2d 64 (D.D.C. 2006) ..............................................................18

*Mattson v. Caterpillar, Inc.*,
    359 F.3d 885 (7th Cir. 2004) ................................................................21, 24

*Maust v. United Parcel Serv. Gen. Servs. Co.*,
    897 F. Supp. 2d 1351 (N.D. Ga. 2012) .......................................................11

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) ....................................................................42

*McGrath v. Clinton*,
    666 F.3d 1377 (D.C. Cir. 2012) ..................................................................18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ............................................................................42, 44

*Morris v. McCarthy*,
    825 F.3d 658 (D.C. Cir. 2016) ...................................................................................33

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ....................................................................................................42

*Nev. Dep't of Hum. Res. v. Hibbs*,
    538 U.S. 721 (2003) ......................................................................................................9

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983) ....................................................................................................16

\* *Pendleton v. Rumsfeld*,
    628 F.2d 102 (D.C. Cir. 1980) .............................................................23, 24, 25, 27

*Powers-Bunce v. District of Columbia*,
    576 F. Supp. 2d 67 (D.D.C. 2008) ..............................................................................6

*Richard v. Bell Atl. Corp.*,
    209 F. Supp. 2d 23 (D.D.C. 2002) ............................................................................34

*Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh*,
    903 F. 2d 243 (3d Cir. 1990) ..............................................................................11, 20

*Sculimbrene v. Reno*,
    158 F. Supp. 2d 8 (D.D.C. 2001) ..............................................................................41

*Siddique v. Macy's*,
    923 F. Supp. 2d 97 (D.D.C. 2013) ..............................................................................7

*Slate v. Pub. Defender Serv. for the Dist. of Columbia*,
    31 F. Supp. 3d 277 (D.D.C. 2014) ............................................................................30

*Spencer v. Va. State Univ.*,
    919 F.3d 199 (4th Cir. 2019) .....................................................................................37

\* *Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011) ..............................................................................................35, 37

*Steffes v. Stepan Co.*,
    144 F.3d 1070 (7th Cir. 1998) ...................................................................................41

*Stephens v. Erickson*,
    569 F.3d 779 (7th Cir. 2009) .....................................................................................31

*Stewart v. Evans*,
    275 F.3d 1126 (D.C. Cir. 2002) ................................................................................40

*Touvian v. District of Columbia*,
    330 F. Supp. 3d 246 (D.D.C. 2018) ..........................................................................40

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Townsend v. Benjamin Enters., Inc.,*
  679 F.3d 41 (2d Cir. 2012)...................................................................................22

*Turner v. Shinseki,*
  824 F. Supp. 2d 99 (D.D.C. 2011) .....................................................................31

\* *Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
  570 U.S. 338 (2013).......................................................................................22, 23

*Vaughn v. Epworth Villa,*
  537 F.3d 1147 (10th Cir. 2008) ..........................................................................24

*Wallace v. Eckert, Seamans, Cherin & Mellott, LLC,*
  57 A.3d 943 (D.C. 2012) ......................................................................................7

*Washington v. Smith,*
  80 F.3d 555 (D.C. Cir. 1996)...............................................................................42

*Wigfall v. Off. of Compliance,*
  332 F. Supp. 3d 159 (D.D.C. 2018) ....................................................................40

*Williams v. Fla. Atl. Univ.,*
  No. 15-cv-60621, 2017 WL 1881676 (S.D. Fla. May 9, 2017)............................39

**STATUTES**

29 U.S.C. § 206 ............................................................................................13, 37, 38

29 U.S.C. § 215 ....................................................................................................18, 22

42 U.S.C. § 2000e ......................................................................................................16

42 U.S.C. § 2000e-2 ..................................................................................................13

42 U.S.C. § 2000e-3 ............................................................................................18, 22

D.C. Code § 2-1402.11 .........................................................................................13, 16

D.C. Code § 2-1402.61 .........................................................................................18, 22

**OTHER AUTHORITIES**

*Childbearing, Childrearing, and Title VII: Parental Leave Policies*
  *at Large American Law Firms,* 118 Yale L.J. 1182 (2009)...................................12

Fed. R. Civ. P. 56 .......................................................................................................6

H.R. Rep. No. 101-28, pt. 1 (1989).............................................................................8

## INTRODUCTION

At the motion-to-dismiss stage, this Court held that "factual development" was needed to test Plaintiffs' claims. *See generally* Dkt. 32 ("MTD Op."). After 18 months of discovery, the record proves what Defendants have been saying all along: Plaintiffs' claims have no merit.

*First*, as to Jones Day's parental leave policies, the record contains no hint of discriminatory intent. Jones Day offers 10 weeks of sex-neutral paid family leave *and* offers birthmothers recovering from childbirth paid short-term disability. Under its short-term disability policy, Jones Day assumes unless notified otherwise that the birthmother's doctor has certified an eight-week disability period. Jones Day adopted the eight-week assumption in 1994 based on its historical experience with postpartum medical certifications and to accommodate the greatest number of disabilities while respecting the birthmother's medical privacy and minimizing everyone's administrative burden. A six-to-eight week postpartum disability assumption for medical certifications and benefits, moreover, is routine—a point on which both sides' medical experts *agree*. Calling the eight-week certification period into question would upend standard medical and insurance practices nationwide.

*Second*, as to Savignac's termination, the facts foreclose any retaliation claim. As the Court previously recognized and as Savignac admitted at his deposition, birthmothers are entitled to *some* period of disability leave under the Pregnancy Discrimination Act ("PDA"). Savignac's email demanding that he receive *exactly the same amount* of leave as birthmothers—even though he concedes he was not disabled—was neither reasonable nor in good faith, and thus was not protected activity at all. Moreover, any protected aspect of the email was not the cause of his termination. Rather, as the decisionmaker testified, the email's conclusory, false, and extortionate assertions reflected such poor judgment, character, and professionalism that immediate termination was appropriate. Nor can Savignac save his retaliation claim by pointing to the Firm's

decision to authorize only a single partner to serve as an employment reference.  Jones Day made an exception to its longstanding policy against such references to *help* Savignac find a job.  He cannot identify a single example of *any* former employee being treated better, and he also cannot identify any evidence that a reasonable employee would have been chilled by receiving "only" the single positive reference provided on Savignac's behalf by a respected appellate partner.

*Third*, there is no evidence supporting Sheketoff's claim that she experienced pay discrimination in 2017 because of an allegedly discriminatory review by Partner A.  Partner A's review itself does not demonstrate gender bias, was consistent with evaluations from other partners whom Sheketoff admits were not biased, and is consistent with Partner A's evaluations of male associates.  Just as important, Partner A's review had *no* impact on Sheketoff's compensation; the Managing Partner never saw the review and based his compensation decision on Sheketoff's two consecutive years of below-average ratings from her (female) Practice Leader.  Partner A's review did *not* impact the Practice Leader's ratings, which were based on her personal knowledge and consistent themes running through multiple other reviews.  Sheketoff received a below-average rating in 2016, when Partner A did not submit an evaluation, and she would have received the same below-average rating in 2017 even if Partner A had not evaluated her.

*Finally*, Plaintiffs' claims concerning Jones Day's press release are disproved by the record and impermissible under the First Amendment.  Jones Day issued the release only after the media attack Savignac had threatened came to pass.  Plaintiffs' post-employment media activities are not protected activity, and the law entitles defendants to respond to plaintiffs' allegations without incurring additional exposure for "retaliation."  Plus, everything in the press release was *true* or at least a matter of reasonable opinion.

For these reasons, the Court should grant summary judgment to Defendants on all claims.

## FACTUAL BACKGROUND

The undisputed material facts are set forth in Defendants' Rule 56.1 Statement ("SUMF"), which is fully incorporated herein.  The following is a brief summary of the record.

### A.   Jones Day's Leave Policies For Childbirth

Jones Day provides paid leave in connection with childbirth under two policies.  First, new birthparents who are primary caregivers (regardless of gender) can take ten weeks of paid *family leave*; secondary caregivers (regardless of gender) can take four weeks.  SUMF ¶¶ 127.  Second, birthmothers can take paid *disability leave* under Jones Day's Short Term Disability Leave policy for the period during which the employee "is unable to perform the material and substantial duties of his or her regular occupation."  SUMF ¶¶ 25-26 (quoting JD_00002483).  Associates must apply for disability leave, and "[u]nless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Caesarean-section births)."  SUMF ¶¶ 26-28 (quoting JD_00002483).  As explained *infra* at 7-9, this disability assumption was adopted in 1994 and was consistent with Jones Day's experience with medical certifications for childbirth.

### B.   Sheketoff's Employment At Jones Day

Julia Sheketoff joined Jones Day in October 2014 following a U.S. Supreme Court clerkship.  SUMF ¶ 15.  Sheketoff struggled to transition to private legal practice and weighted her work heavily toward pro bono, rather than client billable, work.  SUMF ¶¶ 208-24, 235-60.  Based on her work, Sheketoff's practice leader—Beth Heifetz—rated her a 2 out of 5 (below average) for her performance during each of her first two full years at the Firm, and ranked her near the bottom of her Issues & Appeals peers.  SUMF ¶¶ 208-24, 235-60.  At Jones Day, consecutive years of a "2" rating is grounds for termination.  SUMF ¶¶ 210, 257.

3

Jones Day's Managing Partner—Stephen Brogan—personally determined Sheketoff's compensation adjustments in each of her years at the Firm. SUMF ¶¶ 225-32, 261-66. Brogan explained that in 2016, he gave Sheketoff a compensation increase of $65,000, even though she had received a 2 rating, to encourage her to improve. SUMF ¶¶ 225-32. In 2017, after Sheketoff received a second consecutive 2 rating, Brogan gave Sheketoff a compensation increase of $15,000. SUMF ¶¶ 261-65. In 2018, Sheketoff received a 4 rating from her practice; this suggested to Brogan that Sheketoff had turned things around and resulted in an increase in compensation of $85,000. SUMF ¶ 266.

Sheketoff voluntarily left Jones Day for public service in August 2018. SUMF ¶ 19.

### C.   Sheketoff's And Savignac's Challenges To Jones Day's Policies

Before Sheketoff left the Firm, she and Savignac learned that they were expecting a child. SUMF ¶ 294. Although Sheketoff had accepted a position at the Federal Public Defender's Office in July 2018, she wanted to stay at Jones Day "through maternity leave" to take advantage of the Firm's generous paid leave offerings, but as Sheketoff testified: "for some reason the FD office wasn't super pumped about" that. SUMF ¶¶ 20, 294 (quoting JD_00003191). Instead, on August 16, 2018, Sheketoff asked Heifetz to grant *Savignac* "18 weeks paid [leave]"—*i.e.*, 8 weeks more family leave than primary caregivers receive—upon the birth of the couple's child. SUMF ¶ 296 (quoting JD_00003165). Heifetz referred the request to the Firm's HR Director (Sarah McClure) who denied it because Savignac was not eligible for disability leave. SUMF ¶ 298. On August 23, 2018, Savignac responded via email stating: "I oppose your practice, which is made illegal by Title VII." SUMF ¶ 299 (quoting JD_00003164). In response, on August 24, 2018, McClure sent Savignac legal citations demonstrating the legality of Jones Day's policies. SUMF ¶¶ 300-03.

Five months passed. SUMF ¶¶ 304, 306. In January 2019, shortly after Sheketoff gave birth, Savignac emailed McClure, demanding: "Give me the treatment that Jones Day gives to all

women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion.  We are very familiar with the D.C. Circuit and confident that we will win."  SUMF ¶ 306 (quoting JD_00003143).  Savignac acknowledged the Firm's legal citations, but stated (without explanation or contrary authority) that they "do not support Jones Day's discriminatory policy."  SUMF ¶ 306.  And Savignac gratuitously threw in a baseless accusation that Jones Day's "compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation."  SUMF ¶ 306.  Brogan authorized Savignac's termination a few days later.  SUMF ¶ 341.

Following his termination, Savignac asked three Jones Day partners to serve as employment references.  SUMF ¶ 364.  Jones Day's Firm Manual, however, provides that "lawyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party" and that any request for a lawyer's employment reference should be referred to the Administrative Partner who, "[i]n most circumstances," will limit the reference to dates of hire and termination.  SUMF ¶¶ 365-66 (quoting JD_00002117).  Savignac's request was, as required, referred to the Administrative Partner (Michael Shumaker), who authorized an exception to allow one of the partners whom Savignac had approached to serve as Savignac's reference.  SUMF ¶¶ 366-407.  According to one prospective employer, this partner "was very complimentary."  SUMF ¶ 395 (quoting P01709).

### D.    Plaintiffs' Media Attacks In The New York Times And Other Publications

Several months later, Plaintiffs' then-attorney wrote to Jones Day, attaching a proposed complaint.  SUMF ¶¶ 418-20.  Recalling Savignac's threat to attack Jones Day "in the court of public opinion," Brogan believed it was "prudent to begin the process of drafting a press release in anticipation of a media attack," and he therefore drafted a statement.  SUMF ¶¶ 421-23.

Brogan's instincts were correct.  On August 12, 2019, a New York Times reporter informed Jones Day that Plaintiffs would be commencing litigation imminently and sought a comment from Jones Day for the story it was about to publish. SUMF ¶¶ 425-26.  Brogan thereafter authorized the release of Jones Day's statement to the New York Times.  SUMF ¶ 429.

Plaintiffs filed their complaint on August 13, 2019.  SUMF ¶ 432.  The next day, the New York Times published a lengthy story about the suit, complete with professional photographs of Plaintiffs and their child; the article also contained excerpts from Jones Day's press release.  SUMF ¶¶ 433-34.  Plaintiffs subsequently provided interviews to the Washington Post and other media outlets.  SUMF ¶¶ 411-17.  After the New York Times published its story, Jones Day posted its statement to its website and provided no further press comments.  SUMF ¶¶ 435-36.

For the reasons below, Defendants move for summary judgment on all Counts.

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To avoid summary judgment, the opponent "may not rest upon the mere allegations or denials of his pleading," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), nor rely on "whimsey," "speculation," or "conjecture."  *Powers-Bunce v. District of Columbia*, 576 F. Supp. 2d 67, 71 (D.D.C. 2008); *see also Chambers v. Burwell*, 824 F.3d 141, 146 (D.C. Cir. 2016).

## ARGUMENT

## I.   JONES DAY'S DISABILITY POLICY DOES NOT DISCRIMINATE BASED ON SEX.

Defendants are entitled to summary judgment on Plaintiffs' claims relating to the Firm's short-term disability policy (Counts 1-3).  The record conclusively proves that Jones Day's policy is not a "sham" but incorporates a practical administrative assumption that is consistent with

routine medical and insurance practices.  Plaintiffs' claim that the policy facially discriminates against men because it does not guarantee the birthmother's return to work at the exact moment her disability ceases defies both law and logic.

### A.    Jones Day's Policy Reflects Legitimate Administrative And Privacy Concerns And Is Consistent With Prevailing Medical And Insurance Practices.

At summary judgment, Plaintiffs must adduce evidence creating a reasonable inference that Jones Day adopted its disability policy to discriminate against men.  If Jones Day identifies legitimate, non-discriminatory reasons, Plaintiffs must offer evidence sufficient to allow a reasonable jury to conclude they are pretextual.[1]  Here, the undisputed facts disprove discriminatory intent and pretext.

Before 1994, Jones Day provided 12 weeks of paid leave to new mothers but did not distinguish postpartum *disability* leave (*i.e.*, time to recover from childbirth) from *parental* leave (*i.e.*, time to bond with the new baby).  SUMF ¶¶ 31-33.  Fathers relied on vacation and sick days for parental leave.  SUMF ¶ 34.  Jones Day's policies in this regard were generally consistent with other firms of its size at the time.  SUMF ¶ 35.

Jones Day adopted the eight-week disability certification assumption in 1994, shortly after enactment of the Family and Medical Leave Act ("FMLA"), which gave employees the right to *unpaid* family leave under certain circumstances.  *See* SUMF ¶¶ 31, 36.  Specifically, Jones Day's then-Director of Human Resources and Employment Counsel, Julie Stumpe Dressing, reviewed Jones Day's leave policies for compliance with the new law, and to implement Jones Day's

---

[1] *See, e.g.*, *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (applying standard under Title VII); *Siddique v. Macy's*, 923 F. Supp. 2d 97, 103 (D.D.C. 2013) (same under DCHRA); *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 955-56 (D.C. 2012) (same); *Baker-Notter v. Freedom Forum, Inc.*, No. 18-cv-2499, 2022 WL 798382, at *7 (D.D.C. Mar. 15, 2022) (similar under EPA).

decision to provide paid family leave to *all* birthparents.  SUMF ¶¶ 36-39.  Ms. Dressing determined that the appropriate approach was to assume that eight weeks of the previously-provided twelve weeks of leave was for disability, leaving four weeks for sex-neutral family leave. SUMF ¶¶ 40-42.  Although the Firm has since increased its family leave benefits to ten weeks (on a sex-neutral basis), the disability provisions have not materially changed.  SUMF ¶ 106.

Ms. Dressing's determination was based on her review of several years' of doctor certifications for Jones Day staff.  SUMF ¶¶ 43-44.  She understood that doctors "typically certified between six and eight weeks of disability for uncomplicated childbirth, often depending on whether the birth was vaginal or via Cesarean section."  SUMF ¶ 43 (quoting Dressing Decl. ¶ 11(a)).  Even when doctors initially certified six weeks, they "would occasionally provide a second certification late in that six-week period certifying some additional time of disability leave." SUMF ¶ 45 (quoting Dressing Decl. ¶ 11(a)); *see also* SUMF ¶ 45 (noting testimony from HR staff member that a six-week certification would "often" later be "extended to eight weeks").  The six-to-eight week period also aligns with Congress's stated understanding when it enacted the FMLA that "the physical recovery period following childbirth" is "typically 6 to 8 weeks."  H.R. Rep. No. 101-28, pt. 1 (1989).

Due to concerns about "intrusiveness," Jones Day did not want to require medical certifications of, "for instance, the type of birth."  SUMF ¶¶ 46-47 (quoting Dressing Decl. ¶ 11(b)).  Ms. Dressing also explained that Jones Day had not required medical certifications from attorneys in the past and thought that adding such a requirement would offend female associates. SUMF ¶¶ 46-47.  Nor did the Firm want to follow up with associates individually to determine their recovery progress and set return dates.  SUMF ¶¶ 48-49.  In light of these goals, Jones Day determined that a standard eight-week certification assumption was the most administratively

efficient way to accommodate the disability period of most routine childbirths.  SUMF ¶¶ 48-49.

Ms. Dressing also understood that eight weeks was consistent with the time frames that disability

insurance carriers would approve for routine childbirth.  SUMF ¶ 50.  Consistent with Ms.

Dressing's testimony, the 1994 and 1997 versions of Jones Day's Firm Manual included the

updated policy and explained the apportionment of leave by referencing the fact that "physicians

generally certify a six to eight week disability period."  SUMF ¶ 52.

Ms. Dressing's undisputed testimony and the Firm Manuals prove that Jones Day did not

adopt an eight-week assumption to deprive men of equal family leave.  *See* SUMF ¶ 53.  Jones

Day sought to *equalize* parental leave based on its understanding of the certification range for

postpartum disability.  SUMF ¶ 54.  The Firm chose the high end of that range to protect the

associate's medical privacy and to promote administrative convenience for all.  *See* SUMF ¶¶ 36-

54.  Those rationales are all legitimate.  None relies on any "stereotype of women as caregivers."

*Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 738 (2003).

Plaintiffs cannot identify any evidence that could reasonably support an inference of

pretext.  To the contrary, all medical experts *agree* that six-to-eight weeks of postpartum disability

is routine.  *See* SUMF ¶¶ 55-56.  In other words, Ms. Dressing's analysis was correct.

Defendants' expert, Dr. Christine Colie—Vice Chair of OBGYN at MedStar Georgetown

hospital and a professor at Georgetown University Medical Center—opines that "[t]he medical

standard of care for short-term disability following childbirth without complications is six to eight

weeks" and that "[i]t is typical to certify a period that lasts six to eight weeks following the

delivery."  SUMF ¶ 57 (quoting Colie Rpt. at 3).  An eight-week disability period, in particular, is

"the standard of care for women who give birth via caesarean section (one-third of all births)," and

in Dr. Colie's opinion is also "medically reasonable in light of the physiologic and mental health

impacts surrounding routine vaginal delivery."  SUMF ¶ 65 (quoting Colie Rpt. at 3); *see also* SUMF ¶ 65 (citing Colie Rpt. at 11 collecting "medical sources and studies" that "suggest the recovery period may extend longer than six weeks for routine vaginal delivery").

In addition, a uniform eight-week assumption effectively replicates the practice of employers who require disability certifications for childbirth.  As the experts agree, such certifications are typically predictions made at or before birth based on the medical standard of care, and they are not re-evaluated until the mother's first post-partum exam, which is typically not scheduled "until six to eight weeks after delivery."  SUMF ¶ 76 (quoting Colie Rpt. at 3); *see also* SUMF ¶¶ 60-69.  At that time, the doctor will "assess whether the mother is properly recovering from childbirth" and, if so, will clear her to return to employment.  SUMF ¶ 77 (quoting Colie Rpt. at 3, 13).  Assuming an eight-week disability period from routine childbirth therefore "generally reflects what happens in practice when a provider certifies disability from childbirth."  SUMF ¶ 63 (quoting Colie Rpt. at 3).

Plaintiffs' expert, Dr. Kenneth Naylor, agrees with Dr. Colie on each material point.  He acknowledged that "[p]roviders in the United States generally authorize a 6-week disability for an uncomplicated vaginal birth and 8 weeks for an uncomplicated cesarean delivery."  SUMF ¶ 56 (quoting Naylor Rpt. at 2).  And he confirmed that those time frames are medically reasonable.  SUMF ¶¶ 58-59.  Indeed, Dr. Naylor himself certifies six weeks for routine vaginal births, eight weeks for caesarean deliveries, and six-to-eight weeks when the method of delivery is unknown at the time of certification.  SUMF ¶ 66; *see also* SUMF ¶ 66 (citing Naylor testimony that he would not knowingly certify a false disability period).  Dr. Naylor further agreed that eight weeks would be medically appropriate as a disability period for a vaginal birth if there are "complications."  SUMF ¶ 64.

These undisputed facts render Ms. Dressing's testimony all-the-more compelling.  Roughly one-third of deliveries are caesarean; another 10-15% involve some degree of complications; and another 10% or so of birthmothers have ongoing symptoms at six weeks postpartum that require further recovery time.  SUMF ¶ 80.  Accordingly, more than half of all birthmothers would end up being certified for at least eight weeks of disability.  SUMF ¶ 79.  An eight-week assumption avoids the administrative burden and intrusive inquiries needed to track the recovery progress of individual birthmothers within the small window of time between six and eight weeks postpartum—a legitimate basis for Jones Day's policy.  *Cf. Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh*, 903 F. 2d 243, 244 n.1, 248 (3d Cir. 1990) (holding that, by contrast, one year of unpaid leave only for women did not reasonably reflect postpartum disability).

Like the experts, the administrator for Jones Day's short-term disability plan, Unum, confirms that an eight-week post-partum disability assumption is a standard practice based on sound medical standards.  *See Maust v. United Parcel Serv. Gen. Servs. Co.*, 897 F. Supp. 2d 1351, 1360, 1366 (N.D. Ga. 2012) (ensuring "consisten[cy] with industry standards" reflects a legitimate business reason); *see generally* SUMF ¶¶ 81-95.  Unum administers 23,366 short-term disability plans for employers around the country, covering over two million employees, and it has administered Jones Day's plan since 2004.  SUMF ¶¶ 81-82.  For routine, common procedures— such as a routine appendectomy—Unum "automatically consider[s]" the affected employee disabled and "unable to perform the material and substantial duties of his or her regular occupation."  SUMF ¶¶ 83-84 (quoting Latham Decl. ¶ 4).  Unum sets a presumptive period of disability using medical guidelines and its own analysis of actual claims experience.  SUMF ¶ 85.

For "childbirth without complications, Unum considers the standard period of short-term disability to be six to eight weeks."  SUMF ¶¶ 86-92.  Accordingly, Unum allows its clients to

choose from the following "standard options" in designing a short-term disability benefit for childbirth: "(a) six weeks regardless of delivery, (b) eight weeks regardless of delivery, or (c) six weeks for [vaginal] delivery and eight weeks for delivery via cesarean section." SUMF ¶ 88 (quoting Latham Decl. ¶ 8). Unum offered Jones Day those "standard options" in 2004, and "Jones Day selected eight weeks regardless of delivery type." SUMF ¶¶ 88, 93-94 (quoting Latham Decl. ¶¶ 8, 13-14). *See also Childbearing, Childrearing, and Title VII: Parental Leave Policies at Large American Law Firms*, 118 Yale L.J. 1182, 1191, 1193, 1216 (2009) (noting that "[m]ost firms . . . do not base disability leave on the circumstances of the individual woman's pregnancy" and instead offer "fixed leave" of "four to eight weeks," and that approximately half of the firms offered "fixed disability leave of ten weeks or longer"). Far from discrimination, Jones Day's disability assumption is a broadly used standard. SUMF ¶ 95.

Nor can Jones Day's (sex-neutral) adoption leave policy, which provides up to eighteen weeks of *adoption* leave, fill Plaintiffs' evidentiary void. *See generally* SUMF ¶¶ 135-49. The undisputed expert evidence from Dr. Elaine Schulte is that adoption presents "unique challenges" that differ from bringing home a non-adopted child after delivery; that those challenges "justify providing adoptive parents additional family leave"; and that 18 weeks in total is a reasonable amount of time in light of those challenges. SUMF ¶¶ 136-41 (quoting Schulte Rpt. at 1). Jones Day selected a gender-neutral 18-week leave period for adoptive parents for precisely those reasons. SUMF ¶¶ 142-49; *see also* SUMF ¶ 148 (testimony from Shumaker that "adopted leave policy is really different from a birthing maternity or paternity policy," as "adoptions are difficult and unique, and have special concerns") (quoting Shumaker Tr. 213:9-16; 214:2-4). Nothing in the record undermines the undisputed evidence of Jones Day's intent.

*       *       *

12

On this summary-judgment record, this case is now indistinguishable from *Johnson v. University of Iowa*, 431 F.3d 325, 332 (8th Cir. 2005).  There, the Eighth Circuit upheld a similar policy, concluding that "it is not unreasonable for the [employer] to establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth," *id.* at 329, and that the unique "demands on [adoptive parents'] time and finances" rationally warrants giving them additional leave, *id.* at 331.

As in *Johnson*, the undisputed evidence is that Jones Day set a presumptive disability period based on the medical standard of care, its desire to protect medical privacy, and administrative convenience.  *See* SUMF ¶¶ 31-54.  As in *Johnson*, Jones Day has provided testimony from experts that an eight-week period is supported by medical evidence,  SUMF ¶¶ 55-80, as well as testimony that it is consistent with standard insurance practices, SUMF ¶¶ 81-95.  Indeed, even Plaintiffs' expert concedes that eight weeks is medically appropriate for a large segment of birth mothers.  *Supra* at 10-11.  And, as in *Johnson*, Jones Day's separate adoption policy addresses entirely different considerations that cannot support Plaintiffs' discrimination claim.  *See* SUMF ¶¶ 135-49.  Like the Eighth Circuit in *Johnson*, the Court should grant summary judgment to Defendants on these facts.

**B.    Plaintiffs' Alternative Theory Is Factually Erroneous, Legally Misguided, And Administratively Untenable.**

With respect to Plaintiffs' purely legal theory that Jones Day's disability leave policy is unlawful per se because it "is not dependent upon whether women are actually disabled," *see* Dkt. 177 at 1, the claim fails for four basic reasons.

*First*, the policy, on its face, does not discriminate based on sex.  The ultimate question under the discrimination laws is whether the employer has discriminated "because of . . . sex."  42 U.S.C. § 2000e-2(a)(1); *see also* D.C. Code § 2-1402.11(a) ("based upon . . . sex"); 29 U.S.C.

13

§ 206(d)(1) ("on the basis of sex").  When an employer provides disability leave for women who undergo childbirth, that benefit is not provided "because of" or "based upon" sex, but because of the postpartum recovery period—the incurred disability.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020).  The benefit flows neither to all women nor exclusively to individuals who identify as women.  Thus, under Jones Day's disability policy, women who do not give birth are not eligible for leave.  And conversely, disability leave is available to non-binary individuals who give birth.  *See* SUMF ¶ 109.

*Second*, Plaintiffs' argument fundamentally misstates Jones Day's policy.  The policy's "Eligibility Requirements," in subsection (a), provide that a lawyer "will be considered disabled for purposes of this policy if he or she is unable to perform the material and substantial duties of his or her regular occupation, . . . is not working in any occupation, and is under the regular and continuing care of a physician or other 'health care provider' as defined under the federal [FMLA]."  SUMF ¶¶ 24-26 (quoting JD_00002483).  In other words, covered lawyers are eligible for paid disability leave only if they are *actually disabled*.  *See* SUMF ¶¶ 101, 115.

Subsection (b) then explains the *administrative process* to establish eligibility.  The policy provides: "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Cesarean-section births)."  SUMF ¶¶ 28-29 (quoting JD_00002484).  These procedural provisions do not override the substantive rule of subsection (a) that employees must be "disabled" under the policy.  To the contrary, subsection (b) provides that salary continuation is "subject to repayment by the lawyer if the leave is later determined not to qualify for salary continuation under this policy."  SUMF ¶ 27 (quoting JD_00002483); SUMF ¶¶ 100-15.

Consistent with its policy, Jones Day gives written notice to everyone who takes short-term disability leave—including birthmothers—that their right to paid leave depends on qualifying under the policies above and can be recouped.  SUMF ¶ 113.  Jones Day's 30(b)(6) witness, Lori Bounds, testified that she was not aware of any case in which Jones Day learned that a birth mother's disability had ended before eight weeks.  SUMF ¶ 114.  She further testified that in such a scenario, she would seek guidance from Jones Day's HR Director and Counsel, Sarah McClure, who is responsible for overseeing implementation of all employment-related policies.  SUMF ¶ 115.  Plaintiffs chose not to depose McClure, but her testimony is that if a birthmother reported she had fully recovered as of six weeks, the mother's disability leave would end at that time.  SUMF ¶ 115.

*Third,* although it is possible that, without Jones Day's knowledge, a birthmother might recover more quickly than eight weeks, that possibility does not render Jones Day's policy unlawful; that is the reality of *every* medical certification for *every* type of disability.  Every *ex ante* disability certification—whether for childbirth or a routine appendectomy—is a prediction that will not prove precisely accurate for every individual; similarly, every post-disability return-to-work certification reflects the timing of the follow-up exam, which is an equally imperfect assessment of the disability's end.  *Cf.* SUMF ¶¶ 61-78, 84-90.

The same is true for childbirth.  SUMF ¶¶ 61-78.  When a doctor pre-certifies a six- or eight-week postpartum disability—which both sides agree is routine practice in the United States—the doctor necessarily makes a *prediction* about the mother's recovery.  SUMF ¶ 61 (quoting Colie Report (at 12) that "medical certification of birth-related disability typically happens prior to birth"); SUMF ¶ 61 (citing similar testimony from Naylor deposition).  Other than considering the method of delivery (if known) and predictable complications, the certification is

not individualized.  SUMF ¶ 67.  Even certifications provided after delivery have a six-to-eight week disability period baked into them, because there is "typically no comprehensive physical assessment of the patient between a routine birth and the postpartum examination," which occurs "six to eight weeks after delivery."  SUMF ¶ 76 (quoting Colie Rpt. at 13).

*Fourth,* the fact that disability periods cannot be precisely, individually determined for anyone does not make certification assumptions discriminatory—much less undermine the entire U.S. system of reliance on doctor certifications.  Title VII does not require that the administration of disability benefits perfectly and individually track precisely each birth mother's disability period.  Recovery from childbirth, like any other disability, is a gradual, non-linear process, with ups and downs and no precise date demarking its completion.  *See* SUMF ¶¶ 70-78.

As Plaintiffs point out, the PDA defines discrimination based on pregnancy or childbirth as discrimination based on sex.  *See* 42 U.S.C. § 2000e(k).  But the whole point of the PDA was to clarify that "it is discriminatory to treat pregnancy-related conditions *less favorably* than other medical conditions."  *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) (emphasis added); *see* 42 U.S.C. § 2000e(k); D.C. Code § 2-1402.11(a)(1)(B).  Accordingly, the fact that an employer provides a disability benefit to birthmothers cannot itself be forbidden sex discrimination.

Plaintiffs admit as much, but insist that the postpartum disability benefit must be administered so that it expires on the exact day the underlying disability ceases—not a day more.  There is no legal basis for that notion, nor is there any medically responsible way to administer such a requirement.  To the contrary, if Plaintiffs prevail on this theory, employers could no longer rely on postpartum disability assumptions *or* on standard medical certifications.  Birthmothers (and only birthmothers) would be subject to a new and different requirement—either to seek daily

medical screenings to confirm continuing disability or to return to work early based on a self-diagnosis of one's recovery—while lawyers disabled by a routine appendectomy would be free to rely on certification periods or assumptions. Plaintiffs' hyper-individualized rule is not only medically unsupportable but it would be unlawful under the PDA, because it would require pregnancy to be treated *worse* than other disabilities. In short, it is Plaintiffs, not Jones Day, who advance a legally discriminatory policy—and one that defies medical standards and practice.

In their prior briefing, Plaintiffs cited *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272, 275-76 (1987), which considered a California law requiring employers to guarantee reinstatement after pregnancy leave (and only pregnancy leave). The Court held that "Congress intended the PDA to be 'a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise.'" *Id.* at 285. While the Court noted that the state law in that case was "narrowly drawn to cover only the period of actual physical disability" and did not reflect archaic notions, *id.* at 290, the Court nowhere suggested, much less held, that an eight-week postpartum-disability presumption is not "narrowly drawn" to appropriately account for the "period of actual physical disability." The Court was simply making clear that preferential treatment of pregnancy could run afoul of federal law if it relied on "archaic or stereotypical notions" that interfere with "equal employment opportunity." Jones Day's policy does not.

## II.    DEFENDANTS DID NOT RETALIATE AGAINST SAVIGNAC.

Defendants are separately entitled to summary judgment on all claims relating to Savignac's termination (Counts 7-9, 11). To avoid summary judgment, Savignac must establish a dispute of fact on *each* of the following:  (i) that he engaged in *statutorily protected activity* (ii) that *caused* Defendants (iii) to take a *materially adverse action* against him. *See* Dkt. 32, at 35 (citing cases); *see Baker-Notter v. Freedom Forum, Inc.*, No. 18-cv-2499, 2019 WL 4601726, at *7 (D.D.C. Sept. 23, 2019) (applying same standard to EPA retaliation claim). He fails to do so.

## A.      Savignac's January 2019 Email Is Not Protected Activity.

Under Title VII and the DCHRA, there are two distinct categories of protected activity. *First*, an employee is protected under Title VII's "opposition clause" for having "opposed any practice made . . . unlawful" by those statutes. 42 U.S.C. § 2000e-3(a); D.C. Code § 2-1402.61(b). *Second*, an employee is protected under the "participation clause" for having "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under those statutes. 42 U.S.C. § 2000e-3(a); D.C. Code § 2-1402.61(b). Although many courts hold that the EPA protects the same two categories, others have held, correctly, that protection under the EPA is limited to participation in formal agency proceedings, not opposition activities. *See Mansfield v. Billington*, 432 F. Supp. 2d 64, 73-75 (D.D.C. 2006); 29 U.S.C. § 215(a)(3). Plaintiffs did not engage in either protected activity.

### 1.  Savignac had no reasonable, good-faith basis for his discrimination claim.

With respect to the opposition clause, the D.C. Circuit recognizes that an activity can be protected if the employee opposed a practice that he or she "reasonably and in good faith *believed* was unlawful," even though the opposition clause's text appears to require an actually unlawful practice. *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012). Even with that atextual extension, "[n]ot all complaints are protected under this framework," *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013), because the reasonableness and good-faith requirements impose critical limitations.

Under them, an employee's "unsupported assertion [of unlawfulness] . . . neither makes the accusation true nor makes it reasonable for him to have believed it was true." *McGrath*, 666 F.3d at 1381. Thus, in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), an employee who was terminated soon after complaining that she was subjected to a racially hostile work environment, including through being "told by three separate employees to 'go back to Trinidad' or to 'go back

18

to where [she] came from,'" lacked a retaliation claim. *Id.* at 408-10. The statements were "isolated incidents" that fell short of the "severe or pervasive" harassment necessary for a Title VII violation, and the employee "could not reasonably [have] thought" otherwise. *Id.* at 416-17. In addition, "[w]hether an erroneous complaint was asserted in good faith will be determined in part by the extent of the plaintiff's legal sophistication." *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 410 (S.D.N.Y. 1996). So "an attorney or equal employment opportunity specialist will be held to a higher standard of expertise about Title VII." *Id.* (citing cases).

Savignac asserted in his January 2019 email that Jones Day's leave policy was "discriminatory" and demanded: "Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave." SUMF ¶¶ 306, 309 (quoting JD_00003143). Savignac has now admitted that, at the time he wrote the email, he knew, believed, or did not doubt that: (i) the eight additional weeks of paid leave he was demanding was provided in Jones Day's disability policy, not its family leave policy; (ii) he did not and could not have a postpartum disability; (iii) any person who gives birth will have some period of postpartum disability; (iv) birthmothers are entitled to disability leave for their disability; and (v) at least one major medical association described the standard post-partum maternity leave as lasting six weeks. SUMF ¶¶ 310-14.

On these facts, Savignac "could not reasonably [have] thought" or believed in "good faith," *George*, 407 F.3d at 417, that Jones Day's disability policy was an unlawful sham. At least *some portion* of the eight weeks of leave was *necessarily* legitimate disability leave, and thus could not possibly, even under Savignac's view of the world, have been disguised family leave. Indeed, that goes for at least six of the eight weeks given his concession about standard practices for the least complicated vaginal births. Thus, on this record, Savignac could not reasonably and in good faith

have believed, as he proclaimed in his email, that Jones Day's disability policy was a discriminatory sham meant to provide birthmothers with eight weeks of disguised parental leave.

Given his legal background, Savignac cannot credibly assert that he sincerely misunderstood Jones Day's disability leave policy or the lack of legal basis for his demand. Savignac's January 2019 email was sent five months after he received an email from Jones Day's Director of Human Resources, which explained that materially indistinguishable leave policies had been upheld by the Eighth Circuit and blessed by the EEOC, providing case names and citations. SUMF ¶ 300-02. Surely, as a former U.S. Supreme Court clerk and Harvard Law School graduate, Savignac possesses the "legal sophistication," *Iannone*, 941 F. Supp. at 410, to review and understand the cited precedent. He affirmatively asserted in his January 2019 email that he had "closely reviewed the case law." SUMF ¶ 306 (quoting JD_00003143). But even a cursory review of it demonstrates that Jones Day "is *required* to provide pregnancy disability leave to biological mothers on the same terms as it provides leave to other disabled employees [under the PDA]." *Johnson v. Univ. of Iowa*, 408 F. Supp. 2d 728, 740 (S.D. Iowa 2004) (emphasis added), *aff'd*, 431 F.3d 325 (8th Cir. 2005). This precedent, combined with Savignac's admissions, deprive Savignac of any excuse for having demanded "18 weeks of paid leave." *See, e.g.*, *Schafer*, 903 F.2d at 248 (holding that even a one-year maternal disability leave period was "per se void" only "for any leave granted beyond the period of actual physical disability").

All but admitting the error, Plaintiffs retreat to the argument that Jones Day's disability leave policy is insufficiently "narrowly drawn to cover only the period of *actual physical disability*." Dkt. 177 at 2. *But this is not the claim Savignac made in the January 2019 email nor is it the claim asserted in Plaintiffs' EEOC Charge or their Third Amended Complaint*, *see* TAC ¶¶ 226, 232, 237; SUMF ¶ 30. Savignac did not claim that Jones Day's disability policy was too

generous for some subset of birthmothers; rather, the entire policy was "discriminatory" and "illegal."  SUMF ¶ 306 (quoting JD_00003143).  Savignac did not demand an extra week or two of family leave; he demanded all 18 weeks accorded birthmothers, thereby depriving birthmothers of all disability leave.  Having maintained that claim in the TAC filed just three months ago, Plaintiffs cannot now change their theory of the case to retroactively bolster a "protected activity" claim.  Retaliation law does not require that Jones Day recreate reality, rewrite Savignac's email, and credit Savignac with claims he never made.  There is simply no excuse for any employee, let alone a sophisticated attorney like Savignac, to assert—and continue to maintain—the frivolous demand to be treated the same as birthmothers.

In all events, Savignac's claim is objectively indefensible:  it is not sex discrimination for an employer to provide short-term disability benefits based on the medically-established standard of care while accounting for legitimate sex-neutral objectives (feasibility, privacy, employee morale).  *See* Part I, *supra*.  That is all Jones Day has done.

### 2.  There was no pending investigation, proceeding, or hearing.

Plaintiffs alternatively claim that it is immaterial whether Savignac's demand was baseless because they are entitled to "absolute immunity from retaliation" for purportedly participating in a complaint process (Dkt. 177 at 4), but that is incorrect.  Although this Court has held that even bad-faith claims are protected under the participation clause, *see Egei v. Johnson*, 192 F. Supp. 3d 81, 88-89 (D.D.C. 2016), Jones Day respectfully submits that "the same threshold standard" for screening out "utterly baseless" claims "should apply to both opposition and participation clause cases," *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 891 (7th Cir. 2004).  Accordingly, the lack of a good faith, reasonable basis for Savignac's discrimination claim equally precludes Savignac's arguments under the participation clause.

In any event, Savignac's alternative argument fails because "the participation clause . . .

protect[s] only activity under EEOC proceedings," as "district courts in this jurisdiction and other circuits have found." *Brady v. U.S. Capitol Police*, 200 F. Supp. 3d 208, 216 (D.D.C. 2016) (citing cases). Its scope is expressly limited to where the employee "has made a charge, testified, assisted, or participated in any manner *in an investigation, proceeding, or hearing under this subchapter*." 42 U.S.C. § 2000e-3(a) (emphasis added); *see* D.C. Code § 2-1402.61(b) (identical list of protected formal agency activity, "under this chapter"); 29 U.S.C. § 215(a)(3) (similar list of protected formal agency activity, "under or related to this chapter"). The cross-referenced investigations, proceedings, and hearings "describe[e] the enforcement powers of the EEOC" (or its sister agencies). *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012). They do not address "an internal employer investigation not connected with a formal [agency] proceeding." *Id.*

Savignac's January 2019 email was not connected to any formal agency inquiry; it was sent long *before* Plaintiffs filed a charge with any enforcement agency. SUMF ¶ 307. In fact, at the time of the email, Jones Day was not even conducting an informal inquiry into his demand, because the firm had determined *back in August 2018*—and had so notified Plaintiffs—that Savignac's demand was legally meritless. SUMF ¶ 308. Accordingly, the participation clause is plainly inapplicable here.

### B. Savignac's Termination Was Caused By The Myriad Unprotected Aspects Of His Unprofessional And Extortionate Demand.

Savignac's termination claim separately fails because the unprofessional, false, and extortionate nature of his January email reflected so poorly on Savignac's judgment and character that its unprotected tone and manner, not any protected activity, caused Savignac's termination.

Under the Supreme Court's path-marking decision in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Id.* at 360. Reasoning that the employee's

protected activity must be more than just a "motivating[]factor" in the employer's adverse action, the Court held that but-for causation "requires proof" that the adverse action "would not have occurred in the absence of" the protected activity. *Id.*

Importantly, it is well established that even otherwise-protected activity can be unprotected "at least in part" if undertaken in an "improper manner." *Barnes v. Small*, 840 F.2d 972, 977 (D.C. Cir. 1988). For example, "an employee's oppositional conduct under Title VII is not protected" insofar as "the means by which the employee has chosen to express her opposition so interferes with the performance of her job that it renders her ineffective in the position for which she is employed." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1150 (11th Cir. 2020) (en banc). Likewise, an employee "exceed[s] the tolerable limits of protected conduct" when he adopts a "militant self-help posture" that is "in no way conducive to a frank exchange of ideas between employer and employee, and serve[s] no redeeming statutory or policy purpose." *Gonzalez v. Bolger*, 486 F. Supp. 595, 602 (D.D.C. 1980), *aff'd*, 656 F.2d 899 (D.C. Cir. 1981) (mem.); *see also Barnes*, 840 F.2d at 977 ("excessively forceful opposition, including malicious accusations, may forfeit protection"). In short, when employees are "fired for the improper manner of their opposition to [discrimination], not the opposition itself, then the statute does not by its terms apply." *Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C. Cir. 1980).

The D.C. Circuit's decision in *Pendleton* illustrates the principle in analogous circumstances. There, a federal official terminated two employees from their positions as equal-employment counselors because of their perceived participation in "a disruptive demonstration" in the workplace to protest racial discrimination. *Id.* at 104. The court emphasized that, "[i]n determining the limits of protected activity, '*[t]he requirements of the job* and the tolerable limits of conduct in a particular setting must be explored.'" *Id.* at 108. And the court held that "[i]t

23

seems fairly obvious that a reasonable person in [the official's] position might, on learning of the plaintiffs' parts in the demonstration, have felt that they had fatally compromised *their ability to gain the confidence of middle management* . . . and that they were lacking in *ability to appreciate management's point of view*"—abilities that were essential to performing the duties of an equal-employment counselor. *Id.* (emphasis added).

The en banc Eleventh Circuit's decision in *Gogel* is likewise instructive. There, a company fired a "Team Relations manager" who had "recruited [another employee] to sue the company" for sex and race discrimination. 967 F.3d at 1138. The court reaffirmed that "opposition to allegedly unlawful employment practices must be done in a reasonable manner." *Id.* at 1141 (citing *Pendleton*, among other cases). And in that situation, where the Team Relations manager had "abandoned her responsibility to try to resolve an employee's dispute without litigation," and "instead actively solicited a complaining employee to sue the company," the company "could no longer trust [her] to do her job." *Id.* at 1150.[2]

Here, it is undisputed that Stephen Brogan, Jones Day's Managing Partner, terminated Savignac based solely on the January 2019 email. SUMF ¶¶ 340-61. Brogan testified that the "email's assertion . . . that Jones Day's [leave] policy is discriminatory" was itself "no factor" in the termination decision. SUMF ¶ 353 (quoting Brogan Tr. 60:7-16). Likewise, Brogan was emphatic that the "fact that [Savignac was] threatening to sue the firm had no—no impact on [him]

---

[2] Although *Pendleton* and *Gogel* involved the opposition clause, the same principle applies to the participation clause. Regardless of whether the participation clause protects substantively unreasonable claims, *see supra* at 21, it does not immunize *misconduct* that is *incompatible* with an employee's duties. The D.C. Circuit has squarely so held (in a decision not addressed in this Court's *Egei* opinion). *See Barnes*, 840 F.2d at 976-77 (participation clause does not protect "false and malicious" statements made while representing employee claiming race discrimination before an agency adjudicator); *accord, e.g.*, *Mattson*, 359 F.3d at 892 ("bad faith" participation unprotected); *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152-53 (10th Cir. 2008) (same); *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1390 (8th Cir. 1988) (same).

24

at all.  None.  Zero."  SUMF ¶ 359 (quoting Brogan Tr. 68:5-14).  He reiterated that the "fact that somebody threatens a lawsuit against the firm is singularly unimpressive to [him]," and that "if [an employee is] going to get separated from the firm, it's because [the employee] did something else."  SUMF ¶ 360 (quoting Brogan Tr. 151:7-13).  The "something else" that caused Savignac's termination, Brogan explained, was "the character flaws that [he] saw in th[e] email as a whole, and [his] view that [it] was not sent in good faith."  SUMF ¶ 342 (quoting Brogan Tr. 66:19-25).

In his deposition, Brogan reaffirmed his conclusion that the email demonstrated Savignac's "poor judgment and immaturity," for several related reasons.  SUMF ¶ 343; *see also* SUMF ¶¶ 340-61.  *First*, Brogan objected to the email's conclusory and arrogant tone.  As he put it, Savignac "act[ed] as if [Plaintiffs] personally were the law-givers," decreeing that "our policy on leave was illegal."  SUMF ¶ 348 (quoting Brogan Tr. 16:18-20).  He "wasn't impressed with [Savignac's] reasoning," which was nothing more than "a flat-out assertion," SUMF ¶ 349 (quoting Brogan Tr. 59:17-20), with no explanation of the legal basis for Savignac's assertions:  (a) that he should receive the same amount of paid leave as birth mothers; (b) that Jones Day's policy of presuming an eight-week post-partum disability period is "discriminatory"; (c) that the cases Jones Day previously had provided him "do not support" the lawfulness of the policy; and (d) that the policy is "inconsistent with the EEOC enforcement guideline."  SUMF ¶ 306.  Savignac's only "reasoning," to put it charitably, was that he had talked to some unidentified "competent attorneys," that he claimed to be "very familiar with the D.C. Circuit and [was] confident that we will win," and that the EEOC guidance would not be entitled to *Chevron* deference.  SUMF ¶ 306.  Such "pompous" and "arrogant" *ipse dixit* "made [Brogan] lose confidence in [Savignac's] ability as—as a lawyer."  SUMF ¶ 350 (quoting Brogan Tr. 59:17-61:2); *accord Pendleton*, 628 F.2d at

108 (opposition activity unprotected where it "compromised [employees'] ability to gain the confidence of middle management" and illustrated "they were lacking in ability").

*Second*, Brogan objected to the email's unfounded and malicious aspersions about Jones Day's compensation system, in particular Savignac's proclamation that "Jones Day's black-box compensation system and its attempts to keep associate salaries secret are *tailor-made to enable* sex discrimination, including retaliation." SUMF ¶ 351 (quoting JD_00003143). To Brogan, Savignac was accusing the Firm of *intentionally designing* its compensation system to enable sex discrimination. SUMF ¶ 351. Brogan testified: "[n]othing could be further from the truth," as the Firm has treated compensation as confidential since the 1940s, long before the firm hired its first female attorney. SUMF ¶ 352 (quoting Brogan Tr. 15:23-16:8). Brogan concluded that Savignac "had no . . . good-faith basis for making th[is] assertion," SUMF ¶ 355 (quoting Brogan Tr. 16:4-10), and that Savignac was "being completely dishonest in attacking the firm," which "goes to [his] character" and was "just not conduct that we can accept from somebody," SUMF ¶ 358 (quoting Brogan Tr. 39:4-17); *accord Barnes*, 840 F.2d at 976-77 ("false and malicious" statements made before agency adjudicator were unprotected). Savignac admitted as much in his deposition, and retreated to the position that the compensation system potentially "could be used to discriminate," *not* that it was so *designed*, as he had asserted in the January 2019 email. SUMF ¶¶ 356-57 (quoting Savignac Tr. 256:11-15).

*Third*, Brogan objected to the email's extortionate threat. SUMF ¶ 343. Savignac demanded "18 weeks of paid leave . . . or else [he] will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and *in the court of public opinion*." SUMF ¶¶ 306, 317 (emphasis added). Brogan reasonably interpreted the reference to "the court of public opinion" as "a threat to go . . . to the press," which he "viewed as an extortionist

26

demand" given that Savignac "had no claim that [he was] disabled."  SUMF ¶ 344 (quoting Brogan Tr. 17:10-17, 21:21-22:10); *accord Gonzalez*, 486 F. Supp. at 602 (deeming unprotected an employee's "militant self-help posture" that was "in no way conducive to a frank exchange of ideas between employer and employee").  Brogan was also struck by the fact that Savignac was not seeking *to change* Jones Day's leave policies for all associates.  SUMF ¶ 346  Savignac demanded only extra paid leave for *himself*, roughly $80,000 of additional compensation on top of a salary of $500,000 and ten weeks of paid leave benefits equivalent to $96,150.  SUMF ¶¶ 305, 346.  This confirmed Brogan's view that the email was an extortionate threat, not a constructive call for re-examination of the Firm's policies.   SUMF ¶¶ 343-47.

One last point:  Circumstantial evidence corroborates beyond any genuine doubt that Brogan fired Savignac "for the improper manner of [his] opposition to [discrimination], not the opposition itself," *Pendleton*, 628 F.2d at 107.  Most significantly, the Firm took no adverse action against Savignac in August 2018, when he emailed that he expressly "oppose[d]" the "parental leave policy" as "discriminatory" and "illegal."  SUMF ¶¶ 299, 304.  As Brogan explained, unlike the January 2019 email, "[t]here's nothing in . . . [the August 2018] email that seeks to extort money from the firm" or that "is dishonest about the firm's compensation system."  SUMF ¶ 345 (quoting Brogan Tr. 122:7-11); *accord Gogel*, 967 F.3d at 1150 (rejecting retaliation claim where "[plaintiff] had expressed her opposition to various employment practices repeatedly throughout her tenure . . . with no adverse action taken against her for that opposition" until the company "could no longer trust [her] to do her job").

Similarly, in May 2015, another Issues & Appeals associate voiced concerns about whether a previous version of Jones Day's leave policy "provided [family leave] to similarly situated men and women on the same terms."  SUMF ¶ 124 (quoting JD_00003792-93).  Not only did Jones

Day view that as "a proper question" and "a legitimate concern," but it "changed its policy" in response.  SUMF ¶¶ 125-27, 329.  Far from taking adverse action against the associate, she was promoted to partner a few years later.  SUMF ¶ 128.

All this compels the conclusion that Savignac was terminated for the manner in which he made his unprotected and extortionate demand for money, not due to retaliation for alleged protected activity.  Accordingly, Defendants are entitled to summary judgment on Savignac's retaliation claims and his claim for interference with his DC FMLA leave.  *See* Dkt. 32 at 47 (observing that the DC FMLA claim turns on whether Savignac's termination was "unlawful").

### C.    Plaintiffs Fail To State A Retaliation Claim Based On The Number Or Scope Of Employment References Jones Day Provided Savignac.

Plaintiffs separately assert that Jones Day retaliated against Savignac by authorizing only one partner to provide him an employment reference.  Dkt. 181 at 5-6.  Of course, because Savignac's January 2019 email was not protected activity, this aspect of the retaliation claim fails at the outset.  *See* Part II.A, *supra*.  It also has two independent flaws.

*First*, the record disproves the claim that Jones Day limited Savignac's employment references in retaliation for purported protected activity.  The Firm provided Savignac a *favorable exemption* from its restrictive policy on employment references.  The Firm Manual at the time provided (and still provides) that, apart from state bar inquiries, "lawyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party."  SUMF ¶ 365-66 (quoting JD_00002117).  The Firm Manual continues: "[r]equests for employment references should be referred, in the case of lawyer requests, to the Firm Administrative Partner or appropriate Partner-in-Charge," and that "[i]n most circumstances, the response will be limited to disclosing the date of original hire and the date of most recent severance of employment."  SUMF ¶ 366 (quoting JD_00002117).  The Firm Administrative Partner,

Michael Shumaker, testified without contradiction that "[n]ot a lot of exceptions [are] requested" and "not a lot of exceptions [are] granted." SUMF ¶¶ 367-69 (quoting Shumaker Tr. 224:6-16).

Shumaker made an exception for Savignac. *See* SUMF ¶¶ 376-77. He "thought it was in the firm's interest, as well as [Savignac's] interest, to provide an exception and to allow someone to give a more substantive reference." SUMF ¶ 378 (quoting Shumaker Tr. 221:11-22). That "someone" was a well-known partner who "was a very well thought-of person in the issues and appeals bar" and whom "[Savignac] himself had reached out to" for a recommendation. SUMF ¶ 379 (quoting Shumaker Tr. 222:4-14). A prospective employer who spoke to the reference told Savignac that the partner "was very complimentary," SUMF ¶ 395 (quoting P01709), and Savignac has admitted that no prospective employer told him the reference was not positive, SUMF ¶ 396.

*Second*, no reasonable juror could conclude that the reference decision was a materially adverse action. An employer's action is not "materially adverse" unless it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). Absent evidence of "tangible job consequences," the D.C. Circuit has held that even an "unsatisfactory performance review" does not meet this standard. *Id.* at 1199. Here, Savignac cannot identify a single prospective employer whose decision would have been affected by receiving additional references from Jones Day. SUMF ¶ 402. And he was unable to provide any evidence that any prospective employer requested additional references or told him that additional references would have impacted his candidacy. SUMF ¶ 403. Indeed, Savignac already had an impressive list of references that included three federal judges—including Justice Stephen Breyer and Judge Richard Posner—former Acting Solicitor General Neal Katyal, and the General Counsel for the Board of Governors of the Federal

Reserve System.  SUMF ¶ 401.  It is patently absurd that any reasonable employee in Savignac's position would have been chilled from sending the January 2019 email because the employee would have received "only" a single positive reference to which the employee was not entitled.

Finally, at a minimum, there is absolutely no basis for holding *Heifetz* liable for retaliation. To establish that an individual defendant personally violated the DCHRA or EPA, a plaintiff must show that the individual committed retaliation—*i.e.*, took adverse action for retaliatory reasons. *See King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 331 (D.D.C. 2011) (under DCHRA, individual can be liable only if "personally involved in the discriminatory conduct"); *Slate v. Pub. Defender Serv. for the Dist. of Columbia*, 31 F. Supp. 3d 277, 300-01 (D.D.C. 2014) (dismissing DCHRA claim because plaintiff did not allege "adverse employment actions that Primo has personally taken"); *Glover v. City of N. Charleston*, 942 F. Supp. 243, 246 (D.S.C. 1996) (individual liable for FLSA retaliation only if "personally involved in the termination"); *Hanson v. McBride*, No. 18-cv-524, 2018 WL 10230024, at *3 (M.D. Tenn. July 18, 2018) (dismissing FLSA retaliation claim because individual defendant was not "personally involved" in violation). Here, the Firm manual did not authorize Heifetz, a practice leader, to grant exceptions to the reference policy.  SUMF ¶ 366.  And Shumaker (who was so authorized) testified that he, alone, made the decision as to Savignac.  SUMF ¶ 377.  Because Heifetz played no role in making the allegedly retaliatory decision, she cannot be personally liable for it.  Indeed, her only involvement was to convey the Firm's policy and Shumaker's decision.  SUMF ¶ 385.  Defendants are aware of no cases finding that an individual personally violates these statutes merely by communicating a decision made by other supervisors whom she had no authority to override.  *Cf. Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 371 (D.C. 2003) (following company policy is not discriminatory). Since this is the only claim against Heifetz, she should be dismissed entirely from this action.

D.       **Sheketoff Lacks Standing To Assert Retaliation Claims.**

Finally, Defendants are independently entitled to summary judgment against *Sheketoff* on

Plaintiffs' retaliation claims (Counts 7-9), because Brogan believed that the January 2019 email

was sent from Savignac only.  In his deposition, Brogan answered a question from Savignac about

the email's author by testifying:  "I thought the e-mail was from—from you.  I mean, I—you know,

you made this 'royal we' comment that—'We've consulted lawyers, and we think that, you know,

we were right on the law.'  But other than that, the e-mail, on its surface, I took it at face value was

coming from you."  SUMF ¶ 361 (quoting Brogan Tr. 20:2-7).  Because discovery confirmed that

Brogan did not think the email came from Sheketoff, his decision to terminate Savignac could not

have been intended as retaliation against Sheketoff, who no longer worked at the firm at the time.

*See Turner v. Shinseki*, 824 F. Supp. 2d 99, 121 (D.D.C. 2011) ("As a matter of law, there can

obviously be no retaliation if the [alleged] retaliator did not know about the protected activity.");

*Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009); *Ambrose v. Twp. of Robinson*, 303 F.3d

488, 493 (3d Cir. 2002).

III.    **SHEKETOFF WAS NOT SUBJECT TO DISCRIMINATION.**

Sheketoff's claim that her 2017 compensation reflected sex discrimination (Counts 3-6)

similarly fails.  Her pay claim is based on two indisputably false premises:  (1) that a facially non-

discriminatory review from Partner A was motivated by gender bias; and (2) that Partner A's

review was a motivating factor for her 2017 pay adjustment.

A.       **There Is No Evidence Of Discriminatory Animus.**

To survive summary judgment with respect to her Title VII, DCHRA and EPA claims,

Sheketoff must produce evidence creating a genuine dispute that Partner A's review was motivated

by discriminatory animus.  *See supra* at 7 & n.1; *Brady v. Off. of Sergeant Sgt. at Arms*, 520 F.3d

490, 494 (D.C. Cir. 2008).  Sheketoff cannot come close to making this showing.  Sheketoff has

*none* of the evidence plaintiffs typically cite for discriminatory animus. *See Brady*, 520 F.3d at 495 & n.3 (identifying proof). There is no direct evidence of bias—that is, the record is devoid of "expressions by [Partner A] that [are] evidence of discriminatory intent without any need for inference." *Francis v. Perez*, 970 F. Supp. 2d 48, 62 (D.D.C. 2013). There is no male comparator who, like Sheketoff, refused to accept Partner A's revisions; accordingly, the record does not support the claim that Partner A "treated other employees of a different . . . sex . . . more favorably in the same factual circumstances." *Brady*, 520 F.3d at 495.

Indeed, Partner A testified that *no other lawyer*—whether male or female—had ever repeatedly rejected his revisions as Sheketoff had. SUMF ¶ 276. This precludes any inference of discriminatory intent or pretext through comparators, because "to rely on comparator evidence to demonstrate pretext . . . [and] survive summary judgment, a plaintiff . . . must identify evidence from which a reasonable jury could find that 'the relevant aspects' of his performance and overall circumstances were 'nearly identical' to those of [a comparator]." *Coats v. DeVos*, 232 F. Supp. 3d 81, 93 (D.D.C. 2017) (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015). Sheketoff cannot make this showing.

Nor has Sheketoff identified any evidence suggesting that Partner A's "'general treatment of [female] employees' . . . was worse than [his] treatment of [males]." *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495 n.3). Jones Day has produced all of Partner A's written associate evaluations from 2012 through 2020. SUMF ¶ 196. Partner A's reviews of women (other than Sheketoff) were uniformly positive, while his reviews of *male* associates have included substantially more critical statements. SUMF ¶¶ 197-205. For example, Partner A has criticized male associates for attitude issues, *see* SUMF ¶ 202, for lack of attentiveness, *see* SUMF ¶ 205, and for poor writing, *see* SUMF ¶¶ 203-05—the same issues

Partner A identified as Sheketoff's challenges.  This is "a strong track record in equal opportunity employment."  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

Instead, Sheketoff challenges the *accuracy* of Partner A's evaluation.  TAC ¶ 129; Dkt. No. 181, at 6.  Undermining the "validity of [a supervisor's] discretionary judgments about the subordinate's job performance," however, is not sufficient at summary judgment.  *Allen*, 795 F.3d at 41.  Rather, "'[i]f the employer's stated belief about the underlying facts is *reasonable* in light of the evidence,' and is *honestly* held, there ordinarily is no basis to put the case to a jury."  *Id.* (quoting *Brady*, 520 F.3d at 495) (emphasis added).  Thus, Sheketoff "cannot establish pretext merely by demonstrating that the [review] was *false*.  Instead, she must show that [Partner A] *could not have honestly and reasonably believed*" it was accurate.  *Ames v. Nielsen*, No. 13-CV-01054, 2018 WL 5777391, at *3 (D.D.C. Nov. 2, 2018), *aff'd sub nom. Ames v. Wolf*, 820 F. App'x 1 (D.C. Cir. 2020) (emphases added); *see also Brady*, 520 F.3d at 496 (same).[3]

Nothing about Partner A's review suggests that Partner A lacked an honest and reasonable belief in what he wrote.  Partner A's narrative review was mixed, containing many positive statements about Sheketoff's work.  SUMF ¶¶ 283-84.  Partner A's critiques of Sheketoff's writing style, availability, and lack of interest in private practice were consistent with those of other partners who submitted reviews in 2016 and 2017 and with Heifetz's own independent assessment. *See* SUMF ¶¶ 216-23 (2016 reviews noting Sheketoff's academic writing style, failure to take on a larger role on matters, and unwillingness to sacrifice personal time for client matters); SUMF ¶¶ 241-50 (2017 reviews noting continued writing problems and that Sheketoff was "a bit protective

---

[3] *Cf. George*, 407 F.3d at 415 (action justified by "a reasonable belief in the validity of the reason given" even if  false); *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) (plaintiff "must raise a genuine dispute over the employer's honest belief in its proffered explanation"); *Hogan v. Hayden*, 406 F. Supp. 3d 32, 46 (D.D.C. 2019) ("[I]f the employer's stated belief about the underlying facts is reasonable in light of the evidence," summary judgment is required.).

of her time," "a little too academic and intellectually stubborn," and "missing from the office a lot") (quoting JD_JS_00001294, JD_00003742).   And, Partner A's "impression" that Sheketoff was unlikely to remain at Jones Day was ultimately accurate.  SUMF ¶ 19.  Sheketoff thus cannot show the review's falsity, let alone the lack of a reasonably held belief in its truth.

Finally, Sheketoff is not saved by unfounded speculation that Partner A's review was negatively influenced by his unwillingness to accept a *woman* rejecting his revisions.  Partner A's annual review of Sheketoff's work does not even mention that incident, SUMF ¶ 286, and his real-time feedback to Sheketoff permits no inference of gender bias.  He advised that she should not ignore the stylistic changes of the *more senior* attorney and, for efficiency's sake, should engage the senior attorney before rejecting edits:  "My point is that I want you to be cognizant of time, and changing something back to the way you had it (after someone else took the time to change it) is not efficient."  SUMF ¶ 279 (quoting JD_JS_00001441).  Partner A testified that he wrote this email after Sheketoff had *twice* rejected his revisions and *twice* reinstated her original language without consulting him or explaining why—something he had never experienced with any other associate.   SUMF ¶¶ 275-76.   Partner A viewed Sheketoff's uncommunicative rigidity as "annoying," and he viewed his email feedback as "instructional" and "a teaching point or practice pointer for how to interact with more senior lawyers" that "would be helpful to [Sheketoff] when [she] worked for other people."  SUMF ¶ 275-77 (quoting Partner A Tr. 234:14-235:7, 239:15-21).  No jury could construe this exchange as anything other than the nonactionable, "ordinary tribulations of the workplace.  *Richard v. Bell Atl. Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002).

### B.   Partner A's Review Was Not A Motivating Factor In Sheketoff's 2017 Compensation Adjustment.

Separately, Defendants are entitled to summary judgment because Partner A's review had no impact on Sheketoff's 2017 compensation adjustment.   To survive summary judgment,

Sheketoff must produce evidence creating a genuine dispute that Partner A's review—Plaintiffs' sole alleged source of discriminatory animus—was a "motivating factor" in her 2017 compensation. *Burley*, 801 F.3d at 297. Accordingly, there must be evidence of "some direct relation" between Partner A's review and her pay, not causal "link[s] that are too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421-22 (2011) (construing "motivating factor" to require "proximate cause"). The record, however, demonstrates no causal connection at all.

It is undisputed that Managing Partner Brogan *personally* decided Sheketoff's compensation adjustments in 2016, 2017 and 2018. SUMF ¶¶ 226, 262, 266, 354. Importantly, it is also undisputed that Brogan was not aware of Partner A's review until well after Sheketoff left the firm. SUMF ¶¶ 262, 289-90.

Brogan's undisputed testimony is that he gave Sheketoff a lower compensation adjustment in 2017 than in previous years because she had received a "2" (or below average) rating from her practice leader for two consecutive years. Brogan testified that when Sheketoff received her first "2" rating in 2016, he "gave [her] the benefit of the doubt" and a "generous" and "outsized" raise to encourage her dedication and improvement. SUMF ¶ 232 (quoting Brogan Tr. 228:24-229:18); SUMF ¶ 264. But the second, consecutive "2" rating in 2017 demonstrated to Brogan that Sheketoff was not improving. SUMF ¶ 264. As Brogan testified, even a single 2 rating is "normally a really, really bad sign for an associate's future in the firm." SUMF ¶ 229 (quoting Brogan Tr. 29:5-8). Indeed, under Jones Day's associate evaluation guidelines, "successive '2' ratings are inconsistent with continued employment at the Firm." SUMF ¶ 210 (quoting JD_00003075). While Sheketoff was given one more chance to prove herself, Brogan authorized only a small raise in 2017, reflecting her continuing underperformance. SUMF ¶ 264.

Sheketoff's "2" ratings, moreover, were assigned by her practice leader, Heifetz, who explained that Partner A did not review Sheketoff in 2016 and that she would have given Sheketoff a "2" rating again in 2017 even absent Partner A's review.   SUMF ¶¶ 212-13, 224, 293. Specifically, in 2016, Heifetz assigned Sheketoff's first "2" rating due, in part, to Sheketoff's highly unprofessional conduct in a pro bono matter where Sheketoff was lead counsel.   SUMF ¶¶ 213, 218-21.   Heifetz was "appalled" by Sheketoff's conduct in threatening to quit the pro bono appointment because the schedule conflicted with Sheketoff's vacation plans.   SUMF ¶ 221.   In addition, the "2" rating was warranted due to negative comments from partners relating to Sheketoff's overly academic writing, her (at times) analytical woodenness, her lack of availability for projects, and her lack of commitment to billable client work.   SUMF ¶¶ 213-23.

For 2017, Heifetz determined that Sheketoff had not meaningfully improved, resulting in the second "2" rating.   SUMF ¶¶ 235-50.   Heifetz had personal knowledge of Sheketoff's performance on the project with Partner A because she spoke to both Partner A and Sheketoff in "real time" during the project.   SUMF ¶ 291.   Heifetz agreed with the positive and critical aspects of Partner A's written review only to the extent they were consistent with Heifetz's direct knowledge or other reviews.   SUMF ¶ 292.   Thus, as Jones Day's Rule 30(b)(6) witness testified, even if Partner A had not submitted a review, neither Sheketoff's practice rating nor her compensation would have changed.   SUMF ¶ 293.

On this undisputed record, Partner A's review is legally too remote to qualify as a "motivating factor."   Sheketoff does not allege that Brogan or Heifetz discriminated against her; at best, she claims their decisions were unknowingly influenced by the hidden bias that allegedly motivated the facially non-discriminatory review submitted by just one of Sheketoff's eleven reviewers.   But "[w]hen a decision . . . is made with no unlawful animus on the part of the

[decisionmaker], but partly on the basis of a report prompted (unbeknownst to that [decisionmaker]) by discrimination," it is "a considerable stretch to call it 'a motivating factor.'" *Staub*, 562 U.S. at 418-19.  Accordingly, where, as here, an employee receives "consistently poor reviews from evaluators whom [the plaintiff] does not allege harbored sex- or age-related animus," a single allegedly discriminatory review will not be "related so directly to the decision to be considered a 'motivating factor' behind it."  *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. 18-cv-1702, 2021 WL 4033071, at *11-12 (D.D.C. Sept. 3, 2021).  And where, as Heifetz did here, a decisionmaker acts based on independent knowledge and assessment, any causal connection is too remote.  *See Staub*, 562 U.S. at 419; *Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 42-43 (D.D.C. 2019) (independent investigation precluded finding of proximate cause).

Sheketoff's "string of poor reports from unbiased evaluators . . . and [Heifetz's] independent assessment of [Sheketoff's] performance makes any connection between [Partner A's alleged] animus and the [compensation] decision too attenuated to constitute proximate cause." *Klotzbach-Piper*, 2021 WL 4033071, at *12; *see also Duncan v. Johnson*, 213 F. Supp. 3d 161, 194 (D.D.C. 2016) (no causation where "multiple levels" of review and decisionmaker who "did not simply rubberstamp").

### C.    Sheketoff's EPA Claim Fails Due To The Lack Of A Higher-Paid Male Comparator.

Sheketoff's EPA claim (Count 5) fails for the additional reason that she cannot identify any male comparator who performed "equal work" for higher pay.  29 U.S.C. § 206(d)(1).  The record includes no male Issues & Appeals associate who performed as poorly as Sheketoff—whose billable client hours were as low as Sheketoff's, whose reviews were as negative as Sheketoff's, or who received practice ratings of "2" in consecutive years—and yet was paid more than her. These facts foreclose the EPA claim.  *See Spencer v. Va. State Univ.*, 919 F.3d 199, 203-05 (4th

Cir. 2019), as amended (Mar. 26, 2019) ("Equality under the [EPA] is a demanding threshold requirement" that "requires a comparator to have performed work 'virtually identical' (or the apparent synonym, 'substantially equal') to the plaintiff's in skill, effort, and responsibility."); *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 257 (2d Cir. 2014) (rejecting claim that "all lawyers perform the same or similar function[s]" and noting such a "generalization" would "permit lawsuits against any law firm . . . that does not employ a lockstep pay model"). Sheketoff's poor performance is a factor "other than sex" that justifies her lower rate of pay. 29 U.S.C. § 206(d)(1).

### D. Sheketoff Cannot Establish Disparate Impact.

Finally, Sheketoff has failed to pursue the baseless disparate impact claim asserted in the January 2019 email and the Complaint. *See* TAC ¶¶ 245 (Title VII), 260 (DCHRA). Like the plaintiffs in related litigation, *see* Dkt. 181, *Tolton v. Jones Day*, No. 19-cv-00945 (D.D.C. Dec. 14, 2020), Sheketoff provides no expert statistical evidence whatsoever of disparate impact. Defendants are thus entitled to summary judgment on the disparate impact claim.

## IV. JONES DAY'S PRESS RELEASE DOES NOT CONSTITUTE RETALIATION.

Plaintiffs' final claims, regarding Jones Day's press release (Counts 12-14), are no better. Plaintiffs cannot establish a dispute of fact on retaliation or overcome the First Amendment.

### A. Plaintiffs Cannot Establish The Elements Of Retaliation.

The same retaliation framework discussed above, *supra* at 17, applies here. Plaintiffs cannot meet these standards.

*First*, the undisputed record shows that Jones Day issued the press release to respond to Plaintiffs' media attacks, not to retaliate against them for filing a lawsuit:

- In his January 2019 email, Savignac threatened to attack Jones Day "in the court of public opinion"—a threat Brogan understood to mean that "if you don't give me my money, I'm going to the press." SUMF ¶¶ 408-10 (quoting Brogan Tr. 21:18-20).

- Months later, Savignac's then-attorney sent a letter to Jones Day with a draft complaint. SUMF ¶¶ 418-20.  Believing that Savignac's "threat to go to the media was going to come to fruition," Brogan began "the process of drafting a press release in anticipation of a media attack."  SUMF ¶¶ 421-23 (quoting Lovitt Tr. Vol. 1 48:5-14 (with errata)).

- On August 12, 2019, a New York Times reporter informed Jones Day that Plaintiffs would be suing Jones Day imminently, and asked Jones Day for comment.  SUMF ¶¶ 425-27.  The next day, Sheketoff emailed Jones Day a copy of the complaint because "[t]he New York Times reporter said you wanted to see [it]."  SUMF ¶ 428 (quoting JD_00002982).

- At that point, Brogan "knew we had to say something in response to the impending article in the Times about your—what I viewed as false allegations about the firm."  SUMF ¶ 437 (quoting Brogan Tr. 180:16-19).

- "There was no plan to issue the press release until The New York Times ran its article.  [Jones Day] [was] not going to issue a press release unless there was a media attack.  And when we were contacted by The New York Times, and it became clear that there was going to be the media attack, that Mark had threatened, then we decided that we needed to respond via press release."  SUMF ¶ 424 (quoting Lovitt Tr. Vol. 1 22:8-18).

- Plaintiffs filed their complaint on August 13, 2019.  SUMF ¶ 432.  The next day, the New York Times published a lengthy story featuring the Plaintiffs, their lawsuit, and their interviews with the Times, along with professional photographs of Plaintiffs and their child; the article also contained some excerpts from Jones Day's press release.  SUMF ¶¶ 433-34.

- Plaintiffs subsequently provided interviews and photographs of themselves and their child to the Washington Post, *see* SUMF ¶ 416, and gave interviews to other media outlets.  SUMF ¶¶ 411-17 (identifying articles).

- Jones Day posted its press statement on its website.  SUMF ¶ 435.  It did not provide any further statements to press organizations.  SUMF ¶ 436.

The undisputed evidence is that Jones Day's press statement was in direct response to Plaintiffs' media campaign and the media's dissemination of Plaintiffs' "false allegations about the firm"; it was *not* in retaliation for Plaintiffs' suit.  SUMF ¶¶ 437-38 (quoting Brogan Tr. 180:16-19).  This is a legitimate, non-retaliatory reason for the press release.  *See Williams v. Fla. Atl. Univ.*, No. 15-cv-60621, 2017 WL 1881676, at *7 (S.D. Fla. May 9, 2017) ("'public relations'" is a "legitimate non-discriminatory reason").

*Second*, no reasonable jury could find that Jones Day's press statement was "materially

adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  An adverse action must be "likely to dissuade employees from complaining or assisting in complaints."  *Id.* at 70. "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions" for retaliation purposes.  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006).  "Context matters."  *Burlington N.*, 548 U.S. at 69.

There is no evidence that the press release impaired Plaintiffs' "future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002).  Plaintiffs' reliance on "'[p]urely subjective'" harms such as "loss of reputation," do not suffice as a matter of law.  *Holcomb*, 433 F.3d at 902.[4]

In addition, the press release stated only Defendants' legal positions, which were later detailed in filings to which the public has access and about which the media has reported extensively throughout this litigation.  SUMF ¶ 440.  The public airing of Jones Day's defenses was thus an unavoidable consequence of Plaintiffs' filing this suit, particularly after *Plaintiffs themselves* engaged the media to draw attention to the case.  *See* SUMF ¶¶ 411-17 (detailing Plaintiffs' pre-suit media activities).  On these facts, the press release could not materially alter an employee's calculus about whether to sue.  *Cf. Coleman v. Am. Broad. Cos.*, No. 84-cv-1594, 1985 WL 365, at *9 (D.D.C. June 18, 1985) (dismissing defamation claim in part because "[w]hat is contained in the statement is no more than what would be contained in an answer to the complaint").  Indeed, a responsive press release is, itself, a routine incident of litigation.

---

[4] *See Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) ("'[F]alse accusations' without negative employment consequences . . . do[] not constitute an adverse employment action."); *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70-71 (D.D.C. 2012) (public embarrassment and false accusations not "materially adverse"); *Touvian v. District of Columbia*, 330 F. Supp. 3d 246, 251 (D.D.C. 2018) (report and reprimand of employee do not suffice); *Wigfall v. Off. of Compliance*, 332 F. Supp. 3d 159, 174 (D.D.C. 2018) (allegations of "aggressive[]" behavior, a critical memo, being ignored, and a "scold[ing]" do not suffice).

Finally, Defendants' litigation positions cannot be retaliation, as any contrary rule would harm the employer's ability to defend itself.[5]  While Plaintiffs seek to distinguish these cases as involving statements to a court (not the media) that distinction makes no difference where, as here, the media statement merely mimics court statements and was necessitated by the Plaintiffs' decision to try their claims in the court of public opinion and the resulting influence on the jury pool.  *See* SUMF ¶ 440.  The law cannot, at once, allow Plaintiffs to publicize allegations that Defendants view as false while prohibiting Defendants from describing their legal defenses.

## B.    The First Amendment Bars Any Liability For The Press Release.

Plaintiffs' claims are separately barred by the First Amendment.  While Plaintiffs have styled their claims as retaliation (rather than defamation), the First Amendment can "preclude[]" application of statutory claims that seek to hold parties liable for "civil actions alleging reputational or emotional harm from the publication of protected speech."  *Barr v. Clinton*, 370 F.3d 1196, 1202-03 (D.C. Cir. 2004) (citing *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988)).[6]

Plaintiffs have admitted that they promoted their lawsuit to the New York Times, indeed to *multiple* media outlets.  *See* SUMF ¶¶ 411-17.  Because they "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved,"

---

[5] *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998) ("[I]t will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation prohibited by these statutes."); *Baird v. Gotbaum*, 888 F. Supp. 2d 63, 74 (D.D.C. 2012) (no retaliation based on "adversarial conduct arising in the course of litigation"); *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23, 33 (D.D.C. 2009) ("counterclaims cannot, as a matter of law, constitute an adverse employment action").

[6] *Cf. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (First Amendment bars Title VII claims); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (First Amendment bars state antidiscrimination claim); *Barr*, 370 F.3d at 1203 ("[R]uling otherwise, . . . would allow public officials to recast defamation claims barred by *New York Times*"); *Hustler*, 485 U.S. at 50–51 (applying defamation standards to common law claims); *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 18 (D.D.C. 2001) (applying defamation standards to § 1985 action).

Plaintiffs are limited-purpose public figures with respect to these issues. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016). They must adduce evidence raising a reasonable inference that the press release "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996); *Jankovic*, 822 F.3d at 589-90 (listing types of evidence for falsity showing). And where, as here, statements of opinion are involved, the D.C. Circuit has "applied a 'supportable interpretation' standard: the writer is immune . . . [unless] the statement is 'so obviously false' that '*no reasonable person could find* that [its] characterizations were supportable interpretations' of the underlying facts." *Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996) (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 315, 317 (D.C. Cir. 1994)).

Plaintiffs cannot satisfy these high standards. Plaintiffs assert that three aspects of the press statement are retaliatory: (i) the statement that Plaintiffs' claim would result in intrusive medical disclosures, *see* Dkt. 25-1 ¶ 22; (ii) the Firm's statement that it fired Mark due to his unprofessional conduct, immaturity, and poor judgment, *id.* ¶¶ 27-31; and (iii) various statements challenging Sheketoff's discrimination claim, *id.* ¶¶ 59, 65, 73, 85, 86. But these statement are merely an articulation of Jones Day's defense, which the record proves Defendants reasonably believe and are advancing in this litigation. *See, e.g.*, SUMF ¶ 440; *Jankovic*, 822 F.3d at 589-90; *see also Coleman*, 1985 WL 365, at *9 ("What is contained in the statement is no more than what would be contained in an answer to the complaint.").

In addition, uncontroverted testimony from the press release's author (Brogan) and the Rule 30(b)(6) witness (Lovitt) proves that Defendants had a good faith basis for each statement.

For example, with respect to medical disclosures (which is neither defamatory nor caused any harm to Plaintiffs), Lovitt testified:

- "That is . . . the firm's interpretation of the allegations in [Plaintiffs'] Complaint.  That in order to be able to have a disability without . . . a presumption of medical certification, you necessarily have to have medical evidence. . . . There is really a binary choice there. . . . You either have a certification presumption, that is reasonable, like we have, or you have to provide medical evidence.  There is no other way to have a policy.  That is the only way we can construe and interpret [Plaintiffs'] complaint.  And that is, in fact, our opinion of what [Plaintiffs] were arguing in [their] Complaint."  SUMF ¶ 443 (quoting Lovitt Tr. Vol. 1 88:2-89:8).

- "[I]n the firm's opinion, we know of only two ways to implement a [short-term disability] policy like this, which is to have a presumption for medical certification or to have medical evidence.  You were challenging the presumption.  You're advocating medical evidence.  Otherwise, you are in a world of I don't know what."  SUMF ¶ 444 (quoting Lovitt Tr. Vol. 1 90:11-20).

Likewise, as described in Part II, *supra*, Brogan testified extensively about his reasons for terminating Savignac and his opinions about Savignac's conduct, *see generally* SUMF ¶¶ 341-61, including:

- "[T]he character flaws that [he] saw in th[e] email as a whole."  SUMF ¶ 342 (quoting Brogan Tr. 66:19-25).

- Savignac's "poor judgment and immaturity," including the email's conclusory and arrogant tone in which Savignac "act[ed] as if [Plaintiffs] personally were the law-givers," decreeing that "our policy on leave was illegal," yet providing no affirmative legal support for his position.  SUMF ¶¶ 343, 348-50 (quoting Brogan Tr. 16:18-20; *id.* 15:3-18:10).

- Savignac "being completely dishonest in attacking the firm," which "goes to [his] character" and was "just not conduct that we can accept."  SUMF ¶¶ 351-58 (quoting Brogan Tr. 39:4-17).

- Savignac's demand that Jones Day "'[g]ive me what I want,' . . . 'or else,'" which Brogan reasonably interpreted as "a threat to go . . . to the press" and "an extortionist demand" given that Savignac "had no claim that [he was] disabled."  SUMF ¶ 344 (quoting Brogan Tr. 17:10-17, 21:21-22:10).

And, as described in Part III, *supra*, Brogan and Lovitt both testified about the basis for the press release's statements and opinions about Sheketoff:

- Brogan "personally was involved in setting [Sheketoff's] compensation and reviewing [her], and [he] knew that [she] was treated extremely fairly and extremely well," so "there was no basis for [Savignac] to say that [she] was being discriminated against. None. Zero." SUMF ¶ 354 (quoting Brogan Tr. 195 4-12).

- The press release's reference to Sheketoff's "idiosyncratic concerns" was Brogan's way of nicely suggesting that Sheketoff's focus was not on the Firm's client billable work but other personal interests, a fact she acknowledged in her self-evaluation. SUMF ¶¶ 442, 445 (quoting Brogan Tr. 195:20-197:17).

- Sheketoff's outrageous claim that the Firm "doctored" her photo to "conform to the firm's Caucasian standards of female beauty" is "just a lie." SUMF ¶ 451 (quoting Brogan Tr. 197:25-198:18). Jones Day hired a third-party vendor to take photographs of lawyers for its website; Jones Day had no involvement with the photographs chosen or any retouching that the photographer may or may not have made, which is confirmed by a declaration from the photographer. SUMF ¶¶ 447-51.

In short, the record affirmatively disproves that the press statement was false, much less "knowingly false, disingenuous, willfully misleading, and calculated to deceive the reader." Dkt. 25-1 ¶ 5. It merely reflects Jones Day's consistent litigation positions, which cannot establish "actual malice." *See Barr*, 370 F.3d at 1202; *Moldea*, 22 F.3d at 315, 317. Summary judgment is therefore appropriate in Defendants' favor.

## CONCLUSION

For the reasons articulated above, the Court should grant summary judgment for Defendants on all claims.

December 2, 2022                         Respectfully submitted,

                                        */s/ Terri L. Chase*
                                        Terri L. Chase (*pro hac vice*)
                                        JONES DAY
                                        600 Brickell Avenue, Suite 3300
                                        Miami, Florida 33131
                                        Ph: (305) 714-9700
                                        Email: tlchase@jonesday.com

                                        Traci Lovitt (Bar No. 467222)
                                        JONES DAY
                                        250 Vesey Street
                                        New York, NY 10281
                                        Ph: (212) 326-3939
                                        Email: tlovitt@jonesday.com

                                        Christopher DiPompeo (Bar No. 1003503)
                                        JONES DAY
                                        51 Louisiana Avenue NW
                                        Washington, DC 20001
                                        Ph: (202) 879-3939
                                        Email: cdipompeo@jonesday.com

                                        Anderson T. Bailey (*pro hac vice*)
                                        JONES DAY
                                        500 Grant Street
                                        Pittsburgh, PA 15219
                                        Ph: (412) 391-3939
                                        Email: atbailey@jonesday.com

                                        *Attorneys for Defendants*