## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, ) ) ) *Plaintiffs*, ) ) *v.* ) ) JONES DAY, *et al.*, ) ) *Defendants*. ) | Civ. No. 1:19-02443 (RDM)  **RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

In accordance with Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Defendants submit the following statement of material facts, as to all of which there is no genuine issue to be tried:

## I.    THE PARTIES

### A.    Defendants

1.      Jones Day ("Firm") is a general partnership organized under Ohio law, and a global law firm with more than 2,300 lawyers in 42 offices across five continents, including an office in Washington, D.C.  McClure Decl. at ¶ 5.

2.      Stephen J. Brogan is a partner at Jones Day and, since 2003, has been the Firm's Managing Partner.  Answer to Third Am. Compl. ¶ 16 (Dkt. 178); Chase Ex. 77, Brogan Tr. 10:10-12.

3.      Michael Shumaker is a partner at Jones Day and has served as the Firm Administrative Partner since approximately 2014.  Answer to Third Am. Compl. ¶ 17 (Dkt. 178); Chase Ex. 81, Shumaker Tr. 15:24-25, 16:7-8, 16:20-23.

4.      Beth Heifetz was a partner at Jones Day and the Practice Leader for the Issues & Appeals practice throughout the relevant time period, and became Of Counsel to the Firm in 2021.  Answer to Third Am. Compl. ¶ 18 (Dkt. 178); Heifetz Decl. at ¶ 1.

5.      Jones Day's Firm Manual delineates the "values, principles and basic policies which govern the Firm's operations."  Among them are the "foundational value" of "integrity" in dealing with one another, as well as commitments to "the advancement of the rule of law" and to "working together in an environment of mutual respect."  Chase Ex. 1 at JD_00002036, 2038, 2041.

6.      As stated in the Manual, the Firm "embraces diversity" and "operates on the belief that the Firm and every component of the legal profession should be diverse in the broadest sense of the term."  Chase Ex. 1 at JD_00002042.

7.      Managing Partner Brogan has testified that, consistent with those principles, the Firm has always been "committed to trying to encourage everybody" to succeed, "to become great Jones Day lawyers," and "to do great work for the firm" and its clients.  Chase Ex. 77, Brogan Tr. 31:14-21.

8.      Demonstrating Jones Day's commitment to the advancement of all lawyers, including women and diverse lawyers, the legal news service Law360 has named Jones Day a "Ceiling Smasher" in each of the past three years for having one of the top percentages of women partners in law firms with more than 600 lawyers.  McClure Decl. at ¶ 7.

9.      In addition, 48% of the new partners announced in the last five new partner classes are women.  McClure Decl. at ¶ 6.

10.     Women and diverse candidates also occupy leadership positions around the Firm; 45% of Jones Day's offices are led by a female Partner-in-Charge.  McClure Decl. at ¶ 6.

11.     Of the Firm's twenty-two practice groups, nine—including the Issues & Appeals practice, of which Sheketoff and Savignac were part—have a female Practice Leader, and female attorneys comprise 40% of the Firm's two primary governance committees.  McClure Decl. at ¶ 6.

12.     Jones Day also supports six internal, Firmwide affinity groups—including affinity groups for Women Lawyers, Black Lawyers, and LGBTQ+ Lawyers and allies—and hosts an annual 1L Diversity Conference, which involves fully subsidizing the travel and other costs associated with a two-day conference that brings together Jones Day lawyers, Firm clients, and first-year law students from across the country.  McClure Decl. at ¶ 8.

13.     Jones Day also has been "been extraordinarily supportive of people and their families," including by offering associates generous, gender-neutral family leave upon the birth of a child.  Chase Ex. 77, Brogan Tr. 174:8-9.

14.     In the time period relevant to this case, Jones Day provided associates ten weeks of family leave on a gender-neutral basis—that is, to both birthmothers and birthfathers who acted as primary caregivers—and allowed associates to divide their family leave into different blocks to maximize the time that a parent is home with a newborn.  McClure Ex. 1 at JD_00002485-86.

**B.     Plaintiffs**

15.     Julia Sheketoff joined Jones Day in October 2014 following clerkships with Judge David Sentelle of the United States Circuit Court of Appeals for the D.C. Circuit and Justice Breyer of the U.S. Supreme Court.  Sheketoff was an associate in the Issues & Appeals practice, resident in the Firm's Washington D.C. office.  Third Am. Compl. ¶¶ 3, 101 (Dkt. 172); *see also* Chase Ex. 17 at JD_00000194.

3

16.     Prior to joining the Firm, Sheketoff was deciding between Jones Day and a position with the Federal Public Defender's Office, but chose Jones Day because it "paid a lot more" and she "thought I would get good experience there" and "was excited about the idea of being able to do pro bono work with the Federal Defender's Office and other offices."  Chase Ex. 80, Sheketoff Tr. 15:9-14.

17.     She received a clerkship bonus of $300,000 and starting salary of $300,000, and was paid a total of more than $1.8 million in salary and bonus in less than four years at the Firm. Chase Ex. 17 at JD_00000092, 184.

18.     In the time that she was at the Firm, Sheketoff billed a total of 2,628 hours to paying clients (an average of approximately 700 hours a year), and billed 3,388 hours to pro bono matters.  Chase Ex. 15 at JD_JS_00001289, 1296.

19.     In July 2018, Sheketoff accepted a position at the Federal Public Defender's Office—the employer she had initially turned down in favor of the higher-paying position at Jones Day.  Chase Ex. 80, Sheketoff Tr. 23:21-24:3; *see also* Chase Ex. 40, JD_00003191.

20.     Sheketoff was pregnant at that time and wanted to stay at Jones Day "through maternity leave here" so that she could take advantage of the Firm's generous paid leave offerings, but "for some reason the FD office wasn't super pumped about" that.  Chase Ex. 40, JD_00003191; *see also* Chase Ex. 80, Sheketoff Tr. 26:18-27:18.

21.     Her last day at Jones Day was August 24, 2018.  Chase Ex. 17, JD_00000092.

22.     Mark Savignac, who also clerked for Justice Breyer, joined Jones Day in May 2017 and was an associate in the Firm's Issues & Appeals practice, resident in the Washington D.C. office.  Third Am. Compl. ¶ 84.

23.     He was terminated effective January 22, 2019.  Chase Ex. 46, JD_00002633.

4

## II.     JONES DAY'S LEAVE POLICIES RELATED TO CHILDBIRTH

24.     Jones Day maintains various leave policies applicable to associates in a document entitled HR Policies and Benefits – Lawyer – Partner, Of Counsel, Counsel, Associate, and Senior Staff Attorney ("HR Policies").  McClure Ex. 1, JD_00002479-80.

25.     The version of the HR Policies in effect as of January 2019 included a section entitled "Short Term Disability ('STD') Leave" that allows, "[i]n any one year period, full salary and fringe benefits for up to the first 13 weeks of continuous disability, and 75% of salary and full fringe benefits for up to the 14th through 26th weeks of continuous disability."  McClure Ex. 1 at JD_00002483.

26.     There is an application process for STD leave, and an associate "will be considered disabled for purposes of this policy if he or she is unable to perform the material and substantial duties of his or her regular occupation, … is not working in any occupation, and is under the regular and continuing care of a physician or other 'health care provider' as defined under the federal [FMLA]."  McClure Ex. 1 at JD_00002483.

27.     Salary continuation under the STD policy is "subject to repayment by the lawyer if the leave is later determined not to qualify for salary continuation under this policy."  McClure Ex. 1 at JD_00002483.

28.     The STD policy further states: "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, postpartum disability period for routine childbirth (including Cesarean-section births)."  McClure Ex. 1, JD_00002484.

29.     In the event birth-related disability extends beyond eight weeks postpartum, "the specific period of approved STD leave is subject to certification from professional medical personnel that specifies the appropriate length of leave."  McClure Ex. 1 at JD_00002484.

30.     Plaintiffs alleged to the Equal Employment Opportunity Commission that the "8 weeks of leave given to birth mothers (but not birth fathers)" under Jones Day's STD policy "is caretaking leave rather than disability leave" and that Jones Day unlawfully discriminated against Savignac based on his sex by denying his request to take 8 additional weeks of paid leave under the STD policy.  Chase Ex. 43 at JD_00003259.

**A.     Jones Day Adopted the Eight-Week Assumption for Non-Discriminatory Reasons**

31.     Jones Day adopted the eight-week disability assumption for routine childbirth in 1994.  Dressing Decl. at ¶ 15.

32.     Prior to that time, Jones Day's benefits for non-partner lawyers provided twelve weeks of paid leave and twelve weeks of unpaid leave to women who gave birth.  Dressing Decl. at ¶ 6; *see also* Chase Ex. 3 at JD_00003413.

33.     Those leave periods did not differentiate between, on the one hand, time that the new mother needed to recover from childbirth and, on the other, time for the new mother and child to bond, and Jones Day did not require any type of disability certification from the lawyer's medical provider.  Dressing Decl. at ¶ 6.

34.     The Firm also did not provide any type of formal family leave to new fathers, who typically utilized vacation time or sick days to take time off of work following the birth of a child.  Dressing Decl. at ¶ 6.

35.     These policies were generally consistent with those of comparably-sized law firms.  Dressing Decl. at ¶ 6; *see also* Chase Ex. 4, JD_00003899-900.

36.     After Congress enacted the Family and Medical Leave Act in 1993, Julie Dressing—at the time Jones Day's Director of Human Resources & Employment Counsel—

undertook a privileged review of Jones Day's leave policies, acting in her capacity as counsel to the Firm.  Dressing Decl. at ¶ 7.

37.     The review included surveying leave policies at other law firms to understand what types of benefits would be competitive in the legal market.  Dressing Decl. at ¶ 9; *see also* Chase Ex. 4 at JD_00003899-900.

38.     Following that survey, Dressing concluded that the amount of paid leave Jones Day made available to new mothers—twelve weeks—was at the top of the legal market and competitive from a recruiting standpoint.  Dressing Decl. at ¶ 9.

39.     Dressing concluded that Jones Day did not need to expand the amount of paid leave for new mothers, but she did recommend that the Firm begin providing family leave to new fathers as a benefit separate and distinct from vacation or sick days.  Dressing Decl. at ¶ 9.

40.     This necessitated deciding how much of the twelve weeks of paid leave available to new mothers was for recovery from childbirth, and thus available only to those associates who actually gave birth.  The remainder of that period would be deemed family leave and made available to all new parents.  Dressing Decl. ¶ 10.

41.     Dressing recommended assuming that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complications.  Dressing Decl. ¶ 10.

42.     Dressing based her recommendation on several factors.  Dressing Decl. ¶ 11.

43.     *First*, Dressing knew from experience that physicians "typically certified between six and eight weeks of disability for uncomplicated childbirth, often depending on whether the birth was vaginal or via Cesarean section."  Dressing Decl. ¶ 11(a).

44.     Although Jones Day had not previously required attorneys to provide medical certifications for disability from childbirth, it had required such certifications from staff members, and Dressing was familiar with those certifications from her role as Jones Day's Director of Human Resources.  Dressing Decl. ¶ 11(a).

45.     *Second*, in Dressing's experience—echoed by that of other HR staff who testified in this case—even when a physician certified six weeks of short-term disability from childbirth, employees "would occasionally provide a second certification late in that six-week period certifying some additional time of disability leave."  Dressing Decl. ¶ 11(a); *see also* Chase Ex. 76, Bounds Tr. 8:1-25, 192:1-17 (testimony of Lori Bounds, an HR staff member at Jones Day for twenty-five years who worked with staff-related postpartum disability leave, that "the six weeks for vaginal delivery was often the beginning point, and then often it was extended to eight weeks").

46.     *Third*, although the initial certification of disability could differ depending on the type of delivery (vaginal or Cesarean), Jones Day did not want to start compelling female associates to disclose that type of medical information to the Firm as a condition of receiving disability leave.  Dressing Decl. ¶ 11(b).

47.     Dressing was concerned that the female associates working at Jones Day at the time—who had not previously been forced to identify their type of delivery—"might react negatively to the new level of intrusiveness if Jones Day were to start requiring disclosures of, for instance, the type of birth."  Dressing Decl. ¶ 11(b).

48.     *Fourth*, because the Firm did not want to require female associates to identify whether they gave birth vaginally or via Cesarean section, an eight-week assumption would best

ensure that the Firm adequately accommodated all short-term disabilities for routine childbirth. Dressing Decl. ¶ 11(c).

49.     *Fifth*, an assumed disability period would be easier for Jones Day to administer, as it would not only be consistent with medical practice, but also would avoid having to follow-up with associates postpartum to ascertain their overall level of physical capability throughout the course of their recovery.  Dressing Decl. ¶ 11(d).

50.     *Finally*, Dressing understood from her experience in human resources that assuming an eight-week disability for routine childbirth would be consistent with how insurance companies administered disability plans.  Dressing Decl. ¶ 11(e).

51.     The Firm's then-Managing Partner approved the policy change based on Dressing's recommendation.  Chase Ex. 5, JD_00003300.

52.     The 1994 and 1997 versions included the updated policy and explained the apportionment of leave by referencing the fact that "physicians generally certify a six to eight week disability period."  Chase Ex. 6 at JD_00003542; Chase Ex. 7 at JD_00003683.

53.     The Firm did not adopt an eight-week disability assumption to discriminate against men, to provide birthmothers more bonding time than fathers, or to enforce any notion that fathers are breadwinners who should work more than women.  Dressing Decl. ¶¶ 10, 12-14.

54.     The changes that Dressing recommended were based on the Firm's understanding of and experience with the medical standard of care for routine childbirth, how disability plans operate, and administrative and privacy considerations, and those changes granted male associates paid family leave that they did not previously have in an amount equal to the paid family leave available to female associates.  Dressing Decl. ¶¶ 12-14.

**B.      Jones Day's Policy is Consistent with the Undisputed Medical Standard of Care**

55.      Both sides in this case have produced expert evidence from doctors specializing in obstetrics and gynecology ("OBGYN").  Plaintiffs identified Dr. Kenneth Naylor, and Defendants identified Dr. Christine Colie, Vice Chair of OBGYN at MedStar Georgetown and a professor in OBGYN at Georgetown University Medical Center.  *See* Chase Ex. 87, Naylor Report; Chase Ex. 85, Colie Report.

56.      It is undisputed that—in the words of Plaintiffs' expert—"[p]roviders in the United States generally authorize a 6-week disability for an uncomplicated vaginal birth and 8 weeks for an uncomplicated cesarean delivery."  Chase Ex. 87, Naylor Report at 2; *see also* Chase Ex. 85, Colie Report at 3, 12; Chase Ex. 90, Naylor Tr. 23:12-22, 83:9-88:3.

57.      As Dr. Christine Colie opined: "The medical standard of care for short-term disability following childbirth without complications is six to eight weeks," and "[i]t is typical to certify a period that lasts six to eight weeks following the delivery."  Chase Ex. 85, Colie Report at 3.

58.      The experts in this case agree that a six-week period of disability for a routine vaginal delivery is medically reasonable.  Chase Ex. 85, Colie Report at 3; Chase Ex. 90, Naylor Tr. 52:3-5, 83:22-84:1.

59.      The experts also agree that an eight-week period of disability for an uncomplicated cesarean delivery is medically reasonable, and that approximately one-third of all births in the United States are via Cesarean section.  Chase Ex. 85, Colie Report at 3, 15; Chase Ex. 90, Naylor Tr. 83:9-88:3, 142:18-20.

60.      Certified postpartum disability periods can vary between six and eight weeks, depending on the method of delivery and any complications.  Chase Ex. 85, Colie Report at 3,

12; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 23:13-22, 30:20-31:15, 83:9-84:23, 108:24-109:9.

61.     Moreover, "medical certification of birth-related" disability is generally predictive because it "typically happens prior to birth"—indeed, often before the method of delivery is known and before any birth-related complications are known.  Chase Ex. 85, Colie Report at 12; Chase Ex. 90, Naylor Tr. 86:6-10, 109:19-25; Chase Ex. 89, Colie Tr. 26:5-23.

62.     In practice, this means that the certification of postpartum disability—which obstetricians typically provide before birth—will identify a disability period of six weeks, eight weeks, or six-to-eight weeks, on the assumption that delivery will be routine.  Chase Ex. 85, Colie Report at 12; Chase Ex. 90, Naylor Tr. 30:20-31:15, 108:5-111:1.

63.     If prior to birth the method of delivery is unknown, providers often certify a six-to-eight week range based on the standard of care, meaning that for an employer to assume an eight-week disability period from routine childbirth "generally reflects what happens in practice when a provider certifies disability from childbirth."  Chase Ex. 85, Colie Report at 3, 12.

64.     If it is known prior to birth that delivery will be via cesarean section, or that the birthmother presents certain comorbidities or "complications," the provider generally will certify a postpartum disability period of eight weeks.  Chase Ex. 85, Colie Report at 3, 12-13; Chase Ex. 89, Colie Tr. 18:17-19:9, 26:24-27:18, 29:24-30:24, 225:3-226:1; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 82:21-83:3, 84:4-24, 95:18-22.

65.     Dr. Colie also opined that an eight-week disability period is not only "the standard of care for women who give birth via caesarean section (one-third of all births)," but also "medically reasonable in light of the physiologic and mental health impacts surrounding routine vaginal delivery," as well.  Chase Ex. 85, Colie Report at 3; *see also* Chase Ex. 85, Colie Report

11

at 11 (noting "medical sources and studies" that "suggest the recovery period may extend longer than six weeks for routine vaginal delivery").

66.     Dr. Naylor testified that he certifies six weeks for routine vaginal births, eight weeks for caesarean deliveries, and six-to-eight weeks when the method of delivery is unknown at the time of certification, and that he would not knowingly certify a false disability period. Chase Ex. 90, Naylor Tr. 108:5-111:1, 141:6-142:2.

67.     Apart from taking into account method of birth and predictable complications, medical certifications for postpartum disability are generally not individualized.  Chase Ex. 85, Colie Report at 12; Chase Ex. 87, Naylor Report at 2, Chase Ex. 90, Naylor Tr. 108:24-18, 110:11-111:1.

68.     Medical certifications for postpartum disability are not based on the patient's employment status or the particular job duties of an employed patient.  Chase Ex. 85, Colie Report at 14; Chase Ex. 90, Naylor Tr. 114:9-16.

69.     Rather, these certifications reflect the medical standard of care that recovery from childbirth without complications typically requires six-to-eight weeks.  Chase Ex. 85, Colie Report at 2-3; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 83:9-84:1.

70.     Neither expert opined that women should be expected, or reasonably could be expected, to return to any type of job immediately following birth.  Chase Ex. 85, Colie Report at 12; Chase Ex. 87, Naylor Report at 2.

71.     According to Dr. Colie, "[i]mmediately after birth, the mother is physically disabled by any definition, and that disability should be obvious to any reasonable person." Chase Ex. 85, Colie Report at 12.

72.     Myriad conditions and risks necessitate some period of recovery from childbirth, including physical impacts in the vaginal area or incision site in the case of cesarean delivery; postpartum hemorrhaging; bleeding and anemia; swelling, constipation, hemorrhoids, back pain, and other related physical discomfort; the physical impact to the birthparent of breastfeeding issues; and mental health issues, among other things.  Chase Ex. 85, Colie Report at 3, 4-10, 12-13; Chase Ex. 90, Naylor Tr. 37:3-5.

73.     All people who give birth experience many, if not all, of these conditions to some degree in the twelve weeks following delivery, which is often referred to as the "fourth trimester."  Chase Ex. 85, Colie Report at 10-11.

74.     Postpartum medical care for routine deliveries does not include daily—or even weekly—examinations by a medical professional to ascertain the precise moment when recovery from childbirth is complete or when postpartum disability has subsided.  Chase Ex. 86, Colie Rebuttal Report at 2-3; Chase Ex. 90, Naylor Tr. 37:18-38:5.

75.     Such a regimen of regular assessment would overload providers, place undue burdens and stress on new mothers, and would be outside of the global obstetrical package that most insurers use to cover post-partum care.  Chase Ex. 86, Colie Rebuttal Report at 2-3; Chase Ex. 90, Naylor Tr. 36:25-38:5.

76.     Based on medical standards of care, obstetricians advise patients to schedule a postpartum examination "six-to-eight weeks after delivery."  This examination is the doctor's first opportunity to assess how the birthmother's recovery is progressing, as there is "typically no comprehensive physical assessment of the patient between a routine birth and the postpartum examination."  Chase Ex. 85, Colie Report at 3, 13.

77.     During the postpartum medical visit, doctors "assess whether the mother is properly recovering from childbirth" and whether she is able to safely resume work or other activities.  That includes a physical exam to ascertain whether the uterus is involuting properly, assessing the extent of pain and tenderness around the vagina or incision site, administering the Edinburgh Postnatal Depression scale and speaking with the patient about possible signs of postpartum depression, and checking vital signs and blood pressure.  Chase Ex. 85, Colie Report at 3, 13; *see also* Chase Ex. 90, Naylor Tr. 101:9-105:18.

78.     If the mother has not properly recovered, the doctor may certify additional disability leave.  Chase Ex. 85, Colie Report at 12-14; Chase Ex. 90, Naylor Tr. 84:4-23.

79.     Taking into account both the method of delivery, maternal comorbidities, or birth-related complications, over half of all deliveries medically warrant a postpartum disability period of more than six weeks.  Chase Ex. 89, Colie Tr. 91:11-23, 191:5-19, 221:12-222:7, 225:3-226:1.

80.     According to Dr. Colie, roughly one-third of deliveries are Caesarean; another 10-15% involve some degree of complications; and another 10% or so have ongoing symptoms at six weeks postpartum that require further recovery time.  Chase Ex. 85, Colie Report at 3; Chase Ex. 89, Colie Tr. 91:11-23, 221:12-222:7.

**C.     Jones Day's Policy is Consistent with Standard Insurance Practices**

81.     Since 2004, Jones Day's long-term and short-term disability plans have been administered by Unum Group ("Unum").  Latham Decl. at ¶ 13.

82.     As of November 30, 2022, Unum administered the short-term disability plans of 23,366 employers, covering over two million employees.  Latham Decl. at ¶ 8.

83.     A standard term in the disability plans that Unum administers is that an employee is disabled if "unable to perform the material and substantial duties of his or her regular occupation"—the same definition used in Jones Day's STD policy.  Latham Decl. at ¶ 4.

14

84.     For many types of routine medical procedures—such as routine appendectomies or other pre-planned procedures with established standards of care—Unum's "standard practice is to automatically consider this requirement to be met for certain types of conditions if the period of disability is within a standard duration." Latham Decl. at ¶¶ 4-6.

85.     These presumptive periods of disability are based on sources that include both Unum's own internal guidelines, as well as MDGuidelines, a source developed by the American College of Occupational and Environmental Medicine. Unum treats these sources as reflecting a standard of care developed both with input from practitioners and through analysis of actual claims experience. Latham Decl. at ¶ 5.

86.     Unum considers an employee to be unable to perform the material and substantial duties of his or her regular occupation if the period of disability leave for certain types of conditions—including routine childbirth—is within a standard duration. Latham Decl. at ¶ 4.

87.     In the case of childbirth without complications, Unum considers the standard period of short-term disability to be six to eight weeks. Latham Decl. at ¶ 7.

88.     Unum uses these standards in designing the insurance products and services that it offers employers. The "standard options" for childbirth that an employer can choose from when selecting a Unum short-term disability plan are: "(a) six weeks regardless of delivery, (b) eight weeks regardless or delivery, or (c) six weeks for natural delivery and eight weeks for delivery via cesarean section." Latham Decl. at ¶ 8.

89.     Once an employer chooses an option for postpartum disability leave, Unum applies that period to all disability claims related to birth without complications that are subject to the employer's disability plan. Latham Decl. at ¶ 9.

90.     For childbirth without complications, any disability period up to eight weeks is considered standard, and Unum considers the employee unable to perform the material and substantial duties of her regular occupation for that period, regardless of occupation.  Latham Decl. at ¶ 10.

91.     Unum also does not require a physician certification to approve postpartum disability if the disability period is not more than eight weeks.  Latham Decl. at ¶ 10.

92.     In Unum's view, given the physically-apparent nature of pregnancy and childbirth, there is virtually no risk of fraudulent claims.  Latham Decl. at ¶ 10.

93.     After Unum began administering Jones Day's STD plan, the options it offered to Jones Day for the standard disability period for maternity leave included:

> ☐ 6 Weeks Vaginal Delivery
> ☐ 6 Weeks C-Section Delivery
> ☐ 8 Weeks C-Section Delivery
> ☐ 8 Weeks Regardless of Delivery

Chase Ex. 8 at JD_00003278; Latham Decl. at ¶ 13.

94.     "Jones Day selected eight weeks regardless of delivery type."  Latham Decl. at ¶ 14; *see also* Chase Ex. 8 at JD_00003278.

95.     The option Jones Day selected is within industry standards and Unum does not require a physician certification of disability for approval of eight weeks of disability leave for routine childbirth, regardless of delivery.  Latham Decl. at ¶ 14.

**D.     Jones Day's Non-Discriminatory Application of Leave Policies Related to Childbirth and Adoption**

96.     At the time Plaintiffs alleged that Jones Day discriminated against Savignac based on his gender, the Firm's policies set forth two different types of paid leave relating to childbirth—STD leave and family leave.  *See* McClure Ex. 1 at JD_00002483-86.

16

97.     In addition, new parents might have other forms of leave available, such that an associate who gives birth might be away from work for several months on a combination of disability leave, paid family leave, vacation, sick days, and, with approval, unpaid leave.  Chase Ex. 76, Bounds Tr. 97:9-98:5; *see also* McClure Ex. 1 at JD_00002483-85.

98.     The Firm also provides paid family leave for parents who adopt a child.  McClure Ex. 1 at JD_00002485-86.

99.     Jones Day follows its leave policies as they are written.  Chase Ex. 76, Bounds Tr. 247:2-7.

### 1.     STD leave

100.    Jones Day's STD policy applies to all types of medical disabilities, and benefits under the policy are available to all associates, regardless of gender, marital status, sexual orientation, age, or race.  McClure Ex. 1 at JD_00002483-85.

101.    The principal requirement for eligibility under the STD policy is disability—the associate must be disabled.  McClure Ex. 1 at JD_00002484; McClure Decl. at ¶¶ 9-10.

102.    Jones Day—a law firm—does not assess its associates' medical conditions for the purpose of determining whether the individual is disabled.  McClure Decl. at ¶ 11.

103.    Rather, Jones Day has contracted with Unum to administer benefits under the STD policy.  McClure Decl. at ¶ 11.

104.    If Jones Day discovers that an associate was provided salary continuation under the STD policy but was not disabled for some portion of the relevant period, Jones Day has the right to recoup overpayments or reclassify periods away from work from STD leave to, for instance, vacation or sick leave.  McClure Decl. at ¶¶ 10, 13; Chase Ex. 76, Bounds Tr. 58:10-16.

105.    Jones Day has exercised this right in the case of employees who received salary continuation for disability but were later discovered not to be disabled.  McClure Decl. at ¶ 14.

106.    Since its implementation in 1994, Jones Day's assumption that a physician would certify an eight-week disability period for routine childbirth has remained in place.  Dressing Decl. at ¶ 15; McClure Ex. 1 at JD_00002484.

107.    Not all female associates are entitled to this assumption.  Only those female associates who give birth may utilize any aspect of the STD policy for paid leave related to childbirth.  McClure Decl. at ¶ 16.

108.    A new mother whose partner delivered the child could not take disability leave related to that delivery or otherwise benefit from the STD policy (assuming no other disability).  McClure Decl. at ¶ 16.

109.    Nor is the assumption that a physician would certify an eight-week disability for routine childbirth limited to individuals who identify as women.  Jones Day has assumed an eight-week disability period in the case of an associate who gave birth but did not identify as female.  McClure Decl. at ¶ 16.

110.    Moreover, neither the assumption that a physician would certify an eight-week disability for routine childbirth, nor any other aspect of the STD policy prevents an associate from returning to work prior to eight weeks postpartum.  McClure Decl. at ¶ 15.

111.    The assumption that a physician would certify an eight-week disability for routine childbirth is not a guarantee of eights week of paid leave.  McClure Decl. at ¶¶ 10-14.

112.    As stated in the summary of benefits provided to new associates—including Savignac—"[f]or routine childbirth (including cesarean-section births), unless the Firm is notified otherwise, it will assume an 8-week disability period."  Chase Ex. 2 at P02742; *see also* Chase Ex. 79, Savignac Tr. 76:9-77:5.

18

113.    Any person seeking salary continuation under the STD policy—including pregnant associates—is provided both the requirements set forth in the STD policy, as well as separate written notice "that salary continuation may be advanced by the Firm pending certification and approval, subject to repayment by me if the leave is later determined not to qualify for salary continuation under Firm policy."  McClure Ex. 2, JD_00002645; *see also* McClure Decl. at ¶¶ 9-10; McClure Ex. 1 at JD_00002483-85.

114.    Jones Day's 30(b)(6) witness, Lori Bounds testified that the Firm has never learned of an instance when an associate who gave birth was determined not to be disabled for at least eight weeks postpartum.  Chase Ex. 76, Bounds Tr. 68:20-69:6; *see also* McClure Decl. at ¶¶ 12-13.

115.    If Jones Day had learned of such an instance, Bounds would have consulted with the Firm's HR Director, who would advise that the associate was not entitled to salary continuation under the STD policy, and that Jones Day should seek to reclassify the period of disability leave when no disability was present or recoup any salary paid during the period of non-disability.  McClure Decl. at ¶¶ 12-13; Chase Ex. 76, Bounds Tr. 68:20-69:6.

### 2.    Family leave

116.    Since 1994, Jones Day has provided paid family leave as a benefit to all new birthparents.  The family leave policy is set out in a different section of the HR Policies and is distinct from the STD policy.  McClure Ex. 1 at JD_00002486.

117.    The amount of paid family leave was initially four weeks for both male and female associates.  *See supra*; *see also* Chase Ex. 6 at JD_00003542.

118.    In 2014, Jones Day concluded that this four-week period no longer represented the top of the market; comparably-sized firms were offering more generous amounts of paid family leave.  Chase Ex. 10 at JD_00003222-23.

119.     A small group of partners including the Firm Administrative Partner (Michael Shumaker), the Firm Hiring Partner (Sharyl Reisman), and then Firm Diversity Partner (Carter Delorme) concluded that the Firm's smaller (relative to the market) family leave benefit could harm the Firm's ability to retain current associates and recruit new talent.  In the group's view, increasing Jones Day's paid family leave benefit was "necessary to maintain and improve our ability to attract and retain the most qualified law students, judicial clerks, and lateral hires." Chase Ex. 10 at JD_00003216-17; *see also* Chase Ex. 81, Shumaker Tr. 185:18-21.

120.     These partners recommended to Jones Day's Managing Partner that the Firm change its policies to provide 10 weeks of paid family leave to birthmothers.  The change did not, however, benefit male associates, who continued to have four weeks of paid family leave available.  Chase Ex. 10 at JD_00003217.

121.     The partners did not analyze, reconsider, or recommend any changes to Jones Day's STD policy.  *See* Chase Ex. 10 at JD_00003216-17.

122.     Stephen Brogan, Jones Day's Managing Partner, approved the change, though he does not specifically recall reviewing the underlying memo, beyond perhaps looking at the market assessment.  Chase Ex. 77, Brogan Tr. 91:2-93:4.

123.     The change was announced to U.S. lawyers on January 22, 2015.  Chase Ex. 11, JD_00005170.

124.     In May 2015, an Issues & Appeals associate in Jones Day's Washington, D.C., office questioned the legality of the Firm's new policy, noting to her practice leader, Beth Heifetz, that under EEOC guidance "'parental leave must be provided to similarly situated men and women on the same terms.'"  The associate stated that "the firm's policy is a bit problematic" because—following the recent expansion of paid family leave for new mothers—it

gives "'10 weeks … [of] paid family leave' to mothers … but only 4 weeks of paid leave to fathers." Chase Ex. 41 at JD_00003792-93.

125.    Heifetz forwarded the message to the Firm's Director of Human Resources and Employment Counsel, Sarah McClure, who undertook a privileged analysis and contacted Michael Shumaker, the Firm Administrative Partner, who approved a change to the family leave policy. Chase Ex. 41, JD_00003790-92.

126.    Following that change—and again, consistent with comparably sized law firms—Jones Day's policy for paid parental leave took into consideration only caregiver status, not gender. Chase Ex. 12 at JD_00003158; *see also* Chase Ex. 10 at JD_00003222-23 (surveying other firms).

127.    On a gender neutral basis, any parent of a newborn would receive ten weeks of paid family leave if he or she was the "primary caregiver," and four weeks of paid family leave if he or she was the "secondary caregiver." Chase Ex. 12 at JD_00003158.

128.    The associate who contacted Heifetz in 2015 and questioned the Firm's expansion of paid family leave for new mothers as legally "problematic" was later elevated to partner. Chase Ex. 41 at JD_00003792-93; McClure Decl. at ¶ 25.

129.    The Firm does not require associates, whether male or female, to obtain approval for family leave, and Jones Day does "not assume which caregiver leave" (primary or secondary) the associate will take; "we expect them to tell us." Chase Ex. 76, Bounds Tr. 76:23-24; *see also id*. 75:4-77:1, 144:19-23.

130.    No approval or proof of caregiver status is required; Jones Day does not "try to define primary caregiver in the policy. So if an individual—if a lawyer tells, for example, the

HR person in maybe doing their paperwork, I am the primary caregiver, we accept that."  Chase Ex. 76, Bounds Tr. 144:19-23.

131.    Initially, parents were required to commence family leave either within eight weeks of birth or, if applicable, immediately after the end of any disability leave.  Chase Ex. 12 at JD_00003158.

132.    In 2018, however, Jones Day altered that practice: "[C]onsistent with the Firm's commitment to being family friendly," Michael Shumaker approved permitting birthparents to commence family leave months after the child's birth, thereby providing them the flexibility to time leaves according to the family's needs.  Chase Ex. 14, JD_00003162.

133.    For example, where extended family were assisting with newborn care, the birthparent could delay family leave until needed.  And in families where both parents work, birthparents could take their leaves seriatim, "extend[ing] the time that a parent is home with the newborn."  Chase Ex. 14, JD_00003162 *see also* McClure Decl. at ¶ 21.

134.    Jones Day also altered its policy to allow birthparents to take paid family leave in two separate tranches, thus allowing them to parse their paid leave to fit the family's needs. McClure Decl. at ¶¶ 21-22.

### 3.    Leave for parents of adopted children

135.    As of January 2015, Jones Day began providing 18 weeks of leave to the primary caregivers of newly adopted children, and four weeks of paid leave for the secondary caregivers. Chase Ex. 11, JD_00005170.

136.    Defense expert Dr. Elaine Schulte is a board-certified pediatrician who specializes in care for adopted children and their families.  She started one of the first comprehensive adoption programs in the United States and helped establish the American Academy of Pediatrics Section on Adoption and Foster Care.  Chase Ex. 88, Schulte Report at 1.

137.     Dr. Schulte has provided the undisputed expert opinion that "[t]he unique aspects of welcoming an adopted child make it reasonable to distinguish between adoptive parents and birthparents," including by affording adoptive parents a greater amount of paid family leave. Chase Ex. 88, Schulte Report at 8.

138.     According to Dr. Schulte, adopted children—who frequently are not newborns— often present unique attachment and bonding issues; arrive with unknown prenatal histories and other health issues; and can have special needs.  Chase Ex. 88, Schulte Report at 3-6.

139.     Dr. Schulte also opined that adopting a child can require extensive foreign travel for the prospective parents, as well as foreign and/or domestic legal proceedings.  Chase Ex. 88, Schulte Report at 7.

140.     And bringing the adopted child to his or her new home can introduce socialization dynamics that impact the entire family.  Chase Ex. 88, Schulte Report at 6-7.

141.     These "differences between adopting a child and bringing home a biologically related newborn justify providing adoptive parents additional family leave, and 18 weeks of family leave for adoptive parents is a reasonable amount of time in light of the unique challenges that adoptive parents face."  Chase Ex. 88, Schulte Report at 1.

142.     The individuals who recommended providing 18 weeks of leave for adoptive parents are the same as those who examined family leave periods more generally in 2014.  Chase Ex. 10 at JD_00003217.

143.     At the time they were developing the adoption leave recommendation, the Firm Administrative Partner, Michael Shumaker, "question[ed] whether it makes sense to go to the full 18 paid weeks leave for adoption," since that would track the full paid leave available to

birth mothers, including time to "recuperate from the actual birth."  Chase Ex. 9 at

JD_00005118.

144.    But as Delorme, the Firm Diversity Partner, argued in response, 18 weeks of paid

family leave for the primary caregiver of adopted children would send "a particularly strong

message to the LGBT community, especially gay men who would have to adopt."  Chase Ex. 9

at JD_00005118.

145.    Shumaker, Reisman, and Delorme thus recommended, and Brogan approved,

expanding paid family leave for the primary caregiver of adopted children to 18 weeks and the

change took effect January 1, 2015.  *See* Chase Ex. 10 at JD_00003217; Chase Ex. 11,

JD_00005170.

146.    Jones Day reconsidered the issue a few months later.  In October 2015, McClure,

the Firm's Director of Human Resources and Employment Counsel, questioned whether "our

primary caregiver adoptive parents should receive the same as our primary caregiver fathers (10

weeks)," since any additional paid leave for birthmothers arose under the STD policy.  Chase Ex.

13 at JD_00003823.

147.    ███████████████████████  however, expressed concern about any

change, in part because people rely on the policies "as they plan for their family needs," and

████████████████████████████████████████████████████

███████  Chase Ex. 13, JD_00003822.

148.    Shumaker also was aware that "adopted leave policy is really different from a

birthing maternity or paternity policy," as "adoptions are difficult and unique, and have special

concerns" not present with the birth of a biological child.  Chase Ex. 81, Shumaker Tr. 213:9-16,

214:2-4.

24

149.    Accordingly, Shumaker did not authorize any change to the 18 weeks of paid family leave available to primary caregivers of adopted children.  Chase Ex. 81, Shumaker Tr. 212:19-215:17.

### III.    SHEKETOFF WAS NOT SUBJECT TO DISCRIMINATION

#### A.    Background

##### 1.    Jones Day's associate evaluation system

150.    With the exception of the most junior associates in Jones Day's "New Lawyers Group"—who are evaluated through an informal system designed to provide real-time feedback—Jones Day associates are evaluated annually after a comprehensive, months-long, iterative process to assess each associate's performance and contribution to the Firm.  Chase Ex. 82, Lovitt Tr. Vol. I 144:6-9.

151.    Jones Day's evaluation process begins every year in early January, when the Firm solicits from each associate a list of the matters on which they worked in the prior calendar year, a description of their work, and the name of the lawyers (both partners and more senior associates) who supervised the associate's work.  Chase Ex. 83, Lovitt Tr. Vol. II 26:20-30:13; *see also* Chase Ex. 27 at JD_00003069.

152.    The relevant work descriptions and a link to an electronic evaluation form is then sent to the lawyers identified as the associate's supervisors.  Chase Ex. 83, Lovitt Tr. Vol. II 30:14-17; *see also* Chase Ex. 27 at JD_00003069.

153.    The electronic evaluation form requires each supervising lawyer who submits an evaluation to provide feedback on the associate in three ways.  *See* Chase Ex. 28, JD_00005181.

154.    *First*, the supervising lawyer ranks his or her exposure to the associate as extensive, moderate, or limited.  Chase Ex. 28, JD_00005181.

155.    *Second*, the lawyer must rate the associate's performance in more than a dozen substantive categories as either Unacceptable (which correlates to a numeric value of 1), Needs Improvement (2), Satisfactory (3), Exceeds Standards (4), or Exceptional (5).  The substantive categories include the associate's grasp of legal issues and concepts, legal research and analysis, factual analysis, judgment, written and oral presentations, timeliness, efficiency, abilities to interact with clients and as a team member, leadership, relationship with peers and subordinates, and overall effectiveness.  Chase Ex. 28, JD_00005181.

156.    The instructions provided to each supervising lawyer advise that "[t]he Firm needs fair but candid and objective assessments of all lawyers"; that a "Satisfactory" rating is appropriate "when the [associate] assumed responsibilities and performed work of appropriate complexity at a level consistent with the Firm's expectation for lawyers with comparable time in the practice": and that ratings of "Exceeds Standards" and "Exceptional" should be given "only to lawyers whose work is consistently and demonstrably ahead of Jones Day peers."  Chase Ex. 26, JD_00003061.

157.    *Third*, the supervising lawyer must provide a narrative evaluation of the associate's performance on the matter, including the associate's strengths, weaknesses, and areas for improvement, and "anything else about the lawyer's substantive performance you believe important to a fair and objective assessment."  Chase Ex. 28 at JD_00005182.

158.    Supervising lawyers are instructed that "every evaluator must submit a narrative evaluation that fairly describes the lawyer's strengths and areas for improvement," and that the Firm "cannot provide guidance and lawyers cannot be expected to address and correct performance problems unless we all have a clear understanding of the lawyer's strengths and

weaknesses, and candid assessments of their performance on specific projects during the evaluation period."  Chase Ex. 26, JD_00003061.

159.    After these individual lawyer evaluations are completed, the associate's Practice Leader is responsible for "vetting the evaluations, that is to follow up with individual evaluators if there are questions about the evaluation," in order to get "a better grip o[n] or understanding [of] the associate's performance."  Chase Ex. 83, Lovitt Tr. Vol. II 31:23-32:5.

160.    The Practice Leaders have responsibility for preparing a draft "Assessment Statement" for each associate in their practice.  The Assessment Statement is intended to provide "a fair and objective final assessment of the individual's performance and productivity" that will "be conveyed to the [associate] word-for-word" in an in-person review at the end of the evaluation process.  Chase Ex. 29 at JD_00003072.

161.    The Assessment Statement is not intended as a consensus statement that simply cuts and pastes from the associate's individual evaluations.  Chase Ex. 83, Lovitt Tr. Vol. II 80:5-22.

162.    The Assessment Statement is Jones Day's view of the associate and is intended to provide "a whole holistic picture of an associate" that controls for variances among evaluators and work assignments.  Chase Ex. 83, Lovitt Tr. Vol. II 84:17-18; *see also* Chase Ex. 83, Lovitt Tr. Vol. II 83:7-11.

163.    Traci Lovitt—Jones Day's Rule 30(b)(6) designee on the evaluation process—has testified that, to arrive at an Assessment Statement, "[t]here's a vetting process" in which the drafter analyzes the individual evaluations and "look[s] for themes."  Chase Ex. 83, Lovitt Tr. Vol. II 80:18-22**.**

164.    With multiple evaluations for each associate, "you have a lot of evaluators, you have different projects and different levels of difficulties" on various project, so "you go through the stack of evaluations and find commonality," and when "three or four evaluators [are] saying the same thing, you're like okay, I got it, this is the theme that needs to go into the assessment statement."  Chase Ex. 83, Lovitt Tr. Vol. II 80:23-80:11.

165.    If "you see the same theme, you know that you can kind of control for the individuality of the evaluator, you can control for the project."  Chase Ex. 83, Lovitt Tr. Vol. II 83:7-11.

166.    In addition, the Practice Leaders do some "pressure testing of the individual evaluations" to understand their factual basis.  Chase Ex. 82, Lovitt Tr. Vol. I 150:2-14 (and errata).

167.    Practice Leaders also rely on their personal knowledge of an associate's performance to help determine the themes that are appropriate for the Assessment Statement or to corroborate the feedback in the evaluations.  Chase Ex. 83, Lovitt Tr. Vol. II 83:21-84:6.

168.    In the Washington D.C. office, the office leadership, local practice leadership (including the Issues & Appeals Practice Leader), and the litigation partners hold an associate evaluation meeting to provide the D.C. office and practice leadership a variety of viewpoints about the D.C.-based litigation associates to aid the evaluation process.  Chase Ex. 83, Lovitt Tr. Vol. II 59:10-25.

169.    At the D.C. office litigation meeting, a slide summarizing the individual evaluations of each D.C. litigation associate is presented, and the attendees discuss their views of the associate's performance.  Chase Ex. 83, Lovitt Tr. Vol. II 33:20-33:5.

28

170.    The performance of more senior associates is further vetted in practice area-specific meetings (e.g., litigation, transactional, IP, or regulatory) that are firmwide in scope and typically held in late March or early April.  The associate's individual evaluations and the draft Assessment Statements are distributed to the meeting attendees, and the draft Assessment Statements are debated in the meeting.  Chase Ex. 31, JD_00003108.

171.    As Lovitt has testified, the partners who attend the firmwide meetings are:

> the most diverse group you can think of in every sense of the word. There are senior lawyers, there are junior lawyers, there are lawyers of men and women, LGBT lawyers are on that committee, lawyers of all races are on this committee.  And the idea is everyone who is a part of this committee … is tasked with determining whether the draft assessment statements are fair and accurate.

Chase Ex. 82, Lovitt Tr. Vol. I 136:16-137:7.

172.    The firmwide associate review meeting is "combative in the sense that you have an assessment statement and the person who drafted it is forced to defend it, to defend, you know, the negative feedback and the positive feedback.  Everything has to have a factual basis." Chase Ex. 83, Lovitt Tr. Vol. II 60:14-20.

173.    There is also some "grading of the graders," a discussion of the persuasive value of some individual evaluations.  Chase Ex. 82, Lovitt Tr. Vol. I 150:11 (and errata).

174.    Draft Assessment Statements are frequently revised based on input at these firmwide meetings, and the revised drafts are then submitted to the Partners-in-Charge ("PICs") of the office in which each associate works.  The office leadership can challenge statements in an individual associate's Assessment Statement as part of this process.  Chase Ex. 32, JD_00003021.

175.    As a result of this iterative evaluation process—which involves input from individual evaluators, and review by practice leadership, office leadership, some local review

committees, and for more senior associates, a diverse group of firmwide leaders—there are "many eyes on the [Jones Day evaluation] process to ensure fairness and accuracy."  Chase Ex. 83, Lovitt Tr. Vol. II 59:18-19.

176.    The Firm "vet[s] each and every one of the individual evaluations by not only one or two people, but large groups of people.  There are many, many eyes on all the individual evaluations.  And there is a challenge process that happens both at the practice level, at the office level, and … at the [firmwide] level where people test the credibility of individual evaluations." Chase Ex. 82, Lovitt Tr. Vol. I 136:4-15.

177.    The final Assessment Statement is read to the associate at his or her annual performance review, typically held in May or June, followed by discussion.  Chase Ex. 32, JD_00003021; Chase Ex. 27, JD_00003069; *see also, e.g.*, Chase Ex. 19 at JD_00003121.

178.    Apart from the Assessment Statement, the PICs and Practice Leaders separately rate the associates in their office or practice and force rank their most senior associates.  *See* Chase Ex. 29, JD_00003071.

179.    The rating is an objective numerical value of 1 through 5, with 1 representing "Unacceptable performance/seriously deficient" and 5 representing "Exceptional performance." Chase Ex. 29 at JD_00003075.

180.    The forced ranking is a comparative assessment of an associate relative to his or her peers of roughly comparable seniority in the office (for the office ranking) or in the practice (for the practice ranking).  Chase Ex. 29, JD_00003071.

## 2.    Jones Day's compensation system

181.    Adjustments to associate compensation are determined after the Assessment Statements, ratings and rankings are finalized.  Chase Ex. 83, Lovitt Tr. Vol. II 35:12-23.

182.    The Firm approaches associate compensation "on an individual lawyer basis. Each lawyer's compensation should reflect the specific individual contribution of that lawyer, including his or her level of professional achievement, productivity and potential for meaningful growth and advancement," as well as local market data.  Chase Ex. 30, JD_00003042.

183.    Like the evaluation process, the compensation adjustment process is iterative. Compensation adjustment recommendations are initially formed by the associate's PIC, who has access to the final Assessment Statements, the office and practice ratings and rankings, and personal knowledge of the associates in the office.  Chase Ex. 30, JD_00003042; Chase Ex. 32, JD_00003021.

184.    The Partners-in-Charge submit their proposed compensation adjustments in a salary spreadsheet.  Chase Ex. 32, JD_00003021; Chase Ex. 16, JD_00004765-68 (salary spreadsheet entries relating to Sheketoff).

185.    The spreadsheet contains basic information about the associates, including name, hire date, seniority, the office and practice ratings and rankings, hours for the prior year, current salary, and prior year's salary.  *See, e.g.*, Chase Ex. 16, JD_00004765.

186.    In 2016, the spreadsheet—including the PIC recommended adjustments—was sent to Michael Shumaker, the Firm Administrative Partner, who reviewed and commented on the recommended compensation, which could include suggesting an upward or downward adjustment from the number recommended by the PIC.  Chase Ex. 83, Lovitt Tr. Vol. II 39:10-17; *see also* Chase Ex. 81, Shumaker Tr. 328:5-329:10; Chase Ex. 16, JD_00004765.

187.    In 2017 and 2018, the spreadsheet, including the PIC's recommended compensation adjustments, was sent to Shumaker and Traci Lovitt, whom the Managing Partner appointed to help oversee the associate evaluation and compensation process.  Chase Ex. 82,

Lovitt Tr. Vol. I 281:14-15, 283:8-10; Chase Ex. 83, Lovitt Tr. Vol. II 39:18-6; Chase Ex. 77, Brogan Tr. 216:4-15, 229:21-230:7.

188.    Shumaker and Lovitt would review the PIC recommendations and suggest changes.  In doing so, they would "independently without talking to each other come up with our own recommendations," and only after forming their own recommendations, would discuss their recommendations and reconcile any differences.  Chase Ex. 83, Lovitt Tr. Vol. II 40:11-41:3, 97:11-98:21; *see also* Chase Ex. 81, Shumaker Tr. 323:23-324:2.

189.    Shumaker and Lovitt's recommendations were added to the spreadsheet along with the PIC's, and all were sent to the Managing Partner for his review and approval.  Chase Ex. 81, Shumaker Tr. 323:23-324:2; *see also* Chase Ex. 83, Lovitt Tr. Vol. II 43:16-18, 95:21-97:10; Chase Ex. 77, Brogan Tr. 214:15-19.

190.    Salary adjustments generally were finalized and communicated to the associates in late June, becoming effective July 1.  *See, e.g.*, Chase Ex. 17, JD_00000092.

### 3.    Partner A

191.    ██████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████.

192.    ████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████

193.    ███████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ .

194.     Discovery uncovered no evidence of any complaints about Partner A apart from the allegations in this case.  Firm leaders recognize Partner A as a "champion" and "enormous promoter" of diversity, equity, and inclusion at Jones Day.  Chase Ex. 81, Shumaker Tr. 70:14-15; Chase Ex. 77, Brogan Tr. 77:6.

195.     In evaluating associates, Partner A views his job as "to provide the firm my honest assessment of [the associate's] abilities and … potential for growth."  Chase Ex. 84, Partner A Tr. 86:7-9.

196.     Jones Day produced every associate evaluation that Partner A submitted from 2012 through 2020, the last year for which evaluations were available as of the time of production.  Chase Ex. 39, JD_00002849-2860.

197.     Those evaluations show no indication of sex-based discrimination or animus.  *See generally* Chase Ex. 39, JD_00002849-2860.

198.     ████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████
███████████████████ .

199.     ████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████ .

200. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

201.     On the whole, Partner A's evaluations of women other than Sheketoff were uniformly positive, and his evaluations of male associates have included substantially more critical statements. *See generally* Chase Ex. 39, JD_00002849-2860.

202. ████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████

203. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████.

204. ████████████████████████████████████

███████████████████████████████████████

██████████████████████████.

205. ████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████ .

206.     When asked to provide the basis for her accusation that Partner A is biased
against women, Sheketoff's sworn testimony concerned a lunch for Black attorneys that Partner
A purportedly organized and to which he invited a Black female associate but did not invite
Sheketoff.  Chase Ex. 80, Sheketoff Tr. 135:12-25; *see also* Chase Ex. 84, Partner A Tr. 294:6-
297:16.

207.   Sheketoff also accuses Partner A of being biased against women because, in
Sheketoff's opinion, Partner A "seemed somewhat insecure" around her and "reference[d] …
how he had some connection to Harvard"—the school that both Sheketoff and Partner A's
spouse attended.  Chase Ex. 80, Sheketoff Tr. 133:11, 17-18; *see also* Chase Ex. 84, Partner A
Tr. 289:11-290:2.

**B.      Sheketoff Was One of the Worst Associates in Her Practice in 2015**

208.     Sheketoff's first full year at Jones Day was 2015, and her performance in that
year ("Evaluation Year 2015") was evaluated during the 2016 calendar year.  Chase Ex. 15 at
JD_JS_00001296-1299.

209.     For her 2015 performance, Sheketoff's Practice Leader—Beth Heifetz—rated
Sheketoff a 2 (out of 5) and ranked her 23rd out of 24 peers in the Issues & Appeals practice.
Chase Ex. 16 at JD_00004766; *see also* Chase Ex. 15 at JD_JS_00001296; Chase Ex. 24,
JD_00004024 (ranking for JP019917).

210.     A 2 rating indicates performance "below standards" and "performance concerns,"
and "successive '2' ratings are inconsistent with continued employment at the Firm."  Chase Ex.
29 at JD_00003075; Chase Ex. 83, Lovitt Tr. Vol. II 127:23-128:5, 149:21-150:5, 177:3-15.

211.     Sheketoff's office rated her a 3, and also ranked her near the bottom of her peer group in the Washington D.C. office, 30 out of 37.  Chase Ex. 16 at JD_00004766

212.     As Sheketoff's practice leader, Heifetz was ultimately responsible for determining Sheketoff's practice group rating.  Chase Ex. 82, Lovitt Tr. Vol. I 196:24-198:4; Chase Ex. 83, Lovitt Tr. Vol. II 29:14-35:23.

213.     Heifetz assigned Sheketoff a 2 because of Sheketoff's extremely low billable client hours and Heifetz's concerns about her substantive performance.  Chase Ex. 82, Lovitt Tr. Vol. I 196:24-199:4, 200:19-201:1; Heifetz Decl. at ¶ 5.

214.     In 2015, Sheketoff billed 179 hours for paying clients, and 1,590 hours for pro bono clients.  Chase Ex. 15 at JD_JS_00001296.

215.     Sheketoff's combined billable and pro bono hours were well below the billable hours expectations for full-time associates, and the proportion of billable work was unacceptably low.  Chase Ex. 82, Lovitt Tr. Vol. I 209:4-211:1.

216.     The reviews for Sheketoff's 2015 performance (which, again, were submitted in 2016) were mixed—some reviewers offered only positive comments while others noted concerns with Sheketoff's writing and willingness to work at inconvenient times.  Chase Ex. 15 at JD_JS_00001296-1299.

217.     Two reviewers noted, for example, that Sheketoff's written work was "not as strong as it could have been" and was "very poorly structured" because she "found it difficult to transition from the law-clerk role to the advocate role"—a "usual … problem with recent clerks" but which Sheketoff experienced "to a much more significant degree than I would expect for someone with her pedigree, who should know the basic do's and don'ts of appellate briefing." Chase Ex. 15 at JD_JS_00001297.

36

218.    One of those reviewers also provided a particularly negative description of Sheketoff's response to ███████████████████████████████████████████ ██████████████████████████████.  Chase Ex. 15 at JD_JS_00001297.

219.    The partner explained that the ████████████████ schedule conflicted with Sheketoff's vacation, and Sheketoff "dealt with [this request] extremely poorly—excessively complaining, not really trying hard to develop the best argument on the ████ and challenging issue, failing to find cases that the judges themselves ended up finding, and even repeatedly suggesting that she would withdraw from a ███████████████████████████████████████ ████████████████████████ Chase Ex. 15 at JD_JS_00001297.

220.    That evaluation described Sheketoff's work on the matter as "immature across the board—both in terms of substantive execution and professional comportment," and stated that the partner "wouldn't want to work with [Sheketoff] again unless and until others have noted significant improvements on at least some of the above."  Chase Ex. 15 at JD_JS_00001297.

221.    Heifetz became involved in the matter and had personal knowledge of Sheketoff's reaction to ███████████████████████.  Heifetz was "appalled" by Sheketoff's conduct and believed Sheketoff was "skirting the lines of her ethical obligations to her clients by threatening to quit the representation because it was inconvenient to her personal life."  Heifetz Decl. at ¶ 6; Chase Ex. 82, Lovitt Tr. Vol. I 194:7-201:19 (describing how Sheketoff threatened to quit the pro bono appointment rather than disrupt her vacation); Chase Ex. 83, Lovitt Tr. Vol. II 10:2-12:23, 101:17-24.

222.    Another evaluator—who went on to become the Solicitor General of the United States—noted in his evaluation that Sheketoff's work on a small project "was good," but that

when "Julia was offered a larger opportunity in the matter," she "chose not to do it given other ongoing matters."  Chase Ex. 15 at JD_JS_00001298.

223.    At the associate review meeting in the DC office, the attendees noted that they viewed the evaluations as containing an "indication of attitude issues," questioned "who will work with her," and thought Sheketoff was a "2 and [a] counsel out" candidate.  Chase Ex. 18 at JD_00003737.

224.    Partner A did not work with Sheketoff in 2015 and did not submit an evaluation of her during calendar year 2016.  *See* Chase Ex. 15 at JD_JS_00001296-99.

225.    Sheketoff's office leadership recommended a 10% compensation increase, from her then-salary of $360,000 to $396,000, a recommendation that Shumaker did not disagree with.  Chase Ex. 16 at JD_00004766.

226.    Managing Partner Brogan ultimately decided to give Sheketoff a larger adjustment than had been recommended by the PIC.  Chase Ex. 77, Brogan Tr. 28:16-29:15.

227.    Brogan usually did not read individual associate evaluations or Assessment Statements when making compensation determinations, but due to certain personal circumstances in 2016, he had the time available to read the evaluations of all associates in connection with his review of the proposed salary adjustments.  Chase Ex. 77, Brogan Tr. 28:16-29:4.

228.    Brogan read each of Sheketoff's individual evaluations, including the negative evaluation about the ▮▮▮▮▮▮▮▮▮▮▮▮, which Brogan regarded as "very unfavorable." Chase Ex. 77, Brogan Tr. 28:16-19:15, 29:2-4.

229.    Brogan also took note that Sheketoff was rated as a 2 by her practice—"which is normally a really, really bad sign for an associate's future in the firm."  Chase Ex. 77, Brogan Tr.

29:5-8; *see also* Chase Ex. 77, Brogan Tr. 28:16-29:22, 214:20-23; Chase Ex. 83, Lovitt Tr. Vol. II 91:3-21.

230.    Brogan nonetheless decided to give Sheketoff a compensation increase in line with her peers to encourage her to improve and have a successful career at Jones Day.  Chase Ex. 77, Brogan Tr. 28:16-30:7.

231.    Brogan thus increased Sheketoff's compensation by $65,000, to $425,000—an 18% raise.  Chase Ex. 16 at JD_00004766; Chase Ex. 17 at JD_00000098; Chase Ex. 77, Brogan Tr. 29:9-15.

232.    Brogan "gave [Sheketoff] the benefit of the doubt" and a "generous" and "outsized" raise to encourage her dedication and improvement.  Chase Ex. 77, Brogan Tr. 228:24-229:18; *see also* Chase Ex. 77, Brogan Tr. 28:16-29:15, 217:2-20, 221:16-222:3, 226:12-227:15, 228:24-229:18; Chase Ex. 83, Lovitt Tr. Vol. II 114:2-17, 116:15-117:25.

233.    Three other Issues & Appeals associates received a practice rating of 2 for their performance in Evaluation Year 2015.  Two were two years senior to Sheketoff, and their Assessment Statements expressly state that the associates were being counseled to find employment elsewhere, and both soon left the Firm.  Chase Ex. 22, Figure 3.

234.    The third, a male Supreme Court Clerk, was one-year senior to Sheketoff and received a 10% increase to his compensation in 2016; he also soon left the Firm.  Chase Ex. 22, Figure 3.

**C.    Sheketoff Continued to Be One of the Worst Associates in Her Practice in 2016, and Narrowly Avoided Being Counseled Out of the Firm**

235.    Sheketoff's performance in calendar year 2016 was evaluated as part of the annual review process in 2017.  Heifetz again rated her a 2 and ranked her 14th of 18 peers in the Issues & Appeals practice.  Chase Ex. 16 at JD_00004768; *see also* Heifetz Decl. at ¶ 7.

236.    Sheketoff was the only associate in the Issues & Appeals practice who received a 2 rating from Heifetz for Evaluation Year 2016.  Chase Ex. 23, JD_00003985.

237.    Sheketoff's PIC rated her a 3, and ranked her 28 of 37 peer associates across the Washington D.C. office.  Chase Ex. 24, JD_00004025; *see also* Chase Ex. 16 at JD_00004767.

238.    In 2016, Sheketoff billed 1,066 hours for paying clients, and 461 hours for pro bono clients.  Chase Ex. 18 at JD_00003740.

239.    Although the mix of billable and pro bono work improved somewhat, her overall productivity remained well below expectations.  Chase Ex. 82, Lovitt Tr. Vol. I 209:4-211:1.

240.    Heifetz based her rating for Sheketoff primarily on the themes that ran through Sheketoff's evaluations, Sheketoff's failure to improve on the deficiencies in her 2015 performance, and Heifetz's own personal observations of and interactions with Sheketoff.  Chase Ex. 82, Lovitt Tr. Vol. I 196:24-199:4, 200:19-201:1; Heifetz Decl. at ¶ 7.

241.    The evaluations submitted in 2017 for Sheketoff's 2016 performance were again mixed.  Chase Ex. 15 at JD_JS_00001293-1295.

242.    One partner (who is not Partner A) noted that although Sheketoff's writing had improved from the prior year, there was room for additional improvement and that "another area for improvement would be time management—ensuring that tasks are being tracked; providing regular updates to supervisors; and adhering to deadlines."  Chase Ex. 15 at JD_JS_00001293.

243.    Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

244.    Another partner (who is not Partner A, but whose overall numerical evaluation of Sheketoff was lower than Partner A's) commented that Sheketoff's "draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an

advocate for a client" and that "[t]he work also could have been completed more timely and with more intensity in defending the client's interests."  Chase Ex. 15 at JD_JS_00001294.

245.    Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

246.    A third partner (who also is not Partner A) "love[d] working with Julia," but noted that she was "a little too academic and intellectually stubborn," and he "noticed that she's missing from the office a lot."  Chase Ex. 18 at JD_00003742; Chase Ex. 15 at JD_JS_00001293.

247.    Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

248.    A fourth partner (who also is not Partner A) noted that "[f]or whatever reason, [he] got the sense that Julia is a bit protective of her time, and there were some additional projects I would have liked to get her involved in."  Chase Ex. 15 at JD_JS_00001294.

249.    Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

250.    At the D.C. office litigation associate evaluation meeting in 2017 (reviewing work performed in 2016), comments were made that it is "hard to work w/ assoc not physic. present"; that Sheketoff "seems to be falling behind her peers," and "is at the bottom"; and a "strong counseling session [was] needed" because the "light [was] flashing yellow."  Chase Ex. 18 at JD_00003742; Chase Ex. 20, JD_00003256-57.

251.    After the D.C.-office meeting, the practice's draft Assessment Statement and individual evaluations for Sheketoff were reviewed in the firmwide litigation review meeting. Traci Lovitt, co-head of the associate evaluation process at the time, attended the meeting in

2017, at which Sheketoff's 2016 performance was discussed.  Chase Ex. 83, Lovitt Tr. Vol. II

122:19.

252.    After reviewing multiple years of Sheketoff's evaluations in preparation for the

meeting, Lovitt's impression of Sheketoff was that she was "professorial" and "idiosyncratic."

Sheketoff was "okay with doing a couple of hours of client billable work, but [she] really wanted

to focus on the stuff that was of high interest to [her] regardless of whether it was at the core of

private practice… [and] [her] writing seemed to be professorial."  Chase Ex. 83, Lovitt Tr. Vol.

II 132:18-133:5; *see also* Chase Ex. 21, JD_00003754.

253.    At the meeting, there was "a very heated conversation" about Sheketoff that

included the chair of the meeting opining that Sheketoff "probably should be counseled out," as

well as Lovitt advocating for "a much stronger warning in [Sheketoff's] assessment statement."

Chase Ex. 83, Lovitt Tr. Vol. II 124:11-125:22.

254.    Lovitt was looking at "two years of data, [and] there's no change.  This associate

has zero interest in being here.  She doesn't want to be here."  Chase Ex. 83, Lovitt Tr. Vol. II

125:23-126:2.

255.    Lovitt thought that "[s]omeone need[ed] to tell [Sheketoff] you're not going to

make it here," and that "your compensation should reflect that as well, you should receive a

message in comp that you weren't making it, you were not succeeding."  Chase Ex. 83, Lovitt

Tr. Vol. II 126:14-18.

256.    According to Lovitt, "the consensus of everyone in the room [was] that

[Sheketoff] needed to be counseled to leave.  And it was combative because [the Issues &

Appeals Practice Leader, Beth Heifetz] didn't think that that was necessary," because Sheketoff

would soon leave voluntarily.  Chase Ex. 83, Lovitt Tr. Vol. II 127:6-13.

257.     In response to a deposition question from Sheketoff, Lovitt testified: "Julia, you

ha[ve] to understand, you received 2s for two years.  That is in almost every instance but yours a

grounds for termination.  This is a termination case, right?  That's what everybody was arguing.

We need to be consistent in our application of our standards and tell the associate she needs to

leave."  Chase Ex. 83, Lovitt Tr. Vol. II 128:6-16.

258.     Heifetz did not contradict the overall view of Sheketoff's performance, but did

not "want to be that tough," and the attendees compromised that Heifetz would give Sheketoff a

verbal warning at the in-person performance review meeting.  Chase Ex. 83, Lovitt Tr. Vol. II

129:16-130:12.

259.     Sheketoff's final Assessment Statement for her performance in 2016 noted that

Sheketoff "seems to be protecting her time.  She is perceived as often absent from the office

during the weekday; while she is available by cell phone, it is useful to be present in the office

generally.  Addressing these issues is critical to her development in the Firm."  Chase Ex. 15,

JD_JS_00001289.

260.     At her in-person performance review in May 2017, Sheketoff was told it was

"concerning to see multiple reviewers comment on the appearance that Julia is protective of her

time," and she acknowledged the need to "work harder to avoid creating a perception that she

cares more about certain matters than others" and "seem[ed] to take the reviews seriously and

indicate a desire to do better."  Chase Ex. 19 at JD_00003121.

261.     Recommendations for Sheketoff's next compensation adjustment reflected the

consensus about her overall performance and potential at the Firm.  The Washington D.C.

Partner-in-Charge recommended a 6% increase from $425,000 to $450,000; Lovitt and

Shumaker ultimately provided a combined recommendation of $440,000—a $15,000 raise.
Chase Ex. 16 at JD_00004767.

262.    Brogan again made the final determination, but unlike in the prior year, he did not

read any of the reviews of Sheketoff's performance.  Instead, he reviewed only the salary

spreadsheet with Sheketoff's ratings and rankings, and the recommended salary adjustments.

Chase Ex. 77, Brogan Tr. 29:16-18.

263.    Brogan increased Sheketoff's compensation by $15,000 to $440,000, effective

July 1, 2017.  Chase Ex. 16 at JD_00004767.

264.    Brogan testified that he was influenced by the fact that Sheketoff "continued to

have a 2 rating for the practice, and that's the basis upon which I gave you a $15,000 raise

because it seemed to me that I had—I was wrong in giving you an outsized raise the year before

because it didn't really change your contribution. It was still a 2."  Chase Ex. 77, Brogan Tr.

226:14-19 (with errata); *see also* Chase Ex. 77, Brogan Tr. 28:16-29:15, 217:2-20, 221:16-222:3,

226:12-227:15, 228:24-229:18; Chase Ex. 83, Lovitt Tr. Vol. II 114:2-17, 116:15-117:25.

265.    The change took effect July 1, 2017.  Chase Ex. 17 at JD_00000100.

266.    In 2018, Sheketoff's practice rating improved to a 4 rating, which signaled to

Brogan that Sheketoff had turned things around, and he increased her compensation by $85,000.

Chase Ex. 77, Brogan Tr. 217:2-16.

267.    During Sheketoff's tenure, only one other Issues & Appeals associate received

two consecutive practice ratings of 2, and she was counseled in her Assessment Statement to

seek other job opportunities.  Chase Ex. 23 at JD_00003990.

268.    Sheketoff was also well behind both male and female peers as a result of her 2017

pay adjustment.  All of the other D.C. Issues & Appeals associates in Sheketoff's class year who

also clerked on the Supreme Court were performing well and received virtually identical salaries regardless of gender:



Chase Ex. 22, Figures 1-2.

269.    Sheketoff was aware that, as of July 1, 2017, her salary was well below that of both male and female peers.  At the time she filed this lawsuit, she had an understanding that Males 1 and 2 and Females 2 and 3 all received the same adjustment on July 1, 2017.  Chase Ex. 80, Sheketoff Tr. 103:19-104:11.

**D.      Partner A's Review**

270.    Sheketoff first began working with Partner A in January 2016, after Partner A asked Heifetz for an Issues & Appeals associate to help research an issue related to a

_____

[1] Male 3 left the Firm in 2017 prior to the July 1, 2018 adjustment.

memorandum for Client 1.  Chase Ex. 84, Partner A Tr. 38:17-39:3; Chase Ex. 33, JD_JS_00000408.

271.     Drafting the memorandum was an iterative process as Sheketoff and Partner A revised the work over several months.  *See, e.g.*, Chase Ex. 35, JD_JS_00001428; Chase Ex. 38, JD_JS_00001180; Chase Ex. 34, JD_JS_00000487; Chase Ex. 37. JD_JS_00001494.

272.     Throughout the project, Partner A was complimentary of Sheketoff's revisions and thought her "research and writing [was] very strong," but encouraged her "to write more like an advocate and advisor to a general counsel and corporate boards."  Chase Ex. 35, JD_JS_00001428; *see also* Chase Ex. 38, JD_JS_00001180 ("looks good"); Chase Ex. 34, JD_JS_00000487 ("Thanks for your help on this. It was really helpful"); Chase Ex. 37, JD_JS_00001494 ("thanks for your edits").

273.     Partner A had mixed reactions to one set of revisions that Sheketoff circulated on March 2, 2016.  In response to most, Partner A wrote "very good," "[t]hose look great," and "I like your changes a lot."  Chase Ex. 36 at JD_JS_00001442-43.

274.     In response to some of Sheketoff's other edits, Partner A advised her to "avoid making style edits to the writing of the person whose name goes first on the memo" and "when the person whose name goes first on the memos makes an edit, you should not change it back to the way you had it."  Chase Ex. 36 at JD_JS_00001442.

275.     Partner A was referring to specific changes, including an edit he made that Sheketoff changed back to her own style, twice.  As Partner A testified: "I believe you undid what I did twice, at least—at least on one thing."  Sheketoff "had changed it twice, so I don't mind if you change something—you wrote something.  I changed it.  You changed it back to the

46

way you wrote it.  I changed it again back to the way I had it.  And then you changed it back to the way you had it.  That is annoying." Chase Ex. 84, Partner A Tr. 150:21-151:1, 239:15-21.

276.    No other lawyer—male or female—with whom Partner A has worked has ever repeatedly rejected his revisions and changed the writing back to the way it had been in the manner Sheketoff had.  Chase Ex. 84, Partner A Tr. 288:6-16.

277.    Partner A intended his response to be "instructional" and "a teaching point or practice pointer for how to interact with more senior lawyers" that "would be helpful to [Sheketoff] when [she] worked for other people."  Chase Ex. 84, Partner A Tr. 234:14-235:7; *see also* Chase Ex. 84, Partner A Tr. 231:8-14, 232:5-18, 233:13-16.

278.    Sheketoff responded in an email that she "didn't mean to impugn or undermine our hierarchy by suggesting edits to the memo."  Chase Ex. 36, JD_JS_00001441.

279.    Partner A responded that he "did not presume [Sheketoff] was trying to impugn or undermine anything," and that she "undoubtedly made the memo much better," but that he wanted Sheketoff "to be cognizant of time, and changing something back to the way you had it (after someone else took the time to change it) is not efficient.  If it is an important issue, leave the more senior person's edit and ask about it in person or on the phone."  Chase Ex. 36, JD_JS_00001441.

280.    Partner A also telephoned Sheketoff to put her at ease and assure her that this was not a big deal and would not be a problem for their future work together.  Chase Ex. 84, Partner A Tr. 262:6-21, 263:13-264:7.

281.    Following this interaction in March, Partner A and Sheketoff continued to work together on issues for the Client.  Chase Ex. 38, JD_JS_00001180.

282.     Partner A submitted his evaluation of Sheketoff sometime between January 23 and February 14, 2017, almost a year after their March 2016 email exchange.  Chase Ex. 27, JD_00003069.

283.     In his review of Sheketoff's 2016 performance, Partner A gave Sheketoff a mixture of 3s ("Satisfactory") and 4s ("Exceeds Expectations") for all categories for her work for the Client.  Chase Ex. 15, JD_JS_00001289.

284.     Partner A's narrative evaluation was mixed, complimenting Sheketoff because "the research and learning the material presented no problems" but also noting that Sheketoff's initial drafts were too "academic," that she exhibited "little-to-no initiative," that she displayed availability issues, and that he had an "impression" that she lacked interest in the Firm.  Chase Ex. 15, JD_JS_00001289.

285.     Partner A's evaluation was his honest assessment and impression of Sheketoff. He testified that he had "never worked with anyone that seemed not around as much as you weren't around."  Sheketoff was "rarely in the office.  From the best I could tell, you didn't seem to be really busy on a lot of projects, just didn't seem to be engaged in the office was my impression," and "[o]thers made comments that you weren't around much either."  Chase Ex. 84, Partner A Tr. 78:4-79:1, 102:16-17.

286.     Partner A's narrative evaluation made no reference to the March 2016 email exchange, the edits to the Client Memo that prompted the exchange, or any purported lack of deference to some hierarchy.  Chase Ex. 15, JD_JS_00001289.

287.     The critiques in Partner A's review were similar to critiques Sheketoff received from other partners during 2016.  Chase Ex. 15 at JD_JS_00001293-1295; *see also supra*.

48

288.   In making those critiques, Partner A thought that if Sheketoff

> didn't feel that way, *i.e.*, you were going to stay, my hope is that that
> would be conveyed to you during your evaluation, that, you know,
> people don't think you're going to be here very long because you
> don't come in a lot, *et cetera*, you don't do a lot of billable client
> work.  So if you wanted to change that perception of you, you would
> actually come in more and do more client work, in which case the
> impression of you would change.

Chase Ex. 84, Partner A Tr. 84:22-85:8; *see also id*. 83:15-22.

289.   Brogan was not aware of Partner A's evaluation of Sheketoff until well after she

had left Jones Day.  Chase Ex. 77, Brogan Tr. 29:16-22.

290.   Brogan did not see Partner's A evaluation before deciding to give Sheketoff a

raise of only $15,000—a decision that, again, he testified was based on Sheketoff second,

consecutive 2 practice rating.  Chase Ex. 77, Brogan Tr. 29:17, 226:14-19.

291.   Heifetz had spoken to both Partner A and Sheketoff in "real time" during the

project the two worked on together, and had personal knowledge of Sheketoff's performance on

the matter with Partner A.  Chase Ex. 82, Lovitt Tr. Vol. I 152:15-153:10, 202:14-204:4.

292.   Heifetz agreed with the positive and critical aspects of Partner A's evaluation to

the extent they were consistent with her own observations and knowledge of Sheketoff's

performance and/or the themes in other evaluations.  Chase Ex. 82, Lovitt Tr. Vol. I 152:15-

153:10, 202:14-204:4; Chase Ex. 83, Lovitt Tr. Vol. II 83:21-84:6, 92:7-19; Heifetz Decl. at ¶ 9.

293.   As a result, even if Partner A had submitted no evaluation, Sheketoff's practice

rating would have been the same; the rating was based on the common themes of many

evaluations as corroborated by Heifetz's own knowledge.  For the same reason, Sheketoff's

compensation would have been the same as well.  Heifetz Decl. at ¶ 10; Chase Ex. 82, Lovitt Tr.

Vol. I 196:24-199:4, 200:19-201:1; Chase Ex. 83, Lovitt Tr. Vol. II 83:2-86:6, 100:18-101:24.

## IV.   DEFENDANTS DID NOT RETALIATE

### A.   Plaintiffs' August 2018 Emails

294.   As of the end of July 2018, Sheketoff was pregnant and had accepted a position at the Federal Public Defender's Office.  The Federal Public Defender's Office denied Sheketoff's request to delay her start date so that she could take 18 weeks of paid leave from Jones Day before resigning from the Firm.  Chase Ex. 80, Sheketoff Tr. 23:21-24:3, 26:3-8; *see also* Chase Ex. 40, JD_00003191.

295.   Sheketoff and Savignac claim that they anticipated filing a lawsuit against Jones Day by that time.  Chase Ex. 80, Sheketoff Tr. 29:17-20.

296.   After Sheketoff gave notice that she was leaving Jones Day, she sent an email to her Practice Leader, Beth Heifetz, dated August 16, 2018:

---

**From:** Sheketoff, Julia W. <jsheketoff@jonesday.com>
**Date:** Thursday, Aug 16, 2018, 3:41 PM
**To:** Heifetz, Beth R. <bheifetz@JonesDay.com>
**Subject:** Parental Leave

Beth,
I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total) while it gives men 10 weeks of paid leave (and 16 weeks total).  Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled.  That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory.  I don't object that the firm is socially conservative as a general matter, or that its selection of cases promotes those values, but in this case I think it goes too far in imposing those values on its employees.

For me, since Mark will be the primary caregiver, this will have a pretty big impact on my life, because I'll end up staying out of work for the extra eight weeks that Mark cannot.  For career reasons, I'd rather not do that.  I would guess that the effects of the policy are similar for other women.  Is there anything that I can do here?  Would the firm treat Mark equally to female primary caregivers and grant him 18 weeks paid and 24 weeks total leave?

I'd be happy to discuss further.  Thanks very much.
Best,
Julia

---

McClure Ex. 3 at JD_00003165.

297.   The email did not request any amendment to Jones Day's policy, but sought only a benefit for Savignac himself.  McClure Ex. 3 at JD_00003165; *see also* Chase Ex. 79, Savignac Tr. 122:19-123:4.

298.   Heifetz forwarded the email to Sarah McClure, the Firm's Director of Human Resources and Employment Counsel, who spoke with Sheketoff by phone.  McClure explained that Jones Day assumes an 8-week medical certification of disability for routine childbirth and that it is not discrimination to provide disability leave for only the disabled parent.  McClure Ex. 3 at JD_00003164; *see also* McClure Decl. at ¶ 17.

299.   McClure then received this email from Savignac, dated August 23, 2018:

Hi Sarah,

Julia let me know that you decided to reject our request that Jones Day amend its discriminatory parental leave policy. Thank you for your consideration.

Needless to say, I oppose your practice, which is made illegal by Title VII. You may know that it is also illegal to retaliate against an employee who opposes discrimination.

Thanks again, Sarah.
Mark

McClure Ex. 3 at JD_00003164.

300.   At that point, McClure—the Firm's HR counsel—did the same thing she did in 2015 when another associate raised a concern that the Firm's prior policy for paid family leave was "problematic" under Title VII: McClure commissioned privileged research into the legal question to ensure she could accurately respond to Savignac and provide counsel to the Firm regarding its policies.  *Compare* Chase Ex. 41, JD_00003790 *with* McClure Decl. at ¶ 19.

301.   McClure responded to Savignac's email on August 24, 2018, and provided this excerpt from the EEOC's Enforcement Guidelines, among other authority:

EXAMPLE 14
Pregnancy-Related Medical Leave and Parental Leave Policy –
No Disparate Treatment

An employer offers pregnant employees up to 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance. The employer also offers new parents, whether male or female, six weeks of parental leave. A male employee alleges that this policy is discriminatory as it gives up to 16 weeks of leave to women and only six weeks of leave to men. The employer's policy does not violate Title VII. Women and men both receive six weeks of parental leave, and women who give birth receive up to an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

McClure Ex. 3, JD_00003163.

302.    McClure also cited Eighth Circuit precedent that "it is not unreasonable for [employer] to establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth." *Johnson v. Univ. of Iowa*, 431 F.3d 325, 329 (8th Cir. 2005); *see also* McClure Ex. 3, JD_00003163 (citing *Johnson* to Savignac).

303.    McClure concluded: "I hope this is helpful and addresses your concern.  I am happy to answer any additional questions you may have in follow up."  McClure Ex. 3, JD_00003163.

304.    Months went by without any response from Savignac.  In that time, the Firm took no action against Savignac, who continued to have the same title, salary, and other terms and conditions of his employment as he had prior to telling McClure on August 23 that Jones Day's "parental leave policy" was "discriminatory," and that "it is also illegal to retaliate against an employee who opposes discrimination."  McClure Ex. 3 at JD_00003164; *see also* Chase Ex. 79, Savignac Tr. 123:5-19; McClure Decl. at ¶¶ 19-23.

305.    Savignac intended to take ten weeks of paid family under Jones Day's policy for primary caregivers and to split that leave into two blocks, one immediately after the birth of his child, and the remainder later in time, all of which was permissible under the Firm's policy. McClure Decl. at ¶¶ 20-23; *see also* Chase Ex. 79, Savignac Tr. 138:6-14, 189:3-13.

### B.      Savignac's January 16, 2019 Email

306.     Almost five months later, on January 16, 2019, Savignac sent this response to McClure's August 24, 2018 email:

| | |
|---|---|
| **From:** | Savignac, Mark C. |
| **Sent:** | Wednesday, January 16, 2019 9:12 PM |
| **To:** | McClure, Sarah B. |
| **Cc:** | Julia Sheketoff; Heifetz, Beth R. |
| **Subject:** | RE: Parental Leave |

Sarah,

We have closely reviewed the case law, including the two cases you rely on. We have also discussed the matter with other competent attorneys. Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.

Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S.Ct. 1338, 1351-52 (2015).

Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win.

I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation. We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman. As you know, Title VII prohibits retaliation for opposition to sex discrimination.

Mark C. Savignac
Associate
**JONES DAY® - One Firm Worldwide℠**
51 Louisiana Avenue NW
Washington, DC 20001
Office +1.202.879.3821
Cell +1.217.714.3803
msavignac@jonesday.com

McClure Ex. 4, JD_00003143

307.     At the time Savignac sent this email, Plaintiffs had not filed a charge with any enforcement agency.  Chase Ex. 43, JD_00003258 (Savignac's June 19, 2019 EEOC charge); Chase Ex. 44, JD_00003266 (Sheketoff June 18, 2019 EEOC charge); Chase Ex. 45, P02307 (Plaintiffs' June 8, 2020 EEOC charge regarding Jones Day's press statement).

308.     At the time, Jones Day was not conducting any inquiry into Plaintiffs' claim, having already determined in August 2018 that their allegation of discrimination lacked merit. McClure Ex. 3, JD_00003163-64; McClure Decl. at ¶ 19.

309.     The January 16, 2019 email re-asserted Savignac's claim that Jones Day's leave policy was "discriminatory" because it did not "[g]ive me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave."  McClure Ex. 4, JD_00003143.

310.     At the time of the January 16, 2019 email, Savignac knew that the additional eight weeks of paid leave he demanded was offered to birthmothers under Jones Day's Short-Term Disability Leave Policy, not its family leave policy.  Chase Ex. 79, Savignac Tr. 119:15-120:11.

311.     Savignac also knew at the time he sent the email that he would not be disabled by the birth of his child.  Chase Ex. 79, Savignac Tr. 192:15-196:11.

312.     Savignac likewise knew that any person who gives birth to a child will have postpartum disability for at least some period of time, and that at least one major medical association described the standard postpartum disability as six weeks.  Chase Ex. 79, Savignac Tr. 112:21-113:21, 197:15-202:9.

313.     Savignac does not recall ever learning of any Jones Day employee who had taken eight weeks of disability leave following childbirth but recovered from the disability before the eight-week period expired.  Chase Ex. 79, Savignac Tr. 136:13-137:5.

314.     The January 16, 2019 email did not provide any explanation for Savignac's assertion that he should receive the same amount of paid leave as birth mothers, even though he was not disabled and all birth mothers are disabled for some period of time.  McClure Ex. 4, JD_00003143.

315.     Savignac also provided no basis for his claim that the medical certification assumption is "discriminatory" or for his conclusory assertion that Jones Day's cited legal authorities "do not support" the lawfulness of Jones Day's STD Policy.  McClure Ex. 4, JD_00003143.

316.    Savignac provided no analysis for his assertion that Jones Day's policy is "inconsistent with the EEOC enforcement guideline."  McClure Ex. 4, JD_00003143.

317.    Savignac demanded that Jones Day give him "18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with the EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion.  We are very familiar with the D.C. Circuit and confident that we will win."  McClure Ex. 4, JD_00003143.

318.    In addition, Savignac asserted that Jones Day was wrong to rely on EEOC Enforcement Guidelines because the Guidelines "do not receive *Chevron* deference."  McClure Ex. 4, JD_00003143.

319.    Savignac stated that he and Sheketoff had "discussed the matter with other competent attorneys," thereby suggesting to Jones Day that these other "competent attorneys" agreed that Jones Day's short-term disability policy violated anti-discrimination laws.  McClure Ex. 4, JD_00003143.

320.    At her deposition, Sheketoff could not remember who Plaintiffs had in mind when Savignac referenced "competent attorneys."  Chase Ex. 80, Sheketoff Tr. 219:2-23, 295:6-269:12.

321.    Savignac speculated that the reference to "competent attorneys" may have included Travis Annatoyn and Marianna Jackson.  Chase Ex. 79, Savignac Tr. 219:1-18.

322.    Annatoyn is an environmental lawyer.  Savignac does not understand Jackson to have any specialty in employment law.  Chase Ex. 79, Savignac Tr. 235:3-6.

323.    Savignac had only one conversation with Annatoyn and Jackson about Jones Day's policies.  Chase Ex. 79, Savignac Tr. 230:12-231:3.

324.    He did not provide Annatoyn or Jackson with a copy of the policies and does not believe he read the policies to them or told them that the eight-week medical certification assumption was part of a short-term disability policy.  Chase Ex. 79, Savignac Tr. 231:15-232:14.

325.    He does not recall telling them that he planned to demand all eight-weeks of disability leave available to birthparents without a medical certification or a disability, and he does not believe there was any discussion of either the Pregnancy Discrimination Act or the medical standard of care in the course of these conversations.  Chase Ex. 79, Savignac Tr. 232:15-237:21.

326.    Savignac and Sheketoff did ask whether filing a lawsuit challenging Jones Day's leave policies "would be perceived as analogous to, you know, a white person challenging affirmative action, like the Abigail Fisher case."  Chase Ex. 79, Savignac Tr. 234:10-12.

**C.    Shumaker Recommends Terminating Savignac**

327.    In her near-thirty-year Jones Day career, McClure has fielded many inquiries about the Firm's policies and considered challenges to those policies.  But she has never received an email or had a verbal exchange with a colleague that had as hostile, immature and extortionate a tone as Savignac's January 16, 2019 email.  McClure Decl. at ¶¶ 12, 25.

328.    McClure forwarded Savignac's email to Michael Shumaker, the Firm Administrative Partner, who serves as "legal counsel to the Firm" on personnel and other matters.  Chase Ex. 81, Shumaker Tr. 266:10-16; Shumaker Decl. ¶ 1 (Dkt. 66-2).

329.    Shumaker viewed Savignac's January 2019 email as fundamentally different from the 2015 challenge, by a different Issues & Appeals associate, to the Firm's prior paid family leave policy.  The associate acting in 2015 raised "a proper question" and "a legitimate concern" that led the Firm to "change[] its policy."  Chase Ex. 81, Shumaker Tr. 161:1-25.

56

330.     In contrast, Savignac's email was intemperate, extortionate and legally baseless, causing Shumaker to consider whether Savignac should be fired.  To Shumaker, Savignac's email:

> reflected a lack of professionalism.  It reflected a lack of maturity. It reflected a lack of leadership.  It reflected a distortion of applicable law.  It demanded something to which you were not entitled, in an extortionate way.  It showed an absence of integrity.  And those are foundational values for this law firm.  If you pick up the firm manual, first two or three pages, those things make a difference to us.

Chase Ex. 81, Shumaker Tr. 19:20-22, 50:13-23.

331.     Jones Day's Firm Manual, in fact, provides that integrity, personal accountability, and competence are among Jones Day's foundational values; and "[l]awyers and staff alike must show respect and consideration to everyone in the Firm—lawyers, legal support personnel, and staff in all of the Practices, Offices, and Departments of the Firm."  Chase Ex. 1 at JD_00002038, 2041.

332.     For Shumaker, it "was the—'We're going to—if you don't give me what I'm not entitled to, I'm going to take this to the court of public opinion.  I'm going to publicize to you and say bad things about this law firm, this law firm for which I work right now, and is paying me over—has paid me over a million dollars,' that's just immature, unprofessional, complete absence of judgment…."  Chase Ex. 81, Shumaker Tr. 48:11-18.

333.     Shumaker construed Savignac's email as threatening to "somehow bad-mouth the firm in some way"; "[i]t was a clear threat"; "[a]nyone who reads this e-mail would come away and say, 'This is not how people—particularly in an institution that is founded upon collegiality, [a] cohesive approach to [the] practice of law, teamwork, integrity—would act towards one

another.  Give me what I want, or else.'"  Chase Ex. 81, Shumaker Tr. 58:13-14, 104:12-17, 108:6-10.

334.    Shumaker was not impacted by Savignac's threat of a lawsuit: "the threat of a lawsuit, in my view, [is] meaningless.  Threats of lawsuits perhaps to private individuals or corporations are threatening. The threat of a lawsuit to us, particularly one where there was no merit to it, was—was not the issue at all.  What—what the issue was … is what the e-mail said about you as a person, and your understanding of the law firm."  Chase Ex. 81, Shumaker Tr. 31:5-12.

335.    Shumaker also "didn't think you would [file litigation].  I thought it was just a threat, because, again, I didn't see any merit to the position whatsoever, and I thought you were simply making the allegation to try to extract something for yourself that you were not entitled to."  Chase Ex. 81, Shumaker Tr. 34:22-35:2.

336.    Shumaker "sat on [the question of whether to recommend termination] for two or three days, because I think there's merit to taking your time on a decision like that, and making sure it was the right decision."  Chase Ex. 81, Shumaker Tr. 20:16-19.

337.    Shumaker also decided to involve the Firm's Managing Partner, Stephen Brogan, because "we're dealing with people.  We're dealing with lives…. I want to be sure that we're treating people fairly.  So I want to make sure that we understand the facts before we take a decision.  And I don't—notwithstanding the unfortunate nature of your e-mail, I think I owe it to the firm—I owe it to you, I owe it to others, to be fair and balanced."  Chase Ex. 81, Shumaker Tr. 30:12-23.

338.    Ultimately, Shumaker decided to recommend termination "based upon what was reflected in the e-mail, and what it said about you as a person, your understanding of the law

firm, your absence of professionalism, lack of maturity, an absence of leadership on an issue, a self-interested demand for something you weren't entitled to."  Chase Ex. 81, Shumaker Tr. 25:19-25.

339.     Shumaker also "was of the view that we wanted to cut access as soon as we could, because your e-mail had indicated an absence of trustworthiness.  And we have an ethical obligation to our clients to maintain confidentiality over their information, so I viewed that as a threat."  Chase Ex. 81, Shumaker Tr. 28:12-16.

340.     Shumaker forwarded Savignac's January 16, 2016 email to Brogan and recommended that the Firm terminate Savignac immediately.  Chase Ex. 42, JD_00003169-70.

### D.     Jones Day Terminates Savignac

341.     Brogan made the decision to terminate Savignac.  In his response to Shumaker's email, Brogan stated simply:  "He has to go.  Get it done tomorrow Morning first thing."  Chase Ex. 42, JD_00003169; *see also* Chase Ex. 77, Brogan Tr. 10:14-23; Chase Ex. 81, Shumaker Tr. 17:4-18.

342.     Brogan's decision was based on "the character flaws that [he] saw in th[e] email as a whole, and [his] view that [the email] was not sent in good faith."  Chase Ex. 77, Brogan Tr. 66:19-25.

343.     The decision to terminate Savignac was based on his "poor judgment and immaturity reflected by his extortionate threat to harm the firm in the 'court of public opinion' unless it acceded to his demand for eight weeks of paid leave consistent with his having given birth when he had not."  Chase Ex. 77, Brogan Tr. 15:3-18:10; *see also* Chase Ex. 77, Brogan Tr. 19:3-23:14.

344.     Brogan read the reference to "the court of public opinion" as "a threat to go … to the press," which he "viewed as an extortionist demand" given that Savignac "had no claim that

59

[he was] disabled."  Chase Ex. 77, Brogan Tr. 17:10-17, 21:21-22:10, 67:1-14, 167:23-168:11, 192:23-193:3.

345.    When showed Savignac's August 23, 2018 email to McClure at his deposition, Brogan contrasted that with Savignac's later email: "[T]here's nothing in … [the August 2018] email that seeks to extort money from the firm" or that "is dishonest about the firm's compensation system."  Chase Ex. 77, Brogan Tr. 122:7-11.

346.    Brogan was also struck by the fact that Savignac was not seeking to change Jones Day's leave policies for all associates, but was demanding only extra paid leave worth roughly $80,000—confirmation to Brogan that the email was an extortionate threat, not a constructive call for re-examination of the Firm's policies.  Chase Ex. 77, Brogan Tr. 21:3-8:7-11, 120:1-20.

347.    Brogan testified under questioning by Savignac: "If that doesn't say things about your character, I don't know what does. I mean … it shows me that you don't care about anybody else except yourself, and we just don't—we don't have people at Jones Day like that." Chase Ex. 77, Brogan Tr. 67:10-14.

348.    In addition, the email's conclusory and arrogant tone, in which Savignac "act[ed] as if [Plaintiffs] personally were the law-givers," decreeing that "our policy on leave was illegal," caused Brogan to question Savignac's capabilities.  Chase Ex. 77, Brogan Tr. 16:18-20, 60:21-61:2.

349.    Brogan "wasn't impressed with [Savignac's] reasoning," which was nothing more than "a flat-out assertion."  Chase Ex. 77, Brogan Tr. 59:17-20.

350.    The email's "pompous" and "arrogant" *ipse dixit* "made [Brogan] lose confidence in [Savignac's] ability as—as a lawyer."  Chase Ex. 77, Brogan Tr. 59:17-61:2.

60

351.    Brogan also objected to the email's unfounded and malicious assertion that Savignac was "aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are *tailor-made to enable* sex discrimination, including retaliation," which Brogan understood to be a claim that the compensation system was purposely designed to enable sex discrimination  McClure Ex. 4, JD_00003143; Chase Ex. 77, Brogan Tr. 15:21-16:10 (emphasis added).

352.    "[N]othing could be further from the truth"; the Firm has treated compensation as confidential since the 1940s—when it did not have any female attorneys—as a way of "deemphasizing money, so that people weren't being petty and comparing themselves to other people with respect to how much money they made."  As discovery in a recent putative class action alleging systemic pay discrimination confirmed—"[t]here was nothing" to the allegations. Chase Ex. 77, Brogan Tr. 15:23-16:8, 212:10-21, 233:9-239:8; *see also* Dkt. 182, Case No. 19-00945 (D.D.C.) (voluntarily dismissing all "class or collective claims, including those alleging systemic pay discrimination, or disparate impact claims" after "analyzing the nationwide evaluation and compensation data Jones Day produced (for the time period 2012 through 2018)"). Chase Ex. 75, Jones Day One Week.

353.    The "email's assertion … that Jones Day's [leave] policy is discriminatory" was itself "no factor" in Brogan's termination decision.  Chase Ex. 77, Brogan Tr. 60:7-16.

354.    Brogan "personally was involved in setting [Sheketoff's] compensation and reviewing [her], and [he] knew that [she] was treated extremely fairly and extremely well," so "there was no basis for [Savignac] to say that [she] was being discriminated against.  None. Zero."  Chase Ex. 77, Brogan Tr. 195:4-12.

355.    Brogan's view was that Savignac "had no … good-faith basis for making th[is] assertion."  Chase Ex. 77, Brogan Tr. 16:4-10.

356.    Savignac admitted at his deposition that he had no information to support that claim.  He had no involvement in the associate compensation process beyond submitting evaluations of more junior associates, and he was never consulted on any salary decision for another associate.  Chase Ex. 79, Savignac Tr. 256:16-257:15.

357.    When asked the basis for his assertion that the Firm's system is tailor-made to enable sex discrimination, Savignac testified only that Jones Day's compensation system is one "where many people have input that is unreviewable by the person whose salary is being set, such that it "*could* be used to discriminate or retaliate against someone in terms of their pay." Chase Ex. 79, Savignac Tr. 256:11-15 (emphasis added).

358.    Brogan concluded that Savignac was "being completely dishonest in attacking the firm," which "goes to [his] character" and the dishonesty was "just not conduct that we can accept from somebody."  Chase Ex. 77, Brogan Tr. 39:4-17.

359.    Similarly, the "fact that [Savignac was] threatening to sue the firm had no—no impact on [Brogan] at all.  None.  Zero."  Chase Ex. 77, Brogan Tr. 68:5-14.

360.    The "fact that somebody threatens a lawsuit against the firm is singularly unimpressive to [Brogan]," and "if [an employee is] going to get separated from the firm, it's because [the employee] did something else."  Chase Ex. 77, Brogan Tr. 151:7-13.

361.    Brogan understood the January 16, 2019 email to be coming from Savignac alone: "I thought the e-mail was from—from you.  I mean, I—you know, you made this 'royal we' comment that—'We've consulted lawyers, and we think that, you know, we were right on the

law.'  But other than that, the e-mail, on its surface, I took it at face value was coming from you."  Chase Ex. 77, Brogan Tr. 20:2-7.

362.     Once Brogan directed Savignac's termination, Shumaker worked with leadership and staff in the Washington D.C. office to "set[] into motion what needed to be done to execute on the decision."  Chase Ex. 81, Shumaker Tr. 28:1-29:1

363.     Kevyn Orr sent a termination letter to Savignac on January 22, 2019.  Chase Ex. 46, JD_00002633.

**E.      Jones Day Permitted an Exception to its Established Policy Prohibiting Employment References**

364.     On January 27, 2019, Savignac separately emailed three Jones Day partners—Ben Mizer, Shay Dvoretzky, and Karl Thompson—to ask each if each would "serve as a telephone reference for [him] and write a reference letter" to assist Savignac's search for new employment. Chase Ex. 47, JD_PRIV_0165; Chase Ex. 48, P02772; Chase Ex. 50, JD_00002863.

365.     For decades, Jones Day has had a policy generally prohibiting employment references (the "Employment Reference Policy").  The 1992 Firm Manual (the earliest iteration produced in discovery) included a section on "Employment References" stating: "Lawyers … are not authorized to provide any employment reference of any type," except as approved by the Managing Partner, Partner-in-Charge, or Office Administrator.  Chase Ex. 3 at JD_00003431; *see also* Chase Ex. 6 at JD_00003478 (1994 Firm Manual); Chase Ex. 7 at, JD_00003677-78 (1997 Firm Manual).

366.     At the time Savignac wrote to Mizer, Dvoretzky, and Thompson, the policy was largely the same but permitted exceptions only with approval of the Firm Administrative Partner (Michael Shumaker) or the relevant Partner-in-Charge:

> **5.      Employment References**
>
> Except as described below with respect to bar character and fitness forms, lawyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party, including current or former employees themselves.  Requests for employment references should be referred, in the case of lawyer requests, to the Firm Administrative Partner or appropriate Partner-in-Charge, or, in the case of staff and legal support personnel requests, to the appropriate Office Administrator.  In most circumstances, the response will be limited to disclosing the date of original hire and the date of most recent severance of employment.

Chase Ex. 1 at JD_00002117; *see also* Chase Ex. 81, Shumaker Tr. 217:20-214:14.

367.      Shumaker—Jones Day's Rule 30(b)(6) designee for topics relating to Savignac's reference request—testified that the Employment Reference Policy standardizes how the Firm responds to reference requests and "eliminates our trying to make that subjective determination as to who we're going to support and not support, because "it's just stepping on a slippery slope when you got into the reference business."  Chase Ex. 81, Shumaker Tr. 219:21-220:7, 226:6-11, 227:12-20.

368.      According to Shumaker, there are no "blanket rules" for what kinds of exceptions are made; the Firm "will provide exceptions based upon the individual circumstances."  Chase Ex. 81, Shumaker Tr. 223:11-15.

369.      Shumaker further testified: "[I]t is always an individual decision, based upon the facts and circumstances for the given lawyer," but "not a lot of exceptions [are] requested" and "not a lot of exceptions [are] granted." Chase Ex. 81, Shumaker Tr. 220:8-10, 224:6-16.

370.      Savignac was on notice of the policy regarding employment references, having certified to the Firm that he had received and reviewed the Firm Manual and that it was his responsibility to be familiar with, and stay abreast of, its contents.  Chase Ex. 51, JD_00000048; *see also* Chase Ex. 79, Savignac Tr. 79:20-80:17.

371.     Dvoretzky—who also certified his review of the Firm Manual—forwarded Savignac's January 27, 2019 email to Shumaker and the Issues & Appeals Practice Leader, Beth Heifetz.  Chase Ex. 47, JD_PRIV_0165; *see also* Chase Ex. 81, Shumaker Tr. 253:2-7.

372.     Consistent with the Employment Reference Policy, Shumaker responded that the Firm's "standard approach for anyone that departs is no recommendation and mere confirmation of dates work[ed]" but also asked Dvoretzky if he had any desire to give Savignac a reference. Chase Ex. 47, JD_PRIV_0165.

373.     Shumaker testified that "from the get-go, I was wondering to myself, is this a situation where we want to provide an exception?"  Chase Ex. 81, Shumaker Tr. 228:3-5.

374.     Shumaker also forwarded Dvoretzky's email to Sarah McClure.  Chase Ex. 52, JD_00002462.

375.     McClure spoke with Dvoretzky and Heifetz on January 28 and "asked Beth to talk with the partners Mark worked with and remind them of our policy."  Chase Ex. 53, JD_PRIV_0164; *see also* Chase Ex. 54, JD_00002526.

376.     McClure and Shumaker spoke that evening and, pursuant to the terms of the Employment Reference Policy, Shumaker authorized an exception to the general prohibition on employment references that would allow Dvoretzky to serve as a telephone reference, but not provide any written letter of reference.  Chase Ex. 55, JD_00002528; Chase Ex. 81, Shumaker Tr. 220:8-13, 237:5-239:15.

377.     Shumaker made the decision to authorize an exception to the Employment Reference policy that allowed Dvoretsky alone to provide a phone reference.  Chase Ex. 81, Shumaker Tr. 220:8-12, 237:18-238:4.

378.     According to Shumaker (responding to a deposition question from Sheketoff):

> So the fact that we're dealing with a termination was one [exceptional circumstance]. Two, we, generally speaking, want our lawyers to move on to other opportunities and to do well. We had a situation where we properly terminated Mark, but we knew he had a young family. We had, no doubt, people who were supportive of you throughout the firm. So we wanted both you and Mark to do well. So we thought it was in the firm's interest, as well as your interest, to provide an exception and to allow someone to give a more substantive reference.

Chase Ex. 81, Shumaker Tr. 221:11-22.

379.     Shumaker authorized Dvoretzky to provide a telephone reference because:

> the one person who we said should do it was the, in my view, firm's view, the person we thought would be most compelling to an employer to have that individual supportive of Mark. That was Shay. Shay was a very well thought-of person in the issues and appeals bar. We thought his stamp of imprimatur would be more valuable to Mark than any of the others. Mark himself had reached out to Shay. I knew Shay. I trusted Shay. And for that reason, I thought Shay was the right guy.

Chase Ex. 81, Shumaker Tr. 222:4-14.

380.     Shumaker also "knew Shay had a positive view of [Mark]—Shay, he would convey as such. I did not know Ben [Mizer] as well. I did not know Karl [Thompson] as well, which I understand were the other two. So I did not know what their impressions were. But I knew Shay. I knew his reputation in the industry, and that that would be persuasive to an employer." Chase Ex. 81, Shumaker Tr. 238:8-15; *see also* Chase Ex. 81, Shumaker Tr. 240:23-241:9.

381.     Shumaker "wanted to have a unified statement on behalf of the firm regarding Mark. I didn't want there to be inconsistent messages, which I think would have been harmful to the—Mark and—harmful to Mark and to the firm." Chase Ex. 81, Shumaker Tr. 237:21-25.

382.   Shumaker authorized only a telephone reference because that would avoid any static, written recommendation, give Dvoretzky the opportunity to respond to questions, and "be more beneficial to Mark, beneficial to the firm, in terms of helping him get a position."  Chase Ex. 81, Shumaker Tr. 234:5-235:4.

383.   Shumaker believed that "in this situation, the firm and Mark's interests were aligned.  We wanted him to get a new job.  I was trying to act in a manner that would be most advantageous to that."  Chase Ex. 81, Shumaker Tr. 238:1-4.

384.   McClure spoke with Heifetz and Dvoretzky on January 29 and relayed Shumaker's decision.  Chase Ex. 55, JD_00002528; *see also* Chase Ex. 56, JD_00003758 (Heifetz's handwritten notes from call).

385.   Heifetz did not make the decision either on whether or not to provide an employment reference, or how and by whom the Firm would provide an employment reference. Indeed, her only involvement was to convey the Firm's policy and the Firm's decision.  Chase Ex. 81, Shumaker Tr. Tr. 220:8-13, 237:5-239:15; *see also* Heifetz Decl. at ¶ 15.

386.   Mizer was also aware that there might be a policy regarding employment references and called Heifetz for guidance.  Chase Ex. 78, Mizer Tr. 146:5-14.

387.   Heifetz informed Mizer that he "should convey to Mark that [Dvoretzky] would be providing a reference on the firm's behalf."  Chase Ex. 78, Mizer Tr. 147:20-22.

388.   Mizer ultimately declined to act as a reference "[b]ecause firm policy was not to provide a reference for Mark."  Chase Ex. 78, Mizer Tr. 126:5-6.

389.   Thompson was not aware of the Employment Reference Policy and initially agreed to act as a reference for Savignac.  Chase Ex. 48, P02772; Chase Ex. 78, Mizer Tr. 127:18-128:1.

390.    At some point, however, Thompson and Mizer spoke, and Mizer suggested Thompson "might want to talk [to] Beth about the firm policy."  Chase Ex. 78, Mizer Tr. 128:5-6.

391.    Dvoretzky emailed Savignac on January 29, 2019, and informed him that Dvoretzky alone had been authorized to speak with potential employers by phone.  Chase Ex. 49, JD_00002465.

392.    Legal recruiters working with Savignac recognized that "hav[ing] a reference from" Jones Day was not the Firm's "typical policy."  Chase Ex. 57, P00069.

393.    Savignac offered Dvoretzky as a reference in connection with a potential position at Steptoe & Johnson, and was advised in April 2019 to "give Shay a head's up that someone from Steptoe may call."  Chase Ex. 58, P00963, Chase Ex. 59, P01543.

394.    Steptoe offered Savignac an associate position in or around May, and he accepted.  Chase Ex. 79, Savignac Tr. 304:5-10.

395.    Savignac also heard from another firm that "Shay was very complimentary" when serving as a reference.  Chase Ex. 60, P01709; *see also* Chase Ex. 79, Savignac Tr. 271:4-9.

396.    No prospective employer ever told Savignac that Dvoretzky's reference was not positive.  Chase Ex. 79, Savignac Tr. 270:22-271:3.

397.    Discovery did not identify any former Jones Day employee who received an employment reference without an approved exception under the Employment Reference Policy.

398.    Heifetz's practice, for instance, was to call to seek approval from either the Firm Administrative Partner or the Partner-in-Charge of the Washington D.C. office before agreeing to act as an employment reference or authorizing someone else to do so.  Heifetz Decl. at ¶ 14.

399.    There is no evidence that Heifetz ever deviated from that practice. Heifetz Decl. at ¶ 14.

400.    Discovery also did not identify any Jones Day employee comparable to Savignac who received authorization for the additional references that Plaintiffs claim Savignac was denied for retaliatory reasons.

401.    Savignac's other references included three federal judges—including Justice Stephen Breyer and Judge Richard Posner—former Acting Solicitor General Neal Katyal, and the General Counsel for the Board of Governors of the Federal Reserve System.  Chase Ex. 61, P01204.

402.    Savignac could not identify a single prospective employer whose decision about whether to offer him a job would have been affected by more employment references from Jones Day.  Chase Ex. 79, Savignac Tr. 273:11-22.

403.    Savignac does not recall any prospective employer telling him that it wanted an additional Jones Day reference, or that additional references from Jones Day would have impacted his candidacy.  Chase Ex. 79, Savignac Tr. 274:1-5, 309:21-310:4.

404.    Had he acted as an employment reference, Mizer would have been "candid" about Savignac.  Chase Ex. 78, Mizer Tr. 101:2.

405.    That would have included saying that Savignac's "diplomatic skills sometimes could use some work.  So depending on what role you are hiring him for, then that may matter more or less to you."  Chase Ex. 78, Mizer Tr. 101:2-9.

406.    According to Mizer, if prospective employers

> were seeking an associate who would simply be asked to write briefs and do research without any potential responsibilities for interaction with clients or co-counsel, then I would have said that that role would fit your strengths.

69

> But if they anticipated your growth out of the role of an
> associate that essentially does briefs and does research but
> required more interpersonal skills, then I would have flagged
> for them the room for improvement….

Chase Ex. 78, Mizer Tr. 103:1-12.

407.    Mizer also has come to question Savignac's judgment, testifying that "the tone
and content of [Savignac's January 16, 2019 email to McClure] was wildly unprofessional and in
poor judgment."  Chase Ex. 78, Mizer Tr. 93:9-17; *see also* Chase Ex. 78, Mizer Tr. 154:10-14
("I thought that Mark showed extraordinarily bad judgment in sending that e-mail and so—and I
want to be working with colleagues who exercise good judgment."); Chase Ex. 78, Mizer Tr.
160:10-14 ("[T]he complaint as a whole … demonstrated poor judgment."), 186:2-20, 188:18-
19, 272:6-11 ("I regret that the allegations in the complaint, the conduct reflected in those
allegations, and conduct of this litigation has made me think less of the judgment that both of
you have exercised and are exercising.").

### F.    Jones Day's Statement in Response to Plaintiffs' Media Attack

#### 1.    Plaintiffs' media campaign against Jones Day

408.    In his January 2019 email, Savignac stated that unless Jones Day gave him eight
weeks of additional paid leave, the matter would be decided "in the court of public opinion."
McClure Ex. 4, JD_00003143.

409.    When Brogan read Savignac's January 16, 2019 email, he understood the
reference to the "court of public opinion" to be a threat that Plaintiffs would attack Jones Day in
the press unless the Firm acceded to Savignac's demand.  Chase Ex. 77, Brogan Tr. 17:10-13,
21:17-22:10, 48:6-15, 72:2-6, 73:25-74:18; *see also* Chase Ex. 82, Lovitt Tr. Vol. I 46:18-25.

410.    As Brogan testified under questioning from Savignac: "You just said, 'I want my
money.  I want money for me.  And if you don't give me my money,  I'm going to go to the

press…. [Y]ou're going to trash the firm in the press, simply trying to extort $80,000 out of us.'"
Chase Ex. 77, Brogan Tr. 21:18-20, 67:8-9.

411.   Sheketoff admits that Plaintiffs promoted their lawsuit to multiple media outlets.
Chase Ex. 80, Sheketoff Tr. 176:10-25, 181:6-8, 182:21-183:1, 191:7–11.

412.   After Jones Day rejected that demand and as Plaintiffs were preparing this
lawsuit, Sheketoff decided she wanted to "tell my side of the story" beyond the allegations she
planned to file in the lawsuit.  Chase Ex. 80, Sheketoff Tr. 175:8-9.

413.   Sheketoff affirmatively reached out to The New York Times by contacting a
friend who worked there, Rachel Dry, on August 1, 2019.  Chase Ex. 80, Sheketoff Tr. 175:25-
179:19.

414.   Dry put Sheketoff in touch with a reporter, Noam Scheiber.  Chase Ex. 80,
Sheketoff Tr. 177:4-6.

415.   Sheketoff and Savignac spoke with Scheiber, corresponded with him about their
claims, and agreed to have a photographer come to their house to take pictures of them and their
infant son for an article that The New York Times would publish.  Chase Ex. 80, Sheketoff Tr.
184:3-8; *see also* Chase Ex. 69, New York Times Article; Chase Ex. 63, P03679.

416.   After they filed their lawsuit, Plaintiffs and their son also posed for a
photographer from the Washington Post, another newspaper with which Plaintiffs spoke about
their claims.  Chase Ex. 80, Sheketoff Tr. 185:12-18; *see also* Chase Ex. 70, Washington Post
Article.

417.   Plaintiffs also sat for an interview with a third media outlet about this lawsuit.
Chase Ex. 71, Careerist Article.

2.    **Jones Day issues a statement after The New York Times asked for a comment on Plaintiffs' claims**

418.    Jones Day began preparing for Plaintiffs' anticipated media campaign against the Firm shortly after receiving a July 11, 2019 letter from Stephen Chertkof, a lawyer purporting to represent Plaintiffs.  Chase Ex. 62 at JD_00002950.

419.    The letter was addressed to Plaintiffs' former Practice Leader, Beth Heifetz, and accused her of "recruit[ing] Supreme Court clerks by presenting yourself as their progressive advocate and protector," but "fail[ing] to protect or advocate for Mark and Julia" and "directly participat[ing] in the violation of their civil rights."  Chase Ex. 62 at JD_00002950.

420.    The letter also enclosed a draft complaint.  Chase Ex. 62 at JD_00002951.

421.    Jones Day's 30(b)(6) designee testified: "[A]nyone who is running a professional organization, upon seeing a draft Complaint would realize this—that [the] threat to go to the media was going to come to fruition.  And so it was prudent to begin the process of drafting a press release in anticipation of a media attack, which, in fact, happened."  Chase Ex. 82, Lovitt Tr. Vol. I 48:5-14 (and errata).

422.    Brogan drafted a press statement "[s]hortly after I read the—it was—there was some complaint, as I recall, sent over by your lawyer.  Your lawyer made some statement that—it was written to Beth, I think—and said that, you know, … she promised to be a progressive advocate and protector, which I—I didn't know what—what to make of that statement.  Sounded, again, pretty—pretty immature."  Chase Ex. 77, Brogan Tr. 175:10-17; *see also* Chase Ex. 82, Lovitt Tr. Vol. I 16:19-17:14.

423.    Brogan further testified:

> And also in response to your assertion, which I found astonishing, that—that unlike everybody else at Jones Day, all the generations of people who have raised children and took good care of them and had great family lives, you, as you said, stood in opposition to these

> archaic gender roles, because you and your husband wanted to have equal responsibility in the sharing—in the raising of your children, and—and an equally close relationship with your son, as if everybody else at Jones Day had no desire to do that. It—it was an astonishing statement of self-centeredness and hubris. And the combination of those two things, plus your—what I viewed racist assertion that we had doctored your photo, made me convinced that I had to draft something to defend the firm against these unwarranted, unfair, and untruthful attacks.

Chase Ex. 77, Brogan Tr. 175:24-176:16.

424.   Jones Day did not issue the press release until after Plaintiffs initiated their media attack on the Firm. Traci Lovitt—who was personally involved in the press release and was the Firm's Rule 30(b)(6) designee on the release—stated: "There was no plan to issue the press release until The New York Times ran its article. We were not going to issue a press release unless there was a media attack. And when we were contacted by The New York Times, and it became clear that there was going to be the media attack, that Mark had threatened, then we decided that we needed to respond via press release." Chase Ex. 82, Lovitt Tr. Vol. I 22:8-18.

425.   Specifically, Noam Scheiber—the reporter whom Plaintiffs were working with—contacted Jones Day on August 12, 2019, indicated that The New York Times was "working on a story about a discrimination complaint that [Plaintiffs] are planning to file," and confirmed that the "story will go live tomorrow morning." Chase Ex. 64, JD_00002535-36.

426.   Scheiber asked whether anyone at Jones Day might "have some time to discuss this today." Chase Ex. 64, JD_00002535-2536.

427.   The next morning, Lovitt spoke with Scheiber, who ultimately arranged for Jones Day to review the as-yet unfiled complaint. Chase Ex. 64, JD_00002535; Chase Ex. 67 at JD_00002547.

428.     Later that day, Sheketoff emailed Lovitt a copy of the complaint "because [t]he New York Times reporter said you asked to see [it]."  Chase Ex. 68, JD_00002982.

429.     Brogan then authorized the issuance of the press statement on behalf of Jones Day.  Chase Ex. 82, Lovitt Tr. Vol. I 33:15-17, 36:9-11; Chase Ex. 77, Brogan Tr. 180:2-7; Chase Ex. 73, JD_00002494.

430.     Lovitt emailed the statement to Scheiber on August 13, 2019, and agreed not to "publish this statement on our website or social media, or respond to other media outlets, until after [The New York Times has] published your story."  Chase Ex. 67, JD_00002546.

431.     Lovitt responded on behalf of Jones Day to The New York Times reporter's follow-up questions throughout the day on August 13, 2019.  Chase Ex. 66, JD_00002588-92.

432.     Plaintiffs filed their complaint on August 13, 2019.  Compl. (Dkt. 1).

433.     The next day—August 14, 2019—The New York Times ran its story, a multi-page spread complete with the professional photographs of Plaintiffs and their son.  Chase Ex. 66, JD_00002588, Chase Ex. 69, The New York Times Article.

434.     The New York Times story included Jones Day's explanation of its position in the litigation.  Chase Ex. 66, JD_00002588; Chase Ex. 69, The New York Times Article.

435.     After The New York Times story ran, Jones Day posted a version of its press statement to its website and shared it through certain social media outlets.  Chase Ex. 82, Lovitt Tr. Vol. I 35:24-36:8, 134:18-35:6; *see also* Chase Ex. 72, P02271.

436.     Jones Day has not provided any further comments to media outlets about this case, beyond simply referring them to its prior statement.  Chase Ex. 74, JD_00002531.

437.     Brogan authorized the issuance of the press statement because "we had to say something in response to the impending article in the Times about your—what I viewed as false

74

allegations about the firm." Chase Ex. 77, Brogan Tr. 180:16-19; *see also* Chase Ex. 77, Brogan

Tr. 173:13-174:18, 181:4-184:10, 192:9-198:18, Chase Ex. 82, Lovitt Tr. Vol. I 22:10-18, 46:5-

49:11.

438.    As Lovitt testified in her 30(b)(6) capacity: Brogan "felt it was an untruthful

attack on the firm that was about to be turned into a media smear campaign and that we had to

respond to lies." Chase Ex. 82, Lovitt Tr. Vol. I 39:12-40:7.

439.    Jones Day would not have issued the press statement if Plaintiffs had not

publicized their claims in The New York Times. Chase Ex. 82, Lovitt Tr. Vol. I 52:20-21; *see
also* Chase Ex. 82, Lovitt Tr. Vol. I 22:5-18, 46:5-47:10, 51:22-53:2.

### 3.    The content of Jones Day's statement

440.    The assertions in the press statement have also been made separately in filings

throughout this lawsuit:

| Statement | Court Filing |
|---|---|
| Plaintiffs complain that "the Firm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them." Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 22 (Dkt. 43). | Plaintiffs "resort to complaining that Jones Day's disability policy does not force new mothers to provide medical certification of their disability…. On Plaintiffs' view, employers must demand individual medical certification from all mothers before authorizing any disability leave." Motion to Dismiss at 1, 12 (Dkt 15). |
| "Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff." Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 31 (Dkt. 43). | "Jones Day terminated Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are reflected by and apparent in the intemperate email he sent to Ms. McClure." Answer to Am. Compl. ¶ 10 (Dkt. 49). |

| Statement | Court Filing |
|---|---|
| "The gratuitous allegation that Ms. Sheketoff, who voluntarily left the Firm in August 2018, was a victim of gender pay discrimination is false and was not made in good faith."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 59 (Dkt. 43). | "Sheketoff's pay discrimination claim…. is not made in good faith."  Answer at 1 (Dkt. 35) |
| Sheketoff's "contribution to billable client representations was below expectations."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 7.3 (Dkt. 43). | Sheketoff's "billable hours were consistently below expectations in part due to her apparent preference to work on pro bono rather than billable cases."  Answer at ¶ 91 (Dkt. 35) |
| Sheketoff's "attention was focused on idiosyncratic concerns."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 85 (Dkt. 43). | Sheketoff had a "focus on idiosyncratic concerns, and that her practice … assigned her an extremely low practice rating for two consecutive years."  Answer to Third Am. Compl. ¶ 134 (Dkt. 178). |
| "Ms. Sheketoff resorts to the sensationalized allegation that the Firm doctored her website photo 'to conform to the firm's Caucasian standards of female beauty.'"  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 86 (Dkt. 43). | "Sheketoff's sensationalist allegation that Jones Day doctored her website photo to make her look more Caucasian is ridiculous."  Answer at 2 (Dkt. 35) |
| "Sheketoff personally selected the precise photo that was used on the Firm's website."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 88 (Dkt. 43). | "Sheketoff omits that she herself selected and approved the photo that the Firm used on its website"  Answer at 2 (Dkt. 35) |

441.    The evidence, including Brogan's testimony, also establishes the bases for these claims.  *See, e.g.*, Chase Ex. 77, Brogan Tr. 15:5-17:17, 173:13-181:20, 192:9-198:20.

442.    That includes the testimony and undisputed facts set forth above regarding Savignac's termination and Sheketoff's pay discrimination claim; Sheketoff's admitted desire to receive a Jones Day salary to do pro bono work; and the overwhelming imbalance in her pro bono hours, which Sheketoff admitted was an "ongoing problem."  *See supra*; *see also* Chase Ex. 15 at JD_JS_00001292.

443.    Jones Day's 30(b)(6) designee on topics related to the press statement testified about "the firm's interpretation of the allegations in [Plaintiffs'] Complaint": "That in order to be able to have a disability without … a presumption of medical certification, you necessarily have to have medical evidence…. There is really a binary choice there…. You either have a certification presumption, that is reasonable, like we have, or you have to provide medical evidence.  There is no other way to have a policy.  That is the only way we can construe and interpret [Plaintiffs'] complaint.  And that is, in fact, our opinion of what [Plaintiffs are] arguing in [their] Complaint."  Chase Ex. 82, Lovitt Tr. Vol. I 88:2-89:8.

444.    She further testified in response to questions from Sheketoff: "[I]n the firm's opinion, we know of only two ways to implement a [short-term disability] policy like this, which is to have a presumption for medical certification or to have medical evidence.  You were challenging the presumption.  You're advocating medical evidence.  Otherwise, you are in a world of I don't know what."  Chase Ex. 82, Lovitt Tr. Vol. I 90:11-20.

445.    Brogan testified that the press statement's claim that Sheketoff's "attention was focused on idiosyncratic concerns," was his way of nicely suggesting that Sheketoff's focus was not on the Firm's client billable work but on her personal interests.  Chase Ex. 77, Brogan Tr. 195:20-197:17.

446.    Plaintiffs also complain about the objectively true statement in the Firm's press statement that "Ms. Sheketoff was a highly paid associate who made more than her husband"— but cannot dispute that Savignac's salary never exceeded $500,000, while Sheketoff's salary at the time she left Jones Day was $525,000.  Chase Ex. 17 at JD_00000092; Chase Ex. 43 at JD_00003260; Third Am. Compl. ¶ 137 (Dkt. 172).

447.     With respect to Sheketoff's photo allegations, Jones Day never altered Sheketoff's photograph.  *See* Chase Ex. 77, Brogan Tr. 197:19-198:20; Chase Ex. 82, Lovitt Tr. Vol. I 211:3-214:23.

448.     Jones Day does not employ a photographer, but retained a third-party vendor to take website bio photographs of Firm lawyers and Jones Day had no involvement with the photographs chosen or any alterations to them.  Chase Ex. 77, Brogan Tr. 176:10-177:6, 197:19-198:20; Chase Ex. 82, Lovitt Tr. Vol. I 211:3-214:23; McClure Decl. at ¶ 27.

449.     Jones Day has never instructed the photographer to alter an attorney's photo in order to conform to some standard of beauty, change the attorney's racial appearance, or change his or her overall physical appearance, and there is no evidence that Jones Day instructed the photographer to make any alteration to Sheketoff's photo.  Rosenberg Decl. ¶ 7-8.

450.     Sheketoff admitted at her deposition that she selected and approved the photo that Jones Day used on its website.  Chase Ex. 80, Sheketoff Tr. 162:6-169:17.

451.     According to Brogan, the claim that the Firm "doctored" Sheketoff's photo to "conform to the firm's Caucasian standards of female beauty" is "just a lie."  Chase Ex. 77, Brogan Tr. 197:25-198:18.

452.     In response to Plaintiffs' charge alleging that Jones Day's statement constituted retaliation in violation of Title VII, the EEOC determined that Jones Day "did not violate the statute because [it] was contacted by a reporter prior to post[ing] an article about [Plaintiffs'] complaints."  Chase Ex. 65, P03075.

December 2, 2022                              Respectfully submitted,

                                             /s/ *Terri L. Chase*
                                             Terri L. Chase (*pro hac vice*)
                                             JONES DAY
                                             600 Brickell Avenue, Suite 3300
                                             Miami, Florida 33131
                                             Ph: (305) 714-9700
                                             Email: tlchase@jonesday.com

                                             Traci Lovitt (Bar No. 467222)
                                             JONES DAY
                                             250 Vesey Street
                                             New York, NY 10281
                                             Ph: (212) 326-3939
                                             Email: tlovitt@jonesday.com

                                             Christopher DiPompeo (Bar No. 1003503)
                                             JONES DAY
                                             51 Louisiana Avenue NW
                                             Washington, DC 20001
                                             Ph: (202) 879-3939
                                             Email: cdipompeo@jonesday.com

                                             Anderson T. Bailey (*pro hac vice*)
                                             JONES DAY
                                             500 Grant Street
                                             Pittsburgh, PA 15219
                                             Ph: (412) 391-3939
                                             Email: atbailey@jonesday.com

                                             *Attorneys for Defendants*