# Chase Declaration
# Exhibit 77

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


MARK C. SAVIGNAC and JULIA          )
SHEKETOFF,                          )
                                    ) Case No.
          Plaintiffs,               ) 1:19-cv-02443
                                    ) -RDM-ZMF
v.                                  )
                                    )
JONES DAY, STEPHEN J. BROGAN,       )
BETH HEIFETZ, MICHAEL SHUMAKER,     )
and TRACI LOVITT,                   )
                                    )
          Defendants.               )
_____     )



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Videotaped Deposition of STEPHEN J. BROGAN

(Given Remotely)

Monday, June 6, 2022

11:00 a.m. Eastern



Reported by:  Karen Kidwell, RMR, CRR

Job No.: 832679

Pages 1 - 250


Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

1    APPEARANCES:

2    On Behalf of Plaintiffs:

3         MARK C. SAVIGNAC, ESQ. (Pro Se)
          JULIA SHEKETOFF, ESQ. (Pro Se)
4         2207 Combes Street
          Urbana, IL  61801
5         217.714.3803
          202.567.7195
6         marksavignac@gmail.com
          sheketoff@gmail.com

7

8

9    On Behalf of Defendants:

10        TERRI CHASE, ESQ.
          Jones Day
11        Brickell World Plaza
          600 Brickell Avenue
12        Suite 3300
          Miami, FL  33131
13        305.714.9722
          tlchase@jonesday.com

14

15        ANDERSON BAILEY, ESQ.
          Jones Day
16        500 Grant Street
          Suite 4500
17        Pittsburgh, PA  15219
          412.394.7250
18        atbailey@jonesday.com

19

20        MARY ELLEN POWERS, ESQ.
          Jones Day
21        51 Louisiana Avenue, N.W.
          Washington, DC  20001
22        202.879.3870
          mepowers@jonesday.com

23

24   Also Remotely Present:

25        Brianna Diaz, Videographer



Page 3

```
 1                    I N D E X

 2   WITNESS/EXAMINATION                          Page

 3   STEPHEN BROGAN

 4     By Mr. Savignac                              8

 5     By Ms. Sheketoff                            80

 6

 7

 8

 9

10

11

12                    E X H I B I T S

13     Number            Description            Page

14   Exhibit 4   E-mail chain, top e-mail .........37
                 1/23/2019, Michael Shumaker to
15               Stephen Brogan, Subject: RE:
                 Privileged, Confidential,
16               Bates JC_00003169-3172

17   Exhibit 8   E-mail chain, top e-mail ........115
                 8/24/2018, Mark Savignac to
18               Sarah McClure, Subject: RE:
                 Parental Leave, Bates
19               JC_00003186-3187

20   Exhibit 14  Defendants' Answer and ...........14
                 Defenses to Plaintiffs'
21               Complaint

22   Exhibit 19  Amended and Supplemental ........162
                 Objections and Responses to
23               Plaintiffs' Interrogatories,
                 Savignac, et al. v. Jones Day,
24               et al., Confidential

25
```



```
 1              E X H I B I T S (Cont'd)
 2      Number        Description              Page
 3   Exhibit 20   August 2019 Press Release: .......172
                  Jones Day responds to
 4                litigation challenging leave
                  policy, Bates P02271-2273
 5
     Exhibit 26   E-mail chain, top e-mail .........90
 6                11/12/2014, Michael Shumaker
                  to Stephen Brogan and others,
 7                Subject: Memo re Maternity
                  Policy, Confidential, Bates
 8                JC_00003215-3228
 9   Exhibit 27   E-mail chain, top e-mail .........97
                  1/20/2015, Michael Shumaker to
10                Stephen Brogan, Subject:
                  Maternity, Paternity and
11                Adoption Leave Policy,
                  Confidential, Bates
12                JD_00005162-5163
13   Exhibit 28   E-mail chain, top e-mail .........98
                  1/20/2015, Stephen Brogan to
14                Michael Shumaker, Subject: Re:
                  Maternity, Paternity and
15                Adoption Leave Policy,
                  Confidential, Bates
16                JD_00005164-5169
17   Exhibit 29   5/13/2015 E-mail, From Sparkle ...110
                  to Beth, Subject: Benefits
18                questions from yesterday,
                  Confidential, Bates
19                JD_00001957
20   Exhibit 33   ██████████████████████  ......135

21                ████████████████████████

22
     Exhibit 35   ███████████████████████  ....126
23                ██████████████████

24                ███████████████

25                ██████████████████████
```



```
 1                 E X H I B I T S (Cont'd)

 2       Number            Description             Page

 3   Exhibit 36   E-mail chain, top e-mail ........178
                  8/13/2019, Stephen Brogan to
 4                Traci Lovitt, Subject: RE: NYT
                  Statement, Confidential, Bates
 5                JD_00002494

 6   Exhibit 37   2015 excerpt from spreadsheet ....217
                  with Julia Sheketoff
 7                information, Confidential,
                  Bates JD_00004765
 8
     Exhibit 38   Spreadsheet excerpt of Julia .....221
 9                Sheketoff information, 2016,
                  Confidential, Bates
10                JD_00004766

11   Exhibit 39   Excerpt from spreadsheet with ....224
                  Julia Sheketoff information,
12                2017, Confidential, Bates
                  JD_00004767
13
     Exhibit 40   Excerpt from 2018 Salary ........230
14                Master spreadsheet for Julia
                  Sheketoff, Confidential, Bates
15                JD_00004768

16

17

18                       INSTRUCTIONS

19                Instruction not to answer       55

20                Request for ruling              56

21                Instruction not to answer       61

22                Question marked for ruling      203

23

24

25
```



Page 6

1           MONDAY, JUNE 6, 2022

2               P R O C E E D I N G S

3                   - - -

4           VIDEOGRAPHER:  Good morning.  We are now

5      on the record.

6           This begins videotape number 1 in the

7      deposition of Stephen Brogan, taken in the

8      matter of Savignac versus Jones Day, in the

9      United States District Court for the District of

10     Columbia.

11          Today is June 6th, 2022, and the time is

12     11:00 a.m.  This deposition is being taken

13     remotely via web conferencing at the request of

14     Law Offices of Mark Savignac.

15          The videographer is Brianna Diaz of Magna

16     Legal Services, and the court reporter is Karen

17     Kidwell of Magna Legal Services.

18          Will counsel and all parties present state

19     their appearances and whom they represent,

20     please?

21          MR. SAVIGNAC:  Good morning.  My name is

22     Mark Savignac.  I'm a plaintiff, and also with

23     me is Julia Sheketoff, the other plaintiff in

24     the case.

25          MS. CHASE:  And I'm Terri Chase of Jones



1        Day, counsel for Defendants in this action.

2        With me, also appearing as counsel, is Anderson

3        Bailey and Mary Ellen Powers.  And obviously you

4        see in front of you the witness, Stephen Brogan.

5             VIDEOGRAPHER:  Thank you.  Will the court

6        reporter please swear in the witness.

7             THE COURT REPORTER:  All parties to this

8        deposition are appearing remotely and have

9        agreed to the witness being sworn in remotely.

10             STEPHEN BROGAN

11   being first duly sworn, testified as follows:

12             MS. CHASE:  And -- and Mark, just before

13        we get on the record, let me just note we do

14        have a protective order in this case.  We are

15        going to designate the deposition as

16        confidential.  To the extent that there are

17        sections that later need to be de-designated,

18        we'll do it after the deposition.  And as with

19        our prior deposition, we'll follow the Federal

20        Rules.  So all objections will be preserved

21        except as to form.

22             MR. SAVIGNAC:  Okay.  We're happy

23        following the Federal Rules, whatever exactly

24        that entails.

25             And are we ready to proceed, then?



Page 8

```
 1              MS. CHASE:  We are.
 2              MR. SAVIGNAC:  Okay.
 3                     EXAMINATION
 4    BY MR. SAVIGNAC:
 5         Q.   Good morning.  I'm Mark Savignac.  I'm a
 6    Plaintiff in the case.
 7              Mr. Brogan, have you ever been deposed
 8    before?
 9         A.   I have.
10         Q.   About how many times?
11         A.   Twice.
12         Q.   Twice.  Okay.  If I ask you a question
13    that you have trouble understanding, will you please
14    ask me for clarification?
15         A.   Of course.
16         Q.   If you answer a question and later
17    remember more information, will you please let me
18    know?
19         A.   Of course.
20         Q.   If you think of any documents today that
21    might help you answer more fully and accurately, will
22    you let me know that?
23         A.   Of course.
24         Q.   Is there any reason why you may have
25    difficulty giving full and accurate testimony today?
```



```
 1          A.    None.
 2          Q.    And where are you physically located right
 3   now?
 4          A.    I'm in Jones Day's Washington office.
 5          Q.    And who else is there in the room with
 6   you?
 7          A.    The counsel that's been identified
 8   already, and some staff people who are here to make
 9   sure that if we have problems with technology,
10   issues, that they'll be here to fix it.  And that's
11   it.
12          Q.    All right.  And do you have any papers
13   with you?
14          A.    None.
15          Q.    Okay.  And what did you do to prepare for
16   this deposition?
17          A.    Very little.
18          Q.    Okay.  Did you meet with your lawyers to
19   prepare?
20          A.    I did.
21          Q.    About how much time did you spend
22   preparing for the deposition?
23          A.    I met with them twice for a couple hours.
24   That's it.
25          Q.    Okay.  Mr. Brogan, are you an attorney?
```



Page 10

```
 1          A.   I hope so.
 2          Q.   Yeah.  All right.  Are you a partner at
 3    Jones Day?
 4          A.   I hope so.
 5          Q.   And your role there is managing partner?
 6          A.   That's -- I think that's correct.
 7          Q.   And is that comparable to being the CEO of
 8    a business company?
 9          A.   No.
10          Q.   Okay.  And when did you become Jones Day's
11    managing partner?
12          A.   It took effect January 1, 2003.
13          Q.   2003.  Okay.
14               And Jones Day fired me.  Is that correct?
15          A.   Correct.
16          Q.   Okay.  Who at Jones Day made the decision
17    to fire me?
18          A.   I did.
19          Q.   Was there anyone else who made the
20    decision along with you?
21          A.   No.
22          Q.   Okay.  So you're the sole decision-maker?
23          A.   Correct.
24          Q.   Did you need anyone to approve that
25    decision before it could be implemented?
```



Page 11

1          A.     Nobody.

2          Q.     So you made the final decision, correct?

3          A.     Correct.

4          Q.     Okay.  When was the first time you came to

5    consider whether to fire me?

6          A.     When I was sent an e-mail that you sent.

7    That's the first time I considered it.  Not sure I --

8    before that time I even knew who you were.

9          Q.     Sure.  And are you referring to Mike

10   Shumaker forwarding you the e-mail that you referred

11   to?

12         A.     Well, it was -- it was an e-mail trail; I

13   don't remember exactly.  But there was some earlier

14   correspondence, as I recall, that were included,

15   where the firm told you what our position was.

16                So I -- so I don't -- I mean, it was a

17   trail.  It wasn't just one e-mail.

18         Q.     Sure.  Okay.  So what happened after you

19   received that e-mail?

20         A.     I don't understand your question, what

21   happened.  I -- I told Mike that although I was

22   reluctant to do it, you had -- you had to leave the

23   firm, because of what was the -- what I called --

24   what I believed was absolutely false information,

25   charges in the e-mail.



Page 12

```
 1        Q.   And in what medium did you tell Mike
 2   Shumaker that?
 3        A.   I -- I don't know.  I might have talked to
 4   him to ask -- I think I was interested to find out
 5   who you were claiming gave Julia a bad review.  So
 6   there might have been a phone call, but I -- I don't
 7   remember.  I know I was -- before I made a decision,
 8   I -- I knew that you were complaining about Partner A.
 9             And other than that, I think it was --
10   I -- I just sent an e-mail, which I'm sure you have a
11   copy of.
12        Q.   I think that's true.  So just to be clear,
13   you're not sure whether you had other communications
14   with Shumaker before you sent him the e-mail?
15        A.   No, I wouldn't say I'm not clear on that.
16   I -- I'm pretty clear that I -- I was aware that you
17   were complaining about Partner A.  I don't know how I --
18   how I got it; I might have asked somebody that I was
19   with to call.  But I was interested in identifying
20   who you were claiming gave a discriminatory review of
21   Julia.
22        Q.   And so who -- who were you with at the
23   time?
24        A.   I can't remember that.  This is, you know,
25   three years ago.  Don't -- don't remember.
```



1      Q.   Okay.  Are you confident that you were

2   with someone who called Shumaker about this?

3      A.   No, I just said that I don't know whether

4   I called him or whether I asked somebody to call him.

5   But I was -- that was -- I was interested in that

6   issue.  I wanted to know who you were claiming gave a

7   discriminatory review.

8      Q.   Okay.  But you're confident that either

9   you or someone else called Shumaker about that?

10     A.   Yeah.  I mean, I knew that you were

11  complaining about Partner A before I made the decision.

12     Q.   Okay.  Okay.  So just to confirm the

13  chronology, you received an e-mail from Shumaker that

14  included a trail of earlier e-mails.  You or someone

15  else called Shumaker to determine who the partner

16  referenced was, that it was Partner A.  And then you

17  wrote back to Shumaker to say that I should be fired?

18     A.   That's my recollection.

19     Q.   All right.  Okay.

20     A.   I think the words I used is that you had

21  to go.  Not that you should be fired; that you -- you

22  had -- you had conducted yourself in a way that

23  required your separation from the firm.

24     Q.   Okay.  Is it fair to say that when you

25  said "He has to go," you meant that I should be



Page 14

1   fired?

2        A.   No, I -- I think what I said is what I

3   meant.  That's the way I chose the words that I

4   chose.

5        Q.   Okay.  Is it fair to say that you were

6   directing Shumaker to have me fired?

7        A.   I think it was pretty clear that you had

8   conducted yourself in a way that meant that you could

9   no longer continue at the law firm.  And that was the

10  message that I was sending.

11       Q.   All right.  So please look at Plaintiffs'

12  Exhibit 14, which -- if everything went right --

13  should be Tab 14 in your binder.  And it should be

14  Defendants' answer filed in this litigation.

15            And when you find that document, please

16  turn to page 5 and look at paragraph 10.  And let me

17  know when you see that.

18       (Exhibit 14 was marked for identification.)

19            THE WITNESS:  These things are hopeless.

20            MS. CHASE:  I know.

21            Just give me a minute with the binder.

22       Sorry.

23            MR. SAVIGNAC:  And Julia, I assume you've

24       introduced that on the platform.

25            THE WITNESS:  Okay.  So what -- what are



1        you asking me to -- to draw my attention to?

2   BY MR. SAVIGNAC:

3        Q.   So I assume you're on page 5, so look at

4   paragraph 10.

5             Paragraph 10 says:  "Jones Day fired

6   Savignac for the poor judgment and immaturity

7   reflected by his extortionate threat to harm the firm

8   in the 'court of public opinion' unless it acceded to

9   his demand for eight weeks of paid leave consistent

10  with his having given birth when he had not."

11            And my question for you is, is this

12  sentence in your answer a truthful statement of your

13  reason for firing me?

14       A.   It is a truthful statement.

15       Q.   Okay.  Why did you fire me?

16       A.   Well, the e-mail -- which we don't have in

17  front of us, but I -- so I'm doing this from my

18  recollection -- the first thing you said -- not the

19  first thing, but a critical thing that you said was

20  that your wife had been -- before -- actually before

21  you said that, you said that the firm's compensation

22  system was tailor-made to discriminate against women.

23  And nothing could be further from the truth.

24            The firm's compensation system has been in

25  effect going back to when Jack Reavis put it in place



Page 16

1   when he took over, in '48 or '49 or whenever he

2   became managing partner, and long before Naoma

3   Stewart became a partner in the firm.

4          So our -- our desire to have a

5   confidential compensation system has always had an

6   emphasis on deemphasizing money, so that people

7   weren't being petty and comparing themselves to other

8   people with respect to how much money they made.  You

9   had no, in my view, good-faith basis for making that

10  assertion.

11         Secondly, you said that Julia was

12  discriminated against; that you knew -- both you and

13  she knew this.  And I knew that that was also false

14  and dishonest, because I personally made decisions

15  that favored Julia, and gave her raises that based on

16  her rankings and her -- her scores she did not

17  deserve.

18         You then went on to act as if you

19  personally were the law-givers; that the -- our

20  policy on leave was illegal.  And you said that

21  basically, even if you were wrong about that and EEOC

22  was correct, and we -- we had -- and in that e-mail

23  trail, I remember a statement by the EEOC which was

24  pretty much right on point, about our compensation --

25  our policy, which supported it.



1          You said, "Well, the EEOC can be ignored,

2     because" -- quote -- "they're not going to get any

3     Chevron deference."

4          And we know that because we're familiar

5     with the Court, and we know that the Court -- the

6     D.C. Circuit's going to agree with us, which

7     suggested to me that you weren't very confident that

8     a Federal District Court judge was going to agree

9     with you.

10          And then you made the statement that --

11     "Give me what I want," which I viewed as an

12     extortionist demand, particularly when you said "or

13     else; or I will go to the press."

14          And this is all taking place when you had

15     no claim that you were disabled.  And for all those

16     reasons tied up, that's why I made the decision I

17     made.

18          Q.   All right.  That was pretty exhaustive,

19     but I should still ask, were there any other reasons

20     for your decision?

21          A.   You know, I mean, the further we go into

22     it, we could break all those things down further.

23     But I -- I think that for purposes of this, if you've

24     got a question to ask me about it, ask me.

25          Q.   Okay.  Well, I'm -- I'm not asking you to



1   break those things down further.  I'm just asking

2   whether there's anything you haven't already told me,

3   anything that is outside of what you just said.

4          A.   I mean, I think it encompasses the issues.

5   Now, when you ask me questions, are there going to be

6   elaborations on it?  Of course there are.  So --

7          Q.   Understood.

8          A.   You know, if you want to -- if you want to

9   ask about particular aspects of what I just told you,

10  then you should ask me.

11         Q.   Sure.  So I -- I think you've more or less

12  answered this, but would you have fired me if the

13  e-mail you described had never been sent?

14         A.   Would I have fired you -- I'm sorry.

15  Would I have fired you if the e-mail had never been

16  sent?

17         Q.   Yes.

18         A.   Is that your question?

19         Q.   Yes.

20         A.   I didn't know who you were at that time.

21  So I had no interest in firing you.  I wasn't -- as I

22  said earlier on, I -- I don't -- I don't think I've

23  ever fired an associate in all of my years at the

24  firm, even when I was running the Washington office.

25  I'm not in the business of firing associates.



1      So the answer is no, I wouldn't have fired

2  you.

3      Q.   Okay.  And not to belabor this too much,

4  but did anything other than the e-mail factor into

5  your decision to fire me?

6      A.   Anything other than the e-mail?  The

7  e-mail and its falsehoods, which I felt -- there was

8  nothing about that e-mail that was sent in good

9  faith.  And I -- we -- we can't have people -- it's

10  not good for the firm, the institution -- it's not

11  fair to the other people, who are working hard to

12  make the firm better, to let somebody conduct

13  themselves the way you did in sending that e-mail.

14      Q.   Okay.  So just to confirm, there's not

15  anything that I did other than the e-mail, or that

16  anyone else did, outside of that e-mail, that was a

17  factor in your decision?

18      A.   No.  The -- the falsehoods alleged in the

19  e-mail were enough to convince me that you -- your

20  presence at the firm would be hurtful to the firm and

21  to other people; a bad example of the way we want to

22  try to conduct ourselves vis-à-vis one another.  We

23  don't want people acting the way you were acting.

24      Q.   And was it your understanding at the time

25  that the e-mail we're discussing was from Mark



Page 20

 1    Savignac and Julia Sheketoff?

 2         A.   I thought the e-mail was from -- from you.

 3    I mean, I -- you know, you made this "royal we"

 4    comment that -- "We've consulted lawyers, and we

 5    think that, you know, we were right on the law."

 6              But other than that, the e-mail, on its

 7    surface, I took it at face value was coming from you.

 8         Q.   Okay.  Is there -- is there anything that

 9    could refresh your recollection about reasons for

10    firing me, other than the ones you recall as you sit

11    here today?

12         A.   I -- I don't really understand the

13    question.  If you ask me questions about what I've

14    told you, I -- I may have additional things to say.

15    But I don't -- there's no document out there that's

16    going to refresh my recollection, if that's what

17    you're asking.  If you --

18         Q.   No.

19         A.   If that's what you're asking, there's no

20    document that you could hand me or I could identify

21    that would -- would refresh my recollection.

22         Q.   Okay.  And did the e-mail we're discussing

23    say that I would file a discrimination lawsuit?

24         A.   I don't -- I don't have the document in

25    front of me, but as I recall, you were threatening



Page 21

```
 1   some lawsuit and some class action which -- you never
 2   filed a class action.
 3         I -- I read this always about you
 4   demanding money for yourself.  And it was an
 5   extortionist demand for you alone.  I didn't -- I
 6   didn't take seriously anything but that.  This was
 7   all about you wanting -- whatever it was, $80,000 or
 8   something.
 9         And I -- and I also felt at the time that
10   if you were a really good lawyer, and somebody who
11   knew what they were doing, you would have come to --
12   maybe not to me directly; you would have come to
13   somebody and said, you know, "Look, I really would
14   think the firm should be a leader.  We ought to find
15   a way to -- to -- to encourage leave for -- for
16   fathers, and I urge you to consider this."
17         But that didn't happen.  You just said, "I
18   want my money.  I want money for me.  And if you
19   don't give me my money, I'm going to go to the
20   press."  So . . .
21     Q.   Okay.  And did the e-mail say that I would
22   go to the press?
23     A.   Well, it said "the court of public
24   opinion."  I don't know where else you're going to
25   go.  That was -- that's -- that's the way I read it,
```



Page 22

1    and I think that's the way most people would read it.

2    It was a -- it was a threat to go -- which you did; I

3    mean, you -- you went to the press.  You were a --

4    you know, in The New York Times and The Washington

5    Post.  I can't remember whether you were on the front

6    page of both of them, but you -- you certainly ran to

7    the press.

8             So I -- I think it's kind of a ridiculous

9    proposition to assert that you weren't threatening to

10   go to the press.

11        Q.   I don't think it was the front page.

12        A.   I'm sorry.  I couldn't -- I couldn't hear

13   that.

14        Q.   I'm sorry, I just said I don't think it

15   was the front page.

16             Was the e-mail's statement that I would

17   file a discrimination lawsuit a factor in your

18   decision to fire me?

19        A.   None.

20        Q.   Not relevant to the decision?

21        A.   Not at all.  I could -- I mean, I -- I've

22   been practicing law for 45 years.  I've been in more

23   lawsuits than I can count.  The threat of a lawsuit

24   is singularly unimpressive to me.

25        Q.   Does it generally bother you if someone



Page 23

```
 1   sues Jones Day?
 2       A.   Well, we've been -- we've been lucky, in
 3   that the -- the firm's got a long and very proud
 4   history.  So I don't -- I don't really even -- have
 5   we been sued in the course of our 125-year history?
 6   Yes, we have.  But none of it's been significant to
 7   the firm or to its reputation.
 8            The most important thing is our
 9   relationship with our clients, our relationship with
10   our lawyers.  And that's really, you know, been a
11   blessing.  That's -- the firm is a -- is a very
12   blessed institution.
13            And so the answer to your question is no,
14   it doesn't bother me at all.
15       Q.   All right.  If -- if an associate files a
16   discrimination suit against Jones Day while they're
17   working at Jones Day, would that affect how you feel
18   about that associate?
19            MS. CHASE:  Objection to form.
20            But you may answer.
21            THE WITNESS:  Well, I -- you know, this is
22       a hypothetical.  I mean, I -- I think that -- if
23       an associate who's working for the firm is
24       also -- particularly somebody who aspires to be
25       a partner, and he's basically suing his future
```



1           partners, you're kind of in a -- an endless

2           conundrum, because that person -- and you -- you

3           are probably the only -- you're the only example

4           I can think of this.  I don't know of another

5           case where every time there's a decision made

6           about what work you're given, what compensation

7           received, what your advancement is, you could

8           always claim that you are being punished because

9           you claim the firm discriminated against women,

10          or whatever you're claiming.

11              So it would be an awkward situation.  I --

12          I don't know how I would deal with it.  It's

13          completely hypothetical.  So . . .

14     BY MR. SAVIGNAC:

15          Q.   Would you support someone, an associate

16     for partner, who was currently prosecuting a

17     discrimination suit against Jones Day?

18              MS. CHASE:  Objection as to form.

19              But you may answer.

20              THE WITNESS:  No.

21     BY MR. SAVIGNAC:

22          Q.   Okay.  But your testimony is that the

23     statement of intent to litigate in the e-mail played

24     no role in your decision to fire me?

25          A.   Absolutely.  I've explained to you what my



Page 25

1    decision was based on.  Had nothing to do with it.  I

2    am not -- I couldn't be bothered by the fact that you

3    were threatening the lawsuit against us.  We've been

4    litigating this now for three years, and -- you know,

5    it's -- you know, it's -- that's -- that's life; you

6    know?  You bring your lawsuit.  We defend it.  We go

7    to court.  We have a trial.  See how it works out.

8             So the -- the threat of a lawsuit had no

9    factor in my decision.  None.  Zero.

10       Q.   But the reference to the court of public

11   opinion was a factor in your decision, correct?

12       A.   Yeah, because you're -- you're trying to

13   malign and defame the firm.  You're trying to say the

14   fame -- the firm is sexist.  And you're trying -- and

15   you're expressing an intent to go out into the world

16   and to say that.

17             And that's wrong.  It's not true.  It's

18   not remotely true.  And the evidence, if we do go to

19   trial, is going to be overwhelming that it's not

20   true.  You'll have no evidence on your side, in my

21   view.  We'll have -- we'll have so much evidence that

22   the judge will stop it because it's going to be

23   cumulative.

24       Q.   Would you agree that corporate proceedings

25   in this country are public, and are generally



Page 26

1    available to the press, and that --

2         A.    I'm sorry.  Would you say that again?

3         Q.    Would you agree that court proceedings are

4    public, are open to the press and the public?

5         A.    Well, unless they're under seal or some

6    other reason, yeah.  I mean, there's plenty of

7    proceedings that are under seal.  But generally it is

8    true that if you file a public case, it's -- it's

9    open to the media.  Which is as it should be.  But

10   there are -- there are circumstances where that --

11   matters are under seal, for good reason.

12        Q.    So would you agree that press coverage is

13   often the result of the filing of a lawsuit?

14        A.    Yeah, well, of course, which, you know,

15   every -- every time there's a -- there's another

16   sensational allegation by you, somebody in the press

17   picks it up.  I mean, it's not The New York Times,

18   but it's some blog or -- so, I mean, a lot of people

19   with not much to do in life, so they -- they cover

20   these things.

21        Q.    And just to confirm, the complaint about

22   pay discrimination against Julia, that was a factor

23   in your decision to fire me, correct?

24        A.    The untruthfulness of it, not the -- not

25   the fact of the complaint.  If I thought for a moment



Page 27

1   that there was any merit to it, I -- I would not have

2   taken the decision that I took.  But I knew that it

3   was absolutely not true.  It was -- it was dishonest.

4   It was a dishonest allegation.  And it was the

5   dishonesty, not the allegation of pay discrimination,

6   that caused me to make that decision.

7        Q.   And if not for your view that the

8   allegation was dishonest, you would not have taken

9   the action you took?

10        A.   It's not a view.  I mean, it's the --

11   it's -- you know, the evidence on it is, again, going

12   to be overwhelming.  It's not my view.  It's that

13   this is -- this is the fact that are accurate.  I

14   mean, there -- these are documents that they're going

15   to be made -- that are made and kept in the regular

16   course of business at Jones Day.  They're admissible

17   in evidence, will show that there's no way that Julia

18   was discriminated against on the basis of her sex.

19        Q.   Okay.  And -- and at the time that you

20   made this decision, what was your basis for believing

21   that the accusation was false?

22        A.   I made the decisions personally.

23        Q.   Well, as you said, the allegation in the

24   e-mail is that a partner, whom you've identified as

25   Partner A, you know, was discriminatory against her.



Page 28

1    You didn't write his evaluation personally.

2         A.   Look -- okay.  Let's take a moment to go

3    through this.

4         I -- I've been involved in associate

5    evaluations at Jones Day since 1986, when Pat

6    McCartan put me on the evaluation committee for the

7    litigation group.  And then in '89, when I became the

8    head of the Washington office, I was on the firm-wide

9    evaluation committee.

10        In 2003, when I became managing partner, I

11   decided to discontinue the practice of the managing

12   partner over -- sitting in and -- and making

13   decisions at all the associate evaluation.  I wanted

14   to turn it over to others of my partners.  And I -- I

15   kind of concentrated on partner comp.

16   ████████████████████████████████    ██████████

17   ████████████████    ████████████████████████████████

18   ██████████████████████████████████████████████████

19   ██████████████████    ██████████████████████████████

20   ██████████████████████████████████████████

21   And -- and in thinking about, you know, how I could

22   use my time, maybe, that would benefit the firm, I --

23   I decided to reinvolve myself in -- in taking a look

24   at the associate evaluation process.

25        So I asked for the evaluations of all of



MAGNA
LEGAL SERVICES

Page 29

1   the associates for that year.  And I read every one

2   of them, including the evaluations of Julia.  There

3   was a very unfavorable evaluation of her handed in by

4   Hash, who's a very respected lawyer in the firm.

5              And I -- she is also ranked by the

6   practice a 2 -- which is normally a really, really

7   bad sign for an associate's future in the firm -- and

8   by -- and by the office by a 3.

9              And -- and the recommendations for the

10  increase were -- were smaller than -- than I -- I

11  wound up giving her.  And I -- I raised her salary,

12  and I disregarded Hash's evaluation, mainly because I

13  wanted not just her, but all the women of color who

14  were in the firm at that time coming up through the

15  ranks.  So if anything, she got favorable treatment.

16             The following year, I did not read all of

17  the evaluations, so I did not read Partner A's

18  evaluation.  But she once again came up with a 2 and

19  a 3.  And so I thought that the positive message that

20  I was trying to send her the prior year apparently

21  did not get through.  So I gave her less of an

22  increase.

23             The following year, when I went back and

24  looked, she got a 4 from the practice, and I gave her

25  a very substantial raise, that basically brought her



Page 30

1   up and made -- kind of made up for whatever lower

2   raise I gave her the prior year.

3           So I had personal knowledge of -- of

4   Julia's compensation when you sent me that e-mail.

5   And I knew that the firm had been not just fair, but

6   generous, and was trying to encourage Julia to -- to

7   have a very successful career at the firm.

8           So the notion that you would say in an

9   e-mail that she had been discriminated against was

10  just a lie.

11      Q.   Okay.  So is it fair to say that your view

12  was that you and the firm had actually discriminated

13  in Julia's favor and given her --

14      A.   You know, you love this word

15  "discriminate."  I mean, I -- I just think that we

16  tried to make a good decision.  And -- and that's

17  what we did.  And I -- what I said is what I said.  I

18  didn't say we discriminated in her favor.  We didn't

19  -- we looked at the facts, and we made the best

20  decision possible.

21          Now if you want to play word games with

22  that, I don't accept it.  I mean, that's -- you know,

23  you can run with that if you'd like, but I don't --

24      Q.   I don't -- I don't want to play word

25  games.



Page 31

 1        A.    Well, you are, so . . .

 2        Q.    Is it your testimony that the firm paid

 3    her more than it otherwise would have because she is

 4    a woman?

 5        A.    No, I think I said pretty clearly what --

 6    what the process was, and I stand by that.  I -- I

 7    don't -- I don't know how more clearly I could have

 8    recited the events than I just did.

 9        Q.    Well, you referred to women of color.  So

10    it did seem that what you were saying is basically

11    you thought that she didn't deserve a very big raise,

12    but --

13        A.    No, that's -- that's not -- that's just

14    not true.  I mean, I -- I felt -- the firm has always

15    been committed to trying to encourage everybody to --

16    to make -- we don't have any interest at the firm in

17    seeing anybody that we hire fail.  We -- we want them

18    all to succeed.  We want them to become great Jones

19    Day lawyers, do great work for the firm, do great

20    work for our clients.

21             And so we're encouraging people all the

22    time.  It was not a secret.  It is still, to this

23    day, not a secret that there are people who feel --

24    and it's accurate -- that less opportunity is given

25    to some people other rather than others.  And all I



Page 32

1    wanted to do is to -- to make sure -- I'm a great

2    believer in -- great institutions change people;

3    people don't change great institutions.

4            And so this was a manifestation of that

5    belief, that I wanted to encourage her, like I want

6    to encourage a lot of people, to -- to become part of

7    the firm and become a great contributor.

8        Q.   Okay.  So to whom at Jones Day did you

9    give your instruction that I should be fired?

10       A.   I don't know.  Again, I -- what I -- what

11   I said in the e-mail is that you got -- you have to

12   go because of your conduct.

13           I -- I regret it.  I -- I was not happy

14   that I had to make that decision.  I think that you

15   had thrust that upon me.  It was your conduct that

16   forced me to make that decision.  I didn't reach out

17   vindictively just to, quote, fire you.  You conducted

18   yourself in a way that -- that we don't believe is in

19   the best interest of how we want to conduct

20   ourselves.

21           I say all the time to people, you know,

22   "You fight at this firm, you're gone."  And your --

23   your conduct required that you needed to be separated

24   from the firm.

25           I sent an e-mail -- which I'm sure you



Page 33

1    have a copy, so the question is a little

2    disingenuous -- and I told Mike that you needed to

3    go.

4         Q.   Okay.  About how much time passed between

5    when you read Shumaker's e-mail and --

6         A.   I have no -- this is three years ago.  I

7    have no idea.

8         Q.   Well, was it days?

9         A.   Was it what?

10        Q.   Was it -- did it take days between when

11   you got the e-mail and when you made the decision?

12        A.   No, I -- no.

13        Q.   Okay.

14        A.   The e-mail, on its face, was pretty clear

15   about your character.

16        Q.   Okay.  Why do you think Shumaker sent you

17   the e-mail we've been talking about?

18             MS. CHASE:  Objection to form of the

19        question.

20             You may answer.

21             THE WITNESS:  I -- I have no -- I have no

22        idea why Mike sent it to me.  The -- the only

23        thing I can speculate on is that we -- we don't

24        fire associates, really.  I mean, I don't

25        certainly fire associates.  As I mentioned



MAGNA
LEGAL SERVICES

Page 34

```
1       before, I've been in a position of authority at

2       Jones Day since 1989, and I -- I don't recall

3       ever firing an associate.

4            I think that he felt as though this is

5       something that your -- your character flaws were

6       so great that he probably felt you needed to go,

7       and he wanted my approval.

8            But that's speculation.  You have to ask

9       Mike.

10  BY MR. SAVIGNAC:

11       Q.   Did Mike have the authority to fire me

12  without running it by you?

13       A.   Yeah, I mean, I -- I don't -- I -- I

14  delegate all kinds of things in this law firm.  And

15  if Mike had taken that decision, I wouldn't have

16  said, "No, you -- you didn't have the authority to do

17  that."

18            I mean, it could have been done by a PIC.

19       Q.   Right.

20       A.   Could have been done by any number of

21  people in the -- in the chain of command at the firm.

22  You know, so -- I don't -- I don't look at it that

23  way.

24       Q.   Between receiving Mike's e-mail and

25  writing back what you responded, did you communicate
```



Page 35

 1   with anyone about me?

 2        A.   I think I mentioned that I was -- I was

 3   interested -- and I don't remember who I spoke to or

 4   how I got the information.  I wanted to know who you

 5   were claiming gave the discriminatory evaluation of

 6   Julia.

 7        Q.   Okay.  And aside from that, did you

 8   communicate with anyone about me during that period?

 9        A.   No.

10        Q.   Okay.  Did you consult any documents or

11   other information about me between receiving the

12   e-mail --

13        A.   No.  I mean, I -- I couldn't believe my

14   eyes when I saw the e-mail, to tell you the truth.  I

15   didn't need to -- it said -- to me, it said

16   everything about your character.  I didn't need to

17   have a big investigation.

18        Q.   Okay.

19        A.   Which is quite popular in Washington these

20   days, but not necessary in your case.

21        Q.   I think I know the answer to this, but in

22   the time after you wrote back to Shumaker, between --

23   between that time and the time that the termination

24   was implemented, did you reconsider your decision?

25        A.   No.



MAGNA
LEGAL SERVICES

Page 36

1        Q.    Okay.  In the time after you gave Shumaker

2   your decision but before it was implemented, did you

3   have any more communications with anyone about me?

4        A.    No.  Not -- not that I can recall.  I

5   can't imagine why I would.

6        Q.    Okay.  When you -- when you use e-mail, do

7   you use e-mail on your own, or does someone like a

8   secretary help you with e-mail?

9        A.    No, I -- I can manage e-mail on my own,

10  but -- but thank you for your consideration in

11  wondering whether I need help.

12       Q.    Well, some -- some people do.

13            Okay.  So did you personally read

14  Shumaker's e-mail on a computer screen or a telephone

15  screen?

16       A.    Well, I would -- I would have read it on

17  my BlackBerry.

18       Q.    BlackBerry.  Okay.  And you personally

19  typed and sent your response, correct?

20       A.    Yes.

21       Q.    Okay.  So we can look at the e-mail chain

22  now.  That's Exhibit 4.  Should be Tab 4 in your

23  binder.  And that's Bates-stamped, for the record,

24  JD3169 through 3172.

25            (Exhibit 4 was marked for identification.)



Page 37

1           THE WITNESS:  Okay.  Got it.

2    BY MR. SAVIGNAC:

3        Q.   Okay.  So this is a series of e-mails

4    between you and Mike Shumaker, right?

5        A.   Yes.

6        Q.   Okay.  If you look at the second e-mail

7    from the top, that's from Shumaker to you.  It

8    begins, "Steve:  Savignac was terminated yesterday."

9    Correct?

10       A.   Yeah, that's what it says.

11       Q.   And it was sent on Wednesday, January 23,

12   2019, right?

13       A.   That's what it says.

14       Q.   Okay.  Is this how you learned -- how you

15   first learned that the termination had been carried

16   out?

17       A.   No, I'm not even sure I would have read

18   this.  I mean, I -- I -- might have been.  I'm -- I'm

19   sure it is, but I don't -- I have no recollection of

20   this.  It's an inconsequential e-mail.

21       Q.   Sure.  Okay.  So please look at the next

22   e-mail down.

23           Is this an e-mail from you to Shumaker,

24   dated Sunday, January 20, that says, "He has to go.

25   Get it done tomorrow morning first thing"?



Page 38

 1          A.    Correct.

 2          Q.    And is this the communication which you

 3     gave Shumaker your decision?

 4          A.    Correct.

 5          Q.    Okay.  And just to confirm, this is the

 6     only means by which you directed that I be fired?

 7          A.    Correct.

 8          Q.    And that e-mail was sent at 5:36 p.m. on a

 9     Sunday, right?

10          A.    I -- I don't know.  I don't -- I mean, I

11     don't know where I was in the world at the time,

12     so . . .

13          Q.    You -- so you're -- you don't know where

14     you were at that time?

15          A.    No.

16          Q.    Okay.

17          A.    Could have been -- could have been

18     anywhere.

19          Q.    Are there records that would allow Jones

20     Day to determine where you were physically, you

21     know --

22          A.    I'm -- I'm sure there are.  I don't know

23     what the relevance it is, but I'm sure there are.

24          Q.    That's fine.  Okay.

25                Do you have any idea where Shumaker was



Page 39

1    on --

2         A.    No idea.

3         Q.    Okay.  All right.

4               Okay.  Why did you direct that the

5    termination be carried out so quickly?

6         A.    I don't know what -- to me, I -- I think

7    the most important part of that e-mail is "He has to

8    go," because of your conduct, that we -- we have

9    somebody who is, in my view, being completely

10   dishonest in attacking the firm, as I indicated

11   earlier, by claiming that our system is designed to

12   discriminate against women, and that -- and again,

13   dishonestly claiming that Julia was discriminated

14   against.

15              That's just not conduct that we can accept

16   from somebody.  It's just dishonest.  It goes to your

17   character.  You have to go.

18              You know, it's not -- other people in the

19   firm expect us to enforce certain rules.  This firm

20   is built on people feeling obligations to one

21   another, feeling obligations to the law firm.  And

22   here you are saying things that are palpably untrue.

23              So you -- you -- you can't -- you can't be

24   at the firm if that's -- if that's the way you

25   conduct yourself.  It's a character issue.



Page 40

```
 1          Q.   Did you want to fire me before I could
 2    file an EEOC charge or a lawsuit?
 3          A.   No, I told you already, the whole -- you
 4    know, "We're going to file a lawsuit, we're going to
 5    file" -- it's just -- no.
 6               I mean, it's no -- no factor in it.  You
 7    know, you -- like I told you before, it's -- I've
 8    been practicing law for 45 years.  A lawsuit is
 9    not -- this is the business that we're in.  It's
10    like, you know, a surgeon in surgery.  You know.  You
11    want to file a lawsuit, file a lawsuit.  It's --
12          Q.   Did you --
13          A.   So it had no effect.  Zero effect.
14          Q.   Okay.  So look at the next e-mail down,
15    which starts at the bottom of this page.
16               Is this an e-mail from Mike Shumaker to
17    you?
18          A.   Yeah.  I'm -- I'm not sure what you're
19    referring to, but . . .
20          Q.   At the bottom of the front page of
21    Exhibit 4, you know, the very bottom line; it says,
22    "I wanted to bring the attached to your attention"?
23          A.   Yeah.
24          Q.   I'm just asking, you know, the bottom of
25    this e-mail is an e-mail from Shumaker to you?
```



Page 41

1          A.    Yeah.  I got it, I got it, I got it.

2          Q.    Okay.  The e-mail begins, "Steve:  I

3    wanted to bring the attached to your attention."

4    What was "the attached"?

5          A.    I have no idea.  Whatever is here is what

6    the attachment was.  I'm not . . .

7          Q.    Okay.  Are you familiar with the idea of

8    an e-mail attachment?

9          A.    Is that really a serious question?  Yes, I

10    am.

11          Q.    Okay.  Did any of the e-mails in this

12    chain have an attachment?

13          A.    I don't recall.  I have -- I haven't -- I

14    haven't a clue.  I could not possibly recall.

15          Q.    Okay.  The -- the e-mail, if you turn to

16    the next page, at the very top of the next page, the

17    e-mail says, you know, included is the chain below --

18    "Included in the chain below is an e-mail that we

19    received earlier this week from Mark Savignac.  Mark

20    is an I&A associate and former Supreme Court clerk in

21    the Washington office.  He is married to Julia

22    Sheketoff, a former Washington I&A associate and also

23    former Supreme Court clerk that recently left the

24    firm to do public service work."

25                Before you read this e-mail from Shumaker,



Page 42

1    did you know who I was?

2         A.    I have a -- vague recollection -- and not

3    you as Mark Savignac, but that Beth Heifetz came to

4    me and said that we had a current Supreme Court clerk

5    who wanted us to hire her -- I don't know whether you

6    were married or you were dating -- and she gave you a

7    big endorsement.

8              And -- and then the question was, you had

9    not been practicing law; you were -- I don't know, at

10   the Federal Reserve or something.  And -- and Beth

11   said, "Should -- should we -- are you willing to give

12   this candidate" -- I didn't hook up with your name;

13   this was a generic description -- "a Supreme Court

14   bonus to -- to sign?"

15             And I -- I think I said to Beth, "I -- I

16   don't know.  What's your recommendation?"

17             And she said, "Well, on balance, I think

18   we ought to do it."  And I said, "Yes."

19             So that's -- that's kind of the extent of

20   what I -- I knew about you.  That we -- you know,

21   again, we were quite generous to you under

22   circumstances where we didn't need to be.

23        Q.    Okay.

24        A.    So that's -- that's what I knew about you.

25        Q.    All right.  So before you received this



Page 43

1    e-mail, you didn't have any concerns about me?

2         A.   Concerns?  I -- I just told you what I

3    knew about you.  There was, you know -- I -- I knew

4    you were a guy who didn't practice law for a number

5    of years and we gave a very generous bonus to.

6    That's what I knew about you.

7         Q.   Why do you think Shumaker focused on the

8    fact that we clerked at the Supreme Court?

9              MS. CHASE:  Objection to the form of the

10        question.

11             THE WITNESS:  I have no idea.  I mean,

12        I -- I think that's kind of a -- all right.  I

13        won't . . .

14             I -- I have no idea.  I don't even see the

15        significance of the question or what -- what

16        point you're making, but -- go ahead.

17   BY MR. SAVIGNAC:

18        Q.   Have you ever said or done anything to

19   suggest that matters concerning Supreme Court clerks

20   are important to you?

21        A.   Me?

22        Q.   Yeah, you personally.

23        A.   No.  I mean, I -- there's always a running

24   joke.  When I -- I came to the firm, three of the

25   most important partners in my early career were



Page 44

1  Chappie Rose, who -- who clerked for Oliver Wendell
2  Holmes, and Alice McKay and Pat McCartan, all of whom
3  were Supreme Court clerks.  And I used to tease all
4  of them, particularly Pat, that I thought the most
5  overrated qualification in the world was being a
6  Supreme Court clerk.
7           So that's that was my view of Supreme
8  Court clerks, and it remains that way today.
9       Q.   Okay.  So what I just read, Shumaker
10  refers to "the chain below."  So if you look
11  at pages 3170 and 3171, that's the -- the chain
12  below, and there are three more e-mails after
13  Shumaker's.
14           First, lower on page 3170 is an e-mail
15  from Sarah McClure to Shumaker.  Is that right?  Do
16  you see that?
17       A.   Yeah, I -- yeah.  I'm not sure it said
18  McClure, this -- yeah, I see it.
19       Q.   Okay.  Who is Sarah McClure?
20       A.   Sarah McClure is a human resources person.
21       Q.   Okay.  And who is Mike Shumaker?
22       A.   I think you know that.  I mean, he's the
23  administrative partner of the firm.  I mean . . .
24       Q.   What -- what is an administrative partner?
25       A.   You know, we've had an administrative



Page 45

1    partner in the firm for -- I don't know, 40 years.

2    It's somebody who assists the managing partner in

3    dealing with administrative issues.  Period.

4         Q.   And you choose who is your administrative

5    partner, correct?

6         A.   Correct.

7         Q.   Okay.  Okay.  So next, on the bottom of

8    3170 and onto the top of 3171, there's a -- an e-mail

9    dated January 16.  Is this the e-mail that we've been

10   discussing today?

11        A.   Of course it is.

12        Q.   Sure.  Was this e-mail from Shumaker the

13   way that you first learned of this January 16 e-mail?

14        A.   That's the best I can recall.  I don't --

15   I don't -- I don't recall any other way that I

16   learned about it.

17        Q.   Okay.  Finally, on the third page, which

18   is 3171, there's an e-mail from McClure to me, which

19   is dated August 24, 2018?

20        A.   Right.

21        Q.   Was this e-mail from Shumaker to you the

22   way that you first learned of Sarah McClure's

23   August 24 e-mail?

24        A.   Yes.

25        Q.   Before you received this e-mail from



Page 46

1    Shumaker, were you aware that Julia and I had

2    communications with McClure about the leave policy in

3    August of 2018?

4         A.   No.

5         Q.   All right.  If you turn to the last page,

6    3172, you see that McClure's e-mail is the end of the

7    chain, correct?

8         A.   I mean, I don't know if it's the end of

9    the chain.  It's the end of this document, that's for

10   sure.

11        Q.   Yeah.  Okay, but I mean it appears to be

12   the end of the chain?

13        A.   Yeah, I mean -- I -- I don't know.  I

14   don't know the answer to that.

15        Q.   All right.  So when you decided to fire

16   me, is this everything you had in front of you

17   plus --

18        A.   I've already -- I've already testified

19   now, I think pretty clearly, that it's on the basis

20   of your e-mail and also your attack on our position,

21   which seems to be on all squares with what you were

22   told by Sarah at the -- which is repeated at the

23   bottom of 3171.  So this is the -- this is the

24   document.

25        Q.   Okay.  Sarah's e-mail begins, "The firm



Page 47

1   disagrees with your assertion of discrimination and

2   impropriety."

3           At the time that you decided to fire me,

4   had you ever seen the communication that Sarah

5   McClure was responding to when she said that?

6       A.   No.

7       Q.   So you don't know -- you did not know at

8   that time what we said when we first raised the issue

9   with Sarah, correct?

10      A.   No.

11      Q.   Okay.  Before you wrote back to Shumaker

12  and said that I should be fired, did you read the

13  entire January --

14      A.   I didn't say you should be fired.  That's

15  not the language I used.

16      Q.   I'm sorry.

17      A.   I said you had to go.  You have -- "He has

18  to go."  That's what I said.  Because of your conduct

19  and your character.

20      Q.   Before you wrote back to Shumaker and said

21  "He has to go," did you read the January 16 e-mail

22  at pages 3170 and 3171?

23      A.   I -- I did.  I -- and I focused on the

24  language that I -- where it says "Example 14."  That

25  I -- that I read, and found persuasive, and found --



Page 48

1    it just added to my belief that you had no good faith

2    basis for sending your e-mail.

3         Q.   And you believed that we had no good faith

4    basis because you interpreted the EEOC example as

5    supporting --

6         A.   I -- I gave a lot of reasons for why I

7    didn't -- I didn't think you had a good faith basis

8    for anything.  I thought you were dishonest about the

9    firm's compensation system.  You were dishonest about

10   whether Julia was discriminated against.  In my view,

11   you were attacking our citation of what was a clear

12   statement by the EEOC.  You were, in my view, trying

13   to extort us to -- to get money or run to the press.

14        So there were all kinds of reasons why I

15   didn't think it was in good faith.

16        Q.   Okay.  And before you wrote back to

17   Shumaker, you read the entirety of this e-mail chain,

18   correct?

19        A.   Correct.

20        Q.   All right.  Before you wrote back to

21   Shumaker, did you review Jones Day's leave offerings

22   for new parents?

23        A.   No.  I mean, I -- I delegate that.  That's

24   something I -- I've never really gotten myself

25   personally involved, and I rely on mostly -- to me,



Page 49

1  it's -- we need to do what every other law firm is

2  doing, and that's it.  And I rely on Sharyl Reisman

3  for that, so I wouldn't -- I had no reason to believe

4  that we weren't -- not only being fair, but being

5  generous, which is, when you look at it, clearly the

6  case.

7       Q.   And did you know at the time what the

8  terms of those leave offerings were?

9       A.   Well, I -- generally I knew that I

10  approved generous leave.  That's what I knew.  And

11  that was a long time ago.  It was, you know, long --

12  long before this.  I can't remember when the date is,

13  but . . .

14       Q.   Did you know specifically how many weeks

15  of leave Jones Day gives to associates in connection

16  with the arrival of a new child?

17       A.   No.

18       Q.   Did you have any knowledge of the numbers

19  of weeks that are given to associates in that

20  scenario?

21       A.   No.

22       Q.   Okay.  Would you describe Jones Day's

23  decision to fire me as a collaborative decision?

24       A.   I don't know what collaborative -- I don't

25  know what you're talking about, "collaborative."  I



Page 50

1    told you that I made the decision on the basis of

2    what I viewed as your faulty character.

3         Q.   So it wasn't a collaborative decision?

4         A.   I think the partnership completely agrees

5    with the decision.  So to that extent, it's a

6    consensus -- it would be a consensus decision.

7         Q.   But the partnership wasn't involved in the

8    decision when it was made, correct?

9         A.   No, they -- no.  They weren't.

10        Q.   You just mean that looking back, you know,

11   no one has any doubts about the decision?

12        A.   No, I think people are uniformly behind

13   the decision.

14        Q.   Do you know who Shumaker communicated with

15   about me before he sent you --

16        A.   I don't have any idea.  You'd have to ask

17   him.

18        Q.   Okay.  If you go back to the first page of

19   this exhibit, and you look at Shumaker's e-mail on

20   the bottom of the page, that begins, "Steve:  I

21   wanted to bring the attached to your attention," the

22   date on that e-mail is January 21, correct?

23        A.   That's what it says.

24        Q.   And your e-mail immediately above that

25   responding to him is dated January 20; is that right?



Page 51

```
 1        A.    That's what it says.
 2        Q.    So the date on Shumaker's e-mail says that
 3   it came after your e-mail responding to it, right?
 4        A.    The date on -- well, yeah, his date is
 5   January 21.  Mine -- and the e-mail says mine is on
 6   January 20th.
 7        Q.    And that can't actually be right, correct?
 8              MS. CHASE:  Objection to form of the
 9        question.
10              But you may answer.
11              THE WITNESS:  I have no idea.  I mean,
12        it -- it certainly looks like -- I mean, I would
13        say that I could have been anywhere in the
14        world, but the dates don't -- wouldn't match up,
15        because I would have been -- if I were like in
16        Asia or something, I would have been a day ahead
17        of him.  So I -- I can't explain that.
18              I'm not a tech person, so you have
19        to . . .
20   BY MR. SAVIGNAC:
21        Q.    Fair enough.
22        A.    I see the relevance of it, but in any
23   case, I -- I can't explain that.
24        Q.    Okay.  And so you don't have -- do you
25   have any information that would help us determine
```



Page 52

1    what the actual times were of these e-mails?  Do you,

2    as you sit here today?

3         A.   None.

4         Q.   Okay.  Did you delete Shumaker's e-mail

5    dated January 21?

6         A.   No.

7         Q.   Did you delete your e-mail saying "He has

8    to go"?

9         A.   No.  I mean, my -- things fall out of my

10   e-mail.  I get, you know, hundreds of -- if not a

11   thousand e-mails a day.  They fall out at some point.

12        But I didn't -- I didn't delete either of

13   these e-mails.  There would be no reason for it.

14        Q.   Do you have any recollection of doing

15   anything to preserve these e-mails?

16        A.   What do you mean, "to preserve them"?

17   They . . .

18        Q.   To ensure that they wouldn't be deleted.

19             MR. SAVIGNAC:  Is there an issue with the

20        connection?

21             MS. CHASE:  It's frozen here too.

22             MR. SAVIGNAC:  Okay.

23             MS. CHASE:  Mark, we lost you for a

24        minute.  I don't know if you were saying

25        anything, but -- you might be back now.



Page 53

1           MR. SAVIGNAC:  Yes.  If -- can you hear me
2     now?
3           MS. CHASE:  I can.  Let me just see if I
4     can get everything up and running again.
5           I think we're operational again.
6           MR. SAVIGNAC:  Okay.
7  BY MR. SAVIGNAC:
8     Q.   And -- and I think that my last question
9  was, did you do anything to preserve the --
10    A.   There's only -- look, I've been -- I -- I
11 know what I did; I told you what I did.  There's no
12 reason to be worried about preserving it or not
13 preserving it.  I mean, I don't -- you know, this was
14 a decision that I made, and I have told you that.  So
15 I don't know what the preservation issue has got --
16 is.
17    Q.   Okay.  But just to confirm, you have no
18 recollection of taking steps to preserve the e-mails?
19          MS. CHASE:  Mark, you have the e-mails.
20    I'm not quite sure what this line of questioning
21    is about.  Move on.
22 BY MR. SAVIGNAC:
23    Q.   Okay.
24          Please answer the question I asked.
25          MS. CHASE:  It's been asked and answered



Page 54

1        repeatedly.  Repeatedly.  Move on.

2    BY MR. SAVIGNAC:

3        Q.    Okay.  Okay.  It's possible that I didn't

4    hear the answer when the audio went out.  Is the

5    answer, "No, I don't recall doing anything to

6    preserve these e-mails"?

7              MS. CHASE:  The -- the question was asked

8              two or three times before that.  It was answered

9              repeatedly.  He has explained that he doesn't

10             take -- that -- he has explained what the

11             process is.  The transcript will reflect as

12             much; that he did not delete these things.  That

13             e-mails sometimes fall out of his inbox.

14             As you know, we're looking at the

15             document.  You have it.  There's no preservation

16             issue here.  We've told you repeatedly not to

17             waste the time of this witness.  This is a

18             frolic and detour.  Move on.

19   BY MR. SAVIGNAC:

20       Q.    Okay.  So let's look at the January 16

21   e-mail on 3170 and 3171.

22             The header of the e-mail includes "From"

23   and "To" lines, the date, a "CC" line, and a subject,

24   which is "Parental Leave."  Do you see what I'm

25   referring to?



Page 55

1        A.   I do.

2        Q.   Okay.  Was anything in that header a

3   factor in your decision to fire me?

4        A.   None.

5        Q.   If you look at the next page, 3171, at the

6   end of the e-mail is my default Jones Day sitting

7   block.  And I have to ask, was the signature block a

8   factor in your decision to fire me?

9        A.   I don't even know what you're talking

10  about.  Where is this?

11       Q.   If you look on 3171.

12       A.   Right.

13       Q.   Right above where it says, you know,

14  "From:  Sarah McClure," there is my signature block,

15  which says, you know, "Mark C. Savignac, Associate,

16  Jones Day," et cetera?

17       A.   And the question is what?

18       Q.   Was that part of the e-mail a factor in

19  your decision to fire me?

20       A.   None.  I mean, I -- I don't know how to --

21  how it could be.

22            None.  Zero.

23       Q.   Okay.  And so your decision to fire me was

24  based solely on this January 16 e-mail, correct?

25            (Instruction not to answer.)



Page 56

     1          MS. CHASE:  Objection.  Asked and answered

     2     repeatedly.  Mark, move on.  Ask a new question.

     3  BY MR. SAVIGNAC:

     4     Q.   Please answer the question.

     5          MS. CHASE:  No.  I'm going to instruct him

     6     not to answer.  He's answered it repeatedly.

     7     Move on.  Ask a specific question.  Enough

     8     already.

     9          MR. SAVIGNAC:  Okay.  Well, I would ask

    10     the court reporter to mark this for a ruling.

    11          (Request for Ruling.)

    12          MR. SAVIGNAC:  All I'm asking for --

    13          MS. CHASE:  Go for it.

    14          MR. SAVIGNAC:  -- is a one-word answer.

    15  But --

    16          MS. CHASE:  You've asked -- you've asked

    17     the question repeatedly.

    18          MR. SAVIGNAC:  If you believe that the

    19     question has been answered, then we know that

    20     the answer is no.

    21  BY MR. SAVIGNAC:

    22     Q.   Okay.  The e-mail begins on page 3170:

    23  "Sarah."

    24          MR. SAVIGNAC:  Okay.  Just so that the

    25     record is clear, my understanding that the



Page 57

```
 1          answer to the question that the deponent is

 2          refusing to answer is:  "No, there was nothing

 3          outside this January 16 e-mail that was a factor

 4          in the decision."

 5              MS. CHASE:  Mark, the transcript will

 6          reflect that you've asked repeatedly why the

 7          witness made the decision, and he's answered the

 8          question now a number of times.  We've spent an

 9          hour; you've gotten the answer three times.  I'm

10          not going to allow you to waste his time.  Move

11          on.  If you have a specific question that you

12          haven't already asked, we'll stay for it, but

13          we're not going to let you just keep asking the

14          same questions.  It's a waste of time.

15   BY MR. SAVIGNAC:

16          Q.   The e-mail --

17              MS. CHASE:  Move on.

18   BY MR. SAVIGNAC:

19          Q.   The e-mail begins:  "Sarah," and then

20   there's a comma.  Was that a factor in your decision

21   to fire me?

22          A.   The comma?

23          Q.   Either -- either the comma or the word

24   "Sarah" before the comma.

25          A.   I -- I really --
```



Page 58

```
 1            MS. CHASE:  Mark, when I told you in
 2       advance --
 3            THE WITNESS:  Is this a serious question?
 4            MS. CHASE:  When -- when I --
 5            THE WITNESS:  Yeah, the comma was a big
 6       thing to me.  I -- I focused on that right away.
 7       I mean, I -- I don't like commas.
 8  BY MR. SAVIGNAC:
 9       Q.   Okay.
10            MS. CHASE:  I mean, Mark, you -- you
11       really are wasting time.  Let's please respect
12       the time of this individual witness, and ask a
13       real question.
14            MR. SAVIGNAC:  This would be going much
15       more quickly without these objections.
16            MS. CHASE:  Mark, if you weren't asking
17       questions about punctuation, which you know is
18       ridiculous, it would be going much more quickly.
19            MR. SAVIGNAC:  Whether I know something is
20       ridiculous or not is not the standard for
21       summary judgment.
22  BY MR. SAVIGNAC:
23       Q.   The body of the e-mail is four paragraphs.
24  The first paragraph says:  "We have closely reviewed
25  the case law, including the two cases you rely on.
```



Page 59

1   We have also discussed the matter with other

2   competent attorneys.  Your cases do not support Jones

3   Day's discriminatory policy, which is illegal under

4   Title VII and D.C. law."

5            The question is, was anything in that

6   paragraph a factor in your decision to fire me?

7        A.   I think I've told you what -- the basis of

8   my decision to say that you had to leave the firm,

9   because of this e-mail and the character flaws that

10  it disclosed.  In this particular paragraph -- and I

11  think I referred to this; that you speak like you're

12  the law giver.  And we -- we, Jones Day, which is one

13  of the great law firms in the world, should bow down

14  to your assessment of the EEOC.  And -- and that this

15  is a violation of the 1964 Civil Rights Act.  You

16  know.

17           I -- I got to say, I wasn't impressed with

18  your reasoning.  Just -- it's a flat-out assertion.

19  It is a pompous assertion.  It's an arrogant

20  assertion.  So --

21       Q.   Okay.

22       A.   It's -- you want me to finish, or what?

23  Or . . .

24       Q.   Yes.  No, please do finish.

25       A.   It is just -- I -- I just don't see -- I



Page 60

1  mean, I -- I really wondered, you know, how did we

2  let you get into the firm when you say things like

3  this without any -- any support.  You're just

4  asserting it like -- you're right; you're the law

5  givers.  That's not the way things work.  That's not

6  the way the rule of law works.

7      Q.   And just to be clear, the e-mail's

8  assertion that you're wrong and that Jones Day's

9  policy is discriminatory, that was a factor in your

10  decision to fire me?

11      A.   No, the discriminatory point is no factor.

12  I'm -- I keep telling you, this e-mail reveals a --

13  character flaws in you.  That's what it reveals.  It

14  reveals that -- it's got nothing to do with your

15  allegations of discrimination, you know, or your

16  threats of lawsuits.  You know.

17          You know, you huff and puff, and "I'll

18  blow the house down."  You know, it's got nothing to

19  do with it.  It's -- I found it -- all of this stuff

20  singularly unimpressive.  So --

21      Q.   Okay.  The question, again, is whether

22  anything in this first paragraph was a factor in your

23  decision.

24      A.   I -- I told you, it made me lose

25  confidence in your ability as -- as a lawyer, coupled



Page 61

1   with the rest of the character flaws revealed in this

2   e-mail.

3        Q.   Is that a "yes"?

4            MS. CHASE:  You've -- he's answered the

5        question, Mark.  Asked and answered twice.

6   BY MR. SAVIGNAC:

7        Q.   Okay.  I'm just asking for a yes-or-no

8   question.

9            MS. CHASE:  You don't have an entitlement

10       to a yes-or-no answer.  You've got an answer to

11       your question.  Move on.

12  BY MR. SAVIGNAC:

13       Q.   Okay.  Mr. Brogan, yes or no?

14           MS. CHASE:  Objection.  Asked and

15       answered.  I'm going to instruct him not to

16       answer.  It's the third time.  Move on, Mark.

17           (Instruction not to answer.)

18           MR. SAVIGNAC:  Okay.  And we can take this

19       up with the Court if necessary.

20           MS. CHASE:  Go for it.

21  BY MR. SAVIGNAC:

22       Q.   And you testified that when you made your

23  decision, you had not seen our prior communications

24  with Sarah McClure about this topic, correct?

25       A.   That's correct.



Page  62

1        Q.   So when you say you weren't impressed by

2   the reasoning here, you would agree that you hadn't

3   looked into what our reasoning was, correct?

4        A.   Well, I'm -- I'm -- I see your reasoning

5   in that paragraph.  That, you know, we're just wrong,

6   and you're right.  And then you -- you know, you cite

7   that, you know, there's not going to be any Chevron

8   deference, and you know D.C. Circuit, and you're

9   going to win on the appeal, and maybe not before the

10  District Court.

11             I mean, the whole e-mail is -- is

12  really -- like I said, it's singularly unimpressive.

13       Q.   Did you have a view at the time of whether

14  our claim that the policy is illegal was a legally

15  correct claim?

16       A.   Based on what you wrote here, I felt as

17  though there was no good faith basis for you to say

18  it.  To charge -- to charge the firm, when we're

19  giving -- we had a very genius policy, which I -- I

20  had -- two of my children were born when I was in the

21  Justice Department; there was no opportunity for

22  fathers to take any leave.  And you're telling us

23  that we violated a 1964 Civil Rights Act?

24             To me, there's just no good faith basis to

25  it.  You're just -- you're -- I don't even know



Page 63

1   what -- I -- you know, you're just picking a fight,

2   you know.  You're on a crusade.  It just made -- made

3   no sense to me.  It was impossible for me to believe

4   that what you are saying was -- was being said in

5   good faith.

6           Q.   Would you have fired me even if you

7   believed I was right about the policy being illegal?

8               MS. CHASE:  Objection.  Hypothetical.

9               You may answer.

10              THE WITNESS:  Yeah.  I -- no, I -- I would

11      not.

12  BY MR. SAVIGNAC:

13          Q.   Okay.  The second paragraph of the

14  e-mail -- so we can move to the second paragraph.

15              It says:  "Jones Day's policy is also

16  inconsistent with the EEOC enforcement guideline you

17  mention.  Regardless, your reliance on the guideline

18  example is misplaced because EEOC's interpretations

19  of the substantive provisions of Title VII do not

20  receive Chevron deference, and courts routinely

21  reject them."

22              The paragraph concludes by citing a case.

23              Was anything in that paragraph I just read

24  a factor in your decision to fire me?

25          A.   I -- I think that for you to be saying to



Page 64

1    us -- the way I read that, and I still read it this

2    way, that even if we're correct -- I view this as a

3    concession by you, that our policy is consistent with

4    the EEOC.  But you, again, the law givers, are going

5    to tell us that this is not going to stand up because

6    EEOC interpretations don't get Chevron deference, and

7    that therefore you're going to win in the

8    D.C. Circuit, even if you lose in the District Court.

9            There's a level of immaturity and -- and

10   -- that -- again, I found -- you know, I don't want

11   to be too tough on you, but I don't know how else to

12   say it:  I don't know how -- how we got lawyers in

13   the firm that -- that argue this way.

14           I just -- again, it goes back to -- this

15   can't be a serious argument.  It's -- it's got to be

16   made in bad faith.

17       Q.   And you're saying that because the

18   argument seems poorly reasoned to you?

19       A.   Because it's -- it's a silly argument.

20   It's just -- it's -- it's like -- I don't know what

21   else to tell you.  I mean, maybe you were proud of

22   it.  I'll leave that to you, but -- I'm glad I didn't

23   make that argument.

24       Q.   Why is it silly?

25       A.   Because you're saying -- you know,



Page 65

1   you're -- you're basically charging us with violating

2   the '64 Civil Rights action on the grounds that

3   there's no deference to EEOC rules that we otherwise

4   are in compliance with.  And that -- that's

5   completely illogical to me.

6            What you're saying is that -- basically

7   this paragraph says, even if you're right, and the

8   EEOC guidelines are correct and you're in compliance

9   with them, you're not going to get any Chevron

10  deference.  And therefore, you're in violation of the

11  '64 Civil Rights Act.

12       Q.   Did you have a view at the time of whether

13  the EEOC's interpretations of the substantive

14  provisions of Title VII received Chevron --

15       A.   I told you, I read -- I read the

16  Example 14, which seems to me to be square on.  Which

17  is in the body of the e-mail.

18       Q.   If a Court disagrees with the EEOC, whose

19  view counts?

20       A.   I mean --

21            MS. CHASE:  Objection to the form of the

22       question.

23            THE WITNESS:  I mean, there was no Court

24       decision that you cited.  You -- you know, and

25       obviously, we're going to do what the Court



Page 66

1    says.  That's what the rule of law is.  But, you

2    know, this is -- again, I mean -- this is not

3    a -- you know, I feel like I'm -- I'm -- are you

4    asking me a question, or is this like a -- a law

5    review article that we're talking about right

6    now?

7  BY MR. SAVIGNAC:

8    Q.   Okay.  The third paragraph says:  "Because

9  our son has now been born and because Julia made the

10  prior request, whereas I will be the named plaintiff,

11  I write to say:  Give me the treatment that Jones Day

12  gives to all women with new children -- 18 weeks of

13  paid leave and 6 weeks of unpaid leave -- or else I

14  will file a charge with EEOC and then a class action

15  lawsuit, and the matter will be decided in the

16  D.C. Circuit and in the court of public opinion.  We

17  are very familiar with the D.C. Circuit and confident

18  that we will win."

19          Was anything in that paragraph a factor in

20  your decision to fire me?

21    A.   I -- I think I've already told you that

22  the principal reason I fired you was the character

23  flaws that I saw in this e-mail as a whole, and my

24  view that this was not sent in good faith.  That's

25  the reason why I said you -- you have to go.



Page 67

```
 1              And the idea that you would say, you know,
 2   "or else," I mean, it's like you're living in your
 3   own movie.  "Give me what I am demanding, what I am
 4   trying to extort from you.  I want my" -- this is --
 5   the other thing, this is $80,000.  At this point
 6   you've been paid a million dollars at Jones Day, and
 7   you want $80,000 or else you're going to -- you're --
 8   you're going to trash the firm in the press, simply
 9   trying to extort $80,000 out of us.
10              If that doesn't say things about your
11   character, I don't know what does.  I mean, you're --
12   you're -- this is -- it shows me that you don't care
13   about anybody else except yourself, and we just
14   don't -- we don't have people at Jones Day like that.
15       Q.    Okay.  And you agree that it says, "or
16   else I will file a charge with EEOC and then a class
17   action lawsuit."  Correct?
18       A.    Well, that's what it says, but it had
19   no -- as I've said before, it had no factor in -- you
20   can't get -- apparently you don't want to accept the
21   fact that your threat of a lawsuit to me is
22   meaningless, which is why this is -- litigation has
23   been going on for three years.  It's just -- "I'll
24   huff and I'll puff, and I'll blow your house down."
25              You know, it's -- it's just -- it's --
```



Page 68

1    it's not -- it's not anything that -- that entered

2    into my mind.  What entered into my mind is that we

3    have an associate in the firm who has serious

4    character flaws.

5         Q.   And the statement that I would sue Jones

6    Day, did that play into your view that I had

7    character flaws?

8         A.   I don't know how I could say it more

9    clearly.  The -- the fact that you are threatening to

10   sue the firm had no -- no impact on me at all.  None.

11   Zero.  And -- and it's, you know, it's 45 years of

12   practicing law.  I've been in all kinds of lawsuits.

13   I mean, lots of people:  "I'm going to do this, I'm

14   going to do that, I'm going to do the other thing."

15             You know, it's just -- it's all

16   braggadocio.  And I don't -- I don't -- like I said,

17   the evidence on our side is going to be overwhelming

18   here.  And it's going to be objected to at some point

19   on the basis of cumulative.  I don't see any evidence

20   on your side.

21             So your threat -- your threat had no

22   factor in this.

23        Q.   Okay.  Did you have an understanding at

24   the time of whether the e-mail statement that Jones

25   Day gives all women with new children 18 weeks of



Page 69

1   paid leave is an accurate statement about Jones Day's

2   policy?

3          A.   I'm sorry.  Ask me that again?

4          Q.   Sure.  The e-mail -- the paragraph we just

5   read refers to the treatment that Jones Day gives to

6   all women with new children as including 18 weeks of

7   paid leave.  Did you have an understanding at the

8   time of whether that is an accurate statement of

9   what --

10         A.   I -- I didn't -- I -- I wasn't steeped in

11  the -- in the details of our leave.  Whatever it is,

12  I was confident that it was in compliance with the

13  law, and generous, and that's it.

14         Q.   Okay.  But you didn't know whether that

15  statement in the e-mail was true or false?

16         A.   I don't know.  I assume that -- you know.

17              I -- I don't know.  I didn't -- I don't --

18  I didn't have the details on that.  I wasn't involved

19  in -- in deciding.  I approved it, but I -- I

20  wasn't . . .

21         Q.   Sure.

22         A.   But it had nothing -- it had nothing to do

23  with the decision to -- to let you go.

24         Q.   So the particular amount of leave demanded

25  in the e-mail, which is 18 weeks of paid leave and



Page 70

```
 1   6 weeks of unpaid leave, did the specific amount of
 2   leave demanded factor into your decision?
 3        A.   No.
 4        Q.   So it wouldn't have been any different if
 5   the e-mail had demanded 12 weeks of paid leave and
 6   6 weeks of unpaid leave?
 7             MS. CHASE:  Objection.  Hypothetical.
 8             THE WITNESS:  I don't know how to answer
 9        this -- this is kind of like -- you know, I -- I
10        don't know.
11   BY MR. SAVIGNAC:
12        Q.   Okay.
13             MS. CHASE:  It's a hypothetical.
14   BY MR. SAVIGNAC:
15        Q.   So you don't know the answer?
16             MS. CHASE:  As he just said.
17             MR. SAVIGNAC:  Fair enough.
18   BY MR. SAVIGNAC:
19        Q.   If the e-mail had demanded 16 weeks of
20   paid leave rather than 18, would that have been a
21   factor in your decision?
22             MS. CHASE:  Same objection.  Hypothetical.
23        I expect you're going to get the same answer.
24             THE WITNESS:  I mean, I -- I really don't
25        know how to answer that question.  It's sort
```



MAGNA
LEGAL SERVICES

Page 71

1        of . . .

2   BY MR. SAVIGNAC:

3        Q.   All right.

4        A.   I mean, let's -- 52 weeks of unpaid leave.

5   I mean -- I don't know.  This is getting silly.

6             But go ahead.

7        Q.   Okay.  If a Court agreed that Jones Day's

8   policy is unlawful, do you think it could remedy that

9   by giving me 18 weeks of paid leave?

10            MS. CHASE:  Objection.  Hypothetical.

11       Also calls for a legal conclusion.  I'll let him

12       answer, to the extent he can, with the caveats

13       that he's not providing a legal conclusion, he's

14       not sharing any privileged advice, and it's a

15       complete hypothetical.

16            If you want that answer, see if you can

17       get it.

18   BY MR. SAVIGNAC:

19       Q.   Please.

20       A.   We lawyers, we obey the law.  A judge

21   rules, we're going to obey it.  That's -- that's the

22   only response I have to you on that.  I -- I doubt

23   that's going to happen, but -- we're -- we're in the

24   business of obeying the law, and been doing it for

25   125 years.  We've got a reputation for it that's well



Page 72

1    intact.

2          Q.   All right.  What did you understand the

3    e-mail to mean where it says, "The matter will be

4    decided in the D.C. Circuit and in the court of

5    public opinion"?

6          A.   That you were going to go to the press.

7          Q.   Okay.  And what about the D.C. Circuit?

8          A.   That you were afraid you were going to

9    lose in the District Court.

10         Q.   I guess anyone who loses to the -- in the

11   District Court can appeal to the D.C. Circuit, right?

12         A.   Yeah, but it undermines your credibility

13   as to how -- how correct you are about the law, if

14   you didn't have enough confidence to say that the

15   District Court was going to rule in your favor.

16              So it was pretty telling to me that you --

17   you said, "oh, well, I'm not going to say, these

18   guys, we're going to win hands down in the District

19   Court.  We may lose in the District Court, but we'll

20   win in the D.C. Circuit."

21              It's -- I mean, I -- I kind of like

22   laughed at that.  It just -- it showed me again that

23   this was not being done in good faith.  If you were

24   so certain of your position, why wouldn't you be

25   confident you were going to win in front of a



Page 73

1    District Court judge?

2            If I took this position, I would have -- I

3    would have said that.  But you didn't, because I

4    don't think you had any confidence in that.

5        Q.    Okay.  Was the reference to the

6    D.C. Circuit that we've just discussed, was that a

7    factor in your decision to fire me?

8        A.    None.

9        Q.    Was the reference to the court of public

10   opinion a factor in your decision to fire me?

11       A.    I -- I would say the threat of going to

12   the -- to -- to what I viewed as the media, to sort

13   of tarnish the firm and to say that, you know, we

14   were -- as the e-mail reflects, that we were

15   discriminating against Julia, and our compensation

16   system was -- was designed to discriminate, was --

17   was definitely a factor that -- I viewed you as

18   trying to extort the firm for, again, $80,000, which

19   is what was really at stake here, when you were --

20   had already been paid a million dollars over -- what,

21   18 months or -- less than two years, that you want

22   $80,000 or you're going to go to the press and claim

23   that we discriminate against women and that our

24   system is set up to do that.

25       Q.    Okay.  Does the e-mail say that we would



Page 74

1    contact the press?

2              MS. CHASE:  Objection.  Asked and

3         answered.

4              But you can answer it again.

5              THE WITNESS:  That was my understanding of

6         "the court of public opinion."  I don't know --

7         who -- who else would you go to?  I mean . . .

8    BY MR. SAVIGNAC:

9         Q.   Does the e-mail say --

10        A.   It did.  It -- it turned out that I was

11   right.  You ran to the press.  You ran to The New

12   York Times.  You ran to The Washington Post.  And you

13   gave -- you know, you gave a big layout and had

14   photos taken and the whole thing.  So I was right.

15        Q.   Does the e-mail say that we would go to

16   the court of public opinion?

17        A.   It was obvious that that was what you were

18   going to do, and it's in fact what you did do.

19        Q.   Has the lawsuit or the coverage of the

20   lawsuit been embarrassing to Jones Day?

21        A.   No.

22        Q.   Were the words "or else" a factor in your

23   decision to fire me?

24        A.   Yes.  It just struck me as -- here's

25   somebody -- one of the things that came across in



Page 75

1    this e-mail is that you and -- and Julia are two of

2    the more privileged people in the world right now.

3    And you were finding a way to drum up a case that you

4    were the victim of some social injustice; and if you

5    didn't get your way, or else, you were going to

6    attack us.

7         So the -- the "or else" thing is -- is

8    very telling, again, about your character.

9         Q.    Okay.  The statement, "We are very

10   familiar with the D.C. Circuit," was that statement a

11   factor in your decision --

12        A.    None.

13        Q.    -- to fire me?

14        A.    Zero.  I didn't really credit it.

15        Q.    And --

16        A.    It's -- it's nice of you to say that about

17   yourself, but it had no impact on my thinking.

18        Q.    And that sentence concludes, "and

19   confident that we will win."  Did that -- was that a

20   factor in your decision?

21        A.    You know, again, lots of lawyers say

22   they're confident they're going to win.  That's kind

23   of like what lawyers say, even though when they know

24   they're going to lose.

25        Q.    So it was not a factor in your --


MAGNA
LEGAL SERVICES

Page 76

1        A.    Not a factor at all.

2        Q.    All right.  So we can go to the last

3   paragraph.  The last paragraph says:  "I am aware

4   that Jones Day's black-box compensation system and

5   its attempts to keep associate salaries secret are

6   tailor-made to enable sex discrimination, including

7   retaliation.  We ourselves experienced this when

8   Julia's salary was cut in relative terms based on a

9   negative review from a partner who, in hindsight,

10  clearly treated her worse because she is a woman.  As

11  you know, Title VII prohibits retaliation for

12  opposition to sex discrimination."

13            Was the e-mail's assertion that Julia

14  experienced sex-based pay discrimination a factor in

15  your decision to fire me?

16       A.    The fact that it was untrue, and you said

17  that, told me all I needed to know about your

18  dishonesty.

19       Q.    And you say it was untrue.  Did you have a

20  view at the time of whether --

21       A.     I told you already, I made these decisions

22  myself, personally.

23       Q.    Well, I'm focused on the partner

24  referenced in the paragraph.  Did you have a view at

25  the time on whether Partner A treated Julia worse --



```
 1      A.   Well, I -- as I told you, I found that you
 2  were complaining about  Partner A .  And  Partner A  is the
 3  worst example that you or Julia could have chosen.
 4  And if this goes to trial, it's going to be
 5  demonstrated.  He is biracial, as is Julia.  He is an
 6  enormous promoter of diversity -- diversity, equity,
 7  and inclusion.  He is a complete advocate for
 8  somebody like Julia.  The idea that he would file a
 9  discriminatory evaluation of Julia is just not -- it
10  has no credibility.
11           This is a guy who is as high character,
12  unlike yourself, as you can find.  He served in the
13  United States Marine Corps for seven years.  He
14  fought in Iraq; put his life on the line for the
15  country.  He's an unbelievably good man.
16  Unbelievable.  He came out of it as a -- as a
17  captain.
18            Partner A  is like a -- you can't find a
19  better guy.  And the idea that he was
20  discriminating -- he's -- he's out to -- to get
21  Julia, or to write nasty things about Julia, or he's
22  threatened by Julia, or she doesn't respect him, has
23  no credibility.  And it won't.  When he -- when he's
24  called to testify in the trial, good luck
25  cross-examining him.
```



Page 78

1        Q.   Okay.  So just to confirm, you concluded

2   that the statement that Partner A's evaluation was

3   discriminatory was a false statement, correct?

4        A.   It had no credibility, in my view, because

5   I know Partner A, and I have the highest regard for him.

6   And I felt as though -- when I found out that they

7   were taking a shot at him, it just further undermined

8   my sense that this whole e-mail was dishonest.

9        Q.   And at the time that you made this

10  decision, did you have any basis, other than what

11  you've already said, for believing --

12       A.   That's a -- that's a pretty good basis.  I

13  mean, I -- I know this man.  And I -- it -- like I

14  said, I mean, you know, it passes credibility.  It

15  passes it.  You know, it passes belief that he would

16  file a -- a discriminatory evaluation against Julia.

17  It's just not remotely credible.

18       Q.   Understood.

19       A.   No one -- no one, when it comes time, will

20  believe otherwise.

21       Q.   And I'm just asking whether at the time

22  you had any other basis for that belief beyond what

23  you've already said.

24       A.   Well, I guess what -- there's not much

25  beyond what I've already said that -- to have.  I



Page 79

1    mean, it's -- it's just -- the whole theory is --

2    it's got no legs.  It's just a lie.

3         Q.   Well, did you do -- I mean did you, for

4    example, talk to Partner A about his interactions with

5    Julia that --

6         A.   No, I didn't.  And I -- and I -- and it

7    would be something that would be completely unfair to

8    him, that somebody -- in an e-mail that is otherwise

9    riddled with, in my view, falsehoods, that I would

10   call him up and say, you know, this -- "Are you

11   discriminating against people?"

12            It's just -- it's not -- he doesn't

13   deserve that kind of treatment.  We don't -- we don't

14   do things like that at the firm.  It's not -- it's

15   just not fair to him.  Partner A is a tremendous,

16   honest, hard-working, high-character partner.  And

17   you are trying to malign him, smear him.  And I

18   didn't want any part of that.

19        Q.   Okay.

20            MR. SAVIGNAC:  I need to take a

21       three-minute break, unless anyone has a reason

22       to want more than three minutes.  Otherwise we

23       can be back here in three minutes.

24            MS. CHASE:  Well, let's -- let's go off

25       the record and decide how long.



Page 80

```
 1                MR. SAVIGNAC:  Okay.

 2                THE WITNESS:  Three minutes.  How about

 3        two and a half?

 4                MR. SAVIGNAC:  Two and a half is fine with

 5        me.

 6                MS. CHASE:  Let's go off.

 7                VIDEOGRAPHER:  We are going off the record

 8        at 12:33 p.m.

 9                (A recess transpired from 12:33 p.m. until

10                12:43 p.m.)

11                VIDEOGRAPHER:  We are back on the record

12        at 12:43 p.m.

13                         EXAMINATION

14    BY MS. SHEKETOFF:

15        Q.   Hi, Mr. Brogan.  I'm Julia Sheketoff.  I'm

16    going to be doing some questioning now.

17                MS. CHASE:  Julia -- Julia, I need you to

18        speak up a little bit.  You're very low.

19                MS. SHEKETOFF:  Okay.  Sorry about that.

20                How's that?

21                MS. CHASE:  Still a little low.

22                MS. SHEKETOFF:  Well, I'm on the same

23        computer that Mark was, so it should be the

24        same, but he does have a louder voice than I am

25        I'll try to keep it up.  Let me know if you have
```



Page 81

1        trouble discerning what I'm saying.

2    BY MS. SHEKETOFF:

3        Q.   So you testified that you -- after

4    receiving Mike Shumaker's forward of our January 16

5    e-mail, you had communications with someone about

6    figuring out who the partner complained of in the

7    e-mail was.  Is that right?

8        A.   Yeah, I don't remember who it was, and I

9    don't remember all the circumstances.  It's a long

10   time ago.  But I was interested to find out who you

11   were claiming wrote a discriminatory evaluation.

12       Q.   And did you learn anything else in that

13   conversation?

14       A.   I don't recall the conversation.  All I

15   know is that I was interested in finding out who, and

16   I learned it was Partner A.

17       Q.   Okay.  So you don't remember anything

18   further about any substance of that conversation?

19       A.   No.

20       Q.   And you don't remember who it was with?

21       A.   I do not.

22       Q.   Okay.  But are you certain that it was

23   between when you received Mike Shumaker's e-mail

24   forwarding our January 16 e-mail and when you made

25   the termination decision?



Page 82

1        A.   Yes.

2        Q.   Did you have any other communications

3   about me between when you received Shumaker's forward

4   of our January 16 e-mail and when you made the

5   termination decision?

6        A.   No, I felt like I -- I knew who you were.

7   I knew more about you than I did about your husband.

8        Q.   And did you have any communications about

9   me between the time that you received Shumaker's

10  e-mail -- I'm sorry.  Let me start over.

11            Did you have any further communications

12  about me between the time that you made the

13  termination decision and the time that the

14  termination decision was implemented?

15       A.   No, I think I just answered that I -- I

16  didn't have any further communication about you.

17       Q.   Okay.  Did you speak with Mary Ellen

18  Powers at any point between when you received Mike

19  Shumaker's forward of our January e-mail --

20       A.   I don't --

21       Q.   -- and when the -- please let me finish,

22  so we have a clear record -- and the time that the

23  termination was implemented?

24       A.   I don't recall it.

25       Q.   Before Mark was fired, had anyone ever



MAGNA
LEGAL SERVICES

Page 83

1   told you that Mark was personally immature?

2          A.   I'm -- I'm sorry, what was the question?

3          Q.   Before Mark was fired, had anyone ever

4   told you that Mark was immature?

5          A.   I can't remember the timing of it, but

6   I -- I know in his -- his evaluations, it may have

7   been -- I can't place it; probably not between those

8   two times, but that it was a sense that he was

9   awkward and not somebody that we would want to put in

10  front of clients.

11         Q.   You're talking about -- are you talking

12  about Ben Mizer's written evaluation of Mark?

13         A.   No, no.  I think it was -- it was

14  otherwise reflected in some of the evaluations.  But

15  I can't remember when I read them.  But that -- I

16  just know that that was one of the -- one of the --

17  the views of him.

18         Q.   Okay.  So you're not sure whether you read

19  those things before you -- that Mark was terminated?

20         A.   No, I don't -- I -- no, I'm not -- I'm not

21  claiming I did.  I didn't -- this was after that.

22  I -- I asked for -- I asked for the reviews of both

23  of you after I had made the -- the termination

24  decision.

25         Q.   Okay.  So before you decided or -- sorry.



Page 84

```
 1              Before Mark was terminated, nobody had
 2    told you that Mark was immature?
 3         A.   No.
 4         Q.   And you had not read anything suggesting
 5    Mark was immature?
 6         A.   Well, except his bloody e-mail.
 7         Q.   Okay.  I'm -- I'm asking whether someone
 8    told you that.  You hadn't read these reviews before
 9    you terminated Mark?
10         A.   No, and I've already answered that.  But
11    I -- I -- the decision -- the e-mails, to me, speak
12    volumes about the reasons for the decision.
13         Q.   Understood.
14         A.   So I didn't --
15         Q.   Just to clarify --
16              MS. CHASE:  Julia, Mr. Brogan was still
17         speaking.  Please don't cut him off.
18              THE WITNESS:  Yeah, I mean, I -- I think
19         that the e-mail, on its face, spoke volumes
20         about -- about Mark and his maturity, lack of
21         judgment.
22    BY MS. SHEKETOFF:
23         Q.   Okay.  Setting aside --
24              MS. CHASE:  Mr. Brogan is still speaking.
25         Julia, you must not speak while he's answering.
```



MAGNA ▶
LEGAL SERVICES

Page 85

```
 1              THE WITNESS:  So that I had -- I had no
 2        occasion to and didn't really feel any need to
 3        get somebody else's view on it.  It was, to me,
 4        a plain -- plain as could be in the e-mail
 5        that -- that this -- this guy had some serious
 6        character flaws.
 7   BY MS. SHEKETOFF:
 8        Q.   So before Mark was fired, nobody told you,
 9   either in writing or orally, that Mark was immature?
10        A.   I think I've answered that now two or
11   three times.
12              MS. CHASE:  You have.
13   BY MS. SHEKETOFF:
14        Q.   Is the answer "correct"?
15        A.   No, I -- I -- I did not have any
16   communications with anybody about Mark being
17   immature.
18        Q.   Okay.  And before Mark was fired, did
19   anyone tell you, either in writing or orally, that
20   Mark had poor judgment?
21        A.   No.
22        Q.   Before Mark was fired, did anyone ever
23   tell you, in writing or orally, that Mark had a lack
24   of interest or a disinterest in pursuing a career at
25   Jones Day?
```



Page 86

1        A.    No.

2        Q.    Before you terminated Mark, or -- I'm

3   sorry, before Mark was terminated, did anyone ever

4   tell you, orally or in writing, that Mark was

5   discourteous to colleagues?

6        A.    No.

7        Q.    Okay.  Is it your belief that Mark --

8   sorry, that our January 16th e-mail was

9   insufficiently collegial to Sarah McClure?

10       A.    I'm -- I'm sorry, you -- your voice is

11  fading out.

12       Q.    I'm sorry about that.  I'll try again.

13             Is it your view that our January 16 e-mail

14  was insufficiently collegial to Sarah McClure?

15       A.    Yes.

16       Q.    Was that a factor in your decision to fire

17  Mark?

18       A.    It was one of many factors, that -- I

19  think the -- the e-mail, to me, just is -- reeks of

20  poor judgment, lack of character, and immaturity, and

21  lack of courtesy.

22             And I mean, I -- I've been at the firm,

23  with the exception of two years at the Justice

24  Department, for 45 years.  I've never seen an e-mail

25  written by an associate like that.  It's in a class



Page 87

1    by itself.

2         Q.   And you've never seen an e-mail that was
3    so discourteous to colleagues?

4         A.   Not like this one, no.  I mean, I --

5         Q.   I'm just -- I'm asking about courtesy.  Is
6    it your position that you've never seen an e-mail, in
7    your -- your decades at the firm, that reflected the
8    same amount of discourtesy?

9         A.   Not that I can recall right now from an
10   associate who is -- who is attacking the firm, no, I
11   can't recall any.  There might have been some out
12   there.  I mean, you know, there's thousands and
13   thousands and thousands -- I mean, I couldn't count
14   all the e-mails I've seen over the years.

15            But -- but I -- this one stood out.  A
16   singular achievement, I would say, on Mark's part.

17        Q.   Before you -- before Mark was fired, did
18   you have any reason to believe that he was not
19   collegial to anyone at the firm, apart from this
20   January 16 e-mail?

21        A.   I'm -- I'm sorry.  I'm still having a hard
22   time hearing you.

23        Q.   Okay.  I'm sorry.

24            Apart from the January 16 e-mail, before
25   you fired Mark, did you have any reason to believe



1  that he was not collegial to someone else at the

2  firm?

3       A.   No, I -- I didn't pay any attention to

4  Mark.  I mean, he was just another associate that had

5  to -- like every associate, has to prove himself.  So

6  he wasn't really on my radar screen at all.

7       Q.   Okay.  So before Mark was fired, did

8  anyone inform you, either orally or in writing, that

9  Mark was uncollegial?

10       A.   I -- I think I've said to you that I -- I

11  had very little awareness -- and I said this in the

12  questioning that Mark put to me -- of him, at all.

13  I --

14       Q.   Is that a "no"?

15            MS. CHASE:  Julia, please stop cutting the

16       witness off.  You ask questions.  He answers

17       them.  You can then ask another question.  But

18       please do not cut him off.

19            THE WITNESS:  And -- and so I had no

20       reason to discuss Mark with anybody.

21  BY MS. SHEKETOFF:

22       Q.   So nobody had told you --

23            MS. CHASE:  Julia, you must wait until the

24       witness is done with his answer.

25            MS. SHEKETOFF:  I'm sorry.  I thought he



```
 1        was done.  I thought he was done each of these
 2        times, but I was trying to wait longer.
 3             THE WITNESS:  No, it's not -- I mean, I
 4        guess you've got a distorted view of how the --
 5        how the -- no one -- parters in the firm, or
 6        associates, they don't come running to me saying
 7        that they think so-and-so is such-and-such.
 8        It's just not the way we operate.  There could
 9        have been loads of people out there who felt
10        that way.  But no one communicated that to me.
11             So like I said, my contact with Mark, my
12        knowledge of him, was quite minimal, other than
13        what I have testified, that Beth, my
14        recollection, came to me asking whether or not I
15        would approve the bonus payment to him, and
16        that -- I heard that -- and she told me he
17        didn't -- wasn't a practicing lawyer; he had
18        been at the Federal Reserve.
19             Other than that, I didn't know much about
20        him at all, until he -- he sent this e-mail
21        that -- that Mike forwarded to me.
22   BY MS. SHEKETOFF:
23        Q.   Okay.  So just to confirm, no one had
24   informed you that Mark was uncollegial before you
25   decided to terminate him, right?
```



Page 90

```
 1        A.   I don't know.  I think I've answered that
 2   question, but . . .
 3        Q.   Is the answer that I'm correct?
 4             MS. CHASE:  Objection to the form of the
 5        question.
 6             You may answer.
 7             THE WITNESS:  Yeah.
 8             No, I -- I didn't talk with anybody about
 9        Mark until this e-mail came in, about anything.
10   BY MS. SHEKETOFF:
11        Q.   Okay.  Thank you.
12             All right.  I'm -- I'm going to show you
13   on the AgileLaw platform an exhibit, but you're
14   welcome to look at it in your binder instead.  It's
15   Exhibit 26.
16        (Exhibit 26 was marked for identification.)
17             THE WITNESS:  26, she said?
18             MS. CHASE:  Yes, 26.
19             And Julia, I have noted when you're closer
20        to the screen, it seems to pick up better; so
21        when you start to trail back, we have a hard
22        time hearing you.
23             MS. SHEKETOFF:  Okay.  I'll try to stay
24        close.
25
```



Page 91

1    BY MS. SHEKETOFF:

2         Q.   So this is Plaintiffs' Exhibit 26, and

3    just for the record, it's Bates-stamped JD3215

4    to 3228.

5         A.   Yeah, I got it.

6         Q.   You got it.

7              Is this an e-mail and attached memo from

8    Mike Shumaker?

9         A.   That's what it says.

10        Q.   Did you receive this e-mail and memo from

11   Shumaker?

12        A.   I assume so.  This is a long time ago, but

13   I have no reason to think -- this is presumably kept

14   in the regular course of business.  It's in our

15   files; we produced it.  So I'm sure that it was sent

16   and I received it.

17        Q.   And did you receive it around November 12,

18   2014?

19        A.   I don't know when I looked at it.  I mean,

20   I -- you said "around," yeah.  The answer is yes, I

21   would have received it around that time.

22        Q.   Did you read the e-mail?

23        A.   Probably breezed through it.

24        Q.   Did you read the memo?

25        A.   Breezed through it.



Page 92

1          Q.   Did you read the attachment to the memo?

2          A.   No.

3          Q.   Why was this brought to you?

4          A.   Well, I assume that it was brought to me

5     because I was the managing partner of the firm, and

6     they wanted to make a change in the -- in the leave.

7     And they felt as though they needed my approval.

8               I don't -- I don't think Pat had -- my

9     recollection is that they told me at some point that

10    Pat had made some changes in '94, and so this would

11    have been -- however many years; ten years on.

12         Q.   Okay.  And so when you got this e-mail and

13    memo, did you consider making changes to Jones Day's

14    parental leave offering?

15         A.   I just -- I -- I approved it.

16         Q.   Okay.  So before you approved it, did you

17    review any documents apart from this memo and the

18    e-mail?

19         A.   Didn't -- I don't -- I don't even think

20    I -- I don't recall reviewing anything, even this

21    document.  I might have read the section on the

22    market.  That would -- that would be the thing that I

23    was most concerned about, that we made sure that we

24    were current with what other law firms were doing.

25               And I -- well, I have a very high regard



Page  93

1    for Sharyl Reisman, who is in charge of our

2    recruiting.  And so if she recommended this, I -- I

3    would have approved it without really much attention

4    at all.

5              So the only -- the only thing I would have

6    looked at was the couple of sentences about the

7    market.

8         Q.   So you're quite sure you didn't read other

9    documents?

10        A.   No, I definitely didn't read any other

11   documents.

12        Q.   And are you saying -- do you have a

13   recollection that you did not read this memo, or that

14   you did not read certain parts of this memo, or

15   you're --

16        A.   I think it's --

17        Q.   Not sure?

18        A.   -- highly unlikely that I did anything

19   other than approve this recommendation.

20              And I doubt that I would have read this

21   with any care.  I would have just accepted that this

22   was a recommendation coming from Sharyl, and that was

23   it.  And the only thing I would have been interested

24   in -- and I don't even remember doing that -- is to

25   make sure that we were current with what other law



Page 94

1    firms were affording people.

2         Q.   But you're not -- you're not denying that

3    you breezed through the memo?

4         A.   Not denying what?

5         Q.   That you -- that you breezed through the

6    memo?  Those were your words.

7         A.   Yeah, I mean, I -- I said I might have

8    breezed through it.  I have no recollection of it.

9    So . . .

10        Q.   Okay.  But you don't have a recollection

11   that you did not read it?

12        A.   The -- the first time I really recall

13   seeing this memo is -- is when it showed up in this

14   litigation.  I don't -- I don't have any independent

15   recollection of this memo.

16        Q.   And you don't have -- sorry.  I'll -- I'll

17   withdraw that.

18             Did you conduct any research when you

19   were -- before you approved this memo?

20        A.   None.

21        Q.   And you mentioned that you approved this

22   memo because you have a high regard for Sharyl

23   Reisman.  Is there any other reason why you --

24        A.   Her name is Sharyl Reisman.

25        Q.   Okay.  I'm sorry.



Page 95

1           Any other reason besides Sharyl Reisman's

2    recommendation and -- you know, this memo, including

3    Sharyl's Reisman's recommendation?

4           A.   We -- the firm has always got to make sure

5    that it's -- it's updating and being current with

6    what's being afforded to -- to people who are having

7    children in the firm.  This has been a hallmark of

8    the firm forever.

9           But the way I have tried to lead the firm

10   is to delegate and rely on others on issues like

11   this.  And she's somebody who I have the highest

12   regard for.  And if she told me, "Steve, this is

13   something I think we should do," then I was going to

14   do it.

15          Q.   How long after you received this memo did

16   you make your decision to approve the leave offering?

17          A.   I have no -- I have no idea.  This is ten

18   -- this is -- what, ten -- eight years ago.  I have

19   no idea how long it was.

20          Probably wasn't long.  I don't -- I

21   don't -- I make -- I like to make decisions quickly.

22   So I -- I suspect it was a very prompt decision.

23          Q.   Did you communicate your decision in

24   writing, or orally?

25          A.   I have no idea.  Can't -- can't -- can't



Page 96

1   remember.  No idea.  Could have -- could have just

2   picked up the phone and said, "This is great; thanks

3   for the -- all the hard work you put into this."

4          Q.   Okay.

5          A.   That's probably -- that's probably what

6   happened.

7          Q.   Did you have any communications with

8   anyone about the leave offerings proposed in this

9   memo?

10         A.   None.  I told you, I got this, and I

11  probably picked up the phone and -- probably called

12  her; might have called Shumaker, I doubt it, and

13  said, "This is great.  Thanks for all the hard work.

14  It's approved."

15         Q.   Okay.  And did you have any conversations

16  before you received the memo about the leave

17  offerings --

18         A.   Zero.

19         Q.   -- discussed in the memo?

20         A.   Probably didn't even know it was coming.

21         Q.   Okay.  And these leave offerings were put

22  into effect in January 2015.  Is that right?

23         A.   I don't know.  Whatever they --

24  whatever -- whatever it was.  I don't -- I don't know

25  exactly when they were put in.  But whatever --



Page 97

1    whatever -- whatever the timing was, it was.

2         Q.   And does that sound right?

3         A.   I don't -- I don't know.  I assume it is.

4    There've got to be documents that show when it took

5    effect, so I mean, I'm not -- it's not my memory that

6    we should be relying on for when it took effect.  I

7    mean, it took effect on a date that's -- I'm sure --

8    again, in the documents of the firm, made and kept in

9    the regular course of business.  Whatever that date

10   is, that's when --

11        Q.   Okay.

12        A.   -- it took effect.

13        Q.   I'm -- I'm going to show you what's marked

14   as Exhibit 27.  You can turn to it in your binder, if

15   you prefer that way.

16        (Exhibit 27 was marked for identification.)

17             THE WITNESS:  Got it.

18   BY MS. SHEKETOFF:

19        Q.   This is an e-mail from Shumaker with a

20   draft announcement of the leave offerings that you

21   approved in the November -- or after the

22   November 2014 memo, right?

23        A.   It appears so.

24        Q.   Did you receive this e-mail?

25        A.   I assume we did.  Again, if we produced it



Page 98

1    to you, and it's made and kept in the regular course

2    of business, it's authentic.  He sent it; I probably

3    received it.  So . . .

4            Q.    And did you read it?

5            A.    I doubt it.  If I did, I -- again, I just

6    would have glanced on it.  It was not -- I don't

7    spend a lot of my time in managing this firm focusing

8    on things like this.  I take the recommendations of

9    the people who come to me with these.

10           So I don't -- I don't -- again, until --

11   until this showed up in connection with this

12   litigation, I have no recollection of this memo.

13           Q.    Okay.  Please turn to Plaintiffs'

14   Exhibit 28.  I'm showing that on the AgileLaw

15   platform, too.

16               MS. SHEKETOFF:  And I'm sorry, just for

17           the record, the -- Plaintiffs' Exhibit 27 was

18           Bates-stamped JD5162 to 63.

19               And what we're looking at now is

20           Plaintiffs' Exhibit 28, which is Bates-stamped

21           JD5164 to 69.

22           (Exhibit 28 was marked for identification.)

23               THE WITNESS:  Yeah, I -- I got 29 and 30,

24           if that's what you're asking me.  I -- I -- I've

25           seen these documents.



Page 99

```
 1   BY MS. SHEKETOFF:
 2        Q.   Yeah.  I'm focused on Plaintiffs'
 3   Exhibit 28 right now.  Is that your response to
 4   Brogan's e-mail that we just looked at, at
 5   Plaintiffs' Exhibit 27 -- I'm sorry, to Shumaker's
 6   e-mail?
 7        A.   Yeah.  It's got to be.
 8        Q.   Okay.  And before you sent this e-mail,
 9   had you read Shumaker's e-mail with the draft
10   announcement of the changes you were approving?
11             MS. CHASE:  Objection.  Asked and
12        answered.  You may answer it again.
13             THE WITNESS:  Yeah, I mean, like I said, I
14        would have gone with whatever the recommendation
15        is.  I probably said, you know, "Looks good to
16        me," and approved it.  It's not --
17   BY MS. SHEKETOFF:
18        Q.   Okay.  And --
19        A.   -- something that I'm --
20        Q.   I'm sorry?
21        A.   It's not something that I'm going to be
22   closely involved in.  That's what we got lots of
23   partners for, people to do different things.  I mean,
24   it's . . .
25        Q.   Okay.
```



Page 100

```
 1         A.   I -- I'm sure that -- I don't know what
 2    you were asking about times before.  I'm sure I
 3    didn't spend a lot of time on this.  I just approved
 4    it.
 5         Q.   Before you sent this e-mail --
 6         A.   Yeah.
 7         Q.   -- did you review a draft of the written
 8    policy implementing the leave policy changes?
 9         A.   No.  No.
10         Q.   Have you ever seen the written policy
11    implementing the --
12         A.   I doubt it.
13         Q.   -- policy?
14              Under the leave offerings you approved,
15    women get 18 weeks of leave, right?
16              MS. CHASE:  Objection to the form of the
17         question.  Calls for a legal conclusion.
18              You may answer, to the extent you can.
19              THE WITNESS:  Yeah, whatever -- whatever
20         it is, it is.  I mean, the -- leave speaks for
21         itself.
22    BY MS. SHEKETOFF:
23         Q.   And you -- I'm asking about your -- the
24    policy that you approved.  Was it your understanding
25    that you were approving 18 weeks of leave for women?
```



Page 101

```
 1        A.    I approved the recommendation to give
 2   leave as the people who are closest to this wanted.
 3   And that's what I did.  I didn't get any further into
 4   it.
 5        Q.    Well, I'm asking, was it your
 6   understanding of the recommendation that you were
 7   approving, that women --
 8        A.    Well, I'm telling you --
 9        Q.    -- let me finish asking the question for
10   the record.
11             Was it your understanding of the
12   recommendation that you were approving that women
13   were to get 18 weeks of paid leave?
14             MS. CHASE:  Objection.  Asked and
15        answered.
16             You may answer it again.
17             THE WITNESS:  Yeah, you're not -- you're
18        not -- you're not hearing me.  This is not
19        something that I would be spending a lot of time
20        on.  And I approved the recommendation.  I spent
21        very little time reading it or -- I just
22        approved it because I assumed that this was the
23        thing that everybody was doing in the profession
24        right now, and whatever it was, I was going to
25        approve it.  So I really didn't have any
```



Page 102

1          understanding of the details of it beyond that.

2     BY MS. SHEKETOFF:

3          Q.   Okay.  So you were not sure whether it was

4     18 weeks or 14 weeks or whatever; you just weren't

5     sure?

6          A.   I don't know what the word "sure" is.  I

7     mean, it wasn't my job, really, to be sure about it.

8     I -- I gave this to extremely able people, who made

9     the decision on behalf of the firm, and they asked me

10    to approve it, and I approved it.  So sure or not

11    sure has really got no application here.

12         Q.   Okay.

13         A.   It's just -- it's just argumentative.  I

14    mean, it's -- but, you know, that's what this

15    deposition is turning into.  But go ahead.

16         Q.   I'm just trying to clarify whether you

17    know what you were approving.  Whether you knew.

18         A.   I -- I told you that I -- I knew I was

19    approving very generous leave, an upgrade or an

20    advancement of the leave that had been previously

21    available, when it was brought to me.  That's what I

22    understood.  And that -- that this generous leave

23    was -- it was in accord with the standard in the

24    profession at that time.  That's what I understood.

25         Q.   Okay.  And under the leave that you



Page 103

1  approved, men got 4 weeks of leave, right?

2          MS. CHASE:  Objection.  Asked and

3      answered.

4          Julia, he's repeatedly told you he doesn't

5      know the amounts.  I don't know why you continue

6      to waste time this way.

7  BY MS. SHEKETOFF:

8      Q.  Okay.  If we are all clear -- and

9  Mr. Brogan, you can confirm -- that you were unaware

10  of the amounts that women, men, or adoptive parents

11  got, then we can move on.  Is that your --

12     A.  Didn't focus on that at all.

13     Q.  Okay.  And we're talking about paid and

14  unpaid leave; you were not sure about either of those

15  things.  Is that right?  You did not --

16     A.  I didn't -- I didn't focus on any of these

17  things.  I . . .

18     Q.  Okay.  Did you think that the leave

19  offerings that you approved were legal?

20     A.  Of course.  Had no reason to think

21  otherwise, and still think it's a silly argument.

22     Q.  Why is it silly?

23     A.  Because it -- like we've been over this

24  before.  I mean, I think that we were in compliance

25  with the EEOC.  You're challenging the Court.  Let's


MAGNA
LEGAL SERVICES

Page 104

1    see what it happens.

2              But the notion that -- that there was any

3    issue when this was brought forward as to whether or

4    not what we were doing was legal or illegal is

5    just -- it's -- you know, it's out in left field.

6    It's got -- you know, it -- it never occurred to me,

7    it never occurred to anybody in this process that

8    anything that we were considering doing was illegal.

9    It's just made up out of whole cloth to say

10   otherwise.

11       Q.   Is it legal to give women 18 weeks of paid

12   leave and men to give 4?

13            MS. CHASE:  Objection.  Calls for a legal

14       conclusion.  He can answer to the extent he can,

15       with the understanding that it's not a legal

16       conclusion and not to disclose any privileged

17       advice.

18            THE WITNESS:  Yeah, I'm -- I'm not a law

19       professor, so you got -- I am very confident

20       that the firm has always been in compliance with

21       the law.  And --

22   BY MS. SHEKETOFF:

23       Q.   Why are --

24       A.   It's always been intent on that, that the

25   firm's reputation, which has been built up over



Page 105

1   100 years, has always been stellar in terms of our

2   compliance with all applicable laws, including this

3   one.  I've known that from -- I mean, I've -- at the

4   firm for 45 years.  I've seen all kinds of people at

5   this firm do the right thing.  And I'm sure that

6   everybody involved in this process was doing the

7   right thing.  And to suggest otherwise, in my view,

8   is disingenuous and dishonest.

9        Q.   So you think it's disingenuous and

10  dishonest to suggest that Jones Day's leave offerings

11  at this time were unlawful?

12       A.   What you -- I think what you asked is that

13  -- did I think it was illegal, what we were doing?

14  And I'm telling you that no, I don't think it was

15  illegal.  And I think to suggest otherwise is

16  disingenuous and dishonest.

17       Q.   Did you consider whether it would be legal

18  to offer women 18 weeks of paid leave and men 4?

19       A.   I didn't consider that it was remotely

20  illegal.  And -- and no one in the firm did.  No one

21  suggested this, until you and your husband suggested

22  it.

23            And -- and so far, I don't see any cases

24  that support you.  Now, you know, maybe your

25  litigation will -- will prove that it's so, but so



Page 106

1    far, you've got nothing on your side.

2         Q.    If the -- if the firm --

3         A.    Other than your argument.

4         Q.    If the firm gives women 18 -- 18 weeks of

5    paid leave to care for their children, do you think

6    it needs to give any leave to men?

7              MS. CHASE:  Objection.  It's a

8         hypothetical.  It calls for a legal conclusion.

9         This is a fact witness who's here to speak based

10        on his firsthand knowledge.  He has testified

11        repeatedly he does not know the duration of the

12        leaves.  You are not using his time wisely to be

13        asking hypothetical questions on topics he has

14        repeatedly told you he does not have knowledge.

15             Ask another question, Julia.  We're not

16        here for Mr. Brogan to give legal conclusions.

17             MS. SHEKETOFF:  I'm trying to ask

18        Mr. Brogan about his beliefs about the law,

19        which I think are relevant.

20             MS. CHASE:  No.  In fact, what you're

21        asking for about legal conclusions, which is not

22        the appropriate subject matter of a fact

23        deposition.

24             MS. SHEKETOFF:  I'm asking for his

25        understanding and beliefs about whether --



Page 107

1          MS. CHASE:  -- which would be informed by

2     conversations with counsel.  He is not going to

3     be answering privileged communication -- about

4     privileged --

5          MS. SHEKETOFF:  I'm not asking about

6     privileged communication.  I'm asking if --

7          MS. CHASE:  Julia, I'm not letting him

8     answer questions, and -- and providing an

9     interpretation of the law, or disclosing any

10     privileged communications.

11          MS. SHEKETOFF:  I've -- I've --

12          MS. CHASE:  He has told you repeatedly he

13     does not know the durations of these leave

14     periods.  So you're asking him a bunch of

15     hypothetical questions when he's told you he

16     doesn't know the duration of the leave.

17          This is not a good use of time.  It is not

18     a proper use of time.  Move on.

19 BY MS. SHEKETOFF:

20     Q.   I'm -- I'm trying to understand if --

21 Mr. Brogan, if you did not know the length of the

22 leave or how much leave was available, why were you

23 so confident that the leave -- the leave was lawful?

24     A.   Because I believe in Jones Day.  I've been

25 around the firm forever.  This is a great law firm



Page 108

1   that obeys the law, complies with the law, does all

2   kind of good things, and the whole notion that this

3   is premised on -- we have -- we've -- we've also

4   placed the family, and a lack of pettiness about

5   money, above everything else, so these suggestions,

6   insinuations, innuendoes that you are trying to

7   dribble all over this case are, again, just

8   completely disingenuous.

9           I am very confident that every decision at

10  this firm relating to the leave, or anything else,

11  was made with the highest regard for compliance with

12  the law.

13          That's -- that's the basis for my belief.

14  And I've had 45 years of witnessing it to know that

15  that's true.  If that's not good enough for you,

16  I'm -- I'm sorry about that, but that's the case.

17  BY MS. SHEKETOFF:

18      Q.   Why did you decide to give women 18 weeks

19  of leave and men 4 weeks of leave?

20          MS. CHASE:  Objection to the form of the

21      question.  He has told you repeatedly he doesn't

22      know the durations of the leave, and so any

23      question premised upon facts not in evidence,

24      I'm going to instruct him not to answer.

25          MS. SHEKETOFF:  Oh.



 1   BY MS. SHEKETOFF:

 2        Q.   Is there any reason, besides the ones

 3   you've given, about why you approved the leave

 4   offerings that you did in -- that were implemented in

 5   January 2015?

 6        A.   You know, I don't know how to answer that.

 7   I approved the recommendations that were given to me.

 8        Q.   And have you described all the reasons

 9   already for approving those leave offerings?  Or are

10   there any more?

11        A.   I -- I approved the recommendation that

12   was sent to me.

13        Q.   Why?

14        A.   Period.

15             Because I have a high regard for the

16   people who made this recommendation, who I know are

17   great partners and want to do the right thing for the

18   firm and the right thing for our people, and I also

19   know are generous and unselfish and committed to the

20   institution.

21             And if they bring to me a recommendation

22   about a leave policy, I've got the highest level of

23   confidence that it is -- it is not only legal, but is

24   going to be generous, and that I should go with it.

25             That's it.



Page 110

1      Q.   Okay.  I'm going to show you what's been

2  marked as Plaintiffs' Exhibit 29.  Can you please

3  turn to that exhibit in your book?

4      (Exhibit 29 was marked for identification.)

5           THE WITNESS:  I got it.

6  BY MS. SHEKETOFF:

7      Q.   So this is Bates-stamped JD1957, and my

8  question is, if you -- if you had seen this e-mail

9  before, before -- sorry.

10          My question is, before you fired Mark, had

11  you seen this e-mail?

12      A.   No, I didn't -- I don't know anything

13  about this.  This is -- I don't even think I knew

14  anything about this until it came out in the

15  litigation.  I don't -- I didn't know -- I know -- I

16  know zero about this issue.

17          And I've never read the e-mail, even to

18  this day.

19      Q.   Why do you think that this was not brought

20  to your attention?

21      A.   I have no idea.  Because they didn't think

22  that they needed to bring it to my attention.

23  Because I --

24      Q.   Does Sarah McClure have authority to

25  resolve this issue on her own?



Page 111

1          A.   She probably -- I'm sure she would have

2    talked to somebody else.  She would have talked to --

3    I don't know who she would have talked to, but she

4    would have talked to other people.  She -- in my

5    view, she probably would not make this decision

6    without talking to somebody else.

7          Q.   Would she have authority to do that,

8    though?  To make the decision on her own?

9          A.   I don't know what you mean by "authority."

10   I mean, I -- there's no -- there's no written

11   document allocating a -- you know, powers to

12   Sarah McClure.

13              Now, does that mean if she were to --

14   Sarah acts as a counsel for us in these things, as

15   does Mike.  I don't know who they brought it to, but

16   whatever it is, it got approved.  So I -- and I have

17   nothing to add to it.  I haven't read the document.

18   I still haven't read the document, and don't know

19   anything about the issue.

20              So I don't know -- I got -- I'm not a

21   competent witness on this document.

22        Q.   Okay.  I guess -- I'm trying to ask, did

23   Sarah McClure and Mike Shumaker -- sorry.  I'll start

24   with Sarah.

25              Did Sarah have -- in your view, would it



Page 112

1   have been proper for her to resolve this without

2   consulting you?

3        A.   I'm telling you that I don't know anything

4   about this document or the process.  So I don't have

5   anything to --

6        Q.   Okay.  Why don't you read the document,

7   then?  Go ahead and read it.

8             I -- I think we can actually probably move

9   forward from here.

10       A.   Well, I hope so.  Really, I really don't

11  know what -- what I could possibly offer on this.

12       Q.   Okay.  Sorry.  One second.

13            If -- if an associate threatens litigation

14  against the firm, would you expect that that would be

15  brought to your attention?

16            MS. CHASE:  Objection to form of the

17       question.  It's a hypothetical.

18            But you may answer.

19            THE WITNESS:  Yeah, I -- I don't know.

20       It -- it -- it would depend.  Not necessarily.

21  BY MS. SHEKETOFF:

22       Q.   What would it depend on?

23       A.   On circumstances, in the judgment of the

24  PIC, or whoever else was involved in it.  I mean,

25  it's not like there's a requirement that they got to



Page 113

1   bring something to my attention.  I rely on our

2   leaders to exercise their own judgment as to how to

3   handle things.

4           And so the answer -- basic answer to your

5   question is no, it wouldn't be brought to my

6   attention.

7       Q.   Are you aware of whether Jones Day changed

8   its leave offerings in response to this e-mail?

9       A.   Am I aware Jones Day -- what?

10      Q.   Changed its leave offerings in response to

11  Plaintiffs' Exhibit 29?

12      A.   I -- I've heard that since then, and I --

13  you know, in the course of the litigation, I . . .

14      Q.   So it's your current understanding that

15  Jones Day changed its leave offerings in response to

16  Plaintiffs' Exhibit 29?

17          MS. CHASE:  And I'm going to just pause

18      here.  To the extent that the witness's

19      knowledge is based on privileged communications

20      only, I'm going to instruct him not to answer.

21          THE WITNESS:  Yeah.

22          MS. CHASE:  So he can't answer.

23  BY MS. SHEKETOFF:

24      Q.   Jones Day changed its leave offerings

25  around May of 2015.  Is that right?



Page 114

```
 1        A.   I'm -- I'm sorry?  We did what?

 2        Q.   Changed your leave offerings at the firm

 3   in May of 2015, right?

 4        A.   I -- I don't know what the date was.  I've

 5   told you already that whatever it is, it is.  It's in

 6   the records of the firm.

 7             I -- as I sit here today, I have no idea

 8   what the day is.  This is seven years ago.  That's

 9   biblical.

10        Q.   Okay.  Were you involved in any way in

11   making changes to the leave offerings at that time?

12        A.   No.

13        Q.   And when did you first see -- let me

14   withdraw that.

15             Setting aside this litigation and -- or

16   before this litigation, had you seen this e-mail?

17        A.   No.  I -- I said that already.  I didn't.

18        Q.   Okay.

19        A.   I hadn't read it until you asked me to

20   start reading it.

21        Q.   Between January 2015 and January 2019,

22   were you involved in any way in considering whether

23   the firm should change the leave offerings for

24   adoptive parents?

25        A.   No.
```



Page 115

1          Q.    All right.  I'm going to show you what's

2    been marked as Plaintiffs' Exhibit 8.

3          (Exhibit 8 was marked for identification.)

4              MS. SHEKETOFF:  And that's in your binder.

5        It's Bates-stamped JD3186 to 3187.

6              MS. CHASE:  Did you say 8, Julia?  Tab 8?

7              MS. SHEKETOFF:  Yes, Tab 8.  I'm sorry.

8    BY MS. SHEKETOFF:

9          Q.    And I'd like you to start with the second

10   page.

11         A.    Yeah, I got -- I got it.  What do you want

12   to know?

13         Q.    This is an e-mail from me to Beth Heifetz.

14   Right?

15         A.    I see that.

16         Q.    Had -- had you seen this e-mail before you

17   fired Mark?

18         A.    No.

19         Q.    Why do you think the e-mail wasn't brought

20   to your attention?

21         A.    I have no idea.  I haven't ever read this

22   e-mail.  I -- I still haven't read it.  I don't -- I

23   don't recall ever seeing this until you just drew my

24   attention to it.

25         Q.    Okay.  I'd like you to turn -- to turn to



Page 116

 1   the first page.  Oh, actually, I'm sorry.  Please do

 2   read the e-mail.

 3         A.    You want me to read this e-mail?

 4         Q.    Yeah, I want you to read the e-mail.

 5         A.    That I haven't read previously?  Okay.

 6         Q.    Please do.

 7         A.    Okay.  I read it.

 8         Q.    Okay.  What do you think of this e-mail?

 9         A.    I don't know what to think of it.  I mean,

10   I don't -- I don't have an opinion on it.

11         Q.    Do you think it's good?

12         A.    Well, I think this -- there again, there's

13   some things in there that are just not true.  The --

14   "the traditional notion that women should bear most

15   of the burden of child care, which strikes me as

16   unfairly discriminatory."

17              Well, I don't know who you're talking

18   about, but that's not the firm's view.  Never has

19   been, never will be.  And that's what the implication

20   is.  So that's just -- you know, it's just false.

21   It's like -- I guess it's a -- it's a sound bite for

22   somebody.

23              "I don't object that the firm is socially

24   conservative as a general matter, or that its

25   selection of cases promotes those values."



1            I mean, this is all, in my view, just

2   rhetorical stuff.  It's just -- so I -- I don't find

3   that persuasive, and I don't know what it has to do

4   with anything.

5            But that's about the extent of my opinion

6   on this.  Like I said, I -- I don't recall seeing

7   this, so I don't know what -- I'm not a competent

8   witness on this.

9       Q.   If you had seen this e-mail at the time,

10   would you have fired me for sending this e-mail?

11       A.   No.

12            MS. CHASE:  Objection to the form of the

13       question.  It's hypothetical.

14            THE WITNESS:  Absolutely not.

15   BY MS. SHEKETOFF:

16       Q.   Why not?

17       A.   We got loads of people who have expressed

18   their opinions.  You know, you're not -- you're not

19   attacking the law firm.  You're not -- you're not --

20   this is fine.  I mean, do I know that there are

21   people that, you know, hold some of these views?  Of

22   course I do.  And God love you for it.

23            But I mean, again, it's hypothetical.  I

24   don't -- I didn't see this.  If I did, I -- I would

25   have just -- you know, shook my head and just moved



Page 118

1   on.  You know?

2        Q.   Do you think that this e-mail is immature

3   or reflects poor judgment, shows discourtesy to

4   colleagues, or --

5        A.   I think it's just -- I think it's just

6   wrong.  I mean, I don't -- I don't know what

7   motivates it.

8             I wouldn't have given this e-mail the time

9   of day if -- if it was sent to me.  I just -- I -- I

10  would have -- if anybody sent this to me, I would

11  have said, "Well, why are you sending this to me?

12  Really, this is a waste of my time."

13       Q.   Okay.  Could you please --

14       A.   I -- I hate to break it to you, but -- you

15  know, your views on some of these issues is not

16  critical to my responsibility and duty to the firm.

17  There are 20,000 people who are dependent upon Jones

18  Day.  Their livelihoods, you count up all the people

19  who -- all the dependents, all the people that we've

20  made commitments to, these -- these -- this is not

21  something that should be brought to my attention.  It

22  should be dealt with by somebody else in -- in the

23  firm.

24       Q.   Okay.  Could you please turn to the first

25  page of this e-mail chain?



Page 119

```
 1          A.    First page of the same e-mail chain?
 2          Q.    Yeah, exactly.  The top of page --
 3          A.    Yeah, I got it.  I got it.  Thank you.
 4          Q.    And please read that.
 5          A.    Want me to read the beginning of it, the
 6     first one?  "Julia let me know" . . .
 7          Q.    Yes.  Have you seen this e-mail before, or
 8     had you seen --
 9          A.    No, I -- I -- I --
10          Q.    -- this e-mail before --
11          A.    I told you --
12          Q.    -- you fired Mark?
13          A.    I didn't -- I haven't seen this e-mail.
14     I'm not competent on this.  I don't -- I don't --
15     nobody brought this to my attention.
16          Q.    Okay.  And you had not read this e-mail
17     before -- you have not read this e-mail before?
18          A.    Not -- not that I can recall.
19          Q.    Okay.  Can you please read it?
20                Have you read it?
21          A.    I -- I just said I read it.  It's only
22     like three sentences.
23          Q.    Okay.  And this is an e-mail from Mark to
24     Sarah McClure; is that right?
25          A.    That's what it says.
```



Page 120

1       Q.   What do you think of this e-mail?

2       A.   I don't have a view of it.  If anybody

3    thought I should have had a view, I'm sure they would

4    have sent it to me.  I'm -- I'm confident there's no

5    record of that.

6       Q.   So I guess, now that you've seen these two

7    e-mails from Mark and me from back in August 2018, do

8    they make you angry?

9       A.   No.  Not in the slightest.

10       Q.   Do you think they're obnoxious?

11       A.   Not -- no.  I mean, you're expressing

12    your -- your view.  You don't like our leave policy;

13    you want more of it.  I would have had more respect

14    for you if one of you came to me or came to Sharyl or

15    somebody and said, "You know, I think Jones Day could

16    be a leader in this," instead of doing what Mark did

17    in his January e-mail.

18            So this is not troubling at all.  I expect

19    people to have views, and strong views.  I mean, this

20    is a law firm full of strong lawyers.

21       Q.   Do you find it offensive?

22       A.   I want them --

23       Q.   I'm sorry?

24       A.   I'm sorry?

25       Q.   I didn't mean to --



Page 121

1        A.    I can't hear you when you -- when you

2    interrupt me, so -- what -- what's your current

3    question?

4        Q.    Do you find it offensive that we

5    thought -- that we expressed to Jones Day --

6        A.    (Simultaneous speaking) No, I just told

7    you, I didn't find it --

8        Q.    -- were discriminatory -- I'm sorry,

9    please let me finish, so we can get the full question

10   on the record.

11            Do you find it offensive that we called

12   Jones Day's leave offerings discriminatory?

13       A.    First of all, I didn't even know you were

14   doing it, but I don't find it offensive.  I just said

15   that I expect people to have strong views.

16            Now, whether or not you're correct,

17   whether or not the firm is going to agree with you,

18   whether or not the firm is going to change its

19   policies because you take a different view of it, is

20   a separate question.  But the fact that you hold

21   these views is not troubling to me at all.

22            I mean, if -- if we were to go around all

23   800-and-something partners and, you know, 2,400,

24   2,500 lawyers, we're going to have a lot of strong

25   opinions by a lot of strong lawyers that don't



Page 122

1    necessarily agree with everything that the firm does.

2    That's -- that's -- that's kind of life.  And so I

3    wouldn't have found this really surprising.

4         Q.   Do -- does either of these e-mails reflect

5    personal immaturity?

6         A.   I -- I think I've told you what I -- what

7    I thought about this thing.  I mean, the -- there's

8    nothing in this firm that -- in this e-mail that

9    seeks to extort money from the firm.  There's nothing

10   in this e-mail that is dishonest about the firm's

11   compensation system.  There's nothing in this e-mail

12   that claims that you personally were discriminated

13   against.  There's nothing in this e-mail that does --

14   contains any of the other things that I have already

15   testified to in Mark's e-mail.

16             So this e-mail, to me, is -- you know,

17   it's kind of the thing I expect to go on.  And if we

18   were to search all the e-mails of all the Jones Day

19   lawyers, we'd probably find a bunch of these things.

20   Not about this policy, but about different issues

21   that people don't like; that they don't think we

22   should represent such-and-such a client, or -- that's

23   what makes a great law firm.  Strong lawyers,

24   differing opinions, getting together and hashing it

25   out.



Page 123

1            In this instance, you didn't like the

2    leave policy.  You know.  I don't -- I don't -- like

3    I said, if -- if this was brought to me, I'm not sure

4    what I would have decided.  I may well have chosen to

5    be a leader on this issue, and have the firm get out

6    in front and give more leave to fathers than anybody

7    else.  But that's not the way it was presented to me.

8            Q.   Okay.  But you don't --

9            A.   So the fact that -- the fact that you

10   didn't like the leave policy, to me, is not a

11   question of -- of what you're -- you're trying to

12   conflate my reasons for saying that -- that Mark had

13   to go with what I view as routine and -- and

14   relatively innocuous disagreements over firm policies

15   on other -- on the same issue.

16           Q.   Okay.  So just to clarify, you don't think

17   that these e-mails reflect --

18           A.   I don't know how I could be more clear.  I

19   mean I -- you know.  Just to clarify.

20           I'm sorry.  What's your question?

21           Q.   You don't think that these e-mails reflect

22   poor judgment, a disinterest in pursuing a career at

23   Jones Day, or a lack of courtesy to colleagues?

24           A.   I -- I do not.

25           Q.   Okay.  And at the time that you fired



Page 124

1    Mark, Jones Day gave all women 18 weeks of leave,

2    right?

3            MS. CHASE:  Objection.  Julia, we have had

4        a long colloquy about the fact that Mr. Brogan

5        is not aware of the duration of the leaves.  We

6        don't need to go back to that again.  You're not

7        going to get an answer to any question that

8        presumes his knowledge of the duration of leave.

9        I'm not going to let him answer that, when he's

10       repeatedly told you he doesn't know the

11       duration.

12           MS. SHEKETOFF:  Okay.  Just to clarify,

13       I'm asking at the time of the termination, not

14       at the January --

15           MS. CHASE:  He has told you he does not

16       know, has not known.  You want a stipulation?

17       We'll stipulate.

18           MS. SHEKETOFF:  Okay, great.

19           MS. CHASE:  He's not committed to memory

20       the duration of leave at any point in time.

21       It's not for him to do so.

22   BY MS. SHEKETOFF:

23       Q.   Are you aware of any female associate at

24   Jones Day who's taken less than 8 weeks of disability

25   leave?



Page 125

1          A.   If I was, they should get rid of me as a

2     managing partner at the firm.  Really, I mean, that

3     would be -- no, I -- I have -- I -- I couldn't think

4     that I should be further away from what I view as

5     personal decisions that each associate has to make

6     about their own circumstances.

7               I wouldn't -- I -- I can't imagine myself

8     making any kind of inquiry or having any desire to be

9     competent over when somebody returned to work after

10    childbirth.  It's like -- it -- I'd be -- I can't

11    imagine it.

12              So the answer is no, I'm not aware of

13    that.

14         Q.   Okay.  And at the time that you fired

15    Mark, did you think it would be lawful for Jones Day

16    to give 8 weeks of disability leave to every single

17    woman?

18              MS. CHASE:  Objection to the form of the

19         question, and -- both because it calls for a

20         legal conclusion and because you're yet again

21         going back to a question about duration of

22         leave, when we have told you repeatedly, both

23         through this witness's testimony, my

24         stipulation, and my objections, that he's not

25         aware of the duration of leaves.



Page 126

1              MS. SHEKETOFF:  I'm asking a question that

2         does not relate to what in fact Jones Day -- I'm

3         asking whether, at the time that he fired Mark,

4         would it be legal to -- for Jones Day to offer

5         8 weeks of disability leave to every single

6         woman --

7         A.   It -- it didn't occur to me.  It -- it --

8    the -- the idea that -- I told you now repeatedly

9    that I am very confident that no aspect of what we

10   were doing was illegal.  The -- the entire decision

11   to -- and which I felt I was forced to do, to

12   separate your husband from the firm -- had everything

13   to do with what my view is his lack of character and

14   honesty in that e-mail.  It had nothing to do with

15   the leave policy.  Nothing.

16        Q.   Okay.

17        A.   Nothing.

18        Q.   I am going to show you what's been marked

19   as Plaintiffs' Exhibit 35.  Please turn to that in

20   your binder.

21        (Exhibit 35 was marked for identification.)

22   ██████████████████

23        ██  ████████████████████████

24   ██████████████████████████████████

25        ████████████████████████████





































Page 135





Page 136

















Page 140















Page 144

















Page 148



15      Q.  Are you aware of anyone who's ever told
16  the firm that he or she might, would, or had hired an
17  attorney in connection with a complaint of
18  discrimination or retaliation?
19      A.  No.  I -- if I do, I can't recall it now.
20      Q.  Are you aware of anyone who's ever told
21  the firm that he or she might, would, or had filed an
22  administrative complaint or lawsuit in connection
23  with a complaint of discrimination or retaliation
24  against the firm?
25      A.  I -- I don't -- I don't know -- if it



Page 149

1  happened, it didn't get to my level.  I don't have

2  any recollection of it.

3           And like I said before, the threat of

4  somebody filing a claim against the firm is not very

5  compelling to me.  You know, it's just going to

6  happen.

7           So I don't -- I don't recall.  I'm sure it

8  happened.  I mean, we've been -- the firm's been sued

9  in the past.  I -- I can't remember the details of

10  it, but it's had no factor in my thinking about any

11  potential claim.  Zero.

12       Q.   Okay.  So then you would have no desire at

13  all to fire someone who threatened to bring a claim

14  against the firm?

15       A.   The simple fact of bringing a claim is --

16  is not -- is not what caused your husband to be

17  separated from the firm.  I can't make that more

18  clear.

19       Q.   My question is, would you have any desire

20  at all to fire someone who threatened a lawsuit of

21  Jones Day?

22       A.   It's a hypothetical.  I can't tell you

23  what the circumstance.  In your husband's situation,

24  it was -- it was -- you know, he -- he was lying

25  about the firm.  And that's the reason why I took the



Page 150

1   steps that I took.

2   ████████████████████████████████

3   ████████████████████████████████████

4   ██████████  ██████████████████████████

5   ██████████████████████████████████

6   ████████████

7          Q.   And what exactly did Mark lie about?

8          A.   He lied about that you were discriminated

9    against, and he lied about the fact that the firm's

10   compensation system was tailor-made to discriminate

11   against women.  Those are two big, big lies, in my

12   view.

13          Q.   Any other lies?

14          A.   Paragraph's only three -- the e-mail's

15   only three paragraphs, so that kind of covers it.

16          Q.   So no other lies?

17          MS. CHASE:  Objection.  Asked and

18      answered.

19          You may answer again.

20          MS. SHEKETOFF:  Okay.

21   BY MS. SHEKETOFF:

22          Q.   Do you think that you should be allowed to

23   fire someone who threatens to sue the firm?

24          MS. CHASE:  Objection.  It's a

25      hypothetical.



Page 151

1          You may answer.

2          THE WITNESS:  I mean, I -- I think we're

3     going over -- we're just being argumentative

4     right now.  I've told you that it is the lying

5     to the firm that causes me to take action

6     against people, not threatening a lawsuit.

7          I don't know how many times I can say it.

8     I'll say it again, clearly:  The fact that

9     somebody threatens a lawsuit against the firm is

10    singularly unimpressive to me.  Unimpressive.

11    And so if -- if you are going to get separated

12    from the firm, it's because you did something

13    else, like lied about the firm.

14          Now, if that doesn't cover your repetitive

15    questions on this issue, I don't know what does.

16 BY MS. SHEKETOFF:

17    Q.   If someone threatened to sue the firm,

18 would -- that would be escalated to you, right?

19    A.   I -- I can't understand your question at

20 this point.  You know, they're -- say that again?

21    Q.   If someone threatened to sue the firm,

22 would you expect that that matter would be escalated

23 to you?

24    A.   No.  Depends on the circumstances, but

25 I'm -- I'm sure it happens plenty of times and it



Page 152

1    doesn't get to me.

2        Q.   And apart from this case, are you aware of

3    anyone who's threatened to sue the firm since you've

4    been managing partner?

5        A.   I'm sure there are people who have

6    threatened to sue the firm since I've been managing

7    partner.  All of them, I couldn't -- I don't know

8    right now who they are, but I'm sure that there are.

9        Q.   But you're not aware of any?

10       A.   If I -- if I had my memory refreshed, I'm

11   sure that I would say, "Oh, yeah, I -- I recall

12   that."

13            There was a -- we -- we had -- I don't

14   know, associates threatening to sue us.  I knew about

15   that.  The six -- the six associates who brought the

16   $200 million class action threat to sue us.  There

17   was a staff person recently in Boston that threatened

18   to sue us.

19            You know, I'm sure there are other

20   examples that I could think of.  But none of them, in

21   my view, are significant, and had really no serious

22   impact on my thinking about anything.

23       Q.   Are you aware of anyone who threatened to

24   sue the firm while still employed at Jones Day?

25            MS. CHASE:  And I'm going to just caution



Page 153

1          here:  To the extent that you have knowledge

2          only through privileged communications, don't --

3               THE WITNESS:  Yeah, I mean, I don't -- I

4          don't know.  I -- I doubt it, but I don't know.

5          I -- I can't remember any right now.

6   BY MS. SHEKETOFF:

7          Q.   Has anyone ever alleged that you

8   unlawfully discriminated against him or her?

9          A.   Not that I'm aware of.  But, you know, I

10   mean, I guess in every one of these cases, since I'm

11   the managing partner, you could lump it in.  But I

12   think any associates -- the case brought by the six

13   associates, I don't recall any of them making

14   allegations against me personally, but . . .

15          Q.   And anyone else besides those six

16   associates?

17          A.   I don't recall any.

18          Q.   Has anyone ever alleged that you have

19   unlawfully retaliated against him or her?

20          A.   Don't recall any.  Maybe -- maybe there's

21   some out there that I don't remember, but none of

22   them were -- were significant.

23          Q.   Well, do you think being accused of

24   retaliation is significant?

25          A.   No, what I said is I don't recall any of



Page 154

1    them.  But if there is something out there -- Jones

2    Day has had, since I've been the managing partner,

3    ten, twenty thousand people, lawyers, pass through.

4    And I can't remember all of them.

5              Now, could somebody have written a letter

6    to somebody that said that I was mean, or that I

7    retaliated against them?  Maybe.  But it -- it --

8    none of it was a serious claim.  Never amounted to

9    anything.

10        Q.   What do you mean by "serious"?

11        A.   Well, I mean, people can say whatever they

12   want, like you're doing in this case, and just claim

13   retaliation, or claim that you're insulated by -- you

14   know, I -- I did -- "You punished me because I

15   alleged discrimination."

16              That doesn't make it true.

17        Q.   Well, I'm asking if anyone has ever

18   alleged that you --

19        A.   I'm telling you, I can't remember

20   20,000 -- what I'm telling you is that I sit here

21   now, I can't remember it.  And I doubt you can come

22   up with any.

23        Q.   Is it --

24        A.   So what are we -- what are we -- what are

25   we talking about?



Page 155

1          Q.   Do you think it is a significant thing if

2     someone says that you've unlawfully retaliated

3     against them?

4          A.   Only if it's true.

5          Q.   And have you --

6          A.   If it's not true -- if it's not true, it's

7     a lie.  And it's significant because the person is a

8     liar.

9          Q.   Have you spoken with Evan Miller about

10    Mark at any time since --

11         A.   No.

12         Q.   -- January 16, 2019?

13         A.   I have not.

14         Q.   Have you ever spoken with Evan Miller

15    about our January e-mail?

16         A.   No.

17         Q.   Have you ever spoken with Evan Miller

18    about Mark?

19         A.   No.

20         Q.   Were you involved in deciding how Mark

21    should be terminated?

22              MS. CHASE:  Objection to the form of the

23         question.  What do you mean by "how"?

24              MS. SHEKETOFF:  The manner in which the

25         termination was implemented.



1            THE WITNESS:  What time did we start?

2            I've been testifying now for a couple of

3       hours about his separation from the firm.

4       And --

5  BY MS. SHEKETOFF:

6       Q.   I'm talking about the process, the

7  implementation --

8       A.   What do you mean, "the process"?  I mean,

9  I don't know how --

10       Q.   Were you involved --

11       A.   I've already answered that question like

12  at least 60 times, if not 160 times.

13       Q.   I'm asking if you were involved in any way

14  in -- in deciding how Mark should be informed of his

15  termination.

16       A.   How he -- how he should be informed of

17  the -- no.

18       Q.   So setting aside the lawyers who entered

19  an appearance in this case, have you spoken with

20  anyone else about Mark since you fired him?

21            MS. CHASE:  I'm going to let you answer

22       that question, with the caution that you should

23       not disclose privileged communications with

24       anyone who's been acting in a capacity as

25       counsel, whether or not they have entered an



Page 157

1          appearance in this matter.  Because the group of

2          people who've acted as counsel is broader than

3          the list of people who've entered appearance in

4          this matter.

5   BY MS. SHEKETOFF:

6          Q.   That's fine in terms of the substance, but

7   obviously I want you to identify who those

8   conversations are with, if those people are not

9   people who have entered an appearance in this case.

10         A.   Yeah, I -- I tell you that -- you -- you

11  have a -- a sense of the -- that this case and your

12  allegations are occupying a significant portion of my

13  time or my concern.  I really have a hard time

14  identifying many conversations about you or Mark with

15  anybody, including counsel.  I -- I just don't see

16  this case as meritorious, and I've spent very little

17  time worrying about it or communicating with it.  So

18  I -- I don't know that I can identify anybody.

19         Q.   Okay, you're --

20         A.   The -- the conversations are

21  inconsequential.

22         Q.   Conversations about this case are

23  inconsequential?

24         A.   Most people, when they talk about -- when

25  I talk about the case, they all think it's -- it's a



Page 158

1  nonmeritorious case.  That's about as far as it gets.

2       Q.   Okay.  Are you -- so can you please

3  identify who you've talked to about this case?

4       A.   I -- I -- I -- I can't remember who I

5  talked to about it.

6       Q.   You can't remember anyone at all?

7       A.   I -- I can't remember any specific

8  conversations.  I talked -- there are -- there are

9  people that I trust their judgment; when I have

10  spoken to them about this, like Tim Finn or somebody

11  like that, yeah, I mean -- and I -- and I -- and I

12  would have been -- I'm dismissive of the case.  I

13  don't think it's -- it's a legitimate case.  I've

14  never thought it was.

15       Q.   Have you talked to anyone at all, setting

16  aside the lawyers who have entered an appearance in

17  this case, about the reasons why you fired Mark?

18       A.   About the reasons why I fired Mark?  No,

19  I -- I don't recall having any -- any conversations.

20  I really . . .

21       Q.   Any communications at all?

22       A.   Not that I can recall.

23       Q.   So you never talked to Mike Shumaker about

24  the reasons why you fired Mark?

25            MS. CHASE:  Again, outside of privileged



Page 159

```
 1        conversations.
 2             THE WITNESS:  Yeah, I mean, I -- I -- it
 3        may have come up in a -- in a context of
 4        privilege, but not much.  I -- I don't spend a
 5        lot of time on this case.
 6   BY MS. SHEKETOFF:
 7        Q.   And there's no one else besides the
 8   lawyers who've entered an appearance in this case
 9   that you discussed the -- determination of Mark's --
10             MS. CHASE:  (Simultaneous speaking) Again,
11        Julia, you keep -- you can keep saying lawyers
12        entered an appearance.  It's going to include
13        any lawyers who have acted in a privileged
14        capacity, which is broader than the group of
15        people who've entered an appearance.
16             MS. SHEKETOFF:  Well, he would need to
17        identify who those lawyers are.
18             MS. CHASE:  You can come ask me who those
19        lawyers are.
20             THE WITNESS:  Well, I -- I told you, the
21        only one I think I might have talked to about
22        this is -- is Tim Finn.  And it would have been
23        like a -- you know, a -- a very short
24        conversation.
25
```



Page 160

```
 1    BY MS. SHEKETOFF:

 2         Q.   Please describe that conversation.

 3              MS. CHASE:  Again, it was a privileged

 4         conversation, so he cannot describe it.

 5    BY MS. SHEKETOFF:

 6         Q.   I'm sorry.  You're invoking privilege as

 7    to Tim Finn?

 8              MS. CHASE:  It was a privileged

 9         conversation, yes.

10              MS. SHEKETOFF:  I'm asking the witness.

11              MS. CHASE:  I'm going to instruct him not

12         to answer, on privilege.

13              THE WITNESS:  I -- I think you're not

14         hearing me.  I -- I am -- any conversations I

15         had about this case with anybody, almost,

16         including all of this, has been completely

17         dismissive.

18              So that's kind of the lay of the land.  So

19         you can waste a lot of time asking about this.

20         To the extent it's not privileged, it is --

21         these are conversations where I have not -- I

22         don't view this case as being an honest case

23         brought by you and your husband.  And I am very

24         dismissive of it.  And I'm --

25
```



Page 161

1    BY MS. SHEKETOFF:

2         Q.   Apart --

3         A.   I'm very confident we're going to win at

4    trial.

5              So that's the answer to what I think about

6    the case and what I might have said to anybody.

7         Q.   Apart --

8         A.   So there's no -- there's no -- there's

9    nothing here to find.

10        Q.   Apart from your conversations with the

11   lawyers who've entered an appearance in this case,

12   have you ever told anyone that you fired Mark because

13   it was a lie to allege discrimination against me or

14   to say that Jones Day's black-box system was

15   tailor-made to enable discrimination?

16        A.   I'm -- I'm sure I have said that, but I

17   don't remember to whom.  That's been my view of this

18   thing since the beginning.  I -- I -- that's -- that

19   was my initial reaction to reading that e-mail, that

20   this is a pack of lies that -- about the firm, its

21   compensation system, and a pack of lies about you.

22        Q.   Okay.

23             MS. SHEKETOFF:  I think it might make

24        sense to take a short break at this point.  Are

25        you all planning -- or let's go off the record



Page 162

1        for a second, for -- for now.

2            THE VIDEOGRAPHER:  We are going off the

3        record at 2:13 p.m.

4            (A recess transpired from 2:13 p.m. until

5            2:37 p.m.)

6            VIDEOGRAPHER:  We are back on the record

7        at 2:37 p.m.

8    BY MS. SHEKETOFF:

9        Q.   Okay.  I'm going to show you what's been

10   marked as Plaintiffs' Exhibit 19.

11           (Exhibit 19 was marked for identification.)

12   BY MS. SHEKETOFF:

13       Q.   Please take that out of your binder.

14           MS. CHASE:  Julia, if you look towards the

15       computer when you're speaking, we hear you

16       better.

17           MS. SHEKETOFF:  Yeah.

18   BY MS. SHEKETOFF:

19       Q.   This is Plaintiffs' Exhibit 19.  And

20   Mr. Brogan, can you please turn to page 9 and 10, and

21   read -- or, sorry; just take a look at pages 9 to 10

22   and --

23           MS. CHASE:  Julia, I'm having a hard time

24       hearing you.  Can you try to either speak up or

25       get closer?  I can't hear you.



Page 163

1            MS. SHEKETOFF:  Okay.

2  BY MS. SHEKETOFF:

3      Q.   I'm on pages 9 and 10 of this document.

4  I'm looking at number 7 on page 9.  And my question

5  is if you've seen this document before.

6      A.   Yes, I'm -- I'm sure I reviewed it when it

7  was filed.

8      Q.   Okay.  And you signed this under penalty

9  of perjury; is that right?

10     A.   Yes, I did.

11     Q.   In this interrogatory response, you say

12 that you fired Mark because -- well, I'm sorry;

13 actually, I just want to make sure -- can you -- can

14 you review it now?

15           MS. CHASE:  The response to Number 7?

16           MS. SHEKETOFF:  Yeah.

17           THE WITNESS:  Okay, I -- I see it.

18 BY MS. SHEKETOFF:

19     Q.   Okay.  And you have testified today that a

20 factor in your decision to terminate Mark was the

21 e-mail -- the January 16 e-mail statement that Partner A

22 had discriminated against me.  Why don't you say

23 anything about that here in this interrogatory

24 response?

25     A.   Well, partly because of -- as your own



MAGNA ▶

LEGAL SERVICES

Page 164

1   pleadings demonstrate, you don't call him Partner A

2   Partner A; you call him "Partner A."  And in a lot of

3   these things, I was hoping that somebody who has

4   exercised some judgment and realized that this is a

5   flawed case, and that -- I really didn't want to drag

6   Partner A into it.  And I kind of -- when I saw the

7   original draft of your complaint, then you called him

8   "Partner A," I thought, well, I don't know what's

9   going on there, but maybe you're trying to hide it.

10  Maybe you're trying to hide the fact that he's

11  biracial, and he wouldn't be a very -- he wouldn't be

12  very convincing that he discriminated against you.

13          But that's why I didn't -- I didn't really

14  want to drag him into it unnecessarily.

15      Q.   Why didn't you refer to him as Partner A?

16      A.   Well, because I didn't -- I mean, that was

17  your allegation.  It wasn't mine.

18      Q.   Okay.  You mentioned earlier that it was a

19  factor in your decision to terminate Mark, the e-mail

20  statement about the black-box compensation system.

21  Why don't you mention anything about that in your

22  interrogatory response?

23      A.   Well, I -- I think I covered it in the

24  general -- I really think that at the time I -- I

25  think that the position I took -- and this tracks



Page 165

1    kind of what's in the press release, where I was

2    actually being pretty soft, and saying that you were

3    immature and exhibited poor judgment, lack of

4    courtesy, disinterest.

5            It could have been a lot harsher than

6    that.  And so I -- to some extent I took my foot off

7    the pedal.  Now, you're asking me point blank in a

8    deposition what was going through my head, and so

9    I've -- I've told you.  And I've been harsher than I

10   was previously, but it's not inconsistent; it's --

11   it's just a -- a more direct version of what I think

12   has been a dishonest claim against the firm from the

13   outset.

14        Q.   Well, this interrogatory specifically asks

15   you to identify all aspects of the e-mail, correct?

16            MS. CHASE:  Objection to form of the

17        question.

18            THE WITNESS:  Yes, it does.

19   BY MS. SHEKETOFF:

20        Q.   Okay.  And it -- it asks you to quote any

21   language that motivated the decision, right?

22            MS. CHASE:  And I'm just going to pause

23        here, Julia.  You want to start parsing the

24        interrogatory responses?  I'm going to -- you're

25        going to get a lot of speaking from me.  There



Page 166

1    are a whole host of objections in these

2    responses that are part of the responses.  They

3    are legal objections, and not appropriate for

4    the witness to testify to.  Nor are any of the

5    legal strategies about what to include and what

6    to object to appropriate for the witness to

7    testify to.

8         But as you will see, there is a whole

9    paragraph of objections before there is an

10   answer.

11        MS. SHEKETOFF:  (Simultaneous speaking) I

12   don't think he's --

13        MS. CHASE:  And the answer then has

14   information that indicates that things are

15   illustrative, but not exhaustive.  It is not

16   possible that one is going to use every single

17   word exactly the same time from one day to the

18   next, or to use all the possible --

19        MS. SHEKETOFF:  (Simultaneous speaking)

20   Ms. Chase, please --

21        MS. CHASE:  -- adjectives that could be

22   used to describe someone.

23        So I'm going to -- I'm going to object to

24   the line of questioning that kind of implies

25   that there's something improper by not using all



Page 167

1          of the words possible in the thesaurus each time

2          one asks about Mark's behavior.  Which has been

3          a strategy that you've used throughout the case,

4          which we are -- continue to be troubled by.

5                You want to ask a fact witness of this --

6          fact witness -- a fact question to this fact

7          witness, please go ahead and do so.  But we're

8          not -- I'm not going to get into what is

9          appropriate to include or not include in a

10         response.

11    BY MS. SHEKETOFF:

12         Q.   Okay.  You state that in your response,

13    that -- that you terminated -- that you terminated

14    Mark because of the demand for 18 weeks of paid

15    leave.  How did that factor into your decision?

16                MS. CHASE:  Objection to the form of the

17         question.  It assumes that that is the only

18         thing that is stated here.  This is a much more

19         fulsome answer provided here.

20                But with that objection and clarification,

21         that that is one amongst many reasons that are

22         identified, I will allow the witness to answer.

23                THE WITNESS:  I'm -- I'm -- I'm really not

24         sure what you're asking me right now.  He -- he

25         made a demand which I viewed as extortionist, or



Page 168

```
 1          he was going to go to the press.  And I wasn't
 2          really focused on the length of the leave or the
 3          policy.
 4               It was just -- it struck me that the
 5          whole -- his whole conduct, as I say, is --
 6          "poor judgment" is a -- is a very nice way of
 7          saying it.  He's a guy who's been paid a million
 8          dollars, and he's telling me I got -- telling
 9          the firm, we got to pay him another $80,000, or
10          else, if he doesn't get some disability leave,
11          when he's not disabled.
12               So that's -- I guess that's my answer to
13          that.
14     BY MS. SHEKETOFF:
15          Q.   But to clarify -- never mind.
16               And you also say that -- you -- you point
17     to this language; you say, "the implications behind
18     his vague assertion of familiarity with the
19     D.C. Circuit."  What vague -- what implications are
20     you referring to here?
21          A.   I'm not sure, again, what you're asking.
22          Q.   Well, in your interrogatory response, you
23     give as a reason for terminating Mark "the
24     implications behind his vague assertion of
25     familiarity with the D.C. Circuit."
```



1      A.   Yeah, I mean, I don't know -- first of

2  all, as I said before, it suggests to me that

3  whatever confidence you and -- and Mark had in your

4  legal position, it didn't extend to the District

5  Court.  But at the same time, you sort of like act

6  like -- "But boy, are we wired in with the judges on

7  the D.C. Circuit."  You know, which -- which is kind

8  of an odd thing for anybody to say.

9           So I guess that -- that, to me, was -- was

10  a weird way of putting it.  One, you're -- you're not

11  saying that "We're going to win in the District

12  Court, but we got a secret potion when we get to the

13  D.C. Circuit."

14      Q.   A secret what, sorry?

15      A.   A secret potion.  That you had some

16  suggestion that you were really familiar with the

17  D.C. Circuit judges, is the way I read the e-mail.

18      Q.   And was there any further implication

19  besides what you just said?

20      A.   I think that's enough.

21      Q.   I guess I -- I just don't even really

22  understand what you're saying.  What --

23      A.   Well, I mean, I can understand why you

24  don't want to understand what I'm saying.  But you're

25  -- you make an assertion, which is pretty bold,



Page 170

1    about -- you're correct about the law.  But you say,

2    "Well, we're going to win in the D.C. Circuit; maybe

3    not in the District Court.  And the reason why we're

4    going to win in the D.C. Circuit is that we're really

5    wired up in the D.C. Circuit."

6            You know, as if -- I don't know, Jones Day

7    doesn't have anybody that knows anything about the

8    D.C. Circuit.  It's just a -- the whole line of

9    argument struck me, again, as lacking in judgment,

10   and immature, and -- and almost adolescent.

11       Q.   What do you mean by "wired up with the

12   D.C. Circuit"?

13       A.   Well, you're suggesting that, you know,

14   you're -- you're really all familiar with these

15   folks, and you know things that we don't know.

16           Jones Day has been practicing in

17   Washington and argued more cases before the

18   D.C. Circuit than we can probably ever count.  But

19   you're telling us that -- no, you know better than we

20   do; and that you're right and we're wrong.

21       Q.   Okay.

22           And you also testified earlier that you --

23   in between the time that you received Shumaker's

24   e-mail and -- and deciding that you would fire Mark,

25   that you'd ascertained that Partner A was the person



1    referred to in the e-mail.  How -- how did you find

2    out that it was Partner A, as opposed to someone else

3    who had reviewed me?

4         A.   I -- I think I told you, I -- I asked

5    somebody -- I don't remember who it was, but they --

6    the word came back that it was Partner A.

7         Q.   But did -- did I receive any other

8    negative reviews that year?

9         A.   I didn't -- well, at the -- I have

10   reviewed your reviews since then.  And my

11   recollection is that yes.  And I -- we don't have the

12   reviews here, but there were other reviews that were

13   not favorable.  And that you got -- that year, you

14   were also ranked "2," again, by the practice, by

15   Beth; and Beth is very, very favorable in the

16   rankings that she has given to Supreme Court clerks

17   that she has helped recruit.

18             And so now, two years in a row, after --

19   after I gave you a very encouraging raise -- it

20   should have been seen that way, anyway -- you're back

21   still with a "2" from the practice.  That's not good.

22   You know, we don't -- most of the people who are on

23   path to partnership, let alone to get significant

24   raises or being a high-paid associate get 5s; some 4

25   and 5s.  Maybe they get an occasional 3.  But there's



Page 172

1   very few associates that get very far in the firm

2   when they're ranked "2" by the practice.

3           So I don't recall, as I sit here now -- I

4   mean, I -- I got this vague recollection of Partner J

5   Partner J not giving you, after I went back and looked at

6   it later on, a favorable review.  There may have been

7   some others; I'd have to go back and look at them.

8           But the -- the reviews are replete with --

9   with questions about your -- your commitment and your

10  performance.

11      Q.   Okay.

12           And I think now we're going to turn to

13  Plaintiffs' Exhibit 29.

14       (Exhibit 20 was marked for identification.)

15           MS. CHASE:  Did you say 29?

16           MS. SHEKETOFF:  I'm sorry, no.  20.  I'm

17       sorry.

18           MS. CHASE:  Can you look toward the

19       computer and get closer and say that number

20       again?  Because we're not hearing you.

21           MS. SHEKETOFF:  Exhibit 20.

22           MS. CHASE:  20.  Thank you.

23           MS. SHEKETOFF:  This is, for the record,

24       Bates-stamped 2271 to 73.  Plaintiffs'

25       Exhibit 20.



Page 173

1        MS. CHASE:  And -- and the Bates numbers

2     that you just gave were also Plaintiffs' Bates

3     numbers?

4        MS. SHEKETOFF:  Yes.

5        THE WITNESS:  Got it.

6  BY MS. SHEKETOFF:

7     Q.    Okay.  Is this a press release about this

8  case?

9     A.    It is.

10    Q.    And whose idea was it write this press

11 release?

12    A.    Mine.

13    Q.    Who wrote the press release?

14    A.    Well, pretty much me.  I took some

15 comments, but -- you know, I had some points that I

16 needed some help on.  But I -- I wanted to -- first

17 paragraph, I wanted to emphasize what I thought was

18 attacking -- this was in response to -- I read the

19 draft complaint that your lawyer at the time sent

20 over.  And I may have read the complaint, which

21 pretty much tracks it identically, The New York

22 Times, or you sent to Traci.

23            And you started out with this

24 ridiculous -- in my view, again -- dishonest claim

25 that the firm had an archaic view of the relationship



Page 174

1    between the -- the parents; that the mother is to be

2    the caregiver and the -- and the father, the male,

3    the breadwinner.

4          Which I thought there was no good faith

5    basis for saying.  And again, not something that will

6    be borne out by the evidence.  We'll have tons of

7    witnesses who will say that this is just not true.

8    The firm has been extraordinarily supportive of

9    people and their families.  I myself have written

10   tons of e-mails to people who have struggled with

11   circumstances in which the e-mail starts out, "Family

12   first."

13         So I wanted to emphasize in the first

14   paragraph how important -- how supportive the firm

15   has always been of -- of family life, which was of

16   course not something -- you -- you said the direct

17   opposite of that, and I thought it was just not

18   truthful.  It was a lie.

19      Q.   So did you write the first draft of the

20   press release?

21      A.   I did.  I did.  I probably did it on the

22   BlackBerry, wherever I was.  I mean, typed it out,

23   did some changes in it.

24      Q.   And who did you send the first draft to?

25      A.   Bunch of people that -- our counsel in the



Page 175

1   case, basically.  Other people that I -- I respect.

2   And I knew -- you know, at this point, we -- we knew

3   you were going to sue us, because you just sent us a

4   complaint.

5           So I wanted everybody who was in on the

6   team.  I -- I can't tell you what -- who I sent it

7   to, other than I'm sure Terri got it, and Traci got

8   it, and Mary Ellen, and some other folks.

9      Q.   And when did you write it?

10     A.   Shortly after I read the -- it was --

11  there was some complaint, as I recall, sent over by

12  your lawyer.  Your lawyer made some statement that --

13  it was written to Beth, I think -- and said that, you

14  know, we -- we -- she promised to be a progressive

15  advocate and protector, which I -- I didn't know

16  what -- what to make of that statement.  Sounded,

17  again, pretty -- pretty immature.

18          And -- and then you sent another draft of

19  the complaint, which I think was identical or close

20  to identical, that you had given to The New York

21  Times.  So you're -- you're given this document.  So

22  in connection with that, I don't remember the timing,

23  but it was in response to those things.

24          And also in response to your assertion,

25  which I found astonishing, that -- that unlike



Page 176

1  everybody else at Jones Day, all the generations of
2  people who have raised children and took good care of
3  them and had great family lives, you, as you said,
4  stood in opposition to these archaic gender roles,
5  because you and your husband wanted to have equal
6  responsibility in the sharing -- in the raising of
7  your children, and -- and an equally close
8  relationship with your son, as if everybody else at
9  Jones Day had no desire to do that.

10          It -- it was an astonishing statement of
11  self-centeredness and hubris.  And the combination of
12  those two things, plus your -- what I viewed racist
13  assertion that we had doctored your photo, made me
14  convinced that I had to draft something to defend the
15  firm against these unwarranted, unfair, and
16  untruthful attacks.

17          So that's -- that's the timing.  After I
18  read those things, that's what led to this.

19      Q.   I'm sorry.  Just -- are you saying that
20  I -- my allegation is racist about the photograph?

21      A.   When you say that we have a Caucasian
22  view, that the firm has a Caucasian view of beauty, I
23  don't know how you can come to a conclusion that
24  you're not saying that we're racist.  Why would we
25  have a Caucasian view of beauty, as opposed to -- you



Page 177

1    know, just accepting people for what they are?

2         Q.   Okay.  So you're not calling me racist;

3    you're saying --

4         A.   No, I'm saying -- that statement, in my

5    view, was attributing a racial motivation to the

6    firm, which was completely unjustified.

7         Q.   Did you write the entire press release?

8         A.   I didn't write every word, because I asked

9    for comments, so there are changes in it.  But the --

10   the -- the main points are -- are mine.  I mean, it's

11   not complicated.  There's -- there's a paragraph

12   about the family.  There's some history to what

13   happened.  There's a paragraph again about Mark, and

14   there's a paragraph about you.

15            So it's -- it's basically four paragraphs;

16   it's not that complicated a document.  And -- and it

17   was -- it was written in response to the things that

18   I have just mentioned.

19            It was -- it was your attack on the firm

20   that caused us to put out this release, caused me to

21   do the draft of it.

22        Q.   And -- and to be clear, by "your attack on

23   the firm," you mean the -- the complaint that we sent

24   to you?

25        A.   No.  I mean what I just said.  I



Page 178

1    identified things that were specific, that I felt

2    were unwarranted.

3         Q.   Okay.

4         A.   You said -- I don't know.  Do I have to

5    repeat myself again?  I think it's -- it's in the

6    transcript, so . . .

7         Q.   Did Traci Lovitt write the -- the press

8    release?

9         A.   Did Traci Lovitt write it?  No, I'm --

10   what I'm -- I'm taking responsibility for the bulk of

11   writing.  I can't tell you who gave me suggestions,

12   or I got an e-mail and said, "That's great."  You

13   know.  I mean, I -- this is on -- this is on me.  And

14   my reasons for doing it is as I just said.

15        Q.   All right.  I'm showing you what's been

16   marked as Plaintiffs' Exhibit 36.

17        (Exhibit 36 was marked for identification.)

18   BY MS. SHEKETOFF:

19        Q.   Have you had a chance to read it?

20        A.   No, I'm -- I'm still going through this

21   file of materials here.

22             Yeah, I've -- I've got it in front of me.

23   36.

24        Q.   And is this an exchange between you and

25   Traci about the press release?



1        A.    That's what it says.

2        Q.    Okay.  And Traci's e-mail to you on

3   August 13, that's an e-mail about the press release

4   attaching a draft of the press release, right?

5        A.    I'm not sure.  What -- what is your

6   question?

7        Q.    The bottom of the page -- sorry, this

8   is JD2494.  And --

9        A.    Yeah.  I -- I got that.  August 13.  Yeah.

10        Q.    This is an e-mail from Traci to you,

11   attaching a draft of the press release, right?

12        A.    It says "NYT Statement."  Is that what

13   you're talking about?

14        Q.    Yeah.

15        A.    New York Times statement, is what I

16   understood it to mean.

17        Q.    And there's an attachment --

18        A.    Because The New York Times called us at --

19   in response to -- to your communications with them.

20        Q.    You had signed --

21        A.    They wanted to know what -- they wanted to

22   know what we had to say in response.  So that's why

23   it's called "NYT statement."

24        Q.    You had signed to this e-mail, "Okay to

25   send"?



Page 180

1        A.    That's correct.

2        Q.    And you were telling Traci it's okay to

3   send the press release to The New York Times?

4        A.    Yeah, but she was in communication with

5   the reporter, as you know, because we -- you -- you

6   sent us a copy of the complaint that you gave to The

7   New York Times.

8        Q.    And so Traci's e-mail to you is attaching

9   the draft of the press release, and you're confirming

10  okay to send to The New York Times, right?

11       A.    I don't know that it's attaching it.  I

12  can't tell from this document.  But in any case, I

13  had -- I -- I -- like I said, I was okay with it --

14  with the document, so I don't know if it was attached

15  or not.

16            But I knew we had to say something in

17  response to the impending article in the Times about

18  your -- what I viewed as false allegations about the

19  firm.

20       Q.    Okay.  I want to go back to the press

21  release itself.

22            MS. CHASE:  Was that Exhibit 20?

23            Julia, Exhibit 20?

24            MS. SHEKETOFF:  Yep.

25            THE WITNESS:  So we're back to Exhibit 20.



Page 181

```
 1             MS. CHASE:  Yeah, we're back to Exhibit 20
 2       now.
 3   BY MS. SHEKETOFF:
 4       Q.    I'm going to read you a paragraph, or a
 5   line from it.  It says:  "Ignoring both the law and
 6   biology, Mr. Savignac and Ms. Sheketoff complain that
 7   this generous family leave policy, which is fully
 8   consistent with guidance of the EEOC, perpetuates
 9   gender stereotypes because the firm does not require
10   birth mothers to submit medical evidence proving that
11   childbirth has had a physical impact on them
12   sufficient to justify disability leave."
13             Who wrote that sentence?
14       A.    Well, I know one thing, that I was
15   astonished that -- I knew this guy wasn't disabled,
16   so I didn't get the whole "disabled" argument, that
17   he should be entitled to the disability that was
18   given to a mother.  It just -- it made no sense to
19   me, and it was kind of a classic "up is down."
20             So I'm -- I'm sure that came from me.
21       Q.    Had -- had you read the EEOC guidance at
22   the time the press release was published?
23       A.    I read -- what -- what I told you, it's --
24   the -- in the e-mail that he sent, it quotes -- the
25   prior e-mail that -- that -- that you and he got from
```



Page 182

1    us, in which I think the language in EEOC, in

2    Example 14 or whatever it was, was -- was -- tells me

3    that our position was not only reasonable, it was

4    correct, and I really didn't understand what you were

5    complaining about, particularly since he seemed to be

6    most agitated by the disability point.

7             That was -- and that's why he said it's

8    against -- what is this guy talking about, that --

9    you know, he's entitled to disability that we would

10   give to a mother who has just gone through

11   childbirth?  I -- I -- I couldn't for the life of me

12   understand it.

13        Q.   Okay.  And did you read any other part of

14   the EEOC's guidance?

15        A.   I just told you what I read.

16        Q.   Okay.  Did -- so at this time that you

17   were explaining that your policy was consistent with

18   the EEOC policy, or guidelines, did you know what

19   Jones Day's leave offerings were?

20        A.   I -- I think I've been over this already.

21   I was -- I'm very confident, having spent all these

22   years at the firm, that the firm is -- is -- tries,

23   and is without -- maybe the rarest exception, for

24   some maybe small period of time, in compliance with

25   regulations that govern it all over the world.  We



Page 183

1   operate in jurisdictions all over the place.  We've

2   got people who pay attention to this.  And I found an

3   assertion that we're not in compliance with EEOC

4   guidance to be not credible.  It's just not something

5   that this firm does.

6           So I -- I don't have to -- to read every

7   detail of it and come to my own, you know, sort of

8   law professor view of what the law is.

9       Q.   Did --

10      A.   I'm very confident in this firm, and its

11  judgment, and its people.

12      Q.   Did you know at this time what the firm's

13  leave offerings were?

14      A.   I -- I've told you before that I have not

15  and did not immerse myself in the details of the --

16  of these policies.

17      Q.   Do you think --

18      A.   But I was very confident that whatever we

19  were doing was in compliance with the law.

20      Q.   Do you think that any woman is able to

21  work with -- at Jones Day within six -- eight weeks

22  after giving birth?

23      A.   I didn't have -- I didn't -- I didn't have

24  -- I don't even think about this.  I don't have a

25  view on it.  It's not my business to be worrying



Page 184

1   about a woman's personal decision about their

2   circumstances coming through childbirth.

3            Mary and I have had six kids; I've seen

4   Mary go through six births.  I know what -- what

5   childbirth is like, and the recovery associated with

6   it, and I -- and I can't imagine that anything that

7   the firm was doing could be described as wrong, and

8   anything other than doing the right thing.

9            So again, this struck me as unbelievably

10  petty, that --

11       Q.   Was your wife disabled --

12       A.   -- who would -- who would be involving

13  themselves in another person's decision to take

14  disability after childbirth?

15           I -- I -- I -- for the life of me, I

16  couldn't understand how this was something that

17  either you or your husband would immerse yourself

18  into.  It was astonishing.

19       Q.   Do you think --

20       A.   Bad judgment.

21       Q.   Do you think every single woman is

22  disabled after childbirth for eight weeks?

23       A.   I -- I don't have -- I'm not -- I'm not --

24  I'm not -- I'm not a doctor.  I don't -- I'm not --

25  I'm not -- you know, I'm on the board of the



Page 185

1     Cleveland Clinic; I could go get an expert, which

2     we'll probably do for this case, but -- it's not my

3     position to take that position.  I don't have a view

4     on it.  And God forbid that I did.

5          Q.   Was your wife disabled for eight weeks

6     after each of your --

7          A.   Oh --

8          Q.   -- children were born?

9          A.   I'm not going to answer that.

10              MS. CHASE:  And I'm not going to instruct

11         you to.

12    BY MS. SHEKETOFF:

13         Q.   Have you --

14         A.   I mean, you know, it's like -- well, have

15    you no decency?  I mean . . .

16              Go ahead.

17              MS. SHEKETOFF:  So just to be clear,

18         Terri, you're instructing him not to answer the

19         question?

20              MS. CHASE:  Julia, you heard the answer,

21         which was, Do you have no decency?  And I am not

22         going to compel any more of an answer from that.

23         His wife was not a Jones Day associate governed

24         by these policies.  To try to intrude in his

25         personal family matters, and what scope of



Page 186

```
 1        disability his wife did or didn't have, is
 2        totally improper.
 3             MS. SHEKETOFF:  So is your position that
 4        it would be improper to ask a deponent about
 5        disability after childbirth?
 6             MS. CHASE:  It is my position that it
 7        is -- this witness has told you no less than ten
 8        times that the duration of leaves taken is not
 9        for him to choose at any point.  Not now; not
10        when your husband wanted the eight weeks of
11        disability leave he wasn't entitled to; not at
12        any point in time in his tenure at Jones Day.
13             And so his view on this topic is
14        irrelevant, and it's just intrusive to ask about
15        his family matters in that -- in that context.
16        It is not a proper question, and I'm not going
17        to allow him to answer it.
18             It's a very different question to ask your
19        husband, because he was claiming he was entitled
20        to eight weeks of disability leave, when he
21        admitted under oath he wasn't disabled.  Which
22        is where we get to the bottom of this problem in
23        the first place, when you knowingly make a claim
24        for disability leave when you know you're not
25        disabled.
```



Page 187

1           But that is not what this witness did.
2      And that's why it's not appropriate for him to
3      be answering that question.
4       Q.   Mr. Brogan -- (simultaneous speaking)
5           MS. CHASE:  He did not put his personal
6      life in the middle of the situation; you did.
7      You and your husband chose to put your personal
8      life in the middle of this situation.
9           MS. SHEKETOFF:  -- (simultaneous speaking)
10      press statement that the -- the leave policy is
11      fully consistent with EEOC guidance, I'm
12      entitled to explore that.
13           But if you're instructing the witness not
14      to answer --
15           MS. CHASE:  I have told you repeatedly, as
16      has he:  He is not the witness who has personal
17      knowledge on this topic.  Move on.
18  BY MS. SHEKETOFF:
19       Q.   Do you know any -- do you know any
20  woman -- never mind.
21           Well, is it your position that not a
22  single woman that you've met has not been disabled
23  for eight full weeks after childbirth?
24           MS. CHASE:  I'll let you answer it.  I
25      think it's a completely irrelevant,



Page 188

```
 1          inappropriate question, but go for it.
 2               You want to waste your time this way,
 3          Julia, after all of the conversations we had
 4          about frolic and detour, go for it.  You've just
 5          put the nail in the coffin on any effort to get
 6          extra time.  Go for it.
 7               THE WITNESS:  Could -- could you repeat
 8          that question slowly, so I can take its full
 9          import in?
10               "Do I know any woman," is the way it
11          started out, I think.
12     BY MS. SHEKETOFF:
13          Q.   Yeah.  Is it your position, or do you know
14     any woman who has been disabled for -- let me restate
15     it.
16               Is it your position that every single
17     woman you know is disabled for at least eight weeks
18     after childbirth?
19               MS. CHASE:  Same objection.  But he can
20          answer.
21               THE WITNESS:  I -- I -- I wouldn't dare to
22          say anything about any woman and their
23          circumstances following the birth of a child.
24          I -- I -- I just think this is -- it -- it shows
25          you again how in my view, how -- how much bad
```



Page 189

1          judgment is involved in -- in you and your

2          husband making this claim.

3               So I -- I don't even -- I couldn't even

4          know how to answer a question like that.  And I

5          would be ashamed of myself if I tried --

6     BY MS. SHEKETOFF:

7          Q.   Is it --

8          A.   -- to answer it, so I -- I -- it's not my

9     place.  I don't have the competence.  I -- I -- I --

10    it -- it -- the whole thing is premised on a level of

11    intrusion that -- that is just breathtaking.

12         Q.   Okay.  Further down, this says:  "Jones

13    Day's adoptive leave policy, which is gender neutral,

14    reflects the fact that adoptive parents face unique

15    demands on their time and finances that differ from

16    those faced by biological parents -- such as extended

17    foreign travel and adoption-related legal and

18    administrative hurdles."

19              What was your basis for this statement?

20         A.   Well, I -- I -- that -- that was our

21    policy.  And I -- I -- I think it's pretty well known

22    that when people go and they adopt children these

23    days, oftentimes it's overseas, and there's a lot of

24    travel involved, and so we were -- we were giving

25    them generous allotment to -- to do that.  It's



MAGNA

LEGAL SERVICES

Page 190

1   just -- it's a product of the circumstances

2   surrounding the adoption.  If you've got to go to a

3   foreign country and -- there's all kinds of rules.

4          I don't know; I've never been involved in

5   it.  But I -- I didn't -- I don't see anything

6   objectionable about it.  I don't think it's something

7   to complain about.  I would think that anybody,

8   including you and your husband, should be happy that

9   places like Jones Day are supportive of people in

10  those circumstances.

11         But apparently not.  There's some

12  resentment going on there that I -- that I didn't

13  understand, so I felt like I should point it out.

14     Q.   What resentment are you talking about?

15     A.   Well, I don't know why you'd be

16  complaining.  Why -- why would you care what's going

17  on with adoptive parents and what their leave is?  I

18  mean, why -- why is that a concern of yours, or your

19  husband?

20         I mean, it just seems to me so petty.

21  It's -- it's -- it's like, what are you talking

22  about?  Why do you -- why do you involve yourself in

23  something like this?  Why do you want to basically

24  make a legal argument to take something away from

25  somebody else?



Page 191

1                  Which is the way I read the whole thing.

2     It's all about claiming that people are not disabled

3     after childbirth.  It's claiming that they don't

4     deserve all this time if they're adopting kids from

5     overseas.  It's trying to take things away from other

6     people.

7                  That, to me, is petty, and not coming of

8     what I expect out of a Jones Day lawyer.

9          Q.    And why is it taking things away from

10    other people?

11         A.    I can't hear you.  "Why is it" --

12         Q.    Why is it taking things away from other

13    people?

14         A.    Well, basically the premise is that

15    they -- we're somehow giving something to somebody

16    that's not entitled to it.  Otherwise, why is it an

17    issue?  Why -- why do you care -- why are you trying

18    to make an issue out of whether or not a woman is

19    disabled for eight weeks?  Why -- why won't you

20    accept that if that's the -- if that's what's

21    afforded them, and the woman decides she wants to

22    take it, why do you want to stick your nose into

23    that?

24                  To me, that's just petty.

25         Q.    And was that -- our sticking our nose into



Page 192

1    that, was that part of why you fired Mark?

2         A.   It's got nothing to do with Mark.  I told

3    you why Mark had to be separated.  It's just like --

4    you know, this is all argument.  I mean, I feel

5    like -- and I often say this to people, you know,

6    this is like what happens with drunks in a bar:  They

7    just keep saying the same thing over and over again.

8    That's what's going on here right now.

9         Q.   The press release continues:  "Jones Day

10   terminated Mr. Savignac's employment because it

11   concluded that he showed poor judgment, a lack of

12   courtesy to his colleagues, personal immaturity, and

13   a disinterest in pursuing his career at Jones Day --

14   all of which are apparent in an intemperate e-mail he

15   sent to a member of our professional staff and in the

16   complaint itself."

17            And who is the member of the professional

18   staff you're referring to in this e-mail -- in

19   this --

20        A.   Sarah.

21        Q.   And did you understand the January 16th

22   e-mail we sent to be a demand letter?

23        A.   I don't know what it was.  It was a -- it

24   was a -- an e-mail that I felt like was extortionist,

25   I guess is the way I'd put it.  "Give me what I want,



Page 193

1    or else."  You could characterize that in any bunch

2    of ways, so . . .

3         Q.   And do you think that can be characterized

4    as a demand letter?

5              MS. CHASE:  By "demand letter," Julia, are

6         you talking about some sort of protected status,

7         like a Rule 408 communication?  Is there some

8         magic words to this phrase that you're using?

9              MS. SHEKETOFF:  I'm just asking for the

10        witness's own understanding of that --

11             THE WITNESS:  I've told you what --

12             MS. CHASE:  He's already given you --

13             THE WITNESS:  -- my understanding --

14             MS. CHASE:  -- his understanding once --

15             THE WITNESS:  My understanding is that --

16             MS. CHASE:  -- and you asked it a second

17        time.

18             THE WITNESS:  -- it was an e-mail that was

19        a disgrace to the person who signed it.

20             That's -- that's my understanding of that

21        e-mail.  And I -- I -- if it were me, I would

22        not have wanted to be anywhere near responsible

23        for sending an e-mail like that to anybody.

24   BY MS. SHEKETOFF:

25        Q.   The press release says:  "Mr. Savignac



Page 194

1  exhibited open hostility to the firm, demanding that

2  he be given what he wants 'or else' and claiming

3  hardship under circumstances that no reasonable

4  person would view as anything but exceptionally

5  generous."

6         What hardship did Mark claim?

7    A.   Well, that he wasn't getting his

8  disability leave that he wanted, which he wasn't

9  entitled to.  You know, all of that, to me, is a very

10 gentle way of calling him out, really.  And, you

11 know, he -- he's -- he wanted his Maypo.  You know,

12 it's like the old commercials with the little kid.

13 You know:  "I want what I want, and I want it now."

14    Q.   And so what was the hardship?

15    A.   The hardship is that he claims that

16 notwithstanding being paid a million dollars, he's

17 not getting what he deserves, which is I guess

18 another $80,000.  That's his hardship.  That's the

19 way I read it.  Wanted another $80,000 of -- of pay,

20 that if he didn't get it, you know, he's been treated

21 unfairly.

22         That's a hardship argument.  I don't know

23 how else you call it.

24    Q.   And the next -- the press release also

25 says, "The gratuitous allegation that Ms. Sheketoff,



Page 195

1   who voluntarily left the firm in August 2018, was a

2   victim of gender pay discrimination is false and was

3   not made in good faith."

4           What was your basis for saying that my

5   allegation of discrimination was not in good faith?

6           A.   I've already explained at the beginning

7   that -- that I personally was involved in setting

8   your compensation and reviewing you, and I knew that

9   you were treated extremely fairly and extremely well.

10  And there was no basis for you or your husband to say

11  that you were being discriminated against.  None.

12  Zero.

13          Q.   Okay.  The press release also says:

14  "Ms. Sheketoff was a highly paid associate who made

15  more than her husband despite the fact that her

16  reviews from multiple partners were mixed, her

17  contribution to billable client representations was

18  below expectations, and her attention was focused on

19  idiosyncratic concerns."

20          What did you mean by "idiosyncratic

21  concerns"?

22          A.   "Idiosyncratic" was kind of the nicest

23  word I could pick.  I mean, it's actually kind of a

24  nice word, you know.  I mean, everybody I guess, to

25  some extent, is idiosyncratic.  So if anything, I was



Page 196

1    kind of -- you know, not only just being gentle; it
2    was sort of like -- okay -- and I don't
3    necessarily -- you know, you wrote your
4    self-evaluation, at some point, in which you admitted
5    that you were very much focused on the pro bono work
6    that you wanted to do; other people didn't think that
7    you were interested in -- in other client work.  You
8    wanted to do what you wanted to do.
9            You know, I -- I don't -- I can understand
10   that.  Doesn't mean that you got a big bright future
11   at Jones Day with -- with getting 2s from your
12   practices, but I -- I actually thought that was
13   pretty bloody innocuous, to say that your concerns
14   were idiosyncratic.
15       Q.   By "idiosyncratic," did you mean -- you
16   were referring to my interest in pro bono work?
17       A.   No, "idiosyncratic" has got a definition
18   you can look up.
19       Q.   I'm sorry.  Idiosyncratic concerns:  Were
20   you referring to my pro bono work?
21       A.   No.  What -- what I said is that you wrote
22   a self-evaluation -- maybe you don't recall this, but
23   it's in the files -- in which you were -- I don't
24   want to say "apologizing," but promising, sort of, is
25   the way I read it, to do more client work.



Page 197

1             And the suggestion that I took away from

2    it when I read it is that you realized that you were

3    kind of focused more on your concerns than maybe the

4    traditional client work of the firm, that permits us

5    to pay you and your husband the salaries that we pay

6    them.  That's -- that's the way I read it.

7        Q.   And had you read that at the time you

8    wrote the --

9        A.   No, I -- I read it before I sent this

10   e-mail.  I told you that.  After -- after -- between

11   the time that you filed your lawsuit and when I made

12   the decision I had to separate your husband from the

13   firm because of his conduct, I read all of your

14   evaluations and his evaluations.  So I had read these

15   evaluations at the time that you sent across this --

16   the draft complaints, saying that you were going to

17   sue us and giving a copy to the New York Times.

18             So I had read them, is the answer.

19       Q.   The press release says:  "Jones Day never

20   altered any photographs of Ms. Sheketoff, and in

21   fact, Ms. Sheketoff personally selected the precise

22   photo that was used on the firm's website."

23             What was your basis for saying that Jones

24   Day never altered any photographs of me?

25       A.   You know, I -- I don't -- I don't --



Page 198

1   you're -- the -- the cause -- the centerpiece of that

2   is you claiming that we have a Caucasian view of

3   beauty, and that we altered your photo to conform to

4   that Caucasian view of beauty.

5            That's just a lie.  And I -- I mean, it's

6   up for you to prove that -- I know -- I know nothing

7   to support the proposition that we altered anything.

8            Now, when -- when photographers take

9   pictures -- they do it all the time; I mean, when you

10  go into TV, they want to put makeup on you.  I mean,

11  it's just -- the idea that you would try to transport

12  that, or to -- to allege that this constituted some

13  reinforcement of what I view as a -- a -- a racist

14  allegation against us, that we were doing this

15  because we wanted you to conform to our, quote,

16  Caucasian view of beauty, is just not true.  It's got

17  no -- you couldn't have any good faith basis to say

18  it.

19            I can't think of -- you know, it's as

20  nasty a thing as you could say.

21     Q.   How did Hugh Whiting get involved with the

22  press release?

23            MS. CHASE:  And I want to just caution you

24       here, as you know from our many, many discovery

25       disputes regarding this topic, Hugh Whiting was


MAGNA
LEGAL SERVICES

Page 199

```
 1            consulted in his capacity as counsel, and the

 2            substance of those communications is off limits.

 3            That has been ruled on by the Court.

 4                 You want to ask, did he speak to Hugh, he

 5            certainly can answer that question.  If he

 6            remembers when, he can probably answer that

 7            question, too, without getting into the

 8            privilege.  But the substance of those

 9            communications are privileged and not

10            appropriate subject matter for questioning.

11                 Would you like to ask a question that is

12            within those reign -- those parameters?

13      BY MS. SHEKETOFF:

14            Q.   Well, my question was, how did Hugh

15      Whiting get involved with the press release?

16                 MS. CHASE:  With -- with the limitation

17            that you can't talk about the substance, because

18            those are privileged communications I, don't

19            know that there's much that can be said there.

20                 THE WITNESS:  I -- I don't -- I don't

21            remember, because I don't remember what -- what

22            the sequence is.  But -- you know, I may have

23            sent it to Whiting.  But I don't recall ever

24            talking to Whiting about this matter at all,

25            except that he might have said in passing that
```



MAGNA ▶
LEGAL SERVICES

Page 200

```
1         he didn't think that -- might have said
2         something that --
3              MS. CHASE:  I'm going to instruct you
4         not -- yeah, I'm going to instruct you not to
5         disclose the substance of the conversation.
6              THE WITNESS:  Right.
7              Whiting had nothing to do with this.  So
8         you're -- you're -- you're barking up the wrong
9         tree on this.  You got nowhere to go with
10        Whiting.
11   BY MS. SHEKETOFF:
12        Q.   On what matter were you seeking privileged
13   legal advice from Hugh Whiting?
14        A.   What matter what?
15        Q.   Were you seeking privileged legal advice
16   from Hugh Whiting?
17             MS. CHASE:  With respect to the press
18        release, Julia.  This has been the subject of
19        repeated discovery disputes.  You lost on this
20        issue.  The judge said it's privileged.  Do not
21        ask him about the substance of conversations
22        with Whiting on the press release.  It's
23        privileged.
24   BY MS. SHEKETOFF:
25        Q.   Were you aware that Whiting had retired
```



Page 201

1    from Jones Day?

2         A.   Retirement is -- from Jones Day is kind of

3    a -- as a lot of people will tell you, is a -- easier

4    said than done.  He's a -- he -- he's -- he's

5    retired, but I also involve him in things from time

6    to time.

7         Q.   Did he ever -- did Whiting ever tell you

8    that he was an active member of the bar in

9    August 2018?

10             MS. CHASE:  Julia, again, I don't

11        understand; you're wasting time around this

12        issue when you've lost on it.  You are wasting

13        time.  He can answer the question, but this time

14        all counts, and it's a complete and improper use

15        of this witness's time.

16             THE WITNESS:  No, Whiting and I have never

17        had such a conversation.

18             MS. CHASE:  There you go.  Got your

19        answer.  Move on.

20    BY MS. SHEKETOFF:

21        Q.   And after his retirement in general, did

22    he ever suggest to you that he was an active member

23    of the bar?

24             MS. CHASE:  Again, Julia, you've lost on

25        this issue.  Move off the topic.



Page 202

```
 1           THE WITNESS:  I've had no such
 2      conversation with Mr. Whiting.
 3  BY MS. SHEKETOFF:
 4      Q.   Did you believe that Mr. Whiting was an
 5  active member of the bar?
 6           MS. CHASE:  Julia, you've lost on this
 7      issue.  Move off the topic.
 8           The judge has ruled this is irrelevant.
 9      He found these were privileged communications.
10      It's also an attorney work product.  He doesn't
11      even need to be a member of the bar to have a
12      work product privilege.
13           MS. SHEKETOFF:  (Simultaneous speaking)
14      Terri --
15           MS. CHASE:  You are wasting time.  Ask a
16      question --
17           MS. SHEKETOFF:  (Simultaneous speaking)
18      Please stop with a speaking objection.
19           MS. CHASE:  -- that is a fact question of
20      this witness.
21           MS. SHEKETOFF:  (Simultaneous speaking) --
22      a lot of time --
23           MS. CHASE:  The witness has said
24      repeatedly he authorized the statement.  You are
25      wasting time.  Move on.
```



Page 203

1    BY MS. SHEKETOFF:

2        Q.   Did you believe Mr. Whiting was an active

3    member of the bar at the time?

4        A.   I never thought about it.  I mean, until

5    you asked me these goofy questions, I've never

6    thought -- given it any thought at all.

7        Q.   And do you personally handle your own bar

8    renewal process?

9            (Question marked for ruling.)

10           MS. CHASE:  Really, Julia?  No, I'm not --

11           I am not -- we're not getting into the bar

12           review status of this lawyer and who handles it

13           or not.  That is not a proper question.

14           I am going to instruct him not to answer.

15           You are wasting the time of the managing partner

16           of a global law firm -- to ask him who does his

17           paperwork for bar admission?  Are you kidding

18           me?  Move on to something relevant, or we're

19           going to be done here.

20   BY MS. SHEKETOFF:

21       Q.   Okay.  And we're going to change gears

22   slightly.  Can you --

23           MS. SHEKETOFF:  Oh, I'm sorry.  I'm going

24           to mark that for ruling, Karen.

25           MS. CHASE:  Go for it.  Go for it.  We're



Page 204

```
 1          just going to go to the judge and tell the judge
 2          I wouldn't let you answer the question of who
 3          does your paperwork for bar admission.  That
 4          might be just the perfect thing to get Judge
 5          Moss to finally see exactly what you're like.
 6          Go for it.
 7   BY MS. SHEKETOFF:
 8          Q.   What were the factors that affect -- or
 9   what -- sorry.  What are the factors that affect your
10   determination of an associate's annual raise?
11          A.   I -- I can't --
12               MS. CHASE:  We can't hear you, Julia.  Can
13          you speak up and get closer?  You're -- you're
14          mumbling.
15   BY MS. SHEKETOFF:
16          Q.   What are the factors that affect your
17   determination of an associate's annual raise?
18               THE WITNESS:  An associate's what?
19               MS. CHASE:  Raise.  Raise.  Annual raise.
20               THE WITNESS:  Annual raise.  Well, from
21          the time that -- that people come as summer
22          associates and new lawyers, they're given a very
23          consistent message, certainly from me.  I -- I
24          speak each year to the summers and each year to
25          the new lawyers group, except during the recent
```



MAGNA
LEGAL SERVICES

Page 205

1      pandemic.

2           And there are four broad considerations

3      that we use to evaluate everybody in the firm as

4      a lawyer, whether you're -- you're a lawyer or

5      an associate or a partner.

6           And the first one is professional

7      accomplishment or achievement.  And we don't do

8      that -- like much of the profession does; not

9      all of it -- by looking at financial metrics,

10     like hours recorded, or origination credits, or

11     realization rates.  Those financial metrics can

12     be helpful in managing the business aspects of

13     the professional endeavor that the firm is

14     engaged in, but that's not a substitute for

15     professional accomplishment.

16          Professional accomplishment is achieved in

17     the eyes of your colleagues and clients, other

18     lawyers, and ultimately it has very little to do

19     with money.  I -- I've been blessed enough to

20     see great lawyers all across America, and some

21     of the very best lawyers I've ever seen in court

22     don't make a lot of money; they're just really

23     good lawyers.

24          So the -- the assessment of your

25     colleagues as to your quality of your lawyering



Page 206

1          is number one.  It's kind of the sine qua non of

2          operating at this level of the profession.

3               The second thing that we look at is the

4          commitment to the firm.  We want people who care

5          about the firm.  We want people who feel

6          obligations to one another.  We want people who

7          are trying to make the firm stronger and better

8          to service our clients.

9               And we want people to love the firm.

10         Because if they love the firm, they -- they give

11         the firm good advice.  They -- they give good

12         evaluations because they want to see good people

13         succeed.  They just do everything right.  And

14         it's -- it's very easy, because we were all

15         experienced enough in life to know when we're

16         working with somebody who cares principally

17         about themselves, and doesn't think that

18         anything bigger is going on in what they're

19         trying to do professionally, and a consensus can

20         form around that.

21               The third thing is leadership.  And

22         leadership for us is not climbing a ladder or

23         trying to elbow people out.  It's -- it's what

24         causes other people to follow you.  I say all

25         the time, you know, who's here because you're



Page 207

1       here?

2           Your husband, in my view, if he were up to

3       it, he had a perfect opportunity to exhibit

4       leadership by coming to me, or going to Sharyl

5       Reisman, or somebody, and saying, "I would

6       really like the firm to give some further

7       thought -- not because you're violating the law,

8       because I think Jones Day could be a leader in

9       supporting fathers spending more time in the

10      early years with their kids."

11          That's -- that's the kind of leadership

12      that we're looking for.

13          And the last thing is that we want people

14      to accept the history -- the -- the ways and

15      culture of the firm.  You know, we've got to

16      accept everything, including that -- you know,

17      we're a Cleveland law firm.  We don't talk about

18      money.  You know, Jack Reavis gave us a great

19      gift, with Chappie Rose and those guys; they --

20      they -- they used to always say, you know, "We

21      don't talk about money at Jones Day."

22          You know, we -- we don't ask your neighbor

23      what you pay -- what you make.  You don't tell

24      your neighbor -- brag to your neighbor about

25      what you make.  You don't tell -- you don't ask



1          them what they pay for their house.  You don't
2          brag about what you pay for your house.
3               That's a great gift that those guys gave
4          this firm.  And since 1947 or so, when Jack put
5          that out there, people have not violated it, and
6          it's served -- it's served us pretty well.
7               You have to be able to accept that.
8          It's -- it's all over our website.  It's
9          something that is -- we tell everybody during
10         the process that if -- if you're going to obsess
11         about money, which has happened to the
12         profession right now, this is not the law firm
13         for you.
14              So all of those things together form the
15         kind of lawyer, with the kind of character, with
16         the client service mentality, that we want to
17         promote, whether it's in the annual review
18         process in terms of a raise, or eventually
19         promotion to partnership.  Those are the
20         cornerstones of -- of it.
21    BY MS. SHEKETOFF:
22         Q.   Do reviews matter to an associate's annual
23    raise?
24         A.   I'm sorry?
25              MS. CHASE:  Do the performance reviews



1       matter?  Is that what you said?

2               MS. SHEKETOFF:  Yeah.

3    BY MS. SHEKETOFF:

4       Q.   Do the annual performance evaluations

5    matter when you --

6       A.   Of course, as they go into -- they go into

7    this original assessment, in the beginning, of your

8    professional accomplishments.  So that's why we spend

9    so much time on this.  We -- every associate -- as

10   I'm sure you are aware; I'm not sure that this is

11   reflected in your -- your pleadings, but -- they are

12   asked to identify all of the people that they have

13   worked for, that are senior to them, whether they're

14   partners or they're associates, and then all those

15   people submit written evaluations that not only are

16   statements about their experiences, but there's a

17   whole series of ranking and numbers that they check

18   off on.  And then there are firm-wide meetings in

19   which we spend a lot of time and money talking about

20   each associate.

21               So of course those evaluations are

22   important.

23      Q.   And does the consensus statement matter

24   for an associate's annual raise?

25      A.   Well, the associate -- the consensus



Page 210

1    statement is -- is designed principally -- and this

2    came up -- I can't remember when we started it.  But

3    it was designed to be something that could be --

4    would be helpful to share with -- shared with the

5    associate, particularly an associate who was

6    struggling.

7              So of course it's -- it's part of the

8    process.  As is the -- as is the rankings by the

9    office and by the practice.  And increasingly the

10   rankings have not only been a number, on the scale

11   of 1 to 5, but there's also, depending on the office

12   and the group, a numerical ranking of where they

13   stand.  There were 35 associates, somewhere around

14   there, that are ranked 20 or 29 or 1; all that is in

15   the -- is in the mix and in the documents that the

16   firm keeps track of.

17        Q.    Keeps track of in determining the

18   associate's annual raise?

19        A.    Well, keeps track of in evaluating the

20   associate, as to where we're going to go with them,

21   and what their prospects are, what the message is to

22   them.

23              I mean, that's -- that's the most

24   important thing for us.  We want -- we want -- as I

25   said earlier on, we'd like to see all of our



Page 211

1    associates succeed.  I've -- I've said many, many

2    times that, you know, if you come to a firm like

3    Jones Day, you should want to spend the rest of your

4    life there practicing law.  You should want to be a

5    partner.  You should want to be a part of the place.

6    If you don't, you should get out.  I mean, this is --

7    you know, life's too short.  There are plenty of

8    other things to do.

9            So I would say the most important thing is

10   that this is a record of how somebody is developing

11   as a lawyer, and what potential they have to help us

12   serve our clients, which is our number one job.

13       Q.   Does it matter to an associate's annual

14   raise that they are in -- an issues and appeals

15   associate?

16       A.   No.  Not in my view.  I mean, the -- the

17   issues and appeals associates, because of the bonus,

18   have a bit of a head start, in that their annual comp

19   includes a -- a relatively high number, plus they get

20   a bonus.  Over the years, that's influenced me a

21   little bit in terms of wanting to give them some

22   positive messages.  But that's about it.

23           Other than that, the -- they're -- issues

24   and appeals associates are -- in terms of the

25   business of the firm, you know, less important than



Page 212

1      a -- than a promising young trial lawyer, or a

2      promising young M&A lawyer, promising young private

3      equity lawyer.  So there's no -- there's -- there's

4      nothing special about, in my view, being part of

5      issues and appeals.  As I -- I told you previously, I

6      used to make fun of -- of Patrick because he was a

7      Supreme Court clerk.

8             So the answer is no, there's nothing

9      special about it.

10          Q.   And so does an associate's sex matter?

11          A.   None.  And I -- the evidence -- the

12     evidence that we produced and was analyzed in the

13     associate case makes it clear.  You can get -- as one

14     of my partners jokes, plaintiffs' lawyers right now

15     can find somebody to tell you the sun comes up in the

16     west.  And after turning over seven, eight years of

17     data, as we had to, you couldn't find any shred that

18     there was any discrimination against women, whether

19     it was direct or even disparate impact.  There was

20     nothing there.  So the answer is, sex has got nothing

21     to do with the way people are evaluated.

22          Q.   And -- and sorry, I'm talking specifically

23     about raises.  Does it affect -- does sex have

24     anything to do with the raises?

25          A.   It doesn't have anything to do with



Page 213

1    anything.  Promotions, raises, anything.  Zippo.

2         Q.   Does an associate's race matter with

3    respect to --

4         A.   None.  Doesn't make any difference.

5         Q.   Please let me finish this, for the record.

6              Does an associate's race matter to a

7    compensation decision?

8         A.   No.

9         Q.   What documents do you review when you make

10   determinations about an associate's raise?

11        A.   Most of the determinations are not made by

12   me.  I -- as is -- is clear from the materials that

13   were produced in discovery, I -- I change a very

14   small percentage of the recommendations that I get.

15   I normally go with them.

16             What I do concentrate on is -- is

17   practices that are important to the firm, and

18   associates who have gotten 5s year in and year out,

19   both from the office and from the practice, and are

20   ranked in the force rankings very high.

21             So I -- I tend to, when I do look at

22   things, I tend to look at, you know, financial

23   institution litigators or banking lawyers in New

24   York, M&A lawyers in New York, and in Cleveland, and

25   litigators in -- in California.  Government reg



Page 214

1    people in Washington, D.C.  Private equity people in

2    Chicago.

3              I know the firm really well, and I -- and

4    I know these associates, and I'm trying to make sure

5    that we're rewarding them and giving them the

6    messages that we want to give them, which is that

7    they have a very bright future ahead of them in this

8    law firm.

9         Q.   And do you look at I&A lawyers?

10        A.   Yes.

11        Q.   So when you're looking at the lawyers that

12   you're -- whose salaries you're reviewing or

13   compensation adjustments you're reviewing, what

14   documents are you looking at when you do that?

15        A.   There's a big spreadsheet that has all

16   this stuff.  I mean, I could look at more of it if I

17   wanted to; but basically, there's all kinds of

18   backup.  But I focus on the -- to me, the practice

19   ratings and the office ratings are very important.

20             So one of the things I focused on with you

21   is that you had 2s and 3s, for two years running.

22   That's not good for somebody who's a highly paid

23   associate.

24        Q.   And do you look at the evaluations?

25        A.   I did in 2016, as I have testified.  I had



1   not -- ████████████████████████

2   ████████████████████████   Most years I

3   rely upon the recommendations, as I don't make that

4   many changes.  I don't look at every evaluation of

5   every associate.  I look at -- to me, what the

6   practice in the office says, particularly the

7   practice in terms of their ranking, is critically

8   important; and -- and any other number is a numerical

9   number.  If you -- you know, most -- most of our

10  people who succeed are getting 5s year and in year

11  out.

12      Q.   Do you look at the consensus statement?

13      A.   No.

14      Q.   Do you look at hours?

15      A.   Yeah, I look at hours, but I don't spend a

16  lot of time on it.  Otherwise I wouldn't have given

17  you a raise in 2016.

18      Q.   And do you look at --

19      A.   Because I think you had -- you had 50

20  client hours or something at that time.

21          And I count -- I also count pro bono

22  hours.  I'm the one, when I was the head of

23  Washington, who made the decision -- which I

24  convinced Dick, and later Pat, to adopt -- which is

25  to count pro bono hours towards our client hours as



Page 216

1    if they were billable.

2         Q.   Do you review salary recommendations from

3    other people?

4         A.   I'm not following what you're saying,

5    "salary recommendations from other people."  The

6    recommendations are -- are in the document.  There's

7    a -- there's a -- every partner in charge makes a

8    recommendation.  And usually the administrative

9    partner -- and lately Traci has made recommendations,

10   because I -- one of the things that I did after the

11   2016 review is I decided I wanted somebody like Traci

12   on the partnership committee, who could get to know

13   these younger associates better than I could, and

14   give me recommendations.  And that's -- so that's

15   what I did.

16        Q.   Is Traci on the advisory committee?

17        A.   Yes, she is.

18        Q.   And is Mike Shumaker?

19        A.   I'm sorry?

20        Q.   Is Mike Shumaker on the advisory

21   committee?

22        A.   Yes, he is.

23        Q.   I wanted to -- just to confirm -- I think

24   you answered this, but you made the final decisions

25   about my pay for each of the years that I was at the



Page 217

1   firm; is that right?

2       A.   The first year, I don't think I made a

3   decision on you.  The year I made a decision on you

4   is I gave you an over -- extraordinary bump above the

5   recommendations.  I gave you like $65,000, I think,

6   and -- in 2016, notwithstanding Hash's

7   recommendation.

8            The next year, I gave you 15, because I

9   didn't think that you responded well to the -- to the

10  positive messaging, because you came in at 2 and a 3.

11  And then the following year I think you got a -- a 4

12  from the practice, and I gave you a $85,000 raise,

13  because I thought that like maybe we did get through

14  to you.  And like I said, I -- I believe that great

15  institutions change people; people don't change great

16  institutions.

17           So that's -- that's -- that's the history

18  of my involvement with you.  Three -- three years.

19  And those were the raises that I personally entered

20  on -- into the system.

21      Q.   Okay.  I'm going to show you what's been

22  marked as Plaintiffs' Exhibit 37.

23           (Exhibit 37 was marked for identification.)

24  BY MS. SHEKETOFF:

25      Q.   You can turn to it in your binder.  This



Page 218

1   is JD4765.

2          And my question is, what is this document?

3          THE WITNESS:  This is a -- kind of a --

4   a --

5          MS. CHASE:  It's here on the screen, too,

6   Stephen.  It's easier to read it there.

7          THE WITNESS:  Yeah.  It's a -- it's a

8   slice of what you would see for each associate,

9   on a master document, that would have all the

10  associates.

11  BY MS. SHEKETOFF:

12      Q.   And so did you raise my salary to 360,000

13  for 2015?

14      A.   No, I -- I think I just said this.  In

15  2016 --

16      Q.   This is 2015.

17      A.   Well, I told you, I had nothing -- the

18  only times I -- I was involved in your raises were

19  those three years.  2016 was the first time.  2017

20  was the second time.  And then 2018, before you left,

21  I gave you an $85,000 raise because your office

22  ranking -- practice ranking had improved.

23      Q.   Well, the reason I'm asking is, here it

24  says, "PIC Full-Time . . . Recommend Salary," 330.

25  "PIC Actual Recommend Salary," 330.  "Final



Page 219

1    Approved," 360.

2              So I'm just -- was that you who approved

3    that or decided that, or somebody else?

4         A.   I -- I just told you, I didn't -- I didn't

5    touch -- get involved in your salary that first year.

6         Q.   Okay.

7              MS. CHASE:  Julia, just so that you're

8         not -- in case you're not missing -- and I'm

9         hoping you're not intentionally misrepresenting

10        the document -- there's a column that shows the

11        360 comes from Mike Shumaker.

12             MS. SHEKETOFF:  Okay.

13   BY MS. SHEKETOFF:

14        Q.   And so you had no role in this?

15        A.   Well, you know, "no role," I -- I looked

16   at the -- every year I get this document.  And it's

17   all the associates, by office, and I can get it by

18   practice as well.

19             Now, did I look down this document and --

20   and -- I could have disapproved this; I could have

21   changed any one of these things.  So it's a

22   distortion to say that I had no role.

23             What -- what I told you, which I don't

24   think is that complicated, is that I did not involve

25   myself in your salary changes in this year.  But to



Page 220

1    say I had no role, is just -- I mean, I don't know

2    what -- where it comes from.

3    BY MS. SHEKETOFF:

4         Q.   Okay.  Great.

5              So one of the columns is "hours, 1850."

6    Do you know what that means?

7         A.   One of the columns is what?

8              MS. CHASE:  "Hours."

9    BY MS. SHEKETOFF:

10        Q.   At the very end, on the right, there are

11   white columns.  The third one from the right is

12   "hours, 1850."  Do you know what that means?

13             THE WITNESS:  I'm not seeing this on this

14        document.

15             MS. CHASE:  Here.  This column, Steve.

16             THE WITNESS:  Columns --

17             MS. CHASE:  Here, on the right.

18             THE WITNESS:  Yeah.

19             MS. CHASE:  On this one it might be

20        easier, this column.

21             THE WITNESS:  Yeah.

22             I don't -- I don't -- normally, the hours

23        that we would -- we recorded for client work are

24        on the left.  I'm not sure I would have focused

25        on that.



Page 221

1   BY MS. SHEKETOFF:

2       Q.   Okay.  So you're not sure what that means?

3       A.   Well, I'm telling you I didn't focus on

4   it, so -- and it's -- it's not in a place that I

5   normally would look for client hours.

6       Q.   Okay.

7            I'm going to show you what's been marked

8   now as Plaintiffs' Exhibit 38.  It's Bates-stamped

9   JD4766.

10           (Exhibit 38 was marked for identification.)

11           THE WITNESS:  I got it.

12  BY MS. SHEKETOFF:

13      Q.   Why did you raise my salary to -- or I

14  guess -- why did you raise my salary to 425,000 for

15  this year?

16      A.   Because I was trying to encourage you, as

17  I already testified when your husband was questioning

18  me, that I was anxious to encourage what I saw -- I

19  hoped would be a very promising -- which turned out

20  to be true -- young class of -- of women of color.

21  And I thought that Hash's evaluation, which was not

22  complimentary to you, I should disregard, and try to

23  encourage you, for the reasons that I said

24  previously, that I think that -- I'm a great believer

25  that great institutions change people; people don't



Page 222

1    change great institutions, and that a reward like

2    this could pay off for the firm in the future.  So

3    that's why I did it.

4         Q.   Okay.  And on the right -- the third

5    column from the right, it says "hours, 1750."  Do you

6    know what that means?

7         A.   I think the hours that are relevant are

8    the ones that are here.

9              THE WITNESS:  These things are so hard to

10        read.

11             MS. CHASE:  Yeah.  It's a little bit

12        bigger here on the screen, if that helps.

13             THE WITNESS:  This is harder to read than

14        when I get it, I tell you that.

15             MS. CHASE:  Well . . .

16             THE WITNESS:  Yeah.  I mean, the -- the

17        hours that are -- are relevant is where it says

18        "2015 Billable Hours," it says "179."

19             And then it adds to that nonbillable

20        hours, which presumably is -- includes your

21        pro bono work.  And that says "1,590."

22             Those are the hours I would have focused

23        on when I was reviewing the chart.

24   BY MS. SHEKETOFF:

25        Q.   Okay.  So do you know what the



Page 223

1    "hours, 1750," means, or refers to?

2         A.   I don't even see the "1750."

3              THE WITNESS:  What is she talking about

4         here?

5         A.   These are -- the -- the hours that are --

6    that are relevant to what you did for the firm are

7    the billable hours and the nonbillable client hours,

8    client nonbillable hours, which is pro bono.

9              MS. CHASE:  I think she's looking at this

10        column, all the way over here on the right, the

11        one you said you don't --

12             THE WITNESS:  That may be a budget number,

13        for all I -- I -- I suspect that's a budget

14        number, that that's what you were penciled into

15        the chart for clients.

16   BY MS. SHEKETOFF:

17        Q.   I'm sorry.  And so what is a budget

18   number?

19        A.   I assume that it's 1750.  But I didn't --

20        Q.   Okay.

21        A.   I didn't focus on it.  I don't -- I

22   don't -- it's not something that I looked at when I

23   was evaluating these things.  It could have been a

24   budget number.

25        Q.   Okay.  I just mean the general -- more



Page 224

1  general question:  What is a budget number?

2      A.    What is a budget number?

3      Q.    Right.  What do you mean?  What does the

4  term "budget number" mean?

5      A.    Every law firm has to have a system where

6  it predicts each year the revenue it thinks it's

7  going to make for the coming year, in order to be

8  able to make decisions about compensating staff,

9  associates, and partners.  All right?

10           In the course of that, one of the things

11  that it's based on -- it's not only based on it -- is

12  a budget number for each lawyer that -- so many

13  lawyers will budget -- will bill 750 hours.  And

14  there'll be discounts on realization; there'll be all

15  kinds of factors that go in.  Our budget process

16  takes six to nine months.  The amount of -- of hours

17  allocated to individual lawyers is part of that.

18           That's with a budget number is.  It's not

19  a complicated concept at all.

20      Q.    Okay.

21           I'm going to move on to Plaintiffs'

22  Exhibit 39.

23      (Exhibit 39 was marked for identification.)

24  BY MS. SHEKETOFF:

25      Q.    This is Bates-stamped 4767.



Page 225

1        A.    Right.

2        Q.    JD4767.

3        A.    Right.

4        Q.    So what document --

5              MS. CHASE:  Just give me a second.  Let me

6        get it on the AgileLaw.

7              MS. SHEKETOFF:  Okay.

8              (Discussion off the record.)

9              THE WITNESS:  Why don't you ask the

10       question, and we'll figure it out.

11             MS. CHASE:  Yes.

12   BY MS. SHEKETOFF:

13       Q.    So I guess the first question is, what is

14   this document?

15       A.    It's the same as the other two documents

16   you showed me.

17       Q.    And what is that?

18             MS. CHASE:  Objection.  Asked and

19       answered.

20             But you can answer it again.

21             THE WITNESS:  This is a document that

22       shows for each associate across the firm certain

23       statistics about how much time they recorded,

24       what their rankings were, et cetera.

25



Page 226

1   BY MS. SHEKETOFF:

2        Q.   And what documents did you have before you

3   when you were deciding my raise for 2017?

4        A.   It would have been -- this -- it would

5   have been a document that included this line item,

6   but there would have been a lot of other names on it.

7        Q.   Uh-huh.  And -- and did you have any

8   other -- would you have had any documents other --

9   I'm sorry.  Withdrawn.

10           Did you have any other documents in front

11  of you?

12       A.   No, I already told you.  Three or four

13  times.  I did this on the basis of -- this year I did

14  this on the basis of -- you continued to have a "2"

15  ranking from the practice.  And that's the basis upon

16  which I gave you a $15,000 raise, because it seemed

17  to me that I had -- was wrong in giving you an

18  outsized raise the year before, because it didn't

19  really change your contribution.  It was still a 2.

20       Q.   Sorry, so you're saying the ranking from

21  the practice?

22       A.   Ranking from the practice, correct.

23       Q.   And was Beth -- was Beth the person who

24  decided the ranking for the practice?

25           MS. CHASE:  I'm sorry.  What was the



Page 227

1           question?  Was that the person, the document the

2           person?  What is that question supposed to mean?

3      BY MS. SHEKETOFF:

4           Q.   The question is, is Beth the person who --

5                MS. CHASE:  We can't hear you half the

6           time.

7                THE WITNESS:  It -- presumably it's Beth.

8           She might have consulted some other people.  I

9           don't know.  There's a level of -- the

10          evaluation process below this that I'm not

11          involved in, so I can't tell you all of the

12          discussions that went on in terms of her

13          practice giving you that ranking.  All I know is

14          that you got a "2," and the lowest ranking you

15          can get is "1."  We don't give out zeros.

16     BY MS. SHEKETOFF:

17          Q.   Is there any reason besides the "2"

18     practice rating that you gave me, you raised my

19     salary to $440,000 this year?

20          A.   This year --

21               MS. CHASE:  I'm sorry.

22               THE WITNESS:  I raised it from 425 the

23          year before, didn't I?

24     BY MS. SHEKETOFF:

25          Q.   Right.  In -- well, in 2017 you raised my



Page 228

1    salary to $440,000.  Is that right?

2         A.   That's correct.

3         Q.   Okay.  And is there anything --

4         A.   Which is a $65,000 raise.

5         Q.   I'm sorry?

6         A.   Which was I think was a $65,000 raise.

7         Q.   That was a $15,000 raise from the prior

8    year, 425,000.  Correct?

9              MS. CHASE:  The numbers are what the

10        numbers are, Julia.  Let's not sit here and

11        argue about the numbers.

12             THE WITNESS:  It went from --

13             MS. CHASE:  Ask your question.

14             THE WITNESS:  -- whatever it was, from 360

15        to 425 -- we've been over this now four or five

16        times.  425 to 440 to -- whatever it was, 525.

17        Where you got $85,000.

18   BY MS. SHEKETOFF:

19        Q.   Right.

20        A.   This is not that complicated.

21        Q.   And so this is the year that you raised me

22   to 440, right?

23        A.   Correct.

24        Q.   And my question is, what factored -- did

25   anything factor into that decision except for the



Page 229

1   practice rating?

2        A.   Because you were -- you were -- in my

3   view, I -- I was very generous with you the year

4   before.  You were already very highly paid.  And you

5   were still coming in, as you start progressing

6   through the ranks, with a "2" from the practice.  And

7   what I've said before is that if you get 2s at Jones

8   Day, you don't usually last at the firm.

9        Q.   Okay.

10       A.   Most of the people who have -- I take the

11  opinion that you have of yourself -- get 5s.  And,

12  you know, so everything's happy, and they keep

13  clocking along, and they get good raises, and you

14  know, someday they make partner.

15            But getting 2, again, after what -- I

16  already gave you the benefit of the doubt, I -- I

17  could have just left you flat, but I decided to give

18  you a small raise.

19       Q.   Why did Traci Lovitt and Mike Shumaker

20  make recommendations about my salary this year?

21       A.   Well, we've always had other intermediary

22  that's involved with this thing.  You know.  It used

23  to be Hugh Whiting.  Before him, I can't remember who

24  it was.

25            So the administrative partner's always had



Page 230

1    a role in it.  And I think I've already testified

2    several times now that after 2016, after I went

3    through and read all the evaluations, I decided that

4    I wanted somebody who was younger, and on the

5    partnership committee, to be involved in getting

6    closer to the associate evaluation process.  And I

7    chose Traci.

8              And so it is natural for her, in that

9    role, to make recommendations to me.  That's the

10   point to putting her in that position.

11        Q.   Okay.  And I'm now showing you what's been

12   marked as Plaintiffs' Exhibit 40.

13        (Exhibit 40 was marked for identification.)

14             MS. SHEKETOFF:  This is Bates-stamped

15        JD4768.

16   BY MS. SHEKETOFF:

17        Q.   Why did you raise my salary to 525,000 for

18   2017?  Is there anything --

19        A.   Because you got a 4.  I think I've said

20   this already.  You got a 4.

21        Q.   Is there any reason --

22        A.   Practice --

23        Q.   -- besides -- actually, let me clarify.

24             When you say I got a 4, do you mean in my

25   office rating -- or I'm sorry, practice rating?



Page 231

1          A.    Practice ranking.

2          Q.    Okay.  Is there any reason besides that

3     that you gave me --

4          A.    No, I thought that --

5          Q.    -- the raise in 2017 --

6          A.    I thought that --

7          Q.    -- for $85,000 -- I'm sorry --

8          A.    I -- I thought that maybe -- I -- I

9     thought that maybe I was right, that you were --

10    you -- you kind of got the message and -- you know,

11    Beth obviously improved the ranking, or the practice

12    improved it, or whatever was involved in it, and I

13    decided to give you some extra to make up for the

14    fact that you -- you got less of a raise the year

15    before.

16         Q.    And so at that point, was I on track -- or

17    would I -- was I a prospect for partnership at that

18    stage?

19         A.    A little too early to say that, because

20    that's a whole different scenario of recommendations

21    from the office and the practice.  You got to go

22    through a process.  So you were not on that list yet.

23    I mean, you were -- I can't -- you know, probably a

24    year or a couple years away.  I'd have to go back and

25    look.



Page 232

1             But the answer is no, you weren't -- you
2    weren't -- you -- you were -- let's just put it this
3    way:  You were -- in my view, looked like you were
4    going to fail.  You were not going to make it at
5    Jones Day.  Notwithstanding the fact that I tried to
6    give you some encouragement.
7             And then that year you bounced back; you
8    got a 4.  That's progress.  You know?  So that was a
9    good sign.  But I -- I don't think you can conclude
10   anything more than that.
11        Q.   Okay.  So you're just -- okay.  You're
12   just saying you couldn't conclude one way or another
13   whether I would be a partnership prospect or not?
14        A.   You hadn't -- you hadn't performed well
15   enough at that point.  You know, because you got a 4
16   for one year doesn't mean you're going to make
17   partner at Jones Day.  I think --
18        Q.   Okay.
19        A.   -- it's unrealistic to think otherwise.
20        Q.   Okay.  And.
21             What is a rate factor?  Not asking what --
22        A.   It's a budget thing.  A CFO uses it.  I
23   really don't really get involved in it.
24        Q.   What -- again, I don't -- I'm not asking
25   like what the number was, but what is the concept



Page 233

1    referring to?

2         A.   I'm not sure I understand your question.

3         Q.   Well, what do you use a rate factor for?

4         A.   I don't use it at all.  I told you, it's a

5    tool that the CFO has introduced into the process

6    over the years.  And I -- I don't pay really any

7    attention to it.

8         Q.   Okay.

9              I think you alluded earlier to

10   confidentiality in pay.  What is Jones Day's policy

11   about pay confidentiality?

12             MS. CHASE:  And -- and I will just note

13        here that I'm going to instruct the witness to

14        answer as it relates to employees, not partners,

15        who are not employees.  They are -- they're

16        not --

17             THE WITNESS:  I think I -- I've already

18        testified to this, that we -- we -- we think

19        that in general, the profession is obsessing

20        about money.  And this is having an adverse

21        impact, particularly upon associates like

22        yourself.

23             And what we tell them is that -- we tell

24        everybody that we seek to treat our financial

25        matters as confidential.  And we -- we can't --



Page 234

```
1          you know, people are going to talk.  They always
2          talk.  People -- you can't stop people from --
3          partners don't do it much, but the associates
4          have -- years ago we had a couple of associates
5          actually hack into our system to look at other
6          associates' salaries, and -- we didn't punish
7          them.  I didn't punish them.  I was managing
8          partner at the time.  In fact, both of them made
9          partner.  One of them has gone to a client
10         since, so . . .
11              It is -- in our view, it's a way -- it's a
12         standard of conduct that we hope everybody lives
13         up to, that we think that this obsession with
14         money, which has taken over the profession and
15         the bloggers and all these people who don't even
16         practice law, is a bad thing.  And we do not
17         want it to be part of this firm.  As simple as
18         that.
19    BY MS. SHEKETOFF:
20         Q.   Is it fair to say that associates are not
21    supposed to share their salaries with other people?
22         A.   It doesn't say that.  The letter just says
23    that we treat it as confidential.
24         Q.   I'm asking you --
25         A.   And we have not terminated somebody for
```



Page 235

1  sharing information.  It happens all the time.

2      Q.   I'm just asking, is it -- is it Jones

3  Day's policy that associates should not share their

4  salary --

5      A.   I just told you what the policy was.  The

6  policy is -- is as is stated in the letter they get

7  every year:  That the firm views information about

8  its finances as confidential.  And that's the --

9  that's the policy.

10          Now, not everybody is going to adhere to

11  that.  And we know that.  But that's the policy.  And

12  there's nothing -- there's nothing that has been done

13  by this firm, in terms of me or anybody else, that's

14  ever terminated anybody or -- or punished them

15  because they -- they chattered over coffee or drinks

16  about how much their compensation is.

17      Q.   So Jones Day does not pay associates in

18  lockstep for each year of seniority, right?

19      A.   Well, I'm not sure what "lockstep" is

20  anymore.  I mean, I know this is -- this is sort of a

21  trade press/blogger talk, but I -- you know, I -- I

22  don't know -- maybe some firms are paying lockstep;

23  maybe they're not.

24          I know a lot of partners at a lot of

25  firms, and -- you know, people, there are people



Page 236

1    being told all the time that they're not getting

2    raises and they got to leave the firm, so -- I don't

3    know what lockstep is anymore.

4         Q.   Does Jones Day pay all associates of the

5    same seniority the same salary?

6         A.   No.

7         Q.   Okay.  Does Jones Day pay associates

8    individualized salaries?

9              MS. CHASE:  You mean do they make

10        individualized decisions about salary?  Is that

11        what your question is, Julia?

12   BY MS. SHEKETOFF:

13        Q.   No, I'm asking if the salary -- if -- I'm

14   asking if there's variation, or that if -- withdrawn.

15   We don't have to answer that question.

16             Are associates -- are associates told by

17   Jones Day specifically how their salary for each year

18   was determined?

19        A.   I -- I think I've told you that -- that I

20   speak every year to tell people how they're going to

21   be evaluated.  And it's on that basis that their

22   contribution is evaluated and a number arrived at.  I

23   don't know what else we could say.

24        Q.   And so beyond that, do you provide --

25   beyond that speech, do you provide --



Page 237

```
 1        A.    I don't know what beyond -- I don't know
 2   "beyond that" is.  What is that you're suggesting
 3   that we should tell them?  I don't know what else you
 4   could tell them.
 5        Q.    Well, so, for example, you know, did you
 6   tell me before this deposition that you gave me a
 7   raise to $440,000 in 2017 because I got a practice
 8   rating of 2?
 9        A.    No, I did not tell you that.
10        Q.    And that -- and the practice ratings are
11   secret; is that right?  Secret -- kept secret -- I'm
12   sorry.
13             The practice ratings are kept secret from
14   associates; is that right?
15        A.    No, I don't agree with that.  I mean, I
16   think if anybody came and asked about their situation
17   with the firm, the firm would be very honest with
18   them, and very direct.  I certainly would.  I would
19   have had no problem explaining to you, if you had
20   come to me, or if you went to anybody and -- and
21   asked them to talk to me about it, I would have told
22   them what I've said in this deposition today about
23   how you got the raises you got, and why.
24        Q.    Okay.
25        A.    And -- and there's no secret to this.  In
```



Page 238

1    fact, you know, if -- if somebody is unhappy at the

2    firm with their comp, then they should say something

3    to somebody.  You know?  And then we could clear the

4    air.  There's no -- there's no secret here.  If -- if

5    somebody doesn't like that they're not getting enough

6    money, or they think they can go -- all of these

7    lawyers are very smart.  There's so much information

8    out there through the headhunters.  They know what --

9    whatever their raise is, whether they could make more

10   money.

11            So the idea this is all star-chamber

12   secret stuff, is -- is really, it's -- it's -- it's

13   again, a level of immaturity reflected in the -- the

14   blogosphere, you know?  I mean, let's -- let's --

15   let's say all of this is all secret.  It's not

16   secret.

17        Q.   Does Jones Day tell associates what other

18   associates are paid?

19        A.   Why would we do that?  Why would -- talk

20   about invasion of privacy.  Why would we -- why would

21   we tell people at the firm -- to embarrass them?

22        Q.   So that's a "no," you do not; is that

23   right?

24        A.   No.  We're not going to tell somebody else

25   about -- this person didn't get a good raise or that



Page 239

```
 1   person did.  I mean, I can't imagine who would want

 2   that to happen.

 3         Q.   Is it possible --

 4         A.   That's a --

 5         Q.   I'm sorry?

 6         A.   That's a pretty ugly world you're --

 7   you're trying to pave.  Thank God that we don't do

 8   that.

 9         Q.   Is it possible for a Jones Day partner to

10   give an associate a negative evaluation for a

11   discriminatory reason?

12         A.   Is it possible --

13              MS. CHASE:  Object to the form of the

14         question.  It's hypothetical.

15              But you may answer.

16              THE WITNESS:  I don't even understand it.

17         Is it -- is it -- is it -- is it possible for

18         somebody to give a negative evaluation?  Is that

19         the question?

20   BY MS. SHEKETOFF:

21         Q.   Is it possible for a -- for a partner to

22   give an associate a negative evaluation for a

23   discriminatory reason?

24         A.   I haven't seen it happen.

25         Q.   I'm asking if it's possible.
```



Page 240

1        A.   Well, anything's possible.  I mean, that's
2   the whole point of "possible."  Anything in the world
3   is possible.  That's why there is a word "possible."
4        Q.   Is it possible for a Jones Day partner to
5   give an associate a false evaluation for
6   discriminatory --
7        A.   I have not seen it.
8        Q.   I'm asking, is it possible?
9             MS. CHASE:  Objection.  Same objection.
10        These are hypothetical.  They're meaningless.
11        But go right ahead, waste your time with them.
12   BY MS. SHEKETOFF:
13        Q.   Is it possible?
14             MS. CHASE:  Is what possible?
15   BY MS. SHEKETOFF:
16        Q.   Is it possible for a Jones Day partner to
17   give an associate a negative evaluation -- I'm sorry,
18   a false evaluation -- for a discriminatory reason?
19             MS. CHASE:  Same objection.
20             You may answer.
21             THE WITNESS:  No, I -- I -- I think we're
22        really wasting time here.  And I told you,
23        and -- you know, I don't know -- I don't want to
24        be -- be argumentative, like you're being,
25        but -- it is impossible, let's put it that way,



Page 241

1       for anybody to say that something is not
2       possible.  That's the whole point of "possible."
3            So if you're going to ask me, is this
4       possible, is that possible, you know -- you
5       know.  Anything's possible.  I guess that's --
6       that's my answer.
7  BY MS. SHEKETOFF:
8       Q.   And does that include -- that anything's
9  possible, does that include that it's possible for a
10 negative evaluation by a partner to affect an
11 associate's raise?
12      A.   I have not seen it.
13      Q.   I'm asking if it's possible.
14      A.   I don't think so, because I think I would
15 see through it.
16      Q.   I'm not asking -- I'm asking if a negative
17 review --
18           MS. CHASE:  If you didn't like the answer,
19      Julia --
20           THE WITNESS:  I -- I just told you, I
21      don't --
22           MS. CHASE:  -- it doesn't mean you get to
23      ask the question again.
24           THE WITNESS:  That one I'll say --
25           MS. CHASE:  Move on.



Page 242

1            THE WITNESS:  -- is not possible, because

2        I would see through it.

3  BY MS. SHEKETOFF:

4        Q.   I'm not asking about a discriminatory one

5  right now.  I'm just asking a negative evaluation.

6  Is it possible that that would affect an associate's

7  raise?

8        A.   If it was unjustified, I'd see through it.

9             One of the things --

10        Q.   I'm just asking --

11        A.   One of the things that -- one of the

12  things that -- that is -- I think anybody who's been

13  involved in evaluations knows that sometimes you

14  learn as much about the person who is doing the

15  evaluation as the person who does -- that's being

16  evaluated.

17             And I -- I can't conceive of a situation

18  where I wouldn't be able to figure out that somebody

19  was given an unfair negative review to somebody that

20  would adversely impact them.  So I don't -- I think

21  our system is bulletproof enough that that would not

22  happen.

23        Q.   Okay.  And how is the system bulletproof?

24        A.   Well, I -- I've told you how much time and

25  money we spend on this thing, and what the reviews



Page 243

1    are.  I mean, it's -- it's an exhaustive process

2    of -- of going through every associate.  We have

3    meetings.  We fly people from -- in all around the

4    country.  There's forced rankings, great partners

5    talking about everybody.

6              There's just no way.  It just wouldn't

7    happen.  Jones Day's evaluation process, for

8    associates and for partners, is as thorough as it

9    could possibly be.  And in my view, as fair as it

10   could possibly be.  And therefore, I don't believe

11   that it is possible for what you're proposing to have

12   happen.

13        Q.   You're saying it is not possible for a

14   negative review to affect an associate's salary?

15        A.   Unfair negative review.  Somebody doesn't

16   come to work and doesn't do any work, well, I guess

17   they're going to get a negative review.  But I assume

18   that's not what you're asking.

19        Q.   Are you aware of anyone who's ever

20   complained about how discrimination -- that

21   discrimination affected his or her salary?

22        A.   I haven't -- they haven't talked to me

23   about it, except you -- except you.  I can't

24   remember -- I guess the associate, in the associate

25   cases that -- there's that allegation.  But in those



Page 244

1  cases, it's all kind of -- you know, it -- let's just

2  say all their complaints didn't get borne out.

3  Couldn't find any -- any support in the -- in the

4  evidence.

5       Q.   Okay.  In preparing for today's

6  deposition, did you review any documents?

7       A.   I read a few things that I read

8  previously.  I -- I looked at your draft complaint

9  that you sent over with that lawyer, whose name I

10  can't remember, who said that we were supposed to be

11  your protecter and advocate, words to that effect.

12  I -- I looked at the -- the complaint that The Times

13  people sent over.  I -- I looked at the e-mail that

14  we've talked about ad nauseam.  I looked at the press

15  release.

16            I can't think of much else.  There isn't

17  that much to -- for me to look at.

18       Q.   Did you look at anything that hasn't been

19  produced in this litigation?

20       A.   No, not to my knowledge.

21       Q.   Did you look at any notes?

22       A.   Any notes?

23       Q.   Yes.  Did you take any notes?

24       A.   Did I take notes?  No.  I don't --

25       Q.   Prior to this deposition?



Page 245

```
1          A.   I don't -- I don't take notes.

2          Q.   And did you review any notes written by

3     other people?

4          A.   No.

5          Q.   Did anything that you reviewed refresh

6     your recollection as to what we discussed today?

7          A.   No, I -- I didn't spend a lot of time on

8     this thing.  I mean, I think it's all very

9     straightforward.  I know what I did; I know why I did

10    it; I know when I did it.

11              It's just not -- I mean, we've turned this

12    into a -- a long examination, but it doesn't deserve

13    it.  So it didn't -- it didn't, in my view, require a

14    lot of preparation.

15              I mean, my lawyers -- my good lawyers

16    would like, you know, to prepare me forever and a

17    day, but I'm not -- I'm probably -- wasn't as

18    cooperative as they would like.

19              So the answer is, this is, in my view,

20    really very straightforward, this whole thing.  So

21    there's not much to review.

22              MS. SHEKETOFF:  I think we're going to go

23         off the record now.

24              VIDEOGRAPHER:  For a break, Counsel, or --

25              MS. CHASE:  Just go off the record, and
```



Page 246

1      then we'll figure it out.  Okay?

2           VIDEOGRAPHER:  Sure.

3           We are going off the record at 4:11 p.m.

4           (A recess transpired from 4:11 p.m. until

5           4:21 p.m.)

6           VIDEOGRAPHER:  We are back on the record

7      at 4:21 p.m.

8           MS. SHEKETOFF:  Okay.  I'm -- I think that

9      is all for today right now.

10          Can we have a final time check on the

11     record, actually?

12          VIDEOGRAPHER:  Just a moment.

13          MS. SHEKETOFF:  We can do it -- we can do

14     it off record then.  Okay?

15          THE VIDEOGRAPHER:  Okay.  Would it -- are

16     you done questioning?  If so, I would just need

17     to grab the orders on the record real quick.

18     So -- go ahead?

19          MS. CHASE:  You do that on the record, you

20     said?

21          VIDEOGRAPHER:  If you prefer not to -- I

22     usually do, but if not, it's all up to you guys.

23          MS. CHASE:  Yeah, let's go off the record

24     and just take care of administrative business

25     while we're not taking up the time of the



Page 247

1          managing partner.

2                 VIDEOGRAPHER:  Sure.

3                 This concludes today's deposition.  We are

4          going off the record at 4:22 p.m.

5                 MS. CHASE:  Thank you.

6                 VIDEOGRAPHER:  Thank you.

7                 MS. CHASE:  And Brianna, your question,

8          just what we're ordering?

9                 VIDEOGRAPHER:  Absolutely.  Transcript and

10         video orders.

11                MS. CHASE:  Correct, yes.  Both.

12                VIDEOGRAPHER:  Okay.  And would you happen

13         to like the video synced to the transcript?

14                MS. CHASE:  Yes, please.

15                THE COURT REPORTER:  Would anyone like a

16         rough draft?

17                MS. CHASE:  We would like a rough draft.

18                MS. SHEKETOFF:  Let me get back to you

19         with that.

20                VIDEOGRAPHER:  Ms. Julia, did you have --

21         did you want to make any orders now, or get back

22         to us later?

23                MS. SHEKETOFF:  I'll get back to you about

24         that as well.

25                MS. CHASE:  But we would like a time check



Page 248

1          before we leave today.

2                  (Discussion off the record.)

3                  VIDEOGRAPHER:  All right.  I am getting

4          that time for you right now.  Computer is

5          running a little slow.

6                  Okay.  Looks like 4 hours 37 minutes on

7          the record.

8                  MS. CHASE:  Thank you.

9                  (Time Noted:  4:24 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          CERTIFICATE

2

3          I, KAREN K. KIDWELL, Registered Merit Reporter,

4    and Certified Realtime Reporter, do hereby certify

5    that prior to the commencement of the examination,

6    the deponent was remotely sworn.

7          I DO FURTHER CERTIFY that the foregoing is a

8    verbatim transcript of the testimony as taken

9    stenographically by me at the time, place and on the

10   date hereinbefore set forth, to the best of my

11   ability.

12         I DO FURTHER CERTIFY that I am neither a

13   relative nor employee nor attorney nor counsel of any

14   of the parties to this action, and that I am neither

15   a relative nor employee of such attorney or counsel,

16   and that I am not financially interested in this

17   action.

18

19                        _Karen K. Kidwell_

20                        Karen K. Kidwell
                          Registered Merit Reporter
21                        Certified Realtime Reporter
                          Notary Public

22

23

24

25



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | ) ) ) Civ. No. 1:19-02443 (RDM) |
| *Plaintiffs*, | ) ) |
| *v.* | ) ) |
| JONES DAY *et al.*, | ) ) |
| *Defendants.* | ) ) |

**ERRATA SHEET FOR JUNE 6, 2022**
**DEPOSITION OF STEPHEN J. BROGAN**

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 16 | 15-16 | her raises that based on her ranking and her -- her scores she did not | her raises that, based on her ratings and her scores, she did not | Clarification / Transcription error |
| 25 | 14 | fame | firm | Transcription error |
| 26 | 18 | I mean, a lot | I mean, there are a lot | Clarification |
| 27 | 13 | are accurate | is accurate | Clarification / Transcription error |
| 29 | 5 | ranked | rated | Clarification |
| 29 | 8 | office by a 3 | office a 3 | Clarification / Transcription error |
| 31 | 25 | people other rather | people rather | Clarification / Transcription error |
| 38 | 23 | relevance it is | relevance is | Clarification / Transcription error |
| 44 | 2 | Alice McKay | Ellis McKay | Transcription error |
| 44 | 7 | So that's that | So that | Clarification / Transcription error |
| 55 | 6 | sitting | signature | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 62 | 19 | genius | generous | Transcription error |
| 75 | 23 | even though when | even when | Clarification / Transcription error |
| 78 | 7 | undermined | underlined | Transcription error |
| 88 | 5 | has to prove | had to prove | Clarification / Transcription error |
| 89 | 5 | parters | partners | Transcription error |
| 89 | 13 | Beth, my | Beth, to my | Clarification / Transcription error |
| 100 | 2 | about times before | about before | Clarification / Transcription error |
| 103 | 25 | the Court | in court | Transcription error |
| 104 | 1 | it happens | happens | Clarification / Transcription error |
| 104 | 24 | that, that the | that.  The | Punctuation |
| 105 | 3 | I've -- at the | I've been at the | Transcription error |
| 105 | 14 | I don't | I didn't | Transcription error |
| 109 | 18 | and I also | and whom I also | Clarification / Transcription error |
| 123 | 11 | what you're -- you're | what you're --.  You're | Punctuation |
| 126 | 13 | what my view | what in my view | Clarification / Transcription error |
| 128 | 12 | ██████████ | ██████████ | Clarification / Transcription error |
| 136 | 22 | ██████████ | | Punctuation |
| 137 | 13 | ██████████ | ██████████ | Clarification / Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 143 | 6 | ███ | ███ | Clarification / Transcription error |
| 144 | 14 | ███ | ███ | Clarification / Transcription error |
| 144 | 16 | ███ | ███ | Clarification / Transcription error |
| 145 | 1 | ███ | ███ | Clarification / Transcription error |
| 170 | 19 | that -- no, you know | that you know | Clarification / Transcription error |
| 171 | 14 | ranked | rated | Clarification / Transcription error |
| 171 | 16 | rankings | ratings | Clarification / Transcription error |
| 172 | 2 | ranked | rated | Clarification / Transcription error |
| 178 | 14 | it is as | it are as | Clarification / Transcription error |
| 191 | 7-8 | and not coming of what I expect | and not becoming of what I expect | Clarification / Transcription error |
| 205 | 4-5 | you're -- you're a lawyer or an associate | you're an associate | Clarification / Transcription error |
| 206 | 9 | people to love | people who love | Clarification / Transcription error |
| 210 | 8 | As is the -- as is the rankings | As are the ratings | Clarification / Transcription error |
| 210 | 10 | rankings | ratings | Clarification / Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 215 | 6 | practice in the office says | practice and the office say | Clarification / Transcription error |
| 215 | 7 | ranking | rating | Clarification / Transcription error |
| 217 | 13 | that like maybe | that maybe | Clarification / Transcription error |
| 218 | 22 | ranking -- practice ranking had | rating had | Clarification / Transcription error |
| 224 | 12-13 | number for each lawyer that -- so many lawyers will budget -- will bill 750 hours. | number that each lawyer will bill. | Clarification / Transcription error |
| 226 | 15 | ranking | rating | Clarification / Transcription error |
| 226 | 20 | ranking | rating | Clarification / Transcription error |
| 226 | 22 | Ranking | Rating | Clarification / Transcription error |
| 226 | 24 | ranking | rating | Clarification / Transcription error |
| 227 | 13 | ranking | rating | Clarification / Transcription error |
| 227 | 14 | ranking | rating | Clarification / Transcription error |
| 229 | 21-22 | intermediary that's involved | intermediaries that are involved | Clarification / Transcription error |
| 231 | 11 | ranking | rating | Clarification / Transcription error |
| 232 | 23 | really don't really get | really don't get | Clarification / Transcription error |

4

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 235 | 6 | policy is -- is as is stated | policy is as is stated | Clarification / Transcription error |
| 236 | 2 | they got | they've got | Transcription error |
| 237 | 1-2 | I don't know what beyond -- I don't know "beyond that" is.  What is that you're suggesting | I don't know what "beyond that" is.  What is it that you're suggesting | Transcription error |

### ACKNOWLEDGMENT OF DEPONENT

I, Stephen J. Brogan, do hereby certify that I have read the attached transcript, and that the same is a correct transcription of the testimony given by me to the questions therein propounded, except for the corrections or changes in form or substance noted in this Errata Sheet.

Date: 7/20/22                                    /s/ *Stephen J. Brogan*
                                                 Stephen J. Brogan