# Chase Declaration
# Exhibit 81

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and JULIA          )
SHEKETOFF,                          )
                                    ) Case No.
        Plaintiffs,                 ) 1:19-cv-02443
                                    ) -RDM-ZMF
v.                                  )
                                    )
JONES DAY, STEPHEN J. BROGAN,       )
BETH HEIFETZ, MICHAEL SHUMAKER,     )
and TRACI LOVITT,                   )
                                    )
        Defendants.                 )
_____ )

CONFIDENTIAL

Videotaped Deposition of MICHAEL SHUMAKER

(Given Remotely)

Friday, June 17, 2022

8:59 a.m. Eastern

Reported by:  Karen Kidwell, RMR, CRR

Job No.: 832682

Pages 1 - 350

Magna Legal Services
866-624-6221
www.MagnaLS.com



```
 1   APPEARANCES:

 2   On Behalf of Plaintiffs:

 3        MARK C. SAVIGNAC, ESQ. (Pro Se)
          JULIA SHEKETOFF, ESQ. (Pro Se)
 4        2207 Combes Street
          Urbana, IL  61801
 5        217.714.3803
          202.567.7195
 6        marksavignac@gmail.com
          sheketoff@gmail.com
 7

 8

 9   On Behalf of Defendants:

10        TERRI CHASE, ESQ.
          Jones Day
11        Brickell World Plaza
          600 Brickell Avenue
12        Suite 3300
          Miami, FL  33131
13        305.714.9722
          tlchase@jonesday.com
14

15

16   Also Remotely Present:

17        Austin King, Videographer

18

19

20

21

22

23

24

25
```



Page 3

```
 1                    I N D E X

 2   WITNESS/EXAMINATION                        Page

 3   MICHAEL SHUMAKER

 4     By Mr. Savignac                            11

 5     By Ms. Sheketoff                          149

 6

 7

 8

 9                  E X H I B I T S

10     Number         Description              Page

11   Exhibit 4   E-mail chain, top e-mail ..........72
                 1/23/2019, Stephen Brogan to
12               Michael Shumaker, Subject: RE:
                 Privileged, Confidential,
13               Bates JD_00003169-3172

14   Exhibit 7   E-mail chain, top e-mail ........136
                 1/22/2019, Beth Heifetz to
15               Shay Dvoretzky, Subject: FW:
                 Privileged, Bates JD_PRIV_0022
16
     Exhibit 8   E-mail chain, top email ..........153
17               8/24/2018, Mark Savignac to
                 Sarah McClure, Subject: RE:
18               Parental Leave, Bates
                 JD_00003186-3187
19
     Exhibit 9   E-mail chain, top e-mail ........139
20               1/30/2019, Michael Shumaker to
                 Michael Gurdak, Subject: FW:
21               Privileged, Bates JD_PRIV_0043

22   Exhibit 12  E-mail chain, top e-mail ........146
                 1/21/2019, Suzanne Coussons to
23               Michael Shumaker and others,
                 Subject: RE: Julia Sheketoff,
24               Bates JD_PRIV_0019

25
```



Page 4

```
 1              E X H I B I T S (Cont'd)
 2      Number       Description                Page
 3    Exhibit 14  Defendants' Answer and ...........44
                  Defenses to Plaintiffs'
 4                Complaint
 5    Exhibit 22  E-mail chain, top e-mail ........118
                  1/22/2019, Michael Shumaker to
 6                Mary Ellen Powers, Subject:
                  RE: Privileged and
 7                Confidential, Bates
                  JD_PRIV_0163
 8
      Exhibit 23  E-mail chain, top e-mail ........166
 9                8/24/2018, Sarah McClure to
                  Mark Savignac and others,
10                Subject: RE: Parental Leave,
                  Bates JD_00003231-3233
11
      Exhibit 25  E-mail chain, top e-mail ........125
12                1/21/2019, Michael Shumaker to
                  Adrian Wager-Zito and others,
13                Subject: RE: Savignac, Bates
                  JD_PRIV_0013
14
      Exhibit 26  12/12/2014 E-mail, Michael .......200
15                Shumaker to Stephen Brogan and
                  others, Subject: Memo re
16                Maternity Policy, with
                  attachment, Confidential,
17                Bates JD_00003215-3228
18    Exhibit 30  E-mail chain, top e-mail ........133
                  1/21/2019, Sarah McClure to
19                Michael Shumaker, Subject: RE:
                  Savignac, Bates JD_PRIV_0014
20
      Exhibit 31  E-mail chain, top e-mail ........134
21                1/22/2019, Kevyn Orr to Adrian
                  Wager-Zito, Subject: RE:
22                PRIVILEGED AND
                  CONFIDENTIAL-Draft Termination
23                Letter Attached, Bates
                  JD_PRIV_0024
24
25
```



```
 1                  E X H I B I T S (Cont'd)
 2        Number           Description              Page
 3     Exhibit 33    ██████████████████ ........283
 4
       Exhibit 37    Excerpt from Excel spreadsheet ...328
 5                   Julia Sheketoff, 2014,
                     Confidential, Bates
 6                   JD_00004765
 7     Exhibit 38    Excerpt from Excel spreadsheet ...330
                     Julia Sheketoff, 2015,
 8                   Confidential, Bates
                     JD_00004766
 9
       Exhibit 39    Excerpt from Excel spreadsheet ...332
10                   Julia Sheketoff, 2016,
                     Confidential, Bates
11                   JD_00004767
12     Exhibit 40    Excerpt from Excel spreadsheet ...336
                     Julia Sheketoff, 2017,
13                   Confidential, Bates
                     JD_00004768
14
       Exhibit 50    Jones Day Firm Manual, Revised ....35
15                   1-17-2019, Confidential, Bates
                     JD_00002026-2134
16
       Exhibit 52    7/30/2014 E-mail, ███Staff C███ .......182
17                   ██Staff C██  to Michael Shumaker
                     and others, Subject: Maternity
18                   Leave Policies (US), with
                     attachment, Confidential,
19                   Bates JD_00005125-5128
20     Exhibit 53    E-mail chain, top e-mail .........190
                     7/31/2014, Michael Shumaker to
21                   Mary Ellen Powers, Subject:
                     Fw: Maternity Leave Policies
22                   (US), with attachment,
                     Confidential, Bates
23                   JD_00005120-5124
24
25
```



```
 1              E X H I B I T S (Cont'd)
 2      Number        Description              Page
 3   Exhibit 54   E-mail chain, top e-mail ........193
               8/5/2014, mrshumaker to
 4             bheifetz and others, Subject:
               Re: family leave policy, with
 5             attachment, Confidential,
               Bates JD_00005174-5179
 6
       Exhibit 55   E-mail chain, top e-mail ........192
 7             8/6/2014, [Staff C]          to
               Jennifer Shumaker and others,
 8             Subject: Re: Maternity Leave
               Policies (US), with
 9             attachment, Confidential,
               Bates JD_00005102-5107
10
       Exhibit 56   E-mail chain, top e-mail ........195
11             9/15/2014, [Staff C]
               to Michael Shumaker and
12             others, Subject:
               Maternity/Adoption Leave
13             Policy Recommendation Memo,
               Confidential, Bates
14             JD_00005130-5136
15   Exhibit 57   E-mail chain, top e-mail ........194
               9/18/2014, Sharyl Reisman to
16             [Staff C]          and others,
               Subject: Re:
17             Maternity/Adoption Leave
               Policy Recommendation Memo,
18             Confidential, Bates
               JD_00005108-5116
19
       Exhibit 58   E-mail chain, top e-mail ........194
20             9/25/2014, Michael Shumaker to
               [Staff C]          and others,
21             Subject: RE:
               Maternity/Adoption Leave
22             Policy Recommendation Memo,
               Confidential, Bates
23             JD_00005117-5119
24
25
```



Page 7

```
 1                E X H I B I T S (Cont'd)
 2      Number          Description           Page
 3    Exhibit 59  10/24/2014 E-mail, Michael .......199
                  Shumaker to Sharyl Reisman and
 4                others, Subject: Revised
                  Maternity Memo, with
 5                attachment, Confidential,
                  Bates JD_00005140-5146
 6
      Exhibit 61  1/22/2015 E-mail, System ........201
 7                Generated, Subject: Change in
                  Firm Maternity, Paternity and
 8                Adoption Leave Policy for
                  Lawyers, Confidential, Bates
 9                JD_00005171
10    Exhibit 64  E-mail chain, top e-mail ........207
                  5/17/2015, Sarah McClure to
11                Lori Bounds, Subject:
                  *Confidential:
12                Fw:Fw:Privileged and
                  Confidential, Confidential,
13                Bates JD_00003790-3793
14    Exhibit 66  E-mail chain, top e-mail ........212
                  8/12/2019, Sarah McClure to
15                Sarah McClure, Subject: FW:
                  Lawyer Family Leave Policy,
16                Confidential, Bates
                  JD_00003822-3825
17
      Exhibit 70  E-mail chain, top e-mail ........226
18                1/28/2019, Michael Shumaker to
                  Shay Dvoretzky, Subject: RE:,
19                Bates JD_PRIV_0165
20    Exhibit 71  E-mail chain, top e-mail ........228
                  1/28/2019, Sarah McClure to
21                Michael Shumaker, Subject:
                  RE:, Bates JD_00002463
22
      Exhibit 72  E-mail chain, top e-mail ........231
23                1/28/2019, Sarah McClure to
                  Michael Shumaker, Subject:
24                redacted, Bates JD_PRIV_0164
25
```



```
                                                        Page 8
 1                     E X H I B I T S (Cont'd)
 2       Number         Description                    Page
 3     Exhibit 74   E-mail chain, top e-mail ........235
                    1/29/2019, Sarah McClure to
 4                  Shay Dvoretzky, Subject: RE:
                    Draft response -- please
 5                  comment, Bates JD_PRIV_0042
 6     Exhibit 76   E-mail chain, top e-mail ........236
                    1/29/2019, Shay Dvortzky to
 7                  Michael Shumaker, Subject:
                    FW:, Bates JD_00002465
 8
       Exhibit 79   4/15/2017 Memo from Susanne ......340
 9                  Coussons to PIC, and others,
                    Subject: Confidential: Memo
10                  from Mike Shumaker re: Final
                    Assessments and Associate
11                  Compensation, with attachment,
                    Confidential, Bates
12                  JD_00003021-3028
13     Exhibit 83   2016 DC Lit Eval Meeting ........341
                    (covering 2015 evaluations)
14                  presentation, Confidential,
                    Bates JD_00003732-3749
15
       Exhibit 84   2/16/2017 Memo from Mike ........340
16                  Shumaker re: Non-Partner
                    Evaluations-Washington to
17                  Kevyn Orr and others,
                    Confidential, Bates
18                  JD_00003071-3075
19     Exhibit 85   2/6/2017 Memo, Suzanne ..........346
                    Coussons to PIC (US), Subject:
20                  Messager from Mike Shumaker
                    re: Associate Compensation,
21                  Confidential, Bates
                    JD_00003042-3043
22
       Exhibit 87   1/22/2018 E-mail, Suzanne .......347
23                  Coussons to Suzanne Coussons,
                    Subject: From Mike Shumaker
24                  Non-Partner Evaluations - Your
                    Input Requested, with
25                  attachment, Confidential,
```



1                    INSTRUCTIONS

2            Instruction not to answer        88

3            Instruction not to answer        205

4            Instruction not to answer        292

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 10

```
 1                    FRIDAY, JUNE 17, 2022
 2                    P R O C E E D I N G S
 3                              - - -
 4          VIDEOGRAPHER:  Good morning.  We're now on
 5     the record.  This begins Videotape Number 1 in
 6     the deposition of Michael Shumaker, in the
 7     matter of Mark Savignac and Julia Sheketoff
 8     versus Jones Day, et al., filed in the United
 9     States District Court for the District of
10     Columbia, case number of which is
11     1:19-CV-02443-RDM-ZMF.
12          Today is June 17th, 2022, and the time is
13     now 8:59 a.m.  This deposition is being taken
14     via Zoom.  The videographer is Austin King, the
15     court reporter is Karen Kidwell, both of Magna
16     Legal Services.
17          Will counsel please state your name and
18     whom you represent, after which the court
19     reporter will swear in the witness.
20          MR. SAVIGNAC:  Good morning.  My name is
21     Mark Savignac.  I'm a Plaintiff in the case; and
22     also here with me is Julia Sheketoff, the other
23     Plaintiff.
24          MS. CHASE:  And good morning.  This is
25     Terri Chase of Jones Day.  I represent the
```



1          Defendants in this action, and with me is the

2          witness, Michael Shumaker.

3              THE COURT REPORTER:  All parties to this

4          deposition are appearing remotely and have

5          agreed to the witness being sworn in remotely.

6                      MICHAEL SHUMAKER

7      being first duly sworn, testified as follows:

8                        EXAMINATION

9      BY MR. SAVIGNAC:

10         Q.   Good morning, Mr. Shumaker.

11              Have you ever been deposed before?

12         A.   I have been deposed before.

13         Q.   How many times?

14         A.   I believe just the one.  Just once.

15         Q.   Just one.

16         A.   I can't think of -- I think it's just

17     once.

18              VIDEOGRAPHER:  And I apologize to

19         interrupt.  Mr. Shumaker, that's too far down

20         for me.  I need you to -- to back up.  Your

21         entire face is off the screen.

22              MS. CHASE:  Yeah, you know, let us adjust

23         the camera so that he can -- we'll get that

24         worked out.

25              (Brief discussion off the record.)



Page 12

1    BY MR. SAVIGNAC:

2         Q.   Okay.  And have you taken depositions

3    before?

4         A.   Yes, I have.

5         Q.   If I ask a question that you have trouble

6    understanding, will you please ask for clarification?

7         A.   Of course.

8         Q.   If you answer a question and later

9    remember more information or clarification, will you

10   let me know?

11        A.   I will.

12        Q.   If you think of any documents that might

13   help you answer more fully and accurately, will you

14   let me know?

15        A.   I will.

16        Q.   Is there any reason why you would have

17   difficulty giving full and accurate testimony today?

18        A.   No.

19        Q.   And where are you physically located?

20        A.   We're in our Jones Day Washington, D.C.,

21   office.

22        Q.   Who else is there in the room with you?

23        A.   Just Terri Chase and David, our TSS

24   employee, to make sure we don't break any of the

25   technology.



```
 1          Q.    Okay.  Do you have any papers with you?
 2          A.    Only paper I have is the 30(b)(6) notice
 3    that Terri has given to me.
 4          Q.    Okay.
 5          A.    That's all I have here.
 6          Q.    Okay.  And in additional -- in addition to
 7    being deposed in your personal capacity, you're here
 8    as Jones Day's 30(b)(6) designee on some topics,
 9    correct?
10          A.    That is my understanding.
11          Q.    Okay.  So unless specified otherwise,
12    please answer each question in your capacity as
13    the 30(b)(6) designee.
14               MS. CHASE:  And I will note, Mark, that to
15          the extent that I believe a question is outside
16          the scope of Mr. Shumaker's 30(b)(6) designee
17          status, either in terms of the topical scope or
18          the temporal scope, I will so note on the
19          record.
20               MR. SAVIGNAC:  Okay.  Thank you.
21               I'm sorry.  We're getting a request to
22          move the camera back again, or to otherwise
23          adjust the camera.
24               MS. SHEKETOFF:  -- further from Mike's
25          face so that we can see -- when he leans
```



Page 14

```
 1      forward, the videographer is saying that the
 2      video is not capturing his face.
 3             MS. CHASE:  Austin, if there's a tech
 4      issue, let us know.  We're not seeing it on our
 5      side.  He's in the box on Zoom.
 6             VIDEOGRAPHER:  It's not an issue.  It's --
 7      it's just the -- the bottom of his face, when he
 8      leans forward, it cuts him off, and I'm not
 9      capturing that.  And I want you guys to have
10      a -- a good video; that's why I'm here.
11             MS. CHASE:  Yeah, okay.  So -- so let us
12      know.  We'll get -- that's why we're here, to
13      get this set up properly now, so that --
14             VIDEOGRAPHER:  So --
15             MS. CHASE:  -- he can be using the table,
16      not just having to float in the air.
17             VIDEOGRAPHER:  So right there is good, but
18      if you lean too far forward, it will cut you
19      off.  So just please be -- I want you to be
20      comfortable, but just please be cognizant of
21      that.  Thank you.
22             THE WITNESS:  Feel free to let me know if
23      I'm getting out of the screen.  I don't mean to
24      be difficult.
25             VIDEOGRAPHER:  I understand.  It's -- it's
```



Page 15

```
 1        Zoom.  Thank you.  I just didn't want to keep
 2        interrupting.
 3               THE WITNESS:  Sure.
 4   BY MR. SAVIGNAC:
 5        Q.   All right.  Mr. Shumaker, what did you do
 6   to prepare for this deposition?
 7        A.   I met with counsel, two occasions.
 8        Q.   Did you speak with anyone other than
 9   counsel?
10        A.   No.
11        Q.   Did you have any other communications with
12   anyone in preparation for this deposition?
13        A.   No, not in preparation for deposition.
14   Certainly told people who wanted to meet with me
15   today that I was not available, as I was in a
16   deposition.
17        Q.   About how much time did you spend
18   preparing?
19        A.   I guess two to three hours, both days.
20        Q.   Okay.  So a total of four to six hours?
21        A.   That's fair.
22        Q.   And are you an attorney?
23        A.   I am.
24        Q.   Are you a partner at Jones Day?
25        A.   I am.
```



Page 16

1         Q.   And your role there is the firm
2    administrative partner?
3         A.   My role is a practicing partner in the
4    battle group first.  I do have a firm-wide
5    responsibility role, firm administrative partner,
6    correct.
7         Q.   And when did you become the firm-wide
8    administrative partner?
9              MS. CHASE:  And I will note with respect
10        to this line of questioning regarding
11        Mr. Michael's -- Shumaker's individual
12        background, he's answering in his individual
13        capacity, not as a 30(b)(6).  And once,
14        obviously, we switch into any topics that are
15        within the scope of the 30(b)(6) notice, at that
16        point it's as a 30(b)(6) designee, and I'll note
17        it at that time.  But this line of questioning
18        is all in his individual capacity.
19              MR. SAVIGNAC:  Sure.
20              THE WITNESS:  I believe it was 2010.
21        Precise date, I can't tell you.  But generally
22        speaking, I've been in this role for now 11th,
23        12th year, so . . .
24              MR. SAVIGNAC:  Okay.  And I think the --
25        these next questions will be in 30(b)(6)



Page 17

1          capacity.  But you can let me know, Terri, if

2          you disagree.

3     BY MR. SAVIGNAC:

4          Q.   So Jones Day fired me, correct?

5          A.   Yes.  We did terminate you, based upon

6     conduct.

7          Q.   And who at Jones Day made the decision to

8     terminate me?

9          A.   The managing partner made that decision.

10         Q.   And the managing partner is Stephen

11    Brogan, correct?

12         A.   Correct.

13         Q.   Was Brogan the sole decision-maker?

14         A.   He was the sole decision-maker, based upon

15    my recommendation.

16         Q.   And was Brogan -- was Brogan's decision

17    final?

18         A.   It was final, yes.

19         Q.   All right.  You referred to a

20    recommendation.  Did you give Brogan any

21    recommendation about me?

22         A.   I recommended that you be terminated, yes.

23         Q.   Did anyone else recommend that I should be

24    fired?

25         A.   No one else was a sender of the e-mail.



Page 18

1    Did others agree with the decision?  My recollection

2    is yes -- or should I say the recommendation.

3         Q.   Sure.

4              Who agreed with the decision at the time?

5              MS. CHASE:  And let me just object, to the

6         extent that this question calls for privileged

7         communications.  Mr. Shumaker cannot provide any

8         privileged information.  So to the extent that

9         he has -- as I believe he does -- privileged

10        knowledge, privileged discussions regarding the

11        topic of the termination decision, he will not

12        testify to that.

13             To the extent that there are any

14        nonprivileged discussions that he can testify

15        to, to supplement what he's already provided, he

16        will do so.

17             And so are there any --

18             THE WITNESS:  Yes.

19             MS. CHASE:  -- additional nonprivileged

20        conversations that you can supplement with?

21             THE WITNESS:  I think I can safely testify

22        that there were other counsel for the firm who

23        shared my opinion, that I won't identify, in

24        terms of those who I do not consider to have

25        been acting as counsel for the firm at that



Page 19

 1          time.  Kevyn Orr and Adrian Wager-Zito,
 2          leadership for the Washington office, concurred
 3          in my recommendation.
 4    BY MR. SAVIGNAC:
 5          Q.   And just to be clear, you're saying you
 6    did not understand Kevyn and Adrian to be acting in a
 7    counsel capacity; is that correct?
 8          A.   Yes.
 9               MS. CHASE:  His answer was that he didn't
10          understand them to be acting in a counsel
11          capacity with respect to concurrence with the
12          recommendation.  As you know from the prior
13          discussions on this matter, there are contacts
14          in which Kevyn Orr and Adrian Wager-Zito were
15          acting as part of a counsel capacity.
16               THE WITNESS:  Correct.
17    BY MR. SAVIGNAC:
18          Q.   And when was the first time you considered
19    whether I should be fired?
20          A.   First time I ever considered whether you
21    should be fired was when I received the intemperate
22    e-mail that you sent in January of -- is it '19?
23          Q.   Okay.  And so what caused you to first
24    consider whether I should be fired was your receipt
25    of the -- the e-mail you just referenced; is that



Page 20

 1   correct?

 2        A.   Correct.

 3        Q.   And what happened after that, after you

 4   received it?

 5        A.   Well, there was some background prior to

 6   receiving the e-mail.  I certainly engaged with

 7   counsel for the firm to refresh my recollection of

 8   our prior communications back in August of the prior

 9   year.

10             We had not heard from yourself or Julia

11   since that time.  You had made an inquiry.  We had

12   responded.  Having not heard anything for several

13   months, I assumed we were behind that.  So I need to

14   refresh my recollection of where that was.

15             And then I communicated with counsel for

16   the firm and sat on it for two or three days, because

17   I think there's merit to taking your time on a

18   decision like that, and making sure it was the right

19   decision.  Then I drafted the e-mail and sent it to

20   the managing partner.

21        Q.   And the individuals that you conferred

22   with between receiving the e-mail and sending your

23   e-mail to Brogan, who were those individuals?

24        A.   Sarah McClure and Mary Ellen Powers.  I

25   believe Ms. Chase.  Likely Traci Lovitt.  But that's


MAGNA
LEGAL SERVICES

Page 21

1    my recollection.  It's -- it's possible that one or

2    two of those weren't involved in that initial

3    discussion, but those was who I was seeking counsel

4    from at that time.

5         Q.   Okay.  And you also spoke with or

6    communicated with Adrian and Kevyn during that time;

7    is that correct?

8         A.   I did, in terms of actual execution of the

9    determination, once we received the decision from the

10   managing partner.

11        Q.   I think you said Kevyn and Adrian

12   concurred in your recommendation to the managing

13   partner.  Was that before you e-mailed that

14   recommendation to him?

15        A.   It's a -- it's a fair distinction, Mark.

16   I don't know if the concurrence from Kevyn and Adrian

17   came before I sent the e-mail to the managing partner

18   or after, when I engaged with them about execution of

19   the managing partner's decision.  So I -- I do not

20   know.

21        Q.   Do you know whether their concurrence was

22   in writing or spoken?

23        A.   I cannot recall.  It's possible there's a

24   writing.  It's very possible it was over the phone.

25   I just don't remember.



Page 22

1          Let's put it this way:  No one's -- no one

2    had a contrary view.

3          Q.   And you mentioned Sarah McClure, Mary

4    Ellen Powers, Terri Chase, and and Traci Lovitt.  And

5    were they acting in a purely counsel capacity, in

6    your view?

7          A.   Yes.  That was the lawyers, absolutely,

8    would have been in a purely legal counsel capacity.

9    They would have no ownership of the decision, except

10   as in -- in counsel.  Whereas Kevyn and Adrian had

11   responsibility for you as office leadership.

12         Q.   So you said you sat on it for two or three

13   days.  Is that -- is that correct?

14         A.   Yeah, I wouldn't say "sat on it."  I

15   wanted to make sure we were making the right

16   decision.  I wanted to make sure that it was

17   something that was well founded, properly based, so I

18   like to think on those things for at least 24 hours,

19   if not more.

20             I can't remember the timing, whether it

21   was a weekend or -- or whatnot; but I do know that

22   there were a day or two that passed before I actually

23   made a recommendation to the managing partner.

24         Q.   And what did you do in relation to the --

25   this issue during that time?



Page 23

1          A.    I'm not sure there's much more I can

2    recall beyond refreshing my recollection of prior

3    communications with yourself and Julia.  I can't

4    think it's more than that, other than interacting

5    with -- with counsel that I identified, regarding

6    their views of the situation, the law as -- as I

7    understood it.  I can't think of more than that.

8          Q.    All right.  And what were you thinking

9    about during the -- the time period we're discussing?

10         MS. CHASE:  Let me just caution here.

11         There is a portion of this question that data

12         would calls into account the aspect of

13         Mr. Shumaker's thoughts that involve

14         communications with counsel, seeking advice from

15         counsel, processing the advice of counsel.

16         Obviously he cannot testify to those

17         communications, his thoughts, regarding

18         privileged advice, and all of that of course

19         will be outside the scope of his testimony.

20              To the extent that there is a way in which

21         he can respond to that question about his

22         thought processes that do not implicate the

23         privileged communications, legal advice that he

24         was taking at the time, he can respond to that

25         question.



Page 24

```
 1              THE WITNESS:  Yeah, I mean, by the very
 2         nature of the question, what I was thinking, my
 3         mental impressions, and that would be
 4         privileged.
 5              I can tell you, like I said earlier, we
 6         don't make these decisions lightly.  And this
 7         was something new.  I had never seen another
 8         associate threaten the firm in such a blatant
 9         manner, based on such erroneous review of the
10         law.  So this was a little bit new and different
11         for me.
12              What I thought, issues I looked at, I
13         don't think we could go there without violating
14         the privilege.
15    BY MR. SAVIGNAC:
16         Q.   And when you say "erroneous view of the
17    law," what do you mean by that?
18              MS. CHASE:  I'm going to again object, to
19         the extent this calls for Mr. Shumaker to
20         testify with respect to his understanding of the
21         law that was based upon either his own role as
22         counsel for the firm with respect to personnel
23         matters in his capacity as administrative
24         partner, or counsel he received from others that
25         were acting as counsel for the firm at the time.
```


MAGNA
LEGAL SERVICES

Page 25

```
 1              So to the extent he can answer that
 2         question without infringing on the privilege, he
 3         may do so; but if he cannot answer that question
 4         without infringing on the privilege, he may not.
 5              THE WITNESS:  I think the best I -- I can
 6         provide an answer is I reviewed the authority
 7         that we communicated to you back in August, and
 8         I reviewed the information that you provided in
 9         your e-mail.  And I came away with the view that
10         there was no merit to the positions that you
11         were taking in the e-mail, and the situation we
12         were facing was exactly the type situation that
13         the EEOC had reviewed and considered to be
14         appropriate.  And we had two cases that were, in
15         my view, on point.
16    BY MR. SAVIGNAC:
17         Q.   And is that why you recommended that I be
18    fired?
19         A.   I recommended that you be fired based upon
20    what was reflected in the e-mail, and what it said
21    about you as a person, your understanding of the law
22    firm, your absence of professionalism, lack of
23    maturity, an absence of leadership on an issue, a
24    self-interested demand for something you weren't
25    entitled to.
```



Page 26

1            That's just a snippet of the many things I

2    saw in that e-mail that caused me to make a

3    recommendation.

4        Q.   Okay.  So when was it that you -- well,

5    strike that.

6            Is it correct that you conveyed your

7    recommendation to Brogan by e-mail?

8        A.   I did.

9        Q.   And when did you send that e-mail?

10       A.   It would have to be the date and time

11   reflected on the e-mail.  I don't -- can't tell you

12   more than that.  I know that I sent the e-mail -- I

13   knew he was traveling at that time.  I can't remember

14   how long it took him to get back to me.  I just

15   remember knowing that he was not in D.C. at the time,

16   my recollection.

17       Q.   And were you in D.C. at the time?

18       A.   I'd have to look at the dates.  I don't

19   have them memorized.  I -- I do know that this went

20   down -- receipt of your e-mail and my recommendation

21   to Steve was prior to or during a trip to Europe for

22   the budget meetings that I had set.  I believe at the

23   time I sent the recommendation to Steve, I was in

24   Europe, in Germany.

25       Q.   In Germany?  And were you in -- do you



Page 27

1    believe you were in Germany when you received

2    Brogan's e-mail response?

3           A.   I believe so.  Again, I'd have to look at

4    the calendar.  I just remember that there was

5    discussions regarding this happening when I was over

6    in Europe.  Whether I started the communication with

7    Steve before I left or I was actually in Germany, I

8    don't know.  I'd have to look at the dates.

9           Q.   But Brogan was not present at the budget

10   meeting in Germany; is that right?

11          A.   Correct.  My understanding is Steve was in

12   Asia at that time.

13          Q.   In Asia.  Do you know what -- do you know

14   what city in Asia?

15          A.   I don't know.  Steve's like the wind

16   sometimes.  It might have been Australia.  It might

17   have been Asia.  I know he was on the other side of

18   the globe, because I would wake up to messages from

19   him.

20          Q.   Okay.  So after you sent the

21   recommendation to Brogan, what happened next?

22          A.   Steve responded.  Curtained a

23   recommendation, and indicated that we needed to let

24   you go.  I can't remember the exact wording, but to

25   do it as soon as we could.



Page 28

1        Q.   And when you received that response, then
2   what happened?
3        A.   At that point in time I reached out to --
4   to Kevyn and Adrian and shared Steve's response, and
5   would have then started discussions about how to
6   execute on the decision.
7        Q.   Okay.  What happened next?
8        A.   I -- I don't know much more I can provide
9   on that.  There's a lot of things that go into when
10  anyone leaves the law firm.  We have to discuss about
11  turning off access to the network.  We had -- I was
12  of the view that we wanted to cut access as soon as
13  we could, because your e-mail had indicated an
14  absence of trustworthiness.  And we have an ethical
15  obligation to our clients to maintain confidentiality
16  over their information, so I viewed that as a threat.
17            We needed to make sure that we cut off
18  access at the right time.  There are HR issues that
19  go into place.  We have to make sure we pay vacation
20  time, certain jurisdictions, and make sure all the
21  I's are dotted and T's are crossed from an HR
22  perspective, so I would have reached out to Sarah to
23  help me on that front.
24            I -- I can't think of much more, beyond
25  setting into motion what needed to be done to execute



Page 29

1    on the decision.

2         Q.   And if you were concerned about network

3    access, can't you cut network access without having

4    fired someone first?

5         A.   Yes, we can, but -- but that comes with

6    implications for the client.  The lawyer -- I'll just

7    use any lawyer, because it's the same whether it's

8    your situation or someone else's -- they may be

9    actively working on a matter that needs to be dealt

10   with the client.  We always want to have clients'

11   interests paramount, so we want to make sure that he

12   or she were not working on a motion and there's a

13   deadline due or something like that.  We don't want

14   to take any action that would harm a client's

15   interest.

16              So we need to make sure that we knew what

17   you were working on, and to execute turning off the

18   network at the same time that the termination was

19   made.

20        Q.   And why did you decide to forward the

21   e-mail you mentioned to Brogan?

22        A.   When you say "forward," I sent him -- I

23   guess I forwarded your e-mail; that was part of the

24   chain.  My apologies.

25              I would have forwarded the e-mail because



Page 30

1    that e-mail reflected all the things that made me

2    believe termination was appropriate here.  That was

3    part of the picture.  I need to send it.  Provide him

4    a little bit of cover note.  Gave some background.

5    Generally speaking, he wants to know the facts, so I

6    gave him the facts.

7         Q.   And why did you decide to involve Brogan

8    in the matter at all?

9         A.   Again, we don't do these things lightly.

10   I knew that we were talking about -- back up.

11        My approach -- I think the firm's approach

12   to managing situations like this, is we're dealing

13   with people.  We're dealing with lives.  People

14   depend upon them.  I don't know your personal

15   situation.  I didn't know if you have parents.  I

16   know you have one kid.  I didn't know if there were

17   other kids from some other marriage.  I have no idea.

18        But I want to be sure that we're treating

19   people fairly.  So I want to make sure that we

20   understand the facts before we take a decision.  And

21   I don't -- notwithstanding the unfortunate nature of

22   your e-mail, I think I owe it to the firm -- I owe it

23   to you, I owe it to others, to be fair and balanced.

24   So I wanted to make sure I understood everything

25   before we made a decision.



Page 31

1          Q.   Was your decision to involve Brogan in

2    this decision, was it a factor in that decision that

3    the e-mail stated that I would file a lawsuit against

4    the law firm?

5          A.   No.   Lawsuit -- the threat of a lawsuit,

6    in my view, meaningless.   Threats of lawsuits perhaps

7    to private individuals or corporations are

8    threatening.   The threat of a lawsuit to us,

9    particularly one where there was no merit to it,

10   was -- was not the issue at all.   What -- what the

11   issue was was -- is what the e-mail said about you as

12   a person, and your understanding of the law firm.

13             And it was clear to us that you didn't get

14   us; apparently we didn't get you.   And as a senior

15   associate, we want to -- when we -- when we come to a

16   conclusion like that, we want to make the decision as

17   quickly as possible, because we appreciate that you

18   need another opportunity.   And the more we let it

19   linger, the longer you're going to be in a position

20   that is not going to advance you in the future.

21             So we always preach, when we're dealing

22   with senior associates, once you know that he or she

23   is not going to advance within the firm, you owe it

24   to them, you owe it to the firm, to let them know.

25             So there -- that thought was in my head as



Page 32

1   well.  I didn't see how we'd get this train back on

2   the tracks, given what was evidenced in that e-mail.

3          Q.   And what you say about wanting to let

4   senior associates know quickly, is that because it's

5   generally difficult for someone in a senior associate

6   position to find another similar job?

7               MS. CHASE:  Objection to the form of the

8          question.

9               But you may answer.

10              THE WITNESS:  Yeah, I mean, I think -- I

11         don't think it's --

12              MS. CHASE:  And let me just note, with

13         respect to this question, it's in his individual

14         capacity, not as a 30(b)(6).

15              THE WITNESS:  A fair caution.

16              I just -- Jones Day associates come with

17         significant pedigrees.  They generally do not

18         have difficulty finding other jobs.  That said,

19         the longer you are in a job, you may or may not

20         have acquired a skill set that appeals to

21         another law firm, an in-house employer, so we

22         want to try to make that decision as soon as

23         possible.  Whether it's easy or hard really has

24         to be driven by an individual decision.

25              Someone like yourself, with a fantastic



Page 33

```
 1          pedigree and -- would be advantageous to most
 2          any law firm out there who is looking for a good
 3          associate.
 4               So I was not necessarily worried about you
 5          finding another job.  But generally speaking, we
 6          want to, in full candor, be open with the
 7          associates when we don't think they're going to
 8          make it.
 9     BY MR. SAVIGNAC:
10          Q.   If someone at Jones Day indicates that
11     he's going to sue the firm, shouldn't the managing
12     partner be told about that?
13               MS. CHASE:  And again, in this question, I
14          would say that Mr. Shumaker is answering in his
15          individual capacity.  But he certainly may do
16          so.
17               THE WITNESS:  Yeah.  That's a
18          hypothetical.
19               I would say that typically speaking, if
20          someone threatens a lawsuit against the law
21          firm, the most important person to receive
22          notice is Bob Walker, our loss -- our loss
23          prevention partner.  He was then asked to notify
24          our insurance carrier.
25               I would suspect that I would have let the
```



Page 34

1          managing partner know of anyone that threatens a

2          lawsuit against us.  Is it possible we've got

3          some crazy threat, and that wasn't conveyed to

4          the managing partner?  Sure.  But generally

5          speaking, it is my practice to let the managing

6          partner know when someone is making a threat.

7     BY MR. SAVIGNAC:

8          Q.   And did you think that if I was fired, I

9     was likely to file a lawsuit about the termination?

10          MS. CHASE:  In this -- in this context,

11          I'm going to object to the question, both as a

12          hypothetical and that it's outside the scope of

13          the 30(b)(6).  But he certainly can answer in

14          his individual capacity.

15          THE WITNESS:  Yeah.

16          In my individual capacity, number one, I

17          did not view the threat of a litigation as real.

18          I did not see any merit to it whatsoever.  A

19          second point -- now I lost it.

20          But I did not -- there was no threat in

21          there that made me think you would file

22          litigation, and frankly, I didn't think you

23          would.  I thought it was just a threat, because,

24          again, I didn't see any merit to the position

25          whatsoever, and I thought you were simply making



Page 35

1           the allegation to try to extract something for

2           yourself that you were not entitled to.

3                So no, I really did not think you would

4           bring this ridiculous lawsuit.

5      BY MR. SAVIGNAC:

6           Q.   And if a decision to fire someone is

7      likely to lead to a lawsuit against the firm for

8      retaliation, shouldn't the managing partner be

9      consulted about that decision?

10                MS. CHASE:  Same series of objections as

11          the last one.  It is both a hypothetical and it

12          is outside the scope of 30(b)(6).  He can

13          certainly answer the hypothetical question, to

14          the extent he can, in his individual capacity.

15                THE WITNESS:  Understand, I -- how do you

16          answer a hypothetical like that?  Like I

17          testified to earlier, if someone makes a threat

18          of litigation against the law firm, it is

19          generally my practice to let the managing

20          partner know.

21          (Exhibit 50 was marked for identification.)

22     BY MR. SAVIGNAC:

23          Q.   Okay.  So please look at Plaintiffs'

24     Exhibit 50, five-zero.  And that should be Tab 50 in

25     the binder.  This is a large document that the first



Page 36

1  page has the Bates stamp JD_2026.

2         MS. CHASE:  Just give us a second, Mark,

3     to get to that part of the binder.

4         MR. SAVIGNAC:  Yeah.

5         MS. SHEKETOFF:  It's also in AgileLaw.

6         MS. CHASE:  Understood, Julia, but we're

7     using the binder.

8         I also have it.  Thank you.

9  BY MR. SAVIGNAC:

10     Q.   Okay.  So is this a version of Jones Day's

11 firm manual?

12     A.   That's what it appears to be, as revised

13 on January 7, 2019.

14         MS. CHASE:  And I will note that in that

15     question, he was answering in his individual

16     capacity.

17 BY MR. SAVIGNAC:

18     Q.   And -- all right.  So please turn to

19 page 78 of the manual, which is JD_2113.  And just

20 let me know when you're there.

21     A.   I am there.

22     Q.   Beginning on this page, maybe a third of

23 the way down, is this Jones Day's equal employment

24 and anti-harassment policies?

25         MS. CHASE:  And I will again note for the



1        record that with respect to this question,

2        Mr. Shumaker is answering in his individual

3        capacity.  But he certainly may do so.

4            THE WITNESS:  Yes.  This is -- at least in

5        the firm manual are addressing the -- our equal

6        employment and anti-harassment policies.

7            MR. SAVIGNAC:  Okay.  I think that as long

8        as I'm asking this line of questions about this

9        exhibit, we can assume it's in personal

10       capacity.

11           MS. CHASE:  Understood.

12           MR. SAVIGNAC:  Okay.

13  BY MR. SAVIGNAC:

14       Q.   So if you turn to the next page, page 79,

15  in the middle of that page, is this Jones Day's

16  reporting and investigation policy?

17       A.   Yes.

18       Q.   And at the beginning of that section, does

19  the manual say, "Any employee who believes that he or

20  she has been subject to discrimination or harassment

21  in any form should report the incident to the partner

22  in charge"?

23       A.   It's what it says.

24       Q.   Does the paragraph go on to say that

25  perceived discrimination can also be reported to the



Page 38

1    firm director of human resources or the firm

2    administrative partner?

3         A.   Or the office administrator, correct.

4         Q.   Was Sarah McClure the firm director of

5    human resources during the time period we've been

6    discussing?

7         A.   She was.

8         Q.   And were you the firm administrative

9    partner during that time period?

10        A.   I was.

11        Q.   Looking to the next paragraph of that

12   section, does the "Reporting and Investigation"

13   section go on to say, "The firm will investigate

14   allegations of discrimination or harassment in as

15   prompt and confidential a manner as possible"?

16        A.   Correct.

17        Q.   And did Jones Day do anything to

18   investigate the complaint that its leave policy was

19   discriminatory?

20        A.   No.

21             MS. CHASE:  Objection to the form of the

22        question.  I believe it's ambiguous and may very

23        well also involve a response that includes

24        privileged information.

25             I'm not sure what complaint you're



Page 39

1    referring to, Mark.

2         THE WITNESS:  You guys made an inquiry in

3    August.  We analyzed the issue.  We wrote a

4    whole full legal memo.  We took one of our best

5    labor and employment associates, and they

6    analyzed the issue.  We took your -- your

7    questions regarding the policy as legitimate,

8    proper questions.  We analyzed it.

9         And we came away with the view there's no

10   merit to this.  So we wrote that to you.  And we

11   explained it to you.  We cited precise examples

12   from the EEOC.  We gave you two cases that

13   showed you why we believed.

14        So yes, we absolutely had investigated

15   what you and Julie were saying.  And there was

16   no merit to it.  And we conveyed it to you.  You

17   didn't accept it.  You then sent that

18   intemperate e-mail in January.

19        So we're here.

20   BY MR. SAVIGNAC:

21     Q.   Okay.  And referring to the January

22   e-mail, did Jones Day do anything to investigate

23   whether a Jones Day partner gave Julia a negative

24   evaluation because she is a woman?

25     A.   I was -- I was -- having sat in every



Page 40

1    associate review for yourself and for Julia through

2    all the years, I knew that was not true.  I knew that

3    it was not just one person; there were several people

4    who had issues with Julia's work.

5              So I knew that was not true.  I didn't

6    need to do anything more.  And I knew the law at that

7    point.  There was no more investigation that needed

8    to be done.  I knew what you were telling me was

9    wrong.

10        Q.   And you knew -- okay.  So you didn't do

11   any investigation beyond having, you know, had those

12   experiences previously?  Is that correct?

13             MS. CHASE:  Object to the form of the

14        question.

15             But you may answer.

16             THE WITNESS:  Yeah, I mean, I --

17             MS. CHASE:  Again, to the extent that the

18        response involves any privilege discussions or

19        analysis that happened in January 2019,

20        Mr. Shumaker can state that such analysis or

21        discussions happened, but he can't describe the

22        specifics of any of them.

23             THE WITNESS:  Yeah.  I won't go into any

24        communications I had with others.  But

25        certainly, as I testified to earlier, when the



Page 41

```
 1          e-mail came across, the January e-mail, I would
 2          have gone back to what we had conveyed to you
 3          all in August to refresh my recollection, and
 4          that likely would have also included me pulling
 5          up your reviews, to refresh my recollection with
 6          respect to your past work for the firm.
 7   BY MR. SAVIGNAC:
 8          Q.   And when you say "your reviews," do you
 9   mean Julia's reviews as well as mine?
10          A.   Yes.   I mean both of you.
11          Q.   And when you --
12          A.   I'm sorry, Mark.   Just -- I already --
13   again, I already had a pretty strong sense of what
14   those reviews were, having sat through both the
15   Washington office review sessions and the firm-wide
16   review sessions.   So -- and as you might expect,
17   being in the Washington office, I tend to know the
18   Washington people better.
19               So I had a general understanding of where
20   both of you stood in relation to the firm.   I knew
21   that you were new to the firm.   You were doing pretty
22   good.   You had a decent start.   But it was still a
23   bit unknown.   Julia had a rough past, and then had
24   really improved in the last year.
25               I remember Glen Nager having given her a
```



Page 42

1    particularly good review.  I think very highly of

2    Glen Nager.  So she was on the right path.  But I

3    pulled that stuff up and looked at it.

4         Q.   Why does Jones Day have this reporting and

5    investigation policy?

6              MS. CHASE:  Again, I'm going to object to

7         the question, to the extent it calls for

8         Mr. Shumaker to answer about any privileged

9         assessment that the firm has done at any point

10        in time that impacts why the firm has this

11        policy.  To the extent he can answer without

12        divulging privileged information, he can do so.

13             THE WITNESS:  Yeah, this -- this reporting

14        and investigation provision predated my time in

15        this role.  I view this as the type of provision

16        that would exist in any significant institution,

17        certainly one that cares about its policies and

18        having a -- a workplace that is devoid of things

19        like discrimination or harassment.

20   BY MR. SAVIGNAC:

21        Q.   And are -- is there any other reason

22   why -- I don't recall exactly what term you used, but

23   careful employers have policies like this?

24             MS. CHASE:  Again, I'm going to object to

25        the question, to the extent it implicates any



Page 43

1          privileged advice Mr. Shumaker may have received

2          or taken at any point in time, or given the firm

3          with respect to the legal implications that

4          exist or may not exist associated with having

5          such a policy.

6                    To the extent he can answer that question

7          without divulging privileged information, he may

8          do so.

9                    THE WITNESS:  To answer your question,

10         Mark, I'm not a labor and employment lawyer.  I

11         don't know if this type of provision is required

12         legally for any reason.  I know that from my

13         standpoint, as a lawyer working in the best

14         interest of the firm, we want to know if someone

15         believes they are facing harassment or

16         discrimination so we can address the situation

17         and resolve it if there is any merit to the

18         concern.

19    BY MR. SAVIGNAC:

20         Q.   And the paragraph goes on to say,

21    "retaliation in any form against an employee or

22    applicant who complains of discrimination or

23    harassment is strictly prohibited."  Is that right?

24         A.   Correct.

25         Q.   And is that actually Jones Day's policy?



Page 44

1          A.    Absolutely.   We -- we are not -- we are

2    not a firm that doesn't want to have open discussion

3    and communication about our policies and procedures.

4    People like to suggest otherwise in the media,

5    because we have a compensation policy that we believe

6    is appropriate, and in the best interest of our

7    clients, and is confidential as between the firm and

8    the lawyers.   But we -- if there is a situation that

9    someone believes is not appropriate, we want to know

10   about it so we can address it.

11          So, absolutely, we would never retaliate

12   against someone for raising a -- a legitimate

13   concern.

14          Q.    And would you retaliate against someone

15   who raises a concern that you deem illegitimate?

16          A.    No.   Absolutely not.   And -- and I have

17   never retaliated against anyone, whether they've

18   raised it legitimate or baseless.   We wouldn't do

19   that.

20          (Exhibit 14 was marked for identification.)

21   BY MR. SAVIGNAC:

22          Q.    All right.   So please look at Plaintiffs'

23   Exhibit 14, one-four.

24          MS. CHASE:   And just while we're moving

25      off this topic, I want to note for the record



Page 45

1          that entire line of inquiry was in his

2          individual capacity.

3                   And we are now switching topics; is that

4          correct, Mark?

5                   MR. SAVIGNAC:  Yes.  And so this will be a

6          30(b)(6) question.

7                   MS. CHASE:  Okay.

8    BY MR. SAVIGNAC:

9       Q.   So this exhibit, Exhibit 14, this is

10   Defendants' answer.  It doesn't have a Bates stamp.

11                  Will you please turn to page 5, and look

12   at paragraph 15 of the answer.

13                  MS. CHASE:  And I will just note for the

14          record, this does not appear to be the operative

15          answer.  It seems -- appears to be an answer to

16          an earlier version of the complaint.  Is that

17          correct?

18                  MR. SAVIGNAC:  Yes.  This is, I believe,

19          the original answer, the answer to the original

20          complaint.

21                  MS. CHASE:  Okay.  Which page -- I'm

22          sorry, I missed the page again.

23                  MR. SAVIGNAC:  5.  Page 5, paragraph 10.

24                  MS. CHASE:  Thank you.

25                  THE WITNESS:  Yeah, I'm there, Mark.



Page 46

```
 1    BY MR. SAVIGNAC:
 2         Q.   So paragraph 10 says:  "Jones Day fired
 3    Savignac for the poor judgment and immaturity
 4    reflected by his extortionate threat to harm the firm
 5    in the 'court of public opinion' unless it acceded to
 6    his demand for eight weeks of paid leave consistent
 7    with his having given birth when he had not."
 8              Is that what that says?
 9              MS. CHASE:  I'm sorry.  Were you at
10         paragraph 10?  Because that's not what my
11         paragraph 10 says.
12              THE WITNESS:  That's what my paragraph 10
13         does say.
14              MS. CHASE:  I'm sorry.  You're --
15              MR. SAVIGNAC:  Exhibit 14.  There may be
16         another version of the --
17              MS. CHASE:  Ah.  So you just -- right.
18         You didn't read the first sentence.  Okay, thank
19         you.
20              MR. SAVIGNAC:  I'm sorry.  Okay.
21    BY MR. SAVIGNAC:
22         Q.   So paragraph 10 states, among other
23    things, "Jones Day fired Savignac for the poor
24    judgment and immaturity reflected by his extortionate
25    threat to harm the firm in the 'court of public
```



Page 47

1    opinion' unless it acceded to his demand for eight

2    weeks of paid leave consistent with his having given

3    birth when he had not."

4              Is that something that it says?

5         A.   It does.

6         Q.   If the e-mail in question had not said

7    anything about the public, or the court of public

8    opinion, would Jones Day still have fired me?

9              MS. CHASE:  Objection to the question as a

10             hypothetical.  But he can answer it, to the

11             extent he can, with that limitation.

12             THE WITNESS:  It's a hypothetical.  I -- I

13             can say that if you had taken that e-mail, Mark,

14             and drafted it in a professional manner -- and

15             remember, the August communication we had with

16             you said if you have any questions or concerns,

17             please come to us.  That was still an open door.

18             And if you had come to us and said, "You know,

19             I've really got a problem with this, guys," as

20             compared to this lobbing a grenade over the

21             wall, making this type of threat on something

22             that you didn't deserve, were not entitled to,

23             and inclusive of threats against the very firm

24             you now suggest you want to be a partner of,

25             sure, we could have had a discussion.  That's



1        not what you did.

2   BY MR. SAVIGNAC:

3        Q.   And the threat you refer to, is that the

4   threat to file an EEOC charge and a lawsuit?

5        A.   No.  Not at all.  That was not a threat.

6   You know, just like telling Mike Tyson, "I'm going to

7   punch you."  You know, Mike Tyson isn't really

8   fearful of you.  What it says about -- what it says

9   to Mike Tyson about your judgment is something else.

10            It was what you said in the e-mail, and

11   how you said it.  It was the -- "We're going to -- if

12   you don't give me what I'm not entitled to, I'm going

13   to take this to the court of public opinion.  I'm

14   going to publicize to you and say bad things about

15   this law firm, this law firm for which I work right

16   now, and is paying me over -- has paid me over a

17   million dollars," that's just immature,

18   unprofessional, complete absence of judgment.

19            That is why you were terminated.  The

20   threat of a lawsuit, or bringing a charge with the

21   EEOC, is -- that's noise to me.  That's just noise.

22            And again, I didn't make the decision.

23   That's my view, and why I made the recommendation.

24        Q.   So if the e-mail had not said anything

25   about the court of public opinion or publicizing,



Page 49

1    making statements to the public, would Jones Day

2    still have fired me?

3            A.   It's impossible to answer.

4            MS. CHASE:  Same objection -- yes.  Let me

5        just get the objection out there.  Sorry, Mike.

6            It's -- objection.  It's a hypothetical.

7        No such e-mail exists, that we're aware of.

8            With that limitation, you can have a

9        response to a hypothetical that will be

10       inadmissible, because it's a hypothetical, but

11       he can provide it.

12           And again, given that it is a

13       hypothetical, it's not within the scope of the

14       30(b)(6).  And he can answer it in his

15       individual capacity, as with the prior

16       hypothetical, answering in his individual

17       capacity.

18           THE WITNESS:  I -- I don't know how to do

19       that, Mark.  I -- I can't parse out, if it

20       didn't say this or it didn't say that.  It's

21       inherently speculative.  Which of these items

22       was more offensive or reflective of your

23       character than others, it's hard to say, because

24       they're all in there.

25           It wasn't any one thing; let's put it that



Page 50

1       way.  There was a way that you could have

2       communicated your displeasure with the firm's

3       position.  This was not it.

4   BY MR. SAVIGNAC:

5       Q.   All right.  Let me ask you, why did you

6   recommend that Jones Day fire me?

7            MS. CHASE:  This question, I would say he

8       can answer as a 30(b)(6).

9            THE WITNESS:  I -- I mean, I think I've

10       indicated several of the reasons already.  And I

11       remember working with the legal team in our

12       interrogatory response.

13            It -- it reflected a lack of

14       professionalism.  It reflected a lack of

15       maturity.  It reflected a lack of leadership.

16       It reflected a distortion of applicable law.  It

17       demanded something to which you were not

18       entitled, in an extortionate way.  It showed an

19       absence of integrity.

20            And those are foundational values for this

21       law firm.  If you pick up the firm manual, first

22       two or three pages, those things make a

23       difference to us.

24            This is someone who is senior, senior

25       associate, who believes he's entitled to be



Page 51

1          considered for partnership.  And what is

2          reflected in that e-mail screamed out, "I don't

3          get this place.  And you don't get me."

4              And I'm not saying Jones Day is for

5          everyone, but it certainly is not for someone

6          who doesn't understand us, and why what we do is

7          a little bit different than other law firms, and

8          why we have set up the firm the way we have, and

9          we have the foundational values we do to serve

10         our clients' best interests.

11             I would refer you back to the

12         interrogatory response -- I don't remember which

13         one it was -- that had a more careful,

14         considered basis for a determination decision.

15         But that's my off the hand -- cuff as to why I

16         made the recommendation.

17             MR. SAVIGNAC:  Okay.  Just to go back to

18         the previous question about whether Jones Day

19         would have fired me if the e-mail didn't say

20         anything about the public or the court of public

21         opinion, it's my view that that is an

22         appropriate 30(b)(6) question.  I understand

23         there's a disagreement with -- with me about

24         that, but I'm stating my view.

25             I understand that the witness says he



Page 52

1     doesn't know or can't answer the -- the question

2     because it's hypothetical.

3          MS. CHASE:  Yeah, I -- I understand that

4     you disagree with me.  You did not designate a

5     topic asking for responses to hypothetical

6     questions.  It is my view that unless you are

7     dealing with an expert, hypothetical question is

8     not appropriate for any fact witness.  But it is

9     certainly not within the scope of our designee

10    providing testimony about either the firm's

11    policies or practices or decisions taken,

12    because policies or practices or decisions taken

13    are based upon actual facts and circumstances,

14    not hypotheticals.

15         So you can take a different position all

16    you want.  I will tell you, no hypothetical

17    question will be answered in the capacity as a

18    30(b)(6) for this witness or any others.

19         And if you would like to take that to the

20    Court, feel free to do so.  But I am confident

21    that we are designating individuals to speak to

22    actual facts and circumstances.  That's what a

23    30(b)(6) is:  A fact witness, not an expert

24    witness.  And they can speak to things on behalf

25    of the firm that are factual in nature.



Page 53

```
 1   BY MR. SAVIGNAC:
 2        Q.   Okay.  And I think we understand the
 3   answer to this, but just -- just to be clear, would
 4   you have recommended that I be fired if the e-mail
 5   we're talking about, the January 16 e-mail, had never
 6   been sent?
 7             MS. CHASE:  Objection to the form of the
 8        question.  It is a hypothetical.  As such, the
 9        witness can answer, to the extent he can, in his
10        individual capacity.
11             THE WITNESS:  And my apologies.  Make sure
12        I understand the question.  Would I have
13        recommended termination if the e-mail had not
14        been sent?
15   BY MR. SAVIGNAC:
16        Q.   Yes.
17        A.   If the e-mail had not been sent, nothing
18   would have changed from the status quo at that time.
19   We had explained to you in August the firm's
20   position.  If you hadn't sent that e-mail, there
21   would have been no change in circumstances.
22        Q.   And did anything other than the e-mail
23   factor into your decision to make that
24   recommendation?
25             MS. CHASE:  With respect to this question,
```



Page 54

```
 1       which is not a hypothetical, the witness can
 2       answer in his individual capacity.  But I will
 3       note and caution that to the extent there was
 4       any privileged advice taken with respect to that
 5       topic, he is not going to disclose the substance
 6       of such advice.
 7            THE WITNESS:  And again, it wasn't the
 8       e-mail.  It was what's reflected in that e-mail.
 9  BY MR. SAVIGNAC:
10      Q.   And what did the e-mail say?
11            MS. CHASE:  Are you asking the witness to
12       recite the e-mail?  If so, I object to the form
13       of the question, and I think it's both unfair
14       and outside of his 30(b)(6) topic.
15            We did not ask any witness to memorize
16       verbatim your e-mail, and I don't think it would
17       be appropriate to do so.  If you'd like to refer
18       the witness to the e-mail, he certainly can look
19       at the e-mail.  But none of us have memorized
20       the e-mail on your side.  Perhaps you have, but
21       we have not.
22            MR. SAVIGNAC:  Okay.  I'm just asking for
23       the witness's recollection of what the e-mail
24       says, which is --
25            MS. CHASE:  That's a different question,
```



Page 55

1           Mark.  So if you'd like to ask the witness what

2           his recollection is, he can answer that question

3           in his individual capacity, because you're

4           asking about an individual's recollection.

5                   MR. SAVIGNAC:  Okay.

6    BY MR. SAVIGNAC:

7           Q.   What is your recollection of what the

8    e-mail says?

9           A.   You started this deposition saying if I

10   wanted to reference a document that would help me in

11   answering a question, I should do so.  I should have

12   the letter -- the e-mail in front of me if I'm going

13   to answer a question like that.

14                It's in black and white.  My recollection

15   of what it says -- I don't know how that's relevant,

16   or -- or discoverable, when we have the e-mail.

17          Q.   Well, we'll look at it soon.  But I am

18   just asking for your --

19                MS. CHASE:  Well, I -- the witness has

20           told you he's not going to provide information

21           without the document.  You have given that

22           instruction.  He has complied with the

23           instruction.  So if you would like to ask him

24           questions about the e-mail, put the e-mail in

25           front of him.  He has otherwise testified to his



Page 56

1    recollection.  Thank you.

2         MR. SAVIGNAC:  He's saying he doesn't

3    remember anything about it.

4         MS. CHASE:  That's not what he's saying.

5         THE WITNESS:  That's not what I'm saying.

6         MS. CHASE:  Mark, and just so you're

7    clear, when you're speaking what you may believe

8    is a privileged capacity to your wife, we can

9    hear it, so it's not privileged.  So perhaps you

10   want to be muted if you think those are

11   privileged communications.

12        That is not what he's saying.  You've

13   mischaracterized his statement there.  What I've

14   told you is that you have given instruction that

15   has said to the witness, if he'd like a

16   document, he should have it.

17        In courtesy, and in all depositions that

18   I've been involved in the past 20 years, if

19   someone would like to ask about the document and

20   the document exists, you put the document in

21   front of the witness.  That's what we do.

22        He has testified about his reasons for his

23   recommendation.  But if you would like for him

24   to testify about a specific document that he has

25   asked for, give him the document.



Page 57

1                     And if you don't think that's proper, and

2          you would like to go to the Court and explain to

3          the Court why you would like the witness to

4          answer about a document that exists in the

5          record that he has asked to be provided to him,

6          that you refuse to give to him, I would like to

7          hear you explain to the Court why it is you

8          think it's appropriate to do so.

9                     Otherwise, move on, or put the document in

10         front of the witness.

11                    THE WITNESS:  And to get behind this

12         dispute, Mark, my general summary of your e-mail

13         is, "Give me something I'm not entitled to, or

14         else."  And that "else" was, "I'm going to do

15         something to harm this law firm."

16    BY MR. SAVIGNAC:

17         Q.   And what "something to harm the law firm"

18    do you recall the e-mail referencing?

19         A.   I'm sorry, I don't understand that

20    question.

21                    MS. CHASE:  Objection to the form of the

22         question.

23    BY MR. SAVIGNAC:

24         Q.   You said that the e-mail says I'm going to

25    harm the law firm.  What did the e-mail say I would



Page 58

```
 1    do to harm the law firm?
 2              MS. CHASE:  Objection to the form of the
 3         question.
 4              But you may answer, to the extent you can.
 5              THE WITNESS:  The words in your e-mail --
 6         which, again, you won't provide me -- says "I
 7         will take it to a court of public opinion."
 8              I don't know what you mean by that.
 9         Again, I didn't think there was any merit to
10         what you were saying.  I don't know if you were
11         going to go to Facebook, if you were going to,
12         you know, contact the legal blog, do what you
13         did, go to the New York Times.  It was a clear
14         threat.  And that's what the e-mail said.  That
15         was not reflective of necessarily the real
16         reason why you were terminated, because of all
17         the things I just testified to.
18    BY MR. SAVIGNAC:
19         Q.   Okay.  You -- you said that you
20    recommended that I be fired because of traits
21    reflected in the e-mail, and you listed a number of
22    traits.  I don't think we have to discuss them
23    individually.  But was it your belief at the time
24    that those traits were also reflected in anything
25    else that I had done?
```



Page 59

1           MS. CHASE:  Objection to the form of the
2      question.  And I -- I believe that you're asking
3      about his belief, which is an individual
4      capacity.
5           THE WITNESS:  I -- I don't understand what
6      you're trying to get at there, Mark.  I'm sorry.
7  BY MR. SAVIGNAC:
8      Q.   Sure.  So I believe you said that the
9  e-mail reflected immaturity.  Is that -- is that a
10  word you said?
11      A.   Amongst other things, yes.
12      Q.   So did you -- did you believe at the time
13  that there was anything I had done, other than the
14  e-mail, that reflected immaturity?
15      A.   Again, as -- as you probably know, Mark, I
16  had had little to no interaction with you, as far as
17  I can recall.  All I knew of you was what was in that
18  e-mail.  I had your reviews.  I knew your background.
19  Everything I had to know was screaming off that
20  e-mail.
21      Q.   And was the e-mail statement that I would
22  file a discrimination lawsuit a factor in your
23  decision to recommend termination?
24      A.   Absolutely not.
25           I didn't think you'd ever do it, because



Page 60

1    there's no merit to it.  I -- I just -- the decision

2    to fire you had to do with what that e-mail reflected

3    in terms of your values, your value system, your

4    understanding of the firm, our understanding of you.

5    It had nothing to do with your baseless threat of a

6    lawsuit.

7         Q.   If someone does file a discrimination

8    lawsuit against Jones Day, would that have any impact

9    on how you feel about that person?

10             MS. CHASE:  Object to the form of the

11        question, both as a hypothetical and as a

12        question that's outside the scope of his

13        30(b)(6) capacity.  He can answer it -- answer

14        it in his individual capacity, with the

15        limitation that it is still an objectionable

16        hypothetical question.

17             THE WITNESS:  You're talking about

18        hypothetical.  I -- someone files a lawsuit

19        against the firm, does that cause me to -- what

20        your word was -- to slight them, or think

21        negatively of them?  If it's a baseless lawsuit,

22        yes.

23   BY MR. SAVIGNAC:

24        Q.   Would you support -- asking in your

25   personal capacity, would you support an associate for



Page 61

1   promotion to partner who was prosecuting a

2   discrimination lawsuit against Jones Day at the time?

3          MS. CHASE:  Same objection as before.  As

4      you've already noted, it's in his individual

5      capacity; but what you have not noted is that it

6      is yet again another hypothetical, which is

7      objectionable.  So -- but any response is

8      inadmissible and waste of our time here today.

9          But he can answer your inadmissible,

10     objectionable question for another hypothetical,

11     which is not an appropriate question for a fact

12     witness.

13         THE WITNESS:  I cannot answer that

14     hypothetical.  It's never happened.

15  BY MR. SAVIGNAC:

16     Q.   Okay.  Is it your testimony that the

17  e-mail statement that I would sue Jones Day played no

18  role in your decision to recommend termination?

19     A.   Correct.

20         Let's put it this way, Mark:  It made no

21  reference to a lawsuit against Jones Day.  If you

22  took that line out, I still would have terminated

23  you, made a recommendation.  Had nothing to do with

24  the lawsuit.

25     Q.   And what if you took out the line that



Page 62

```
 1    mentions the court of public opinion?
 2         A.   Again, we have --
 3              MS. CHASE:  It was the same objection to
 4         the --
 5              THE WITNESS:  -- if we have to go through
 6         an editing exercise of what you should have
 7         written, I'm -- I'm not going to go down that.
 8         I'm just trying to helpful to you.
 9              To the extent you want to know, was my
10         threat of a lawsuit the reason you got
11         terminated, the answer is no.  And if you had
12         taken out the portion that said "I'm going to
13         sue you," you still likely would have been
14         terminated.  But it's speculative.  I'd have to
15         look at the whole context of the e-mail.
16              MS. CHASE:  And let me just note that both
17         this question and the prior one were both in his
18         individual capacity, and the same objections
19         about hypotheticals exist.  No such e-mail along
20         the lines you described has been presented in
21         this case.  This is entirely a hypothetical.
22    BY MR. SAVIGNAC:
23         Q.   Okay.  Other than the e-mails that you had
24    with Mr. Brogan, did you have any communications with
25    him in any other medium about the termination
```



Page 63

1    decision, or about us, during this time period?

2              MS. CHASE:  I will note -- let me just

3         note first --

4              THE WITNESS:  Yes.

5              MS. CHASE:  -- just so we have a clear

6         start and stop.

7              This question I believe is, in his

8         30(b)(6) capacity, an appropriate question.  He

9         can answer as such, with, of course, the

10        limitation that to the extent any communications

11        that Mr. Shumaker had with Mr. Brogan were in

12        his privileged capacity, he can tell you about

13        the existence of such conversation, but he could

14        not disclose the substance of them.

15             THE WITNESS:  And to your question, Mark,

16        I don't believe I had any oral discussions with

17        Steve.  He was traveling at that time.  Steve

18        and I generally communicate through e-mail.  But

19        he certainly knows my number, and -- and it's

20        possible he called me.  I don't recall that.  I

21        can't remember if Steve testified any

22        differently, but I don't remember a phone

23        conversation.

24   BY MR. SAVIGNAC:

25        Q.   Do you have any -- were there any



Page 64

1   communications with anyone who was speaking to you on

2   behalf of Brogan?

3         A.   No.  No.  In terms of someone conveying a

4   message as to Steve last night, he told me to tell

5   you this or something like that, no.

6         Q.   Was there anyone speaking on behalf of --

7   communications with anyone speaking on behalf of

8   Brogan to ask you any questions?

9         A.   No.  Steve had -- Steve would notify me.

10        Q.   And are you confident that you didn't have

11  phone communications with Brogan about this issue

12  during this period?

13        A.   As reasonably confident as I can be.  If

14  you showed me a phone record that would indicate that

15  we had a conversation, I wouldn't be shocked or

16  surprised.  I'm just saying I don't remember it.

17        Q.   Do you have any knowledge of whether a

18  phone record would exist, if there was a

19  communication?

20        A.   I have no idea.  I have no idea.

21        Q.   Do you ever communicate with Brogan by

22  text message?

23        A.   No.  No.

24        Q.   Do you ever communicate with Brogan about

25  firm matters using personal e-mail addresses?



Page 65

1          A.    No, never.  I don't know if Steve has a

2     personal e-mail address.

3               MS. CHASE:  And I'll just note that

4          question, that line of questioning about Mr. --

5          about communication methods is in his individual

6          capacity.

7     BY MR. SAVIGNAC:

8          Q.    During -- during the time between when you

9     e-mailed Brogan with your recommendation and when he

10    responded to you by e-mail, did you have any

11    communications with anyone relating to the January 16

12    e-mail?

13              MS. CHASE:  Objection to the question as

14         asked and answered.  And objection to the

15         question, to the extent it asks about the

16         substance of any privileged communications.

17         Mr. Shumaker can answer about the existence of

18         privileged communications, but not to the

19         substance.

20              And I, just for clarification's sake, will

21         say that I do believe this question can be

22         answered in his 30(b)(6) capacity, and it

23         already has been today.  But he can answer it

24         again.

25              THE WITNESS:  Yeah, I can't go on to



Page 66

1          substance, but certainly I had communications
2          with people I identified earlier:  Mary Ellen
3          Powers, Sarah McClure, Traci Lovitt, Terri
4          Chase.  I know I would have communicated with
5          Kevyn Orr and Adrian Wager-Zito regarding
6          execution of the separation.
7     BY MR. SAVIGNAC:
8          Q.   All right.  And just to be clear -- and
9     maybe you don't have this granular a recollection;
10    but I'm just asking about the period between when you
11    e-mailed Brogan and when he e-mailed you back.
12         A.   I -- I would not be able to tell you,
13    Mark.  It would be the same answer.  If I had
14    communications during that time, it would have been a
15    subset of the people I identified.  But I don't have
16    any precise recollection between I sent the e-mail,
17    there was a gap, then Steve answered, as to who I
18    talked to at that time.
19         Q.   And Brogan's response to you agreed that I
20    should be fired.  Is that correct?
21         A.   He -- he accepted my recommendation, yeah,
22    and made the decision.
23         Q.   And prior to receiving his response, had
24    you done any investigation of the e-mail's statements
25    about pay discrimination against Julia?



Page 67

```
1           MS. CHASE:  Objection to the question, to

2      the extent it calls for Mr. Shumaker to testify

3      about either privileged analysis that he did or

4      privileged communications he had with others

5      with respect to that topic.  He can answer, with

6      that limitation.

7           THE WITNESS:  And as I think I testified

8      to earlier, I was already very well aware of the

9      reviews of Julia, having sat through them.  I

10     was a personal witness to the discussion in the

11     room about her performance, both her written

12     record -- as I said earlier, I would have

13     certainly pulled up both yours and her reviews.

14          In thinking through these issues, I

15     certainly would have been cognizant of both the

16     good and bad in those reviews.  In terms of the

17     suggestion of discrimination, I knew the

18     objective facts, that that wasn't true.  I know

19     that we had just recently been in a lawsuit

20     where we had our pay data analyzed backwards and

21     forwards, and no one could find what I already

22     knew to be true:  That there was no

23     discrimination occurring in any way, shape, or

24     form.

25
```



Page 68

1   BY MR. SAVIGNAC:

2       Q.   When you saw that the January 16 e-mail

3   asserts that Julia was treated worse because she is a

4   woman, did you have an understanding of what Jones

5   Day partner the e-mail was referring to as having

6   treated her worse?

7       A.   The answer is no.  And I can't remember,

8   though, when I first learned that she was ascribing

9   the negative review to Partner A, because there are

10  others who had expressed concern about her.  I -- it

11  didn't matter to me when I saw that, because I knew

12  there were others who had concerns with Julia's work.

13  She had two 2s in a row, which is very rare.  That

14  usually comes with a message.

15           We stuck it out with her, thinking that,

16  you know, she -- she -- there was a spark there

17  somewhere.  And then it finally shown in that last

18  year where she got the 4s.  I was really happy to see

19  that.  So I knew she was getting a pretty fair shot

20  when I -- I got this.

21           I would have had the reviews in front of

22  me.  I would have gotten them as part of the concern

23  in this issue.  Did I do anything more than that?

24  Not that I can think of.

25       Q.   And how did you come to believe that the



Page 69

1    e-mail was referring to Partner A, rather than the other

2    partners you mentioned?

3              MS. CHASE:  Let me just object to this

4         question on a couple of bases.

5              THE WITNESS:  Yeah.

6              MS. CHASE:  One, I'm going to object to

7         the question as being outside the scope of the

8         30(b)(6).  Two, I'm going to object to the

9         question to the extent that the knowledge that

10        Mr. Shumaker acquired was in the context of a

11        privileged investigation.  He can testify to the

12        extent he has another basis or way to answer

13        that question, but if -- if the source of

14        information was a privileged communication, he

15        can so indicate, but he cannot provide any more

16        substance, other than to say the source of

17        the -- of the knowledge was a privileged

18        communication.

19              THE WITNESS:  And to answer the question

20        without going into privilege, I -- I do not

21        recall if I learned it from others on the legal

22        team or whether I learned it from one of your

23        filings.  I -- I cannot recall.  Somehow I

24        learned -- it was likely through our privileged

25        communication, where someone said, "My best



Page 70

1          guess, it's Partner A."

2               But I -- I can't recall details.

3     BY MR. SAVIGNAC:

4          Q.   Might that have been after we, through

5     counsel, sent Jones Day a draft of our complaint?

6          A.   I don't know.

7               MS. CHASE:  Objection to the form of the

8          question.  It is yet again another hypothetical.

9          He can answer in his individual capacity, to the

10         extent he can.

11              THE WITNESS:  That was more -- when I

12         learned it was Partner A, I was more -- more

13         dumbfounded.  I know Partner A, and who he is, and

14         what he's about.  More of a champion for

15         diversity, equity, and inclusion, so . . .

16              But when I learned it, how I learned it,

17         I -- I really cannot recall.

18    BY MR. SAVIGNAC:

19         Q.   And just to be clear, you don't recall

20    whether you knew it was Partner A as of the time the

21    termination was implemented?

22         A.   I -- I don't recall.  I -- frankly,

23    that -- that was not something that I have any

24    recollection of.

25         Q.   And just asking, in your -- in your



Page 71

```
1    30(b)(6) capacity, do you have any knowledge of when
2    Jones Day first became aware that Julia claims that
3    Partner A had discriminated against her?
4         MS. CHASE:  I will note that I do not
5         believe that in his 30(b)(6) capacity, he is
6         designated to answer such a question.
7             That being said, he can certainly answer
8         the question, as he has endeavored to do so in
9         his individual capacity, to the extent he can,
10        without revealing privileged communications.
11            If he's going to indicate that he learned
12        through privileged communications, he can state
13        that he learned through privileged
14        communications, but not the substance of them.
15        THE WITNESS:  Yeah.  I just looked at the
16        30(b)(6).  It's not -- it's not covered by those
17        topics.
18            But my answer's the same, Mark.  I can't
19        recall if I learned it through a privileged
20        communication or through a filing of your own.
21        If I had to place a bet, it would likely have
22        been through a privileged communication.  When,
23        I don't know.
24        MR. SAVIGNAC:  Okay.  I unfortunately need
25        to take a four- to five-minute break.  Is that
```



MAGNA
LEGAL SERVICES

Page 72

```
 1        all right?  Does anyone need a break, or is that
 2        a good period?
 3             MS. CHASE:  I -- I would go with five,
 4        Mark.
 5             MR. SAVIGNAC:  All right.
 6             MS. CHASE:  Let's say five, yeah.
 7             MR. SAVIGNAC:  All right.
 8             VIDEOGRAPHER:  We're off the record
 9        at 10:15.
10             (A recess transpired from 10:15 a.m. until
11             10:23 a.m.)
12             VIDEOGRAPHER:  We're back on the record at
13        10:23 a.m.
14   BY MR. SAVIGNAC:
15        Q.   Okay.  Can you hear me?
16        A.   I can.
17        (Exhibit 4 was marked for identification.)
18   BY MR. SAVIGNAC:
19        Q.   All right.  So please turn to Plaintiffs'
20   Exhibit 4, which is Bates-stamped JD_3169 to 3172.
21             Let me know when you see that document.
22        A.   I'm there.
23        Q.   Is this a series of e-mails between you
24   and Steve Brogan?
25        A.   Correct.
```



Page 73

1          Q.   And the second e-mail from the top page is

2    from you to Brogan, and begins:  "Steve:  Savignac

3    was terminated yesterday."  Is that right?

4          A.   Correct.

5          Q.   And that was sent on Wednesday,

6    January 23, 2019.  Correct?

7               MS. CHASE:  I don't think that any of us

8          know what day of the week it was --

9               THE WITNESS:  No.

10              MS. CHASE:  -- so I'm going to object to

11         the reference to Wednesday.  But I think the

12         witness can otherwise answer the question.

13              THE WITNESS:  Yeah, it says January 23rd,

14         2019.  If that was a Wednesday, I -- I don't

15         know if that was the case.

16   BY MR. SAVIGNAC:

17         Q.   Okay.  And the next e-mail down says it

18   was sent on Sunday, January 20.

19         A.   Doesn't say "Sunday," does it?

20              MS. CHASE:  It actually does.

21              THE WITNESS:  Where?

22              Oh, I see.  I'm sorry.  All the way down.

23         Yes.  Yes, correct.

24   BY MR. SAVIGNAC:

25         Q.   Okay.  And this e-mail says, "He has to



Page 74

1    go.  Get it done tomorrow morning first thing."

2    Correct?

3         A.   Correct.

4         Q.   Is this the communication which Brogan

5    directed that I be fired?

6         A.   Yes.

7         Q.   And this is the only means by which Brogan

8    directed that I be fired, correct?

9         A.   Yeah, he conveyed the message.  That's

10   pretty clear what he wanted.

11        Q.   And this e-mail is Brogan's only response

12   to your e-mail recommending that I be fired, correct?

13        A.   As far as I can recall, yes.

14        Q.   And Brogan's e-mail, it -- it says it was

15   sent at 5:36 p.m. on January 20?

16        A.   Correct.

17        Q.   And do you know what time zone that is

18   reflecting?

19        A.   Yeah, given that I sent the e-mail on

20   January 21st, and he responded on January 20th, he

21   must have been in Asia at that point in time.

22        Q.   Okay.  And what it's referring -- when it

23   refers to -- to January 21st, is that during the time

24   that you believe you were in Germany?

25        A.   Again, I'd have to look at a calendar.  I



Page 75

```
 1    generally go over on like a Saturday night, land on a
 2    Sunday.  I can't -- I think -- I -- I know by the
 3    23rd, almost certain I was in Europe by then.
 4         Q.   Okay.
 5         A.   I believe.
 6         Q.   Okay.
 7         A.   And I remember because I was not thinking
 8    about the MLK holiday, because I wasn't in the
 9    States.  I remember learning that we can't do it
10    Monday because it was a holiday.
11         Q.   Okay.  And so when Brogan said, "Get it
12    done tomorrow morning first thing," he was referring
13    to Monday morning; is that right?
14         A.   Correct.
15         Q.   Okay.  So if you look at the next e-mail
16    down, which starts at the bottom of this page, is
17    this an e-mail from you to Steve Brogan?
18         A.   Correct.
19         Q.   And the Subject line is "Forward:
20    Privileged."  Correct?
21         A.   Yes.
22         Q.   The e-mail begins:  "Steve:  I wanted to
23    bring the attached to your attention."
24              What were you referring to as "the
25    attached"?
```



Page 76

1          A.    Just the e-mail chain behind, that

2     follows.

3          Q.    And are you familiar with the concept of

4     an e-mail attachment?

5          A.    Sure.

6          Q.    But in this case, you were using the

7     phrase "the attached" to refer to something other

8     than an e-mail attachment?  Is that correct?

9          A.    Correct.  I'm sure you've also seen people

10    use that term in reference to the follow-on e-mail

11    string.

12         Q.    Did any of the e-mails in this chain have

13    an attached -- have an e-mail attachment?

14         A.    If they did, you'd probably see an

15    indication of a paper clip or something.  I don't

16    believe so.  I don't think there's anything that we

17    would have needed to provide, beyond the e-mail

18    chain, that was forwarded.

19         Q.    Okay.  Your e-mail continues, "Included in

20    the chain below is an e-mail that we received earlier

21    this week from Mark Savignac.  Mark is an I&A

22    associate and a former Supreme Court clerk in the

23    Washington office.  He is married to Julia Sheketoff,

24    a former Washington I&A associate and also former

25    Supreme Court clerk that recently left the firm to do



Page 77

1    public service work."

2              Why did you focus on the fact that the two

3    of us clerked at the Supreme Court?

4              MS. CHASE:  Objection to the form of the

5         question.

6              But you may answer.

7              THE WITNESS:  It's just background for

8         Steve.  Steve likes to know the facts of things

9         I'm asking him to consider, so it was just

10        background.  If it was Mary Smith and she was a

11        battle associate in the Detroit office, I would

12        have put that.  No -- no significance there.

13   BY MR. SAVIGNAC:

14        Q.   Has Brogan ever said or done anything that

15   suggested to you that matters concerning Supreme

16   Court clerks are important to him?

17              MS. CHASE:  I'm going to object to this

18        question as outside the scope of the 30(b)(6)

19        topics.  But he can answer in his individual

20        capacity.

21              THE WITNESS:  Yeah.  Steve has never

22        indicated to me that he attaches any special

23        importance to issues and appeals associates, or

24        Supreme Court clerks.  I do know that when we

25        are making compensation adjustments, that Steve



Page 78

```
 1          has sometimes, by individual, marked up some of
 2          the compensation, which at least to me, you'd be
 3          better -- obviously you should have asked him --
 4          reflective of their value to us as a law firm,
 5          in much the same way, you know, sometimes a
 6          particular practice is hot.
 7                Right now, private equity is hot.  And
 8          thus, when I get the compensation adjustments
 9          from Steve this year, I would not be surprised
10          to see him pushing up the PE associate numbers.
11                But nothing beyond that.
12     BY MR. SAVIGNAC:
13          Q.   And when you said -- I think you said that
14     he -- you've seen him mark up the -- the salary
15     documents for Supreme Court clerks.  Do you mean
16     increase their salaries relative to what they would
17     have been without his -- his having intervened?
18          A.   Yeah.  Steve reviews the compensation
19     adjustments for all the associates.  It's the end of
20     the process.  And he may see Mary Smith, and he
21     may -- we may, you know, the PIC may have
22     recommended 350; me or Traci may have recommended
23     360; and he pushed it to 370, something like that.
24                MS. CHASE:  And I'll just say that
25          question was in his individual capacity.
```



1            MR. SAVIGNAC:  Sure.

2   BY MR. SAVIGNAC:

3        Q.   And in your individual capacity, are you

4   saying that you have seen him do this more often with

5   Supreme Court clerks than with other associates?

6        A.   I wouldn't say that.  I've seen him do it.

7   I've seen him do it with issues and appeals

8   associates.  He may have done it one year but not

9   another year.  And there may -- I think you guys have

10  the sheets on that.  They would speak for themselves

11  as to when he pushed up a particular I&A associate as

12  compared to others.

13       Q.   And why did you recommend that the

14  termination be carried out immediately?

15       A.   That really goes back to the conclusions

16  to be drawn from what's reflected in that e-mail.  It

17  was clear to me that you were not aligned with the

18  firm and/or our clients' interests.

19            We have an ethical obligation to maintain

20  and protect our clients' information and material.

21  Any Jones Day lawyer has pretty much unbridled access

22  to client material and documents.  You have to have

23  that in order to provide legal services.

24            Once we come to the conclusion that an

25  individual's not trustworthy, we want to cut that



Page 80

1    access off, so that he or she can't acquire

2    information they're not entitled to.

3         Q.   And just so I'm clear, asking in your

4    personal capacity, am I right that Jones Day often

5    tells associates, you know, "You will -- you will

6    need to leave by such-and-such date," but allows them

7    to continue working at Jones Day for a period of

8    time?

9         A.   I wouldn't say "often."  That certainly

10   has happened.  We have had situations where we will

11   set a firm date, and we stick by that firm date.  We

12   have situations where we will set a date, and he or

13   she is actively looking for a new job or employment,

14   and we will push that date.

15            Again, we want to treat people like the

16   professionals they are.  People are relying upon

17   them, some for their livelihoods.  So we are adaptive

18   to the individual circumstances of our associates.

19   Sometimes they have to go by firm date.  Sometimes we

20   can push that date out.

21        Q.   Was your reason for saying that the

22   termination should be carried out immediately that

23   you thought I would access client materials and do

24   something with them that would be harmful to the

25   clients?



Page 81

1        A.    It -- it was nothing personal to you,
2    Mark.  It was standard operating procedure, that if
3    we believe someone is untrustworthy and threatening
4    in the firm, in this particular instance we needed to
5    protect our clients' information, and we were going
6    to cut off access.
7        Q.    Did you think that I should be fired
8    immediately so that I would be fired before I could
9    file a lawsuit or any EEOC charge?
10       A.    Again, the lawsuit -- the lawsuit was
11   meaningless to me.  I -- I did not think you would
12   file a lawsuit.  I couldn't see any basis for it.  I
13   thought it was just a threat to get what you wanted.
14       Q.    Have you ever directed or recommended that
15   any other associate be fired with immediate effect?
16       A.    Sure.  Sure.
17       Q.    And how many times?
18       A.    Thankfully, it's very rare.  I have one
19   situation that comes to mind where it was not an
20   associate.  ████████████████████████████
21   ██████████████████████████████
22   ████████████████████████████████
23   ████████████████████████████████
24   █████████████████████████████
25   ███████████████████████████



1 ████████████████

2          There may have been others.  I would have

3 to go through Sarah McClure, where termination would

4 have been approved with immediate effect.  There are

5 exceptional circumstances that use it.

6      Q.   And do you remember any other

7 circumstances where this happened?

8          MS. CHASE:  I will note in this capacity,

9      he's answering in his individual capacity.

10          THE WITNESS:  Yeah, as individual

11      capacity, I -- something -- let's make sure

12      I'm -- I'm answering what you're looking for, is

13      a situation where an attorney is being

14      terminated at the immediate effect.

15 ████████████████████████████████████████

16 ██████████████████████████████████████

17 ███████   █████████████████████   ███████████

18 ███████████████████████

19          I can't think of anyone else.  I remember

20      the one -- I remember the of -- the of counsel,

21      because she was right down the hall from me in

22      Washington.

23 BY MR. SAVIGNAC:

24      Q.   And in either of those cases, did you

25 consult or confer with Brogan before the person was



Page 83

1   fired?

2        A.   With respect to the of counsel

3   termination, I did consult with Steve.  With respect

4   to my vague recollection of the Chicago associate, I

5   don't believe I did.

6        Q.   And in those cases, were you the person

7   who made the decision?

8        A.   I made the recommendation for the of

9   counsel, just like I did for yourself, and Steve made

10  a decision.

11            On the associate in Chicago -- and again,

12  it's still vague.  It may have been Columbus.  It may

13  have been -- I want to say I made the decision with

14  the partner in charge.

15            I'd have to refresh my recollection

16  through Sarah McClure.

17       Q.   So your e-mail referred Brogan to the

18  chain below.  If you turn the page, on the pages

19  Bates-stamped 3170 and 3171 --

20       A.   Yes.

21       Q.   -- there are three more e-mails after

22  yours.  First, lower on page 3170 is an e-mail from

23  Sarah McClure to you.  Is that -- do you see that?

24       A.   I do.

25       Q.   And she says, "I know you have an argument



Page 84

1  tomorrow so we can discuss after then."  Where was

2  the argument?

3       A.   I was wondering that when I read this in

4  our prep session.  I can't recall.

5            MS. CHASE:  I will note that this is in

6       his individual capacity again.

7            THE WITNESS:  I don't remember.  I'm sure

8       I did great.

9            I don't remember.

10  BY MR. SAVIGNAC:

11       Q.   Would it have been an American city,

12  rather than abroad?

13       A.   At this -- at this point in time, 2019, I

14  was -- might have been involved in one of the

15  antitrust merger cases that I was handling back in

16  those days.  But I can't recall.

17       Q.   And next, on the bottom of 3170 and onto

18  the top of 3171, is an e-mail dated January 16.  Is

19  this the e-mail we've been discussing today?

20            MS. CHASE:  Objection.  Form of the

21       question is vague.  But you may answer.

22            THE WITNESS:  Yeah, this is the e-mail

23       that you wanted me to tell you what it stated

24       here.

25



Page 85

 1  BY MR. SAVIGNAC:

 2       Q.   And was this e-mail from McClure the way

 3  that you first learned of the January 16 e-mail?

 4            MS. CHASE:  Object to the form of the

 5       question as vague.  They're both January 16th

 6       e-mails.  Which one are you asking about?

 7            MR. SAVIGNAC:  I'm sorry.

 8  BY MR. SAVIGNAC:

 9       Q.   Was this e-mail from McClure the way that

10  you learned the January 16 e-mail that is being

11  forwarded by McClure?

12       A.   Yes.

13       Q.   Okay.  And on the third page is an e-mail

14  from McClure to me, dated August 24, 2018.  Is that

15  right?

16       A.   Correct.

17       Q.   And aside from the chain that you see

18  here, did you communicate with Brogan in any way

19  about these matters before you received his e-mail

20  saying, "He has to go"?

21       A.   No.  I don't believe I ever surface for

22  Steve the inquiry from you and Julia back in

23  August 2018.  His first exposure would have been the

24  January 21st e-mail dispute.

25       Q.   And aside from the chain that we are



Page 86

```
 1    looking at here, did you provide Brogan with any
 2    other information about me or Julia, or this
 3    January 16 e-mail, before you received his response
 4    saying "He has to go"?
 5              MS. CHASE:  And again, I will note, as is
 6         reflected here, there is a portion of this
 7         e-mail that is redacted that -- contains
 8         privileged communication.  Obviously that was
 9         part of what was forwarded to Mr. Brogan.
10              Mr. Shumaker cannot testify to the
11         substance of any of that privileged
12         communication.  I just want to be clear that
13         that is outside the scope of the question and
14         the answer.
15              THE WITNESS:  Yeah, I -- to answer your
16         question, Mark, I -- I don't recall sending
17         anything else to Steve.  That does not mean that
18         Steve didn't inquire or get information from
19         anyone else.  He could have contacted Beth.  He
20         could have contacted Traci.  I just don't know.
21              But I don't recall providing any other
22         information, other than what you see -- what you
23         don't see in the stuff that's redacted.
24    BY MR. SAVIGNAC:
25         Q.   Okay.  And asking in your 30(b)(6)
```



Page 87

1   capacity, at any point between January 16 and the

2   implementation of the termination, which was

3   January 22, did anyone other than you communicate

4   with Brogan in any way about me or Julia or this

5   January 16 e-mail?

6           MS. CHASE:  I believe that that's beyond

7       the scope of this witness's testimony --

8           THE WITNESS:  Yeah.

9           MS. CHASE:  -- as a 30(b)(6).  He can

10      answer in his individual capacity.

11          THE WITNESS:  I can tell you that I never

12      sent anything else more than this.  I am not

13      aware of anyone else sending anything else to

14      Steve relating to this issue.

15          Could I testify as a 30(b)(6)?  No.  I --

16      I can't say that I have investigated that, and

17      don't think that was part of my charge for

18      today.

19   BY MR. SAVIGNAC:

20      Q.   Was Jones Day's decision to fire me a

21   collaborative decision?

22      A.   No.  All of our decisions are

23   collaborative in some way, shape, or form.  Steve

24   makes the final decision, but I think my interacting

25   with him is exactly the type of collaboration that we



Page 88

1   hope and expect.  I made a recommendation.  He agreed

2   with it.  Steve does not agree with all my

3   recommendations.

4        Q.   And did anyone else collaborate in the

5   decision?

6        A.   I don't know that I can -- I think there's

7   some information in that privileged material that

8   might address that, but I won't testify to it.  But

9   as I testified to earlier, there were others that

10  shared my view.  There was no one that was opposed to

11  the termination decision.

12       Q.   And who was it that shared your view?

13            (Instruction not to answer.)

14            MS. CHASE:  Again, I'm --

15            THE WITNESS:  That's privileged.

16            MS. CHASE:  -- going to instruct the

17       witness not to provide any privileged

18       communications.

19            And he -- and I'm not sure if we were

20       speaking at the same time.  He said it was

21       privileged.

22            THE WITNESS:  Yes.

23  BY MR. SAVIGNAC:

24       Q.   And what was Kevyn Orr's role in the

25  collaborative decision?



Page 89

```
 1              MS. CHASE:  Objection to the form of the
 2         question.
 3              But you may answer.
 4              THE WITNESS:  Kevyn, if I recall
 5         correctly, at this point in time was partner in
 6         charge of the Washington office, and I reached
 7         out to him to execute on the termination
 8         decision.  I do not recall engaging with Kevyn
 9         beyond that with respect to the recommendation.
10              It is possible that I reached out to him
11         to get his thoughts, and there's a privileged
12         communication between me and him then.  But my
13         recollection as I sit here today is that
14         communicated with others is what's in the
15         redacted pieces.
16              I made the recommendation to Steve.  Steve
17         chimed in, and then I reached out to Kevyn and
18         Adrian on the issue.
19    BY MR. SAVIGNAC:
20         Q.   And I believe you said earlier that Kevyn
21    was in agreement with the recommendation.  Is that
22    right?
23         A.   He certainly didn't express any
24    opposition.
25         Q.   And it's -- is it your recollection that
```



Page 90

1    Kevyn's views on the decision were an important

2    factor in your decision to recommend that I be fired

3    to Brogan?

4              MS. CHASE:  Objection to form of the

5         question.

6              But you may answer.

7              THE WITNESS:  Again, I don't believe I

8         spoke to Kevyn about the circumstances until

9         after I had heard from Steve.  It's possible I

10        talked to him before.  Kevyn and I are close

11        friends.  But I -- I don't remember.

12   BY MR. SAVIGNAC:

13        Q.   And is your recollection the same with

14   Adrian Wager-Zito?

15        A.   Yes.

16        Q.   Did you --

17        A.   And I'm almost certain I didn't speak to

18   Adrian prior to making a recommendation -- well, I

19   shouldn't say that.  I -- I don't know.  It's

20   possible.  Adrian and I are friends, too.

21        Q.   And understanding that I'm not asking for

22   the substance of any privileged communication, the

23   people that you believe you spoke with before you

24   made the recommendation to Steve Brogan are Sarah

25   McClure, Mary Ellen Powers, Terri Chase, and Traci



Page 91

1    Lovitt.  Is that correct?

2         A.   Yeah.  As I said earlier, it was any or

3    all of those.  Those would have been the subset of

4    people that I would have communicated with at various

5    times.  If -- if I was a betting man, I suspect I

6    talked or communicated with each and every one of

7    those before I made the recommendation to Steve.

8         Q.   And do you have any recollection of anyone

9    else you may have conferred with?

10        A.   (Moving head from side to side.)

11        Q.   Okay.

12        A.   I don't think so.  It's . . .

13        Q.   So -- I'm sorry.  Did I cut you off?

14        A.   No, I said "I don't think so."

15             I -- I remember reaching out to Mike

16   Gurdak as the departure partner.  That was after, I

17   think, the recommendation -- after Steve made a

18   decision.

19        Q.   Turning back to the first page of this

20   exhibit, do you have any -- do you have any

21   recollection of about how much time passed between

22   when you sent your e-mail and when you received

23   Brogan's response?

24        A.   It was relatively quick.  But I want to

25   say that one of us was going to bed or asleep at the



Page 92

1    time, because of the time change.  Steve answers his

2    e-mails generally pretty quickly.  So he awoke, is my

3    guess, somewhere -- or at the end of a meeting he may

4    have been attending, and he saw it, and he responded

5    right away.

6              I don't recall there being a delay as if

7    he spent time ruminating.  I think that I sent it.

8    There was a gap of a number of hours, whether he was

9    asleep or he was in meetings.  And reasonably

10   promptly, I got his answer.

11        Q.   And when you refer to him being asleep or

12   in meetings, is that just your supposition, based on

13   your understanding that he was in Asia, and it would

14   have been nighttime there?

15        A.   Yeah.  Yeah, I think that's fair.  Steve

16   is generally pretty responsive.  And it's not

17   unusual, if he is active and on his BlackBerry, that

18   he would respond pretty quickly.  And when he's not,

19   it's usually because he's busy.

20        Q.   Is it possible that it was less than an

21   hour between when you sent your e-mail and when you

22   received a response?

23        A.   I don't know.

24             MS. CHASE:  Object to the question as

25        hypothetical.  But he can answer it in his



Page 93

```
1        individual capacity.
2              THE WITNESS:  I -- I don't recall it being
3        a quick response, by any stretch of the
4        imagination.  I -- I just don't know.  I would
5        think that that could be figured out.  But I
6        don't know.
7   BY MR. SAVIGNAC:
8        Q.   Do you remember what you were doing when
9   you received his response?
10       A.   I -- I do not.  I do not.  I -- I see
11  my -- I sent this -- to go.  He sent it to me at
12  5:36, but the time is off.  I probably was --
13             MS. CHASE:  And I'm going to --
14             THE WITNESS:  I'm guessing.
15             MS. CHASE:  I'm going to instruct the
16       witness not to guess.
17             THE WITNESS:  Yeah, I'm sorry.
18             I really don't know.
19  BY MR. SAVIGNAC:
20       Q.   Do you have -- so -- so understanding that
21  the issue is that your e-mail -- it's stamped as if
22  it came after, which of course isn't possible, do you
23  have any other information that could help determine
24  when these e-mails were actually sent?
25       A.   Not that I can think of.  I mean, I think
```



Page 94

1  if you looked at the calendars and assumed someone is

2  on one side of the globe and -- and I'm on the other,

3  it would become clearer.  But I haven't -- I haven't

4  undertaken that exercise.

5       MS. CHASE:  And I'll note this line of

6       questioning is in his individual capacity about

7       time zones and where people were located.

8  BY MR. SAVIGNAC:

9       Q.   Do you have any other information that

10 could help determine when these e-mails were actually

11 read?

12      A.   No.

13      Q.   And did you delete any of these individual

14 e-mails?

15      A.   No.  There's a hold on my -- on my e-mail

16 box, unfortunately.  Everything that comes in my

17 e-mail box is captured.

18      Q.   And that's not related to this litigation?

19 That's just a general fact about your e-mail?

20      A.   No, not -- yeah, I'm sorry.  I didn't mean

21 to talk over you.

22           No, that -- that's been in existence now

23 for five years or so, unrelated to this.

24      Q.   Okay.  Let's look again at the January 16

25 e-mail, on 3170 to 71.



Page 95

1          MS. SHEKETOFF:  Exhibit 4.

2          MR. SAVIGNAC:  Yeah, right, Exhibit 4.

3   BY MR. SAVIGNAC:

4      Q.   And your recommendation to Steve was

5   based -- Steve Brogan -- was based solely on this

6   e-mail and on your beliefs about the characteristics

7   it reflected.  Is that correct?

8          MS. CHASE:  Objection to form of the

9       question as vague.  But I -- I believe that what

10      you're intending to describe is this e-mail is

11      your e-mail, Mark, dated January 16th.  Is that

12      correct?

13         THE WITNESS:  Yeah.

14  BY MR. SAVIGNAC:

15     Q.   Yes, the e-mail dated January 16th

16  at 4:12 p.m.

17     A.   And to your question, yes, it was this

18  e-mail and what it reflected and the conclusions to

19  be drawn from it that were the basis for my

20  recommendation.

21     Q.   The first paragraph of the e-mail says:

22  "We have closely reviewed the case law, including the

23  two cases you rely on.  We have also discussed the

24  matter with other competent attorneys.  Your cases do

25  not support Jones Day's discriminatory policy, which



Page 96

1    is illegal under Title VII and D.C. law."

2            Was anything in that paragraph a factor in

3    your decision to recommend termination?

4        A.    Yes.

5        Q.    What was that?

6        A.    I could not believe you had closely

7    reviewed the case law, given the authority it

8    provided you, and how you can dismiss the two cases

9    that we rely upon.  I couldn't believe there were

10   actually other competent attorneys that would

11   conclude otherwise.

12           Your statement that Jones Day's policy is

13   discriminatory is conclusory and erroneous, and your

14   statement that it's illegal under Title VII and

15   D.C. law was wrong.

16       Q.    Is there anything else in the paragraph

17   that was a factor in your decision to recommend

18   termination?

19       A.    I think that covers it.

20       Q.    Did you understand the statement "We have

21   also discussed the matter with other competent

22   attorneys" to mean that we had retained counsel or

23   consulted counsel about this issue?

24       A.    I -- I frankly hadn't thought about that.

25   My only focus was I would object to the term



```
 1    "competent."

 2        Q.   And that's because you believe that no

 3    competent attorney could reach the conclusion that

 4    the policy is discriminatory.  Is that correct?

 5        A.   Correct.  Based upon my reading in the law

 6    and the privileged communications that I had.

 7        Q.   Would you have recommended that Jones Day

 8    fire me if you had believed that I was right about

 9    the policy being illegal?

10             MS. CHASE:  Objection to the form of the

11        question.  It's a hypothetical.  He can answer

12        in his individual capacity, with the same

13        notation that it's still a hypothetical

14        question, and therefore, I believe, an

15        inadmissible question and answer.  But he can

16        provide it.

17             THE WITNESS:  I -- I don't know to answer

18        that hypothetical, Mark.  If you want to

19        black-line this e-mail, what was significant or

20        not, the e-mail in its entirety formed a basis

21        for your termination.  It wasn't --

22    BY MR. SAVIGNAC:

23        Q.   So --

24        A.   -- any one thing.

25        Q.   Okay.  Are you saying that you don't know
```



Page 98

1    if you would have recommended termination if you

2    believed I was right about the law?

3            MS. CHASE:  Same objection, Mark.  You are

4        asking a hypothetical question.  No such

5        hypothetical has been presented.  The witness is

6        here as a 30(b)(6) witness with respect to

7        termination, and so any hypothetical question

8        will be one in which he cannot answer in his

9        30(b)(6) capacity.

10           He can answer as an individual who has

11       been also noticed in his individual capacity.

12       But it will still be a hypothetical question,

13       such that any answer, I believe, is

14       inadmissible, and a waste of our time for us to

15       continue this pattern of hypothetical questions.

16           But with that notation, he can answer the

17       hypothetical that never occurred.

18           THE WITNESS:  I don't know how I can

19       answer any differently, Mark.  I -- the facts

20       are, this is what the e-mail said.  There are

21       many things in here that are objectionable,

22       offensive, and just wrong.  If you want to take

23       out this one, there are others.  If you want to

24       take that down and the other one, say would that

25       have caused me, I don't know.  I don't know.  I



1       can't -- I'm not a superhero that can go back in
2       time.
3              I'm just telling you what the basis was
4       for termination:  It's the entirety of this
5       e-mail and all the things I testified to
6       earlier.
7   BY MR. SAVIGNAC:
8       Q.   Okay.  The second paragraph says, "Jones
9   Day's policy is also inconsistent with the EEOC
10  enforcement guideline you mention.  Regardless, your
11  reliance on the guideline example is misplaced
12  because EEOC's interpretations of the substantive
13  provisions of Title VII do not receive Chevron
14  deference, and courts routinely reject them."
15             Then it cites the case.
16             Was anything in that paragraph a factor in
17  your decision to recommend termination?
18      A.   I would say this -- this thing that --
19  that jumped out at me when I first read that is you
20  tell me that it's inconsistent with the EEOC
21  enforcement guidelines.  You don't tell me why.
22  Again, cite the Chevron discussion as -- even if
23  you're right, Chevron -- you know, they won't get
24  Chevron deference.  That gets closer into the law, in
25  an area that I am not steeped, and I would have



Page 100

1   relied on counsel at that point in time.

2              But to tell me that something is

3   inconsistent with EEOC enforcement guidelines, when

4   we cited you the exact example that was squarely on

5   all fours, to just say it's wrong and not explain how

6   or why, is indicative of what comes later, which is

7   just a threat:  "Give me what I want, or I'm going to

8   harm you."

9        Q.   So are you saying that the e-mail

10  statement that it's inconsistent with the guideline,

11  but without providing an explanation, was a factor in

12  your decision to recommend termination?

13       A.   No, it was just telling.  It was just

14  telling.  Again, everything that was -- that I

15  testified to earlier was a factor in why we

16  terminated you.

17             You asked me about this specific language

18  and what about it.  Was it influential?  I simply

19  told you, you didn't provide any explanation.  That

20  to me was telling.

21       Q.   And did you consider whether you could ask

22  for explanation?

23       A.   I had already tasked an associate and my

24  senior counsel of HR to analyze the issue and

25  provided the results in August.  I didn't need to do



Page 101

1    any more.

2         Q.   You believed that the Jones Day policy was

3    clearly the same as the one in the enforcement

4    guideline?

5         A.   Actually, the policy --

6              MS. CHASE:  And let me just object.  To

7         the extent that this question calls for the

8         witness to testify about privileged

9         communications, I'm going to direct him not to

10        do so.  If he can answer that question

11        otherwise, he can do so; but he's not going to

12        disclose privileged communications here today.

13             THE WITNESS:  I would -- I would simply

14        add that the Example 14 was actually less

15        favorable to our policy.  It provided up to

16        ten -- or I should say more favorable than our

17        policy -- provided up to ten weeks of paid

18        pregnancy leave, we provide eight.

19    BY MR. SAVIGNAC:

20        Q.   You say that in the EEOC policy -- in the

21    guideline, it refers to providing up to ten weeks,

22    and that you provide eight.  Does Jones Day provide

23    up to eight weeks, or does it provide at least eight

24    weeks to everyone who gives birth?

25             MS. CHASE:  Object to the question as



Page 102

1        being outside the scope of the 30(b)(6), and as

2        well, object to the question to the extent that

3        the knowledge the witness has on this topic is

4        based upon privileged communications.

5            With those two caveats, he can answer in

6        his individual capacity, with the notation that

7        he should not be disclosing any privileged

8        communications or analysis that he did or that

9        was provided to him.

10           THE WITNESS:  The Example 14 refers to ten

11       weeks of short-term disability.  My

12       understanding is that Jones Day provides eight

13       weeks of short-term disability.  I'm sure you

14       know that too.

15  BY MR. SAVIGNAC:

16       Q.   Okay.  The third paragraph says, "Because

17  our son has now been born and because Julia made the

18  prior request whereas I will be the named plaintiff,

19  I write to say:  Give me the treatment that Jones Day

20  gives to all women with new children -- 18 weeks of

21  paid leave and 6 weeks of unpaid leave -- or else I

22  will file a charge with EEOC and then a class action

23  lawsuit, and the matter will be decided in the

24  D.C. Circuit and in the court of public opinion.  We

25  are very familiar with the D.C. Circuit and confident



Page 103

1    we will win."

2              Was anything in that paragraph a factor in

3    your decision to recommend termination?

4         A.   Sure.  All the things I testified to

5    earlier and what it reflects:  An inapposite analysis

6    of the law, lack of judgment, threatening,

7    extortionate request for something that you weren't

8    entitled to, lack of leadership, lack of respect.

9              And yet you'd send this to a senior leader

10   in this law firm, a director of this law firm?  And

11   treat staff this way?  It's just frankly appalling.

12             And to listen to you read it again just --

13   I just could not imagine that someone would so

14   misunderstand this law firm, or what we're about, and

15   to think that -- think that way and treat people that

16   way.

17        Q.   And when you say "treat people that way,"

18   are you referring to Sarah McClure?

19        A.   In part, yes.

20        Q.   What other people are you referring to?

21        A.   Every partner or lawyer in this law firm

22   that depends upon this law firm for its livelihood.

23   To have such disrespect, to make a threat of such a

24   personal nature, to threaten, you know, harm, in a

25   law firm that you say you want to be a partner in,



Page 104

1    it's tough to wrap my head around.

2         Q.   And is it your view that the e-mail was

3    not sufficiently collegial to Sarah McClure?

4         A.    Absolutely.

5         Q.   Was that a factor in your decision to

6    recommend termination?

7         A.   Yes.

8         Q.   And what was uncollegial about it?  With

9    respect to --

10        A.   I think the document -- the document

11   speaks for itself, Mark.  I'm not going to argue with

12   you.  Anyone who reads this e-mail would come away

13   and say, "This is not how people -- particularly in

14   an institution that is founded upon collegiality,

15   cohesive approach to practice of law, teamwork,

16   integrity -- would act towards one another.

17            "Give me what I want, or else."

18        Q.   And was I ever less than collegial to

19   anyone else at the firm, aside from this e-mail?

20            MS. CHASE:  Objection to the form of the

21        question to the extent it is seeking information

22        in a 30(b)(6) capacity.  He can answer in his

23        individual capacity.

24            THE WITNESS:  The answer to your question,

25        Mark, I don't know.  I believe there was some



Page 105

1          reference to that in one of your reviews.  Ben

2          Mizer may have said something like that.

3   BY MR. SAVIGNAC:

4          Q.   Okay.  The e-mail that the January 16

5   e-mail is responding to, Sarah McClure's August 24

6   e-mail?

7          A.   Yeah.

8          Q.   Was Sarah McClure acting as Jones Day's

9   counsel when she sent me this e-mail?

10          A.   Well, Sarah has dual hats.  She is our HR

11   director, so she is responsible for the minutiae

12   of HR: payroll, what our payment system is, how to

13   track hours for employees.  There's a lot in that

14   role.

15          She's also -- I don't know if you know

16   this, but she was a practicing Jones Day lawyer for

17   10 to 12 years.  She was an excellent attorney, and

18   we were fortunate enough to convince her to just have

19   one client, and it to be Jones Day.

20          So she was responding to you in that joint

21   role as counsel and HR director.

22          Q.   So are you saying I was insufficiently

23   collegial in a demand letter to Jones Day's attorney?

24          MS. CHASE:  Objection to the form of the

25          question.  In particular, assumes facts not in



```
 1      evidence.
 2              You can answer, though.
 3              THE WITNESS:  Yes, is -- is the answer.
 4      BY MR. SAVIGNAC:
 5         Q.   Should I have sent the e-mail to someone
 6      other than McClure?
 7         A.   Again, hypothetical.  Sarah was the
 8      right -- was -- was one of -- we started this
 9      deposition by going through the individuals you could
10      have contacted with any concern or issue you had.
11      Sarah was one of them.
12         Q.   Okay.  Returning to the third paragraph of
13      the January 16 e-mail, the e-mail says -- refers to
14      the treatment that Jones Day gives to all women with
15      new children as 18 weeks of paid leave and 6 weeks of
16      unpaid leave.  Did you understand the assertion that
17      Jones Day gives all women with new children 18 weeks
18      of paid leave to be a true assertion?
19         A.   I -- I must confess, Mark, that's not
20      something I focused on.  I -- I didn't -- I didn't
21      view it as inaccurate at the time.  But I would have
22      to have relied upon legal counsel as to whether you
23      got that right or wrong.
24              I -- I generally know what we provided,
25      how it changed over time.  But I didn't focus on, did
```



1  he get the right number of weeks, paid and unpaid?  I

2  didn't -- I didn't think about that.

3       Q.   And what was your understanding at that

4  time of the leave that Jones Day offers to associates

5  with new children?

6            MS. CHASE:  And I will note that the

7       witness has just testified that he had to rely

8       on privileged advice with respect to that topic,

9       and therefore he's not going to be able to

10       answer that question, either in his individual

11       capacity or as a 30(b)(6).

12  BY MR. SAVIGNAC:

13       Q.   So you -- you didn't know -- aside from

14  privileged advice, you didn't have knowledge on that

15  topic?

16       A.   I think I testified I had a general

17  understanding.  The particulars were based upon Sarah

18  McClure, who knows this, chapter and verse.

19       Q.   Was the statement that I would file

20  an EEOC charge a factor in your decision to recommend

21  that I be fired?

22       A.   As I've testified before, none whatsoever.

23       Q.   What did you understand the e-mail to mean

24  where it says, "the matter will be decided in the

25  D.C. Circuit and in the court of public opinion"?



1      A.    The D.C. Circuit, I assume, is reference

2   to your threat of a class action lawsuit, which again

3   I didn't find very compelling.  I didn't see there

4   was any merit to it.  I didn't think you'd actually

5   file it.

6           And the court of public opinion, to me, is

7   you're going to somehow bad-mouth the firm in some

8   way, whether that's through -- like you did, The New

9   York Times article, or something on social media.

10  It's the world we live in today, unfortunately.

11      Q.    Is it possible to bad-mouth the firm in

12  the way you're referencing through court filings?

13          MS. CHASE:  Objection to form of the

14      question.  It's hypothetical.  He cannot answer

15      a hypothetical question in his 30(b)(6)

16      capacity.  I will allow him to answer in his

17      individual capacity, with the same objection,

18      that it is hypothetical and therefore I think a

19      waste of our time to ask both a series of --

20      these continuing series of what I believe to be

21      objectionable, and thus will lead to

22      inadmissible responses, for a witness whose time

23      is valuable.

24          With that, I will let him answer the

25      question.



```
 1              THE WITNESS:  Okay.  I must confess I
 2         don't even remember the question.
 3              Would the filing of statements like that
 4         in a lawsuit be considered the court of public
 5         opinion?  You know, I didn't think about that.
 6         You told me quite clearly that you were going to
 7         file a class action lawsuit and a charge at the
 8         EEOC.  I didn't believe you.
 9              And you added in, "in the court of public
10         opinion."  That suggests to me you're thinking
11         about something in addition to an EEOC charge, a
12         class action lawsuit, and the court of public
13         opinion.  Looked to me like you were trying to
14         cover all your bases of how you were going to
15         harm this law firm if we didn't give you
16         something you weren't entitled to.
17    BY MR. SAVIGNAC:
18         Q.   The paragraph concludes, "We are very
19    familiar with the D.C. Circuit and confident that we
20    will win."
21              Was that sentence a factor in your
22    decision to recommend that I be fired?
23         A.   Yeah, it -- it was.
24         Q.   And why is that?
25         A.   "We will" -- first off, the statement that
```



Page 110

1    "we will win," again, suggests is a complete

2    misunderstanding and distortion of the applicable

3    law.  A statement that you are very familiar with the

4    D.C. Circuit spoke to your hubris, suggesting that

5    you knew the D.C. Circuit and perhaps we did not.

6              We've been practicing law for 129 years.

7    I'd like to think that we, as an institution, have

8    had more -- far more experience than you and Julia in

9    the D.C. Circuit.

10             Again, immaturity, lack of

11   professionalism, judgment, all screamed off of that

12   sentence.

13        Q.   Do you think it's inappropriate in general

14   for a person to claim to be familiar with a court?

15             MS. CHASE:  Objection to the form of the

16        question, to the extent you seek his knowledge

17        as a 30(b)(6).  He can answer in his individual

18        capacity, however.

19             THE WITNESS:  We hired you.  We paid you

20        over a million dollars.  I would hope and expect

21        that you have some familiarity with the

22        D.C. Circuit.

23   BY MR. SAVIGNAC:

24        Q.   And what did you understand the phrase "We

25   are very familiar with the D.C. Circuit" to mean?



Page 111

```
 1        A.   I think I just testified to that.  I'm not
 2   going to go back there.
 3        Q.   All right.
 4             The fourth and final paragraph says, "I am
 5   aware that Jones Day's black-box compensation system
 6   and its attempts to keep associate salaries secret
 7   are tailor-made to enable sex discrimination,
 8   including retaliation.  We ourselves experienced this
 9   when Julia's salary was cut in relative terms based
10   on a negative review from a partner who, in
11   hindsight, clearly treated her worse because she is a
12   woman.  As you know, Title VII prohibits retaliation
13   for opposition to sex discrimination."
14             Was the e-mail's assertion that Julia
15   experienced pay discrimination a factor in your
16   decision to recommend that I be fired?
17        A.   Not the statement itself, but the
18   suggestion that -- well, two things.  One, I knew it
19   wasn't true, as I testified to earlier.  I had viewed
20   every review relating to Julia.  I knew the merits
21   and demerits.  I knew that there were several who
22   were supportive of Julia and some who had concerns.
23   I knew that she had gotten a fair shot, and she had
24   actually gotten increases, even in the wake of some
25   poor performance.  So I knew that was not true.
```



Page 112

1                    The idea that you would so conclusively

2     say that she was clearly treated in a negative way

3     because she is a woman, to me, said more about the

4     two of you than it did about Jones Day.

5                    And again, it goes back to the -- the

6     values and the lack thereof that flowed from this

7     e-mail.

8          Q.   I'm sorry.  Did you say that there were

9     two things about --

10                   MS. CHASE:  I --I think you're going to

11        generally find that most witnesses are not going

12        to remember exactly what they said.  Would you

13        like to have the answer read back?

14                   MR. SAVIGNAC:  Yes, please.

15                   (Whereupon the Court Reporter read the

16                   previous answer.)

17    BY MR. SAVIGNAC:

18         Q.   Mr. Shumaker, do you know what the second

19    thing was that you were referring to?

20         A.   I think they're all encompassed in there.

21    One is the suggestion that she was discriminated

22    against because she's a woman, and that is

23    objectively -- objectively false.

24                   And two, it was less about that, but

25    again, the -- what it reflected regarding your lack



Page 113

1    of understanding of the firm's values.

2              So, again, the objective facts is she was

3    not discriminated; and two, to make the allegation to

4    begin with reflected poorly on your judgment,

5    professionalism, maturity, all the other stuff I've

6    been testifying about.

7        Q.   And your view at the time, that the

8    allegation was not true, is it fair to say that you

9    did not know what particular partner was being

10   referenced when you reached that view?

11       A.   I can't recall if I knew at that point or

12   not.  I -- I likely did not.  But again, I was in the

13   reviews.  I reviewed every review.  Four, five, six

14   years Julia was there, I saw every partner who

15   commented on what she said.  And there was not a

16   single one of them that indicated that they were

17   calling the balls and strikes in any way different

18   from another.

19              We have a review process that involves

20   partners from all practices, from -- male and female,

21   gay and straight, California, Texas; they're all in

22   there.  If -- if anyone was being discriminated

23   against because of their particular race or sex or

24   leaning, it did not happen.

25              And I also know that we had just been



Page 114

1    through a lawsuit where people had made exactly those

2    allegations.  And paid experts analyzed our data and

3    said there's nothing there, and the lawsuit had to be

4    dropped.

5               So for you and Julia to say Julia's being

6    discriminated against, it was reflective of -- "It's

7    not me; it must be you."

8               And that's not true.  At some point you

9    need to face up to the fact that we all -- all aren't

10   perfect.  And as good a lawyer as Julia was, she

11   wasn't perfect.  And criticism of the person, her

12   performance, does not mean they're being

13   discriminated against.

14        Q.    The lawsuit you're referring to, is that

15   the Tolton against Jones Day lawsuit?

16        A.    Yes, sir.

17        Q.    And is it consistent with your

18   recollection that that lawsuit had not been filed at

19   the time that I was terminated?

20        A.    I don't remember the timing.

21        Q.    Okay.  When you say that they dropped the

22   lawsuit, do you mean that the lawsuit was settled?

23   Or did they dismiss the lawsuit without, you know --

24               MS. CHASE:  And I -- let me just note that

25          all of this questioning about the Tolton lawsuit



Page 115

1    is questioning that he can answer in his

2    individual capacity, not as a 30(b)(6).

3           And to the extent that his knowledge on

4    these topics has been gleaned from privileged

5    communications, I'm going to instruct him not to

6    answer, other than to state "I don't have

7    information other than such is privileged."

8    ████████████████    ████████    █████████████████

9    ███████████████████████████████████████████████

10   ██████████    ███████████████████████████

11          MS. CHASE:  And I will note again,

12   individual capacity for that response.

13   BY MR. SAVIGNAC:

14      Q.   Okay.  So asking in your 30(b)(6)

15   capacity --

16          MS. CHASE:  And actually, while we're --

17   just before we move on to the next topic, I -- I

18   meant to do this at the beginning, and I did

19   not.

20          There is a protective order that governs

21   this litigation.  And Karen, probably a note

22   more to you than to anyone else.  I am

23   designating this deposition as confidential.  We

24   can de-designate portions of it later, but

25   please note that the entire deposition is



Page 116

1           designated as confidential.

2                   To the extent that we discuss at any point

3           any client privileged information which has a

4           different and additional level of designation, I

5           will so note.  I don't anticipate that will

6           happen today, but to the extent it does, I will

7           let you know at that point.

8                   But otherwise, this deposition is being

9           designated as confidential from start to finish.

10                  MR. SAVIGNAC:  Okay.

11   BY MR. SAVIGNAC:

12       Q.   In your 30(b)(6) capacity, was this

13   e-mail's assertion that Julia experienced pay

14   discrimination a factor in the firm's decision to

15   fire me?

16                  MS. CHASE:  Objection.  Asked and

17           answered.  But he may answer again, in his

18           30(b)(6) capacity.

19                  THE WITNESS:  Again, that -- that goes

20           back to our 1, 2.  Number 1, I knew it wasn't

21           true.  I had been in all of the reviews.

22                  And number 2, what it reflected for you to

23           even make the allegation proved to me that --

24           that your future with the firm was coming to an

25           end.



1   BY MR. SAVIGNAC:

2        Q.   Are you aware of other people who, while

3   employed at Jones Day, have complained that a partner

4   may have treated them worse, based on sex?

5             MS. CHASE:  I'm going to object to the

6        question as being outside the scope of his

7        30(b)(6) topics.  But he can answer in his

8        individual capacity, with respect to employees

9        of Jones Day in the United States.  I will

10       instruct him not to answer about partners or

11       anything outside of the United States.

12            THE WITNESS:  The only person I think that

13       suggested she was being paid less than males was

14       Tolton, California.  I don't believe there are

15       others.  But -- nor have I talked to Sarah about

16       that.

17   BY MR. SAVIGNAC:

18       Q.   And is it your view that the allegation

19   you mentioned from Tolton is -- was also false?

20       A.   It was false, as was ultimately

21   established with the data analysis.  She made that

22   allegation about a year and a half before she ever

23   left the firm.  So we didn't fire her.  We just said,

24   "That's not true."

25            We tried to communicate with her and



1   explain to her that there were weaknesses in her

2   performance.

3          (Exhibit 22 was marked for identification.)

4   BY MR. SAVIGNAC:

5          Q.   Let's move to Exhibit 22, which is

6   Bates -- well, it's not really a Bates number, but

7   it's stamped JD_PRIV_163.

8          A.   So I did talk to Mary Ellen.

9          Q.   Right, right.  Okay.

10              MS. SHEKETOFF:  Exhibit 22?

11              MR. SAVIGNAC:  Yes, Exhibit 22.

12  BY MR. SAVIGNAC:

13         Q.   So let's look at the last page of the

14  exhibit.  It doesn't have any pagination, but --

15         A.   163?

16         Q.   They all say 163.

17         A.   Oh, sorry.  Yeah.

18         Q.   Is this an e-mail chain beginning with an

19  e-mail from you, with the subject line "Julia

20  Sheketoff"?

21         A.   Yes, sir.

22         Q.   And since I don't know how to pronounce

23  this, who did you send this e-mail to?

24         A.   I sent this to Suzanne Coussons and Sarah

25  McClure.



Page 119

1          Q.    And is this how you began an investigation

2     into the claim of pay discrimination against Julia?

3               MS. CHASE:  I would just note for the

4          record that this line of inquiry is in his

5          individual capacity, but that he can answer,

6          again with the notation that any privileged

7          investigation, he can testify to the existence

8          of such, but not the substance of any of the

9          communications.

10              THE WITNESS:  Yeah, I -- obviously I don't

11         have the unredacted copy in front of me.

12         Suzanne was at that time director of practice

13         services, and oversaw our associate review

14         process.  And Sarah, I suspect at this point in

15         time I was seeking either her reviews or her

16         compensation adjustments over the years.

17    BY MR. SAVIGNAC:

18         Q.    Okay.  And so is this e-mail how you began

19    the -- this investigation?

20         A.    I wouldn't -- I don't know how -- what it

21    means to begin an investigation.  I was looking to

22    refresh my recollection, if you want to call that an

23    investigation.  I was trying to get the facts.

24         Q.    Sure.

25              Okay.  Please look at the third page.



1          MS. CHASE:  Third from the back or from

2     the front?

3   BY MR. SAVIGNAC:

4          Q.   Third from the front.  So the second is

5   just a big redacted block.

6          A.   Okay.

7          Q.   And then the third.

8               At the bottom of this page, is this an

9   e-mail from you to Sarah McClure, that says, "I gave

10  Beth a heads up"?

11         A.   Correct.

12         Q.   Is "Beth" Beth Heifetz?

13         A.   I am sure that's who I was referring to.

14         Q.   And what did you give her a heads-up

15  about?

16         A.   That -- again, I don't have the unredacted

17  version.  I suspect -- I'm dealing with two issues

18  and appeals lawyers.  She had responsibility for them

19  as practice leader, and I wanted her to know of -- of

20  these concerns being raised.

21         Q.   Okay.  So it appears -- on the next page,

22  the -- I guess it's the fourth page, is an e-mail

23  from McClure to you that says, "Before we do

24  anything, we should give Beth a heads up so she can

25  be prepared for reaction from the I&A folks."



Page 121

 1              What does "before we do anything" refer

 2    to?

 3         A.   I suspect that from the beginning, we were

 4    thinking about a possible termination.  But I don't

 5    know.  That's Sarah's words, not mine.

 6         Q.   And what reaction was McClure referring

 7    to?

 8         A.   I don't know what Sarah --

 9              MS. CHASE:  Let me object to the -- let me

10         just object to the question as -- this question

11         and the prior question are clearly in his

12         individual capacity, not as a 30(b)(6) witness.

13              I am also going to object to the question

14         to the extent you're asking Mr. Shumaker what

15         was in the mind of someone else.  He can

16         certainly provide you what his understanding of

17         these words meant, either at the time or

18         presently.  But he certainly can't speak for

19         what was in Sarah's mind at the time.

20              With that noted, he can answer in his

21         individual capacity.

22    BY MR. SAVIGNAC:

23         Q.   What is your understanding of what she was

24    referring to with the word "reaction"?

25         A.   I suspect if the -- again, you have to ask



Page 122

1   Sarah.  She used the word, not I.  I, in receiving

2   that e-mail, would likely have understood her to be

3   saying that if we are going to move forward with a

4   severance, we need to be prepared for how that might

5   ripple through the I&A practice.  And we need to make

6   sure that our leadership is aware that this is going

7   to happen.

8         You don't tell Beth that -- "Hey, I'm

9   going to terminate Mark Savignac," and he's gone.

10  People start calling Mark, and people -- "Where's

11  Mark?  Mark's gone.  What happened?"

12        People start to talk.  We want to make

13  sure we can provide answers when people are starting

14  to talk.  So I assume that's what she's referring to.

15     Q.   To your knowledge, did Jones Day

16  leadership provide answers to people in the issues

17  and appeals group about what had happened to Mark?

18        MS. CHASE:  I'm going to note that

19     Mr. Shumaker can answer in his individual

20     capacity with respect to this question.

21        THE WITNESS:  I can't -- I can't tell you

22     what Beth -- how -- what -- what questions she

23     fielded or -- certainly none of them came to me.

24     I don't know.

25



Page 123

1    BY MR. SAVIGNAC:

2        Q.   Okay.  Let's look at the first half or the

3    first page of this exhibit, the front page, that has

4    the stamp that says "Plaintiffs' Exhibit 22."

5        A.   Okay.

6        Q.   On the bottom half of the page, is this an

7    e-mail from you to Mary Ellen Powers and Shay

8    Dvoretzky?

9        A.   Yeah, I'm forwarding a chain to them.

10       Q.   And why did you forward the e-mail chain

11   to Mary Ellen Powers?

12       A.   Mary Ellen used to have my role.  She

13   has -- I trust her.  I've known Mary Ellen for the

14   31 years I've been here.  I -- she has, in my view,

15   impeccable judgment.  And she's a -- a female leader,

16   so I want her to know that we have a situation where

17   someone is questioning our leave policies.

18            And I had spoken with her in the past,

19   when we made changes to leave policy, to make sure

20   that she's in agreement with -- with where we're

21   going, what we're doing, that type of thing.

22       Q.   And was Mary Ellen acting as counsel in

23   connection with these e-mails?

24       A.   Absolutely.  She -- she's on my speed

25   dial.  She's just -- she is commonly tasked to



Page 124

1  provide counsel to the firm, and -- and me in

2  particular, in my role as administrative partner.

3        Q.   And why did you forward this chain to Shay

4  Dvoretzky?

5        A.   Shay -- Shay was a leader in our issues

6  and appeals group, a wonderful lawyer.  And I knew

7  that he had handled issues like this in his client

8  work, and I trusted his counsel and advice, and

9  that's why I reached -- reached out to Shay.

10       Q.   And when you say "issues like this," you

11  mean terminations where someone --

12       A.   No, no, not that.  More along the lines of

13  labor and employment issues.  I -- I don't recall

14  being specific to leave issues.  I -- it could have

15  been.  I don't remember.  But I remember Shay having

16  some unique expertise regarding the law, so I would

17  have been seeking to take advantage of a really big

18  brain, knowing the law better than perhaps me.

19       Q.   So was Shay acting as counsel in

20  connection with my termination?

21       A.   I would defer to Terri as to whether

22  we've -- the firm viewed him as counsel.  I certainly

23  did.

24            MR. SAVIGNAC:  Terri, does -- do you have

25       a --



Page 125

1              MS. CHASE:  Yes.  Certainly Shay, as has

2         been just described, was consulted for his legal

3         analysis with respect to this issue, which is

4         acting in a counsel capacity.  So yes.

5              THE WITNESS:  And I wasn't -- he wasn't in

6         a leadership position, in the sense that he was

7         a practice leader.  I don't -- I don't think

8         that was the case at that point in time.  I

9         literally was reaching out to him for his mental

10        impressions and his legal advice.

11   BY MR. SAVIGNAC:

12        Q.   Okay.  Let's look at Exhibit 25.  And this

13   is a document Bates-stamped -- well, it's marked

14   JD_PRIV_13.

15        (Exhibit 25 was marked for identification.)

16             THE WITNESS:  Yes, I'm here.

17   BY MR. SAVIGNAC:

18        Q.   Is this an e-mail chain with the subject

19   line "Savignac"?

20        A.   Yes.

21        Q.   And is the bottom e-mail -- that is, the

22   first e-mail in the chain -- an e-mail from you to

23   Kevyn Orr and Adrian Wager-Zito, beginning, "Steve

24   has asked that we terminate Savignac immediately"?

25        A.   Yeah.  I'm -- I'm impressed with myself



Page 126

1  that I remembered it accurately, that I reached out

2  to Kevyn after I had Steve's decision to discuss

3  execution.

4        Q.   Does this refresh your recollection about

5  whether you'd spoken to Kevyn and Adrian about this

6  before you heard from Brogan?

7        A.   Yeah.  This -- this suggests the way I was

8  leaning, as I testified earlier, that I didn't reach

9  out to Kevyn and Adrian till after I had gotten

10  Steve's decision, and now we're talking about

11  execution.

12        Q.   Doesn't it suggest that they must have

13  known something about the topic, or else the first

14  sentence would seem to come out of nowhere?

15        A.   Yeah, I'll give you that.  There must have

16  been some indication before.  I may have let them --

17  I may have informed them of -- of the -- the issue

18  having been raised, but I -- they were not intimately

19  involved in the discussions, and now I'm obviously

20  getting them involved in terms of how we're going to

21  execute on the severance.

22        Q.   Do you know where Kevyn and Adrian were,

23  physically, at this time?

24        A.   I have no reason to believe they weren't

25  in Washington, but I do not know.



Page 127

1          MS. CHASE:  And I'll note with respect to

2      that inquiry and response, Mr. Shumaker is

3      answering in his individual capacity.

4  BY MR. SAVIGNAC:

5      Q.   You don't -- they wouldn't have been at

6  the budget meeting in Europe?

7      A.   No.  No, Kevyn nor Adrian were on the

8  budget committee.

9      Q.   And is your answer the same with respect

10  to Sarah McClure, that she would presumably have been

11  in Washington?

12     A.   Presumably.  At that point in time of the

13  year, you know, there's no spring breaks or holiday

14  breaks, I would think -- well, I don't know.  I would

15  think she was in Washington.  Maybe she was on a

16  holiday trip because the MLK weekend.  I don't -- but

17  I would suspect she was in Washington.

18         MS. CHASE:  And I would note that the same

19      inquiry regarding Ms. McClure's whereabouts at

20      any particular point in time, Mr. Shumaker is

21      answering in his individual capacity, not as a

22      30(b)(6).

23  BY MR. SAVIGNAC:

24     Q.   And the e-mail from you, the date given is

25  January 21 at 2:16 a.m.  Do you have a view on



Page 128

1   whether that is most likely the time where you were

2   located?  In other words, do you think you were

3   sending this e-mail in the middle of the night?

4        A.   No, I -- I likely would have been on my

5   computer, and that's a time change.  So if you put

6   six hours, it was probably 8:16 a.m. in Germany, and

7   it's coming across at 2:16 a.m. in the States.

8             And my -- I think your BlackBerry adjusts,

9   but I don't think your computer adjusts -- or at

10  least back then it didn't.

11            So that's why.  I would never send an

12  e-mail -- well, unless really something was hitting

13  the fan -- at 2:16 in the morning.

14       Q.   Okay.  So if you look back quickly at

15  Exhibit 4.  Your e-mail recommending that I be fired

16  is dated January 21 at 12:27 a.m.

17       A.   Yes.

18       Q.   Do you have any reason to doubt that that

19  12:27 a.m. is not, you know, a little less than two

20  hours before the 2:16 a.m. on your e-mail to Kevyn

21  and Adrian?

22            MS. CHASE:  Objection to the form of the

23       question.  And I will note this is outside of

24       his 30(b)(6) capacity.  But he can answer, to

25       the extent he can, as an individual.



Page 129

```
 1              THE WITNESS:  Yeah, I -- I can't help you,
 2       Mark.  I -- God forbid I would be a computer
 3       forensic person.  I -- I don't know.  And I
 4       think the documents speak for themselves.  I
 5       don't have a recollection.  Certainly after.
 6              MS. CHASE:  Mark, we can't hear you.
 7              MR. SAVIGNAC:  I apologize.
 8  BY MR. SAVIGNAC:
 9       Q.   You have no reason to doubt the
10  relation --
11              MS. CHASE:  He just said he cannot speak
12       to the time stamp on any of these, either as a
13       30(b)(6) or in his individual capacity, that he
14       is not a computer forensics person.  That is
15       what his testimony was.
16              So he is not going to provide any factual
17       testimony about what the time stamps reflect.
18       If you want to ask him what came first and what
19       came second, I believe he can answer those
20       questions without having to have knowledge of
21       the computer's time stamps.
22  BY MR. SAVIGNAC:
23       Q.   Okay.  And on Exhibit 25, is the top
24  e-mail an e-mail from you saying, "Let's hold
25  momentarily.  Mary Ellen is inquiring and I don't
```



Page 130

1    want to execute until she's good with it"?

2         A.   Correct.

3         Q.   What does the word "execute" refer to?

4         A.   Execute in termination.  Actually putting

5    into motion how we're going to give you notice and do

6    all the HR issues that need to be done, get the

7    vacation pay paid, get network access turned off.

8    What's the out-of-office notice going to be, and

9    there's a lot that goes into that.  Talk to Gurdak

10   about, you know, what forms do or do not need to be

11   signed, that type of stuff.

12        Q.   And what was Mary Ellen inquiring about?

13             MS. CHASE:  I'm going to note that to the

14        extent that the inquiry was privileged in

15        nature, he can so indicate, but that he's not

16        going to describe the substance.

17             THE WITNESS:  Yeah, this -- this is a

18        reference to what I testified earlier, that I

19        trust Mary Ellen's judgment, relied upon Mary

20        Ellen's judgment in these areas in the past, and

21        I have reached out to her, and she was getting

22        back to me.  And I hadn't been -- likely I had

23        not been able to add back up with her, and I

24        didn't want to move forward until I had

25        discussion with her.



Page 131

1      BY MR. SAVIGNAC:

2           Q.   And how did you know that she was

3      inquiring?

4           A.   You may know better than I.   I don't know

5      if there would be an e-mail or a voice message where

6      she called me, and I tried to call her back and I

7      didn't get through.   I don't know.

8           Q.   And who was she inquiring with?

9           A.   Oh, she -- that's a reference to she's

10     contacting me, likely because I tried to reach out to

11     her, and she's now coming back to me, and we hadn't

12     been able to add up.

13          Q.   Okay.   And so it's not a reference to

14     inquiring with Brogan about his decision, correct?

15          A.    That -- no, I don't -- I don't recall that

16     being the case.   She -- honestly, Mary Ellen has her

17     own ability to interact with Steve.   They're --

18     they're good friends and partners.   But my

19     recollection is that was just me and her

20     communicating, that she was not -- she was not with

21     Steve, nor communicating with Steve about the subject

22     at the time.

23          Q.   Okay.   You don't think that she

24     communicated directly with Brogan about this topic

25     during the time period?



Page 132

```
 1          A.   I -- I have no knowledge of that.
 2          MS. CHASE:  I'll note in this, with
 3      respect to any questions about who Mary Ellen
 4      and/or Steve communicated with that do not
 5      involve Mr. Shumaker, he can answer in his
 6      individual capacity, not as a 30(b)(6).
 7  BY MR. SAVIGNAC:
 8          Q.   I'm sorry.  What was the answer?
 9          A.   Yeah, I have no reason to think that Mary
10  Ellen was communicating with Steve at that time.
11  That does not mean that she was not.
12          Q.   And you were the one who first contacted
13  Mary Ellen Powers about this issue; is that correct?
14          MS. CHASE:  Again, in his individual
15      capacity, he can answer that question, to the
16      extent he knows.
17          THE WITNESS:  I suspect I did.  I can't
18      think of who else would have brought her into
19      discussion, if not me.
20  BY MR. SAVIGNAC:
21          Q.   And did she recommend that I be fired?
22          A.   That's privileged.
23          MS. CHASE:  Again, I instruct the witness
24      not to answer about anything that's
25      privileged -- which I believe he just said:
```



Page 133

1         That's privileged.

2              MR. SAVIGNAC:  Okay.  Let's look at

3         Exhibit 30.

4          (Exhibit 30 was marked for identification.)

5    BY MR. SAVIGNAC:

6         Q.   This is marked JD_PRIV_14.

7              And is this another iteration of the

8    e-mail chain with the subject line "Savignac"?

9         A.   Yes.

10        Q.   And if you turn to the second page -- I

11   think there are only two pages.

12             On the second page, about a third of the

13   way down the page, there's an e-mail from you that

14   says, "Mary Ellen is good with proceeding with the

15   termination."

16             What does that language mean?

17        A.   That means that I had finally gotten

18   through to Mary Ellen.  We had discussed the

19   situation, discussed the issues that were being

20   raised.  I told her that -- which way I was leaning.

21   And she concurred with my approach.

22             I suspect this was part of a privilege

23   challenge.  That should have been privileged.

24             Neither here nor there.

25        Q.   I'm sorry.  I didn't hear that.



Page 134

1        A.   I said it's neither here nor there, now

2   that you have it.  I'm just telling you, this was a

3   privileged communication.  I don't know if this was a

4   battle you all had in front of the judge.

5            MS. CHASE:  It was, and the judge ordered

6        it produced.

7            THE WITNESS:  Yeah.  That's fine.

8            MR. SAVIGNAC:  Okay.  Let's go to

9        Exhibit 31.

10          (Exhibit 31 was marked for identification.)

11           MR. SAVIGNAC:  This is JD_PRIV_24.

12  BY MR. SAVIGNAC:

13       Q.   And is this an e-mail chain that you were

14  on?

15       A.   Yes.  I see my name, yes.

16       Q.   And in the middle e-mail on the page,

17  there's an e-mail from Adrian to you and others that

18  begins, "Firm TSS is on stand by to shut down access

19  when we ask him to."

20           And she writes, "Also, ran a report

21  checking Interwoven.  Nothing out of the ordinary."

22           What is Interwoven?

23       A.   Interwoven is our document management

24  system.  So that's Interwoven.

25       Q.   And when you have referred to concerns



Page 135

1    about access to materials on Jones Day's system, is

2    Interwoven what you're thinking of?

3           A.    One of the things.

4           Q.    And what was Adrian checking for?

5           A.    This is a regular procedure when we are --

6    two parts to why we check.  One, we want to make sure

7    we have a good understanding of what the lawyer's

8    working on.  Better or for worse, whether intentional

9    or not, lawyers may identify the six matters they're

10   working on, but they miss the seventh; and we want to

11   make sure we got all the balls covered and nothing's

12   getting dropped.

13          That would be part of the reason.  The

14   other is we have had situations where people have

15   accessed documents for reasons other than work, and

16   we wanted to make sure that that was not occurring in

17   this instance.

18          Q.    And when she says "Nothing out of the

19   ordinary," did you understand that to mean there was

20   no evidence that I had done anything improper on

21   Interwoven?

22          A.    Yeah, it was a normal -- what we would see

23   for any lawyer who is just working on his casework.

24          MR. SAVIGNAC:  All right.  Let's look at

25   Exhibit 7, which is JD_PRIV_22.



Page 136

1          (Exhibit 7 was marked for identification.)

2     BY MR. SAVIGNAC:

3          Q.   And let me know when you see that.

4          A.   I'm there.

5          Q.   Okay.  Is this an e-mail chain in which

6     you forwarded your recommendation e-mail to Brogan,

7     and Brogan's e-mail saying "He has to go," to Beth

8     Heifetz?

9          A.   Correct.

10         Q.   Is this what you were referring to when

11    you said you had given Beth a heads-up?

12         A.   I don't remember in which context I

13    referenced giving Beth a heads-up, but this is

14    absolutely giving Beth a heads-up.

15         Q.   And what was Beth's role in the decision

16    to fire me?

17         A.   The decision to fire was -- was purely

18    Steve's decision, based upon my recommendation.  My

19    recollection is Beth did not disagree with that, but

20    I'm not sure that I would say she had a role in the

21    decision.

22         Q.   And you didn't have any communications

23    with her about the decision prior to making your

24    recommendation to Brogan; is that correct?

25              MS. CHASE:  Objection to the form of the



Page 137

```
 1        question.

 2                But you may answer.

 3                THE WITNESS:  I -- I don't remember if I

 4        had any discussions with that.  That would not

 5        have been unusual, for me to have communicated

 6        with Beth while we're talking about two people

 7        in her practice, but I don't have any

 8        recollection.

 9   BY MR. SAVIGNAC:

10        Q.   You don't recall seeking her advice or

11   recommendation on the issue?

12                MS. CHASE:  In his individual capacity, he

13        can answer this question.

14                THE WITNESS:  I -- I don't.  But I'll say

15        I think in reality, with Beth, too, I would

16        have -- I could have very well asked, "What do

17        you think?"  I just don't remember that.

18   BY MR. SAVIGNAC:

19        Q.   And why did you decide to share with Beth

20   the legal advice you'd given to Brogan?

21        A.   I wasn't necessarily thinking about

22   sharing the legal advice, as compared to sharing with

23   her that the managing partner had made the decision

24   to make the separation.  We were talking about

25   someone in her practice.  She needed to know that.
```



1       Q.   And does this exhibit show Beth then

2    forwarding the same e-mail chain to Shay?

3       A.   Yes.

4       Q.   Do you have any understanding of why Beth

5    decided to share the legal advice with Shay?

6            MS. CHASE:  Let me just object, first,

7         before we get the order of sequence wrong here.

8            Any of the inquiry regarding why some

9         other person forwarded some document is a

10        question outside the scope of the 30(b)(6).  I

11        will note that the witness has previously

12        identified Shay as someone who was part of the

13        privileged analysis that was done in connection

14        with the analysis related to your termination.

15           I can note that as counsel, that that is

16        something that we have also previously indicated

17        here.  To the extent the witness knows why Beth

18        did something, in his individual capacity, he

19        can so indicate.  But he certainly can't

20        indicate as a 30(b)(6).

21           THE WITNESS:  Yeah, to answer the

22        question, I -- Beth and Shay would have been --

23        I can't remember the timing.  Again, like I

24        testified to earlier, I had gone to Shay because

25        of his expertise.  He was involved in the



Page 139

1        discussion, so it does not surprise me that Beth

2        would have sent this on to Shay.

3            MR. SAVIGNAC:  Okay.  Let's look at

4        Exhibit 9.

5        (Exhibit 9 was marked for identification.)

6   BY MR. SAVIGNAC:

7        Q.    It's marked JD_PRIV_43?

8        A.    Yeah.

9        Q.    And is this an e-mail where you forward

10  your advice to Brogan, and Brogan's response, saying

11  "He has to go," to Michael P. Gurdak?

12       A.    Yeah, I wouldn't have been sending it to

13  Mike because of advice I had given Steve, but rather

14  because of Steve's decision he needed to go.  Mike is

15  our departure partner in the Washington office, and

16  make sure the I's are dotted and T's are crossed when

17  someone leaves the firm.

18       Q.    So --

19            MS. CHASE:  And let me just be clear:

20       This is a question and answer in the individual

21       capacity.  And I -- and I will also note that we

22       have previously indicated that this is an

23       exchange that we believe to be privileged, and

24       I'm certainly happy on behalf of the firm to

25       speak to that issue.  As I said, Mr. Shumaker



Page 140

1          can't answer in his individual capacity, but I'm
2          happy to speak to that issue, if there's any
3          questions about that.
4                    THE WITNESS:  Yeah.
5                    MS. CHASE:  I would suggest also that we
6          take a break here.  Just --
7                    MR. SAVIGNAC:  Well, I -- could I ask --
8                    MS. CHASE:  I may need to clarify a
9          privilege issue with counsel, in my role as
10         counsel, so we need to take a break.
11                   MR. SAVIGNAC:  All right.  That's fine.
12                   MS. CHASE:  But I can't have that
13         privileged conversation with my client with you
14         all listening --
15                   MR. SAVIGNAC:  That's fine.
16                   MS. CHASE:  -- about privilege.
17                   So we do need to take a break here.  It
18         could be just a two-minute break, be a 60-second
19         break.  But we need to have a privileged
20         conversation about -- so that I make sure that
21         this witness does not waive privilege with
22         respect to something.  Do you understand?
23                   MR. SAVIGNAC:  That's fine.  And I -- I
24         will just say, very shortly after that, we will
25         need another break to change the setup of the



Page 141

1      desk.

2              MS. CHASE:  Understood.

3              MR. SAVIGNAC:  But I'm happy to take --

4              MS. CHASE:  But let's --

5              MR. SAVIGNAC:  -- a short break now --

6              MS. CHASE:  -- just take a short break --

7              MR. SAVIGNAC:  -- and then a longer

8      break after.

9              MS. CHASE:  -- to clarify this question,

10     and then we can come back on.  So that's --

11             MR. SAVIGNAC:  Okay.

12             MS. CHASE:  Thank you.

13             MR. SAVIGNAC:  All right.

14             VIDEOGRAPHER:  We're off the record.

15     11:49 a.m.

16             (A recess transpired from 11:49 a.m. until

17             11:52 a.m.)

18             VIDEOGRAPHER:  We're back on the record.

19     11:52 a.m.

20             MS. CHASE:  Thank you.

21             As you know, we took a break to have a

22     privileged communication.  I wanted to make sure

23     that -- in my capacity as counsel, I was making

24     sure that we do not have any inadvertent waiver

25     of privilege here today, with respect to both



Page 142

```
 1          the document that has been marked as Exhibit 7
 2          and the document that has been marked as
 3          Exhibit 9, need for this witness to provide
 4          clarification with respect to the roles of the
 5          parties involved.
 6               And so, going back to Exhibit 9, which was
 7          an exchange that Mr. Shumaker shared with Beth
 8          that was then shared with --
 9               MR. SAVIGNAC:  That's Exhibit 7.
10               MS. CHASE:  I'm sorry.  Thank you for
11          clarifying.
12               We're back with Exhibit 7, the exchange
13          that went to Beth and then Shay.  I believe the
14          witness needs to provide a clarification with
15          respect to the context of this communication.
16               THE WITNESS:  Yeah.  With respect to
17          both 7 and 9, where I am interacting with Beth
18          and with Mike Gurdak, as indicated on the back,
19          I view them -- they're privileged and
20          confidential, because I was providing my legal
21          advice and counsel to them, which is why --
22          frankly I'm a little bit surprised that this did
23          not -- this is even unredacted.
24               But I do view that to be privileged and
25          confidential communication to me as counsel to
```



Page 143

```
1        the firm, and two leaders in the firm, Beth
2        Heifetz and Mike Gurdak, as my client.
3             MS. CHASE:  That was the clarification I
4        wanted to provide.  Thank you.
5             MR. SAVIGNAC:  Okay.  But just to clarify,
6        to the extent that I have these documents,
7        there's been a ruling that they're not
8        privileged.  They are not --
9             MS. CHASE:  To the extent -- correct.  We
10       understand that the documents have been provided
11       to you with respect -- portions of the documents
12       have been provided to you based upon a ruling
13       from the Court.
14            The Court ultimately agreed with us that
15       there were portions of these documents that are
16       privileged.  And my understanding of the
17       reasoning for that, based upon our
18       communications that we had, is that the Court
19       understood that there are individuals in the
20       firm who can receive legal advice from, amongst
21       others, Mike Shumaker, who can be forwarding
22       legal advice that was provided to him, and then
23       those are the client recipients of those e-mail
24       advice, and that that -- and therefore, they are
25       the provision of a -- to a practice leader of a
```



Page 144

```
1        legal analysis that was underlying the decision

2        that ultimately was going to be implemented and

3        affecting her, which clearly is not privileged,

4        but the legal analysis remains privileged, which

5        is what the Court concluded.

6            Similarly, with respect to Mike Gurdak as

7        the departure partner, who needed to operate --

8        had responsibilities to take action when people

9        depart from the firm, the provision to that

10       individual in his capacity as departure partner

11       is that he is a recipient of that legal advice.

12       And the legal advice, the Court concluded, was

13       privileged.

14           What the Court concluded is not privileged

15       is the pieces that are unredacted, and therefore

16       you have.  And certainly Mr. Shumaker can

17       testify about those portions of these documents.

18       I was just having clarification, for the record,

19       of what we understood to be the bases for these

20       privileged conclusions that the Court agreed

21       with.

22           MR. SAVIGNAC:  All right.

23 BY MR. SAVIGNAC:

24       Q.   I was just going to ask, am I right in

25 understanding that Gurdak is someone who handles
```



Page 145

1    issues that arise in connection with the departure of

2    any lawyer from the D.C. office?

3            MS. CHASE:  My answer -- I will allow the

4        witness to answer in his individual capacity.

5            THE WITNESS:  Yeah.  No, Mike is the

6        departure partner, and I provide him counsel

7        relating to the issues that come up with that.

8    BY MR. SAVIGNAC:

9        Q.   And did Gurdak have any role in the events

10   leading to my termination, other than his usual role

11   as departure partner?

12       A.   No.

13       Q.   And what does the phrase "departure

14   partner" mean?

15           MS. CHASE:  Again, he can answer in his

16       individual capacity.

17           THE WITNESS:  It's -- it's a thankless

18       job.  It's making sure that when a -- any lawyer

19       leaves the firm, that we are knowledgeable about

20       the matters that he or she is handling, make

21       sure we get proper withdrawal notices, if

22       they're a litigator.  Understanding of the

23       engagement letters they're handling, just to

24       make sure that, you know, all the matters that

25       they're handling, no balls are dropped for the



Page 146

```
 1        client.  Commonly there are legal issues that
 2        arise in relation to that.  So I -- Mike's a
 3        regular caller to my office, and we -- we talk
 4        about those issues.
 5           (Exhibit 12 was marked for identification.)
 6  BY MR. SAVIGNAC:
 7        Q.   All right.  Let's look at Plaintiffs'
 8  Exhibit 12 which is JD_PRIV_19.
 9             And is this an e-mail from Suzanne
10  Coussons to you and McClure, with the subject line
11  "RE:  Julia Sheketoff"?
12        A.   Yes.
13        Q.   If you turn the page, is Suzanne sending
14  you and McClure an attachment that appears on the
15  third through sixth pages of the exhibit?
16        A.   Yeah, that's what I would have guessed the
17  attachment was, but now I see you have it attached,
18  yes.
19        Q.   And what is this attachment?
20        A.   This is the reviews for Julia in the 2015
21  evaluation year.
22        Q.   And is it fair to say this is how you
23  accessed Julia's evaluations to review them?
24        A.   Yeah, I got them from Suzanne.  God forbid
25  I tried to do it myself.  Yes, Suzanne.
```



Page 147

1      Q.   Do you have the ability to do it by

2  yourself?

3      A.   I have no idea.  I suspect I do, but I

4  don't know how.

5      Q.   I'm sure you have the authority, but --

6  understood.

7      A.   I don't know how -- I don't know how to

8  get there.

9      Q.   And did these evaluations play a role in

10  the firm's decision to fire me?

11      A.   No.  No, Julia's reviews, no.  This is

12  just refreshing my recollection.  A lot of associates

13  in this firm, as you well know, and I just wanted to

14  make sure I know the individuals and know the facts.

15      Q.   Okay.  And why did Suzanne send you the

16  evaluations?

17          MS. CHASE:  I'm going to instruct the

18      witness not to answer, to the extent that it

19      would convey the substance of privileged

20      communications.  To the extent he can answer

21      otherwise, he can do so.

22          THE WITNESS:  I -- I suspect I asked her

23      for them.

24  BY MR. SAVIGNAC:

25      Q.   Why did you ask for them?



Page 148

```
 1          MS. CHASE:  I'm going to give the same
 2     instruction, to the extent it would reveal
 3     privilege.  He may say that he can answer -- he
 4     cannot answer because of privilege.  If there is
 5     another basis for him to answer, he can do so.
 6          Again, this line of questioning and the
 7     prior -- prior questioning is both in his
 8     individual capacity.  This is outside the scope
 9     of the 30(b)(6).
10          THE WITNESS:  Yeah, I -- I can't tell from
11     this version if there was a specific legal
12     question.  At a minimum, I would have been
13     trying to refresh my recollection.
14          MR. SAVIGNAC:  Okay.  So we need to take a
15     break so that we can change the height of this
16     desk and change who's asking the questions.  If
17     others would like to take the lunch break now,
18     that's fine with us.  It's only 11:00 here, but,
19     you know, I don't -- I don't care.  Otherwise,
20     we just need a few minutes to crank the desk up.
21          VIDEOGRAPHER:  Do you want me to take us
22     off the record while we figure that out,
23     Counsel?
24          MS. CHASE:  Yes.  Let's go off the record.
25          THE WITNESS:  We're off the record at
```



Page 149

1           12:00 p.m.

2                   (A recess transpired from 12:00 p.m. until

3                   12:14 p.m.)

4                   VIDEOGRAPHER:  We're back on the record at

5                   12:14 p.m.

6                              EXAMINATION

7     BY MS. SHEKETOFF:

8           Q.    Hi, Mr. Shumaker.

9           A.    Hello.

10          Q.    I'm going to take over for the rest of the

11    deposition.

12                I just wanted to direct your attention

13    back to Exhibit 4 again.  The -- I'm talking about --

14    I want to go to the January 16 e-mail.  And I want to

15    direct your attention to page 3 of that.

16                So I want to focus you on the final

17    paragraph of our January 16 e-mail.  And the first

18    sentence says, "I am aware that Jones Day's black-box

19    compensation system and its attempts to keep

20    associate salaries secret are tailor-made to enable

21    sex discrimination, including retaliation."

22                Was that factor -- sorry.  Was that

23    sentence a factor in your decision to terminate Mark?

24                MS. CHASE:  Objection.  Asked and

25          answered.



Page 150

1            But you can answer again in your --

2            MS. SHEKETOFF:  And -- no, I'm sorry.

3       This is -- these questions are in Mr. Shumaker's

4       30(b)(6) capacity.

5            MS. CHASE:  Julia, please don't cut me

6       off.

7            As I said, objection, asked and answered.

8            But you may answer it again.

9            MS. SHEKETOFF:  Okay.  And then just to be

10      clear, the questions about the reasons for the

11      termination are in Mr. Shumaker's 30(b)(6)

12      capacity, and this is a question about whether

13      this sentence was a factor in Jones Day's

14      decision to terminate Mark.

15           MS. CHASE:  Same objection.

16           But you can answer.

17           THE WITNESS:  Sure.

18           As I believe I testified, it was the

19      entirety of this e-mail that formed the basis of

20      my recommendation, and that would include this

21      last paragraph.

22  BY MS. SHEKETOFF:

23      Q.   And so what about these -- this sentence

24  was a factor that caused you to fire -- or caused the

25  firm to fire Mark?



Page 151

 1          A.    One, it was objectively not true.  The

 2    black-box compensation system, which is how it's

 3    termed by the media, doesn't fully, accurately, state

 4    the system.

 5          Q.    I'm sorry.  Can you say that again?

 6          A.    Doesn't accurately state the system.

 7               We call it a black-box compensation

 8    system.  That's what the media calls it.  It is a

 9    confidentiality, a financial compensation system

10    between the firm and the associates.

11               It has absolutely nothing to do with an

12    effort to discriminate against sex.  It pre-existed

13    the firm having even hired female attorneys.  It is

14    all about setting up the firm in such a way that we

15    strip away the issues and egos that get in the way of

16    proper client service.  And that's why we have that

17    system.

18               So I knew that was incorrect and false.

19    And the fact that Mark would include such a

20    confrontational statement, again, caused me to at

21    least determine that he doesn't get us, and we don't

22    get him.

23          Q.    And then it says, "We ourselves

24    experienced this when Julia's salary was cut in

25    relative terms based on a negative review from a



Page 152

1   partner who, in hindsight, clearly treated her worse

2   because she is a woman."

3            Was the fact that the partner in this,

4   that was -- is being referred to in this e-mail is

5   the fact that it was Partner A, was that a factor in

6   Jones Day's decision to terminate Mark?

7       A.   As I think I testified earlier, I -- I

8   don't recall whether I knew it was Partner A at that

9   point in time.  I don't believe so.  And because I

10  had access to participate in all of your reviews, I

11  knew it wasn't any one partner that expressed concern

12  about your performance.  So whether it was Partner A or

13  not did not play a part.

14      Q.   Okay.  And just to clarify, I'm asking

15  about Jones Day's decision, if this was important to

16  Jones Day's decision.

17      A.   Same answer.

18      Q.   Okay.  Thank you.

19            Okay.  I wanted to direct your attention

20  to -- I'm sorry, just need to -- to Exhibit 8.  I'm

21  putting that on the AgileLaw platform, if it's

22  easier, but of course you're welcome to use your

23  binder.

24            That's Bates-stamped JD_3186 to 87.

25  Please turn to the second page, at the very bottom,



Page 153

1    to the e-mail from me to Beth.

2         (Exhibit 8 was marked for identification.)

3    BY MS. SHEKETOFF:

4         Q.   My question is -- or you can read it.  I'm

5    sorry.

6         A.   I just said I was there.

7         Q.   Oh, okay.  When you're ready, my question

8    is, when did you first learn about this e-mail?

9         A.   I don't have a precise recollection.  I --

10   I can't imagine -- it would have been -- I don't

11   think Beth came to me directly.  I think Beth went to

12   Sarah.  Sarah in turn informed me.  If there's not an

13   e-mail forwarding it to me, she would have called me,

14   I suspect, shortly after Beth went to Sarah.

15        MS. CHASE:  And let me just note, with

16        respect to this prior question and inquiry, his

17        answer is in his individual capacity.

18        MS. SHEKETOFF:  Yes.  I am about to ask a

19        series of questions about these e-mails.  I

20        believe that they will all be in his individual

21        capacity.

22        MS. CHASE:  Okay.  Great.

23        MS. SHEKETOFF:  But -- yeah, I'll try to

24        let you know if I think that's not the case.

25



Page 154

1    BY MS. SHEKETOFF:

2         Q.   So do you have any specific recollection

3    of a communication with Sarah McClure about this

4    e-mail?

5         A.   I have a specific --

6              MS. CHASE:   Let me just -- let me object

7         first.

8              To the extent that Mr. Shumaker is going

9         to testify about the existence of privileged

10        communication, he can certainly testify about

11        what he recalled, about when, and how they

12        communicated.   The substance of any privileged

13        communication, he will not disclose.

14             MS. SHEKETOFF:   That's fine.

15             THE WITNESS:   Okay.   I don't have a

16        specific recollection of when she came to me or

17        how she came to me.   I have a specific

18        recollection of her coming to me and our having

19        discussions.

20             Sometimes Sarah will forward something.

21        We tend to have regular meetings every couple

22        weeks or so, depending upon how -- how busy or

23        unbusy we are.

24   BY MS. SHEKETOFF:

25        Q.   And why did Sarah get you involved in



Page 155

1   this?

2       A.   You know, in much the same way that I

3   might get the managing partner involved.  It's -- it

4   involves a matter of one of our associates; someone

5   is raising a concern.  She knows that I have worked

6   with her in the past, from a legal standpoint of

7   analyzing our leave policies, and here's someone

8   who's raising some questions.  And she brought it to

9   my attention.

10      Q.   Okay.  So fair to say she got you involved

11  because the e-mail is raising questions about the

12  legality of the firm's leave policy?

13      A.   I wouldn't say the legality, as compared

14  to it's raising questions about the leave policy, and

15  we had a history of looking at it together.

16      Q.   Did Jones Day ever do anything to

17  investigate this claim of sex discrimination in the

18  leave policy?

19           MS. CHASE:  Object to the form of the

20      question.

21           But you may answer.  And again, with the

22      notation that to the extent there was a

23      privilege analysis done, you can so indicate,

24      but do not describe the substance of it.

25           THE WITNESS:  Understood.



Page 156

```
 1              As I testified to earlier, we take
 2         requests like this seriously, and -- I can't
 3         tell you what I told Sarah, but we did do a
 4         legal analysis of the issues raised.
 5              And it was pretty significant.  And it
 6         was -- used a high-qualified labor and
 7         associate -- labor and employment associate to
 8         help us.
 9    BY MS. SHEKETOFF:
10         Q.   Is that Blake Pulliam, or Aaron -- Marcum,
11    I think?
12         A.   Yeah, that's -- I was thinking of Aaron.
13    I don't -- Blake might have been involved too.  I
14    don't -- I just remember Aaron was involved.
15         Q.   So besides Blake and Aaron, potentially
16    Aaron, Blake, and Sarah McClure, was anyone else
17    involved in Jones Day's investigation of this
18    discriminatory -- this e-mail challenging this
19    discriminatory leave policy?
20              MS. CHASE:  Object to the form of the
21         question.  Assumes facts not in evidence.
22              But you can answer, again with the same
23         caveat, not to disclose the substance.  But you
24         certainly can disclose who, if you recall, was
25         involved in the legal analysis that was done in
```



 1        the -- in response to this e-mail.

 2             THE WITNESS:  Yeah, I -- I don't recall

 3        anyone other than me and Sarah.  It is very

 4        possible that I reached out to Mary Ellen,

 5        Traci, or Terri.  I -- I don't remember.

 6             I remember me and Sarah.  I remember Sarah

 7        commissioning the research, Sarah sending me

 8        back the research.  I read the memo and the --

 9        the attached materials, and came away thinking

10        that our policy is absolutely proper, pursuant

11        to that guidance.

12             But I -- anyone else involved, I can't

13        recall.

14   BY MS. SHEKETOFF:

15        Q.   Why would you have reached out to Terri or

16   Traci or Mary Ellen about this?

17        A.   Just like I testified to earlier, I --

18   each of them are, number one, female lawyers.  I like

19   to make sure that I am thinking through this just not

20   as a male.  All of them have had children.  All of

21   them, in some way, shape, or form, have assisted me

22   in providing legal counsel to the firm.  They were

23   just people I trusted and knew, and -- and were good

24   sounding boards for what we were looking at.

25        Q.   And did you think that -- at this point



Page 158

1    that Mark or I might bring a discrimination claim at

2    this time?

3         A.   I did not.  I -- I read this as be raising

4    a concern.  It was a little bit threatening.  But for

5    the same reasons that I ultimately -- when I got the

6    January e-mail, I didn't see any basis for an actual

7    claim, and thinking that you all were good lawyers,

8    that you knew you were pushing the envelope a little

9    bit, but you wanted us to at least look into it and

10   get back to you.  And that's what we did.

11        Q.   And when you say the e-mail was a little

12   bit threatening, what are you referring to?

13        A.   Well, the conclusory facts in saying it

14   was discriminatory.

15        Q.   Anything else?

16        A.   You said it was illegal.

17        Q.   Anything else?

18        A.   That's not true.  That's why we conducted

19   the research.

20             No, that's all.

21        Q.   Please turn to the first page of this

22   exhibit, and take a look at Beth's response.

23        A.   At the bottom there?

24        Q.   Yes.

25        A.   "Julia, I have passed this along"?



1        Q.    Yes.

2        A.    Yes, I'm there.

3        Q.    Were you involved in how Beth should

4   respond?

5        A.    No.  I don't have any recollection that

6   Beth reached out to me.

7        Q.    Who made the decision that the request in

8   the August e-mail should be denied, would be denied?

9        A.    Make sure I understand your question.

10  When you say the request being denied, are you

11  referring to that Jones Day amend its parental leave

12  policy?

13       Q.    Well, the question that the e-mail poses

14  at the very end is, "Would the firm treat Mark

15  equally to female primary caregivers and grant him

16  18 weeks paid and 24 weeks leave total?"

17             And my question is, who made the decision

18  that that request would be denied?

19       A.    I'm sorry.  I wasn't with you.

20             That would have been my decision, based

21  upon my legal counsel and interaction with Sarah

22  McClure and the others, I think, but . . .

23       Q.    Apart from any legal reasons provided by

24  your counsel, did you have any other reasons to deny

25  the request?



Page 160

1       A.   No, it just -- what -- what you all were

2   suggesting was illegal and discriminatory was not, so

3   I viewed this as you seeking something that others

4   were not entitled to, and I didn't believe that an

5   exception was warranted.

6       Q.   Did you consider changing the policy at

7   this time to provide 18 -- to provide men, or male

8   primary caregivers, with 18 weeks' paid and 24 weeks'

9   total leave?

10      A.   As I think the documents produced in this

11  case have shown, I've always been amenable to

12  changing the family leave policy.  We changed it once

13  or twice, maybe three times, to make sure that we not

14  only were in compliance with the law but were

15  competitive with our peers.

16           And I recall at one point back in '14, we

17  determined that we needed to make some changes.  We

18  made some changes.  I remember Sparkle raising some

19  concerns.  We looked at it.  We sort of came away

20  thinking, "You know, she might be right."  So we made

21  another change.

22           We always want to get it right.  But this

23  -- when we looked at it this time, we said, "Boy,

24  this looks to be on all squares, and no changes need

25  to be made."



Page 161

1        Q.   So I guess, why -- yeah, can you explain

2   to me why the firm changed its policy after Sparkle

3   complained about the policy?

4        A.   Because we looked at it and came away

5   thinking that there was some merit to her position.

6   And you guys may not believe it, but we really do

7   care about our people, and we want to support them in

8   their family lives.

9             And she raised a proper question.  We

10  looked at it.  We analyzed it.  We said, "She's

11  right."

12            There's nothing that stops us from making

13  a change.  So we made a change.

14       Q.   Is there any other reason?

15       A.   No.

16       Q.   And how did you determine -- I'm sorry.

17  Oh, one second.

18       A.   I'm sorry.  I just said "no."

19       Q.   And just to be clear, when you say that

20  Sparkle's right, you mean she's right that there was

21  a legal problem with the policy?

22       A.   No, I wouldn't say that.  I -- I didn't

23  come away thinking it was legal or illegal as

24  compared to -- it was a legitimate concern, and that

25  clarification would be helpful.



Page 162

1      Q.   What do you mean by "clarification"?

2      A.   That -- go back and look at exactly what

3  Sparkle had raised, but it had to do with the amount

4  of time for the secondary caregiver, I believe, and

5  whether we were applying that consistently.

6           And we made an adjustment.  I'd have to

7  look at the documents.

8      Q.   Can you please --

9           MS. CHASE:  Just -- just hold on a second,

10      please, Julia.

11           Just to be clear, to the extent you think

12      this has been a change of topic, all of this

13      remains in his individual capacity.  He's not

14      designated as a 30(b)(6) on any of these topics.

15           THE WITNESS:  Sarah is the expert on this

16      stuff.

17  BY MS. SHEKETOFF:

18      Q.   Okay.  Sorry.  So I just wanted to

19  clarify.  So Jones Day didn't simply clarify its

20  policy; it changed the amount of leave available to

21  men after Sparkle's complaint, right?

22           MS. CHASE:  Objection to the form of the

23      question.

24           You can answer, to the extent you know.

25           THE WITNESS:  I believe that's correct.



Page 163

1   BY MS. SHEKETOFF:

2        Q.   And that's because you determined that the

3   policy, as it stood before you changed the leave, was

4   illegal?

5             MS. CHASE:  Objection to the form of the

6        question.

7             You can answer, to the extent you can.

8             THE WITNESS:  Not at all.

9   BY MS. SHEKETOFF:

10       Q.   Let's go back to -- I want to -- yeah, I

11  wanted to go back to my question about changing the

12  policy at the time of our August e-mail.

13            So you said, you know -- I guess my

14  question is, why didn't you change the policy at that

15  time, to provide men, like women, with 24 weeks'

16  total leave and 18 weeks' paid leave?

17            MS. CHASE:  Objection to the form of the

18       question.  It assumes facts not in evidence.  It

19       misstates the facts.  It's outside the scope of

20       his 30(b)(6), and it's asked and answered.

21            But he can answer it again in his

22       individual capacity.  If you'd like for the

23       witness to continue to just answer the same

24       question over and over again, we are wasting a

25       lot of time here.



Page 164

1          But he can answer it again.

2          THE WITNESS:  Yeah, I mean I -- I feel

3     like I've been down this road before.  But we

4     reviewed the policy.  We analyzed the law.  The

5     law seemed to be on all fours, that the woman

6     delivers the child; that leads to 8 weeks of

7     disability.

8          And then for the paid leave under the

9     policy, the primary and the secondary caregiver

10    get the same, regardless of their sex.  So it

11    looked to be in complete compliance with the

12    law.  So we didn't believe a change was

13    appropriate.

14   BY MS. SHEKETOFF:

15    Q.   Did you consider whether it might be a

16   good policy decision to increase the amount of leave

17   for men to 24 weeks' paid -- or, sorry, 24 weeks'

18   unpaid and 18 weeks' paid?

19    A.   You say a policy decision.  I -- I'm not

20   sure what you mean by that.  We wanted it to be fair,

21   the policy always to be fair, and in furtherance of

22   our associates' and all lawyers' family lives.  And

23   we -- we determined that there was no reason to make

24   a change.

25    Q.   Did you participate on Sarah McClure's



Page 165

1    phone call to me about this e-mail?

2         A.   I don't believe so.

3         Q.   Do you know what phone call I'm referring

4    to?

5         A.   No.

6         Q.   Okay.  So you're not aware whether Sarah

7    McClure called me to tell me the firm would not grant

8    the request in the August e-mail that we're talking

9    about?

10        A.   I -- I don't recall.  It's very possible

11   she told me she was going to call you, but I don't

12   recall.

13        Q.   Do you recall her telling you about the

14   call afterward?

15             MS. CHASE:  And I'm just going to instruct

16        to the extent there was any sort of privilege

17        analysis in connection with any conversation

18        with Sarah, don't describe it.  To the extent

19        Sarah was just reporting on a call that she may

20        or may not have had with Julia, you can

21        certainly testify about that in your individual

22        capacity.

23             THE WITNESS:  I -- I don't recall her

24        reporting back.  That does not mean she did not.

25



Page 166

1  BY MS. SHEKETOFF:

2      Q.   All right.  And can you please scroll

3  to -- or, sorry; turn to the first page, and take a

4  look at the e-mail from Mark.  The top of the first

5  page of Exhibit 8.

6      A.   The very first one, "Hi Sarah"?

7      Q.   Yes.

8      A.   Yes.

9      Q.   And so how did you learn of this e-mail?

10     A.   I think I testified I don't recall if it

11 was forwarded to me, or if someone described what

12 Mark had raised.  I -- I don't know.  I would

13 eventually become aware of it, presumably through

14 Sarah.

15     Q.   And do you know why this e-mail was shared

16 with you?

17     A.   Again, going back to that we have been

18 working over the years on the leave policies.  I have

19 general responsibility for personal matters within

20 the firm.  And they believed it was appropriate to

21 share with me.

22     Q.   I'm showing you now -- or can you please

23 turn in your binder to Plaintiffs' Exhibit 23.

24         (Exhibit 23 was marked for identification.)

25         MS. SHEKETOFF:  That's Bates-stamped



Page 167

1            JD_3231 to 33.

2     BY MS. SHEKETOFF:

3            Q.    At the top of this page is an e-mail from

4     Sarah McClure to Mark, right?

5            A.    Correct.

6            Q.    And that e-mail is Sarah McClure's

7     response to the e-mail we just looked at from Mark?

8            A.    Correct.

9            Q.    You were bcc'd on this e-mail; is that

10    right?

11           A.    Yes, looks to be I'm bcc'd.

12           Q.    Why were you bcc'd on this e-mail?

13           A.    You'd have to ask Sarah.  I presume that

14    we had had discussions about it.  I was involved in

15    the -- reviewed the legal analysis, and she wanted me

16    to be aware that she had reached out to Mark.

17               MS. CHASE:  Just to be clear, this line of

18          questioning, again, is still in his individual

19          capacity.  To the extent you consider this a

20          change of topic with a change of documents, it

21          is all outside the scope of his 30(b)(6).

22               MS. SHEKETOFF:  I -- I agree.  I'll let

23          you know when -- well, let me move to another

24          topic.  I think it will be obvious.  We will

25          move off the topic of these August e-mails.



Page 168

1    BY MS. SHEKETOFF:

2         Q.    Okay.  So did you review this e-mail

3    before it was sent?

4         A.    Likely, yes.

5         Q.    Why?

6         A.    Again, because I was involved in reviewing

7    the matters with her.  She knew that I wanted to see

8    the research, which was a little bit exceptional.  I

9    don't always dig into it that way.  But I -- I wanted

10   to make sure we were right on this one.

11              And I reviewed the EEOC policy.  I read

12   those cases.  And I presume she knew I was interested

13   and wanted to involve me.

14        Q.    And so you signed off on this e-mail?

15        A.    I think --

16              MS. CHASE:  Objection.  Asked and

17        answered.

18              But you may answer it again.

19              THE WITNESS:  I think that's -- I think

20        that's fair.

21   BY MS. SHEKETOFF:

22        Q.    Did you think this e-mail was accurate?

23        A.    I -- I do, and still do.

24        Q.    Can you please turn to the third page, the

25   last page of this document?  This is the e-mail we



Page 169

1    were looking at earlier, but . . .

2          A.    Yes, ma'am.

3          Q.    So I write in this e-mail, "Jones Day

4    gives women 18 weeks of paid leave (and 24 weeks

5    total) while it gives men 10 weeks of paid leave (and

6    16 weeks total)."

7                Did you understand that to be an accurate

8    statement of Jones Day's leave offerings?

9          A.    I must confess, Julia, I -- every time I

10   look at this, the -- the weeks counting and what's

11   paid and unpaid, I'm confused.  I would have relied

12   on Sarah to confirm the accuracy of the

13   representation.

14         Q.    So you just -- you did not know?

15         A.    I wouldn't say I did not know.  I had a

16   general understanding.  But I did not focus on that

17   when I read this.

18         Q.    What was your general understanding?

19         A.    At that point in time, that the female had

20   some measure of short-term disability.  If -- trying

21   to put myself back in my shoes then, whether it was

22   6 to 8, I could not remember, and that we had set the

23   policy for paid leave for primary and secondary

24   caregivers to be the same, regardless of whether they

25   were male -- male or female.



Page 170

```
 1        Q.   So I also write, "Eight of the weeks for
 2   women are labeled as disability leave, but the leave
 3   is not dependent upon whether women are actually
 4   disabled."  Is that what I wrote?
 5        A.   Yes, ma'am.
 6        Q.   And you understood that to be an accurate
 7   statement of Jones Day's policy, right?
 8             MS. CHASE:  Objection to the form of the
 9        question.
10             You may answer.
11             THE WITNESS:  Same thing.  I had no reason
12        to think it was an inaccurate statement, but I
13        would have relied on Sarah to say, "She's got it
14        wrong."  And I don't remember that coming up.
15   BY MS. SHEKETOFF:
16        Q.   Okay.
17             Okay, let's go back to the first page.
18   And the second sentence of Sarah's e-mail is that
19   "Jones Day's family leave policy provides for male
20   and female lawyers with newborn children to receive
21   ten weeks of paid family leave (primary caregiver),
22   while female lawyers receive eight weeks of
23   additional paid leave under the firm's short-term
24   disability policy for the childbirth."
25             Did you understand that to be a correct
```



MAGNA ▶
LEGAL SERVICES

Page 171

1    statement of the policy?

2         A.   Yes.

3         Q.   Just one second.

4              Okay.  Do -- so we -- I guess let's go

5    back to Plaintiffs' Exhibit 8.

6         A.   In my --

7         Q.   Should be Tab 8 in your binder.

8              MS. CHASE:  Hold on.

9              THE WITNESS:  Yeah, I'm just -- I'm -- I'm

10             sorry.  I'm just -- I'm just looking at the

11             23 -- your e-mail, Julia, and -- second

12             sentence:  "Eight of the weeks for women are

13             labeled as disability leave, but the leave is

14             not dependent upon whether the women are

15             actually disabled" -- I think that is an

16             incorrect statement.

17   BY MS. SHEKETOFF:

18        Q.   Did you just have an interaction with

19   Terri Chase before you said that?

20        A.   I did, and she said, "Make sure you're

21   looking at the document," which made me think, go

22   back and take a look at it.

23        Q.   Okay.  When I read that statement out loud

24   to you, right?

25        A.   Yes.



Page 172

1      Q.   All right.  Let's go back to page 8 --
2  sorry.  Exhibit 8.
3           Oh, yeah, I'm sorry.  I'm sorry.  Well,
4  let's -- to follow up on that, on
5  Plaintiffs' Exhibit 23, what about that statement is
6  not accurate?
7      A.   The women are disabled for the eight
8  weeks.  That's based upon, as I understand it,
9  standard policies.  The idea that they're not
10 disabled during that time is not a proper conclusion.
11 So for you to say that statement is erroneous.
12           And my apologies for not picking up when
13 you read it to me.
14      Q.   Is your view that every single woman is
15 disabled from office work at Jones Day for at least
16 eight weeks?
17           MS. CHASE:  Objection to the form of the
18      question.
19           But you may answer.
20           THE WITNESS:  My view is that the medical
21      experts are of the view that a woman is
22      typically disabled for eight weeks after birth.
23 BY MS. SHEKETOFF:
24      Q.   I'm asking -- I'm sorry.
25      A.   Okay.



Page 173

```
 1          Q.   I'm sorry.  Go ahead.
 2          A.   And that for that reason, that's how the
 3     eight weeks were established.
 4          Q.   I'm asking for your view.  Is it your view
 5     that every single woman is disabled from working at
 6     Jones Day for at least eight weeks after childbirth?
 7               MS. CHASE:  Objection.  Asked and
 8          answered.  Would you like him to -- just --
 9          would you like to have it read back, so he can
10          just say it again?  You're just asking the exact
11          same question twice, Julia.
12               Would you like to hear the same answer
13          again?  He can give it to you again.
14               MS. SHEKETOFF:  I would like an answer to
15          my question, Terri.
16               MS. CHASE:  Okay.  Then you'll get the
17          same answer again, Julia, if you keep asking the
18          same question twice.  It's not efficient.  It's
19          not an effective use of our time.
20               THE WITNESS:  The answer is the same.
21          It's not for me.  I am not a medical doctor.
22          I -- they're the ones who relied upon for those
23          eight weeks, and for that reason that's why we
24          went with the eight weeks.
25               It's the -- it's medical experts that have
```



Page 174

```
 1         that view or opinion.  My view or opinion I
 2         think is irrelevant.
 3    BY MS. SHEKETOFF:
 4         Q.   So you don't have a view or opinion on
 5    that?
 6         A.   No, not -- I'm not a doctor.
 7         Q.   I'm sorry.  Is that a "no"?
 8              MS. CHASE:  He said he does not have an
 9         opinion.  He's not a doctor.
10              MS. SHEKETOFF:  Okay.
11    BY MS. SHEKETOFF:
12         Q.   And just going back to McClure's response
13    to this e-mail, my e-mail, Sarah doesn't say that I
14    misunderstood the policy, does she?
15         A.   I'm sorry.  Say that again?
16         Q.   Sarah McClure does not say that I
17    misunderstood the policy, does she?
18         A.   She -- she does not there, no.
19         Q.   And she doesn't say that I misstated the
20    policy in any way, does she?
21         A.   Not on that document.  But we certainly
22    had privileged discussions.
23         Q.   And you reviewed her e-mail before she
24    sent it?
25         A.   I reviewed the e-mail she sent to Mark.
```



Page 175

1          Q.    This is the e-mail.  That's what I'm

2     talking about.

3          A.    Right, but aren't you saying --

4               MS. CHASE:  Julia, you were asking about a

5          response to your e-mail, which I think is

6          leading to the confusion here.

7               THE WITNESS:  Yeah.

8     BY MS. SHEKETOFF:

9          Q.    I'm asking about in Sarah's response at

10    the top of page 1, on Plaintiffs' Exhibit 23, Sarah

11    does not say that I misstated the policy.

12         A.    She's just talking --

13         Q.    And my question -- and my question is --

14    which I think you answered, so we don't need to go

15    back -- but that you reviewed this e-mail before she

16    sent it?

17         A.    That is correct.

18         Q.    She doesn't say that the leave is actually

19    dependent on whether a woman is disabled, does she?

20               MS. CHASE:  Would you like him to read the

21          e-mail into the record?  We could just read the

22          e-mail into the record, if that's what you'd

23          like do.

24               Mike, just read the e-mail into the

25          record, please.



Page 176

1          THE WITNESS:  This is silly.

2          MS. CHASE:  It's silly.

3          THE WITNESS:  That's what it's -- she's

4     not addressed whether what you stated was

5     inaccurate.  I don't know that it -- she needed

6     to.  She responded to your substantive question.

7  BY MS. SHEKETOFF:

8     Q.   And she does not say that -- that the

9  leave is actually dependent on whether a woman is

10 disabled, does she?

11         MS. CHASE:  Julia, would you like him to

12    read the document into the record?  Would you

13    like to read -- have him read the document into

14    the record?  He has told you what it -- you've

15    answered this question.  I don't understand this

16    line of inquiry to be a good use of time.

17         THE WITNESS:  The document says what it

18    says.

19         MS. CHASE:  Thank you.

20 BY MS. SHEKETOFF:

21    Q.   If I was wrong about how I interpreted the

22 leave policy, why didn't you ensure that Sarah told

23 me that?

24         MS. CHASE:  Objection to the form of the

25    question.



Page 177

1           You may answer it.

2           THE WITNESS:  This is like Alice in

3      Wonderland.

4           MS. CHASE:  It is like Alice in Wonderland

5      when Julia is asking questions.  She lives down

6      the rabbit well.  But you please answer it.

7           THE WITNESS:  Sarah provided a response to

8      your concerns about the family leave policy and

9      whether it was in compliance with applicable

10     law.  I reviewed the cases that she cited.  I

11     reviewed the EEOC example that she provided.

12          I can say that your statement in your

13     initial e-mail was erroneous.  I didn't know

14     that that needed to be rebutted in our response

15     to Mark, in a cooperative effort to convey to

16     you the firm's policy and its legality.

17          If you want to draw some conclusion from

18     that based upon the documents that exist, have

19     at it.

20  BY MS. SHEKETOFF:

21      Q.   So is it your understanding that under the

22  policy, every woman gets eight weeks of disability

23  leave?

24          MS. CHASE:  Objection to the form of the

25     question.



```
 1              But you may answer, again in your
 2         individual capacity.
 3              THE WITNESS:  I understand, under the
 4         firm's policy, if a woman delivers a child, she
 5         receives eight weeks of short-term disability.
 6    BY MS. SHEKETOFF:
 7         Q.   And if a woman delivers a baby, she gets
 8    18 weeks of paid leave; is that right?
 9              MS. CHASE:  Objection to the form of the
10         question.  Assumes facts not in evidence.
11              THE WITNESS:  She's entitled to eight
12         weeks of short-term, and then ten if she's a
13         primary caregiver, as I understand.
14    BY MS. SHEKETOFF:
15         Q.   My question is, is any woman entitled to
16    less than 18 weeks?
17              MS. CHASE:  Objection to the form of the
18         question.  He has answered it already.  And the
19         question form is improper.
20              THE WITNESS:  I would think there is --
21              MS. CHASE:  It's also a hypothetical.
22              THE WITNESS:  Yes, it is a hypothetical.
23              But if someone were to deliver a child and
24         then she wants to come back to work earlier, I
25         would think she would have the ability to do
```



Page 179

```
 1      that.

 2   BY MS. SHEKETOFF:

 3        Q.   My question is whether every woman is

 4   entitled.  If she wants to stay off for 18 weeks,

 5   does she get at least 18 weeks?

 6             MS. CHASE:  He has answered and answered

 7        this question repeatedly.  He has told you that

 8        if she's the primary caregiver, she gets the

 9        eight weeks.

10             I don't understand why you continue to ask

11        the question time and time again, Julia.  It is

12        not efficient.  It is not a fair use of our

13        time.

14   BY MS. SHEKETOFF:

15        Q.   So is the answer to my question "yes"?

16             MS. CHASE:  You have gotten an answer.

17        Move on, Julia.  I'm not going to let the

18        witness just continue to say the same thing over

19        and over again.  Move on.

20             Would you like to have it read back into

21        the record a second time?  It's not efficient.

22             MS. SHEKETOFF:  Terri, your -- your

23        objections are not efficient.

24   BY MS. SHEKETOFF:

25        Q.   My question is if --
```



Page 180

1           MS. CHASE:  Your -- your -- Julia, your

2      whole line -- I understand that you are not a

3      litigator.  I get it.  This isn't what you do

4      for a living.  I get that.  But you get up here,

5      and you just say the same thing over and over

6      and over again, in an argumentative, improper

7      manner, and then you wonder why we get

8      frustrated with you.  We get frustrated for that

9      reason.

10           As you might know, we didn't have this

11      level of frustration with Mark, because he

12      actually doesn't get argumentative in the way

13      that you do.

14           MS. SHEKETOFF:  I have a question, and I'm

15      not getting an answer, and I would just like an

16      answer.

17           MS. CHASE:  Well, that is how it works in

18      a deposition.  You get an answer you don't like,

19      and you have to live with it.  It doesn't mean

20      you just ask the same question over and over

21      again.  It's been asked and answered twice now.

22      Move on.

23 BY MS. SHEKETOFF:

24      Q.   If a woman is disabled for -- sorry.  If a

25 woman ceases to be disabled at four weeks, can she



Page 181

1   continue to take the -- an additional four weeks

2   before switching to family leave?

3            MS. CHASE:  Objection to the form of the

4            question.  It is a hypothetical.  It calls for a

5            legal conclusion.  He is not designated to speak

6            to this topic in his individual capacity.  If

7            you would like to him to answer yet another

8            hypothetical question that calls for a legal

9            conclusion, he can do so, to the extent he can.

10           And if he can't, he'll say he can't.

11   BY MS. SHEKETOFF:

12           Q.   Will you please answer the question?

13           A.   A female is entitled to eight weeks of

14   short-term disability and then ten weeks of paid

15   leave, just like the male is entitled to ten weeks'

16   paid leave.

17           Q.   So if a woman were disabled at --

18           MS. CHASE:  You know, we're going to pause

19           here Julia.  I cannot be -- the series of

20           hypothetical questions has to stop.  We're going

21           to go off the record, please.

22           VIDEOGRAPHER:  We're off the record at

23           12:50 p.m.

24           (A recess transpired from 12:50 p.m. until

25           12:58 p.m.)



Page 182

1          VIDEOGRAPHER:  We're back on the record at
2      12:58 p.m.
3  BY MS. SHEKETOFF:
4      Q.   Did you consider whether to involve Brogan
5  in the decision about how to respond to these August
6  e-mails?
7      A.   You're talking Steve Brogan?  Did I
8  involve him in answering these August e-mails?  No.
9      Q.   And why not?
10     A.   He's a busy guy.  He's got things more
11 important than -- than this to focus on.  I -- I
12 bring things to his attention when I think it -- it
13 merits his attention.  I didn't think at this point
14 in time it merited Steve's attention.
15     Q.   Okay.  Please turn to Plaintiffs'
16 Exhibit 52, which is Bates-stamped JD_5125 to 5129.
17         (Exhibit 52 was marked for identification.)
18 BY MS. SHEKETOFF:
19     Q.   My question is, is this an e-mail from an
20 attachment that you received from ███ Staff C ███?
21     A.   Yes.
22  ██  ████████████████
23  ██  ██████████████████████  ███
24  ██████████████████  ████████████
25  ████████████████  ██████████████



Page 183





Page 184



17         And was ▆▆ Staff C ▆▆ involved with making

18 decisions on how to change Jones Day's leave policy

19 in 2014?

20         A.   No.

21         Q.   Okay.  Was Sarah McClure involved?

22         A.   She was.

23         Q.   And in this e-mail that we're looking at,

24 is this not ▆▆ Staff C ▆▆ being involved in suggesting

25 how to change Jones Day's parental leave policy in



Page 185

```
 1  2014?

 2       A.   Maybe I misunderstood you, Julia.  I -- I

 3  understood your question, was she involved in the

 4  decision-making as to whether we were going to change

 5  the leave policy.  She certainly assisted in

 6  gathering information that we were interested in

 7  to -- when we were considering making the change.

 8  But she did not get the final decision.

 9       Q.   Did she have any other role?

10       A.   Only as filling her role as ████████

11  ██████████████████, and -- and seeking information

12  that we wanted to see what was going on in the

13  marketplace.

14       Q.   And what was McClure's role?

15       A.   Sarah was in the same role.  She was HR

16  director and counsel.

17       Q.   Who else was involved?

18       A.   The other people on this chain had some

19  involvement.  Carter was our firm diversity partner

20  at that time.  Staff D ██████████████████████████.

21  Sharyl Reisman was the firm-wide hiring partner.

22       Q.   And was there anyone else?

23       A.   Anyone else involved in that?  None come

24  to mind.  Well, I shouldn't -- the only other person

25  I would say that was definitely involved would have
```



Page 186

1    been Hugh Whiting.  He was my predecessor in this

2    position.  At this point in time, I was still sort

3    of -- while I had the title of firm administrative

4    partner, I was still very much working closely with

5    Hugh, so it's very likely I discussed this with him.

6            Q.   And what was your role?

7            A.   I was a firm administrative partner.

8            Q.   What was your role with respect to this,

9    considering changes to the parental leave policy?

10           A.   I was a member of the group making --

11   considering decisions as to whether we should make a

12   policy change.

13           Q.   And how did this group come to work on

14   this project?

15           A.   It's been a while.  I suspect that we were

16   hearing from people we were recruiting, having

17   questions about our family leave policy, and some

18   feedback from some of the recruits suggesting that

19   perhaps we have -- we had fallen behind market on

20   leave policy, so we wanted to -- to take a look at

21   that.

22           Q.   And would that have been specifically

23   recruits of -- recruiting of Supreme Court clerks?

24   Or Supreme Court clerks that you were recruiting?

25           A.   I don't recall it being exclusive to



Page 187

1   Supreme Court clerks, no.

2        Q.   Okay.  And was there anything else that

3   can cause a firm to consider making changes to the

4   parental leave policy in 2014?

5        A.   No.  We want to be in step.  We want to be

6   competitive.  We want to support our lawyers, happy

7   family lives for our -- for our lawyers.  Helps them

8   be happy people and better lawyers, so we want to

9   make sure we're consistent with the marketplace.

10       Q.   Okay.  So going back to this exhibit, did

11  you read this e-mail when you received it?

12       A.   I'm sure I did.  I'm sure I did.

13       Q.   And the attachment as well?

14       A.   Yes, ma'am.

15       Q.   The e-mail says, "here is the blurb from

16  our Careers website explaining our own policy (the

17  firm manual was not easy to decipher and I think the

18  website does a nice job of explaining it)."  Do you

19  see that?

20       A.   Where are you reading from?

21       Q.   The -- the e-mail from Staff C.  It says, "And

22  here is the blurb."  Do you see the underlined

23  portion?

24       A.   Yeah, I got it now.  Thank you.

25       Q.   And then it says, "For routine childbirth



Page 188

1   (including cesarean section . . . the firm will

2   assume an eight-week disability period, unless we are

3   notified that the associate is disabled for a longer

4   period."

5           So did you understand that to mean that a

6   woman would get at least eight weeks of disability

7   leave?

8       A.   A woman is entitled to eight weeks'

9   disability leave.  My understanding is if they are

10  not disabled for that full eight weeks' period,

11  they're not -- they don't take the full eight weeks.

12          But I'm not the best person for that.

13  That's really Sarah.  I don't know if you've deposed

14  her yet.

15      Q.   Okay.  So it was your understanding or it

16  was not your understanding that each woman would get

17  at least eight weeks of paid leave, but maybe longer?

18          MS. CHASE:  Objection to the form of the

19      question.  There's a lot of negatives in that

20      question.

21          You can answer it, to the extent you can.

22          THE WITNESS:  My understanding -- and

23      again, I go with Sarah -- they're entitled to

24      short-term disability leave for eight weeks.

25      That's what they can take.  If they, after



Page 189

```
1        six weeks, "I'm okay," they are not entitled to

2        the additional two weeks.

3             I don't know if that's ever happened or

4        not.  That would be a Sarah question.  But

5        that's my understanding.

6   BY MS. SHEKETOFF:

7        Q.   Thank you.

8             Did you talk with Terri about this during

9   the break?

10       A.   No.

11       Q.   You didn't talk to Terri about what the

12  disability leave allows during the break we took?

13       A.   I did not.  That's privileged in any

14  event.

15       Q.   Okay.  So you didn't write back to

16  ▮Staff C▮ to tell her that that wasn't a correct

17  statement of the policy, right?

18             MS. CHASE:  Objection.  Form of the

19        question.

20             But you may answer.

21             THE WITNESS:  Say that again?  I'm sorry.

22  BY MS. SHEKETOFF:

23       Q.   Did you write back to ▮Staff C▮, telling

24  her that she had incorrectly stated the firm's

25  policy?
```



Page 190

1         A.   What did she say incorrectly?  I'm trying

2    to think where you're -- what you're pointing to.

3    "The firm will assume an eight-week disability

4    period."  That's the eight weeks that the medical

5    people say they're entitled to.  So I don't know that

6    that's incorrect.

7              "Unless we are notified that the

8    associate" -- okay, that's going longer.  No, I

9    didn't -- I didn't -- I don't recall addressing her

10   at all on that point.  Not something I would have

11   focused on, because, again, I got the experts on

12   the -- on the e-mail.

13        Q.   I'm going to show you on -- on AgileLaw,

14   Plaintiffs' Exhibit 53.  Feel free to turn to that in

15   your binder instead.

16              This is Bates-stamped JD_5120 to JD_5124.

17        (Exhibit 53 was marked for identification.)

18              MS. CHASE:  Exhibit 53.

19              MS. SHEKETOFF:  Yeah.  Exhibit 53.

20              THE WITNESS:  Thank you.

21              Okay, I'm there.

22   BY MS. SHEKETOFF:

23        Q.   Okay.  This is an e-mail and attachment

24   you sent to Mary Ellen Powers.  Is that right?

25        A.   Yes.



Page 191

1          Q.    Why did you forward this to Mary Ellen?

2          A.    Consistent with what I testified to

3    earlier, Mary Ellen is -- previously held this job.

4    I trusted her judgment.  She's a female leader in the

5    law firm, and I often take counsel from her.

6          Q.    What was her role in -- in considering

7    changes to the parental leave policy at this time?

8          A.    Her role was as my sounding board.  I

9    don't know there's any more formal role than that.  I

10   was looking at her as counsel to the firm.

11         Q.    In your e-mail, you say, "I asked Staff C to

12   update her prior work."  What prior work were you

13   referring to?

14         A.    I recall that this was not the first time

15   we started looking at maternity leave.  What

16   precipitated that, I don't recall.  But I suspect the

17   issue was raised anew, and that I asked her to update

18   it.

19         Q.    And do you remember when -- or did you

20   just say you don't remember when that issue was

21   raised?

22         A.    I don't know.  Now that I read this

23   closer, it might have been that we had done a review

24   of the domestic offices, and when we do a firm

25   policy, we of course are thinking about the firm as a



Page 192

1    whole.  So I needed to understand the international

2    picture as well.

3         Q.   Okay.  So just to clarify, you don't

4    remember when she had done her prior work?

5         A.   I don't.

6         Q.   I'm going to show you Plaintiffs'

7    Exhibit 55 on the AgileLaw platform.  Please turn to

8    it in your binder.  That's Bates-stamped JD_5102

9    to 5107.

10        (Exhibit 55 was marked for identification.)

11   BY MS. SHEKETOFF:

12        Q.   Is this an e-mail exchange and attachment

13   about the firm's maternity leave offerings?

14        A.   This looks to be -- the attachment is --

15   my apologies, if I didn't hear your question.

16   International leave policies?

17        Q.   Please turn to the fourth page of this

18   document.  It's JD_5103.

19             The first line says that Jones Day's

20   United States offices' maternity leave policy is

21   84 calendar days paid, and up to 84 calendar days

22   unpaid.  And 84 calendar days is 12 weeks.  Is that

23   right?

24        A.   You can do the math probably better than

25   I.  I'll accept your representation.



Page 193

1          Q.   Okay.  I'll make that representation.

2               84 calendar days is -- I'm sorry.  Is --

3    did you understand that that was a correct or

4    accurate statement of the firm's maternity leave?

5          A.   I would not have -- I don't know, Julia,

6    at the time.  I -- I certainly would not have been

7    checking the numbers.  I would have assumed that my

8    people got it right as to what our policy was.

9          Q.   Okay.  And I'm going to show you now on

10   the platform -- again, you can look at it in your

11   binder -- Plaintiff's Exhibit 54.  That's

12   Bates-stamped JD_5174 to JD_5179.

13               (Exhibit 54 was marked for identification.)

14   BY MS. SHEKETOFF:

15         Q.   Is this an e-mail exchange and attachment

16   between you and Beth Heifetz?

17         A.   Yes.

18         Q.   If you look on the final page of your

19   e-mail, which is actually the third page of your

20   document, Beth sends you a question about a Supreme

21   Court clerk that Jones Day's recruiting, and is

22   asking about paternity leave.  Is that right?

23         A.   I'm sorry.  I lost you.  Where exactly are

24   you referring?

25         Q.   At the bottom of the third page of this



Page 194

1  document is a forward -- or it's an e-mail from Beth,

2  asking about a Supreme Court clerk that Jones Day is

3  recruiting, and that person's inquiry about paternity

4  leave; is that right?

5      A.   I see it, thank you.  Yes.  She's writing

6  to Staff D.

7      Q.   Okay.  Thank you.  Hang on one second.

8           Okay.  Now I'm going to show you what's on

9  the AgileLaw platform, Plaintiffs' Exhibit 58.

10 That's Bates-stamped JD_5117 to 5119.

11      (Exhibit 58 was marked for identification.)

12 BY MS. SHEKETOFF:

13      Q.   Please turn to page 2 of this document.

14      A.   Okay.

15      Q.   And my question is, is this an e-mail --

16 I'm sorry.

17           I'm sorry.  Can we actually go back to

18 Plaintiffs' Exhibit 57.  I'm sorry about that.

19           That's Bates-stamped JD_5108 to JD_5116.

20      (Exhibit 57 was marked for identification.)

21 BY MS. SHEKETOFF:

22      Q.   And my question is, is this an e-mail from

23 Sharyl Reisman, with revisions?

24      A.   The cover e-mail indicates that yes, she's

25 providing edits to our attorney adoption leave memo



Page 195

1    back in September 2014.

2         Q.   So this is Sharyl Reisman's revisions to a

3    memo about the parental leave policy?

4         A.   That's what it looks like to me.

5         Q.   And I want to go back to Plaintiffs'

6    Exhibit 56.  This is Bates-stamped JD_5130 to 5136.

7         (Exhibit 56 was marked for identification.)

8    BY MR. SAVIGNAC:

9         Q.   And is this an e-mail from ▮▮▮Staff C▮▮▮

10   about the parental leave offering?

11        A.   I'm sorry.  I just -- I don't have 5131 to

12   5136.  It starts at 5137.  I don't know if that was

13   intentional.

14        Q.   Yeah, I switched -- I'm sorry.  The order

15   of the attachments is switched.  So if you look, it

16   goes -- the term 5130 then 5137, but then it ends

17   with a memo at 5131 to 513- --

18        A.   I see it, yeah.  Okay, got it.

19             I'm sorry, your question again?

20        Q.   Okay.  My question is, is this an e-mail

21   from ▮▮▮Staff C▮▮▮, attaching a memo about the

22   parental leave policy and a -- a chart comparing

23   other firms' parental leave offerings with Jones Day?

24        A.   Yes.

25        Q.   And then going back to Plaintiffs'



Page 196

1   Exhibit 57.

2           And my question is -- so we looked at this

3   before.  This was Sharyl Reisman revisions.  My

4   questions, is this Sharyl Reisman's revisions to the

5   memo that    Staff C    circulated that we just looked

6   at?

7       A.   You're asking me to compare the two.

8       Q.   Well, you can -- you can actually just

9   look at Sharyl Reisman's e-mail and make whatever

10  inference you -- you like.

11      A.   It looks to be a red line.  I'll take it

12  at face value.  This is Sharyl editing something that

13  Staff C may have prepared.

14      Q.   And now we can finally turn to Plaintiffs'

15  Exhibit 58.  And please turn to page --

16           MS. CHASE:  Which number?

17           MS. SHEKETOFF:  Plaintiffs' Exhibit 58.

18           MS. CHASE:  Thank you.

19  BY MS. SHEKETOFF:

20      Q.   And this is the one Bates-stamped JD_5117

21  to 5119.

22      A.   Okay.

23      Q.   Okay.  And my question is, on page 2, is

24  this an e-mail from you responding to the e-mail from

25  Sharyl Reisman that we just looked at?



Page 197

```
 1        A.   Yes.   I'm telling -- Sharyl has edited it.
 2   I told her I'm going to take a look at it and make
 3   any edits as well.   Yes.
 4        Q.   Okay.   And in this e-mail, you say, "I
 5   question whether it makes sense to go to the full 18
 6   paid weeks for adoption.   Arguably, some chunk of
 7   time is included in the leave because the mother must
 8   recuperate from the actual birth.   That doesn't
 9   happen with adoption" and that some sort -- sorry,
10   "and thus some would say they are getting more
11   benefit than those who deliver the children.   I sort
12   of like the Skadden approach, 18 weeks for birth mom;
13   12 weeks for primary caregiver."
14             Why did you like the Skadden approach?
15        A.   I can't remember that far back.   This is
16   really the sausage-making of our trying to figure out
17   what the policy should be.   And I remember being
18   concerned that we are making a significant change in
19   the policy, and I wanted to make sure we were being
20   smart about it.   I can't remember what the Skadden
21   approach was.
22        Q.   You say the Skadden approach is 18 weeks
23   for birth mom, 12 weeks for the primary caregiver.
24        A.   I don't know how that 18 weeks is broken
25   up, or the 12 weeks.   I mean, I -- I assume they're
```



Page 198

1  getting six weeks, maybe, for the birth mom, for STD.

2  I don't -- I don't know.

3       Q.   Did you think that birth moms were

4  arguably recuperating for the first six weeks?

5       A.   I don't know how to answer that question.

6  I don't know what -- what connection you're trying to

7  make there.  I'm not following you.

8       Q.   You say, "Arguably, some chunk of time is

9  included in the leave because the mother must

10 recuperate from the actual birth."

11          Why did you use the word "arguably" here?

12      A.   I do not recall.  I suspect it's arguable

13 because different birthing mothers will have

14 different experiences than other -- than other

15 birthing mothers.

16      Q.   And can you please read the e-mail above

17 yours -- sorry, the e-mails above yours, and on the

18 first page?

19      A.   From Carter?

20      Q.   From Carter, and then from Staff C.

21          And my question is just, did you read

22 these e-mails?

23      A.   At the time, I absolutely read them.

24 Staff C sends me something, I read it.

25      Q.   Good policy.



Page 199

1                    At the top of the e-mail -- or, sorry, at

2        the top of the page is an e-mail from you, right?

3            A.   Yes.

4            Q.   And you sent that on September 25, 2014?

5            A.   Correct.

6                 MS. SHEKETOFF:  Okay.  And I'd like to

7            move to Plaintiffs' Exhibit 59.  That's

8            Bates-stamped JD_5140 to JD_5146.

9            (Exhibit 59 was marked for identification.)

10                THE WITNESS:  Okay.

11       BY MS. SHEKETOFF:

12           Q.   My question is, this is an e-mail from

13       you, right?

14           A.   Yes.

15           Q.   And this e-mail attaches your revisions to

16       the memo we've been talking about?

17           A.   Correct.

18           Q.   And you sent this e-mail and memo on

19       October 24, 2014?

20           A.   Yes.

21           Q.   Did you do any research between sending

22       your e-mail on September 25, the one we just looked

23       at, and then sending out these revisions on

24       October 24?

25           A.   I cannot remember.  It's too long ago.



Page 200

1          Q.   And did you consult any documents in
2     connection with this memo during that same time
3     frame?
4          A.   Same answer.  I don't know.
5          Q.   And then can you please turn to
6     Plaintiffs' Exhibit 26.  That's Bates-stamped
7     JD_312 -- sorry, 3215 to 3228.
8          (Exhibit 26 was marked for identification.)
9     BY MS. SHEKETOFF:
10          Q.   And this is an e-mail from you to Brogan,
11     cc'ing Sharyl Reisman, Carter, and Mary Ellen Powers.
12     Is that right?
13          A.   Yes.
14          Q.   And it -- your e-mail attaches a memo and
15     an exhibit?
16          A.   It does.
17          Q.   And that memo is the final version of the
18     memo we've been talking about just now, right?
19          A.   It looks to be a version of the memo that
20     I had edited in an earlier exhibit.
21          Q.   And apart from these documents that we've
22     reviewed together today, did you review any other
23     documents when you were considering whether to make
24     this recommendation to Brogan?
25          A.   Again, you're talking eight years ago.  I



Page 201

1    don't remember.

2         Q.   And did you conduct any research that you

3    remember during that time frame?

4         A.   I know research was conducted.  Do I

5    remember who did what or what I reviewed prior to

6    sending this to Steve?  I don't know.

7         Q.   And now I'm going to show you what's been

8    marked as Plaintiffs' Exhibit 61.  You can turn to

9    that in your binder.

10        (Exhibit 61 was marked for identification.)

11   BY MS. SHEKETOFF:

12        Q.   This is Bates-stamped JD_5171.

13             And my question is, is this an e-mail sent

14   out to the firm announcing changes to the firm's

15   parental leave policy on January 22, 2015?

16        A.   Yes.

17        Q.   And did you write this e-mail?

18        A.   I likely did not prepare the first draft.

19   I would have reviewed it.

20        Q.   And did you approve it?

21        A.   I would have approved it, yes.

22        Q.   Why is Beth cc'd to this e-mail -- sorry.

23             Why is Beth bcc'd to this e-mail?

24        A.   I -- you'd have to ask Sarah that.  I

25   assume we had engaged with Beth as part of the



Page 202

1    sausage-making, and Sarah wanted to make sure she was

2    aware of this policy going out.

3              MS. CHASE:  I -- I can answer it from an

4         assistance standpoint.  This document was --

5         this reflects what would have been collected

6         from Beth's e-mail.  Everyone who receives it

7         gets a bcc, because it's going to all attorneys.

8              THE WITNESS:  That makes sense.

9    BY MS. SHEKETOFF:

10        Q.   Why did you recommend keeping leave for

11   men at 4 weeks total, while raising women's leave to

12   18 weeks of paid leave plus 6 weeks of unpaid leave?

13        A.   That would have been based upon the work

14   and analysis that -- as reflected in the documents we

15   were just looking at.  We believed that that was

16   market at that time.

17        Q.   Is there any other reason?

18        A.   No.

19        Q.   And why do you think the market, or other

20   firms, had that sort of policy?

21        A.   You want to ask me what the market -- why

22   -- what I think the market --

23              MS. CHASE:  Let me --

24              THE WITNESS:  -- leads?

25              MS. CHASE:  -- just object to form of the



Page 203

```
 1        question first, and then you can answer it.

 2                Objection to the form of the question.

 3                Now you may answer.

 4                THE WITNESS:  I can't speak to what the

 5        market does or does not.  That's -- I can react

 6        to the market.  I can't tell you how or why we

 7        get there.

 8  BY MS. SHEKETOFF:

 9        Q.   Why do you think other firms give women

10  more leave than men?

11                MS. CHASE:  Objection to the form of the

12        question.

13                But you may answer.

14                THE WITNESS:  I -- I can surmise that they

15        may get short-term disability, and fathers do

16        not, because they birth the child.  But

17        that's -- can't answer it more than that.

18  BY MS. SHEKETOFF:

19        Q.   Well, why do you think women -- sorry.

20                Why do you think firms might give women

21  18 weeks of paid and 6 weeks of unpaid, and men

22  4 weeks of paid?

23                MS. CHASE:  Objection.  It's a

24        hypothetical.

25                But you may answer it in your individual
```



Page 204

```
1        capacity, to the extent any hypothetical has any

2        value.

3               THE WITNESS:  I -- I don't know.  I

4        can't -- I can't answer for the market.

5   BY MS. SHEKETOFF:

6        Q.   Why did you think it was legal to treat

7   men and women differently in this way?

8               MS. CHASE:  Objection to the form of the

9        question.  To the extent it calls for the

10       witness to testify about any privileged

11       communications he had, he may not do so.  To the

12       extent he has any other basis to answer this

13       question, he may do so in his individual

14       capacity.

15              THE WITNESS:  Seeking a legal conclusion.

16       I -- I had no reason to think that it was

17       illegal, and in our view was consistent with the

18       market and the law at the time.  We subsequently

19       had revised it and made changes to it.

20  BY MS. SHEKETOFF:

21       Q.   Why did you think it was legal to give

22  women more parental leave than men?

23              MS. CHASE:  Same objection.  It calls for

24       privileged analysis, and the witness cannot

25       provide privileged analysis in response to
```



```
 1       questions.

 2            THE WITNESS:  And the mother and father, I

 3       understand it, during your period with the firm,

 4       received the same.

 5  BY MS. SHEKETOFF:

 6       Q.   Right, and this --

 7       A.   Now we're talking about '15.

 8       Q.   Well, I was employed at Jones Day in 2015,

 9  and I'm asking about the policy changes that you

10  recommended in your memo to Brogan in November 2014.

11            So my question is, at that time, why did

12  you think it was legal to give more parental leave to

13  women than men?

14            (Instruction not to answer.)

15            MS. CHASE:  Objection to the form of the

16       question.  You're not asking about the policy.

17       You're asking for a legal conclusion of a fact

18       witness.  And any legal conclusion he had is

19       based upon privileged communications, and thus

20       I'm going to instruct him not to answer that

21       question.

22            He can answer a factual question about

23       what the policy is.  He cannot answer a legal

24       conclusion question that is informed by

25       privileged communications.  I'm going to
```



Page 206

1      instruct him not to answer that.

2  BY MS. SHEKETOFF:

3      Q.   Why did you decide not to recommend giving

4  men more than four weeks of leave?

5           MS. CHASE:  Same instruction.  To the

6           extent that the basis for that is based on

7           privileged communications, you cannot answer.

8           To the extent there's an alternate basis that

9           you can provide to -- in response to that

10          question, you may certainly do so.

11          THE WITNESS:  All I can say, it was based

12          upon the analysis that we'd done, and that

13          determined that our policy was completely in

14          accordance with the law.

15          And as you know, the law is always

16          evolving and changing, and we are adjusting

17          accordingly.

18  BY MS. SHEKETOFF:

19      Q.   Okay.  And I think we might have been

20  talking about this earlier, but I'll just try to

21  cover it more quickly this time.  But Jones Day

22  changed its parental leave offerings from 4 weeks of

23  paid leave for all men to 10 weeks of paid leave for

24  primary caretakers and 4 weeks of paid leave for

25  secondary caretakers; is that right?



Page 207

1         A.    Again, I'm not the right person for these

2    questions, but --

3              MS. CHASE:  So if the answer is you don't

4         know, then you should say you don't know.

5              THE WITNESS:  I don't know.  All I know is

6         what's in this document.  And I would have

7         relied upon my team to accurately convey what

8         our policies were at the time.  What changes we

9         were making, I would have reviewed and approved

10        it; but the minutiae, the details of -- of all

11        that, I would have had to rely upon counsel and

12        inform with Sarah McClure.

13             MS. CHASE:  Julia, if you are speaking,

14        you are muted.

15             MS. SHEKETOFF:  Sorry.

16             Please turn to -- in your binder to

17        Plaintiffs' Exhibit 64.  That's Bates-stamped

18        JD_3790 to 3793.

19        (Exhibit 64 was marked for identification.)

20   BY MS. SHEKETOFF:

21        Q.    And please review this e-mail chain.

22        A.    Okay.

23        Q.    And so my question is, did Jones Day,

24   around May of 2015, change its parental leave

25   offerings?



Page 208

1          A.    Yeah.   I mean -- I'm pausing only because

2    I assume it was done in May and not leak on to June.

3    But we absolutely made a change.   As I testified to

4    earlier, Sparkle raising a concern, and we looked at

5    it and made a change.

6          Q.    And it changed the parental leave

7    offerings from 4 weeks of paid leave for men to

8    10 weeks of paid leave for parental -- I'm sorry, for

9    primary caretakers and 4 weeks of paid leave to

10   secondary caretakers; is that right?

11          MS. CHASE:   Objection.   Asked and

12          answered.   I believe the witness has previously

13          said he doesn't recall the specifics of this,

14          but he can certainly try to answer it a second

15          time.

16          THE WITNESS:   I -- that sounds about

17          right, Julia, my -- based upon my recollection.

18          But I -- I can't say I knew, chapter and verse,

19          where we were back in '15.

20   BY MS. SHEKETOFF:

21          Q.    And did you approve that -- that change in

22   May or June of 2015?

23          A.    Says right here I'm okay with this change.

24   So yes.

25          Q.    Okay.   And why were you okay with that



Page 209

1   change?

2       A.   Because it was -- Sparkle had raised a

3   legitimate concern.  We looked at it.  We thought

4   there was some merit to her argument.  We wanted to

5   support all the lawyers, not just female lawyers, our

6   male lawyers as well.  And it made sense.  So we made

7   a change.

8       Q.   And what was Sparkle's concern, as you

9   understood it?

10      A.    I think she says it pretty clearly here

11  herself.  She wanted parental leave status to be

12  provided to similarly situated men and women on the

13  same terms.

14      Q.    And you -- you said you thought there was

15  merit to that legal concern?

16          MS. CHASE:  Objection to the form of the

17      question.  Characterizing as a legal concern.

18      This witness has not accepted that

19      characterization.

20          But you may answer, to the extent you can.

21          THE WITNESS:  Sure.

22          We made a change in the policy in response

23      to what Sparkle had raised.

24  BY MS. SHEKETOFF:

25      Q.    Okay.  And did you do that because she had



Page 210

1   raised a legal challenge to the -- to the policy, and

2   you assessed that there was some merit to that legal

3   challenge?

4        A.   I didn't view it as legal or illegal as

5   compared to -- in accordance with what the market was

6   doing.  I never believed that the prior policy was

7   illegal.  The market was changing.  Our competitors

8   were changing.  We were trying to stay abreast of the

9   changes that were occurring.  Sparkle raised it.  We

10  looked at it, had discussions that were privileged,

11  and we made the move.

12       Q.   So are you saying you also changed the

13  policy, or you changed the policy because of the

14  market moving?

15            MS. CHASE:  Objection to the form of the

16       question.

17            But you may answer.

18            THE WITNESS:  It was certainly part of the

19       discussion.  I mean, you saw earlier that we

20       were staying on top of what the -- the market

21       was.  We of course also stayed on top of what

22       the legal obligations were.

23  BY MS. SHEKETOFF:

24       Q.   In -- in Sparkle's e-mail, she says, "I

25  can also talk with them about our 'grandfathered'



Page 211

1    status with respect to women's preventative health

2    benefits."  Do you know what she's referring to?

3         A.    I'm looking for where you're referring.

4              MS. CHASE:  It's in the first few

5         sentences.

6              THE WITNESS:  I see it, okay.

7              I have no idea, Julia.

8    BY MS. SHEKETOFF:

9         Q.    Okay.

10        A.    I don't recall that at all.

11        Q.    And this -- if you scroll up in the --

12   this e-mail chain, you have an e-mail exchange with

13   Sarah McClure.  Is that right?

14        A.    At the top of page 91?  Yes.  Privileged.

15        Q.    And on the top of 7 -- 3790, right in the

16   middle, you say, "I am okay with this change."

17             And you and Sarah are continuing --

18   Sarah's responding to you, and you respond to Sarah?

19        A.    Correct.

20        Q.    Did you have any communications with

21   anyone, besides in this e-mail exchange, about

22   changing the leave offerings at this time?  In May or

23   June of 2015?

24        A.    It is very possible.  I have no

25   recollection now.  The same people I told you about,



Page 212

1    that I typically use as sounding boards on these

2    issues, would have been -- would have been potential

3    discussions.

4         Q.   Okay.  But you don't remember them?

5         A.   Do not.

6         (Exhibit 66 was marked for identification.)

7    BY MS. SHEKETOFF:

8         Q.   And then I'd like you to turn to Exhibit

9    -- Plaintiffs' Exhibit 66, which is Bates-stamped

10   JD_3822 to 3825.

11             At the bottom of the first page, and then

12   continuing on to the second, is what appears to be an

13   e-mail from Sarah McClure to you and  Staff B ,

14   dated October 18, 2015.  Is that right?

15        A.   Yeah, I missed the start of your question,

16   but yes, this is an exchange between me and Sarah,

17   copying  Staff B .  We're looking at revising the

18   policy.

19        Q.   Okay.  And so on the first page, above

20   Sarah's e-mail, appears to be an e-mail from  Staff B

21    Staff B .  There doesn't appear to be any e-mail from

22   you here, and no other e-mail was produced.  So my

23   question is, did you respond to Sarah?

24        A.   I don't know if there's a writing response

25   on the subject to Sarah or not.  It is very likely



Page 213

1    that I had at least an oral communication with her

2    and ▮Staff B▮.  I have a specific recollection of

3    discussing these issues with ▮Staff B▮.

4        Q.    Okay.  And please describe that

5    discussion.

6        A.    Well, I know that when we were looking to

7    revise the adoption leave policy, that there was some

8    question as to the number of weeks we were going to

9    approve.  And ▮Staff B▮ was persuasive to me.  ▮Staff B▮

10   ██████████████████████████  ████████████████

11   ██████████████████████  Trust her implicitly.  And

12   she has at least two adopted children.

13           And when we were considering the change in

14   the policy, she was persuasive that adopted leave

15   policy is really different from a birthing maternity

16   or paternity policy, and that there are special and

17   different considerations to take advantage of, or

18   to -- to consider.  And she was advocating for the

19   period that we eventually ended up at.

20       Q.    Was there anything else said in that

21   conversation?

22       A.    No, just that she felt strongly -- and I

23   can't remember how we brought her into the

24   conversation.  I -- I talked with ▮Staff B▮ a lot, on a

25   lot of different things.  Sarah has a reporting



Page 214

1    responsibility to Staff B , so sometimes I raise some

2    issues with her.  And she expressed her view that

3    adoptions are difficult and unique, and have special

4    concerns that we should be accounting for.

5         Q.   And who else was present for this meeting?

6         A.   Sarah may have been in there.  But I -- I

7    don't know.  She may have been in there only because

8    sometimes I have meetings, three of us sometimes.  I

9    have meetings with Staff B .  Sometimes I have a

10   meeting just with Sarah.

11        Q.   And was anyone else present during your

12   meeting with Staff B that you can remember?

13        A.   The only other person I can think of

14   that -- I shouldn't say that.  It's -- it's possible

15   that, you know, Sharyl Reisman.  But I suspect it was

16   me and Staff B alone, or me and Staff B and Sarah.

17        Q.   And when was this meeting?

18        A.   Oh, about this time that we were

19   considering the entry.  So I'm looking at it here:

20   October 2015.  That is my -- use that as a guide

21   point.  But I'm not sure exactly when.

22        Q.   And -- and was this in person?

23        A.   It likely would have been in person.

24        Q.   Where does Staff B work?

25        A.   Staff B



Page 215

1    Q.   Was there anything else said in that

2    conversation with Staff B ?

3    A.   I'm sure there are other things discussed,

4    but not that I can recall.  Discussed other issues,

5    not necessarily this.

6    Q.   And did the -- was Brogan consulted at

7    this time?  Or was Brogan consulted about changing

8    the parental leave policy?

9    A.   I don't believe at this point in time I

10   would have consulted with Steve.

11   Q.   Why didn't you respond to Sarah's e-mail

12   or Staff B 's e-mail in writing?

13   A.   It was certainly not an intention not to

14   put something in writing, as compared to we met in --

15   in person.  There's no -- I have -- I frequently

16   responded to them in writing.  Why I did not in this

17   circumstance, I have no idea.

18        MS. SHEKETOFF:  I'm going to switch to a

19        different topic.  We can take a break now, or we

20        can keep going.  I'm happy to keep going.

21        MS. CHASE:  Let -- let me just give that a

22        quick inquiry.  Like is this a quick topic, or

23        are we about to embark on a long topic?

24        MS. SHEKETOFF:  I would not say this is

25        quick.



Page 216

```
 1              MS. CHASE:  Okay.  This probably is a good
 2         time to take a meal break, then.
 3              VIDEOGRAPHER:  So we're off the record
 4         at 1:41 p.m.
 5              (A luncheon recess transpired
 6              from 1:41 p.m. until 2:05 p.m.)
 7              VIDEOGRAPHER:  Back on the record at
 8         2:05 p.m.
 9    BY MS. SHEKETOFF:
10         Q.   Okay.  I'd like to go back to Plaintiffs'
11    Exhibit 50, please.
12              And my question on this is just, is this
13    the firm manual that was in effect in January 2019?
14              MS. CHASE:  And I will note with respect
15         to this question, he can answer in his
16         individual capacity, not as a 30(b)(6), in terms
17         of the -- whether this was the actual one at
18         this time.
19              MS. SHEKETOFF:  I don't think that's --
20         well, I mean, we're talking about the reference
21         policy at this point, and so I think I am going
22         to ask in his capacity as a 30(b)(6) witness.
23              I mean, I guess -- ultimately my question
24         will be about the reference policy in effect at
25         this time.  If you feel like you -- he is not
```



Page 217

```
 1          able to say the policy manual in general was the
 2          one in effect, I guess that can be fine in an
 3          individual capacity; but the rest of this does
 4          need to be in 30(b)(6).
 5               MS. CHASE:  I -- I agree that if you point
 6          him to the reference policy and ask him if it
 7          was the reference policy in effect at the time,
 8          that he can either answer as a 30(b)(6) or we
 9          can take a break and confirm.
10               But with respect to anything broader than
11          the reference policy, he'll be answering in his
12          individual capacity.
13               MS. SHEKETOFF:  Okay.
14     BY MS. SHEKETOFF:
15          Q.   So please take a look at the date on the
16     top of this.  It says, "Revised 1-7-2019."
17               And then my question is, I guess -- if you
18     have to answer in your personal capacity, that's
19     fine.
20               Is this the firm manual that was in effect
21     in January 2019?
22          A.   Certainly after January 7th, 2019, yes.
23          Q.   Great.  And can you please turn to the
24     page that's Bates stamped JD_2117.  The internal page
25     number is 82.
```



Page 218

1          A.    I'm there.

2          Q.    Okay.  And my question is, if this is the

3    policy -- if you take a look at the "Employment

4    References" policy.

5                And my question is, in your capacity --

6    this and all the other questions about this will be

7    in your capacity as a 30(b)(6) witness.

8                And my question is, is this the policy in

9    effect when Mark was fired?

10         A.    Correct.  It was.

11         Q.    And is this the policy in effect when the

12   firm made its decision about whether to allow Mark an

13   employment reference?

14         A.    Yes.

15         Q.    And so you were the firm's administrative

16   partner, right?

17         A.    Guilty.

18         Q.    And you were, at the time that the firm

19   made the decision about whether to allow Mark the

20   employment references he requested, right?

21         A.    I was.

22         Q.    So under the policy, you decide whether to

23   authorize an employment reference for a lawyer; is

24   that right?

25         A.    If I recall, I am one of the persons.  It



Page 219

 1    came to my -- across my desk.  At least --

 2            A.    (Simultaneous speaking.)

 3            MS. CHASE:  I'm sorry.  I couldn't hear

 4       that.

 5    BY MS. SHEKETOFF:

 6            Q.    I didn't mean to interrupt you.  Go ahead.

 7            A.    No, I'm sorry.  I was just saying, I know

 8    I am at least one person who can provide an exception

 9    to the policy.  I'd have to read this to see if it

10    includes others.  (Reading.)

11            Q.    Okay.  So you had the power to decide when

12    a lawyer gets an employment reference?

13            A.    I am one person who I think can provide an

14    exception to this policy if one is requested.

15            Q.    And nothing in this policy tells you when

16    you can and you can't authorize an employment

17    reference?

18            A.    That's correct.

19            Q.    So what determines when you authorize an

20    employment reference?

21            A.    Well, first off, this policy has existed

22    at the firm as long as I have been here.  May have

23    been tweaked here and there over -- over the years.

24    And it's designed to have a standard approach of --

25    of not forcing the firm into -- who are we going to



Page 220

1    give a good reference to and who are we not.

2              And that -- that certainly creates issues.

3    And for that reason we've always had the policy of --

4    we simply identify when the person was employed, what

5    their position was, start and end date, and don't go

6    into, generally speaking, the -- the reason for

7    separation.

8              In terms of when we provide exceptions, it

9    is always an individual decision, based upon the

10   facts and circumstances for the given lawyer.

11             And certainly when it came to my desk for

12   Mark, I believed there was an exceptional

13   circumstance.

14             MS. CHASE:  And let me just note, with

15        respect to this topic and all other topics upon

16        which the witness has testified in his 30(b)(6)

17        capacity, that our objections note a temporal

18        limitation to the time period.  So, for example,

19        while the witness could certainly answer about

20        2010 in his individual capacity, with respect to

21        the topic on which he's designated as a

22        30(b)(6), the temporal period is more limited,

23        to the time period 2014 to 2019, which I believe

24        is the relevant period in this case.

25             But to the extent that you have any



Page 221

1          ambiguity about the -- the temporal scope upon

2          which he's testifying as a 30(b)(6), I just

3          wanted to clarify that for the record, with

4          respect to this and -- and the other topics upon

5          which he's designated as a 30(b)(6).

6    BY MS. SHEKETOFF:

7          Q.   And so what was the exceptional

8    circumstance in Mark's case?

9          A.   Well, this policy applies for whatever

10   reason someone may leave the firm, not just a -- a

11   termination.  So the fact that we're dealing with a

12   termination was one thing.

13              Two, we, generally speaking, want our

14   lawyers to move on to other opportunities and to do

15   well.  We had a situation where we properly

16   terminated Mark, but we knew he had a young family.

17   We had, no doubt, people who were supportive of you

18   throughout the firm.  So we wanted both you and Mark

19   to do well.  So we thought it was in the firm's

20   interest, as well as your interest, to provide an

21   exception and to allow someone to give a more

22   substantive reference.

23         Q.   And so why did you deny the other

24   references request that he made?

25              MS. CHASE:  Object to the form of the



Page 222

1          question.

2                    You can answer.

3                    THE WITNESS:  Yeah.  It was -- the policy

4          was not -- we agreed to do one.  And the one

5          person who we said should do it was the, in my

6          view, firm's view, the person we thought would

7          be most compelling to an employer to have that

8          individual supportive of Mark.  That was Shay.

9          Shay was a very well thought-of person in the

10         issues and appeals bar.  We thought his stamp of

11         imprimatur would be more valuable to Mark than

12         any of the others.  Mark himself had reached out

13         to Shay.  I knew Shay.  I trusted Shay.  And for

14         that reason, I thought Shay was the right guy.

15    BY MS. SHEKETOFF:

16         Q.   And then you mentioned it's always an

17    individualized decision and depends on the facts and

18    circumstances whether you authorize reference.

19    What -- what facts and circumstances matter?

20         A.   Obviously, like I -- the ones I identified

21    earlier:  The termination, the fact that he had a

22    young family.

23         Q.   Just to clarify, I'm asking in general.

24    I'm not asking just Mark.

25         A.   Oh, okay.



Page 223

1             It -- it varies.  It could be an associate

2    who, better or worse, people love, but he or she does

3    not have the -- the skill set to advance at Jones

4    Day.  We want to be supportive of that individual.

5    We could have someone who was a disaster from the

6    time he or she arrived.  They requested an exception,

7    and we're not going to give an exception, because to

8    even address it would not be in their best interest

9    or the firm's best interest.

10            It varies.  It's all over the lot.

11       Q.   So there are no blanket rules about

12   certain references that you will give or won't give?

13       A.   No.  No.  No blanket rule.  It's a -- we

14   have a policy for a reason.  We will provide

15   exceptions based upon the individual circumstances.

16            We thought that was the case here.  I, you

17   know, would have expected a "thank you" instead of a

18   lawsuit.

19       Q.   And so are there particular types of

20   employers that you all allow reference for and not

21   others?

22       A.   I would say no.  My only caveat is

23   sometimes who the employer is asking for the

24   reference, and how limited that reference request

25   might be might play a role.  So if it's "I just would



Page 224

1  like to get a reference for this one client," or "I'd

2  like a reference for this one law firm," that may be

3  something better or different than "This person can

4  speak to this individual's performance for all

5  potential employers."  That's all.

6      Q.  Okay.  But it -- it depends on the

7  circumstances?

8      A.  Correct.

9      Q.  And what percentage of the time do you

10 allow -- do you authorize an employment reference?

11     A.  Oh, boy.  Percentages are always dangerous

12 in a deposition.  I would have to know the numerator

13 and denominator.  I will say there's not a lot of

14 exceptions granted.  There's not a lot of exceptions

15 requested.  Have I granted other exceptions?  Yes.

16 But there's not a lot of them.

17     Q.  So under the policy, the appropriate

18 office administrator decides whether to authorize an

19 employment reference for staff and legal support?

20     A.  I'm sorry.  Say that again?

21     Q.  Under the policy for legal support

22 personnel and staff, the appropriate office

23 manager -- or, sorry, office administrator is the one

24 who decides whether to authorize an employment

25 reference.  Is that right?



1      A.   I believe that's accurate.  I am not

2  typically involved in that situation, and I like to

3  think that our office administrators are working with

4  lawyer leadership as to whether such a reference

5  should be given.

6      Q.   And who is the appropriate office

7  administrator for staff and legal support personnel

8  in the D.C. office?

9           MS. CHASE:  At what time period, Julia?

10          MS. SHEKETOFF:  I'm asking in a 30(b)(6)

11     capacity, so from 2014 to 2019.

12          THE WITNESS:  The current OA is Kathy

13     Abebe, A-b-e-b-e.  Prior -- God, this is sad.

14     I'm trying to to think who her predecessor was,

15     who was here.  Oh, my God, I'm getting too old.

16          Jay Guenthner.  Sorry.  Jay moved on.  It

17     was Jay.  Jay then got moved into a director

18     leadership role.  Jay Guenthner was our office

19     administrator for many years.

20  BY MS. SHEKETOFF:

21      Q.   Was he the office administrator between

22  2014 and 2019?

23      A.   He certainly was in 2014.  I don't know

24  when his -- when he changed that role.  I suspect in

25  2019 he was still in that role, but you'd have to go



Page 226

1    to the HR records.

2         Q.   Is there any purpose for the policy

3    besides -- I'm sorry.  Withdrawn.

4              Is there any purpose to the reference

5    policy besides the ones you've mentioned?

6         A.   No, it's -- it really is administrative

7    convenience, and then there may be some legal reasons

8    as well.  I could see that being part of the policy.

9    But generally speaking, it's just stepping on a

10   slippery slope when you got into the reference

11   business.

12        Q.   I'm going to show you Plaintiffs'

13   Exhibit 70 on the screen.  You can also turn to it in

14   your binder.

15        (Exhibit 70 was marked for identification.)

16   BY MS. SHEKETOFF:

17        Q.   That's Bates-stamped JD_PRIV_165.  And

18   please begin with the e-mail at the bottom, from Mark

19   to Shay.

20        A.   Mm-hmm.

21        Q.   And just to confirm, that's an e-mail from

22   Mark to Shay on January 27, 2019, asking Shay to give

23   an employment reference.  Right?

24        A.   Correct.

25        Q.   And then Shay forwards Mark e-mail --



Page 227

1    sorry.  Then Shay forwards Mark's e-mail to you a few
2    minutes later.  Is that right?
3          A.   Yes.
4          Q.   And your response to Shay, the same day,
5    is on the top of this page, correct?
6          A.   Yes.
7          Q.   You write, "We do that for good and bad
8    for reasons so we can deftly handle requests like
9    this."
10              What did you mean by "for reasons so we
11   can deftly handle requests like this"?
12         A.   Yeah, that's my reference to the
13   administrative convenience.  You know, we have people
14   who are very good lawyers and staff, who want a
15   recommendation, and for which we may be willing to
16   provide something.  And sometimes we have bad
17   employees, lawyers and staff, who want a reference.
18   This sort of eliminates our trying to make that
19   subjective determination as to who we're going to
20   support and not support.
21              Now, granted, the exception that I
22   explained earlier goes a little bit into making that
23   determination.  But that is only in very unusual and
24   unique circumstances.
25         Q.   And why did you ask Shay if he wanted to



Page 228

1   be a reference?  Or what -- sorry.  Why did you ask

2   Shay if he wanted to give a recommendation?

3       A.   Because I -- from the get-go, I was

4   wondering to myself, is this a situation where we

5   want to provide an exception?  And I wanted to know,

6   if -- if we were going to do that, was Shay's

7   recommendation, would it be positive, and would that

8   be something he would be comfortable doing.

9       Q.   Okay.  I'm going to show you on the screen

10  Plaintiffs' Exhibit 71.

11      (Exhibit 71 was marked for identification.)

12  BY MS. SHEKETOFF:

13      Q.   This is Bates-stamped JD_2463.  In the

14  middle of this page, is that an e-mail from you to

15  Sarah McClure, forwarding the e-mail from Shay that

16  we just discussed?

17      A.   Uh-huh.

18      Q.   And why did you forward that to

19  Sarah McClure?

20      A.   She's my legal counsel on HR issues.

21  She's got a request for a reference.  This -- we -- I

22  wanted to make sure that there was nothing from a

23  labor and employment standpoint that I should know

24  about.

25      Q.   At the top of the e-mail, is that an



Page 229

1    e-mail from McClure to you, on January 28, 2019?

2         A.    From myself to --

3         Q.    Sorry.  From Sarah to you, on January 28?

4         A.    Yes, okay.  I'm sorry, yes.  From Sarah to

5    me.

6         Q.    And the e-mail says, "I met with Beth and

7    Shay on this this morning.  Can discuss when you have

8    a moment."

9              Did you discuss with Sarah her meeting

10   with Beth and Shay?

11        A.    I'm sure I did.

12        Q.    Okay.  When?

13        A.    After she sent this e-mail.  I don't know

14   how long or short after.

15        Q.    And please describe that conversation.

16             MS. CHASE:  And I will just caution, to

17        the extent that the conversation is privileged,

18        you can attest to the fact of it, but not the

19        substance.

20             THE WITNESS:  One, it's privileged.  Two,

21        I can't recall the substance of the

22        conversation.  Three, I wouldn't tell you if I

23        could recall it.

24   BY MS. SHEKETOFF:

25        Q.    You said earlier that Shay provided legal



Page 230

1    advice in connection with Mark's termination.  Is

2    that right?

3          A.   He did provide me counsel, yes.

4          Q.   And so do you think it's fair to say that

5    Shay was in an adversarial posture with respect to

6    Mark?

7          A.   No.  No.  Not at all.  I think Shay was

8    supportive of Mark.

9          Q.   But you're saying he -- Shay acted as a

10   lawyer for Jones Day in terminating Mark, right?

11         A.   He was -- and again, we're getting into

12   privilege.  But at a high level, I was bouncing off

13   him what the legal landscape was.  I don't -- Shay

14   was not opposed to Mark, he was not in favor of Mark,

15   or a decision one way or another on Mark.  I was

16   picking his big brain about labor and employment law.

17   But my understanding then, understanding now, was

18   that Shay was generally positive on Mark.

19         Q.   Was the fact that Shay was a lawyer

20   involved in representing Jones Day with respect to

21   the termination of Mark any factor in your decision

22   to select Shay as the person to provide a reference

23   for Mark?

24         A.   None whatsoever.  No.

25         Q.   Did you notify Mark that Shay had been an



Page 231

1    attorney representing Jones Day in connection with

2    his termination, and --

3         A.   I never had -- I'm sorry.

4         Q.   Go ahead.

5         A.   I never had a communication with Mark, as

6    far as I know.

7         Q.   Did you think it was appropriate to advise

8    Mark that the single person who you at Jones Day had

9    authorized to be his reference was actually an

10   attorney representing Jones Day in connection with

11   his termination?

12        A.   What was appropriate or not appropriate, I

13   don't know why it would have been relevant.  As I

14   said, I would reach out to Mark, someone I'd never

15   interacted with, to tell him that "the person I am

16   willing to give you a reference -- I'm going to

17   approve a reference is one of the top issues and

18   appeals practitioners in the country today."

19             And somehow that was a bad thing.  I did

20   not do that.  No.

21        Q.   Okay.  I'm going to show you what's been

22   marked as Plaintiffs' Exhibit 72.

23        (Exhibit 72 was marked for identification.)

24   BY MS. SHEKETOFF:

25        Q.   That is Bates-stamped JD_PRIV_164.



Page 232

1           And my question is, is this an e-mail
2    exchange between you and Sarah McClure on
3    January 28, '19?
4           A.   It is.
5           Q.   And on the bottom of the page, Sarah
6    writes, "could we discuss the Savignac recommendation
7    issue?"
8           And did you discuss the Savignac
9    recommendation issue with Sarah after receiving this
10   e-mail?
11          A.   I have no reason to think that I did not.
12          Q.   Can you please describe that discussion?
13          MS. CHASE:  Same objection, to the extent
14       that it was a privileged communication.  You can
15       say that it occurred, but not the substance of
16       it.
17          THE WITNESS:  Yeah.  It -- it occurred.  I
18       would have given her the factual accounts of the
19       request, to whom requests had been made.  We
20       would have had a discussion regarding legal
21       counsel, which of course we won't get into.
22          I either then or later would have said --
23       would have informed her that "This is what I'm
24       thinking about doing."  Would have gotten her
25       counsel on that.  There's not much more than



Page 233

 1       that I can recall.

 2  BY MS. SHEKETOFF:

 3       Q.   You keep saying "would have."  Are you

 4  actually testifying about a memory, or are you just

 5  supposing?

 6       A.   I am supposing.  This is -- this is my

 7  standard pattern and practice with Sarah.  We have a

 8  regular set of discussions, communications.  We talk

 9  on a -- if not weekly, biweekly basis.  And I seek

10  her counsel on a whole host of items.

11            The fact that we have an e-mail exchange

12  saying that the two of us are going to talk, I'm sure

13  a talk would have occurred.  I would have given her

14  the facts.  I would ask her opinion and counsel on

15  the facts.  I would have brought my own views on the

16  facts, and my legal background to those facts, and

17  made a determination.

18            So I am absolutely certain it happened.

19  Can I tell you, chapter and verse, where it was, what

20  I was wearing, what time of day?  No, I can't.

21       Q.   Okay.  Did you at any time direct

22  Sarah McClure to tell Shay and Beth that Shay was the

23  only person to have calls about Mark?

24       A.   Did I instruct Sarah to tell Shay?  I

25  instructed someone.  I don't know if I told Sarah to



Page 234

1   communicate that, if I told Beth, or if I called Shay

2   myself.

3        Q.   And did you direct Sarah -- or did you

4   direct that nothing should be in writing?

5        A.   I directed that I would prefer that Shay

6   have the discussion with the potential employer

7   orally, because in my view, a static documentary

8   reference is that:  It's static.  And I thought that

9   an oral call reference would be more beneficial to

10  Mark, beneficial to the firm, in terms of helping him

11  get a position.  That's why I suggested that that

12  call should be oral.

13       Q.   And did you say nothing -- to do nothing

14  in writing?

15       A.   I -- I don't recall if I did or did not.

16  It would not surprise me if I gave that instruction.

17       Q.   And why would you have said not simply

18  that Shay should have an oral call, but that he

19  should not put anything in writing?

20       A.   The "in writing" was that I thought the

21  reference should be oral so that Shay would have the

22  ability to field the questions, and not just be a

23  static writing document:  "I hereby recommend Mark

24  Savignac to be an associate in your office."

25            What good does that do?  I want Shay to be



Page 235

1   able to say -- the guy says, "Well, what type of

2   person is Mark?"  I trusted Shay to field that

3   appropriately, as my partner.  And he wouldn't be

4   able to do that in a writing.

5        Q.   And at that time, what was your

6   understanding of what type of person Shay thought

7   Mark was?

8        A.   Boy.  Like I said earlier, I thought Shay

9   felt that based upon his reviews, he thought Mark was

10  a good developing lawyer.  What he thought regarding

11  Mark's behavior and conduct in sending the e-mail,

12  that would be privileged.

13       Q.   I'm going to show you what's been marked

14  as Plaintiffs' Exhibit 74.  You can turn to that in

15  your binder.

16       (Exhibit 74 was marked for identification.)

17  BY MS. SHEKETOFF:

18       Q.   It's Bates-stamped JD_PRIV_42.  Is this an

19  e-mail exchange between you, Shay, Beth, and

20  Sarah McClure, on January 29, with the subject line:

21  "Draft response -- please comment"?

22       A.   Yes.

23       Q.   And then I'm going to show you Plaintiffs'

24  Exhibit 76, that's marked -- sorry, Bates-stamped

25  JD_2465.



Page 236

1          (Exhibit 76 was marked for identification.)

2     BY MS. SHEKETOFF:

3          Q.   Is this an e-mail from Shay to you, Beth,

4     and Sarah McClure, forwarding your -- his response to

5     Mark's reference request?

6          A.   Yes.

7          Q.   And did you review his response before it

8     was sent out?

9          A.   Did I review Shay's response?

10         Q.   Yeah.

11         A.   I don't believe I did.

12         Q.   I'm going to take you back to Plaintiffs'

13    Exhibit 74 and ask you that question again.

14         A.   You're refreshing my recollection?

15              Yeah, it's possible.  You -- you may be

16    right on that.  That's hard for me to say, because

17    it's redacted, but it looks like I was forwarded and

18    asked to comment on something.  It's possible that it

19    was that.

20         Q.   And you authorized Shay to respond to

21    Mark's reference request this way, right?

22              MS. CHASE:  Objection to the form of the

23         question.

24              But you may answer.

25              THE WITNESS:  Yeah.  Quibble with



Page 237

```
 1          "authorize."  Shay is a partner of mine, and
 2          certainly was seeking my input.  I'm not sure he
 3          needed my authority to respond to Mark.
 4   BY MS. SHEKETOFF:
 5          Q.   So Shay writes, "I" -- well, he did need
 6   your authority to provide a reference?
 7          A.   A reference, correct, yes.  But not to
 8   respond, per se.
 9          Q.   Okay.  So Shay writes, "I (and only I)
10   have been authorized to speak with potential
11   employers and to provide a reference by phone."
12               Why did you authorize Shay to speak with
13   potential employers to provide a reference by phone?
14               Again, you can -- you can set aside the
15   reasons you already gave, but is there anything else
16   beyond that?
17          A.   No, it's the reasons I already gave.
18          Q.   Okay.  And beyond -- if -- well, actually,
19   why did you authorize only Shay to write a reference
20   for Mark?
21          A.   Because I wanted to have a unified
22   statement on behalf of the firm regarding Mark.  I
23   didn't want there to be inconsistent messages, which
24   I think would have been harmful to the -- Mark and --
25   harmful to Mark and to the firm.
```



Page 238

```
 1              Our -- this -- in this situation, the firm
 2    and Mark's interests were aligned.  We wanted him to
 3    get a new job.  I was trying to act in a manner that
 4    would be most advantageous to that.
 5         Q.   And how -- how could this -- how could
 6    authorizing multiple references for Mark have been
 7    disadvantageous to the firm?
 8         A.   Because I knew Shay had a positive view
 9    of -- Shay, he would convey as such.  I did not know
10    Ben as well.  I did not know Karl as well, which I
11    understand were the other two.  So I did not know
12    what their impressions were.
13              But I knew Shay.  I knew his reputation in
14    the industry, and that that would be persuasive to an
15    employer.
16         Q.   Did you -- did your decision to authorize
17    only Shay to speak with potential employers have
18    anything to do with your anticipation of a lawsuit
19    against Jones Day?
20         A.    Not at all.  I -- that was nowhere on my
21    radar screen.  Again, as I testified, I did not think
22    he'd file a lawsuit, because I did not see any merit.
23    I thought -- I thought you were simply making
24    threats.
25         Q.    You selected -- did you select Shay
```



Page 239

1   because you felt you could trust him to advance Jones

2   Day's interests?

3         A.   I trusted Shay to advance Jones Day's

4   interests, and in the process advance Mark's

5   interests.

6         Q.   And why didn't you allow Mark to decide

7   how to advance Mark's interests by granting him the

8   references that he's -- he requested?

9         A.   I have no control over how to advance

10  Mark's interests except through Jones Day.  I was

11  providing him an extremely rare, unusual exception to

12  our standard policy that has been in place for years.

13  That, I thought, was a pretty commendable approach

14  for someone who had treated the firm in a manner --

15  in the manner that he had.

16        Q.   Well, just to be clear, you had power --

17             MS. CHASE:  Please don't cut the witness

18        off, Julia.  Mark -- Mr. Shumaker was speaking.

19        You'll have an opportunity to ask a follow-up

20        question, but please don't cut off the witness.

21             Mr. Shumaker, I believe you were still

22        testifying.

23             THE WITNESS:  I -- I think it was

24        beneficial that she cut me off.  I was not -- I

25        was not going to say something kind.  Go ahead.



Page 240

1    BY MS. SHEKETOFF:

2         Q.   What were you going to say?

3         A.   I was going to say that I would have

4    expected a "thank you" from Mark, not a lawsuit.

5         Q.   Just to be clear, you had the power to

6    authorize Ben Mizer and Karl Thompson to provide a

7    reference for Mark, right?

8         A.   You say "power."  I don't view my role as

9    having power as compared to fielding fly balls.

10             Sure.  If -- if the firm determined that

11   three references were better than one, sure, we could

12   have done that.  I didn't believe that was

13   appropriate in this case, for the reasons I've

14   testified to.

15        Q.   And again, if the firm determined it was

16   appropriate, you mean for the firm, not for Mark?

17        A.   I'm sorry.  Can you restate that?  I lost

18   you.

19        Q.   I'll withdraw it.

20             Is there any reason you haven't provided

21   about why you didn't authorize Karl Thompson to

22   provide a reference to Mark?

23        A.   I -- again, I don't know that I've ever

24   met Karl Thompson.  I don't know if his judge of a

25   character is good or bad.  I don't know how he



Page 241

1   assesses a lawyer's work product.  At the time this

2   happened, I did not know Ben well, so I -- I was in

3   the same boat with Ben.  I since have worked with

4   Ben, and trust his judgment.  And at that time --

5   this was now, I may have made a decision between Ben

6   or Shay.

7           But the one person who I trusted and knew,

8   who had a positive experience with Mark, was Shay.

9   That's why I went with Shay.

10      Q.   And did you have any understanding of the

11  experience that Ben Mizer or Karl Thompson had with

12  Mark?

13      A.   I can't remember if we had gotten to the

14  review sessions at that time.  I think so.  I think

15  I -- I think I was aware that Ben, while generally

16  positive, had some concerns about Mark in terms of

17  tone; tone and -- I can't remember if it was tone --

18  client tone, with other lawyers.  I remember it

19  wasn't a flawless review, but it was generally

20  positive.

21      Q.   And did you have any understanding of Karl

22  Thompson's impression of Mark?

23      A.   I -- I don't.  I don't recall Karl's take

24  on things.

25      Q.   And why didn't you authorize Yaakov Roth



1    to provide a reference for Mark?

2         A.   I didn't think Mark had asked Yaakov.  If

3    he had, I would have been down to picking between

4    ████████████████     ████████████████████████

5    ██████████████████████████

6         Q.   And so would you have selected Yaakov over

7    Shay?

8         A.   I can't say that.  Both of them are

9    outstanding lawyers.

10             MS. CHASE:  Note with respect to the last

11        question, I was going to note an objection as to

12        hypothetical.  Just get it on the record.

13             THE WITNESS:  And you know -- you know,

14        Julia, how good both Shay and Yaakov are.  That

15        was not a -- an empty recommendation.

16   BY MS. SHEKETOFF:

17        Q.   Why didn't you authorize Shay to provide,

18   in addition to his oral reference, a written letter?

19             MS. CHASE:  Objection.  Asked and

20        answered.

21             But you may answer it again.

22             THE WITNESS:  Yeah, I answered it.  Our

23        policy is not to provide that.  I provided an

24        exception.  I stated the reason why I thought an

25        oral recommendation was better than an in-paper



Page 243

```
 1      recommendation.

 2  BY MS. SHEKETOFF:

 3      Q.   And why did you think the oral

 4  recommendation was better than an oral recommendation

 5  and a paper recommendation?

 6          MS. CHASE:  Objection to the form of the

 7      question, and that it's been asked and answered.

 8          But you may answer it again.

 9          THE WITNESS:  I don't know that anyone

10      asked me to provide both.  So I'm not sure that

11      was ever in front of me.  I went with the oral

12      one because I think that was the -- the question

13      was posed, "Would we provide a reference for

14      Mark?"

15          And I said, yes, it should be oral, so

16      that Shay has the ability to field the questions

17      as they come.

18  BY MS. SHEKETOFF:

19      Q.   So Shay wrote, "I will be able to speak"

20  about -- sorry.

21          "I will be able to speak only about the

22  work we had together; I won't be able to answer any

23  other questions."

24          Why did you authorize Shay to speak only

25  about the work he and Mark did together, rather than
```



Page 244

1    other things?

2              MS. CHASE:  Objection to the form of the

3         question.  Assumes facts not in evidence.

4              But you may answer.

5              THE WITNESS:  Yeah.  Because I wanted Shay

6         to be opining from his personal knowledge and

7         background so he has a proper foundation for

8         providing a recommendation.

9              I did not know what the experience were --

10        experiences were from the other guys.  Unless I

11        was assisting the firm and Mark in giving what I

12        believe to be a positive recommendation to an

13        employer, I thought that was in the firm's best

14        interest.  I thought it was in Mark's best

15        interest.

16   BY MS. SHEKETOFF:

17        Q.   Why would it -- why didn't you allow

18   people or employers to read, or -- I'm sorry.

19   Withdrawn.

20             Why didn't you allow Shay to read Mark's

21   consensus statement, so he could represent how Mark

22   was viewed by other people?

23             MS. CHASE:  Objection to the form of the

24        question.

25             But you may answer.



Page 245

1              THE WITNESS:  That assumes I told Shay he

2         couldn't.  My guess is Shay had his assessment

3         statement, but I don't know that.  I don't

4         recall ever saying "You can't read it."

5              If Shay wanted to have an assessment

6         statement of Mark's, and wanted to read it, he

7         could certainly have done so.

8    BY MS. SHEKETOFF:

9         Q.   Why didn't you authorize Shay to represent

10   Mark's experiences with the firm more generally,

11   based on his consensus statement?

12             MS. CHASE:  Objection to the form of the

13        question.  Assumes facts not in evidence.

14             You may answer.

15             THE WITNESS:  I don't -- I didn't -- Shay

16        is a big boy.  Shay is able to give a reference

17        based upon direct experience with Mark.  I

18        didn't go to the point of telling him what he

19        should review or not review in providing a

20        reference for Mark.  I was providing exception

21        to the policy.

22             I'm not sure what more to say about it.

23   BY MS. SHEKETOFF:

24        Q.   Why didn't you authorize Shay to talk to

25   other people about why Mark was terminated?



Page 246

 1              MS. CHASE:  Objection to the form of the

 2        question.  Assumes facts not in evidence.

 3              But you may answer.

 4              THE WITNESS:  I never instructed him not

 5        talk or to talk.

 6   BY MS. SHEKETOFF:

 7        Q.   So when -- when Shay represents --

 8   withdrawn.

 9              Did you authorize Shay to speak only about

10   the work that he and Mark did together?

11        A.   I instructed him, in the best interest of

12   the firm, that he should have a well-founded basis

13   for giving a recommendation.  I think that's

14   generally a good idea when you're giving a

15   recommendation that purports to be supportive.

16        Q.   Okay.  So you did not tell Shay that he

17   could speak -- that you would -- that you had

18   authorized him only to speak about the work that he

19   and Mark did together?

20        A.   I think I --

21              MS. CHASE:  Objection to the form of the

22        question.

23              But you may answer.

24              THE WITNESS:  I think I did tell him,

25        "Only talk about what -- the direct experience



Page 247

1      you have with him.  I don't want you guessing."
2  BY MS. SHEKETOFF:
3      Q.   Okay.  So why didn't you authorize him to
4  talk about the basis for Mark's termination?
5           MS. CHASE:  Objection to the form of the
6           question.
7           But you may answer.
8           THE WITNESS:  I didn't think that was in
9           the firm or -- or Mark's interest, for Shay to
10          state, "Mark is an immature, unprofessional,
11          provided poor legal judgments in analyzing
12          issues."
13          Did you want us to say that?  That was our
14          view.  As compared to -- "You can tell him,
15          Shay, your experience, your limited experience.
16          I think that would be helpful to him and to the
17          firm.  Yes, you can do that."
18  BY MS. SHEKETOFF:
19      Q.   Why did you think it wouldn't be helpful
20  to the firm for him to tell employers the basis for
21  Mark's termination?
22      A.   Again, I thought it was in the firm's best
23  interest for Mark to get a job.  The -- we're dealing
24  with people.  We -- as unfortunate and as intemperate
25  that e-mail was, dealing with people's lives.  We're



Page 248

1    not vindictive.  Ask for a reference.  Came in from

2    three people.  We had a policy.  I could have stood

3    on that policy and said, "We're not going to provide

4    a reference."

5            We made an exception.  Now we get sued for

6    it.

7        Q.   Have you personally given an employment

8    reference before?

9        A.   Sure.

10           MS. CHASE:  I think this question, he can

11       answer in his individual capacity.

12           THE WITNESS:  Sure.

13           MS. SHEKETOFF:  The 30(b)(6) topic is

14       about Jones Day's practices, as well as the

15       policy, so I think that would include --

16           MS. CHASE:  I -- I disagree with that

17       characterization.  Yes, it is about the

18       practices, but when there are any of the

19       thousands of people at Jones Day at any point in

20       time have given references is not within the

21       scope of that question.  You happen to have one

22       of those thousands of people here.  He can

23       answer in his individual capacity, but not as a

24       30(b)(6).

25           He can talk about the policies and



Page 249

```
1         practices.  But if you're going to ask about
2         what he personally has done in his individual
3         capacity, he will answer in his individual
4         capacity.
5    BY MS. SHEKETOFF:
6         Q.   Please answer the question.
7         A.   I'll restate the question and make sure
8    it's clear in the record what I'm answering.
9              As I understand the question, have I ever
10   provided a reference while I've been at Jones Day?
11   Yes, I have.
12        Q.   How many times?
13        A.   Gave one last week for a former paralegal.
14        Q.   You can estimate.
15        A.   The question is -- are you inclusive of
16   character and fitness inquiries?  Sometimes I will
17   have -- lawyers are going to the government.  Part of
18   the process of approval, security clearance and the
19   like, we need to respond to Special Agent X or Y.
20        Q.   I'm not including a security clearance.
21        A.   Okay.  Then two or three.
22        Q.   And do you understand your -- the
23   reference policy to apply to security clearances?
24        A.   That's a good question.  I think the
25   policy excludes character and fitness-type questions,
```



Page 250

1    but I've have to look at it.

2          Q.   And how many times have you been asked for

3    a reference?  Again, setting aside security

4    clearances.

5          A.   Boy, I -- I can't say it's a lot, because

6    most of them are character and fitness-type people

7    going into government.  That, I've had -- probably

8    over ten.  Someone going somewhere else, would I

9    provide a reference?  Three or four times.

10          Q.   Okay.  Sorry, I'm just not sure.  Are you

11    saying that ten of those times were for character and

12    fitness, and three or four times you've been asked to

13    give reference outside of character and fitness?

14          A.   Correct.

15          Q.   Okay.  And then you said two to three

16    times you've granted one, outside of character and

17    fitness; is that right?

18          A.   For the firm, yes.  Some have come to me.

19    You know, this person is an associate from Detroit.

20    They've been with us for seven years.  For whatever

21    reason, they're not going to advance within the firm.

22    Can we make an exception to the policy and provide a

23    reference?  That has happened.

24          Q.   Okay.  I'm sorry.  I was asking about you

25    personally, before -- you personally giving



Page 251

1    reference, not whether you'd authorized.  And the

2    answers you gave me, were those about you personally

3    giving a reference?

4         A.   Director is getting my -- I have given

5    probably over ten character and fitness

6    recommendations for people who go into the

7    government.  Sometimes that is because they put me

8    down as someone I've worked with, or someone had put

9    me down as -- in a leadership position in the firm.

10        Q.   Let's put aside the character and fitness

11   people.  I'm sorry.  I don't mean to ask about them.

12   Just the ones outside of character and fitness I'm

13   asking about.  How many times have you personally

14   given a reference?

15        A.   Two or three times.

16        Q.   And how many times -- out of how many

17   times that you were requested to give one?

18        A.   There have been two or three, I think,

19   over the 30 years, where someone has asked and I

20   said, "I can't, because of our policy."

21        Q.   Okay.  And why did you give -- sorry, one

22   second.

23             Have you ever learned that someone else is

24   going to provide a reference without seeking your

25   approval?



Page 252

```
 1            MS. CHASE:  And just to be clear here,
 2       Julia, you are talking about the employment
 3       reference, not the character and fitness,
 4       correct?
 5  BY MS. SHEKETOFF:
 6       Q.   Yes.  Let's set aside, for the rest of
 7  today, the character and fitness.
 8       A.   I don't believe so.  And the reason I say
 9  I don't believe so, I've been practicing for 30
10  years.  I can't think of an instance where I found
11  out after the fact that John or Mary in XYZ office
12  provided a reference in violation of a policy.
13            That said, we are a big law firm, with
14  42 offices.  We have 2,500 lawyers.  Would it
15  surprise me if a partner in charge, or an M&M
16  partner, or a practice leader was unaware of a policy
17  and made a reference?  No.  That would not surprise
18  me.
19            MS. CHASE:  And I'll note, just for the
20       record, as I think I indicated previously, to
21       the extent that Mr. Shumaker is testifying about
22       the period of decades in his career, that the
23       period of decades he can testify to in his
24       individual capacity, the period from 2014 to
25       2019, he can testify as a 30(b)(6).
```



Page 253

1    BY MS. SHEKETOFF:

2         Q.   Is it your understanding -- or is the

3    firm's policy well known within the firm about --

4    sorry, the firm's policy about employment references,

5    is that policy well known within the firm?

6         A.   Yes.  Everyone certifies the review of the

7    firm manual every year.

8         Q.   Have you ever learned that someone else is

9    going to provide a reference, without seeking your

10   approval, before it had happened?

11        A.   I'm sorry.  Say that again.

12        Q.   I think you testified earlier that -- that

13   there might have been times where after the fact,

14   you -- somebody provided -- or you learned that

15   somebody provided an employment reference?

16             MS. CHASE:  That's actually the opposite

17        of what he testified.  He testified that it is

18        certainly possible that in 30 years, someone may

19        have provided a reference and he did not hear

20        about it.

21             THE WITNESS:  Right.

22             MS. CHASE:  Not that he heard about it

23        after the fact.

24             THE WITNESS:  Correct.

25



Page 254

1    BY MS. SHEKETOFF:

2         Q.   Well, you were -- are you aware -- you're

3    aware that Karl Thompson agreed to provide a

4    reference for Mark, right?  Seeking authorization,

5    right?

6         A.   I -- I got to be honest.  I -- that's news

7    to me.  Unless you have a document showing that it

8    crossed my desk.  It's possible, but I did not know

9    Karl provided a -- a reference.

10             MS. CHASE:  I think the two of you are

11        answering different questions.  I -- I believe

12        Mike answered the question about whether the

13        reference had been provided, and I think Julia

14        was asking about whether or not Karl had

15        actually agreed, as opposed to actually provided

16        the reference.

17             THE WITNESS:  Oh.

18             MS. CHASE:  I think we've having a

19        disconnect.

20             MS. SHEKETOFF:  That's correct.

21             THE WITNESS:  Sorry.  My apologies.

22    BY MS. SHEKETOFF:

23         Q.   And so -- are you saying you don't know

24    about that either?

25         A.   I think it came to my attention that Karl



Page 255

1   was also asked by Mark to provide a reference, and he

2   was unware of the policy, and said that he would

3   provide it; and then someone indicated to him that we

4   have a policy and that we have authorized Shay and

5   only Shay to provide the reference.

6        Q.   Has Beth Heifetz ever learned that someone

7   was going to provide a reference without seeking

8   approval?

9        A.   You'd have to ask Beth Heifetz.

10            MS. CHASE:   And I'll note with respect to

11       that question, he's answering in his individual

12       capacity about what Beth Heifetz's knowledge is.

13   BY MS. SHEKETOFF:

14       Q.   Did Beth Heifetz provide a reference for

15   Blake Delaplane about his employment at Jones Day?

16       A.   I do not know.

17       Q.   Did you authorize Beth to provide any

18   reference for Blake Delaplane?

19       A.   If she asked me, she gave me the reasons

20   for, and I granted an exception, it is certainly

21   possible.  As I sit here today, I don't recall.

22       Q.   You don't have any documents suggesting

23   Beth Heifetz sought and that you provided an

24   authorization for an employment reference?

25       A.   Not that I'm aware of.  If you have



Page 256

1   something that suggests otherwise, I'd be happy to

2   take a look at it.  It would not surprise me.

3        Q.   Did Beth Heifetz --

4             MS. CHASE:  With respect to this question,

5        this -- this line of questioning is in his

6        individual capacity.  Beth is certainly capable

7        to testify about these topics if you'd like to

8        ask her.

9   BY MS. SHEKETOFF:

10       Q.   And so I guess, just for clarity, you're

11  not aware of whether Beth Heifetz, Shay Dvoretzky,

12  Ben Mizer, or Karl Thompson, or Yaakov Roth have

13  provided references for other -- for people at the

14  firm; is that right?

15       A.   I would not know.

16       Q.   And you don't remember giving any of those

17  people authorization to provide an employment

18  reference; is that right?

19            MS. CHASE:  Objection to the form of the

20       question.  Assumes facts not in evidence.  For

21       any particular individual?  Or at any point in

22       time?  Which is the question?

23            MS. SHEKETOFF:  I'm asking just in

24       general, ever.

25



Page 257

1   BY MS. SHEKETOFF:

2        Q.   Do you have any recollection of ever

3   giving any of those people I mentioned authorization

4   to provide an employment reference for someone?

5        A.   Not as I sit here today.  It's certainly

6   possible.  All of those people are good partners and

7   friends of mine.  But I -- I have no specific

8   recollection of Beth or Shay or Yaakov coming to me

9   and saying, "Can I provide a reference for this

10  person?  And here's why."

11            That does not mean it didn't happen.  But

12  as I sit here today, I don't recall that.

13       Q.   Okay.  And just to confirm, and going --

14  definitely need to be in your 30(b)(6) capacity for

15  this:  It's routine for lawyers at the firm to write

16  employment references for current and former

17  employees, isn't it?

18            MS. CHASE:  Objection to the form of the

19       question.  It assumes facts not in evidence.

20            THE WITNESS:  You said that I am --

21            MS. CHASE:  But you may answer.

22  BY MS. SHEKETOFF:

23       Q.   Let me ask another question.  Was there --

24            MS. CHASE:  I'm sorry.  We're all speaking

25       at the same time, so nothing is going to get



Page 258

1    taken down.

2         I -- did my objection get taken down?  Are

3    you now asking a different question?  Or is --

4    or what's happening now, Julia?

5         If you're speaking, we don't hear you.

6         THE WITNESS:  She's talking to him.

7         MS. CHASE:  Is there a question, Julia?

8         MS. SHEKETOFF:  Please give me a second.

9         Yeah, I -- I wonder if we should take a

10   five-minute break here.  I actually also need to

11   use the bathroom.  If that works, we'll take a

12   five-minute break now.

13        MS. CHASE:  Yes, we will certainly take a

14   restroom break.  Five minutes.

15        VIDEOGRAPHER:  We're off the record

16   at 2:54 p.m.

17        (A recess transpired from 2:54 p.m. until

18        2:59 p.m.)

19        VIDEOGRAPHER:  We're back on the record at

20   2:59 p.m.

21   ███████████

22     ██  ████████████████

23   ████████████████

24   ██████████

25     ██  ███████████████

















12       Q.   How often are you involved in decisions

13  about whether to terminate associates?

14       A.   Thankfully it does not happen often.

15       Q.   About -- about what percentage of

16  termination decisions for associates are made without

17  your involvement?

18          MS. CHASE:  Objection to the form of the

19      question.

20          THE WITNESS:  I'm not sure I --

21          MS. CHASE:  Assumes facts not in evidence.

22          I'm also not sure this witness is

23      competent to testify information that is not

24      within his line of knowledge, certainly not as a

25      30(b)(6).



Page 263

```
 1              To the extent he knows in his individual
 2       capacity -- I don't know how he would -- he can
 3       answer.
 4              It is outside the scope of any 30(b)(6)
 5       topic.  He's not designated to speak to how
 6       often or how many associates are terminated.  So
 7       he can answer in his individual capacity, if he
 8       knows.
 9              THE WITNESS:  And just for clarification,
10       the question was, how many termination requests
11       have I received?
12              MS. CHASE:  I think it was whether they
13       happen without your knowledge.
14              THE WITNESS:  Oh.
15  BY MS. SHEKETOFF:
16       Q.   What percentage of termination decisions
17  for associates are you involved in?
18              MS. CHASE:  Same objection, that it's
19       outside the scope of 30(b)(6).  To the extent he
20       has knowledge of this, to answer this question,
21       he can certainly do so in his individual
22       capacity.
23              THE WITNESS:  It's really hard for me to
24       say.  It does not happen often.
25              You also have to remember, I oftentimes
```



Page 264

```
1        also -- shouldn't say "often" -- I also have to

2        deal with staff issues, and sometimes there are

3        requests for termination on staff, for

4        nonperformance, for other failings, not living

5        up to our policies and procedures.

6             So I would have engaged in them.  So it's

7        hard for me to really say how many I have seen

8        or how many may have occurred outside of my

9        knowledge.

10   BY MS. SHEKETOFF:

11        Q.   In the last ten years, how many times have

12   you been involved in deciding whether to terminate an

13   associate?

14             MS. CHASE:  In his individual capacity, he

15        can answer these questions to the best of his

16        recollection.

17             THE WITNESS:  It's complete guesswork.

18        I --

19             MS. CHASE:  Well, if you don't know, then

20        you don't know.

21             THE WITNESS:  I just don't know.

22   BY MS. SHEKETOFF:

23        Q.   If you had to estimate, how many would you

24   estimate you've been involved in in the last ten

25   years?  Deciding whether --
```



Page 265

1          MS. CHASE:  Object to the form of the

2     question.  That makes it a hypothetical.  If

3     you're asking for an estimate based upon what

4     the witness has just said he doesn't know, that

5     would be just a guess.  We don't guess in

6     depositions.

7          THE WITNESS:  I do not know.

8   BY MS. SHEKETOFF:

9     Q.   Have you been involved, in the last ten

10  years, in making decisions about whether -- sorry.

11  Withdrawn.

12          In the last ten years, have you been

13  involved in other decisions, besides Mark, where you

14  considered whether to terminate another associate?

15          MS. CHASE:  And I'll again note he can

16     answer this in his individual capacity.

17          THE WITNESS:  Yes.

18  BY MS. SHEKETOFF:

19     Q.   But you have no idea how many times?

20     A.   No.

21     Q.   Okay.  Can you describe the times that you

22  remember.  What was the conduct that caused you to

23  consider terminating the person, and then did you in

24  fact terminate the person?

25     A.   First off --



Page 266

1          MS. CHASE:  Objection to the question

2     being compound.

3          But you can answer, to the extent you can,

4     in your individual capacity.  And to the extent

5     the considerations are a part of privileged

6     communications, do not answer with respect to

7     privilege; but you can certainly answer about

8     whether there was such an associate that there

9     was consideration.

10          THE WITNESS:  Right.  These are situations

11     where office leadership, practice leadership,

12     come to my attention -- come to me with a

13     situation relating to an associate and want to

14     discuss termination.

15          They are coming to me as legal counsel to

16     the firm.  Sometimes I involve -- not always --

17     Sarah McClure, and we have discussion.  And in

18     that position, I am viewing myself as providing

19     legal advice.

20          So I -- I don't know how to answer that

21     without invading the privilege.

22     BY MS. SHEKETOFF:

23     Q.   Have you been involved in the last --

24     well, I'm asking how -- whether the -- in these

25     instances, whether the person was terminated, and



Page 267

1    what the base -- what the conduct was that caused the

2    firm to consider terminating a person.

3             MS. CHASE:  But that was not your prior

4        question.

5             THE WITNESS:  Yeah.

6             MS. CHASE:  If your -- if your -- if your

7        new question is about people who were actually

8        terminated and what the reasons for those

9        terminations were, I believe he can answer that

10       in his individual capacity.  Again, without

11       disclosing any of the privilege considerations

12       that might have led to that decision.

13            THE WITNESS:  There is -- again, doesn't

14       happen often.  And as I testified earlier, I

15       believe with Mark, you know, sometimes it's a --

16       someone has done something that is so offensive

17       or harmful that a termination needs to be done.

18       ████████████████████████████████████████████████

19       ████████████████████████████████████    █

20       ██████████████████████████████████████████████████

21       ██████████████████████████████████

22            Those to me are, you know, pretty clear,

23       cut and dry:  Got to go.  Are there others?

24       Sure.  They vary.  There's a whole host of

25       reasons why someone might need to be separated



Page 268

1      from the firm.

2   BY MS. SHEKETOFF:

3      Q.   My question now is, apart from those two

4   people that you just mentioned and apart from Mark,

5   is there anyone else in the last ten years who you --

6   who the firm terminated for conduct?

7           MS. CHASE:  Again, in your individual

8       capacity, to the extent you can recall others,

9       you can certainly answer without providing any

10      of the privilege analysis that led to the

11      decision.

12          THE WITNESS:  There are others, but I

13      can't recall details.

14  BY MS. SHEKETOFF:

15     Q.   Okay.  Do you know approximately how many

16  others?

17     A.   Very few.

18     Q.   And was Mark terminated for conduct?

19     A.   Yes.

20     Q.   Were any of those people terminated

21  because of personal immaturity, poor judgment,

22  discourtesy toward colleagues, disinterest in

23  pursuing a career at Jones Day, or lying about an

24  allegation of discrimination?

25     A.   I just told you I can't remember.  I told



1    you two I could remember.  If someone is engaged in

2    ███████████████████████ violating firm policy, all

3    of those things will come into play.

4         Q.   Okay.  Apart from Mark and those two

5    individuals -- the of counsel and the Chicago

6    associate -- have you ever been involved in

7    considering whether to terminate anyone for poor

8    judgment, personal immaturity, discourtesy to

9    colleagues, disinterest in pursuing a career at Jones

10   Day, or lying about an allegation of discrimination

11   at Jones Day?

12        A.   Yes.

13             MS. CHASE:  Again, I will give the

14        objection that you should answer in your

15        individual capacity, without disclosing any

16        privileged communication.

17             THE WITNESS:  And the answer is yes.

18   BY MS. SHEKETOFF:

19        Q.   And how many?

20        A.   I told you I can't --

21             MS. CHASE:  Asked and answered, but he can

22        tell you again.

23   BY MS. SHEKETOFF:

24        Q.   You said you can't remember, and you can't

25   remember any of the other circumstances?



Page 270

1        A.    One of the one is the one you identified:
2    ████████████████████████████████████  ███
3    ███████████████████
4        Q.    Okay.  And how --
5        A.    I assure you, that was on the list.
6        Q.    Anyone else that you remember?
7        A.    Again, I -- I can't recall.  I'm sure
8    there are others.  Sarah may have -- be able to
9    provide more information, to the extent she can do so
10   in a nonprivileged way.
11       Q.    Okay.
12       A.    And again, we have staff issues, too.  I
13   would say I have more staff issues than I have
14   attorney issues.
15       Q.    Okay.  And then apart from the three --
16   sorry, the four associates we've talked about now --
17   ████████████████████████████████  the
18   of counsel, and Mark -- have you ever recommended to
19   Brogan that he terminate an employee?
20            MS. CHASE:  Objection to the form of the
21       question.  I believe it -- it misstates in the
22       premise an involvement of Mr. Brogan in those
23       other circumstances.
24   BY MS. SHEKETOFF:
25       Q.    I just need to set aside those people.



Page 271

```
 1   Apart from those people, whether or not you
 2   recommended them to Brogan, have you recommended
 3   anyone besides those people to Brogan?
 4            MS. CHASE:  I'll state the same objection
 5        to the form of the question, because it still
 6        has a factual premise that is inaccurate.
 7            But if the question is, other than Mark,
 8        have you recommended the termination of any
 9        other associate to Mr. Brogan -- which I think
10        is what you're trying to ask -- he can certainly
11        answer that question.
12            MS. SHEKETOFF:  Great.
13            MS. CHASE:  Is that the question?
14            But Julia, is that the question you're
15        trying to ask?
16            MS. SHEKETOFF:  I said, "great."
17   BY MS. SHEKETOFF:
18        Q.   Please answer that question.
19        A.   So, yes.  Yeah, I'm sorry.
20        ███████████████████████████████████
21   ███████████████████████████████████
22        Q.   That's correct.
23        A.   Again, I can't remember the others.  So
24   whether I brought them to Steve's attention, I
25   don't -- I can't recall.  ███████████████████
```



MAGNA ▶
LEGAL SERVICES

Page 272



1 ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬

2 ▬▬▬▬▬

3        Q.    Okay.

4        A.    Were there others that went to Steve?

5   It's possible.  I can't think of any, as I sit here.

6        ■ ▬▬▬▬▬▬▬▬▬

7   ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬

8   ▬▬▬▬▬▬▬

9   ▬▬▬▬▬▬▬▬▬▬

10       ▬▬▬▬▬▬

11  ▬▬▬▬▬▬▬▬▬

12  ▬▬

13       ▬▬▬ ▬▬▬▬▬

14     ▬▬▬▬▬▬

15     ▬▬▬▬▬▬▬

16     ▬▬▬▬▬▬

17     ▬▬▬▬

18       ▬▬▬▬▬

19     ▬▬▬▬▬▬▬

20     ▬▬▬▬▬

21     ▬▬▬▬▬▬▬

22     ▬▬▬▬▬▬▬

23     ▬▬▬

24       ▬▬▬▬▬

25     ▬▬▬▬▬▬



























Page 279

































1 

2

3

4

5

6

7

8

9

10

11

12

13

14

15        THE WITNESS:  When you get a chance,

16   Julia -- you can keep going.  I'd like to take a

17   quick break.

18        MS. SHEKETOFF:  You know, this would be a

19   fine time.  Do you want -- how long would you

20   like?

21        THE WITNESS:  Just five minutes.

22        MS. SHEKETOFF:  Okay.  That sounds good.

23        VIDEOGRAPHER:  We're off the record

24   at 3:34.

25        (A recess transpired from 3:34 p.m. until



Page 288

1              3:39 p.m.)

2              VIDEOGRAPHER:  Back on the record at

3         3:39 p.m.

4    BY MS. SHEKETOFF:

5         Q.   Okay.  I want to ask -- go back to your

6    capacity as a 30(b)(6) designee.

7              Did Jones Day fire Mark for lying?

8         A.   Mark -- that's a question of intent, I

9    think.  I continue to believe -- I don't see how

10   anyone could view the law in the manner in which he

11   was portraying it to be.  Whether he knew

12   intentionally it was off or not, I can't say.

13        Q.   Did Jones Day fire Mark for -- because it

14   concluded that he was lying?

15        A.   Concluded he was misrepresenting the law,

16   perhaps intentionally.

17        Q.   And were there any other lies or

18   misrepresentations that Jones Day fired Mark for?

19        A.   Can I go back to the document?

20        Q.   I believe that was Plaintiffs' Exhibit 8.

21             MR. SAVIGNAC:  4.

22             MS. SHEKETOFF:  4?

23             All right.  4.

24             THE WITNESS:  Whether you want to call it

25        a lie or not, the suggestion that he was talking



Page 289

1          with competent attorneys, I don't believe that's

2          true.  I don't believe it's true when he says it

3          was illegal.  I can't believe he would come to

4          that conclusion, based on the research we

5          provided him.

6     BY MS. SHEKETOFF:

7          Q.   I'm sorry.  I just want to clarify, but I

8     want you to continue.  I'm asking about things

9     that -- that Jones Day concluded were lies, not just

10    that -- what, you know, might have -- you might in

11    hindsight think could not have been true, but what --

12    I'm asking if Jones Day concluded -- or fired Mark

13    because it concluded that these things were lies.

14         A.   And again, that's a question of intent.  I

15    don't know -- can't get into Mark's brain.  I'm

16    looking at the objective facts as they were presented

17    to me, as someone who is a practicing lawyer at this

18    point in time for 28 years.

19              And to read those authorities, and all --

20    both of you come from fantastic backgrounds and

21    pedigrees.  I don't know how you could come away --

22    come to the conclusion that you did, other than to

23    come up with a self-interested argument to get

24    something you weren't entitled to.

25              Whether that's a lie or a -- people have a



Page 290

1    way of twisting things in their own -- own head to

2    get what they want.  That's the society we live in.

3    So lying, to me, suggests a level of culpability or

4    intent that it's hard for me to assess.  I'm

5    simply -- based on the objective facts, they were not

6    true.

7          Q.   Okay.  So please point out to me if there

8    are any statements in here that -- that Jones Day

9    fired Mark because of, because it concluded that he

10   was lying.

11         A.   Pointed out the law --

12              MS. CHASE:  Objection to the form -- let

13         me just object to the form of the question.

14              But you may answer.

15              THE WITNESS:  I pointed out the law.  It's

16         an arguable lie for him to suggest it's other

17         than what it is.  The assertion at the end, that

18         the black-box compensation system was designed

19         to enable sex discrimination, that's just wrong.

20         It's -- black-box compensation system is -- I

21         can't believe the two of you would even suggest

22         it, for someone who's been in our firm for that

23         long, because -- for that reason.

24              That's a lie.  It's a lie to suggest that

25         your salary was cut in relative terms based on a



Page 291

```
 1          negative review from a partner.  In fact I saw
 2          your compensation going the other way.  You had
 3          no basis to make that.  Whether it was a lie,
 4          it's -- it's simply untrue.
 5     BY MS. SHEKETOFF:
 6          Q.   I -- I understand -- I totally -- I guess
 7     I just wanted to draw a distinction between what you
 8     are saying is false and what you are saying is a lie.
 9     So my question is --
10          A.   That's a distinction I can't draw.
11          Q.   Okay.  If you cannot draw the distinction,
12     you cannot.  But my -- my question is, is there -- is
13     there anything that, at the time Jones Day fired
14     Mark, Jones Day had concluded was a lie?
15               That is the question.
16          A.   I can't tell you any more than what I just
17     testified to.  I believe these are untruths.  Whether
18     you want to take the negative, pejorative approach to
19     untruth being a lie, I'll leave that to you.  We
20     found it untrue in basis.
21          Q.   And my question is, did Jones Day
22     determine not just that it was untrue, but that the
23     person saying these words believed it was untrue?
24          A.   I cannot crawl into Mark's head.  I can't
25     crawl into your heads.  You are smart people.  I
```



Page 292

1    don't know how you could come to that erroneous

2    conclusion and not understand that it was a lie.

3          Q.   And are you aware that the judge concluded

4    that it is not unreasonable to reach -- to conclude

5    that the leave policy is illegal?

6                (Instruction not to answer.)

7                MS. CHASE:  I -- I am going to object to

8          that mischaracterization of the judge's ruling

9          and instruct the witness not to answer.

10               If you would like to ask the witness

11         factual questions, he can answer them.  I am --

12         I am -- A, it is a misstatement of the law.  It

13         is a misstatement of what the judge has stated,

14         and it is not an appropriate question for a fact

15         witness.

16               If you would like to ask a fact question

17         of this witness, either in his individual

18         capacity or his 30(b)(6) capacity, he can answer

19         them.  If not, we should be done for the day.

20   BY MS. SHEKETOFF:

21         Q.   Let's talk about some things in your

22   individual capacity again.

23               Are you aware of any attorney or staff who

24   separated from the firm within three months after

25   complaining about retaliation or discrimination



Page 293

1    against the firm?

2         A.   Make sure I understand it.  Any attorney

3    who complained against -- I'm sorry.  Restate that

4    again.  I'm sorry, Julia.

5              THE WITNESS:  Ms. Court Reporter, can you

6         read it back?  It was just a long --

7    BY MS. SHEKETOFF:

8         Q.   I'm happy to read it again.

9         A.   Okay.

10        Q.   Are you aware of any attorney or staff who

11   separated from Jones Day within three months after

12   complaining of discrimination or retaliation?

13        A.   No.

14        Q.   Are you aware of anyone who has ever told

15   the firm that he or she might, would, or had hired an

16   attorney in connection with a complaint of

17   discrimination or retaliation?

18        A.   Hired an attorney -- no.  Not to my

19   knowledge.

20        Q.   Are you aware of anyone who's ever told

21   the firm that he or she might, would, or had filed an

22   administrative complaint or lawsuit in connection

23   with a -- a complaint of retaliation or

24   discrimination?

25        A.   I hate to do this again.  Can you say it



Page 294

1    one more time?

2         Q.   No problem.

3              Are you aware of anyone who's ever told

4    the firm that he or she might, would, or had filed an

5    administrative complaint or a lawsuit in connection

6    with a complaint of discrimination or retaliation?

7         A.   Might, would, or had.  No.

8         Q.   Would you want to fire someone who accused

9    Jones Day of discrimination and threatened to sue?

10        A.   Fire someone --

11             MS. CHASE:  Objection to the question, to

12        the extent it's a hypothetical.

13             But you can answer in your individual

14        capacity, with that limitation.

15             THE WITNESS:  It's a hypothetical,

16        absolutely.  It would depend on the individual

17        circumstances and what that is reflective of the

18        individual.

19             We want -- if someone believes he or she

20        is being harassed, discriminated, whatever, we

21        have a zero tolerance policy for that.  We want

22        to get to the bottom of it.  We would engage

23        with them and -- and see if we can't address

24        their concerns and find out what it's about.

25             When we get a claim for harassment or



Page 295

```
1          discrimination, we are on it, like white on

2          rice, to investigate, to make sure there's

3          nothing there.  That's our obligation, not only

4          to the individual lawyer, to all lawyers and

5          staff in this institution.

6    BY MS. SHEKETOFF:

7          Q.   What -- you said it would depend on the

8    individual circumstances.  What would it depend on?

9          A.   If -- if he or she were properly reading

10   the facts right, if -- if we have someone who

11   actually is in a situation that someone is acting in

12   a manner not consistent with our values, we will

13   engage.  I assure you of that.

14         Q.   But if someone is reading the facts wrong,

15   then -- then not?

16              MS. CHASE:  Object to the form of the

17         question.

18              But you may answer.

19              THE WITNESS:  It's absolutely a

20         hypothetical, and speculative.  But if we have

21         someone who is misunderstanding circumstances,

22         we would try to work with them and get to the

23         bottom of the disconnect.

24   BY MS. SHEKETOFF:

25         Q.   Do you think you should be allowed to fire
```



Page 296

1    someone who threatens to sue the firm?

2              MS. CHASE:  Objection to the form of the

3         question.  And, I think, hypothetical.

4              But you can answer.

5              I think it also potentially calls for a

6         legal conclusion --

7              THE WITNESS:  Absolutely.

8              MS. CHASE:  -- says you're seeking a legal

9         conclusion, cannot provide that.

10             THE WITNESS:  I mean, I am certainly aware

11        of the law of retaliation, and I don't disagree

12        in any way, shape, or form that if someone makes

13        a legitimate claim, that they should not be

14        subject to termination.  That's what retaliation

15        is all about.

16   BY MS. SHEKETOFF:

17        Q.   Okay.  If someone threatened to sue the

18   firm, would you escalate the matter to Brogan?

19             MS. CHASE:  Object to the question.  It is

20        a hypothetical, and again, we're still in his

21        individual capacity.  He can answer in his

22        individual capacity, to the extent he can to a

23        hypothetical question.

24             THE WITNESS:  It depends on circumstances.

25



Page 297

1   BY MS. SHEKETOFF:

2          Q.   Okay.  And apart from this case -- I'm

3   sorry.  Just a second.

4               Has anyone ever alleged that you

5   personally unlawfully discriminated against him or

6   her?

7          A.   Me personally?

8          Q.   Uh-huh.

9          A.   God, I hope not.  No.

10         Q.   And has anyone ever alleged that you

11  personally unlawfully retaliated against him or her?

12         A.   Not to my knowledge.

13         Q.   Who at Jones Day told Evan Miller about

14  Mark's termination on January -- or our January

15  e-mail?

16              MS. CHASE:  Again, I'll note this is all

17         in his individual capacity.  To the extent he

18         knows, he can answer.

19              THE WITNESS:  Say that again, Julia?  This

20         is a new one for me.  Evan Miller?

21  BY MR. SAVIGNAC:

22         Q.   Yeah.  Who at Jones Day told Evan Miller

23  about Mark's termination or January e-mail?

24         A.   I have no idea.  You'd have to --

25         Q.   So it was not you?



Page 298

1        A.    -- to ask Evan.  I don't --

2              MS. CHASE:  He said you'd have to ask

3        Evan.

4              THE WITNESS:  If -- if Evan said I did, I

5        wouldn't disagree with him.  I -- Evan's a

6        partner of mine.  I don't recall any

7        communication or discussion with him, but it's

8        certainly possible.  But I don't know.  You'd

9        have to ask Evan.

10   BY MS. SHEKETOFF:

11        Q.    Okay.  But you don't remember talking with

12   Evan about Mark since January 16, 2019?

13        A.    I do not.

14        Q.    And did you --

15        A.    I know Evan, but I don't recall having a

16   conversation with him.

17        Q.    Did you speak with him about our January

18   e-mail?

19        A.    I do not know.

20              When you say "our," you mean Mark's e-mail

21   to him?

22        Q.    I'm talking about the January 16 e-mail

23   that we've been talking about, in Exhibit 4.

24        A.    Yeah, I don't recall.  Is it possible?

25   Sure.  I don't -- I don't recall.



Page 299

1        Q.   Were you involved in deciding how Mark

2   should be informed of his termination?

3        A.   I -- I suspect I was.  I don't have any

4   direct recollection regarding how we were going to

5   inform him of it, but I likely would have been

6   involved in that discussion.

7        Q.   Why did you decide that someone should

8   come to our home and hand-deliver a termination

9   letter?

10            MS. CHASE:  Objection to the form of the

11       question.  Assumes facts not in evidence.

12            But you may answer, to the extent you can,

13       in your individual capacity.

14            THE WITNESS:  I do not recall the manner

15       in which that decision was made.  I suspect if

16       that's the way you received notice, it was

17       because there was a reasonable belief you would

18       not be coming into the office.  There was no

19       other way to get it to you.  I don't have a

20       distinct recollection.

21   BY MS. SHEKETOFF:

22       Q.   Did you speak with anyone about Mark after

23   he was fired?

24            MS. CHASE:  You mean other than the

25       reference inquiry that you've testified about?



Page 300

```
 1        I'm a little confused.
 2   BY MS. SHEKETOFF:
 3        Q.   You can set aside the people that we --
 4   the conversations that we've already spoken about,
 5   but outside of those conversation, please let me
 6   know.
 7             MS. CHASE:  Outside of conversations that
 8        you've already testified to, any conversations
 9        with counsel you can testify in your individual
10        capacity, if there were other conversations
11        where you spoke about Mark since his
12        termination, which I believe was the question,
13        correct, Julia, after the termination?
14             MS. SHEKETOFF:  Yes, I don't mean to set
15        aside conversations with counsel, though.  You
16        can --
17             MS. CHASE:  We are certainly not going to
18        let him testify to conversations with counsel.
19             MS. SHEKETOFF:  I'm asking whether he had
20        conversations --
21             MS. CHASE:  That's been years, and there,
22        as you can imagine, have been probably more than
23        100 conversations about this litigation that
24        Mr. Shumaker has had with counsel about the
25        litigation.  And so I am not going to sit here
```



Page 301

```
1        and have him try to recount the hundreds of

2        times there've been drafts of answers or

3        interrogatories, all of which is outside the

4        scope of discovery.

5             So we're not going to go through that

6        exercise.  That is absolutely outside the scope

7        of the question.

8   BY MS. SHEKETOFF:

9        Q.   Why don't you -- why don't you start by,

10  can you please identify the people that you've spoken

11  to about Mark since his termination?

12       A.   Let me put it this way:  You all went to

13  The New York Times, made a public splash about filing

14  this lawsuit.  On a nearly weekly basis, my partners

15  have to read some other headline-grabbing pleading,

16  whether it's filed by you or we have to respond to

17  you.

18            I am chief counsel of this firm on

19  personal matters, and people ask me questions because

20  they're my partner.  Can I remember all those people

21  I spoke to or -- or what was said?  I cannot.  But

22  there absolutely would be discussions in my

23  interactions with my partners, because they of course

24  want to know about the matters that the law firm is

25  handling, because they are -- they care about the
```



Page 302

1    partnership, and equally liable as partners in this

2    law firm.

3            But I cannot tell you what was discussed,

4    who I spoke with.  Impossible.

5        Q.   So setting aside conversations with

6    counsel, have you talked to anyone about the reasons

7    that Mark was fired?

8        A.   If I did, it would be everything I told

9    you today.  But I don't have distinct recollection.

10       Q.   You don't remember talking to anyone?

11           MS. CHASE:  He just said he doesn't have a

12       distinct recollection.

13           THE WITNESS:  I mean -- many.

14   BY MS. SHEKETOFF:

15       Q.   I'm sorry?

16       A.   Many.  Many partners are interested in

17   what, to most, view this as the insanity of this

18   litigation.

19       Q.   And did you talk with them about the

20   reasons for the termination?

21       A.   If they asked, I would have communicated

22   that to my partners.  I have a fiduciary obligation

23   to them.

24       Q.   But you don't remember a single person

25   that you talked to?



Page 303

1          A.   Oh, I didn't say I couldn't tell you a

2     single person.  I could tell you probably every

3     member of the partnership committee at some point has

4     asked me about it.  Many members of the advisory

5     committee.  I communicate with the partners in charge

6     in the practice areas on a regular basis.  Interact

7     with my Washington partners.  They all read it.  They

8     all ask about it.  And I provide them with

9     information they may be -- may be interested.

10               "Why did they file that answer again?"

11               "I don't know.  Read the papers.  They're

12    public."

13               "Why did we terminate Mark?"  I tell them

14    just exactly what I just told you.

15          Q.   And have you said anything to any of those

16    people, that is, beyond what you've said here today?

17               MS. CHASE:  And again, excluding the

18          substance of any privileged conversation.

19               THE WITNESS:  I can't think of anything

20          that I would have discussed with them that did

21          not come up here today.

22    BY MS. SHEKETOFF:

23          Q.   I'm sorry.  I missed that.

24               MS. SHEKETOFF:  Court reporter, would you

25          mind reading that answer back?



Page 304

1  BY MS. SHEKETOFF:

2      Q.  Or Mike, you can restate it.

3      A.  I -- I can restate it.  Let's save the

4  court reporter.

5          There is nothing that I would discuss with

6  them that would not have come up at some point during

7  our discussions today.  The merits, demerits of -- of

8  your claims, Mark's separation, all the claims you're

9  making, our defenses, our responses, types of things

10  they may raise cover all -- run the gamut.

11      Q.  Okay.  I'm going to ask you these next set

12  of questions in your capacity as your -- as a

13  30(b)(6) designee.

14          When does your -- when does Jones Day

15  terminate an attorney for conduct?

16          MS. CHASE:  And again, let me just note

17      with respect to this -- this testimony, he can

18      answer it in -- as a 30(b)(6) with respect to

19      the temporal period that has been designated,

20      '14 to '19.

21          And again, with respect to attorneys who

22      are in the United States; because as you are

23      well aware, the laws are quite different in

24      other jurisdictions outside of the U.S.

25          THE WITNESS:  For an at-will employee, we



Page 305

1          would terminate any attorney for cause, for any

2          violation.  It's all subjective, to the extent

3          that we have to make the decision whether to

4          terminate or not.  But a violation of the firm

5          policies, practices, any violation of the law,

6          any improper practice of law, any behavioral

7          conduct that is not consistent with our

8          foundational values.  Those are some of the

9          reasons we would have to make such a decision.

10     BY MS. SHEKETOFF:

11          Q.   And between 2014 and 2019, how many

12     attorneys has Jones Day terminated for conduct?

13          MS. CHASE:  Again, with the same caveat,

14          that the answer is going to be limited to those

15          in the United States; because, again, there are

16          different definitions of what that -- what

17          "terminate" and what "conduct" would mean

18          outside the United States.

19          You can answer that question in your

20          30(b)(6) capacity.

21          THE WITNESS:  And I believe I testified I

22          could not give you a number.  I identified two I

23          can recall: ████████████████████████████

24     ███████████████████████████████████████████████

25     ████████████



Page 306

1           Are there others?  Perhaps.  But I cannot

2      recall.

3  BY MS. SHEKETOFF:

4      Q.   And in this context, as -- as Jones Day's

5  30(b)(6) witness, did you do any investigation or

6  research to determine how many people Jones Day had

7  terminated for conduct in the United States between

8  2014 and 2019?

9           MS. CHASE:  And let me just note for

10      record, there's nothing in your 30(b)(6)

11      designation that requires us to do any research

12      about the individual circumstances of any

13      particular associate, or for that matter, of

14      counsel.

15           The witness was designated with respect to

16      policies and practices regarding termination.

17      He can speak as a 30(b)(6) regarding policies

18      and practices regarding termination.  The

19      individual circumstances of any individual,

20      other than Mark, are outside the scope of his

21      designee status as a 30(b)(6).

22           He can, as the administrative partner,

23      certainly speak in his individual capacity, to

24      the extent he has knowledge.  But we do not

25      interpret questions about policies or practices



Page 307

```
1       to involve an obligation to investigate factual

2       circumstances for individuals.

3              We did understand that he was testifying

4       as a 30(b)(6) with respect to Mark's

5       circumstances; and to that topic, certainly, it

6       would be appropriate to ask questions beyond the

7       scope of things that Mr. Shumaker knew in his

8       personal capacity.

9              But with respect to any other individual,

10      he is testifying about those specifics only in

11      his individual capacity.  He can talk, again,

12      policies and practices as a 30(b)(6), but not

13      about the individual circumstances of anyone

14      else.

15             MS. SHEKETOFF:  Well, that's not how I --

16      that's not --

17             MS. CHASE:  I know that's not how you do

18      it, how you interpret it, Julia.  But your

19      question in your 30(b)(6) was as a 30(b)(6)

20      designee on policies and practices.  You did not

21      ask us to identify -- to designate someone to

22      testify about the circumstances of any other

23      individual employee of the firm, with respect to

24      their circumstances, their misconduct that led

25      to their termination.
```



Page 308

```
 1              No one has been designated to speak to
 2         that topic.  No one will be designated to speak
 3         to that topic, based upon the 30(b)(6) notice
 4         that you sent us.
 5              MS. SHEKETOFF:  I don't think there's
 6         anything more to discuss here on the record.
 7    BY MS. SHEKETOFF:
 8         Q.   Okay.  We can move on.  This will be in
 9    your individual capacity, these next questions.
10              So between 2014 and 2018, what was your
11    role in determining associates' raises?
12         A.   The administrative partner, one of his
13    responsibilities is overseeing the nonpartner
14    evaluation process that starts in January and
15    concludes with July 1 adjustments.  In each of those
16    years you identified, '14 to '19, I would have been
17    involved in that process, overseeing the process.
18              Later in that period, Traci Lovitt
19    thankfully came in to assist me, and working through
20    that process, reviewing the adjustments, working with
21    the right group of committees, like membership
22    committees, to engage in that process.
23              So from soup to nuts, I've been involved
24    from that -- during that whole time period in the
25    review process, and ultimately the compensation
```



Page 309

1    adjustments.

2         Q.   And did you make recommendations to Brogan

3    about associates' raises?

4         A.   I would get -- the way the process works

5    is recommendations come up from the partners in

6    charge.  Traci and I get an opportunity to review

7    them.  We make an adjustment here or there.  Let them

8    move on to the managing partner, who may make an

9    adjustment here or there.  And then we finalize those

10   numbers.

11        Q.   And was that true between 2014 and 2018?

12        A.   The only difference would be Traci came

13   onto the picture, I'm guessing, '17.  So there was

14   a -- there was a time, '14, '15, Hugh might still

15   have been involved, Hugh Whiting.  Then it was just

16   me for a time.  Then Traci came and joined me and

17   helped me in the process.  So that would have been, I

18   think, '17 on, Traci.

19        Q.   And so do you make recommendations or

20   adjust the recommendations for everyone?

21        A.   No.

22        Q.   And how do you decide who to -- whose --

23   sorry.  How do you decide for which associates you'll

24   adjust the recommendation?

25        A.   It's -- it's based upon what we learn in



Page 310

1    the review meetings, the objective data, the market

2    in which they're in, the practice in which they're

3    in.  Market data, in terms of what would we expect a

4    fifth-year who's doing well or doing average make in,

5    say, Detroit in this particular practice.  What are

6    their ratings?  What is their rankings?

7            And you're making a -- a decision based

8    upon the data and information we have available to

9    us.  I may look at 25 lawyers, just to take a subset,

10   and I may tweak three of them in one group of 25, and

11   the next 25 I may move ten of them.  It all varies.

12        Q.   What's the point of your tweaking

13   recommendations?

14        A.   To get it right.  These are people's

15   lives.  This is people's compensation.  We want it to

16   be fair.  We want to make sure -- a lot of people are

17   looking at it, and no matter how many different ways

18   we look at it, we are being right by the individual.

19        Q.   Sorry.  Go ahead.

20        A.   I think -- that's fine.  You cut me off

21   there, but I forgot where I was going.

22        Q.   And why doesn't Brogan just do it himself?

23        A.   That's a big job, number one.  Number two,

24   we don't work that way.  We have a managing partner

25   system so that he can make a -- a final decision, but



Page 311

1    it's a much more cooperative, collaborative approach.

2              It's a big place.  Different people look

3    at things differently, and we want to have a

4    dialogue.  We want to have communication,

5    conversation with respect to the nonpartner lawyers,

6    who are our assets.  This is what we do.  We sell to

7    good legal minds we have in the firm, and we want to

8    do right by them.

9              And some people are superstars, and they

10   get compensated as such.  Some not so much, and they

11   may never pan out.  Some may be late bloomers.  We

12   don't know.  But we're constantly trying to make sure

13   that as between the firm and the individual, they are

14   being compensated according to the market and the

15   value we place on their services.

16       Q.   Why did you get involved in the associate

17   evaluation process -- or, sorry, withdrawn.

18              Why did you get involved in the associate

19   compensation process?

20       A.   If I recall correctly, that's one of the

21   few delineated responsibilities in the firm manual

22   for the administrative partner.  Someone has to

23   oversee that process.  And someone some time ago

24   decided we should have the administrative partner in

25   that role.



Page 312

1          Q.   And have you made determinations yourself
2     about an associate's annual raise?
3               MS. CHASE:  Objection to the form of the
4          question.  I'm not sure what you mean by -- by
5          "yourself."  You mean without anybody else
6          having input?  Or -- what is that question?
7               MS. SHEKETOFF:  I'll rephrase it.
8     BY MS. SHEKETOFF:
9          Q.   Have you -- have you been the final
10    decision-maker for associates' raises?
11         A.    It depends how you -- how you determine
12    that.  It may be a situation where Mary Smith, an
13    associate from Cleveland, the PIC recommends 350.  I
14    think the objective data suggests that she should be
15    360.  Traci suggests 355.  Managing partner doesn't
16    make a suggestion, and my number wins the day at 360.
17              Traci may, in that same number, say "I
18    think 355 is the number.  I think 360 is too high,
19    Mike.  What do you think?"
20              I say, "Well, why do you think that?"
21    We'll have a discussion.  And I may stick with my 360
22    or go to 355.
23              Some of these people, my -- my number
24    will -- will win the day.  The managing partner
25    chimes in.  It may be at a higher number.  It may be



Page 313

1    at a lower number.  Traci and I may engage with him

2    and say, "Steve, you said 380 for this person.  But

3    we learned this information in the review process, or

4    this objective data.  Did you see that?"

5              And he may say, "I didn't see that.  Go

6    with your number."  Or "I did see that, and here's

7    why I made the adjustment."

8              It's a very collaborative process.

9        Q.   And so if Brogan doesn't change your

10   recommendation, does your -- is your recommendation

11   the one that governs?

12             MS. CHASE:  You mean as -- at a time

13        period when it's just Mike, or when it was Mike

14        and Hugh?  What time period are you talking

15        about?

16             MS. SHEKETOFF:  I'm talking about between

17        2014 and 2018.

18             MS. CHASE:  Well, but in that time period,

19        at one point, as he testified, it was Mike and

20        Hugh.  At another point, it was just Mike.  And

21        at a third point, it was Mike and -- and Traci.

22        So which period are you talking about?

23             MS. SHEKETOFF:  I'm asking for all of

24        them.  I'm asking for all of them.

25             MS. CHASE:  Then it's a compound question.



Page 314

1         Because you can't ask that.  It's three

2         different questions, then.

3              THE WITNESS:  I can answer it, though.  In

4         the -- before Traci was involved, if no one

5         touches the number beyond me after the PIC, my

6         number would control.  After Traci gets

7         involved, it would be discussion between me and

8         Traci as to what the number was, assuming the

9         managing partner doesn't chime in.  It may or

10        may not be the number.  I may go with Traci's

11        number.  It varies.

12   BY MS. SHEKETOFF:

13        Q.   What are the factors that affect your

14   determination of what to recommend for an associate's

15   annual raise?

16        A.   Market, practice, ratings, rankings,

17   productivity, professional accomplishment,

18   leadership, compliant with the firm's foundational

19   values, respect for staff and lawyers.  All of those

20   things go into it.

21        Q.   Anything else?

22        A.   I think I covered it all.  I don't know if

23   there's anything I missed.

24        Q.   Do reviews matter?

25        A.   Absolutely.  That's the associate review



Page 315

1   process.

2        Q.   And do consensus statements matter?

3        A.   Consensus statements are simply an effort

4   to summarize for the firm and for the individual, in

5   an encapsulated form, the firm's position on where

6   they stand.  It's not a consensus statement as

7   compared to an assessment statement, but the

8   assessment statement is -- is really a distillation

9   of what's within the reviews.

10       Q.   I'm sorry.  Were you distinguishing

11  between a consensus statement and an assessment

12  statement?  Or are those the same thing?

13       A.   They -- a consensus statement is

14  different, in my mind, from an assessment statement.

15  I -- I recall at some point people started to use the

16  term "consensus statement."  And that, to me, is a

17  misnomer, because a consensus statement suggests that

18  we're taking everyone's views and pressing them

19  together, as compared to an assessment statement, in

20  which the individual reviews are data points from

21  which the statement is made.  It's a little bit of

22  a -- a distinction.  Albeit --

23       Q.   Okay.  So you're not -- you're not saying

24  they're different documents.  You're just saying

25  these are different names.  Okay.  I'm sorry.



Page 316

```
 1        A.    Right.
 2        Q.    And so should the assessment statement be
 3   correlated in some way, reflect in some way the same
 4   sort of factors that -- that lead into an associate's
 5   compensation?
 6             MS. CHASE:  Objection to the form of the
 7        question.
 8             But you may answer.
 9             THE WITNESS:  I'm not -- I'm not sure what
10        you're getting at.  Certainly the assessment
11        statement should take into account all of the
12        objective data and the values by which we judge
13        our nonpartner lawyers.  So I -- presumably all
14        of that context and background is formative of
15        what the assessment statement is.
16             If you're -- if you're being an ass to the
17        staff, chances are you're going to find it in
18        the assessment statement.
19   BY MS. SHEKETOFF:
20        Q.    And so is an assessment statement
21   generally reflective of things that have affected the
22   associate's compensation, or raise?
23             MS. CHASE:  Objection to the form of the
24        question.
25             But you may answer, to the extent you can.
```



Page 317

1            THE WITNESS:  Yes and no.  The -- the idea
2       that you could capture all in one assessment
3       statement everything that has an impact or a
4       potential impact on the compensation, or whether
5       that's -- I don't know if that's possible to be
6       done.  But we certainly are trying to
7       encapsulate the performance of that lawyer for
8       the year, give them information about where they
9       stand, and presumably that would be reflected in
10      their compensation.
11 BY MS. SHEKETOFF:
12      Q.   Okay.  Understood.  And so is the
13 assessment statement itself something that affects
14 compensation?  Or it's more, as you say, sort of
15 reflective of compensation?
16      A.   Say that again.  I missed the first part
17 of that.
18      Q.   I'm sorry.  Maybe I'm not asking this
19 well.
20           Is the assessment statement itself sort of
21 an input into the associate's compensation?  Or is it
22 more -- almost an explanation of the associate's
23 compensation?
24           MS. CHASE:  Objection to the form of the
25      question, that it presumes that one of those



Page 318

1      two --

2             THE WITNESS:  Yeah.

3             MS. CHASE:  -- alternatives is the only

4      possible answer.  So objection to the form of

5      the question.

6             THE WITNESS:  Yeah.  An appropriate

7      objection.

8             I will say it's more akin to the latter.

9   BY MS. SHEKETOFF:

10     Q.   Okay.  So it's not something -- withdrawn.

11            MS. CHASE:  Julia, is what you're trying

12     to ask, do you look at the assessment statement

13     when you're making the comp decision?  Because

14     that's a direct question.  Right?  Is that what

15     you're trying to get to?

16            MS. SHEKETOFF:  It's not exactly what I'm

17     trying to get at.

18  BY MS. SHEKETOFF:

19     Q.   But I would be happy for you to answer

20  that question as well.

21     A.   I look at a lot of information when I'm

22  looking -- and I'm actually in the middle of doing it

23  right now.  I look at the ratings.  I look at the

24  rankings.  I look at the numbers.  I look at my

25  notes.  I look at the assessment statements.  Do I do



Page 319

1    each and every one of those for every individual

2    associate?  No.  I would -- I would be doing it for a

3    whole year.

4              But they're all data points that I look at

5    at various points in time.

6         Q.   Okay.  Great.  And does it matter to an

7    associate's annual compensation adjustment whether

8    the associate's an I&A associate?

9         A.   Only in the sense that a lawyer's

10   individual practice always could have an impact on

11   the adjustment.  If -- I think I gave this

12   hypothetical earlier:  If private equity is hot, and

13   there's a demand for private equity lawyers, and we

14   want to make sure that we keep our good lawyers, that

15   may have an impact on their adjustment for the year.

16             Issues and appeals lawyers are in demand,

17   the good ones, and I have seen years where we have

18   been more bullish in their compensation than others,

19   but not always.

20        Q.   Does it matter whether the associate is a

21   former Supreme Court clerk, when you determine

22   associate compensation?

23        A.   Not in my view.  I mean, to the extent

24   that you include the bonus that they get in the

25   compensation, once they're in the door, we rate them



Page 320

```
 1   together, take it -- very well thought of issues and
 2   appeals associate, now partner, ██████████
 3   ███████████████████████████████████   ███
 4   █████████████████████████████████████
 5   ██████████
 6            ██████████████████████████████
 7   ████████████████████████████████████████
 8   █████  ███████████████████████████████
 9   █████████████
10        Q.   And was Bill Coglianese paid less than
11   every single Supreme Court clerk in his year?
12        A.   I have no idea.
13        Q.   Does an associate's sex matter to her
14   compensation, or his?
15        A.   Absolutely not.
16        Q.   I'm sorry?
17        A.   Absolutely not.
18        Q.   Does an associate's race matter to his or
19   her compensation adjustment?
20        A.   Does their what?  Race?
21        Q.   Race.
22        A.   Rates?
23             No.  Race, absolutely not.
24        Q.   Okay.  Does the partner in charge's
25   recommendation matter to you when you're making your
```



Page 321

1     recommendation?

2          A.    Certainly.

3          Q.    And what documents do you review -- you

4     listed some of them, but please list all -- all of

5     the documents that you review when you make

6     determinations about an associate's annual raise.

7               MS. CHASE:  Objection to the form of the

8          question.

9               But you may answer, to the extent you can.

10              Are you talking about on an

11         associate-by-associate basis, or just generally?

12    BY MS. SHEKETOFF:

13         Q.    I'm talking about when you're making a

14    recommendation for a particular associate's

15    compensation adjustment, what documents will you

16    review for that -- in connection with that?

17         A.    It will vary.  We obviously have a

18    spreadsheet that has a lot of the objective data:

19    Ratings, ranking, billable hours, pro bono hours --

20    what's on there -- office, practice.

21              We then have the individual reviews.  We

22    have the assessment statements.  We have notes from

23    the associate review meetings.  That's hard copy.  I

24    also have it in my brain, of course, my experience at

25    the actual meetings.  I go to all of the meetings,



Page 322

1   whether it be transactional, litigation, or

2   regulatory.  Market data.

3           I think that's it.  I'm sure there's

4   something I may have missed, but that's -- that

5   should cover it.

6       Q.   And do you attend meetings in connection

7   with determining an associate's annual raise?

8       A.   I try to attend every associate review

9   meeting we have.  We in recent years have a group of

10  transactional review meetings, regulatory review

11  meetings, and litigation review meetings, and the

12  practices divide -- and intellectual property;

13  they're their own beast.

14          And I try to attend all those meetings.

15  And -- and my attendance and Traci's attendance in

16  there is an effort to ensure consistency and

17  uniformity across the firm as a whole.

18      Q.   And how many of those are there each year?

19      A.   Each of those groups, there's one meeting.

20  There are also office meetings that lead up to them.

21  So, for example, using you and Mark, you would have

22  been discussed as part of the Washington litigation

23  meeting.  That occurs separately.  There isn't a

24  firm-wide litigation meeting at which representatives

25  from the Washington office will be there to speak to



Page 323

1   the office's view of Julia and Mark.

2           So those are litigation meetings.  Same

3   thing happens for transactional, regulatory,

4   intellectual property.

5       Q.   Okay.  And are there other meetings beyond

6   those?

7       A.   Well, there's the impromptu meetings in

8   which every lawyer may get feedback from a lawyer

9   they're working with.  But in terms of the formal

10  process, no.

11      Q.   All right.  And approximately when in the

12  year, when in the calendar year, is the Washington

13  litigation meeting?

14      A.   The process kicks off roughly the second

15  week in January.  We then reach out to the lawyers.

16  They provide indications of the work they worked on.

17  They identify their evaluators.  It then goes to the

18  evaluators.  That's roughly the February-March

19  timetable.  It's usually around April that the office

20  meetings start to happen.  End of April, I always

21  know it, because it screws up spring break.

22  Firm-wide evaluation meetings start.  That will flow

23  into May.  Then, coming out of those meetings, the

24  ratings, the rankings, all of those spreadsheets are

25  created.  PICs provide their numbers.  Me and Traci


MAGNA
LEGAL SERVICES

1  review, provide our numbers.  And it goes to the

2  managing partner.  On July 1, numbers come out.

3       Q.   Are there documents created or distributed

4  at the firm-wide litigation meeting?

5       A.   Only -- nothing beyond the actual reviews,

6  and the -- some -- some meetings they'll have a draft

7  assessment statement, but not always.

8       Q.   And does anyone take notes at the

9  firm-wide litigation meeting?

10      A.   We -- there's one, typically, note-taker

11  that is there to make adjustments to perhaps the

12  assessment statement, or a change in the ratings or

13  rankings.  But -- but that's -- that's the only

14  notes.  Generally speaking, it's not a note-taking

15  exercise, as compared to a discussion.

16      Q.   Okay.  And for the Washington litigation

17  meetings, same question:  Are there any documents

18  prepared -- or, sorry -- created or distributed in

19  connection with that meeting?

20      A.   Beyond the reviews and what I -- what I

21  talked about, the assessment statements, the reviews,

22  are circulated to the participants, no.

23      Q.   Okay.  And are there notes taken at that

24  meeting?

25      A.   Only as I testified before, if there is an



Page 325

1    edit to an assessment statement that's been done, and

2    someone says, "Hey, take that 'very' out," or "Delete

3    this sentence or that sentence," or "Make sure we

4    capture the issue that he or she had on that matter."

5              Nothing more than that.

6         Q.   Okay.  So beyond the things that we've

7    already talked about, looking at the documents we

8    talked about in the meetings, do you do anything else

9    to learn about an associate in making a

10   recommendation of his or her annual compensation

11   adjustment?

12        A.   No, other than, you know, individual

13   interaction.  Every lawyer has experiences with a

14   different subset of people, and me and Traci and the

15   managing partner certainly would have that, and I

16   guess that would play some role in numbers.

17             But the large majority is simply the

18   objective data and the feedback we get from the

19   offices and practices.

20        Q.   Okay.  Between 2014 and 2018, who wrote

21   the assessment statements for I&A associates?

22        A.   I do not know.

23        Q.   Do you know -- so you don't know if that's

24   Beth Heifetz?

25        A.   No, I don't, but -- I mean, Beth -- would



Page 326

1    have been Beth or someone she designated, but I don't

2    know who she would have designated.

3         Q.   And are they drafted during either of the

4    litigation, the -- I think you said the Washington

5    litigation meeting or the firm-wide litigation

6    meeting?  Or are they drafted before that?

7         A.   It could be before or after.

8         Q.   Are they revised during those litigation

9    meetings that you mentioned?

10        A.   Sometimes someone will -- my pet peeve,

11   when lawyers really like someone, they'll use words

12   like "very," "outstanding," "excellent."  And

13   sometimes I think they just overstate, and I'll ask

14   them to edit out superlatives like that.  That's the

15   type of editing that may happen at the meeting.

16             But there's no group reading, no "Hey, how

17   about I say this?  This is the first sentence.

18   Someone give me a second sentence."  That doesn't

19   happen.

20        Q.   And if revisions are made, who

21   incorporates them?

22        A.   It would be a different staff.  Usually a

23   practice services employee in the meeting that will

24   work with the practice leader to get the assessment

25   statements done.



Page 327

1          Q.   And did you ever make the final decision
2    about my pay when I was an employee at Jones Day?
3          A.   I don't know.  I'd have to look at the
4    sheets as to whether my number was made -- it was the
5    final number or not.  I -- I really don't know.
6          Q.   Okay.  Let's do that, actually.
7               I'm going to show you what's been marked
8    as Plaintiffs' Exhibit 37.  You probably should look
9    at this on the screen, because it's very small in the
10   print version.  And on the screen, you can -- you can
11   blow it up.  There's a "plus" button --
12               MS. CHASE:  He's timed out, Julia.  So
13          let's just get him logged back in.
14               MS. SHEKETOFF:  Okay.  I actually --
15               MS. CHASE:  Want to take a two-minute
16          break?
17               MS. SHEKETOFF:  Yeah, let's take a
18          two-minute break, because he'll need to
19          re-request permission, and I'll have to regrant
20          it.
21               Okay.  Let's go off the record for a
22          minute.
23               VIDEOGRAPHER:  We're off the record at
24          4:25 p.m.
25               (A recess transpired from 4:25 p.m. until



Page 328

```
 1                4:31 p.m.)
 2                VIDEOGRAPHER:  We're back on the record at
 3          4:31 p.m.
 4           (Exhibit 37 was marked for identification.)
 5                MS. SHEKETOFF:  So this is Plaintiffs'
 6          Exhibit 37, Bates-stamped JD_4765.
 7     BY MS. SHEKETOFF:
 8          Q.   And my question is, why did you recommend
 9     raising my salary to $360,000 for 2015?
10          A.   It's a 20 percent increase.  I don't know
11     here what the market had moved to.  Double-3 rating.
12     Double-3 rating.  19 out of 33 in the office.  19 out
13     of 20 in the practice.
14                I am guessing this was mostly on market
15     move, because you're relatively junior.  You are
16     doing just fine.  And that's -- I don't see any
17     exceptional judgment here -- exceptional adjustment.
18     So you're, in my view, on good target, and you
19     deserve an adjustment.
20                You're -- you're muted.
21          Q.   Sorry.
22                The PIC, the partner in charge, his
23     recommendation was to raise my salary to 330,000.  Is
24     that right?
25          A.   Yes.
```



Page 329

1      Q.   And so why did -- is there any reason you

2  went up to 360 instead of accepting that

3  recommendation?

4      A.   It would have to have been the market had

5  moved.

6      Q.   Would the market have moved between when

7  he made -- the PIC made his recommendation and when

8  you made your recommendation?

9      A.   No, I just would have been closer to the

10  numbers.

11      Q.   Okay.

12      A.   I don't -- I don't think it had moved.

13           Let me try and think.  I shouldn't say

14  that.  There were a couple of years where the market

15  moved in the middle of the year.  It's possible that

16  that was this year.  I do not know.

17      Q.   Okay.  I'm going to show you -- well,

18  sorry.  Sticking with this one for a second.

19           Did you make the final decision for this

20  year?

21      A.   Well, I don't see a column here for the

22  managing partner, so I don't know -- usually I see a

23  spreadsheet that would have my number -- at this

24  point in time, my number and then a managing

25  partner's number.  I can't see if that 360 truly is



Page 330

1   just from me, or if Steve didn't weigh in.  I -- it's

2   unclear to me.

3          MS. CHASE:  Julia, you've muted again.

4   BY MS. SHEKETOFF:

5      Q.   And so the raise that you recommended

6   here, was that to a salary that was the highest

7   salary that anyone in my class of seniority at the

8   firm received?

9      A.   You're asking me that in 2014.  I don't

10  know.

11     Q.   Okay.  I'm going to show you what's been

12  marked as Plaintiffs' Exhibit 38.

13     (Exhibit 38 was marked for identification.)

14  BY MS. SHEKETOFF:

15     Q.   I'm going to show you four of these, so

16  all four of these you probably want to look at on the

17  screen.  This is JD_4766.

18          MS. CHASE:  Julia, I'm just going to come

19      help him find it.

20          MS. SHEKETOFF:  Oh, you know, I can also

21      show it to you.  Hold on.

22          MS. CHASE:  Did you put it up?

23          MS. SHEKETOFF:  I did put it up for you.

24          MS. CHASE:  Yeah, no, I just -- I was just

25      showing him where to find --



Page 331

```
 1                THE WITNESS:  Okay.  Yeah.
 2                MS. CHASE:  -- the exhibit on the
 3         platform.
 4                THE WITNESS:  Okay, I'm with you.
 5                This is 2015, I take it?
 6    BY MS. SHEKETOFF:
 7         Q.    This is the adjustment that went into
 8    effect in 2016, I believe, and -- for work in 2015.
 9         A.    Okay.
10         Q.    And my question is, why did you raise my
11    salary to -- or I'm sorry.  Did you make a
12    recommendation this year?  For my salary?
13         A.    It doesn't look like I did.
14         Q.    And why not?
15         A.    Look at your numbers.  You had a 3 from
16    the office.  A 30 out of 37.  The practice gave you
17    a 2.  That's -- that's falling behind your peers.
18    Billable hours, 179.  Client nonbillable, 1,590.
19    That's out of whack.
20                So the PIC recommended 396.  I was good
21    with that.  I passed on.  The managing partner saw
22    something else, and wanted to push you to 425.
23         Q.    Any other reasons why you didn't make a
24    recommendation this year?
25         A.    No.
```



Page 332

1        Q.   And --

2        A.   I can't remember what the discussion was

3   at the associate review meeting, but that certainly

4   would have been in play.

5        Q.   Okay.  I'm showing you what's been marked

6   as Plaintiffs' Exhibit 39, Bates-stamped JD_4767.

7        (Exhibit 39 was marked for identification.)

8   BY MS. SHEKETOFF:

9        Q.   And my question is, what documents did you

10   review when you were deciding what to recommend for

11   my raise this year?

12        A.   Documents that I reviewed would have been

13   the same as I testified earlier, all the things that

14   go into it.  All of the subjective data, as well as

15   information I obtained from the associate review

16   meetings, the review of your associate reviews,

17   possibly assessment statement.  Getting a 2 again

18   from the practice, second year in a row.

19             PIC is at 450.  I decreased that to 445.

20   That would be in response to two 2s in a row.  Traci

21   is going lower, at 435.  Me and Traci compromise

22   at 440.

23        Q.   So why did you recommend a raise of 445

24   that year?

25        A.   I was just decreasing off the PIC.  I



1    thought that was too high for someone who has shown

2    marginal performance two years in a row, behind your

3    peers.

4         Q.    And any other reason?

5         A.    What else I had learned in the associate

6    review meetings.  Concerns that people had.

7         Q.    Anything else?

8         A.    Not that I can think of.

9         Q.    And in the associate review meeting,

10   what -- what material -- or, sorry.  Withdrawn.

11           In the associate review meeting, can you

12   describe how -- when you talk about an individual

13   associate, what documents are shown during the

14   associate review meeting?

15        A.    Sure.  So Julia Sheketoff -- go through

16   class by class.  Julia Sheketoff comes up.  She's a

17   class of -- whatever you're the class of.  Person

18   running the meeting will say, usually in the

19   practice, "Why don't you tell us something about

20   Julia and her year this year."

21           That would be the practice leader.  She

22   would give a review.  There would be other people in

23   the room to work with you.

24           "What's your sense of Julia?"  They may

25   comment.  There may be three or four people who



Page 334

1    comment.  There may be questions, commentary from

2    others in the room.

3              People talk about whether to raise 2 or 3.

4    Ask any questions they have.  Any individual's

5    discussion could range from 5 minutes to 35 minutes,

6    depending upon how hot or cold the bench is.

7         Q.   And is a PowerPoint presentation provided?

8         A.   Not a PowerPoint, as compared to -- you've

9    seen it in the -- like the assessment statement,

10   but -- picture of who you are.  Numbers, your

11   ratings, rankings, usually from the prior year.

12        Q.   And does that include the reviews?

13        A.   Not up on the screen, no.

14        Q.   But that's what people have in the room?

15        A.   I believe so.  Certainly at the firm

16   meeting, they do.

17        Q.   Okay.

18        A.   I don't know, in the office meetings,

19   whether all of the reviews are shared at that point

20   in time.

21        Q.   Did you -- so you did consider, I think

22   you said Kevyn's -- or the partner in charge's number

23   when you made your recommendation?

24        A.   Yes.  I thought that was generally in the

25   ballpark, but I thought it was too favorable.



Page 335

1      Q.    And did you consider the raises you were

2    recommending for other Supreme Court clerks in making

3    this recommendation for me?

4      A.    Not really.  I mean, it really is an

5    individual thing.  I -- I may have some sense of

6    where the class of 2010 is.  When someone's at the

7    firm for ten years, the -- the numbers really start

8    to deviate, depending upon -- you could have someone

9    who has three great years in a row, and they get

10   pretty healthy adjustments.  And then something

11   happens where they -- they fall off.  They have a bad

12   performance or something, and -- it's all up and

13   down.  It's really hard to say.

14          Do I have a general sense?  Yes.  But I'm

15   not comparing, "Oh, Julia is as good as Jim."  I

16   don't do that.

17     Q.    Do you consider the raises that you're

18   recommending for other I&A associates when you're

19   making a decision about what to recommend for my

20   raise?

21     A.    Same answer.  I have a general sense of

22   it, but I'm not comparing, per se.

23     Q.    Okay.

24     A.    Trying to make it very much an individual

25   decision.



Page 336

1         Q.    And did you consider my reviews in making

2    your recommendation, my raise?

3         A.    I would have, yes.

4         Q.    And apart from what you've already

5    discussed, was there any other information that you

6    considered in connection with deciding what to

7    recommend for my raise in 2017?

8         A.    Not that I can think of.  The objective

9    data, your reviews, what I heard in the meetings.  I

10   hadn't had any interaction with you, so I couldn't

11   bring my personal experience into it.

12        Q.    And I think I know the answer, but just to

13   confirm:  You don't know who wrote my assessment

14   statement for this year?

15        A.    I do not.  Beth should know.

16        Q.    And so I'm going to show you the last one

17   of these.  It's Plaintiff's Exhibit 40, JD Bates --

18   Bates-stamped JD_4768.

19        (Exhibit 40 was marked for identification.)

20   BY MS. SHEKETOFF:

21        Q.    And my question is, did you make a

22   recommendation for my raise this year?

23        A.    PIC recommended 485.  I did not adjust it,

24   nor did Traci.  And Steve took you to 525.  Nice --

25   nice adjustment.



1         Q.   And why did you not make a recommendation

2    this year?

3         A.   Oh, I just thought I would have looked at

4    the market information and had seen that you were

5    consistent with market, and what the PIC had

6    recommended was a nice healthy adjustment already.

7    The managing partner decided to pump it up.

8    ████ ██████████████████ ████████████████

9    ████████████████████████████████████████

10   ████ ██████████████████ ████████████████

11   ██████████████████████████████████

12   █████████████████████████████████

13   ████████████████████████████████

14   ██████████████████████████████████████

15   ████████████

16        █████████████████████████████████

17   ████████████████████████████████

18   ████████████████████████ ██████████████

19   ██████████████████ ████████████████ ██████

20   ██████████████████████████████████

21             MS. CHASE:  I'm just going to note that --

22             MS. SHEKETOFF:  We will not put this in

23        any briefing.

24             MS. CHASE:  The actual rate factor we have

25        declined to provide.



Page 338

1            THE WITNESS:  Oh, I'm sorry.  Just kick

2      me.

3            MS. CHASE:  Too far away to kick you.

4            MS. SHEKETOFF:  We will not -- we will not

5      use that.

6            MS. CHASE:  Thank you.

7  BY MS. SHEKETOFF:

8      Q.   So is it fair to say that you try to

9  ensure that there's some correlation between the

10 associate's salary and the associate's billing rate?

11     A.   Generally, yes.  I -- I can't say I follow

12 it much.  But, you know, we try to -- we're running a

13 business, too, so we got to make sure that the money

14 coming in the door matches the -- the compensation

15 we're paying our lawyers.

16     Q.   Okay.  And outside of the allegations made

17 by the plaintiffs in the Tolton litigation, were you

18 aware of anyone who's ever complained -- and I guess

19 I should also say outside of the Wendy Moore

20 situation -- are you aware of anyone who's ever

21 complained that discrimination affected their salary

22 or raise?

23     A.   Other than Tolton, other than Wendy,

24 lawyers, no.  No.

25     Q.   Okay.  And nonlawyers?



Page 339

1          A.    We had a -- what was she -- paralegal in

2     Boston.  We also had a secretary in Los Angeles years

3     ago.  That's all I can think of.

4          Q.    And what became of those people?

5               Maybe I'll ask a more specific question:

6     Did they continue on in Jones Day's employ?

7          A.    No.  The paralegal in Boston didn't.  I

8     don't think she raised the claim until after she was

9     terminated.  ███████████████████████████████████████

10              The secretary in Los Angeles was really

11    before my time.  That was a litigation.  And I

12    believe it went to trial, and we won.  But I -- I

13    can't say that for sure.

14         Q.    And was she fired from Jones Day?

15         A.    I -- I do not remember the facts.  It was

16    before my time.  I -- I came on very shortly after, I

17    think, it was tried.

18         Q.    And do you remember her name?

19         A.    ████████████████████████, but I can't

20    remember her last name.

21         Q.    So you're not aware of whether she was

22    fired or voluntarily left the firm?

23         A.    I do not know.

24         Q.    And then outside of the paralegal in

25    Boston, the secretary in Los Angeles, the Tolton



Page 340

1    litigation, and Wendy Moore, are you aware of anyone

2    else who complained about discrimination in pay?

3         A.   I don't think so.

4         Q.   Okay.  I'm going to show you what's been

5    marked as Plaintiffs' Exhibit 84.

6         (Exhibit 84 was marked for identification.)

7    BY MS. SHEKETOFF:

8         Q.   You're welcome to do it in your binder or

9    on the AgileLaw platform.

10        And my question is just -- is this the

11   memo written by you about nonpartner evaluations?

12        A.   Yes.  This is a memo.  A version of this

13   memo goes out every year.  It gets tweaked and

14   revised slightly every year.  But yes, this is done

15   in my name.

16        Q.   And is this memo sent to partners in

17   charge and practice leaders?

18        A.   Yes.

19        (Exhibit 79 was marked for identification.)

20   BY MS. SHEKETOFF:

21        Q.   All right.  And then I'm going to show you

22   what's been marked as Plaintiffs' Exhibit 79.  And

23   that's Bates-stamped JD_3021 to JD_3028.

24        And I'm sorry, for the record, I don't

25   know if I said Plaintiffs' Exhibit 84 was



Page 341

1    Bates-stamped JD_3071 to 3075.

2              My question about this Plaintiffs'

3    Exhibit 79 is, is this an e-mail and attachment sent

4    by you on April 15th, 2017?

5         A.   It wasn't sent my me.  It was sent by

6    Suzanne at my request.

7         Q.   And now I'm showing you what's been marked

8    as Plaintiffs' Exhibit 83.

9              (Exhibit 83 was marked for identification.)

10   BY MS. SHEKETOFF:

11        Q.   That's Bates-stamped JD_3732 to 3729 --

12   I'm sorry, that must be 39.  Sorry.  That was JD_3732

13   to JD_3749 -- no, I got that wrong again -- yes.  I

14   got that right.  Okay.

15             And my question is, what is this?

16        A.   This is what you were talking about

17   earlier about what comes up on the screen at the

18   associate review meeting.  So 2015, you would have

19   come up.  They would have identified your client

20   hours, client nonbillable, firm and public service,

21   the matters you were working on, and some excerpts

22   from the reviews.  Sort of give us a general sense of

23   how things are going.

24        Q.   Okay.  Can you please turn to the sixth

25   page of this document, which is Bates-stamped



Page 342

1    JD_3737.

2              What are these -- this is -- the heading

3    is "2016 Meeting Notes."  What are these?

4         A.   I suspect these are notes from the

5    practice services employee who was in the room, who

6    is trying to encapsulate in some way -- very rough --

7    general comments that came in during the meeting.

8              So Cullen here has reviewed the file, has

9    expressed an opinion that you're a 2.  That's not a

10   good rating.  Gauch says that there may be some

11   attitude issues.  I agree with Cullen.  That's a 2.

12   And I think we can already call it, based -- and that

13   would be based upon what I was hearing at the

14   meeting, out of the numbers.

15        Q.   And so my question is, is this -- this is

16   up on the screen?

17        A.   No.  No, that would not be up on the

18   screen.  That would be in the wake of the meeting.

19        Q.   And so how would this document -- I mean,

20   who would put this document together?

21        A.   It would be the practice services person.

22   Like for now it's -- I'm thinking of Max.  Max is our

23   transactional practice services assistant for this

24   litigation.

25        Q.   And do you know who the practice services



Page 343

1    assistant was between 2014 and 2018?

2            MS. CHASE:  Even if the witness doesn't

3        seem to know who it was now, I going to guess

4        you're not going to get an answer to that.  But

5        you can certainly try.

6            THE WITNESS:  I don't recall.

7    BY MS. SHEKETOFF:

8        Q.  Okay.  And so is there -- is there an

9    entry for every person who spoke?

10       A.  You'd have to talk to the person.  I

11   don't -- I've never seen this before.  I don't know

12   what it -- it looks to be some effort to encapsulate

13   the discussion, or capture some of the commentary for

14   the practice leader, as he or she then goes to decide

15   on their ratings, rankings, and job assessment

16   statement.

17       Q.  Okay.  And did you suggest that I should

18   be counseled out of the firm?

19       A.  That's what it says.  I don't recall that.

20       Q.  Okay.  If you thought I should be

21   counseled out, is that something that Brogan would

22   have to approve?

23       A.  No.  No.  That can be done -- that's a

24   discussion between the firm and yourself, that we

25   don't believe there is a future for you, given what



Page 344

 1  we're hearing.

 2          I would have been reacting to what I

 3  likely heard from Gauch, and there must have been

 4  some attitude issues.  This is why I was happy to

 5  see, at the end of your tenure with us, I -- I got it

 6  wrong.  You were a 4 at the end.  So things were

 7  looking up.

 8          That's why we have the collaborative

 9  discussions.  I'm just one viewpoint of the room.

10  Clearly others felt otherwise.

11      Q.   And so was I counseled out of the firm?

12      A.   No, not that I'm aware of.

13      Q.   Who -- who could --

14      A.   I believe you left voluntarily.  Am I

15  wrong about that?  You were a 4 at that point.  We

16  were bullish on you at that time.

17      Q.   Apologize if you already sort of

18  referenced the answer to this, but who -- who can

19  make the ultimate decision to counsel someone out?

20      A.   Oh, that -- that's -- it's a cooperative

21  effort.  It usually is a decision made between the

22  practice leader and the PIC.  Every lawyer really has

23  two people that they report to.  It's the practice

24  leader and the PIC.

25          Even I, today, have my own practice leader



Page 345

1   and PIC.  They are responsible for my professional

2   development.  The two of them may talk together and

3   say, "Mike Shumaker's got to go.  He's not meeting up

4   the opportunity to closing.  He should move along."

5           So the PIC and PL.

6       Q.   Okay.  Would you please turn to page 11 of

7   this document, and just -- that page is Bates-stamped

8   JD_3742.

9       A.   Okay.

10      Q.   So same questions.  You know, what are

11  these notes?  If it's the same answer, you can just

12  say that.

13      A.   Again, nothing I ever prepared or saw

14  before.  It looks to be an effort to capture some of

15  the commentary at the meeting.

16      Q.   Okay.  And would this have been written

17  down by the practice services assistant?

18      A.   That is my presumption.

19      Q.   And is it your understanding that the

20  practice services assistant is taking notes

21  contemporaneous with the meeting?

22      A.   I don't know if I can go there.  I don't

23  know.

24      Q.   Okay.  And just -- and just to clarify,

25  this meeting would have occurred around



Page 346

1  approximately -- I think you said early April each

2  year; is that right?

3       A.   Roughly speaking.  Spring.

4       Q.   Okay.  All right.  And let's go to page --

5  the very last page of this document, please.  And the

6  same questions for this:  What are these, and -- what

7  are these?

8       A.   Same answer as before.  Nothing I've ever

9  seen before.  It looks to be some effort by the

10  practice services person to capture the discussion in

11  the room.

12       Q.   So your -- just to clarify, your answers

13  for all of these are the same; you've not seen these

14  documents, but you have the same basic idea, that

15  they are trying to capture the discussion in the

16  room?

17       A.   And again, if I was defending this

18  deposition, I'd be kicking the witness for

19  speculating as to what this is.  That's what it looks

20  to me to be.

21       Q.   Okay.  I'm going to show you what's marked

22  as Plaintiffs' Exhibit 85.

23       (Exhibit 85 was marked for identification.)

24            MS. SHEKETOFF:  And this is Bates-stamped

25       JD_3042 to 3043.



Page 347

1    BY MS. SHEKETOFF:

2         Q.   My question is just, is this a memo from

3    you to partners in charge about associate

4    compensation?

5         A.   Yeah, this is -- we sort of have a process

6    laid out.  I think the first year it happens is we

7    send out to the associates, identify who their

8    evaluators are, for them to fill out the forms for

9    work they've done.  We provide them information.

10   They populate the fields.

11              Shortly after that, we are trying to give

12   the PICs some direction regarding where we see the

13   market going.  This is the first effort at that -- I

14   think there may be subsequent communication where we

15   provide the actual market grid of what we're seeing.

16        Q.   And I'm going to show you now Plaintiffs'

17   Exhibit 87.  This is another one with really small

18   text, so it might be easier to look on the screen;

19   it's up to you.

20              This is Bates-stamped JD_3016 to JD_3063.

21        (Exhibit 87 was marked for identification.)

22   BY MS. SHEKETOFF:

23        Q.   And my question is just, is this a memo

24   that you had sent to all lawyers that are -- that

25   were asked to evaluate the performance of associates



Page 348

1   and other nonpartners in January of 2016 -- I'm

2   sorry, in January of 2017?

3           I'm sorry.  In January of 2018?

4       A.   Yes.  So this is the second step to the

5   process.  The lawyers have already identified who

6   their evaluator should be, and now this is being sent

7   out to the evaluator to say, "Click on this link.

8   It'll take you to the database, and you should start

9   filling these out."

10      Q.   And do you send out a memo like this each

11  year?

12      A.   As far as I can recall, every year that

13  I've been the administrative partner, I will send

14  that out -- or I should say Suzanne sends it out, at

15  my request.

16      Q.   Okay.  And -- and so this would have gone

17  out to all partners filling out nonpartner

18  evaluations?

19      A.   I don't think this goes out to just

20  partners.  This goes out to anyone who's been

21  identified as an evaluator, all lawyers asked to

22  evaluate the performance of associates.

23           So if you're -- I can't remember the --

24  the gap we had, but if you're a two- or three-year

25  senior to someone, they may identify you.  If you're



Page 349

1   an eighth-year associate and you work with a

2   fifth-year associate, you would receive this to

3   provide a review for that fifth year.

4         Q.   And any reason to think that there would

5   be any material differences in this memo the year

6   before?

7         A.   We tweak them every year.  This is '18.

8   This is around -- around the time Traci's coming in

9   to help, now that I look at it.

10             Yeah, this -- see the second page?  This

11  is Traci.

12        Q.   Oh, I just -- I'm sorry.  I'm just focused

13  on that first page right now.  But thank you for

14  clarifying that.

15        A.   It may have been altered in some way.  I

16  can't tell you what or how it was altered.  Something

17  like this would go out every year.

18        Q.   Okay.  And does Hashim Mooppan have a

19  reputation for giving associates harsh reviews?

20        A.   Hash has a reputation for being a

21  demanding and discerning reviewer.  I wouldn't say

22  he's harsh.

23        Q.   Does he have a reputation for giving

24  negative reviews?

25        A.   No.



Page 350

```
 1        Q.   Have you heard the term "getting Hashed"
 2   before?
 3        A.   No.
 4        Q.   So you have no idea what it means?
 5        A.   Well, the connotation that you're
 6   providing is that someone gets a negative review from
 7   Hash, and they say "getting Hashed."  I have not
 8   heard that.  I'm usually the last to know.
 9        Q.   Has Hash given negative reviews to people
10   who were later promoted to partner at Jones Day?
11        A.   I do not know.  Hash has been away from
12   us.  He came back to us recently.  I -- you know,
13   every time --
14        Q.   Sorry.  What were -- what were you going
15   to say?
16        A.   No, it was not responsive, so I don't need
17   to go there.  Waste of time.
18   ███████████████████████████████████
19    █ ██████████████████████████████████
20   ████████████████████████████████████████
21   █████████████████
22       ███████████  ████████████████
23    ███████████
24       █████████████  ██████████████████████
25     █████████████████
```



Page 351





Page 352

1 ███████████████████████

2 ██████████████   ███████

3 ███████████████   ███████████████████████

4 ██████████

5 █████████████████████████████████████████

6 ██████████

7        VIDEOGRAPHER:  We're back on the record at

8        5:07 p.m.

9 BY MS. SHEKETOFF:

10        Q.   In preparing for today's deposition, did

11 you review any documents?

12        A.   I reviewed documents, yes.

13        Q.   What documents?

14        A.   The collection of documents I reviewed is

15 privileged.

16        Q.   Did you review any documents that were not

17 produced in this litigation?

18        A.   No.

19        Q.   Are you quite sure about that?

20        A.   Yes.

21        Q.   Did you prepare any notes?

22        A.   No.

23        Q.   And -- sorry.  Just to clarify, when I

24 say -- when I ask if you reviewed documents that

25 weren't produced in this litigation, I mean did you



Page 353

1   review -- I would include within that documents that

2   you reviewed in unredacted form, that were produced

3   in redacted form; did you review any of those kind of

4   documents?

5        A.   Say again?  Most of that -- you lost me.

6        Q.   I'm sorry.  Did you review any documents

7   in unredacted form that were produced in redacted

8   form?

9        A.   Did I review any of our privileged

10  communications?  Sure.

11       Q.   And did anything that you review refresh

12  your recollection as to anything that we discussed

13  during this deposition?

14       A.   Nothing specifically, no.

15       Q.   And did anything that you reviewed affect

16  in any way your testimony today?

17       A.   Only to the extent it helped refresh my

18  recollection in providing truthful testimony today.

19       Q.   And what documents helped you refresh your

20  recollection to provide truthful testimony?

21       A.   No specific document.  I'm just saying, in

22  general -- I hadn't reviewed some of this information

23  for some time, so I reviewed many of the documents,

24  for instance, you showed me here today, and they

25  refreshed my recollection.  But there was nothing in



Page 354

1    particular that is an "aha" moment.  That's for sure.

2         Q.   Okay.  Did any of the documents that you

3    produced in redacted form, that you reviewed in

4    unredacted form, refresh your recollection as to

5    anything today?

6         A.   Nothing I could say specifically, no.

7         Q.   I think -- well, I understand that you

8    can't say specifically.  But did it in general

9    refresh your recollection on the topics that we

10   discussed today?

11        A.   It's really hard for me to say what was

12   refreshing my recollection.  I can't say -- can't

13   provide any more specifics than that.  I reviewed

14   materials, like any deponent getting ready for a

15   deposition.  Nothing specific was, "Aha, now I

16   remember that."  No.  Nothing like that.

17             MS. SHEKETOFF:  I think that that is all

18        for today.  So I think we can go off the record.

19             Wait.  Sorry, one second.  Just one

20        second.  Let's go off record for transcript

21        orders, if that's okay.

22             VIDEOGRAPHER:  I need to get them on the

23        record, Counsel.

24             MS. SHEKETOFF:  I'd like to have at least

25        the time excluded.  There's no reason to put all



Page 355

1          that on the record.

2                    VIDEOGRAPHER:  I'm supposed to get the

3          transcript orders on the record, and -- and the

4          video orders.  It's kind of standard procedure.

5                    MS. SHEKETOFF:  Okay.  I'll follow up with

6          you all about that, but I guess -- he's probably

7          seeking your order, Terri.

8                    VIDEOGRAPHER:  Yeah.  If I can get -- the

9          transcript, Ms. Chase?

10                   MS. CHASE:  Yes, I would like to order the

11         transcript and the video, and I would like for

12         them to be synced up.

13                   VIDEOGRAPHER:  Perfect.

14                   We're off the record at 5:11 p.m.

15                   THE COURT REPORTER:  Does anyone want a

16         rough draft?

17                   MS. CHASE:  I would like a rough, Karen.

18         Thank you for asking.

19                   MS. SHEKETOFF:  I will follow up with you

20         after.  Thank you.

21                   (Time Noted:  5:11 p.m.)

22

23

24

25



```
 1                        CERTIFICATE

 2

 3          I, KAREN K. KIDWELL, Registered Merit Reporter,

 4     and Certified Realtime Reporter, do hereby certify

 5     that prior to the commencement of the examination,

 6     the deponent was remotely sworn.

 7          I DO FURTHER CERTIFY that the foregoing is a

 8     verbatim transcript of the testimony as taken

 9     stenographically by me at the time, place and on the

10     date hereinbefore set forth, to the best of my

11     ability.

12          I DO FURTHER CERTIFY that I am neither a

13     relative nor employee nor attorney nor counsel of any

14     of the parties to this action, and that I am neither

15     a relative nor employee of such attorney or counsel,

16     and that I am not financially interested in this

17     action.

18

19                        Karen K. Kidwell
                          _____
20                        Karen K. Kidwell
                          Registered Merit Reporter
21                        Certified Realtime Reporter
                          Notary Public
22

23

24

25
```



```
 1                  INSTRUCTIONS TO WITNESS
 2              Please read your deposition over
 3   carefully and make any necessary corrections.
 4   You should state the reason in the
 5   appropriate space on the errata sheet for any
 6   corrections that are made.
 7              After doing so, please sign the
 8   errata sheet and date it.
 9              You are signing same subject to
10   the changes you have noted on the errata
11   sheet, which will be attached to your
12   deposition.
13              It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you.  If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25
```



```
 1                          ERRATA

 2   PAGE   LINE   CHANGE

 3   _____  _____  _____

 4          REASON: _____

 5   _____  _____  _____

 6          REASON: _____

 7   _____  _____  _____

 8          REASON: _____

 9   _____  _____  _____

10          REASON: _____

11   _____  _____  _____

12          REASON: _____

13   _____  _____  _____

14          REASON: _____

15   _____  _____  _____

16          REASON: _____

17   _____  _____  _____

18          REASON: _____

19   _____  _____  _____

20          REASON: _____

21   _____  _____  _____

22          REASON: _____

23   _____  _____  _____

24          REASON: _____

25
```



```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3              I, MICHAEL SHUMAKER, do hereby certify

 4      that I have read the foregoing pages and that

 5      the same is a correct transcription of the

 6      answers given by me to the questions therein

 7      propounded, except for the corrections or

 8      changes in form or substance, if any, noted

 9      in the attached Errata Sheet.

10

11

12      _____

13      MICHAEL SHUMAKER                    DATE

14

15

16      Subscribed and sworn to before me this

17      _____ day of _____, 20 _____.

18      My commission expires: _____

19

20      _____

21      Notary Public

22

23

24

25
```



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARK C. SAVIGNAC and | ) | |
| JULIA SHEKETOFF, | ) | Civ. No. 1:19-02443 (RDM) |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| JONES DAY *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**ERRATA SHEET FOR JUNE 17, 2022**
**DEPOSITION OF MICHAEL R. SHUMAKER**

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 16 | 4 | battle group | B&TL group | Transcription error |
| 18 | 23 | won't identify in | won't identify.  In | Punctuation |
| 19 | 1 | time Kevyn | time, Kevyn | Punctuation |
| 20 | 13 | So I need to | So I needed to | Transcription error |
| 21 | 3 | those was who | those were who | Transcription error |
| 24 | 9 | such erroneous | such an erroneous | Transcription error |
| 25 | 12 | the type situation | the type of situation | Transcription error |
| 27 | 22 | Curtained | It contained | Transcription error |
| 28 | 8 | don't know much | don't know if there's much | Transcription error |
| 28 | 20 | time, certain | time, in certain | Transcription error |
| 29 | 10 | with the client | with for the client | Transcription error |
| 31 | 6 | in my view, meaningless | in my view, is meaningless | Transcription error |
| 33 | 23 | He was then asked to notify | He would then notify | Clarification / Transcription error |
| 34 | 21 | made me think you | made me think that you | Transcription error |

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 44 | 18 | raised it legitimate | raised it, legitimate | Punctuation |
| 47 | 20 | to this lobbing | to this, lobbing | Punctuation |
| 48 | 14 | publicize to you | publicize you | Transcription error |
| 50 | 24 | senior, senior | senior, a senior | Transcription error |
| 58 | 12 | legal blog, do what | legal blogs, do what | Transcription error |
| 60 | 18 | I -- someone | I -- if someone | Clarification / Transcription error |
| 62 | 8 | to helpful to you | to be helpful to you | Transcription error |
| 64 | 4 | as to Steve | as to I was with Steve | Clarification / Transcription error |
| 70 | 14 | More of a champion | There could not be more of a champion | Clarification / Transcription error |
| 77 | 11 | battle | B&TL | Transcription error |
| 82 | 14 | terminated at the immediate | terminated with immediate | Transcription error |
| 82 | 20 | I remember the of -- of counsel | I remember the of counsel | Clarification / Transcription error |
| 85 | 21 | surface for | surfaced for | Transcription error |
| 96 | 7 | authority it | authority we | Transcription error |
| 100 | 24-25 | and provided | and they provided | Transcription error |
| 101 | 14 | add that the Example | add that Example | Transcription error |
| 103 | 6 | judgment, threatening | judgment, a threatening | Transcription error |
| 104 | 14-15 | collegiality, cohesive approach to practice | collegiality, a cohesive approach to the practice | Transcription error |
| 105 | 19 | and it to be | and for it to be | Transcription error |
| 108 | 3 | see there | see that there | Transcription error |
| 110 | 1 | suggests is a complete | suggests a complete | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 113 | 15 | what she said. | what she did. | Transcription error |
| 124 | 9 | I reached -- reached out | I reached out | Clarification |
| 127 | 16 | I don't -- but | I don't know, but | Transcription error |
| 135 | 5-6 | procedure when we are -- two | procedure.  There are | Clarification / Transcription error |
| 139 | 16 | make sure | makes sure | Transcription error |
| 151 | 7 | We call | We don't call | Transcription error |
| 158 | 16-20 | A.  You said it was illegal. Q.  Anything else? A.  That's not true. That's why we conducted the research. No that's all. | A.  You said it was illegal.  That's not true. That's why we conducted the research. Q.  Anything else? A.  No that's all. | Clarification / Transcription error |
| 159 | 9 | Make sure I understand | Let me make sure I understand | Clarification / Transcription error |
| 162 | 2 | That -- go back | I'd have to go back | Clarification / Transcription error |
| 186 | 7 | was a firm | was the firm | Transcription error |
| 204 | 15-16 | Seeking a legal conclusion.  I -- I had no | You're seeking a legal conclusion.  I had no | Clarification / Transcription error |
| 208 | 2 | leak on to June | leak on into June | Transcription error |
| 208 | 4 | Sparkle raising | Sparkle raised | Transcription error |
| 210 | 20 | what the -- the market | what the market | Clarification / Transcription error |
| 213 | 11 | Trust her | I trust her | Transcription error |
| 219 | 23 | there over -- over the | there over the | Clarification / Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 219 | 24-25 | approach of -- of not forcing | approach of not forcing | Clarification / Transcription error |
| 220 | 2 | And that -- that certainly | And that certainly | Clarification / Transcription error |
| 220 | 6 | speaking, the -- the reason | speaking, the reason | Clarification / Transcription error |
| 221 | 10-11 | just a -- a termination | just a termination | Clarification / Transcription error |
| 223 | 3 | have the -- the skill | have the skill | Clarification / Transcription error |
| 228 | 5-6 | know, if -- if we | know, if we | Clarification / Transcription error |
| 228 | 21-22 | This -- we -- I wanted | I wanted | Clarification / Transcription error |
| 237 | 24-25 | to the -- Mark and -- harmful to Mark | to Mark | Clarification / Transcription error |
| 238 | 23 | I thought -- I thought you | I thought you | Clarification / Transcription error |
| 241 | 4-5 | And at that time -- this was now, I may | But at that time.  If this was now, I may | Clarification / Transcription error |
| 241 | 14-15 | I think I -- I think I was | I think I was | Clarification / Transcription error |
| 245 | 20 | providing exception | providing an exception | Clarification / Transcription error |
| 247 | 25 | that email was, dealing | as that email was -- are dealing | Clarification / Transcription error |
| 252 | 15 | M&M | M&A | Transcription error |
| 254 | 9 | provided a -- a reference | provided a reference | Clarification / Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 260 | 5 | ██████████ | ██████████ | Clarification / Transcription error |
| 260 | 7 | ██████████ | ██████████ | Clarification / Transcription error |
| 264 | 6 | in them | on them | Transcription error |
| 267 | 13 | again, doesn't | again, it doesn't | Transcription error |
| 267 | 19 | ██████ | ██████ | Transcription error |
| 273 | 17-18 | ██████████████ | ██████████ | Clarification / Transcription error |
| 277 | 21 | ██████ | ████████ | Clarification / Transcription error |
| 277 | 22-23 | ██████████████ | ██████████████ | Transcription error |
| 278 | 19 | ████████ | ██████████ | Transcription error |
| 280 | 24 | ████ | ████ | Transcription error |
| 281 | 20 | ██████████ | ████████ | Clarification / Transcription error |
| 284 | 5 | ██████████ | ████████████ | Clarification / Transcription error |
| 285 | 2 | ██████████ | ██████████ | Transcription error |
| 285 | 20-21 | ██████████ | ████████████ | Clarification / Transcription error |
| 287 | 7 | ██████ | ██████ | Clarification / Transcription error |
| 288 | 15 | Concluded he | We concluded he | Clarification / Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 290 | 20-21 | wrong.  It's -- black-box compensation system is -- I can't believe | wrong.  I can't believe | Clarification |
| 290 | 23 | long, because -- for that reason. | long. | Clarification / Transcription error |
| 291 | 3-4 | to make that.  Whether it was a lie, it's -- it's simply untrue. | to make that claim.  Whether it was a lie?  It's simply untrue. | Clarification / Transcription error |
| 291 | 19-20 | untruth being a lie, I'll leave that to you.  We found it untrue in basis. | an untruth being a lie, I'll leave that to you.  We found it untrue. | Clarification / Transcription error |
| 303 | 9 | may be interested. | may be interested in. | Transcription error |
| 308 | 21-22 | like membership committees | like the membership of the committees | Clarification / Transcription error |
| 309 | 7-8 | Let them move on | We then move on | Transcription error |
| 311 | 6-7 | We sell to good legal minds we have | We sell the good legal minds that we have | Transcription error |
| 320 | 1 | together, take it -- very well | together.  Take a very well | Transcription error |
| 322 | 9 | We in recent years have a group | We, in recent years, have a group | Punctuation |
| 323 | 20-22 | End of April, I always know it, because it screws up spring break.  Firm-wide | End of April -- I always know it because it screws up spring break -- firm-wide. | Punctuation |
| 333 | 23 | the room to work with you | the room that work with you | Transcription error |
| 342 | 23-24 | assistant for this litigation. | assistant. | Clarification |

## ACKNOWLEDGMENT OF DEPONENT

    I, Michael R. Shumaker, do hereby certify that I have read the attached transcript, and that the same is a correct transcription of the testimony given by me to the questions therein propounded, except for the corrections or changes in form or substance noted in this Errata Sheet.

Date: 7/29/22             */s/ Michael R. Shumaker*
                      Michael R. Shumaker