# Chase Declaration
# Exhibit 83

Page 1

IN THE UNITED STATES DISTRICT COURT

    FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC AND  )

    JULIA SHEKETOFF  )

               ) CASE NO.

      VS.        ) 1:19-CV-02443

               ) -RDM-ZMF

JONES DAY, STEPHEN J. )

BROGAN, BETH HEIFETZ, )

AND MICHAEL SHUMAKER  )

  ---------------------------------

           DATE: September 1, 2022

           TIME: 3:24 P.M.

      DEPOSITION of TRACI L. LOVITT,

ESQ., CORPORATE REPRESENTATIVE OF

JONES DAY, taken by the Plaintiffs,

pursuant to the Federal Rules of Civil

Procedure, held via ZOOM VIDEO

COMMUNICATION, before Leah

Siemiatycki, a Notary Public of the

State of New York.



```
 1   A P P E A R A N C E S:
 2
 3   FOR THE PLAINTIFFS:
 4    MR. MARK C. SAVIGNAC - PRO SE
      2207 Combes Street
 5    Urbana, Illinois 61801
      (217) 714-3803
 6    marksavignac@gmail.com
 7
      - AND -
 8
 9    MS. JULIA SHEKETOFF - PRO SE
      2207 Combes Street
10    Urbana, Illinois 61801
      (202) 567-7195
11    sheketoff@gmail.com
12
13   FOR THE DEFENDANTS:
14    MS. TERRI CHASE
      JONES DAY
15    500 Grant Street, Suite 4500
      Pittsburgh, Pennsylvania 15219
16    (412) 394-7250
      tlchase@jonesday.com
17
18   ALSO PRESENT:
      CARLOS ANDREU, videographer
19    MAGNA LEGAL SERVICES
              *     *     *
20
21
22
23
24
25
```



Page 3

1    F E D E R A L   S T I P U L A T I O N S

2

3

4    IT IS HEREBY STIPULATED AND AGREED by

5    and between the counsel for the

6    respective parties herein that the

7    sealing, filing and certification of

8    the within deposition be waived; that

9    the original of the deposition may be

10   signed and sworn to by the witness

11   before anyone authorized to administer

12   an oath, with the same effect as if

13   signed before a Judge of the Court;

14   that an unsigned copy of the

15   deposition may be used with the same

16   force and effect as if signed by the

17   witness, 30 days after service of the

18   original & 1 copy of same upon counsel

19   for the witness.

20

21   IT IS FURTHER STIPULATED AND AGREED

22   that all objections except as to form,

23   are reserved to the time of trial.

24

25            *    *    *    *



Page 4

```
 1                    T. LOVITT, ESQ.
 2    T R A C I  L.  L O V I T T, E S Q.,
 3    called as a witness, having been first
 4    duly sworn by a Notary Public of the
 5    State of New York, was examined and
 6    testified as follows:
 7              VIDEOGRAPHER: We're back on
 8    the video record at 3:24 p.m.
 9    EXAMINATION BY
10    MS. SHEKETOFF:
11        Q.    Okay. Ms. Lovitt, I wanted to
12    ask you similar questions about
13    Ms. Heifetz's alleged conversations
14    concerning my review by  Partner A .
15              You had mentioned that she
16    spoke to Partner A , Yaakov and I think
17    me.  Please describe all conversations
18    that she had. Let's start with Yaakov.
19        A.    She did not recall the
20    specifics of the Yaakov conversation.
21              And I guess I should back up
22    and say that she talked to Partner A  and
23    you and Yaakov with what she called
24    real time as you were working on the
25    work assignment, the project for
```



Page 5

```
 1              T. LOVITT, ESQ.
 2   Partner A, and she had a subsequent
 3   conversation with Partner A about his
 4   evaluation once she saw the
 5   evaluation.
 6              She recalled -- she did not
 7   recall the details of the Yaakov
 8   conversation, only recalling that it
 9   took it place and it was about
10   Partner A's work, but she did not have
11   the details of that.
12              She recalled the conversation
13   with Partner A as being -- again, she
14   didn't recall specifics either the
15   actuals, you know, quote to quote of
16   the conversation or the timing, but
17   she did recall that it was generally a
18   positive conversation.
19              He was happy with the work,
20   but he was frustrated by the fact that
21   you were not accepting some of his
22   edits multiple times and not talking
23   to him about it and telling him why
24   you weren't accepting his edits.
25              That was her general
```



Page 6

                        T. LOVITT, ESQ.

1

2    recollection of the conversation at

3    the time.

4              She also recalled you coming

5    -- and I'm just -- I'm sorry, go

6    ahead.

7         Q.    Like in switching topics, to

8    conversations with me?

9         A.    With you, yeah.

10        Q.    So just to follow up on the

11   Partner A, this is the real time

12   conversation?

13        A.    Correct.

14        Q.    Please continue.

15        A.    And her recollection to

16   conversation with you was is that you

17   came to her asking how to manage the

18   Partner A situation, that you were, i.e.,

19   he was asking for edits and you didn't

20   know how to respond.

21             That was generally her

22   recollection. She didn't have any

23   specifics.

24             But she recalled, you know,

25   real time this sort of question coming



Page 7

1              T. LOVITT, ESQ.

2    up about taking Partner A's edits.

3              And she also recalled

4    speaking to Partner A once she saw his

5    evaluation. Again, she could not

6    recall specifics of that conversation,

7    but she did recall her impression

8    being that he was generally impressed

9    with your work product but again

10   annoyed by your not taking his edits

11   and being protective of your time in

12   his view.

13             And, again, she didn't have

14   any specifics beyond that. But in

15   terms of her vetting Partner A's

16   evaluation, she based that both of her

17   actual knowledge and the statement

18   itself that she viewed as consistent

19   with what he was hearing real time

20   when that project was happening. And

21   that was the extent of her

22   recollection.

23      Q.    And just to clarify the time

24   of the latter conversation with

25   Partner A, was that -- did you say that



Page 8

```
 1              T. LOVITT, ESQ.
 2   was after she received his evaluation
 3   of me?
 4      A.    Correct. And before she
 5   signed the rating.
 6      Q.    Before she signed the rating,
 7   okay.
 8            Is there anything that she
 9   recalled from those conversations?
10      A.    No, that was it.
11      Q.    Did she recall any discussion
12   about discrimination?
13      A.    That was -- all she said was
14   that was all she could recall.
15      Q.    And did she -- could she give
16   any approximate timeframe beyond the
17   real time and then, you know, more
18   specifically what month?
19            I can -- I could tell you we
20   worked together in 2016. Did she
21   remember when in 2016 these
22   conversations came up?
23      A.    No.
24      Q.    And then for the later
25   conversation  -- I'm sorry.
```



Page 9

1          T. LOVITT, ESQ.

2          For Partner A, Yaakov and me,

3     the real-time conversations she did

4     not remember when in 2016?

5          A.   It was commensurate with the

6     work project, so I think that would --

7     you know, to the extent you know when

8     that work was happening, it was

9     commensurate with the project. That's

10    how she said it was real time with the

11    project.

12         Q.   Okay. And then for the later

13    Partner A conversation, when in the year

14    -- I'm sorry -- that would have been,

15    I guess, in 2017, correct?

16         A.   She wasn't that specific. She

17    said it was after she read his

18    evaluation, but she didn't have

19    specific timing.

20         Q.   Okay. Okay, thank you. Was

21    there any other information you wanted

22    to provide?

23         A.   Well, we were going to move

24    on to ████.

25         Q.   Yes, please.



```
 1              T. LOVITT, ESQ.
 2      A.    So she recalled speaking to
 3   both you and Hash about the
 4   █████████████████████████
 5            Again, she did not -- she
 6   could not distinguish the █████
 7   ████████████████████████████████
 8   ████████████████████   in terms
 9   of a time.
10            She just remembered that
11   there being conversations about the
12   █████████████████████████
13            With respect to Hash, she
14   recalled that he was disappointed by
15   your response to the ████████████
16   ███████████       She said there was a, quote,
17            She said there was a, quote,
18   a lot of drama around getting the work
19   done, but that the work eventually did
20   get done.
21            She also recalled Hash
22   commenting on your oral argument
23   shortly after it occurred and that he
24   was not impressed with the substance
25   of your argument.
```



1                    T. LOVITT, ESQ.

2              She recalled you coming to

3      her and --

4      Q.    Can you try to --

5      A.    The time? She -- that was --

6      again, the best she could say was real

7      time, so it was happening commensurate

8      with the project, commensurate with

9      the argument.

10             Obviously not while, but you

11     know, shortly within that timeframe.

12             She recalled you coming to

13     her about the ███████████████,

14     and she couldn't recall the specifics,

15     she recalled her reaction which was

16     that she was disappoint -- very

17     disappointed in how you were reacting,

18     and she recalled you saying something

19     to the effect of -- it wasn't an exact

20     quote -- something to the effect of I

21     don't want to do it, which is that you

22     didn't want to do the work that the

23     ███████████████████.

24             And she was very disappointed

25     in that response. Again, she couldn't



1                     T. LOVITT, ESQ.

2      give specific timing, that was the

3      best of her recollection.

4          Q.    And her memory is that she

5      had this conversation with me, not

6      that she read this in the review with

7      Hash?

8          A.    Correct.

9          Q.    And was that also a real-time

10     conversation?

11         A.    Yes. That was -- the best she

12     could narrow it down was a real-time

13     conversation, i.e., as the

14     ████████████████████ were coming in.

15              ██████████████████████████

16     ██████████████████████

17     ████████████████████████████

18     █████████████████████████

19     ███████████████████

20         Q.    And did she remember anything

21     else about the conversations with me

22     and Hash?

23         A.    No. Not that specifics.

24         Q.    Did she remember where this

25     supposed conversation with me took



Page 13

```
 1              T. LOVITT, ESQ.
 2   place?
 3        A.    No. That -- she just -- she
 4   gave us the best of her recollection.
 5        Q.    Did she remember whether it
 6   was by phone or in person or by
 7   e-mail?
 8        A.    I don't think we asked her
 9   that level of detail.
10        A.    Okay.
11        Q.    I can try to track that down.
12   Again, but, you know, having talked to
13   her, she just has a general
14   impression.
15        Q.    And did she talk to anyone
16   else about my work with Hash?
17        A.    She did not mention Yaakov or
18   anyone else on that, no.
19        Q.    Did she and Sparkle sit down
20   with Erin Tang?
21        A.    She did not say.
22        Q.    Okay. Is that something you
23   can try to find out?
24        A.    Yep.
25        Q.    Okay, thank you.
```



Page 14

1               T. LOVITT, ESQ.

2               We can move on from that for

3      now. Hopefully, we won't have any more

4      technical issues, but if we do, that

5      might be very fine. Okay.

6               Okay. I'm going to show you

7      what's been marked as Plaintiffs'

8      Exhibit 23. You can turn to it in your

9      binder. For the record that's Bates

10     stamped JD3221 to JD3233.

11              (Whereupon, chain of e-mails

12     was marked as Plaintiffs' Exhibit 23

13     for identification as of this date.)

14     BY MS. SHEKETOFF:

15         Q.    And my question is did you

16     have any involvement in this e-mail

17     before it was sent?

18              MS. CHASE: And just to

19     clarify, you're referring -- by this

20     e-mail, you're referring to the e-mail

21     that appears under the signature block

22     of Sarah McClure?

23              MS. SHEKETOFF: Yes. The

24     e-mail on the very first page, the top

25     e-mail in the chain. Thank you for the



1              T. LOVITT, ESQ.

2    clarification.

3              THE WITNESS: I had no

4    involvement of this e-mail.

5

6    BY MS. SHEKETOFF:

7        Q.    And did you have any

8    involvement in reviewing this e-mail

9    before it was sent?

10       A.    No.

11       Q.    I'm going to show you now

12   what's been marked Plaintiffs'

13   Exhibit 177. Please turn to that in

14   your binder.

15       A.    I'm sorry, I'm going to have

16   to grab that second binder. I'll try

17   to keep it close to me.

18       Q.    Okay. And I'm going to ask

19   you about the e-mail at the top of the

20   page.

21       A.    You said 1-7-7?

22       Q.    Yes.

23             MS. CHASE: We don't have

24   that.

25             THE WITNESS: I don't have



Page 16

```
 1                    T. LOVITT, ESQ.

 2    any --

 3    BY MS. SHEKETOFF:

 4         Q.    You're right. This is an

 5    e-mail that was not in your binder.

 6    I'm sorry about that.

 7         A.    Okay. So I'll go to Agile Law

 8    for this one?

 9         Q.    Yes.

10         A.    Okay.

11         Q.    And just -- well, never mind.

12         A.    See how can I scroll down

13    on --

14              MS. CHASE: There's a little

15    grey --

16              THE WITNESS: I see. Right

17    there, yeah.

18              MS. CHASE: I am not seeing it

19    yet, but, Julia, is it there?

20              MS. SHEKETOFF: Yeah.

21              (Whereupon, chain of e-mails

22    was marked as Plaintiffs' Exhibit 177

23    for identification as of this date.)

24    BY MS. SHEKETOFF:

25         Q.    Plaintiffs' Exhibit 177, I
```



```
 1               T. LOVITT, ESQ.
 2   just tried to show it you, to direct
 3   you screen to it. I don't know if that
 4   worked.
 5       A.    I see. I see, yeah. That
 6   actually --- it just popped up on the
 7   screen.
 8       Q.    Okay, super. So I'm just
 9   talking about the e-mail at the top of
10   the page. We talked about this earlier
11   today.
12       A.    Okay. The one that says
13   "Sarah, we have closely reviewed the
14   case law"?
15       Q.    Yeah.
16       A.    Okay, yeah.
17       Q.    And this is the e-mail that
18   caused Jones Day to fire Mark,
19   correct?
20       A.    This -- I mean, that's a big
21   question. This was the e-mail --
22            MS. CHASE: And let me just
23   note, this entire line of questioning
24   is in her individual capacity.
25            THE WITNESS: Yeah. I mean, I
```



Page 18

1                    T. LOVITT, ESQ.

2      wasn't involved in the termination of

3      Mark, actually, so anything I had to

4      know about this e-mail is going to be

5      privileged anyway.

6      BY MS. SHEKETOFF:

7          Q.    Did you talk with Mike

8      Shumaker about this e-mail before Mark

9      was fired?

10              MS. CHASE: I'm going to

11     instruct the witness not to disclose

12     any privileged communications

13     regarding this topic.

14              She has had just indicated

15     that any involvement she had or

16     knowledge she has about the

17     termination of Mark is in a privileged

18     capacity.

19              MS. SHEKETOFF: I'm just

20     asking if she had conversations with

21     Shumaker about this document before

22     Mark was fired.

23              MS. CHASE: And, again, the

24     substance and timing of privileged

25     communications is a non-appropriate



Page 19

```
 1               T. LOVITT, ESQ.
 2    subject for either a fact witness who
 3    is here in her individual capacity or
 4    a 30(b)(6), so I'm instructing the
 5    witness not to answer that question.
 6    BY MS. SHEKETOFF:
 7       Q.   Okay. I'm going to show you
 8    what's been marked as Plaintiffs'
 9    Exhibit 178. This is also not in your
10    binder.
11       A.   Okay.
12            (Whereupon, transcript was
13    marked as Plaintiffs' Exhibit 178 for
14    identification as of this date.)
15    BY MS. SHEKETOFF:
16       Q.   This is Mike Shumaker's -- a
17    transcript of Mike Shumaker's
18    deposition in this case, and I'm going
19    to direct you to page page 20, line 7.
20            I will actually pull it up
21    for you.
22            Page 20, line 7 [sic], the
23    transcript reads: Question, "And the
24    e-mails that you conferred with
25    between receiving the e-mail and
```



Page 20

```
 1                T. LOVITT, ESQ.
 2    sending your e-mail to Brogan, who
 3    were those individuals?"
 4                Answer --
 5                MS. CHASE: I'm sorry, we
 6    don't have it yet.
 7                THE WITNESS: Yeah. You have
 8    to scroll down. It's -- I can only see
 9    down to line 20 of page 20.
10    BY MS. SHEKETOFF:
11        Q.    You might have to --
12        A.    I see, hang on. Okay, I got
13    it. Sorry. See, Agile Law does take me
14    a long time, I'm not that smooth with
15    it. Okay.
16                And you're at line 21, right?
17        Q.    Yes. Question, "And the
18    individuals that you conferred with
19    between receiving the e-mail and
20    sending your e-mail to Brogan, who are
21    those individuals?"
22                Answer, "Sarah McClure and
23    Mary Ellen Powers. I believe
24    Ms. Chase. Likely Traci Lovitt."
25                Do you think Shumaker was
```



Page 21

```
 1                    T. LOVITT, ESQ.
 2    remembering that correctly?
 3              MS. CHASE: Objection to the
 4    form of the question. The testimony of
 5    another witness saying that it is
 6    likely that he spoke to someone is not
 7    an appropriate subject for this
 8    witness to answer questions on.
 9    BY MS. SHEKETOFF:
10       Q.   Well, this is in your
11    individual capacity, and I'm asking
12    did you speak to Mike Shumaker about
13    this e-mail before Mark was fired. He
14    is saying that you did or that you
15    likely did.
16              MS. CHASE: No. You have
17    mischaracterized it. He said that it's
18    likely that I spoke to Ms. Lovitt. He
19    did not say that he actually spoke to
20    Ms. Lovitt.
21              So please start with not
22    mischaracterizing the deposition
23    testimony, and this witness who's here
24    in here individual capacity on this
25    topic, can't interpret that deposition
```



Page 22

```
 1                  T. LOVITT, ESQ.
 2    testimony.
 3             And I have already informed
 4    you that with respect to her
 5    involvement, and she has stated on
 6    this topic, all of it is privileged.
 7    So she's not going to answer questions
 8    about that.
 9             Why don't you move onto
10    something that this witness is in
11    either the personal knowledge of this
12    witness that's not privileged or the
13    30(b)(6) topics?
14             We wasted enough time with
15    tech issues, let's not waste time with
16    more attempts to interfere with our
17    privilege.
18             MS. SHEKETOFF: This is in
19    your individual capacity. There is a
20    waiver over any attorney-client
21    privilege to the extent that Mike
22    Shumaker has already answered this
23    question. You --
24             MS. CHASE: I am telling you
25    that this witness' involvement, if
```



Page 23

```
 1                 T. LOVITT, ESQ.
 2   any, in communications regarding the
 3   termination was privileged and
 4   therefore not an appropriate subject
 5   for testimony. Move on, Julia.
 6            MS. SHEKETOFF: To the extent
 7   of that communication, I'm asking if
 8   there were communications.
 9            Mike Shumaker testified
10   without an instruction not to answer
11   that there likely were, and I'm asking
12   the witness now were there.
13            MS. CHASE: And, again, I'm
14   instructing her not to answer.
15            MS. SHEKETOFF: We will mark
16   that for a ruling.
17            MS. CHASE: Please do.
18   BY MS. SHEKETOFF:
19     Q.   On page 65, line 8, I will
20   direct -- I will bring it up, bring
21   that up for you.
22            MS. CHASE: Given the hours
23   that we lost today, are you really
24   going to ask this witness about
25   another witness' deposition testimony
```



Page 24

```
 1                  T. LOVITT, ESQ.
 2    as opposed to focusing on her 30(b)(6)
 3    topics?
 4    BY MS. SHEKETOFF:
 5        Q.    This transcript reads:
 6    Question, "During the time between" --
 7        A.    Where are you, which line?
 8        Q.    Line 8.
 9        A.    Okay.
10              MS. CHASE: What page?
11              THE WITNESS: She's got it --
12    it's up on the screen, not up on my
13    screen.
14              MS. CHASE: Okay. What --
15              MS. SHEKETOFF: Page 65, line
16    8.
17              MS. CHASE: Okay.
18    BY MS. SHEKETOFF:
19        Q.    Question, "During the time
20    between when you e-mailed Brogan with
21    your recommendation and when he
22    responded to you by e-mail, did you
23    have any communications with anyone
24    relating to the January 16 e-mail?"
25              Then there's a lengthy
```



Page 25

```
 1                  T. LOVITT, ESQ.
 2    objection by Ms. Chase and then the
 3    witness, "Yeah, I can't go onto
 4    substance, but I certainly had
 5    communications with people identified
 6    earlier: Mary Ellen Powers, Sara
 7    McClure, Traci Lovitt, Terri Chase."
 8              Now, did you have
 9    communications with Mike Shumaker
10    during the time between when he
11    e-mailed Brogan with his
12    recommendation to fire Mark and when
13    Brogan responded to Mr. Shumaker via
14    e-mail same --
15              MS. CHASE: Let's have a
16    60-second pause, we don't need to go
17    off the record, to have a privileged
18    consultation to see if there's a way
19    to answer this without waiving the
20    privilege.
21              THE WITNESS: I'm just going
22    to mute myself real fast and just
23    confer.
24              (Whereupon, an off-the-record
25    discussion was held.)
```



Page 26

```
 1                 T. LOVITT, ESQ.
 2                 THE WITNESS: All right. I can
 3    answer that at some point I had a
 4    privileged conversation with Mike
 5    Shumaker, at some point prior to
 6    Mark's termination.
 7    BY MS. SHEKETOFF:
 8        Q.    And were you -- did you have
 9    any personal involvement at all with
10    Mark's termination?
11        A.    No. Apart from just a
12    privileged communication but not -- I
13    think -- just to clarify, I thought
14    you were asking if I had a
15    decision-making capacity, and the
16    answer to that question was no.
17        Q.    So would you -- what do you
18    mean by you had no involvement if you
19    did have a privileged communication?
20        A.    I --
21                 MS. CHASE: Privileged
22    communications are not involvement.
23    Those are privileged communications.
24    Those are not actions of the firm.
25                 The actions and the decisions
```



Page 27

1              T. LOVITT, ESQ.

2    of the firms, those are decisions of

3    the firm, those are decisions that are

4    taken in a not privileged capacity.

5              And so, again, this witness

6    cannot speak to the substance of what

7    her privileged involvement was in

8    communications regarding this topic as

9    she has just testified she was not

10   involved as a decision-maker.

11   BY MS. SHEKETOFF:

12       Q.    I'm asking the witness, what

13   did you mean when you said you were

14   not involved?

15       A.    I meant -- I clarified. I

16   thought you were asking I was involved

17   as a decision-maker.

18              I was clearly involved in

19   some form as counsel, but I was not

20   involved as a decision-maker.

21       Q.    Okay. Were you consulted

22   about whether to terminate Mike?

23              MS. CHASE: That is privileged

24   communications.

25              THE WITNESS: That's



Page 28

```
 1                    T. LOVITT, ESQ.
 2    privileged.
 3              MS. CHASE: That substance of
 4    what was or wasn't discussed but she
 5    had or didn't have, and it would've
 6    all been within a privileged capacity,
 7    and the substance of that is not going
 8    to be disclosed.
 9    BY MS. SHEKETOFF:
10       Q.    And at any time --
11              MS. CHASE: I'm instructing
12    the witness not to answer that
13    question.
14    BY MS. SHEKETOFF:
15       Q.    At any time before the firm
16    fired Mark, were you aware of the
17    identity of the partner that the
18    e-mail says discriminated against me?
19              MS. CHASE: Any knowledge she
20    would have regarding that topic is in
21    a privileged capacity. I'm instructing
22    her not to answer.
23              MS. SHEKETOFF: Okay.
24    BY MS. SHEKETOFF:
25       Q.    Were you consulted by anyone
```



Page 29

```
 1                T. LOVITT, ESQ.
 2    about -- withdrawn.
 3                Okay. We're going to switch
 4    gears here, and these are all going to
 5    be in your 30(b)(6) capacity.
 6                So just for clarity before we
 7    get started, I just want to clarify
 8    I'm only going to or I'm going to be
 9    asking you about 2014 to 2018.
10        A.    2014 to 2018, okay, thank
11    you. So I'll use that time reference
12    in answering all these questions. That
13    will be implied, okay.
14        Q.    Thank you. What were the
15    process for determining associate
16    salaries at that time?
17        A.    Again, the general-- it's a
18    big question, so I'm going to give you
19    a general answer.
20                The general process is that
21    there's first the evaluation process.
22    That starts in early January of the
23    year -- of the calendar year, and that
24    begin with an e-mail from Suzanne
25    Coussons, now Jay Guenthner,
```



Page 30

1             T. LOVITT, ESQ.

2    soliciting from the associates a list

3    of the matters on which they have

4    worked.

5             And they give the list of the

6    matters, a description of the work

7    that they did, and they identify all

8    the folks who were in a position to

9    evaluate them.

10            By all the folks, I mean

11   people who oversaw and reviewed work.

12   It can be anyone two or more years

13   senior to the associate.

14            Then at that point the

15   individual evaluators who are

16   identified by the associate get a link

17   to an evaluation.

18            They fill out that evaluation

19   form. It's changed a little bit within

20   that period we're discussing from 2014

21   to the -- through 2016. And it

22   might've been -- this change might not

23   have been made until 2018.

24            There was no required

25   self-evaluation. There's a point



Page 31

```
 1                    T. LOVITT, ESQ.
 2    within that timeframe, I believe it's
 3    for the 2018 evaluations, you know,
 4    the 2018 calendar year evaluations,
 5    that -- those have a self-evaluation
 6    required component, so that was the
 7    only change to the form between then.
 8            The evaluators fill it out.
 9    Then it goes back to Suzanne Coussons
10    and/or currently Jay Guenthner, and
11    they send all of the evaluation to the
12    -- for a given associate, so it's to
13    that person's practice leader.
14            It's then the responsibility
15    of the practice to draft an assessment
16    statement.
17            As part of that process --
18    and, again, I'm speaking generally, so
19    I'll try to give you variations when
20    it's relevant to you.
21            As a general practice, the
22    practices are responsible for what I
23    referred to earlier as vetting the
24    evaluations, that is to follow up with
25    individual evaluators that there are
```



```
 1                T. LOVITT, ESQ.
 2   questions about the evaluation, trying
 3   to get a better grip of or
 4   understanding the associate's
 5   performance. And then after that they
 6   draft an assessment statement.
 7             Those drafts are then sent to
 8   review committees. Now, in the case of
 9   Washington D.C. -- this is true
10   throughout this 2014 and 2018 period.
11             In Washington D.C. there is a
12   D.C. litigation review committee and
13   that committee looks at the draft
14   assessment statement and all the
15   individual evaluations and they have a
16   conversation about the D.C. associate
17   which can lead to or -- do they have
18   the draft? No, they don't have the
19   draft. I'm sorry.
20             That's the D.C. folks have
21   the individual evaluations and they
22   discuss what they think the, you know,
23   what -- each individual person in the
24   room can give their opinion of the
25   associate's performance based on the
```



Page  33

```
 1                T. LOVITT, ESQ.
 2    evaluations that they have.
 3                That is sort of feedback
 4    that's communicated to the practice
 5    leadership and the office leadership.
 6                The practice leadership then
 7    completes the drafting of the
 8    assessment statements and those are
 9    sent to the national review committee.
10    In your case that would have been the
11    litigation committee.
12                As I testified earlier, the
13    composition of that committee has
14    changed over time from the 2014 to the
15    2018 period.
16                The review committees then,
17    you know, goes through again for every
18    associate from the most senior
19    associate to I want to say fourth or
20    fifth years, I can't recall exactly.
21                Each and every associate they
22    go through one by one in alphabetical
23    order and they discuss the individual
24    -- the draft assessment statement, the
25    proposed ratings by the practice and
```



Page 34

```
 1                  T. LOVITT, ESQ.
 2    they give the practice leader their,
 3    you know, the individual members,
 4    their opinion of the draft assessment.
 5             There is also further vetting
 6    of the individual evaluations. I can
 7    tell you that meeting has a lot of
 8    debate that goes on, and out of that
 9    debate and associate review committee
10    meetings comes a final or a draft, you
11    know, normally a revised draft
12    assessment statement and a practice
13    rating.
14             Then the offices get a copy
15    of the assessment statement. And the
16    office leadership has the opportunity
17    to suggest edits to the assessment
18    statement and they can also have a
19    conversation with the practice leader
20    if they disagree with the practice
21    leader's rating or ranking. And the
22    office --
23        Q.    That's --
24        A.    Office leadership. Office
25    leadership. So you can imagine, the
```



1                    T. LOVITT, ESQ.

2    assessment statement drafting only

3    bubbles up through the practice side

4    and -- but the offices have a chance

5    to review that assessment statement

6    before it becomes final in case they

7    have disagreements or proposed edits.

8                    And they also use the

9    assessment statements then to, you

10   know, review their own ratings and

11   rankings.

12                   So out of this process, which

13   ends in about I think the assessment

14   statements are final maybe in late

15   April, beginning of May.

16                   When they're finalized --

17   which means we have a final assessment

18   statement, we have the office ratings,

19   we have the practice ratings, we have

20   office rankings where applicable and

21   practice rankings where applicable,

22   then we start the compensation

23   process.

24                   So the office leaders then

25   get the final assessment statements



Page 36

```
 1                    T. LOVITT, ESQ.
 2    with the ratings and rankings and they
 3    get, you know, a spreadsheet that
 4    basically shows each associate in that
 5    office what their practice is, what
 6    their hours are, what their ratings
 7    are, what their rankings are for that
 8    year -- for the compensation
 9    adjustment year and one or two years
10    prior.
11              And based on that -- and I
12    omitted one piece.
13              There's also -- the offices
14    are responsible for doing market
15    research, so, you know, there's
16    variation and compensation by market.
17              So, for example, you know,
18    the compensation structure is
19    different in Columbus than it is New
20    York for the time period we're talking
21    about now.
22              We can talk -- have a debate
23    about whether that's changed post
24    COVID, but for this time period
25    there's different market.
```



Page  37

```
 1                    T. LOVITT, ESQ.
 2                And so the office leadership
 3      while the practice is doing all of
 4      this drafting of the assessment
 5      statements, the office leadership is
 6      doing market research so that when
 7      they get this information -- which is
 8      the final assessment, final ratings,
 9      final rankings and historical -- they
10      have a sense of what the, you know,
11      the market is for the -- I'm talking
12      too quickly -- for attorney
13      compensation in that market.
14                So the practice -- the office
15      leadership with all of this
16      information then makes compensation
17      recommendations for each associate in
18      that office.
19                The step from there varies --
20      Q.    When you say office
21      leadership, are you referring to the
22      partner in charge of an office?
23      A.    I'm referring to the partner
24      in charge and the administrative
25      partner. I will put an asterisk by
```



Page 38

1                 T. LOVITT, ESQ.

2    that and say each office kind of does

3    arrives at compensation

4    recommendations in their own way.

5                 So, for example, in Boston

6    there is one year where I convened a

7    set of partners, three or four

8    partners, and we all did it

9    individually.

10                But for Washington, which is

11   the relevant office here, Adrian

12   Wager-Zito and Kevyn Orr both

13   independently arrived at their -- that

14   their compensation recommendations.

15                And then they would meet and

16   they would discuss the

17   recommendations. And Kevyn would come

18   to a final recommendation for the

19   office.

20                So in that case, it was

21   Kevyn. And for the benefit of the

22   court reporter, Kevyn is K-e-v as in

23   victor -y-n, last name O-r-r.

24                Kevyn would make the final

25   determination based on his



Page 39

```
 1                T. LOVITT, ESQ.
 2    conversations with Adrian as well in
 3    her view.
 4            Then those office
 5    recommendations then go to the
 6    administrative partner.
 7            Now, again, I'm going to have
 8    to break out the timeframe a little
 9    bit for you.
10            I believe in 2014, 2015 and
11    2016, in those years it was Mike
12    Shumaker who was administrative
13    partner, and for the two first years,
14    2014 and 2015, my understanding is
15    that he was consulting with Hugh
16    Whiting as well on these compensation
17    adjustments.
18            For 2017 and 2018, I was
19    involved in the compensation process,
20    so Mike Shumaker and I would review
21    the compensation recommendations by
22    the office.
23            Mike and Hugh, my
24    understanding is, they would discuss
25    the recommendations and come up with a
```



Page 40

```
 1                T. LOVITT, ESQ.
 2    uniform recommendation in theyyears
 3    they were doing it together, and the
 4    year Mike was doing it himself, he
 5    would, you know, obviously it was his
 6    own input.
 7                The years that Mike and I
 8    were doing it together for '17 and
 9    '18, we did it in the sense of we both
10    would get the office's recommendation
11    and we would independently without
12    talking to each other come up with our
13    own recommendations and then in some
14    years we would reconcile them so that
15    we would come up  -- I want to say in
16    -- yeah, it started in 2017 we would
17    give sort of a joint recommendation to
18    the managing partners.
19                So he would have his
20    determination, I'd have mine, we'd do
21    it blind from each other and then we
22    would show each other our
23    recommendations.
24                And where we had
25    discrepancies, we would meet and,
```



Page 41

```
 1                    T. LOVITT, ESQ.
 2    again, talk and talk through what we
 3    thought the recommendation should be.
 4              Those recommendations -- and
 5    I should say the materials that we
 6    relied on when we were looking at, you
 7    know, these recommendations would be
 8    we had the offices' compensation
 9    recommendations and we had the same
10    spreadsheet that the offices' did
11    which had the associate, their hours,
12    their rating, and their rankings,
13    their practice group, how many years
14    they've been at the firm -- all of
15    that within the spreadsheet.
16              And I want to say we had at
17    least two -- I think three years of
18    data, so you'd have the current
19    ratings, one year prior ratings and
20    then two years prior ratings,
21    rankings, hours.
22              We also had our knowledge
23    from the associate review committee
24    meetings. Mike would attend those. In
25    2014, 2015 and 2016 Mike and I both
```



Page 42

T. LOVITT, ESQ.

1    attended them, in 2017 and 2018 as

2    co-heads of the associate evaluation

3    process.

4            I also attended the 2016 --

5    Q.    Just a second. I think -- I

6    was a little bit confused. Are you

7    saying that you and Mike both attended

8    them --

9    A.    Yes.

10   Q.    -- at 2017 and 2018?

11   A.    Yeah, in 2017 and 2018. We

12   attended all of them, but for your

13   purposes, we attended the litigation

14   meeting.

15           In 2016, just to be clear, I

16   also attended the litigation

17   associates meeting in the capacity as

18   the Boston PIC, so it was a different

19   capacity but I was physically present

20   at that meeting.

21   Q.    The national meeting?

22   A.    The national meeting. The

23   national meeting.

24           Then Mike and I would -- we



Page 43

1                    T. LOVITT, ESQ.

2      were also -- I personally would also

3      rely on my notes from those meetings

4      along with my general recollection.

5                    I don't recall ever going

6      back and looking at an individual

7      evaluation as part of my compensation

8      recommendations.

9           Q.    Did you have access to the

10     assessment statement, you said?

11          A.    Yeah. I had access, but I

12     rarely -- didn't really need them

13     because at that point I've gone

14     through the review committee, I read

15     everything and I had notes.

16                   Then our recommendations,

17     mine and Mike's, would go to Steve

18     Brogan for his review and approval.

19                   Steve -- for all the years

20     that we're talking about -- in 2014,

21     2015, 2016, 2017 and 2018 -- Steve had

22     the spreadsheet which would show, you

23     know, the associate's name, their

24     practice, their office, their JD year

25     -- for the court reporter, that's J as



Page 44

1                  T. LOVITT, ESQ.

2      in Jones, D as in Day, JD year -- the

3      year they joined the firm, their

4      hours, their ratings, their rankings

5      for the current period and for the two

6      prior periods as well as the offices,

7      their current -- the previous year's

8      salary, the current -- the associate's

9      current salary, the office's

10     recommendation for compensation, my

11     recommendation for compensation and

12     the years where that's relevant, and

13     the administrative partners'

14     recommendations and then our joint

15     recommendation for 2017 and 2018.

16              Hang on. For the 2016

17     evaluation period  -- for the 2015

18     evaluation, in the 2016 calendar year

19     ████████████████████, and that was

20     the only year where he actually read

21     individual evaluations.

22              So he read the individual

23     evaluations for each associate in the

24     firm, is my understanding, ████████

25     ████████████████.



Page 45

1                    T. LOVITT, ESQ.

2                    Apart from that year, the

3    2016 calendar year, he did not look at

4    individual evaluations or the

5    assessment statements. He looked -- he

6    focused on the spreadsheet.

7        Q.    And did the spreadsheet

8    include -- when you say JD year, what

9    is JD year?

10       A.    That's the year -- so JD year

11   means in most cases the year you

12   graduated from law school.

13                   There are individual

14   instances where someone's year, you

15   know, their JD year is different from

16   the year in which they graduated from

17   law school because let's say they, you

18   know  -- intellectual property is a

19   great example.

20                   Someone might have been a

21   physicist for a few years before, you

22   know, maybe they went to law school,

23   they decided to be an engineer and

24   then turned to the practice of law.

25                   So it might be that you don't



Page 46

```
 1                T. LOVITT, ESQ.
 2    have the experience, you know, you
 3    haven't been practicing as a lawyer
 4    for the entire time since you
 5    graduated from law school.
 6                If something like that
 7    happened, you might say well, you
 8    graduated in 2010 but we're going to
 9    deem you a 2012 graduate to capture
10    the fact that you didn't practice for
11    all that time.
12                So JD year is basically the
13    firm's year that your seniority that
14    you've been deemed.
15                And, like I said, for your
16    case it correlates with the year you
17    graduated from law school.
18    Q.    Relevance is the year that
19    you've been deemed to be for purposes
20    of --
21    A.    It shows your seniority. So
22    if you're, you know, a 10th-year
23    associate, if you got -- if it's 2015
24    and you graduated in 2007, the
25    expectation is -- and your JD year is
```



Page 47

1                    T. LOVITT, ESQ.

2    2007, the expectation is that you're

3    going to be doing the work of an

4    eighth-year associate.

5              So as we talked about earlier

6    today, if you are an eighth-year

7    associate and you're doing the kind of

8    document review that a second-year

9    associate is doing, that's important

10   information not only for the

11   evaluation function but for the

12   compensation function because you're

13   not performing, you know, you're not

14   doing the work you're supposed to be

15   doing at your level of seniority.

16        Q.   And the JD year also matters

17   for partnership eligibility?

18        A.   Yes, it matters for

19   partnership eligibility as well. You

20   have to be at least 10 years out.

21              But more for an individual

22   circumstances, I can details for you

23   -- it's not part of the compensation

24   question, that's a separate answer I

25   can come back to, there are reasons



Page 48

1                    T. LOVITT, ESQ.

2    why you would have more than 10 years

3    of out from your JD year.

4        Q.    And did the spreadsheet list

5    sex and race?

6        A.    No.

7        Q.    Neither?

8        A.    No.

9        Q.    Does Jones Day know what my

10   race is?

11            MS. CHASE: I'm just going to

12   -- the question about whether Jones

13   Day knows what your race is is a

14   question she can answer in her

15   individual capacity.

16            THE WITNESS: I -- again, I

17   can't answer that for Jones Day. I

18   have read in your complaint -- I

19   believe it was in your complain an

20   allegation about your race, and I

21   believe the allegation was that you're

22   of mixed race.

23   BY MS. SHEKETOFF:

24       Q.    So just to remind me, I think

25   you said this earlier, the two



Page 49

```
 1                  T. LOVITT, ESQ.
 2   meetings to go over the evaluation,
 3   the D.C. one -- what do you call that
 4   one? The D.C. one with the local
 5   folks.
 6        A.    Yeah, I just call that --
 7   yeah, let's call that the D.C.
 8   meeting.
 9        Q.    D.C. meeting.
10        A.    And then we'll call the other
11   one the national meeting just so we
12   aren't confused.
13        Q.    Okay. And so for the D.C.
14   meeting, I think I also asked you this
15   before and I just can't remember what
16   you said, so I'm sorry, but who -- are
17   all partners in litigation invited to
18   the D.C. litigation meeting?
19        A.    My understanding is that it's
20   only leadership within the D.C.
21   meetings, not that it's not all
22   partners.
23        Q.    So is there any meeting where
24   all litigation partners are invited to
25   discuss evaluations?
```



Page 50

                    T. LOVITT, ESQ.

1

2      A.    All litigations in the

3 country -- no.

4      Q.    No, no. Well, for in the D.C.

5 office, is there any litigation

6 meeting, partner meeting, where, for

7 example, Yaakov Roth or ▆Partner A▆

8 would've been invited to discuss the

9 evaluations?

10     A.    They might have been invited

11 as part of that meeting, but, you

12 know, it's not that it's open to every

13 partner in D.C.

14          It's funny that you're saying

15 that. I can -- this is a fact that I

16 should drill down on and -- I think

17 you asked me this question before, I

18 put that on the list I need to find

19 out by speaking to someone at the D.C.

20 office.

21          But my recollection in

22 interviewing Adrian was that she said

23 that the leadership was invited.

24          So, for example, Beth would

25 be invited as the head of the issues



Page 51

1                    T. LOVITT, ESQ.

2    and appeals group, and if there's a

3    practice, let's say, labor and

4    employment where you don't have the

5    practice leader in the office, you

6    know, someone -- this is hypothetical

7    -- like someone like Alison Marshall

8    might be invited to give a labor and

9    employment view.

10            And then I think like the

11   national meeting they invite some

12   additional folks.

13            But my impressions speaking

14   to Adrian was that it's not cast wide

15   open to every partner in the D.C.

16   litigation practices.

17        Q.    Okay. Please do confirm that.

18   That would be helpful.

19        A.    I will, yeah.

20        Q.    Between 2014 -- actually, so

21   at the D.C. -- D.C. litigation

22   meeting, what materials did the people

23   who attended have access to?

24        A.    There's -- actually, we

25   produced this, and it would make it



```
 1                    T. LOVITT, ESQ.
 2    handy if we -- if I had that.
 3            It was -- there was a slide
 4    deck that was prepared for the
 5    meeting. And, again, we produced this
 6    for your years and -- I think we --
 7    didn't we produce like --
 8        Q.    I have not received a slide
 9    --  I have a PowerPoint presentation
10    by you, but otherwise I have no
11    slides.
12            MS. CHASE: No, Julia you have
13    it. You used it with other witnesses.
14    It is --
15            MS. SHEKETOFF: I'm sorry, I
16    know what you're talking about, yeah.
17            MS. CHASE: Evaluation
18    meeting, slides that I can't swear,
19    PowerPoint we're calling a slide deck,
20    but it has been produced. And I know
21    you used it with other witnesses in
22    other depositions.
23            MS. SHEKETOFF: Yeah, I'm
24    sorry. I think I did not understand
25    what you're referring to.
```



Page 53

```
 1                   T. LOVITT, ESQ.
 2              Okay. This will be
 3     Plaintiffs' Exhibit 83.
 4              (Whereupon, Evaluation
 5     Meetings was marked as Plaintiffs'
 6     Exhibit 83 for identification as of
 7     this date.)
 8     BY MS. SHEKETOFF:
 9       Q.   Can you please turn to
10     Plaintiffs' Exhibit 83, Bates stamped
11     JD3732 to 3749?
12       A.   Yes. This -- so this is,
13     again, there's multiple pages to this,
14     and in that meeting the participants
15     would have everything but that last
16     page that is entitled Meeting Notes.
17     Those were notes that were produced
18     after the meeting.
19              So they -- the meeting
20     participants would have this, and I
21     believe they'd also have the
22     individual evaluations.
23       Q.   Okay. And who prepared -- so
24     let's start, for example, with page 8,
25     Bates stamped JD3739.
```



Page 54

1              T. LOVITT, ESQ.

2              Who prepared that -- this?

3      A.     3739, so that would be -- I

4   think the, you know, the physical

5   preparation of this would have been by

6   Erica Valentine who's administrative

7   staff, but I think this was the

8   consent of it was under the direction

9   of Cari Ruttenberg.

10     Q.     Was Beth Heifetz involved in

11  putting this together?

12     A.     No.

13     Q.     And then please turn to page

14  -- well, actually we'll come back to

15  this.

16             You just wanted this to

17  refresh your recollection on what

18  materials were before --

19     A.     Exactly. So this Exhibit 83

20  would have been in that meeting for

21  the participants along with the

22  individual evaluations, and, again,

23  but for that page that says notes,

24  that page was produced to capture the

25  commentary during the meeting. So it



Page 55

1                    T. LOVITT, ESQ.

2    was created after the meeting.

3        Q.    Okay. And would they have

4    access to any draft assessment

5    statement?

6        A.    I don't think so. At that

7    point -- this is, you know, this

8    meeting is being done to help create

9    the assessment statement.

10            I can't say no in all

11   instances. What I can say is that Beth

12   did not recall whether or not she had

13   the assessment statements completed

14   before or after these meetings for

15   you.

16            So with respect to you, she

17   didn't think they were -- she didn't

18   think they were done by that point in

19   time, but she couldn't recall.

20       Q.    Okay. When --

21       A.    It wouldn't be something that

22   was like given out as a matter of

23   course.

24       Q.    Where --

25       A.    At the national meeting, the



Page 56

1                    T. LOVITT, ESQ.

2    whole point of them is to review the

3    drafts, so you would get the drafts.

4        Q.    Okay. And so -- so, for

5    example, this 2017 meeting on my 26

6    [sic] work, when did that occur?

7        A.    The exact date I don't know,

8    but it would've been prior to the

9    national meeting.

10            After the practices had

11   received -- you know how I went

12   through that whole process -- when all

13   the individual evaluations went to

14   practice leadership? In between that

15   period.

16            So, you know, ballpark it, I

17   can't say specifically, but just to

18   give a sense of how these things time

19   out, it would've been likely in, you

20   know, March or early April, that kind

21   of timeframe.

22       Q.    And that's about the same

23   time every year?

24       A.    Yeah.

25       Q.    Okay.



Page 57

1                    T. LOVITT, ESQ.

2       A.    This is -- like COVID was a

3   weird year, but you're not asking

4   about that year.

5       Q.    I mean, I'm just asking 2014

6   to 2018.

7       A.    Yes.

8       Q.    So the national meeting, when

9   does that happen?

10      A.    That happens afterward. And,

11  again, it varies because there's

12  always spring break, you know, at some

13  point in there, so we're always trying

14  to, you know, negotiate around spring

15  break.

16            But it's normally around

17  April, like mid to late April is my

18  recollection.

19      Q.    Okay. If you're able to

20  ascertain the dates of the D.C.

21  meeting for each of the years that I

22  -- 2014, 2015, 2016, 2017, 2018, that

23  would be helpful or I would like that.

24      A.    The D.C. and the national

25  meetings? Because I know that -- I



Page 58

```
 1                    T. LOVITT, ESQ.
 2    think the nationals would be probably
 3    easier.
 4       Q.    I think just the D.C. office
 5    meetings.
 6            MS. CHASE: And I'll just say,
 7    Julia, we can certainly look. I don't
 8    know that that's something we'll be
 9    able to get today, but we could try.
10            MS. SHEKETOFF: That's okay.
11    I mean -- if you -- I think we can all
12    agree that that's within the scope of
13    the witness' --
14            MS. CHASE: Yes. What I would
15    say is if it's not something we could
16    get quickly, I'm happy to put that in
17    a letter or some other way, if the
18    information is still available.
19            THE WITNESS: But I could help
20    sort of sequentially it happened --
21    the practices get the individual
22    evaluations, the D.C. meeting would
23    happen, then the national meeting
24    would happen, and the assessments
25    would be drafted for the national
```



Page 59

                    T. LOVITT, ESQ.

1
2    meeting. And it's really the national
3    meeting that is the big meeting.
4    BY MS. SHEKETOFF:
5         Q.    And is it fair to say that
6    the D.C. meeting is to sort of assist
7    sort in part, to assist the practice
8    leader to draft an accurate assessment
9    statement?
10        A.    I mean, it's meant to assist
11   both the office leadership and the
12   practice leadership in their -- I
13   think more in their ratings than
14   anything else.
15            It is the whole point of our
16   process, which we talked about this
17   morning, a big part of it is having
18   many eyes on the process to ensure
19   fairness and accuracy.
20            And so what the D.C. meeting
21   does is it gives the practice
22   leadership and office leadership
23   someone else's view, someone else has
24   read the cold file and can give you
25   their viewpoint.



Page 60

```
1              T. LOVITT, ESQ.

2              Now whether or not that

3    actually translates into a change or

4    into the assessment statement would

5    depend on each individual.

6              The national meeting is --

7    it's the same purpose, but it's, you

8    know, I've attended both recently

9    outside the timeframe you're talking

10   about.

11             The national meeting is much

12   more for lack of a -- it's the wrong

13   word, but it's going to get the point

14   across -- it's more combative in the

15   sense that you have an assessment

16   statement and the person whose drafted

17   it is forced to defend it, to defend,

18   you know, the negative feedback and

19   the positive feedback. Everything has

20   to have a factual basis.

21             And so it's sort of a

22   different -- you can think about it as

23   sort of a different -- slightly

24   different in their process.

25       Q.    Okay. And so -- am I correct
```



1              T. LOVITT, ESQ.

2    that you said that the proposed

3    ratings aren't done by the practice

4    leader until after the D.C. litigation

5    meeting?

6        A.    It depends. You know, some of

7    it could have, it's not required for

8    the D.C. meeting, and that I recall

9    doing hers afterwards.

10       Q.    Okay.

11       A.    They're also provisional

12   until they're final, right? I mean,

13   Beth might have a provisional, you

14   know, recommendation for her rating,

15   go through the national meeting and

16   having been sort for forced to defend

17   her ratings, you know, say you know

18   what, I was wrong. So the ratings are

19   not final until it's final.

20       Q.    Okay. Let's talk about my

21   work for calendar year 2015.

22       A.    Okay.

23       Q.    My -- what-- when had -- when

24   did Beth come up with my proposed

25   rating, was that before or after the



Page 62

1                    T. LOVITT, ESQ.

2    D.C. litigation meeting?

3        A.    I did not ask in that level

4    of detail, and based on what she told

5    me, she didn't have a recollection of

6    when she drafted even the assessment

7    statements whether before or after.

8              So, you know, she doesn't

9    have a recollection of even when she

10   drafted the assessment statements.

11             So I don't think she could

12   have a rating -- would have a

13   recollection of that, either.

14             But, again, I'm going to tell

15   you, the rating is not final until its

16   final. So she might have in her head

17   an idea of what the rating would be

18   that would change over time.

19             She doesn't determine her

20   final rating until she turns in the

21   slip of paper to Suzanne Coussons with

22   the rating written down that says this

23   is the rating, and that happens at the

24   end of April.

25       Q.    Okay. And then when she does



Page 63

```
 1              T. LOVITT, ESQ.
 2    that -- I'm sorry, is that before or
 3    after the national meeting?
 4        A.    After. It's always after the
 5    national meeting.
 6        Q.    And does she give a
 7    provisional rating before the national
 8    meeting?
 9        A.    Yes. That's a topic that's
10    part of the discussion for the
11    national meeting.
12        Q.    Did my rating ever change
13    between the provisional rating and the
14    final rating by the practice or the
15    office?
16        A.    My -- I have to refresh with
17    some documents. I think we have -- my
18    recollection is there's a document in
19    here were Beth had given you a
20    provisional -- and, again, I'd love to
21    see -- this is being based on having
22    read the document and having the
23    document would help -- that she
24    assigned you a provisional 3 and then
25    after the national meeting gave you a
```



Page 64

                    T. LOVITT, ESQ.

1
2    2. I can't remember which year that

3    was. That would help to have the

4    documents.

5       Q.    Okay. Do you want to go off

6    the record and take a look?

7            MS. CHASE: Well, do you have

8    the document?

9            THE WITNESS: I don't --

10           (Simultaneous speaking.)

11           THE WITNESS: Previous

12   deposition testimony so unless you got

13   it --

14           MS. SHEKETOFF: I don't

15   believe -- I'm not sure what document

16   you're talking about, so I don't have

17   that document.

18           MS. CHASE: If you would like,

19   I think we could go off the record and

20   we could probably find the document?

21           MS. SHEKETOFF: Yeah. Why

22   don't we keep going and let's put it

23   in that -- is that another thing that

24   you can look up during your next

25   break?



Page 65

1              T. LOVITT, ESQ.

2              MS. CHASE: We're going to try

3    to keep a list, so this was the

4    provisional rating change.

5              THE WITNESS: Yeah. And so the

6    document I have in mind is the draft

7    assessment statement that went to

8    Beth.

9              MS. CHASE: Yeah.

10             MS. SHEKETOFF: Yeah, I don't

11   think that was produced.

12             MS. CHASE: It was.

13             THE WITNESS: You might not

14   have known what it was but yeah.

15             MS. SHEKETOFF: Okay. So let's

16   keep going.

17   BY MS. SHEKETOFF:

18      Q.   So between 2014 and 2018,

19   what -- actually, I'm sorry,

20   withdrawn.

21             Let's go back to the D.C. --

22   sorry -- to the national meeting, and

23   apologies if you already said this as

24   well, but what are the materials that

25   they have access to?



Page 66

```
 1                    T. LOVITT, ESQ.
 2              And if you said that they
 3    have access to all the individual
 4    evaluations, the draft assessment
 5    statements, the draft ratings, is
 6    there anything else?
 7         A.    And draft rankings.
 8         Q.    And draft rankings. Is there
 9    anything else?
10         A.    For me personally in 20 -- in
11    the calendar year 2017, I -- it was my
12    first year co-heading that meeting,
13    and my recollection is that I read the
14    evaluations -- at least two years of
15    evaluations.
16              So I didn't just read the
17    current year, I read the prior years
18    as well to basically, you know, to
19    catch up in some sense my knowledge of
20    the associates.
21              And so -- I should also say
22    that when you have the draft
23    assessment statement, you also have
24    the assessment statements and ratings
25    and rankings from the two prior years.
```



```
 1              T. LOVITT, ESQ.

 2              So I think it's -- like as

 3    it's been produced in the litigation,

 4    you'll have assessment statement and

 5    then the years underneath it.

 6              So you have when you're in

 7    the room, you know, just to give a --

 8    just to be concrete -- when it's

 9    calendar 2017, the people in the

10    national meeting would have the draft

11    of the 2016 evaluation period

12    assessment statement and the final

13    from 2015 and 2014 as well as the

14    ratings and rankings from those --

15    from all of those years whether draft

16    or final and the hours.

17              So there's also a separate

18    column for your client billable hours,

19    your pro bono, public service. And

20    then if folks had to leave, it would

21    also be on there something showing

22    that there was like a leave or if

23    you're part time, and then you'd have

24    an annualization so that you'd know

25    like if someone was on leave for six
```



Page 68

1                    T. LOVITT, ESQ.

2    months, you'd have their actual hours

3    and you'd have their annualized hours

4    to account for the fact that they were

5    on leave.

6              THE WITNESS: Anderson, could

7    you turn me that water?

8    BY MS. SHEKETOFF:

9        Q.    Between 2014 and 2018, what

10   were the factors that affected an

11   associate's annual raise?

12       A.    I'm sorry, between 2014,

13   2015, what were the factors that what?

14       Q.    Had affected an associate's

15   annual raise.

16       A.    An associate's annual raise.

17   Well, it's pretty much the same every

18   year. So it's like probably give you

19   that for the entire time period.

20             I'm going to take a sip of

21   water because I could feel a cough

22   coming on.

23             So I'd say there were kind of

24   like two buckets of factors, right?

25             Bucket one of factors would



Page 69

1                    T. LOVITT, ESQ.
2     be what I would call market factors,
3     so it would be, you know, what is the
4     compensation in the market in which
5     the associate sits.
6                    And as we talked about
7     earlier, the market for compensation
8     in Columbus is not the same it's in
9     New York, so you have that also means
10    the compensation adjustments vary.
11                   You know, what would be a big
12    adjustment in Columbus may not big a
13    adjustment in New York. So you have
14    first the market factor.
15                   I would also put in the
16    market factor years that there is --
17    there are changes to compensation, we
18    talked about this earlier.
19                   In 2016 and in 2018 there
20    were actually market shifts in the
21    amount of compensation that was going
22    to associates, that would also impact
23    how much you would adjust for a --
24    sorry -- adjust compensation.
25                   I'd say a third market factor



Page 70

```
 1                  T. LOVITT, ESQ.
 2    is in demand -- in demand practices.
 3            I mean, we have an example of
 4    that last year when -- rated every
 5    private equity associate it could get
 6    its hands on, right?
 7            Suddenly the compensation
 8    that was being paid to private equity
 9    associates was dramatically different
10    from the compensation being given to
11    other kinds of associates in the
12    market itself, right?
13            And so in that kind of
14    instance as a market factor, so I'm
15    saying like not a merit-based factor
16    but a market factor, you have to take
17    into account someone's practice
18    groups.
19            You know, other examples of
20    that historically have been, you know,
21    we had there was a run in power outs
22    for several years, there was a huge
23    demand for oil and gas lawyers in
24    Houston in 2016.
25            So you look at that too, that
```



Page 71

1                    T. LOVITT, ESQ.

2    you have to factor in that market

3    demand as part of your compensation

4    adjustment.

5                    Then there was evaluative

6    functions factors, right? So things

7    that go to the merit of an associate,

8    and in that bucket I put the ratings,

9    the rankings, hours -- all of that

10   goes to sort of to performance.

11                   And then, of course, you have

12   the things that we were looking for as

13   part of our assessment which is

14   leadership, professional skills, and,

15   you know, merit, you know, your talent

16   level.

17                   You're looking for, you know,

18   respect for the firm's culture and

19   individual -- and its value. You're

20   looking at, you know, courtesy, that's

21   how much -- how well you collaborate

22   and work in a team.

23                   All of these are sort of the

24   are you performing well kind of

25   factors, and that all is -- that's a



Page 72

1              T. LOVITT, ESQ.

2    big bucket.

3              And for some associates, you

4    know, some don't matter at all and

5    some matter a lot. If you're in New

6    York, you know, you look at the New

7    York market, it's pretty easy. But

8    that's a debate -- it's a big variable

9    -- it's a big pot of factors.

10    Q.    What do you mean by when you

11   say you look at the New York market,

12   it's pretty easy?

13    A.    Well, I just think New York

14   is easy because like, Cravath

15   publishes, right? So you have -- it's

16   really easy whereas you get to a place

17   like Columbus, it's kind of harder to

18   figure out what market is for Columbus

19   just because you don't have as many

20   firms and you don't have as much

21   information. That was all I was trying

22   to suggest.

23    Q.    Is D.C. in the same market as

24   New York?

25    A.    Well, that's changed over



Page 73

           1                    T. LOVITT, ESQ.
  2    time.
  3         Q.    Between 2014 and 2018?
  4         A.    I think it's changed between
  5    2014 -- in the early years Boston,
  6    D.C., L.A., Chicago were at a slight
  7    discount to New York.
  8                    And I think what was --
  9    sorry, go ahead.
 10         Q.    Just the video came out a
 11    little, now it's back in. Go ahead.
 12         A.    Okay, that was probably me
 13    moving around.
 14                    And what you see, actually,
 15    over time, probably more to 2019, is
 16    there's a nationalization that's
 17    happening in those markets where you
 18    have, you know, more and more
 19    competition from national firms.
 20                    I'd say probably by at least
 21    2019 those markets were very close.
 22    And where you see the differences is
 23    the markets are pretty much the same
 24    for base compensation, right?
 25                    So if you're to look at -- we



```
 1                 T. LOVITT, ESQ.
 2     don't -- Jones Day doesn't do base and
 3     bonus, but if you were to look at a
 4     market in D.C., so the base-level
 5     compensation for most associates is
 6     basically the same.
 7               Where you see the variability
 8     is in the bonus amount, right? That
 9     D.C. was pretty -- was took a few
10     years to get to the full bonuses of
11     New York whereas sort of in New York
12     there are a lot of lockstep firms in
13     New York that you get -- you get the
14     full bonus as long as you're
15     breathing, right?
16               That's not has been the case
17     in D.C. that there's more of a
18     merit-based component, fewer
19     associates get the full bonus amount.
20               So when I'm talking about
21     discount of New York, it's -- it was
22     harder to get the full bonus if you
23     were living in D.C. as an associate
24     than it would be in New York.
25               So generally the -- would
```



Page 75

1                    T. LOVITT, ESQ.

2    take the median of compensation for

3    all associates in D.C., it will be

4    lower than the median in New York

5    during that time period.

6              As I testified, over time

7    that median shifted up. And really --

8    I mean, if you are really interested

9    in this stuff, it really accelerated

10   during COVID because at that point

11   when remote work kicked in in 2021,

12   you know, a lot of people it didn't --

13   for several years didn't matter where

14   you worked.

15             And you really started to see

16   all of these markets kind of get

17   closer together including the Columbus

18   and the Cleveland, but that's outside

19   of the period. It's just if you're

20   interested, that's outside the period.

21     Q.    Thank you. Did an evaluation

22   -- or did anything else matter to

23   compensation?

24     A.    That's the big bucket. I

25   could break, you know, we could break



Page 76

1                    T. LOVITT, ESQ.

2    it down further, but I think that's

3    the big bucket.

4        Q.    Do evaluations matter?

5        A.    I mean, only in the -- not

6    really. You're not looking at the --

7    because here's why: We go through -- I

8    think I took 15 minutes explaining the

9    evaluation process to you.

10            And the point of the process

11   is before you get to compensation,

12   there's been massive vetting of each

13   and every individual evaluation to

14   produce an assessment to date.

15            And what governs, you know,

16   after -- at the end of that process is

17   the assessment statements.

18            Individual evaluations are a

19   single partner's view of your

20   performance on a single assignment.

21   The assessment statement is the firm's

22   assessment of your performance for

23   that calendar year.

24            So when you're talking about

25   compensation, the thing that matters



Page 77

```
 1                    T. LOVITT, ESQ.

 2    the most as between the individual

 3    evaluation and the assessment

 4    statement is the assessment statement.

 5            Because all of that vetting

 6    that's gone on before to sort of, you

 7    know, to figure out what part of the

 8    evaluation is relevant to the

 9    assessment.

10            So is it, you know, does it

11    have zero, you know -- because it's

12    part of the vetting process, it could

13    but no.

14            You're looking at the

15    assessment statement and you're really

16    looking at that point the ratings, the

17    rankings, the hours and your personal

18    knowledge after going through this

19    review committee.

20            And when I say you, I'm

21    talking about me and Mike. Like we got

22    a lot of data at that point.

23    Q.    So are you saying that

24    evaluations are irrelevant to the

25    salary that someone ultimately gets?
```



Page 78

```
 1                    T. LOVITT, ESQ.
 2        A.    I'd say they are never
 3   talismanic, like the evaluations would
 4   matter only to the extent that they
 5   had surfaced in the assessment
 6   statement.
 7             But at that point there's
 8   been -- we had so much vetting of the
 9   individual. You're asking on a global
10   scale, right, about everybody.
11             Like you're not going to go
12   back and read every individual
13   evaluation over again when you're
14   making a compensation decision when
15   you've had this massive vetting
16   process and you have an assessment
17   statement.
18             And by that time the
19   assessment statement is vetted to
20   ratings and ranking, and so it's, you
21   know, you're weighing, you're looking
22   more at the ratings, the ranking, the
23   hours and the assessment statements.
24             And I should also add that,
25   you know, to the branch with respect
```



Page 79

1                    T. LOVITT, ESQ.

2    to you, the managing partner but for

3    calender year 2016 for the 2015 review

4    period had none of your individual

5    evaluations. They didn't impact your

6    compensation at all but for that one

7    year.

8                    And Steve has testified, and

9    I could grab it, that he actually

10   decided to disregard Hash's individual

11   evaluation which is the negative

12   evaluation.

13                   So to take it from the

14   general to the specific for you, no,

15   the individual evaluations didn't

16   matter for your comp.

17      Q.    So is it your testimony that

18   individual evaluations don't have any

19   effect on the assessment statement?

20      A.    That's not what I'm saying.

21   What I'm saying is they're never --

22   it's never the case they're

23   talismanic.

24      Q.    Well, I'm not asking --

25      A.    Because, I mean, you got to



Page 80

1                    T. LOVITT, ESQ.
2    break this down. You're asking this --
3    you're treating this as a process way
4    too simplistically.
5                    I mean, because you haven't
6    asked what do you do with the
7    individual evaluations, how do they
8    weigh into the assessment.
9                    Well, let me tell you, you
10   don't look at an individual evaluation
11   -- and these aren't consensus
12   statements, they're assessment
13   statements.
14                   You don't take bits and
15   phrases from individual evaluations
16   and copy and paste them into an
17   assessment statement.
18                   There's a vetting process
19   that happens, and part of that vetting
20   process and how things go from the end
21   of July to the assessment statement is
22   you're looking for themes, right?
23                   You're looking for -- you
24   have a lot of evaluators, you have
25   different projects and different



Page 81

1                    T. LOVITT, ESQ.

2     levels of difficulties. How do you

3     weigh through all that?

4              And what you do is you go

5     through the stack of evaluations and

6     find commonality, right? And then the

7     commonality -- then you have from

8     three or four evaluators saying the

9     same thing, you're like okay, I got

10    it, this is the theme that needs to go

11    into the assessment statement.

12             So to the extent that you

13    have an aggregate of individual

14    evaluations that are going towards the

15    same theme, that drives into the

16    assessment statement.

17             But this notion that one

18    partner could have one individual

19    evaluation and it would impact like

20    compensation, that's not how it works.

21    That's not how an evaluation process

22    works. It's not how an assessment

23    works.

24       Q.    Is an evaluation -- are

25    evaluations relevant or do they have



Page 82

```
 1                  T. LOVITT, ESQ.
 2    any effect on ratings?
 3         A.    I mean, again, this is you're
 4    looking at this too -- I can't answer
 5    this as simplistically as it's been
 6    posed.
 7              You -- to the extent that
 8    through the aggregate of a bunch of
 9    individual evaluations, you have
10    theme. The theme would be impacting
11    the assessment.
12              I happen to still have my
13    binder open to this Tab 83 and a great
14    example of this, this notion of how an
15    individual evaluation feeds into the
16    thematic.
17              I send you to Tab --
18    Exhibit 83, page -- let me get it here
19    -- page 10. So it's JD0003741.
20              And I'm giving you this as an
21    example of how an evaluation works
22    which is this -- what this slide is
23    doing is saying there's a pile of
24    evaluations, if you're reading that
25    pile, you see theme.
```



Page 83

```
 1                    T. LOVITT, ESQ.
 2             It's not a single individual
 3    evaluation impacting this theme. It's
 4    that you can discern -- when you see
 5    the same thing crossing against a
 6    bunch of different evaluators -- and
 7    by bunch I mean two or three -- if you
 8    see the same theme, you know that you
 9    can kind of control for the
10    individuality of the evaluator, you
11    can control for the project.
12             Now you're talking about the
13    associate because this is something
14    that's common that's running across
15    each individual evaluation.
16             So it's not the individual
17    evaluation feeds into, you know, this
18    big picture of the associate, and you
19    also have and in the case of you, like
20    you have personal knowledge.
21             I mean, Beth -- Beth had not
22    only had the individual evaluations,
23    but she talked to you, she knew you.
24    So she could also look at this, the
25    assessment statement, through the lens
```



Page 84

1               T. LOVITT, ESQ.

2    of not only individual evaluations but

3    personal knowledge and say yeah, the

4    themes that I see running through

5    these evaluations are consistent with

6    what I know about Julia.

7               So you can't oversimplify

8    this process, I'm not going to let you

9    do this. This is a process that starts

10   in January and it ends at the end of

11   May.

12              And the work we do is so

13   tremendous and the amount of effort

14   that we put in trying to understand an

15   associate, it's not about taking a

16   single evaluation and making it this

17   talismanic thing, it's being a whole

18   holistic picture of an associate.

19              It's by far the best

20   evaluation process I know of, and I

21   know that because I've actually

22   interviewed lateral partners about the

23   evaluation processes of other firms

24   and nothing comes as close to getting

25   as good, as fair and as accurate a



Page 85

1                T. LOVITT, ESQ.

2    picture of associates as the process

3    we do at Jones Day.

4       Q.   So is your testimony that if

5    Partner A's review had been glowingly

6    positive or entirely positive that

7    would've had absolutely no effect on

8    my rating, my ranking, my assessment

9    statement or any individual's

10   recommendation as to how much my

11   salary should be increased?

12      A.   My recollection is that

13   Partner A's evaluation was consistent

14   with other evaluations.

15          If it had been glowing, you

16   would still have other evaluations

17   pointing to a problem.

18          And the other thing that you

19   have to get, I was part of the 2017

20   meeting. I could tell you as a

21   30(b)(6), it wasn't just Partner A.

22          You had two years of these

23   themes running through your

24   evaluations, so you could've -- Partner A

25   could've been hit by a bus and never



Page 86

1                    T. LOVITT, ESQ.

2     put in that individual evaluation, you

3     had the themes that come through your

4     assessment statements all over your

5     evaluations for the 2015 review period

6     and the 2016 review period.

7                    And I don't think you heard

8     me earlier, when I was in that 2017

9     meeting, I advocated for your -- for

10    you being told to leave the firm

11    because to me these themes were so

12    omnipresent and so clear, there was no

13    way you were going to succeed at this

14    law firm.

15                   You were not interested in

16    being a private practicing attorney.

17    That's not Partner A. That is based on

18    your performance at the firm.

19    Q.    Was your recommendation

20    embraced by the firm?

21    A.    No, it wasn't.

22    Q.    Why not?

23    A.    Because the practice leader

24    -- the first time I made that

25    recommendation which was when I was in



Page 87

```
 1                T. LOVITT, ESQ.
 2     the evaluation meeting, I want to say
 3     that was -- calendar 2016, the
 4     practice leader's view was that it was
 5     still too early in your career and
 6     that she wanted to motivate you.
 7                And so she did not embrace
 8     that but did put, I think, some
 9     warning language in your assessment
10     statement.
11                The second year, which was
12     calendar year 2017, I strenuously
13     argued for you being counseled out of
14     the firm, and Beth's reply to me was
15     she doesn't want to practice law,
16     she's going to leave so there's no
17     reason for us to put this in her
18     assessment statement, this problem is
19     going to solve itself and I don't want
20     to, you know, upset feelings and
21     potentially her betraying by telling
22     Julia to leave.
23                But we agreed that you needed
24     a very strong, stern warning. And that
25     warning was included in your
```



Page 88

```
 1              T. LOVITT, ESQ.
 2    assessment statement. That's the final
 3    sentence in your assessment statement.
 4       Q.    And so is it your testimony
 5    that if Partner A's review had been
 6    entirely positive, that would've had
 7    no effect whatsoever on my assessment
 8    statement, on my rating, on my ranking
 9    on anyone's recommendation that my
10    salary and then on my final salary?
11       A.    I'm --
12              MS. CHASE: Objection to the
13    form.
14              THE WITNESS: Too compound.
15              MS. CHASE: Yeah, let me make
16    the objection.
17              It is a multi compound. I
18    think that was seven questions. If
19    you'd like to break those questions
20    down, I believe the witness can
21    answer.
22              But no human can answer seven
23    question at once particularly in a
24    capacity as a 30(b)(6) but also in an
25    individual capacity.
```



Page 89

```
 1                  T. LOVITT, ESQ.
 2   BY MS. SHEKETOFF:
 3       Q.    Is it your testimony that
 4   Partner A 's -- if Partner A 's review had
 5   been entirely positive about me that
 6   that would not have affected my
 7   assessment statement?
 8       A.    I have to go back and read
 9   your assessment statement to see if
10   there is -- if there's any reference
11   to Partner A  in there at all.
12            So if you want to put the
13   assessment statement in front of me, I
14   could probably answer that question.
15            I think the more relevant
16   question for you is your compensation,
17   and it would've not have impacted your
18   compensation because there are
19   multiple reviews that are reflective
20   of your underlying problem, Julia, is
21   that you weren't interested in the
22   private practice of law.
23            You had an idiosyncratic
24   interest in doing pro bono work, and
25   when you're not interested in doing
```



Page 90

```
 1                 T. LOVITT, ESQ.
 2    the private practice of law, it
 3    screams out because the associates
 4    here want to be here, they want to
 5    practice law.
 6                 You were disinterested in it,
 7    and it showed in your work product and
 8    in your attendance at the office, and
 9    it shows into your evaluations.
10                 And it's that fundamental
11    disinterest in practicing law that
12    impacted your compensation. You don't
13    want to be here, fine. We're not going
14    to pay you a bunch either. That's the
15    fundamental point.
16                 So it's -- and, again, I
17    think I said this before, but I'll say
18    it again, the managing partner made
19    the final determination of your
20    compensation and he never read
21    Partner A's evaluation in making that
22    determine.
23                 He read it afterwards, and I
24    think that was his testimony when he
25    told you when he read it. So he
```



Page 91

1                 T. LOVITT, ESQ.

2    answered that question already.

3        Q.    And just to clarify, it's

4    your testimony that my salary would

5    not have been even a dollar different

6    had Partner A's review of me been

7    entirely positive?

8        A.    Correct. Because the managing

9    partner didn't have it in front of him

10   and he set your compensation. I got

11   the deposition testimony, I've got --

12   like we can read it.

13           He said that he wanted to

14   encourage you and to incentivize you

15   in 2016 and that's why he gave you the

16   bump. In 2017 he saw your hours, he

17   saw your two ratings and he goes she

18   doesn't want to be here, I get it.

19           He had no clue about Partner A's

20   evaluation. That's already testimony

21   that's in the record.

22           And I can tell you personally

23   that I read this file and the only

24   thing I saw in this file is an

25   associate who didn't want to be here



Page  92

1              T. LOVITT, ESQ.

2    regardless of Partner A's evaluation.

3              You're putting away too much

4    weight on a single evaluation when

5    your performance for two consistent

6    years was problematic.

7         Q.    And is it your testimony that

8    my -- that if Partner A's recommendation

9    had been entirely positive, it would

10   not have affected my rating at all?

11        A.    It would not have affected

12   your rating. Beth -- in my interview

13   with Beth, she said that she focused

14   on the positive aspects of Partner A's

15   evaluation.

16             She focused on the fact that

17   she said that you did a good job. That

18   was what drove -- that's the impact

19   his evaluation had on her rating.

20        Q.    Okay. And is it --

21        A.    So I don't know how many

22   times I can answer this question

23   again. I'm happy to.

24        Q.    Is it your testimony that if

25   Partner A's review of me had been



Page 93

1              T. LOVITT, ESQ.
2    entirely positive, it would've had no
3    effect whatsoever on my ranking?
4        A.    Correct. For the reasons I
5    just articulated.
6        Q.    And is it is your testimony
7    that it would've had no effect on my
8    office rating or ranking?
9        A.    My recollection of the office
10   is Kevyn and Adrian saying that they
11   also had personal knowledge of you,
12   that they had their ear to the ground
13   on performance and that their
14   impression of you was that you were
15   trending in entirely the wrong
16   direction, that you didn't want to be
17   at the firm.
18              So, you know, again, this is
19   a vibe you're giving off, not Partner A,
20   but you yourself are creating, and
21   that is getting through to the
22   practice leadership and the office
23   leadership.
24              And the reality is, Julia,
25   you didn't want to be there. You



Page 94

1                    T. LOVITT, ESQ.
2   didn't want to practice in private
3   practice. You wanted to do what you're
4   doing now, and that's fine, but you
5   can't fought your evaluators for
6   picking up your basic disinterest in
7   your job.
8       Q.    Does it matter to an
9   associate's annual raise that the
10  associate is an INA?
11      A.    Annual raise -- no. I mean,
12  it impacts the bonus, the SCOTUS
13  bonus, so that's not even really INA,
14  that's more supreme court practice.
15          We have have a special bonus
16  for the people who clerk on the
17  supreme court. But the annual raise,
18  no. Once you're in the door, you got
19  to prove yourself.
20      Q.    And does it matter to the
21  annual raise whether the associate is
22  a former supreme court clerk?
23      A.    No. Again, same answer, once
24  you're in the door here, you got to
25  prove your medal.



Page 95

                    T. LOVITT, ESQ.

1

2       Q.    And does the PIC, the partner

3   in charge's, recommendation of salary

4   matter?

5       A.    I mean, it's -- I've

6   explained the process to you. Mike and

7   I look at it. Sometimes we agree,

8   sometimes we disagree, and we report

9   our recommendations to the managing

10  partner.

11            The managing partner looks at

12  all of of those recommendations, and

13  he makes the determination.

14      Q.    Okay.

15      A.    So is he part of the

16  information that's received, yes.

17      Q.    And so does Mike Shumaker's

18  recommendation matter?

19      A.    I mean, I'm going to give you

20  the same answer.

21            So the managing partner --

22  and we're talking generally -- you're

23  asking me for 2014 to 2018 for all

24  associates in th world at this point,

25  and so, you know, you're not asking



Page 96

```
 1              T. LOVITT, ESQ.
 2   about you.
 3              And the managing partner has
 4   in front of him the spreadsheet that
 5   has the offices' recommendation, Mike
 6   Shumaker's recommendation and for 2017
 7   and 2018 my recommendation.
 8              He looks at all of them. He
 9   may disagree with all of them. He
10   might disagree with Mike and me and go
11   to the office. It depends on each
12   individual circumstance and each
13   individual attorney.
14              And I can't say that it
15   matters in all instances and I can't
16   say that it never matters because,
17   again, it's a person-by-person inquiry
18   and it's information he has in front
19   of him.
20       Q.    And he has in front of him or
21   does it matter in general what your
22   recommendation is?
23       A.    I'll give you the exact same
24   answer. For the calendar years --
25   obviously I didn't have a
```



Page 97

```
 1                T. LOVITT, ESQ.
 2    recommendation in 2014, 2015 or 206 as
 3    to your compensation.
 4                I had a recommendation in
 5    2017 and 2018. That was information
 6    that was before the managing partner.
 7    And to the extent he considered for
 8    any individual associate, he
 9    considered it. Again, it's case by
10    case, but its information he has.
11       Q.   And if you and Mike Shumaker
12    made different recommendations, how
13    would you determine your final
14    recommendation?
15       A.    We would talk. So I think I
16    testified to this earlier. We would
17    separately and blindly from each other
18    come up with our compensation
19    recommendations, and when we were both
20    finished, then we would exchange.
21                And at that point -- and I
22    think technically what would happen is
23    we send our recommendations to Suzanne
24    Coussons and Suzanne would make a
25    spreadsheet like and then we could go
```



Page 98

1              T. LOVITT, ESQ.

2     through and see where we were

3     different.

4              And if it was something like,

5     you know, couple thousand dollars,

6     then I'd think we were sort of like

7     highest wins unless there's some

8     specific reason why it shouldn't.

9              But if it was something more

10    significant, we would actually talk

11    through each and every one and we'd

12    come up with, you know, sometimes --

13    it would vary.

14             Like sometimes Mike would

15    say, Traci, I think you forgot this,

16    and that influenced my compensation.

17    I go, gosh, you're right. You know,

18    there's a lot of associates. And

19    sometimes it would be the other way

20    around. And sometimes we'd just meet

21    in the middle.

22       Q.    Okay. Did -- did Beth Heifetz

23    determine all practice ratings between

24    2014 and 2018?

25       A.    Yes.



Page 99

1                    T. LOVITT, ESQ.

2        Q.    And she also did the final

3   practice rating, correct?

4        A.    Right. I want to --

5              MS. CHASE: Let's just

6   clarify.

7              THE WITNESS: Yeah, exactly. I

8   thought when you said for issues and

9   appeals, I thought you meant final. I

10  don't understand the distinctions

11  between those two questions.

12  BY MS. SHEKETOFF:

13       Q.    Well, you had testified

14  earlier there were provisional ratings

15  that go to the national meeting and

16  then final ratings; is that correct?

17       A.    Yes. Those were hers. My

18  recollection from reviewing the

19  production is that she had the

20  assessment statements initially

21  drafted by Lou Fisher and or Mike

22  Fried and in some instances Lou Fisher

23  and or Mike Fried might make

24  suggestions to her. But ultimately the

25  ratings were Beth. She owned them.



Page 100

1             T. LOVITT, ESQ.

2     Q.    And what factors mattered for

3  -- well, withdrawn.

4          For practice rating, would

5  evaluations -- I think we talked about

6  -- evaluations in general matter to

7  practice ratings; is that correct?

8          MS. CHASE: She can answer,

9  but, we can -- I mean, we spent about

10  20 minutes on this topic. You really

11  want the same answer again?

12          THE WITNESS: It's a long

13  answer, and I'm going to give it again

14  if you want it again.

15  BY MS. SHEKETOFF:

16     Q.    Well, I understand that --

17  okay.

18          I mean,  I guess I'm asking

19  for Beth Heifetz for her practice

20  ratings, did evaluations matter to her

21  practice rating?

22     A.    In the exact same way that

23  they would matter to any person acting

24  in the evaluation process which is

25  that you don't -- no single evaluation



Page 101

1                    T. LOVITT, ESQ.

2      is talismanic.

3                    What you're looking for are

4      themes that are running -- and I in my

5      -- I should make clear that in my

6      conversation with Beth as part of the

7      interviews in this 30(b)(6), she said

8      that she's looking for common themes.

9                    She's going through

10     evaluations trying to see, you know,

11     if you control for projects, you

12     control for evaluator, what's the

13     commonality.

14                   And that's what she was

15     looking for, a commonality and common

16     themes.

17                   She also had with respect to

18     you, personal knowledge. She

19     interacted with you on a regular

20     basis, and so her -- the evaluations

21     she could also vet through her own

22     personal knowledge.

23                   So all of those things

24     matter, not one talismanically.

25          Q.    Did the assessment statement



Page 102

1                T. LOVITT, ESQ.

2    matter in determining -- to Beth in

3    determining her practice rating?

4        A.    I mean, you have to think

5    about it. Those things were done --

6    she's creating the assessment

7    statement and the rating, right?

8             So I don't think you can

9    hermetically seal one from the other.

10       Q.    And did recruiting efforts

11   matter to Beth in determining practice

12   rating?

13       A.    I didn't ask her that

14   specific question. I could ask her

15   that specific question, and I can tell

16   you like as an office leader,

17   sometimes it would impact the rating,

18   shape my rating a little bit if

19   someone was a good corporate citizen.

20            But, again, the point of te

21   rating is not to, you know, reward

22   someone for recruiting efforts.

23            The point of the rating is to

24   assess someone's performance, and so

25   you're really looking at if someone is



Page 103

1                   T. LOVITT, ESQ.

2    a poor performer, you're not going to

3    rate them highly just because they're

4    a good recruiter. Maybe you give them,

5    you know, recommend a higher

6    compensation bump or something like

7    that, but you're not -- it's not

8    performance.

9        Q.    Okay. And did anyone in

10   Mark's class year make more than me in

11   2018?

12       A.    I can't do this without a

13   spreadsheet.

14           MS. CHASE: Yeah. Julian,

15   that's not an answer that any 30(b)(6)

16   could answer.

17           You've been produced

18   documents that demonstrate information

19   -- the relevant information, and we

20   commend you to those document.

21           If you'd like to have that

22   answer, you should give us those

23   documents.

24   BY MS. SHEKETOFF:

25       Q.    Why did you pay me more than



Page 104

```
 1              T. LOVITT, ESQ.

 2   Mark?

 3          MS. CHASE: By you, you mean

 4   the firm?

 5          MS. SHEKETOFF: That's

 6   correct.

 7          MS. CHASE: So, again, the

 8   30(b)(6) topic was with respect to the

 9   evaluation process generally and with

10   respect to you specifically.

11          It did not in any way address

12   Mark, and so there's no part of the

13   prep process that involved a

14   comparative assessment of Mark's comp

15   to your comp.

16          It's possible the witness

17   might know in her individual capacity,

18   but she certainly doesn't know as a

19   30(b)(6) how your comp compared to

20   Mark's.

21          MS. SHEKETOFF: Just a second.

22          (Whereupon, an off-the-record

23   discussion was held.)

24   BY MS. SHEKETOFF:

25      Q.   You can answer the question
```



Page 105

```
 1                T. LOVITT, ESQ.
 2   in your individual capacity.
 3       A.    I have no clue.
 4       Q.    And who -- did you say Kevyn
 5   Orr and Adrian Wager-Zito determined
 6   office ratings in D.C.?
 7       A.    But ultimately it was Kevyn.
 8   Kevyn had final authority, but he
 9   consulted with Adrian, yes.
10       Q.    And do evaluations matter to
11   office ratings?
12       A.    Do -- I'm sorry, would you
13   mind repeating that question?
14       Q.    Do evaluations have any --
15   are they a factor in what someone's
16   office rating is?
17       A.    I mean, the office ratings
18   are looking at the same, you know --
19   Kevyn and Adrian are looking at the
20   same thing. They're looking at common
21   themes, so a single negative remark in
22   a single evaluation is not going to be
23   talismanic.
24             What they're looking at is
25   how -- what the basic theme is coming
```



Page 106

1              T. LOVITT, ESQ.

2    from all the evaluations, and, again,

3    they have personal knowledge. They

4    actually have their ear to the ground

5    on how the associates are doing in

6    D.C., and they are looking at all of

7    that in determining the ratings and

8    the ranking.

9              They're also -- I believe

10   Kevyn said he's also looking at, you

11   know, year-over-year changes.

12             So if you had something that

13   you were trying -- you had been, you

14   know, told to fix or that, you know,

15   you had a challenge, you got some

16   constructive feedback in one

17   assessment statement, he'd want to see

18   improvement on that point in the next

19   year.

20             So he's also doing a little

21   bit of a backwards look as to is there

22   development, is the associate actually

23   responding to feedback that we're

24   giving them.

25        Q.   Okay. And Kevyn -- was Kevyn



Page 107

```
 1                   T. LOVITT, ESQ.
 2     also responsible for determining
 3     office rankings?
 4          A.    Yes.
 5          Q.    And the same, he reached
 6     those rankings through the same
 7     process we discussed already?
 8          A.    Yes. You have to -- you do
 9     have to keep in mind, rankings are
10     necessarily comparative, right?
11               So whereas the rating, you're
12     aren't going to, you know, it's just
13     not like you can say well, you only
14     have five 5s to give out, you know.
15     It's not on a curve, right?
16               Rankings, it's the same
17     factors, but it's necessarily more
18     comparative than a rating might be.
19               So I, you know, I think some
20     people have described it as -- people
21     in the process -- look at it as a
22     rating is talking about your
23     performance for the year, the ranking
24     is sort of talking about how you're
25     doing overall.
```



1              T. LOVITT, ESQ.

2              You know, you could have one

3    bad year and still be highly ranked if

4    you're, you know, your trajectory

5    overall, you know, is very positive.

6         Q.    Can someone who is ranked

7    above someone else have a better

8    trajectory then?

9         A.    Relatively speaking.

10        Q.    And do ratings affect

11   ranking?

12        A.    They're one part of it.

13   Again, they're measuring different

14   things.

15             Like I said, a rating is

16   looking at your performance for one

17   year. You know, the ranking is really

18   talking about, you know, your overall

19   trajectory.

20             And, you know, in my

21   interview with Kevyn, he mentions the

22   fact that in his view your trajectory

23   was down. That even though you had

24   been getting 3s consistently from your

25   rating for the office, as you got more



Page 109

```
 1                 T. LOVITT, ESQ.
 2    senior, you needed to move out of
 3    those 3s to be on a positive
 4    trajectory.
 5              So giving you a 3 in 2018 to
 6    him was a negative trajectory. So even
 7    through the ratings stayed the same,
 8    because you were more senior and you
 9    were still in his view only doing
10    adequate work, your trajectory was
11    going down.
12        Q.   And in 2015, why did the firm
13    raise my salary to $360,000?
14        A.   I can't recall. That was -- I
15    believe Mike Shumaker's testimony on
16    this was that he was trying to keep it
17    to the market.
18        Q.   And is there any other
19    reason?
20        A.   That's my recollection of
21    Mike Shumaker's testimony.
22              Again, I had to rely on Mike
23    for years I wasn't involved in the
24    process.
25        Q.   And why did the firm raise --
```



1            T. LOVITT, ESQ.

2    withdrawn.

3            Do you have any testimony

4    beyond what Steven Brogan testified to

5    about why the firm raised my salary to

6    $425,000 for 2016?

7        A.   No, not beyond the testimony

8    Steve Brogan.

9        Q.   Does Hasham Mooppan have

10   a --

11       A.   Hang on, let me just -- I'm

12   sorry, just let me think about that

13   before I go too fast.

14           No, it would be the

15   deposition testimony of Steve Brogan.

16       Q.   In other words, you don't --

17   you did not do further research

18   besides consult deposition testimony

19   of Steven Brogan on this?

20       A.   I consulted the deposition

21   testimony of Mike Shumaker and the

22   deposition testimony of Steve Brogan.

23       Q.   Have you heard or does Hash

24   Mooppan have a reputation for giving

25   associates harsh reviews?



Page 111

1                T. LOVITT, ESQ.

2      A.    No, not to my knowledge.

3      Q.    Have you heard --

4      A.    I wasn't finished. And, you

5    know, I now work as the practice

6    leader -- I am now the practice leader

7    in issues and appeals, and I can

8    testify that I think he gives some of

9    the best reviews in the practice

10   because his reviews are candid and

11   they're honest. And that's what you

12   want from an evaluator.

13              COURT REPORTER: Can you just

14   spell that name?

15              THE WITNESS: Hash -- H as in

16   Harry - a as in Adam - s, Sam - h,

17   Harry is the first name. His full name

18   is Hasham and we all call him Hash.

19   And Mooppan is his last name -- M as

20   in Mike - o, Oscar - o, Oscar - one p

21   or two, I think two p's -a-n.

22   BY MS. SHEKETOFF:

23      Q.    So does he have a reputation

24   for giving harsh reviews?

25      A.    No. He has a reputation for



Page 112

1                    T. LOVITT, ESQ.

2      giving candid reviews. It may sound

3      harsh because you don't want to hear

4      them, but they're candid, they're

5      fair, they're accurate.

6          Q.    Have you heard the term

7      getting Hashed?

8          A.    Never.

9          Q.    Has Hash given negative

10     reviews to people who are subsequently

11     promoted to partner at Jones Day?

12              MS. CHASE: Then I will say

13     that this question is outside the

14     capacity for a 30(b)(6). She can

15     answer it to the extent she can, if

16     she knows in her individual capacity.

17              THE WITNESS: I'm trying to

18     think of others -- I mean, my

19     individual capacity on this would be

20     as a member of the partnership

21     committee. So it would be looking at

22     2018, 2019, 2020, 2021.

23              For a lot of that period,

24     Hash wasn't at the firm. He's in the

25     administration, and so I'm trying to



```
 1                T. LOVITT, ESQ.
 2   think back.
 3            So I don't have a
 4   recollection, no. I don't have a
 5   recollection one way or another.
 6   BY MS. SHEKETOFF:
 7       Q.    Did -- in raising my salary
 8   to $425,000, did Brogan discount
 9   Hash's review in any part because of
10   his reputation as a reviewer?
11       A.    Let me get Steve's testimony
12   on this. My recollection is Steve's
13   testimony is that he disregarded --
14   I'm going to get it. I want to answer
15   this accurately, one second.
16            Here it goes. So I'm on
17   page 29 of Steven Brogan's June 6th --
18   Brogan is B as in boy - r, Robert - o,
19   Oscar - g, guy - a, Adam - n, Nancy.
20            And he says, "I raised her
21   salary and I disregarded Hash's
22   evaluation mainly because I wanted not
23   just her but all the women of color
24   who were in the firm at that time
25   coming up through the ranks."
```



1          T. LOVITT, ESQ.

2              And my understanding of that,

3    he clarifies that later, is he wanted

4    to encourage you. It's not that he

5    disregarded Hash's evaluation because

6    he didn't believe it or because he

7    thought it was harsh.

8              He wanted you to succeed, and

9    he thought that this great institution

10   of Jones Day could make you better.

11             What does he mean by that?

12   If he had given you a lower

13   compensation adjustment, you'd have

14   felt more disaffected from the firm,

15   you would've felt more distant from

16   the firm and resisted it more. He

17   wanted you to embrace it.

18             And so he discounted Hash's

19   review because his goal was for you to

20   succeed. He wanted you embraced by the

21   practice. He wanted you to feel part

22   of the firm, that's why he gave you --

23   and that's later in his deposition

24   testimony at page 221.

25             "Because" -- I'm sorry, it



Page 115

```
 1                T. LOVITT, ESQ.
 2    says "Because I was" -- I'm quoting
 3    now from Steve Brogan.
 4                "Because I was trying to
 5    encourage you, as I already testified
 6    when your husband was questioning me,
 7    that I was anxious to encourage what I
 8    saw. I hoped would be very promising,
 9    which turned out to be true, a young
10    class of women of color, and I thought
11    that Hash's evaluation which was not
12    complimentary to you I should
13    disregard and try to encourage you for
14    the reasons that I said previously
15    that I think that I'm a great believer
16    that great institutions change people,
17    people don't change great
18    institutions. And that a reward like
19    this could pay off for the firm in the
20    future, so that's why I did it."
21                He didn't disregard Hash's
22    evaluation because he thought it was
23    unfair, inaccurate or harsh. He wanted
24    you to embrace the firm.
25                And he gave you an adjustment
```



Page 116

```
 1                    T. LOVITT, ESQ.
 2     to say, you know, we want you, we want
 3     you to succeed, and the next year you
 4     didn't, and so he said okay, message
 5     not received. That's his testimony on
 6     this.
 7        Q.     And so was my salary in 2017
 8     lower than it would have been because
 9     of Hash's review the prior year?
10              MS. CHASE: Objection to the
11     form of the question, but you can
12     answer to the extent you can.
13              THE WITNESS: I'm going to
14     give the long answer again.
15              No single evaluation is
16     talismanic, not one. But what happened
17     was you had two years of reviews,
18     multiple individual evaluators
19     pointing out the same characteristics
20     with respect to your performance.
21              And Steve decided to
22     disregard that even though -- I mean,
23     it was -- there were red flags in that
24     file, not just from Hash.
25              He decided to disregard those
```



```
 1                  T. LOVITT, ESQ.
 2    red flags because had he compensated
 3    you with what your performance
 4    suggested, you would have been more
 5    distant from the firm, you wouldn't
 6    have embraced the institution, you
 7    would've hated it.
 8              He wanted you to embrace the
 9    institution and to succeed. So it's
10    not that yet Hash's would've mattered
11    more, it's that this whole theme of
12    two years of multiple evaluators
13    pointing out the same issues had not
14    resolved at the end of the second
15    year.
16              So, again, no single
17    evaluation was talismanic, but after
18    sending you a message to support and
19    asking you to perform and embrace
20    private practice and try to make it
21    here, you didn't respond. That's why
22    he didn't give you a big increase.
23              It had nothing to do with
24    individual evaluations. He's messaging
25    you.
```



Page 118

1                    T. LOVITT, ESQ.

2    BY MS. SHEKETOFF:

3        Q.    Okay. I'm going to show you

4    -- I'll go back to Plaintiffs'

5    Exhibit 83. I'd like you to turn to

6    page 6.

7        A.    Yep.

8        Q.    And so who -- what is this?

9        A.    So this is a summary of the

10   comments that are made about you

11   during the -- not the national but the

12   D.C. litigation meeting.

13            My understanding it's either

14   compiled by Erica Valentine who's a

15   staff member during the evaluation

16   meeting.

17       Q.    And she did write that, I

18   guess, did she write down these words

19   during the meeting?

20       A.    Yes. She's keeping notes

21   during the meeting.

22       Q.    So did these notes reflect,

23   accurately reflect what was said about

24   me during the meeting?

25       A.    Yes.



Page 119

```
 1                    T. LOVITT, ESQ.
 2       Q.     Is there anything that was
 3  said about me that's not in these
 4  notes?
 5       A.     That I do not know.
 6       Q.     And do you -- I guess, you're
 7  going to get back to me about when
 8  this meeting took place?
 9       A.     Yes.
10              MS. CHASE: We're going to
11  endeavor to get that information.
12  Whether it is obtainable today is a
13  different question.
14  BY MS. SHEKETOFF:
15       Q.     Did what was said about me
16  during this meeting have any effect on
17  my salary for 2016?
18       A.     No. The meeting notes weren't
19  given to anybody in the compensation
20  process.
21              (Whereupon, spreadsheet was
22  marked as Plaintiffs' Exhibit 160 for
23  identification as of this date.)
24  BY MS. SHEKETOFF:
25       Q.     Okay. I'm showing you what's
```



Page 120

```
 1                    T. LOVITT, ESQ.
 2    been marked as Plaintiffs'
 3    Exhibit 160. This is in your binder,
 4    but it's pretty hard to see so you
 5    might prefer to look at it on the
 6    screen.
 7         A.    Is this tinsy -- teeny-tiny
 8    thing?
 9         Q.    Yep. What is this?
10         A.    If you can -- let me see if I
11    can get it on the screen. Hang on.
12    Okay.
13              MS. CHASE: There are
14    little --
15              THE WITNESS: Yeah, let me try
16    to get this thing --
17              MS. SHEKETOFF: And just for
18    the record, this is Bates stamped JDJ
19    -- sorry -- JD3754.
20              THE WITNESS: I'm sorry, I
21    don't know what I just did. I just got
22    a different exhibit up. Hang on. 160.
23              Okay. Now I'm trying -- okay.
24    Okay. Hang on. I've blown it so much
25    it's not all on the same page.  Shoot.
```



Page 121

1              T. LOVITT, ESQ.

2              MS. CHASE: There's a little

3    grey bar at the bottom --

4              THE WITNESS: Yeah, I got it.

5    It's just that I can't -- now I have

6    it so big I can't see at all.

7              Yes, yes. It starts with JD

8    or dmd, if deemed actual, PT across

9    the top, yeah.

10   BY MS. SHEKETOFF:

11       Q.    And so -- I'm sorry, what did

12   you just say?

13       A.    I was just identifying making

14   sure we were looking at the same

15   document. It said -- it's like a

16   spread sheet and it has a column that

17   says JD or D as in dog - m, Michael -

18   d, as in dog. It's like the first

19   header for the column.

20       Q.    Okay. And what is this

21   document?

22       A.    I'm sorry, what was the

23   question?

24       Q.    What is this document?

25       A.    Those are my notes from



Page 122

```
 1              T. LOVITT, ESQ.
 2    calendar year 2017.
 3        Q.    So is this about my work in
 4    2016?
 5        A.    These are -- correct. Right,
 6    that I should give you more
 7    clarification on that because these
 8    notes were taken at different points
 9    of time.
10              Do you want me to kind of
11    walk you through the document or do
12    you want to ask questions?
13        Q.    Yes, please. You can walk me
14    through it.
15        A.    So this -- I created these
16    notes in 2017 -- calendar year 2017
17    which would've been for the 2016
18    evaluation period.
19              As I testified earlier, that
20    was my first year as co-head of the
21    evaluation process, and I read for
22    each associate and not just litigation
23    but all of these meetings for each
24    associate multiple years of individual
25    evaluations and assessment statements.
```



Page 123

1                    T. LOVITT, ESQ.

2    It took a long time.

3                    As I read, I created an

4    impression of people based on, you

5    know, the cold file. I recorded my

6    immediate impression of someone and

7    what is labeled on this document as

8    TLL Pre-Meeting Notes. So this is a

9    cold read of the file.

10                   Then, when I was in the

11   national review meeting and we were

12   talking about people and we were

13   debating people, I would put in my

14   impression of the associate after

15   hearing everything.

16                   And the column labeled TLL

17   In-Meeting Notes is my impression of

18   you and your performance after

19   listening to the presentations about

20   you in the national meeting.

21       Q.    And who made presentations

22   about me in the national meeting?

23       A.    Wow. There was -- well, Beth

24   was in charge. Beth had primary

25   responsibility for, you know,



1                T. LOVITT, ESQ.

2    explaining the basis for her

3    assessment statement and explaining

4    the basis for her rating.

5              And the way the process

6    worked is after she would give -- and

7    this is true not just for you but in

8    general how the meeting works -- after

9    she would give her presentation, it

10   was then open for question.

11             And my recollection of your

12   -- of you in this year was that it was

13   a very heated conversation.

14             Again, this would've occurred

15   after the D.C. meeting. My

16   recollection is Tim Collin spoke and

17   basically thought you were a 2 that

18   wouldn't succeed at the firm.

19             That Jim Jones said

20   something. Jim Jones was the chair of

21   the meeting. You know, he's read --

22   gosh, he's been the chair of the

23   litigation meeting since time began as

24   far as I'm concerned.

25             He's probably read tens of



Page 125

```
 1                T. LOVITT, ESQ.

 2    thousands of assessment statements and

 3    evaluations. And I recall him saying

 4    he didn't think you were going to

 5    succeed and probably should be

 6    counseled out of the firm.

 7                I recall Cari Ruttenberg

 8    being in this meeting and making

 9    comments.

10                And I myself made an argument

11    to Beth because I thought you needed a

12    much stronger warning in your

13    assessment statement than what was

14    showing up in the draft. And, again, I

15    suggested that we might start the

16    counseling out process because not

17    only based on the 20 -- you know, the

18    information that was available in, you

19    know, the 2016 packet, but I'm reading

20    the 2015, you know, set of materials

21    as well and saying the writing is on

22    the wall here guys.

23                Like there's two years of

24    data, there's no change. This

25    associate has zero interest in being
```



Page 126

```
 1                T. LOVITT, ESQ.
 2     here. She doesn't want to be here.
 3            And that's why after -- I
 4     don't do a lot of all bold and all
 5     caps in my notes. All bold -- bold and
 6     all caps in my notes means this is
 7     important, Lovitt, go back and pay
 8     attention to this.
 9            And my first writing there is
10     warn. Someone needs to tell you you're
11     not going to make it here in my view.
12     That was my impression.
13        Q.    And --
14        A.    And I thought your
15     compensation should reflect that as
16     well, you should receive a message in
17     comp that you weren't making it, you
18     were not succeeding.
19        Q.    Did anyone else speak at the
20     meeting?
21        A.    Many people spoke. I can't --
22     I remember this being -- this being a
23     more extended presentation being Beth
24     was hesitant to, you know, give you a
25     warning.
```



Page 127

```
 1                T. LOVITT, ESQ.
 2                I wanted you and I advocated
 3    for you being counseled out of the
 4    firm or you being told to leave.
 5                And my recollection is that
 6    was the consensus of everyone in the
 7    room is that you needed to be
 8    counseled to leave.
 9                And it was combative because
10    Beth didn't think that that was
11    necessary. She thought you were
12    already looking and that you were
13    going to leave.
14                And there was debate as you
15    might imagine about look, these are
16    the books and records of the firm,
17    they need to accurately reflect that
18    this room thinks that Julia should be
19    told to leave.
20                That was -- and there were a
21    lot of people on that, a lot of people
22    talked about that.
23                I mean, Julia, you had to
24    understand, you received 2s for two
25    years. That is in almost every
```



Page 128

1              T. LOVITT, ESQ.
2    instance but yours a grounds for
3    termination. It's actually in our
4    evaluation materials that successive
5    years of 2s is ground for termination.
6              This is a termination case,
7    right? That's what everybody was
8    arguing. We need to be consistent in
9    our application of our standards and
10   tell the associate she needs to leave.
11   That's what that room is about.
12       Q.    Was I told to leave?
13       A.    No, you weren't. And I, you
14   know, it -- but you -- but Beth ended
15   up being, you know, prescient in that
16   sense because you left voluntarily.
17             She was right, you didn't
18   want to stay, and everybody knew you
19   didn't want to stay, everybody knew
20   you didn't want to be in the firm.
21   That's the problem with your
22   performance, and you left.
23             I can't hear you, sorry.
24       Q.    When did I leave?
25       A.    My recollection is that you



Page 129

```
 1                T. LOVITT, ESQ.
 2    left at some point in 2018.
 3         Q.    And --
 4         A.    Wait, that -- I might've been
 5    wrong on that. It might be 2019.
 6         Q.    What did Cari Ruttenberg say
 7    at this meeting?
 8         A.    I don't have a specific
 9    recollection of what everyone said in
10    the meeting. What I can tell you is
11    the sense of the room, and the sense
12    of the room is that you were not
13    succeeding.
14         Q.    And you said it was a heated
15    discussion. Who is on the other side?
16         A.    Beth. And it wasn't that Beth
17    was saying you weren't succeeding.
18    Beth, was saying I don't -- I don't
19    want be that tough.
20              Like I think she even said it
21    might impact our supreme court
22    recruiting if I tell her this, you
23    know.
24              And so people were getting
25    heated because that's not a reason to
```



```
 1                T. LOVITT, ESQ.
 2   not put a strong warning in someone's
 3   assessment statement.
 4                And I think the compromise
 5   that we came up with was that she was
 6   going to tell you verbally in your
 7   evaluation, she was going to give you
 8   a very strong warning, a very strong
 9   look. You got one more year, you got
10   to get it together, you got to turn it
11   around. And that was how we were going
12   to approach you.
13        Q.    And did she do that?
14        A.    I don't know. You have to
15   tell me, you were in the room. That's
16   I don't think part of the 30(b)(6)
17   topic.
18                MS. CHASE: Agree. The
19   evaluation process is but not the
20   meeting between you and Beth.
21                MS. SHEKETOFF: You're saying
22   that the meeting which someone is
23   given their -- is read their
24   assessment is not part of the
25   evaluation process?
```



```
1                  T. LOVITT, ESQ.

2             MS. CHASE: The witness was

3    designated to speak generally about

4    the process, and she has spoken

5    generally about the process.

6             The specific inquiry that was

7    related to you in the 30(b)(6) was to

8    speak to your ratings, rankings and

9    compensations for those years, and the

10   witness is speaking as a 30(b)(6) on

11   those topics.

12            You did not ask for a

13   30(b)(6) to address the topic of your

14   personal -- as meetings in any of the

15   years in which you had performance,

16   that was not within the scope.

17            MS. SHEKETOFF: That was in my

18   assessment -- withdrawn.

19   BY MS. SHEKETOFF:

20       Q.   Was I ever counseled out of

21   the firm?

22       A.   To my knowledge, no.

23       Q.   Okay. What did you do --

24       A.   That's a different question

25   from should you have been in my
```



Page 132

```
 1              T. LOVITT, ESQ.
 2  opinion, personal opinion.
 3      Q.    Understood. What did you mean
 4  by "Reads like professorial type"?
 5      A.    So, again, it read to me --
 6  like when I think of professorial
 7  type, I think of my good friends at
 8  academia who work for about three
 9  hours a day.
10              You know, they teach a class
11  for an hour, they have office hours
12  for an hour and, you know, maybe they
13  talk to some students, and then they
14  spend the rest of their time doing
15  research and writing articles on
16  whatever is of interest to them.
17              And to me that's how you
18  read. You were idiosyncratic. You were
19  like okay with doing a couple of hours
20  of client billable work, but you
21  really wanted to focus on the stuff
22  that was of high interest to you
23  regardless of whether it was at the
24  core of private practice.
25              I also meant that your
```



1              T. LOVITT, ESQ.

2    writing seemed to be professorial.

3    That was something else that was

4    coming through in some of these

5    evaluations.

6              It wasn't -- it was a theme,

7    sometimes your writing was really

8    good, sometimes it was, you know, not

9    the stuff of advocates. Again, it

10   depended on whether or not you were

11   interested in the topic about what you

12   had to writing.

13             To me the classic professor

14   is the person who gets as quickly

15   through the classroom as possible to

16   get to the research that they want to

17   do, and that to me was what you were

18   like.

19     Q.    And what did you mean by

20   "Soft warn"?

21     A.    Well, when I first read the

22   file, I thought that, you know, maybe

23   -- because there was -- you know, I'm

24   a person of hope and I wanted to think

25   you could turn it around.



```
 1                 T. LOVITT, ESQ.
 2             So my initial thought was we
 3    give a soft warning and give her the
 4    like, you know, you need a kick in the
 5    butt.
 6             When I came out of the
 7    meeting, I really thought you should
 8    be counseled out of the firm, and
 9    that's what I meant by warn.
10    Q.    And did I ultimately turn it
11    around?
12    A.    Well, that's a subject of
13    debate. Again, I mean, from my
14    perspective, you did better but you
15    were below your peers.
16             So you had a better year in,
17    you know, in your 2017 review, but you
18    still were behind your peers. And at
19    that point you're like what, you're --
20    I can't remember, I could probably
21    look at this thing and it will tell me
22    -- you're a 2010, right?
23             So at that point you're
24    coming onto your eighth year as an
25    associate and you've got consistent 3s
```



Page 135

```
 1                 T. LOVITT, ESQ.
 2   from the office. A person of that
 3   level of seniority with a 3 is not on
 4   track.
 5              And, you know, as I told you,
 6   that was Kevyn Orr's perception of you
 7   was that your trajectory was going
 8   down. As you got more senior, you
 9   might've been fixing some problems,
10   but you were being lapped by your
11   peers. You weren't at their -- at that
12   level.
13              You weren't -- your
14   trajectory might've been better, but
15   it wasn't good enough to make you
16   commensurate with your class in terms
17   of what was expected of you.
18       Q.    And what did you mean when
19   you said you weren't on track?
20       A.    Like -- then, again, this is
21   my personal opinion -- is a review
22   file with someone as an eighth-year
23   with three 3s -- but straight 3s from
24   the office and then two 2s in their
25   file, that's not -- you're not shoe-in
```



Page 136

```
 1               T. LOVITT, ESQ.
 2   for partner at that point, you're like
 3   behind and you have to -- we make
 4   partners who have like straight 5s,
 5   and, you know, we terminate people, we
 6   fire people when they have two years
 7   of 2s.
 8               So you can look at that
 9   objective record and say, you know,
10   you're so far from your peers who were
11   getting 5s in this period and were
12   doing excellent work and really
13   enjoyed being lawyers of the firm.
14      Q.    And did your impression that
15   I read like a professorial type have
16   any effect on your recommendation for
17   my raise this year?
18      A.    I mean, again, this was the
19   early version. I think my personal
20   recommendation was based on my general
21   impression that you had no interest in
22   being a private practicing attorney at
23   Jones Day.
24               And when you were doing the
25   core work of this law firm, when you
```



Page 137

```
 1                  T. LOVITT, ESQ.
 2     were doing work for billable clients,
 3     your performance was mediocre at best,
 4     and you shined when you were doing
 5     things that aren't in the core of the
 6     law firm, things like pro bono, and
 7     that's where you spent your time.
 8              And to me you aren't going
 9     to, you know, you shouldn't be
10     rewarded as high as the people who --
11     your peers who are billing 18,000,
12     2,000 hours and doing excellent work
13     across a number of things.
14              No. I mean, you just -- I
15     don't know how to -- you asked these
16     very specific questions, but in
17     reality it's my general impression
18     that you were not -- you were not
19     interested in private practice and you
20     you weren't succeeded in client
21     billable work.
22              Did that impression impact my
23     recommendation? Yep.
24        Q.    Okay. And what did you mean
25     by -- or hold on one second.
```



Page 138

1              T. LOVITT, ESQ.

2              (Whereupon, an off-the-record

3    discussion was held.)

4    BY MS. SHEKETOFF:

5       Q.    What did you mean by

6    "Compensation Watch"?

7       A.    I wanted to pay careful

8    attention to your -- like to your

9    compensation adjustment.

10      Q.    And what --

11      A.    That's what that means.

12      Q.    So what does --

13      A.    You have to think about this

14   process.

15            You know, I listen to about

16   stuff on about 800 associates, and I'm

17   pretty good at remembering -- you'd be

18   shocked at I'm pretty good remembering

19   a lot of them in that time period.

20            But I have my notes open, and

21   when I see something big and bold that

22   says compensation watch, what that

23   means is when I'm working under comp,

24   you know, this is someone I have a

25   negative impression of. Like, Traci,



Page 139

```
 1              T. LOVITT, ESQ.
 2    refresh your own recollection, but
 3    this is an associate who does not
 4    belong to the firm.
 5              So it's a tip to me when I'm
 6    going through compensation adjustments
 7    that this is someone I want to watch
 8    their comp, like they shouldn't be
 9    getting a big increase.
10    Q.    And what did you mean when
11    you wrote "Read 'Final' Assessment"?
12    A.    I was curious -- after
13    discussions we had with Beth, I didn't
14    want her tp water down your assessment
15    statement.
16              Because remember, the
17    practice leadership has really the pen
18    on the assessment statement, and I
19    wanted to make sure that that final
20    sentence that was in your assessment
21    statement didn't get watered down.
22    That's what that meant.
23    Q.    And was there any change that
24    year between my provisional assessment
25    statement and my final assessment
```



```
 1              T. LOVITT, ESQ.
 2    statement?
 3      A.    I would have to look at the
 4    drafts, but my recollection is that
 5    the final sentence remained the same.
 6            MS. SHEKETOFF: I think that
 7    maybe now would make sense to take a
 8    five-minute break.
 9            THE WITNESS: Yeah, I need a
10    bathroom break. So that would be
11    great.
12            VIDEOGRAPHER: All right.
13    Going off the video record at
14    5:16 p.m.
15            COURT REPORTER: Ms. Chase,
16    you want a copy of the transcript?
17            MS. CHASE: Yes, please. I'd
18    like a rough as well. I understand
19    with the two reporters I understand
20    it's not going to be as quick as
21    typical, but as much as that's
22    feasible, we would like to get a rough
23    in addition to the final.
24            (Whereupon, a short recess
25    was taken.)
```



Page 141

1                 T. LOVITT, ESQ.

2                 VIDEOGRAPHER: We're on the

3      record at 5:28 p.m.

4      BY MS. SHEKETOFF:

5         Q.    Ms. Lovitt, did you want to

6      add anything from your conversation or

7      your investigation?

8         A.    Yes. I was able to get the

9      clarifications and additional

10     information during the break in my

11     30(b)(6) capacity. I wanted to address

12     some of the outstanding questions.

13                I think the first one was the

14     date of the D.C. litigation associate

15     evaluation meetings. I actually got

16     them all.

17                The first was April 1, 2014;

18     the next was March 30, 2015; the next

19     was March 17, 2016; then March 14,

20     2017; and March 15, 2018.

21                I was also able to get

22     clarification around the meeting

23     attendees and materials.

24                In the D.C. litigation

25     meetings, all litigation partners



Page 142

```
 1                T. LOVITT, ESQ.
 2    attended that meeting, not just the
 3    leadership. All litigation partners
 4    attended that meeting, but only the
 5    leadership had copies of the
 6    individual evaluation.
 7            MS. CHASE: I just want to
 8    clarify the part of that process, was
 9    invited or attended?
10            THE WITNESS: Invited. Invited
11    to attend. Invited to attend. So all
12    litigation partners were invited to
13    attend the meeting. I can't say that
14    there was 100 percent attendance, but
15    all were invited.
16            And the attendees did not not
17    have the evaluations unless they were
18    leaderships. So the practice leaders
19    would have the individual evaluations.
20    And Cari Ruttenberg who was running
21    the meeting had the individual
22    evaluations and Adrian Wager-Zito had
23    the individual evaluations.
24            The attendees saw the slides
25    that we've been going through earlier
```



Page 143

```
 1                T. LOVITT, ESQ.
 2   today. I can't remember if it's
 3   Tab 83, that's -- yeah, Tab 83.
 4            The attendees had the slide
 5   decks that were at Tab 83 but for
 6   those notes.
 7            With respect to Beth Heifetz,
 8   Beth does not recall any conversation
 9   with Sparkle or with Erin Tang about
10   you and Hasham Mooppan or she has no
11   recollection of anything.
12            Beth also does not use
13   recruiting as a metric for determining
14   a rating. She might include a
15   statement about recruiting in the
16   assessment statement, but her ratings
17   are just substantive performance is
18   being reflected in the ratings.
19            We were able to clarify that
20   my recollection of the drafting
21   process was from my conversations with
22   Beth, not from produced documents, and
23   I was able to talk to Beth.
24            And there was -- her rating
25   -- her thought on what you should be
```



MAGNA ▶
LEGAL SERVICES

Page 144

```
 1                  T. LOVITT, ESQ.
 2    rated, and I believe it was 2017
 3    fluctuated between -- or 2016
 4    fluctuated between a 3 and a 2, but at
 5    the end of the day she assigned you a
 6    2.
 7                  But if you can think about
 8    it, she had Lou Fisher and Mike Fried
 9    do the drafts of the associate
10    evaluations in issues and appeals and
11    then she edited them and finalized
12    them.
13                  And in that kind of iterative
14    process, she would sometimes reflect
15    on your file and think it was a 3 and
16    sometimes think it was a 2, but at the
17    end of the day she assigned you a
18    final rating of a 2.
19        Q.    And what -- when you say that
20    was for 2016, do you mean for my work
21    in 2016 or for my work in 2015?
22        A.    I believe it was for your
23    work in 2016.
24        Q.    Okay.
25        A.    Maybe -- I'm pretty sure
```



Page 145

```
 1                  T. LOVITT, ESQ.
 2   about that. I want to look -- I want
 3   to desperately -- I don't want to have
 4   to come back again. I believe that was
 5   for your 2016 work. If you wanted to
 6   take 30 seconds --
 7        Q.    You can take 30 seconds.
 8        A.    I want to close out these
 9   open questions for you so, you know,
10   they're not lingering.
11              Give me 30 seconds. We don't
12   even have to go off. Let me just put
13   it on mute.
14              (Whereupon, an off-the-record
15   discussion was held.)
16              THE WITNESS: It was the work
17   done in the 2016 period, so it was
18   your 2016 evaluation.
19   BY MS. SHEKETOFF:
20        Q.    Okay. And when -- so she
21   didn't provide any specific time about
22   when her --
23        A.    No. She just -- she said it's
24   an iterative process, you know, she's
25   taking more information, she's hearing
```



Page 146

1              T. LOVITT, ESQ.

2    things. Sometimes she thinks it's a 3,

3    sometimes she thinks it's a 2. But she

4    landed on a 2.

5        Q.    Okay. And when you say she

6    landed on a 2, do you mean for the

7    provisional rating or the final

8    rating?

9        A.    Final rating.

10       Q.    And what was her provisional

11   rating?

12       A.    Well, I mean, it takes -- it

13   changes at points in time. When she

14   went into the meeting  -- this might

15   be in here -- I think it was a 2, when

16   she actually went into the national

17   review committee meeting.

18       Q.    Okay. So it was some point

19   before that that she was thinking

20   about giving a 3?

21       A.    Correct.

22       Q.    Okay, great.

23             (Whereupon, spreadsheet was

24   marked as Plaintiffs' Exhibit 39 for

25   identification as of this date.)



Page 147

1                T. LOVITT, ESQ.

2    BY MS. SHEKETOFF:

3        Q.    I'm going to show you

4    Plaintiffs' Exhibit 39. You can turn

5    to that in your book, but it's another

6    one of those spreadsheets so it might

7    be easier to see it on the screen.

8    It's JD4767.

9        A.    I'm going to try to get on

10   the Agile Law. I'm not that fast.

11   Thirty-nine you said?

12       Q.    Yeah.

13       A.    Gosh. Let me zoom in to try

14   to make it big. Yep, okay.

15       Q.    And what is this document?

16       A.    These are notes that I made

17   in 2018 -- I spoke to fast, hang on,

18   that's incorrect. Hang on.

19            I blew it up so much I can't

20   see the whole thing. Give me two

21   seconds just to scroll across the

22   screen.

23            This -- this appears to be

24   the final compensation spreadsheet

25   entry for you for the 2017



Page 148

```
 1              T. LOVITT, ESQ.
 2   compensation adjustment.
 3       Q.    And did you -- that year, did
 4   you recommend -- I'm sorry -- for 20
 5   -- my raise for 2017?
 6       A.    Yeah. So this would have been
 7   the compen -- this would've been --
 8   double check here -- I'm sorry, I had
 9   to blow this thing up so much that now
10   it's hard to manage.
11              Yes. So this would have been
12   a recommendation -- this this would
13   have been the spreadsheet with respect
14   to your adjustment in July of 2017 for
15   your performance in 2016.
16       Q.    Okay. And did you recommend
17   rasing my salary to $445,000?
18       A.    I think I recommended 435 for
19   a $10,000 adjustment.
20       Q.    And this document says on it
21   "TLL & MS Full-Time Equivalent Salary
22   Recommend 440," what does that mean?
23       A.    That means Mike and I split
24   the baby. He recommended 445 and I
25   recommend 435 and we agreed on the
```



```
 1                 T. LOVITT, ESQ.
 2   midpoint.
 3        Q.    Okay. And what was the basis
 4   for your -- or why did you agree on
 5   the midpoint?
 6        A.    Because it was just an easy
 7   point of agreement. You've got a lot
 8   of associates to go through.
 9        Q.    You just did it because it
10   was the midpoint?
11        A.    Yeah, because it was the
12   midpoint.
13        Q.    Did your joint recommendation
14   with Mike Shumaker to raise my salary
15   440,000 have any effect on the firm's
16   decision to raise my salary to 440,000
17   in 2017?
18        A.    It appears that the managing
19   partner accepted our recommendation.
20        Q.    And so --
21        A.    I'll say for the record, this
22   was like one of my first years going
23   through this.
24              Now my practice has been in
25   the last three years, anybody who
```



Page 150

```
 1                T. LOVITT, ESQ.
 2    receives two 2s either from the
 3    practice or the office, I go flat.
 4            So if this would've happened
 5    today, you would've been held flat.
 6    Q.    Okay. So did your joint
 7    recommendation to raise my salary to
 8    440 have any effect on the firm's
 9    decision to raise my salary to 440?
10    A.    I mean, the managing partner
11    independently makes this decision. And
12    he looked at everything himself, and
13    he decided that that was the right
14    number.
15            I think he testified as to
16    this too. I can grab this for you real
17    fast where he's talking about this
18    number. And I think he says that he
19    determined -- I'm looking at page 226,
20    page 227 where he testifies that his
21    basis for giving you the 440 -- I want
22    to answer this properly -- is "I did
23    this" -- now I'm quoting Steve Brogan.
24            "I did this" -- and this is
25    referencing your compensation
```



1               T. LOVITT, ESQ.

2    adjustment that we're discussing.

3               And now I'm quoting again,

4    "On the basis of this year I did it on

5    the basis of you continued to have a 2

6    ranking for the practice, and that's

7    the basis upon which I gave you a

8    $15,000 raise because it seemed to me

9    that I had -- I was wrong in giving

10   you an outsized raise the year before

11   because it didn't really change your

12   contribution. It was still a 2."

13              And you asked, "Sorry, so

14   you're saying the ranking from the

15   practice?" And he's saying, "The

16   ranking from the practice, correct."

17   I think you both meant rating.

18              But -- so his testimony is

19   that he made an independent evaluation

20   to get to the 440 number based upon

21   your 2 rating from the practice.

22              You're muted. I don't know if

23   you mean to be muted.

24              (Whereupon, spreadsheet was

25   marked as Plaintiffs' Exhibit 162 for



Page 152

1                    T. LOVITT, ESQ.

2    identification as of this date.)

3    BY MS. SHEKETOFF:

4        Q.    Sorry. I'm going to show you

5    what's been marked as Plaintiffs'

6    Exhibit 162. It's JD4761. This is

7    another spreadsheet that you may want

8    to look on the screen.

9        A.    Yeah. I'm learning here.

10       Q.    My question is just what is

11   this document?

12       A.    I'm bringing it up. This is

13   also teeny-tiny. Okay. Let me scroll

14   across, I learned that lesson.

15             Okay. These are my

16   impressions and notes from the 2018

17   national associate review committee

18   meeting.

19             They're a little bit

20   different in their organization than

21   the notes that we discussed before.

22   I'll just quickly walk you through the

23   document so you can -- hopefully save

24   you some time.

25             In the column that's labeled



Page 153

```
 1              T. LOVITT, ESQ.
 2   2016 Notes, this is literally a copy
 3   and paste from my notes that we
 4   discussed previously, I just copied
 5   and pasted my final notes as a way of
 6   refreshing my recollection of sort of
 7   where we had been.
 8              And where it says TLL
 9   Pre-Meeting Notes, this is in reality
10   both pre-meeting notes and notes I had
11   contemporaneously in the meeting.
12              I wasn't -- I didn't have
13   absolute precision in some of these
14   meetings.
15              My recollection is the first
16   sentence which says "Has a serious
17   imbalance in her pro bono hours" was
18   my impression from reading your file
19   cold. And the second sentence which is
20   "Went off of the 2s, which were due to
21   her not coming into the office," was
22   something Beth said in the meeting and
23   it kind of ticked me off, so I wrote
24   it down.
25              Because to me your 2s were
```



Page 154

1               T. LOVITT, ESQ.

2    not dealing with you not coming into

3    the office, it was a broader problem

4    than that. So I put that in there to

5    remind myself that that was said in

6    the meeting and it was something which

7    I did not agree.

8        Q.    What does that mean "Went off

9    of the 2s"?

10       A.    That instead of getting a 2

11   from the practice, the practice gave

12   you a 4.

13            So the practice was

14   advocating in that meeting giving your

15   rating -- rating you a 4 for that

16   year, and Beth was saying that she

17   felt the 2s were more about you not

18   coming to the office.

19            I debated her in that

20   meeting. I pushed back on that

21   statement, and I, again, suggested

22   that you be counseled out of the firm

23   because in my view and my recollection

24   of all of these prior meetings was

25   that your 2s had nothing to do with



Page 155

1                    T. LOVITT, ESQ.

2   you not coming into the office.

3            Your 2s were reflective of

4   your performance and the fact that you

5   were performing very poorly on client

6   billable work, and that to me, as I

7   read your file, you were doing better,

8   but, as I testified before, you were

9   well behind your peer group.

10            You weren't doing anything,

11   you know, you were still a 3 from the

12   office. You were trending in the okay

13   we don't have to immediately fire you

14   category where you were the last year,

15   but you weren't doing what you needed

16   to do to show your commitment to the

17   firm.

18      Q.    And so when you say "Went off

19   of the 2s," that's Beth saying that

20   she is no longer giving a 2?

21      A.    Yeah. The practice rated you

22   a 4 that year.

23      Q.    Okay. And so -- and Beth is

24   the one who determined those prior 2s?

25      A.    Correct.



Page 156

1                T. LOVITT, ESQ.

2        Q.    You didn't write anything in

3    your pre-meeting notes about

4    counseling me out, correct?

5        A.    Correct.

6        Q.    But your testimony is that

7    you -- it was your view that I should

8    be counseled out?

9        A.    Yeah. Because in my view --

10   look, and I say this a lot, and I say

11   it in these litigation -- these

12   national meetings, it is fundamentally

13   unfair for us to have an eighth- or

14   ninth-year associate who isn't

15   performing at the 5 level, which is

16   really what you need to be partner and

17   to have them continue in our system,

18   because the more senior you get, the

19   harder it is it to find another job.

20            So it may be that you're not

21   like -- you're not like the prior

22   year, which I was just saying there's

23   like -- there's a problem here,

24   there's red flags, it's you turned it

25   around, but you hadn't turned it



Page 157

```
 1              T. LOVITT, ESQ.
 2   around enough.
 3            And so to me it's
 4   fundamentally unfair to not tell an
 5   eighth-year okay, you had a better
 6   year, but you're still not there,
 7   you're still not good enough. And
 8   you're getting way too senior for you
 9   to stick around here.
10            I think it's more fair to
11   tell an associate while they still
12   have time to find another job that,
13   you know, hey, you turned it around a
14   little bit but you didn't -- you're
15   not there.
16            So that's why to me I thought
17   you should be counseled out because
18   I'm looking at this record saying, you
19   know, I don't see long-term
20   partnership potential here, and at
21   this level of seniority, man, it's
22   going to be hard for her to find a new
23   job, let's tell her as quickly as we
24   can. It's fair.
25       Q.   So the people who are ranked
```



Page 158

1                    T. LOVITT, ESQ.

2    below me, would they have been on

3    track for partnership?

4        A.    It depends. So I can't

5    remember your ranking this year, but

6    you had to remember, the ranking isn't

7    a single-class year, it's a multitude

8    of class years.

9             So it's frequently the case

10   of the people who are below you are

11   more junior to you. It's not always

12   the case that you're on different

13   tracks. You're looking at, you know,

14   different people of different JD

15   years.

16            So it's a little bit of

17   apples and oranges. You can't make a

18   statement that broad.

19       Q.    So for people who had earlier

20   JD years, if they were ranked below

21   me, would they have been on track to

22   make partner?

23       A.    I'm not going to answer a

24   hypothetical. Like if I had the

25   rankings and I, you know, knew who



Page 159

1                    T. LOVITT, ESQ.

2      they were, but I don't have all that

3      information.

4              It's not that easy. I can

5      tell you when you're ranked 21st out

6      of 21, there's -- yeah, you're the

7      bottom, but if you're 20 out of 21, I

8      don't have your rankings in front of

9      me, so I don't know what they were for

10     that year, but the one might also not

11     be on partnership track.

12             MS. CHASE: Can I just note

13     for the record that the ratings and

14     rankings of other associates in the

15     relative basis that they had compared

16     to Ms. Sheketoff is not within the

17     scope of the 30(b)(6), so testimony on

18     that topic is in individual capacity.

19             THE WITNESS: Conclusion just

20     based on looking at the ranking

21     without more information.

22     BY MS. SHEKETOFF:

23        Q.    I'd like to go back

24     Plaintiffs' 83 --

25        A.    Yes.



Page 160

```
 1                T. LOVITT, ESQ.
 2      Q.     -- page 10.
 3      A.     Yeah, I think I have that
 4  right here.
 5      Q.     And my question is what is
 6  this?
 7      A.     Page 10, hang on, catching up
 8  to you.
 9             Page 10 of 83, I just want to
10  hold it up for the camera just to make
11  sure we're talking about the same
12  thing. This page (indicating)?
13      Q.     Yes.
14      A.     So this is part the of the
15  D.C. litigation slide deck that we
16  discussed, so this would have been
17  part of the presentation to the D.C.
18  litigation partners.
19             This would have been a slide
20  that was presented there, and, again,
21  it's kind of evaluating, giving you
22  themes. The themes that are sort of
23  cross through across your evaluations.
24      Q.     And who put this together?
25      A.     Again, this was Erica
```



Page 161

1                   T. LOVITT, ESQ.

2    Valentine did the technical, you know,

3    actual typing, but it's under Cari

4    Ruttenberg's direction.

5        Q.    And could you please turn to

6    the next page Bates stamped JD3742?

7        A.    Yep.

8        Q.    What are these?

9        A.    Again, this is Erica

10   Valentine's notes from the D.C.

11   office meeting where she's trying to

12   capture what was said during the

13   meeting.

14       Q.    And do these notes accurately

15   reflect what was said about me during

16   the litigation -- the D.C. litigation

17   meeting in 2017?

18       A.    Yes.

19       Q.    And just to confirm, the

20   proposed assessment statement and the

21   proposed rating were not provided

22   during this meeting; is that your

23   testimony?

24       A.    That's correct.

25       Q.    And when you spoke with Beth,



Page 162

```
 1                    T. LOVITT, ESQ.
 2    were you able to determine whether my
 3    assessment statement changed at any
 4    point during this for my 2016 work?
 5        A.    2016 there was obviously a
 6    draft and she worked on the draft
 7    iteratively but in iterations.
 8        Q.    I just -- there's a proposed
 9    draft that goes to the national
10    meeting and then the final draft.
11            I'm talking about was there
12    any difference between a proposed
13    draft and the final draft?
14        A.    That's not a Beth question,
15    that's a document question. I'd have
16    to grab those documents.
17            I don't know -- I thought
18    there might be the litigation meetings
19    in here. That is something -- that's
20    not a Beth question. I'll have to see
21    if I could get you an answer to that
22    question.
23            (Whereupon, spreadsheet was
24    marked as Plaintiffs' Exhibit 40 for
25    identification as of this date.)
```



Page 163

```
1                T. LOVITT, ESQ.
2    BY MS. SHEKETOFF:
3        Q.    Okay. I'm going to show you
4    Plaintiffs' Exhibit 40. This is also a
5    spreadsheet, you might want to look at
6    it on the computer.
7        A.    I'll try on the computer.
8        Q.    JD4768. Did you make a
9    recommendation for my raise in --
10       A.    Hang on, I haven't even been
11   able to get to the computer yet.
12             You said it's Document 40?
13       A.    Yes. Hang on, I'm opening it
14   up. Okay. That is teeny-tiny. Let me
15   get that up, yep.
16             Okay. Then let me scroll
17   across, it's so big now that I can't
18   -- yep.
19       Q.    Did you make a recommendation
20   for my salary this year?
21       A.    Mike and I agreed with the
22   PIC's recommendation, so we didn't
23   make a recommendation separate from
24   the PIC. We endorsed the PIC's
25   recommendation.
```



Page 164

1                    T. LOVITT, ESQ.

2      Q.    And why was my salary raised

3    to 525 this year?

4      A.    Let me take a look at Steve's

5    testimony. I also want to see what

6    year this is. This is 2018.

7              I would -- this is 2018. I

8    would note that this is a -- there is

9    inevitably some portion of this

10   compensation adjustment that reflects

11   a market shift.

12             The market for -- the market

13   for associate compensation in the

14   United States changed in 2018, and we

15   incorporated a market adjustment in

16   the 2018 adjustment, so part of that

17   525 is necessarily reflective of a

18   market shift as opposed to a

19   performance issue.

20     Q.    Just do you have -- is there

21   any other reason my salary was changed

22   beyond what Steve's testimony is?

23     A.    I said the market issue. So

24   Steve Brogan's deposition -- and I

25   know because this was unbelievably



Page 165

```
 1                  T. LOVITT, ESQ.
 2   painful because the market changed
 3   like four times.
 4             It was that crazy year where
 5   Cravath announced and then Davis
 6   announced and Cravath announced again.
 7   And Mike and I had to like -- the
 8   managing partner like redo three or
 9   four times. So it was painful, I
10   remember. I do know that there's a
11   market component to this.
12             And with respect --
13             THE WITNESS: Am I going too
14   fast, Leah?
15             COURT REPORTER: No. Just it's
16   Cravath, what was it before Davis?
17             THE WITNESS: Cravath, Davis
18   and then I think Cravath went again.
19             COURT REPORTER: Yeah. But how
20   do you spell it?
21             THE WITNESS: C as in cat - r
22   as in rabbit - a, Adam - v, Victor -
23   a, Adam - T, Tom - H, Harry.
24   BY MS. SHEKETOFF:
25        Q.    What does the column --
```



Page 166

```
 1              T. LOVITT, ESQ.

 2      A.    Hang on, hang on. So in

 3   addition to what Steven Brogan

 4   testified, which was that he saw --

 5   I'm trying to get it -- my

 6   recollection is -- here we go.

 7            His testimony, which is on

 8   page 230 and 231 of his deposition,

 9   was that, and I quote, "I thought

10   maybe -- I thought that maybe I was

11   right that you were -- you kind of got

12   the message, and, you know, Beth

13   obviously improved the ranking or the

14   practice improved it or whatever was

15   involved in it, and I decided to give

16   you some extra to make up for the fact

17   that you got less of a raise the year

18   before."

19            And I would adopt the

20   managing partner's testimony and add

21   to that that there was also some

22   component of this, I know, that was a

23   market adjustment.

24      Q.    In that spreadsheet at

25   Plaintiffs' Exhibit 40 there is a
```



1                 T. LOVITT, ESQ.

2    salary that says market adjuster --

3    Market ADJ Salary. What does that

4    mean?

5        A.    Okay. Okay. So we didn't

6    adjust you further, that's right. So

7    we decided -- okay, thank you, you

8    refreshed my recollection on this. I'm

9    going to have to amend that testimony

10   a little bit.

11               I just, to clarify for the

12   record, I have the spreadsheet blown

13   up so much that I can't see all of it

14   on the screen at one time, so you just

15   prompted me to scroll further and look

16   at all these columns, and you now

17   refreshed my recollection that Steve

18   recommended that you go to 485 to 525

19   based on the reasons he gave in the

20   testimony that I read and that when we

21   went through and adjusted for the

22   market -- that's the next column which

23   says MS/TLL Market Adjustments --

24   that's the next column that reflects

25   Mike and I going at this point --



1          T. LOVITT, ESQ.

2    Cravath has raised its salaries, Davis

3    raised it salaries, all this craziness

4    has happened -- and Mike and I go back

5    through and for people that, you know,

6    we think are good performers and

7    deserve the market adjustment, we

8    added.

9          We decided that 525 was far

10   more than enough for you, so we did

11   not raise you beyond what the managing

12   partner -- we did not recommend that

13   you be raised beyond what the managing

14   partner did not withstanding the fact

15   that the market had moved. And the

16   managing partner agreed with that.

17     Q.    So my salary did not reflect

18   any market improvement?

19     A.    Correct. We decided that that

20   was an adjustment enough.

21     Q.    Okay. Let's go back to

22   Plaintiffs' Exhibit 83. Please turn to

23   page 15.

24     A.    Sorry, I just put that away.

25   I'm back. Page 15 you said?



1              T. LOVITT, ESQ.

2              MS. CHASE: Just to confirm,

3     Julia, you mean the page that has a

4     Bates number 15?

5              MS. SHEKETOFF: No. I mean --

6     well, it actually also has the page

7     number 15. It's Bates stamped JD3746.

8              MS. CHASE: Thank you.

9              THE WITNESS: I got it.

10    BY MS. SHEKETOFF:

11      Q.    Just to -- sorry, to go back

12    before we address this section.

13             Was my salary in 2018 when it

14    was raised to 525, was that above

15    market?

16      A.    I can't remember. I don't

17    remember.

18      Q.    Okay.

19      A.    I don't remember off the top

20    of my head.

21      Q.    And if it was above market,

22    would that have been a reason not to

23    adjust my salary in light of the

24    market?

25      A.    It's a hypothetical question,



1                  T. LOVITT, ESQ.

2     but, I mean, really the determination

3     was more whether Mike and I thought

4     that the compensation you were

5     receiving was adequate and fair. And

6     we decided that it was adequate and

7     fair.

8        Q.    Okay. So, yeah, going back to

9     page 15 of Plaintiffs' Exhibit 83, is

10    this -- what is this?

11       A.    This is, again, part of the

12    evaluation, the D.C. litigation

13    evaluation meeting slide notes --

14    slide decks.

15            So this would have been what

16    was in the D.C. litigation meeting in

17    2018 for your performance in 2017.

18       Q.    And did Cari Ruttenberg put

19    this together?

20       A.    Yes. Cari Ruttenberg with --

21    you know, Erica Valentine technically

22    did the inputting into the slide sheet

23    putting it all together, but it was

24    under the direction of Cari

25    Ruttenberg.



Page 171

1                    T. LOVITT, ESQ.

2        Q.    Okay. And can you please turn

3    to page 18 of this document that's

4    Bates stamped JD7349?

5        A.    Yep.

6        Q.    What is this?

7        A.    It's the same as in the prior

8    meeting. This is a summary of what was

9    said in the meeting.

10        Q.    And does it accurately

11    reflect what was said about me in the

12    meeting?

13        A.    In the D.C. litigation, yes.

14    BY MS. SHEKETOFF:

15        Q.    I'm going to show you what's

16    been marked as Plaintiffs' Exhibit

17    179.

18        A.    That's one of the ones that's

19    not in the book.

20        Q.    Just one second.

21        A.    Yeah, I got to find it, too.

22    Is this one you're going to open for

23    me and have it appear on my page?

24        Q.    I'm sorry, what? And I think

25    I'm actually going to just try to move



```
 1                  T. LOVITT, ESQ.
 2   along a little more quickly, so we can
 3   skip this.
 4            Just actually, sorry, give me
 5   one more second.
 6            (Whereupon, an off-the-record
 7   discussion was held.)
 8   BY MS. SHEKETOFF:
 9     Q.    So you can actually -- we're
10   not going to show you that exhibit. We
11   are running out of time.
12            Outside of the total
13   litigation, are you aware of anyone
14   who's ever complained about
15   discrimination affecting their salary
16   or raise?
17            MS. CHASE: Let me just note
18   that the witness on this topic is
19   answering in her individual capacity
20   and can answer only to the extent that
21   she has information that's not
22   privileged.
23            If she has privileged
24   information, she could just say I have
25   privileged information.
```



1            T. LOVITT, ESQ.

2            THE WITNESS: By -- I think

3    you asked about anybody, right? Is

4    that you meant staff, lawyers -- I

5    mean, I just want to understand your

6    scope of your question.

7            MS. SHEKETOFF: Correct.

8            MS. CHASE: And I will note

9    that as it relates to anyone who is a

10   partner of Jones Day, that we have

11   taken the position in discovery, as

12   you're well aware, that partner

13   allegations and issues regarding

14   partners are not the subject of

15   discovery with the narrow exception of

16   one former partner named  Partner G  .

17           So I'm going to instruct the

18   witness that she can answer to the

19   extent she has knowledge anywhere for

20   that one partner or associates or

21   employees, again, not disclosing any

22   privileged information.

23           THE WITNESS: So my knowledge

24   -- my recollection from the advisory

25   committee meeting with respect to



Page 174

1                T. LOVITT, ESQ.

2   ████████████████████████████████

3   █████████████████████████

4   ████████████████████████████████

5   ██████████████████████████████

6   ██████████████████

7          ████████████████████████████████

8   █████████████████████████

9   ████████████████████████████████

10  BY MS. SHEKETOFF:

11      Q.     And anyone else?

12      A.     Not to my knowledge.

13             (Whereupon, memo was marked

14  as Plaintiffs' Exhibit 84 for

15  identification as of this date.)

16  BY MS. SHEKETOFF:

17      Q.     I'm going to show you what's

18  been marked as Plaintiffs' Exhibit 84.

19  That is in your binder.

20      A.     Yep.

21      Q.     That's Bates stamped JD3071

22  to 3075.

23      A.     Yep.

24      Q.     This is a very simple

25  question, but in the first paragraph



Page 175

```
 1                    T. LOVITT, ESQ.
 2    of the document it says "Practice
 3    services will begin distributing the
 4    evaluation summaries next week." What
 5    are evaluation summaries?
 6        A.    Hang on, hang on. I just got
 7    to -- I'm not sure what this document
 8    is, you're going to have to give me a
 9    second.
10            Okay. The evaluation
11    summaries are -- I wish I could I flip
12    to one in the book and show you.
13            When the practice -- I think
14    remember I told you there is in the
15    evaluation system the individual
16    evaluators, you know, submit their
17    individual evaluations and then
18    Suzanne Coussons compiles them for the
19    year. Like that compilation of the
20    individual evaluations is the
21    evaluation summaries.
22        Q.    I see, okay. So I'm going to
23    show you --
24        A.    Summary of the evaluations.
25            (Whereupon, evaluation
```



Page 176

 1                    T. LOVITT, ESQ.

 2    summary was marked as Plaintiffs'

 3    Exhibit 6 for identification as of

 4    this date.)

 5    BY MS. SHEKETOFF:

 6        Q.    Can you just look on your

 7    screen? I'm going to show you what's

 8    been marked as Plaintiff's Exhibit 6.

 9        A.    Sure.

10        Q.    Is this the evaluation

11    summary?

12        A.    Yes, exactly. Thank you.

13        Q.    Okay. Can you go back to

14    Plaintiffs' Exhibit 84, please?

15        A.    Yep.

16        Q.    Please turn to page 3, Bates

17    stamped JD3275.

18        A.    Yep.

19        Q.    What are these evaluations --

20    withdrawn.

21              Are these the evaluation

22    rating standards that were in place

23    between 2014 and 2018?

24        A.    I mean, this document is

25    dated 2016, but they're pretty



Page 177

```
 1                  T. LOVITT, ESQ.
 2    consistent throughout the time.
 3              And this is the document I
 4    was referencing earlier when I said
 5    it's in our evaluation meeting that
 6    multiple 2s is grounds for
 7    termination.
 8              If you look at 2 where it
 9    says 2 equals needs improvement, it
10    says right there in the middle of that
11    paragraph "Successive '2' ratings are
12    inconsistent with continued employment
13    at the Firm." This is what I was
14    referencing when I talked about your
15    two 2s being grounds for termination.
16        Q.    And are these the ratings,
17    evaluation ratings, you used for
18    individual partner evaluation?
19        A.    No.
20              MS. CHASE: I'll instruct you
21    not to answer questions about how
22    partners are evaluated. That's --
23              THE WITNESS: Partners. I
24    thought you meant --
25
```



Page 178

1              T. LOVITT, ESQ.

2     BY MS. SHEKETOFF:

3          Q.     How partners are evaluated.

4     When a partner fills out an individual

5     -- a rating for an individual

6     associate, are these the rating

7     standards that govern?

8          A.     My investigation is that this

9     document goes to all evaluators.

10              But now that you're asking me

11     that question and I'm looking at this

12     document, it might go to probably the

13     practice leaders and the PIC.

14              I'm not sure that this goes

15     to all partners. I can get you an

16     answer to that, but this document it's

17     sending only to partners in charge and

18     practice leaders.

19          Q.     I am going to show you --

20          A.     I think -- you know what? I

21     think on the evaluation form that the

22     individual evaluators fill out, those

23     numbers are defined on the form

24     itself.

25              So, you know, it's like if



Page 179

```
 1                 T. LOVITT, ESQ.
 2    you -- I don't know if you have a
 3    screenshot or anything of the
 4    associate evaluation that you get on
 5    the computer, you know, like who you
 6    -- I don't know if you can evaluate
 7    other associates, but you like pop it
 8    up and you have a numerical rating,
 9    that -- the numerical ratings are
10    actually defined on that sheet.
11              Like zero -- like, for
12    example, we don't have a category zero
13    here, right? But zero is defined on
14    that sheet has no basis.
15         Q.    Okay.
16         A.    So there's actually -- it's
17    actually, you know, I can't remember.
18    We have to take a look at that, that
19    screenshot.
20         Q.    Okay.
21         A.    I think these go to the
22    practice leaders and the PIC. And then
23    the numerical ratings that are
24    assigned in the individual evaluations
25    are defined on the form itself.
```



Page 180

```
 1                T. LOVITT, ESQ.
 2           (Whereupon, e-mail was marked
 3      as Plaintiffs' Exhibit 144 for
 4      identification as of this date.)
 5      BY MS. SHEKETOFF:
 6      Q.    Okay. I'm going to show you
 7      what's marked as Plaintiffs'
 8      Exhibit 144. That's in your binder.
 9      This is JD3048 to 3053.
10      A.    Give me a second. This is
11      that binder with the -- looks like
12      it's stuck, hang on.
13           144, right?
14      Q.    Yes, exactly.
15      A.    Okay, I'm there. All right.
16      Q.    Okay. Just one second. This
17      section says "We will receive the
18      evaluation reports for review by
19      February 23." What --
20      A.    Where are you on this?
21      Q.    The -- under The Task, second
22      paragraph, first sentence.
23      A.    Okay.
24      Q.    What evaluation reports were
25      reviewed?
```



Page 181

```
 1                    T. LOVITT, ESQ.
 2        A.    That is the, you know, the
 3   draft assessment statements of which
 4   would include like the two prior
 5   years' finals combined with the
 6   individual evaluations for that year.
 7        Q.    Okay. And is this --
 8        A.    This is a national review
 9   meeting.
10        Q.    All right. Can you please
11   turn to page 4, Bates stamped 3051?
12        A.    Yep.
13        Q.    Actually -- okay.
14              The final paragraph for this
15   says, "For example, some partners are
16   notoriously hard on people."
17        A.    Yes.
18        Q.    Hash one of those people?
19        A.    I was thinking of Bob
20   Profusek when I said that -- when I
21   wrote that sentence.
22              The nicest thing I've ever
23   read Bob Profusek say about an
24   associate was ████████████████████
25   ██████████████. That was the highest
```



Page 182

1                    T. LOVITT, ESQ.

2    phrase Bob Profusek ever gave anybody.

3    That's what I had in mind.

4        Q.    Did --

5        A.    That when Bob said ██████

6    ████████████, it was like the nicest

7    -- it was the highest phrase ever.

8        Q.    Okay. And was Hasham Mooppan

9    notoriously hard on people?

10       A.    No, no. Hash is candid, I

11   already testified to this. Hash was

12   candid, he was fair, he was accurate.

13             Hash saying, you know, a Hash

14   review is actually giving you

15   information in a factual basis for his

16   assessment. Bob's would literally read

17   ████████████████████████████. Big

18   difference.

19             (Whereupon, e-mail was marked

20   as Plaintiffs' Exhibit 141 for

21   identification as of this date.)

22   BY MS. SHEKETOFF:

23       Q.    I'm going to show you what's

24   been marked as Plaintiff Exhibit 141.

25   You can look at it in your binder, if



Page 183

1                  T. LOVITT, ESQ.

2    you prefer. This is Bates stamped 3037

3    to 3040.

4             And my question is this an

5    e-mail and attachment you sent on May

6    2, 2017?

7       A.    It appears be so, yes.

8       Q.    Please turn to page 2, which

9    is Bates stamped JD3038.

10            At the top of the page -- I'm

11   sorry.

12            Please turn to page 3, Bates

13   stamped --

14      A.    3039? Okay.

15      Q.    At the top of the page it

16   says "Where there is no disclosure

17   obligation by law, the Firm's policy

18   is not to distribute the assessment

19   statements to associate." Why is that

20   the firm's policy?

21      A.    You know, that policy

22   predates me and predated Hugh because

23   I asked him about this and I don't --

24   I have yet to get to an answer as to

25   why that's the firm's policy. It's not



Page 184

1                    T. LOVITT, ESQ.

2    policy, but it's really practice.

3        Q.    Okay. In the fourth full

4    paragraph, the document refers to the

5    associate review committee and here

6    I --

7        A.    You lost me. Where are you

8    again? I'm not as fast as you.

9        Q.    The fourth bullet point. The

10   one, two --

11       Q.    Same page?

12       A.    Three -- third sentence in

13   the fourth -- in the fourth bullet

14   point starts "The associate review

15   committees."

16       A.    I'm with you now. Thank you.

17       Q.    And are you -- is this memo

18   referring there to the national review

19   meeting and also the D.C. office

20   meeting?

21       A.    Not the D.C. office meeting.

22   This is the national review meeting.

23       Q.    And in the panel of the

24   bullet point the document says "Copies

25   of the individual evaluations prepared



Page 185

```
 1              T. LOVITT, ESQ.
 2    by individual lawyers should not be
 3    provided to the lawyer in that
 4    debriefing meeting." Why is that?
 5        A.    That's because there is --
 6    like I said, there's a lot of vetting
 7    going on and you're not -- you're
 8    focused on themes across the
 9    individual evaluations and personal
10    knowledge, and individual evaluations
11    are not talismanic.
12              And so you're, you know, what
13    matters from the firm's perspective at
14    this point in the process is the
15    firm's assessment statement.
16              The assessment statement
17    reflects the views of the firm;
18    individual evaluations reflect the
19    views of a single partner or single
20    associate on a single project.
21              (Whereupon, e-mail was marked
22    as Plaintiffs' Exhibit 152 for
23    identification as of this date.)
24    BY MS. SHEKETOFF:
25        Q.    I'm going to turn to or I'd
```



Page 186

```
 1                T. LOVITT, ESQ.
 2    ask you to turn to Plaintiffs' Exhibit
 3    152, and I'm showing that to you on
 4    the platform. That's Bates stamped
 5    JD3108.
 6        A.    Yep.
 7        Q.    So my question is is this
 8    concerning the D.C. office meeting or
 9    the --
10        A.    This is the national meeting.
11        Q.    And so here --
12        A.    I could help you out, when
13    you see Suzanne Coussons, she's
14    national. She was the head of all
15    this.
16        Q.    And who would be sending out
17    her -- who would be sending out
18    e-mails -- who coordinated the D.C.
19    meeting?
20        A.    Erica Valentine.
21        Q.    Okay.
22        A.    She's a little bit -- I mean,
23    my recollection is she might -- Erica
24    might've one year sat in the
25    regulatory meeting, a national
```



Page 187

1                 T. LOVITT, ESQ.

2    regulatory meeting.

3                 But at this point I can't

4    remember Suzanne's title, but she's an

5    administrative staff at the firm who

6    was, you know, the staff sort of in

7    charge of the evaluation process from

8    an administrative perspective.

9                 (Whereupon, e-mail was marked

10   as Plaintiffs' Exhibit 146 for

11   identification as of this date.)

12   BY MS. SHEKETOFF:

13       Q.    Okay. I'm going to show you

14   what's been marked as Plaintiffs'

15   Exhibit 146. That is Bates stamped JD

16   3056.

17                Is this another document that

18   was distributed in advance of the

19   national litigation meeting?

20       A.    Yes, national litigation

21   meeting.

22       Q.    And the first bullet point on

23   this page refers to meeting books.

24   What is a meeting book?

25       A.    That is -- let's see. Let me



```
 1                    T. LOVITT, ESQ.
 2  just -- yeah, the meeting book, I
 3  think Jim Jones referred to it as the
 4  evaluation report so referring to the
 5  same thing.
 6               You're getting, you know, a
 7  hard copy of the draft assessment
 8  statement which is, you know, with the
 9  two years' final assessment statement
10  and the two years' ratings and
11  rankings and the underlying individual
12  evaluations. And you're getting that
13  for every single associate who's
14  discussed in that meeting.
15               So my recollection is for the
16  national litigation meetings, these
17  were like three volumes. Like the
18  stuff you gave me today, it was like
19  three volumes of that.
20       Q.    Okay. We're going to change
21  topics here to a few questions in your
22  individual capacity. Potentially I
23  think the rest may be in your
24  individual capacity.
25               At the time -- do you need a
```



Page 189

1                     T. LOVITT, ESQ.

2    break?

3        A.    No. I'm good, let's go.

4        Q.    At the time when Mark was

5    fired, did Jones Day give all mothers

6    who are primary caregivers 18 weeks of

7    paid leave?

8        A.    Hang on. At the time Mark was

9    -- did the firm do what?

10       Q.    Give all mothers who were

11   primary caregivers 18 weeks of paid

12   leave?

13       A.    I would disagree with that

14   characterization. They -- the firm

15   gave 10 weeks of family leaving to

16   women -- to birthing mothers.

17   Birthing mothers were also eligible

18   for eight weeks of short-term

19   disability leave.

20       Q.    How is that different from

21   what I said?

22       A.    You said gave as if there was

23   no eligibility requirement. You need

24   to have -- you need to be disabled to

25   get the disability leave, and we had a



Page 190

```
 1                 T. LOVITT, ESQ.
 2    presumption of a medical certification
 3    of disability. So that's not giving,
 4    that's eligibility.
 5       Q.    For primary caregivers -- for
 6    mothers who are primary caregivers who
 7    are able to work at Jones Day six
 8    weeks after giving birth, how much
 9    paid leave are they entitled to take?
10             MS. CHASE: Objection to the
11    form of the question. It's a
12    hypothetical question. And witness can
13    answer to the extent she can the
14    hypothetical.
15             THE WITNESS: Yeah. I can't --
16    I mean, you're asking me a
17    hypothetical question. If I had
18    knowledge that, you know, an associate
19    was like running marathons and stuff
20    after six weeks, I think we would call
21    them up and say you better get in the
22    office, you're not disabled, you know,
23    but we were allowed to rely on medical
24    certification.
25             Medical certifications are
```



Page 191

1                    T. LOVITT, ESQ.

2    necessarily prospective. Doctors give

3    them before the baby is born.

4        Q.    Mike -- I'm sorry, go ahead.

5        A.    Yeah. So, you know, if a

6    doctor certifies someone as

7    eight-weeks disabled, you know, we

8    rely on that certification.

9             If someone is not disabled

10   and we know that and we find out about

11   that, then they shouldn't be on

12   disability leave.

13            So like -- let me give you an

14   example. So if -- and this is

15   hypothetical. You asked me a

16   hypothetical question, I'm going to

17   give you a hypothetical answer.

18            So if someone says I want to

19   come back to work after six weeks, I

20   feel great, I'm ready to do it, and by

21   the way I've got this great oral

22   argument, and I'm going to come and

23   prep for it, I don't want to lose that

24   argument.

25            And then they come back and



1                     T. LOVITT, ESQ.

2    work two or three weeks, and then they

3    say, you know what, I'm missing going

4    home, I want to go back to the baby,

5    can I get that two weeks of disability

6    back.

7                     The answer is no. You want to

8    go back, now you got to use your

9    family leave time. You just

10   demonstrated to the whole world that

11   you're no longer disabled.

12                    So if you want to take more

13   leave that you're now off disability

14   and you're now on the family, that's

15   how that works.

16        Q.    And so is a woman required to

17   tell the firm she's no longer disabled

18   within eight weeks of giving birth?

19                    MS. CHASE: Objection to the

20   form of the question. Again, all this

21   is in her individual capacity. It's a

22   hypothetical. To the extent you can

23   answer it, you can.

24                    THE WITNESS: I'm -- you would

25   have to talk to one of HR experts on



Page 193

```
1                T. LOVITT, ESQ.
2    this and that's policy people.
3            I don't think there is a
4    requirement in the sense of, you know,
5    a directive that goes out and -- but
6    I'm not in -- I don't know. I --
7            MS. CHASE: Don't answer
8    questions you don't know.
9            THE WITNESS: Strike that
10   answer. I have no idea.
11   BY MS. SHEKETOFF:
12       Q.   So I'm sorry, just to
13   clarify --
14       A.   I don't know. I don't do
15   leave. Like I'm not the administrative
16   leave person, so what the firm
17   requires and doesn't require is a
18   question I can't answer.
19            I apologize for attempting to
20   give you speculation, that's all that
21   was. You need to ask that question to
22   someone who actually can answer it.
23       Q.   So do you know when you say
24   that the firm presumes certification
25   of eight weeks, if a woman does not
```



Page 194

```
1                 T. LOVITT, ESQ.
2    actually have a certification of eight
3    weeks, was she supposed to tell the
4    firm?
5            MS. CHASE: Objection,
6    hypothetical; objection, asked and
7    answered. You can answer again.
8            THE WITNESS: This is all
9    outside the scope of my practice and
10   knowledge.
11   BY MS. SHEKETOFF:
12       Q.   Okay. To your knowledge are
13   all primary caregiver moms who don't
14   affirmatively tell Jones Day that they
15   are able to work sooner than eight
16   weeks after childbirth, are all of
17   those women entitled to take 18 weeks
18   of paid leave?
19           MS. CHASE: Same objection for
20   being hypothetical, and, of course,
21   all of this is in her individual
22   capacity. She can answer to the extent
23   she can.
24           THE WITNESS: I disagree with
25   your characterization of entitled, so
```



Page 195

```
 1                    T. LOVITT, ESQ.
 2    I would never say entitled.
 3                    But beyond that, I can't give
 4    you an answer to that question.
 5    BY MS. SHEKETOFF:
 6        Q.    Well, why do you disagree
 7    with entitled?
 8        A.    Because you's saying entitled
 9    as if it's an entitlement.
10                    You know, an entitlement
11    means you get it regardless of any
12    condition. There, you know, disability
13    leave requires, you know, that you're
14    certified disabled.
15                    It's, like I said, if you
16    come back after six weeks and say I'm
17    ready to go, let's go and you work for
18    two weeks and then you say I miss the
19    baby, I kind of want to go back on
20    leave now, can I get my two weeks of
21    disability back, the answer is no, you
22    can't.
23                    Now you got to go on family
24    leave because you've just demonstrated
25    that you're not disabled.
```



Page 196

1              T. LOVITT, ESQ.

2      Q.    And so for a woman at six

3   weeks who doesn't tell the firm that

4   she is recovered but is in fact

5   recovered and able to work, is she --

6   under the policy is she permitted to

7   continue taking 18 weeks of paid

8   leave?

9          MS. CHASE: I'm going to again

10  object to the question as it being

11  hypothetical and, again, outside the

12  scope of the 30(b)(6).

13          To the extent this witness

14  has any non-privileged knowledge on

15  this topic, she can answer. If she

16  doesn't have non-privileged knowledge

17  on this topic, she can tell you I have

18  no knowledge.

19          THE WITNESS: I have to refer

20  you to someone who can answer this

21  question. I don't have any

22  non-privileged knowledge.

23  BY MS. SHEKETOFF:

24     Q.    So just using the

25  hypothetical that you yourself came up



Page 197

```
 1                    T. LOVITT, ESQ.
 2    with for that woman who was running a
 3    marathon and, you know, told the firm
 4    about it, what if she were running
 5    marathon but, you know, totally better
 6    but didn't tell the firm at six weeks?
 7         A.    How would we know about that?
 8         Q.    I'm just -- wait. I'm not
 9    asking whether you --
10         A.    That's why these
11    hypotheticals are confounding me a
12    little bit, sort of like what would
13    you -- I don't know how you'd know.
14         Q.    The question is would she be
15    violating the policy if she continued
16    to take eight weeks of --
17              MS. CHASE: Hold on, freeze.
18    Same objection. It is a hypothetical,
19    it outside the scope of 30(b)(6), and
20    the witness can answer to the extent
21    she can only based upon knowledge she
22    had in her individual capacity that is
23    not learned through a privileged --
24    through -- as a result of privileged
25    communication.
```



Page 198

```
 1                  T. LOVITT, ESQ.
 2              If there is such knowledge,
 3    you can answer; otherwise, do not
 4    answer.
 5              THE WITNESS: The knowledge
 6    that I have individually as -- that's
 7    non privileged is from my personal use
 8    of the Jones Day leave policy when I
 9    was an associate.
10    ████████████████████████████
11    ████████████████████
12    ███████████████████████
13    ██████████████████████
14    ████████████████████
15    ██████████████████████████
16    ██████████████████████████
17       █████████████████████████████
18    ███████████████████████████
19    ██████████████████████
20    █████████████████████████
21    ███████████████████
22    █████████████████████████
23    █████████████████████████
24    ████████████████████████
25    ██████████████████
```





Page 199

1                    T. LOVITT, ESQ.



Page 200

```
1              T. LOVITT, ESQ.
2    ███████████████████████████████
3    ████████████████████████████
4    ██████████████████████████████
5    ██████████████
6              So you want my personal
7    knowledge? That's my personal
8    knowledge of how leave works and how
9    disability works in a childbirth
10   situation.
11             MS. SHEKETOFF: Okay. Well,
12   I'm sorry about your personal
13   situation. Hold on just one second.
14             (Whereupon, an off-the-record
15   discussion was held.)
16   BY MS. SHEKETOFF:
17      Q.   Okay. I want to show you
18   Plaintiffs' Exhibit -- I'm not done.
19             Are you aware of any female
20   associate at Jones Day who has taken
21   less than eight weeks of disability
22   leave after childbirth?
23      A.   Not to my knowledge.
24             MS. CHASE: Personal capacity.
25             MS. SHEKETOFF: Yes. All these
```



Page 201

```
 1                    T. LOVITT, ESQ.
 2   questions --
 3                 THE WITNESS: I certainly
 4   didn't. ███████████████████████████
 5   ████████████████████
 6   BY MS. SHEKETOFF:
 7       Q.    Okay. And has there been any
 8   change to Jones Day's parental leave
 9   offering since Mark was fired?
10                 MS. CHASE: Again, I'm going
11   to instruct the witness not to answer
12   any information she knows based upon
13   privileged communications. If she has
14   knowledge in her individual capacity
15   as to the individual topic, she can
16   answer.
17                 THE WITNESS: I just don't
18   know off the top of my head.
19                 (Whereupon, Reply Memorandum
20   in Support of Defendants' Motion to
21   Dismiss was marked as Plaintiffs'
22   Exhibit 169 for identification as of
23   this date.)
24   BY MS. SHEKETOFF:
25       Q.    I'm going to show you what's
```



Page 202

1                    T. LOVITT, ESQ.

2    been marked as Plaintiffs' Exhibit

3    169, which is Defendants' Reply

4    Memorandum in Support of Defendants'

5    Motion to Dismiss in this case. It's

6    docketed at 19.

7              Please turn to page 6, which

8    is internally marked as page 1.

9        A.    I'm sorry, I'm not following.

10   I'm on Exhibit 169. You asked me to

11   turn to page 6?

12       Q.    Yeah, page 6 of --

13       A.    The pagination at the

14   bottom?.

15       Q.    If you want to go by the

16   pagination at the bottom it's page 1.

17       A.    Okay, all right. I'm there.

18       Q.    Okay. This first paragraph

19   says that the firm's disability leave

20   policy -- about the firm's disability

21   leave policy. It offers leave only for

22   the period of actually disability.

23              Is that true with respect to

24   leave following routine --

25       A.    Hang on, hang on. You're



Page 203

1              T. LOVITT, ESQ.

2    summarizing. I need a sentence pointed

3    out to me.

4         Q.    Towards the end of the first

5    paragraph, the final -- the sentence

6    begins "It offers leave only for the

7    period of actual disability," and then

8    it says "and then adopts a presumable

9    presumption" -- focus on that first

10   phrase, it offers leave only for the

11   period of actual disability.

12            And my question is is that

13   true for the -- for women after

14   routine childbirth?

15            MS. CHASE: And I'm going to

16   instruct the witness not to answer

17   anything about privileged

18   communications or work product related

19   to the preparation of a brief that she

20   was aware of in her capacity as

21   counsel.

22            To the extent she has

23   independent knowledge about the truth

24   or accuracy of that statement in her

25   individual base as not through



```
 1                T. LOVITT, ESQ.
 2   privileged communications, she could
 3   so answer.
 4            THE WITNESS: Well --
 5            MS. CHASE: So if you don't
 6   know other than through privileged
 7   communications, then the answer is I
 8   can't answer the question.
 9            THE WITNESS: Yeah. This is
10   all privileged. This is knowledge that
11   I gained from privilege work product.
12   BY MS. SHEKETOFF:
13       Q.    Okay.
14       A.    But I stand behind the
15   voracity of our briefs.
16            MS. CHASE: And I'm, again,
17   going to to instruct you not to
18   provide any privileged testimony.
19            MS. SHEKETOFF: One second.
20            (Whereupon, an off-the-record
21   discussion was held.)
22   BY MS. SHEKETOFF:
23       Q.    Can you please turn to --
24       A.    Can we get a time check?
25       Q.    I think we have to go off the
```



Page 205

```
 1                 T. LOVITT, ESQ.
 2    record to do that, but I'm happy to do
 3    that, if you want.
 4          MS. CHASE: Let's do that for
 5    60 seconds to get a time check.
 6          VIDEOGRAPHER: All right.
 7    Going off the video record at
 8    6:24 p.m.
 9          (Whereupon, an off-the-record
10    discussion was held.)
11          VIDEOGRAPHER: We're back on
12    the video record at 6:30 p.m.
13    BY MS. SHEKETOFF:
14      Q.    So going back to Plaintiffs'
15    Exhibit 169 -- or maybe I never --
16    could you please turn to page 11,
17    footnote 2, the internal pagination 6.
18      A.    Okay, 6. I'm sorry, you
19    confused me for a second, 6, footnote
20    2.
21      Q.    This filing says "The
22    presumption of an eight-week
23    disability period" --
24      A.    I'm sorry, where are you?
25      Q.    In the footnote.
```



Page 206

```
 1              T. LOVITT, ESQ.
 2      A.    Yep. And I see starts
 3    "Retreating from their prior
 4    position."
 5      Q.    Right.
 6            MS. CHASE: Julia, I'm not
 7    going to let this witness answer any
 8    questions about legal analysis or --
 9    so if that's what you're wanting to
10    do, let's move on because she's not
11    going to answer any questions about
12    the legal analysis or brief. That's
13    all privileged.
14    BY MS. SHEKETOFF:
15      Q.    It says, The presumption of
16    an eight-week disability period for
17    routine childbirth originated with the
18    Firm's third-party administrator, and
19    my question is, is that an accurate
20    statement?
21            MS. CHASE: Again, any
22    knowledge that is reflected in this
23    footnote if she has in a privileged
24    capacity, she cannot answer.
25            If she has any independent
```



Page 207

```
 1              T. LOVITT, ESQ.
 2    basis outside of privileged
 3    communications to support this
 4    statement, she can indicate, but if
 5    the only knowledge source is
 6    privileged communications, she needs
 7    to say the only knowledge source is
 8    privileged communications.
 9              THE WITNESS: The only
10    knowledge source is privileged
11    communication.
12              MS. SHEKETOFF: Okay.
13    NU MS. SHEKETOFF:
14      Q.    Now, I'm going to show you
15    what's been marked as Plaintiffs'
16    Exhibit 26.
17              Actually, before we do with
18    that exhibit, were you involved in any
19    way in the firm's change of its
20    parental leave policy that was made
21    effective in January 2015?
22      A.    No.
23      Q.    And did you consult anyone
24    about that change?
25      A.    Are you asking as a lawyer in
```



Page 208

1                T. LOVITT, ESQ.

2    this case?

3        Q.    No. Before it was

4    implemented. You had distinguished

5    earlier between being involved in

6    something --

7        A.    No, I was not involved in

8    that process at all or consulted.

9        Q.    Okay. Did you -- and, again,

10   these questions are in your individual

11   capacity.

12            Did  Staff A  ever talk

13   with you about her complaint of

14   discrimination?

15       A.    A complaint of

16   discrimination. You're taking me back.

17   My recollection is that she and I did

18   not speak of her complaint of

19   discrimination. She and I talked about

20   a performance plan -- a performance

21   improvement plan.

22            She complained to me that she

23   felt like she was inadequately trained

24   for what she was being asked to do,

25   and I remember having a meeting with



Page 209

1                     T. LOVITT, ESQ.

2   her where we came up literally a, you

3   know, a plan for lack of a better word

4   -- I keep using that over and over

5   again -- but this was the training she

6   was going to receive and that was --

7   you know, her claim of discrimination

8   really came in the complaint.

9            And think she had -- she

10  might've had a claim earlier, but that

11  was something that she would've done

12  with HR, not with me.

13       Q.    Were you involved in any way

14  in the decision to fire her?

15       A.    Yes.

16       Q.    What was your role?

17       A.    I fired her.

18       Q.    Why did you fire her?

19       A.    She lied to me. And she

20  admitted lying to me. She lied to me

21  and partners for who she was working,

22  and she admitted that she lied.

23            And if there is one rule with

24  me is that if you lie, you violated

25  basic principles of trust and you can



Page 210

1                  T. LOVITT, ESQ.

2     no longer be in my employ.

3                  I not only fired  Staff A

4     for lying, I fired a number of staff

5     members for lying. I don't tolerate

6     liars.

7        Q.    And what did she lie to you

8     about?

9        A.    She lied to me about her

10    availability to do a project.

11               She wanted to leave the

12    office at a certain time and she --

13    this, again, you're going on my

14    recollection here, and she lied to

15    both the people she was working for

16    about her availability to complete a

17    project and -- no, wait. Hang on, hang

18    on.

19               Shoots, you see I'm going too

20    fast because I'm now -- I haven't

21    thought about  Staff A  in a long

22    time, so I'm talking and refreshing my

23    own recollection.

24               I think she lied about a

25    conversation -- yeah, a conversation



Page 211

1                    T. LOVITT, ESQ.

2    that she had with an associate. She

3    misrepresented -- and I can't give you

4    more than this because, again, I'm

5    going off of old memories here -- of a

6    direction that she was given by an

7    associate and she called the associate

8    a liar and then she -- and she lied to

9    the partner and tried to get this

10   associate in trouble and she admitted

11   later that she in fact was the liar.

12             And when she admitted to me

13   sitting in my office looking at me in

14   the eye she had lied to my face, I

15   decided she had to go. She completely

16   obliterated my trust in her.

17        Q.    Are you -- I'm sorry what?

18        A.    She was a liar.

19        Q.    Are you aware of any

20   attorneys or staff who separated from

21   the firm within three months after

22   complaining of discrimination or

23   retaliation against the firm?

24             MS. CHASE: I'm going to

25   caution that any information about



Page 212

1                    T. LOVITT, ESQ.

2  partners other than ▇ Partner G ▇ should

3  not be that subject matter of any

4  testimony. With any other examples you

5  can provide, as long as you're not

6  providing information that you learned

7  only in a privileged capacity.

8              THE WITNESS: I'm sorry, your

9  time is within three months of

10 complaining about discrimination, was

11 that the question?

12             MS. SHEKETOFF: Within three

13 months of complaining about

14 discrimination or retaliation against

15 the firm.

16             THE WITNESS: Complaining

17 about discrimination or retaliation --

18 it's a very specific question which is

19 why I'm saying it over and over again.

20             And the only -- and I don't

21 know timing. The only person --

22             MS. CHASE: I'm going to

23 caution you --

24             THE WITNESS: It's a very

25 specific question --



Page 213

```
 1              T. LOVITT, ESQ.
 2          MS. CHASE: I'm going to again
 3   -- privileged information not to
 4   disclose.
 5          THE WITNESS: Yeah. But I
 6   can't disclose privileged information,
 7   but I can't for the life of me say
 8   three months, four months, two months.
 9          I can't -- I don't remember
10   that. I'm trying really hard, but I
11   don't remember. I can't give you that
12   granular an answer.
13   BY MS. SHEKETOFF:
14      Q.    Let's say within six months.
15      A.    Okay. You're not helping me
16   out here.
17          I think if you take the time
18   component out, then you would bring in
19   ▮ Partner G ▮, but I for the life of me
20   don't have the chronology implanted in
21   my brain.
22      Q.    Okay. Are you aware of anyone
23   who has ever told the firm that he or
24   she might or would have hired an
25   attorney in connection with a
```


MAGNA
LEGAL SERVICES

Page 214

```
 1              T. LOVITT, ESQ.
 2    complaint of discrimination or
 3    retaliation?
 4      A.    Gosh. You know, here too --
 5            MS. CHASE: Same caution, if
 6    you have knowledge in a way of
 7    privileged capacity, don't provide it;
 8    if you have other knowledge  --
 9    speaking to  █ Partner G █  --
10            THE WITNESS:  █ Partner G █,
11    yeah.
12            So I'm trying to -- like --
13    and I'm almost checking myself as I
14    give this answer.
15            You know, my recollection of
16    the Tolton plaintiffs -- and, again,
17    this is in my individual capacity, I
18    haven't looked at this stuff in years.
19            MS. CHASE: If you don't
20    know --
21            THE WITNESS: Yeah. But my
22    recollection is the first time I saw
23    their allegation of discrimination was
24    in their complaint. And with █Partner G█
25    █Partner G█, you know, I don't recall, I
```



Page 215

```
 1              T. LOVITT, ESQ.
 2   just don't remember if there was
 3   discussion of a lawyer or not. I don't
 4   remember. It was a long time ago.
 5   BY MS. SHEKETOFF:
 6      Q.    Setting aside the Tolton
 7   plaintiffs and [Partner G], can you
 8   think of anyone else?
 9      A.    No.
10      Q.    Are you aware of anyone who's
11   ever told the firm that he or she
12   might, would or had filed an
13   administrative complaint or lawsuit in
14   connection with a claim of
15   discrimination or retaliation? And you
16   can set aside the Tolton plaintiffs
17   and [Partner G].
18      A.    Yeah; no, no.
19      Q.    Okay. Has anyone ever alleged
20   that you personally unlawfully
21   retaliated against him or her?
22      A.    Not to my knowledge. Although
23   did the [Partner G] make an allegation
24   -- no, she did not make an allegation
25   against me.
```



Page 216

1               T. LOVITT, ESQ.

2          MS. CHASE: You mean Staff A

3     Staff A ?

4          THE WITNESS: Sorry, Staff A

5     Staff A . It's late in the day.

6               Staff A , my recollection

7     of her complaint is that there was no

8     allegation that I discriminated

9     against her, that the allegation was

10    that the partners who directly oversaw

11    her work engaged in discrimination,

12    so, no, not to my knowledge has there

13    been any such allegation or statement.

14    BY MS. SHEKETOFF:

15         Q.    Outside of the conversations

16    with Brogan and your lawyers who've

17    entered an appearance in this case,

18    have you talked with anyone about this

19    case, me or Mark?

20         A.    Gosh, I mean, I'm sure. I --

21    you know, every time there's some

22    splashy press thing, someone will call

23    me and make some snide remark.

24               I mean, I can't give you

25    people, I can't give you times, but



Page 217

1                    T. LOVITT, ESQ.

2    like, you know, I've got vague

3    recollections. And they're not

4    flattering to you, so I don't want to

5    put them in the record. But I do get

6    commentary that I'm going to put

7    politely to the effect of I read their

8    briefs, how in the world could you

9    have hired these people.

10             I get some of that throughout

11   the course of this case, but I don't

12   want to go down that road. I don't

13   think we need to put that on the

14   record.

15       Q.    What have you said about us?

16       A.    I say very -- I say nothing

17   just sort of like a nod and, you know.

18   Because I'm counsel, I can't. I can't

19   speak to others. I'm not on the

20   receiving end, I'm on the listening

21   end.

22       Q.    And who are people who have

23   talked to you about this case?

24       A.    I don't -- again, this is in

25   the context of you'll file something



Page 218

1                    T. LOVITT, ESQ.

2     and someone will say God, I couldn't

3     understand this or that and I just --

4     I'm counsel, I can't say anything.

5              All I can do is go, you know,

6     bobble my head all around. But I don't

7     have a specific recollection of a

8     person or an event --

9        Q.    Are you talking about

10    attorneys at Jones Day?

11       A.    Again, I don't really pay

12    attention to this stuff because I

13    can't talk about it, so I try to get

14    in and out of the room as quickly as

15    possible.

16             You know, I can't -- I mean,

17    I think my husband read something and

18    said this is gobbly goo. You know,

19    he's not inside the firm, but, again,

20    I'm just like honey, I can't talk to

21    you.

22             So no, I mean, I haven't

23    talked to people, and I just have

24    these general recollections, and

25    they're not flattering to you, and



Page 219

```
 1                T. LOVITT, ESQ.
 2    they're snide comments. So beyond
 3    saying that, I think that's all in my
 4    answer.
 5        Q.    Okay. So there's nothing that
 6    you can remember saying about us to
 7    people --
 8        A.    Me?
 9        Q.    Yes.
10        A.    Me saying, no. No. I'm
11    counsel, I don't.
12              (Whereupon, Defendants'
13    Response to Pre-Motion Statement was
14    marked as Plaintiffs' Exhibit 172 for
15    identification as of this date.)
16    BY MS. SHEKETOFF:
17        Q.    Okay. I'm going to show you
18    on the screen what's been marked as
19    Plaintiffs' Exhibit 172.
20              I believe this is in your
21    binder. This is Defendants' response
22    to the pre-motion statement in this
23    case.
24        A.    Which number? I'm sorry, I
25    missed that.
```



Page 220

```
 1              T. LOVITT, ESQ.
 2       Q.    172.
 3       A.    Okay.
 4       Q.    This is docketed at 84.
 5       A.    Yep.
 6       Q.    And you signed this document,
 7   right?
 8       A.    It looks like I did.
 9       Q.    Please turn to page 6.
10       A.    Is that the Arabic numbers on
11   the bottom?
12       Q.    Hold on one second, actually.
13             No. That's -- the internal
14   pagination is 5.
15       A.    Okay.
16       Q.    Okay. The statement in the --
17   it's a final sentence of the first
18   paragraph on the page, it says "In
19   opposing summary judgment, Defendants
20   would seek to bolster that inference
21   through a declaration --
22       A.    I'm not with you yet. I'm not
23   with you yet. The final sentence of
24   the carry-over paragraph?
25       Q.    Yes, exactly.
```



MAGNA
LEGAL SERVICES

Page 221

```
 1                  T. LOVITT, ESQ.
 2        A.    Okay, yep. I'm there.
 3        Q.    "In opposing summary
 4   judgement, Defendants would seek to
 5   bolster that inference through a
 6   declaration from the relevant
 7   decisionmaker."
 8              Who is the relevant
 9   decisionmaker you are referring to?
10              MS. CHASE: I'm going to
11   instruct the witness not to answer
12   questions about interpretation of a
13   legal briefing that she signed in her
14   privileged capacity. That is not an
15   appropriate subject for a fact
16   witness.
17              You're now trying to
18   interfere with Jones Day's
19   relationship with its counsel and its
20   signatory on a filing in court and
21   asking her to interpret that. She is
22   not going to do that. I'm instructing
23   her not to.
24              THE WITNESS: And I have to
25   read a lot more than the sentence to
```



Page 222

```
 1                  T. LOVITT, ESQ.
 2    understand what this means --
 3             MS. CHASE: And you're being
 4    instructed not to answer, anyway.
 5             THE WITNESS: Okay. So I'm
 6    going to stop reading.
 7    BY MS. SHEKETOFF:
 8        Q.    Do you know who at Jones Day
 9    told Evan Miller about Mark's
10    termination or January e-mail?
11             MS. CHASE: Objection.
12    Assumes facts not in evidence. You can
13    answer to the extent you know.
14             THE WITNESS: I have no idea
15    what you're talking about.
16    BY MS. SHEKETOFF:
17        Q.    Have you ever spoken to Evan
18    Miller about Mark at any time since
19    January 16, 2019?
20             MS. CHASE: I'm going to
21    instruct you not to answer any
22    privileged communications, but if
23    you've spoken to Mark -- spoken about
24    Mark to Evan Miller in a
25    non-privileged capacity you can so
```



Page 223

```
 1                T. LOVITT, ESQ.
 2    indicate.
 3                THE WITNESS: I have not
 4    spoken to Evan Miller in a
 5    non-privileged capacity.
 6    BY MS. SHEKETOFF:
 7        Q.    Okay. At all about Mark or --
 8        A.    I talked to Evan Miller
 9    because I like Evan but not about
10    Mark, so.
11        Q.    And have you spoken to him in
12    a non-privileged capacity about our
13    January e-mail since Mark's
14    termination?
15        A.    No.
16        Q.    Or, I guess, actually before
17    Mark's termination?
18        A.    No.
19        Q.    And are you claiming you had
20    an attorney-client relationship with
21    Evan Miller?
22                MS. CHASE: I am making the
23    representation that there --
24    Ms. Lovitt is counsel for the firm,
25    and to the extent that she has been
```



Page 224

1                    T. LOVITT, ESQ.

2    involved in any investigatory calls or

3    discussions related to the allegations

4    in your complaint, that those are

5    privileged and she cannot speak to

6    them.

7             She has said she had no

8    non-privileged communications, and

9    therefore this is not a question she

10   can answer without getting into the

11   privileged, so I'm instructing her not

12   to answer.

13   BY MS. SHEKETOFF:

14      Q.    Do you know what happened

15   with John Getz's -- sorry.

16             Do you know what happened

17   with Jones Day's representation of the

18   Erie Diocese case that I worked on

19   with John Getz?

20      A.    I have no knowledge of the

21   Erie Diocese case, period.

22      Q.    So you are -- do you know

23   whether the firm was threatened by

24   litigation --  with litigation?

25      A.    I don't even know if we



Page 225

1                    T. LOVITT, ESQ.

2      represent the Erie Diocese -- Diocese,

3      so I've got nothing.

4         Q.    Okay. In preparing for

5      today's deposition, did you review any

6      documents?

7         A.    Yeah.

8         Q.    Were any of those documents

9      ones that were not produced in full in

10     discovery?

11        A.    I have no idea. I am counsel

12     in this case, but I did not run

13     production. So I reviewed documents, I

14     couldn't tell you what their status

15     was with respect to production.

16        Q.    Did you prepare any notes?

17        A.    I -- during -- like remember

18     that last set of questions you had,

19     like the April meetings? I did run --

20     it was just too much, I wrote it down

21     like the December -- like that. That

22     was within -- it was just too much. I

23     couldn't commit that to memory.

24              But apart from this kind of

25     what we're talking about inside today,



Page 226

```
 1                T. LOVITT, ESQ.
 2   like, no, I didn't -- not in
 3   preparation for deposition, I did not
 4   prepare any notes.
 5        Q.    Did you review any notes
 6   prepared by someone else?
 7        A.    No. I reviewed -- I mean, I'm
 8   kind of squinching my head because I'm
 9   thinking about how to characterize
10   deposition testimony.
11              I read deposition testimony.
12   Those aren't -- I mean, those are
13   technically court reporter notes, but
14   not -- I don't think in the main way
15   you mean, no.
16        Q.    Did anything you reviewed
17   refresh your recollection as to
18   anything we discussed in this
19   deposition?
20              And I should say I'm really
21   asking about anything that was not
22   produced in full, so anything that was
23   redacted over which you're claiming
24   attorney-client privilege.
25        A.    I can't answer that question
```



Page 227

```
 1                   T. LOVITT, ESQ.
 2    because I'm not sure what was produced
 3    and not produced. So I'm not sure how
 4    to go about answering that.
 5            MS. CHASE: The answer is you
 6    can't answer.
 7            THE WITNESS: Yeah, I can't
 8    answer that the way it's phrased. I'm
 9    sorry.
10    BY MS. SHEKETOFF:
11        Q.    Okay. Well, did anything you
12    reviewed refresh your recollection as
13    to anything that we discussed about
14    during this deposition today?
15        A.    I mean, sure. I didn't
16    remember word for word your assessment
17    statements until I read them again,
18    that sort of stuff; I didn't remember
19    all the individual evaluations, you
20    know, five years later until I read
21    them again. So, yeah, in that sense I
22    read some documents that refreshed my
23    recollection.
24        Q.    Anything else?
25        A.    I'm trying to think of what I
```



Page 228

1                    T. LOVITT, ESQ.

2    reviewed. No, not really.

3        Q.    Nothing else?

4        A.    Nothing comes to mind, no.

5    But, I mean, it's like, you know,

6    reading the evaluation file, I just

7    didn't remember all the ins and outs

8    of your evaluation file so I read it

9    again.

10       Q.    So besides the things you

11   mentioned, there's nothing else that

12   you can remember that refreshed your

13   recollection as to your testimony

14   today?

15       A.    Not sitting here today, no.

16       Q.    Did anything else you

17   reviewed affect any of your testimony

18   today?

19       A.    Affect -- well, I mean, I'm a

20   30(b)(6), right, so I had to conduct

21   interviews and gain knowledge that I

22   didn't have in an individual capacity.

23            So sure, yeah, my interviews

24   of Kevyn Orr and Adrian Wager-Zito and

25   Beth Heifetz affected my testimony.



Page 229

```
 1                 T. LOVITT, ESQ.

 2       Q.    I'm talking --

 3       A.    Gain knowledge from that.

 4       Q.    I'm talking about documents.

 5       A.    Sure. It's the same with the

 6   deposition testimony of Steve Brogan,

 7   that's how I gained my knowledge of

 8   the managing partner's decisionmaking

 9   as I read his deposition transcript. I

10   didn't independently have his

11   knowledge.

12       Q.    Is there anything else --

13       A.    But as a 30(b)(6) I'm

14   required to answer for the firm.

15       Q.    Anything else besides the

16   deposition transcript?

17       A.    No.

18             MS. SHEKETOFF: Okay. I think

19   that closes out our deposition today

20   -- actually, let me take one second

21   just to confer with Mark.

22             (Whereupon, an off-the-record

23   discussion was held.)

24             MS. SHEKETOFF: Okay, yes. So

25   we're done for today. Thank you
```



Page 230

```
 1                  T. LOVITT, ESQ.
 2      everyone.
 3                  VIDEOGRAPHER: Before we go
 4      off the video record -- go head.
 5                  THE WITNESS: I don't want to
 6      be accused of destroying anything. Do
 7      you want -- can I throw these Post-It
 8      Notes away where I -- "Trying to
 9      remember. Beth does not use recruiting
10      and ratings" -- just it's what I
11      testified to?
12                  MS. SHEKETOFF: Okay.
13                  THE WITNESS: I want to throw
14      them away, but I'm not going to throw
15      them away if there's any possibility
16      that that's going to cause a problem.
17                  MS. SHEKETOFF: I'm happy for
18      you to throw it away.
19                  THE WITNESS: Okay. Have it
20      on the record.
21                  VIDEOGRAPHER: Before we go
22      off the record, Julia, would you like
23      a video copy of the deposition?
24                  MS. SHEKETOFF: Yes. I'll
25      coordinate everything with Magna.
```



Page 231

```
 1                    T. LOVITT, ESQ.
 2    Thank you.
 3             VIDEOGRAPHER: And, Ms. Chase,
 4    would you like a video copy?
 5             MS. CHASE: Yes, we would.
 6    Thank you.
 7             VIDEOGRAPHER: And do you want
 8    it synced with the transcript?
 9             MS. CHASE: Yes, please.
10             VIDEOGRAPHER: DVD or digital
11    file?
12             MS. CHASE: Digital file.
13             VIDEOGRAPHER: All right.
14             MS. CHASE: I had to seek
15    guidance on that topic. Digital file.
16             VIDEOGRAPHER: All right,
17    okay.
18             With that being said, this
19    concludes the video conference
20    deposition of Ms. Traci Lovitt. We're
21    going off the video record on
22    September 1, 2022 at 6:50 p.m.
23    Standby.
24
25
```



Page 232

1              T. LOVITT, ESQ.

2              (Whereupon, at 6:50  P.M.,

3      the Examination of this witness was

4      concluded.)

5

6                    o     o        o       o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 233

```
 1
 2                D E C L A R A T I O N
 3
 4        I hereby certify that having been
 5   first duly sworn to testify to the
 6   truth, I gave the above testimony.
 7
 8        I FURTHER CERTIFY that the
 9   foregoing transcript is a true and
10   correct transcript of the testimony
11   given by me at the time and place
12   specified hereinbefore.
13
14
15
           _____
16                TRACI LOVITT, ESQ.
17
18
19   Subscribed and sworn to before me
20   this _____ day of _____
     20___.
21
22
23   _____
          NOTARY PUBLIC
24
25
```



```
 1
 2              E X H I B I T S
 3
 4    PLAINTIFF EXHIBITS
 5
 6    EXHIBIT EXHIBIT                    PAGE
 7    NUMBER  DESCRIPTION
 8    6       Evaluation summary        175
 9    23      Chain of e-mails          14
10    39      Spreadsheet               146
11    40      Spreadsheet               162
12    83      Evaluation Meetings       53
13    84      Memo                      174
14    141     E-mail                    182
15    144     E-mail                    180
16    146     E-mail                    187
17    152     E-mail                    185
18    160     Spreadsheet               119
19    162     Spreadsheet               151
20    169     Reply Memorandum in
21            Support of Defendants'
22            Motion to Dismiss         201
23    172     Defendants' Response to
24            Pre-Motion Statement      219
25    177     Chain of e-mails          16
```



Page 235

1

2    178      Transcript                    19

3

4    (Exhibits retained by Court Reporter.)

5

6            I N D E X

7

8    EXAMINATION BY                        PAGE

9    MS. SHEKETOFF                  4

10

11    INFORMATION AND/OR DOCUMENTS

12   REQUESTED

13   INFORMATION AND/OR DOCUMENTS      PAGE

14   (None)

15

16

17       QUESTIONS MARKED FOR RULINGS

18   PAGE LINE   QUESTION

19   21    10   Well, this is in your

20             individual capacity, and I'm

21             asking did you speak to Mike

22             Shumaker about this e-mail

23             before Mark was fired. He is

24             saying that you did or that

25             you likely did.



Page 236

1

2        C E R T I F I C A T E

3

4   STATE OF NEW YORK        )

              :  SS.:

5   COUNTY OF ROCKLAND      )

6

7       I, LEAH SIEMIATYCKI, a Notary

8   Public for and within the State of New

9   York, do hereby certify:

10      That the witness whose examination

11  is hereinbefore set forth was duly

12  sworn and that such examination is a

13  true record of the testimony given by

14  that witness.

15      I further certify that I am not

16  related to any of the parties to this

17  action by blood or by marriage and

18  that I am in no way interested in the

19  outcome of this matter.

20      IN WITNESS WHEREOF, I have hereunto

21  set my hand this 6th day of September

22  2022.

23

24

25        _Leah Siemiatycki_



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | ) ) ) Civ. No. 1:19-02443 (RDM) |
| *Plaintiffs*, | ) ) ) |
| *v.* | ) ) |
| JONES DAY *et al.*, | ) ) |
| *Defendants.* | ) ) |

**ERRATA SHEET FOR SEPTEMBER 1, 2022**
**DEPOSITION OF TRACI LOVITT**

**Part 1**

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 6 | 23 | Toltan (phonetically) | Tolton | Transcription error |
| 15 | 2 | Internet | Intranet | Transcription error |
| 15 | 20 | getting a chat | getting a check | Transcription error |
| 16 | 7 | it has | that is | Transcription error |
| 17 | 12 | set | sent | Transcription error |
| 18 | 15 | testimony for you. | record for you. | Transcription error |
| 21 | 24 | interrupting | interpreting | Transcription error |
| 25 | 21 | Hue Whitey | Hugh Whiting | Transcription error |
| 35 | 13 | privileged knowledge of something of | non-privileged knowledge of something about | Transcription error |
| 47 | 4 | Complaint in anticipation | Complaint and in anticipation | Transcription error |
| 47 | 9-10 | comments.  I will make clear it was right in the story. | comments, when it made clear that it was writing a story. | Transcription error |
| 48 | 5-8 | Anyone who is threatening a professional organization upon state address | And, anyone who is running a professional organization, upon seeing a draft | Transcription error |

1

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 48 | 9-10 | to go to the media was going under (inaudible) | to go to the media was going to come to fruition. | Transcription error |
| 52 | 8 | Toltan | Tolton | Transcription error |
| 53 | 4 | Toltan | Tolton | Transcription error |
| 53 | 18 | -- it was | -- I was | Transcription error |
| 87 | 18 | Berdon | burden | Transcription error |
| 88 | 23 | binary way (inaudible) | binary way this could work | Transcription error |
| 106 | 2 | administrative (inaudible.) | administrative requirements. | Transcription error |
| 106 | 17 | (inaudible) for violence | penchant for violence | Transcription error |
| 108 | 2 | (inaudible) | false | Transcription error |
| 108 | 7 | (inaudible) | false | Transcription error |
| 108 | 20 | 30 (b) (6) | 30 | Transcription error |
| 109 | 14 | termination (inaudible) | termination decision | Transcription error |
| 109 | 19 | it's claim | his claim | Transcription error |
| 109 | 24 | Mcora (phonetically) | McClure | Transcription error |
| 110 | 2 | Mcora | McClure | Transcription error |
| 110 | 23 | if were | if he were | Transcription error |
| 110 | 25 | humor | hubris | Transcription error |
| 120 | 21 | sediment | synonym | Transcription error |
| 129 | 21 | compatible | compelling | Transcription error |
| 135 | 3 | his | her | Transcription error |
| 138 | 22 | (inaudible) and | associate | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 140 | 12 | So it is at least 30 (b) (6) people. | So it is in excess of 30 people. | Transcription error |
| 145 | 22 | Majoris (phonetically). | Majoras. | Transcription error |
| 146 | 5 | Tombay (phonetically), | Tambe, | Transcription error |
| 146 | 8 | Klem (phonetically) | Klehm | Transcription error |
| 146 | 11 | exhausted | exhaustive | Transcription error |
| 146 | 16-17 | evaluating the | the evaluation | Transcription error |
| 146 | 19 | Tom | Tim | Transcription error |
| 146 | 20 | Bill Neger (phonetically) | Glen Nager | Transcription error |
| 146 | 22 | Glenn | Glen | Transcription error |
| 147 | 9-10 | Depoalot (phonetically) | Debra Belott | Transcription error |
| 148 | 21-22 | of Blaker Flynn (phonetically) | if Labor & Employment | Transcription error |
| 148 | 23 | Mike | Greg | Clarification / Transcription error |
| 149 | 24 | refresher | pressure | Transcription error |
| 150 | 11 | breaking of the grates | grading of the graders | Transcription error |
| 154 | 13 | Tomaro (phonetically) | Tomaro | Transcription error |
| 154 | 25 | me, as | me, at | Transcription error |
| 156 | 16 | PSP | PIC | Transcription error |
| 157 | 15-16 | claim is a false | claim is false | Transcription error |
| 157 | 22-23 | and the -- fair and accurate | and that your evaluation was fair and accurate | Transcription error |
| 158 | 19 | computation | compensation | Transcription error |
| 159 | 21-22 | the Jones Day except for Tobay (phonetically) | Jones Day except for Taipei | Transcription error |
| 160 | 23 | refer to (inaudible). | defer to Terri on this. | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 163 | 6 | how to set | how it set | Transcription error |
| 178 | 19 | JV year | JD year | Transcription error |
| 181 | 23 | INA | I&A | Transcription error |
| 182 | 15-16 | not a categorical note of what happened. | not a categorical "no, it won't happen." | Transcription error |
| 183 | 8 | senior view has | senior to you had a | Transcription error |
| 185 | 14 | Yachov (phonetically) | Yaakov | Transcription error |
| 185 | 18 | Hasunton (phonetically) | Hashim | Transcription error |
| 185 | 20 | �one{Partner J} | Partner J | Transcription error |
| 185 | 21-22 | Natt Geer (phonetically) | Nat Garrett | Transcription error |
| 187 | 12 | with him | within | Transcription error |
| 188 | 2 | canceled | counseled | Transcription error |
| 190 | 5-7 | on the performance basis that might cap -- you know, cap out under claims | on a performance basis - -- that might cast doubt on your claim | Transcription error |
| 193 | 10-11 | suggest that the particular reads and records in | suggest -- particularly his reference to | Transcription error |
| 193 | 15 | oh, wait, | only | Transcription error |
| 193 | 24-25 | Yachat Brov (phonetically) even | Yaakov Roth even said | Transcription error |
| 194 | 8 | ordered to | ordered you to | Transcription error |
| 194 | 13-14 | to get it quit | to quit | Transcription error |
| 194 | 16-17 | clients but the | clients because the | Transcription error |
| 194 | 22 | state | talk | Transcription error |
| 196 | 3 | Tash | Hash | Transcription error |
| 196 | 21 | both spoke to Hash | Beth spoke to Hash | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 197 | 11-14 | ███████████ | ███████████ | Clarification / Transcription error |
| 198 | 23 | misrepresentation | representation | Transcription error |
| 202 | 21 | Yachav Brash | Yaakov Roth | Transcription error |
| 203 | 9 | Yachav | Yaakov | Transcription error |
| 203 | 23 | Yachav | Yaakov | Transcription error |
| 204 | 7 | Yachav | Yaakov | Transcription error |
| 206 | 6 | Yachav | Yaakov | Transcription error |
| 207 | 7-8 | sentences and the evaluation | sentences in the evaluation | Transcription error |
| 208 | 4 | Yachav | Yaakov | Transcription error |
| 215 | 14-16 | "Ms. Sheketoff's (inaudible) is a sensationalized allegation" | "Ms. Sheketoff resorts to the sensationalized allegation" | Transcription error |
| 217 | 4 | describing | ascribing | Transcription error |
| 223 | 3 | Petrone | Petrou and | Transcription error |
| 223 | 25 | Patrone | Petrou | Transcription error |
| 224 | 19 | Patrone | Petrou | Transcription error |
| 226 | 13 | conversation with them | conversation with him | Transcription error |
| 226 | 14 | Patrone | Petrou | Transcription error |
| 227 | 21 | conversation | recollection | Transcription error |
| 229 | 20 | (inaudible) | a presumption | Transcription error |
| 231 | 2-3 | have eligibility required. | have an eligibility requirement. | Transcription error |
| 231 | 7 | than | then | Transcription error |

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 233 | 12 | a.m. | p.m. | Transcription error |
| 234 | 20 | unless | until | Transcription error |
| 251 | 10 | interest and knowing | interest in knowing | Transcription error |
| 257 | 25 | followed | flowing | Transcription error |
| 258 | 5 | reporter and a | reporter as a | Transcription error |
| 275 | 19 | sent people | sent it to people | Transcription error |
| 276 | 24-25 | Emrich (phonetically) | Enrich | Transcription error |
| 277 | 19 | he is asking | he was asking | Transcription error |
| 279 | 9 | Emrich | Enrich | Transcription error |
| 279 | 10 | myself would | myself, would | Transcription error |
| 279 | 11 | with counsel | as counsel | Transcription error |
| 279 | 15 | Emrich | Enrich | Transcription error |
| 280 | 3 | Emrich | Enrich | Transcription error |
| 280 | 20 | leadership at | leadership position at | Transcription error |
| 281 | 14 | both | co-head | Transcription error |
| 281 | 17-18 | Fray Whitesack (phonetically) | Ray Wiacek | Transcription error |
| 281 | 20 | practicing with | practice leader of | Transcription error |
| 282 | 14 | (Inaudible) partnership | For partnership committee | Transcription error |
| 282 | 15 | currently an | currently I'm an | Transcription error |
| 283 | 7 | Fray White Sack | Ray Wiacek | Transcription error |
| 283 | 13 | (inaudible). | Joe Sims. | Transcription error |
| 283 | 23 | proposition of associates and | promotion of associates to | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 284 | 19 | Internet | Intranet | Transcription error |
| 284 | 20 | Internet | Intranet | Transcription error |
| 285 | 21 | role, the | role for the | Transcription error |
| 285 | 24 | (inaudible) to | endeavor to do | Transcription error |
| 286 | 4 | that you | you that | Transcription error |

**Part 2**

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 4 | 23 | with | in | Transcription error |
| 4 | 24 | real time | "real time," | Transcription error |
| 5 | 9 | took it place | took place | Transcription error |
| 5 | 15 | actuals, you know, quote to quote of | | |
| 6 | 15 | recollection to | recollection of the | Transcription error |
| 6 | 16 | was is that | was that | Transcription error |
| 7 | 16 | both of her | both on her | Transcription error |
| 7 | 19 | what he was | what she was | Transcription error |
| 8 | 5 | signed | assigned | Transcription error |
| 8 | 6 | signed | assigned | Transcription error |
| 10 | 10-11 | remembered that there | remembered there | Transcription error |
| 15 | 4 | involvement of this | involvement in this | Transcription error |
| 27 | 16 | I was | was I | Transcription error |
| 29 | 24 | begin | begins | Transcription error |
| 31 | 11 | evaluation | evaluations | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 31 | 25 | that | if | Transcription error |
| 32 | 10-11 | period.  In Washington D.C. | period -- in Washington D.C., | Transcription error |
| 36 | 16 | and | in | Transcription error |
| 36 | 25 | market | markets | Transcription error |
| 38 | 13 | that | at | Transcription error |
| 40 | 2 | theyyears | the years | Transcription error |
| 40 | 18 | the managing partners. | the Managing Partner. | Transcription error |
| 40 | 20 | determination, I'd have mine, we'd | determination.  I'd have mine.  We'd | Transcription error |
| 47 | 21 | But more for an | But there are | Transcription error |
| 47 | 22 | details | detail | Transcription error |
| 47 | 25 | to, there | to -- there | Transcription error |
| 48 | 19 | complain | complaint | Transcription error |
| 50 | 14 | funny that | funny now that | Transcription error |
| 54 | 8 | consent | content | Transcription error |
| 54 | 9 | Cari | Kerri | Transcription error |
| 61 | 8 | that | Beth, | Transcription error |
| 68 | 7 | turn | hand | Transcription error |
| 68 | 18 | it's like | I'll like | Transcription error |
| 70 | 4 | rated | K&E raided | Transcription error |
| 70 | 21 | power outs | oil and gas | Transcription error |
| 71 | 19 | value | values | Transcription error |
| 74 | 16 | not has been | not been | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 74 | 21 | of New | off New | Transcription error |
| 74 | 25 | -- would | -- if you would | Transcription error |
| 76 | 6 | the | them | Transcription error |
| 76 | 14 | to date. | statement. | Transcription error |
| 77 | 16 | point the | point at the | Transcription error |
| 77 | 21 | we got | we've got | Transcription error |
| 78 | 9 | individual. | individual evaluations. | Transcription error |
| 78 | 25 | you know, to the branch with respect | you know, with respect | Transcription error |
| 79 | 2 | partner but | partner, but | Transcription error |
| 79 | 4 | period had | period, had | Transcription error |
| 79 | 11 | the negative | the most negative | Transcription error |
| 80 | 10 | at an | to an | Transcription error |
| 80 | 20-21 | end of July to | evaluations to | Transcription error |
| 82 | 10 | theme.  The | themes, the | Transcription error |
| 82 | 25 | theme | themes | Transcription error |
| 83 | 13 | associate | assessment | Transcription error |
| 83 | 17 | evaluation feeds | evaluation.  It feeds | Transcription error |
| 83 | 21 | had not | had, not | Transcription error |
| 87 | 21 | her betraying by | hurt recruiting by | Transcription error |
| 89 | 17 | would've | would | Transcription error |
| 89 | 20 | Julia, is | Julia, which is | Transcription error |
| 90 | 9 | shows into | showed in | Transcription error |
| 90 | 22 | determine | determination | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 91 | 17 | goes she | goes: she | Transcription error |
| 92 | 3 | away | way | Transcription error |
| 92 | 17 | she said | he said | Transcription error |
| 93 | 20 | you yourself | you, yourself | Transcription error |
| 94 | 5 | fought | fault | Transcription error |
| 94 | 10 | INA | I&A | Transcription error |
| 94 | 13 | INA | I&A | Transcription error |
| 94 | 18 | you got | you've got | Transcription error |
| 94 | 24 | you got | you've got | Transcription error |
| 94 | 25 | medal | mettle | Transcription error |
| 95 | 15 | is he part | is it part | Transcription error |
| 95 | 24 | th world | the world | Transcription error |
| 97 | 2 | 206 | 2016 | Transcription error |
| 98 | 17 | I go | I'd go | Transcription error |
| 99 | 21 | and or | and/or | Transcription error |
| 99 | 23 | and or | and/or | Transcription error |
| 101 | 7 | interviews in | interviews for | Transcription error |
| 101 | 12 | evaluator | evaluators | Transcription error |
| 102 | 20 | point of te | point of the | Transcription error |
| 111 | 18 | Hasham | Hashim | Transcription error |
| 117 | 10 | that yet Hash's | that Hash's | Transcription error |
| 117 | 18 | message to support | message of support | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 118 | 13 | it's either | is that its | Transcription error |
| 118 | 14 | Valentine who's | Valentine, who's | Transcription error |
| 118 | 15 | member during | member, during | Transcription error |
| 124 | 16 | Collin | Cullen | Transcription error |
| 125 | 7 | Cari | Kerri | Transcription error |
| 127 | 23 | had to | have to | Transcription error |
| 128 | 5 | ground | grounds | Transcription error |
| 129 | 6 | Cari | Kerri | Transcription error |
| 130 | 8-9 | strong look.  You | strong: Look, you | Transcription error |
| 133 | 11 | about what you | about which you | Transcription error |
| 133 | 12 | to | been | Transcription error |
| 137 | 11 | 18,000 | eighteen hundred | Transcription error |
| 137 | 20 | succeeded | succeeding | Transcription error |
| 138 | 15-16 | about stuff | about -- stuff | Transcription error |
| 138 | 23 | under comp | on comp | Transcription error |
| 139 | 4 | to the firm | in the firm | Transcription error |
| 139 | 14 | tp water | to water | Transcription error |
| 142 | 19 | the individual | their individual | Transcription error |
| 142 | 20 | Cari | Kerri | Transcription error |
| 143 | 10 | Hasham | Hashim | Transcription error |
| 154 | 6 | something which | something with which | Transcription error |
| 161 | 3 | Cari | Kerri | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 170 | 18 | Cari | Kerri | Transcription error |
| 170 | 20 | Cari | Kerri | Transcription error |
| 170 | 24 | Cari | Kerri | Transcription error |
| 172 | 12 | total | Tolton | Transcription error |
| 177 | 5 | meeting | materials | Transcription error |
| 178 | 8 | investigation is | recollection is | Transcription error |
| 182 | 15 | in a factual | and a factual | Transcription error |
| 184 | 11 | Q.  Same page? | A.  Same page? | Transcription error |
| 184 | 12 | A.  Three -- third | Q.  Three -- third | Transcription error |
| 189 | 15 | leaving | leave | Transcription error |
| 190 | 24 | certification | certifications | Transcription error |
| 192 | 8 | you got | you've got | Transcription error |
| 192 | 13 | leave that | leave then | Transcription error |
| 193 | 2 | that's policy people | the policy people | Transcription error |
| 195 | 23 | you got | you have got | Transcription error |
| 198 | 10 | And my | And for my | Transcription error |
| 198 | 22 | baby's | babies' | Transcription error |
| 199 | 12 | postop | postpartum appointment | Clarification |
| 199 | 13 | bleed | bled | Transcription error |
| 200 | 5 | ███████ | ███████ | Transcription error |
| 204 | 15 | voracity | veracity | Transcription error |
| 209 | 21 | and partners for who | and the partners for whom | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 210 | 19 | Shoots | Shoot | Transcription error |
| 215 | 23 | Partner G ███ | Partner G ███ | Transcription error |
| 217 | 19 | not on | not -- on | Transcription error |
| 223 | 8 | I talked | I've talked | Transcription error |

## ACKNOWLEDGMENT OF DEPONENT

I, Traci Lovitt, do hereby certify that I have read the attached transcript, and that the same is a correct transcription of the testimony given by me to the questions therein propounded, except for the corrections or changes in form or substance noted in this Errata Sheet.

Date: Oct. 12, 2022                        /s/ *Traci Lovitt*
                                           Traci Lovitt