# Chase Declaration
# Exhibit 84

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

MARK C. SAVIGNAC AND            )
JULIA SHEKETOFF,                )
                                )
        Plaintiffs,             )
                                ) Case No.
    vs.                         ) 1:19-CV-02443-RDM-ZMF
                                )
JONES DAY, STEPHEN J. BROGAN,   )
BETH HEIFETZ, and MICHAEL       )
SHUMAKER.                       )
                                )
        Defendants.             )
- - - - - - - - - - - - - - - +


Friday, August 26, 2022
REMOTE VIDEOTAPED DEPOSITION OF
███ Partner A ███, ESQUIRE


** CONTAINS PRIVILEGE CONFIDENTIAL SECTION **


Remote Videotaped Deposition of ███ Partner A ███,
ESQUIRE, a Witness herein, called for examination by
counsel for Plaintiffs in the above-entitled matter,
pursuant to notice, the witness being duly sworn by
MICHELE E. EDDY, RPR, CRR, a Notary Public in and for
the District of Columbia, taken virtually with the
witness located in Washington, D.C., at 9:11 a.m.



Page 2

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4        JULIA SHEKETOFF, ESQUIRE

 5        The Law Offices of Mark Savignac

 6        2207 Combes Street

 7        Urbana, Illinois  61801

 8        (202) 567-7195

 9        sheketoff@gmail.com

10

11   ON BEHALF OF THE DEFENDANTS AND THE WITNESS:

12        ANDERSON BAILEY, ESQUIRE

13        JONES DAY

14        500 Grant Street, Suite 4500

15        Pittsburgh, Pennsylvania  15219

16        (412) 394-7250

17        atbailey@jonesday.com

18

19   ALSO PRESENT:

20        Louwhan Welch, Video Technician

21        Reginald Wright, Video Technician

22
```



Page 3

```
 1                    EXAMINATION INDEX

 2                                                     PAGE

 3    EXAMINATION BY MS. SHEKETOFF                       16

 4

 5    PRIVILEGE CONFIDENTIAL STARTS                      32

 6

 7                    E X H I B I T S

 8              (Attached to the Transcript)

 9    DEPOSITION EXHIBIT                                PAGE

10    Exhibit 6    Julia W. Sheketoff Evaluation;        34

11                 JD_JS_00001289 - 1300

12    Exhibit 11   Exhibit placeholder for ▮Partner A▮   46

13                 Time - Jan through April;

14                 JD_JS_00002657

15    Exhibit 13   Exhibit placeholder for ▮Partner A▮  361

16                 Time; JD_JS_00002658

17    Exhibit 15   Exhibit placeholder for Julia's       40

18                 Time Entries; JD_JS_00002511

19    Exhibit 17   Email chain; most recent email        32

20                 dated 4-18-16 from  ▮Partner A▮

21                 to Julia Sheketoff;

22                 JD_JS_00001714 - 1717
```



Page 4

1                    EXHIBIT INDEX CONTINUED

2      DEPOSITION EXHIBIT                                      PAGE

3      Exhibit 42  Email chain; most recent email            38

4                  dated 1-13-16 from ████Partner A████ to

5                  Julia Sheketoff;

6                  JD_JS_00002068 - 2072

7      Exhibit 43  Email chain; most recent email            40

8                  dated 1-19-16 from ████Partner A████

9                  to Julia Sheketoff;

10                 JD_JS_00002081 - 82

11     Exhibit 45  Email chain; most recent email            45

12                 dated 1-27-16 from ████Partner A████

13                 to Julia Sheketoff;

14                 JD_JS_00000418 - 420

15     Exhibit 46  Email dated 2-2-16 from Julia            160

16                 Sheketoff to ████Partner A████,

17                 with attached Memorandum;

18                 JD_JS_00000458 - 468

19     Exhibit 47  Email dated 2-5-16 from Julia            161

20                 Sheketoff to ████Partner A████, with

21                 attached Memorandum;

22                 JD_JS_00000487 - 511



Page 5

```
1                    EXHIBIT INDEX CONTINUED

2    DEPOSITION EXHIBIT                               PAGE

3    Exhibit 48  Text messages with dates 2-3-16      165

4                and 2-9-16; P04088 - 4089

5    Exhibit 49  Email dated 2-8-16 from Julia         180

6                Sheketoff to ███Partner A███, with

7                attached Memorandum;

8                JD_JS_00000512 - 535

9    Exhibit 51  Memorandum dated 2-8-16;              182

10               JD_JS_00000263 - 273

11   Exhibit 60  Email dated 2-9-16 from              185

12               Julia Sheketoff to ███Partner A███,

13               etc.; JD_JS_00000541 - 558

14   Exhibit 62  Memorandum dated 2-8-16               203

15   Exhibit 68  Email chain; most recent email        203

16               dated 2-17-16 from Julia

17               Sheketoff to ███Partner A███;

18               JD_JS_00000602 - 629

19   Exhibit 69  Email dated 2-28-16 from             209

20               ███Partner A███  to ████████████,

21               Julia Sheketoff and ██████;

22               JD_JS_00001427
```



Page 6

```
 1                        EXHIBIT INDEX

 2

 3   DEPOSITION EXHIBIT                                    PAGE

 4   Exhibit 73   Memorandum dated 4-15-16;                 56

 5                JD_JS_00000939 - 954

 6   Exhibit 75   Email from  Partner A   to               216

 7                Julia Sheketoff dated 3-1-16,

 8                with attached Memorandum;

 9                JD_JS_00001428 - 1440

10   Exhibit 77   Memorandum dated 3-1-16 from             217

11                 Partner A  , Julia Fong Sheketoff

12   Exhibit 86   Email chain; most recent email           299

13                dated 3-2-16 from  Partner A

14                to Julia Sheketoff;

15                JD_JS_00000638 - 663

16   Exhibit 88   Email chain; most recent email           227

17                dated 3-3-16 from  Partner A

18                to Julia Sheketoff, with

19                attached Memorandum;

20                JD_JS_00002160 - 2162

21

22
```



Page 7

```
1                        EXHIBIT INDEX

2

3   DEPOSITION EXHIBIT                                  PAGE

4   Exhibit 93  Email chain; most recent email         299

5               dated 3-3-16 from Julia

6               Sheketoff to ████Partner A████, with

7               attached Memorandum;

8               JD_JS_00000666 - 680

9   Exhibit 95  Email chain; most recent email         301

10              dated 3-8-16 from Julia

11              Sheketoff to ████Partner A████, with

12              attached Memorandum;

13              JD_JS_00000696 - 710

14  Exhibit 96  Email chain; most recent email         309

15              dated 3-28-16 from ████Partner A████

16              ██████████████████████████████

17              ██████, with attached Memorandum;

18              JD_JS_00002201 - 2229

19  Exhibit 97  Memorandum dated March 2016            310

20              JD_JS_00000699 - 710

21  Exhibit 98  Internal Memorandum dated             316

22              17 March 2016; JD_JS_00001464 -77
```



Page 8

```
1                        EXHIBIT INDEX

2

3   DEPOSITION EXHIBIT                               PAGE

4   Exhibit 99    Email chain; most recent email     319

5                 dated 3-31-16 from Julia

6                 Sheketoff to ████████ and Partner A

7                 Partner A; JD_JS_00000780 - 794

8   Exhibit 100   Non-Partner Evaluations form;       61

9                 JD_00005181 - 5182

10  Exhibit 104   Email dated 4-5-16 from Partner A   130

11                Partner A to ███████████;

12                JD_JS_00002316

13  Exhibit 108   Email chain; most recent email     327

14                dated 4-5-16 from    Partner A

15                to Julia Sheketoff;

16                JD_JS_00001595 - 1596

17  Exhibit 110   Email dated 4-12-16 from Partner A  331

18                Partner A to Julia Sheketoff

19                dated 4-12-16, with attached

20                Memorandum;

21                JD_JS_00001597 - 1611

22
```



```
                                                        Page 9
 1                        EXHIBIT INDEX

 2

 3    DEPOSITION EXHIBIT                                 PAGE

 4    Exhibit 112  Email chain; most recent email        335

 5                 dated 4-12-16 from Julia

 6                 Sheketoff to [Partner A];

 7                 JD_JS_00001612 - 1613

 8    Exhibit 113  Email chain; most recent email        337

 9                 dated 4-13-16 from Julia

10                 Sheketoff to [Partner A],

11                 with attached Memorandum;

12                 JD_JS_00002322 - 2354

13    Exhibit 114  Email dated 4-14-16 from              338

14                 [Partner A]  to Julia Sheketoff

15                 dated 4-14-20, with attached

16                 Memorandum; JD_JS_00000923 - 954

17    Exhibit 115  Email chain; most recent email        342

18                 dated 4-14-16 from Julia

19                 Sheketoff to [Partner A];

20                 JD_JS_00000956 - 957

21

22
```



Page 10

```
 1                      EXHIBIT INDEX

 2

 3    DEPOSITION EXHIBIT                              PAGE

 4    Exhibit 116   Email dated 4-14-16 from Julia    342

 5                  Sheketoff to  [Partner A] , with

 6                  Internal Memorandum attached;

 7                  JD_JS_00001655 - 2670

 8    Exhibit 117   Email chain; most recent email    347

 9                  dated 4-18-16 from  [Partner A]

10                  to  [            ] ;

11                  JD_JS_00002361 - 2362

12    Exhibit 118   Email chain; most recent email    349

13                  dated 4-18-16 from  [Partner A]

14                  to Julia Sheketoff;

15                  JD_JS_00000978

16    Exhibit 119   Email dated 4-18-16 from [Partner A]  350

17                  [Partner A] [         ]  and

18                  Julia Sheketoff; with Memorandum

19                  attached; JD_JS_00001681 - 1710

20    Exhibit 120   Memorandum dated April 18, 2016    351

21

22
```



```
                                                        Page 11
 1                       EXHIBIT INDEX

 2

 3   DEPOSITION EXHIBIT                                   PAGE

 4   Exhibit 121   Email chain; most recent email        357

 5                 dated 4-19-16 from  [Partner A]

 6                 to Julia Sheketoff;

 7                 JD_JS_00001793 - 1794

 8   Exhibit 122   Email dated 4-21-16 from Julia         360

 9                 Sheketoff to  [Partner A] , with

10                 Memorandum attached;

11                 JD_JS_00001141 - 1174

12   Exhibit 123   Email chain; most recent email         365

13                 dated 4-22-16 from  [Partner A]

14                 to Julia Sheketoff;

15                 JD_JS_00001177

16   Exhibit 124   Memorandum dated 4-22-16;              365

17                 JD_JS_00000114 - 129

18   Exhibit 125   Memorandum dated 4-22-16               367

19   Exhibit 128   Email chain; most recent email         370

20                 dated 5-18-16 from  [Partner A]

21                 to Julia Sheketoff;

22                 JD_JS_00001963 - 1965
```



Page 12

```
 1                      EXHIBIT INDEX

 2

 3   DEPOSITION EXHIBIT                                   PAGE

 4   Exhibit 129  Email chain; most recent email          376

 5                dated 11-27-16 from ███████

 6                ████████ ██ Partner A ██

 7                ██████████ ;

 8                JD_JS_00001271 - 72

 9   Exhibit 133  Email chain; most recent email          242

10                dated 3-3-16 from ██ Partner A ██

11                to Julia Sheketoff;

12                JD_JS_00001441 - 1444

13   Exhibit 134  Text messages with the dates of         290

14                5-31-17 and 6-5-17

15

16

17

18

19

20

21

22
```



Page 13

```
 1              P R O C E E D I N G S

 2              August 26, 2022

 3                   - - -

 4              VIDEO TECHNICIAN:   Good morning.

 5    We are now on the record.  This begins Media No. 1

 6    in the deposition of   Partner A   in the matter of

 7    Mark Savignac versus Jones Day, et al., in the

 8    United States District Court, District of

 9    Columbia, Case No. 1:19-CV-02443-RDM-ZMF.   Today's

10    date is Friday, August 26, 2022, and the time is

11    9:11 a.m.

12              This deposition is being taken

13    remotely via web conferencing at the request of

14    Law Offices of Mark Savignac.  The videographer is

15    Louwhan Welch of Magna Legal Services.  The court

16    reporter is Michele Eddy of Magna Legal Services.

17              Will counsel and all parties

18    present state their appearance and whom they

19    represent, after which the court reporter will

20    swear in the witness.

21              MS. SHEKETOFF:   This is Julia

22    Sheketoff.  I'm the plaintiff in this case.  Just
```



Page 14

```
1    to clarify, it's not the Law Offices of Mark

2    Savignac.  We're just proceeding as Mark Savignac

3    and I, Julia Sheketoff, we are plaintiffs in this

4    case.

5                   MR. BAILEY:  This is Anderson

6    Bailey on behalf of the defendants and the

7    deponent.

8                         - - -

9              [Partner A]       , ESQUIRE,

10   having been duly sworn, testified as follows:

11                  MR. BAILEY:  And, Julia, before we

12   begin, can I just note for the record we are

13   provisionally designating this transcript in its

14   entirety as confidential pursuant to the

15   stipulated protective order in the case.  I

16   suspect there will be portions of this deposition

17   that also need to be designated as privileged

18   confidential.  We can mark those as they arise and

19   if you could just please confirm, Julia, that Mark

20   is not in attendance today?

21                  MS. SHEKETOFF:  Confirmed.

22                  MR. BAILEY:  Thank you.  Go ahead.
```



MAGNA
LEGAL SERVICES

Page 15

 1              MS. SHEKETOFF:  And we may want to

 2    designate the entire transcript as client

 3    confidential.  I guess -- no, you're right, we can

 4    -- we can do it as we go.  I would say the vast

 5    majority of it will be client confidential.

 6              MR. BAILEY:  I'm happy if you would

 7    like to just go ahead and designate the whole

 8    thing as confidential.

 9              MS. SHEKETOFF:  Let's not, because

10    at least the beginning part is not and the end is

11    not, but I think you're right, we can go and

12    designate relatively early on and continue under

13    that designation for quite a while.

14              MR. BAILEY:  If you don't mind just

15    flagging that when you get to that portion.

16              MS. SHEKETOFF:  Yes, I think it

17    will be clear.

18              MR. BAILEY:  Thank you.  Go ahead.

19              MS. SHEKETOFF:  All right.  You can

20    swear the witness.

21              THE REPORTER:  The witness has been

22    sworn.



Page 16

1              MS. SHEKETOFF:  Oh, I'm sorry.

2              THE REPORTER:  That's okay.

3              MS. SHEKETOFF:  Okay, let's get

4    started.

5                    EXAMINATION

6    BY MS. SHEKETOFF:

7         Q.   Good morning.

8              Have you been deposed before?

9         A.   No.

10        Q.   Have you ever taken a deposition?

11        A.   Yes.

12        Q.   How many times?

13        A.   A few dozen.

14        Q.   If I ask a question that you have

15   trouble understanding, will you please ask for

16   clarification?

17        A.   Sure.

18        Q.   And if you answer a question and later

19   remember additional information or clarification,

20   will you let me know?

21        A.   Yes.

22        Q.   Is there any reason why you might have



Page 17

```
 1    difficulty giving accurate testimony today?
 2         A.   No.
 3         Q.   Where are you physically located?
 4         A.   In a conference room at Jones Day in the
 5    Washington office.
 6         Q.   And who else is with you?
 7         A.   Anderson Bailey.
 8         Q.   Anyone else?
 9         A.   No.
10         Q.   Do you have any papers with you?
11         A.   I do not.
12         Q.   Are you currently employed at Jones Day?
13         A.   Yes.  I'm a partner at Jones Day.  I
14    don't know technically if that means I'm employed
15    or not.  I work at Jones Day.  I'm a partner.
16         Q.   And how long have you been a partner at
17    Jones Day?
18         A.   Since January 1st, 2016.
19         Q.   And do you have a leadership role?
20         A.   Yes.
21         Q.   What is that?
22    ███  █████████████████████  █████████████████
```



Page 18

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████

```
 6        Q.    For the co-practice leader position,

 7   when were you given that role?

 8        A.    ████████████████████

 9        Q.    And who gave you that position?

10        A.    Who gave me the position?

11        Q.    Yes.

12        A.    Steve Brogan appointed me as the

13   co-leader of the group.

14        Q.    And for your other two leadership

15   positions, when were you given those leadership

16   positions?
```

█████     ███    ████████████████████

█████    ███████████████████████    ████████

█████    ████████████████████████████

█████    ████████████████████    ██████████

█████    ████████████████████

```
22        Q.    Do you remember what year?
```











Page 21

```
 1                    MR. BAILEY:  Let me just pause
 2      there, Julia.  You are a little faint.  I'm going
 3      to try to turn up our speaker, but perhaps you
 4      could stand closer.
 5                    MS. SHEKETOFF:  Yes.  If we could
 6      go off the record for a minute, I can have Mark
 7      come in and fix my microphone to make it better.
 8         A.   We can actually hear you fine.  We just
 9      turned it up a little bit, so we're -- you're not
10      going in and out.  It's just a volume issue.
11                    MS. SHEKETOFF:  Okay.  And just to
12      confirm, Court Reporter, you're not having any
13      issues, and the Videographer?
14                    THE REPORTER:  Not at all.
15                    VIDEO TECHNICIAN:  No.
16                    THE REPORTER:  You sound better
17      now.
18                    MS. SHEKETOFF:  Okay, great.
19      BY MS. SHEKETOFF:
20         Q.   Did you go to college?
21         A.   Did I go to college?
22         Q.   Yes.
```





Page 22

1    A.   Yes.

2    Q.   And where did you go to college?

21   Q.   And besides law school, did you have any

22   further education beyond -- you know, in addition



Page 23

1   to college and high school -- beyond college?

6        Q.   Were you -- when you joined Jones Day,

7   were you in the new lawyers group?

8        A.   Yes.

12       Q.   And what work did you do as a

13  second-year associate?

14            MR. BAILEY:  Let me just caution

15  the witness to protect attorney-client privilege

16  information.  I think you can answer that question

17  with general information, but obviously we want to

18  respect the attorney-client privilege.

19       A.   Okay.  I was -- I did mostly litigation

20  work as -- as a new lawyer,



███████████████████████████████

███████████

3        Q.    Okay.  And what kind of tasks did you

4    do?

5        A.    Basic research, writing memos, sitting

6    in on interviews of witnesses, drafting motions,

7    document review, typical new lawyer group tasks.

8        Q.    Did you personally interview any

9    clients?

10       A.    As a -- as a second-year associate?

11       Q.    Right.

12       A.    Yes, some pro bono clients.  I mean, let

13   me --

14       Q.    Did you --

15       A.    I sat in on interviews, second-chaired

16   interviews for paying clients.  For pro bono

17   clients as a second-year associate, I took the

18   lead on those interviews.

19       Q.    Did you take the lead on any interviews

20   for paying clients?

21       A.    Not that I recall.

22       Q.    Did you communicate directly with any



1    clients that year?

2        A.   Yes.

3        Q.   Did you lead any factual investigations

4    that year?

5        A.   For -- yes, I did.

6        Q.   For paying clients?

7        A.   No, not for paying clients.

8        Q.   And for paying clients, did you

9    coordinate projects with any foreign offices?

10                  MR. BAILEY:  Can I just confirm

11   we're talking about his second year at the law

12   firm?

13                  MS. SHEKETOFF:  Yes.

16       Q.   Yes, I'm asking when you were a

17   second-year associate.

18       A.   Okay.  Can you repeat the question?  I'm

19   sorry.

20       Q.   Did you coordinate with any foreign

21   offices on projects?

22       A.   Not that I recall.



Page 26

1       Q.    Did you ever suggest revisions to your

2    superior's writing that year?

3       A.    Yes.

4       Q.    And what work do second-year associates

5    typically do at Jones Day?

6       A.    I think it depends on the team you're

7    on, but typically you're involved in doc review,

8    especially in litigation practices, doc review,

9    legal research, drafting memos, or at least the

10   first draft of the memo for a client, for example,

11   first draft of briefs, witness interviews, helping

12   prepare for depositions.

13      Q.    And when you say witness interviews, do

14   you mean leading witness interviews?

15      A.    Do I mean leading interviews?  As a

16   second-year associate?

17      Q.    Yes.

18      A.    Typically not.

19      Q.    Do second-year associates generally

20   communicate directly with clients?

21      A.    I think it depends.  I did on certain

22   occasions.


MAGNA
LEGAL SERVICES

Page 27

1      Q.    In paying cases?

2      A.    Yeah, I think -- yes, mostly for, I

3  think, administrative things like, you know,

4  setting up witness interviews, following up on

5  witness interviews.  But in terms of communicating

6  with a client without supervision, yes.

7      Q.    Yeah, I guess I mean, would it be

8  typical for a second-year associate to communicate

9  with a client about a substantive matter?

10     A.    Is it typical?  Second-year associates

11  that work for me, I have them communicate with

12  clients directly on things.  So I don't know about

13  typical beyond what I have second-year and

14  third-year associates do for me.

15     Q.    Okay.  And would it be typical for a

16  second-year associate to lead a factual

17  investigation?

18     A.    It could, depending on the case.

19     Q.    I'm asking if it would be typical.

20     A.    Probably not, especially if it was a big

21  case.

22     Q.    And would it be -- do second-year



Page 28

1    associates generally revise the writing of other

2    Jones Day lawyers?

3        A.    I guess my question is revise the

4    writing, what do -- I don't know -- I'm not sure

5    what you mean.

6        Q.    Would it be typical for a second-year

7    associate to suggest revisions to the writing of

8    other Jones Day lawyers?

9        A.    I think it's typical when drafting that

10   it's an iterative process and it goes -- everybody

11   that has the pen at some point makes edits to

12   briefs, memos, et cetera.

13       Q.    And would it be typical for a

14   second-year associate to suggest revisions to the

15   writing of a Jones Day partner?

16       A.    Suggest revisions?  I think so.

17       Q.    And would it be typical for a

18   second-year associate to coordinate with a foreign

19   office on a project?

20       A.    It depends.  I think it happens.  I

21   don't know -- I don't know how typical it is.

22   It's not -- it's not -- it's not something that


MAGNA
LEGAL SERVICES

Page 29

1    would be noteworthy or newsworthy if a second-year

2    associate coordinated with a foreign office on

3    something.

4         (Exhibit 17 was marked for identification and

5         attached to the deposition transcript.)

6    BY MS. SHEKETOFF:

7         Q.   Okay.  And -- okay.  I'm going to show

8    you on the screen here Plaintiffs' Exhibit 17.

9    You're open to look at it in your binder, if you

10   prefer.  I like the online platform.

11                  THE WITNESS:  We have that, Mark?

12                  MR. BAILEY:  Yes.  Just so you

13   know, Julia, the documents have not arrived.  They

14   may have arrived this morning, but for now we will

15   just be using the AgileLaw platform.

16                  MS. SHEKETOFF:  Okay.  I'm sorry.

17   I don't know why that -- well, I guess that's not

18   on me.  Okay.  Yeah, let me know if you're having

19   any difficulty with anything.

20                  Just so you know, you can download, if

21   you for some reason need a hard copy, you can

22   download and print things from this platform.



Page 30

1   Okay.

2              MR. BAILEY:  Yes, if you click on

3   this, actually.  Just give us a moment, please, to

4   make sure he reviews this document.  Do you need

5   it --

6              THE WITNESS:  Yes, let me blow that

7   up.  We're just trying to blow it up.

8              MR. BAILEY:  Can we go off the

9   record for just one second?

10             MS. SHEKETOFF:  Yes.

11             MR. BAILEY:  We may have to shift

12  our monitors around.

13             VIDEO TECHNICIAN:  Okay.  We are

14  going off the record at 9:26 a.m.

15             (A brief recess was taken.)

16             VIDEO TECHNICIAN:  We are back on

17  video record at 9:28 a.m.

18             MR. BAILEY:  And just for the

19  record, I think we can designate this as privilege

20  confidential?

21             MS. SHEKETOFF:  Yes, I think

22  that's -- we can go privilege confidential from



Page 31

1   this be point forward and then we can stop a

2   little later.

3                   MR. BAILEY:  Very good.

4                   MS. SHEKETOFF:  Okay.

5   (Privilege Confidential Section starts on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22







































































Page 49





























Page 56















Page 59







Page 61

██  ██  ████

██  ██  █████████████████

██  ███████████  █████████████

██  ████████████████████  █████

██  ██████████████

██  ██  ███  ████████████████

██  █████████  ████████████████

██  ██████████

██  ██  ████  ████████████████

10          (Exhibit 100 was marked for identification and

11          attached to the deposition transcript.)

12    BY MS. SHEKETOFF:

13          Q.   I'm going to show you what's been marked

14    as Plaintiffs' Exhibit 100.  This is Bates stamped

15    JD_5181 to 82.

16               And is this the form that you filled out

17    when you did my evaluation?

18          A.   Am I looking at a blank form?

19          Q.   I'm sorry?

20          A.   Am I looking at a blank form?

21          Q.   Yes.

22          A.   I don't recall if this is the specific



Page 62

1    form or not.  The format has changed from time to

2    time over the years.  This was a form that was in

3    use at some point.  I'm not sure if it still is.

4         Q.   Is there anything that you remember as

5    different in the form that you filled out for me?

6         A.   No.

7         Q.   So as far as you remember, this is --

8    this doesn't differ from what you filled out for

9    me?

10        A.   No.  I think that's fair to say.

11        Q.   Okay.  And you filled out this form

12   online?

13        A.   Yes.

14        Q.   What is the purpose of evaluations?

15        A.   Do you mean generally?

16        Q.   Yes.

17             MR. BAILEY:  Object to foundation.

18        A.   Yeah.

19        Q.   What do you think the purpose of

20   evaluations is?

21        A.   We're talking about evaluations at Jones

22   Day?



Page 63

1      Q.    Correct.

2      A.    Okay.  I think the purpose of

3   evaluations at Jones Day are to assess the current

4   performance of associates, to also write and

5   analyze their prospect for future growth at the

6   firm so that decisions can be made about

7   retention, promotion, et cetera.

8      Q.    And do evaluations matter for annual

9   raises?

10              MR. BAILEY:  Objection.

11   Foundation.

12      A.    I don't know.

13      Q.    Do you think that evaluations matter for

14   annual raises?

15      A.    Do I think?  I think so, yes.

16      Q.    And I think you alluded to this already,

17   but do you think they matter for decisions about

18   partnership promotion?

19      A.    I think so, yes.

20      Q.    Please turn to -- we're going to go back

21   to Plaintiffs' Exhibit 6.  Please turn to page 5

22   again.  It's Bates stamped JD_JS_1293.  In this --



Page 64

1   let me know when you're there.

2        A.   Yeah, give me one second.

3             MR. BAILEY:   May I also just make a

4   statement for the record that this was a document

5   produced from the books and records of Jones Day.

6   I don't know if ▮Partner A▮ has seen this or not

7   before, but it is a Jones Day document.

8        A.   I'm sorry.  So, Julia, what is this

9   document?

10       Q.   Well, Anderson would be able to tell me

11  better.  My question to you is, which you answered

12  before was, is this your review and you said it

13  was.  Is that correct?

14       A.   Yes, okay, so these are your reviews or

15  my review of you is here, right?  I'm just trying

16  to make sure that it wasn't all the reviews I had

17  written from other people.  Sorry, I'm just -- I'm

18  just checking this out here.

19            What page was mine on?  Oh, there it is.

20  I'm sorry.  Okay.  I found it.

21            So what's the question?  I'm sorry, I

22  meandered.



Page 65

1      Q.   So just to confirm, this is the review

2   that you wrote about me, correct?

3      A.   Yes.

4      Q.   In this review you write, "As one might

5   expect, given Julia's superior academic

6   credentials and SCOTUS clerkship, the research and

7   learning material presented no problems."

8           Did you think my research was very

9   strong?

10     A.   Yes, I thought your research was strong

11   or I wouldn't --

12     Q.   I'm sorry?

13     A.   Yes, I thought your research was strong.

14     Q.   Did you think it was very strong?

15     A.   Yes.

16     Q.   Why didn't you say so?

17     A.   This is so small.  Can you read the part

18   again that you just read?  I'm sorry.

19     Q.   "As one might expect, given Julia's

20   superior academic credentials and SCOTUS

21   clerkship, the research and learning material

22   presented no problems."



Page 66

1       A.    What's your question?

2       Q.    Why did you not say that my research was

3    very strong if that's what you thought?

4       A.    I mean, it's a -- I think where we talk

5    about in the radio buttons before, there's marks

6    for things like research.  The part of this --

7    this part of the assessment is for me to write a

8    narrative.

9       Q.    Right.  And here you just say -- you say

10   my research presented no problems.  Why did you

11   just say it presented no problems rather than

12   saying it was very strong?

13      A.    I don't know.

14      Q.    Did you think my learning of the

15   material was very strong?

16              MR. BAILEY:  Objection to form.

17      A.    I thought your research and getting up

18   to speed on the issues were, yes, very strong, and

19   I -- I might have conveyed that with talking about

20   how as one would expect, doing -- getting up to

21   speed on this complicated issue did not present

22   any problems for you.  So I think it's just -- I



Page 67

1    think it's a word choice issue.

2        Q.   Why did you decide to describe it as

3    having no problems instead of saying it was very

4    strong?

5        A.   I don't recall.

6        Q.   Why did you rate me only at 4 on issues

7    grasp?

8        A.   I don't recall.

9        Q.   What did you think was lacking in my

10   grasp of the issues?

11       A.   I don't recall.

12       Q.   Did you think my writing was very

13   strong?

14       A.   From what I recall of the writing, I

15   thought that it was more in line with what a clerk

16   would do and didn't really -- wasn't strong for

17   the audience that we had.  I thought that the

18   legal analysis was strong, I thought your research

19   was strong, but the major issue I had with the

20   written product was it was written much more like

21   a clerk and not as practical advice to a client,

22   but I don't view that as a negative because I



Page 68

1    think most people who come off of clerkships get

2    that sort of -- what's the word I'm looking for --

3    constructive criticism about their writing when

4    they first join a firm.  So I didn't view anything

5    about your writing as something like fatal or even

6    derogatory.  I just thought it was just something

7    that needed to be worked on just like a lot of

8    other people who come off of a clerkship.

9        Q.   Okay.  So did you think -- how would you

10   describe -- never mind.  Withdrawn.

11           You write in your review, "But her

12   initial drafts were for more academic/pure legal

13   advice than helpful advice to the client.  In

14   fact, there was little to no advice or direction

15   to the client.  That improved in subsequent

16   drafts, however."

17           Are your statements here accurate?

18               MR. BAILEY:  Object to form.

19       A.   Yes.

20       Q.   How are my initial drafts more

21   academic/pure legal advice than helpful legal

22   advice to the client?



Page 69

```
 1      A.    Well, I think there was a lot of one
 2  could argue this, one could argue that.  Like I
 3  said, when you read the memo, at least the initial
 4  drafts of the memo, it was much more written like
 5  the audience was a judge or like you were a clerk.
 6  There was no advice, especially that was readily
 7  apparent early on in the memo, about what the
 8  client was actually facing and what the chances of
 9  success were that the pension plan had.  I mean,
10  we did -- we improved it together in subsequent
11  drafts and came up with an executive summary, et
12  cetera, but I thought your initial drafts were not
13  tailored to the audience that we were writing to.
14      Q.    Let's take that individually or piece by
15  piece.
16            So you said that I said things like "one
17  could argue."  How did that -- how did saying one
18  could argue reflect a lack of -- or reflect a lack
19  of advice or direction to the client?
20      A.    Well, I think a memo that says a lot of
21  one could argue this, one could argue that, if you
22  put yourself in the position of a general counsel
```



Page 70

1    who has to advise our CEO ███████████████

██████████████████████████████████████████

██████████████████████████████████

4    that's not very helpful advice.  That doesn't give

5    them anything really to base a decision off of.

6         Q.   And is your representation that I -- the

7    initial drafts of the memo did not contain an

8    analysis of whether the arguments were likely to

9    succeed or not?

10        A.   As I --

11             MR. BAILEY:  Object to form.  I

12   don't think he's making representations.

13        A.   Could you repeat the question, Julia?

14   I'm sorry.

15        Q.   Did the initial drafts of the memo lack

16   an assessment of whether with arguments --

17   withdrawn.

18             Did the initial draft of the memo lack

19   an assessment of the strength of the arguments

20   discussed?

21             MR. BAILEY:  To your recollection.

22   If you're asking him to characterize the document,



Page 71

1   you have to show him the document.

2       A.   Yeah, so, based on my recollection, I

3   don't think it was stated very forcefully and it

4   wasn't stated prominently.  If it was in there, I

5   think I had to look for it, but like I said, it

6   was something that is typical of the way that

7   people who are new to law firms and fresh off of

8   clerkships tend to write.  So I didn't view it --

9   I didn't view it as a negative.  I viewed it as

10  pretty typical, pretty typical in terms of what

11  recent clerks write like.

12      Q.   What helpful advice to the client was I

13  supposed to provide that was missing in my initial

14  drafts?

15           MR. BAILEY:  To the best of your

16  recollection.

17      A.   Yeah, I think -- I think -- and I'm

18  thinking about this as we went through this

19  iterative process, but something akin to, like I

20  said, if you're advising a general counsel, you'd

21  put █████████████████████████████████████████

22  position of having to advise ███ CEO and her Board



Page 72

```
 1    on what outside counsel thinks, you know, the

 2    likelihood of success.  And that can be

 3    qualitative.  It doesn't have to be quantitative

 4    ███████████████████████████████████████████████

 5    ██████████.  I think that kind of analysis needs to

 6    be prominent in the memo and -- yeah, prominent

 7    and explained because in-house counsel don't have

 8    a lot of time to read things.

 9         Q.   And so in my initial drafts, was it

10    prominent?  Was this -- withdrawn.

11              In my initial drafts, was an assessment

12    of the likelihood of success prominent?

13         A.   I don't recall -- I don't recall it

14    being prominent.

15         Q.   And in my initial drafts --

16         A.   Or even present.  I don't know if it was

17    prominent or present.  I don't recall.

18         Q.   Well, why did you -- you said that there

19    was little to no advice or direction to the

20    client.  So my question is, what helpful advice to

21    the client was I supposed to provide that was

22    missing in my initial drafts?
```



Page 73

```
 1        A.    To the best of my recollection, I think

 2   helpful advice would have been explaining the

 3   likelihood of success ████████████████████████████

 4   ████████████████████      and explaining it in a clear

 5   and concise way so that the general counsel could

 6   speak to ███ CEO and Board.

 7        Q.    And is there anything else that was --

 8   any other helpful advice to the client that I was

 9   supposed to provide that was missing in my initial

10   drafts?

11                   MR. BAILEY:  To the best of your

12   recollection.

13        A.    Yeah, I don't recall.

14        Q.    You revised my initial drafts?

15        A.    Yes.

16        Q.    Did you ask me to add any advice or

17   direction to the client in your revisions to my

18   initial drafts?

19        A.    I don't recall.

20        Q.    Did you add any advice or direction to

21   the client yourself to your revisions to my

22   drafts?
```



Page 74

1      A.    I don't recall.

2      Q.    You say that my initial draft had little

3   to no advice to the client but that improved in

4   subsequent drafts.  So what advice or direction to

5   the client did my subsequent drafts contain that

6   my initial drafts lacked?

7                MR. BAILEY:  To the best of your

8   recollection.

9      A.    Yes, to the best of my recollection, I

10  think, you know, the iterative process that you

11  and I went through, we got to a point where we had

12  an executive summary, we talked about the

13  likelihood of success on the various issues,

14  ████████████████████████████████████████████,

15  et cetera.  And I just think the end result was a

16  much more polished piece and a much more helpful

17  piece to the client than our initial iterations

18  were.

19     Q.    What advice -- what advice did you later

20  -- you say specifically that there was no -- there

21  was little to no advice or direction to the

22  client.  So that doesn't mean that it was located



Page 75

1   in an executive -- withdrawn.

2           You say that there's little to no advice

3   or direction to the client.  Correct?

4       A.   In the evaluation?

5       Q.   Yes.

6       A.   Yes.

7       Q.   So that means the advice or direction

8   was lacking altogether, correct?

9       A.   I said little to no.

10              MR. BAILEY:  Objection.

11      A.   I said little to no.  I don't ...

12      Q.   Right.  So there was little to no advice

13  in the memo as a whole, correct?

14      A.   About specific directions or concrete

15  advice to the client or likelihood of success, you

16  know, explaining the likelihood of success?  I

17  didn't -- I don't recall it being there.

18      Q.   Okay.  And is it your position that it

19  was there in the subsequent drafts?

20      A.   Eventually I think we turned in a

21  product to the client that was helpful and good

22  advice and something that they could make



Page 76

1    decisions off of.

2         Q.   My question is, what advice or direction

3    to the client was in subsequent drafts of the memo

4    that was not in my initial drafts of the memo?

5                   MR. BAILEY:  Asked and answered.

6         A.   I don't recall.  I recall the -- the one

7    thing I recall is likelihood of success that the

8    ██████████████████████████████████.  That is one

9    thing I recall, but I don't recall much more than

10   that.  It was a long time ago.

11        Q.   Okay.  You also say, "My impression of

12   Julia" -- oh, withdrawn.

13                  So, to clarify, you understood that this

14   would be perceived as a criticism of me, correct?

15        A.   I don't -- I don't agree with that.

16        Q.   Okay.  Your position -- what -- how do

17   you think that these statements would be

18   perceived?

19                  MR. BAILEY:  Can you clarify which

20   statements?

21        Q.   But her -- okay.  How did you think that

22   the following sentences would be perceived:  "But



Page 77

1   her initial drafts were far more academic/pure

2   legal advice than helpful advice to the client.

3   In fact, there was little to no advice or

4   direction to the client.  That improved in

5   subsequent drafts, however."

6       A.   What's the question?

7       Q.   How did you think that that would be

8   perceived by other people?

9       A.   I thought it would be perceived as Julia

10   has the typical writing transition challenges that

11   most clerks have who just recently clerked.

12       Q.   Okay.  So you thought it would be

13   perceived that I had challenges?

14       A.   To learn to write for a law firm, a

15   client audience as opposed to a judge?  Yes.

16       Q.   But your position is this was not a

17   criticism of my writing.

18       A.   Right.

19       Q.   And you also state, "My impression of

20   Julia is that she is not long for firm life.  She

21   is just not that into us."  Are your statements

22   here truthful?



Page 78

1      A.   Yes.  That is my impression, yes.

2      Q.   And why did you say that your impression

3 of me was that I was not long for firm life?

4      A.   You were rarely in the office.  From the

5 best I could tell, you didn't seem to be really

6 busy on a lot of projects, just didn't seem to be

7 engaged in the office was my impression.

8      Q.   And how did I not seem to be engaged in

9 the office?

10     A.   I didn't see you around much.  A lot of

11 times when we were to meet, it was over the phone.

12 Other people said you weren't around much.  You

13 were on my floor so I'm on the floor with -- I was

14 on the floor at that time with most of the I&A

15 associates.  So you just didn't seem like you were

16 around very much and didn't seem like you enjoyed

17 law life that much.

18     Q.   How did it seem that I didn't enjoy law

19 life that much?

20     A.   For the things I just said.

21     Q.   Anything else?

22     A.   Not that I could think of.  Others made


MAGNA
LEGAL SERVICES

Page 79

```
 1   comments that you weren't around much either.

 2       Q.   And to be clear, when you said -- when

 3   you say others made comments, that was after you

 4   wrote this review, correct?

 5       A.   No, I think people even before that.

 6       Q.   Okay.  Which people?

 7       A.   I don't recall.  I can say that

 8   generally for I&A associates, especially former

 9   Supreme Court clerks, the pattern is most of them

10   leave after two years because they don't have to

11   give any part of their bonus back after two years.

12   So you get some who look like they really enjoy

13   firm life, work really hard, bill commensurate

14   with what non-former Supreme Court clerks bill,

15   but there is a really high percentage of former

16   Supreme Court clerks who don't bill a lot, aren't

17   around a lot, and leave after two years, and you

18   struck me as someone in that group.

19       Q.   Okay.  And what about me struck you as

20   someone in that group?

21       A.   You weren't around much.  You didn't

22   seem to be busy on a lot of paying client matters,
```



Page 80

1    things like that.

2         Q.    How did you -- well, was there anything

3    else?

4         A.    Not that I can think of.

5         Q.    And how did you -- how did you have any

6    idea whether I was busy on paying client matters

7    or not?

8         A.    People talk about who's engaged in doing

9    what.

10        Q.    And who did you talk to?

11        A.    I spoke with Anthony Dick.  I talked to

12   some of the senior associates in I&A, some of the

13   battle partners who were working with people in

14   I&A.  I don't know.  I think you get -- you get a

15   sense of who's busy and who's not.

16        Q.    Okay.  And what did the battle partners

17   say about whether I was busy?

18        A.    It wasn't a specific conversation about

19   you, but we would talk about who was staffed on

20   particular cases and your name never came up, so I

21   would talk to someone who's working on a big case

22   and I would say, oh, who's working on it with you?



Page 81

```
 1   It was like, oh, these particular partners, we got

 2   I&A help, you know, Anthony Dick is helping us

 3   from I&A, Jeff Johnson is helping us from I&A,

 4   Caroline is helping us, whatever.  And your name

 5   never really came up.

 6        Q.   And did you write reviews of other I&A

 7   associates, other former Supreme Court clerks?

 8        A.   Yes, at least one that I can think of.

 9   I'm not -- yes.  Two.  Let me see.  ████, ████. █

10   █████ M Associate F 's a former Supreme Court clerk.

11   I can't remember if I wrote an email on him.  And

12   then there's some I&A associates who weren't

13   Supreme Court clerks.  I would have to

14   double-check.  I have written evals on former

15   Supreme Court clerks, on at least two.

16        Q.   And have you ever said that they were

17   not long for firm life?

18        A.   I think I have, actually.

19        Q.   Yes.  For whom?

20        A.   I believe.  I'm sorry?

21        Q.   For whom?

22        A.   I don't recall.  I remember saying the
```



1   opposite.  I remember saying I thought ████████

2   ████████ would be here for a long time.  She's not a

3   former Supreme Court clerk, but she's I&A.  But I

4   have made comments about whether I think people

5   will stick around, both former Supreme Court

6   clerk, I&A associates, and I think other non-I&A

7   associates, battle, et cetera.

8        Q.   Yeah.  You made those comments in your

9   reviews?

10       A.   I think so.  If I didn't make them in

11  reviews, I made them verbally.  I don't recall.

12       Q.   So was there anything else that you

13  haven't mentioned that caused you to conclude that

14  I was not long for firm life?

15       A.   Then you left shortly thereafter.

16       Q.   When did you -- when do you think I

17  left?

18       A.   I don't know if it was 2017 or '18.  I

19  don't recall.  Or maybe '19.  I don't recall.

20       Q.   So do you think four years at Jones Day

21  is not long for firm life?

22       A.   I don't know how long you were here.  I



1   don't recall.

2        Q.   I'm just asking would four years be

3   considered long for firm life?

4        A.   Four years is not really long for firm

5   life, no.

6        Q.   And you mentioned that many --

7        A.   In my opinion.

8        Q.   In your opinion.

9             So you think someone who only stays --

10  an associate only stays for four years is someone

11  who is not very invested in the firm and isn't

12  long for firm life?

13       A.   I'm not sure.  It depends on the

14  associate.

15       Q.   Okay.  And how did you think your

16  statement that I wasn't long for firm life would

17  be understood by other partners?

18       A.   I don't know how it would be understood

19  by other partners.  I know that I wanted to say

20  that in case other people felt the same way or

21  it's a data point, one data point that goes into

22  your evaluation.



Page 84

1      Q.   Did you think --

2      A.   My guess was other people would feel the

3  same way.

4      Q.   Did you think that other people would

5  think it was a good thing to be not long for firm

6  life?

7      A.   No, but I would let other people draw

8  their own conclusions.

9      Q.   Did you understand it's a criticism?

10              MR. BAILEY:  Object to form and

11  foundation.

12     A.   I don't know if it's a criticism.  I

13  think it's a fact.

14     Q.   Did you mean it as a negative thing

15  about me?

16     A.   I just meant it as my impression of you,

17  positive or negative.

18     Q.   But you didn't think it was a negative

19  thing?

20     A.   I think for the purposes of the firm

21  evaluating you, if that were in your evaluation

22  and you didn't feel that way, i.e., you were going



Page 85

1    to stay, my hope is that that would be conveyed to

2    you during your evaluation, that, you know, people

3    don't think you're going to be here very long

4    because you don't come in a lot, et cetera, you

5    don't do a lot of billable client work.  So if you

6    wanted to change that perception of you, you would

7    actually come in more and do more client work, in

8    which case the impression of you would change.

9         Q.   Right.  So, in other words, it is a

10   negative thing to be not -- to have this in your

11   evaluation, correct?

12        A.   I think it's an instructive thing to

13   have in your evaluation.

14        Q.   You would have to change if you wanted

15   to have a successful career at the firm?

16        A.   Yes.

17        Q.   Why did you decide to write in my review

18   about your impression about how long I would

19   remain in firm life?

20        A.   For the same reason I just said, because

21   I wanted it to be conveyed to you that at least

22   one partner has the impression that you're not



Page 86

1    going to be here very long and so if you wanted to

2    be here longer, you could change that impression.

3         Q.   And you -- is there any other reason?

4         A.   No.

5         Q.   You -- why did you say that I --

6         A.   Let me change that answer.  I think my

7    job as someone who was writing an evaluation is to

8    provide the firm my honest assessment of their

9    abilities and their potential for future growth.

10   And so by saying you don't look like you're going

11   to be here very long is a data point for the firm

12   to analyze your potential for future growth.  And

13   like I said, your evaluation -- in your

14   evaluation, when you sit down to do your

15   face-to-face evaluation with Beth or whoever it

16   was, my thought would be that this is something

17   that would come up, especially if more than one

18   partner said it.  And that tends to be how these

19   things go.

20             You get -- you get evaluated by multiple

21   people.  And so if one person says a thing in an

22   evaluation and nobody else says it, then I think



Page 87

1   it's given less weight.  If more than one person

2   says it in an evaluation, I think it's given more

3   weight.  It becomes weighty enough that whoever is

4   sitting down to do your face-to-face evaluation

5   with you would say this is what your evaluation

6   said.  People don't think you're very dedicated to

7   being here, so if you want to change that, you

8   should do something to change that perception,

9   like take on more billable work, come into the

10  office more, be around more, things like that.

11       Q.   And just to be clear, you did not

12  actually know how much billable work I was doing,

13  correct?

14       A.   Correct.

15       Q.   You didn't have access to my billing

16  records.

17       A.   Correct.

18       Q.   And you -- how often did you think I was

19  in the office?

20       A.   I didn't keep a tracker, but you seemed

21  to be here less than you were here.

22       Q.   Okay.  So you're saying I was out of the



Page 88

1    office -- your impression I was out of the office

2    the majority of the time?

3         A.    That was my impression during the time

4    period I worked with you.

5         Q.    And did you ever stop by my office?

6         A.    I don't recall.

7         Q.    Did you ever try to call my office and

8    have me not answer?

9         A.    I don't recall.

10        Q.    So what was your impression --

11    withdrawn.

12             Your impression that I wasn't in the

13    office for the majority of the time was based on

14    the fact that you just didn't see me in the halls?

15        A.    Didn't see you in the halls, didn't see

16    you at lunch.  Like I said, we were on the same

17    floor.  I would, I think, walk by your office.  I

18    would walk past I&A associates.  Others said you

19    weren't around very much.

20        Q.    We were -- our offices were on opposite

21    ends of the -- we were not in the same building,

22    were they?



Page 89

1        A.    I don't know where your office was.  I

2   was on the fourth floor in the 53 building.  I

3   thought you were on the fourth floor with the

4   other I&A associates.

5        Q.    But you don't actually remember where my

6   office was.

7        A.    I don't recall specifically.

8        Q.    The sort of the obvious question, you

9   didn't use the same bathroom, correct?

10       A.    I would assume not.

11       Q.    And you had no idea whether I ate lunch

12   in my office or in the cafeteria, correct?

13       A.    I don't know.

14       Q.    Okay.  You wrote, "She's just not into

15   us."  Why did you say that I wasn't that into us?

16       A.    For the reasons we just talked about.

17   You didn't seem to be here very much.  You

18   didn't -- you didn't strike me as someone who was

19   busy on billable work, all the things we just

20   mentioned, or that I just mentioned.

21       Q.    And just to clarify, the reason why it

22   didn't seem like I was busy with billable work to



Page 90

```
1    you is because when you talked to battle partners,

2    they didn't mention that I was on any particular

3    case with them; is that right?  Is that right?

4         A.   In part.

5         Q.   And what else was it?

6         A.   I talked to other I&A people.  You

7    didn't seem to be working on billable matters.  I

8    didn't see case teams, your name on anything.

9    Just -- it was just my impression.

10        Q.   Do you have a sense of, you know, all of

11   the case teams that each I&A associate works on?

12        A.   Not a detailed list, but I generally

13   talk to a lot of people and we talk about what

14   people are working on.

15        Q.   Okay.  Well, what cases did I work on at

16   Jones Day, what case teams was I on during my --

17   during my four years at Jones Day?

18             MR. BAILEY:  Objection to

19   foundation.

20        Q.   Can you name any of them?

21             Withdrawn.

22             Can you name any of the case teams I was
```



Page 91

1    on during my time at Jones Day?

2         A.   Other than the one you worked on with

3    me?  I just said I didn't hear your name about

4    being on any other case teams.

5         Q.   Okay.  So it's your impression that I

6    wasn't on any other case teams at Jones Day?

7         A.   No, it was not my impression that you

8    weren't on any other case teams.  My impression

9    was that you weren't very busy with billable

10   client work.

11        Q.   Can you name any case teams that I was

12   on?

13        A.   No.

14        Q.   Can you name any case teams that Sparkle

15   Sooknanan was on?

16        A.   She was on ███████████ with me.

17        Q.   Can you name any case teams that Sparkle

18   Sooknanan was on that you were not personally

19   involved in?

20             MR. BAILEY:  Julia, I think you

21   should let him finish his answer.

22        A.   I don't recall specifically.  I remember



Page 92

1  people saying they were working with Sparkle on

2  things.

3      Q.   Which people?

4      A.   I don't recall.

5      Q.   Can you remember which case teams Aaron

6  Tang was on, any case teams that you were not

7  personally involved in?

8      A.   I don't recall Aaron.

9      Q.   Okay.  Can you remember any case teams

10 that Mike Murray was involved in that you were not

11 personally involved in?

12     A.   No, I don't recall Mike.

13     Q.   Can you remember any case teams that

14 Ryan Walsh was involved in that you were not

15 involved in?

16     A.   Yaakov mentioned a couple of matters

17 that he worked one with Ryan.  I don't recall the

18 specific matters.

19     Q.   Okay.  Did Yaakov ever mention to you

20 any matters that I worked on with Yaakov?

21     A.   No.

22     Q.   Can you identify any case teams that



Page 93

1  Emily Kennedy was involved in that you were not

2  personally involved in?

3       A.   No, not a specific name.

4       Q.   Can you identify any case teams that

5  Caroline -- I cannot -- Caroline Edsall Littleton

6  was involved in?

7       A.   I know who you're talking about, yes.

8       Q.   That you were not personally involved

9  in.

10      A.   I'm sorry.  Finish the question.  I

11  didn't mean to interrupt.

12      Q.   I'm sorry.  Can you remember any case

13  teams that Caroline Edsall Littleton was involved

14  in that you were not personally involved in?

15      A.   She did work for ███████.  I know she did

16  generally ████████████████████ work.  I don't

17  remember the specific case names, but I do

18  remember people talking about working with

19  Caroline and how she was really busy and worked

20  really hard.

21           MR. BAILEY:  Let me just caution, I

22  think you need to be protective of the



Page 94

1   attorney-client privilege here, so general answers

2   to these questions is fine, but I just want to

3   caution the witness not to get into specific

4   detail about matters.

5            THE WITNESS:  Okay.

6     Q.   Okay.  So besides hearing about the case

7   teams that people were involved in -- withdrawn.

8         Besides not hearing that I was involved

9   on particular case teams, what -- are there other

10  reasons that you thought that I didn't do a lot of

11  billable hours?

12     A.   Like I said, I didn't see you around the

13  office very much.  I didn't hear your name.  Other

14  people didn't talk about you being on cases with

15  them.  I think that's it.

16     Q.   Okay.  And what does it mean to not be

17  that into us?  Who does "us" refer to?

18     A.   The firm.

19     Q.   And what does it mean to be not that

20  into us?

21     A.   That you don't seem very dedicated to

22  the firm.



Page 95

1      Q.   And why is it important to be dedicated

2   to the firm?

3              MR. BAILEY:  Objection.

4   Foundation.  Form.

5      A.   It's important to be dedicated to the

6   firm because this is not a normal 9 to 5 job.

7   Client matters come up at all hours of the night,

8   on weekends.  It's a service business.  Our

9   clients expect us to be responsive, and not just

10   partners but associates, everyone.  So I think

11   that's why it's important to be committed to the

12   firm.

13      Q.   And how -- withdrawn.

14              Did you think that your statement that I

15   wasn't that into us would be perceived as a

16   negative thing by other partners?

17      A.   I think --

18              MR. BAILEY:  Objection.  Sorry, go

19   ahead.

20      A.   I think it was the same as the comment

21   before.  I'm sorry, we lost the connection, at

22   least I did.  Did you?



Page 96

1                    MR. BAILEY:  I did not.  Partner A has

2     lost his connection to AgileLaw.

3                    MS. SHEKETOFF:  We'll go off the

4     record for a minute.  Louwhan?

5                    VIDEO TECHNICIAN:  We are going off

6     the record at 10:34 a.m.

7                    (A brief recess was taken.)

8                    VIDEO TECHNICIAN:  We are back on

9     video record at 10:41 a.m.

10    BY MS. SHEKETOFF:

11        Q.   Okay.  Let's go back to Plaintiffs'

12    Exhibit 100, please.  And that's Bates stamped

13    again 51 -- JD_5181 to 82.

14             My question is -- you can go to page 2.

15    Does this prompt ask you to talk whether an

16    associate is long for firm life?

17        A.   Which prompt are you talking about?

18        Q.   The evaluation prompt that we discussed

19    earlier.

20        A.   Oh, where it says, "Narrative

21    evaluation"?

22        Q.   Well, I guess you can -- why -- you can



Page 97

```
 1   answer it however you want.  You can look anywhere
 2   on this document.
 3            My question is, does the evaluation form
 4   anywhere ask you to discuss whether an associate
 5   is long for firm life?
 6            MR. BAILEY:  Just make sure you
 7   read the document.
 8            THE WITNESS:  Yes, I'll read it.
 9   A.   Could you repeat your question?
10   Q.   Does this form -- where on this form
11   does it ask for you to talk about whether an
12   associate is long for firm life?
13   A.   I think that's wrapped up in sort of the
14   overall evaluation of the lawyer.
15   Q.   Okay.  So can you identify any language
16   here that asks you to talk about whether someone
17   is going to stay at the firm more than two years?
18   A.   No, that's not expressly asked for.  It
19   asks for an overall assessment.
20   Q.   Are you talking about where it says,
21   "Anything else about the lawyer's substantive
22   performance you believe important to a fair and
```



1    objective assessment"?

2        A.    No, I just said a concise statement of

3    your overall evaluation of the lawyer's

4    performance.

5        Q.    "On the identified project."

6        A.    Yes.

7        Q.    And is that the language you're focused

8    on?

9        A.    I think the narrative asks for our view

10   of your overall -- my overall assessment of you.

11       Q.    Okay.  It says -- so where does --

12   right.  Are you talking about where it says,

13   "Please provide a concise statement of your

14   overall evaluation of the lawyer's performance on

15   the identified project"?

16       A.    Is there a question?

17       Q.    Is that what you're talking about;

18   that's where you feel that it was calling for you

19   to talk about whether I was long for firm life?

20            MR. BAILEY:  Asked and answered.

21       A.    No, I'm saying that the purpose of a

22   narrative evaluation is for me to provide my



1   overall assessment of you.

2        Q.   Okay.  And does that say that anywhere

3   here?

4        A.   To provide an overall assessment of you?

5        Q.   Yes.

6        A.   Not expressly.

7        Q.   So your understanding is that in the

8   evaluation, you should be providing an overall

9   assessment of the lawyer outside of the project

10  that you actually -- that you worked on with the

11  lawyer?

12        A.   I think, yeah, that happens all the time

13  with law firm evaluations, even when someone is a

14  summer associate, we evaluate their substantive

15  performance on their tasks assigned, but we also

16  talk about their social skills, judgment.  That's

17  a very important part of the firm's evaluation and

18  analysis of an associate or summer associate in

19  deciding whether to give that person an offer for

20  an associate, in deciding whether to promote them,

21  to retain them, et cetera.

22        Q.   Okay.



Page 100

1      A.    And actually I should also say as

2   feedback for the attorney so that they can improve

3   their performance.

4      Q.    And you understood that by saying that I

5   wasn't long for firm life, that would be an

6   impediment to my promotion to partner?

7                MR. BAILEY:  Objection.

8      A.    I didn't view --

9                MR. BAILEY:  Objection.  It

10  mischaracterizes the prior testimony.

11               MS. SHEKETOFF:  It's a question,

12  Anderson.  I'm asking a question.

13     A.    I viewed it as something that if

14  others -- especially if others said it in your

15  evaluation of you would be something that was

16  brought up to you in your face-to-face evaluation

17  so that you could make adjustments if you wanted

18  to.  And if you were going to leave anyway, you

19  wouldn't have to make any adjustments.

20     Q.    And did you think it would be an

21  impediment to my promotion to partner?

22     A.    If you weren't around very much,



Page 101

```
 1   absolutely.  That's my guess.  I don't make the
 2   decisions for partner, but that's my impression.
 3        Q.   My question is, if I wasn't -- if I
 4   appeared to not be long for firm life and was not
 5   that into us, would that be an impediment to
 6   partner?
 7             MR. BAILEY:  Objection.
 8   Foundation.
 9        A.   I don't make partnership decisions, but
10   my impression would be it's not something
11   conducive with making someone a partner.
12        Q.   Have you ever said in another written
13   review that any other associate wasn't long for
14   firm life?
15        A.   I don't recall.
16        Q.   Have you ever worked with any other
17   associate who you thought might not plan to stay
18   at the firm long-term?
19        A.   Not someone that to my view made it as
20   obvious as you.
21        Q.   Okay.  And to be clear, when you say
22   someone who made it as obvious as me, it's based
```



Page 102

1    on the things that we talked about earlier today?

2         A.   Right, my impression.

3         Q.   Right.

4              So my question is, have you ever worked

5    with any other associate who you thought didn't

6    plan to stay long at the firm?

7         A.   Not that I recall.

8         Q.   So have you ever worked with any

9    associate who you thought didn't plan to stay

10   longer than, let's say, two years at the firm?

11        A.   I'm trying to think through the

12   associates I've worked with, whether anyone either

13   -- most of the people who leave that I work with,

14   associates especially, they announce that they

15   were leaving and then left very quickly.  I never

16   had someone -- I never worked with anyone that

17   seemed not around as much as you weren't around.

18        Q.   And did you ever -- I think you're still

19   not answering my question.  My question is, did

20   you ever work with anyone that you believed would

21   not stay longer than two years at the firm?

22        A.   So I think that there's a -- I think no



Page 103

1    one is surprised when a former Supreme Court clerk

2    leaves after two or three years to go do something

3    else, academia, et cetera.  That seems to be a

4    pretty typical path, or at least not an uncommon

5    path.  But I think the distinction I would make is

6    while they're here, if they're busy and

7    contributing to the firm, if they leave at two

8    years, I don't think anyone is surprised, but I

9    don't think it's -- I think they're viewed

10   differently as someone who is actually putting in

11   a lot of work.  They're viewed as someone who is

12   putting in a lot of work and contributing to the

13   firm.

14       Q.   Okay.  Yes or no, have you ever worked

15   with any other associate that you believe -- that

16   you personally believed did not plan to stay more

17   than two years with the firm?

18            MR. BAILEY:  Asked and answered.

19       A.   Not that I can recall.

20       Q.   And yes or no, have you ever worked with

21   another associate who you personally believed did

22   not plan to stay more than three years at the



Page 104

1   firm?

2          A.   Not that I recall.

3          Q.   And have you ever worked with another

4   associate who you thought didn't plan to stay to

5   make partner at the firm?

6          A.   Who didn't plan to stay to make partner.

7          Q.   Yeah.  Who didn't plan to try to make

8   partner at the firm, to stay long enough to try to

9   make partner at the firm.

10              MR. BAILEY:  Objection to the form.

11         A.   Not that I recall.  I think that in

12  normal life most associates end up leaving at some

13  point but not that I -- nothing that that

14  associate did or said would indicate to me that,

15  you know, he or she is leaving in two years, three

16  years, four years.

17         Q.   Okay.  And have you ever known another

18  associate that you believed would not stay long --

19  sorry, withdrawn.

20              Did you -- have you ever known any

21  associate at Jones Day who you believed was not

22  long for firm life?



Page 105

```
 1                MR. BAILEY:  Asked and answered.
 2        A.    I recall one associate who, after her
 3   husband made partner at a different firm, said
 4   that she wasn't going to stay for very long, but
 5   that was based on what she said.  I didn't work
 6   with her.  She just said that in a social context.
 7        Q.    Anyone else?
 8        A.    Not that I recall.
 9        Q.    And what did you mean when you said not
10   long for firm life?  How long did you mean?
11        A.    Two, three years.  Some -- not much
12   longer after you wouldn't have to give your bonus
13   back.
14        Q.    All right.  And -- okay.  And did you
15   ever say in any other review that another
16   associate wasn't into the firm?
17        A.    Not that I recall.
18        Q.    Why -- why not?
19        A.    Because my work with that associate --
20   so I'm writing a review on someone I worked with,
21   right?  No one had ever -- I don't think I ever
22   worked with any other associate that was as
```



Page 106

1    unavailable as you were.

2         Q.   Okay.

3         A.   Meaning in the office.

4         Q.   Meaning physically in the office?

5         A.   Correct.

6         Q.   And so for you, if you were not

7    physically in the office, that suggests that you

8    were not into the firm.

9         A.   Correct.

10        Q.   Okay.  And --

11             MR. BAILEY:  Just to clarify that

12   last statement, I assume the question and answer

13   were in reference to the time period relevant to

14   this particular lawsuit?

15             THE WITNESS:  Yes, prepandemic.

16   Actually I should clarify.  Prepandemic.

17        Q.   Okay.  And so during the pandemic, did

18   you work from home?

19        A.   Yes.

20        Q.   And during the pandemic, did Jones Day

21   ever have a policy whether you could come into the

22   office if you wanted but you did not have to?



Page 107

```
1       A.   Yes.

2       Q.   And did the people who did not come into

3  the office show that they weren't that into the

4  firm?

5       A.   Not in my opinion.

6       Q.   Why not?

7       A.   Because we were in a pandemic.

8       Q.   Okay.  Did you go into the office?

9       A.   Yes.  Not every day, but some.

10      Q.   So is your -- okay.

11           And why didn't you ever say -- why don't

12  you ever recall saying about another associate

13  that they weren't long for firm life in your

14  review?

15           MR. BAILEY:  Asked and answered.

16      A.   Because no one ever gave me an

17  indication by their actions that they were going

18  to leave soon or soon -- acted in a way that I

19  thought it was reasonable to infer that they would

20  leave soon.

21      Q.   By not being in the office.

22      A.   Not being in the office, not being
```



Page 108

1    staffed on billable matters, et cetera, not

2    hearing their name being -- about being on work

3    teams, et cetera.

4        Q.   Okay.  After saying that I just wasn't

5    that into us, you say, "Almost nothing about her

6    work on this case suggests otherwise."  Was your

7    statement here truthful?

8              MR. BAILEY:  Sorry to interrupt,

9    but are we switching documents?

10             MS. SHEKETOFF:  Yes.  I'm sorry.

11   We're going back to Plaintiffs' Exhibit 6.  Thank

12   you.  And that's again page 5, JD_JS_1293.

13       A.   Okay.

14       Q.   Okay.  So you say, again, after you say

15   that I wasn't that into us, you say, "Almost

16   nothing about her work on this case suggests

17   otherwise."  Was that statement truthful?

18       A.   Yes, my impression.

19       Q.   Were you distinguishing between being

20   into the firm outside of my work on the case and

21   then into the firm on my work on the case?

22       A.   I'm sorry, could you repeat that?



Page 109

```
1        Q.    Were you distinguishing between being

2   into the firm outside of my work on the case and

3   then my work on the case?

4              MR. BAILEY:  Form.

5        A.    I don't think I understand the question.

6        Q.    Okay.  That's fine.  I'll withdraw it.

7              What was your basis for saying that

8   almost nothing about my work on the case suggested

9   that I was into us?  Us being the firm.

10             MR. BAILEY:  Form.

11       A.    Could you repeat the question?  I'm

12  sorry.

13       Q.    When you say she wasn't that into us,

14  you mean -- you mean the firm, correct?

15       A.    Yes.

16       Q.    Okay.  So what was your basis for saying

17  that almost nothing about my work on the case

18  suggested that I was into the firm?

19       A.    I think mostly that dealt with

20  availability, you know, of how eager you seemed to

21  be about working on the matter.  I just felt that

22  you do what was asked, didn't show a lot of
```



Page 110

1   initiative, didn't seem to be really into the case

2   or the firm generally.

3        Q.   Okay.  Is there anything else that

4   showed that I -- sorry.  Withdrawn.

5             Was there anything else about my work on

6   the case that suggested that I wasn't into the

7   firm?

8             MR. BAILEY:  Objection to form.

9        A.   Was there anything about your work on

10  the case?

11       Q.   Yes.

12       A.   Well, like I said, the research and the

13  writing I thought were -- the research was strong.

14  The writing got better for our particular

15  audience.  You just struck me as somebody who --

16  again, this is my overall impression of you -- you

17  struck me as someone who wasn't really into the

18  work we were doing, to being in the office, to

19  learning about sort of the case more broadly.  Not

20  a lot of initiative shown, I thought.  So those

21  were all the things that formed my impression and

22  led to me writing what I wrote.



Page 111

1    Q.   Okay.  What specifically about my work

2    on the case suggested that I wasn't into the firm?

3            MR. BAILEY:  Asked and answered.

4    A.   I don't recall.

5    Q.   Did I do anything -- you say, "Almost

6    nothing about her work on the case suggests

7    otherwise."  What did I do or what about my work

8    didn't suggest that I was into us, into the firm?

9            MR. BAILEY:  Form.

10   A.   Yeah, I'm sorry, could you repeat the

11   question?  What about your work -- please repeat

12   it.  I'm sorry, go ahead.

13   Q.   You say, "Almost nothing about her work

14   on this case suggests otherwise."  So what about

15   my work did suggest that I was into the firm?

16   A.   I mean, you didn't do nothing on the

17   case.  I mean, you did the research.  You drafted

18   memos.  We went through the iterative process.  I

19   think if -- I think to justify a statement like,

20   you know, she doesn't want to be here and she's

21   leaving tomorrow would mean you didn't do any work

22   on the case.



Page 112

1      Q.    Okay.  You say, "She exhibits little to

2  no initiative.  Rather, like a second-year

3  associate, she merely does what is asked of her."

4  Are your statements here truthful?

5      A.    Yes, that was my impression.

6      Q.    Did I lead a factual investigation about

7  ███████████████████████████████████████████

8  ███████████████? 

9      A.    Did you lead it?

10     Q.    Yes.

11     A.    I don't know what you mean by lead.

12     Q.    What do you think the word lead means?

13     A.    I think I led the case and led the

14  investigation.  I would think if you -- getting on

15  the phone -- in my view, having some calls with a

16  client without a partner present to ask about

17  issues we're trying to track down does not in my

18  mind mean you're leading an investigation.

19     Q.    So did I have phone calls with the

20  client without you?

21     A.    I don't recall.

22     Q.    Did I have phone calls with the client



Page 113

1   with you?

2       A.   I believe you were on calls with -- I

3   don't recall specifically, but I tend to, when I

4   have associates working with me, have them on a

5   call with clients so that I can introduce them to

6   clients and they see who's -- get a -- associate a

7   face with a name on a memo, et cetera.

8       Q.   When we were on calls together, did you

9   ask questions or did I ask questions?

10      A.   I don't recall.

11      Q.   And did I do the legal research about

12  what facts were relevant to our investigation?

13      A.   Did you do the legal research?

14      Q.   About what facts were relevant to our

15  investigation.

16      A.   I don't recall specifically, but you

17  were the associate, I was the partner, so I would

18  imagine that you did the research.

19      Q.   Did I come up with the questions to ask

20  during the factual investigation?

21      A.   I don't recall.

22      Q.   Did I email the client directly to ask



1    questions?

2         A.   I don't recall.

3         Q.   Did I follow up with the client when

4    they responded?

5         A.   I don't recall.

6         Q.   Did I interview the client?

7         A.   I don't recall.

8         Q.   You don't recall if I interviewed the

9    client without you?

10        A.   No.

11        Q.   And I ran interviews with the client

12   when you were on the line, correct?

13        A.   I don't recall.

14        Q.   It was my idea to have a separate memo

15   about ████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████, correct?

18        A.   You say it was your idea?

19        Q.   That's correct.

20        A.   I don't recall that.

21        Q.   I suggested it to you, didn't I?

22        A.   I don't recall.



Page 115

```
 1                    MR. BAILEY:  Asked and answered.

 2        A.    I don't recall.

 3        Q.    You never even considered it before,

 4   correct?

 5        A.    I never considered having a separate

 6   memo?

 7        Q.    You never considered that there was a

 8   separate issue about ████████████████████

 9   ████████████████████, correct?

10        A.    I think you researched it -- researched

11   the issue, and as I recall, said this is something

12   that we should look into, I believe.

13        Q.    And you would call me to ask me to

14   explain the written memos to you, right?

15        A.    I don't recall.

16        Q.    You called me to ask me to explain what

17   the written memo from our ████████ colleagues

18   said; is that right?

19                    MR. BAILEY:  Asked and answered.

20        A.    The question is, did I call you and ask

21   you to explain to me what the memo said?

22        Q.    Yeah, correct.  I'll rephrase.
```



Page 116

```
 1            The memo written by our ████████
 2   colleagues I'll call the ████████ memo, okay?
 3        A.   Okay.
 4        Q.   All right.  You asked me to explain --
 5   withdrawn.
 6            You called me to ask me to explain to
 7   you what the ████████ memo said, correct?
 8        A.   I would not need you to explain what a
 9   memo said to me.  If I didn't get a chance to read
10   a memo, I may ask you to tell me what the memo
11   said because I hadn't read it or if there were
12   some area of law that you had discussed with our
13   ████████ colleagues that I wasn't on the phone
14   at the time or wasn't readily apparent from the
15   memo what was meant.  But in general would I ask
16   you to explain a memo to me?  No.
17        Q.   You read the ████████ memo and you
18   called me to ask me questions about it, correct?
19        A.   I don't recall.  I probably did.
20        Q.   I'm sorry?
21        A.   I'm sure that's part of the normal
22   course.  If I read a memo and you have been
```



1   working on it too, I would think we would have a

2   discussion on it.  I would not characterize it

3   asking you to explain it to me.

4        Q.   You didn't understand various parts of

5   that memo, did you?

6        A.   I don't recall not understanding parts

7   of the memo.

8        Q.   You called me to ask me to explain the

9   legal principles written in the memo, correct?

10       A.   Not that I recall.

11       Q.   You don't recall one way or the other or

12   you're saying it didn't happen?

13       A.   I'm saying I don't think that I would

14   need you to explain a memo to me if I had read the

15   memo or if there were certain nuance that wasn't

16   evident from the memo, I think we would have a

17   discussion about it.  You're characterizing it

18   that I needed you to explain something to me, and

19   I disagree with that.

20       Q.   So you're saying that did not -- that

21   did not happen.

22                 MR. BAILEY:  Form.



Page 118

```
 1        A.   I'm saying that would not happen.

 2        Q.   When you first received the ████████

 3   memo, I made revisions or I suggested revisions to

 4   that memo, correct?

 5        A.   I don't recall.

 6        Q.   And you didn't ask me to do that, did

 7   you?

 8        A.   I don't recall.

 9        Q.   I made substantive suggestions on how to

10   improve that memo; is that right?

11        A.   I don't recall.

12        Q.   You didn't ask me to do that either.

13        A.   I don't recall.

14        Q.   I made line edits to the ████████

15   memo, correct?

16        A.   Is that a question?

17        Q.   Yes.  Did I make line edits to the

18   ████████  memo?

19        A.   I don't recall.

20        Q.   You didn't ask me to make line edits to

21   the ████████  memo, did you?

22        A.   I don't recall.
```



Page 119

1    Q.   I communicated directly with our

2    ███████   colleagues to answer their questions

3    about what we were asking them to research,

4    correct?

5    A.   I don't recall.

6    Q.   And I had calls with them?

7    A.   Who?

8    Q.   Our ███████ colleagues.

9    A.   Are you asking me if you had calls with

10   our ███████ colleagues?

11   Q.   Correct.

12   A.   I would assume you did.

13   Q.   And you weren't on the line on those

14   calls?

15   A.   I don't recall.

16   Q.   I was the one who was answering

17   questions on those calls from our ███████

18   colleagues, correct?

19        MR. BAILEY:   The calls that you say

20   he was not on?

21        MS. SHEKETOFF:   He can answer the

22   question.   If he doesn't know, he can say that.



Page 120

```
1        A.    Can you repeat the question, please?

2        Q.    I was the one who was answering

3   questions from our ███████ colleagues on calls,

4   correct?

5                    MR. BAILEY:   Which calls?

6        A.    Yeah, so I don't -- I don't recall --

7   I'm trying to think back to our calls with our

8   ███████ colleagues.   I remember we did some

9   video chats with the ███████ client.   Your

10  question is, did you answer questions from our

11  ███████ colleagues?

12       Q.    About -- about the memo we were asking

13  them to write.

14       A.    I don't recall.

15       Q.    And you didn't ask me to have calls with

16  them, correct?

17       A.    I don't recall.

18       Q.    I offered to -- withdrawn.

19             I was the one who was in charge of

20  explaining what our request was of the ███████

21  office, correct?

22       A.    I don't recall.
```



Page 121

1        Q.    I was in charge of explaining what

2    research we had done, correct?

3                   MR. BAILEY:  Same objection.

4        Q.    To our ████████ colleagues.

5        A.    I don't recall.  I mean, generally it is

6    much more efficient for an associate when there is

7    a lot of legwork that needs to be done in the sort

8    of day-to-day preparation of the case and drafting

9    of the memo and tracking things down, that is a --

10   that is a typical role for an associate.  So

11   you're asking me if you did all of these things?

12   I don't recall specifically.  I would assume you

13   did because that's what associates typically do.

14       Q.    And I was in charge of explaining what

15   we wanted in our memo, correct?

16       A.    I wouldn't say you were in charge of

17   anything on that project.

18       Q.    I was the person who was communicating

19   with the ████████ office to answer any questions

20   and provide guidance about what we wanted their

21   memo to address; is that correct?

22       A.    I wouldn't characterize that as being in



Page 122

1    charge.

2         Q.    Please answer the question I asked.

3              MR. BAILEY:  He's entitled to

4    answer the question.

5         A.    Can you repeat the question?  I'm sorry.

6    I thought we were still talking about being in

7    charge.  I thought that was the follow-up to the

8    in the charge part.

9         Q.    I was the person who was in contact with

10   the ██████████ office to answer questions and

11   provide guidance about what we wanted their memo

12   to address.

13        A.    I don't recall that specifically, but I

14   would -- I would think so.

15        Q.    And after we started working together,

16   you did not personally conduct interviews with the

17   client about this memo, correct, factual --

18   withdrawn.

19              After we started working together, you

20   were not making calls to the client to obtain

21   facts relevant to our memo; is that correct?

22        A.    I don't think that's correct.  I



Page 123

```
 1   remember calls with our client about the memo,

 2   about preparing the memo.  I remember doing -- I

 3   remember flying to ███████ to meet in person

 4   with the CEO, the general counsel, and others to

 5   talk about the memo and the case more broadly.  We

 6   did a conference call with the ███████

 7   subsidiaries, their general counsel, some of their

 8   executive leadership team.  I don't think -- you

 9   didn't fly to ███████ with me, so I don't think

10   it's accurate to say that I didn't talk to the

11   client once you got involved on this memo.

12        Q.   Okay.  During the factual investigation

13   that we conducted for this memo, were you involved

14   on any of those calls?

15             MR. BAILEY:  Which calls?

16        A.   Yeah.  I mean, I was involved in calls

17   where we asked factual questions, yes.

18        Q.   And did you ask any questions during

19   those calls?

20        A.   I don't think I've ever had a call where

21   I didn't ask a question, especially of the client.

22        Q.   I was the one asking questions of the
```



Page 124

1    client, correct?

2        A.    Did you ask questions?  I would assume

3    so, but your question to me was did I -- did I --

4    I thought your question to me was that I didn't --

5    your statement was that I didn't ask any questions

6    on the call.  And I said -- my recollection -- I

7    don't think I've ever been on a call with a client

8    where I didn't ask a question.

9        Q.    And I was asking the vast majority of

10   the questions, right?

11       A.    I don't recall.

12       Q.    I came up with the questions, correct?

13       A.    I would hope so.  That's what associates

14   are supposed to do.

15       Q.    And I didn't run anything by you?

16       A.    I don't recall.

17       Q.    You didn't ask me to?

18       A.    Is that a question?

19       Q.    Yes.

20       A.    The question is did I ask you to run

21   anything by me?

22       Q.    Correct.



Page 125

```
 1      A.   I don't recall.

 2      Q.   And so I was the one gathering factual

 3  information from the client on these calls?

 4               MR. BAILEY:  Objection.

 5      A.   You were -- yes, you were part of the

 6  process of gathering factual information from the

 7  client on the calls.

 8      Q.   You had a very -- you had very little --

 9  a very small speaking role on the calls, correct?

10      A.   I don't recall.  I was -- I was the one

11  in charge of this process, of this memo, of this

12  -- actually I first-chaired ███████████

13  ███████████, so I don't know -- I don't know how

14  much I spoke on the calls or not.  I don't recall.

15      Q.   You say -- back to Plaintiffs' Exhibit

16  6.  You say, "Her availability seems to be

17  whatever is convenient for her.  On multiple

18  occasions, I asked her for the next version of the

19  memo.  She said she was tied up with other

20  things."

21               Were your statements here accurate?

22      A.   Yes, those were my impressions.
```



Page 126

1      Q.   What was your basis for your statement

2  that my availability seemed to be whatever was

3  convenient for me?

4      A.   From what I can recall, I think I asked

5  for the next version of the memo by certain

6  dates/times and your response to me on more than

7  one occasion was I can't get it to you by that

8  date or time.

9      Q.   And do you remember when --

10                MR. BAILEY:  Let him finish.

11     A.   Sorry, I dropped off for a second.  And

12  I -- I don't even know what I was going to say,

13  but go ahead.

14     Q.   Well, please -- please continue.

15                THE WITNESS:  Can you read back to

16  me the answer, please.

17                (Record read.)

18     A.   Okay, I'm done.  Thanks.

19     Q.   Was there any other basis for your

20  statement that my availability seemed to be

21  whatever was convenient for me?

22     A.   I think I recall -- in fact I know I


MAGNA
LEGAL SERVICES

1   recall multiple occasions where we would just meet

2   by phone because you were not in the office.

3   Where a lot of times with other associates, we

4   would sit in the same office to do a call together

5   with the client or work on the memo, just meet in

6   person to further the case.

7       Q.   So when you said my availability seemed

8   to be whatever was convenient, you were actually

9   saying -- is it your position that someone is not

10  available if they're meeting with you by phone?

11            MR. BAILEY:  Form.

12      A.   I think not being in person is part of

13  it, but there were also -- I think the other part

14  of that is there were dates by which I wanted to

15  have the next version of the memo so we could get

16  it to the client, et cetera, and you couldn't make

17  it happen.

18      Q.   And can you describe those?  How many

19  occasions were there?  Actually, withdrawn.

20      A.   I don't recall.  It was more than one

21  because if it's only once or twice even, I

22  wouldn't put that in a review.



Page 128

```
 1      Q.    Okay.  So it was at least three times?

 2      A.    That's my recollection.

 3      Q.    And is there anything besides, you know,

 4   not getting you the memo when you needed it and

 5   not having phone calls with you rather than being

 6   present in the office, that was the basis for your

 7   statement about my availability?

 8      A.    Yes.

 9      Q.    What?

10      A.    Yes.

11            MR. BAILEY:  I think there's a

12   disconnect between the question and the answer

13   there.  Maybe we could --

14            THE WITNESS:  Can you read the

15   question back, please?

16      Q.    I'm asking whether there is any other

17   basis besides the two you stated for your

18   statement that my availability seemed to be

19   whatever was convenient for me?

20            THE WITNESS:  I'm sorry, can you

21   read the prior question back and the answer?  I

22   thought it was a lot.
```



Page 129

1                    (Record read.)

2          A.    Right, you said that was the statement

3    about my basis for availability and my answer is

4    yes.

5          Q.    My question is, is there anything

6    besides those things?

7          A.    Not that I recall.

8          Q.    And you mentioned the three occasions or

9    at least three occasions when I didn't get you the

10   memo when you asked for it.  Please describe the

11   first occasion.

12         A.    I don't recall the occasions

13   specifically.

14         Q.    Okay.  Do you remember anything about

15   any of the occasions?

16         A.    Other than generally asking for it by a

17   particular date and you saying that you couldn't

18   get it to me on more than two occasions?  No.

19         Q.    And do you have any recollection of how

20   many times this occurred besides that it was at

21   least three?

22         A.    No.



Page 130

```
 1        Q.   So you remember nothing about these
 2   occasions other than what you said.
 3        A.   Correct.
 4        (Exhibit 104 was marked for identification and
 5        attached to the deposition transcript.)
 6   BY MS. SHEKETOFF:
 7        Q.   I'm going to show you Plaintiffs'
 8   Exhibit 104.  This is Bates stamped JD_JS_2316.
 9   And my question is, I would like you to read it,
10   but my question is, is this one of the occasions
11   that you're referring to?
12        A.   I really need glasses.
13        Q.   You can make it bigger, too.
14        A.   I think I need to.  My Lasik is wearing
15   off, I think.
16             Okay, what was the question?
17        Q.   My question is, is this one of the
18   occasions you were referring to?
19        A.   I don't recall.
20        Q.   You say here in this email -- is this an
21   email from you to ███████████████████ on
22   April 5th, 2016?
```





1     A.   Yes.

2     Q.   Okay.  And you say here,



Page 132

1          So you're saying you're not sure whether

2    this was one of the instances you're referring to?

3          A.   I don't think it was because when

4    someone has like other filings to do, it would

5    strike me as a reasonable basis for not being able

6    to do the work that I asked them to do.  So, no, I

7    wouldn't -- I wouldn't write in an evaluation

8    whatever I wrote about your schedule is convenient

9    or particular of your time or whatever the phrase

10   I used was if you had two files this week.

11         Q.   Okay.  So you wouldn't have written that

12   at all about this incident?

13         A.   That's right, I would not -- to say

14   something was like sort of a reasonable basis or

15   like a solid reason for not being able to work on

16   my project to other files, that happens all the

17   time.  I would not -- I would not put something in

18   an evaluation that says you're not available based

19   on something like this.  I would not do that.

20         Q.   And you say that I wasn't able to update

21   the memo until the weekend.  Why did you say the

22   weekend?



Page 133

1          A.    Well, if the client really needed it,

2    your filings were due Friday, I would hope that

3    you would work on it on the weekend.

4          Q.    And did you ask me to start over the

5    weekend?

6          A.    I don't recall.

7          Q.    Did I offer to start over the weekend?

8          A.    I don't recall.

9          Q.    Had I offered, I guess, at the time you

10   wrote this, had I offered to start it on the

11   weekend?

12         A.    I don't recall.

13         Q.    Was there any other occasion that you

14   recall when you -- withdrawn.

15               Okay.  So let's go back to Plaintiffs'

16   Exhibit 6.  You say, "Working on a weekend does

17   not seem to be in her vocabulary."  What was your

18   basis for saying that?

19         A.    I would only say that if I had asked you

20   to do something on a weekend and you said you

21   couldn't do it is my -- how I generally do things.

22         Q.    Do you remember any other basis for



Page 134

1    saying that?

2        A.    No.

3        Q.    And what do you mean by "working on a

4    weekend does not seem to be in her vocabulary"?

5        A.    I think it's consistent with what I've

6    testified to earlier, that you didn't seem to be

7    very busy.  You didn't seem to be very eager to

8    take on a lot of work, to have a high client

9    billable or even -- yeah, to have a high client

10   billable.

11       Q.    And more specifically what did you mean

12   by "working on the weekend does not seem to be in

13   her vocabulary"?

14       A.    I don't know how to answer it other than

15   just how I did.

16       Q.    Okay.  Did you mean to say I did not do

17   work on weekends when you asked me to; is that

18   what you're saying?

19       A.    I don't recall if I asked you

20   specifically to work on a weekend or if I said I

21   need something on Monday or Tuesday and the only

22   reasonable way that would have been done was to



Page 135

1    work on a weekend.  I don't recall the specifics.

2         Q.   Okay.  But you're saying that one of

3    those kinds of things happened and then I did not

4    -- I refused to do that?

5         A.   Or, yeah, you said you were unavailable

6    to work over the weekend.

7         Q.   Okay.  You say -- are you okay?

8         A.   I'm sorry, I just coughed.

9         Q.   You say, "My guess would be that she did

10   not bill 2,000 hours last year."  Why did you

11   decide to include that statement in your review?

12        A.   Because that was my impression, that you

13   weren't -- that it wasn't just you couldn't do

14   things when I asked you for them on a particular

15   timeline because you were super busy for other

16   things.  There are some associates that you work

17   with that bill 1,900 or 2,000 or 2,100 hours, and

18   if the answer for them is I can't get it to you by

19   this date because I'm busy, you would expect that

20   they're really busy with other billable matters.

21   And I wrote that because I wanted to convey that I

22   didn't think your lack of availability for me was



Page 136

1    due to you being super busy on other billable

2    matters.

3        Q.   Okay.  And did you understand the prompt

4    to ask you to guess how many hours an associate

5    billed?

6        A.   I'm sorry?

7        Q.   Did you understand the prompt or the

8    form for this evaluation to ask you to guess how

9    many hours an associate billed?

10       A.   No, it asked for my evaluation of you.

11       Q.   And did you -- did you believe that

12   other people would perceive that as a negative

13   statement?

14       A.   Yes.

15       Q.   And have you made guesses about

16   associates' hours in other reviews?

17       A.   No, because I never worked with anybody

18   that seemed as unavailable as you.

19       Q.   Okay.  And can you tell me again in what

20   ways I seemed more unavailable than any other

21   person at the law firm?

22            MR. BAILEY:  Asked and answered.



Page 137

1      A.    You seemed to be in the office less than

2    most other people.  You didn't seem busy because I

3    never heard your name as being on a case team.

4    Those kinds of things.

5      Q.    And were there other things?

6      A.    Not that I recall.

7      Q.    And you also say, "My guess is that she

8    will soon leave to become Professor Sheketoff."

9    Why did you include that statement in your review?

10     A.    I was just trying to convey that I

11   thought you would leave to go be a professor.

12     Q.    And what was the basis for that guess?

13     A.    The things we just talked about, how you

14   weren't around very much, I didn't think you were

15   busy on billable matters, you didn't seem that

16   dedicated to the firm.

17     Q.    Anything else?

18     A.    I don't think so.  Not that --

19     Q.    What?

20     A.    Not that I recall.

21     Q.    How did I not seem that dedicated to the

22   firm?



Page 138

1          MR. BAILEY:  Asked and answered.

2     A.   You didn't seem to be in the office a

3  lot.  You didn't seem to be busy because I didn't

4  hear your name on other case teams.

5     Q.   Anything else?

6     A.   Not that I recall.

7     Q.   Had I ever told you that I was

8  interested in academia?

9     A.   Not that I recall.

10    Q.   How did you think that your statement

11 that you guess I would soon leave to become a

12 professor would be understood by other partners?

13    A.   I thought they would view it as

14 consistent with my prior sentences and the overall

15 theme that you would leave soon.

16    Q.   Did you think that they would think it

17 was a good thing?

18    A.   I thought that this would be, especially

19 if others made similar statements, that this would

20 be brought up in your evaluation and if you wanted

21 to stay, you would start doing the things to show

22 that you were more dedicated to the firm.  And if


MAGNA
LEGAL SERVICES

Page 139

1    you didn't want to stay, then you wouldn't change

2    anything you were doing.

3         Q.    Did you think it was a criticism?

4         A.    Yes.

5         Q.    Have you ever said in any other eval

6    that you guessed someone else would leave to

7    become a professor?

8         A.    I don't recall.  I may have said that

9    about another I&A associate, but I don't recall.

10        Q.    Did you ever work with Aaron Tang?

11        A.    Now that you mention the name, I recall

12   his name.  And I cannot place his face.  I don't

13   remember working with Aaron.

14        Q.    Okay.  Did you review him?

15        A.    I don't -- I don't recall.

16        Q.    Did you say that he would soon leave to

17   become a professor?

18        A.    I don't recall.

19        Q.    Did you ever work with Richard Re?

20        A.    I don't think so.

21        Q.    Did you review him?

22        A.    I don't ever remember writing a review



Page 140

1    for Richard Re.  Like R-A-Y Ray?

2         Q.   R-E.

3         A.   Richard Re, R-E?

4         Q.   Yes.

5         A.   No, I don't recall.

6         Q.   Did you ever say that he would soon

7    leave to become a professor?

8         A.   I don't even recall Richard Re.

9         Q.   Okay.  Did you ever work with Farah

10   Peterson?

11        A.   I don't know if I ever worked with

12   Farah.  I don't think I ever worked with Farah.  I

13   remember her.

14        Q.   Okay.  Did you ever review her?

15        A.   I don't believe so.  I don't think we

16   ever worked together.

17        Q.   Okay.  Were you friends or -- withdrawn.

18             Were you friends with her when she was

19   at the law firm?

20        A.   We were friendly.  I wouldn't say we

21   were friends.  We didn't associate outside of

22   work.



Page 141

```
 1       Q.   Did you perceive that she might leave

 2  soon to become a professor?

 3       A.   I think she told me she was going to

 4  leave to become a professor.

 5       Q.   Okay.  And did you ever say anything

 6  about that in her reviews -- sorry, in the partner

 7  meetings or group meetings about associate

 8  evaluations?

 9       A.   Not that I recall.  I don't ever

10  remember her being discussed in a partner meeting.

11  I just don't recall her in particular.  If I -- I

12  really -- I pay more attention to the people that

13  I work with, but -- so I don't recall Farah being

14  discussed.

15       Q.   Okay.  If -- so you, I guess by

16  definition you don't recall saying at any

17  discussion about Farah that she would soon leave

18  to become a professor?

19       A.   I mean, I remember talking with her

20  about becoming a professor.

21       Q.   Right.

22            Outside of that.
```



Page 142

```
 1      A.   Did I ever mention to anyone else that

 2   she was going to be a professor?

 3      Q.   That she was going to leave soon to

 4   become a professor.

 5      A.   I don't --

 6           MR. BAILEY:  I'm sorry, is this

 7   before or after she told him that she was leaving?

 8      Q.   At any point.

 9      A.   I don't recall.

10      Q.   Did you ever work with Kenton Skarin?

11      A.   I don't even know that name.  No, not

12   that I recall.

13      Q.   Did you ever put Chris Ryan -- I can't

14   remember his name.  I'll have to come back to

15   that.

16           Did you ever review anyone that you

17   thought would become a professor?

18      A.   Not that I recall.

19      Q.   And so you don't recall -- do you recall

20   ever saying in any review that someone would leave

21   soon to become a professor?

22      A.   I don't recall saying for anyone else
```



Page 143

1   that they would leave soon to become a professor.

2       Q.   So what was your -- withdrawn.

3            What was your basis for rating me a

4   three for judgment?  Let's -- withdrawn.

5            What do you understand a three to mean?

6                 MR. BAILEY:  Let me just specify.

7   You're referring to the numbers above the

8   narrative in the comments field?

9                 MS. SHEKETOFF:  Correct.

10      A.   I don't recall what the scale was.

11      Q.   I'll represent to you that the scale is

12  one to five.  What do you understand a three to

13  mean?  Well, withdrawn.

14           Is the scale currently one to five for

15  associate evaluations?

16                MR. BAILEY:  You're asking at

17  present?

18                MS. SHEKETOFF:  Yes.

19      A.   I don't recall.

20      Q.   You don't recall how you rate associates

21  now?

22      A.   I recall -- I know that I write a



Page 144

1    narrative.  I can't recall whether we still do one

2    to five for all of those things.  I just don't

3    remember.

4         Q.   Okay.  How long have you been with Jones

5    Day?

6         A.   15 years, not including summer, so a

7    little more.

8         Q.   In those 15 years, do you remember at

9    any point using the scale one to five to rate

10   people's abilities?

11        A.   Yes.

12        Q.   And what did you understand or what do

13   you understand a three to mean?

14        A.   I think three is satisfactory. I think

15   five is like -- I believe five is the highest,

16   excellent.  And four is like exceeds standards.

17   Three is like satisfactory, I believe, or like in

18   line with peers, something like that, sort of

19   middle of the road.

20        Q.   Okay.

21        A.   I don't remember the precise verbiage.

22        Q.   And what would you understand a five to



Page 145

1    mean?

2         A.    Excellent.

3         Q.    Okay.  And so why did you rate me a

4    three?  What was your basis for rating me a three

5    for judgment?

6         A.    I don't recall.

7         Q.    Fair to say a three is not very good?

8         A.    I think three is satisfactory.

9         Q.    Fair to say you won't make partner if

10   you get all threes?

11             MR. BAILEY:  Objection to

12   foundation.

13        A.    I don't know.

14        Q.    Do you believe that -- do you believe

15   that someone who gets lots of threes would be a

16   strong prospect for partnership?

17             MR. BAILEY:  Foundation.

18        A.    I don't know.

19        Q.    You have no idea?

20        A.    I have no idea.

21        Q.    You have no belief?

22        A.    I don't have a belief one way or the



Page 146

1    other.

2        Q.   Do you believe that someone who gets

3    lots of threes would be likely to get a

4    significant annual raise?

5                MR. BAILEY:   Foundation.

6        A.   I don't know.

7        Q.   No idea?

8        A.   I don't know.

9        Q.   Did you ever get threes?

10       A.   I never saw my evaluations.  I don't

11   know.

12       Q.   Understood.

13            Okay.  What was your basis for rating me

14   a three?  I'm sorry, you said you do not recall

15   what your basis was for rating me a three for

16   judgment?

17       A.   I don't recall.

18       Q.   What was your basis for rating me a

19   three for written work?

20       A.   I don't recall.

21       Q.   Would a three for written work be

22   consistent with having very strong writing?



1      A.   I think the three -- I think a three for

2  writing says it's satisfactory.  My recollection

3  is based on reading the narrative, that you got a

4  three because the work wasn't, I don't think,

5  tailored to our audience.

6      Q.   Okay.  So fair to say that a three

7  suggests that my writing was not very strong?

8      A.   I think a three suggests that your

9  writing needs improvement, but I think most people

10  who come -- I know most people who come off of a

11  clerkship receive similar comments and

12  constructive criticism about how their writing

13  needs to change now that they're at a firm, so I

14  would not -- I would not view that as negative.

15      Q.   How would you rate very -- if you -- for

16  an associate whose writing was very strong, how

17  would you rate that associate on writing?

18      A.   I don't know.  It depends.

19      Q.   What would it depend on?

20      A.   How much work I had to do to make it

21  client ready in part.

22      Q.   So you're not sure how you would rate



Page 148

```
 1   someone's -- if you believed someone's writing was

 2   very strong, you're not sure how you would rate

 3   them?

 4        A.   I think a three or four.  It wouldn't be

 5   a two.  Three is satisfactory.

 6        Q.   So you think -- do you think that

 7   satisfactory and very strong are equivalent?

 8        A.   It could be.

 9        Q.   It could be?  In what cases could it be?

10        A.   It's hard to answer a hypothetical.

11        Q.   Well, you just said it could be, so I'm

12   just wondering when it could be.

13        A.   I mean, it depends on the written work,

14   how many -- how many different assignments an

15   associate did for me, were they -- were they

16   really good at writing sort of -- you know,

17   there's a lot of different written work product

18   that you get in a law firm.  Sometimes it's taking

19   notes during an interview and summarizing those.

20   Sometimes it's preparing an outline for

21   depositions.  Sometimes it's drafting a memo to a

22   client.  Sometimes it's drafting a brief.  And you
```


MAGNA
LEGAL SERVICES

Page 149

1    could have some associates that do one or two of

2    those really well at a sort of exceeds standards

3    level like a four, and you could have some that do

4    other things poorly, and so maybe on balance it's

5    a three.  Then overall they're different -- they

6    write at varying degrees of quality on -- based on

7    the kind of assignment.  It's just something, a

8    hypothetical I could think of.

9        Q.   Got it.

10            So if someone did one written work, one

11   writing for you and you thought that writing was

12   strong, would you rate that person exceeds

13   expectations or excellent or would you rate that

14   person satisfactory?

15       A.   It's hard to say.

16       Q.   Why?

17       A.   Because you're giving me a hypothetical.

18       Q.   Okay.  Do you think that very strong is

19   synonymous with satisfactory?

20            MR. BAILEY:  Just in general?

21            MS. SHEKETOFF:  Yes.

22       A.   I think it -- I don't think three is



Page 150

1    negative, especially for someone who's just coming

2    out of a clerkship.

3        Q.   Do you think that three is positive?

4        A.   I think it's satisfactory.

5        Q.   Do you think very strong is positive?

6        A.   It depends on the kind of writing.

7    Generally very strong is positive, yes.

8        Q.   Yes, that seems true.

9             All right.  What was your basis for

10   rating me a three for efficiency?

11       A.   As I recall, we -- I didn't think we

12   were very efficient -- you made some changes to

13   stuff I had written and changed it back multiple

14   times that led us to not have a very efficient

15   process, at least for parts of us working

16   together.

17       Q.   So I changed something back multiple

18   times you said?

19       A.   Yes.

20       Q.   How many times?

21       A.   I don't recall specifically.  I believe

22   you undid what I did twice, at least -- at least



Page 151

1    on one thing.

2         Q.   And was there any other basis for you

3    giving me a three for efficiency?

4         A.   I don't recall.

5         Q.   What was your basis for rating me a

6    three for client?

7         A.   I thought you were satisfactory.

8         Q.   Okay.  Did you -- what was your basis

9    for not giving me a higher rating for client?

10        A.   My overall --

11             MR. BAILEY:  Object to one thing.

12   We don't actually have the names of the categories

13   that we're discussing.  I don't know what client

14   you are --

15        Q.   Do you want me to show you the prompt?

16        A.   Say that again, please.  I'm sorry.

17        Q.   I'm sorry?

18        A.   Say that again, please.  I didn't hear

19   you.

20        Q.   If you would like to take a look again

21   at the prompt, if you're not sure what something

22   means, that's Plaintiffs' Exhibit 100.  And you



Page 152

1   can sort of match up what the things -- the

2   reviews say to this form.

3           So I assume that client is ability to

4   interact with client.  Why did you rate me

5   satisfactory?

6       A.   Because that was my impression of your

7   ability to interact with clients.

8       Q.   And what was your basis for thinking it

9   was only satisfactory as opposed to exceptional or

10  exceeds standards?

11      A.   I think -- I think satisfactory is fine.

12  It's good.

13      Q.   All right.  What was --

14      A.   I don't think -- I don't think you

15  exceeded standards of other associates I had

16  worked with.  Part -- part of this is comparative

17  in my view when you rate an associate.

18      Q.   And what did I --

19           MR. BAILEY:  Wait a second.  He's

20  still answering the question.

21      A.   So -- and I got it wrong.  It wasn't

22  excellent.  It is exceptional is number five,



Page 153

1   right?  So exceptional is five.  Exceeds standards

2   is four.  Satisfactory is three.  Needs

3   improvement is two.  Unacceptable is one and then

4   no basis.  So your question is why did I give you

5   a three ...

6       Q.   As opposed to the higher ratings.

7       A.   Because I thought your interactions with

8   the client were satisfactory and they -- I don't

9   think they exceeded the standards and I didn't

10  think they were an exception.

11      Q.   In what way were they not -- in what way

12  were they lacking?

13      A.   I didn't say they were lacking.

14      Q.   Well, in what way -- you know, what was

15  the basis for you concluding that I was not

16  exceptional in my ability to interact with

17  clients?

18      A.   Observing you interact with clients.

19      Q.   And what about my interactions with

20  clients was not exceptional or exceeding

21  standards?

22      A.   Again, the way you interact with



Page 154

1    clients, I think you -- as I seem to recall, you

2    asked good questions, got answers, but there's a

3    comparative element to this that other associates

4    I think did better.  I think your -- I think your

5    performance was fine.  You were relatively new to

6    the law firm.  You were interacting with clients

7    on a satisfactory basis.  I don't think you

8    exceeded the standard.  I don't think you were

9    exceptional.  That was my impression of your

10   performance, and that's what I'm asked to do in an

11   evaluation is give my impression.

12        Q.   And what would I have had to do better

13   to -- or what should I have done better to obtain

14   an exceptional or exceeds standard rating?

15        A.   This was six years ago.  I don't recall.

16   I wrote the -- I wrote the evaluation at the time.

17        Q.   What was your basis -- I'm sorry, what

18   was the last thing you said?

19        A.   I said I wrote the evaluation closer in

20   time to when -- to when all of this was done.

21        Q.   Okay.  And what was your basis for

22   rating me a three for teamwork, which I guess is



Page 155

1    described in the prompt as "ability to function as

2    a team member."

3        A.    Because I thought your performance was

4    satisfactory.

5        Q.    And what about my performance -- or what

6    would I have had to do to be exceptional or to

7    exceeds standards?

8        A.    I don't recall.

9        Q.    What was your basis for rating me a

10   three for my ability to work independently?

11       A.    Because that was my impression of your

12   ability to work independently at the time.

13       Q.    And why was my ability to -- in what way

14   -- sorry.  On what basis did you conclude that my

15   ability to work independently was not exceptional

16   or -- nor did it exceed standards?

17       A.    I don't recall.

18       Q.    What was your basis for rating me a

19   three for my "relationships with peers,

20   subordinates and staff"?

21       A.    Because I thought it was satisfactory.

22       Q.    And what was missing to cause you to



Page 156

```
 1    conclude that it was not exceptional or exceeds

 2    standards?

 3         A.   I don't think anything was missing.

 4         Q.   What would I have had to do differently

 5    to be rated exceptional or exceeding standards, my

 6    relationship with peers, subordinates and staff?

 7         A.   I don't recall.

 8         Q.   And what knowledge did you have of my

 9    relationships with peers, subordinates and staff?

10         A.   I don't recall.

11         Q.   Did you have any -- any knowledge at all

12    of my relationship with peers, subordinates and

13    staff?

14         A.   I would not have marked you if I didn't,

15    but I don't recall what it was.  I would have said

16    no basis.

17         Q.   Pardon?

18         A.   I would have said no basis.

19         Q.   And did we have any staff working with

20    us on this project?

21         A.   I don't recall.

22         Q.   Did we have any subordinates working --
```



1    did I have any subordinates working with me on

2    this project?

3         A.   I don't recall.

4         Q.   Was there any other peer that I had on

5    this project?

6         A.   I don't recall.

7         Q.   And what was your basis for rating me a

8    three for leadership and initiative?

9         A.   I'm sorry, can I ask which exhibit this

10   is?  I'm still on the prompt page.

11        Q.   We're -- I'm sort of toggling between

12   Plaintiffs' Exhibit 100, which gives a little bit

13   more information about what each category is

14   asking for, and then Plaintiffs' Exhibit 6, which

15   is your ratings itself.

16        A.   Six, thank you.  Okay.  All right.  I'm

17   sorry, what was your question?

18        Q.   What was your basis for rating me a

19   three for leadership and initiative?

20        A.   My overall impression of your leadership

21   and initiative.

22        Q.   And what about my leadership and



Page 158

1   initiative -- or what was your basis for

2   concluding that they were not exceptional or did

3   not exceed standards.

4        A.   My impression of your leadership and

5   initiative at the time.  I don't -- I don't view

6   that as -- I don't -- I think I was anticipating

7   your next question, which I shouldn't.  Please go

8   ahead.

9        Q.   Well, what about my leadership and

10  initiative -- or what was your -- what did I do to

11  cause you to conclude that I was not exceptional

12  or -- and did not exceed standards in my

13  leadership and initiative?

14       A.   I don't recall particularly.  That was

15  why -- satisfactory was my impression of your

16  performance in those categories at the time.

17       Q.   And what was that based upon?

18            MR. BAILEY:  Asked and answered.

19       A.   The initiative and the leadership that

20  you showed on that project.

21       Q.   Specifically what was -- what was that?

22       A.   I don't recall.



1      Q.   And what was your basis for rating me a

2   three for overall effectiveness?

3      A.   My overall impression of how you

4   performed on the project.

5      Q.   And why -- on what basis did you

6   conclude that I was not exceptional and did not

7   exceed standards?

8              MR. BAILEY:  Asked and answered.

9      A.   I don't recall.

10             MS. SHEKETOFF:  All right.  So

11  we're kind of switching gears or changing gears

12  here, so if you wanted to take a break, this would

13  be a fine time.  I'm also happy to continue.  Up

14  to you guys.

15             THE WITNESS:  Should we take ten

16  minutes?

17             MS. SHEKETOFF:  That's fine.  Is

18  that good for the court reporter and videographer?

19  Okay, let's take a ten-minute break then.

20             MR. BAILEY:  I'm sorry.

21             MS. SHEKETOFF:  Yes.

22             MR. BAILEY:  Do you have any idea



Page 160

1    where we are overall in the deposition?  I just

2    note it's getting toward lunchtime, so I'm

3    thinking about a longer plan here.

4                MS. SHEKETOFF:  I would guess that

5    we are about a third of the way through.

6                MR. BAILEY:  Okay.  Ten minutes?

7                THE WITNESS:  Yes, that's fine.

8                VIDEO TECHNICIAN:  We're going off

9    the record at 11:47 a.m.

10                   (A brief recess was taken.)

11                VIDEO TECHNICIAN:  We are back on

12    video record at 11:57 a.m.

13                MS. SHEKETOFF:  Okay.  Thank you.

14        (Exhibit 46 was marked for identification and

15          attached to the deposition transcript.)

16    BY MS. SHEKETOFF:

██    ██  ████████████████████████████

██  ██████████████████████    ████████████

██  ████████████    ████████████████████

██  ██████████████████████████████

██  ██████████████

██    ██  ██████████████████████████



















Page 165

 1          (Exhibit 48 was marked for identification and

 2          attached to the deposition transcript.)

 3     BY MS. SHEKETOFF:

 4          Q.   I'm showing you what's been marked as

 5     Plaintiffs' Exhibit 48.  This is Bates stamped

 6     P0488.  And I'll just represent to you that the

 7     bottom two-thirds of this page are text messages

 8     between Partner F and me on February 9, 2016.  And

 9     Partner F says, "BTW, Partner A also told me you did a

10     great job on a memo for him."  Did you tell Partner F

11     that I had done a great job on a memo for you?

12          A.   I don't recall.

13          Q.   You're not -- are you claiming that you

14     did not say it or you just don't remember?

15          A.   I don't remember.  I'm sorry.  I'm just

16     looking at the document.  (Document review.)

17               I'm sorry, the green is you?

18          Q.   The green is me and the gray is Partner F.

19          A.   Okay.

20               MR. BAILEY:  Just to be clear, this

21     is a document that  Partner A  never saw, authored,

22     or received.



1          MS. SHEKETOFF:  Yes, I'm just

2    showing it to him.  I'm not asking him to

3    authenticate it.  I'm asking whether Partner A told

4    Partner F I did a great job on a memo for him.

5          A.   Okay.  So I might have just looked at

6    the first page.  I'm sorry.  How many pages is

7    this?

8          Q.   It's two.  You can read the second one

9    as well.

10         A.   Oh, okay.

11         Q.   And well --

12         A.   Okay.

13         Q.   All right.  And did you believe that I

14   had done a great job on the memo?

15         A.   Yes, I think so.  It was an area of law

16   that I hadn't looked into a lot, and so we were a

17   lot further along after the memo you sent me than

18   we were when we started.

19         Q.   Okay.  And I say, "Partner F, I was

20   actually finishing incorporating his edits," and

21   then Partner F asked, "He had edits?  Were they

22   punctuation related?"  Why do you think Partner F may



Page 167

1    have asked those questions?

2              MR. BAILEY:  Objection.

3    Foundation.

4         A.   I have no idea.

5              MR. BAILEY:  And frankly, Julia,

6    this gives me great concern about the manner in

7    which you're conducting this deposition with

8    documents if you're going to ask  Partner A  to

9    opine on why third parties are making comments

10   that he was not privy to and never saw prior to

11   today.

12        Q.   Okay.  I'm asking do you have any idea

13   why Partner F would have said that?

14        A.   No.

15        Q.   Okay.  Later on -- later down in this

16   exchange on the second page, Partner F says that you

17   are fun and easy-going.  Do you think you were fun

18   and easy-going when working with Partner F?

19        A.   Did I think I was fun and easy-Going

20   when working with Partner F?

21        Q.   Yes.

22              MR. BAILEY:  Objection.  Assumes



Page 168

1   facts not in evidence.

2       A.   I'm sorry, is the question -- can you

3   repeat the question?  I'm sorry.

4       Q.   Did you ever work with Partner F?

5       A.   Yes.

6       Q.   And do you think that you were fun and

7   easy-going when you worked with him?

8       A.   I don't know.  I think I'm relatively

9   easy-going.  I don't know what Partner F thinks is

10  fun.

11      Q.   Okay.  I'm sorry.  Did you say you are

12  easy-going?

13      A.   I think I'm pretty easy-going, yes.







Page 170

















Page 174





Page 175

































Page 183

















Page 187





Page 188









Page 190













Page 193















Page 196







































































Page 214

































Page 222









Page 224







19          MR. BAILEY:  Is it this a good time

20   for a lunch break?

21          MS. SHEKETOFF:  This is a good

22   time.



Page 226

```
 1                    THE WITNESS:  Okay, thanks.

 2                    MR. BAILEY:  What do you want to

 3   say, 30 minutes?

 4                    MS. SHEKETOFF:  Can we -- yes,

 5   let's say 30 minutes.  That's fine.  Can we go off

 6   the record?

 7                    VIDEO TECHNICIAN:  We're going off

 8   the record at 1:13 p.m.

 9               (A lunch recess was taken.)

10                    VIDEO TECHNICIAN:  We are back on

11   video record at 1:49 p.m.

12   BY MS. SHEKETOFF:

13       Q.   Were you angry with me when you

14   submitted your evaluation of me?

15       A.   No.

16       Q.   Did you dislike me when you sent the

17   evaluation?

18       A.   No, not at all.

19       Q.   Did you intend for your evaluation of me

20   to harm me?

21       A.   No.

22       Q.   Did you intend for your evaluation to
```



Page 227

```
 1    harm my career?

 2         A.   No.

 3         Q.   So were you irritated with me when you

 4    submitted your evaluation for any reason at all?

 5         A.   No.

 6         Q.   Not annoyed for any reason at all?

 7         A.   No.

 8         (Exhibit 88 was marked for identification and

 9         attached to the deposition transcript.)

10    BY MS. SHEKETOFF:

11         Q.   Okay.  I would like to show you what's

12    been marked as Plaintiffs' Exhibit 88.  That's

13    Bates stamped JD_JS_2160 to 62.

14              And do you recognize this email

15    exchange?

16         A.   Let me look at it.

17              Yes.

18         Q.   And you reviewed this in preparation for

19    your deposition, correct?

20         A.   Yes.

21         Q.   All right.  You wrote here, "You should

22    avoid making style edits to the writing of the
```



Page 228

1    person whose name goes first on the memo."  Is

2    that right?

3         A.   Yes.

4         Q.   And your name went first on our memo?

5         A.   Yes.

6         Q.   It was just our two names on the memo?

7         A.   Yes.

8         Q.   Okay.  Your name went first -- I'm

9    sorry, withdrawn.

10             Your name went before mine because you

11   were more senior than I was?

12        A.   Yes.

13        Q.   And did you understand that I had sent

14   you a track changes version of the memo?

15        A.   I don't recall track changes.  I thought

16   it was a red line, but it was a long time ago.

17        Q.   And did you -- did you understand that

18   you could accept or reject all of my changes?

19        A.   Again, I thought it was -- my

20   recollection was that it was track changes, so I

21   couldn't just click accept/reject, but more like

22   you compare in Change-Pro, and so I got a clean



Page 229

1    version and then a version that was redlined that

2    would not allow me to just accept or reject your

3    edits.

4         Q.   Do you understand with red-line versions

5    that you can accept -- sorry, with Word, a red

6    line that you can accept and reject changes?

7         A.   I don't know -- I don't know if I knew

8    that.

9         Q.   Well, you were just referring to

10   something where you could accept or reject

11   changes.  What were you referring to?

12        A.   Yes, I'm sorry.  In a -- just to level

13   set here, I think when I think of a track changes

14   document, you can go under review in Word and

15   accept or reject changes, you know, for each edit.

16   Right?  And I'm telling you my recollection was

17   that I thought what you sent me and I thought what

18   we exchanged with each other throughout the

19   process was not a track changes form of the

20   document but a clean version and then a red line

21   that had been brought.

22        Q.   And with the red line you're saying --



Page 230

1   you're saying that your recollection is that I

2   sent that through Change-Pro so it was not in Word

3   form where you could accept or reject edits?

4       A.   That's my recollection.

5       Q.   And is it your understanding that when

6   something is in Word form, that the changes are

7   provisional and you can accept or reject them?

8               MR. BAILEY:  Objection to form.

9       A.   Yes, I think that's fair to say.

10      Q.   And using a red line with track changes

11  is a common way of editing at Jones Day; is that

12  right?

13              MR. BAILEY:  I'm sorry, objection

14  to form.  I think he's testified that he

15  differentiates between track changes and red

16  lines.

17              MS. SHEKETOFF:  Right.  I'm talking

18  about track changes.

19      Q.   When I say -- withdrawn.

20           Using track changes is a common way of

21  editing at Jones Day; is that correct?

22      A.   I don't know.



Page 231

1              MR. BAILEY:  Objection.

2   Foundation.

3        A.   I don't know.  When I typically work

4   with associates, I ask them to send me a clean

5   version and a red line because I don't

6   particularly like to go through and accept or

7   reject each change.

8        Q.   Okay.  It struck you as inappropriate

9   that I edited your work for style?

10       A.   Did it strike me as inappropriate?  I

11   thought that taken together, the edits that you

12   made were inappropriate in a sense that it was I

13   didn't think professional or I thought it was a

14   little bit rude.

15       Q.   And you say, "You should avoid making

16   style edits to the writing of the person whose

17   name goes first in the memo."  So you thought the

18   style edits I made were rude?

19       A.   No, not all.  The -- I'm sorry, repeat

20   the question.

21       Q.   You say you should avoid making style

22   edits to the writing of the -- sorry.



Page 232

1           "You should avoid making style edits to

2     the writing of the person whose name goes first in

3     the memo."  And so you thought my style edits to

4     your writing were rude?

5          A.   I think that certain things like

6     changing "as well as" back to "and," yes, was

7     rude.  I would prefer to use "as well as" in that

8     one particular instance.  I can't remember if this

9     change was made more than once or not, but, yes, I

10    think a purely stylistic edit on something small

11    is not something I did when I wrote -- made edits

12    to what senior people had given me or when they

13    made edits to mine, so yes.  But if -- I will say

14    that if it was just style, I think the more

15    important one, I'm sure we'll get to, is number 2.

16    But the -- yes, for the style edits, I thought

17    changing those kinds of little things was not the

18    most professional thing to do.

19          Q.   And did you say that people more senior

20    than you did not edit your writing for style?

21          A.   No, I didn't say that.

22          Q.   So people more senior do make edits to



Page 233

1    style; is that correct?

2        A.    More senior than me?

3        Q.    Yes.   That was a bad question.   Let

4    me -- let me rephrase.

5             Do you think it's appropriate for senior

6    lawyers to make style edits to the work of more

7    junior lawyers?

8        A.    Yes, because the more senior lawyer's

9    name is at the top of the memo and the one

10   communicating with the client.

11       Q.    And did you think editing your writing

12   -- my edits to your writing were arrogant?

13       A.    I wouldn't have characterized it as

14   arrogant.   I thought it was sort of rude and maybe

15   naive, just a naivete about how life at a law firm

16   works.

17       Q.    How so?

18       A.    In this instance when you have someone

19   who is more senior, I think making small changes,

20   especially to something that's not important, is

21   typically not done.

22       Q.    Did you find it insulting?



Page 234

```
1      A.   No, I wasn't insulted.

2      Q.   Did you think it was obnoxious?

3           MR. BAILEY:  Could you repeat that,

4   Julia?

5      Q.   Did you think it was sort of obnoxious?

6      A.   That wasn't -- I thought it was rude and

7   annoying.  I wouldn't have said obnoxious.

8      Q.   I should have deferred to your style?

9      A.   Yeah, I think so.

10     Q.   I was out of place?

11          MR. BAILEY:  Objection.

12     A.   I wouldn't say that.

13     Q.   I was out of line?

14     A.   No, to me out of line means like you

15   asked someone to do something and they continue to

16   not do it.  No, I view this as -- I view this

17   email generally and comments in number 1 and 2 as

18   instructional.  It was -- I didn't write this

19   because I was mad.  I wrote it purposely by saying

20   when the person whose name is at the top of the

21   memo or whose name is first in the memo in an

22   effort to create a teaching point and not have it
```



Page 235

1   be about me because I thought the advice would be

2   helpful to you when you worked for other people

3   too.  That's why I didn't say when I make changes

4   to the memo, don't change what I wrote.  It's not

5   about me in particular.  I think it was more about

6   a teaching point or practice pointer for how to

7   interact with more senior lawyers.

8        Q.   But it was -- I was annoying to you?

9        A.   You were not annoying.  The changes --

10  the changes were annoying.

11       Q.   And you felt annoyed?

12       A.   Yes, it was annoying, and I felt

13  annoyed, yes.

14       Q.   Is it appropriate to edit the writing of

15  a senior lawyer or a more senior lawyer to fix

16  something that's not idiomatic?

17       A.   That's not what?

18       Q.   That's not idiomatic.

19       A.   I think -- look, writing a memo is an

20  iterative process.  I think changes can be

21  helpful, whether the junior person makes them or

22  the senior person makes them.  So if something is



Page 236

1    not clear, et cetera, I think you should suggest a

2    change.  But if the more senior person rejects the

3    change, I don't think you should change it back,

4    especially without talking to the person.

5         Q.   And do you know what the word

6    "idiomatic" means?

7         A.   Idiom, dealing with.  Is this a Latin

8    test?

9         Q.   When I use the word "idiomatic," I mean

10   something sort of commonly understood or a phrase

11   sort of commonly used, sort of a phrase that

12   sounds good as opposed to one that is maybe

13   ungrammatical or even if not ungrammatical, not a

14   phrase that someone says.

15             So my question is, would it be

16   appropriate to edit the writing of a more senior

17   lawyer to fix something that's not idiomatic?

18                  MR. BAILEY:  Objection to form.

19        A.   I think the junior person -- I lost my

20   connection again -- whether it's an idiomatic

21   suggestion, whether it's a grammatical suggestion,

22   whether it's for clarity, I don't think it should



Page 237

1    be limited to making suggestions, suggested edits

2    in the iterative process.

3        Q.    I'm sorry, you don't think -- can you

4    say that again?

5        A.    Yeah.   Whether it's suggesting edits to

6    something that's idiomatic or any other reason, I

7    don't think a junior associate should feel shy

8    about making a suggested edit.

9        Q.    Okay.   But you think it is inappropriate

10   for a more junior person to suggest a style edit

11   to a more senior lawyer?

12       A.    I think if a more senior -- typically

13   the junior associate, the junior lawyer,

14   especially when they're working with a more senior

15   lawyer on something that the senior lawyer's name

16   is at the top and they're writing with them in an

17   iterative process, should defer to the more senior

18   lawyer and write like the more senior lawyer,

19   especially in style.

20       Q.    Okay.   And what if there are

21   idiomatic -- or what if something is unidiomatic

22   in the senior lawyer's style or ungrammatical, is



Page 238

1    it appropriate for the junior lawyer to suggest --

2    to make a revision to that?

3              MR. BAILEY:  Objection to form.

4         A.   I don't understand the question.

5         Q.   Is it appropriate if the senior lawyer's

6    style includes language that is unidiomatic or

7    ungrammatical?  Is it appropriate for the junior

8    lawyer to suggest a revision to that?

9              MR. BAILEY:  Objection to form.

10   I'm not sure anybody understands what you mean by

11   unidiomatic.

12        A.   I don't.

13        Q.   Okay.  Do you think --

14        A.   I mean, the example I gave you was

15   change "as well as" to "and."  That's what I was

16   talking about.

17        Q.   Do you think it is idiomatic to say both

18   Julia as well as Partner A?  Is that idiomatic to

19   you?

20              MR. BAILEY:  Objection to the form

21   for the reasons previously stated.

22        A.   I don't know.



Page 239

1        Q.    Okay.  Have you ever used -- do you

2    think it sounds good to say "both" together with

3    "as well as"?

4        A.    It depends on the context.

5        Q.    Okay.  You gave an example that we've

6    been talking about, about the style edit that I

7    made.  Were there other style edits that I made?

8        A.    I don't recall.

9        Q.    You also wrote, "When the person whose

10   name goes first on the memo makes an edit, you

11   should not change it back to the way you had it."

12   So you thought it was inappropriate that I had

13   changed something back to the way I had it before

14   you had changed it; is that correct?

15       A.    As I recall, I wrote this because you

16   had changed it twice, so I don't mind if you

17   change something -- you wrote something.  I

18   changed it.  You changed it back to the way you

19   wrote it.  I changed it again back to the way I

20   had it.  And then you changed it back to the way

21   you had it.  That is annoying.

22       Q.    Okay.  So if it had only happened the



Page 240

1    one time, that would not have been inappropriate?

2         A.   Correct.

3         Q.   Okay.  And by the one time I mean, I

4    wrote something, you changed it, and I changed it

5    back, would that have been inappropriate?

6         A.   I don't think it's a best practice.  I

7    don't think it would have -- in fact, I know it

8    wouldn't have prompted me to write this email.

9         Q.   Okay.  So you found what I did annoying.

10        A.   Yes.

11             MR. BAILEY:  Objection to form.

12        Q.   I didn't mean to interrupt you.

13             You found it annoying?

14             MR. BAILEY:  Objection to form.

15        A.   Yes, I found changing something back

16   twice annoying, yes.

17        Q.   And did you find it arrogant?

18        A.   No.

19        Q.   Was it insulting?

20        A.   No.

21        Q.   I should have deferred to what you had

22   done; is that right?



Page 241

```
 1              MR. BAILEY:  Objection to form.

 2     A.   Especially after the second time I made

 3 the edit, yes.

 4     Q.   Okay.  I was out of line?

 5              MR. BAILEY:  Objection to form.

 6     A.   No.  I'm sorry.

 7              MR. BAILEY:  Objection to form.

 8     A.   No.

 9     Q.   Was I -- did it bother you, what I had

10 done?

11              MR. BAILEY:  Objection to form.

12     A.   If bother me is synonymous with it was

13 annoying, then yes.

14     Q.   Okay.

15          And was it offensive to you?

16     A.   No.

17     Q.   And so you felt annoyed?

18     A.   Yes, it was annoying.

19     Q.   And you give an example here when I

20 changed something back.  Did I do that in any

21 where else besides this one example?

22     A.   I don't recall.
```



Page 242

1          (Exhibit 133 was marked for identification and

2          attached to the deposition transcript.)

3    BY MS. SHEKETOFF:

4          Q.   I'm going to show you Plaintiffs'

5    Exhibit 133.  This is Bates stamped JD_JS_1441 to

6    44.  I just want you to take a look at that top

7    email.  You wrote here, "My point is that I want

8    you to be cognizant of time.  In changing

9    something to the way you had after someone else

10   took the time to change it is not efficient.  If

11   it is an important issue, leave the more senior

12   person's edit and ask about it in person or on the

13   phone."

14          My question is, how would it be more

15   efficient to have an in-person meeting or a phone

16   call rather than what I did?

17          A.   Well, I think just naturally making

18   edits in written form can be more efficient, but

19   since this had gone back through five iterations

20   and you having changed it twice, we clearly needed

21   to escalate it to a conversation as opposed to

22   just an email because email exchanges were not



1    getting us any closer to solving the problem.

2        Q.   So would you agree that meetings or

3    phone calls are generally not more efficient for

4    line edits than exchanging track changes edits by

5    email?

6        A.   I would not agree with that.

7        Q.   So in what -- in what context would it

8    be more efficient to have a phone call or a

9    meeting about something -- about a line edit

10   rather than exchanging track changes version?

11       A.   I think it would have been more

12   efficient in this situation where you had undone

13   my edit on two occasions and -- I think we needed

14   to -- I think it would have been more efficient to

15   talk on the phone as opposed to me changing it

16   back again and you changing it a third time.

17       Q.   Okay.  And if I had only changed it a

18   second time, so only changed it back once, would

19   it have been more efficient to just email or would

20   it have been more efficient to have a phone call

21   or a meeting?

22               MR. BAILEY:  Objection.



Page 244

1    Hypothetical.

2         A.   Can you repeat the question?  I'm sorry.

3         Q.   If we had -- if I had only corrected --

4    withdrawn.

5              If I had only changed it back to the way

6    I had it one time rather than two, as you're

7    saying, would that have been a situation where it

8    would be more efficient to have a phone call or

9    meeting or would it have been more efficient to

10   exchange the track changes version by email?

11                  MR. BAILEY:  Same objection.

12        A.   So, you sent me an original.  I made an

13   edit.  You undid my edit and put it back to the

14   way you had it.  You're saying if -- well, if I

15   had changed it a second time and you didn't change

16   it a second time, like fix my second fix?

17        Q.   No.

18        A.   I'm sorry.

19        Q.   I interrupted you.  I'm sorry.

20        A.   No, go ahead.  It sounds like I wasn't

21   answering your question.

22        Q.   I'm asking if we were just talking about



Page 245

1   a situation where I had sent it back to you with

2   having changed your edit once, would that -- was

3   that -- would that have been a more efficient

4   route or would it have been more efficient for me

5   to have a phone call with you?

6        A.   No, you had -- I'm sorry.

7             MR. BAILEY:  Same as the prior

8   objection.  Go ahead.

9        A.   If you had only changed it once and then

10  when I sent it back to you, you didn't change it

11  again, then there wouldn't be anything to discuss.

12  That would be -- it would be more efficient to

13  just have that email exchange than having to get

14  on the phone.

15       Q.   Okay.  And do you typically make blind

16  edits to documents using phone calls or meetings?

17       A.   Oftentimes, yes.

18       Q.   And did we ever make line edits over

19  phone calls or meetings in our work together on

20  these memos?

21       A.   I don't recall.

22       Q.   Okay.  All right.  In 2016, you went --



Page 246

1    did you go to a partner meeting to discuss the

2    evaluations of the litigation associates' work in

3    calendar year 2015?

4         A.   Yes.

5         Q.   And we didn't work together in calendar

6    year 2015, correct?

7         A.   Correct.

8         Q.   But we were working on the communiques

9    together at the time of that litigation

10   associates' partner meeting in 2016?

11        A.   Yes.

12        Q.   And we had recently just had that

13   exchange that we were talking about in Plaintiffs'

14   Exhibit 133; is that correct?

15        A.   I don't recall when the meeting was,

16   when the partner meeting was.

17        Q.   When are the partner meetings usually?

18        A.   Which partner meetings are you talking

19   about?

20        Q.   The partner meetings to discuss the work

21   of litigation associates as part of the evaluation

22   process.



Page 247

1            MR. BAILEY:  Objection.

2       A.   They --

3            MR. BAILEY:  Objection to form.

4       A.   They typically take place in March

5   sometime, maybe late February.  I don't recall.

6       Q.   In 2016, you piped up about me during

7   the partner meeting; is that right?

8            MR. BAILEY:  Objection to form.

9       A.   I don't know what you mean by piped up

10  about you.

11      Q.   You spoke up about me.

12      A.   I don't recall.

13      Q.   You said that you're working with me on

14  a ▊Client 1▊ matter; is that right?

15      A.   I don't recall.

16      Q.   And you said that you didn't think I

17  liked big firm arguments; is that right?

18      A.   I don't recall.

19      Q.   Is saying that someone doesn't like big

20  firm arguments, is that something that you think

21  other partners would perceive as a negative thing

22  about that person?



Page 248

```
 1        A.    Possibly.

 2        Q.    Do you think it's a negative thing about

 3   an associate if they don't like big firm arguments

 4   and they work at a big firm?

 5        A.    I don't see how that's sustainable.

 6        Q.    So you think it's a negative thing for

 7   that person?

 8        A.    If they continue to not like big law

 9   arguments, yes.

10        Q.    So it's a criticism you would say.

11              MR. BAILEY:  Objection to form.

12        A.    I think it's a statement of fact.

13        Q.    It's a negative statement of fact; is

14   that right?

15              MR. BAILEY:  Objection to form.

16        A.    I don't necessarily agree with that.  I

17   think just like we talked about before with your

18   evaluation, in your evaluation it will likely be

19   conveyed to you that here is how you're seen at

20   the firm and, for example, with you, if you work

21   here a lot, didn't bill a lot of hours, if you

22   wanted to stay at the firm, you would need to
```



Page 249

1    change those things.

2        Q.   Okay.  So it would be a negative --

3        A.   The same way -- I'm sorry, go ahead.

4        Q.   No, I'll let you finish.

5        A.   I think in the same way that the

6    statement you said that I said about not liking

7    big firm arguments to me is in line with a comment

8    that you don't seem to be very invested in working

9    at Jones Day in particular or any big law firm in

10   general.

11       Q.   At that time in 2016, did you think I

12   liked big firm arguments?

13            MR. BAILEY:  Objection to form.

14       A.   I don't recall.

15       Q.   Would you have had any basis at that

16   time to conclude that I -- or did you have any

17   basis at that time from which one could conclude

18   that I didn't like big firm arguments?

19            MR. BAILEY:  What time are we

20   referring to?

21            MS. SHEKETOFF:  Oh, I'm sorry, at

22   that partner meeting in 2016.



Page 250

1    A.   I think you were very heavy on pro bono

2    hours and not on client billable hours is what I

3    recall from the presentation having looked at

4    documents.

5    Q.   And is there anything in my work with

6    you, any personal knowledge that you had about my

7    work that suggested I didn't like big firm

8    arguments?

9    A.   No, I think it was the really high pro

10   bono hours and the very low client billable hours.

11   Q.   Okay.  And why did you decide to speak

12   up about that at the meeting?

13        MR. BAILEY:  Objection.  States

14   facts not in evidence.

15   A.   I don't recall making that statement at

16   the meeting.  I can tell you generally that is a

17   forum to discuss associate performance and views

18   of associates.

19   Q.   And so what did you feel you were

20   contributing if you were simply drawing an

21   inference based on objective numbers about my pro

22   bono and billable work?



Page 251

1               MR. BAILEY:  Objection.  Assumes

2     facts not in evidence.

3          A.   Can you repeat the question?  I'm sorry.

4          Q.   What did you think you were --

5     withdrawn.

6               In 2017, you also went to the partner

7     meeting to discuss litigation associates and their

8     work from calendar year 2016.  Is that right?

9          A.   Yes.

10         Q.   You spoke first about me; is that right?

11         A.   I don't recall.

12         Q.   You spoke about me?

13         A.   Yes.

14         Q.   You said I did a fantastic job

15    researching the memo but that the memo was too

16    long and not client ready.  Is that right?

17         A.   I don't recall.

18         Q.   You said the memo was 16 to 18 pages,

19    correct?

20         A.   I don't recall.

21         Q.   And so it needed an executive summary,

22    correct?



Page 252

```
 1       A.    I don't recall.

 2       Q.    When I first sent you the memo, it was

 3  ten pages; is that right?

 4       A.    I'm sorry?

 5       Q.    Withdrawn.

 6             When I first sent you the memo, it was

 7  under ten pages, correct?

 8       A.    I don't recall.

 9       Q.    And it got longer over the editing

10  process, right?

11       A.    I have seen that here today as we have

12  gone through edits, but I don't recall from that

13  time frame.

14       Q.    None of your edits made the memo

15  shorter, did they?

16             MR. BAILEY:  Objection.  Do you

17  want him to look at all the edits?

18       Q.    You can just testify from memory.  And

19  if you don't remember, that's okay.

20             Do you recall any of your edits making

21  the memo shorter?

22       A.    I don't recall.
```



Page 253

1       Q.    And did your edits all make the memo

2   longer?

3             MR. BAILEY:   Same objection.   Do

4   you want him to look at all of them?

5       A.    I don't recall.   I know that the final

6   work product -- that the final product was longer

7   than when we first started.

8       Q.    From the very first document I sent you,

9   the memo always had a summary at the beginning; is

10   that right?

11      A.    I don't recall.

12      Q.    And you added the title executive

13   summary above what was the summary; is that right?

14      A.    From my recollection, there was never

15   anything that said summary in any of the drafts

16   before we added -- I don't think it's fair to say

17   I just added executive to the summary.   I don't

18   think we had a summary or at least nothing labeled

19   summary or a section labeled summary in any of the

20   earlier drafts.

21      Q.    I think you might have misunderstood my

22   question.   My question was, did you put the label



Page 254

1   in the executive summary above the text of the

2   summary?

3              MR. BAILEY:  If you recall.  We can

4   go back and look at documents.

5      A.   I don't recall there being an executive

6   summary or anything labeled summary at all.

7      Q.   Okay.  I'm not asking about whether

8   something was labeled.  You added the label

9   executive summary to the memo; is that correct?

10     A.   Yes.

11     Q.   There always was an actual summary in

12  the memo, correct?

13             MR. BAILEY:  If you recall.

14     A.   I don't recall.

15     Q.   You said at this meeting, at the

16  partners evaluation meeting in 2017 that the memo

17  needed to be more readable.  Is that right?

18     A.   I don't recall.

19     Q.   You said that the fix was learning to

20  write bullet points?

21     A.   I don't recall.

22     Q.   You said you didn't see me there at



1    Jones Day for the long haul; is that correct?

2        A.   I don't recall.

3        Q.   Okay.  And what was your basis for

4    saying you didn't see me being there for the long

5    haul?

6        A.   Well, I think -- go ahead.

7            MR. BAILEY:  Objection to the

8    extent we're assuming facts not in evidence.

9        A.   Typically at these meetings, any

10   comments that are made are an expansion upon what

11   is written in the evaluation.  We looked at the

12   evaluation.  I wrote in the evaluation that I

13   didn't think you would be there for very long, so

14   if and when I spoke about you or when I spoke

15   about you, I'm sure I either summarized what was

16   in my written evaluation or answered questions

17   that people had about you.  That's typically how

18   those meetings go.  I don't remember that meeting

19   specifically.  I don't remember specifically

20   talking about you at that meeting.  I don't

21   remember that meeting in particular.  The meetings

22   sort of run together.  I go through -- I've been



Page 256

1   through -- I've been through seven of those now,

2   and they tend to run together a little bit.

3        Q.    Did you say during that meeting that I

4   wasn't hungry for the practice of law?

5        A.    I don't recall saying that.

6        Q.    And did you have any basis to determine

7   or to infer -- sorry, withdrawn.

8             Did you have any basis at that time

9   supporting the notion that I was not hungry for

10  the practice of law?

11       A.    I think like we talked about earlier,

12  your lack of regular attendance in the office, at

13  least my impression of that, never hearing your

14  name on a case team, seeing your really high

15  number of hours for pro bono.  I think that year

16  we added your hours up and they were really low.

17  I forget what the numbers were, but all of those

18  things together led me to believe that you weren't

19  really excited about the practice of law, at least

20  at a big law firm.

21       Q.    Do you consider pro bono practice to be

22  practice of law?



Page 257

1      A.   Yes.

2      Q.   And was there anything else that you

3  knew about me that supported the notion or a

4  notion that I wasn't hungry for the practice of

5  law.

6      A.   Other than your low hours and lack of

7  attendance in the office and not hearing your name

8  on case teams, that was pretty much it.

9      Q.   You said you struggled to get any

10 weekend help from me; is that right?

11     A.   I don't recall saying that.

12     Q.   And do you have any basis supporting the

13 notion that you struggled to get any weekend help

14 from me?

15     A.   Well, I wrote it in my evaluation, and I

16 would not have written it in the evaluation unless

17 that was an experience I had with you because the

18 evaluation is my -- reflects my experience with

19 you and my impression of your performance.

20     Q.   Okay.  And how did you -- withdrawn.

21          You said I didn't want to inconvenience

22 myself.  Is that right?



Page 258

1       A.   I don't recall saying that.

2       Q.   Did you have any basis to support --

3  excuse me.

4            Did you have any basis supporting the

5  notion that I didn't want to inconvenience myself?

6       A.   Yes, your lack of regular attendance in

7  the office, your low hours, and not hearing your

8  name on case teams.

9       Q.   And just to be clear, when you say my

10  low hours, do you mean my low billable hours or my

11  low pro bono hours?

12      A.   I mean your low billable hours.

13      Q.   So what about having low billable hours

14  would have -- low pro bono hours would suggest I

15  didn't want to inconvenience myself?

16      A.   I don't remember even your pro bono

17  hours being particularly high.  I don't know the

18  number off the top of my head, but typically when

19  we talk about associates who have high hours, it's

20  those with 2,000 plus hours.

21      Q.   And do all associates that don't have

22  2,000 plus hours not want to inconvenience



Page 259

1    themselves?

2         A.   I don't know how to answer that.

3         Q.   Do you infer that anyone -- do you think

4    that if someone doesn't bill 2,000 hours, that

5    that showed that they don't want to inconvenience

6    themselves?

7         A.   Can you rephrase the question?

8         Q.   Does the fact that an associate has not

9    worked 2,000 or more hours support the notion that

10   he or she doesn't want to inconvenience him or

11   herself?

12        A.   Not necessarily.  Sometimes things are

13   slow, but usually if things are slow, the lawyers

14   that are really dedicated do things like

15   recruiting, help with pitches, are just generally

16   firm citizens and dedicate a lot of hours to the

17   firm, write articles, et cetera.

18        Q.   And do you have any idea whether I

19   participated in firm recruiting?

20        A.   I don't know.

21        Q.   Do you have any idea whether I

22   participated in firm pitches?



Page 260

```
 1        A.    I don't know.

 2        Q.    Do you have any idea if I wrote

 3   articles?

 4        A.    I don't know.

 5        Q.    And besides the things you've already

 6   mentioned, did you have any other facts supporting

 7   the notion that I didn't want to inconvenience

 8   myself --

 9        A.    Not that I recall.

10        Q.    -- at the time of this meeting in 2017?

11        A.    I'm sorry, say the last part again.

12        Q.    At the time of this meeting in 2017.

13        A.    No, I think the things I mentioned were

14   the basis of my statement.

15        Q.    Okay.  During the time that we worked

16   together, did you ever talk about me to other

17   people?

18        A.    I think I talked to Yaakov about you.

19        Q.    Anyone else?

20        A.    Not that I recall.

21        Q.    How many times did you talk to Yaakov

22   about me?
```



Page 261

```
 1        A.   I don't recall. ███████████████
 2  ███████████████, I had not recalled that I
 3  had talked to him about one of your earlier
 4  iterations of the memo.  I think after the email,
 5  I forget the exhibit number, but where I said not
 6  to make changes to stylistic edits or other
 7  changes to the person whose name is at the top of
 8  the memo, I think I talked to Yaakov about that
 9  after I sent that email.
10        Q.   Any other time?
11        A.   Not that I recall.
12        Q.   And when -- when -- withdrawn.
13             What do you recall about that
14  conversation with Yaakov?
15        A.   The conversation about the email?
16        Q.   Yes.
17        A.   I don't remember who initiated the
18  conversation.  It was probably me because I'm
19  usually the one that approaches Yaakov and starts
20  a conversation just generally.  What I recall
21  about the conversation was we talked about the
22  email and he said you were -- I forget the exact
```



Page 262

```
 1    words he used -- but something to the effect of

 2    you were upset or you were mad or you didn't like

 3    the email that I sent.  And so I believe after

 4    that -- the impression I got was that you were mad

 5    or upset about the email that I sent.

 6         Q.    Okay.  And did you call me after that?

 7         A.    I believe so.  I think based on my

 8    conversation with Yaakov, I wanted to reach out to

 9    you and let you know that I wasn't -- like this

10    wasn't some big thing that would carry on or sort

11    of last with me.  I didn't -- I wanted, I think,

12    to try to put you at ease that this was not a huge

13    deal.

14         Q.    And did you ask me in that -- do you

15    remember anything else about that conversation?

16         A.    No, I don't.  I think I -- the best I

17    can recall, I forget exactly how I phrased it, but

18    I said I just wanted to talk to you after I sent

19    you that email to make sure that you weren't mad

20    or didn't think that I was mad at you because I

21    was not mad at you.

22         Q.    You were just annoyed.
```



Page 263

```
 1        A.    Correct.
 2        Q.    And did you ask if I was scarred by your
 3   email?
 4        A.    I don't recall.
 5        Q.    Do you remember having any other
 6   conversations with other people about me during
 7   the time that we worked together?
 8        A.    No.
 9        Q.    And when did you first learn that I
10   thought you had discriminated against me?
11        A.    I think when the lawsuit was filed.
12        Q.    Okay.
13        A.    Can I just go back to say one more thing
14   about the conversation?  The reason I wanted to
15   have a call with you is because I -- I would hate
16   for someone that I'm working with to think that
17   either I'm mad at them unjustifiably or, like,
18   have an unpleasant experience working with me.  I,
19   you know -- I appreciate having a good working
20   relationship with my colleagues, whether they be
21   more senior, more junior, or my peers, whatever.
22   So the notion when Yaakov told me that you --
```



Page 264

1   again, I forget the exact word that he used -- you

2   were either upset or mad or something at the

3   email, I wanted to reach out to you so that -- to

4   check on you to make sure that I conveyed to you

5   that I was not mad at you or that this was a

6   bigger deal than it was because at the end of the

7   day, it was not a big deal.

8        Q.   Okay.  Anything else you wanted to add?

9        A.   No.

10       Q.   Okay.  So you learned that I thought you

11  discriminated against me when I -- when we filed a

12  lawsuit, correct?

13       A.   Yes.

14       Q.   You weren't aware of that before?

15       A.   No.

16       Q.   And did you read the lawsuit?

17       A.   Yes.

18       Q.   And did you know that you were partner

19  A?

20       A.   I realized it at some point.  I don't

21  remember exactly when or if someone told me

22  before, hey, you should read this, you're partner



1    A.   I mean, I came to realize I was partner A at

2    some point.

3         Q.   And is it your view that I'm lying when

4    I say that I believe that you discriminated

5    against me on the basis of sex?

6              MR. BAILEY:  Objection.

7         A.   Do I think that you're lying?

8         Q.   Yes.

9         A.   No, I don't think you're lying.  I don't

10   think I -- I know I didn't write my evaluation or

11   have any interaction with you based on your

12   gender.  But it's not -- I'm not you.  I don't

13   have your worldview or interpret things the way

14   you do.

15        Q.   Since learning about my allegations of

16   discrimination -- sorry, withdrawn.

17             Since learning about my allegations

18   against you of discrimination, have you had

19   conversations about me with other people, setting

20   aside the lawyers who entered an appearance in

21   this case?

22             MR. BAILEY:  And just to add on to



Page 266

1    that, setting aside anybody who has been acting as

2    counsel or any --

3        Q.    No, you have to identify those people.

4    I want -- if you're going to represent that they

5    are acting as your counsel, then I won't ask you

6    about the substance, but for anyone who has not

7    entered an appearance in this case, please let me

8    know if you've discussed with them anything about

9    me since you learned about my allegations of

10   discrimination.

11              MR. BAILEY:  And with that

12   restriction, I'll allow you to answer, but

13   obviously you do not want to talk about any

14   discussion with counsel.

15       A.    I can't recall if Yaakov and I had a

16   conversation.  I don't know.  I think maybe just

17   in passing, like -- it definitely was not a long

18   conversation if we had one.  Right.  I don't

19   recall.  There was several I&A people at lunch,

20   Partner B was there, Jeff Johnson, Anthony Dick.  I

21   don't remember anybody else.  There may have been

22   one or two more people that sort of were talking



Page 267

1    about the complaint generally and said something

2    about me being partner A and Partner B being, I don't

3    know, partner something else.

4        Q.    Anything else during that conversation

5    that you remember?

6        A.    Most of the conversation was geared

7    toward Partner B, and I don't recall -- I don't

8    recall exactly what was said.  I think they were

9    sort of making fun of Partner B, and I can't recall

10   what it was.  And then -- I now I forgot who said

11   it, but someone made a comment that it was an odd

12   case or it would be interesting to see Julia

13   claiming discrimination when she was making, I

14   don't know, $500,000 a year and saying that you

15   were the one discriminating against her, but that

16   would be interesting to see in front of a D.C.

17   jury or something like -- something along those

18   lines.

19       Q.    And why would that be?

20               MR. BAILEY:  Objection.

21   Foundation.

22       A.    I don't know why they -- I don't know if



Page 268

```
 1    there was any follow-up comment.  Or something
 2    about like having ███████████████████████
 3    ███████████   and the claim being it didn't lead
 4    to me making more than $550,000 or whatever the
 5    number was.  I don't remember.
 6         Q.   Did you make more than 500,000 at that
 7    time?
 8              MR. BAILEY:  Objection.  Just pause
 9    for one second.  Can we get a clarification of
10    time frame?  You were partner at this point?
11         A.   I don't know when the lawsuit was filed.
12         Q.   It was filed in August 2018 -- 2019.
13    I'm sorry.
14              MR. BAILEY:  In that case I'm going
15    to instruct the witness not to answer the
16    question.
17              MS. SHEKETOFF:  On what basis?
18              MR. BAILEY:  On the basis of the
19    protective order we have in this case.
20              MS. SHEKETOFF:  There is no
21    protective order that applies to partner wages.
22              MR. BAILEY:  The judge has ruled
```



Page 269

1   about damages discovery.

2              MS. SHEKETOFF:  This is not damages

3   discovery.  I'm asking about a conversation and

4   the meaning of the conversation that seems to call

5   the comparison of salaries.

6              MR. BAILEY:  We have been over this

7   before.  I'm not going to allow him to identify

8   his pay at that time.

9              MS. SHEKETOFF:  So you're

10  instructing him not to answer?

11             MR. BAILEY:  I'm instructing him

12  not to answer.

13             MS. SHEKETOFF:  You're instructing

14  him not to answer whether he made more than

15  500,000 in August of 2019?

16             MR. BAILEY:  I'm instructing him

17  not to answer that question.

18             MS. SHEKETOFF:  Okay.

19  BY MS. SHEKETOFF:

20      Q.   Was there anything else said -- I'm

21  sorry, who was the person who suggested that you

22  were partner A?



Page 270

```
 1      A.   I don't recall.

 2      Q.   Who was the person that suggested that

 3  Partner B was one of the partners?

 4      A.   I don't recall.

 5      Q.   Who were the people making fun of

 6  Partner B?

 7      A.   I remember Jeff Johnson, Anthony Dick.

 8  I don't know who else was there.  I don't recall

 9  who else was there.

10      Q.   Did Partner B or Anthony or Jeff think that

11  the allegations about Partner B were funny?

12      A.   About Partner B were funny?

13           MR. BAILEY:  Objection to

14  foundation.

15      A.   The tone wasn't that the allegations

16  were funny.  I think it was that it was more

17  poking fun at Partner B.

18      Q.   Poking fun at Partner B for what?

19           MR. BAILEY:  Objection to form.

20      A.   I don't really recall.  I don't recall.

21      Q.   And do you recall anything else about

22  this conversation?
```



Page 271

```
 1        A.    I recall that I -- it was not me sitting

 2   there having lunch with him.  I was walking -- I

 3   was leaving FLIK with my lunch.  They were seated.

 4   We stopped to have a short conversation, and then

 5   I left.

 6        Q.    Were there any women sitting at the

 7   table?

 8        A.    I don't recall.

 9        Q.    Okay.  Did you have any conversations

10   with any other people besides Yaakov and this

11   group, I&A lunch, about me since the lawsuit was

12   filed?  Withdrawn.

13             Did you have any conversations with

14   Yaakov -- I'm sorry.

15             Did you have any conversations about me

16   with anyone besides Yaakov and this I&A table

17   since you first learned that I believed you

18   discriminated against me?

19             MR. BAILEY:  Objection to form.

20        A.    I told Evan Miller that I was partner A.

21        Q.    Anyone else?

22        A.    Not that I recall.  My wife, but --
```



Page 272

1      Q.    You can claim privilege over that.

2      A.    Okay.

3            No one else that I can recall.

4      Q.    Okay.  And when did you talk to Evan

5  Miller?

6      A.    I think not long after the lawsuit was

7  filed.

8      Q.    And what -- could you please describe

9  your conversation with him?

10     A.    It wasn't long.  I don't recall much

11  about it.  I think I asked him if he had seen the

12  lawsuit, told him I was partner A.  I think he

13  shook his head, and I don't recall much more after

14  that.

15     Q.    Okay.  And when was your conversation

16  with Yaakov?

17     A.    I don't recall.  If it was, it was soon

18  after the lawsuit, I think, was filed.  I had to

19  really think about the -- I think I was conflating

20  the conversation sort of after the emails in March

21  of 2016 after the lawsuit, but then as I thought

22  about it more, I do remember the conversation with



Page 273

```
 1   Yaakov soon after the emails in '16 and then --
 2   then I -- now I can't remember if I actually had a
 3   conversation with Yaakov after the lawsuit was
 4   filed.
 5        Q.   Okay.  And I guess fair to say that you
 6   also don't remember what that conversation would
 7   have been or --
 8        A.   Correct.
 9        Q.   All right.  And there's no one else that
10   you can remember having a conversation with
11   outside of --
12        A.   I did ask Beth Heifetz if she said --
13             MR. BAILEY:  Objection.
14             THE WITNESS:  Sorry.
15             MS. SHEKETOFF:  I don't think
16   that's going to be privileged, Anderson.
17             MR. BAILEY:  Can we just go off the
18   record for a couple minutes and let me investigate
19   this?
20             MS. SHEKETOFF:  No.  Well ...
21             MR. BAILEY:  Yes, we're going to go
22   off.
```



Page 274

1          MS. SHEKETOFF:  The question is

2    going to be did you ask Beth Heifetz whether she

3    said you were a terrible lawyer -- or terrible

4    writer.

5          MR. BAILEY:  All right.  You can

6    ask that question.

7     Q.   Did you?

8     A.   I don't even think I asked her that.  I

9    don't think I -- no, I didn't ask her that.  I

10   didn't ask her.

11    Q.   Did you ask her --

12    A.   I did -- Beth was someone that I saw --

13   we mentioned the lawsuit very briefly.

14    Q.   And what did you -- what did you say in

15   the conversation and what did she say?

16          MR. BAILEY:  And now we're going to

17   go off the record.

18          MS. SHEKETOFF:  That's fine.

19          And just to be clear, are you claiming

20   that Beth Heifetz is a lawyer for ███ Partner A ███?

21          MR. BAILEY:  What I'm claiming is

22   that I would like to go off the record to



Page 275

1    understand what the information is so I can make a

2    determination.

3              MS. SHEKETOFF:  That's fine.  Let's

4    go off the record.

5              VIDEO TECHNICIAN:  We're going off

6    the record at 2:37 p.m.

7              (A brief recess was taken.)

8              VIDEO TECHNICIAN:  We are back on

9    the record at 2:40 p.m.

10             MR. BAILEY:  You can go ahead.

11   BY MS. SHEKETOFF:

12        Q.   Okay.  Can you please describe your --

13   or when was your conversation with Beth Heifetz?

14        A.   Not long after the complaint was filed.

15   I don't recall the precise date.

16        Q.   And can you please describe that

17   conversation?

18        A.   It wasn't a long one.  I don't recall

19   much about it.  I recall more what I didn't ask,

20   like I didn't -- I was thinking about asking her

21   whether she said what was said in the complaint,

22   but I didn't.  And I think it was sort of like,



1   well, we probably shouldn't talk much about it

2   because we didn't know who was going to be a

3   witness, so -- but your question was like who did

4   I even mention anything to.  Beth is one person.

5        Q.    I appreciate that.

6              Do you believe that I believe that you

7   discriminated against me?

8              MR. BAILEY:  Objection.

9        A.    I don't know what you believe.

10       Q.    Have you ever told anyone that you don't

11  believe I discriminated against you?

12             MR. BAILEY:  Objection.  And I will

13  caution the witness not to divulge any information

14  about communications with counsel.

15             THE WITNESS:  Understood.

16       A.    I'm sorry, what's the question again?

17       Q.    Have you ever told somebody else that

18  you -- that you think that I don't believe I was

19  discriminated against by you?

20             MR. BAILEY:  Same objection and

21  caution.

22       A.    Have I ever told anyone that you don't



Page 277

1    believe you were discriminated against by me, like

2    I view that you're lying?

3         Q.   Yes.

4         A.   No.

5         Q.   All right.  Have you ever used the word

6    bitch to describe a woman?

7         A.   In my whole life?

8         Q.   Yes.

9         A.   I don't recall a specific example.  I

10   don't know.

11        Q.   Have you ever used the word bitch to

12   describe a woman since you've been a partner at

13   Jones Day?

14             MR. BAILEY:  Asked and answered.

15        A.   No.

16        Q.   No, you've never used the word bitch in

17   reference to a woman?

18        A.   I don't think so.

19        Q.   In the last seven years?

20        A.   I don't think so.

21        Q.   So have you ever used the word bitch in

22   reference to me?



Page 278

```
 1      A.   No.

 2                MR. BAILEY:  Objection.

 3      Q.   Have you ever used the word cunt to

 4  describe a woman?

 5      A.   In my whole life?

 6      Q.   Yes.

 7      A.   Maybe in high school.

 8      Q.   Okay.  Have you ever used the word cunt

 9  to describe a woman since you were a lawyer at

10  Jones Day?

11      A.   No.

12      Q.   Have you ever used the word cunt in

13  reference to me?

14      A.   No.

15      Q.   Have you ever used the word slut to

16  describe a woman?

17      A.   Maybe in high school.

18      Q.   Have you ever used the word slut to

19  describe a woman since you've been a lawyer at

20  Jones Day?

21      A.   No.

22      Q.   Have you ever used the word slut in
```



Page 279

1    reference to me?

2         A.   No.

3         Q.   Have you ever used the word bitch to

4    describe a woman since you were a lawyer at Jones

5    Day?

6              MR. BAILEY:  Asked and answered.

7         A.   I think I answered that already.  No.

8         Q.   You answered about whether -- since you

9    were a partner.  I'm asking since you joined Jones

10   Day.

11             MR. BAILEY:  You asked with respect

12   to his entire life.

13        A.   I don't think so.

14        Q.   And have you ever used the word ass or

15   asshole in reference to me?

16        A.   No.

17        Q.   And have you ever used the word slut in

18   reference to me?

19             MR. BAILEY:  Asked and answered.

20        A.   No.

21        Q.   Have you ever used any derogatory term

22   in reference to me?



Page 280

```
 1      A.   Not that I recall.

 2           MR. BAILEY:  Objection to form.

 3      Q.   Sorry?

 4      A.   There was an objection.  I'm sorry.

 5           MR. BAILEY:  I objected to form.  I

 6  believe he gave an answer.

 7      Q.   Okay.  Are you aware of anyone else who

 8  said that you treated him or her in a

 9  discriminatory manner?

10      A.   No.

11      Q.   Have you ever made self-deprecating

12  comments about your own intelligence?

13      A.   Self-deprecating comments about my own

14  intelligence?

15      Q.   Yes.

16           MR. BAILEY:  Object to form.

17      A.   I believe so.

18      Q.   And have you ever made self-deprecating

19  comments about your own intelligence in front of

20  the issues and appeals associates in the Jones Day

21  cafeteria?

22           MR. BAILEY:  Objection to form.
```



Page 281

```
 1       A.   I think so.

 2       Q.   What comments have you made?

 3       A.   I don't recall.

 4       Q.   Have you ever said that -- have you ever

 5  mocked your intelligence?

 6       A.   I don't understand.

 7            MR. BAILEY:  Objection to form.

 8       A.   I don't understand the question.

 9       Q.   Have you ever remarked on how

10  intelligent you were relative to male associates

11  at Jones Day?

12       A.   I don't recall.

13       Q.   What -- fair to say that the issues and

14  appeals table at Jones Day back in 2016 was

15  predominantly male?

16            MR. BAILEY:  Objection to form.

17       A.   You said the I&A table?

18       Q.   In the FLIK, in the cafeteria at Jones

19  Day.

20            MR. BAILEY:  Objection to form.

21  Assumes facts not in evidence.

22       A.   There were times when I&A associates
```



MAGNA ◗
LEGAL SERVICES

Page 282

1    would sit together or I&A lawyers would sit

2    together outside of FLIK, and most of the time

3    that I saw the tables were predominantly male.

4         Q.   And most of the time it was all male,

5    correct?

6                   MR. BAILEY:  Objection.

7         A.   I don't know.

8         Q.   Do you think it's fair to say that

9    there's -- in 2016 that there was an issues --

10   withdrawn.

11                  Do you think it's fair to say that in

12   2016 there was an issues and appeals table?

13                  MR. BAILEY:  Objection to form.

14        A.   I wouldn't characterize it as that.

15        Q.   No?

16                  Have you heard other people characterize

17   it that way?

18                  MR. BAILEY:  Objection to form.

19        A.   I don't recall.

20        Q.   Fair to say that in 2016, Jeff Johnson,

21   Anthony Dick or Vivek Suri and others would sit

22   together every day in the FLIK cafeteria?



Page 283

1           MR. BAILEY:  Objection to form.

2      A.   I don't know about every day.  I wasn't

3  at FLIK every day.  I wasn't in the office every

4  day, so I can't speak to every day.

5      Q.   Fair to say that they were there

6  virtually every day?

7           MR. BAILEY:  Form and foundation.

8      A.   I would say it was common to see Jeff,

9  Nick, and Anthony, plus others, sitting together.

10     Q.   And fair to say that the plus others

11  were either all male or almost all male?

12     A.   I would say almost all male.  I think

13  Caroline sat there.  I forget some of the other

14  I&A, female I&A associates or even non-I&A

15  associates who were female.

16     Q.   Your testimony is you would see Caroline

17  sitting with the I&A table?

18     A.   Caroline Edsall?

19     Q.   Yes.

20     A.   I thought I would see her sitting there

21  with her I&A colleagues.  I don't recall.  Are we

22  talking 2016?


MAGNA
LEGAL SERVICES

Page 284

1       Q.   Yes.

2       A.   The years sort of run together.  I can't

3   recall when Caroline showed up.

4       Q.   What does the term "soft skills" mean to

5   you?

6            Actually, I'm sorry, can we go back to

7   an earlier question.  I'll go back to that.

8            You said you thought you did make

9   self-deprecating comments in general about your

10  intelligence.  What kinds of comments do you think

11  you made?

12      A.   Something along the lines of, you know,

13  I'm just a litigator, not I&A, you know, something

14  along those lines.

15      Q.   Anything else?

16      A.   Not that I recall.

17      Q.   So going back to the question I asked,

18  what does the term "soft skills" mean to you?

19      A.   In what context?

20      Q.   At any context, what do you understand

21  the words "soft skills" to mean, if anything?

22      A.   Well, I'll answer in the law firm



Page 285

```
 1    context.  I think soft skills generally refer to

 2    things like your ability to keep an open line of

 3    communication with who you're working for, whether

 4    you would be good at business development, good at

 5    recruiting, just good at client interaction

 6    generally.

 7         Q.   Anything else?

 8         A.   Good at public speaking.  I really can't

 9    think of anything else.

10         Q.   Did you ever work with Sparkle Sooknanan

11    on a memo?

12         A.   Not that I recall.

13         Q.   Did you ever work on a memo in the

14    ██████████ case?

15         A.   I remember the ██████████ case.  I

16    don't know if I -- if I drafted a memo or helped

17    edit a memo.

18         Q.   Do you recall writing a section of the

19    memo --

20              MR. BAILEY:  I'm sorry, Julia.  Let

21    me just caution that general Q&A is fine, but --

22              MS. SHEKETOFF:  I'm not going to
```



Page 286

1    ask about substance.

2              MR. BAILEY:  -- obviously privilege

3    information about that matter don't divulge.

4              THE WITNESS:  Okay.

5    BY MS. SHEKETOFF:

6         Q.   Do you recall writing a portion of a

7    memo for the ███████ case back in 2015?

8         A.   Vaguely, yes.

9         Q.   And do -- was your section rewritten by

10   someone else?

11        A.   I don't recall.

12        Q.   Did you say anything about your work

13   being rewritten?

14        A.   I don't recall.

15        Q.   Are you aware of  Partner G 's lawsuit

16   against Jones Day?

17        A.   Only superficially.

18        Q.   Did you ever tell anyone at Jones Day

19   that you weren't troubled by  Partner G 's

20   allegations?

21        A.   That I was not troubled by her

22   allegations?



Page 287

1     Q.   Yes.  Did you ever tell anyone at Jones

2   Day something to the effect of you weren't

3   troubled by her allegations?

4                MR. BAILEY:  Putting aside any

5   conversations that you had with counsel.

6     A.   I don't recall ever making a statement

7   about ██Partner G██ 's lawsuit one way or another.

8     Q.   Did you ever tell anyone at Jones Day

9   something to the effect of things like ██Partner G██

10  alleges happen at every law firm?

11    A.   I don't even remember what ██Partner G██

12  alleged in particular, and I don't remember making

13  the statement.

14    Q.   Have you ever told Yaakov not to make

15  style edits to your writing?

16    A.   Not that I recall.

17    Q.   Have you ever told Yaakov not to change

18  something back to the way he had it after you

19  edited it?

20    A.   No, Yaakov has never changed anything

21  after I edited it.

22    Q.   Yaakov has never changed anything after



Page 288

1    you edited it?

2         A.    Not back to the way he had it, no.

3         Q.    Have you ever told any man not to make

4    style edits to your writing?

5         A.    Not that I recall.

6         Q.    Have you ever told any man not to change

7    something back to the way he had it after you

8    edited it?

9         A.    No male I have ever worked with took

10   something that I had changed of theirs and changed

11   it back to the way they had it.

12        Q.    Okay.  So you never said that to any

13   man?

14        A.    No, because they have never done it, and

15   no other -- no other lawyer, not just other men,

16   no other lawyer has ever done that.

17        Q.    Have you ever felt insecure about your

18   capabilities as a lawyer?

19        A.    No.

20        Q.    Have you ever felt insecure around woman

21   who have strong academic credentials?

22        A.    No.



Page 289

```
 1        Q.    Have you ever felt insecure around woman

 2   who worked on the Supreme Court?

 3        A.    No.

 4        Q.    Would you say it's fair to say that you

 5   reference your family's connection to Harvard

 6   frequently?

 7        A.    I don't know about frequently.

 8        Q.    Is it fair to say --

 9        A.    I would say -- I would say, no, it's not

10   fair to say that.

11        Q.    Is it fair to say you referenced your

12   family's connection to Harvard multiple times with

13   me?

14        A.    I don't recall.

15        Q.    Is it fair to say you felt somewhat

16   insecure about the fact that I went to Harvard?

17        A.    No, I never even applied to Harvard.

18        Q.    Is it fair to say that you mentioned

19   your family's connection with Harvard multiple

20   times to Sparkle Sooknanan?

21        A.    Perhaps when someone, male or female,

22   goes to Harvard, sometimes the conversation I
```



Page 290

1    spent time up there because my wife went there and

2    we dated while she was in college.

3         (Exhibit 134 was marked for identification and

4         attached to the deposition transcript.)

5    BY MS. SHEKETOFF:

6         Q.   After ▮F Associate B▮ was hired --

7    actually, I'm sorry.  I'm going to show you

8    Plaintiffs' Exhibit 134.  And please go ahead and

9    read that.

10             And for the record, this is Bates

11    stamped P04070 to 71.

12        A.   So this is two pages of text messages;

13    is that right?

14        Q.   Yes.  And I'll represent to you that

15    these are text messages between ▮F Associate B▮ and me.

16             MR. BAILEY:  I'll just make the

17    same objection I made earlier with respect to the

18    use of the document that ▮Partner A▮ apparently

19    never authored, nor received, has likely never

20    reviewed, and can neither authenticate or speak to

21    any personal knowledge.

22        A.   Okay, so what's the question?  I'm



Page 291

```
1    sorry.
2         Q.   After  F Associate B  was hired by UVA,
3    did she tell you that she was going to commute to
4    Charlottesville?
5         A.   I think so, yes.
6         Q.   Did you offer to talk to Kip so see if
7    he knew of any retired drivers who might want to
8    drive her?
9         A.   I don't recall.
10        Q.   Was Kip the person at Jones Day who
11   arranged the car service for the firm?
12        A.   Yes, I believe he owns a car service,
13   and I don't know if he's an independent contractor
14   or an employee of the firm, but, yes, he provides
15   car services to the firm.
16        Q.   Did you come into Associate B 's office and shut
17   the door?
18        A.   I don't recall.
19        Q.   Did you tell F Associate B that you had been
20   thinking that you wouldn't want her to be in a car
21   ten hours a week with a guy?
22        A.   I don't recall.
```



Page 292

```
 1      Q.   Is that because she was a woman?

 2           MR. BAILEY:  Objection.

 3      A.   I don't recall making --

 4           MR. BAILEY:  Facts not in evidence.

 5      A.   Sorry.

 6      Q.   Did you tell her that you wouldn't want

 7  your wife to be in a car with a guy for that many

 8  hours?

 9      A.   I don't recall ever saying that.

10      Q.   And would you want your wife to be in a

11  car for ten hours a week with a man?

12           MR. BAILEY:  Objection to form.

13  Hypothetical.

██    ██    ████████████████████████████████

██    ████████████████████████████████████

██    █████████████████████████████

17      Q.   Okay.  Would you -- do you want your

18  wife to spend ten hours in a car with a man; would

19  that be okay with you?

20           MR. BAILEY:  Objection.

21      A.   I mean, what kind of guy are we talking

22  about?  I don't even know what -- I don't know
```



Page 293

1    what the basis is.

2         Q.    Would you be okay with your wife

3    spending ten hours in a car with a male driver?

4         A.    If she were comfortable with that, that

5    would be not uncomfortable for me. ████████████

██ ████████████████████████████████████████████

██ ████████████

8         Q.    Did you tell █F Associate B█ that familiarity bred

9    contempt?

10        A.    I don't recall ever saying that.

11        Q.    Did you say that the driver might want

12   to make conversation?

13        A.    I don't recall ever saying that.

14        Q.    And did you express that you were

15   concerned that the driver might develop a crush on

16   █F Associate B█?

17        A.    I don't recall.

18        Q.    You wouldn't have had that concern if

19   █F Associate B█ were a man, correct?

20        A.    I don't recall having the concern at

21   all.

22        Q.    Okay.  Have you organized any event for



Page 294

```
 1    ██████████████ that Farah Peterson suggested you

 2    invite Sparkle and me to; is that right?

 3         A.    There were a lot of questions in there.

 4    I'll take the first part.  Have I ever organized

 5    an event -- I'm sorry, how did you say it?

 6         Q.    Do you ever organize events for ██████

 █    ████████████████

 8         A.    Yes.

 9         Q.    And was there one such event where Farah

10    suggested that you invite Sparkle and me?

11         A.    I don't recall that.

12         Q.    And was there such an event that you

13    then invited Sparkle?

14         A.    I recall inviting Sparkle to what we

15    would call a █████████████████████████████

16    lawyers in the D.C. office, perhaps once a

17    quarter, maybe a little bit less than that, but,

18    you know, two to three to four times a year would

19    sort of go off-site to have lunch.  And so I

20    believe I asked Sparkle to join us for one of

21    those lunches.

22         Q.    And is that the lunch that Farah
```



Page 295

1   recommended that you invite Sparkle and me to?

2        A.   I don't recall having a conversation

3   with Farah about inviting you or Sparkle.  If I

4   invited Sparkle, I don't recall it being at the

5   suggestion of Farah.

6        Q.   Okay.  Do you remember that you asked

7   Farah, "Is Sparkle cool"?

8        A.   I don't recall.

9        Q.   And do you remember that -- or do you

10  remember if Farah told you that she was?

11       A.   I don't recall.

12       Q.   And do you remember then inviting

13  Sparkle?

14       A.   Like I said, I remember inviting Sparkle

15  to a lunch.  I don't remember it being tied to or

16  triggered by a conversation with Farah.

17       Q.   And you didn't invite me to that lunch;

18  is that right?

19       A.   I don't believe so.

20       Q.   Why not?



Page 296

1     Q.   And is Sparkle ████?

████    ████   ████████████  ████████████

████   ████████████

4     Q.   Okay.  Did you ask Sparkle if she was

5    ████?

6     A.   Did I ask her if she's ████?

7     Q.   Yes.

8     A.   I don't recall ever asking her that.

9     Q.   Okay.  ████████████

████  ████████████████████████████

████  ████████████

████  ████  ████████████  ████████

████  ████████████  ████████  ████

████  ████████████  ████████

████  ████ F. Associate H?

████  ████  F. Associate H  F. Associate H████, and she

17  invited herself to lunch, and would come to all of

18  our lunches and we would not say no to F. Associate H

19  joining us.

20     Q.   Okay.  So why was F. Associate H allowed to come

21  but I was not?

22             MR. BAILEY:  Objection.  States



Page 297

1    facts not in evidence.

2        A.   I did not invite ███ to lunch, and I

3    was not the gatekeeper of the lunch.   ███ invited

4    herself to lunch.  I never invited ███ to lunch.

5    And then I don't know how she ended up at lunch.

6    Well, I know how she ended up.  She invited

7    herself because she said that.  And then what was

8    the other part of the question?  I'm sorry.

9        Q.   I don't think there was another part of

10   the question.

11       A.   Why weren't you invited.  I think that's

12   what you said.

13             MR. BAILEY:  Or why wasn't she

14   allowed.

15       A.   I don't think you were ever not allowed

16   to go to lunch.

17       Q.   And did any other ██████ attorneys

18   attend the -- what did you call it?

19       A.   The ████ lunch.

20       Q.   The ████ lunch.

████    ██    ████████████████████████████

██   █████████████████████████    ████████



Page 298

████ ████ ████████████████ ████

████ ████████████████████ ██████

████████████████ ██████████

████████████████████████

██████████████████████████████

████████████████████████

7       Q.   Okay.  We're going to go back to the

8    memo.  We're going to Plaintiffs' Exhibit 77.

9          Actually, if you guys want, this would

10   be a fine time to take a break.  I'm happy to keep

11   going.  It's up to you.

12               MR. BAILEY:  Yeah, why don't we

13   take ten minutes.  Do you have any sense of where

14   we were overall?

15               MS. SHEKETOFF:  Let's talk off the

16   record.

17               VIDEO TECHNICIAN:  Do you want to

18   go off the record?  We're going off the record at

19   3:02 p.m.

20               (A brief recess was taken.)

21               VIDEO TECHNICIAN:  We are back on

22   video record at 3:10 p.m.

















Page 302







Page 304

































Page 312





Page 313









































Page 323





Page 324

[REDACTED]

 9          Did I ever refuse to work on a weekend?

10     A.   My recollection is that I asked -- I

11  would ask for things on a Monday, for example, or

12  it was in order to get it done it would have

13  required weekend work and you said you couldn't

14  get it to me on Monday, that it would have to be

15  later in the week.

16     Q.   Okay.  How many times --

17     A.   I don't recall ever saying like, hey,

18  can you work Saturday and Sunday on this.

19     Q.   But your recollection is that you asked

20  me to get something to you by a specific time and

21  I said I could not?

22     A.   That's my recollection, yes.



Page 325

1      Q.    Did I ever tell you that I didn't want

2   to work on the weekend?

3      A.    Not that I recall.

4      Q.    Okay.  And then just to make sure, did I

5   ever refuse to work on the weekend?

6      A.    Not that I recall.

7      Q.    Did you ever specifically ask me to work

8   on the weekend?

9           MR. BAILEY:  Asked and answered.

10   Go ahead.

11      A.    Same as before, I don't recall ever

12   asking you to work over a particular weekend.  I

13   think I recall asking for things to be done by a

14   Monday or a Tuesday and your response was that you

15   couldn't.  And I don't know -- I don't remember if

16   it was I couldn't because I'm unavailable this

17   weekend or whatever, but the clear implication

18   would be in order to get it to me by the date I

19   asked for it, that Monday or Tuesday, it would

20   require weekend work.

21      Q.    And I said I wouldn't do that or I

22   couldn't do that?



```
                                           Page 326
 1        A.   That's my recollection.

 2        Q.   Did I ever tell you my practice was not

 3   to work on the weekend?

 4        A.   Not that I recall.

 5        Q.   Is your view that Jones Day associates

 6   should always work on the weekend?

 7        A.   No.

 8        Q.   Do you always work on the weekend?

 9        A.   Most weekends I work.

10        Q.   When you were an associate, did you

11   always work on the weekend?

12        A.   Most weekends.

13        Q.   Is it your view that Jones Day

14   associates should treat the weekend as presumptive

15   workdays?

16        A.   No, not necessarily.

17        Q.   Well, what do you mean by not

18   necessarily?  Do you think that they should treat

19   them as presumptive workdays?

20        A.   I think it depends on how much work they

21   have to do and what their deadlines are.

22        Q.   Okay.  Is it your view that Jones Day
```



Page 327

1   associates should treat the weekend the same as a

2   weekday?

3        A.   No.

4        (Exhibit 108 was marked for identification and

5        attached to the deposition transcript.)

6   BY MS. SHEKETOFF:











Page 330





Page 331



















Page 335































Page 343

```
1                    MR. BAILEY:  Julia, I just note

2    it's 4:00.  I don't know if this is a convenient

3    time.

4                    MS. SHEKETOFF:  Oh, right.  I'm

5    sorry.

6                    THE WITNESS:  I just lost the

7    connection too so ...

8                    MS. SHEKETOFF:  I'm in central

9    time, so I was thinking it was 3.  Let's take a

10   break.  That would be -- that's good.

11                   THE WITNESS:  How long?

12                   VIDEO TECHNICIAN:  We are going off

13   the record at 4:00.

14                   (A brief recess was taken.)

15                   VIDEO TECHNICIAN:  We are back on

16   the record at 4:13 p.m.

17   BY MS. SHEKETOFF:
```





































["







Page 354





Page 355





Page 356







The entire content area is redacted. Header navigation at top.

Page 358





Page 359











Page 361











Page 364







Page 365



Page 366













Page 369

















Page 373







Page 374











Page 377





Page 378







Page 379

10      Q.   What is Jones Day's parental leave

11   policy?

12      A.   I don't know.





Page 380

17      Q.   Do you think it's important for a father
18   to spend time with his kids soon after they're
19   born?
20      A.   Yes.



Page 381

███ ████ ████ ████

███ ███████████████████████████

███ ████████████ ██████████████

███ ████████████████████████████

███ ████████████████████████████

███ ████████████████████████████

███ ████

███ ██ ███ ████ ████████████████

███ ████████████████████████████

███ ██████████████████████

███ ██ ████████ ████████████████

███ ███████████████████████

```
13        Q.    Okay.  And just a final question back to

14   your review of me, your evaluation of me.  Did you

15   lie about me in that review?

16        A.    Did I what?

17        Q.    Did you lie in that review?

18        A.    No.

19        Q.    Were there any lies at all in that

20   review?

21        A.    No.

22        Q.    What did you do to prepare for today's
```



Page 382

1   deposition?

2       A.   I met with counsel and reviewed some

3   documents.

4       Q.   How long did you meet with counsel?

5       A.   Approximately six to eight hours.

6       Q.   And how long in total did you spend

7   preparing?

8       A.   I would say seven to ten hours.

9       Q.   Did you review -- what documents did you

10  review?

11      A.   Looked at various emails.  Looked at

12  some versions of the memo.  Looked at notes on

13  things used in the partner meetings to discuss

14  your evaluations in '16 and '17.  I think that's

15  it.

16      Q.   Did you review anything that hasn't been

17  produced in discovery?  Withdrawn.

18           Did you review anything that doesn't

19  have a Bates stamp on it?

20           MR. BAILEY:  Let me just make a

21  representation that we only reviewed documents

22  that have been produced in discovery.



1      Q.   Okay.  Did you speak with anyone besides

2   your counsel?  Withdrawn.

3           Who did you speak with in connection

4   with preparing for this deposition?

5      A.   In connection with --

6           MR. BAILEY:  You can identify --

7   you can identify the lawyers but obviously do not

8   divulge any communications.

9           THE WITNESS:  Sure.

10      A.   Anderson Bailey, Terry Chase, and

11   Amanda, is it Dollinger?  Amanda Dollinger, yes.

12      Q.   Did you meet with anyone -- or did you

13   speak with anyone else in preparation for this

14   deposition?

15      A.   No.

16      Q.   And how many times did you meet with

17   your counsel?

18      A.   Twice.

19      Q.   Who is Amanda Dollinger?

20      A.   She's a colleague of ours in New York.

21      Q.   She's a lawyer?

22      A.   Yes.



Page 384

```
 1        Q.   Did anything you reviewed -- withdrawn.

 2                  MS. SHEKETOFF:  I think that's

 3   actually it for today.

 4                  MR. BAILEY:  Okay.  Thank you.

 5                  MS. SHEKETOFF:  That concludes.

 6   Let's go off the record and do a final time check.

 7                  VIDEO TECHNICIAN:  Stand by.  We

 8   are off the record at 5:06 p.m.

 9           (Discussion off the video record.)

10                  MR. BAILEY:  We will review and

11   sign and take a rough transcript in the next day

12   or two.

13                  THE REPORTER:  Julia?

14                  MS. SHEKETOFF:  I will follow up

15   with you outside of this conversation.

16

17           (Deposition concluded at 5:06 p.m.;

18                  signature not waived.)

19

20

21

22
```



Page 385

1                              * * *

2                    ACKNOWLEDGMENT OF WITNESS

3        I,  █████████ , ESQUIRE, do hereby acknowledge

4   that I have read and examined the foregoing

5   testimony, and the same is a true, correct and

6   complete transcription of the testimony given by me,

7   and any corrections appear on the attached Errata

8   sheet signed by me.

9

10

11   _____   _____

12   (DATE)                    (SIGNATURE)

13

14

15

16

17

18

19

20

21

22



Page 386

1                    CERTIFICATE OF SHORTHAND REPORTER

2

3         I, Michele E. Eddy, Registered Professional

4    Reporter and Certified Realtime Reporter, the court

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing

7    transcript is a true and correct record of the

8    testimony given; that said testimony was taken by me

9    stenographically and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14

15        IN WITNESS WHEREOF, I have hereunto set my hand

16   and affixed my notarial seal this 7th day of

17   September, 2022.

18   My commission expires July 31, 2027

19

20   _Michele C Eddy_____

21   MICHELE E. EDDY

     NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARK C. SAVIGNAC and<br>JULIA SHEKETOFF, | ) ) ) | Civ. No. 1:19-02443 (RDM) |
| *Plaintiffs,* | ) ) | |
| *v.* | ) ) | |
| JONES DAY *et al.,* | ) ) | |
| *Defendants.* | ) | |

**ERRATA SHEET FOR AUGUST 26, 2022
DEPOSITION OF** ████ Partner A ████

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 15 | 8 | thing as confidential | thing as privileged confidential | Clarification / Transcription error |
| 18 | 1 | ████████ | ████████ | Transcription error |
| 19 | 11 | ████ | ████ | Transcription error |
| 22 | 5 | ████ | ████ | Transcription error |
| 23 | 1 | ████ | ████ | Transcription error |
| 23 | 20-21 | ████ | ████ | Transcription error |
| 27 | 18 | It could, depending | It could be, depending | Transcription error |
| 29 | 11 | We have that, Mark? | We have that? | Transcription error |
| 34 | 4 | ████ | ████ | Transcription error |
| 38 | 10 | ████ | ████ | Transcription error |
| 38 | 17-18 | ████ | ████ | Transcription error |
| 42 | 20 | ████ | ████ | Transcription error |
| 43 | 3 | ████ | ████ | Transcription error |
| 43 | 4-5 | ████ | ████ | Transcription error |
| 52 | 2 | Client 1's | Client 1's | Transcription error |
| 52 | 8 | ████ | ████ | Transcription error |
| 53 | 6 | Client 1's | Client 1's | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 53 | 21 | Client 1's | **Client 1**'s | Transcription error |
| 54 | 10 | Client 1's | **Client 1**'s | Transcription error |
| 56 | 6 | Client 1's | **Client 1**'s | Transcription error |
| 69 | 1-2 | of one could argue this, one could argue that. | of "one could argue" this, "one could argue" that. | Transcription error |
| 69 | 21 | one could argue this, one could argue that, | "one could argue" this, "one could argue" that, | Transcription error |
| 70 | 1 | our CEO | her CEO | Transcription error |
| 70 | 1-2 | about what the chance of success that the | about the chance of success the | Clarification / Transcription error |
| 71 | 20-21 | counsel, you'd put her into | counsel, you're put into | Transcription error |
| 75 | 21 | and good | and included good | Transcription error |
| 80 | 13 | battle | B&TL | Transcription error |
| 80 | 16 | battle | B&TL | Transcription error |
| 81 | 11 | an email | an eval | Transcription error |
| 82 | 7 | battle | B&TL | Transcription error |
| 86 | 10 | And so by | And so my | Transcription error |
| 87 | 21 | you were here | you were not here | Transcription error |
| 90 | 1 | battle | B&TL | Transcription error |
| 92 | 17 | one with Ryan | on with Ryan | Transcription error |
| 103 | 10 | differently as someone | differently, as someone | Transcription error |
| 117 | 2 | characterize it | characterize it as | Transcription error |
| 117 | 15 | memo or if | memo.  If | Transcription error |
| 122 | 8 | in the charge | in-charge | Transcription error |
| 127 | 6 | further the case | further discuss the case | Transcription error |
| 132 | 9 | particular | protective | Transcription error |
| 132 | 10 | files | filings | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 132 | 16 | project to other files | project due to other filings | Transcription error |
| 134 | 15 | just how I did. | how I just did. | Transcription error |
| 175 | 2 | █████ | █████ | Transcription error |
| 177 | 8 | ████████████ | ████████████ | Transcription error |
| 185 | 12 | ███ | ███ | Transcription error |
| 218 | 17 | ██████ | ██████ | Transcription error |
| 223 | 6 | ████ | ██ | Transcription error |
| 224 | 3 | ██████ | ████ | Transcription error |
| 228 | 20 | was track | was not track | Transcription error |
| 245 | 15 | blind | line | Transcription error |
| 248 | 20 | work | weren't | Transcription error |
| 259 | 15-16 | are just generally firm citizens and dedicate | and just generally being good citizens and dedicating | Clarification / Transcription error |
| 262 | 10-11 | on or sort of last | on or, sort of, last | Transcription error |
| 267 | 10 | I now | now | Transcription error |
| 283 | 8-9 | Jeff, Nick, and Anthony, plus others | Jeff, Anthony Dick, plus others | Transcription error |
| 289 | 22 | the conversation I | in conversation I might say I | Transcription error |
| 290 | 21 | any personal | with any personal | Transcription error |
| 293 | 5 | would be not | would not be | Transcription error |
| 298 | 5 | ██████ | ██████ | Transcription error |
| 319 | 15 | ███ | █████ | Transcription error |
| 358 | 21 | April 4th | April 14th | Transcription error |

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 370 | 2 | sharpened | sharpening | Transcription error |

## ACKNOWLEDGMENT OF DEPONENT

I, ▮Partner A▮, do hereby certify that I have read the attached transcript, and that the same is a correct transcription of the testimony given by me to the questions therein propounded, except for the corrections or changes in form or substance noted in this Errata Sheet.

Date: 10/3/2022                         /s/ ▮Partner A▮_____
                                        ▮Partner A▮