**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | |
| *Plaintiffs*, | Case No. 1:19-cv-02443-RDM-ZMF |
| v. | |
| JONES DAY, STEPHEN J. BROGAN, BETH HEIFETZ, and MICHAEL SHUMAKER, | |
| *Defendants*. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' SANCTIONS MOTION
AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
FOR RULE 11 SANCTIONS**

## TABLE OF CONTENTS

I.   The challenge to Jones Day's leave policy clearly is not sanctionable .................................2

II.  Julia's pay discrimination claim clearly is not sanctionable .................................12

   A.  Julia's work for Jones Day clients was excellent.........................................14

   B.  Partner A's evaluation of Julia was motivated by gender bias ...................................24

   C.  Partner A's evaluation affected Julia's salary ...............................................34

III. The employment reference claim clearly is not sanctionable ..........................................37

Conclusion ...................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Johnson*,
   795 F.3d 34 (D.C. Cir. 2015) ........................................................................................ 25

*Bill Johnson's Restaurants, Inc. v. NLRB*,
   461 U.S. 731 (1983) ........................................................................................................ 1

*Brady v. Office of Sergeant at Arms*,
   520 F.3d 490 (D.C. Cir. 2008) ................................................................................ 24, 31

*Burley v. National Passenger Rail Corp.*,
   801 F.3d 290 (D.C. Cir. 2015) ................................................................................ 25, 34

*Burlington Northern & Santa Fe Railway Co. v. White*,
   548 U.S. 53 (2006) ........................................................................................ 39, 40, 41

*California Federal Savings & Loan Ass'n v. Guerra*,
   479 U.S. 272 (1987) .................................................................................................. 2, 3, 9

*City of Los Angeles v. Manhart*,
   435 U.S. 702 (1978) ........................................................................................................ 3

*Cleveland Board of Education v. LaFleur*,
   414 U.S. 632 (1974) ........................................................................................................ 3

*Coats v. DeVos*,
   232 F. Supp. 3d 81 (D.D.C. 2017) .............................................................................. 34

*Dunlop v. Carriage Carpet Co.*,
   548 F.2d 139 (6th Cir. 1977) ........................................................................................ 39

*EEOC v. L.B. Foster Co.*,
   123 F.3d 746 (3d Cir. 1997) .......................................................................................... 39

*Fred A. Smith Management Co. v. Cerpe*,
   957 A.2d 907 (D.C. 2008) ............................................................................................ 45

*George v. Leavitt*,
   407 F.3d 405 (D.C. Cir. 2005) ...................................................................................... 30

*Glover v. City of North Charleston*,
   942 F. Supp. 243 (D.S.C. 1996) .............................................................................. 42, 43

*Hamilton v. Geithner*,
   666 F.3d 1344 (D.C. Cir. 2012) .................................................................................... 25

*Hanson v. McBride,*
    2018 WL 10230024 (M.D. Tenn. 2018) ........................................................42, 43

*Hedgeye Risk Management, LLC v. Heldman,*
    412 F. Supp. 3d 15 (D.D.C. 2019) ...........................................................................1

*Johnson v. University of Iowa,*
    431 F.3d 325 (8th Cir. 2005) ...................................................................................2

*King v. Triser Salons, LLC,*
    815 F. Supp. 2d 328 (D.D.C. 2011) ...........................................................42, 43, 44

*McCaskill v. Gallaudet University,*
    36 F. Supp. 3d 145 (D.D.C. 2014) ........................................................................44

*McKenna v. Weinberger,*
    729 F.2d 783 (D.C. Cir. 1984) .........................................................................24, 25

*Nevada Department of Human Resources v. Hibbs,*
    538 U.S. 721 (2003) .....................................................................................2, 3, 7

*Passer v. American Chemical Society,*
    935 F.2d 322 (D.C. Cir. 1991) ..............................................................................39

*Ponce v. Billington,*
    679 F.3d 840 (D.C. Cir. 2012) ..............................................................................13

*Quick v. EduCap, Inc.,*
    2019 WL 95566 (D.D.C. 2019) ...............................................................................1

*Rafferty v. Nynex Corp.,*
    60 F.3d 844 (D.C. Cir. 1995) ...................................................................................2

*Reeves v. Sanderson Plumbing Products, Inc.,*
    530 U.S. 133 (2000)..........................................................................................25, 31

*Savignac v. Jones Day,*
    486 F. Supp. 3d 14 (D.D.C. 2020) ..................................................3, 4, 10, 11, 12, 31, 39

*Schafer v. Board of Public Education,*
    903 F.2d 243 (3d Cir. 1990).....................................................................................2

*Staub v. Proctor Hospital,*
    562 U.S. 411 (2011).................................................................................................34

*Thompson v. North American Stainless, LP,*
    562 U.S. 170 (2011).................................................................................................39

*University of Texas Southwestern Medical Center v. Nassar*,
    570 U.S. 338 (2013) ...........................................................................................13

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
    715 A.2d 873 (D.C. 1998) ...........................................................................44, 45

**Statutes and rules**

42 U.S.C. § 2000e-2 ..............................................................................................13

D.C. Code § 2-1402.62 ....................................................................................43, 44

Federal Rule of Civil Procedure 11 ....................................................................1, 10

## PLAINTIFFS' RULE 11 BRIEF

Sanctions is "an extreme punishment." *Hedgeye Risk Management, LLC v. Heldman*, 412 F. Supp. 3d 15, 23 (D.D.C. 2019).  The test "is an objective one that asks whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim." *Id.* at 34.  Where, as here, a sanctions motion "relies upon and repeats the arguments set out in [a] motion for summary judgment," "the sanctions motion clearly fails as to those claims" on which the Court denies summary judgment.  *Id.* at 33; *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (same).  Rule 11 motions should not be used "to emphasize the merits of a party's position, to exact an unjust settlement, [or] to intimidate an adversary into withdrawing contentions that are fairly debatable." *Id.*  And "Rule 11 is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Quick v. EduCap, Inc.*, 2019 WL 95566, at *2 (D.D.C. 2019) (quotation marks omitted).

Jones Day's bid for sanctions is not simply meritless—it is "objectively unreasonable, and thus sanctionable, under Rule 11." Dkt. 188 at 8.  There is no legal or factual basis for Defendants' frivolous assertion that Plaintiffs have violated Rule 11.  And Defendants' motion and demand for attorney fees are calculated to harass the pro se plaintiffs in this case and intimidate others who may have claims against Jones Day.  While Plaintiffs have refrained from burdening the Court with Rule 11 motions in the past despite grounds for them, Jones Day is now forcing the Court and Plaintiffs to address Rule 11 sanctions, and Plaintiffs feel they have no choice but to take action to stop Jones Day's frivolous attempt to force an end to this case by resort to inappropriate economic intimidation. *Cf. Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740-41 (1983).  The Court should impose sanctions sufficient to deter further frivolous Rule 11 motions seeking exorbitant fees from pro se civil rights plaintiffs. *See* Fed. R. Civ. P. 11(c)(4).

I.      **The challenge to Jones Day's leave policy clearly is not sanctionable.**

In its motion to dismiss, Jones Day argued that "the Court need not go so far as to deem [Plaintiffs'] challenge 'frivolous' in the sanctionable sense," because "Rule 11 protects arguments 'for the extension, modification or reversal of existing law'" and "[t]hat is evidently what Plaintiffs are trying to effectuate."  Dkt. 15 at 26-27 (quoting *Rafferty v. Nynex Corp.*, 60 F.3d 844, 852 (D.C. Cir. 1995)).  Given that Jones Day admitted at the pleading stage that Plaintiffs' challenge was *not* sanctionably frivolous, it would need some extraordinary developments to make its bid for sanctions reasonable.  But all developments since the pleading stage have favored Plaintiffs.

When Plaintiffs raised their concerns about Jones Day's policy—which gives eight extra weeks of leave to all mothers without regard for disability—the firm responded that its policy is lawful because materially identical policies had been upheld by the Supreme Court in *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987), and the Eighth Circuit in *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005), and blessed by the EEOC.  PSF ¶ 211.  Plaintiffs responded that the citations did not support the policy.  PSF ¶ 212.  After Plaintiffs filed suit, Jones Day moved to dismiss, invoking the three authorities just mentioned and cases that speak of a four-to-eight-week disability period after childbirth.  Dkt. 15 at 16-23.  Plaintiffs responded that the authorities actually supported their claim, and that the Third Circuit has followed *Guerra* in holding that a leave policy for mothers "contravenes Title VII and is thus per se void for any leave granted beyond the period of actual physical disability."  *Schafer v. Board of Public Education*, 903 F.2d 243, 248 (3d Cir. 1990); *see* Dkt. 18 at 7-27.

In particular, the Supreme Court has made clear that the law prohibits employers from "granting more family-leave time to women than to men" upon the arrival of a new child.  *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 739 n.12 (2003).  The Court has upheld disability leave for new mothers so long as it is "narrowly drawn to cover only the period of *actual*

*physical disability*" while emphasizing that the law prohibits "special treatment of pregnant workers based on … generalizations about their needs and abilities." *Guerra*, 479 U.S. at 285 n.17, 290 (emphasis in original).  Jones Day's policy deeming every woman disabled for at least eight weeks after giving birth, and giving her eight weeks of paid leave on that basis, is inarguably "special treatment of pregnant workers based on … generalizations about their needs and abilities." The Court has also affirmed that even "true" sex-based generalizations are off-limits to employer. *See, e.g.*, *City of Los Angeles v. Manhart*, 435 U.S. 702, 704, 707-08 (1978).  And it has made clear that eight weeks of "disability" leave for all women is not a "true" generalization in any event.  *See Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 649 n.15 (1974) ("patient may return to 'full activity or employment' if course of progress up to fourth or fifth week [postpartum] is normal" (quoting Handbook of Obstetrics & Gynecology)).

After considering the authorities, this Court held that "Plaintiffs have stated a claim." *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020).  The Court reasoned that "the central question raised by Plaintiffs' claim" was whether "some portion of the [eight-week] leave [is] untethered to actual disabilities."  *Id.* at 36.  And, "[w]ithout providing the parties with some opportunity for discovery and to offer evidentiary submissions, the Court [could not] determine whether the policy was adopted and operates, in whole or in part, as a substitute for an extended period of parental leave for birth mothers."  *Id.*  Acknowledging that the Supreme Court has referred to "the typical 4- to 8-week period of physical disability due to pregnancy and childbirth" (*Hibbs*, 538 U.S. at 731), the Court reasoned that "four weeks is very different than eight weeks, and substantial ground for difference of opinion may exist about whether many (or most) of the associates who benefit from Jones Day's maternal disability policy are, in fact, disabled for the entire eight-week period."  486 F. Supp. 3d at 36.

The Court also acknowledged that Mark "did not suffer from a disability" (and did not claim to). *Id.* at 37. Rather, "[l]ike the plaintiffs in *Johnson* and *Schafer*, Savignac alleges that the policies discriminate against him as a new father, who sought the same amount of paid leave provided to *all* new mothers, regardless of whether they are *actually* disabled. ... [Plaintiffs'] claim alleges that at least a portion of the eight weeks of presumptive disability leave afforded to new mothers is not disability leave at all." *Id.* (emphases in original; citations omitted).

Finally, having discussed the parties' citations at length (*see id.* at 32-37), the Court held that, even assuming that Mark's "status as an attorney requires application of a more demanding reasonableness standard [to his retaliation claim], Defendants have yet to show that his belief was unreasonable. Among other things, Defendants have not shown that the text of Title VII, the FLSA, or the DCHRA or any precedent (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's leave policy was unlawful." *Id.* at 39.

Discovery addressed the decisions behind the policy and the medical profession's views.

As for the decisions behind the policy, Jones Day's former Human Resources Director, Julie Dressing, says that, until 1994, the firm gave new mothers a 12-week block of leave to recover from childbirth and care for the baby, without distinguishing the two purposes, and did not give fathers *any* parental leave. PSF ¶¶ 2-7. It is beyond dispute that this policy was rooted in traditional gender roles and that it has been illegal for an employer to impose such stereotypes on workers since at least the Equal Pay Act of 1963 and Civil Rights Act of 1964.

In 1994, Dressing determined that the new Family and Medical Leave Act of 1993 (FMLA) required the firm to provide caretaking leave to men and women on an equal basis, contrary to its longstanding policy. PSF ¶ 8; Sheketoff Ex. 1 at JD_00003291; Dressing Decl. ¶¶ 7-10, 13; JDSF ¶ 39. She recommended that women continue to receive the same 12 weeks and that fathers' leave

be determined by dividing the 12-week block for women into a portion that would be deemed disability leave (and given to women only) and a portion that would be deemed caretaking leave (and thus offered to men as well).  PSF ¶¶ 8-37; JDSF ¶ 40.  Her experience was that doctors asked to certify disability typically certify six weeks following an uncomplicated vaginal birth, that this period is only "occasionally" extended, and that doctors typically certify eight weeks of disability following an uncomplicated Caesarean section.  PSF ¶ 35.  An uncomplicated vaginal birth is the most typical type of birth; C-sections now account for about a third of births.  PSF ¶¶ 162-65.  Nonetheless, in deciding what part of mothers' leave should be deemed disability leave *for the purpose of setting the leave period for men*, Dressing decided to deem *all* mothers disabled for the full eight weeks.  PSF ¶¶ 8-37.

By choosing this top-end disability period, Jones Day was able to set a concomitantly minimal caretaking period to be offered to fathers.  PSF ¶¶ 26-37.  Dressing states that she recommended deeming all women disabled for eight weeks because it would have required more paperwork to distinguish between types of births and some mothers may have been resistant to disclosing the type of birth to the firm's HR department or plan administrator.  Again, however, her sworn statement is that the purpose of the whole exercise was to decide how much leave to give to *fathers*, where deeming a longer portion of mothers' 12 weeks "disability" leave would result in a concomitantly shorter four-week period of caretaking leave for fathers.  PSF ¶¶ 26-37.

The firm then revised its leave policies for new parents in 2014, with the changes taking effect in January 2015.  PSF ¶¶ 42-85.  The revised policy was developed by a group of top Jones Day managers, who came up with the proposed revisions and drafted a memo to convey the proposals to Brogan, who approved them.  PSF ¶¶ 47-74.  The revisions left birth fathers' leave unchanged at four weeks while increasing paid leave to 18 weeks for birth mothers and for adoptive

parents who acted as primary caregivers. PSF ¶¶ 47-80. Adoptive secondary caregivers, by contrast, received four weeks of leave. PSF ¶ 77. In other words, the revised policy treated birth mothers and adoptive primary caregivers alike—even though eight of the weeks for birth mothers are supposedly "disability" leave and adoptive parents are not disabled—and treated birth fathers identically to adoptive secondary caregivers.

One of the managers "question[ed] whether it makes sense to go to the full 18 paid weeks leave for adoption" because, "[a]rguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth," which "doesn't happen with adoption." PSF ¶ 59. But the managers ultimately decided that birth mothers and adoptive primary caregivers should be treated the same. PSF ¶¶ 60-69. One explained: "The rationale for the 18 weeks for adoption to mirror the same time as births was based on the primary caregivers role in bringing the child into the family." PSF ¶ 60. In other words, Jones Day deems a birth mother to be the primary caregiver in the family (and the birth father to be secondary), and that understanding is fundamental to its leave policies. Another manager participating in the decision, ███████████████████████ ██████ agreed that the rationale is to give birth mothers ample caregiving leave: "personally, I was very much out and about within days after having babies. I know that may not be the 'norm,' but the point is that I still very much appreciated the extended period at home to acclimate and adjust to our new life." PSF ¶ 61. And the managers' memo to Brogan to obtain his approval of the revisions pointed to the firm's belief in the equivalence of mothers with primary caregivers and fathers with secondary, which was the explicit rationale for the 18-week adoptive primary caregiver leave: "We recommend bringing our paid adoption leave policy in line with our maternity and paternity leave policies (18 weeks paid and 6 weeks unpaid leave for primary caregivers and 4 weeks paid leave for secondary caregivers)." PSF ¶¶ 66-69.

Any competent attorney would have instantly recognized as of 2015 that the firm's preferred policy—18 weeks of leave for birth mothers (with eight deemed "disability" leave and the other 10 admitted to be family leave) and just four weeks for birth fathers—was a blatant violation of Title VII and other laws prohibiting sex discrimination in employment.  Indeed, the whole Supreme Court made that observation in the 2003 *Hibbs* decision rejecting Jones Day's challenge to the FMLA, where both Chief Justice Rehnquist's majority opinion and the principal dissent acknowledged that "granting more family-leave time to women than to men … would 'run afoul of the Equal Protection Clause or Title VII.'"  538 U.S. at 739 n.12; *see also id.* at 756 (Kennedy, J., dissenting).  Yet Jones Day's leadership moved the firm to that glaringly illegal policy in 2015.  It wanted to give 18 weeks to all primary caretakers (i.e., women) regardless of disability, even if they did not give birth at all, while keeping secondary caretakers (i.e., fathers) at a much lower level.  It was only after an associate who had discussed with Julia pointed out the obvious illegality that the firm partially backed off by allowing fathers to seek the "primary caretaker" *label*—but even then they only got 10 weeks, not the full 18 that Jones Day leadership gives, regardless of disability, to all those it views as *true* primary caregivers.  PSF ¶¶ 86-102.

As for the medical profession's views, both sides retained obstetricians as expert witnesses. And both doctors agreed that physicians who are asked to certify disability typically certify six weeks for uncomplicated vaginal births and eight for uncomplicated C-sections.  PSF ¶¶ 153. Again, this was also the experience of Jones Day's HR Director (PSF ¶ 35), and it makes sense of the statements in court cases that the typical postpartum disability period is "four-to-eight" weeks. Moreover, while doctors will certify six weeks of disability if asked to provide a certification, they do not generally advise women that they are physically disabled from or should avoid office work or reading or computer use for six weeks or eight weeks or any particular time period after birth.

PSF ¶ 159-61.  Thus, while everyone agrees that certain medical advice is routinely given to new mothers concerning their course of recovery (e.g., to abstain from intercourse for a specified period), the medical profession does not generally inform women who have uncomplicated births that they have *any* disability from working or that they should avoid working for any particular time period.  *Id.*  Plaintiffs' expert explained that doctors do not routinely provide any such advice—instead trusting women themselves to decide when they are able to resume work and other physical activities—and Julia herself has given birth at two well-regarded hospitals in two major cities (George Washington University Hospital and Northwestern University Hospital) and attended the typical appointments before and after giving birth without any medical professional ever suggesting to her that she should not work for any particular time period after giving birth. *Id.*  Plaintiffs' expert also stated that there is no medical basis to deem every woman who gives birth disabled for eight weeks.  PSF ¶¶ 166-68.  Jones Day's own expert also conceded that, though she claims to prefer to women to have more time off, an eight-week leave is not necessary for a typical birth: "I have never said that I—that vaginal delivery needs more than six weeks."  Chase Ex. 89 (Colie) at 315:1-3.  Indeed, nearly half of women in fact return to work within six weeks after giving birth.  PSF ¶¶ 182-83; *see also* Chase Ex. 89 (Colie) at 81:21-82:5 (acknowledging that most women are able to return to work within six weeks if they want to).

In short, this Court has already reviewed Jones Day's legal authorities and determined that none of those authorities (much less any binding authority) unambiguously forecloses Plaintiffs' claim.  Jones Day does not contend that it has uncovered a more on-point authority since the Court made that statement in 2020.  And discovery has shown that Jones Day's leave policy is firmly rooted in the firm's preference for traditional gender roles and that its eight-week "disability" leave for all new mothers is 33% longer than anything that the medical profession even arguably supports

for the most typical type of birth.  As Plaintiffs explain in related briefing, the Court should grant summary judgment *for Plaintiffs*.  How, under these circumstances, can Jones Day represent to the Court that Plaintiffs' claim is not just meritless but *sanctionably frivolous*?

Jones Day offers less than two pages of argument, in which it never addresses the legal authorities or even cites any law besides a few cases on the Rule 11 standard.  *See* Dkt. 188 at 8-10.  Its main argument is that "[b]oth sides' medical experts agree that six-to-eight weeks of postpartum disability is routine" and that even Plaintiffs' expert "opine[d] that Jones Day's assumed disability period is medically reasonable."  *Id.* at 8-9.  Even if the eight weeks *were* a medically reasonable sex-based generalization, it would not follow that an *employer* could lawfully impose that generalization on its workers—much less that a challenge to an employer's imposition of that generalization would be *frivolous*.  *See, e.g.*, *Guerra*, 479 U.S. at 290 (law prohibits "special treatment of pregnant workers based on … generalizations about their needs and abilities"); *Manhart*, 435 U.S. at 707 (employer could not base pension contributions on "a generalization that the parties accept as unquestionably true: Women, as a class, do live longer than men").

Anyway, Jones Day is being disingenuous.  Plaintiffs' expert opined that Jones Day's eight-week disability period is *not* medically reasonable for the most typical type of birth.  PSF ¶¶ 166-67; *see also* PSF ¶¶ 168.  And the experts' agreement is that physicians typically certify six weeks for vaginal births and eight for C-sections, not an undifferentiated "six-to-eight week" period as Jones Day seeks to pretend away when it says that "six-to-eight weeks of postpartum disability is routine."  PSF ¶¶ 153-55.

Jones Day adds that "the administrator for [its] short-term disability plan, Unum, confirms that an eight-week post-partum disability assumption is a standard practice based on sound medical standards."  Dkt. 188 at 9.  Jones Day chose not to serve the Unum declaration it relies on here

until after it filed its sanctions motion.  Rule 11 gives litigants a 21-day "safe harbor" to decide whether to withdraw a challenged claim before the sanctions motion can be filed (*see* Fed. R. Civ. P. 11(c)(2)), so evidence that was withheld from the non-moving party until after the sanctions motion was filed plainly is not a legitimate basis for sanctions.  And Jones Day has not even purported to present the Unum representative who signed the declaration as an expert witness (he is not a medical expert), so he cannot opine on what "sound medical standards" are.  What other businesses do is simply irrelevant; there is no "everyone is doing it" defense to a Title VII claim (if there were, many of the most significant civil rights cases would have come out differently).  In any event, the Unum declaration wholly misrepresents the facts.  PSF ¶¶ 194-204.

Jones Day goes on to argue that Plaintiffs should be sanctioned because "their theory rests on a fundamental misstatement of Jones Day's policy, both as written and as conclusively established by the testimony of Jones Day's Director of Human Resources and Counsel, who explained that if a birthmother reported she had fully recovered before eight weeks, the mother's disability leave would end at that time, and her family leave would begin."  Dkt. 188 at 9.  The argument is frivolous.  As for the firm's "policy … as written," the Court addressed Jones Day's contrived reading of its written policy at the pleading stage and held that "the language of the disability policy upon which [Defendants] hang their hat is subject to different interpretations, which the Court cannot resolve on the pleadings."  *Savignac*, 486 F. Supp. 3d at 36.  Now that discovery has proved that Plaintiffs were right all along—Jones Day in fact gives all mothers eight extra weeks without regard for disability (PSF ¶¶ 111-48)—the firm repeats the textual argument that the Court rejected in 2020.  That losing argument is obviously no basis for sanctions.

As for McClure's "testimony," Jones Day chose not to serve the declaration it points to until after it filed its sanctions motion.  Anyway, it mischaracterizes McClure's declaration—she

never says that a new mother's eight weeks of disability leave would end if she (gratuitously) "reported" that she had recovered sooner. She just makes the general point that if an employee takes disability leave while he is admittedly not disabled, then she would advise that he should not be allowed to do so. Everyone agrees that this is Jones Day's general rule. Plaintiffs' point is that the rule is different for the fixed eight-week leave given to all mothers regardless of disability; and McClure's declaration simply does not address that (as Jones Day implicitly admits by recharacterizing her declaration to fit its argument). Finally, even assuming that McClure *would* end the "disability" leave of a new mother who chose to report to Jones Day that she had recovered in under eight weeks, a woman who recovers sooner is under no obligation either to report the fact to Jones Day or to come back to work or to transition to her family leave time. PSF ¶¶ 114-18. Given that Jones Day permits every new mother to take eight weeks of "disability" leave regardless of whether she is actually disabled, it is beside the point how McClure would react if a woman did, for some inexplicable reason, call in to tell Jones Day that she was all better and did not need all eight weeks. It is undisputed that no woman has ever called in to say that, and that practically all women take all eight weeks, even though women generally are not disabled for eight weeks after a normal birth. PSF ¶¶ 119, 151.

Jones Day also seeks to deceive regarding Plaintiffs' consistency in their position. It says that Plaintiffs "retreat[] to an alternative theory that Jones Day's disability leave policy 'is illegally discriminatory as a matter of law' because it 'is not dependent upon whether women are actually disabled.'" Dkt. 188 at 9. There is no "retreat." Julia stated in Plaintiffs' very first communication on this issue that "[e]ight of the weeks for women are labeled as disability leave, *but the leave is not dependent upon whether women are actually disabled*." PSF ¶ 207 (emphasis added). The Court recognized this in its 2020 ruling: "Savignac alleges that the policies discriminate against

him as a new father, who sought the same amount of paid leave provided to *all* new mothers, regardless of whether they are *actually* disabled." 486 F. Supp. 3d at 37 (emphases in original). Plaintiffs have been consistent, while Jones Day's position a moving target.

Finally, Jones Day says that "Plaintiffs themselves concede that all birthmothers suffer from some period of disability, and thus they have no basis to allege that the *entire* eight weeks is a sham (which was the predicate for Savignac's extortionate demand)." Dkt. 188 at 9. Plaintiffs do not "concede" that "all" birthmothers are disabled—and certainly not long enough to qualify for Jones Day's short-term disability leave. PSF ¶ 120. They would have no basis whatsoever to make such a blanket assertion about the abilities of "all women." Nor is the settlement that Plaintiffs proposed to Jones Day to resolve their challenge to the leave policy relevant to the underlying claim that the policy is unlawful—which is the claim on which Jones Day seeks sanctions. And while Jones Day seeks to sow confusion about (and place undue weight on) the word "sham," Plaintiffs' point has always been clear and remains true: "The policy labels the extra eight weeks 'disability leave,' but the label is a sham: Jones Day gives the extra eight weeks to all mothers regardless of disability, simply because they are mothers rather than fathers." Dkt. 18 at 7; *see also Savignac*, 486 F. Supp. 3d at 32 (describing Plaintiffs' point that "[t]he 'disability leave label' … is a 'sham,' which '*deems* all new mothers disabled from office work for eight weeks, even though many are not'" (quoting Plaintiffs' brief)); "sham," dictionary.com ("something that is not what it purports to be").

## II. Julia's pay discrimination claim clearly is not sanctionable.

Unlike most BigLaw firms, Jones Day does not pay associates in lockstep but, rather, sets pay through a black-box system that purportedly compensates each associate in proportion to his or her contribution to the firm and its clients. PSF ¶¶ 481, 684-90; JDSF ¶¶ 182-90. Through its

black-box system, Jones Day made clear that it viewed Julia as an excellent associate.  PSF ¶¶ 481-84.  From her high starting salary of $300,000 when she joined the firm four years out of law school in 2014, Jones Day gave her extremely large merit-based yearly raises in three of her four years.  PSF ¶¶ 472-75.  It increased her pay by $60,000 in 2015 and another $65,000 in 2016 (i.e., based on her work in calendar year 2015), at which point her $425,000 salary was, along with a handful of peers, higher than the pay that Jones Day set for all of the dozens of other associates in the Class of 2010.  PSF ¶¶ 472-73, 483.  In 2017, however, Julia's raise was $15,000—far below the trend of her other years.  PSF ¶ 474.  Finally, she received an $85,000 raise in 2018, putting her salary at $525,000 when she left the firm to become a public defender.  PSF ¶ 475.

Julia's pay claim focuses on the aberrant raise she received in 2017 (for her work in 2016).  In Counts IV-VI, Julia claims that her pay from July 2017 through her departure from Jones Day in August 2018 was lower than it otherwise would have been at least partly because of a negative evaluation from a male partner who was admittedly annoyed at her because she did not show him the deference that he expects of women.  As Jones Day acknowledges (Dkt. 189 at 40), this claim turns on only two questions: (1) Was gender bias a motivating factor behind Partner A's evaluation of Julia?  And (2) was that evaluation a factor in her 2017 pay adjustment?  *See also* 42 U.S.C. § 2000e-2(m) (sex discrimination claims only require a showing that sex was a motivating factor in the adverse action, not that it was a but-for cause); *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 343 (2013) (same); *id.* at 348-49; *Ponce v. Billington*, 679 F.3d 840, 844-45 (D.C. Cir. 2012) (discussing motivating factor causation); Dkt. 188 at 11-12 (Jones Day acknowledging that motivating factor analysis applies to this claim).

A reasonable jury could find for Julia on both questions, so Jones Day's sanctions motion is meritless.  Indeed, the sanctions motion itself is objectively unreasonable and violates Rule 11.

A.      **Julia's work for Jones Day clients was excellent.**

While Julia's claim might appear to concern only her work on her one case with Partner A, Jones Day devotes a great deal of effort to creating the impression that Partner A's negative evaluation was consistent with the consensus of her other evaluators, suggesting that his evaluation was accurate and that it would not have made a difference in her pay in any event because it did not meaningfully alter the picture painted by others.  That impression is false; as confirmed by Jones Day's own decisions to pay her a top-of-class salary and extremely large merit-based raises for her work in every year other than 2016, Julia did excellent work for Jones Day and its clients. PSF ¶¶ 472-84.  It is true that she took on fewer projects and billed fewer hours than is typical for a BigLaw associate.  PSF ¶¶ 472-76.  But her hours do not explain why Jones Day gave her very large raises in three of her four years but a much smaller one for her 2016 performance, and Jones Day does not seriously argue that it does (in fact, her billable hours were *much higher* in 2016 than any of her other three years at Jones Day).  PSF ¶¶ 472-84.  Nor do Julia's hours suggest that her work on the projects that she did take on was of low quality.  And her evaluations from other partners refute any such notion, and also refute Jones Day's insinuation that she did good work for pro bono clients but not for paying clients like the client on the case with Partner A.

1.      Setting aside one partner who did not rate Julia and wrote that she had "[n]o basis for assessment," Julia received 11 evaluations for her 2016 work, including Partner A's. JD_JS_00001293-95.[1]  Again, Partner A wrote as follows (after describing the client and issue):

> This was a complicated issue because it required Julia to learn about ███████ and procedures to enforce judgments internationally.  It was also a fact-intensive analysis because ██████████████████████████  As one might expect, given Julia's superior academic credentials and SCOTUS clerkship, the research and learning the material presented no problems.  But her initial drafts were far more academic / pure legal

---

[1] Julia's evaluations are collected at Chase Ex. 15, the pages of which are cited here.

> analysis than helpful advice to the client.  In fact, there was little-to-no advice or
> direction to the client.  That improved in subsequent drafts, however.  My
> impression of Julia is that she is not long for firm life.  She's just not that into us.
> Almost nothing about her work on this case suggests otherwise.  She exhibits little-
> to-no initiative.  Rather, like a second year associate, she merely does what is asked
> of her.  And her availability seems to be whatever is convenient for her.  On multiple
> occasions, I asked for the next version of the memo, but she was tied up on other
> things.  Working on a weekend does not seem to be in her vocabulary.  And my
> guess would be that she did not bill 2000 hours last year.  My guess is that she will
> soon leave to become Professor Sheketoff.

JD_JS_00001293.  In short, Partner A complains that (1) Julia's first drafts of the memo had too

much "legal analysis" and too little "direction to the client"; (2) she showed "little-to-no initiative,

… like a second year associate, she merely does what is asked of her"; (3) she failed to get him

"the next version of the memo" in a timely manner "[o]n multiple occasions"; and (4) she refused

to work weekends.  *Id.*  Partner A also gratuitously speculated that Julia "is not long for firm life,"

"not that into" Jones Day," "did not bill 2000 hours last year," and "will soon leave to become

Professor Sheketoff."  *Id.*

    **2.**    Of Julia's other 10 evaluations for her 2016 work, seven are best characterized as

entirely or extremely positive (Asbill, Taylor, Hale, Nager, Fisher, Ruttenberg, Vergonis).  Aside

from one 3 from Nager, these seven rated Julia a 4 or 5 in every single category that they evaluated

her in.  (There are 15 categories for associates at Julia's level of seniority, though some evaluators

entered a 0 for certain categories, indicating that they had "no basis for assessment.)  Two who

rated their exposure to Julia the highest rated her straight 5s across the board.  Even though

evaluators are instructed to describe areas for improvement, the *only* statement by any of the seven

that could be viewed as criticism is Asbill's statement that Julia "stresses a lot when she cannot

accomplish what she thinks is the right, just resolution.  She never gives up but finds it very hard

to accept adverse results or decisions."  JD_JS_00001293.  Especially for a criminal defense

attorney like Asbill or Julia, that sounds like advertising, not criticism.

An eighth evaluator, Garrett, was entirely positive about Julia's performance on their project together but expressed regret that she declined to take on "some additional projects I would have liked to get her involved in." JD_JS_00001294. He gave her strong numerical ratings (12 4s and three 3s) and praised her initiative, including being "brave enough to ask for an oral argument, which I thought she deserved and is ready for," and advised her to keep doing "more of the same, stepping up on projects and taking on additional responsibilities." *Id.*

A ninth evaluator, Roth, noted that Julia's "work was very strong," she "developed a clever argument that succeeded in acquitting our client on the most serious charge of ███████," and "[s]he is a smart and capable lawyer with good judgment." JD_JS_00001293. His suggested areas for improvement were limited to "time management" and "written advocacy," though his point on the latter was more a criticism of federal judges than of Julia: "I think [her writing] can be further improved by focusing more on the audience: judges who are usually less sophisticated legally … This requires simplifying and dumbing things down." *Id.*[2]

The remaining evaluation, from Partner J, is admittedly lukewarm: Julia's work was "satisfactory" and "helpful," but supposedly "could have been presented with more passion, creativity, and using the facts of our client in a more persuasive fashion" rather than "going straight to the black letter conclusion of the law. … The work also could have been completed more timely and with more intensity in defending the client's interests." JD_JS_00001294. A reasonable jury could find, however, that the Partner J review was inaccurate and that Heifetz, Shumaker, and Lovitt would have given it little if any weight: He is not an appellate lawyer like Julia and most of her evaluators, he has (as ██████ noted) a reputation as "an idiot," he admittedly had the lowest

---

[2] Roth's evaluation of Mark was along the same lines: "His writing is very good, but stylistically bears some similarity to the judge for whom he clerked (Posner), meaning it is not necessarily appropriate for a less sophisticated audience." Sheketoff Ex. 48 at JD_MS_00000007.

degree of exposure to Julia, and his own excessive "passion" in litigating the case ███████████

███████████████████████████

     **3.**     Partner A's criticisms are not consistent with or supported by other evaluators' reviews of Julia's 2016 work (and, again, the raises that Jones Day paid Julia for her other years make clear that it viewed her work in those years as excellent).

     *First*, Partner A complained that Julia's initial drafts were too "academic" and focused on "pure legal analysis" rather than "helpful advice to the client." JD_JS_00001293. But other evaluators praised her writing. Taylor called her "an excellent writer" who "fram[ed] the complex issues at a high level to ensure a clear and precise presentation" and "putting together a cogent and fluidly written draft of our brief." *Id.* Garrett declared her "a very skilled writer" whose "writing is always persuasive, and needs little editing." JD_JS_00001294. Hale likewise called her "an excellent writer" who "did an outstanding job summarizing the case for the judge." *Id.* Fisher found that Julia "didn't need much guidance at all" on a Supreme Court brief: "The drafts were excellent, and Julia did a great job analyzing and talking through some tricky issues." *Id.* Far from being too academic and offering little helpful advice for the client, "[s]he also diplomatically convinced the law-professor clients that ████████████████████████." *Id.* Ruttenberg wrote that "Julia has consistently demonstrated a strong strategic sense in this case," "demonstrat[ing] excellent judgment" on "which arguments to press and which to give up." *Id.* Vergonis wrote that the argument that Julia drafted "was very well written and argued and needed virtually no editing for style or substance." JD_JS_00001295. While Roth noted that Julia should "further improve[]" her writing by "dumbing things down" for federal judges, that is not the same criticism expressed by Partner A, and Roth's one evaluation of an actual written assignment was that she "rewrote" a ████████████ and "her work was very strong." JD_JS_00001293.

*Second*, Partner A complained that Julia "exhibits little-to-no initiative. *Id.* Rather, like a second year associate, she merely does what is asked of her." No other evaluator likened Julia to a junior associate, and many found that she showed a great deal of initiative. Asbill wrote that she "takes total ownership of her projects and is dogged about pushing for what she wants with everyone opposed to her position." *Id.* His one *criticism* of her was that she is *too* committed and not passive enough: "She never gives up but finds it very hard to accept adverse results or decisions." *Id.* Roth wrote that Julia "developed a clever argument that succeeded in acquitting our client on the most serious charge." *Id.* Taylor praised Julia for "putting together a cogent and fluidly written draft." *Id.* Garrett liked that "Julia was brave enough to ask for an oral argument, which [he] thought she deserved," and recommended that she "do *more of the same*, stepping up on projects and taking on additional responsibilities, even if it feels a bit overwhelming." JD_JS_00001294 (emphasis added). Fisher wrote that Julia "brought in" the matter, "didn't need much guidance at all," "took full ownership," "handled all aspects," and "did especially well supervising [a junior] associate." *Id.* "In all," Fisher concluded, "Julia showed a strong ability to lead a small briefing team." *Id.* Ruttenberg praised Julia's "suggestions on how to proceed— which arguments to press and which to give up." *Id.*

Most significantly, Vergonis praised "the initiative" that Julia showed by questioning his revisions to her work—the very thing that drove Partner A to discriminate against her. JD_JS_00001295. Vergonis wrote that he "did shorten [her draft] for length (only because we were up against a tight page limit and *not* because of any wordiness); following my revisions, Julia took the initiative to question whether the cuts caused the legal analysis to be too truncated. Though I ultimately disagreed with her assessment on that point, I appreciated both her care to

detail and that, despite being a peripheral player on this case team, she wasn't bashful about speaking up and challenging a decision that had been made." *Id.*

*Third*, Partner A complained that Julia's "availability seems to be whatever is convenient for her" because she supposedly failed to get him "the next version of the memo" in a timely manner "[o]n multiple occasions." JD_JS_00001293. Admittedly, Roth wrote that an "area for improvement would be time management," including "adhering to guidelines." *Id.* But this was not a general criticism—other reviewers (besides Partner A and Partner J) did not echo it; they rated Julia a 4 or 5 out of 5 on time management (the column labeled "Timely"). JD_JS_00001293-95. (While Garrett said that he "got the sense that Julia is a bit protective of her time," he made clear that this sense was based on her declining to take on "additional projects I would have liked to get her involved in" rather than missing deadlines on their "couple of Ninth Circuit appeals" together; he rated her a 4 for "Timely." JD_JS_0000_1294.)

*Fourth*, Partner A wrote that "[w]orking on a weekend does not seem to be in her vocabulary." JD_JS_00001293. No one else made a comparable assertion.

Jones Day tries to create the impression that Partner A's evaluation complained that Julia sometimes worked from home and spoke to him by phone rather than being in the office and meeting in person, and that other partners had a similar criticism. But Partner A's evaluation does not say that, and nor does any other evaluation of her 2016 work. While notes purporting to summarize statements made at a meeting about the evaluations appear to indicate that Asbill said that Julia worked from home too much and that Partner A then echoed that sentiment (Sheketoff Ex. 103), the notes are hearsay and, regardless, neither partner included any such complaint in his evaluation (JD_JS_00001293). To the contrary, Asbill wrote that his "*only* concern about Julia is that she personally stresses a lot when she cannot accomplish what she thinks is the right, just

19

resolution" (emphasis added), and Partner A plainly did his best to include every negative assertion he could think of about Julia yet failed to say anything about working from home. *Id.*

4.      Apparently recognizing that Partner A's assertions about Julia's 2016 work are contrary to the overwhelming majority of other evaluators' assessments from the same year, Jones Day turns to the evaluations of her *2015* work—even though the firm gave her a $65,000 raise based on that set of evaluations that left her tied with just a few peers as the *highest-paid Jones Day associate in the Class of 2010*, out of many dozens at the same level of seniority.  Of course, if the evaluations in one year shed light on the associate's performance in an adjacent year, then Julia's evaluations for 2017 are just as probative of 2016 as her 2015 evaluations are; and everyone agrees that (to quote Jones Day's formal assessment statement based on her evaluations that year) Julia's 2017 performance "was excellent"; "her writing is very strong"; she "shows great initiative, is deeply invested in her work, and has a terrific attitude that inspires others"; "[s]he took a leadership role in multiple matters"; and she "works hard and is dependable".  JD_JS_00001289. All this, of course, is directly contrary to Partner A's assertions

Julia's 2015 work was excellent, too, as Jones Day itself conceded with the salary it chose to pay her based on that work.  PSF ¶¶ 473, 481-84.  Jones Day focuses on a single extremely negative review, from Hash Mooppan.  *See* JD_JS_00001297.  Their matter together was an appeal that Julia argued ███████████████████████████████████, exactly the type of work that Jones Day says that Julia preferred and that she chose to leave her high-paying job there to do at the Federal Public Defender's Office.  Mooppan's harsh assertions about Julia are largely false.  PSF ¶¶ 641-69.  More to the point, Jones Day plainly disregarded his evaluation, understanding him to be an unfairly harsh evaluator across the board.  PSF ¶ 646.  Indeed, Mooppan gave *no* positive evaluations for 2015.  PSF ¶ 648.  And he infamously torpedoed the

Supreme Court clerkship application of a then-summer associate who was extremely well-regarded by others at Jones Day, is now a partner there, and ultimately did receive a Supreme Court clerkship years after Mooppan's interference.   PSF ¶¶ 649-52.   Unsurprisingly, Brogan acknowledged at his deposition that he "disregarded [Mooppan's] evaluation."  PSF ¶ 646.  Nor does Julia's official assessment statement for 2015 suggest that the firm took Mooppan's harsh evaluation seriously.  Far from echoing his criticisms of her, it just says (after several sentences of praise): "Experienced difficulty on a project for one partner on a variety of fronts." JD_JS_00001296.  Jones Day's effort to resurrect Mooppan's evaluation now is unserious.

And Julia's seven other evaluations for her 2015 work just further refute Partner A's criticisms.  *See* JD_JS_00001297-99.  Asbill wrote that "Julia is exceptional. … She is very smart and articulate, writes and analyzes legal issues very well and cares deeply about the client. … Everyone was very impressed by Julia. … She constantly challenges herself and those around her and does not give up" and achieved a positive outcome for a client.  JD_JS_00001297.  Roth wrote that she "played a very effective role" and showed initiative on multiple fronts.  *Id.*  Ruttenberg praised her for doing "a terrific job on this project," including thinking "creatively and strategically about how to address challenges," obtaining amicus support for the client, and "le[a]d[ing] calls with counsel for [the] amici. … [S]he's doing very well and is on a great trajectory." JD_JS_00001298.  Garrett also praised Julia's writing and initiative: "Julia is very bright and writes very well.  I asked Julia to help with an appellate brief and she did just what an enterprising associate ought to: develop not only the ideas I have mentioned but come up with her own creative and persuasive arguments."  *Id.*  If anything, Julia was putting in too much effort: "My sense is that Julia's goal is perfection, which isn't always feasible in law practice.  Her work is very solid, and she needs to trust her instinct to properly balance quality with time constraints."  *Id.*  Krinsky

wrote: "Under significant time pressure, Julia did an absolutely stellar job," including "concise and lucid writing. … Julia performed brilliantly and I can only assume that she has a tremendous future at the [f]irm." *Id.* Hale praised Julia for "an outstanding job preparing the briefing." *Id.* And Francisco, who assigned Julia a "very small research project," wrote that "Julia's work product was good, though [the project] did not give her an opportunity to demonstrate the full range of her talent" and he noted (like Garrett in his 2016 evaluation) that he offered Julia additional work that she declined "given other ongoing matters." *Id.*

4.      Finally, the evidence refutes any inference that Julia performed poorly on matters that called for her to write a memorandum rather than a brief or other work product. She received four other evaluations for other memos across her time at Jones Day, and all were very positive.

Defendant Heifetz—the head of the Issues & Appeals group and Julia's supervisor—wrote of her 2014 work: "This memo was among Julia's first projects upon coming to the [f]irm. She did a thorough and in depth analysis, demonstrating familiarity with the legal issues and an effective and easy style of writing." JD_JS_00001300.

Discussing a memo that Julia prepared in 2015, Krinsky praised Julia's writing, timeliness, advice to the client, and initiative, writing: "Under significant time pressure, Julia did an absolutely stellar job. She produced a definitive memorandum that clearly and plainly answered the client's question. Julia demonstrated exceptional analytical ability and coupled that with concise and lucid writing." JD_JS_00001298.

After Julia worked on another memo with her in 2017, Heifetz wrote that "Julia stepped in to take over this case when another associate went out on leave. The transition was seamless and Julia provided high level thinking and writing." JD_JS_00001292. Heifetz rated Julia's partnership prospects a 4 out of 5. *Id.*

Finally, Julia worked with Ben Mizer "on a series of memos" in 2017, and he wrote:

> Julia's research into and grasp of various complex areas of law—including labor law and criminal scienter requirements—was exceptional.  She also did an excellent job drafting a memo for the client summarizing the risks.  The memo was challenging to write because we were not privy to many of the facts that were being developed, but Julia nonetheless was able to craft very helpful guidance.  And her positive attitude and constant availability to do work even when she was swamped with other matters was impressive and greatly appreciated. … Julia is an excellent attorney and will, I'm sure, only to [sic] continue to stand out as she gains even more experience.

JD_JS_00001291.  Mizer rated Julia a 5 out of 5 across the board, including for partnership potential.  *Id.*

**5.** In short, when Julia chose to leave Jones Day for public service in August 2018, she did so at the end of an extremely successful four years with the firm, in which she received very high merit-based raises for three out of four years and extremely positive evaluations from the vast majority of the partners who worked with her.  Had she chosen to remain, she would have easily made partner at the end of 2019, consistent with Jones Day's universal treatment of Supreme Court clerks who stay until they are eligible for partnership and with her average "Partnership" rating of 4.5 out of 5 for her 2017 work (the only year in which she was senior enough to be rated for "Partnership").  JD_JS_00001290-92.  Jones Day compares her only to the handful of other former Supreme Court clerks in the Class of 2010, insisting that they all outperformed her, but even assuming that is true it is irrelevant—they were the highest-paid associates out of the dozens in that class and all of them went on to make partner, so the assertion that their performance was better than Julia's would not explain why Julia's raise based on her 2016 work was ███ less than theirs.  JDSF ¶ 268.  And Julia compared favorably to others, ████████

███████████████████████████████████████

███████████████.  PSF ¶¶ 734-35.

The only dark spot in Julia's Jones Day career was 2016, and even then her only negative evaluations were from Partner A and Partner J, while Roth was overall positive and the others extremely positive.  Any suggestion that Julia in fact did less-than-excellent work—or that Jones Day in fact viewed her as anything less than an excellent lawyer before she challenged sex discrimination there in 2018—is simply false.  And far from supporting Jones Day's narrative that Partner A was simply echoing the consensus view of Julia's work and that his harsh evaluation therefore cannot have made a difference in her pay, Julia's full record, including the views of many Jones Day partners who worked with her, shows that Partner A's review was false and malicious.

### B.    Partner A's evaluation of Julia was motivated by gender bias.

1.    Jones Day stakes its bid for sanctions and for summary judgment on the notion that Julia "has *none* of the evidence plaintiffs typically cite for discriminatory animus."  Dkt. 189 at 40-41 (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 & n.3 (D.C. Cir. 2008)); *see also* Dkt. 188 at 10-11 (same).  Conspicuously absent from Jones Day's list of "the evidence plaintiffs typically cite" is evidence that the alleged discriminator *lied* about the plaintiff.  *See* Dkt. 189 at 41.  But that sort of evidence is not absent from the firm's cited case, which acknowledges that, "[a]lternatively, the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."  *Brady*, 520 F.3d at 495; *see also id.* at 496 (affirming summary judgment because the plaintiff "did not produce evidence sufficient to show that the [employer's] conclusion was dishonest or unreasonable").  It has long been established that a plaintiff may carry her "ultimate burden of proving intentional discrimination … in one of two ways.  First, a plaintiff may persuade the court that the employment decision more likely than not was motivated by a discriminatory reason.  In addition, however, this burden is also carried if the plaintiff shows that the employer's

proffered explanation is unworthy of credence." *McKenna v. Weinberger*, 729 F.2d 783, 788 (D.C. Cir. 1984) (quotation marks omitted).  Indeed, as then-Judge Kavanaugh observed in Jones Day's cited case: "Of course, discrediting an employer's asserted reason is often quite probative of discrimination."  *Brady*, 520 F.3d at 496 n.4 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).  After all, it "is frequently true, even of successful discrimination cases, [that] there is no direct evidence … of racial bias." *Burley v. National Passenger Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015).  The D.C. Circuit "do[es] not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment."  *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quotation marks omitted).  Under that rule, there is no ground for summary judgment here, much less sanctions.

Julia's claim is and always have been that, "because [she] is a woman, Partner A wrote her a disingenuous, severely negative performance evaluation for being insufficiently deferential to him."  Dkt. 1 (Compl.) ¶ 85.  A reasonable jury could find that—as Julia has always maintained— Partner A was indeed "lying about the underlying facts that formed the predicate for the employment decision."  In other words, a jury could find that Partner A's negative statements about Julia were false and he knew it.[3]

As noted above, Partner A's evaluation makes four factual assertions about her work on their case together: (1) Julia's first drafts of the memo had too much "legal analysis" and too little "direction to the client"; (2) she showed "little-to-no initiative, … like a second year associate, she merely does what is asked of her"; (3) she failed to get him "the next version of the memo" in a

---

[3] Jones Day notes that if the employer's "belief about the underlying facts" was "honestly held," then "there ordinarily is no basis to put the case to a jury."  Dkt. 189 at 42 (quoting *Allen v. Johnson*, 795 F.3d 34, 41 (D.C. Cir. 2015)).  The point here is that Partner A lied in his evaluation; his false assertions (about facts within his direct perception) were not "honestly held."

timely manner "[o]n multiple occasions"; and (4) she refused to work weekends.  *Id.*  Partner A then gratuitously speculated that Julia "is not long for firm life," "not that into" Jones Day, "did not bill 2000 hours last year," and "will soon leave to become Professor Sheketoff." JD_JS_00001293.  As explained above, these assertions are almost entirely inconsistent with the views of other partners who worked with Julia.  That is because they are false.

*First*, Partner A's evaluation asserts that Julia's "initial drafts were far more academic / pure legal analysis than helpful advice to the client.  In fact, there was little-to-no advice or direction to the client.  That improved in subsequent drafts, however."  JD_JS_00001293. Actually, the assignment that Partner A gave Julia was ██████████████████████

███████████████████████████████████████████████████

██████████████—an assignment that would appear to call for "legal analysis" and leave little room for "helpful advice."  PSF ¶ 518-19.  Regardless, the amount of "advice or direction" did not change between Julia's initial drafts and subsequent drafts.  PSF ¶¶ 520-27.  At deposition, Partner A testified that the "helpful advice" that supposedly was missing from the initial drafts was "the likelihood of success.  And that can be qualitative.  It doesn't have to be quantitative."  PSF ¶ 523. But the initial version of the memo described the "likelihood of success": ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████" PSF ¶ 524 (emphasis added).  And the final version described it like this:

███████████████████████████████████████████████████

██████████████████████████████  In other words, the first and the final version contained materially *identical* assessments of the "likelihood of success," as Partner A was forced to admit at his deposition.  PSF ¶¶ 526-27; *see also* PSF ¶¶ 528-49.  The only arguable

assessment of the likelihood of success that Partner A added to the memo between the initial and final drafts was a summary of a separate memo (addressing a different legal issue and prepared by another Jones Day office) that had not yet been written at the time of Julia's initial drafts.  PSF ¶ 533.  More to the point, before he got "annoyed" by Julia's suggested revisions, Partner A actually told Partner F that Julia had done a "great job" on the initial draft and told Julia that her initial draft was "really helpful" and that his revisions were "mostly style" edits.  PSF ¶ 534-36.

Again, as described more fully above, other evaluators for whom Julia drafted memos praised her memos as "thorough and in depth," "demonstrating familiarity with the legal issues and an effective and easy style of writing," "absolutely stellar," "definitive," providing a "clear[] and plain[] answer [to] the client's question," "concise and lucid," "brilliant," "high level," "exceptional," and "excellent."  PSF ¶¶ 550-51.

*Second*, Partner A asserted: "She's just not that into us.  Almost nothing about her work on this case suggests otherwise.  She exhibits little-to-no initiative.  Rather, like a second year associate, she merely does what is asked of her."  PSF ¶ 552.  As discussed above, this assertion is inconsistent with Julia's other evaluations, which often praise Julia's initiative (and never suggest that she was anything like a second-year associate).[4]  The assertion is also risible given

---

[4] In relevant part, Julia's other evaluations state that: "Julia … took the initiative to draft substantial portions of the brief, while lending a hand in any way she could"; "Julia was the indispensable heart of our team on this Supreme Court matter.  She had unparalleled mastery of the legal and factual issues and did an outsized share of excellent work developing our briefing strategy and writing (and re-writing) the brief"; "Julia … is passionate about her work; a hard worker; thoughtful in her analysis; wanting to improve and excel; and a very good writer.  She is extremely dependable.  She has a great attitude and inspires others as a result"; "Julia worked tirelessly to examine every angle, think through every potential issue, and exhaustively research a long list of topics"; "[Julia] is also impressively dogged and firm in her defense of the client's interests….  She certainly took ownership of the project"; "her positive attitude and constant availability to do work even when she was swamped with other matters was impressive and greatly appreciated"; "[Julia] contributed enthusiastically to business development efforts"; "[Julia] takes

that Julia's actual problem with Partner A was that she showed *too much initiative* by revising his writing, thereby upsetting him (whereas another, less insecure partner who worked with her the same year praised her for caring enough to question his revisions to her draft).  PSF ¶ 561.

The assertion that Julia showed no initiative and did only what was asked of her is also demonstrably false.  As the contemporaneous documents show, Julia reached out to Partner A without prompting on a great many occasions to check in or offer to do something that he had not asked her to do.  PSF ¶¶ 553-55.  And when Partner A broadened the assignment to include an investigation of the underlying facts, Julia led that investigation.  PSF ¶ 556.  With no substantive involvement from Partner A, she interviewed the client by email and by phone.  Partner A provided no feedback or guidance on this—and he admitted at deposition that he did not lead an investigation or interview clients in billable cases when *he* was a second-year associate.  PSF ¶¶ 557-60.  In the very email exchange that admittedly annoyed Partner A, Julia went above and beyond what was asked of her (which was just to "do a really good proof") when she suggested revisions to Partner A's changes to the memo, after also taking the initiative to reach out to Partner F for guidance on whether she should do so.  PSF ¶ 561.

*Third*, Partner A asserted that Julia's "availability seems to be whatever is convenient for her" because "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things."  PSF ¶ 565.  That too is false.  PSF ¶ 566.  As his deposition, Partner A

---

total ownership of her projects and is dogged about pushing for what she wants with everyone opposed to her position….  My only concern about Julia is that she personally stresses a lot when she cannot accomplish what she thinks is the right, just resolution.  She never gives up but finds it very hard to accept adverse results or decisions"; "I also appreciated her consistent willingness to help out with the various smaller tasks, whether interesting or frustrating, that arose along the way"; "[Julia] took full ownership and, supervising a junior associate, handled all aspects"; "[Julia] deeply cares about the client… She constantly challenges herself and those around her and does not give up"; "[m]y sense is that Julia's goal is perfection."  PSF ¶ 562-64.

testified that there were "at least three times" when he "wanted to have the next version of the memo so we could get it to the client, et cetera, and [Julia] couldn't make it happen." PSF ¶ 567. In fact, there was a single occasion when he asked for the next version but Julia had "two other filings th[at] week"—but Partner A *disavowed* this occasion as being one of the supposed "multiple occasions" when he "asked for the next version of the memo, but she was tied up with other things." PSF ¶¶ 568-70. There was not a single other occasion when Partner A asked Julia for the next version of the memo but she was tied up with other things. PSF ¶ 571. To the contrary, the contemporaneous documents show that Julia promptly turned drafts around, whereas Partner A routinely sat on drafts for days or weeks at a time. PSF ¶¶ 571-73.

At his deposition, Partner A then pivoted and claimed that another basis for the evaluation's statement about Julia's "availability seem[ing] to be whatever is convenient for her" was that there were "multiple occasions when we would just meet by phone because you were not in the office." PSF ¶ 574. But that is not what Partner A said in his review. PSF ¶ 575; *see also* PSF ¶¶ 577-82. Nor does it support the review's false statement that "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things." PSF ¶ 576.

*Fourth*, Partner A complained that Julia refuses to work during the weekend ("Working on the weekend does not seem to be in her vocabulary."). PSF ¶ 584. He apparently reiterated that complaint at a partner meeting during the salary-setting process, representing that he "struggled to get any weekend help from [Julia]." PSF ¶ 587. The complaint is simply false. PSF ¶ 585. At his deposition, he said that the basis for the complaint was that he asked Julia "specifically to work on a weekend or [said he] need[ed] something on Monday or Tuesday and the only reasonable way that would have been done was to work on a weekend," and Julia "refused to do that." PSF ¶ 586. In fact, though, there was not a single time that Partner A asked Julia to work on the weekend (or

requested something that would require weekend work) and Julia refused or said that she was unavailable, as the extensive written record reflects.  PSF ¶ 588.

To the contrary, she offered to and did work on the weekend, both with Partner A and on other matters.  PSF ¶ 589-99.  In one instance, when Partner A mentioned over the weekend that he was going to be "███████████████████████, Julia responded: "[███████████ ████████████████████!"  PSF ¶ 590.  In another instance, ████████████████ ████████████████████████.  PSF ¶ 591.  She responded that she was "███████████████████████████████████████ ████████████."  PSF ¶ 592.  Partner A declined that offer: ███████████████."  PSF ¶ 593.  In a third instance, he asked on a Friday afternoon ████████████████████ ████.  PSF ¶ 594.  She responded that she ██████████████████████ ██████████████████████████████████████████ ████████  PSF ¶ 595.  He declined again: ██████████████  PSF ¶ 596.  In a fourth instance, ██████████████████████████████████████████ ████████████████.  PSF ¶ 597.  As Partner A knew (████████████████████), Julia worked that weekend.████████████████████████████████. PSF ¶ 598.  Indeed, the record reflects that Julia worked 22 weekends in the year for which Partner A claimed that "[w]orking on the weekend does not seem to be in her vocabulary."  PSF ¶ 599.  In short, there is zero support for that falsehood, and ample evidence disproving it.

"Usually, proffering evidence from which a jury could find that [the employer's] stated reasons … were pretextual … will be enough to get a plaintiff's claim to a jury."  *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (quotation marks omitted; alterations in original).  A jury could readily find that the factual assertions in Partner A's evaluation of Julia were false.  And, given

that they were all assertions about his personal experience with her, the jury could readily find that he *knew* they were false.  *Cf. Brady*, 520 F.3d at 496 (distinguishing the situation where the employer relies on another employee's report and so the employer's belief may have been indisputably honest even if in fact it was false).  "Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."  *Reeves*, 530 U.S. at 147 (quotation marks omitted).  Because the jury could reject the proffered reasons here, summary judgment is inappropriate and Jones Day's Rule 11 motion is frivolous.

    **2.**    Other assertions in the evaluation are more subjective, but they confirm that Partner A was seeking to harm Julia's reputation and career: "My impression of Julia is that she is not long for firm life.  She's just not that into us.  Almost nothing about her work on this case suggests otherwise. … My guess is that she will soon leave to become Professor Sheketoff."  PSF ¶ 601, 616.  As the Court noted, the evaluation boils down to an insinuation that "she was overly academic and not invested in the firm, and, presumably, for those reasons the firm should not be invested in her."  *Savignac*, 486 F. Supp. 3d at 29.

    Notably, Partner A's negative commentary was gratuitous and improper.  The evaluation prompt does not call for this sort of "impression" unrelated to the associate's work on the particular project for which she is being reviewed.  PSF ¶ 602.  Rather, it calls for "a concise statement of your overall evaluation of the lawyer's *performance on the identified project*.  Also please identify performance strengths, weaknesses, unique expertise, areas needing improvement, and *anything else about the lawyer's substantive performance* you believe important to a fair and objective assessment."  *Id.* (emphases added).  Evaluators are asked to "provide an objective narrative evaluation of the lawyer's *performance on the identified project.  … These are not intended to be*

31

*'career' evaluations that comment on the lawyer generally and they are not assessments of where you think the lawyer stands or should stand overall*." *Id.* (emphases added).

Partner A admitted that he understood that conveying the "impression" that he chose to include would be harmful to Julia's career at Jones Day. PSF ¶ 603. And he has never before included in any of his reviews of other associates his impression that an associate was not long for firm life or not into the firm. PSF ¶ 604. Nor did he have credible basis for making that assertion about Julia. PSF ¶¶ 605-15; *see also* PSF ¶ 621. Partner A noted that for "former Supreme Court clerks, the pattern is most of them leave after two years." PSF ¶ 611. Yet Julia stayed for nearly four, *longer* than all but one of the six clerks from the 2013 Term. PSF ¶ 610.

**3.**     Other evidence beyond Partner A's evaluation of Julia further confirms that the false evaluation was motivated by sexism.

Partner A admittedly was "annoyed" at Julia's suggestions to his revisions, which he perceived as "rude," and scolded her about them. PSF ¶¶ 494-97, 726. As Partner F and Female Associate A confirmed, Partner A's email was hostile and inappropriate, and Female Associate A agreed with Julia's inference that sexism may have motivated the email. PSF ¶¶ 500-06. She recounted her own experience with Partner A, where she also had to revise his writing, had a male bankruptcy associate send around the revised draft, and heard no objection from Partner A. PSF ¶ 507. Partner was also surprised by Partner A's reaction to Julia's suggested revisions; he had worked with Partner A in the past and had found him to be "laid back." PSF ¶¶ 623-24.

Notably, though Partner A was admittedly upset with Julia for her insufficient deference to his writing, Partner A did not express *that* complaint in his evaluation of her. JD_JS_00001293. A reasonable jury could find that he was seeking to harm her career without drawing attention to or raising questions about the true source of his animosity.

Jones Day argues that Partner A's reviews of other associates do not suggest sexism because he is positive about women but negative about some men. But Julia's claim has never been that Partner A hates all women and loves all men. Rather, it is that he expects women (but not men) to be deferential to him and thus feels insecure working with women who have (to quote his own description of Julia) "superior academic credentials and [a] SCOTUS clerkship." *Id.*

His evaluations of other associates confirm that he views men and women differently. His evaluations of female associates frequently praise their ██████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████. PSF ¶ 634. For one woman, Partner A even offers ██████████████████████████████████████." *Id.* Though he evaluated about the same number of men and women, he mentions ████████████████████████████████████ ██████████████████████████████████. PSF ¶ 635. Even setting aside the fact that his evaluation of Julia is full of knowing falsehoods, a jury could find that Partner A has different expectations for male and female associates and was upset with Julia for what he perceived as her lack of soft skills in "rude[ly]" suggesting changes to his revisions. PSF ¶ 636.

On a separate occasion, Partner A counseled another woman who had clerked at the Supreme Court against hiring a male car service driver for her commute. After coming into her office and closing the door, Partner A said "I was just thinking, I wouldn't want you to be in a car ten hours a week with a guy. B[ecause] you know, I wouldn't want my wife to be in a car with a guy that many hours, and I don't think she would feel comfortable with it either." The female associate felt that this was a "borderline inappropriate thing to close my door and say." PSF ¶ 633.

### C.   Partner A's evaluation affected Julia's salary.

Jones Day insists that no reasonable jury could find that Partner A's evaluation was even a "motivating factor" in Julia's 2017 pay adjustment. *See* Dkt. 189 at 43-46; Dkt. 188 at 11-12. The argument is frivolous. "The relevant question … is whether the ultimate decisionmaker acted 'for reasons unrelated to the supervisor's original biased action' or report, or whether he took that action or report 'into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" *Coats v. DeVos*, 232 F. Supp. 3d 81, 90 (D.D.C. 2017) (quoting *Staub v. Proctor Hospital*, 562 U.S. 411, 421 (2011)); *see Burley*, 801 F.3d at 297. Here, it is undisputed that the purpose behind performance evaluations is to set associate pay, which, Jones Day claims, is determined each year based on an individualized assessment of the associate's contribution during the prior calendar year. JDSF ¶¶ 150, 182. Jones Day's argument is that Julia's 2017 raise was insulated from the influence of Partner A's evaluation because Brogan "*personally*" determined that adjustment without reading the evaluation. Dkt. 189 at 44; Dkt. 188 at 11. But Brogan did not read *any* evaluations that year. JDSF ¶ 262. Jones Day's argument thus suggests, absurdly, that *no* evaluation of *any* associate had any influence on the associate's pay— even though the whole point of the evaluation process is, admittedly, to determine pay adjustments, and even though (as Jones Day told the Court in *Tolton*) "compensation is *principally based*" on "performance evaluations." *Tolton* Dkt. 147 at 42 (emphasis added); *see also* PSF ¶¶ 684-690. Indeed, Jones Day *admits* that Julia's evaluations were among the factors on which her 2017 pay adjustment was based. PSF ¶ 691; *see also* PSF ¶ 692 (Jones Day admission that "the amount of [Julia's 2017 raise] was based in part on her 2016 assessment statement."); PSF ¶¶ 693-94 (Partner A's review figured prominently in Julia's assessment statement).

Jones Day's attempted sleight of hand is transparent: While Brogan did not personally read or rely on the evaluations, he relied on input from advisors who *did* rely on the evaluations. PSF ¶¶ 696-732. In particular, Brogan appointed Shumaker and Traci Lovitt to oversee the firm-wide associate evaluation-and-compensation process each year. JDSF ¶ 187. In that capacity, Shumaker and Lovitt reviewed all evaluations (including Partner A's evaluation of Julia) and attended meetings at which evaluations were discussed and "assessment statements" of the firm's view of each associate's prior-year performance were agreed upon. PSF ¶¶ 704-15. Shumaker and Lovitt then came up with compensation recommendations for each associate for Brogan's "review and approval." JDSF ¶¶ 188-189; *see also* PSF ¶¶ 700-02. For Julia's 2017 pay adjustment (based on her 2016 performance), Shumaker and Lovitt jointly recommended that Julia's pay be raised $15,000, from $425,000 to $440,000. JDSF ¶ 261; PSF ¶ 702. Brogan approved their joint recommendation without modifying it in any way, and Julia's salary was raised to $440,000 effective July 1, 2017. JDSF ¶¶ 263, 265; PSF ¶ 703. A reasonable jury could (and almost certainly would) find that Brogan set Julia's salary at $440,000 because the two partners he had appointed to oversee the process jointly recommended the exact figure. The alternative—that he ignored their recommendation (though it was one of the few data points in front of him, *see* JDSF ¶ 262) and reached precisely the same dollar amount through sheer coincidence—is utterly implausible. It is not as if Julia was obviously a "$440,000 associate"; there is no such thing, and all three Jones Day managers who made recommendations (the D.C. office partner-in-charge, Shumaker, and Lovitt) arrived at *different* figures. PSF ¶¶ 699-702. In short, Brogan picked $440,000 because the two partners he appointed to oversee the process and make recommendations to him presented it to him as their joint recommendation. PSF ¶ 703.

A jury could also find that Partner A's evaluation affected Shumaker's and Lovitt's individual salary recommendations (and the jury would only need to find that it affected *one* of their individual recommendations for it to have affected their $440,000 joint recommendation, which was simply the midpoint of their individual recommendations). PSF ¶¶ 704-15. Again, this is not a case where Partner A's evaluation was so similar to Julia's other evaluations that it would not have altered the overall picture painted by the evaluations. Shumaker has never suggested that the evaluation had no effect on his recommendation. Lovitt testified that the evaluation had no effect on her recommendation because the recommendation was based on "themes" that she drew from Julia's evaluations viewed collectively. PSF ¶ 731. This testimony is incoherent; a jury could easily discredit her testimony that his evaluation had no effect on her "themes," which were admittedly based on Julia's evaluations and thus necessarily affected by them, and discredit her testimony that she would have magically arrived at the exact same $435,000 recommendation if Partner A's evaluation had been positive or neutral. PSF ¶¶ 711-15, 731. Lovitt's testimony is also obviously false: As explained above, Julia's evaluations were generally extremely positive.

Jones Day's position is that (1) Brogan based Julia's salary solely on Heifetz' "2" rating, and was not influenced at all by the joint recommendation from Shumaker and Lovitt but reached exactly the same dollar figure by some miracle; and (2) Heifetz would have given Julia a "2" for other reasons even if Julia had never worked with Partner A. Jones Day must establish both points, and as explained above, its case on point (1) is exceedingly flimsy. So is its case on point (2). Indeed, Heifetz was charged with preparing Julia's assessment statement as well as her practice group rating, and the former pervasively shows the influence of Partner A's review. PSF ¶¶ 721-30, 694. And Jones Day admits that Julia's 2017 raise was based at least in part on that assessment statement. PSF ¶ 692. Nor does the record support the claim that Heifetz's ratings of associates

in her practice group are a principal determinant of salaries—or even that they receive any weight at all.  PSF ¶¶ 718-20.  A jury could find that the review affected Julia's pay.  PSF ¶¶ 683-735.

## III.   The employment reference claim clearly is not sanctionable.

Plaintiffs claim that Jones Day and certain managers there committed illegal retaliation for Plaintiffs' challenge to the firm's leave policy by forbidding partners from providing employment references to support Mark's search for a new job and restricting what the one partner who was permitted to provide a reference could say.  The claim clearly is not sanctionable.

**The evidence.**  The record establishes the following.  Mark was fired on January 22, 2019. On January 27, he emailed three Jones Day partners who had worked with him extensively (Ben Mizer, Karl Thompson, and Shay Dvoretzky) to ask them to "serve as a telephone reference for me and write a reference letter based on our work together."  PSF ¶ 348.  Thompson quickly agreed: "I would be very happy to serve as a reference, of course.  Just let me know how I can help."  PSF ¶ 349.  Julia asked a fourth partner who had worked extensively with Mark (Partner F) to act as a reference, and he also agreed to do so.  PSF ¶ 352.

On January 28, however, Partner F texted Julia to say:

Whoever [Mark] emailed told [Defendant] Beth [Heifetz].  And now Beth is calling everyone to "remind" us that (apparently) the [f]irm handbook prohibits employment references. … I told her I hadn't spoken to Mark (which is true) and she basically said not to answer if he calls or emails. … Please don't repeat any of this or I'll be the next one to get fired. … I just wish I hadn't been told about that policy against references because that I cannot do now.  If it's someone I know then I can still do it informally.

PSF ¶ 353.

As Jones Day itself acknowledges (*e.g.*, Dkt. 188 at 12), the firm's policy does not prohibit references; it merely gives the firm's Administrative Partner (Shumaker) authority to decide which to allow and which to forbid.  PSF ¶¶ 361-368.  Shumaker testified that he makes such determinations on a case-by-case basis, with no rules to constrain his discretion.  *Id.*  Here, he

determined that (1) only one partner, Dvoretzky, would be permitted to act as a reference for Mark; and (2) Dvoretzky would be limited to speaking on the phone and addressing only work that he personally did with Mark; he would not be allowed to put anything in writing, address the non-merit-based reason for Mark's termination, or discuss Mark's reputation within Jones Day (as shown by, for example, Mark's assessment statement and partner evaluations). PSF ¶¶ 356—360.

At his deposition, Shumaker insisted that he did not impose these restrictions because of Plaintiffs' email challenging the firm's leave policy—though he admittedly recommended that Mark be *fired* because of that email—and that he was actually trying to *help* Mark by forbidding Dvoretzky from putting anything in writing or addressing anything beyond his personal experience with Mark and by forbidding other partners from providing a reference at all.  This is not because the other partners would have been less than positive; Thompson's response strongly suggests that he would have done his best to help Mark, and Mizer's formal evaluation of Mark's 2018 work, which he submitted about a week before Mark asked him for a reference, establishes that he would have been extremely positive.  PSF ¶¶ 349, 370-380.  Rather, Shumaker insisted that, as a general rule, a job applicant is better off if he has just one reference, if nothing in support of him is put in writing, and if the one reference allowed speaks only from his personal experience.  Shumaker also disclosed that Dvoretzky had participated in Jones Day's decision the prior week to fire Mark because of his challenge to the leave policy.  PSF ¶¶ 359-360.  But he insisted that Dvoretzky's role in that retaliation had nothing to do with his selection as the sole authorized reference.

Ultimately, Dvoretzky appears to have spoken to at least two of the employers that Mark applied to, including the one that hired him and another that rejected him while telling him that Dvoretzky was "very complimentary."  As he had indicated he would, Partner F also discussed Mark with contacts at potential employers.  PSF ¶¶ 388-391.  Another Jones Day partner (then a

senior associate) also apparently spoke about Mark to the head appellate attorney at the one firm that ultimately offered Mark a job.   *Id.*   There is no evidence that Thompson or Mizer communicated about Mark with any potential employer.  PSF ¶ 370.

The elements of a retaliation claim are (1) "protected activity," (2) an "adverse action," and (3) causation.  *Savignac*, 486 F. Supp. 3d at 38.   Jones Day's sanctions motion does not dispute that Plaintiffs engaged in protected activity by challenging its leave policy in the January 2019 email for which Mark was fired.   But it appears to argue that its interference with Mark's employment references was not an "adverse action" and that the interference was not causally related to the January email.  Jones Day also contends that Heifetz' role does not make her liable. None of these arguments justifies Jones Day's abusive sanctions motion.

**Adverse action.**   "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Thompson v. North American Stainless, LP*, 562 U.S. 170, 174 (2011) (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006)).   It should be obvious that the hypothetical "reasonable worker" "well might" be dissuaded from protected activity "if she knew that her" employer would refuse to let well-connected partners who had done a lot of work with her to assist with her search for a new job.  *Id.*  And, indeed, "it is well established that efforts by an employer to scuttle a former employee's search for a new job, such as by withholding a letter of recommendation …, can constitute illegal retaliation."  *Passer v. American Chemical Society*, 935 F.2d 322, 331 (D.C. Cir. 1991); *see EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-55 (3d Cir. 1997) (finding prima facie case where employer "refused to provide a reference" and noting that asking for evidence that the retaliation harmed the plaintiff's job search "is not the proper test"); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 146 (6th Cir. 1977) ("it is

a fact of business life that employers almost invariably require prospective employees to provide the names of their previous employers as references when applying for a job").

Jones Day asserts that it is "absurd to argue that any reasonable employee in Savignac's position would have been chilled from sending the January 2019 email because the employee would have received 'only' a single positive reference to which the employee was not entitled." Dkt. 188 at 12.. This is unpersuasive on its face; it certainly is not an appropriate basis for seeking sanctions. The assertion that Mark "was not entitled" to employment references is irrelevant to the adverse action element. Most adverse actions entail taking away things to which employees are not "entitled." For example, at-will employees like Mark are not "entitled" to their jobs, but firing an at-will employee obviously is an adverse action. Nothing in *Passer* suggests that the denial of a reference is illegal retaliation only if the worker was "entitled" to the reference under the employer's policies.

And the point that Mark did receive one reference that apparently was positive says nothing about whether the denial of the *other* references that he would otherwise have also had, and the artificial limitations placed on the one that was permitted, meets the *Burlington* standard. Common sense says that it is better to have several positive references than just one, including because different people have different contacts that would make them more effective with different potential employers. Every attorney would recognize that Mizer and Thompson could have been compelling references to many key individuals at other law firms who had no connection to Dvoretzky and would thus place less weight on his reference. Jones Day itself appears to concede that it is better to have multiple strong references than one, arguing that the absence of Mizer and Thompson would not have "impacted [Mark's] candidacy" because he "already had an impressive list of references [from prior employers] that included three federal judges—including Justice

Stephen Breyer and Judge Richard Posner—former Acting Solicitor General Neal Katyal, and the General Counsel of the Board of Governors of the Federal Reserve System." Dkt. 189 at 38.

In short: Mark's illegal termination forced him to scramble for new employment to save his career. To do so, he sought references from well-connected Jones Day partners who had worked with him a great deal and would have been very positive references. Jones Day interfered with those reference requests. As a result, Mark was a materially weaker candidate for new employment than he would have been with the requested references. These facts plainly meet the *Burlington* standard. *See also Burlington*, 548 U.S. at 69 ("excluding an employee from a weekly training lunch that contributes significantly to … professional advancement might well deter a reasonable employee from complaining" and would therefore be actionable); *id.* at 71-73 (reassignment to less "prestig[ious]," "more arduous and dirtier" role is actionable; suspension without pay is actionable even after the employer voluntarily reinstated the plaintiff with backpay).

**Causation.** Jones Day previously argued that the interference with Mark's references was caused not by Plaintiffs' challenge to the firm's leave policy (which admittedly got Mark fired) but rather by Jones Day's written policy prohibiting employment references. It is clear now, though, that the written policy simply assigns the choice of whether to permit or prohibit employment references to Shumaker. PSF ¶¶ 361-368. The only question, then, is whether Shumaker's interference with Mark's references had a "causal link" to protected activity. The fact that Shumaker had recommended that Brogan fire Mark because of the January email (PSF ¶¶ 220-225) strongly suggests that he was also motivated by the email when, a week later, he interfered with Mark's attempts to find a new job. Jones Day's sole response is that Shumaker "testified that he made an exception to this policy in order to *help* Savignac find a job." Dkt. 188 at 12. A jury

could obviously discredit Shumaker's claim that he was trying to "help" Mark, whom he had just illegally fired; it is not remotely *sanctionable* for Plaintiffs to maintain their claim.

**Heifetz.**  Jones Day says that the claim is "inappropriate against Heifetz, whom discovery has revealed was not a decisionmaker."  Dkt. 188 at 13.  Its summary judgment brief says that individual liability is limited to those managers who were "personally involved" in the violation. Dkt. 189 at 39.  For instance, it points to *Hanson v. McBride*, where the court held that FLSA individual liability "logically includes all individuals who are personally involved" but Martina McBride was not individually liable for the plaintiff's firing because she was "not alleged to have had knowledge of the employee's engagement in protected activity or to have played any part in his termination."  2018 WL 10230024, at *3 (M.D. Tenn. 2018).  In the passage of *Glover v. City of North Charleston* that Jones Day cites, the court explained that "[t]he employer's consultant and plant manager were personally involved in the [allegedly retaliatory] termination" and so they "could conceivably be personally liable for violating the FLSA."  942 F. Supp. 243, 246 (D.S.C. 1996).  And *King v. Triser Salons, LLC* says that "[c]ourts have held individuals liable under the DHCRA when they were personally involved in the discriminatory conduct *or* when they aided or abetted in the discriminatory conduct of others.  Courts have permitted actions against plaintiffs' supervisors to proceed under an aiding and abetting theory when it was alleged that they knew or should have known about the discriminatory conduct and failed to stop it."  815 F. Supp. 2d 328, 331-32 (D.D.C. 2011) (citations omitted; emphasis added).  *King* goes on to say that "[t]he complaint does not allege that [the defendant] personally committed the discriminatory and

harassing acts, so the issue … is whether it states a plausible claim that [he] 'aided, abetted, invited, compelled or coerced' the discriminatory behavior." *Id.* at 332 (quoting D.C. Code § 2-1402.62).[5]

Jones Day's own chosen citations show that its sanctions motion is frivolous.  The record establishes that those cases' "personally involved" standard is satisfied.  As soon as she caught wind of Mark's reference requests on January 28, 2019, Heifetz personally took action to harm his career by "calling everyone to 'remind' us that (apparently) the [f]irm handbook prohibits employment references" and "not to answer if he calls or emails."  PSF ¶¶ 350-355, 394.  It was only as a result of her interference that Partner F—who had "never heard of that policy" and had previously agreed to be a reference for Mark—chose not to provide a formal reference for Mark. *Id.*  Likewise, Thompson (who also was unaware of the policy) had *already agreed* to help Mark until Heifetz intervened.  *Id.*  This goes beyond mere "personal involvement"—Heifetz was actively and personally acting to thwart Mark's attempt to salvage his career.  She is completely unlike Martina McBride in Jones Day's cited *Hanson* case, where there was no individual liability because she was "not alleged to have had knowledge of the employee's engagement in protected activity or to have played any part in his termination."  2018 WL 10230024, at *3.  Rather, she is like the "consultant and plant manager" in Jones Day's cited *Glover* case, who could be held liable because they "were personally involved in the [challenged] termination."  942 F. Supp. at 246. She was well aware of Plaintiffs' challenge to the firm's leave policies, having been a recipient of all of the relevant emails; she knew that Mark had been fired for the email; and she played the principal role in preventing partners from providing references that they had already agreed to

---

[5] Jones Day misrepresents *King*, asserting that an individual "can be liable *only* if 'personally involved in the discriminatory conduct'" (Dkt. 189 at 39), when in fact the quoted sentence explicitly says that individual liability *also* applies to an aider or abettor.

provide.  She also went out of her way to report the reference requests to HR Director McClure, which predictably precipitated Shumaker's involvement and his role in the interference.

Needless to say, selective enforcement of even a "real" employer policy against workers who engage in protected activity is a form of actionable retaliation.  And Heifetz would not have taken it upon herself to block Mark's reference requests if not for his protected activity.  After all, she frequently gave or authorized references for others.  PSF ¶¶ 394-401.  Jones Day admits that it has no record of her following the policy and obtaining Shumaker's permission before providing or authorizing those references.  *Id.*  Nor does Shumaker recall a single request from Heifetz.  *Id.*

Even if Heifetz is not liable under the "personally involved" standard, she is liable for aiding and abetting the retaliation.  The D.C. Human Rights Act (DCHRA) expressly prohibits aiding and abetting: "It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of [the DCHRA] or to attempt to do so."  D.C. Code § 2-1402.62.  "The aiding-and-abetting clause is meant to prohibit an individual from assisting another person in … retaliating."  *McCaskill v. Gallaudet University*, 36 F. Supp. 3d 145, 156 (D.D.C. 2014).  Jones Day's own cited case explains that "[c]ourts have permitted actions against plaintiffs' supervisors to proceed under an aiding and abetting theory when it was alleged that they knew or should have known about the discriminatory conduct and failed to stop it."  *King*, 815 F. Supp. 2d at 332.  Here, it is beyond dispute that Heifetz (who, as head of the Issues & Appeals practice, was Plaintiffs' supervisor) knew about the retaliatory reference denial and failed to stop it or even to decline to personally advance it—as shown above, she was the principal implementer of that retaliatory denial.

The leading case on DCHRA liability for law firm partners is *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873 (D.C. 1998).  The partner defendants urged that they could

not be liable because they were not the plaintiff's employer—she "was employed for compensation by Skadden, Arps, and not by the individual partners." *Id.* at 888.  The Court of Appeals disagreed: The DCHRA applies to "any person acting in the interest of such employer, directly or indirectly," which "necessarily includes a partner"—if it "does not extend to a partner in a law firm, it is difficult to conceive of any person to whom it would apply." *Id.*  The Court of Appeals then held that "if Skadden, Arps unlawfully discriminated against the plaintiff as alleged, then *the partners who carried out the allegedly discriminatory acts aided and abetted the employer's discrimination*, in violation of Section 1-2526" (which is now codified as § 2-1402.62). *Id.* (emphasis added); *see also id.* ("An aider and abettor is one who in some sort associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his action to make it succeed" (quotation marks, brackets, and ellipsis omitted)).  That language, from the authoritative court on the interpretation of the DCHRA, inarguably covers Heifetz' admitted participation in carrying out Jones Day's retaliation against Plaintiffs.  *See also Fred A. Smith Management Co. v. Cerpe*, 957 A.2d 907, 914 n.5 (D.C. 2008) ("in light of D.C. Code § 2-1402.62 … and Cremin's own actions in the capacity of executive vice president, her complicity in the charged retaliation easily presented a jury issue").  Jones Day's sanctions motion is frivolous.

## CONCLUSION

The Court should deny Jones Day's sanctions motion and sanction Jones Day for filing it.

| | |
|---|---|
| /s/ Julia Sheketoff | /s/ Mark Savignac |
| Julia Sheketoff (pro se) | Mark C. Savignac (pro se) |
| 2207 Combes Street | 2207 Combes Street |
| Urbana, IL 61801 | Urbana, IL 61801 |
| (202) 567-7195 | (217) 714-3803 |
| sheketoff@gmail.com | marksavignac@gmail.com |
| D.C. Bar No. 1030225 | D.C. Bar No. 995367 |

January 27, 2023