**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

       v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and MICHAEL
SHUMAKER,

    *Defendants*.

Case No. 1:19-cv-02443-RDM-ZMF

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION**

# TABLE OF CONTENTS

I.  Jones Day's leave offerings for new parents are unlawful (Counts I-III) ..........................1

   A.  Jones Day gives every new mother an extra eight weeks of sex-based leave ..............1

   B.  Jones Day's policy is illegal sex discrimination as a matter of law ............................5

      1.  Leave for new mothers must be limited to the period of actual disability..............5

      2.  Even if "true" generalizations were permissible, Jones Day's is not true ............10

      3.  Sexist gender roles are a motivating factor behind the leave policy.....................12

   C.  Under any view of the law, fact disputes preclude judgment for Jones Day .............17

II.  Jones Day committed illegal retaliation by firing Mark (Counts VII-IX, XI) .................17

   A.  Title VII's opposition clause....................................................................................17

   B.  Title VII's participation clause.................................................................................36

   C.  The FLSA's protection for "any complaint … under or related to" the FLSA...........48

   D.  The D.C. Human Rights Act ....................................................................................50

   E.  Jones Day's summary judgment motion fails under all circumstances......................50

III.  Julia is a proper retaliation plaintiff (Counts VII-IX)....................................................51

IV.  Brogan and Shumaker are individually liable for firing Mark (Counts VIII-IX)...........53

V.  Jones Day's interference with job references was illegal retaliation (Counts VII-IX).....54

VI.  Jones Day committed pay discrimination against Julia (Counts IV-VI) ........................57

VII.  Jones Day's press release was illegal retaliation (Counts XII-XIV)..............................60

Conclusion .................................................................................................................................65

# TABLE OF AUTHORITIES

## Cases

*Ali v. Federal Bureau of Prisons*,
    552 U.S. 214 (2008)................................................................................49

*Ardestani v. INS*,
    502 U.S. 129 (1991)................................................................................41

*Baloch v. Kempthorne*,
    550 F.3d 1191 (D.C. Cir. 2008)..............................................................55

*Barnes v. Small*,
    840 F.2d 972 (D.C. Cir. 1988).................................................................42

*Bell v. Gonzales*,
    398 F. Supp. 2d 78 (D.D.C. 2005)..........................................................41

*Berg v. La Crosse Cooler Co.*,
    612 F.2d 1041 (7th Cir. 1980).........................................................28, 47

*Borgo v. Goldin*,
    204 F.3d 251 (D.C. Cir. 2000).........................................................30, 31

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)................................................................8, 44, 60

*Bouveng v. NYG Capital LLC*,
    175 F. Supp. 3d 280 (S.D.N.Y. 2016).....................................................27

*Boyle v. United States*,
    556 U.S. 938 (2009)................................................................................49

*Brady v. Office of Sergeant at Arms*,
    520 F.3d 490 (D.C. Cir. 2008).................................................................58

*Brennan Center v. DOJ*,
    2021 WL 2711765 (D.D.C. 2021) ..........................................................34

*Broderick v. Donaldson*,
    338 F. Supp. 2d 30 (D.D.C. 2004).....................................................17, 29

*Bryant v. Aiken Regional Medical Centers Inc.*,
    333 F.3d 536 (4th Cir. 2003) ..................................................................39

*Burlington Industries, Inc. v. Ellerth*,
    524 U.S. 742 (1998)................................................................37, 38, 39, 47

*Burlington Northern & Santa Fe Railway Co. v. White*,
    548 U.S. 53 (2006) ................................................................................41, 42, 61

*Califano v. Westcott*,
    443 U.S. 76 (1979) ...........................................................................................26

\* *California Federal Savings & Loan Ass'n v. Guerra*,
    479 U.S. 272 (1987) ..............................................................5, 6, 7, 8, 10, 11

*Carson v. American Brands, Inc.*,
    450 U.S. 79 (1981) ...........................................................................................25

*Chandler v. Berlin*,
    2020 WL 5593905 (D.D.C. 2020) ...............................................................27, 35

*Chavkin v. Santaella*,
    81 A.D.2d 153 (N.Y. App. 1981) ....................................................................10

\* *City of Los Angeles v. Manhart*,
    435 U.S. 702 (1978) ...............................................................................6, 10, 11

*Clark County School District v. Breeden*,
    532 U.S. 268 (2001) ........................................................................................20

*Clark-Williams v. WMATA*,
    2016 WL 4186810 (D.D.C. 2016) ...................................................................64

*Cleveland Board of Education v. LaFleur*,
    414 U.S. 632 (1974) ..........................................................................................8

*Clover v. Total System Services, Inc.*,
    176 F.3d 1346 (11th Cir. 1999) .................................................................42, 43

*Cooke v. Rosenker*,
    601 F. Supp. 2d 64 (D.D.C. 2009) ..................................................................49

*Costa v. Desert Palace, Inc.*,
    299 F.3d 838 (9th Cir. 2002) ..........................................................................39

\* *Crawford v. Metropolitan Government of Nashville*,
    555 U.S. 271 (2009) .............................................................................28, 31, 37

*Dea v. Washington Suburban Sanitary Comm'n*,
    11 F. App'x 352 (4th Cir. 2001) .....................................................................24

*EEOC v. Crown Zellerbach Corp.*,
    720 F.2d 1008 (9th Cir. 1983) ...................................................................30, 35

*EEOC v. Total System Services, Inc.*,
  240 F.3d 899 (11th Cir. 2001) .................................................................37

\* *Egei v. Johnson*,
  192 F. Supp. 3d 81 (D.D.C. 2016) ...................................................26, 33, 36

*Estenos v. PAHO/WHO Federal Credit Union*,
  952 A.2d 878 (D.C. 2008) .......................................................................50

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ...................................................................37, 38, 39, 47

*FedEx Corp. v. Holowecki*,
  552 U.S. 389 (2008) ..............................................................................37

*Fowler v. District of Columbia*,
  404 F. Supp. 2d 206 (D.D.C. 2005) ..........................................................20

*Franks v. Edison Electric Institute*,
  2022 WL 971157 (D.D.C. 2022) .........................................................17, 29

*Fred A. Smith Management Co. v. Cerpe*,
  957 A.2d 907 (D.C. 2008) .......................................................................57

*General Electric Co. v. Gilbert*,
  429 U.S. 125 (1976) ................................................................................8

*George v. Leavitt*,
  407 F.3d 405 (D.C. Cir. 2005) ................................................................20

*G-I Holdings, Inc. v. Baron & Budd*,
  179 F. Supp. 2d 233 (S.D.N.Y. 2001) .......................................................27

*Gillette Foods Inc. v. Bayernwald-Fruchteverwertung, GmbH*,
  977 F.2d 809 (3d Cir. 1992) ....................................................................23

*Glover v. City of North Charleston*,
  942 F. Supp. 243 (D.S.C. 1996) ..............................................................56

*Glover v. S.C. Law Enforcement Division*,
  170 F.3d 411 (4th Cir. 1999) ..................................................................36

*Gogel v. Kia Motors*,
  967 F.3d 1121 (11th Cir. 2020) ...............................................................29

*Gonzalez v. Bolger*,
  486 F. Supp. 595 (D.D.C. 1980) .........................................................23, 41

*Greathouse v. JHS Security Inc.*,
  784 F.3d 105 (2d Cir. 2015)................................................................43, 48

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982)...........................................................................4

*Hajjar-Nehad v. George Washington University*,
  873 F. Supp. 2d 1 (D.D.C. 2012) .....................................................35

*Hamilton v. Geithner*,
  666 F.3d 1344 (D.C. Cir. 2012) ........................................................58

*Hanson v. McBride*,
  2018 WL 10230024 (M.D. Tenn. 2018) ............................................55

*Hashimoto v. Dalton*,
  118 F.3d 671 (9th Cir. 1997) ............................................................41

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982).....................................................................22, 23

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984)............................................................................63

*Hochstadt v. Worcester Foundation for Experimental Biology*,
  545 F.2d 222 (1st Cir. 1976)........................................................30, 36

*Howard R.L. Cook & Tommy Shaw Foundation v. Billington*,
  737 F.3d 767 (D.C. Cir. 2013).....................................................52, 53

*Jackson v. Genesee County Road Comm'n*,
  999 F.3d 333 (6th Cir. 2021) ............................................................35

*Jeffries v. Wal-Mart Stores, Inc.*,
  15 F. App'x 252 (6th Cir. 2001) .......................................................39

*Johnson v. University of Cincinnati*,
  215 F.3d 561 (6th Cir. 2000) ............................................................36

* *Johnson v. University of Iowa*,
  431 F.3d 325 (8th Cir. 2005) .......................................................6, 7, 8

*Johnson Controls, Inc. v. United Ass'n of Journeymen & Apprentices*,
  39 F.3d 821 (7th Cir. 1994) ..............................................................23

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
  563 U.S. 1 (2011).............................................................................46

*King v. Jackson*,
  487 F.3d 970 (D.C. Cir. 2007) .................................................................18, 20

*King v. Triser Salons, LLC*,
  815 F. Supp. 2d 328 (D.D.C. 2011) ...............................................................56

*Knussman v. Maryland*,
  272 F.3d 625 (4th Cir. 2001) .........................................................................6

*Kolstad v. American Dental Association*,
  527 U.S. 526 (1999)...........................................................................38, 39, 47

*Kurtz v. McHugh*,
  423 F. App'x 572 (6th Cir. 2011) ..................................................................41

*Littlejohn v. City of New York*,
  795 F.3d 297 (2d Cir. 2015)....................................................................28, 35

*Match-E-Be-Nash-She-Wish Band v. Patchak*,
  567 U.S. 209 (2012)......................................................................................52

*Mattera v. JPMorgan Chase Corp.*,
  740 F. Supp. 2d 561 (S.D.N.Y. 2010)............................................................17

*McCaskill v. Gallaudet University*,
  36 F. Supp. 3d 145 (D.D.C. 2014) .................................................................56

*McGrath v. Clinton*,
  666 F.3d 1377 (D.C. Cir. 2012) .....................................................................20

*McInnis v. Fairfield Communities, Inc.*,
  458 F.3d 1129 (10th Cir. 2006) .....................................................................39

* *McKenna v. Weinberger*,
  729 F.2d 783 (D.C. Cir. 1984) ..............................................36, 37, 41, 42, 58

*McKennon v. Nashville Banner Publishing Co.*,
  513 U.S. 352 (1995)......................................................................................60

*Monteiro v. Poole Silver Co.*,
  615 F.2d 4 (1st Cir. 1980)..............................................................................20

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ...............................................................34

*Nemeroff v. Abelson*,
  620 F.2d 339 (2d Cir. 1980)...........................................................................23

*Netter v. Barnes*,
    908 F.3d 932 (4th Cir. 2018) ....................................................................36

\* *Nevada Department of Human Resources v. Hibbs*,
    538 U.S. 721 (2003)...........................................................................6, 12, 16

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983) ..................................................................................8

*NLRB v. Burnup & Sims, Inc.*,
    379 U.S. 21 (1964)...................................................................................33

*Orange v. District of Columbia*,
    59 F.3d 1267 (D.C. Cir. 1995)..................................................................29

*Parker v. Baltimore & Ohio Railroad Co.*,
    652 F.2d 1012 (D.C. Cir. 1981)...............................20, 27, 28, 36, 47, 48, 49

*Passer v. American Chemical Society*,
    935 F.2d 322 (D.C. Cir. 1991) ....................................................54, 55, 62

*Payne v. McLemore's Wholesale & Retail Stores*,
    654 F.2d 1130 (5th Cir. 1981) ..................................................................35

*Pendleton v. Rumsfeld*,
    628 F.2d 102 (D.C. Cir. 1980) .....................................................28, 29, 30, 47

*Pettway v. American Cast Iron Pipe Co.*,
    411 F.2d 998 (5th Cir. 1969) ....................................................................32

*Phillips v. Martin Marietta Corp.*,
    400 U.S. 542 (1971)...................................................................................8

*Ponce v. Billington*,
    679 F.3d 840 (D.C. Cir. 2012) ..................................................................12

*Procunier v. Navarette*,
    434 U.S. 555 (1978)..................................................................................23

*Randolph v. ADT Security Services, Inc.*,
    2011 WL 3476898 (D. Md. 2011) .......................................................49, 50

*Rangel v. Boehner*,
    785 F.3d 19 (D.C. Cir. 2015).....................................................................34

*Ray v. Ropes & Gray LLP*,
    799 F.3d 99 (1st Cir. 2015).......................................................................20

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ............................................................................58

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .........................................................45, 46, 47, 53

*Rochon v. Gonzales*,
    438 F.3d 1211 (D.C. Cir. 2006) ....................................................46, 61

*Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.*,
    399 F.3d 52 (1st Cir. 2005) ..............................................................39

*Russello v. United States*,
    464 U.S. 16 (1983) ...........................................................................41

*Sanders v. Madison Square Garden, L.P.*,
    525 F. Supp. 2d 364 (S.D.N.Y. 2007) ..............................................33

\* *Savignac v. Jones Day*,
    486 F. Supp. 3d 14 (D.D.C. 2020) ...........................1, 8, 10, 17, 18, 23

*Savignac v. Jones Day*,
    539 F. Supp. 3d 107 (D.D.C. 2021) ..................................................59

\* *Schafer v. Board of Public Education*,
    903 F.2d 243 (3d Cir. 1990) ....................................................5, 7, 8, 11

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017) ......................................................................26

*Shapiro v. Baltimore County*,
    1997 U.S. Dist. LEXIS 24686 (D. Md. 1997) ..................................10

*Sias v. City Demonstration Agency*,
    588 F.2d 692 (9th Cir. 1978) ............................................................28

*Slagle v. County of Clarion*,
    435 F.3d 262 (3d Cir. 2006) ..............................................................36

*Sloan v. American Brain Tumor Ass'n*,
    901 F.3d 891 (7th Cir. 2018) ............................................................50

*Smith v. Secretary of Navy*,
    659 F.2d 1113 (D.C. Cir. 1981) ..........................................41, 54, 55, 62

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...........................................................................63

*Sussman v. Bank of Israel*,
    56 F.3d 450 (2d Cir. 1995) ........................................................................27, 34

*Swinton v. Potomac Corp.*,
    270 F.3d 794 (9th Cir. 2001) ...........................................................................39

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
    60 F. Supp. 2d 427 (S.D.N.Y. 2009) ...............................................................29

*Thompson v. North American Stainless, LP*,
    562 U.S. 170 (2011) ...............................................................51, 52, 53, 54, 61

*Townsend v. Benjamin Enterprises, Inc.*,
    679 F.3d 41 (2d Cir. 2012) ...................................................43, 44, 46, 47

*United States v. Brunson*,
    482 F. App'x 811 (4th Cir. 2012) .....................................................................34

*University of Texas Southwestern Medical Center v. Nassar*,
    570 U.S. 338 (2013) ..........................................................................................12

*Valerio v. Putnam Associates, Inc.*,
    173 F.3d 35 (1st Cir. 1999) ..............................................................................48

*Waldron v. George Weston Bakeries Inc.*,
    570 F.3d 5 (1st Cir. 2009) ................................................................................27

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
    715 A.2d 873 (D.C. 1998) ..........................................................................53, 57

*Wengler v. Druggists Mutual Insurance Co.*,
    446 U.S. 142 (1980) ..........................................................................................11

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) .........................................................................65

*Wood v. Strickland*,
    420 U.S. 308 (1975) ..........................................................................................22

*Wrighten v. Metropolitan Hospitals, Inc.*,
    726 F.2d 1346 (9th Cir. 1984) .........................................................................35

*Wyatt v. City of Boston*,
    35 F.3d 13 (1st Cir. 1994) ................................................................................36

*Yazdian v. ConMed Endoscopic Technologies, Inc.*,
    793 F.3d 634 (6th Cir. 2015) ...........................................................................35

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018)........................................................................8, 44

*Zimmerman v. Associates First Capital Corp.*,
    251 F.3d 376 (2d Cir. 2001).............................................................................39

**Statutes, rules, and other authorities**

29 U.S.C. § 203..................................................................................................53

29 U.S.C. § 206..................................................................................................26

29 U.S.C. § 215................................................................................47, 48, 49, 50

29 U.S.C. § 216..................................................................................................53

29 U.S.C. § 2601..................................................................................................6

42 U.S.C. § 1981a..............................................................................................26

42 U.S.C. § 2000e-2...........................................................................................12

42 U.S.C. § 2000e-3...........................................................17, 20, 31, 36, 42, 45, 46

42 U.S.C. § 2000e-5......................................................................................41, 52

42 U.S.C. § 2000e-8...........................................................................................41

42 U.S.C. § 2000e-9...........................................................................................41

D.C. Code § 2-1401.02.......................................................................................53

D.C. Code § 2-1403.16.......................................................................................52

EEOC Enforcement Guidance on Pregnancy Discrimination & Related Issues .............................5

EEOC Enforcement Guidance on Retaliation & Related Issues ........................35, 36, 37

Federal Rule of Civil Procedure 72 ....................................................................20

**Statutes at issue**

D.C. Family and Medical Leave Act (DCFMLA), D.C. Code § 32-501 et seq.

D.C. Human Rights Act (DCHRA), D.C. Code § 2-1401 et seq.

Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206(d)

Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 et seq.

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

## PLAINTIFFS' SUMMARY JUDGMENT BRIEF

Plaintiffs respectfully seek judgment against Defendants for violating Title VII, the Fair Labor Standards Act (FLSA), the D.C. Human Rights Act (DCHRA), and the D.C. FMLA through their leave policy (Counts I-III) and by firing Mark (VII-IX, XI).  Their motion should be denied.[1]

## I.      Jones Day's leave offerings for new parents are unlawful (Counts I-III).

### A.      Jones Day gives every new mother an extra eight weeks of sex-based leave.

In August 2018, Julia wrote to her supervisor at Jones Day that "the firm's parental leave policy" is "discriminatory" because it "gives women 18 weeks of paid leave … while it gives men 10," where "[e]ight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of leave." JDSF ¶ 296. Jones Day says that this "misstates [the] policy" and that mothers "are eligible for paid disability leave only if they are *actually disabled*."  Dkt. 189 at 23.  Jones Day made the same argument at the pleading stage, and the Court held that "the language of the disability policy upon which [Defendants] hang their hat is subject to different interpretations, which the Court cannot resolve on the pleadings."  *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020).  It explained:

> The policy asserts that, "[u]nless the [f]irm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth (including Caesarean-section births)." … [O]ne might conclude—as Plaintiffs urge—that the ratchet turns only one way.  *All* birth mothers receive *at least* eight weeks, and they are entitled to more if "the [f]irm is notified" that the "lawyer's medical provider has certified that a longer period of "post-partum disability" exists.  The Court cannot determine which side had the better view without some factual development.

*Id.* (citations omitted; emphases in original).

---

[1] Like Jones Day (Dkt. 189 at 12), Plaintiffs lay out the facts in the Local Rule 7(h) statements— "JDSF" (including Plaintiffs' responses) and "PSF"—and incorporate them here by reference.

Discovery has confirmed beyond genuine dispute that "the ratchet turns only one way."  In fact, this very question arose at Jones Day in 1994, just after the firm moved from its prior policy giving all new mothers a 12-week block of paid maternity leave (without distinguishing between "disability" leave and "family" leave) to its current policy deeming eight of the weeks of leave for women to be "disability" leave and the rest "family" leave.  PSF ¶¶ 2-19.  Human Resources Director Julie Dressing (who recommended the eight-week rule) sent a memo to "the Female Of Counsel, Senior Attorneys and Associates" to address "a few inquiries regarding the [f]irm's new paid medical and family leave policy."  PSF ¶ 19.  She answered the inquiries as follows:

> *As under the prior policy*, lawyers who go out on maternity leave will receive twelve weeks of paid leave … The difference in the new policy is *the manner in which the leave is tracked administratively*.  The lawyer is *considered to be* on paid medical leave for the disability portion of the maternity leave.  Because most doctors certify a six to eight week period of disability in the event of an uncomplicated pregnancy and delivery, the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability for *a longer period*.  In addition …, the lawyer may take an additional four weeks of paid child care leave, bringing the total paid leave period up to *twelve weeks as set forth in the [ff]irm's prior policy*.

*Id.* (emphases added).  As the memo states explicitly, the eight-week "disability" leave is a one-way ratchet: Every woman is entitled to take at least eight weeks, regardless of whether she is actually disabled for eight weeks, and women who need a *longer* period may apply for more time. By guaranteeing that every woman would have at least eight weeks of "disability" leave, along with four of "family" leave, the firm ensured that every woman would receive at least the same 12 weeks of paid maternity leave that she would have received under the pre-1994 policy.  PSF ¶¶ 19-37.  Ensuring that all women would receive at least as much total leave under the new policy as the old one was the explicit goal, and that required providing a block of at least eight weeks of so-called "disability" leave alongside the four weeks of "family" leave.  PSF ¶ 1-37.

The other evidence of the "one-way ratchet" is overwhelming.  PSF ¶¶ 42-148.

*First*, countless Jones Day documents—starting with its written "Family Leave" policy—say that mothers get "18 weeks" of paid leave (including eight labeled "disability" leave).  PSF ¶¶ 52, 56, 65, 70, 73, 77, 104, 111-12, 130-31, 133-34.  Anyone reading these documents would understand that women are entitled to (at least) 18 weeks, including the full eight weeks of "disability" leave.  Not one document says otherwise.  *Id.*

*Second*, Jones Day advertises the policy as giving mothers 18 weeks.  PSF ¶ 130.

*Third*, the general understanding at Jones Day is that every mother will have at least 18 weeks of paid leave, regardless of whether she is disabled for eight weeks.  PSF ¶¶ 131-32

*Fourth*, consistent with that understanding, virtually all associates who give birth in fact take the full 18 weeks.  PSF ¶ 119.  HR assumes that they will all do so.  PSF ¶¶ 134-35.  That would not be true if women were "eligible for paid disability leave only if they are *actually disabled*" (Dkt. 189 at 23), since it is undisputed that many or most women are not disabled for eight weeks.  PSF ¶¶ 149-51.

*Fifth*, Jones Day's 30(b)(6) witness on "[t]he meaning, application, and operation" of its policy testified that mothers who are able to work in under eight weeks nonetheless receive eight weeks of leave due to the eight-week "assumption" of "disability."  PSF ¶ 112.  "[T]he firm would still be assuming the eight-week disability because they are unaware of anything else. And so the—the disability salary continuation would be in play."  *Id.*  And these mothers are *not* required to make the firm aware of their non-disability—nor are they required to stop taking disability leave, start taking a form of non-disability leave, or return to work.  PSF ¶¶ 113-15, 117-18.

*Sixth*, while McClure and Shumaker now say that Julia "fundamentally misstate[d]" the policy in her August 2018 email, they expressed no disagreement with Julia's understanding at the time.  PSF ¶¶ 137-43; *see also* PSF ¶ 144.  The same understanding was repeated in Plaintiffs'

complaint, yet Jones Day expressed no disagreement in either its press release or its motion to dismiss, raising its argument only in its *reply*.  PSF ¶¶ 146-48; *cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 589 (1982) (Stevens, J., dissenting) ("the dog did not bark").

*Seventh*, the 18 weeks for birth mothers are intended to "mirror" the leave for adoptive primary caregivers, who get a full 18 weeks (though they are not disabled).  PSF ¶¶ 59-69.

*Eighth*, Jones Day's own expert understood its policy as Plaintiffs do and based her expert opinion on that understanding (which Jones Day insists is wrong).  PSF ¶ 136.

Jones Day offers little response to this mountain of evidence.  It points to the words of its disability policy, but the Court has already held that the policy is ambiguous and must be read in light of the evidence—which has now confirmed the one-way ratchet view.  The *only* evidence that Jones Day offers is HR Director McClure' generic assertion that:

> Under the [f]irm's STD policy, an associate is eligible for disability leave only if the associate is disabled under the definition of disability set forth in the policy.  No one has ever advised me that an associate had taken disability leave for a period of time when the associate was not disabled.  If someone informed me [of that], my response would be that the associate was not entitled to salary continuation for the period that the associate was disabled.

McClure Decl. ¶ 13.  The statement is not specific to new mothers (though Jones Day's brief pretends that it is).  Everyone agrees that the general rule, for situations *except* the eight weeks after a birth, is that an associate is only eligible for disability leave if he is actually disabled from working at Jones Day.  Plaintiffs' point is that Jones Day has a different rule for new mothers, whom it deems disabled for at least eight weeks whether they are or not.  McClure's statement is not responsive to that.  Anyway, (1) women are not required to notify HR if they cease to be disabled in under eight weeks (PSF ¶ 114), (2) no woman has ever provided that gratuitous notification (PSF ¶ 116), and (3) McClure's testimony only pertains to that hypothetical scenario, not to the typical case where a woman recovers in under eight weeks but does not tell HR (because

she is not required or asked to do so, PSF ¶ 114; Chase Ex. 76 (Bounds 30(b)(6)) at 33:13-19). Even if McClure's hypothetical were true for mothers, it would not change the fact that the firm gives them all eight weeks of "disability" leave regardless of actual disability.

> **B.     Jones Day's policy is illegal sex discrimination as a matter of law.**

This case raises the same issue as Julia's 2018 email: May Jones Day give eight more weeks of paid leave to all mothers than to fathers, where the weeks "are labeled as disability leave but the leave is not dependent upon whether women are actually disabled" but merely on whether they are mothers?  JDSF ¶ 296.  For three independent reasons, the answer is no.

> **1.     Leave for new mothers must be limited to the period of actual disability.**

**a.**     Jones Day is subject to the laws at issue.  PSF ¶ 1.  Those laws prohibit "special treatment of pregnant workers based on … generalizations about their needs and abilities." *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 285 n.17 (1987).  Thus, leave limited to mothers is lawful only if "narrowly drawn to cover only the period of *actual physical disability*."  *Id.* at 290 (emphasis in original).  The Third Circuit has applied *Guerra* to hold that leave limited to mothers is "thus per se void for any leave granted beyond the period of actual physical disability."  *Schafer v. Board of Public Education*, 903 F.2d 243, 248 (3d Cir. 1990).

It is undisputed that, for most or many women, "the period of *actual physical disability*" does not extend for eight weeks postpartum and that Jones Day's leave policy thus reflects a generalization.  PSF ¶¶ 149-51.  The policy thus violates the prohibition on "special treatment of pregnant workers based on … generalizations about their needs and abilities."  *Guerra*, 479 U.S. at 285 n.17; *see Schafer*, 903 F.2d at 248; Dkt. 15-5 at 5 (EEOC stating that if "an employer extends leave to new mothers beyond the period of recuperation from childbirth," "it cannot

lawfully fail to provide an equivalent amount of leave to new fathers"); Dkt. 18 at 8-27 (discussing authorities).[2]

Jones Day says that its policy is not based on a "stereotypes." Dkt. 189 at 26. But *Guerra* says that "special treatment of pregnant workers" must not be "based on stereotypes *or generalizations*." 479 U.S. at 285 n.17 (emphasis added). The law is clear that even "true" or "reasonable" generalizations (Jones Day's is neither) are unlawful: "The statute's focus on the individual is unambiguous," so "the existence or nonexistence of 'discrimination' is to be determined by comparison of … individual characteristics," not "class characteristics." *City of Los Angeles v. Manhart*, 435 U.S. 702, 704, 707-08 (1978); Dkt. 21-1 at 6-8.[3]

    **b.** Jones Day misreads *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005). *Johnson* upheld a policy that gave mothers leave "for any period of pregnancy-related disability" but *not* "after their period of disability has ended." *Id.* at 327, 329. Jones Day pretends that the policy (like its own) gave all mothers a fixed block of "disability" leave without regard for actual disability. But *Johnson* makes clear that the policy gave a mother leave only while she was actually

---

[2] Jones Day invokes *Guerra*'s statement that, "subject to certain limitations, we agree … that Congress intended the PDA to be 'a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise.'" 479 U.S. at 285. But the leave here is not a *disability* benefit, a concept that *Guerra* understood to "cover only the period of *actual physical disability*." *Id.* at 290. Anyway, *Guerra* points to the prohibition on "special treatment … based on … generalizations" as a "limitation[]" on its "floor-not-ceiling" language. *Id.* at 285 & n.17.

[3] The law prohibits generalizations for good reason: "Practices that classify employees in terms of … sex tend to preserve traditional assumptions," *Manhart*, 435 U.S. at 709—like the stereotype that men are breadwinners and women are caretakers. Giving women extra leave on the basis of generalizations thereby harms not only fathers and children but women as well. Indeed, "[s]tereotypes about women's domestic roles" and "parallel stereotypes presuming a lack of domestic responsibilities for men" "create[] a self-fulfilling cycle of discrimination that force[s] women to continue to assume the role of primary family caretaker, and foster[s] employers' stereotypical views about women's commitment to work and their value as employees." *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 736 (2003) (Rehnquist, C.J.); 29 U.S.C. § 2601(a)(6); *Knussman v. Maryland*, 272 F.3d 625, 635-37 (4th Cir. 2001).

disabled, though, for leaves up to six weeks, it used an honor system rather than requiring proof:

> Biological mothers are entitled to leave for any period of pregnancy-related temporary disability, to be charged against accrued sick leave. Based on current medical practice, a leave of six weeks or less would not require the employee to provide disability documentation. … Any request for absence beyond the period of disability is considered as leave of absence without pay or as vacation.

431 F.3d at 327 (quoting the policy). The policy provided leave "for *any* period of pregnancy-related disability" but not beyond: "Any request for absence beyond the period of disability is considered as leave of absence without pay or as vacation." *Id.* (emphasis added). Thus, a woman who ceased to be disabled after four weeks would have to either return to work or switch to "leave of absence without pay or … vacation." *Id.* This limitation of leave to the period of actual disability was critical for the Eighth Circuit, which upheld the policy because it "does not allow mothers to use accrued sick leave after their period of disability has ended" and provided "pregnancy-related disability leave *on the same terms* as employees with other disabilities." *Id.* at 329 (emphasis added). The *only* role of the "six weeks" in *Johnson* was as a period when a disabled mother could take leave under the honor system rather than having to submit proof: "a leave of six weeks or less would not require the employee to provide disability documentation." *Id.* at 327.

If Jones Day similarly limited "disability" leave to the mother's period of actual disability but used an honor system, Plaintiffs would not be challenging its policy. But Jones Day's policy is a one-way ratchet that gives every mother an extra eight weeks without regard for actual disability. *Johnson* did not address such a policy, and Jones Day has never pointed to *any* authority upholding a fixed period of leave for all mothers. The *only* case that that actually rules on a challenge to a policy giving a fixed period of leave to all mothers is *Schafer*.[4]

---

[4] Even if *Johnson* did support Jones Day, one non-binding decision could not override the authorities that support Plaintiffs, including *Guerra* and *Schafer*. Notably, while *Schafer* (decided in 1990) recognized *Guerra* (decided in 1987) as the key precedent, *Johnson* (decided in 2005)

**c.**         Jones Day's "four basic reasons" why Plaintiffs should lose (Dkt. 189 at 22) all fail.

*First*, it says its policy "does not discriminate based on sex" because it only benefits *mothers*. *Id.* at 22; *see id.* at 14 (policy applies "neither to all women nor exclusively to individuals who identify as woman"). But the same was true in *Guerra*, *Johnson*, *Schafer*, and this case at the pleading stage, yet no judge in any of those cases suggested that benefits limited *to mothers* are exempt from the ban on sex discrimination. After her period of actual disability from childbirth, the only material differences between a woman with a child and a similarly situated man (i.e., a father) are sex and proxies for sex (like the fact of having a uterus, the fact of having recently given birth, the potential to give birth in the future)—which are all off-limits for employers. *See Schafer*, 903 F.2d at 248 ("We disagree … that *Guerra* allows preferential treatment to employees who have recently given birth to a child without a simultaneous showing of a continuing disability related to either the pregnancy or to the delivery"); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 131 (2d Cir. 2018) (en banc) ("traits that operate as a proxy for sex are an impermissible basis for disparate treatment"), *aff'd sub nom. Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Even before the PDA, courts recognized that treating mothers differently from both (1) fathers and (2) childless workers of both sexes is unlawful. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974).[5]

---

never mentions *Guerra* or *Schafer*. If Jones Day were reading *Johnson* correctly, the panel's failure to address the two leading cases would substantially reduce the decision's persuasive force.

[5] Jones Day's point is the same made by *General Electric Co. v. Gilbert*, 429 U.S. 125, 134-35 (1976) (distinguishing between pregnant women and non-pregnant persons of either sex is not sex discrimination). But the PDA rejected the reasoning as well as the holding of *Gilbert*. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 676-78 (1983). Jones Day says the PDA only prohibits *less favorable* treatment of pregnancy, but it "made clear that, *for all Title VII purposes*, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* at 684 (holding that employer rule that disadvantage male employees' wives "violates Title VII by discriminating against male employees"). Analogously, a policy favoring workers

*Second*, mothers get the leave whether or not "they are *actually disabled*."  *See* § I.A, *supra*.

*Third*, Jones Day says that "although it is possible that, without Jones Day's knowledge, a birthmother might recover more quickly than eight weeks, that possibility does not render Jones Day's policy unlawful."  Dkt. 189 at 24.  This is a strawman.  Plaintiffs are not challenging an inadvertent failure to perfectly enforce a lawful rule.  They are challenging a rule that is itself unlawful because it gives all mothers an extra eight weeks regardless of disability.

*Fourth*, Jones Day says that "Plaintiffs … insist that the postpartum disability benefit must be administered so that it expires on the exact day the underlying disability ceases—not a day more."  Dkt. 189 at 25.  This too is a strawman.  The claim is that the policy is illegal because it *does not depend on disability*, not because it *does* depend disability but is applied imprecisely.  Likewise, a merit-based policy is not unlawful simply because merit cannot be measured with absolute precision, but a policy that turns on sex rather than *attempting* to turn on merit is unlawful.

Plaintiffs' claim would not require Jones Day to do the impossible, treat women worse than others with disabilities, or "undermine the entire U.S. system of reliance on doctor certifications."  Dkt. 189 at 25.  Again, everyone agrees that in all circumstances other than the eight weeks following childbirth, Jones Day's rule is that "lawyers are eligible for paid disability leave only if they are *actually disabled*"—that is, only while "unable to perform the material and substantial duties of [their] regular occupation" as law firm associates.  Dkt. 189 at 23.  Nothing prevents the firm from applying the same substantive rule to new mothers, whether by relying on doctors' certifications (which would not all be for eight weeks) or the honor system.  What it cannot do is give all new mothers "special treatment" in the form of eight extra weeks of sex-based leave based

---

who had a bar mitzvah would be religion (and sex) discrimination, even if it excluded Jews (and men) who had not had one and included those who had but identified as atheists (or nonbinary).

on an admittedly overinclusive "generalization[] about their needs and abilities." *Guerra*, 479 U.S. at 285 n.17; *cf. Shapiro v. Baltimore County*, 1997 U.S. Dist. LEXIS 24686, at *9-12 (D. Md. 1997); *Chavkin v. Santaella*, 81 A.D.2d 153, 157-58 (N.Y. App. 1981) (New York law).

> ## 2. Even if "true" generalizations were permissible, Jones Day's is not true.

Jones Day insists that its eight-week generalization is lawful because it "generally reflects what happens in practice when a provider certifies disability from childbirth." Dkt. 189 at 19. As shown above, the law does not allow employers to use generalizations, even when they are "true" or reflect what experts who are not employers do. *Manhart* thus held that Title VII prohibits employers from charging women more for pensions, even though women do live longer on average (making their pension more valuable and costly), and even though actuaries charge women more for annuities. 435 U.S. at 704-10, 717-18 & nn.33-34. Even setting the law aside, though, Jones Day's premise is false: Eight weeks does *not* reflect what happens in practice.

Both sides retained obstetricians as expert witnesses. Both doctors agree that physicians asked to certify a disability period for new mother typically certify six weeks for uncomplicated vaginal births and eight for uncomplicated C-sections. PSF ¶¶ 153-55. Jones Day's former HR Director Dressing, who first recommended its eight-week rule, had the same experience. PSF ¶ 35. Medical publications often suggest a shorter period; none states that doctors should or typically do certify more than six weeks for uncomplicated vaginal births. *See* PSF ¶¶ 151, 173, 180-81, 186-87 (citing sources). This makes sense of the statements in the case law that the typical postpartum disability period is "four-to-eight" or "six-to-eight" weeks (*see Savignac*, 486 F. Supp. 3d at 36): The period is expressed as a range not because some doctors certify eight weeks while some do not, but, rather, because doctors typically certify eight for one type of birth (C-section) but *not* for a typical vaginal birth.

Doctors *only* provide a disability certification when asked to do so.  PSF ¶ 153.  Doctors do *not* generally advise women that they are disabled from or should avoid office work (or reading or thinking or phone calls or computers) for six or eight weeks or any particular time following a birth.  PSF ¶¶ 159-61.  Thus, whereas some medical advice is routinely given to new mothers concerning their limitations during recovery (e.g., abstain from intercourse for a specified period), doctors do not generally inform women who have uncomplicated births that they have *any* disability from working or should avoid working for any particular period.  *Id.*

Plaintiffs' expert testified that there is no medical basis to deem every woman disabled for eight weeks or certify an eight-week disability for uncomplicated vaginal births.  PSF ¶¶ 166-67; *see also* PSF ¶¶ 173, 168.  Jones Day's expert conceded that, while she prefers for women to have more time off, that view is idiosyncratic and a six-week leave is sufficient for a vaginal birth: "I have never said that I—that vaginal delivery needs more than six weeks."  PSF ¶¶ 151, 156, 168.  In fact, nearly half of women return to work in under six weeks.  PSF ¶ 182-83.  And Jones Day's claims about what its plan administrator does are irrelevant and inaccurate.  PSF ¶¶ 194-204.

In the face of all this, Jones Day effectively admits that its rule is an overbroad generalization rather than a "true" one.  Rather than argue that the generalization is lawful because it is *accurate*, it argues that it is lawful because, by treating every woman as if she had a C-section, it promotes efficiency and privacy by avoiding any need to inquire into each worker's method of birth.  Dkt. 189 at 17-18.  But generalizations almost invariably promote efficiency and privacy more than individualized determinations; that does not make sex-based generalizations lawful. *E.g.*, *Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 151-52 (1980); *LaFleur*, 414 U.S. at 641-42.  Cases like *Guerra*, *Manhart*, and *Schafer* make clear that overinclusive generalizations about the are off the table *regardless of why the employer decided to generalize*.  Anyway, if Jones

Day wants to prioritize efficiency and privacy, it can do so while complying with the law by giving each woman as much leave as she and her doctor decide she needs on an honor system basis.

### 3.    Sexist gender roles are a motivating factor behind the leave policy.

Separately, Plaintiffs are entitled to judgment because the policy is motivated at least in part by traditional gender roles that call for mothers to have more childcare time.  *See* 42 U.S.C. § 2000e-2(m); *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 343, 348-49 (2013); *id.* at 348-49; *Ponce v. Billington*, 679 F.3d 840, 844-45 (D.C. Cir. 2012).

**a.**    Until 1994, Jones Day gave mothers a 24-week block of leave (12 paid and 12 unpaid) to care for the child and recover from the birth; it did not distinguish between "disability" leave and caretaking leave.  PSF ¶¶ 2-5.  The firm did not provide *any* leave to new fathers, who had to use vacation or sick days.  PSF ¶ 6-7.  It is beyond dispute that this policy was rooted in gender roles and illegal under the EPA and Title VII since the 1960s.  *Hibbs*, 538 U.S. at 739 n.12.

**b.**    In 1994, Dressing determined that the new FMLA required equal caretaking leave for men and women.  PSF ¶ 8; Sheketoff Ex. 1 at JD_00003291; Dressing Decl. ¶¶ 7-10, 13; JDSF ¶ 39.  She determined that women should keep the same 12-week block of paid leave and that fathers receive paid caretaking leave equal to mothers'.  PSF ¶¶ 8-37; JDSF ¶ 40.  Thus, to determine how much fathers would receive, she had to determine what portion of the 12 weeks for mothers would be deemed "disability" leave (and given only to mothers), with the balance deemed to be "caretaking" leave (and given to fathers as well).  PSF ¶¶ 8-37.  According to Dressing:

> To decide how much paid leave Jones Day would offer new fathers …, I concluded the [f]irm should assume that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complications.  The remaining four weeks available to new mothers were then also made available to new fathers as paid family leave.

Dressing Decl. ¶ 10.  Needless to say, the longer the portion of the maternity leave that Jones Day deemed to be "disability" leave, the shorter the "caretaking" leave it would offer to fathers.

Dressing's experience was that doctors asked to certify disability for new mothers typically certified just six weeks for an uncomplicated vaginal birth (and only "occasionally" extended that by "some additional time" based on the mother's course of recovery), whereas they typically certified eight weeks of disability for an uncomplicated C-section.  PSF ¶ 35.  An uncomplicated vaginal birth is the most common type of birth; about a third of births are C-sections.  PSF ¶¶ 162-65.  Nonetheless, for purposes of determining how much leave to give fathers, Dressing picked a period that she knew to be overinclusive deem *all* mothers disabled for a full eight weeks.  As Jones Day concedes, she "chose the high end of th[e] range" of disability certifications for mothers (Dkt. 189 at 18)—and, concomitantly, the *bottom end of the range* for caretaking leave for fathers.

That choice of an atypically long disability period for the purpose of setting a concomitantly short leave for fathers is compelling evidence of pretext—especially considering that Jones Day previously had a blatantly discriminatory policy, which it altered only because it concluded that the FMLA required it to.  Where an employer with an openly discriminatory practice perceives the law as compelling a change and makes as small a change as possible, a reasonable jury will necessarily find that discriminatory intent remains at least a motivating factor.

Jones Day asserts that it chose the "high-end" eight-week period for efficiency and privacy reasons.  Even if true, those are not legitimate bases for a discriminatory policy.  Nor would that change that traditional gender roles have always been a motivating factor, even if there were others.

Anyway, there is *zero* evidence that *Jones Day* was motivated by efficiency and privacy.  The firm's decisionmaker was managing partner Pat McCartan.   JDSF ¶ 51; PSF ¶¶ 15-16.  Dressing recommended the policy by memo on December 22, 1993, and he responded: "I have reviewed your memorandum of [that date] and approve the amendments."   Chase Ex. 5 at JD_00003300.  He is dead, and there is no direct evidence of what motivated his decision except

13

Dressing's memo.  Jones Day has withheld that as attorney-client privileged.  *See* Sheketoff Ex. 1.

Its arguments about *why* it adopted the policy—"to protect the associate's medical privacy and to

promote administrative convenience," and not "to discriminate against men, to provide

birthmothers more bonding time than fathers, or to enforce any notion that fathers are breadwinners

who should work more than women" (JDSF ¶ 53; Dkt. 189 at 18)—are necessarily assertions about

why *McCartan* made his decision, and since he made the decision because of the Dressing memo

(JDSF ¶ 51), they are necessarily assertions about the memo's substance.  Jones Day has therefore

put Dressing's advice at issue and waived privilege over communications on the subject.  Plaintiffs

have requested a conference on this issue.  And if Jones Day were *not* making a representation

about the substance of the Dressing memo, then it would have no record evidence to support its

arguments about why it (i.e., McCartan) made the decision and no basis in the record to claim that

it was made for "legitimate, non-discriminatory reasons."

     **c.**     Effective 2015, Jones Day adopted the policy at issue here, which gives mothers 18

weeks of paid leave without regard for disability.  PSF ¶¶ 46-80.  The policy was developed by

some Jones Day managers who drafted a memo proposing them to Brogan, who approved them.

The revisions left fathers' leave at four weeks while increasing paid leave to 18 weeks for birth

mothers and adoptive primary caregivers.  PSF ¶¶ 65, 70, 73-74.  Adoptive secondary caregivers,

by contrast, received four weeks.  PSF ¶ 77.  In other words, the policy treated birth mothers as

equivalent to adoptive primary caregivers (even though eight of the weeks for birth mothers are

supposedly "disability" leave and adoptive parents are not disabled) and treated birth fathers as

equivalent to adoptive secondary caregivers.  The parallel treatment confirmed that Jones Day

continued to view mothers as natural primary caregivers and fathers as secondary and to impose

that view through its leave policy.

Indeed, the memo to Brogan states explicitly that those traditional gender roles were the firm's rationale for setting adoptive parents' leave parallel to birth parents': "We recommend bringing our paid adoption leave policy in line with our maternity and paternity leave policies (18 weeks paid and 6 weeks unpaid leave for primary caregivers and 4 weeks paid leave for secondary caregivers)." PSF ¶ 66. Jones Day's lawyer once told the Court that the leave for adoptive parents was based on different concerns unique to adoption (e.g., the need for foreign travel for certain adoptions) rather than reflecting an intent to give all women 18 weeks whether they gave birth or not. Aug. 4, 2020 Tr. 9:6-10:21. The record says otherwise: The memo to Brogan explains that "parental reactions to and needs after adoption *are not dissimilar* to those experienced by biological parents." PSF ¶ 66 (emphasis added). One manager participating in the 2014 revision "question[ed] whether it makes sense to go to the full 18 paid weeks leave for adoption" because, "[a]rguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth," which "doesn't happen with adoption." PSF ¶ 59. But the managers decided in favor of parallel treatment: "The rationale for the 18 weeks of adoption to mirror the same time as births was *based on the primary caregivers [sic] role in bringing the child into the family.* … [A]doption leave should be parallel to *the maternity leave for the primary caregiver* because *the functions are the same.*" PSF ¶ 60 (emphases added). In other words, Jones Day deems birth mothers to be primary caregivers (and fathers secondary)—the "functions are the same." And that understanding is fundamental to its policy. Another manager, ███████████████████████ ████████████, agreed that the 18 weeks should extend to adoptive primary caregivers because the rationale is to give *caregiving* time: "I was very much out and about within days after having babies. I know that may not be the 'norm,' but the point is that I still very much appreciated the extended period at home to acclimate and adjust to our new life." PSF ¶ 61.

Any competent attorney would have seen that the policy—18 weeks of leave for mothers (with eight deemed "disability" leave and the other 10 admitted to be family leave) and four for fathers—was blatantly illegal, as the Supreme Court said in 2003 when rejecting Jones Day's challenge to the FMLA (*Hibbs*, 538 U.S. at 739 n.12) and as Plaintiffs immediately recognized (PSF ¶ 216). Jones Day adopted it anyway. It wanted to give 18 weeks to all primary caretakers (i.e., women) regardless of disability, even if they did not give birth at all, while keeping secondary caretakers (i.e., fathers) at a much lower level. PSF ¶¶ 47-85. It was only after an associate pointed out the obvious illegality that the firm partially backed off by allowing fathers to seek the "primary caretaker" *label*—but even then they only got 10 weeks, not the full 18 that Jones Day leadership gives, regardless of disability, to all those it views as *true* primary caregivers. PSF ¶¶ 86-102.

Indeed, the firm's treatment of adoptive parents itself shows that its policy illegally discriminates against fathers without any need to consider disability for birth mothers. Again, the written record shows that Jones Day chose to treat adoptive parents in parallel with birth parents (18 weeks for the primary caregiver and four for the secondary) not because of any perceived difference between birth and adoption but rather because it viewed birth and adoption as *the same* and believed that primary caregivers should have 18 weeks of leave *even if they adopt and are never disabled at all*. Only birth fathers were (and remain) excluded from the 18 weeks that the firm admittedly believes is appropriate for the primary caregiver's role—because the firm's leadership deems them secondary. But for that gender role, they too would get 18. That is discrimination. At a minimum, the gender role is a factor behind the disparate treatment of fathers.

On the undisputed facts, any reasonable jury would find that the traditional, stereotypical view of mothers as the primary caregivers and fathers as secondary caregivers (i.e., breadwinners) has always been at least a motivating factor behind the firm's leave policy. PSF ¶¶ 2-101.

**C.     Under any view of the law, fact disputes preclude judgment for Jones Day.**

Even under Jones Day's view of the law, genuine fact disputes preclude its motion.  As discussed, a jury could find that the policy giving all mothers eight extra weeks without regard for disability is unsupported by the views of the medical profession.  PSF ¶¶ 103-187.  A jury could also find that the policy is based on traditional discriminatory gender roles.  PSF ¶¶ 2-101.

**II.     Jones Day committed illegal retaliation by firing Mark (Counts VII-IX, XI).[6]**

On January 16, 2019, Plaintiffs sent Jones Day an email reaffirming that its leave policy is discriminatory and advising that if it did not grant equal treatment, Mark would file an EEOC charge and a lawsuit.  JDSF ¶ 306.  On January 22, Jones Day fired Mark.  *Id.* ¶ 363.

An employer commits illegal retaliation if (1) an employee engages in "protected activity," (2) the employer takes an "adverse action," and (3) the adverse action was "causally related" to the protected activity.  *Savignac*, 486 F. Supp. 3d at 38.  It is undisputed that Jones Day fired Mark solely because of the January email (Dkt. 189 at 33), and that termination is an adverse action.  The question is therefore whether the email was "protected activity," a concept that the relevant laws define in various ways and that presents a question of law.  *E.g.*, *Franks v. Edison Electric Institute*, 2022 WL 971157, at *2 (D.D.C. 2022); *Broderick v. Donaldson*, 338 F. Supp. 2d 30, 41 (D.D.C. 2004); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 579 (S.D.N.Y. 2010).  For the reasons that follow, the email was protected activity.

**A.     Title VII's opposition clause**

Title VII's opposition clause makes it illegal to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice by" Title VII.  42 U.S.C. § 2000e-3(a).  The January email was protected under the opposition clause.

---

[6] All agree that Count XI rises or falls with Counts VII-IX.  *See* Dkt. 176 at 4; Dkt. 189 at 26, 37.

1.     Jones Day concedes that "[c]omplaining about an *unlawful* employment practice constitutes protected activity."  Dkt. 15 at 24.  As discussed above in § I.B, Jones Day's policy is unlawful.  Plaintiffs' complaint was therefore protected.

2.     Additionally, "Title VII protects opposition to employer conduct that the plaintiff incorrectly—though reasonably—believes falls within the statute's definition of an 'unlawful employment practice.'"  *Savignac*, 486 F. Supp. 3d at 39 (quoting *King v. Jackson*, 487 F.3d 970, 973 (D.C. Cir. 2007)).   Plaintiffs reasonably believed that Jones Day's leave policy is illegal.

a.     **Reasonableness.**   "The reasonableness of a plaintiff's belief that an employer's actions violate Title VII depends in part on whether the governing law is 'unambiguous' or 'unsettled.'"  *Id.* (quoting *King*, 487 F.3d at 973).  After considering all the authorities that Jones Day can muster, this Court held that "Defendants have not shown that the text of Title VII, the FLSA, or the DCHRA or any precedent (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's leave policy was unlawful."  *Id.*  That is dispositive. And § I above further confirms that Plaintiffs' view is, at a minimum, objectively reasonable.

Jones Day does not seriously argue that it is unreasonable to believe that its policy violates Title VII.  *See* Dkt. 189 at 27-30.  Instead, effectively admitting that its eight-week policy is illegal, Jones Day posits that some *shorter* generalization (say, six weeks) would be lawful, and then tries to reason to the conclusion that Plaintiffs' challenge to its *longer* block of leave is not just wrong but unreasonable.  *Id.*  It says that "[a]t least *some portion* of the eight weeks [it provides] was *necessarily* legitimate disability leave" rather than "disguised family leave."  Dkt. 189 at 28.  That is like saying that at least some portion of a 200-pound man is a 100-pound man.  And even if the eight-week block of leave could be metaphysically subdivided into a legitimate "portion" and an illegitimate one, that would just confirm that the policy is illegal.  After all, a policy that "partly"

18

violates the law is an unlawful policy.  Indeed, a court could strike down Jones Day's eight-week policy without ever considering whether a six-week policy would be lawful.

But, Jones Day insists, Plaintiffs challenged its "entire policy" rather than arguing that only a part of it is illegal.  Wrong.  A claim that eight weeks is unlawful because it is too long *is* a challenge to "the entire policy," which gives eight weeks (not two or four or six).  Jones Day pretends that there multiple "claims" in play, but they are just *arguments* in support of a single claim: Jones Day's leave policy violates the civil rights laws.  *See* § I.B, *supra* (three independent arguments).  At a minimum, disagreement over metaphysics cannot make a discrimination claim *unreasonable*.  And Plaintiffs have always made clear that, *even if* some fixed period of leave for all new mothers could be justified, eight weeks is excessive: The January email simply says that the policy is "discriminatory" and refers back to Julia's August 2018 email, which expressly complains that "[m]ost women aren't physically disabled from office work for such a long period and yet still get the full eight weeks."  JDSF ¶ 296.  The same point has been made in every version of the complaint and in Plaintiffs' motion-to-dismiss briefs.  *E.g.*, Dkt. 172 at 24 (TAC ¶ 161); Dkt. 18 at 24; Dkt. 21-1 at 7.  The ruling on the motion to dismiss shows that the Court understood this "eight weeks is too long" argument to be in play.  486 F. Supp. 3d at 36-37.  Finally, even if Plaintiffs' sole argument were that *any* fixed block of leave limited to new mothers violates Title VII, that view would be legally reasonable (and indeed correct).  *See* § I.B.1, *supra*.[7]

Jones Day's true argument here is that the January email's *settlement demand*—eight weeks of leave—was unreasonable.  *See* Dkt. 189 at 27-30.  But the "good faith, reasonable belief" test applies to the "belief that *the challenged practice*" is unlawful, not to a settlement demand.

---

[7] Jones Day says the email "proclaimed … [its] disability policy was a discriminatory sham meant to provide birthmothers with eight weeks of disguised parental leave."  Dkt. 189 at 29.  Not true.

*George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (emphasis added).[8]  The "practice" at issue here is giving all new mothers eight extra weeks of leave without regard for disability.  Jones Day *concedes* that Plaintiffs' demanded settlement "is separate and distinct from their challenge to the leave policy (the employment practice)."  Dkt. 104 at 12.  The belief that the leave policy is unlawful is plainly reasonable.  And the firm's attempt to shift the focus from the challenged practice to the settlement demand also fails for other reasons discussed below.

  **b.** **Good faith.**  It is beyond dispute that Plaintiffs believed that the policy is illegal. To the extent that good faith is a distinct requirement from reasonableness, the question is simply whether the employee "had a subjective, honestly held belief that her claim was valid."  *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 111 (1st Cir. 2015).  Some precedents, like *King*, do not even say "good faith" but merely require that the plaintiff "reasonably [] believe[]" that the challenged practice is unlawful.  487 F.3d at 973.  For three independent reasons, the requirement is met.

  **i.** *First*, Jones Day sought to compel discovery that it viewed as relevant to good faith. Dkt. 101 at 6; Mar. 23, 2022 Tr. 26:9-19, 27:12-15.  Judge Faruqui denied the request, explaining that the good-faith question focuses on whether the plaintiff made up a discrimination claim to try to deter an impending adverse employment action and that Jones Day's theory "would expand good faith really [] far greater than that term is meant to be used."  *See id.* at 30:2-32:13; *Monteiro v. Poole Silver Co.*, 615 F.2d 4, 8 (1st Cir. 1980) (claim raised "as a smokescreen in challenge to the supervisor's legitimate criticism"); *Fowler v. District of Columbia*, 404 F. Supp. 2d 206, 211 (D.D.C. 2005).  Jones Day waived any objection to that ruling.  *See* Fed. R. Civ. P. 72(a).  And it

---

 [8] *See* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation against worker who "opposed any practice made an unlawful employment practice"); *Clark County School District v. Breeden* 532 U.S. 268, 270 (2001) ("practices that the employee could reasonably believe were unlawful"); *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (same); *King*, 487 F.3d at 972-73 (same); *Parker*, 652 F.2d at 1020 (same).

does not contend that Plaintiffs made up their opposition so that they could claim that an impending action against Mark was retaliatory; it does not even argue that it contemplated any negative action before Plaintiffs sent the January email. Plaintiffs' good faith is beyond dispute.[9]

**ii.** *Second*, if a litigant's belief on a question of law is objectively reasonable, then by definition at least some judges could agree with the litigant, and it is incoherent to ask whether the litigant subjectively "knows" that her belief is "wrong." Plaintiffs are unaware of any case that asks whether an objectively reasonable belief on a question of law was somehow held in bad faith. (And if the belief was *not* objectively reasonable, then there is no reason to ask about good faith, since objective unreasonableness is fatal on its own.) It is not clear how that inquiry would go.

Would the question be how Mark would have voted in the hypothetical world where he was not an employee but a 31-year-old Supreme Court Justice and a challenge to the policy came before that Court? Would two plaintiffs with identical claims then be treated differently because they have different judicial philosophies (even though they are not actually judges)? How would

---

[9] Jones Day says that Plaintiffs' unreasonableness is shown by five points that Mark supposedly "admitted." Dkt. 189 at 28. Points (ii) and (iv) have never been disputed; if they helped Jones Day, it would have won at the pleading stage. Points (i) and (iii) are disputed (JDSF ¶¶ 310, 312) and irrelevant. It is irrelevant whether the eight weeks are conferred by the family leave policy or the disability policy or both (a metaphysical question). As for whether all women are disabled long enough postpartum to need leave under Jones Day's STD policy (which only kicks in if the associate has already missed at least ten workdays, PSF ¶ 120), Plaintiffs have no basis for making that blanket assertion about the abilities of all women, and the question is irrelevant since the point here is that many are not disabled for *eight weeks* but receive it anyway. Point (v) is irrelevant because "maternity leave" includes caretaking time, six weeks is much less than eight, and the document does not *endorse* a six-week maternity leave—it says that it is too short for some women and too long for others. JDSF ¶ 312. It also says that "[o]ne in four women return to work within *10 days* of giving birth," "[t]here are no standardized or validated tools for assessing a woman's readiness to return to work," and "[e]valuation of readiness to return to work should include a comprehensive assessment of a woman's physical and psychological health, *family needs, and work requirements*." Sheketoff Ex. 29 (emphases added). In short, generalization is improper.

the analysis apply to lay victims who have no legal philosophy?  How could a lay jury meaningfully determine what a victim's judicial philosophy says about what he really "believes"?

Or would the question be how the plaintiff assessed her odds of success in court, considering the judges of this District and Circuit and their appointing Presidents, voting records, and other predictors, along with the odds of drawing each district judge or appellate panel and how the outcomes of future elections might change the composition of the D.C. Circuit prior to any appeal?  On that view, what percentage chance of success would equate to a good-faith belief? Ten percent?  Fifty?  Should plaintiffs with identical retaliation claims be treated differently because one is an optimist and the other a cynic?  Should plaintiffs with identical retaliation claims be treated differently in, say, the Fifth and Ninth Circuits, since one is viewed as more hostile to discrimination claims than the other?  What would that analysis have to do *what the plaintiff really believed* anyway?  It is a premise of our legal culture that one can disagree with a court decision— that there is a distinction between how a court answers a question and the "right" answer.

Any attempt to say whether a retaliation plaintiff subjectively believed a reasonable legal position would be incoherent and inadministrable.  It would be impossible for a jury to apply.  It would be foreign to the axiom that a party may advance reasonable legal arguments for its position, with the job of deciding which are "right" assigned to the court rather than the lawyers.

Decisions in other fields buttress the point.  For instance, the Supreme Court initially formulated the qualified immunity defense as asking whether the defendant "knew or reasonably should have known that the action he took … would violate constitutional rights."  *Wood v. Strickland*, 420 U.S. 308, 322 (1975).  Not long thereafter, though, the Court jettisoned the subjective aspect in *Harlow v. Fitzgerald*, reasoning: "If the law at [when the defendant acted] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal

developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."  457 U.S. 800, 818 (1982); *see also id.* at 821 (Brennan, J., concurring) ("summary judgment will be readily available to public-official defendants whenever the state of the law was so ambiguous at the time of the alleged violation that it could not have been 'known' then").  Here, since no text or "precedent (much less any controlling precedent) is unambiguously at odds with Savignac's belief that Jones Day's leave policy was unlawful" (*Savignac*, 486 F. Supp. 3d at 39), it was (and is) impossible for Mark to "know" that his position was "wrong." *See also Procunier v. Navarette*, 434 U.S. 555, 565 (1978) (where "there was no 'clearly established' [constitutional] right," "there was no basis for rejecting the immunity defense on the ground that petitioners knew … that their alleged conduct violated a constitutional right").

The rule is the same in other contexts: The reasonableness of a legal view precludes a bad-faith finding.  *See, e.g.*, *Johnson Controls, Inc. v. United Ass'n of Journeymen & Apprentices*, 39 F.3d 821, 826 (7th Cir. 1994); *Gillette Foods Inc. v. Bayernwald-Fruchteverwertung, GmbH*, 977 F.2d 809, 814-15 (3d Cir. 1992); *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980).

    **iii.**    *Third*, legal arguments aside, it is beyond genuine dispute that Mark believed that Jones Day's policy is unlawful; nothing in the record would permit a jury to find otherwise.  Plaintiffs have declared on penalty of perjury that they did (and do) believe that the policy is illegal (and would have ruled it illegal in the hypothetical world where they were judges confronted with the issue).  PSF ¶¶ 214-19; *cf. Gonzalez v. Bolger*, 486 F. Supp. 595, 601 (D.D.C. 1980) ("plaintiff's testimony established his good-faith belief that the practice violated Title VII").  Nothing in the record suggests otherwise.  Indeed, Mark told Julia in writing in *January 2015*— years before he had any conceivable motive to provide anything but his honest view—that

"[p]resumably the 8-week disability leave is also illegal."  PSF ¶ 215-218; *see Dea v. Washington Suburban Sanitary Comm'n*, 11 F. App'x 352, 359-60 (4th Cir. 2001).

**3.    Jones Day fired Mark for challenging discrimination.**  Brogan *admits* that he fired Mark because of the email's claim that the firm's leave policy was unlawful.  PSF ¶¶ 230-236.  When Mark asked "Why did you fire me?," Brogan said that Mark and Julia "act[ed] as if you personally were the law-givers; that the – our policy on leave was illegal."  PSF ¶ 230.  He testified that his decision was "on the basis of your e-mail and also your attack on our position, which seems to be on all squares with what you were told by [McClure]."  *Id.*  When asked whether anything in the first paragraph of the email was a factor in the decision, Brogan testified:

> In this particular paragraph … you speak like you're the law giver.  And … Jones Day, which is one of the great law firms in the world, should bow down to your assessment of the EEOC [guidelines].  And – and that this is a violation of the 1964 Civil Rights Act. … I wasn't impressed with your reasoning.  Just – it's a flat-out assertion.  It is a pompous assertion.  It's an arrogant assertion.

*Id.*  Brogan testified that, in "telling us that we violated [the] 1964 Civil Rights Act," Plaintiffs were "just picking a fight, you know.  You're on a crusade."  *Id.*  Mark asked, "Would you have fired me even if you believed I was right about the policy being illegal?"  PSF ¶ 232.  Brogan responded: "I – no, I – I would not."  *Id.*  The email's complaint about the firm's leave policy was protected activity, and Brogan's admission that it was a but-for cause of his decision to fire Mark establishes that Jones Day committed illegal retaliation.[10]

Brogan also testified that he fired Mark because "you said that Julia was discriminated against."  PSF ¶¶ 237-263.  This claim of discrimination was also a but-for cause of the termination

---

[10] Jones Day argues in passing that Brogan fired Mark because he sought equal treatment for himself rather than demanding that the firm change its policy across the board.  Dkt. 189 at 36.  That just confirms that the firing was for protected opposition.  No case says that Title VII's protection is weaker when an employee opposes discrimination against himself rather than others.

decision: "If I thought for a moment that there was any merit to it, I – I would not have taken the decision that I took."  PSF ¶ 239.  This provides an independent basis for Jones Day's liability.

    **4.**    **Settlement demand.**  As noted above, Jones Day does not seriously dispute that Plaintiffs reasonably believed that its policy is unlawful.  Rather, it argues that Mark lacked a reasonable basis for seeking to *settle* for eight weeks of leave.  *See* Dkt. 189 at 28-30.  But it offers no authority suggesting that a worker who expresses reasonable, good-faith opposition to an employment practice can be fired because of the settlement she demands (or other action she seeks from the employer).  A worker engaged in protected opposition to what she reasonably believes is illegal discrimination surely does not lose protection if she seeks a remedy or settlement that is not itself mandated by Title VII.  For instance, if a woman reasonably perceived her workplace as hostile, it would be protected opposition for her to demand that the employer provide sexual harassment training, even though Title VII does not *require* employers to provide such trainings.  The rule that Jones Day would have this Court adopt—opposition may be protected, but an accompanying settlement demand is not—would amount to a warning that discrimination victims should not attempt to resolve their claims without litigation, contrary to both the general policy in favor of settlement and the specific proposition that Congress intended to promote informal, pre-suit resolution of Title VII claims.  *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

    Anyway, the eight weeks that Plaintiffs sought *is* part of the relief that a court would likely award.  Jones Day gives *all* mothers (including adoptive mothers) an extra eight weeks, regardless of disability and solely because they are women (and, thus, in Jones Day's view, natural primary caregivers).  Female primary caregivers receive 18 weeks of paid leave, whereas Mark (a male primary caregiver) was offered 10.  To say that this is illegal discrimination is to say that it was illegal for Jones Day to deny Mark, because he is a man rather than a woman, the 18 weeks of paid

leave that it *automatically* gives to *all* mothers.  So it was reasonable for Plaintiffs to demand, to settle their claim, that Jones Day give Mark the leave that it would have given him (regardless of disability) if he were a woman.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 (2017) ("the preferred rule in the typical case is to extend favorable treatment"); *Califano v. Westcott*, 443 U.S. 76, 89 (1979).  Indeed, that is the remedy *required* by the EPA.  *See* 29 U.S.C. § 206(d)(1).[11]

Moreover, even if an employer could lawfully fire a complaining worker because of the settlement she demanded, no jury could find that that happened here.  PSF ¶¶ 264-266.  Brogan *disclaimed* having fired Mark based on the number of weeks demanded.  *Id.*  Indeed, he admitted that he did not even know how many weeks the firm's leave policies provided.  *Id.*  "[T]he relevant question under Title VII is not whether [Mark] could have been terminated on the basis of 'other misconduct,' but whether []he was."  *Egei v. Johnson*, 192 F. Supp. 3d 81, 92 (D.D.C. 2016).

Finally, Jones Day's argument hinges on the notion that Mark's settlement demand was unreasonable because it sought the exact same amount of leave offered to women.  Dkt. 189 at 30.  As Jones Day elsewhere concedes, though, that is false: The firm's policy offers associates (including new mothers) *up to 13 weeks* of disability leave at full pay and another 13 at 75% pay.  JDSF ¶ 25.  Jones Day's lawyer told the Court that saying "you could take up to eight weeks of disability leave … would misstate the disability policy.  You can actually take up to 26."  Aug. 4, 2020 Tr. 63; *see id.* at 5 (up to 26 weeks "is the actual disability leave benefit").  Plaintiffs never challenged that bona fide disability policy, which requires that the worker actually be "unable to perform the material and substantial duties of his or her regular occupation."  JDSF ¶ 26.

---

[11] Plaintiffs' settlement offer was modest in light of the total remedy available in litigation over the policy, which would include not just the wrongfully denied leave but also compensatory damages for emotional harm and punitive damages.  *See* 42 U.S.C. § 1981a(a)(1).

"[B]y extending protection to employees who oppose discriminatory practices without resort to the EEOC, Congress encouraged voluntary internal attempts to remedy discrimination. The remedial purposes of Title VII would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal EEOC filings, and that internal opposition, though encouraged, is undertaken at the accuser's peril." *Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981) (quotation marks omitted). Denying protection to settlement offers would subvert Title VII's "remedial purposes."

5.    **Manner.** Jones Day says that it fired Mark based on the "tone" or "manner" of the January email.  *See* Dkt. 189 at 31.  But the "manner" was protected along with the substance. Jones Day has never pointed to any authority saying that a written discrimination complaint sent to the appropriate person could lose protection because of its "manner."  Even if it could in egregious circumstances, the January email is not egregious.  It is not clear how a letter accusing one's employer of illegal discrimination and threatening litigation could be much more "collegial." Indeed, Jones Day's real argument seems to be that the email was unprotected not because of manner but because its *substance* is supposedly false or "extortionate."[12]

---

[12] Jones Day throws around the label "extortionate," but it does not argue that Plaintiffs actually committed the crime of extortion—a defamatory argument that would merit sanctions.  *See, e.g.*, *Waldron v. George Weston Bakeries Inc.*, 570 F.3d 5, 10 (1st Cir. 2009) ("Trying to transmogrify what was obviously a settlement demand in a pending civil case into an act of extortion … would severely impede the salutary policies favoring settlements"); *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1994) ("Mere warnings by a party of its intention to assert nonfrivolous claims, with predictions of those claims' likely public reception, are not improper."); *Chandler v. Berlin*, 2020 WL 5593905, at *4-5 (D.D.C. 2020); *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 323-25 (S.D.N.Y. 2016) (letter threatening "embarrassing litigation" not extortionate—rather, the defendant broke the law by falsely accusing plaintiff of extortion); *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 259 (S.D.N.Y. 2001) (citing cases) ("[t]hreats of litigation, and even threats of meritless litigation …, have been held not to constitute acts of extortion").

27

The Supreme Court addressed what counts as "opposition" for Title VII purposes in *Crawford v. Metropolitan Government of Nashville*, 555 U.S. 271 (2009).  It reasoned that "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize; to contend against; to confront; resist; withstand'" and "'to be hostile or adverse to, as in opinion.'"  *Id.* at 276 (quoting dictionaries; citations, brackets, and ellipsis omitted).  Thus, in giving workers the right to *oppose* discrimination, Congress necessarily contemplated that Title VII should protect opposition that was not merely "rude" but even "antagoni[stic]," "confront[ational]," and "hostile."  *Cf. id.* at 277 n.2 (opposition included telling manager to "bite me" and "flipping him a bird"); *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) ("any activity designed 'to resist or antagonize …; to contend against; to confront; resist; [or] withstand' discrimination prohibited by Title VII" is protected opposition).

There is no support for the notion that courts should subject complaints to heightened scrutiny, parsing them for "maturity" or "collegiality" before deeming them protected.  Again, "[t]he remedial purposes of Title VII would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal EEOC filings, and that internal opposition, though encouraged, is undertaken at the accuser's peril."  *Parker*, 652 F.2d at 1019 (quotation marks omitted).  Jones Day's claim that it was entitled to fire Mark for the email's "manner" is the sort of "accuser's peril" argument that would "not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation" informally.  *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978); *see Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980).

The D.C. Circuit has said that when workers are "fired for the improper manner of their opposition to [discrimination], not for the opposition itself, then the statute does not by its terms

apply." *Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C. Cir. 1980).  Two points are crucial here.

*First*, the manner must have been legally "improper."  No case suggests that Title VII's protections

vanish simply because *the employer* feels that the manner of opposition was improper (which,

presumably, is usually true).  Whether the manner is "improper" is a question of law—does federal

law protect a given act?[13]  *Second*, whether the manner was proper only matters if the employee

was fired for manner and not substance—a question of causation.  *See Egei*, 192 F. Supp. 3d at 92.

      Jones Day's cited cases find opposition improper on two grounds.  Neither applies here.

      *First*, when an employee's job is to represent management in resolving discrimination

complaints (e.g., as an in-house lawyer or HR person), she loses protection if she goes too far in

advocating for *other workers* against management, thereby abandoning her job duties.  This is the

fundamental point of Jones Day's two lead citations.[14]  But Mark's job did not involve helping the

firm resolve other employees' claims, and anyway Jones Day harps on the point that Mark sought

equal treatment for himself rather than advocating for others (Dkt. 189 at 36).  There is no evidence

that Mark's opposition bled into his work in any way.  *Pendleton* and *Gogel* are inapposite.  *Gogel*,

967 F.3d at 1144 ("Gogel had every right to oppose actions *directed to her*" (emphasis added)).[15]

---

[13] *Orange v. District of Columbia*, 59 F.3d 1267, 1272 (D.C. Cir. 1995); *Franks*, 2022 WL 971157, at *2; *Broderick*, 338 F. Supp. 2d at 41 ("protected activity is a question of law because it relies on an interpretation of Title VII"); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 60 F. Supp. 2d 427, 443 (S.D.N.Y. 2009).

[14] *Pendleton*, 628 F.2d at 104-09 (plaintiffs removed *as EEO counselors* for participating in disruptive demonstration against discrimination; their EEO roles were dispositive, *id.* at 108-09); *Gogel v. Kia Motors*, 967 F.3d 1121, 1138-47 (11th Cir. 2020) (en banc) (plaintiff with "HR manager" role fired for soliciting coworker to sue employer); *see also id.* at 1139-40 (collecting similar precedents concerning "a human resources advisor," "Equal Employment Opportunity compliance officer," and "in-house legal counsel and … Manager of [EEO] Programs").

[15] *See also Pendleton*, 628 F.2d at 107 (acknowledging "plaintiffs' right to express grievances" but finding that unique "circumstances here swing the balance for defendant"); *Gogel*, 967 F.3d at 1140 (where technician did not "recruit[] other employees to file a complaint, nor would such conduct have conflicted with [her] job responsibilities," "conduct did not render her ineffective").

*Second*, a worker may be fired for manner if her opposition severely disrupts the employer's effectiveness as a business.  The leading case is *Hochstadt v. Worcester Foundation for Experimental Biology*, where the plaintiff's "constant complaints to colleagues damaged relationships … and sometimes even interfered with laboratory research."  545 F.2d 222, 233 (1st Cir. 1976).  *Pendleton*, which cited *Hochstadt*, falls into this bucket too: The plaintiffs joined an unauthorized demonstration in a military hospital's "food division that could disrupt the feeding of patients."  628 F.2d at 107.  The "military and medical" context was crucial to the ruling.  *Id.*

"On the other hand, [Title VII] clearly does protect an employee against discharge for … registering grievances through channels appropriate in the particular employment setting."  *Hochstadt*, 545 F.2d at 230-31.  Here, Mark was fired for a single written complaint sent to Jones Day's HR Director—the "channel[]" deemed appropriate by the Firm Manual.  There is no evidence that he ever disrupted his colleagues' performance of their jobs.  *See also EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1015 & n.5 (9th Cir. 1983).

6.      **Other aspects of the email.**  While Jones Day concededly fired Mark for the January email, it has offered shifting explanations.  *See* Dkt. 84-1 at 20-21.  They all presuppose that the protection for a written complaint is limited to the assertion of illegality rather than covering the complaint as a whole.  Yet the firm offers no authority for the notion that such a document can be gerrymandered into "protected" and "unprotected" passages.  The January email is "a single, unitary complaint of discrimination," with every sentence directly related to the claim that the leave policy is unlawful.  *Borgo v. Goldin*, 204 F.3d 251, 256 (D.C. Cir. 2000).  The first two paragraphs explain that Plaintiffs have considered the issue and reaffirm their conclusion that the policy is unlawful.  The third seeks to settle.  The fourth warns Jones Day not to retaliate.

Where a plaintiff makes a unitary complaint of discrimination based on a reasonable, good-faith belief, without improper manner, the law's protection covers the complaint as a whole. *Cf. id.* at 257-58 (letter was not "a single, unitary complaint of discrimination" because "[o]nly one paragraph of the letter can be characterized as such"). The law protects "oppos[ition]" to "unlawful employment practice[s]." 42 U.S.C. § 2000e-3(a). The whole email was plainly "opposition" to the leave policy. *See Crawford*, 555 U.S. at 276-78 (defining "opposition" broadly).

Even if their complaint can be chopped up into its constituent phrases, Plaintiffs should still prevail. Jones Day points to three reasons that Brogan gave at his deposition, but all fail.

    a.    **Challenge to leave policy.** Jones Day argues that Brogan fired Mark because of the email's "conclusory and arrogant" statement that the leave policy is unlawful, which Brogan supposedly viewed as "act[ing] as if [Plaintiffs] personally were the law-givers." Dkt. 189 at 34-35. As noted in § II.A.3, this is an admission that Brogan *did* fire Mark because of Plaintiffs' assertion that the leave policy is illegal. That assertion was protected. Jones Day offers no authority for the absurd notion that an employer can circumvent Title VII simply by saying that he felt that the claim of illegality was "conclusory," "arrogant," under-explained, or dead wrong (which is likely true in most retaliation cases). Nothing in the "tone" here—a straightforward statement that "[y]our cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law"—is unprotected. *Every* protected complaint tells the employer that it is breaking the law. Of course, the employer may find that upsetting. But that is why *Crawford* holds that "opposition" includes antagonizing, contending against, confronting, resisting, and being hostile or adverse to the employer. Nor does Title VII's protection depend on whether the complaining employee lays out a detailed legal argument. Anyway, Julia did explain Plaintiffs' position in her August 2018 email, yet Brogan fired Mark *without even reading it*. PSF ¶¶ 230-

31

236.  If he was interested in the legal issues, he could have *asked* Plaintiffs—whose legal ability he valued at over $1 million per year—to explain more.  *See* Dkt. 18 at 7-27 (detailed explanation).

      **b.**    **Black-box compensation system.**  The email's fourth paragraph warns Jones Day not to retaliate by giving Mark a lower raise:

> I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation.  We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman.  As you know, Title VII prohibits retaliation for opposition to sex discrimination.

PSF ¶ 212.  At his deposition, Brogan insisted that he fired Mark because of the email's statement that the firm's black-box compensation system and pay secrecy rules "are tailor-made to enable sex discrimination," which he supposedly read as an assertion that the policies were intentionally designed with the goal of enabling discrimination against women.  Dkt. 189 at 35.  Jones Day says that assertion would be incorrect because, when it first adopted the black-box system, it did not even allow women to practice law, so it could not have intended to enable pay discrimination against them.  *Id.*  As the context of the statement (a reference to pay discrimination against Julia) and its use of the present-tense "are tailor-made" make clear, however, Plaintiffs were pointing out that the black-box system is perfectly suited to enabling sex discrimination.  PSF ¶¶ 286-87, 305-12.  They were not opining on the subjective intent of the long-dead partners who devised the system (which would make the statement "We ourselves experienced this" senseless).  Both Plaintiffs so testified.  *Id.*  Even if Brogan were telling the truth about misunderstanding the email, that would not make it unprotected: An employer that fires a worker for a discrimination complaint assumes the risk that it will be found liable, for "[a] protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith."  *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1005 (5th Cir. 1969) (quoting

*NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964)); *Egei*, 192 F. Supp. 3d at 90-91 (honest mistake by employer is no defense, because of "the chill on legitimate claims"); *Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 366-67 (S.D.N.Y. 2007) (Lynch, J.) (same).

In any event, Defendants cannot contradict their interrogatory responses by pointing to the fourth paragraph as a reason for firing Mark.  In a response signed by Brogan and Jones Day in September 2021, they stated: "Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's [press release], and in Defendants' pleadings and other filings in this action. *Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons*."  PSF ¶ 288 (emphasis added).  Defendants had not previously "articulated" the reasons about the email's fourth paragraph; they gave them for the first time at Brogan's June 2022 deposition.  PSF ¶¶ 287-304.  Indeed, as late as January 2022, Jones Day's lead counsel represented to the Court that "[t]he rationale for Jones Day's action was the threat that if you don't give me these eight weeks of paid leave, we'll go to the court of public opinion."  PSF ¶ 301.  June 2022 was too late for them to change their story.

Even if Defendants are permitted to contradict their interrogatory response, no reasonable jury would credit Brogan's testimony about how he interpreted the "black-box" statement or about it being a reason for the termination.  Again, Defendants repeatedly gave their reasons for the termination in the three-and-a-half years between the termination and Brogan's deposition, yet they never hinted in all that time that the fourth paragraph was among them or that they read it as an assertion about someone's mental state in the 1940s.  To the contrary, Jones Day told the Court in October 2021 that it viewed the statement as "apparently a reference to the now dismissed but then active litigation in the *Tolton* case."  Dkt. 93-1 at 9.  The claim in *Tolton*, of course, and in the *Moore v. Jones Day* case filed in mid-2018, was that the black box has a disparate impact on

women and enables discrimination *today*.  PSF ¶¶ 307-12.  Jones Day admittedly understood Plaintiffs to be making the same basic point, which was undisputedly protected.  *Id.*

   **c.    Court of public opinion.**  The email states that, absent a settlement, Mark would "file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion."  PSF ¶ 271.  Brogan testified that he read the reference to the "court of public opinion" as a "threat to go … to the press."  In fact, though, the email does not say that Plaintiffs would take *any* action with the "court of public opinion," much less that they would "go … to the press."  It says that, if the parties could not settle out of court, then Mark would file suit, and both the court and the public would decide for themselves who was in the right.  PSF ¶¶ 273-84.  If threatening suit is protected, mentioning a necessary consequence of litigation is, too.  "Mere warnings by a party of its intention to assert nonfrivolous claims, with predictions of those claims' likely public reception, are not improper."  *Sussman*, 56 F.3d at 459.[16]

   Jones Day has itself explained to the Court that a reasonable person "who is contemplating a discrimination suit necessarily understands that doing so will result in litigation in a public forum" with "[p]ublic airing of … legal and factual positions."  PSF ¶¶ 278-84.  That being the case, Jones Day explained, a reasonable person would not care whether the "airing" occurred only in court filings (which, of course, are public and often reported on) or also through out-of-court statements.  *Id.*  Considering the firm's own statements, no jury would believe that Brogan did not care about being sued and yet was moved to fire Mark by the point that litigation is public.

---

[16] This Court has equated "the court of public opinion" with "public perceptions."  *Brennan Center v. DOJ*, 2021 WL 2711765, at *11 (D.D.C. 2021); *see also, e.g.*, *Rangel v. Boehner*, 785 F.3d 19, 21 (D.C. Cir. 2015); *United States v. Brunson*, 482 F. App'x 811, 819 (4th Cir. 2012) (because trial was "open to the public," it was "subject to contemporaneous review in the court of public opinion"); *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).

Nor could a reasonable jury believe that Brogan really read the email as a threat to "go to the press." PSF ¶¶ 270-84.  Considering the email's actual words, that interpretation is implausible on its face.  And Jones Day has consistently said that it understood the reference as a threat to make *in-court statements* with an eye to how they would affect Jones Day's reputation with the public.  PSF ¶ 279.  It has receded from that view because it realizes that court filings have absolute protection.  But the realization came too late: Jones Day told its story on the reasons for firing Mark in its August 2019 press release, yet its press release says *nothing* about any threat to "go to the press."  PSF ¶¶ 277-79.  No jury could find that Brogan fired Mark based on an implausible reading that the firm did not even concoct until after it published its supposed reasons.

All that aside, it is established that opposition expressed to the press *is* protected: "protected activity includes complaints to co-workers, *reporters*, and managers, therefore *to whom [the plaintiff] made statements opposing discrimination is immaterial* to the viability of his retaliation claim."  *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 647 (6th Cir. 2015) (emphases added).  Even on Brogan's purported reading, the statement was protected activity.[17]

---

[17]  *See also Jackson v. Genesee County Road Comm'n*, 999 F.3d 333, 344-45 (6th Cir. 2021) ("complaining to … newspapers"); *Littlejohn*, 795 F.3d at 317 ("writing critical letters to [the employer's] customers"); *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1355-56 (9th Cir. 1984) ("going public with" complaints); *Crown Zellerbach*, 720 F.2d at 1014-16 (same); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136 (5th Cir. 1981) ("boycott and picketing"); EEOC Enforcement Guidance on Retaliation & Related Issues § II.A.2.b (Aug. 25, 2016) ("even activities such as picketing"; "public protests against discrimination"; "critical letters to customers"); *Chandler*, 2020 WL 5593905, at *5 ("there is no meaningful legal distinction between 'mere predictions' about the consequences of filing a colorable action, and active communications with the press, coupled with such predictions. … [T]here was nothing improper about Plaintiff's counsel's 'express statement' that they would 'publicize the facts asserted in the complaint.'"); *Hajjar-Nehad v. George Washington University*, 873 F. Supp. 2d 1, 22 (D.D.C. 2012) ("Complaining to anyone"; threatening suit; "picketing").

**B.     Title VII's participation clause**

Title VII's participation clause provides absolute immunity from retaliation against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  The January email was protected participation in Jones Day's internal "Reporting and Investigation" process.

**1.**     The D.C. Circuit addressed the participation clause in *McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984).  McKenna complained of her boss's alleged sexism to the boss's supervisor, who launched an investigation.  *Id.* at 787.  McKenna was fired soon after.  *Id.* 787-88.  Rejecting the district court's ruling that she failed make out a prima facie case of retaliation, the D.C. Circuit held that her "complaints to [the boss's supervisor] were clearly protected."  *Id.* at 790-91.  The district court had applied the *Hochstadt* framework, which asks if the manner of *opposition* was so improper as to lose protection.  *Id.* at 790 n.54.  That was error: McKenna's conduct was not mere "opposition" but "participation in an investigation under the [participation] clause," which is "clearly protected" and is not subject to the improper manner rule.  *Id.*

**2.**     "The participation clause speaks in clear, absolute terms" (*Parker*, 652 F.2d at 1019), and many cases agree with *McKenna*—and this Court in *Egei*, 192 F. Supp. 3d at 86-91—that it has no atextual exception for activity deemed improper, unreasonable, or even bad-faith.[18]

---

[18] *See Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Slagle v. County of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006); *Johnson v. University of Cincinnati*, 215 F.3d 561, 581-82 (6th Cir. 2000); *Glover v. S.C. Law Enforcement Division*, 170 F.3d 411, 413-14 (4th Cir. 1999) (Wilkinson, C.J.) (rejecting view that "conduct is only protected participation if that conduct is 'reasonable'"); *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994); EEOC Enforcement Guidance on Retaliation & Related Issues § II.A.1 (Aug. 25, 2016) (no "reasonable, good faith belief" requirement).

Jones Day says that *Egei* is wrong and relies on cases that it rejected.  If the Court is considering rejecting its long and thorough ruling in *Egei*, Plaintiffs seek leave to file a supplemental brief.

**3.**     While the participation clause is most often applied to participation in EEOC proceedings, neither the text nor the purpose of Title VII limits it to that context—and *McKenna* made clear that it covers a complaint to an employer that sparks an internal investigation.

Likewise, "[t]he [EEOC] and the Solicitor General have long taken the view … that raising complaints … or otherwise participating in an employer's internal complaint or investigation process … is covered under the broad protections of the participation clause, although it is also covered as 'opposition.'"  EEOC Enforcement Guidance on Retaliation & Related Issues § II.A.1 (Aug. 25, 2016); *see also FedEx Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (EEOC gets *Skidmore* deference).  The Bush Administration advanced this view in *Crawford*.  *See* Savignac Ex. 1 ("U.S. *Crawford* Br.") at 16-25.  (The Court left the issue open.)  Some courts reject the Government's view, though at least one judge endorsed it in a compelling dissent.  *See EEOC v. Total System Services, Inc.*, 240 F.3d 899, 899-04 (11th Cir. 2001) (Barkett, J., dissenting).

Jones Day contends that the participation clause is limited to EEOC proceedings because participation in an employer's internal complaint process is not participation "in an investigation, proceeding, or hearing *under this subchapter*" (i.e., Title VII).  *See* Dkt. 189 at 31.  *McKenna* forecloses that contention; the EEOC was not involved there.  Moreover, the Supreme Court's interpretations of Title VII have given internal complaint procedures legal force, which Jones Day itself invokes here.  That legal force places those procedures squarely "under" Title VII.

**4.**     In two 1998 decisions, the Court interpreted Title VII to make hostile workplace claims turn on (1) whether the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) whether the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 807 (1998) (same).  The Court made clear that, for larger employers (*see id.*

at 808-09), this would generally boil down to (1) whether the employer had a formal procedure for

discrimination complaints and (2) whether the worker invoked that procedure:

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.  And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Ellerth*, 524 U.S. at 765; *see Faragher*, 524 U.S. at 806-08.  The Court expressly acknowledged

that it was motivated by its recognition that:

> Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms.  Were employer liability to depend in part on an employer's effort to create such procedures, it would effect Congress's intention to promote conciliation rather than litigation in the Title VII context and the EEOC's policy of encouraging the development of grievance procedures.

*Ellerth*, 524 U.S. at 764 (citation omitted); *see Faragher*, 524 U.S. at 806; *id.* at 809 ("EEOC

issued regulations dealing with [employers'] … providing a complaint mechanism in 1990").

A year later, in *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), the Court

applied the same principles to punitive damages claims under Title VII.  Again pointing to "the

incentive for employers to implement antidiscrimination programs" (*id.* at 544), the Court held

that "in the punitive damages context, an employer may not be vicariously liable for the

discriminatory employment decisions of managerial agents where these decisions are contrary to

the employer's good-faith efforts to comply with Title VII."  *Id.* at 545 (quotation marks omitted).

"Where an employer has undertaken such good faith efforts at Title VII compliance, it

demonstrates that it never acted in reckless disregard of federally protected rights" (which is the

standard for punitive damages).  *Id.* at 544 (brackets and quotation marks omitted).

The courts of appeals have applied *Kolstad* to focus, like *Faragher* and *Ellerth*, on the employer's implementation of an internal antidiscrimination policy and complaint process.  *See Swinton v. Potomac Corp.*, 270 F.3d 794, 815 (9th Cir. 2001) ("*Ellerth*, *Faragher*, and *Kolstad* clearly stand for the proposition that employers should be encouraged to institute anti-harassment measures"); *Jeffries v. Wal-Mart Stores, Inc.*, 15 F. App'x 252, 265 (6th Cir. 2001) (*Kolstad* embraced "the *Ellerth-Faragher* vicarious liability rules").   "Accordingly, [employer] investigations are subject to review in Title VII actions to ensure compliance with the employer's obligations as envisioned by [the Supreme] Court's decisions."  U.S. *Crawford* Br. 20.[19]

**5.**      In the wake of *Faragher*, *Ellerth*, and *Kolstad*, employers have adopted written antidiscrimination policies and complaint procedures to limit their potential Title VII liability. Jones Day's Firm Manual has a section on "Equal Employment and Anti-Harassment Policies," which says that the firm "adheres to applicable laws and regulations with regard to nondiscrimination" and "provides equal employment opportunity" "without regard to … gender." PSF ¶¶ 314-315.  The Manual sets out this internal complaint-and-investigation procedure:

**Reporting And Investigation**

Any employee who believes that he or she has been subject to discrimination or harassment in any form should report the incident to [managers including the] Director of Human Resources, the Firm Administrative Partner, or their Office

---

[19] *See, e.g.*, *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006) ("To avail itself of *Kolstad*'s good-faith-compliance standard, an employer must at least 1) adopt antidiscrimination policies; 2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and 3) make good faith efforts *to enforce* an antidiscrimination policy" (emphasis in original; quotation marks omitted)); *Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.*, 399 F.3d 52, 64 (1st Cir. 2005) (same); *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536, 548-49 (4th Cir. 2003) (reversing punitive damages because employer had "implemented organization-wide Equal Employment Opportunity Policy … in the employee handbook" with "a grievance policy encouraging employees to bring forward claims" and stating that "they would not be retaliated against for making a complaint"); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 864 (9th Cir. 2002); *Zimmerman v. Associates First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001).

Administrator.

> The [f]irm will investigate allegations of discrimination or harassment in as prompt and confidential a manner as possible and will take appropriate action if warranted. Any person who is determined by the [f]irm to have engaged in discrimination or harassment in violation of this policy may be subject to disciplinary action, including termination from the [f]irm.  Further, retaliation in any form against an employee or applicant who complains of discrimination or harassment is strictly prohibited, and may itself be cause for appropriate disciplinary action, including termination from the [f]irm.

PSF ¶ 316.  Plaintiffs did exactly what the policy told them to do, presenting their January 2019 email complaining about the leave policy to HR Director McClure.  PSF ¶¶ 314-326.

Jones Day has contended throughout this litigation that its policy has legal force *under Title VII*, invoking *Faragher-Ellerth-Kolstad* principles through defenses like this:

> Jones Day at all relevant times has maintained, disseminated and observed equal employment, affirmative action, a harassment-free work environment, and anti-retaliation policies, that, *inter alia*, provide that all personnel decisions are to be made on the basis of merit without regard to gender, protected activity, or on any other basis that is protected under applicable law, and prohibit any form of retaliation against an individual who in good faith reports a claim of discrimination or who opposes any act or practice made unlawful by any federal, state, or local statute, or who cooperates in the investigation of such a report.

Dkt. 178 at 40 (Eleventh Defense); *see also id.* at 39 (Sixth Defense) (invoking *Kolstad* by asserting that "[a]ll actions by Defendants with respect to Plaintiffs were lawful and were made in good faith compliance with applicable provisions of law").  Jones Day also contends that "Plaintiffs' claims are barred … to the extent that … Jones Day exercised reasonable care to prevent the alleged incidents, and *the Plaintiffs unreasonably failed to take advantage of available preventative or corrective opportunities*."  *Id.* at 40 (Thirteenth Defense) (emphasis added).

In other words, Jones Day argues that Plaintiffs' participation in its formal internal complaint process was not "under" Title VII, yet it simultaneously maintains that the existence of that process and Plaintiffs' supposed failure to take sufficient "advantage" of it preclude Plaintiffs from obtaining the relief they seek under Title VII.  This inconsistency is untenable.  The ordinary

meaning of the word "under" in a statute is "subject to" or "governed by" that statute. *Ardestani v. INS*, 502 U.S. 129, 135 (1991). Here, Jones Day asks the Court to review its internal process and the use that Plaintiffs made of it under Title VII's standards (as established in the case law) and find that it has satisfied those standards and that Plaintiffs' remedies should be limited or precluded accordingly. That is an admission that the internal process was "subject to" Title VII.

**6.** Jones Day argues that the participation clause's phrase "investigation, proceeding, or hearing" refers solely to "the enforcement powers of the EEOC (or its sister agencies)." Dkt. 189 at 31 (quotation marks omitted). Again, *McKenna* says otherwise. And the clause says nothing about the EEOC—whereas other parts of Title VII *do* refer to EEOC investigations. *See* 42 U.S.C. § 2000e-5(b) ("the Commission … shall make an investigation"); *id.* § 2000e-8(a) (EEOC shall have access to evidence "[i]n connection with any investigation of a charge"); *id.* § 2000e-9 ("hearings and investigations conducted by the Commission"). "We normally presume that, where words differ as they differ here, 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 63 (2006) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Further undermining Jones Day's "EEOC only" view are the many cases holding that a government worker's internal complaint to an EEO counselor is protected because it is "participation in the machinery set up by Title VII to enforce its provisions." *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997); *see Bell v. Gonzales*, 398 F. Supp. 2d 78, 94-95 (D.D.C. 2005); *Gonzalez*, 486 F. Supp. at 601, *aff'd* 656 F.2d 899 (D.C. Cir. 1981); *Kurtz v. McHugh*, 423 F. App'x 572, 578 (6th Cir. 2011); *cf. Smith v. Secretary of Navy*, 659 F.2d 1113, 1121-22 (D.C. Cir. 1981) (work as agency EEO counselor protected by participation clause, which seeks to "encourage private efforts to enforce the law"). Under *Faragher*, *Ellerth*, and *Kolstad*, the same

is true of a worker's invocation of a private employer's internal procedures, which those cases treat as a crucial part of the machinery for enforcing Title VII. "The antiretaliation provision seeks to prevent employer interference with unfettered access to *Title VII's remedial mechanisms* … by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, *and their employers*." *Burlington*, 548 U.S. at 68 (emphases added).

7.    Jones Day says that, at the time of the January email, it "was not even conducting an informal inquiry into [the] demand." Dkt. 189 at 31. It is usually true that an investigation is sparked by a complaint, meaning that the investigation is not already in progress when the complaint comes in. That makes no legal difference. Indeed, it was true in *McKenna*: It was McKenna's complaint to her boss's supervisor, causing him to start an investigation, that the D.C. Circuit held was protected participation. 729 F.2d at 790-91 & n.54. The EEOC likewise is not conducting any sort of investigation or proceeding when it first hears from the complainant, yet commencing an EEOC proceeding is plainly covered by the clause's broad protection for "participat[ing] in *any* manner." 42 U.S.C. § 2000e-3(a) (emphasis added).[20] Indeed, the clause would apply here even if Jones Day had not performed any investigation even *in response to* the January email. Its stated policy is to investigate allegations made to the HR Director. PSF ¶ 316. The complainant's protection cannot turn on whether the firm follows through. Regardless, there *was* an investigation here in response to the January email. PSF ¶¶ 323-26.[21] The email was also

---

[20] *See, e.g.*, *Barnes v. Small*, 840 F.2d 972, 976 (D.C. Cir. 1988) ("The statutory prohibition against discrimination is very broad, protecting an employee who 'participates in *any* manner' in a Title VII proceeding" (emphasis in original)); *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999) ("The words 'participate in any manner' express Congress' intent to confer 'exceptionally broad protection'").

[21] Additionally, Jones Day admittedly investigated when Plaintiffs raised the issue in August 2018. PSF ¶¶ 319-20. That it says it was not actively investigating in the interval between its response to Plaintiffs and Plaintiffs' reply does not mean that the investigation ceased to exist

participation because the clause also covers making a "charge," and that includes invoking an employer's complaint process as well as an EEOC charge. *Cf. Greathouse v. JHS Security Inc.*, 784 F.3d 105, 110 n.8, 111-17 (2d Cir. 2015) (FLSA retaliation provision's phrase "filed any complaint … under or related to this chapter" encompasses internal complaints).

8.       No appeals court has held that the participation clause never applies to internal investigations. U.S. *Crawford* Br. 16. But several have held that the clause does not apply to internal investigations *before* (rather than after) the worker files an EEOC charge. *See Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 48-49 & n.6 (2d Cir. 2012). That line has no textual basis—whether the EEOC is involved cannot change whether *the employer's internal investigation* is "under" Title VII. Courts that draw that line say that the internal investigation is "under" Title VII after an EEOC charge is filed because the employer knows that the fruits of its investigation may be used in the EEOC proceeding. *See, e.g., Clover*, 176 F.3d at 1352-53. But the same is true here, where Plaintiffs sought to achieve an informal resolution of the dispute before filing an EEOC charge but made clear that if no resolution could be reached then EEOC involvement was imminent. And, as further addressed below, the line adopted by these cases vitiates the congressional goal of promoting informal resolution *without recourse to the EEOC*.

Jones Day relies on *Townsend*, but its reasoning is flawed. The majority opinion says that the "plain language of the participation clause"—"under" Title VII—"does not include participation in an internal employer investigation unrelated to a formal EEOC charge." 679 F.3d at 49. There is nothing "plain" about that. *Townsend* adds that cases like *Faragher* do not affect its conclusion because they do not *require* employees to participate in internal investigations as a

_____

during that interval. To the contrary, Shumaker testified that "the August [email from Jones Day] said if you have any questions or concerns, please come to us. That was still an open door" as of January 2019. PSF ¶ 321.

prerequisite to suit. *Id.* at 50. The point, though, is that those decisions give internal investigations legal force under Title VII—which is sufficient for them to qualify as being "under" Title VII.

The *Townsend* concurrence rightly rejects the majority's plain-language approach but "reluctantly" joined its disposition. *Id.* at 60 (Lohier, J., concurring). It reasons that "affirming requires reference to the legislative history of Title VII's anti-retaliation provision because the text is ambiguous." *Id.* And it concludes that internal complaints are not covered because internal investigations by private employers were unheard of in 1964, so "Congress appears to have had only government investigations in mind" when it enacted Title VII. *Id.* at 61-62.; *see id.* at 62 ("Without evidence that private-sector internal investigations existed and that Congress considered them at the time it enacted Title VII, I am hard pressed to conclude from the legislative history that Congress intended to include these investigations in the ambit of the participation clause.").

While the concurrence saw the flaws in the majority's reasoning, its own reasoning is also flawed. *First*, it speaks past the Government's point, which is that internal complaint procedures are "under" Title VII *because of Supreme Court decisions in the 1990s that read Title VII to give those procedures legal force*, not because of what Congress was thinking in 1964. *Second*, on the concurrence's reasoning, Title VII allows sexual orientation discrimination—no one thinks that Congress "considered" or "intended" to prohibit it in 1964. But the Court rejected that reasoning in *Bostock*, 140 S. Ct. at 1737, 1754. *Accord Zarda*, 883 F.3d at 137 (Lohier, J., concurring) (asking "what the legislature would have decided if the issue had occurred to the legislators at the time of enactment is, unfortunately, no longer an interpretative option of first resort").[22]

---

[22] The *Townsend* concurrence disregarded the EEOC's amicus brief as inconsistent with its then-current Compliance Manual. *See* 679 F.3d at 62-63; *but see* U.S. *Crawford* Br. 29. As noted above, the current (2016) Guidance does treat internal complaints as protected participation. And the EEOC has taken that position in briefs going back at least to 2000. *See* U.S. *Crawford* Br. 29.

**9.** Where the language of Title VII's antiretaliation provision is unclear, precedent demands recourse not to the law's legislative history but to its purpose, as Justice Thomas explained in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). The antiretaliation provision protects "employees or applicants for employment." 42 U.S.C. § 2000e-3(a). The Fourth Circuit held that this did not cover *former* employees like the plaintiff, whose former employer gave him "a negative reference in retaliation for his having filed [an] EEOC charge." 519 U.S. at 339.

The Supreme Court reversed. *Id.* The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," looking to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 340-41. "At first blush, the term 'employees' in [§ 2000e-3(a)] would seem to refer to those having an existing employment relationship with the employer." *Id.* at 314. And the Court had unanimously held just a month before that "employees" in another part of Title VII *is* limited to current employees. *Id.* at 341 & n.2. But the Court rejected "[t]his initial impression," finding nothing in the antiretaliation provision to "make plain that [it] protects only persons still employed at the time of the retaliation." *Id.* at 341. Rather, the provision "is ambiguous as to whether it excludes former employees." *Id.*

The Court resolved the ambiguity by looking to the antiretaliation provision's purpose. *See id.* at 345-46. Some individuals complaining about Title VII violations will necessarily be former employees (e.g., in discriminatory termination cases). *Id.* at 345. The plaintiff noted that the Fourth Circuit's view "would effectively vitiate much of the protection afforded by" § 2000e-3(a), and the EEOC pointed out that "exclusion of former employees … would undermine the effectiveness of [§ 2000e-3(a)] by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC, and would provide a perverse incentive

45

for employers to fire employees who might bring Title VII claims." *Id.* at 345-46. The Court held that "[t]hese arguments carry persuasive force given their coherence and their consistency with a primary purpose of antiretaliation provisions: Maintaining unfettered access to statutory remedial mechanisms." *Id.* at 346; *see also id.* (narrower interpretation "would be destructive of this purpose"). The Court concluded that "the term employees, as used in [§ 2000e-3(a)], is ambiguous as to whether it includes former employees. It being more consistent with the broader context of Title VII and the primary purpose of [§ 2000e-3(a)], we hold that former employees are included." *Id.* at 346; *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7-13 (2011) (rejecting most natural reading of FLSA retaliation clause in favor of reading that promotes statute's broad purpose); *Rochon v. Gonzales*, 438 F.3d 1211, 1218 (D.C. Cir. 2006) (following *Robinson* by rejecting reading of § 2000e-3(a) that would "be destructive of [its] purpose").

As the *Townsend* concurrence noted, it cannot be said that § 2000e-3(a)'s language ("under this subchapter") "unambiguously *excludes* internal investigations." 679 F.3d at 61. If this Court concludes, despite the arguments above, that the clause is ambiguous with respect to whether internal complaint procedures are "under" Title VII, then, as *Robinson* requires, it should determine which interpretation is more consistent with the antiretaliation provision's overarching context and purpose. The answer is clear. There is no conceivable reason for giving an employee *less* protection for making an internal complaint than she would receive for directing the same complaint to the EEOC. Like the position rejected in *Robinson*, that "would provide a perverse incentive for employers to fire employees who might bring Title VII claims" (519 U.S. at 346) so as to deprive employees of the clause's absolute protection against retaliatory termination. Employees would have an equal incentive to go directly to the agency and courts to secure the clause's protection. All this would undermine the statutory purposes of promoting settlement of

46

disputes without recourse to the EEOC, promoting the use of internal discrimination complaint procedures, and deterring harm to employees.[23]  The D.C. Circuit's rationale for a broad reading of the opposition clause applies no less here: "The remedial purposes of Title VII would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal EEOC filings, and that internal opposition, though encouraged, is undertaken at the accuser's peril."  *Parker*, 652 F.2d at 1019 (quotation marks omitted).

> As the Solicitor General explained in his *Crawford* amicus brief:
>
> In light of the importance of the internal investigation process to Title VII liability, it would make no sense to interpret the participation clause to leave employees unprotected in that process. … Employers should not be permitted to use such an investigation as a shield to liability under Title VII while at the same [time] insisting that the absence of an EEOC charge precludes any liability to retaliation for participation in the very same investigation.

U.S. *Crawford* Br. 20-21; *see also Townsend*, 679 F.3d at 63 (Lohier, J., concurring) (feeling "compelled to agree" with the majority, but acknowledging that "the distinction between investigations in which the government is involved and internal investigations strikes me as antiquated and arbitrary" since "[i]nternal investigations form an integral part of Title VII today").

**10.**     Finally, Jones Day says that the participation clause should be interpreted like the FLSA's retaliation provision, 29 U.S.C. § 215(a)(3), which (as Jones Day notes) describes a "similar list of protected formal agency activity, 'under or related to this chapter.'"  Dkt. 189 at 31

---

[23] *See, e.g.*, *Kolstad*, 527 U.S. at 544 (rejecting measure that "would reduce the incentive for employers to implement antidiscrimination programs"); *Ellerth*, 524 U.S. at 764 ("Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms"); *Faragher*, 524 U.S. at 806 (Title VII's "primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm" (quotation marks omitted)); *Pendleton*, 628 F.2d at 108 ("The private settlement of grievances is a purpose of the Act."); *Berg*, 612 F.2d at 1045 ("the elimination of employment discrimination by informal means" is "Title VII's central purpose," and "the frank and nondisruptive exchange of ideas between employers and employees" is "one of the chief means of achieving that purpose").

(quoting § 215(a)(3)).   Indeed, the FLSA's language—prohibiting retaliation because a worker "has filed any complaint … under or related to this chapter"—looks *more* like a reference to agency or court activity than does the language of the participation clause.   Yet all ten courts of appeals to decide the issue have held, correctly, that *the FLSA's parallel language protects internal complaints*.   *See Greathouse*, 784 F.3d at 110 n.8, 111-17 (collecting cases).   In joining that consensus, the Second Circuit was persuaded by the First Circuit's point that "'[b]y protecting only those employees who kept secret their belief that they were being illegally treated until they filed a legal proceeding,' a narrow interpretation of FLSA 'would discourage prior discussion of the matter between employee and employer, and would have the bizarre effect both of discouraging early settlement attempts and creating an incentive for the employer to fire an employee as soon as possible after learning the employee believed he was being treated illegally.'"   *Id.* at 114 (quoting *Valerio v. Putnam Associates, Inc.*, 173 F.3d 35, 43 (1st Cir. 1999)).   The same reasoning applies equally to Title VII's parallel provision.

## C.      The FLSA's protection for "any complaint … under or related to" the FLSA

The FLSA makes it illegal to "discharge … any employee because such employee has filed any complaint … under or related to this chapter" (i.e., the FLSA).   29 U.S.C. § 215(a)(3).   The January email was a protected "complaint" under this provision.   Jones Day asserts that the "filed any complaint" language only protects "participation in formal agency proceedings."   Dkt. 189 at 27.   As just noted, though, all ten courts of appeals to consider the issue have correctly held that the language equally protects internal complaints.   Since Jones Day offers no argument, this Court has no reason to go against them, and Plaintiffs will not rehash their reasoning.

Like Title VII's participation clause, the FLSA's antiretaliation provision "speaks in clear, absolute terms" (*Parker*, 652 F.2d at 1019), providing absolute immunity for "*any complaint …*

*under or related to*" the FLSA.  *See Randolph v. ADT Security Services, Inc.*, 2011 WL 3476898, at *5-6 (D. Md. 2011).  As a result, the January email was protected activity under the FLSA as a matter of law.  Since Jones Day admits that it fired Mark because of the email, Plaintiffs have established all three elements of an FLSA retaliation claim and are entitled to judgment.

Jones Day has previously argued, however, that the scope of protected activity under the FLSA should, like Title VII's *opposition* clause, be limited to claims proved to be reasonable and in good faith.  *See* Dkt. 15 at 24 n.7.  If that were true, Plaintiffs would prevail for the reasons in § II.A.  But Jones Day ignores the enormous textual differences between the FLSA and the opposition clause.  It goes without saying that courts must "respect any differences in language and purpose between Title VII and the FLSA."  *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 73 (D.D.C. 2009) (quoting *Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008)).  Indeed, Jones Day itself invokes those textual differences when it urges that the FLSA only protects administrative complaints (which, of course, is not true of the opposition clause).

The "good-faith, reasonable belief" requirement is a gloss on the text of Title VII's opposition clause, which protects opposition to "any practice *made an unlawful employment practice* under" Title VII.  *See Parker*, 652 F.2d at 1019.  By contrast, the FLSA protects "*any complaint ...* under or related to" the FLSA.  Again, these are "clear, absolute terms," like the terms of Title VII's participation clause.  *Id.*  The FLSA's language does not require a violation (or reasonably perceived violation) of the FLSA—it only requires a *complaint* under or related to the FLSA.  Having received a complaint, the employer is on notice not to retaliate.  And, of course, "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009).  Finally,

grafting the opposition clause's limits onto the FLSA would be particularly perverse given that the FLSA was enacted in 1938—decades *before* Title VII—and protects complaints about many other issues (e.g., minimum-wage violations).  As *Randolph* rightly holds, "Title VII's participation clause provides the closer analogy to the FLSA's complaint clause," so "reasonableness does not have a place in a complaint clause analysis either."  2011 WL 3476898, at *5-6.[24]

### D.      The D.C. Human Rights Act

The DCHRA goes "above and beyond" Title VII and must be "read … liberally" and "generously construed," consistent with its "sweeping statement of intent."  *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887 (D.C. 2008).  Plaintiffs are entitled to summary judgment under the DCHRA for the reasons given above in the Title VII context.

### E.      Jones Day's summary judgment motion fails under all circumstances

Even if the Court rejects Plaintiffs' arguments for summary judgment, genuine fact disputes preclude judgment for Jones Day.  In particular, a reasonable jury could find that Jones Day fired Mark because of his stated intention to file an EEOC charge and civil rights lawsuit rather than the elements of the January email that Jones Day now claims were unprotected. Brogan's contrary testimony—that he had no reaction whatsoever to the specter of litigation but viewed practically every other aspect of the email as demanding immediate termination—is incredible.  And despite claiming to be utterly unfazed by the prospect of litigation here, he confessed that he would not support for partner an associate who was litigating a discrimination claim against his firm.  PSF ¶¶ 267-69.  And, in the only other instance uncovered in discovery where a current Jones Day employee advised that she was contemplating a discrimination suit,

---

[24] The Seventh Circuit grafted the opposition clause's "good-faith, reasonable belief" requirement onto the FLSA in *Sloan v. American Brain Tumor Ass'n*, 901 F.3d 891, 895-96 (7th Cir. 2018).  But its cursory discussion offers no reasoning and ignores the stark textual differences.

████████████████████████████████████████████

████████████████████████—exactly what occurred here.  PSF ¶¶ 330-41.  In short, a reasonable jury

could discredit Brogan's testimony, which was largely incredible.  *E.g.*, PSF ¶¶ 237-54.[25]

## III.    Julia is a proper retaliation plaintiff (Counts VII-IX).

Jones Day urges that Julia's retaliation claim fails "because Brogan believed that the

January 2019 email was sent from [Mark] only."  Dkt. 189 at 40.  To the contrary, Julia is a proper

plaintiff—and entitled to summary judgment—for two independent reasons.

**A.    Jones Day retaliated against Julia.**  Jones Day's treatment of Julia satisfies all

three elements: (1) she engaged in protected activity by challenging Jones Day's leave policy,

including by writing and sending the January email with Mark (PSF ¶ 213); (2) she suffered

adverse action in the form of Jones Day's firing of her husband (*see Thompson v. North American*

*Stainless, LP*, 562 U.S. 170, 174-75 (2011) ("firing a close family member will almost always

meet the … standard")); and (3) the firm fired Mark because of the email (PSF ¶¶ 220-229).

Jones Day's only response is that "Brogan believed that the January 2019 email was sent

from [Mark] only."  Dkt. 189 at 40.  Even if true, that does not negate any element of her claim.

---

[25] Jones Day says no jury could find that Brogan fired Mark for saying that he would sue because associates had told the firm on prior occasions that its family leave policies were discriminatory *without* saying they would sue and had *not* been fired.  Dkt. 189 at 36.  The argument is unserious. Just as the fact that a company has hired some non-white applicants would not show that it did not discriminate on another occasion, the fact that Jones Day does not always fire everyone who points to discrimination in its leave policies does not show that it did not do so here.  And the main distinction between the January email and the prior complaints is that only the former indicates an intent to sue—if anything, the comparison suggests that Mark *was* fired for saying he would sue. Jones Day insists that the difference is that the January email had an objectionable "tone."  But the tone of Mark's August email is the same—a direct statement that the firm was breaking the law. Jones Day previously said that the August email *did* reflect the same negative traits that supposedly led it to fire him, giving the lie to its current claim that a difference in manner explains the different reaction.  JDSF ¶¶ 345.  Finally, the January email was the only complaint that was escalated to Brogan.  PSF ¶¶ 234, 236.  If he had seen the others, he may well have responded the same way.

Jones Day notes that some cases say that "there can obviously be no retaliation if the retaliator did not know about the protected activity." *Id.*   But Brogan knew about the protected activity (the email).   What Jones Day has to establish is that there can be no retaliation of the retaliator knows of the protected activity but not *the identity of all participants in that activity*.   Its cases do not speak to that scenario.   And it is obvious that there could be actionable retaliation.   Suppose four workers complain that a manager discriminated against an applicant.   Headquarters disciplines him, but does not say who complained.   So he arranges to deprive all four of a raise.   The four meet all three elements and thus have claims.   But Jones Day's argument says, absurdly, that *none* has a claim, because, for each worker, the retaliator did not know that the worker participated in sending the complaint.   Since Jones Day's one argument fails, Julia is entitled to judgment.   And even if Jones Day were right on the law, a jury could discredit Brogan's testimony.   JDSF ¶ 361.

**B.**   **Julia has a cause of action as an aggrieved person.**   Julia is also a proper plaintiff because the law gives a cause of action not only to the worker retaliated against but also any "person claiming to be aggrieved … by the alleged unlawful employment practice."   42 U.S.C. § 2000e-5(f)(1); D.C. Code § 2-1403.16.   This "enabl[es] suit by any plaintiff with an interest arguably [sought] to be protected by the statute."   *Thompson*, 562 U.S. at 178.   "[T]he word 'arguably' in the test [] indicate[s] that the benefit of any doubt goes to the plaintiff."   *Match-E-Be-Nash-She-Wish Band v. Patchak*, 567 U.S. 209, 225 (2012).   This is "a low bar.   A plaintiff with Article III standing satisfies the requirement unless his 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"   *Howard R.L. Cook & Tommy Shaw Foundation v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013) (Kavanaugh, J.) (quoting *Thompson*, 562 U.S. at 178).   *Billington* thus held that employees could sue over the employer's allegedly retaliatory

refusal to recognize a foundation created to "help[] employees pursue allegations of racial discrimination against the [employer]." *Id.* at 769, 771-72. "Title VII[] gives injured employees a right to sue. As employees, the individual plaintiffs' interests obviously cannot be deemed 'marginally related to or inconsistent with' the purposes of Title VII. The individual plaintiffs in this case have therefore satisfied the [person aggrieved] requirement." *Id.* at 772 (citation omitted).

Julia also clears the "low bar," for she is *both* the wife of the fired employee *and* the employee who initiated the challenge to the leave policy. Under *Billington*, the second point would be dispositive on its own: "Title VII[] gives injured employees a right to sue," including for retaliation against others. *Id.*; *see Thompson*, 562 U.S. at 178 ("the purpose of Title VII is to protect employees from their employers' unlawful actions"); *Robinson*, 519 U.S. at 346 (former employees are covered). The FLSA's "right of action" provision likewise covers Julia, authorizing "[a]n action … against any employer … by any one or more employees." 29 U.S.C. § 216(b).

## IV. Brogan and Shumaker are individually liable for firing Mark (Counts VIII-IX).

Brogan and Shumaker are personally liable. Shumaker recommended the firing to Brogan, who authorized it. PSF ¶¶ 221-227. The FLSA imposes liability for retaliation on "[a]ny employer," defined to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §§ 203(d), 216(b). The DCHRA defines "employer" to include "any person acting in the interest of such employer, directly or indirectly." D.C. Code § 2-1401.02(10). "Where, as here, the employer is a law partnership, the phrase 'any person acting in the interest of such employer, directly or indirectly,' necessarily includes a partner." *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998).

**V.      Jones Day's interference with job references was illegal retaliation.**

After firing Mark, Defendants continued to retaliate by prohibiting partners from providing employment references and putting artificial limitations on the one who was authorized to do so. PSF ¶¶ 347-401.  Jones Day seeks summary judgment, but its cursory arguments fail.

**Causation.**  Jones Day concedes that its policy does not prohibit references but simply assigns authority over which to allow and which to prohibit to Shumaker.  Dkt. 188 at 12; PSF ¶¶ 361-368.  He testified that the policy puts no limits on his discretion, that he had authority to permit the references here, and that he makes decisions on a case-by-case basis, based on the individual circumstances of each request.  *Id.*  On these facts, the written policy requiring Shumaker's approval is beside the point.  This is simply a case where a manager can choose whether to take an adverse action and chooses to take it.  The only causation question is whether the protected activity caused that choice.  Here, a jury could find that the January email was a cause.  Shumaker had procured Mark's termination based on the email a week before, so it is implausible that the email did not cause any of his reference restrictions.  And a jury could discredit his incredible testimony that the restrictions were intended to *help Mark*.

**Adverse action.**  "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct."  *Thompson*, 562 U.S. at 173.  It "prohibits any employer action that 'well might have dissuaded a reasonable worker from making … a charge.'"  *Id.* at 174 (quoting *White*, 548 U.S. at 64).  A "reasonable worker" "well might" be dissuaded "if she knew that her employer would bar well-connected partners from assisting with her job search.  *Id.*  Indeed, "it is well established that efforts by an employer to scuttle a former employee's search for a new job, such as by withholding a letter of recommendation …, can constitute illegal retaliation."  *Passer v. American Chemical Society*, 935 F.2d 322, 331 (D.C. Cir. 1991); *see Smith*, 659 F.2d at 1121.

Ignoring *Passer*, Jones Day says a negative *performance review* is not an "adverse action" "[a]bsent evidence of 'tangible job consequences'" and infers that a denial of employment references is not actionable unless the plaintiff can point to a specific firm that would have hired him if he had the references (which, in practice, would bar most reference-based retaliation claims).  Dkt. 189 at 38 (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008)). What *Baloch* actually says is that "performance reviews typically constitute adverse actions only when attached to financial harms. … Baloch had already achieved the highest step for his grade" and "did not produce evidence showing that the 2003 negative performance evaluation *could* affect his position, grade level, salary, or promotion opportunities."  550 F.3d at 1199 (emphasis added). Here, a jury could find that the reference denial "could" have affected Mark (and most likely did). The restrictions made Mark a materially weaker candidate.  PSF ¶¶ 347, 351, 354-360, 368-393. That meets the *Burlington* standard.[26]

**Heifetz.**  Jones Day argues that Heifetz is not liable because she was not "personally involved" in interfering with Mark's references.  Dkt. 189 at 39 (citing cases stating that a manager is liable if she was "personally involved"); *see Hanson v. McBride*, 2018 WL 10230024, at *3 (M.D. Tenn. 2018) (Jones Day's cited case, holding that liability "logically includes all individuals who are personally involved").  But she *was* personally involved.  Jones Day pointed to her as an "individual[] involved" in its response to the reference requests in an interrogatory response signed by Heifetz herself.  PSF ¶ 394.  As soon as she caught wind of Mark's reference requests on

---

[26] *See also Smith*, 659 F.2d at 1121-22 (retaliatory performance evaluation violated Title VII even though plaintiff had yet to show financial harm from it); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-55 (3d Cir. 1997) (finding prima facie case where employer "refused to provide a reference" and noting that asking for evidence that the retaliation negatively influenced the plaintiff's job search "is not the proper test").  Whether Mark was "entitled" to references (Dkt. 189 at 39) is irrelevant; at-will workers are not "entitled" to jobs, but firing them is an adverse action.

January 28, 2019, she took action to harm his job search by "calling everyone to 'remind' us that (apparently) the [f]irm handbook prohibits employment references" and "not to answer if he calls or emails."  PSF ¶¶ 350-355, 371-372, 394.  It was only as a result of her interference that Partner F—who had "never heard of that policy" before and had previously agreed to be a reference for Mark—refused to provide a formal reference for Mark.  PSF ¶ 353.  Likewise, Karl Thompson (who also was unaware of the policy) had *already agreed* to help Mark before she intervened.  PSF ¶¶ 348-351.  This goes beyond "personal involvement"; Heifetz was actively seeking to thwart Mark's attempt to salvage his career.  She is like the "consultant and plant manager" in Jones Day's cited case, who could be liable because they "were personally involved" in the firing.  *Glover v. City of North Charleston*, 942 F. Supp. 243, 246 (D.S.C. 1996).  Heifetz knew that Mark had been fired for the email challenging the leave policy and she played the principal role in preventing partners from providing the references that they had already agreed to provide.  She also went out of her way to report the reference requests to McClure, which predictably precipitated Shumaker's involvement and his role in the interference.

Additionally, as Jones Day's cited case notes, "[c]ourts have held individuals liable under the DCHRA when they were personally involved in the discriminatory conduct *or* when they aided or abetted in the discriminatory conduct of others.  Courts have permitted actions against plaintiffs' supervisors to proceed under an aiding and abetting theory when it was alleged that they knew or should have known about the discriminatory conduct and failed to stop it."  *King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 331-32 (D.D.C. 2011) (citations omitted; emphasis added); *see* D.C. Code § 2-1402.62.  "The aiding-and-abetting clause is meant to prohibit an individual from assisting another person in … retaliating."  *McCaskill v. Gallaudet University*, 36 F. Supp. 3d 145, 156 (D.D.C. 2014).  It is beyond dispute that Heifetz knew about the retaliatory reference denial

and failed to stop it or even to refrain from personally advancing it—she was the principal implementer of that retaliatory denial.  PSF ¶¶ 350-355, 371-372, 394.

The D.C. Court of Appeals held in *Wallace* that "if Skadden, Arps unlawfully discriminated against the plaintiff as alleged, then *the partners who carried out the allegedly discriminatory acts aided and abetted the employer's discrimination*."  715 A.2d at 888 (emphasis added).  That holding inarguably covers Heifetz' admitted participation in carrying out the retaliation.  *See also Fred A. Smith Management Co. v. Cerpe*, 957 A.2d 907, 914 n.5 (D.C. 2008).

## VI.    Jones Day committed pay discrimination against Julia (Counts IV-VI).[27]

Julia's pay claim turns on two questions: (1) Was gender bias a motivating factor behind Partner A's evaluation?  And (2) was that evaluation a factor in her 2017 pay adjustment?  A jury could find for Julia on both points, so Jones Day's motion fails.

**A.**    Jones Day argues that Partner A just said the same things that everyone was saying about Julia.  That is false.  PSF ¶¶ 433-66, 551, 562-63, 583.  Julia did excellent work, as confirmed by both her top-of-class merit-based salary and the evaluations of countless partners across all four years—which *conflict with* Partner A's falsehoods.  *Id.*; PSF ¶¶ 481-83.  While her billable hours were on the lower side, that cannot explain her 2017 raise; her billables were much *higher* in 2016 than in any other year.  PSF ¶¶ 472-78.

Partner A's evaluation makes several factual assertions: (1)  Julia's initial (but not later) drafts had too much "legal analysis" and too little "direction to the client"; (2) she showed "little-to-no initiative, … like a second-year associate, she merely does what is asked of her"; (3)  she failed to get him "the next version of the memo" in a timely manner "[o]n multiple occasions";

---

[27] Jones Day has forced Julia to respond to a frivolous Rule 11 motion on this issue as well. Plaintiffs' opposition to that motion (at § II) includes a more detailed discussion.

and (4) she refused to work weekends.  PSF ¶ 448.  A jury could find that these assertions were knowingly false and could therefore find that Partner A discriminated.  PSF ¶¶ 485-782.[28]  In fact: (1) the memo did not call for much advice, and the advice in the initial and final drafts was materially the same (and Partner A said at the time that the first draft was "great") (PSF ¶¶ 516-527, 534-36); (2) Julia showed a great deal of initiative, repeatedly reaching out to Partner A to offer assistance without prompting, leading an investigation, interviewing the client, and suggesting the very revisions that upset Partner A and led to his negative evaluation (PSF ¶¶ 552-61); (3) aside from one that Partner A *disavowed* at deposition, there was *no* occasion when he asked for the next version but Julia was tied up (PSF ¶¶ 565-573); and (4) Julia frequently worked on weekends, including working with Partner A on Thanksgiving weekend, and repeatedly offered to do other weekend work for him (PSF ¶¶ 584-599).

Partner A was admittedly annoyed by Julia's revisions.  PSF ¶¶ 494-98.  Confirming his animus, he added to his evaluation a great deal of largely baseless speculation about Julia's overall relationship with the firm, contrary to his usual practice and the evaluation prompt.  PSF ¶¶ 600-21.  And his evaluations of other associates are highly gendered, including ███████████████ ████████████████████████████████████████████████████████████████████  PSF ¶¶ 634-35.  Apparently he was upset by Julia's perceived lack of the ████████ he demands from women when she "rude[ly]" suggested changes to his revisions.  PSF ¶¶ 636-37.  As other female associates who knew Partner A perceived, he treated women and men differently.  PSF ¶¶ 623-33.

**B.**     While Julia's starting salary and first two raises were in lockstep with her peers, her 2017 raise was a fifth of theirs.  PSF ¶¶ 472-75, 483; JDSF ¶ 268.  Jones Day's argument that no

---

[28] *E.g.*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000); *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *George*, 407 F.3d at 413; *McKenna*, 729 F.2d at 788.

jury could find that Partner A's review accounts for *any* of that $60,000 gap is frivolous.  It admits that her evaluations were a factor in the pay decision and so was her assessment statement (which echoes Partner A's complaints).  PSF ¶¶ 691-94.  It previously told the Court that "compensation is *principally based*" on evaluations.  PSF ¶ 684; *see also* PSF ¶¶ 686-94.  Ignoring Partner A's review, Julia's record for 2016 was very similar to her 2015 record (including one negative review from someone other than Partner A and a "2" rating from Heifetz).  Chase Ex. 15.  A jury could find that Partner A's review made the difference that explains her much smaller raise for 2016. Jones Day says that Brogan made the decision without reading evaluations, but he simply adopted the joint recommendation of Shumaker and Lovitt, who did read them.  PSF ¶¶ 695-716; *see also* PSF ¶¶ 704, 717 (Brogan's decision was also based on Orr's recommendation, and he had the evaluations top).  A jury could easily find that the evaluation affected their recommendation.  A jury could also find that it affected the "2" rating from Heifetz, who was also responsible for Julia's assessment statement, which was indisputably influenced by the evaluation.  PSF ¶¶ 721-30. Anyway, Heifetz's ratings do not appear to have affected *anyone's* pay.  PSF ¶¶ 718-20.

**C.**       As for Julia's EPA claim, Jones Day says the higher-paid men in her practice group are invalid comparators because her performance supposedly did not equal theirs.  Dkt. 189 at 37. But the Court has held that the EPA's "equal work" element asks whether the workers have substantially the same *job requirements*—not whether their performance in those jobs was equally good, which is instead an affirmative defense.  *Savignac v. Jones Day*, 539 F. Supp. 3d 107, 111-116 (D.D.C. 2021).  Jones Day does not even try to argue that Julia had materially different job requirements than men in the same practice and class year.  It throws in a cursory assertion that the affirmative defense is established because "Sheketoff's poor performance is a factor 'other than sex' that justifies her lower rate of pay."  Dkt. 189 at 38 (quoting 29 U.S.C. § 206(d)(1)).  But

the record does not establish as a matter of law that Julia's performance was "poor," that her pay was "based on" her supposed poor performance (*see McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995) ("proving that the same decision would have been *justified* … is not the same as proving that the same decision would have been *made*") (emphases added)), or that Jones Day's assessment of her performance is "based on any factor other than sex" rather than being influenced by Partner A's evaluation. Jones Day has not carried its burden under the EPA.

## VII.   Jones Day's press release was illegal retaliation (Counts XII-XIV).

A lawsuit is clearly protected activity. In response to the filing of this one, Jones Day posted to its website, Facebook, LinkedIn, and Twitter a press release full of malicious falsehoods apparently intended to destroy Plaintiffs' careers. Chase Ex. 72. Its summary judgment bid fails.

**A.    Causation.** Jones Day says that it "issued the press release to respond to Plaintiffs' media attacks," not this litigation. Dkt. 189 at 47. Yet it titled the press release "Jones Day Responds to Litigation Challenging Leave Policy." PSF ¶ 403. Its content reflects the title (it says nothing about Plaintiffs speaking to the New York Times); so does its timing. Chase Ex. 72. Even if the Times story was one cause of the press release, a jury could find that the filing of this lawsuit was, too. *See Bostock*, 140 S. Ct. at 1739.[29] Nor does it matter if the firm was moved by a desire to protect its public reputation rather than animus against discrimination complainants—Title VII asks whether the protected act or status *caused* the adverse action; it does not ask about the employer's "ultimate intention." *Id.* at 1742. Anyway, the release would be illegal if its sole cause was the Times story—the law protects complaints to the public or press (*see* § II.A, *supra*).

---

[29] A jury could also discredit Brogan's claim that he read the January email as a "threat to go to the media" and find that Jones Day, which prepared the press release long before Plaintiffs talked to the Times, was going to publish it either way. PSF ¶¶ 270-284, 411-414; JDSF ¶¶ 418-439.

**B.     Adverse action.** An "adverse action" for retaliation purposes is one that "well might have dissuaded a reasonable worker." *Thompson*, 562 U.S. at 174. Jones Day says that "public humiliation" and "loss of reputation" can never meet that standard absent evidence of tangible harm to employment opportunities. Dkt. 189 at 49. But its three D.C. Circuit cases predate the adoption of the "dissuade a reasonable worker" standard in *Rochon*, 438 F.3d 1211 (D.C. Cir. 2006), and *Burlington*, and do not observe the crucial distinction drawn in those cases between *adverse employment actions for discrimination claims* and *adverse actions for retaliation claims*. *See* 548 U.S. at 59-67; 438 F.3d at 1216-20. Public humiliation and loss of reputation can indisputably meet the now-binding *Burlington*/*Rochon* standard.[30]

Anyway, a jury could find that the press release—which remains online—harmed Plaintiffs' career prospects and will continue to do so, since any employer or client who googles Plaintiffs will encounter its malicious statements. PSF ¶¶ 402-410; *cf. Burlington*, 548 U.S. at 69 (even "excluding an employee from a weekly training lunch" could meet the *Burlington* standard). Jones Day's argument that Plaintiffs must prove that they have already suffered a concrete instance of monetary loss (e.g., a specific employer that told them it was rejecting them because of the press release) has no support in the case law under *Burlington* and is inconsistent with the rule adopted there, which asks whether the action might well have dissuaded a reasonable worker if she had known it would follow—a forward-looking, ex ante inquiry rather than one focused on the loss ultimately incurred. *See Thompson*, 562 U.S. at 174; *Burlington*, 548 U.S. at 71-73 (move to less "prestig[ious]," "more arduous and dirtier" role actionable; suspension without pay actionable

---

[30] *Chambers v. District of Columbia* criticizes Jones Day's cited case and strongly suggests that "public humiliation or loss of reputation" also meet the standard for discrimination claims. 35 F.4th 870, 875, 881-82 (D.C. Cir. 2022) (en banc).

even after the employer voluntarily reinstated the plaintiff with backpay); *Smith*, 659 F.2d at 1122 (bad review actionable even though plaintiff had yet to suffer financial loss).

In *Passer*, the D.C. Circuit observed that "it is well established that efforts by an employer to scuttle a former employee's search for a new job, such as … by providing negative information to a prospective employer, can constitute illegal retaliation."  935 F.2d at 331; *see also Smith*, 659 F.2d at 1121 ("dissemination of adverse employment references for reasons condemned by Title VII constitutes an unlawful 'employment practice'").  The same surely goes for providing negative information *to the whole world*, including *every* potential client or employer.  Indeed, *Passer* held that a defendant's "cancellation of a major public symposium in [the plaintiff's] honor" *was* an adverse action for retaliation purpose because it "humiliated him before the assemblage of his professional associates and peers from across the nation, and made it more difficult for him to procure future employment."  *Id.*  The same is true here.

Jones Day's other arguments are the same ones rejected at the pleading stage, with the same inapposite citations.  *See* Dkt. 42 (Order).  Anyway, its argument—that a reasonable plaintiff would not care whether the defendant makes false and malicious statements about it not just in dry filings on PACER (which might be referenced in paywalled articles on legal websites) but also in a press release posted to its website (where it has more than *25,000* views) and disseminated to tens of thousands of followers on Twitter and Facebook—is absurd.  PSF ¶¶ 402-410.

**C.     First Amendment.**  Finally, Jones Day says that even if it violated the civil rights laws, the violation was protected by the First Amendment.  The argument fails.  As an initial matter, the protection for reporting on or parody of public figures does not carry over unchanged to an employer's violation of its workers' rights under the workplace discrimination laws.  "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing

incidental burdens on speech.  That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  That is why this Court reasoned that "[t]here is no reason to believe, for example, that an employee would have no recourse if her employer published career-damaging 'opinions' about her because the employee was angry that the employee had filed an equal employment opportunity complaint."  Dkt. 42 at 5.  And it is why an employer is prohibited from telling potential employers the (true) fact that the worker filed an EEOC charge, or refusing to provide an reference because a worker filed a charge (despite the constitutional bar on compelled speech).  *E.g.*, *Passer*, 935 F.2d at 331.[31]

Even if the Constitution treats violation of the employment laws the same way it treats a defamation claim against the Times, Jones Day concedes that a false statement is unprotected if made "with knowledge that it was false or with reckless disregard of whether it was false or not" (which is all that "actual malice" means).  Dkt. 189 at 51.  A jury could find that standard met.

*First*, the press release asserts that "[Plaintiffs] complain that [Jones Day's] leave policy … perpetuates gender stereotypes because the [f]irm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them sufficient to justify disability leave."  PSF ¶¶ 415-417.  In fact, Plaintiffs never claimed that Jones Day should or must require medical disclosures.  *Id.*  The firm's assertion that they had made such a complaint was knowingly false and plainly intended to harm their reputations by falsely casting them as anti-woman.  *Id.*  Jones Day argues that it was merely stating its "opinion."  Dkt. 189 at 52.  But the statement is no opinion—it is an objectively false claim about what Plaintiffs' complaint was.

---

[31] Jones Day notes with a *cf.* citation that some entities have constitutional rights to discriminate.  Dkt. 189 at 50 n.6.  But law firms do not.  *See Hishon v. King & Spalding*, 467 U.S. 69 (1984).

*Second*, the press release asserts that Mark's "claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent" and that the firm fired him "because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day." PSF ¶¶ 418-421. This is a factual assertion about why the firm fired Mark—*not* because he challenged the leave policy, but rather because it determined that he had character flaws. As explained above, a jury could find that the assertion is knowingly false and that Jones Day did fire Mark for saying its policy is illegal. In fact, Brogan openly testified to that. PSF ¶¶ 230-236.

*Third*, the press release asserts that Julia's pay discrimination claim Julia "is false and was not made in good faith." The assertion that Julia does not believe that her claim has merit is a falsifiable assertion of objective fact, not an opinion. The record proves that Julia *did* (and does) believe that Partner A discriminated against her. PSF ¶¶ 422-429; *see Clark-Williams v. WMATA*, 2016 WL 4186810, at *6 (D.D.C. 2016) ("A showing of 'bad faith' … requires a showing of fraud, or deceitful or dishonest action" (quotation marks omitted)). Certainly a jury could so find. And Jones Day made the assertion with, at best, recklessness as to its truth or falsity. It had no basis to say that Julia filed her claim despite believing it to be false—an assertion that, if credited, would end her career—and at least two Jones Day partners had long known that Julia believed that Partner A discriminated (one of them agreed with her). PSF ¶ 423. Brogan's explanation—that he knew Julia was lying because Partner A is "biracial" and was in the military and because the firm's evaluation system is so perfect that any bias would be detected—is not credible. PSF ¶¶ 240-263. Indeed, even Partner A conceded that he had no reason to believe Julia was in bad faith. PSF ¶ 425. Yet no one bothered to speak to him about Julia before issuing the press release. PSF ¶ 424.

The press release also asserts that Julia "resorts to the sensationalized allegation that the [f]irm doctored her website photo 'to conform to the firm's Caucasian standards of female beauty.' [The quoted language is not in the complaint.]   Jones Day never altered any photographs of Ms. Sheketoff, and in fact, Ms. Sheketoff personally selected the precise photo that was used on the [f]irm's website."   PSF ¶ 430.   Jones Day now argues that its photographer was not its "employee" and that the acts of its non-employee agents on its behalf are not fairly attributed to it. Dkt. 189 at 53.  But that is not what the press release says.  A reasonable jury could find that Jones Day made the statement to convey the false implication that Julia had lied about her photo being doctored.  PSF ¶¶ 430-432.  There is no other explanation for the statement that she "personally selected the precise photo that was used" on the website; Jones Day knew that Julia had complained when Jones Day proposed using the doctored photo, which is why the un-doctored version was used instead; she never complained about the version that was actually used.  PSF ¶ 431; JDSF ¶¶ 447-451.   A literally true statement is unprotected if the defendant intended to convey a defamatory inference.  *White v. Fraternal Order of Police*, 909 F.2d 512, 518-21 (D.C. Cir. 1990).

Finally, Jones Day's argument that the press release is protected because it reflects the firm's "litigation positions" is baseless.  The First Amendment does not immunize false statements to a court, and it certainly does not immunize false out-of-court statements merely because they coincide with arguments later made in court.  None of Jones Day's citations suggests otherwise.

## CONCLUSION

The Court should deny Jones Day's motion and enter partial judgment for Plaintiffs.

65

/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

January 27, 2023

/s/ Mark Savignac
Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367