**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

     *Plaintiffs*,

       v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and MICHAEL
SHUMAKER,

     *Defendants*.

Case No. 1:19-cv-02443-RDM-ZMF

**CORRECTED RESPONSE TO DEFENDANTS' LOCAL RULE 7(h) STATEMENT**

**I.**    **THE PARTIES**

    **A.**    **Defendants**

    1.    Jones Day ("Firm") is a general partnership organized under Ohio law, and a global law firm with more than 2,300 lawyers in 42 offices across five continents, including an office in Washington, D.C.  McClure Decl. at ¶ 5.

    Response: Undisputed that Jones Day is a general partnership and a law firm with more than 2,300 lawyers and an office in Washington, D.C.  The remaining facts in this compound paragraph are plainly immaterial—a point that applies to many of Defendants' paragraphs but that Plaintiffs will not repeat in their other responses.

    2.    Stephen J. Brogan is a partner at Jones Day and, since 2003, has been the Firm's Managing Partner.  Answer to Third Am. Compl. ¶ 16 (Dkt. 178); Chase Ex. 77, Brogan Tr. 10:10-12.

    Response: Undisputed, except that he no longer holds that title.

3.      Michael Shumaker is a partner at Jones Day and has served as the Firm Administrative Partner since approximately 2014.  Answer to Third Am. Compl. ¶ 17 (Dkt. 178); Chase Ex. 81, Shumaker Tr. 15:24-25, 16:7-8, 16:20-23.

Response: Undisputed.

4.      Beth Heifetz was a partner at Jones Day and the Practice Leader for the Issues & Appeals practice throughout the relevant time period, and became Of Counsel to the Firm in 2021.  Answer to Third Am. Compl. ¶ 18 (Dkt. 178); Heifetz Decl. at ¶ 1.

Response: Undisputed.

5.      Jones Day's Firm Manual delineates the "values, principles and basic policies which govern the Firm's operations."  Among them are the "foundational value" of "integrity" in dealing with one another, as well as commitments to "the advancement of the rule of law" and to "working together in an environment of mutual respect."  Chase Ex. 1 at JD_00002036, 2038, 2041.

Response: Disputed in part.  Undisputed that the manual includes those words.  Disputed that the words are true.  The facts of this case, among others, demonstrate that the words are not true.  See PSF at ¶¶ 1-735.  The Manual is inadmissible hearsay if offered for the truth of the proposition that Jones Day holds those values.  A company's puffery about its values is not a legitimate evidentiary basis for the proposition that the company actually holds those values.  The press has reported on Jones Day for its failed attempts to undermine the rule of law in the United States.  See, e.g., The New York Times, "Growing Discomfort at Law Firms Representing Trump in Election Lawsuits" (Nov. 9, 2020); The New York Times, "How a Corporate Law Firm Led a Political Revolution" (Aug. 25, 2022).

6. As stated in the Manual, the Firm "embraces diversity" and "operates on the belief that the Firm and every component of the legal profession should be diverse in the broadest sense of the term." Chase Ex. 1 at JD_00002042.

Response: Disputed in part. Undisputed that the manual includes those words. Disputed that the words are true. The facts of this case, among others, demonstrate that the words are not true. *See* PSF at ¶¶ 1-735. The Manual is inadmissible hearsay if offered for the truth of the proposition that Jones Day holds those values. A company's puffery about its values is not a legitimate evidentiary basis for the proposition that the company actually holds those values.

7. Managing Partner Brogan has testified that, consistent with those principles, the Firm has always been "committed to trying to encourage everybody" to succeed, "to become great Jones Day lawyers," and "to do great work for the firm" and its clients. Chase Ex. 77, Brogan Tr. 31:14-21.

Response: Disputed in part. Undisputed that Brogan said those words. Disputed that the words are true or that they relate to the puffery in the preceding two paragraphs. The facts of this case, among others, demonstrate that the words are not true. *See* PSF at ¶¶ 205-735.

8. Demonstrating Jones Day's commitment to the advancement of all lawyers, including women and diverse lawyers, the legal news service Law360 has named Jones Day a "Ceiling Smasher" in each of the past three years for having one of the top percentages of women partners in law firms with more than 600 lawyers. McClure Decl. at ¶ 7.

Response: Disputed in part. Undisputed that a legal news service has named Jones Day a "ceiling smasher." Disputed that the statements are true. Statements by Law360 are

3

hearsay and are not admissible for the truth of the matter asserted (that Jones Day has a relatively high percentage of female partners) or for any inference that Defendants might seek to draw therefrom.  Plaintiffs object to this paragraph because it is based on a declaration from Sarah McClure but is beyond Jones Day's disclosure for McClure, which states only that "███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ██████████."  Sheketoff Ex. 34 at 9.

9.      In addition, 48% of the new partners announced in the last five new partner classes are women.  McClure Decl. at ¶ 6.

Response: Disputed in part.  Undisputed that, since 2018, when Jones Day was sued by a female partner (Wendy Moore) for sex discrimination and also learned that a group of former associates (Tolton et al.) were preparing a putative class action against it for sex discrimination (which was filed in January 2019), the firm has conferred the title "partner" on roughly equal numbers of male and female associates (i.e., effective 2019, 2020, 2021, 2022, and 2023).  Disputed that Jones Day's well-publicized promotions during a five-year period that post-dates the acts of sex discrimination at issue in this suit and the two others just referenced—and during which period Jones Day was at all times subject to sex discrimination litigation (including this suit)—says anything positive about Jones Day.  The more relevant period would be the time leading up to the events at issue here and in the other lawsuits.  During that period, Jones Day promoted men at a much higher rate than women.  *Tolton v. Jones Day*, No. 19 Civ. 945, Dkt. 115 at 20-22 (hereinafter *Tolton*); *id.* at Dkt. 155-9 (Jones Day's partnership announcements showing

that it promoted far more men than women—which Jones Day removed from its website

when the *Tolton* suit was filed).  Thus, assuming Jones Day's premise here that the

gender breakdown in a firm's new partners is indicative of whether the firm is sexist,

Jones Day was indeed sexist throughout the relevant time and then changed its behavior

only in response to litigation.  Plaintiffs object to this paragraph because it is based on a

declaration from Sarah McClure but is beyond Jones Day's disclosure for McClure,

which states only that "███████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████." Sheketoff Ex. 34 at 9.

     10.     Women and diverse candidates also occupy leadership positions around the Firm;

45% of Jones Day's offices are led by a female Partner-in-Charge.  McClure Decl. at ¶ 6.

     <u>Response</u>: Disputed in part.  Undisputed that some leadership positions are held by

women.  Disputed that the partner-in-charge title is meaningfully indicative of

membership in the firm's leadership.  The firm's managing partner has absolute authority

over the governance of the firm, including picking his own successor, and that role has

only ever been held by white males.  Dkt. 178 at ¶ 2; *Gregory M. Shumaker becomes*

*eighth Managing Partner of Jones Day*, https://msjexhibits.page.link/gZ9b. Plaintiffs

object to this paragraph because it is based on a declaration from Sarah McClure but is

beyond Jones Day's disclosure for McClure, which states only that "█████████

████████████████████████████████████

██████████████████████████████████████

███████████████████." Sheketoff Ex. 34 at 9.

11.     Of the Firm's twenty-two practice groups, nine—including the Issues & Appeals practice, of which Sheketoff and Savignac were part—have a female Practice Leader, and female attorneys comprise 40% of the Firm's two primary governance committees.  McClure Decl. at ¶ 6.

> <u>Response</u>: Disputed in part.  Undisputed that Defendant Heifetz, who led the Issues & Appeals group at the relevant time, is female.  Otherwise disputed.  The firm's managing partner has absolute authority over the governance of the firm, including picking his own successor, and that role has only ever been held by white males.  Dkt. 178 at ¶ 2; *Gregory M. Shumaker becomes eight Managing Partner of Jones Day*, https://msjexhibits.page.link/gZ9b.  Plaintiffs object to this paragraph because it is based on a declaration from Sarah McClure but is beyond Jones Day's disclosure for McClure, which states only that " ███████████████████████████ ████████████████████████████████████ ██████████████████████████████ ███████ ." Sheketoff Ex. 34 at 9.

12.     Jones Day also supports six internal, Firmwide affinity groups—including affinity groups for Women Lawyers, Black Lawyers, and LGBTQ+ Lawyers and allies—and hosts an annual 1L Diversity Conference, which involves fully subsidizing the travel and other costs associated with a two-day conference that brings together Jones Day lawyers, Firm clients, and first-year law students from across the country.  McClure Decl. at ¶ 8.

> <u>Response</u>: Disputed.  This transparently immaterial puffery is not consistent with Plaintiffs' experience at Jones Day, and Plaintiffs object to this paragraph because it is based on a declaration from Sarah McClure but is beyond Jones Day's disclosure for

McClure, which states only that "█████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████." Sheketoff Ex. 34 at 9.

13.     Jones Day also has been "been extraordinarily supportive of people and their families," including by offering associates generous, gender-neutral family leave upon the birth of a child.  Chase Ex. 77, Brogan Tr. 174:8-9.

> Response: Disputed.  The leave that Jones Day offers to new parents is not gender-neutral and is not generous (much less extraordinary) compared to other large corporate firms, many of which offer 18 weeks of paid family leave to both fathers and mothers.  *E.g.*, McClure Ex. 1 at JD_00002486 ("Mothers who are primary caregivers" receive "18 weeks of paid leave" and "total leave" up to "24 weeks," while "[f]athers who are primary caregivers" receive "ten weeks of paid leave … but in no case may the total leave [including unpaid leave] exceed 16 weeks").  *See also* PSF ¶¶ 111-204.  The firm's illegal treatment of Plaintiffs in the month of their child's birth also belies any claim that the firm is pro-family.  PSF ¶¶ 205-346.

14.     In the time period relevant to this case, Jones Day provided associates ten weeks of family leave on a gender-neutral basis—that is, to both birthmothers and birthfathers who acted as primary caregivers—and allowed associates to divide their family leave into different blocks to maximize the time that a parent is home with a newborn.  McClure Ex. 1 at JD_00002485-86.

> Response: Disputed.  The cited "Family Leave" policy states that "[m]others who are primary caregivers" receive "18 weeks of paid leave" and "total leave" (including unpaid

leave) up to "24 weeks," while "[f]athers who are primary caregivers" receive "ten weeks

of paid leave … but in no case may the total leave [including unpaid leave] exceed 16

weeks."  McClure Ex. 1 at JD_00002485-86.

**B.    Plaintiffs**

15.    Julia Sheketoff joined Jones Day in October 2014 following clerkships with Judge

David Sentelle of the United States Circuit Court of Appeals for the D.C. Circuit and Justice

Breyer of the U.S. Supreme Court.  Sheketoff was an associate in the Issues & Appeals practice,

resident in the Firm's Washington D.C. office.  Third Am. Compl. ¶¶ 3, 101 (Dkt. 172); *see also*

Chase Ex. 17 at JD_00000194.

Response: Undisputed.

16.    Prior to joining the Firm, Sheketoff was deciding between Jones Day and a

position with the Federal Public Defender's Office, but chose Jones Day because it "paid a lot

more" and she "thought I would get good experience there" and "was excited about the idea of

being able to do pro bono work with the Federal Defender's Office and other offices."  Chase

Ex. 80, Sheketoff Tr. 15:9-14.

Response: Undisputed.

17.    She received a clerkship bonus of $300,000 and starting salary of $300,000, and

was paid a total of more than $1.8 million in salary and bonus in less than four years at the Firm.

Chase Ex. 17 at JD_00000092, 184.

Response: Undisputed.

18.    In the time that she was at the Firm, Sheketoff billed a total of 2,628 hours to

paying clients (an average of approximately 700 hours a year), and billed 3,388 hours to pro

bono matters.  Chase Ex. 15 at JD_JS_00001289, 1296.

Response: Undisputed.

19.     In July 2018, Sheketoff accepted a position at the Federal Public Defender's Office—the employer she had initially turned down in favor of the higher-paying position at Jones Day.  Chase Ex. 80, Sheketoff Tr. 23:21-24:3; *see also* Chase Ex. 40, JD_00003191.

Response: Undisputed.

20.     Sheketoff was pregnant at that time and wanted to stay at Jones Day "through maternity leave here" so that she could take advantage of the Firm's generous paid leave offerings, but "for some reason the FD office wasn't super pumped about" that.  Chase Ex. 40, JD_00003191; *see also* Chase Ex. 80, Sheketoff Tr. 26:18-27:18.

Response: Undisputed.

21.     Her last day at Jones Day was August 24, 2018.  Chase Ex. 17, JD_00000092.

Response: Undisputed.

22.     Mark Savignac, who also clerked for Justice Breyer, joined Jones Day in May 2017 and was an associate in the Firm's Issues & Appeals practice, resident in the Washington D.C. office.  Third Am. Compl. ¶ 84.

Response: Undisputed.

23.     He was terminated effective January 22, 2019.  Chase Ex. 46, JD_00002633.

Response: Undisputed.

## II.     JONES DAY'S LEAVE POLICIES RELATED TO CHILDBIRTH

24.     Jones Day maintains various leave policies applicable to associates in a document entitled HR Policies and Benefits – Lawyer – Partner, Of Counsel, Counsel, Associate, and Senior Staff Attorney ("HR Policies").  McClure Ex. 1, JD_00002479-80.

Response: Disputed in part.  Undisputed that Jones Day maintains various written policies.  Disputed that the written policies always convey Jones Day's actual policies.  *E.g.*, PSF ¶¶ 17-19.

9

25.     The version of the HR Policies in effect as of January 2019 included a section entitled "Short Term Disability ('STD') Leave" that allows, "[i]n any one year period, full salary and fringe benefits for up to the first 13 weeks of continuous disability, and 75% of salary and full fringe benefits for up to the 14th through 26th weeks of continuous disability."  McClure Ex. 1 at JD_00002483.

> Response: Undisputed.

26.     There is an application process for STD leave, and an associate "will be considered disabled for purposes of this policy if he or she is unable to perform the material and substantial duties of his or her regular occupation, … is not working in any occupation, and is under the regular and continuing care of a physician or other 'health care provider' as defined under the federal [FMLA]."  McClure Ex. 1 at JD_00002483.

> Response: Undisputed that the written STD policy so states.  However, an associate is *also* deemed disabled if she has given birth within the preceding eight weeks, without regard for whether she is actually disabled from performing the material and substantial duties of her regular occupation.  PSF ¶¶ 2-148.

27.     Salary continuation under the STD policy is "subject to repayment by the lawyer if the leave is later determined not to qualify for salary continuation under this policy."  McClure Ex. 1 at JD_00002483.

> Response: Undisputed that the written STD policy so states.  However, an associate who has given birth within the preceding eight weeks does qualify for salary continuation under the policy, regardless of whether she is in fact disabled.  PSF ¶¶ 2-148.

28.     The STD policy further states: "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, postpartum disability period for routine childbirth (including Cesarean-section births)."  McClure Ex. 1, JD_00002484.

Response: Undisputed.

29.     In the event birth-related disability extends beyond eight weeks postpartum, "the specific period of approved STD leave is subject to certification from professional medical personnel that specifies the appropriate length of leave."  McClure Ex. 1 at JD_00002484.

Response: Undisputed.  The policy indicates that this requirement applies to all associates seeking STD leave with the sole exception of associates who have given birth in the preceding eight weeks, so the requirement would apply to an associate who seeks more than eight weeks of STD leave.  See McClure Ex. 1 at JD_00002484.

30.     Plaintiffs alleged to the Equal Employment Opportunity Commission that the "8 weeks of leave given to birth mothers (but not birth fathers)" under Jones Day's STD policy "is caretaking leave rather than disability leave" and that Jones Day unlawfully discriminated against Savignac based on his sex by denying his request to take 8 additional weeks of paid leave under the STD policy.  Chase Ex. 43 at JD_00003259.

Response: Disputed in part.  Undisputed that Mark's EEOC charge states, in part, that "[t]he additional 8 weeks of leave given to birth mothers … is caretaking leave rather than disability leave … because the birth mother's entitlement to 8 more weeks of paid leave than birth fathers does not depend on whether the birth mother is actually disabled during that 8-week period" and that "Jones Day's denial of Mr. Savignac and Ms. Sheketoff's requests that Mr. Savignac be given parental leave equal to that given to women also constitutes sex discrimination in violation of Title VII."  Chase Ex. 43 at

JD_00003259-61.  Disputed that the charge characterizes the eight weeks as "under the STD policy."  It states that "Jones Day's parental leave policy unlawfully provides 18 weeks of paid parental leave … to birth mothers … but provides only 10 weeks … to birth fathers" and that "Jones Day's denial of Mr. Savignac and Ms. Sheketoff's requests that Mr. Savignac be given parental leave equal to that given to women also constitutes sex discrimination in violation of Title VII."  *Id.* at JD_00003259-61; *see also, e.g.*, McClure Ex. 1 at JD_00002485-86 (Jones Day's "Family Leave" policy, stating that "Mothers who are primary caregivers" receive "18 weeks of paid leave," while "[f]athers who are primary caregivers" receive "ten weeks of paid leave").

## A.      Jones Day Adopted the Eight-Week Assumption for Non-Discriminatory Reasons

31.      Jones Day adopted the eight-week disability assumption for routine childbirth in 1994.  Dressing Decl. at ¶ 15.

Response: Undisputed, though Plaintiffs note that Jones Day has previously told the Court that "the presumption of an eight-week disability period for routine childbirth … originated with the [f]irm's third-party plan administrator," and that the firm's "only role was limited to selecting one of the three industry-standard options."  Dkt. 19 at 11 n.2.

32.      Prior to that time, Jones Day's benefits for non-partner lawyers provided twelve weeks of paid leave and twelve weeks of unpaid leave to women who gave birth.  Dressing Decl. at ¶ 6; *see also* Chase Ex. 3 at JD_00003413.

Response: Undisputed.

33.      Those leave periods did not differentiate between, on the one hand, time that the new mother needed to recover from childbirth and, on the other, time for the new mother and

child to bond, and Jones Day did not require any type of disability certification from the lawyer's medical provider.  Dressing Decl. at ¶ 6.

> Response: Undisputed.

34.     The Firm also did not provide any type of formal family leave to new fathers, who typically utilized vacation time or sick days to take time off of work following the birth of a child.  Dressing Decl. at ¶ 6.

> Response: Disputed in part.  Undisputed that Jones Day gave no family leave at all to
> male associates while giving female associates 24 weeks of leave.  Plaintiffs dispute any
> implication that the ability of male associates to expend vacation or sick leave following
> the birth of a child constituted "informal" family leave.

35.     These policies were generally consistent with those of comparably-sized law firms.  Dressing Decl. at ¶ 6; *see also* Chase Ex. 4, JD_00003899-900.

> Response: Undisputed that the cited document (a table apparently prepared by HR
> Director Dressing in the early 1990s) represents that other BigLaw firms had generally
> similar policies, though some did give leave to fathers and many cells of the table simply
> say "cbc," an entry that Plaintiffs do not understand.  Plaintiffs also object that the
> summaries of other firms' policies are inadmissible hearsay.

36.     After Congress enacted the Family and Medical Leave Act in 1993, Julie Dressing—at the time Jones Day's Director of Human Resources & Employment Counsel— undertook a privileged review of Jones Day's leave policies, acting in her capacity as counsel to the Firm.  Dressing Decl. at ¶ 7.

> Response: Disputed in part.  Undisputed that Dressing was HR Director and undertook a
> review.  Whether the review was "privileged" or done "in her capacity as counsel" are

legal characterizations rather than facts, and Plaintiffs do not admit those

characterizations (to the extent that a response is required, Plaintiffs dispute them).

37.     The review included surveying leave policies at other law firms to understand

what types of benefits would be competitive in the legal market.  Dressing Decl. at ¶ 9; *see also*

Chase Ex. 4 at JD_00003899-900.

> Response: Disputed.  As stated above in Jones Day's ¶ 36, Jones Day maintains that
>
> Dressing's review was "privileged" and, on that basis, has withheld virtually all
>
> contemporaneous documents.  *E.g.*, Sheketoff Ex. 1.  Plaintiffs object to this partial
>
> disclosure of the alleged substance of the allegedly privileged investigation allegedly
>
> performed by its alleged counsel.

38.     Following that survey, Dressing concluded that the amount of paid leave Jones

Day made available to new mothers—twelve weeks—was at the top of the legal market and

competitive from a recruiting standpoint.  Dressing Decl. at ¶ 9.

> Response: Disputed.  The cited declaration says that the firm concluded that keeping
>
> mothers' paid leave at 12 weeks would "ensure[] that Jones Day remained competitive in
>
> associate recruiting."  Dressing Decl. ¶ 9.  That the leave was allegedly "competitive"
>
> does not suggest that it was "at the top of the legal market."  Moreover, as stated above in
>
> Jones Day's ¶ 36, Jones Day maintains that Dressing's review was "privileged" and, on
>
> that basis, has withheld virtually all contemporaneous documents.  *See* Plaintiffs'
>
> response to ¶ 37, supra.  Plaintiffs object to this partial disclosure of the alleged
>
> conclusions of the allegedly privileged investigation allegedly performed by its alleged
>
> counsel.

39.     Dressing concluded that Jones Day did not need to expand the amount of paid leave for new mothers, but she did recommend that the Firm begin providing family leave to new fathers as a benefit separate and distinct from vacation or sick days.  Dressing Decl. at ¶ 9.

Response: Disputed.  The cited paragraph states that, circa 1994, "the [f]irm decided that … Jones Day would begin offering new fathers paid leave."  Dressing Decl. ¶ 9.  So stated, the proposition is undisputed.  Plaintiffs object to this partial disclosure of the alleged conclusions of the allegedly privileged investigation allegedly performed by its alleged counsel.

40.     This necessitated deciding how much of the twelve weeks of paid leave available to new mothers was for recovery from childbirth, and thus available only to those associates who actually gave birth.  The remainder of that period would be deemed family leave and made available to all new parents.  Dressing Decl. ¶ 10.

Response: Disputed in part.  Undisputed that Jones Day determined how much family leave to offer to fathers by deciding how much of mothers' 12 weeks would be deemed disability leave and deeming the balance to be family leave that would be offered to fathers as well.  Disputed that this process for deciding how much family leave to offer fathers was "necessitated" by anything.  Dressing Decl. ¶ 10.

41.     Dressing recommended assuming that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complications.  Dressing Decl. ¶ 10.

Response: Disputed in part.  As stated above in Jones Day's ¶ 36, Jones Day maintains that Dressing's review was "privileged" and, on that basis, has withheld virtually all contemporaneous documents.  See Plaintiffs' response to ¶ 37, supra.  Plaintiffs object to

this partial disclosure of alleged "recommend[ations]" emerging from the allegedly privileged investigation allegedly performed by its alleged counsel.  Undisputed that, as Dressing stated in an unprivileged 1994 memo to "the Female Of Counsel, Senior Attorneys and Associates," the firm gives women (but not men) eight extra weeks of paid leave, with those extra eight weeks "tracked administratively" such that "[t]he lawyer is considered to be on paid medical leave."  Ex. Sheketoff Ex. 2 at JD_00003302.

42.     Dressing based her recommendation on several factors.  Dressing Decl. ¶ 11.

Response: Disputed.  As stated above in Jones Day's ¶ 36, Jones Day maintains that Dressing's review was "privileged" and, on that basis, has withheld virtually all contemporaneous documents.  See Plaintiffs' response to ¶ 37, supra.  Plaintiffs object to this partial disclosure of its counsel's alleged thought process during her allegedly privileged investigation and resulting in allegedly privileged advice to Jones Day emerging from the allegedly privileged investigation allegedly performed by its alleged counsel.  There is no admissible evidence of Jones Day's counsel's thought process.

43.     First, Dressing knew from experience that physicians "typically certified between six and eight weeks of disability for uncomplicated childbirth, often depending on whether the birth was vaginal or via Cesarean section."  Dressing Decl. ¶ 11(a).

Response: Undisputed that this was Dressing's experience.  As stated in response to ¶ 42, however, Plaintiffs object to and dispute any assertion that this experience was part of Dressing's thought process in her alleged capacity as Jones Day's counsel conducting an allegedly privileged investigation, which assertion would be an improper partial disclosure of matter claimed to be privileged.

44.    Although Jones Day had not previously required attorneys to provide medical certifications for disability from childbirth, it had required such certifications from staff members, and Dressing was familiar with those certifications from her role as Jones Day's Director of Human Resources.  Dressing Decl. ¶ 11(a).

Response: Undisputed.

45.    *Second*, in Dressing's experience—echoed by that of other HR staff who testified in this case—even when a physician certified six weeks of short-term disability from childbirth, employees "would occasionally provide a second certification late in that six-week period certifying some additional time of disability leave."  Dressing Decl. ¶ 11(a); *see also* Chase Ex. 76, Bounds Tr. 8:1-25, 192:1-17 (testimony of Lori Bounds, an HR staff member at Jones Day for twenty-five years who worked with staff-related postpartum disability leave, that "the six weeks for vaginal delivery was often the beginning point, and then often it was extended to eight weeks").

Response: Undisputed that Dressing's experience was that doctors would "occasionally" certify additional leave following a six-week disability period.  Disputed that the supposed experience of Bounds (the only "other HR staff" whose experience is in evidence here), inasmuch as it suggests that additional leave is certified "often" rather than just "occasionally," has anything to do with Dressing's experience prior to 1994 or the firm's policy adopted circa 1994 (which was before Bounds even began working for Jones Day).  As stated in response to ¶ 42, Plaintiffs object to and dispute any assertion that this experience was part of Dressing's thought process in her alleged capacity as Jones Day's counsel conducting an allegedly privileged investigation, which assertion would be an improper partial disclosure of matter claimed to be privileged.

17

46.     *Third*, although the initial certification of disability could differ depending on the type of delivery (vaginal or Cesarean), Jones Day did not want to start compelling female associates to disclose that type of medical information to the Firm as a condition of receiving disability leave.  Dressing Decl. ¶ 11(b).

> Response: Disputed.  Jones Day's disability policy requires far more intrusive disclosures from new mothers who incur disabilities substantial enough to require more than eight weeks of disability leave as a condition of receiving the disability leave they require. *See, e.g.*, McClure Ex. 1 at JD_00002484.  A reasonable jury could find that Jones Day and its managers have never been concerned with the medical privacy of new mothers. Also disputed that Dressing's supposed thinking can be attributed to "Jones Day." Dressing was not the Jones Day decisionmaker, and there is no evidence in the record regarding whether Dressing even communicated her supposed sensitivity about the type of delivery to the decisionmaker, much less that the decisionmaker shared that sensitivity. Rather, the decision to do as Dressing recommended was made by managing partner McCartan (as Jones Day states below at ¶ 51) and there is no evidence of McCartan's rationale besides that it was based on a memorandum from Dressing over which Jones Day is claiming privilege.  Sheketoff Ex. 3; *see also* Dressing Decl. ¶ 8 (asserting that "[m]y review culminated in late 1993 with a privileged memorandum that I sent to Patrick F. McCartan, then Jones Day's Managing Partner").  As stated in response to ¶ 42, Plaintiffs object to and dispute any assertion purporting to characterize Dressing's thought process or to characterize communications that she made to the decisionmaker in her alleged capacity as Jones Day's counsel conducting an allegedly privileged

investigation, which assertions would be improper partial disclosures of matter claimed to be privileged.

47.     Dressing was concerned that the female associates working at Jones Day at the time—who had not previously been forced to identify their type of delivery—"might react negatively to the new level of intrusiveness if Jones Day were to start requiring disclosures of, for instance, the type of birth."  Dressing Decl. ¶ 11(b).

Response: Disputed.  In the absence of any pre-litigation evidence, a reasonable jury could find that it is not plausible that Dressing or Jones Day had that concern, particularly given that the firm's pre-existing policy for staff required certifications of the type of delivery (and there is no evidence that anyone "react[ed] negatively" to that) and its disability policy required and continues to require intrusive disclosures from female associates who require more than eight weeks of disability leave after giving birth, *see, e.g.*, McClure Ex. 1 at JD_00002484 (and there is no evidence of anyone "react[ing] negatively" to that, either).  Also disputed that Dressing's declaration of her supposed thinking is either admissible or relevant to Jones Day's decision to adopt the policy. Dressing was not the Jones Day decisionmaker, and there is no evidence in the record regarding whether Dressing even communicated her supposed concern about the type of delivery to the decisionmaker, much less that the decisionmaker shared that concern. Rather, as discussed in response to ¶ 46 above, the decision to do as Dressing recommended was made by managing partner McCartan and there is no evidence of McCartan's rationale besides that it was based on a memorandum from Dressing over which Jones Day is claiming privilege.  Sheketoff Ex. 3; *see also* Dressing Decl. ¶ 8.  As stated in response to ¶ 42, Plaintiffs object to and dispute any assertion purporting to

characterize Dressing's thought process or to characterize communications that she made to the decisionmaker in her alleged capacity as Jones Day's counsel conducting an allegedly privileged investigation, which assertions would be improper partial disclosures of matter claimed to be privileged.

48.     *Fourth*, because the Firm did not want to require female associates to identify whether they gave birth vaginally or via Cesarean section, an eight-week assumption would best ensure that the Firm adequately accommodated all short-term disabilities for routine childbirth. Dressing Decl. ¶ 11(c).

Response: Disputed in part.  Undisputed that a longer "disability" leave will, by definition, always be more overinclusive in the sense of providing a sufficient or excessive leave period to a larger proportion of employees than would a shorter "disability" leave.  Otherwise disputed for the reasons given in response to ¶¶ 46-47.

49.     *Fifth*, an assumed disability period would be easier for Jones Day to administer, as it would not only be consistent with medical practice, but also would avoid having to follow-up with associates postpartum to ascertain their overall level of physical capability throughout the course of their recovery.  Dressing Decl. ¶ 11(d).

Response: Disputed in part.  Undisputed that a one-size-fits-all generalization may be somewhat easier to administer, though there is no evidence that it would be materially burdensome to administer leave on the same individualized basis as applies to all other disabilities under the STD policy.  Disputed that the one-size-fits-all eight-week generalization is "consistent with medical practice."  PSF ¶¶ 149-87.  It is undisputed that medical providers would only certify a six-week disability period for the most common form of birth.  *See* Jones Day's ¶ 56, infra.  (Jones Day appears to be using the term

"consistent with" to mean "equal to or greater than," which is not the ordinary meaning

of the phrase.)  Also disputed that Dressing's declaration of her supposed thinking is

either admissible or relevant to Jones Day's decision to adopt the policy.  Dressing was

not the Jones Day decisionmaker, and there is no evidence in the record regarding

whether Dressing even communicated her supposed concern about the type of delivery to

the decisionmaker, much less that the decisionmaker shared that concern.  Rather, as

discussed in response to ¶ 46 above, the decision to do as Dressing recommended was

made by managing partner McCartan, and there is no evidence of McCartan's rationale

besides that it was based on a memorandum from Dressing over which Jones Day is

claiming privilege.  Sheketoff Ex. 3; *see also* Dressing Decl. ¶ 8.  As stated in response to

¶ 42, Plaintiffs object to and dispute any assertion purporting to characterize Dressing's

thought process or to characterize communications that she made to the decisionmaker in

her alleged capacity as Jones Day's counsel conducting an allegedly privileged

investigation, which assertions would be improper partial disclosures of matter claimed to

be privileged.

50.     *Finally*, Dressing understood from her experience in human resources that

assuming an eight-week disability for routine childbirth would be consistent with how insurance

companies administered disability plans.  Dressing Decl. ¶ 11(e).

Response: Disputed.  PSF ¶¶ 194-204.  Jones Day appears to be using the term

"consistent with" to mean "equal to or greater than," which is not the ordinary meaning

of the phrase.  Also disputed that Dressing's declaration of her supposed thinking is

either admissible or relevant to Jones Day's decision to adopt the policy.  Dressing was

not the Jones Day decisionmaker, and there is no evidence in the record regarding

whether Dressing even communicated her supposed concern about the type of delivery to the decisionmaker, much less that the decisionmaker shared that concern. Rather, as discussed in response to ¶ 46 above, the decision to do as Dressing recommended was made by managing partner McCartan and there is no evidence of McCartan's rationale besides that it was based on a memorandum from Dressing over which Jones Day is claiming privilege. Sheketoff Ex. 3; *see also* Dressing Decl. ¶ 8. As stated in response to ¶ 42, Plaintiffs object to and dispute any assertion purporting to characterize Dressing's thought process or to characterize communications that she made to the decisionmaker in her alleged capacity as Jones Day's counsel conducting an allegedly privileged investigation, which assertions would be improper partial disclosures of matter claimed to be privileged.

51.     The Firm's then-Managing Partner approved the policy change based on Dressing's recommendation. Chase Ex. 5, JD_00003300.

Response: Disputed in part. Undisputed that the managing partner adopted the policy that Dressing proposed. Disputed that his action was "based on [her] recommendation" in the sense of being motivated by her alleged reasoning. The record contains no valid evidence of what Dressing told the managing partner or of what his rationale for adopting the policy was. To the contrary, the only evidence that might arguably have allowed an inference as to his thinking—the memo from Dressing that precipitated his approval— has been withheld under a claim of privilege. Sheketoff Ex. 1; *see also* Dressing Decl. ¶ 8. As stated in response to ¶ 42, Plaintiffs object to and dispute any assertion purporting to characterize Dressing's thought process or to characterize communications that she made to the decisionmaker in her alleged capacity as Jones Day's counsel

conducting an allegedly privileged investigation, which assertions would be improper

partial disclosures of matter claimed to be privileged.

52.     The 1994 and 1997 versions included the updated policy and explained the

apportionment of leave by referencing the fact that "physicians generally certify a six to eight

week disability period."  Chase Ex. 6 at JD_00003542; Chase Ex. 7 at JD_00003683.

> Response: Disputed in part.  Undisputed that those versions state that "physicians
>
> generally certify a six to eight week disability period."  Disputed that the statement is a
>
> "fact" or that it constitutes an "expla[nation]" for "the apportionment of leave."  The
>
> evidence is that doctors in the United States, when asked to certify a disability period
>
> following childbirth, typically certify six weeks for a vaginal birth and eight weeks for a
>
> C-section, not an undifferentiated "six to eight week disability period."  PSF ¶¶ 153-55.

53.     The Firm did not adopt an eight-week disability assumption to discriminate

against men, to provide birthmothers more bonding time than fathers, or to enforce any notion

that fathers are breadwinners who should work more than women.  Dressing Decl. ¶¶ 10, 12-14.

> Response: Disputed.  As stated above in response to ¶ 50 and elsewhere, Dressing was
>
> not the decisionmaker and Defendants have asserted attorney-client privilege over her
>
> relevant communications with the decisionmaker.  She has no admissible testimony
>
> regarding the decisionmaker's rationale or motivations.  Plaintiffs object to the use of
>
> Dressing's partial disclosure of her thought process in her alleged counsel capacity to
>
> characterize either what reasoning she provided to the decisionmaker in the memo that
>
> has been withheld under a claim of privilege or what reasoning led the decisionmaker to
>
> adopt the policy in response to that withheld memo.  Moreover, as also discussed in
>
> Plaintiffs' brief, a reasonable jury could find that Jones Day, which admittedly selected

its eight-week rule as a way of determining how much leave to give fathers, picked that admittedly overinclusive eight-week period at least in part because it resulted in a concomitantly shorter family leave for fathers and more bonding time for mothers, consistent with the traditional "breadwinner/caretaker" view of proper gender roles that Jones Day was inarguably pursuing through its longstanding policy (12 weeks paid and 12 unpaid for mothers and zero weeks of leave for fathers) that it altered in 1994 only because its counsel allegedly determined that the 1993 FMLA required it to do so. Sheketoff Ex. 1 at JD_00003291; Sheketoff Ex. 2 at JD_00003302; PSF ¶¶ 2-110.

54. The changes that Dressing recommended were based on the Firm's understanding of and experience with the medical standard of care for routine childbirth, how disability plans operate, and administrative and privacy considerations, and those changes granted male associates paid family leave that they did not previously have in an amount equal to the paid family leave available to female associates. Dressing Decl. ¶¶ 12-14.

Response: Disputed in part. Undisputed that the 1994 change increased leave for new fathers from no time at all to four weeks. Otherwise disputed. As stated above, including in response to ¶¶ 50 and 53, there is no admissible evidence of why Dressing recommended her changes, what rationales she actually presented to the decisionmaker, or what rationales actually motivated the decisionmaker to approve the change, and a reasonable jury could find that the change was motivated at least in part by the discriminatory view (embodied in the firm's prior policy) that men should receive minimal leave relative to women in connection with the arrival of a new child.

### B.   Jones Day's Policy is Consistent with the Undisputed Medical Standard of Care

55.      Both sides in this case have produced expert evidence from doctors specializing in obstetrics and gynecology ("OBGYN").  Plaintiffs identified Dr. Kenneth Naylor, and Defendants identified Dr. Christine Colie, Vice Chair of OBGYN at MedStar Georgetown and a professor in OBGYN at Georgetown University Medical Center.  *See* Chase Ex. 87, Naylor Report; Chase Ex. 85, Colie Report.

Response: Undisputed.

56.      It is undisputed that—in the words of Plaintiffs' expert—"[p]roviders in the United States generally authorize a 6-week disability for an uncomplicated vaginal birth and 8 weeks for an uncomplicated cesarean delivery."  Chase Ex. 87, Naylor Report at 2; *see also* Chase Ex. 85, Colie Report at 3, 12; Chase Ex. 90, Naylor Tr. 23:12-22, 83:9-88:3

Response: Undisputed.  As Dr. Naylor explained, this occurs only when the provider is actually asked to provide a disability certification for purposes of an employer's leave policy, and providers generally do not actually advise birthmothers that they are disabled from or should avoid performing office work or constituent tasks like reading, thinking, and using a computer for any particular period of time.  Chase Ex. 90 (Naylor) at 31:1-18; Sheketoff Ex. 38 (Naylor Rebuttal) at 5 ¶ 6 and attached exhibit.

57.      As Dr. Christine Colie opined: "The medical standard of care for short-term disability following childbirth without complications is six to eight weeks," and "[i]t is typical to certify a period that lasts six to eight weeks following the delivery."  Chase Ex. 85, Colie Report at 3.

Response: Disputed in part.  Undisputed that Dr. Colie so opined.  Disputed to the extent that the opinion implies that doctors typically certify an undifferentiated disability period

25

of "six to eight weeks" in any given case.  The evidence is that, as stated in Jones Day's

¶ 56 above, providers typically certify six weeks for a vaginal birth and eight for a C-

section, and where a doctor certifies "six-to-eight weeks" prior to the birth because he or

she is uncertain of whether the birth will be vaginal or Caesarean, this is understood to

mean "six if vaginal, eight if C-section."  PSF ¶¶ 153-156; *see also* Chase Ex. 90

(Naylor) at 110:11-111:1.  Further disputed that the practice of certifying a period of six

weeks of disability after a vaginal birth and eight weeks of disability after a cesarean

birth to third parties upon request constitutes a "standard of care" rather than a

convention unsupported by clinical outcome data.  Sheketoff Ex. 38 (Naylor Rebuttal) at

3 ¶ 1; Chase Ex. 87 (Naylor Report) at 3 ("This is based on tradition rather than clinical

outcome data or clinical necessity.").

58.     The experts in this case agree that a six-week period of disability for a routine

vaginal delivery is medically reasonable.  Chase Ex. 85, Colie Report at 3; Chase Ex. 90, Naylor

Tr. 52:3-5, 83:22-84:1.

    Response: Undisputed.

59.     The experts also agree that an eight-week period of disability for an

uncomplicated cesarean delivery is medically reasonable, and that approximately one-third of all

births in the United States are via Cesarean section.  Chase Ex. 85, Colie Report at 3, 15; Chase

Ex. 90, Naylor Tr. 83:9-88:3, 142:18-20.

    Response: Undisputed.

60.     Certified postpartum disability periods can vary between six and eight weeks,

depending on the method of delivery and any complications.  Chase Ex. 85, Colie Report at 3,

12; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 23:13-22, 30:20-31:15, 83:9-84:23, 108:24-109:9.

> Response: Disputed in part.  Undisputed that, when asked to provide a certification, providers typically certify a six-week disability period for uncomplicated vaginal births and an eight-week disability period for uncomplicated cesarean births.  Further undisputed that complications can extend the period of certified disability.  Any implication that complications would likely or necessarily extend a six-week period of disability to an eight-week period of disability is disputed.  PSF ¶¶ 178-79.

61.    Moreover, "medical certification of birth-related" disability is generally predictive because it "typically happens prior to birth"—indeed, often before the method of delivery is known and before any birth-related complications are known.  Chase Ex. 85, Colie Report at 12; Chase Ex. 90, Naylor Tr. 86:6-10, 109:19-25; Chase Ex. 89, Colie Tr. 26:5-23.

> Response: Undisputed.  As indicated in response to ¶ 57 above, the evidence is that the typical practice when the method of delivery is unknown at the time of certification is to provide a certification of six weeks for vaginal and eight for C-section.  PSF ¶¶ 153-156; *see also* Chase Ex. 90 (Naylor) at 110:11-111:1

62.    In practice, this means that the certification of postpartum disability—which obstetricians typically provide before birth—will identify a disability period of six weeks, eight weeks, or six-to-eight weeks, on the assumption that delivery will be routine.  Chase Ex. 85, Colie Report at 12; Chase Ex. 90, Naylor Tr. 30:20-31:15, 108:5-111:1.

> Response: Undisputed, with the caveat that, as indicated in response to ¶ 57 above, a pre-birth certification of "six-to-eight weeks" means and would be understood to mean "six

weeks if the birth is vaginal and eight weeks if by C-section."  PSF ¶¶ 153-156; *see also* Chase Ex. 90 (Naylor) at 110:11-111:1.

63.     If prior to birth the method of delivery is unknown, providers often certify a six-to-eight week range based on the standard of care, meaning that for an employer to assume an eight-week disability period from routine childbirth "generally reflects what happens in practice when a provider certifies disability from childbirth."  Chase Ex. 85, Colie Report at 3, 12.

Response: Disputed in part.  Undisputed that providers sometimes provide a pre-birth certification for a 6-8-week range, which, as indicated in response to ¶ 57 above, means and would be understood to mean "six weeks if the birth is vaginal and eight weeks if by C-section."   PSF ¶¶ 153-156; *see also* Chase Ex. 90 (Naylor) at 110:11-111:1.  As Jones Day itself states in ¶ 56 above, providers typically certify six weeks for a vaginal birth and eight for a C-section.  An employer rule like Jones Day's giving all women eight weeks of birth regardless of disability would not "generally reflect[] what happens in practice when a provider certifies disability," since such a rule would give all women (at least) eight weeks, whereas medical practice would generally give only six weeks for the most common type of birth (which HR Director Dressing declares is only "occasionally" extended to eight weeks based on the mother's actual course of recovery, Dressing Decl. ¶ 11(a)).  PSF ¶¶ 151, 153-56, 162-68, 171-80, 182-83, 186-87.  Further disputed that the practice of certifying a period of six weeks of disability after a vaginal birth and eight weeks of disability after a cesarean birth to third parties upon request constitutes a "standard of care" rather than a convention unsupported by clinical outcome data.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 1; Chase Ex. 87 (Naylor Report) at 3 ("This is based on tradition rather than clinical outcome data or clinical necessity.").

28

64.     If it is known prior to birth that delivery will be via cesarean section, or that the birthmother presents certain comorbidities or "complications," the provider generally will certify a postpartum disability period of eight weeks.  Chase Ex. 85, Colie Report at 3, 12-13; Chase Ex. 89, Colie Tr. 18:17-19:9, 26:24-27:18, 29:24-30:24, 225:3-226:1; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 82:21-83:3, 84:4-24, 95:18-22.

> Response: Undisputed that providers generally certify eight weeks for C-sections and for "certain comorbidities or 'complications,'" though Dr. Naylor made clear that it "would be very uncommon for a patient not to be able to work eight weeks after an uncomplicated vaginal birth."  Chase Ex. 90 (Naylor) at 83:1-3.  (Dr. Colie's particular views on the scope and frequency of comorbidities or complications that require more than a six-week recover period is disputed, but this paragraph does not encompass those particular views.)

65.     Dr. Colie also opined that an eight-week disability period is not only "the standard of care for women who give birth via caesarean section (one-third of all births)," but also "medically reasonable in light of the physiologic and mental health impacts surrounding routine vaginal delivery," as well.  Chase Ex. 85, Colie Report at 3; *see also* Chase Ex. 85, Colie Report at 11 (noting "medical sources and studies" that "suggest the recovery period may extend longer than six weeks for routine vaginal delivery").

> Response: Disputed in part.  Undisputed that Dr. Colie so opined at one point.  However, Dr. Colie opined during her deposition that in fact most women are not disabled for six weeks after an uncomplicated vaginal birth.  PSF ¶ 168; *see also* PSF ¶¶ 169-172.  Also disputed that eight weeks is medically reasonable for vaginal births.   PSF ¶¶ 166-67. Further disputed that the practice of certifying a period of eight weeks of disability after a

cesarean birth to third parties upon request constitutes a "standard of care." rather than a convention unsupported by clinical outcome data.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 1.

66.     Dr. Naylor testified that he certifies six weeks for routine vaginal births, eight weeks for caesarean deliveries, and six-to-eight weeks when the method of delivery is unknown at the time of certification, and that he would not knowingly certify a false disability period. Chase Ex. 90, Naylor Tr. 108:5-111:1, 141:6-142:2.

> Response: Undisputed that these are the periods Dr. Naylor *typically* certifies, with the caveat that, as indicated in response to ¶ 57 above, a pre-birth certification of "six-to-eight weeks" means and would be understood to mean "six weeks if the birth is vaginal and eight weeks if by C-section."  PSF ¶¶ 153-156; *see also* Chase Ex. 90 (Naylor) at 110:11-111:1.  Dr. Naylor also certifies new mothers to return sooner that those typical periods, when they want to do so.  Chase Ex. 90 (Naylor) at 54:1-11, 143:5-16.

67.     Apart from taking into account method of birth and predictable complications, medical certifications for postpartum disability are generally not individualized.  Chase Ex. 85, Colie Report at 12; Chase Ex. 87, Naylor Report at 2, Chase Ex. 90, Naylor Tr. 108:24-18, 110:11-111:1.

> Response: Undisputed.

68.     Medical certifications for postpartum disability are not based on the patient's employment status or the particular job duties of an employed patient.  Chase Ex. 85, Colie Report at 14; Chase Ex. 90, Naylor Tr. 114:9-16.

> Response: Disputed in part.  Undisputed that medical certifications for a six-week disability period for an uncomplicated vaginal birth or an eight-week disability period

after a cesarean birth are not based on the patient's type of job.  Disputed that

certifications for less or more time are not based on the patient's type of job.  Chase Ex.

87 (Naylor Report) at 3 ("Patients who have an uncomplicated vaginal birth can typically

physically return to relatively sedentary employment within 3-4 weeks of delivery.");

Chase Ex. 90 (Naylor) at 54:1-11, 143:5-16.

69.     Rather, these certifications reflect the medical standard of care that recovery from

childbirth without complications typically requires six-to-eight weeks.  Chase Ex. 85, Colie

Report at 2-3; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 83:9-84:1.

Response: Disputed.  Plaintiffs dispute that the practice of certifying a period of six

weeks of disability after a vaginal birth and eight weeks of disability after a cesarean

birth to third parties upon request constitutes a "standard of care" rather than a

convention unsupported by clinical outcome data.  Sheketoff Ex. 38 (Naylor Rebuttal) at

3 ¶ 1; Chase Ex. 87 (Naylor Report) at 3 ("This is based on tradition rather than clinical

outcome data or clinical necessity.").  Plaintiffs further dispute the suggestion that

doctors certify an undifferentiated "six-to-eight" week period for childbirth.  As stated in

¶ 57 above, providers typically certify six weeks for a vaginal birth and eight for a C-

section, and where a doctor certifies "six-to-eight weeks" prior to the birth because he or

she is uncertain of whether the birth will be vaginal or Caesarean, this is understood to

mean "six if vaginal, eight if C-section."  PSF ¶¶ 153-156; *see also* Chase Ex. 90

(Naylor) at 110:11-111:1.

70.     Neither expert opined that women should be expected, or reasonably could be

expected, to return to any type of job immediately following birth.  Chase Ex. 85, Colie Report at

12; Chase Ex. 87, Naylor Report at 2.

31

Response: Undisputed that neither expert so opined, assuming that "immediately" means, say, within an hour of giving birth. However, Dr. Naylor testified that women— including medically sophisticated women—often choose to return to relatively demanding jobs much earlier than six weeks and that there is no medical problem with their doing so if they feel up to it. Chase Ex. 90 (Naylor) at 53:9-17. Dr. Naylor also opined that "[p]atients with sedentary employment who have had an uncomplicated birth and postpartum course may return to work at their discretion. Chase Ex. 87 (Naylor Report) at 3.

71.    According to Dr. Colie, "[i]mmediately after birth, the mother is physically disabled by any definition, and that disability should be obvious to any reasonable person." Chase Ex. 85, Colie Report at 12.

Response: Disputed in part. Undisputed that Dr. Colie so opined. Plaintiffs object to the vague terms "immediately" (unless it carries its ordinary meaning of "without any intervening time") and "by any definition," and also object that Dr. Colie is not competent to opine on what "should be obvious to any reasonable person." Plaintiffs further note that Julia worked on this case from the hospital after the birth of her daughter. PSF ¶ 160.

72.    Myriad conditions and risks necessitate some period of recovery from childbirth, including physical impacts in the vaginal area or incision site in the case of cesarean delivery; postpartum hemorrhaging; bleeding and anemia; swelling, constipation, hemorrhoids, back pain, and other related physical discomfort; the physical impact to the birthparent of breastfeeding issues; and mental health issues, among other things. Chase Ex. 85, Colie Report at 3, 4-10, 12-13; Chase Ex. 90, Naylor Tr. 37:3-5.

Response: Disputed in part.  Undisputed that some women experience such conditions for some period following pregnancy and that some conditions are disabling for some women.  Disputed that any of them typically or frequently results in disability at or beyond six weeks postpartum.  PSF ¶¶ 151, 153-55, 162-68, 173-74, 182, 186.  Further disputed that it is possible to generalize about what *all* new mothers experience after childbirth, including as to whether they require a period of recovery.  PSF ¶ 152.  Further disputed that the "period of recovery from childbirth" is coextensive with the period of disability.  Sheketoff Ex. 38 at 3 ¶ 3; PSF ¶ 174.  Indeed, as Dr. Naylor explained, in some ways mothers never return to their prepartum state.  E.g., Chase Ex. 90 (Naylor) at 60:11-3 ("The uterus never gets back to the size before they were pregnant.").

73.     All people who give birth experience many, if not all, of these conditions to some degree in the twelve weeks following delivery, which is often referred to as the "fourth trimester."  Chase Ex. 85, Colie Report at 10-11.

Response: Disputed.  Most of the cited conditions are uncommon and/or short-lived, rarely persisting as of six weeks postpartum, much less eight or twelve.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3-4 ¶ 4.  Nor do they necessarily cause disability, let alone eight or twelve weeks of disability.  *Id.*  Furthermore, Jones Day does not provide any special leave entitlement for women during the actual three trimesters of pregnancy, so even if the term indicated that the "fourth trimester" is comparable to the three actual trimesters of pregnancy in its effect on ability to work, that would not support Jones Day's policy.

74.     Postpartum medical care for routine deliveries does not include daily—or even weekly—examinations by a medical professional to ascertain the precise moment when recovery

from childbirth is complete or when postpartum disability has subsided.  Chase Ex. 86, Colie

Rebuttal Report at 2-3; Chase Ex. 90, Naylor Tr. 37:18-38:5.

Response: Undisputed.

75.    Such a regimen of regular assessment would overload providers, place undue

burdens and stress on new mothers, and would be outside of the global obstetrical package that

most insurers use to cover post-partum care.  Chase Ex. 86, Colie Rebuttal Report at 2-3; Chase

Ex. 90, Naylor Tr. 36:25-38:5.

Response: Undisputed.

76.    Based on medical standards of care, obstetricians advise patients to schedule a

postpartum examination "six-to-eight weeks after delivery."  This examination is the doctor's

first opportunity to assess how the birthmother's recovery is progressing, as there is "typically no

comprehensive physical assessment of the patient between a routine birth and the postpartum

examination."  Chase Ex. 85, Colie Report at 3, 13.

Response: Disputed.  Providers typically have patients schedule their postpartum

examination between four and six weeks after delivery.  PSF ¶ 184.  ACOG also

recommends that a new mother be contacted by her provider within the first three weeks

after delivery, a recommendation that Dr. Naylor and other doctors follow.  PSF ¶ 185;

Chase Ex. 90 (Naylor) at 36:1-13.  Indeed, Dr. Colie also testified that the majority of her

patients come in to see her within the first three weeks after childbirth.  Chase Ex. 89

(Colie) at 241:18-243:6.  Further disputed that the practice of certifying a period of six

weeks of disability after a vaginal birth and eight weeks of disability after a cesarean

birth to third parties upon request constitutes a standard of care rather than a convention

unsupported by clinical outcome data.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 1; Chase

Ex. 87 (Naylor Report) at 3 ("This is based on tradition rather than clinical outcome data or clinical necessity.").

77.     During the postpartum medical visit, doctors "assess whether the mother is properly recovering from childbirth" and whether she is able to safely resume work or other activities.  That includes a physical exam to ascertain whether the uterus is involuting properly, assessing the extent of pain and tenderness around the vagina or incision site, administering the Edinburgh Postnatal Depression scale and speaking with the patient about possible signs of postpartum depression, and checking vital signs and blood pressure.  Chase Ex. 85, Colie Report at 3, 13; *see also* Chase Ex. 90, Naylor Tr. 101:9-105:18.

> <u>Response</u>: Undisputed that the postpartum visit generally entails some or all of the listed items.  Disputed that the purpose of the postpartum visit or of any of the listed items generally involves assessing "whether [the mother] is able to safely resume work," which proposition is not supported by Dr. Naylor's testimony.  As Dr. Naylor opined, new mothers can and often do return to work before their postpartum visit.  Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Naylor) at 54:7-12.

78.     If the mother has not properly recovered, the doctor may certify additional disability leave.  Chase Ex. 85, Colie Report at 12-14; Chase Ex. 90, Naylor Tr. 84:4-23.

> <u>Response</u>: Disputed in part.  Plaintiffs object to the vague term "properly recovered" and note that, as Dr. Naylor has explained, the length of time it takes to completely "recover" from childbirth does not equate with when someone can perform the material and substantial duties of their position.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 3.  Undisputed that, if a new mother is disabled beyond the period of disability original certified, her provider may certify additional disability leave.

79.     Taking into account both the method of delivery, maternal comorbidities, or birth-related complications, over half of all deliveries medically warrant a postpartum disability period of more than six weeks.  Chase Ex. 89, Colie Tr. 91:11-23, 191:5-19, 221:12-222:7, 225:3-226:1.

Response: Disputed.  PSF ¶¶ 151, 177; see also PSF 152-76, 178-87, 200, 202.

80.     According to Dr. Colie, roughly one-third of deliveries are Caesarean; another 10-15% involve some degree of complications; and another 10% or so have ongoing symptoms at six weeks postpartum that require further recovery time.  Chase Ex. 85, Colie Report at 3; Chase Ex. 89, Colie Tr. 91:11-23, 221:12-222:7.

Response: Undisputed that Dr. Colie so opined.

C.     Jones Day's Policy is Consistent with Standard Insurance Practices

81.     Since 2004, Jones Day's long-term and short-term disability plans have been administered by Unum Group ("Unum").  Latham Decl. at ¶ 13.

Response: Undisputed.

82.     As of November 30, 2022, Unum administered the short-term disability plans of 23,366 employers, covering over two million employees.  Latham Decl. at ¶ 8.

Response: Undisputed.

83.     A standard term in the disability plans that Unum administers is that an employee is disabled if "unable to perform the material and substantial duties of his or her regular occupation"—the same definition used in Jones Day's STD policy.  Latham Decl. at ¶ 4.

Response: Undisputed.  In other words, whether the employee is disabled turns on the particular duties of the employee's job.

84.     For many types of routine medical procedures—such as routine appendectomies or other pre-planned procedures with established standards of care—Unum's "standard practice

is to automatically consider this requirement to be met for certain types of conditions if the period of disability is within a standard duration."  Latham Decl. at ¶¶ 4-6.

> Response: Undisputed.

85.     These presumptive periods of disability are based on sources that include both Unum's own internal guidelines, as well as MDGuidelines, a source developed by the American College of Occupational and Environmental Medicine.  Unum treats these sources as reflecting a standard of care developed both with input from practitioners and through analysis of actual claims experience.  Latham Decl. at ¶ 5.

> Response: Disputed in part.  Undisputed that Unum may base *certain* periods of disability on its own guidelines and MDGuidelines.  Disputed that the eight-week period of "disability" leave for new mothers that Unum administers for Jones Day is based on MDGuidelines, which does *not* recommend an eight-week period for all childbirths.  PSF ¶¶ 198-202.

86.     Unum considers an employee to be unable to perform the material and substantial duties of his or her regular occupation if the period of disability leave for certain types of conditions—including routine childbirth—is within a standard duration.  Latham Decl. at ¶ 4.

> Response: Disputed.  The cited paragraph says nothing about childbirth.  And the cited paragraph says only that, for certain conditions, Unum considers its requirement that employees be unable to do their jobs to be satisfied during a standard duration, not that Unum in fact considers them to be actually disabled.

87.     In the case of childbirth without complications, Unum considers the standard period of short-term disability to be six to eight weeks.  Latham Decl. at ¶ 7.

Response: Disputed.  Undisputed that Latham's declaration so states.  Disputed that in fact Unum considers such a period to be a standard period of disability for childbirth without complications.  PSF ¶ 195.

88.     Unum uses these standards in designing the insurance products and services that it offers employers.  The "standard options" for childbirth that an employer can choose from when selecting a Unum short-term disability plan are: "(a) six weeks regardless of delivery, (b) eight weeks regardless or delivery, or (c) six weeks for natural delivery and eight weeks for delivery via cesarean section."  Latham Decl. at ¶ 8.

Response: Disputed.  PSF ¶ 195.

89.     Once an employer chooses an option for postpartum disability leave, Unum applies that period to all disability claims related to birth without complications that are subject to the employer's disability plan.  Latham Decl. at ¶ 9.

Response: Undisputed.

90.     For childbirth without complications, any disability period up to eight weeks is considered standard, and Unum considers the employee unable to perform the material and substantial duties of her regular occupation for that period, regardless of occupation.  Latham Decl. at ¶ 10.

Response: Disputed.  PSF ¶ 195.

91.     Unum also does not require a physician certification to approve postpartum disability if the disability period is not more than eight weeks.  Latham Decl. at ¶ 10.

Response: Disputed.  PSF ¶ 195.

92.     In Unum's view, given the physically-apparent nature of pregnancy and childbirth, there is virtually no risk of fraudulent claims.  Latham Decl. at ¶ 10.

<u>Response</u>: Disputed in part.  Undisputed that the Unum representative opines that a woman would be unlikely to fraudulently claim to have given birth when she actually had not.  However, he did not opine on the risk of fraud regarding the length of disability following a birth.

93.     After Unum began administering Jones Day's STD plan, the options it offered to Jones Day for the standard disability period for maternity leave included:

> ☐ 6 Weeks Vaginal Delivery
> ☐ 6 Weeks C-Section Delivery
> ☐ 8 Weeks C-Section Delivery
> ☐ 8 Weeks Regardless of Delivery

Chase Ex. 8 at JD_00003278; Latham Decl. at ¶ 13.

<u>Response</u>: Disputed.  Disputed that eight weeks for all childbirths is a "standard disability period" for Unum.  PSF ¶ 195.  Further disputed that in any meaningful sense Unum "offered" Jones Day these options.  Jones Day had selected its eight-week "disability" period a decade before it began working with Unum, and Unum was simply providing administrative support for Jones Day's own self-funded "salary continuation" policy. PSF ¶¶ 188-192.

94.     "Jones Day selected eight weeks regardless of delivery type."  Latham Decl. at ¶ 14; *see also* Chase Ex. 8 at JD_00003278.

<u>Response</u>: Disputed in part.  Undisputed that Unum administered Jones Day's plan to provide an eight-week disability period for all new mothers.  Disputed that in any meaningful sense Unum "offered" Jones Day any particular options.  Jones Day selected its eight-week "disability" period a decade before it began working with Unum, and Unum was simply providing administrative support for Jones Day's own self-funded "salary continuation" policy.  PSF ¶¶ 188-192.

95.     The option Jones Day selected is within industry standards and Unum does not require a physician certification of disability for approval of eight weeks of disability leave for routine childbirth, regardless of delivery.  Latham Decl. at ¶ 14.

Response: Disputed.  PSF ¶¶ 194-204.

**D.     Jones Day's Non-Discriminatory Application of Leave Policies Related to Childbirth and Adoption**

96.     At the time Plaintiffs alleged that Jones Day discriminated against Savignac based on his gender, the Firm's policies set forth two different types of paid leave relating to childbirth—STD leave and family leave.  *See* McClure Ex. 1 at JD_00002483-86.

Response: Disputed.  The cited "Family Leave" policy states that "[m]others who are primary caregivers" receive "18 weeks of paid leave" and "total leave" (including unpaid leave) up to "24 weeks," while "[f]athers who are primary caregivers" receive "ten weeks of paid leave … but in no case may the total leave [including unpaid leave] exceed 16 weeks."  McClure Ex. 1 at JD_00002485-86.  While eight of the 18 weeks given to mothers are apparently "tracked administratively" such that "[t]he lawyer is considered to be on paid medical leave" (Sheketoff Ex. 2 at JD_00003302), all 18 are set forth in the Family Leave policy, they do not depend on the prerequisites otherwise imposed by the firm's written STD policy or on whether the woman is actually disabled, and the way that they supposedly are "tracked administratively" has no material effect on the woman or her managers.  Plaintiffs therefore dispute the vague assertion that the eight weeks are somehow a "different type[]" of leave or are STD leave rather than family leave. (Plaintiffs acknowledge that a mother who is actually disabled from her job for more than

eight weeks may seek additional disability leave under the generally applicable

provisions of the written STD policy, but that bona fide disability leave is not at issue.)

97.     In addition, new parents might have other forms of leave available, such that an

associate who gives birth might be away from work for several months on a combination of

disability leave, paid family leave, vacation, sick days, and, with approval, unpaid leave.  Chase

Ex. 76, Bounds Tr. 97:9-98:5; *see also* McClure Ex. 1 at JD_00002483-85.

Response: Undisputed.

98.     The Firm also provides paid family leave for parents who adopt a child.  McClure

Ex. 1 at JD_00002485-86.

Response: Undisputed.

99.     Jones Day follows its leave policies as they are written.  Chase Ex. 76, Bounds Tr.

247:2-7.

Response: Disputed in part.  The Court held previously that the written STD policy is

ambiguous, so it is not meaningful to speak of following it "as [it] is written." *See*

*Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020).  Plaintiffs have set forth

their position on Jones Day's actual leave offerings for new parents in their statement of

facts.  PSF ¶¶ 2-148.  Plaintiffs believe Jones Day's written policies are consistent with

their position on what the actual leave offerings are (as stated in PSF ¶¶ 2-148.  ), but to

the extent that Defendants or the Court construe the written leave policies differently,

Plaintiffs maintain that Jones Day's actual leave offerings are identified in PSF ¶¶ 2-148.

### 1.     STD leave

100.    Jones Day's STD policy applies to all types of medical disabilities, and benefits

under the policy are available to all associates, regardless of gender, marital status, sexual

orientation, age, or race.  McClure Ex. 1 at JD_00002483-85.

<u>Response</u>: Disputed in part.  Undisputed except to the extent that Jones Day deems eight weeks of leave given to women without regard to disability to be "benefits under the [STD] policy."  PSF ¶¶ 2-148.  That benefit is explicitly limited by gender to "Mothers."  McClure Ex. 1 at JD_00002486.

101.    The principal requirement for eligibility under the STD policy is disability—the associate must be disabled.  McClure Ex. 1 at JD_00002484; McClure Decl. at ¶¶ 9-10.

<u>Response</u>: Disputed in part.  Undisputed that an associate is "disabled for purposes of [the STD] policy if he or she is unable to perform the material and substantial duties of his or her regular occupation."  McClure Ex. 1 at JD_00002483.  Disputed that this is the "principal" requirement or that it applies to mothers who have given birth within the preceding eight weeks.  PSF ¶¶ 2-148.  As discussed in Plaintiffs' brief, every new mother is given eight weeks of paid leave without regard for disability.

102.    Jones Day—a law firm—does not assess its associates' medical conditions for the purpose of determining whether the individual is disabled.  McClure Decl. at ¶ 11.

<u>Response</u>: Disputed.  The written STD policy contains extensive provisions for Jones Day to second-guess the opinions of its associates' physicians, including a requirement that the associate authorize her doctor to discuss her medical condition with and release all medical records to Jones Day and a provision empowering the firm to have firm-selected doctors examine the woman and report their findings to the firm, which "may rely on either opinion [i.e., the woman's doctor's or the firm's hired doctor's] in its sole discretion."  *See* McClure Ex. 1 at JD_00002484.  However, Plaintiffs do not dispute the paragraph's (apparently intentional) implication that it is odd for a law firm to be

demanding such intrusive disclosures and imposing such second-guessing on attorneys whom it supposedly trusts.

103.    Rather, Jones Day has contracted with Unum to administer benefits under the STD policy.  McClure Decl. at ¶ 11.

Response: Disputed in part.  The word "[r]ather," which assumes that the preceding (disputed) paragraph is accurate, is disputed.  The policy makes clear that the firm itself retains authority to administer benefits when it chooses to do so.  *See* McClure Ex. 1 at JD_00002483-84.  Moreover, as discussed above, Jones Day contracts with Unum to provide administrative support services for Jones Day's own salary continuation policy and has directed Unum on how to administer benefits and what benefits to administer.  PSF ¶¶ 180-193.  Otherwise undisputed.

104.    If Jones Day discovers that an associate was provided salary continuation under the STD policy but was not disabled for some portion of the relevant period, Jones Day has the right to recoup overpayments or reclassify periods away from work from STD leave to, for instance, vacation or sick leave.  McClure Decl. at ¶¶ 10, 13; Chase Ex. 76, Bounds Tr. 58:10-16.

Response: Disputed in part.  Undisputed that Jones Day generally claims the right to recoup payments or take other action against associates who improperly take STD leave.  Disputed to the extent that the paragraph is meant to suggest that a new mother must actually be disabled to take the full eight weeks of paid leave.  PSF ¶¶ 2-148.  As discussed in Plaintiffs' brief, every new mother is given eight weeks of paid leave without regard for disability, and there is no evidence that Jones Day ever has sought to or would have the right to recoup anything from a new mother because she took the eight weeks despite not being disabled for all eight weeks.

105.    Jones Day has exercised this right in the case of employees who received salary continuation for disability but were later discovered not to be disabled.  McClure Decl. at ¶ 14.

Response: Disputed in part.  As discussed in the prior paragraph, Plaintiffs dispute that a mother must be disabled to take the full eight weeks of leave, or that Jones Day has the "right" to recoup anything from such a mother if she is not disabled for that period.  PSF ¶¶ 2-149.  Moreover, Jones Day has admitted that it has never tried to recoup overpayments or reclassify leave in the case of a new mother who took "disability" leave within the first eight weeks of childbirth.  Chase Ex. 76 (Bounds (30(b)(6)) at 57:23-58:22.  Undisputed that Jones Day may have exercised this right for other people who are not mothers within the first eight weeks after childbirth.

106.    Since its implementation in 1994, Jones Day's assumption that a physician would certify an eight-week disability period for routine childbirth has remained in place.  Dressing Decl. at ¶ 15; McClure Ex. 1 at JD_00002484.

Response: Undisputed that the rule giving at least eight weeks of so-called "disability" leave to every new mother without regard for actual disability has remained in place since 1994.

107.    Not all female associates are entitled to this assumption.  Only those female associates who give birth may utilize any aspect of the STD policy for paid leave related to childbirth.  McClure Decl. at ¶ 16.

Response: Disputed.  Jones Day states that it applies its policies as written.  See ¶ 99, supra.  And the written leave policy for new parents states that "mothers" who are primary caregivers are entitled to 18 weeks of paid leave, including the eight weeks that are deemed "disability" leave.  McClure Ex. 1 at JD_00002486.  That written policy is

not limited to mothers who gave birth as opposed to the female partners of parents who give birth (who also would presumably be "mothers").

108.    A new mother whose partner delivered the child could not take disability leave related to that delivery or otherwise benefit from the STD policy (assuming no other disability). McClure Decl. at ¶ 16.

Response: Disputed as stated in response to ¶ 107.

109.    Nor is the assumption that a physician would certify an eight-week disability for routine childbirth limited to individuals who identify as women.  Jones Day has assumed an eight-week disability period in the case of an associate who gave birth but did not identify as female.  McClure Decl. at ¶ 16.

Response: Disputed.  Jones Day states that it applies its policies as written.  *See* ¶ 99, *supra*.  The eight weeks of extra leave are explicitly limited by gender to "Mothers." McClure Ex. 1 at JD_00002486.  Moreover, there is no evidence that Jones Day applied this atextual interpretation of the policy prior to the events at issue in this case.

110.    Moreover, neither the assumption that a physician would certify an eight-week disability for routine childbirth, nor any other aspect of the STD policy prevents an associate from returning to work prior to eight weeks postpartum.  McClure Decl. at ¶ 15.

Response: Undisputed that Jones Day would allow a new mother to return to work prior to eight weeks postpartum—because it knows that many new mothers are capable of doing their jobs less than eight weeks postpartum and are able to assess for themselves whether they are capable or not.  This undercuts the testimony of Jones Day's expert that all new mothers should be given at least eight weeks of leave because of mental

deficiencies associated (according to the firm's expert) with new motherhood.  Chase Ex. 89 (Colie) at 45:13-46:18.

111.    The assumption that a physician would certify an eight-week disability for routine childbirth is not a guarantee of eights week of paid leave.  McClure Decl. at ¶¶ 10-14.

Response: Disputed.  PSF ¶¶ 2-148.  As discussed in Plaintiffs' brief, the eight weeks are presented as and universally understood to be a minimum entitlement of every new mother without regard for actual disability (though, as with practically any employment benefit, a particular employee could gratuitously choose not to take all eight weeks).  The assertion in this paragraph is baseless.  Moreover, the cited matter does not support the assertion.  While McClure asserts the general proposition that associates are entitled to STD leave only while actually disabled—a proposition that both sides agree is true in all circumstances other than the eight weeks following childbirth—she says nothing inconsistent with Plaintiffs' understanding (and the overwhelming evidence) that the eight weeks is given to every new mother without regard for disability (though, of course, a mother who is disabled for *longer* may be able to obtain *more* than eight weeks).

112.    As stated in the summary of benefits provided to new associates—including Savignac—"[f]or routine childbirth (including cesarean-section births), unless the Firm is notified otherwise, it will assume an 8-week disability period."  Chase Ex. 2 at P02742; *see also* Chase Ex. 79, Savignac Tr. 76:9-77:5.

Response: Disputed in part.  Undisputed that the summary of benefits includes that language.  Plaintiffs dispute the baseless implication that the language means that the leave could ever be *less* than eight weeks.  Rather, to use the Court's phrasing, "the ratchet turns only one way.  *All* birth mothers receive *at least* eight weeks, and they are

entitled to more if 'the [f]irm is notified' that the 'lawyer's medical provider has certified' that a longer period of 'post-partum disability' exists."  486 F. Supp. 3d at 36. While Jones Day has persistently represented the contrary, HR Director Dressing stated this explicitly in a memo to "the Female Of Counsel, Senior Attorneys and Associates" sent shortly after the firm adopted the policy that Dressing allegedly proposed.  The memo states: "As under the prior policy, lawyers who go out on maternity leave will receive twelve weeks of paid leave and an additional twelve weeks of paid leave, should they choose to use it.  The difference in the new policy is the manner in which the leave is tracked administratively.  The lawyer is considered to be on paid medical leave for the disability portion of the maternity leave.  Because most doctors certify a six to eight week period of disability in the event of an uncomplicated pregnancy and delivery, the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has *certified disability for a longer period.*  In addition to this eight week paid medical leave, the lawyer may take an additional four weeks of paid child care leave, bringing the total paid leave period up to twelve weeks as set forth in the [f]irm's prior policy."  Sheketoff Ex. 2 at JD_00003302 (emphasis added).  This and other evidence, as discussed in Plaintiffs' filings, conclusively proves that the eight weeks is indeed a guaranteed minimum given to all new mothers without regard for disability. PSF ¶ 2-148.  There is no contrary evidence.

113.    Any person seeking salary continuation under the STD policy—including pregnant associates—is provided both the requirements set forth in the STD policy, as well as separate written notice "that salary continuation may be advanced by the Firm pending certification and approval, subject to repayment by me if the leave is later determined not to

qualify for salary continuation under Firm policy."  McClure Ex. 2, JD_00002645; *see also* McClure Decl. at ¶¶ 9-10; McClure Ex. 1 at JD_00002483-85.

> Response: Disputed in part.  Undisputed that Jones Day provides the identified notice.
> Disputed that Jones Day provides the STD policy to new mothers, who instead are left to access it through Jones Day's intranet site if they think to do so.  Chase Ex. 76 (Bounds (30(b)(6)) at 31: 9-13.  Moreover, as stated in response to ¶ 112, a new mother is entitled to paid leave for at least eight weeks regardless of disability.

114.    Jones Day's 30(b)(6) witness, Lori Bounds testified that the Firm has never learned of an instance when an associate who gave birth was determined not to be disabled for at least eight weeks postpartum.  Chase Ex. 76, Bounds Tr. 68:20-69:6; *see also* McClure Decl. at ¶¶ 12-13.

> Response: Disputed in part.  Undisputed that, according to Bounds, no specific woman has ever gratuitously informed HR that she was not disabled for eight weeks.  However, in light of the admitted facts about physicians' practices certifying disability from childbirth and the length of postpartum disability (PSF ¶¶ 149-154, 162-65), Jones Day is necessarily aware that many of the women who have taken the eight weeks would not have been disabled for at least eight weeks, even if it is not aware of which specific women fall into that group.

115.    If Jones Day had learned of such an instance, Bounds would have consulted with the Firm's HR Director, who would advise that the associate was not entitled to salary continuation under the STD policy, and that Jones Day should seek to reclassify the period of disability leave when no disability was present or recoup any salary paid during the period of non-disability.  McClure Decl. at ¶¶ 12-13; Chase Ex. 76, Bounds Tr. 68:20-69:6.

<u>Response</u>: Disputed in part.  Undisputed that, even though the question whether a woman who is disabled for less than eight weeks is entitled to all eight weeks was disputed at the pleading stage and pointed to as an open issue in the Court's opinion (486 F. Supp. 3d at 36), even though Bounds' job is to administer the policy and she has extensive experience doing so, even though Jones Day designated her as its 30(b)(6) witness prepared to testify on its behalf regarding "[t]he meaning, application, and operation of Jones Day's leave offerings for new parents" (Sheketoff Ex. 15; Sheketoff Ex. 18), and even though she had access to the policy and Jones Day represented to the Court that *any* reasonable person reading it would recognize that a new mother's leave is limited to her period of actual disability (which may be less than eight weeks), Bounds nonetheless testified on behalf of Jones Day at one point that *she does not know* whether a woman who ceases to be disabled in less than eight weeks is still entitled to the full eight weeks of so-called "disability" leave and would therefore have to escalate the question to her boss.  Chase Ex. 76 (Bounds (30(b)(6)) at 68:13-71:10.  Disputed that Jones Day would actually deem such an associate to have violated the policy or seek to recoup pay from her.  PSF ¶¶ 2-148.  Jones Day is bound by its 30(b)(6) witness's statement that she just does not know the answer to a fundamental question at the core of the subject she was designated to testify to.  Additionally, even if McClure were permitted to change the firm's testimony after discovery closed, Jones Day mischaracterizes the statements in her declaration.  McClure does *not* say that a mother's leave would end before eight weeks if she reported that she had ceased to be disabled.  She makes only a generic statement that associates in general are entitled to disability leave only while disabled "under the definition of disability set forth in the policy" and that "[i]f someone informed me that an

associate received salary continuation under the STD policy for a period when the associate was not disabled, my response would be that the associate was not entitled to salary continuation for the period that the associate was not disabled."  McClure  Decl. ¶ 13.  Again, all agree that the policy *generally* limits leave to the period of actual disability.  McClure does not address how it applies in the *particular* case of a mother who ceases to be disabled in under eight weeks.  Her artfully drafted declaration (unlike the false assertion in this paragraph and the attorney argument in the firm's brief) is consistent with Plaintiffs' understanding—and overwhelming evidence—that the firm *conclusively deems* all mothers "disabled" for eight weeks.  PSF ¶¶ 2-148; Dkt. 18 (MTD Opp.) at 9.

### 2.    Family leave

116.    Since 1994, Jones Day has provided paid family leave as a benefit to all new birthparents.  The family leave policy is set out in a different section of the HR Policies and is distinct from the STD policy.  McClure Ex. 1 at JD_00002486.

Response: Disputed in part.  Undisputed as to the first sentence.  Disputed as to the second sentence.  The referenced "Family Leave" section lays out all of the leave that new mothers receive, including the eight weeks of paid leave that is deemed to be paid under the STD policy, stating that "[m]others who are primary caregivers" receive "18 weeks of paid leave" and "total leave" (including unpaid leave) up to "24 weeks," while "[f]athers who are primary caregivers" receive "ten weeks of paid leave … but in no case may the total leave [including unpaid leave] exceed 16 weeks."  McClure Ex. 1 at JD_00002485-86.  In other words, the family leave offerings cover all leave to which new parents are entitled and include eight weeks of sex-based "disability" leave for new mothers.  While eight of the 18 weeks given to mothers are apparently "tracked

administratively" such that "[t]he lawyer is considered to be on paid medical leave" (Sheketoff Ex. 2 at JD_00003302), all 18 are set forth in the Family Leave policy, they do not depend on the prerequisites otherwise imposed by the firm's written STD policy or on whether the woman is actually disabled, and the way that they supposedly are "tracked administratively" has no material effect on the woman or her managers.  PSF ¶¶ 2-148.  Plaintiffs therefore dispute the meaningless assertion that the eight weeks are somehow a "distinct" from the other leave described in the Family Leave section.

117.    The amount of paid family leave was initially four weeks for both male and female associates.  *See supra*; *see also* Chase Ex. 6 at JD_00003542.

Response: Disputed in part.  Disputed as to the word "initially"; as Jones Day itself states above, prior to 1994, women received 12 weeks of paid leave and men received none at all.  Undisputed that, beginning in 1994 and apparently continuing through 2014, both mothers and fathers were offered four weeks of paid leave that was *labeled* as family leave, with mothers also receiving the eight weeks that are "tracked administratively" such that "[t]he lawyer is considered to be on paid medical leave" (Sheketoff Ex. 2 at JD_00003302).  Disputed that the eight weeks of leave that are "tracked administratively" such that "[t]he lawyer is considered to be on paid medical leave" are not actually family leave.  PSF ¶ 2-148.

118.    In 2014, Jones Day concluded that this four-week period no longer represented the top of the market; comparably-sized firms were offering more generous amounts of paid family leave.  Chase Ex. 10 at JD_00003222-23.

Response: Disputed in part.  Undisputed that the cited document suggests that many other BigLaw firms were offering more than four weeks of family leave, though a page is

apparently missing from the table.  Otherwise disputed.  As discussed in ¶ 117, disputed

that "this four-week period" was the only family leave Jones Day offered to new mothers.

Moreover, the cited document does not support the implication that a four-week period

had previously "represented the top of the market."  Moreover, Jones Day's cited

document further refutes Jones Day's argument that it has a gender-neutral "family

leave" period and a "distinct" eight-week "disability" period for new mothers.  Rather,

Jones Day's document indicates that the firm offered "Paid Maternity Leave" of "12

weeks paid [and] up to 12 weeks unpaid" while offering "Paid Paternity Leave" of "4

weeks."  Chase Ex. 10 at JD_00003222.  Jones Day's document also shows that even in

2014 some BigLaw firms (Dechert, Milbank, Alston & Bird) were offering gender-

neutral leave periods of 12 or 18 weeks to both mothers and fathers upon the arrival of a

new child.  *Id.* at JD_00003222-23; *see also* Sheketoff Ex. 141 at JD_00005175-76 (█████

████████████████████████████████████████████████).

119.     A small group of partners including the Firm Administrative Partner (Michael

Shumaker), the Firm Hiring Partner (Sharyl Reisman), and then Firm Diversity Partner (Carter

Delorme) concluded that the Firm's smaller (relative to the market) family leave benefit could

harm the Firm's ability to retain current associates and recruit new talent.  In the group's view,

increasing Jones Day's paid family leave benefit was "necessary to maintain and improve our

ability to attract and retain the most qualified law students, judicial clerks, and lateral hires."

Chase Ex. 10 at JD_00003216-17; *see also* Chase Ex. 81, Shumaker Tr. 185:18-21.

Response: Disputed in part.  Undisputed that the cited memo to Brogan is signed by those

partners and states that Jones Day should increase family leave for women (but not men)

to remain competitive in associate recruiting.  Disputed that the named partners were the

only or principal managers behind the recommendation.  The documents show that

another Jones Day manager—███████████████████████████████

███████████████████—drafted of the memo to Brogan and played at least as

significant a role as the referenced partners in developing the policy that was proposed to

Brogan.  *See* Chase Ex. 9 at JD_00005117-19.

120.    These partners recommended to Jones Day's Managing Partner that the Firm

change its policies to provide 10 weeks of paid family leave to birthmothers.  The change did

not, however, benefit male associates, who continued to have four weeks of paid family leave

available.  Chase Ex. 10 at JD_00003217.

> <u>Response</u>: Disputed in part.  The cited memo to Brogan in fact recommends that the firm
>
> "[i]ncrease paid maternity leave from 12 weeks to 18 weeks."  Chase Ex. 10 at
>
> JD_00003217; *see also id.* at JD_00003219 ("we recommend that the [f]irm increase its
>
> paid maternity leave policy from 12 weeks to 18 weeks").  Nothing in the memo reflects
>
> the fiction that women previously received four weeks of "family" leave that would be
>
> increased to 10; rather, it reflects that women previously received 12 weeks of
>
> "maternity" leave that would be increased to 18.  This further refutes Jones Day's
>
> argument that it has a gender-neutral "family leave" period and a "distinct" eight-week
>
> "disability" period for new mothers.  Undisputed that the memo recommended increasing
>
> paid leave to 18 weeks for all mothers while keep birth fathers' leave at just four.  See
>
> also PSF ¶¶ 65-74.

121.    The partners did not analyze, reconsider, or recommend any changes to Jones

Day's STD policy.  *See* Chase Ex. 10 at JD_00003216-17.

<u>Response</u>: Disputed in part.  Disputed in that, while Jones Day now pretends that it had two separate policies—one giving women eight weeks of so-called "disability" leave and another giving them four weeks of so-called "family" leave—and that it increased the family leave to 10 weeks while leaving disability leave at 8 weeks, the cited memo in fact shows that what was proposed to and approved by Brogan was simply an increase in undifferentiated paid "maternity" leave from 12 weeks to 18 weeks.  *See* Chase Ex. 10 at JD_00003216-19.  Undisputed that the memo does not propose changes to "disability" leave—but it also does not propose changes to "family" leave.  The memo demonstrates that, far from having a fundamental distinction between sex-based "disability" leave and gender-neutral "family" leave, the actual distinction is between a long period of sex-based "maternity" leave and a short period of sex-based "paternity" leave.  While the memo does not speak of "family" or "disability" leave, it does refer to "maternity" leave as "primary caregiver" leave and "paternity" leave as "secondary caregiver" leave, making clear that the firm's management based its leave offerings for new parents not on beliefs about birth being a disabling process but rather on beliefs about the appropriate roles of men and women as "caregivers" for a new child.  *See id.* at JD_00003219; *see also* Chase Ex. 9 at JD_00005117-18; PSF ¶¶ 65-74.

122.    Stephen Brogan, Jones Day's Managing Partner, approved the change, though he does not specifically recall reviewing the underlying memo, beyond perhaps looking at the market assessment.  Chase Ex. 77, Brogan Tr. 91:2-93:4.

<u>Response</u>: Disputed in part.  Undisputed that Brogan was the decisionmaker who approved the change and that he testified that he does not remember what he reviewed before doing so.  However, a reasonable jury could conclude that Brogan probably did

review the underlying memo, especially considering that it is quite short and was

provided to him by his trusted advisors in order to advise them of their rationale for

proposing that the firm make a costly policy change.

123.   The change was announced to U.S. lawyers on January 22, 2015.  Chase Ex. 11,

JD_00005170.

Response: Undisputed.

124.   In May 2015, an Issues & Appeals associate in Jones Day's Washington, D.C.,

office questioned the legality of the Firm's new policy, noting to her practice leader, Beth

Heifetz, that under EEOC guidance "'parental leave must be provided to similarly situated men

and women on the same terms.'"  The associate stated that "the firm's policy is a bit

problematic" because—following the recent expansion of paid family leave for new mothers—it

gives "'10 weeks … [of] paid family leave' to mothers … but only 4 weeks of paid leave to

fathers."  Chase Ex. 41 at JD_00003792-93.

Response: Undisputed.

125.   Heifetz forwarded the message to the Firm's Director of Human Resources and

Employment Counsel, Sarah McClure, who undertook a privileged analysis and contacted

Michael Shumaker, the Firm Administrative Partner, who approved a change to the family leave

policy.  Chase Ex. 41, JD_00003790-92.

Response: Undisputed, except for the legal conclusion that any analysis was "privileged."

126.   Following that change—and again, consistent with comparably sized law firms—

Jones Day's policy for paid parental leave took into consideration only caregiver status, not

gender.  Chase Ex. 12 at JD_00003158; *see also* Chase Ex. 10 at JD_00003222-23 (surveying

other firms).

Response: Disputed.  The cited policy provides "mothers" with "18 weeks of paid leave" under the heading "Maternity Leave" and provides "[f]athers" with "ten weeks of paid leave" under the heading "Paternity Leave."  Chase Ex. 12 at JD_00003158.  The terms "mother," "father," "maternity," and "paternity" are gender-based terms.  It is undisputed that the cited policy labels eight of the weeks given to women as "disability" leave, but that is just a label.  *See also* PSF ¶¶ 111-48.

127.    On a gender neutral basis, any parent of a newborn would receive ten weeks of paid family leave if he or she was the "primary caregiver," and four weeks of paid family leave if he or she was the "secondary caregiver."  Chase Ex. 12 at JD_00003158.

Response: Disputed.  The cited policy states, under the heading "Family Leave Policy," that "mothers" receive "18 weeks of paid leave" and "fathers" receive "10 weeks of paid leave."  Chase Ex. 12 at JD_00003157-58.  While the cited "Family Leave Policy" labels eight weeks of "Maternity Leave" as "disability leave" and ten weeks as "family leave," Plaintiffs dispute that those labels have legal significance or in any sense reflect the substance of the leave entitlement.  The whole 18 weeks is (to repeat) "Maternity Leave" that is laid out as part of the "Family Leave Policy."  The substance of the leave entitlement is accurately reflected by the Family Leave Policy's reference to "the 18 weeks of paid leave" for "mothers," by HR Director Dressing's statement to the firm's female associates when the eight-week rule was adopted in 1994 that the only thing that had changed was "the manner in which the leave is tracked administratively" (PSF ¶ 19), and by the references in the 2014 memo to Brogan to an undifferentiated 12-week block of "maternity leave" that would be increased to an undifferentiated 18-week block (PSF ¶¶ 65-74).

128.    The associate who contacted Heifetz in 2015 and questioned the Firm's expansion of paid family leave for new mothers as legally "problematic" was later elevated to partner. Chase Ex. 41 at JD_00003792-93; McClure Decl. at ¶ 25.

Response: Undisputed.

129.    The Firm does not require associates, whether male or female, to obtain approval for family leave, and Jones Day does "not assume which caregiver leave" (primary or secondary) the associate will take; "we expect them to tell us."  Chase Ex. 76, Bounds Tr. 76:23-24; *see also id.* 75:4-77:1, 144:19-23.

Response: Disputed.  PSF ¶¶ 96-98; *see also* Chase Ex. 76 (Bounds (30(b)(6)) at 278:2-11, 279:11-281:1.

130.    No approval or proof of caregiver status is required; Jones Day does not "try to define primary caregiver in the policy.  So if an individual—if a lawyer tells, for example, the HR person in maybe doing their paperwork, I am the primary caregiver, we accept that."  Chase Ex. 76, Bounds Tr. 144:19-23.

Response: Disputed in part.  Undisputed that the written policy does not purport to define "primary caregiver."  Otherwise disputed as stated in response to ¶ 129.

131.    Initially, parents were required to commence family leave either within eight weeks of birth or, if applicable, immediately after the end of any disability leave.  Chase Ex. 12 at JD_00003158.

Response: Undisputed that the cited written policy so required.

132.    In 2018, however, Jones Day altered that practice: "[C]onsistent with the Firm's commitment to being family friendly," Michael Shumaker approved permitting birthparents to

commence family leave months after the child's birth, thereby providing them the flexibility to time leaves according to the family's needs.  Chase Ex. 14, JD_00003162.

> Response: Disputed in part.  Undisputed that Shumaker approved that change.  Disputed that Jones Day is committed to being "family friendly."  A reasonable jury could reject any such assertion, including in light of the firm's illegal treatment of Plaintiffs the month their first child was born.

133.    For example, where extended family were assisting with newborn care, the birthparent could delay family leave until needed.  And in families where both parents work, birthparents could take their leaves seriatim, "extend[ing] the time that a parent is home with the newborn."  Chase Ex. 14, JD_00003162 *see also* McClure Decl. at ¶ 21.

> Response: Undisputed.

134.    Jones Day also altered its policy to allow birthparents to take paid family leave in two separate tranches, thus allowing them to parse their paid leave to fit the family's needs. McClure Decl. at ¶¶ 21-22.

> Response: Undisputed.

### 3.    Leave for parents of adopted children

135.    As of January 2015, Jones Day began providing 18 weeks of leave to the primary caregivers of newly adopted children, and four weeks of paid leave for the secondary caregivers. Chase Ex. 11, JD_00005170.

> Response: Undisputed.

136.    Defense expert Dr. Elaine Schulte is a board-certified pediatrician who specializes in care for adopted children and their families.  She started one of the first comprehensive adoption programs in the United States and helped establish the American Academy of Pediatrics Section on Adoption and Foster Care.  Chase Ex. 88, Schulte Report at 1.

<u>Response</u>: Undisputed.

137.    Dr. Schulte has provided the undisputed expert opinion that "[t]he unique aspects of welcoming an adopted child make it reasonable to distinguish between adoptive parents and birthparents," including by affording adoptive parents a greater amount of paid family leave. Chase Ex. 88, Schulte Report at 8.

> <u>Response</u>: Undisputed that Dr. Schulte so opined.  However, Schulte was not involved in Jones Day's decision to adopt the policy and was not opining on why Jones Day in fact did so.  In fact, the contemporaneous Jones Day documents show that the firm's view was the exact opposite:  "Adoption leave issues have not historically arisen with great frequency, but parental reactions to and needs after adoption are not dissimilar to those experienced by biological parents.  We recommend bringing our paid adoption leave policy in line with our maternity and paternity leave policies (18 weeks paid and 6 weeks unpaid leave for primary caregivers and 4 weeks paid leave for secondary caregivers)." Chase Ex. 10 at JD_00003219.  "The rationale for the 18 weeks for adoption to mirror the same time as births was based on the primary caregivers [sic] role in bringing the child into the family. … We thought the adoption leave should be parallel to the maternity leave for the primary caregiver because the functions are the same."  Chase Ex. 9 at JD_00005117-18.

138.    According to Dr. Schulte, adopted children—who frequently are not newborns— often present unique attachment and bonding issues; arrive with unknown prenatal histories and other health issues; and can have special needs.  Chase Ex. 88, Schulte Report at 3-6.

> <u>Response</u>: Undisputed that Dr. Schulte so opined, but see Plaintiffs' response to ¶ 137.

139.    Dr. Schulte also opined that adopting a child can require extensive foreign travel for the prospective parents, as well as foreign and/or domestic legal proceedings.  Chase Ex. 88, Schulte Report at 7.

Response: Undisputed that Dr. Schulte so opined, but see Plaintiffs' response to ¶ 137.

140.    And bringing the adopted child to his or her new home can introduce socialization dynamics that impact the entire family.  Chase Ex. 88, Schulte Report at 6-7.

Response: Undisputed that Dr. Schulte so opined, but see Plaintiffs' response to ¶ 137.

141.    These "differences between adopting a child and bringing home a biologically related newborn justify providing adoptive parents additional family leave, and 18 weeks of family leave for adoptive parents is a reasonable amount of time in light of the unique challenges that adoptive parents face."  Chase Ex. 88, Schulte Report at 1.

Response: Undisputed that Dr. Schulte so opined, but see Plaintiffs' response to ¶ 137.

142.    The individuals who recommended providing 18 weeks of leave for adoptive parents are the same as those who examined family leave periods more generally in 2014.  Chase Ex. 10 at JD_00003217.

Response: Undisputed that the individuals in question simultaneously recommended to Brogan that mothers' paid maternity leave should be increased to 18 weeks and that adoptive primary caregivers should likewise receive 18 weeks.  See Chase Ex. 10 at JD_00003216-20; Chase Ex. 9 at JD_00005117-18.

143.    At the time they were developing the adoption leave recommendation, the Firm Administrative Partner, Michael Shumaker, "question[ed] whether it makes sense to go to the full 18 paid weeks leave for adoption," since that would track the full paid leave available to

birth mothers, including time to "recuperate from the actual birth."  Chase Ex. 9 at

JD_00005118.

> <u>Response</u>: Disputed in part.  Undisputed that Shumaker questioned whether adoptive
>
> parents should get "the full 18 paid weeks leave."  However, his actual statement was that
>
> "Arguably, some chunk of time is included in the leave because the mother must
>
> recuperate from the actual birth."  And he proposed "18 weeks for birth mom; 12 weeks
>
> for primary caregiver," indicating that he believed that birth mothers take six (not eight)
>
> weeks to "recuperate from the actual birth."  Chase Ex. 9.

144.    But as Delorme, the Firm Diversity Partner, argued in response, 18 weeks of paid

family leave for the primary caregiver of adopted children would send "a particularly strong

message to the LGBT community, especially gay men who would have to adopt."  Chase Ex. 9

at JD_00005118.

> <u>Response</u>: Disputed in part.  DeLorme's response reads: "The rationale for the 18 weeks
>
> for adoption to mirror the same time as births was based on the primary caregivers [sic]
>
> role in bringing the child into the family.  While there is obviously a physical component
>
> for birth Moms it comes at the front end of the leave so the extension to 18 weeks for
>
> maternity leave is not based on the recovery from the birth itself.  We thought the
>
> adoption leave should be parallel to the maternity leave for the primary caregiver because
>
> the functions are the same.  It is a particularly strong message to the LGBT community,
>
> especially gay men who would have to adopt.  I respectfully disagree with making a
>
> distinction between maternity leave and primary caregiver adoption leave."  Chase Ex. 9
>
> at JD_00005117-18.  Thus, DeLorme stated that birth mothers (unlike birth fathers) are
>
> primary caregivers, and that adoptive primary caregivers should receive the same leave as

61

those birth mothers because they are all primary caregivers. ███Staff C███

███████████████████████, then agreed that the leave given to birthmothers is

primary caregiver leave: "I'm with Carter [DeLorme] on this one.  And, personally, I was

very much out and about within days after having babies [as a Jones Day associate].  I

know that may not be the 'norm,' but the point is that I still very much appreciated the

extended period at home to acclimate and adjust to our new life."  *Id.* at JD_00005117.

145.    Shumaker, Reisman, and Delorme thus recommended, and Brogan approved,

expanding paid family leave for the primary caregiver of adopted children to 18 weeks and the

change took effect January 1, 2015.  *See* Chase Ex. 10 at JD_00003217; Chase Ex. 11,

JD_00005170.

> Response: Disputed in part.  Undisputed that the memo to Brogan recommended that
>
> adoptive primary caregivers be treated parallel to birth mothers and that Brogan approved
>
> the change.  Disputed as to the causal relationship implied by the word "thus," which
>
> Jones Day apparently intends to suggest that DeLorme's reference to "gay men who
>
> would have to adopt" was the principal rationale for treating adoptive primary caregivers
>
> parallel to birth mothers.  The record, as set forth in response to ¶ 144, shows that the
>
> rationale for the parallel treatment was that (a) Jones Day views birth mothers as primary
>
> caregivers and birth fathers as secondary; (b) Jones Day views the 18 weeks of leave for
>
> birth mothers as being based on "the primary caregivers [i.e., the woman's] role in
>
> bringing the child into the family" rather than the "physical component" of childbirth;
>
> and (c) Jones Day therefore determined that adoptive primary caregivers should likewise
>
> receive the 18 weeks, despite the absence of any "physical component."  In short: "The
>
> rationale for the 18 weeks for adoption to mirror the same time as births was based on the

primary caregivers role in bringing the child into the family."  Chase Ex. 9 at

JD_00005117.  Crucially, this was the rationale that was actually presented to and

adopted by the decisionmaker, Brogan: "parental reactions to and needs after adoption

are not dissimilar to those experienced by biological parents.  We recommend bringing

our paid adoption leave policy in line with our maternity and paternity leave policies (18

weeks paid and 6 weeks unpaid leave for primary caregivers and 4 weeks paid leave for

secondary caregivers)."  Chase Ex. 10 at JD_00003219.  ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████.  The only rationale actually provided to and

adopted by Brogan is the one described above.

146.    Jones Day reconsidered the issue a few months later.  In October 2015, McClure,

the Firm's Director of Human Resources and Employment Counsel, questioned whether "our

primary caregiver adoptive parents should receive the same as our primary caregiver fathers (10

weeks)," since any additional paid leave for birthmothers arose under the STD policy.  Chase Ex.

13 at JD_00003823.

    Response: Disputed in part.  Undisputed that, after an associate who had discussed the

    matter with Julia observed to Defendant Heifetz that it was obviously illegal for the firm

    to give birthmothers 18 weeks of paid leave and birthfathers just four and Jones Day

    increased leave for primary caregiver birthfathers to 10 weeks, McClure made the quoted

    statement.  Chase Ex. 13 at JD_00003823.  Disputed that the statement by the HR

    Director constituted "Jones Day reconsider[ing] the issue," given that she is not a

    decisionmaker and apparently was not even involved in Jones Day's decision to treat

adoptive primary caregivers the same as birth mothers as discussed in response to the
preceding paragraphs.

147.    ██████Staff B██████████████████, however, expressed concern about any
change, in part because people rely on the policies "as they plan for their family needs," and
████████████████████████████████████████████████████████████████

████████    Chase Ex. 13, JD_00003822.

<u>Response</u>: Disputed in part. ██████Staff B████████████ responded to McClure that
she was "concerned that we changed the amounts of leave last year, and so soon again
this year.  Changing terminology is fine, but changing the leave amounts can be
confusing – especially if we don't advertise the changes. [McClure had suggested that
associates who adopt might not notice the change 'if we simply make it in the policy
without any formal announcement'].  People read the policies well in advance as they
plan for their family needs, and will not be happy to learn later there have been changes
they were not told about. ████████████████████████████████████
████████████████████████." Chase Ex. 13 at JD_00003822-23.  In other
words, the ████Staff B████████████'s central point was that employees rely on the
employer's leave policies and would not be "happy" to have leave taken away (which is
obviously accurate).  Plaintiffs dispute that "Jones Day," as distinct from McClure, ever
considered *reducing* its paid parental leave benefits, which would be an extraordinary
thing for an employer to do and which Jones Day does not appear to have ever done.

148.    Shumaker also was aware that "adopted leave policy is really different from a
birthing maternity or paternity policy," as "adoptions are difficult and unique, and have special

concerns" not present with the birth of a biological child.  Chase Ex. 81, Shumaker Tr. 213:9-16, 214:2-4.

> Response: Disputed.  As discussed above, Shumaker and his colleagues agreed to propose to Brogan that adoptive primary caregivers should receive the same amount of paid leave as birthmothers (even though only the latter can be disabled) because "[t]he rationale for the 18 weeks for adoption to *mirror the same time as birth* was based on the primary caregivers role" and "the adoption leave should be parallel to the maternity leave for the primary caregiver [i.e., the woman] because *the functions are the same*."  Chase Ex. 9 at JD_00005117-18 (emphases added).  Shumaker and his colleagues then advised Brogan to adopt a policy treating birthmothers and adoptive primary caregivers equivalently on the ground that "parental reactions to and *needs after adoption are not dissimilar to those experienced by biological parents*."  Chase Ex. 10 at JD_00003219 (emphasis added).  It plainly was *not* Shumaker's view at the relevant time that adoptive parents are in a different situation than birthmothers.  Rather, he, his colleagues, and decisionmaker Brogan believed that, in the case of a biological child, the woman is invariably the primary caregiver and that the situation of an adoptive primary caregiver is materially identical to that of a woman who gives birth, even though the former would not have given birth and could not incur disability.

149.   Accordingly, Shumaker did not authorize any change to the 18 weeks of paid family leave available to primary caregivers of adopted children.  Chase Ex. 81, Shumaker Tr. 212:19-215:17.

> Response: Disputed in part.  Undisputed that Jones Day's policy of giving adoptive primary caregivers 18 weeks of paid leave has never been changed since it was

authorized by Brogan and took effect in January 2015.  The term "Accordingly" is disputed for the reasons stated in response to the preceding paragraph.  A reasonable jury could discredit Shumaker's contrary testimony.

## III.  SHEKETOFF WAS NOT SUBJECT TO DISCRIMINATION

### A.  Background

#### 1.  Jones Day's associate evaluation system

150.    With the exception of the most junior associates in Jones Day's "New Lawyers Group"—who are evaluated through an informal system designed to provide real-time feedback—Jones Day associates are evaluated annually after a comprehensive, months-long, iterative process to assess each associate's performance and contribution to the Firm.  Chase Ex. 82, Lovitt Tr. Vol. I 144:6-9.

Response: Undisputed that associates are formally evaluated each year and that the process takes several months.  Plaintiffs object to the vague characterizations "comprehensive" and "iterative" and deny them.

151.    Jones Day's evaluation process begins every year in early January, when the Firm solicits from each associate a list of the matters on which they worked in the prior calendar year, a description of their work, and the name of the lawyers (both partners and more senior associates) who supervised the associate's work.  Chase Ex. 83, Lovitt Tr. Vol. II 26:20-30:13; *see also* Chase Ex. 27 at JD_00003069.

Response: Undisputed.

152.    The relevant work descriptions and a link to an electronic evaluation form is then sent to the lawyers identified as the associate's supervisors.  Chase Ex. 83, Lovitt Tr. Vol. II 30:14-17; *see also* Chase Ex. 27 at JD_00003069.

Response: Undisputed.

66

153.    The electronic evaluation form requires each supervising lawyer who submits an

evaluation to provide feedback on the associate in three ways.  *See* Chase Ex. 28, JD_00005181.

Response: Undisputed.

154.    *First*, the supervising lawyer ranks his or her exposure to the associate as

extensive, moderate, or limited.  Chase Ex. 28, JD_00005181.

Response: Undisputed.

155.    *Second*, the lawyer must rate the associate's performance in more than a dozen

substantive categories as either Unacceptable (which correlates to a numeric value of 1), Needs

Improvement (2), Satisfactory (3), Exceeds Standards (4), or Exceptional (5).  The substantive

categories include the associate's grasp of legal issues and concepts, legal research and analysis,

factual analysis, judgment, written and oral presentations, timeliness, efficiency, abilities to

interact with clients and as a team member, leadership, relationship with peers and subordinates,

and overall effectiveness.  Chase Ex. 28, JD_00005181.

Response: Undisputed aside from the vague characterization of all categories as being

"substantive."  The reviewing attorney can also indicate that he has an inadequate basis to

evaluate the associate in a particular category, in which case the evaluation assigns the

associate a 0 in that category.  Chase Ex. 28 at JD_00005181.

156.    The instructions provided to each supervising lawyer advise that "[t]he Firm

needs fair but candid and objective assessments of all lawyers"; that a "Satisfactory" rating is

appropriate "when the [associate] assumed responsibilities and performed work of appropriate

complexity at a level consistent with the Firm's expectation for lawyers with comparable time in

the practice": and that ratings of "Exceeds Standards" and "Exceptional" should be given "only

to lawyers whose work is consistently and demonstrably ahead of Jones Day peers."  Chase Ex. 26, JD_00003061.

Response: Undisputed.

157.   *Third*, the supervising lawyer must provide a narrative evaluation of the associate's performance on the matter, including the associate's strengths, weaknesses, and areas for improvement, and "anything else about the lawyer's substantive performance you believe important to a fair and objective assessment."  Chase Ex. 28 at JD_00005182.

Response: Undisputed that the instructions provided to reviewing attorneys so state, though many of Plaintiffs' evaluations do not in fact point to any purported "weaknesses" or "areas for improvement."

158.   Supervising lawyers are instructed that "every evaluator must submit a narrative evaluation that fairly describes the lawyer's strengths and areas for improvement," and that the Firm "cannot provide guidance and lawyers cannot be expected to address and correct performance problems unless we all have a clear understanding of the lawyer's strengths and weaknesses, and candid assessments of their performance on specific projects during the evaluation period."  Chase Ex. 26, JD_00003061.

Response: Undisputed that the instructions so state.  The instructions for the narrative assessment open by saying: "[Y]ou should provide an objective narrative evaluation of the lawyer' performance on the identified project(s)."  Chase Ex. 28 at JD_00003061. The instructions also state: "These are not intended to be 'career' evaluations that comment on the lawyer generally and they are not assessments of where you think the lawyer standards or should stand overall."  *Id.*

159.    After these individual lawyer evaluations are completed, the associate's Practice Leader is responsible for "vetting the evaluations, that is to follow up with individual evaluators if there are questions about the evaluation," in order to get "a better grip o[n] or understanding [of] the associate's performance."  Chase Ex. 83, Lovitt Tr. Vol. II 31:23-32:5.

> Response: Disputed in part.  Undisputed that the Practice Leader (here, Defendant
>
> Heifetz) is supposed to review the evaluations and speak with evaluators in some
>
> circumstances.  Disputed that this process constitutes "vetting" in any meaningful sense,
>
> or that any "vetting" occurred in Julia's case.  Chase Ex. 83 (Lovitt) at 4:11-9:19.

160.    The Practice Leaders have responsibility for preparing a draft "Assessment Statement" for each associate in their practice.  The Assessment Statement is intended to provide "a fair and objective final assessment of the individual's performance and productivity" that will "be conveyed to the [associate] word-for-word" in an in-person review at the end of the evaluation process.  Chase Ex. 29 at JD_00003072.

> Response: Undisputed.

161.    The Assessment Statement is not intended as a consensus statement that simply cuts and pastes from the associate's individual evaluations.  Chase Ex. 83, Lovitt Tr. Vol. II 80:5-22.

> Response: Disputed in part.  Undisputed that Assessment Statements are not literally cut-
>
> and-pastes that are limited to repeating the words of individual evaluations verbatim.
>
> This paragraph is disputed to the extent that it is meant to convey anything other than that
>
> Assessment Statements are not literally cut and pasted from individual evaluations.  PSF
>
> ¶¶ 685-87. Plaintiffs dispute the implication that the Assessment Statements are not
>
> intended to present the partnership's "consensus" regarding an associate.  PSF ¶¶ 688-91.

162.    The Assessment Statement is Jones Day's view of the associate and is intended to provide "a whole holistic picture of an associate" that controls for variances among evaluators and work assignments.  Chase Ex. 83, Lovitt Tr. Vol. II 84:17-18; *see also* Chase Ex. 83, Lovitt Tr. Vol. II 83:7-11.

> Response: Disputed in part.  Undisputed that the Assessment Statement is supposed to be "holistic."  Disputed that Assessment Statements "control for" anything.  Assessment Statements are compilations of comments made in individual evaluations; they incorporate flaws (if any) in those individual evaluations rather than somehow cancelling them out.  PSF ¶¶ 685-87.

163.    Traci Lovitt—Jones Day's Rule 30(b)(6) designee on the evaluation process—has testified that, to arrive at an Assessment Statement, "[t]here's a vetting process" in which the drafter analyzes the individual evaluations and "look[s] for themes."  Chase Ex. 83, Lovitt Tr. Vol. II 80:18-22.

> Response: Disputed in part.  Undisputed that Lovitt so testified.  Disputed that most individual evaluations are "vetted" in any meaningful sense or that assessment statements in fact reflect "themes" of an associate's evaluations.  Chase Ex. 15; Chase Ex. 83 (Lovitt) at 4:11-9:19; PSF ¶¶ 550-51, 562-64, 583.

164.    With multiple evaluations for each associate, "you have a lot of evaluators, you have different projects and different levels of difficulties" on various project, so "you go through the stack of evaluations and find commonality," and when "three or four evaluators [are] saying the same thing, you're like okay, I got it, this is the theme that needs to go into the assessment statement."  Chase Ex. 83, Lovitt Tr. Vol. II 80:23-80:11.

70

Response: Disputed in part. Undisputed that Lovitt so testified. Disputed that

Assessment Statements incorporate all "themes" that appear in multiple individual

evaluations or that Assessment Statements are limited to "themes" appearing in multiple

individual evaluations. Chase Ex. 15; PSF ¶¶ 550-51, 562-64, 583.

165.    If "you see the same theme, you know that you can kind of control for the

individuality of the evaluator, you can control for the project." Chase Ex. 83, Lovitt Tr. Vol. II

83:7-11.

Response: Disputed in part. Undisputed that a "theme" that genuinely appears in

multiple individual evaluations is more likely to be accurate than a statement made in one

evaluation but not repeated in others. Disputed that this means that Assessment

Statements can "control for" individual evaluations in any meaningful sense.

166.    In addition, the Practice Leaders do some "pressure testing of the individual

evaluations" to understand their factual basis. Chase Ex. 82, Lovitt Tr. Vol. I 150:2-14 (and

errata).

Response: Undisputed that Lovitt so testified. The record does not establish that this was

done in connection with particular evaluations relevant to this case. Chase Ex. 83

(Lovitt) at 4:11-9:19.

167.    Practice Leaders also rely on their personal knowledge of an associate's

performance to help determine the themes that are appropriate for the Assessment Statement or

to corroborate the feedback in the evaluations. Chase Ex. 83, Lovitt Tr. Vol. II 83:21-84:6.

Response: Undisputed as a general statement. Disputed that Heifetz' personal knowledge

of Julia's performance was a basis for Julia's assessment statement and/or corroborated

Partner A's evaluation. As evidenced by her own reviews (for two separate projects in

71

which she supervised Julia's drafting of a memo), Heifetz' personal experience with

Julia's work was quite positive.  Chase Ex. 15 at JD_JS_00001292, JD_JS_00001300.

Heifetz' only other "knowledge" of Julia's performance would have come from her

review of Julia's evaluations, which were not consistent with Partner A's criticisms.  PSF

¶¶ 550-51, 562-64, 583.

168.    In the Washington D.C. office, the office leadership, local practice leadership

(including the Issues & Appeals Practice Leader), and the litigation partners hold an associate

evaluation meeting to provide the D.C. office and practice leadership a variety of viewpoints

about the D.C.-based litigation associates to aid the evaluation process.  Chase Ex. 83, Lovitt Tr.

Vol. II 59:10-25.

Response: Undisputed.

169.    At the D.C. office litigation meeting, a slide summarizing the individual

evaluations of each D.C. litigation associate is presented, and the attendees discuss their views of

the associate's performance.  Chase Ex. 83, Lovitt Tr. Vol. II 33:20-33:5.

Response: Undisputed.

170.    The performance of more senior associates is further vetted in practice area-specific

meetings (e.g., litigation, transactional, IP, or regulatory) that are firmwide in scope and typically

held in late March or early April.  The associate's individual evaluations and the draft

Assessment Statements are distributed to the meeting attendees, and the draft Assessment

Statements are debated in the meeting.  Chase Ex. 31, JD_00003108.

Response: Undisputed, except as to the vague characterization of the process described as

"vett[ing]."  Plaintiffs disagree that the described process constitutes "vetting" in any

meaningful sense.

171.    As Lovitt has testified, the partners who attend the firmwide meetings are:

> the most diverse group you can think of in every sense of the word. There are senior lawyers, there are junior lawyers, there are lawyers of men and women, LGBT lawyers are on that committee, lawyers of all races are on this committee.  And the idea is everyone who is a part of this committee … is tasked with determining whether the draft assessment statements are fair and accurate.

Chase Ex. 82, Lovitt Tr. Vol. I 136:16-137:7.

Response: Undisputed that Lovitt so testified.  Disputed that any group of corporate law firm partners could be "the most diverse group you can think of" in any "sense of the word."  *See also Tolton* Dkt. 146-21 (NALP forms for 2017 showing Jones Day demographics).

172.    The firmwide associate review meeting is "combative in the sense that you have an assessment statement and the person who drafted it is forced to defend it, to defend, you know, the negative feedback and the positive feedback.  Everything has to have a factual basis." Chase Ex. 83, Lovitt Tr. Vol. II 60:14-20.

Response: Undisputed that Lovitt so testified.  Any implication that the firmwide meeting reviews and rigorously seeks a "factual basis" for all feedback in every associate's Assessment Statement is wildly implausible and contradicted by what happened to Julia. PSF ¶¶ 515-621, 693-94.

173.    There is also some "grading of the graders," a discussion of the persuasive value of some individual evaluations.  Chase Ex. 82, Lovitt Tr. Vol. I 150:11 (and errata).

Response: Undisputed that there is "some" such discussion as a general matter.

174.    Draft Assessment Statements are frequently revised based on input at these firmwide meetings, and the revised drafts are then submitted to the Partners-in-Charge ("PICs") of the office in which each associate works.  The office leadership can challenge statements in an

individual associate's Assessment Statement as part of this process.  Chase Ex. 32, JD_00003021.

> Response: Undisputed that draft Assessment Statements are sometimes revised and that partners-in-charge can challenge statements in Assessment Statements if they choose to do so.

175.    As a result of this iterative evaluation process—which involves input from individual evaluators, and review by practice leadership, office leadership, some local review committees, and for more senior associates, a diverse group of firmwide leaders—there are "many eyes on the [Jones Day evaluation] process to ensure fairness and accuracy."  Chase Ex. 83, Lovitt Tr. Vol. II 59:18-19.

> Response: Disputed.  The fundamental input into the process is the individual evaluations, and Lovitt identified only one instance in which the "iterative evaluation process" determined that an individual evaluation was unfair.  Chase Ex. 82 (Lovitt) at 150:15-17.  There is no evidence showing that the process can or does uncover false or unfair statements in individual evaluations, much less that the ultimate outcome is not influenced by individual evaluations. To the contrary, in Julia's case, the process did not uncover Partner A's false and unfair statements; they figured prominently in Julia's assessment statement.  PSF ¶¶ 515-621, 693-94.

176.    The Firm "vet[s] each and every one of the individual evaluations by not only one or two people, but large groups of people.  There are many, many eyes on all the individual evaluations.  And there is a challenge process that happens both at the practice level, at the office level, and … at the [firmwide] level where people test the credibility of individual evaluations." Chase Ex. 82, Lovitt Tr. Vol. I 136:4-15.

Response: Disputed.  While it may be true that multiple partners read each individual evaluation and could choose to "challenge" it, there is no evidence that multiple partners in any meaningful sense "test the credibility of individual evaluations," or even that it would be plausible for them to do so.  Again, in Julia's case, the falsity of Partner A's statements was not uncovered and they figured prominently in her assessment statement. PSF ¶¶ 515-621, 693-94.

177.   The final Assessment Statement is read to the associate at his or her annual performance review, typically held in May or June, followed by discussion.  Chase Ex. 32, JD_00003021; Chase Ex. 27, JD_00003069; *see also, e.g.*, Chase Ex. 19 at JD_00003121.

Response: Undisputed that the Assessment Statement is generally read to the associate at his or her annual performance review, that the review is typically held in May or June, and that the review could involve "discussion."

178.   Apart from the Assessment Statement, the PICs and Practice Leaders separately rate the associates in their office or practice and force rank their most senior associates.  *See* Chase Ex. 29, JD_00003071.

Response: Disputed in part.  Undisputed that an associate's office partner-in-charge and practice leader each both rate the associate and rank the associate relative to other associates of similar seniority.  Disputed that these ratings and rankings are based on anything other than the individual evaluations and the Assessment Statements (which are themselves derived from the individual evaluations).  PSF ¶¶ 721-30.

179.   The rating is an objective numerical value of 1 through 5, with 1 representing "Unacceptable performance/seriously deficient" and 5 representing "Exceptional performance." Chase Ex. 29 at JD_00003075.

Response: Undisputed that the rating is on a 1-to-5 scale with 1 and 5 defined as stated. Plaintiffs do not know what Defendants mean by the characterization "objective" and thus dispute it. The ratings are necessarily subjective; they are assigned by individual partners, and the two partners (the office partner-in-charge and the practice group leader) appear to frequently assign different ratings, refuting any claim to objectivity. Chase Ex. 15 at JD_JS_00001289, JD_JS_00001296.

180.    The forced ranking is a comparative assessment of an associate relative to his or her peers of roughly comparable seniority in the office (for the office ranking) or in the practice (for the practice ranking). Chase Ex. 29, JD_00003071.

Response: Undisputed.

### 2.    Jones Day's compensation system

181.    Adjustments to associate compensation are determined after the Assessment Statements, ratings and rankings are finalized. Chase Ex. 83, Lovitt Tr. Vol. II 35:12-23.

Response: Undisputed.

182.    The Firm approaches associate compensation "on an individual lawyer basis. Each lawyer's compensation should reflect the specific individual contribution of that lawyer, including his or her level of professional achievement, productivity and potential for meaningful growth and advancement," as well as local market data. Chase Ex. 30, JD_00003042.

Response: Undisputed that compensation is supposed to be individualized and to reflect the stated factors as well as the salaries paid by other large firms in the same geographical market.

183.    Like the evaluation process, the compensation adjustment process is iterative. Compensation adjustment recommendations are initially formed by the associate's PIC, who has access to the final Assessment Statements, the office and practice ratings and rankings, and

personal knowledge of the associates in the office.  Chase Ex. 30, JD_00003042; Chase Ex. 32, JD_00003021.

> Response: Disputed in part.  The second sentence is undisputed except that it omits that the partner-in-charge *also has access to associates' individual evaluations*, and also that there is no evidence that the office partner-in-charge has "personal knowledge" of all associates in the office, which would be implausible in an office as large as the D.C. office.  PSF ¶ 704.  The first sentence is undisputed assuming that characterization "iterative" means that the process has multiple steps.

184.    The Partners-in-Charge submit their proposed compensation adjustments in a salary spreadsheet.  Chase Ex. 32, JD_00003021; Chase Ex. 16, JD_00004765-68 (salary spreadsheet entries relating to Sheketoff).

> Response: Undisputed.

185.    The spreadsheet contains basic information about the associates, including name, hire date, seniority, the office and practice ratings and rankings, hours for the prior year, current salary, and prior year's salary.  *See, e.g.*, Chase Ex. 16, JD_00004765.

> Response: Undisputed.

186.    In 2016, the spreadsheet—including the PIC recommended adjustments—was sent to Michael Shumaker, the Firm Administrative Partner, who reviewed and commented on the recommended compensation, which could include suggesting an upward or downward adjustment from the number recommended by the PIC.  Chase Ex. 83, Lovitt Tr. Vol. II 39:10-17; *see also* Chase Ex. 81, Shumaker Tr. 328:5-329:10; Chase Ex. 16, JD_00004765.

Response: Undisputed, except that there is no evidence that Shumaker "commented on" the partner-in-charge recommendations beyond potentially suggesting a higher or lower number than the recommendation.

187.     In 2017 and 2018, the spreadsheet, including the PIC's recommended compensation adjustments, was sent to Shumaker and Traci Lovitt, whom the Managing Partner appointed to help oversee the associate evaluation and compensation process.  Chase Ex. 82, Lovitt Tr. Vol. I 281:14-15, 283:8-10; Chase Ex. 83, Lovitt Tr. Vol. II 39:18-6; Chase Ex. 77, Brogan Tr. 216:4-15, 229:21-230:7.

Response: Undisputed.

188.     Shumaker and Lovitt would review the PIC recommendations and suggest changes.  In doing so, they would "independently without talking to each other come up with our own recommendations," and only after forming their own recommendations, would discuss their recommendations and reconcile any differences.  Chase Ex. 83, Lovitt Tr. Vol. II 40:11-41:3, 97:11-98:21; see also Chase Ex. 81, Shumaker Tr. 323:23-324:2.

Response: Undisputed, except that there is no evidence that Shumaker and Lovitt always "reconcile[d] any differences."

189.     Shumaker and Lovitt's recommendations were added to the spreadsheet along with the PIC's, and all were sent to the Managing Partner for his review and approval.  Chase Ex. 81, Shumaker Tr. 323:23-324:2; see also Chase Ex. 83, Lovitt Tr. Vol. II 43:16-18, 95:21-97:10; Chase Ex. 77, Brogan Tr. 214:15-19.

Response: Undisputed.

190.     Salary adjustments generally were finalized and communicated to the associates in late June, becoming effective July 1.  See, e.g., Chase Ex. 17, JD_00000092.

<u>Response</u>: Undisputed.

**3.      Partner A**

191.      █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

<u>Response</u>: ██████████████████████████████. The other

assertions are inarguably immaterial and, given that they are redacted from the publicly

filed version, could only have been included in the hopes of improperly influencing the

Court's ruling.

192.      █████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

<u>Response</u>: Undisputed.

193.      █████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

██████████████████████

<u>Response</u>: ███████████████████████████████████

████████████████████████████████████

██████████████████████████████

194.      Discovery uncovered no evidence of any complaints about Partner A apart from

the allegations in this case.  Firm leaders recognize Partner A as a "champion" and "enormous

promoter" of diversity, equity, and inclusion at Jones Day.  Chase Ex. 81, Shumaker Tr. 70:14-15; Chase Ex. 77, Brogan Tr. 77:6.

> Response: Disputed in part.  Documents produced in discovery include complaints about Partner A treating another female associate in a bizarrely and inappropriately paternalistic manner on the basis of sex.  PSF ¶ 633.  Undisputed that Defendant Shumaker described Partner A as "champion" or that Defendant Brogan called Partner A an "enormous promoter" of diversity, equity, and inclusion.  Disputed that Partner A is in fact either of those things, as the facts in this case demonstrate.  PSF ¶¶ 433-735.

195.    In evaluating associates, Partner A views his job as "to provide the firm my honest assessment of [the associate's] abilities and … potential for growth."  Chase Ex. 84, Partner A Tr. 86:7-9.

> Response: Disputed.  A jury could find that Partner A intentionally lied in his evaluation of Julia in order to harm her career and reputation.  PSF ¶¶ 433-682.

196.    Jones Day produced every associate evaluation that Partner A submitted from 2012 through 2020, the last year for which evaluations were available as of the time of production.  Chase Ex. 39, JD_00002849-2860.

> Response: Undisputed.

197.    Those evaluations show no indication of sex-based discrimination or animus.  *See generally* Chase Ex. 39, JD_00002849-2860.

> Response: Disputed.  A jury could find that Partner A intentionally lied in his evaluation of Julia because of her sex.  PSF ¶¶ 433-682.  Moreover, ██████████████
> ██████████████████████████████████████████████
> ██.  PSF ¶ 634-37.

198. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

Response: Undisputed.

199. ██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

Response: Undisputed that evaluations of other female associates include the quoted

language.

200. ████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████

Response: Undisputed that the quoted language appears in the evaluation. ████

██████████████████████████████████████████

██████████████████████████████████████████

201.    On the whole, Partner A's evaluations of women other than Sheketoff were

uniformly positive, and his evaluations of male associates have included substantially more

critical statements.  *See generally* Chase Ex. 39, JD_00002849-2860.

Response: Undisputed.

202. ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

Response: Undisputed. ████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

203. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

Response: Undisputed.

204. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

Response: Undisputed.

205. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

Response: Undisputed.

206.     When asked to provide the basis for her accusation that Partner A is biased

against women, Sheketoff's sworn testimony concerned a lunch for Black attorneys that Partner

A purportedly organized and to which he invited a Black female associate but did not invite

Sheketoff.  Chase Ex. 80, Sheketoff Tr. 135:12-25; *see also* Chase Ex. 84, Partner A Tr. 294:6-

297:16.

> Response: Disputed.  Julia gave an in-depth response when asked to describe her reasons
>
> for thinking that Partner A discriminated against her.  Chase Ex. 80 (Sheketoff) at 87:25-
>
> 88:12, 89:5-91:1, 128:23-138:15, 140:1-16, 142:10-19, 143:14-144:12, 145:10-146:7,
>
> 150:1-151:22, 155:17-156:14.  Those reasons included that Partner A made numerous
>
> intentionally false statements about Julia in his review of her, that he reacted to her
>
> suggestions to his revisions to their memo with annoyance and insecurity, that he treated
>
> her differently than he treated male Issues & Appeals attorneys, that he had had a
>
> troubling and paternalistic conversation with another female associate, and that another
>
> female associate agreed that Partner A wouldn't have responded to male Issues &
>
> Appeals associates in the same way as he responded to Julia when she revised their
>
> memo, among other things.  *Id.*  One additional reason Julia gave was that, after Partner
>
> A's hostile response to her suggested changes to his revisions, Partner A invited ████
>
> ████████ to an event for people of color at Jones Day.  ████████████ suggested
>
> that Partner A invite Julia and ██████████████, and Partner A invited only ██████
>
> ████████, which suggested to Julia that "he was still feeling hostile towards [her]
>
> about the memo and [her] revisions to [the] memo."  *Id.* at 135:12-25, 137:17-138:15 ("It
>
> seemed to me that he was still holding a grudge against me").  Disputed that the event

83

was only for Black lawyers rather than for people of color generally, and also disputed in

any event that Jones Day's citations support the assertion that ████████████████

identifies as Black.  Chase Ex. 84 (Partner A) at 294:6-11 (admitting that he organized

events for people of color and claiming that he did not recall any event to which ████

████████ suggested he invite Julia and ████████████); *id.* at 294:12- 298:6

(testifying that he invited ████████████ to a "folks lunch" that multiple non-Black

associates attended, but disavowing any memory that he had talked with ████

████████ about inviting Julia or ████████████ to that event); *see also* Chase Ex.

80 (Sheketoff) at 135:12-25, 137:17-138:15.

207.    Sheketoff also accuses Partner A of being biased against women because, in

Sheketoff's opinion, Partner A "seemed somewhat insecure" around her and "reference[d] …

how he had some connection to Harvard"—the school that both Sheketoff and Partner A's

spouse attended.  Chase Ex. 80, Sheketoff Tr. 133:11, 17-18; *see also* Chase Ex. 84, Partner A

Tr. 289:11-290:2.

Response: Disputed.  Julia's reasons for accusing Partner of discriminating against her on

the basis of sex are set out in Plaintiffs' statement of facts.  PSF ¶¶ 433-682.  Julia also

gave an in-depth response during her deposition when asked to describe her reasons for

thinking that Partner A discriminated against her.  Chase Ex. 80 (Sheketoff) at 87:25-

88:12, 89:5-91:1, 128:23-138:15, 140:1-16, 142:10-19, 143:14-144:12, 145:10-146:7,

150:1-151:22, 155:17-156:14.  Those reasons included that Partner A made numerous

intentionally false statements about Julia in his review of her, that he reacted to her

suggestions to his revisions to their memo with annoyance and insecurity, that he treated

her differently than he treated male Issues & Appeals attorneys, that he had had a

troubling and paternalistic conversation with another female associate, and that another

female associate agreed that Partner A wouldn't have responded to male Issues &

Appeals associates in the same way as he responded to Julia when she revised their

memo, among other things.  *Id.*  One additional reason Julia gave was that Partner A

seemed insecure around her and ████████████—including by often referencing his

connections to Harvard—whereas he seemed secure around men, even going to far as to

make self-deprecating comments about his intelligence in front of the male Issues &

Appeals table.  Chase Ex. 80 (Sheketoff) at 143:19-144:12; Chase Ex. 84 (Partner A) at

280:18-282:7.

### B.  Sheketoff Was One of the Worst Associates in Her Practice in 2015

208.  Sheketoff's first full year at Jones Day was 2015, and her performance in that

year ("Evaluation Year 2015") was evaluated during the 2016 calendar year.  Chase Ex. 15 at

JD_JS_00001296-1299.

Response: Undisputed.

209.  For her 2015 performance, Sheketoff's Practice Leader—Beth Heifetz—rated

Sheketoff a 2 (out of 5) and ranked her 23rd out of 24 peers in the Issues & Appeals practice.

Chase Ex. 16 at JD_00004766; *see also* Chase Ex. 15 at JD_JS_00001296; Chase Ex. 24,

JD_00004024 (ranking for JP019917).

Response: Undisputed.

210.  A 2 rating indicates performance "below standards" and "performance concerns,"

and "successive '2' ratings are inconsistent with continued employment at the Firm."  Chase Ex.

29 at JD_00003075; Chase Ex. 83, Lovitt Tr. Vol. II 127:23-128:5, 149:21-150:5, 177:3-15.

Response: Disputed.  After receiving a practice rating of 2 in 2015, Julia was given a

compensation adjustment that left her (along with ████████████████████ in

the I&A group) as the highest paid associate in her class year across the entire firm,

strongly suggesting that Julia was not viewed by Jones Day as having performed "below

standards" or in a way that was raised "concerns." PSF ¶¶ 473, 474, 481-83; JDSF ¶ 209.

After having received a second practice rating of 2 in 2016, Julia continued to be

employed at the firm—and the following year (the first year she was eligible to be rated)

was rated an average of 4.5 out of 5 for partnership potential. Chase Ex. 15 at 1290-92;

JDSF ¶ 235.

211.    Sheketoff's office rated her a 3, and also ranked her near the bottom of her peer

group in the Washington D.C. office, 30 out of 37. Chase Ex. 16 at JD_00004766

Response: Disputed that 30 out of 37 is "near the bottom."

212.    As Sheketoff's practice leader, Heifetz was ultimately responsible for determining

Sheketoff's practice group rating. Chase Ex. 82, Lovitt Tr. Vol. I 196:24-198:4; Chase Ex. 83,

Lovitt Tr. Vol. II 29:14-35:23.

Response: Undisputed.

213.    Heifetz assigned Sheketoff a 2 because of Sheketoff's extremely low billable

client hours and Heifetz's concerns about her substantive performance. Chase Ex. 82, Lovitt Tr.

Vol. I 196:24-199:4, 200:19-201:1; Heifetz Decl. at ¶ 5.

Response: Disputed in part. Undisputed that Heifetz assigned Julia a 2 for her 2015

work because of Julia's very high hours on a pro bono project that Heifetz authorized but

that took many hundreds more hours than anticipated, resulting in fewer billable hours.

Sheketoff Ex. 171 at JD_00003755-56. Disputed that Heifetz had concerns with Julia's

substantive performance apart from her billable hours. PSF ¶¶ 640-45; Chase Ex. 15 at

JD_JS_1296 (Julia's assessment statement for her 2015 work).

214.    In 2015, Sheketoff billed 179 hours for paying clients, and 1,590 hours for pro bono clients.  Chase Ex. 15 at JD_JS_00001296.

<u>Response</u>: Undisputed.

215.    Sheketoff's combined billable and pro bono hours were well below the billable hours expectations for full-time associates, and the proportion of billable work was unacceptably low.  Chase Ex. 82, Lovitt Tr. Vol. I 209:4-211:1.

> <u>Response</u>: Disputed in part.  Disputed that Julia's combined billable and pro bono hours were below the expectations for total hours for full-time associates.  Julia was given a compensation adjustment for her 2015 work that left her (along with  in the I&A group) as the highest paid associate in her class year across the entire firm, strongly suggesting that Julia was not viewed by Jones Day as "unacceptabl[e]."  PSF ¶¶ 472-484.  Other associates were also promoted and/or given large raises despite significantly lower total hours.
>
> Undisputed that Jones Day prefers for its associates to have a higher ratio of billable to pro bono work.

216.    The reviews for Sheketoff's 2015 performance (which, again, were submitted in 2016) were mixed—some reviewers offered only positive comments while others noted concerns with Sheketoff's writing and willingness to work at inconvenient times.  Chase Ex. 15 at JD_JS_00001296-1299.

<u>Response</u>: Disputed in part.  Undisputed that some reviews were entirely positive while others included both positive and negative comments.  All but one of the evaluations (the one by Hashim Mooppan) were positive on the whole.  Plaintiffs therefore dispute the characterization of the reviews for 2015 as being collectively "mixed."

217.    Two reviewers noted, for example, that Sheketoff's written work was "not as strong as it could have been" and was "very poorly structured" because she "found it difficult to transition from the law-clerk role to the advocate role"—a "usual … problem with recent clerks" but which Sheketoff experienced "to a much more significant degree than I would expect for someone with her pedigree, who should know the basic do's and don'ts of appellate briefing." Chase Ex. 15 at JD_JS_00001297.

<u>Response</u>: Disputed in part.  One of the two referenced evaluations states, after a string of positive remarks, that "Her initial written draft of the opening brief was not as strong as it could have been, I think because she was not persuaded by our argument on the merits and found it difficult to transition from the law-clerk role to the to the advocate role." Chase Ex. 15 at JD_JS_00001297.  That evaluation does not support the "very poorly structured" characterization.  Plaintiffs therefore dispute the false assertion that "[t]wo reviewers noted" that her writing was "very poorly structured."  The other referenced evaluation, by Hashim Mooppan, is admittedly negative.  *Id.*

218.    One of those reviewers also provided a particularly negative description of Sheketoff's response to a ██████████████████████████████ ███████████████████████████████.  Chase Ex. 15 at JD_JS_00001297.

<u>Response</u>: Disputed in part.  Undisputed that Mooppan provided a negative description.  Disputed in that the description is materially false.  PSF ¶¶ 641-69.

219.     The partner explained that the ███████████ schedule conflicted with Sheketoff's vacation, and Sheketoff "dealt with [this request] extremely poorly—excessively complaining, not really trying hard to develop the best argument on the ███ and challenging issue, failing to find cases that the judges themselves ended up finding, and even repeatedly suggesting that she would withdraw from a ████████████████████████ ████████████████████ Chase Ex. 15 at JD_JS_00001297.

Response: Disputed in part.  Undisputed that Mooppan provided a negative description. Disputed in that the description is materially false.  PSF ¶¶ 641-69.

220.     That evaluation described Sheketoff's work on the matter as "immature across the board—both in terms of substantive execution and professional comportment," and stated that the partner "wouldn't want to work with [Sheketoff] again unless and until others have noted significant improvements on at least some of the above."  Chase Ex. 15 at JD_JS_00001297.

Response: Disputed in part.  Undisputed that Mooppan's evaluation so states.  Disputed in that the description is materially false.  PSF ¶¶ 641-69.

221.     Heifetz became involved in the matter and had personal knowledge of Sheketoff's reaction to the ██████████████████.  Heifetz was "appalled" by Sheketoff's conduct and believed Sheketoff was "skirting the lines of her ethical obligations to her clients by threatening to quit the representation because it was inconvenient to her personal life."  Heifetz Decl. at ¶ 6; Chase Ex. 82, Lovitt Tr. Vol. I 194:7-201:19 (describing how Sheketoff threatened to quit the pro bono appointment rather than disrupt her vacation); Chase Ex. 83, Lovitt Tr. Vol. II 10:2-12:23, 101:17-24.

Response: Disputed.  PSF ¶¶ 641-45, 653-62.

222.    Another evaluator—who went on to become the Solicitor General of the United States—noted in his evaluation that Sheketoff's work on a small project "was good," but that when "Julia was offered a larger opportunity in the matter," she "chose not to do it given other ongoing matters."  Chase Ex. 15 at JD_JS_00001298.

Response: Undisputed.

223.    At the associate review meeting in the DC office, the attendees noted that they viewed the evaluations as containing an "indication of attitude issues," questioned "who will work with her," and thought Sheketoff was a "2 and [a] counsel out" candidate.  Chase Ex. 18 at JD_00003737.

Response: Disputed in part.  The cited exhibit is typed notes purportedly representing statements of various individual partners at the meeting.  To the extent that it is intended to show that those partners actually made those statements or held those views, the document is inadmissible hearsay.

224.    Partner A did not work with Sheketoff in 2015 and did not submit an evaluation of her during calendar year 2016.  See Chase Ex. 15 at JD_JS_00001296-99.

Response: Undisputed.  However, while he had not worked with Julia in 2015, Partner A nonetheless spoke up at the associate review meeting in the DC office (which was held in 2016, after Partner A got annoyed by Julia's suggested revisions to his edits to their memo) to criticize Julia for supposedly not "lik[ing] big firm arguments."  Chase Ex. 18 at JD_00003737; Chase Ex. 83 (Lovitt) at 141:13-20.

225.    Sheketoff's office leadership recommended a 10% compensation increase, from her then-salary of $360,000 to $396,000, a recommendation that Shumaker did not disagree with. Chase Ex. 16 at JD_00004766.

Response: Undisputed.

226.    Managing Partner Brogan ultimately decided to give Sheketoff a larger adjustment than had been recommended by the PIC.  Chase Ex. 77, Brogan Tr. 28:16-29:15.

Response: Undisputed.

227.    Brogan usually did not read individual associate evaluations or Assessment Statements when making compensation determinations, but due to certain personal circumstances in 2016, he had the time available to read the evaluations of all associates in connection with his review of the proposed salary adjustments.  Chase Ex. 77, Brogan Tr. 28:16-29:4.

Response: Undisputed.

228.    Brogan read each of Sheketoff's individual evaluations, including the negative evaluation about the ▮▮▮▮▮▮▮▮▮▮, which Brogan regarded as "very unfavorable." Chase Ex. 77, Brogan Tr. 28:16-19:15, 29:2-4.

Response: Disputed in part.  Undisputed that Brogan read the evaluations and, at his deposition, characterized Mooppan's evaluation as "very unfavorable."  Disputed that Brogan actually viewed the evaluation as reflecting poorly on Julia.  Having read Julia's evaluations, Brogan determined that Julia should receive a $65,000 raise and be paid a salary higher than nearly all other associates in the Class of 2010 (and tied for highest in that class year).  PSF ¶¶ 646-47.  Particularly given Jones Day's insistence that compensation decisions are individualized and reflect an associate's contribution to the firm, a reasonable jury could find that Brogan discredited Mooppan's allegations and that he viewed Julia's other evaluations as demonstrating that her contribution to the firm was very high, as reflected in his decision on her compensation.  PSF ¶¶ 481-83.

229.    Brogan also took note that Sheketoff was rated as a 2 by her practice—"which is normally a really, really bad sign for an associate's future in the firm."  Chase Ex. 77, Brogan Tr. 29:5-8; *see also* Chase Ex. 77, Brogan Tr. 28:16-29:22, 214:20-23; Chase Ex. 83, Lovitt Tr. Vol. II 91:3-21.

> Response: Undisputed that Brogan noted that Defendant Heifetz rated Julia as a 2 and
>
> that a 2 is "normally" a bad sign for an associate's future at the firm.

230.    Brogan nonetheless decided to give Sheketoff a compensation increase in line with her peers to encourage her to improve and have a successful career at Jones Day.  Chase Ex. 77, Brogan Tr. 28:16-30:7.

> Response: Disputed in part.  Undisputed that Brogan gave the same raise and salary to
>
> Julia and to the other members of the Class of 2010 ███████████████
>
> ███  (whom Jones Day refers to as her "peers") and a higher salary than to any other
>
> members of the Class of 2010.  Disputed that the large raise reflected a belief that Julia
>
> needed to "improve" or was designed to "encourage" Julia.  Particularly given Jones
>
> Day's insistence that compensation decisions are individualized and reflect an associate's
>
> contribution to the firm, a reasonable jury could find that Brogan discredited Heifetz'
>
> rating and that he viewed Julia's contribution to the firm as very high, as reflected in his
>
> decision on her compensation.  PSF ¶¶ 456-63, 470, 481-84; JDSF ¶ 214.

231.    Brogan thus increased Sheketoff's compensation by $65,000, to $425,000—an 18% raise.  Chase Ex. 16 at JD_00004766; Chase Ex. 17 at JD_00000098; Chase Ex. 77, Brogan Tr. 29:9-15.

> Response: Undisputed.

232.    Brogan "gave [Sheketoff] the benefit of the doubt" and a "generous" and "outsized" raise to encourage her dedication and improvement.  Chase Ex. 77, Brogan Tr. 228:24-229:18; *see also* Chase Ex. 77, Brogan Tr. 28:16-29:15, 217:2-20, 221:16-222:3, 226:12-227:15, 228:24-229:18; Chase Ex. 83, Lovitt Tr. Vol. II 114:2-17, 116:15-117:25.

> Response: Disputed that the large raise reflected a belief that Julia needed to "improve," that Brogan viewed it as out of proportion to Julia's contribution to the firm, or that Brogan gave her the raise to "encourage" her.  Particularly given Jones Day's insistence that compensation decisions are individualized and reflect an associate's contribution to the firm, a reasonable jury could find that Brogan viewed Julia's contribution to the firm as very high, as reflected in his decision on her compensation.  PSF ¶¶ 456-63, 470, 481-84; JDSF ¶ 214.

233.    Three other Issues & Appeals associates received a practice rating of 2 for their performance in Evaluation Year 2015.  Two were two years senior to Sheketoff, and their Assessment Statements expressly state that the associates were being counseled to find employment elsewhere, and both soon left the Firm.  Chase Ex. 22, Figure 3.

> Response: Undisputed.

234.    The third, a male Supreme Court Clerk, was one-year senior to Sheketoff and received a 10% increase to his compensation in 2016; he also soon left the Firm.  Chase Ex. 22, Figure 3.

> Response: Undisputed.

C.     **Sheketoff Continued to Be One of the Worst Associates in Her Practice in 2016, and Narrowly Avoided Being Counseled Out of the Firm**

235.    Sheketoff's performance in calendar year 2016 was evaluated as part of the annual review process in 2017.  Heifetz again rated her a 2 and ranked her 14th of 18 peers in the Issues & Appeals practice.  Chase Ex. 16 at JD_00004768; *see also* Heifetz Decl. at ¶ 7.

Response: Undisputed.

236.    Sheketoff was the only associate in the Issues & Appeals practice who received a 2 rating from Heifetz for Evaluation Year 2016.  Chase Ex. 23, JD_00003985.

Response: Undisputed.

237.    Sheketoff's PIC rated her a 3, and ranked her 28 of 37 peer associates across the Washington D.C. office.  Chase Ex. 24, JD_00004025; *see also* Chase Ex. 16 at JD_00004767.

Response: Undisputed.

238.    In 2016, Sheketoff billed 1,066 hours for paying clients, and 461 hours for pro bono clients.  Chase Ex. 18 at JD_00003740.

Response: Undisputed.

239.    Although the mix of billable and pro bono work improved somewhat, her overall productivity remained well below expectations.  Chase Ex. 82, Lovitt Tr. Vol. I 209:4-211:1.

Response: Disputed.  Other associates who had clerked at the Supreme Court had comparable hours were given large raises and are now Jones Day partners. ▮



240.     Heifetz based her rating for Sheketoff primarily on the themes that ran through Sheketoff's evaluations, Sheketoff's failure to improve on the deficiencies in her 2015 performance, and Heifetz's own personal observations of and interactions with Sheketoff.  Chase Ex. 82, Lovitt Tr. Vol. I 196:24-199:4, 200:19-201:1; Heifetz Decl. at ¶ 7.

> Response: Disputed.  A reasonable jury could conclude that Heifetz' rating of Julia was substantially based on Partner A's review.  PSF ¶¶ 721-30.  A reasonable jury could further conclude that, if Heifetz had based her rating for Julia primarily on the themes that ran through her evaluations, she would have given Julia a higher rating—as those themes are quite positive.  PSF ¶¶ 443-55.  A jury could further conclude that Julia's primary deficiency in 2015 in Heifetz's eyes was her relatively high pro bono hours (and concomitantly low billable hours), and that Julia did improve that ratio in 2016.  *See supra* at ¶ 213 (Plaintiffs' Response).  Further, a jury could discredit the claim that Heifetz had any meaningful or relevant personal observations of or interactions with Julia.  PSF ¶¶ 642-45, 653-63.

241.     The evaluations submitted in 2017 for Sheketoff's 2016 performance were again mixed.  Chase Ex. 15 at JD_JS_00001293-1295.

> Response: Disputed.  Julia received two negative evaluations for her 2016 work, from Partner A and Partner J.  Chase Ex. 15.  Her other evaluations are quite positive.  *Id.*

242.     One partner (who is not Partner A) noted that although Sheketoff's writing had improved from the prior year, there was room for additional improvement and that "another area for improvement would be time management—ensuring that tasks are being tracked; providing regular updates to supervisors; and adhering to deadlines."  Chase Ex. 15 at JD_JS_00001293.

Response: Undisputed.  In particular, the partner in question advised that Julia's writing would be better if she focused on the fact that the audience for her writing was "judges who are usually less sophisticated legally" than Julia, which requires "dumbing things down."  In short, the evaluation was generally very positive about Julia, but very negative about federal judges.  Chase Ex. 15 at JD_JS_00001293.

243.    Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

Response: Undisputed.

244.    Another partner (who is not Partner A, but whose overall numerical evaluation of Sheketoff was lower than Partner A's) commented that Sheketoff's "draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an advocate for a client" and that "[t]he work also could have been completed more timely and with more intensity in defending the client's interests."  Chase Ex. 15 at JD_JS_00001294.

Response: Disputed in part.  Undisputed that Partner J so wrote.  Disputed that Partner J's statements are accurate.  PSF ¶¶ 671-82.  Plaintiffs are not aware of any "overall numerical evaluation[s]" in the evaluations, and none appears on the face of the cited page.

245.    Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

Response: Undisputed that Julia does not claim that the evaluation was motivated by illegal discrimination.

246.    A third partner (who also is not Partner A) "love[d] working with Julia," but noted that she was "a little too academic and intellectually stubborn," and he "noticed that she's

missing from the office a lot." Chase Ex. 18 at JD_00003742; Chase Ex. 15 at

JD_JS_00001293.

> Response: Disputed in part. Undisputed that the partner in question stated in his
>
> evaluation that he "love[d] working with Julia." Chase Ex. 15 at JD_JS_00001293. The
>
> evaluation further states that the partner's "*only concern* about Julia is that she personally
>
> stresses a lot when she cannot accomplish what she thinks is the right, just resolution.
>
> She never gives up but finds it very hard to accept adverse results or decisions." *Id.*
>
> (emphasis added). The other statements about being "academic," "intellectually
>
> stubborn," and physically absent from the office "a lot" are from a document that
>
> purports to be typed notes of oral statements made at a meeting. That document is
>
> inadmissible hearsay and, if it is interpreted to express any "concern" other than the
>
> concern that Julia "stresses a lot" because she is too committed to getting the right result
>
> for her clients, is contradicted by the evaluation's statement that said stress was his "only
>
> concern" about Julia. *See* Chase Ex. 18 at JD_00003742.

247. Sheketoff does not allege or believe that this evaluation was "a product of

discrimination." Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

> Response: Undisputed, but, again, the evaluation does not include the less positive
>
> comments in Jones Day's preceding paragraph.

248. A fourth partner (who also is not Partner A) noted that "[f]or whatever reason,

[he] got the sense that Julia is a bit protective of her time, and there were some additional

projects I would have liked to get her involved in." Chase Ex. 15 at JD_JS_00001294.

> Response: Undisputed.

249.     Sheketoff does not allege or believe that this evaluation was "a product of discrimination."  Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

<u>Response</u>: Undisputed.

250.     At the D.C. office litigation associate evaluation meeting in 2017 (reviewing work performed in 2016), comments were made that it is "hard to work w/ assoc not physic. present"; that Sheketoff "seems to be falling behind her peers," and "is at the bottom"; and a "strong counseling session [was] needed" because the "light [was] flashing yellow."  Chase Ex. 18 at JD_00003742; Chase Ex. 20, JD_00003256-57.

<blockquote>

<u>Response</u>: Disputed.  The cited page of Chase Ex. 18, which attributes to Defendant Shumaker the statement that Julia "seems to be falling behind her peers" and to Defendant Heifetz the view that Julia "is at the bottom" of the "I&A Class of 2009," is inadmissible hearsay if offered to show that those people actually said those things.  Julia was not even in the class of 2009, further undermining the reliability of the notes.  The other statements are from Chase Ex. 20, which is handwritten notes purportedly from the meeting and is also inadmissible hearsay to show that the individuals in question made the quoted remarks.  Plaintiffs also dispute any suggestion that the quoted comments, if they were made at all, were an evaluation of Julia's actual performance.  Aside from the inaccurate statement that it is "hard to work w/ assoc not physic. present," which is attributed to the same partner who allegedly stated at the meeting (but not in his formal evaluation) that Julia was "missing from the office a lot," all of the quoted comments are attributed to Defendant Shumaker or (in the case of the "is at the bottom" comment) Defendant Heifetz and represent their takeaway based on the evaluations of Julia

</blockquote>

(including Partner A's) rather than a judgment made independent of Partner A's evaluation.

251.    After the D.C.-office meeting, the practice's draft Assessment Statement and individual evaluations for Sheketoff were reviewed in the firmwide litigation review meeting. Traci Lovitt, co-head of the associate evaluation process at the time, attended the meeting in 2017, at which Sheketoff's 2016 performance was discussed.  Chase Ex. 83, Lovitt Tr. Vol. II 122:19.

    Response: Undisputed.

252.    After reviewing multiple years of Sheketoff's evaluations in preparation for the meeting, Lovitt's impression of Sheketoff was that she was "professorial" and "idiosyncratic." Sheketoff was "okay with doing a couple of hours of client billable work, but [she] really wanted to focus on the stuff that was of high interest to [her] regardless of whether it was at the core of private practice… [and] [her] writing seemed to be professorial."  Chase Ex. 83, Lovitt Tr. Vol. II 132:18-133:5; *see also* Chase Ex. 21, JD_00003754.

    Response: Undisputed that Lovitt so testified.  Her impression was clearly based in large part on Partner A's evaluation.

253.    At the meeting, there was "a very heated conversation" about Sheketoff that included the chair of the meeting opining that Sheketoff "probably should be counseled out," as well as Lovitt advocating for "a much stronger warning in [Sheketoff's] assessment statement." Chase Ex. 83, Lovitt Tr. Vol. II 124:11-125:22.

    Response: Undisputed.  As the cited transcript makes clear, both Lovitt and the chair (Jim Jones), neither of whom ever worked with Julia, were basing their views on Julia's evaluations, including Partner A's.

254.     Lovitt was looking at "two years of data, [and] there's no change.  This associate has zero interest in being here.  She doesn't want to be here."  Chase Ex. 83, Lovitt Tr. Vol. II 125:23-126:2.

> Response: Disputed in part.  Undisputed that Lovitt so testified and apparently intended the quoted testimony as an account of what she said at the meeting in the course of arguing for a "stronger warning in [Julia's] assessment statement than what was showing up in the draft."  Disputed that there was "no change" in Julia's performance during the two years or that Julia's evaluations, excluding Partner A's, could reasonably read to support the belief that Julia "ha[d] no interest in being here."  PSF ¶¶ 445-63, 640-82; JDSF ¶¶ 214, 238.

255.     Lovitt thought that "[s]omeone need[ed] to tell [Sheketoff] you're not going to make it here," and that "your compensation should reflect that as well, you should receive a message in comp that you weren't making it, you were not succeeding."  Chase Ex. 83, Lovitt Tr. Vol. II 126:14-18.

> Response: Undisputed.

256.     According to Lovitt, "the consensus of everyone in the room [was] that [Sheketoff] needed to be counseled to leave.  And it was combative because [the Issues & Appeals Practice Leader, Beth Heifetz] didn't think that that was necessary," because Sheketoff would soon leave voluntarily.  Chase Ex. 83, Lovitt Tr. Vol. II 127:6-13.

> Response: Undisputed that Lovitt testified that this was her "recollection."

257.     In response to a deposition question from Sheketoff, Lovitt testified: "Julia, you ha[ve] to understand, you received 2s for two years.  That is in almost every instance but yours a grounds for termination.  This is a termination case, right?  That's what everybody was arguing.

We need to be consistent in our application of our standards and tell the associate she needs to leave."  Chase Ex. 83, Lovitt Tr. Vol. II 128:6-16.

> Response: Undisputed that Lovitt so testified.

258.    Heifetz did not contradict the overall view of Sheketoff's performance, but did not "want to be that tough," and the attendees compromised that Heifetz would give Sheketoff a verbal warning at the in-person performance review meeting.  Chase Ex. 83, Lovitt Tr. Vol. II 129:16-130:12.

> Response: Undisputed that Lovitt testified that she "think[s] the compromise that [the attendees] came up with" was that Heifetz would give "a very strong warning."  Chase Ex. 83 (Lovitt) at 130:4-12.  Lovitt further stated that she did not know whether Heifetz gave any such warning, despite being Jones Day's Rule 30(b)(6) designee on the evaluation process.  *Id.* at 130:13-17.

259.    Sheketoff's final Assessment Statement for her performance in 2016 noted that Sheketoff "seems to be protecting her time.  She is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the office generally.  Addressing these issues is critical to her development in the Firm."  Chase Ex. 15, JD_JS_00001289.

> Response: Undisputed.

260.    At her in-person performance review in May 2017, Sheketoff was told it was "concerning to see multiple reviewers comment on the appearance that Julia is protective of her time," and she acknowledged the need to "work harder to avoid creating a perception that she cares more about certain matters than others" and "seem[ed] to take the reviews seriously and indicate a desire to do better."  Chase Ex. 19 at JD_00003121.

Response: Undisputed that typed notes that apparently purport to have been prepared following the meeting so state.  The notes further state that "Julia said she thought the reviews generally were fair with a couple of exceptions," describing her experience with Partner A and with Partner J, and that "Julia wanted to give her side of the story" and that "it was unclear whether she accepted the criticism [from those two partners] as even partially valid."  Chase Ex. 19 at JD_00003121.

261.    Recommendations for Sheketoff's next compensation adjustment reflected the consensus about her overall performance and potential at the Firm.  The Washington D.C. Partner-in-Charge recommended a 6% increase from $425,000 to $450,000; Lovitt and Shumaker ultimately provided a combined recommendation of $440,000—a $15,000 raise. Chase Ex. 16 at JD_00004767.

Response: Disputed in part.  Undisputed that the D.C. partner-in-charge, Lovitt, and Shumaker made the stated recommendations to Brogan.  Disputed that those recommendations (raises of $25,000 and $15,000 from a salary that was tied for the highest that Jones Day paid to any associate in the Class of 2010) reflect the supposed negative consensus described by Jones Day above.  PSF ¶¶ 683-735.

262.    Brogan again made the final determination, but unlike in the prior year, he did not read any of the reviews of Sheketoff's performance.  Instead, he reviewed only the salary spreadsheet with Sheketoff's ratings and rankings, and the recommended salary adjustments. Chase Ex. 77, Brogan Tr. 29:16-18.

Response: Disputed in part.  Disputed that Brogan "again made the final determination"; unlike the prior year, where Brogan set a different salary than had been recommended,

for 2017 he simply rubber-stamped the $440,000 recommendation made by Shumaker and Lovitt.  PSF ¶ 703.  Otherwise undisputed.

263.     Brogan increased Sheketoff's compensation by $15,000 to $440,000, effective July 1, 2017.  Chase Ex. 16 at JD_00004767.

Response: Disputed in part.  As stated in response to the preceding paragraph, Brogan simply adopted the $440,000 recommendation made by Shumaker and Lovitt.  PSF ¶ 703.

264.     Brogan testified that he was influenced by the fact that Sheketoff "continued to have a 2 rating for the practice, and that's the basis upon which I gave you a $15,000 raise because it seemed to me that I had—I was wrong in giving you an outsized raise the year before because it didn't really change your contribution. It was still a 2."  Chase Ex. 77, Brogan Tr. 226:14-19 (with errata); *see also* Chase Ex. 77, Brogan Tr. 28:16-29:15, 217:2-20, 221:16-222:3, 226:12-227:15, 228:24-229:18; Chase Ex. 83, Lovitt Tr. Vol. II 114:2-17, 116:15-117:25.

Response: Undisputed that Brogan so testified.  However, a reasonable jury could find that Brogan approved $440,000 simply because that was the joint recommendation of the two top advisors he had appointed to oversee the associate compensation process (Shumaker and Lovitt) and discredit any testimony that Brogan based the decision on the 2 rating (rather than the Shumaker-Lovitt recommendation)—or even that he truly remembers his contemporaneous reasons for accepting Shumaker and Lovitt's recommendations for each of the roughly 1000 associates whose salaries he set in 2017.  PSF ¶ 703.

265.     The change took effect July 1, 2017.  Chase Ex. 17 at JD_00000100.

Response: Undisputed.

266.    In 2018, Sheketoff's practice rating improved to a 4 rating, which signaled to Brogan that Sheketoff had turned things around, and he increased her compensation by $85,000. Chase Ex. 77, Brogan Tr. 217:2-16.

> Response: Disputed in part.  Undisputed that Julia's practice rating for her 2017 work
>
> was a 4 and that Brogan increased Julia's compensation by $85,000.  Disputed that
>
> Julia's practice rating was relevant to Brogan's compensation decision or signaled that
>
> Julia had changed.  PSF ¶¶ 716-720, 473; JDSF ¶ 209.

267.    During Sheketoff's tenure, only one other Issues & Appeals associate received two consecutive practice ratings of 2, and she was counseled in her Assessment Statement to seek other job opportunities.  Chase Ex. 23 at JD_00003990.

> Response: Undisputed.

268.    Sheketoff was also well behind both male and female peers as a result of her 2017 pay adjustment.  All of the other D.C. Issues & Appeals associates in Sheketoff's class year who also clerked on the Supreme Court were performing well and received virtually identical salaries regardless of gender:



---

[1] Male 3 left the Firm in 2017 prior to the July 1, 2018 adjustment.



Chase Ex. 22, Figures 1-2.

Response: Undisputed that, following Partner A's evaluation and the resulting

compensation adjustment, Julia was paid less than the other Class of 2010 associates who

had also clerked at the Supreme Court, all of whom were apparently paid in lockstep.

The chart indicates that a ███ associate who received a ████████████████████

as a ██████ associate who received ████████████ .

269.    Sheketoff was aware that, as of July 1, 2017, her salary was well below that of

both male and female peers.  At the time she filed this lawsuit, she had an understanding that

Males 1 and 2 and Females 2 and 3 all received the same adjustment on July 1, 2017.  Chase Ex.

80, Sheketoff Tr. 103:19-104:11.

Response: Undisputed on the understanding that Jones Day is defining "peers" to mean

members of the Class of 2010 in the D.C. office who also clerked at the Supreme Court.

**D.    Partner A's Review**

270.    Sheketoff first began working with Partner A in January 2016, after Partner A

asked Heifetz for an Issues & Appeals associate to help research an issue related to a

memorandum for Client 1.  Chase Ex. 84, Partner A Tr. 38:17-39:3; Chase Ex. 33,

JD_JS_00000408.

Response: Undisputed.

271.    Drafting the memorandum was an iterative process as Sheketoff and Partner A revised the work over several months. *See, e.g.*, Chase Ex. 35, JD_JS_00001428; Chase Ex. 38, JD_JS_00001180; Chase Ex. 34, JD_JS_00000487; Chase Ex. 37. JD_JS_00001494.

Response: Undisputed.

272.    Throughout the project, Partner A was complimentary of Sheketoff's revisions and thought her "research and writing [was] very strong," but encouraged her "to write more like an advocate and advisor to a general counsel and corporate boards." Chase Ex. 35, JD_JS_00001428; *see also* Chase Ex. 38, JD_JS_00001180 ("looks good"); Chase Ex. 34, JD_JS_00000487 ("Thanks for your help on this. It was really helpful"); Chase Ex. 37, JD_JS_00001494 ("thanks for your edits").

Response: Undisputed that Partner A made the statements quoted above. Disputed that Partner A's behavior towards Julia was consistent "throughout" their project together; Partner admittedly became annoyed (rather than complimentary) with Julia when she suggested revisions to his edits to their memo. PSF ¶¶ 494-98.

273.    Partner A had mixed reactions to one set of revisions that Sheketoff circulated on March 2, 2016. In response to most, Partner A wrote "very good," "[t]hose look great," and "I like your changes a lot." Chase Ex. 36 at JD_JS_00001442-43.

Response: Disputed in part. Undisputed that Partner A wrote the words quoted above. Disputed that Partner A's reaction to Julia's revisions were "mixed." Partner A admitted that he was annoyed by Julia's supposedly "rude" email suggesting changes to his revisions. PSF ¶¶ 494-98.

274.    In response to some of Sheketoff's other edits, Partner A advised her to "avoid making style edits to the writing of the person whose name goes first on the memo" and "when

106

the person whose name goes first on the memos makes an edit, you should not change it back to the way you had it."  Chase Ex. 36 at JD_JS_00001442.

>Response: Undisputed.

275.    Partner A was referring to specific changes, including an edit he made that Sheketoff changed back to her own style, twice.  As Partner A testified: "I believe you undid what I did twice, at least—at least on one thing."  Sheketoff "had changed it twice, so I don't mind if you change something—you wrote something.  I changed it.  You changed it back to the way you wrote it.  I changed it again back to the way I had it.  And then you changed it back to the way you had it.  That is annoying."  Chase Ex. 84, Partner A Tr. 150:21-151:1, 239:15-21.

>Response: Disputed in part.  Partner A identified a single transgression of each of the two principles he demanded that Julia follow, but he also stated that they those transgressions were simply examples.  SMF ¶¶ 497-98. Partner A, however, does not recall any other transgressions.  *Id.* at ¶ 498.

276.    No other lawyer—male or female—with whom Partner A has worked has ever repeatedly rejected his revisions and changed the writing back to the way it had been in the manner Sheketoff had.  Chase Ex. 84, Partner A Tr. 288:6-16.

>Response: Disputed in part.  Undisputed that Partner A so testified.  Disputed that there was more than a single instance when Julia repeatedly changed a single phrase back to the way she had it (not multiple "revisions"), and disputed that Partner A could possibly recall whether any other associate in his many years at the firm had also done so.  A reasonably jury could discredit this testimony.

277.    Partner A intended his response to be "instructional" and "a teaching point or practice pointer for how to interact with more senior lawyers" that "would be helpful to

[Sheketoff] when [she] worked for other people."  Chase Ex. 84, Partner A Tr. 234:14-235:7; *see also* Chase Ex. 84, Partner A Tr. 231:8-14, 232:5-18, 233:13-16.

Response: Disputed.  PSF ¶¶ 488-637.

278.    Sheketoff responded in an email that she "didn't mean to impugn or undermine our hierarchy by suggesting edits to the memo."  Chase Ex. 36, JD_JS_00001441.

Response: Undisputed.

279.    Partner A responded that he "did not presume [Sheketoff] was trying to impugn or undermine anything," and that she "undoubtedly made the memo much better," but that he wanted Sheketoff "to be cognizant of time, and changing something back to the way you had it (after someone else took the time to change it) is not efficient.  If it is an important issue, leave the more senior person's edit and ask about it in person or on the phone."  Chase Ex. 36, JD_JS_00001441.

Response: Undisputed that Partner A so responded.

280.    Partner A also telephoned Sheketoff to put her at ease and assure her that this was not a big deal and would not be a problem for their future work together.  Chase Ex. 84, Partner A Tr. 262:6-21, 263:13-264:7.

Response: Disputed.  When Partner A called Julia, he said he wanted to confirm that she wasn't "scarred" by his email and then gave her further "guidance."  Sheketoff Ex. 41 at P02168.

281.    Following this interaction in March, Partner A and Sheketoff continued to work together on issues for the Client.  Chase Ex. 38, JD_JS_00001180.

Response: Undisputed.

282.    Partner A submitted his evaluation of Sheketoff sometime between January 23 and February 14, 2017, almost a year after their March 2016 email exchange.  Chase Ex. 27, JD_00003069.

Response: Undisputed.

283.    In his review of Sheketoff's 2016 performance, Partner A gave Sheketoff a mixture of 3s ("Satisfactory") and 4s ("Exceeds Expectations") for all categories for her work for the Client.  Chase Ex. 15, JD_JS_00001289.

Response: Undisputed.  The correct citation is JD_JS_00001293.

284.    Partner A's narrative evaluation was mixed, complimenting Sheketoff because "the research and learning the material presented no problems" but also noting that Sheketoff's initial drafts were too "academic," that she exhibited "little-to-no initiative," that she displayed availability issues, and that he had an "impression" that she lacked interest in the Firm.  Chase Ex. 15, JD_JS_00001289.

Response: Disputed in part.  Undisputed that Partner A's narrative so states.  Disputed the proper characterization of Partner A's review is "mixed" as opposed to quite negative.

285.    Partner A's evaluation was his honest assessment and impression of Sheketoff. He testified that he had "never worked with anyone that seemed not around as much as you weren't around."  Sheketoff was "rarely in the office.  From the best I could tell, you didn't seem to be really busy on a lot of projects, just didn't seem to be engaged in the office was my impression," and "[o]thers made comments that you weren't around much either."  Chase Ex. 84, Partner A Tr. 78:4-79:1, 102:16-17.

Response: Disputed that the evaluation was Partner A's honest assessment and impression of Julia.  PSF ¶¶ 485-637.  Undisputed that Partner A testified as stated.

286.     Partner A's narrative evaluation made no reference to the March 2016 email exchange, the edits to the Client Memo that prompted the exchange, or any purported lack of deference to some hierarchy.  Chase Ex. 15, JD_JS_00001289.

Response: Undisputed.

287.     The critiques in Partner A's review were similar to critiques Sheketoff received from other partners during 2016.  Chase Ex. 15 at JD_JS_00001293-1295; *see also supra*.

Response: Disputed.  Chase Ex. 15.

288.     In making those critiques, Partner A thought that if Sheketoff

> didn't feel that way, *i.e.*, you were going to stay, my hope is that that
> would be conveyed to you during your evaluation, that, you know,
> people don't think you're going to be here very long because you
> don't come in a lot, *et cetera*, you don't do a lot of billable client
> work.  So if you wanted to change that perception of you, you would
> actually come in more and do more client work, in which case the
> impression of you would change.

Chase Ex. 84, Partner A Tr. 84:22-85:8; *see also id*. 83:15-22.

Response: Disputed.  Chase Ex. 15; PSF ¶¶ 550-51, 562-64, 583.  A reasonable jury could find that the evaluation includes knowingly false criticisms intended to harm Julia's career, compensation, and reputation.  PSF ¶¶ 485-637.

289.     Brogan was not aware of Partner A's evaluation of Sheketoff until well after she had left Jones Day.  Chase Ex. 77, Brogan Tr. 29:16-22.

Response: Undisputed that Brogan was not personally aware of the evaluation itself.

290.     Brogan did not see Partner's A evaluation before deciding to give Sheketoff a raise of only $15,000—a decision that, again, he testified was based on Sheketoff second, consecutive 2 practice rating.  Chase Ex. 77, Brogan Tr. 29:17, 226:14-19.

Response: Disputed in part.  Undisputed that Brogan did not personally review the evaluation itself.  Disputed that his selection of a $15,000 raise was based on Julia's

110

rating from Defendant Heifetz.  PSF ¶¶ 703, 716-20.  Brogan selected $15,000 because the two partners he had appointed to oversee the process and make recommendations to him (Shumaker and Lovitt) jointly recommended that he select $15,000.  PSF ¶ 703. Brogan adopts their recommendation in the vast majority of cases.  *Tolton* Dkt. 146 at 25; *Tolton* 146-5 (Lovitt Decl.) at ¶ 27.

291.    Heifetz had spoken to both Partner A and Sheketoff in "real time" during the project the two worked on together, and had personal knowledge of Sheketoff's performance on the matter with Partner A.  Chase Ex. 82, Lovitt Tr. Vol. I 152:15-153:10, 202:14-204:4.

Response: Disputed in part.  Undisputed that Julia told Heifetz about Partner A's reaction to Julia's suggested revisions to their memo.  Disputed that Heifetz' conversation with Julia, or any purported conversation with Partner A, gave Heifetz "personal knowledge of Sheketoff's performance."

292.    Heifetz agreed with the positive and critical aspects of Partner A's evaluation to the extent they were consistent with her own observations and knowledge of Sheketoff's performance and/or the themes in other evaluations.  Chase Ex. 82, Lovitt Tr. Vol. I 152:15-153:10, 202:14-204:4; Chase Ex. 83, Lovitt Tr. Vol. II 83:21-84:6, 92:7-19; Heifetz Decl. at ¶ 9.

Response: Disputed.  Heifetz had no basis to agree with the critical aspects of Partner A's evaluation.  As evidenced by her own reviews (for two separate projects in which she supervised Julia's drafting of a memo), Heifetz' personal experience with Julia's work was quite positive.  Chase Ex. 15 at JD_JS_00001292, JD_JS_00001300.  Heifetz' only other "knowledge" of Julia's performance would have come from her review of Julia's evaluations, which were not consistent with Partner A's criticisms.  PSF ¶¶ 550-51, 562-64, 583.

293.    As a result, even if Partner A had submitted no evaluation, Sheketoff's practice

rating would have been the same; the rating was based on the common themes of many

evaluations as corroborated by Heifetz's own knowledge.  For the same reason, Sheketoff's

compensation would have been the same as well.  Heifetz Decl. at ¶ 10; Chase Ex. 82, Lovitt Tr.

Vol. I 196:24-199:4, 200:19-201:1; Chase Ex. 83, Lovitt Tr. Vol. II 83:2-86:6, 100:18-101:24.

>    Response: Disputed.  A reasonable jury could find that Julia would most likely have

>    received a higher rating if not for Partner A's evaluation.  PSF ¶¶ 721-30.  A reasonable

>    jury could also find that Julia's compensation resulted from Brogan simply adopting the

>    joint recommendation of Shumaker and Lovitt, and that their recommendations were

>    affected by Partner A's evaluation. PSF ¶¶ 683-731

## IV.    DEFENDANTS DID NOT RETALIATE

### A.    Plaintiffs' August 2018 Emails

294.    As of the end of July 2018, Sheketoff was pregnant and had accepted a position at

the Federal Public Defender's Office.  The Federal Public Defender's Office denied Sheketoff's

request to delay her start date so that she could take 18 weeks of paid leave from Jones Day

before resigning from the Firm.  Chase Ex. 80, Sheketoff Tr. 23:21-24:3, 26:3-8; *see also* Chase

Ex. 40, JD_00003191.

>    Response: Undisputed.

295.    Sheketoff and Savignac claim that they anticipated filing a lawsuit against Jones

Day by that time.  Chase Ex. 80, Sheketoff Tr. 29:17-20.

>    Response: Undisputed that Plaintiffs anticipated litigation with Jones Day over its

>    discriminatory leave policy around that time.

296.    After Sheketoff gave notice that she was leaving Jones Day, she sent an email to

her Practice Leader, Beth Heifetz, dated August 16, 2018:

From: Sheketoff, Julia W. <jsheketoff@jonesday.com>
Date: Thursday, Aug 16, 2018, 3:41 PM
To: Heifetz, Beth R. <bheifetz@JonesDay.com>
Subject: Parental Leave

Beth,
I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total) while it gives men 10 weeks of paid leave (and 16 weeks total). Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled. Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled. That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory. I don't object that the firm is socially conservative as a general matter, or that its selection of cases promotes those values, but in this case I think it goes too far in imposing those values on its employees.

For me, since Mark will be the primary caregiver, this will have a pretty big impact on my life, because I'll end up staying out of work for the extra eight weeks that Mark cannot. For career reasons, I'd rather not do that. I would guess that the effects of the policy are similar for other women. Is there anything that I can do here? Would the firm treat Mark equally to female primary caregivers and grant him 18 weeks paid and 24 weeks total leave?

I'd be happy to discuss further. Thanks very much.
Best,
Julia

McClure Ex. 3 at JD_00003165.

    <u>Response</u>: Undisputed.

    297.    The email did not request any amendment to Jones Day's policy, but sought only

a benefit for Savignac himself. McClure Ex. 3 at JD_00003165; *see also* Chase Ex. 79, Savignac

Tr. 122:19-123:4.

    <u>Response</u>: Disputed in part. Undisputed that the email does not explicitly request that

Jones Day change its policy. But that would be the fair inference from the email's

explanation of how the policy is "unfairly discriminatory," its statement that "in this case

I think [Jones Day] goes too far in imposing [its socially conservative] values on its

employees," and its statement that "I would guess that the effects of the policy are similar

for other women" who are married to Jones Day associates. Thus, Mark's August 23

email, quoted in ¶ 299 below, refers to Julia's email as "our request that Jones Day

amend its discriminatory parental leave policy."

    298.    Heifetz forwarded the email to Sarah McClure, the Firm's Director of Human

Resources and Employment Counsel, who spoke with Sheketoff by phone. McClure explained

113

that Jones Day assumes an 8-week medical certification of disability for routine childbirth and that it is not discrimination to provide disability leave for only the disabled parent.  McClure Ex. 3 at JD_00003164; *see also* McClure Decl. at ¶ 17.

> Response: Disputed in part.  Undisputed that Heifetz forwarded the email to McClure, who called Julia and said that Jones Day would not change its policy.  Disputed to the extent that the paragraph attempts to characterize Jones Day's policy in any way inconsistent with PSF ¶¶ 111-148.

299.    McClure then received this email from Savignac, dated August 23, 2018:

Hi Sarah,

Julia let me know that you decided to reject our request that Jones Day amend its discriminatory parental leave policy. Thank you for your consideration.

Needless to say, I oppose your practice, which is made illegal by Title VII. You may know that it is also illegal to retaliate against an employee who opposes discrimination.

Thanks again, Sarah.
Mark

McClure Ex. 3 at JD_00003164.

> Response: Undisputed.

300.    At that point, McClure—the Firm's HR counsel—did the same thing she did in 2015 when another associate raised a concern that the Firm's prior policy for paid family leave was "problematic" under Title VII: McClure commissioned privileged research into the legal question to ensure she could accurately respond to Savignac and provide counsel to the Firm regarding its policies.  *Compare* Chase Ex. 41, JD_00003790 *with* McClure Decl. at ¶ 19.

> Response: Disputed in part.  Undisputed that McClure investigated Plaintiffs' legal claim of discrimination and that she investigated the assertion of illegal discrimination made in 2015.  Disputed that McClure made a good faith effort to find the right legal answer rather than merely providing a defense of her client's practice.  Plaintiffs do not assent to

the characterization of the research as "privileged," which is a legal conclusion rather than a fact.

301.    McClure responded to Savignac's email on August 24, 2018, and provided this excerpt from the EEOC's Enforcement Guidelines, among other authority:

<div style="border:1px solid">

**EXAMPLE 14**
**Pregnancy-Related Medical Leave and Parental Leave Policy –**
**No Disparate Treatment**

An employer offers pregnant employees up to 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance. The employer also offers new parents, whether male or female, six weeks of parental leave. A male employee alleges that this policy is discriminatory as it gives up to 16 weeks of leave to women and only six weeks of leave to men. The employer's policy does not violate Title VII. Women and men both receive six weeks of parental leave, and women who give birth receive up to an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

</div>

McClure Ex. 3, JD_00003163.

Response: Undisputed.  The Court has explained why Jones Day's reliance on the example was dubious.  *See Savignac v. Jones Day*, 486 F. Supp. 3d 14, 34-37, 39 (D.D.C. 2020).  Jones Day does not appear to rely on it anymore.  *See* Dkt. 189 at 15-26 (Jones Day's current argument in support of its policy).

302.    McClure also cited Eighth Circuit precedent that "it is not unreasonable for [employer] to establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth."  *Johnson v. Univ. of Iowa*, 431 F.3d 325, 329 (8th Cir. 2005); *see also* McClure Ex. 3, JD_00003163 (citing *Johnson* to Savignac).

Response: Undisputed, but disputed that Jones Day's policy is limited to a rebuttable presumption or that the *Johnson* case is on point.

303.    McClure concluded: "I hope this is helpful and addresses your concern.  I am happy to answer any additional questions you may have in follow up."  McClure Ex. 3, JD_00003163.

Response: Undisputed.

304.    Months went by without any response from Savignac.  In that time, the Firm took no action against Savignac, who continued to have the same title, salary, and other terms and conditions of his employment as he had prior to telling McClure on August 23 that Jones Day's "parental leave policy" was "discriminatory," and that "it is also illegal to retaliate against an employee who opposes discrimination."  McClure Ex. 3 at JD_00003164; *see also* Chase Ex. 79, Savignac Tr. 123:5-19; McClure Decl. at ¶¶ 19-23.

Response: Undisputed that several months passed between McClure's August 24 email and Plaintiffs' response to her on January 16.  Undisputed that Mark is not aware of any action taken against him during that period that would constitute an actionable adverse employment action under the civil rights laws and that his title and salary were not changed.

305.    Savignac intended to take ten weeks of paid family under Jones Day's policy for primary caregivers and to split that leave into two blocks, one immediately after the birth of his child, and the remainder later in time, all of which was permissible under the Firm's policy. McClure Decl. at ¶¶ 20-23; *see also* Chase Ex. 79, Savignac Tr. 138:6-14, 189:3-13.

Response: Undisputed.

116

B.      **Savignac's January 16, 2019 Email**

306.    Almost five months later, on January 16, 2019, Savignac sent this response to

McClure's August 24, 2018 email:



| From: | Savignac, Mark C. |
|---|---|
| Sent: | Wednesday, January 16, 2019 9:12 PM |
| To: | McClure, Sarah B. |
| Cc: | Julia Sheketoff; Heifetz, Beth R. |
| Subject: | RE: Parental Leave |

Sarah,

We have closely reviewed the case law, including the two cases you rely on. We have also discussed the matter with other competent attorneys. Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.

Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S.Ct. 1338, 1351-52 (2015).

Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win.

I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation. We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman. As you know, Title VII prohibits retaliation for opposition to sex discrimination.

Mark C. Savignac
Associate
**JONES DAY® - One Firm Worldwide℠**
51 Louisiana Avenue NW
Washington, DC 20001
Office +1.202.879.3821
Cell +1.217.714.3803
msavignac@jonesday.com

McClure Ex. 4, JD_00003143

Response: Undisputed, except that the email was drafted and sent by Plaintiffs together.

PSF ¶ 213.

307.    At the time Savignac sent this email, Plaintiffs had not filed a charge with any

enforcement agency.  Chase Ex. 43, JD_00003258 (Savignac's June 19, 2019 EEOC charge);

Chase Ex. 44, JD_00003266 (Sheketoff June 18, 2019 EEOC charge); Chase Ex. 45, P02307

(Plaintiffs' June 8, 2020 EEOC charge regarding Jones Day's press statement).

Response: Undisputed.  As the email states, it was an attempt to resolve the dispute

without resort to the agency or the courts, as Congress intended.

117

308.     At the time, Jones Day was not conducting any inquiry into Plaintiffs' claim, having already determined in August 2018 that their allegation of discrimination lacked merit. McClure Ex. 3, JD_00003163-64; McClure Decl. at ¶ 19.

> Response: Disputed in part.  Undisputed that McClure's August 24 email asserts that the firm's policy is lawful.  Disputed that Jones Day ever actually concluded that Plaintiffs' claim "lacked merit"; any assertion by Jones Day that its supposedly privileged investigation did reach that conclusion would likely waive the privilege.  Disputed that Jones Day had closed its investigation.  PSF ¶ 321; Chase Ex. 81 (Shumaker) at 47:12-25.

309.     The January 16, 2019 email re-asserted Savignac's claim that Jones Day's leave policy was "discriminatory" because it did not "[g]ive me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave."  McClure Ex. 4, JD_00003143.

> Response: Disputed.  This paragraph misleadingly combines phrases that appear two paragraphs apart and asserts a causal connection ("because") that is not present in or supported by the January email.  The January email, which speaks for itself, states that Plaintiffs have reviewed the case law and then reaffirms Plaintiffs' view expressed in August 2018 that the policy is discriminatory, the reasons for which view were explained in the August 2018 email.  See McClure Ex. 3 at JD_00003165.  Two paragraphs later, the email states that Mark would file an EEOC charge and lawsuit unless Jones Day settled the claim by giving him 18 weeks of paid leave.  See McClure Ex. 4, JD_00003143.

310.    At the time of the January 16, 2019 email, Savignac knew that the additional eight weeks of paid leave he demanded was offered to birthmothers under Jones Day's Short-Term Disability Leave Policy, not its family leave policy.  Chase Ex. 79, Savignac Tr. 119:15-120:11.

Response: Disputed.  Jones Day mischaracterizes the cited testimony, in which Mark acknowledges that "the leave is *purportedly paid* under the disability policy, whatever that means" and that, "as [Julia's August 2018 email] itself says, eight of the weeks for women are *labeled* as disability leave, so I—I agree, generally speaking, that eight of those weeks were, you know, *purportedly* disability leave."  Chase Ex. 79 (Savignac) at 119:15-120:11 (emphases added).  The testimony does not admit that the leave is "offered … under" the STD policy (whatever that means), but only that it is purportedly "paid" under that policy and that it is sometimes "labeled" as "disability" leave.  And neither Chase's questions nor Mark's answers in the cited passage say anything about whether the leave is or is not offered under the Family Leave policy.  As explained above, including in response to ¶¶ 96, 116, 127, the whole 18-week block of sex-based paid leave is indeed explicitly part of the written Family Leave policy.

311.    Savignac also knew at the time he sent the email that he would not be disabled by the birth of his child.  Chase Ex. 79, Savignac Tr. 192:15-196:11.

Response: Undisputed except for the word "also."

312.    Savignac likewise knew that any person who gives birth to a child will have postpartum disability for at least some period of time, and that at least one major medical association described the standard postpartum disability as six weeks.  Chase Ex. 79, Savignac Tr. 112:21-113:21, 197:15-202:9.

119

<u>Response</u>: Disputed.  In the first cited passage (pp. 112-113), Mark states that a woman is entitled to take disability leave in connection with childbirth "[f]or such time as the person is—the individual is disabled" and, when asked "what a typical duration was associated with childbirth for disability leave," responds that "it varies, and for most people it would be less than eight weeks.  For some people it could be more."  Chase Ex. 79 (Savignac) at 112:21-113:21.  There is no statement that "any person who gives birth to a child will have postpartum disability for at least some period of time," and no basis for such a sweeping assertion about the needs and abilities of "all women."  *See also* Chase Ex. 80 (Sheketoff) at 236:13-238:4.  In the second cited passage, Mark testifies "I would agree that the document is referring to some—something it is calling the standard postpartum maternity leave and saying that that lasts six weeks.  I don't know what that is a reference to."  *Id.* at 202:3-7.  Jones Day mischaracterizes the document in question— which it conspicuously declines to put before the Court—as referring to "postpartum disability."  In fact, it says: "The standard postpartum maternity leave, which lasts 6 weeks, may not be appropriate for all women" because some may need more time and some may need less.  Sheketoff Ex. 49 at P02258.  Also, as Jones Day knows, the term "maternity leave" encompasses both leave related to the physical effects of childbirth and leave to care for the new child.  *See, e.g.*, Chase Ex. 12 at JD_00003157-58 (Jones Day's written "Family Leave Policy," characterizing all leave provided to women in connection with the arrival of a new child as "Maternity Leave").  Nothing in the ACOG document or in Mark's cited testimony supports the implication that Jones Day seeks to draw that ACOG was endorsing the notion of a six-week leave in the bullet in question, rather than simply recognizing that it is or was standard for employers to provide six weeks of

combined disability-and-caretaking leave to new mothers.  Again, the bullet expressly

says that six weeks is too long for some women and too short for others.

313.    Savignac does not recall ever learning of any Jones Day employee who had taken

eight weeks of disability leave following childbirth but recovered from the disability before the

eight-week period expired.  Chase Ex. 79, Savignac Tr. 136:13-137:5.

> Response: Undisputed that Mark is not personally aware of a specific Jones Day
>
> employee who took the full eight weeks of "disability" leave even though she was not
>
> actually disabled for eight weeks.  However, in light of the overwhelming evidence
>
> demonstrating that many women do recover in less than eight weeks and Jones Day's
>
> concession that virtually all women take the full eight weeks, it is certain that many Jones
>
> Day employees have indeed ceased to be disabled before eight weeks yet taken the full
>
> eight weeks anyway (as they are entitled to do under Jones Day's policy, which does not
>
> actually turn on disability).  Julia made this point in her August 2018 email: "Most
>
> women aren't physically disabled from office work for such a long period and yet still get
>
> the full eight weeks of disability leave."  McClure Ex. 3 at JD_00003165.  Whether
>
> Plaintiffs knew the circumstances of a *specific woman* in that situation is immaterial.

314.    The January 16, 2019 email did not provide any explanation for Savignac's

assertion that he should receive the same amount of paid leave as birth mothers, even though he

was not disabled and all birth mothers are disabled for some period of time.  McClure Ex. 4,

JD_00003143.

> Response: Disputed.  The email does not assert that Mark should receive the same
>
> amount of paid leave as birth mothers; it offers a settlement of a discrimination claim.
>
> While the January email does not itself lay out the reasons behind Plaintiffs' view that

Jones Day's policy is discriminatory, the email must be understood (and doubtless was understood) in light of Plaintiffs' prior communications with McClure on the topic in August 2018, which did explain Plaintiffs' view.

315.     Savignac also provided no basis for his claim that the medical certification assumption is "discriminatory" or for his conclusory assertion that Jones Day's cited legal authorities "do not support" the lawfulness of Jones Day's STD Policy.  McClure Ex. 4, JD_00003143.

> Response: Disputed in part.  Undisputed that the email does not provide a legal discussion of Jones Day's cited cases, though Jones Day could of course have asked for one if it had been interested (or it could have simply read its own cited cases, which in fact support Plaintiffs).  Disputed that Plaintiffs claimed that any "medical certification assumption" was discriminatory.  Plaintiffs challenged Jones Day's policy of giving all new mothers an additional eight weeks of paid leave on the basis of sex and without regard for disability.  That policy is not fairly characterized as a "medical certification assumption."

316.     Savignac provided no analysis for his assertion that Jones Day's policy is "inconsistent with the EEOC enforcement guideline."  McClure Ex. 4, JD_00003143.

> Response: Undisputed that the January email does not provide such analysis, though Jones Day could have asked for one and Plaintiffs did provide one in their successful opposition to Jones Day's motion to dismiss.

317.     Savignac demanded that Jones Day give him "18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with the EEOC and then a class-action lawsuit, and

the matter will be decided in the D.C. Circuit and in the court of public opinion.  We are very familiar with the D.C. Circuit and confident that we will win."  McClure Ex. 4, JD_00003143.

    Response: Undisputed.

318.    In addition, Savignac asserted that Jones Day was wrong to rely on EEOC Enforcement Guidelines because the Guidelines "do not receive *Chevron* deference."  McClure Ex. 4, JD_00003143.

    Response: Disputed in part.  Undisputed that the email states that Jones Day's "reliance on the guideline example is misplaced" because the guidelines do not carry the force of law under *Chevron*.  Disputed to the extent that "wrong to rely on" conveys anything more than that the firm's reliance was misplaced.  The email speaks for itself.

319.    Savignac stated that he and Sheketoff had "discussed the matter with other competent attorneys," thereby suggesting to Jones Day that these other "competent attorneys" agreed that Jones Day's short-term disability policy violated anti-discrimination laws.  McClure Ex. 4, JD_00003143.

    Response: Undisputed that the email states that Plaintiffs had "discussed the matter with other competent attorneys."  The cited document does not support any assertion about what this statement purportedly "suggest[ed] to Jones Day."  The statement that Plaintiffs had "discussed the matter with other competent attorneys" is not a representation about other attorneys' opinions.  It indicates that Plaintiffs had put effort into the question and taken it seriously, as they had also done by closely reviewing the case law.  Chase Ex. 80 (Sheketoff Tr.) 219:11-15, 295:6-15.

320.     At her deposition, Sheketoff could not remember who Plaintiffs had in mind when Savignac referenced "competent attorneys."  Chase Ex. 80, Sheketoff Tr. 219:2-23, 295:6-269:12.

Response: Undisputed that Julia testified: "I don't have a specific memory of who I was thinking of when we wrote that e-mail. … the point of that—of saying that was to explain we had, you know, put in effort and had seriously considered this."  Chase Ex. 80 (Sheketoff Tr.) 219:9-15.

321.     Savignac speculated that the reference to "competent attorneys" may have included Travis Annatoyn and Marianna Jackson.  Chase Ex. 79, Savignac Tr. 219:1-18.

Response: Undisputed.

322.     Annatoyn is an environmental lawyer.  Savignac does not understand Jackson to have any specialty in employment law.  Chase Ex. 79, Savignac Tr. 235:3-6.

Response: Undisputed.  Shumaker, who Jones Day had act as its point person in evaluating Plaintiffs' claim and deciding to fire Mark for it, is also not an employment lawyer.  Chase Ex. 81 (Shumaker) at 43:10 ("Mark, I'm not a labor and employment lawyer.").  Jones Day itself has had only one of its 100+ employment attorneys enter an appearance in this case, whereas two generalist Issues & Appeals attorneys have done so and a third filed a brief in opposition to Julia's successful reconsideration motion.

323.     Savignac had only one conversation with Annatoyn and Jackson about Jones Day's policies.  Chase Ex. 79, Savignac Tr. 230:12-231:3.

Response: Undisputed.

324.     He did not provide Annatoyn or Jackson with a copy of the policies and does not believe he read the policies to them or told them that the eight-week medical certification

assumption was part of a short-term disability policy.  Chase Ex. 79, Savignac Tr. 231:15-232:14.

> Response: Undisputed.  However, Plaintiffs dispute the implication of the statement that "the eight-week medical certification assumption was part of a short-term disability policy."  The aspect of Jones Day's policy that Plaintiffs challenge is not fairly characterized as a "medical certification assumption" and, as discussed above, including in response to ¶¶ 96, 116, 127, is part of the firm's "Family Leave" policy.  Moreover, as Mark testified, Plaintiffs did tell Annatoyn and Jackson that "the extra eight weeks given to women are labeled as disability leave."  Chase Ex. 79 (Savignac Tr.) 232:7-10.

325.    He does not recall telling them that he planned to demand all eight-weeks of disability leave available to birthparents without a medical certification or a disability, and he does not believe there was any discussion of either the Pregnancy Discrimination Act or the medical standard of care in the course of these conversations.  Chase Ex. 79, Savignac Tr. 232:15-237:21.

> Response: Disputed in part.  The cited portion of the record does not say anything about "the medical standard of care," and Plaintiffs denied Jones Day's request for admission stating that they did not discuss "medical standards related to the duration of post-partum disability."  Otherwise undisputed.

326.    Savignac and Sheketoff did ask whether filing a lawsuit challenging Jones Day's leave policies "would be perceived as analogous to, you know, a white person challenging affirmative action, like the Abigail Fisher case."  Chase Ex. 79, Savignac Tr. 234:10-12.

> Response: Undisputed.

C.   **Shumaker Recommends Terminating Savignac**

327.    In her near-thirty-year Jones Day career, McClure has fielded many inquiries about the Firm's policies and considered challenges to those policies.  But she has never received an email or had a verbal exchange with a colleague that had as hostile, immature and extortionate a tone as Savignac's January 16, 2019 email.  McClure Decl. at ¶¶ 12, 25.

> Response: Disputed.  There is no evidence in the record of what other emails or verbal exchanges McClure has had, but Plaintiffs' January 16, 2019 email does not have a hostile, immature, and/or extortionate tone, and a reasonable jury could discredit McClure's irrelevant and incredible claim that she perceived it as such.

328.    McClure forwarded Savignac's email to Michael Shumaker, the Firm Administrative Partner, who serves as "legal counsel to the Firm" on personnel and other matters.  Chase Ex. 81, Shumaker Tr. 266:10-16; Shumaker Decl. ¶ 1 (Dkt. 66-2).

> Response: Disputed in part.  Undisputed that McClure forwarded Plaintiffs' email to Shumaker.  Disputed that this was related to his supposed counsel role.  Shumaker is the firm's Administrative Partner and the purpose of his involvement was to procure Mark's illegal termination, which is a managerial rather than a counsel action.

329.    Shumaker viewed Savignac's January 2019 email as fundamentally different from the 2015 challenge, by a different Issues & Appeals associate, to the Firm's prior paid family leave policy.  The associate acting in 2015 raised "a proper question" and "a legitimate concern" that led the Firm to "change[] its policy."  Chase Ex. 81, Shumaker Tr. 161:1-25.

> Response: Disputed in part.  Undisputed that Shumaker so testified and that Jones Day abandoned a blatantly illegal aspect of its policy following Sooknanan's email in 2015.  Undisputed that Sooknanan's email and the January 2019 email are different in various respects—most obviously, only the latter says anything about suing Jones Day.  Disputed

to the extent that the paragraph implies that Shumaker viewed the January email as "improper" or "illegitimate."  A reasonable jury could find that he viewed it as different because it stated an intent to litigate and procured Mark's termination for that reason.

330.    In contrast, Savignac's email was intemperate, extortionate and legally baseless, causing Shumaker to consider whether Savignac should be fired.  To Shumaker, Savignac's email:

> reflected a lack of professionalism.  It reflected a lack of maturity. It reflected a lack of leadership.  It reflected a distortion of applicable law.  It demanded something to which you were not entitled, in an extortionate way.  It showed an absence of integrity.  And those are foundational values for this law firm.  If you pick up the firm manual, first two or three pages, those things make a difference to us.

Chase Ex. 81, Shumaker Tr. 19:20-22, 50:13-23.

> Response: Disputed.  The email is not intemperate, extortionate, or legally baseless; if it were legally baseless, then Jones Day's motion to dismiss would not have failed.  There is zero evidence that integrity and maturity are fundamental values of Jones Day and overwhelming evidence that its actual values are otherwise, including Shumaker's admission that he did not think that a male associate who called his female colleagues "cunts" should be fired.  PSF ¶¶ 342-346.  A reasonable jury could discredit Shumaker's testimony about his perception of the email and find that he most likely recommended that Mark be fired because of the email's statement that he would file an EEOC charge and a civil rights lawsuit.  Indeed, Shumaker's quoted testimony effectively admits that he had Mark fired because he did not like the January email's challenge to the firm's discriminatory policy.

127

331.    Jones Day's Firm Manual, in fact, provides that integrity, personal accountability, and competence are among Jones Day's foundational values; and "[l]awyers and staff alike must show respect and consideration to everyone in the Firm—lawyers, legal support personnel, and staff in all of the Practices, Offices, and Departments of the Firm."  Chase Ex. 1 at JD_00002038, 2041.

> Response: Disputed in part.  Undisputed that the manual includes those words.  Disputed that the words are true.  As one Jones Day partner stated, blind loyalty to the firm's leadership is far more important than "competence": "you can make it at Jones Day without being very talented or very smart, but you have to be on the team."  Chase Ex. 80 (Sheketoff) at 272:10-11.  The facts of this case, among others, demonstrate that the manual's words are not true.  There is no record support for the notion that integrity (much less competence) is an important value for Jones Day.  The Manual is inadmissible hearsay if offered for the truth of the proposition that Jones Day holds those values.  A company's puffery about its values is not a legitimate evidentiary basis for the proposition that the company actually holds those values.  Jones Day is best known for its failed attempts to undermine the rule of law in the United States, which hardly attest to its "integrity."  *See, e.g.*, The New York Times, "Growing Discomfort at Law Firms Representing Trump in Election Lawsuits" (Nov. 9, 2020); The New York Times, "How a Corporate Law Firm Led a Political Revolution" (Aug. 25, 2022).

332.    For Shumaker, it "was the—'We're going to—if you don't give me what I'm not entitled to, I'm going to take this to the court of public opinion.  I'm going to publicize to you and say bad things about this law firm, this law firm for which I work right now, and is paying

me over—has paid me over a million dollars,' that's just immature, unprofessional, complete absence of judgment…."  Chase Ex. 81, Shumaker Tr. 48:11-18.

> Response: Disputed in part.  Disputed that the email's statement that Plaintiffs would litigate if necessary to end Jones Day's discriminatory policy, and that litigation in this country is public, was immature or unprofessional showed an absence of judgment. Undisputed that Shumaker decided that Mark should be fired for the email's statement that Plaintiffs would litigate if necessary.

333.     Shumaker construed Savignac's email as threatening to "somehow bad-mouth the firm in some way"; "[i]t was a clear threat"; "[a]nyone who reads this e-mail would come away and say, 'This is not how people—particularly in an institution that is founded upon collegiality, [a] cohesive approach to [the] practice of law, teamwork, integrity—would act towards one another.  Give me what I want, or else.'"  Chase Ex. 81, Shumaker Tr. 58:13-14, 104:12-17, 108:6-10.

> Response: Disputed in part.  The email does not threaten to "bad-mouth the firm" in any "way" except inasmuch as Shumaker deemed litigation challenging its discriminatory leave policy to be "bad-mouthing."  PSF ¶¶ 270-284.  Undisputed that Shumaker procured Mark's termination in retaliation for the email's statement that Plaintiffs would litigate.

334.     Shumaker was not impacted by Savignac's threat of a lawsuit: "the threat of a lawsuit, in my view, [is] meaningless.  Threats of lawsuits perhaps to private individuals or corporations are threatening. The threat of a lawsuit to us, particularly one where there was no merit to it, was—was not the issue at all.  What—what the issue was … is what the e-mail said

about you as a person, and your understanding of the law firm."  Chase Ex. 81, Shumaker Tr. 31:5-12.

> Response: Disputed.  A reasonable jury could discredit Shumaker's incredible testimony that he was utterly indifferent to whether a current Jones Day associate sued the firm for illegal discrimination.  Indeed, Shumaker testified that this litigation is of great interest to the firm, with virtually every partner there having asked him about it.  Chase Ex. 81 (Shumaker) at 301:9-303:14 (Shumaker's "Washington partners … all read it.  They all ask about it.").

335.   Shumaker also "didn't think you would [file litigation].  I thought it was just a threat, because, again, I didn't see any merit to the position whatsoever, and I thought you were simply making the allegation to try to extract something for yourself that you were not entitled to."  Chase Ex. 81, Shumaker Tr. 34:22-35:2.

> Response: Disputed.  A reasonable jury could discredit Shumaker's testimony that he did not believe that Plaintiffs would sue and his testimony that he saw no merit to Plaintiffs' challenge.

336.   Shumaker "sat on [the question of whether to recommend termination] for two or three days, because I think there's merit to taking your time on a decision like that, and making sure it was the right decision."  Chase Ex. 81, Shumaker Tr. 20:16-19.

> Response: Undisputed that Shumaker apparently waited a couple of days before contacting Brogan, which belies his false claim that he was concerned about Mark's having access to the firm's information systems.

337.   Shumaker also decided to involve the Firm's Managing Partner, Stephen Brogan, because "we're dealing with people.  We're dealing with lives…. I want to be sure that we're

treating people fairly.  So I want to make sure that we understand the facts before we take a

decision.  And I don't—notwithstanding the unfortunate nature of your e-mail, I think I owe it to

the firm—I owe it to you, I owe it to others, to be fair and balanced."  Chase Ex. 81, Shumaker

Tr. 30:12-23.

> Response: Disputed in part.  Undisputed that Shumaker involved Defendant Brogan.  A
>
> reasonable jury could discredit Shumaker's testimony about his supposed motivations for
>
> involving Brogan in illegally firing the father of a two-week-old child and find that he
>
> chose to involve Brogan because Plaintiffs' email threatened meritorious litigation
>
> against the firm and/or because he recognized that firing Mark in retaliation for the email
>
> would be blatantly illegal and lead to litigation and did not want the decision pinned on
>
> him.

338.    Ultimately, Shumaker decided to recommend termination "based upon what was

reflected in the e-mail, and what it said about you as a person, your understanding of the law

firm, your absence of professionalism, lack of maturity, an absence of leadership on an issue, a

self-interested demand for something you weren't entitled to."  Chase Ex. 81, Shumaker Tr.

25:19-25.

> Response: Disputed in part.  Undisputed that Shumaker recommended that Mark be fired.
>
> Disputed at to Shumaker's testimony about his rationale, which a reasonable jury could
>
> discredit, especially given that he did not convey that rationale to Brogan when
>
> recommending the termination.  PSF ¶¶ 221-223.

339.    Shumaker also "was of the view that we wanted to cut access as soon as we could,

because your e-mail had indicated an absence of trustworthiness.  And we have an ethical

obligation to our clients to maintain confidentiality over their information, so I viewed that as a threat."  Chase Ex. 81, Shumaker Tr. 28:12-16.

Response: Disputed.  Nothing in the email remotely indicates an "absence of trustworthiness."  A reasonable jury could discredit Shumaker's testimony that it did. Moreover, Shumaker could have ordered that Mark's access be cut immediately upon reviewing the email on January 16, but he instead waited until January 22, belying any claim that he viewed the matter as urgent or wanted to act "as soon as we could."

340.    Shumaker forwarded Savignac's January 16, 2016 email to Brogan and recommended that the Firm terminate Savignac immediately.  Chase Ex. 42, JD_00003169-70.

Response: Undisputed.

**D.    Jones Day Terminates Savignac**

341.    Brogan made the decision to terminate Savignac.  In his response to Shumaker's email, Brogan stated simply:  "He has to go.  Get it done tomorrow Morning first thing."  Chase Ex. 42, JD_00003169; *see also* Chase Ex. 77, Brogan Tr. 10:14-23; Chase Ex. 81, Shumaker Tr. 17:4-18.

Response: Undisputed that Brogan so stated and that he made the final termination decision.  Plaintiffs dispute any implication that Shumaker does not have legal responsibility along with Brogan.

342.    Brogan's decision was based on "the character flaws that [he] saw in th[e] email as a whole, and [his] view that [the email] was not sent in good faith."  Chase Ex. 77, Brogan Tr. 66:19-25.

Response: Disputed.  The email does not display any character flaws and there was no basis to conclude that it was not sent in good faith.  Brogan's testimony is incredible.  A reasonable jury could discredit the quoted testimony and find that Brogan's decision was

probably based on the email's warning of litigation.  PSF ¶¶ 220-313 (addressing

Brogan's purported reasons for firing Mark).

343.    The decision to terminate Savignac was based on his "poor judgment and

immaturity reflected by his extortionate threat to harm the firm in the 'court of public opinion'

unless it acceded to his demand for eight weeks of paid leave consistent with his having given

birth when he had not."  Chase Ex. 77, Brogan Tr. 15:3-18:10; *see also* Chase Ex. 77, Brogan Tr.

19:3-23:14.

>    Response: Disputed.  The characterization of the email is baseless.  Brogan's testimony is
>
>    incredible.  A reasonable jury could find that Brogan's decision was probably based on
>
>    the email's warning of litigation.  PSF ¶¶ 220-313 (addressing Brogan's purported
>
>    reasons for firing Mark).

344.    Brogan read the reference to "the court of public opinion" as "a threat to go … to

the press," which he "viewed as an extortionist demand" given that Savignac "had no claim that

[he was] disabled."  Chase Ex. 77, Brogan Tr. 17:10-17, 21:21-22:10, 67:1-14, 167:23-168:11,

192:23-193:3.

>    Response: Disputed.  PSF ¶¶ 270-284.

345.    When showed Savignac's August 23, 2018 email to McClure at his deposition,

Brogan contrasted that with Savignac's later email: "[T]here's nothing in … [the August 2018]

email that seeks to extort money from the firm" or that "is dishonest about the firm's

compensation system."  Chase Ex. 77, Brogan Tr. 122:7-11.

>    Response: Undisputed.  However, Jones Day stated in response to an interrogatory
>
>    (signed by Brogan) that "Savignac demonstrated poor judgment, lack of courtesy,
>
>    personal immaturity, disinterest in pursuing a career at Jones Day, intemperateness,

and/or hostility to Jones Day … These attributes of Savignac are reflected in his communications to Jones Day in *August 2018* and January 2019."  Sheketoff Ex. 31 at 21-22.  Jones Day's and Brogan's position is that all of these negative attributes are in both emails and therefore cannot explain why Mark was fired for the January email but not the August email.  The difference is that only the former mentions litigation.

346.     Brogan was also struck by the fact that Savignac was not seeking to change Jones Day's leave policies for all associates, but was demanding only extra paid leave worth roughly $80,000—confirmation to Brogan that the email was an extortionate threat, not a constructive call for re-examination of the Firm's policies.  Chase Ex. 77, Brogan Tr. 21:3-8;7-11, 120:1-20.

Response: Disputed.  A reasonable jury could discredit Brogan's testimony that Brogan was "struck by" the fact that Mark sought equal treatment for his family rather than demanding that Jones Day change its policies across the board or that this point had anything to do with his termination decision.

347.     Brogan testified under questioning by Savignac: "If that doesn't say things about your character, I don't know what does. I mean … it shows me that you don't care about anybody else except yourself, and we just don't—we don't have people at Jones Day like that." Chase Ex. 77, Brogan Tr. 67:10-14.

Response: Undisputed that Brogan so testified.  A reasonable jury could discredit his testimony, which would by definition apply likewise to anyone who sought equal treatment.

348.     In addition, the email's conclusory and arrogant tone, in which Savignac "act[ed] as if [Plaintiffs] personally were the law-givers," decreeing that "our policy on leave was

illegal," caused Brogan to question Savignac's capabilities.  Chase Ex. 77, Brogan Tr. 16:18-20, 60:21-61:2.

> Response: Disputed in part.  Undisputed that Brogan admitted that he fired Mark because of the email's statement that Jones Day's leave policy was illegal.  Disputed that the statement is a matter of "tone" rather than substance.  Disputed that Brogan had any ability to assess Plaintiffs' legal abilities or that he actually questioned them.  Brogan conceded that he knew nothing about the underlying facts, including being ignorant of what the firm's leave policy was and never having reviewed Julia's August 2018 email explaining the basis for Plaintiffs' complaint.  PSF ¶¶ 233-234, 264-266.

349.    Brogan "wasn't impressed with [Savignac's] reasoning," which was nothing more than "a flat-out assertion."  Chase Ex. 77, Brogan Tr. 59:17-20.

> Response: Undisputed that Brogan so testified.  Brogan conceded that he never reviewed Julia's August 2018 email, which had explained Plaintiffs' position, even though both the January email and McClure's August email (which Brogan claimed to have read) refer to it.  PSF ¶¶ 233-234.

350.    The email's "pompous" and "arrogant" *ipse dixit* "made [Brogan] lose confidence in [Savignac's] ability as—as a lawyer."  Chase Ex. 77, Brogan Tr. 59:17-61:2.

> Response: Disputed.  The email is not pompous or arrogant.  Brogan had no ability to assess Mark's ability as an attorney.  Nothing in the email would cause a reasonable person to question the author's legal ability, and a reasonable jury could discredit Brogan's false testimony.  Brogan conceded that he knew nothing about the underlying facts, including being ignorant of what the firm's leave policy was and never having

reviewed Julia's August 2018 email explaining the basis for Plaintiffs' complaint.  PSF ¶¶ 233-234, 264-266.

351.    Brogan also objected to the email's unfounded and malicious assertion that Savignac was "aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are *tailor-made to enable* sex discrimination, including retaliation," which Brogan understood to be a claim that the compensation system was purposely designed to enable sex discrimination  McClure Ex. 4, JD_00003143; Chase Ex. 77, Brogan Tr. 15:21-16:10 (emphasis added).

> Response: Disputed.  The email is referencing the fact that "it is a compensation system where many people have input that is unreviewable by the person whose salary is being set and that, therefore, could be used to discriminate or retaliate against someone in terms of their pay."  Chase Ex. 79 (Savignac) at 256:1-15.  Jones Day and Brogan understood that at the time; their many explanations of why it fired Mark make no reference to the portion of the email addressing the firm's black-box compensation system.  A reasonable jury could discredit Brogan's testimony that he interpreted the statement as a claim that the system was purposely designed to enable sex discrimination or that any such interpretation played any role in the termination decision.  PSF ¶¶ 285-313.

352.    "[N]othing could be further from the truth"; the Firm has treated compensation as confidential since the 1940s—when it did not have any female attorneys—as a way of "deemphasizing money, so that people weren't being petty and comparing themselves to other people with respect to how much money they made."  As discovery in a recent putative class action alleging systemic pay discrimination confirmed—"[t]here was nothing" to the allegations. Chase Ex. 77, Brogan Tr. 15:23-16:8, 212:10-21, 233:9-239:8; *see also* Dkt. 182, Case No. 19-

00945 (D.D.C.) (voluntarily dismissing all "class or collective claims, including those alleging systemic pay discrimination, or disparate impact claims" after "analyzing the nationwide evaluation and compensation data Jones Day produced (for the time period 2012 through 2018)"). Chase Ex. 75, Jones Day One Week.

> Response: Disputed.  That Jones Day adopted the black-box compensation system at a time when it did not allow women to be lawyers at all hardly suggests that the firm is not sexist.  Moreover, a statement in a voluntary dismissal of another discrimination suit that Jones Day chose to settle is not evidence in this case.  Even assuming (though there is no evidentiary support) that discovery in the *Tolton* case did show that the black-box compensation system did not have a disparate impact, that case was not even *filed* until months after Mark was fired.  And this Court has already held that as of its filing there was sufficient basis to claim that the black-box system had a disparate impact against women.  *See Tolton* Order of June 9, 2020.

353.     The "email's assertion … that Jones Day's [leave] policy is discriminatory" was itself "no factor" in Brogan's termination decision.  Chase Ex. 77, Brogan Tr. 60:7-16.

> Response: Disputed.  As Jones Day pointed out a few paragraphs above (¶¶ 348-350), Brogan admitted that he fired Mark because of the email's claim of illegality.  PSF ¶¶ 230-236.  And a reasonable jury could so find even without the admission.

354.     Brogan "personally was involved in setting [Sheketoff's] compensation and reviewing [her], and [he] knew that [she] was treated extremely fairly and extremely well," so "there was no basis for [Savignac] to say that [she] was being discriminated against.  None. Zero."  Chase Ex. 77, Brogan Tr. 195:4-12.

Response: Disputed. PSF ¶¶ 237-263. Brogan himself had no basis for that purported belief. *Id.*

355.    Brogan's view was that Savignac "had no … good-faith basis for making th[is] assertion." Chase Ex. 77, Brogan Tr. 16:4-10.

Response: Disputed. PSF ¶¶ 237-263. A reasonable jury could find that Brogan lacked the information necessary to evaluate the claim and simply did not care whether it was true or not.

356.    Savignac admitted at his deposition that he had no information to support that claim. He had no involvement in the associate compensation process beyond submitting evaluations of more junior associates, and he was never consulted on any salary decision for another associate. Chase Ex. 79, Savignac Tr. 256:16-257:15.

Response: Disputed in part. Undisputed as to the second sentence, which paraphrases the cited testimony, but that sentence and testimony obviously do not support the first sentence's baseless assertion that Mark had "no information" supporting the claim that Julia was discriminated against. Disputed as to the first sentence, which has no support in the record.

357.    When asked the basis for his assertion that the Firm's system is tailor-made to enable sex discrimination, Savignac testified only that Jones Day's compensation system is one "where many people have input that is unreviewable by the person whose salary is being set, such that it "*could* be used to discriminate or retaliate against someone in terms of their pay." Chase Ex. 79, Savignac Tr. 256:11-15 (emphasis added).

Response: Undisputed that Mark testified that "it is a compensation system where many people have input that is unreviewable by the person whose salary is being set and that,

therefore, could be used to discriminate or retaliation against someone in terms of their

pay." *See also* Chase Ex. 80 (Sheketoff Tr.) 115:25-117:24 (further explaining Plaintiffs'

statement that the black-box compensation system enables discrimination); PSF ¶¶ 285-

313.

358.     Brogan concluded that Savignac was "being completely dishonest in attacking the

firm," which "goes to [his] character" and the dishonesty was "just not conduct that we can

accept from somebody."  Chase Ex. 77, Brogan Tr. 39:4-17.

Response: Disputed.  A reasonable jury could discredit Brogan's testimony.  PSF ¶¶ 228-

313.

359.     Similarly, the "fact that [Savignac was] threatening to sue the firm had no—no

impact on [Brogan] at all.  None.  Zero."  Chase Ex. 77, Brogan Tr. 68:5-14.

Response: Disputed.  A reasonable jury could discredit Brogan's testimony, which is

implausible on its face.  PSF ¶¶ 267-68, 330-341.

360.     The "fact that somebody threatens a lawsuit against the firm is singularly

unimpressive to [Brogan]," and "if [an employee is] going to get separated from the firm, it's

because [the employee] did something else."  Chase Ex. 77, Brogan Tr. 151:7-13.

Response: Disputed.  A reasonable jury could discredit Brogan's testimony, which is

implausible on its face.  PSF ¶¶ 267-68, 330-341.

361.     Brogan understood the January 16, 2019 email to be coming from Savignac alone:

"I thought the e-mail was from—from you.  I mean, I—you know, you made this 'royal we'

comment that—'We've consulted lawyers, and we think that, you know, we were right on the

law.'  But other than that, the e-mail, on its surface, I took it at face value was coming from

you."  Chase Ex. 77, Brogan Tr. 20:2-7.

<u>Response</u>: Disputed.  There is no documentary or other pre-litigation evidence that Brogan was unaware of Julia's role in the protected activity, and a reasonable jury could easily discredit his testimony and find that he did understand that Julia engaged in the protected activity along with Mark.  The email chain that Shumaker sent him made clear that Julia had a major role in the challenge to Jones Day's sexist leave policy.  *See* Chase Ex. 42 at JD_00003172 (McClure's email defending the policy, stating "I explained this to Julia on the phone yesterday"); *id.* at JD_00003171 ("Julia made the prior request"). Shumaker's cover email recommending the termination focuses precisely as much on Julia as it does on Mark.  *See id.* at JD_00003170.  And, as the Court noted previously, the January email repeatedly uses the plural "We," obviously referring to "Julia and Mark."  *See id.* at JD_00003170-71 ("We have closely reviewed the case law … We have also discussed the matter with other competent attorneys … We are very familiar with the D.C. Circuit and confident that we will win … We ourselves experienced [discrimination through the black-box system] when Julia's salary was cut in relative terms …").  A reasonable jury could discredit Brogan's incredible testimony that he believed that the email's use of the plural "we" was instead an instance of the "royal we," an archaic convention commonly associated with Shakespeare in which the monarch refers to himself as "we" rather than "I."  *See* en.wikipedia.org/wiki/Royal_we; *Seshadri v. Kasraian*, 130 F.3d 798, 804 (7th Cir. 1997) (plaintiff's assertion that "when he wrote the *Journal of Applied Physics* that 'We carried out the theoretical analysis for the above-mentioned manuscript' he was using the royal 'we' is both incredible and, in light of all the other statements showing joint authorship, incomplete"); *Yeo v. Town of Lexington*, 1997 WL 292173, at *7 n.8 (1st Cir. 1997) (deponents' claims that they used "we" "in

the sense of the 'royal "we"' … strain[ed] the ordinary usage of language"), vacated on

other grounds at 131 F.3d 241; *United States v. Dunan*, 2014 WL 655410, at *7 (M.D.

Tenn. 2014) ("though Vance was a ranking member of the Vice Lords, the jury could

properly surmise that he was not referring to the royal 'we,' but rather to the notion that

their drug trafficking venture would be over if both he and Parnell were busted").

362.    Once Brogan directed Savignac's termination, Shumaker worked with leadership

and staff in the Washington D.C. office to "set[] into motion what needed to be done to execute

on the decision."  Chase Ex. 81, Shumaker Tr. 28:1-29:1

Response: Undisputed.

363.    Kevyn Orr sent a termination letter to Savignac on January 22, 2019.  Chase Ex.

46, JD_00002633.

Response: Undisputed.

### E.    Jones Day Permitted an Exception to its Established Policy Prohibiting Employment References

364.    On January 27, 2019, Savignac separately emailed three Jones Day partners—Ben

Mizer, Shay Dvoretzky, and Karl Thompson—to ask each if each would "serve as a telephone

reference for [him] and write a reference letter" to assist Savignac's search for new employment.

Chase Ex. 47, JD_PRIV_0165; Chase Ex. 48, P02772; Chase Ex. 50, JD_00002863.

Response: Undisputed.

365.    For decades, Jones Day has had a policy generally prohibiting employment

references (the "Employment Reference Policy").  The 1992 Firm Manual (the earliest iteration

produced in discovery) included a section on "Employment References" stating: "Lawyers … are

not authorized to provide any employment reference of any type," except as approved by the

Managing Partner, Partner-in-Charge, or Office Administrator.  Chase Ex. 3 at JD_00003431;

*see also* Chase Ex. 6 at JD_00003478 (1994 Firm Manual); Chase Ex. 7 at, JD_00003677-78 (1997 Firm Manual).

> <u>Response</u>: Disputed in part.  Undisputed that the firm has a written policy under which certain specified managers have authority to decide whether to allow references. (However, many at Jones Day are not aware of and do not follow the policy.  PSF ¶¶ 349, 352-353, 385-391.)  Disputed that the policy "generally prohibit[s]" references.  It simply delegates to the specified managers whether to allow them or not.  *See, e.g.*, Dkt. 188 at 12 (Jones Day's statement that "Jones Day's written policies prohibit employment references unless authorized by specified individuals, including the Administrative Partner."); PSF ¶¶ 361-368.  There are numerous instances in the record where a reference was given (with or without the approval demanded by the written policy), and no instance in the record where authorization for a reference was denied under the policy with the exception of this case.  PSF ¶¶ 349, 352-353, 385-391.

366.    At the time Savignac wrote to Mizer, Dvoretzky, and Thompson, the policy was largely the same but permitted exceptions only with approval of the Firm Administrative Partner (Michael Shumaker) or the relevant Partner-in-Charge:

> **5.     Employment References**
>
> Except as described below with respect to bar character and fitness forms, lawyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party, including current or former employees themselves.  Requests for employment references should be referred, in the case of lawyer requests, to the Firm Administrative Partner or appropriate Partner-in-Charge, or, in the case of staff and legal support personnel requests, to the appropriate Office Administrator.  In most circumstances, the response will be limited to disclosing the date of original hire and the date of most recent severance of employment.

Chase Ex. 1 at JD_00002117; *see also* Chase Ex. 81, Shumaker Tr. 217:20-214:14.

Response: Disputed in part.  Undisputed that the written policy at the relevant time was as set forth.  Disputed as to the term "exceptions," which falsely implies that the norm is to deny references.  *See* response to ¶¶ 365-66, *supra*.  While the written policy states that "[i]n most circumstances, the response will be limited to disclosing the date of original hire and the date of most recent severance of employment," on its face, this is not a rule; it is a factual assertion about Jones Day's practice, and it is not admissible to prove the truth of that factual assertion (Fed. R. Evid. 801(c), 802).  There is no evidence that most reference requests are actually denied.  And even if most requests actually were denied, that would not be probative given that most departures occur under different circumstances (e.g., the attorney voluntarily departed, showing disloyalty, or was pushed out for poor performance, so a reference would not be helpful).

367.    Shumaker—Jones Day's Rule 30(b)(6) designee for topics relating to Savignac's reference request—testified that the Employment Reference Policy standardizes how the Firm responds to reference requests and "eliminates our trying to make that subjective determination as to who we're going to support and not support, because "it's just stepping on a slippery slope when you got into the reference business."  Chase Ex. 81, Shumaker Tr. 219:21-220:7, 226:6-11, 227:12-20.

Response: Disputed in part.  Undisputed that Shumaker so testified.  However, his other testimony refuted this testimony by showing that he does in fact undertake a highly subjective determination to determine whether to allow references and that he made such a subjective determination in Mark's case.  PSF ¶¶ 361-368.  As set forth above in response to ¶¶ 365-66, references are frequently provided (with or without the approval purported required by the written rule).  Any assertion that Jones Day is not in "the

143

reference business" or that it avoids "making that subjective determination as to who we're going to support and not support" is unsupported by the record.

368.     According to Shumaker, there are no "blanket rules" for what kinds of exceptions are made; the Firm "will provide exceptions based upon the individual circumstances."  Chase Ex. 81, Shumaker Tr. 223:11-15.

Response: Undisputed except as to the word "exceptions" (*see* responses to ¶¶ 365-66, *supra*).  In other words, the firm does perform, in each case, a "subjective determination as to who we're going to support and not support," contrary to Shumaker's prior testimony.

369.     Shumaker further testified: "[I]t is always an individual decision, based upon the facts and circumstances for the given lawyer," but "not a lot of exceptions [are] requested" and "not a lot of exceptions [are] granted." Chase Ex. 81, Shumaker Tr. 220:8-10, 224:6-16.

Response: Disputed in part.  Undisputed that it is an "individual decision" for Shumaker.  In other words, it is a "subjective determination as to who we're going to support and not support," contrary to Shumaker's prior testimony.  Disputed that "not a lot of exceptions" are requested or granted; the phrase "a lot" is vague, but Plaintiffs are aware of many references having been given.  *See* response to ¶¶ 365-66, *supra*; PSF ¶¶ 347-401.  Note that Shumaker did not say that most requests are denied.  Moreover, Shumaker's testimony on this point is unreliable, because he denied having any recollection of authorizing references that Defendants assert were in fact requested and authorized (e.g., for Defendant Heifetz).  PSF ¶¶ 395-401.

370.     Savignac was on notice of the policy regarding employment references, having certified to the Firm that he had received and reviewed the Firm Manual and that it was his

responsibility to be familiar with, and stay abreast of, its contents.  Chase Ex. 51, JD_00000048; *see also* Chase Ex. 79, Savignac Tr. 79:20-80:17.

> Response: Undisputed that Mark had reviewed the manual two years before and that the
>
> manual included the written policy.  As Jones Day admits, several of the Jones Day
>
> partners involved were likewise unaware of the policy.  *See, e.g.*, ¶ 389, *infra*.

371.    Dvoretzky—who also certified his review of the Firm Manual—forwarded Savignac's January 27, 2019 email to Shumaker and the Issues & Appeals Practice Leader, Beth Heifetz.  Chase Ex. 47, JD_PRIV_0165; *see also* Chase Ex. 81, Shumaker Tr. 253:2-7.

> Response: Undisputed.

372.    Consistent with the Employment Reference Policy, Shumaker responded that the Firm's "standard approach for anyone that departs is no recommendation and mere confirmation of dates work[ed]" but also asked Dvoretzky if he had any desire to give Savignac a reference. Chase Ex. 47, JD_PRIV_0165.

> Response: Disputed in part.  Undisputed that Shumaker so responded.  Disputed as to the
>
> statement's accuracy.  The written policy itself makes clear that the firm's approach is for
>
> Shumaker to decide whether a given attorney gets references or not.  *See* response to
>
> ¶¶ 365-66, *supra*.  There is no evidence that Shumaker standardly (or *ever*) refuses to
>
> authorize requests to give a reference outside of this case.

373.    Shumaker testified that "from the get-go, I was wondering to myself, is this a situation where we want to provide an exception?"  Chase Ex. 81, Shumaker Tr. 228:3-5.

> Response: Undisputed that Shumaker so testified.

374.    Shumaker also forwarded Dvoretzky's email to Sarah McClure.  Chase Ex. 52, JD_00002462.

<u>Response</u>: Undisputed.

375.    McClure spoke with Dvoretzky and Heifetz on January 28 and "asked Beth to talk with the partners Mark worked with and remind them of our policy."  Chase Ex. 53, JD_PRIV_0164; *see also* Chase Ex. 54, JD_00002526.

> <u>Response</u>: Undisputed.  McClure's apparent involvement is contrary to Jones Day's
> interrogatory response stating that "The individuals involved in responding to those
> [reference] requests were Michael Shumaker, Beth Heifetz, and Shay Dvoretzky."
> Sheketoff Ex. 31 at 2-4.  The managers' felt need to "remind" their partners of the policy
> confirms their awareness that the policy was, in fact, generally ignored.

376.    McClure and Shumaker spoke that evening and, pursuant to the terms of the Employment Reference Policy, Shumaker authorized an exception to the general prohibition on employment references that would allow Dvoretzky to serve as a telephone reference, but not provide any written letter of reference.  Chase Ex. 55, JD_00002528; Chase Ex. 81, Shumaker Tr. 220:8-13, 237:5-239:15.

> <u>Response</u>: Disputed in part.  Disputed that there is any "general prohibition."  Again, the
> policy is simply that Shumaker gets to decide.  Undisputed that Shumaker authorized
> only Dvoretzky and directed that Dvoretzky should not put anything in writing.

377.    Shumaker made the decision to authorize an exception to the Employment Reference policy that allowed Dvoretsky alone to provide a phone reference.  Chase Ex. 81, Shumaker Tr. 220:8-12, 237:18-238:4.

> <u>Response</u>: Undisputed aside from the term "exception."

378.    According to Shumaker (responding to a deposition question from Sheketoff):

> So the fact that we're dealing with a termination was one
> [exceptional circumstance].  Two, we, generally speaking, want our

146

lawyers to move on to other opportunities and to do well.  We had a
situation where we properly terminated Mark, but we knew he had
a young family.  We had, no doubt, people who were supportive of
you throughout the firm.  So we wanted both you and Mark to do
well.  So we thought it was in the firm's interest, as well as your
interest, to provide an exception and to allow someone to give a
more substantive reference.

Chase Ex. 81, Shumaker Tr. 221:11-22.

Response: Undisputed that Shumaker so testified.  A reasonable jury could discredit the

testimony.  Shumaker showed animus against Mark by having him fired, and if he had

wanted Mark to do well in his job search, he would not have limited Dvoretzky to

speaking on the phone and only about his own work with Mark and would not have

prohibited the other well-connected partners whose support Mark sought from providing

references.

379.    Shumaker authorized Dvoretzky to provide a telephone reference because:

the one person who we said should do it was the, in my view, firm's
view, the person we thought would be most compelling to an
employer to have that individual supportive of Mark.  That was
Shay.  Shay was a very well thought-of person in the issues and
appeals bar.  We thought his stamp of imprimatur would be more
valuable to Mark than any of the others.  Mark himself had reached
out to Shay.  I knew Shay.  I trusted Shay.  And for that reason, I
thought Shay was the right guy.

Chase Ex. 81, Shumaker Tr. 222:4-14.

Response: Disputed in part.  Undisputed that Shumaker "knew" and "trusted Shay"

(including when they decided to fire Mark) and therefore chose him to act as a reference.

Disputed that Shumaker believed that Dvoretzky would be the "most compelling" or that

any such belief was a factor in his decision.  A reasonable jury could find that Shumaker

trusted Dvoretzky—whom he'd already consulted in deciding to have Mark illegally

fired, PSF ¶¶ 359-360—to put the firm's interests first, and that he did not trust

Thompson or Mizer to support the firm's illegal termination of Mark.

380.     Shumaker also "knew Shay had a positive view of [Mark]—Shay, he would

convey as such.  I did not know Ben [Mizer] as well.  I did not know Karl [Thompson] as well,

which I understand were the other two.  So I did not know what their impressions were.  But I

knew Shay.  I knew his reputation in the industry, and that that would be persuasive to an

employer."  Chase Ex. 81, Shumaker Tr. 238:8-15; *see also* Chase Ex. 81, Shumaker Tr. 240:23-

241:9.

>    Response: Undisputed, except inasmuch as Dvoretzky participated in and endorsed Jones
>
>    Day's "collaborative decision" to fire Mark.  PSF ¶¶ 359-360.

381.     Shumaker "wanted to have a unified statement on behalf of the firm regarding

Mark.  I didn't want there to be inconsistent messages, which I think would have been harmful to

the—Mark and—harmful to Mark and to the firm."  Chase Ex. 81, Shumaker Tr. 237:21-25.

>    Response: Disputed.  A reasonable jury could discredit Shumaker's implausible
>
>    testimony that he thought Mark would be better off being limited to just one reference
>
>    rather than having the three he had requested.  The testimony about wanting "a unified
>
>    statement on behalf of the firm regarding Mark" is also incredible given that Shumaker
>
>    limited Dvoretzky to speaking only about his personal experience with Mark rather than
>
>    about Mark's reputation at the firm (based on, for instance, Mark's consensus statement,
>
>    ratings, and rankings).  PSF ¶¶ 356-358.

382.     Shumaker authorized only a telephone reference because that would avoid any

static, written recommendation, give Dvoretzky the opportunity to respond to questions, and "be

more beneficial to Mark, beneficial to the firm, in terms of helping him get a position." Chase Ex. 81, Shumaker Tr. 234:5-235:4.

> Response: Disputed in part. Undisputed that authorizing only a telephone reference would avoid a written recommendation and that Shumaker wanted to avoid having anything in writing. Disputed that Shumaker sought to be "more beneficial to Mark" or believed that limiting Dvoretzky to a telephone reference would be best "in terms of helping [Mark] get a position." A reasonable jury could find that Mark would have been better off if Dvoretzky could both email potential employers about Mark *and* speak to them on the phone, as Mark had requested (*see* response to ¶ 364, *supra*), and that Shumaker was undoubtedly aware of this.

383.    Shumaker believed that "in this situation, the firm and Mark's interests were aligned. We wanted him to get a new job. I was trying to act in a manner that would be most advantageous to that." Chase Ex. 81, Shumaker Tr. 238:1-4.

> Response: Disputed in part. Undisputed that it was in Jones Day's interest for Mark to get the best new job possible. Disputed that Shumaker sought to advance the firm's interests. A reasonable jury could find that if Shumaker had actually wanted the help Mark get a new job, then he would have encouraged all of the partners whose support Mark sought to do their best to help him rather than prohibiting them from doing so.

384.    McClure spoke with Heifetz and Dvoretzky on January 29 and relayed Shumaker's decision. Chase Ex. 55, JD_00002528; *see also* Chase Ex. 56, JD_00003758 (Heifetz's handwritten notes from call).

> Response: Undisputed.

385.    Heifetz did not make the decision either on whether or not to provide an employment reference, or how and by whom the Firm would provide an employment reference. Indeed, her only involvement was to convey the Firm's policy and the Firm's decision.  Chase Ex. 81, Shumaker Tr. Tr. 220:8-13, 237:5-239:15; *see also* Heifetz Decl. at ¶ 15.

Response: Disputed.  PSF ¶¶ 350-355, 394-401.

386.    Mizer was also aware that there might be a policy regarding employment references and called Heifetz for guidance.  Chase Ex. 78, Mizer Tr. 146:5-14.

Response: Undisputed.

387.    Heifetz informed Mizer that he "should convey to Mark that [Dvoretzky] would be providing a reference on the firm's behalf."  Chase Ex. 78, Mizer Tr. 147:20-22.

Response: Undisputed.

388.    Mizer ultimately declined to act as a reference "[b]ecause firm policy was not to provide a reference for Mark."  Chase Ex. 78, Mizer Tr. 126:5-6.

Response: Disputed in part.  Undisputed that Mizer so testified.  Disputed that the statement is accurate.  The "firm policy" was for Shumaker to decide whether to allow references.  Undisputed that Shumaker decided to permit only Dvoretzky to do so.

389.    Thompson was not aware of the Employment Reference Policy and initially agreed to act as a reference for Savignac.  Chase Ex. 48, P02772; Chase Ex. 78, Mizer Tr. 127:18-128:1.

Response: Undisputed.

390.    At some point, however, Thompson and Mizer spoke, and Mizer suggested Thompson "might want to talk [to] Beth about the firm policy."  Chase Ex. 78, Mizer Tr. 128:5-6.

<u>Response</u>: Undisputed.  Heifetz told Thompson that he could not serve as a reference for Mark.  PSF ¶ 350.

391.    Dvoretzky emailed Savignac on January 29, 2019, and informed him that Dvoretzky alone had been authorized to speak with potential employers by phone.  Chase Ex. 49, JD_00002465.

<u>Response</u>: Undisputed.

392.    Legal recruiters working with Savignac recognized that "hav[ing] a reference from" Jones Day was not the Firm's "typical policy."  Chase Ex. 57, P00069.

<u>Response</u>: Disputed.  The cited email chain involves just one recruiter (not "recruiters"), and it simply states that she told a potential employer that it was "not [Jones Day's] typical policy" to provide a reference.  Chase Ex. 57 at P00069.  The recruiter was simply echoing Mark's statement to her that Dvoretzky claimed in his email that Jones Day's policy was not to allow references.  She was not purporting to have independent personal knowledge of Jones Day's policies, and there is no evidence in the record that she in fact had personal knowledge.  Chase Ex. 79 (Savignac) at 279:2-22.

393.    Savignac offered Dvoretzky as a reference in connection with a potential position at Steptoe & Johnson, and was advised in April 2019 to "give Shay a head's up that someone from Steptoe may call."  Chase Ex. 58, P00963, Chase Ex. 59, P01543.

<u>Response</u>: Undisputed.

394.    Steptoe offered Savignac an associate position in or around May, and he accepted. Chase Ex. 79, Savignac Tr. 304:5-10.

<u>Response</u>: Undisputed.

395.    Savignac also heard from another firm that "Shay was very complimentary" when serving as a reference.  Chase Ex. 60, P01709; *see also* Chase Ex. 79, Savignac Tr. 271:4-9.

Response: Undisputed, though that firm rejected Mark's application.

396.    No prospective employer ever told Savignac that Dvoretzky's reference was not positive.  Chase Ex. 79, Savignac Tr. 270:22-271:3.

Response: Undisputed.

397.    Discovery did not identify any former Jones Day employee who received an employment reference without an approved exception under the Employment Reference Policy.

Response: Disputed.  PSF ¶¶ 385-391, 395-401.

398.    Heifetz's practice, for instance, was to call to seek approval from either the Firm Administrative Partner or the Partner-in-Charge of the Washington D.C. office before agreeing to act as an employment reference or authorizing someone else to do so.  Heifetz Decl. at ¶ 14.

Response: Disputed.  PSF ¶¶ 394-401.

399.    There is no evidence that Heifetz ever deviated from that practice. Heifetz Decl. at ¶ 14.

Response: Disputed.  PSF ¶¶ 394-401.  For one thing, Shumaker had no recollection of any instance of Heifetz following that supposed practice.  PSF ¶ 401.

400.    Discovery also did not identify any Jones Day employee comparable to Savignac who received authorization for the additional references that Plaintiffs claim Savignac was denied for retaliatory reasons.

Response: Disputed.  The phrase "comparable to Savignac" is so vague in this context as to be meaningless.  However, the record shows that Jones Day provided better treatment

to others, including by providing written references, official references on Jones Day letterhead, and references from multiple Jones Day attorneys.  PSF ¶¶ 348-401.

401.    Savignac's other references included three federal judges—including Justice Stephen Breyer and Judge Richard Posner—former Acting Solicitor General Neal Katyal, and the General Counsel for the Board of Governors of the Federal Reserve System.  Chase Ex. 61, P01204.

Response: Undisputed.

402.    Savignac could not identify a single prospective employer whose decision about whether to offer him a job would have been affected by more employment references from Jones Day.  Chase Ex. 79, Savignac Tr. 273:11-22.

Response: Disputed in part.  Undisputed that Mark cannot point to a specific employer that would have hired him but for Jones Day's interference with his reference requests. However, a reasonable jury could find that Mark would have been a materially stronger candidate with the denied references and would have had more success in his search, whether in terms of the number of firms giving him offers, the title offered, or the salary offered.

403.    Savignac does not recall any prospective employer telling him that it wanted an additional Jones Day reference, or that additional references from Jones Day would have impacted his candidacy.  Chase Ex. 79, Savignac Tr. 274:1-5, 309:21-310:4.

Response: Undisputed.

404.    Had he acted as an employment reference, Mizer would have been "candid" about Savignac.  Chase Ex. 78, Mizer Tr. 101:2.

Response: Undisputed that Mizer's reference would have been at least as positive as the glowing evaluation of Mark that he submitted contemporaneously with Mark's termination, which he testified was his candid evaluation.  PSF ¶¶ 370-379.

405.    That would have included saying that Savignac's "diplomatic skills sometimes could use some work.  So depending on what role you are hiring him for, then that may matter more or less to you."  Chase Ex. 78, Mizer Tr. 101:2-9.

Response: Disputed in part.  Undisputed that Mizer *might* have repeated the statement in his evaluation about Mark's supposedly "sharp in tone" "comment-bubble feedback in response to" co-counsel whose "briefs have not risen to [Mark and Mizer's] extremely high standards."  Disputed that such a statement, in the context of Mizer's evaluation as a whole, would make a material impression on any potential employer.  PSF ¶¶ 370-379.  Mizer's actual view was that Mark had *exceptional partnership potential*.  PSF ¶¶ 375-77.

406.    According to Mizer, if prospective employers

> were seeking an associate who would simply be asked to write briefs and do research without any potential responsibilities for interaction with clients or co-counsel, then I would have said that that role would fit your strengths. But if they anticipated your growth out of the role of an associate that essentially does briefs and does research but required more interpersonal skills, then I would have flagged for them the room for improvement….

Chase Ex. 78, Mizer Tr. 103:1-12.

Response: Disputed.  A reasonable jury would discredit Mizer's self-serving testimony and find that his reference would have been at least as positive as the glowing evaluation of Mark that he submitted contemporaneously with Mark's termination, which Mizer testified was his candid evaluation and which advised Jones Day that Mark had

*exceptional partnership potential.*  PSF ¶¶ 370-379.  Based on Mizer's evaluation, submitted when he had no motive to be anything but perfectly candid and honest (and contemporaneously with Mark's termination), a reasonable jury would conclude that he would have given Mark a strong recommendation as someone with excellent interpersonal skills and excellent potential as a partner at a firm like Jones Day.

407.     Mizer also has come to question Savignac's judgment, testifying that "the tone and content of [Savignac's January 16, 2019 email to McClure] was wildly unprofessional and in poor judgment."  Chase Ex. 78, Mizer Tr. 93:9-17; *see also* Chase Ex. 78, Mizer Tr. 154:10-14 ("I thought that Mark showed extraordinarily bad judgment in sending that e-mail and so—and I want to be working with colleagues who exercise good judgment."); Chase Ex. 78, Mizer Tr. 160:10-14 ("[T]he complaint as a whole … demonstrated poor judgment."), 186:2-20, 188:18-19, 272:6-11 ("I regret that the allegations in the complaint, the conduct reflected in those allegations, and conduct of this litigation has made me think less of the judgment that both of you have exercised and are exercising.").

> Response: Disputed in part.  Undisputed that Mizer so testified.  Disputed as to any implication that Mizer would have provided a less-than-glowing reference had he been allowed to do so.  PSF ¶¶ 370-379.  He was not aware of the email or lawsuit at the relevant time, and if he had been aware and made his reference less positive (or declined to give one) on that basis, that would be illegal retaliation.

**F.     Jones Day's Statement in Response to Plaintiffs' Media Attack**

**1.     Plaintiffs' media campaign against Jones Day**

408.     In his January 2019 email, Savignac stated that unless Jones Day gave him eight weeks of additional paid leave, the matter would be decided "in the court of public opinion." McClure Ex. 4, JD_00003143.

> <u>Response</u>: Disputed in part.  Undisputed that the January email states that unless Jones
>
> Day gave Mark eight weeks of additional paid leave, "I will file a charge with EEOC and
>
> then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the
>
> court of public opinion.  We are very familiar with the D.C. Circuit and confident that we
>
> will win."  McClure Ex. 4 at JD_00003143.  Disputed as to any implication that Jones
>
> Day seeks to create through its selective quotation.

409.    When Brogan read Savignac's January 16, 2019 email, he understood the
reference to the "court of public opinion" to be a threat that Plaintiffs would attack Jones Day in
the press unless the Firm acceded to Savignac's demand.  Chase Ex. 77, Brogan Tr. 17:10-13,
21:17-22:10, 48:6-15, 72:2-6, 73:25-74:18; *see also* Chase Ex. 82, Lovitt Tr. Vol. I 46:18-25.

> <u>Response</u>: Disputed.  A reasonable jury could find that Brogan did not interpret the email
>
> as a threat to "attack Jones Day in the press," including because that is not what the email
>
> says and because Jones Day's press release gives a lengthy description of Jones Day's
>
> supposed reasons for firing Mark without saying anything about attacks in the press or
>
> the January email's reference to the "court of public opinion."  PSF ¶¶ 270-284.

410.    As Brogan testified under questioning from Savignac: "You just said, 'I want my
money.  I want money for me.  And if you don't give me my money,  I'm going to go to the
press…. [Y]ou're going to trash the firm in the press, simply trying to extort $80,000 out of us.'"
Chase Ex. 77, Brogan Tr. 21:18-20, 67:8-9.

> <u>Response</u>: Disputed.  *See* the response to the preceding paragraph.

411.    Sheketoff admits that Plaintiffs promoted their lawsuit to multiple media outlets.
Chase Ex. 80, Sheketoff Tr. 176:10-25, 181:6-8, 182:21-183:1, 191:7–11.

<u>Response</u>: Disputed in part.  Undisputed that Plaintiffs discussed their claims with several media outlets, though Plaintiffs only reached out to one (the New York Times); all of the others approached Plaintiffs after reading their publicly filed complaint.  Chase Ex. 79 (Savignac) at 319:2-325:11; Chase Ex. 80 (Sheketoff) at 174:20-180:5, 184:9-185:8.  Plaintiffs dispute the characterization of their answering reporters' questions as "promot[ing]" the lawsuit.

412.     After Jones Day rejected that demand and as Plaintiffs were preparing this lawsuit, Sheketoff decided she wanted to "tell my side of the story" beyond the allegations she planned to file in the lawsuit.  Chase Ex. 80, Sheketoff Tr. 175:8-9.

<u>Response</u>: Disputed in part.  Undisputed that, following Jones Day's rejection of Plaintiffs' attempt in July 2019 to settle their claims without litigation (*see* ¶ 418 below), Julia "knew that the lawsuit was going to be public, and I thought the complaint would likely be reported on and I wanted to be able to tell my side of the story.  I thought it was also likely that Jones Day would say something about the complaint and I wanted—like I said, I wanted to say something—talk—tell my side of the story to—to talk about it." Chase Ex. 80 (Sheketoff Tr.) 175:2-9; *see* Response to ¶ 411, *supra*.  Plaintiffs dispute the vague phrase "beyond the allegations she planned to file in the lawsuit," which is not supported by the cited testimony.

413.     Sheketoff affirmatively reached out to The New York Times by contacting a friend who worked there, Rachel Dry, on August 1, 2019.  Chase Ex. 80, Sheketoff Tr. 175:25-179:19.

<u>Response</u>: Undisputed.

414.    Dry put Sheketoff in touch with a reporter, Noam Scheiber.  Chase Ex. 80, Sheketoff Tr. 177:4-6.

Response: Undisputed.

415.    Sheketoff and Savignac spoke with Scheiber, corresponded with him about their claims, and agreed to have a photographer come to their house to take pictures of them and their infant son for an article that The New York Times would publish.  Chase Ex. 80, Sheketoff Tr. 184:3-8; see also Chase Ex. 69, New York Times Article; Chase Ex. 63, P03679.

Response: Undisputed, aside from the characterization of Plaintiffs' apartment as a "house."

416.    After they filed their lawsuit, Plaintiffs and their son also posed for a photographer from the Washington Post, another newspaper with which Plaintiffs spoke about their claims.  Chase Ex. 80, Sheketoff Tr. 185:12-18; see also Chase Ex. 70, Washington Post Article.

Response: Undisputed.  As stated above in response to ¶ 411, the Post reached out to Plaintiffs after its reporter saw the complaint, not in response to any outreach by Plaintiffs.

417.    Plaintiffs also sat for an interview with a third media outlet about this lawsuit. Chase Ex. 71, Careerist Article.

Response: Undisputed that Plaintiffs were telephonically interviewed by a third media outlet about this lawsuit.

2.   **Jones Day issues a statement after The New York Times asked for a comment on Plaintiffs' claims**

418.    Jones Day began preparing for Plaintiffs' anticipated media campaign against the Firm shortly after receiving a July 11, 2019 letter from Stephen Chertkof, a lawyer purporting to represent Plaintiffs.  Chase Ex. 62 at JD_00002950.

Response: Disputed in part.  Undisputed that Jones Day received a letter from an lawyer representing Plaintiffs that proposed settlement discussions to resolve this dispute privately.  Disputed that Jones Day anticipated any "media campaign" from Plaintiffs. The cited document says nothing about a "media campaign," and neither does the January email.

419.    The letter was addressed to Plaintiffs' former Practice Leader, Beth Heifetz, and accused her of "recruit[ing] Supreme Court clerks by presenting yourself as their progressive advocate and protector," but "fail[ing] to protect or advocate for Mark and Julia" and "directly participat[ing] in the violation of their civil rights."  Chase Ex. 62 at JD_00002950.

Response: Undisputed.

420.    The letter also enclosed a draft complaint.  Chase Ex. 62 at JD_00002951.

Response: Undisputed.

421.    Jones Day's 30(b)(6) designee testified: "[A]nyone who is running a professional organization, upon seeing a draft Complaint would realize this—that [the] threat to go to the media was going to come to fruition.  And so it was prudent to begin the process of drafting a press release in anticipation of a media attack, which, in fact, happened."  Chase Ex. 82, Lovitt Tr. Vol. I 48:5-14 (and errata).

Response: Disputed in part.  Undisputed that Lovitt so testified.  Disputed that there was ever any "threat to go to the media" or that anything in the letter proposing settlement

discussions or the attached draft complaint can be perceived as threatening a media

attack.  Also disputed that Plaintiffs' being interviewed about their civil rights claims by

The New York Times is fairly characterized as a "media attack."  Disputed that Jones

Day prepared the press release "in anticipation of a media attack"; it drafted it in

anticipation of this lawsuit.  PSF ¶¶ 402-403, 411-414.

422.   Brogan drafted a press statement "[s]hortly after I read the—it was—there was

some complaint, as I recall, sent over by your lawyer.  Your lawyer made some statement that—

it was written to Beth, I think—and said that, you know, … she promised to be a progressive

advocate and protector, which I—I didn't know what—what to make of that statement.

Sounded, again, pretty—pretty immature."  Chase Ex. 77, Brogan Tr. 175:10-17; *see also* Chase

Ex. 82, Lovitt Tr. Vol. I 16:19-17:14.

> Response: Disputed in part.  Undisputed that Brogan claims to have produced a first draft
>
> of the press release following receipt of the letter from Plaintiffs' attorney proposing
>
> settlement discussions.  Otherwise disputed.  PSF ¶¶ 402-403, 411-414.

423.   Brogan further testified:

> And also in response to your assertion, which I found astonishing,
> that—that unlike everybody else at Jones Day, all the generations of
> people who have raised children and took good care of them and had
> great family lives, you, as you said, stood in opposition to these
> archaic gender roles, because you and your husband wanted to have
> equal responsibility in the sharing—in the raising of your children,
> and—and an equally close relationship with your son, as if
> everybody else at Jones Day had no desire to do that.  It—it was an
> astonishing statement of self-centeredness and hubris.  And the
> combination of those two things, plus your—what I viewed racist
> assertion that we had doctored your photo, made me convinced that
> I had to draft something to defend the firm against these
> unwarranted, unfair, and untruthful attacks.

Chase Ex. 77, Brogan Tr. 175:24-176:16.

Response: Undisputed that Brogan so testified.  Otherwise disputed.  A reasonable jury
could discredit Brogan's testimony about his beliefs and motivations and find that Jones
Day would have issued a false and malicious press release in response to being sued
regardless.  PSF ¶¶ 402-403, 411-414.

424.   Jones Day did not issue the press release until after Plaintiffs initiated their media
attack on the Firm.  Traci Lovitt—who was personally involved in the press release and was the
Firm's Rule 30(b)(6) designee on the release—stated: "There was no plan to issue the press
release until The New York Times ran its article.  We were not going to issue a press release
unless there was a media attack.  And when we were contacted by The New York Times, and it
became clear that there was going to be the media attack, that Mark had threatened, then we
decided that we needed to respond via press release."  Chase Ex. 82, Lovitt Tr. Vol. I 22:8-18.

Response: Disputed in part.  Undisputed that Jones Day—which had agreed with the New
York Times to place its press release under embargo until the Times published its story
(see ¶ 430 below)—did not post the press release on its website or social media accounts
until after Plaintiffs filed suit and the Times ran its story.  Otherwise disputed.  In
particular, it is disputed that "[t]here was no plan to issue the press release until The New
York Times ran its article."  A reasonable jury could find that Jones Day would have
issued the press release in response to this litigation regardless of whether Plaintiffs
spoke to the press.  The press release is titled "Jones Day Responds to Litigation
Challenging Leave Policy" and makes no reference to Plaintiffs' having spoken to the
New York Times.  PSF ¶¶ 402-403, 411-414.  Moreover, Lovitt's statement based on her
personal involvement in the press release is an improper and inadmissible assertion by a

161

litigant's supposed attorney about the substance of supposed communications with the supposed client that have been withheld under claims of privilege.

425.    Specifically, Noam Scheiber—the reporter whom Plaintiffs were working with— contacted Jones Day on August 12, 2019, indicated that The New York Times was "working on a story about a discrimination complaint that [Plaintiffs] are planning to file," and confirmed that the "story will go live tomorrow morning."  Chase Ex. 64, JD_00002535-36.

Response: Undisputed, except for the characterization of a New York Times reporter as "working with" Plaintiffs.

426.    Scheiber asked whether anyone at Jones Day might "have some time to discuss this today."  Chase Ex. 64, JD_00002535-2536.

Response: Undisputed.

427.    The next morning, Lovitt spoke with Scheiber, who ultimately arranged for Jones Day to review the as-yet unfiled complaint.  Chase Ex. 64, JD_00002535; Chase Ex. 67 at JD_00002547.

Response: Undisputed.

428.    Later that day, Sheketoff emailed Lovitt a copy of the complaint "because [t]he New York Times reporter said you asked to see [it]."  Chase Ex. 68, JD_00002982.

Response: Undisputed.

429.    Brogan then authorized the issuance of the press statement on behalf of Jones Day.  Chase Ex. 82, Lovitt Tr. Vol. I 33:15-17, 36:9-11; Chase Ex. 77, Brogan Tr. 180:2-7; Chase Ex. 73, JD_00002494.

Response: Undisputed.

430.    Lovitt emailed the statement to Scheiber on August 13, 2019, and agreed not to "publish this statement on our website or social media, or respond to other media outlets, until after [The New York Times has] published your story."  Chase Ex. 67, JD_00002546.

Response: Undisputed.

431.    Lovitt responded on behalf of Jones Day to The New York Times reporter's follow-up questions throughout the day on August 13, 2019.  Chase Ex. 66, JD_00002588-92.

Response: Undisputed.

432.    Plaintiffs filed their complaint on August 13, 2019.  Compl. (Dkt. 1).

Response: Undisputed.

433.    The next day—August 14, 2019—The New York Times ran its story, a multi-page spread complete with the professional photographs of Plaintiffs and their son.  Chase Ex. 66, JD_00002588, Chase Ex. 69, The New York Times Article.

Response: Undisputed except for the characterization of the story as "a multi-page spread."  The cited documents do not show how the story was formatted in the print edition of the Times.

434.    The New York Times story included Jones Day's explanation of its position in the litigation.  Chase Ex. 66, JD_00002588; Chase Ex. 69, The New York Times Article.

Response: Disputed in part.  The story includes a partial account of Jones Day's statements in its press release.  See Chase Ex. 69.

435.    After The New York Times story ran, Jones Day posted a version of its press statement to its website and shared it through certain social media outlets.  Chase Ex. 82, Lovitt Tr. Vol. I 35:24-36:8, 134:18-35:6; see also Chase Ex. 72, P02271.

Response: Undisputed.

436.    Jones Day has not provided any further comments to media outlets about this case, beyond simply referring them to its prior statement.  Chase Ex. 74, JD_00002531.

Response: Disputed.  The cited exhibit arguably suggests that Jones Day directed the Washington Post to the press release, but it does not indicate what else it may or may not have said to the Post at that point, much less support the broad proposition that it has made no other comment to any media outlet.

437.    Brogan authorized the issuance of the press statement because "we had to say something in response to the impending article in the Times about your—what I viewed as false allegations about the firm."  Chase Ex. 77, Brogan Tr. 180:16-19; *see also* Chase Ex. 77, Brogan Tr. 173:13-174:18, 181:4-184:10, 192:9-198:18, Chase Ex. 82, Lovitt Tr. Vol. I 22:10-18, 46:5-49:11.

Response: Disputed.  A reasonable jury could find that Jones Day would have issued the press release in response to this litigation regardless of whether Plaintiffs spoke to the press.  The press release is titled "Jones Day Responds to Litigation Challenging Leave Policy" and makes no reference to Plaintiffs' having spoken to the New York Times. PSF ¶¶ 402-403, 411-414.  A reasonable jury could also discredit Brogan's testimony that he viewed the allegations in Plaintiffs' complaint as "false."

438.    As Lovitt testified in her 30(b)(6) capacity: Brogan "felt it was an untruthful attack on the firm that was about to be turned into a media smear campaign and that we had to respond to lies."  Chase Ex. 82, Lovitt Tr. Vol. I 39:12-40:7.

Response: Disputed for the reasons given in response to the preceding paragraph.

164

439.   Jones Day would not have issued the press statement if Plaintiffs had not

publicized their claims in The New York Times.  Chase Ex. 82, Lovitt Tr. Vol. I 52:20-21; *see also* Chase Ex. 82, Lovitt Tr. Vol. I 22:5-18, 46:5-47:10, 51:22-53:2.

> Response: Disputed. PSF ¶¶ 402-403, 411-414; response to ¶ 424, *supra*.  A reasonable
> jury could find that Jones Day would have issued the press release in response to this
> litigation regardless of whether Plaintiffs spoke to the press.  The press release is titled
> "Jones Day Responds to Litigation Challenging Leave Policy" and makes no reference to
> Plaintiffs' having spoken to the New York Times.

### 3.   The content of Jones Day's statement

440.   The assertions in the press statement have also been made separately in filings

throughout this lawsuit:

| Statement | Court Filing |
| --- | --- |
| Plaintiffs complain that "the Firm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 22 (Dkt. 43). | Plaintiffs "resort to complaining that Jones Day's disability policy does not force new mothers to provide medical certification of their disability…. On Plaintiffs' view, employers must demand individual medical certification from all mothers before authorizing any disability leave."  Motion to Dismiss at 1, 12 (Dkt 15). |
| "Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 31 (Dkt. 43). | "Jones Day terminated Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are reflected by and apparent in the intemperate email he sent to Ms. McClure."  Answer to Am. Compl. ¶ 10 (Dkt. 49). |

| Statement | Court Filing |
|---|---|
| "The gratuitous allegation that Ms. Sheketoff, who voluntarily left the Firm in August 2018, was a victim of gender pay discrimination is false and was not made in good faith."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 59 (Dkt. 43). | "Sheketoff's pay discrimination claim…. is not made in good faith."  Answer at 1 (Dkt. 35) |
| Sheketoff's "contribution to billable client representations was below expectations."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 7.3 (Dkt. 43). | Sheketoff's "billable hours were consistently below expectations in part due to her apparent preference to work on pro bono rather than billable cases."  Answer at ¶ 91 (Dkt. 35) |
| Sheketoff's "attention was focused on idiosyncratic concerns."  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 85 (Dkt. 43). | Sheketoff had a "focus on idiosyncratic concerns, and that her practice … assigned her an extremely low practice rating for two consecutive years."  Answer to Third Am. Compl. ¶ 134 (Dkt. 178). |
| "Ms. Sheketoff resorts to the sensationalized allegation that the Firm doctored her website photo 'to conform to the firm's Caucasian standards of female beauty.'"  Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 86 (Dkt. 43). | "Sheketoff's sensationalist allegation that Jones Day doctored her website photo to make her look more Caucasian is ridiculous." Answer at 2 (Dkt. 35) |
| "Sheketoff personally selected the precise photo that was used on the Firm's website." Chase Ex. 72, P02271; *see also* Supp. Compl. ¶ 88 (Dkt. 43). | "Sheketoff omits that she herself selected and approved the photo that the Firm used on its website"  Answer at 2 (Dkt. 35) |

Response: Undisputed that Jones Day has later included in its court filings many of the

statements that first appeared in its press release, apparently in an attempt to buttress its

legally defective argument that the press release somehow retroactively ceased to be an

adverse action when its assertions were later echoed in court filings.

441.    The evidence, including Brogan's testimony, also establishes the bases for these

claims.  *See, e.g.*, Chase Ex. 77, Brogan Tr. 15:5-17:17, 173:13-181:20, 192:9-198:20.

Response: Disputed.  This paragraph blatantly violates the requirement in the Court's

standing order that each paragraph be limited to a single factual assertion.  Plaintiffs

dispute the claims for the reasons given elsewhere here and in Plaintiffs' fact statement (PSF ¶¶ 1-735). A reasonable jury could discredit Brogan's testimony.

442. That includes the testimony and undisputed facts set forth above regarding Savignac's termination and Sheketoff's pay discrimination claim; Sheketoff's admitted desire to receive a Jones Day salary to do pro bono work; and the overwhelming imbalance in her pro bono hours, which Sheketoff admitted was an "ongoing problem." *See supra*; *see also* Chase Ex. 15 at JD_JS_00001292.

> Response: Disputed. This paragraph blatantly violates the requirement in the Court's
> standing order that each paragraph be limited to a single factual assertion. Plaintiffs
> dispute the claims for the reasons given elsewhere here and in Plaintiffs' fact statement
> (PSF ¶¶ 1-735). A reasonable jury could discredit Brogan's testimony.

443. Jones Day's 30(b)(6) designee on topics related to the press statement testified about "the firm's interpretation of the allegations in [Plaintiffs'] Complaint": "That in order to be able to have a disability without … a presumption of medical certification, you necessarily have to have medical evidence…. There is really a binary choice there…. You either have a certification presumption, that is reasonable, like we have, or you have to provide medical evidence. There is no other way to have a policy. That is the only way we can construe and interpret [Plaintiffs'] complaint. And that is, in fact, our opinion of what [Plaintiffs are] arguing in [their] Complaint." Chase Ex. 82, Lovitt Tr. Vol. I 88:2-89:8.

> Response: Disputed in part. Undisputed that Lovitt so testified. This is inappropriate
> testimony by the defendant's supposed attorney about how her client purportedly
> "construed" Plaintiffs' court filing. Disputed as to the veracity of Lovitt's testimony. A
> reasonable jury could find that there is no "binary choice," that other alternatives exist

such as providing disability leave until the employee determined (perhaps in consultation

with her physician) that she had ceased to be disabled from working at Jones Day, and

that Lovitt and her client were aware of this.  More to the point, the press release states

that Plaintiffs were complaining that Jones Day did not demand medical evidence, but it

is undisputed that Plaintiffs never said that (and there is no evidence that they did).

Regardless of the reasonableness of Jones Day's purported "opinion" that this was an

implication of Plaintiffs' complaint, Plaintiffs never said anything about demanding

medical evidence, and Jones Day's statement that they did is flatly and knowingly false.

PSF ¶¶ 415-417.

444.    She further testified in response to questions from Sheketoff: "[I]n the firm's

opinion, we know of only two ways to implement a [short-term disability] policy like this, which

is to have a presumption for medical certification or to have medical evidence.  You were

challenging the presumption.  You're advocating medical evidence.  Otherwise, you are in a

world of I don't know what."  Chase Ex. 82, Lovitt Tr. Vol. I 90:11-20.

Response: Disputed for the reasons given in response to the preceding paragraph.

445.    Brogan testified that the press statement's claim that Sheketoff's "attention was

focused on idiosyncratic concerns," was his way of nicely suggesting that Sheketoff's focus was

not on the Firm's client billable work but on her personal interests.  Chase Ex. 77, Brogan Tr.

195:20-197:17.

Response: Disputed in part.  Undisputed that Brogan so testified, but a reasonable jury

could discredit his incredible testimony that Jones Day was trying to be "nice[]" to Julia

in the press release and find that it was making a sexist remark about her intelligence.

446.     Plaintiff's also complain about the objectively true statement in the Firm's press statement that "Ms. Sheketoff was a highly paid associate who made more than her husband"— but cannot dispute that Savignac's salary never exceeded $500,000, while Sheketoff's salary at the time she left Jones Day was $525,000.  Chase Ex. 17 at JD_00000092; Chase Ex. 43 at JD_00003260; Third Am. Compl. ¶ 137 (Dkt. 172).

> Response: Undisputed that the statement is literally true, as Plaintiffs have always acknowledged (*see* Dkt. 25-1 at 11 (Supp. Compl. ¶¶ 65-69)).  A reasonable jury could find that the statement was intended to falsely suggest that Mark was poorly regarded and paid a low salary for his class year and/or that Julia actually was not underpaid relative to her class year, when in fact Mark was well-regarded and had a high salary for his class year and Julia was paid more simply because she was a year more senior than Mark and seniority is admittedly a key determinant of associate pay at Jones Day.  PSF ¶¶ 426-429. Jones Day has itself represented to this Court that it is "materially flawed and misleading" to draw a comparison between an associate's pay and that of a more senior associate.  *Tolton* Dkt. 169-5 at 3.

447.     With respect to Sheketoff's photo allegations, Jones Day never altered Sheketoff's photograph.  *See* Chase Ex. 77, Brogan Tr. 197:19-198:20; Chase Ex. 82, Lovitt Tr. Vol. I 211:3-214:23.

> Response: Disputed.  Jones Day is an artificial entity that can only act through its agents, and it doctored the photograph acting through its agent the Jones Day photographer. Chase Ex. 80 (Sheketoff) at 163:3-22.  There is no record evidence that the photo was not altered; it is undisputed that it was.  *Id.* at 169:7-17.  To the extent that Jones Day is

arguing that the Jones Day photographer was not its agent, that is a characterization rather than a fact, and Plaintiffs deny it.

448.    Jones Day does not employ a photographer, but retained a third-party vendor to take website bio photographs of Firm lawyers and Jones Day had no involvement with the photographs chosen or any alterations to them.  Chase Ex. 77, Brogan Tr. 176:10-177:6, 197:19-198:20; Chase Ex. 82, Lovitt Tr. Vol. I 211:3-214:23; McClure Decl. at ¶ 27.

<u>Response</u>: Disputed.  The assertion that the Jones Day photographer was not the firm's "employee" is a legal conclusion and is irrelevant; Brogan was not a Jones Day "employee," but his acts are attributable to the firm.  Jones Day acts through its agents and, here, acted through its photographer.  Jones Day was also involved in that partners including Defendant Heifetz were aware of the doctoring of associate photos but took no action to stop it.  McClure's declaration on whether the photographer was an "employee" is inappropriate because she was disclosed as a witness only with respect to " ███████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████  Sheketoff Ex. 34 at 9 (Attachment A to Defendants' Amended Rule 26(a)(1) Disclosures at 4).  The other cited material does not establish the assertion in the paragraph.

449.    Jones Day has never instructed the photographer to alter an attorney's photo in order to conform to some standard of beauty, change the attorney's racial appearance, or change his or her overall physical appearance, and there is no evidence that Jones Day instructed the photographer to make any alteration to Sheketoff's photo.  Rosenberg Decl. ¶ 7-8.

<u>Response</u>: Disputed inasmuch as the paragraph implies a distinction between Jones Day and its agents.  Jones Day acted through its photographer.  *See* Response to ¶ 447, *supra*.

450.     Sheketoff admitted at her deposition that she selected and approved the photo that Jones Day used on its website.  Chase Ex. 80, Sheketoff Tr. 162:6-169:17.

<u>Response</u>: Undisputed.  As Jones Day has always known (though it pretends otherwise in its press release), Julia's objection was to the doctored photograph that Jones Day proposed to post to its website, not to the un-doctored version that it ultimately posted after she objected.  Dkt. 25-1 at 14 (Supp. Compl. ¶¶ 86-91).

451.     According to Brogan, the claim that the Firm "doctored" Sheketoff's photo to "conform to the firm's Caucasian standards of female beauty" is "just a lie."  Chase Ex. 77, Brogan Tr. 197:25-198:18.

<u>Response</u>: Disputed.  Jones Day doctored the photograph through its agent the Jones Day photographer, and a comparison of the doctored and un-doctored versions shows that the changes are intended to make Julia appear more Caucasian (presumably to improve her appearance in the opinion of the editor).  Dkt. 1 at 8 (Compl. ¶¶ 59-62).

452.     In response to Plaintiffs' charge alleging that Jones Day's statement constituted retaliation in violation of Title VII, the EEOC determined that Jones Day "did not violate the statute because [it] was contacted by a reporter prior to post[ing] an article about [Plaintiffs'] complaints."  Chase Ex. 65, P03075.

<u>Response</u>: Disputed for the reasons stated at length at Dkt. 109 at 14-15 & n.7.  This is a frivolous attempt to deceive the Court.  And whether the quoted language represents a "determin[ation]" by "the EEOC" (it does not) is a question of legal characterization, not a matter of fact, and Plaintiffs deny it.

/s/ Julia Sheketoff
_____

Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

January 31, 2023

/s/ Mark Savignac
_____

Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367