**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARK C. SAVIGNAC and<br>JULIA SHEKETOFF,<br><br>　　*Plaintiffs*,<br><br>　　　v.<br><br>JONES DAY, STEPHEN J. BROGAN,<br>BETH HEIFETZ, and MICHAEL<br>SHUMAKER,<br><br>　　*Defendants*. | Case No. 1:19-cv-02443-RDM-ZMF |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND THEIR
OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION**

　　Pursuant to Local Rule 7(h)(1), Plaintiffs set forth the following facts in support of their cross-motion for summary judgment and opposition to Jones Day's summary judgment motion, as well as their cross-motion for Rule 11 sanctions and opposition to Jones Day's sanctions motion. As the accompanying citations to the record confirm, there is no genuine dispute as to these facts. In the alternative, if the Court finds that any of the following facts is *not* undisputed, then, at a minimum, a reasonable jury could find that fact and it therefore presents a genuine issue for trial.


/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

January 27, 2023

/s/ Mark Savignac
Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

1.     As Jones Day admits, it is an employer subject to Title VII, the Equal Pay Act, the D.C. Human Rights Act, and the D.C. FMLA.  Sheketoff Ex. 32 at 4-6 (RFAs 1-7).

**I.     Jones Day's leave policy for new parents discriminates on the basis of sex.**

   **A.     The history of the leave policy confirms that it is discriminatory.**

      **i.     In 1994, Jones Day adopted the eight-week "disability" leave.**

2.     Prior to 1994, Jones Day did not offer new mothers any set period of "disability" leave in connection with the arrival of a new child.  Dressing Decl. ¶ 6; JDSF ¶ 32.

3.     Rather, prior to 1994, Jones Day had a "Maternity Leave Policy" that gave "female" associates a "maternity leave" made up of 12 weeks of paid leave and 12 weeks of unpaid leave.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 32.

4.     None of the leave offered under this pre-1994 "Maternity Leave Policy" was labeled or treated as "disability" or "medical" leave.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 33.

5.     During this period, the firm provided 12 weeks of paid leave and 12 weeks unpaid leave to new mothers regardless of the length of the mother's disability.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶¶ 32-33.

6.     During the same period, Jones Day did not provide fathers with leave in connection with the arrival of a new child.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 34.

7.     If new fathers wanted to take leave, they had to use their vacation or sick time, if available.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 34.

8.     By memo dated December 22, 1993, Jones Day's then-Human Resources Director Julie Stumpe Dressing proposed changes to the firm's leave offerings for new parents to then-managing

partner Patrick McCartan.  Sheketoff Ex. 1 at JD_00003291-99; Chase Ex. 5 at JD_00003300; Dressing Decl. ¶¶ 7-8.

9.      The memo included proposed written amendments to the firm manual.  Sheketoff Ex. 1 at JD_00003296-98; Chase Ex. 5 at JD_00003300; Dressing Decl. ¶¶ 7-8.

10.      In those proposed written amendments, Dressing proposed deleting the "Maternity Leave Policy" from the firm manual and replacing it with provisions for "Paid Medical and Family Leave" and "Unpaid Leaves of Absence."  Sheketoff Ex. 1 at JD_00003296-3298; Chase Ex. 5 at JD_00003300.

11.      Under the new proposed provisions, Jones Day would, for the first time, label some of the 12 weeks of paid maternity leave available to new mothers as "disability" (or "medical") leave. Sheketoff Ex. 1 at JD_00003296-3298; Sheketoff Ex. 2 at JD_00003302.

12.      The proposed "Paid Medical and Family Leave" provision stated: "In the event of a serious illness or medical condition of [a non-partner attorney], the Firm will provide short-term medical leave as follows: full salary and fringe benefits for up to the first three months of continuous disability, and 75% of salary and full fringe benefits for up to the fourth through sixth months of continuous disability.  For routine pregnancy and delivery, physicians generally certify a six to eight week disability period."  Sheketoff Ex. 1 at JD_00003296.

13.      The proposed "Paid Medical and Family Leave" provision also stated: "As a condition of approving any medical leave, the Firm may request appropriate certification and ask for a second physician's opinion, paid for by the Firm, at any time during the course of the leave, including when the leave is requested, while the lawyer is on leave, or when the lawyer desires to return to work."  Sheketoff Ex. 1 at JD_00003297.

14.     The proposed "Paid Medical and Family Leave" provision further stated: "In the event a [non-partner attorney] has a newborn or newly adopted child … , the Firm may provide up to four weeks of paid family leave, with fringe benefits continuing as though actively at work." Sheketoff Ex. 1 at JD_00003296.

15.     Jones Day's managing partner approved Dressing's proposed amendments to the firm manual by memo dated January 11, 1994, and directed Dressing to "[p]lease see to it that the new policy is included in the 1994 revision of the [f]irm [m]anual."  Chase Ex. 5 at JD_00003300; JDSF ¶ 51.

16.     Jones Day's decision to make the changes proposed by Dressing was made by managing partner McCartan.  Chase Ex. 5 at JD_00003300; JDSF ¶ 51.

17.     As directed by the managing partner, the "new policy" was included in the May 1994 revision of the firm manual.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-3298; JDSF ¶ 52.

18.     Shortly thereafter, and in response to "a few inquiries regarding the [f]irm's new paid medical and family leave policy for lawyers," Dressing provided an explanation of the firm's new policy in a June 14, 2014 memo to "all female Of Counsel, Senior Attorneys and Associates" and entitled "The Firm's Maternity Leave Policy."  Sheketoff Ex. 2 at JD_00003301-02.

19.     The memo explains:

> *As under the prior policy*, lawyers who go out on maternity leave will receive twelve weeks of paid leave and an additional twelve weeks of unpaid leave, should they choose to use it.  *The difference in the new policy is the manner in which the leave is tracked administratively*.  The lawyer is *considered to be* on paid medical leave for the disability portion of the maternity leave.  Because most doctors certify a six to eight week period of disability in the event of an uncomplicated pregnancy and delivery, the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability *for a longer period*.  In addition to this eight week paid medical leave, the lawyer may take an additional four weeks of paid child care leave, bringing the total paid leave period

up to twelve weeks as set forth in the Firm's prior policy.  Thereafter, the lawyer may request an additional twelve weeks of unpaid leave, should she so desire.

Sheketoff Ex. 2 at JD_00003302 (emphases added).

20.     As Dressing explained, upon Jones Day's amendment of its leave offerings for new parents in 1994, the amount of leave for new mothers remained the same as it had been before: 12 weeks of paid leave and 12 weeks of unpaid leave.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9.

21.     Like the pre-1994 policy, the policy adopted in 1994 gave every new mother at least 12 weeks of paid leave and 12 weeks of unpaid leave without regard for how long she was disabled. Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶¶ 6, 9; Chase Ex. 3 at JD_00003413.

22.     As the leave offerings were amended, however, eight of those twelve weeks of paid leave were deemed "disability" (or "medical") leave for purposes of "the manner in which the leave is tracked administratively," because Jones Day decided to "assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability for a longer period."  Sheketoff Ex. 2 at JD_00003302.

23.     If a new mother notified Jones Day that her doctor had certified more than 8 weeks of disability leave, she could receive more than 12 weeks of paid leave after childbirth.  Sheketoff Ex. 2 at JD_00003302.

24.     If a new mother was disabled for less than eight weeks, however, she was nonetheless entitled to the full 12 weeks of paid leave, just as under the pre-1994 policy.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9; Chase Ex. 76 (Bounds 30(b)(6)) at 214:15-215:3.

25.     Jones Day made no substantive changes to its eight-week "disability" provision between 1994 and 2019.  Chase Ex. 76 (Bounds 30(b)(6)) at 185:18-186:14, Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20; Dressing Decl. ¶ 15; Chase Ex. 7 at JD_00003683; McClure Ex. 1 (Plaintiffs' Ex. 44); Chase Ex. 76 (Bounds 30(b)(6)) at 91:2-5; Dkt. 189 at 17 ("the disability provisions have not materially changed"); JDSF ¶ 106.

26.     The reason that Jones Day decided to "assume that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complication" was "to decide how much paid leave Jones Day would offer new fathers."  Dressing Decl. ¶ 10.

27.     The firm "decided that … the overall amount of leave that Jones Day offered new mothers would remain at twelve weeks of paid leave and twelve weeks of unpaid leave, which ensured that Jones Day remained competitive in associate recruiting."  Dressing Decl. ¶ 9.

28.     "[N]othing about [the eight-week assumption of disability] would impact how much paid or total leave female associates received for a childbirth without complications."  Dressing Decl. ¶ 9.

29.     "Rather, the change was to how different types of leave stacked together to form the total leave period.  A female associate's paid leave would now be a combination of [so-called] paid disability leave and paid family leave …."  Dressing Decl. ¶ 13.

30.     According to Dressing, "an equal amount of paid family leave would also be provided to male associates."  Dressing Decl. ¶ 13.

31.     In other words, Jones Day decided that it would offer leave that it *labeled* family leave to new fathers and new mothers equally.  Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16.

32.     But Jones Day decided that, if it "assumed" that eight of the weeks of paid leave it gave to new mothers was "disability" or "medical" leave, it would not offer that leave to new fathers. Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

33.     "By assuming that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complications," Jones Day determined that it would offer new fathers four weeks of paid leave.  Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

34.     Accordingly, in 1994, Jones Day began to offer fathers four weeks of paid leave in connection with a new child.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

35.     At the time Jones Day adopted the eight-week "assumption" of disability for all new mothers in 1994, Dressing's experience was that, when asked to certify the length of disability to employers or insurers, doctors would typically certify a period of six weeks of disability after an uncomplicated vaginal birth, and would only "occasionally provide a second certification late in that six-week period certifying some additional time of disability leave."  Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

36.     Under its own framework for determining how much family leave to offer to fathers, if Jones Day had assumed a physician would certify a disability period shorter than eight weeks for some mothers, then it would have offered more than four weeks of leave to fathers in order to keep new mothers' paid leave at 12 weeks.  Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

37.     Under its own framework for determining how much family leave to offer to fathers, if Jones Day had not made any "assumption" about what a physician would certify as a disability

period for new mothers, then it would have offered more than four weeks of paid leave to fathers in order to keep new mothers' paid leave at 12 weeks.  Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

38.     Under the leave offerings in 1994, Jones Day gave adoptive parents four weeks of paid leave.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98.

39.     The firm revised it manual again effective October 1, 1994, but made no material changes to its eight-week disability provision.  Chase Ex. 6 at JD_00003542-43; Dkt. 189 at 17 ("disability provisions have not materially changed"); JDSF ¶ 106.

40.     Effective June 18, 1997, the firm revised its written manual to state, as Dressing had stated in her 1994 memo to female attorney, that for routine pregnancy and delivery, "the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability for a *longer period*."  Sheketoff Ex. 2 at JD_00003302 (emphasis added); Chase Ex. 7 at JD_00003683; Chase Ex. 76 (Bounds 30(b)(6)) at 184:8-24.

41.     Again, the firm made no material changes to its eight-week disability provision.  Chase Ex. 7 at JD_00003683; Dkt. 189 at 17.

**ii.     In 2015, Jones Day began to give mothers and adoptive parents 18 weeks.**

42.     Jones Day made no changes to the amounts of its leave offerings for new parents between 1997 and 2014.  *Compare* Chase Ex. 7 at JD_00003683, *with* Chase Ex. 10 at JD_00003225-28; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20, 185:5-186:14.

43.     As in prior versions, the 2014 firm manual further read: "In the event a [non-partner lawyer] has a newborn or newly adopted child, … the [f]irm provides up to four weeks of paid family leave, with fringe benefits continuing as though actively at work."  Chase Ex. 10 at JD_00003226.

44.     In other words, up to and including 2014, Jones Day provided new mothers 12 weeks of paid leave (eight weeks of which were deemed "disability" leave from 1994 on), and provided fathers and adoptive parents four weeks of paid leave.  Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Sheketoff Ex. 1 at JD_00003296-98; Chase Ex. 5 at JD_00003300; Chase Ex. 6 at JD_00003542; Chase Ex. 7 at JD_00003683; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20, 185:5-186:14; Dressing Decl. ¶ 15.

45.     And as had been the case since 1994, in 2014 if a new mother notified Jones Day that her doctor had certified *more* than 8 weeks of disability leave, she could receive more than 12 weeks of paid leave after childbirth—but she would still be eligible for 12 weeks of paid leave if she were disabled for less than eight weeks.  Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Sheketoff Ex. 1 at JD_00003296-98; Chase Ex. 5 at JD_00003300; Chase Ex. 6 at JD_00003542; Chase Ex. 7 at JD_00003683; Sheketoff Ex. 4 at JD_00005125; Dressing Decl. ¶¶ 9, 15; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20, 185:5-186:14; Dkt. 189 at 17; JDSF ¶ 106.

46.     Indeed, as of July 2014, Jones Day "explain[ed its] own policy" this way on its website:

> Paid Medical, Maternity and Family Leave: The Firm provides salary continuation in the event of a major illness or medical condition, including pregnancy, childbirth and related medical conditions, as follows: full salary and benefits for up to the first 13 weeks of continuous disability and 75% of salary and full benefits for up to the 14th through 26th weeks of continuous disability.  For routine childbirth (including caesarean-section births), the Firm will assume an eight-week disability period, unless we are notified that the Associate is disabled for a longer period.  Further, in the event an Associate has a newborn or newly adopted child, … the Firm provides up to four weeks of paid family leave with fringe benefits as though actively at work.  Thus the available leave for routine childbirth generally includes an eight-week paid medical leave and a four-week paid family leave, *for a total of twelve weeks of paid leave,* and with approval, up to an additional 12 weeks of unpaid leave with benefits continued at the Associate's expense.

Sheketoff Ex. 4 at JD_00005125 (emphasis added).

9

47.     In 2014, Sarah McClure (the firm's human resources director), ██████████ ████████████████████, Sharyl Reisman (the firm's hiring partner), Jolie Blanchard (the firm's director of recruiting), Carter DeLorme (the firm's diversity partner), and Michael Shumaker (the firm's administrative partner) worked together to consider whether to recommend that the firm make changes to its maternity leave offerings.  Chase Ex. 81 (Shumaker) at 184:17-186:7

48.     As part of that effort, ██████████ Staff C ██████████ compiled and circulated to the group a lengthy chart on "the paid maternity currently being offered by the AmLaw 50."  Sheketoff Ex. 4 at JD_00005125-29.

49.     In her chart, ████ Staff C ████ identified Jones Day as providing a "Paid Maternity Leave" of "12 weeks paid" and "up to 12 weeks unpaid" while providing a "Paid Paternity Leave" of "4 weeks."  Sheketoff Ex. 4 at JD_00005125, JD_00005127.

50.     ████ Staff C ████ also circulated to the group a chart listing Jones Day's "Internal Office Maternity Leave Policies."  Sheketoff Ex. 5 at JD_00005102-07.

51.     In that chart, she identified Jones Day's United States offices as providing a "Maternity Leave Policy" of "84 calendar days [i.e., 12 weeks] paid" and "up to 84 calendar days [i.e., 12 weeks] unpaid."  Sheketoff Ex. 5 at JD_00005103.

52.     Together with ██ Staff D ██, ██ Staff C ██ also drafted and distributed to the group a draft memorandum ████████████████████████████████ ██████████████" Sheketoff Ex. 16 at JD_00005133.

53.     The  draft  memorandum ████████████████████████████ ████████████████████████████████████████████ ██████████  Sheketoff Ex. 16 at JD_00005130-36.

54.     Indeed, the first page of the memo ██████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████ Sheketoff Ex. 16 at JD_00005131 (emphasis added).

55.     The remaining pages of the memo ██████████████████████████

████████████████████████ Sheketoff Ex. 16 at JD_00005132 ("███████████

███████████"), JD_00005133 ("██████████████████████████████████

██████████████████████████████████"), JD_00005134 ("███████████████

█████████").

56.     Similarly, the memo ███████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████. Sheketoff Ex. 16 at JD_00005132 ("█

███████████████████"), JD_00005133 ("t███████████████████████████████

█████████"), JD_00005134 ("█████████████"), JD_00005134 ("██████████"), JD_00005135 ("█

████████████████████████████").

57.     The draft memo also ██████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████." Sheketoff Ex. 16 at

JD_00005134.

58.     Thus, the draft memo ████████████████████████████████████

████████████████████████████" Sheketoff Ex. 16 at JD_00005134.

59.     Thereafter, Michael Shumaker noted that he planned to make edits to the memo, but

raised a "question" about the recommendation for increasing adoptive leave:

> I question whether it makes sense to go to the full 18 paid weeks leave for adoption. Arguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth. That doesn't happen with adoption and thus some would say they are getting more benefit than those who deliver the children. I sort of like the Skadden approach. 18 weeks for birth mom; 12 weeks for primary caregiver. Thoughts?

Chase Ex. 9 at JD_00005118.

60.    DeLorme responded: "The rationale for the 18 weeks for adoption to mirror the same time as births was based on the primary caregiver[']s role in bringing the child into the family…. We thought the adoption leave should be parallel to the maternity leave for the primary caregiver because the functions are the same. I respectfully disagree with making a distinction between maternity leave and primary caregiver adoption leave." Chase Ex. 9 at JD_00005118.

61.    █Staff C█████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████,
replied: "I'm with Carter on this one. And, personally, I was very much out and about within days after having babies. I know that may not be the 'norm,' but the point is that I still very much appreciated the extended period at home to acclimate and adjust to our new life." Chase Ex. 9 at JD_00005117; Chase Ex. 81 (Shumaker) at 182:2-184:9.

62.    After "ponder[ing] a bit," Shumaker circulated his suggested revisions to the memo to the committee. Chase Ex. 9 at JD_00005117; Sheketoff Ex. 8 at JD_00005410-16.

63.    Shumaker █████████████████████████████████████████████████
████████████████████████████████████████████████. Sheketoff Ex. 8
at JD_00005141-46 (█████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████ ").

64.     On November 12, 2014, the group provided its final memo to Brogan.  Chase Ex. 10 at JD_00003214-3228.

65.     The final memo "recommend[ed] that the [f]irm implement the following policy changes in our domestic offices: [1] Increase paid maternity leave from 12 weeks to 18 weeks. Total maternity leave would remain at 24 weeks (i.e., decreasing permissible unpaid leave from 12 weeks to 6 weeks). [2] Provide 18 weeks of paid adoption leave to primary caregivers.  Total adoption leave would also be extended to the 24 weeks permitted for combined paid/unpaid maternity leave.  [3] Provide 4 weeks of paid adoption leave for secondary caregivers.  This would match the 4 weeks of paternity leave that we currently provide."  Chase Ex. 10 at JD_00003216-17.

66.     In supporting the recommendation for changing adoption leave, the final memo explained: "[P]arental reactions to and needs after adoption are not dissimilar to those experienced by biological parents.  We recommend bringing our paid adoption leave in line with our maternity and paternity leave policies (18 weeks paid and 6 weeks unpaid leave for primary caregivers and 4 weeks paid leave for secondary caregivers)."  Chase Ex. 10 at JD_00003219.

67.     The final memo thus equated new mothers with "primary caregivers" and new fathers with "secondary caregivers."  Chase Ex. 10 at JD_00003219.

68.     The final memo also justified providing the same amount of leave to primary caregiver adoptive parents (who do not give birth) and to new biological mothers (who do give birth) on the ground that "parental reactions to and needs after adoption are not dissimilar to those experienced by biological parents"—despite the fact that (as the committee had discussed) adoptive parents do

not give birth and thus are not disabled as a result of childbirth.  Chase Ex. 10 at JD_00003219; Chase Ex. 9 at JD_00005118 ("Arguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth.  That doesn't happen with adoption….").

69.    Nothing in the final memo said anything about any *differences* between adopting a child and bringing home a biologically related newborn, or about any complexities or challenges involved with the process of adopting a child or bringing an adopted child into a new home.  Chase Ex. 10 at JD_00003215-28.

70.    The final memo makes clear that the Jones Day's current maternity leave benefit was "12 weeks" and that the recommendation was to increase the maternity leave benefit to "18 weeks"—with "[t]otal maternity leave remaining at 24 weeks."  Chase Ex. 10 at JD_00003215-28.

71.    Indeed, one section of the final memo states that "the [f]irm currently provides mothers an eight-week paid medical leave and a four-week paid family leave, *for a total of twelve weeks paid leave.*"  Chase Ex. 10 at JD_00003217 (emphasis added).

72.    The rest of the memo simply refers to the available maternity leave as consisting of "12 weeks" of paid leave.  Chase Ex. 10 at JD_00003217 ("12 weeks"), JD_00003218 ("their 12 weeks paid leave"), JD_00003219 ("12 weeks"; "12 week paid leave"), JD_00003222 ("12 weeks paid").

73.    Similarly, the final memo recommends increasing the "paid maternity leave … to 18 weeks," with no distinction between the so-called "eight-week paid medical leave" and any purportedly distinct period for family leave.  Chase Ex. 10 at JD_00003217 ("18 weeks"), JD_00003218 ("18 weeks paid leave"), JD_00003219 ("18 weeks"; "18 week paid leave").

74.    Brogan made the decision that Jones Day's policy should be changed as recommended by the final memo.  Chase Ex. 77 (Brogan) at 92:12-15.

75.     On January 22, 2015, McClure emailed the firm to announce the "Change in Firm Maternity, Paternity and Adoption Leave Policy for Lawyers."  Chase Ex. 11 at JD_00005170.

76.     Shumaker and Brogan both reviewed and approved McClure's announcement before it was distributed.  Sheketoff Ex. 9 at JD_00005164-69; Chase Ex. 81 (Shumaker) at 201:13-21.

77.     The announcement stated that, effective January 1, 2015:

> [1] The [f]irm will provide mothers a total of 18 weeks of paid leave post-partum (with the first 8 weeks paid under the [f]irm's STD policy and the next 10 weeks paid under the [f]irm's paid family leave policy) and, with approval, up to an additional 6 weeks of unpaid leave, for a total maternity leave of 24 weeks post-partum. [2] Fathers are entitled to a paid paternity leave of 4 weeks as is the current policy.  [3] In the case of adoptions, the [f]irm will provide 18 weeks of paid adoption leave to the primary caregiver and, with approval, up to an additional 6 weeks of unpaid leave, for a total adoption leave of 24 weeks.  Secondary caregivers are entitled to 4 weeks of paid adoption leave.

Chase Ex. 11 at JD_00005170.

78.     As the announcement made clear, effective January 1 of 2015, every new mother would receive at least 18 weeks of paid leave, without regard for disability.  Chase Ex. 11 at JD_00005170; Chase Ex. 10 at JD_00003215-3228.

79.     For biological mothers, "the first eight weeks [were] *paid under* the Firm's STD policy," while "the next 10 weeks [were] *paid under* the Firm's paid leave policy."  Chase Ex. 11 at JD_00005170 (emphasis added).

80.     Thus, as Dressing had previously explained, "the difference" between a mother's weeks of "disability" leave and her weeks of "family" leave is simply "the manner in which the leave is tracked administratively."   Sheketoff Ex. 2 at JD_00003302; *see also* Chase Ex. 76 (Bounds 30(b)(6)) at 247:8-248:2.

81.     With both "disability" and "family" leave, the firm continues to pay the employee's salary itself during the leave.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

82.     Jones Day does not obtain insurance from any third party to cover the "salary continuation" benefit.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

83.     But the firm tracks the types of the different "kinds" of leave because "there is a specific amount of short-term disability benefit leave made available.  There is a specific amount of family leave made available under the policy.  And in order for us to know when that has been exhausted or how much it's been used, we need to track it."  Chase Ex. 76 (Bounds 30(b)(6)) at 242:20-243:2.

84.     The value of the "disability" benefit drops down to 75% of salary after 13 weeks, and it ends entirely at 26 weeks.  McClure Ex. 1 at JD_00002483; Chase Ex. 76 (Bounds 30(b)(6)) at 243:3-11.

85.     So when it allots eight weeks of a new mother's leave to disability leave, Jones Day reduces the amount of additional paid leave (including the amount of disability leave at 100% salary continuation) that the mother will receive if she is disabled for *more* than eight weeks.  Chase Ex. 76 (Bounds 30(b)(6)) at 242:20-246:10, 248:23-249:18.

**iii.     Later in 2015, Jones Day adjusted its leave policy for fathers.**

86.     On May 12, 2015, after discussing the matter with Julia and Aaron Tang, Sparkle Sooknanan spoke in person with Beth Heifetz about how Jones Day's parental leave offerings were inconsistent with EEOC guidance.  Chase Ex. 80 (Sheketoff) at 208:20-212:22; Sheketoff Ex. 10 at P02720; Sheketoff Ex. 11 at JD_00001957.

87.     The next day, Sooknanan emailed Heifetz "to follow up" with "the relevant portion of the EEOC Guidance Document about parental leave that [she] was referring to yesterday."  Sheketoff Ex. 11 at JD_00001957.

88.     Sooknanan advised Heifetz that, "I know this is not your area at all, but if you can point me to the right person in Benefits, I would be happy to share this with them," and noted that, under

the EEOC guidance, "it seems like the firm's policy is a bit problematic."  Sheketoff Ex. 11 at JD_00001957.

89.     Sooknanan did not suggest that she would sue Jones Day.  Sheketoff Ex. 11 at JD_00001957.

90.     Five days after Sooknanan's email, Jones Day revised the firm manual.  Chase Ex. 12 at JD_00003153-60.

91.     The revised manual for the first time created a distinction between "primary" and "secondary" caretakers for biological mothers and fathers.  Chase Ex. 12 at JD_00003158.

92.     Mothers are presumed to be primary caretakers.  See infra ¶¶ 93-95.

93.     Indeed, Bounds, who has worked in Jones Day human resources department for 25 years, and whom Jones Day designated as its 30b6 witness on all topics relating to its leave offerings, is not aware of any new mother who ever taken leave as secondary caregiver.  Chase Ex. 76 (Bounds 30(b)(6)) at 148:8-16.

94.     Further, Jones Day does not require mothers to explain why they are primary caregivers and does not require them to obtain approval for their primary caregiver status.  Chase Ex. 76 (Bounds 30(b)(6)) at 46:16-18, 81:2-84:16.

95.     Instead, shortly after mothers give birth, and without first asking whether they will be primary caregivers, Jones Day's human resources department advises them of the dates that their primary caregiver leave period begins and ends.  E.g., Sheketoff Ex. 161 at JD_00002869, 2879; Sheketoff Ex. 162 at JD_00004061; Sheketoff Ex. 163 at JD_00004129; Sheketoff Ex. 164 at JD_00004189; Sheketoff Ex. 165 at JD_00004273; Chase Ex. 76 (Bounds 30(b)(6)) at 81:2-84:16.

96.     In contrast, fathers are presumed to be secondary caregivers.  Sheketoff Decl. ¶ 3.

97.     For example, when two of Julia's male friends asked to take primary caregiver leave,

Jones Day interrogated them about their request and required them to justify why they should be considered primary caregivers.  Sheketoff Decl. ¶¶ 3-6; *see also* Chase Ex. 76 (Bounds (30(b)(6)) at 276:25-281:8.

98.   ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████. Sheketoff Ex. 167 at JD_0004965; Sheketoff Ex. 168 at JD_00004989; Sheketoff Ex. 169 at JD_00005015.

99.   According to the revised manual, the firm would provide new mothers who were primary caregivers the same "18 weeks of paid leave" that mothers had been receiving since January 2015, made up of "eight weeks of paid disability leave under the Firm's Short Term Disability policy" and "an additional ten weeks of paid family leave," and it would provide fathers who were primary caregivers "ten weeks of paid family leave."  Chase Ex. 12 at JD_00003158.

100.   The revised manual stated that the firm would provide new mothers who were secondary caretakers 12 weeks of paid leave, made up "four weeks of paid family leave after the eight weeks of paid disability leave," and would provide fathers who were secondary caregivers "four weeks of paid family leave."  Chase Ex. 12 at JD_00003158.

101.   The revised manual did not change the amounts of leave the firm would provide to adoptive parents, who would continue to receive 18 weeks of paid leave if they primary caregivers and 4 weeks of leave if they were secondary caregivers.  Chase Ex. 12 at JD_00003158.

102.   The revised manual also stated that the firm would provide new parents "up to an additional six weeks of unpaid leave."  Chase Ex. 12 at JD_00003158.

### iv.     The relevant terms of the policy have been unchanged since 2015.

103.    The amounts of Jones Day's leave offerings for new parents did not change between May 2015 and January 2019.  Chase Ex. 76 (Bounds 30(b)(6)) at 91:22-96:19, 129:21-134:18; Chase Ex. 12 at JD_00003157-58; McClure Ex. 1 at JD_00002485-86.

104.    As of January 2019, the firm's "Family Leave" policy stated:

**5.     Family Leave**

**a.     Leave to Care for a Newborn or Newly Adopted Child**

In the event an Of Counsel, Counsel, Associate or Senior Staff Attorney has a newborn or newly adopted child, the Firm will provide the following benefits:

**(1)     Primary Caregiver**

In the case of a newly born child, the Firm will provide mothers eight weeks of paid leave under the Firm's Short Term Disability policy (the first 5 days of which will be charged to sick or vacation).  In addition, if the mother is the primary caregiver, the Firm will provide an additional ten weeks of paid family leave after the eight weeks of paid disability leave and, with approval, up to an additional six weeks of unpaid leave. Mothers who are primary caregivers may use accrued vacation leave following the 18 weeks of paid leave instead of unpaid leave, but in no case may the total leave exceed 24 weeks.  Mothers must commence this family leave immediately after the short term disability for the pregnancy and childbirth ends.

In the case of a newly born child, if the father is the primary caregiver, the Firm will provide ten weeks of paid family leave and, with approval, up to an additional six weeks of unpaid leave. Fathers who are primary caregivers may use accrued vacation leave following the ten weeks of paid leave instead of unpaid leave, but in no case may the total leave exceed 16 weeks. Fathers must commence this family leave within eight weeks after the birth of the child.

In the case of a newly adopted child, the Firm will provide 18 weeks of paid adoption leave to the primary caregiver and, with approval, up to an additional six weeks of unpaid leave. The primary caregiver may use accrued vacation leave following the 18 weeks of paid leave instead of unpaid leave, but in no case may the total leave exceed 24 weeks.   Primary caregivers must commence this family leave within eight weeks after the adoption of the child.

### (2)   Secondary Caregiver

In the case of a newly born child, the Firm will provide mothers eight weeks of paid disability leave under the Firm's Short Term Disability policy.  In addition, if the mother is the secondary caregiver, the Firm will provide an additional four weeks of paid family leave after the eight weeks of paid disability leave. Mothers must commence family leave immediately after the short term disability for the pregnancy and childbirth ends.

In the case of newly born child, if the father is the secondary caregiver, the Firm will provide four weeks of paid family leave. Fathers must commence family leave within eight weeks after the birth of the child.

In the case of a newly adopted child, the Firm will provide four weeks of paid family leave to the secondary caregiver.  Secondary caregivers must commence this family leave within eight weeks after the adoption of the child.

McClure Ex. 1 at JD_00002485-86.

105.   Thus, between January 2015 and at least January 16, 2019, Jones Day provided new mothers (at least to the extent that they were "primary caregivers") "a total of 18 weeks of paid leave post-partum."  Chase Ex. 11 at JD_00005170; *see also* Chase Ex. 76 (Bounds 30(b)(6)) at 91:22-96:19, 129:21-134:18; Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86.

106.   Eight of those weeks for women are labeled as disability leave, but the leave is not dependent on whether women are actually disabled.  Chase Ex. 76 (Bounds 30(b)(6)) at 232:9-235:21; Chase Ex. 81 (Shumaker) at 170:1-14.

107.   Between May 2015 and at least January 16, 2019, Jones Day provided new fathers who were "primary caregivers" ten weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86.

108.   Between January 2015 and at least January 16, 2019, Jones Day provided adoptive parents who were "primary caregivers" 18 weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86; Chase Ex. 11 at JD_00005170.

109.    Between May 2015 and at least January 16, 2019, Jones Day provided fathers who were "secondary caregivers" four weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86.

110.    Between January 2015 and at least January 16, 2019, Jones Day provided adoptive parents who were "secondary caregivers" four weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86; Chase Ex. 11 at JD_00005170.

**B.  Jones Day gives all new mothers 18 weeks of paid leave regardless of disability.**

111.    Under the August 2018 leave offerings, all new mothers are entitled to an eight-week period of leave after childbirth that is deemed "disability" leave.  Chase Ex. 76 (Bounds 30(b)(6)) at 117:3-118:5; Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-142:5, 185:5-186:14; Chase Ex. 8 at JD_00003274 ("I did have the system updated to have your maternity benefit be 8 weeks regardless of method of delivery."), JD_00003278 ("Jones Day standardly provides 8 weeks post-delivery"); Chase Ex. 76 (Bounds 30(b)(6)) at 228:23-11-229:1; Latham Decl. ¶¶ 4, 10 ("For childbirth without complications, … Unum considers the employee unable to perform the material and substantial duties of her regular occupation for [any period up to eight weeks], regardless of what that occupation is."); Dkt. 189 at 20 ("Unum 'automatically consider[s]' the affected employee disabled and 'unable to perform the material and substantial duties of his or her regular occupation.'" (quoting Latham Decl. ¶ 4)).

112.    Under the August 2018 leave offerings, if a biological mother notified Jones Day that her doctor had certified *more* than 8 weeks of disability leave, Jones Day might provide more than eight weeks of "disability" leave—but Jones Day would provide eight weeks of so-called "disability" leave even if the mother were disabled for less than eight weeks.  Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-142:5,

185:5-186:14, 69:11-20 ("the firm would still be assuming the eight-week disability because they are unaware of anything else.  And so the—the disability salary continuation would be in play."); August 4, 2020 Tr. at 6:25-7:5 (Jones Day's counsel stating: "So absent some affirmative contrary notification, the operation of this certification assumption means that the firm will provide birth mothers eight weeks of paid disability leave."); Sheketoff Ex. 20 at JD_00003905 (Jones Day website: "For routine childbirth (including cesarean-section births), the Firm will assume an eight week disability period, unless we are notified that the Associate is disabled for a longer period."); Chase Ex. 8 at JD_00003274 ("I did have the system updated to have your maternity benefit be 8 weeks regardless of method of delivery."), JD3278 ("Jones Day standardly provides 8 weeks post-delivery"); Chase Ex. 76 (Bounds 30(b)(6)) at 228:23-11-229:1; Latham Decl. ¶¶ 4, 10; Dkt. 189 at 20.

113.    Jones Day's counsel told the Court: "[U]nless you provide contrary evidence you will get eight weeks."  August 4, 2020 Tr. at 17:6-7.

114.    Under the August 2018 leave offerings, new mothers are *not* required to notify the firm if they not disabled sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 59:21-60:6, 33:13-19.

115.    That is, new mothers have no obligation to "provide contrary evidence," and thus "will get eight weeks."  Chase Ex. 76 (Bounds 30(b)(6)) at 59:21-60:6, 33:13-19; August 4, 2020 Tr. at 17:6-7.

116.    According to the firm, no new mother has ever informed the firm that she was not disabled sooner than eight weeks after childbirth.   Chase Ex. 76 (Bounds 30(b)(6)) at 68:21-25, 69:20-21.

117.    Under the August 2018 leave offerings, new mothers are not required to switch to a

form of non-disability leave or return to work if they not disabled sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 54:15-56:4.

118.    Under the August 2018 leave offerings, new mothers are not required to stop taking disability leave if they are not disabled sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 68:13-71:17.

119.    Jones Day has provided virtually every new mother with eight weeks of so-called "disability" leave after her childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 109:23-110:13, 68:21-25, 69:11-21, 70:16-21, 114:2-11; *see also* August 4, 2020 Tr. at 16:24, 64:9-15.

120.    Furthermore, Jones Day's short-term disability policy imposes a ten-day "elimination period" for all non-childbirth-related disabilities, under which an employee begins to receive disability benefits only if she is disabled for at least 10 days, at which time the disability benefits are retroactive to the sixth day.  McClure Ex. 1 at JD_00002483 ("This STD policy applies only once an absence extends for a period more than 10 consecutive work days …. Once the elimination period has been satisfied and an absence continues for more than ten consecutive work days, the leave period, retroactive to the sixth day of certified leave, is covered under the STD policy.").

121.    Jones Day acknowledges that not all women are disabled from working for at least eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 72:2-5; Dressing Decl. ¶ 11.a ("physicians typically certified between six and eight weeks of disability for uncomplicated childbirth, often depending on whether the birth was vaginal or via Cesarean section"); Chase Ex. 76 (Bounds 30(b)(6)) at 194:6-10 ("Q… I am asking if that means that, typically, she saw doctors certify six weeks for vaginal deliveries and eight weeks for Caesarean deliveries? A.  Yes, that's what I would read."); Dkt. 15 at 21 (MTD) (acknowledging that, under the firm's policy,

"pregnant women … might be able to obtain more disability leave than they would be able to medically justify"); Dkt. 189 at 24 ("a birth mother might recover more quickly than eight weeks").

122.    Indeed, for years, Jones Day did not "assume" an eight-week disability period for female staff.  Dressing Decl. ¶ 11.a.

123.    Instead, Jones Day required that female staff to provide a medical certification of their disability in order to obtain "medical" or "disability" leave following childbirth.  Dressing Decl. ¶ 11.a.

124.    Moreover, as of at least 2018, Jones Day's leave offerings did not provide female project or staff attorneys with at least eight weeks of leave—either paid *or* unpaid—within the first year of their employment with the firm.  Chase Ex. 76 (Bounds 30(b)(6)) at 157:20-167:24; Sheketoff Ex. 27 at JD_00003853-54.

125.    Accordingly, unless such a female project or staff attorney requested and the firm in its discretion granted unpaid leave, the attorney was required to return to work at Jones Day sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 157:20-167:24; Sheketoff Ex. 27 at JD_00003853-54.

126.    At least one staff member has returned to work at Jones Day sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 103:21-104:14.

127.    Under the August 2018 leave offerings, new mothers are permitted to return to work within eight weeks of giving birth.  Chase Ex. 76 (Bounds 30(b)(6)) at 104:23-106:17; McClure Decl. ¶ 15.

128.    Jones Day's August 2018 leave offerings remained in effect as of January 2019.  Chase Ex. 76 (Bounds 30(b)(6)) at 91:22-25.

129.    Under the August 2018 leave offerings, all new mothers who are primary caregivers receive at least 18 weeks of paid leave (and more if medically justified).  Chase Ex. 76 (Bounds 30(b)(6)) at 110:25-112:15, 230:12-231:12; Chase Ex. 11 at JD_00005170.

130.    Jones Day advertises its policy as providing 18 weeks of paid leave for new mothers and 24 weeks total (including unpaid leave).  Sheketoff Ex. 19 at JD_00003788-89 (Jones Day submission to NALP in 2015: "SARAH [MCCLURE'S] EDITS[:] Maternity Leave: The firm provides 18 weeks of paid maternity leave and 6 weeks of unpaid maternity leave, for a total maternity leave of up to 24 weeks….  How many weeks of paid parental leave do female attorneys receive?  18."); Sheketoff Ex. 23 at JD_00003816 (Jones Day submission to NALP in 2016: "the Firm provides 18 weeks of paid leave"); Sheketoff Ex. 24 (Jones Day website: "Maternity Leave: For mothers who are primary caregivers the [f]irm provides 18 weeks of paid leave (8 weeks of paid disability leave plus 10 weeks of paid family leave) and 6 weeks of unpaid leave, for a total leave of up to 24 weeks."); Sheketoff Ex. 21 at JD_00003800 (proposed material for Jones Day website: "Maternity Leave: The Firm provides 18 weeks of paid maternity leave and 6 weeks of unpaid maternity leave, for a total maternity leave of up to 24 weeks."); Sheketoff Ex. 22 at JD_00002664 (Summary of Benefits for New Associates/Judicial Clerks: "for a total maternity leave of 24 weeks"); Sheketoff Ex. 25 (Summary of Benefits for Lateral Associates: "for a total maternity leave of 24 weeks post-partum"); Chase Ex. 80 (Sheketoff) at 246:13-20; Sheketoff Decl. ¶ 7.

131.    Within the firm, Jones Day describes its leave offerings for new mothers as 18 weeks of paid maternity or parental leave.  Sheketoff Ex. 25 at JD_00003969 (Human Resources Manager: "The policy allows for 18 weeks of maternity leave and if requested and approved, an additional 6 weeks of leave."); *id.* (Heifetz: describing "maternity leave" as "18 weeks"); August

4, 2020 Tr. at 16:15-17:8 (Jones Day's counsel asserting that it's "understandable" that Jones Day itself would refer to "18 weeks parental leave" and advertise it in that manner to lawyers, because it's just "not the way humans speak" to say that "the firm has a certification assumption of eight weeks of a medical disability, and unless you provide contrary evidence you will get eight weeks."); Sheketoff Ex. 161 at JD_00002887 ("███████████████████"); Sheketoff Ex. 162 at JD_00004061 (same); Sheketoff Ex. 164 at JD_00004193 ("████████████████████████████████████████████████████████████████████████████████████████████████████."); Sheketoff Ex. 166 at JD_00004251 ("██████████████████████████████████████████████"); Chase Ex. 80 (Sheketoff) at 245:23-247:1, 257:18-262:3; Sheketoff Decl. ¶ 7.

132.    The general understanding at Jones Day is that any woman who gives birth will have at least 18 weeks of paid leave, regardless of whether she is disabled for eight weeks.  Chase Ex. 80 (Sheketoff) at 245:23-247:1; *see also*, *e.g.*, Sheketoff Ex. 163 at JD_00004145 (████████████████████████████████████████████); Sheketoff Ex. 164 at JD_00004193 (████████████████████); Sheketoff Ex. 165 at JD_00004293 ████████████████████████████"); Sheketoff Ex. 166 at JD_00004245 (████████████████████████████████████████████████"); *see also* Chase Ex. 80 (Sheketoff) at 257:18-262:3.

133.    When Julia, who was five months pregnant and a Jones Day associate at the time, asked Jones Day's human resources manager for the firm's "parental leave policy," she responded sending only the written "Family Leave" policy—not the written "Short Term Disability Policy." Sheketoff Ex. 6 at P02753-55.

134.    Shortly after mothers give birth, and without regard to the actual length of the mother's disability, Jones Day's human resources department advises mothers of the dates that their eight-week "disability" leave period begins and ends.  *E.g.*, Sheketoff Ex. 161 at JD_00002869, 2879; Sheketoff Ex. 162 at JD_00004061; Sheketoff Ex. 163 at JD_00004129; Sheketoff Ex. 164 at JD_00004189; Sheketoff Ex. 165 at JD_00004273.

135.    Mothers-to-be at Jones Day arrange to take 18 weeks of leave before they give birth and thus before they know how long they will be disabled.  Sheketoff Decl. ¶¶ 8-9.

136.    Jones Day's own expert based her opinion in this case on her understanding that Jones Day's leave offerings provided all women who gave birth eight weeks of "disability" leave regardless of when any individual woman recovered from childbirth.  Chase Ex. 89 (Colie) at 188:11-190:20.

137.    Julia's August 2018 email challenging Jones Day's policy (which is discussed further below) states that "[e]ight of the weeks for women [under the policy] are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period of time and yet still get the full eight weeks of disability leave."  McClure Ex. 3 at JD_00003165.

138.    Julia's August 2018 email was forwarded to Jones Day Human Resources Director Sarah McClure, who responded on behalf of Jones Day.  McClure Ex. 3 at JD_00003163-64.

139.    While McClure argued in her response that Jones Day's policy is lawful, she said nothing to suggest that she disagreed with Julia's factual statement that the eight-week "disability" leave "is not dependent upon whether women are actually disabled" and women "still get the full eight weeks of disability."  McClure Ex. 3 at JD_00003163.

140.    Jones Day's Administrative Partner, Michael Shumaker, also analyzed the issue in

August 2018 and reviewed McClure's response before it was sent.  Chase Ex. 81 (Shumaker) at 168:2-20; McClure Ex. 3 at JD_00003163 (showing that Shumaker was Bcc'd on the response).

141.    When Julia asked Shumaker at his deposition whether he understood her email's statement that "Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled" to be an "accurate statement of Jones Day's policy," Shumaker responded: "I had no reason to think it was an inaccurate statement, but I would have relied on Sarah [McClure] to say, 'She's got it wrong.'  And I don't remember that coming up."  Chase Ex. 81 (Shumaker) at 170:1-14.

142.    Shortly thereafter, Shumaker stated that, actually, "I think that is an incorrect statement" about the policy—a statement that Shumaker acknowledged was prompted by something his lawyer said to him.  Chase Ex. 81 (Shumaker) at 171:3-25.

143.    Nonetheless, Shumaker acknowledged that when Julia made the statement in her August 2018 email, he and McClure did not "correct" her or otherwise suggest that the statement was inaccurate.  Chase Ex. 81 (Shumaker) at 174:12-181:25.

144.    Jones Day's lead counsel stated at Shumaker's deposition that "[h]e [Shumaker] has told you that if she's the primary caregiver, she gets the eight weeks."  Chase Ex. 81 (Shumaker) at 179:3-13.

145.    Plaintiffs' complaint in this action likewise asserts that "Jones Day provides 'the eight weeks' of 'disability leave,' and (for primary caregivers) a total of '18 weeks of paid leave,' to all biological mothers without regard for how long they are disabled from performing legal work." Dkt. 1 at 14 (Compl. ¶¶ 110-12).

146.    Jones Day's press release responding to this litigation does not state that Plaintiffs misunderstood what its policy allows or that a woman who ceases to be disabled in less than eight

weeks actually is not entitled to the full eight weeks of so-called disability leave.  Chase Ex. 72.

147.    Nor does Jones Day's motion to dismiss the complaint say that Plaintiffs misunderstood what its policy allows or that a woman who ceases to be disabled in less than eight weeks actually is not entitled to the full eight weeks of so-called disability leave.  Dkt. 15.

148.    Rather, Jones Day first raised its argument that a woman who ceases to be disabled in less than eight weeks actually is not entitled to the full eight weeks of so-called disability leave in its *reply* in support of its motion to dismiss, as the Court pointed out when it denied that motion. Dkt. 19; *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020) ("Starting with the argument raised in Defendants' reply brief …").

## C. Giving all new mothers eight weeks of "disability" leave is an overinclusive generalization unsupported by medical practice.

149.    As Jones Day's own medical expert acknowledged, assuming an eight-week disability period after childbirth for all women is a generalization.  Chase Ex. 89 (Colie) at 192:14-18.

150.    Not all women are disabled for eight weeks after childbirth.  Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Colie) at 192:14-21; *id.* at 78:19-21 ("Q: Does it take at least six to eight weeks for a woman to be able to work?  A: Sometimes."); *id.* at 279:23-280:14 (testifying that most women can work on a computer at least eight hours per day within six weeks of an uncomplicated vaginal birth); Chase Ex. 90 (Naylor) at 53:9-17 ("I have female partners in our practice who return to taking call[] at four weeks.  There's an anesthesiologist I have worked with who has a number of children who returns to work at two weeks.  There's a midwife I work with who returned at four weeks.  So it's very common, even with health care providers, for people to return to work at four weeks and even earlier if they're feeling well and aren't experiencing any complications."); August 4, 2020 Tr. at 24:3-4 ("There are instances where mothers recover before the certification's expiration."); Dkt. 15 at 21 (MTD) (acknowledging that, under the firm's policy,

"pregnant women … might be able to obtain more disability leave than they would be able to medically justify"); Dkt. 189 at 24 ("a birth mother might recover more quickly than eight weeks").

151.    In fact, most women are not disabled for a full eight weeks after childbirth.  Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Colie) at 81:21-82:5 ("Q: Are most women able to return to work sooner than six weeks if they want to do so?...  A: Are most women able if they want to do so?  Well, able is a tough question.  It's a tough point.  Able, I would say they could probably, again cobble through...."); *id*. at 315:1-3 ("I have never said that I—that vaginal delivery needs more than six weeks."); *id.* at 344:3-7 ("Q: And my question is: Does that cause you to question your assertion that most women are unable to return to work six weeks after childbirth?  A: Ms. Sheketoff, I never told you that most women are unable to return to work."); Sheketoff Ex. 70 (Plaintiffs' Ex. 138) at 7 ("According to the Guidelines for Perinatal Care (6th edition), '…a woman can return to a normal work schedule 4-6 weeks after delivery'"); ACOG, Guidelines for Perinatal Care 211 (8th ed.), available at https://msjexhibits.page.link/cD4N ("A period of 4-6 weeks after delivery generally is required for a woman's physiological condition to return to normal"); Chase Ex. 89 (Colie) at 8:21-23 (agreeing the ACOG publications are reliable); *id.* at 307 ("Nope, don't disagree with ACOG.  Definitely a good ACOG OB-GYN."); NIOSH, Guidelines on Pregnancy and Work at 23, available at https://www.cdc.gov/niosh/docs/78-118/default.html (following vaginal delivery, patient generally "reach[es] full capacity three to four weeks postpartum."); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 649 n.15 (1974) (new mothers "may return to 'full activity or employment' if course of progress up to fourth or fifth week is normal" (citing Handbook of Obstetrics & Gynecology)); *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 731 (2003) (referring to "the typical 4- to 8-week period of physical disability due to pregnancy and childbirth"); *id.* at 731 n.4; *see also* Sheketoff Ex. 71

(Plaintiffs' Ex. 139) at 6 (noting that even after "major" procedures like a hysterectomy, a woman may only require "four to six weeks to recover").

152.    In practice, the period of disability after childbirth is individualized. Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Colie) at 48:22-49:12 ("I think everyone is different.  I think the circumstances around every birth are a little different …."); *id.* at 52 ("I think everyone is different."); *id.* at 57:3-13 ("Because every woman is different and is … undoubtedly going to have an individual response to all the things that happen to her…"); *id.* at 58 ("I think all of these are things that have to be somewhat individualized"); *id.* at  306:10-13 ("Q: Do you agree or disagree with the statement that a six-week maternity leave may be inappropriately long for some women?   A: Maybe.   I don't   know."); ACOG, Postpartum Pain Management, https://msjexhibits.page.link/2L6u ("The type, intensity, and duration of postpartum symptoms will vary from person to person. Some symptoms may last a few days, while others may last several weeks."); NIOSH, Guidelines on Pregnancy and Work at 23, available at https://www.cdc.gov/niosh/docs/78-118/default.html ("Time for recovery varies considerably depending upon the individual patient.").

153.    When asked to provide a certification of disability to an employer or insurance company for new mothers, providers typically certify a six-week disability for an uncomplicated vaginal birth and an eight-week disability period for an uncomplicated cesarean section birth. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10; Chase Ex. 90 (Naylor) at 31:1-18.

154.    Providers do not typically certify an eight-week disability period for an uncomplicated vaginal birth.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase

Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase

Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

155.    There is no "window" or "range" of "six to eight weeks" in the medical practice for

childbirth; rather, the practice when a certification is requested is to certify *six weeks if the birth is*

*vaginal* and to certify *eight weeks if the birth is cesarean*.   Chase Ex. 87 (Naylor Report) at 3;

Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6,

313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

156.    Indeed, while Dr. Colie personally "prefers the longest recovery window I can find,"

she acknowledged that her personal practice is idiosyncratic.  Chase Ex. 89 (Colie) at 344:3-25;

*see also id.* at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21.

157.    The practice of certifying a six-week disability period for an uncomplicated vaginal

birth and an eight-week disability period for an uncomplicated c-section birth is based on

convention and tradition rather than any "standard of care" or clinical outcome data.  Chase Ex.

87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Sheketoff Ex. 74 (Plaintiffs'

Exhibit 126) (identifying the "[t]raditional period of rest and recuperation from birth"); Sheketoff

Ex. 69 (Plaintiffs' Ex. 137) at 17 ("There are no data on which to base recommendations regarding

postpartum physical activity."); Sheketoff Ex. 70   ("There are little prospective data on which to

base guidelines for return to work after childbirth.").

158.    A certification of six weeks of disability for an uncomplicated vaginal birth and eight

weeks of disability for an uncomplicated c-section birth includes a period of time for mother-infant

bonding.  Chase Ex. 90 (Naylor) at 53:2-4; *see also* Chase Ex. 89 (Colie) at 81:21-82:6 (admitting

that most women are able to return to work sooner than six weeks if they want to); *id.* at 344:3-8

("Ms. Sheketoff, I never told you that most women are unable to work."); Sheketoff Ex. 157 (for

32

pregnancy and vaginal delivery, recommending 42-day disability period for "regular work, days after delivery (*also allowing newborn care*)"); Sheketoff Ex. at 7 (Plaintiffs' Exhibit 32) at JD_00003941 ("[M]aternity disability cases are generally benefit driven rather than by clinical necessity.").

159.    While doctors typically advise new mothers about certain activities (e.g., avoid heavy lifting directly after a cesarean section, avoid intercourse for several weeks after a vaginal birth), doctors do *not* typically advise new mothers that they are disabled from working in relatively sedentary jobs after an uncomplicated vaginal birth for any amount of time—let alone six or eight weeks.   Sheketoff Ex. 38 (Naylor Rebuttal) at 5 ¶ 6; *id.* at 7-8; Chase Ex. 89 (Colie) at 99:20-102:7.

160.    When Julia gave birth at Northwestern and George Washington University hospitals, no one advised her that she was disabled from working for any period of time (and, in fact, Julia worked on this case from her hospital room).  Sheketoff Decl. ¶¶ 10-11.

161.    While Colie initially suggested that it would be contrary to the supposed "standard of care" not to advise women that they were disabled from working after six or eights weeks after childbirth, she admitted that she would "second-guess" that statement if she learned that patients at Northwestern and George Washington University were not so advised.  Chase Ex. 89 (Colie) at 178:7-180:19.

162.    The vast majority of vaginal births are uncomplicated.  Sheketoff Ex. (Naylor Rebuttal) 38 at 3; Chase Ex. 89 (Colie) at 97 (acknowledging that she doesn't know what percentage of vaginal births are uncomplicated).

163.    The vast majority of cesarean births are uncomplicated (apart from the "complication" of the cesarean section itself).  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2; Chase Ex. 89 (Colie)

at 94:20-94:17 (admitting that she "doesn't have a good sense of" the percentage of cesarean births that are routine).

164.    Approximately 2/3 of births are vaginal births and approximately 1/3 of births are cesarean section.  Chase Ex. 90 (Naylor) at 99:3-8; Chase Ex. 89 (Colie) at 88:23-89:2.

165.    The majority of births are uncomplicated vaginal births.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 97 (acknowledging that she doesn't know what percentage of vaginal births are uncomplicated).

166.    It is not medically reasonable or appropriate to assume an eight-week postpartum disability period for all childbirths.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 90 (Naylor) at 82:16-83:3; *see also supra* ¶ 151.

167.    It is not medically reasonable or appropriate to assume an eight-week postpartum disability period for vaginal births.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 90 (Naylor) at 82:16-83:3; *see also supra* ¶ 151.

168.    Indeed, while Colie opined in her report that it was medically reasonable and appropriate to assume an eight-week postpartum disability period for vaginal births and cesarean births, she conceded during her deposition that most women *are* able to work within six weeks after an uncomplicated vaginal birth if they want to.  Chase Ex. 89 (Colie) at 81:21-82:5; *see also id.* at 344:3-8 ("Ms. Sheketoff, I never told you that most women are unable to work."); *id.* at 315:1-3 ("I have never said that I—that vaginal delivery needs more than six weeks.").

169.    Colie also admitted that has never refused to clear a new mother who wanted to return six weeks after childbirth.  Chase Ex. 89 (Colie) at 169:5-10.

170.    Nor has Colie ever refused to clear a new mother who wanted to work less than four weeks after childbirth.  Chase Ex. 89 (Colie) at 169:13-20.

171.    Colie's primary basis for concluding that it is medically reasonable and appropriate to assume an eight-week postpartum disability for all childbirths is that, if they wanted to return to work sooner than eight weeks, the eight-week "assumption" of disability would not *preclude* women from doing so.  Chase Ex. 89 (Colie) at 219:9-220:1.

172.    Further, according to Colie, "eight weeks is clearly an average" that's "smack right between 4 and 12 weeks.  So while there would be some women who might be ready closer to a 4-week window, there's definitely women who won't be ready closer to a 12-week window… And so if I had to pick, I would always want to pick the thing that gave the woman the most time, if she needed it, so I don't [need] to recertify her at a later time.  Because, again, my experience has been that I've yet to have a lady who is not allowed to go back to work by her employer."  Chase Ex. 89 (Colie) at 220:10-221:12.

173.    In fact, new mothers can typically return to relatively sedentary employment within four weeks after an uncomplicated vaginal birth.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; *see also* NIOSH, Guidelines on Pregnancy and Work at 23, available at   https://www.cdc.gov/niosh/docs/78-118/default.html   (following   vaginal   delivery,   patient generally "reach[es] full capacity three to four weeks postpartum."); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 649 n.15 (1974) (new mothers "may return to 'full activity or employment' if course of progress up to fourth or fifth week is normal" (citing Handbook of Obstetrics & Gynecology)); Sheketoff Ex. 70 (Plaintiffs' Ex. 138) at 7 ("'a woman can return to a normal work schedule 4-6 weeks after delivery'"); Sheketoff Ex. 155 at 2 ("The vast majority of women   with   uncomplicated   spontaneous   or   assisted   vaginal   singleton   deliveries   are physiologically stable enough to return to full-time work within 4 to 6 weeks of delivery.").

174.    Moreover, when Colie opines that "the medically appropriate time to allow for recovery from childbirth without complications is at least six to eight weeks," she acknowledges that she uses the term "recovery" to mean something more expansive than "regain the ability to work" and that may extend to "six months" or "60 years."  Chase Ex. 89 (Colie) at 77:9-79:18; *see also id.* at 218:5-11 (testifying that "the period of time during which a woman is unable to return to work" is not "the same length of time as the period of recovery from childbirth" because "the period of recovery from childbirth is going to continue on out through that fourth trimester"); *id.* 34:10-14 (describing the "recovery period" for women as "probably an 8 to 12-week window in my—sort of in my lowest estimation and—and a 90 odd year in my highest"); *id.* at 164:14-18 ("there's enough data to suggest that a three-month window would be great"); Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 3 ("The length of time it takes to completely recover from childbirth does not equate with when someone can perform the material and substantial duties of their position."

175.    An employment policy that assumes an eight-week disability from routine childbirth does not reflect what happens in practice when a provider certifies disability from childbirth. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

176.    As discussed above, providers typically do not certify an eight-week disability period for all childbirths; rather, they typically certify a six-week disability period for an uncomplicated vaginal birth and an eight-week disability period—as Colie admitted during her deposition.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

177.    In practice, doctors do not certify a disability period of eight or more weeks for the majority of women.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) 226:7-229:12 (disclaiming knowledge on the topic).

178.    When a new mother has a birth or postpartum complication, the amount of time during which she is disabled depends on her individual circumstances.  NIOSH, Guidelines on Pregnancy and Work at 23, https://www.cdc.gov/niosh/docs/78-118/default.html ("The scope and severity of the complications of labor and/or delivery determine the length of the recovery period.").

179.    When a mother has a birth or postpartum complication, the amount of time during which a new mother with either a birth or postpartum complication is disabled may be less than eight    weeks.    NIOSH,    Guidelines    on    Pregnancy    and    Work    at    23, https://www.cdc.gov/niosh/docs/78-118/default.html; *see also* Dressing Decl. ¶ 11.a (declaring that, occasionally, doctors certify "some additional time").

180.    In practice, most women receive less than eight weeks of disability leave.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2; Chase Ex. 89 (Colie) 226:7-229:12 (disclaiming knowledge on the topic); Sheketoff Ex. 74 (Plaintiffs' Exhibit 126) at 4 (identifying the "[t]raditional period of rest and recuperation from birth" as six weeks); *id.* at 7 (45% of employed women return to work in less than six weeks); WHO, Postpartum Care of the Mother and Newborn ("Although not officially sanctioned, traditionally the postpartum period is supposed to end 6 weeks after birth. The period of 6 weeks fits very well into cultural traditions in many countries, where often the first 40 days after birth are considered a time of convalescence for the mother and her newborn infant…. Six weeks after delivery the body of the woman has largely returned to the non-pregnant state."); Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2.

181.    There is no clinical outcome data to support the notion that new mothers should refrain from working in sedentary employment for at least eight weeks after childbirth.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 1; Sheketoff Ex. 28 (Plaintiffs' Ex. 102) at 60 ("There are no standardized or validated tools for assessing a woman's readiness to return to work after maternity leave."); Sheketoff Ex. 69 (Plaintiffs' Ex. 137) at 17 ("There are no data on which to base recommendations regarding postpartum physical activity.  In particular, there are no high-quality data on which to base restrictions on lifting, climbing stairs, bathing, swimming, driving, or resuming vaginal intercourse, exercise, or work after giving birth.  A reasonable approach is to tell mothers to resume activities such as housework, driving, exercise, and sexual intercourse when they are comfortable performing these activities."); Sheketoff Ex. 70 (Plaintiffs' Ex. 138) at 7 ("There are little prospective data on which to base guidelines for return to work after childbirth."); Sheketoff Ex. 72 (Plaintiffs' Ex. 142) at 19 (noting that there are "scant data to guide any postoperative activity recommendations" and a "lack of consensus among surgeons" for new mothers who have had a cesarean birth); Sheketoff Ex. 7 (Plaintiffs' Exhibit 32) at JD_00003941 ("[M]aternity disability cases are generally benefit driven rather than by clinical necessity.").

182.    Approximately 23% of employed women return to work within 10 days postpartum, and an additional 22% return to work between 10 and 40 days.  Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 6.

183.    Thus, nearly half of women with jobs are back at work less than six weeks after childbirth.  Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 6.

184.   Providers typically schedule the comprehensive postpartum visit between four weeks and six weeks after delivery.  Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 2; Chase Ex. 89 (Colie) at 237:9-240:2; Sheketoff Ex. 38 (Naylor Rebuttal) at 4 ¶ 5.

185.   The American College of Obstetricians and Gynecologists recommends that a new mother be contacted by her provider during the first three weeks after delivery.  Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 1; *see also* Chase Ex. 89 (Colie) at 242:19-243:6 ("more than half of women already are coming in earlier than [three weeks after childbirth]").

186.   After an uncomplicated vaginal birth, it is medically advisable for new mothers to begin to exercise as soon as they personally feel able to do so.  Chase Ex. 89 (Colie) at 296:7-298:8; Sheketoff Ex. 28 (Plaintiffs' Ex. 102) at 38 ("After an uncomplicated vaginal delivery, counsel patients that they can begin or resume an exercise program (eg, walking, jogging, strength conditioning) as soon as they feel able to engage in such activities.  Women should not be discouraged from resuming physical activity before the 6-week postpartum visit."); Sheketoff Ex. 72 (Plaintiffs' Ex. 142) at 18 ("After a vaginal birth, most individuals should resume their normal physical activities at their own pace and in consultation with their medical provider."); Sheketoff Ex. 73 (Plaintiffs Ex. 143) at P02263 ("If you had a healthy pregnancy and a normal vaginal delivery, you should be able to start exercising again soon after the baby is born.  Usually it is safe to begin exercising a few days after giving birth—or as soon as you feel ready.").

187.   After an uncomplicated cesarean birth, a new mother can resume full physical activity within four to six weeks.  Sheketoff Ex. 28 (Plaintiffs' Ex. 102) at 38 ("In the absence of postoperative complications, counsel women that they can resume full physical activity in the 4-6 weeks after a cesarean delivery.  Before that time, women are able to be physically active (eg, walking, stretching)."); NIOSH, Guidelines on Pregnancy and Work at 22-23, available at

www.cdc.gov/niosh/docs/78-118/default.html ("[F]ollowing an uncomplicated cesarean section, the woman … can usually return to full capacity by six weeks.  This is arbitrary, and should be individualized for each woman; many women return to full function earlier."); Chase Ex. 89 (Colie) at 303:18-304:11 (acknowledging that, while she "likes" a longer window, "some" of that is simply her "preference" for as long a "recover[y]" period as possible).

**D.  Jones Day's irrelevant argument regarding its administrator is factually baseless.**

188.    Jones Day adopted its 8-week disability period in 1994—a decade before it hired Unum to perform administrative services for it.  Dressing Decl. ¶ 15 (adopted in 1994); Latham Decl. ¶ 13 (began working with JD in 2004).

189.    Unum does not provide disability insurance to Jones Day.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

190.    Rather, Jones Day funds its own "salary continuation" by itself.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

191.    Unum simply provides administrative support for Jones Day.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

192.    Unum's involvement with Jones Day's leave for new mothers did not change the 8-week disability provision that had been in place since 1994.  Dressing Decl. ¶ 15; Dkt. 189 at 17; JDSF ¶ 108.

193.    Indeed, after it began working with Unum, Jones Day instructed Unum to "have the system updated to have [Jones Day's] maternity benefit be 8 weeks regardless of method of delivery."  Chase Ex. 8 at JD_00003274; *see also id.* at JD_00003278 ("Jones Day standardly provides 8 weeks post-delivery."); Chase Ex. 76 (Bounds (30(b)(6)) at 227:12-229:1.

194.    In a declaration submitted and relied on by Jones Day, Zach Latham of Jones Day's

third-party administrator (Unum) states:

> Unum considers the standard period of short-term disability to be six to eight
> weeks…. I am not aware of Unum ever using different duration standards for short-
> term disability without complications…. The standard options for childbirth that
> an employer can choose from when selecting a Unum short-term disability plan are:
> (a) six weeks regardless of delivery, (b) eight weeks regardless or delivery, or (c)
> six weeks for natural delivery and eight weeks for delivery via cesarean section.

Latham Decl. ¶¶ 7-8

195.    According to Unum's own website, however, *Unum does not offer an eight-week*

*disability period for vaginal births under its short-term disability insurance*. Unum, Frequently

Asked Questions about Short-Term Disability, https://msjexhibits.page.link/V9Hh ("How does

Unum handle maternity claims?  For a delivery with no complications, pregnancy claims are

approved under short term disability for a period of 6 weeks.  If the employer chooses, delivery by

C-sections can result in an 8 week benefit period."); Unum, Frequently Asked Questions Individual

Short Term Disability ("The standard pregnancy benefit is 6 weeks and includes the Elimination

Period."),        https://msjexhibits.page.link/PZXe;        Unum,        Bringing        Up        Baby,

https://msjexhibits.page.link/MMwp ("If you're a birth mother, including your elimination period,

you may receive short-term disability benefits typically for 6 weeks").

196.    Other short-term disability insurance providers typically cover six weeks of disability

leave for all uncomplicated deliveries or, alternatively, six weeks for uncomplicated vaginal births

and eight weeks for uncomplicated cesarean births.  MetLife, Frequently Asked Questions About

Pregnancy, https://msjexhibits.page.link/W5Nd ("Generally, for an uncomplicated pregnancy and

normal delivery, most plans allow you to take 6 weeks from the date of delivery."); Prudential,

How Maternity Leave and Short-Term Disability Work, https://msjexhibits.page.link/nYJz

("Under most short-term disability insurance plans, maternity leave typically starts two weeks

prior to your delivery date and ends six weeks after your baby is born."); The Hartford, What to Expect from Your Maternity Benefits, https://msjexhibits.page.link/85Up ("Maternity claims are commonly approved for six weeks following delivery"); MetLife, Short-Term Disability Insurance, Frequently Asked Questions about short-term disability benefits due to pregnancy, https://msjexhibits.page.link/wtQ4 ("Normal vaginal delivery disability period is 6 weeks from date of delivery, and Cesarean delivery disability period is 8 weeks from date of delivery."); Northwestern Mutual, Will Short-Term Disability Insurance Cover Maternity Leave?, https://msjexhibits.page.link/J6y1 ("The typical timeframe you are considered disabled following delivery of the baby, without complications, is six weeks; eight weeks if a C-section was performed."); Lincoln Financial Group, Frequently Asked Questions Regarding Claims, https://msjexhibits.page.link/TJBU ("Standard recovery time for vaginal delivery is six weeks, or eight weeks for Cesarean delivery.").

197.    Latham also states: "When assessing the short-term disability period associated with a given medical procedure Unum utilizes … MDGuidelines.  Unum treats these sources as reflecting a standard of care," which Unum purportedly used to come up with a six- to eight-week "standard period of short-term disability."  Latham Decl. ¶ 5.

198.    Actually, unlike Jones Day's eight-week disability period for all births, the MDGuidelines on which Unum professes to rely distinguish between vaginal birth and cesarean births.  Sheketoff Ex. 155; Sheketoff Ex. 156.

199.    For a vaginal birth, the MD Guidelines list the "maximum" and "optimum" "length of disability" for a "normal vaginal delivery" as 42 days (i.e, six weeks), and the "minimum" length of disability as 28 days (four weeks), and notes that the duration for vaginal births specifically (unlike durations for other conditions) "reflects accepted standard post-delivery recovery periods

and are *not* necessarily representative of medical recovery time."  Sheketoff Ex. 155 at 1 (emphasis added).

200.    The MDGuidelines further state: "Most women recover rapidly from an otherwise uncomplicated vaginal or assisted vaginal delivery…. *The vast majority of women with uncomplicated spontaneous or assisted vaginal singleton deliveries are physiologically stable enough to return to full-time work within 4 to 6 weeks of delivery*."  Sheketoff Ex. 155 at 2 (emphasis added).

201.    For a cesarean section birth, the MDGuidelines provide that the "maximum" and "optimum" "length of disability" for "sedentary" and "light" jobs is 42 days (six weeks), and the "minimum" "length of disability" is 28 days (four weeks) for "sedentary" and "light" jobs. Sheketoff Ex. 156 at 1.

202.    The MDGuidelines further state: "Stair climbing, lifting, and driving may be temporarily restricted after cesarean section, usually for less than a week…. The *vast majority* of women who have uncomplicated pregnancy and cesarean delivery recover to modified work capacity by 6 weeks postpartum…."  Sheketoff Ex. 156 at 2 (emphasis added).

203.    Like the MDGuidelines, other disability duration guidelines recommend a period substantially shorter than eight weeks after an uncomplicated childbirth.  Sheketoff Ex. 157 (for pregnancy and vaginal delivery, recommending a 21-day disability period for "modified work," a 42-day disability period for "regular work, days after delivery (*also allowing newborn care*)" and a "best practice" of 42 days (emphasis added)); Sheketoff Ex. 158 (for cesarean section delivery, recommending a 28-day disability period for "clerical/modified work," a 42-day disability period for "manual work," and a "best practice" of 42 days).

43

204.    Neither Jones Day's nor Plaintiffs' obstetrical expert are aware of disability insurance policies covering an eight-week disability period for an uncomplicated vaginal birth.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2; Chase Ex. 89 (Colie) at 138:9-14.

## II.    Jones Day illegally retaliated against Plaintiffs for challenging its leave policy.

### A.    Plaintiffs challenged Jones Day's discriminatory leave policy.

205.    In mid-2018, Plaintiffs learned that Julia was pregnant with their first child.  JDSF ¶ 294.

206.    Prior to August 16, 2018, Julia informed Jones Day that she would be leaving the firm before the birth to take a position as an Assistant Federal Public Defender.  JDSF ¶¶ 294, 296.

207.    On August 16, Julia sent the following email to Defendant Heifetz with the subject line "Parental Leave":

> Beth,
>
> I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total) while it gives men 10 weeks of paid leave (and 16 weeks total).  Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled.  That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory.  I don't object that the firm is socially conservative as a general matter, or that its selection of cases promotes those values, but in this case I think it goes too far in imposing those values on its employees.
>
> For me, since Mark will be the primary caregiver, this will have a pretty big impact on my life, because I'll end up staying out of work for the extra eight weeks that Mark cannot.  For career reasons, I'd rather not do that.  I would guess that the effects of the policy are similar for other women.  Is there anything that I can do here?  Would the firm treat Mark equally to primary caregivers and grant him 18 weeks paid and 4 weeks total leave?
>
> I'd be happy to discuss further.  Thanks very much.
>
> Best,

Julia

JDSF ¶ 296; McClure Ex. 3 at JD_00003164-65.

208.    Heifetz forwarded the email to Jones Day's HR Director, Sarah McClure.  JDSF ¶ 298;

McClure Ex. 3 at JD_00003164.

209.    On August 23, 2018, McClure called Julia and informed her that Jones Day was

denying her request.  JDSF ¶ 298.

210.    Later on August 23, Mark sent the following email to McClure on the same chain as

Julia's email quoted above:

> RE: Parental Leave
>
> Hi Sarah,
>
> Julia let me know that you decided to reject our request that Jones Day amend its
> discriminatory parental leave policy.  Thank you for your consideration.
>
> Needless to say, I oppose your practice, which is made illegal by Title VII.  You
> may know that it is also illegal to retaliate against an employee who opposes
> discrimination.
>
> Thanks again, Sarah.
>
> Mark

JDSF ¶ 299; McClure Ex. 3 at JD_00003163-64.

211.    On August 24, McClure sent the following response to Mark:

> RE: Parental Leave
>
> Mark –
>
> The Firm disagrees with your assertion of discrimination and impropriety.  Jones
> Day's family leave policy provides for male and female lawyers with newborn
> children to receive ten weeks of paid family leave (primary caregiver), while female
> lawyers receive eight weeks of additional paid leave under the Firm's short term
> disability policy for the childbirth.  This is consistent with Title VII, which allows
> employers to provide female employees disability leave for childbirth while not
> providing the same disability leave to male lawyers.  *See e.,g.,* [sic] *Johnson v.
> University of Iowa*, 408 F. Supp. 2d 728, 734 (S.D. Iowa 2004), *aff'd*, 431 F.3d 325
> (8th Cir. 2005) (employer's policy allowing mothers six weeks of disability leave

due to pregnancy but not the equivalent disability leave to fathers did not violate Title VII); *See also California Fed. Sav. & Loan Ass'n v. Guerra*, 472 U.S. 272, 290 (1987) (upholding a state law that required employers to provide four weeks of medical leave to women who had given birth without extending similar benefits to men or persons with other disabilities).  The EEOC's Enforcement Guidelines address your concern and confirm the propriety of Jones Day's approach. Specifically, the Guidelines provide the following example:

EXAMPLE 14

Pregnancy-Related Medical Leave and Parental Leave Policy –

No Disparate Treatment

An employer offers pregnant employees up to 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance.  The employer also offers new parents, whether male or female, six weeks of parental leave.  A male employee alleges that this policy is discriminatory as it gives up to 16 weeks of leave to women and only six weeks of leave to men.  The employer's policy does not violate Title VII.  Women and men both receive six weeks of parental leave, and women who give birth receive up to an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

EEOC's Enforcement Guidance: Pregnancy Discrimination and Related Issues (June 25, 2015).

I explained this to Julia on the phone yesterday.  I hope this is helpful and addresses your concern.  I am happy to answer any additional questions you may have in follow up.

Sarah

McClure Ex. 3 at JD_00003163.

212.    Less than two weeks after their child was born, Plaintiffs sent McClure the following response on January 16, 2019:

RE: Parental Leave

Sarah,

We have closely reviewed the case law, including the two cases you rely on.  We have also discussed the matter with other competent attorneys.  Your cases do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.

46

Jones Day's policy is also inconsistent with the EEOC enforcement guidline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S. Ct. 1338, 1351-52 (2015).

Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win.

I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation. We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman. As you know, Title VII prohibits retaliation for opposition to sex discrimination.

JDSF ¶ 306; McClure Ex. 4 at JD_00003143.

213.    Plaintiffs drafted and sent the January 16 email together. Chase Ex. 79 (Savignac) at 213:19-214:15, 242:4-8, 254:15-255:11, 256:1-15; Chase Ex. 80 (Sheketoff) at 115:10-14; McClure Ex. 4 at JD_00003143.

**B. Plaintiffs believed (and continue to believe) that the leave policy is unlawful.**

214.    Mark believed (and continues to believe) that Jones Day's leave policy violates the antidiscrimination laws. Savignac Decl. ¶¶ 3-4; Chase Ex. 79 (Savignac) at 112:10-115:2, 120:16-121:1, 164:8-22; Sheketoff Ex. 43 at P02721.

215.    In January 2015, following Jones Day's announcement that it would give mothers 18 weeks of paid maternity leave while keeping fathers limited to just four weeks of leave, Julia discussed the policy's blatant illegality with colleagues and also forwarded an email about it to Mark. Sheketoff Ex. 43 at P02721.

216.    Mark wrote back: "It does seem pretty clearly illegal …. Presumably the 8-week disability leave is also illegal (if not, they could just say the first 14 are for disability)."  Sheketoff Ex. 43 at P02721; Chase Ex. 79 (Savignac) at 45:17-46:1.

217.    This is the same point that Julia made in 2018: Leave that is not limited to the woman's of actual disability is discriminatory, and putting the "disability leave" label on it does not change that.  JDSF ¶ 296; Chase Ex. 79 (Savignac) at 45:17-46:1.

218.    January 2015 was years before Mark married Julia, started work at Jones Day, had a child, or anticipated litigation, and Mark had no conceivable incentive to give anything but his honest legal opinion in his private email to Julia.  Savignac Decl. ¶ 5.

219.    Julia believed (and continues to believe) that Jones Day's leave policy violates the antidiscrimination laws.  Sheketoff Decl. ¶ 12; Chase Ex. 80 (Sheketoff) at 273:3-288:21; JDSF ¶ 296.

**C.  Jones Day fired Mark in retaliation for Plaintiffs' challenge to its leave policy.**

220.    McClure forwarded the January 16 email to Shumaker.  Chase Ex. 42 at JD_00003170.

221.    On or about January 20, 2019, Shumaker forwarded the January 16 email to Brogan with the following cover message:

> PRIVILEGED AND CONFIDENTIAL
>
> Steve:
>
> I wanted to bring the attached to your attention.  Included in the chain below is an email that we received earlier this week from Mark Savignac.  Mark is an I&A associate and former Supreme Court clerk in the Washington office.  He is married to Julia Sheketoff, a former Washington I&A associate and also former Supreme Court clerk that recently left the Firm to do public service work.  [Material redacted as attorney-client privileged/attorney work product.]
>
> I would recommend that we terminate Mark immediately.  [Material redacted as attorney-client privileged/attorney work product.]
>
> Mike

Chase Ex. 42 at JD_00003169-70.

222.    Nothing in Shumaker's email—including the redacted portions—says that Mark's email shows poor judgment or is intemperate.   Jan. 31, 2022 Tr. 21:9-15;  Chase Ex. 42 at JD_00003169-70.

223.    In other words, Shumaker's one communication to Brogan recommending that he fire Mark *does not include the rationale* that Shumaker and Brogan now both say was behind their decision that Mark should be fired.  Jan. 31, 2022 Tr. 21:9-15; Chase Ex. 42 at JD_00003169-70.

224.    The email chain that Shumaker forwarded to Brogan also included McClure's August 2018 email to Plaintiffs, but did not include Plaintiffs' August 2018 emails about the policy.  Chase Ex. 42.

225.    On or about January 20, Brogan responded:

> He has to go.  Get it done tomorrow Morning [sic] first thing.
>
> Steve

JDSF ¶ 341; Chase Ex. 42 at JD_00003169.

226.    The emails just quoted were the only communications between Shumaker and Brogan regarding Mark or the January 16 email until after the termination was implemented.  Chase Ex. 81 (Shumaker) at 62:23-64:16.

227.    On January 22, 2019, Jones Day fired Mark. JDSF ¶ 363; Chase Ex. 46.

**D.  Jones Day's asserted reasons for the firing confirm that it was unlawful.**

228.    Jones Day fired Mark solely because of the January 16 email.  *See* Dkt. 189 (JD MSJ) at 33 ("it is undisputed that Stephen Brogan, Jones Day's Managing Partner, terminated Savignac based solely on the January 2019 email"); Chase Ex. 77 (Brogan) at 18:11-19:2.

229.    There was no incident prior to January 16, 2019, that was a factor in the decision to fire Mark.  Sheketoff Ex. 31 at 12 (Second Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

### i.    The January email's assertion that the leave policy is unlawful

230.    Jones Day fired Mark because of the January email's complaint that the firm's leave policy is illegally discriminatory.  Chase Ex. 77 (Brogan) at 15:15, 16:18-25 ("Q. Okay.  Why did you fire me?"  "A. … You then went on to act as if you personally were the law-givers; that the – our policy on leave was illegal."); *id.* at 46:15-22 (the firing decision was "on the basis of your e-mail and also your attack on our position, which seems to be on all fours with what you were told by Sarah [McClure]"); *id.* at 58:23-59:20 ("Q. … was anything in [the email's first] paragraph a factor in your decision to fire me?"  A. … In this particular paragraph – and I think I referred to this; that you speak like you're the lawgiver.  And we – we, Jones Day, which is one of the great law firms in the world, should bow down to your assessment of the EEOC.  And – and that this is a violation of [Title VII of] the 1964 Civil Rights Act. … It's a pompous assertion.  It's an arrogant assertion."); *id.* at 62:22-25 ("And you're telling us that we violated [the] 1964 Civil Rights Act?  To me, there's just no good faith basis to it.").

231.    Shumaker likewise testified that the January email's complaint that the firm's leave policy is illegally discriminatory was a factor in his "decision to recommend termination."  Chase Ex. 81 (Shumaker) 96:2-19, 103:2-6.

232.    But for Brogan's reaction to the January email's complaint that Jones Day's leave policy violates Title VII, Jones Day would not have fired Mark.  Chase Ex. 77 (Brogan) at 63:6-11 ("Q. Would you have fired me even if you believed I was right about the policy being illegal?"  "THE WITNESS. Yeah.  I – no, I – I would not.").

50

233.    Brogan testified that he "wasn't impressed with your reasoning" in claiming that Jones

Day's leave policy is discriminatory.  Chase Ex. 77 (Brogan) at 59:17-18.

234.    However, Brogan admitted that he made the termination decision without looking at

Plaintiffs' reasoning in their August 2018 emails with McClure.  Chase Ex. 77 (Brogan) at 46:25-

10, 61:22-62:12, 113:1-123:24.

235.    Brogan testified that it would have shown "leadership" if Mark had instead requested

that the firm consider changing its policy without saying "you're violating the law."  Chase Ex. 77

(Brogan) at 207:2-12.

236.    When he read the August 2018 emails at his deposition, Brogan testified that they were

"routine and – and relatively innocuous disagreements over firm policies" and did not "reflect poor

judgment, a disinterest in pursuing a career at Jones Day, or a lack of courtesy to colleagues."

Chase Ex. 77 (Brogan) at 123:8-24.

> **ii.     The January email's complaint of pay discrimination against Julia**

237.    The January email complains that Plaintiffs "experienced [sex-based pay

discrimination] when Julia's salary was cut in relative terms based on a negative review from a

partner who, in hindsight, clearly treated her worse because she is a woman."  McClure Ex. 4 at

JD_00003143.

238.    Jones Day fired Mark because of the January email's complaint of sex-based pay

discrimination against Julia.  Chase Ex. 77 (Brogan) at 15:15-16:17 ("Q. Okay.  Why did you fire

me?"  "A. … you said that Julia was discriminated against.");

239.    But for Brogan's reaction to the January email's complaint of sex-based pay

discrimination against Julia, Jones Day would not have fired Mark.  Chase Ex. 77 (Brogan) at

26:21-27:2 ("If I thought for a moment that there was any merit to it, I – I would not have taken the decision that I took.").

240.    Brogan testified that he knew that the claim of discrimination against Julia was 'false and dishonest, because I personally made decisions that favored Julia, and gave her raises that based on her rankings and her – scores she did not deserve." Chase Ex. 77 (Brogan) at 16:11-17.

241.    The January email's allegation, however, is that a partner who worked with Julia wrote her a negative evaluation because she is a woman and that it affected her pay. McClure Ex. 4 at JD_00003143.

242.    Brogan acknowledged that "of course those evaluations are important" to determining associate compensation. Chase Ex. 77 (Brogan) at 209:4-22.

243.    Shumaker agreed that reviews "[a]bsolutely" matter to his recommendations on associate pay. Chase Ex. 81 (Shumaker) at 314:13-25.

244.    Brogan's role as the final decisionmaker on compensation for Jones Day attorneys would not give him insight into whether a particular input into the compensation process—a single evaluation by a single partner—was motivated by sexism or not. Chase Ex. 77 (Brogan) at 213:9-15 (Brogan generally simply accepts the compensation recommendations made to him); *Tolton v. Jones Day*, No. 19 Civ. 945 (D.D.C.), Dkt. 146 at 37-38 (hereinafter "*Tolton*") (describing process for making compensation adjustments).

245.    Indeed, Brogan did not even read Julia's reviews for the year in which she got a small raise until *after* he fired Mark. JDSF ¶ 262; Chase Ex. 77 (Brogan) at 83:18-24.

246.    Brogan testified that he did not credit the idea that Partner A would submit a discriminatory evaluation of Julia because (according to Brogan) "[h]e is biracial, as is Julia," "an enormous promoter of diversity," "a complete advocate for somebody like Julia," "is as high

character … as you can find," and "served in the United States Marine Corps."  Chase Ex. 77 (Brogan) at 76:23-77:78:25; *id.* at 164:10-12 ("he's biracial, and he wouldn't be a very – he wouldn't be very convincing that he discriminated against you" on the basis of sex).

247.    But the January email does not identify the partner who wrote the "negative review" of Julia.  McClure Ex. 4 at JD_00003143.

248.    As Brogan acknowledged, Julia received two negative reviews from male partners for the same year for which she received a low salary adjustment, so the January email's statement that a male partner gave her a negative review did not identify anyone in particular.  Chase Ex. 77 (Brogan) at 171:1-172:10; Chase Ex. 15 at JD_JS_00001293-1294.

249.    Nonetheless, Brogan testified that, before he made the termination decision, he communicated with Shumaker and learned the identity of the partner that the January email alleges discriminated against Julia (Partner A).  Chase Ex. 77 (Brogan) at 12:1-13:18.

250.    But Brogan was unable to provide any detail about that purported communication.  Chase Ex. 77 (Brogan) at 12:3-13:18 ("there might have been a phone call, but I – I don't remember. … I might have asked somebody that I was with to call. … I don't know whether I called [Shumaker] or whether I asked somebody to call him. …"  "Q. So just to confirm the chronology, you received an e-mail from Shumaker that included a trail of earlier emails.  You or someone else called Shumaker to determine who the partner referenced was, that it was [Partner A].  And then you wrote back to Shumaker to say that I should be fired?"  "A. That's my recollection.").

251.    Contrary to Brogan's claim that he or "somebody that I was with" called Shumaker before Brogan made the termination decision and learned who Partner A was, Shumaker—who testified, the week after Brogan's deposition, both on behalf of himself and on behalf of Jones Day

as its 30(b)(6) witness—had no oral or telephone discussions with Brogan between forwarding Brogan the January email and receiving Brogan's response that Mark should be fired and, when asked whether there were "any communications with anyone who was speaking to you on behalf of Brogan," testified "No.  No.  In terms of someone conveying a message as to Steve [Brogan] last night, he told me to tell you this or something like that, no."  Chase Ex. 81 (Shumaker) at 62:23-64:16.

252.    Shumaker himself did not know who the referenced partner was at the time of the termination.  Chase Ex. 81 (Shumaker) at 68:2-70:2 ("Q. … did you have an understanding of what Jones Day partner the e-mail was referring to as having treated [Julia] worse?"  "A. The answer is no."); *id.* at 70:4-71:23 ("when I learned it, how I learned it, I – I really cannot recall. … I can't recall if I learned it through a privileged communication or through a filing of your own.").

253.    Testifying as Jones Day's 30(b)(6) witness on the subject of Mark's termination, Shumaker confirmed that, contra Brogan, the identity of the partner referenced in the January email was not "a factor in Jones Day's decision to terminate Mark."  Chase Ex. 81 (Shumaker) at 151:23-152:17 ("A. … So whether it was [Partner A] or not did not play a part."  "Q. Okay.  And just to clarify, I'm asking about Jones Day's decision, if this was important to Jones Day's decision."  "A. Same answer.").

254.    Even Partner A himself did not know that Plaintiffs had complained about his treatment of Julia until after this case was filed.  Chase Ex. 84 (Partner A) at 263:9-11, 264:10-265:2.

255.    In a September 2021 interrogatory response signed by Brogan and by Shumaker (on behalf of himself and Jones Day), Defendants stated:

> Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action. *Beyond the reasons articulated in the prior sentence, Jones Day did*

*not have other reasons for terminating Savignac's employment in January 2019.*

Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories) (emphasis added); *id.* at 23 (signature page).

256.    As Brogan acknowledged, Defendants' response to Interrogatory 7 says nothing about the January email's complaint of pay discrimination against Julia being a factor in the termination decision.    Sheketoff Ex. 30 at 15-16 (Response to Interrogatory 7 of Plaintiffs' First Interrogatories); Chase Ex. 77 (Brogan) at 161:3-164:17.

257.    Jones Day's statement regarding Plaintiffs' lawsuit that was posted to Jones Day's website (i.e., Jones Day's press release) does not give the January email's complaint of pay discrimination against Julia as a factor in the termination decision.  Chase Ex. 72 at P02272.

258.    Even Jones Day's summary judgment brief does not acknowledge Brogan's testimony that he fired Mark because of the email's complaint of pay discrimination against Julia.  *See* Dkt. 189.

259.    None of Jones Day's "pleadings and other filings in this action" as of the date of Defendants' First Supplemental Response to the interrogatory referenced above (September 10, 2021) says that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark.  *See* Dkts. 1 through 78.

260.    Rather, Brogan's deposition on June 6, 2022, was the first time that Defendants ever suggested that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark.  Chase Ex. 77 (Brogan) at 15:15, 16:11-17.

261.    Brogan's testimony on June 6, 2022, that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark is directly contradicted by Defendants' September 10, 2021 interrogatory response stating that "Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's

statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019."   Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

262.    Brogan chose not to investigate the pay discrimination claim, such as by by asking Partner A about it before he fired Mark.  Chase Ex. 77 (Brogan) at 79:3-18.

263.    In contrast to Brogan's professed certainty, without having spoken to Partner A and without having any personal knowledge of Partner A's interactions with Julia, Partner A himself testified that he did not know whether Julia honestly believed that he had discriminated.  Chase Ex. 84 (Partner A) at 265:3-14.

### iii.    The particular number of weeks of leave demanded in the January email

264.    The number of weeks of leave that the January email demanded to settle the challenge to the leave policy played no role in Jones Day's decision to fire Mark.  Chase Ex. 77 (Brogan) at 69:24-70:3 ("Q. So the particular amount of leave demanded in the e-mail, which is 18 weeks of paid leave and 6 weeks of unpaid leave, did the specific amount of leave demanded factor into your decision?"  "A. No."); *id.* at 70:4-16 (asked if he would have fired Mark if the email had instead "demanded 12 weeks of paid leave and 6 weeks of unpaid leave" (i.e., six weeks less than the email in fact demanded), Brogan answered: "I don't know."); *id.* at 48:16-49:21, 68:23-71:5, 124:4-18, 167:12-168:3.

265.    Indeed, when he decided to fire Mark, Brogan did not "have any knowledge of the numbers of weeks [of leave] that are given to associates" in connection with the arrival of a new child.  Chase Ex. 77 (Brogan) at 49:14-21; *see id.* at 48:16-49:21, 68:23-71:5; *id.* at 124:4-18

("Ms. Chase: … Mr. Brogan is not aware of the duration of the leaves. … He has told you he does not know, has not known.  You want a stipulation?  We'll stipulate.").

266.   Brogan "doubt[s]" that he has ever seen the firm's written leave policy.  Chase Ex. 77 (Brogan) at 100:10-13.

### iv.   The January email's statement that Mark would sue Jones Day

267.   Brogan insisted that the email's statement that Mark would file an EEOC charge and court complaint against Jones Day was not a factor in his decision.  Chase Ex. 77 (Brogan) at 22:16-19.

268.   However, Brogan opined that for a Jones Day associate to keep working for the firm while suing it for discrimination would create "an endless conundrum" because "every time there's a decision made about what work you're given, what compensation received, what your advancement is, you could always claim the firm discriminated," "[s]o it would be an awkward situation.  I – I don't know how I would deal with it."  Chase Ex. 77 (Brogan) at 23:15-24:13.

269.   Brogan further admitted that if an associate sued Jones Day for discrimination, he would not support that associate for partner.  Chase Ex. 77 (Brogan) at 24:15-24:20 ("Q. Would you support someone, an associate for partner, who was currently prosecuting a discrimination suit against Jones Day?"  "THE WITNESS: No.").

### v.   The January email's reference to the "court of public opinion"

270.   Brogan testified that he fired Mark because the January email "said 'or else; or else I will go to the press.'"  Chase Ex. 77 at 15:15, 17:10-13 ("Q. Okay.  Why did you fire me?"  A. … And then you made the statement that – 'Give me what I want,' which I viewed as an extortionist demand, particularly when you said 'or else; or else I will go to the press.'").

271.     Brogan was referring to the January email's statement that if Jones Day did not give Mark 18 weeks of paid leave and six weeks of unpaid leave, Mark would "file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion."  McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 77 (Brogan) at 72:2-6, 73:25-74:18.

272.     Brogan testified that he fired Mark "because you're – you're trying to malign and defame the firm.  You're trying to say the fame – the firm is sexist.  And you're trying – and you're expressing an intent to go out into the world and to say that."  Chase Ex. 77 (Brogan) at 25:10-16.

273.     The January email does not say that Plaintiffs would "go to the press."  McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 77 (Brogan) at 73:25-74:14.

274.     The January email does not say that Plaintiffs would "go to" the "court of public opinion."  McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 77 (Brogan) at 74:15-18; Chase Ex. 79 (Savignac) at 245:4-246:9.

275.     The January email says that Mark would file a lawsuit and that the result would be that "the matter will be decided in the D.C. Circuit and in the court of public opinion."  McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 79 (Savignac) at 244:18-247:6.

276.     The email refers to the fact that "court proceedings in this country are public.  The public can follow court proceedings on matters of public interest, and the public can basically draw conclusions about those matters in the same way that a literal court does – not in the same way, but it's an analogy."  Chase Ex. 79 (Savignac) at 255:12-22.

277.     Jones Day's August 2019 press release gives the firm's purported reasons for firing Mark, but it says nothing about the January email's reference to the "court of public opinion" or about Plaintiffs having supposedly threatened to "go to the press."  Chase Ex. 72 at P02272.

278.    That is because Defendants did not actually read the reference to the "court of public opinion" as a threat to "go to the press," either at the time they fired Mark or at the time they posted their press release.  Chase Ex. 72 at P02272; McClure Ex. 4 at JD_00003143.

279.    Jones Day has repeatedly indicated to the Court that it understood the reference to the "court of public opinion" as a threat to make statements *in publicly available court filings* that would be publicly embarrassing to Jones Day.  *E.g.*, Dkt. 113 at 1 (arguing that Plaintiffs' Motion for Remote Depositions in Light of Ongoing Pandemic was "nothing more than another effort to litigate this case 'in the court of public opinion'" (citing the January email as reproduced in Plaintiffs' amended complaint)); Dkt. 128 at 8 (arguing that by filing Third Amended Complaint, "Plaintiffs are misusing Rule 15 and this Court's docket to make good on their extortionate threat to attack Jones Day 'in the court of public opinion' if the [f]irm did not accede to Savignac's demand"); *id.* at 23 (arguing that proposed amendment to complaint "is a transparently bad faith effort to litigate this case in 'the court of public opinion,' as Savignac threatened from the beginning"); *id.* at 25 (arguing that, by adding allegations to their complaint, "Plaintiffs are continuing to make good on their threat to try their claims 'in the court of public opinion'"); Dkt. 160 at 7-8, 23, 25 (more of the same); Dkt. 165-1 at 23 ("the Court should make clear to Plaintiffs that they should not be *using this Court's docket* to continue to make good on their threat to try this case in the court of public opinion" (emphasis added)).

280.    Brogan acknowledged that lawsuits are open to the public and the press and that public attention and press coverage are a typical result of litigation, including in this case.  Chase Ex. 77 (Brogan) at 26:7-9 ("generally it is true that if you file a public case, it's – it's open to the media. Which is as it should be."); *id.* at 26:12-20 ("Q. So would you agree that press coverage is often

the result of the filing of a lawsuit?"  "A. Yeah, well, of course, which, you know, every – every time there's a – there's another sensational allegation by you, somebody in the press picks it up.").

281.    Jones Day has asserted to the Court in this case that a person "who is contemplating a discrimination suit necessarily understands that doing so will result in litigation in a public forum" with "[p]ublic airing of … legal and factual positions."  Dkt. 26 at 2-3.

282.    And it explained to the EEOC that "[p]ublicly airing … legal and factual positions … is the natural and inevitable result of litigation."  Sheketoff Ex. 61 at 6 (P02322).

283.    Jones Day thus asserted to the Court that the distinction between court filings and out-of-court statements (like the press release it sent to the New York Times) "cannot possibly matter." Dkt. 26 at 3; *see also* Sheketoff Ex. 61 at 6 (P02322) (arguing to the EEOC that "[i]t makes no difference that Jones Day stated its positions both in court when seeking to dismiss Claimants' lawsuit, and in the Aug. 14 Statement posted to its website" and social media accounts).

284.    Given Brogan's acknowledgement that attention from the press and public was the necessary result of this litigation and Jones Day's argument that the distinction between court filings and out-of-court statements about the litigation "cannot possibly matter," Brogan's testimony that he was indifferent to the January email's statement that Mark would file a lawsuit is irreconcilable with his assertion that he was moved to fire Mark because he purportedly read the email to say that Mark would also "go to the press."

### vi.    The January email's reference to Jones Day's black-box compensation system

285.    Brogan testified that Jones Day fired Mark because of the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation."  Chase

Ex. 77 (Brogan) at 15:15-22 ("Q. Okay. Why did you fire me?" "A. ... you said that the firm's compensation system was tailor-made to discriminate against women").

286.    The email's statement refers to the fact that "it is a compensation system where many people have input that is unreviewable by the person whose salary is being set and that, therefore, could be used to discriminate or retaliate against someone in terms of their pay." Chase Ex. 79 (Savignac) at 256:1-15; Chase Ex. 80 (Sheketoff) at 115:15-119:21.

287.    Jones Day and Brogan understood this at the time and, until Brogan's deposition three-and-a-half years later, avoided pointing to the email's reference to the black-box system as a reason for firing Mark. Dkts. 1 through 161; Chase Ex. 72 (Jones Day's press release); Sheketoff Ex. 30 at 15-17 (Response to Interrogatory 7 and First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

288.    In a September 2021 interrogatory response signed by Brogan and by Shumaker (on behalf of himself and Jones Day), Defendants stated:

> Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action. *Beyond the reasons articulated in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019.*

Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories) (emphasis added); *id.* at 23 (signature page).

289.    Defendants' response to Interrogatory 7 provides the following reasons:

> Savignac's demand for 18 weeks of paid leave, which clearly was improper given Savignac's own admission that birth mothers are entitled to disability leave while he is not; the intemperate tone of the email directed at a Jones Day staff member; his conclusory and inapposite legal analysis; the implications behind his vague assertion of familiarity with the D.C. Circuit; and his announced intent to seek media attention to publicize his defamatory allegations unless the [f]irm gave in to his extortionate demands. Savignac demonstrated in his email that he was uninterested in advancing a good-faith claim of illegality or in constructively advocating for an expansion of the [f]irm's lawful and already-generous family

> leave policies for the benefit of others, but rather was threatening to take steps to damage the [f]irm unless he was given 18 weeks of paid leave to which he had no entitlement (as he has since admitted in court). Savignac's serious lapses of judgment, extortionate conduct, and stated intent to cause damage to the [f]irm meant that he could no longer be trusted with access to the [f]irm's internal systems or any responsibility for the [f]irm's client matters. His conduct also showed a rejection of [f]irm values, an inability to accept the duties that are expected of a Jones Day partner, and a lack of any interest in a long-term future with Jones Day.

Sheketoff Ex. 30 at 15-16 (Response to Interrogatory 7 of Plaintiffs' First Interrogatories).

290.    Defendants' response to Interrogatory 7 does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation." Sheketoff Ex. 30 at 15-16 (Response to Interrogatory 7 of Plaintiffs' First Interrogatories).

291.    Jones Day's statement regarding Plaintiffs' lawsuit that was posted to Jones Day's website (i.e., Jones Day's press release) states as follows regarding Mark's termination:

> Mr. Savignac's claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent. In August 2018, Mr. Savignac and Ms. Sheketoff raised questions about the legal basis for the leave policies, and the [f]irm responded to those questions. No adverse actions were taken against either of them in response to their inquiries. Five months later, Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff and in the complaint itself. Mr. Savignac exhibited open hostility to the [f]irm, demanding that he be given what he wants "or else" and claiming hardship under circumstances that no reasonable person would view as anything but exceptionally generous.

Chase Ex. 72 at P02272.

292.    Jones Day's statement regarding Plaintiffs' lawsuit that was posted to Jones Day's website (i.e., Jones Day's press release) does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep

associate salaries secret are tailor-made to enable sex discrimination, including retaliation." Chase Ex. 72 at 2-4 (P02271-73).

293.    Jones Day maintains that the press release "set forth the [f]irm's reasons for terminating Savignac's employment." Sheketoff Ex. 61 at 5 (P02321).

294.    In its motion to dismiss (filed in September 2019), Jones Day represented to the Court that "Actually, Jones Day fired [Mark] for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his unreasoned demand." Dkt. 15 at 9; *see also id.* at 23 ("Jones Day terminated Savignac … after his intemperate, unreasoned threat in January 2019 to wage a public relations campaign to damage the [f]irm if he did not receive the extra paid leave he demanded.").

295.    Jones Day maintains that "the [f]irm's motion to dismiss … explained the reasons for Savignac's termination." Sheketoff Ex. 61 at 5 (P02321).

296.    But the motion to dismiss does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation." *See* Dkt. 15.

297.    In its Answer (filed in September 2020), Jones Day represented to the Court that "Jones Day fired Savignac for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his demand for eight weeks of paid leave." Dkt. 35 at 5; *see also id.* at 23 (representing that "Mark … was fired because of his poor judgment, behavior to colleagues, and intemperate, unreasoned threat to wage a public relations campaign to damage Jones Day if it did not provide him with extra paid family leave").

298. The answer does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation." *See* Dkt. 35.

299. In a February 2021 submission to the Court, Jones Day again gave its supposed reasons for firing Mark but did not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation." *See* Dkt. 44 at 4-5.

300. At a July 2021 hearing, Jones Day argued that Mark's comparators would be associates who "either threatened to publicly embarrass the firm" or were "rude to staff," but said nothing about the black-box system.  July 20, 2021 Tr. 52-53.

301. At a January 2022 hearing, Jones Day's lead counsel represented to the Court that "the rationale for Jones Day's action was the threat that if you don't give me these eight weeks of paid leave, we'll go to the court of public opinion, which is not protected activity."  Jan. 31, 2022 Tr. 41:21-24.

302. None of Jones Day's "pleadings and other filings in this action" as of the date of Defendants' First Supplemental Response to the interrogatory referenced above (September 10, 2021) says that the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" was among Defendants' reasons for firing Mark.  *See* Dkts. 1 through 78.

303. Rather, Brogan's deposition on June 6, 2022, was the first time that Defendants ever suggested that the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable

sex discrimination, including retaliation" was among Defendants' reasons for firing Mark.  Chase Ex. 77 (Brogan) at 15:15-22.

304.    Brogan's testimony on June 6, 2022, that the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" was among Defendants' reasons for firing Mark is directly contradicted by Defendants' September 2021 interrogatory response stating that "Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019."   Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

305.    Brogan's deposition on June 6, 2022, was the first time that Defendants ever asserted that they interpreted the January 2019 email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" as an assertion that the black-box system was "intentionally design[ed]" to enable sex discrimination when it was initially adopted in the 1940s.  Chase Ex. 77 (Brogan) at 15:15-16:10.

306.    Plaintiffs used the term "tailor-made" in the sense of "very well suited for."  Chase Ex. 80 (Sheketoff) at 116:1-117:16; Chase Ex. 79 (Savignac) at 256:1-15; "tailor-made," merriam-webster.com ("made or fitted especially to a particular use or purpose"); "tailor-made," collinsdictionary.com ("If you say that someone or something is tailor-made for a particular task, purpose, or need, you are emphasizing that they are perfectly suitable for it.").

307.    Jones Day had previously told the Court that it understood the email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" as "a reference to the now dismissed but then active litigation in the *Tolton* case."  Dkt. 92 at 9.

308.    Jones Day's summary judgment fact statement likewise connects the January email's statement to the claim in the *Tolton* case.  JDSF ¶ 352.

309.    The *Tolton* lawsuit did not claim that Jones Day's black-box compensation system was intentionally designed to enable sex discrimination when it was initially adopted in the 1940s. Sheketoff Ex. 59 at 12-17 (*Tolton* TAC ¶¶ 41-48, under the heading "Jones Day's 'Black Box' Compensation Policy Facilitates Pay Discrimination Against Women").

310.    Rather, the *Tolton* lawsuit claimed that the black-box compensation system enables discrimination and has a disparate impact on female associates in the 21st century.  Sheketoff Ex. 59 at 12-17 (*Tolton* TAC ¶¶ 41-48).

311.    The same complaint about Jones Day's black-box compensation system was raised by the complaint in *Moore v. Jones Day*, filed in the summer of 2018.  Sheketoff Ex. 56 at 3-4, 8-10 (¶¶ 3-5, 23-30).

312.    In June 2020, this Court rejected Jones Day's argument that the *Tolton* lawsuit's claims that "Jones Day paid men more than women" through its black-box compensation system were "brought … without factual support" or objectively unreasonable.  *Tolton* Minute Order of June 9, 2020.

313.    Also contrary to Defendants' interrogatory response, Brogan testified that the email's statement "We are very familiar with the D.C. Circuit and confident that we will win" was *not* a factor in the firing.  Chase Ex. 77 (Brogan) at 75:9-76:1; *see also* Chase Ex. 81 (Shumaker) at

110:19-22 ("We hired you.  We paid you over a million dollars.  I would hope and expect that you have some familiarity with the D.C. Circuit.").

**E.  Plaintiffs' challenge invoked Jones Day's formal Reporting and Investigation policy.**

314.    As of January 2019, Jones Day maintained in its Firm Manual so-called "EQUAL EMPLOYMENT AND ANTI-HARASSMENT POLICIES" stating that the firm "adheres to applicable laws and regulations with regard to nondiscrimination" and "provides equal employment opportunity" "without regard to … gender."  Chase Ex. 1 at JD_00002113.

315.    When he joined Jones Day, Mark was directed to and did read and certify his understanding of the "provisions of the firm manual concerning equal employment opportunity and anti-harassment."  Chase Ex. 79 (Savignac) at 84:5-85:5, 87:21-91:10.

316.    That section of the Firm Manual sets out this internal complaint-and-investigation procedure:

> **Reporting And Investigation**
>
> Any employee who believes that he or she has been subject to discrimination or harassment in any form should report the incident to the Partner-in-Charge of the Office involved.  If the employee is uncomfortable for any reason discussing the situation with the Partner-in-Charge or, in the alternative, if the employee is not satisfied after bringing the situation to the attention of the Partner-in-Charge, the employee should report the situation to the Firm Director of Human Resources, the Firm Administrative Partner, or their Office Administrator.
>
> The Firm will investigate allegations of discrimination or harassment in as prompt and confidential a manner as possible and will take appropriate action if warranted.  Any person who is determined by the Firm to have engaged in discrimination or harassment in violation of this policy may be subject to disciplinary action, including termination from the Firm.  Further, retaliation in any form against an employee or applicant who complains of discrimination or harassment is strictly prohibited, and may itself be cause for appropriate disciplinary action, including termination from the Firm.

Chase Ex. 1 at JD_00002114.

317.    Sarah McClure is the "Firm Director of Human Resources" designated by the official Reporting and Investigation policy as one of the individuals to whom employees should report allegations of discrimination.   Chase Ex. 1 at JD_00002114; JDSF ¶ 298; Chase Ex. 81 (Shumaker) at 37:18-38:10; *id.* at 106:5-11 ("Q. Should I have sent the e-mail to someone other than McClure?"  "A. … Sarah [McClure] was the right – was – was one of – we started this deposition by going through the individuals you could have contacted with any concern or issue you had.  Sarah was one of them.").

318.    Mark's August 2018 email alleges that Jones Day's parental leave policy is "discriminatory."  McClure Ex. 3 at JD_00003164.

319.    Mark sent his August 2018 email to HR Director McClure.  McClure Ex. 3 at JD_00003163-64; Chase Ex. 79 (Savignac) at 91:2-10.

320.    Jones Day then investigated the email's allegation that its policy was discriminatory. JDSF ¶ 300; Chase Ex. 81 (Shumaker) at 39:2-15 ("we absolutely had investigated what you and Juli[a] were saying"); *id.* at 155:16-157:11, 168:2-12.

321.    McClure's August 2018 response left the door open for further discussion over the leave policy.  Chase Ex. 81 (Shumaker) at 47:12-25 ("remember, the August communication we had with you said if you have any questions or concerns, please come to us.  That was still an open door.  And if you had come to us and said, 'You know, I've really got a problem with this, guys,' as compared to this lobbing a grenade over the wall … sure, we could have had a discussion.").

322.    In August 2018, Plaintiffs reviewed and printed off the "Reporting and Investigation" policy.  Sheketoff Decl. ¶ 13; Sheketoff Ex. 45 at P02146.

323.    Plaintiffs sent their January 2019 email reiterating the allegation that the firm's parental leave policy is "discriminatory" to McClure.  McClure Ex. 4 at JD_00003143.

324.     Jones Day investigated in response to the January 2019 email.   Chase Ex. 81 (Shumaker) at 19:18-20:25, 22:24-23:7, 24:7-25:15; *id.* at 123:10-124:2 (Shumaker conferred with Mary Ellen Powers regarding Plaintiffs' "questioning [of] our leave policies"); *id.* at 124:3-125:10 (Shumaker consulted Shay Dvoretzky because "he had handled issues like this in his client work … More along the lines of labor and employment issues.  I – I don't recall being specific to leave issues … But I remember Shay having some unique expertise regarding the law, so I would have been seeking to take advantage of a really big brain, knowing the law better than perhaps me").

325.     Jones Day also investigated the January email's allegation that Julia experienced sex-based pay discrimination.   Chase Ex. 81 (Shumaker) at 66:23-67:24 ("I would have certainly pulled up both yours and her reviews."); *id.* at 68:21-24; *id.* at 118:18-119:23 (Shumaker had Julia's evaluations pulled because he "was trying to get the facts"); Sheketoff Ex. 49; Sheketoff Ex. 50; *see also* Chase Ex. 77 (Brogan) at 12:3-21 (Brogan "was interested in identifying who you were claiming gave a discriminatory review of Julia" and purportedly did so before making the termination decision).

326.     Jones Day also investigated ███████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████." Chase Ex. 81 (Shumaker) at 134:13-135:23; Sheketoff Ex. 46.

327.     As its Eleventh Defense in this action, Jones Day asserts:

> Jones Day at all relevant times has maintained, disseminated and observed equal employment, affirmative action, a harassment-free work environment, and anti-retaliation policies, that, *inter alia*, provide that all personnel decisions are to be made on the basis of merit without regard to gender, protected activity, or on any other basis that is protected under applicable law, and prohibit any form of retaliation against an individual who in good faith reports a claim of discrimination or who opposes any act or practice made unlawful by any federal, state, or local statute, or who cooperates in the investigation of such a report.

Dkt. 178 (Answer to TAC) at 40; *see also* Dkt. 45 at 19 (same defense in response to the supplemental complaint).

328.   As part of its Sixth Defense in this action, Jones Day asserts that "[a]ll actions by Defendants with respect to Plaintiffs were lawful and were made in good faith compliance with applicable provisions of law."  Dkt. 178 (Answer to TAC) at 39.

329.   As part of its Thirteenth Defense in this action, Jones Day asserts that "Plaintiffs' claims are barred … to the extent that … Jones Day exercised reasonable care to prevent the alleged incidents, and the Plaintiffs unreasonably failed to take advantage of available preventative or corrective opportunities."  Dkt. 178 (Answer to TAC) at 40; *see also* Dkt. 45 at 19 (same defense in response to the supplemental complaint).

**F.  Jones Day's treatment of others further confirms that it fired Mark illegally.**

**i.      Jones Day also immediately fired the only other employee who threatened a discrimination lawsuit.**

330.   Wendy Moore was a female Jones Day partner.  Dkt. 71-2 at 5 (Shumaker Decl. ¶ 12).

331.   ██████████████████████████████████████████████████████████

████████████ Chase Ex. 77 (Brogan) at 136:3-6.

332.   ██████████████████████████████████████████████████████████

███████████████████████. Chase Ex. 77 (Brogan) at 136:7-12.

333.   ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████. Chase Ex. 77 (Brogan) at 136:7-12, 139:20-141:23, 142:10-16.

334.   ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████. Chase Ex. 77 (Brogan) at 138:5-140:6, 145:2-7,

147:2-5 ("██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████.."); Chase Ex. 81 (Shumaker) at 279:6-14, 280:20-281:2.

335.   According  to  Shumaker,  ████████████████████████████████

████████████████████████████████████ Chase Ex. 81 (Shumaker) at 285:15-286:5.

336. ████████████████████████████████████████████████

███████████. Chase Ex. 77 (Brogan) at 136:25-139:16, 145:2-7; Chase Ex. 81 (Shumaker) at

279:6-1, 280:20-281:2.

337. ███████████████████████████████████████████████████

██████████████████████████████████████████████████ Chase Ex. 77

(Brogan) at 137:11-17.

338.   When asked whether he would "have any desire at all to fire someone who threatened a

lawsuit [against] Jones Day," ████████████████████████████████████

███████████████: "In [Mark's] situation, it was – it was – you know, he – he was lying about the

firm.  And that's the reason why I took the steps that I took. ███████████████████

██████████████████████████████████████████████████████████

█████████" Chase Ex. 77 (Brogan) at 149:19-150:4.

339. ███████████████████████████████. Chase Ex. 77 (Brogan) at 139:18-19.

340. █████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████. Chase Ex. 81 (Shumaker) at 277:16-25.

341. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

### ii.   Jones Day did not fire the male associate who called his colleagues "cunts."

342.   A male associate at Jones Day referred to his female colleagues as "cunts." ██████
████████████████████████; Sheketoff Ex. 59 at P04356 (TAC in *Tolton v. Jones Day* at ¶ 94); Sheketoff Ex. 60 at P04492 (Answer to TAC in *Tolton v. Jones Day* at ¶ 94).

343.   ████████████████████████████████████. Chase Ex. 81 (Shumaker) at 259:2-4.

344.   ███████████████████████████████████████████

███████████████████████████████████████████

██████████████. Chase Ex. 81 (Shumaker) at 261:5-15.

345.   These are █████████████████ that Jones Day asserts Mark was fired for demonstrating in the January email. *E.g.*, Chase Ex. 72 at P02272.

346.   ███████████████████████████████████████████

████████████████████████████████ Chase Ex. 77 (Brogan) at 131:15-18; Chase Ex. 81 (Shumaker) at 261 ("██████████████████████████████████").

### G. Jones Day continued to retaliate by interfering with Mark's employment references.

347.   It is difficult for a senior associate like Mark, who was nearly eight years out of law school when he was fired, to find a new partner-track job at a top-tier law firm. Chase Ex. 83 (Lovitt) at 156:18-19 ("the more senior you get, the harder it is to find another job"); *id.* at 157:2023 ("at this level of seniority, man, it's going to be hard for her to find a new job").

348.    On January 27, 2019, Mark sent emails to three Jones Day partners who had worked

with extensively (Ben Mizer, Karl Thompson, and Shay Dvoretzky) to ask them to "serve as a

telephone reference for me and write a reference letter based on our work together."  JDSF ¶ 364;

Chase Ex. 47 at JD_PRIV_0165; Chase Ex. 48 at P02772; Chase Ex. 50 at JD_00002863.

349.    Thompson agreed: "I would be very happy to serve as a reference, of course.  Just let

me know how I can help."  Chase Ex. 48 at P02772.

350.    Heifetz told Thompson that he could not serve as a reference for Mark.  Sheketoff

Ex. 32 at 7 (Response to Request 13 of Plaintiffs' First Requests for Admission); Sheketoff Ex. 39

at P04214-17.

351.    Had he been allowed to do so, Thompson would have acted as a reference for Mark, as

he had agreed to do before Heifetz interfered.  Chase Ex. 48 at P02772.

352.    Julia asked a fourth partner who had worked extensively with Mark to act as a

reference, and he also agreed to do so.  Sheketoff Decl. ¶ 14; Sheketoff Ex. 39 at P04214-17; Chase

Ex. 79 (Savignac) at 274:6-14.

353.    On January 28, however, that partner texted Julia to say:

> Whoever [Mark] emailed told [Defendant] Beth [Heifetz].  And now Beth is calling
> everyone to "remind" us that (apparently) the Firm handbook prohibits employment
> references. … I told her I hadn't spoken to Mark (which is true) and she basically
> said not to answer if he calls or emails. … Please don't repeat any of this or I'll be
> the next one to get fired. … I just wish I hadn't been told about that policy against
> references because that I cannot do now.  If it's someone I know then I can still do
> it informally.

Sheketoff Ex. 39 at P04214-17.

354.    Heifetz told Partner F that he could not serve as a reference for Mark.  Sheketoff Ex. 39

at P04214-17; Sheketoff Ex. 32 at 8 (Response to Request 15 of Plaintiffs' First Requests for

Admission).

355.    Had he been allowed to do so, Partner F would have acted as a formal reference for

Mark.  Sheketoff Ex. 39 at P04214-17.

356.    On January 29, Dvoretzky emailed Mark the following response:

> Hi Mark,
>
> Jones Day's policy is not to provide substantive recommendations, and only to
> confirm dates of employment.  Despite that, I (and only I) have been authorized to
> speak with potential employers and to provide a reference by phone.  I will be able
> to speak only about the work we did together; I won't be able to answer any other
> questions.  If you'd like me to do that, please feel free to give out my contact
> information.

Chase Ex. 49 at JD_00002465.

357.    Shumaker restricted Dvoretzky to providing only a telephonic reference and prohibited

him from putting anything in writing.   JDSF ¶¶ 376-77; Chase Ex. 56 at JD_00003758; Chase

Ex. 81 (Shumaker) at 234:3-235:12.

358.    Shumaker restricted Dvoretzky to speaking only about the work that he personally did

with Mark rather than addressing other partners' views or Mark's general reputation at Jones Day.

Chase Ex. 81 (Shumaker) at 243:19-244:15; Chase Ex. 49 at JD_00002465.

359.    Unlike Mizer and Thompson, Dvoretzky had participated in what Jones Day calls its

"collaborative decision" to fire Mark.  Dkt. 35 at 23 (Answer ¶ 154); Chase Ex. 81 (Shumaker) at

124:3-125:10.

360.    Dvoretzky supported Jones Day's decision to fire Mark.  Chase Ex. 77 (Brogan) at

50:4-13; Chase Ex. 81 (Shumaker) at 18:21-23, 22:1-2, 88:4-11.

361.    Jones Day's written policy does not prohibit employment references.  Chase Ex. 1 at

JD_00002117; Chase Ex. 81 (Shumaker) at 218:22-25, 219:15-18, 240:5-14.

362.    In fact, Jones Day attorneys do provide employment references.   Chase Ex. 79 (Savignac) at 266:15-19; Sheketoff Ex. 47; Sheketoff Ex. 64; Sheketoff Ex. 65; Sheketoff Ex. 66; Sheketoff Ex. 67; Sheketoff Ex. 68; Sheketoff Ex. 92; Chase Ex. 80 (Sheketoff) at 301:3-303:8.

363.    The written policy states in relevant part:

> [L]awyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party, including current or former employees themselves.  Requests for employment references should be referred, in the case of lawyer requests, to the Firm Administrative Partner or appropriate Partner-in-Charge.

Chase Ex. 1 at JD_00002117.

364.    The written policy assigns the decision whether to allow employment references to specified managers, including the Administrative Partner (Shumaker).   Chase Ex. 1 at JD_00002117; Chase Ex. 81 (Shumaker) at 218:22-25 ("Q. So under the policy, you decide whether to authorize an employment reference for a lawyer, is that right?"  "A. If I recall, I am one of the persons.").

365.    The written policy does not constrain Shumaker's discretion in deciding when to allow and when to deny an employment reference.  Chase Ex. 81 (Shumaker) at 219:15-18 ("Q. And nothing in this policy tells you when you can and you can't authorize an employment reference?" "A. That's correct.").

366.    Shumaker's decision whether to authorize a reference "is always an individual decision, based upon the facts and circumstances for the given lawyer."  Chase Ex. 81 (Shumaker) at 220:8-10.

367.    There is no "blanket rule" that determines when a reference is allowed.  Chase Ex. 81 (Shumaker) at 223:11-15.

368.    Shumaker could have authorized Mizer and Thompson to act as references for Mark. Chase Ex. 81 (Shumaker) at 240:5-14.

369.    Shumaker's recollection is that, when he himself has been asked to serve as a reference, he has done so "[t]wo or three times" and "[t]here have been two or three, I think, over the 30 years [at Jones Day], where someone has asked and I said, 'I can't, because of our policy.'"  Chase Ex. 81 (Shumaker) at 251:10-20.

370.    Mizer and Thompson did not act as references for Mark during his 2019 job search. Chase Ex. 50 at JD_00002863; Chase Ex. 79 (Savignac) at 311:2-21.

371.    Heifetz told Mizer that he could not serve as a reference for Mark.  Chase Ex. 78 (Mizer) at 129:18-130:16; Sheketoff Ex. 32 at 7 (Response to Request 11 of Plaintiffs' First Requests for Admission); Sheketoff Ex. 39 at P04214-17.

372.    Had he been allowed to do so, Mizer would have acted as a reference for Mark. Sheketoff Ex. 32 at 7 (Response to Request 12 of Plaintiffs' First Requests for Admission).

373.    In January 2019 (the same month that Mark was fired and sought employment references), Mizer submitted a formal evaluation of Mark's performance in 2018.  Sheketoff Ex. 48 at JD_MS_00000003.

374.    The evaluation reflects that Mark billed 424 hours to matters with Mizer in 2018. Sheketoff Ex. 48 at JD_MS_00000003.

375.    Mizer's evaluation states:

> **Comments:** I love working with Mark.  His work is mature, incisive, elegant, and thorough.  I never worry that he has missed a case or an argument.  He has written countless briefs [for one client], and all have been stellar; they never require much revision. ███████████████████████████████████████████████████████
> ███████████████████████████ In addition, Mark is excellent at time management: He always meets deadlines and communicates clearly about the status of his projects.  I would be thrilled if I could work with Mark on every case.
>
> **Goals:** My only bit of constructive feedback for Mark is that he might wish to heighten his diplomatic skills. ████████████████████████████████████████
> ████████████████████████████████████████████████████████████

Sheketoff Ex. 48 at JD_MS_00000003.

376.    As part of that formal evaluation, Mizer rated Mark a 5 out of 5 in all categories rated, including "Partnership" and "Leadership."  Sheketoff Ex. 48 at JD_MS_00000003; Chase Ex. 28 at JD_00005181.

377.    Mizer thus indicated that, in his view, Mark's "Partnership potential" was "Exceptional" (5 out of 5) and Mark was also "Exceptional" (5 out of 5) on every other category rated.  Sheketoff Ex. 48 at JD_MS_00000003; Chase Ex. 28 at JD_00005181.

378.    Because Mark was terminated before the deadline for submitting evaluations, no one other than Mizer submitted a formal evaluation of Mark's work in 2018.  Dkt. 178 at 16 (Answer to TAC ¶ 79).

379.    Had Mizer acted as a reference for Mark in 2019, his statements to potential employers would have been extremely positive, like his statements in the January 2019 evaluation, which were virtually contemporaneous with Mark's termination that month and which Mizer testified were honest and candid.  Sheketoff Ex. 48 at JD_MS_00000003; Chase Ex. 78 (Mizer) at 224:9-225:8, 235:1-5.

380.    Had Thompson acted as a reference for Mark, his statements to potential employers would have been extremely positive, as damages discovery will confirm.  Chase Ex. 48 at P02772.

381.    Following his termination from Jones Day, Mark sought employment with more than 40 other law firms.  Sheketoff Ex. 35 at 7-10 (Response to Interrogatory 1 of Defendants' Second Discovery Requests); Chase Ex. 79 (Savignac) at 308:4-309:3.

382.   Only one of those firms offered Mark a job.   Sheketoff Ex. 35 at 9 (Response to Interrogatory 1 of Defendants' Second Discovery Requests); Chase Ex. 79 (Savignac) at 308:4-309:3.

383.   With strong references from Mizer and Thompson, and without the artificial limitations that Jones Day put on Dvoretzky's reference, Mark would have been a materially stronger candidate for a job as an appellate attorney at another law firm.  Chase Ex. 79 (Savignac) at 271:10-273:17.

384.   Indeed, as Jones Day has acknowledged, Mark was in a particularly difficult situation in trying to find new employment by virtue of his being a very senior associate.   Chase Ex. 83 (Lovitt) at 156:18-19, 157:3-24; Chase Ex. 81 (Shumaker) at 31:14-24.

385.   It "would not surprise" Shumaker if partners at the firm were "unaware of the policy and made a reference" without seeking authorization.  Chase Ex. 81 (Shumaker) at 252:13-18.

386.   In fact, Jones Day attorneys do act as employment references without seeking the authorization purportedly required by the written policy, as the following paragraphs confirm.  *See infra* at ¶¶ 387-88, 395-401.

387.   One former associate received employment references from both Julia and Jones Day partner Yaakov Roth; Julia did not seek authorization, and it is beyond dispute that Roth did not either, ███████████████████████████████████████████████████████████.  Chase Ex. 80 (Sheketoff) at 301:3-304:16; ████████████████████████.

388.   Roth and Jones Day partner Anthony Dick, who had worked with Mark in 2018, also acted as an informal references for Mark during his 2019 job search.  ███████████████████ ████████.

389.    The limited involvement from Roth and Dick, who acted informally and spoke only to existing contacts, confirms that more reference support would have made Mark a materially stronger candidate and that Jones Day's interference harmed his candidacy, as the following paragraphs confirm.

390.    Dick spoke only to the head of the appellate group at Steptoe & Johnson, which is the only firm that actually offered Mark a job. ████████████████████████

391.    Roth communicated with contacts at Jenner & Block and a small firm in Chicago. Following Roth's intervention (he "told [his contact] to hire mark") Jenner invited Mark for interviews at its office (per Roth, his contact "intervened and Jenner is going to give mark an interview")—one of just three firms (including the one that hired Mark) that did so. ████████
████████████████████████; Sheketoff Ex. 35 at 7-10 (Response to Interrogatory 1 of Defendants' Second Discovery Requests).

392.    In his formal evaluation of Mark's work, Roth pointed to Mark's work across three matters and wrote:

> Mark is one of the most thoughtful and contemplative associates I've worked with. He can identify the vulnerabilities in any argument and articulate them better than any opposing counsel.  Discussing legal issues with him is an intellectual pleasure, and highly valuable.  And he is a diligent worker.  His writing is very good, but stylistically bears some similarity to the judge for whom he clerked (Posner), meaning it is not necessarily appropriate for a less sophisticated audience.  That's just something to be mindful of.  Overall, Mark is a highly capable lawyer and shows great promise.

Sheketoff Ex. 48 at JD_MS_00000007.

393.    Had Roth acted as a formal reference for Mark in 2019, his statements to other potential employers would have been very positive, consistent with his formal evaluation quoted above and ████████████████████████████████. ████████████████████████████

██████████████████████████████ Sheketoff Ex. 48 at JD_MS_00000007;

Chase Ex. 79 (Savignac) at 6-16.

394. Heifetz was personally involved in Jones Day's response to Mark's reference requests. Sheketoff Ex. 31 at 3-4 (Response to Interrogatory 1 of Plaintiffs' First Interrogatories) ("The individuals involved in responding to those requests were Michael Shumaker, Beth Heifetz, and Shay Dvoretzky."); Sheketoff Ex. 39 at P04214-17; Sheketoff Ex. 32 at 7-8 (Responses to Requests 11, 13, and 15 of Plaintiffs' First Requests for Admission); Chase Ex. 78 (Mizer) at 129:18-130:16.

395. But in the past, Heifetz authorized Julia (together with several of Julia's friends) to provide a letter of reference on Heifetz's behalf for ██Staff E██, a Jones Day employee. Sheketoff Decl. ¶¶ 15-16; Sheketoff Ex. 64; Sheketoff Ex. 65; Sheketoff Ex. 66; Sheketoff Ex. 67; Sheketoff Ex. 68.

396. As Defendants have admitted, there is no documentary evidence suggesting that Heifetz ever obtained authorization to provide a reference for ██Staff E██ Sheketoff Ex. 33 at 6 (RFA 9).

397. Heifetz also authorized Julia to "write a letter of recommendation for" ██M Associate K██, a Jones Day employee who had worked with them. Sheketoff Ex. 47 at JD_00003760; Sheketoff Decl. ¶ 17.

398. There is no documentary evidence suggesting that Heifetz ever obtained authorization to provide this reference. Sheketoff Ex. 47 at JD_00003760

399. Heifetz also agreed to serve as a reference for ██Staff F██, another former Jones Day employee, just hours after receiving the request. Sheketoff Ex. 92 at JD_00003836-37.

400.    As Defendants have admitted, there is no documentary evidence suggesting that Heifetz ever obtained authorization to serve as a reference for [Staff F] Sheketoff Ex. 33 at 7 (RFA 11).

401.    Shumaker has no recollection of Heifetz—or Dvoretzky or Mizer or Thompson or ████—ever seeking his authorization to provide an employment reference.   Chase Ex. 81 (Shumaker) at 256:10-257:12.

**H.  Jones Day's malicious press release is unlawful retaliation for filing this lawsuit.**

402.    Plaintiffs filed this lawsuit on August 13, 2019.  Dkt. 1.

403.    Soon thereafter, Jones Day posted to its website a press release titled "Jones Day responds to litigation challenging leave policy."  Chase Ex. 72 at 2 (P02271).

404.    Jones Day also disseminated its press release to its social media accounts on Twitter and Facebook, where it had more than 20,000 followers.  Dkt. 45 at 5 (Answer to Supp. Compl. ¶ 19).

405.    As of September 30, 2019, Jones Day's Twitter account alone had more than 21,000 followers.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

406.    Jones Day also disseminated the press release on LinkedIn, where Plaintiffs and other attorneys maintain accounts for the purpose of connecting with potential clients or employers. Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2); Chase Ex. 82 (Lovitt) at 134:18-25.

407.    As of September 30, 3019, Jones Day's LinkedIn account alone had more than *45,000* followers.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

408.    As of August 24, 2021, Jones Day's LinkedIn account alone had more than *65,000* followers.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

409.    As of August 24, 2021, the press release page on Jones Day's website had received more than *25,000* unique visitors.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

410.    The press release remains posted to Jones Day's website and social media accounts. Dkt. 45 at 5 (Answer to Supp. Compl. ¶ 19).

411.    Brogan decided that Jones Day would prepare the press release in July 2019, after the attorney who was then representing Plaintiffs sent Jones Day a draft complaint along with a letter proposing settlement discussions.  Chase Ex. 77 (Brogan) at 175:9-18; Chase Ex. 62.

412.    Brogan explained that "at this point, we – we knew you were going to sue us, because you just sent us a complaint."  Chase Ex. 77 (Brogan) at 175:2-4.

413.    On August 13, 2019, Julia emailed Jones Day a copy of the complaint.  Chase Ex. 68 at JD_00002982; Chase Ex. 77 (Brogan) at 175:18-23.

414.    Brogan testified that Jones Day prepared the press release in response to the draft complaint sent by Plaintiffs' then-attorney and the complaint that Julia sent prior to filing.  Chase Ex. 77 (Brogan) at 175:9-23.

415.    The press release asserts that Plaintiffs "complain that [Jones Day's] leave policy … perpetuates gender stereotypes because the [f]irm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them sufficient to justify disability leave.  Neither the law nor common sense requires such intrusive disclosures."  Chase Ex. 72 at 2.

416.    Contrary to the press release, Plaintiffs have never suggested that Jones Day should require medical documentation from women or asserted that it was required to do so, and there is no evidence in the record that Plaintiffs made such an assertion.  McClure Ex. 3; McClure Ex. 4; Chase Ex. 79 (Savignac) at 150:13-16; Dkt. 18 at 6 (MTD Opp. 1).

417.     Indeed, this very point was made to Jones Day just before it published the press release. Sheketoff Ex. 170 at JD_00002559.

418.     The press release asserts that Mark's "claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent" and asserts that he was instead fired for supposed character flaws and not for challenging the leave policy.  Chase Ex. 72 at 3.

419.     Contrary to the press release, Brogan has now admitted that he decided to fire Mark for asserting that the firm's leave policy is illegally discriminatory and that he would not have fired Mark but for his reaction to that complaint.  Chase Ex. 77 (Brogan) at 15:15, 16:18-25 ("Q. Okay. Why did you fire me?"  "A. … You then went on to act as if you personally were the law-givers; that the – our policy on leave was illegal."); *id.* at 46:15-22 (the firing decision was "on the basis of your e-mail and also your attack on our position, which seems to be on all fours with what you were told by Sarah [McClure]"); *id.* at 58:23-59:20 ("Q. … was anything in [the email's first] paragraph a factor in your decision to fire me?"  A. … In this particular paragraph – and I think I referred to this; that you speak like you're the lawgiver.  And we – we, Jones Day, which is one of the great law firms in the world, should bow down to your assessment of the EEOC.  And – and that this is a violation of [Title VII of] the 1964 Civil Rights Act. … It's a pompous assertion.  It's an arrogant assertion."); *id.* at 62:22-25 ("And you're telling us that we violated [the] 1964 Civil Rights Act?  To me, there's just no good faith basis to it."); *id.* at 63:6-11 ("Q. Would you have fired me even if you believed I was right about the policy being illegal?"  "THE WITNESS. Yeah. I – no, I – I would not."); Chase Ex. 81 (Shumaker) 96:2-19, 103:2-6.

420.     The press release asserts that Mark sent an "intemperate email … to a member of our professional staff," maliciously insinuating that Mark mistreated subordinate staff members like paralegals or secretaries.  Chase Ex. 72 at 3.

421.     Contrary to that insinuation, the individual in question (Sarah McClure) is a long-time Jones Day attorney of a higher rank than Mark (Counsel) who purportedly acted as counsel for Jones Day in rejecting Plaintiffs' request for equal treatment, who is designated by the firm's manual as one of the people to whom employees should direct complaints of discrimination, and whom Shumaker described as "a senior leader in this law firm, a director of this law firm."  Chase Ex. 1 at JD_00002114; JDSF ¶ 298; Chase Ex. 81 (Shumaker) at 37:18-38:10, 103:9-106:11.

422.     The press release asserts that Julia's claim of "pay discrimination is false and was not made in good faith."  Chase Ex. 72 at 3.

423.     Contrary to the press release, and as prominent Jones Day partners are aware, Julia has long believed that Partner A discriminated against her because of her sex, and Jones Day had no basis for publicly accusing Julia of lying to the Court.  Sheketoff Ex. 41 at P02164-69; Sheketoff Ex. 39 at P04178; Chase Ex. 80 (Sheketoff) at 55:3-6, 78:4-10, 89:11-92:23, 131:7-140:8; Sheketoff Decl. ¶ 18.

424.     Further confirming the frivolity of Jones Day's false assertion, the firm asserted that Julia brought her claim in bad faith *before it even interviewed Partner A about the claim that he discriminated*.  Chase Ex. 84 (Partner A) at 263:9-11, 264:10-15 (Partner A testified that he did not know of the accusation until after the complaint was filed).

425.     Shumaker and Partner A both acknowledged that they did not have a basis to conclude that Julia did not genuinely believe her claim.  Chase Ex. 84 (Partner A) at 265:3-14 ("No, I don't think you're lying."); Chase Ex. 81 (Shumaker) at 291:6-25 ("I can't crawl into your heads")

426.    Purporting to refute Julia's pay discrimination claim, the press release asserts that Julia "was a highly paid associate who made more than her husband despite the fact that her reviews from multiple partners were mixed," maliciously insinuating that Mark was a subpar attorney who received a subpar salary under Jones Day's ostensibly merit-based black-box compensation system.  Chase Ex. 72 at 3.

427.    Contrary to that insinuation, Mark received excellent evaluations and his merit-based $500,000 salary was the same as what Jones Day's top-paid associates in the year above him had earned the year before.  Sheketoff Ex. 48 (Mark's evaluations); Dkt. 178 at 14 (Answer to TAC ¶¶ 68, 89).

428.    Julia was paid slightly more than Mark as a result of her earlier graduation year (2010), making Jones Day's direct comparison of their salaries meaningless and willfully misleading. JDSF ¶ 230 (Brogan increased Julia's pay "in line with her peers" in the Class of 2010); Sheketoff Ex. 104 at JD_00000043 (Mark "is a Class of 2011" and should be paid $405,000 because "$405 would be in line with the other Supreme's in his Class").

429.    Jones Day has itself represented to this Court that it is "materially flawed and misleading" to draw a comparison between an associate's pay and that of a more senior associate. *Tolton* Dkt. 169-5 at 3.

430.    The press release asserts, in response to Julia's allegation that Jones Day doctored the photo of her taken for its website to "lighten Julia's skin and narrow her nose" and with "[t]he apparent purpose" of making her "appear more Caucasian and (in the opinion of the editor) more attractive" (Dkt. 1 at 8 (Compl. ¶¶ 59-62)), that, "in fact, Ms. Sheketoff personally selected the precise photo that was used on the [f]irm's website," maliciously insinuating that Julia had somehow lied about the doctored photo.  Chase Ex. 72 at 3.

431.    Contrary to that insinuation, Julia's complaint was about the doctored photo that Jones Day proposed to post to its website; she never "selected" that doctored version, and she has never complained about the un-doctored version that was ultimately used on the website   Chase Ex. 80 (Sheketoff) at 165:8-170:6; Sheketoff Ex. 63.

432.    While Jones Day now argues that the photographer did not legally qualify as its employee, that is not what the press release said.  Chase Ex. 72 at 3.

### III.    A reasonable jury could find that Jones Day discriminated against Julia.

#### A.  Julia received excellent performance reviews throughout her four years at Jones Day.

433.    During Julia's four years at Jones Day, she received the following reviews:

434.    Yaakov Roth (2017): "On the ▮▮▮▮▮ matter, I let Julia take the lead in analyzing the record, evaluating which arguments to press on appeal, and drafting the brief after consultation with me about structure and substance. The result was very strong. Julia's written advocacy has really improved over the past couple of years, in terms of style and structure. Her legal ability was always excellent (and remains so). With additional experience, her judgment about litigation strategy has also sharpened noticeably. On the ▮▮▮▮▮ case, I took the lead on briefing the opening brief on appeal, but Julia handled parts of the reply brief, and she was an invaluable resource in developing our arguments and revising the drafts to make them as strong as possible. Indeed, she is a very effective editor and I often ask her for comments on my briefs in other matters. In my experience, Julia is at her best when emotionally and intellectually invested in the matter, and that was true for all of the matters on which we collaborated in 2017."  Chase Ex. 15 at JD_JS_00001290.

435.    Kerri Ruttenberg (2017): "Julia really stepped up and took ownership of the ▮▮▮▮ ▮▮▮▮ matter. She was the team's primary strategist, the client's main contact, and the Jones Day

representative interfacing with joint defense counsel. Her strategic thinking was nuanced and she added tremendous value to the joint defense team by providing thoughtful, well-written drafts of briefs, motions and jury instructions. She thought carefully and creatively about how to address the government's charges in an environment ████████████████████████████ ██████████████████. Julia also did an excellent job in court arguing a motion on our client's behalf. She was able to keep the judge focused and was polished in her presentation. Throughout the matter, Julia exercised good judgment regarding what to handle independently versus what to run by me. She kept me in the loop on important case developments and ran her ideas by me for input I was particularly impressed with Julia's growth in identifying arguments that, while legally sound, likely wouldn't carry the day with a judge or jury. Julia really shined on this matter and I had tremendous confidence in her." Chase Ex. 15 at JD_JS_00001290.

436.    Ruttenberg also filled out a section called "Goals," which asks the evaluator to "[p]lease identify key areas for development or improvement for this associate to pursue over the coming year, including developmental areas necessary for the associate to progress in his or her practice and areas that may contribute to the associate enhancing his or her professional profile end leadership skins."  Chase Ex. 28 at JD_00005182.  She wrote: "The one area I'd suggest for Julia's development is to take more opportunities to supervise associates below her. Julia had a challenging experience with a junior associate who was under-performing. Julia's initial reaction was to simply stop assigning him work. Eventually, we discussed the situation and, to her credit, she agreed to speak with the associate directly to discuss her expectations and his performance. We talked through how this could be approached, and she confronted the associate for a constructive but honest discussion. She circled back with me and said the conversation went very

well, and that the associate's performance improved thereafter. The more Julia has opportunities to supervise, the more comfortable she'll feel in that role."  Chase Ex. 15 at JD_JS_00001290.

437.    Nat Garrett (2017): "I worked with Julia on a Supreme Court merits brief, and so had extensive exposure. Julia is a pleasure to work with, she blends right into a team and took the initiative to draft substantial portions of the brief, while lending a hand in any way she could. Julia is very strategic, and thinks ahead to how arguments will be received or the collateral consequences of those arguments. I came to trust Julia deeply and would often call to get her reaction on important strategic decisions.  **Goals**: I have used Julia on a number of appellate matters now, and she is always great in that support role. I hope she is getting opportunities to be the lead I&A lawyer on certain cases because she is ready."  Chase Ex. 15 at JD_JS_00001290.

438.    Charlotte Taylor (2017): "Julia was the indispensable heart of our team on this Supreme Court matter. She had unparalleled mastery of the legal and factual issues and did an outsized share of excellent work developing our briefing strategy and writing (and re-writing) the brief. She also did a great job supervising more junior lawyers on research projects. When prepping for oral argument, her command of the record and legal universe also made her extremely effective--she caught all the angles and made sure we had answers to the tough questions. If I had to identify an "area needing improvement," it would be to work on simplifying and boiling down arguments in order to get them across most effectively. She's always incisive and detailed, but is sometimes ahead of her audience. However, the flip side of that is that nothing gets past her! In short, she's a formidably smart and talented appellate lawyer, and I always enjoy working with her.  **Goals**: If she's not already doing so, Julia should pursue opportunities to deliver solo oral arguments, including before appellate courts."  Chase Ex. 15 at JD_JS_00001290.

439.    Glen Nager (2017): "Julia is a joy to work with. She is passionate about her work; a

hard worker; thoughtful in her analysis; wanting to improve and excel; and a very good writer. She is extremely dependable. She has a great attitude and inspires others as a result.  **Goals**: Julia worked more directly with Yaakov, so I would defer to his assessments in this regard."  Chase Ex. 15 at JD_JS_00001291.

440.    Lou Fisher (2017): "Julia gave a star performance in this pro bono criminal appeal. It involved two very complex issues, one jurisdictional and one related to sentencing. Julia worked tirelessly to examine every angle, think through every potential issue, and exhaustively research a long list of topics. She did a great job fielding comments from cocounsel and from co-defendants' counsel—she was diplomatic and made appropriate accommodations while holding firm where adopting suggestions would have been counterproductive. Julia's briefs were outstanding—the writing was clear and, despite the difficulty of the arguments, she provided persuasive reasoning and struck a tone that effectively conveyed credible confidence without stridency. Julia's oral argument was equally or even more masterful. She was articulate and persuasive, struck the right tone, was fully responsive to questions, and showed great judgment and an ability to think quickly on her feet. Julia really seemed to have the respect of all three judges, whereas the panel appeared frustrated with the experienced government lawyer on the other side. We came out of the argument much more optimistic (or less pessimistic) than when we went in. A decision hasn't been issued, but Julia did fabulous work to maximize the chances of success."   Chase Ex. 15 at JD_JS_00001291.

441.    Karl Thompson (2017): "I worked with Julia on the motion to dismiss and supporting reply brief in a ██████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████. Julia did the first draft of both briefs. Her work on

both was first-rate. On the opening brief, apart from drafting a new paragraph in the Introduction, I would say my contributions to the brief were relatively minor. This is because her draft was truly excellent. We discussed certain concepts related to standing (e.g., ███████████████████ ██████████████████████████) and other issue her grasp of the law and cases was impressive. It is also relevant that this was a difficult motion to write, because the Complaint was actually ████████████████████████. Julia thought creatively to come up with convincing arguments for why, appearances to the contrary notwithstanding, the Complaint failed to state a claim. She delivered her draft on the promised timeframe. And working with her on editing and refining the draft was a pleasure. She is personable and has a friendly demeanor that avoids unnecessary stress, but still maintains very high levels of seriousness and focus. She is also impressively dogged and firm in her defense of the client's interests. Her draft for the reply brief was also excellent, and delivered at the promised lime. This was an even more challenging brief to write, because the plaintiffs' opposition brief was █████████████████████████ █████████████. Julia did a lot of excellent work figuring out exactly what plaintiffs were trying to argue (or could best be surmised to have been trying to argue), and then responding appropriately. I did more editing on this draft, but I think that is because the huge amount of work involved in hacking through the plaintiffs' brief and figuring out what they were saying and how to respond, combined with the short amount of time we had to work on the brief, left her a little short on time to then impose a firm expository structure on the brief. That was my main contribution in editing; I think the division of labor was effective. She certainly took ownership of the project, proposing reasonable deadlines that I then accepted, coming to talk over questions that required discussion, but otherwise working independently and (as far as I could tell) efficiently. She also talked frequently to other lawyers in Columbus and Cleveland who are also working on

the case.  **Goals**: As described above, Julia's work was excellent. I think she is already an excellent writer, and has skills of clear exposition and organization. I think she should continue to refine and hone those skills, making sure her writing is as clear and accessible as possible even to people who aren't as knowledgeable or as smart as she is. She already can do this and does it; it's just something we can all continuously work on and improve on."  Chase Ex. 15 at JD_JS_00001291.

442.    Ben Mizer (2017): "Julia worked with me on a series of memos in the ████████ ████████████████████████████████████████. Julia's research into and grasp of various complex areas of law—including labor law and criminal scienter requirements—was exceptional. She also did an excellent job drafting a memo for the client summarizing the risks. The memo was challenging to write because we were not privy to many of the facts that were being developed, but Julia nonetheless was able to craft very helpful guidance. And her positive attitude and constant availability to do work even when she was swamped with other matters was impressive and greatly appreciated.  **Goals**: Julia is an excellent attorney and will, I'm sure, only to continue to stand out as she gains even more experience."  Chase Ex. 15 at JD_JS_00001291.

443.    Beth Heifetz (2017): "Julia stepped in to take over this case when another associate went out on leave. The transition was seamless and Julia provided high level thinking and writing as we explored potential challenges to the ████████████."  Chase Ex. 15 at JD_JS_00001292.

444.    Shay Dvoretzy (2017): "My work with Julia this year was limited, but she contributed enthusiastically to business development efforts and demonstrated good analytical abilities in doing so."  Chase Ex. 15 at JD_JS_00001292.

445.    Hank Asbill (2016): "I love working with Julia. She is very smart, takes total ownership of her projects and is dogged about pushing for what she wants with everyone opposed to her

position. She is very good with clients and seems to really like being a defense lawyer. My only concern about Julia is that she personally stresses a lot when she cannot accomplish what she thinks is the right, just resolution. She never gives up but finds it very hard to accept adverse results or decisions. In my line of law practice, you have to learn to balance the inevitable (hopefully not frequent) bad results while taking total responsibility even for things outside your control without becoming depressed. It's sort of like football cornerbacks or hockey goalies—you have to have a short memory and eternal optimism.  **Goals**: N/A."  Chase Ex. 15 at JD_JS_00001293.

446.     Yaakov Roth (2016): "I worked most extensively with Julia on the ▇▇▇▇ case. She is at her best when she is passionate about her clients, and this case is a good example. When trial counsel produced a ▇▇▇▇▇▇▇▇▇▇▇▇, Julia rewrote it almost entirely in a short period of time, and her work was very strong. She also researched and developed a clever argument that succeeded in acquitting our client on the most serious charge of ▇▇▇▇▇▇▇. She is a smart and capable lawyer with good judgment. Her written advocacy has improved since last year, in structure and style. I think it can be further improved by focusing more on the audience: judges who are usually less sophisticated legally and less immersed in the facts. This requires simplifying and dumbing things down. Another area for improvement would be time management—ensuring that tasks are being tracked; providing regular updates to supervisors; and adhering to deadlines." Chase Ex. 15 at JD_JS_00001293.

447.     Charlotte Taylor (2016): "Julia is an extraordinarily sharp and subtle legal thinker from whose insights I have repeatedly benefited. She is an excellent writer and an effective researcher. She contributed essential help to our project by framing the complex issues at a high level to ensure a clear and precise presentation; by digging into the weeds of state law and nailing down support for our points; and by putting together a cogent and fluidly written draft of our brief. I also

appreciated her consistent willingness to help out with the various smaller tasks, whether interesting or frustrating, that arose along the way. I am always happy to work with her. **Goals**: N/A." Chase Ex. 15 at JD_JS_00001293.

448.    Partner A (2016): "

. This was a complicated issue because it required Julia to learn about ERISA and procedures to enforce judgments internationally. It was also a fact-intensive analysis because

. As one might expect, given Julia's superior academic credentials and SCOTUS clerkship, the research and learning the material presented no problems. But her initial drafts were far more academic / pure legal analysis than helpful advice to the client. In fact, there was little-to-no advice or direction to the client. That improved in subsequent drafts, however. My impression of Julia is that she is not long for firm life. She's just not that into us. Almost nothing about her work on this case suggests otherwise. She exhibits little-to-no initiative. Rather, like a second year associate, she merely does what is asked of her.  And her availability seems to be whatever is convenient for her. On multiple occasions, I asked for the next version of the memo, but she was tied up on other things.  Working on a weekend does not seem to be in her vocabulary.

And my guess would be that she did not bill 2000 hours last year. My guess is that she will soon leave to become Professor Sheketoff. **Goals**: See above." Chase Ex. 15 at JD_JS_00001293.

449.    Nat Garrett (2016): "Julia is a very skilled writer. I have worked with her on a couple of Ninth Circuit appeals now and her writing is always persuasive, and needs little editing. I also like that Julia was brave enough to ask for an oral argument, which I thought she deserved and is ready for. For whatever reason, I've got the sense that Julia is a bit protective of her time, and there were some additional projects I would have liked to get her involved in. **Goals**: This is the time for Julia to take the brakes off and let er rip. She has an argument coming up for ███████ which she has prepared hard for, and I expect her to do very well. To progress further, I think Julia needs to do more of the same, stepping up on projects and taking on additional responsibilities, even if it feels a bit overwhelming." Chase Ex. 15 at JD_JS_00001294.

450.    Mary Hale (2016): "Julia did a great job successfully representing our client ████████ ████████████████████████████. She is an excellent writer, and also did an outstanding job summarizing the case for the judge. So good, in fact, that after the judge satisfied herself that the testimony would be consistent with Julia's summary, she dispensed with further testimony. Julia is also very flexible with the give and take of litigation, and easy to work with. She is quite talented and an asset to the firm. **Goals**: N/A." Chase Ex. 15 at JD_JS_00001294.

451.    Glen Nager (2016): "Although I had only limited opportunity to work with Julia, I found her to be fun to work with and to make a helpful contribution. **Goals**: I did not have sufficient interaction with Julia to form any judgments about developmental needs." Chase Ex. 15 at JD_JS_00001294.

452.    Partner J (2016): "Julia researched a variety of issues relating to the ████████ ████████████ and then drafted a motion ██████████████████. Her research and work

product was satisfactory, and the case team revised and molded the draft motion substantially before filing. The legal arguments in Julia's drafts were helpful, but could have been presented with more passion, creativity, and using the facts of our client in more persuasive fashion. The draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an advocate for a client. The work also could have been completed more timely and with more intensity in defending the client's interests. Julia was obligated to a number of other projects that detracted from her overall effectiveness here."   Chase Ex. 15 at JD_JS_00001294.

453.    Lou Fisher (2016): "Julia brought in this pro bono Supreme Court ███████ and asked me to supervise. She didn't need much guidance at all—she took full ownership and, supervising a junior associate, handled all aspects. The drafts were excellent, and Julia did a great job analyzing and talking through some tricky issues. Julia did especially well supervising the associate, giving him appropriate amounts of guidance and leeway, so that he seemed to enjoy and learn from the experience while producing excellent work product. She also diplomatically convinced the law-professor clients that ████████████████████████. In all, Julia showed a strong ability to lead a small briefing team."  Chase Ex. 15 at JD_JS_00001294.

454.    Kerri Ruttenberg (2016): "Our activity on this matter was more limited this year. Still, Julia has consistently demonstrated a strong strategic sense in this case. She has a nuanced understanding of our case facts and her suggestions on how to proceed -- which arguments to press and which to give up -- demonstrate excellent judgment. Julia is also a pleasure to work with, as she has a great attitude and sense of humor. I look forward to working with her on another matter. **Goals**: I had the opportunity to see Julia in a stand-up role on another matter and I thought she did great. I'd love to see her get more such opportunities."  Chase Ex. 15 at JD_JS_00001294.

455.    Chris Vergonis (2016): "Julia drafted a short section of an opposition to dismiss on jurisdictional grounds in ███████████████████████████████. She asked Jackie Holmes to evaluate, but Jackie and I have agreed that I am better positioned to do so. Julia's short section (just two or three pages), on associational standing, was very well written and argued and needed virtually no editing for style or substance. I did shorten for length (only because we were up against a light page limit and *not* because of any wordiness); following my revisions, Julia took the initiative to question whether the cuts caused the legal analysis lo be loo truncated. Though I ultimately disagreed with her assessment on that point, I appreciated both her care to detail and that, despite being a peripheral player on this case team, she wasn't bashful about speaking up and challenging a decision that had been made."  Chase Ex. 15 at JD_JS_00001295.

456.    Hank Asbill (2015): "For someone 6 years out of law school with only one minor trial to her credit, Julia is exceptional. She is very smart and articulate, writes and analyzes legal issues very well and deeply cares about the client. Her witness cross examinations were strong and her writing was compelling. This was a very difficult case with a ███████████████ ███████ and frustrating co-defendants' counsel—██████████████████████████ ████████████████████. Everyone was impressed by Julia and I think her self confidence (already very strong) improved dramatically over the life of the case. █████████████████ ████████████████████████l. I would be glad to work with Julia on any matter. She constantly challenges herself and those around her and does not give up. As for the ███████ matter, Julia got to represent the client on her own in a ████████████ hearing where the lawyer is supposed to be a potted plant. The client, because of Julia's prep, did well and was ultimately allowed to ████████████."  Chase Ex. 15 at JD_JS_00001297.

457.    Yaakov Roth (2015): "On the ████████ matter, Julia played a very effective role in

coordinating the ███ defense and representing him at the ███ hearing. She kept track of the evidence, interviewed the witnesses, and assisted with drafting various letters. It was great fun working with her and she displayed impressive trial skills. On the ███ matter, Julia prepared first drafts of the opening and reply briefs and also assisted me in preparing for oral argument. She is very smart and it was a pleasure to discuss the legal issues with her, including during the outlining phase. Her research and mooting help were also invaluable in connection with the oral argument. Her initial written draft of the opening brief was not as strong as it could have been, I think because she was not persuaded by our argument on the merits and found it difficult to transition from the law-clerk role to the advocate role. Her reply draft was considerably improved, although she did have some difficulties meeting the deadlines we had set for that draft." Chase Ex. 15 at JD_JS_00001297.

458.    Hashim Mooppan (2015): "This is a difficult review for me to give. On the positive side, I really like Julia personally, I enjoy discussing legal issues with her, and I do think that she's pretty sharp. Nevertheless, my experience supervising her on this case was quite negative, on a variety of fronts. To begin, her writing was very poorly structured—the usual type of problem with recent clerks who haven't yet figured out the transition to advocacy writing, but to a much more significant degree than I would expect for someone with her pedigree, who should know the basic do's and don'ts of appellate briefing. I had to revise much more extensively than should have been necessary in this case. Likewise, her oral advocacy in the moot courts leading up to her argument was so poor in terms of both substance and presentation that I was truly worried about how the actual argument would go—while it ended up fine, the judges weren't very active, so it's hard to tell how she would have held up with a more active bench. Part of the problem with the moot courts was lack of preparation, and that in turn was due in part to a lack of judgment: she took a

vacation to London a few weeks before the argument, ██████████████████████████ ████████████████████████████████████, as that ate into her argument prep time. Moreover, while the Court's ████████████ was fairly unreasonable, she dealt with it extremely poorly—excessively complaining, not really trying hard to develop the best argument on the ███ and challenging issue, failing to find cases that the judges themselves ended up finding, and even repeatedly suggesting that she would withdraw from a ████████ ██████████████████████████. Finally, especially in light of all of the above, I think the amount of time she spent on this pro bone case seemed quite excessive; it shouldn't have taken nearly this long, especially given the quality of what she produced. In sum, although I hate to say it, I think her work on this case was immature across the board—both in terms of substantive execution and professional comportment I wouldn't want to work with her again unless and until others have noted significant improvements on at least some of the above."  Chase Ex. 15 at JD_JS_00001297.

459.    Kerri Ruttenberg (2015): "Julia did a terrific job on this project. She quickly grasped the nuances of our legal arguments, and thought creatively and strategically about how to address challenges. I don't have a great sense of how much of the written product I saw was exclusively Julia's (versus how much was edited by Yaakov), so it's tough to evaluate her written work. But, based on early drafts—as well as Julia's strong grasp of our issues that was evident during our oral communications—I think she's doing very well. I was also impressed with Julia's efforts to secure amici for this case - she contacted folks in her network, and then worked closely with amici that ████████ secured for us, marshaling the amicus briefs through to completion. She led calls with counsel for our amici and did a terrific job presenting comments and edits to their drafts. Overall, a very strong performance on this case.  **Goals**: I'd encourage Julia to keep taking opportunities to

add to her experience, whether it's writing, research or oral presentation. Based on her performance in this case, she's doing very well and is on a great trajectory."  Chase Ex. 15 at JD_JS_00001298.

460.    Nat Garrett (2015): "Julia is very bright and writes very well. I asked Julia to help with an appellate brief and she did just what an enterprising associate ought to: develop not only the ideas I have mentioned but come up with her own creative and persuasive arguments.  **Goals**: Going forward, Julia's challenge will be working quickly and efficiently. My sense is that Julia's goal is perfection, which isn't always feasible in law practice. Her work is very solid, and she needs to trust her instinct to properly balance quality with time constraints."  Chase Ex. 15 at JD_JS_00001298.

461.    Glenn Krinsky (2015): "I once again turned to the Issues and Appeals practice when a major client of ours (          needed a speedy and complex matter of statutory interpretation resolved for it. While the issues arose in a            setting, the project was really a matter of complex and gnarly statutory interpretation, and I thought that one of our former Supreme Court clerks would be well-suited for the assignment. Under significant time pressure, Julia did an absolutely stellar job. She produced a definitive memorandum that clearly and plainly answered the client's question. Julia demonstrated exceptional analytical ability and coupled that with concise and lucid writing. While the project was fairly limited and contained, Julia performed brilliantly and I can only assume that she has a tremendous future at the Firm." Chase Ex. 15 at JD_JS_00001298.

462.    Mary Hale (2015): "Julia has done an outstanding job preparing the briefing necessary to obtain the predicate order for these                                        . She has established a relationship of trust with the client                          , which will hopefully lead to a successful outcome."  Chase Ex. 15 at JD_JS_00001298.

463.    Noel Francisco (2015): "This was a very small research project. Julia's work product was good, though did not give her an opportunity to demonstrate the full range of her talent. Julia was offered a larger opportunity in the matter but chose not to do it given other ongoing matters." Chase Ex. 15 at JD_JS_00001298.

464.    Beth Heifetz (2014): "This memo was among Julia's first projects upon coming to the Firm. She did a thorough and in depth analysis, demonstrating familiarity with the legal issues and an effective and easy style of writing."  Chase Ex. 15 at JD_JS_00001300.

465.    Nat Garrett (2014): "Julia helped us draft an appellate brief dealing with thorny First Amendment issues. I thought her analysis and writing was what I would expect from someone with her pedigree: refined and persuasive. She also operated well in a team that had been working on the case for far longer, making helpful suggestions where appropriate but recognizing when a different viewpoint prevailed. My one suggestion for future improvement would be efficiency. Particularly with clients where, as here, a lower rate is approved, crafting persuasive briefs efficiently is imperative. I expect that as Julia transitions from a clerk to an attorney for paying clients, there will be improvement in this area.  **Goals**: N/A."  Chase Ex. 15 at JD_JS_00001300.

466.    Bob Naeve (2014): "Julia did a fine job ████████████████████ ██. My interactions with her were limited.  **Goals**: N/A."  Chase Ex. 15 at JD_JS_00001300.

467.    Julia also received mostly the highest or second-highest ratings across her reviews. Chase Ex. 15.

468.    Julia's assessment statement for her 2017 work states: "Julia's work this year was excellent and reflected significant growth. Her legal analysis and strategic thinking are superb, and her writing is very strong. She performed exceptionally well on her feet during oral arguments before the D.C. Circuit and a trial court. Julia shows great initiative, is deeply invested in her work,

and has a terrific attitude that inspires others. She took a leadership role in multiple matters, doing well at and growing in the role of supervising more junior lawyers, working with difficult cocounsel, and interacting with clients. Julia works hard and is dependable. As she has acknowledged, Julia continues to have an imbalance between her billable and non-billable hours. The bulk of her pro bono work was on three cases. The first was a Supreme Court case in which she prepared a partner for his first argument. The second case was a C. Circuit appeal that grew out of a case Julia and another associate took on in their first year at the Firm at the trial stage, which continued well into 2017 of the work ended up occurring when the other associate was out on leave. Julia gained trial and appellate argument experience in this case. In the third case, Julia and the other associate helped lead the defense's legal strategy for the more than 200 defendants. Julia again ended up handling the case when the associate involved went on leave. Julia presented argument in the D.C. Superior Court. It is essential that going forward, Julia will focus on billable work."  Chase Ex. 15 at JD_JS_1289.

469.    Julia's assessment statement for her 2016 work states: "Julia is an extremely smart and pleasant lawyer who grasps issues quickly and has great research skills.  Her writing is generally very strong, although at times her drafts need to be better tailored to their intended audiences.  For example, some of her writing was viewed as complicated for a judge who might not be as immersed in the law and facts; a client mem was too focused on pure legal analysis without accompanying advice; and a motion did not read enough like an advocacy piece.  Still, much of her written work was excellent and skillful.  Julia shows passionate commitment to some matters and seeks to take on responsibility, but in other matters does not take initiative and seems to be protecting her time. She is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the office generally.  Addressing these issues is critical to her

development at the [f]irm."  Chase Ex. 15 at JD_JS_1289.

470.    Julia's assessment statement for her 2015 work states: "Writes and analyzes legal issues well. Produces compelling witness examinations. Effectively coordinated defense of student at a disciplinary hearing and displayed impressive trial skills. Experienced difficulty on a project for one partner on a variety of fronts. Should work on transitioning to advocate role and improving writing and efficiency."  Chase Ex. 15 at JD_JS_1296.

471.    Julia's assessment statement for her 2014 work states: "New to the [f]irm.  Thorough researcher and effective, refined writer.   Works well with a team, has an easy and pleasant manner."  Chase Ex. 15 at JD_JS_1296.

**B.  Julia's relatively lower hours do not explain her low raise based on her 2016 work.**

472.    Julia began working at Jones Day on October 27, 2014, and recorded approximately 58 hours on billable client representations during the remainder of 2014, implying an annualized billable hours amount of about 322 hours.  She received a $60,000 raise the next summer, to a salary of $360,000.  Dkt. 45 at ¶ 78.

473.    In 2015, Julia recorded approximately 179 hours on billable client representations. She received a $65,000 raise the next summer.  Dkt. 45 at ¶ 79.

474.    In 2016, Julia recorded approximately 1066 hours on billable client representations. That is also the year that she worked for Partner A. She received a $15,000 raise the next summer, after Partner A submitted his negative review.  Dkt. 45 at ¶ 80.

475.    In 2017, Julia recorded approximately 573 hours on billable client representations. She received an $85,000 raise the next summer, leaving her salary at $525,000.  Dkt. 45 at ¶ 81.

476.    During her time at Jones Day, Julia also worked thousands of hours on non-billable client pro bono representations.  Dkt. 45 at ¶ 81.

477.     The number of Julia's billable hours each year was not a principal determinant of her salary while at Jones Day.  Dkt. 45 at ¶¶ 78-81; Sheketoff Ex. BB at JD_00001458 ███████████

████████████████████████████████████████████████████████

███████████████████ ); Chase Ex. 77 (Brogan) at 215:14-216:1 ("Q: Do you look at hours? A: Yeah, I look at hours, but I don't spend a lot of time on it.  Otherwise I wouldn't have given you a raise in 2016…  Because I think you had—you had 50 client hours or something at that time.").

478.     Indeed, the year for which Julia received the smallest raise was also the year that she worked the highest number of billable hours.  Dkt. 45 at ¶ 82.

479.     Julia's relatively low hours for billable clients (and her substantially higher hours for pro bono clients) do not suggest that Julia worked any less diligently or skillfully for her billable clients than for her pro bono clients, and in fact Julia worked diligently and skillfully for both billable and pro bono clients.  Sheketoff Decl. ¶ 19.

480.     Julia's reviews for her billable clients are equally positive as her reviews for her pro bono clients.  *See supra* at ¶¶ 433-66; *infra* at ¶¶ 712-13.

481.     According to Jones Day, "Jones Day rewards and advances lawyers based on their individual merit."  Dkt. 45 ¶ 84; *see also* Sheketoff Ex. 152 at JD_00001458 ("The [f]irm's compensation system is individual and merit-based.").

482.     And in Jones Day's words, Julia was a "highly paid associate."  Dkt. 45 at ¶ 84.

483.     Indeed, before being evaluated by Partner A, Julia (together with ████████████████ ██████████ in the I&A group) was the highest paid associate in her class year across the entire firm.  Dkt. 178 at ¶ 68.

484.     By Jones Day's own admission then, Julia was an associate with considerable merit despite her relatively low billable hours.  Dkt. 45 ¶ 84.

**C.  Partner A wrote Julia a false and malicious evaluation because of her sex.**

485.    In January 2016, Heifetz assigned Julia to assist Partner A with a research project. Chase Ex. 33.

486.    As part of that research project, Partner A ultimately asked Julia to draft a memo summarizing her research.  Chase Ex. 84 (Partner A) at 36:3-37:12; Sheketoff Ex. 75.

487.    Julia drafted the memo as requested.  Sheketoff Ex. 75.

488.    At one point in the revision process, Partner A made edits to the memo that Julia believed rendered it misleading or unclear.  Sheketoff Decl. ¶ 20.

489.    Julia consulted Partner F, who was an associate at the time, about how to respond. Sheketoff Decl. ¶ 21; Sheketoff Ex. 39 at P04091 ("I'm really sorry if I gave you bad advice.").

490.    Partner F had worked with Partner A in the past and had also found Partner A's writing and legal analysis to be very poor and in need of substantial revision.  Sheketoff Decl. ¶ 22.  Chase Ex. 80 (Sheketoff) at 130:20-22; *see also* Sheketoff Ex. 39 at P04092 ("Jackass doesn't sufficiently capture the incompetence."); *id.* at P04093 ("Remember he is a bad writer."); *id.* at P04100 ("He messed something up badly"); *id.* at P04118 ("[Partner A's] brief didn't even mention the ▮ decision in the intro"); *id.* at P04138 ("[Partner A] is getting us sued btw"); *id.* at P04200 ("Plus [Partner A will prob mess up the oral arg").

491.    Partner F advised Julia to speak up about the problems introduced by Partner A's edits and try to improve the memorandum.  Sheketoff Decl. ¶ 23; Sheketoff Ex. 39 at P04091 ("I'm really sorry if I gave you bad advice.").

492.    Julia followed Partner F's advice: She suggested further edits and explained to Partner A why she believed he should not implement all of his edits.  Sheketoff Ex. 84.

493.    Julia provided a "track-changes version of the document so [Partner A] could easily reject any (or all) of [her] suggestions."  Chase Ex. 36 at JD_JS_00001441; *see also* Sheketoff Ex. 84 at JD_JS_652-63.

494.    Partner A was "annoyed" by Julia's suggested edits and felt they were "rude."  Chase Ex. 84 (Partner A) 233:11-21, 235:6-7, 235:8-13, 241:9-13; Chase Ex. 83 (Lovitt) at 4:11-5:24 ("he was frustrated").

495.    Partner A felt that Julia should have "deferred to [his] style."  Chase Ex. 84 (Partner A) at 234:9; *see also id.* at 237:13-19 ("the junior lawyer, especially when they're working with a more senior lawyer on something that the senior lawyer's name is at the top and they're writing with them in an iterative process, should defer to the more senior lawyer and write like the more senior lawyer, especially in style.").

496.    In response, he scolded her for second-guessing his edits.   Chase Ex. 36 at JD_JS_00001441.

497.    Without salutation, and invoking his senior status in the firm's hierarchy, Partner A directed: "Some general comments. 1. you should avoid making style edits to the writing of the person whose name goes first on the memo (e.g., the first sentence on p. 2 under exec summary … where you changed 'as well as' to 'and') 2. When the person whose name goes first on the memo makes an edit, you should not change it back to the way you had it (e.g., on p. 4 when describing the district court case … the citation alerts the reader to the specific court)."  Chase Ex. 36 at JD_JS_00001441 (ellipses in original).

498.    Although purporting to give only an "example" of each of Julia's transgressions in his "general comments," Partner A does not recall any other instances of such transgressions in the memo.  Chase Ex. 84 (Partner A) 239:5-8, 241:19-22.

499.     Julia interpreted Partner A's email as conveying hostility and annoyance.  Sheketoff Ex. 39 at P04090 ("I just got a really mean email from [Partner A]"); *id.* at P04091 (explaining that Partner A is "mad about the edits.  His email is pretty nasty."); Sheketoff Ex. 41 at P02164 ("Got a crazy email from [Partner A] that I've been trying to deal with"); id at P02165 ("Female Associate A: Def total asshole… That was not to be helpful.  Julia: That's what I thought too.").

500.     Julia shared Partner A's "general comments" with Partner F and another lawyer (Female Associate A), who both agreed that Partner A's email was hostile and inappropriate.  Sheketoff Ex. 39 at P04090-92; Sheketoff Ex. 41 at P02164-69.

501.     Partner F responded: "LOL. What an ass."  Sheketoff Ex. 39 at P04091-92.

502.     Partner F told Julia: "I guess he is defensive about being called out.  But you were just doing your job…. I'm really sorry if I gave you bad advice.  But I really believe you did the right thing.  You can't let a memo like that go out if it's not accurate."  Sheketoff Ex. 39 at P04091.

503.     Female Associate A responded: "His email is so obnoxious."  Sheketoff Ex. 41 at P02164; accord *id.* at P02165 (Julia: "What is the tone of the email?  Was he trying to be helpful?  Or was he being a total asshole?  Female Associate A: Def total asshole … That was not to be helpful … If it was he woulda said it differently.").

504.     At the time, Julia believed that Partner A's hostile response to her was at least "partially a sexism thing," and thought it was "hard to imagine him saying that to a guy."  Sheketoff Ex. 41 at P02166; *see also* Chase Ex. 80 (Sheketoff) at 131:7-14, 131:19-23.

505.     She also believed it was "an insecurity thing."  Sheketoff Ex. 41 at P02166; *see also* Chase Ex. 80 (Sheketoff) 129:6-9, 133:10-134:18.

506.     Julia expressed those beliefs to Female Associate A, who agreed: "Definitely insecurity.  And maybe you're right about the sexist thing too…. I've gotta believe he would not

be sending this email to Male Associate C or Male Associate B [████████████████

████████████████████████████████████████████████████████████████

████████████ ].”  Sheketoff Ex. 41 at P02166, P02168.

507.    Female Associate A also told Julia about her own experience with Partner A: “[W]hen
[she] rewrote his memo, [s]he had the bankruptcy associate send it and [Partner A] didn’t say a
word.”  Sheketoff Ex. 41 at P02166; *see also* Chase Ex. 80 (Sheketoff) at 136:17-22.

508.    Female Associate A’s statements strengthened Julia’s belief that Partner A’s hostile
response to her suggested was motivated by sex.   Sheketoff Decl. ¶¶ 24-26; Chase Ex. 80
(Sheketoff) at 136:7-137:5; *see also* Sheketoff Ex. 39 at P04178 (“I do think [Partner A] is sexist,
and that’s why he was so offended”).

509.    When Julia learned of Partner A’s performance review of her, it further strengthened
her belief that her sex was a motivating factor in his hostile response to her suggested edits.
Sheketoff Decl. ¶ 27.

510.    Julia believed that sex was a motivating factor in Partner A’s performance review of
her.  Sheketoff Decl. ¶ 27; Chase Ex. 80 (Sheketoff) at 136:1-6.

511.    Partner A’s narrative review of Julia is very negative.    Chase Ex. 15 at
JD_JS_00001293.

512.    The numerical ratings that Partner A assigned to Julia are also negative—and indeed
lower than those he assigned to virtually every other associate during his tenure at the firm.  Chase
Ex. 15 at JD_JS_00001293; Sheketoff Ex. 142.

513.    Partner A understood that his evaluation was negative and critical.  Chase Ex. 84
(Partner A) at 77:7-11, 136:11-14, 139:3-4.

514.     Partner A thought that, if credited, his performance evaluation of Julia could harm her career at Jones Day.  Chase Ex. 84 (Partner A) at 85:14-16, 95:14-21, 100:22-101:2; *see also id.* at 63:13-18.

515.     Partner A's performance review of Julia contained numerous deliberately false statements about Julia, as discussed below.  Chase Ex. 80 (Sheketoff) at 89:11-91:1.

516.     Partner A's review states: "[H]er initial drafts were far more academic / pure legal analysis than helpful advice to the client.  In fact, there was little-to-no advice or direction to the client.  That improved in subsequent drafts, however."  Chase Ex. 15 at JD_JS_00001293.

517.     Those statements are false.  Chase Ex. 80 (Sheketoff) 89:11-19.

518.     The assignment that Partner A gave to Julia was to research and draft a memorandum about ███████████████████████████████████████████████████████ ███████████████████████████." Chase Ex. 15 at JD_JS_00001293.

519.     Whether ███████████████████████████████████████████████ ██████████████████████████████████████ it was the only task Partner A assigned to Julia. Chase Ex. 15 at JD_JS_00001293; Chase Ex. 84 (Partner A) 37:18-38; Sheketoff Decl. ¶ 29.

520.     All of Julia's drafts—from the initial draft to the final draft—assessed ████████████ █████████████████████ as requested by Partner A.  Sheketoff Ex. 75; Sheketoff Ex. 77; Sheketoff Ex. 79; Sheketoff Ex. 81 at JD_JS_00000618-629; Sheketoff Ex. 84; Sheketoff Ex. 85; Sheketoff Ex. 86; Sheketoff Ex. 89; Sheketoff Ex. 90; Sheketoff Ex. 94; Sheketoff Ex. 97; Sheketoff Ex. 100.

521.     In other words, the only "helpful advice" or "advice or direction" requested from Julia was precisely what Julia provided.  Chase Ex. 15 at JD_JS_00001293; Sheketoff Decl. ¶ 29.

522.    The amount of "advice or direction" did not change between Julia's initial drafts and subsequent drafts.   Sheketoff Ex. 75; Sheketoff Ex. 77; Sheketoff Ex. 79; Sheketoff Ex. 81 at JD_JS_00000618-29; Sheketoff Ex. 84; Sheketoff Ex. 85; Sheketoff Ex. 86; Sheketoff Ex. 89; Sheketoff Ex. 90; Sheketoff Ex. 94; Sheketoff Ex. 97; Sheketoff Ex.144; Sheketoff Ex. 100.

523.    At his deposition, Partner A testified that the "helpful advice" supposedly missing from Julia's initial drafts was "the likelihood of success.  And that can be qualitative.  It doesn't have to be quantitative."  Chase Ex. 84 (Partner A) 71:12-72:8.

524.    The initial version of the memorandum described the "likelihood of success" like this:

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████" Sheketoff Ex. 75 at JD_JS_00000459 (emphasis added).

525.    The final version of the memorandum described the "likelihood of success" like this:

███████████████████████████████████████████████████████████████████

█████████████████████████████████████" Sheketoff Ex. 100 at JD_JS_00001929 (emphasis added).

526.    There is no qualitative or quantitative difference in the likelihood of success described in the initial and final versions of the memo: ████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████. Sheketoff Ex. 75 (Plaintiffs' Ex. 46) at JD_JS_00000459; Sheketoff Ex. 100 at JD_JS_00001929.

527.    During his deposition, Partner A was forced to acknowledge that in fact Julia's initial memorandum *did* identify the likelihood of success—indeed, the same likelihood of success

identified in the final version of the memo.  Chase Ex. 84 (Partner A) 195:7-199:11.

528.   Partner A pivoted, ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████.  Chase Ex. 84 (Partner A) 195:7-199:11.

529.   But that isn't what Partner A said in his review.  Chase Ex. 15 at JD_JS_00001293.

530.   The review criticized the memo ██████████████████████████

████████████████████████████████ because it supposedly contained "little-to-no

advice or direction" at all.  Chase Ex. 15 at JD_JS_00001293.

531.   In any event, as Partner A well knew, ████████████████████████

███████████████████████████████████████████████████████████.

Sheketoff Ex. 151 at JD_JS_00001367; Chase Ex. 84 (Partner A) 199:4-201:15.

532.   And, as Partner A further understood, the likelihood of success ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.  Sheketoff Ex. 75 at JD_JS_00000459-62; Chase

Ex. 84 (Partner A) 199:4-201:15.

533.   The only arguable assessment of the likelihood of success Partner A added to the memo

between Julia's initial draft and the final draft was █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████.

534.    Moreover, before he got "annoyed" by Julia's suggestions to his revisions, Partner A admitted to Partner F that Julia had done a "great job" on the initial draft of the memo.  Sheketoff Ex. 39 at P04088.

535.    Similarly, before he got "annoyed" by Julia's suggestions to his revisions, Partner A told Julia directly ████████████████████████████████ ██████████████████████████████.  Sheketoff Ex. 76 at JD_JS_00000487.

536.    He never suggested to Julia that she had somehow failed to provide "helpful advice" or "advice or direction" that she should have.  Sheketoff Ex. 76 at JD_JS_00000487; Sheketoff Decl. ¶ 30.

537.    ████████████████████████████████████████ ████████████████████████████."  Sheketoff Ex. 101.

538.    ████████████████████████████████████████ ███████████████████████████████████████ Sheketoff

111

Ex. 102.

539.   Partner A spoke up to criticize Julia during two partner meetings about associate evaluations.  Sheketoff Ex. 103 at JD_00003737, JD_00003742; Chase Ex. 20 at JD_00003256.

540.   But in neither meeting did he say anything about Julia's supposed failure to give "helpful advice" or "direction" to the client.  Sheketoff Ex. 103 at JD_00003737, JD_00003742; Chase Ex. 20 at JD_00003256.

541.   To the contrary, Partner A acknowledged that Julia's writing was "thorough," and then came up with the new criticisms that the memo was "too long and "not client ready."  Chase Ex. 20 at JD_00003256; Sheketoff Ex. 103 at JD_00003742.

542.   As for Julia's draft being "not client ready," ███████████████████████████ █████████████████████████████████.  Sheketoff Decl. ¶ 31; Sheketoff Ex. 75 at JD_JS_00000458 ("████████████████████████████████."); *id.* at JD_JS_00000459 (████████████████████████).

543.   And as for Partner A's new criticism that Julia's memo was too long, before the iterative revision process began, ██████████████████.  Sheketoff Ex. 75.

544.   Similarly, when Heifetz supposedly talked to Partner A "in real time," Partner A said nothing about her memo lacking advice or direction, being not client ready, or being too long.  Chase Ex. 83 (Lovitt) at 4:11-5:24.

545.   Rather, he admitted that "[h]e was happy with the work, but he was frustrated by" Julia's revisions to his changes to the memo.  Chase Ex. 83 (Lovitt) at 4:11-5:24; *see also id.* at 7:3-12 (after writing his evaluation of Julia, Partner A told Heifetz "he was generally impressed with [Julia's] work product but again annoyed with [her] not taking his edits and being protective of [her] time").

546.     Partner A further claimed to Heifetz that Julia was "not accepted some of his edits multiple times and not talking to him about it and telling him why [she] wasn't accepting his edits." Chase Ex. 83 (Lovitt) at 4:11-5:24.

547.     That new claim was also false.

548.     In her email that "annoyed" and "frustrated," Julia explained at length the reasons for the revisions she was suggesting.  Sheketoff Ex. 84 at JD_JS_00000638.

549.     Moreover, Partner A has only identified a single instance (not "some") when Julia supposedly changed something back multiple times to the way she had it—a change that Julia explained in detail to him.  Sheketoff Ex. 84 at JD_JS_00000638 ("On page 4, I changed the description of the court back [from District of Columbia] to the District Court for the District of Columbia, because I wanted to make sure the reader didn't think we were referring to the local DC trial court.").

550.     In Julia's four years at Jones Day, she wrote four other memos, and no other reviewer suggested that Julia failed to provide helpful advice or direction to the client.  Chase Ex. 15; *see supra* ¶¶ 442-43, 461, 464.

551.     Those reviews are quoted above in full, but in short they praise Julia's memos as "thorough and in depth," "demonstrating familiarity with the legal issues and an effective and easy style of writing," "absolutely stellar," "definitive," providing a "clear[] and plain[] answer [to] the client's question," "concise and lucid," "brilliant," "high level," "exceptional," and "excellent." *See supra* ¶¶ 442-43, 461, 464.

552.     Next, Partner A's review states: "She's just not that into us.  Almost nothing about her work on this case suggests otherwise.  She exhibits little-to-no initiative.  Rather, like a second year associate, she merely does what is asked of her."  Chase Ex. 15 at JD_JS_00001293.

553.     Those statements are false.  Chase Ex. 80 (Sheketoff) at 89:24-90:20.

554.     In fact, Julia demonstrated initiative and dedication to the project, and did many things that were not asked of her, as discussed below.

555.     On numerous occasions Julia reached out to Partner A without prompting to either check in or offer to do (or simply do) something he had not asked her to do.  Sheketoff Ex. 105 at JD_JS_00000418 (████████████████); Sheketoff Ex. 106 at JD_JS_00000439 (████████████████ ████████████████████████████████████████████); Sheketoff Ex. 107 (████████████████████████████████████████████████████████); Sheketoff Ex. 108 (████████████████████████████████████████████ ████████████████████████); Sheketoff Ex. 81 at JD_JS_00000602 (████████████ ████████████████████████████████████████); Sheketoff Ex. 97 (████████████████████████████████████████████████ ████); Sheketoff Ex. 109 (████████████████████████████ ████████████████"); Sheketoff Ex. 110 (████████████████████████████ ████████████████████████); Sheketoff Ex. 111 (████████████ ████████████████████████████████████████████); Sheketoff Ex. 112 (████████████████████████████████████████████████████); Sheketoff Ex. 113 (████████████████████████████████████████████ ████████████); Sheketoff Ex. 114 at JD_JS_00002638 (████████████████████████████); Sheketoff Ex. 115 at JD_JS_00002045-46 (████████████████████████████ ████).

556.     When Partner A broadened the assignment to include an investigation into the underlying historical facts, Julia led that investigation.  Sheketoff Exs. 116-23; Sheketoff Decl.

¶ 32.

557.    Without substantive involvement by Partner A, Julia came up with the relevant questions to ask the client and then interviewed the client both by email and on the phone. Sheketoff Exs. 116-123; Sheketoff Decl. ¶ 33.

558.    Partner A provided no feedback or guidance on interview outlines and did not participate substantively in any client interviews.  Sheketoff Exs. 116-123; Sheketoff Decl. ¶¶ 33-34.

559.    Indeed, Partner A was out of the office during the first week of Julia's factual investigation.  Sheketoff Ex. 117 ("███████████████"); Sheketoff Ex. 112 ("███████████████").

560.    Partner A did not lead an investigation or interview clients in billable cases when he was a second-year associate at Jones Day.  Chase Ex. 84 (Partner A) at 24:8-21, 25:3-7.

561.    In the very email exchange that admittedly annoyed Partner A, Julia showed initiative by doing more than what was asked of her when she suggested revisions to Partner A's changes to their memo.  Chase Ex. 35 at JD_JS_00001428 (directing Julia to simply "do a really good proof (and have an I&A paralegal) do one also [sic]"); Chase Ex. 36 at JD_JS_00001442-43 (suggesting numerous revisions to Partner A's changes).

562.    In another review the same year, a different partner expressed appreciation of Julia's "initiative" for doing the same thing: "[F]ollowing my revisions, Julia took the initiative to question whether the cuts caused the legal analysis to be too truncated.  Though I ultimately disagreed with her assessment on that point, I appreciated both her care to detail and that, despite being a peripheral player on this case team, she wasn't bashful about speaking up and challenging a decision that had been made."  Chase Ex. 15 at JD_JS_00001295.

563.    Many of Julia's other reviews praise her initiative and dedication.  Chase Ex. 15.

564.    Julia's reviews are quoted in full above, but in relevant part they state that: "Julia …
took the initiative to draft substantial portions of the brief, while lending a hand in any way she
could"; "Julia was the indispensable heart of our team on this Supreme Court matter.  She had
unparalleled mastery of the legal and factual issues and did an outsized share of excellent work
developing our briefing strategy and writing (and re-writing) the brief"; "Julia … is passionate
about her work; a hard worker; thoughtful in her analysis; wanting to improve and excel; and a
very good writer.  She is extremely dependable.  She has a great attitude and inspires others as a
result"; "Julia worked tirelessly to examine every angle, think through every potential issue, and
exhaustively research a long list of topics"; "[Julia] is also impressively dogged and firm in her
defense of the client's interests….  She certainly took ownership of the project"; "her positive
attitude and constant availability to do work even when she was swamped with other matters was
impressive and greatly appreciated"; "[Julia] contributed enthusiastically to business development
efforts"; "[Julia] takes total ownership of her projects and is dogged about pushing for what she
wants with everyone opposed to her position….  My only concern about Julia is that she personally
stresses a lot when she cannot accomplish what she thinks is the right, just resolution.  She never
gives up but finds it very hard to accept adverse results or decisions"; "I also appreciated her
consistent willingness to help out with the various smaller tasks, whether interesting or frustrating,
that arose along the way"; "[Julia] took full ownership and, supervising a junior associate, handled
all aspects"; "[Julia] deeply cares about the client… She constantly challenges herself and those
around her and does not give up"; "[m]y sense is that Julia's goal is perfection."  Chase Ex. 15.

565.    Next, Partner A's review states: "And her availability seems to be whatever is
convenient for her.  On multiple occasions, I asked for the next version of the memo, but she was
tied up with other things."

566.    Those statements are false.  Chase Ex. 80 (Sheketoff) at 90:21-91:1.

567.    In his deposition, Partner A testified that the basis for these statements was that there were "at least three times" when he "wanted to have the next version of the memo so we could get it to the client, et cetera, and [Julia] couldn't make it happen."  Chase Ex. 84 (Partner A) at 128:7-128:2.

568.    In fact, there was a single occasion when Partner A asked for the next version of the memo, but Julia had ███████████████████████████████████

569.    Partner A disavowed that this occasion was a basis for his representation in his review that, "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things."  Chase Ex. 15 at JD_JS_00001293; Chase Ex. 84 (Partner A) at 130:17-132:19.

570.    According to Partner A, "when someone has like other filings to do, it would strike me as a reasonable basis for not being able to do the work that I asked them to do.  So, no, I wouldn't— I wouldn't write in an evaluation whatever I wrote about your schedule is convenient or particular of your time or whatever the phrase I used was if you had two files this week….  I would not put something in an evaluation that says you're not available based on something like this.  I would not do that."  Chase Ex. 84 (Partner A) 132:1-19.

571.    There was no other occasion when Partner A asked Julia for the next version of the memo but she was tied up with other things.  Sheketoff Decl. ¶ 35; *see also* Sheketoff Exs. 75-79 (████████████████████); Sheketoff Exs. 81-82 (████████████████████); Sheketoff Exs. 84-87 (████████████████████████); Sheketoff Exs. 89-91, 92-95 (████████████████████ ████████ Sheketoff Exs. 97-98 (████████████████); Sheketoff Exs. 144-146 (████████████████ ████████); Sheketoff Ex. 100 (████████████████).

572.    Julia was virtually always available to work on the project and promptly turned around

drafts of the memo to Partner A.  Chase Ex. 33 at JD_JS_0000408 (proposing that she and Partner A meet the day after being assigned the project); Sheketoff Ex. 124 (█████████████████

█████████████████████████████████████████████████████████████

███████████████████”); Sheketoff Exs. 76-77 (██████████████████

██████████████████); Sheketoff Ex. 108 (███████████████████████

█████████████████████████████); Sheketoff Exs. 82, 84 (████████████████████); Sheketoff Ex.

85 (███████████████████); Sheketoff Ex. 125 at JD_JS_00000697 (████████████

█████████████████████████████████████████████████████); *id.* at

JD_JS_00000696 (█████████████████); Sheketoff Ex. 126 (███████████████

█████████████████████████████████████████████████

████████████████████”); Sheketoff Ex. 127 at JD_JS_00002531

(██████████████████); Sheketoff Ex. 128 (██████████████

████████████████); Sheketoff Ex. 93 (███████████████████████████);

Sheketoff Exs. 116-123 (█████████████████████); Sheketoff Ex. 122 (██

█████████████████); Sheketoff Ex. 129 (███████████

██████████████████); Sheketoff Ex. 130 (███████████████

█████████████); Sheketoff Ex. 131 at JD_JS_00001918-19 (████████

██████████); Sheketoff Ex. 146 at JD_JS_00001860 (█████████████

█████████████████████████████████”); Sheketoff Ex.

132 at JD_JS_00001252-53 (████████████████████████████

████████); *id.* at JD_JS_00001252 (██████████████████████████);

Sheketoff Exs. 133-34 (

); Sheketoff Exs. 135-36 (

); Sheketoff Ex. 137 (

).

573.    Actually, it was Partner A who routinely sat on drafts of the memo for days or weeks at a time.  Sheketoff Exs. 75-76 (              ); Sheketoff Exs. 81-82 (              ); Sheketoff Exs. 86-87 (            ); Sheketoff Exs. 93, 95 (              ).

574.    During his deposition, Partner A pivoted again, claiming that a second basis for his statement about Julia's availability was that there were "multiple occasions when we would just meet by phone because you were not in the office."  Chase Ex. 84 (Partner A) at 126:19-6.

575.    But that is not what Partner A said in his review.  Chase Ex. 15 at JD_JS_00001293.

576.    Working remotely is neither a basis for saying that someone's availability is "whatever is convenient for her" nor saying that "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things."  See Chase Ex. 15 at JD_JS_00001293.

577.    In truth, Julia met in person with Partner A frequently.  Sheketoff Decl. ¶ 36.

578.    Partner A also frequently called Julia and talked with her by phone while Julia was in the office.  Sheketoff Decl. ¶ 37.

579.    On the two or three occasions when Partner A and Julia spoke by phone while Julia was working remotely, Partner A never asked Julia why she was working remotely and whether she was doing so merely because it was "whatever was convenient for her."  Sheketoff Decl. ¶ 38.

580.    Nor did Partner A at any time express any displeasure with Julia's remote work to Julia.  Sheketoff Decl. ¶ 39.

581. In fact, the only time that Partner A ever expressed any displeasure to Julia about her work was in his hostile response to her suggestions to his edits on March 2. Chase Ex. 36 at JD_JS_00001442.

582. Yet Partner A's review mentions nothing about that exchange, despite his admitted "annoyance" at it. Chase Ex. 15 at JD_JS_00001293; Chase Ex. 84 (Partner A) at 235:11-13.

583. Julia's other reviews praised her availability on the projects she'd taken on. Chase Ex. 15 at 1290 ("lending a hand in any way she could"); *id.* ("outsized share of excellent work"); *id.* at JD_00001291 ("a hard worker" and "extremely dependable"); *id.* ("worked tirelessly"); *id.* ("constant availability to do work even when she was swamped with other matters"); id at JD_000012979 ("She constantly challenges herself and those around her and does not give up."); *id.* at JD_00001298 ("Under significant time pressure, Julia did an absolutely stellar job.").

584. Next, Partner A's review states: "Working on the weekend does not seem to be in her vocabulary." Chase Ex. 15 at JD_JS_00001293.

585. That statement is false. Chase Ex. 80 (Sheketoff) 90:21-91:1.

586. During his deposition, Partner A stated that the basis for this statement in his review was that he asked Julia "specifically to work on a weekend or [said he] need[ed] something on Monday or Tuesday and the only reasonable way that would have been done was to work on a weekend," and Julia "refused to do that" or "said [she] w[as] unavailable to work on the weekend." Chase Ex. 84 (Partner A) 134:11-135:7.

587. During the 2017 partner meeting to review associate evaluations, Partner A reiterated the comment, representing that he supposedly "struggled to get any weekend help from [Julia]." Sheketoff Ex. 103 at JD_00003742.

588. In fact, there was never a single time that Partner A asked Julia for weekend work (or

120

for something that required weekend work) that Julia refused or said she was unavailable, as the extensive written record reflects.  Sheketoff Decl. ¶ 40; *see also* Sheketoff Exs. 75-79, 81-82, 84-87, 89-91, 93-95, 97-98, 100, 144-146.

589.    To the contrary, Julia offered to and did work on the weekend—both with Partner A and in other cases, as the paragraphs below demonstrate.  Sheketoff Decl. ¶ 41.

590.    In one instance during the weekend, when Partner A mentioned he was going to be ███████████████████████, Julia offered (without prompting): ████████████████ ███████████████████████ Sheketoff Ex. 109 at JD_JS_00000630.

591.    In another instance, on a Friday afternoon, Partner A asked Julia ████████████ ████████████████████████████████████████████████."  Sheketoff Ex. 125 at JD_JS_00000698.

592.    Julia promptly ████████████████████████████████████ ████████████████████████████████████ Sheketoff Ex. 125 at JD_JS_00000697.

593.    Partner A advised her against it: "████████████████████████████ ████████████  Sheketoff Ex. 125 at JD_JS_00000697.

594.    In another instance, Partner A asked on a Friday afternoon ████████████ ████████████████████████████.  Sheketoff Ex. 139 at JD_JS_00001849.

595.    Julia responded ████████████████████████████ ████████████████████████████████████████ ████████████████████████████  Sheketoff Ex. 139 at JD_JS_00001849.

596.    Partner A declined ████████████████████████████████



Sheketoff Ex. 139 at JD_JS_00001849.

597.    In a fourth instance, ███████████████████████████████████

███████████████████████.  Sheketoff Ex. 140 at JD_JS_00002018.

598.    Julia joined the lengthy call late on Sunday evening.  ████████████████

████████████████████████████████████████████████████  Sheketoff Decl.

¶ 42.

599.    Julia worked on 22 weekends during the year she worked with Partner A.  Sheketoff

Ex. 149 (lines: 925, 1041-42, 1080, 1103-05, 1152-53, 1288-89, 1305, 1337-38, 1365, 1381-83,

1399, 1464, 1478-80, 1515-1516, 1601-02, 1614, 1628, 1642-46, 1662-64, 1675-76, 1694, 1705).

600.    Partner A's performance review of Julia also contained gratuitous negative statements

about her unrelated to their work together, as the following paragraphs demonstrate.

601.    Partner A's review states: "My impression of Julia is that she is not long for firm life.

She's just not that into us."  Chase Ex. 15 at JD_JS_00001293.

602.    The evaluation prompt does not seek this kind of "impression" unrelated to an

associate's work on the particular project for which she is being reviewed.  Chase Ex. 28 at

JD_00005182 ("Please provide a concise statement of your overall evaluation of the lawyer's

*performance on the identified project*.  Also please identify performance strengths, weaknesses,

unique expertise, areas needing improvement, and *anything else about the lawyer's substantive

performance* you believe important to a fair and objective assessment." (emphases added)); *see

also* Chase Ex. 84 (Partner A) 99:2-6 ("Not expressly."); Chase Ex. 26 ("[Y]ou should provide an

objective narrative evaluation of the lawyer's *performance on the identified project…. These are

not intended to be 'career' evaluations that comment on the lawyer generally* and they are not

assessments of where you think the lawyer stands or should stand overall." (emphasis added)).

603.    Partner A understood that conveying his "impression" would be harmful to Julia's career at Jones Day.  Chase Ex. 84 (Partner A) 85:14-16, 100:21-101:11; *see also* Chase Ex. 26 ("The appraisals submitted during the annual review cycle are used to provide these lawyers with … career guidance.").

604.    Partner A has never before included in any of his reviews of other associates his impression that an associate was not long into firm life or not into the firm.  Chase Ex. 39.

605.    According to Partner A, his basis for making these representations about Julia was that she was "rarely in the office," which he inferred because he "[d]idn't see [her] in the halls, didn't see [her] at lunch," he often spoke with her "over the phone," and "[o]ther people said [she] wasn't around that much."  Chase Ex. 84 (Partner A) 78:2-17, 88:12-19.

606.    As Partner A admitted, he didn't even know where Julia's office was, he didn't know if he'd ever tried to stop by her office, he didn't remember ever calling her office and her not answering, and he didn't know where she ate her lunch.  Chase Ex. 84 (Partner A) 87:22-89:13.

607.    In fact, Julia worked in a different building from Partner A and usually ate her lunch outside, in a conference room with her friends, or in her office.  Sheketoff Decl. ¶ 43.

608.    Partner A also stated that his basis for these representations was that Julia left the firm "shortly" after joining the firm.  Chase Ex. 84 (Partner A) 82:12-15.

609.    But Julia did not leave the firm until well over a year *after* Partner A wrote his evaluation, so he did not know how long her tenure at the firm was when he wrote the evaluation. JDSF ¶¶ 19, 21.

610.    Julia's actual tenure at the firm was nearly four years, which is longer than many associates' tenures at the firm—and longer than the tenure of all but one of the six Supreme Court clerks from her Term.  JDSF ¶¶ 15, 19, 21

611.    According to Partner A, "generally for I&A associates, especially former Supreme Court clerks, the pattern is most of them leave after two years."  Chase Ex. 84 (Partner A) 79:7-11.

612.    Nonetheless, despite having worked with many I&A associates, Partner A implausibly testified that he had never worked with *any* associate (besides Julia) who he believed did not plan to stay "long" at Jones Day—or even any associate who he thought didn't plan to try to make partner at the firm.  Chase Ex. 84 (Partner A) 103:14-19, 104:3-16.

613.    Partner A stated that his final basis for his representations that Julia wasn't "long for firm life" and "was just not that into us" was that Julia didn't seem busy on billable cases, which he supposedly concluded because he didn't hear through the grapevine that Julia was working on any particular case teams.  Chase Ex. 84 (Partner A) 80:5-81:5.

614.    But Julia did work on case teams (including during the year she worked with Partner A), and Partner A was admittedly ignorant of them.  Sheketoff Decl. ¶ 44; Chase Ex. 84 (Partner A) 91:5-13.

615.    Partner A was also unable to identify *any* case teams for numerous other associates. Chase Ex. 84 (Partner A) 91:14-93:20.

616.    Partner A's review states: "And my guess would be that she did not bill 2000 hours last year.  My guess is that she will soon leave to become Professor Sheketoff."

617.    Again, nothing in the evaluation prompt sought these types of "guess[es]."  Chase Ex. 28 at JD_00005182.

618.    Partner A understood that these "guess[es]" were a "criticism."  Chase Ex. 84 (Partner A) 139:3-4.

619.    Partner A has never before included in any of his evaluations any guess of how many

hours an associate worked or whether she would leave private practice for another type of legal work.  Chase Ex. 39.

620.    Partner A had no access to Julia's billing records, and did not know how much billable work she was doing.  Chase Ex. 84 (Partner A) 87:11-17.

621.    Julia never suggested to Partner A that she might be interested in academia.  Sheketoff Decl. ¶ 45; Chase Ex. 84 (Partner A) 138:7-9.

622.    Apart from Partner A's pretextual criticisms of Julia in his review of her, there is significant evidence that sex was a motivating factor in his negative review of Julia, as the paragraphs below demonstrate.

623.    Partner F, who had previously had to revise Partner A's writing, encouraged Julia to suggest revisions to Partner A's writing and then was surprised at Partner A's hostile reaction. Sheketoff Decl. ¶ 23; Sheketoff Ex. 39 at P04091 ("I'm really sorry if I gave you bad advice."); *id.* at P04091-92 ("Lol What an ass"); █████████████████████████

624.    Contrary to Julia's experience with Partner A, Partner A was "usually pretty laid back" with Partner F.  Sheketoff Ex. 39 at P04091; *see also id.* at P04089 ("Yeah he is fun.  Easygoing.").

625.    Female Associate A also "told [Julia] that when she had had to rewrite something that he had done for … a project they were working on together, she had … I believe that was a male bankruptcy associate send out the memo and that [Partner A] hadn't responded at all to that." Chase Ex. 80 (Sheketoff) at 136:17-23; accord Sheketoff Ex. 41 at P02166.

626.    Julia saw Partner A "interact frequently with ███████, and he seemed quite deferential to ██████ was able to joke around with him and seemed to … [be] self-deprecating with ███████  Chase Ex. 80 (Sheketoff) at 129:9-18.

627.    Partner A was also self-deprecating about his own intelligence with the male Issues & Appeals table in the Jones Day cafeteria.  Savignac Decl. ¶ 6; Chase Ex. 84 (Partner A) 280:11-284:3; Sheketoff Ex. 41 at P02175 (referring to the "white ma[l]e conservative table"); *see also* Chase Ex. 80 (Sheketoff) at 129:19-23 ("my general impression was that he did not seem insecure with men, including with other male Supreme Court clerks").

628.    In contrast, Partner A did not make self-deprecating comments about his intelligence in front of Julia.  Sheketoff Decl. ¶ 46.

629.    Rather, "in [their] first meeting, … it just seemed important to [Partner A] to project that he was the more knowledgeable one, that he … could teach me things about this or that he was superior to me, and … that to me seemed to be a mark of insecurity."  Chase Ex. 80 (Sheketoff) at 134:2-17.

630.    Partner A seemed "insecure" around Julia in other ways as well.  Chase Ex. 80 (Sheketoff) at 133:6-134:2.

631.    For example, "[h]e brought up that [Julia] went to Harvard multiple times … and he often would make jokes or references to how he had some connection to Harvard…. [I]t just seemed like he was trying to show [Julia] that … he had a connection to a prestigious institution as well."  Chase Ex. 80 (Sheketoff) at 133:6-134:2.

632.    Partner A made similar comments to ███████████████ but Julia did not hear him make those kinds of comments to ████████ or other men.  Chase Ex. 80 (Sheketoff) at 144:1-12.

633.    Partner A also had the following conversation with Female Associate B, who then reported it to Julia: "Weirdest interaction ever with [Partner A] just now…  So I told him I'm leaving the firm and he offered to talk to ████ the guy who arranges care service for the firm, to see if he knew of any retired drivers who might want a job Driving me to ██████████████  That

was over breakfast.  Then an [] hour later, he comes to my office and closes the door.  And he says,

I was just thinking, I wouldn't want you to be in a car ten hours a week with a guy.  Bc you know,

I wouldn't want my wife to be in a car with a guy that many hours, and I don't think she would

feel comfortable with it either … Isn't that a weird and awkward and borderline inappropriate thing

to close my door and say? … I mean, he elaborated a little bit and it just made it worse[.]  He was

like, you know, because familiarity breeds contempt and he might want to make conversation."

Sheketoff Ex. 42 at P04080-71; *see also* Chase Ex. 80 (Sheketoff) at 132:2-23.

634.    Moreover, in Partner A's narrative evaluations of women,



635.

636.    Partner A was "annoyed" by what he perceived as Julia's lack of ▮▮▮▮▮ in "rude[ly]"

suggesting changes to his revisions.  Chase Ex. 84 (Partner A) 233:11-21, 235:6-7, 235:8-13,

241:9-13.

637.    Partner A held Julia to a sex-based standard (demonstrating "▮▮▮▮▮") that he did

not hold men to.  Chase Ex. 84 (Partner A) 233:11-21, 235:6-7, 235:8-13, 241:9-13; Chase Ex. 39.

**D.  Contra Jones Day, Julia's other evaluations do not corroborate Partner A.**

638.    Contrary to Jones Day's argument, Julia's other reviews do not corroborate Partner A's negative review of her.  Chase Ex. 15 at JD_JS_00001293.

639.    As demonstrated in detail in Section III.A above, the vast majority of Julia's reviews were extremely positive.  *See supra* ¶¶ 433-66.

640.    During her four years, Julia received two other negative reviews besides Partner A's: from Hashim Mooppan for 2015 and from Partner J for 2016.  Chase Ex. 15.

641.    Mooppan's review criticized numerous aspects of Julia's performance.  Chase Ex. 15 at JD_JS_00001293.

642.    Julia spoke at length with Heifetz about Mooppan's review of her.  Sheketoff Decl. ¶ 47.

643.    Heifetz told Julia not to worry about the review because Mooppan was known as an extremely critical reviewer.  Sheketoff Decl. ¶ 47.

644.    Heifetz told Julia that being reviewed negatively by Mooppan was so common that it was known as "getting Hashed."  Sheketoff Decl. ¶ 48

645.    Heifetz told Julia that Mooppan's reviews were largely discounted because of his reputation for being extremely critical of others. Sheketoff Decl. ¶ 48.

646.    Indeed, Brogan admitted that he read all of Julia's reviews for her work in 2015, and decided he "should disregard" Mooppan's evaluation.  Chase Ex. 77 (Brogan) 221:21-22; accord *id.* at 28:25-29:12 (Brogan testifying that he "disregarded Hash's evaluation").

647.    Despite Mooppan's "very unfavorable evaluation," Brogan decided to award Julia the highest salary paid by the firm to associates across her entire class year.  See Chase Ex. 77 (Brogan) 29:2-4 ("very unfavorable evaluation"); *id.* at 217:3-7 ("I gave you an over—extraordinary bump

about the recommendations. I gave you like $65,000, I think, and—in 2016, notwithstanding Hash's evaluation."); Dkt. 178 at ¶ 68 (admitting that Julia and four other Issues & Appeals associates "were the highest paid associates in the class of 2010 law graduates as of July 1, 2016").

648.    According to Partner F, "███ gave no positive reviews this year [the year he worked with her]." Sheketoff Ex. 40.

649.    Partner F also reported: "If it makes you feel any better, he ruined ████████ shot at a [S]calia clerkship based on review of his summer associate work. So keep that in perspective." Sheketoff Ex. 39 at P04326.

650.    Notwithstanding ██████ negative assessment of ██████ Jones Day viewed ██████ as such an "outstanding" associate that it awarded him a "discretionary payment" generally reserved for partners when he left the firm to join the Trump administration. *Tolton* Dkt. 96-1 at 4 (Lovitt Decl.).

651.    Jones Day subsequently re-hired ██████ as a partner at the law firm, where he remains today. ██████████████████████████████

652.    ██████ was also ultimately hired by Justice ██████ who evidently thought him qualified to be a Supreme Court law clerk, contrary to ██████ view. ████████████████████

653.    Julia did not threaten to withdraw from the case she worked on with Mooppan. Sheketoff Decl. ¶ 49.

654.    Rather, together with her friends (Female Associate A, Male Associate J, and possibly one other friend), and also with Mooppan, Julia joked that she couldn't take any more ██████ ██████. Sheketoff Decl. ¶ 49.

655.    Heifetz was not present, and Julia did not make any similar comment to Heifetz. Sheketoff Decl. ¶ 50; *see also* Chase Ex. 15 at JD_JS_00001296 (no reference in Heifetz's assessment statement of Julia to any supposed "threat" to withdraw); contra Heifetz Decl. ¶ 6 (falsely suggesting that she had "personal knowledge" of Sheketoff's alleged "threat[] to quit the representation because it was inconvenient to her personal life")

656.    It was clear to Julia's friends, and Julia believed it was clear to Mooppan, that she was playfully commiserating with her friends.  Sheketoff Decl. ¶ 51.

657.    During the conversation, Julia and her friends were laughing.  Sheketoff Decl. ¶ 51.

658.    After Julia learned of Mooppan's review, she told Female Associate A and Male Associate J associate about it.  Sheketoff Decl. ¶ 52.

659.    Female Associate A and Male Associate J were shocked that Mooppan had described Julia's comments as threats to withdraw and said it was obvious that Julia was simply commiserating with her friends.  Sheketoff Decl. ¶ 52.

660.    Julia inaccurately believed at the time that Mooppan was a friend.  Sheketoff Decl. ¶ 53.

661.    Julia told Heifetz that she had not threatened to withdraw from the case and explained that she was commiserating with her friends, and Heifetz never suggested that she disbelieved Julia.  Sheketoff Decl. ¶ 54.

662.    Heifetz never said or did anything suggesting to Julia that she was "appalled" at the false allegation that Julia "threaten[ed] to quit the representation because it was inconvenient to her personal life."  Sheketoff Decl. ¶ 55.

663.    Moreover, Julia tried very hard to come up with the best arguments to address the ████████████████████.  Sheketoff Decl. ¶ 56.

664.    Julia spoke with numerous other lawyers, spent hours reading caselaw, and even researched ███████ ethics in an attempt to come up with the best arguments in response to the ████████████████.  Sheketoff Decl. ¶ 57.

665.    Julia's ███████████ brief was effective; the court did not resolve the case against her on the grounds ██████████████████████.  Sheketoff Decl. ¶ 58.

666.    While Mooppan criticized Julia for her "lack of judgment" for taking "a vacation to London a few weeks before the argument," and claimed "it became a real problem when the Court asked for ██████████████ right before she left, as that ate into her argument prep time," actually Julia worked each day of her five-day trip, including over the weekend.  Sheketoff Ex. 149 (████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████).

667.    What "ate into [Julia's] argument prep time" was the time Julia spent working hard on her response to the ███████████████, not the fact that she was located in London during that work.  Sheketoff Decl. ¶ 59.

668.    Moreover, while Mooppan fairly criticized Julia's "oral advocacy in the moot courts leading up to her argument," he failed to mention that, as Julia had informed him, this was her first-ever appellate argument and she was experiencing severe public-speaking anxiety.  Chase Ex. 15 at JD_00001297; Sheketoff Decl. ¶ 60.

669.    Nor did Mooppan mention that Julia took the initiative to convene additional moots without his participation in order to overcome her nerves, or that after the actual argument, Mooppan had told her that he was proud of her performance and, with the exception of her initial answer to one question, she couldn't have done anything better; instead Mooppan represented in

his review simply that the argument had gone "fine."  Sheketoff Decl. 62; *see also* Chase Ex. 15 at JD_JS_00001291 (reviewer describing Julia's second appellate argument as "masterful," "articulate and persuasive," "fully responsive to questions," and demonstrating "great judgment and an ability to think quickly on her feet").

670.    Partner J gave Julia a negative review for her work in 2016, the same year for which Partner A gave her a negative review.  Chase Ex. 15 at JD_JS_00001294.

671.    Partner J criticized Julia because her draft motion "could have been presented with more passion, creativity, and using the facts of our client in more persuasive fashion."  Chase Ex. 15 at JD_JS_00001294.

672.    Partner J also criticized Julia because "[t]he work could have been completed more timely and with more intensity in defending the client's interest."   Chase Ex. 15 at JD_JS_00001294.

673.    Julia does not doubt the sincerity of Partner J's belief at the time that Julia's motion could have been more "passionate," "creativ[e]," or "persuasive," but her work was as "passionate," "creativ[e]," and "persuasive" as the law and her ethical obligations allowed.  Sheketoff Decl. ¶ 63.

674.    Another partner on the project and the head of the office where Partner J worked (who did not submit a review) thanked Julia for her quick and excellent work on the draft motion.  Sheketoff Decl. ¶ 64.

675.    After Julia stopped working on the case, .  Sheketoff Decl. ¶¶ 65-66.

676.    .

677.    

678.   Partner F subsequently worked with Partner J on a matter that was "prob related to what [Julia] worked on" with Partner J.  Sheketoff Ex. 39 at P04191.

679.   Perhaps having learned from the past, when Partner J emailed Heifetz to request assistance with the matter, he specifically said he "wanted someone dispassionate."  Sheketoff Ex. 39 at P04193.

680.   In other words, after criticizing Julia for being insufficiently "passionate," he subsequently realized he needed "someone dispassionate" to check his excessive passion. Sheketoff Ex. 39 at P04193.

681.   Partner F "███████████████████████████████████████████
████████████████████████.  Sheketoff Ex. 39 at P04191, P04195.

682.   Partner J is known within Jones Day as "an idiot."  Sheketoff Ex. 39 at P04135.

**E.   A jury could find that Partner A's evaluation affected Julia's pay.**

683.   Partner A's negative evaluation of Julia affected her 2017 salary adjustment. ████████
███████████████████████████████████████.

684.   In Jones Day's own words to this Court, "compensation is *principally based*" upon "performance evaluations."  *Tolton* Dkt. 146 at 42 (emphasis added); *see also* Chase Ex. 77 (Brogan) at 204:16 (in response to question about what "factors … affect your determination of an associate's annual raise," testifying that "the assessment of your colleagues as to the quality of your lawyering is number one.  It's kind of the sine qua non of operating at this level of the profession."); *id.* at 208:22-209:22 ("Q: Do reviews matter to an associate's annual raise?...  A: Of course, as they go into—into this original assessment, in the beginning, of your professional accomplishments.  So that's why we spend so much time on this….  So of course those evaluations are important.").

685.    Jones Day uses each associate's performance evaluations to put together an assessment statement (also called a consensus statement).  Dkt. 178 ¶ 72 (admitting that "an assessment statement for each associate is prepared based on the associate's written evaluations"); Chase Ex. 81 (Shumaker) 315:9-21 (for "assessment statement … the individual reviews are data points from which the statement is made"); *Tolton* Dkt. 185 at ¶ 12 ("The strength of and bases for the individual evaluations are then assessed by the practice leaders or their designees, culminating in a draft assessment").

686.    The assessment statement is based on the performance evaluations.  Dkt. 178 ¶ 72; Chase Ex. 81 (Shumaker) 315:9-21; *Tolton* Dkt. 185 at ¶ 12.

687.    The "assessment statement is—is really a distillation of what's within the reviews." Chase Ex. 81 (Shumaker) 315:9-10.

688.    The assessment statement should reflect and explain an associate's compensation adjustment.   Chase Ex. 81 (Shumaker) 316:20-317:10 ("we are trying to encapsulate the performance of that lawyer for the year, give them information about where they stand, and presumably that would be reflected in their compensation"); *id.* at 317:20-318:8 (assessment statement "more akin to" "an explanation of the associate's compensation" than itself "an input into the associate's compensation"); Chase Ex. 77 (Brogan) at 209:23-210:8 ("the consensus statement … was designed to be something that could be—would be helpful to share with—shared with the associate"); Sheketoff Ex. 153 at JD_00003050 ("████████████████████ ███████████████████████████████████████████████████████████████.").

689.    Indeed, the assessment statement is supposed to "reflect[] the [f]irm's view of that associate's performance and *overall contribution* to the Firm in the prior calendar year." *Tolton* Dkt. 146-5 ¶ 15 (emphasis added); accord Chase Ex. 83 (Lovitt) 76:18-23 ("The assessment

statement is the firm's assessment of [an associate's] performance for that calendar year."); *Tolton* Dkt. 145-11 at 15 (Lovitt testifying that assessment statement is "intended to be the firm's assessment with those evaluations"); *Tolton* Dkt. 146-5 at ¶ 16 ("a primary purpose of the assessment statement is to ensure each associate understands the [f]irm's view of his or her performance").

690.    And the firm's "compensation adjustments are based upon the subjective quality of each person's *overall contribution*."  Dkt. 178 (Answer to TAC) at ¶ 69 (emphasis added); accord *id.* at ¶ 77 ("Jones Day compensates associates based on each individual's performance…   The Firm makes annual compensation decisions after a comprehensive months-long evaluation process in which an assessment is made of each associate's overall contribution to the success of the Firm."); *Tolton* Dkt. 88-8 ("[T]he [f]irm intends that its associated be compensated … based on the market conditions and (most importantly) their individual performance and contribution to the [f]irm.").

691.    As Jones Day has expressly admitted: "███████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████); *see also* Dkt. 178 at ¶ 134 ("Sheketoff's compensation adjustment reflected the fact that her reviews from multiple partners were mixed"); Chase Ex. 83 (Lovitt) at 77:23-78-6 ("the evaluations would matter … to the extent that they had surfaced in the assessment statement").

692.    As Jones Day has further admitted: "[T]he amount of [Julia's July 2017 raise] was based in part on her 2016 assessment statement."  Dkt. 45 at ¶ 80.

693.    Partner A's review of Julia's performance in 2016 affected her assessment statement that year.  Dkt. 178 at ¶ 132 ("Defendants admit that Sheketoff's assessment statement for 2016

took into account the written evaluations that individual attorneys submitted."); *see also* Chase Ex. 15 at JD_JS_00001293 (Partner A evaluation); *id.* at JD_JS_00001289 (assessment statement).

694.    Representations from Partner A's review figured prominently in Julia's assessment statement.   Dkt. 178 at ¶ 132 (admitting that "Sheketoff's assessment statement echoed [Partner A's] concern … about her availability and the fact that 'a client memo was too focused on pure legal analysis without accompanying advice'"); *compare* Chase Ex. 15 at JD_JS_00001293 (review: "her initial drafts were far more academic / pure legal analysis than helpful advice to the client"), *with id.* at JD_JS_00001289 (assessment statement: "a client memo was too focused on pure legal analysis without accompanying advice"); *compare id.* at JD_JS_00001293 (review: "She exhibits little-to-no-initiative"), *with id.* at JD_JS_00001289 (assessment statement: "in other matters [she] does not take initiative"); *compare id.* at JD_JS_00001293 (review: "availability seems to be whatever is convenient for her"), *and* Chase Ex. 83 (Lovitt) at 7:3-12 (Partner A complained to Heifetz that Julia was "protective of [her] time"), *with* Chase Ex. 15 at JD_JS_00001289 (assessment statement: "in other matters … [she] seems to be protecting her time"); *compare* Chase Ex. 84 (Partner A) at 105:21-106:5, 126:19-127:17 (testifying that when he criticized Julia for her availability, he meant that she was not "physically in the office"), *with* Chase Ex. 15 at JD_JS_00001289 ("She is perceived as often absent from the office during the weekday").

695.    Jones Day claims that Partner A's review of Julia couldn't have affected her compensation adjustment, because Brogan "*personally*" decided on her compensation adjustments in 2017 and 2018 and he did not read Partner A's review.  Dkt. 189 at 44.

696.    But Brogan didn't decide on Julia's compensation alone or in vacuum.  Chase Ex. 81 (Shumaker) 310:22-311:1 ("it's a much more cooperative, collaborative approach"); *id.* at 312:9-

313:8 ("It's a very collaborative process."); *Tolton* Dkt. 146 at 25-26 (Brogan has a "limited role" in salary adjustments); *id.* at 38 ("the Managing Partner …. defers to the PIC recommendations in the vast majority of cases"); *Tolton* Dkt. 146-5 at ¶ 27 ("Outside of changes responding to significant market events, the Managing Partner's adjustments to individual compensation recommendations are generally limited."); *Tolton* Dkt. 169-3 at 5 ¶ 12 (Lovitt declaring that Brogan "generally reviews and responds to proposed annual associate salary adjustments in a matter of days").

697.    As Jones Day previously told this Court: "Associate pay is determined in the first instance by office PICs …. Their recommended adjustments are reviewed by Lovitt and Shumaker and then by the Managing Partner." *Tolton* Dkt. 146 at 42.

698.    Brogan's "review is not the same as first-instance decision-making." *Tolton* Dkt. 146 at 42.

699.    For Julia's salary adjustment for her 2016 work, the Washington PIC (Kevyn Orr) made the decision to raise her compensation to $450,000.  Chase Ex. 16 at JD_00004767.

700.    Shumaker reviewed Orr's decision and recommended a salary of $445,000 instead. Chase Ex. 16 at JD_00004767.

701.    Lovitt reviewed Orr's decision and recommended a salary of $435,000 instead.  Chase Ex. 16 at JD_00004767.

702.    Shumaker and Lovitt then "split the baby [and] agreed on the midpoint," making a joint recommendation to Brogan of $440,000.  Chase Ex. 83 (Lovitt) 148:20-149:12 ("Q: You did it just because it was the midpoint? A: Yeah, because it was the midpoint."); Chase Ex. 16 at JD_00004767.

703.    Brogan accepted Shumaker and Lovitt's recommendation.  Chase Ex. 83 (Lovitt) at 149:13-19 (30(b)(6) deposition) ("It appears that the managing partner accepted our recommendation."); Chase Ex. 16 at JD_00004767; *see also* Chase Ex. 81 (Shumaker) 313:9-314:11 ("if no one touches the number beyond me after the PIC, my number would control"); *Tolton* Dkt. 146 at 43 (describing another salary adjustment as "recommended by Shumaker and accepted by the Managing Partner").

704.    In the process leading up to their reviewing and/or recommending salary adjustments for associates' 2016 work, Orr, Lovitt, and Shumaker all reviewed and considered associates' evaluations and assessment statements.  Chase Ex. 81 (Shumaker) at 318:11-319:5, 321:13-322:5; Chase Ex. 83 (Lovitt) at 35:24-36:10, 65:21-67:5, 77:14-22; Sheketoff Ex. 152 at JD_00001458; *Tolton* Dkt. 146 at 22.

705.    Shumaker also specifically admitted that he considered Julia's reviews in making his recommendation to her 2017 raise.  Chase Ex. 81 (Shumaker) 336:1-3.

706.    In the process leading up to their making or reviewing salary adjustments for associates' 2016 work, Shumaker and Orr also attended a D.C. litigation meeting, which was a meeting for all litigation partners in Washington where each associate's performance was discussed.  Chase Ex. 83 (Lovitt) at 59:5-25, 141:24-142:6; Sheketoff Ex. 103 at JD_00003737.

707.    During the D.C. litigation meeting about Julia's 2016 performance, the attendees were shown a slide show that drew from Partner A's review.  Sheketoff Ex. 103 at JD_00003741; Chase Ex. 83 (Lovitt) at 160:14-18.

708.    During that meeting, Partner A opened the conversation about Julia by saying that her memo was "too long and not client ready [and] needed an executive; that he "d[id]n't see her here for the long haul"; that he "struggled to get any weekend help from her"; that Julia was "[n]ot

hungry for the practice of law"; and that Julia "d[id]n't want to inconv[enience] herself."  Sheketoff Ex. 103 at JD_00003742; Chase Ex. 20 at JD_00003256.

709.    Lovitt and Shumaker reviewed and considered Orr's compensation decisions when they made their own recommendations.  Chase Ex. 83 (Lovitt) at 95:2-10.

710.    Indeed, Shumaker specifically acknowledged that, when he was considering Julia's salary adjustment for her 2016 work, he had considered Orr's salary adjustment decision for her.  Chase Ex. 81 (Shumaker) 332:23-333:3, 334:21-25.

711.    According to Lovitt, she recommended raising Julia's salary to $435,000 because she had a "general impression that [Julia] had no interest in being a private practicing attorney at Jones Day," because "when [Julia] was doing work for billable clients, [her] performance was mediocre at best" whereas "[Julia] shined when [she] w[as] doing things that aren't in the core of the law firm, things like pro bono."  Chase Ex. 83 (Lovitt) at 136:14-137:23; *see also id.* at 89:15-22 (claiming that Partner A's review had no impact on Julia's compensation because "there are multiple reviews that are reflective of your underlying problem, Julia, is that you weren't interested in the private practice of law"); id at 90:5-9 (claiming that Julia's "disinterest[]…show[ed] in [her] evaluations").

712.    Actually, all of Julia's reviews for her billable clients were positive except for Partner A's and Partner J's reviews.  Chase Ex. 15.

713.    While Julia's reviews are quoted in full above, the subset of those reviews for billable clients state in relevant part that Julia's work was "very strong" and "excellent"; that she was "an invaluable resource" and "a very effective editor"; that she was "at her best" and "emotionally and intellectually invested" in the matters; that she was "a joy to work with," "passionate about her work," "wanting to improve and excel," and "extremely dependable"; that her work was "truly

excellent"; that she was "impressively dogged and firm in her defense of the client's interest" and "took total ownership of the project"; that her work was "exceptional," "excellent, and "very helpful"; that she had a "positive attitude and constant availability to work"; that she "takes total ownership of her projects and is dogged about pushing for what she wants"; that she "never gives up"; that she "was at her best" and "passionate about her client[]"; that her work was "excellent" and "effective"; that she showed "consistent willingness to help out"; that her work was "always persuasive" and that she was "brave enough to ask for an oral argument, which … she deserved"; that she was "fun to work with" and "helpful"; that her work was "very well written and argued and needed virtually no editing for style or substance"; that she showed "care to detail" and initiative"; that she was an "enterprising associate" and her "goal was perfection"; that she "did an absolutely stellar job" and produced a "definitive memorandum"; that she "demonstrated exceptional analytical ability and coupled that with concise and lucid writing"; that she "performed brilliantly"; that her work was "refined and persuasive"; and that she made "helpful suggestions." Chase Ex. 15.

714.    In contrast, Partner A asserted that Julia was "not long for firm life," "not that into us," exhibited "little-to-know- initiative," "merely d[id] what was asked of her," was available only when "convenient for her," did not know what "[w]orking on a weekend" meant, and "w[ould] soon leave to become Professor Sheketoff."   Chase Ex. 15 at 1293.

715.    Lovitt's own notes about Julia demonstrate that she was directly influenced by Partner A's review: After reading Julia's reviews and draft assessment statement for her 2016 work, Lovitt's only note about Julia was "Reads like professorial type.  Soft warn"—a direct reference to Partner A's representation that Julia would "soon leave to become Professor Sheketoff."  Sheketoff Ex. 155; Chase Ex. 83 (Lovitt) 121:24-122:13.

716.   In reviewing salary adjustments, Brogan of course looked at and considered Orr's decisions and Lovitt and Shumaker's recommendations.   Chase Ex. 83 (Lovitt) at 95:2-98:10; Chase Ex. 16 at JD_00004767.

717.   Brogan specifically admitted that his decision not to change Lovitt and Shumaker's joint recommendation on Julia's salary adjustment was based in part of Orr's practice rating of Julia (which was 3).   Chase Ex. 77 (Brogan) 314:11-23.

718.   Brogan's salary determinations for Issues & Appeals associates who were former Supreme Court clerks, including Julia, were not significantly influenced by Heifetz's practice ratings.   Chase Ex. 22.

719.   █████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████.

720.   Brogan also awarded five of those clerks (one had departed in the interim) the same salary for their 2016 work, ███████████████████████████ Chase Ex. 22.

721.   In any event, Heifetz's practice rating of Julia (which was a 2) was affected by Partner A's evaluation, as demonstrated below.   *See infra* ¶¶ 722-30.

722.   Admittedly, Heifetz "fluctuated between [giving Julia] a 3 and a 2" for her practice rating before she ultimately settled on a 2.   Chase Ex. 83 (Lovitt) at 143:19-144:18.

723.   Heifetz "would sometimes reflect on [Julia's] file and think it was a 3 and sometimes think it was a 2."   Chase Ex. 83 (Lovitt) at 144:13-18.

724.   Before she ultimately decided to give Julia a 2 rather than 3 for her practice rating, Heifetz attended the D.C. litigation meeting, which is "meant to assist both the office leadership

and the practice leadership … in their ratings," where Partner A opened the discussion about Julia by roundly criticizing her.  *See supra* ¶ 708; Chase Ex. 83 (Lovitt) at 59:5-14.

725.    Before she picked between a 2 and a 3 for her practice rating, Heifetz also supposedly talked to Partner A about his evaluation of Julia.  Chase Ex. 83 (Lovitt) at 4:11-8:10.

726.    During her conversation with Partner A, Partner A purportedly told Heifetz that he was "annoyed by [Julia's] not taking his edits" and that Julia was "protective of [her] time."  Chase Ex. 83 (Lovitt) at 7:3-22.

727.    Further, Heifetz was in charge of Julia's assessment statement *and* her practice rating. Chase Ex. 83 (Lovitt) 143:19-144:18.

728.    As a result, as Lovitt admitted, the assessment statement and Heifetz's practice rating can't be sealed off from each other.  Chase Ex. 83 (Lovitt) at 101:25-102:9.

729.    Indeed, like an assessment statement, a practice rating is supposed to constitute a "final, overall assessment of the lawyer's performance during the evaluation period, taking into account the evaluators' written evaluations," and other factors.  Sheketoff Ex. 154 at JD_00003133.

730.    And as discussed above, Partner A's criticisms of Julia, including his representation that she was protective of her time, figure prominently in Julia's assessment statement.  *See supra* ¶ 694.

731.    While Lovitt suggested that Julia's compensation was based on negative "themes" in her review that were independent of Partner A's review, Partner A's review contributed to any such "themes."  Chase Ex. 83 (Lovitt) at 81:4-16 ("then you have from three or four evaluators saying the same thing, you're like okay, I got it, this is the theme that needs to go into the assessment statement"); Sheketoff Ex. 103 at JD_00003741 (identifying Partner A as one of the three evaluators for two negative "themes" about Julia); Chase Ex. 15 at 1289, 1293 (assessment

statement for 2016 echoes Partner A's review in significant part); Dkt. 178 at ¶ 132 (admitting same).

732.     In any event, Brogan was not the "final" decisionmaker with respect to Julia's compensation adjustment for her 2016 work, as Jones Day now claims. *Tolton* Dkt. 146 at 23-24.

733.     Jones Day previously told this Court: "After the Managing Partner completes his review, the proposed compensation adjustments are sent back to the coheads of the association evaluation process [Shumaker and Lovitt], the Regional PICs, and the office PICs.  The offices can challenge any change and further adjustments can be—and are—made.  At that stage, Lovitt and Shumaker are authorized to implement certain changes without further consultation with the Managing Partner." *Tolton* Dkt. 146 at 23-24 (internal citations omitted); *see also id.* at 38 (same); Dkt. 145-11 at 7 (Lovitt: "think about it as a roundtrip"); *id.* at 51 (Lovitt: "They aren't final because the PICs have another opportunity to look at any adjustments that have been made and say, I disagree with you….  [A]nd, in fact, every year, the PICs have changes and we do not go back to the managing partner.").

734.     ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████.

735.     ███████████████████████████████████████████████████
███