**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

       *Plaintiffs*,

*v.*

JONES DAY, *et al.*,

       *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 1:19-02443 (RDM)


**DEFENDANTS' REPLY IN SUPPORT
OF MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION
TO PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD ............................................................................................... 2

ARGUMENT ......................................................................................................... 3

I.    JONES DAY'S DISABILITY POLICY IS LAWFUL ...................................... 3

    A.    Plaintiffs Offer No Evidence of Discriminatory Intent or Pretext ............... 4

    B.    Plaintiffs' Categorical Legal Theory Is Untenable and Wrong ................... 7

        1.    Plaintiffs' theory would require all employers to use an "honor system" exclusively for childbirth-related disability ............. 7

        2.    There is no legal basis for Plaintiffs' precision requirement ............. 8

        3.    There is no evidence that Jones Day's policy is a "one-way ratchet" ............. 11

II.    SAVIGNAC'S TERMINATION WAS NOT UNLAWFUL RETALIATION ................. 12

    A.    Savignac's Email Was Not Protected Activity ........................................ 13

        1.    Savignac lacked a reasonable, good-faith basis for the email's claim that it was sex discrimination not to give him 18 weeks of paid leave ............. 13

        2.    Plaintiffs cannot rehabilitate the email by characterizing the 18-week claim as a settlement demand ............. 14

        3.    The lack of a reasonable, good-faith basis for the email is dispositive under all three retaliation statutes ............. 17

    B.    The Unprotected Manner Of Savignac's Email Caused His Termination ................. 19

        1.    Objecting to discrimination in an improper manner is not protected by any of the retaliation statutes at issue ............. 20

        2.    Brogan fired Savignac because of the conclusory, false, and extortionate manner of his email ............. 23

    C.    At Minimum, Plaintiffs Are Not Entitled To Summary Judgment ............. 26

    D.    Sheketoff Has No Cause Of Action For Retaliation ............. 30

III.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE RETALIATION CLAIMS ARISING FROM SAVIGNAC'S REFERENCE REQUESTS ............. 31

IV.    SHEKETOFF'S PAY CLAIMS FAIL (COUNTS IV-VI) ............. 34

    A.    Sheketoff Presents No Evidence of Discriminatory Animus ............. 34

    B.    Partner A's Review Was Not A Motivating Factor in Sheketoff's 2017 Salary ....... 37

    C.    Sheketoff's EPA Claim Fails for the Same Reasons ............. 39

i

# TABLE OF CONTENTS

(continued)

Page

V.    JONES DAY DID NOT RETALIATE WHEN IT ISSUED ITS PRESS RELEASE ....... 39

    A.    Plaintiffs Have No Evidence of Retaliatory Intent ...................................................... 39

    B.    Plaintiffs Have No Evidence of Materially Adverse Action .................................... 41

    C.    The First Amendment Bars Any Liability For The Press Release............................ 44

CONCLUSION.................................................................................................................................. 45

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

Cᴀsᴇs

Allen v. Johnson,
   795 F.3d 34 (D.C. Cir. 2015) ........................................................................................35, 36

Ames v. Nielsen,
   2018 WL 5777391 (D.D.C. Nov. 2, 2018) ...........................................................................35

Ames v. Wolf,
   820 F. App'x 1 (D.C. Cir. 2020) .........................................................................................35

\* Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ........................................................................................................2, 44

Arredondo v. Beer Barrel, Inc.,
   __ F. Supp. 3d __, 2022 WL 17544180 (N.D. Ohio Dec. 9, 2022) .......................................40

Baloch v. Kempthorne,
   550 F.3d 1191 (D.C. Cir. 2008) .....................................................................................40, 42

\* Barnes v. Small,
   840 F.2d 972 (D.C. Cir. 1988) ................................................................................... passim

\* Barr v. Clinton,
   370 F.3d 1196 (D.C. Cir. 2004) ...........................................................................................44

Bd. of Trs. of State Univ. of N.Y. v. Fox,
   492 U.S. 469 (1989) ..............................................................................................................10

Bonnette v. Shinseki,
   907 F. Supp. 2d 54 (D.D.C. 2012) .......................................................................................42

Borgo v. Goldin,
   204 F.3d 251 (D.C. Cir. 2000) .............................................................................................20

Bose Corp. v. Consumers Union of U.S., Inc.,
   466 U.S. 485 (1984) ..............................................................................................................41

\* Brady v. Off. of Sergeant at Arms,
   520 F.3d 490 (D.C. Cir. 2008) ...............................................................................2, 15, 24

Brown v. Brody,
   199 F.3d 446 (D.C. Cir. 1999) ...............................................................................................2

\* Burlington N. & Santa Fe Ry. v. White,
   548 U.S. 53 (2006) .....................................................................................................41, 42, 43

Burns v. Blackhawk Mgmt. Corp.,
   494 F. Supp. 2d 427 (S.D. Miss. 2007) ................................................................................22

Cal. Fed. Sav. & Loan Ass'n v. Guerra,
   479 U.S. 272 (1987) .........................................................................................................9, 10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chambers v. District of Columbia*,
  35 F.4th 870 (D.C. Cir. 2022) (en banc) ............................................................42

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011) .............................................................................................12

*Coats v. DeVos*,
  232 F. Supp. 3d 81 (D.D.C. 2017) .......................................................................39

*Coleman v. Am. Broad. Cos.*,
  1985 WL 365 (D.D.C. June 18, 1985) ..................................................................43

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*,
  555 U.S. 271 (2009) .............................................................................................21

\* *Egei v. Johnson*,
  192 F. Supp. 3d 81 (D.D.C. 2016) ...........................................................15, 21, 25

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018) .........................................................................................18

*Fischbach v. D.C. Dep't of Corr.*,
  86 F.3d 1180 (D.C. Cir. 1996) .............................................................................35

\* *Forkkio v. Powell*,
  306 F.3d 1127 (D.C. Cir. 2002) .....................................................................42, 43

*Forman v. Small*,
  271 F.3d 285 (D.C. Cir. 2001) .............................................................................37

\* *George v. Leavitt*,
  407 F.3d 405 (D.C. Cir. 2005) .......................................................................13, 15

*Gleklen v. DCCC*,
  199 F.3d 1365 (D.C. Cir. 2000) .............................................................................2

\* *Gonzalez v. Bolger*,
  486 F. Supp. 595 (D.D.C. 1980) ................................................................. *passim*

*Holcomb v. Powell*,
  433 F.3d 889 (D.C. Cir. 2006) .......................................................................41, 42

*Iannone v. Frederic R. Harris, Inc.*,
  941 F. Supp. 403 (S.D.N.Y. 1996) ...................................................................24, 27

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) .............................................................................44

\* *Johnson v. Univ. of Iowa*,
  431 F.3d 325 (8th Cir. 2005) ...............................................................................6, 9

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
    563 U.S. 1 (2011) .............................................................................................................18

*Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*,
    2021 WL 4033071 (D.D.C. Sept. 3, 2021) ..........................................................................39

*Kucana v. Holder*,
    558 U.S. 233 (2010) .........................................................................................................17

*Lackman v. Recovery Servs. of N.J., Inc.*,
    2008 WL 583660 (D.N.J. Feb. 13, 2008) ...........................................................................2

*Lambert v. Ackerley*,
    180 F.3d 997 (9th Cir. 1999) ...........................................................................................18

*Laningham v. U.S. Navy*,
    813 F.2d 1236 (D.C. Cir. 1987) .........................................................................................2

*Mansfield v. Billington*,
    432 F. Supp. 2d 64 (D.D.C. 2006) ...................................................................................18

*Mason v. Geithner*,
    811 F. Supp. 2d 128 (D.D.C. 2011) .............................................................................15, 24

*Mattson v. Caterpillar, Inc.*,
    359 F.3d 885 (7th Cir. 2004) ...........................................................................................19

*McKenna v. Weinberger*,
    729 F.2d 783 (D.C. Cir. 1984) .....................................................................................17, 22

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ...........................................................................................45

*Monteiro v. Poole Silver Co.*,
    615 F.2d 4 (1st Cir. 1980) ...............................................................................................27

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .........................................................................................................44

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983) ...........................................................................................................8

*Panwar v. Access Therapies, Inc.*,
    975 F. Supp. 2d 948 (S.D. Ind. 2013) ...............................................................................19

*Passer v. Am. Chem. Soc'y*,
    935 F.2d 322 (D.C. Cir. 1991) .................................................................................33, 41, 42, 43

*Patacca v. CSC Holdings, LLC*,
    2019 WL 1676001 (E.D.N.Y. Apr. 17, 2019) .....................................................................6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Pearsall v. Holder*,
    610 F. Supp. 2d 87 (D.D.C. 2009) .........................................................36

\* *Pendleton v. Rumsfeld*,
    628 F.2d 102 (D.C. Cir. 1980) .................................................. *passim*

*Pers. Admin. of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...............................................................................4

*Phillips v. Martin Marietta Corp.*,
    400 U.S. 542 (1971) (per curiam) .........................................................9

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .............................................................................44

*Randolph v. ADT Sec. Servs., Inc.*,
    2011 WL 3476898 (D. Md. Aug. 8, 2011) ..........................................18

*Richardson v. Newburgh Enlarged City Sch. Dist.*,
    984 F. Supp. 735 (S.D.N.Y. 1997) .........................................................5

*Richardson v. Petasis*,
    160 F. Supp. 3d 88 (D.D.C. 2015) .......................................................34

*Robinson v. Red Coats, Inc.*,
    31 F. Supp. 3d 201 (D.D.C. 2014) .......................................................35

*Rogosin v. Mayor & City Council of Balt.*,
    197 F. Supp. 2d 345 (D. Md. 2002) .....................................................40

*Schafer v. Bd. of Pub. Educ.*,
    903 F.2d 243 (3d Cir. 1990) ...........................................................10, 13

*Sculimbrene v. Reno*,
    158 F. Supp. 2d 8 (D.D.C. 2001) .........................................................44

*Shapiro v. McManus*,
    577 U.S. 39 (2015) ...............................................................................19

*Sloan v. Am. Brain Tumor Ass'n*,
    901 F.3d 891 (7th Cir. 2018) ...............................................................18

*Spiteri v. AT & T Holdings, Inc.*,
    40 F. Supp. 3d 869 (E.D. Mich. 2014) ................................................18

*Stewart v. Evans*,
    275 F.3d 1126 (D.C. Cir. 2002) ...........................................................42

*Townsend v. Benjamin Enters., Inc.*,
    679 F.3d 41 (2d Cir. 2012) ..................................................................17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tyes-Williams v. Whitaker*,
    361 F. Supp. 3d 1 (D.D.C. 2019) ........................................................... 42

\* *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) .......................................................... 26, 30, 40

*Vaughn v. Epworth Villa*,
    537 F.3d 1147 (10th Cir. 2008) .......................................................... 22, 41

*Washington v. Smith*,
    80 F.3d 555 (D.C. Cir. 1996) .......................................................... 45

*Wiley v. Glassman*,
    511 F.3d 151 (D.C. Cir. 2007) .......................................................... 42

*Williams v. Fla. Atl. Univ.*,
    2017 WL 1881676 (S.D. Fla. May 9, 2017) .......................................................... 40

*Woodruff v. Peters*,
    482 F.3d 521 (D.C. Cir. 2007) .......................................................... 40

STATUTES

29 U.S.C. § 215 .......................................................... 30

29 U.S.C. § 216 .......................................................... 31

42 U.S.C. § 2000e-3 .......................................................... 30

D.C. Code § 2-1402.61 .......................................................... 30

OTHER AUTHORITIES

Fed. R. Civ. P. 11 .......................................................... 25, 34

Fed. R. Civ. P. 12 .......................................................... 42

Dan Roe, *Former SCOTUS Clerk Suing Jones Day Promoted to Counsel*
    *at Steptoe*, Am. Lawyer (Dec. 14, 2022) .......................................................... 43

Marc Tracy, *New York Times Up to 4.7 Million Subscribers*,
    The New York Times (Aug. 7, 2019) .......................................................... 43

WashPostPR, *More than 92 million people visited The Washington Post*
    *in August 2019*, The Washington Post (Sept. 17, 2019) .......................................................... 43

## INTRODUCTION

On critical issue after critical issue, Plaintiffs offer no valid evidence to rebut Defendants' factual showing that their actions were legitimate, non-discriminatory, and non-retaliatory.

Jones Day's eight-week postpartum disability assumption was adopted based on science, privacy, and administrative ease, not to deprive fathers of bonding time. Savignac was terminated for his unprofessional email making conclusory assertions, malicious accusations, and extortionate threats, not because he made a discrimination complaint or threatened to sue. Defendants took the rare step of authorizing a substantive employment reference for Savignac because they wanted him to find a new job; they did not "limit" his references to retaliate against him. Sheketoff received mixed reviews on her performance because her performance was mixed, not because one of the multiple reviewers who criticized her writing, lack of initiative, and low hours was secretly biased against women. And Jones Day issued a press statement about Plaintiffs' false allegations to protect the firm's reputation from media attacks, not to harm Plaintiffs' reputations out of retaliatory animus. The record is undisputed on each of these points.

Plaintiffs have no evidence contradicting any of this. So, like other *pro se* plaintiffs before them, they respond with speculation, "evidence" that could never be admissible, and conclusory insistence that a jury could disbelieve Defendants. That is not how summary judgment works. To circumvent their lack of evidence, Plaintiffs also repeatedly fall back to sweeping legal theories— *e.g.*, the only legal way to administer disability benefits for childbirth is using an "honor system"; any complaint or demand to an employer, no matter how unreasonable or offensive, is immune; and any press statement by a defendant about a lawsuit is automatically "retaliation" for filing the suit. No court has ever adopted any of these novel theories, and this Court should not either.

In short, Plaintiffs' brief (Dkt. 205, "Opp.") only confirms that Defendants are entitled to summary judgment, per their opening brief (Dkt. 189, "MSJ"). And Plaintiffs certainly are not.

## **LEGAL STANDARD**

In purporting to dispute Defendants' facts, Plaintiffs often rest on materials that are not valid evidence or otherwise misunderstand their burden. Because this case is now at the summary judgment stage, Plaintiffs can no longer rest on "mere allegation or denials"; they must "set forth specific facts showing that there is a genuine issue for trial," *i.e.*, "sufficient evidence" to allow "a jury to return a verdict" for them. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 256 (1986). Evidence that is "merely colorable" or "not significantly probative" is not sufficient. *Id.* at 249. Nor is evidence that is not "capable of being converted into admissible evidence," which means "sheer hearsay … counts for nothing." *Gleklen v. DCCC*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Plaintiffs' "own speculations" are also inadequate. *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999). And "[i]f parties … could succeed in raising an issue of fact merely by positing hypothetical questions that elicit speculative responses, summary judgment would never be appropriate." *Lackman v. Recovery Servs. of N.J., Inc.*, 2008 WL 583660, at *10 (D.N.J. Feb. 13, 2008).

Contrary to their responses to Defendants' facts, Plaintiffs cannot "defeat a defendant's properly supported motion for summary judgment … by merely asserting that the jury might, and legally could, disbelieve the defendant's denial." *Anderson*, 477 U.S. at 256. Rather, they "must present *affirmative evidence*." *Id.* at 257 (emphasis added). Those principles apply equally when "the issue in dispute involves a party's state of mind," *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 n.6 (D.C. Cir. 1987), such as in discrimination and retaliation cases. Indeed, so long as "the employer's stated belief about the underlying facts is reasonable in light of the evidence, … there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

In light of these principles, and as further discussed below, the facts material to Defendants' summary judgment motion are undisputed, notwithstanding Plaintiffs' denials.

## ARGUMENT

### I.    JONES DAY'S DISABILITY POLICY IS LAWFUL.

The Court ordered discovery to test whether Jones Day's eight-week disability assumption for lawyers who undergo childbirth is just a "sham" to conceal "additional parental leave" withheld from fathers based on "sex-based stereotypes and archaic gender roles."  Dkt. 32 at 24-25, 34. Discovery unequivocally refuted that claim.  It showed, instead, that the firm selected the eight-week assumption given the well-established six-to-eight week range doctors certify for postpartum disability, while also respecting medical privacy and minimizing the administrative burdens associated with individualized inquiries.  None of that is sex discrimination.

Tellingly, Plaintiffs defer until the very end of their argument any claim that the eight-week assumption was motivated by discrimination or stereotypes.  Opp. 12-16.  And what they do say on that score is not even probative evidence; it certainly would not allow any reasonable jury to conclude that Jones Day's industry-standard approach to disability leave for childbirth is actually discrimination on the basis of sex.

Plaintiffs therefore largely revert to their sweeping theory that *any* assumed disability period is unlawful because it does not hinge on whether an individual mother is "actually disabled." *Id.* at 5-12.  That wrongly mischaracterizes Jones Day's policy as a "one-way ratchet," when the only record evidence about its implementation is that, consistent with the policy's text, one *does* have to be "actually disabled" to qualify for leave.  In all events, however, there is no legal basis for Plaintiffs' novel precision requirement.  And as a practical matter, that theory would make it equally unlawful to rest on *ex ante* medical certifications (since they too are non-individualized projections), upending the entire system of disability benefits for childbirth and ultimately making compliance with the Pregnancy Discrimination Act (PDA) all but impossible.

### A.    Plaintiffs Offer No Evidence of Discriminatory Intent or Pretext.

As Jones Day explained, it adopted an eight-week disability assumption in 1994 because doctors routinely certified six-to-eight weeks of disability; insurers considered eight weeks to be a compensable disability period without medical certification; and the firm wanted an administrable rule that would predictably cover most birth mothers while avoiding intrusive inquiries into mode of delivery or complications.  MSJ 6-13.  Those are legitimate, factual, non-discriminatory grounds that have nothing to do with sex stereotypes or depriving fathers of equal bonding time.

Plaintiffs largely do not contest those underlying facts or reasonable grounds.  They admit that six weeks is medically reasonable for routine vaginal deliveries; that eight weeks is medically reasonable for the one-third of deliveries that are Cesarean; that doctors (including their expert) certify "six-to-eight" weeks if (as is typical) the mode of delivery is not known at the time of the certification; and that doctors who initially certify six weeks may certify additional disability after the postpartum visit.  *See* DSF ¶¶ 56, 58-59, 61-62, 78.  In the face of all that, Plaintiffs nonetheless make two attempts to link Jones Day's eight-week assumption to "[s]exist gender roles."  Opp. 12.  Neither is remotely sufficient to reach a jury on these intentional discrimination claims.

*First*, Plaintiffs point out that when Dressing divided the prior 12-week leave period into its constitutent parts (disability leave and family leave), it was necessarily true that the longer the portion treated as disability leave, the shorter the family leave that would be offered to fathers.  *Id.* at 12-13.  That says nothing about discriminatory *intent*.  The key question is whether Dressing acted "'because of,' not merely 'in spite of,'" that effect on the leave afforded to fathers.  *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  If Dressing had assumed a longer disability period *because* that would reduce the leave available to fathers, that would be one thing.  But her undisputed testimony is that she *did not* act for that reason; rather, she sought to identify how much of the existing leave corresponded to the medically accepted period of recovery from childbirth.

And she assumed the top of the typically-certified range in order to cover all routine cases without the need for burdensome paperwork or intrusive inquiries. DSF ¶¶ 42-50, 53; PSF ¶ 26.

Plaintiffs therefore pivot, arguing that Dressing's testimony is irrelevant because she wrote a memo about the eight-week assumption to the firm's then-managing partner, Pat McCartan, who is deceased and has not testified about his rationale for signing off. Opp. 13-14; PSF ¶ 16. But it is Dressing who developed the policy, and her "non-discriminatory reason for recommending" it is plainly probative even if McCartan approved it. *Richardson v. Newburgh Enlarged City Sch. Dist.*, 984 F. Supp. 735, 747 (S.D.N.Y. 1997). Indeed, her testimony is dispositive in the absence of any contrary evidence; *Plaintiffs* bear the burden of proving intentional discrimination, and they offer none, from Dressing *or* McCartan (or anyone else involved in the decision).[1]

*Second*, Plaintiffs fast-forward to 20 years *after* selection of the eight-week assumption, and focus on revisions to the family-leave policies made in 2015. Opp. 14-16. These attacks are misplaced for several reasons. Most fundamentally, the 2015 revisions related only to the *family-leave* and *adoption-leave* benefits (which were increased). The eight-week disability assumption that the firm adopted in 1994 and that Plaintiffs attack in this suit was not touched by the 2015 changes. DSF ¶¶ 31, 121; PSF ¶ 15. The latter thus cannot bear on the intent behind the former.

In any case, Plaintiffs misrepresent the record surrounding the 2015 changes. They point out that, as originally adopted, the changes increased the family leave available to mothers (from four weeks to ten weeks) but left fathers with the same original four weeks. Opp. 14. As Plaintiffs admit, however, this discrepancy was flagged by an associate—years before this dispute arose—

---

[1] Plaintiffs also make hay about a privileged memo that Jones Day redacted (Opp. 14) and try to "dispute" many facts on that basis. The objection is both forfeited (because it was not raised until long after the close of discovery) and meritless (because Dressing is not precluded from testifying about her business reasons for recommending the policy just because she also wrote a privileged memo providing legal analysis in her capacity as an employment lawyer). DSF ¶ 37.

and the firm then clarified *within days* that primary caregivers of *any sex* would be eligible for ten weeks of family leave, while secondary caregivers of any sex would receive four. *Id.* at 16; PSF ¶¶ 86-91. It is backwards for Plaintiffs to assert that prompt *compliance* with the law is somehow evidence from which a jury could infer intent to *violate* that law. *See Patacca v. CSC Holdings, LLC*, 2019 WL 1676001, at *11 (E.D.N.Y. Apr. 17, 2019) (noting that "evidence of [defendants'] compliance with their legal obligations cannot create an inference of discrimination").

Plaintiffs also renew their claim that a jury could infer discriminatory intent in the eight-week disability assumption from the fact that Jones Day in 2015 expanded primary-caregiving adoptive leave to match the 18 weeks afforded to primary-caregiving birth mothers, even though adoptive parents do not undergo disability. Opp. 15-16. The undisputed expert evidence, however, is that adoptive parents face *other* burdens that warrant more family leave than biological parents. DSF ¶¶ 136-41. And courts have recognized the same in rejecting the inference Plaintiffs seek to draw. *See Johnson v. Univ. of Iowa*, 431 F.3d 325, 331 (8th Cir. 2005).

Plaintiffs respond that, even if so, Jones Day did not act for that permissible reason. Opp. 15. In fact, the partners considering the issue expressly recognized that adoptive parents do not need to "recuperate from the actual birth" and lack that "physical component." Pls. Resp. DSF ¶¶ 143-44; PSF ¶ 59. They recommended 18 weeks of adoptive leave *despite* that difference, for legitimate, non-discriminatory reasons: One partner wanted send a "strong message to the LGBT community, especially gay men who would have to adopt." DSF ¶ 144. Another testified that he understood—including from discussions with a senior employee who had adopted at least two children—that "adoptions are difficult and unique, and have special concerns." DSF ¶ 148; PSF ¶ 68. There is no support for the strained inference that, by expanding adoptive leave in 2015, the firm somehow admitted that its longtime disability period for birth mothers was just a "sham."

### B.    Plaintiffs' Categorical Legal Theory Is Untenable and Wrong.

Since there is no evidence that Jones Day adopted the eight-week assumption based on sex stereotypes, Plaintiffs retreat to their categorical legal theory: that *any* assumed disability period is "illegal sex discrimination as a matter of law" because it is a "generalization" about a woman's recovery from childbirth, functioning as a "one-way ratchet" that entitles birth mothers to a fixed period of leave whether or not they are "actually disabled" for the entire period.  Opp. 5-12.

#### 1.    Plaintiffs' theory would require all employers to use an "honor system" exclusively for childbirth-related disability.

Before returning to why that theory is both legally confused and factually mistaken, consider its practical implications.  As Plaintiffs do not dispute, it would prohibit employers from assuming *any* period of disability—not just eight weeks, but even six, four, or two.  Regardless of the length, Plaintiffs would say the leave is illegal because it applies "regardless of disability" and is therefore a sex-based preference.  Opp. 9.  So while it is standard practice to assume a standard period of disability for, *e.g.*, a routine appendectomy (DSF ¶ 84), Plaintiffs say the same approach applied to childbirth (or presumably a hysterectomy or any other procedure that only members of one sex undergo) somehow becomes a facial violation of the anti-discrimination laws.

Plaintiffs suggest that, instead, employers could rely on "doctors' certifications."  Opp. 9. But if their theory were correct, doctor certifications would be equally illegal.  As the undisputed expert evidence shows, doctors certify a disability period *ex ante*, as a prediction, based on their own generalizations rather than individualized analysis.  DSF ¶¶ 61, 66-67.  On Plaintiffs' theory, those certifications therefore cannot be used to grant leave, because they are "generalizations" that do not reflect "the period of actual physical disability" for "most or many women."  Opp. 5.  There is no conceivable legal difference between *an employer's reasonable assumption* that birth mothers will be disabled for eight weeks, and a *doctor's generic projection* to the same effect.

As Plaintiffs are thus forced to admit, the only option that would satisfy their novel rule is an "honor system" under which mothers are advised to take "as much leave as she and her doctor decide she needs." *Id.* at 12; *see also id.* at 7 ("honor system"); *id.* at 9 (same). Mothers would then have to engage in continuous self-diagnosis or daily medical screenings to determine when they must return to work—even though it is undisputed that such an approach would harm mothers and the healthcare system. DSF ¶¶ 74-75. Childbirth would be the *only* disability subject to that regimen, contradicting the PDA's goal of equal treatment. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983). And, of course, even if Jones Day used the "honor system" rather than an assumption, Savignac still would not have been entitled to any extra leave.

The bottom line is that Plaintiffs' novel theory, if accepted, would make every short-term disability plan unlawful unless it is administered using an "honor system."

### 2.    There is no legal basis for Plaintiffs' precision requirement.

Not surprisingly, Plaintiffs are wrong about the law. They admit employers can (indeed, must, under the PDA) treat birth mothers differently from birth fathers when it comes to disability leave. But Plaintiffs insist that any leave must be limited to a particular mother's "period of actual disability" or else it becomes an illegal "sex-based" generalization. Opp. 7-10. That does not follow. Again, under the PDA, providing benefits based on a birth mother's disability is *required*, not *unlawful*. And nothing in the PDA or Title VII micromanages how employers *measure or administer* those disability benefits. It is perfectly lawful to assume a standard period of disability in lieu of a precise individualized inquiry, so long as the assumption is *reasonably intended* as a disability benefit and rests on legitimate, sex-neutral factors (like medical privacy or efficiency). If so, the employer is generalizing about *disability*, not *sex*. Or, to use the statutory terms, the employer is not acting *based on sex*. It is instead permissibly acting *based on disability*, just by deploying a standardized assumption instead of individualized inquiry.

The Eighth Circuit in *Johnson* held that this difference—between standard assumption and individualized inquiry—is of no concern to Title VII. *See* 431 F.3d at 829. Having previously argued that *Johnson* "strongly supports" them (Dkt. 18 at 11), Plaintiffs now dismiss it as just "one non-binding decision" (Opp. 7 n.4). They also try to draw a tenuous distinction, because the policy in *Johnson* only excused birth mothers from *submitting documentation* for leaves up to six weeks. *Id.* at 6-7. Jones Day's policy is actually no different (*see infra* at 11-12), but regardless, the Eighth Circuit's holding went further: that "it is not unreasonable … to establish a period of presumptive disability" to avoid "review[ing] medical records for each and every employee who gives birth." 431 F.3d at 329. That was plainly correct. Adopting a standard period of disability, for sex-neutral reasons like administrative convenience (or medical privacy), is not sex discrimination.

In arguing otherwise, Plaintiffs continue to overread the two decisions they have cited from the start. *California Federal Savings & Loan Association v. Guerra* actually held that the PDA forbids "discrimination *against* pregnancy," but not "preferential treatment of pregnancy." 479 U.S. 272, 285-86 (1987). That *contradicts* Plaintiffs' theory. Even if Jones Day's disability policy treated pregnancy better than other disabilities, *Guerra* upheld exactly such a regime.

Plaintiffs build their theory on a footnote clarifying that, nevertheless, a State "could not mandate special treatment of pregnant workers based on stereotypes or generalizations about their needs and abilities." *Id.* at 285 n.17. But the accompanying cross-reference points to the page of the opinion distinguishing "protective labor legislation" that was based on "archaic or stereotypical notions" and at odds with "Title VII's goal of equal employment opportunity," *id.* at 290—like a policy of "not accepting job applications from women with pre-school-age children," *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543 (1971) (per curiam). Jones Day's assumption is based on science (not archaic stereotypes) and furthers women's privacy (consistent with Title VII).

9

Plaintiffs also quote *Guerra*'s observation that the state law at issue was "narrowly drawn" to cover "*actual physical disability*." 479 U.S. at 290. But the Court there was just underscoring the "limited nature" of that California statute, not identifying a necessary condition for upholding the law. *Id.* Anyway, Jones Day's eight-week assumption is "narrowly drawn" too. The Supreme Court has made clear that "narrowly drawn" means a "fit" that is "reasonable" but "not necessarily perfect"; this is a standard that eschews "precision" and instead gives "leeway" to policymakers. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477-81 (1989). A policy can be "narrowly drawn" to cover disability without requiring perfect individualized precision.

Plaintiffs' only other case is *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir. 1990). The CBA there expressly distinguished the one-year "childrearing" period at issue, which was available only to female employees, from the shorter "actual time of the disability," *id.* at 244 n.1, and there was "no evidence in the record that suggests that the normal maternity disability … extends to one year," *id.* at 248. The Third Circuit framed the question as whether the leave was "*related to* the conditions of pregnancy, childbirth or related medical conditions." *Id.* (emphasis added). Only after easily answering in the negative did the court hold, as a matter of *remedy*, that the provision was "void" to the extent it exceeded "the period of actual physical disability." *Id.* Plaintiffs harp on that clause, but the court did not say a disability period is illegal unless limited to the "period of actual physical disability." Rather, it said a leave period that is not "*related to*" disability cannot be sustained *beyond* the "period of actual physical disability." Here, as Plaintiffs do not seriously dispute, the eight-week assumption is reasonably "related to" disability.[2]

---

[2] *Schafer*'s remedial holding actually *hurts* Plaintiffs, because it confirms that the remedy for their imagined legal flaw would be to "void" the eight-week period only "for any leave granted beyond the period of actual physical disability," 903 F.2d at 248—not to extend all eight weeks to fathers, like Savignac, who are not even arguably disabled. *Contra* Opp. 25-26.

### 3.    There is no evidence that Jones Day's policy is a "one-way ratchet."

For the reasons above, it does not matter whether Jones Day's policy is a "one-way ratchet." Assuming a standard disability period is not sex discrimination regardless.

But Plaintiffs are also wrong on this factual point. The short-term disability policy applies only if the associate is "disabled," *i.e.*, "is unable to perform the material and substantial duties of … her regular occupation." DSF ¶ 26. In a later section of the policy that addresses the application process and certifying the length of the disability, the policy also provides that the firm will assume an eight-week postpartum disability if not "notified otherwise," DSF ¶ 28, but that assumption does not *override* the basic requirement that the associate must be disabled. It is merely a way of *administering* the disability requirement.

Even Plaintiffs admit that applying a disability requirement "imprecisely" is not illegal, so long as the policy technically requires the employee to be disabled to receive the benefit. Opp. 9. But they insist that Jones Day's eight-week assumption is not just a matter of administration but, rather, substantively supersedes the disability requirement and thus functions as a one-way ratchet. At the pleading stage, the Court said it needed "factual development" to assess that claim (Dkt. 32 at 32), yet Plaintiffs on this issue too offer no facts for their theory. They cannot identify a single birth mother who took disability leave despite not being disabled, let alone an example where the firm *knew* this was happening and allowed it. To the contrary, the testimony reflects that the firm has never learned of such an instance. DSF ¶ 114. As Plaintiffs concede, this is a "hypothetical scenario." Opp. 4. And, to the extent it matters, the only record evidence is that the firm would *not* allow an associate to continue to take disability leave if she had completely recovered before the eight-week period elapsed. DSF ¶ 115. In short, Plaintiffs have no evidence for their contrary interpretation of the firm's policy, or any evidence that actual practice does not follow the text of the written policy, which limits disability leave to those who are disabled.

Instead of pointing to any evidence, Plaintiffs spend pages establishing the *consequences* of the eight-week assumption: *e.g.*, the firm generally assumes birth mothers will take eight weeks of disability leave, and most do so.  Opp. 2-4; *e.g.*, PSF ¶¶ 119, 134.  None of that contradicts the undisputed record evidence that the policy, both in writing and in practice, limits disability leave to the period of disability.  Indeed, the same would be true under the regime Plaintiffs promote, where birth mothers could take up to eight weeks on an "honor system."  Plaintiffs also point out that the firm has referred, in summary documents and promotional materials, to 18 weeks of total leave for birth mothers.  PSF ¶¶ 130-32.  Those short-form summaries, however, cannot override the terms of the actual benefit plan.  *See CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (distinguishing summary description from governing plan terms).

*          *          *

After extensive discovery, there is no credible case that Jones Day's eight-week disability assumption is the product of sex discrimination or stereotypes rather than science, privacy, and efficiency.  Nor is there any merit to Plaintiffs' suggestion that the law demands—for childbirth alone—that disability leave be defined solely by each individual mother's personalized day-to-day experience.  The Court should therefore grant summary judgment to Defendants on Counts 1-3.

## II.    SAVIGNAC'S TERMINATION WAS NOT UNLAWFUL RETALIATION.

Plaintiffs fail to overcome two fundamental flaws that each independently foreclose their retaliatory-termination claims under all of the statutes they invoke.  *First*, Savignac's January 2019 email was *not protected activity*, because he lacked a reasonable, good-faith basis for the email's sex-discrimination claim.  *Second*, Brogan did not fire Savignac *because of* any protected claim in the email, but rather because of the email's unprotected, unprofessional manner in making its claim.  As the record does not support essential elements of the retaliatory-termination claims, Defendants are entitled to judgment as a matter of law, and at minimum, Plaintiffs are not.

### A.    Savignac's Email Was Not Protected Activity.

As Jones Day explained, Savignac could not have reasonably and sincerely believed the email's claim that the firm engaged in sex discrimination by not offering fathers *the same amount* of paid leave it offers to mothers who have given birth.  MSJ 18-21.  Plaintiffs do not seriously dispute that proposition.  Instead, they erroneously argue that Savignac's insistence that he must receive 18 weeks of paid leave was only a "settlement demand" that does not render the email unreasonable.  And Plaintiffs further err in arguing that Savignac had "absolute immunity" for the email even if it was unreasonable.  Defendants thus are entitled to summary judgment on the retaliatory-termination claims because Savignac's email was not protected activity.

### 1.    Savignac lacked a reasonable, good-faith basis for the email's claim that it was sex discrimination not to give him 18 weeks of paid leave.

Savignac's email demanded: "Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave."  DSF ¶ 306.  Yet Plaintiffs admit that Savignac was *not* disabled by the birth of his child, DSF ¶ 311, and they effectively admit that every birth mother will have postpartum disability *for at least some* period of time.  All record evidence supports this obvious fact, and Plaintiffs cite no evidence to support their denial.  DSF ¶ 312; PSF ¶ 214.

Savignac thus lacked "a good faith, reasonable belief" that it was unlawful for Jones Day to deny him the same 18 weeks of paid leave offered to birth mothers.  *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005).  This fatal flaw in Savignac's demand is confirmed by *Schafer*, the very case on which he relies.  Although the Third Circuit held that a one-year leave policy for birth mothers could not be justified based on "normal maternity disability," it held the policy "per se void" *only* "for any leave granted beyond the period of actual physical disability."  903 F.2d at 248.  *Schafer* thus confirms that under no circumstance was Savignac entitled to the *full eight* weeks of paid leave offered to birth mothers for postpartum disability.  *See supra* at 10 n.2.

13

Likewise, giving Savignac the same 18 weeks offered to birth mothers would effectively mean that all 18 weeks was parental leave and *none* of it was disability leave. That result, however, would violate the PDA. *See supra* at 8. Plaintiffs try to avoid that problem by suggesting that Jones Day could have given Savignac 18 weeks of paid parental leave and then given birth mothers *additional* paid leave for the period when they were "actually" disabled. Opp. 26. But even if such a convoluted remedy were proper and feasible (including retroactively), it is *not* what Savignac demanded. He asked for the *same* "treatment" as birth mothers. DSF ¶ 306.

### 2. Plaintiffs cannot rehabilitate the email by characterizing the 18-week claim as a settlement demand.

Plaintiffs retreat to the position that the email's insistence that Savignac receive 18 weeks of paid leave was only a "settlement demand," and that this does not render the email's challenge to the leave policy unreasonable. Opp. 19-20, 25-27. Their gambit fails at four separate steps.

*First*, Plaintiffs mischaracterize the email's unambigous meaning. Nowhere in the email did Savignac say or even imply that he was making a mere "settlement demand." DSF ¶ 309; PSF ¶ 264. To the contrary, the email said Jones Day's leave policy was "discriminatory" and then demanded "the treatment that Jones Day gives to all women with new children—18 weeks of paid leave." DSF ¶ 306. The only plausible reading is that he was claiming it was sex discrimination for Jones Day not to offer fathers the full eight weeks of paid leave it offers birth mothers for postpartum disability. Indeed, Plaintiffs' brief repeatedly describes the alleged discrimination as the "extra eight weeks," Opp. 25; *see id.* at 1, 7, 9, 17, 20, consistent with their complaint, TAC ¶¶ 226, 232, 237. The "settlement demand" characterization appears nowhere in Plaintiffs' motion-to-dismiss briefing, Dkt. 18, 21, and Plaintiffs appear to have used this characterization for the first time in the context of a discovery dispute two years into the litigation, Dkt. 96 at 19.

14

*Second*, whatever Savignac may have meant, it is indisputable that *Brogan reasonably and sincerely believed* that Savignac was making the unreasonable legal claim that he was entitled to "eight weeks of paid leave consistent with his having given birth when he had not."  DSF ¶ 343 (quoting Chase Ex. 77, Brogan Tr. 15:3-14).  In a retaliation claim, "[t]he question is not whether [Savignac] in fact" engaged in conduct that would be unprotected if it had occurred, "but rather whether [Brogan] 'honestly and reasonably believed'" that such conduct did occur.  *Mason v. Geithner*, 811 F. Supp. 2d 128, 205 (D.D.C. 2011) (quoting *Brady*, 520 F.3d at 496); *accord Egei v. Johnson*, 192 F. Supp. 3d 81, 90 (D.D.C. 2016).  Although Brogan did not know the minutiae of how the 18 weeks was allocated between disability and parental leave, Opp. 26, that was immaterial to his recognizing that it was indefensible for Savignac to demand to be *treated the same* as birth mothers even though he had not given birth.  DSF ¶ 343; PSF ¶¶ 264-66.

*Third*, Plaintiffs cite no authority for their position that settlement demands are protected no matter how unreasonable, and that position has no basis in law or logic.  An employer who fires an employee for making a patently unreasonable settlement demand has *not* retaliated *because* the employee opposed a practice reasonably believed to be unlawful.  *See George*, 407 F.3d at 417.  Rather, such a demand is an "improper manner" of opposing discrimination; when an employee is fired *for that reason*, "not the opposition itself, then the statute does not by its terms apply." *Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C. Cir. 1980).  Although many settlement demands will be reasonable and proper even if they go beyond what the law requires, *see* Opp. 25, Plaintiffs cannot seriously contend that, so long as an employee has a reasonable legal claim, he is shielded for making "settlement demands" that all would agree are improper—*e.g.*, insisting that his supervisor must beg forgiveness on hands and knees in front of the entire company.  Such "militant" demands are "in no way conducive to a frank exchange of ideas between employer and

employee[] and serve[] no redeeming statutory or policy purpose." *Gonzalez v. Bolger*, 486 F. Supp. 595, 602 (D.D.C. 1980), *aff'd*, 656 F.2d 899 (D.C. Cir. 1981) (mem.).  And wherever the line is between reasonable and unreasonable settlement demands, Savignac jumped well past it with his *unlawful* demand to receive the same leave as birth mothers, in violation of the PDA.

*Fourth*, in all events, Savignac lacked a reasonable, good-faith basis to challenge the leave policy itself, wholly apart from his demanded relief.  Plaintiffs assert that it is "dispositive" that this Court held their retaliation claims were sufficiently plausible to survive a motion to dismiss, Opp. 18, but they ignore this Court's rationale.  The opinion reasoned that the claims were viable "at th[at] point" because "factual development" was necessary to determine the reasonableness of believing that Jones Day's eight-week disability assumption is a "pretext" rather than a "bona fide" disability policy.  Dkt. 32 at 37-38.  Factual development has now shown that there is no genuine factual basis to dispute that Jones Day adopted a medically reasonable disability assumption for sex-neutral reasons.  *See supra* at Part I.A.  And Savignac himself had no basis to believe otherwise in January 2019.  PSF ¶ 214.  Importantly, this Court did *not* suggest it would be reasonable to believe Plaintiffs' alternative theory that any postpartum disability assumption is *per se* unlawful merely because it is a generalization not precisely tailored to each birth mother's actual disability period.  Dkt. 32 at 37-38.  Contrary to Plaintiffs' rhetoric (Opp. 18-19), there is no colorable legal basis for that illogical and unworkable theory, *see supra* at Part I.B, and Savignac had no good-faith basis to substantiate the factual premises underlying it, PSF ¶ 214.  So while Savignac's demand for 18 weeks of leave was especially indefensible, he lacked a reasonable, good-faith basis to challenge Jones Day's policy at all, and thus his January 2019 email was not protected activity.

### 3. The lack of a reasonable, good-faith basis for the email is dispositive under all three retaliation statutes.

Plaintiffs concede that, if the sex-discrimination claim in Savignac's email was objectively unreasonable, that forecloses his retaliation claim under the opposition clause of Title VII and the DCHRA. Opp. 17-18, 50. But they argue that Savignac nevertheless had "absolute immunity" for the email under the EPA and the participation clause of Title VII and the DCHRA. *Id.* at 36, 48-49, 50. None of those statutes provides such protection in these circumstances.

As for Title VII and the DCHRA, *no court* has accepted Plaintiffs' theory that the participation clause applies to *internal complaints to employers* in the absence of any pending proceedings before courts or agencies, because only formal judicial or agency proceedings are conducted "under" those statutes. MSJ 21-22. Plaintiffs try to refute this textual reasoning by emphasizing that internal employer investigations can provide certain defenses to certain claims. Opp. 37-41. But courts have properly rejected that argument, because the *legal effects* of an employer's voluntary investigations do not mean the investigations themselves are conducted *under* the statutes. *See, e.g.*, *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012). Such investigations are still neither "specified in[]" the statutes nor authorized "pursuant to[]" them. *Kucana v. Holder*, 558 U.S. 233, 244 (2010) (listing definitions of "under"). Plaintiffs also invoke *McKenna v. Weinberger*, 729 F.2d 783, 790 n.54 (D.C. Cir. 1984), and other *federal*-employer cases, Opp. 36-37, 41, but that context is inapposite because internal investigations by federal agencies, unlike by private employers, are conducted "under" regulations implementing the statutes and requiring federal employees to exhaust such remedies. *See, e.g.*, *Townsend*, 679 F.3d at 49. Accordingly, the participation clause plainly does not apply here *at all*.

As for the EPA, although some courts have extended that statute's retaliation provision to reach internal complaints to employers, Opp. 47-48, those cases both rest on erroneous reasoning

and also moderate their result by requiring reasonableness rather than granting absolute immunity. To begin, as Judge Urbina has correctly explained, the cases improperly invoke the "generalized purpose" of the statute to override its "plain language," which is limited to participation in formal proceedings. *See Mansfield v. Billington*, 432 F. Supp. 2d 64, 74-75 (D.D.C. 2006); *accord Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17-24 (2011) (Scalia, J., dissenting). Courts have worried that, because the retaliation provision in the FLSA—which the EPA incorporates—does not have a separate opposition clause, excluding internal complaints would "leave employees completely unprotected" from retaliation even for well-founded claims. *See, e.g.*, *Lambert v. Ackerley*, 180 F.3d 997, 1004 (9th Cir. 1999); *but see Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (rejecting "the flawed premise that the FLSA pursues its remedial purposes at all costs," and admonishing that courts "have no license to give the [statute] anything but a fair reading" (cleaned up)).

In any event, courts that have extended the EPA's retaliation provision to internal employer complaints have also incorporated the objective-reasonableness requirement established in Title VII opposition-clause case law, consistent with the policy-based rationale for atextually extending the EPA to that context in the first place. *See, e.g.*, *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 895-96 (7th Cir. 2018); *Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869, 876-77 (E.D. Mich. 2014) (collecting cases). Tellingly, Plaintiffs cite only a single case holding that the EPA's retaliation provision protects objectively unreasonable claims, and that unpublished district court case did *not* involve internal complaints to employers; rather, it involved conduct in connection with a complaint to a state agency, and the court expressly emphasized the difference between such formal participation and mere informal opposition. Opp. 48-49 (citing *Randolph v. ADT Sec.*

*Servs., Inc.*, 2011 WL 3476898, at *5-6 (D. Md. Aug. 8, 2011)).  Thus, the EPA also provides no

basis for Plaintiffs to end-run the objective-reasonableness requirement.[3]

### B.    The Unprotected Manner Of Savignac's Email Caused His Termination.

Defendants are independently entitled to summary judgment because Brogan did not fire

Savignac for any protected activity.  As Jones Day explained, Brogan terminated Savignac, not

because the email raised a discrimination claim, but rather because it did so in a manner that was

so unprofessional as to render it unprotected.  MSJ 22-24.  In particular, Brogan lost confidence in

Savignac's judgment and character as a lawyer and colleague, because of the email's conclusory

legal assertions, false factual accusations, and extortionate threat to sully the firm in the press

unless Savignac received $80,000 worth of leave to which he had no plausible entitlement.  *Id.* at

24-27.  That Savignac was fired for the improper manner of his January 2019 email, not the mere

claim of discrimination, is demonstrated beyond doubt by the undisputed fact that the Firm took

no adverse action against Savignac for his August 2018 email, which likewise claimed the leave

policy was discriminatory but did not have the improper attributes identifed above.  *Id.* at 27-28.

Although Plaintiffs make a half-hearted effort to muddy the factual record with distraction

and rhetoric, they cannot dispute that Brogan reasonably and sincerely construed the email this

way and terminated Savignac because of it.  So they focus their energies on a theory that even

manifestly improper conduct of this type—by a law-firm associate, no less—remains protected

---

[3] More generally, Plaintiffs are incorrect that the text of the retaliation statutes cannot be construed to require objective reasonableness across the board.  Opp. 49.  Courts have long held that federal claims that are "wholly insubstantial and frivolous" do not trigger federal-jurisdiction statutes because they are "essentially fictitious" and "legally speaking non-existent."  *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015).  Likewise, "utterly baseless" claims should not trigger participation protection under these retaliation statutes.  *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890-91 (7th Cir. 2004) (Title VII); *see also, e.g.*, *Panwar v. Access Therapies, Inc.*, 975 F. Supp. 2d 948 (S.D. Ind. 2013) (EPA).

from employer discipline. That is legally wrong, and there is no genuine factual dispute on this record that Brogan fired Savignac for the email's improper manner.

>    1.    **Objecting to discrimination in an improper manner is not protected by any of the retaliation statutes at issue.**

"If [employees] were fired for the improper manner of their opposition to [discrimination], not the opposition itself, then [the opposition clause] does not by its terms apply." *Pendleton*, 628 F.2d at 107; *accord Barnes v. Small*, 840 F.2d 972, 976-77 (D.C. Cir. 1988) (same for participation clause). Plaintiffs' scattershot arguments for why that rule does not apply here all miss the mark.

*First*, Plaintiffs categorically assert that, where "a written discrimination complaint" is at issue, "the 'manner' [is] protected along with the substance," because such a document purportedly cannot be "gerrymandered into 'protected' and 'unprotected' passages." Opp. 27, 30. Plaintiffs cite no authority adopting that sweeping and nonsensical position. Just as a letter with a protected "paragraph alleging discrimination" can also contain unprotected paragraphs on different topics, so too a "single, unitary complaint of discrimination" can contain both protected and unprotected language (for example, profanity or threats of violence). *See Borgo v. Goldin*, 204 F.3d 251, 256-57 (D.C. Cir. 2000). Unsurprisingly, Plaintiffs almost immediately abandon this opening position, retreating to argue that the manner of a written complaint *can* be unprotected but only "in egregious circumstances." Opp. 27. Even that standard is too narrow: The proper inquiry is whether the complaint was "expressed in an unreasonable manner." *Gonzalez*, 486 F. Supp. at 602.

*Second*, Plaintiffs try to draw a rigid distinction between improper *manner* and improper "*substance*," insisting that activity does not lose protection even if it includes *false and malicious* assertions. Opp. 27, 29. But that line is foreclosed by the D.C. Circuit's decision in *Barnes*. There, a federal employee raised racial-discrimination claims in a personnel proceeding on behalf of another employee, and was terminated for sending letters to the agency head that wrongly accused

other employees of misconduct in connection with the proceeding. 840 F.2d at 974-75. Although the D.C. Circuit recognized that letters alleging misconduct in agency discrimination proceedings generally fall within Title VII's participation clause, it held that the letters were nevertheless "unprotected" because they "contained false and malicious statements." *Id.* at 976-77. In so holding, *Barnes* expressly invoked *Pendleton*'s rule that terminating an employee for an "improper manner" in raising discrimination claims is not prohibited retaliation, and it characterized such employee conduct as "forfeit[ing] protection of" Title VII. *Id.* at 977. Notably, the lies about misconduct in *Barnes* did not concern the truth of the underlying discrimination claims, *cf. Egei*, 192 F. Supp. 3d at 91 (distinguishing this situation), and so too here: Savignac's gratuitous lie about Jones Day's compensation system had nothing to do with his underlying claim that the leave policy is discriminatory. *See infra* at 24-25. Jones Day's opening brief repeatedly cited the binding holding of *Barnes*, MSJ 23, 24 n.2, 26, yet Plaintiffs' opposition never even mentions it.

*Third*, Plaintiffs contend that, under *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 276 (2009), Title VII protects discrimination complaints even when they are expressed in an "'antagoni[stic],' 'confront[ational],' [or] 'hostile'" tone. Opp. 28. But that grossly misreads *Crawford*, which merely held that "answering questions" posed by an employer about a co-worker's alleged discriminatory conduct can constitute protected opposition when the answers convey "disapprov[al]" of the conduct. 555 U.S. at 276-77. Although the opposing employee had used crude invective in *fending off her harasser*, *see id.* at 277 n.2, there was no suggestion that *her protected responses to her employer* were in any way improper, *see id.* at 273-74. Conversely, Plaintiffs ignore *Gonzalez*, where Judge Gessell (summarily affirmed by the D.C. Circuit) held that an employee "exceeded the tolerable limits of protected conduct" because his complaints—some of which were covered by Title VII's participation clause—were

"disrespectful both in manner and language, to supervisors and also to EEO personnel." 486 F. Supp. at 601-02. To be sure, the employee there *also* "disrupted the working environment." *Id.*; *see* Opp. 30 (emphasizing presence of this factor in some improper-manner cases). But neither *Gonzalez* nor any other case holds that disruption is necessary, or that disrespect is insufficient, to forfeit protection. "[I]n a particular setting," an employee's disrespectful language, no less than his disruptive conduct, may contravene "the requirements of the job" and "fatally compromise[] the[] ability to [retain] the confidence" of the employer. *Pendleton*, 628 F.2d at 108.

*Finally*, Plaintiffs' erroneous position that Savignac had "absolute immunity" for the email under the EPA and the participation clause in Title VII and the DCHRA is even more misguided with respect to the email's improper manner. Regardless of whether those statutes protect internal complaints to employers at all, let alone ones that are objectively unreasonable, *see supra* at Part II.A.3, they plainly do not immunize *bad-faith misconduct* such as malicious lies, disrespectful tone, or other improper behavior that exists independent of whether the underlying discrimination claim is right or wrong. Again, *Barnes* and *Gonzalez* both squarely held that such misconduct forfeits protection under Title VII's participation clause. *See Barnes*, 840 F.2d at 976-77; *Gonzalez*, 486 F. Supp. at 601-02.[4] Ignoring *Barnes* and *Gonzalez*, Plaintiffs erroneously assert that a footnote in *McKenna* holds that participation claims are "not subject to the improper manner rule." Opp. 36. Plaintiffs' selective quotation elides critical language contradicting their assertion: "participation in an investigation …, *when it is not accompanied by activities adverse to the employer*, is clearly protected." *McKenna*, 729 F. 2d at 790 n.54 (emphasis added). In all events,

---

[4] *See also, e.g.*, *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150-54 (10th Cir. 2008) (no protection under Title VII's participation clause for improperly disclosing unredacted medical records to EEOC); *Burns v. Blackhawk Mgmt. Corp.*, 494 F. Supp. 2d 427, 432-36 (S.D. Miss. 2007) (no protection under the EPA's retaliation provision for unreasonably complaining to employer's customers in order to pressure employer to redress grievance).

any ambiguity in that footnote has been overtaken by *Barnes*' later, unambiguous holding that *Pendleton*'s "improper manner" rule applies under the participation clause too.  840 F.2d at 977.

### 2.   Brogan fired Savignac because of the conclusory, false, and extortionate manner of his email.

Brogan expressly testified that he did not fire Savignac because the January 2019 email raised a discrimination claim or threatened a lawsuit, but rather because the email demonstrated poor character and judgment unbecoming of a Jones Day lawyer.  MSJ 24-25.  Indeed, Brogan expressly distinguished this email from the one Savignac sent in August 2018—without suffering *any* adverse action—where he *also* "oppose[d]" the "parental leave policy" as "discriminatory" and "illegal" but *did not include* the egotistical, malicious, and extortionate language that caused Brogan to fire him.  *Id.* at 27.  Plaintiffs fail to raise a genuine dispute about any of these three unprotected aspects of the email that Brogan emphasized, much less all of them.

For starters, Brogan testified that the email's conclusory and arrogant tone caused him to lose confidence in Savignac as an attorney and colleague.  *Id.* at 25-26.  Plaintiffs respond that Title VII's protection does not "depend on whether the complaining employee lays out a detailed legal argument."  Opp. 31.  Although that may well be true for most employees, law-firm associates are fundamentally different.  As the D.C. Circuit has emphasized, "[i]n determining the limits of protected activity," "*[t]he requirements of the job* … must be explored," because conduct that might be proper for most employees could "fatally compromise[] the[] ability" of certain employees to retain "the confidence of" their employers.  *Pendleton*, 628 F.2d at 108.  Plaintiffs emphasize that *Pendleton* involved equal-employment counselors who flouted their "job duties," but Savignac's email "bled into his work" in a way that was just as destructive to his performance as a Jones Day associate.  Opp. 29.  Brogan explained that the "pompous" and "arrogant" tone of the email, which was "a flat-out assertion" of a legal conclusion, devoid of any "reasoning," caused

him to "lose confidence in [Savignac's] ability as—as a lawyer." DSF ¶¶ 348-50.  It was entirely reasonable for Jones Day's managing partner to decide that if Savignac engaged in shoddy and unprofessional advocacy on his own behalf, he should no longer be entrusted to advocate on behalf of the firm's clients.  *Cf. Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 410 (S.D.N.Y. 1996) (similarly concluding that "an attorney … will be held to a higher standard" under Title VII with respect to the reasonableness of his discrimination claim).

Plaintiffs respond that *they* do not believe the email was conclusory or arrogant, Opp. 31; DSF ¶¶ 348-50, and that *this Court* should so hold as a matter of law, Opp. 29.  But again, the relevant question is whether *Brogan* "honestly and reasonably believed" that the email fell below Jones Day's professional standards and fired Savignac as a result.  *Mason*, 811 F. Supp. 2d at 205 (quoting *Brady*, 520 F.3d at 496); *see Pendleton*, 628 F.2d at 108 (focusing on what "a reasonable person in [a supervisor's] position might … have felt").  Plaintiffs identify *no evidence* to create a genuine dispute about Brogan's beliefs.  Although they stress that Brogan did not read Sheketoff's August 2018 email articulating her position that the leave policy was unlawful, Opp. 31-32; DSF ¶¶ 348-50; PSF ¶¶ 230-36, that in no way calls into question the credibility of his testimony that the specific assertions in Savignac's January 2019 email were unprofessional *ipse dixit*.[5]

In addition, Brogan testified that the email's baseless and malicious insinuation that Jones Day's compensation system is intentionally designed to enable sex discrimination was evidence of Savignac's poor character.  MSJ 26.  Plaintiffs respond that the term "tailor-made" was meant to suggest only that the system is "perfectly suited" to enable discrimination, even if that is not its

---

[5] Sheketoff's earlier email did not, and indeed could not, supply the reasoning missing from Savignac's email.  *After* Sheketoff's email, Jones Day's HR Director and Counsel had responded to Savignac with an email invoking judicial precedent and EEOC guidance, DSF ¶¶ 296-302, and Brogan found fault with Savignac's conclusory and egotistical proclamation that those authorities did not support the firm's policy, DSF ¶¶ 315-16, 348-50; PSF ¶ 234.

intent.  Opp. 32.  This is like saying off-the-rack suits are "tailor-made" for average-sized people.  Any reasonable reader would understand that Savignac was wrongly accusing the firm of *purposefully* facilitating sex discrimination.  DSF ¶ 351; PSF ¶¶ 286, 306.  And regardless, once again, what matters is whether Brogan acted because he reasonably and sincerely believed that Savignac was making "false and malicious statements" about compensation (a topic unrelated to his opposition to the leave policy).  *See Barnes*, 840 F.2d at 977; *Egei*, 192 F. Supp. 3d at 90-91; *cf.* Opp. 32-33 (citing inapposite participation-clause cases involving lies about the discrimination complaint itself).  Plaintiffs lack *any evidence* that Brogan did not act for this reason.[6]

Brogan also testified that he objected to the email's extortionate threat to go to the press unless Savignac received an $80,000 windfall of paid leave in violation of birth mothers' PDA rights.  MSJ 26-27.  None of Plaintiffs' cited cases support their extraordinary position that such an improper threat is protected activity.  *See* Opp. 34 (citing case declining to impose Rule 11 sanctions for sending prelitigation letters); *id.* at 35 & n.17 (citing cases suggesting that reporting discrimination to press could be protected).  Nor can Plaintiffs rehabilitate the email by asserting that the phrase "court of public opinion" referred *solely* to the public's forming an opinion of the case based on litigation filings and statements.  *Id.* at 34-35.  The phrase plainly *also* conveyed that Savignac would directly reach out to the press, as confirmed by the conceded fact that he actually did so (DSF ¶ 411).  In all events, once more, the only material question is whether Brogan

---

[6] Plaintiffs instead note that Jones Day did not mention the "black-box compensation" issue in its interrogatory response, press release, or litigation filings prior to Brogan's deposition.  Opp. 33-34; DSF ¶ 351; PSF ¶¶ 285-313.  But the interrogatory response stated that Savignac's poor judgment and character were "demonstrated throughout the January 16, 2019 email and surrounding context, not from any single word or phrase," and that the response was merely "includ[ing,]" "for instance," certain "aspects of the email that exemplify th[ose] attributes."  Defs. Resp. PSF ¶ 290.  The press release and litigation filings took the same approach.  PSF ¶ 292.  None of this is a valid basis to question Brogan's credibility.  DSF ¶ 351.

acted based on a reasonable and sincere belief, as he testified, that Savignac was threatening to muddy the firm's name in the press unless he received an indefensible payment that would violate the PDA rights of birth mothers.  DSF ¶¶ 343-44, 409-10.  Plaintiffs say it is implausible that Brogan would have cared whether Savignac conveyed his allegations directly through the press or indirectly through the courts.  Opp. 34-35; DSF ¶¶ 343-44, 409-10; PSF ¶¶ 270-84.  But while press coverage of judicial proceedings is ordinary and unavoidable, threatening to malign one's colleagues to reporters (let alone to pressure them to provide unlawful benefits) is extraordinary and gratuitous.  DSF ¶ 344; PSF ¶ 280.  Plaintiffs may pretend this distinction is not material to them, but they have no evidence undermining Brogan's testimony that it was material to him.

In sum, the undisputed evidence compels the conclusion that Savignac was "fired for the improper manner" of his email, not because the email threatened to bring suit claiming the leave policy was discriminatory.  *Pendleton*, 628 F.2d at 107.  Accordingly, Plaintiffs cannot make the requisite showing that any "protected activity was a but-for cause" of the termination.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

## C.    At Minimum, Plaintiffs Are Not Entitled To Summary Judgment.

Regardless of whether Defendants are entitled to summary judgment on the retaliatory-termination claims, Plaintiffs certainly are not.  Notably, Plaintiffs bear the burden of proof, which means they cannot secure summary judgment unless the record is conclusive on all elements.

At minimum, a reasonable jury could find that Savignac lacked a *good-faith belief* in the discrimination claim asserted in the January 2019 email.  Recognizing their vulnerability on this element, Plaintiffs try at the outset to eliminate or eviscerate it.  They spend pages theorizing why Savignac's subjective insincerity should not be considered.  Opp. 20-23.  But this Court has already held in this case that "'[g]ood faith' and 'reasonableness' are separate requirements" under circuit precedent, with the latter "turn[ing] on an objective test" while the former "requires a subjective

26

inquiry." Dkt. 124 at 7. Plaintiffs alternatively suggest (Opp. 19-20) that "bad faith" in this context should be limited to employees who seek to deter adverse employment action by deploying a reasonable-but-erroneous discrimination claim that they do not not "honestly" believe as an improper "smokescreen." *Monteiro v. Poole Silver Co.*, 615 F.2d 4, 8 (1st Cir. 1980). But setting off such a smokescreen to maliciously pressure an employer into *providing unwarranted benefits* likewise "serve[s] no redeeming statutory or policy purpose." *Gonzalez*, 486 F. Supp. at 602.

Plaintiffs also assert that Savignac's good faith is indisputable because he testified to his belief that the leave policy is discriminatory and once expressed a similar opinion years before this dispute arose. Opp. 23-24 (citing PSF ¶¶ 214-18). But none of that remotely suggests, let alone unequivocally proves, that he honestly believed he was entitled to *the same extra eight weeks* of paid leave that birth mothers receive. On this record, a reasonable jury instead could find that he did not honestly believe either that some birth mothers have *no* period of disability, *see supra* at 13, or that the 18-week leave was a "settlement demand" (much less a reasonable one), *see supra* at 14. Likewise, a reasonable jury could find that he did not honestly believe that Jones Day pretextually adopted an eight-week assumption to give birth mothers more parental leave, rather than to ensure administrability and privacy. *See supra* at 16. Finally, especially given the "higher standard" applicable to someone of his "legal sophistication," *Iannone*, 941 F. Supp. at 410, a reasonable jury could find that he did not honestly believe that Jones Day's leave policy (*i.e.*, postpartum disability leave for a presumptive period of eight weeks) was unlawful sex discrimination based on the illusory difference from his proposed policy (*i.e.*, postpartum disability leave for the period of actual disability but enforced by an honor system for eight weeks). *See supra* at Part I.B. Simply put, a reasonable jury could find, as this Court should find, that this is a

too-clever-by-half legal claim that a Harvard Law graduate and former Supreme Court clerk dishonestly contrived to obtain extra paid parental leave that he did not deserve.

A reasonable jury also could find that Brogan fired Savignac because of the *unprofessional manner* of his email, not any protected claim therein. A jury could believe Brogan's unequivocal testimony that neither the discrimination claim nor the threatened lawsuit was a factor in, let alone a but-for cause of, the termination decision. DSF ¶¶ 353, 359-60. And a jury likewise could reject Plaintiffs' (untenable) attempts to question Brogan's credibility. *See supra* at 23-26.

Plaintiffs emphasize that, when asked about his decision, Brogan said he would not have fired Savignac if he believed that Savignac was right about the policy's illegality. Opp. 24 (citing PSF ¶ 232). At most, however, that shows Brogan would have *excused the improper manner* of Savignac's email if Savignac had at least brought a real problem with the policy to Brogan's attention. It in no way undermines, let alone refutes, Brogan's testimony that the improper manner of raising the claim, not the claim itself, was the cause of the termination decision. Brogan never said that he would have tolerated such an unprofessional email if it was not raising a discrimination claim *at all*, and he made crystal clear that he would *not* have terminated Savignac if the discrimination claim had been raised in a professional manner. DSF ¶¶ 353, 359-60.[7]

The same flaw infects Plaintiffs' invocation of Brogan's testimony that he fired Savignac in part because the email included the gratuitous lie that Sheketoff's salary was reduced because

---

[7] ████████████████████████████████████████████████████████████████
████████████ Nor is any inconsistency created by Brogan's statements that an associate's suing the firm while continuing to work there "would be an awkward situation" that he "d[id]n't know how [he] would deal with," PSF ¶ 268, and that he would not "support … for partner[ship]" an associate who was suing the firm, PSF ¶ 269. Defendants properly objected to those improper questions asking Brogan to speculate about irrelevant hypotheticals, and regardless, a reasonable jury could still credit his directly applicable testimony that he did not fire Savignac because of the threatened lawsuit.

of sex discrimination, and that he would not have made that decision if he thought there was any truth to that accusation. Opp. 24-25 (citing PSF ¶¶ 237-39). And as to this testimony, the more fundamental flaw is that the email was *not even purporting to raise a pay discrimination complaint* for Sheketoff, which means the statement at issue indisputably was not protected activity. Take Plaintiffs' own word for it: "The January email is 'a single, unitary complaint of discrimination,' *with every sentence* directly related to the claim that *the leave policy is unlawful.* … The fourth [paragraph, in which the pay statement appears,] warns Jones Day *not to retaliate.*" Opp. 30 (emphasis added). Anyway, the pay statement is also unprotected because it was subjectively dishonest and objectively frivolous. *See supra* at 20-21; *infra* at Part IV.

Tellingly, Plaintiffs have no valid rejoinder to the undisputed fact that Savignac was not terminated for his August 2018 email, which *also* asserted that the leave policy was discriminatory, but which was *not* expressed in the improper manner of his January 2019 email. MSJ 27. Plaintiffs speculate that the reason for the difference in outcome is that the August 2018 email was not elevated to Brogan and did not threaten to sue. Opp. 51 n.25. But they have *no evidence* to contradict Brogan's testimony that the material difference was instead that the August email does not "contain[] any of the … things that [he] ha[d] already testified to" about Mark's January email, such as the "dishonest[y] about the firm's compensation system" or the "extortionate" demand for the same amount of leave as birth mothers. DSF ¶¶ 345-46; PSF ¶ 236; Defs. Resp. PSF ¶ 236. Although no reasonable jury could reject this undisputed testimony, at the very least a reasonable jury could accept it. That alone forecloses summary judgment for Plaintiffs on the retaliatory-termination claims.

### D.    Sheketoff Has No Cause Of Action For Retaliation.

Sheketoff's retaliation claims are entirely derivative of Savignac's, *see* Opp. 51-53, so her claims fail for the same reasons his do.  Sheketoff's claims additionally fail because she has no cause of action to sue over Savignac's termination.

Plaintiffs primarily contend that Sheketoff herself was retaliated against when Brogan fired Savignac.  *Id.* at 51-52.  But Brogan testified that he understood the January 2019 email to come from Savignac alone, *not from* Sheketoff.  DSF ¶ 361.  That is dispositive, as Title VII prohibits an employer from "discriminat[ing] against" an employee "*because he* has opposed any [covered practice] …, or *because he has* … participated in any [covered event]."  42 U.S.C. § 2000e-3(a) (emphasis added); *see* D.C. Code § 2-1402.61(b) (similar); 29 U.S.C. § 215(a)(3) (similar).  By definition, Brogan cannot have retaliated against Sheketoff *because she* allegedly co-sent the email if he did not even know that; and *her having done so* cannot have been "a but-for cause" of Savignac's termination, *Nassar*, 570 U.S. at 362, as Brogan would have fired Savignac if he sent the email by himself (as Brogan in fact believed).  Unsurprisingly, Plaintiffs cite no authority for their absurd position that Brogan retaliated against Sheketoff even if he did not believe she sent the email.  *See* Opp. 51-52 (relying solely on an inapposite hypothetical where a manager retaliated against four employees because each one may have engaged in protected activity).

Nor do Plaintiffs have any valid basis to dispute Brogan's testimony.  Nothing they cite remotely calls into question Brogan's unequivocal testimony that "the e-mail, on its surface, I took it at face value was coming from you [Savignac]."  DSF ¶ 361.  Indeed, the only "incredible" position  is that Plaintiffs persist notwithstanding the undisputed facts that (1) the email ends with *only Savignac's signature block*, and (2) the sentence explaining the purpose of the email *distinguishes* between what Sheketoff had previously said and what Savignac was saying therein

("[B]ecause Julia made the prior request whereas I will be the named plaintiff, I write to say …").
DSF ¶ 306; PSF ¶ 213.  No reasonable jury could reject Brogan's testimony in the face of all this.

Finally, Plaintiffs alternatively contend that Sheketoff may sue for Brogan's alleged retaliation against Savignac because she is "aggrieved" under Title VII and the DCHRA, as both Savignac's wife *and* herself a former employee.  Opp. 52-53.  But they fail to cite any authority allowing a claim to proceed on that basis:  In their cited cases, the plaintiff was an employee who was either the *direct object* of the retaliatory action or a *member of the employee association* that was the direct object.  *Id.*  And they disregard the many cases Jones Day cited in the motion-to-dismiss briefing that *rejected* suits by the spouses of retaliated-against employees, including one where the spouse was himself also an employee.  Dkt. 19 at 8-9 n.3.  Relief for Sheketoff likewise is not "appropriate" to redress any retaliation against Savignac under the EPA.  29 U.S.C. § 216(b).

## III.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE RETALIATION CLAIMS ARISING FROM SAVIGNAC'S REFERENCE REQUESTS.

Plaintiffs do not dispute that, if their retaliatory-termination claims fail for lack of protected activity, their retaliation claims relating to Savignac's employment references fail too.  MSJ 28.  But Defendants are also independently entitled to summary judgment on the latter claims.  There is no evidentiary support for the implausible notion that Shumaker's decision to *authorize* one of the firm's *most-respected appellate partners* to provide a *favorable* reference for Savignac was motivated by retaliatory intent, or even that such a decision could be treated as "adverse action" at all.  In arguing otherwise, Plaintiffs proffer only speculation and conjecture.

To start, Plaintiffs argue—with no citation to any evidence—that a jury could find based purely on the chronology of events that Savignac's email caused Shumaker to put "restrictions" on his employment references.  Opp. 54.  By that, they apparently mean that Shumaker (i) selected *one* of the three partners Savignac had solicited to provide an official firm reference; (ii) specified

that the reference be provided by *phone*; and (iii) directed that the reference address *that partner's positive personal experience with Savignac*.  PSF ¶¶ 356-58.  This theory is fundamentally bizarre: Why would Shumaker take the "extremely rare, unusual" step of authorizing a reference in the first place, Chase Ex. 81, Shumaker Tr. 239:10-12, only to then retaliate against its beneficiary by neutrally specifying the who, how, and what?  In any case, none of these supposed "restrictions" could reasonably be chalked up to retaliatory intent on this record.

*First*, as to the *number* of references, Shumaker testified that he "wanted to have a unified statement on behalf of the firm" rather than a series of one-off references sending "inconsistent messages."  DSF ¶ 381.  To provide that statement, Shumaker selected one of the three partners Savignac had solicited, because he was the one Shumaker best "trusted" and "knew," who was "supportive" and had a "positive view" of Savignac, and who would be "more valuable" and most "persuasive" given his "reputation in the industry."  DSF ¶¶ 379-81.  Plaintiffs point to nothing in the record undercutting Shumaker's reasonable explanation for his choice.  *See* PSF ¶¶ 359-60.  Nor can Plaintiffs identify any example of Shumaker *ever* authorizing multiple references for *any* former employee.[8]  There is thus no evidentiary basis for a jury to infer retaliatory intent.

*Second*, as to the *mode* of the reference, Shumaker testified that he thought an oral reference would be "more beneficial" than a written one because it would let the partner answer questions.  DSF ¶ 382.  Again, Plaintiffs point to no contrary evidence.  *See* PSF ¶ 357.  Savignac speculates that he would have been better off with *both* a written and an oral reference, but the record shows Shumaker never even considered that possibility: He understood the question to be "Would we

---

[8] Plaintiffs claim Sheketoff and a Jones Day partner both provided references for a former associate.  PSF ¶ 387.  But there is no evidence the partner did so; Sheketoff merely cites her own testimony that she "think[s]" he did, or at least was "asked."  Chase Ex. 80, Sheketoff Tr. 301:22-302:3.  Anyway, *unauthorized* references are irrelevant to whether Shumaker acted with retaliatory intent in limiting Savignac to one reference—a limit there is no basis to find he ever deviated from.

provide a reference for Mark?" and his answer was "yes," and "it should be oral, so that [the partner] has the ability to field the questions"; a request for "both" was never "in front of [him]." Chase Ex. 81, Shumaker Tr. 243:3-17. So again, there is no evidentiary basis for a jury to infer retaliatory intent from the decision to authorize an oral reference rather than a written one or both.

*Finally*, Plaintiffs complain that the reference was only authorized to discuss the work he had done with Savignac. PSF ¶ 358. Here, too, Shumaker explained that he wanted the partner to be able to deliver a "positive recommendation" based on "personal knowledge," without having to address the "immature" and "unprofessional" conduct that had caused Savignac's termination. Chase Ex. 81, Shumaker Tr. 244:5-15, 246:9-15, 247:3-17. Once again, Plaintiffs offer nothing to rebut that explanation, or to explain how this could have been intended to retaliate.

For many of the same reasons, these supposed "limits" do not qualify as adverse actions. Efforts "to scuttle a former employee's search for a new job" might dissuade a reasonable worker, *Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991), but Shumaker's actions were just the opposite. DSF ¶ 378. In terms of concrete harm, which is an element of a retaliation claim (*infra* at 41-42), Savignac never substantiates his claim that having one oral reference by a partner with whom he had a positive personal work experience made him "a materially weaker candidate." Opp. 55; *see* DSF ¶¶ 402-03; PSF ¶ 383. And from an objective standpoint, when a firm's default policy is to confirm only dates of employment, no reasonable employee would be dissuaded by the prospect of getting a *positive reference from one of the firm's most respected attorneys*.

Finally, Heifetz is entitled to summary judgment in all events. Plaintiffs do not dispute she played no role in imposing the "restrictions" they now attack as retaliatory; those were Shumaker's decision. *See* PSF ¶¶ 357-58, 365, 368. Plaintiffs instead complain that Heifetz was involved in *communicating the firm's policy* regarding references. Opp. 55-56. But accurately communicating

firm policy cannot be—and is not even alleged to be—retaliatory adverse action.[9]  Nor can they proceed on an aiding-and-abetting theory: Even assuming Shumaker was driven by retaliatory intent, there is no evidence that Heifetz—whom Plaintiffs did not even bother to depose—ever knew or suspected as much.  *See Richardson v. Petasis*, 160 F. Supp. 3d 88, 143 (D.D.C. 2015) ("[T]here is no legal authority suggesting that any employee who serves merely as a passive 'conduit' of her supervisor's discrimination—while having no discriminatory animus herself—is liable for aiding and abetting [under the DCHRA].").

## IV.    SHEKETOFF'S PAY CLAIMS FAIL (COUNTS IV-VI).

Sheketoff spends only three pages defending her pay claims against summary judgment (Opp. 57-60), while devoting 25 pages to why those claims do not violate Rule 11 (Sanctions Opp. 12-37).  As Sheketoff thus apparently recognizes, the only serious question is whether these claims are so baseless as to warrant sanctions.  They certainly do not come close to reaching a jury.

### A.    Sheketoff Presents No Evidence of Discriminatory Animus.

Sheketoff's opposition confirms that her sole theory of pay discrimination is that Partner A's review of her performance was tainted by sex-based discriminatory animus.  But she presents no evidence for that claim.  As Jones Day pointed out, there is no evidence Partner A reviewed women more negatively than men; no evidence he ever made discriminatory comments; and no evidence he treated any similarly-situated men differently.  MSJ 31-33.  Sheketoff implicitly admits all of this by failing to respond with any such evidence.  There is none.

---

[9] Insofar as Plaintiffs suggest Heifetz ignored the reference policy on other occasions, they cite no evidence.  Plaintiffs say only that Heifetz had previously given references; that there is "no documentary evidence" she was authorized; and that Shumaker did not *recall* authorizing her.  PSF ¶¶ 395-401.  But Heifetz attested without dispute that she always obtained approval, and did so by *calling* Shumaker *or* the head of the Washington D.C. Office.  DSF ¶¶ 398-99.

Indeed, the only argument Sheketoff makes about Partner A's supposed gender bias is that his reviews complimented female associates more often than male associates on "soft skills" (Opp. 58), meaning the "ability to keep an open line of communication with who you're working for, whether you would be good at business development, good at recruiting, just good at client interaction" (Chase Decl. Ex. 84, Partner A Tr. 285:1-9). Partner A's disproportionate *praise* of female associates is not evidence of bias *against* women; it is consistent with his undisputed pattern of evaluating female associates more favorably *across the board*. DSF ¶ 201. That, of course, cuts powerfully *against* any inference that his review of Sheketoff reflected gender bias.[10]

Instead of adducing evidence of discriminatory animus, Sheketoff debates the merits of Partner A's review, defending her writing, initiative, and availability. Opp. 57-58. But quibbling over the "validity of [a supervisor's] discretionary judgments" about her "job performance" cannot defeat summary judgment. *Allen v. Johnson*, 795 F.3d 34, 41 (D.C. Cir. 2015). Sheketoff "cannot establish pretext merely by demonstrating that the [review] was false"; she instead "must show that [Partner A] could not have honestly and reasonably believed" it. *Ames v. Nielsen*, 2018 WL 5777391, at *3 (D.D.C. Nov. 2, 2018), *aff'd sub nom. Ames v. Wolf*, 820 F. App'x 1 (D.C. Cir. 2020). She needs proof that Partner A *lied*, or that his errors were "too obvious to be unintentional." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

---

[10] Sheketoff also cites, without elaboration, ten paragraphs in Plaintiffs' factual statement to the effect that she perceived Partner A to be more "deferential" and "self-deprecating" around certain men, but "insecure" around her. PSF ¶¶ 623-33. Such generalized, "conclusory allegations of discriminatory animus lacking any factual basis in the record are insufficient to defeat summary judgment." *Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 213 (D.D.C. 2014).

Sheketoff has neither.  Partner A testified at length about the basis for his critiques;[11] she offers no evidence to undermine his testimony.  DSF ¶ 285; PSF ¶¶ 515, 517 (citing Sheketoff's own deposition as "evidence" that review was "false").  Some of Partner A's criticisms—like his "impression" that Sheketoff did not bill 2,000 hours and would soon leave Jones Day—are *true* as a matter of *undisputed* fact.  DSF ¶¶ 18-19.  And his opinions about her writing, availability, and initiative were all echoed by multiple other reviewers whom Sheketoff does not claim were biased. DSF ¶ 217 (writing), ¶ 219 (initiative / attitude), ¶ 222 (availability), ¶ 242 (writing, availability), ¶ 244 (writing), ¶ 246 (availability), ¶ 248 (availability and initiative).  Sheketoff tries to dismiss every negative comment—one reviewer is "unfairly harsh," another an "idiot," etc.  *See* Sanctions Opp. 16, 20.  But the consistent themes, combined with Sheketoff's repeated "2" practice rating and bottom-of-the-class ranking, makes it impossible to conclude that Partner A's criticisms were so plainly wrong he could not have reasonably believed them.  *Allen*, 795 F.3d at 41.  Contrary to Sheketoff's arguments, positive "[r]eviews [by] other supervisors do nothing to call into question the accuracy of [Partner A's] first-hand observations of [her] performance …, nor do they suggest that [Partner A] is lying about [his] impressions of [her] work performance."  *Pearsall v. Holder*, 610 F. Supp. 2d 87, 101 (D.D.C. 2009).  They simply confirm her uneven record.

Even more attenuated is Sheketoff's speculation that Partner A's review was attributable to his annoyance at her repeated reversal of edits he made to a memo.  The review was submitted over nine months after that interaction, and is mentioned nowhere in it.  DSF ¶ 286.  Partner A testified that he was *not* "annoyed" with Sheketoff when he submitted the evaluation, and that he had earlier reached out about the edits because he thought it could be a "teaching point or practice

---

[11] *See* Chase Ex. 84, Partner A Tr. 67:12-77:18 (writing), 77:19-111:22, 137:7-143:1 (availability / commitment to firm), 112:1-125:14 (initiative), 125:15-135:6 (weekend availability), 135:9-137:6 (hours), 143:2-159:9 (numerical ratings).

pointer for how to interact with more senior lawyers" that "would be helpful to [Sheketoff] when [she] worked for other people."  DSF ¶ 277; Chase Ex. 84, Partner A Tr. 227:3-7, 234:18-235:7, 239:15-21.

In all events, Sheketoff offers nothing beyond rank speculation that Partner A's annoyance had *anything to do with gender*.  As he testified (and as the email exchange reflects), he thought it was unprofessional, inefficient, and rude for a junior associate to reject a more senior partner's style edits, let alone to do so repeatedly.  *See* DSF ¶¶ 274-79; Chase Ex. 84, Partner A Tr. 231:8-243:16.  That has nothing to do with sex or gender.  And there is nothing in the record even hinting that Partner A "expects women (but not men) to be deferential to him," which is the linchpin of Sheketoff's theory that Partner A's reaction was gender-based.  *See* Sanctions Opp. 33.

In short, nothing in the record suggests Partner A's understandable annoyance at Sheketoff for her repeated refusal to incorporate his edits, or his later mixed review of her performance, was motivated by sex-based discrimination.  The question under the relevant statutes is "whether [the plaintiff] produced sufficient evidence of … discrimination, not whether [s]he was treated fairly." *Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001).  Measured against that standard, Sheketoff's claims plainly fail.

### B.    Partner A's Review Was Not A Motivating Factor in Sheketoff's 2017 Salary.

Sheketoff's claims also fail because there is no evidence from which a jury could conclude that Partner A's review was a "motivating factor" in Sheketoff's 2017 compensation adjustment. *See* MSJ 34-37.  Sheketoff does not dispute that Brogan personally determined her pay adjustment in 2017, or that he did so without reading Partner A's review.  Opp. 59.  Instead, she argues that, in doing so, Brogan relied on (i) the "2" rating from Heifetz, and (ii) a recommendation from Shumaker and Lovitt; and she suggests both of those turned on Partner A's review.  But there is no evidence to support either of those causation theories.

*First*, Heifetz attested that "even if Partner A had submitted no evaluation, Sheketoff's practice rating would have been the same"—a "2," just as it had been the prior year, before Partner A's review—because "the rating was based on the common themes of many evaluations." DSF ¶ 293. Sheketoff's mere contention that a jury could dispute that testimony is insufficient; she fails to proffer any evidence undermining the undisputed testimony. *Id.* Plaintiffs chose not to depose Heifetz and, as a result, have no evidentiary basis to contradict her stated reasons for giving Sheketoff a "2" rating, which were independent of Partner A.

*Second*, as to the recommendation by Lovitt and Shumaker, Sheketoff again ignores the record evidence. Brogan's unrebutted testimony was that he exercised independent judgment and did not merely rubber-stamp the recommendations. *See* Chase Ex. 77, Brogan Tr. 27:19-30:10, 226:12-227:15, 228:24-230:10. Indeed, he made a large departure upward for Sheketoff's pay just the year before. DSF ¶¶ 225-26. Moreover and in any event, Lovitt testified that she did not base her compensation recommendation on Partner A's review, either, but instead on "theme[s]" present throughout Sheketoff's reviews. Chase Ex. 83, Lovitt Tr. Vol. II 85:4-86:18. Sheketoff cites no contrary evidence from Lovitt, Shumaker, or anyone else. She has thus failed to point to any *evidence* that Partner A's review actually caused the pay adjustment she is challenging.

Sheketoff also speculates that, because her overall record for 2016 was (aside from Partner A's review) similar to her record for 2015, a jury could conclude that Partner A's review caused her raise in 2017 to be lower than her raise in 2016. Opp. 59. But trajectory matters too, and by 2016 Sheketoff had amassed *two successive* "2" ratings from her practice, which as a matter of firm policy is "inconsistent with continued employment at the Firm." DSF ¶ 210. Brogan testified that he did not penalize Sheketoff in 2016 because he wanted to encourage her to improve, but that the second successive "2" convinced him that had been a mistake. DSF ¶¶ 230-32, 264.

None of this is to deny that "the whole point of the evaluation process is … to determine pay adjustments." Sanctions Opp. 34. But that does not mean every individual review is itself a motivating factor in a final pay decision. As Sheketoff's cited case recognizes, the question is one of proximate cause, and an individual review will only matter if the decisionmaker "took that … report 'into account'" in making a decision. *Coats v. DeVos*, 232 F. Supp. 3d 81, 90 (D.D.C. 2017). Here, Sheketoff's "string of poor reports from unbiased evaluators … and [Heifetz's] independent assessment of [Sheketoff's] performance makes any connection between [Partner A's alleged] animus and the [compensation] decision too attenuated to constitute proximate cause." *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 2021 WL 4033071, at *11-12 (D.D.C. Sept. 3, 2021). Summary judgment is warranted for this additional reason too.

### C.    Sheketoff's EPA Claim Fails for the Same Reasons.

Jones Day is entitled to summary judgment on Sheketoff's EPA claim for the same reasons. Even looking past Sheketoff's failure to make out a *prima facie* case of "equal work," she admits the EPA claim hinges on the premises that "Partner A's evaluation" was "based on … sex" and "influenced" her pay. Opp. 59-60. As shown, the record forecloses both contentions.

## V.    JONES DAY DID NOT RETALIATE WHEN IT ISSUED ITS PRESS RELEASE.

Finally, Plaintiffs have not cleared the "host of substantial hurdles" this Court identified as facing their claims challenging Jones Day's press release. Dkt. 42 at 4. Plaintiffs cite no evidence from which a jury could find that retaliatory intent caused the firm to issue the statement, or that it was a materially adverse action. And the First Amendment would bar these claims anyway.

### A.    Plaintiffs Have No Evidence of Retaliatory Intent.

As Jones Day explained, it issued the press statement to respond to media coverage of the "false allegations about the firm," *not* to retaliate against Plaintiffs for suing. DSF ¶¶ 437-38; PSF ¶ 403. Plaintiffs do not contest that public relations and protecting the firm's reputation are

legitimate and non-retaliatory grounds for the press statement. *See, e.g.*, *Rogosin v. Mayor & City Council of Balt.*, 197 F. Supp. 2d 345, 350-51 (D. Md. 2002) (fact that "Plaintiff was projecting a negative public image" was "a legitimate non-discriminatory reason" for termination); *Arredondo v. Beer Barrel, Inc.*, __ F. Supp. 3d __, 2022 WL 17544180, at *9 (N.D. Ohio Dec. 9, 2022) ("social media" concerns were legitimate, non-discriminatory reason); *Williams v. Fla. Atl. Univ.*, 2017 WL 1881676, at *7 (S.D. Fla. May 9, 2017) (same for "public relations").

To survive summary judgment, Plaintiffs must therefore "produce sufficient evidence that would discredit th[at] reason[] and show that the action[] w[as] retaliatory." *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008). That is, they need evidence that "retaliatory intent" was a "but-for cause" of the press release—*i.e.*, that the firm would not have issued the statement if not for its desire to punish Plaintiffs for engaging in allegedly protected activity. *Nassar*, 570 U.S. at 359, 362. But there is no basis in the record to support the implausible position that Jones Day would not have protected its reputation in the press or responded to false media attacks "but for" the incidental effect that defense might have on Plaintiffs' reputations.

Plaintiffs cite just two facts: (i) the title of the release and (ii) its timing. Opp. 60 (citing PSF ¶ 403). Neither, however, in any way rebuts the sworn testimony that Jones Day issued its press statement only because of the media attacks. Both the coverage and the press release, of course, related to Plaintiffs' lawsuit, so neither the title nor the timing of the release is surprising. Still, the *reason for issuing it* was the threat of public relations harm to the firm, not to retaliate against Plaintiffs. *See Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine"). And, as explained above, it is not enough to insist "[a] jury could … discredit" Brogan's testimony. Opp. 60 n.29. Even truly "discredited testimony" is not "sufficient" to defeat summary

judgment, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984), let alone implausible speculation that a jury *could* disbelieve the witness.  *See supra* at 2.

Perhaps realizing they offer no affirmative evidence that retaliatory intent caused Jones Day to issue the press release, Plaintiffs assert that "ultimate intention" does not matter.  Opp. 60. So long as the release was in any sense triggered by their lawsuit or media activity (which they say was also protected), Plaintiffs contend they have established causation and the press release was categorically "illegal."  *Id.*  That is too simplistic an account of but-for causation.  In *Barnes*, for example, the agency could fire the representative for making false and malicious statements about the personnel proceeding, even though those statements never would have happened if the representative had not participated in the proceeding in the first place.  840 F.2d at 976-77; *see also Vaughn*, 537 F.3d at 1150-54 (employer could discipline employee for improperly disclosing unredacted medical records to EEOC in proceedings initiated by employee).  Likewise, here, Jones Day issued the press release *because of* the press coverage Plaintiffs generated about the suit, "not the [suit] itself," and thus "the statute does not by its terms apply."  *Cf. Pendleton*, 628 F.2d at 107.

### B.    Plaintiffs Have No Evidence of Materially Adverse Action.

Plaintiffs also fail to establish a genuine issue on "adverse action."  More than reputational harm is required; they must show "objectively tangible harm" to employment opportunities, of the sort that would dissuade a reasonable worker from making a complaint.  MSJ 39-41.  Plaintiffs have not identified any such harm, let alone one that has evidentiary support and accounts for "[c]ontext," which "matters."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006).

Plaintiffs first attack the "objectively tangible harm" requirement.  Even as they continue to rest almost entirely on the 1991 *Passer* decision, they complain that the three (subsequent) D.C. Circuit cases rejecting subjective and speculative harms "predate" the Supreme Court's decision in *Burlington*.  Opp. 61.  But courts in this Circuit continue to apply those three cases—*Holcomb*

*v. Powell*, 433 F.3d 889 (D.C. Cir. 2006), *Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002), and *Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002)—and even cite them alongside *Burlington*. *See, e.g.*, *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007).[12]  And the en banc D.C. Circuit just confirmed that the "objectively tangible harm" test remains alive and well in the retaliation context. *See Chambers v. District of Columbia*, 35 F.4th 870, 876 (D.C. Cir. 2022) (en banc); *see also id.* at 876-77 (noting that, in retaliation context, courts must assess "material adversity").

Plaintiffs cannot seriously dispute that they lose under this standard.  There is *no evidence* that the press release impaired Plaintiffs' "future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio*, 306 F.3d at 1131-32; MSJ 40. Plaintiffs aver that "[a]nyway, a jury could find that the press release . . . harmed Plaintiffs' career prospects and will continue to do so."  Opp. 61.  But that is every bit as "conclusory" as it was in *Forkkio*, *see* 306 F.3d at 1131 (noting the plaintiff "failed to provide any *evidence*" of "any adverse consequence to his position or future career" (emphasis added)).  Plaintiffs did not even bother to declare they have faced or anticipate any impairment whatsoever in "employment opportunities." *Id.*  Indeed, their only cited evidence reveals nothing more than statistics about Jones Day's social media followers and website visitors.  *See* PSF ¶¶ 404-09.  That is insufficient as a matter of law. *See, e.g.*, *Forkkio*, 306 F.3d at 1131.  And *Passer* does not save Plaintiffs, because that was a "Rule 12[]" case that "accept[ed] as true, for purposes of assessing the legal sufficiency of [a] claim,"

---

[12] *See also, e.g.*, *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70-71 (D.D.C. 2012) (citing *Holcomb* and *Forkkio*); *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 13 (D.D.C. 2019) (citing *Holcomb*); *Baloch*, 550 F.3d at 1199 (requiring "tangible" consequences and noting the plaintiff "did not produce evidence showing that" alleged adverse action "could affect his position, grade level, salary, or promotion opportunities").

the allegations that the actions "made [the plaintiff] essentially unemployable in his field." 935 F.2d at 325-26, 331. Plaintiffs now need *evidence* for their claims, and they have adduced none.[13]

Plaintiffs' conclusory assertions of harm are especially silly in "[c]ontext," *Burlington*, 548 U.S. at 69. They never deny that "[w]hat is contained in the statement is no more than what would be contained in an answer to the complaint"—and indeed has been included in every major filing to date. *Coleman v. Am. Broad. Cos.*, 1985 WL 365, at *9 (D.D.C. June 18, 1985); DSF ¶ 440. The reality that Jones Day (like any defendant employer) would share its defenses and narrative in public filings fatally undermines Plaintiffs' theory that an admittedly redundant press statement alone would either harm them or dissuade employees from suing.

Plaintiffs' only response is that fewer people read "dry filings on PACER" than the firm's statement on its website and social media. Opp. 62. But even if that (unsubstantiated) claim were true, it ignores that Plaintiffs themselves encouraged media amplification of the filings, which are publicly available and have been broadly covered by major publications like Reuters, Bloomberg, and Law.com. Indeed, while Plaintiffs point out that Jones Day's post was visible to "21,000" "Twitter … followers," "65,000" "LinkedIn … followers," and "25,000" "website … visitors" (PSF ¶¶ 404-09), Plaintiffs orchestrated lengthy features in the *New York Times* and *Washington Post* about their lawsuit (DSF ¶¶ 416, 433). The *New York Times* then had *4.7 million* subscribers, and the two newspapers had *tens of millions* of visitors to their websites. Marc Tracy, *New York Times Up to 4.7 Million Subscribers*, The New York Times (Aug. 7, 2019); WashPostPR, *More than 92 million people visited The Washington Post in August 2019*, The Washington Post (Sept. 17, 2019).

---

[13] Indeed, Savignac was just *promoted*. Dan Roe, *Former SCOTUS Clerk Suing Jones Day Promoted to Counsel at Steptoe*, Am. Lawyer (Dec. 14, 2022), https://bit.ly/3YglMBF; *cf. Forkkio*, 306 F.3d at 305 (calling assertions "conclusory … especially in light of [a] promotion").

At bottom, it cannot be the law that plaintiffs may seek out publicity for their complaints in newspapers read by tens of millions, yet employers are forbidden to identify their defenses in website postings with orders of magnitude fewer viewers. The latter is neither adverse action nor driven by retaliatory intent. For either reason, the Court should grant summary judgment.

### C.    The First Amendment Bars Any Liability For The Press Release.

The First Amendment bars these claims in any event. Plaintiffs half-heartedly question the First Amendment's application to "workplace discrimination laws." Opp. 62-63. But while the First Amendment may not grant employers an unfettered right to discriminate through speech, it certainly does not permit employees to malign their employers in the press while invoking a statute to prohibit the employers from defending themselves in that arena. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992) ("[The government] has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.").

As relevant here, the D.C. Circuit has held that the First Amendment at minimum "preclude[s]" "civil actions"—including statutory claims sounding in retaliation—from imposing liability for "reputational or emotional harm from the publication of protected speech." *Barr v. Clinton*, 370 F.3d 1196, 1202-03 (D.C. Cir. 2004); *see also Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 18 (D.D.C. 2001) (similar). Therefore, because Plaintiffs are limited-purpose public figures, *see Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016), the only question is whether Jones Day's speech was "protected," *Barr*, 370 F.3d at 1203.

It was. MSJ 41-44. Most fundamentally, there is no evidence—let alone the requisite *clear and convincing* evidence—that the press release "was made with 'actual malice,'" *i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Anderson*, 477 U.S. at 254.

44

Plaintiffs cherry-pick a few sentences they claim Defendants could not have believed—about Plaintiffs' legal theory and its implications, the reasons for Savignac's termination, and the disingenuousness of Sheketoff's pay claims. Opp. 64-65. But the evidence is undisputed that Jones Day believed its statement to be *true* in all three respects. *See* DSF ¶ 443 (quoting Chase Ex. 82, Lovitt Tr. Vol. I 88:2-89:8) (noting that on Plaintiffs' theory, "you have to provide medical evidence"); DSF ¶¶ 343, 348-50 (quoting Chase Ex. 77, Brogan Tr. 15:3-18:10) (describing Savignac's "poor judgment and immaturity" as a basis for termination); DSF ¶ 354 (quoting Chase Ex. 77, Brogan Tr. 195:4-12) (noting "no basis … to say that [Sheketoff] was being discriminated against"; "[n]one"; "[z]ero"). These are eminently reasonable opinions and there is *no evidence* that Jones Day did not genuinely believe them. That is the end of the analysis. *See* MSJ 42-44.[14]

At minimum, the press statement is not "'so obviously false' that '*no reasonable person could find* that [its] characterizations were supportable interpretations' of the underlying facts." *Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996) (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 315, 317 (D.C. Cir. 1994)). Plaintiffs may be offended by the statement's strength, but they cannot recast "an opinion" statement into "falsifiable assertion[s] of objective fact." Opp. 64. Once again, they miss "the context," *Moldea*, 22 F.3d at 311, and indeed the forest for the trees.

## CONCLUSION

For the reasons in Defendants' opening brief and above, the Court should grant summary judgment to Defendants. At minimum, the Court should deny Plaintiffs' cross-motion.

---

[14] Indeed, Jones Day continues to maintain that its statement was true in all respects, except that Plaintiffs' theory about the disability policy is even more aggressive than Jones Day realized. As explained above, *even medical certifications* would be illegal on their view. *Supra* at 7-8.

February 24, 2023

*/s/ Terri L. Chase*　　　　　　
Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*