IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, <br><br>*Plaintiffs*, <br><br>v. <br><br>JONES DAY, *et al.*, <br><br>*Defendants*. | Civ. No. 1:19-02443 (RDM) <br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR RULE 11 SANCTIONS AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR RULE 11 SANCTIONS** |

Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 714-9700

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Phone: (412) 391-3939

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

*Attorneys for Defendants*

## TABLE OF CONTENTS

                                                  **Page**

TABLE OF AUTHORITIES ................................................................................................. ii
INTRODUCTION ................................................................................................................ 1
ARGUMENT ........................................................................................................................ 2

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Coats v. DeVos*,
   232 F. Supp. 3d 81 (D.D.C. 2017) ........................................................................................5

*Gleklen v. DCCC*,
   199 F.3d 1365 (D.C. Cir. 2000) ............................................................................................3

*In re Ames*,
   993 F.3d 27 (1st Cir. 2021) ..................................................................................................10

*Jackson v. Cronic*,
   2013 WL 12099477 (N.D. Ga. Aug. 23, 2013) ...................................................................13

*Muhammad v. Louisiana*,
   2000 WL 1876350 (E.D. La. Dec. 21, 2000) .......................................................................9

*Passer v. Am. Chem. Soc'y*,
   935 F.2d 322 (D.C. Cir. 1991) ............................................................................................11

*Richardson v. Petasis*,
   160 F. Supp. 3d 88 (D.D.C. 2015) ......................................................................................12

*Silberman v. Innovation Luggage, Inc.*,
   2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) ......................................................................13

**OTHER AUTHORITIES**

\* Fed. R. Civ. P. 11 ........................................................................................................... *passim*

# **INTRODUCTION**

Defendants explained in their opening brief (Dkt. 188, "Defs. Sanctions Br.") that certain of Plaintiffs' claims—those challenging Jones Day's disability policy, Sheketoff's compensation, and Savignac's reference authorization—are so lacking in evidentiary support that it is objectively unreasonable for Plaintiffs to continue pursuing them. *See* Fed. R. Civ. P. 11(b)(3).

In their response (Dkt. 200-1, "Sanctions Opp."), Plaintiffs rely heavily on the fact that their claims survived a motion to dismiss, suggesting this immunizes them from sanctions after discovery absent some "extraordinary developments." Sanctions Opp. 2. But that is not the law. At the pleading stage, plaintiffs can assert factual allegations they believe will be supported by discovery—but they cannot continue to press those allegations if, after discovery, it is clear they have no "evidentiary support." Fed. R. Civ. P. 11(b)(3). Such is the case here.

Nor are Plaintiffs' arguments against summary judgment sufficient to avoid sanctions. The full response to Plaintiffs' merits arguments are addressed in Defendants' consolidated summary judgment reply and cross-opposition ("DMSJ Reply/Opp."), but the common theme is that each of Plaintiffs' claims rests on factual assertions that Plaintiffs do not—and cannot—support with valid evidence. That is not sufficient to avoid summary judgment and, because Plaintiffs' claims are objectively unreasonable, Plaintiffs are also in violation of Rule 11.

Finally, Plaintiffs' purported cross-motion for sanctions is a make-weight. Other than a few stray comments that Defendants' arguments are "frivolous," Plaintiffs offer no actual grounds for their sanctions motion. Filing one appears to have been a transparent attempt to distract from Plaintiffs' own violations or an effort to gain additional pages of merits briefing.

In short, discovery has shown that Plaintiffs lack evidentiary support to pursue certain of their claims, yet Plaintiffs persist nonetheless. They should be sanctioned.

1

# ARGUMENT

As Defendants explained in their opening brief, there is a total absence of evidentiary support for certain of Plaintiffs' claims.  That makes these claims objectively unreasonable, and thus sanctionable, under Rule 11.  This is true notwithstanding that, as Plaintiffs repeatedly emphasize, this Court denied a motion to dismiss.  Although plaintiffs at the pleading stage can allege "factual contentions . . . [that] will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," Fed. R. Civ. P. 11(b)(3), they cannot "later advocat[e]" the same allegations if discovery reveals that they have no "evidentiary support," Fed. R. Civ. P. 11(b).  Indeed, this Court clearly admonished Plaintiffs in July that they needed to have a good-faith basis to press claims in light of the post-discovery evidentiary record.  Tr. of July 1, 2022, Hr'g at 8:9-23.  The law is clear that Rule 11 is triggered when a "litigant" "reaffirm[s] to the court and advocat[es] positions contained in . . . pleadings and motions after learning that they cease to have any merit."  Fed. R. Civ. P. 11(b)-(c) advisory committee's note to 1993 amendment; *see* Defs. Sanctions Br. 2-4 (collecting cases).  That is exactly what has happened here, and Plaintiffs' counter-arguments are meritless.

      1.      **Discriminatory Pay Claims (Counts IV-VI).**  Plaintiffs' lack of a good-faith basis is perhaps most evident in the continued pursuit of Sheketoff's claims about her 2017 pay adjustment.  Tellingly, Sheketoff devotes 25 pages to trying to ward off sanctions on these claims, while devoting only three pages to opposing summary judgment.  But while she seeks to deluge this Court with a flood of irrelevant facts, she cannot obscure the straightforward conclusion that there is no evidentiary basis for these claims.

*First*, Sheketoff has no evidence whatsoever of discriminatory intent.  This Court allowed discovery to test Sheketoff's allegation that Partner A's review was motivated by gender because

2

he was less accepting of pushback from women. Dkt. 32 at 18-20. But discovery has unequivocally contradicted that allegation. There is no evidence that Partner A ever gave a more favorable review to a male associate who was similarly situated to Sheketoff—not on any of the topics actually mentioned in her review or even on the topic of reversing his edits (which is mentioned nowhere in the review). DMSJ Reply/Opp. 34-37. To the contrary, Partner A testified that no associate of either sex had ever repeatedly rejected his revisions, DSF ¶ 276, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Nor is there even evidence that Partner A otherwise treated men better than women or made sexist comments. DMSJ Reply/Opp. 34-35.

Unable to dispute any of this, yet stubbornly unwilling to abandon the baseless theory that Partner A "expects women (but not men) to be deferential to him," Sanctions Opp. 33, Plaintiffs grasp for the straw that Partner A complimented female associates more often than male associates on "soft skills," *id*. It should be obvious to any good-faith litigant, however, that Partner A's disproportionate *praise* of female associates is not even arguably evidence of bias *against* women. Indeed, it strongly refutes such an inference, consistent with his undisputed pattern of evaluating female associates *more favorably across the board*. DMSJ Reply/Opp. 34-35. There is no basis in reality to malign Partner A as demanding greater deference from women than men, which is why there is not a scintilla of evidence that he would have been ok with a male associate's undoing his revisions (which, to repeat, was not even a basis of Sheketoff's review nine months later).[1] *Id.* at 36.

---

[1] Sheketoff also relays an anecdote apparently told to her by Female Associate B about an interaction between Partner A and that associate regarding whether to hire a male driver. Sanctions Opp. 33. That anecdote is sheer hearsay, and is inadmissible even at summary judgment. *Gleklen v. DCCC*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). It also has nothing to do with whether Partner A is biased against women, or with his review of Sheketoff.

3

Sheketoff appears unable to accept the truth because she insists that her performance was better than Partner A deemed it, debating at length his assessment of her writing, initiative, and availability. Sanctions Opp. 24-32. But it is black-letter law that a plaintiff cannot manufacture a genuine dispute about discriminatory intent merely by disagreeing with the merits of her supervisor's evaluation—she instead must show, at the very least, that Partner A could not *sincerely and reasonably* have believed his assessment. DMSJ Reply/Opp. 35. Here, Partner A testified at length about the basis for his criticisms, and Sheketoff cannot possibly show that this was all pretextual, given the multiple reviews *echoing* those same criticisms from partners Sheketoff admits were *not* biased. *Id.* at 35-36. True to form, Sheketoff tries to malign the reasoning of each those reviewers—one was "unfairly harsh," another an "idiot," and so on, Sanctions Opp. 16, 20—but all this just confirms that she sees fault in everyone but herself. Sheketoff points to her "top-of-class salary" as proof she was performing highly (*id.* at 14), but Brogan directly testified that her compensation adjustment for her first full year was intended as encouragement to improve—which he later realized was a mistake when she did not. DSF ¶¶ 230-32. In fact, her two successive "2" ratings from her practice group (the first before she ever worked for Partner A) were grounds for *termination* under the Firm's written policies, which is why Sheketoff would have been advised to seek other employment except that Heifetz believed she was already doing so. DSF ¶¶ 210, 253-58.

Simply put, on this record, Sheketoff's insistence that she was an "excellent" associate who had "an extremely successful four years with the firm" and "would have easily made partner at the end of 2019" (Sanctions Opp. 23) is nothing short of delusional. It is consistent, though, with her implausible theory that Partner A's stated reasons for his review were all a pretext for his purported residual annoyance about an event that happened nine months earlier, that he did not even bother

4

to mention in the review, and that has nothing to do with gender in all events.

*Second*, and relatedly, Sheketoff has no evidence whatsoever that Partner A's review was a motivating factor in her 2017 compensation adjustment. She does not dispute that Brogan personally determined her pay adjustment in 2017, or that he did so without reading Partner A's review. *Id.* at 34-36. Instead, she argues that Brogan relied on the "2" rating from Heifetz and a recommendation from Shumaker and Lovitt, both of which she asserts were influenced by Partner A's review. *Id.* But there is no evidence to support that theory either. *See* DMSJ Reply/Opp. 37-38. Heifetz—whom Plaintiffs did not even bother to depose—has explained that even if Partner A had submitted no evaluation, Sheketoff's practice rating would have been the same—a "2," just as it had been the prior year, before Partner A's review—because the rating was based on common themes of many evaluations, Sheketoff's failure to improve on the deficiencies in her 2015 performance, and Heifetz's own personal observations and interactions with Sheketoff. DSF ¶¶ 240, 293. Nor does Sheketoff present any evidence undermining Lovitt's similar testimony that Partner A's review did not affect the recommendation from her and Shumaker. *See* Chase Ex. 83, Lovitt Tr. Vol. II 85:4-86:18.

Sheketoff cannot fill the evidentiary void with the immaterial observation that part of the "point" of the evaluation process is "to determine pay adjustments." Sanctions Opp. 34. That does not mean, of course, that *every* individual review is a motivating factor in a final pay decision. The question is one of proximate cause, and an individual review will only matter if the decisionmaker "took that . . . report 'into account'" in making a decision. *Coats v. DeVos*, 232 F. Supp. 3d 81, 90 (D.D.C. 2017). Indeed, Sheketoff *disproves* her own case by arguing that "[i]gnoring Partner A's review, Julia's record for 2016 was very similar to her 2015 record." PMSJ 59. After all, it is *undisputed* that: (1) her "similar" record in 2015 was so mediocre that she

5

received a "2" practice rating, DSF ¶¶ 209-24; (2) Brogan excused the "2" rating for 2015 hoping she would improve, but she did not, as her record remained "similar," DSF ¶¶ 225-32; and (3) consecutive "2" ratings are grounds for termination, so she should count herself lucky that she "only" received a $15,000 raise, DSF ¶¶ 210, 233-34. Given all that, there is no basis for any rational jury to find that Partner A's review in particular had any effect at all on her pay adjustment.

At bottom, Sheketoff was treated extraordinarily well by Jones Day. She was paid over $1.8 million despite her low ratings and rankings and the fact that her contributions to client billable work and the Firm's revenues were incredibly low. DSF ¶ 17. She was allowed to pursue pro bono projects that fit her interests and let her build litigation skills. DSF ¶ 18. And she left the firm voluntarily to pursue her career at the Federal Public Defender. DSF ¶ 19. In response, Sheketoff decided to sue Jones Day for ████ she says she was entitled to receive in her 2017 compensation adjustment, using litigation and the press to attack Jones Day and multiple individual partners and associates. DSF ¶ 268. Sheketoff apparently cannot come to grips with the fact that she was a subpar associate who, while capable of strong performance, was perceived by many as interested primarily in pro bono cases and not fully engaged with the Firm's work. Sheketoff's unwillingness to believe that others could have a negative view of her performance, however, is not an excuse for bringing claims of sex-based discrimination that lack any evidentiary basis. Rule 11 requires attorneys and *pro se* plaintiffs to have an "objectively reasonable" basis for the claims they press. Sheketoff does not have one, so sanctions are appropriate.

**2.     Leave Policy Claims (Counts I-III)**. Plaintiffs' lack of good faith is also evident in their continued challenge to the leave policy. At the pleading stage, this Court concluded that "factual development" was needed because, "[w]ithout providing the parties with some opportunity for discovery and to offer evidentiary submissions, the Court cannot determine

6

whether the policy was *adopted* and *operates*, in whole or in part, as a substitute for an extended period of parental leave for birth mothers." ECF No. 32 at 32 (emphasis added).

Discovery foreclosed any claim that Jones Day's eight-week disability assumption operates as a parental-leave "substitute" that is "untethered to actual disabilities." *Id. Both sides'* experts testified that six weeks is medically reasonable for routine vaginal deliveries; that eight weeks is medically reasonable for the one-third of deliveries by Cesarean section; that doctors (including Plaintiffs' expert) routinely certify "six-to-eight" weeks if the mode of delivery is not yet known (and that it typically is not known at the time of certification); and that doctors who initially certify six weeks may certify additional disability after the mother's postpartum visit. In other words, six-to-eight weeks is a reasonable and accepted disability period after routine childbirth, and Jones Day's assumption aligns with that consensus. *See* DMSJ Reply/Opp. 4.

Discovery likewise foreclosed any claim that Jones Day's disability assumption was nevertheless adopted so that the unknown subset of birth mothers who might happen to recover earlier than eight weeks can obtain a small, random amount of extra parental leave that is not provided to fathers. Rather, Julie Dressing, who developed and recommended the eight-week assumption in 1994, testified that Jones Day adopted it because doctors routinely certified six-to-eight weeks of disability; that insurers considered eight weeks to be a compensable disability period without medical certification of disability; and that the firm wanted an administrable rule that would predictably cover most birth mothers while avoiding intrusive inquiries into mode of delivery or complications. None of that, of course, amounts to discrimination on the basis of sex or gender stereotypes. *See id.* at 4-5. Plaintiffs' sole response to Dressing's testimony is to contend that, by dividing the prior 12-week leave period for birth mothers into a period of disability leave and a period of parental leave, and then setting the disability assumption at the higher end of the

7

medically reasonable range rather than the lower end, the *effect* was to reduce the amount of parental leave offered to birth mothers and fathers. Sanctions Opp. 4-6. That math, however, does nothing to undermine Dressing's testimony that her *intent* was not to short-change fathers, but to protect the privacy of birth mothers and the administrability of the policy. Indeed, Plaintiffs' willful blindness to facts harmful to their case is exemplified by their failure even to depose Dressing, despite having her declaration months ago.[2]

Since there is no evidence at all that Jones Day adopted the eight-week assumption based on sex or gender stereotypes, Plaintiffs have retreated to the categorical legal theory that "[e]ven if the eight weeks *were* … medically reasonable," the Firm cannot "lawfully impose that generalization on its workers." *Id.* at 9. Even that legal theory, however, rests on a factual premise lacking any evidentiary support—namely, that the eight-week assumption functions as a "one-way ratchet" that birth mothers can continue to invoke even if their actual period of postpartum disability ends before eight weeks. PMSJ 2; *see* Sanctions Opp. 10. The actual text of the leave policy does not purport to permit this, and there is no evidence suggesting that Jones Day failed to follow and enforce the policy language. *See* DMSJ Reply/Opp. 11-12. In particular, (1) Plaintiffs have not identified a single birth mother who took disability leave for the full eight weeks despite not actually being disabled for part of that time, let alone where the firm knew this was happening and allowed it, *see id* at 11; (2) Jones Day's 30(b)(6) witness, Lori Bounds, testified that the Firm has never learned of such an instance, and that if it did, she would consult with Sarah McClure, Jones Day's Director of Human Resources and Counsel, who would determine how the policy

---

[2] Plaintiffs also try to divert attention to certain changes to family leave and adoption leave policies that Jones Day adopted in 2015, *see* Sanctions Opp. 5-7, but none of that could be probative of the *intent* behind the disability assumption adopted *in 1994*, and Plaintiffs blatantly mischaracterize the 2015 record anyway, *see* DMSJ Reply/Opp. 5-6.

8

applies, DSF ¶¶ 114-15; and (3) McClure—whom Plaintiffs chose not to depose, even after Bounds' testimony—confirmed in a declaration that if the firm were to learn that an associate had remained out on disability leave after childbirth longer than she was actually disabled, the Firm would determine that her disability leave had ended and reclassify her leave as family leave, DSF ¶ 115. Although Plaintiffs emphasize that Jones Day does not impose any "obligation" on birth mothers "to report" if their postpartum disability has ended before the eight weeks elapses, Sanctions Opp. 11, that does not change the fact that such employees would no longer be entitled to disability leave—indeed, it is no different than how Plaintiffs' own preferred "honor system" would operate. PMSJ 7.[3]

In all events, Plaintiffs' theory that *any* period of assumed postpartum disability is an illegal "generalization"—simply because it is not precisely tailored to each individual birth mother's period of actual disability—is not just wrong as a matter of law, but legally frivolous. Nothing in the text of Title VII or the Pregnancy Discrimination Act (PDA) even arguably supports the absurd notion that an employer discriminates *because of sex* when it adopts an assumption about postpartum disability period based on a *reasonable*, *sex-neutral* analysis of medical standards and for the *legitimate*, *sex-neutral* reasons of privacy and administrability. *See* DMSJ Reply/Opp. 7-10. To the contrary, it would *violate* the PDA to say that birth mothers cannot be offered the type of assumed disability period that is offered for other disabilities, that they likewise cannot rely on

---

[3] Plaintiffs also object that they did not receive McClure's declaration until after the sanctions motion was filed and thus after Rule 11's 21-day safe-harbor period. Sanctions Opp. 10. But given that Plaintiffs did not file their summary-judgment briefs *until roughly eight weeks after that*, they cannot dispute that they "ultimately received well over 21 days to consider whether to withdraw" the policy claims, and thus that Jones Day "substantially complied with 11(c)(1)(A)." *Muhammad v. Louisiana*, 2000 WL 1876350, at *2 (E.D. La. Dec. 21, 2000). Regardless, McClure's testimony simply confirmed the other evidence discussed above, and Plaintiffs' failure to depose McClure themselves, despite Bounds' testimony, itself demonstrates their bad faith.

the "generalizations" in doctors' *ex ante* certifications, and that they therefore must be subjected to an "actual disability" rule enforced either through invasive check-ups or an "honor system." *See id.* at 7-10. Although Plaintiffs insist that this ridiculous theory is not foreclosed by the case law, *see* Sanctions Opp. 2-3, that is neither correct, *see* DSMJ Reply/Opp. 9-10, nor dispositive, *see In re Ames*, 993 F.3d 27, 35 (1st Cir. 2021) (noting that the "key question is not whether" a claim "disregarded" a "precedent directly on point," but rather "whether any reasonable attorney" would have made it).[4]

In short, Plaintiffs are former Supreme Court clerks who cannot honestly believe the too-clever-by-half legal theory that Jones Day's leave policy (*i.e.*, postpartum disability leave for a presumptive period of eight weeks) is unlawful sex discrimination based on the illusory difference from their proposed policy (*i.e.*, postpartum disability leave for the period of actual disability but enforced by an honor system for eight weeks). Once factual development established, as it unequivocally has, that the eight-week assumption operates in a medically reasonable way and was adopted for sex-neutral reasons of privacy and administrability, Plaintiffs should have dropped their claims against the policy. Because they persist, they are subject to Rule 11 sanctions.

**3.    Reference Claims (Counts VII-IX).** Plaintiffs also have no good-faith basis for moving forward with their retaliation claims relating to Savignac's employment references. The Firm Manual has long *prohibited* lawyers from providing employment references unless authorized by the Firm Administrative Partner (Michael Shumaker) or the Partner-in-Charge of

---

[4] Plaintiffs also erroneously imply that this Court already found their "no generalizations" theory legally viable. *See* Sanctions Opp. 2-4. To the contrary, this Court allowed the policy claims to make it past the pleadings because discovery was needed to determine whether the eight-week disability assumption was adopted and operates as a pretextual substitute for parental leave. *See* Dkt. 32 at 32; *see also id.* at 37-38 (similar for retaliation claims); *cf. id.* at 34 (assuming the policy claims were correct on the merits for purposes of "Article III standing").

the lawyer's office. *See* DSF ¶¶ 365-66. And here, Shumaker authorized one of the firm's most-respected appellate partners to provide a favorable employment reference for Savignac. Plaintiffs nevertheless insist that Defendants retaliated when Shumaker (i) selected one of the three partners Savignac had solicited to provide an official firm reference; (ii) specified that the reference be provided by phone; and (iii) directed that the reference address that partner's positive personal experience with Savignac. *See* DMSJ Reply/Opp. 31.

There is no evidence, however, to support the bizarre theory that Shumaker took the rare step of authorizing a substantive positive reference only to then retaliate by neutrally specifying the who, how, and what. Shumaker explained his reasoning for each of these so-called "restrictions," DSF ¶¶ 381-82, and Plaintiffs point to no evidence undercutting Shumaker's reasonable explanations or suggesting retaliatory intent. Most notably, they cannot identify a single former employee whom Shumaker treated *better* in any of these respects. *See* DMSJ Reply/Opp. 32-33. Simply put, there is not a shred of evidence of retaliatory intent; Shumaker was *trying to help* Savignac.

Likewise, there is no evidence that these supposed "limitations" were adverse actions. Efforts "to scuttle a former employee's search for a new job" might dissuade a reasonable worker, *Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991), but Shumaker's actions were just the opposite. *See* DMSJ Reply/Opp. 33. Although a showing of concrete harm is an element of a retaliation claim, Savignac never substantiates his speculation that having one oral reference, by a partner with whom he had a positive work experience, made him "a materially weaker candidate." Sanctions Opp. 41. And from an objective standpoint, when a firm's default policy is to confirm only dates of employment, no reasonable employee would be dissuaded by the prospect of getting a *positive reference from one of the firm's most respected attorneys*. *See* DMSJ Reply/Opp. 33.

11

Without any evidentiary basis for their claim of retaliatory intent, and providing nothing more than speculation that Shumaker's decision to authorize a reference caused Savignac harm, Plaintiffs had no objectively reasonable basis for moving forward with these retaliation claims.

4. **Claims Against Beth Heifetz (Counts VIII-IX).** Plaintiffs' continued pursuit of Heifetz is also undertaken in bad faith. It is *undisputed* that she played no role in *imposing* the "restrictions" they now attack as retaliatory; those were Shumaker's decision. *See* DMSJ Reply/Opp. 33-34. Plaintiffs instead complain that Heifetz was involved in *communicating the firm's policy* regarding references. Sanctions Opp. 43-44. But accurately communicating firm policy cannot be—and is not even alleged to be—retaliatory adverse action. *See* DMSJ Reply/Opp. 33-34. And insofar as Plaintiffs suggest that Heifetz ignored the reference policy on other occasions, their claim is both immaterial and not supported by any evidence. *See id.* at 33 & n.9. Indeed, Plaintiffs' exhibits show the *opposite*—that when Sheketoff asked Heifetz for permission to write a reference, Heifetz had to, in Sheketoff's words, check with the "powers that be" before authorizing it. *See* PSF ¶ 397; Sheketoff Ex. 47 at JD_00003760. Nor is it surprising that there is no "documentary evidence" that Heieftz sought approval for this reference, *see* PSF ¶ 396, as Heifetz explained that she typically sought approval over the telephone. Heifetz Decl. ¶ 14. Plaintiffs' accusation that Heifetz intended to retaliate against them is supported by nothing more than their own speculation.

Nor is there any evidence to support an aiding-and-abetting theory. Even if *Shumaker* was driven by retaliatory animus, Plaintiffs cite no evidence that *Heifetz* knew or suspected as much. *See Richardson v. Petasis*, 160 F. Supp. 3d 88, 143 (D.D.C. 2015) ("[T]here is no legal authority suggesting that any employee who serves merely as a passive 'conduit' of her supervisor's discrimination—while having no discriminatory animus herself—is liable for aiding and abetting

12

[under the DCHRA]."); *see also* DMSJ Reply/Opp. 33-34.  Indeed, Plaintiffs did not even bother to depose Heifetz, yet have no hesitation about accusing her of illegal conduct and dragging her name through the mud based on nothing but their own speculation.  Rule 11 was designed to prevent exactly this type of harassment.

    **5.**    **Plaintiffs' Request for Cross-Sanctions.**  Finally, Plaintiffs' motion for cross-sanctions should be rejected.  Plaintiffs present no argument in support of their cross-motion.  Indeed, Plaintiffs' Table of Contents does not even mention Plaintiffs' request for sanctions, but instead merely asserts that Plaintiffs' own claims are "not sanctionable."  *See* Sanctions Opp. p. i.  And apart from a few stray comments that Defendants' sanctions motion is "frivolous," *see*, *e.g.*, *id.* at 1, 31, 43, 45, Plaintiffs offer no explanation as to why Defendants' limited Rule 11 motion covering only certain of Plaintiffs' claims is objectively unreasonable.

Rather, the cross-motion "appears to have been submitted principally in retaliation for defendants' well-founded sanctions motion," *Silberman v. Innovation Luggage, Inc.*, 2003 WL 1787123, at *16 (S.D.N.Y. Apr. 3, 2003), or perhaps to give Plaintiffs additional pages of merits briefing and a surreply on claims for which Plaintiffs are not seeking summary judgment.  Either way, there is no legitimate basis for Plaintiffs' cross-motion.

*   *   *

Despite this Court's admonition that Plaintiffs must have evidentiary support for their claims even if they previously survived a motion to dismiss, Plaintiffs continue to "advocate[]" their "frivolous claim[s]" "[after] discovery." *Jackson v. Cronic*, 2013 WL 12099477, at *4 (N.D. Ga. Aug. 23, 2013).  Because Plaintiffs continue to advance these claims well after "it became clear there was no evidentiary support for [them]," they are "subject to Rule 11 sanctions." *Id.*

13

Dated: February 24, 2023

Respectfully submitted,

/s/ Terri L. Chase
Terri L. Chase (*pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Ph: (305) 714-9700
Email: tlchase@jonesday.com

Traci Lovitt (Bar No. 467222)
JONES DAY
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939
Email: tlovitt@jonesday.com

Christopher DiPompeo (Bar No. 1003503)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Ph: (202) 879-3939
Email: cdipompeo@jonesday.com

Anderson T. Bailey (*pro hac vice*)
JONES DAY
500 Grant Street
Pittsburgh, PA 15219
Ph: (412) 391-3939
Email: atbailey@jonesday.com

*Attorneys for Defendants*