**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

       v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and MICHAEL
SHUMAKER,

    *Defendants*.

Case No. 1:19-cv-02443-RDM-ZMF

**REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.   Jones Day's leave offerings for new parents are unlawful (Counts I-III) ...........................1

    A.  Jones Day gives every new mother an extra eight weeks of sex-based leave ..............1

    B.  Jones Day's policy is illegal sex discrimination for three independent reasons ...........2

        1.  Leave for new mothers must be limited to the period of actual disability..............2

        2.  Even if "true" generalizations were permissible, Jones Day's is not true ..............5

        3.  Sexist gender roles are a motivating factor behind the leave policy......................6

II.  Jones Day committed illegal retaliation by firing Mark (Counts VII-IX, XI) .................10

    A.  Opposition clause ..................................................................................................10

    B.  Participation clause ...............................................................................................20

    C.  The FLSA ..............................................................................................................23

    D.  The D.C. Human Rights Act .................................................................................24

III.  Julia is a proper retaliation plaintiff (Counts VII-IX).....................................................24

Conclusion ..................................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. McCreary County*,
  607 F.3d 439 (6th Cir. 2010) ...............................................................3

*Ardestani v. INS*,
  502 U.S. 129 (1991)...........................................................................21

*Barnes v. Small*,
  840 F.2d 972 (D.C. Cir. 1988)...............................................16, 21, 22

*Borgo v. Goldin*,
  204 F.3d 251 (D.C. Cir. 2000).............................................................16

*Brady v. Office of Sergeant at Arms*,
  520 F.3d 490 (D.C. Cir. 2008).............................................................10

*Burlington Northern & Santa Fe Railway Co. v. White*,
  548 U.S. 53 (2006)..............................................................................18

\* *California Federal Savings & Loan Ass'n v. Guerra*,
  479 U.S. 272 (1987).......................................................................2, 3, 4

*Center for Biological Diversity v. DOI*,
  563 F.3d 466 (D.C. Cir. 2009)..............................................................3

\* *City of Los Angeles v. Manhart*,
  435 U.S. 702 (1978).............................................................................5

\* *Crawford v. Metropolitan Government of Nashville*,
  555 U.S. 271 (2009)......................................................................13, 16

*EEOC v. Crown Zellerbach Corp.*,
  720 F.2d 1008 (9th Cir. 1983) .......................................................16, 17

\* *Egei v. Johnson*,
  192 F. Supp. 3d 81 (D.D.C. 2016)..............................10, 21, 22, 24

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018).......................................................................23

*Estenos v. PAHO/WHO Federal Credit Union*,
  952 A.2d 878 (D.C. 2008) ..................................................................24

*FedEx v. NLRB*,
  849 F.3d 1123 (D.C. Cir. 2017)..........................................................22

*General Electric Co. v. Gilbert*,
   429 U.S. 125 (1976)..................................................................................2

*George v. Leavitt*,
   407 F.3d 405 (D.C. Cir. 2005) ..............................................................11

*Greathouse v. JHS Security Inc.*,
   784 F.3d 105 (2d Cir. 2015)...................................................................23

*Hochstadt v. Worcester Foundation for Experimental Biology*,
   545 F.2d 222 (1st Cir. 1976)...........................................................21, 22

*In re Kellogg Brown & Root, Inc.*,
   796 F.3d 137 (D.C. Cir. 2015). ................................................................7

*Jennings v. Tinley Park*,
   796 F.2d 962 (7th Cir. 1986) ...........................................................16, 17

\* *Johnson v. University of Iowa*,
   431 F.3d 325 (8th Cir. 2005) ...................................................................3

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
   563 U.S. 1 (2011)....................................................................................23

*Kucana v. Holder*,
   558 U.S. 233 (2010)................................................................................21

*Maryland v. EPA*,
   958 F.3d 1185 (D.C. Cir. 2020) ..............................................................24

*Mason v. Geithner*,
   811 F. Supp. 2d 128 (D.D.C. 2011) .......................................................10

\* *McKenna v. Weinberger*,
   729 F.2d 783 (D.C. Cir. 1984) .....................................................20, 21, 22

*MikLin Enterprises, Inc. v. NLRB*,
   861 F.3d 812 (8th Cir. 2017) ..................................................................20

*Newdow v. Bush*,
   391 F. Supp. 2d 95 (D.D.C. 2005) ...........................................................3

*Parker v. Baltimore & Ohio Railroad Co.*,
   652 F.2d 1012 (D.C. Cir. 1981).............................................21, 22, 23, 24

*Pendleton v. Rumsfeld*,
   628 F.2d 102 (D.C. Cir. 1980) .........................................................17, 18, 21

*Richardson v. Newburgh Enlarged City School District*,
   984 F. Supp. 735 (S.D.N.Y. 1997) ............................................................... 7

*Robinson v. Diamond Housing Corp.*,
   463 F.2d 853 (D.C. Cir. 1972) .................................................................. 20

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ................................................................................ 23

\* *Savignac v. Jones Day*,
   486 F. Supp. 3d 14 (D.D.C. 2020) .................................................. 1, 15, 25

\* *Schafer v. Board of Public Education*,
   903 F.2d 243 (3d Cir. 1990) ............................................................ 2, 3, 4, 14

*Townsend v. Benjamin Enterprises, Inc.*,
   679 F.3d 41 (2d Cir. 2012) ...................................................................... 20

*Vaughn v. Epworth Villa*,
   537 F.3d 1147 (10th Cir. 2008) ........................................................... 22, 23

**Statutes, rules, and other authorities**

1 U.S.C. § 1 .................................................................................................. 25

42 U.S.C. § 2000e-3 ............................................................................... 16, 20

EEOC Enforcement Guidance on Retaliation & Related Issues ..................... 21

Federal Rule of Evidence 602 ...................................................................... 13

Federal Rule of Evidence 701 ...................................................................... 13

Garner et al., The Law of Judicial Precedent (2016) ................................... 22

Contrary to Jones Day's opposition ( "Opp."), Plaintiffs are entitled to summary judgment on Counts I-III, VII-IX, and XI as set forth in their cross-motion ( "PMSJ").

## I.      Jones Day's leave offerings for new parents are unlawful (Counts I-III).

### A.      Jones Day gives every mother an extra eight weeks of sex-based leave.

Jones Day's policy is, in the Court's phrase, a "ratchet [that] turns only one way. *All* birth mothers receive *at least* eight weeks, and they are entitled to more if" they submit medical evidence that justifies more. *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020). Jones Day insists that Plaintiffs have "no evidence" just because they have not named a specific "mother who took disability leave despite not being disabled." Opp. 11. Actually, Plaintiffs presented overwhelming evidence—most of which Jones Day does not even try to respond to. PMSJ 1-5. Indeed, the firm's 30(b)(6) witness—who has overseen the policy for *decades*—declined to endorse its false claim that the policy limits a mother's leave to her period of actual disability. JDSF ¶ 115 (Plaintiffs' response). And the firm admits that its "summary documents and promotional materials" (not to mention its written family leave policy) explicitly tell women that they can all take eight weeks. Opp. 12. Jones Day continues to rely solely on an inapposite declaration from its HR Director and a creative misreading of its written STD policy. *Id.* at 11-12. But it has no response to Plaintiffs' point that McClure's declaration speaks past the issue. PMSJ 4-5. And it does not dispute that the Court already held that the written policy is ambiguous and must be read in light of the evidence (486 F. Supp. 3d at 36), which confirms the one-way ratchet view. Nor does it ask the Court to reconsider that ruling. Finally, its cited ERISA case is obviously irrelevant to this Title VII suit—and not just because the written STD policy it hangs its hat on is not the "actual benefit plan" and also explicitly states that it "is not subject to ERISA." McClure Ex. 1 at JD_00002483; PSF ¶¶ 46, 51.

**B.**     **Jones Day's policy is illegal sex discrimination for three independent reasons.**

**1.**     **Leave for new mothers must be limited to the period of actual disability.**

The employment discrimination laws prohibit "pregnancy disability benefits" or other "special treatment of pregnant workers based on … generalizations about their needs and abilities." *California Federal Savignac & Loan Ass'n v. Guerra*, 479 U.S. 272, 285 & n.17 (1987); *see* PMSJ 5-10.  The *only* case to rule on a challenge to a policy that, like Jones Day's, gives all mothers a fixed period of extra leave not offered to fathers thus applied *Guerra* to "hold as a matter of law" that the policy "contravenes Title VII … for any leave granted beyond the period of actual physical disability."  *Schafer v. Board of Public Education*, 903 F.2d 243, 248 (3d Cir. 1990).  Beyond that period, the only differences between a mother and a father are sex and proxies for sex (e.g., having given birth in the past), which are unlawful grounds for discrimination.  Jones Day responds with (a) deficient legal arguments (Opp. 9-10) and (b) strawman policy arguments (*id.* at 7-8).

**a.**     Picking a test out of thin air, Jones Day says that it can rely on a generalization "so long as the assumption is *reasonably intended* as a disability benefit and rests on legitimate, sex-neutral factors."  Opp. 8.  It has no authority for its standard, and Plaintiffs' citations refute it.  The firm adds that it is "generalizing about *disability*, not *sex*."  *Id.*  That was precisely the view of Title VII—treatment of mothers is based on physical condition rather than sex—that the Supreme Court relied on in *Gilbert* and that Congress overruled with the PDA.  PMSJ 8 n.5.  Anyway, *Guerra* and *Schafer* explicitly prohibit benefits for new mothers based on generalizations about their abilities and disabilities.  *See* 479 U.S. at 285 & n.17; 903 F.2d at 248.

**Guerra.**  Jones Day responds that *Guerra* recognized no limits on *preferential* treatment of mothers, insisting that its statement that Title VII prohibits "special treatment of pregnant workers based on … generalizations about their needs and abilities" refers only to *negative* treatment.  Opp. 9.  But the Court presented the "generalizations" point as one "example" of the

2

"limitations" on the notion that the PDA is "a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise." 479 U.S. at 285 & n.17; *see also id.* at 294 n.3 (Stevens, J., concurring); *Schafer*, 903 F.2d at 248 ("We disagree … that *Guerra* allows preferential treatment to employees who have recently given birth to a child without a simultaneous showing of a continuing disability"); PMSJ 5-6; Dkt. 18 at 17-21.[1]

**Johnson.**  Jones Day concedes that the policy in *Johnson* "only excused birth mothers from *submitting documentation* for leaves up to six weeks"; it did not, like Jones Day's policy, tell mothers that they could take leave regardless of whether they were disabled. Opp. 9. But the firm urges that *Johnson*'s reasoning went beyond its facts when it said that "it is not unreasonable … to establish a period of presumptive disability" to avoid "review[ing] medical records for each and every employee." *Id.* (quoting 431 F.3d at 329). This is wordplay. It is clear in context that when the Eighth Circuit referred to "a period of presumptive disability" it was referring to the *evidentiary* presumption that the employer there made by excusing mothers from submitting medical records in the first six weeks, not to a substantive rule like Jones Day's that gives mothers a fixed period of sex-based leave without regard for actual disability. *See* PMSJ 6-7; Dkt. 18 at 14-17. If *Johnson* were addressing a fact pattern not presented there, as the firm says, then its dicta would be wrong.

**Schafer.**  Jones Day argues, for the first time, that the rule of *Schafer* is simply that leave limited to mothers must be "related to" pregnancy or childbirth. Opp. 10. *Schafer* actually holds: "We hold as a matter of law that [the policy] contravenes Title VII and is thus per se void for any

---

[1] The "generalization" language is no more dicta than the "floor-not-ceiling" language that it limits.  And "courts are obligated to follow Supreme Court dicta, particularly where there is not a substantial reason for disregarding it." *ACLU v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010); *see Center for Biological Diversity v. DOI*, 563 F.3d 466, 481 (D.C. Cir. 2009); *Newdow v. Bush*, 391 F. Supp. 2d 95, 107 (D.D.C. 2005).  Finally, Jones Day's claim that *Guerra*'s use of the phrase "narrowly drawn" incorporates the concept of "narrow tailoring" from First Amendment commercial speech case law is implausible and irrelevant to the generalization point.

leave granted beyond the period of actual physical disability."  903 F.2d at 248.  Jones Day insists that this was just the "remedy" and that "the court did not say that a disability period is illegal unless limited to the 'period of actual physical disability.'"  Opp. 10.  But that is exactly what the Third Circuit held, both in the language just quoted and when it "disagree[d] with the district court's holding that *Guerra* allows preferential treatment to employees who have recently given birth to a child without a *simultaneous showing* of a *continuing disability*."  903 F.2d at 248 (emphases added).  The court used the term "void" to mean "contrary to law," not to indicate that it was imposing a remedy rather than a substantive test.  In any event, it said in the same sentence that the policy "contravenes Title VII … for any leave granted beyond the period of actual physical disability."  And, in fact, the Third Circuit actually remanded to the district court to determine whether the plaintiff was constructively discharged and impose an appropriate remedy, instructing: "The Board must be liable for whatever time, *up to one year*, a father chooses to use for childrearing if women are given the choice of selecting childrearing leave or maternity leave for up to one year, without a showing of disability related to childbirth."  *Id.* at 250 (emphasis added).  Thus, the Third Circuit imposed a substantive rule that a policy giving leave only to mothers violates Title VII if the leave exceeds the "period of actual physical disability," and that the proper remedy for a violation is to extend to fathers the full period of leave granted to mothers regardless of disability—here, the 18 weeks that new mothers receive regardless of disability.

      **b.**     Jones Day pretends that Plaintiffs' claim would prohibit it from relying on doctors' certifications.  Opp. 7; *but see* Chase Ex. 72 at P02271 (asserting that Plaintiffs' claim would *require* it to rely on doctors' notes).  Wrong.  Plaintiffs' position is the one that prevailed in *Schafer*: An employer cannot offer leave that is limited to mothers beyond the period of disability.  The parties agree that this *is* Jones Day's rule for all circumstances other than the eight weeks

following childbirth: "lawyers are eligible for paid disability leave only if they are *actually disabled*." Dkt. 189 at 23.  And Jones Day insists that it *actually does* impose the same requirement on mothers.  Opp. 3, 11 (asserting that disability leave, including for new mothers, is available "only if the associate is 'disabled,' *i.e.*, 'is unable to perform the material and substantial duties of … her regular occupation'").  Jones Day cannot simultaneously argue that it would be *impossible* for it to comply with Plaintiffs' position and insist that it *already does*.[2]

Plaintiffs' position would not require an honor system or constant medical assessment.  An employer can defer to a doctor's advice; Jones Day offers zero authority or argument for its contrary position (which is thus forfeited).  Doctor-patient relationships are not governed by Title VII.  *Cf. City of Los Angeles v. Manhart*, 435 U.S. 702, 717-18 & n.33 (1978).  Or the employer can use an honor system, with the worker self-assessing her readiness to work or relying on her doctor's advice, which could be to stay home for a specified period or to self-assess.[3]  Nor do Plaintiffs seek to impose a demanding "precision" requirement, as Jones Day concedes.  Opp. 11.

### 2.    Even if "true" generalizations were permissible, Jones Day's is not true.

While Jones Day notes that doctors often make ex ante predictions (Opp. 7), its own generalization is not a "prediction"—it is a knowingly inaccurate and overinclusive generalization untethered to what doctors actually certify for the most common type of birth, based not on science or medical practice but on an employer's business preferences.  PMSJ 10-12.  It is undisputed that

---

[2] Jones Day says that it is standard to assume a standard period of disability for, "*e.g.*, a routine appendectomy."  Opp. 7.  Its cited evidence is only that Unum does so for some *other* employers.  Jones Day and Unum do not do so here—Jones Day has a special rule for mothers only.

[3] Jones Day pretends that women cannot possibly assess when they are able to return to office work, but its paternalism is at odds with medical practice (which generally does not tell women they should refrain from office work at all, and recommends self-assessment even for physical activities like exercise) (PSF ¶¶ 159-61, 186), its expert's testimony that she has certified mothers to return to work early and has never advised one against it (*id.* ¶¶ 169-70), and its own practice of allowing mothers to return early based on self-assessment without medical clearance (*id.* ¶ 126).

doctors do *not* certify eight weeks of disability for all births.  PSF ¶ 153-54.  The Court could resolve the case on this ground without deciding whether an employer could provide six weeks of leave to all new mothers on the theory that doctors will almost universally certify six weeks and so such a leave policy just replicates what would happen if the employer required certifications.[4]

### 3.      Sexist gender roles are a motivating factor behind the leave policy.

As Plaintiffs have explained, the record establishes that archaic gender roles were, at a minimum, a motivating factor behind Jones Day's leave policy.  PMSJ 12-16.

**a.**      Until 1994, Jones Day gave mothers 24 weeks of leave and fathers *none*, an egregiously discriminatory policy that had been plainly illegal since 1964.  The firm has no answer.

**b.**      The firm began to give fathers some leave in 1994 only because HR Director Dressing decided that the new FMLA required it to do so, not because the Jones Day's longstanding preference for imposing sexist gender roles had changed.  The firm has no answer.

**c.**      When Dressing decided what portion of mothers' leave would be deemed "disability" leave, she picked a figure much higher than doctors certify for the most common type of birth.  Jones Day concedes that she picked the "top" of the range and that this resulted in a concomitantly short period for fathers (Opp. 4-5), thereby preserving the pre-1994 policy's disparate treatment to the maximum extent possible under Dressing's view of the FMLA.  The firm responds that the question is whether it acted *because* of that effect or *in spite of it*.  But it *admits* that the point was "[t]o decide how much paid leave Jones Day would offer new fathers"— an adverse action based explicitly on sex.  Dressing Decl. ¶¶ 10, 12; PSF ¶ 33.  And, contra Jones

---

[4] Jones Day says that doctors "certify 'six-to-eight' weeks" when the certification is made before the mode of delivery is known (Opp. 4), but it omits that this simply means "six if the birth is vaginal, and eight if it is a C-section."  PSF ¶¶ 153-55.  Again, Jones Day's own hired expert admitted "I have never said that I—that vaginal delivery needs more than six weeks."  PSF ¶ 151.

Day, Dressing did *not* say that she did not intend to minimize fathers' leave. She said, irrelevantly, that the change was not intended to *increase mothers' leave*. Dressing Decl. ¶ 12. That just confirms that the only point was to set fathers' leave, which Dressing's assumption minimized.

Even if Dressing's *recommendation* was not motivated even in part by its effect (minimizing fathers' leave), that does not suggest that the firm's *adoption* of the change was not. Decisionmaker McCartan made the change based on Dressing's memo recommending it (PSF ¶¶ 15-16), but Jones Day has withheld it as privileged. The firm's assertion about why it (i.e., McCartan) acted necessarily put the memo at issue—it is a party's claim that it took the challenged action because it was recommended in privileged advice. Dkt. 189 at 16-17; JDSF ¶¶ 36-54.[5] Aside from (perhaps) the memo, no evidence shows that McCartan shared Dressing's purported rationales or was even *aware* of them. Yet Jones Day insists that her rationales are still "probative" of his intent. That is senseless—he cannot have acted based on rationales he was unaware of.[6]

    **d.**    In 2015, the firm again adopted a blatantly illegal policy, openly giving mothers far more self-designated "caretaker" leave than fathers, and partially backed down only when an associate happened to complain that the policy was illegal. Jones Day responds that "*compliance*

---

  [5] *E.g.*, *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145-48 (D.C. Cir. 2015). Jones Day says Plaintiffs forfeited the point by not raising it during discovery, but an at-issue waiver does not occur until the party makes the *argument* that puts the advice at issue—as Jones Day did for the first time in its summary judgment motion. *Id.* at 146.

  [6] *Richardson v. Newburgh Enlarged City School District*, 984 F. Supp. 735 (S.D.N.Y. 1997), does not hold that the non-discriminatory rationale of the person who recommends an adverse action is imputed to the decisionmaker. Jones Day's quoted language refers to the District "recommending" termination because the plaintiff was not actually terminated but resigned in response to that recommendation (which was thus the adverse action). "The District" *was* the decisionmaker. *Id.* at 738 ("the 'District'[] forced her to resign").

  Jones Day also says that lack of direct evidence of McCartan's motives hurts *Plaintiffs* because they bear the ultimate burden. Opp. 5. But Plaintiffs' point is that Jones Day's assertions about its (i.e., McCartan's) motives have no factual basis. Plaintiffs have presented overwhelming evidence that sexism was (at least) a motivating factor. *See* PMSJ 12-16.

with the law" is not "evidence from which a jury could infer intent to *violate* the law."  Opp. 6.

But Plaintiffs' point is that Jones Day's *decision to blatantly discriminate* in 2015 shows intent to

discriminate.  Its shift to a less blatantly discriminatory policy does not *negate* that intent,

especially since it occurred only because a third party complained.

> **e.**      The *explicit* rationale behind the current policy giving mothers and adoptive parents
>
> 18 weeks is that "primary caretakers" should get 18 weeks *even if they never give birth or incur*
>
> *any disability*—with only birth fathers excluded from that primary caregiver benefit.

Jones Day insists that the 2015 revisions shed no light on the intent behind the challenged

policy.  Wrong.  The revisions show why birth fathers receive far less leave than everyone else.

The underlying communications confirm what was obvious all along: Jones Day gives 18 weeks

of leave to mothers and adoptive parents because it intends to offer 18 weeks *to all primary*

*caregivers without regard for disability*, even those that never give birth and incur no disability at

all.  Yet it limits fathers to 10 weeks because its view is that they are just *secondary caregivers*.

But for the firm's sexist view that fathers are all secondary caregivers, they would receive the same

18 weeks that it gives to everyone it views as a true primary caregiver, regardless of disability.

Jones Day says that longer leave for adoptive parents is reasonable because they "face *other*

burdens."  Opp. 6.  But it concedes that this is irrelevant if "Jones Day did not act for that

permissible reason."  *Id.*  And it did not.  It set adoptive primary caregivers' leave equal to birth

mothers' leave because it believed that "parental reactions to and needs after adoption *are not*

*dissimilar* to those experienced by biological parents" and that adoptive primary caregivers should

therefore be treated like the primary caregiver in a couple with a biological child—i.e., the woman:

"The rationale for the 18 weeks of adoption to mirror the same time as births was *based on the*

*primary caregivers [sic] role in bringing the child into the family.* … [A]doption leave should be

parallel to *the maternity leave for the primary caregiver* because *the functions are the same*."  PSF ¶¶ 60, 66 (emphases added).  Jones Day notes that the partner who made that statement *also* wrote that more leave for adoptive parents "is a particularly strong message to the LGBT community" (Opp. 15), but at most that shows that he had *two* motivating factors: the view that birth mothers are primary caregivers, that all primary caregivers should receive 18 weeks of leave regardless of disability, and that birth fathers are just secondary; and desire to appeal to LGBT attorneys.  But *only the former rationale was presented to decisionmaker Brogan*—the partners *deleted* all mention of LGBT adoption from the memo to him.  *Compare* Sheketoff Ex. 16 at JD_00005134 *with* Chase Ex. 10.  And though the firm later allowed birth fathers to be *designated* primary caregivers and receive *10* weeks of leave (because an associate pointed out that it was breaking the law), it *still* denies them the 18 weeks that it gives to all parents it views as *actual* primary caregivers.  That is textbook sex discrimination.  This point *alone* compels judgment for Plaintiffs.[7]

---

[7] Jones Day says Shumaker "testified that he understood—including from discussions with a senior employee who had adopted at least two children—that 'adoptions are difficult and unique, and have special concerns.'"  Opp. 6.  Even if that were credited, the referenced "discussion" admittedly occurred months *after* the 2015 change.  PSF ¶ 68 (Plaintiffs' reply); JDSF ¶¶ 146-48 (Plaintiffs' responses).  That was *not* Shumaker's view when the policy was hashed out and adopted—at that time, he "question[ed]" the treatment of adoptive parents in parallel with birth mothers, since "[a]rguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth" which "doesn't happen with adoption."  PSF ¶ 59.  He then advised Brogan that "parental reactions to and needs after adoption are not dissimilar to those experienced by biological parents."  PSF ¶ 66.  Even if he later believed that they *are* dissimilar, the fact remains that the firm decided in 2015 to give all primary caregivers 18 weeks of paid leave regardless of whether they gave birth or incurred disability, extended that to adoptive primary caregivers because it viewed them as having the "same" "functions" as birth mothers, and denied it to birth fathers because it views them as secondary caregivers.

**II.** **Jones Day committed illegal retaliation by firing Mark (Counts VII-IX, XI).**

    **A.** **Opposition clause**

    **1.** **Employer's beliefs.** Jones Day's main argument under the opposition clause is that an employer may fire a worker because of protected activity if the employer misinterprets it or otherwise "reasonably and sincerely believe[s]" that it is unprotected. Opp. 15. That is wrong. In that scenario, all three elements are present: The worker engaged in protected activity, and the employer would not have taken adverse action but for that activity. Perhaps the employer's misperception was *also* a but-for cause, but that is no defense. Nor is there a fourth element requiring that the employer correctly understand the protected activity, or act *because it is protected*. The employer (not the worker) bears the risk of the employer's mistake. PMSJ 32-33. Jones Day ignores Plaintiffs' authorities and has failed to find *any* support for its own position. It even cites *Egei v. Johnson*, 192 F. Supp. 3d 81, 90-91 (D.D.C. 2016), which *rejects* its position.[8]

    **2.** **Protected challenge.** The January email was protected because its statement that the firm was engaged in an unlawful practice (the leave policy) was correct. Alternatively, it was protected because Plaintiffs held a reasonable belief that the policy was unlawful. PMSJ 18-24.

    **a.** **Reasonableness.** Jones Day continues to argue primarily that *the settlement* that Plaintiffs sought in the January email was unprotected because Plaintiffs supposedly lacked a reasonable belief that the law required Jones Day to give Mark the extra eight weeks of leave that Plaintiffs demanded to settle the claim. *See* Opp. 13-14. Again, though, the "reasonable belief"

---

[8] In *Brady v. Office of Sergeant at Arms*, the employer did not fire Brady for activity that it erroneously perceived as unprotected; it was a race discrimination case, with no retaliation claim. 520 F.3d 490, 491-92 (D.C. Cir. 2008). Brady was fired for "grabbing his crotch in front of three other employees," and though he insisted that he had not, the D.C. Circuit's point was that he had no evidence that the employer did not believe he had—and that the firing thus was not because of race. *Id.* at 495-96. *Mason v. Geithner* dealt with management's understanding of a "management directive," not its misunderstanding of protected activity. 811 F. Supp. 2d 128, 205 (D.D.C. 2011).

requirement applies to the "belief that *the challenged practice*" is unlawful. *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (emphasis added). Here, the "practice" was the leave policy. Conceding the distinction, Jones Day itself admits that that "many settlement demands will be reasonable and proper even if they go beyond what the law requires." Opp. 15.[9]

Jones Day says that the email claimed that it "engaged in sex discrimination by not offering fathers *the same amount* of paid leave it offers to mothers who have given birth." Opp. 13. The email does not say that; it says that the policy is unlawful and then, two paragraphs later, seeks a settlement. Even if it did say that, the "challenged practice" would still be the policy. Jones Day insists that email actually is *not* a settlement demand. Opp. 14. The argument is unserious. The email states that Mark would sue unless given eight additional weeks of leave. Jones Day has *already conceded* that "*Plaintiffs' … demand for … 18 weeks of leave … is separate and distinct from their challenge to the leave policy (the employment practice)*." Dkt. 104 at 12 (emphasis added). And Shumaker understood the email as "a demand letter to Jones Day's attorney." Chase Ex. 81 (Shumaker) at 105:22-106:3; *see* PSF ¶ 264 (Plaintiffs' Reply); Chase Ex. 80 (Sheketoff) at 294:1-15. No contrary evidence exists. Nor does it matter whether the "settlement demand" label applies; the question is whether Plaintiffs reasonably believed that *the policy* is unlawful.

---

[9] Jones Day offers just a paragraph on the relevant issue—whether Plaintiffs had "a reasonable, good-faith basis to challenge the leave policy itself, wholly apart from [their] demanded relief." Opp. 16. It insists that when this Court held that its cases were not "unambiguously at odds with Savignac's belief that Jones Day's leave policy was unlawful," it was merely referring to a belief that the policy was unlawful if adopted with the *intent* of giving mothers more leave, not the argument that it is unlawful because it is not tied to actual disability and is excessively long. *Id.* Context refutes that reading. 486 F. Supp. 3d at 32-40; Dkt. 18 at 7-32. And all three of Plaintiffs' arguments are reasonable; Jones Day has yet to find a single case (much less a binding one) at odds with any of them. *See* PMSJ 18-20 & n.8. Finally, Plaintiffs had ample basis to believe that the firm intended to impose traditional gender roles through its admittedly excessive eight-week rule. For one, the firm's leadership had just tried giving mothers much more *self-described* family leave than fathers, an obviously illegal move that could only have been driven by disregard for the law and devotion to discriminatory gender roles. PSF ¶ 77; *see also, e.g.*, PSF ¶¶ 92-97, 207.

**b.    Good faith.**   Jones Day concedes, as it must, that "since at least January 2015, [Plaintiffs] have subjectively believed … that it is unlawfully discriminatory to have a presumptive period of disability leave for recovery from childbirth."  PSF ¶ 217.  That is dispositive on good faith, which (as the firm apparently agrees) simply asks whether the plaintiff "honestly believed" that the employer violated the law.  Opp. 27.  Jones Day also does not dispute that (1) it is bound by Judge Faruqui's ruling, under which Plaintiffs were inarguably in good faith; or (2) an objectively reasonable view on a question of law cannot be said to be in bad faith.  PMSJ 20-24.  (It says that good faith is a subjective inquiry distinct from reasonableness, but Plaintiffs' arguments take that for granted.  *Id.* at 20.)  Rather, it argues that the challenge was *unreasonable* (or "illusory") and that a jury could find *on that basis* that Plaintiffs were in bad faith.  Opp. 27-28.  But if Plaintiffs' view is objectively unreasonable, then they lose and good faith does not matter.  In short, Jones Day ends up in the same place as Plaintiffs: If Plaintiffs' view was objectively reasonable, then there is no basis to discredit their testimony that they hold that view.[10]

**3.    Jones Day admittedly fired Mark for challenging discrimination.**   Brogan confessed at deposition that the January email's assertion that the leave policy violates Title VII was a but-for cause of his termination decision, as was the email's statement that Julia experienced pay discrimination.  PMSJ 24-25.  Jones Day responds with attorney argument that the confession just "shows Brogan would have *excused the improper manner* of Savignac's email if Savignac had at least brought a real problem with the policy to Brogan's attention" and does not refute "Brogan's testimony that the improper manner of raising the claim, not the claim itself, was the cause of the

---

[10] Jones Day argues that Mark's 2015 email to Julia does not show "that he honestly believed he was entitled to *the same extra eight weeks* of paid leave that birth mothers receive."  Opp. 27.  The email says: "Presumably *the 8-week disability leave* is also illegal."  PSF ¶¶ 215-18.  Anyway, the relevant question is whether Plaintiffs honestly believed that *Jones Day's policy* was illegal.  Mark's 2015 email confirms that he did—and Jones Day admits it.  *Id.* ¶ 217.

termination decision." Opp. 28. Jones Day apparently does not know what "but-for cause" means: If Brogan would have "excused" the email's supposed "manner" and not fired Mark *but for* his reaction to the email's assertion that the policy is unlawful, then that was, by definition, a but-for cause. Even if that the "manner" of email was severable, unprotected, and *also* a but-for cause, the charge of illegality was a but-for cause and so all three elements of the retaliation claim are met. It is hard to imagine a clearer case of the retaliation that Congress sought to prohibit than a boss who fires a worker because he disagrees with and is upset by a discrimination complaint.

As for Brogan's confession that the charge of discrimination against Julia was a but-for cause, Jones Day says "the email was *not even purporting to raise a pay discrimination complaint*" because the statement about Julia is part of the paragraph warning the firm not to retaliate through its black-box system. Opp. 29. But the statement was plainly a complaint and "opposition" under *Crawford v. Metropolitan Government of Nashville*, 555 U.S. 271, 276 (2009). PSF ¶ 237 (Plaintiffs' reply). And it was reasonable and in good faith. PMSJ 57-59, 64; PSM 12-37.[11]

**4.      Settlement demand.**  Jones Day concedes that "many settlement demands will be reasonable and proper even if they go beyond what the law requires." Opp. 15 (citing PMSJ 25).

---

[11] Jones Day acknowledges Brogan's admission that he would retaliate against an associate who sued Jones Day for discrimination by withholding support for promotion to partner. Opp. 28 n.7. It responds that it "objected to those improper questions asking Brogan to speculate about irrelevant hypotheticals." *Id.* But Brogan's confession that he would unlawfully block a worker from promotion for protected participation in a civil rights lawsuit is inarguably relevant to whether he fired Mark for the same reason the year before he would have come up for partner. And "hypothetical" questions are not ipso facto improper—but-for causation is "hypothetical" by definition, and the firm relies heavily on hypothetical testimony (e.g., Brogan would not have fired Mark in August 2018 in the hypothetical world where that month's emails were escalated to him; Heifetz and Lovitt would have assessed Julia identically in the hypothetical world where Partner A's review was positive). A lay witness may offer opinion testimony if it is "rationally based on the witness's perception" and within his "personal knowledge." Fed. R. Evid. 602, 701. Brogan perceives his own thoughts and has personal knowledge of how he would feel if a Jones Day associate filed a discrimination suit. Nothing in his unambiguous testimony suggests otherwise, and Jones Day has no support for its implausible argument to the contrary.

But it says that Plaintiffs' demand for eight extra weeks of leave was improper *as a settlement demand* and therefore a lawful basis to fire Mark.  *Id.*  Its whole argument for that proposition, for which it offers no authority, is that "wherever the line is between reasonable and unreasonable settlement demands, Savignac jumped well past it with his *unlawful* demand to receive the same leave as birth mothers, in violation of the PDA."  *Id.* at 16.   In other words, Jones Day does not say that $80,000 (eight weeks of Mark's pay, Opp. 19) was so disproportionate to what Plaintiffs could hope to recover in litigation as to be a frivolous demand (such an argument would be untenable, PMSJ 25-26 & n.11).[12]  Nor can it contend that the demand was improperly spiteful or vindictive, as in its fanciful hypothetical about "beg[ging] forgiveness on hands and knees." Opp. 15.  Its argument is simply that it would have violated the PDA for it to accept the demand.[13]

The argument fails on many grounds.  *First*, if it truly would be unlawful for an employer to agree to a settlement, that is a basis to reject the settlement, but it is not a basis to fire the worker. *Second*, settling a claim is not sex discrimination; even on Jones Day's view that accepting the settlement would amount to giving Mark more leave than it offers to other parents (of either sex), it would be giving him that treatment *because he asserted a legal claim*, not because he is male. *Third*, Jones Day's argument is premised on its false notion that Plaintiffs demanded *all* of the time off given to any new *birth* mother.  Actually, they demanded "the treatment that Jones Day gives to *all* women with new children [*including adoptive mothers*]—*18 weeks of paid leave*." PSF ¶ 212.  That is not all the leave given to *birth* mothers, who undisputedly "can actually take up to 26."  PMSJ 26.  Plaintiffs have never disputed that Jones Day could give birth mothers as much additional time as they are actually disabled—which *would* be the same "treatment" as Mark,

---

[12] As explained above, Jones Day's newly concocted reading of *Schafer* (Opp. 10, 13) is wrong.

[13] The firm's phrasing suggests that the "demand" was itself "unlawful," but it cannot believe that *Plaintiffs* were violating the PDA, which regulates employers, not workers.

who was not disabled and not seeking true disability leave (which Jones Day apparently concedes would "avoid that problem," Opp. 14).  Plaintiffs simply sought the same leave that Jones Day gives to *all* mothers, *including those who adopt*, *regardless of disability* and regardless of whether they give birth at all—a fact that Jones Day continues to ignore (Opp. 14).  *See* PMSJ 26 (making the identical point); *Savignac*, 486 F. Supp. 3d at 37 ("Savignac alleges that the policies discriminate against him as a new father, who sought the same amount of paid leave provided to *all* new mothers, regardless of whether they are *actually* disabled").  *Fourth*, gender-neutral leave policies are increasingly common and do not violate the PDA.  *E.g.*, cov.com/en/diversity/work-life-balance; JDSF ¶ 118 (Plaintiffs' response).  Jones Day provides *zero* contrary authority.  Yet even if those firms actually were violating the PDA, it would not have been *unreasonable* for Plaintiffs to believe that gender-neutral policies are lawful.  Jones Day, a major law firm with over a hundred employment lawyers, is trying to hold civil rights plaintiffs to a standard that it cannot itself meet.  After all, it is undisputed that the firm's leadership has *twice* imposed blatantly illegal leave policies in violation of Title VII, retreating from the second one only after another associate with no specialization in employment law pointed out the obvious illegality.  PMSJ 12, 14-15.

   *Finally*, it does not matter if the settlement demand for eight extra weeks was unprotected, for Brogan testified that the number of weeks demanded played no role in the termination decision and that he was ignorant of the leave offerings.  PMSJ 26; PSF ¶¶ 264-66.  Nor is there any evidence that he believed the demand violated the PDA, or even knows what the PDA is.

   5.     **Manner.**  Jones Day's brief confirms that it is not accusing Plaintiffs of actual extortion or other unlawful acts.  *See* PMSJ 27 n.12.  It cannot dispute that the plaintiff in each of its "manner" cases (1) had a job representing management in resolving discrimination complaints and abandoned that role by advocating for *other* workers against management; and/or (2) severely

disrupted the employer's operations.  PMSJ 29-30; *Barnes v. Small*, 840 F.2d 972, 980 (D.C. Cir. 1988) ("unfounded accusations … resulted in considerable disruption of agency work due to the time and expense necessary to investigate the charges and also interfered with the personnel who were the objects of the accusations").  Instead, it says that no case treats these factors as *necessary* to render opposition unprotected.  Wrong.  *E.g.*, *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014-15 & n.5 (9th Cir. 1983); *Jennings v. Tinley Park*, 796 F.2d 962, 968 & n.6 (7th Cir. 1986).

Nor has the firm found a case saying that a written discrimination complaint sent to the appropriate person could lose protection because of its "manner," or finding a complaint like the one here unprotected.  It speculates that a written complaint could be unprotected if it includes "profanity or threats of violence" (Opp. 20), but there is nothing of the sort here.  It adds that the test is whether the complaint's manner was "unreasonable" (*id.*), but Plaintiffs' point is that all of the cases that give content to that standard turned on far more egregious facts.  That includes many cases holding *much less restrained* opposition to be protected—such as picketing, boycotts, public protests, and complaints to the employer's customers.  PMSJ 35 n.17.  And the Supreme Court case that literally *defines* "opposition" for Title VII purposes (which Jones Day improperly seeks to limit to its facts, Opp. 21) confirms that the core of what Congress intended to protect included, by definition, "antagoni[stic]," "confront[ational]," and "hostile" behavior.  PMSJ 28.

**6.     Other aspects of the email.**  When a worker opposes employment practices that she reasonably believes to be unlawful, without improper manner, the opposition clause prohibits retaliation "because" of that "oppos[ition]."  42 U.S.C. § 2000e-3(a).  The January email was "a single, unitary complaint of discrimination" (*Borgo v. Goldin*, 204 F.3d 251, 256 (D.C. Cir. 2000)), all of which fits easily within *Crawford*'s definition of "opposition."  Since Jones Day concededly fired Mark for the email, it violated the opposition clause.  *E.g.*, *Crown Zellerbach*, 720 F.2d at

1012-14 (construing letter as a single instance of opposition).  Even if the Court disagrees and parses the email word-by-word, Jones Day's three rationales all fail.

      **a.**      **Challenge to leave policy.**  No jury could believe Brogan's ridiculous testimony that he fired Mark for asserting that Jones Day's leave policy is unlawful *without including sufficiently detailed legal analysis in the email*.  *See also* PSF ¶ 213 (Plaintiffs' Reply) (Brogan's credibility).  Regardless, that omission was not a lawful ground to fire Mark.  Jones Day concedes that Title VII's protection generally does not "depend on whether the complaining employee lays out a detailed legal argument," but spitballs that "law-firm associates" *are* subject to such a requirement, citing only *Pendleton v. Rumsfeld*'s statement that the "requirements of the job" are pertinent to "the limits of protected activity."  Opp. 23.  *Pendleton* was just saying that a person whose job is to represent management interests in dealing with workers' discrimination grievances violates those requirements by publicly siding with protesting workers against management.  628 F.2d 102, 108 (D.C. 1980) ("the problem before us for resolution really has the duties of an EEO Counselor as its most significant element"); *see* PMSJ 29 & nn.14-15.  No court has read it to call for a free-wheeling inquiry, in every opposition case, into whether the worker's complaint would have satisfied her job requirements *if it had been prepared as part of her job*.  Title VII protects a mime's complaint made orally, a literary novelist's complaint that uses trite clichés, and a TV screenwriter's complaint that fails to hold the reader's attention.  There is no basis in text, purpose, or case law for Jones Day's argument to the contrary.  *Jennings*, 796 F.2d at 968 & n.6.

      But even if Title VII protects "law-firm associates" only when their internal complaints include the level of legal analysis that would be satisfactory in a comparable deliverable for a fee-paying client, the January email would qualify.  It is a pre-suit demand letter, which definitively communicates to Jones Day that Plaintiffs were unpersuaded by its deficient citations and would

commence litigation unless the parties reached a settlement.  Drafting demand letters was never part of Mark's job as an appellate attorney, but, in any event, there is no requirement that a demand letter give a detailed account of the sender's legal arguments, especially in a simple discrimination case.  The email is not "shoddy and unprofessional advocacy on [Plaintiffs'] own behalf."  Opp. 24.  Nor is it conceivable that Brogan would fire an associate for sending a comparable demand, as part of her job, to a recipient other than Jones Day.  Finally, the argument that Brogan fired Mark because the email's complaint is "arrogant," "pompous" and "egotistical" in accusing Jones Day of breaking the law is just an admission that he fired Mark because the opposition upset him.[14]

    **b.**    **Black-box pay system.**  Jones Day pokes fun at Plaintiffs' understanding of the term "tailor-made," but it is undisputely a recognized definition, and, in context, the one relevant to the email.  No one could interpret the email as Jones Day now (belatedly) pretends to, and the firm does not even attempt to respond to most of Plaintiffs' arguments on this point.  PMSJ 32.

    Jones Day concedes that it "did not mention the 'black-box compensation' issue in its interrogatory [7] response, press release, or litigation filings prior to Brogan's deposition."  Opp. 25 n.6.  It argues that all those statements just gave non-exclusive *examples* of its reasons for firing Mark.  *Id.*  But a defendant cannot wait until long after document discovery to make up new reasons not disclosed in response to an interrogatory directing it to provide its reasons.  And even if a defendant could generally get away with such sandbagging, Jones Day *ignores* that it swore in another interrogatory response in September 2021—served on this Court's order and signed by

---

[14] Jones Day cites *Pendleton* for its theory that whether the email was protected turns on Brogan's (supposed) subjective reaction to it.  Opp. 24.  But the language it quotes clearly describes an *objective* test—what "a reasonable person in [the supervisor's] position might … have felt" about the conduct.  628 F.2d at 108; *see also Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68-69 (2006) ("emphasiz[ing] the need for objective standards in … Title VII contexts" and that the term "*reasonable*" calls for an objective test).  Talk about "shoddy advocacy."

Brogan and Shumaker on penalty of perjury—that "Jones Day's reasons for terminating Savignac *are set forth* in response to Interrogatory 7, in [the press release], and in Defendants' pleadings and other filings in this action. *Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons*." PSF ¶ 288 (emphases added). Defendants did not "articulate" the black-box claim until June 2022. They should be held to their sworn response. Anyway, no jury could believe that they fired Mark for a reason not mentioned in the first three years of litigation, when they gave countless reasons *and swore that they had no others*. Nor could a jury find that the "black-box" statement was "knowingly false and malicious," as required even under Jones Day's reading of its cited case (Opp. 20-21, 24-25). PSF ¶¶ 286-313.

       **c.**     **Court of public opinion.** Jones Day concedes that the email's reference to the "court of public opinion" referred to "the public's forming an opinion of the case based on litigation filings" (which have absolute protection from retaliation). Opp. 25. But it insists that "[t]he phrase plainly *also* conveyed that Savignac would directly reach out to the press." *Id.* That makes no sense—given that the phrase undisputedly had the first meaning, why would it have a second, distinct one (particularly given that the email says nothing about Plaintiffs taking any action with "court of public opinion")? Unlike Shakespeare, lawyers do not write so as to convey double meanings. PMSJ 34-35. And the fact that Julia reached out to the Times in August 2019 says little about what Plaintiffs intended in January, and nothing about how Brogan interpreted the email. Finally, even if Plaintiffs threatened to "go to the press" with their view that Jones Day's leave policy is discriminatory (Chase Ex. 77 (Brogan) at 25:10-16 ("You're trying to say the f[irm]—the firm is sexist. And you're expressing an intent to go out into the world and to say that"), such opposition is protected just like complaints to an employer—as shown by the many authorities that Plaintiffs cited and to which Jones Day offers no response. PMSJ 35 & n.17.

**B.     Participation clause.**  Jones Day has an internal complaint and investigation process, Plaintiffs participated in it, and the firm contends that *it* merits legal protection based on the process under Title VII.  But it argues that the participation clause (1) does not apply to such complaints and (2) confers no more protection than the opposition clause.  Both points fail.

**1.     Internal complaints.**  The participation clause protects a worker who "has made a charge … or participated in any manner in an investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a).  Jones Day says "*no court* has accepted Plaintiffs' theory that the participation clause applies to *internal complaints to employers* in the absence of any pending proceedings before courts or agencies, because only formal judicial or agency proceedings are conducted 'under' th[e] statutes."  Opp. 17.  But the D.C. Circuit applied that theory in *McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984).  Jones Day dismisses it as "inapposite" because McKenna was a federal employee and "internal investigations by federal agencies, unlike by private employers, are conducted 'under' regulations implementing the statutes and requiring federal employees to exhaust such remedies."  Opp. 17.  Federal workers must indeed exhaust claims with their agency's EEO counselor.  *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 49 (2d Cir. 2012).  But that was not relevant in *McKenna*.  McKenna did not go to the EEO officer until learning that she was to be fired.  729 F.2d at 787.  Her claim was that the termination was retaliation for her internal complaint to a *manager*, and it was *that* internal complaint that the D.C. Circuit held was "participation in an investigation" protected by the participation clause regardless of manner.  *Id.* at 790 n.54, 791.  Nothing in the decision suggests that the ruling turned on the public-sector context.  Jones Day is trying to limit a binding precedent to its facts—"a clear error of law."  *MikLin Enterprises, Inc. v. NLRB*, 861 F.3d 812, 825 n.5 (8th Cir. 2017); *see, e.g.*, *Robinson v. Diamond Housing Corp.*, 463 F.2d 853, 862-63 (D.C. Cir. 1972).

Even without *McKenna*, Plaintiffs should prevail.  Jones Day argues that only agency and court proceedings are "under" Title VII, even though internal investigations concededly have "legal effects" under Title VII.  Opp. 17.  It says *Kucana v. Holder*, 558 U.S. 233, 244 (2010), defined "under" as "specified in[]" or "authorized 'pursuant to[].'"  But those were definitions *advanced by the parties*.  The Court held that "[t]he word 'under' is chameleon; it 'has many dictionary definitions and must draw its meaning from its context.'"  *Id.* at 245 (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991)).  Jones Day ignores *Ardestani*, but, as Plaintiffs explained, it holds that "under" means "subject to."  PMSJ 40-41.  Internal investigations are "subject to" Title VII, which determines whether a given investigation complies with Title VII's requirements so as to have the "legal effect" that Jones Day itself claims for its procedure in this case.  PMSJ 37-47.  Other definitions of "under" exist, but Jones Day offers no justification for a narrower one.  Nor is its reading consistent with the view of every appellate court to address the question that internal participation *is* covered if an EEOC charge has been filed.  PMSJ 43.

2.      **Absolute immunity.**  Jones Day argues that the participation clause does not confer absolute immunity, contra *McKenna*, *Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012 (D.C. Cir. 1981), *Egei*, the EEOC, and the cases at PMSJ 36 n.18.  Opp. 22-23.  It relies on *Barnes*, where the D.C. Circuit said that a federal employee's letters to a supervisor accusing coworkers of committing criminal misconduct during internal proceedings fell under the participation clause's "very broad" protection for participating "in any manner."  840 F.2d at 974-76.  *Barnes* went on to find that the letters were nonetheless unprotected because their accusations were "knowingly false and malicious," violating an Army Regulation.  *Id.* at 975-78.  As support, *Barnes* cited language from two *opposition* cases, *Parker* and *Pendleton*.  *Id.* at 977.  Jones Day says that *Barnes* silently overruled *McKenna*'s clear statement that the *Hochstadt-Pendleton* "improper manner"

21

rule does not apply to participation.  But nothing in *Barnes* suggests that the court considered the distinction between opposition and participation.  Nor did the parties urge that distinction; the plaintiff did not contend that he could win if the letters were false and malicious.  Sheketoff Ex. 183 at 25-26.  *Barnes* could not overrule *McKenna* and did not purport to.  *FedEx v. NLRB*, 849 F.3d 1123, 1127 n.3 (D.C. Cir. 2017); Garner, The Law of Judicial Precedent § 6, p. 85 ("An opinion is precedential only for points of law argued by the litigants and adjudicated by the court").[15]

Even under Jones Day's view of *Barnes*, it at most means "participation" may be unprotected if it takes the form of malicious falsehoods, *not* that it is subject to the "reasonable, good-faith belief" requirement of the opposition clause.  *See* Opp. 22-23 ("improper behavior that exists independent of whether the underlying discrimination claim is right or wrong").  After all, *Parker*, which adopted the "reasonable belief" rule for opposition, makes clear that participation is not subject to it.  652 F.2d at 1019.  Regardless of whether Plaintiffs' opposition to Jones Day's discriminatory leave policy and its pay discrimination against Julia enabled by its black-box policy meets the reasonable belief requirement as a matter of law, there plainly was no "improper manner."  *See* § II.A.5, *supra*.[16]

---

[15] As Jones Day notes, *McKenna* says that participation has absolute immunity and is not subject to a *Hochstadt* "improper manner" analysis "when it is not accompanied by activities adverse to the employer."  729 F.2d at 790 n.54.  That qualification means that participation is immune unless the worker engages in *other activities*.  Here, it is undisputed that Mark was terminated *solely* for the January email, not any "accompan[ying] … activities adverse to the employer."  Jones Day's reading of *McKenna* as holding, tautologically, that participation is not subject to an "improper manner" analysis *unless it is conducted in an improper manner* is untenable.

[16] Distinguishing *Egei* from *Barnes*, Jones Day says that Plaintiffs' statement about the black-box system "did not concern the truth of the underlying discrimination claims."  Opp. 21.  Wrong.  The passage asserts that Julia's pay was affected because of her sex and that this resulted from the black-box system's enablement of sex discrimination.  That is like the assertions of discrimination held protected in *Egei*, not like the accusations held unprotected in *Barnes*, which (as Jones Day says, *see* Opp. 20-21) were, at best, tenuously related to the truth of any discrimination claim.

Finally, *Vaughn v. Epworth Villa* actually held that "given the plain language of the participation

C.      **The FLSA.**  Ten courts of appeals have held that the FLSA's protection for "any complaint … under or related to" that statute applies to internal complaints.  Jones Day says they are wrong under Justice Scalia's *dissent* in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011).  But his point was that the Court there effectively held that the FLSA *does* protect internal complaints.  *See id.* at 25-26.  The Second Circuit agreed, relying on *Kasten* to overrule its precedent and hold that internal complaints are protected.  *Greathouse v. JHS Security Inc.*, 784 F.3d 105, 110 n.8, 111-17 (2d Cir. 2015).  The firm's other case is a pre-*Kasten* district court ruling.  *Greathouse* and *Kasten* confirm Plaintiffs' point about reading retaliation clauses: If the text "admits of more than one reading," the right one is the one that aligns with "statutory purpose" and agency guidance.  784 F.3d at 111-15.[17]

Casting off its fig leaf of textualism, Jones Day asks the Court to "moderate" the FLSA's protection for internal complaints with an "atextual[]," "policy-based" incorporation of "the objective-reasonableness requirement established in Title VII opposition-clause case law."  Opp. 18.  There is *no* textual basis for that.  And only one court of appeals appears to have adopted it—without explaining why or pretending that it accords with the FLSA's text or purpose.  *Id.*  Providing less protection for internal complaints than agency or court complaints under the

---

clause, we must conclude that Vaughn engaged in a 'protected activity' when she submitted the unredacted medical records to the EEOC."  537 F.3d 1147, 1152 (10th Cir. 2008).

[17] *See also* PMSJ 45-47; *Kasten*, 563 U.S. at 7-13 (holding, 6-2, that "filed any complaint" protects oral complaints); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-46 (1997) (holding, 9-0, that "employees or applicants" includes ex-employees); *Parker*, 652 F.2d at 1019 (opposition to "practice made an unlawful employment practice" includes opposition to lawful practice that plaintiff reasonably believed was unlawful); *Greathouse*, 784 F.3d at 111-15 ("filed any complaint" covers internal complaints).  Jones Day points to *Encino Motorcars, LLC v. Navarro*'s rejection of "the principle that exemptions to the FLSA should be construed narrowly."  138 S. Ct. 1134, 1142 (2018).  That principle is not at issue here, and Plaintiffs do not contend that the FLSA "pursues its remedial purpose at all costs," just that purpose and agency interpretations are relevant in interpreting retaliation provisions where the text admits of more than one reading.  Justice Thomas's 5-4 opinion in *Encino* did not secretly overrule his unanimous one in *Robinson*.

FLSA's unitary protection for "any complaint … under or related to" the FLSA would violate the fundamental rule that "statutes are not chameleons, acquiring different meanings when presented in different contexts." *Maryland v. EPA*, 958 F.3d 1185, 1202 (D.C. Cir. 2020).  Nor is there any reason to give a formal internal complaint less protection than one directed to the agency. Congress's goal of promoting "voluntary internal attempts to remedy discrimination … would be ill served by telling employees that they can be sure of protection only if they limit their complaints about discrimination to formal [agency] filings, and that internal opposition, though encouraged, is undertaken at the accuser's peril." *Parker*, 652 F.2d at 1019.[18]

      **D.**      **The D.C. Human Rights Act.**  It is undisputed that the DCHRA goes "above and beyond" Title VII and must be "read … liberally" and "generously construed" in keeping with its "sweeping statement of intent." *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887 (D.C. 2008).  Accordingly, even if the Court determines that Title VII is subject to some of the limitations that Jones Day advocates, it should not graft those limitations onto D.C. law, including for the reasons given in Plaintiffs' Title VII arguments and by this Court in *Egei*.  *See* PMSJ 50.

**III.**      **Julia is a proper retaliation plaintiff (Counts VII-IX).**

      Jones Day does not dispute that Julia is a proper plaintiff to challenge its leave policy.  Yet it says she has no recourse for its firing of her husband in retaliation for that challenge—even though it is undisputed that she wrote the January email with her husband, was a Jones Day employee, and initiated Plaintiffs' opposition to Jones Day's leave offerings.  PSF ¶¶ 207, 213;

---

[18] By contrast, the lesser protection of Title VII's *opposition* clause is consistent with the clause's text, its far broader coverage of activities that are outside the scope of the FLSA provision (picketing, complaints to coworkers or customers, etc.), and the fact that Title VII's participation clause provides absolute immunity for participation in the employer's complaint process.

JDSF ¶ 15.  That is wrong.  She is plainly aggrieved.  PMSJ 52-53.  The firm's sole response is to ask the Court to limit binding precedents to their facts; it offers nothing for its own view.[19]

## CONCLUSION

The Court should grant partial summary judgment for Plaintiffs.

---

[19] Jones Day purports to incorporate a footnote to its pleading-stage reply, saying one case cited there (it does not say which) had comparable facts.  This is insufficient to preserve the argument.

Plaintiffs showed that Jones Day's treatment of Julia satisfies all three elements of retaliation. PMSJ 51; PSF ¶ 213.  Jones Day disputes only causation, pointing out that the law prohibits "discriminat[ing] against" an employee "because he has opposed" perceived discrimination.  JD Opp. 30.  It argues that "Brogan would have fired [Mark] if he sent the email by himself," so Julia's "co-sending" cannot have been a but-for cause.  *Id.*  It might as well argue that she has no claim because the text only protects men ("he")—for just as "words importing the masculine gender include the feminine," "words importing the singular include and apply to several persons." 1 U.S.C. § 1.  The law thus prohibits retaliating against *employees* because *they* opposed discrimination *jointly*.  Plaintiffs jointly opposed discrimination through the email, and the email caused the firing.  Jones Day ignores the possibility of joint opposition and suggests, absurdly, that *no one* has protection for joint opposition, because the retaliation would still have happened if any given worker did not join in.  The law does not require that the employer know the identities of all participants in joint opposition—it requires only that the workers engage in opposition and that the employer take an adverse action because of the opposition.  *Savignac*, 486 F. Supp. 3d at 38 ("the plaintiff must show that '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to *the exercise of her rights*.'" (emphasis added)).  Jones Day faults Plaintiffs for making their point with a hypothetical, but it cites no cases supporting its view and does not dispute Plaintiffs' hypothetical, which rested on case law showing that the employer's knowledge of the identity of the individual(s) behind the protected activity is not an element.  PMSJ 52.  Jones Day adds, for the first time, that the email has the signature block automatically included with emails from Mark's firm account.  That adds nothing to the point that the email was sent from Mark's firm email address.  Anyway, Brogan's claim that he read an email phrased largely in the plural and continuing opposition initiated by Julia to come from Mark alone because he thought that Mark was using the "royal we" is incredible.  *See also* PSF ¶ 213 (Plaintiffs' reply); JDSF ¶ 361 (Plaintiffs' response).  The firm cannot refute that by pointing to parts of the email, like the signature block, that Brogan did not point to.

/s/ Julia Sheketoff

Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

April 7, 2023

/s/ Mark Savignac

Mark C. Savignac (pro se)
2207 Combes Street
Urbana, IL 61801
(217) 714-3803
marksavignac@gmail.com
D.C. Bar No. 995367