## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK C. SAVIGNAC and
JULIA SHEKETOFF,

    *Plaintiffs*,

       v.

JONES DAY, STEPHEN J. BROGAN,
BETH HEIFETZ, and MICHAEL
SHUMAKER,

    *Defendants*.

Case No. 1:19-cv-02443-RDM-ZMF

**PLAINTIFFS' CORRECTED STATEMENT OF UNDISPUTED FACTS
(INCLUDING DEFENDANTS' RESPONSES AND PLAINTIFFS' REPLIES)**

As Jones Day has done in support of its own fact statement, Plaintiffs respectfully submit the following reply to Jones Day's response to Plaintiffs' statement of undisputed material facts in support of Plaintiffs' cross-motion for summary judgment, opposition to Jones Day's summary judgment motion, cross-motion for Rule 11 sanctions, and opposition to Jones Day's sanctions motion. As the accompanying citations to the record confirm, there is no genuine dispute as to these facts.

In the alternative, if the Court finds that any of the following facts is *not* undisputed, then, at a minimum, a reasonable jury could find that fact and it presents a genuine issue for trial. In assessing these facts on Jones Day's motion for summary judgment, Plaintiffs have no burden to establish the *absence* of a factual dispute in their favor; it suffices to show the *presence* of a factual dispute. With respect to many of these facts, including facts relating to Julia's pay discrimination claims, the reference-denial claims, and the press release claims, Plaintiffs are not seeking summary judgment and are simply opposing Jones Day's motion.

## Preliminary Statement

To avoid undue repetition in the specific replies below, Plaintiffs address at the outset the following persistent issues in Jones Day's responses:

**A.** Jones Day purports to dispute most of the facts below on the ground that Plaintiffs have supposedly stated them in an "argumentative" fashion or "interpret[ed]" the evidence in an "argumentative" way. This is not a valid objection and does not create a genuine fact dispute. Under Federal Rule of Civil Procedure 56, "[a] party asserting that a fact cannot be or is genuinely disputed must support that assertion by: (A) citing to particular parts of material in the record … or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact." Fed. R. Civ. P. 56(c)(1). Thus, where Jones Day does not successfully "cit[e] to particular parts of material in the record" establishing a genuine dispute, "show[]" that Plaintiffs' cited materials do not establish an undisputed fact, or "show[]" that Plaintiffs' cited evidence is inadmissible and "cannot be presented in a form that would be admissible" at trial, it has no valid response to the fact in question, and that fact therefore is not genuinely disputed. *E.g.*, *Hartley v. Rubio*, 785 F. Supp. 2d 165, 171 (S.D.N.Y. 2011) (conclusory objections are insufficient). And it cannot do any of these things simply by asserting that Plaintiffs' statement is "argumentative" or "argumentative interpretation" (whatever that means). The cases that Jones Day cites supporting its objections simply say that a party should not insert *legal arguments*, replete with citations to *case law*, in its statements of fact. *E.g.*, *Chambliss v. National Railroad Passenger Corp.*, 2007 WL 581900, at *2 (D.D.C. 2007). Plaintiffs have not done so.

**B.** Jones Day also "disputes" numerous statements by asserting—without explanation—that they "mischaracteriz[e]" the cited evidence. Again, Rule 56(c)(1) requires that,

to show that a genuine dispute exists, Jones Day must either "*show[]* that the materials cited do not establish the absence … of a genuine dispute" or else "cite to particular parts of materials in the record" that controvert the statement.  Fed. R. Civ. P. 56(c)(1) (emphasis added).  Jones Day's conclusory claims of alleged "mischaracterization" are woefully insufficient.  *E.g.*, *Gonzagowski v. United States*, 495 F. Supp. 3d 1048, 1070 n.40 (D.N.M. 2020) (assertion that statement "mischaracterizes the evidence" insufficient to create genuine fact dispute).

**C.**    Jones Day also purports to dispute many facts by objecting that they involve "hypotheticals," apparently referring to a witness's testimony about how he or she would have acted in a scenario that has not actually occurred.  Such an unelaborated objection plainly does not "show[] that the materials cited do not establish the absence … of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(B).  Nor is it a valid evidentiary objection.  A witness may testify to a matter as long as he has "personal knowledge" of the matter (FRE 602) and may offer a lay opinion if it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge" (FRE 701).  A witness's testimony regarding how he would behave if a certain situation arose—for instance, Brogan's testimony that he would retaliate against an associate who was suing the firm for discrimination by refusing to support her when she came up for partner—is generally based on his "personal knowledge" and "perception" (since the witness presumably knows his own mind) and can plainly be probative of important fact issues (such as whether Brogan possesses animus against those who exercise their civil rights by challenging discrimination at Jones Day).  *See also* PMSJ 13 n.11.

**D.**    Jones Day objects to certain evidence on the ground that it supposedly is not admissible.  As discussed in detail in the appropriate places below, the vast majority of those

objections are meritless because the evidence at issue *is* admissible.  Regardless, evidence need

not be admissible itself for its substance to be considered at summary judgment.  Rather, the Rules

preclude the consideration of evidence that "cannot be presented in a form that *would be* admissible

in evidence" at trial.  Fed. R. Civ. P. 54(c)(2).  The "burden" on the proponent of the evidence is

thus *either* to show that "the material is admissible as presented *or to explain the admissible form*

*that is anticipated.*"  Fed. R. Civ. P. 54, Committee Notes to 2010 Amendment (emphasis added);

*see, e.g.*, *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment

stage, we do not focus on the admissibility of the evidence's form. We instead focus on the

admissibility of its contents."); *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017)

("[M]aterial relied on at summary judgment need not be admissible in the form presented to the

district court.  Rather, so long as the evidence in question will be presented in admissible form at

trial, it may be considered on summary judgment."); *Domestic Violence Survivors Support Group,*

*Inc. v. Crouch*, 2022 WL 1044688, at *1 (4th Cir. 2022); *Lee v. Offshore Logistical & Transport*,

859 F.3d 353, 355 (5th Cir. 2017), *as revised* (July 5, 2017) (citing additional cases); *Austin*

*Investment Fund, LLC v. United States*, 2015 WL 7303514, at *8 (D.D.C. 2015).  Because the

substance of the material to which Jones Day objects can be presented in admissible form at trial

for the reasons provided in response to individual objections below, the firm's objections are

meritless and the evidence may be properly considered at this stage.

     **E.**     Finally, Jones Day's complaint in its own Preliminary Statement (at 2) that

Plaintiffs respond to some its facts by cross-referencing paragraphs of their own fact statement is

baseless.  While the rules indeed require a party controverting a fact to either point to specific

evidence in the record or else actually "show[]" why the other side's cited evidence does not

establish the fact, nothing prohibits a party from doing so through cross-references—which avoids

needless repetition and thereby reduces the length of the filings and the burden on the Court. Indeed, Jones Day itself frequently employs cross-references: It incorporates its whole fact statement in its summary judgment brief, purportedly incorporates cases from a footnote in its motion-to-dismiss reply in its summary judgment reply, cross-references internally in both its fact statement and Plaintiffs', and even incorporated a whole 20-page brief from another lawsuit earlier in this litigation (*see* Dkt. 36 at 9).  And where Plaintiffs cross-reference many paragraphs, that is because the evidence against Jones Day is overwhelming.  That is not Plaintiffs' fault.

*          *          *

Needless to say, where Jones Day disputes a statement based only on a meritless admissibility objection, or where it purports to dispute a statement without either citing record evidence establishing a genuine dispute or actually "showing [rather than just asserting] that the materials cited [by Plaintiffs] do not establish the absence … of a genuine dispute," the statement is admitted in its entirety.  Standing Order 10(d)(iv)-(v); D.D.C. Local Rule 7(h)(1); *Rodriguez v. City of Berwyn*, 2018 WL 5994984, at *2 (N.D. Ill. 2018).  Indeed, Jones Day makes the same point in support of its own fact statement: "Merely claiming the existence of a genuine dispute without citing supporting evidence has no effect; where the non-moving party fails to cite evidence establishing the existence of a dispute, the Court may assume that the movant's factual assertion is admitted."  JDSF Preliminary Statement 1-2.  But the firm has not heeded its own admonition.

<table>
<tr><td>/s/ Julia Sheketoff</td><td>/s/ Mark Savignac</td></tr>
<tr><td>Julia Sheketoff (pro se)</td><td>Mark C. Savignac (pro se)</td></tr>
<tr><td>2207 Combes Street</td><td>2207 Combes Street</td></tr>
<tr><td>Urbana, IL 61801</td><td>Urbana, IL 61801</td></tr>
<tr><td>(202) 567-7195</td><td>(217) 714-3803</td></tr>
<tr><td>sheketoff@gmail.com</td><td>marksavignac@gmail.com</td></tr>
<tr><td>D.C. Bar No. 1030225</td><td>D.C. Bar No. 995367</td></tr>
</table>

April 7, 2023

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

1.      As Jones Day admits, it is an employer subject to Title VII, the Equal Pay Act, the D.C. Human Rights Act, and the D.C. FMLA.  Sheketoff Ex. 32 at 4-6 (RFAs 1-7).

**RESPONSE:** Undisputed that Jones Day admits that from 2017-2019 it was an "employer" subject to the prohibitions on sex discrimination and retaliation in Title VII and the D.C. Human Rights Act; was an employer having employees subject to provisions of the Equal Pay Act in its D.C. office during that same period; and was an employer subject to the D.C. FMLA in 2019.  Disputed that Jones Day admitted to its status as an employer under these statutes for any other time frame.  *See* Sheketoff Ex. 32.

**I.      Jones Day's leave policy for new parents discriminates on the basis of sex.**

**A.      The history of the leave policy confirms that it is discriminatory.**

**i.      In 1994, Jones Day adopted the eight-week "disability" leave.**

2.      Prior to 1994, Jones Day did not offer new mothers any set period of "disability" leave in connection with the arrival of a new child.  Dressing Decl. ¶ 6; JDSF ¶ 32.

**RESPONSE:** Undisputed that prior to 1994, Jones Day's benefits for non-partner lawyers provided up to twelve weeks of paid leave, and up to twelve weeks of unpaid leave to female associates who gave birth, and that those leave periods did not differentiate between time required to recover from childbirth and time for family leave. Chase Ex. 3 at JD_00003413; Dressing Decl. at ¶ 6.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**3.**     Rather, prior to 1994, Jones Day had a "Maternity Leave Policy" that gave "female" associates a "maternity leave" made up of 12 weeks of paid leave and 12 weeks of unpaid leave. Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 32.

**RESPONSE:** Undisputed that prior to 1994, Jones Day had a "Maternity Leave Policy," under which "Female Of Counsel, Senior Attorneys, Associates and Senior Staff Attorneys who intend to return to active work with the Firm following pregnancy will normally be granted maternity leave as follows: -- up to 12 weeks with salary and fringe benefits continuing as though actively at work; up to an additional 12 weeks without salary and with fringe benefits continued at the lawyer's expense." Chase Ex. 3 at JD_00003413. Defendants dispute Statement 3 to the extent it selectively quotes the policy to suggest that all female associates who qualified for this benefit were required to, or in fact did, take 24 weeks of leave following delivery. *Id.*

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The statement describes the maternity leave Jones Day "gave" to female associates; it does not suggest that all female associates were required to take or actually took the full maternity leave Jones Day gave them, but merely that they could do so if they chose.

**4.**     None of the leave offered under this pre-1994 "Maternity Leave Policy" was labeled or treated as "disability" or "medical" leave.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 33.

**RESPONSE:** Undisputed that prior to 1994, Jones Day's "Maternity Leave Policy" did not differentiate between, on the one hand, time that a new mother needed to recover from childbirth and, on the other, time for the new mother and child to bond, and that Jones Day did not require any type of disability certification from the lawyer's medical provider for childbirth

without complications. Jones Day was aware at the time that physicians typically certified a six-to eight week disability period for childbirth without complications. Dressing Decl. at ¶¶ 6, 11.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

5.      During this period, the firm provided 12 weeks of paid leave and 12 weeks unpaid leave to new mothers regardless of the length of the mother's disability.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶¶ 32-33.

**RESPONSE:** Undisputed that prior to 1994, Jones Day's policy provided female non-partner lawyers up to twelve weeks of paid leave, and up to twelve weeks of unpaid leave following childbirth without complications. Chase Ex. 3 at JD_00003413; Dressing Decl. at ¶ 6.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

6.      During the same period, Jones Day did not provide fathers with leave in connection with the arrival of a new child.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 34.

**RESPONSE:** Undisputed that prior to 1994, the Firm's written policies did not include a grant of leave specific to male non-partner lawyers welcoming a new child, and that those lawyers typically utilized vacation time or sick days to take time off of work following the birth. Dressing Decl. at ¶ 6.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

7.      If new fathers wanted to take leave, they had to use their vacation or sick time, if available.  Chase Ex. 3 at JD_00003413; Dressing Decl. ¶ 6; JDSF ¶ 34.

**RESPONSE:** Undisputed that prior to 1994, male non-partner lawyers welcoming a new child typically utilized vacation time or sick days to take time off of work following the birth. Dressing Decl. at ¶ 6.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

8.      By memo dated December 22, 1993, Jones Day's then-Human Resources Director Julie Stumpe Dressing proposed changes to the firm's leave offerings for new parents to then-managing partner Patrick McCartan.  Sheketoff Ex. 1 at JD_00003291-99; Chase Ex. 5 at JD_00003300; Dressing Decl. ¶¶ 7-8.

**RESPONSE:** Undisputed.

9.      The memo included proposed written amendments to the firm manual.  Sheketoff Ex. 1 at JD_00003296-98; Chase Ex. 5 at JD_00003300; Dressing Decl. ¶¶ 7-8.

**RESPONSE:** Undisputed.

10.      In those proposed written amendments, Dressing proposed deleting the "Maternity Leave Policy" from the firm manual and replacing it with provisions for "Paid Medical and Family Leave" and "Unpaid Leaves of Absence."  Sheketoff Ex. 1 at JD_00003296-3298; Chase Ex. 5 at JD_00003300.

**RESPONSE:** Undisputed.

11.      Under the new proposed provisions, Jones Day would, for the first time, label some of the 12 weeks of paid maternity leave available to new mothers as "disability" (or "medical") leave. Sheketoff Ex. 1 at JD_00003296-3298; Sheketoff Ex. 2 at JD_00003302.

**RESPONSE:** Undisputed that the updates to Jones Day's policies that Dressing proposed in her December 22, 1993 memorandum differentiated between disability leave for

recovery from childbirth and family leave available in connection with the birth of a child, and also did not change the total amount of paid leave presumptively available to new mothers for routine childbirth. Sheketoff Ex. 1 at JD_00003296-3298; Dressing Decl. at ¶ 9. The assertion that this was a mere "label" change is improper argument that lacks evidentiary support and is disputed. In establishing the proposed period of presumptive disability for routine childbirth, Dressing considered several factors, including physician certifications of disability for routine childbirth, as well as insurance practices related to childbirth without complications. Dressing Decl. at ¶¶ 10-11.

**REPLY:** Jones Day disputes the word "label" in this memo on the ground that it is "improper argument that lacks evidentiary support."  That assertion is false; the cited evidence includes a memo sent by Dressing that directly supports this statement.  Sheketoff Ex. 2 at JD_00003302 ("As under the prior policy, lawyers who go out on maternity leave will receive twelve weeks of paid leave and an additional twelve weeks of unpaid leave, should they choose to use it.  *The difference in the new policy is the manner in which the leave is tracked administratively.*" (emphasis added)).  Moreover, Jones Day's conclusory "dispute," made without any explanation or citation to controverting evidence, does not suffice to establish the absence of a genuine factual dispute.  Fed. R. Civ. Proc. 56(c)(1).  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  As to Jones Day's nonresponsive final sentence, Jones Day maintains that Dressing's analysis was "privileged" and, on that basis, has withheld virtually all contemporaneous documents. *E.g.*, Sheketoff Ex. 1.  Plaintiffs object to this partial disclosure of and reliance upon the alleged substance of the allegedly privileged investigation allegedly performed by its alleged counsel.

12.     The proposed "Paid Medical and Family Leave" provision stated: "In the event of a serious illness or medical condition of [a non-partner attorney], the Firm will provide short-term medical leave as follows: full salary and fringe benefits for up to the first three months of continuous disability, and 75% of salary and full fringe benefits for up to the fourth through sixth months of continuous disability.  For routine pregnancy and delivery, physicians generally certify a six to eight week disability period."  Sheketoff Ex. 1 at JD_00003296.

**RESPONSE:** Undisputed.

13.     The proposed "Paid Medical and Family Leave" provision also stated: "As a condition of approving any medical leave, the Firm may request appropriate certification and ask for a second physician's opinion, paid for by the Firm, at any time during the course of the leave, including when the leave is requested, while the lawyer is on leave, or when the lawyer desires to return to work."  Sheketoff Ex. 1 at JD_00003297.

**RESPONSE:** Undisputed.

14.     The proposed "Paid Medical and Family Leave" provision further stated: "In the event a [non-partner attorney] has a newborn or newly adopted child … , the Firm may provide up to four weeks of paid family leave, with fringe benefits continuing as though actively at work." Sheketoff Ex. 1 at JD_00003296.

**RESPONSE:** Undisputed except for typographical errors in Statement 14 that are inconsistent with the exhibit and to the extent Statement 14 implies that the quoted text follows the text quoted in Statement 13, which is not the case. Sheketoff Ex. 1 at JD_00003296

15.     Jones Day's managing partner approved Dressing's proposed amendments to the firm manual by memo dated January 11, 1994, and directed Dressing to "[p]lease see to it that the new

policy is included in the 1994 revision of the [f]irm [m]anual."  Chase Ex. 5 at JD_00003300; JDSF ¶ 51.

**RESPONSE:** Undisputed.

16.     Jones Day's decision to make the changes proposed by Dressing was made by managing partner McCartan.  Chase Ex. 5 at JD_00003300; JDSF ¶ 51.

**RESPONSE:** Undisputed.

17.     As directed by the managing partner, the "new policy" was included in the May 1994 revision of the firm manual.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-3298; JDSF ¶ 52.

**RESPONSE:** Undisputed that the policy changes Dressing proposed were incorporated into the Jones Day Firm Manual in 1994. The claim that this occurred in May 1994 is disputed on the grounds that there is no evidence to support the date when that occurred. Statement 17 cites (through Statement 52 in Defs.' Statement of Material Facts ("DSF")) to a version of the Firm Manual revised as of October 1, 1994, and a version of the Firm Manual dated June 1, 1997. *See* Chase Ex. 6 and Chase Ex. 7.

**REPLY:** JDSF ¶ 52 says that "[t]he 1994 and 1997 versions [of the firm manual] included the updated policy," and the cover of the October 1994 manual (Chase Ex. 6 at JD_00003443) indicates that there was a May 1994 version of the manual, which Jones Day inexplicably did not produce in discovery.  Moreover, Dressing's June 1994 memo (discussed *infra* at PSF ¶¶ 18-20) refers to "the Firm's new paid medical and family leave policy for lawyers (set forth on page 25 of the new [f]irm [m]annual)," indicating that the new leave policy was included in the firm manual well before October 1994.  Sheketoff Ex. 2 at JD_00003302.

18.     Shortly thereafter, and in response to "a few inquiries regarding the [f]irm's new paid medical and family leave policy for lawyers," Dressing provided an explanation of the firm's new policy in a June 14, 2014 memo to "all female Of Counsel, Senior Attorneys and Associates" and entitled "The Firm's Maternity Leave Policy."  Sheketoff Ex. 2 at JD_00003301-02.

**RESPONSE:** Undisputed, except for typographical errors in Statement 18 that are inconsistent with the cited exhibit, including that the date of the quoted memorandum is June 15, 1994. Sheketoff Ex. 2 at JD_00003301-02.

**REPLY:** There are no typographical errors in this statement.  The first quote appears at Sheketoff Ex. 2 at JD_00003302 and the second quote appears at Sheketoff Ex. 2 at JD_00003301.  There is internal inconsistency in the exhibit as to the date, and the date cited appears at Sheketoff Ex. 2 at JD_00003301.

19.     The memo explains:

> *As under the prior policy*, lawyers who go out on maternity leave will receive twelve weeks of paid leave and an additional twelve weeks of unpaid leave, should they choose to use it.  *The difference in the new policy is the manner in which the leave is tracked administratively*.  The lawyer is *considered to be* on paid medical leave for the disability portion of the maternity leave.  Because most doctors certify a six to eight week period of disability in the event of an uncomplicated pregnancy and delivery, the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability *for a longer period*.  In addition to this eight week paid medical leave, the lawyer may take an additional four weeks of paid child care leave, bringing the total paid leave period up to twelve weeks as set forth in the Firm's prior policy.  Thereafter, the lawyer may request an additional twelve weeks of unpaid leave, should she so desire.

Sheketoff Ex. 2 at JD_00003302 (emphases added).

**RESPONSE:** Undisputed that the memorandum includes the quoted text (without Plaintiffs' argumentative italicization and other alterations).

20.     As Dressing explained, upon Jones Day's amendment of its leave offerings for new parents in 1994, the amount of leave for new mothers remained the same as it had been before: 12

weeks of paid leave and 12 weeks of unpaid leave.  Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9.

**RESPONSE:** Disputed.  The policy as amended in 1994 provided for up to three months of short-term medical leave at full salary and fringe benefits; up to an additional three months of short-term medical leave at 75% salary and full fringe benefits; additional disability leave for those enrolled in the long-term disability insurance program; up to four weeks of paid family leave; and, subject to certain restrictions, up to a total of twelve weeks of unpaid leave. Sheketoff Ex. 1 at JD_00003296-97; *see also* Chase Ex. 6 at JD_00003542.

**REPLY:** This statement is not genuinely disputed.  Jones Day cites only the written "Paid Medical and Family Leave" provision proposed by Dressing in 1993 and the incorporation of that proposal into the October 1994 firm manual.  But as Jones Day has admitted in its response to PSF ¶ 18, Dressing (who was the purported architect of that written policy and the human resources director who oversaw its implementation) "provided an explanation of the policy" in her June 1994 memo.  Dressing also explained the policy in the declaration that Jones Day has submitted in connection with its summary judgment motion, on which the firm repeatedly relies. In both accounts, Dressing makes clear that, under the new policy in 1994, the amount of leave for new mothers remained the same as it had been before: 12 weeks of paid leave and 12 weeks of unpaid leave.  Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9.  Indeed, in its response to PSF ¶ 27, Jones Day admits the substance of this statement.

21.     Like the pre-1994 policy, the policy adopted in 1994 gave every new mother at least 12 weeks of paid leave and 12 weeks of unpaid leave without regard for how long she was disabled. Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶¶ 6, 9; Chase Ex. 3 at JD_00003413.

**RESPONSE:** The terms of the policy implemented in 1994 are undisputed and are set forth in full at Chase Ex. 6. To the extent this Statement asserts that the policy of assuming a physician has certified an eight-week disability period for recovery from childbirth without complications—which has not changed since 1994—constitutes an entitlement to eight weeks of paid leave without regard to disability, nothing in the material cited in Statement 21 establishes that assertion as an "undisputed fact." The assertion that the disability policy provides an entitlement to leave without regard to disability is not supported by any evidence and, in fact, contradicts evidence of record that Plaintiffs have not legitimately disputed. Defendants' December 2, 2022 Statement of Material Facts set forth that the assumption "is not a guarantee of eight weeks of paid leave." DSF ¶ 111. Associates are given the written policy for short-term disability benefits, and those associates seeking salary continuation under that policy are given separate written notice that it is subject to repayment if they do not meet the requirements of the policy. *Id*. ¶ 113. Those documents are in the record and are undisputed. *See* Pls. Resp. DSF ¶ 113 (Dkt. 208); *see also* McClure Ex. 1 and McClure Ex. 2. Human resources personnel have provided sworn testimony that the Firm retains the ability to recoup salary or reclassify leave if it learns an associate was not disabled during the time of salary continuation under the short-term disability policy; that the Firm has exercised that right in cases not involving pregnancy and childbirth; and that, although the Firm has never learned of such a case involving pregnancy and childbirth, if it did the Firm would ensure it was appropriately following policy there too. DSMF ¶ 114-15. While Plaintiffs purport to dispute that testimony, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶¶ 112-15. Moreover, none of the exhibits cited in Statement 21 support the assertion that any associate was ever entitled to benefits under the short-term disability regardless of disability.

**REPLY:** This statement is not genuinely disputed.  Jones Day has elsewhere admitted the substance of this statement.  PSF ¶¶ 27-28 (Jones Day's response).  Jones Day has admitted that, before 1994, new mothers received 12 weeks of paid leave and 12 weeks of unpaid leave regardless of disability.  PSF ¶¶ 3-5 (Jones Day's responses).  And, as Defendants admit in response to PSF ¶¶ 27-28, and as the evidence cited in this statement demonstrates, under the policy adopted in 1994, new mothers got the same amount of leave as under the policy before 1994: "*As under the prior policy*, lawyers who go out on maternity *will receive twelve weeks of paid leave and an additional twelve weeks of unpaid leave*, should they choose to us it.  *The difference in the new policy is the manner in which the leave is tracked administratively*." Sheketoff Ex. 1 at JD_00003296-98 (emphases added); *accord* Dressing Decl. ¶ 9 ("the overall amount of leave that Jones Day offered new mothers would *remain* at twelve weeks of paid leave and twelve weeks of unpaid leave" (emphasis added)).  "As under the prior policy," the 12 weeks of paid leave did not depend on the length of the mother's disability.  Sheketoff Ex. 1 at JD_00003296-98.  Jones Day also purports to dispute "an assertion that the disability policy provides an entitlement to leave without regard to disability," but this statement makes no such assertion about a "disability policy."  The written policy adopted in 1994 is entitled "Paid Medical and Family Leave" and the eight-week entitlement to leave regardless of the length of disability is not disability leave.  Further, the second half of Jones Day's response (beginning with "Associates are given") does not purport to identify facts relating the policy in place in 1994, is non-responsive to this statement, and should be disregarded.  In any event, the evidence cited therein casts no doubt on this statement.  Even if the evidence established (contrary to fact) that the firm would "ensure it was appropriately following the policy" in the hypothetical scenario where a new mother gratuitously informed the firm that she was not disabled for eight weeks after childbirth (even

though she is indisputably not required to do so, PSF ¶ 114), that is orthogonal to the question of what the policy actually is. As the evidence cited in this statement demonstrates, the policy adopted in 1994 was to give all new mothers 12 weeks of paid leave and 12 weeks of unpaid leave, without regard to disability. *See also* PSF ¶¶ 3-5, 18-19, 20, 27-28.

22. As the leave offerings were amended, however, eight of those twelve weeks of paid leave were deemed "disability" (or "medical") leave for purposes of "the manner in which the leave is tracked administratively," because Jones Day decided to "assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability for a longer period." Sheketoff Ex. 2 at JD_00003302.

**RESPONSE:** Statement 22 argumentatively repeats in selective fashion previously asserted facts. Defendants incorporate their responses to Statements 8 through 21 and further state that it is undisputed that the 1994 amendment to Jones Day's leave polices followed the then-recent enactment of the federal Family and Medical Leave Act; that as part of those amendments the Firm considered the time that physicians typically certified for disability from routine childbirth; and that the Firm conformed its policies accordingly. *See* Dressing Decl. at ¶¶ 7-11.

**REPLY:** Jones Day does not dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

23. If a new mother notified Jones Day that her doctor had certified more than 8 weeks of disability leave, she could receive more than 12 weeks of paid leave after childbirth. Sheketoff Ex. 2 at JD_00003302.

**RESPONSE:** Undisputed.

24. If a new mother was disabled for less than eight weeks, however, she was nonetheless entitled to the full 12 weeks of paid leave, just as under the pre-1994 policy. Sheketoff Ex. 2 at

JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9; Chase Ex. 76 (Bounds 30(b)(6)) at 214:15-215:3.

    **RESPONSE:** Disputed. Defendants incorporate by reference their response to Statement 21. Plaintiffs cite no evidence that the assumption a physician has certified an eight-week disability period for recovery from childbirth without complications—which has not changed since 1994—constitutes an entitlement to eight weeks of paid leave without regard to disability. Plaintiffs' citation to the deposition testimony of Rule 30(b)(6) designee Lori Bounds ignores the testimony that Jones Day has the ability to recoup salary or reclassify leave if it determines that an associate received salary continuation under the Firm's short-term disability policy period during a time in which he or she did not meet the requirements of that policy; that the Firm has never learned of an associate who had received salary continuation under that policy in relation to childbirth but did not meet the requirements of that policy for the presumptive eight-week period; and that in the event the Firm did learn of such an individual, "I would speak to Sarah McClure or whomever else to make sure that we were appropriately following policy." Chase Ex. 76, Bounds Tr. 70:21-24.

    **REPLY:** This statement is not genuinely disputed. Jones Day has admitted that, before 1994, new mothers received 12 weeks of paid leave and 12 weeks of unpaid leave regardless of disability. PSF ¶¶ 3-5 (Jones Day's responses). And it has admitted in response to PSF ¶¶ 27-28 that, under the policy adopted in 1994, new mothers got the same amount of leave as under the policy before 1994: "*As under the prior policy*, lawyers who go out on maternity *will receive twelve weeks of paid leave and an additional twelve weeks of unpaid leave*, should they choose to us it. *The difference in the new policy is the manner in which the leave is tracked administratively*." Sheketoff Ex. 1 at JD_00003296-98 (emphases added); *accord* Dressing Decl. ¶ 9 ("the overall

18

amount of leave that Jones Day offered new mothers would *remain* at twelve weeks of paid leave and twelve weeks of unpaid leave" (emphasis added)).  "As under the prior policy," the 12 weeks of paid leave did not depend on the length of the mother's disability.  Sheketoff Ex. 1 at JD_00003296-98.  Moreover, Jones Day says the cited testimony of its 30(b)(6) witness "ignores" other testimony, but the witness's cited testimony is unambiguous: *nothing* would decrease a new mother's 12 weeks of paid leave unless she "chose not to take advantage of the four weeks of family [leave]."  Chase Ex. 76 (Bounds (30(b)(6)) at 214:15-215:3.

25.     Jones Day made no substantive changes to its eight-week "disability" provision between 1994 and 2019.  Chase Ex. 76 (Bounds 30(b)(6)) at 185:18-186:14, Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20; Dressing Decl. ¶ 15; Chase Ex. 7 at JD_00003683; McClure Ex. 1 (Plaintiffs' Ex. 44); Chase Ex. 76 (Bounds 30(b)(6)) at 91:2-5; Dkt. 189 at 17 ("the disability provisions have not materially changed"); JDSF ¶ 106.

        **RESPONSE:** Undisputed.

26.     The reason that Jones Day decided to "assume that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complication" was "to decide how much paid leave Jones Day would offer new fathers."  Dressing Decl. ¶ 10.

        **RESPONSE:** Disputed.  Dressing proposed changes to Jones Day's leave policies following a privileged review of those policies subsequent to the passage of the federal Family Medical Leave Act (the passage of which required for the first time that employers provide family leave for the birth or adoption of a new child). *See* Dressing Decl. at ¶¶ 7-11. The reasons why she concluded that the Firm should assume an eight-week period of disability following routine childbirth are set forth in her declaration and include, *inter alia*, her experience with actual physician certifications of disability following childbirth, insurance practices for covering routine

childbirth, privacy interests of associates who previously had not been required to disclose whether they delivered vaginally, and administrative convenience. *See id*. at ¶ 11.

**REPLY:** Jones Day cannot genuinely dispute this statement, which is lifted nearly verbatim from Dressing's own declaration: "To decide how much paid leave Jones Day would offer new fathers under the amended non-partner lawyer leave policy, I concluded the [f]irm should assume that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complications." Dressing Decl. ¶ 10. Moreover, Jones Day maintains that Dressing's analysis was "privileged" and, on that basis, has withheld virtually all contemporaneous documents. *E.g.*, Sheketoff Ex. 1. Plaintiffs object to Jones Day's partial disclosure and reliance upon of the alleged substance of the allegedly privileged investigation and analysis allegedly performed by its alleged counsel. Finally, while Jones Day states irrelevantly that the 1993 FMLA "required for the first time that employers provide family leave for the birth or adoption of a new child," it cannot dispute that federal law from the 1960s (the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964) had required that employers who give family leave to mothers provide it equally to fathers, and that Jones Day blatantly violated that law.

27.     The firm "decided that … the overall amount of leave that Jones Day offered new mothers would remain at twelve weeks of paid leave and twelve weeks of unpaid leave, which ensured that Jones Day remained competitive in associate recruiting." Dressing Decl. ¶ 9.

**RESPONSE:** Undisputed. Defendants further state that the new policies implemented in 1994 set forth the types of leave available thereunder, as well as restrictions on the use of those leaves, which Dressing was not purporting to describe in detail in her declaration, and which Statement 27 ignores. *See, e.g.*, Sheketoff Ex. 1 at JD_00003296-97; *see also* Chase Ex. 6 at JD_00003542. Defendants also incorporate by reference their response to Statement 21.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

28.    "[N]othing about [the eight-week assumption of disability] would impact how much paid or total leave female associates received for a childbirth without complications."  Dressing Decl. ¶ 9.

**RESPONSE:** Undisputed  that  the  quoted  language  appears  (without  Plaintiffs' alterations) in Paragraph 12 of Dressing's declaration in reference to the decision to adopt an assumption that a physician would certify an eight-week disability period for routine childbirth. Defendants incorporate by reference their response to Statement 21 and dispute Statement 28 to the extent Plaintiffs selectively quote the evidence out of context to make assertions about the language and operation of any Jones Day leave policy.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

29.    "Rather, the change was to how different types of leave stacked together to form the total leave period.  A female associate's paid leave would now be a combination of [so-called] paid disability leave and paid family leave …."  Dressing Decl. ¶ 13.

**RESPONSE:** Undisputed  that  the  quoted  language  appears  (without  Plaintiffs' argumentative alterations) in Dressing's declaration. Also undisputed that in the wake of recently enacted federal legislation, the leave policies implemented in 1994 changed the type of leave available  and  how  that  leave  was  tracked  administratively.  *See*  Dressing  Decl.  at  ¶¶  7-14. Defendants incorporate by reference their response to Statement 21 and dispute Statement 29 to the extent Plaintiffs selectively quote the evidence out of context to make assertions about the language and operation of any Jones Day leave policy. Plaintiffs' gratuitous insertion of the phrase

"so-called" is argumentative, and Statement 29 does not cite any evidence to support the suggestion that Jones Day's short-term disability policy is somehow a sham. Statement 29 is disputed on those bases.

**REPLY:** Jones Day does not dispute any part of this statement aside from its use of the term "so-called." The statement is thus otherwise admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

30. According to Dressing, "an equal amount of paid family leave would also be provided to male associates." Dressing Decl. ¶ 13.

**RESPONSE:** Undisputed.

31. In other words, Jones Day decided that it would offer leave that it *labeled* family leave to new fathers and new mothers equally. Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16.

**RESPONSE:** Undisputed that following changes to its policies implemented in 1994, Jones Day provided family leave to new fathers and new mothers equally. Statement 31 is otherwise argumentative and cites to no evidence suggesting that "family leave" was merely a "label." On that basis, it is disputed.

**REPLY:** This statement is not genuinely disputed. There is no genuine dispute that the eight weeks of "disability" leave extended to new mothers under the 1994 policy did not depend on disability. PSF ¶¶ 21, 24. Nor is there any dispute that Jones Day explicitly referred to four of the weeks of paid leave as "family leave." PSF ¶ 14. Finally, there is no dispute that Jones Day only provided the four weeks of paid leave that it referred to as "family leave" to new fathers. PSF ¶¶ 14, 30.

**32.** But Jones Day decided that, if it "assumed" that eight of the weeks of paid leave it gave to new mothers was "disability" or "medical" leave, it would not offer that leave to new fathers. Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

**RESPONSE:** Undisputed that Jones Day does not offer salary continuation for postpartum disability to those associates who have not delivered a child. Statement 32 is otherwise argumentative interpretation of the evidence and on that basis disputed. Following enactment of the federal Family Medical Leave Act, Jones Day amended its leave policies to differentiate between disability leave and family leave, and made those leaves available on a gender-neutral basis. The disability policy implemented at that time included a presumption that healthcare providers certify an eight-week period of disability for childbirth without complications. The basis for that presumption is set out at Paragraph 11 of Dressing's declaration and includes, *inter alia*, familiarity with both actual postpartum disability certifications, and insurance practices standards. Plaintiff's own expert corroborated that testimony by opining that providers generally "authorize a 6-week disability for an uncomplicated vaginal birth and 8 weeks for an uncomplicated cesarean delivery." Chase Ex. 87, Naylor Report at 2. Dr. Naylor's own practice is to certify six to eight weeks of disability when the type of delivery is unknown. Chase Ex. 90, Naylor Tr. 30:20-31:15, 108:5-111:1. Unum offered 8 weeks of disability for all births when first becoming the administrator of Jones Day's short-term disability policy, and presumptively considers a disability period of up to eight weeks as standard for any childbirth without complications. Chase Ex. 8 at JD_00003278; Latham Decl. at ¶¶ 10-13. While Plaintiffs purport to dispute those facts, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶¶ 88-93.

**REPLY:** Jones Day disputes this statement on the ground that it is a supposedly "argumentative interpretation of the evidence." That is inaccurate and it is not a legitimate basis for disputing a statement. *See* Preliminary Statement A. Jones Day does not otherwise dispute any part of this statement. (To the contrary, Jones Day, admits the substance of it elsewhere, *see* PSF ¶ 33 (Jones Day's response).). The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day's factual assertions are not responsive to this statement and should be disregarded. They are also inaccurate and/or irrelevant as demonstrated in PSF ¶¶ 153-204 and JDSF ¶¶ 31, 57, 60, 62-69 (Plaintiffs' responses). Moreover, Jones Day maintains that Dressing's analysis was "privileged" and, on that basis, has withheld virtually all contemporaneous documents. *E.g.*, Sheketoff Ex. 1. Plaintiffs object to Jones Day's partial disclosure and reliance upon of the alleged substance of the allegedly privileged investigation and analysis allegedly performed by its alleged counsel.

33.     "By assuming that a physician would certify an eight-week disability period for new mothers who underwent childbirth without complications," Jones Day determined that it would offer new fathers four weeks of paid leave. Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6) at 198:16-200:16, 215:4-217:4.

**RESPONSE:** Undisputed. Defendants also incorporate by reference their response to Statement 32.

34.     Accordingly, in 1994, Jones Day began to offer fathers four weeks of paid leave in connection with a new child. Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98; Dressing Decl. ¶ 9; Chase Ex. 76 (Bounds 30(b)(6) at 198:16-200:16, 215:4-217:4.

**RESPONSE:** Undisputed.

35.     At the time Jones Day adopted the eight-week "assumption" of disability for all new mothers in 1994, Dressing's experience was that, when asked to certify the length of disability to employers or insurers, doctors would typically certify a period of six weeks of disability after an uncomplicated vaginal birth, and would only "occasionally provide a second certification late in that six-week period certifying some additional time of disability leave."  Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

**RESPONSE:** Undisputed that in Dressing's experience "physicians typically certified between six and eight weeks of disability for uncomplicated childbirth" and that "even when a physician certified six weeks of short-term disability from childbirth, employees would occasionally provide a second certification late in that six-week period certifying some additional time of disability leave." Dressing Decl. at ¶ 11.a. The remainder of Statement 31 is argumentative and disputed. Jones Day does not offer any assumption of disability to all "new mothers." A new mother who has not given birth is not entitled to any short-term disability benefit due to childbirth. *See* DSF ¶ 108. While Plaintiffs purport to dispute that fact, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶ 108. Defendants also incorporate by reference their response to Statement 32.

**REPLY:** Jones Day disputes only this statement only insofar as it regards all "new" mothers rather than all "birth" mothers.  (*But see* Plaintiffs' responses to JDSF ¶¶ 107-08.)  Jones Day does not dispute any other parts of this statement, which are therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

36.     Under its own framework for determining how much family leave to offer to fathers, if Jones Day had assumed a physician would certify a disability period shorter than eight weeks for some mothers, then it would have offered more than four weeks of leave to fathers in order to keep

new mothers' paid leave at 12 weeks.  Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

**RESPONSE:** Undisputed that the policies Jones Day implemented in 1994 made disability and family leave available on a gender-neutral basis. The remainder of Statement 36 is argumentative and sets out a hypothetical, does not call for a response, and is on that basis disputed.

**REPLY:** Jones Day says that it disputes this statement because it supposedly is argumentative and sets out a hypothetical.  These conclusory assertions do not suffice to create a genuine fact dispute, *see* Preliminary Statement A & C, and the statement is not argumentative in any event.  Nor is it hypothetical; it is a factual statement about the implications of Jones Day's own asserted framework for determining how much family leave to offer to fathers.  Jones Day also says that this statement does not "call for a response." But the Rules and this Court's standing order require a party to respond to each statement in order to preserve an argument that there is indeed a genuine dispute as the statement.  Local R. 7(h)(1); Standing Order 10(d)(iv)-(v).  Jones Day does not otherwise dispute any part of this statement.  *See also* PSF ¶ 33 (Jones Day's response).  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**37.**    Under its own framework for determining how much family leave to offer to fathers, if Jones Day had not made any "assumption" about what a physician would certify as a disability period for new mothers, then it would have offered more than four weeks of paid leave to fathers in order to keep new mothers' paid leave at 12 weeks.  Dressing Decl. ¶¶ 10, 12-14; Chase Ex. 76 (Bounds 30(b)(6)) at 198:16-200:16, 215:4-217:4.

**RESPONSE:** Undisputed that the policies Jones Day implemented in 1994 made disability and family leave available on a gender-neutral basis. The remainder of Statement 37 is argumentative and sets out a hypothetical, does not call for a response, and is on that basis disputed.

**REPLY:** Jones Day says that it disputes this statement because it supposedly is argumentative and sets out a hypothetical. These conclusory assertions are inadequate to create a genuine fact dispute, *see* Preliminary Statement A & C, and the statement is not argumentative in any event. Nor is it hypothetical; it is a factual statement about the implications of Jones Day's own asserted framework for determining how much family leave to offer to fathers. Jones Day also says that this statement does not "call for a response." But the Rules and this Court's standing order require a party to respond to each statement in order to preserve an argument that there is indeed a genuine dispute as the statement. Local R. 7(h)(1); Standing Order 10(d)(iv)-(v). Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

38.    Under the leave offerings in 1994, Jones Day gave adoptive parents four weeks of paid leave. Sheketoff Ex. 2 at JD_00003302; Sheketoff Ex. 1 at JD_00003296-98.

**RESPONSE:** Undisputed.

39.    The firm revised it manual again effective October 1, 1994, but made no material changes to its eight-week disability provision. Chase Ex. 6 at JD_00003542-43; Dkt. 189 at 17 ("disability provisions have not materially changed"); JDSF ¶ 106.

**RESPONSE:** Undisputed that both the policy language that Dressing proposed in December 1993 and the version of the Firm Manual effective October 1, 1994, state: "For routine pregnancy and delivery, physicians generally certify a six to eight week disability period." *See* Chase Ex. 6 at JD_0003542; Sheketoff Ex. 1 at JD_00003296. The reference to "eight-week

disability provision" in Statement 39 is disputed to the extent it is intended to refer to something other than the language in the Firm Manual providing that "For routine pregnancy and delivery, physicians generally certify a six to eight week disability period." Chase Ex. 6 at JD_0003542.

**REPLY:** Jones Day does not properly dispute any part of this statement.  *See also* JDSF ¶ 106.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

40.     Effective June 18, 1997, the firm revised its written manual to state, as Dressing had stated in her 1994 memo to female attorney, that for routine pregnancy and delivery, "the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability for a *longer period*."  Sheketoff Ex. 2 at JD_00003302 (emphasis added); Chase Ex. 7 at JD_00003683; Chase Ex. 76 (Bounds 30(b)(6)) at 184:8-24.

**RESPONSE:** Disputed to the extent that Plaintiffs seek to conflate Dressing's June 15, 1994 memorandum with the Firm Manual. The quoted language does not appear in the Firm Manual cited as Chase Ex. 7. Undisputed that the language quoted in Statement 40 appears (without Plaintiffs' argumentative italicization and other alterations) in Dressing's memorandum. Sheketoff Ex. 2. The version of the Firm Manual effective June 1, 1997, states: "For routine pregnancy and childbirth, physicians generally certify a six to eight week disability period. Thus, unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight week disability period for pregnancy and childbirth." Chase Ex. 7 at JD_00003683.

**REPLY:** As the cited evidence demonstrates, effective June 18, 1997, the firm revised its written manual to *incorporate* the 8-week disability rule explained by Dressing in her 1994 memo to female attorneys: "the [f]irm will assume that the disability period is eight weeks, unless the lawyer notifies the [f]irm that the doctor has certified disability for a *longer period*."  Sheketoff

Ex. 2 at JD_00003302 (emphasis added); Chase Ex. 7 at JD_00003683 ("unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight week disability period for pregnancy and childbirth"); Chase Ex. 76 (Bounds 30(b)(6)) at 184:8-24 (admitting that 1997 manual incorporates the clarifications made in Dressing's 1994 memo).

41.     Again, the firm made no material changes to its eight-week disability provision.  Chase Ex. 7 at JD_00003683; Dkt. 189 at 17.

**RESPONSE:** Undisputed that the Firm Manual effective June 1, 1997, states: "For routine pregnancy and childbirth, physicians generally certify a six to eight week disability period. Thus, unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight week disability period for pregnancy and childbirth." Chase Ex. 7 at JD_00003683. The reference to "eight-week disability provision" in Statement 41 is disputed to the extent it is intended to refer to something other than the language in the Firm Manual quoted in this response.

**REPLY:** Jones Day does not properly dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

### ii.     In 2015, Jones Day began to give mothers and adoptive parents 18 weeks.

42.     Jones Day made no changes to the amounts of its leave offerings for new parents between 1997 and 2014.  *Compare* Chase Ex. 7 at JD_00003683, *with* Chase Ex. 10 at JD_00003225-28; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20, 185:5-186:14.

**RESPONSE:** Undisputed that Jones Day did not make material changes to its leave policies for non-partner attorneys as they apply to childbirth between 1997 and 2014.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**43.**    As in prior versions, the 2014 firm manual further read: "In the event a [non-partner lawyer] has a newborn or newly adopted child, … the [f]irm provides up to four weeks of paid family leave, with fringe benefits continuing as though actively at work."   Chase Ex. 10 at JD_00003226.

>    **RESPONSE:** Undisputed.

**44.**    In other words, up to and including 2014, Jones Day provided new mothers 12 weeks of paid leave (eight weeks of which were deemed "disability" leave from 1994 on), and provided fathers and adoptive parents four weeks of paid leave.   Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Sheketoff Ex. 1 at JD_00003296-98; Chase Ex. 5 at JD_00003300; Chase Ex. 6 at JD_00003542; Chase Ex. 7 at JD_00003683; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20, 185:5-186:14; Dressing Decl. ¶ 15.

>    **RESPONSE:** The language of the relevant policies is undisputed. Statement 44, which begins "in other words," is argumentative interpretation and is disputed, including based on the undisputed evidence related to the Firm's assumption that a lawyer's medical provider has certified an eight week disability period for childbirth. Defendants incorporate by reference their responses to Statements 21 and 32.

>    **REPLY:** As the language in this statement makes clear, it is not making an assertion merely about what words are in Jones Day's firm manual (the meaning of which the Court has already held is ambiguous, *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020)); it is making a factual assertion about the leave offerings that Jones Day actually provides to new parents.  Jones Day's assertion that "[t]he language of the relevant policies is undisputed" is thus irrelevant.  Jones Day purports to dispute this statement as "argumentative interpretation" but that is neither accurate nor a proper basis to dispute a statement. *See* Preliminary Statement A.  Jones

Day also disputes the statement based on "evidence related to the [f]irm's assumption that a lawyer's medical provider has certified an eight week disability period for childbirth." But Jones Day fails to explain how any such "evidence" demonstrates a dispute as to this statement, or even what evidence it is referring to. That does not suffice to create a genuine dispute of fact. Fed. R. Civ. Proc. 56(c)(1). In any event, the record evidence directly supports this statement, as the cited sources demonstrate. Jones Day's responses to PSF ¶¶ 21 and 32 similarly fail to cast any doubt on this statement. *See* PSF ¶¶ 21, 32 (Plaintiffs' replies). This statement is not genuinely disputed.

45.     And as had been the case since 1994, in 2014 if a new mother notified Jones Day that her doctor had certified *more* than 8 weeks of disability leave, she could receive more than 12 weeks of paid leave after childbirth—but she would still be eligible for 12 weeks of paid leave if she were disabled for less than eight weeks. Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Sheketoff Ex. 1 at JD_00003296-98; Chase Ex. 5 at JD_00003300; Chase Ex. 6 at JD_00003542; Chase Ex. 7 at JD_00003683; Sheketoff Ex. 4 at JD_00005125; Dressing Decl. ¶¶ 9, 15; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-139:20, 185:5-186:14; Dkt. 189 at 17; JDSF ¶ 106.

**RESPONSE:** Undisputed that between 1994 and 2014, a new mother could receive more than eight weeks of disability leave. The remainder of Statement 45 is disputed. Defendants incorporate by reference their responses to Statements 21 and 32.

**REPLY:** Jones Day's responses to PSF ¶¶ 21 and 32 cast no doubt on this statement. *See* PSF ¶¶ 21, 32 (Plaintiffs' replies). This statement is not genuinely disputed.

46.     Indeed, as of July 2014, Jones Day "explain[ed its] own policy" this way on its website:

Paid Medical, Maternity and Family Leave: The Firm provides salary continuation in the event of a major illness or medical condition, including pregnancy, childbirth and related medical conditions, as follows: full salary and benefits for up to the first 13 weeks of continuous disability and 75% of salary

and full benefits for up to the 14th through 26th weeks of continuous disability. For routine childbirth (including caesarean-section births), the Firm will assume an eight-week disability period, unless we are notified that the Associate is disabled for a longer period.  Further, in the event an Associate has a newborn or newly adopted child, … the Firm provides up to four weeks of paid family leave with fringe benefits as though actively at work.  Thus the available leave for routine childbirth generally includes an eight-week paid medical leave and a four-week paid family leave, *for a total of twelve weeks of paid leave,* and with approval, up to an additional 12 weeks of unpaid leave with benefits continued at the Associate's expense.

Sheketoff Ex. 4 at JD_00005125 (emphasis added).

**RESPONSE:** Undisputed that the quoted language has appeared on Jones Day's website, which does not purport to be an official plan document and states what the available leave times "**generally**" include. Sheketoff Ex. 4 at JD_00005125. Individuals who are offered employment as an associate with Jones Day are provided a more detailed description of the Firm's employment policies in connection with their employment than the summary provided on the Firm website, and informed that "[f]or routine childbirth (including cesarean-section births), unless the Firm is notified otherwise, it will assume an 8-week disability period." *See* Chase Reply Ex. 91 at P02501 (Sheketoff Offer of Employment attaching Statement of Benefits); Chase Reply Ex. 92 at P02742 (Savignac Offer of Employment attaching Chase Ex. 2). They are also provided the full detail in those official plan documents and again told "these provisions apply to … Associates … who are employed on a salaried basis." McClure Ex. 1 at JD_00002481; Chase Ex. 76, Bounds Tr. 31:9-13. For associates who seek birth-related leave, HR staff goes over the policy with them and, if applicable, the Firm also provides separate notice that salary continuation under the Firm's short-term disability policy is subject to potential repayment to the extent the person does not qualify for that benefit. Chase Ex. 76, Bounds Tr. 31:14-32:14; McClure Ex. 2. While Plaintiffs purport to dispute some of these facts, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶¶ 112-13.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In fact, the new documents that Jones Day cites in its response simply buttress the point.  *See* Chase Ex. 91 at P02501 ("Thus, the available leave includes an eight-week paid medical leave and a four-week paid family leave, *for a total of twelve weeks paid leave*, and with approval, up to an additional 12 weeks of unpaid leave with benefits continued at the lawyer's expense."); Chase Ex. 92 at P02742 ("*for a total maternity leave of 24 weeks post-partum*" (emphasis added)); McClure Ex. 1 at JD_00002485 ("the 18 weeks of paid leave").  Moreover, Jones Day's nonresponsive assertion that the written short-term disability leave constitutes an "official plan document[]" is inaccurate.  The firm's short-term disability policy is a salary-continuation policy funded by Jones Day itself; it is not an insurance contract or an ERISA defined benefit plan.  PSF ¶¶ 189-190.  Indeed, the written short-term disability policy itself declares: "*This payroll practice* provides some level of salary continuation .…  *It is not subject to ERISA*."  McClure Ex. 1 at JD_00002483.  Thus the written short-term disability policy—just like Jones Day's website descriptions, its family leave policy, and innumerable other evidence demonstrating that Jones Day gives all new mothers 8 weeks of "disability" leave without regard to disability—is simply evidence of what the actual policy (practice) is.  Anyway, no law suggests that "employment practices" in Title VII cases can only be evidenced by "official plan documents," or even that plan documents deserve any more weight than other statements by the employer of the practice it will follow.

**47.**   In 2014, Sarah McClure (the firm's human resources director), ▮▮▮▮Staff C▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮, Sharyl Reisman (the firm's hiring partner), ▮▮▮▮Staff D▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮, Carter DeLorme (the firm's diversity partner), and Michael Shumaker (the firm's administrative partner) worked together to consider whether to recommend

that the firm make changes to its maternity leave offerings.  Chase Ex. 81 (Shumaker) at 184:17-186:7.

**RESPONSE:** Undisputed that each of the individuals identified here had some involvement in a process that culminated with a proposal to Jones Day's Managing Partner to make certain changes to the Firm's policy on family leave. Disputed to the extent the term "maternity leave offerings" as used in Statement 47 is intended to imply that these individuals made proposals with respect to Jones Day's short-term disability policy. Shumaker, Reisman, and DeLorme only proposed changes to the Firm's family leave policies; they did not make any proposed changes to Jones Day's short-term disability policy. Chase Ex. 10.

**REPLY:** This statement is not genuinely disputed.  The cover email specifically describes the memo as "relating to some proposed changes to the [f]irm's *maternity* and adoption policies."  Chase Ex. 10 at JD_00003215 (emphasis added).  The memo is entitled "*Maternity*/Adoption Leave Benefit Recommendation."  *Id.* at JD_00003216 (emphasis added). The memo makes clear that it recommended a change from a 12-week block of paid maternity leave to an 18-week block of paid maternity leave, without distinguishing between any so-called "disability" and "family" leave.  PSF ¶¶ 70-73.

48.    As part of that effort, ██████Staff C██████ compiled and circulated to the group a lengthy chart on "the paid maternity currently being offered by the AmLaw 50."  Sheketoff Ex. 4 at JD_00005125-29.

**RESPONSE:** Undisputed.

49.    In her chart, ████Staff C████ identified Jones Day as providing a "Paid Maternity Leave" of "12 weeks paid" and "up to 12 weeks unpaid" while providing a "Paid Paternity Leave" of "4 weeks."  Sheketoff Ex. 4 at JD_00005125, JD_00005127.

**RESPONSE:** Undisputed.

50.   ▉▉Staff C▉▉   also circulated to the group a chart listing Jones Day's "Internal Office Maternity Leave Policies."  Sheketoff Ex. 5 at JD_00005102-07.

**RESPONSE:** Disputed in that the phrase "Internal Office Maternity Leave Policies" is not included anywhere in Sheketoff Ex. 5, which does include a chart titled "Jones Day International Office Maternity Leave Policies (2014)."

**REPLY:** Jones Day has corrected a typo: "Interna[tiona]l."  The statement is otherwise undisputed.

51.   In that chart, she identified Jones Day's United States offices as providing a "Maternity Leave Policy" of "84 calendar days [i.e., 12 weeks] paid" and "up to 84 calendar days [i.e., 12 weeks] unpaid."  Sheketoff Ex. 5 at JD_00005103.

**RESPONSE:** Undisputed.  This short-form chart does not supersede the benefit plan documents that govern the benefits provided to associates. Defendants incorporate by reference their response to Statement 46.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day's supplemental statement and cross reference are nonresponsive and should be disregarded.  They are also inaccurate.  The written short-term disability leave policy is not a "benefit plan document."  Short-term disability leave is a salary-continuation practice funded by Jones Day itself—not an insurance contract or an ERISA defined benefit plan.  PSF ¶¶ 189-190.  Indeed, the written short-term disability policy itself declares: "*This payroll practice* provides some level of salary continuation …. *It is not subject to ERISA*."  McClure Ex. 1 at JD_00002483 (emphasis added).  Thus the written short-term disability policy—just like Shumaker's chart, the firm's written family leave

policy, and innumerable other evidence demonstrating that Jones Day gives all new mothers 8 weeks of so-called "disability" leave without regard to disability—is simply evidence of what the actual policy is.

**52.**     Together with ███Staff D███ , ███Staff C███████ also drafted and distributed to the group a draft memorandum ████████████████████████████████████

████████████████"  Sheketoff Ex. 16 at JD_00005133.

**RESPONSE:** Undisputed.

**53.**     The  draft  memorandum  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████."  Sheketoff Ex. 16 at JD_00005130-36.

**RESPONSE:** Undisputed that since 1994 Jones Day has assumed that a lawyer's medical provider has certified an eight week disability period for pregnancy and childbirth, and that the Firm has also provided a separate family leave benefit. The remainder of Statement 53 is argumentative interpretation of evidence and on that basis disputed. Neither the draft memorandum cited here nor the final version of that memorandum submitted to Jones Day's Managing Partner purports to describe in full Jones Day's leave policies or includes any meaningful reference to Jones Day's short-term disability policy. *See* Chase Ex. 10; *see also* Sheketoff Ex. 16. Defendants also incorporate by reference their response to Statement 46.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, Jones Day's admission that the draft memorandum does not include "any

meaningful reference to Jones Day's short-term disability policy" corroborates this statement; Jones Day's "maternity" leave offerings are not about disability.

**54.**     Indeed, 

Sheketoff Ex. 16 at JD_00005131 (emphasis added).

**RESPONSE:** Undisputed that the reference to Jones Day's Careers website and the quoted language appear in Sheketoff Ex. 16. The remainder of statement 54 is argumentative interpretation of the evidence and disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."   That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**55.**     The remaining pages of the memo .  Sheketoff Ex. 16  at JD_00005132

), JD_00005133

), JD_00005134

).

**RESPONSE:** Undisputed that the quoted language appears in Sheketoff Ex. 16.  The remainder of statement 55 is argumentative interpretation of the evidence and disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**56.**      Similarly, the memo recommends



.  Sheketoff Ex. 16 at JD_00005132 ("                "), JD_00005133 ("                "), JD_00005134 ("                "), JD_00005134 ("                "), JD_00005135 ("                ").

**RESPONSE:** Undisputed that the quoted language appears in Sheketoff Ex. 16.  The remainder of statement 56 is argumentative interpretation of the evidence and disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**57.**      The draft memo also



"  Sheketoff Ex. 16 at JD_00005134.

**RESPONSE:** Undisputed that the quoted language appears in Sheketoff Ex. 16. The remainder of Statement 57 is argumentative interpretation of the evidence and disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence." That is neither accurate nor a basis to dispute a statement. *See* Preliminary Statement A. Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

58.    Thus, the draft memo ████████████████████████████████████ ████████████████████████." Sheketoff Ex. 16 at JD_00005134.

**RESPONSE:** Undisputed that the quoted language appears in Sheketoff Ex. 16. The remainder of Statement 58 is argumentative interpretation of the evidence and disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence." That is neither accurate nor a basis to dispute a statement. *See* Preliminary Statement A. Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

59.    Thereafter, Michael Shumaker noted that he planned to make edits to the memo, but raised a "question" about the recommendation for increasing adoptive leave:

> I question whether it makes sense to go to the full 18 paid weeks leave for adoption. Arguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth. That doesn't happen with adoption and thus some would say they are getting more benefit than those who deliver the children. I sort of like the Skadden approach. 18 weeks for birth mom; 12 weeks for primary caregiver. Thoughts?

Chase Ex. 9 at JD_00005118.

**RESPONSE:** Undisputed.

60.     DeLorme responded: "The rationale for the 18 weeks for adoption to mirror the same time as births was based on the primary caregiver[']s role in bringing the child into the family…. We thought the adoption leave should be parallel to the maternity leave for the primary caregiver because the functions are the same.  I respectfully disagree with making a distinction between maternity leave and primary caregiver adoption leave."  Chase Ex. 9 at JD_00005118.

**RESPONSE:** Undisputed that the quoted language in Statement 60 appears at JD_00005117-18 of Chase Exhibit 9.

61.     ███ Staff C ██████████████████████████████████████████

████████████████████████████████████████████████████████

replied: "I'm with Carter on this one.  And, personally, I was very much out and about within days after having babies.  I know that may not be the 'norm,' but the point is that I still very much appreciated the extended period at home to acclimate and adjust to our new life."  Chase Ex. 9 at JD_00005117; Chase Ex. 81 (Shumaker) at 182:2-184:9.

**RESPONSE:** Undisputed, except to the extent Plaintiffs are implying anything about ███ Staff C ███'s medical condition and postpartum disability. To that extent, Statement 61 is disputed for lack of any supporting evidence. There is no evidence in the record regarding what ███ Staff C ███'s physician certified beyond the consensus testimony from experts that it is standard practice to certify disability from childbirth as six to eight weeks. Chase Ex. 85, Colie Report at 2; Chase Ex. 90, Naylor Tr. 30:20-31:15, 108:5-111:1.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.   Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  *Plaintiffs* are not

"implying anything about ███████ medical condition and postpartum disability." ███████ ██████ described her (lack of) postpartum disability during the eight-week "disability" period herself in the undisputed text quoted above: "I was very much out and about within days after having babies," though she appreciated taking the "extended period" of leave that is denied to birth fathers because it gave her time "at home to acclimate and adjust to our new life."

62.     After "ponder[ing] a bit," Shumaker circulated his suggested revisions to the memo to the committee.  Chase Ex. 9 at JD_00005117; Sheketoff Ex. 8 at JD_00005410-16.

**RESPONSE:** Undisputed.

63.     Shumaker ████████████████████████████████████ ██████████████████████████████████████████.  Sheketoff Ex. 8 at JD_00005141-46 (███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████").

**RESPONSE:** Undisputed that the quoted language appears in Sheketoff Ex. 8 and that ████████████████████████████████████████████ ██████████████████.  The remainder of Statement 63 is argumentative interpretation of the evidence and disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes some unidentified part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not

otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.

Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

64.     On November 12, 2014, the group provided its final memo to Brogan.  Chase Ex. 10 at

JD_00003214-3228.

**RESPONSE:** Undisputed that on November 12, 2014, Michael Shumaker circulated

the final memorandum to Jones Day's Managing Partner; that the final memorandum was signed

by Michael Shumaker, DeLorme, and Reisman; and that Shumaker's email to the Managing

Partner copied Resiman and DeLorme (as well as Mary Ellen Powers). Disputed that the "group"

deciding what recommendations to make included McClure, ███████████, or ███████

Chase Ex. 81, Shumaker Tr. 184:1-186:5.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make

any assertion about who decided what recommendations to make (though in fact McClure, ███████

███████ and ███████ did help decide what recommendations to make, *see, e.g.*, Sheketoff Ex.

16 at JD_00005130).  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v);

Local R. 7(h)(1).

65.     The final memo "recommend[ed] that the [f]irm implement the following policy

changes in our domestic offices: [1] Increase paid maternity leave from 12 weeks to 18 weeks.

Total maternity leave would remain at 24 weeks (i.e., decreasing permissible unpaid leave from

12 weeks to 6 weeks). [2] Provide 18 weeks of paid adoption leave to primary caregivers.  Total

adoption leave would also be extended to the 24 weeks permitted for combined paid/unpaid

maternity leave.  [3] Provide 4 weeks of paid adoption leave for secondary caregivers.  This would

match the 4 weeks of paternity leave that we currently provide."  Chase Ex. 10 at JD_00003216-

17.

**RESPONSE:** Undisputed.

66.     In supporting the recommendation for changing adoption leave, the final memo explained: "[P]arental reactions to and needs after adoption are not dissimilar to those experienced by biological parents.  We recommend bringing our paid adoption leave in line with our maternity and paternity leave policies (18 weeks paid and 6 weeks unpaid leave for primary caregivers and 4 weeks paid leave for secondary caregivers)."  Chase Ex. 10 at JD_00003219.

**RESPONSE:** Undisputed that the quoted text appears in Chase Ex. 10, subject to typographical errors in Statement 66 that are inconsistent with the exhibit.

67.     The final memo thus equated new mothers with "primary caregivers" and new fathers with "secondary caregivers."  Chase Ex. 10 at JD_00003219.

**RESPONSE:** Statement 67 is argumentative interpretation of the evidence and is disputed. The memo never states that all mothers are primary caregivers or that all fathers are secondary caregivers. Defendants also incorporate their responses to Statements 46 and 53 and further state that the Firm changed the policies recommended in this memorandum to provide primary- and secondary-caregiver family leave on a gender-neutral basis to both birthparents and adoptive parents. Chase Ex. 12 at JD_00003158.

**REPLY:** Jones Day disputes this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  And the memo expressly (and undisputedly) indicates that, in the drafters' view, birth mothers are primary caregivers and birth fathers are secondary caregivers.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**68.**     The final memo also justified providing the same amount of leave to primary caregiver adoptive parents (who do not give birth) and to new biological mothers (who do give birth) on the ground that "parental reactions to and needs after adoption are not dissimilar to those experienced by biological parents"—despite the fact that (as the committee had discussed) adoptive parents do not give birth and thus are not disabled as a result of childbirth.  Chase Ex. 10 at JD_00003219; Chase Ex. 9 at JD_00005118 ("Arguably, some chunk of time is included in the leave because the mother must recuperate from the actual birth.  That doesn't happen with adoption….").

**RESPONSE:** Statement 68 is argumentative interpretation of the evidence that selectively quotes the referenced sources, seeks to raise negative inferences from the absence of particular discussions or clarifying language in a memo that recommends expanding family leave to "bring us to market" and because it would be "helpful in recruiting efforts," and is disputed. Chase Ex. 10 at JD_00003219. It is indisputable (and undisputed) that individuals who give birth face physical disabilities from childbirth. Moreover, Delorme, the Firm Diversity Partner, also argued that 18 weeks of paid family leave for the primary caregiver of adopted children would send "a particularly strong message to the LGBT community, especially gay men who would have to adopt." Chase Ex. 9 at JD_00005118. And Michel Shumaker—who also revisited the question of leave for adoptive parents in 2015—testified that he was aware that "adopted leave policy is really different from a birthing maternity or paternity policy," as "adoptions are difficult and unique, and have special concerns" not present with the birth of a biological child. Chase Ex. 81, Shumaker Tr. 213:9-18, 214:2-4; *see also* Chase Ex. 13 at JD_00003822.

**REPLY:** Jones Day disputes this statement on the ground that it is supposedly an "argumentative interpretation of evidence" and "seeks to raise negative inferences."  That is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones

Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day's supplemental statements (beginning with "It is indisputable") are nonresponsive and should be disregarded.  Shumaker's testimony concerned a supposed conversation he had in October 2015—a year *after* the final memo was provided to Brogan—making it irrelevant to the firm's rationale for adopting the policy announced in January 2015.  A reasonable jury would also discredit Shumaker's account of this purported conversation based on its marked inconsistency with the written communications on the topic, Shumaker's inability to remember key details about it, the lack of any corroborative evidence that it occurred, and Shumaker's impeachable testimony on other topics.  *E.g.*, Chase Ex. 81 (Shumaker) at 212:8-214:4 (claiming that Staff B advocated not changing the 18-week adoptive leave period because the "adopted leave policy is really different from a birthing maternity or paternity policy"); Chase Ex. 13 at JD_00003822 (Staff B's written response stating that "changing the leave amounts can be confusing—especially if we don't advertise the changes" and that "[i]f we go this route, I think we have to tell people"); *see also* JDSF ¶¶ 146-49 (Plaintiffs' responses).

**69.**    Nothing in the final memo said anything about any *differences* between adopting a child and bringing home a biologically related newborn, or about any complexities or challenges involved with the process of adopting a child or bringing an adopted child into a new home.  Chase Ex. 10 at JD_00003215-28.

**RESPONSE:** Statement 69 is argumentative interpretation of the evidence that seeks to raise negative inferences from the absence of particular discussions or clarifying language in a memo that recommends expanding family leave to "bring us to market" and because it would be "helpful in recruiting efforts," and is disputed. Chase Ex. 10 at JD_00003219. No conclusions can

be drawn based on the absence of a particular discussion. Defendants also incorporate by reference their response to Statement 68.

**REPLY:** Jones Day disputes this statement on the ground that it is supposedly an "argumentative interpretation of evidence." That is neither accurate nor an adequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Moreover, the absence of an event that would have been expected if a certain fact were true is evidence that the fact is not true: "the fact that the dog did not bark can itself be significant." *E.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 589 (1982) (Stevens, J., dissenting). The memo provides the partners' reasons for recommending that Brogan treat adoptive primary caregivers like birth mothers and states that their needs are not dissimilar. That is conclusive evidence that the change was not actually made based on any belief that their needs *are* dissimilar.

70.     The final memo makes clear that the Jones Day's current maternity leave benefit was "12 weeks" and that the recommendation was to increase the maternity leave benefit to "18 weeks"—with "[t]otal maternity leave remaining at 24 weeks." Chase Ex. 10 at JD_00003215-28.

**RESPONSE:** Statement 70 is argumentative interpretation of the evidence and is disputed. The memo details that "the Firm currently provides mothers an eight-week paid medical leave and a four-week paid family leave, for a total of twelve weeks paid leave, and with approval, up to an additional 12 weeks of unpaid leave with benefits continued at the Associate's expense" and recommended that the Firm "increase its paid maternity leave policy from 12 weeks to 18 weeks" thus "reducing the current unpaid maternity leave from 12 weeks to 6 weeks" in order to match the market and accommodate female attorneys' historical use of unpaid leave and likely use

of additional unpaid time "if it were financially feasible for them." Chase Ex. 10 at JD_00003217-18. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** This statement is not genuinely disputed. Jones Day claims that this statement is supposedly an "argumentative interpretation of evidence." That is inaccurate and inadequate to create a genuine dispute. *See* Preliminary Statement A. Jones Day also quotes from the memo, but the quoted language cites fully supports this statement (and Jones Day provides no explanation suggesting the contrary).

71.     Indeed, one section of the final memo states that "the [f]irm currently provides mothers an eight-week paid medical leave and a four-week paid family leave, *for a total of twelve weeks paid leave*." Chase Ex. 10 at JD_00003217 (emphasis added).

**RESPONSE:** Undisputed that the quoted language appears in Chase Ex. 10. The remainder of Statement 71 is argumentative interpretation of the evidence and is disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence." That is neither accurate nor an adequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

72.     The rest of the memo simply refers to the available maternity leave as consisting of "12 weeks" of paid leave. Chase Ex. 10 at JD_00003217 ("12 weeks"), JD_00003218 ("their 12 weeks paid leave"), JD_00003219 ("12 weeks"; "12 week paid leave"), JD_00003222 ("12 weeks paid").

**RESPONSE:** Undisputed that the quoted language appears in Chase Ex. 10.  The remainder of Statement 72 is argumentative interpretation of the evidence and is disputed. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**73.** Similarly, the final memo recommends increasing the "paid maternity leave … to 18 weeks," with no distinction between the so-called "eight-week paid medical leave" and any purportedly distinct period for family leave.  Chase Ex. 10 at JD_00003217 ("18 weeks"), JD_00003218 ("18 weeks paid leave"), JD_00003219 ("18 weeks"; "18 week paid leave").

**RESPONSE:** Undisputed that the quoted language appears in Chase Ex. 10.  The remainder of Statement 73 is argumentative interpretation of the evidence that seeks to raise negative inferences from the absence of particular discussions or clarifying language in a memo that recommends expanding family leave to "bring us to market" and because it would be "helpful in recruiting efforts," and is disputed. Chase Ex. 10 at JD_00003219. No conclusions can be drawn based on the absence of a particular discussion or language. Defendants also incorporate their responses to Statements 46 and 53.

**REPLY:** Jones Day disputes part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R.

7(h)(1).  Moreover, the absence of an event that would have been expected if a certain fact were true is evidence that the fact is not true.  *E.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 589 (1982) (Stevens, J., dissenting) ("the fact that the dog did not bark can itself be significant").

**74.**     Brogan made the decision that Jones Day's policy should be changed as recommended by the final memo.  Chase Ex. 77 (Brogan) at 92:12-15.

      **RESPONSE:** Undisputed.

**75.**     On January 22, 2015, McClure emailed the firm to announce the "Change in Firm Maternity, Paternity and Adoption Leave Policy for Lawyers."  Chase Ex. 11 at JD_00005170.

      **RESPONSE:** Undisputed.

**76.**     Shumaker and Brogan both reviewed and approved McClure's announcement before it was distributed.  Sheketoff Ex. 9 at JD_00005164-69; Chase Ex. 81 (Shumaker) at 201:13-21.

      **RESPONSE:** Undisputed.

**77.**     The announcement stated that, effective January 1, 2015:

> [1] The [f]irm will provide mothers a total of 18 weeks of paid leave post-partum (with the first 8 weeks paid under the [f]irm's STD policy and the next 10 weeks paid under the [f]irm's paid family leave policy) and, with approval, up to an additional 6 weeks of unpaid leave, for a total maternity leave of 24 weeks post-partum. [2] Fathers are entitled to a paid paternity leave of 4 weeks as is the current policy.  [3] In the case of adoptions, the [f]irm will provide 18 weeks of paid adoption leave to the primary caregiver and, with approval, up to an additional 6 weeks of unpaid leave, for a total adoption leave of 24 weeks. Secondary caregivers are entitled to 4 weeks of paid adoption leave.

Chase Ex. 11 at JD_00005170.

      **RESPONSE:** Undisputed that the quoted language appears in Chase Ex. 11, along with text that Plaintiffs omit, including: "The remainder of the Firm's policies with respect to maternity, paternity and adoption leave are set out in the Firm Manual." Chase Ex. 11 at JD_00005170. The Firm Manual at that time included the language that "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week,

post-partum disability period for routine pregnancy (including cesarean-section births)." Sheketoff Ex. 13 at JD_00000338.

    **REPLY:**   Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day's supplemental statements (beginning with the text "along with text") are nonresponsive and should be disregarded.  In any event, Jones Day's statements are highly misleading.  The firm's manual was *never amended* to incorporate the policy announced by McClure and implemented on January 1, 2015.  Sheketoff Ex. 174 at JD_00000669 (███████████████████████████████ ███████████); Sheketoff Ex. 173 at JD_00003799 ("████████████████████████").  The version of the firm manual in place at the time of McClure's announcement (which Jones Day only selectively quotes above) thus reflects the firm's *prior* policy that new mothers receive "four weeks of paid family leave" and an eight-week disability period—for a total of 12 weeks of paid leave— rather that the amended policy of "a total of 18 weeks of paid leave post-partum" effective January 1, 2015.  Sheketoff Ex. 13 at JD_00000338.  McClure's email's reference to the "*remainder* of the firm's policies with respect to maternity, paternity and adoption leave … set out in the firm manual" was thus incoherent—and in no way did the never-amended firm manual override the terms of the announcement.  Indeed, it is undisputed that, despite the firm manual's contrary text, the amount of leave labeled "family leave" given to birthmothers was ten weeks in January 2015, not four (PSF ¶¶ 73-74, 105), and the amount of leave adoptive parents received was 18 weeks in January 2015, not four (PSF ¶ 108).  Moreover, in referring to the (non-existent) "*remainder*" of the firm's January 2015 policies, McClure's email plainly was not suggesting that those other documents would *undermine or contradict* (as opposed to potentially *supplement*) the policy changes announced in the email.  The reference to the "*remainder*" of the policies also confirms

that the announcement itself was policy—undermining Jones Day's assertions elsewhere that the written documents in the firm manual are the only relevant documents.

**78.**     As the announcement made clear, effective January 1 of 2015, every new mother would receive at least 18 weeks of paid leave, without regard for disability.   Chase Ex. 11 at JD_00005170; Chase Ex. 10 at JD_00003215-3228.

> **RESPONSE:** Statement 78 is argumentative interpretation of the evidence and is disputed. The announcement explicitly disclaims that it is a full description of the relevant policies and refers associates to the Firm Manual for the full detail of those policies, and the Firm Manual in effect at that time explained that "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy (including cesarean-section births)." Sheketoff Ex. 13 at JD_00000338. Defendants also incorporate by reference their response to Statement 21.

> **REPLY:** This statement is not genuinely disputed.  Jones Day disputes this statement on the ground that it is supposedly an "argumentative interpretation of evidence."  That is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also asserts that the "announcement disclaims that it is a full description of the relevant policies" and refers to the firm manual for the "remainder" of the policies.   Even accepting that characterization, it is not genuinely disputable (and apparently not disputed) that the text of McClure's email quoted in PSF ¶ 78 conveyed that all new mothers would receive 18 weeks of paid leave (irrespective of disability).   Whether or not that announcement purported to be a *complete* statement of the policy is irrelevant.   In referring to the "*remainder*" of the firm's January 2015 policies, McClure's email plainly was not suggesting that those other documents would *undermine or contradict* (as opposed to potentially *supplement*) the policy changes announced in

the email.  In any event, Jones Day's assertion is also misleading because the firm's manual was *never amended* to incorporate the policy announced by McClure and implemented on January 1, 2015.  Sheketoff Ex. 174 at JD_00000669 (███████████████████████████████████ ███████████); Sheketoff Ex. 173 at JD_00003799 ("████████████████████████").  The version of the firm manual in place at the time of McClure's announcement (which Jones Day only selectively quotes above) thus reflects the firm's *prior* policy that new mothers receive "four weeks of paid family leave" and an eight-week disability period—for a total of 12 weeks of paid leave— rather that the amended policy of "a total of 18 weeks of paid leave post-partum" effective January 1, 2015.  Sheketoff Ex. 13 at JD_00000338.  The manual also says that adoptive parents receive only four weeks of paid leave rather than the amended policy of 18 weeks of adoptive leave.  *Id.* McClure's email's reference to the "*remainder* of the firm's policies with respect to maternity, paternity and adoption leave … set out in the firm manual" was thus incoherent—and in no way did the never-amended firm manual override the terms of the announcement.  Indeed, it is undisputed that, despite the firm manual's contrary text, the amount of leave labeled "family leave" given to birthmothers was ten weeks in January 2015, not four (PSF ¶¶ 73-74, 105), and the amount of leave adoptive parents received was 18 weeks in January 2015, not four (PSF ¶ 108).

**79.**  For biological mothers, "the first eight weeks [were] *paid under* the Firm's STD policy," while "the next 10 weeks [were] *paid under* the Firm's paid leave policy."  Chase Ex. 11 at JD_00005170 (emphasis added).

**RESPONSE:** Undisputed that the quoted language appears in Chase Ex. 11 without Plaintiffs' argumentative italicizations and other alterations.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**80.**     Thus, as Dressing had previously explained, "the difference" between a mother's weeks of "disability" leave and her weeks of "family" leave is simply "the manner in which the leave is tracked administratively."   Sheketoff Ex. 2 at JD_00003302; *see also* Chase Ex. 76 (Bounds 30(b)(6)) at 247:8-248:2.

**RESPONSE:** Statement 80 is argumentative interpretation of the evidence and is disputed. The implication of Statement 80 that woman who give birth do not experience any disability is also disputed. The consensus testimony from experts that it is standard practice to certify disability from childbirth as six to eight weeks. Chase Ex. 85, Colie Report at 2; Chase Ex. 90, Naylor Tr. 30:20-31:15, 108:5-111:1.

**REPLY:** Jones Day disputes this statement on the ground that it is supposedly an "argumentative interpretation of evidence."   That is neither accurate nor a basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also disputes the "implication" that "woman [sic] who give birth do not experience any disability"—but this statement makes no such implication.  Jones Day does not otherwise dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day's assertion about the "consensus testimony" is nonresponsive and should be disregarded.  It is also false.  PSF ¶¶ 153-55.

**81.**     With both "disability" and "family" leave, the firm continues to pay the employee's salary itself during the leave.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

**RESPONSE:** Undisputed that Jones Day provides salary continuation under the terms of its short-term disability policy, as well as paid leave under its family leave policy.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**82.**     Jones Day does not obtain insurance from any third party to cover the "salary continuation" benefit.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

        **RESPONSE:** Undisputed.

**83.**     But the firm tracks the types of the different "kinds" of leave because "there is a specific amount of short-term disability benefit leave made available.  There is a specific amount of family leave made available under the policy.  And in order for us to know when that has been exhausted or how much it's been used, we need to track it."  Chase Ex. 76 (Bounds 30(b)(6)) at 242:20-243:2.

        **RESPONSE:** Undisputed.

**84.**     The value of the "disability" benefit drops down to 75% of salary after 13 weeks, and it ends entirely at 26 weeks.  McClure Ex. 1 at JD_00002483; Chase Ex. 76 (Bounds 30(b)(6)) at 243:3-11.

        **RESPONSE:** Undisputed, except that Plaintiffs' use of quotation marks is argumentative and on that basis disputed. Defendants further state that Jones Day offers long-term disability benefits that may apply in some cases. *See* McClure Ex. 1 at JD_00002485.

**85.**     So when it allots eight weeks of a new mother's leave to disability leave, Jones Day reduces the amount of additional paid leave (including the amount of disability leave at 100% salary continuation) that the mother will receive if she is disabled for *more* than eight weeks.  Chase Ex. 76 (Bounds 30(b)(6)) at 242:20-246:10, 248:23-249:18.

        **RESPONSE:** Undisputed that under Jones Day's short-term disability policy, an associate may receive up to 13 weeks of salary continuation at 100% salary, and an additional 13 week of salary continuation at 75% salary, and that time charged to short-term disability reduces proportionally the amount of benefit remaining. DSF ¶ 25. Statement 85 is otherwise argumentative interpretation of the evidence and on that basis disputed.

**REPLY:** Jones Day disputes some unidentified part of this statement on the ground that it is supposedly an "argumentative interpretation of evidence." That is neither accurate nor an adequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day does not otherwise dispute any part of this statement, which explains the significance of the firm's statement that the difference between "disability" leave and the preexisting maternity leave is how the leave is "tracked administratively." The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

### iii.    Later in 2015, Jones Day adjusted its leave policy for fathers.

**86.** On May 12, 2015, after discussing the matter with Julia and Aaron Tang, Sparkle Sooknanan spoke in person with Beth Heifetz about how Jones Day's parental leave offerings were inconsistent with EEOC guidance. Chase Ex. 80 (Sheketoff) at 208:20-212:22; Sheketoff Ex. 10 at P02720; Sheketoff Ex. 11 at JD_00001957.

**RESPONSE:** Undisputed that Sheketoff, Tang, and Sooknanan engaged in an email exchange in January 2015 regarding Jones Day's family leave policy and that Sooknanan communicated with Heifetz in May 2015 that the family leave policy was "problematic" in light of EEOC guidance. *See* Sheketoff Ex. 10; *see also* Chase Ex. 41. Disputed pursuant to Fed. R. Civ. P. 56(c) to the extent Statement 86 cites no admissible evidence regarding any other hearsay discussions between Sheketoff, Tang, and Sooknanan. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day does not dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day objects to this statement "to the extent [it] cites no admissible evidence regarding any other hearsay discussions between Sheketoff, Tang, and Sooknanan." This vague complaint fails to identify the specific

evidence objected to, and Plaintiffs do not understand what it means.  It is thus insufficient to raise an evidentiary objection.

87.    The next day, Sooknanan emailed Heifetz "to follow up" with "the relevant portion of the EEOC Guidance Document about parental leave that [she] was referring to yesterday." Sheketoff Ex. 11 at JD_00001957.

**RESPONSE:** Undisputed.

88.    Sooknanan advised Heifetz that, "I know this is not your area at all, but if you can point me to the right person in Benefits, I would be happy to share this with them," and noted that, under the EEOC guidance, "it seems like the firm's policy is a bit problematic."  Sheketoff Ex. 11 at JD_00001957.

**RESPONSE:** Undisputed.

89.    Sooknanan did not suggest that she would sue Jones Day.  Sheketoff Ex. 11 at JD_00001957.

**RESPONSE:** Statement 89 is argumentative interpretation of the evidence and is on that basis disputed. Sooknanan's email directed to her Practice Leader asserted that Jones Day's family leave policy was "problematic" because it provided different amounts of paid family leave to male and female associates. Also disputed pursuant to Fed. R. Civ. P. 56(c) to the extent Statement 89 is intended to refer to any inadmissible hearsay statements between Sooknanan and Jones Day.  *See* Fed. R. Evid. 801, 802.

**REPLY:** This statement is not genuinely disputed.  Jones Day asserts that this statement is an "argumentative interpretation of evidence."  That is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also disputes the statement "to the extent [it] is intended to refer to any inadmissible hearsay statements between

Sooknanan and Jones Day."  That vague complaint is insufficient to preserve any objection, and Plaintiffs do not understand what it means.  Conversations between Sooknanan and Jones Day about whether Sooknanan would sue Jones Day would not be introduced at trial for the truth of the matter asserted during the conversation, and would thus be definitionally not hearsay.  Fed. R. Evid. 801(c)(2).  Lastly, Jones Day notes that Sooknanan said that its policy was "a bit problematic."  That does not controvert this statement.

90.    Five days after Sooknanan's email, Jones Day revised the firm manual.  Chase Ex. 12 at JD_00003153-60.

**RESPONSE:** Undisputed.

91.    The revised manual for the first time created a distinction between "primary" and "secondary" caretakers for biological mothers and fathers.  Chase Ex. 12 at JD_00003158.

**RESPONSE:** Undisputed.

92.    Mothers are presumed to be primary caretakers.  See infra ¶¶ 93-95.

**RESPONSE:** Disputed.  Statement 92 cites no evidence, constitutes argument, and is improper under Local Rule 7(h). To the extent Statement 92 purports to incorporate other assertions, it is disputed based on the responses to those other assertions. Moreover, Plaintiffs' arguments about purported presumptions of caregiver status are immaterial. How Jones Day administered the distinction between caregiver status under a policy first announced in 2015 has no bearing on why, twenty years earlier, a different set of managers decided that the Firm would assume a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy. There also is no evidence of any presumption one way or another about caregiver status under the policy announced in 2015; there is no evidence that any individual was denied leave based on his or her caregiver status or despite his or her caregiver status; and there is

no evidence that any such presumption otherwise impacted the amount of leave available to any individual. To the contrary, the evidence is that the Firm's written policy provided primary caregiver status on a gender neutral basis, and that ████████████████████████████████ ████████████████████████████████████████████████. Chase Ex. 12 at JD_00003158; *see also* Sheketoff Ex. 167, Sheketoff Ex. 168, Sheketoff Ex. 169. Savignac himself informed Jones Day that he would be taking family leave as a primary caregiver—and received no resistance from any purported presumption, was not asked to provide any documentation or proof, or otherwise justify taking leave as a primary caregiver—a point that Savignac does not dispute in his own declaration. *See* McClure Decl. at ¶ 23; *see also* Chase Ex. 79, Savignac Tr. 138:6-14; Savignac Decl. (ECF 199).

**REPLY:** Jones Day disputes this statement on the ground that it does not cite any evidence. That is incorrect. The statement cites PSF ¶¶ 93-95 and incorporates the factual statements and evidentiary support cited therein (and Jones Day likewise incorporates other paragraphs in its own statements). Jones Day also disputes this statement on the ground that it "constitutes argument." That is neither accurate nor an adequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day's supplemental statements (beginning with "Plaintiffs arguments … are immaterial") are plainly nonresponsive and should be disregarded. They are also inaccurate, as discussed below. As for Jones Day's materiality argument, the firm's presumption that mothers are primary caregivers and fathers are secondary caregivers shows that sex stereotypes are a motivating factor in the firm's policy of giving new mothers 18 weeks of paid leave and giving even new fathers who identify as primary caregivers eight weeks less, as discussed in Plaintiffs' briefs.

93.     Indeed, Bounds, who has worked in Jones Day human resources department for 25 years, and whom Jones Day designated as its 30b6 witness on all topics relating to its leave offerings, is not aware of any new mother who has ever taken leave as secondary caregiver.  Chase Ex. 76 (Bounds 30(b)(6)) at 148:8-16.

**RESPONSE:** Disputed as set forth in response to Statement 92, incorporated here by reference, except undisputed that Bounds testified she is not personally aware of a female associate taking secondary caregiver leave. Chase Ex. 76, Bounds Tr. 148:8-16. Plaintiffs do not cite any evidence to support a claim that no new mother has ever taken leave as a secondary caregiver, or that female attorneys do not have an option to take secondary caregiver leave. Plaintiffs' Rule 30(b)(6) notice did not include as a topic, and Bounds was not designated to testify about, the leave period for each female associate who has given birth while employed with Jones Day in the past 25 years. Chase Reply Ex. 93, 30(b)(6) notice, Topics 1-2; *see also* Chase Ex. 76, Bounds Tr. 148:10 (scope objection). Based on the records produced in discovery in this case, the amount of total paid leave any given female associate has taken following childbirth has ███████████

████. Chase Ex. 94, JD_00004891. Further, the Firm's provision of primary caregiver status was available on a gender neutral basis. Chase Ex. 12 at JD_00003158.

**REPLY:** This statement is not genuinely disputed, as Jones Day expressly admits that "Bounds testified she is not personally aware of a female associate taking secondary caregiver leave."  Jones Day's supplemental statements (beginning with "Plaintiffs do not cite any evidence") are nonresponsive and should be disregarded.

94.     Further, Jones Day does not require mothers to explain why they are primary caregivers and does not require them to obtain approval for their primary caregiver status.  Chase Ex. 76 (Bounds 30(b)(6)) at 46:16-18, 81:2-84:16.

**RESPONSE:** Disputed as set forth in response to Statement 92, incorporated here by reference. To the extent Statement 94 purports to be limited to just "mothers," it mischaracterizes the evidence. Jones Day does not require an explanation from any associate—whether male or female—as to why they are primary caregivers, and does not require any associate—whether male or female—to seek approval for their primary caregiver status. Undisputed that the Firm relies on its associates—both male and female—to tell it whether they are taking leave as a primary or secondary caregiver.  *See* Chase Ex. 76, Bounds Tr. 84:12-16, 144:19-145:17, 147:7-148:7, 148:17-149:9.

**REPLY:** Jones Day does not identify any part of this statement that it disputes.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day's supplemental statements (beginning with "To the extent") are nonresponsive and should be disregarded.  Those statements are also contradicted by the record evidence in this case. *See* infra PSF ¶¶ 97-98.

95.     Instead, shortly after mothers give birth, and without first asking whether they will be primary caregivers, Jones Day's human resources department advises them of the dates that their primary caregiver leave period begins and ends.  *E.g.*, Sheketoff Ex. 161 at JD_00002869, 2879; Sheketoff Ex. 162 at JD_00004061; Sheketoff Ex. 163 at JD_00004129; Sheketoff Ex. 164 at JD_00004189; Sheketoff Ex. 165 at JD_00004273; Chase Ex. 76 (Bounds 30(b)(6)) at 81:2-84:16.

**RESPONSE:** Disputed as set forth in response to Statement 92, incorporated here by reference. Statement 95 does not cite any evidence supporting the claim that Human Resources calculates leave dates without first discussing with the associate whether he or she is taking primary caregiver leave. Bounds testified that once an associate informs HR that he or she is expecting a new child—a conversation that occurs well before birth—the HR staff in that

associate's office will review the leave policies with the associate, who informs HR whether he or she is taking leave as a primary or secondary caregiver. Chase Ex. 76, Bounds Tr. 20:3-21; 26:4-27:15; 31:14-32:14; 46:3-18; 148:22-149:4. None of the exhibits cited in Statement 95 establish that any leave dates are calculated prior to those discussions. Sheketoff Exhibits 161 through 165

███████████████████████████████████████████████████

██████████████████████████████████. Sheketoff Ex. 161 at JD_ 00002889; Sheketoff Ex. 162 at JD_00004049; Sheketoff Ex. 163 at JD_00004147; Sheketoff Ex. 164 at JD_00004219; Sheketoff Ex. 165 at JD_00004307.

**REPLY:** This statement is not genuinely disputed.  Jones Day asserts that Bounds testified that female associates tell Jones Day during a meeting with HR staff whether they are going to take primary or secondary caregiver leave.  That is not supported by the cited testimony. Actually, Bounds testified that, as "part of the conversation" with *male* associates, HR staff asks whether they are taking primary-caregiver or secondary-caregiver leave.   Chase Ex. 76 (Bounds (30(b)(6)) at 148:18-149:4.  That plainly does not establish that it was part of the conversation for *female* associates—nor does it establish that any associates informed HR staff during their meeting what type of caregiver leave they would take.  Even more critically, Jones Day specifically advised Plaintiffs during discovery that "in the Washington, D.C. office, the standard practice of including in leave files communications with an associate taking leave *encompasses communications about caregiver status.*"  Sheketoff Ex. 180 at 3 (response regarding RFP 8) (emphasis added).  The fact that ██████████████████████████████████████████████, and that HR staff nonetheless reach out to advise female associates of the dates that their primary caregiver leave period begins and ends, thus directly supports this statement.

96.     In contrast, fathers are presumed to be secondary caregivers.  Sheketoff Decl. ¶ 3.

**RESPONSE:** Disputed as set forth in response to Statements 92 and 94, incorporated here by reference. Jones Day relies on the person taking leave—whether male or female—to tell the Firm whether he or she is taking leave as a primary or secondary caregiver. *See* Chase Ex. 76, Bounds Tr. 84:12-16, 144:19-145:17, 147:7-148:7, 148:17-149:9. Plaintiffs cite no admissible evidence to the contrary. Paragraph 3 of Sheketoff's declaration states in full: "Two male associates at Jones Day told me that, when they sought leave in connection with a new child, the firm presumed they were secondary caregivers." That statement purports to describe out-of-court verbal statements by unknown individuals, and Plaintiffs are offering those statements for the truth of the matters asserted, and Plaintiffs did not identify any individual in their Fed. R. Civ. P. 26(a)(1) disclosures competent to offer these out-of-court statements in admissible form. Chase Reply Ex. 95 at ¶ 2 (initial disclosures). Defendants therefore object pursuant to Fed. R. Civ. P. 56(c) that the material cited to support this assertion constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day objects to the evidence cited in this statement on the ground that Julia's declaration describes out-of-court conversations with two men about their experiences seeking primary caregiver leave from Jones Day.  As discussed above, however, the substance of those men's experiences with Jones Day is properly considered at the summary-judgment stage if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  Julia can testify to their statements to her consistent with her sworn statement in her declaration.  There can be no hearsay objection to the extent that Julia so testifies in connection with establishing good faith in challenging the leave policy, since the material would not be offered for the truth of the matter asserted (that the firm in fact discriminated against the two men in its application of its leave policy) but merely to show Julia's mental state (that she had been told and understood that the firm

discriminated in the application of its leave policy).  FRE 801(c)(2).  Moreover, a witness need not

be disclosed in initial disclosures if the testimony would be solely for impeachment or if the

witness and subject matter have "otherwise been made known to the other parties during the

discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  Plaintiffs specifically informed

Jones Day in a written interrogatory response that "████████ and ████████ provided

information to Julia about how Jones Day responded to their requests to be treated as primary

caregivers."  Sheketoff Ex. 36 at 4 (response to interrogatory 2); *see also id.* at 3 (response to

interrogatory 1) (advising Jones Day in writing that Julia "discussed Jones Day's leave policies

with … Jones Day colleagues who had taken or were planning to take leave (such as ██

████████)").  Finally, Jones Day does not dispute that the two male associates

were indeed subjected to a sex-based presumption that they were mere secondary caregivers, and

its 30(b)(6) witness's testimony corroborates their statements to Julia.  Chase Ex. 76 (Bounds

30(b)(6)) at 277-81 (testifying that the D.C. HR manager "did ask if there was anything that was

needed if a father stated that they wanted to take primary caregiver" and that Bounds does not

know whether the manager in fact subjected men in the D.C. office to sex-based scrutiny as her

question and annotations in the men's leave files suggest).

**97.**      For example, when two of Julia's male friends asked to take primary caregiver leave,

Jones Day interrogated them about their request and required them to justify why they should be

considered primary caregivers.  Sheketoff Decl. ¶¶ 3-6; *see also* Chase Ex. 76 (Bounds (30(b)(6))

at 276:25-281:8.

      **RESPONSE:** Disputed as set forth in response to Statements 92 and 94, incorporated

here by reference. Jones Day relies on the person taking leave—whether male or female—to tell

the Firm whether he or she is taking leave as a primary or secondary caregiver. *See* Chase Ex. 76,

Bounds Tr. 84:12-16, 144:19-145:17, 147:7-148:7, 148:17-149:9. Plaintiffs cite no admissible evidence to the contrary. Paragraphs 3 through 6 of Sheketoff's declaration purport to describe out-of-court verbal statements by unknown individuals, and Plaintiffs are offering those statements for the truth of the matters asserted, and Plaintiffs did not identify any individual in their Fed. R. Civ. P. 26(a)(1) disclosures competent to offer these out-of-court statements in admissible form. Chase Reply Ex. 95 at ¶ 2 (initial disclosures). Defendants therefore object pursuant to Fed. R. Civ. P. 56(c) that the material cited to support this assertion constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Moreover, the testimony cited in Statement 97 demonstrates the opposite of what Plaintiffs assert. Bounds testified that when asked if the Firm required anything for a male to take leave as a primary caregiver, she responded "no, we don't need anything. It's fine. If they say they are primary caregiver, then use primary caregiver." Chase Ex. 76, Bounds Tr. 278:8-10.

**REPLY:** As discussed in Plaintiffs' reply on PSF ¶ 96, the substance of these two men's experiences seeking primary caregiver leave from Jones Day is admissible and thus may be considered at summary judgment.

98. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Sheketoff Ex. 167 at JD_0004965; Sheketoff Ex. 168 at JD_00004989; Sheketoff Ex. 169 at JD_00005015.

**RESPONSE:** Disputed as set forth in response to Statements 92 and 94, incorporated here by reference. Jones Day relies on the person taking leave—whether male or female—to tell the Firm whether he or she is taking leave as a primary or secondary caregiver. *See* Chase Ex. 76, Bounds Tr. 84:12-16, 144:19-145:17, 147:7-148:7, 148:17-149:9. Plaintiffs also again mischaracterize the evidence. Bounds did not testify that what occurred was "approval" to take

family leave as the primary caregiver. *Id*. at 278:10-11. On that issue, the local HR manager in the Washington, D.C. office, Saundra Madyun, "reached out to me at one point asking, what do I need -- or do I need anything in regards to backup or documentation or anything in regards to granting someone primary-caregiver leave? And the -- the answer was, no; if they say they're primary caregiver, we can give them primary-caregiver leave." *Id*. at 279:18-25; *see also id*. at 277:16-278:16.

████████████████████████████████████████████████

. Bounds testified that this note related to approval for the associate's request that family leave "be taken intermittently and, potentially, start after the normal commencement period." Chase Ex. 76, Bounds Tr. 284:13-18; *see also id*. at

281:9-285:2. Statement 98 is contrary to the cited evidence and otherwise without any support in the record.

**REPLY:** This statement is not genuinely disputed.  The cited ██████ files are not ambiguous, and the comparison between those files (where approval for primary caregiver leave is noted) and ██████ files (which are cited in PSF ¶ 95 and where no such approval is noted) is particularly illuminating.

99.     According to the revised manual, the firm would provide new mothers who were primary caregivers the same "18 weeks of paid leave" that mothers had been receiving since January 2015, made up of "eight weeks of paid disability leave under the Firm's Short Term Disability policy" and "an additional ten weeks of paid family leave," and it would provide fathers who were primary caregivers "ten weeks of paid family leave."  Chase Ex. 12 at JD_00003158.

**RESPONSE:** Undisputed. Defendants further state that the Firm Manual revised as of May 18, 2015, includes a detailed description of the Short Term Disability policy referenced in the language quoted in Statement 99, and that Short Term Disability policy sets forth the requirements for qualifying for short-term disability leave, as well as the Firm's assumption "that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy." Chase Ex. 12 at JD_00003155.

**REPLY:** Jones Day acknowledges that this statement is undisputed.  Its supplemental statement (beginning with "Defendants further state") is nonresponsive and should be disregarded.

100.    The revised manual stated that the firm would provide new mothers who were secondary caretakers 12 weeks of paid leave, made up "four weeks of paid family leave after the eight weeks of paid disability leave," and would provide fathers who were secondary caregivers "four weeks of paid family leave."  Chase Ex. 12 at JD_00003158.

**RESPONSE:** Undisputed. Defendants further state that the Firm Manual revised as of May 18, 2015, includes a detailed description of the Short Term Disability policy referenced in the language quoted in Statement 99, and that the Short Term Disability policy sets forth the requirements for qualifying for short-term disability leave, as well as the Firm's assumption "that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy." Chase Ex. 12 at JD_00003155.

**REPLY:** Jones Day acknowledges that this statement is undisputed.  Its supplemental statement (beginning with "Defendants further state") is nonresponsive and should be disregarded.

101.    The revised manual did not change the amounts of leave the firm would provide to adoptive parents, who would continue to receive 18 weeks of paid leave if they primary caregivers and 4 weeks of leave if they were secondary caregivers.  Chase Ex. 12 at JD_00003158.

**RESPONSE:** Undisputed.

102.    The revised manual also stated that the firm would provide new parents "up to an additional six weeks of unpaid leave."  Chase Ex. 12 at JD_00003158.

**RESPONSE:** Undisputed.

iv.    **The relevant terms of the policy have been unchanged since 2015.**

103.    The amounts of Jones Day's leave offerings for new parents did not change between May 2015 and January 2019.  Chase Ex. 76 (Bounds 30(b)(6)) at 91:22-96:19, 129:21-134:18; Chase Ex. 12 at JD_00003157-58; McClure Ex. 1 at JD_00002485-86.

**RESPONSE:** Undisputed.

104.    As of January 2019, the firm's "Family Leave" policy stated:

5. **Family Leave**

a. **Leave to Care for a Newborn or Newly Adopted Child**

In the event an Of Counsel, Counsel, Associate or Senior Staff Attorney has a newborn or newly adopted child, the Firm will provide the following benefits:

(1) **Primary Caregiver**

In the case of a newly born child, the Firm will provide mothers eight weeks of paid leave under the Firm's Short Term Disability policy (the first 5 days of which will be charged to sick or vacation). In addition, if the mother is the primary caregiver, the Firm will provide an additional ten weeks of paid family leave after the eight weeks of paid disability leave and, with approval, up to an additional six weeks of unpaid leave. Mothers who are primary caregivers may use accrued vacation leave following the 18 weeks of paid leave instead of unpaid leave, but in no case may the total leave exceed 24 weeks. Mothers must commence this family leave immediately after the short term disability for the pregnancy and childbirth ends.

In the case of a newly born child, if the father is the primary caregiver, the Firm will provide ten weeks of paid family leave and, with approval, up to an additional six weeks of unpaid leave. Fathers who are primary caregivers may use accrued vacation leave following the ten weeks of paid leave instead of unpaid leave, but in no case may the total leave exceed 16 weeks. Fathers must commence this family leave within eight weeks after the birth of the child.

In the case of a newly adopted child, the Firm will provide 18 weeks of paid adoption leave to the primary caregiver and, with approval, up to an additional six weeks of unpaid leave. The primary caregiver may use accrued vacation leave following the 18 weeks of paid leave instead of unpaid leave, but in no case may the total leave exceed 24 weeks. Primary caregivers must commence this family leave within eight weeks after the adoption of the child.

(2) **Secondary Caregiver**

In the case of a newly born child, the Firm will provide mothers eight weeks of paid disability leave under the Firm's Short Term Disability policy. In addition, if the mother is the secondary caregiver, the Firm will provide an additional four weeks of paid family leave after the eight weeks of paid disability leave. Mothers must commence family leave immediately after the short term disability for the pregnancy and childbirth ends.

In the case of newly born child, if the father is the secondary caregiver, the Firm will provide four weeks of paid family leave. Fathers must commence family leave within eight weeks after the birth of the child.

In the case of a newly adopted child, the Firm will provide four weeks of paid family leave to the secondary caregiver. Secondary caregivers must commence this family leave within eight weeks after the adoption of the child.

McClure Ex. 1 at JD_00002485-86.

**RESPONSE:** Undisputed.

**105.** Thus, between January 2015 and at least January 16, 2019, Jones Day provided new

mothers (at least to the extent that they were "primary caregivers") "a total of 18 weeks of paid

leave post-partum." Chase Ex. 11 at JD_00005170; *see also* Chase Ex. 76 (Bounds 30(b)(6)) at 91:22-96:19, 129:21-134:18; Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86.

**RESPONSE:** Disputed to the extent Statement 105 asserts that Jones Day's Short Term Disability policy entitled associates at the Firm to at least eight weeks of disability leave for childbirth between January 2015 and at least January 16, 2019 (or at any other time). That assertion is not supported by any of the cited testimony, and Defendants also incorporate by reference their response to Statement 21. Undisputed that that the Firm Manual revised as of May 18, 2015, includes a detailed description of the Short Term Disability policy referenced in the language quoted in Statement 99, and that the Short Term Disability policy sets forth the requirements for qualifying for short-term disability leave, as well as the Firm's assumption "that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy." Chase Ex. 12 at JD_00003155; *see also* McClure Ex. 1 at JD_00002483-84 (later iteration of the same policies). Chase Exhibit 11 is not the Short Term Disability policy, does not purport to be the Short Term Disability policy, and refers associates to the Firm Manual for a statement of the policy and to Human Resources personnel for any questions. Chase Ex. 11 at JD_00005170.

**REPLY:** Jones Day does not genuinely dispute this paragraph, which makes an assertion about what "Jones Day provided" to "new mothers," as described by human resources director Sarah McClure in an email announcing a "Change in Firm Maternity, Paternity and Adoption Leave Policy for Lawyers." The bulk of Jones Day's response (beginning with "Undisputed that") is not responsive to this statement and should be disregarded. In any event, Jones Day's representations are misleading. For example, while Jones Day claims that Chase Exhibit 11 "refers associates to the [f]irm [m]annual for a statement of the policy," the exhibit

actually reads: "The *remainder* of the [f]irm's policies with respect to maternity, paternity and adoption leave are set out in the [f]irm [m]anual."  Chase Ex. 11 (emphasis added).  It is not genuinely disputable (and apparently not disputed) that the text of McClure's email (quoted in PSF ¶ 78) conveyed that all new mothers would receive 18 weeks of paid leave, irrespective of disability.   In referring to the "*remainder*" of the firm's January 2015 policies, McClure's email plainly was not suggesting that those other documents would *undermine or contradict* (as opposed to potentially *supplement*) the policy changes announced in the email.  Moreover, the firm's manual was *never amended* to incorporate the policy announced by McClure's January 2015 email.  Sheketoff Ex. 174 at JD_00000669 (█████████████████████████ █████████); Sheketoff Ex. 173 at JD_00003799 ("█████████████████████████").  The version of the firm manual in place at the time of the announcement reflects the firm's *prior* policy that new mothers receive "four weeks of paid family leave" and an eight-week disability period— for a total of 12 weeks of paid leave—rather that the amended policy of "a total of 18 weeks of paid leave post-partum" effective January 1, 2015.  Sheketoff Ex. 13 at JD_00000338.  The email's reference to the "*remainder* of the firm's policies with respect to maternity, paternity and adoption leave … set out in the firm manual" was thus incoherent—and in no way did the never-amended firm manual override the terms of the announcement.  Indeed, it is undisputed that, despite the firm manual's contrary text, the amount of leave labeled "family leave" given to birthmothers was ten weeks in January 2015, not four (PSF ¶¶ 73-74, 105), and the amount of leave adoptive parents received was 18 weeks in January 2015, not four (PSF ¶ 108).  McClure's reference to the "*remainder*" of the policies also confirms that the announcement email itself was policy, undermining Jones Day's suggestion here that the firm manual is the only relevant document.

**106.**    Eight of those weeks for women are labeled as disability leave, but the leave is not dependent on whether women are actually disabled.  Chase Ex. 76 (Bounds 30(b)(6)) at 232:9-235:21; Chase Ex. 81 (Shumaker) at 170:1-14.

**RESPONSE:** Disputed. Plaintiffs cite no evidence that the assumption a physician has certified an eight-week disability period for recovery from childbirth without complications constitutes an entitlement to eight weeks of paid leave without regard to disability. Plaintiffs' citation to the deposition testimony of Rule 30(b)(6) designee Lori Bounds ignores the testimony that Jones Day has the ability to recoup salary or reclassify leave if it determines that an associate received salary continuation under the Firm's short-term disability policy period during a time in which he or she did not meet the requirements of that policy; that the Firm has never learned of an associate who had received salary continuation under that policy in relation to childbirth but did not meet the requirements of that policy for the presumptive eight-week period; and that in the event the Firm did learn of such an individual, "I would speak to Sarah McClure or whomever else to make sure that we were appropriately following policy." Chase Ex. 76, Bounds Tr. 70:21-24. Plaintiffs' citation to the deposition testimony of Shumaker ignores Shumaker's correction on the record that "your e-mail, Julia, and -- second sentence: 'Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether the women are actually disabled' -- I think that is an incorrect statement." Chase Ex. 81, Shumaker Tr. 171:9-16. Defendants also incorporate by reference their response to Statement 21.

**REPLY:** This statement is not genuinely disputed.  Jones Day is bound by its 30(b)(6) witness's testimony, which is clear on this point.  Chase Ex. 76 (Bounds 30(b)(6)) at 232:9-235:21. As for Shumaker's testimony, Shumaker's "correction" was surreptitiously prompted by his lawyer: "Did you just have an interaction with Terri Chase before you said that?  A: I did…"

Chase Ex. 81 at 171:18-22.  In any event, Shumaker's "correction" was that the statement is inaccurate only in that all women supposedly *are* disabled for 8 weeks after childbirth—which *everyone* now agrees is false.  *Id.* at 172:3-22.  Shumaker specifically admitted that all women are entitled to eight weeks of "disability" leave, even if they are disabled for less time.  Chase Ex. 81 at 177:21-181:16; *see also id.* 179:6-8 (counsel's representing that "He has told you that if she's the primary caregiver, she gets the eight weeks.").  That means the leave is not dependent upon whether women are actually disabled.

107.   Between May 2015 and at least January 16, 2019, Jones Day provided new fathers who were "primary caregivers" ten weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86.

**RESPONSE:** Undisputed.

108.   Between January 2015 and at least January 16, 2019, Jones Day provided adoptive parents who were "primary caregivers" 18 weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86; Chase Ex. 11 at JD_00005170.

**RESPONSE:** Undisputed.

109.   Between May 2015 and at least January 16, 2019, Jones Day provided fathers who were "secondary caregivers" four weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86.

**RESPONSE:** Undisputed.

110.   Between January 2015 and at least January 16, 2019, Jones Day provided adoptive parents who were "secondary caregivers" four weeks of paid leave.  Sheketoff Ex. 14 at JD_00000835-36; McClure Ex. 1 at JD_00002485-86; Chase Ex. 11 at JD_00005170.

**RESPONSE:** Undisputed.

**B.      Jones Day gives all new mothers 18 weeks of paid leave regardless of disability.**

**111.**      Under the August 2018 leave offerings, all new mothers are entitled to an eight-week period of leave after childbirth that is deemed "disability" leave.  Chase Ex. 76 (Bounds 30(b)(6)) at 117:3-118:5; Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-142:5, 185:5-186:14; Chase Ex. 8 at JD_00003274 ("I did have the system updated to have your maternity benefit be 8 weeks regardless of method of delivery."), JD_00003278 ("Jones Day standardly provides 8 weeks post-delivery"); Chase Ex. 76 (Bounds 30(b)(6)) at 228:11-229:1; Latham Decl. ¶¶ 4, 10 ("For childbirth without complications, … Unum considers the employee unable to perform the material and substantial duties of her regular occupation for [any period up to eight weeks], regardless of what that occupation is."); Dkt. 189 at 20 ("Unum 'automatically consider[s]' the affected employee disabled and 'unable to perform the material and substantial duties of his or her regular occupation.'" (quoting Latham Decl. ¶ 4)).

**RESPONSE:** Statements 111 through 148 constitute improper argument. Rather than cite specific parts of the record to establish purportedly undisputed facts, Plaintiffs string-cite a patchwork of out-of-context quotes that they contend support their argument that "Jones Day gives all new mothers 18 weeks of paid leave regardless of disability." Plaintiffs are aware from Defendants' own filings that this argument is both disputed and contrary to undisputed evidence. *See, e.g.*, *supra* Response to Statements 21 and 46. This entire section should be disregarded as contrary to Local Rule 7(h).

Statement 111 itself is an argumentative interpretation of the cited exhibits and is disputed. None of those exhibits establishes that an associate was at any time entitled to short-term disability benefits under the Jones Day Short Term Disability policy even when the Firm was aware the associate did not meet the requirements of that policy. Undisputed that in August 2018, Jones Day

assumed that for associates who delivered a child, the "lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth." McClure Ex. 1 at JD_00002483-84. The basis for that presumption is set out at Paragraph 11 of Dressing's declaration and is consistent with both insurance standards and the practice of both obstetricians who testified in this case, including Plaintiff's expert, who testified that he certifies a disability period of six to eight weeks in cases where the method of delivery is not known prior to birth. Chase Ex. 90, Naylor Tr. 108:24-111:11; *see also* Latham Decl. at ¶¶ 5-12. Defendants also incorporate their responses to Statements 21 and 106.

**REPLY:** Jones Day objects to statements 111 through 148 on the ground that they "constitute improper argument." That conclusory and sweeping assertion is both inaccurate and an inadequate basis for disputing a statement (let alone 38 statements). *See* Preliminary Statement A. Jones Day also claims that Plaintiffs do not cite specific parts of the record to establish discrete facts, but each of Plaintiffs' statements identifies an undisputed fact and then cites evidence in the record that supports that fact, in compliance with Local Rule 7(h) and this Court's standing order. Next, Jones Day complains that Plaintiffs' support supposedly consists of a "string-cite a patchwork of out-of-context quotes." That is not true and not a proper objection anyway. Local Rule 7(h) requires parties moving for summary judgment to provide a "statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." Plaintiffs' citations and quotations are the "parts of the record relied on to support the statement"; the only difference between the references to the record in these paragraphs and in certain other paragraphs is that the cited material is often quoted in parentheses for the Court's convenience. If the material Plaintiffs relied upon was actually taken out of context, Jones Day could have explained the true meaning of that material

in its responses.  It has not done so.  Finally, Jones Day also argues that these statements are "disputed and contrary to undisputed evidence."  As the evidence Plaintiffs have cited in support of each statement (together with Defendants' responses) show, these statements are not *genuinely* disputed—even if Defendants purport to dispute them—nor are they "contrary to undisputed evidence."  Ultimately, Jones Day's objection is that the evidence refuting its knowingly false representations to the Court regarding its leave policy is overwhelming and conclusively supported by countless facts in the record.  That is not Plaintiffs' fault, nor is it a valid basis for objection.  It is the foreseeable result of Jones Day's inexplicable decision to cling to a factual argument that Defendants—and hundreds of other current and former Jones Day personnel (to the extent that they follow this case)—have always known to be false.

As for statement 111 specifically, this statement is not genuinely disputed.  Jones Day says that it is an "argumentative interpretation of the cited exhibits."  But that is inaccurate and it is an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also asserts that the cited evidence does not "establish[] that an associate was at any time entitled to short-term disability benefits under the Jones Day Short Term Disability policy even when the Firm was aware the associate did not meet the requirements of that policy."  Even if that were true (and it is not), this statement is not making an assertion about the written short-term disability policy; it is making an assertion about what new mothers are actually entitled to under Jones Day's leave offerings for new parents—and the evidence indisputably shows that new mother are entitled to eight weeks of leave after childbirth that is deemed "disability" leave.  The remainder of Jones Day's response (starting with "Undisputed that in August") is not responsive to this statement and should be disregarded.

**112.**     Under the August 2018 leave offerings, if a biological mother notified Jones Day that her doctor had certified *more* than 8 weeks of disability leave, Jones Day might provide more than eight weeks of "disability" leave—but Jones Day would provide eight weeks of so-called "disability" leave even if the mother were disabled for less than eight weeks.  Sheketoff Ex. 2 at JD_00003302; Chase Ex. 3 at JD_00003413; Chase Ex. 76 (Bounds 30(b)(6)) at 138:12-142:5, 185:5-186:14, 69:11-20 ("the firm would still be assuming the eight-week disability because they are unaware of anything else.  And so the—the disability salary continuation would be in play."); August 4, 2020 Tr. at 6:25-7:5 (Jones Day's counsel stating: "So absent some affirmative contrary notification, the operation of this certification assumption means that the firm will provide birth mothers eight weeks of paid disability leave."); Sheketoff Ex. 20 at JD_00003905 (Jones Day website: "For routine childbirth (including cesarean-section births), the Firm will assume an eight week disability period, unless we are notified that the Associate is disabled for a longer period."); Chase Ex. 8 at JD_00003274 ("I did have the system updated to have your maternity benefit be 8 weeks regardless of method of delivery."), JD3278 ("Jones Day standardly provides 8 weeks post-delivery"); Chase Ex. 76 (Bounds 30(b)(6)) at 228:23-11-229:1; Latham Decl. ¶¶ 4, 10; Dkt. 189 at 20.

**RESPONSE:** Statement 112 is an argumentative interpretation of the cited exhibits and is disputed. None of those exhibits establishes that an associate was at any time entitled to short- term disability benefits under the Jones Day Short Term Disability policy even when the Firm was aware the associate did not meet the requirements of that policy. For instance, Plaintiffs cite Jones Day counsel's statement out of context and without reference to the related content that "[w]hen a birth mother seeks short-term disability leave, the firm's starting assumption is that the birth mother has, from her medical provider, an actually certified eight-week postpartum disability.

To get more leave time -- like I did -- or to get less paid leave time, the firm must receive some affirmative contrary notification." Aug. 4, 2020 Hearing Tr. 6:21-7:2. Undisputed that in August 2018, Jones Day assumed that for associates who delivered a child, the "lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth." McClure Ex. 1 at JD_00002483-84. The basis for that presumption is set out at Paragraph 11 of Dressing's declaration and is consistent with both insurance standards and the practice of both obstetricians who testified in this case, including Plaintiff's expert, who testified that he certifies a disability period of six to eight weeks in cases where the method of delivery is not known prior to birth. Chase Ex. 90, Naylor Tr. 108:24-111:11; *see also* Latham Decl. at ¶¶ 5-12. Defendants also incorporate their responses to Statements 21 and 106.

**REPLY:** This statement is not genuinely disputed.  Jones Day says that it is an "argumentative interpretation of the cited exhibits," but that is inaccurate and it is an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also asserts that the cited evidence does not "establish[] that an associate was at any time entitled to short- term disability benefits under the Jones Day Short Term Disability policy even when the Firm was aware the associate did not meet the requirements of that policy."  Even if that were true (and it is not), this statement is not making an assertion about the written short-term disability policy; it is making an assertion about what Jones Day provides for new mothers who are disabled for less than eight weeks after childbirth—and the evidence indisputably supports that assertion.  The remainder of Jones Day's response (starting with "For instance") is not responsive to this statement and should be disregarded.

**113.**   Jones Day's counsel told the Court: "[U]nless you provide contrary evidence you will get eight weeks."  August 4, 2020 Tr. at 17:6-7.

**RESPONSE:** Undisputed that the quoted language appears (without Plaintiffs' alterations) in the August 4, 2020 hearing transcript. Disputed to the extent Plaintiffs cite Jones Day counsel's statement out of context and without reference to the related content in that statement including "Birth mothers receive an eight-week certification assumption. So the firm's starting assumption is that the birth mother's medical provider has certified an eight-week disability. That results, in virtually every case, in birth mothers taking an eight-week disability leave. So it's understandable that when people talk about the disability leave policy, that they shorthand it in exactly the same way that the family leave policy does and describe it as eight weeks. Because otherwise, you have to say the firm has a certification assumption of eight weeks of a medical disability, and unless you provide contrary evidence you will get eight weeks. That's just not the way humans speak." Aug. 4, 2020 Hearing Tr. at 16:15-17:8.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "Disputed to the extent") is not responsive and should be disregarded. The quoted language confirms both that this statement accurately represents its counsel's admission and that everyone at Jones Day speaks of the policy as giving new mothers the full eight weeks, further corroborating that new mothers in fact get the full eight weeks.  *See also* PSF ¶¶ 131-32.

**114.**    Under the August 2018 leave offerings, new mothers are *not* required to notify the firm if they not disabled sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 59:21-60:6, 33:13-19.

**RESPONSE:** Undisputed that Jones Day trusts its associates to act consistently with Firm policies.  Under those policies, associates are eligible for disability leave if they meet the

requirements of the Short Term Disability policy and are provided written notice that salary continuation is "subject to repayment by me if the leave is later determined not to qualify for salary continuation under Firm policy." McClure Decl. at ¶¶ 10, 13; McClure Ex. 2.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day's narrative response is not responsive to this statement and should be disregarded.

115.    That is, new mothers have no obligation to "provide contrary evidence," and thus "will get eight weeks."  Chase Ex. 76 (Bounds 30(b)(6)) at 59:21-60:6, 33:13-19; August 4, 2020 Tr. at 17:6-7.

**RESPONSE:** Disputed as mischaracterizing the cited exhibits and as argumentative interpretation of the evidence. The quoted language does not appear in testimony by Jones Day's 30(b)(6) designee Lori Bounds cited in Statement 115. Defendants dispute Statement 115 to the extent it selectively quotes Jones Day counsel's statements to suggest that female associates are entitled to eight weeks disability leave without actually being disabled. Defendants also incorporate by reference their responses to Statements 21, 106, and 114.

**REPLY:** Jones Day disputes this statement on the ground that it mischaracterizes the cited exhibit, but it fails to identify any way in which this statement mischaracterizes the evidence. *See* Preliminary Statement B.  It also disputes this statement as an "argumentative interpretation of the evidence."  That is inaccurate and an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Defendants identify no other basis to dispute the statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**116.**     According to the firm, no new mother has ever informed the firm that she was not disabled sooner than eight weeks after childbirth.   Chase Ex. 76 (Bounds 30(b)(6)) at 68:21-25, 69:20-21.

**RESPONSE:** Undisputed.

**117.**     Under the August 2018 leave offerings, new mothers are not required to switch to a form of non-disability leave or return to work if they not disabled sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 54:15-56:4.

**RESPONSE:** Disputed as an argumentative hypothetical and interpretation of the evidence, and not supported by the cited evidence. The cited testimony only states the general policy that Jones Day assumes an eight-week disability period for routine childbirth; the cited testimony does not state that new mothers are not required to switch to non-disability leave if they are not disabled. Plaintiffs' statement ignores the terms of the policy itself, as well as testimony that the Firm follows the policy. Chase Ex. 76, Bounds Tr. 71:16; *see also* McClure Ex. 1 at JD_00002483-84. Jones Day has previously clawed back payment in instances where staff members took disability leave during a period where they were not disabled, and the Firm's Director of Human Resources would advise applying the same treatment to an associate who did not meet the requirements for salary continuation in relation to childbirth and thus would recommend the Firm "claw back the payment and/or utilize another type of paid time off (such as sick or vacation time or paid family leave, if available) for the period that the associate was not disabled." McClure Decl. at ¶ 14. Defendants also incorporate by reference their responses to Statements 21 and 106.

**REPLY:** Jones Day conclusorily asserts that this statement is "argumentative … interpretation of the evidence."  That is inaccurate and an inadequate basis to dispute a statement.

*See* Preliminary Statement A.  It also claims that this statement is hypothetical.  That is incorrect; this statement makes an assertion about the operation of Jones Day's leave policy.  There are indisputably new mothers covered by the policy who are not disabled within eight weeks after childbirth; this statement is about how the leave policy applies to those mothers.  In any event, the bare assertion that a statement involves a hypothetical is insufficient to dispute a statement.  *See* Preliminary Statement C.  Next, Jones Day inaccurately claims that this statement is not supported by the evidence.  In fact, as the cited evidence demonstrates, the firm's 30(b)(6) witness designated on the topic of "[t]he meaning, application, and operation of Jones Day's leave offerings for new parents between January 2015 and January 2019" repeatedly answered questions about whether a woman who was disabled for less than eight weeks after childbirth would have the obligation to return to work or switch to non-disability leave by saying: "And the answer to your question is: Jones Day assumes an eight-week disability period.  And that's the end of my answer."  Any factfinder would understand that testimony to mean a woman need not return to work or switch to another form of leave if she is disabled for less than eight weeks after childbirth because of the eight-week "assumption."  Jones Day is bound to its 30(b)(6) witness's testimony; the sham affidavit rule prohibits it from using McClure's declaration to undermine or revise that deposition testimony.  In any event, as discussed in Plaintiffs' briefs, McClure's declaration does not in fact address how the firm treats mothers within the first eight weeks after birth.

**118.**    Under the August 2018 leave offerings, new mothers are not required to stop taking disability leave if they are not disabled sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 68:13-71:17.

**RESPONSE:** Disputed as an argumentative hypothetical and interpretation of the evidence, and not supported by the cited evidence. Defendants also incorporate by reference their responses to Statements 21, 106, and 117.

**REPLY:** Jones Day conclusorily asserts that this statement is "argumentative … interpretation of the evidence." That is inaccurate and an inadequate basis to dispute a statement. *See* Preliminary Statement A. It also claims that this statement is hypothetical. That is incorrect; this statement makes an assertion about the operation of Jones Day's leave policy. There are indisputably new mothers covered by the policy who are not disabled within eight weeks after childbirth; this statement is about how the leave policy applies to those mothers. In any event, the bare assertion that a statement involves a hypothetical is insufficient to dispute a statement. *See* Preliminary Statement C. Next, Jones Day inaccurately says that the statement is not supported by the evidence. Any factfinder who read the cited testimony would understand it to mean that new mothers are *not* required to stop taking disability leave they are not disabled sooner than eight weeks after childbirth—at least unless they gratuitously notify the firm of their non-disability (which they are indisputably *not* required to do, *see* PSF ¶ 114).

119.    Jones Day has provided virtually every new mother with eight weeks of so-called "disability" leave after her childbirth. Chase Ex. 76 (Bounds 30(b)(6)) at 109:23-110:13, 68:21-25, 69:11-21, 70:16-21, 114:2-11; *see also* August 4, 2020 Tr. at 16:24, 64:9-15.

**RESPONSE:** Undisputed that since 1994, Jones Day's Short Term Disability has assumed "that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth." McClure Ex. 1 at JD_00002483-84. The remainder of Statement 119 is argumentative interpretation of the evidence, is not supported by any evidence, and is disputed. Plaintiffs cite no evidence regarding the amount of leave "virtually every new mother"

at the Firm has taken, and their reference to "so-called 'disability' leave" is argumentative and likewise unsupported by the record. The amount of leave taken by individual associates was beyond the scope of the 30(b)(6) topics on which Bounds was designated to testify, and counsel's statements at the August 4, 2020 argument did not describe the specific type or amount of leave taken by any given associate.

**REPLY:** Jones Day conclusorily asserts that this statement is "argumentative interpretation of the evidence." That is inaccurate and an inadequate basis for disputing a statement. *See* Preliminary Statement A. Jones Day also says that this statement is not supported by any evidence. But the cited evidence includes the firm's own 30(b)(6) witness testifying (without any scope objection) that she had "*never* known of a situation" where the disability period was less than eight weeks. It also includes counsel's express admission that: "That results, in virtually every case, in birth mothers taking an eight-week disability leave." August 4, 2020 Tr. at 16:24. Jones Day's attempt to dispute Lovitt's own express statement to the Court is frivolous.

**120.** Furthermore, Jones Day's short-term disability policy imposes a ten-day "elimination period" for all non-childbirth-related disabilities, under which an employee begins to receive disability benefits only if she is disabled for at least 10 days, at which time the disability benefits are retroactive to the sixth day. McClure Ex. 1 at JD_00002483 ("This STD policy applies only once an absence extends for a period more than 10 consecutive work days …. Once the elimination period has been satisfied and an absence continues for more than ten consecutive work days, the leave period, retroactive to the sixth day of certified leave, is covered under the STD policy.").

**RESPONSE:** Disputed that the elimination period applies only to "non-childbirth-related disabilities." Undisputed that Jones Day's Short-Term Disability policy "applies only once an absence extends for a period more than ten consecutive work days…which is hereinafter

referred to as the 'elimination period.' . . . Once the elimination period has been satisfied and an absence continues for more than ten consecutive work days, the leave period, retroactive to the sixth day of certified leave, is covered under the STD policy." McClure Ex. 1 at JD_00002483. That applies to birth-related disabilities as well as other short-term disabilities. *See* Chase Ex. 76, Bounds Tr. 138:24-140:18.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make a representation about whether the elimination period applies to childbirth-related disabilities. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

121.   Jones Day acknowledges that not all women are disabled from working for at least eight weeks after childbirth. Chase Ex. 76 (Bounds 30(b)(6)) at 72:2-5; Dressing Decl. ¶ 11.a ("physicians typically certified between six and eight weeks of disability for uncomplicated childbirth, often depending on whether the birth was vaginal or via Cesarean section"); Chase Ex. 76 (Bounds 30(b)(6)) at 194:6-10 ("Q… I am asking if that means that, typically, she saw doctors certify six weeks for vaginal deliveries and eight weeks for Caesarean deliveries? A. Yes, that's what I would read."); Dkt. 15 at 21 (MTD) (acknowledging that, under the firm's policy, "pregnant women … might be able to obtain more disability leave than they would be able to medically justify"); Dkt. 189 at 24 ("a birth mother might recover more quickly than eight weeks").

**RESPONSE:** The generic proposition that the amount of time needed to recover from childbirth can depend on the individual circumstances of the delivery has never been disputed. Statement 121 is otherwise argumentative interpretation and disputed. Plaintiffs cite no evidence that Jones Day has acknowledged not all women are disabled from working for at least eight weeks after childbirth. At page 72, Bounds was asked whether "every single woman is disabled for eight weeks"—a question outside the scope of the topics for which the witness had been designated—

and answered that that was not her testimony. Chase Ex. 76, Bounds Tr. 72:2-7; *see also* Chase Reply Ex. 93, Bounds 30(b)(6) notice. Dressing described her experience with what physicians typically certify. Dressing Decl. at ¶ 11(a). The legal briefs cited by Plaintiffs are legal argument about hypotheticals and taken out of context here. Since 1994, Jones Day has assumed that an associate's medical provider would certify an eight-week disability period for routine childbirth. The basis for that assumption is set out at Paragraph 11 of Dressing's declaration, and the assumption is consistent with testimony from both obstetricians and the administrator for Jones Day's short-term disability benefits about what is standard. Chase Ex. 90, Naylor Tr. 108:24-111:11; *see also* Latham Decl. at ¶¶ 5-12. Jones Day informs its associates of the requirements for benefits under the Firm's Short Term Disability policy, and that salary continuation under that policy depends on meeting the requirements of the policy. McClure Ex. 1; McClure Ex. 2. While Plaintiffs purport to dispute that testimony, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶¶ 110-15. The undisputed evidence also shows the Firm has never learned of an associate who had received salary continuation under its Short-Term Disability policy in relation to childbirth but did not meet the requirements of that policy for the relevant period. Chase Ex. 76, Bounds Tr. 68:21-25; *see also* McClure Decl. at ¶ 15.

**REPLY:** This statement is not genuinely disputed. Jones Day conclusorily asserts that the statement is an "argumentative interpretation of the evidence," but that inaccurate and an inadequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day's briefs are admissible statements of an opposing party under FRE 801(d)(2), are not "hypothetical," and directly support this statement. Jones Day has also made this representation during oral argument to the Court. PSF ¶ 150 (citing August 4, 2020 Tr. at 24:3-4 ("There are instances where mothers

recover before the certification's expiration.")).  The bulk of Jones Day's response (beginning with "Since 1994") is nonresponsive to this statement and should be disregarded.

122.    Indeed, for years, Jones Day did not "assume" an eight-week disability period for female staff.  Dressing Decl. ¶ 11.a.

**RESPONSE:** Undisputed that the Firm's paid Short Term Disability leave offerings for staff did not include such an assumption. Disputed to the extent that Statement 122 implies that Jones Day did not believe that physicians would certify eight weeks of postpartum disability for female staff. The only implication that can be drawn from this Statement is that the Firm elected to require documentation of female staff that it decided not to require of female attorneys. *See* Dressing Decl. at ¶ 11.a.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

123.    Instead, Jones Day required that female staff to provide a medical certification of their disability in order to obtain "medical" or "disability" leave following childbirth.  Dressing Decl. ¶ 11.a.

**RESPONSE:** Undisputed.

124.    Moreover, as of at least 2018, Jones Day's leave offerings did not provide female project or staff attorneys with at least eight weeks of leave—either paid *or* unpaid—within the first year of their employment with the firm.  Chase Ex. 76 (Bounds 30(b)(6)) at 157:20-167:24; Sheketoff Ex. 27 at JD_00003853-54.

**RESPONSE:** Disputed.  Plaintiffs' arguments about Jones Day's staff policy is immaterial. How Jones Day administers its leave policy with respect to staff has no bearing on the Short Term Disability and Family Leave policies disputed by Plaintiffs. Moreover, Plaintiffs' Rule

30(b)(6) notice did not include, and Bounds was not designated to testify about, Jones Day's leave policy for staff. Chase Reply Ex. 93, Bounds 30(b)(6) notice; *see also* Chase Ex. 76, Bounds Tr. at 157:23-158:19, 165:25-166:8 (scope objection). Plaintiffs' citation also ignores Bounds's confirmation, within her personal knowledge, that the relevant staff are not entitled to *any* short-term disability benefits for their first year of employment. Chase Ex. 76, Bounds Tr. 158:22-160:16.

      **REPLY:** Although Jones Day purports to dispute this statement, it identifies no part of the statement that it actually disputes.  Moreover, Bounds was designated as Jones Day's 30(b)(6) witness on the topic of "the meaning, application, and operation of Jones Day's leave offerings for *new parents*"—which includes staff attorneys, project attorneys, and associate attorneys.  And regardless, whether Bounds' testimony was in her 30(b)(6) capacity or her personal capacity is irrelevant to the admissibility and the undisputed character of her testimony (which she was undisputedly competent to give in her personal capacity as a Jones Day HR official who administers the policy for staff as well as associates).  *E.g.*, Chase Ex. 76 (Bounds (30(b)(6)) at 158:18-19 ("So I can answer from personal knowledge, not from any other standpoint.").  This statement is admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  ontra Jones Day, the statement is material because it shows that (1) Jones Day does not actually believe that all female attorneys are disabled from working at Jones Day for eight weeks after childbirth, since its policies require some female attorneys to return to work sooner than eight weeks after childbirth; and (2) Jones Day's representation that its 8-week "disability" rule for female associate attorneys was motivated by its interests in administrative efficiency and women's privacy is false, since those theoretical interests are equally applicable with female staff attorneys and female project attorneys.

**125.**    Accordingly, unless such a female project or staff attorney requested and the firm in its discretion granted unpaid leave, the attorney was required to return to work at Jones Day sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 157:20-167:24; Sheketoff Ex. 27 at JD_00003853-54.

**RESPONSE:** Statement 125 is argumentative interpretation, is not supported by the cited evidence, and is immaterial as set forth in response to Statement 124, which is incorporated here by reference. None of the cited testimony states that "unless such a female project or staff attorney requested and the firm in its discretion granted unpaid leave, the attorney was required to return to work at Jones Day sooner than eight weeks after childbirth." The cited exhibit merely describes the policy for salary continuation for certain employees who qualify for short-term disability benefits.

**REPLY:** This statement is not genuinely disputed.  Jones Day conclusorily asserts that this statement is "argumentative interpretation."  This is inaccurate and an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says this statement does not quote Bounds' testimony verbatim, but that is irrelevant and nonresponsive to the substance of this statement.  Next, Jones Day says that the statement is not supported by the cited exhibit, but its subsequent admission that the cited exhibit "describes the policy for salary continuation for certain employees" belies that false representation.  Contra Jones Day, the statement is material because it shows that (1) Jones Day does not actually believe that all female attorneys are disabled from working at Jones Day for eight weeks after childbirth, since its policies require some female attorneys to return to work sooner than eight weeks after childbirth; and (2) Jones Day's representation that its 8-week "disability" rule for female associate attorneys was motivated by its

interests in administrative efficiency and women's privacy is false, since those theoretical interests are equally applicable with female staff attorneys and female project attorneys.

126.    At least one staff member has returned to work at Jones Day sooner than eight weeks after childbirth.  Chase Ex. 76 (Bounds 30(b)(6)) at 103:21-104:14.

**RESPONSE:** Disputed. Jones Day's 30(b)(6) designee testified that prior to 2005, there was a "possibility that a staff member was released to return earlier than that" by a physician under a different policy. Chase Ex. 76, Bounds Tr. 103:21-104:14. Statement 126 is also immaterial, in that nothing precludes an associate from returning to work sooner than eight weeks following delivery. *See id*. at 104:23-105:1.

127.    Under the August 2018 leave offerings, new mothers are permitted to return to work within eight weeks of giving birth.  Chase Ex. 76 (Bounds 30(b)(6)) at 104:23-106:17; McClure Decl. ¶ 15.

**RESPONSE:** Undisputed.

128.    Jones Day's August 2018 leave offerings remained in effect as of January 2019.  Chase Ex. 76 (Bounds 30(b)(6)) at 91:22-25.

**RESPONSE:** Undisputed.

129.    Under the August 2018 leave offerings, all new mothers who are primary caregivers receive at least 18 weeks of paid leave (and more if medically justified).  Chase Ex. 76 (Bounds 30(b)(6)) at 110:25-112:15, 230:12-231:12; Chase Ex. 11 at JD_00005170.

**RESPONSE:** Undisputed that Jones Day's policy in August 2018 assumed "that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth" under its Short-Term Disability Policy and provided ten weeks of family leave for primary caregivers on a gender-neutral basis. Further undisputed that a new mother could receive

more than eight weeks of disability leave. Disputed to the extent Statement 129 suggests that women are entitled to the eight week assumption without regard to disability and that all women take the full ten weeks of family leave. The cited testimony does not state that all new mothers who are primary caregivers receive at least 18 weeks of paid leave; identifies an instance where a new mother would not receive 18 weeks of paid leave; and states that to assert that all new mothers receive 18 weeks of paid leave is "incomplete as to what the full policy is," and that the amount of leave "depend[s] on the circumstances of the particular individual." Chase Ex. 76, Bounds Tr. 111:17-19, 230:21-231:4. Similarly, Chase Ex. 11 explicitly disclaims that it is a full description of the relevant policies and refers associates to the Firm Manual for the full detail of those policies, and the Firm Manual in effect at the time explained that "Unless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy (including cesarean-section births)." Sheketoff Ex. 13 at JD_00000338. Further, Chase Exhibit 11 summarizes certain updates to Jones Day's policies that took effect in in January 2015, and the policy was thereafter revised before August 2018. Defendants also incorporate by reference their responses to Statements 21 and 106.

      **REPLY:** This statement is not genuinely disputed. Jones Day points to three pieces of evidence in support of its purported dispute. First, it points to Bounds' 30(b)(6) testimony—but that testimony identifies the *only* circumstance in which a new mother would not get 18 weeks of leave as one where the "individual doesn't *choose* to take 10 weeks of primary care." Since this statement only addresses mothers who are "primary caregivers," Bounds' testimony fully supports it. And Jones Day is bound by its 30(b)(6) witness's testimony. Second, Jones Day says that Chase Exhibit 11 (which is McClure's announcement of the January 2015 leave offerings) supposedly "disclaims that it is a full description of the relevant policies and refers associates to

90

the [f]irm [m]annual for the full description of those policies."  The exhibit actually reads: "The
*remainder* of the [f]irm's policies with respect to maternity, paternity and adoption leave are set
out in the [f]irm [m]anual."  Chase Ex. 11 (emphasis added).  It is not genuinely disputable (and
apparently not disputed) that the text of McClure's email (quoted in PSF ¶ 78) conveyed that all
new mothers would receive 18 weeks of paid leave irrespective of disability.   In referring to the
"*remainder*" of the firm's January 2015 policies, McClure's email plainly was not suggesting that
those other documents would *undermine or contradict* (as opposed to potentially *supplement*) the
policy changes announced in the email.  Moreover, the firm's manual was *never amended* to
incorporate the policy announced by McClure and implemented on January 1, 2015.  Sheketoff
Ex. 174 at JD_00000669 (█████████████████████████████████████████);
Sheketoff Ex. 173 at JD_00003799 ("████████████████████").  The version of the firm
manual in place at the time of McClure's announcement (which Jones Day only selectively quotes
above) thus reflects the firm's *prior* policy that new mothers receive "four weeks of paid family
leave" and an eight-week disability period—for a total of 12 weeks of paid leave—rather that the
amended policy of "a total of 18 weeks of paid leave post-partum" effective January 1, 2015.
Sheketoff Ex. 13 at JD_00000338.  McClure's email's reference to the "*remainder* of the firm's
policies with respect to maternity, paternity and adoption leave … set out in the firm manual" was
thus incoherent—and in no way did the never-amended firm manual override the terms of the
announcement.  Indeed, it is undisputed that, despite the firm manual's contrary text, the amount
of leave labeled "family leave" given to birthmothers was ten weeks in January 2015, not four
(PSF ¶¶ 73-74, 105), and the amount of paid leave given to adoptive parents was 18 weeks in
January 2015, not four (PSF ¶ 108).  Jones Day has admitted that the amount of paid leave for new
mothers (at least insofar as they identify as primary caretakers) did not change between McClure's

announcement and January 2019.  PSF ¶¶ 99, 103 (Jones Day's responses).  Third, Jones Day points to the out-of-date firm manual statement that, "[u]nless the Firm is notified otherwise, it will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine pregnancy (including cesarean-section births)."  Sheketoff Ex. 13 at JD_00000338.  This Court has already held that that language is ambiguous, so it doesn't help Jones Day. *See Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020).

**130.**    Jones Day advertises its policy as providing 18 weeks of paid leave for new mothers and 24 weeks total (including unpaid leave).  Sheketoff Ex. 19 at JD_00003788-89 (Jones Day submission to NALP in 2015: "SARAH [MCCLURE'S] EDITS[:] Maternity Leave: The firm provides 18 weeks of paid maternity leave and 6 weeks of unpaid maternity leave, for a total maternity leave of up to 24 weeks…. How many weeks of paid parental leave do female attorneys receive?  18."); Sheketoff Ex. 23 at JD_00003816 (Jones Day submission to NALP in 2016: "the Firm provides 18 weeks of paid leave"); Sheketoff Ex. 24 (Jones Day website: "Maternity Leave: For mothers who are primary caregivers the [f]irm provides 18 weeks of paid leave (8 weeks of paid disability leave plus 10 weeks of paid family leave) and 6 weeks of unpaid leave, for a total leave of up to 24 weeks."); Sheketoff Ex. 21 at JD_00003800 (proposed material for Jones Day website: "Maternity Leave: The Firm provides 18 weeks of paid maternity leave and 6 weeks of unpaid maternity leave, for a total maternity leave of up to 24 weeks."); Sheketoff Ex. 22 at JD_00002664 (Summary of Benefits for New Associates/Judicial Clerks: "for a total maternity leave of 24 weeks"); Sheketoff Ex. 25 (Summary of Benefits for Lateral Associates: "for a total maternity leave of 24 weeks post-partum"); Chase Ex. 80 (Sheketoff) at 246:13-20; Sheketoff Decl. ¶ 7.

**RESPONSE:** Undisputed that Jones Day provides summary description of various leave policies in response to surveys from the National Association for Law Placement and through the Firm's website. The remainder of Statement 130 is argumentative interpretation of the evidence and is disputed. None of these exhibits are advertisements or purports to be full statements of Jones Day's policies. Sheketoff Exhibit 25 also is not a Summary of Benefits and does not contain the quoted language. The quotations in Statement 130 from Sheketoff Exhibits 22, 23, and 24 also omit reference to the content in those exhibits that indicates leave for new mothers who are primary caregivers consists of a combination of leave under the Firm's Short Term Disability policy and family leave. *See, e.g.*, Ex. 22 at JD_00002644 ("For routine childbirth…unless the Firm is notified otherwise, it will assume an 8-week disability period…In the case of a newly born child, the Firm will provide mothers eight weeks of paid disability leave under the Firm's Short Term Disability policy. In addition, if the mother is the primary caregiver, the Firm will provide an additional ten weeks of paid family leave and, with approval, up to an additional six weeks of unpaid leave…for a total maternity leave of 24 weeks post-partum."). Defendants also incorporate by reference their responses to Statements 21 and 46.

**REPLY:** Jones Day conclusorily asserts that this statement is an argumentative interpretation of the evidence. That is inaccurate and it is an inadequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day also notes that Plaintiffs cited the incorrect exhibit for Jones Day's Summary of Benefits for Lateral Associates, which Jones Day produced to Plaintiffs. That exhibit (originally miscited as Sheketoff Ex. 25) is included here as Sheketoff Ex. 175. The quoted material appears at JD_00002708. Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**131.** Within the firm, Jones Day describes its leave offerings for new mothers as 18 weeks of paid maternity or parental leave. Sheketoff Ex. 25 at JD_00003969 (Human Resources Manager: "The policy allows for 18 weeks of maternity leave and if requested and approved, an additional 6 weeks of leave."); *id.* (Heifetz: describing "maternity leave" as "18 weeks"); August 4, 2020 Tr. at 16:15-17:8 (Jones Day's counsel asserting that it's "understandable" that Jones Day itself would refer to "18 weeks parental leave" and advertise it in that manner to lawyers, because it's just "not the way humans speak" to say that "the firm has a certification assumption of eight weeks of a medical disability, and unless you provide contrary evidence you will get eight weeks."); Sheketoff Ex. 161 at JD_00002887 ("███████████████████"); Sheketoff Ex. 162 at JD_00004061 (same); Sheketoff Ex. 164 at JD_00004193 ("██████████████████ ████████████████████████████████████████ ██████████"); Sheketoff Ex. 166 at JD_00004251 ("██████████████████ ████████████████"); Chase Ex. 80 (Sheketoff) at 245:23-247:1, 257:18-262:3; Sheketoff Decl. ¶ 7.

**RESPONSE:** Disputed. Within the Firm, Jones Day provides individuals who are offered employment as an associate a detailed description of the Firm's employment policies, including that "[f]or routine childbirth (including cesarean-section births), unless the Firm is notified otherwise, it will assume an 8-week disability period." *See* Chase Reply Ex. 91 at P02501 (Sheketoff Offer of Employment attaching Statement of Benefits); Chase Reply Ex. 92 at P02742 (Savignac Offer of Employment attaching Chase Ex. 2). They are also provided the full detail in those official plan documents and again told "these provisions apply to … Associates … who are employed on a salaried basis." McClure Ex. 1 at JD_00002481; Chase Ex. 76, Bounds Tr. 31:9-13. For associates who seek birth-related leave, HR staff goes over the policy with them and, if

applicable, the Firm also provides separate notice that salary continuation under the Firm's short-term disability policy is subject to potential repayment to the extent the person does not qualify for that benefit. Chase Ex. 76, Bounds Tr. 31:14-32:14; McClure Ex. 2. While Plaintiffs purport to dispute some of these facts, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶¶ 112-13. Defendants also incorporate by reference their responses to Statements 21 and 46. Moreover, no contrary conclusion can be drawn from off-hand references that do not purport to describe in detail every facet of multiple-page leave policies. *See*, *e.g.*, Sheketoff Ex. 25. In addition, the quotations in Statement 131 from Sheketoff Exhibits 161, 162, 164, and 166 omit reference to the content in those exhibits that indicates leave for new mothers who are primary caregivers consists of a combination of leave under the Firm's Short Term Disability policy and family leave. *See*, *e.g.*, Sheketoff Ex. 163 at JD_00004123.

**REPLY:** This statement is not genuinely disputed.  The Court has already held that the language quoted above from Chase Reply Exhibit 91 and 92 is ambiguous, so it can hardly "correct" Jones Day's countless explicit statements that female associates who give birth are entitled to (at least) 18 weeks of paid leave (regardless of disability).  *See Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020).  In any event, in language not quoted by Jones Day, after discussing the "assum[ption] [of] an eight-week disability period," Chase Exhibit 91 clarifies what that means: "*Thus*, the available leave includes an eight-week paid medical leave and a four-week paid family leave, *for a total of twelve weeks paid leave*, and with approval, up to an additional 12 weeks of unpaid leave with benefits continued at the lawyer's expense."  Chase Ex. 91 at P02499 (emphases added).  (The amount of paid leave is 12 weeks rather than 18 weeks because Julia received this document in July 2014, before the firm increased its leave offerings for new mothers

effective January 2015.)  Chase Exhibit 92 further describes the available leave for new mothers as: "a total maternity leave of 24 weeks post-partum," and refers to the so-called "disability leave" as "the eight weeks of disability leave."  *Id.*  Jones Day also points to its written short-term disability policy, suggesting it is an "official plan document" that somehow supersedes the firm's countless other representations about its leave offerings.  Actually, the firm's short-term disability policy is a salary-continuation policy funded by Jones Day itself—not an insurance contract or an ERISA defined benefit plan.  PSF ¶¶ 189-190.  The written short-term disability policy itself declares: "*This payroll practice* provides some level of salary continuation …. *It is not subject to ERISA.*"  McClure Ex. 1 at JD_00002483 (emphasis added).  Thus the written short-term disability policy—just like emails from the firm's HR managers, the written family leave policy, and innumerable other evidence demonstrating that Jones Day gives all new mothers at least 18 weeks of leave—is simply evidence of what the actual policy is.  In any event, the Court has already held that the language in the firm's written short-term disability policy (McClure Ex. 1 at JD_00002481) is ambiguous.  *Savignac v*, 486 F. Supp. 3d at 36.  In contrast, the written family leave policy *unambiguously* describes "the eight weeks of paid disability," the "additional ten weeks of paid family leave," and "the 18 weeks of paid leave" (McClure Ex. 1 at JD_00002485).  The evidence cited this paragraph shows how Jones Day interprets and applies the language in its written policies, including in its human resources department's communications with new mothers about taking leave.  *E.g.*, Sheketoff Ex. 164 at JD_00004193 ("████████████████████ ██████████████████████████████████████████████████████████ ██████████████████."); Sheketoff Ex. 166 at JD_00004251 ("████████████████ ███████████████████████").

**132.** The general understanding at Jones Day is that any woman who gives birth will have at least 18 weeks of paid leave, regardless of whether she is disabled for eight weeks. Chase Ex. 80 (Sheketoff) at 245:23-247:1; *see also*, *e.g.*, Sheketoff Ex. 163 at JD_00004145 (█████ ████████████████████████████████████████████████████████ █████); Sheketoff Ex. 164 at JD_00004193 (████████████████████████ █████); Sheketoff Ex. 165 at JD_00004293 ("███████████████████████ █"); Sheketoff Ex. 166 at JD_00004245 (████████████████████████ ████████████████████████████████████████"); *see also* Chase Ex. 80 (Sheketoff) at 257:18-262:3.

**RESPONSE:** Disputed. Within the Firm, Jones Day provides individuals who are offered employment as an associate a detailed description of the Firm's employment policies, including that "[f]or routine childbirth (including cesarean-section births), unless the Firm is notified otherwise, it will assume an 8-week disability period." *See* Chase Reply Ex. 91 at P02501 (Sheketoff Offer of Employment attaching Statement of Benefits); Chase Reply Ex. 92 at P02742 (Savignac Offer of Employment attaching Chase Ex. 2). They are also provided the full detail in those official plan documents and again told "these provisions apply to … Associates … who are employed on a salaried basis." McClure Ex. 1 at JD_00002481; Chase Ex. 76, Bounds Tr. 31:9-13. For associates who seek birth-related leave, HR staff goes over the policy with them and, if applicable, the Firm also provides separate notice that salary continuation under the Firm's short-term disability policy is subject to potential repayment to the extent the person does not qualify for that benefit. Chase Ex. 76, Bounds Tr. 31:14-32:14; McClure Ex. 2. While Plaintiffs purport to dispute some of these facts, they offer in response only argument that does not legitimately dispute the point; they do not cite any contrary evidence. *See* Pls. Resp. DSF ¶¶ 112-13. Defendants also

incorporate by reference their responses to Statements 21 and 46. No contrary conclusion can be drawn from off-hand references that do not purport to describe in detail every facet of multiple-page leave policies, and the evidence cited in Statement 132—including a total of three emails—does not support a "general understanding at Jones Day." Defendants also object pursuant to Fed. R. Civ. P. 56(c) to Plaintiffs' reliance on Chase Ex. 80, which offers out-of-court statements by unknown individuals for the truth of the matter, and thus constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day does not genuinely dispute this statement.  It regurgitates largely verbatim its response to PSF ¶ 131, and Plaintiffs thus incorporate their reply to PSF ¶ 131.  Jones Day also objects to Plaintiffs' reliance on Chase Exhibit 80 on the ground that it "offers out-of-court statements by unknown individuals for the truth of the matter."  The cited exhibit is Julia's deposition testimony about her personal conversation with Sarah McClure in which McClure acknowledged that Jones Day gives all women 18 weeks of leave irrespective of disability.  McClure's statements are plainly admissible under FRE 801(d)(2).  The cited exhibit also describes the "common understanding at Jones Day that women get 18 weeks of leave," and references Julia's conversations with Defendant Beth Heifetz and other associates.  Heifetz' statements about the terms of the firm's leave offerings are admissible under FRE 801(d)(2).  Heifetz' and other associates' statements about the terms of the leave policy also separately bear on the "common *understanding* at Jones Day that women get 18 weeks of leave" irrespective of the truth of the assertions in those statements (that women in fact get 18 weeks) and thus are definitionally not hearsay.  FRE 801(c)(2).

133.    When Julia, who was five months pregnant and a Jones Day associate at the time, asked Jones Day's human resources manager for the firm's "parental leave policy," she responded

sending only the written "Family Leave" policy—not the written "Short Term Disability Policy." Sheketoff Ex. 6 at P02753-55.

**RESPONSE:** Undisputed.

**134.** Shortly after mothers give birth, and without regard to the actual length of the mother's disability, Jones Day's human resources department advises mothers of the dates that their eight-week "disability" leave period begins and ends. *E.g.*, Sheketoff Ex. 161 at JD_00002869, 2879; Sheketoff Ex. 162 at JD_00004061; Sheketoff Ex. 163 at JD_00004129; Sheketoff Ex. 164 at JD_00004189; Sheketoff Ex. 165 at JD_00004273.

**RESPONSE:** Undisputed that Jones Day assumes that an associate's medical provider has certified an eight-week disability for routine childbirth, and that, once the date of delivery is known, human resources calculates a date at which the associate is planning to return to work after expiration of the different types of leave the associate plans to take at that time, which can include disability leave, family leave, unpaid leave, and a combination of sick days and vacation, often for a return date several months after delivery. Jones Day also provides each associate seeking benefits under the Firm's Short Term Disability policy that salary continuation under that policy is subject to repayment if the associate does not meet the requirements of the policy. McClure Ex. 2. Defendants further dispute Statement 133 to the extent it is argumentative interpretation and suggests the eight-week assumptions constitutes an entitlement to eight weeks of paid leave without regard to disability. Defendants also incorporate by reference their responses to Statements 21 and 46.

**REPLY:** Jones Day disputes some unidentified portion of this statement on the ground that it is "argumentative interpretation." That vague and conclusory assertion is inaccurate and an inadequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day does not

otherwise dispute any part of this statement.   The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

135.    Mothers-to-be at Jones Day arrange to take 18 weeks of leave before they give birth and thus before they know how long they will be disabled.  Sheketoff Decl. ¶¶ 8-9.

**RESPONSE:** Disputed. Statement 135 cites no admissible evidence regarding how new mothers at Jones Day arrange to take leave. Defendants object pursuant to Fed. R. Civ. P. 56(c) to Plaintiffs' reliance on Sheketoff's declaration, which offers out-of-court statements by unknown individuals for the truth of the matter, and thus constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802. The declaration also does not support any assertion about "mothers-to-be at Jones Day" generally. Based on the records produced in discovery in this case, the amount of total paid leave any given female associate has taken following childbirth has ████████████. Chase Reply Ex. 94 at JD_00004891. Moreover, the assertion in Statement 135 about pre-partum planning is consistent with the common practice of physicians—including Plaintiffs' expert witness—to provide a pre-delivery certification of six to eight weeks of disability when the type of delivery is unknown. Chase Ex. 90, Naylor Tr. 30:20-31:15, 108:5-111:1.

**REPLY:** This statement is not genuinely disputed.   Jones Day "disputes" this statement on the ground that it is inadmissible hearsay.  However, other Jones Day employees' statements to Julia about their departure and return dates from maternity leave, including in the form of transition memos discussed in Julia's declaration at ¶ 9, would be introduced not to prove the truth of the matter asserted (e.g., that a mother-to-be would return on a particular date) but instead to prove that the declarants were able to arrange to take 18 weeks of paid leave before they gave birth.  That is not a hearsay purpose.  FRE 801(c)(2).  In any event, such statements to Julia

(including transition memos) would also be admissible under FRE 801(d)(2) and FRE 803(6); *see also* FRE 805.

136.   Jones Day's own expert based her opinion in this case on her understanding that Jones Day's leave offerings provided all women who gave birth eight weeks of "disability" leave regardless of when any individual woman recovered from childbirth.  Chase Ex. 89 (Colie) at 188:11-190:20.

**RESPONSE:** Disputed.  Defendants' expert based her opinions on her extensive personal knowledge and experience as a board-certified OB-GYN for over 30 years. Chase Ex. 85 at 1-2 and Exhibit A. Further disputed to the extent Statement 136 suggests Dr. Colie opined on the application of Jones Day's Short Term Disability policy; Dr. Colie offered opinions based on her expertise on the impact of childbirth on the mother, post-partum standards of care and recovery, and the medical reasonableness of the Firm's eight-week disability period. *See id.* at 2.

**REPLY:** Colie testified unequivocally: "Q: And is it your understanding that the policy gives all women eight weeks regardless of when any individual woman is recovered from childbirth?  [counsel's objection omitted]  A:  Yes.  Q: And that's—that's part of your understanding on which you base your opinion that Jones Day's policy is reasonable?  A: Yes." Chase Ex. 89 (Colie) at 190:11-20.  This statement, which makes no representation about whether Colie also relied on her own experience, is not genuinely disputed.

137.   Julia's August 2018 email challenging Jones Day's policy (which is discussed further below) states that "[e]ight of the weeks for women [under the policy] are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled.  Most women aren't physically disabled from office work for such a long period of time and yet still get the full eight weeks of disability leave."  McClure Ex. 3 at JD_00003165.

**RESPONSE:** Undisputed that the quoted text appears in McClure Exhibit 3, subject to typographical errors in Statement 137 that are inconsistent with the exhibit.

138.   Julia's August 2018 email was forwarded to Jones Day Human Resources Director Sarah McClure, who responded on behalf of Jones Day.  McClure Ex. 3 at JD_00003163-64.

**RESPONSE:** Undisputed.

139.   While McClure argued in her response that Jones Day's policy is lawful, she said nothing to suggest that she disagreed with Julia's factual statement that the eight-week "disability" leave "is not dependent upon whether women are actually disabled" and women "still get the full eight weeks of disability."  McClure Ex. 3 at JD_00003163.

**RESPONSE:** Disputed as argumentative interpretation of the evidence.  Sheketoff's August 2018 email sought eight weeks of post-partum paid disability leave for Savignac—who indisputably was not giving birth and would have no birth-related post-partum disability—on the grounds that the Firm would otherwise be illegally discriminating against Savignac. McClure Ex. 3. McClure's verbal response indicated that the Firm assumes an eight-week period of disability for routine childbirth. McClure Dec. ¶ 17. Her written response focused on the allegation of unlawful discrimination and the legality of granting additional leave for disability to those who actually give birth. *See* McClure Ex. 3 at JD_00003163. None of that is evidence that associates at Jones Day are entitled to at least eight weeks of disability leave for childbirth or that McClure agreed that Sheketoff had fully and accurately described Jones Day's leave policies. Defendants also incorporate by reference their responses to Statements 21 and 46.

**REPLY:** Jones Day conclusorily asserts that this statement is argumentative interpretation of the evidence.  That is inaccurate and insufficient to create a genuine dispute of fact.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this

statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "Sheketoff's August 2018 email") is nonresponsive and should be disregarded.

140.    Jones Day's Administrative Partner, Michael Shumaker, also analyzed the issue in August 2018 and reviewed McClure's response before it was sent.  Chase Ex. 81 (Shumaker) at 168:2-20; McClure Ex. 3 at JD_00003163 (showing that Shumaker was Bcc'd on the response).

**RESPONSE:** Undisputed. By way of further response, Shumaker testified that "Sarah provided a response to your concerns about the family leave policy and whether it was in compliance with applicable law. I reviewed the cases that she cited. I reviewed the EEOC example that she provided. I can say that your statement in your initial e-mail was erroneous. I didn't know that that needed to be rebutted in our response to Mark, in a cooperative effort to convey to you the firm's policy and its legality." Chase Ex. 81, Shumaker Tr. 177:7-16. Defendants also incorporate by reference their responses to Statements 21, 46, and 139.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its lengthy response (beginning with "By way of further response") is not responsive to this statement and should be disregarded.  Jones Day also omits that Shumaker claimed that "your statement in your initial e-mail was erroneous" after he was surreptitiously prompted by his lawyer to retract his prior admission that he "had no reason to think that it was an inaccurate statement," as discussed in PSF ¶¶ 141-42.  Chase Ex. 81 (Shumaker) 170:11-14.

141.    When Julia asked Shumaker at his deposition whether he understood her email's statement that "Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled" to be an "accurate statement of Jones Day's policy," Shumaker responded: "I had no reason to think it was an inaccurate statement, but I would

have relied on Sarah [McClure] to say, 'She's got it wrong.' And I don't remember that coming up." Chase Ex. 81 (Shumaker) at 170:1-14.

**RESPONSE:** Undisputed that the quoted language appears (without Plaintiffs' alterations) in Shumaker's deposition testimony. Disputed to the extent Plaintiffs cite this testimony out of context and ignore Shumaker's testimony immediately thereafter that elaborated on his response and confirmed his understanding that "I'm just looking at the… -- your e-mail, Julia, and -- second sentence: 'Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether the women are actually disabled' -- I think that is an incorrect statement." Chase Ex. 81, Shumaker Tr. at 171:9-16. *See also id.* at 172:9-11 ("The idea that they're not disabled during that time is not a proper conclusion. So for you to say that statement is erroneous.").

**REPLY:** Jones Day does not dispute any part of this statement. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The statement does not "cite this testimony out of context" and does not "ignore" his contradictory subsequent testimony, which is described in the immediately following statement (PSF ¶ 142). As noted there, *Jones Day's* response here ignores Shumaker's testimony immediately thereafter, which admitted that he was responding to coaching by his attorney. In any event, Shumaker's subsequent testimony was that this statement is inaccurate only because all women *are* disabled for 8 weeks after childbirth—which everyone now agrees is false. Chase Ex. 81 (Shumaker) at 172:3-22. Shumaker specifically admitted that all women are entitled to eight weeks of "disability" leave, even if they are disabled for less than eight weeks. Chase Ex. 81 at 177:21-178:10, 180:24-181:16. That means the "disability" leave is not dependent upon whether women are actually disabled, as this statement

asserts and as Shumaker candidly acknowledged before his lawyer inappropriately prompted him to revise his testimony.

142.     Shortly thereafter, Shumaker stated that, actually, "I think that is an incorrect statement" about the policy—a statement that Shumaker acknowledged was prompted by something his lawyer said to him.  Chase Ex. 81 (Shumaker) at 171:3-25.

**RESPONSE:** Undisputed that the quoted language appears in Michael Shumaker's deposition testimony. The remainder of Statement 142 is disputed as argumentative interpretation of the evidence. Shumaker testified that Jones Day counsel told him to "'Make sure you're looking at the document,'" and, as a result, it "made me think, go back and take a look at it." Chase Ex. 81, Shumaker Tr. 171:18-22.

**REPLY:** This statement is not genuinely disputed.  Jones Day asserts that it is "argumentative interpretation of evidence."  That is inaccurate and it is an inadequate basis to create a genuine fact dispute.  *See* Preliminary Statement A.  Jones Day's quotation simply confirms this statement's assertion that Shumaker acknowledged that his "correction" was prompted by something his lawyer said to him.

143.     Nonetheless, Shumaker acknowledged that when Julia made the statement in her August 2018 email, he and McClure did not "correct" her or otherwise suggest that the statement was inaccurate.  Chase Ex. 81 (Shumaker) at 174:12-181:25.

**RESPONSE:** Disputed as argumentative interpretation of evidence and ignoring Shumaker's testimony explaining that "Sarah provided a response to your concerns about the family leave policy and whether it was in compliance with applicable law…I can say that your statement in your initial e-mail was erroneous. I didn't know that that needed to be rebutted in our response to Mark, in a cooperative effort to convey to you the firm's policy and its legality." Chase

Ex. 81, Shumaker Tr. 177:7-19. Defendants also incorporate by reference their responses to Statements 21, 46, 139, and 140.

**REPLY:** This statement is not genuinely disputed. Jones Day says that this statement is "argumentative interpretation of the evidence." That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute. *See* Preliminary Statement A. Jones Day also disputes this statement for "ignoring" certain testimony quoted above. That quoted testimony in no way conflicts with this statement.

**144.** Jones Day's lead counsel stated at Shumaker's deposition that "[h]e [Shumaker] has told you that if she's the primary caregiver, she gets the eight weeks." Chase Ex. 81 (Shumaker) at 179:3-13.

**RESPONSE:** Disputed as not based on admissible evidence, but on statements of counsel at a deposition that were part of a broader series of objections in light of Sheketoff's improper questioning.

**REPLY:** Jones Day "dispute[s]" this statement as being "not based on admissible evidence." It fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection. Statements of counsel are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401). Moreover, counsel's statement here was both an admission and a stipulation, which are properly considered on a summary judgment motion. *See* FRCP 56(c)(1)(A) (referring to "admissions")); Wright & Miller, Federal Practice and Procedure § 2722 ("The admissions need not be pursuant to Rule 36; they may … have been made in connection with one of the other discovery procedures, or have their roots in a … stipulation by counsel."). Indeed, counsel was directing Plaintiffs to stop trying to get an answer to a question because the witness supposedly "answered and answered this question repeatedly.

He has told you that if she's the primary caregiver, she gets the eight weeks."  Chase Ex. 81 (Shumaker) at 179:3-13.  Counsel then directed Plaintiffs to "Move on" and Plaintiffs ultimately asked a different question, in part based on the stipulation by counsel quoted in this statement. *Id.* at 180:24-181:2.  Apart from the invalid inadmissibility objection, Jones Day does not dispute this statement.  It is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**145.**   Plaintiffs' complaint in this action likewise asserts that "Jones Day provides 'the eight weeks' of 'disability leave,' and (for primary caregivers) a total of '18 weeks of paid leave,' to all biological mothers without regard for how long they are disabled from performing legal work." Dkt. 1 at 14 (Compl. ¶¶ 110-12).

**RESPONSE:** Undisputed that the quoted language appears in Plaintiffs' complaint. Disputed to the extent Plaintiffs intend to assert that their complaint allegations are admissible evidence, which they are not.

**REPLY:** Jones Day disputes this "to the extent Plaintiffs intend to assert that their complaint allegations are admissible evidence, which they are not."  It fails to explain on what ground the complaint is inadmissible (which is not self-evident) and on that basis forfeits the objection.  Plaintiffs' complaint allegations would not be admitted to prove the truth of those allegations but to simply to show what the allegations were.  That is relevant because, despite the clarity of the complaint's allegations about the substance of Jones Day's leave offerings, Jones Day never suggested in its press release or its motion to dismiss that Plaintiffs misunderstood its leave offerings or that a woman who ceases to be disabled in less than eight weeks actually is not entitled to the full eight weeks of so-called disability leave.

146.     Jones Day's press release responding to this litigation does not state that Plaintiffs misunderstood what its policy allows or that a woman who ceases to be disabled in less than eight weeks actually is not entitled to the full eight weeks of so-called disability leave.  Chase Ex. 72.

**RESPONSE:** Disputed as argumentative interpretation of evidence. Jones Day's August 2019 press release was not drafted in response to Sheketoff's August 2018 email and does not purport to describe in full Jones Day's response to all of Plaintiffs' allegations. Statement 146 also ignores the press release's statement that "Birth mothers are eligible to receive an additional eight weeks of paid leave under the Firm's short term disability policy." Chase Ex. 72 at P02271. That policy provides that the Firm "will assume that a lawyer's medical provider has certified an eight- week, post-partum disability period for routine childbirth." McClure Ex. 1 at JD_00002484. Defendants also incorporate by reference their responses to Statements 21 and 46.

**REPLY:** Jones Day claims that this statement an argumentative interpretation of evidence.  That is inaccurate and it is an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day not otherwise dispute any part of this statement.  It is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning "Jones Day's press release") is not responsive to this statement and should be disregarded.  It is also misleading.  Jones Day's press release was responding to Plaintiffs' complaint, which asserted that "Jones Day provides 'the eight weeks' of 'disability leave,' and (for primary caregivers) a total of '18 weeks of paid leave,' to all biological mothers without regard for how long they are disabled from performing legal work." Dkt. 1 at 14 (Compl. ¶¶ 110-12).

147.     Nor does Jones Day's motion to dismiss the complaint say that Plaintiffs misunderstood what its policy allows or that a woman who ceases to be disabled in less than eight weeks actually is not entitled to the full eight weeks of so-called disability leave.  Dkt. 15.

**RESPONSE:** Disputed as argumentative and mischaracterizing legal briefing by taking it out of context. Defendants' arguments on a motion to dismiss that Plaintiffs' claims fail as a matter of law as pleaded are not evidence of Jones Day policy. That policy provides that the Firm "will assume that a lawyer's medical provider has certified an eight-week, post-partum disability period for routine childbirth." McClure Ex. 1 at JD_00002484. Defendants also incorporate by reference their responses to Statements 21 and 46.

**REPLY:** Jones Day disputes this statement an argumentative interpretation of evidence. That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute. *See* Preliminary Statement A. Jones Day also disputes this statement as "mischaracterizing" its legal briefing, but fails to identify any way in which the its legal briefing is mischaracterized or any evidence supporting the purported dispute. Jones Day does not otherwise dispute any part of this statement. It is therefore admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

148.     Rather, Jones Day first raised its argument that a woman who ceases to be disabled in less than eight weeks actually is not entitled to the full eight weeks of so-called disability leave in its *reply* in support of its motion to dismiss, as the Court pointed out when it denied that motion. Dkt. 19; *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 36 (D.D.C. 2020) ("Starting with the argument raised in Defendants' reply brief …").

**RESPONSE:** Disputed as argumentative and mischaracterizing legal briefing by taking it out of context. Defendants' arguments on a motion to dismiss that Plaintiffs' claims fail as a matter of law as pleaded are not evidence of Jones Day policy. Moreover, Jones Day's reply brief responded appropriately to Plaintiffs' opposition arguments, which clarified Plaintiffs' apparent objection to Jones Day's policies as the "fundamental distinction between the following

two regimes: (A) Birth mothers are entitled to leave while they are disabled—but no medical evidence is needed to prove disability for the first eight weeks after childbirth [Plaintiffs characterize as "bona fide" disability leave]; and (B) Birth mothers are entitled to eight weeks of disability leave after childbirth [Plaintiffs characterize as a "sham"]." Dkt. 19 at 1-2. Defendants also incorporate by reference their responses to Statements 21, 46, and 147.

**REPLY:** Jones Day disputes this statement an argumentative interpretation of evidence.  That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute.  *See* Preliminary Statement A.  Jones Day also disputes this statement as "mischaracterizing" its legal briefing, but fails to identify any way in which the its legal briefing is mischaracterized or any evidence supporting the purported dispute.  Jones Day does not otherwise dispute any part of this statement.  It is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

### C.   Giving all new mothers eight weeks of "disability" leave is an overinclusive generalization unsupported by medical practice.

**149.**   As Jones Day's own medical expert acknowledged, assuming an eight-week disability period after childbirth for all women is a generalization.  Chase Ex. 89 (Colie) at 192:14-18.

**RESPONSE:** Disputed. The cited exhibit does not support the asserted fact. Dr. Colie's testimony was that "it is a generalization to say that women need at least eight weeks of recovery after childbirth." Chase Ex. 89, Colie Tr. 192:16-18.

**REPLY:** As Jones Day's quotation of its own expert's testimony reflects, this statement is not genuinely disputed.  It is not clear how Jones Day purports to dispute it.

**150.**   Not all women are disabled for eight weeks after childbirth.  Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Colie) at 192:14-21; *id.* at 78:19-21 ("Q: Does it take at least six to eight weeks for a woman to be able to work?  A: Sometimes."); *id.* at 279:23-280:14 (testifying

that most women can work on a computer at least eight hours per day within six weeks of an uncomplicated vaginal birth); Chase Ex. 90 (Naylor) at 53:9-17 ("I have female partners in our practice who return to taking call[] at four weeks.  There's an anesthesiologist I have worked with who has a number of children who returns to work at two weeks.  There's a midwife I work with who returned at four weeks.  So it's very common, even with health care providers, for people to return to work at four weeks and even earlier if they're feeling well and aren't experiencing any complications."); August 4, 2020 Tr. at 24:3-4 ("There are instances where mothers recover before the certification's expiration."); Dkt. 15 at 21 (MTD) (acknowledging that, under the firm's policy, "pregnant women … might be able to obtain more disability leave than they would be able to medically justify"); Dkt. 189 at 24 ("a birth mother might recover more quickly than eight weeks").

**RESPONSE:** The generic proposition that the amount of time needed to recover from childbirth can depend on the individual circumstances of the delivery has never been disputed. Defendants dispute that Statement 150 cites any admissible evidence that supports the assertion. Anecdotal evidence about some people returning to work does not establish the extent of any person's disability, what disability period their physician certified, or when that disability resolved relative to delivery date. For people whose employers do not offer salary continuation during disability leave, economic pressures can force a premature return to work before disability ends. *See* Chase Ex. 89, Colie Tr. 80:9-83:9, 344:6-18; *see also* Chase Ex. 90, Naylor Tr. 143:24-144:9 (testifying that many of his patients are part of self-employed farming families that have a financial incentive to return to work earlier). Dr. Colie also elaborated on the testimony cited in Statement 150 and stated that a woman may be able to work remotely for eight hours a day at six weeks post-partum if "they [are] in bed the other 16" hours each day and has "nothing else she needs to do." Chase Ex. 89, Colie Tr. 279:23-280:14. It is undisputed that both experts testified that it is

medically reasonable to certify six weeks of disability for vaginal delivery without complications, and eight weeks of disability for a cesarean delivery without complications, and that approximately one-third of all births in the U.S. are via cesarean section. Chase Ex. 90, Naylor Tr. 140:16-142:18-23; *see also* Pls. Resp. DSF ¶¶ 58-59. Both experts also agree that certifications occur prior to birth and are, therefore, predictive. Pls. Resp. DSF ¶ 61.

Neither side presented any admissible evidence about whether "all women" or "most women" experience postpartum disability for eight weeks, or about the actual certifications of any Jones Day associate who gave birth (much less "all" of them or "most" of them). Nor did either expert conduct any admissible statistical analysis of disability durations. Dr. Naylor opined that "[p]atients who have an uncomplicated vaginal birth can typically physically return to relatively sedentary employment within 3-4 weeks of delivery," but still acknowledged that "[p]roviders in the United States generally authorize a 6-week disability for an uncomplicated vaginal birth and 8 weeks for an uncomplicated cesarean delivery." Chase Ex. 87 at 2. He provides those certifications without regard to what type of job the patient has. Chase Ex. 90, Naylor Tr. 112:10- 113:18. Moreover, his practice does not schedule a comprehensive post-partum examination until six weeks after a patient has delivered, and sees patients prior to that six-week exam only in about 10% of cases. *Id*. at 96:19-98:20. Dr. Naylor also has never looked at any benchmarking analysis with respect to the short-term disability periods associated with recovery from childbirth. *Id*. at 116:25-117:3. And, he is not aware of any medical literature that certifying six weeks of disability following routine vaginal childbirth is inappropriate. *Id*. at 49:14-50:1. The arguments and hypotheticals in Defendants' legal briefing and oral argument are similarly mischaracterized here, and are not evidence that can support Statement 150 in any event.

More generally, Statements 150 through 187 constitute improper argument. Rather than cite specific parts of the record to establish purportedly undisputed facts, Plaintiffs string-cite a patchwork of out-of-context quotes that they contend support an argument that "[g]iving all new mothers eight weeks of 'disability' leave is an overinclusive generalization." These statements are replete with bold statements about disability lengths in practice, but present no competent evidence on that point. The entire section should be disregarded, both as contrary to Local Rule 7(h), and as immaterial.

**REPLY:** This statement is not genuinely disputed.  Indeed, Jones Day admits that "the amount of time needed to recover from childbirth can depend on the individual circumstances of the delivery," so it is unclear what aspect of this statement it purports to dispute.  Jones Day says that it "dispute[s]" this statement on the ground that it is not supported by "any admissible evidence."  But it fails to explain on what ground the cited evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, the cited evidence consists of statements of the parties' experts (relaying either their expert opinions or their personal knowledge of historical facts) and statements by Jones Day itself (through its counsel).  Those statements, when presented at trial, will not be hearsay (e.g., FRE 801(d)(2)) and are relevant (FRE 401).  *See also* Preliminary Statement D.  Jones Day does not otherwise dispute any part of this statement. The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's lengthy response (e.g., "[n]either expert[s] conduct[ed] any admissible statistical analysis of disability durations") is non-responsive to this statement and should be disregarded.

Jones Day also objects "[m]ore generally" to statements 150 through 187 on the ground that they "constitute improper argument."  That conclusory and sweeping assertion is inaccurate

and an inadequate basis for disputing a statement (let alone 38 statements).  *See* Preliminary Statement A.  Jones Day claims also claims that Plaintiffs do not cite specific parts of the record to establish discrete facts, but each of Plaintiffs' statements identifies an undisputed fact and then cites evidence in the record that supports that fact, in compliance with Local Rule 7(h) and this Court's standing order.  Next, Jones Day complains that Plaintiffs' support supposedly consists of a "string-cite a patchwork of out-of-context quotes."  That is false and not a proper objection. Local Rule 7(h) requires parties moving for summary judgment to provide a "statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  Plaintiffs' citations and quotations are the "parts of the record relied on to support the statement"; the only difference between the references to the record in these paragraphs and in certain other paragraphs is that the cited material is often quoted in parentheses for ease of review. If the material Plaintiffs relied upon was actually taken out of context, Jones Day could have explained the true meaning of that material in its responses.  It has not done so.  Finally, Jones Day says that these statements "present no competent evidence" about "disability lengths in practice."   Again, that sweeping and conclusory assertion is insufficient to create a genuine fact dispute.  Fed. R. Civ. Proc. 56(c)(1). If Jones Day wishes to dispute a statement on the ground that it cannot be supported by admissible evidence, the Rules and this Court's standing order require the firm to "identif[y]" the specific "fact" that it disputes in a "correspondingly numbered paragraph," and "support[]" that dispute "by a precise citation to the controverting evidence."  Standing Order 10(d)(iv)-(v); *see also* Local. R. 7(h)(1).  Jones Day's sweeping (and false) criticisms here do not comply with those rules.

**151.**    In fact, most women are not disabled for a full eight weeks after childbirth.  Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Colie) at 81:21-82:5 ("Q: Are most women able to return

to work sooner than six weeks if they want to do so?...  A: Are most women able if they want to do so?  Well, able is a tough question.  It's a tough point.  Able, I would say they could probably, again cobble through...."); *id.* at 315:1-3 ("I have never said that I—that vaginal delivery needs more than six weeks."); *id.* at 344:3-7 ("Q: And my question is: Does that cause you to question your assertion that most women are unable to return to work six weeks after childbirth?  A: Ms. Sheketoff, I never told you that most women are unable to return to work."); Sheketoff Ex. 70 (Plaintiffs' Ex. 138) at 7 ("According to the Guidelines for Perinatal Care (6th edition), '…a woman can return to a normal work schedule 4-6 weeks after delivery'"); ACOG, Guidelines for Perinatal Care 211 (8th ed.), available at https://msjexhibits.page.link/cD4N ("A period of 4-6 weeks after delivery generally is required for a woman's physiological condition to return to normal"); Chase Ex. 89 (Colie) at 8:21-23 (agreeing the ACOG publications are reliable); *id.* at 307 ("Nope, don't disagree with ACOG.  Definitely a good ACOG OB-GYN."); NIOSH, Guidelines on Pregnancy and Work at 23, available at https://www.cdc.gov/niosh/docs/78-118/default.html (following vaginal delivery, patient generally "reach[es] full capacity three to four weeks postpartum."); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 649 n.15 (1974) (new mothers "may return to 'full activity or employment' if course of progress up to fourth or fifth week is normal" (citing Handbook of Obstetrics & Gynecology)); *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 731 (2003) (referring to "the typical 4- to 8-week period of physical disability due to pregnancy and childbirth"); *id.* at 731 n.4; *see also* Sheketoff Ex. 71 (Plaintiffs' Ex. 139) at 6 (noting that even after "major" procedures like a hysterectomy, a woman may only require "four to six weeks to recover").

      **RESPONSE:** Disputed as unsupported by the record, improper argument, and mischaracterization of evidence.  Statement 151 ignores Jones Day's expert testimony that

assuming an eight-week disability period for routine delivery is medically reasonable. Chase Ex. 85 at 3, 12-13; Chase Ex. 86, Colie Rebuttal Rep. at 1. Being disabled, having a certified disability, and returning to work are not necessarily the same thing; some people return to work while disabled because their employers do not offer salary continuation during the period of disability. *See* Chase Ex. 89, Colie Tr. 80:9-83:9, 344:6-18; *see also* Chase Ex. 90, Naylor Tr. 143:24-144:9 (testifying that many of his patients are part of self-employed farming families that have a financial incentive to return to work earlier). Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 151 cites material that cannot support Plaintiffs' assertion. Sheketoff Ex. 70 (ACOG Guidelines) and Sheketoff Ex. 71 are inadmissible hearsay, and citations to case law cannot support an assertion of fact. *See* Fed. R. Evid. 801, 802. These sources do not support the stated assertion in any event. *See, e.g.*, *Hibbs*, 538 U.S. at 731 (referring to "the typical 4- to 8-week period of physical disability due to pregnancy and childbirth"). Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed. Jones Day complains this statement constitutes "improper argument." That is incorrect and, in any event, it is an inadequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day's remaining complaints are that this statement supposedly mischaracterizes the evidence and is unsupported by the record, but Jones Day fails to explain (let alone substantiate) how that is so. It points out that its own medical expert originally opined that assuming an eight-week disability for routine delivery is medically *reasonable*, but that does not contradict this statement—particularly given that its expert acknowledged that women who have routine vaginal births (which is the majority of women) are *not* disabled for more than six weeks. Chase Ex. 89 (Colie) at 315:1-3 ("I have never said that I— that vaginal delivery needs more than six weeks."). Jones Day also asserts that "[b]eing disabled,

having a certified disability, and returning to work are not *necessarily* the same thing," but the evidence it cites does not support that statement—and being disabled from working and being able to return to work are quite obviously related, even if they are not "necessarily" identical as Jones Day contends.  Jones Day also objects that two of Plaintiffs' cited sources (Sheketoff Ex. 70 and 71) are inadmissible hearsay.  Actually, this medical treatise and periodical article are admissible under FRE 803(18).  Both quoted sources (and the specific material cited therein) were called to the attention of Colie during her during her deposition, and they were established as reliable by Colie or Naylor.  Chase Ex. 89 (Colie) at 8:12-9:1, 329:20-330:24, 332:18-333:20; Chase Ex. 90 (Naylor) at 148:10-23.  Regardless, what matters is whether these sources will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.  Jones Day also claims that "citations to case law cannot support an assertion of fact" but provides no explanation of or support for that claim—and has relied on the same case Plaintiffs cite (and the same material in that case) in its own filings in the past.  *E.g.*, Dkt. 15 at 20 (citing *Hibbs*).

**152.**   In practice, the period of disability after childbirth is individualized. Chase Ex. 87 (Naylor Report) at 3; Chase Ex. 89 (Colie) at 48:22-49:12 ("I think everyone is different.  I think the circumstances around every birth are a little different …."); *id.* at 52 ("I think everyone is different."); *id.* at 57:3-13 ("Because every woman is different and is … undoubtedly going to have an individual response to all the things that happen to her…"); *id.* at 58 ("I think all of these are things that have to be somewhat individualized"); *id.* at  306:10-13 ("Q: Do you agree or disagree with the statement that a six-week maternity leave may be inappropriately long for some women?   A: Maybe.    I don't know."); ACOG, Postpartum Pain Management, https://msjexhibits.page.link/2L6u ("The type, intensity, and duration of postpartum symptoms

will vary from person to person. Some symptoms may last a few days, while others may last several weeks."); NIOSH, Guidelines on Pregnancy and Work at 23, available at https://www.cdc.gov/niosh/docs/78-118/default.html ("Time for recovery varies considerably depending upon the individual patient.").

> **RESPONSE:** Disputed.  While the generic proposition that each person's experience might be unique has never been disputed, the undisputed point of agreement between the experts in this case is that providers generally certify a disability period of six to eight weeks for routine childbirth, and that this general practice is medically reasonable. *See* Pls. Resp. DSF ¶¶ 58-59. Both experts also testified that there was no support for the proposition that six weeks was too long. *See* Chase Ex. 89, Colie Tr. 306:10-15 ("[I]t is not in my experience that a six-week maternity leave it unusually long for most women, no."); Chase Ex. 90, Naylor Tr. 49:14-50:1 ("that really hasn't been studied").  An individualized approach to medical certification for disability from childbirth is infeasible and would place undue burdens on healthcare providers, insurers, and new mothers. *See* Chase Ex. 85, Colie Rep. at 16; Chase Ex. 86, Colie Rebuttal Rep. at 2-3. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 152 cites material that cannot support Plaintiffs' assertion. ACOG Guidelines are inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

> **REPLY:** While Jones Day purports to dispute this paragraph, it admits here that "each person's experience might be unique," admits above that "the amount of time needed to recover from childbirth can depend on the individual circumstances of the delivery" (PSF ¶ 150), and identifies no part of this statement that it actually disputes.  The statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**153.** When asked to provide a certification of disability to an employer or insurance company for new mothers, providers typically certify a six-week disability for an uncomplicated vaginal birth and an eight-week disability period for an uncomplicated cesarean section birth. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10; Chase Ex. 90 (Naylor) at 31:1-18.

**RESPONSE:** Undisputed that a six-week disability period is typically associated with routine vaginal delivery and an eight-week disability period is typically associated with routine cesarean delivery, but disputed that providers certify disability in that way when asked to do so by an employer or insurance company. The two providers who testified in this case described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. Defendants incorporate by reference their response to Statement 150.

**REPLY:** Jones Day does not identify any part of this statement—which does not make a representation that an insurance company or employer themselves make requests for certifications—that it disputes. It is therefore admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The bulk of Jones Day's response (beginning with "The two providers") is nonresponsive and should be disregarded. In any event, those statements are misleading as shown in PSF ¶¶ 154-155. Naylor did *not* testify that he *ever* certified eight weeks for an uncomplicated vaginal birth.

**154.** Providers do not typically certify an eight-week disability period for an uncomplicated vaginal birth. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase

Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

**RESPONSE:** Disputed.  The two providers who testified in this case described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. Defendants incorporate by reference their response to Statement 150.

**REPLY:** Jones Day has already admitted the substance of this statement.  PSF ¶ 153 (Jones Day's response).  As discussed in PSF ¶ 155, when physicians certify "six to eight" weeks before birth when the method of delivery is unknown, that means six weeks for a vaginal birth and eight weeks for a cesarean birth.  Moreover, while Colie claimed that she certified eight weeks when space on the form is limited, she admitted that her practice was atypical and that the typical practice was to certify six weeks (not eight) for an uncomplicated vaginal birth.  Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21.  Naylor did *not* testify that he *ever* certified eight weeks for an uncomplicated vaginal birth.

**155.**   There is no "window" or "range" of "six to eight weeks" in the medical practice for childbirth; rather, the practice when a certification is requested is to certify *six weeks if the birth is vaginal* and to certify *eight weeks if the birth is cesarean*.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

**RESPONSE:** Disputed.  The two providers who testified in this case described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor

Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. Defendants incorporate by reference their response to Statement 150.

> **REPLY:** This statement is not genuinely disputed. Jones Day misleadingly points out that the two experts testified that, when asked to certify disability before a birth (when they don't yet know the type of birth), their administrative staff write down "six to eight" weeks on the certification form. But as both doctors' testimony makes clear, *what that means is six weeks if the birth is vaginal and six weeks if the birth is cesarean section. E.g.*, Chase Ex. 90 (Naylor) at 110:11-111:1 (explaining that "sometimes they'll put six to eight, and then it's clarified afterwards whether it was vaginal birth or c-section" and that "it's adjudicated after the delivery"); Chase Ex. 89 (Colie) at 73:8-14 ("Q. And when you were taught about the six to eight window, were you taught that the six weeks was for a vaginal birth and the eight weeks was for a C-section birth? A: Without exigent circumstances. Q: Is that correct? A. Yes, without exigent circumstances."); Chase Ex.76 (Bounds (30)(b)(6)) at 193:12-194:10 (Jones Day's 30(b)(6) witness testifying that she "would read" Dressing's assertion that "physicians typically certified between six and eight weeks of disability for uncomplicated birth, often depending on whether the birth was vaginal or via Cesarean section" to mean typically "she saw doctors certify six weeks for vaginal deliveries and eight weeks for Caesarean delivers"). Indeed, both doctors testified unequivocally that the typical practice among physicians is to certify six weeks for an uncomplicated vaginal birth and eight weeks for an uncomplicated cesarean section birth. PSF ¶ 150. Jones Day has *expressly admitted* that "a six-week disability period is typically associated with routine vaginal delivery and an eight-week disability period is typically associated with routine cesarean delivery." PSF ¶ 150 (Jones Day's response).

**156.** Indeed, while Dr. Colie personally "prefers the longest recovery window I can find," she acknowledged that her personal practice is idiosyncratic. Chase Ex. 89 (Colie) at 344:3-25; *see also id.* at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21.

**RESPONSE:** Disputed. Dr. Colie never referred to her personal practice as "idiosyncratic." Moreover, the two providers who testified in this case both described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification) and space allowed. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed. This statement does not assert that Colie used the specific word "idiosyncratic"; it asserts that Colie admitted that, in fact, her practice is idiosyncratic (meaning atypical, unusual), which is demonstrated by the cited evidence. Much of Jones Day's answer (beginning with "Moreover, the two providers") is not responsive to this statement and should be disregarded. It is also misleading because it is not genuinely disputed that certifying "six to eight" weeks when the method of delivery is unknown means *six weeks if the birth is vaginal and six weeks if the birth is cesarean section*. PSF ¶ 155.

**157.** The practice of certifying a six-week disability period for an uncomplicated vaginal birth and an eight-week disability period for an uncomplicated c-section birth is based on convention and tradition rather than any "standard of care" or clinical outcome data. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Sheketoff Ex. 74 (Plaintiffs' Exhibit 126) (identifying the "[t]raditional period of rest and recuperation from birth"); Sheketoff Ex. 69 (Plaintiffs' Ex. 137) at 17 ("There are no data on which to base recommendations regarding

postpartum physical activity."); Sheketoff Ex. 70   ("There are little prospective data on which to base guidelines for return to work after childbirth.").

**RESPONSE:** Disputed.   Jones Day expert's opinion that medical certification of disability as a result of childbirth are based on medical standards of care which "reflects the time that OBGYN physicians historically have considered to be the average period necessary for recovery from the physical and physiological impact of childbirth." Chase Ex. 85, Colie Rep. at 2-12; *see also* Chase Ex. 86, Colie Rebuttal Rep. at 1-2. Plaintiffs' expert stated he does not know the history of where the six-week disability window originated, but confirmed that he would not knowingly submit a false document to an insurance carrier and thus his certifications of six weeks, eight weeks, or six-to-eight weeks, are based on his belief that women are disabled for the length of time he has certified. Chase Ex. 90, Naylor Tr. 52:19-21, 141:6-142:6. Statement 157 is also immaterial in that the particular origin of these medical standards does not change that these are the medical standards. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 157 cites material that cannot support Plaintiffs' assertion. Sheketoff Exhibits 69, 70, and 74 are inadmissible hearsay. *See* Fed. R. Evid. 801, 802. This material also states—contrary to Statement 157—that "The end [of the postpartum period] is less well defined, but is often considered the six to eight weeks after birth because the effects of pregnancy on many systems have largely returned to the prepregnancy state by this time." Sheketoff Ex. 69 at 1. Defendants incorporate by reference their response to Statement 150.

**REPLY:** While Jones Day purports to dispute this statement, it does not identify any part of the statement that it actually disputes.   The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).   Its expert's description of what physicians have "historically considered" does not contradict this statement and, if anything, supports it.   Jones

Day also objects that Sheketoff Exhibit 69, 70, and 74 are inadmissible hearsay.  Actually, these medical publications are admissible under FRE 803(18).  The quoted sources (and the specific material cited therein) were called to the attention of Colie during her deposition, and they were established as reliable by Colie and/or Naylor. Chase Ex. 89 (Colie) at 8:12-9:1, 330:25-331:3, 341:14-342:5, 324:25-325:325:16; Ex. 90 (Naylor) at 148:10-23.  Regardless, what matters is whether these sources will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.  The remainder of Jones Day's response is non-responsive to this statement and should be disregarded.  This statement is material because it demonstrates that the traditional six-week and eight-week certification periods, which are *not* medical standards of care, are not supported by any evidence showing that new mothers are actually disabled from working (or that they would be otherwise harmed from working) for six weeks after a vaginal birth or eight weeks after a cesarean birth.

**158.**   A certification of six weeks of disability for an uncomplicated vaginal birth and eight weeks of disability for an uncomplicated c-section birth includes a period of time for mother-infant bonding.  Chase Ex. 90 (Naylor) at 53:2-4; *see also* Chase Ex. 89 (Colie) at 81:21-82:6 (admitting that most women are able to return to work sooner than six weeks if they want to); *id.* at 344:3-8 ("Ms. Sheketoff, I never told you that most women are unable to work."); Sheketoff Ex. 157 (for pregnancy and vaginal delivery, recommending 42-day disability period for "regular work, days after delivery (*also allowing newborn care*)"); Sheketoff Ex. at 7 (Plaintiffs' Exhibit 32) at JD_00003941 ("[M]aternity disability cases are generally benefit driven rather than by clinical necessity.").

> **RESPONSE:** Disputed and unsupported by the record. No provider testified that he or she certifies post-partum disability in order to create bonding time. Plaintiffs' expert testified that

he would not knowingly submit a false document to an insurance carrier and thus his certifications of six weeks, eight weeks, or six-to-eight weeks, are based on his belief that women are disabled for the length of time he has certified. Chase Ex. 90, Naylor Tr. 52:19-21, 141:6-142:6. The testimony of Jones Day's expert cited in Statement 158 is unrelated to mother-infant bonding and Plaintiffs' selective quotes are devoid of context and ignore testimony that women often return to work before they have recovered due to other competing demands, such as needing money; that there is a difference between recovery from childbirth and "return to work"; and that most women should not return to work sooner than six to eight weeks after childbirth, particularly not before they are able to meet with their provider. *See* Chase Ex. 89, Colie Tr. 80:9-83:9; 344:6-18. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 158 cites material that cannot support Plaintiffs' assertion. Sheketoff Exhibit 157 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

     **REPLY:** This statement is not genuinely disputed.  Jones Day claims that this statement is not supported by the record, because no provider says she certifies postpartum disability to create bonding time.  That is not what this statement asserts.  In support of this statement, Colie specifically acknowledged that most new mothers *are able to work within six weeks if they want to*, and that she nonetheless certifies at least six weeks of leave for an uncomplicated vaginal birth.  Chase Ex. 89 (Colie) at 81:21-82:6, 344:3-8.  Similarly, Naylor testified that, "baked into that six-week, of course, is some time for parental leave for bonding with the infant, as well as recovery from childbirth."  Chase Ex. 90 (Naylor) at 53:2-5.  That does not conflict with his testimony that it is *reasonable* to certify a six-week disability period for new mothers, or that he does so.

159.     While doctors typically advise new mothers about certain activities (e.g., avoid heavy lifting directly after a cesarean section, avoid intercourse for several weeks after a vaginal birth), doctors do *not* typically advise new mothers that they are disabled from working in relatively sedentary jobs after an uncomplicated vaginal birth for any amount of time—let alone six or eight weeks.  Sheketoff Ex. 38 (Naylor Rebuttal) at 5 ¶ 6; *id.* at 7-8; Chase Ex. 89 (Colie) at 99:20-102:7.

**RESPONSE:** Disputed. Plaintiffs' expert testified that he would not knowingly submit a false document to an insurance carrier and thus his certifications of six weeks, eight weeks, or six-to-eight weeks, are based on his belief that women are disabled for the length of time he has certified. Chase Ex. 90, Naylor Tr. 52:19-21, 141:6-142:6. He also testified that he does not consider the job requirements of the patient when certifying post-partum disability. *Id.* at 112:10-14. The citation to the testimony of Jones Day's expert, Dr. Colie, in Statement 159 mischaracterizes her testimony and ignores Dr. Colie's repeated testimony that she advises women that they should be sleeping and resting as much as possible. *See* Chase Ex. 89, Colie Tr. 103:20-104:16; *see also id.* at 109:5-12 ("I do not ask what they're doing. I don't ask what the nature of their work is. I don't ask how long they've been there and do they like their job. What I ask is if you are returning to a job, my -- my advice to you is to -- to not return to your job until you have affected your own recovery and, in my opinion, that would be in at least a six to eight-week window."). Defendants incorporate by reference their response to Statement 150.

**REPLY:** Jones Day purports to dispute this statement, but it does not identify any part of this statement that it actually disputes.  The first half of Jones Day's response ("Plaintiffs' expert testified … certifying post-partum disability.") is wholly nonresponsive and should be disregarded. The second half, regarding Colie's testimony that she advises new mothers to "sleep[]" and "rest"

as much as possible, does not contradict this statement, which is about whether doctors advise new mothers that they are disabled from working in relative sedentary jobs after an uncomplicated birth.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**160.**    When Julia gave birth at Northwestern and George Washington University hospitals, no one advised her that she was disabled from working for any period of time (and, in fact, Julia worked on this case from her hospital room).  Sheketoff Decl. ¶¶ 10-11.

> **RESPONSE:** Undisputed, but misleading and immaterial. Sheketoff testified she took 16-17 weeks of leave and that she did not remember "exactly" when she fully physically recovered from childbirth, but that it was at least five or six weeks after delivery. Chase Ex. 80, Sheketoff Tr. 29:3-16. Defendants also incorporate by reference their response to Statement 150.

> **REPLY:** Jones Day concedes that this statement is undisputed.   Jones Day's supplemental assertions are non-responsive and should be disregarded.   They are also highly misleading.   As Jones Day well knows, the deposition testimony it references concerns Julia's disability following the birth of her *first* child, before this case had been filed and thus before she could have worked on this case from her hospital room.  Following the birth of her *second* child, Julia's period of disability following childbirth was less than 48 hours and she worked on this case from her hospital room.  *See* Sheketoff Decl. ¶ 11.

**161.**    While Colie initially suggested that it would be contrary to the supposed "standard of care" not to advise women that they were disabled from working after six or eights weeks after childbirth, she admitted that she would "second-guess" that statement if she learned that patients at Northwestern and George Washington University were not so advised.  Chase Ex. 89 (Colie) at 178:7-180:19.

**RESPONSE:** Disputed as a mischaracterization of evidence. Dr. Colie testified: "I think being surprised as a provider…causes one to go back and relook at what they've learned, what data there might be since that time, and try to sort of reckon with other things that are happening and -- and where possible to have some kind of gathering to discuss that type of -- of thing. So -- so would I be surprised? Yes, I'd be surprised if they weren't doing it. And would it cause me to second guess? Yes. I hope all -- all physicians are always second guessing how they're making recommendations and trying to stay as current as they can on what's out there." Chase Ex. 89, Colie Tr. 180:6-19. Defendants also incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  The material Jones Day quotes substantiates this statement.

**162.** The vast majority of vaginal births are uncomplicated.  Sheketoff Ex. (Naylor Rebuttal) 38 at 3; Chase Ex. 89 (Colie) at 97 (acknowledging that she doesn't know what percentage of vaginal births are uncomplicated).

**RESPONSE:** Disputed.  Statement 162 ignores Dr. Colie's testimony that whether a vaginal birth is "uncomplicated" depends on several factors including whether it is a first-time mother, any comorbidities, complications from delivery, such as third or fourth-degree lacerations, and post-delivery complications, such as post-partum depression. *See* Chase Ex. 89, Colie Tr. 83:24-84:13, 86:10-16, 89:5-21, 96:16-97:6.   Defendants also incorporate by reference their responses to Statements 150 and 165.

**REPLY:** Jones Day does not genuinely dispute this statement.  It claims that the statement "ignores" Colie's testimony about what factors make a vaginal birth "uncomplicated," but the supposed factors that render a birth uncomplicated do not undermine this statement.

**163.**     The vast majority of cesarean births are uncomplicated (apart from the "complication" of the cesarean section itself).  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2; Chase Ex. 89 (Colie) at 94:20-94:17 (admitting that she "doesn't have a good sense of" the percentage of cesarean births that are routine).

**RESPONSE:** Disputed as a mischaracterization.  Statement 163 acknowledges that cesarean delivery is by itself a complicated delivery. Defendants incorporate by reference their responses to Statements 150 and 165.

**REPLY:** This statement is not genuinely disputed.  Jones Day claims the statement is a "mischaracterization."  That conclusory assertion is false and insufficient to create a genuine fact dispute in any event.  *See* Preliminary Statement B.  Colie testified that, for purposes of her deposition, "uncomplicated" and "routine" could be used interchangeably unless she distinguished between them, Sheketoff Ex. 89 (Colie) at 7:19-8:11, and she distinguished between them in this context only insofar as she deemed an unplanned cesarean section itself a "complication," *id.* at 94:20-95:17, which this statement acknowledges.  Jones Day does not dispute that the majority of cesarean births are routine.

**164.**     Approximately 2/3 of births are vaginal births and approximately 1/3 of births are cesarean section.  Chase Ex. 90 (Naylor) at 99:3-8; Chase Ex. 89 (Colie) at 88:23-89:2.

**RESPONSE:** Undisputed.

**165.**     The majority of births are uncomplicated vaginal births.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 97 (acknowledging that she doesn't know what percentage of vaginal births are uncomplicated).

**RESPONSE:** Disputed. Plaintiffs do not dispute that, according to Dr. Colie, roughly one-third of deliveries are Caesarean; another 10-15% involve some degree of complications; and

another 10% or so have ongoing symptoms at six weeks postpartum that require further recovery time. Pls. Resp. DSF ¶ 80. Defendants incorporate by reference their response to Statement 150.

**REPLY:** While Jones Day disputes this statement, the dispute is not genuine. Colie's testimony was that roughly one-third of deliveries are c-section births, another 10-15% *of the remaining births* involve some comorbidity, and 10% of women have symptoms at their postpartum visits that may require further recovery time ("past that eight-week window"). That is how Plaintiffs understood JDSF ¶ 80, and it is what Colie's actual testimony is. *See* JDSF ¶ 80 (citing Chase Ex. 85, Colie Report at 3; Chase Ex. 89, Colie Tr. 91:11-23, 221:12-222:7 ("So a third of women will have a Caesarian, so they're out of the stats. And you're looking for a number, so of the 65% that will have a vaginal delivery, I would say at least 10 to 15 percent *of them* would have a comorbidity that's already going to be suggesting a longer recovery window. And then as I'm seeing women in the six to eight-week window in the office, I would say there's at least another 10 percent of them who will have symptoms that I would suggest they take more time to manage in that—past that eight-week window." (emphasis added))). In other words, according to Colie, approximately 33% of total births are cesarean births, approximately 6.7% of total births are vaginal births where the mother has a comorbidity (i.e., 10% of the 67% of births that are vaginal births), and 10% of women have symptoms at six to eight weeks postpartum. As Naylor testified, however, a *pregnancy* or other *health* complication (i.e., comorbidity) does not equate with a *birth* complication. Chase Ex. 90 (Naylor) at 26:1-27:13. Symptoms observed at the six-week postpartum visit do not affect whether the birth six weeks earlier was itself complicated. *See id.* Indeed, the primary such symptom Colie identified is postpartum depression, which is plainly not a *birth* complication. Chase Ex. 89 (Colie) at 222:17-19. Accordingly, Colie's testimony here simply establishes that 67% of births are vaginal births—but does not touch on the percentage of

total births that are uncomplicated vaginal births vs. complicated vaginal births. That accords with Colie's express admission that she does not know what percentage of vaginal births are uncomplicated (and thus, a fortiori, what percentage of total births are uncomplicated vaginal births). Chase Ex. 89 (Colie) at 97:9-17. Naylor, in contrast, opined that the majority of births are uncomplicated vaginal births. Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2.

However, even assuming (counterfactually) that both comorbidities and symptoms at the postpartum visit are birth complications, Colie's testimony still *supports* this statement. As discussed above, according to Colie, 6.7% of total births are vaginal births where the mother has a comorbidity. If those are considered complicated vaginal births, then that increases the percentage of births that are *not* uncomplicated vaginal births to 39.7% (with the percentage of births that are uncomplicated vaginal births at 60.3%). As for the 10% of women Colie identified as having symptoms at their postpartum visit, those *include* women who had c-sections and complicated vaginal births, just as they include new mothers who originally had uncomplicated vaginal births. Even assuming (generously) that these women with postpartum symptoms are proportionately distributed across all births (though one would actually expect a *higher* rate of postpartum depression in women who had cesarean births and complicated vaginal births than in women who had uncomplicated vaginal births), that means that 6% of births are births that were originally uncomplicated vaginal births and later became complicated vaginal births (i.e., 10% of the 60.3% of women who originally had uncomplicated vaginal births). Adding those figures together (6% + 39.7%) leaves us with 45.7% of women who do *not* have uncomplicated vaginal births, meaning that that 54.3% of women *do* have uncomplicated vaginal births. That is a majority of women and thus supports this statement.

**166.**    It is not medically reasonable or appropriate to assume an eight-week postpartum disability period for all childbirths.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 90 (Naylor) at 82:16-83:3; *see also supra* ¶ 151.

**RESPONSE:** Disputed as argumentative interpretation of evidence. There is no basis on which Plaintiffs can present this to the Court as an undisputed fact. Defendants' expert opined that it is medically reasonable to assume an eight-week postpartum disability leave for all childbirths. Chase Ex. 85, Colie Rep. at 3, 15; Chase Ex. 86, Colie Rebuttal at 1; *see also* Latham Decl. at ¶¶ 5, 8 (confirming insurance company Unum offers short-term disability plan for 8 weeks regardless of delivery method and that these standards are based on standards of care developed from input of practitioners and analysis of actual claims experience). Defendants incorporate by reference their responses to Statements 150 and 151.

**REPLY:** This statement is not genuinely disputed.  Jones Day says this statement is an argumentative interpretation of evidence.  That is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  As discussed in PSF ¶ 168, Defendants' expert admitted that most women *are* able to work within six weeks after an uncomplicated vaginal birth if they want to and further admitted that women do not need more than six weeks of disability leave after a vaginal birth.  As discussed in PSF ¶ 171, Colie's primary basis for concluding that it is medically reasonable and appropriate to assume an eight-week postpartum disability for all childbirths is that, if they wanted to return to work sooner than eight weeks, the eight-week "assumption" of disability would not *preclude* women from doing so.  Chase Ex. 89 (Colie) at 219:9-220:1.  Jones Day further points to representations in a declaration by Unum, but those representations about its insurance practices are both factually *false* (*see* PSF ¶¶ 195, 197-202) and irrelevant to medical reasonableness.

**167.**     It is not medically reasonable or appropriate to assume an eight-week postpartum disability period for vaginal births.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 90 (Naylor) at 82:16-83:3; *see also supra* ¶ 151.

**RESPONSE:** Disputed as argumentative interpretation of evidence. There is no basis on which Plaintiffs can present this to the Court as an undisputed fact. Defendants' expert opined that it is medically reasonable to assume an eight-week postpartum disability leave for all childbirths. Chase Ex. 85, Colie Rep. at 3, 15; Chase Ex. 86, Colie Rebuttal Rep. at 1; *see also* Latham Decl. at ¶¶ 5, 8 (confirming insurance company Unum offers short-term disability plan for 8 weeks regardless of delivery method and that these standards are based on standards of care developed from input of practitioners and analysis of actual claims experience). Defendants incorporate by reference their responses to Statements 150 and 151.

**REPLY:** This statement is not genuinely disputed.  Jones Day says this statement is an argumentative interpretation of evidence.  That is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  As discussed in PSF ¶ 168, Defendants' expert admitted that most women *are* able to work within six weeks after an uncomplicated vaginal birth if they want to and further admitted that women do not need more than six weeks of disability leave after a vaginal birth.  As discussed in PSF ¶ 171, Colie's primary basis for concluding that it is medically reasonable and appropriate to assume an eight-week postpartum disability for all childbirths is that, if they wanted to return to work sooner than eight weeks, the eight-week "assumption" of disability would not *preclude* women from doing so.  Chase Ex. 89 (Colie) at 219:9-220:1.  Jones Day further points to representations in a declaration by Unum, but those representations about its insurance practices are both factually *false* (*see* PSF ¶¶ 195, 197-202) and irrelevant to medical reasonableness.

**168.**     Indeed, while Colie opined in her report that it was medically reasonable and appropriate to assume an eight-week postpartum disability period for vaginal births and cesarean births, she conceded during her deposition that most women *are* able to work within six weeks after an uncomplicated vaginal birth if they want to.  Chase Ex. 89 (Colie) at 81:21-82:5; *see also id.* at 344:3-8 ("Ms. Sheketoff, I never told you that most women are unable to work."); *id*. at 315:1-3 ("I have never said that I—that vaginal delivery needs more than six weeks.").

**RESPONSE:** Disputed.  Statement 168, which begins with "Indeed, while," is improper argument and mischaracterization of evidence, including to the extent Plaintiffs' quoted language is devoid of context, selectively quoted, and ignores Jones Day's expert's testimony that women often return to work before they have recovered due to other competing demands, such as needing money, that there is a difference between recovery from childbirth and "return to work," and that most women should not return to work sooner than six to eight weeks after childbirth, particularly not before they are able to meet with their provider. *See* Chase Ex. 89, Colie Tr. 80:9-83:9, 344:6- 18; *see also id*. at 315:4-8 (Dr. Colie qualifying her response and testifying that "because of all of the other issues that could accompany that vaginal delivery, I picked the eight-week mark. Six to eight weeks is perfectly reasonable to cover all of those contingencies"); Chase Ex. 90, Naylor Tr. 143:24-144:9 (testifying that many of his patients are part of self-employed farming families that have a financial incentive to return to work earlier); Defendants also incorporate their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  Jones Day says this statement is "improper argument," but that is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says this statement mischaracterizes the evidence because it supposedly "ignor[es]" that its expert distinguishes between being "recovered" from

childbirth and being able to return to work.  That distinction fully supports this statement, and Plaintiffs have made the same point themselves (in PSF ¶ 174).  Colie conceives of "recovery" from childbirth as an expansive concept that lasts until a new mother is "back to normal" (her "new normal") and "she's accomplishing all of the things that are now part of her world."  Chase Ex. 89 (Colie) at 33:1-36:3.  Colie "would use probably an 8 to 12-week window in my—sort of in my lowest estimation and—and a ***90 odd year*** in my highest."  *Id.* at 34:10-13 (emphasis added). Colie's "recovery" period is thus much longer than a new mother's "disability" period (as the parties and the courts have used that term); it extends well beyond the period when an associate is "unable to perform the material and substantial duties of his or her regular occupation" (under Jones Day's written short-term disability leave policy) and, indeed, longer than all but a tiny handful of new mothers will live.  *See also* Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 3 ("The length of time it takes to completely recover from childbirth does not equate with when someone can perform the material and substantial duties of their position.").

169.    Colie also admitted that has never refused to clear a new mother who wanted to return six weeks after childbirth.  Chase Ex. 89 (Colie) at 169:5-10.

**RESPONSE:** Disputed as a mischaracterization of evidence. The testimony cited by Dr. Colie in Statement 169 does not establish whether Dr. Colie actually received any requests from new mothers to return to work six weeks after childbirth and ignores contextual testimony that details countervailing considerations, including not wanting to alienate patients that need to return to work for non-medical reasons and working together toward a solution that allows for rest and recovery while maintaining that patient within care. *See* Chase Ex. 89, Colie Tr. 167:8-24 ("I will clear a woman to go back to work if there is no great option for her and by that I mean, again, as I said before, if she does not have any kind of leave and if she has no economic support and she

needs to go back, so she eats or she rests, I think that puts us in a rock and a hard place, but I would probably try to support her."); id. at 164:6-13 ("So I am going to work together with the patient. If she wants to go early, I'm going to help her to do it if that's what has to happen. But it's not that my advice isn't always going to be more -- more rest and recovery time is likely to impact these things as well. But I'm definitely not going to strand her. I'm not going to refuse her. I'm going to do the best I can to work with her."). Statement 169 is also immaterial in that it is undisputed Jones Day's Short Term Disability policy does not prevent associates from returning to work prior to eight weeks postpartum. *See* Pls. Resp. DSF ¶ 110. Defendants also incorporate their response to Statement 150.

**REPLY:** Jones Day does not genuinely dispute this statement, which is lifted nearly verbatim from Colie's deposition transcript.

**170.**   Nor has Colie ever refused to clear a new mother who wanted to work less than four weeks after childbirth.  Chase Ex. 89 (Colie) at 169:13-20.

**RESPONSE:** Disputed as a mischaracterization of evidence, including ignoring the testimony of Dr. Colie that she has "infrequently" cleared a patient to return to work less than six weeks after giving birth. Chase Ex. 89, Colie Tr. 165:21-166:9 (estimating it has only happened 2-5 times in Dr. Colie's 30+ year career). Defendants also incorporate by reference their responses to Statements 150 and 169.

**REPLY:** Jones Day does not genuinely dispute this statement, which is lifted directly from Colie's deposition transcript.

**171.**   Colie's primary basis for concluding that it is medically reasonable and appropriate to assume an eight-week postpartum disability for all childbirths is that, if they wanted to return to

work sooner than eight weeks, the eight-week "assumption" of disability would not *preclude* women from doing so.  Chase Ex. 89 (Colie) at 219:9-220:1.

**RESPONSE:** Disputed as improper argument and mischaracterization of evidence. The basis for Dr. Colie's opinions are detailed in her expert reports, including that her opinion that an eight-week assumption of disability is reasonable based on her "medical training, judgment, and experience, and in light of the impacts for even routine childbirth." Chase Ex. 85, Colie Rep. at 15 (An eight-week disability assumption "is consistent with—and, in the case of cesarean deliveries, exactly the same as—the standard of care recognized throughout medicine as the recovery period from routine birth. Even in the case of vaginal deliveries without complication…assuming an eight-week postpartum disability period is consistent with the time necessary to recover from the physical and physiological impacts of childbirth."). Statement 171 ignores Dr. Colie's reports and selectively cites Dr. Colie's testimony, ignoring her other testimony that extensively details why Dr. Colie finds eight weeks to be a reasonable disability period for all childbirth. *See, e.g.*, Chase Ex. 89, Colie Tr. 191:3-192:2, 220:16-222:7. Defendants also incorporate by reference their response to Statement 150

**REPLY:** This statement is not genuinely disputed.  This statement makes an assertion about the *primary*—not the *exclusive*—basis for Colie's conclusion.   The cited deposition testimony is clear on this point.

**172.**   Further, according to Colie, "eight weeks is clearly an average" that's "smack right between 4 and 12 weeks.  So while there would be some women who might be ready closer to a 4-week window, there's definitely women who won't be ready closer to a 12-week window… And so if I had to pick, I would always want to pick the thing that gave the woman the most time, if she needed it, so I don't [need] to recertify her at a later time.  Because, again, my experience

has been that I've yet to have a lady who is not allowed to go back to work by her employer." Chase Ex. 89 (Colie) at 220:10-221:12.

**RESPONSE:** Undisputed.

173.   In fact, new mothers can typically return to relatively sedentary employment within four weeks after an uncomplicated vaginal birth.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; *see also* NIOSH, Guidelines on Pregnancy and Work at 23, available at https://www.cdc.gov/niosh/docs/78-118/default.html (following vaginal delivery, patient generally "reach[es] full capacity three to four weeks postpartum."); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 649 n.15 (1974) (new mothers "may return to 'full activity or employment' if course of progress up to fourth or fifth week is normal" (citing Handbook of Obstetrics & Gynecology)); Sheketoff Ex. 70 (Plaintiffs' Ex. 138) at 7 ("'a woman can return to a normal work schedule 4-6 weeks after delivery'"); Sheketoff Ex. 155 at 2 ("The vast majority of women with uncomplicated spontaneous or assisted vaginal singleton deliveries are physiologically stable enough to return to full-time work within 4 to 6 weeks of delivery.").

**RESPONSE:** Disputed as unsupported by the record, improper argument, and mischaracterization of evidence. Statement 173 ignores Jones Day's expert testimony that assuming an eight-week disability period for routine delivery is medically reasonable. *See* Chase Ex. 85, Colie Report at 3, 12-13; Chase Ex. 86, Colie Rebuttal Rep. at 1. Being disabled, having a certified disability, and returning to work are not necessarily the same thing; some people return to work while disabled because their employers do not offer salary continuation during the period of disability. *See* Chase Ex. 89, Colie Tr. 80:9-83:9, 344:6-18; *see also* Chase Ex. 90, Naylor Tr. 143:24-144:9 (testifying that many of his patients are part of self-employed farming families that have a financial incentive to return to work earlier). Defendants also object pursuant to Fed. R.

Civ. P. 56(c) that Statement 173 cites material that cannot support Plaintiffs' assertion. Sheketoff Ex. 70 and Sheketoff Ex. 155 are inadmissible hearsay, and citations to case law cannot support an assertion of fact. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

      **REPLY:** This statement is not genuinely disputed.  Jones Day disputes this statement on the ground that it constitutes improper argument, but that conclusory assertion is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says that the statement is unsupported by the record and a mischaracterization of the record. The statement is directly supported by numerous record sources, including Plaintiffs' expert's opinion that "patients who have an uncomplicated vaginal birth can typically physically return to relatively sedentary employment within 3-4 weeks of delivery."  Chase Ex. 87 (Naylor Report) at 3.  Jones Day says that "Being disabled, having a certified disability, and returning to work are not necessarily the same thing"—but even assuming the truth of that representation, it casts no doubt on this statement.  Jones Day objects that Sheketoff Exhibit 70 is inadmissible hearsay.  Actually, it is admissible under FRE 803(18).  The quoted source (and the specific material cited therein) were called to the attention of and established as reliable by Colie during her during her deposition. Chase Ex. 89 (Colie) at 329:20-330:24.  Regardless, what matters is whether these sources will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.  Jones Day also claims that "citations to case law cannot support an assertion of fact" but provides no explanation of or support for that claim, which ignores both countless judicial opinions that do so and its own prior practice.  *E.g.*, Dkt. 15 at 20.  In any event, this statement is supported by substantial admissible evidence even setting aside the specific sources to which Jones Day objects.

**174.** Moreover, when Colie opines that "the medically appropriate time to allow for recovery from childbirth without complications is at least six to eight weeks," she acknowledges that she uses the term "recovery" to mean something more expansive than "regain the ability to work" and that may extend to "six months" or "60 years." Chase Ex. 89 (Colie) at 77:9-79:18; *see also id.* at 218:5-11 (testifying that "the period of time during which a woman is unable to return to work" is not "the same length of time as the period of recovery from childbirth" because "the period of recovery from childbirth is going to continue on out through that fourth trimester"); *id.* 34:10-14 (describing the "recovery period" for women as "probably an 8 to 12-week window in my—sort of in my lowest estimation and—and a 90 odd year in my highest"); *id.* at 164:14-18 ("there's enough data to suggest that a three-month window would be great"); Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 3 ("The length of time it takes to completely recover from childbirth does not equate with when someone can perform the material and substantial duties of their position."

**RESPONSE:** Disputed as immaterial, improper argument, and a mischaracterization of evidence. The citation of Dr. Colie's testimony in Statement 174 is selectively quoted, divorced from relevant context, and ignores Dr. Colie's testimony that explains that disability as used by insurers and recovery as used by doctors can be used synonymously, but do not always mean the same thing. Additionally, Dr. Colie testified that, based on her experience and medical studies she reviewed, women may still be recovering from the residual effects of pregnancy or childbirth and adjusting to life as a new parent six to eight weeks after delivery. *See, e.g.*, Chase Ex. 89, Colie Tr. 31:3-11 ("The body has gone through enormous changes. There's significant medical, physiologic, mental health and even social issues that she's having to try to address in this time window [of six to eight weeks]. So recovery versus disability, I think we do use that somewhat interchangeably but, again, disability I think only is relevant in the context of employer or insurer

information. For the woman. She's recovering."); *see also id*. at 32:4-6 ("Well, I think I said where a disability has to be put out, then, yes, you could use those terms synonymously."); *id*. at 32:7-35:20 (discussing recovery and return to a "new normal" after disability as defined by insurers); *id*. at 79:4-18 (discussing studies suggesting over half of women continue to have medical complaints up to 12 weeks and referring back to earlier testimony regarding recovery and return to a "new normal" after disability as defined by insurers); *id*. at 218: 13-17 (attempting to clarify Plaintiff's misleading questioning with further testimony that "I think that this might be a way for you to be asking me can a woman who hasn't completely recovered from her delivery be able to return to work. If that is the question then, yes."); *id*. at 164:4-165:15 (further testimony discussing ideal time frames based on medical studies and maternal mortality rates in the context of working with patients to establish the right course of care). Immaterial to the extent the testimony of Dr. Naylor is not evidence of Dr. Colie's opinions or of disability insurance plans or employer policies. Defendants also incorporate by reference their responses to Statements 150 and 173.

**REPLY:** Jones Day does not genuinely dispute this statement.  To the contrary, just a few paragraphs earlier it makes the same assertion: according to Colie, "there is a difference between recovery from childbirth and 'return to work.'"  PSF ¶ 168 (Jones Day's response).  Jones Day also says (without citation) that Colie testified that "disability as used by insurers and recovery as used by doctors can be used synonymously, *but do not always mean the same thing*."  Even assuming the truth of that representation, it supports rather than contradicts this statement.  The same is true of Jones Day's citations to Colie's testimony.

175.    An employment policy that assumes an eight-week disability from routine childbirth does not reflect what happens in practice when a provider certifies disability from childbirth. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie)

at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

**RESPONSE:** Disputed as improper argument and mischaracterization of evidence. The cited evidence does not support Statement 175. Defendants also incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed. Jones Day disputes it on the ground that it is improper argument, but that conclusory claim is neither accurate nor an adequate basis to create a genuine fact dispute. *See* Preliminary Statement A. Jones Day also says that the statement mischaracterizes the evidence and is unsupported by the evidence, but it provides no explanation of those conclusory assertions. That too is insufficient to create a genuine dispute of fact. *See* Preliminary Statement B. The assertions are also false. Most obviously, Plaintiffs' expert's rebuttal report (the second source cited) says: "I also disagree that an employment policy that assumes an 8-week disability from routine childbirth generally reflects what happens in practice when a provider certifies disability from childbirth. Providers do not generally certify 8 weeks of disability after an uncomplicated vaginal birth, which are a majority of births." Sheketoff Ex. 38 (Naylor Rebuttal) at 3.

**176.** As discussed above, providers typically do not certify an eight-week disability period for all childbirths; rather, they typically certify a six-week disability period for an uncomplicated vaginal birth and an eight-week disability period—as Colie admitted during her deposition. Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) at 56:20-57:2, 73:8-14, 75:3-6, 313:18-24, 318:2-21; Dressing Decl. ¶ 11.a; Chase Ex. 76 (Bounds 30(b)(6)) at 191:16-194:10.

**RESPONSE:** Disputed.  The two providers who testified in this case described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  Indeed, Jones Day has admitted elsewhere that this statement is undisputed.  PSF ¶ 153 (Jones Day's response).  Jones Day misleadingly points out that the two experts testified that, when asked to certify disability before a birth (when they don't yet know the type of birth), their practice is to write down "six to eight" weeks on the certification form.  But as both doctors' testimony makes clear, *what that means is six weeks if the birth is vaginal and six weeks if the birth is cesarean section.  E.g.*, Chase Ex. 90 (Naylor) at 110:11-111:1 (explaining that "sometimes they'll put six to eight, and then it's clarified afterwards whether it was vaginal birth or c-section" and that "it's adjudicated after the delivery"); Chase Ex. 89 at 73:8-14 ("Q. And when you were taught about the six to eight window, were you taught that the six weeks was for a vaginal birth and the eight weeks was for a C-section birth?  A: Without exigent circumstances.  Q: Is that correct?  A. Yes, without exigent circumstances."); Chase Ex.76 (Bounds (30)(b)(6)) at 193:12-194:10 (Jones Day's 30(b)(6) witness testifying that she "would read" Dressing's assertion that "physicians typically certified between six and eight weeks of disability for uncomplicated birth, often depending on whether the birth was vaginal or via Cesarean section" to mean typically "she saw doctors certify six weeks for vaginal deliveries and eight weeks for Caesarean delivers").  Indeed, both doctors testified unequivocally that the typical practice among physicians is to certify six weeks for an uncomplicated vaginal birth and

eight weeks for an uncomplicated cesarean section birth.   PSF ¶ 150.  And Naylor did *not* testify that he *ever* certified eight weeks for an uncomplicated vaginal birth.

**177.**   In practice, doctors do not certify a disability period of eight or more weeks for the majority of women.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3; Chase Ex. 89 (Colie) 226:7-229:12 (disclaiming knowledge on the topic).

**RESPONSE:** Disputed.  The two providers who testified in this case described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. Immaterial in the reference to eight "or more" weeks. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  Jones Day misleadingly points out that the two experts testified that, when asked to certify disability before a birth (when they don't yet know the type of birth), their practice is to write down "six to eight" weeks on the certification form.  But as both doctors' testimony makes clear, *what that means is six weeks if the birth is vaginal and six weeks if the birth is cesarean section.  E.g.*, Chase Ex. 90 (Naylor) at 110:11-111:1 (explaining that "sometimes they'll put six to eight, and then it's clarified afterwards whether it was vaginal birth or c-section" and that "it's adjudicated after the delivery"); Chase Ex. 89 at 73:8-14 ("Q. And when you were taught about the six to eight window, were you taught that the six weeks was for a vaginal birth and the eight weeks was for a C-section birth?  A: Without exigent circumstances.  Q: Is that correct?  A. Yes, without exigent circumstances."); Chase Ex.76 (Bounds (30)(b)(6)) at 193:12-194:10 (Jones Day's 30(b)(6) witness testifying that she "would read" Dressing's assertion that "physicians typically certified between six and eight weeks of disability

for uncomplicated birth, often depending on whether the birth was vaginal or via Cesarean section" to mean typically "she saw doctors certify six weeks for vaginal deliveries and eight weeks for Caesarean delivers").  Indeed, both doctors testified unequivocally that the typical practice among physicians is to certify six weeks for an uncomplicated vaginal birth and eight weeks for an uncomplicated cesarean section birth.   PSF ¶ 150.  And the majority of births are uncomplicated vaginal births.  PSF ¶ 165.  Moreover, contra Jones Day, Naylor did *not* testify that he *ever* certified eight weeks for an uncomplicated vaginal birth.

**178.**   When a new mother has a birth or postpartum complication, the amount of time during which she is disabled depends on her individual circumstances.  NIOSH, Guidelines on Pregnancy and Work at 23, https://www.cdc.gov/niosh/docs/78-118/default.html ("The scope and severity of the complications of labor and/or delivery determine the length of the recovery period.").

> **RESPONSE:** The generic proposition that the amount of time needed to recover from childbirth can depend on the individual circumstances of the delivery has never been disputed. But the undisputed point of agreement between the experts in this case is that providers generally certify a disability period of six to eight weeks for routine childbirth, and that this general practice is medically reasonable. *See* Pls. Resp. DSF ¶¶ 58-59. Both experts also agree that certifications occur prior to birth and are, therefore, predictive. *Id*. ¶ 61. The experts described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. An individualized approach to medical certification for disability from childbirth is infeasible and would place undue burdens on healthcare providers, insurers, and new mothers. *See* Chase Ex. 85, Colie Rep. at 16; Chase Ex.

86, Colie Rebuttal Rep. at 2-3. Defendants incorporate by reference their response to Statement 150.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of its answer (beginning with "But the undisputed") is nonresponsive and should be disregarded.  It is also misleading for the reasons described in in PSF ¶ 177 (Plaintiffs' reply).

179.    When a mother has a birth or postpartum complication, the amount of time during which a new mother with either a birth or postpartum complication is disabled may be less than eight weeks.    NIOSH, Guidelines on Pregnancy and Work at 23, https://www.cdc.gov/niosh/docs/78-118/default.html; *see also* Dressing Decl. ¶ 11.a (declaring that, occasionally, doctors certify "some additional time").

**RESPONSE:** The generic proposition that the amount of time needed to recover from childbirth can depend on the individual circumstances of the delivery has never been disputed. But the undisputed point of agreement between the experts in this case is that providers generally certify a disability period of six to eight weeks for routine childbirth, and that this general practice is medically reasonable. *See* Pls. Resp. DSF ¶¶ 58-59. Defendants incorporate by reference their responses to Statements 150 and 178.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of its answer (beginning with "But the undisputed") is nonresponsive and should be disregarded.  It is also misleading for the reasons described in in PSF ¶ 177 (Plaintiffs' reply).

180.    In practice, most women receive less than eight weeks of disability leave.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2; Chase Ex. 89 (Colie) 226:7-229:12 (disclaiming knowledge on

the topic); Sheketoff Ex. 74 (Plaintiffs' Exhibit 126) at 4 (identifying the "[t]raditional period of rest and recuperation from birth" as six weeks); *id.* at 7 (45% of employed women return to work in less than six weeks); WHO, Postpartum Care of the Mother and Newborn ("Although not officially sanctioned, traditionally the postpartum period is supposed to end 6 weeks after birth. The period of 6 weeks fits very well into cultural traditions in many countries, where often the first 40 days after birth are considered a time of convalescence for the mother and her newborn infant…. Six weeks after delivery the body of the woman has largely returned to the non-pregnant state."); Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2.

**RESPONSE:** Disputed as argumentative interpretation of the evidence and not supported by the cited material. Neither expert conducted any analysis, survey, or benchmarking regarding the amount of disability leave that "most women" receive. According to benchmarking analytics from the Integrated Benefits Institute, the average birth-related disability period in 2013, 2014, and 2015 was 53.1 days for "normal delivery" (over 7.5 weeks) and 61.6 days for cesarean delivery (over 8.5 weeks). Chase Reply Ex. 96 at 4. According to Jones Day's informal survey in 2014, many law firms provided eight or ten (or even more) greater weeks of paid maternity leave than paid paternity leave—a difference presumably attributable to post-partum disability. Sheketoff Ex. 4 at JD_00005127-29. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 180 cites material that cannot support Plaintiffs' assertion. WHO, Postpartum Care of the Mother and Newborn is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed. Jones Day asserts that the statement is an argumentative interpretation of the evidence. That unsupported claim is neither accurate nor an adequate basis to dispute a statement. *See* Preliminary Statement A. Jones Day also says that

this statement is not supported by the cited evidence because "[n]either expert conducted any analysis, survey, or benchmarking regarding the leave that most women receive."   That is irrelevant.  An expert's opinion may properly be grounded in his professional training and decades of experience, regardless of whether he conducted any particular kind of "benchmarking" or "survey."  *See* FRE 702.  In any event, the statement is supported by numerous other sources, including ACOG's assessment that nearly half of women return to work within *six weeks* of delivery.  Jones Day notes that, according to a document apparently associated with an entity called "Integrated Benefits Institute," the average birth-related disability period in 2013, 2014, and 2015 was 53.1 days for "normal delivery" (over 7.5 weeks) and 61.6 days for cesarean delivery (over 8.5 weeks).  Even if that were accurate, it *supports* this statement since, according to the document, "normal deliveries" constitute the majority of births.  In fact, however, the document describes the durations of "STD claims for *pregnancy*," not birth itself.  Since most STD policies provide two weeks of paid leave *before childbirth*, this document actually suggests that most women with "normal deliveries" receive approximately 5.5 weeks of disability leave after childbirth.  *E.g.*, Prudential, How Maternity Leave and Short-Term Disability Work, https://msjexhibits.page.link/nYJz ("Under most short-term disability insurance plans, maternity leave typically starts two weeks prior to your delivery date and ends six weeks after your baby is born."); MetLife, Frequently Asked Questions about short-term disability benefits due to pregnancy, https://msjexhibits.page.link/wtQ4 ("Ante-partum time (before delivery) of up to 2 weeks is allowed without medical documentation.").   In any event, this document—which does not appear to be available on the internet—is inadmissible hearsay and will remain so at trial.  This document is not a "treatise, periodical, or pamphlet," and no medical expert could testify that a document apparently written by the "Integrated Benefits Institute" is a "reliable authority" in her

field, as required by Federal Rule of Evidence 803(18).  Jones Day also cites its "informal survey in 2014" which purports to describe what "many law firms provided" as *maternity* leave and muses about what portion of that leave is "presumably attributable to post-partum disability."  That is hearsay evidence that will not be admissible at trial and quite obviously does not undermine this statement.  As Jones Day admits, the document describes *maternity* rather than *disability* leave, Jones Day's "presum[ptions]" notwithstanding.  And in any event, what a handful of corporate law firms provide their employees has no bearing on the amount of disability leave that the majority of women receive.  Finally, Jones Day also objects that one of Plaintiffs' sources (WHO, Postpartum Care of the Mother and Newborn) as inadmissible hearsay.  What matters is whether the material will be admissible at trial (*see* Preliminary Statement D), and it will be under FRE 803(18).  Colie already testified that she relies on the WHO publications to practice obstetrics and gynecology, Chase Ex. 89 (Colie) at 8:12-20, and the cited material will be called to her attention on cross examination at trial.

**181.**    There is no clinical outcome data to support the notion that new mothers should refrain from working in sedentary employment for at least eight weeks after childbirth.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 1; Sheketoff Ex. 28 (Plaintiffs' Ex. 102) at 60 ("There are no standardized or validated tools for assessing a woman's readiness to return to work after maternity leave."); Sheketoff Ex. 69 (Plaintiffs' Ex. 137) at 17 ("There are no data on which to base recommendations regarding postpartum physical activity.  In particular, there are no high-quality data on which to base restrictions on lifting, climbing stairs, bathing, swimming, driving, or resuming vaginal intercourse, exercise, or work after giving birth.  A reasonable approach is to tell mothers to resume activities such as housework, driving, exercise, and sexual intercourse when they are comfortable performing these activities."); Sheketoff Ex. 70

(Plaintiffs' Ex. 138) at 7 ("There are little prospective data on which to base guidelines for return to work after childbirth."); Sheketoff Ex. 72 (Plaintiffs' Ex. 142) at 19 (noting that there are "scant data to guide any postoperative activity recommendations" and a "lack of consensus among surgeons" for new mothers who have had a cesarean birth); Sheketoff Ex. 7 (Plaintiffs' Exhibit 32) at JD_00003941 ("[M]aternity disability cases are generally benefit driven rather than by clinical necessity.").

**RESPONSE:** Disputed as not supported by any record evidence. No expert in this case purported to analyze "clinical outcome data."  The two providers who testified in this case described their practice as certifying "six to eight" when the method of delivery is unknown (as it typically is at the time of certification), or just "eight" if the space on the form is limited. Chase Ex. 90, Naylor Tr. 112:10-14, 131:17-23; *see also* Chase Ex. 89, Colie Tr. 122:17-123:8. They do that without regard to the patient's job requirements, such that doctors are certifying disability from any and all types of jobs. Chase Ex. 90, Naylor Tr. 112:10-14. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 181 cites material that cannot support Plaintiffs' assertion. Sheketoff Exs. 28, 69, 70, and 72 are inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  Jones Day claims the statement is not supported by any record evidence, but Plaintiffs have quoted numerous medical publications supporting this statement and Plaintiffs' expert specifically opined that the practice of certifying women for six or eight weeks of disability was not supported by clinical outcome data.  Chase Ex. 87 (Naylor Report) at 3; Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 1.  Jones Day also objects that Plaintiffs Exhibits 28, 69, 70, and 72 are inadmissible hearsay—but they are (or will be at trial) admissible under FRE 803(18).  Colie already established that ACOG publications are reliable,

Chase Ex. 89 (Colie) at 8:12-9:1, and Sheketoff Exhibits 28 and 70 are ACOG publications. (Sheketoff Ex. 70 was published in the periodical *Obstetrics & Gynecology*, which is published by ACOG.)  Naylor testified that Up-To-Date publications are reliable, Chase Ex. 90 (Naylor) at 148:10-23, and Sheketoff Exhibits 69 and 72 are Up-To-Date publications.  The material cited was called to the attention by Colie during her during her deposition.  Chase Ex. 89 (Colie) at 319:7-13, 325:1-16, 330:25-331:4.  Regardless, what matters is whether these sources will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.

**182.**    Approximately 23% of employed women return to work within 10 days postpartum, and an additional 22% return to work between 10 and 40 days.  Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 6.

**RESPONSE:** Disputed.  Neither expert conducted any analysis, survey, or benchmarking regarding the amount of disability leave that women generally receive. According to benchmarking analytics from the Integrated Benefits Institute, the average birth-related disability period in 2013, 2014, and 2015 was 53.1 days for "normal delivery" (over 7.5 weeks) and 61.6 days for cesarean delivery (over 8.5 weeks). Chase Reply Ex. 96 at 4. Further disputed to the extent Statement 182 suggests that returning to work prior to six to eight weeks confirms that a woman is no longer disabled. *See* Chase Ex. 86, Colie Rebuttal Rep. at 3 ("[W]omen who do not have paid short-term disability leave can feel compelled to return to work for financial reasons despite ongoing disability and contrary to their provider's medical guidance."). Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 182 cites material that cannot support Plaintiffs' assertion. Sheketoff Ex. 74 is inadmissible hearsay, and Dr. Colie addressed why it is unreliable for the specific point asserted in Statement 182. *See* Fed. R. Evid. 801, 802; Chase Ex.

86, Colie Rebuttal Rep. at 3 n.2. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed. Jones Day claims that the experts in this case didn't conduct benchmarking or surveys about disability leave, but this statement relies on an ACOG publication for support. That publication and the referenced data therein is not inadmissible hearsay, as Jones Day claims, because it is admissible under FRE 803(18). Colie has testified that ACOG publications are reliable, Chase Ex. 89 (Colie) at 8:12-9:1, and the cited material was called to her attention during her deposition, *id.* at 342:12-25. Regardless, what matters is whether this source will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time. Jones Day also relies on a document apparently written by an entity called "Integrated Benefits Institute," which is inadmissible hearsay and substantively unhelpful to Jones Day for the reasons discussed in Plaintiffs reply on PSF ¶ 180. In any event, that document only purports to describe the length of certain STD claims, not the experience of most women, including those without STD coverage. The remainder of Jones Day's answer is nonresponsive and should be disregarded.

183.    Thus, nearly half of women with jobs are back at work less than six weeks after childbirth. Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 6.

**RESPONSE:** Disputed. Defendants incorporate by reference their responses to Statements 150 and 182.

**REPLY:** As described Plaintiffs' reply in support of PSF ¶ 182, this statement is not genuinely disputed.

**184.** Providers typically schedule the comprehensive postpartum visit between four weeks and six weeks after delivery.  Sheketoff Ex. 74 (Plaintiffs' Ex. 126) at 2; Chase Ex. 89 (Colie) at 237:9-240:2; Sheketoff Ex. 38 (Naylor Rebuttal) at 4 ¶ 5.

**RESPONSE:** Disputed.  Plaintiff's expert instructs his patients to "Make a 6 week appointment to see the doctor or midwife after delivery." Sheketoff Ex. 38, Ex. A; *see also* Chase Ex. 90, Naylor Tr. 98:11-20 (confirming 6-week visit instruction and testifying that only about 10 percent of patients prior to the 6-week visit primarily where someone was worried about unusual symptoms). Dr. Colie testified that "The most common times to schedule a postpartum examination is six weeks or later." Chase Ex. 89, Colie Tr. 237:7-8. Plaintiffs cite this testimony in asserting that providers typically schedule the comprehensive postpartum visit between four weeks and six weeks after delivery, but Dr. Colie testified that "it has never been typical that we have" scheduled the exam prior to six weeks "in my practice." *Id*. at 240:1-2. She further testified that the "average" practice or "prevailing view" was that recovery from childbirth should be assessed six to eight weeks after delivery. *Id*. at 44:20-245:2. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 184 cites material that cannot support Plaintiffs' assertion. Sheketoff Ex. 74 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  Colie specifically distinguished what she does in her practice from what is typically done, and admitted that she had no reason to doubt the accuracy of an ACOG statement that "the comprehensive postpartum visit has typically been scheduled between four and six weeks after delivery."  Chase Ex. 89 (Colie) at 237:9-240:2.

**185.** The American College of Obstetricians and Gynecologists recommends that a new mother be contacted by her provider during the first three weeks after delivery.  Sheketoff Ex. 74

(Plaintiffs' Ex. 126) at 1; *see also* Chase Ex. 89 (Colie) at 242:19-243:6 ("more than half of women already are coming in earlier than [three weeks after childbirth]").

**RESPONSE:** Undisputed that Dr. Colie testified that more than half of women are coming in earlier than three weeks for an incision check, to manage comorbidities, because of complicated vaginal lesions, or due to a low postpartum depression score. Chase Ex. 89, Colie Tr. 242:7-243:2. That is not the same as having a comprehensive postpartum exam to assess overall recovery. Dr. Colie stated that most birth mothers are not ready for the comprehensive exam before six to eight weeks after delivery. Chase Ex. 86, Colie Rebuttal Rep. at 3. There is also the question of who pays for tailored individual care that involves multiple checkups and examinations, where the Global Obstetrical Package that covers many patients only covers one comprehensive postpartum examination (at any time up to twelve weeks from delivery). *Id*. at 2- 3; *see also* Chase Ex. 89, Colie Tr. 240:3-12, 244:6-9. As ACOG recognizes, more individually tailored care means having to change insurance coverage practices. Sheketoff Ex. 74 at e141. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 185 cites material that cannot support Plaintiffs' assertion. Sheketoff Ex. 74 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants incorporate by reference their response to Statement 150.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day objects that Sheketoff Exhibit 74 is inadmissible hearsay.  That is incorrect.  Here, it is not being offered for the truth of the matter asserted but merely to show what ACOG says.  In any event, it is also admissible for its truth under FRE 803(18).  Colie has already established that ACOG publications are reliable, Chase Ex. 89 (Colie) at 8:12-9:1, and the cited material was brought to the attention of Colie during her deposition, *id.* at 240:3-242:1.  Regardless, what matters is whether this source

will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.  The remainder of Jones Day's answer is nonresponsive and should be disregarded.

186.     After an uncomplicated vaginal birth, it is medically advisable for new mothers to begin to exercise as soon as they personally feel able to do so.  Chase Ex. 89 (Colie) at 296:7-298:8; Sheketoff Ex. 28 (Plaintiffs' Ex. 102) at 38 ("After an uncomplicated vaginal delivery, counsel patients that they can begin or resume an exercise program (eg, walking, jogging, strength conditioning) as soon as they feel able to engage in such activities.  Women should not be discouraged from resuming physical activity before the 6-week postpartum visit."); Sheketoff Ex. 72 (Plaintiffs' Ex. 142) at 18 ("After a vaginal birth, most individuals should resume their normal physical activities at their own pace and in consultation with their medical provider."); Sheketoff Ex. 73 (Plaintiffs Ex. 143) at P02263 ("If you had a healthy pregnancy and a normal vaginal delivery, you should be able to start exercising again soon after the baby is born.  Usually it is safe to begin exercising a few days after giving birth—or as soon as you feel ready.").

**RESPONSE:** Undisputed that after an uncomplicated vaginal birth an individual can resume exercise provided that such activity is commensurate with their level of conditioning prior to delivery. Disputed as to the remainder of Statement 186, which mischaracterizes evidence. The citation of Dr. Colie's testimony ignores her detailed testimony regarding different considerations for exercise following childbirth. *See* Chase Ex. 89, Colie Tr. 296:6-300:2. Further disputed to the extent Statement 186 suggests that exercise after delivery is evidence of an individual's disability from returning to full-time work. *See, e.g.*, Sheketoff Ex. 28 at 38 (recommending "150 minutes of moderate exercise each week" including a "target of 20-30 minutes of exercise on most days of the week"); Sheketoff Ex. 73 at P02263 ("Aim to stay active for 20-30 minutes a day.").

Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 186 cites material that cannot support Plaintiffs' assertion. Sheketoff Exs. 28, 72, and 73 are inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants also incorporate by reference their response to Statement 150.

**REPLY:** Jones Day does not identify any part of this statement that it disputes. The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day objects to Sheketoff Exhibits 28, 72, and 73 as inadmissible hearsay, but they are admissible under FRE 803(18). Colie already established that ACOG publications are reliable, Chase Ex. 89 (Colie) at 8:12-9:1, and Sheketoff Exhibits 28 and 73 are ACOG publications. Naylor has already established that Up-To-Date publications are reliable, Chase Ex. 90 (Naylor) at 148:10-23, and Sheketoff Exhibit 72 is an Up-To-Date publications. The material cited was called to the attention by Colie during her during her deposition. Chase Ex. 89 (Colie) at 296:6-16, 334:17-335:8, 336:3-11. Regardless, what matters is whether these sources will be admissible at trial (*see* Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.

**187.** After an uncomplicated cesarean birth, a new mother can resume full physical activity within four to six weeks. Sheketoff Ex. 28 (Plaintiffs' Ex. 102) at 38 ("In the absence of postoperative complications, counsel women that they can resume full physical activity in the 4-6 weeks after a cesarean delivery. Before that time, women are able to be physically active (eg, walking, stretching)."); NIOSH, Guidelines on Pregnancy and Work at 22-23, available at www.cdc.gov/niosh/docs/78-118/default.html ("[F]ollowing an uncomplicated cesarean section, the woman … can usually return to full capacity by six weeks. This is arbitrary, and should be individualized for each woman; many women return to full function earlier."); Chase Ex. 89

(Colie) at 303:18-304:11 (acknowledging that, while she "likes" a longer window, "some" of that is simply her "preference" for as long a "recover[y]" period as possible).

**RESPONSE:** Disputed. Neither expert conducted any analysis, survey, or benchmarking regarding when "a new mother" can resume "full physical activity." The only citation to record evidence selectively quotes Jones Day's expert and ignores other testimony, including Dr. Colie's testimony that women could not get to full physical activity in the four to six weeks after a Cesarean delivery unless "they were not deconditioned by the pregnancy." Chase Ex. 89, Colie Tr. 303:21-23. Further disputed to the extent Statement 186 suggests that physical activity after cesarean delivery is evidence of an individual's disability from returning to full-time work. Both experts agree that an eight-week period of disability for an uncomplicated cesarean delivery is medically reasonable. Chase Ex. 86, Colie Rebuttal Rep. at 3, 15; Chase Ex. 90, Naylor Tr. 83:9- 88:3, 142:18-20. Defendants also object pursuant to Fed. R. Civ. P. 56(c) that Statement 186 cites material that cannot support Plaintiffs' assertion. Sheketoff Ex. 28 constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants also incorporate by reference their response to Statement 150.

**REPLY:** This statement is not genuinely disputed.  Jones Day says that the parties' medical experts didn't conduct any benchmarking or surveys, but that is irrelevant—both because experts need not conduct such "benchmarking" to offer an opinion (FRE 702) and because this statement relies primarily on other evidence.  As to that other evidence, Jones Day simply objects that one source (Sheketoff Ex. 28) is inadmissible hearsay.  Actually, Sheketoff Exhibit 28 is admissible under FRE 803(18).  Colie testified that ACOG publications are reliable, Chase Ex. 89 (Colie) at 8:12-9:1, and the material was brought to her attention during her deposition, *id.* at 300:12-20.  Regardless, what matters is whether these sources will be admissible at trial (*see*

Preliminary Statement D), and the prerequisites of FRE 803(18) will be satisfied by Colie and Naylor at that time.

> ### D.   Jones Day's irrelevant argument regarding its administrator is factually baseless.

**188.**   Jones Day adopted its 8-week disability period in 1994—a decade before it hired Unum to perform administrative services for it.  Dressing Decl. ¶ 15 (adopted in 1994); Latham Decl. ¶ 13 (began working with JD in 2004).

> **RESPONSE:** Undisputed, except to the extent that Statement 188 asserts that Jones Day "hired" Unum. There is no evidence that Jones Day employs Unum.

**189.**   Unum does not provide disability insurance to Jones Day.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

> **RESPONSE:** Undisputed that Jones Day is self-funded for purposes of short-term disability benefits and that Unum serves as Jones Day's third-party administrator for short-term disability claims.

> **REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**190.**   Rather, Jones Day funds its own "salary continuation" by itself.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

> **RESPONSE:** Undisputed.

**191.**   Unum simply provides administrative support for Jones Day.  Chase Ex. 76 (Bounds 30(b)(6)) at 224:24-225:12, 247:23-24.

> **RESPONSE:** Undisputed that Unum serves as Jones Day's third-party administrator for short-term disability claims. The remainder of Statement 191 is disputed as not supported by any evidence. There is no evidence that the overall services Unum provides Jones Day are "simply"

administrative support, and none of the testimony cited in Statement 191 purports to describe the overall services Unum provides Jones Day.

192.    Unum's involvement with Jones Day's leave for new mothers did not change the 8-week disability provision that had been in place since 1994.  Dressing Decl. ¶ 15; Dkt. 189 at 17; JDSF ¶ 108.

    **RESPONSE:** Undisputed that Jones Day first began to assume that an associate's physician has certified an eight-week disability period for recovery from childbirth without complications in 1994, before Unum began administering Jones Day's Short Term Disability policy. Defendants further respond that when it began working with Jones Day, Unum offered several standard options for short-term disability leave from childbirth without complications, including eight weeks regardless of disability type. Latham Decl. at ¶ 13; *see also* Chase Ex. 8 at JD_00003278.

    **REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

193.    Indeed, after it began working with Unum, Jones Day instructed Unum to "have the system updated to have [Jones Day's] maternity benefit be 8 weeks regardless of method of delivery."  Chase Ex. 8 at JD_00003274; *see also id.* at JD_00003278 ("Jones Day standardly provides 8 weeks post-delivery."); Chase Ex. 76 (Bounds (30(b)(6)) at 227:12-229:1.

    **RESPONSE:** Undisputed that prior to 2004, Jones Day's Short Term Disability policy assumed that an associate's physician had certified an eight-week disability period for routine childbirth; that in 2004, Unum offered Jones Day standard leave periods for delivery, including "8 Weeks Regardless of Delivery"; and that Unum "ha[d] the system updated to have your maternity benefit be 8 weeks regardless of method of delivery. Chase Ex. 8 at JD_00003274-JD_00003278;

*see also* Latham Decl. at ¶¶ 8, 13. Statement 193 is disputed to the extent it attributes that update

to an instruction from Jones Day, which the cited evidence does not support. *See* Chase Ex. 76,

Bounds Tr. 228:17-20 ("whether or not Unum made updates for their own records, for their own

information, separate and apart from conversations with us, I can't speak to."). Statement 193 also

is disputed to the extent it suggests that the options for birth-related disability leave that Unum

offered did not include "8 Weeks Regardless of Delivery."

> **REPLY:** This statement is not genuinely disputed.  The only part of it that Jones Day

purports to dispute is that *Jones Day* instructed Unum to "have the system updated to have [Jones

Day's] maternity benefit be 8 weeks regardless of method of delivery," on the ground that the

"cited evidence does not support" it.  In fact, Bounds testified that, "if there is a change or an

update, then it likely came after a discussion with us."  Chase Ex. 76 (Bounds (30(b)(6)) at 228:11-

229:1.  That is adequate to support the statement under a preponderance standard, and there is no

evidence that would enable a jury to discredit Bounds' statement that it "likely" came from Jones

Day.

**194.**     In a declaration submitted and relied on by Jones Day, Zach Latham of Jones Day's

third-party administrator (Unum) states:

> Unum considers the standard period of short-term disability to be six to eight
> weeks….  I am not aware of Unum ever using different duration standards for
> short-term disability without complications….   The standard options for
> childbirth that an employer can choose from when selecting a Unum short-term
> disability plan are: (a) six weeks regardless of delivery, (b) eight weeks
> regardless or delivery, or (c) six weeks for natural delivery and eight weeks for
> delivery via cesarean section.

Latham Decl. ¶¶ 7-8

> **RESPONSE:** Undisputed that Jones Day has cited the Latham declaration, and that

the language quoted in Statement 194 appears (without Plaintiffs' alterations) in Paragraphs 7 and

8 of that declaration.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

195.    According to Unum's own website, however, *Unum does not offer an eight-week disability period for vaginal births under its short-term disability insurance*.  Unum, Frequently Asked Questions about Short-Term Disability, https://msjexhibits.page.link/V9Hh ("How does Unum handle maternity claims?  For a delivery with no complications, pregnancy claims are approved under short term disability for a period of 6 weeks.  If the employer chooses, delivery by C-sections can result in an 8 week benefit period."); Unum, Frequently Asked Questions Individual Short Term Disability ("The standard pregnancy benefit is 6 weeks and includes the Elimination Period."),      https://msjexhibits.page.link/PZXe;      Unum,      Bringing      Up      Baby, https://msjexhibits.page.link/MMwp ("If you're a birth mother, including your elimination period, you may receive short-term disability benefits typically for 6 weeks").

**RESPONSE:** Statement 195   relies   exclusively   on      unauthenticated,   out-of-court statements of unknown provenance that are stored on a website evidently of Plaintiffs' own creation; offers no surrounding information about the creation or reliability of the documents, or what purpose or audience they were intended for; and offers the statements for the truth of the matter. *See* Fed. R. Evid. 801, 802. That is inauthentic, inadmissible hearsay and, under Fed. R. Civ. P. 56(c) and Local Rule 7(h), cannot demonstrate any dispute.

Nor do the documents cited in Statement 195 support Plaintiffs' claim that Unum "does not offer an eight-week disability period for vaginal births." None of them purports to identify the options that Unum offered at any point between 2004 and present. The document referred to as "Bringing up Baby" merely advises employees to "Familiarize yourself with you company's leave policies" and lists the "most common types of leave," under which a birth mother "may receive

short-term disability benefits typically for 6 weeks." The document referred to as "Frequently Asked Questions Individual Short Term Disability" is evidently intended to "help you better understand the benefits … you purchased at your workplace" and states that the "standard pregnancy benefit is 6 weeks." The document referred to as "Frequently Asked Questions about Short Term Disability" acknowledges that "each employee benefit plan is unique, [and] benefits can vary based on choices your employer makes for your benefit plan." None of these documents establishes that Unum does not offer employers the option of an eight-week disability period for vaginal births under its short-term disability insurance.

Statements 195 through 204 should be disregarded in their entirety as improper argument contrary to Local Rule 7(h). Rather than cite specific parts of the record to establish purportedly undisputed facts, these Statements generally string-cite a patchwork of out-of-context quotes— most of it inadmissible hearsay—that Plaintiffs contend supports their argument that Unum is "irrelevant" and "does not offer an eight-week disability period for vaginal births." Plaintiffs are aware from Defendants' filings that this argument is contrary to undisputed evidence, and they have no basis to represent such statements to the Court as "undisputed facts."

The record demonstrates that when it became the third-party administrator for Jones Day's short-term disability benefits, Unum offered three options for short-term disability from childbirth: "(a) six weeks for both vaginal delivery and C-section delivery; (b) six weeks for vaginal delivery and eight weeks for C-section delivery; and (c) eight weeks regardless of delivery type." Latham Decl. at ¶ 13. That is set forth both in the sworn Latham Declaration and in communications with Unum from 2005. *See* Chase Ex. 8 at JD_00003278 (Unum's short-term disability grid indicating that options for maternity leave includes "8 [w]eeks [r]egardless of [d]elivery"); *see also* Chase Ex. 76, Bounds Tr. 225:13-229:1 (confirming the chart was "Unum's document" that Unum

completed and updated). Unum continues to offer its employers these three standard options for childbirth. Latham Decl. at ¶ 8. That is hardly controversial. It is undisputed that these timelines are consistent with the practice of both obstetricians who testified in this case, including Plaintiff's' expert, who testified that he certifies a disability period of six to eight weeks in cases where the method of delivery is not known prior to birth; that both experts certify eight weeks disability leave for the one-third of women who give birth via cesarean, and other comorbidities or complications may also warrant a postpartum disability period of greater than six weeks; and that medical sources recognize that women continue to recover from the impacts of routine vaginal delivery past six weeks. *See* Chase Ex. 85, Colie Report at 3, 11-13; Chase Ex. 89, Colie Tr. 18:17-19:9, 26:24-27:18, 29:24-30:24, 225:3-226:1; Chase Ex. 87, Naylor Report at 2; Chase Ex. 90, Naylor Tr. 82:21-83:3, 84:4-23, 108:24-111:11.

While Plaintiffs purport to dispute those facts, they do not offer any contrary evidence that Unum does not offer an option (or recognize) an 8-week disability for all routine childbirth as consistent with medical and insurance standards. Rather, they offer inadmissible hearsay, argumentative interpretation of the evidence, and citations back to their own statements of fact, principally Statement 195. *See* Pls. Resp. DSF ¶¶ 85-95. All of that is improper under Local Rule 7(h) and F. R. Civ. P. 56(c).

**REPLY:** This statement is not genuinely disputed. Jones Day objects that the cited evidence is unauthenticated and "stored on a website evidently of Plaintiffs' own creation." That is incorrect; as Jones Day surely confirmed on its own, the cited documents are on Unum's own website (and can be authenticated at trial as such, *see* Preliminary Statement D). Plaintiffs simply used Google's URL shortener to make the URLs for the Unum website less unwieldy. Clicking on the cited links directs the reader to the *Unum website*, not to a website hosted by Plaintiffs. *See*

Sheketoff Ex. 184 (identifying each shortened URL cited by Plaintiffs with the full URL to which to redirects).  Jones Day also claims that the cited sources are inadmissible hearsay.  That too is incorrect.  These exhibits are not being offered to prove the truth of the matter asserted; they are being offered to impeach Unum's assertions about the standard disability leave options it provides.  That is not a hearsay purpose.  FRE 801(c)(2).  Jones Day also claims that the cited evidence does not support this statement.  The evidence speaks for itself: "How does Unum handle maternity claims?  For a delivery with no complications, pregnancy claims are approved under short term disability for a period of 6 weeks.  If the employer chooses, delivery by C-sections can result in an 8 week benefit period."  Unum, Frequently Asked Questions about Short-Term Disability, https://msjexhibits.page.link/V9Hh.

Jones Day objects to statements 195 through 204 on the ground that they "constitute improper argument."  That conclusory and sweeping assertion is both inaccurate and an inadequate basis for disputing a statement (let alone 10 statements).  *See* Preliminary Statement A.  Jones Day claims also claims that Plaintiffs do not cite specific parts of the record to establish undisputed facts, but each of Plaintiffs' statements identifies an undisputed fact and then cites evidence in the record that supports that fact, in compliance with Local Rule 7(h) and this Court's standing order.  Next, Jones Day complains that Plaintiffs' support supposedly consists of a "string-cite a patchwork of out-of-context quotes."  That is not a proper objection.  Local Rule 7(h) requires parties moving for summary judgment to provide a "statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  Plaintiffs' citations and quotations are the "parts of the record relied on to support the statement"; the only difference between the references to the record in these paragraphs and in certain other paragraphs is that the cited material is often quoted in

parentheses for ease of review.  If the material Plaintiffs relied upon was actually taken out of context, Jones Day could have explained the true meaning of that material in its responses.  It has not done so.  Finally, Jones Day claims that these statements are "contrary to undisputed evidence" and that Plaintiffs "have no basis to represent such statements to the Court as undisputed facts." As the evidence Plaintiffs have cited in support of each statement (together with Defendants' responses) show, these statements are not *genuinely* disputed—even if Defendants purport to dispute them—nor are they "contrary to undisputed evidence."  The remainder of Jones Day's answer (i.e., the third and fourth paragraphs) is nonresponsive to this statement and should be disregarded.  It is also highly misleading, as shown in PSF ¶¶ 153-55, 188-204.

196.    Other short-term disability insurance providers typically cover six weeks of disability leave for all uncomplicated deliveries or, alternatively, six weeks for uncomplicated vaginal births and eight weeks for uncomplicated cesarean births.  MetLife, Frequently Asked Questions About Pregnancy, https://msjexhibits.page.link/W5Nd ("Generally, for an uncomplicated pregnancy and normal delivery, most plans allow you to take 6 weeks from the date of delivery."); Prudential, How Maternity Leave and Short-Term Disability Work, https://msjexhibits.page.link/nYJz ("Under most short-term disability insurance plans, maternity leave typically starts two weeks prior to your delivery date and ends six weeks after your baby is born."); The Hartford, What to Expect from Your Maternity Benefits, https://msjexhibits.page.link/85Up ("Maternity claims are commonly approved for six weeks following delivery"); MetLife, Short-Term Disability Insurance, Frequently Asked Questions about short-term disability benefits due to pregnancy, https://msjexhibits.page.link/wtQ4 ("Normal vaginal delivery disability period is 6 weeks from date of delivery, and Cesarean delivery disability period is 8 weeks from date of delivery."); Northwestern Mutual, Will Short-Term Disability Insurance Cover Maternity Leave?,

https://msjexhibits.page.link/J6y1 ("The typical timeframe you are considered disabled following delivery of the baby, without complications, is six weeks; eight weeks if a C-section was performed."); Lincoln Financial Group, Frequently Asked Questions Regarding Claims, https://msjexhibits.page.link/TJBU ("Standard recovery time for vaginal delivery is six weeks, or eight weeks for Cesarean delivery.").

**RESPONSE:** Disputed.  Statement 196 relies exclusively on unauthenticated, out-of-court statements of unknown provenance that are stored on a website evidently of Plaintiffs' own creation; offers no surrounding information about the creation or reliability of the documents, or what purpose or audience they were intended for; and offers the statements for the truth of the matter. That is inauthentic, inadmissible hearsay and, under Fed. R. Civ. P. 56(c) and Local Rule 7(h), cannot demonstrate any dispute. *See* Fed. R. Evid. 801, 802. Also disputed that MetLife Frequently Asked Questions About Pregnancy states "Generally, for an uncomplicated pregnancy and normal delivery, most plans allow you to take 6 weeks from the date of delivery"; it does not. Statement 196 is also immaterial in that none of these insurers administer Jones Day's short-term disability benefits. Defendants incorporate by reference their response to Statement 195.

**REPLY:** This statement is not genuinely disputed.  Jones Day points out that Plaintiffs inadvertently cited the wrong MetLife publication.  While the originally cited publication also supports this statement ("Normal vaginal delivery disability period is 6 weeks from date of delivery, and Cesarean delivery disability period is 8 weeks from date of delivery"), the correct citation is:  MetLife, Frequently Asked Questions About Pregnancy, https://www.phbp.org/downloads/Met_Life_Information_on_Disability_due_to_Pregnancy.pdf. Jones Day also claims that the cited evidence is unauthenticated and "apparently" stored on Plaintiffs' own website.  That is incorrect; as Jones Day has surely confirmed on its own, the

documents are available on each of the referenced companies' own websites (and can be authenticated at trial as such, *see* Preliminary Statement D).  Plaintiffs simply used Google's URL shortener to make the citations to those companies' websites less unwieldy.  Clicking on the cited links directs the reader to the relevant company's website, *not* to a website hosted by Plaintiffs. *See* Sheketoff Ex. 184.  Jones Day further claims that the cited sources are inadmissible hearsay. That too is incorrect.  These exhibits are not being offered to prove the truth of the matter asserted; they are being offered to impeach Jones Day's and Unum's false assertions about the industry standards for disability leave.  *See* Dkt. 189 at 22 (claiming that Jones Day is entitled to summary judgment because "an eight week period … is consistent with *standard insurance practices*"); Latham Decl. ¶¶ 12, 14 ("industry standards").  That is not a hearsay purpose.  FRE 801(c)(2). Statements by the nation's largest insurance companies about their own insurance policies' terms and posted to their own company websites are also sufficiently trustworthy to be admissible under FRE 807.  In all events, what matters is the admissibility of the substance of this evidence at trial (*see* Preliminary Statement D), and Plaintiffs could call representatives of these insurance companies to testify about their policies at trial if necessary to impeach the false testimony about standard practices in the insurance industry offered by Jones Day.  *See* Fed. R. Civ. P. 26(a)(3)(A) (initial disclosures do not require identification of witness who will be presented "solely for impeachment").  This statement is material because it contradicts Jones Day's (and Unum's) false assertions that "an eight week period … is consistent with *standard insurance practices*."  Dkt. 189 at 22.

**197.**   Latham also states: "When assessing the short-term disability period associated with a given medical procedure Unum utilizes … MDGuidelines.  Unum treats these sources as reflecting

a standard of care," which Unum purportedly used to come up with a six- to eight-week "standard period of short-term disability."  Latham Decl. ¶ 5.

**RESPONSE:** Undisputed that the quoted language appears (without Plaintiffs' alterations) in Paragraph 5 of Latham's declaration. Disputed to the extent Plaintiffs' selective quotation ignores surrounding content and context, including to suggest that Unum does not rely on any other guidelines based on input from practitioners and analysis of insurance claims. Latham Decl. at ¶ 5. Defendants also incorporate by reference their response to Statement 195.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

198.    Actually, unlike Jones Day's eight-week disability period for all births, the MDGuidelines on which Unum professes to rely distinguish between vaginal birth and cesarean births.  Sheketoff Ex. 155; Sheketoff Ex. 156.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) as argumentative interpretation that mischaracterizes the evidence and relies exclusively on inadmissible hearsay and lacks a foundation in the record that can support a dispute. Moreover, the MDGuidelines documents that Plaintiffs cite establish that between vaginal delivery and cesarean delivery, most women are able to return to work somewhere between 4 and 12 weeks after delivery. Sheketoff Ex. 155 at 2 (most women are "physiologically stable enough to return to full-time work within 4 to 6 weeks of [vaginal] delivery"); Sheketoff Ex. 156 at 2 ("most mothers return to previous job duties by 12 weeks" from cesarean delivery). That is entirely consistent with assuming an 8-week disability period for routine delivery. Defendants also incorporate by reference their response to Statement 195.

**REPLY:** This statement is not genuinely disputed. Jones Day asserts that this statement is "argumentative interpretation." But that bare assertion is neither accurate nor a legitimate basis to dispute a statement. *See* Preliminary Statement A. Jones Day also says that this statement mischaracterizes the evidence, but it fails to identify any way in which it does so (and it does not). Again, such a conclusory assertion is inadequate to create a genuine dispute of fact. *See* Preliminary Statement B. Finally, Jones Day claims that the cited evidence is inadmissible hearsay. That is incorrect. The evidence is being offered to impeach Unum's false assertion that the MDGuidelines support Jones Day's 8-week disability period for all childbirths and that Unum's purported embrace of such a period is consistent with the source that it purportedly relies on, not to prove the truth of the matter asserted. FRE 801(c)(2). The remainder of Jones Day's answer (beginning with "Moreover, the MDGuidelines") is nonresponsive and should be disregarded.

199.   For a vaginal birth, the MD Guidelines list the "maximum" and "optimum" "length of disability" for a "normal vaginal delivery" as 42 days (i.e, six weeks), and the "minimum" length of disability as 28 days (four weeks), and notes that the duration for vaginal births specifically (unlike durations for other conditions) "reflects accepted standard post-delivery recovery periods and are *not* necessarily representative of medical recovery time." Sheketoff Ex. 155 at 1 (emphasis added).

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) as argumentative interpretation that mischaracterizes the evidence, relies exclusively on inadmissible hearsay, and lacks a foundation in the record that can support a dispute. *See* Fed. R. Evid. 801, 802. Defendants also incorporate by reference their responses to Statements 195 and 198.

**REPLY:** This statement is not genuinely disputed. Jones Day disputes it on the ground that this statement is an "argumentative interpretation," but that is neither accurate nor a legitimate basis to dispute a statement. *See* Preliminary Statement A. Jones Day also says that this statement mischaracterizes the evidence, but fails to identify any way in which it does so (and it does not). Finally, Jones Day claims that the cited evidence is inadmissible hearsay. That is incorrect. The evidence is being offered to impeach Unum's false assertion that the MDGuidelines support Jones Day's 8-week disability period for all childbirths, not to prove the truth of the matter asserted. That is not a hearsay purpose. FRE 801(c)(2).

**200.** The MDGuidelines further state: "Most women recover rapidly from an otherwise uncomplicated vaginal or assisted vaginal delivery…. *The vast majority of women with uncomplicated spontaneous or assisted vaginal singleton deliveries are physiologically stable enough to return to full-time work within 4 to 6 weeks of delivery*." Sheketoff Ex. 155 at 2 (emphasis added).

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) as argumentative interpretation that mischaracterizes the evidence, relies exclusively on inadmissible hearsay, and lacks a foundation in the record that can support a dispute. *See* Fed. R. Evid. 801, 802. Defendants also incorporate by reference their responses to Statements 195 and 198

**REPLY:** This statement is not genuinely disputed. Jones Day disputes it on the ground that this statement is an "argumentative interpretation," but that is neither accurate nor a legitimate basis to dispute a statement. *See* Preliminary Statement A. Jones Day also says that this statement mischaracterizes the evidence, but fails to identify any way in which it does so (and it does not). Finally, Jones Day claims that the cited evidence is inadmissible hearsay. That is incorrect. The evidence is being offered to impeach Unum's false assertion that the MDGuidelines support Jones

Day's 8-week disability period for all childbirths, not to prove the truth of the matter asserted. That is not a hearsay purpose.  FRE 801(c)(2).

201.    For a cesarean section birth, the MDGuidelines provide that the "maximum" and "optimum" "length of disability" for "sedentary" and "light" jobs is 42 days (six weeks), and the "minimum" "length of disability" is 28 days (four weeks) for "sedentary" and "light" jobs. Sheketoff Ex. 156 at 1.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) as argumentative interpretation that mischaracterizes the evidence, relies exclusively on inadmissible hearsay, and lacks a foundation in the record that can support a dispute. *See* Fed. R. Evid. 801, 802. Defendants also incorporate by reference their responses to Statements 195 and 198.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes it on the ground that this statement is an "argumentative interpretation," but that is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says that this statement mischaracterizes the evidence, but fails to identify any way in which it does so (and it does not). Finally, Jones Day claims that the cited evidence is inadmissible hearsay.  That is incorrect.  The evidence is being offered to impeach Unum's false assertion that the MDGuidelines support Jones Day's 8-week disability period for all childbirths, not to prove the truth of the matter asserted. That is not a hearsay purpose.  FRE 801(c)(2).

202.    The MDGuidelines further state: "Stair climbing, lifting, and driving may be temporarily restricted after cesarean section, usually for less than a week.… The *vast majority* of women who have uncomplicated pregnancy and cesarean delivery recover to modified work capacity by 6 weeks postpartum…."  Sheketoff Ex. 156 at 2 (emphasis added).

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) as argumentative interpretation that mischaracterizes the evidence, relies exclusively on inadmissible hearsay, and lacks a foundation in the record that can support a dispute. *See* Fed. R. Evid. 801, 802. Defendants also incorporate by reference their responses to Statements 195 and 198.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes it on the ground that this statement is an "argumentative interpretation," but that is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says that this statement mischaracterizes the evidence, but fails to identify any way in which it does so (and it does not). Finally, Jones Day claims that the cited evidence is inadmissible hearsay.  That is incorrect.  The evidence is being offered to impeach Unum's false assertion that the MDGuidelines support Jones Day's 8-week disability period for all childbirths, not to prove the truth of the matter asserted. That is not a hearsay purpose.  FRE 801(c)(2).

**203.**  Like the MDGuidelines, other disability duration guidelines recommend a period substantially shorter than eight weeks after an uncomplicated childbirth.  Sheketoff Ex. 157 (for pregnancy and vaginal delivery, recommending a 21-day disability period for "modified work," a 42-day disability period for "regular work, days after delivery (*also allowing newborn care*)" and a "best practice" of 42 days (emphasis added)); Sheketoff Ex. 158 (for cesarean section delivery, recommending a 28-day disability period for "clerical/modified work," a 42-day disability period for "manual work," and a "best practice" of 42 days).

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) as argumentative interpretation that mischaracterizes the evidence, relies exclusively on inadmissible hearsay, and lacks a foundation in the record that can support a dispute. *See* Fed. R. Evid. 801, 802. Moreover, according to benchmarking analytics from the Integrated Benefits Institute, the average birth-

related disability period in 2013, 2014, and 2015 was 53.1 days for "normal delivery" (over 7.5 weeks) and 61.6 days for cesarean delivery (over 8.5 weeks). Chase Reply Ex. 96 at 4. Defendants also incorporate by reference their responses to Statements 195 and 198.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes it on the ground that this statement is an "argumentative interpretation," but that is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says that this statement mischaracterizes the evidence, but fails to identify any way in which it does so (and it does not). *See* Preliminary Statement B.  Finally, Jones Day claims that the cited evidence is inadmissible hearsay.  That is incorrect.  The evidence is being offered to impeach Unum's false assertion that numerous "guidelines" in the industry (including but not limited to the MDGuidelines) support Jones Day's 8-week disability period for all childbirths (Latham Decl. ¶ 5), not to prove the truth of the matter asserted.  That is not a hearsay purpose.  FRE 801(c)(2).  Jones Day also refers to a document associated with an entity called "Integrated Benefits Institute" to make claims about the average birth-related disability.  That is nonresponsive to this statement and should be disregarded. In any event, the document is both inadmissible and substantively unhelpful to Jones Day for the reasons discussed in Plaintiffs' reply on PSF ¶ 180.

204.    Neither Jones Day's nor Plaintiffs' obstetrical expert are aware of disability insurance policies covering an eight-week disability period for an uncomplicated vaginal birth.  Sheketoff Ex. 38 (Naylor Rebuttal) at 3 ¶ 2; Chase Ex. 89 (Colie) at 138:9-14.

**RESPONSE:** Disputed.  Dr. Colie testified that "six to eight-week window is what I know to be the case varying multiple different insurers and so forth," and that she suspects some insurers provide 8 weeks of coverage for a vaginal delivery without complication. Chase Ex. 89, Colie Tr. 176:21-177:8. Statement 204 is also immaterial in that neither Dr. Colie nor Dr. Naylor

was offered as an insurance expert. *See id*. at 247:9-16; *see also* Chase Ex. 90, Naylor Tr. 92:19-20 ("I don't know if insurance companies would allow an eight-week disability for an uncomplicated vaginal birth"). Dr. Naylor also testified that it is his practice to certify six-to-eight weeks of disability for all patients, regardless of job type, when the type of delivery is not known, and that sometimes insurance carriers ask for an updated certification after delivery, and sometimes they do not. Chase Ex. 90, Naylor Tr. 110:16-112:14. Defendants also incorporate by reference their response to Statement 195.

**REPLY:** This statement is not genuinely disputed.   None of the evidence cited by Jones Day contradicts this statement.   And while Jones Day complains that Colie and Naylor were offered as an insurance expert, that is irrelevant; they testified based on their personal knowledge. The remainder of Jones Day's answer (beginning with "Dr. Naylor also testified") is nonresponsive (and misleading) and should be disregarded.

## II.     Jones Day illegally retaliated against Plaintiffs for challenging its leave policy.

### A.      Plaintiffs challenged Jones Day's discriminatory leave policy.

205.    In mid-2018, Plaintiffs learned that Julia was pregnant with their first child.   JDSF ¶ 294.

**RESPONSE:** Undisputed.

206.    Prior to August 16, 2018, Julia informed Jones Day that she would be leaving the firm before the birth to take a position as an Assistant Federal Public Defender.   JDSF ¶¶ 294, 296.

**RESPONSE:** Undisputed.

207.    On August 16, Julia sent the following email to Defendant Heifetz with the subject line "Parental Leave":

Beth,

I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total) while it gives men 10 weeks of paid leave (and 16 weeks total). Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled. Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave— and adoptive parents receive the full 18 weeks paid and 24 weeks total leave even though they are not disabled. That seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory. I don't object that the firm is socially conservative as a general matter, or that its selection of cases promotes those values, but in this case I think it goes too far in imposing those values on its employees.

For me, since Mark will be the primary caregiver, this will have a pretty big impact on my life, because I'll end up staying out of work for the extra eight weeks that Mark cannot. For career reasons, I'd rather not do that. I would guess that the effects of the policy are similar for other women. Is there anything that I can do here? Would the firm treat Mark equally to primary caregivers and grant him 18 weeks paid and 4 weeks total leave?

I'd be happy to discuss further. Thanks very much.

Best,

Julia

JDSF ¶ 296; McClure Ex. 3 at JD_00003164-65.

**RESPONSE:** Undisputed that Sheketoff sent an email to Heifetz dated August 16, 2018, and that the text of that email is set forth in Statement 207, subject to typographical errors in Statement 207 that are inconsistent with the referenced exhibit.

**208.** Heifetz forwarded the email to Jones Day's HR Director, Sarah McClure. JDSF ¶ 298; McClure Ex. 3 at JD_00003164.

**RESPONSE:** Undisputed, except that McClure's title is Director of Human Resources and Employment Counsel. McClure Decl. ¶ 1.

**209.** On August 23, 2018, McClure called Julia and informed her that Jones Day was denying her request. JDSF ¶ 298.

**RESPONSE:** Undisputed that McClure called Sheketoff on August 23, 2018, and informed Sheketoff that Jones Day was denying her request that the Firm give Savignac 18 weeks of paid leave in connection with the birth of his child.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

210.    Later on August 23, Mark sent the following email to McClure on the same chain as Julia's email quoted above:

> RE: Parental Leave
>
> Hi Sarah,
>
> Julia let me know that you decided to reject our request that Jones Day amend its discriminatory parental leave policy.  Thank you for your consideration.
>
> Needless to say, I oppose your practice, which is made illegal by Title VII.  You may know that it is also illegal to retaliate against an employee who opposes discrimination.
>
> Thanks again, Sarah.
>
> Mark

JDSF ¶ 299; McClure Ex. 3 at JD_00003163-64.

**RESPONSE:** Undisputed.

211.    On August 24, McClure sent the following response to Mark:

> RE: Parental Leave
>
> Mark –
>
> The Firm disagrees with your assertion of discrimination and impropriety. Jones Day's family leave policy provides for male and female lawyers with newborn children to receive ten weeks of paid family leave (primary caregiver), while female lawyers receive eight weeks of additional paid leave under the Firm's short term disability policy for the childbirth.  This is consistent with Title VII, which allows employers to provide female employees disability leave for childbirth while not providing the same disability leave to male lawyers. *See e.,g.,* [sic] *Johnson v. University of Iowa*, 408 F. Supp. 2d 728, 734 (S.D. Iowa 2004), *aff'd*, 431 F.3d 325 (8th Cir. 2005) (employer's policy allowing

176

mothers six weeks of disability leave due to pregnancy but not the equivalent disability leave to fathers did not violate Title VII); *See also California Fed. Sav. & Loan Ass'n v. Guerra*, 472 U.S. 272, 290 (1987) (upholding a state law that required employers to provide four weeks of medical leave to women who had given birth without extending similar benefits to men or persons with other disabilities).  The EEOC's Enforcement Guidelines address your concern and confirm the propriety of Jones Day's approach.  Specifically, the Guidelines provide the following example:

EXAMPLE 14

Pregnancy-Related Medical Leave and Parental Leave Policy –

No Disparate Treatment

An employer offers pregnant employees up to 10 weeks of paid pregnancy-related medical leave for pregnancy and childbirth as part of its short-term disability insurance.  The employer also offers new parents, whether male or female, six weeks of parental leave.  A male employee alleges that this policy is discriminatory as it gives up to 16 weeks of leave to women and only six weeks of leave to men.  The employer's policy does not violate Title VII.  Women and men both receive six weeks of parental leave, and women who give birth receive up to an additional 10 weeks of leave for recovery from pregnancy and childbirth under the short-term disability plan.

EEOC's Enforcement Guidance: Pregnancy Discrimination and Related Issues (June 25, 2015).

I explained this to Julia on the phone yesterday.  I hope this is helpful and addresses your concern.  I am happy to answer any additional questions you may have in follow up.

Sarah

McClure Ex. 3 at JD_00003163.

**RESPONSE:** Undisputed.

212.  Less than two weeks after their child was born, Plaintiffs sent McClure the following response on January 16, 2019:

RE: Parental Leave

Sarah,

We have closely reviewed the case law, including the two cases you rely on. We have also discussed the matter with other competent attorneys.  Your cases

do not support Jones Day's discriminatory policy, which is illegal under Title VII and D.C. law.

Jones Day's policy is also inconsistent with the EEOC enforcement guidline you mention. Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them. E.g., *Young v. UPS*, 135 S. Ct. 1338, 1351-52 (2015).

Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion. We are very familiar with the D.C. Circuit and confident that we will win.

I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation. We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman. As you know, Title VII prohibits retaliation for opposition to sex discrimination.

JDSF ¶ 306; McClure Ex. 4 at JD_00003143.

**RESPONSE:** Undisputed that Savignac sent an email to McClure dated January 16, 2019, and that the text of that email is set forth in Statement 212, except for typographical errors in Paragraph 212 that are inconsistent with the referenced exhibit, and except for Savignac's Jones Day signature block, which was in the referenced email but is omitted from Statement 212.

**REPLY:** Jones Day concedes that this statement is undisputed. It notes that Mark's signature block was supposedly "omitted" from the email, but that is misleading. Associates are required to set up a signature block that is automatically included in emails. The signature block is no more "omitted" from this email than the "To," "From," "CC," or "BCC" headers.

**213.** Plaintiffs drafted and sent the January 16 email together. Chase Ex. 79 (Savignac) at 213:19-214:15, 242:4-8, 254:15-255:11, 256:1-15; Chase Ex. 80 (Sheketoff) at 115:10-14; McClure Ex. 4 at JD_00003143.

**RESPONSE:** Undisputed that Plaintiffs claim they drafted the email together. Disputed that the email actually was from Sheketoff, or that Brogan understood the email as coming from Sheketoff; he testified in response to a question from Savignac: "I took it at face value [that the email] was coming from you." Chase Ex. 77, Brogan Tr. 20:7. The email was sent exclusively from Savignac's email account; contained a signature block only of Savignac; listed Sheketoff as one of two "cc" recipients; and included first-person references to Savignac, including in the sentence describing the purpose of the email (which also distinguished Savignac from Sheketoff): "Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me … 18 weeks of paid leave and 6 weeks of unpaid leave … or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion." McClure Ex. 4 at JD_00003143.

**REPLY:** Jones Day does not dispute that Plaintiffs drafted the email together.  That part of this statement is therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The remainder of this statement is not genuinely disputed.  While Jones Day claims to dispute whether the email was "actually *from*" Julia, it is unclear if it means to dispute that Julia "*sent*" the email together with Mark, which is what this statement actually asserts.  In any event, none of the evidence cited by Jones Day undermines the assertion that Plaintiffs sent the email together.  What Brogan supposedly "understood" at the time is not relevant to this assertion.  And regardless, Brogan's professed understanding that the email was coming from Mark alone is contradicted by testimony indicating that he actually understood the January email as coming from both Julia and Mark.  *See, e.g.*, Chase Ex. 77 (Brogan) at 16:18-19 ("You then went on to act as if you personally *were* the law-*givers*" (emphasis added)); *id.* at 17:4-6 ("And *we* know that because

*we're* familiar with the Court, and *we* know that the Court—the D.C. Circuit's going to agree with *us*" (emphasis added)); *id*. at 60:4-5 ("you're the law *givers*" (emphasis added)); *id*. at 64:4-5 ("But you, again, the law *givers*" (emphasis added)); *id*. at 12-13 ("I don't know how—how we got *lawyers* in the firm that—that argue this way." (emphasis added)); id. at 72: 16-20 ("So it was pretty telling to me that you—you said, 'oh, well, I'm not going to say, *these guys*, *we're* going to win hands down in the District Court. *We* may lose in the District Court, but *we'll* win the D.C. Circuit." (emphasis added)); *id.* at 74:24-75:4 ("one of the things that came across in this e-mail is that *you and—Julia are two* of the more privileged *people* in the world right now. And you were finding a way to drum up a case that you were the victim of some social injustice." (emphasis added)); *id.* at 78:6-8 ("when I found out that *they were* taking a shot at him, it just further undermined my sense that this whole e-mail was dishonest" (emphasis added)); *see also* PSF ¶ 233 (Jones Day's response) ("Undisputed that Brogan testified that he was not impressed with *Plaintiffs'* conclusory reasoning in their response to McClure's email." (emphasis added)).

There are numerous reasons other bases to doubt Brogan's credibility. *E.g.*, *compare* Dkt. 119 at 30 (Answer to SAC ¶ 199) ("The [f]irm's decision to terminate Savignac was a collaborative decision, which included consultation with Brogan."), *with* Chase Ex. 77 (Brogan) at 10:16-23 (admitting that Brogan alone made the decision to fire Mark), *and id.* at 49:22-50:2 ("Q. Okay. Would you describe Jones Day's decision to fire me as a collaborative decision? A. I don't know what collaborative—I don't know what you're talking about, 'collaborative.'"); *compare id.* at 68:5-11 (claiming threat to sue was had "no impact on me at all. None. Zero."), *with id.* 23:15-24:13 (testifying that continuing to employ an associate who had filed a discrimination lawsuit against Jones Day would create "an endless conundrum" and an "awkward situation" because "you could always claim that you are being punished because you claim the firm discriminated against

women, or whatever you're claiming"), *and id*. at 24:15-20 (admitting that he would not support someone for partner who was litigating a discrimination suit against Jones Day); *compare* Sheketoff Ex. 31 at 12, 27 (First Supplemental Response to Interrogatory 8 and Brogan's personal verification) ("Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019."), w*ith* Chase Ex. 77 (Brogan) at 15:15-16:17 (testifying to brand-new reasons for termination decision); *compare id.* at 123:8-24 (testifying that the August emails "did not "reflect poor judgment, a disinterest in pursuing a career at Jones Day, or a lack of courtesy to colleagues"), *with* ███████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ *compare id*. at 26:21-27:6, 76:13-18, 78:1-8 (claiming that part of reason he fired Mark was because January email complained about Partner A specifically), *with* Chase Ex. 81 (Shumaker) at 152:3-17 (testifying as Jones Day's 30(b)(6) witness that the identity of Partner A was not a factor in the firm's decision to fire Mark); *see also* PSF ¶¶ 246-254.

Jones Day's other assertions similarly fail to undermine Plaintiffs' sworn testimony that they jointly sent the email.  The nature of email is that it comes from a single account, so the fact that it came from Mark's account does not suggest Julia was uninvolved in sending the email.  And the fact that Mark's signature block appeared at the email of the email is just another way of saying

that it came from Mark's account, as Jones Day requires associates to have a signature block that is automatically appended to emails.  That Julia was listed as a cc recipient corroborates rather than undermines her involvement.  And the email's references to Mark individually reflects the undisputed legal principle that Mark had standing to bring a class-action lawsuit, whereas Julia did not.

**B.      Plaintiffs believed (and continue to believe) that the leave policy is unlawful.**

214.     Mark believed (and continues to believe) that Jones Day's leave policy violates the antidiscrimination laws.  Savignac Decl. ¶¶ 3-4; Chase Ex. 79 (Savignac) at 112:10-115:2, 120:16-121:1, 164:8-22; Sheketoff Ex. 43 at P02721.

**RESPONSE:** Undisputed that Savignac has asserted a subjective belief that Jones Day's leave policies violate antidiscrimination laws. Disputed that he could hold such a belief in good- faith, or that such a belief is consistent with any anti-discrimination law at issue, particularly when demanding from Jones Day disability leave fully equal to that which the Firm assumes a physician has certified for a lawyer who gives birth. To begin, Savignac admits that he was not disabled in January 2019. Chase Ex. 79, Savignac Tr. 192:6-12. At least two female attorneys with whom Savignac had discussed the matter prior to January 2019 both told him that associates who deliver a child should have postpartum disability leave, and that "a blanket or a block grant of some number of weeks to all new mothers" was "not improper" (though Savignac did not let their perspective "influence[] my views"). Chase Ex. 79, Savignac Tr. 49:9-50:2, 108:14-112:9. And Plaintiffs also have never—in their depositions, in their Complaints, or in any other filing—provided any good-faith basis for Savignac to think that someone who delivers a child does not have any post-partum disability. Instead, their filings now recognize that post-partum disability does indeed exist; that Jones Day's expert testified how "[i]mmediately after birth, the mother is

182

physically disabled by any definition, and that disability should be obvious to any reasonable person," Chase Ex. 85, Colie Report at 12; that Plaintiffs' own expert opined that "[p]atients who have an uncomplicated vaginal birth can typically physically return to relatively sedentary employment within 3-4 weeks of delivery," Chase Ex. 87, Naylor Report at 2; and that their expert also admits that it is medically reasonable to certify at least six weeks of disability for any childbirth. Chase Ex. 90, Naylor Tr. 52:3-5, 83:22-84:1; *see also* DSF ¶¶ 58-59, 71. In fact, Jones Day had made Savignac aware of both caselaw and EEOC guidance recognizing that an employer can give women who give birth disability leave that is not given to men who do not give birth. McClure Ex. 3. And yet, Savignac—a Harvard Law School graduate who clerked at the U.S. Supreme Court—never inquired whether Jones Day's Short Term disability policy was a "one-way ratchet" or instead an assumption that would not apply if a birth mother informed the Firm that her disability had ended before eight weeks, *see* McClure Exs. 3, 4, and he failed to investigate whether the eight week assumption was medically reasonable, *see* Chase Ex. 79, Savignac Tr. 114:1-115:2; Third Amend. Compl. ¶ 80 (ECF 172).

      **REPLY:** Jones Day does not dispute that Mark subjectively believed (and continues to believe) that its leave policy violates the antidiscrimination laws.  Indeed, Jones Day expressly acknowledges below that it is undisputed that "since at least January 2015, [Plaintiffs] have subjectively believed, legal precedent notwithstanding, that it is unlawfully discriminatory to have a presumptive period of disability leave for recovery from childbirth" (which is how it characterizes its eight-week rule).  PSF ¶ 217 (Jones Day's response).   Since this statement only makes an assertion about Mark's subjective belief, it is admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  What Jones Day apparently disputes is whether Mark could have held his subjective beliefs "in good faith."  But as Plaintiffs have explained—and Jones Day has

never disputed—the only "good faith" question is whether Plaintiffs subjectively held the belief that Jones Day's leave policy was illegally discriminatory.  PMSJ 20.  And (as just discussed) it is undisputed that Mark did.  Jones Day's lengthy response appears to be arguing (a) that the policy is actually lawful; (b) that two associates Mark consulted with only partly agreed with Mark's legal view (though they certainly shared his factual view that the Jones Day gives new mothers eight additional weeks of leave irrespective of actual disability and that this is improper); and (c) Mark should have asked more factual questions about the substance of the leave policy.  Even if all of those assertions were true (and they certainly are not), they do nothing to undermine Mark's sworn testimony that he subjectively held the belief that the policy is unlawful.

**215.**    In January 2015, following Jones Day's announcement that it would give mothers 18 weeks of paid maternity leave while keeping fathers limited to just four weeks of leave, Julia discussed the policy's blatant illegality with colleagues and also forwarded an email about it to Mark.  Sheketoff Ex. 43 at P02721.

**RESPONSE:** Undisputed that Jones Day announced a change in certain leave policies in January 2015, that Sheketoff communicated with others about the leave policies as indicated in Sheketoff Ex. 43, and that Sheketoff forwarded an email about the policies to Savignac. Statement 215 does not cite any evidence that Sheketoff otherwise discussed the policy with colleagues. The remainder of Statement 215 is improper argument about the legality of the policy and disputed for the reasons set forth in Defendants' briefing.

**REPLY:** This statement is not genuinely disputed.  Defendants purport to dispute only whether Jones Day's policy in January 2015 was illegal, "for the reasons set forth in Defendants' briefing."  But Defendants' briefing actually does not dispute that Jones Day's January 2015 leave offerings were illegal (and certainly provides no reasons suggesting they weren't illegal).  To the

contrary, Jones Day admits that Female Associate A's assertion that the policy was illegal was "right" and a "legitimate concern" and caused Jones Day to change its policy. Dkt. 189 at 36-37; *see also* Chase Ex. 81 (Shumaker) at 161:1-13 ("We looked at it.  We analyzed it.  We said, 'She's right.'"); *id.* ("we looked at it and came away thinking that there was some merit to her position.").

216.   Mark wrote back: "It does seem pretty clearly illegal …. Presumably the 8-week disability leave is also illegal (if not, they could just say the first 14 are for disability)."  Sheketoff Ex. 43 at P02721; Chase Ex. 79 (Savignac) at 45:17-46:1.

**RESPONSE:** Undisputed. Defendants further respond that Savignac's email did not say that this meant birthfathers were entitled to the same eight-week disability leave, and he did not have any basis to say that (unlike his hypothetical 14 weeks), Jones Day's assumption of an eight- week postpartum disability period was random or fabricated, rather than being grounded in actual physician certifications, insurance practices, privacy, and administrability. Sheketoff Ex. 43; *see also* Chase Ex. 79, Savignac Tr. 114:1-115:2 (Savignac testifying that as of August 2018, he did not have any belief about whether there was a medical consensus on the amount of time that a woman who gives birth should refrain from doing office work after the birth).

**REPLY:** Jones Day concedes that this statement is undisputed.  Its lengthy answer (beginning with "Defendants further respond") is nonresponsive to this statement and should be disregarded.  In any event, Jones Day's assertion here that Mark's statement that "the 8-week disability period is also illegal" "did *not* say that this meant birthfathers were entitled to the same eight-week disability leave" is in direct conflict with its assertions elsewhere that Plaintiffs' claim that the "extra eight weeks" constitutes illegal discrimination is inherently akin to "claiming it was sex discrimination for Jones Day not to offer fathers the full eight weeks of paid leave it offers birth mothers for postpartum disability."  JD MSJ Opp. at 14.

**217.**    This is the same point that Julia made in 2018: Leave that is not limited to the woman's of actual disability is discriminatory, and putting the "disability leave" label on it does not change that.  JDSF ¶ 296; Chase Ex. 79 (Savignac) at 45:17-46:1.

**RESPONSE:** Undisputed to the extent Plaintiffs are asserting that since at least January 2015, they have subjectively believed, legal precedent notwithstanding, that it is unlawfully discriminatory to have a presumptive period of disability leave for recovery from childbirth. Disputed that they could hold such a belief in good-faith, or that such a belief is consistent with the law, particularly where Plaintiffs' own expert admits that it is medically reasonable to certify at least six weeks of disability for any childbirth. Chase Ex. 90, Naylor Tr. 52:3-5, 83:22-84:1. Defendants incorporate by reference their response to Statement 214. Defendants also dispute that Savignac made the "same point" in 2015 that Sheketoff made in 2018. There is no evidence that Savignac asserted in 2015 that he was legally entitled to the same amount of disability leave that Jones Day assumes a medical provider would certify for a lawyer who gives birth. *See* Sheketoff Ex. 43 at P02721.

**REPLY:** Jones Day does not dispute that Mark's January 2015 email makes the point that leave that is not limited to the woman's actual disability is discriminatory, and putting the "disability leave" label on it does not change that.  Indeed, Jones Day expressly admits that it is undisputed that "since at least January 2015, [Plaintiffs] have subjectively believed, legal precedent notwithstanding, that it is unlawfully discriminatory to have a presumption period of disability leave for recovery from childbirth" (which is how Jones Day refers to its eight-week rule).  That part of this statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  What Jones Day appears to dispute is whether Plaintiffs could hold their subjective belief about the illegality of Jones Day's policy "in good faith," and whether their belief

is actually correct.  But this statement does not make an assertion about whether Plaintiffs' belief is correct.  And as Plaintiffs have explained—and Jones Day has never disputed—the *only* "good faith" question is whether Plaintiffs subjectively believed that Jones Day's leave policy was illegally discriminatory.  PMSJ 20.  Jones Day also disputes that Julia's August 2018 email and Mark's 2015 email made the "same point" on the ground that Julia's email supposedly asserts that Mark "was legally entitled to the same amount of disability leave that Jones Day assumes a medical provider would certify for a lawyer who gives birth."  Actually, Julia's email says: "Eight of the weeks for women are labeled as disability leave but the leave is not dependent upon whether women are actually disabled…. [That] strikes me as unfairly discriminatory."  PSF ¶ 207.  That is indisputably the same point that Mark's 2015 email made.

**218.**   January 2015 was years before Mark married Julia, started work at Jones Day, had a child, or anticipated litigation, and Mark had no conceivable incentive to give anything but his honest legal opinion in his private email to Julia.  Savignac Decl. ¶ 5.

**RESPONSE:** Undisputed that January 2015 was before Savignac started at Jones Day in May 2017. The remainder of Statement 218 is argumentative and speculative interpretation of evidence not capable of being disputed or undisputed; any number of hypothetical reasons may have incentivized Savignac, but Defendants can neither dispute nor agree with a hypothetical.

**REPLY:** Jones Day does not dispute any part of this statement.  To the contrary, it admits that it *cannot* dispute this statement, purportedly because it is a "hypothetical."  Whether Mark had an incentive to lie in January 2015 is not hypothetical, and is the sort of factual issue about a party's motives that juries frequently consider.  Nor is this statement argumentative or inadmissibly speculative, as Jones Day conclusorily asserts.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

219.    Julia believed (and continues to believe) that Jones Day's leave policy violates the antidiscrimination laws.  Sheketoff Decl. ¶ 12; Chase Ex. 80 (Sheketoff) at 273:3-288:21; JDSF ¶ 296.

**RESPONSE:** Undisputed that Sheketoff has asserted a subjective belief that Jones Day's leave policies violate antidiscrimination laws. Disputed that she could hold such a belief in good- faith, or that such a belief is consistent with any anti-discrimination law at issue. Defendants incorporate by reference their response to Statement 214.

**REPLY:** Jones Day does not dispute any part of this statement.  Indeed, Jones Day elsewhere expressly acknowledges that it is undisputed that "since at least January 2015, [Plaintiffs] have subjectively believed, legal precedent notwithstanding, that it is unlawfully discriminatory to have a presumptive period of disability leave for recovery from childbirth." PSF ¶ 217 (Jones Day's response).   This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  What Jones Day appears to dispute is whether Plaintiffs could hold their subjective belief about the illegality of Jones Day's policy "in good faith," and whether their belief is actually correct.  But this statement does not make an assertion about whether Plaintiffs' belief is correct.  And as Plaintiffs have explained—and Jones Day has never disputed— the *only* "good faith" question is whether Plaintiffs subjectively believed that Jones Day's leave policy was illegally discriminatory.  PMSJ 20.

### C.    Jones Day fired Mark in retaliation for Plaintiffs' challenge to its leave policy.

220.    McClure forwarded the January 16 email to Shumaker.  Chase Ex. 42 at JD_00003170.

**RESPONSE:** Undisputed.

221.    On or about January 20, 2019, Shumaker forwarded the January 16 email to Brogan with the following cover message:

PRIVILEGED AND CONFIDENTIAL

Steve:

I wanted to bring the attached to your attention.  Included in the chain below is an email that we received earlier this week from Mark Savignac.  Mark is an I&A associate and former Supreme Court clerk in the Washington office.  He is married to Julia Sheketoff, a former Washington I&A associate and also former Supreme Court clerk that recently left the Firm to do public service work.  [Material redacted as attorney-client privileged/attorney work product.]

I would recommend that we terminate Mark immediately.  [Material redacted as attorney-client privileged/attorney work product.]

Mike

Chase Ex. 42 at JD_00003169-70.

**RESPONSE:** Undisputed.

**222.**   Nothing in Shumaker's email—including the redacted portions—says that Mark's email shows poor judgment or is intemperate.   Jan. 31, 2022 Tr. 21:9-15; Chase Ex. 42 at JD_00003169-70.

**RESPONSE:** Without prejudice to the privilege assertion that Judge Faruqui upheld, Defendants do not dispute that Shumaker's email does not expressly state that Savignac's email shows poor judgment or is intemperate. Shumaker testified that was because Savignac's email "speaks for itself…. Anyone who reads this e-mail would come away and say, 'This is not how people—particularly in an institution that is founded upon collegiality, cohesive approach to practice of law, teamwork, integrity—would act towards one another. "Give me what I want, or else."'" Chase Ex. 81, Shumaker Tr. 104:11-17.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Shumaker testified") is nonresponsive to this statement and should be disregarded.

**223.**   In other words, Shumaker's one communication to Brogan recommending that he fire Mark *does not include the rationale* that Shumaker and Brogan now both say was behind their decision that Mark should be fired.  Jan. 31, 2022 Tr. 21:9-15; Chase Ex. 42 at JD_00003169-70.

**RESPONSE:** Without prejudice to the privilege assertion that Judge Faruqui withheld, Defendants do not dispute that Shumaker's email does not expressly state the rationale behind his recommendation of termination. Shumaker testified that was because Savignac's email "speaks for itself.... Anyone who reads this e-mail would come away and say, 'This is not how people— particularly in an institution that is founded upon collegiality, cohesive approach to practice of law, teamwork, integrity—would act towards one another. "Give me what I want, or else."'" Chase Ex. 81, Shumaker Tr. 104:11-17.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Shumaker testified") is nonresponsive to this statement and should be disregarded.

**224.**   The email chain that Shumaker forwarded to Brogan also included McClure's August 2018 email to Plaintiffs, but did not include Plaintiffs' August 2018 emails about the policy.  Chase Ex. 42.

**RESPONSE:** Undisputed that Shumaker forwarded to Brogan the entire email chain that included Savignac's January 16, 2019 email. In drafting that email, Savignac deleted the prior emails from August 2018, which otherwise would have been included in the chain with Savignac's January 16, 2019 email. *Compare* McClure Ex. 3 *with* McClure Ex. 4.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**225.**   On or about January 20, Brogan responded:

He has to go.  Get it done tomorrow Morning [sic] first thing.

Steve

JDSF ¶ 341; Chase Ex. 42 at JD_00003169.

**RESPONSE:** Undisputed.

**226.**   The emails just quoted were the only communications between Shumaker and Brogan regarding Mark or the January 16 email until after the termination was implemented.  Chase Ex. 81 (Shumaker) at 62:23-64:16.

**RESPONSE:** Disputed. Brogan testified that he may have spoken with Shumaker after receiving Shumaker's email because "I was interested to find out who [Savignac was] claiming gave Julia a bad review. So there might have been a phone call, but … I don't remember." Chase Ex. 77, Brogan Tr. 11:18-12:7. Shumaker testified he did not recall any oral discussion with Brogan during this time period, but he did not testify that no such conversation took place, and he acknowledged the possibility that one did: "If you showed me a phone record that would indicate that" Shumaker and Brogan "had a conversation, I wouldn't be shocked or surprised. I'm just saying I don't remember it." Chase Ex. 81, Shumaker Tr. 62:23-64:16.

**REPLY:** This statement is not genuinely disputed.  Brogan testified that the only communication he had with Shumaker was when either he or someone else on his behalf talked with Shumaker to determine the identity of the person that the January email alleged had discriminated against Julia.  Chase Ex. 77 (Brogan) at 11:18-13:18.  According to Brogan, he found out that the referenced person was Partner A and, "because he kn[e]w [Partner A], and [had] the highest regard for him," he determined that the complaint of sex discrimination against Julia "had no credibility," which motivated his decision to fire Mark.  *Id.* at 78:1-79:18, 13:8-11, 26:21-27:6.  But Shumaker, *testifying both in his personal capacity and in his capacity as Jones Day's*

*30(b)(6) witness*, admitted that had no recollection of any such phone call, acknowledged that did he himself did not even know that the email was referencing Partner A, and contradicted Brogan's account both that he told Brogan (or someone else on Brogan's behalf) that the email was referencing Partner A and that the knowledge of Partner A's identity had anything to do with the decision to terminate Mark.  Chase Ex. 81 (Shumaker) at 62:23-64:16, 151:23-152:17.  It is undisputed that Shumaker and Brogan did not have any other communications about Mark during this time period.

**227.**   On January 22, 2019, Jones Day fired Mark. JDSF ¶ 363; Chase Ex. 46.

   **RESPONSE:** Undisputed.

   **D.     Jones Day's asserted reasons for the firing confirm that it was unlawful.**

**228.**   Jones Day fired Mark solely because of the January 16 email.  *See* Dkt. 189 (JD MSJ) at 33 ("it is undisputed that Stephen Brogan, Jones Day's Managing Partner, terminated Savignac based solely on the January 2019 email"); Chase Ex. 77 (Brogan) at 18:11-19:2.

   **RESPONSE:** Undisputed that there was no incident apart from the January 16, 2019 email that was a factor in the decision to terminate Savignac. Defendants dispute the remainder of Statement 228 as mischaracterizing the cited testimony and briefing, all of which distinguish between the email itself and the conduct reflected in the email that caused Jones Day to terminate Savignac.  *See, e.g.*, Chase Ex. 77, Brogan Tr. 15:15-23:14, 59:17-61:2, 67:10-14, 84:4-85:6, 120:1-20; Chase Ex. 81, Shumaker Tr. 48:11-18, 58:13-14, 104:12-17, 108:6-10; *see also* JD MSJ Br. At 24-27 (ECF 189).

   Defendants further respond that Statements 228 through 313 should be disregarded in their entirety as improperly argumentative under Local Rule 7(h). Rather than cite specific parts of the record to establish discrete, purportedly undisputed facts, Plaintiffs ignore the evidence about why

Jones Day terminated Savignac, mischaracterize the evidence by selectively reciting isolated testimony taken out of context, and attack credibility. That is argument, and it consistently mischaracterizes or overlooks the evidence and testimony that Jones Day fired Savignac because of his conduct as reflected in his January email as a whole, not because of any individual statement. Jones Day's filings, discovery responses, witness testimony, and other statements have been uniform on why Jones Day fired Savignac, and the isolated quotes from various pleadings, filings, and argument transcripts that Plaintiffs cite—documents that virtually always focus on some discrete dispute between the parties, not the underlying facts—are taken out of context and not nor fairly presented in Plaintiffs' Statements.

**REPLY:** This statement is not genuinely disputed.  This statement tracks Jones Day's admission its own summary judgment brief nearly verbatim.  Dkt. 189 (JD MSJ) at 33 ("it is undisputed that Stephen Brogan, Jones Day's Managing Partner, terminated Savignac based solely on the January 2019 email").  If there is some metaphysical distinction to be drawn between the email itself and conduct reflected in the email (whatever that means), Jones Day has clearly stated to the Court that it fired Mark based solely on *the email*.

Jones Day also says that statements 228 through 313 should be disregarded as "improperly argumentative."  That sweeping and conclusory assertion is both inaccurate and an illegitimate basis to dispute or "disregard" a statement (let alone dozens of statements).  *See* Preliminary Statement A.  Jones Day claims that Plaintiffs do not cite specific parts of the record to establish discrete facts, but each of Plaintiffs' statements identifies an undisputed fact and then cites evidence in the record that supports that fact, in compliance with Local Rule 7(h) and this Court's standing order.  Next, Jones Day says that Plaintiffs "ignore," "overlook," and "mischaracterize" evidence and "attack credibility."  That conclusory assertion is also inaccurate—and it is an

illegitimate basis to dispute or demand that the Court "disregard" dozens of Plaintiffs' statements (including many that Jones Day *admits* are undisputed).  If Jones Day wishes to dispute any particular statement on the ground that it supposedly ignores, overlooks, or mischaracterizes evidence, or simply attacks credibility, the Rules and this Court's standing order require the firm to "identif[y]" the specific "fact" that it disputes in a "correspondingly numbered paragraph," and "support[]" that dispute "by a precise citation to the controverting evidence."  Standing Order 10(d)(iv)-(v); *see also* Local. R. 7(h)(1).  Jones Day's sweeping (and false) criticisms here do not comply with those rules.

229.    There was no incident prior to January 16, 2019, that was a factor in the decision to fire Mark.  Sheketoff Ex. 31 at 12 (Second Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

**RESPONSE:** Undisputed.

**i.    The January email's assertion that the leave policy is unlawful**

230.    Jones Day fired Mark because of the January email's complaint that the firm's leave policy is illegally discriminatory.  Chase Ex. 77 (Brogan) at 15:15, 16:18-25 ("Q. Okay.  Why did you fire me?"  "A. … You then went on to act as if you personally were the law-givers; that the – our policy on leave was illegal."); *id.* at 46:15-22 (the firing decision was "on the basis of your e-mail and also your attack on our position, which seems to be on all fours with what you were told by Sarah [McClure]"); *id.* at 58:23-59:20 ("Q. … was anything in [the email's first] paragraph a factor in your decision to fire me?"  A. … In this particular paragraph – and I think I referred to this; that you speak like you're the lawgiver.  And we – we, Jones Day, which is one of the great law firms in the world, should bow down to your assessment of the EEOC.  And – and that this is a violation of [Title VII of] 1964 Civil Rights Act. … It's a pompous assertion.  It's an arrogant

assertion."); *id.* at 62:22-25 ("And you're telling us that we violated [the] 1964 Civil Rights Act? To me, there's just no good faith basis to it.").

  **RESPONSE:** Disputed.  Plaintiffs have no basis on which to represent this as an undisputed fact. Statement 230 mischaracterizes the evidence by reciting isolated testimony taken out of context and ignoring Brogan's testimony that he terminated Savignac because of Savignac's unprofessional demand to receive the same amount of disability available to birth mothers who indisputably are disabled for at least some period, even though Savignac obviously had no postpartum disability—a demand supported by conclusory reasoning, false assertions, and an extortionate threat to go to the media if he was not given the $80,000 worth of leave that he was demanding. *See* Chase Ex. 77, Brogan Tr. 15:3-18:10; *see also, e.g.*, *id*. 21:21-22:10, 39:4-17, 59:17-61:2, 66:19-25. "[F]or all those reasons tied up, that's why I made the decision I made." *Id.* at 17:15-17. Brogan expressly testified that neither the assertion that the leave policy was discriminatory, nor the threat of a lawsuit, was a factor in his decision to terminate Savignac. *Id.* at 22:16-24, 60:7-11.

  **REPLY:** While Jones Day disputes this statement, the dispute is not genuine. Brogan's cited testimony is unambiguous.  Indeed, Jones Day admits in its brief that Jones Day fired because Mark because he and Julia "acted as if Plaintiffs personally were the law-givers, decreeing that our policy on leave was illegal." Dkt. 189 at 35 (brackets omitted).  Even assuming that Brogan deemed this "decree[]" to be "conclusory and arrogant," and then fired Mark for the "conclusory and arrogant" decree, that is just another way of saying that Brogan fired Mark because of the "decree[]."  Additionally, the fact that Brogan testified that other aspects of the email were motivating factors or even but-for causes for the termination does not conflict with his own sworn testimony that the email's complaint that the leave policy is discriminatory was a but-

for cause of the termination, which is all that Plaintiffs state in this paragraph.  "Often, events have multiple but-for causes."  *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020).

231.    Shumaker likewise testified that the January email's complaint that the firm's leave policy is illegally discriminatory was a factor in his "decision to recommend termination."  Chase Ex. 81 (Shumaker) 96:2-19, 103:2-6.

**RESPONSE:** Disputed.  Statement 231 mischaracterizes the cited testimony and ignores Shumaker's testimony about his reasons for recommending Savignac's termination, including that Savignac's email "reflected a lack of professionalism. It reflected a lack of maturity. It reflected a lack of leadership. It reflected a distortion of applicable law. It demanded something to which [Savignac was] not entitled, in an extortionate way. It showed an absence of integrity. And those are foundational values for this law firm. If you pick up the firm manual, first two or three pages, those things make a difference to us." Chase Ex. 81, Shumaker Tr. 50:13-23. Shumaker construed Savignac's email as "a clear threat" to "somehow bad-mouth the firm in some way." *Id.* at 58:13- 14, 108:7-8. To Shumaker, it "was the—'We're going to—if you don't give me what I'm not entitled to, I'm going to take this to the court of public opinion. I'm going to publicize to you and say bad things about this law firm, this law firm for which I work right now, and is paying me over—has paid me over a million dollars,' that's just immature, unprofessional, complete absence of judgment…." *Id.* at 48:11-18.

**REPLY:** While Jones Day disputes this statement, the dispute is not genuine. Shumaker's cited testimony is unambiguous:

> Q: Was there anything in that [first] paragraph [of the January email] a factor in your decision to recommendation termination?
>
> A. Yes.
>
> Q.  What was that?

A. I could not believe you had closely reviewed the case law, given the authority it provided you, and how you can dismiss the two cases that we rely upon.  I couldn't believe there would actually be competent attorneys that would conclude otherwise. Your statement that Jones Day's policy is discriminatory is conclusory and erroneous, and your statement that it's illegal under Title VII and D.C. law was wrong.

Chase Ex. 81 (Shumker) at 96:2-19; *see also id.* at 103:2-6.

**232.**   But for Brogan's reaction to the January email's complaint that Jones Day's leave policy violates Title VII, Jones Day would not have fired Mark.  Chase Ex. 77 (Brogan) at 63:6-11 ("Q. Would you have fired me even if you believed I was right about the policy being illegal?" "THE WITNESS. Yeah.  I – no, I – I would not.").

> **RESPONSE:** Disputed. Plaintiffs mischaracterize the evidence by distorting Brogan's response to the quoted question. Brogan denied that the e-mail's assertion that Jones Day's policy is discriminatory was a factor in his decision to terminate Savignac. Chase Ex. 77, Brogan Tr. 60:4-11. Brogan never said that he would have tolerated such an unprofessional email if it was not raising a discrimination claim at all. He also testified that he would not have terminated Savignac if the discrimination claim had been raised in a professional manner. *Id.* at 22:16-24, 60:7-11. Viewed in full, Brogan's testimony suggests at most that he would have excused the improper manner of Savignac's email if Savignac had at least brought a real problem with the policy to Brogan's attention. Defendants also incorporate by reference their response to Statement 230.

> **REPLY:** This statement is not genuinely disputed.   Brogan's testimony is unambiguous and Jones Day offers no explanation for its false allegation that Plaintiffs somehow "distorted" it.  Jones Day's factual assertions are nonresponsive (and, in any event, inaccurate). As the cited testimony states, Brogan admitted he would not have fired Mark but for his reaction to the email's statement that the policy is illegal.  Jones Day's speculative telling—Brogan "would have excused the improper manner of [the] email" if not for his disagreement with its challenge to

the policy—is just an admission that the email's assertion that the policy is illegal was a but-for cause for the termination.  Moreover, Brogan's testimony was clear that the email was improper *because of* its allegedly false assertion that the policy was illegal, not despite it.  That is, the complaint of discrimination *was* "improper manner."  *See, e.g.*, Chase Ex. 77 (Brogan) at 16:18-17:17 ("You then went on to act as if you personally were the lawgivers; that the—our policy on leave was illegal."); *id.* at 46:15-18 ("I've already testified now, I think pretty clearly, that it's on the basis of your e-mail and also your attack on our position, which seems to be on all squares with what you were told by Sarah [McClure]"); *id.* at 47:20-48:15 ("I gave a lot of reasons for why I didn't—I didn't think you had a good faith basis for anything…. In my view, you were attacking our citation of what was a clear statement by the EEOC."); *id*. at 58:23-59:19 ("I think I've told you what—the basis of my decision to say that you had to leave the firm, because of this e-mail and the character flaws it disclosed.  In this particular paragraph—and I think I referred to this; that you speak like you're the law giver.  And we—we, Jones Day, which is one of the great law firms in the world, should bow down to your assessment of the EEOC.  And—and that this is a violation of the 1964 Civil Rights Act."); *id*. at 62:13-63:5 ("And you're telling us that we violated a 1964 Civil Rights Act?  To me, there's just no good faith basis to it.  You're just—you're—I don't even know what—I—you know, you're just picking a fight, you know.  You're on a crusade.  It just made—made no sense to me.  It was impossible for me to believe that what you are saying was—was being in said in good faith."); *id.* at 74:22- 75:8 ("you and—and Julia are two of the more privileged people in the world right now. And you were finding a way to drum up a case that you were the victim some social injustice").  To the extent that Brogan testified that other aspects of the email were motivating factors or even but-for causes for the termination, that does not conflict with his own sworn testimony that the email's complaint that the leave policy is

discriminatory was a but-for cause of the termination, which is all that Plaintiffs state in this paragraph. "Often, events have multiple but-for causes." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020).

**233.** Brogan testified that he "wasn't impressed with your reasoning" in claiming that Jones Day's leave policy is discriminatory. Chase Ex. 77 (Brogan) at 59:17-18.

 **RESPONSE:** Undisputed that Brogan testified that he was not impressed with Plaintiffs' conclusory reasoning in their response to McClure's email. Chase Ex. 77, Brogan Tr. 62:1-10. McClure had cited both case precedent and EEOC guidance in her August email to Savignac, which email Brogan had reviewed at the time he approved the recommendation to terminate Savignac. *See* Chase Ex. 42. Brogan considered Savignac's response to be just "a flat-out assertion. It is a pompous assertion. It's an arrogant assertion." Chase Ex. 77, Brogan Tr. 59:18-20.

 **REPLY:** Jones Day does not dispute any part of this statement, and correctly acknowledges that Brogan understood the "reasoning" in question to be both "Plaintiffs' … reasoning." The statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**234.** However, Brogan admitted that he made the termination decision without looking at Plaintiffs' reasoning in their August 2018 emails with McClure. Chase Ex. 77 (Brogan) at 46:25-10, 61:22-62:12, 113:1-123:24.

 **RESPONSE:** Undisputed. To the extent it is intended to be read with Statement 233, Statement 234 mischaracterizes the testimony, for the reasons set forth in response to the prior Statement. In addition, Sheketoff's earlier email did not, and indeed could not, supply the reasoning missing from Savignac's email. McClure's email citing judicial precedent and agency

guidance was sent after Sheketoff's email, McClure Ex. 3, and Brogan found fault with Savignac's conclusory and arrogant proclamation that those authorities did not support the Firm's policy. Chase Ex. 77, Brogan Tr. 61:22-62:12.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

235.    Brogan testified that it would have shown "leadership" if Mark had instead requested that the firm consider changing its policy without saying "you're violating the law."  Chase Ex. 77 (Brogan) at 207:2-12.

**RESPONSE:** Undisputed that Brogan testified: "[I]f he were up to it, [Savignac] had a perfect opportunity to exhibit leadership by coming to me, or going to Sharyl Reisman, or somebody, and saying, 'I would really like the firm to give some further thought—not because you're violating the law, because I think Jones Day could be a leader in supporting fathers spending more time in the early years with their kids. That's—that's the kind of leadership that we're looking for." Chase Ex. 77, Brogan Tr. 207:2-12.

**REPLY:** Jones Day does not dispute any part of this statement, which further confirms that Brogan was upset because Plaintiffs indicated that Jones Day had violated the law.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

236.    When he read the August 2018 emails at his deposition, Brogan testified that they were "routine and – and relatively innocuous disagreements over firm policies" and did not "reflect poor judgment, a disinterest in pursuing a career at Jones Day, or a lack of courtesy to colleagues." Chase Ex. 77 (Brogan) at 123:8-24.

**RESPONSE:** Undisputed. And Brogan further testified that Mark's August 2018 email does not "contain[] any of the … things that [he] ha[d] already testified to" about Mark's

January 2019 email, such as the "dishones[ty] about the firm's compensation system" or the "extortion[ate]" demand for the same amount of leave as birth mothers. Chase Ex. 77, Brogan Tr. 122:4-123:7.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Plaintiffs note that Brogan's testimony directly contradicts his sworn interrogatory responses. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

### ii.   The January email's complaint of pay discrimination against Julia

237.   The January email complains that Plaintiffs "experienced [sex-based pay discrimination] when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman."  McClure Ex. 4 at JD_00003143.

**RESPONSE:** Disputed. Plaintiffs have denied that the January email complained about discrimination against Sheketoff. *See* Pls. MSJ Br. at 30 ("The January email is a single, unitary complaint of discrimination, with every sentence directly related to the claim that the leave policy is unlawful…. The fourth [paragraph] warns Jones Day not to retaliate." (marks and citation omitted)). Also disputed that Plaintiffs could have any good-faith belief that Sheketoff's pay reflected sex-based discrimination. Even after a year of discovery, Plaintiffs have no evidence of gender-based discrimination by Partner A. *See, e.g.*, DSF ¶¶ 196, 197, 201. In addition, Statements 237 through 266 generally constitute improper argument. Rather than cite specific parts of the

record to establish purportedly undisputed facts, Plaintiffs mischaracterize snippets of testimony, and present argumentative and flawed interpretations that they know are disputed.

**REPLY:** This statement is not genuinely disputed.  The email inarguably complains about pay discrimination against Julia.  Plaintiffs' accurate and undisputed statement that the email as a whole (including the complaint about pay discrimination against Julia) is a complaint about the firm's leave policy, with the fourth paragraph as a whole warning Jones Day not to retaliate for the challenge to the leave policy, is perfectly consistent with the indisputable fact that the quoted language complains of pay discrimination against Julia.  The bulk of Jones Day's answer (beginning with "Also disputed that Plaintiffs") is nonresponsive and should be disregarded.  It is also false.  In asserting that "Plaintiffs have no evidence of gender-based discrimination by Partner A" and that "Plaintiffs could [not] have any good-faith belief that Sheketoff's pay reflected sex-based discrimination," Jones Day tries to pretend out of existence Plaintiffs' painstaking exposition of the evidence set out in their statement of facts.  PSF ¶¶ 433-735.

Jones Day also disputes Statements 237 through 266 because they supposedly constitute "improper argument."  This is the same objection (to the same paragraphs) that Jones Day makes above, in its response to PSF ¶ 228.  As discussed in their reply to PSF ¶ 228, that is both inaccurate and an illegitimate basis to dispute statements.  *See* Preliminary Statement A.   Jones Day also claims that Plaintiffs do not cite specific parts of the record to establish facts.  Again, Jones Day has already made the identical objection to these paragraphs above.  PSF ¶ 228.  As Plaintiffs said there, each of Plaintiffs' statements identifies an undisputed fact and then cites evidence in the record that supports that fact, in compliance with Local Rule 7(h) and this Court's standing order.  Finally, again repeating the same objections to the same paragraphs as made above, Jones Day says that Plaintiffs "mischaracterize" and provide "flawed interpretations" of evidence.  PSF ¶ 228.

That too is inaccurate—and it is an illegitimate basis to dispute nearly 30 of Plaintiffs' statements. If Jones Day wishes to dispute any particular statement on the ground that it supposedly mischaracterizes or misinterprets the evidence, the Rules and this Court's standing order require the firm to "identif[y]" the specific "fact" that it disputes in a "correspondingly numbered paragraph," and "support[]" that dispute "by a precise citation to the controverting evidence." Standing Order 10(d)(iv)-(v); *see also* Local. R. 7(h)(1).   Jones Day's sweeping (and false) criticisms here do not comply with those rules.

**238.**   Jones Day fired Mark because of the January email's complaint of sex-based pay discrimination against Julia.  Chase Ex. 77 (Brogan) at 15:15-16:17 ("Q. Okay.  Why did you fire me?"  "A. … you said that Julia was discriminated against.").

> **RESPONSE:** Disputed. Plaintiffs mischaracterize the evidence by selectively reciting isolated testimony taken out of context. Brogan testified at length about his reasons for approving Savignac's termination, and he did not testify that he fired Savignac for complaining about pay discrimination, but rather, in part, for telling the gratuitous lie that Sheketoff had suffered pay discrimination. Chase Ex. 77, Brogan Tr. 26:21-25 ("**Q.** And just to confirm, the complaint about pay discrimination against Julia, that was a factor in your decision to fire me, correct? **A.** The untruthfulness of it, not the—not the fact of the complaint."). Defendants incorporate by reference their responses to Statements 230 and 237.

> **REPLY:** While Jones Day disputes this statement, the dispute is not genuine.  Even assuming that Brogan deemed the complaint of pay discrimination against Julia to be "untruthful[]"—and that he fired Mark because of the "untruthfulness" of the complaint—that is just another way of saying that Brogan fired Julia because of the complaint.  Whether Brogan's

baseless insistence that he viewed the claim as "untruthful" is a defense to the retaliation claim is a legal matter addressed in the parties' briefing.

**239.**   But for Brogan's reaction to the January email's complaint of sex-based pay discrimination against Julia, Jones Day would not have fired Mark.   Chase Ex. 77 (Brogan) at 26:21-27:2 ("If I thought for a moment that there was any merit to it, I – I would not have taken the decision that I took.").

**RESPONSE:** Disputed. Plaintiffs mischaracterize the evidence by selectively reciting isolated testimony taken out of context and distorting Brogan's response to the quoted question. At most, Brogan's testimony suggests that he would have excused the improper manner of Savignac's email if Savignac had at least brought a real problem about Sheketoff's pay to Brogan's attention. Defendants incorporate by reference their responses to Statements 230, 232, and 237.

**REPLY:** This statement is not genuinely disputed.  Brogan's testimony is explicit and Jones Day offers no explanation for its false allegation that Plaintiffs somehow "distorted" it. Jones Day's factual assertions are nonresponsive.  As the cited testimony states, Brogan admitted he would not have fired Mark but for his reaction to the email's statement that Julia experienced sex-based pay discrimination.  Jones Day's attorney argument that Brogan "would have excused the improper manner of [the] email" if he had not disagreed with the assertion of pay discrimination is just an admission that the email's assertion of pay discrimination was a but-for cause of the termination.  In any event, Brogan's testimony was clear that the email was improper *because of* its allegedly false assertion that Julia had experienced pay discrimination, not despite it.  That is, the complaint of pay discrimination *was* the "improper manner."  *See, e.g.*, Chase Ex. 77 (Brogan) at 15:15-16:17 ("Q. Okay.  Why did you fire me?  A… Secondly, you said that Julia was discriminated against; that you knew—both you and she knew this."); *id.* at 39:4-17 (" I think the

most important part of that e-mail is 'He has to go,' because of your conduct, that we—we have somebody who is, in my view, being completely dishonest in attacking the firm, as I indicated earlier, by claiming that our system is designed to discriminate against women, and that—and again, dishonestly claiming that Julia was discriminated against.  That's just not conduct that we can accept from somebody.  It's just dishonest.  It goes to your character.  You have to go."); *id.* at 76:2 at 18 ("Was the e-mail's assertion that Julia experienced sex-based pay discrimination a factor in your decision to fire me?  A.  The fact that it was untrue, and you said that, told me all I needed to know about your dishonesty."); *see also* PSF ¶ 238 (Jones Day's response) ("Brogan … fired Savignac … for telling the gratuitous lie that Sheketoff had suffered pay discrimination."). To the extent that Brogan testified that other aspects of the email were motivating factors or even but-for causes for the termination, that does not conflict with his own sworn testimony that the email's complaint that the leave policy is discriminatory was a but-for cause of the termination, which is all that Plaintiffs state in this paragraph.  "Often, events have multiple but-for causes." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020).

240.    Brogan testified that he knew that the claim of discrimination against Julia was 'false and dishonest, because I personally made decisions that favored Julia, and gave her raises that based on her rankings and her – scores she did not deserve."  Chase Ex. 77 (Brogan) at 16:11-17.

**RESPONSE:** Undisputed.

241.    The January email's allegation, however, is that a partner who worked with Julia wrote her a negative evaluation because she is a woman and that it affected her pay.  McClure Ex. 4 at JD_00003143.

**RESPONSE:** Disputed insofar as Plaintiffs are trying in Statements 240 and 241 to suggest that Brogan did not have personal knowledge of what influenced his decision-making in

setting Sheketoff's salary adjustments in the relevant years and the falsity of Savignac's email. Brogan testified that "I made the decisions [about Sheketoff's compensation adjustments] personally" and described the bases for his decision-making. Chase Ex. 77, Brogan Tr. 27:22, 28:2-30:2. He "had personal knowledge of—of Julia's compensation when [Savignac] sent me that e-mail. And I knew that the firm had been not just fair, but generous, and was trying to encourage Julia to—to have a very successful career at the firm." *Id*. at 30:3-7. Plaintiffs cite no evidence suggesting that Brogan lacked personal knowledge of the falsity of allegations about decisions that Brogan himself had made. Also disputed that the January email complains about pay discrimination, which Plaintiffs have denied. Defendants incorporate by reference their response to Statement 237.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make an assertion about whether Brogan had personal knowledge of what influenced his decisionmaking in setting Julia's salary adjustments.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

242.   Brogan acknowledged that "of course those evaluations are important" to determining associate compensation.  Chase Ex. 77 (Brogan) at 209:4-22.

**RESPONSE:** Undisputed.  Brogan also testified that, while he has never seen any instance of a discriminatory associate evaluation, the Firm's iterative process for reviewing evaluations of associates would identify and discount any such evaluation. Chase Ex. 77, Brogan Tr. 240:16-243:12. Others involved in that process testified similarly. *See, e.g.*, Chase Ex. 81, Shumaker Tr. 113:16-114:12. According to Traci Lovitt—who oversees the associate evaluation process and testified on that topic as the Firm's 30(b)(6) designee—there is a lot of "grading of the graders" during that process. Chase Ex. 82, Lovitt Tr. Vol. I 150:11 (and errata). "There are

many, many eyes on all the individual evaluations. And there is a challenge process that happens both at the practice level, at the office level, and … at the [firmwide] level where people test the credibility of individual evaluations." Chase Ex. 82, Lovitt Tr. Vol. I 136:4-15. At the firmwide level, a review committee meeting attended by "the most diverse group you can think of in every sense of the word" goes through the assessments of each associate, and that meeting is "combative in the sense that you have an assessment statement and the person who drafted it is forced to defend it, to defend, you know, the negative feedback and the positive feedback. Everything has to have a factual basis." Chase Ex. 83, Lovitt Tr. Vol. II 60:14-20.

**REPLY:** Jones Day admits that this statement is undisputed.  Virtually all of its answer (beginning with "Brogan also testified") is nonresponsive and facially implausible puffery and should be disregarded.  *See also*, *e.g.*, JDSF ¶¶ 163-66, 171-73, 176 (Plaintiffs' responses).

**243.**  Shumaker agreed that reviews "[a]bsolutely" matter to his recommendations on associate pay.  Chase Ex. 81 (Shumaker) at 314:13-25.

**RESPONSE:** Undisputed.  Defendants also incorporate by reference their response to Statement 242.

**244.**  Brogan's role as the final decisionmaker on compensation for Jones Day attorneys would not give him insight into whether a particular input into the compensation process—a single evaluation by a single partner—was motivated by sexism or not.  Chase Ex. 77 (Brogan) at 213:9-15 (Brogan generally simply accepts the compensation recommendations made to him); *Tolton v. Jones Day*, No. 19 Civ. 945 (D.D.C.), Dkt. 146 at 37-38 (hereinafter "*Tolton*")  (describing process for making compensation adjustments).

**RESPONSE:** Disputed, including as argumentative interpretation of the evidence. The cited material does not support the asserted fact. Defendants incorporate by reference their

response to Statement 242. Moreover, Brogan is well aware of the Firm's process for evaluating associates and testified that it "is as thorough as it could possibly be. And in my view, as fair as it could possibly be." Chase Ex. 77, Brogan Tr. 243:8-10. It also is undisputed that Brogan personally made the final decision on Sheketoff's compensation adjustment each year. *Id*. at 28:2- 30:7. Filings in a separate lawsuit cannot be presented in an admissible form as evidence in this case. Plaintiffs also mischaracterize the cited pleading, which describe the general process for setting associate compensation and does not address Brogan's role with respect to setting compensation for any given associate, such as Sheketoff.

**REPLY:** This statement is not genuinely disputed.  Jones Day complains that this statement is an argumentative interpretation of the evidence.  The statement is not argumentative, and in any event Jones Day's conclusory assertion is not an adequate basis for disputing a statement.  *See* Preliminary Statement A.  Jones Day also claims that the cited evidence does not support the statement, and that Plaintiffs mischaracterize that evidence, but evidence about how the compensation process works and Brogan's limited role in that process directly supports this statement.  Jones Day further objects that "[f]ilings in a separate lawsuit cannot be presented in an admissible form in this case," but it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  Jones Day's own statements (through counsel or otherwise) are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  There is no exception to the admissibility of an opposing party's statements for statements that were made in another lawsuit as opposed to some other context.  (The one exception, for responses to requests for admission under FRCP 36(a)(1), confirms the general rule that a party's statements in litigation are admissible against that party in other litigation.)  The

remainder of Jones Day's response (beginning with "Moreover, Brogan is well aware" and continuing until "each year") is non-responsive and should be disregarded.

245.     Indeed, Brogan did not even read Julia's reviews for the year in which she got a small raise until *after* he fired Mark.  JDSF ¶ 262; Chase Ex. 77 (Brogan) at 83:18-24.

**RESPONSE:** Undisputed that Brogan did not read Sheketoff's individual evaluations of her performance in 2016 until after Jones Day fired Savignac, but disputed that Brogan—who had been the decision-maker for Sheketoff's compensation adjustments—needed to read the evaluations in order to know that any claim Sheketoff was paid less because of an allegedly discriminatory evaluation was false. Chase Ex. 77, Brogan Tr. 27:22, 28:2-30:2. Defendants also incorporate by reference their responses to Statements 240 and 241.

**REPLY:** Jones Day does not dispute any part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

246.     Brogan testified that he did not credit the idea that Partner A would submit a discriminatory evaluation of Julia because (according to Brogan) "[h]e is biracial, as is Julia," "an enormous promoter of diversity," "a complete advocate for somebody like Julia," "is as high character … as you can find," and "served in the United States Marine Corps."  Chase Ex. 77 (Brogan) at 76:23-77:78:25; *id.* at 164:10-12 ("he's biracial, and he wouldn't be a very – he wouldn't be very convincing that he discriminated against you" on the basis of sex).

**RESPONSE:** Undisputed.

247.     But the January email does not identify the partner who wrote the "negative review" of Julia.  McClure Ex. 4 at JD_00003143.

**RESPONSE:** Undisputed.

**248.** As Brogan acknowledged, Julia received two negative reviews from male partners for the same year for which she received a low salary adjustment, so the January email's statement that a male partner gave her a negative review did not identify anyone in particular.  Chase Ex. 77 (Brogan) at 171:1-172:10; Chase Ex. 15 at JD_JS_00001293-1294.

**RESPONSE:** Undisputed that Sheketoff received more than one negative review for her performance in 2016 and that the January email did not identify which partner it was referring to. Disputed that Brogan was not aware at the time that he approved Savignac's termination that the email was referring to Sheketoff's work with Partner A. Brogan testified: "I'm pretty clear that I—I was aware that you were complaining about" Partner A, though he did not recall how he got that information. Chase Ex. 77, Brogan Tr. at 12:16-21; *see also id*. at 13:1-18.

**REPLY:** Jones Day does not dispute any part of this statement.  This particular statement (unlike other statements) makes no representation about whether Brogan was aware at the time he fired Mark that the January email was referring to Partner A.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**249.** Nonetheless, Brogan testified that, before he made the termination decision, he communicated with Shumaker and learned the identity of the partner that the January email alleges discriminated against Julia (Partner A).  Chase Ex. 77 (Brogan) at 12:1-13:18.

**RESPONSE:** Disputed that Brogan definitively testified that he communicated with Shumaker on this topic. Brogan testified that he "knew that [Savignac was] complaining about [Partner A] before I made the decision" to terminate, and his recollection was that he or someone he was with called Shumaker. Chase Ex. 77, Brogan Tr. 13:1-18. Brogan could not, however, recall if that is exactly what happened: "I wouldn't say I'm clear on that…. I'm pretty clear that I … was aware that you were complaining about [Partner A]. I don't know how I—how I got it….

This is, you know, three years ago." Chase Ex. 77, Brogan Tr. 12:15-25. Defendants also incorporate by reference their response to Statement 226.

**REPLY:** This statement is not genuinely disputed.  Brogan testified that either he or someone on his behalf called Shumaker and learned that Partner A was the person that the January email alleges discriminated against Julia.  Chase Ex. 77 (Brogan) at 11:18-13:18.

250.     But Brogan was unable to provide any detail about that purported communication. Chase Ex. 77 (Brogan) at 12:3-13:18 ("there might have been a phone call, but I – I don't remember. … I might have asked somebody that I was with to call. … I don't know whether I called [Shumaker] or whether I asked somebody to call him. …"   "Q. So just to confirm the chronology, you received an e-mail from Shumaker that included a trail of earlier emails.  You or someone else called Shumaker to determine who the partner referenced was, that it was [Partner A].  And then you wrote back to Shumaker to say that I should be fired?"  "A. That's my recollection.").

**RESPONSE:** Undisputed that Brogan does not recall how he learned that the January email was alleging Partner A wrote a discriminatory review. Defendants also incorporate by reference their responses to Statements 226 and 249.

**REPLY:** Jones Day does not dispute that part of this statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

251.     Contrary to Brogan's claim that he or "somebody that I was with" called Shumaker before Brogan made the termination decision and learned who Partner A was, Shumaker—who testified, the week after Brogan's deposition, both on behalf of himself and on behalf of Jones Day as its 30(b)(6) witness—had no oral or telephone discussions with Brogan between forwarding Brogan the January email and receiving Brogan's response that Mark should be fired and, when

asked whether there were "any communications with anyone who was speaking to you on behalf of Brogan," testified "No.  No.  In terms of someone conveying a message as to Steve [Brogan] last night, he told me to tell you this or something like that, no."  Chase Ex. 81 (Shumaker) at 62:23-64:16.

> **RESPONSE:** Disputed.  Shumaker did not testify that no such communications occurred; he testified that he did not recall any such communications, but that they may have occurred: "If you showed me a phone record that would indicate that" Shumaker and Brogan "had a conversation, I wouldn't be shocked or surprised. I'm just saying I don't remember it." Chase Ex. 81, Shumaker Tr. 64:13-16. Defendants also incorporate by reference their responses to Statements 226 and 249.

> **REPLY:** This statement is not genuinely disputed.  Shumaker's testimony that *he has no recollection* of having any conversation with Brogan plainly supports the statement that no such conversation occurred.   All of Shumaker's testimony was (supposedly) to the best of his recollection.  This testimony was no different.  Moreover, according to Brogan, the entire point of this supposed phone call was to learn the identity of the person that the January email referenced; Shumaker supposedly told Brogan (or someone calling on Brogan's behalf) that the person was Partner A.   However, Shumaker—*testifying both for himself and as Jones Day's 30(b)(6) witness*—admitted that he *could not have* told Brogan that Partner A was referenced in the email because he did not himself know at the time.  Chase Ex. 81 (Shumaker) at 62:23-64:16, 151:23-152:17.

**252.**     Shumaker himself did not know who the referenced partner was at the time of the termination.  Chase Ex. 81 (Shumaker) at 68:2-70:2 ("Q. … did you have an understanding of what Jones Day partner the e-mail was referring to as having treated [Julia] worse?"  "A. The

answer is no."); *id.* at 70:4-71:23 ("when I learned it, how I learned it, I – I really cannot recall. …
I can't recall if I learned it through a privileged communication or through a filing of your own.").

**RESPONSE:** Disputed.  Shumaker did not testify thar he did not know who the
referenced partner was at the time of the termination. Shumaker testified he did not recall how or
when he learned that the January email was referring to Partner A. Chase Ex. 81, Shumaker Tr.
70:4-71:23.

**REPLY:** This statement is not genuinely disputed.  Shumaker admitted that he did not
know that the January email referenced Partner A when he received it.  Chase Ex. 81 (Shumaker)
at 68:1-7.  And while he said he didn't remember *exactly* when he first learned about it, he
specifically said that *he didn't believe it was before Mark's termination*.  Chase Ex. 81 at 152:3-9
("I don't recall whether I knew it was [Partner A] at that point in time. *I don't believe so*."
(emphasis added)).   Context confirms his belief.  Indeed, Shumaker testified that he learned it
either from lawyers on the "*legal team*" or "*from one of [Plaintiffs'] filings*."  *Id* at 68:25-69:18.
Given that Plaintiffs' first filing was in mid-August of 2019, nearly *eight months* after the
termination decision, it is not plausible that Shumaker would have so testified if in fact he knew
that information at the time of Mark's termination.   The same is confirmed by the relevant
documentary evidence, which shows that Shumaker did not begin his investigation into the email's
complaint of discrimination against Julia until *after* Brogan directed that Mark be fired.  *See id.* at
68:2-24 ("I would have gotten the reviews in front of me.  I would have gotten them as part of the
concern in this issue [about which partner the January email was referring to].  Did I do anything
more than that?  Not that I can think of."); *id.* at 146:7-148:13 (Shumaker obtained Julia's reviews
by emailing administrative staff to request them); Sheketoff Ex. 176 at JD_PRIV_19 (Shumaker's

emails to and from administrative staff to get Julia's reviews; all sent *after* Brogan made termination decision).

**253.**    Testifying as Jones Day's 30(b)(6) witness on the subject of Mark's termination, Shumaker confirmed that, contra Brogan, the identity of the partner referenced in the January email was not "a factor in Jones Day's decision to terminate Mark."  Chase Ex. 81 (Shumaker) at 151:23-152:17 ("A. … So whether it was [Partner A] or not did not play a part."  "Q. Okay.  And just to clarify, I'm asking about Jones Day's decision, if this was important to Jones Day's decision."  "A. Same answer.").

     **RESPONSE:** Disputed, including as a mischaracterization of the evidence.    Brogan testified at length about his reasons for approving Savignac's termination, and he did not testify that he fired Savignac for complaining about pay discrimination or for complaining about Partner A, but rather, in part, for telling the gratuitous lie that Sheketoff had suffered pay discrimination. Chase Ex. 77, Brogan Tr. 26:21-27:22. Brogan also testified that when he found out the email was "taking a shot at [Partner A], it just further underlined my sense that this whole email was dishonest." Chase Ex. 77, Brogan Tr. 78:7-8 (with errata). Shumaker's testimony that Partner A's identity was not itself a basis for the decision does not contradict or undermine Brogan's testimony that Savignac's dishonesty was a basis for the decision and the identity of Partner A further confirmed that Savignac was dishonest. Chase Ex. 81, Shumaker Tr. 151:23-152:17. Defendants also incorporate by reference their responses to Statements 230 and 237.

     **REPLY:** This statement is not genuinely disputed.  Shumaker specifically testified that Partner A's identity "*did not play a part*" in the termination decision.  Chase Ex. 81 (Shumaker) at 151:23-152:17.  That is irreconcilable with Brogan's testimony.  *See, e.g.*, Chase Ex. 77 (Brogan) at 78:1-8 ("It had no credibility, in my view, because I know [Partner A], and I have the

highest regard for him.  And I felt as though—when I found out they were taking a shot at him, it just further undermined my sense that this whole e-mail was dishonest."); *id.* ("Q… Was the email's assertion that Julia experienced sex-based pay discrimination a factor in your decision to fire me?  A. The fact that it was untrue, and you said that, told me *all I needed to know* about your dishonesty." (emphasis added)); *id.* at 26:21-27:6 (acknowledging that the alleged "untruthfulness" of the pay discrimination allegation was but-for cause of Mark's termination). According to Brogan's own account,  he fired Mark because he believed that the January email's accusation *about Partner A* was a lie, and that he knew that it was a lie because of *Partner A's* character and racial background.

**254.**   Even Partner A himself did not know that Plaintiffs had complained about his treatment of Julia until after this case was filed.  Chase Ex. 84 (Partner A) at 263:9-11, 264:10-265:2.

> **RESPONSE:** Undisputed.

**255.**   In a September 2021 interrogatory response signed by Brogan and by Shumaker (on behalf of himself and Jones Day), Defendants stated:

> Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  *Beyond the reasons articulated in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019.*

Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories) (emphasis added); *id.* at 23 (signature page).

> **RESPONSE:** Undisputed that the exhibit includes the quoted text (without Plaintiffs' argumentative italicization).

**256.**   As Brogan acknowledged, Defendants' response to Interrogatory 7 says nothing about the January email's complaint of pay discrimination against Julia being a factor in the termination

decision.     Sheketoff Ex. 30 at 15-16 (Response to Interrogatory 7 of Plaintiffs' First Interrogatories); Chase Ex. 77 (Brogan) at 161:3-164:17.

      **RESPONSE:** Disputed.   The cited testimony does not support Plaintiffs' assertion. Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac for complaining about pay discrimination, and Plaintiffs have denied that the email complains about pay discrimination. *See* Pls. MSJ Br. at 30. Moreover, Brogan's testimony was consistent with the response to Interrogatory 7, which states "that the immaturity, poor judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day that caused the Firm to terminate Savignac's at-will employment are demonstrated throughout the January 16, 2019 email and surrounding context, not from any single word or phrase," and "include[s]" "for instance," certain "aspects of the email that exemplify th[ose] attributes." Sheketoff Ex. 30 at 14. Defendants also incorporate by reference their responses to Statements 230 and 237.

      **REPLY:** This statement is not genuinely disputed.  The cited testimony from Brogan's deposition is as follows: "Q.  Okay.  And you have testified today that a factor in your decision to terminate Mark was the e-mail—the January 16 e-mail statement that [Partner A] had discriminated against [Julia].  Why don't you say anything about that here in this interrogatory response?  A: Well, partly because of—as your own pleadings demonstrate, you don't call him [name]; you call him 'Partner A.' … And I really didn't want to drag [Partner A] into it…. But that's why I didn't—I didn't really want to drag him into it unnecessarily."  Chase Ex. 77 (Brogan) at 163:19-164:14.  Moreover, the statement here is not that the response to *Interrogatory 7* is *inconsistent* with Brogan's testimony that he fired Mark because of the email's assertion of pay discrimination against Julia, but rather that Interrogatory 7 *does not articulate* that reason (making

Brogan's testimony that he fired Mark because of the email's assertion of pay discrimination against Julia inconsistent with Defendants response to *Interrogatory 8*, as set forth in PSF ¶ 255).

257.    Jones Day's statement regarding Plaintiffs' lawsuit that was posted to Jones Day's website (i.e., Jones Day's press release) does not give the January email's complaint of pay discrimination against Julia as a factor in the termination decision.  Chase Ex. 72 at P02272.

**RESPONSE:** Disputed.  Brogan's testimony was consistent with Jones Day's press release, which Brogan drafted, and which described the Firm's reasons for terminating Savignac: "Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day." Chase Ex. 72; *see also* Chase Ex. 77, Brogan Tr. 173:13-174:23. Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac for complaining about pay discrimination, and Plaintiffs have denied that the email complains about pay discrimination. *See* Pls. MSJ Br. at 30. Defendants also incorporate by reference their responses to Statements 230 and 237.

**REPLY:** Jones Day purports to dispute this statement, but does not identify any part of this statement that it disputes and cites no evidence that controverts the statement.  This statement does not make an assertion about Brogan's testimony, which is the topic of Jones Day's entire response to the statement.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Nor could Jones Day dispute this statement in good faith, since the press release is in the record and clearly "does not give the January email's complaint of pay discrimination against Julia as a factor in the termination decision."

In any event, Brogan's deposition testimony was that he fired Mark because the January email's allegation of sex discrimination against Julia was a lie, which supposedly showed that

Mark was dishonest.  Chase Ex. 77 (Brogan) at 76:13-18 ("untrue"; "dishonesty") *id.* at 26:21-27:6 ("untruthfulness"; "absolutely not true"; "dishonest"; "dishonest allegation"; "dishonesty"); *id.* at 30:8-10 ("a lie"); *id.* at 77:10-23 ("no credibility"; "no credibility"); *id.* at 78:1-8 ("no credibility"; "dishonest"); *id*. at 78:17 ("not remotely credible"); *id.* at 79:2 ("It's just a lie.").  Yet the press release says nothing about firing Mark for lying or being dishonest.  Chase Ex. 72 at P02272.

**258.**   Even Jones Day's summary judgment brief does not acknowledge Brogan's testimony that he fired Mark because of the email's complaint of pay discrimination against Julia.  *See* Dkt. 189.

**RESPONSE:** Disputed.   Defendants' summary judgment brief stated that "[i]n his deposition, Brogan reaffirmed his conclusion that the email demonstrated Savignac's 'poor judgment and immaturity,' for several related reasons" and cited to Paragraphs 343; *see also* DSF ¶¶ 343 and 340-61. Plaintiffs also mischaracterize the evidence. Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac for complaining about pay discrimination, and Plaintiffs have denied that the email complains about pay discrimination. *See* Pls. MSJ Br. at 30. Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination. Defendants incorporate by reference their responses to Statements 230, 237, and 256.

**REPLY:** While Jones Day purports to dispute this statement, the dispute is not genuine.  *See* Dkt. 189.  This statement is about whether Jones Day (in its summary judgment brief) acknowledges Brogan's testimony that *he fired Mark because* of the email's complaint of sex discrimination against Julia.  None of the sources Jones Day cites (neither its brief nor the 22

paragraphs its brief identifies in a "see also" cite) acknowledges that Brogan *fired Mark because* of that complaint.

**259.**   None of Jones Day's "pleadings and other filings in this action" as of the date of Defendants' First Supplemental Response to the interrogatory referenced above (September 10, 2021) says that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark.  *See* Dkts. 1 through 78.

**RESPONSE:** Disputed as a mischaracterization of the evidence.  Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac for complaining about pay discrimination, and Plaintiffs have denied that the email complains about pay discrimination.  Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination.  Defendants incorporate by reference their responses to Statements 230, 237, and 256.

**REPLY:** Although Jones Day purports to dispute this statement, Jones Day does not identify any part of this statement that is false.  The statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  This statement does not make any allegation about Brogan's testimony, which is the entire subject of Jones Day's answer.  The statement states that none of Jones Day's filings in this case through September 10, 2021 articulates the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark.  The statement is beyond dispute; otherwise, Jones Day could have easily disputed it by pointing to a filing before the date in question that articulates that reason for the termination.

**260.**   Rather, Brogan's deposition on June 6, 2022, was the first time that Defendants ever suggested that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark.  Chase Ex. 77 (Brogan) at 15:15, 16:11-17.

**RESPONSE:** Disputed.  Plaintiffs mischaracterize the evidence.  Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac for complaining about pay discrimination, and Plaintiffs have denied that the email complains about pay discrimination. *See* Pls. MSJ Br. at 30. Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination. Defendants incorporate by reference their responses to Statements 230, 237, 256, and 257.

**REPLY:** This statement is not genuinely disputed.  This statement asserts that, prior to Brogan's deposition, Jones Day had never previously articulated that the January email's complaint of pay discrimination against Julia was among the reasons for firing Mark.  Defendants do not dispute that assertion or identify any evidence that controverts it.  The assertion is therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  This statement also asserts that Brogan suggested during his deposition that the January email's complaint of pay discrimination against Julia was among the reasons for firing Mark.  As discussed above, Jones Day's dispute about that is not genuine.  PSF ¶¶ 237-39.

**261.**    Brogan's testimony on June 6, 2022, that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark is directly contradicted by Defendants' September 10, 2021 interrogatory response stating that "Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019."   Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

**RESPONSE:** Disputed.   Plaintiffs mischaracterize the evidence.   Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac for complaining about pay discrimination, and Plaintiffs have denied that the email complains about pay discrimination. *See* Pls. MSJ Br. at 30. Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination. Defendants incorporate by reference their responses to Statements 230, 237, 256, and 257.

**REPLY:** This statement is not genuinely disputed.   The statement asserts that (as previously established in PSF ¶¶ 237-39) Brogan testified on June 6, 2022, that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark.   As discussed above, Jones Day's dispute about that is not genuine.   PSF ¶¶ 237-39.   This statement also asserts that the quoted interrogatory response contradicts Brogan's testimony that the January email's complaint of pay discrimination against Julia was among Defendants' reasons for firing Mark, since that reason had not been articulated in any of the places listed by the interrogatory response as having exhaustively articulated Defendants' reasons.   Defendants do not dispute that assertion or identify any evidence that controverts it.   The assertion is therefore admitted.   Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**262.**   Brogan chose not to investigate the pay discrimination claim, such as by by asking Partner A about it before he fired Mark.   Chase Ex. 77 (Brogan) at 79:3-18.

**RESPONSE:** Disputed.   Brogan had personal knowledge of the bases for Sheketoff's salary adjustment. Brogan also testified that he "knew that [Savignac was] complaining about [Partner A] before I made the decision" to terminate. Chase Ex. 77, Brogan Tr. 13:10-11. Defendants incorporate by reference their responses to Statements 241 through 244.

**REPLY:** This statement is not genuinely disputed.  Brogan's professed memory of his past behavior does not constitute an investigation.  And, as discussed above, Shumaker—testifying as Jones Day's 30(b)(6) witness—contradicted Brogan's testimony that he knew that the January email was complaining about Partner A.  PSF ¶¶ 252-54.  Jones Day does not otherwise dispute that Brogan performed no investigation into the January's assertion of pay discrimination—such as talking with Partner A about it or even reading Partner A's review of Julia.  The statement is therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**263.**   In contrast to Brogan's professed certainty, without having spoken to Partner A and without having any personal knowledge of Partner A's interactions with Julia, Partner A himself testified that he did not know whether Julia honestly believed that he had discriminated.  Chase Ex. 84 (Partner A) at 265:3-14.

**RESPONSE:** Undisputed that Partner A testified in response to questioning from Sheketoff that he does not "have your worldview or interpret things the way you do," and does not "know what you believe." Chase Ex. 84, Partner A Tr. 265:13-14, 276:9. The remainder of Statement 263 is argumentative interpretation, mischaracterizes the evidence, and is disputed. Partner A also testified that "I know I didn't write my evaluation or have any interaction with you based on your gender," *id.* 265:10-12, and Plaintiffs cannot have alleged—and cannot continue alleging—discrimination against Partner A in good faith. Even after a year of discovery, Plaintiffs have no evidence of gender-based discrimination by Partner A. *See, e.g.*, DSF ¶¶ 196, 197, 201.

**REPLY:** This statement is not genuinely disputed, as the cited deposition testimony reflects.  Indeed, Jones Day expressly concedes that Partner A admitted that he does not "know what [Julia] believe[s]."  Chase Ex. 84 (Partner A) at 276:6-9.  Standing Order 10(d)(iv)-(v); Local

R. 7(h)(1).   Much of Jones Day's answer (beginning with "Partner A also testified") is nonresponsive to this statement and should be disregarded.  It is also false.  *See* PSF ¶¶ 433-735.

### iii.   The particular number of weeks of leave demanded in the January email

**264.**   The number of weeks of leave that the January email demanded to settle the challenge to the leave policy played no role in Jones Day's decision to fire Mark.  Chase Ex. 77 (Brogan) at 69:24-70:3 ("Q. So the particular amount of leave demanded in the e-mail, which is 18 weeks of paid leave and 6 weeks of unpaid leave, did the specific amount of leave demanded factor into your decision?"  "A. No."); *id.* at 70:4-16 (asked if he would have fired Mark if the email had instead "demanded 12 weeks of paid leave and 6 weeks of unpaid leave" (i.e., six weeks less than the email in fact demanded), Brogan answered: "I don't know."); *id.* at 48:16-49:21, 68:23-71:5, 124:4-18, 167:12-168:3.

**RESPONSE:** Disputed. The number of weeks of paid leave Savignac demanded was a factor in Brogan's decision. Although the precise number of weeks was not a factor in Brogan's decision, the fact that Savignac was asking for the same amount of weeks of leave as birth mothers was a factor. In response to questioning from Savignac, Brogan testified that he objected to the email's claim that Savignac was entitled to "paid leave consistent with his having given birth when he had not" and "when you had no claim that you were disabled." Chase Ex. 77, Brogan Tr. 15:3-14, 17:15. Defendants also dispute that Savignac's January email was a "settlement" demand—a post-hoc characterization that Plaintiffs invented after it was clear that the position Savignac actually articulated in his January email was untenable. The email itself nowhere said or implied that Savignac was making a mere "settlement demand," and it instead said Jones Day's leave policy was "discriminatory" and then demanded "the treatment that Jones Day gives to all women with new children—18 weeks of paid leave." McClure Ex. 4. Plaintiffs' summary judgment brief

repeatedly describes the alleged discrimination as the "extra eight weeks," Pls. MSJ Br. at 25; *see id.* at 1, 7, 9, 17, 20, consistent with their complaint. Third Amend. Compl. ¶¶ 226, 232, 237 (ECF 172). The "settlement demand" characterization appears nowhere in Plaintiffs' motion-to-dismiss briefing. *See* Pls.' Opp'n to MTD (ECF 18); Pls.' Sur-Reply (ECF 21). Plaintiffs appear to have used this characterization for the first time in the context of a discovery dispute two years into the litigation. Pls.' Reply in Support of Mot. to Compel at 19 (ECF 96).

**REPLY:** This statement is not genuinely disputed.  Jones Day tries to distinguish between "the precise number of weeks" demanded (which it concedes was *not* a factor in the decision) and "the number of weeks" demanded (which is says *was* a factor).  That makes no sense.  Anyway, Brogan's testimony was unambiguous that the number of weeks demanded was *not* a factor in his decision to fire Mark, and that he didn't even know how much leave new mothers received.  Brogan's objection was to the January email's assertion that the *leave policy* was illegal—i.e., that the policy was  discriminatory because it gave more leave to mothers than fathers, when the additional leave was not dependent on whether women are actually disabled—not the number of weeks of weeks demanded.   Brogan could not have been clearer about that.  *See, e.g,.* Chase Ex. 77 (Brogan) at 69:24-70:3, 70:4-16, 48:16-49:21, 68:23-71:5, 124:4-18, 167:12-168:3.  He never remotely hinted that he wouldn't have fired Mark if the January email had sought fewer than 18 weeks.  Here are Brogan's own words, which foreclose Jones Day's post hoc attorney argument:

> Q.    Sure.  The e-mail—the paragraph we just read refers to the treatment that Jones Day gives to all women with new child as including 18 weeks of paid leave.  Did you have an understanding at the time of whether that is accurate statement of what—
>
> A.    I—I didn't—I—I wasn't steeped in the—in the details of our leave.  Whatever it is, I was confident that it was in compliance with the law, and generous, and that's it.
>
> Q.    But you didn't know whether that statement in the e-mail was true or false?

A.     I don't know.  I assume that—you know.  I—I don't know.  I didn't—I don't—I didn't have the details on that.  I wasn't involved in—in deciding.  I approved it, but I—I wasn't…

Q.     Sure.

A.     But it had nothing—*it had nothing to do with the decision to—to let you go.*

Q.     *So the particular amount of leave demanded in the email, which his 18 weeks of paid leave and 6 weeks of unpaid leave, did the specific amount of leave demanded factor into your decision?*

A.     *No.*

Q.     So it wouldn't have been any different if the e-mail had demanded 12 weeks of paid leave and 6 weeks of unpaid leave?

A.     I don't know how to answer this—this is kind of like—you know, I—I don't know.

Chas Ex. 77 (Brogan) at 69:4-70:10 (emphasis added and attorney objection omitted); *see also id.*

at 49:14-21.

Brogan further testified:

Q.     You state that in your response [to one of Plaintiffs' interrogatories] that—that you terminated—that you terminated Mark because of the demand for 18 weeks of paid leave.  How did that factor into your decision?

A.     I'm—I'm—I'm not sure what you're asking me right now.  He—he made a demand which I viewed as extortionist, or he was going to go to the press.  *And I wasn't really focused on the length of the leave or the policy*.

*Id.* at 167:12-168:3 (emphasis added and attorney objection omitted).  Jones Day's cited Brogan

testimony (*id.* at 15:3-14) does not contradict Brogan's clear testimony that the amount of leave

demanded had nothing to do with his decision.

Jones Day also disputes that the January email made a settlement demand.  But the

language of the email leaves no room for doubt.  It asserts that "Jones Day's discriminatory policy

… is illegal under Title VII and D.C. law," notes that Plaintiffs "closely reviewed the case law,

including the two cases you rely on," and "also discussed the matter with other competent

attorneys," says that the policy is "inconsistent with the EEOC enforcement guideline" that was cited by McClure" and explains that, in any event, Jones Day's "reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them." PSF ¶ 212. Then, it makes a specific demand (for "the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid") and says "or else [Mark] will file a charge with the EEOC and then a class-action lawsuit." *Id.* That is what a settlement demand is. *See* Black's Law Dictionary, Settlement Offer ("An offer by one party to settle a dispute amicably (usu. By paying money) to avoid or end a lawsuit or other legal action."); The Law Dictionary, "What Is a Demand Letter?" ("A legal demand letter informs one party, typically a person or a company, that a problem exists and that taking specific steps could efficiently resolve the concern described in the document. … These letters usually outline what consequences could result if the receiving party doesn't right the perceived wrong."), thelawdictionary.org/article/how-to-respond-to-a-legal-demand-letter/.  In any event, Jones Day admittedly understood the January email as a demand letter.  Chase Ex. 81 (Shumaker) at 105:22-106:2 ("Q. So are you saying I was insufficiently collegial in a *demand letter* to Jones Day's attorney?  A. Yes, is—is the answer." (emphasis added and attorney objection omitted)); *see also* Chase Ex. 77 (Brogan) at 192:21-193:2 ("Q. And did you understand the January 16th e-mail we sent to be a demand letter?  A.  I don't know what it was…  You could characterize that in any bunch of ways….").  Plaintiffs' references to the illegality of the "extra eight weeks" are not to the contrary, and Plaintiffs do not understand Jones Day's argument that they are.  Jones Day's policy is illegal *because* it gives all new mothers (including adoptive mothers) eight more weeks than fathers receive and the leave is not dependent upon disability. Finally, whether Plaintiffs characterized the email as a settlement demand in their (successful)

opposition to Jones Day's motion to dismiss is irrelevant.  There was no reason to characterize it there.

265.   Indeed, when he decided to fire Mark, Brogan did not "have any knowledge of the numbers of weeks [of leave] that are given to associates" in connection with the arrival of a new child.  Chase Ex. 77 (Brogan) at 49:14-21; *see id.* at 48:16-49:21, 68:23-71:5; *id.* at 124:4-18 ("Ms. Chase: … Mr. Brogan is not aware of the duration of the leaves. … He has told you he does not know, has not known.  You want a stipulation?  We'll stipulate.").

**RESPONSE:** Undisputed, but Defendants incorporate by reference their response to Statement 264 for why Statement 265 is misleading and immaterial.

**REPLY:** Plaintiffs incorporate their reply in support of ¶ 264.

266.   Brogan "doubt[s]" that he has ever seen the firm's written leave policy.  Chase Ex. 77 (Brogan) at 100:10-13.

**RESPONSE:** Undisputed, but Defendants incorporate by reference their response to Statement 264 for why Statement 266 is misleading and immaterial.

**REPLY:** Plaintiffs incorporate their reply in support of ¶ 264.

### iv.   The January email's statement that Mark would sue Jones Day

267.   Brogan insisted that the email's statement that Mark would file an EEOC charge and court complaint against Jones Day was not a factor in his decision.  Chase Ex. 77 (Brogan) at 22:16-19.

**RESPONSE:** Undisputed.

268.   However, Brogan opined that for a Jones Day associate to keep working for the firm while suing it for discrimination would create "an endless conundrum" because "every time there's a decision made about what work you're given, what compensation received, what your

advancement is, you could always claim the firm discriminated," "[s]o it would be an awkward situation.  I – I don't know how I would deal with it."  Chase Ex. 77 (Brogan) at 23:15-24:13.

**RESPONSE:** Disputed as an inadmissible hypothetical and speculation, and as a mischaracterization of the evidence. Brogan testified that "the threat of somebody filing a claim against the firm is not very compelling to me, and that the "simple fact of bringing a claim … is not what caused [Savignac] to be separated from the firm. I can't make that more clear." Chase Ex. 77, Brogan Tr. 149:3-18. He also declined to speculate about what he would do in the event a person did threaten a lawsuit because "[i]t's a hypothetical. I can't tell you what the circumstance." *Id*. at 149:19-23. "[Savignac is] the only example I can think of this," *id*. at 24:3-4, and in that "situation, it was—it was—you know, he—he was lying about the firm," *id*. at 149:23-25. The testimony cited in Statement 268 was in response to a separate question: "If—if an associate files a discrimination suit against Jones Day while they're working at Jones Day, would that affect how you feel about that associate?" *Id*. at 23:15-18. And in all events, Brogan's response that "it would be an awkward situation" and he didn't "know how [he] would deal with it, *id*. at 24:11-13, is not inconsistent with his testimony that Savignac's threat to sue was not a factor in his decision, *id*. at 22:16-24.

**REPLY:** Jones Day disputes this statement on the ground that is an "inadmissible hypothetical and speculation."  That is incorrect.  No evidentiary rule bars Brogan from testifying about how he himself would respond to someone who sued Jones Day, and Jones Day's conclusory assertion to the contrary is insufficient to create a genuine dispute of fact.  *See* Preliminary Statement C.  The central inquiry on the retaliation claim—whether Brogan would have fired Mark but-for the protected activity—is obviously equally "hypothetical," and so Jones Day's position would mean that Brogan's *direct admissions* about but-for causation are also inadmissible and

speculative.  That is not the law.  *See* FRE 602, 701.  Brogan has personal knowledge of his own mind, motives, and beliefs, and thus his testimony is not unduly speculative or otherwise inadmissible.  Jones Day also asserts that this statement "mischaracterizes" the evidence, but it does not identify any way in which it does so.  Its assertion is factually inaccurate and, without an accompanying "show[ing]" of any mischaracterization or identification of any controverting evidence, it is an illegitimate basis on which to dispute a statement.  Fed. R. Civ. Proc. 56(c)(1). Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "Brogan testified that") is nonresponsive and should be disregarded.  In any event, it is indisputable that Brogan's admission that he believed employing an associate who was suing Jones Day would create "an endless conundrum" and an "awkward situation" undermines his representation that the January email's threat to sue had nothing to do with his decision to terminate Mark.

**269.**    Brogan further admitted that if an associate sued Jones Day for discrimination, he would not support that associate for partner.  Chase Ex. 77 (Brogan) at 24:15-24:20 ("Q. Would you support someone, an associate for partner, who was currently prosecuting a discrimination suit against Jones Day?"  "THE WITNESS: No.").

**RESPONSE:** Disputed as an inadmissible hypothetical and speculation, and as a mischaracterization of the evidence. *See* Chase Ex. 77, Brogan Tr. 24:18 (objecting to the form of the question). There is no evidence that this scenario ever occurred, and no detail about the hypothetical "discrimination suit" that was asked about at Brogan's deposition. Brogan elsewhere testified that he did not know how he would feel about an associate, "particularly somebody who aspires to be a partner," suing his future partners; "I don't know how I would deal with it. It's

completely hypothetical." Chase Ex. 77, Brogan Tr. 23:15-24:13. In all events, Brogan's response about elevation to partnership is not inconsistent with his testimony that Savignac's threat to sue was not a factor in his decision. *Id*. at 22:16-24.

**REPLY:** Jones Day disputes this statement on the ground that is an "inadmissible hypothetical and speculation."  That is incorrect.  No evidentiary rule bars Brogan from testifying about how he himself would respond to someone who sued Jones Day, and Jones Day's conclusory assertion to the contrary is insufficient to create a genuine dispute of fact.  *See* Preliminary Statement C.  The central inquiry on the retaliation claim—whether Brogan would have fired Mark but-for the protected activity—is obviously equally "hypothetical," and so Jones Day's position would mean that Brogan's *direct admissions* about but-for causation are also inadmissible and speculative.  That is obviously not the law.  *See* FRE 602, 701. Brogan has personal knowledge of his own mind, motives, and beliefs, and thus his testimony is not unduly speculative or otherwise inadmissible.  Indeed, Brogan unequivocally answered this question, never remotely suggesting that he didn't or couldn't possibly know his own mind.  Jones Day also asserts that this statement "mischaracterizes" the evidence, but it does not identify any way in which it does so.  Its assertion is factually inaccurate and, without an accompanying "show[ing]" of any mischaracterization or identification of any controverting evidence, it is an illegitimate basis on which to dispute a statement.  Fed. R. Civ. Proc. 56(c)(1).  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "Brogan testified that") is nonresponsive and should be disregarded.  In any event, it is indisputable that Brogan's admission that he would not support an associate for partner if the associate was pursuing a discrimination

suit against the firm undermines his representation that the January email's threat to sue had nothing to do with his decision to terminate Mark.

> ### v.   The January email's reference to the "court of public opinion"

**270.**   Brogan testified that he fired Mark because the January email "said 'or else; or else I will go to the press.'"  Chase Ex. 77 at 15:15, 17:10-13 ("Q. Okay.  Why did you fire me?"  A. … And then you made the statement that – 'Give me what I want,' which I viewed as an extortionist demand, particularly when you said 'or else; or else I will go to the press.'").

**RESPONSE:** Disputed.  Statement 270 mischaracterizes the evidence by selectively reciting isolated testimony taken out of context and ignoring Brogan's testimony that he terminated Savignac because of Savignac's unprofessional demand to receive the same amount of disability available to birth mothers who indisputably are disabled for at least some period, even though Savignac obviously had no postpartum disability—a demand supported by conclusory reasoning, false assertions, and extortionate threat to go to the media if he was not given the $80,000 worth of leave that he was demanding. *See* Chase Ex. 77, Brogan Tr. 15:3-18:10; *see also, e.g.*, *id*. at 21:21-22:10, 39:4-17, 59:17-61:2, 66:19-25. "[F]or all those reasons tied up, that's why I made the decision I made." *Id*. at 17:15-17. Brogan expressly testified that neither the assertion that the leave policy was discriminatory, nor the threat of a lawsuit, was a factor in his decision to terminate Savignac. *Id*. at 22:16-24, 60:7-11.

**REPLY:** Jones Day disputes this statement on the ground that it statement "mischaracterizes" the evidence, but Jones Day does not identify any way in which it does so. Without an accompanying "show[ing]" of any mischaracterization or identification of any controverting evidence, that is an illegitimate basis on which to dispute a statement.  Fed. R. Civ. Proc. 56(c)(1).  Jones Day's claim of "mischaracterization" is also factually inaccurate; Jones Day

itself has asserted time and again that Brogan fired Mark because the January email said "or else I will go to the press." *See, e.g.*, Chase Ex. 72 at P02272; Dkt. 15 at 9; 1/31/22 Tr. at 41:21-24. Moreover, as demonstrated above in PSF ¶¶ 264-66, Jones Day's current view that Brogan terminated Mark because he demanded "the same amount of disability available to birth mothers" is a post hoc fabrication, and is directly contradicted by the Brogan's testimony. Jones Day does not otherwise dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**271.**   Brogan was referring to the January email's statement that if Jones Day did not give Mark 18 weeks of paid leave and six weeks of unpaid leave, Mark would "file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion." McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 77 (Brogan) at 72:2-6, 73:25-74:18.

**RESPONSE:** Undisputed that Brogan's testimony at 17:10-13 was referring to the language quoted in Statement 271.

**272.**   Brogan testified that he fired Mark "because you're – you're trying to malign and defame the firm. You're trying to say the fame – the firm is sexist. And you're trying – and you're expressing an intent to go out into the world and to say that." Chase Ex. 77 (Brogan) at 25:10-16.

**RESPONSE:** Disputed.   Statement 272 mischaracterizes the evidence by selectively reciting isolated testimony taken out of context.     Defendants incorporate by reference their response to Statement 270.

**REPLY:** This statement, which consists almost exclusively of a quotation lifted from Brogan's deposition, is not genuinely disputed. The full quotation is:

> Q.    But the reference to the court of public opinion was a factor in your decision, correct?

A.     Yeah, because you're trying to malign and defame the firm.  You're trying to say the fame—the firm is sexist.  And you're trying—and you're expressing an intent to go out into the world and to say that.  And that's wrong.  It's not true.  It's not remotely true.  And the evidence, if we do go to trial, is going to be overwhelming that it's not true.  You'll have no evidence on your side, in my view.  We'll have—we'll have so much evidence that the judge will stop it because it's going to be cumulative.

Chase Ex. 77 (Brogan) at 25:10-23.

**273.**   The January email does not say that Plaintiffs would "go to the press."  McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 77 (Brogan) at 73:25-74:14.

**RESPONSE:** Undisputed that the email does not use that literal phrase, but disputed that the email did not communicate that meaning. McClure, to whom the email was sent, understood Savignac's reference to the court of public opinion "to mean Plaintiffs intended to publicly disparage Jones Day 'in the court of public opinion.'" McClure Decl. at ¶ 24. Shumaker, to whom McClure sent the email, understood Savignac's reference to the court of public opinion to be "a clear threat" that Plaintiffs would "say bad things about this law firm" in the media: "you're going to somehow bad-mouth the firm in some way, whether that's through—like you did, The New York Times article, or something on social media." Chase Ex. 81, Shumaker Tr. 48:14-15, 58:13- 14, 108:7-9. Brogan, to whom Shumaker sent the email, understood Savignac's reference to the court of public opinion to mean Plaintiffs "were going to go to the press." Chase Ex. 77, Brogan Tr. 72:6.  Brogan dismissed Plaintiffs' hyper-technical questioning about whether the email contained those specific words: "It was obvious that that was what you were going to do." *Id.* at 74:17-18. While Plaintiffs purport to dispute some of these facts, they present no contrary evidence about what the recipients of Savignac's email understood the email to be communicating and their responses instead present improper argument. *See, e.g.*, Pls. Resp. DSF ¶ 344. Plaintiffs also do not dispute that, consistent with Brogan and Shumaker's understanding, Plaintiffs went to at least three media outlets—including the New York Times and the Washington

Post—and accused the Firm of discrimination after Jones Day did not grant Savignac 8 weeks of paid leave under its Short Term Disability policy. *See* Chase Ex. 69, Chase Ex. 70, Chase Ex. 71; *see also* DSF ¶¶ 14-17.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Virtually all of Jones Day's response (beginning with "McClure, to whom the email was sent") is nonresponsive and should be disregarded. In any event, Jones Day's own press release contradicts Jones Day's post hoc testimony about how it interpreted the January email. The press release quotes from the exact sentence that Jones Day now claims threatens that Plaintiffs would go to the press to complain about discrimination, but does not quote the "court of public opinion" language and says nothing about any alleged threat to go to the press: "Mr. Savignac exhibited open hostility to the [f]irm, demanding that he be given what he wants '*or else*' and claiming hardship under circumstances that no reasonable person would view as anything but exceptionally generous." Chase Ex. 72 (emphasis added).

**274.** The January email does not say that Plaintiffs would "go to" the "court of public opinion." McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 77 (Brogan) at 74:15-18; Chase Ex. 79 (Savignac) at 245:4-246:9.

**RESPONSE:** Undisputed that the email does not use the literal phrase "go to," but disputed that the email did not communicate that meaning. Defendants incorporate by reference their response to Statement 273.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**275.**     The January email says that Mark would file a lawsuit and that the result would be that "the matter will be decided in the D.C. Circuit and in the court of public opinion."  McClure Ex. 4 at JD_00003143 (the email); Chase Ex. 79 (Savignac) at 244:18-247:6.

> **RESPONSE:** Undisputed that the quoted language is in the January email.  Any suggestion about what that language communicates is disputed.    Defendants   incorporate   by reference their response to Statement 273.

> **REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**276.**     The email refers to the fact that "court proceedings in this country are public.  The public can follow court proceedings on matters of public interest, and the public can basically draw conclusions about those matters in the same way that a literal court does – not in the same way, but it's an analogy."  Chase Ex. 79 (Savignac) at 255:12-22.

> **RESPONSE:** Undisputed that the public can form an opinion of a case based on litigation filings and statements, but disputed that Savignac's January email did not communicate that he would directly reach out to the press. Defendants incorporate by reference their response to Statement 273.

> **REPLY:** This statement is not genuinely disputed.  Even assuming that Jones Day interpreted the email to mean that Plaintiffs would reach out to the press (*but see* PSF ¶¶ 278-84; Chase Ex. 72 (press release)), that is irrelevant to this statement, which is about what *Plaintiffs* were referring to.  Jones Day identifies no evidence undermining Plaintiffs' sworn testimony. Chase Ex. 79 (Savignac) at 255:12-22.

**277.**   Jones Day's August 2019 press release gives the firm's purported reasons for firing Mark, but it says nothing about the January email's reference to the "court of public opinion" or about Plaintiffs having supposedly threatened to "go to the press."  Chase Ex. 72 at P02272.

**RESPONSE:** Disputed, including as a mischaracterization about Jones Day's reasons for terminating Savignac. Brogan testified at length about his reasons for approving Savignac's termination, including why he concluded that—as stated in the press release—Savignac "showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day." Chase Ex. 72.

**REPLY:** Jones Day disputes this statement on the ground that it "mischaracterizes" the evidence, but Jones Day does not identify any way in which it does so.  This statement is about the press release—not about Brogan's testimony, which is the sole subject of Jones Day's answer. Without an accompanying "show[ing]" of any mischaracterization or identification of any controverting evidence, that is an illegitimate basis on which to dispute a statement.  Fed. R. Civ. Proc. 56(c)(1).  Jones Day's claim of "mischaracterization" is also factually inaccurate, as the press release itself makes clear.  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**278.**   That is because Defendants did not actually read the reference to the "court of public opinion" as a threat to "go to the press," either at the time they fired Mark or at the time they posted their press release.  Chase Ex. 72 at P02272; McClure Ex. 4 at JD_00003143.

**RESPONSE:** Disputed, including as argumentative.  Defendants incorporate by reference their response to Statement 273. Plaintiffs have no basis to present this to the Court as an undisputed fact. Chase Ex. 72 is a copy of Jones Day's website statement. McClure Ex. 4 is a

copy of the January email. Neither support a claim about how Brogan and Shumaker "actually read" Savignac's reference to the court of public opinion.

**REPLY:** Jones Day's press release supports this statement because it contradicts the firm's post hoc testimony about how it interpreted the January email.  The press release quotes from the exact sentence that Jones Day now claims threatens to go to the press, but says nothing about the "court of public opinion" or any alleged threat to go to the press: "Mr. Savignac exhibited open hostility to the [f]irm, demanding that he be given what he wants '*or else*' and claiming hardship under circumstances that no reasonable person would view as anything but exceptionally generous."  Chase Ex. 72 (emphasis added).  The January email further supports this statement because it is undisputed that it does not actually say that Plaintiffs will go to the press.  McClure Ex. 4 at JD_00003143; PSF ¶ 273 (undisputed).

279.    Jones Day has repeatedly indicated to the Court that it understood the reference to the "court of public opinion" as a threat to make statements *in publicly available court filings* that would be publicly embarrassing to Jones Day.  *E.g.*, Dkt. 113 at 1 (arguing that Plaintiffs' Motion for Remote Depositions in Light of Ongoing Pandemic was "nothing more than another effort to litigate this case 'in the court of public opinion'" (citing the January email as reproduced in Plaintiffs' amended complaint)); Dkt. 128 at 8 (arguing that by filing Third Amended Complaint, "Plaintiffs are misusing Rule 15 and this Court's docket to make good on their extortionate threat to attack Jones Day 'in the court of public opinion' if the [f]irm did not accede to Savignac's demand"); *id.* at 23 (arguing that proposed amendment to complaint "is a transparently bad faith effort to litigate this case in 'the court of public opinion,' as Savignac threatened from the beginning"); *id.* at 25 (arguing that, by adding allegations to their complaint, "Plaintiffs are continuing to make good on their threat to try their claims 'in the court of public opinion'");

Dkt. 160 at 7-8, 23, 25 (more of the same); Dkt. 165-1 at 23 ("the Court should make clear to Plaintiffs that they should not be *using this Court's docket* to continue to make good on their threat to try this case in the court of public opinion" (emphasis added)).

**RESPONSE:** Undisputed that the quoted language appears in Defendants' filings, but misleading, immaterial, and argumentative. Although the public can form an opinion of a case based on litigation filings and statements, any reasonable reader could, and the evidence reflects that Brogan and Shumaker did, understand Savignac's reference to the "court of public opinion" to be a threat that Savignac would directly reach out to the press. Plaintiffs have no evidence that rebuts this undisputed testimony from Brogan and Shumaker of their latter understanding—an understanding that was both eminently reasonable under common parlance and corroborated by Plaintiffs' own actions. Defendants incorporate by reference their response to Statement 273.

**REPLY:** Jones Day claims that this statement is misleading, immaterial, and argumentative. That unadorned claim is false and conclusory, and is insufficient to create a genuine fact dispute. *See* Fed. R. Civ. 56(c)(1). Jones Day does not otherwise dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The bulk of Jones Day's answer (beginning with "Although the public") is nonresponsive and should be disregarded. It is also inaccurate. As Plaintiffs have described, Jones Day's own press release rebuts its post hoc claims that it fired Mark because it interpreted the January email as a threat to go to the press. Chase Ex. 72 (quoting the "or else" language from the email but mentioning nothing about the "court of public opinion" or any threat to go to the press).

**280.**    Brogan acknowledged that lawsuits are open to the public and the press and that public attention and press coverage are a typical result of litigation, including in this case. Chase Ex. 77 (Brogan) at 26:7-9 ("generally it is true that if you file a public case, it's – it's open to the media.

Which is as it should be."); *id.* at 26:12-20 ("Q. So would you agree that press coverage is often the result of the filing of a lawsuit?"  "A. Yeah, well, of course, which, you know, every – every time there's a – there's another sensational allegation by you, somebody in the press picks it up.").

**RESPONSE:** Undisputed, but Defendants incorporate by reference their response to Statement 273 for why Statement 280 is misleading and immaterial. Moreover, Brogan testified that while press coverage of judicial proceedings is ordinary and unavoidable, maligning one's own colleagues to reporters is extraordinary and gratuitous. Chase Ex. 77, Brogan Tr. 24:22- 26:20.

**REPLY:** Jones Day concedes that this statement is undisputed.  The bulk of Jones Day's response (beginning with its "incorporat[ion] of [its] response to PSF ¶ 273) is nonresponsive and should be disregarded.

281.  Jones Day has asserted to the Court in this case that a person "who is contemplating a discrimination suit necessarily understands that doing so will result in litigation in a public forum" with "[p]ublic airing of … legal and factual positions." Dkt. 26 at 2-3.

**RESPONSE:** Undisputed that the quoted language appears in Defendants' filings, but misleading, immaterial, and argumentative. Statement 281 also mischaracterizes the cited filing, which argued that Plaintiffs could not state a claim against Defendants for making a statement to the media, which is what Brogan and Shumaker understood Savignac was threatening to do in his January email. Plaintiffs have no evidence that rebuts the undisputed testimony from Brogan and Shumaker about what they understood the "court of public opinion" to mean—an understanding that was both eminently reasonable under common parlance and corroborated by Plaintiffs' own actions. Defendants incorporate by reference their response to Statement 273.

**REPLY:** Jones Day concedes that this statement is undisputed.  It nonetheless claims that the statement is "misleading" and "argumentative."  That unadorned claim is false and

conclusory, and it is insufficient to create a genuine fact dispute.  *See* Preliminary Statement A &

B.  Moreover, contra Jones Day, this statement is material because it undercuts Jones Day's

assertion that it fired Mark because the January email threatened to publicize his and Julia's

allegations of discrimination rather than because it threatened to sue the firm.  *See also* Chase Ex.

72 (no mention of purported threat to go to the press).  Jones Day does not otherwise dispute any

part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-

(v); Local R. 7(h)(1).

**282.**    And it explained to the EEOC that "[p]ublicly airing … legal and factual positions …

is the natural and inevitable result of litigation."  Sheketoff Ex. 61 at 6 (P02322).

**RESPONSE:** Disputed, including as argumentative and for mischaracterizing the cited

filing, which argued there was no merit to Plaintiffs' charge against Defendants for making a

statement to the media, which is what Brogan and Shumaker understood Savignac was threatening

to do in his January email. Plaintiffs have no evidence that rebuts the undisputed testimony from

Brogan and Shumaker about what they understood the "court of public opinion" to mean—an

understanding that was both eminently reasonable under common parlance and corroborated by

Plaintiffs' own actions. Defendants incorporate by reference their response to Statement 273.

**REPLY:** Jones Day disputes this statement on the ground that it is "argumentative"

and "mischaracterize[s] the cited filing."  But Plaintiffs have just quoted Jones Day's own words.

The referenced sentence states, in full: "Publicly airing a defendants' [sic] legal and factual

positions cannot be retaliatory *when it is the natural and inevitable result of litigation*."  Chase Ex.

61 at 6 (P02322).  In any event, Jones Day's conclusory assertion is insufficient to create a genuine

fact dispute.  *See* Preliminary Statement A & B.  Jones Day does not otherwise dispute any part of

this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local

R. 7(h)(1).  The remainder of Jones Day's answer (beginning with "Plaintiffs have no evidence") is nonresponsive and should be disregarded.  It is also inaccurate.  *See, e.g.*, Chase Ex. 72 (no mention of purported threat to go to the press).

283.    Jones Day thus asserted to the Court that the distinction between court filings and out-of-court statements (like the press release it sent to the New York Times) "cannot possibly matter." Dkt. 26 at 3; *see also* Sheketoff Ex. 61 at 6 (P02322) (arguing to the EEOC that "[i]t makes no difference that Jones Day stated its positions both in court when seeking to dismiss Claimants' lawsuit, and in the Aug. 14 Statement posted to its website" and social media accounts).

**RESPONSE:** Undisputed that the quoted language appears in Defendants' filings, but misleading, immaterial, and argumentative. Statement 283 also mischaracterizes the cited filings, which argued that Plaintiffs could not state a claim against Defendants for making a statement to the media, which is what Brogan and Shumaker understood Savignac was threatening to do in his January email. Plaintiffs have no evidence that rebuts the undisputed testimony from Brogan and Shumaker about what they understood the "court of public opinion" to mean—an understanding that was both eminently reasonable under common parlance and corroborated by Plaintiffs' own actions. Defendants incorporate by reference their response to Statement 273.

**REPLY:** Jones Day concedes that this statement is undisputed.  It nonetheless claims that the statement is "misleading" and "argumentative."  That conclusory assertion is false, and it is insufficient to create a genuine fact dispute.  *See* Preliminary Statement A & B.  Moreover, contra Jones Day, this statement is material because it undercuts Jones Day's assertion that it fired Mark because the January email threatened to go to the press about his and Julia's allegations of discrimination rather than because it threatened to sue the firm.  *See also* Chase Ex. 72 (no mention of purported threat to go to the press).  Jones Day does not otherwise dispute any part of this

statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

284.    Given Brogan's acknowledgement that attention from the press and public was the necessary result of this litigation and Jones Day's argument that the distinction between court filings and out-of-court statements about the litigation "cannot possibly matter," Brogan's testimony that he was indifferent to the January email's statement that Mark would file a lawsuit is irreconcilable with his assertion that he was moved to fire Mark because he purportedly read the email to say that Mark would also "go to the press."

**RESPONSE:** Disputed. Statement 284 cites no evidence, is pure argument, and should be disregarded as contrary to Local Rule 7(h), along with the foregoing argumentative Statements presented in support. There is no basis for Plaintiffs to represent Statement 284 to the Court as an undisputed fact. Defendants incorporate by reference their responses to Statements 273 and 280.

### vi.    The January email's reference to Jones Day's black-box compensation system

285.    Brogan testified that Jones Day fired Mark because of the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation."  Chase Ex. 77 (Brogan) at 15:15-22 ("Q. Okay.  Why did you fire me?"  "A. … you said that the firm's compensation system was tailor-made to discriminate against women").

**RESPONSE:** Disputed.   Statement 285 mischaracterizes the evidence by selectively reciting isolated testimony taken out of context and ignoring Brogan's testimony that he terminated Savignac because of Savignac's unprofessional demand to receive the same amount of disability available to birth mothers who indisputably are disabled for at least some period, even though Savignac obviously had no postpartum disability—a demand supported by conclusory reasoning,

false assertions, and an extortionate threat to go to the media if he was not given the $80,000 worth of leave that he was demanding. *See* Chase Ex. 77, Brogan Tr. 15:3-18:10; *see also, e.g.*, *id.* at 21:21-22:10, 39:4-17, 59:17-61:2, 66:19-25. "[F]or all those reasons tied up, that's why I made the decision I made." *Id.* at 17:15-17. Brogan expressly testified that neither the assertion that the leave policy was discriminatory, nor the threat of a lawsuit, was a factor in his decision to terminate Savignac. *Id.* at 22:16-24, 60:7-11. Also disputed that the January email complains about pay discrimination, which Plaintiffs have denied as set forth in response to Statement 237, which response is incorporated by reference.

**REPLY:** This statement is not genuinely disputed.  The testimony is unambiguous, as the testimony cited and quoted makes clear.  Chase Ex. 77 (Brogan) at 15:15-22 ("Q. Okay.  Why did you fire me?"  "A. … you said that the firm's compensation system was tailor-made to discriminate against women").  Jones Day also admits this statement elsewhere.  JDSF ¶ 351; Dkt. 189 at 35.  Moreover, as demonstrated above in PSF ¶¶ 264-66, Jones Day's current assertion that Brogan terminated Mark because he demanded "the same amount of disability available to birth mothers" is a post hoc fabrication, and is unsupported by and even directly contradicted by the Brogan's testimony.

**286.**    The email's statement refers to the fact that "it is a compensation system where many people have input that is unreviewable by the person whose salary is being set and that, therefore, could be used to discriminate or retaliate against someone in terms of their pay."  Chase Ex. 79 (Savignac) at 256:1-15; Chase Ex. 80 (Sheketoff) at 115:15-119:21.

**RESPONSE:** Disputed. Consistent with ordinary parlance, Shumaker and Brogan both understood the accusation about the Firm's "black-box compensation system" being "tailor-made to enable sex discrimination" as an accusation that the firm treats compensation confidentially for

the purpose of facilitating sex discrimination. As Shumaker testified, "black-box compensation system" is "what the media calls it. It is a confidentiality, a financial compensation system between the firm and the associates. It has absolutely nothing to do with an effort to discriminate against sex. It pre-existed the firm having even hired female attorneys." Chase Ex. 81, Shumaker Tr. 151:7-13. Shumaker thus knew Savignac's allegation "was incorrect and false. And the fact that Mark would include such a confrontational statement, again, caused me to at least determine that he doesn't get us, and we don't get him." *Id.* at 151:8-22. Brogan testified: "you said that the firm's compensation system was tailor-made to discriminate against women. And nothing could be further from the truth. The firm's compensation system has been in effect going back to when Jack Reavis put it in place when he took over, in '48 or '49 or whenever he became managing partner, and long before Naoma Stewart became a partner in the firm…. [O]ur desire to have a confidential compensation system has always had an emphasis on deemphasizing money, so that people weren't being petty and comparing themselves to other people with respect to how much money they made. You had no, in my view, good-faith basis for making that assertion." Chase Ex. 77, Brogan Tr. 15:16-16:10.

**REPLY:** This statement is not genuinely disputed.  Even assuming that *Jones Day* interpreted the email to mean that Plaintiffs were alleging that the black-box system was intended to discriminate (*but see* PSF ¶¶ 287-310), that is irrelevant to this statement, which is about what *Plaintiffs* were referring to.  Jones Day identifies no evidence undermining Plaintiffs' sworn testimony.  Chase Ex. 79 (Savignac) at 256:1-15; Chase Ex. 80 (Sheketoff) at 115:15-119:21.

**287.**    Jones Day and Brogan understood this at the time and, until Brogan's deposition three-and-a-half years later, avoided pointing to the email's reference to the black-box system as a reason for firing Mark.  Dkts. 1 through 161; Chase Ex. 72 (Jones Day's press release); Sheketoff Ex. 30

at 15-17 (Response to Interrogatory 7 and First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

      **RESPONSE:** Disputed, including as argumentative and unsupported by the record. Plaintiffs cite no evidence demonstrating that what "Jones Day and Brogan understood at the time" was contrary to Brogan and Shumaker's testimony. Defendants incorporate by reference their response to Statement 286.

      **REPLY:** Jones Day disputes this statement as "argumentative."  That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute.  *See* Preliminary Statement A.  Jones Day also claims that this statement is not supported by the record.  But the cited evidence establishes that, prior to Brogan's deposition, despite making a great many statements about the cause of Mark's termination, Jones Day never once pointed to Plaintiffs' statement about the black-box compensation system, the alleged falsity of which Jones Day now claims caused the termination.  *See* PSF ¶¶ 288-310.  That strongly supports the inference that Jones Day did not interpret the statement about the black-box system at the time in the way it now claims to.  Indeed, no other inference is plausible.

    **288.**   In a September 2021 interrogatory response signed by Brogan and by Shumaker (on behalf of himself and Jones Day), Defendants stated:

> Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  *Beyond the reasons articulated in the prior sentence, Jones Day did not have other reasons for terminating Savignac's employment in January 2019.*

Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories) (emphasis added); *id.* at 23 (signature page).

**RESPONSE:** Undisputed that the exhibit includes the quoted text (without Plaintiffs' argumentative italicization).

289.   Defendants' response to Interrogatory 7 provides the following reasons:

> Savignac's demand for 18 weeks of paid leave, which clearly was improper given Savignac's own admission that birth mothers are entitled to disability leave while he is not; the intemperate tone of the email directed at a Jones Day staff member; his conclusory and inapposite legal analysis; the implications behind his vague assertion of familiarity with the D.C. Circuit; and his announced intent to seek media attention to publicize his defamatory allegations unless the [f]irm gave in to his extortionate demands.  Savignac demonstrated in his email that he was uninterested in advancing a good-faith claim of illegality or in constructively advocating for an expansion of the [f]irm's lawful and already-generous family leave policies for the benefit of others, but rather was threatening to take steps to damage the [f]irm unless he was given 18 weeks of paid leave to which he had no entitlement (as he has since admitted in court). Savignac's serious lapses of judgment, extortionate conduct, and stated intent to cause damage to the [f]irm meant that he could no longer be trusted with access to the [f]irm's internal systems or any responsibility for the [f]irm's client matters.  His conduct also showed a rejection of [f]irm values, an inability to accept the duties that are expected of a Jones Day partner, and a lack of any interest in a long-term future with Jones Day.

Sheketoff Ex. 30 at 15-16 (Response to Interrogatory 7 of Plaintiffs' First Interrogatories).

**RESPONSE:** Undisputed that the exhibit includes the quoted text (without Plaintiffs' alterations).

290.   Defendants' response to Interrogatory 7 does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation."   Sheketoff Ex. 30 at 15-16 (Response to Interrogatory 7 of Plaintiffs' First Interrogatories).

**RESPONSE:** Disputed. Interrogatory 7 states "that the immaturity, poor judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day that caused the Firm to terminate Savignac's at-will employment are demonstrated throughout the January 16, 2019 email and

surrounding context, not from any single word or phrase," and "include[s]," "for instance," certain "aspects of the email that exemplify th[ose] attributes." Sheketoff Ex. 30 at 14. Shumaker and Brogan both testified about the aspects of Savignac's January email that led them to conclude he was lying, lacked a good-faith basis for his claims, and was for that reason and others demonstrating immaturity, poor judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day. Defendants incorporate by reference their response to Statement 286.

**REPLY:** While Jones Day purports to dispute this statement, it does not identify any part of this statement that it disputes—and any dispute is not genuine in any event.  Jones Day's response, which focuses on Shumaker's and Brogan's testimony, has nothing to do with this statement, which is about the content of Defendants' response to Interrogatory 7.  The content of Interrogatory 7 is clear and directly supports this statement.

291.    Jones Day's statement regarding Plaintiffs' lawsuit that was posted to Jones Day's website (i.e., Jones Day's press release) states as follows regarding Mark's termination:

> Mr. Savignac's claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent.  In August 2018, Mr. Savignac and Ms. Sheketoff raised questions about the legal basis for the leave policies, and the [f]irm responded to those questions.  No adverse actions were taken against either of them in response to their inquiries.  Five months later, Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff and in the complaint itself.  Mr. Savignac exhibited open hostility to the [f]irm, demanding that he be given what he wants "or else" and claiming hardship under circumstances that no reasonable person would view as anything but exceptionally generous.

Chase Ex. 72 at P02272.

**RESPONSE:** Undisputed that the exhibit includes the quoted text (without Plaintiffs' alterations).

**292.**    Jones Day's statement regarding Plaintiffs' lawsuit that was posted to Jones Day's website (i.e., Jones Day's press release) does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation." Chase Ex. 72 at 2-4 (P02271-73).

> **RESPONSE:** Disputed.   The exhibit states "Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day." Chase Ex. 72 at P02272. Brogan testified that he used general language in drafting the press release rather than describe in more harsh detail each specific point that was in his mind regarding Savignac's conduct. Chase Ex. 77, Brogan Tr. 164:18-165:13. At the depositions, Shumaker and Brogan both testified about the aspects of Savignac's January email that led them to conclude he was lying, lacked a good-faith basis for his claims, and was for that reason and others demonstrating immaturity, poor judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day. Defendants incorporate by reference their response to Statement 286.

> **REPLY:** While Jones Day purports to dispute this statement, it does not identify any part of this statement that it disputes—and any dispute is not genuine in any event.  Jones Day's response, which focuses on Shumaker's and Brogan's testimony, has nothing to do with this statement, which is about the content of Defendants' press release.  The content of the press release is clear and directly supports this statement.

**293.**    Jones Day maintains that the press release "set forth the [f]irm's reasons for terminating Savignac's employment."  Sheketoff Ex. 61 at 5 (P02321).

**RESPONSE:** Undisputed that the document includes the quoted text (without Plaintiffs' alterations).

294.    In its motion to dismiss (filed in September 2019), Jones Day represented to the Court that "Actually, Jones Day fired [Mark] for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his unreasoned demand."  Dkt. 15 at 9; *see also id.* at 23 ("Jones Day terminated Savignac … after his intemperate, unreasoned threat in January 2019 to wage a public relations campaign to damage the [f]irm if he did not receive the extra paid leave he demanded.").

**RESPONSE:** Undisputed that the filings include the quoted text (without Plaintiffs' alterations), except that the second quote is on page 15.

295.    Jones Day maintains that "the [f]irm's motion to dismiss … explained the reasons for Savignac's termination."  Sheketoff Ex. 61 at 5 (P02321).

**RESPONSE:** Undisputed that the document includes the quoted text (without Plaintiffs' alterations).

296.    But the motion to dismiss does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation."  *See* Dkt. 15.

**RESPONSE:** Disputed.  Jones Day's motion to dismiss argued that the Firm "fired [Savignac] for the poor judgment and immaturity reflected by his extortionate threat to harm the Firm in the 'court of public opinion' unless it acceded to his unreasoned demand." Mot. to Dismiss at 9 (ECF 15); *see also id*. at 15 ("Jones Day terminated Savignac … after his intemperate, unreasoned threat in January 2019 to wage a public relations campaign to damage the Firm if he

did not receive the extra paid leave he demanded."). Shumaker and Brogan both testified about the aspects of Savignac's January email that led them to conclude he was lying, lacked a good- faith basis for his claims, and was for that reason and others demonstrating immaturity, poor judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day. Defendants incorporate by reference their response to Statement 286.

**REPLY:** While Jones Day purports to dispute this statement, it does not identify any part of this statement that it disputes—and any dispute is not genuine in any event.  Jones Day's response, which focuses on Shumaker's and Brogan's testimony, has nothing to do with this statement, which is about the  content of Jones Day's motion to dismiss, which is clear and directly supports this statement.

297.    In its Answer (filed in September 2020), Jones Day represented to the Court that "Jones Day fired Savignac for the poor judgment and immaturity reflected by his extortionate threat to harm the [f]irm in the 'court of public opinion' unless it acceded to his demand for eight weeks of paid leave."  Dkt. 35 at 5; *see also id.* at 23 (representing that "Mark … was fired because of his poor judgment, behavior to colleagues, and intemperate, unreasoned threat to wage a public relations campaign to damage Jones Day if it did not provide him with extra paid family leave").

**RESPONSE:** Undisputed that the filing includes the quoted text (without Plaintiffs' alterations).

298.    The answer does not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation."  *See* Dkt. 35.

**RESPONSE:** Disputed. Jones Day's Answer states that Savignac was fired "because of his poor judgment, behavior toward colleagues, and intemperate, unreasoned threat to wage a

public relations campaign to damage Jones Day if it did not provide him with extra paid family leave beyond what all other associates, both male and female, receive under the family leave policy." Answer ¶ 152 (ECF 35). Shumaker and Brogan both testified about the aspects of Savignac's January email that led them to conclude he was lying, lacked a good-faith basis for his claims, and was for that reason and others demonstrating immaturity, poor judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day. Defendants incorporate by reference their response to Statement 286.

**REPLY:** While Jones Day purports to dispute this statement, it does not identify any part of this statement that it disputes—and any dispute is not genuine in any event. Jones Day's answer, which focuses on Shumaker's and Brogan's testimony, has nothing to do with this statement, which is about the content of Jones Day's Answer. The content of Jones Day's Answer is clear and directly supports this statement.

**299.** In a February 2021 submission to the Court, Jones Day again gave its supposed reasons for firing Mark but did not say anything about the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation." *See* Dkt. 44 at 4-5.

**RESPONSE:** Disputed. The referenced filing repeats that Savignac was fired for making extortionate threats, demanding leave to which he admits he was not entitled with the threat of damaging Jones Day in the "court of public opinion," and for his immaturity and discourtesy. Defs.' Response to Pre-Motion Statement at 4-5 (ECF 44). Shumaker and Brogan both testified about the aspects of Savignac's January email that led them to conclude he was lying, lacked a good-faith basis for his claims, and was for that reason and others demonstrating immaturity, poor

judgment, lack of courtesy, and disinterest in pursuing a career at Jones Day. Defendants incorporate by reference their response to Statement 286.

**REPLY:** While Jones Day purports to dispute this statement, it does not identify any part of this statement that it disputes—and any dispute is not genuine in any event.  Indeed, Jones Day's own description of the content of the relevant filing echoes this statement.  The remainder of Jones Day's response, which focuses on Shumaker's and Brogan's testimony, has nothing to do with this statement, which is about the content of Jones Day's February 2021 filing.  The content of that filing is clear and directly supports this statement.

300.    At a July 2021 hearing, Jones Day argued that Mark's comparators would be associates who "either threatened to publicly embarrass the firm" or were "rude to staff," but said nothing about the black-box system.  July 20, 2021 Tr. 52-53.

**RESPONSE:** Undisputed.   Jones Day's argument aligned with the reasons why it terminated Savignac. Defendants incorporate by reference their responses to Statements 230, 286, and 290.

301.    At a January 2022 hearing, Jones Day's lead counsel represented to the Court that "the rationale for Jones Day's action was the threat that if you don't give me these eight weeks of paid leave, we'll go to the court of public opinion, which is not protected activity."  Jan. 31, 2022 Tr. 41:21-24.

**RESPONSE:** Undisputed.

302.    None of Jones Day's "pleadings and other filings in this action" as of the date of Defendants' First Supplemental Response to the interrogatory referenced above (September 10, 2021) says that the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable

sex discrimination, including retaliation" was among Defendants' reasons for firing Mark.  *See* Dkts. 1 through 78.

**RESPONSE:** Disputed, including as argumentative.  Plaintiffs mischaracterize the evidence. Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac simply because Savignac claimed to be "aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor- made to enable sex discrimination, including retaliation." Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination. Defendants incorporate by reference their responses to Statements 230, 286, and 290.

**REPLY:** This statement is not genuinely disputed.  Jones Day claims that this statement is "argumentative."  That conclusory assertion is factually inaccurate and an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also claims that Plaintiffs mischaracterize the evidence, but it provides no explanation of how Plaintiffs do so.  That does not suffice to dispute a statement under FRCP 56(c)(1) either.  *See* Preliminary Statement B. Lastly, Jones Day describes Brogan's June 2022 testimony, but that testimony is irrelevant to this statement, which is about Jones Day's filings through the September 10, 2021 date of Defendants' crucial interrogatory response.

**303.**   Rather, Brogan's deposition on June 6, 2022, was the first time that Defendants ever suggested that the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" was among Defendants' reasons for firing Mark.  Chase Ex. 77 (Brogan) at 15:15-22.

**RESPONSE:** Disputed, including as argumentative.  Plaintiffs mischaracterize the evidence. Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac simply because Savignac claimed to be "aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor- made to enable sex discrimination, including retaliation." Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination. Defendants incorporate by reference their responses to Statements 230, 286, and 290.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes this statement as "argumentative."  That conclusory assertion is factually inaccurate and it is a legally inadequate to dispute a statement.  *See* Preliminary Statement A.  Jones Day also claims that Plaintiffs mischaracterize the evidence, but it provides no explanation of how Plaintiffs do so.  That does not suffice to dispute a statement under FRCP 56(c)(1).  *See* Preliminary Statement B.  Lastly, Jones Day describes Brogan's testimony, but that testimony is irrelevant to this statement, which is about Jones Day's filings.

**304.**   Brogan's testimony on June 6, 2022, that the January email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" was among Defendants' reasons for firing Mark is directly contradicted by Defendants' September 2021 interrogatory response stating that "Jones Day's reasons for terminating Savignac are set forth in response to Interrogatory 7, in Jones Day's statement regarding Plaintiffs' lawsuit that was posted to the Jones Day website, and in Defendants' pleadings and other filings in this action.  Beyond the reasons articulated in the sources described in the prior sentence, Jones Day did not have other reasons for

terminating Savignac's employment in January 2019."   Sheketoff Ex. 30 at 16-17 (First Supplemental Response to Interrogatory 8 of Plaintiffs' First Interrogatories).

**RESPONSE:** Disputed, including as argumentative.   Plaintiffs mischaracterize the evidence. Brogan testified at length about his reasons for approving Savignac's termination, he did not testify that he fired Savignac simply because Savignac claimed to be "aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor- made to enable sex discrimination, including retaliation." Defendants' filings and discovery responses are consistent with Brogan's testimony about why he approved Savignac's termination. Defendants incorporate by reference their responses to Statements 230, 286, and 290.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes this statement as "argumentative."  That conclusory assertion is factually inaccurate and it is a legally inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also claims that Plaintiffs mischaracterize the evidence, but it provides no explanation of how Plaintiffs do so.  That does not suffice to dispute a statement under FRCP 56(c)(1).  *See* Preliminary Statement B.  Lastly, Jones Day describes Brogan's testimony, but that testimony is irrelevant to this statement, which is about Jones Day's filings.

**305.**   Brogan's deposition on June 6, 2022, was the first time that Defendants ever asserted that they interpreted the January 2019 email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" as an assertion that the black-box system was "intentionally design[ed]" to enable sex discrimination when it was initially adopted in the 1940s. Chase Ex. 77 (Brogan) at 15:15-16:10.

**RESPONSE:** Undisputed, except that the statement is also accusing Jones Day of intentionally maintaining (not just adopting) its compensation scheme to facilitate sex discrimination. Brogan's deposition on June 6, 2022 was the first time any Defendant was asked how Savignac's January email had been understood.

**REPLY:** Jones Day concedes that it does not dispute this statement.  Moreover, the statement plainly cannot be read to accuse Jones Day of intentionally *maintaining* the policy to facilitate discrimination, and no one ever testified that they so interpreted it.  The parties' dispute is over whether the term "tailor-made" bore its definition of "perfectly suited for" or its definition of "intentionally designed for."  The term never means "intentionally maintained for."  Jones Day's unsupported and inapt attorney argument should be disregarded.

306.   Plaintiffs used the term "tailor-made" in the sense of "very well suited for."  Chase Ex. 80 (Sheketoff) at 116:1-117:16; Chase Ex. 79 (Savignac) at 256:1-15; "tailor-made," merriam-webster.com ("made or fitted especially to a particular use or purpose"); "tailor-made," collinsdictionary.com ("If you say that someone or something is tailor-made for a particular task, purpose, or need, you are emphasizing that they are perfectly suitable for it.").

**RESPONSE:** Disputed, including as unsupported by any admissible evidence. Sheketoff admitted she did not know how any individual who read Savignac's January email interpreted the phrase "tailor-made" and Brogan and Shumaker both testified to their understanding. Chase Ex. 79, Sheketoff Tr. 117:17-24. Plaintiffs' dictionary cites are hearsay and in any event incomplete; they support Brogan and Shumaker's understanding that Savignac used "tailor-made" to claim that the Firm's compensation system was "specially designed for a particular person or purpose." https://www.collinsdictionary.com/dictionary/english/tailor-made; *see also* https://www.merriam-webster.com/dictionary/tailor-made ("made…to a particular us or

purpose");  https://www.dictionary.com/browse/tailor-made   ("fashioned to a particular taste, purpose, demand").

**REPLY:** While Jones Day claims to dispute this statement, its dispute is not genuine. This statement is about how *Plaintiffs* used the term "tailor-made," so Jones Day's assertions about how *Brogan* and *Shumaker* understood the term are irrelevant.  (They are also contradicted by the record.  *See* PSF ¶¶ 307-10.)  Jones Day's argument that the Court cannot consider dictionary definitions because they are "hearsay" is unserious; courts regularly consult dictionaries.

307.   Jones Day had previously told the Court that it understood the email's statement that "I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation" as "a reference to the now dismissed but then active litigation in the *Tolton* case."  Dkt. 92 at 9.

**RESPONSE:** Undisputed, but argumentative and immaterial.  Nothing in the quoted statement is inconsistent with the testimony of Brogan and Shumaker that they viewed "tailor-made" as accusing the firm of purposefully facilitating sex discrimination through its compensation system.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its representation that this statement is not inconsistent with Brogan and Shumaker's testimony is nonresponsive and should be disregarded.  It is also clearly false.  *See* PSF ¶¶ 309-10.

308.   Jones Day's summary judgment fact statement likewise connects the January email's statement to the claim in the *Tolton* case.  JDSF ¶ 352.

**RESPONSE:** Disputed, including for lack of evidence, as argumentative, and as a mischaracterization of the cited filing.  The "connection" that Statement 308 references is the undisputed testimony that—as this Court is aware—allegations of intentional, systemic pay

discrimination at Jones Day failed miserably to the point that the Plaintiffs in *Tolton* abandoned the claim altogether without trying to defend their allegations on the facts. *See* DSF ¶ 352.

**REPLY:** This statement is not genuinely disputed.  The referenced paragraph from Jons Day's fact statement says that the January email's assertion about the black-box compensation system "could [not] be further from the truth" and cites in support the voluntary dismissal notice in the *Tolton* litigation.  JDSF ¶ 352.

**309.**   The *Tolton* lawsuit did not claim that Jones Day's black-box compensation system was intentionally designed to enable sex discrimination when it was initially adopted in the 1940s. Sheketoff Ex. 59 at 12-17 (*Tolton* TAC ¶¶ 41-48, under the heading "Jones Day's 'Black Box' Compensation Policy Facilitates Pay Discrimination Against Women").

**RESPONSE:** Disputed.  Pleadings in a separate lawsuit cannot be presented in an admissible form as evidence in this case. Plaintiffs also mischaracterize the cited pleading, which alleged that "[w]hether inadvertently or by design, this review system discriminates against female associates, including in pay and opportunities for promotion to partnership." Sheketoff Ex. 59 ¶ 16.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes this statement on the ground that "[p]leadings in a separate lawsuit cannot be presented in an admissible form as evidence in this case."  But it fails to explain on what ground the cited evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  The *Tolton* complaint would not be introduced to prove the truth of the matter asserted (*i.e.*, that Jones Day committed any of the illegal conduct alleged in the suit) but to show that the complaint does not allege that the black-box compensation system was *intentionally* designed in the 1940s to discriminate on the basis of sex.  That is not a hearsay purpose under FRE 801(c)(2).  And the complaint is relevant (under

FRE 401) because, given Jones Day's prior admission that it understood the January email's assertion about the black-box compensation system to be "a reference to the now dismissed but then active litigation in the *Tolton* case" (Dkt. 92 at 9), it contradicts Jones Day's current assertion that it understood the January email to be claiming that the black-box system was intentionally designed to discriminate circa 1949 (a claim not made in the *Tolton* case). Jones Day also says that Plaintiffs mischaracterize the *Tolton* complaint, but the passage it quotes confirms the contrary. The allegation that the system discriminates against women "*whether* inadvertently *or* by design*" is obviously not an allegation that the system discriminates by design. And it certainly is not an allegation that, 70+ years ago, "when Jack Reavis put [the black-box system] in place when he took over, in '48 or '49," he adopted it with the specific intent to discriminate against women, as Brogan claimed he interpreted the January email to assert. Chase Ex. 77 (Brogan) at 15:16-16:10; *see also* JDSF ¶ 352; Dkt. 189 at 35. It is beyond dispute, and undisputed, that there was no such claim in *Tolton*.

**310.**     Rather, the *Tolton* lawsuit claimed that the black-box compensation system enables discrimination and has a disparate impact on female associates in the 21st century. Sheketoff Ex. 59 at 12-17 (*Tolton* TAC ¶¶ 41-48).

     **RESPONSE:** Disputed. Pleadings in a separate lawsuit cannot be presented in an admissible form as evidence in this case. Plaintiffs also mischaracterize the cited pleading, which alleged that "[w]hether inadvertently or by design, this review system discriminates against female associates, including in pay and opportunities for promotion to partnership." Sheketoff Ex. 59 ¶ 16.

     **REPLY:** This statement is not genuinely disputed. Jones Day disputes this statement on the ground that "[p]leadings in a separate lawsuit cannot be presented in an admissible form as

evidence in this case."  But it fails to explain on what ground the cited evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  The *Tolton* complaint would not be introduced to prove the truth of the matter asserted (*i.e.*, that Jones Day committed any of the illegal conduct alleged in the suit) but to show that the complaint alleges that the black-box compensation system enables discrimination and has a disparate impact on female associates today.  That is not a hearsay purpose under FRE 801(c)(2).  And it is relevant (under FRE 401) because, given Jones Day's prior admission that it understood the January email's assertion about the black-box compensation system to be "a reference to the now dismissed but then active litigation in the *Tolton* case" (Dkt. 92 at 9), it contradicts Jones Day's current assertion that it understood the January email to be claiming that the black-box system was intentionally designed to discriminate.  Jones Day also says that Plaintiffs mischaracterize the *Tolton* complaint, but the passage it quotes confirms the contrary.  The allegation that the system discriminates against women "*whether* inadvertently *or* by design" is obviously not an allegation that the system discriminates by design.  More importantly, it is not an allegation that, *over 70 years ago*, "when Jack Reavis put [the black-box system] in place when he took over, in '48 or '49," he adopted it with the specific intent to discriminate against women, as Brogan claimed he interpreted the January email to assert.  Chase Ex. 77 (Brogan) at 15:16-16:10; *see also* JDSF ¶ 352; Dkt. 189 at 35.

311.    The same complaint about Jones Day's black-box compensation system was raised by the complaint in *Moore v. Jones Day*, filed in the summer of 2018.  Sheketoff Ex. 56 at 3-4, 8-10 (¶¶ 3-5, 23-30).

**RESPONSE:** Disputed.  Pleadings in a separate lawsuit cannot be presented in an admissible form as evidence in this case. Plaintiffs also mischaracterize the cited pleading,

which—in a claim that the plaintiff in *Moore* also abandoned—accused Jones Day of intentional pay discrimination against female lawyers. Sheketoff Ex. 56 ¶¶ 75-77.

**REPLY:** This statement is not genuinely disputed. Jones Day disputes this statement on the ground that "[p]leadings in a separate lawsuit cannot be presented in an admissible form as evidence in this case." But it fails to explain on what ground the cited evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection. The *Moore* complaint would not be introduced to prove the truth of the matter asserted (*i.e.*, that Jones Day committed any of the illegal conduct alleged in the suit) but to show what its factual allegations were. That is not a hearsay purpose under FRE 801(c)(2). Jones Day also says that the Moore complaint accuses Jones Day of intentional pay discrimination on the basis of sex. But Plaintiffs' point is that Moore was not complaining that when Jack Reavis adopted the black-box system *over 70 years ago* (before Jones Day even allowed women to work there), he had the subjective intent to discriminate against women, as Brogan is now alleging he understood the January email to assert. (Jones Day mischaracterizes what happened in the *Moore* suit, which the firm actually settled. Chase Ex. 77 (Brogan) at 139:18-19.)

312.   In June 2020, this Court rejected Jones Day's argument that the *Tolton* lawsuit's claims that "Jones Day paid men more than women" through its black-box compensation system were "brought … without factual support" or objectively unreasonable. *Tolton* Minute Order of June 9, 2020.

**RESPONSE:** Undisputed that on June 9, 2020, the Court denied without prejudice Jones Day's motion for sanctions in the *Tolton* case, holding that "the Court does not yet know enough about the relevant facts to determine whether Plaintiffs' allegations are so baseless that sanctions are warranted." The Court did not have the opportunity to revisit the issue because the

*Tolton* plaintiffs voluntarily withdrew their claims of systemic pay discrimination after discovery proved that those claims were without evidentiary support. *See* DSF ¶ 352.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The Court in *Tolton* rejected Jones Day's argument that the claim was objectively unreasonable when filed.

**313.** Also contrary to Defendants' interrogatory response, Brogan testified that the email's statement "We are very familiar with the D.C. Circuit and confident that we will win" was *not* a factor in the firing. Chase Ex. 77 (Brogan) at 75:9-76:1; *see also* Chase Ex. 81 (Shumaker) at 110:19-22 ("We hired you. We paid you over a million dollars. I would hope and expect that you have some familiarity with the D.C. Circuit.").

**RESPONSE:** Disputed. Brogan testified: "I think I've already told you that the principal reason I fired you was the character flaws that I saw in this e-mail as a whole, and my view that this was not sent in good faith." Chase Ex. 77, Brogan Tr. 66:21-24. Among the factors Brogan cited in detailing his response to Savignac's email was that Savignac "sort of like act[ed] like— 'But boy, are we wired in with the judges on the D.C. Circuit.' You know, which—which is kind of an odd thing for anybody to say. So I guess that—that, to me, was—was a weird way of putting it. One, you're—you're not saying that 'We're going to win in the District Court, but we got a secret potion when we get to the D.C. Circuit.'… That you had some suggestion that you were really familiar with the D.C. Circuit judges, is the way I read the e-mail…. I mean, I can understand why you don't want to understand what I'm saying. But you're—you make an assertion, which is pretty bold, about—you're correct about the law. But you say, 'Well, we're going to win in the D.C. Circuit; maybe not in the District Court. And the reason why we're going to win in the D.C. Circuit is that we're really wired up in the D.C. Circuit.' You know, as if—I

don't know, Jones Day doesn't have anybody that knows anything about the D.C. Circuit. It's just a—the whole line of argument struck me, again, as lacking in judgment, and immature, and—and almost adolescent." *Id.* at 169:5-170:10.

> **REPLY:** This statement is not genuinely disputed.  The cited testimony reads:

Q.  Okay.  The statement, "We are very familiar with the D.C. Circuit," was that statement a factor in your decision—

A.  None.

Q.  —to fire me?

A.  Zero.  I didn't really credit it.

Q.  And—

A.  It's—it's nice of you to say that about yourself, but it had no impact on my thinking.

Q.  And that sentence  concludes, "and confident that we will win."  Did that—was that a factor in your decision?

A.  You know, again, lots of lawyers say they're confident they're going to win.  That's kind of like what lawyers say, even though when they know they're going to lose.

Q.  So it was not a factor in your—

A.  Not a factor at all.

Chase Ex. 77 (Brogan) at 75:9.  Virtually all of Jones Day's response (beginning with "Brogan testified") is nonresponsive and should be disregarded.

> **E.   Plaintiffs' challenge invoked Jones Day's formal Reporting and Investigation policy.**

**314.**   As of January 2019, Jones Day maintained in its Firm Manual so-called "EQUAL EMPLOYMENT AND ANTI-HARASSMENT POLICIES" stating that the firm "adheres to applicable laws and regulations with regard to nondiscrimination" and "provides equal employment opportunity" "without regard to … gender."  Chase Ex. 1 at JD_00002113.

> **RESPONSE:** Undisputed.

**315.**   When he joined Jones Day, Mark was directed to and did read and certify his understanding of the "provisions of the firm manual concerning equal employment opportunity and anti-harassment."  Chase Ex. 79 (Savignac) at 84:5-85:5, 87:21-91:10.

>    **RESPONSE:** Undisputed.

**316.**   That section of the Firm Manual sets out this internal complaint-and-investigation procedure:

> **Reporting And Investigation**
>
> Any employee who believes that he or she has been subject to discrimination or harassment in any form should report the incident to the Partner-in-Charge of the Office involved.  If the employee is uncomfortable for any reason discussing the situation with the Partner-in-Charge or, in the alternative, if the employee is not satisfied after bringing the situation to the attention of the Partner-in-Charge, the employee should report the situation to the Firm Director of Human Resources, the Firm Administrative Partner, or their Office Administrator.
>
> The Firm will investigate allegations of discrimination or harassment in as prompt and confidential a manner as possible and will take appropriate action if warranted.  Any person who is determined by the Firm to have engaged in discrimination or harassment in violation of this policy may be subject to disciplinary action, including termination from the Firm.  Further, retaliation in any form against an employee or applicant who complains of discrimination or harassment is strictly prohibited, and may itself be cause for appropriate disciplinary action, including termination from the Firm.

Chase Ex. 1 at JD_00002114.

>    **RESPONSE:** Undisputed.

**317.**   Sarah McClure is the "Firm Director of Human Resources" designated by the official Reporting and Investigation policy as one of the individuals to whom employees should report allegations of discrimination.   Chase Ex. 1 at JD_00002114; JDSF ¶ 298; Chase Ex. 81 (Shumaker) at 37:18-38:10; *id.* at 106:5-11 ("Q. Should I have sent the e-mail to someone other than McClure?"  "A. … Sarah [McClure] was the right – was – was one of – we started this

deposition by going through the individuals you could have contacted with any concern or issue you had.  Sarah was one of them.").

     **RESPONSE:** Undisputed.

318.    Mark's August 2018 email alleges that Jones Day's parental leave policy is "discriminatory."  McClure Ex. 3 at JD_00003164.

     **RESPONSE:** Undisputed.

319.    Mark sent his August 2018 email to HR Director McClure.  McClure Ex. 3 at JD_00003163-64; Chase Ex. 79 (Savignac) at 91:2-10.

     **RESPONSE:** Undisputed.

320.    Jones Day then investigated the email's allegation that its policy was discriminatory. JDSF ¶ 300; Chase Ex. 81 (Shumaker) at 39:2-15 ("we absolutely had investigated what you and Juli[a] were saying"); *id.* at 155:16-157:11, 168:2-12.

     **RESPONSE:** Undisputed.

321.    McClure's August 2018 response left the door open for further discussion over the leave policy.  Chase Ex. 81 (Shumaker) at 47:12-25 ("remember, the August communication we had with you said if you have any questions or concerns, please come to us.  That was still an open door.  And if you had come to us and said, 'You know, I've really got a problem with this, guys,' as compared to this lobbing a grenade over the wall … sure, we could have had a discussion.").

     **RESPONSE:** Disputed, including as argumentative.  McClure's August 2018 email stated: "I hope this is helpful and addresses your concern. I am happy to answer any additional questions you may have in follow up." McClure Ex. 4 at JD_00003144. Plaintiffs never asked any follow-up questions about the policy, and only repeated their conclusory allegation of

discrimination and demand that Savignac receive eight weeks of paid disability leave "or else." *See id*. at JD_00003143.

**REPLY:** Jones Day's "dispute[s]" this statement on the ground that it is "argumentative."  That conclusory assertion is not accurate, and it is not an adequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute this statement, which is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**322.**    In August 2018, Plaintiffs reviewed and printed off the "Reporting and Investigation" policy.  Sheketoff Decl. ¶ 13; Sheketoff Ex. 45 at P02146.

**RESPONSE:** Undisputed.

**323.**    Plaintiffs sent their January 2019 email reiterating the allegation that the firm's parental leave policy is "discriminatory" to McClure.  McClure Ex. 4 at JD_00003143.

**RESPONSE:** Undisputed.

**324.**    Jones Day investigated in response to the January 2019 email.   Chase Ex. 81 (Shumaker) at 19:18-20:25, 22:24-23:7, 24:7-25:15; *id.* at 123:10-124:2 (Shumaker conferred with Mary Ellen Powers regarding Plaintiffs' "questioning [of] our leave policies"); *id.* at 124:3-125:10 (Shumaker consulted Shay Dvoretzky because "he had handled issues like this in his client work … More along the lines of labor and employment issues.  I – I don't recall being specific to leave issues … But I remember Shay having some unique expertise regarding the law, so I would have been seeking to take advantage of a really big brain, knowing the law better than perhaps me").

**RESPONSE:** Disputed. Plaintiffs mischaracterize the evidence by selectively reciting isolated testimony taken out of context. Shumaker did not conduct any investigation into claims of discrimination in response to Savignac's January email. While he refreshed his recollection

about the August 2018 correspondence, the only question he considered was whether the Firm should terminate Savignac. In response to a question about "the first time you considered whether [Savignac] should be fired," Shumaker testified that as of the time he received the January email, "We had not heard from yourself or Julia since [August 2018]. You had made an inquiry. We had responded. Having not heard anything for several months, I assumed we were behind that. So I need to refresh my recollection of where that was." Chase Ex. 81, Shumaker Tr. 20:10-14. His testimony at pages 19 to 25 and 123 to 125 is in the context of considering whether Jones Day should terminate Savignac. *See also id*. at 133:6-21.

      **REPLY:** This statement is not genuinely disputed.  Shumaker admittedly conducted an investigation upon receiving the January email.  One of the things he investigated was Plaintiffs' challenge to the firm's leave policy and whether it was meritorious.  In Shumaker's own words, he "certainly engaged with counsel from the firm to refresh my recollection our prior communications back in August of the prior year."  Chase Ex. 81 (Shumaker) at 20:3-9; *see also id.* at 123:10-124:2 (Shumaker conferred with Powers regarding Plaintiffs' "questioning [of] our leave policies"); *id.* at 124:3-125:10 (Shumaker conferred with Dvoretzky because he "kn[ew] the law better than perhaps me").   According to Shumaker: "I reviewed the authority that we communicated to you back in August, and I reviewed the information that you provided in your email.  And I came away with the view that there was no merit to the positions that you were taking in the e-mail, and the situation we were facing was exactly the type situation that the EEOC had reviewed and had considered to be appropriate.  And we had two cases that were, in my view, on point."  *Id.* at 25:5-15.  Based upon that investigation, he purportedly determined that the January email was "based on such [an] erroneous view of the law."  *Id.* at 23:8-24:11.  Jones Day admits (as it must) that Shumaker did all of this—but it contends that "the only question he considered

was whether the [f]irm should terminate Savignac."  Even if that were relevant, it is simply inaccurate—and unsupported by anything but baseless attorney argument.  Again, Shumaker admitted that he "came away [from his investigation] with the view that there was no merit to the positions that you were taking in the e-mail, and the situation we were facing was exactly the type situation that the EEOC had reviewed and considered to be appropriate." *Id.* at 25:5-15.  Of course, Shumaker also testified that "the view that there was no merit to the positions that you were taking in the e-mail" was a basis for his decision to terminate Mark.  PSF ¶ 231.  But that doesn't help Jones Day; it just establishes that the termination was illegal retaliation.  Far from being separate and distinct from each other, Jones Day's assessment of whether to terminate Mark was inextricably bound up with its assessment of the merits of Plaintiffs' challenge to the leave policy.  *See also* PSF ¶ 232 ("Q. Would you have fired me if you believed I was right about the policy being illegal?  THE WITNESS.  Yeah. I—no, I—I would not.").

**325.**   Jones Day also investigated the January email's allegation that Julia experienced sex-based pay discrimination.  Chase Ex. 81 (Shumaker) at 66:23-67:24 ("I would have certainly pulled up both yours and her reviews."); *id.* at 68:21-24; *id.* at 118:18-119:23 (Shumaker had Julia's evaluations pulled because he "was trying to get the facts"); Sheketoff Ex. 49; Sheketoff Ex. 50; *see also* Chase Ex. 77 (Brogan) at 12:3-21 (Brogan "was interested in identifying who you were claiming gave a discriminatory review of Julia" and purportedly did so before making the termination decision).

**RESPONSE:** Undisputed that Brogan was interested in identifying who Savignac was claiming gave a discriminatory review of Sheketoff and knew it was Partner A before he made the decision to terminate Savignac. Disputed that this was an investigation of any claim of pay discrimination, which Plaintiffs have denied they were making in the January 2019 email. Brogan

had been the decision-maker with respect to Sheketoff's compensation adjustment and had personal knowledge of his bases for those adjustments. *See* Chase Ex. 77, Brogan Tr. 28:2-30:10. Shumaker was familiar with the facts from his personal experience with Sheketoff's reviews in prior years and "was looking to refresh my recollection." Chase Ex. 81, Shumaker Tr. 119:21-22. He testified: "I was already very well aware of the reviews of Julia, having sat through them [in prior years]. I was a personal witness to the discussion in the room about her performance [before she left Jones Day in August 2018], both her written record—as I said earlier, I would have certainly pulled up both yours and her reviews. In thinking through these issues, I certainly would have been cognizant of both the good and bad in those reviews. In terms of the suggestion of discrimination, I knew the objective facts, that that wasn't true." *Id*. 67:8-18. This was in the process of deciding whether to recommend that Savignac be terminated. *Id*. 19:18-25:15. Defendants also incorporate by reference their responses to Statements 237 and 324.

**REPLY:** This statement is not genuinely disputed.  As Shumaker specifically admitted: "I would have gotten [Julia's reviews] as part of the concern in this issue."  Chase Ex. 81 (Shumaker) at 68:2-23; *id.* at 119:18-23 ("I was trying to get the facts.").  The written record corroborates that this investigation into the assertion of pay discrimination against Julia occurred. Sheketoff Exs. 49 & 50 (email chains entitled "Julia Sheketoff").  And Brogan testified that, upon receiving the January email, he investigated the identity of the partner referenced in the email as having discriminated against Julia.  Chase Ex. 77 (Brogan) at 12:3-13:18.

**326.**    Jones Day also investigated to ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████." Chase Ex. 81 (Shumaker) at 134:13-135:23; Sheketoff Ex. 46.

**RESPONSE:** Disputed that this review was undertaken as an investigation of Savignac's January email. Shumaker testified that it is "regular procedure" to review a departing lawyer's activity on the Firm's document management system. Chase Ex. 81, Shumaker Tr. 135:5. The Firm undertakes this review "to make sure we have a good understanding of what the lawyer's working on" because "we want to make sure we got all the balls covered and nothing's getting dropped," and because "we have had situations where people have accessed documents for reasons other than work, and we wanted to make sure that that was not occurring in this instance." *Id*. 135:5-17. That review was undertaken after the decision had been made to terminate Savignac, not in connection with investigating his claim of discrimination. Sheketoff Ex. 46.

**REPLY:** This statement is not genuinely disputed.  It is undisputed ███████████ ████████████████████████████████████████████████████████████ ████████████████████████   Chase Ex. 81 (Shumaker) at 134:13-135:23; Sheketoff Ex. 46. Whether such an investigation is a "regular procedure" is not discussed by this statement and is legally immaterial.

327.   As its Eleventh Defense in this action, Jones Day asserts:

> Jones Day at all relevant times has maintained, disseminated and observed equal employment, affirmative action, a harassment-free work environment, and anti-retaliation policies, that, *inter alia*, provide that all personnel decisions are to be made on the basis of merit without regard to gender, protected activity, or on any other basis that is protected under applicable law, and prohibit any form of retaliation against an individual who in good faith reports a claim of discrimination or who opposes any act or practice made unlawful by any federal, state, or local statute, or who cooperates in the investigation of such a report.

Dkt. 178 (Answer to TAC) at 40; *see also* Dkt. 45 at 19 (same defense in response to the supplemental complaint).

**RESPONSE:** Undisputed.

328.     As part of its Sixth Defense in this action, Jones Day asserts that "[a]ll actions by Defendants with respect to Plaintiffs were lawful and were made in good faith compliance with applicable provisions of law."  Dkt. 178 (Answer to TAC) at 39.

**RESPONSE:** Undisputed.

329.     As part of its Thirteenth Defense in this action, Jones Day asserts that "Plaintiffs' claims are barred … to the extent that … Jones Day exercised reasonable care to prevent the alleged incidents, and the Plaintiffs unreasonably failed to take advantage of available preventative or corrective opportunities."  Dkt. 178 (Answer to TAC) at 40; *see also* Dkt. 45 at 19 (same defense in response to the supplemental complaint).

**RESPONSE:** Undisputed.

F.     **Jones Day's treatment of others further confirms that it fired Mark illegally.**

i.     **Jones Day also immediately fired the only other employee who threatened a discrimination lawsuit.**

330.     Wendy Moore was a female Jones Day partner.  Dkt. 71-2 at 5 (Shumaker Decl. ¶ 12).

**RESPONSE:** Undisputed.

331.     ██████████████████████████████████████████████

████████.  Chase Ex. 77 (Brogan) at 136:3-6.

**RESPONSE:** Disputed. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████.

**REPLY:** This statement is not genuinely disputed. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████ , and

cites no evidence that controverts this statement.  This statement is therefore admitted in its

entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

**332.**   ████████████████████████████████████████████

████████████████████████████. Chase Ex. 77 (Brogan) at 136:7-12.

**RESPONSE:**  ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

**REPLY:** This statement is not genuinely disputed.  ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████  This statement is therefore admitted in its

entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

**333.** 

. Chase Ex. 77 (Brogan) at 136:7-12, 139:20-141:23, 142:10-16.

>      **RESPONSE:** Undisputed.

**334.**

. Chase Ex. 77 (Brogan) at 138:5-140:6, 145:2-7, 147:2-5 ("

."); Chase Ex. 81 (Shumaker) at 279:6-14, 280:20-281:2.

>      **RESPONSE:**

.

>      **REPLY:** Jones Day purports to disputes this statement, but it does not identify any part of it that it disputes or cite any controverting evidence.  Rather, Jones Day "dispute[s]" this statement as "argumentative and a mischaracterization of the evidence."  This statement is not actually argumentative, and anyway that conclusory assertion is inadequate to create a genuine dispute of fact.  *See* Preliminary Statement A.  Similarly, Jones Day fails to identify any way in

which this statement mischaracterizes the evidence or to identify any alternative characterization. Without such a "show[ing]," or the identification of any controverting evidence, Jones Day's complaint of "mischaracterization" is an inadequate basis to dispute this statement.  Fed. R. Civ. Proc. 56(c)(1).  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  (███████████████████████████████████████████████

███████████████████████████████████.  Chase Ex. 77 (Brogan) at 139:18-19.)

335.   According to Shumaker, ███████████████████████████████████

█████████████████████████████████."  Chase Ex. 81 (Shumaker) at 285:15-286:5.

**RESPONSE:** Disputed as incomplete and a mischaracterization of the evidence. Defendants incorporate by reference their responses to Statements 331 through 334.

**REPLY:** This statement, which quotes testimony by Shumaker, is not genuinely disputed.  Jones Day asserts that it is "incomplete and a mischaracterization of the evidence," but it fails to identify how that is so.  Without a "showing that the materials cited do not establish the absence … of a genuine dispute," or the identification of any controverting evidence, that is an illegitimate basis on which to dispute a statement.  Fed. R. Civ. Proc. 56(c)(1).  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

336.  █████████████████████████████████████████████████████

███████████.  Chase Ex. 77 (Brogan) at 136:25-139:16, 145:2-7; Chase Ex. 81 (Shumaker) at 279:6-1, 280:20-281:2.

**RESPONSE:** Disputed as incomplete and a mischaracterization of the evidence, which unequivocally demonstrated that ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. Defendants incorporate by reference their

responses to Statements 331 through 334.

      **REPLY:** Jones Day purports to disputes this statement, but it does not identify any part

of it that it disputes or cite any controverting evidence, and it acknowledges that ████████

████████████████████████ Jones Day's basis for disputing this statement is that it is

allegedly "incomplete and a mischaracterization of the evidence," but the firm fails to identify how

that it so. Without actually "*showing* that the materials cited do not establish the absence … of a

genuine dispute," or identifying any controverting evidence, that is an illegitimate basis on which

to dispute a statement. Fed. R. Civ. Proc. 56(c)(1). This statement is thus admitted in its entirety.

Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

    **337.** ████████████████████████████████████████

████████████████████████████████████████" Chase Ex. 77

(Brogan) at 137:11-17.

      **RESPONSE:** Disputed as incomplete and a mischaracterization of the evidence.

Brogan testified: "████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████.” Chase Ex. 77, Brogan Tr. 138:6-8, 144:13-1451. Defendants also incorporate by reference their responses to Statements 331 through 334.

**REPLY:** This statement is not genuinely disputed.  Brogan testified: ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ Chase Ex. 77 (Brogan) at 137:6-17 (emphasis added).

**338.**    When asked whether he would "have any desire at all to fire someone who threated a lawsuit [against] Jones Day," ███████████████████████████████████

████████████    "In [Mark's] situation, it was – it was – you know, he – he was lying about the firm.  And that's the reason why I took the steps that I took. ███████████████████

█████████████████████████████████████████████████████

██████" Chase Ex. 77 (Brogan) at 149:19-150:4.

**RESPONSE:** Undisputed.

**339.**    ████████████████████████████ Chase Ex. 77 (Brogan) at 139:18-19.

**RESPONSE:** Disputed as incomplete and a mischaracterization of the evidence. ████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ Aug.

27, 2021 Decl. of M. Shumaker (ECF 70-1).

**REPLY:** This statement is not genuinely disputed.  Brogan testified: "██████████

███████████████████████████████ Chase Ex. 77 (Brogan) at 13:18-19.

**340.** ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████. Chase Ex. 81 (Shumaker) at 277:16-25.

**RESPONSE:** Disputed. ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

**REPLY:** This statement is not genuinely disputed.  Jones Day's representation ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

**341.** ██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████. Sheketoff Ex. 31 at 15-16 (response to

interrogatory 12).

**RESPONSE:** ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████. Defendants

incorporate by reference their response to Statement 331.

**REPLY:** This statement is not genuinely disputed. ██████████████████

███████████████████████████████████████████████████

████████████████████.

ii.      **Jones Day did not fire the male associate who called his colleagues "cunts."**

**342.** A male associate at Jones Day referred to his female colleagues as "cunts." ███████

████████████████████; Sheketoff Ex. 59 at P04356 (TAC in *Tolton v. Jones Day* at

¶ 94); Sheketoff Ex. 60 at P04492 (Answer to TAC in *Tolton v. Jones Day* at ¶ 94).

**RESPONSE:** Undisputed that it was reported to the Firm that a male associate in

████████ had used that word █████████████████████████████. Sheketoff Ex. 60

¶ 94. Pleadings in a separate lawsuit cannot be presented in an admissible form as evidence in this case.

**REPLY:** Jones Day concedes that this statement is undisputed but asserts that "pleadings" in a separate lawsuit aren't admissible in this case.  Even if that were true, ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Chase Ex. 81 (Shumaker) at 258:22-259:4.  In any event, Jones Day fails to identify on what basis the cited pleading are inadmissible (which is not self-evident) and on that basis forfeits the objection.  Jones Day's own statements (through counsel or otherwise) are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  There is no exception to the admissibility of an opposing party's statements for statements that were made in another lawsuit as opposed to some other context. (The one exception, for responses to requests for admission under FRCP 36(a)(1), confirms the general rule that a party's statements in litigation are admissible against that party in other litigation.)  And the *Tolton* Complaint would be admissible simply for context—i.e., to show what Jones Day was responding to in its Answer—not for the truth of the matter asserted.  *See* FRE 801(c)(2).

**343.** ███████████████████████████████████. Chase Ex. 81 (Shumaker) at 259:2-4.

**RESPONSE:** ███████████████████████████████████ ███████████████████████████. Chase Ex. 81, Shumaker Tr. 260:4-21.

**344.** ███████████████████████████████████ ██████████████████████████████████████████████ ███████████████. Chase Ex. 81 (Shumaker) at 261:5-15.

**RESPONSE:** Undisputed. ███████████████████████

███████████████████████████████████████████

█████████████████████████ " Chase Ex. 81, Shumaker Tr. 261:3-262:6. ██████

████████████████████████████████████████████

█████████ " Chase Ex. 77, Brogan Tr. 130:25, 131:24-25.

**REPLY:** Jones Day concedes that this statement is undisputed.  The remainder of its answer (beginning with "Shumaker also testified") is nonresponsive and should be disregarded.

**345.**   These are the ███████████████ that Jones Day asserts Mark was fired for demonstrating in the January email.  *E.g.*, Chase Ex. 72 at P02272.

**RESPONSE:** Undisputed  that  both  individuals ██████████████████████ ██████████████████████████████████████████████████.

Disputed that the two circumstances are equivalent or even materially similar. The male associate in █████ did not formally direct his language to a member of the Firm's professional staff in a work-related email, the way Savignac did. Rather, the incident ███████████████████ █████████████████████████████████. Sheketoff Ex. 60 ¶ 94. Moreover, as Brogan testified in response to questioning from Sheketoff: the associate in

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ Chase Ex. 77, Brogan Tr. 132:14-24.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "Disputed that the two circumstances") is nonresponsive attorney argument and should be disregarded.  In any event, the distinction Jones Day tries to draw between Mark and the other associate— ███████████████████████████ ███████████████████—highlights that their different treatment was caused by Mark's protected activity.  According to Brogan, Mark was "dishonest" and "attack[ed]" the firm by alleging sex discrimination.  *E.g.*, PSF ¶¶ 238-40, 272; PSF ¶ 257 (Plaintiffs' reply).

**346.** ███████████████████████████████████ ████████████████████████████████████████ Chase Ex. 77 (Brogan) at 131:15-18; Chase Ex. 81 (Shumaker) at 261 ("███████████████████████████).

**RESPONSE:** ██████████████████████████ ████████████████████████████████████████ █████████████████. Defendants incorporate by reference their responses to  Statements 342 through 345.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Besides being nonresponsive, the distinction Jones Day tries to draw between Mark and the other associate— which is that the other associate ██████████████████████████— highlights that their different treatment was caused by Mark's protected activity.  According to Brogan, Mark was "dishonest" and "attack[ed]" the firm by alleging sex discrimination.  *E.g.*, PSF ¶¶ 238-40, 272; PSF ¶ 257 (Plaintiffs' reply).

      **G.**    **Jones Day continued to retaliate by interfering with Mark's employment references.**

**347.**   It is difficult for a senior associate like Mark, who was nearly eight years out of law school when he was fired, to find a new partner-track job at a top-tier law firm.  Chase Ex. 83 (Lovitt) at 156:18-19 ("the more senior you get, the harder it is to find another job"); *id.* at 157:2023 ("at this level of seniority, man, it's going to be hard for her to find a new job").

**RESPONSE:** Undisputed that Traci Lovitt testified that one factor Jones Day considers in evaluating associates and deciding whether to counsel under-performing associates to find new employment is the seniority of the associate. The remainder of Statement 347 is disputed as argumentative interpretation of the evidence. Lovitt was not testifying about Savignac, asked to identify associates "like" Savignac, opining about the job prospects of anyone with Savignac's resume and background, or assessing Savignac's prospects for employment. *See* Chase Ex. 83, Lovitt Tr. Vol. II 156:9-157:24. Plaintiffs' evidence indicates that at least one Jones Day partner didn't "think [Savignac] will have trouble" finding a new job. Sheketoff Ex. 39 at P04214-17. Savignac also received an offer from Steptoe & Johnson by May 6, 2019, but waited to accept the offer and did not begin until June 2019. *See* Chase Ex. 79, Savignac Tr. 304:5-306:10.

**REPLY:** This statement is not genuinely disputed.  The quoted testimony is not ambiguous.  Nor is this statement argumentative.  Jones Day asserts that one partner didn't think Mark would have trouble finding a new job, but that text message is hearsay when used by Jones Day (FRE 801(d)(2) does not apply to Jones Day's use of its own partners out-of-court statements). In any event, Partner F (███████████████████████████████████ ███████████████████████████████) was proven wrong: Mark applied to over forty other law firms and received one offer.  Sheketoff Ex. 35 at 7 (response to interrogatory 5).

**348.**   On January 27, 2019, Mark sent emails to three Jones Day partners who had worked with extensively (Ben Mizer, Karl Thompson, and Shay Dvoretzky) to ask them to "serve as a

telephone reference for me and write a reference letter based on our work together."  JDSF ¶ 364; Chase Ex. 47 at JD_PRIV_0165; Chase Ex. 48 at P02772; Chase Ex. 50 at JD_00002863.

>        **RESPONSE:** Undisputed.

349.    Thompson agreed: "I would be very happy to serve as a reference, of course.  Just let me know how I can help."  Chase Ex. 48 at P02772.

>        **RESPONSE:** Undisputed that the quoted language appears in Chase Exhibit 48.

350.    Heifetz told Thompson that he could not serve as a reference for Mark.  Sheketoff Ex. 32 at 7 (Response to Request 13 of Plaintiffs' First Requests for Admission); Sheketoff Ex. 39 at P04214-17.

>        **RESPONSE:** Disputed, including as a mischaracterization of the evidence. For at least decades, Jones Day has had a policy generally prohibiting employment references. Chase Ex. 3 at JD_00003431 (1992 Firm Manual). Upon receipt of Savignac's email seeking a reference on January 27, 2019, Dvoretzky forwarded the email to Mike Shumaker and Beth Heifetz. Chase Ex. 47 at JD_PRIV_165. Shumaker responded the following day on January 28, 2019, that "Our standard approach for anyone that departs is no recommendation and mere confirmation of dates work" and asked whether Dvoretzky wanted to give Savignac a recommendation. *See id.* Shumaker also forwarded Savignac's request to Dvoretzky to Jones Day's HR Director, Sarah McClure. Chase Ex. 52 at JD_00002462. McClure met with Heifetz and Dvoretzky that Monday, on January 28, and "asked Beth to talk with the partners Mark worked with and remind them of our policy." Chase Ex. 53 at JD_PRIV 0164; *see also* Chase Ex. 54 at JD_00002526 (McClure requesting meeting with Heifetz and Dvoretzky); Heifetz Decl. ¶ 15 ("I was not a decisionmaker either on whether or not to provide an employment reference, or how or by whom the Firm would provide an employment reference. My only involvement in this issue was to convey the Firm's

policy and the Firm's decision."). Heifetz thereafter informed Thompson about the provision in Jones Day's Firm Manual regarding requests for employment references, that Shay Dvoretzky would be providing a reference for Savignac, and that Thompson should communicate as much to Savignac. Sheketoff Ex. 32 at 9 (RFA 13). None of the exhibits cited in Statement 350 show that Heifetz told Thompson that he could not serve as a reference. *See* Sheketoff Ex. 32 at 9 (admitting only that "Heifetz informed Thompson about the provision in Jones Day's Firm Manual regarding requests for employment, that Shay Dvoretzky would be providing a reference for Savignac, and that Thompson should communicate as much to Savignac."); Sheketoff Ex. 39 at P04214 (confirming Heifetz reminded attorneys of Firm's employment reference policy).

      **REPLY:** This statement is not genuinely disputed.  Thompson agreed to be a reference, and then Heifetz "call[ed] everyone to 'remind' us that (apparently) *the [f]irm handbook prohibits references*."  Sheketoff Ex. 39 at P04214 (emphasis added).  While that is not what the firm manual actually says, that is how Heifetz represented it to "everyone"—and the obvious message that her interference communicated.  *Id.*; *see also, e.g.*, Chase Ex. 78 (Mizer) at 126:2-13 (Mizer testifying that he did not agree to provide a reference because "Beth Heifetz" conveyed to him that "firm policy was *not to provide a reference for Mark*" (emphasis added)).  The natural inference is that Heifetz told Thompson what she told Partner F.  And Thompson got the intended message.  Despite being "very happy" to provide a reference to Mark, once he heard from Heifetz, he did not do so. PSF ¶¶ 351, 370.

      **351.**    Had he been allowed to do so, Thompson would have acted as a reference for Mark, as he had agreed to do before Heifetz interfered.  Chase Ex. 48 at P02772.

**RESPONSE:** Undisputed, though Defendants dispute any suggestion that a reference from Thompson would have been positive—a point that Plaintiffs admit in Statement 380 they have no evidence to support. Defendants incorporate by reference their response to Statement 380.

**REPLY:** As Jones Day concedes, this statement is undisputed.   Jones Day nonresponsively claims that Plaintiffs have no evidence that Thompson's reference would have been positive, but Thompson's enthusiastic response to Mark's request for a reference—including his statement that he would "of course" be "very happy" to be Mark's reference and his offer to "[j]ust let me know how I can help"—plainly show that he would have been a positive reference. Chase Ex. 48 at P02772.

352.   Julia asked a fourth partner who had worked extensively with Mark to act as a reference, and he also agreed to do so.  Sheketoff █████████████████████████████████

██████████████████████

**RESPONSE:** Undisputed.

353.   On January 28, however, that partner texted Julia to say:

> Whoever [Mark] emailed told [Defendant] Beth [Heifetz].  And now Beth is calling everyone to "remind" us that (apparently) the Firm handbook prohibits employment references. … I told her I hadn't spoken to Mark (which is true) and she basically said not to answer if he calls or emails. … Please don't repeat any of this or I'll be the next one to get fired. … I just wish I hadn't been told about that policy against references because that I cannot do now.  If it's someone I know then I can still do it informally.

Sheketoff Ex. 39 at P04214-17.

**RESPONSE:** Undisputed that the quoted language appears (without Plaintiffs' alterations) in Sheketoff Exhibit 39. Disputed to the extent Statement 353 selectively quotes Exhibit 39 and removes relevant context, including the partner's texts confirming that the Firm Manual contained the policy, explaining that Heifetz was in the process of seeing if the Firm would

make an exception to its policy and authorize a reference for Savignac, and expressing the partner's view that Savignac would not have trouble finding a new job. Sheketoff Ex. 39 at P04214-17.

**REPLY:** This statement is not genuinely disputed.  Jones Day's nonresponsive factual assertions do not add any "relevant context" or change the meaning of the undisputed written words in this statement.

354.    Heifetz told Partner F that he could not serve as a reference for Mark.  Sheketoff Ex. 39 at P04214-17; Sheketoff Ex. 32 at 8 (Response to Request 15 of Plaintiffs' First Requests for Admission).

**RESPONSE:** Undisputed that Heifetz informed Partner F about the provision in Jones Day's Firm Manual regarding requests for employment references and that the Firm was considering authorizing someone to provide a reference for Savignac consistent with that provision. Disputed as to the remainder as mischaracterization of evidence and to the extent Exhibit 39 does not support Statement 354, including that Partner F attributes his inability to provide a reference to Jones Day's policy. Sheketoff Ex. 39 at P04217 ("I just wish I hadn't been told about that policy against references because that I cannot do now.").

**REPLY:** This statement is not genuinely disputed.  According to Partner F, Heifetz "call[ed] everyone to 'remind' us that (apparently) *the [f]irm handbook prohibits references*."  Sheketoff Ex. 39 at P04214 (emphasis added).  That is not what the manual actually says, but it is how Heifetz represented it to "everyone"—and the obvious message that her interference communicated.  *Id.*; *see also, e.g.*, Chase Ex. 78 (Mizer) at 126:2-13 (Mizer testifying that he did not agree to provide a reference because "Beth Heifetz" conveyed to him that "firm policy was *not to provide a reference for Mark*" (emphasis added)).  Indeed, Heifetz "basically said not to answer if [Mark] calls or emails."  *Id.* at P04125.  Heifetz' interference had the intended

effect on Partner F: "I just wish I hadn't been told about that policy against references because that I cannot do now." *Id.* at P04217. Partner F plainly attributed his inability to provide a formal reference to Heifetz' interference—which he understood as Heifetz going out of her way to hurt Mark—and her (false) statement that the written policy prohibits references rather than merely requiring Shumaker's approval.

355. Had he been allowed to do so, Partner F would have acted as a formal reference for Mark. Sheketoff Ex. 39 at P04214-17.

**RESPONSE:** Disputed. Partner F did provide references for Savignac. *See* Sheketoff Ex. 39 at P04241-67, P04270-76; *see also* Sheketoff Ex. 32 at 8 (RFA 16) ("Defendants deny that Jones Day prevented ███ from providing an employment reference for Mark.").

**REPLY:** This statement is not genuinely disputed. This statement makes an assertion about whether Partner F would have served as a *formal* reference for Mark if he had been permitted to do so. The evidence is unambiguous. According to Partner F himself: "I just wish I hadn't been told about that policy against references because that I cannot do now. If it's someone I know then I can still do it *informally.*" Sheketoff Ex. 39 at P04217 (emphasis added). Partner F was prevented from serving as a *formal* reference for Mark (i.e., a person who could be listed as a reference for employers he did not know personally and could not contact informally) as a result of Heifetz' interference. *Id.*

356. On January 29, Dvoretzky emailed Mark the following response:

Hi Mark,

Jones Day's policy is not to provide substantive recommendations, and only to confirm dates of employment. Despite that, I (and only I) have been authorized to speak with potential employers and to provide a reference by phone. I will be able to speak only about the work we did together; I won't be able to answer any other questions. If you'd like me to do that, please feel free to give out my contact information.

Chase Ex. 49 at JD_00002465.

**RESPONSE:** Undisputed.

**357.** Shumaker restricted Dvoretzky to providing only a telephonic reference and prohibited him from putting anything in writing.   JDSF ¶¶ 376-77; Chase Ex. 56 at JD_00003758; Chase Ex. 81 (Shumaker) at 234:3-235:12.

**RESPONSE:** Undisputed that Shumaker authorized an exception to Jones Day's employment reference policy to allow Dvoretzky to provide a phone reference. Defendants further state that Shumaker authorized a telephone reference because that would avoid any static, written recommendation, give Dvoretzky the opportunity to respond to questions, and "be more beneficial to Mark, beneficial to the firm, in terms of helping him get a position." Chase Ex. 81, Shumaker Tr. 234:5-235:4. Defendants further state that Shumaker never contemplated the possibility of authorizing both a written and oral reference and did not view that as the question before him. *Id*. at 243:3-14.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Defendants further state") is nonresponsive and should be disregarded. It is also false.  Jones Day says that Shumaker "never contemplated the possibility of authorizing both a written and oral reference and did not view that as the question before him."  But Mark's request to Dvoretzky asked: "Would you be willing to serve as a telephone reference for me *and* write a reference letter"?  Chase Ex. 47 (emphasis added).  Dvoretzky forwarded that request to Shumaker: "Please see below and advise on how I should respond?"  Chase Ex. 47.  The question was thus indisputably "before" Shumaker. Shumaker then instructed Heifetz (through McClure)

not just that "Shay only person *to have call*" but also "*Nothing in writing*."   Chase Ex. 56 at JD_00003758 (emphasis added).

**358.**     Shumaker restricted Dvoretzky to speaking only about the work that he personally did with Mark rather than addressing other partners' views or Mark's general reputation at Jones Day. Chase Ex. 81 (Shumaker) at 243:19-244:15; Chase Ex. 49 at JD_00002465.

**RESPONSE:** Disputed. Shumaker's instruction to Dvoretzky was "that he should have a well-founded basis for giving a recommendation" and that he should discuss "the direct experience you have with him. I don't want you guessing." Chase Ex. 81, Shumaker Tr. 246:9-247:1. Shumaker trusted Dvoretzky to determine what he should review for Savignac's reference and did not instruct Dvoretzky, for example, not to review Savignac's assessment statement. Chase Ex. 81, Shumaker Tr. 245:9-21 ("Shay is a big boy. Shay is able to give a reference based upon direct experience with Mark. I didn't go to the point of telling him what he should review or not review in providing a reference for Mark, I was providing exception to the policy."); *see also id.* at 245:2-7 ("My guess is Shay had [Savignac's] assessment statement, but I don't know that. I don't recall ever saying 'You can't read it.' If Shay wanted to have an assessment statement of Mark's, and wanted to read it, he certainly could have done so."). Shumaker further testified that by limiting the reference to Savignac's work, he ensured that Dvoretzky did not have to address the immature and unprofessional conduct that led to Savignac's termination. *Id.* at 247:3- 17.

**REPLY:** This statement is not genuinely disputed.  According to Dvoretzky's own email: "I will be able to speak only about the work we did together; I won't be able to answer any other questions."  Chase Ex. 49 at JD_00002465.  And it is undisputed that Shumaker is the one who defined the scope of the reference Dvoretzky could give.  JDSF ¶¶ 376-77; *see also* Chase Ex. 81 (Shumaker) at 246:24-247:1 (admitting that he told Dvoretzky "Only talk about what—the

direct experience you have with him") *id*. at 247:14-15 ("You can tell him, Shay, your experience, your limited experience."); Sheketoff Ex. 178 (█████████████████████████ █████████████); Chase Ex. 49 at JD_00002465 (Dvoretzky forwarded to final written response to Mark's reference request to Shumaker).  Jones Day insists that Dvoretzky could have *read* the assessment statement, but that is not responsive—the point here is that he was prohibited from providing a reference that drew from the assessment statement or other evaluations of Mark's work for Jones Day.

**359.**    Unlike Mizer and Thompson, Dvoretzky had participated in what Jones Day calls its "collaborative decision" to fire Mark.  Dkt. 35 at 23 (Answer ¶ 154); Chase Ex. 81 (Shumaker) at 124:3-125:10.

**RESPONSE:** Disputed. There is no evidence that the actual decision-maker, Brogan, ever consulted with Dvoretzky about the termination decision. *See generally* Chase Ex. 77, Brogan Tr. Plaintiffs also mischaracterize the evidence by selectively reciting isolated testimony taken out of context. Shumaker testified that he sought privileged counsel with Dvoretzky on "labor and employment issues." Chase Ex. 81, Shumaker Tr. 124:13; *see also id*. at 124:3-125:10, 229:25-230:18. When Plaintiffs asked about the content of those privileged discussions, Shumaker responded that "we're getting into privilege. But at a high level, I was bouncing off him what the legal landscape was." *Id*. at 230:11-13. Shumaker denied that Dvoretzky took a position on the business decision of whether to terminate Savignac, denied that Dvoretzky was "adversarial" to Savignac, and testified that Dvoretzky "was generally positive on Mark." *Id*. 230:4-18. Shumaker also denied that Dvoretzky was chosen to provide a reference because of any purported involvement in termination discussions. *See id*. at 230:19-24 ("Q. Was the fact that Shay was a lawyer involved in representing Jones Day with respect to the termination of Mark any factor in

your decision to select Shay as the person to provide a reference for Mark? A. None whatsoever. No." ). Defendants also object pursuant to Fed. R. Civ. P. 56(c) to the extent Statement 359 cites a pleading that was subsequently amended following discovery to remove the quoted text and state that "the final decision to fire Savignac was made by Brogan." Answer to Third Amend. Compl. ¶ 197 (ECF 178). That superseded pleading cannot be offered as admissible evidence.

**REPLY:** This statement is not genuinely disputed.  In Jones Day's own words: "The [f]irm's decision to terminate Savignac was a collaborative decision, which included consultation with Brogan."  Dkt. 35 at 23 (Answer ¶ 154).  And by Shumaker's own account, Dvoretzky "was involved in the discussion."  Chase Ex. 81 (Shumaker) at 138:21-139:2; *see also id.* at 124:19-125:10 (Shumaker testifying that he believed Dvoretzky was "acting as counsel in connection with [Mark's] termination"); *id*. at 138:10-14 (counsel's assertion that "I will note that the witness has previously identified Shay as someone who was part of the privileged analysis that was done in connection with the analysis related to your termination."); *id.* (counsel's admission that Dvoretzky "was consulted for his legal analysis with respect to this issue"); *id*. at 229:24-230:3 ("Q. You said earlier that Shay provided legal advice in connection with Mark's termination.  Is that right?  A.  He did provide me counsel, yes.").  Jones Day asserts that a superseded pleading cannot be offered as admissible evidence, but it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, Jones Day's own statements (through counsel or otherwise) are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  There is no exception to the *admissibility* of an opposing party's statements for assertions in a superseded pleading.  Jones Day's factual assertions are largely irrelevant to this statement and should be disregarded.  Moreover, Jones Day's conclusory

assertion that Plaintiffs "mischaracterize the evidence" is both false and insufficient to show the presence of a genuine fact dispute.  *See* Fed. R. Civ. Proc. 56(c)(1).

360.   Dvoretzky supported Jones Day's decision to fire Mark.  Chase Ex. 77 (Brogan) at 50:4-13; Chase Ex. 81 (Shumaker) at 18:21-23, 22:1-2, 88:4-11.

**RESPONSE:** Disputed. There is no evidence to support Statement 360. Plaintiffs also mischaracterize the evidence by selectively reciting isolated testimony taken out of context to create a misleading impression about the content of Dvoretzky's reference. To begin, there is no evidence that the actual decision-maker, Brogan, ever consulted with Dvoretzky about the termination decision. *See generally* Chase Ex. 77, Brogan Tr. Consistent with the privileged nature of his discussions with Dvoretzky, Shumaker denied that Dvoretzky took a position on the business decision of whether to terminate Savignac. *See*, *e.g*., Chase Ex. 81, Shumaker Tr. 230:9-18. The exhibits cited in Statement 360 are general statements that are not specific to Dvoretzky, and that are not contrary to Shumaker's testimony. *See id*. at 18:21-23, 22:1-2, 88:4-11; Chase Ex. 77, Brogan Tr. 50:4-13. Moreover, it is undisputed that when he did provide a reference for Savignac, Dvoretzky "was very complimentary"; that the only firm that gave Savignac an offer apparently spoke with Dvoretzky; and that no firm ever told Savignac that Dvoretzky's reference was not positive. Chase Ex. 60, P01709; *see also* Chase Ex. 79, Savignac Tr. 271:4-9; 395-96; DSF ¶¶ 393-96. Defendants also incorporate by reference their response to Statement 359.

**REPLY:** This statement is not genuinely disputed.  Jones Day claims that there is no evidence to support this statement, but the cited evidence is explicit.  "*There was no one that was opposed to the termination decision*."  Chase Ex. 81 (Shumaker) at 88:4-11 (emphasis added); *accord id.* at 22:1-2 ("no one had a contrary view"). Rather, "there were other counsel for the firm who shared my opinion." *Id.* at 18:21-23; *accord id.* at 88:3-11 ("there were others that shared my

view"). That plainly included Dvoretzky. Indeed, Brogan confirmed: "[P]eople are *uniformly* behind the decision." Chase Ex. 77 (Brogan) at 50:12-13 (emphasis added); *accord id.* at 50:3-4 ("the partnership completely agrees with the decision"). Jones Day's assertion that Dvoretzky did not give "business" advice is nonresponsive. This statement is not concerned with whether Dvoretzky's collaboration constituted "business" advice or "legal" advice. Jones Day's factual assertions (beginning with "Moreover, it is undisputed") are irrelevant to this statement and should be disregarded. And Jones Day's conclusory assertion that Plaintiffs "mischaracterize the evidence" is both false and insufficient to show the presence of a genuine fact dispute. *See* Fed. R. Civ. Proc. 56(c)(1).

**361.** Jones Day's written policy does not prohibit employment references. Chase Ex. 1 at JD_00002117; Chase Ex. 81 (Shumaker) at 218:22-25, 219:15-18, 240:5-14.

**RESPONSE:** Disputed as mischaracterization of evidence. Jones Day's employment policy provides "lawyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party, including current or former employees themselves. Requests for employment references should be referred, in the case of lawyer requests, to the Firm Administrative Partner or appropriate Partner-in-Charge, or in the case of staff and legal support personnel requests, to the appropriate Office Administrator." Chase Ex. 1 at JD_00002117.

**REPLY:** This statement is not genuinely disputed. As shown in PSF ¶¶ 364-367 (which are undisputed by Jones Day), the written reference policy simply assigns the decision of whether to provide a reference to Shumaker, whose discretion on whether to allow a reference is unbounded. Jones Day's conclusory assertion that Plaintiffs "mischaracterize the evidence" is

both false and insufficient to show the presence of a genuine fact dispute. *See* Fed. R. Civ. Proc. 56(c)(1).

362.     In fact, Jones Day attorneys do provide employment references.   Chase Ex. 79 (Savignac) at 266:15-19; Sheketoff Ex. 47; Sheketoff Ex. 64; Sheketoff Ex. 65; Sheketoff Ex. 66; Sheketoff Ex. 67; Sheketoff Ex. 68; Sheketoff Ex. 92; Chase Ex. 80 (Sheketoff) at 301:3-303:8.

**RESPONSE:** Undisputed that the Firm has—as in Savignac's case—authorized exceptions to its policy against employment references, consistent with the express terms of the written policy. Statement 362 is misleading and immaterial to the extent it relies on instances where a Jones Day attorney provided an employment reference without seeking and obtaining the authorization required under the policy, or after disregarding the lack of authorization.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its allegation that Jones Day's actual practice is "misleading and immaterial" is false.  Jones Day's actual practice—as undertaken by the attorneys who comprise Jones Day—is obviously relevant both to what Jones Day's actual policy is and to whether Jones Day retaliated against Mark by denying him the references he requested, in contrast to common practice.

363.     The written policy states in relevant part:

> [L]awyers, legal support personnel, and staff of the Firm are not authorized to provide any employment reference of any type to any other party, including current or former employees themselves.  Requests for employment references should be referred, in the case of lawyer requests, to the Firm Administrative Partner or appropriate Partner-in-Charge.

Chase Ex. 1 at JD_00002117.

**RESPONSE:** Undisputed that the quoted language appears (without Plaintiffs' alterations) in Chase Ex. 1.

364.     The written policy assigns the decision whether to allow employment references to specified managers, including the Administrative Partner (Shumaker).   Chase Ex. 1 at

JD_00002117; Chase Ex. 81 (Shumaker) at 218:22-25 ("Q. So under the policy, you decide whether to authorize an employment reference for a lawyer, is that right?"  "A. If I recall, I am one of the persons.").

**RESPONSE:** Undisputed.

**365.**   The written policy does not constrain Shumaker's discretion in deciding when to allow and when to deny an employment reference.  Chase Ex. 81 (Shumaker) at 219:15-18 ("Q. And nothing in this policy tells you when you can and you can't authorize an employment reference?" "A. That's correct.").

**RESPONSE:** Undisputed that Shumaker has discretion in authorizing exceptions to Jones Day's employment reference policy.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**366.**   Shumaker's decision whether to authorize a reference "is always an individual decision, based upon the facts and circumstances for the given lawyer."  Chase Ex. 81 (Shumaker) at 220:8-10.

**RESPONSE:** Undisputed that the quoted language in Statement 366 is in Shumaker's transcript.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**367.**   There is no "blanket rule" that determines when a reference is allowed.  Chase Ex. 81 (Shumaker) at 223:11-15.

**RESPONSE:** Undisputed that Shumaker testified in response to Sheketoff's question on whether there are blanket rules about certain references: "No blanket rule. It's a—we have a

policy for a reason. We will provide exceptions based upon the individual circumstances." Chase Ex. 81, Shumaker Tr. 223:11-15. Disputed as to the remainder of Statement 367 as improper argument and mischaracterization of evidence.

**REPLY:** Jones Day does not identify any part of this statement that it disputes statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Jones Day conclusorily asserts that some unidentified part of this statement constitutes "improper argument and mischaracterization of evidence."  That vague assertion is both false and insufficient to show the presence of a genuine fact dispute.  *See* Fed. R. Civ. Proc. 56(c)(1).

**368.**   Shumaker could have authorized Mizer and Thompson to act as references for Mark. Chase Ex. 81 (Shumaker) at 240:5-14.

**RESPONSE:** Undisputed that Shumaker testified that "if the firm determined that three references were better than one, sure, we could have done that. I didn't believe that was appropriate in this case, for the reasons I've testified to." Chase Ex. 81, Shumaker Tr. 240:10-14. Shumaker testified that he authorized an exception to the policy for only Dvoretzky to serve as a reference for Savignac "[b]ecause I wanted to have a unified statement on behalf of the firm regarding Mark. I didn't want there to be inconsistent messages, which I think would have been harmful to … Mark and to the firm…. [T]he firm and Mark's interests were aligned. We wanted him to get a new job. I was trying to act in a manner that would be most advantageous to that." *Id.* at 237:21-238:4. Dvoretzky was chosen because Shumaker "knew his reputation in the industry, and that that would be persuasive to an employer" and "knew Shay had a positive view of [Savignac]" and "would convey as much" whereas Shumaker did not know Mizer and Thompson as well and therefore "did not know what their impressions were." *Id.* at 237:18- 238:15; *see also*

*id.* at 238:25-239:5 ("I trusted Shay to advance Jones Day's interests, and in the process advance Mark's interests.").

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Shumaker testified that he authorized") is nonresponsive and should be disregarded.  The notion that Shumaker was trying to *help* Mark by denying his requests to have multiple references who would support his job search both in writing and by phone is implausible on its face and contradicted by the written record.  *E.g.*, Chase Ex. 56 ("Nothing in writing").

369.    Shumaker's recollection is that, when he himself has been asked to serve as a reference, he has done so "[t]wo or three times" and "[t]here have been two or three, I think, over the 30 years [at Jones Day], where someone has asked and I said, 'I can't, because of our policy.'"  Chase Ex. 81 (Shumaker) at 251:10-20.

**RESPONSE:** Undisputed.  Shumaker also testified that exceptions to the policy are "extremely rare." Chase Ex. 81, Shumaker Tr. 239:10-15 ("I was providing him an extremely rare, unusual exception to our standard policy that has been in place for years. That, I thought, was a pretty commendable approach for someone who had treated the firm in a manner—in the manner that he had."); *see also* McClure Decl. at ¶ 26 ("I am aware of numerous instances in which the Firm has denied requests to provide an employment reference.")

**REPLY:** Jones Day concedes this statement is undisputed.  Its factual assertions are nonresponsive and should be disregarded.  They are also misleading.  Even the limited discovery in this case shows numerous instances where a reference was given either with authorization or without it.  PSF ¶¶ 369, 387-88, 390-92, 395, 397, 399; Chase Ex. 78 (Mizer) at 165:16-167:11.  Shumaker said that authorization is rarely requested of him and rarely granted, but that is consistent

with all requests being granted—and he did not say that he has ever denied a request.  Chase Ex. 81 (Shumaker) at 224:9-16.  Indeed, there is no evidence that a request for authorization has *ever* been denied outside this case.  Shumaker said that he has sometimes declined to serve as a reference (PSF ¶ 369), but that just shows that partners can point to the policy as an excuse for not giving references they do not want to give, not that the policy is ever applied to deny authorization to a partner who *wants* to give a reference (except in this case).  Moreover, Shumaker indisputably does not know how many references are given either without authorization (he admitted he would not be surprised if this occurs, PSF ¶ 385, and half of the partners asked to provide references for Mark did not even know about the policy, PSF ¶¶ 349-355) or with authorization from one of the firm's many office partners-in-charge (and presumably partners who seek authorization often seek it from their local PIC rather than going to firm-wide Administrative Partner Shumaker, PSF ¶ 363).  As for McClure's declaration, she does not identify the foundation for her purported "aware[ness]" of the firm's alleged denial of references.  Any knowledge she has would be hearsay (and thus inadmissible), since she does not authorize or deny employment references.  And her after-the-fact *declaration* obviously cannot save Jones Day from *deposition testimony*—let alone deposition testimony provided by the person actually in charge of authorizing and denying reference requests.  In any event, McClure's declaration on this topic is also inadmissible, because Jones Day's initial disclosures did not identify her as a witness on the subject.  Sheketoff Ex. 34 at 9 ("███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████.").

**370.**   Mizer and Thompson did not act as references for Mark during his 2019 job search.  Chase Ex. 50 at JD_00002863; Chase Ex. 79 (Savignac) at 311:2-21.

**RESPONSE:** Undisputed that Mizer did not act as a reference for Savignac during his 2019 job search. Disputed to the extent there is no evidence whether Thompson acted as a reference for Savignac. Chase Ex. 79, Savignac Tr. 311:2-312:11 (confirming he did not know whether employers contacted Thompson).

**REPLY:** This statement is not genuinely disputed.  It is not genuinely disputed that the firm authorized only Shay to be a reference for Mark, that Heifetz told Thompson that he couldn't serve as a reference for Mark, and that after his conversation with Heifetz, Thompson (who had initially been "very happy" to be Mark's reference and asked Mark to "just let [him] know how [he could] help") did not respond to Mark's request that he "write a short letter."  Chase Ex. 48 at P02773; Chase Ex. 50 at JD_00002863.  In any event, Jones Day admits elsewhere that Thompson did not provide a reference for Mark.  PSF ¶ 351 (undisputed).

371.    Heifetz told Mizer that he could not serve as a reference for Mark.  Chase Ex. 78 (Mizer) at 129:18-130:16; Sheketoff Ex. 32 at 7 (Response to Request 11 of Plaintiffs' First Requests for Admission); Sheketoff Ex. 39 at P04214-17.

**RESPONSE:** Disputed.  Defendants incorporate by reference their response to Statement 350. With respect to Mizer, Heifetz again only informed Mizer about the provision in Jones Day's Firm Manual regarding requests for employment references, that Shay Dvoretzky would be providing a reference for Savignac, and that he should communicate as much to Savignac. *See* Chase Ex. 53, at JD_PRIV_0164; Chase Ex. 54 at JD_00002526; Chase Ex. 78, Mizer Tr. 97:9- 98:21, 125:9-126:11, 130:5-13, 150:16-21; Sheketoff Ex. 32 at 7 (RFA 11); *see also* Heifetz Decl. at ¶ 15 ("I was not a decisionmaker either on whether or not to provide an employment reference, or how or by whom the Firm would provide an employment reference. My only involvement in this issue was to convey the Firm's policy and the Firm's decision."). Mizer

testified that "the reason I declined request for recommendation is firm policy as conveyed to me by Beth." Chase Ex. 78, Mizer Tr. 151:16-18. Statement 371 is otherwise unsupported by the record, improper argument, and mischaracterization of evidence. None of the exhibits in Statement 371 show that Heifetz told Mizer that he could not serve as a reference.

**REPLY:** This statement is not genuinely disputed.   After Mizer received Mark's request for a reference," Heifetz "call[ed] everyone to 'remind' us that (apparently) *the [f]irm handbook prohibits references*."  Sheketoff Ex. 39 at P04214 (emphasis added).  While that is not what the firm manual actually says, that is how Heifetz represented it to "everyone"—and the obvious message her interference communicated.  *Id.*  Indeed, Mizer specifically admitted that "Beth Heifetz" conveyed to him "that "firm policy was *not to provide a reference for Mark*" (emphasis added)); *see also id.* at 130:5-16 ("[S]he got back to me and said Shay will be providing a letter of reference on the firm's behalf.  The firm las a policy *of not providing references*, but in this instance, we decided that we will make an exception to that and have a *single person* provide a reference, and that person will be Shay Dvoretzky.  Q.  Did you understand that to mean you could not provide a reference? A. That's correct." (emphasis added)).  Jones Day asserts that some unidentified part of this statement is "unsupported by the record, improper argument, and mischaracterization of evidence."   That vague and conclusory assertion is both false and insufficient to show the presence of a genuine fact dispute.  *See* Fed. R. Civ. Proc. 56(c)(1).

**372.**   Had he been allowed to do so, Mizer would have acted as a reference for Mark. Sheketoff Ex. 32 at 7 (Response to Request 12 of Plaintiffs' First Requests for Admission).

**RESPONSE:** Disputed. Although undisputed that on March 23, 2022, Defendants admitted that "Mizer would have provided a candid employment reference regarding Savignac," Mizer qualified his response during his deposition on March 28, 2022. As he testified, "I was

vaguely aware that a dispute had arisen between you and the firm. And I don't know how I would have handled that knowledge if I were asked for a recommendation." Chase Ex. 78, Mizer Tr. 120:14-19; *see also id.* at 121:5-15 ("if I had been informed that I could serve as a recommender, then I don't know what I would have done. In the past, I have been asked for recommendations from individuals who I was going to have to provide a pretty mixed reference or I thought maybe they should just know that they might not want my recommendation. So I have shared that with individuals in the past and then let them reach their own judgment as to whether they still wanted me to do it."). Mizer also testified that he questioned Savignac's judgment after reviewing Savignac's January 2019 email, which he believed "showed extraordinarily bad judgment." *See id.* at 154:7-14 ("I thought that Mark showed extraordinarily bad judgment in sending that e-mail and so – and I want to be working with colleagues who exercise good judgment."); 93:8-17 ("[I]n reading the alleged e-mail that you yourself alleged you sent to the firm, I concluded that you exercised exceedingly poor judgment.… I thought the tone and content of the e-mail was wildly unprofessional and in poor judgment."), 158:5-16 ("[A]s I later learned from reading the complaint, Mark in my judgment did exercise poor judgment in his interactions with the firm. And so in the moment, I recognized that the facts were not known to me, and it may be that Mark had exercised poor judgment. And I don't like working with lawyers with poor judgment."); 182:19-183:3 ("[W]hat struck me most about the complaint was that the e-mail reflected in the complaint that Mark sent to the firm was in – demonstrated exceedingly poor judgment, and I thought that the complaint as a whole was – demonstrated poor judgment."); 186:12-20 ("As I stated, I thought that the e-mail from Mark to the law firm was in and of itself in poor judgment, and therefore, I also thought that founding a lawsuit on the basis of that e-mail was in poor judgment."); 272:5-11 ("Well, as I said earlier, I really liked working with Mark, and I regret that the allegations in the

complaint, the conduct reflected in those allegations, and conduct of this litigation has made me think less of the judgment that both of you have exercised and are exercising.").

**REPLY:** This statement is not genuinely disputed.   The cited response to one of Plaintiffs' requests for admission reads: "Admit that, had Jones Day not prevented Ben Mizer from providing an employment reference for Mark, he would have provided a positive employment reference.   RESPONSE: Defendants incorporate by reference their General Objections as if set forth in full.   Subject to and without waiver of those objections, Defendants admit that Mizer would have provided a candid employment reference regarding Savignac and otherwise deny this Request."   Sheketoff Ex. 32 at 7 (response to RFA 12).   Under Rule 36(b), which governs Jones Day's response to the request for admission just quoted: "A matter admitted under this rule is *conclusively established* unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. Proc. 36(b).   Jones Day has not moved to withdraw or amend the admission—which the firm served on Plaintiffs a mere *five days* before the deposition it now claims displaces the admission—and thus it is conclusively established.   Jones Day's factual assertions should thus be disregarded.   Given Jones Day's admission, which it could only have provided after "reasonable inquiry" with Mizer (Fed. R. Civ. Proc. 36(a)(4)), Mizer's contradictory deposition testimony constitutes impeachment material and undermines his credibility.   His testimony that admittedly protected activity (such as the filing of this lawsuit) would have affected his employment reference also suggests retaliatory animus and a willingness to toe the company line in this retaliation lawsuit (i.e., witness bias).

**373.**   In January 2019 (the same month that Mark was fired and sought employment references), Mizer submitted a formal evaluation of Mark's performance in 2018.   Sheketoff Ex. 48 at JD_MS_00000003.

**RESPONSE:** Undisputed.

374.     The evaluation reflects that Mark billed 424 hours to matters with Mizer in 2018. Sheketoff Ex. 48 at JD_MS_00000003.

**RESPONSE:** Undisputed.   Defendants further state that the evaluation shows that Savignac billed 709 hours to matters with Dvoretzky, the attorney whom the Firm authorized to provide a reference. Sheketoff Ex. 48 at JD_MS_00000004 (185 hours), JD_MS_00000007 (524 hours). That is the most of any other attorney at Jones Day. ████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

375.     Mizer's evaluation states:

> **Comments:** I love working with Mark.  His work is mature, incisive, elegant, and thorough.  I never worry that he has missed a case or an argument.  He has written countless briefs [for one client], and all have been stellar; they never require much revision. ████████████████████████████
> ████████████████████████████████████████
> ████████████████████████  In addition, Mark is excellent at time management: He always meets deadlines and communicates clearly about the status of his projects.  I would be thrilled if I could work with Mark on every case.
>
> **Goals:** My only bit of constructive feedback for Mark is that he might wish to heighten his diplomatic skills. ████████████████████████████
> ████████████████████████████████████████
> ████████████████████████.

Sheketoff Ex. 48 at JD_MS_00000003.

**RESPONSE:** Undisputed that the quoted language (without Plaintiffs' alterations and typographical errors) appears in Sheketoff Exhibit 48. Defendants further state that Mizer provided additional testimony regarding this evaluation, including that Mizer "frequently had to revise the

comments that you provided on those briefs to other firms because I didn't think that they were appropriate for passing back to other law firms because they weren't sufficiently collegial…the tone of the comments was often condescending, and in my view, it wouldn't have been very productive to share comments that took that tone." Chase Ex. 78, Mizer Tr. 30:3-10; *see also id.* at 36:4-16 ("I think that on occasion you would come to, like, group meetings, and my sense was sometimes that you were sort of disengaged….you would come to the meeting not – not with a note pad, not prepared to take notes…it was a presentation style that I think made me wonder whether you were ready for – for client interaction."). Defendants also incorporate by reference their response to Statement 372.

> **REPLY:** Jones Day concedes that this statement is undisputed.  Its factual assertions are nonresponsive and should be disregarded.  Directly before Mark was fired, and thus before Mizer had a motive to lie, he rated Mark a 5 out of 5 across the board—*including for partnership*. Sheketoff Ex. 48 at JD_MS_00000003.  He also said that his "*only bit of constructive feedback* for Mark" was that " ███████████████████████████████████████████████
> ███████ " *Id.* (emphasis added).  That forecloses Mizer's post hoc testimony suggesting that Mark's alleged failure to bring a "note pad" to meetings caused him to wonder whether Mark was ready for "client interaction" or that Mizer "frequently" had to revise Mark's comment bubbles.

**376.**     As part of that formal evaluation, Mizer rated Mark a 5 out of 5 in all categories rated, including "Partnership" and "Leadership."  Sheketoff Ex. 48 at JD_MS_00000003; Chase Ex. 28 at JD_00005181.

> **RESPONSE:** Undisputed.  Defendants also incorporate by reference their response to Statement 375.

**377.**   Mizer thus indicated that, in his view, Mark's "Partnership potential" was "Exceptional" (5 out of 5) and Mark was also "Exceptional" (5 out of 5) on every other category rated.  Sheketoff Ex. 48 at JD_MS_00000003; Chase Ex. 28 at JD_00005181.

**RESPONSE:** Undisputed, though at his deposition, Mizer clarified that he provided Savignac a "5" for partnership "[b]ecause I thought that your brief and – your brief writing and analytical abilities were, as reflected, very strong, and I believed that you had room for improvement, as we've discussed. But there was, in my view, time for those weaknesses to be overcome. I think I understood that you were still some time away from partnership consideration and, therefore, had time to continue to get better, as we all hopefully do." Chase Ex. 78, Mizer Tr. 71:8-20. Defendants also incorporate by reference their responses to Statements 372 and 375.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its factual assertions are nonresponsive and should be disregarded.  Directly before Mark was fired, and thus before Mizer had a motive to lie, he write that he "loved working with Mark," that Mark's work was "mature, incisive, elegant, and thorough," that he "would be thrilled if [he] could work with Mark on every case," and said that his "*only* bit of constructive feedback for Mark" was that ██████ ████████████████████████████████████████████████████."  *Id.* (emphasis added). That, together with his ratings of Mark for partnership, forecloses Mizer's post hoc testimony casting any doubt on whether he viewed Mark as an exceptional lawyer who would be an exceptional partner.

**378.**   Because Mark was terminated before the deadline for submitting evaluations, no one other than Mizer submitted a formal evaluation of Mark's work in 2018.  Dkt. 178 at 16 (Answer to TAC ¶ 79).

**RESPONSE:** Undisputed.

**379.**     Had Mizer acted as a reference for Mark in 2019, his statements to potential employers would have been extremely positive, like his statements in the January 2019 evaluation, which were virtually contemporaneous with Mark's termination that month and which Mizer testified were honest and candid.  Sheketoff Ex. 48 at JD_MS_00000003; Chase Ex. 78 (Mizer) at 224:9-225:8, 235:1-5.

**RESPONSE:** Disputed. Statement 379 ignores Mizer's testimony that that he "would have provided a candid assessment of [Savignac's] strengths and weaknesses, [Savignac's] strengths being that you're a very strong brief writer and have very strong analytical abilities, but I would have said his diplomatic skills sometimes could use some work. So depending on what role you are hiring him for, then that may matter more or less to you." Chase Ex. 78, Mizer Tr. 101:2-9. "I think when providing a reference or recommendation, I often will ask the person seeking the recommendation what they are looking for. And so if they were seeking an associate who would simply be asked to write briefs and do research without any potential responsibilities for interaction with clients or co-counsel, then I would have said that that role would fit your strengths. But if they anticipated your growth out of the role of an associate that essentially does briefs and does research but required more interpersonal skills, then I would have flagged for them the room for improvement that we have previously discussed." *Id.* at 102:20-103:12. Mizer's testimony cited in Statement 379 did not discuss how Mizer would have handled a reference for Savignac and his testimony at page 235 was discussing a review of Sheketoff, not Savignac.

**REPLY:** This statement is not genuinely disputed.  Directly before Mark was fired, and thus before Mizer had a motive to lie, he evaluated Mark.  He rated him as exceptional—the highest possible rating—across every single metric he filled out, and provided a narrative evaluation that is quoted in full in PSF ¶ 375.  Those ratings and narrative evaluation preclude

Mizer's post hoc testimony that he might not have provided a stellar employment reference for Mark. Indeed, Mizer specifically wrote that his "*only* bit of constructive feedback for Mark" was that "███████████████████████████████████████████" and rated him "exceptional" for partnership (the highest possible rating). *Id.* In the deposition testimony Plaintiffs cite, Mizer specifically admitted that he "would not be anything other than honest" in "evaluations," and that the firm specifically "encouraged [him] to provide constructive feedback" in his evaluations. Chase Ex. 78 (Mizer) at 224:9-225:8, 234:8-10. (Plaintiffs have corrected the page range supporting the second quotation.)

**380.** Had Thompson acted as a reference for Mark, his statements to potential employers would have been extremely positive, as damages discovery will confirm. Chase Ex. 48 at P02772.

**RESPONSE:** Disputed as contrary to Rule 7(h). As the Statement itself states, Plaintiffs have no evidence to support this statement, but only hope to develop evidence on this point sometime in the future. Statement 380 is also disputed as improper argument, mischaracterization of evidence, and based on speculation. Chase Exhibit 48 is not evidence of how Thompson would have acted as a hypothetical reference for Savignac.

**REPLY:** This statement is not genuinely disputed. Thompson's enthusiastic response to Mark's request for a reference—including his statement that he would "of course" be "very happy" to be Mark's reference and his offer to "[j]ust let me know how I can help"—plainly show that he would have been a positive reference. Chase Ex. 48 at P02772. And Jones Day cites no controverting evidence. Instead, Jones Day asserts that this statement is "improper argument, mischaracterization of evidence, and based on speculation." Those conclusory statements are false and insufficient to show the presence of a genuine dispute. See Fed. R. Civ. Proc. 56(c)(1).

**381.** Following his termination from Jones Day, Mark sought employment with more than 40 other law firms.  Sheketoff Ex. 35 at 7-10 (Response to Interrogatory 1 of Defendants' Second Discovery Requests); Chase Ex. 79 (Savignac) at 308:4-309:3.

**RESPONSE:** Undisputed except that Plaintiffs' response to Interrogatory 1 does not support Statement 381.

**REPLY:** The correct interrogatory number is 5.  The citation should read: Sheketoff Ex. 35 at 7-10 (Response to Interrogatory <u>5</u> of Defendants' Second Discovery Requests).

**382.** Only one of those firms offered Mark a job.  Sheketoff Ex. 35 at 9 (Response to Interrogatory 1 of Defendants' Second Discovery Requests); Chase Ex. 79 (Savignac) at 308:4-309:3.

**RESPONSE:** Undisputed that Savignac did not receive an offer of employment from any firm other than Steptoe & Johnson through May 2019. Chase Ex. 79, Savignac Tr. 306:3-14. Disputed to the extent that Plaintiffs' response to Interrogatory 1 does not support Statement 382.

**REPLY:** The correct interrogatory number is 5.  The citation should read: Sheketoff Ex. 35 at 9 (Response to Interrogatory <u>5</u> of Defendants' Second Discovery Requests).

**383.** With strong references from Mizer and Thompson, and without the artificial limitations that Jones Day put on Dvoretzky's reference, Mark would have been a materially stronger candidate for a job as an appellate attorney at another law firm.  Chase Ex. 79 (Savignac) at 271:10-273:17.

**RESPONSE:** Disputed as speculative, unsupported by the record, improper argument, mischaracterization of evidence, and based on a hypothetical. Statement 383 ignores Mizer's testimony that he would have provided a "candid assessment" of Savignac's strengths and weaknesses, including that "his diplomatic skills sometimes could use some work." Chase Ex. 78,

Mizer Tr. 101:2-9. Plaintiffs admit they have no evidence of what Thompson would have said in Savignac's reference. Defendants incorporate by reference their responses to Statements 379 and 380. Moreover, the references Savignac did provide included three federal judges—including Justice Stephen Breyer and Judge Richard Posner—former Acting Solicitor General Neal Katyal, and the General Counsel for the Board of Governors of the Federal Reserve System. Chase Ex. 61 at P01204. In addition to those, two well-respected Issues & Appeals partners at Jones Day provided references on Savignac's behalf. Sheketoff Ex. 39 at P04241-67, P04270-76. Savignac also testified that no law firm told him they wanted more than one reference, no law firm told him that he would have received a job if he was provided additional references from Jones Day, and that he could not identify any firms that would have hired him if he provided additional references. *See* Chase Ex. 79, Savignac Tr. 270:15-21, 273:11-274:5, 309:21-310:4. The testimony cited in support of Statement 383 is conclusory and lacks foundation concerning how other firms perceived Savignac. *Id*. at 272:10-273:17. Savignac testified that the basis for his speculative opinion that more Jones Day references would have made him a stronger candidate was that "three or four strong references is better than one." *Id*. He already had at least six references.

   **REPLY:** This statement is not genuinely disputed.  It is beyond reasonable debate that Mark would have been a materially stronger applicant if, after having been fired with immediate effect from Jones Day as a senior associate, he had had multiple Jones Day partners available to vouch for him.  As Jones Day has admitted, it is quite difficult to obtain a new job as a senior associate.  PSF ¶ 384 (citing testimony by Lovitt and Shumaker).  Given that Mark had the added difficulty of having been *fired by Jones Day*, it is obvious that Mark would have been a materially more attractive applicant if he had multiple references from *within Jones Day*—particularly given that he had no advance warning and thus little time to find a new job.  Chase Ex. 79 at 272:17-19

("three or four strong references is better than one").  As Mark testified, "different people have different networks," *id*. at 272:20-21, and as Mark's experience bore out, having the support of someone with a personal connection to partners at a firm often has a substantial effect on the applicant's chances.  PSF ¶¶ 389-93.  Indeed, the only firm to give Mark an offer received an (unauthorized) informal reference from a Jones Day attorney, and one of the handful of firms that interviewed Mark did so only after receiving an informal reference from Partner F.  *Id.*

384.    Indeed, as Jones Day has acknowledged, Mark was in a particularly difficult situation in trying to find new employment by virtue of his being a very senior associate.  Chase Ex. 83 (Lovitt) at 156:18-19, 157:3-24; Chase Ex. 81 (Shumaker) at 31:14-24.

**RESPONSE:** Disputed as argumentative interpretation of the evidence. The citation of Lovitt's and Shumaker's testimony in Statement 384 is selectively quoted, devoid of context, and does not support the statement, including the fact that Lovitt did not discuss Savignac's ability to find employment or assess his prospects for employment. *See* Chase Ex. 83, Lovitt Tr. Vol. II 156:9-157:24; *see also* Chase Ex. 81, Shumaker Tr. 31:13-24 ("And it was clear to us that you didn't get us; apparently we didn't get you. And as a senior associate, we want to – when we – when we come to a conclusion like that, we want to make the decision as quickly as possible, because we appreciate that you need another opportunity. And the more we let it linger, the longer you're going to be in a position that is not going to advance you in the future. So we always preach, when we're dealing with senior associates, once you know that he or she is not going to advance within the firm, you owe it to them, you owe it to the firm, to let them know.").

**REPLY:** This statement is not genuinely disputed.  Jones Day says that it the statement is "argumentative," but that conclusory assertion is inaccurate and an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also asserts that the cited evidence is

"selectively quoted, devoid of context, and does not support the statement."  The cited evidence, as Jones Day's own quotations make clear, directly support this statement.  *See also* PSF ¶¶ 381-82.

**385.**    It "would not surprise" Shumaker if partners at the firm were "unaware of the policy and made a reference" without seeking authorization.  Chase Ex. 81 (Shumaker) at 252:13-18.

**RESPONSE:** Undisputed that Shumaker testified in response to Sheketoff's question of whether he had "ever learned that someone else is going to provide a reference without seeking your approval": "I don't believe so. And the reason I say I don't believe so, I've been practicing for 30 years. I can't think of an instance where I found out after the fact that John or Mary in XYZ office provided a reference in violation of a policy. That said, we are a big law firm, with 42 offices. We have 2,500 lawyers. Would it surprise me if a partner in charge, or an M&A partner, or a practice leader was unaware of a policy and made a reference? No. That would not surprise me." Chase Ex. 81, Shumaker Tr. 252:6-18 (with errata). Jones Day's Director of Human Resources and Employment Counsel also is "not aware of any employment references having been provided without obtaining appropriate authorization." McClure Decl. at ¶ 26.

**REPLY:** Jones Day concedes that this statement is undisputed.  The bulk of its answer (beginning with "I don't believe so") is nonresponsive and should be disregarded.  Jones Day's reliance on McClure's testimony is even further afield and manifestly inappropriate; this statement is about Shumaker's testimony, not McClure's.  McClure's lack of "awareness" is also not evidence of whether references are or are not given without authorization; she has no role in the authorization process and there is no reason she would be contacted if someone was unaware of the policy or did not follow it.  In any event, McClure's declaration on this topic is also inadmissible, because Jones Day's initial disclosures did not identify her as a witness on the

subject.  Sheketoff Ex. 34 at 9 ("

.").

**386.**    In fact, Jones Day attorneys do act as employment references without seeking the authorization purportedly required by the written policy, as the following paragraphs confirm.  *See infra* at ¶¶ 387-88, 395-401.

**RESPONSE:** Disputed. Statement 386 cites no evidence, constitutes argument, and is improper under Rule 7(h). To the extent Statement 386 purports to incorporate other assertions, it is disputed based on the responses to those other assertions. In addition, Statement 386 and the statements it cites are immaterial as Plaintiffs identify instances where they either have no foundation to assert whether the Firm provided authorization, or evidently know that a lawyer was providing a reference in violation of the policy and without informing others within Jones Day.

**REPLY:** This statement is not genuinely disputed for the reasons provided in PSF ¶¶ 387-401.  The firm's statement that Plaintiffs identify instances where "a lawyer was providing a reference in violation of the policy and without informing" Shumaker just confirms Plaintiffs' point that Jones Day attorneys do act as employment references without seeking the authorization purportedly required by the written policy.

**387.**    One former associate received employment references from both Julia and Jones Day partner ; Julia did not seek authorization, and it is beyond dispute that ▮ did not either, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Chase Ex. 80 (Sheketoff) at 301:3-304:16; ▮▮▮▮▮▮▮▮▮▮▮▮ .

**RESPONSE:** Immaterial, argumentative, and disputed. The evidence does not support the proposition that ▮ or any other person besides Sheketoff provided an employment reference



for this associate; Sheketoff's testimony was only "that there were a—a handful of people that Jordan asked for references," and █████████████████████████████████

█████████████████████████████████████████████████████████

████████ Sheketoff also has no foundation to testify what the Firm did or did not know about the reference. Sheketoff admitted in her deposition that she did not know whether other persons who supposedly were asked to provide a reference sought authorization. *Id.* at 302:4-22. Insofar as Sheketoff or others violated Firm policy, that is not a material fact.

     **REPLY:** This statement is not genuinely disputed.  As Jones Day concedes, Julia testified during her deposition that she believed ████ provided a reference for Jordan Von Bokern at some point between 2016 and 2018.  Chase Ex. 80 (Sheketoff) at 301:19-25.  That is evidence that ████ provided that reference.  (And if Jones Day had any controverting evidence, it would have submitted it; ████ remains a partner at the firm and has participated in this litigation.)  Julia's uncertainty was about who *else* provided a reference: "I don't remember right now who else besides ████████ gave a reference to Jordan."  *Id.* at 302:19-21.  Moreover, it is undisputed that that ████ had never even heard of the reference policy ███████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████ ignorance of the policy at the time he gave a reference to Von Bokern directly supports the assertion that he did not seek authorization.  And again, Jones Day submits no controverting evidence.  Jones Day disputes this statement on the ground that it is supposedly argumentative.  That conclusory assertion is both inaccurate and an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  This statement is material because it, along

with the statements that follow, describes Jones Day's actual practices concerning references and the different treatment Mark received.

**388.** ██████████████████████████████, who had worked with Mark in 2018, also acted as an informal references for Mark during his 2019 job search. ████████████████ ██████████

     **RESPONSE:** Undisputed that ███████ provided an employment reference. The references to ███████ purport to describe out-of-court statements offered for the truth of the matter by someone who was then a Jones Day associate. Defendants therefore object pursuant to Fed. R. Civ. P. 56(c) that the material cited to support this assertion constitutes inadmissible hearsay as it relates to ███████ *See* Fed. R. Evid. 801, 801. In any event, unauthorized conduct by a Jones Day associate is not a material fact.

     **REPLY:** Jones Day disputes this statement on the ground that the evidence relating to ███████ is inadmissible hearsay.  But the substance of out-of-court statements may be considered at summary judgment if it will be admissible in any form at trial.  *See* Preliminary Statement D. Here, any number of people can testify at trial that ███████ provided a reference to Steptoe on behalf of ███████ including Steptoe or ███████ himself.  ███████'s statements to Steptoe will not be used to prove the truth of the matter asserted (e.g., that Mark was an excellent associate) but instead to prove that he provided a reference, that it was positive, and that the reference had a positive effect on Mark's prospects at Steptoe (i.e., that Mark was hired).  Those are not hearsay purposes.  FRE 801(c)(2). Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**389.** The limited involvement from ████████████████ who acted informally and spoke only to existing contacts, confirms that more reference support would have made Mark a materially

stronger candidate and that Jones Day's interference harmed his candidacy, as the following paragraphs confirm.

**RESPONSE:** Disputed as unsupported by the record, improper argument, mischaracterization of evidence, and based on a hypothetical. There is no evidence about how any law firm perceived Savignac or about what ███ said to any law firm. Moreover, ███ spoke with several law firms, many of whom did not make an offer of employment to Savignac. *See* Sheketoff Ex. 39 at P04241-67, P04270-76. Defendants also incorporate by reference their responses to Statements 383.

**REPLY:** This statement is not genuinely disputed.  As discussed above, after ███ provided an informal reference to friend of his at Jenner & Block, that friend "intervened and Jenner is going to give [M]ark an interview." ████████████.  While Jenner did not ultimately extend an offer of employment, it was one of only a handful of firms to offer him an interview—and it did so only after receiving ███ informal reference.  Moreover, the only firm to give Mark an offer of employment did so only after an informal reference from ███ ███ ████████████.  The evidence thus strongly supports this statement.  In contrast, Jones Day's assertions that "███ spoke with several law firms" is not supported by the evidence.  And as ███ explained, the evidence certainly supports the inference that ██████████ about Mark (*id.*)—and Jones Day could provide controverting evidence if that were not the case, given that ████████████. *See also, e.g.*, Chase Ex. 60 at P01709 (Vinson & Elkins offered Mark an interview after receiving informal recommendation).

390.  ███ spoke only to the head of the appellate group at Steptoe & Johnson, which is the only firm that actually offered Mark a job. ████████████.

315

**RESPONSE:** Undisputed that Savignac did not receive an offer of employment from any firm than Steptoe & Johnson through May 2019. Chase Ex. 79, Savignac Tr. 306:3-14. The references to ██ purport to describe out-of-court statements offered for the truth of the matter by someone who was then a Jones Day associate. Defendants therefore object pursuant to Fed. R. Civ. P. 56(c) that the material cited to support this assertion constitutes inadmissible hearsay as it relates to ██ *See* Fed. R. Evid. 801, 802. In any event, unauthorized conduct by a Jones Day associate is not a material fact.

**REPLY:** Jones Day disputes this statement on the ground that the evidence relating to ██ is inadmissible hearsay.  But the substance of out-of-court statements may be considered at summary judgment if they will be admissible in any form at trial.  *See* Preliminary Statement D. Here, any number of people can testify at trial that ██ provided a reference to Steptoe on behalf of Mark, including ██ himself.  ██'s statements to Steptoe will not be used to prove the truth of the matter asserted (e.g., that Mark was an excellent associate) but instead to prove that he provided a reference, that it was positive, and that the reference had a positive effect on Mark's prospects at Steptoe (i.e., that Mark was hired).  Those are not hearsay purposes.  FRE 801(c)(2). Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

391.  ██ communicated with contacts at Jenner & Block and a small firm in Chicago. Following ██ intervention (he "told [his contact] to hire mark") Jenner invited Mark for interviews at its office (per ██ his contact "intervened and Jenner is going to give mark an interview")—one of just three firms (including the one that hired Mark) that did so.  ██ ██████████████████; Sheketoff Ex. 35 at 7-10 (Response to Interrogatory 1 of Defendants' Second Discovery Requests).

**RESPONSE:** Undisputed. Also undisputed that Jenner & Block did not offer Savignac a job, notwithstanding ██████ reference. Defendants further state that Savignac only reached out to Karl Thompson, Ben Mizer, and Shay Dvoretzky for a reference; not ████ *See* DSF ¶ 364.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its factual assertions are nonresponsive and should be disregarded.  They are also irrelevant.  As this statement and the cited evidence demonstrates, ████'s informal reference to Jenner & Block had a significant effect: It led the firm to invite Mark for an interview.  And as Jones Day has already conceded, Julia asked ████ to serve as a reference for Mark; whether Mark reached out directly is immaterial.  PSF ¶ 352.

392.   In his formal evaluation of Mark's work, Roth pointed to Mark's work across three matters and wrote:

> Mark is one of the most thoughtful and contemplative associates I've worked with.  He can identify the vulnerabilities in any argument and articulate them better than any opposing counsel.  Discussing legal issues with him is an intellectual pleasure, and highly valuable.  And he is a diligent worker.  His writing is very good, but stylistically bears some similarity to the judge for whom he clerked (Posner), meaning it is not necessarily appropriate for a less sophisticated audience.  That's just something to be mindful of.  Overall, Mark is a highly capable lawyer and shows great promise.

Sheketoff Ex. 48 at JD_MS_00000007.

**RESPONSE:** Undisputed. Defendants further state that Savignac only reached out to Karl Thompson, Ben Mizer, and Shay Dvoretzky for a reference; not ████ *See* DSF ¶ 364.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its factual assertion is nonresponsive and should be disregarded.  In any event, as Jones Day has already conceded, Julia asked ████ to serve as a reference for Mark; whether Mark reached out directly is immaterial.

393.   Had ████ acted as a formal reference for Mark in 2019, his statements to other potential employers would have been very positive, consistent with his formal evaluation quoted above and

████████████████████████████████████████████████████████

███████████████████████████████ Sheketoff Ex. 48 at JD_MS_00000007;

Chase Ex. 79 (Savignac) at 6-16.

**RESPONSE:** Disputed.  As Plaintiffs admit in Statement 391, ████ did act as a

reference for Savignac.

**REPLY:** This statement is not genuinely disputed.  Jones Day does not dispute that

████ 's statements to other potential employers had he provided a formal reference would have

been very positive.  Its only purported dispute with this statement is that ████ "did act as a

reference."  But this statement makes an assertion about the kind of reference ████ would have

given if he had provided a *formal* reference.  ████ himself made the distinction between the

"informal[]" reference he could (and did) give, and the kind of formal reference that Mark

requested: "I just wish I hadn't been told about that policy against references because that I cannot

do now.  *If it's someone I know* then I can still do it *informally*."  █████████████████████

████████████   Jones Day does not otherwise dispute any part of this statement.  This statement

is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**394.**   Heifetz was personally involved in Jones Day's response to Mark's reference requests.

Sheketoff Ex. 31 at 3-4 (Response to Interrogatory 1 of Plaintiffs' First Interrogatories) ("The

individuals involved in responding to those requests were Michael Shumaker, Beth Heifetz, and

Shay Dvoretzky."); Sheketoff Ex. 39 at P04214-17; Sheketoff Ex. 32 at 7-8 (Responses to

Requests 11, 13, and 15 of Plaintiffs' First Requests for Admission); Chase Ex. 78 (Mizer) at

129:18-130:16.

**RESPONSE:** Disputed  as  a  mischaracterization  of  evidence.   Defendants  also

incorporate by reference their response to Statement 350.

**REPLY:** Jones Day's sole basis for "disput[ing]" this statement is that it is supposedly a "mischaracterization of evidence," but it fails to identify how that is so.  Without a "showing that the materials cited do not establish the absence … of a genuine dispute," or the identification of any controverting evidence, that is an illegitimate basis on which to dispute a statement.  Fed. R. Civ. Proc. 56(c)(1).  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, this statement is amply supported by the cited materials, including Jones Day's own interrogatory response (signed by Heifetz) that "the individuals involved in responding to those [reference] requests were Michael Shumaker, Beth Heifetz, and Shay Dvoretzky."   Sheketoff Ex. 31 at 3-4 (Response to Interrogatory 1 of Plaintiffs' First Interrogatories).

395.    But in the past, Heifetz authorized Julia (together with several of Julia's friends) to provide a letter of reference on Heifetz's behalf for Staff E, a Jones Day employee. Sheketoff Decl. ¶¶ 15-16; Sheketoff Ex. 64; Sheketoff Ex. 65; Sheketoff Ex. 66; Sheketoff Ex. 67; Sheketoff Ex. 68.

**RESPONSE:** Disputed as a mischaracterization of evidence.  Staff E was applying to law school—a scenario that the employment policy does not address. Sheketoff Ex. 65. A recommendation letter in support of an application for law school does not fall under the terms of Jones Day's policy for employment references. In any event, Heifetz has confirmed that when the policy does apply, she has sought and obtained necessary approval prior to acting as or approving someone else to act as a reference. Heifetz Decl. at ¶ 14. There is no evidence that Heifetz did not seek authorization to provide a letter of recommendation in support of Staff E's law school application.

**REPLY:** This statement is not genuinely disputed.  Jones Day's sole basis for "disput[ing]" this statement is that it supposedly "mischaracterize[es]" the evidence because Jones Day's written reference policy does not apply to law school reference letters.  This statement makes no assertion about how the policy applies to law school reference letters; it asserts that Heifetz authorized Julia to provide a letter of reference on Heifetz' behalf for <span style="background:black;color:white">Staff E</span>.  Jones Day conspicuously does not deny that Heifetz did so.  Nor does it provide any controverting evidence, though Heifetz could easily submit a declaration to dispute this fact if it weren't true.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Moreover, Jones Day's assertions about the scope of the written reference policy are nonresponsive and should be disregarded.  They are also quite obviously false: The language in the written policy does not distinguish between "employment references" submitted to law schools vs. other employers.  To the contrary, "[c]haracter and fitness forms" are the sole employment references that the written reference policy treats differently.  *See* Chase Ex. 1 at JD_00002117.

396.   As Defendants have admitted, there is no documentary evidence suggesting that Heifetz ever obtained authorization to provide a reference for <span style="background:black;color:white">Staff E</span>  Sheketoff Ex. 33 at 6 (RFA 9).

**RESPONSE:** Undisputed, but misleading and immaterial. Subsequent to the Request for Admission cited in Statement 396, Heifetz provided a written declaration stating under oath that she would call the Firm Administrative Partner or Partner-in-Charge of the Washington, D.C. Office to seek authorization under the policy before agreeing to provide an employment reference or approving someone else to act as a reference. *See* Heifetz Decl. at ¶ 14. There also is no evidence that Heifetz did not seek authorization to provide a letter of recommendation in support of <span style="background:black;color:white">Staff E</span> 's law school application.

**REPLY:** Jones Day concedes that this statement is undisputed.  The remainder of its answer is nonresponsive and should be disregarded.  It is also false.  Jones Day's acknowledgement that *no documentary evidence* exists suggesting that Heifetz received authorization regarding ▮Staff E▮'s employment reference is plainly evidence from which a jury could infer that she did not receive any such authorization, especially because the evidence shows that Heifetz frequently communicated about reference requests in *writing*.  *E.g.*, Sheketoff Ex. 92 at JD_00003836-37; Sheketoff Ex. 47 at JD_00003760.  Moreover, there is significant evidence casting doubt on Heifetz's representation that she always sought authorization *orally* before agreeing to provide an employment reference or approving someone else to act as a reference.  Most significantly for purposes of ▮Staff E▮, Jones Day contends that the reference policy does not apply to his reference letter.  And it makes no claim that Heifetz sought authorization to provide reference where the reference policy did not apply.  Accordingly, it would seem undisputed that Heifetz did not seek authorization (oral or otherwise) regarding the employment reference for ▮Staff E▮

**397.**    Heifetz also authorized Julia to "write a letter of recommendation for" ▮M Associate K▮, a Jones Day employee who had worked with them.  Sheketoff Ex. 47 at JD_00003760; Sheketoff Decl. ¶ 17.

**RESPONSE:** Undisputed. There is no evidence that Heifetz did not seek authorization for a letter of recommendation in support of ▮M Ass. K▮ and Heifetz has confirmed that she would call the Firm Administrative Partner or Partner-in-Charge of the Washington, D.C. Office to seek authorization under the policy before agreeing to provide an employment reference or approving someone else to act as a reference. *See* Heifetz Decl. at ¶ 14.

**REPLY:** Jones Day concedes this statement is undisputed.  Jones Day's factual assertions about whether Heifetz invariably made calls to obtain authorization are nonresponsive

to this statement and should be disregarded.  In any event, as discussed in PSF ¶ 398, Heifetz's

email exchange with Julia about ███████'s reference casts significant doubt on her representation

that she always obtained authorization.  Sheketoff Ex. 47 at JD_00003760.  A jury could discredit

Heifetz' testimony that she always obtained authorization orally on the additional grounds (a) that

Heifetz frequently communicated about reference requests in writing, and so her purported practice

of only obtaining authorization orally is both surprising and remarkably convenient, Sheketoff Ex.

92 at JD_00003836-37; (b) that Shumaker remembered no instances when Heifetz obtained

authorization from him, Chase Ex. 81 (Shumaker) at 256:10-257:12; (c) that Heifetz, a named

defendant, has a motive to lie; and (d) that Heifetz' testimony on multiple topics is contradicted

by other record evidence, further calling into doubt her credibility.  *E.g.*, *compare* Heifetz Decl.

¶ 15 ("My only involvement in this issue was to convey the [f]irm's policy and the [f]irm's

decision."), *with* Sheketoff Ex. 39 at P04214-16 ("Beth is calling everyone to 'remind' us that

(apparently) the [f]irm handbook prohibits employment references…  [S]he basically said not to

answer if [Mark] calls or emails... Please don't repeat this or I'll be the next one to get fired…  She

clearly thinks he is up to something.  Like she said 'you need to be very careful if he calls you….

Well you just cannot discuss with him the circumstances of his departure.'"); *compare* Heifetz

Decl. ¶ 5 (claiming to have "personal knowledge of Sheketoff's reaction to the ███████

███████" and that she "believed Sheketoff was skirting the lines of her ethical obligations to

her client by threatening to quit the representation because it was inconvenient to her personal

life"), *with* Sheketoff Decl. ¶ 49-55 ("Heifetz was not present at the time, and I did not make any

similar comment to her."), *and* Chase Ex. 15 at JD_JS_00001296 (no mention in Heifetz'

assessment statement about Julia's alleged threat to quit); *compare* Heifetz Decl. ¶ 5 ("I assigned

Sheketoff a 2 rating because of a combination of Sheketoff's extremely low billable hours … and

my concerns about her substantive performance."), *and id.* ¶ 6 ("In 2017, I rated Sheketoff a 2 for her performance in 2016… I based this rating primarily on the themes that ran throughout Sheketoff's evaluations, Sheketoff's failure in 2016 to improve on the deficiencies in her 2015 performance, and my own personal observations of and interactions with Sheketoff."), *with* Chase Ex. 83 (Lovitt) at 154:8-18 ("Beth was saying that she felt the 2s were more about you not coming into the office."); *compare* Heifetz Decl. ¶ 10 ("Partner A's review had no effect on my decision to assign Sheketoff a 2 rating… [T]he rating was based on common themes of many evaluations as corroborated by my own knowledge."), *with* Chase Ex. 83 (Lovitt) at 143:19-145:18 (admitting that Heifetz "fluctuated between a 3 and a 2" for Julia's practice rating); Chase Ex. 15 at JD_JS_00001292 (Heifetz' positive personal experience with Julia); *id.* at JD_JS_00001399 (same); Chase Ex. 15 at JD_JS_00001289 (Heifetz' assessment statement heavily incorporating Partner A's review).

**398.** There is no documentary evidence suggesting that Heifetz ever obtained authorization to provide this reference.  Sheketoff Ex. 47 at JD_00003760

 **RESPONSE:** Disputed. In communicating with Heifetz on this matter, Sheketoff asked "Did you ever end up hearing back from the powers that be about whether it's okay for me to write a letter of recommendation," making clear that Heifetz had indicated she needed such authorization and would reach out to obtain it. Sheketoff Ex. 47. Heifetz also has stated under oath that she would call the Firm Administrative Partner or Partner-in-Charge of the Washington, D.C. Office to seek authorization under the policy before agreeing to provide an employment reference or approving someone else to act as a reference. *See* Heifetz Decl. at ¶ 14.

 **REPLY:** This statement is not genuinely disputed.  The *only* documentary evidence that Jones Day says suggests that Heifetz received authorization regarding M Ass. K 's employment

reference is her email exchange with Julia.  But that evidence cuts the other way.  In that exchange, at 5:09 pm eastern, Julia sked Heifetz: "Did you ever end up hearing back from the powers that be about whether it's okay for me to write a letter of recommendation for M Ass. K (not on JD letterhead)?"  A mere *two minutes later*, at 5:11 pm eastern, Heifetz wrote back *without answering Julia's question*: "Go ahead and write the rec letter on personal letterhead."  (The format in which Jones Day has produced emails unhelpfully identifies the time/date in the UTC time zone only for the top email in the chain.  The time/date for emails lower in the chain are generally reflected in the time zone of the recipient of each email, which is the eastern time zone in this instance.)  The immediacy of Heifetz' response, together with her nonresponsiveness to Julia's question, strongly suggest that Heifetz did *not* obtain authorization.  If Heifetz had received authorization before Julia's prompting, she would have told Julia about it at that time.  And it is implausible that Heifetz was able to obtain authorization after she received Julia's email, since she responded within two minutes.  More importantly, if she had received authorization, Heifetz's response to Julia's question would surely have been a simple "yes."  Jones Day's factual assertions about whether Heifetz invariably made calls to obtain authorization are nonresponsive to this statement and should be disregarded.  In any event, as just discussed, Heifetz's email exchange with Julia casts significant doubt on her representation that she always obtained authorization.  And a jury could discredit Heifetz' testimony that she always obtained authorization orally on the additional grounds discussed in Plaintiffs' reply on PSF ¶ 397.

**399.**    Heifetz also agreed to serve as a reference for Staff F , another former Jones Day employee, just hours after receiving the request.  Sheketoff Ex. 92 at JD_00003836-37.

**RESPONSE:** Undisputed. There is no evidence that Heifetz did not seek authorization for a letter of recommendation in support of Staff F and Heifetz has confirmed that she would call

the Firm Administrative Partner or Partner-in-Charge of the Washington, D.C. Office to seek authorization under the policy before agreeing to provide an employment reference or approving someone else to act as a reference. *See* Heifetz Decl. at ¶ 14.

**REPLY:** Jones Day concedes this statement is undisputed.  Jones Day's factual assertions about whether Heifetz invariably made calls to obtain authorization are nonresponsive to this statement and should be disregarded.  In any event, as discussed in PSF ¶ 398, Heifetz's email exchange with Julia about ███M Ass. K███'s reference casts significant doubt on her representation that she always obtained authorization.  Sheketoff Ex. 47 at JD_00003760.  A jury could discredit Heifetz' testimony that she always obtained authorization *orally* on the additional grounds discussed in Plaintiffs' reply on PSF ¶ 397.

**400.**    As Defendants have admitted, there is no documentary evidence suggesting that Heifetz ever obtained authorization to serve as a reference for ███Staff F███  Sheketoff Ex. 33 at 7 (RFA 11).

**RESPONSE:** Undisputed, but misleading and immaterial. Subsequent to the Request for Admission cited in Statement 396, Heifetz provided a written declaration stating under oath that she would call the Firm Administrative Partner or Partner-in-Charge of the Washington, D.C. Office to seek authorization under the policy before agreeing to provide an employment reference or approving someone else to act as a reference. *See* Heifetz Decl. at ¶ 14. There also is no evidence that Heifetz did not seek authorization to provide an employment reference for ███Staff F███

**REPLY:** Jones Day concedes this statement is undisputed.  Its factual assertions are nonresponsive and should be disregarded.  Jones Day's acknowledgement that *no documentary evidence* exists suggesting that Heifetz received authorization regarding ███Staff F███'s employment reference is plainly evidence from which a jury could infer that she did not receive such

authorization, especially because the evidence shows that Heifetz frequently communicated about reference requests in *writing*.  Sheketoff Ex. 92 at JD_00003836-37.  Moreover, as discussed in PSF ¶ 398, Heifetz's email exchange with Julia about ▮M Ass. K▮'s reference casts significant doubt on her representation that she always obtained authorization.  Sheketoff Ex. 47 at JD_00003760.  A jury could discredit Heifetz' testimony that she always obtained authorization orally on the additional grounds discussed in Plaintiffs' reply on PSF ¶ 397.

401.    Shumaker has no recollection of Heifetz—or Dvoretzky or Mizer or Thompson or ▮▮▮—ever seeking his authorization to provide an employment reference.    Chase Ex. 81 (Shumaker) at 256:10-257:12.

**RESPONSE:** Undisputed that Shumaker testified he lacked any such recollection (excepting anything related to Savignac's request for a reference). Disputed to the extent Statement 401 suggests Shumaker is the only person able to authorize exceptions to Jones Day's reference policy. *See* Chase Ex. 1 at JD_00002117. The Partner-in-Charge or appropriate Office Administrator of the relevant office can also authorize an exception, and Heifetz's practice has been to call either the Firm Administrative Partner or Partner-in-Charge to obtain authorization before agreeing to provide reference. Heifetz Decl. at ¶ 14.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

### H.    Jones Day's malicious press release is unlawful retaliation for filing this lawsuit.

402.    Plaintiffs filed this lawsuit on August 13, 2019.  Dkt. 1.

**RESPONSE:** Undisputed.

403.    Soon thereafter, Jones Day posted to its website a press release titled "Jones Day responds to litigation challenging leave policy."  Chase Ex. 72 at 2 (P02271).

**RESPONSE:** Undisputed, though Statement 403 omits important parts of the chronology. By way of further response, Jones Day was contacted by a reporter on August 12, 2019, who reported that The New York Times was writing a story about discrimination claims that Plaintiffs were planning to file. Chase Ex. 64, JD_00002535-36. Plaintiffs previously had served Jones Day with a draft complaint, both signaling the nature of their allegations, and indicating to the Firm the possibility that Plaintiffs would carry through with what the Firm reasonably perceived as their threat to "bad-mouth the firm" in "the court of public opinion." Chase Ex. 81, Shumaker Tr. 108:6-7; *see also* Chase Ex. 77, Brogan Tr. 72:6 (understanding Savignac's reference to court of public opinion to mean "you were going to go to the press"); Chase Ex. 62 (draft complaint). Jones Day had prepared a press release responding to those allegations to be held in case Plaintiffs did indeed launch a media attack, and the outreach from The New York Times confirmed that Plaintiffs were doing so. Chase Ex. 82, Lovitt Tr. Vol. I 48:5-14 (and errata) (it was "prudent to begin the process of drafting a press release in anticipation of a media attack" after "seeing a draft Complaint" and "realiz[ing] this—that [the] threat to go to the media was going to come to fruition."). As Jones Day's 30(b)(6) designee on the press release testified, "[t]here was no plan to issue the press release until The New York Times ran its article. We were not going to issue a press release unless there was a media attack. And when we were contacted by the New York Times, and it became clear that there was going to be the media attack, that Mark had threatened, then we decided that we needed to respond via press release." Chase Ex. 82, Lovitt Tr. Vol. I 22:8-18. Jones Day agreed to provide a statement in response to the inquiry from The New York Times, and the first time the Firm issued its press release publicly was when it mailed the release to the reporter at The New York Times, and Jones Day agreed not to "publish this statement on our website or social media" until after The New York Times ran its story. Chase Ex.

67 at JD_00002546. The New York Times published its story on August 14, 2019, complete with professional photographs of Plaintiffs and their son. Chase Ex. 69 (New York Times article). Only after The New York Times published its story on August 14, 2019, did Jones Day link its press release responding to Plaintiffs' allegations to its website and social media accounts—a fact that Plaintiffs do not dispute. *See* Pls. Resp. DSF ¶ 435; *see also* Chase Ex. 72 at P02271; Chase Ex. 82, Lovitt Tr. Vol. 1 35:24-36:8, 134:18-135:6. Jones Day would not have issued the press release if Plaintiffs had not publicized their claims in the media. *See* Chase Ex. 82, Lovitt Tr. Vol. I 52:20-21; *see also id.* at 22:5-18, 46:5-47:10, 51:22-53:2.

**REPLY:** Jones Day concedes this statement is undisputed.  Its very lengthy set of factual assertions is nonresponsive and should be disregarded.  Those factual representations are simply a repetition of assertions Jones Day has made in its own statement of facts, and are disputed for the reasons Plaintiffs have set forth in response.  JDSF ¶¶ 424, 437-39 (Plaintiffs' responses). In short, in serving Jones Day with a draft complaint, Plaintiffs signaled that they intended to *sue* Jones Day, not that they would speak to the press.  A reasonable jury would find that Jones Day prepared the press release in anticipation of that anticipated lawsuit.  (Indeed, Jones Day's assertion that it perceived the draft complaint as a "threat to bad-mouth the firm in the court of public opinion" seems to be an acknowledgment that the public badmouthing it feared was a public lawsuit.)  The press release is titled "Jones Day Responds to Litigation Challenging Leave Policy" and makes no reference to Plaintiffs' having spoken to the New York Times.  Moreover, Lovitt's testimony based on her personal involvement in the press release is an improper and inadmissible assertion by a litigant's supposed attorney about the substance of supposed communications with the supposed client that have been withheld under claims of privilege.  It is also not supported by any admissible evidence and a reasonable jury could disregard it for the reasons discussed here

and in response to Jones Day's statement of facts.  Finally, Jones Day suggests that it somehow supports its narrative that it waited until the New York Times published its story before it posted the press release to its website and social media accounts, but that couldn't be further from the truth.  As the evidence reflects, Jones Day agreed to the embargo *because the New York Times requested it* as a condition of incorporating Jones Day's statement into its article.  Chase Ex. 67 at JD_00002546 (Lovitt: "Also, *as promised*, we will not publish this statement on our website or on social media, or respond to other media outlets, until after you have published your story." (emphasis added)).  That in no way suggests that Jones Day would not have published the statement absent involvement by the New York Times.

**404.**  Jones Day also disseminated its press release to its social media accounts on Twitter and Facebook, where it had more than 20,000 followers.  Dkt. 45 at 5 (Answer to Supp. Compl. ¶ 19).

**RESPONSE:** Undisputed that after The New York Times ran an article on Plaintiffs' allegations, Jones Day placed links to its press release on its Facebook page and Twitter account, and that, based on reasonably accessible information, as of September 30, 2019, there were 3,911 followers for Jones Day's Facebook account.  Defendants also incorporate by reference their response to Statement 403. Defendants further state by way of comparison, in August 2019 Plaintiffs orchestrated lengthy features in The New York Times and Washington Post about their lawsuit. Chase Ex. 69; Chase Ex. 70. At the time, The New York Times had 4.7 million subscribers, and the two newspapers had tens of millions of visitors to their websites. *See* Marc Tracy, *New York Times Up to 4.7 Million Subscribers*, N.Y. Tines (Aug. 7, 2019); Washington Post PR, *More than 92 million people visited The Washington Post in August 2019*, Wash. Post (Sep. 17, 2019). The New York Times Facebook page currently has over 19 million followers, and

that paper's Twitter account currently has 54.9 million followers. *See* The New York Times Facebook page, *available at* https://www.facebook.com/nytimes/ (last visited Feb. 18, 2023); The New York Times Twitterpage, *available at* https://twitter.com/nytimes?ref_src=twsrc%5Egoogle%_7Ctwcamp%5Eserp%7Ctwgr%5Eauthor (last visited February 18, 2023).

**REPLY:** Jones Day does not identify any part of this statement that it disputes.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Its factual assertions are nonresponsive and should be disregarded.

405.    As of September 30, 2019, Jones Day's Twitter account alone had more than 21,000 followers.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

**RESPONSE:** Undisputed.  Defendants also incorporate by reference their response to Statement 404.

406.    Jones Day also disseminated the press release on LinkedIn, where Plaintiffs and other attorneys maintain accounts for the purpose of connecting with potential clients or employers. Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2); Chase Ex. 82 (Lovitt) at 134:18-25.

**RESPONSE:** Undisputed that Jones Day placed links to the press release on its LinkedIn page. There is no evidence in the record regarding who, if anyone, clicked that link or whether they were a potential client or employer of either Plaintiff, and the remainder of Statement 406 is disputed as argumentative interpretation of the evidence. Sheketoff works for the Federal Public Defender for the District of Columbia and presumably does not use social media for the purpose of connecting with potential clients. Defendants also incorporate by reference their response to Statement 403.

**REPLY:** Jones Day's sole basis for disputing this statement is that some unspecified portion is an "argumentative interpretation of evidence."  That  conclusory assertion is inaccurate and it is an inadequate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**407.**   As of September 30, 3019, Jones Day's LinkedIn account alone had more than *45,000* followers.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

**RESPONSE:** Undisputed that Jones Day's LinkedIn account had over 45,000 followers as of September 30, 2019. By way of comparison, The New York Times Linked page has over 7 million followers. *See* The New York Times LinkedIn Page, available at https://www.linkedin.com/company/the-new-york-times/ (last visited Feb. 18, 2023). Defendants also incorporate by reference their responses to Statements 403, 404, and 406.

**REPLY:** Jones Day concedes that this statement is undisputed.  Its factual assertion about the New York Times is nonresponsive and should be disregarded.

**408.**   As of August 24, 2021, Jones Day's LinkedIn account alone had more than *65,000* followers.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

**RESPONSE:** Undisputed that Jones Day's LinkedIn account had more than 65,000 followers as of August 24, 2021. Defendants also incorporate by reference their responses to Statements 403, 404, 406, and 407.

**409.**   As of August 24, 2021, the press release page on Jones Day's website had received more than *25,000* unique visitors.  Sheketoff Ex. 159 at 3 (Jones Day letter of Aug. 30, 2021 at 2).

**RESPONSE:** Disputed. Plaintiffs are misleadingly conflating two statements that cover overlapping periods. *See* Sheketoff Ex. 159. For the period from Aug. 12, 2019, to August

24, 2021, there were 15,241 unique visitors to the URL within the Jones Day website that contained the statement titled "Jones Day Responds to Litigation Challenging Leave Policy." *Id*. Defendants also incorporate by reference their response to Statement 403.

410.    The press release remains posted to Jones Day's website and social media accounts. Dkt. 45 at 5 (Answer to Supp. Compl. ¶ 19).

**RESPONSE:** Undisputed that the press release remains posted to Jones Day's website and links to the press release remain on Jones Day's social media accounts. Defendants also incorporate by reference their response to Statement 403.

411.    Brogan decided that Jones Day would prepare the press release in July 2019, after the attorney who was then representing Plaintiffs sent Jones Day a draft complaint along with a letter proposing settlement discussions.  Chase Ex. 77 (Brogan) at 175:9-18; Chase Ex. 62.

**RESPONSE:** Undisputed.  Defendants also incorporate by reference their response to Statement 403.

412.    Brogan explained that "at this point, we – we knew you were going to sue us, because you just sent us a complaint."  Chase Ex. 77 (Brogan) at 175:2-4.

**RESPONSE:** Undisputed that the quoted language in Statement 412 appears in Chase Exhibit 77. Plaintiffs mischaracterize the evidence by selectively reciting isolated testimony taken out of context. Brogan, in responding to a question about to whom he sent a draft of the press release, stated, "our counsel in the case, basically. Other people that I – I respect. And I knew – you know, at this point, we – we knew you were going to sue us, because you just sent us a complaint. So I wanted everybody who was in on the team." Chase Ex. 77, Brogan Tr. 174:24-175:6. Brogan also testified that "I knew we had to say something in response to the impending article in the Times about your – what I viewed as false allegations about the firm." Chase Ex. 77,

Brogan Tr. 180:16-19. Statement 412 also ignores testimony from Jones Day's 30(b)(6) designee, Traci Lovitt, that "anyone who is running a professional organization, upon seeing a draft Complaint would realize this—that [the] threat to go to the media was going to come to fruition." Chase Ex. 82, Lovitt Tr. Vol. I 48:5-14 (and errata). Defendants also incorporate by reference their response to Statement 403.

**REPLY:** This statement is not genuinely disputed.  Jones Day asserts that Plaintiffs "mischaracterize the evidence," but there is no mischaracterization.  As Jones Day admits, when Brogan drafted the press release, he "knew you were going to sue us, because you just sent us a complaint."  Chase Ex. 77 (Brogan) at 175:2-4.

**413.**    On August 13, 2019, Julia emailed Jones Day a copy of the complaint.  Chase Ex. 68 at JD_00002982; Chase Ex. 77 (Brogan) at 175:18-23.

**RESPONSE:** Undisputed.  Defendants also incorporate by reference their response to Statement 403.

**414.**    Brogan testified that Jones Day prepared the press release in response to the draft complaint sent by Plaintiffs' then-attorney and the complaint that Julia sent prior to filing.  Chase Ex. 77 (Brogan) at 175:9-23.

**RESPONSE:** Undisputed that Brogan began drafting the press release after he read the draft complaint sent by Plaintiffs' lawyer in July 2019. Disputed that the press release was issued in response to the draft complaint. In preparing the press release, Jones Day was responding to allegations that it anticipated Plaintiffs would be making in the media, and did not issue its press release until after The New York Times published its story launching Plaintiffs' threatened media attack against the Firm. Defendants incorporate by reference their responses to Statements 403 and 412.

**REPLY:** This statement is not genuinely disputed.  Brogan's testimony was unambiguous that he drafted the press release "in response to -- I read the draft complaint that your lawyer at the time sent over."  Chase Ex. 77 (Brogan) at 175:9-23, 173:13-22.

415.   The press release asserts that Plaintiffs "complain that [Jones Day's] leave policy … perpetuates gender stereotypes because the [f]irm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them sufficient to justify disability leave.  Neither the law nor common sense requires such intrusive disclosures."  Chase Ex. 72 at 2.

**RESPONSE:** Undisputed that the selectively quoted language (without Plaintiffs' alterations) appear in Chase Exhibit 72.

416.   Contrary to the press release, Plaintiffs have never suggested that Jones Day should require medical documentation from women or asserted that it was required to do so, and there is no evidence in the record that Plaintiffs made such an assertion.  McClure Ex. 3; McClure Ex. 4; Chase Ex. 79 (Savignac) at 150:13-16; Dkt. 18 at 6 (MTD Opp. 1).

**RESPONSE:** Disputed, including as improper argument and mischaracterization of evidence. Jones Day's 30(b)(6) designee testified that the press release was based on "the firm's interpretation of [Plaintiffs'] Complaint" and "[t]hat in order to be able to have a disability without … a presumption of medical certification, you necessarily have to have medical evidence…. There is really a binary choice there…. You either have a certification presumption, that is reasonable, like we have, or you have to provide medical evidence. There is no other way to have a policy. That is the only way we can construe and interpret [Plaintiffs'] Complaint. And that is, in fact, our opinion of what [Plaintiffs are] arguing in [their] Complaint." Chase Ex. 82, Lovitt Tr. Vol. I 88:2-89:8; *see also id.* at 90:11-20 ("[I]n the firm's opinion, we know of only two ways to implement a [short-term disability] policy like this, which is to have a presumption for medical certification or

to have medical evidence. You were challenging the presumption. You're advocating medical evidence. Otherwise, you are in a world of I don't know what."). The Firm's understanding was also reasonable in light of Savignac's assertions to the Firm in his January 2019 email, to the EEOC in his administrative charge, and in this lawsuit that all of the disability leave provided to someone who delivers a child is a sham, thus entitling him to 8 full weeks of additional paid leave—clearly suggesting a need for a medical certification of disability as a precondition of any disability leave. *See, e.g.*, McClure Ex. 4. After discovery, when it became undisputed that those who deliver a child are disabled for at least some period, Plaintiffs began arguing that Jones Day violates Title VII by assuming that a provider has certified eight weeks of postpartum disability because that assumption is "overinclusive"—also suggesting that actual medical certification of disability is a precondition of disability leave. *See supra* page 70. And Plaintiffs' summary judgment brief likewise argues that use of medical certifications is one way to avoid alleged violations of anti-discrimination laws. *See* Pls.' Jan. 27, 2023 MSJ Br. at 9.

      **REPLY:** This statement is not genuinely disputed.  Jones Day attempts to create a dispute by discussing Jones Day's purported "opinions" and "interpretations" of the implications of Plaintiffs' position, but it cannot and does not dispute that Plaintiffs actually have never suggested that Jones Day should require medical documentation from women or asserted that it was required to do so—and the cited documentary evidence is conclusive in any event.  By the same token, if X advocates that the nation convert to Communism and Y reasonably believes that such a process would necessarily entail a bloody civil war, it is still false for Y to claim without elaboration that X advocates a bloody civil war.  Ironically, Jones Day's current position is that Plaintiffs' view of the law would *prohibit* Jones Day from requiring medical documentation.  Jones

Day tries to explain that about-face away by pretending that it is Plaintiffs who have changed their position, but the record establishes the contrary.

**417.** Indeed, this very point was made to Jones Day just before it published the press release. Sheketoff Ex. 170 at JD_00002559.

**RESPONSE:** Undisputed that the reporter who contacted Jones Day indicated that Plaintiffs "don't argue that the policy must require birth mothers to show evidence of their ongoing disability to be valid, just that birth mothers can't be given the 8 weeks automatically. (so, for example an acceptable policy in [Plaintiffs'] view would be *up to* weeks for birth mothers, but it's on them to come back when they're ready and they're not supposed to stay out longer than that point even if it's less than 8 weeks.)" Sheketoff Ex. 170 at JD_00002559. The remainder of Statement 417 is disputed, including as argumentative. Jones Day responded to the reporter: "Under the Firm's disability leave, a birth mother may take up to eight weeks of disability leave without submitting medical proof documenting the physical impact of childbirth on her…. No one is required to take the full disability period, and any birth mother can take less disability leave if the presumption is not reflective of her experience or if she desires to return to work in less than 8 weeks." *Id*. Defendants also incorporate by reference their response to Statement 416.

**REPLY:** Jones Day does not identify any part of this statement that it disputes. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day's quoted email to the reporter is nonresponsive to this statement. In any event, it only further confirms that Jones Day understood Plaintiffs' actual position but chose to ignore and mischaracterize it.

**418.** The press release asserts that Mark's "claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent"

and asserts that he was instead fired for supposed character flaws and not for challenging the leave policy.  Chase Ex. 72 at 3.

**RESPONSE:** Undisputed that the press release says Savignac's "claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent" and that "Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursuing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff and in the complaint itself. Mr. Savignac exhibited open hostility to the Firm, demanding that he be given what he wants 'or else' and claiming hardship under circumstances that no reasonable person would view as anything but exceptionally generous." Chase Ex. 72 at P02272. The remainder of Statement 418 is disputed as improper argument and mischaracterization of evidence.

**REPLY:** Jones Day does not identify any part of this statement that it disputes.  It vaguely asserts that some portion ("the remainder") of this statement "is disputed as improper argument and mischaracterization of evidence," but it fails to even identify what parts of this statement it disputes, let alone on what basis it mischaracterizes the evidence or is argumentative. That is inadequate to create a genuine dispute.  *See* Fed. R. Civ. Proc. 5(c)(1).  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

419.   Contrary to the press release, Brogan has now admitted that he decided to fire Mark for asserting that the firm's leave policy is illegally discriminatory and that he would not have fired Mark but for his reaction to that complaint.  Chase Ex. 77 (Brogan) at 15:15, 16:18-25 ("Q. Okay. Why did you fire me?"  "A. … You then went on to act as if you personally were the law-givers; that the – our policy on leave was illegal."); *id.* at 46:15-22 (the firing decision was "on the basis

of your e-mail and also your attack on our position, which seems to be on all fours with what you were told by Sarah [McClure]"); *id.* at 58:23-59:20 ("Q. … was anything in [the email's first] paragraph a factor in your decision to fire me?"  A. … In this particular paragraph – and I think I referred to this; that you speak like you're the lawgiver.  And we – we, Jones Day, which is one of the great law firms in the world, should bow down to your assessment of the EEOC.  And – and that this is a violation of [Title VII of] the 1964 Civil Rights Act. … It's a pompous assertion.  It's an arrogant assertion."); *id.* at 62:22-25 ("And you're telling us that we violated [the] 1964 Civil Rights Act?  To me, there's just no good faith basis to it."); *id.* at 63:6-11 ("Q. Would you have fired me even if you believed I was right about the policy being illegal?"  "THE WITNESS. Yeah. I – no, I – I would not."); Chase Ex. 81 (Shumaker) 96:2-19, 103:2-6.

**RESPONSE:** Disputed. Plaintiffs mischaracterize the evidence by selectively reciting isolated testimony taken out of context. Brogan denied that the assertion in Savignac's January email that Jones Day's policy is discriminatory was a factor in his decision to terminate Savignac. Chase Ex. 77, Brogan Tr. 60:4-11. Defendants incorporate by reference their response to Statement 232.

**REPLY:** While Jones Day disputes this statement, the dispute is not genuine. Brogan's cited testimony is unambiguous.  Indeed, Jones Day admits in its brief that Jones Day fired because Mark because he and Julia "acted as if Plaintiffs personally were the law-givers, decreeing that our policy on leave was illegal." Dkt. 189 at 35 (brackets omitted).  Even assuming that Brogan deemed this "decree[]" to be "conclusory and arrogant," and then fired Mark for the "conclusory and arrogant" decree, that is just another way of saying that Brogan fired Mark because of the "decree[]."

**420.** The press release asserts that Mark sent an "intemperate email … to a member of our professional staff," maliciously insinuating that Mark mistreated subordinate staff members like paralegals or secretaries.  Chase Ex. 72 at 3.

**RESPONSE:** Undisputed that the quoted language appears in the press release.  The remainder of Statement 420 is disputed, including as improper argument and mischaracterization of evidence. Plaintiffs have no basis to represent to the Court that it is an undisputed fact that Jones Day "maliciously insinuate[ed]" anything. Chase Exhibit 72 is a copy of Jones Day's website statement. It does not support a claim about what Jones Day was "maliciously insinuating" when it stated that Savignac sent "an intemperate email" to "a member of our professional staff." Jones Day's 30(b)(6) designee on the press release confirmed that the email referenced in that statement was Savignac's January 2019 email to Sarah McClure, who indisputably is a member of Jones Day's professional staff. *See* Chase Ex. 82, Lovitt Tr. Vol. I 116:23-117:17; *see also* Chase Ex. 77, Brogan Tr. 192:17-20 ("And who is the member of the professional staff you're referring to in this email – in this – A. Sarah."); *see* McClure Decl. at ¶¶ 1, 25 (confirming position as Director of Human Resources and Employment Counsel at Jones Day and that "In all of the years that I have worked at Jones Day, I have never received an email (or for that matter had a verbal exchange with a colleague at Jones Day) that contained the hostile and demanding tone of Mr. Savignac's January 2019 [email]."). There is no basis to assert that the term "professional staff" refers only to so-called "subordinate" employees like "paralegals or secretaries" and excludes the Director of Human Resources, and also no basis to suggest that mistreating the latter is somehow more appropriate than mistreating the former.

**REPLY:** Jones Day disputes what its press release insinuates, but the dispute is not genuine.  Claiming that Mark sent an "intemperate email … to a member of our professional staff,"

rather than that Mark was "insufficiently collegial in a demand letter to Jones Day's attorney" (as Shumaker admitted was Jones Day's position, Chase Ex. 81 (Shumaker) at 105:22-106:3), plainly insinuates that Mark mistreated his subordinates. *See also* Merriam-Webster, https://www.merriam-webster.com/dictionary/insinuate (defining "insinuate" to mean "to impart or suggest in an artful or indirect way").

**421.**    Contrary to that insinuation, the individual in question (Sarah McClure) is a long-time Jones Day attorney of a higher rank than Mark (Counsel) who purportedly acted as counsel for Jones Day in rejecting Plaintiffs' request for equal treatment, who is designated by the firm's manual as one of the people to whom employees should direct complaints of discrimination, and whom Shumaker described as "a senior leader in this law firm, a director of this law firm."  Chase Ex. 1 at JD_00002114; JDSF ¶ 298; Chase Ex. 81 (Shumaker) at 37:18-38:10, 103:9-106:11.

**RESPONSE:** Undisputed that Shumaker described McClure as "a senior leader in this law firm, a director of this law firm"; that McClure provides privileged legal counsel to Jones Day; and that she conveyed to Plaintiffs that the Firm was declining Savignac's demand for eight weeks of disability leave despite admittedly having no disability. The remainder of Statement 421 is disputed, including as improper argument and mischaracterization of evidence. McClure's title is not Counsel—an actual title within Jones Day for certain lawyers who represent Firm clients. McClure's title is Director of Human Resources and Employment Counsel. McClure Decl. at ¶ 1. There is no evidence of where Savignac and McClure "rank" relative to each other. It also is undisputed that McClure is a member of Jones Day's professional staff, and that Jones Day policy required Savignac to "show respect and consideration to everyone in the Firm—lawyers, legal support personnel, and staff in all of the Practices, Offices, and Departments of the Firm." Chase Ex. 1 at JD_00002041. In nearly thirty years, McClure has "never received an email (or for that

matter had a verbal exchange with a colleague at Jones Day) that contained the hostile and demanding tone of Mr. Savignac's January 2019 [email]." McClure Decl. at ¶ 25.

**REPLY:** This statement is not genuinely disputed. Jones Day claims that some unspecified portion of this statement (the "remainder") is disputed "as improper argument and mischaracterization of the evidence." That conclusory assertion is both inaccurate and is insufficient basis for creating a genuine dispute. *See* Fed. R. Civ. Proc. 56(c)(1). Further, Jones Day's assertion that McClure did not "rank" higher than Mark is contradicted by Shumaker's testimony that she is "a senior leader in this law firm, a director of this law firm," Chase Ex. 81 (Shumaker) at 103:9-11, whereas it is undisputed that Mark was an associate, JDSF ¶ 22. And her title confirms that Jones Day intends to hold her out as a Counsel, a well-recognized rank in the legal profession including Jones Day. Jones Day's factual assertions (beginning with "It is also undisputed") are nonresponsive and should be disregarded.

**422.** The press release asserts that Julia's claim of "pay discrimination is false and was not made in good faith." Chase Ex. 72 at 3.

**RESPONSE:** Undisputed. Defendants further state that Jones Day's press release follows that quotation by stating that Sheketoff was a "highly paid associate" "despite the fact that her reviews from multiple partners were mixed, her contribution to billable client representations was below expectations, and her attention was focused on idiosyncratic concerns." Chase Ex. 72 at P02272.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day's nonresponsive assertion about a different sentence in the press release is irrelevant and should be disregarded.

**423.**     Contrary to the press release, and as prominent Jones Day partners are aware, Julia has long believed that Partner A discriminated against her because of her sex, and Jones Day had no basis for publicly accusing Julia of lying to the Court.  Sheketoff Ex. 41 at P02164-69; Sheketoff Ex. 39 at P04178; Chase Ex. 80 (Sheketoff) at 55:3-6, 78:4-10, 89:11-92:23, 131:7-140:8; Sheketoff Decl. ¶ 18.

**RESPONSE:** Disputed.  Jones Day had ample basis for stating that Sheketoff's allegations of pay discrimination were false. Indeed, Plaintiffs do not dispute that Brogan personally decided Sheketoff's compensation adjustments; that he did not see Partner A's evaluation before this case was filed; and that he based her allegedly discriminatory compensation adjustment principally on the (also undisputed) fact that she received a 2 rating from her practice in consecutive years. Chase Ex. 77, Brogan Tr. 28:2-29-22; *see also* Pls. Resp. DSF ¶ 264. Plaintiffs also do not legitimately dispute that Sheketoff received a 2 rating from her practice in consecutive years based on consistent themes across her evaluations, and that Heifetz testified she would have given Sheketoff a 2 rating for her performance in 2016 even without Partner A's evaluation. Heifetz Decl. ¶ 10; *see also* Pls. Resp. DSF ¶ 293. After a year of discovery, Plaintiffs also have no evidence of gender-based discrimination by Partner A. *See, e.g.*, DSF ¶¶ 196, 197, 201. Jones Day likewise had ample basis for stating that Sheketoff's allegations of pay discrimination were not made in good faith. Sheketoff has accused Partner A of gender bias because he sent what Sheketoff called a "mean email." Sheketoff Ex. 39 at P04090. But Sheketoff knew that her actions in repeatedly undoing a minor revision Partner A had made to a memo, which precipitated his email, were not mentioned in Partner A's evaluation of Sheketoff's performance nine months later. *See* Chase Ex. 19 (indicating discussion with Sheketoff about her evaluations); *see also* Chase Ex. 80, Sheketoff Tr. 72:7-8 (testifying that evaluations were read out loud in

review meetings). She also knew that in other instances, Partner A had been complimentary of her writing and edits when they did not involve repeatedly undoing his revision, and she has not claimed and cannot claim that Partner A had received similar repeated changes from a male associate and reacted differently. Chase Ex. 84, Partner A Tr. 288:15-16 ("no other lawyer, not just other men, no other lawyer has ever done that"); *see also* DSF ¶ 272. Sheketoff also was aware that comments in Partner A's evaluation were similar with criticisms of Sheketoff in other evaluations for the second straight year. *See id*.; *see also generally* Chase Ex. 15. And any reasonable person would view Sheketoff's stated reasons for accusing Partner A of gender bias as unreasonable, and Sheketoff herself has previously expressed doubt on her own purported suspicions. *See* Sheketoff Ex. 41, P02166; *see also* DSF ¶¶ 206-07.

**REPLY:** This statement is not genuinely disputed.  First, Jones Day does not dispute that it publicly accused Julia of lying to the Court.  As discussed at length below, Partner A discriminated against Julia and that discrimination affected Julia's salary.  PSF ¶¶ 433-735.  But even setting all of that aside and assuming that Partner A was not motivated by sex, nothing Jones Day says controverts this statement's assertion that Julia honestly believed she was discriminated against, that prominent Jones Day partners were so aware, and that Jones Day had no basis to conclude that Julia did not honestly so believe.  Indeed, the written record reflects that Julia expressed her beliefs about Partner A's discrimination to Partner F and Female Associate A (later a partner) before she had any conceivable motive to lie.  PSF ¶ 504-06; Sheketoff Ex. 39 at P04178, P04199.  Female Associate A agreed with Julia's assessment: "And maybe you're right about the sexist thing too…  I've  gotta believe he would not be sending this email to [Male Associate C] or [Male Associate B]."  PSF ¶ 506.  And despite Julia mentioning it to him several times, Partner F never once disagreed that Partner A was motivated by sex or suggested that Julia's views were

unreasonable.  Sheketoff Ex. 39 at P04178, P04199.  Moreover, as Julia has explained, while she previously had entertained the possibility that "maybe [Partner A was] an all-around equal-opportunity asshole," Sheketoff Ex. 41 at P02166, two subsequent things strengthened her belief that he had discriminated against her on the basis of sex: First, Female Associate A told Julia that after she rewrote a memo he had written, she had a bankruptcy associate circulate the revised draft and Partner A didn't say anything about it.  And second, Heifetz read aloud to Julia Partner A's performance review of her 2016 work (which contained numerous false statements).  Sheketoff Decl. ¶¶ 25-28.  Perhaps most gallingly, Jones Day did not even bother to interview Partner A to *ask him if he'd discriminated against her* until after it issued the press release.  PSF ¶ 424.  Nor did it talk to Julia, Partner F, or Female Associate A, *or anyone else*.  To the contrary, Brogan (who purportedly wrote the press release) testified that he knew without any investigation that Partner A had not discriminated against Julia *because Partner A was biracial, had served in the military, and supposedly had great character*.  Chase Ex. 77 (Brogan) at 76:23-79:18.  None of that is a basis for publicly accusing Julia of lying.  And Jones Day does not dispute that its press release accused Julia of lying.

**424.**    Further confirming the frivolity of Jones Day's false assertion, the firm asserted that Julia brought her claim in bad faith *before it even interviewed Partner A about the claim that he discriminated*.  Chase Ex. 84 (Partner A) at 263:9-11, 264:10-15 (Partner A testified that he did not know of the accusation until after the complaint was filed).

**RESPONSE:** Undisputed that when asked when he first learned Sheketoff though he had discriminated against her, Partner A testified "I think when the lawsuit was filed," and that he was not aware of the allegation before then. Chase Ex. 84, Partner A Tr. 263:9-11, 264:10-15. But those involved in creating, disseminating, and conducting privileged reviews of the draft press

release included Brogan, Shumaker, Lovitt, and Heifetz. *See* Sheketoff Ex. 31 at 3-4 (interrogatory response identifying individuals involved with the press release). It is undisputed that Brogan personally had set Sheketoff's compensation adjustments, was familiar with his reasons for doing so, and testified based on his personal knowledge that the notion Sheketoff "had been discriminated against was just a lie." Chase Ex. 77, Brogan Tr. 30:9-10; *see also id*. at 28:2-30:7. Shumaker and Lovitt also had first-hand knowledge related to those compensation adjustments and each had participated in the evaluation process during Sheketoff's tenure at Jones Day. *See, e.g.*, Chase Ex. 81, Shumaker Tr. 308:10-337:7; Chase Ex. 83, Lovitt Tr. Vol. II 121:20-128:11; Chase Ex. 16; Chase Ex. 18. Heifetz had reviewed all of Sheketoff's evaluations and discussed with both Sheketoff and Partner A their experience working with each other and Partner A's evaluation of Sheketoff. Chase Ex. 82, Lovitt Tr. Vol. I 152:15-153:10, 202:14-204:4; *see also* Chase Ex. 19 at JD_00003121. Defendants also incorporate by reference their responses to Statements 423 and 425.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The vast majority of Jones Day's answer (beginning with "But those involved") is nonresponsive and should be disregarded.

**425.**    Shumaker and Partner A both acknowledged that they did not have a basis to conclude that Julia did not genuinely believe her claim.  Chase Ex. 84 (Partner A) at 265:3-14 ("No, I don't think you're lying."); Chase Ex. 81 (Shumaker) at 291:6-25 ("I can't crawl into your heads")

**RESPONSE:** Disputed. Plaintiffs mischaracterize the evidence by selectively reciting isolated testimony taken out of context. Shumaker testified: "I'm looking at the objective facts as they were presented to me, as someone who is a practicing lawyer at this point in time for 28 years…. It's a lie to suggest that your salary was cut in relative terms based on a negative review

from a partner. In fact I saw your compensation going the other way. You had no basis to make that. Whether it was a lie, it's—it's simply untrue…. I believe these are untruths. Whether you want to take the negative, pejorative approach to untruth being a lie, I'll leave that to you. We found it untrue in basis…. I can't crawl into your heads. You are smart people. I don't know how you could come to that erroneous conclusion and not understand that it was a lie." Chase Ex. 81, Shumaker Tr. 289:15-292:2. Partner A had no involvement in drafting the press release and is therefore irrelevant to this assertion. *See* Sheketoff Ex. 31 at 3-4 (interrogatory response identifying individuals involved with the press release).

**REPLY:** Jones Day does not dispute that Partner A acknowledged that he had no basis to conclude that Julia did not genuinely believe her claim.  Instead, Jones Day asserts that the undisputed fact is "irrelevant."  It is obviously relevant that the one person with personal knowledge of the discriminatory review disclaimed any basis to disbelieve that Julia thought he had written a discriminatory review.  It is also relevant that Jones Day never bothered to talk to Partner A before publicly accusing Julia of lying.

**426.**   Purporting to refute Julia's pay discrimination claim, the press release asserts that Julia "was a highly paid associate who made more than her husband despite the fact that her reviews from multiple partners were mixed," maliciously insinuating that Mark was a subpar attorney who received a subpar salary under Jones Day's ostensibly merit-based black-box compensation system.  Chase Ex. 72 at 3.

**RESPONSE:** Undisputed that the quoted language appears in the press release.  The remainder of Statement 426 is disputed, including as improper argument and interpretation. Plaintiffs have no basis to represent to the Court that Jones Day "maliciously insinuate[ed]" anything, much less for representing that as an undisputed fact. It is an undisputed fact that at the

time of her departure from Jones Day, Sheketoff's salary was $525,000, and that Savignac's highest salary during his time at the Firm was $500,000. Chase Ex. 17 at JD_00000092; Chase Ex. 43 at JD_00003260. It is likewise undisputed that Sheketoff received both positive and negative evaluations from other attorneys during her tenure at Jones Day, and was rated and ranked as one of the worst associates in her cohort within Jones Day's Issues & Appeals practice. *See* Chase Ex. 15; Chase Ex. 24 at JD_00004024 (Sheketoff ranked 23 out of 24 for 2015 performance year); Chase Ex. 16 at JD_00004768 ranking for JP019917 (Sheketoff ranked 14 out of 18 for 2016 performance year); *see also* DSF ¶¶ 209, 216-22, 235, 242-49.

**REPLY:** Jones Day claims to dispute the insinuation made by the press release, but the dispute is not genuine.  The press release states that Julia made more than her husband and criticizes Julia's performance.  The upshot is that Julia was a subpar attorney, and that Mark was an even more subpar attorney, since he made less than she did.  Jones Day identifies no other interpretation of the statement.  Nor does it identify any other reason for mentioning Mark's salary, or for suppressing the fact that Mark was a year junior to Julia (despite its own admitted view that it is "materially flawed and misleading" to draw a comparison between an associate's pay and that of a more senior associate, *Tolton* Dkt. 169-5 at 3).   *See also* Merriam-Webster, https://www.merriam-webster.com/dictionary/insinuate (defining "insinuate" to mean "to impart or suggest in an artful or indirect way").

427.    Contrary to that insinuation, Mark received excellent evaluations and his merit-based $500,000 salary was the same as what Jones Day's top-paid associates in the year above him had earned the year before.  Sheketoff Ex. 48 (Mark's evaluations); Dkt. 178 at 14 (Answer to TAC ¶¶ 68, 89).

**RESPONSE:** Undisputed that Savignac received positive evaluation and that his salary at the time of termination was $500,000. The remainder of Statement 427 is disputed, including as improper argument and mischaracterization of evidence. There is no evidence of what Jones Day's top-paid associates earned as of July 1, 2017, which is the year before Savignac received a compensation adjustment to $500,000. Paragraph 68 of the cited pleading refers to certain salaries as of July 1, 2016. Paragraph 89 merely admits that Savignac's salary effective July 2018 was $500,000.

**REPLY:** Again, Jones Day claims to dispute the insinuation made by the press release, but the dispute is not genuine.  The press release states that Julia made more than her husband and criticizes Julia's performance.  The obvious upshot is that Julia was a subpar attorney, and that Mark was an even more subpar attorney, since he made less than she did.  Jones Day identifies no other interpretation of the statement.  Nor does it identify any other reason for mentioning Mark's salary, or for suppressing the fact that Mark was a year junior to Julia (despite its own admitted view that it is "materially flawed and misleading" to draw a comparison between an associate's pay and that of a more senior associate, *Tolton* Dkt. 169-5 at 3).  *See also* Merriam-Webster, https://www.merriam-webster.com/dictionary/insinuate (defining "insinuate" to mean "to impart or suggest in an artful or indirect way").  Jones Day also asserts that this statement cites "no evidence" of what Jones Day's top-paid associates earned as of July 1, 2017.  That is incorrect.  As reflected in the cited evidence, Jones Day has admitted that the top-paid members of the class of 2010 made $425,000 as of July 2016. Dkt. 178 at 14 (Answer to TAC ¶¶ 68).  And it is asserted in its own statement of facts that those same individuals made $500,000 as of July 2017.  JDSF ¶ 268.  That plainly supports the assertion that the top-paid individuals in the class of 2010 made $500,000 as of July 2017.  Despite having ready access to all salary data, Jones Day notably fails

to identify any controverting evidence.  That fails to create a genuine dispute of fact.  See Fed. R. Civ. Proc. 56(c)(1).

428.    Julia was paid slightly more than Mark as a result of her earlier graduation year (2010), making Jones Day's direct comparison of their salaries meaningless and willfully misleading. JDSF ¶ 230 (Brogan increased Julia's pay "in line with her peers" in the Class of 2010); Sheketoff Ex. 104 at JD_00000043 (████████████████████████████████████████████ ████████████████████████████████████).

**RESPONSE:** Disputed, including as argumentative interpretation.  Plaintiffs have no basis to represent to the Court that Jones Day was "willfully misleading," much less for representing that as an undisputed fact. The evidence cited in Statement 428 describe specific pay increases for Sheketoff and Savignac at certain points in their Jones Day career; they do not demonstrate the Firm's intent with respect to its truthful, undisputed statement in the press release that Sheketoff was paid more than Savignac. *See* Answer at ¶ 137 (confirming Sheketoff's salary at $525,000) (ECF 178); ¶ 89 (confirming Savignac's salary at $500,000). It is an undisputed fact that Sheketoff was paid more than Savignac. *See* Pls. Resp. DSF ¶ 446.

**REPLY:** This statement is not genuinely disputed.  Jones Day does not dispute that Julia was paid slightly more than Mark as a result of her earlier graduation year.  It has also represented to this Court that is "materially flawed and misleading" to draw a comparison between an associate's pay and that of a more senior associate.  *Tolton* Dkt. 169-5 at 3.  In light of that undisputed evidence, any jury would conclude that Jones Day direct comparison of their salaries was willfully misleading.

**429.**    Jones Day has itself represented to this Court that it is "materially flawed and misleading" to draw a comparison between an associate's pay and that of a more senior associate. *Tolton* Dkt. 169-5 at 3.

**RESPONSE:** Filings in a separate lawsuit cannot be presented in an admissible form as evidence in this case. The remainder of Statement 426 also is disputed as argumentative. Jones Day's legal defense of the claims in *Tolton* are materially different from pointing out the relevant and undisputed fact that Sheketoff was making allegations of gender-based pay discrimination while knowing that she was paid more highly than her male spouse despite her own mixed performance record. Defendants also incorporate by reference their response to Statement 426.

**REPLY:** Jones Day disputes this statement on the ground that "[f]ilings in a separate lawsuit cannot be presented in admissible form as evidence in this case," but it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  Jones Day's own statements (through counsel or otherwise) are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  There is no exception to the admissibility of an opposing party's statements for statements that were made in another lawsuit as opposed to some other context.  (The one exception, for responses to requests for admission under FRCP 36(a)(1), confirms the general rule that a party's statements in litigation are admissible against that party in other litigation.)  Jones Day also disputes some unidentified portion of this statement (the "remainder") as argumentative.  That vague and conclusory assertion is inaccurate and an illegitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

430.    The press release asserts, in response to Julia's allegation that Jones Day doctored the photo of her taken for its website to "lighten Julia's skin and narrow her nose" and with "[t]he apparent purpose" of making her "appear more Caucasian and (in the opinion of the editor) more attractive" (Dkt. 1 at 8 (Compl. ¶¶ 59-62)), that, "in fact, Ms. Sheketoff personally selected the precise photo that was used on the [f]irm's website," maliciously insinuating that Julia had somehow lied about the doctored photo.  Chase Ex. 72 at 3.

**RESPONSE:** Disputed, including as argumentative interpretation.  Plaintiffs have no basis to represent to the Court that Jones Day was "maliciously insinuat[ed]" anything, much less for representing that as an undisputed fact. Sheketoff's sensationalistic and gratuitous allegation that Jones Day doctored her photo to make her look more Caucasian—in a case with no race-based discrimination claim—were false and misleading for several reasons, including because it is undisputed that the photographer is not an employee of Jones Day, and that Jones Day has never instructed the independent photographer to alter any attorney's photo (including Sheketoff's) in order to confirm to some standard of beauty, change the attorney's racial appearance, or change his or her overall physical appearance, Rosenberg Decl. at ¶¶ 7-8; because it is undisputed that Sheketoff personally selected the photograph posted to Jones Day's website, Chase Ex. 80, Sheketoff Tr. 162:6-169:17; because it is undisputed that the purportedly doctored photo was never posted to the Jones Day website, *id.*; and because it is undisputed that when Sheketoff expressed dissatisfaction with the photo, the Firm worked with her to find a substitute that she did approve, *id*.

**REPLY:** This statement is not genuinely disputed.  While Jones Day tries to dispute its press release's insinuation, the dispute is not genuine.  Jones Day does not dispute that the press release responded to Plaintiffs' allegation about the doctoring of Julia's photo by asserting that

Julia had "personally selected the precise photograph."  Nor does it dispute that such a response

conveys that Julia had lied about her photo being doctored.  Those parts of this statement are

therefore admitted (Standing Order 10(d)(iv)-(v); Local R. 7(h)(1)), and they plainly support this

statement's assertion that Jones Day willfully insinuated that Julia had lied about her photo being

doctored.  *See also* Merriam-Webster, https://www.merriam-webster.com/dictionary/insinuate

(defining "insinuate" to mean "to impart or suggest in an artful or indirect way").  The bulk of

Jones Day's response (beginning with "Sheketoff's sensationalistic and gratuitous allegation") is

nonresponsive to this statement and should be disregarded.  This statement makes an assertion

about the insinuation made by the press release, whereas Jones Day makes irrelevant arguments

about why the Complaint's allegations about the doctoring of Julia's photo were supposedly "false

and misleading."  In any event, Jones Day does not dispute that Julia's photograph was doctored

to lighten her skin and narrow her nose.  It simply claims that it didn't instruct the photographer to

doctor Julia's photograph and that the photographer was not an employee of Jones Day.  Even if

those things were undisputed and relevant (they are not), the fact remains that *Jones Day did not*

*say them*.  By instead responding to Julia's allegation as it did, it insinuated that Julia had lied

about her photograph being doctored.

**431.**    Contrary to that insinuation, Julia's complaint was about the doctored photo that Jones

Day proposed to post to its website; she never "selected" that doctored version, and she has never

complained about the un-doctored version that was ultimately used on the website   Chase Ex. 80

(Sheketoff) at 165:8-170:6; Sheketoff Ex. 63.

> **RESPONSE:** Disputed, including as improper argument and mischaracterization of
>
> evidence. It is undisputed that Jones Day's statement in its press release that Sheketoff chose the
>
> photo on the Firm's website is true. *See* Chase Ex. 80, Sheketoff Tr. 162:6-169:17. Sheketoff

Exhibit 63 does not suggest otherwise; rather, Exhibit 63 is a communication between Sheketoff and a Jones Day staff member that demonstrates that Jones Day requested and obtained her unaltered photo from the photographer at her request. *See* Sheketoff Ex. 63 (Sheketoff email correspondence stating "Someone dropped off a hard copy of my photograph for the Jones Day website, and it looks like the photographer has digitally altered it. It's not a bad picture, but it doesn't really look like me, and I'd prefer not to have it on the website if possible. Is there a way to request the digitally unaltered version from the photographer?"); *see also* Chase Ex. 80, Sheketoff Tr. 169:10-17 (confirming unaltered photograph used on website). Defendants also incorporate by reference their response to Statement 430.

**REPLY:** While Jones Day purports to dispute this statement, the only part of this statement it seems to dispute is what its press release insinuated.  For the reasons described in Plaintiffs' reply on PSF ¶ 430, Jones Day's dispute about what the press release insinuated is not genuine.  Jones Day does not otherwise dispute any part of this statement.  The remainder of this statement is thus admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**432.**   While Jones Day now argues that the photographer did not legally qualify as its employee, that is not what the press release said.  Chase Ex. 72 at 3.

**RESPONSE:** Undisputed that the press release does not go into the nature of the legal relationship between Jones Day and the photographer who took Sheketoff's photo. Nor did it purport to describe in full Jones Day's response to all of Plaintiffs' allegations related to this issue. What Jones Day "now argues" and has argued at all times since the pleading stage is that Sheketoff's allegations related to her photograph are false and misleading, for a host of reasons, to which Plaintiffs have no factual rebuttal. *See* DSF ¶¶ 447-51.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

### III.    A reasonable jury could find that Jones Day discriminated against Julia.

#### A.    Julia received excellent performance reviews throughout her four years at Jones Day.

433.    During Julia's four years at Jones Day, she received the following reviews:

**RESPONSE:** Undisputed that Statements 434 to 466 quote from select evaluations of Sheketoff submitted to Jones Day's Non-Partner Evaluation system as part of the Firm's associate review process during Sheketoff's tenure, subject to any alterations or errors noted in response to individual Statements. Also undisputed that the year referenced in parentheses at the beginning of Statements 434 to 466 refers to the relevant year of performance for which Sheketoff was being evaluated, not the year in which the evaluation was drafted and submitted.

**REPLY:**  Jones Day admits this statement, yet insinuates that the Plaintiffs have quoted only "select" evaluations for Julia.   In fact, Plaintiffs have quoted *in full all* of the evaluations except for three that simply said they had no basis for assessment.  *See* Chase Ex. 15 at JD_JS_00001292, 1295, 1298 (Tuell, Holmes, O'Reilly: "No basis for assessment").

434.    Yaakov Roth (2017): "On the ████████ matter, I let Julia take the lead in analyzing the record, evaluating which arguments to press on appeal, and drafting the brief after consultation with me about structure and substance. The result was very strong. Julia's written advocacy has really improved over the past couple of years, in terms of style and structure. Her legal ability was always excellent (and remains so). With additional experience, her judgment about litigation strategy has also sharpened noticeably. On the ██████ case, I took the lead on briefing the opening brief on appeal, but Julia handled parts of the reply brief, and she was an invaluable resource in developing our arguments and revising the drafts to make them as strong as possible.

Indeed, she is a very effective editor and I often ask her for comments on my briefs in other matters. In my experience, Julia is at her best when emotionally and intellectually invested in the matter, and that was true for all of the matters on which we collaborated in 2017."  Chase Ex. 15 at JD_JS_00001290.

**RESPONSE:** Undisputed that Statement 434 quotes a review regarding work done by Sheketoff in 2017.

**435.**   Kerri Ruttenberg (2017): "Julia really stepped up and took ownership of the ▮▮▮ ▮▮▮ matter. She was the team's primary strategist, the client's main contact, and the Jones Day representative interfacing with joint defense counsel. Her strategic thinking was nuanced and she added tremendous value to the joint defense team by providing thoughtful, well-written drafts of briefs, motions and jury instructions. She thought carefully and creatively about how to address the government's charges in an environment ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. Julia also did an excellent job in court arguing a motion on our client's behalf. She was able to keep the judge focused and was polished in her presentation. Throughout the matter, Julia exercised good judgment regarding what to handle independently versus what to run by me. She kept me in the loop on important case developments and ran her ideas by me for input I was particularly impressed with Julia's growth in identifying arguments that, while legally sound, likely wouldn't carry the day with a judge or jury. Julia really shined on this matter and I had tremendous confidence in her."  Chase Ex. 15 at JD_JS_00001290.

**RESPONSE:** Undisputed that Statement 435 quotes a review regarding work done by Sheketoff in 2017, subject to typographical errors in Statement 435 that are inconsistent with the referenced exhibit.

**436.**     Ruttenberg also filled out a section called "Goals," which asks the evaluator to "[p]lease identify key areas for development or improvement for this associate to pursue over the coming year, including developmental areas necessary for the associate to progress in his or her practice and areas that may contribute to the associate enhancing his or her professional profile end leadership skins."  Chase Ex. 28 at JD_00005182.  She wrote: "The one area I'd suggest for Julia's development is to take more opportunities to supervise associates below her. Julia had a challenging experience with a junior associate who was under-performing. Julia's initial reaction was to simply stop assigning him work. Eventually, we discussed the situation and, to her credit, she agreed to speak with the associate directly to discuss her expectations and his performance. We talked through how this could be approached, and she confronted the associate for a constructive but honest discussion. She circled back with me and said the conversation went very well, and that the associate's performance improved thereafter. The more Julia has opportunities to supervise, the more comfortable she'll feel in that role."  Chase Ex. 15 at JD_JS_00001290.

     **RESPONSE:** Undisputed.

**437.**     Nat Garrett (2017): "I worked with Julia on a Supreme Court merits brief, and so had extensive exposure. Julia is a pleasure to work with, she blends right into a team and took the initiative to draft substantial portions of the brief, while lending a hand in any way she could. Julia is very strategic, and thinks ahead to how arguments will be received or the collateral consequences of those arguments. I came to trust Julia deeply and would often call to get her reaction on important strategic decisions.  **Goals**: I have used Julia on a number of appellate matters now, and she is always great in that support role. I hope she is getting opportunities to be the lead I&A lawyer on certain cases because she is ready."  Chase Ex. 15 at JD_JS_00001290.

**RESPONSE:** Undisputed that Statement 437 quotes a review regarding work done by Sheketoff in 2017.

438.     Charlotte Taylor (2017): "Julia was the indispensable heart of our team on this Supreme Court matter. She had unparalleled mastery of the legal and factual issues and did an outsized share of excellent work developing our briefing strategy and writing (and re-writing) the brief. She also did a great job supervising more junior lawyers on research projects. When prepping for oral argument, her command of the record and legal universe also made her extremely effective--she caught all the angles and made sure we had answers to the tough questions. If I had to identify an "area needing improvement," it would be to work on simplifying and boiling down arguments in order to get them across most effectively. She's always incisive and detailed, but is sometimes ahead of her audience. However, the flip side of that is that nothing gets past her! In short, she's a formidably smart and talented appellate lawyer, and I always enjoy working with her. **Goals**: If she's not already doing so, Julia should pursue opportunities to deliver solo oral arguments, including before appellate courts." Chase Ex. 15 at JD_JS_00001290.

**RESPONSE:** Undisputed that Statement 438 quotes a review regarding work done by Sheketoff in 2017.

439.     Glen Nager (2017): "Julia is a joy to work with. She is passionate about her work; a hard worker; thoughtful in her analysis; wanting to improve and excel; and a very good writer. She is extremely dependable. She has a great attitude and inspires others as a result. **Goals**: Julia worked more directly with Yaakov, so I would defer to his assessments in this regard." Chase Ex. 15 at JD_JS_00001291.

**RESPONSE:** Undisputed that Statement 439 quotes a review regarding work done by Sheketoff in 2017.

**440.**   Lou Fisher (2017): "Julia gave a star performance in this pro bono criminal appeal. It involved two very complex issues, one jurisdictional and one related to sentencing. Julia worked tirelessly to examine every angle, think through every potential issue, and exhaustively research a long list of topics. She did a great job fielding comments from cocounsel and from co-defendants' counsel—she was diplomatic and made appropriate accommodations while holding firm where adopting suggestions would have been counterproductive. Julia's briefs were outstanding—the writing was clear and, despite the difficulty of the arguments, she provided persuasive reasoning and struck a tone that effectively conveyed credible confidence without stridency. Julia's oral argument was equally or even more masterful. She was articulate and persuasive, struck the right tone, was fully responsive to questions, and showed great judgment and an ability to think quickly on her feet. Julia really seemed to have the respect of all three judges, whereas the panel appeared frustrated with the experienced government lawyer on the other side. We came out of the argument much more optimistic (or less pessimistic) than when we went in. A decision hasn't been issued, but Julia did fabulous work to maximize the chances of success."   Chase Ex. 15 at JD_JS_00001291.

**RESPONSE:** Undisputed that Statement 440 quotes a review regarding work done by Sheketoff in 2017, subject to typographical errors in Statement 440 that are inconsistent with the referenced exhibit.

**441.**   Karl Thompson (2017): "I worked with Julia on the motion to dismiss and supporting reply brief in ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████. Julia did the first draft of both briefs. Her work on both was first-rate. On the opening brief, apart from drafting a new paragraph in the Introduction,

I would say my contributions to the brief were relatively minor. This is because her draft was truly excellent. We discussed certain concepts related to standing (e.g., ███████████████████ ███████████████████████████) and other issue her grasp of the law and cases was impressive. It is also relevant that this was a difficult motion to write, because the Complaint was actually ███████████████████████. Julia thought creatively to come up with convincing arguments for why, appearances to the contrary notwithstanding, the Complaint failed to state a claim. She delivered her draft on the promised timeframe. And working with her on editing and refining the draft was a pleasure. She is personable and has a friendly demeanor that avoids unnecessary stress, but still maintains very high levels of seriousness and focus. She is also impressively dogged and firm in her defense of the client's interests. Her draft for the reply brief was also excellent, and delivered at the promised lime. This was an even more challenging brief to write, because the plaintiffs' opposition brief was ████████████████████████ ██████████. Julia did a lot of excellent work figuring out exactly what plaintiffs were trying to argue (or could best be surmised to have been trying to argue), and then responding appropriately. I did more editing on this draft, but I think that is because the huge amount of work involved in hacking through the plaintiffs' brief and figuring out what they were saying and how to respond, combined with the short amount of time we had to work on the brief, left her a little short on time to then impose a firm expository structure on the brief. That was my main contribution in editing; I think the division of labor was effective. She certainly took ownership of the project, proposing reasonable deadlines that I then accepted, coming to talk over questions that required discussion, but otherwise working independently and (as far as I could tell) efficiently. She also talked frequently to other lawyers in Columbus and Cleveland who are also working on the case.  **Goals**: As described above, Julia's work was excellent. I think she is already an excellent

writer, and has skills of clear exposition and organization. I think she should continue to refine and hone those skills, making sure her writing is as clear and accessible as possible even to people who aren't as knowledgeable or as smart as she is. She already can do this and does it; it's just something we can all continuously work on and improve on." Chase Ex. 15 at JD_JS_00001291.

**RESPONSE:** Undisputed that Statement 441 quotes a review regarding work done by Sheketoff in 2017.

442. Ben Mizer (2017): "Julia worked with me on a series of memos in the ███████████ ████████████████████████████████████. Julia's research into and grasp of various complex areas of law—including labor law and criminal scienter requirements—was exceptional. She also did an excellent job drafting a memo for the client summarizing the risks. The memo was challenging to write because we were not privy to many of the facts that were being developed, but Julia nonetheless was able to craft very helpful guidance. And her positive attitude and constant availability to do work even when she was swamped with other matters was impressive and greatly appreciated. **Goals**: Julia is an excellent attorney and will, I'm sure, only to continue to stand out as she gains even more experience." Chase Ex. 15 at JD_JS_00001291.

**RESPONSE:** Undisputed that Statement 442 quotes a review regarding work done by Sheketoff in 2017, subject to typographical errors in Statement 442 that are inconsistent with the referenced exhibit.

443. Beth Heifetz (2017): "Julia stepped in to take over this case when another associate went out on leave. The transition was seamless and Julia provided high level thinking and writing as we explored potential challenges to the ██████████████." Chase Ex. 15 at JD_JS_00001292.

**RESPONSE:** Undisputed that Statement 443 quotes a review regarding work done by Sheketoff in 2017.

444.    Shay Dvoretzy (2017): "My work with Julia this year was limited, but she contributed enthusiastically to business development efforts and demonstrated good analytical abilities in doing so."  Chase Ex. 15 at JD_JS_00001292.

**RESPONSE:** Undisputed that Statement 444 quotes a review regarding work done by Sheketoff in 2017.

445.    Hank Asbill (2016): "I love working with Julia. She is very smart, takes total ownership of her projects and is dogged about pushing for what she wants with everyone opposed to her position. She is very good with clients and seems to really like being a defense lawyer. My only concern about Julia is that she personally stresses a lot when she cannot accomplish what she thinks is the right, just resolution. She never gives up but finds it very hard to accept adverse results or decisions. In my line of law practice, you have to learn to balance the inevitable (hopefully not frequent) bad results while taking total responsibility even for things outside your control without becoming depressed. It's sort of like football cornerbacks or hockey goalies—you have to have a short memory and eternal optimism.  **Goals**: N/A."  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed that Statement 445 quotes a review regarding work done by Sheketoff in 2016.

446.    Yaakov Roth (2016): "I worked most extensively with Julia on the ▇▇▇▇▇ case. She is at her best when she is passionate about her clients, and this case is a good example. When trial counsel produced a ▇▇▇▇▇▇▇▇▇, Julia rewrote it almost entirely in a short period of time, and her work was very strong. She also researched and developed a clever argument that succeeded in acquitting our client on the most serious charge of ▇▇▇▇▇▇. She is a

smart and capable lawyer with good judgment. Her written advocacy has improved since last year, in structure and style. I think it can be further improved by focusing more on the audience: judges who are usually less sophisticated legally and less immersed in the facts. This requires simplifying and dumbing things down. Another area for improvement would be time management—ensuring that tasks are being tracked; providing regular updates to supervisors; and adhering to deadlines." Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed that Statement 446 quotes a review regarding work done by Sheketoff in 2016.

447.   Charlotte Taylor (2016): "Julia is an extraordinarily sharp and subtle legal thinker from whose insights I have repeatedly benefited. She is an excellent writer and an effective researcher. She contributed essential help to our project by framing the complex issues at a high level to ensure a clear and precise presentation; by digging into the weeds of state law and nailing down support for our points; and by putting together a cogent and fluidly written draft of our brief. I also appreciated her consistent willingness to help out with the various smaller tasks, whether interesting or frustrating, that arose along the way. I am always happy to work with her.  **Goals**: N/A." Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed that Statement 447 quotes a review regarding work done by Sheketoff in 2016.

448.   Partner A (2016): "█████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████. This was a complicated issue because it required Julia to learn about ERISA and procedures to enforce judgments internationally. It was also a fact-intensive analysis because

███████████████████████████████████████

██████. As one might expect, given Julia's superior academic credentials and SCOTUS clerkship, the research and learning the material presented no problems. But her initial drafts were far more academic / pure legal analysis than helpful advice to the client. In fact, there was little-to-no advice or direction to the client. That improved in subsequent drafts, however. My impression of Julia is that she is not long for firm life. She's just not that into us. Almost nothing about her work on this case suggests otherwise. She exhibits little-to-no initiative. Rather, like a second year associate, she merely does what is asked of her.  And her availability seems to be whatever is convenient for her. On multiple occasions, I asked for the next version of the memo, but she was tied up on other things.  Working on a weekend does not seem to be in her vocabulary. And my guess would be that she did not bill 2000 hours last year. My guess is that she will soon leave to become Professor Sheketoff.  **Goals**: See above." Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed that Statement 448 quotes a review regarding work done by Sheketoff in 2016.

449.    Nat Garrett (2016): "Julia is a very skilled writer. I have worked with her on a couple of Ninth Circuit appeals now and her writing is always persuasive, and needs little editing. I also like that Julia was brave enough to ask for an oral argument, which I thought she deserved and is ready for. For whatever reason, I've got the sense that Julia is a bit protective of her time, and there

were some additional projects I would have liked to get her involved in.  **Goals**: This is the time

for Julia to take the brakes off and let er rip. She has an argument coming up for ███████ which

she has prepared hard for, and I expect her to do very well. To progress further, I think Julia needs

to do more of the same, stepping up on projects and taking on additional responsibilities, even if

it feels a bit overwhelming." Chase Ex. 15 at JD_JS_00001294.

    **RESPONSE:** Undisputed that Statement 449 quotes a review regarding work done by

Sheketoff in 2016.

**450.**    Mary Hale (2016): "Julia did a great job successfully representing our client ███████

████████████████████████████████. She is an excellent writer, and also did an

outstanding job summarizing the case for the judge. So good, in fact, that after the judge satisfied

herself that the testimony would be consistent with Julia's summary, she dispensed with further

testimony. Julia is also very flexible with the give and take of litigation, and easy to work with.

She is quite talented and an asset to the firm.  **Goals**: N/A." Chase Ex. 15 at JD_JS_00001294.

    **RESPONSE:** Undisputed that Statement 450 quotes a review regarding work done by

Sheketoff in 2016.

**451.**    Glen Nager (2016): "Although I had only limited opportunity to work with Julia, I

found her to be fun to work with and to make a helpful contribution.  **Goals**: I did not have

sufficient interaction with Julia to form any judgments about developmental needs." Chase Ex. 15

at JD_JS_00001294.

    **RESPONSE:** Undisputed that Statement 451 quotes a review regarding work done by

Sheketoff in 2016.

**452.**    Partner J (2016): "Julia researched a variety of issues relating to the ███████████

███████████ and then drafted a motion to ██████████████████. Her research and work

product was satisfactory, and the case team revised and molded the draft motion substantially before filing. The legal arguments in Julia's drafts were helpful, but could have been presented with more passion, creativity, and using the facts of our client in more persuasive fashion. The draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an advocate for a client. The work also could have been completed more timely and with more intensity in defending the client's interests. Julia was obligated to a number of other projects that detracted from her overall effectiveness here."   Chase Ex. 15 at JD_JS_00001294.

      **RESPONSE:** Undisputed that Statement 452 quotes a review regarding work done by Sheketoff in 2016.

**453.**   Lou Fisher (2016): "Julia brought in this pro bono Supreme Court ███████ and asked me to supervise. She didn't need much guidance at all—she took full ownership and, supervising a junior associate, handled all aspects. The drafts were excellent, and Julia did a great job analyzing and talking through some tricky issues. Julia did especially well supervising the associate, giving him appropriate amounts of guidance and leeway, so that he seemed to enjoy and learn from the experience while producing excellent work product. She also diplomatically convinced █████████████████████████████████████. In all, Julia showed a strong ability to lead a small briefing team."  Chase Ex. 15 at JD_JS_00001294.

      **RESPONSE:** Undisputed that Statement 453 quotes a review regarding work done by Sheketoff in 2016.

**454.**   Kerri Ruttenberg (2016): "Our activity on this matter was more limited this year. Still, Julia has consistently demonstrated a strong strategic sense in this case. She has a nuanced understanding of our case facts and her suggestions on how to proceed -- which arguments to press

and which to give up -- demonstrate excellent judgment. Julia is also a pleasure to work with, as she has a great attitude and sense of humor. I look forward to working with her on another matter. **Goals**: I had the opportunity to see Julia in a stand-up role on another matter and I thought she did great. I'd love to see her get more such opportunities." Chase Ex. 15 at JD_JS_00001294.

 **RESPONSE:** Undisputed that Statement 454 quotes a review regarding work done by Sheketoff in 2016.

 455. Chris Vergonis (2016): "Julia drafted a short section of an opposition to dismiss on jurisdictional grounds in ███████████████████████████████. She asked Jackie Holmes to evaluate, but Jackie and I have agreed that I am better positioned to do so. Julia's short section (just two or three pages), on associational standing, was very well written and argued and needed virtually no editing for style or substance. I did shorten for length (only because we were up against a light page limit and *not* because of any wordiness); following my revisions, Julia took the initiative to question whether the cuts caused the legal analysis lo be loo truncated. Though I ultimately disagreed with her assessment on that point, I appreciated both her care to detail and that, despite being a peripheral player on this case team, she wasn't bashful about speaking up and challenging a decision that had been made." Chase Ex. 15 at JD_JS_00001295.

 **RESPONSE:** Undisputed that Statement 455 quotes a review regarding work done by Sheketoff in 2016.

 456. Hank Asbill (2015): "For someone 6 years out of law school with only one minor trial to her credit, Julia is exceptional. She is very smart and articulate, writes and analyzes legal issues very well and deeply cares about the client. Her witness cross examinations were strong and her writing was compelling. This was a very difficult case with a ██████████████████ ████████ and frustrating co-defendants' counsel— ███████████████████████

██████████████████████. Everyone was impressed by Julia and I think her self confidence (already very strong) improved dramatically over the life of the case. ████████████████ ████████████████████████. I would be glad to work with Julia on any matter. She constantly challenges herself and those around her and does not give up. As for the ███████ matter, Julia got to represent the client on her own in a ██████████████████ where the lawyer is supposed to be a potted plant. The client, because of Julia's prep, did well and was ultimately allowed to ████████████." Chase Ex. 15 at JD_JS_00001297.

**RESPONSE:** Undisputed that Statement 456 quotes a review regarding work done by Sheketoff in 2015.

**457.** Yaakov Roth (2015): "On the ██████ matter, Julia played a very effective role in coordinating the ███████ defense and representing him at the ████████ hearing. She kept track of the evidence, interviewed the witnesses, and assisted with drafting various letters. It was great fun working with her and she displayed impressive trial skills. On the ████████ matter, Julia prepared first drafts of the opening and reply briefs and also assisted me in preparing for oral argument. She is very smart and it was a pleasure to discuss the legal issues with her, including during the outlining phase. Her research and mooting help were also invaluable in connection with the oral argument. Her initial written draft of the opening brief was not as strong as it could have been, I think because she was not persuaded by our argument on the merits and found it difficult to transition from the law-clerk role to the advocate role. Her reply draft was considerably improved, although she did have some difficulties meeting the deadlines we had set for that draft." Chase Ex. 15 at JD_JS_00001297.

**RESPONSE:** Undisputed that Statement 457 quotes a review regarding work done by Sheketoff in 2015.

**458.**   Hashim Mooppan (2015): "This is a difficult review for me to give. On the positive side, I really like Julia personally, I enjoy discussing legal issues with her, and I do think that she's pretty sharp. Nevertheless, my experience supervising her on this case was quite negative, on a variety of fronts. To begin, her writing was very poorly structured—the usual type of problem with recent clerks who haven't yet figured out the transition to advocacy writing, but to a much more significant degree than I would expect for someone with her pedigree, who should know the basic do's and don'ts of appellate briefing. I had to revise much more extensively than should have been necessary in this case. Likewise, her oral advocacy in the moot courts leading up to her argument was so poor in terms of both substance and presentation that I was truly worried about how the actual argument would go—while it ended up fine, the judges weren't very active, so it's hard to tell how she would have held up with a more active bench. Part of the problem with the moot courts was lack of preparation, and that in turn was due in part to a lack of judgment: she took a vacation to London a few weeks before the argument, ███████████████████████████ ████████████████████████████████████████, as that ate into her argument prep time. Moreover, while the Court's ████████████████████████████████, she dealt with it extremely poorly—excessively complaining, not really trying hard to develop the best argument on the ████ and challenging issue, failing to find cases that the judges themselves ended up finding, and even repeatedly suggesting that she would withdraw from a ███████████ ████████████████████████████████████. Finally, especially in light of all of the above, I think the amount of time she spent on this pro bone case seemed quite excessive; it shouldn't have taken nearly this long, especially given the quality of what she produced. In sum, although I hate to say it, I think her work on this case was immature across the board—both in terms of substantive execution and professional comportment I wouldn't want to

work with her again unless and until others have noted significant improvements on at least some of the above."  Chase Ex. 15 at JD_JS_00001297.

**RESPONSE:** Undisputed that Statement 458 quotes a review regarding work done by Sheketoff in 2015.

459.    Kerri Ruttenberg (2015): "Julia did a terrific job on this project. She quickly grasped the nuances of our legal arguments, and thought creatively and strategically about how to address challenges. I don't have a great sense of how much of the written product I saw was exclusively Julia's (versus how much was edited by Yaakov), so it's tough to evaluate her written work. But, based on early drafts—as well as Julia's strong grasp of our issues that was evident during our oral communications—I think she's doing very well. I was also impressed with Julia's efforts to secure amici for this case - she contacted folks in her network, and then worked closely with amici that ███████ secured for us, marshaling the amicus briefs through to completion. She led calls with counsel for our amici and did a terrific job presenting comments and edits to their drafts. Overall, a very strong performance on this case.  **Goals**: I'd encourage Julia to keep taking opportunities to add to her experience, whether it's writing, research or oral presentation. Based on her performance in this case, she's doing very well and is on a great trajectory."  Chase Ex. 15 at JD_JS_00001298.

**RESPONSE:** Undisputed that Statement 459 quotes a review regarding work done by Sheketoff in 2015.

460.    Nat Garrett (2015): "Julia is very bright and writes very well. I asked Julia to help with an appellate brief and she did just what an enterprising associate ought to: develop not only the ideas I have mentioned but come up with her own creative and persuasive arguments.  **Goals**: Going forward, Julia's challenge will be working quickly and efficiently. My sense is that Julia's goal is perfection, which isn't always feasible in law practice. Her work is very solid, and she

needs to trust her instinct to properly balance quality with time constraints."  Chase Ex. 15 at JD_JS_00001298.

**RESPONSE:** Undisputed that Statement 460 quotes a review regarding work done by Sheketoff in 2015.

461.    Glenn Krinsky (2015): "I once again turned to the Issues and Appeals practice when a major client of ours (███████ needed a speedy and complex matter of statutory interpretation resolved for it. While the issues arose in a ████████ setting, the project was really a matter of complex and gnarly statutory interpretation, and I thought that one of our former Supreme Court clerks would be well-suited for the assignment. Under significant time pressure, Julia did an absolutely stellar job. She produced a definitive memorandum that clearly and plainly answered the client's question. Julia demonstrated exceptional analytical ability and coupled that with concise and lucid writing. While the project was fairly limited and contained, Julia performed brilliantly and I can only assume that she has a tremendous future at the Firm." Chase Ex. 15 at JD_JS_00001298.

**RESPONSE:** Undisputed that Statement 461 quotes a review regarding work done by Sheketoff in 2015.

462.    Mary Hale (2015): "Julia has done an outstanding job preparing the briefing necessary to obtain the predicate order for these ███████████████████████████. She has established a relationship of trust with the client ████████████████, which will hopefully lead to a successful outcome."  Chase Ex. 15 at JD_JS_00001298.

**RESPONSE:** Undisputed that Statement 462 quotes a review regarding work done by Sheketoff in 2015.

**463.**   Noel Francisco (2015): "This was a very small research project. Julia's work product was good, though did not give her an opportunity to demonstrate the full range of her talent. Julia was offered a larger opportunity in the matter but chose not to do it given other ongoing matters." Chase Ex. 15 at JD_JS_00001298.

**RESPONSE:** Undisputed that Statement 463 quotes a review regarding work done by Sheketoff in 2015.

**464.**   Beth Heifetz (2014): "This memo was among Julia's first projects upon coming to the Firm. She did a thorough and in depth analysis, demonstrating familiarity with the legal issues and an effective and easy style of writing."  Chase Ex. 15 at JD_JS_00001300.

**RESPONSE:** Undisputed that Statement 464 quotes a review regarding work done by Sheketoff in 2014.

**465.**   Nat Garrett (2014): "Julia helped us draft an appellate brief dealing with thorny First Amendment issues. I thought her analysis and writing was what I would expect from someone with her pedigree: refined and persuasive. She also operated well in a team that had been working on the case for far longer, making helpful suggestions where appropriate but recognizing when a different viewpoint prevailed. My one suggestion for future improvement would be efficiency. Particularly with clients where, as here, a lower rate is approved, crafting persuasive briefs efficiently is imperative. I expect that as Julia transitions from a clerk to an attorney for paying clients, there will be improvement in this area.  **Goals**: N/A."  Chase Ex. 15 at JD_JS_00001300.

**RESPONSE:** Undisputed that Statement 465 quotes a review regarding work done by Sheketoff in 2014.

**466.**   Bob Naeve (2014): "Julia did a fine job ████████████████████████ ████  My interactions with her were limited.  **Goals**: N/A."  Chase Ex. 15 at JD_JS_00001300.

**RESPONSE:** Undisputed that Statement 466 quotes a review regarding work done by Sheketoff in 2014.

467.    Julia also received mostly the highest or second-highest ratings across her reviews. Chase Ex. 15.

**RESPONSE:** Undisputed that Sheketoff received a combination of numerical ratings from many reviewers in various categories, including (out of options from "0"—indicating no basis—to "5"), "0," "2," "3," "4" and "5." Disputed to the extent Statement 467 purports to suggest that Sheketoff exclusively received "4s" and "5s," or that her reviews were among the highest of associates, but not disputed if Statement 467 is intended to indicate that Sheketoff primarily received "4s" and "5s" in the numerical rating portion of her individual reviews. Chase Ex. 15.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make an assertion about whether Julia received "exclusively" 4s and 5s or whether her reviews were among the highest of associates.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

468.    Julia's assessment statement for her 2017 work states: "Julia's work this year was excellent and reflected significant growth. Her legal analysis and strategic thinking are superb, and her writing is very strong. She performed exceptionally well on her feet during oral arguments before the D.C. Circuit and a trial court. Julia shows great initiative, is deeply invested in her work, and has a terrific attitude that inspires others. She took a leadership role in multiple matters, doing well at and growing in the role of supervising more junior lawyers, working with difficult cocounsel, and interacting with clients. Julia works hard and is dependable. As she has acknowledged, Julia continues to have an imbalance between her billable and non-billable hours. The bulk of her pro bono work was on three cases. The first was a Supreme Court case in which

she prepared a partner for his first argument. The second case was a C. Circuit appeal that grew out of a case Julia and another associate took on in their first year at the Firm at the trial stage, which continued well into 2017 of the work ended up occurring when the other associate was out on leave. Julia gained trial and appellate argument experience in this case. In the third case, Julia and the other associate helped lead the defense's legal strategy for the more than 200 defendants. Julia again ended up handling the case when the associate involved went on leave. Julia presented argument in the D.C. Superior Court. It is essential that going forward, Julia will focus on billable work."  Chase Ex. 15 at JD_JS_1289.

**RESPONSE:** Undisputed, subject to typographical errors in Statement 468 that are inconsistent with the referenced exhibit.

**469.**   Julia's assessment statement for her 2016 work states: "Julia is an extremely smart and pleasant lawyer who grasps issues quickly and has great research skills.  Her writing is generally very strong, although at times her drafts need to be better tailored to their intended audiences.  For example, some of her writing was viewed as complicated for a judge who might not be as immersed in the law and facts; a client mem was too focused on pure legal analysis without accompanying advice; and a motion did not read enough like an advocacy piece.  Still, much of her written work was excellent and skillful.  Julia shows passionate commitment to some matters and seeks to take on responsibility, but in other matters does not take initiative and seems to be protecting her time. She is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the office generally.  Addressing these issues is critical to her development at the [f]irm."  Chase Ex. 15 at JD_JS_1289.

**RESPONSE:** Undisputed.

**470.** Julia's assessment statement for her 2015 work states: "Writes and analyzes legal issues well. Produces compelling witness examinations. Effectively coordinated defense of student at a disciplinary hearing and displayed impressive trial skills. Experienced difficulty on a project for one partner on a variety of fronts. Should work on transitioning to advocate role and improving writing and efficiency."  Chase Ex. 15 at JD_JS_1296.

**RESPONSE:** Undisputed.

**471.** Julia's assessment statement for her 2014 work states: "New to the [f]irm.  Thorough researcher and effective, refined writer.  Works well with a team, has an easy and pleasant manner." Chase Ex. 15 at JD_JS_1296.

**RESPONSE:** Undisputed.

**B.    Julia's relatively lower hours do not explain her low raise based on her 2016 work.**

**472.** Julia began working at Jones Day on October 27, 2014, and recorded approximately 58 hours on billable client representations during the remainder of 2014, implying an annualized billable hours amount of about 322 hours.  She received a $60,000 raise the next summer, to a salary of $360,000.  Dkt. 45 at ¶ 78.

**RESPONSE:** Disputed in part.  Undisputed that Sheketoff recorded 58 client billable hours in 2014 that would annualize to 322 hours; that she received a $60,000 raise the next summer; and that her salary thereafter was $360,000. Disputed to the extent Statement 472 is meant to imply a causal link between these disparate facts. *See* Response 482.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make an assertion about causation.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**473.**    In 2015, Julia recorded approximately 179 hours on billable client representations.  She received a $65,000 raise the next summer.  Dkt. 45 at ¶ 79.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff recorded 179 client billable hours in 2015 and that she received a $65,000 raise the next summer. Disputed to the extent Statement 473 is meant to imply a causal link between these disparate facts. *See* Response 482.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make an assertion about causation.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**474.**    In 2016, Julia recorded approximately 1066 hours on billable client representations. That is also the year that she worked for Partner A. She received a $15,000 raise the next summer, after Partner A submitted his negative review.  Dkt. 45 at ¶ 80.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff recorded approximately 1066 hours on billable client representations in calendar year 2016; that she worked with Partner A during 2016; that Partner A later submitted a review of Sheketoff's performance; and that, effective July 1, 2017, Sheketoff's salary was increased by $15,000. Defendants dispute Plaintiffs' characterization of Partner A's review as "negative" as an argumentative mischaracterization of the evidence not supported by the cited exhibit or consistent with the evidentiary record. Defendants further dispute Statement 474 to the extent it is meant to imply a causal link between these disparate facts. *See* Response 482.

**REPLY:** Jones Day disputes that Partner A's review of Julia is negative.  But as this Court has already explained, Partner A's evaluation conveys that Julia "was overly academic and not invested in the firm, and, presumably, for those reasons the firm should not be invested in her." *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 29 (D.D.C. 2020).  In any event, the negativity of the

review is self-apparent, Chase Ex. 15 at JD_JS_1293, especially in comparison to Partner A's other reviews, Chase Ex. 39.  Jones Day does not dispute any other part of this statement, which does not make an assertion about causation.  This statement is thus admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

475.    In 2017, Julia recorded approximately 573 hours on billable client representations. She received an $85,000 raise the next summer, leaving her salary at $525,000.  Dkt. 45 at ¶ 81.

**RESPONSE:** Disputed in part.  Undisputed that Sheketoff recorded 575 hours on billable client work in calendar year 2017; that she received an $85,000 raise the next summer; and that her salary thereafter was $525,000. Chase Ex. 15 at JD_JS_00001289. Disputed to the extent Statement 475 is meant to imply a causal link between these disparate facts. *See* Response 482.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make an assertion about causation.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

476.    During her time at Jones Day, Julia also worked thousands of hours on non-billable client pro bono representations.  Dkt. 45 at ¶ 81.

**RESPONSE:** Undisputed that, during the nearly four years Sheketoff was employed with Jones Day, she recorded 3,388 hours to non-billable client matters, including matters for pro bono clients. Chase Ex. 15 at JD_JS_00001289, JD_JS_00001296.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

477.    The number of Julia's billable hours each year was not a principal determinant of her salary while at Jones Day.  Dkt. 45 at ¶¶ 78-81; Sheketoff Ex. BB at JD_00001458 ("█████████

███████████████████████████████████████████████████

████████████████.”); Chase Ex. 77 (Brogan) at 215:14-216:1 (“Q: Do you look at hours? A:

Yeah, I look at hours, but I don't spend a lot of time on it.  Otherwise I wouldn't have given you

a raise in 2016…  Because I think you had—you had 50 client hours or something at that time.”).

**RESPONSE:** Undisputed.

**REPLY:** The correct citation of the second source in this statement is Sheketoff Ex.

152 at JD_00001458, not Sheketoff Ex. BB at JD_00001458.

**478.**   Indeed, the year for which Julia received the smallest raise was also the year that she

worked the highest number of billable hours.  Dkt. 45 at ¶ 82.

**RESPONSE:** Undisputed.

**479.**   Julia's relatively low hours for billable clients (and her substantially higher hours for

pro bono clients) do not suggest that Julia worked any less diligently or skillfully for her billable

clients than for her pro bono clients, and in fact Julia worked diligently and skillfully for both

billable and pro bono clients.  Sheketoff Decl. ¶ 19.

**RESPONSE:** Disputed as argumentative interpretation of the evidence.  Also disputed

that Sheketoff worked as diligently and skillfully for both billable and pro bono clients. Sheketoff's

practice leader—who observed Sheketoff throughout her tenure at the Firm, reviewed all

evaluations of Sheketoff's performance, and was responsible for rating and ranking all associates

in Sheketoff's practice group—considered “Sheketoff to be interested in pro bono work, but much

less interested in doing work for the corporate clients that compromise a significant portion of our

paying client work.” Heifetz Decl. ¶ 8. Others within Jones Day with responsibility for the

firmwide associate review process concluded that Sheketoff—who admittedly joined Jones Day

for the money and opportunity to do pro bono work—was not “interested in the private practice of

law" and "probably should be counseled out of the firm." Chase Ex. 83, Lovitt Tr. Vol. II 89:21-22, 125:5-6.

**REPLY:** Jones Day does not genuinely dispute this statement.  It purports to dispute the statement as argumentative interpretation of the evidence, but that conclusory assertion is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day also says that Heifetz considered Julia to be more *interested* in pro bono work than billable work.   But that is not responsive to this statement, which is about whether Julia worked as diligently and skillfully for her billable clients as for her pro bono clients—not whether Heifetz inferred from Julia's hours that she had more interest in pro bono than billable cases.  Heifetz' only personal experience with Julia's work was on two pro bono matters and in both cases Heifetz reviewed Julia very favorably.  Chase Ex. 15 at JD_JS_00001300, JD_JS_00001292.  Lastly, Jones Day points to (hearsay) statements by Lovitt and another partner criticizing Julia's interest in private practice.  Even assuming those statements were admissible (though they are not), they are not responsive to this statement, which is about the quality of Julia's work for billable and pro bono clients, not her relative interest in pro bono over billable cases.  Jones Day presents no evidence controverting this statement's assertion that Julia's low hours do not suggest that she worked less diligently and skillfully for both billable and pro bono clients.  And indeed, Julia's reviews show that she worked skillfully and diligently for both her pro bono and billable clients.  *See* PSF ¶¶ 480, 712-713.  This statement is therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**480.**    Julia's reviews for her billable clients are equally positive as her reviews for her pro bono clients.  *See supra* at ¶¶ 433-66; *infra* at ¶¶ 712-13.

**RESPONSE:** Disputed as argumentative interpretation of the evidence. Undisputed that Sheketoff's evaluations included a mix of both negative and positive comments, including for work performed both on pro bono matters and matters for paying clients. *See generally* Chase Ex. 15. Sheketoff's evaluations caused her Practice Leader to conclude that Sheketoff was "interested in pro bono work, but much less interested in doing work for the corporate clients that compromise a significant portion of our paying client work." Heifetz Decl. at ¶ 8. *See also* Chase Ex. 19 at JD_00003121 (noting Sheketoff's agreement to "work harder to avoid creating a perception that she cares more about certain matters than others.").

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes this statement on the ground that it is "argumentative interpretation."  That conclusory assertion is insufficient to create a genuine fact dispute.  *See* Preliminary Statement.  Jones Day does not otherwise dispute any part of this statement.   Jones Day's nonresponsive factual assertions (beginning with "Sheketoff's evaluations caused her Practice Leader") should be disregarded.   They are also inaccurate.  Heifetz' declaration says that she "*observed* Sheketoff to be interested in pro bono work, but much less interested in doing work for the corporate clients"—not that Julia's *evaluations* caused Heifetz to make that conclusion, as Jones Day falsely asserts.  And the apparent basis of Heifetz' purported "observation" is that Julia's hours skewed heavily towards pro bono work during initial time at the firm.  *See also* Sheketoff Ex. 171.  That says nothing about the quality of Julia's work for billable clients.

481.    According to Jones Day, "Jones Day rewards and advances lawyers based on their individual merit."   Dkt. 45 ¶ 84; *see also* Sheketoff Ex. 152 at JD_00001458 ("The [f]irm's compensation system is individual and merit-based.").

**RESPONSE:** Disputed as incomplete. The Firm approaches associate compensation "on an individual lawyer basis. Each lawyer's compensation should reflect the specific individual contribution of that lawyer, including his or her level of professional achievement, productivity and potential for meaningful growth and advancement," as well as local market data. Chase Ex. 30 at JD_00003042. The Firm attempts to ensure that "compensation adjustments align with the associate's ratings, Final Assessment and relative rankings by Practice and Office" and "careful, individual consideration [is] given to appropriate compensation decisions for those lawyers who receive only mid-level ratings in our system." *Id.*; *see also* Chase Ex. 77, Brogan Tr. 204:16-208:20.

**REPLY:** Jones Day purports to dispute this statement as incomplete, but that is not a legitimate basis on which to dispute a statement. Fed. R. Civ. Proc. 56(c)(1). In any event, Jones Day does not identify any way in which it is incomplete. This statement is therefore admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

482.   And in Jones Day's words, Julia was a "highly paid associate." Dkt. 45 at ¶ 84.

**RESPONSE:** Undisputed that Sheketoff was a highly paid associate. Disputed as argumentative mischaracterization of the evidence to the extent Statement 482 is meant to imply that Sheketoff's salary was commensurate with the quality of her performance each year she was at the Firm. The undisputed evidence in this case is that Sheketoff's salary adjustments in certain years were disproportionately high relative to the quality of her performance because the Managing Partner wanted to encourage someone he viewed as having potential. Chase Ex 77, Brogan Tr. 28:16-30:7, 221:16-222:3, 228:24-229:18. Sheketoff's adjustment effective July 1, 2016, was despite her actual performance up to that date and intended to encourage her to improve—a point of fact on which Plaintiffs have no contrary evidence. *See* Pls. Resp. DSF ¶¶ 229-232.

**REPLY:** Jones Day does not dispute any of this statement, which does not make an assertion about Julia's performance.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, contra Jones Day's representations, it certainly is disputed Brogan's awarded Julia a substantial raise in 2016 because he wanted to encourage her rather than because of the quality of her work, for the reasons discussed in Plaintiffs' response to DSF ¶ 232.  Indeed, according to Brogan, that was the one year in which he actually read associates' evaluations.  Chase Ex. 77 (Brogan) at 28:10-29:2.

**483.**  Indeed, before being evaluated by Partner A, Julia (together with ███████████ ███████  in the I&A group) was the highest paid associate in her class year across the entire firm.  Dkt. 178 at ¶ 68.

**RESPONSE:**  Undisputed that certain Issues & Appeals associates, including Plaintiff Sheketoff, were the highest paid associates in the class of 2010 law graduates as of July 1, 2016.  Disputed to the extent Statement 483 is meant to imply that Sheketoff's salary was commensurate with the quality of her performance each year she was at the Firm, for the reasons stated in Response 482. Disputed that the evidence supports the statement that the other associates referenced in the exhibit were ███████████████. Dkt. 178 at ¶ 68.

**REPLY:** Jones Day disputes that the evidence supports that the other associates who, together with Julia, were the highest paid associates in their class year across the entire firm as of 2016 were ███████████.  Jones Day admits the identical thing in its own summary judgment submission to this Court.  *See* Chase Ex. 22 (███████████████████████ ███████████████████).  Jones Day does not otherwise dispute any part of this statement, which does not make an assertion abut Julia's performance.  This statement is thus admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**484.**    By Jones Day's own admission then, Julia was an associate with considerable merit despite her relatively low billable hours.  Dkt. 45 ¶ 84.

**RESPONSE:** Disputed.  Statement 484 is argumentative interpretation of evidence.  It also is not supported by the citation. The undisputed evidence in this case is that Sheketoff's salary adjustments in certain years were disproportionately high relative to the quality of her performance because the Managing Partner wanted to encourage someone he viewed as having potential, for the reasons stated in Response 482. Also disputed that Sheketoff "was an associate with considerable merit despite her relatively low billable hours" or that the Firm's view of Sheketoff's performance can be inferred solely from her compensation for any particular year. For her 2015 performance, Sheketoff received a rating of 2 (out of 5) by the Issues & Appeals practice and was ranked 23rd out of 24 peers in that practice. Chase Ex. 16 at JD_00004766; *see also* Chase Ex. 15 at JD_JS_00001296; Chase Ex. 24, JD_00004024 (ranking for ███████ DSF ¶ 209 (undisputed). For her 2016 performance, Sheketoff was the only associate in the Issues & Appeals practice who received a '2' rating. ████████████████████████████████████ ███████████████████████████████████████ A '2' rating indicates performance "below standards" and "performance concerns," and "successive '2' ratings are inconsistent with continued employment at the Firm." Chase Ex. 29 at JD_00003075; Chase Ex. 83, Lovitt Tr. Vol. II 127:23-128:5, 149:21-150:5, 177:3-15. Individuals with responsibility for Jones Day's associate evaluation system argued that Sheketoff's performance as an Issues & Appeals associate warranted counseling her out of the Firm—a point of fact Plaintiffs do not dispute. *See* Pls. Resp. DSF ¶¶ 253, 256-58.

**REPLY:** Jones Day claims that the cited evidence does not support this statement. That is incorrect.  The cited evidence is Jones Day's own admission that "Jones Day rewards and

advances lawyers based on their individual merit." Dkt. 45 at ¶ 84. Jones Day references its response to PSF ¶ 482 in making representations about Brogan's purported desire to encourage Julia, but Brogan's testimony is contradicted by Jones Day's own admission (cited here). *See also* JDSF ¶ 232 (Plaintiffs' response). The remainder of Jones Day's statement simply demonstrates what Plaintiffs demonstrate below: that Heifetz's practice ratings and rankings are not given much weight in salary determinations, PSF ¶¶ 718-720, and were in any event affected by Partner A's review of Julia, PSF ¶¶ 721-30.

### C. Partner A wrote Julia a false and malicious evaluation because of her sex.

**485.** In January 2016, Heifetz assigned Julia to assist Partner A with a research project. Chase Ex. 33.

> **RESPONSE:** Undisputed.

**486.** As part of that research project, Partner A ultimately asked Julia to draft a memo summarizing her research. Chase Ex. 84 (Partner A) at 36:3-37:12; Sheketoff Ex. 75.

> **RESPONSE:** Undisputed.

**487.** Julia drafted the memo as requested. Sheketoff Ex. 75.

> **RESPONSE:** Undisputed that Sheketoff drafted a memorandum in or around January 2016 after being asked to do so by Partner A. Sheketoff Ex. 75. Plaintiffs' assertion that the memo was drafted "as requested" is not supported by the evidence. Specifically, Partner A wrote that Sheketoff's initial drafts were too "academic," without sufficient "helpful advice to the client," and that she exhibited "little-to-no-initiative[.]" Chase Ex. 15 at JD_JS_00001293. Following the initial draft, Sheketoff and Partner A collaborated in an iterative fashion, revising the work over several months. *See, e.g.*, Chase Ex. 35 at JD_JS_00001428, Chase Ex. 37 at JD_JS_00001494.

Throughout that process, Partner A encouraged Sheketoff to "write more like an advocate and advisor to general counsel and corporate boards." Chase Ex. 35.

**REPLY:** This statement is not genuinely disputed.  Jones Day does not dispute that Julia drafted a memo summarizing her research, which is what Partner A requested that she do. As for Jones Day's assertions about whether Julia's initial drafts were too academic and without helpful advice to the client, and the nonresponsive assertion that Julia exhibited "little-to-no initiative," those are addressed below in PSF ¶¶ 516-64.

488.    At one point in the revision process, Partner A made edits to the memo that Julia believed rendered it misleading or unclear.  Sheketoff Decl. ¶ 20.

**RESPONSE:** Undisputed that Sheketoff has asserted in this litigation that she believed Partner A's revisions were "misleading or unclear." By way of further response, the only edits Sheketoff believed rendered the memo "misleading or unclear" were Partner A's "description of the court," which Sheketoff changed "back to District Court for the District of Columbia, because [she] wanted to make sure the reader didn't think we were referring to the local DC trial court." Chase Ex. 36 at JD_JS_00001443. Sheketoff did not tell Partner A at the time that she believed his edits made the memo misleading or unclear, but instead simply refused on multiple occasions to include them. Chase Ex. 84, Partner A Tr. 235:19-236:4, 242:14-243:16; Chase Ex. 36 at JD_JS_00001441. As Partner A testified with respect to this edit: "[Y]ou wrote something. I changed it. You changed it back to the way you wrote it. I changed it again back to the way I had it. And then you changed it back to the way you had it." Chase Ex. 84, Partner A Tr. 239:15-21.

**REPLY:** Jones Day does not dispute any part of this statement.  It is therefore admitted in its entirety.   Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer is nonresponsive (beginning with "By way of further response") and should be disregarded.  It is

also false.  Julia believed that many of Partner A's edits were misleading or unclear, as her suggested revisions and her email to Partner A about those edits convey.  Sheketoff Ex. 84 at JD_JS_00000638 ("I made a few changes to your changes—just to try to be as precise as possible about some of our analysis."); *id.* ("I made changes ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████."); *id.* ("I██████████████████████ ████████████████████████████████████████████ "); *id.* ("I suggested some changes [████████████████████████████ to try to clarify the procedural posture of the various scenarios we're discussing."); *see also id.* at JD_JS_00000652-663 (redline version identifying Julia's suggested revisions).   Jones Day's assertion that Julia "simply refused on multiple occasions to include [Partner A's edits]" is also false.  As the record demonstrates, Partner A actually chastised Julia for doing two things: first, "making style edits to the writing of the person whose name goes first on the memo," and second, "chang[ing] it back to the way you had it" "when the person whose name goes first on the memos makes an edit."  Chase Ex. 36 at JD_JS_00001441.  He identified a single violation of each of these two principles.  *Id.*  Partner A never suggested that Julia had rejected one of his edits on *multiple occasions*; that is a post hoc litigation-related invention.   Moreover, Julia did not "refus[e]" to incorporate any of Partner A's edits, even once.  To the contrary, she asked: "Do these changes look alright to you?  If not, we can (of course) revert back to your version."  Chase Ex. 36 at JD_JS_00001443; *see also id.* at JD_JS_00001441 ("I sent you the track-changes version of the document so you could easily reject any (or all) of my suggestions.").

**489.**   Julia consulted Partner F, who was an associate at the time, about how to respond.  Sheketoff Decl. ¶ 21; Sheketoff Ex. 39 at P04091 ("I'm really sorry if I gave you bad advice.").

**RESPONSE:** Undisputed. By way of further response, there is no evidence that Sheketoff showed Partner F the specific revisions at issue. Sheketoff Ex. 39 at P04091.

490.    Partner F had worked with Partner A in the past and had also found Partner A's writing and legal analysis to be very poor and in need of substantial revision.  Sheketoff Decl. ¶ 22.  Chase Ex. 80 (Sheketoff) at 130:20-22; *see also* Sheketoff Ex. 39 at P04092 ("Jackass doesn't sufficiently capture the incompetence."); *id.* at P04093 ("Remember he is a bad writer."); *id.* at P04100 ("He messed something up badly"); *id.* at P04118 ("[Partner A's] brief didn't even mention the ▮ decision in the intro"); *id.* at P04138 ("[Partner A] is getting us sued btw"); *id.* at P04200 ("Plus [Partner A will prob mess up the oral arg").

**RESPONSE:** Disputed.   There is no admissible evidence to support Statement 490. Sheketoff's statement in ¶ 22 of her declaration, and all of the exhibits proffered to support Statement 490, are inadmissible hearsay pursuant to Fed. R. Civ. P. 56(c). *See also* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day only basis for "disput[ing]" this statement is that the cited evidence is inadmissible hearsay.  That is incorrect.  The substance of evidence is properly considered at summary judgment as long as it will be admissible in some form at trial.  *See* Preliminary Statement D.  As reflected in her declaration, Julia will testify at trial that Partner F told her, prior to her working with Partner A, that Partner A had worked with Partner F before and had found his legal work to be very poor and in need of substantial revision.  Julia's in-court testimony is definitionally not hearsay under FRE 801(c)(1).  And Partner F's statements to Julia about his experiences working with Partner A at Jones Day are similarly not hearsay under FRE 801(d)(2)(D).  In any event, it is undisputed that Partner F will testify to the same effect at trial. The remaining evidence is also admissible.  This statement cites Julia's deposition testimony about

Partner A's past experiences with Partner F; the substance of that evidence is the same that contained in Julia's declaration and will be admissible at trial for the same reasons.  Finally, this statement cites various text messages between Julia and Partner F.  Many of those text messages will not be introduced to prove the truth of the matter asserted (e.g., that Partner A's brief didn't actually mention the ███████████ in the intro) but instead to corroborate that Partner F found Partner A's writing to be of low quality and in need of revision—and thus to corroborate that Partner F had previously revised Partner A's writing and was surprised at Partner A's reaction to Julia's suggested revisions, because Partner A did not respond in a similar way to Partner F.  In any event, the text messages from Partner F about his work with Partner A at Jones Day are themselves admissible to prove the truth of the matter asserted under FRE 801(d)(2)(D).  And the substance of those text messages is admissible through Partner F's in-court testimony.  Apart from its meritless admissibility "dispute," Jones Day does not dispute any part of this statement.  It is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**491.**    Partner F advised Julia to speak up about the problems introduced by Partner A's edits and try to improve the memorandum.  Sheketoff Decl. ¶ 23; Sheketoff Ex. 39 at P04091 ("I'm really sorry if I gave you bad advice.").

    **RESPONSE:** Disputed. There is no admissible evidence to support Statement 491 or any evidence that Sheketoff showed Partner F the specific revisions at issue, *see* Sheketoff Ex. 39 at P04091. Sheketoff's statement in ¶ 23 of her declaration and the exhibit proffered to support Statement 491 are inadmissible hearsay pursuant to Fed. R. Civ. P. 56(c). *See also* Fed. R. Evid. 801, 802. Further disputed on the ground that proffered exhibit does not support Plaintiffs' implication that there were "problems introduced by Partner A's edits." Nor is there any evidence

cited in support of Plaintiffs' assertion that Partner F provided advice to "try to improve the memorandum."

**REPLY:** Jones Day "disputes" this statement on the ground that the cited evidence is hearsay. That is incorrect. The substance of evidence is properly considered at summary judgment as long as it will be admissible in some form at trial. *See* Preliminary Statement D. As Julia's declaration reflects, Julia will provide in-court testimony that Partner F advised her to speak up about the problems introduced by Partner A's edits. Julia's in-court testimony is definitionally not hearsay under FRE 801(c)(1). And Partner A's advice to Julia to speak up will not be introduced to prove the truth of the matter asserted and is therefore definitionally not hearsay under FRE 801(c)(2). (Even if introduced for the truth—whatever that would mean—Partner F's advice to Julia about a Jones Day case on which she was consulting him is not hearsay under FRE 801(d)(2)(D).) Similarly, Partner F's statement that he was "really sorry if I gave you bad advice" would not be admitted for the truth of the matter asserted (i.e., that in fact Partner F was actually "really sorry"), but to corroborate that Partner F in fact did advise Julia to speak up. And, again, even if introduced for the truth, Partner F's statement is admissible under FRE 801(d)(2)(D). Regardless, it is undisputed that Partner F will testify at trial to the same effect, so the substance of this evidence will be admissible at trial in all events.

492.    Julia followed Partner F's advice: She suggested further edits and explained to Partner A why she believed he should not implement all of his edits. Sheketoff Ex. 84.

**RESPONSE:** Disputed as a mischaracterization of the evidence. Sheketoff's March 2, 2016 email to Partner A suggested five specific edits, one of which was a style edit to the writing and another of which was a revision to a change Partner A had already made twice before. Chase Ex. 36. *See also* Chase Ex. 84, Partner A Tr. 150:21-151:1, 239:15-21. In response to most of

Sheketoff's edits, Partner A wrote "very good," "[t]hose look great," and "I like your changes a lot." Chase Ex. 36 at JD_JS_00001442-43. Further disputed on the ground that there is no cited evidence that Partner F advised Sheketoff to respond in this way.

**REPLY:** Jones Day claims that this statement is disputed as a "mischaracterization of evidence" but fails to show any way in which this statement mischaracterizes the evidence. That is inadequate to create a genuine fact dispute (*see* Preliminary Statement B) and this statement does not mischaracterize in any event. Jones Day does not otherwise dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day's factual assertions do not contradict this statement, and are themselves mischaracterizations of the evidence. As the exhibit cited in this statement reflects, Julia made numerous edits and provided explanations of five sets of them. Sheketoff Ex. 84. The single "style" edit that Partner A identified and objected to (where Julia changed some language to make it more idiomatic, *id.* at JD_JS_00000653; Sheketoff Ex. 85 at JD_JS_00000666) was not one of the five sets of changes for which she provided an explanation.

**493.** Julia provided a "track-changes version of the document so [Partner A] could easily reject any (or all) of [her] suggestions." Chase Ex. 36 at JD_JS_00001441; *see also* Sheketoff Ex. 84 at JD_JS_652-63.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff's March 3, 2016, email included the quoted language. Disputed as lacking context to the extent Statement 493 implies that Sheketoff provided a track changes version with her March 2, 2016, email so that Partner A could easily accept or reject her suggestions or that Partner A understood this was Sheketoff's intent. Sheketoff's March 2, 2016, email stated that she had attached "the latest version of the draft as well as a compare version so [Partner A] can see all of the changes [she] made since [Partner A's]

draft." Chase Ex. 36 at JD_JS_00001442; Chase Ex. 84 Partner A Tr. 228:19-229:3 ("Again, I thought it was – my recollection was that it was not track changes, so I couldn't just click accept/reject, but more like you compare in Change-Pro, and so I got a clean version and then a version that was redlined that would not allow me to just accept or reject your edits.") (as corrected by errata).

**REPLY:** This statement is not genuinely disputed.  The document that Julia sent to Partner A on March 2 is cited here, and it indisputably includes a track changes (Word) version of their memo.  Sheketoff Ex. 84 at JD_JS_00000652-63.  That is clear from the appearance of the document, which is quite different from the appearance of a Change-Pro blackline (*see, e.g.*, Sheketoff Ex. 78 at JD_JS_00000488-500).   Partner A's purported recollection is disproven by the record.  Sheketoff Ex. 84 at JD_JS_00000652-63.  And Julia's contemporaneously asserted purpose in sending a track-changes version is not controverted by anything in the record; to the contrary, in the testimony Jones Day cites, Partner A admitted that a "track changes" version allows him to "just click accept/reject," though he inaccurately recalled that Julia had not sent him a track-changes version.  *See also* Chase Ex. 36 at JD_JS_00001443 ("Do these changes look alright to you?  If not, we can (of course) revert back to your version.").

494.   Partner A was "annoyed" by Julia's suggested edits and felt they were "rude."  Chase Ex. 84 (Partner A) 233:11-21, 235:6-7, 235:8-13, 241:9-13; Chase Ex. 83 (Lovitt) at 4:11-5:24 ("he was frustrated").

**RESPONSE:** Disputed. In response to most of the edits suggested by Sheketoff, Partner A wrote "very good," "[t]hose look great," and "I like your changes a lot." Chase Ex. 36 at JD_JS_00001442-43. Partner A did not testify that he was "annoyed" by Sheketoff's suggested edits or believed they were "rude." Partner A testified that he was "annoyed" by Sheketoff's

repeated refusal to incorporate specific stylistic changes that Partner A had already reinstated twice. As Partner A testified, Sheketoff "had changed it twice, so I don't mind if you change something—you wrote something. I changed it. You changed it back to the way you wrote it. I changed it again back to the way I had it. And then you changed it back to the way you had it. That is annoying." Chase Ex. 84, Partner A Tr. 239:15-21; *see also id.* at 150:21-151:1. Partner A further testified that it was Sheketoff's repeated refusal to accept his stylistic revisions—not her initial suggested edits—that was "rude" and "not the most professional thing to do." Chase Ex. 84, Partner A Tr. 231:8-241:3.

**REPLY:** This statement is not genuinely disputed.  Even if Jones Day's statements factual assertions about Partner A's testimony were accurate, they would not controvert this statement and thus fail to create a genuine dispute. Fed. R. Civ. Proc. 56(c)(1).  But regardless, Jones Day's factual representations are also inaccurate.  Jones Day denies that Partner A testified that he was annoyed by Julia's edits or believed they were rude, and says that Partner A only said he was annoyed by Julia's "repeated" refusal to incorporate "specific stylistic changes."  That is a mischaracterization of the deposition transcript.  Partner A admitted that he thought it was "rude" and "annoying" for Julia to make *any* style edits to his writing, because "when you have someone who is more senior, I think making small changes, especially to something that's not important, is not typically done…. I thought it was rude and annoying."  Chase Ex. 84 (Partner A) at 233:11-21; *see also id.* 235:6-13 ("Yes, it was annoying, and I felt annoyed, yes.").  Partner A also testified at his *deposition* that a *second* thing that annoyed him was when Julia "had changed [it] *twice*." *Id.* at 239:9-21 (emphasis added).  And he described a single instance when Julia had supposedly twice edited Partner A's description of a court, not multiple stylistic changes as Jones Day falsely represents.  Yet that that what Partner A actually told Julia *at the time* was: "When the person whose

name goes first on the memo makes an edit, you should not change it back to the way you had it"—with nothing about changing something back *twice*.  Sheketoff Ex. 85 at JD_JS_00000666. Partner A's post hoc re-invention of the basis for his annoyance with Julia is thus directly at odds with the record.

Partner A's deposition testimony is also foreclosed by the underlying facts.  Partner A first added the language at issue (referring ████████████████████████████████ ████), along with several other changes, on February 4, 2016.  *See* Sheketoff Ex. 76 at JD_JS_00000491 (████████).  Julia changed the language (to ███████████████████ ██████████████) on February 8, 2016, along with *many* other changes.  *See* Sheketoff Ex. 77 at JD_JS_ 00000526 (████████).  Julia's language stayed in the memo for nearly a month.  On March 1, 2016, Partner A made numerous edits to the memo, including describing the case again as a "████████████████████."  Sheketoff Ex. 82 at JD_JS_00001432; Sheketoff Ex. 83 at 5. The next day, on March 2, 2016, in the email that annoyed Partner A, Julia called attention to how she had changed the description of that case: "on page 4, I changed the description of the District Court for the District of Columbia, because I wanted to make sure the reader didn't think we were referring to the local DC trial court."  Sheketoff Ex. 84 at JD_JS_00000638.  As discussed above, Partner A responded (after first chastising Julia for making style changes): "when the person whose name goes first on the memos makes an edit, you should not change it back to the way you had it (e.g., on p. 4 when describing the district court case … the citation alerts the reader to the specific court)."  Sheketoff Ex. 85 at JD_JS_00000666 (ellipses in original).  That is, Partner A responded to and criticized changes that Julia had told him she had made.  Neither Julia nor Partner A said anything about Julia changing the language twice.  *See also* Chase Ex. 84 (Partner A) at 37:18-38:1 (no recollection of the scope of Julia's assignment); *id.* at 39:4-19 (no recollection of

conversation about memo); *id*. at 41:15-44 (same); *id*. at 49:20-51:14 (same); *id*. at 52:2-55:8 (no recollection of underlying facts conveyed to Julia); *id*. at 58:4-59:1 (no recollection of basis for factual assumptions made in memo, and whether Julia was involved in gathering them); *id*. at 60:2-61:9 (no recollection of conversation about memo); *id*. at 67:2-2-11 (no recollection of basis for certain representations and ratings in his own review); *id*. at 73:14-74:1 (no recollection of whether he had ever advised Julia to add advice or direction to client, or whether he had added advice or direction to client himself). *See generally id.* (testifying "I don't recall" at least 289 times).

**495.**    Partner A felt that Julia should have "deferred to [his] style." Chase Ex. 84 (Partner A) at 234:9; *see also id.* at 237:13-19 ("the junior lawyer, especially when they're working with a more senior lawyer on something that the senior lawyer's name is at the top and they're writing with them in an iterative process, should defer to the more senior lawyer and write like the more senior lawyer, especially in style.").

      **RESPONSE:** Disputed in part. Undisputed that Partner A testified that, rather than make "style edits" that were "small changes, especially to something that's not important," Sheketoff should have "deferred to [his] style." Chase Ex. 84, Partner A Tr. 233:11-234:9. By way of further response, Partner A testified that he intended his response to be "instructional" and a "teaching point for practice pointer for how to interact with more senior lawyers." *Id.* at 288:6-16. Partner A also testified that no other lawyer—male or female—with whom Partner A has worked has ever repeatedly rejected his revisions and changed the writing back to the way it had been in the manner Sheketoff had. *Id*. Further disputed to the extent Statement 495 is meant to imply that Partner A's belief that Sheketoff should have deferred to his writing style had anything to do with her sex. Partner A testified that his belief was due to concerns of seniority and efficiency and that a "junior lawyer, especially when they're working with a more senior lawyer on something [where]

the senior lawyer's name is at the top and they're writing with them in an iterative process, should defer to the more senior lawyer and write like the more senior lawyer, especially in style." *Id.* at 237:12-19; *see also id.* at 231:8-241:3.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded.

**496.** In response, he scolded her for second-guessing his edits. Chase Ex. 36 at JD_JS_00001441.

**RESPONSE:** Disputed. Statement 496 is argumentative interpretation of evidence that is not supported by the citation or consistent with the record evidence. In response to most of Sheketoff's edits, Partner A wrote: "very good," "[t]hose look great," and "I like your changes a lot." Chase Ex. 36 at JD_JS_00001442-43. Partner A also later stated that Sheketoff "undoubtedly made the memo much better." *Id.* at JD_JS_00001441. Partner A intended his response to be "instructional" and "a teaching point or practice pointer for how to interact with more senior lawyers" that "would be helpful to [Sheketoff] when [she] worked for other people." Chase Ex. 84, Partner A Tr. 234:14-235:7; *see also id.* at 231:8-14, 232:5-18, 233:13-16. Partner A believed that it was "not efficient" for Sheketoff to repeatedly reject stylistic revisions of a senior lawyer without discussing the issue with the senior lawyer. Chase Ex. 36 at JD_JS_00001441.

**REPLY:** This statement is not genuinely disputed. Jones Day complains that it is an argumentative interpretation of the evidence. That conclusory assertion is incorrect and inadequate to create a genuine fact dispute. *See* Preliminary Statement A. Jones Day also says that the statement is not supported by the evidence. As discussed in PSF ¶ 494, Partner A thought Julia's suggested edits were rude and annoying, he was annoyed, and he told her not to make style edits

to his writing and not to change his writing back to the way she had it.  *See also* Chase Ex. 36 at JD_JS_00001441.

497.    Without salutation, and invoking his senior status in the firm's hierarchy, Partner A directed: "Some general comments. 1. you should avoid making style edits to the writing of the person whose name goes first on the memo (e.g., the first sentence on p. 2 under exec summary … where you changed 'as well as' to 'and') 2. When the person whose name goes first on the memo makes an edit, you should not change it back to the way you had it (e.g., on p. 4 when describing the district court case … the citation alerts the reader to the specific court)."  Chase Ex. 36 at JD_JS_00001441 (ellipses in original).

RESPONSE: Disputed in part. Undisputed that Partner A made partner effective January 1, 2016, and was more senior to Sheketoff, who was an associate in only her second year at Jones Day; that Partner A was leading the particular matter to which this research related and had reached out to the practice leader of I&A for an associate available to assist with researching and drafting a memorandum to the client; and that the quoted language in Statement 497 is an accurate quotation of a portion of Chase Ex. 36 at JD_JS_00001441. The remainder of Statement 497 is argumentative interpretation of evidence and is disputed. Partner A was responding to a series of proposed changes, including several for which he commented: "very good," "[t]hose look great," and "I like your changes a lot." *Id.* at JD_JS_00001442-43. Partner A's "general comments" related to specific changes, including an edit that he had made that Sheketoff reverted back to her original draft—twice. *See* DSF ¶¶ 275-76; Response 494-95.

REPLY: Jones Day claims that some unidentified part of this statement is disputed as "argumentative interpretation of evidence."  That vague and conclusory assertion is inaccurate and insufficient to create a genuine dispute of fact.  *See* Preliminary Statement A.  Jones Day does not

otherwise dispute this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

498.    Although purporting to give only an "example" of each of Julia's transgressions in his "general comments," Partner A does not recall any other instances of such transgressions in the memo.  Chase Ex. 84 (Partner A) 239:5-8, 241:19-22.

**RESPONSE:** Statement 498 is argumentative interpretation of evidence. It also is not supported by the citation. Undisputed that Partner A made two general comments, each of which was followed by an "e.g." describing a specific example of Sheketoff's edits. Chase Ex. 36 at JD_JS_00001442. Also undisputed that Partner A testified that he could not recall "other style edits" or circumstances when Sheketoff "changed something back" in a memo drafted in 2016 during his deposition in 2022.  Chase Ex. 84, Partner A Tr. 239:5-8, 241:19-22.  Plaintiffs' implication that Partner A was falsely suggesting that there were multiple instances of Sheketoff's "transgressions" is argumentative interpretation of the evidence and is disputed on that ground.

**REPLY:** Jones Day does not dispute any part of this statement.  It does not dispute that "e.g." means "for example," or that Partner A has no recollection of any instances beyond what is identified in his email where Julia committed the alleged transgressions, and it cites no controverting evidence.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

499.    Julia interpreted Partner A's email as conveying hostility and annoyance.  Sheketoff Ex. 39 at P04090 ("I just got a really mean email from [Partner A]"); *id.* at P04091 (explaining that Partner A is "mad about the edits.  His email is pretty nasty."); Sheketoff Ex. 41 at P02164 ("Got a crazy email from [Partner A] that I've been trying to deal with"); id at P02165 ("Female Associate A: Def total asshole… That was not to be helpful.  Julia: That's what I thought too.").

**RESPONSE:** Disputed in part.  It is undisputed that Sheketoff has asserted that she "interpreted Partner A's email as conveying hostility and annoyance." It is also undisputed that Partner A testified that he was "annoy[ed]" by Sheketoff's repeated refusal to accept his revisions. Chase Ex. 84, Partner A Tr. 150:21-151:1, 239:15-21. The remainder of Statement 499 is disputed as argumentative interpretation of evidence and not supported by the citation. Defendants dispute that Sheketoff could reasonably interpret Partner A's email as conveying hostility. In response to most of Sheketoff's edits, Partner A wrote: "very good," "[t]hose look great," and "I like your changes a lot." Chase Ex. 36 at JD_00001442-43. Partner A also followed up in a later email to say "[n]o worries," explaining that Sheketoff "undoubtedly made the memo much better." *Id.* at JD_JS_00001441. Partner A also telephoned Sheketoff to assure her that this was not a big deal and would not be a problem for their future work on the project. Chase Ex. 84, Partner A Tr. 262:6-21, 263:13-264:7. And, following this interaction, Partner A and Sheketoff continued to work together for Client 1. *See, e.g.*, Chase Ex. 38, JD_JS_00001180. Finally, Defendants dispute Statement 499 pursuant to Fed. R. Civ. P. 56(c) on the ground that the evidence cited therein is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** This statement is not genuinely disputed.  Julia's cited text messages, which she wrote just after receiving Partner A's email, demonstrate that she indeed interpreted his email as conveying hostility and annoyance—and Jones Day does not appear to dispute that Julia honestly held that interpretation.  Julia's interpretation was correct: As discussed above, Partner A was indeed annoyed with Julia, and he thought her edits were rude.  PSF ¶ 494.  Jones Day says that the text messages are inadmissible hearsay.  That is incorrect.  The text messages will not be introduced to prove the truth of the matter asserted (e.g., that Partner A's email actually was "really mean") but to prove how Julia perceived Partner A's email (e.g., that she interpreted it as "really

mean"). The messages are thus definitionally not hearsay. FRE 801(c)(2). Regardless, even if introduced for the truth, they are admissible under FRE 803(1) and 803(3). In all events, as discussed above, the substance of this evidence can be considered at summary judgment if it can be presented in admissible form at trial, *see* Preliminary Statement D, and Julia will testify in support of this statement at trial. While irrelevant, Jones Day's assertion that Julia could not possibly "reasonably interpret Partner A's email as conveying hostility" is also false: Partner F and Female Associate A both indisputably shared the same interpretation. *See* PSF ¶¶ 501-03.

**500.** Julia shared Partner A's "general comments" with Partner F and another lawyer (Female Associate A), who both agreed that Partner A's email was hostile and inappropriate. Sheketoff Ex. 39 at P04090-92; Sheketoff Ex. 41 at P02164-69.

**RESPONSE:** Disputed. Statement 500 is argumentative interpretation of evidence. It also is not supported by the citations. Neither Partner F nor Female Associate A stated that Partner A's email was "hostile" or "inappropriate." And there is no evidence that Sheketoff showed Partner F or Female Associate A the email from Partner A, rather than Sheketoff's own slanted summary of it. *See* Sheketoff Ex. 39 at P04090-92; Sheketoff Ex. 41 at P02164-69. Defendants further dispute Statement 500 pursuant to Fed. R. Civ. P. 56(c) on the ground that it is not supported by any admissible evidence because statements by Partner F and Female Associate A are inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** This statement is not genuinely disputed. As the cited text messages reflect, Julia quoted verbatim Partner F's "general comments" in her text messages to Partner F, and she forwarded the email in its entirety to Female Associate A. Sheketoff Ex. 39 at P04091-92; Sheketoff Ex. 41 at P02164-65. Jones Day also claims that Partner F and Female Associate A did not use the precise words "hostile" or "inappropriate" to describe Partner A's email, but that is

irrelevant because their statements convey that they did indeed view the email as hostile and inappropriate regardless of the precise words they used (and Jones Day does not dispute that they did). Finally, Jones Day "dispute[s]" this statement on the ground that the cited text messages are inadmissible. As discussed above, the substance of the out-of-court statements is appropriately considered at summary judgement if it can be presented in an admissible form at trial. *See* Preliminary Statement D. Here, it is undisputed that both Partner F and Female Associate A will testify consistent with their messages at trial. In any event, the text messages themselves (statements by Jones Day lawyers consulting with Julia about her work at Jones Day) are definitively not hearsay under FRE 801(d)(2)(D). And they are not introduced for the truth of the matter (e.g., to prove that Partner A is indeed an "ass") but to prove how the writers perceived Partner A's email (he was being an "ass"), and are thus admissible under FRE 801(c)(2). In all events, the messages are also admissible under FRE 803(1).

**501.** Partner F responded: "LOL. What an ass." Sheketoff Ex. 39 at P04091-92.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c). There is no admissible evidence cited in support of Statement 501. Partner F's statement is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. And there is no evidence that Sheketoff showed Partner F the email from Partner A, rather than her own slanted summary of it. *See* Sheketoff Ex. 39 at P04090-92.

**REPLY:** This statement is not genuinely disputed. As the cited text messages reflect, Julia quoted verbatim Partner F's "general comments" in her text messages to Partner F, and Partner F made the quoted "What an ass" statement in direct response to such a verbatim quotation. Sheketoff Ex. 39 at P04091-92. Jones Day also "dispute[s]" this statement on the ground that the cited text messages are inadmissible. As discussed above, the substance of the cited messages is appropriately considered at summary judgement if it can be presented in an admissible form at

trial.  *See* Preliminary Statement D.  Here, it is undisputed that Partner F will testify at trial consistent with his text messages.  In any event, the text messages themselves (statements by Jones Day lawyers consulting with Julia about her work at Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D).  And they are not introduced for the truth of the matter (e.g., to prove that Partner A is indeed an "ass") but to prove how Partner F perceived Partner A's email (he was being an "ass"), and are thus admissible under FRE 801(c)(2).  The messages are also admissible under FRE 803(1).

**502.**   Partner F told Julia: "I guess he is defensive about being called out.  But you were just doing your job…. I'm really sorry if I gave you bad advice.  But I really believe you did the right thing.  You can't let a memo like that go out if it's not accurate."  Sheketoff Ex. 39 at P04091.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c). There is no admissible evidence cited in support of Statement 502. Partner F's statement is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Further disputed because there is no evidence that Sheketoff showed Partner F the email from Partner A, rather than her own slanted summary of it. *See* Sheketoff Ex. 39 at P04090-92.

**REPLY:** This statement is not genuinely disputed.  As the cited text messages reflect, Julia quoted verbatim Partner F's "general comments" in her text messages to Partner F.  Sheketoff Ex. 39 at P04091-92.  Jones Day also "dispute[s]" this statement on the ground that the cited text messages are inadmissible.  As discussed above, the substance of the cited messages is appropriately considered at summary judgement if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Partner F will testify at trial consistent with his text messages.  In any event, the text messages themselves (statements by a Jones Day lawyer consulting with Julia about her work at Jones Day) are definitionally not hearsay

under FRE 801(d)(2)(D).  And they are not introduced for the truth of the matter (e.g., to prove that Partner A was "defensive about being called out") but to prove how Partner F perceived Partner A's reaction to Julia's edits (Partner A seemed to be defensive), and are thus admissible under FRE 801(c)(2).  (That is relevant because Partner F, a male, had had to revise Partner A's writing in the past as well, and he did not receive a similar response when he did so.)

**503.**   Female Associate A responded: "His email is so obnoxious."  Sheketoff Ex. 41 at P02164; accord *id.* at P02165 (Julia: "What is the tone of the email?  Was he trying to be helpful?  Or was he being a total asshole?  Female Associate A: Def total asshole … That was not to be helpful …  If it was he woulda said it differently.").

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c). There is no admissible evidence cited in support of Statement 503. Female Associate A's statements are inadmissible hearsay. Fed. R. Evid. 801, 802. Further disputed because there is no evidence that Sheketoff showed Partner F the email from Partner A, rather than her own slanted summary of it. *See* Sheketoff Ex. 41 at P02164-69.

**REPLY:** This statement is not genuinely disputed.  As the cited text messages reflect, Julia forwarded the email in its entirety to Female Associate A, who then proceeded to quote various parts of it back to Julia.  Sheketoff Ex. 41 at P02164-65.   Jones Day also "dispute[s]" this statement on the ground that the cited text messages are inadmissible.  As discussed above, the substance of the cited messages is appropriately considered at summary judgement if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Female Associate A will testify at trial consistent with her text messages.  In any event, the text messages themselves (statements by a Jones Day lawyer consulting with Julia about her work at Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D).  And they are not introduced

for the truth of the matter (e.g., to prove that Partner A's email was "so obnoxious") but to prove how Female Associate A perceived that email (it seemed "so obnoxious" to her), and are thus admissible under FRE 801(c)(2).  In all events, the messages are also admissible under FRE 803(1).

**504.**   At the time, Julia believed that Partner A's hostile response to her was at least "partially a sexism thing," and thought it was "hard to imagine him saying that to a guy."  Sheketoff Ex. 41 at P02166; *see also* Chase Ex. 80 (Sheketoff) at 131:7-14, 131:19-23.

> **RESPONSE:** Disputed in part. It is undisputed that Statement 504 describes Sheketoff's assertions as to her beliefs regarding Partner A's email. It is also undisputed that Statement 504 accurately quotes certain out-of-context testimony by Sheketoff. Defendants dispute that Sheketoff could reasonably interpret Partner A's email as conveying hostility, as set forth in response to Statement 499. Defendants also dispute that Partner A's response was "at least 'partially a sexism thing'" or that Sheketoff could reasonably have interpreted it as such. Nothing in the email exchange references Sheketoff's sex or gender. Partner A's evaluations of other female associates are highly complimentary; for instance, ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ By contrast, Partner A's evaluations of male associates have included substantially more critical statements. *See generally* Chase Ex. 39 at JD_00002849-2860. Defendants also dispute that Partner A would not criticize a male associate for refusing to accept his revisions. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████

**REPLY:** Jones Day does not dispute any part of this statement.  This statement does not make an assertion about Partner A's motivation, or what it was "reasonabl[e]" for Julia to believe.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Nothing in the email exchange") is nonresponsive and should be disregarded.  It is also inaccurate.  For example, Jones Day's irrelevant assertion that Julia could not possibly "reasonably interpret Partner A's email as conveying hostility" is contradicted by the reactions of Partner F and Female Associate A, who both indisputably shared the same interpretation.  *See* PSF ¶¶ 501-03.

505. She also believed it was "an insecurity thing."  Sheketoff Ex. 41 at P02166; *see also* Chase Ex. 80 (Sheketoff) 129:6-9, 133:10-134:18.

**RESPONSE:** Disputed in part. It is undisputed that Statement 505 describes Sheketoff's assertions as to her beliefs regarding Partner A's email. It is also undisputed that Statement 505 accurately quotes certain out-of-context testimony by Sheketoff. Defendants dispute Plaintiffs' assertion that Partner A's response was "an insecurity thing" for the reasons set forth in response to Statement 504, above. By way of further response, Defendants note that Sheketoff's belief that Partner A's response to her rejection of his revisions was due to "insecurity" undercuts her assertion that it was due to sexism because insecurity is not discrimination. Defendants also dispute Statement 505 pursuant to Fed. R. Civ. P. 56(c) to the extent it relies on inadmissible hearsay as support. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement does not make an assertion about Partner A's motivation.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded.  It is also false.

Partner A was insecure around less deferential women but not less deferential men; that is sexist. Jones Day "dispute[s]" this statement "to the extent it relies on inadmissible hearsay" for support. Jones Day does not identify what it claims is hearsay (which is not self-evident) and forfeits the objection on that basis. As discussed above, the substance of evidence is properly considered at summary judgment if it can be presented in admissible form at trial. *See* Preliminary Statement D. Julia will testify to the substance of her text messages and deposition testimony at trial. Julia's text messages are also themselves admissible under FRE 803(1). And they are admissible under FRE 801(c)(2) because Jones Day has suggested that Julia acted in bad faith and made up her motivations.

506.   Julia expressed those beliefs to Female Associate A, who agreed: "Definitely insecurity. And maybe you're right about the sexist thing too…. I've gotta believe he would not be sending this email to Male Associate C or Male Associate B [███████████████████████

████████████████████████████████████████████████████████

██████████████]." Sheketoff Ex. 41 at P02166, P02168.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 506 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Further disputed because, to the extent it is not hearsay, the statement is immaterial. To the extent Partner A's response to Sheketoff's rejection of his revisions was due to "insecurity" undercuts her assertion that it was due to sexism because insecurity is not discrimination. Further disputed as contrary to the record evidence, which shows that Partner A ████████████████████████████████

██████████████████████████████████████████████████. *See* DSF

¶ 202; Chase Ex. 39 at JD_00002855, Eval. No. 54 (████████████████████████████

██████████████████████).

**REPLY:** This statement—which is about a statement that Female Associate A made in writing to Julia—is not genuinely disputed. Jones Day first claims that it is inadmissible hearsay, but that is incorrect. As discussed above, the substance of this evidence may be considered at summary judgment if it can be produced in admissible form at trial. *See* Preliminary Statement D. Here, it is undisputed that Female Associate A will testify at trial to the substance of this evidence—i.e., that she too thought that Partner A was motivated by insecurity and possibly sexism, and that she didn't think he would have sent such an email to Male Associate C or Male Associate B in the same circumstances. In any event, the text messages themselves (statements by a Jones Day lawyer consulting with Julia about her work at Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D). And they are not cited here solely to prove the truth of the matter asserted, but instead to prove (a) Julia's bases for thinking that Partner A discriminated against her (to disprove Jones Day's false assertions that her complaint is in bad faith); and (b) that Female Associate A agreed with Julia's assessment of the situation (to disprove Jones Day's false assertions that no one could *reasonably* believe that Partner A's response was motivated by sex). *See* FRE 801(c)(2). In all events, the statements are also admissible under FRE 803(1) and 803(3). Jones Day's remaining assertions (beginning with "To the extent") are nonresponsive and should be disregarded. They are also false. The notion that Partner A's experience with an associate that he suggests was racist is remotely analogous to the situation here is absurd. And Partner A's insecurity around less deferential women but not less deferential men *is* sexist.

507. Female Associate A also told Julia about her own experience with Partner A: "[W]hen [she] rewrote his memo, [s]he had the bankruptcy associate send it and [Partner A] didn't say a word." Sheketoff Ex. 41 at P02166; *see also* Chase Ex. 80 (Sheketoff) at 136:17-22.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 507 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's sole basis for "disput[ing]" this statement is that it is supposedly inadmissible hearsay.  As discussed above, the substance of this evidence may be considered at summary judgment if it can be produced in admissible form at trial.  *See* Preliminary Statement D. Here, it is undisputed that Female Associate A will testify at trial consistent with her text messages. In any event, the text messages themselves (statements by a Jones Day lawyer about her own work at Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D).  They are also cited here for at least one non-hearsay purpose (even if they are cited also to prove the truth of the matter asserted): to prove Julia's bases for thinking that Partner A discriminated against her (and thus disprove Jones Day's false assertions that her complaint is in bad faith). *See* FRE 801(c)(2).

508.    Female Associate A's statements strengthened Julia's belief that Partner A's hostile response to her suggested was motivated by sex.  Sheketoff Decl. ¶¶ 24-26; Chase Ex. 80 (Sheketoff) at 136:7-137:5; *see also* Sheketoff Ex. 39 at P04178 ("I do think [Partner A] is sexist, and that's why he was so offended").

**RESPONSE:** Disputed in part. It is undisputed that Statement 508 describes Sheketoff's assertions as to her beliefs regarding Partner A's response. Defendants dispute that Sheketoff could reasonably interpret Partner A's email as conveying hostility for the reasons set forth in response to Statement 499. Defendants further dispute that Sheketoff could reasonably believe Partner A's comments were motivated by sexism because there is no indication the associates in Female Associate A's anecdote were similarly situated to Sheketoff. To the contrary, Partner A testified that no other lawyer—male or female—with whom Partner A has worked has

ever repeatedly rejected his revisions and changed the writing back to the way it had been in the manner Sheketoff had. Chase Ex. 84, Partner A Tr. 288:6-16.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement does not make an assertion about what it was "reasonable" for Julia to believe.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  While irrelevant, Jones Day's assertion that Julia could not "*reasonably* interpret Partner A's email as conveying hostility" is also false: Partner F and Female Associate A both indisputably shared the same interpretation. *See* PSF ¶¶ 501-03.  Similarly, Jones Day's assertion that Julia could not "*reasonably* believe Partner A's comments were motivated by sexism" is false as well: Female Associate A agreed with Julia, and Partner F never suggested he disagreed.  PSF ¶ 506, Sheketoff Ex. 39 at P04178, P04199.  Further, as discussed in PSF ¶ 494 (Plaintiffs' Reply), Julia did not "repeatedly reject[] his revisions" and that is not what Partner A was annoyed at her for.

509.    When Julia learned of Partner A's performance review of her, it further strengthened her belief that her sex was a motivating factor in his hostile response to her suggested edits. Sheketoff Decl. ¶ 27.

**RESPONSE:** Disputed in part. It is undisputed that Statement 509 describes Sheketoff's assertions as to her beliefs regarding Partner A's performance review. Defendants dispute Plaintiffs' assertion that "sex was a motivating factor" and that Partner A's response was "hostile" for the reasons set forth in response to Statements 499 and 504, above. Further disputed that Partner A's review was a reasonable basis for Sheketoff to believe that he had discriminated based on sex because nothing about the review suggests any sex bias. *See* Chase Ex. 15 at JD_JS_00001293.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement makes an assertion about Julia's beliefs, not Partner A's motivations and what it was "reasonable" for Julia" to believe.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, Jones Day's assertion that Partner A's review was not a reasonable basis for Julia to believe that he had discriminated against is obviously false in light of (a) the lies Partner A tells about Julia in the review, PSF ¶¶ 516-600; *see also* PSF ¶¶ 601-621 (gratuitous negative statements to harm Julia); and (b) the additional evidence of Partner A's discriminatory motive of which Julia was aware at the time, PSF ¶¶ 622-633.

**510.**   Julia believed that sex was a motivating factor in Partner A's performance review of her.  Sheketoff Decl. ¶ 27; Chase Ex. 80 (Sheketoff) at 136:1-6.

**RESPONSE:** Disputed in part. It is undisputed that Statement 510 describes Sheketoff's assertions as to her beliefs regarding Partner A's performance review. Defendants dispute Plaintiffs' assertion that "sex was a motivating factor in Partner A's performance review of her" for the reasons set forth in response to Statement 504, above. Further disputed that Partner A's review was a reasonable basis for Sheketoff to believe that he had discriminated based on sex because nothing about the review suggests any sex bias. *See* Chase Ex. 15 at JD_JS_00001293.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement makes an assertion about Julia's beliefs, not Partner A's motivations and what it was "reasonable" for Julia" to believe.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, Jones Day's assertion that Partner A's review was not a reasonable basis for Julia to believe that he had discriminated against her is obviously false in light of (a) the lies Partner A tells about Julia in the review, PSF ¶¶ 516-600; *see also* PSF ¶¶ 601-621 (gratuitous

negative statements to harm Julia); and (b) the additional evidence of Partner A's discriminatory motive of which Julia was aware at the time, PSF ¶¶ 622-633.

**511.**   Partner A's narrative review of Julia is very negative.   Chase Ex. 15 at JD_JS_00001293.

> **RESPONSE:** Disputed.  Statement 511 is argumentative interpretation of evidence.  It also is not supported by the citation. Partner A's narrative evaluation compliments Sheketoff because "the research and learning the material presented no problems," even though it involved a "complicated issue" that was "fact[ ]intensive." Chase Ex. 15 at JD_JS_00001293. The narrative review also notes that Sheketoff's initial drafts were too "academic," that she exhibited "little-to-no-initiative," that she displayed availability issues, and that he had an "impression" that she lacked interest in the Firm. *Id.*

> **REPLY:** This statement is not genuinely disputed.   Jones Day claims that this statement is an argumentative interpretation of the evidence.   That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute.  *See* Preliminary Statement A.  Jones Day also says that Partner A's review is not negative.  That is incorrect.  In short, the view asserts that Julia "was overly academic and not invested in the firm, and, presumably, for those reasons the firm should not be invested in her."  *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 29 (D.D.C. 2020).  In any event, the negativity of the review is self-evident, Chase Ex. 15 at JD_JS_1293, especially in comparison to Partner A's other reviews, Chase Ex. 39.

**512.**   The numerical ratings that Partner A assigned to Julia are also negative—and indeed lower than those he assigned to virtually every other associate during his tenure at the firm.  Chase Ex. 15 at JD_JS_00001293; Sheketoff Ex. 142.

**RESPONSE:** Disputed.  Statement 512 is argumentative interpretation of evidence.  It also is not supported by the citation. Partner A's review of Sheketoff's 2016 performance includes a mixture of 3s ("Satisfactory") and 4s ("Exceeds Expectations") for all categories of her work. Chase Ex. 15 at JD_JS_00001293. Partner A's numerical ratings for other associates—male and female—are similarly mixed. By way of example, ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

**REPLY:** This statement is not genuinely disputed.  Jones Day says the statement is an argumentative interpretation of the evidence.   That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute.  *See* Preliminary Statement A.  Jones Day also responds that Julia's ratings were "mixed" and "Partner A's numerical ratings for other associates" are "similarly mixed."  That is not responsive to this statement, which asserts that the numerical ratings he gave to Julia are *lower* than those he assigned to virtually every other associate during his tenure at the firm—not whether his ratings for Julia and others were mixed or not.  This statement is thus admitted its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, Partner A's ratings themselves are available (and cited above) and they indisputably support this statement.

**513.**   Partner A understood that his evaluation was negative and critical.   Chase Ex. 84 (Partner A) at 77:7-11, 136:11-14, 139:3-4.

**RESPONSE:** Disputed.   Statement 513 is not supported by the evidence.        Partner A nowhere testifies that he understood or believed that his evaluation was negative or critical overall. Partner A did not believe his comments about Sheketoff's writing would be perceived as a criticism, Chase Ex. 84, Partner A Tr. 76:13-15, 77:16-18, but rather that she "has the typical writing transition challenges that most clerks have who just recently clerked," *id.* at 77:7-11. Partner A also did not believe that his statements that Sheketoff "was not long for firm life" and was "not into" the Firm were negative or a criticism but were rather his impressions of Sheketoff's future plans and interest in the Firm that could be confirmed or refuted by others' impressions and, if confirmed, communicated to Sheketoff for her improvement. *Id.* at 83:15-85:13, 100:4-19. Partner A understood that a specific comment in his evaluation regarding the number of hours he believed Sheketoff billed on billable matters would be "perceive[d]" as a negative statement by other people, *Id.* at 136:11-14, and that another specific statement that he guessed Sheketoff "would soon leave to become a professor" was a criticism, *id*. at 138:10-139:4.

**REPLY:** This statement is not genuinely disputed.   The evidence cited is clear and, after some obfuscation, Jones Day ultimately admits: "Partner A understood that a specific comment in his evaluation regarding the number of hours he believed Sheketoff billed on billable matters would be 'perceive[d]' as a negative statement by other people and that another specific statement that he guessed Sheketoff 'would soon leave to become a professor' was a criticism." (citations omitted).  *See also* PSF ¶ 514 (citing Chase Ex. 84 (Partner A) at 85:9-16, 100:20-101:11 (admitting that appearing "not long for firm life" was something that Julia would need to change "to have a successful career at the firm" and be promoted to partner)); Chase Ex. 84 (Partner A) at

95:15-22 (admitting that being not "into" the firm would be perceived in the same way as being not long for firm life)).

514.    Partner A thought that, if credited, his performance evaluation of Julia could harm her career at Jones Day.  Chase Ex. 84 (Partner A) at 85:14-16, 95:14-21, 100:22-101:2; *see also id.* at 63:13-18.

**RESPONSE:** Disputed.  Statement 514 is directly contradicted by Partner A's testimony that he did not intend his performance evaluation to harm Sheketoff:

Q. Did you intend for your evaluation of me to harm me?

A. No.

Q. Did you intend for your evaluation to harm my career?

A. No.

Chase Ex. 84, Partner A Tr. 226:19-227:2.

By way of further response, Partner A testified that he hoped that his impressions of Sheketoff, if confirmed by other reviewers, would be conveyed to her during her evaluation, so that if she "wanted to change that perception of [her], [she] would actually come in more and do more client work, in which case the impression of [her] would change." *Id*. at 84:20-85:8; 85:17-87:10.

**REPLY:** This statement is not genuinely disputed.  The statement makes an assertion about whether Partner A thought his review, if credited, could harm Julia's career—not what Partner A purportedly *intended*.  Jones Day's answer is thus nonresponsive and should be disregarded.  Because Jones Day has identified no evidence that controverts this statement, which is supported by numerous citations to the record, the statement is admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**515.** Partner A's performance review of Julia contained numerous deliberately false statements about Julia, as discussed below.  Chase Ex. 80 (Sheketoff) at 89:11-91:1.

**RESPONSE:** Disputed.  Statement 515 is argumentative interpretation and mischaracterization of evidence. Statement 515 is also directly contradicted by Partner A's testimony that the statements in his review were "truthful" statements about his "impression" of Sheketoff, Chase Ex. 84, Partner A Tr. 77:19-78:1, 108:14-18, 112:1-5. Partner A testified that he understood his job in writing evaluations to be to "provide the firm [his] honest assessment of [the associate's] abilities and their potential for future growth." *Id.* at 86:6-9. Partner A testified at length regarding the basis for each statement in his review. *Id.* at 67:12-77:18 (writing), 77:19-111:22, 137:7-143:1 (availability / commitment to firm), 112:1-125:14 (initiative), 125:15-135:6 (weekend availability), 135:9-137:6 (hours), 143:2-159:9 (numerical ratings). Some of Partner A's criticisms—like his "impression" that Sheketoff did not bill 2,000 hours, did not do weekend work on their matter together, and that she would soon leave Jones Day—are true as a matter of undisputed fact.  Chase Ex. 15 at JD_JS_00001293, JD_JS_00001296, Chase Ex. 40 at JD_00003191, Chase Ex. 80, Sheketoff Tr. 23:21-24:3; Sheketoff Ex. 149 at line 1644 (████████

████████████████████████████████████████████████████████████████

██). Partner A's opinions about Sheketoff's writing were consistent with his contemporaneous emails critiquing Sheketoff's work. *See, e.g.,* Chase Ex. 36 at JD_JS_00001443. And Partner A's opinions about Sheketoff's writing, availability, and initiative were all echoed by multiple other reviewers whom Sheketoff does not claim were biased. *See generally* Chase Ex. 15 at JD_JS_00001293-95; DSF ¶ 217 (writing), ¶ 219 (initiative / attitude), ¶ 222 (availability), ¶ 242 (writing, availability), ¶ 244 (writing), ¶ 246 (availability), ¶ 248 (availability and initiative).

**REPLY:** Plaintiffs prove this statement in the paragraphs below (PSF ¶¶ 516-615). Jones Day claims that this statement is contradicted by Partner A's testimony that he was "telling the truth" in his review (and thought he was supposed to be "honest" in his reviews). But Partner A's testimony that he was actually being honest is foreclosed by the record. As shown in PSF ¶¶ 516-615, Partner A made *specific factual assertions* about Julia that are directly contradicted by the undisputed documentary evidence in this case. Jones Day also claims that Partner A's supposed "impression … that Sheketoff … did not do weekend work on their matter together" is true. Actually, even adopting Jones Day's characterization of Partner A's assertion about her weekend work, it is false. As Jones Day acknowledges, █████████████

█████████████████████████; that is weekend work. More fundamentally, what Partner A actually said was that: "Working on a weekend does not seem to be in her vocabulary." Chase Ex. 15 at JD_JS_00001293. He explained what he meant by that during the litigation associate review meeting in the D.C. office and during his own deposition: On multiple occasions, Julia supposedly *refused* to work on the weekend. PSF ¶ 586; *see also* PSF ¶ 587 ("struggled to get any weekend help from [Julia]"). As shown below, the factual record leaves no room for dispute that the representation was false. PSF ¶¶ 588-99. Next, Jones Day claims that Partner A was right about his "impression … that [Julia] is not long for firm life." But, as shown below, Julia actually stayed at Jones Day for nearly four years—longer than any other associate who clerked on the Supreme Court her Term but one (PSF ¶ 610), and longer ██████

█████████████████████████████████████████

███████████████████████████████████ (Chase Ex. 39 at JD_00002859 (█████ Sheketoff Ex. 160 (█████ Indeed, Julia stayed at the firm for nearly an additional two years after Partner A submitted his evaluation of her. JDSF ¶ 21. Jones

Day notes that Partner A was correct in "guess[ing] … that [Julia] did not bill 2000 hours last year," but Julia has never alleged (and does not allege in this statement) that that particular "guess" turned out to be wrong.  Jones Day then says that Partner A's supposed "opinions" about Julia's writing were consistent with his contemporaneous emails critiquing Julia's work.   Again, the record proves the opposite.  Before Julia annoyed him by suggesting revisions to his work, Partner A told Partner F that Julia did a "*great job*" on her initial draft of the memo.  PSF ¶ 534.  But in his review, Partner A reported that that Julia's initial drafts were "far more academic / pure legal analysis that helpful advice to the client" and in fact contained "little to no advice or direction to the client."  Chase Ex. 15 at JD_JS_00001293.  Before he got annoyed with Julia, he told her that her "legal research and writing [were] very strong," Sheketoff Ex. 82 at JD_JS_00001428, but then in her review he gave her a "satisfactory" numerical rating for her writing and had only negative things to say about it, Chase Ex. 15 at JD_JS_00001293.  And rather than say that her research skills were "very strong," Partner A said dismissively that they simply "presented no problems."  *Id.*  Moreover, Partner A's sole criticism of Julia during their project (apart from the email in which he scolded her from second-guessing his edits) was to "write more like an advocate and advisor to a general counsel and corporate boards.  *That means*, at least in part, less 'one could argue' language and more definitive statements, at least in the executive summary."  Sheketoff Ex. 82 at JD_JS_00001428.  That *stylistic suggestion* to avoid using the phrase "one could argue" does not appear in his review and is in no way supportive of his review's allegation that Julia altogether failed to provide substantive "advice or direction" in her initial drafts of the memo.  Chase Ex. 15 at JD_JS_00001293.  Finally, Jones Day says that Partner A's claims about Julia's writing, availability, and initiative were echoed by other reviewers.  That is not true.  Again, Partner A

made *specific factual assertions* about Julia's work, failure to turn around drafts when requested, and refusal to work on the weekend.  No one else said anything like that.  PSF ¶¶ 433-66, 550-51.

516.    Partner A's review states: "[H]er initial drafts were far more academic / pure legal analysis than helpful advice to the client.  In fact, there was little-to-no advice or direction to the client.  That improved in subsequent drafts, however."  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed.

517.    Those statements are false.  Chase Ex. 80 (Sheketoff) 89:11-19.

**RESPONSE:** Disputed. There is no evidence to support Plaintiffs' claim that anything in Partner A's review was "false," let alone deliberately false, for the reasons stated in Response 515. With respect to Sheketoff's writing, Partner A's 2017 review of Sheketoff is consistent with his contemporaneous feedback on Sheketoff's drafts of the memo. Partner A's March 1, 2016, email to Sheketoff—submitted over nine months before his narrative evaluation while Partner A and Sheketoff were actively revising the client memorandum—expressly states that Partner A "wanted [Sheketoff] to learn to write more like an advocate and advisor to a general counsel and corporate boards," which meant "less 'one could argue' language and more definitive statements, at least in the executive summary." Chase Ex. 36, JD_JS_00001443. Numerous evaluations that Sheketoff does not allege were "a product of discrimination" also describe Sheketoff's writing as academic and lacking in client advocacy. For instance, one partner—who is not Partner A— commented that Sheketoff's "draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an advocate for a client." Chase Ex. 15 at JD_JS_00001294; Chase Ex. 80, Sheketoff Tr. 97:3-98:2. Another partner—also not Partner A— commented that Sheketoff was "a little too academic and intellectually stubborn." Chase Ex. 18 at JD_00003742, Chase Ex. 15 at JD_JS_00001293, Chase Ex. 80, Sheketoff Tr. 97:3-98:2. Yet

another reviewer stated that Sheketoff's "initial written draft of the opening brief was not as strong as it could have been . . . because she was not persuaded by our argument on the merits and found it difficult to transition from the law-clerk role to the advocate role." Chase Ex. 15 at JD_JS_00001297. And Partner A testified extensively about his basis for his opinions about Sheketoff's writing. Chase Ex. 84, Partner A. Tr. 68:11-77:18.

**REPLY:** Plaintiffs prove this statement in PSF ¶¶ 518-551. Jones Day then says that Partner A's review is consistent with his contemporaneous feedback. Again, the record proves the opposite. Before Julia annoyed him by suggesting revisions to his work, Partner A told Partner F that Julia did a "*great job*" on her initial draft of the memo. PSF ¶ 534. But in his review, Partner A reported that that Julia's initial drafts were "far more academic / pure legal analysis that helpful advice to the client" and in fact contained "little to no advice or direction to the client." Chase Ex. 15 at JD_JS_00001293. Before he got annoyed with Julia, he told her that her "legal research and writing [were] very strong," Sheketoff Ex. 82 at JD_JS_00001428, but then in her review he gave her a "satisfactory" numerical rating for her writing and had only negative things to say about it, Chase Ex. 15 at JD_JS_00001293. And rather than say that her research skills were "very strong," Partner A said that they simply "presented no problems." *Id.* Moreover, Partner A's sole criticism of Julia during their project (apart from the email in which he scolded her from second-guessing his edits) was to "write more like an advocate and advisor to a general counsel and corporate boards. *That means*, at least in part, less 'one could argue' language and more definitive statements, at least in the executive summary." Sheketoff Ex. 82 at JD_JS_00001428. That *stylistic suggestion* to avoid using the phrase "one could argue" does not appear in his review and is in no way supportive of his review's allegation that Julia altogether failed to provide substantive "advice or direction" in her initial drafts of the memo. Chase Ex. 15 at JD_JS_00001293. Finally,

Jones Day says that Partner A's assertions about Julia's writing are corroborated by other reviews. But Partner A said that Julia's memo provided "little-to-no advice or direction to the client."  No one else said anything like that.  PSF ¶¶ 550-51.

518.    The assignment that Partner A gave to Julia was to research and draft a memorandum about "███████████████████████████████████████████████████████ ███████████████████████████." Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed that Partner A's evaluation of Sheketoff describes the assignment as excerpted in Statement 518. By way of further response, Partner A requested research assistance regarding "███████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████ Chase Ex. 33 at JD_JS_00000410. It was conveyed to Sheketoff that the purpose of the research was ████████████████████ ████████████████ *Id.* And, Sheketoff understood that the assignment related to ████████████ ██████████████████████████ Chase Reply Ex. 97 at JD_JS_00000458.

**REPLY:** Jones Day does not dispute any part of this paragraph.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded. It is also misleading, as the quotes come from Partner A's first request for research assistance and the project evolved (as Partner A's own description of the project makes clear, Chase Ex. 15 at JD_JS_00001293).

519.    Whether an ████████████████████████████████████████████████████ ██████████████████████████████████████," it was the only task Partner A assigned

to Julia. Chase Ex. 15 at JD_JS_00001293; Chase Ex. 84 (Partner A) 37:18-38; Sheketoff Decl. ¶ 29.

**RESPONSE:** Disputed. Statement 519 is argumentative interpretation of evidence. As further set forth in Defendants' response to Statement 518, Sheketoff was asked ███████ ███████████████████████████████████████████████████████████. *See* Response 518.

**REPLY:** Jones Day's sole basis for disputing this statement is that it is "argumentative interpretation of evidence."  That conclusory assertion is neither accurate nor an adequate basis to dispute a statement.  *See* Preliminary Statement A.  This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

520.   All of Julia's drafts—from the initial draft to the final draft—assessed th███████ ████████████ as requested by Partner A.  Sheketoff Ex. 75; Sheketoff Ex. 77; Sheketoff Ex. 79; Sheketoff Ex. 81 at JD_JS_00000618-629; Sheketoff Ex. 84; Sheketoff Ex. 85; Sheketoff Ex. 86; Sheketoff Ex. 89; Sheketoff Ex. 90; Sheketoff Ex. 94; Sheketoff Ex. 97; Sheketoff Ex. 100.

**RESPONSE:** Disputed in part.  It is undisputed that Partner A noted that Sheketoff's "legal research and writing [was] very strong" in the drafts of the memo. Chase Ex. 36 at JD_JS_00001443. Defendants dispute Plaintiffs' assertion that the draft was "as requested" by Partner A, for the reasons stated in Response 487.

**REPLY:** Jones Day does not dispute that all of Julia's drafts—from the initial draft to the final draft—assessed ██████████████████████, which is what Partner A requested that she do.  Jones Day's purported disputes about, e.g., whether Julia exhibited initiative (as discussed in its response to PSF ¶ 487) are non-responsive to this statement, and addressed in PSF ¶¶ 516-64.

**521.**     In other words, the only "helpful advice" or "advice or direction" requested from Julia was precisely what Julia provided.  Chase Ex. 15 at JD_JS_00001293; Sheketoff Decl. ¶ 29.

**RESPONSE:** Disputed. Statement 521 is argumentative interpretation of evidence that is not supported by the citation provided or consistent with the evidentiary record. Plaintiffs' assertion that the memo provided was as "requested" is not supported by the evidence for the reasons stated in Response 487. Defendants further dispute Statement 521 to the extent it is meant to imply that Partner A made "deliberately false statements" about Sheketoff's writing, for the reasons stated in Responses 515 and 517. As explained in Response 517, Partner A's opinions about Sheketoff's writing were consistent with his contemporaneous feedback to Sheketoff about her drafts and with numerous evaluations that Sheketoff do not allege to be a product of discrimination.

**REPLY:** Jones Day has already admitted the substance of this statement in its response to PSF ¶¶ 518-20.  The "helpful advice" or "advice or direction" requested from Julia was the assessment of ██████████████████████, and it is undisputed all of Julia's drafts assessed ███████████████. As discussed above (in Plaintiffs' replies to PSF ¶¶ 515 and 517), Partner A's review asserted that Julia's memo provided "little-to-no advice or direction"—but no other reviewer said that.  *See also* PSF ¶¶ 550-51.  Nor was that assertion consistent with Partner A's contemporaneous feedback.  PSF ¶¶ 534-36; *see also* PSF ¶¶ 539-49.

**522.**     The amount of "advice or direction" did not change between Julia's initial drafts and subsequent drafts.  Sheketoff Ex. 75; Sheketoff Ex. 77; Sheketoff Ex. 79; Sheketoff Ex. 81 at JD_JS_00000618-29; Sheketoff Ex. 84; Sheketoff Ex. 85; Sheketoff Ex. 86; Sheketoff Ex. 89; Sheketoff Ex. 90; Sheketoff Ex. 94; Sheketoff Ex. 97; Sheketoff Ex.144; Sheketoff Ex. 100.

**RESPONSE:** Disputed.  Statement 522 is argumentative interpretation of evidence. Sheketoff's initial drafts were "more academic/pure legal advice than helpful legal advice to the client" because "there was a lot of one could argue this, one could argue that." Chase Ex. 84, Partner A Tr. 68:20-69:2; Chase Ex. 36, JD_JS_00001443. Defendants further dispute Statement 522 to the extent it is meant to imply that Partner A made "deliberately false statements" about Sheketoff's writing, for the reasons stated in Responses 515 and 517. As explained in Response 517, Partner A's opinions about Sheketoff's writing were consistent with his contemporaneous feedback to Sheketoff about her drafts and with numerous evaluations that Sheketoff do not allege to be a product of discrimination.

**REPLY:** This statement is not genuinely disputed.  At his deposition, Partner A testified that the "helpful legal advice" missing from Julia's initial drafts of the memo was an assessment of "the likelihood of success."  PSF ¶ 523.  As Partner A explained (in the testimony immediately after the quotation supplied by Jones Day), "[t]here was no advice, especially that was readily apparent early on in the memo, about what the client was actually facing and what the chances of success were that ███████████ had."  Chase Ex. 84 (Partner A) at 69:6-9.  The evidence cited in this statement, *which comprises all the drafts of the memo*, forecloses any argument that amount of assessment of "the likelihood of success" changed between drafts. Moreover, as discussed above (in Plaintiffs' replies to PSF ¶¶ 515 and 517), Partner A's review asserted that Julia's memo provided "little-to-no advice or direction"—but no other reviewer said that. *See also* PSF ¶¶ 550-51.  Nor was that assertion consistent with Partner A's contemporaneous feedback.  PSF ¶¶ 534-36; *see also* PSF ¶¶ 539-49.

**523.**     At his deposition, Partner A testified that the "helpful advice" supposedly missing from Julia's initial drafts was "the likelihood of success.  And that can be qualitative.  It doesn't have to be quantitative."  Chase Ex. 84 (Partner A) 71:12-72:8.

**RESPONSE:** Disputed in part. Undisputed that Partner A testified that the helpful advice would include "something akin to" "the likelihood of success." Chase Ex. 84, Partner A Tr. 71:12- 72:8. Partner A also testified that, based on his recollection, the memo's "assessment of the strength of the arguments" was not "stated very forcefully and it wasn't stated prominently." *Id.* at 71:2-11. He also testified that "the end result was a much more polished piece and a much more helpful piece to the client than [the] initial iterations were." *Id.* at 74:2-18.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response is nonresponsive and should be disregarded.  In any event, that testimony does not help Jones Day, because it is inconsistent with the specific factual assertion in Partner A's review that "there was little-to-no advice or direction to the client" in Julia's initial drafts, but "that improved in subsequent drafts"—not that the advice or direction was stated insufficiently forcefully or prominently.  Chase Ex. 15 at JD_JS_00001293.

**524.**     The initial version of the memorandum described the "likelihood of success" like this:



Sheketoff Ex. 75 at JD_JS_00000459 (emphasis added).

**RESPONSE:** Disputed in part.  It is undisputed that the memorandum states that "█

████████████████████████████████████████████████████████████

███████████████████████████████ *Sheketoff* Ex. 75 at JD_JS_00000459. That sentence

appears in the middle of the second paragraph, with no heading and no description of the discussion

as presenting the "likelihood of success." *Id*. By way of further response, Partner A testified that

the memo's "assessment of the strength of the arguments" was not "stated very forcefully and it

wasn't stated prominently." Chase Ex. 84, Partner A Tr. 71:2-11. Defendants further dispute this

statement is actually a statement of advice about the "likelihood of success." The statement simply

says that ██████████████████████████████████████████████████████

██████████████████████████████████████████████. Such a tautology

would not be helpful advice to a client, as Partner A testified. Chase Ex. 84, Partner A Tr. 69:1-

70:5, 73:1-6, 195:7-199:11.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus

admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's

answer (beginning with "That sentence appears") is nonresponsive and should be disregarded.

And those nonresponsive assertions are not helpful to Jones Day in any event.  Partner A's review

does not criticize Julia for providing helpful advice insufficiently "forcefully" or "prominently" or

"with no heading," but for providing "little-to-no advice or direction to the client" at all.  Chase

Ex. 15 at JD_JS_00001293.  Jones Day also claims that the quotation in this statement is not

actually an assessment of the likelihood of success because it rests on the assumption that the

████████████████████████████████████████████████. But Partner A acknowledged

that it was such an assessment (Chase Ex. 84 (Partner A) at 195:19-199:11)—and indeed he had

directed Julia to make the precise assumptions on which the analysis admittedly rested, PSF ¶ 531;

*see also id.* at 201:1-15 ("██████████████████████████████████████████████

 Jones Day also bizarrely claims that the assessment of the likelihood of success was "tautological" because it rested on assumptions about ████████████████████████████████. That is wrong (███████████ ████████████████████████████████████████ ████████████████████████), but if true it would simply condemn Partner A's choice to have Julia write a memo assessing █████████ without having first verified his own assumptions about the ████████████████████. It certainly doesn't condemn *only* Julia's summary of her analysis, which by Jones Day's argument, is inseparable from those assumptions.

525.    The final version of the memorandum described the "likelihood of success" like this:

████████████████████████████████████

████████████████████ Sheketoff Ex. 100 at JD_JS_00001929 (emphasis added).

**RESPONSE:** Disputed in part. Undisputed that Statement 525 includes an excerpted portion of the executive summary of the final version of the memorandum. That executive summary also provides a qualitative assessment of the strength of the arguments described "█ ████████████████████████████████ ████████████████████████" Sheketoff Ex. 100 at JD_JS_00001930. Defendants further dispute Statement 525 to the extent it implies that the final memorandum's "likelihood of success" is no different from the quoted language in Statement 524, for the reasons stated in Response 526.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day also points to

language in the final version of the memo that initially appeared in ███████ of the memo ("███████

███████████████████████), suggesting it also "provides a qualitative assessment." *See*

Sheketoff Ex. 78 (████████); Sheketoff Ex. 80 (█████████████████████████████).



Chase Ex. 84 (Partner A) at 187:21-199:11.

526.    There is no qualitative or quantitative difference in the likelihood of success described

in the initial and final versions of the memo: █████████████████████████████████

Sheketoff Ex. 75 (Plaintiffs' Ex. 46) at JD_JS_00000459; Sheketoff

Ex. 100 at JD_JS_00001929.

**RESPONSE:** Disputed. Statement 526 is argumentative interpretation of evidence and

is not supported by the evidence cited. As set forth in response to Statement 525, the discussion of

the likelihood of success in the final version of the memo included additional analysis set forth in

a specific "Executive Summary." In comparison, as Partner A testified, the initial draft of the

memo's "assessment of the strength of the arguments" was not "stated very forcefully and it wasn't

stated prominently." Chase Ex. 84, Partner A Tr. 71:2-11. Furthermore, the final version removed

the tautological assumption in Sheketoff's original draft, *see* Response 524, which, as Partner A

testified, undermined and ███████" Sheketoff's assessment of the likelihood of success. Chase

Ex. 84 (Partner A) 195:7-199:11. In contrast, by removing the assumption, the revised version's

likelihood of success was "██████████████████████ and more useful to a

client. *Id.*; *see also id.* at 199:4-11 ("█████████████████████████

████████████████████████████████

███████████████████████████").



**REPLY:** This statement is not genuinely disputed.  First, Jones Day points to language in the final version of the memo that initially appeared in ██████ of the memo ("██████ ██████ ████████"). *See* Sheketoff Ex. 78 (██████); Sheketoff Ex. 80 (██████ ██████ ██████6).  But as discussed in Plaintiffs' reply to PSF ¶ 525, ██████ ██████ ██████████████████████████████████████████████.  Chase Ex. 84 (Partner A) at 187:21-199:11.  Second, Jones Day says that the assessment of the likelihood of success differs in the two memos in that it is stated more "██████ and "██████ in the later memo.  Using the word "██████ as opposed to "████ doesn't make the latter memo's statement of the likelihood of success more "██████ and whether or not the assessment was "██████ is irrelevant to this statement (and irrelevant to this case, since Partner A's review asserted that the assessment was missing altogether, not that it was ██████).  Finally, Jones Day says that the statement of the likelihood of success in the final memo was "██████" because it did not have the "██████."  But as Partner A admitted, he directed Julia to make the relevant assumptions and acknowledged that the likelihood of success was dependent on those assumptions.  PSF ¶ 531 ██████ ████████████████████████████ ██████ ██████ ██████); *see also* Sheketoff Ex. 91 at JD_JS_000009231.

**527.**   During his deposition, Partner A was forced to acknowledge that in fact Julia's initial memorandum *did* identify the likelihood of success—indeed, the same likelihood of success identified in the final version of the memo.  Chase Ex. 84 (Partner A) 195:7-199:11.

**RESPONSE:** Disputed. Statement 527 is argumentative interpretation of evidence. During his deposition, Partner A testified that the likelihood of success in the initial memo was not ██████████████████████████████████████████████

 Chase Ex. 84, Partner A Tr. 195:7-21. By way of further response, while Partner A testified that the initial memorandum contained a phrase that "could be" interpreted as ███████████████████████ (*id.* at 196:1-2) the final memorandum included a statement of the likelihood of success that was ████████████████," and contained "█████████ language because it removed the tautological assumption Sheketoff had included, as described in Response 526. *Id.* at 197:16-198:22.

**REPLY:** This statement is not genuinely disputed. Whether or not, for example, the assessment was "███████████████████" is irrelevant to this statement, which asserts that the substance of the assessment of the likelihood of success in the memos was identical. And Partner A's testimony directly supports this statement.

**528.**   Partner A pivoted, 

███████ . Chase Ex. 84 (Partner A) 195:7-199:11.

**RESPONSE:** Disputed. Statement 528 is argumentative interpretation of evidence. Undisputed that Partner A testified that the final memorandum included a likelihood of success that was "███████████████," and contained "█████████" language. Chase Ex. 84, Partner A. Tr. 197:16-198:22. Defendants dispute Plaintiffs' assertion that this position represented a "pivot[ ]." As explained in Response 526, Partner A's removal of Sheketoff's tautological assumption made the likelihood of success more clear for a client. This is also consistent with Partner A's March 1, 2016, email to Sheketoff describing his edits to the memorandum and noting that he "want[ed] Sheketoff to learn to write more like an advocate and

advisor to a general counsel and corporate boards. That means, at least in part, less 'one could argue' language and more definitive statements . . ." Chase Ex. 35 at JD_JS_00001428.

**REPLY:** This statement is not genuinely disputed. Partner A "pivoted" by abandoning his review's assertion that Julia's initial drafts contained "little-to-no advice or direction to the client" and instead claiming in his deposition that, as this statement asserts and as Jones Day admits in its response, the problem with Julia's initial drafts was actually that the likelihood of success should have been more ███████████████████████████████.

**529.**   But that isn't what Partner A said in his review. Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Disputed. Partner A's review described Sheketoff's initial drafts as "far more academic / pure legal analysis than helpful advice to the client." Chase Ex. 15 at JD_JS_00001293. Consistent with this, Partner A testified that the likelihood of success included in early drafts of the memo was less clear than the executive summary included in subsequent drafts, which was "████████████████████████████████████████ ███████████████████. Chase Ex. 84, Partner A Tr. 197:17-199:3. As explained in Response 526, Partner A's removal of Sheketoff's tautological assumption made the likelihood of success more clear for a client. Partner A's review was also consistent with his March 1, 2016, email to Sheketoff in which he explained that he "wanted [Sheketoff] to learn to write more like an advocate and advisor to a general counsel and corporate boards," which meant "less 'one could argue' language and more definitive statements, at least in the executive summary." Chase Ex. 36, JD_JS_00001443.

**REPLY:** This statement is not genuinely disputed. Partner A's review asserts that Julia's initial drafts contained "little-to-no advice or direction to the client," not that the problem

428

was that her initial drafts ███████████████████████████████████

███████████████████████. Chase Ex. 15 at JD_JS_00001293.

**530.** The review criticized the memo ██████████████████████████

███████████████████████, but because it supposedly contained "little-to-no

advice or direction" at all.  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Disputed as an argumentative interpretation of evidence that is

inconsistent with the record evidence. Partner A's evaluation stated that "there was little-to-no

advice or direction to the client," but that this "improved in subsequent drafts." Chase Ex. 15 at

JD_JS_00001293. This statement is consistent with Partner A's testimony that Sheketoff's

tautological assumption—██████████████████████████████████████

██████████████████████████████████—rendered

Sheketoff's advice useless to a client, for the reasons explained in Response 526. Partner A's

review is also consistent with Partner A's March 1, 2016, email providing revisions to Sheketoff's

memo, which explained that he "wanted [Sheketoff] to learn to write more like an advocate and

advisor to a general counsel and corporate boards," which meant "less 'one could argue' language

and more definitive statements, at least in the executive summary." Chase Ex. 36,

JD_JS_00001443.

**REPLY:** This statement is not genuinely disputed.  Jones Day says it is an

argumentative interpretation of evidence.  That conclusory assertion is false and insufficient to

create a genuine fact dispute. *See* Preliminary Statement A.  Jones Day also says that this statement

is inconsistent with the record evidence, but this statement makes a verifiably accurate assertion

about a written document.  The bulk of Jones Day's answer (beginning with "This statement is

consistent with") is nonresponsive and should be disregarded, because this statement does not

make an assertion about Partner A's testimony.  Anyway, Jones Day's assertion that Julia's initial assessment of the likelihood of success was useless because it rested on assumptions is simply bizarre.  Not only is it incorrect (since the primary ███████████████████████████████ ██████████████████████████████████████████████████████████ ), but if true it would simply condemn Partner A's choice to have Julia write a memo assessing ██████ ██████ without having first verified his own assumptions.  It certainly doesn't condemn only Julia's *summary* of her assessment, which is admittedly inseparable from those assumptions.  In other words, ████████████████████████████, the assessment of ████████████████ indisputably *did* rest on Partner A's assumptions.  Jones Day's argument is that Julia's introductory paragraph summarizing the likelihood of success was useless because it did not pretend otherwise.

**531.**   In any event, as Partner A well knew, ██████████████████████ ████████████████████████████████████████████████████

Sheketoff Ex. 151 at JD_JS_00001367; Chase Ex. 84 (Partner A) 199:4-201:15.

**RESPONSE:** Disputed. Statement 531 is an argumentative interpretation of evidence that is not supported by the testimony cited. ██████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████." Chase Ex. 84, Partner A Tr. 199:12-16. ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████. *Id.* at 202:10-22.

**REPLY:** This statement is not genuinely disputed.  Jones Day does not dispute that

Partner A directed Julia ███████████████████████████████████████

███████████████████████.  That part of this assertion is therefore admitted.  Standing

Order 10(d)(iv)-(v); Local R. 7(h)(1).  And the evidence of that point is unequivocal in any event.

Sheketoff Ex. 151 at JD_JS_00001367; Sheketoff Ex. 91 at JD_JS_00000946; Chase Ex. 84

(Partner A) at 213:12-15.  Jones Day simply disputes that Partner A ██████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████  But this

assertion is about what Partner A knew at the time he submitted his review, and a jury would find

that Partner A plainly was aware of his own conduct during the project for which he was evaluating

Julia.

**532.**   And, as Partner A further understood, the likelihood of success of ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████.  Sheketoff Ex. 75 at JD_JS_00000459-62; Chase

Ex. 84 (Partner A) 199:4-201:15.

**RESPONSE:** Disputed. Statement 532 is an argumentative interpretation of evidence

that is not supported by the testimony cited. Defendants dispute the implication in Statement 532

that the memo's likelihood of success ███████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████." Chase Ex. 84, Partner A Tr. 202:10-22. *See* Response 531.

**REPLY:** This statement is not genuinely disputed.  Indeed, Jones Day takes an even more aggressive position on this issue when it says ████████████████████████

███████████████████████████████████████████████████████████████████

██████.  *E.g.*, PSF ¶ 526 (Jones Day's response) ("tautological").  In any event, Partner A testified as follows: ████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████ Chase Ex. 84 (Partner A) at 201:1-3.

**533.**    The only arguable assessment of the likelihood of success Partner A added to the memo between Julia's initial draft and the final draft was a ████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████

**RESPONSE:** Disputed. Statement 533 is an argumentative interpretation of evidence that is not supported by the evidence cited. As set forth in Defendants' responses to Statements 525 through 530, after an iterative process of revisions, *see* Chase Ex. 84, Partner A Tr. 74:9-18, the final memorandum included a statement of the likelihood of success that was █████████ ████████ and contained "████████" language than Sheketoff's initial drafts. Chase Ex. 84, Partner A Tr. 197:16-198:22. Pursuant to Fed. R. Civ. P. 56(c), Defendants also object that Sheketoff Exhibits 80, 83, 88, 96, 99, and 150 are not authentic or admissible. These are documents Sheketoff created during discovery in this matter, and there is no evidence which versions she used to make the redlines or the history of revisions to those versions.

**REPLY:** This statement is not genuinely disputed.  Jones Day asserts that this statement is argumentative interpretation and not supported by the evidence.  That vague and conclusory assertion is incorrect and insufficient to create a genuine fact dispute.  *See* Preliminary Statement A.  This statement is directly supported by the cited evidence, which comprise the versions of the memos and redlines showing the changes that were made by Partner A.  Jones Day claims that Sheketoff Exhibits 80, 83, 88, 99, and 150 are not authentic or admissible.  As for authenticity, Julia has submitted a sworn declaration describing what these exhibits are: word documents created by comparing specifically identified documents produced by defendants.  *See* Sheketoff Decl. (identifying Exhibits 80, 83, 88, 99, and 150).  And if Julia's testimony is required to provide further details about her process of creating those word documents, that can be supplied at trial.  *See* Preliminary Statement D (evidence can be considered at summary judgment if it can

be produced in admissible form at trial).  Jones Day has not identified any other basis for challenging these exhibits' admissibility (which is not self-evident) and has forfeited the objection on that basis.

**534.**    Moreover, before he got "annoyed" by Julia's suggestions to his revisions, Partner A admitted to Partner F that Julia had done a "great job" on the initial draft of the memo.  Sheketoff Ex. 39 at P04088.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 534 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants also incorporate their response to Statement 494 in response to Plaintiffs' implication that Partner A was "annoyed" by Sheketoff's suggested edits. Partner A was not annoyed by Sheketoff's revisions, but by her repeated refusal to accept his changes. *See* Response 495. Also disputed to the extent Statement 534 implies that the comments on Sheketoff's writing in Partner A's review were meant to be critical. Partner A did not believe his comments about Sheketoff's writing would be perceived as a criticism, Chase Ex. 84, Partner A Tr. 76:13-15, 77:16-18, but rather that she "has the typical writing transition challenges that most clerks have who just recently clerked," *id*. at 77:7-11.

**REPLY:** This statement is not genuinely disputed.  Jones Day's "disputes" this statement on the ground that it is inadmissible hearsay.  That is incorrect.  As for Partner A's statement (to Partner F) that Julia had done a "great job," that statement is admissible for purposes apart from the truth of the matter asserted (i.e., that Julia had actually done a great job).  First, it is admissible to prove Partner A's perception of Julia's memo (i.e., that Partner A *perceived* Julia's memo as great).  Second, it is admissible as a prior statement by Partner A that is inconsistent with his review, to show that Partner A lied in his review.  Those are definitionally not hearsay purposes.

FRE 801(c)(2).  In any event, even if it were introduced for the truth of the matter asserted, Partner A's statement, which is an assertion by a Jones Day partner about Julia's work on their joint Jones Day project, is admissible under FRE 801(d)(2)(D).  As for Partner F's statement to Julia (about what Partner A had told him), the substance of that evidence can be considered at summary judgment as long as it can be introduced in an admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Partner F will testify at trial consistent with his text messages.  Jones Day also incorporates its response to PSF ¶ 494, but as discussed above, PSF ¶ 494 is not genuinely disputed and Jones Day's assertions in its response to PSF ¶ 494 are disproven by the record.  *See* PSF ¶ 494 (Plaintiffs' reply).  Jones Day does not otherwise dispute this statement.

**535.**     Similarly, before he got "annoyed" by Julia's suggestions to his revisions, Partner A told Julia directly that the initial draft of her memo was "really helpful" and admitted that his only revisions to the draft were "mostly style" edits.  Sheketoff Ex. 76 at JD_JS_00000487.

**RESPONSE:** Disputed in part.  Undisputed that Partner A emailed Sheketoff on February 5, 2016, requesting that she "[t]ake a look at the new version and redline," and stating: "Thanks for your help on this. It was really helpful. You'll see that my changes were mostly style . . . and, of course, spelling the client's name correctly[.]" Disputed to the extent that Statement 535 implies that Partner A had no concerns or critiques about Sheketoff's initial draft. The February 5, 2016, email was one email of several in an iterative editing process. Other feedback provided by Partner A included an encouragement that Sheketoff should "learn to write more like an advocate and advisor to a general counsel and corporate boards," which meant "less 'one could argue' language and more definitive statements, at least in the executive summary." Chase Ex. 36, JD_JS_00001443.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

536.     He never suggested to Julia that she had somehow failed to provide "helpful advice" or "advice or direction" that she should have.  Sheketoff Ex. 76 at JD_JS_00000487; Sheketoff Decl. ¶ 30.

**RESPONSE:** Disputed.   Partner A's March 1, 2016, email providing revisions to Sheketoff's memo explained that he "wanted [Sheketoff] to learn to write more like an advocate and advisor to a general counsel and corporate boards," which meant "less 'one could argue' language and more definitive statements, at least in the executive summary." Chase Ex. 36, JD_JS_00001443 This is consistent with the statements in Partner A's evaluation that her drafts were "more academic / pure legal analysis than helpful advice to the client," that "there was little-to-no advice or direction to the client," but that this "improved in subsequent drafts." Chase Ex. 15 at JD_JS_00001293.

**REPLY:** This statement is not genuinely disputed.  Jones Day claims that Partner A suggested that Julia had failed to provide "helpful advice" or "advice or direction" when he told her that she should use "less 'one could argue' language and more definitive statements."  But Partner A testified during his deposition that the "helpful advice" that her initial drafts of the memo was missing was "the likelihood of success."  Chase Ex. 84 (Partner A) 71:12-72:8.  That has nothing to do with whether Julia used "less 'one could argue' language and more definitive statements."  Indeed, neither Partner A nor Jones Day has ever identified a single place where Julia's use of "one could argue" language was connected to an assessment of the likelihood of success.

**537.** 

�â–ˆ Sheketoff Ex. 101.

**RESPONSE:** Disputed in part. Undisputed that a ██████████████████████

███████████████████████████████████████████████████

████████████████████████" Sheketoff Ex. 101. Defendants dispute Statement 537

to the extent it implies that ████████████████████████████████████

████████████████████████ as neither of those facts is supported by the evidence

cited.

**538.** ████████████████████████████████████████

████████████████████████████████████████████ Sheketoff

Ex. 102.

**RESPONSE:** Disputed in part. Undisputed that ██████ praised the final version of

the memorandum, which was the product of an "iterative process" of revisions involving both

Sheketoff and Partner A. Chase Ex. 84, Partner A Tr. 28:9-12, 74:9-18. Disputed to the extent

Statement 538 implies that the client saw or praised Sheketoff's initial version of the

memorandum.

**REPLY:** Jones Day does not dispute any part of this statement, which specifically

refers to the "final version of the memo." This statement is thus admitted in its entirety. Standing

Order 10(d)(iv)-(v); Local R. 7(h)(1).

**539.** Partner A spoke up to criticize Julia during two partner meetings about associate

evaluations. Sheketoff Ex. 103 at JD_00003737, JD_00003742; Chase Ex. 20 at JD_00003256.

**RESPONSE:** Disputed. Statement 539 is an argumentative interpretation of evidence.

Undisputed that the 2016 associate evaluation meeting notes state that Partner A was working with

Sheketoff on Peabody and that he didn't "think she likes big firm arguments." Sheketoff Ex. 103 at JD_00003737. Also undisputed that the 2017 associate evaluation meeting notes attribute the following assessment to Partner A: "fantastic job researching but memo was too long and not client ready; needed an executive summary; don't see her here for the long haul; struggled to get any weekend help from her." *Id*. at JD_00003742. Heifetz's handwritten notes from the 2017 associate evaluation meeting contain a similarly mixed assessment of Sheketoff's work attributed to Partner A, noting that Sheketoff did "fantastic rsch" with "writing thorough," but also stating that she "needed to make it more readable" and "need exec summary." Chase Ex. 20 at JD_00003256. Defendants dispute Plaintiffs' assertion in Statement 539 that Partner A specifically "spoke up to criticize" Sheketoff. Partner A testified that his job in submitting evaluations "is to provide the firm my honest assessment of [the associate's] abilities and their potential for future growth." Chase Ex. 84, Partner A Tr. 86:6-9. In Sheketoff's case, that meant providing his "impression of [her], positive or negative," and he included comments that were both complimentary of Sheketoff's performance, and comments intended to provide constructive feedback. *Id*. 84:16-87:13. Partner A was one of several partners who provided their impressions of Sheketoff and her work, and the themes across these evaluations were notably consistent. Sheketoff Ex. 103 at JD_00003737, JD_00003742; Chase Ex. 20 at JD_00003256.

**REPLY:** This statement is not genuinely disputed.  Jones Day does not dispute that, during the described meetings, Partner A said that he "d[idn]'t think [Julia] likes big firm arguments."  Sheketoff Ex. 103 at JD_00003742.  Partner A expressly admitted that was "negative" thing to say about Julia.  Chase Ex. 84 (Partner A) at 247:16-248:9 (also admitted that it's not "sustainable" for an associate who works at a big firm).  Nor does Jones Day dispute that, during the relevant meetings, Partner A proclaimed that he "needed to make [Julia's memo] more

readable"; that her memo "needed [an] exec[utive] summary"; that Julia was "not hungry for [the] practice of law"; that Julia "d[oes]n't want to inconv[enience] herself"; that Julia's "memo was too long and not client ready"; that he "d[id]n't see [Julia] here for the long haul"; and that he "struggled to get any weekend help from her."  Sheketoff Ex. 103 at JD_00003742; Chase Ex. 20 at JD_00003256.  It cannot seriously be disputed that those statements were criticisms.  Jones Day's assertion that other partners' reviews were "notably consistent" with Partner A's is both nonresponsive to this statement and contradicted by the record.  PSF ¶¶ 433-66.

**540.**   But in neither meeting did he say anything about Julia's supposed failure to give "helpful advice" or "direction" to the client.  Sheketoff Ex. 103 at JD_00003737, JD_00003742; Chase Ex. 20 at JD_00003256.

**RESPONSE:** Disputed.  Statement 540 is an argumentative interpretation of evidence. Defendants further dispute Statement 540 on the ground that it is contradicted by the record evidence. It is undisputed that notes from the 2017 associate evaluation meeting indicate that Partner A explained that Sheketoff's memo was "too long and not client ready" (Sheketoff Ex. 103 at JD_00003742) and that she "needed to make it more readable" with an "exec summary" (Chase Ex. 20 at JD_00003256). This is consistent both with Partner A's narrative evaluation and his March 1, 2016, email transmitting his revisions to the memo. Chase Ex. 15 at JD_JS_00001293; Chase Ex. 36 at JD_JS_00001443. In any event, the cited exhibits are shorthand notes from the 2016 and 2017 evaluation meetings that do not purport to reflect a full and complete summary of all statements made during those meetings.

**REPLY:** This statement is not genuinely disputed.  Jones Day says *other* things that Partner A said (including that Julia's memo was "too long" and insufficiently "readable") were supposedly "consistent with" his review.  But even if that were true (and it is quite plainly not),

that has nothing to do with this statement, which makes an assertion about Partner A's failure to say anything during the relevant meetings about Julia's supposed failure to provide "helpful advice" or "direction" to the client.  Jones Day points to no evidence suggesting that Partner A actually did say something about this supposed failure, so the statement is admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**541.**   To the contrary, Partner A acknowledged that Julia's writing was "thorough," and then came up with the new criticisms that the memo was "too long and "not client ready."  Chase Ex. 20 at JD_00003256; Sheketoff Ex. 103 at JD_00003742.

**RESPONSE:** Disputed in part. Statement 541 is argumentative interpretation of evidence. It is undisputed that Statement 541 accurately quotes from select portions of the cited exhibits. Defendants dispute Plaintiffs' assertion that Partner A's statement that the memo was "not client ready" was a "new criticism[ ]." Throughout the editing process, Partner A provided feedback that improved the draft prior to circulation to the client, including correcting the spelling of the client's name (Sheketoff Ex. 76 at JD_JS_00000487) and revising the draft to include an executive summary that was "████████████████████████████████████ ████████████████" the initial draft. Chase Ex. 84, Partner A. Tr. 197:17-199:3. Partner A's statement that the memo was "not client ready" is consistent both with Partner A's narrative evaluation and his March 1, 2016, email transmitting his revisions to the memo. Chase Ex. 15 at JD_JS_00001293; Chase Ex. 36 at JD_JS_00001443

**REPLY:** This statement is not genuinely disputed.  Jones Day does not dispute that Partner A's criticism that Julia's memo was "too long" was a new criticism.  That part of this statement is therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  And context makes clear that that Partner A was saying that Julia's memo was not "client ready" *because* it

"needed an executive summary." Sheketoff Ex. 103 at JD_00003742.  Jones Day cannot genuinely dispute that that too was a new criticism.  It is unrelated to Julia's purported inclusion of "little-to-no advice or direction not the client" or any of the other false criticisms in Partner A's review.  *See* Chase Ex. 15 at JD_JS_00001293.

**542.** As for Julia's draft being "not client ready," . Sheketoff Decl. ¶ 31; Sheketoff Ex. 75 at JD_JS_00000458 ("████████████████████████████████."); *id.* at JD_JS_00000459 (████████████████████████).

**RESPONSE:** Disputed. The cited exhibits do not support the statement that "Partner A had not even advised Julia that the memo was for the client when she first wrote the memo."

**REPLY:** The cited paragraph of Julia's declaration states: "████████████████ ████████████████████████████████████████████████ ████████████████████ This statement is not genuinely disputed.

**543.** And as for Partner A's new criticism that Julia's memo was too long, before the iterative revision process began, ████████████████. Sheketoff Ex. 75.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff's initial draft of the memo was approximately 9.5 pages long. Defendants dispute Plaintiffs' assertion that Partner A's critique regarding the length of the memo was a "new criticism" on the ground that this assertion is not supported by the evidence cited.

**REPLY:** This statement is not genuinely disputed.  In response to PSF ¶ 541, Jones Day admits that Partner A's critique about the length of Julia's memo was new.

**544.**    Similarly, when Heifetz supposedly talked to Partner A "in real time," Partner A said nothing about her memo lacking advice or direction, being not client ready, or being too long. Chase Ex. 83 (Lovitt) at 4:11-5:24.

**RESPONSE:** Disputed on the ground that it is not supported by the evidence cited—the 30(b)(6) testimony of Traci Lovitt is that Heifetz recalled having two conversations with Partner A—on in "real time" as Sheketoff was working on the assignment, and a "subsequent conversation" with Partner A about his evaluation. Chase Ex. 83, Lovitt Tr. Vol. II 4:11-5:24. Lovitt's description of Heifetz's conversation with Partner A does not distinguish between those two conversations. *Id.* Nor does it purport to be a complete summary of everything discussed between Heifetz and Partner A, neither of whom were asked about their personal recollections on the issues raised in Statement 544. To the contrary, Heifetz stated that "she didn't recall [the] specifics" of the conversation. Chase Ex. 83, Lovitt Tr. Vol. II 5:12-18.

**REPLY:** This statement is not genuinely disputed.  Speaking as Jones Day's 30(b)(6) witness on the topic, Lovitt testified to Heifetz's account of her "real-time" conversation with Partner A.  Chase Ex. 83 (Lovitt) at 5:12-6:12.  That is evidence of what Partner A did and did not tell Heifetz, and thus directly supports this statement.  Partner A, of course, could have submitted his own declaration of what he told Heifetz, if he believed that Jones Day's account of that conversation was incomplete.  But he did not; Jones Day identifies no evidence to contradict this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**545.**    Rather, he admitted that "[h]e was happy with the work, but he was frustrated by" Julia's revisions to his changes to the memo.  Chase Ex. 83 (Lovitt) at 4:11-5:24; *see also id.* at 7:3-12 (after writing his evaluation of Julia, Partner A told Heifetz "he was generally impressed

with [Julia's] work product but again annoyed with [her] not taking his edits and being protective of [her] time").

**RESPONSE:** Disputed. Statement 545 mischaracterizes the cited testimony. Lovitt did not testify that Partner A was frustrated by Sheketoff's revisions but that he was frustrated because Sheketoff was "not accepting some of his edits multiple times and not talking to him about it and telling him why [she wasn't] accepting his edits." Chase Ex. 83, Lovitt Tr. Vol. II at 4:11-5:24; *see also* Response 494. Defendants further dispute Statement 545 for the same reasons set forth in Statement 544. By way of further response, Defendants note that Partner A also told Heifetz he was annoyed that Sheketoff was protective of her time, which is a critique reflected in Partner A's written review and comments at the associate evaluation meeting, and which is also consistent with comments in Sheketoff's other reviews. Chase Ex. 15 at JD_JS_00001294 ("I've got the sense that Julia is a bit protective of her time)"; JD_JS_00001293 (noting an area of improvement was time management); *see also* Response 566; DSF ¶¶ 222, 242, 245, and 248.

**REPLY:** This statement is not genuinely disputed.  Whatever distinction Jones Day sees between being purportedly "frustrated by Julia's revisions to his changes to the memo" and "frustrated by [Julia's] not accepting some of his edits" is not self-apparent, and Jones Day does not explain the distinction.  Partner A's other statements during his "real-time" conversation with Heifetz are addressed in PSF ¶ 546.  The remainder of Jones Day's answer (beginning with "By way of further response") is nonresponsive—indeed, it addresses an entirely different conversation—and should be disregarded.

546.   Partner A further claimed to Heifetz that Julia was "not accepted some of his edits multiple times and not talking to him about it and telling him why [she] wasn't accepting his edits." Chase Ex. 83 (Lovitt) at 4:11-5:24.

**RESPONSE:** Undisputed that the quoted language reflects' Heifetz' recollection of her conversation with Partner A. Disputed that Heifetz's recollection reflects everything said in the conversation, for the same reasons set forth in Statement 544.

**REPLY:** This statement is not genuinely disputed.  As discussed in Plaintiffs' reply on PSF ¶ 544, Lovitt testified to Heifetz's account of her "real-time" conversation with Partner A. Chase Ex. 83 (Lovitt) at 5:12-6:12.  That is evidence of what Partner A did and did not tell Heifetz, and thus directly supports this statement.  Partner A, of course, could have submitted his own declaration of what he told Heifetz, if he believed that Jones Day's account of that conversation was incomplete, but he did not.  Jones Day identifies no evidence to contradict this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

547.   That new claim was also false.

**RESPONSE:** Disputed.  Plaintiffs do not cite any evidence—admissible or otherwise—in support of Statement 547. Statement 547 is also an argumentative mischaracterization of evidence. Defendants dispute Statement 547 for the reasons stated in Responses 495 and 517. As explained in Response 495, Sheketoff refused to incorporate Partner A's stylistic revisions after he had included them twice before, something no other lawyer had ever done in interactions with Partner A. And as explained in Response 515 and 517, Partner A's opinions about Sheketoff's writing were consistent with his contemporaneous feedback to Sheketoff about her drafts and with numerous evaluations that Sheketoff do not allege to be a product of discrimination

**REPLY:** Plaintiffs explain specifically what supports this statement in PSF ¶¶ 548-49. Those statements are not genuinely disputed.

**548.**     In her email that "annoyed" and "frustrated," Julia explained at length the reasons for the revisions she was suggesting.  Sheketoff Ex. 84 at JD_JS_00000638.

    **RESPONSE:** Disputed. Statement 548 is argumentative interpretation of evidence. Also disputed because Sheketoff's claim that she "explained at length the reasons for the revisions she was suggesting" as not supported by the cited evidence. Sheketoff provided five bullet points to "briefly summarize" the changes made in the draft. Sheketoff Ex. 84 at JD_JS_00000638. Also disputed because the cited exhibit does not support the proposition that Partner A was "annoyed" or "frustrated" by Sheketoff's email. Partner A testified that he was not annoyed by Sheketoff's revisions or email, but by Sheketoff's repeated refusal to accept his edits. As Partner A testified: "I believe you undid what I did twice, at least—at least on one thing." Sheketoff "had changed it twice, so I don't mind if you change something—you wrote something. I changed it. You changed it back to the way you wrote it. I changed it again back to the way I had it. And then you changed it back to the way you had it. That is annoying." Chase Ex. 84, Partner A Tr. 150:21-151:1, 239:15-21.

    **REPLY:** This statement is not genuinely disputed.  Jones Day says that it is an argumentative interpretation of evidence, but that conclusory assertion is both factually inaccurate and a legally insufficient basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute the assertion that Julia explained the reasons for her suggested revisions (contra Partner A's representation to Heifetz that she had not done so).  What Jones Day does dispute is whether Julia's five paragraphs of explanation to Partner A were sufficiently lengthy to be characterized as an "at length" explanation.  That semantic question is immaterial to the point here: As Jones Day admits, despite Partner A's representation to Heifetz that Julia was not "telling him why [she] wasn't accepting his edits," Julia wrote a five-paragraph email explaining why she

made the revisions she did.  Jones Day's final "dispute" is to the assertion that Julia's email (at Sheketoff Ex. 84) "annoyed" and "frustrated" Partner A.  That dispute is not genuine for the reasons discussed in PSF ¶ 494 (Plaintiffs' reply).

549.    Moreover, Partner A has only identified a single instance (not "some") when Julia supposedly changed something back multiple times to the way she had it—a change that Julia explained in detail to him.  Sheketoff Ex. 84 at JD_JS_00000638 ("On page 4, I changed the description of the court back [from District of Columbia] to the District Court for the District of Columbia, because I wanted to make sure the reader didn't think we were referring to the local DC trial court.").

RESPONSE: Disputed.  Statement 549 is argumentative interpretation of evidence.  Sheketoff's "in detail" explanation of her change was a single sentence explanation of a change she had already made—and Partner A had revised—twice. *See* Sheketoff Ex. 84; Response 548.  Defendants also dispute Plaintiffs' implication that Sheketoff did not make repeated revisions to prior changes in other circumstances, as that fact is not supported by the evidence cited in Statement 549. By way of further response, Defendants state that Partner A described the district court revision as one example of Sheketoff's repeated revisions: "when the person whose name goes first on the memos makes an edit, you should not change it back to the way you had it (e.g., on p. 4 when describing the district court case…" Chase Ex. 36 at JD_JS_00001442.

REPLY: This statement is not genuinely disputed.  Jones Day says that it is an argumentative interpretation of evidence, but that conclusory assertion is both factually inaccurate and a legally illegitimate basis to dispute a statement.  *See* Preliminary Statement A.  Jones Day does not dispute that Partner A has only identified a single instance ("not some") when Julia supposedly changed something back multiple times to the way she had it, or that she explained

that change to him.  Those assertions are thus admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).   What Jones Day does dispute is whether Julia's sentence-long explanation was sufficiently long to qualify as an "in detail" explanation.  It is inconceivable what more detail Julia could have provided beyond what she said: "On page 4, I changed the description of the court back [from District of Columbia] to the District Court for the District of Columbia, because I wanted to make sure the reader didn't think we were referring to the local DC trial court."  But regardless, the semantic question is immaterial to the point here: As Jones Day admits, despite Partner A's representation to Heifetz that Julia was not "telling him why [she] wasn't accepting his edits," Julia explained why her suggested revisions included not implementing one of his changes.

**550.**   In Julia's four years at Jones Day, she wrote four other memos, and no other reviewer suggested that Julia failed to provide helpful advice or direction to the client.  Chase Ex. 15; *see supra* ¶¶ 442-43, 461, 464.

**RESPONSE:** Disputed. Numerous reviewers noted concerns with Sheketoff's writing in various evaluations submitted during her time at Jones Day. Two reviewers noted in 2015, for example, that Sheketoff's written work was "not as strong as it could have been" and was "very poorly structured" because she "found it difficult to transition from the law-clerk role to the advocate role"—a "usual … problem with recent clerks" but which Sheketoff experienced "to a much more significant degree than I would expect for someone with her pedigree, who should know the basic do's and don'ts of appellate briefing." Chase Ex. 15 at JD_JS_00001297. Another partner noted in 2017 that although Sheketoff's writing had improved from the prior year, there was room for additional improvement. Chase Ex. 15 at JD_JS_00001293. And, another partner commented that Sheketoff's "draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an advocate for a client" and that "[t]he

work also could have been completed more timely and with more intensity in defending the client's interests." Chase Ex. 15 at JD_JS_00001294; *see also* DSF ¶¶ 242, 244, 246.

**REPLY:** This statement is not genuinely disputed.  Jones Day's answer is entirely nonresponsive.  None of the assertions Jones Day makes concern any reviewer suggesting that Julia failed to provide helpful advice or direction to a client.  Nor do they involve Julia's work on memos.  The cited reviews concern Julia's written briefs for courts—which by definition would not be expected to include helpful advice or direction to a client.

**551.**   Those reviews are quoted above in full, but in short they praise Julia's memos as "thorough and in depth," "demonstrating familiarity with the legal issues and an effective and easy style of writing," "absolutely stellar," "definitive," providing a "clear[] and plain[] answer [to] the client's question," "concise and lucid," "brilliant," "high level," "exceptional," and "excellent." *See supra* ¶¶ 442-43, 461, 464.

**RESPONSE:** Disputed in part. Undisputed that Statement 551 contains accurate quotes of portions of selected reviews from her annual evaluations. Defendants dispute Plaintiffs' implication that Sheketoff's reviews contained only "praise" of Sheketoff's memos. As set forth in response to Statement 550, numerous evaluators criticized Sheketoff's substantive drafting abilities across multiple matters and evaluation years. In any event, one person's perception of an associate's performance on one project is not probative evidence of another person's different impression on a different project is "false," let alone deliberately false.

**REPLY:** Jones Day does not dispute any part of this statement, which makes an assertion about the reviews of Julia's memos (and contra Jones Day, they do actually contain only praise, *see* PSF ¶¶ 442-43, 461, 464).  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

552.    Next, Partner A's review states: "She's just not that into us.  Almost nothing about her work on this case suggests otherwise.  She exhibits little-to-no initiative.  Rather, like a second year associate, she merely does what is asked of her."  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed.

553.    Those statements are false.  Chase Ex. 80 (Sheketoff) at 89:24-90:20.

**RESPONSE:** Disputed.   Partner A testified about the basis for his impression that Sheketoff lacked initiative. Chase Ex. 84, Partner A. Tr. 109:16-112:5. Partner A testified that his "overall impression" of Sheketoff was "as someone who wasn't really into the work we were doing, to being in the office, to learning about sort of the case more broadly." *Id.* at 110:15-19. Numerous evaluations that Sheketoff does not allege were "a product of discrimination" describe Sheketoff's writing as academic and lacking in client advocacy. For instance, one partner—who is not Partner A—commented that Sheketoff's work "could have been completed more timely and with more intensity in defending the client's interests." Chase Ex. 15 at JD_JS_00001294, Chase Ex. 80, Sheketoff Tr. 97:3-98:2. Another partner—also not Partner A—commented that "[t]o progress further," Sheketoff needed to "step[ ] up on projects and tak[e] on additional responsibilities, even if it feels a bit overwhelming." *Id.* And, a third partner noted in his evaluation that "[t]he legal arguments in Julia's drafts were helpful, but could have been presented with more passion, creativity, and using the facts of our client in more persuasive fashion. The draft briefs read like a law clerk memo, going straight to the black letter conclusion of the law, rather than as the brief of an advocate for a client. The work also could have been completed more timely and with more intensity in defending the client's interests." *Id*.

**REPLY:** Jones Day purports to dispute this statement in full, but says only that "Partner A testified about the basis for his impression that Sheketoff lacked *initiative*."  Actually,

the quoted testimony says nothing about Partner A's allegation that Julia lacked initiative. Chase Ex. 84 (Partner A) at 109:16-112:5. The falsity of Partner A's assertion of Julia's lack of initiative is therefore admitted. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Moreover, this statement also asserts that Partner A falsely asserted that "like a second year associate, [Julia] merely does what is asked of her." Jones Day does not even purport to dispute that that representation was false. Its falsity is therefore admitted. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day's quotations from other people's reviews are irrelevant; even as Jones Day mischaracterizes them, they say nothing to suggest that Julia displayed a lack of initiative or did only what was asked of her. Jones Day also mischaracterizes the reviews. Two of the quotations (that Jones Day claims are from two different partners) are actually drawn from the same review (by the same partner, obviously), and indeed quote the same sentence. Chase Ex. 15 at JD_JS_00001294. That is Partner J's review, discussed below. PSF ¶¶ 670-82. And the third review Jones Day quotes does *not* say that Julia "needed to step up," as Jones Day claims. The actual quote (which is quite complimentary) is: "To progress further, I think Julia needs to *do more of the same*, stepping up on projects and taking on additional responsibilities, even if it feels a bit overwhelming." *Id*. (Nat Garrett) (emphasis added).

**554.** In fact, Julia demonstrated initiative and dedication to the project, and did many things that were not asked of her, as discussed below.

**RESPONSE:** Disputed. Plaintiffs do not cite any evidence—admissible or otherwise—in support of Statement 554. Defendants dispute Statement 554 for the reasons stated in Response 553 and 555 through 564.

**REPLY:** Plaintiffs prove this statement in PSF ¶¶ 555-564.

555.    On numerous occasions Julia reached out to Partner A without prompting to either check in or offer to do (or simply do) something he had not asked her to do.  Sheketoff Ex. 105 at JD_JS_00000418 (███████████████"); Sheketoff Ex. 106 at JD_JS_00000439 (████████████ ███████████████████████████████); Sheketoff Ex. 107 (███████████████████████████████████████); Sheketoff Ex. 108 (███████████████████████); Sheketoff Ex. 81 at JD_JS_00000602 (████████ ███████████████████████████████); Sheketoff Ex. 97 (███████████████████████████ █████); Sheketoff Ex. 109 (█████████████); Sheketoff Ex. 110 (████████████████ ███████████████; Sheketoff Ex. 111 (████████████ ███████████████████████████ Sheketoff Ex. 112 (███████████████████████████████████); Sheketoff Ex. 113 ███████████████████████ █████); Sheketoff Ex. 114 at JD_JS_00002638 (█████████████████████); Sheketoff Ex. 115 at JD_JS_00002045-46 (███████████████████ ████).

**RESPONSE:** Disputed in part.  Undisputed that Sheketoff emailed Partner A to complete work or arrange meetings regarding their ongoing project for Client 1.  Defendants dispute Statement 555 to the extent it implies that such routine communications between a junior associate and a partner is evidence that Partner A's "overall impression" that Sheketoff lacked initiative is false, let alone deliberately false.  As explained in Response 553, Partner A testified

about the basis for his impression of Sheketoff, which was consistent with other reviews Sheketoff does not allege to be the product of bias.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The firm's response also does nothing to defend Partner A's indisputably false assertion that Julia "merely does what is asked of her" (which his review does not couch as a mere "overall impression").

556.   When Partner A broadened the assignment to include an investigation into the underlying historical facts, Julia led that investigation.  Sheketoff Exs. 116-23; Sheketoff Decl. ¶ 32.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff communicated with Client 1 regarding certain factual questions raised during the iterative process of revising the memo. *See, e.g.*, Sheketoff Ex. 117. Defendants dispute Plaintiffs' characterization of Sheketoff 'leading' that investigation, which is an argumentative characterization of the evidence. Defendants further dispute Statement 556 on the ground that it is directly contradicted by Partner A's testimony that *he* led the investigation. *See* Chase Ex. 84, Partner A Tr. 112:6-18. As Partner A testified, "having some calls with a client without a partner present to ask about issues we're trying to track down does not in my mind mean you're leading an investigation." *Id.* In any event, Defendants further dispute Sheketoff's characterization of a series of telephone calls with a client to follow-up on open issues an "investigation." *See id.*

**REPLY:** This statement is not genuinely disputed, as demonstrated by the documentary evidence cited here, including Julia's sworn declaration, and PSF ¶¶ 557-59 below.

**557.**   Without substantive involvement by Partner A, Julia came up with the relevant questions to ask the client and then interviewed the client both by email and on the phone. Sheketoff Exs. 116-123; Sheketoff Decl. ¶ 33.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff communicated with Client 1 regarding certain factual questions raised during the iterative process of revising the memo. *See, e.g.*, Sheketoff Ex. 117. Defendants dispute Plaintiffs' assertion in Statement 557 that Sheketoff "came up with the relevant questions to ask the client" without the substantive involvement of Partner A on the grounds that this assertion is contradicted by the evidence cited therein and adduced in discovery. By way of example, on March 28, 2016, Partner A emailed Client 1 regarding several factual assumptions that needed to be confirmed as part of finalization of the memo. Sheketoff Ex. 117 at JD_JS_00000760-61. Defendants further dispute Statement 556 on the ground that it is directly contradicted by Partner A's testimony that *he* led the investigation. *See* Chase Ex. 84, Partner A Tr. 112:6-18. As Partner A testified, "having some calls with a client without a partner present to ask about issues we're trying to track down does not in my mind mean you're leading an investigation." *Id.*

**REPLY:** This statement is not genuinely disputed.  Defendant do not dispute that Julia interviewed the client both by email and on the phone without substantive involvement by Partner A.  That assertion is thus admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The only part of this statement that Jones Day purports to dispute is that Julia "came up with the relevant questions to ask the client," as Julia's sworn declaration states.  And Jones Day's only basis for the dispute is a single email from Partner A to the client.  But that email does not pose any questions to the client.  It simply notes that he and Julia had to confirm their factual assumptions and then *quotes a passage from the memo written by Julia* summarizing the

assumptions the memo made.  Sheketoff Ex. 117 at JD_JS_00000760-61.  Then, later in the same

email chain, he tells the client that "it would be helpful to have *Julia* talk to" its employees.  *Id.* at

JD_JS_00000760 (emphasis added).  As for Partner A, "I may or may not be able to join a call."

*Id.*  Jones Day also says that Partner A's vague deposition testimony that he (rather than Julia)

"led" the investigation supports its position.  But Partner A made clear that all he meant that he

was the senior lawyer and thus "in charge."  Chase Ex. 84 (Partner A) at 125:10 ("I was the one in

charge of this process, of this memo."); *see also id.* 112:6-125:15.  Indeed, he agreed that Julia

came up with the questions and that he didn't recall whether she ran those questions by him.  Chase

Ex. 84 (Partner A) at 124:12-125:2.

**558.**     Partner A provided no feedback or guidance on interview outlines and did not

participate substantively in any client interviews.  Sheketoff Exs. 116-123; Sheketoff Decl. ¶¶ 33-

34.

> **RESPONSE:** Disputed. Statement is contradicted by Partner A's testimony that *he* led
>
> the investigation. *See* Chase Ex. 84, Partner A Tr. 112:6-18. Partner A could not recall who came
>
> up with the questions to ask the client or the details of the calls with the client. *Id.* 113:19-115:15.
>
> These facts are immaterial, however, because, as Partner A testified, "having some calls with a
>
> client without a partner present to ask about issues we're trying to track down does not in my mind
>
> mean you're leading an investigation." *Id*.

> **REPLY:** Jones Day purports to dispute this statement, but does not identify any part
>
> of this statement that it actually disputes.  This statement does not make an assertion about whether
>
> Partner A led the investigation, but about whether he provided feedback or guidance on interview
>
> outlines and participated substantively in client interviews.  Jones Day does not dispute that Partner
>
> A provided no feedback or guidance on interview outlines and did not participate substantively in

any client interviews.   This statement is therefore admitted in its entirety.   Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

559.   Indeed, Partner A was out of the office during the first week of Julia's factual investigation.  Sheketoff Ex. 117 ("████████████████"); Sheketoff Ex. 112 ("██████████████").

**RESPONSE:** Disputed in part. Undisputed that Partner A was traveling during the week of March 28, 2016. Defendants dispute Statement 559 to the extent it implies that Partner A did not work on the matter for Client 1 while he was traveling, as the evidence cited does not support that assertion. *See, e.g.*, Sheketoff Ex. 117 ("████████████████████████████████ ████████████████████████████████████████.") Defendants further dispute Sheketoff's characterization of a series of telephone calls with a client to follow-up on open issues an "investigation." *See* Chase Ex. 84, Partner A Tr. 112:6-18.

**REPLY:** Jones Day does not dispute that Partner A was out of the office during the stated period.  That assertion is therefore admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). Jones Day's sole dispute is whether Julia's work is appropriately deemed an "investigation" or instead "a series of telephone calls with a client to follow-up on open issues."  The documentary evidence makes clear Julia's work was a factual investigation, but the semantic question is immaterial to the point: as Jones Day concedes, Partner A was out of town when Julia first began work on this new front of their project.

560.   Partner A did not lead an investigation or interview clients in billable cases when he was a second-year associate at Jones Day.  Chase Ex. 84 (Partner A) at 24:8-21, 25:3-7.

**RESPONSE:** Disputed. Partner A testified that he could not recall taking the lead on any interviews for paying clients as a second-year associate. Chase Ex. 84, Partner A Tr. 24:8-21. This is not evidence that Partner A did or did not lead an investigation as a second-year associate,

and there is no evidence in the record to support that factual claim. Defendants further dispute Statement 560 to the extent it implies that Sheketoff was a "second-year associate" in March 2016. When Sheketoff joined the firm in 2014, she was told she would be "considered a member of the Class of 2010," making her a sixth year associate at the time she worked on Client 1 with Partner A. Chase Ex. 17 at JD_00000184. In any event, Defendants further dispute Sheketoff's characterization of a series of telephone calls with a client to follow-up on open issues an "investigation." *See* Chase Ex. 84, Partner A Tr. 112:6-18.

**REPLY:** This statement is not genuinely disputed.  The cited lines of the transcripts state: "Q. Did you take the lead on any interviews for paying clients?  A. Not that I recall.… Q. did you lead any factual investigations that year?  A. For—yes, I did.  Q. For paying clients?  A. No, not for paying clients."  Chase Ex. 84 (Partner A) at 24:19-25:7.  This statement does not assert or imply that Julia was a second-year associate; Julia agrees that she was not.

**561.**   In the very email exchange that admittedly annoyed Partner A, Julia showed initiative by doing more than what was asked of her when she suggested revisions to Partner A's changes to their memo.  Chase Ex. 35 at JD_JS_00001428 (directing Julia to simply "do a really good proof (and have an I&A paralegal) do one also [sic]"); Chase Ex. 36 at JD_JS_00001442-43 (suggesting numerous revisions to Partner A's changes).

**RESPONSE:** Disputed.  Statement 561 is argumentative interpretation of evidence. Sheketoff's repeated refusal to incorporate Partner A's stylistic revisions was not "doing more than was asked of her," for the reasons in Response 495. By way of further response, Defendants object to Statement 561's reference to Chase Ex. 36 as "the very email exchange that admittedly annoyed Partner A" for the reasons set forth in response to Statement 494.

**REPLY:** This statement is not genuinely disputed.  It is undisputed that, in the relevant exchange, Partner A directed: "Please do a really good proof (and have an I&A paralegal) do one also."  Chase Ex. 35 at JD_JS_00001428.   In response, Julia "reviewed the memo and proofread it (as did a paralegal)," as Partner A had requested.  Chase Ex. 36 at JD_JS_00001442. But she also took the initiative to reach out to Partner F about how to respond and then "made a few changes to [Partner A's] changes—just to try to be as precise as possible about some of our analysis."  *Id.*; Sheketoff Decl. ¶ 21-23.  It is indisputable that that went beyond "do[ing] merely what is asked of her," as Partner A falsely stated in his evaluation of Julia.  Chase Ex. 15 at JD_JS_00001293.  Moreover, in addition to being nonresponsive and irrelevant, Jones Day's assertion that Julia "repeated[ly] refus[ed] to incorporate Partner A's stylistic revisions" is false.  Partner A chastised Julia for doing two things: first, "making style edits to the writing of the person whose name goes first on the memo," and second, "chang[ing] it back to the way you had it" "when the person whose name goes first on the memos makes an edit."  Chase Ex. 36 at JD_JS_00001441.  He identified a single violation of each of these two principles.  *Id.*  Partner A never suggested that Julia had *repeatedly* rejected one of his edits; that is a post hoc litigation-related invention.  In any event, Julia did not "refus[e]" to incorporate any of Partner A's edits, even once.  To the contrary, she asked: "Do these changes look alright to you?  If not, we can (of course) revert back to your version."  Chase Ex. 36 at JD_JS_00001443; *see also id.* at JD_JS_00001441 ("I sent you the track-changes version of the document so you could easily reject any (or all) of my suggestions.").

562.    In another review the same year, a different partner expressed appreciation of Julia's "initiative" for doing the same thing: "[F]ollowing my revisions, Julia took the initiative to question whether the cuts caused the legal analysis to be too truncated.  Though I ultimately disagreed with her assessment on that point, I appreciated both her care to detail and that, despite

being a peripheral player on this case team, she wasn't bashful about speaking up and challenging a decision that had been made." Chase Ex. 15 at JD_JS_00001295.

**RESPONSE:** Disputed in part. Undisputed that Statement 562 accurately quotes from a portion of another partner's evaluation of Sheketoff in 2017. Defendants dispute Plaintiffs' implication in Statement 562 that the work for which Sheketoff was praised in that review was "the same thing" as what she had done for Partner A with respect to her work on Client 1. Sheketoff did not simply "question" cuts to the memo drafted for Client 1. Instead, as set forth in response to Statements 492 and 494 above, Sheketoff refused to incorporate Partner A's stylistic edits twice. Chase Ex. 36. *See also* Chase Ex. 84, Partner A Tr. 150:21-151:1, 239:15-21. In any event, one person's perception of an associate's performance on one project is not probative evidence of another person's different impression on a different project is "false," let alone deliberately false.

**REPLY:** This statement is not genuinely asserted. Jones Day says that Julia didn't do "the same thing" for Partner A and this different partner, because she "refused to incorporate Partner A's stylistic edits twice." As discussed in PSF ¶ 493, Julia sent a sent a "track-changes version of the document so [Partner A] could easily reject any (or all) of [her] suggestions." Chase Ex. 36 at JD_JS_00001441; *see also* Sheketoff Ex. 84 at JD_JS_652-63. Nor did Partner A admonish Julia for refusing his "stylistic" edits *twice*, as Jones Day falsely suggests. Chase Ex. 36 at JD_JS_00001442. As just discussed above, Partner A's actual criticisms of Julia were that she should not make *either* stylistic suggestions to his writing *or* suggest changing something back to the way he had it at all, and he identified a single instance of each transgression. PSF ¶ 561 (Plaintiffs' reply).

563.    Many of Julia's other reviews praise her initiative and dedication. Chase Ex. 15.

**RESPONSE:** Disputed.  Statement 563 is argumentative interpretation of evidence. Numerous evaluations that Sheketoff does not allege were a product of discrimination describe Sheketoff as lacking in initiative or dedication to her clients, as stated in Response 553. In any event, one person's perception of an associate's performance on one project is not probative evidence of another person's different impression on a different project is "false," let alone deliberately false. This is particularly true for Sheketoff, given that the evidentiary record demonstrates that her performance varied significantly from one matter to another. *See, e.g.*, Chase Ex. 15 at JD_JS_00001293 (evaluation from a reviewer who worked with Sheketoff on multiple matters that "[s]he is at her best when she is passionate about her clients").

**REPLY:** Jones Day disputes this statement solely on ground that it is argumentative interpretation of evidence.  That is factually inaccurate and a legally inappropriate basis to dispute a statement.  Jones Day does not otherwise dispute this statement, which is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Numerous evaluations…") is nonresponsive and should be disregarded.  (It is also false, as demonstrated elsewhere.  PSF ¶¶ 433-66, 564.)

564.    Julia's reviews are quoted in full above, but in relevant part they state that: "Julia … took the initiative to draft substantial portions of the brief, while lending a hand in any way she could"; "Julia was the indispensable heart of our team on this Supreme Court matter.  She had unparalleled mastery of the legal and factual issues and did an outsized share of excellent work developing our briefing strategy and writing (and re-writing) the brief"; "Julia … is passionate about her work; a hard worker; thoughtful in her analysis; wanting to improve and excel; and a very good writer.  She is extremely dependable.  She has a great attitude and inspires others as a result"; "Julia worked tirelessly to examine every angle, think through every potential issue, and

exhaustively research a long list of topics"; "[Julia] is also impressively dogged and firm in her defense of the client's interests…. She certainly took ownership of the project"; "her positive attitude and constant availability to do work even when she was swamped with other matters was impressive and greatly appreciated"; "[Julia] contributed enthusiastically to business development efforts"; "[Julia] takes total ownership of her projects and is dogged about pushing for what she wants with everyone opposed to her position…. My only concern about Julia is that she personally stresses a lot when she cannot accomplish what she thinks is the right, just resolution. She never gives up but finds it very hard to accept adverse results or decisions"; "I also appreciated her consistent willingness to help out with the various smaller tasks, whether interesting or frustrating, that arose along the way"; "[Julia] took full ownership and, supervising a junior associate, handled all aspects"; "[Julia] deeply cares about the client… She constantly challenges herself and those around her and does not give up"; "[m]y sense is that Julia's goal is perfection." Chase Ex. 15.

     **RESPONSE:** Disputed in part. Undisputed that Statement 564 contains accurate quotes of portions of selected reviews from her annual evaluations. Defendants dispute Plaintiffs' implication that Sheketoff's reviews contained only "praise" of Sheketoff's client dedication. As set forth in Response 553, numerous evaluators describe Sheketoff as lacking in initiative or dedication to her clients. In any event, one person's perception of an associate's performance on one project is not probative evidence of another person's different impression on a different project is "false," let alone deliberately false.

     **REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**565.**   Next, Partner A's review states: "And her availability seems to be whatever is convenient for her.  On multiple occasions, I asked for the next version of the memo, but she was tied up with other things."

**RESPONSE:** Undisputed that Statement 565 is an accurate quote from Partner A's narrative evaluation of Sheketoff. Chase Ex. 15 at JD_JS_00001293.

**566.**   Those statements are false.  Chase Ex. 80 (Sheketoff) at 90:21-91:1.

**RESPONSE:** Disputed.  Partner A testified about the basis for his impression that Sheketoff was often unavailable. Chase Ex. 84, Partner A. Tr. 77:19-89:13, 125:16-128:2. Partner A testified that he "asked for the next version of the memo by certain dates/times and [Sheketoff's] response to [him] on more than one occasion was I can't get it to you by that date or time." *Id.* at 126:4-8; *see also id.* at 127:12-128:2. Partner A also "recall[ed] multiple occasions where [he and Sheketoff] would just meet by phone because [she was] not in the office," in contrast to other associates who "would sit in the same office to do a call together with the client or work on the memo, just to meet in person to further the case." *Id.* at 127:1-6. In fact, Partner A testified that he did not think he had ever "worked with anybody that seemed as unavailable as [Sheketoff]." *Id.* at 136:15-18. Numerous evaluations that Sheketoff does not allege were "a product of discrimination" describe Sheketoff as being unavailable or protective of her time. For instance, one partner—who is not Partner A—stated in his evaluation: "For whatever reason, I've got the sense that Julia is a bit protective of her time, and there were some additional projects I would have liked to get her involved in." Chase Ex. 15 at JD_JS_00001294; Chase Ex. 80, Sheketoff Tr. 97:3-98:2. Another reviewer noted that one area of improvement for Sheketoff in 2016 was time management: "ensuring that tasks are being tracked; providing regular updates to supervisors; and adhering to deadlines." Chase Ex. 15 at JD_JS_00001293; Chase Ex. 80, Sheketoff Tr. 97:3-98:2.

And another reviewer (who would later become Solicitor General of the United States) noted that Sheketoff "was offered a larger opportunity in the matter but chose not to do it given other ongoing matters." Chase Ex. 15, at JD_JS_00001298. Sheketoff turned down these matters despite her extraordinarily low client hours. *Id.* at JD_JS_00001289, JD_JS_00001296. An associate with such low hours who refuses to take on additional work offered to her is by definition protective of her time. In any event, Defendants further dispute Statement 566 to the extent it is meant to imply that Partner A made "deliberately false statements" about Sheketoff's availability, for the reasons stated in Response 515.

**REPLY:** This statement is proven in PSF ¶¶ 567-583.  In attempting to dispute this statement, Jones Day points to Partner A's assertion that "[he] asked for the next version of the memo by certain dates/times and [Julia's] response to [him] on more than one occasion was I can't get it to you by that date/time."  Chase Ex. 84 (Partner A) at 126:1-8.  According to Partner A, Julia did this at least three times.  *Id.* at 127:18-128:3.  The extensive record in this case disproves that assertion.  The record includes the emails (and attachments) from each time Julia and Partner A exchanged drafts, and (as Julia's sworn declaration affirms), there was only a single time when Partner A asked for the next version of the memo and Julia said she couldn't get it to him by that date/time.  *See* PSF ¶ 571; Sheketoff Decl. ¶ 35.  Partner A disavowed that was one of the times, because Julia's unavailability was caused by having "two other filings th[at] week"—but there were *no other times*.  PSF ¶¶ 568-71.  Jones Day also says that, according to Partner A, there were "multiple occasions where we would just meet by phone because you were not in the office."  *Id.* at 126:19-127:6.  Even if that were true (*but see* PSF ¶¶ 577-580), Julia's remote work does not support Partner A's assertion that her availability was whatever was convenient for her (particularly where Partner A never expressed any displeasure that Julia worked remotely, PSF

¶ 580), and it certainly does not support his assertion that Julia failed to produce the next version of the memo on the date/time he requested it.  Jones Day points to other testimony by Partner A (Chase Ex. 84 (Partner A) at 77:19-89:13), which it erroneously characterizes as about Julia's availability, but Partner A was clear that there were no other grounds besides the two just described for his assertions about Julia's alleged unavailability and failure to turn drafts around.  Chase Ex. 84 (Partner A) at 129:5-7.  Finally, Jones Day points to other reviews of Julia's work to support Partner A's false statements—but no one else suggested that Julia's availability was whatever was convenient for her or that on multiple occasions she couldn't turn around her work because she was tied up with other things.  PSF ¶¶ 433-66.  Indeed, even assuming that Julia's other reviews could establish that she was protective of her time when taking on other matters, that would lend no support to Partner A's false claim that, on a case that she was working on, she failed to turn around drafts when requested.  In any event, Julia's reviews often commented upon her hard work and availability for the cases she was working on.  PSF ¶ 583.

567.     In his deposition, Partner A testified that the basis for these statements was that there were "at least three times" when he "wanted to have the next version of the memo so we could get it to the client, et cetera, and [Julia] couldn't make it happen."  Chase Ex. 84 (Partner A) at 128:7-128:2.

**RESPONSE:** Undisputed.

568.     In fact, there was a single occasion when Partner A asked for the next version of the memo, but Julia had "███████████████████" Sheketoff Ex. 138.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff Ex. 138 states that Sheketoff "████████████████████████████████████████████████████

████████████████████████████████████."  Defendants  dispute  Plaintiffs'  assertion  that  this

represented the "single occasion" when Partner A requested work and Sheketoff was busy on other matters, as that assertion is not supported by the evidence cited.

**569.** Partner A disavowed that this occasion was a basis for his representation in his review that, "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things." Chase Ex. 15 at JD_JS_00001293; Chase Ex. 84 (Partner A) at 130:17-132:19.

> **RESPONSE:** Disputed in part. Partner A testified that he "could not recall" if this occasion was the basis for his representation in his narrative evaluation that Sheketoff was "tied up with other things" "on multiple occasions," but stated that he did not believe this was the basis for his statement because "when someone has like other filings to do, it would strike [him] as a reasonable basis for not being able to do the work that [he] asked them to do." Chase Ex. 84, Partner A Tr. 125:19-20, 132:1-10.

> **REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**570.** According to Partner A, "when someone has like other filings to do, it would strike me as a reasonable basis for not being able to do the work that I asked them to do. So, no, I wouldn't— I wouldn't write in an evaluation whatever I wrote about your schedule is convenient or particular of your time or whatever the phrase I used was if you had two files this week…. I would not put something in an evaluation that says you're not available based on something like this. I would not do that." Chase Ex. 84 (Partner A) 132:1-19.

> **RESPONSE:** Undisputed.

**571.** There was no other occasion when Partner A asked Julia for the next version of the memo but she was tied up with other things. Sheketoff Decl. ¶ 35; *see also* Sheketoff Exs. 75-79 (███████████████████); Sheketoff Exs. 81-82 (███████████████████); Sheketoff Exs.

84-87 (█████████████████); Sheketoff Exs. 89-91, 92-95 (███████████████

███); Sheketoff Exs. 97-98 (███████████); Sheketoff Exs. 144-146 (███████

████); Sheketoff Ex. 100 (█████████████).

**RESPONSE:** Disputed. The cited evidence does not support the assertion that "[t]here was no other occasion when Partner A asked Julia for the next version of the memo but she was tied up on other things." The documentary record does not purport to be the only communications between Partner A and Sheketoff. The documentary record would not capture verbal or telephonic communications, and Plaintiffs' Statements 577 and 578 assert that Sheketoff spoke with Partner A in person and by phone "frequently." *See* PSF ¶¶ 577, 578. Partner A testified that he remembered multiple occasions when Sheketoff was unavailable to return the next version of the memo, and the cited evidence does not contradict this assertion. *See* Chase Ex. 84, Partner A Tr. 126:1-128:2.

**REPLY:** The documentary record contains each version of the memo and the cover emails accompanying those versions.  The record thus shows the dates on which Julia sent each draft to Partner A, the dates on which Partner A returned drafts to Julia, and Julia and Partner's A statements about timing.  The record forecloses Partner A's false testimony that there were multiple occasions when Julia failed to turn around the next draft of the memo because she was tied up with other things.  Julia's sworn declaration says the same thing.

**572.**   Julia was virtually always available to work on the project and promptly turned around drafts of the memo to Partner A.  Chase Ex. 33 at JD_JS_0000408 (proposing that she and Partner A meet the day after being assigned the project); Sheketoff Ex. 124 (█████████████

████████████████████████████████████████████████

████████████████████"); Sheketoff Exs. 76-77 (████████████████



); Sheketoff Ex. 108 (

); Sheketoff Exs. 82, 84 (                                      ); Sheketoff Ex.
85 (                              ); Sheketoff Ex. 125 at JD_JS_00000697 (

);  *id.*  at
JD_JS_00000696 (                              ); Sheketoff Ex. 126 (

”); Sheketoff Ex. 127 at JD_JS_00002531
(                              ); Sheketoff Ex. 128 (

); Sheketoff Ex. 93 (                              );
Sheketoff Exs. 116-123 (                              ); Sheketoff Ex. 122 (

); Sheketoff Ex. 129 (

); Sheketoff Ex. 130 (

); Sheketoff Ex. 131 at JD_JS_00001918-19 (

); Sheketoff Ex. 146 at JD_JS_00001860 (

”); Sheketoff Ex.
132 at JD_JS_00001252-53 (

);  *id.*  at JD_JS_00001252 (                              );
Sheketoff Exs. 133-34 (

); Sheketoff Exs. 135-36 (

); Sheketoff Ex. 137 (

███████████████████████████████████████████████████████

███████████ ).

**RESPONSE:** Disputed in part. Statement 563 is argumentative interpretation of evidence. Undisputed that the cited exhibits and parentheticals include accurate quotes from the referenced documents. Defendants dispute Plaintiffs' argumentative and conclusory assertion that Sheketoff was "virtually always available" to work on the project. As Partner A testified, he recalled multiple occasions, over the course of time he and Sheketoff spent on this project, when he "wanted to have the next version of the memo so we could get it to the client, et cetera, and [Julia] couldn't make it happen." Chase Ex. 84, Partner A Tr. 128:7-128:2.

**REPLY:** This statement is not genuinely disputed. The written record here is extensive and undisputed, and forecloses Partner A's contrary testimony. *See also* PSF ¶ 571.

**573.** Actually, it was Partner A who routinely sat on drafts of the memo for days or weeks at a time. Sheketoff Exs. 75-76 (███████████); Sheketoff Exs. 81-82 (███████████); Sheketoff Exs. 86-87 (██████████); Sheketoff Exs. 93, 95 (██████████).

**RESPONSE:** Disputed. Statement 563 is argumentative interpretation of evidence. Undisputed that Plaintiffs have correctly counted the number of days between the emails identified in the Sheketoff exhibits cited above. Defendants dispute Plaintiffs' characterization of the cited correspondence as Partner A "sitting on" drafts of the memo, as that assertion is not supported by the cited evidence, which provides no indication of the other competing demands on Partner A's time during the time periods reflected in the email exchanges.

**REPLY:** Jones Day does not dispute any part of this statement, which does not make an assertion about whether Partner A had other demands on his time. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**574.** During his deposition, Partner A pivoted again, claiming that a second basis for his statement about Julia's availability was that there were "multiple occasions when we would just meet by phone because you were not in the office."  Chase Ex. 84 (Partner A) at 126:19-6.

**RESPONSE:** Disputed in part.  Undisputed that Partner A testified that there were "multiple occasions when we would just meet by phone because you were not in the office." Chase Ex 84, Partner A Tr. 126:19-127:6. Defendants dispute Plaintiffs' assertion that this position represented a "pivot[]," as that assertion is an argumentative interpretation of the evidence and is not supported by the evidence cited. Partner A said in his review that Sheketoff's "availability seems to be whatever is convenient for her." Chase Ex. 15 at JD_JS_00001293. And Partner A's impression that Sheketoff was often absent from the office is also confirmed by the reviews of others, and was specifically noted in Sheketoff's 2017 assessment statement. *See id.* at JD_00001289 ("[Sheketoff] is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the office generally. Addressing these issues is critical to her development at the Firm."); *see also* Chase Ex. 18 at JD_00003742; Chase Ex. 19 at JD_00003121; Chase Reply Ex. 100 at JD_JS_00000903 (███████████ ██████████████████████████████████████████ ██████ ).

**REPLY:** This statement is not genuinely disputed.  Whether or not Julia worked remotely "on multiple occasions" does not support Partner A's assertion that her availability was whatever was convenient for her (particularly where Partner A never expressed any displeasure that Julia worked remotely, PSF ¶ 580), and it certainly does not support his assertion that Julia failed to produce the next version of the memo on the date/time he requested it.  Partner A's testimony thus constitutes a "pivot[]" from his review.  The remainder of Jones Day's response

(beginning with "And Partner A's impression") is nonresponsive to this statement and thus should be disregarded.  It is also false.  No one besides Partner A suggested that Julia's availability was whatever was convenient for her or that on multiple occasions she couldn't turn around her work because she was tied up with other things.  PSF ¶¶ 433-66.  Quite the contrary, Julia's reviews often commented upon her hard work and availability for the cases she was working on.  PSF ¶ 583.

575.    But that is not what Partner A said in his review.  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Disputed.  Partner A said in his review that Sheketoff's "availability seems to be whatever is convenient for her." Chase Ex. 15, JD_JS_00001293. This is consistent with his testimony that he had not ever "worked with anybody that seemed as unavailable as [Sheketoff]." Chase Ex. 84, Partner A. Tr. 136:15-18. Partner A testified that there were "multiple occasions where [they] would just meet by phone because [Sheketoff was] not in the office" which was unlike "other associates [who] would sit in the same office to do a call together with the client or work on the memo, just meet in person to further the case." Chase Ex. 84, Partner A Tr. 127:1-6. And Partner A's impression that Sheketoff was often absent from the office is also confirmed by the reviews of others, and was specifically noted in Sheketoff's 2017 assessment statement. *See* Chase Ex. 15 at JD_00001289 ("[Sheketoff] is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the office generally. Addressing these issues is critical to her development at the Firm."); *see also* Chase Ex. 18 at JD_00003732; Chase Ex. 19 at JD_00003121 ("[W]orking remotely is not the norm.").

**REPLY:** Jones Day's answer is largely nonresponsive to this statement, which asserts that Partner A did not say in his review that there were multiple occasions when he and Julia would talk by phone because Julia was not in the office.  That assertion is not genuinely disputed.

Partner A's representation in his review that Julia's "availability seems to be whatever is convenient for her" and "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things" is a very different complaint from his deposition testimony that Julia worked remotely on multiple occasions.  PSF ¶ 576.

576.    Working remotely is neither a basis for saying that someone's availability is "whatever is convenient for her" nor saying that "[o]n multiple occasions, I asked for the next version of the memo, but she was tied up with other things."  See Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Disputed. Statement 576 is argumentative interpretation of evidence. It is also not supported by the evidence cited and is contrary to Partner A's testimony that "not being in person is part of" his basis for believing that Sheketoff's availability was "whatever [is] convenient for [her]." Chase Ex. 84, Partner A Tr. 126:19-127:17. By way of further response, Defendants incorporate their Responses to Statements 574 and 575.

**REPLY:** This statement cannot be genuinely disputed.

577.    In truth, Julia met in person with Partner A frequently.  Sheketoff Decl. ¶ 36.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff and Partner A met in person to discuss their work for Client 1. Defendants dispute Plaintiffs' characterization of those meetings as "frequent[]." Partner A testified that he recalled "multiple occasions where [he and Sheketoff] would just meet by phone" because Sheketoff was "not in the office." Chase Ex. 84, Partner A Tr. 126:19-127:2.

**REPLY:** This statement is not genuinely disputed.  Julia's sworn declaration directly supports the statement, Sheketoff Decl. ¶ 36, and Partner A's testimony that there were "multiple occasions" when he and Julia met by phone casts no doubt on the assertion that they frequently met in person.

**578.**   Partner A also frequently called Julia and talked with her by phone while Julia was in the office.  Sheketoff Decl. ¶ 37.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff and Partner A spoke on the phone to discuss their work for Client 1. Defendants dispute Plaintiffs' characterization of those phone calls when Sheketoff was in the office as "frequent[]." As set forth in response to Statement 577, Partner A testified that there were multiple occasions when he and Sheketoff met by phone because Sheketoff was not in the office. *See also* Chase Ex. 84, Partner A Tr. 78:10-12 ("I didn't see you around much. A lot of times when we were to meet, it was over the phone.").

**REPLY:** This statement is not genuinely disputed.  Julia's sworn declaration directly supports the statement, Sheketoff Decl. ¶ 37, and Partner A's testimony that there were "multiple occasions" when he and Julia met by phone while she was not in the office casts no doubt on the assertion that they also frequently talked on the phone while she was in the office.

**579.**   On the two or three occasions when Partner A and Julia spoke by phone while Julia was working remotely, Partner A never asked Julia why she was working remotely and whether she was doing so merely because it was "whatever was convenient for her."  Sheketoff Decl. ¶ 38.

**RESPONSE:** Disputed in part. Undisputed that Partner A did not inquire as to why Sheketoff was working remotely. Defendants dispute Plaintiffs' characterization of Partner A's and Sheketoff's phone calls having occurred on "two or three occasions . . . while Julia was working remotely." That statement is not supported by the evidence cited. As set forth in response to Statement 577, Partner A testified that there were multiple occasions when he and Sheketoff would meet by phone because Sheketoff was not in the office. *See also* Chase Ex. 84, Partner A Tr. 78:10-12 ("I didn't see you around much. A lot of times when we were to meet, it was over the phone.").

**REPLY:** This statement is not genuinely disputed.  Julia's sworn declaration directly supports the statement, Sheketoff Decl. ¶ 38, and Partner A's testimony that there were "multiple occasions" when he and Julia met by phone while she was out of the office is entirely consistent with Julia's assertion that this occurred on "two or three occasions."  Jones Day also points to Partner A's testimony that he didn't see Julia "around much," but that too casts not doubt on this statement—particularly where Julia worked in a different building and usually ate her lunch outside, in a conference room with her friends, or in her office.  PSF ¶¶ 606-607.  Finally, Jones Day points to Partner A's testimony that "[a] lot of times when we were to meet, it was over the phone."  Again, that is consistent with this statement, since Julia and Partner A frequently met by phone while she was in the office.  PSF ¶ 578.

580.    Nor did Partner A at any time express any displeasure with Julia's remote work to Julia. Sheketoff Decl. ¶ 39.

**RESPONSE:** Undisputed.

581.    In fact, the only time that Partner A ever expressed any displeasure to Julia about her work was in his hostile response to her suggestions to his edits on March 2.  Chase Ex. 36 at JD_JS_00001442.

**RESPONSE:** Disputed.  Statement 581 is argumentative interpretation of evidence. Plaintiffs' assertion that Chase Ex. 36 is the "only time" Partner A expressed displeasure to Sheketoff about her work is not supported by the evidence cited. On several occasions, Partner A provided feedback to Sheketoff regarding improvements to her writing and advocacy. *See, e.g.*, Chase Ex. 35 (stating that Partner A wanted Sheketoff "to learn to write more like an advocate and advisor to a general counsel and corporate boards."). Defendants also dispute that Sheketoff could

reasonably interpret Partner A's email at Chase Ex. 36 as conveying hostility for the reasons set forth in Defendants' response to Statement 499.

**582.**   Yet Partner A's review mentions nothing about that exchange, despite his admitted "annoyance" at it.  Chase Ex. 15 at JD_JS_00001293; Chase Ex. 84 (Partner A) at 235:11-13.

**RESPONSE:** Disputed in part. Statement 582 is argumentative interpretation of evidence. Undisputed that Partner A's review does not reference the specific emails between Partner A and Sheketoff in March regarding the memo for Client 1. Chase Ex. 15 at JD_JS_00001293. As set forth in response to Statement 494, Partner A's "annoyance" was with specific suggested edits, including an edit that he had made that Sheketoff reverted back to her original draft twice.

**REPLY:** Jones Day only basis for disputing this statement is that it is argumentative interpretation of evidence.  That conclusory assertion is factually inaccurate and inadequate to create a genuine dispute of fact.  *See* Preliminary Statement A.  Jones Day does not otherwise dispute this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**583.**   Julia's other reviews praised her availability on the projects she'd taken on.  Chase Ex. 15 at 1290 ("lending a hand in any way she could"); *id.* ("outsized share of excellent work"); *id.* at JD_00001291 ("a hard worker" and "extremely dependable"); *id.* ("worked tirelessly"); *id.* ("constant availability to do work even when she was swamped with other matters"); id at JD_000012979 ("She constantly challenges herself and those around her and does not give up."); *id.* at JD_00001298 ("Under significant time pressure, Julia did an absolutely stellar job.").

**RESPONSE:** Disputed in part. Undisputed that Statement 583 accurately quotes excerpts from certain evaluations Sheketoff received. Disputed to the extent Statement 583 implies

that Sheketoff did not receive other reviews noting a lack of availability. Numerous reviewers also noted Sheketoff's perceived lack of availability during her time at Jones Day. During the same year as Partner A's review, another reviewer noted: "[f]or whatever reason, I've got the sense that Julia is a bit protective of her time, and there were some additional projects I would have liked to get her involved in." Chase Ex. 15 at JD_JS_00001294. Another reviewer that year stated that her "work also could have been completed more timely and with more intensity in defending the client's interests. Julia was obligated to a number of other projects that detracted from her overall effectiveness here." *Id.* And another reviewer (who would later become Solicitor General of the United States) noted that Sheketoff "was offered a larger opportunity in the matter but chose not to do it given other ongoing matters." *Id.* at JD_JS_00001298. Sheketoff turned down these matters despite her extraordinarily low client hours. *Id.* at JD_JS_00001289, JD_JS_00001296. An associate with such low hours who refuses to take on additional work offered to her is by definition protective of her time. In addition, during the D.C. office litigation associate evaluation meeting in 2017 (reviewing work performed in 2016), a comment was made regarding Sheketoff that she is "[m]issing fr. office a lot" and it is "[h]ard to work w/ assoc not physic. present." Chase Ex. 20 at JD_00003257. And concerns about in-office availability were specifically noted in Sheketoff's 2017 assessment statement. *See* Chase Ex. 15 at JD_00001289 ("[Sheketoff] is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the office generally.  Addressing these issues is critical to her development at the Firm."). In any event, one person's perception of an associate's performance on one project is not probative evidence of another person's different impression on a different project is "false," let alone deliberately false.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "Numerous reviewers also noted") is nonresponsive and should be disregarded.  It is also false and misleading.  None of Julia's reviewers suggested that her availability was whatever was convenient for her or that on multiple occasions she couldn't turn around her work because she was tied up with other things.  Even assuming those reviews could establish that Julia was protective of her time *when taking on other matters*, or that she worked remotely, that would lend no support to Partner A's false claims that, on a case that she was working on, she failed to turn around drafts when requested and was only available whenever it was convenient for her.  (Chase Ex. 20 is also inadmissible hearsay; those handwritten notes kept in Heifetz's private work journal, which supposedly document partners' experiences with Julia *the prior year*, are not business records under FRE 803(6).)

584.   Next, Partner A's review states: "Working on the weekend does not seem to be in her vocabulary."  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed.

585.   That statement is false.  Chase Ex. 80 (Sheketoff) 90:21-91:1.

**RESPONSE:** Disputed. ███████████████████████████████████

████████████████████████████████████. *See* Sheketoff Ex. 149 at line 1644. Partner A testified about his basis for believing that Sheketoff did not often work on weekends. *See* Chase Ex. 84, Partner A Tr. 324:10-15, 325:11-20. He explained that, although he could not recall specific instances, he would only say that if [he] had asked [Sheketoff] to do something on a weekend and [she] had said [she] couldn't do it." *Id.* at 133:19-21; 134:16-135:1. Partner A also testified that his impression about Sheketoff's lack of weekend availability was

"consistent with" his impression "that [Sheketoff] didn't seem to be very busy . . . didn't seem to be very eager to take on a lot of work, to have a high client billable" docket. *Id.* at 134:5-10. Numerous reviewers also noted Sheketoff's lack of availability during her time at Jones Day, as set forth in Response 583.

**REPLY:** This statement is not genuinely disputed.  It asserts that Partner's A representation that "[w]orking on a weekend does not seem to be in [Julia's] vocabulary" is false. Partner A testified that he "would *only* say that if [he] had asked [Julia] to do something on a weekend and [Julia] said [she] couldn't do it."  Chase Ex. 84 (Partner A) at 133:15-21.  The extensive written record in this case demonstrates that Julia never did that.  *E.g.*, PSF 571 (cited exhibits include memo drafts and cover emails).  Julia's sworn declaration attests to the same.

██████████████████████████████████████████████████

████████ is irrelevant to whether Partner A asked for weekend work and Julia refused to do it. The same is true of Julia's other reviews—none of which say anything to suggest that Julia refused to work on the weekend.

**586.**   During his deposition, Partner A stated that the basis for this statement in his review was that he asked Julia "specifically to work on a weekend or [said he] need[ed] something on Monday or Tuesday and the only reasonable way that would have been done was to work on a weekend," and Julia "refused to do that" or "said [she] w[as] unavailable to work on the weekend." Chase Ex. 84 (Partner A) 134:11-135:7.

**RESPONSE:** Undisputed that Statement 586 includes accurate excerpts from Partner A's deposition transcript. Disputed as lacking context because Partner A testified that his impression that Sheketoff did not work on weekends was also due to his perception that she did not seem busy or interested in building a large base of billable work. *See* Response 585.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  In any event, Partner A testified that he "would *only* say that if [he] had asked [Julia] to do something on a weekend and [Julia] said [she] couldn't do it."  Chase Ex. 84 (Partner A) at 133:15-21 (emphasis added).

587.    During the 2017 partner meeting to review associate evaluations, Partner A reiterated the comment, representing that he supposedly "struggled to get any weekend help from [Julia]." Sheketoff Ex. 103 at JD_00003742.

**RESPONSE:** Undisputed.

588.    In fact, there was never a single time that Partner A asked Julia for weekend work (or for something that required weekend work) that Julia refused or said she was unavailable, as the extensive written record reflects.  Sheketoff Decl. ¶ 40; *see also* Sheketoff Exs. 75-79, 81-82, 84-87, 89-91, 93-95, 97-98, 100, 144-146.

**RESPONSE:** Disputed. As explained in Response 585, ██████████████████████ ██████████████████████████████████████████████, and Partner A testified that he would not have said that Sheketoff was unavailable on weekends unless she was unable to complete work over a weekend that Partner A had requested. *See* Response 585. Statement 588 is also inconsistent with examples in the record of Sheketoff offering to work over the weekend, but failing to do so. Compare Chase Reply Ex. 98 at JD_JS_00002101 ("████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████") to Sheketoff Ex. 149 (████████████████████████). In any event, the documentary record does not purport to be the only communications between Partner A and Sheketoff. The documentary record would not capture verbal or telephonic communications, and

Plaintiffs' Statements 577 and 578 assert that Sheketoff spoke with Partner A in person and by phone "frequently." *See* PSF ¶¶ 577, 578.

**REPLY:** This statement is not genuinely disputed. The amount of weekend work that Julia actually performed in this particular case is irrelevant to whether Julia ever refused Partner A's requests for weekend work. Jones Day also points to "examples" in the record where Julia offered to work over the weekend but then didn't do so. There are no such examples. ██

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████. Chase Reply 98; Sheketoff Ex. 177 at JD_JS_00002108; Sheketoff Ex. 75 at JD_JS_00000458. ████████████████████████

███████████████████████████████████████████████

████████ The extensive written record—which shows the dates on which Julia and Partner A exchanged drafts with each other, as well as their communications about timing—leaves no room for doubt that there was occasion when Julia refused to work on the weekend. *E.g.*, PSF 571 (cited exhibits include memo drafts and cover emails).

589.     To the contrary, Julia offered to and did work on the weekend—both with Partner A and in other cases, as the paragraphs below demonstrate. Sheketoff Decl. ¶ 41.

**RESPONSE:** Disputed. Defendants dispute Statement 589 on the ground that it is contradicted by evidence in this matter. As explained in Response 585, ███████████████

███████████████████████████████████, and Partner A testified that he would not have said that Sheketoff was unavailable on weekends unless she was unable to complete work over a weekend that Partner A had requested. In addition to Partner A, as set forth in response to Statement 583, numerous reviewers also noted Sheketoff's lack of availability

during her time at Jones Day. Defendants incorporate their responses to the below Statements in response to Statement 589.

**REPLY:** This statement is not genuinely disputed. Jones Day elsewhere admits its truth. PSF ¶ 590-98 (Jones Day's responses). Jones Day's factual assertions and citations here cast no doubt on whether Julia offered to and did work on the weekend with both Partner A and in other cases. In any event, the written record (which Jones Day does not even try to controvert) is unambiguous on this point.

590. In one instance during the weekend, when Partner A mentioned he was going to be "█████████████" of their memo, Julia offered (without prompting): "[████████████████████ ████████████████████" Sheketoff Ex. 109 at JD_JS_00000630.

**RESPONSE:** Undisputed that Statement 590 is an accurate excerpt of one exchange between Sheketoff and Partner A regarding their work for Client 1.

591. In another instance, on a Friday afternoon, Partner A asked Julia to ████████████ ██████████████████████████████████████████." Sheketoff Ex. 125 at JD_JS_00000698.

**RESPONSE:** Undisputed that Statement 591 is an accurate excerpt of one exchange between Sheketoff and Partner A regarding their work for Client 1.

592. Julia promptly ███████████████████████████████████████ ██████████████████████████████████████████." Sheketoff Ex. 125 at JD_JS_00000697.

**RESPONSE:** Undisputed.

593. Partner A advised her against it: "████████████████████████████ █████████" Sheketoff Ex. 125 at JD_JS_00000697.

**RESPONSE:** Undisputed.

594.   In another instance, Partner A asked on a Friday afternoon when ███████████████████████ ███████████████████████████████████. Sheketoff Ex. 139 at JD_JS_00001849.

**RESPONSE:** Disputed in part. Undisputed that Partner A asked Sheketoff when they could discuss responses to another partner's comments at 3:10 PM on a Friday. Sheketoff Ex. 139 at JD_JS_00001849. Defendants dispute Statement 594 to the extent it implies that this partner reviewed was a "supervisor" to Partner A, as that fact is not supported by the evidence cited.

595.   Julia responded ███████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ Sheketoff Ex. 139 at JD_JS_00001849.

**RESPONSE:** Undisputed.

596.   Partner A declined ████████████████████████████ Sheketoff Ex. 139 at JD_JS_00001849.

**RESPONSE:** Undisputed.

597.   In a fourth instance, ████████████████████████████ ████████████████████ Sheketoff Ex. 140 at JD_JS_00002018.

**RESPONSE:** Undisputed.

598.   Julia joined the lengthy call late on Sunday evening. ████████████ ████████████████████████████████████); Sheketoff Decl. ¶ 42.

**RESPONSE:** Disputed in part. ████████████████████████ ██████████████████████ Sheketoff Ex. 149 at line 1644. ███████████

████████████████████████████████████████████████████████████████

*Id.*; *see also* Response 585. However, the cited exhibit—Sheketoff Ex. 149 at line 27—is an ██████

████████████████████████████████████████████████████████████████

██████████████   and does not support Statement 598. Defendants also dispute Plaintiffs'

characterization of the ████████████████████████."

**REPLY:** This statement is not genuinely disputed.

599.   Julia worked on 22 weekends during the year she worked with Partner A.  Sheketoff

Ex. 149 (lines: 925, 1041-42, 1080, 1103-05, 1152-53, 1288-89, 1305, 1337-38, 1365, 1381-83,

1399, 1464, 1478-80, 1515-1516, 1601-02, 1614, 1628, 1642-46, 1662-64, 1675-76, 1694, 1705).

**RESPONSE:** Disputed in part. Defendants do not dispute that Sheketoff billed time

on weekend days during 22 weekends in 2016. Defendants dispute Plaintiffs' implication that

Sheketoff worked on weekends on matters with Partner A. ████████████████████████

████████████████████████████. *See* Sheketoff Ex. 149 at line 1644. By way of

further response, Defendants note that during Sheketoff's review that year, her Practice Leader

"emphasized that it was concerning to see *multiple* reviewers comment on the appearance that

Julia is protective of her time." Chase Ex. 19 at JD_00003121 (emphasis added).

**REPLY:** Jones Does not dispute any part of this statement, which does not make an

assertion about Julia's work for Partner A (though Julia did in fact work on a weekend for

Partner A, as Jones Day admits).  This statement is thus admitted in its entirety.  Standing Order

10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "By way of

further response") is nonresponsive and should be disregarded.  Partner A did not assert in his

review that Julia was protective of her time; he made the specific (false) factual assertion that

"[w]orking on the weekend does not seem to be in her vocabulary," which he said was based on Julia's *refusal* to do weekend work when *he asked her to do so*.  PSF ¶ 586.

600.   Partner A's performance review of Julia also contained gratuitous negative statements about her unrelated to their work together, as the following paragraphs demonstrate.

**RESPONSE:** Disputed.  Statement 600 does not contain a citation to any evidence—admissible or otherwise.   Defendants incorporate their responses to the below Statements in response to Statement 600.

**REPLY:** This statement is proved in PSF ¶¶ 601-21.

601.   Partner A's review states: "My impression of Julia is that she is not long for firm life. She's just not that into us."  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed. By way of further response, Defendants note that Partner A's "impression" was correct, as Sheketoff left Jones Day the year after Partner A submitted his review to take a position with the Federal Public Defender's Office, which Sheketoff had originally turned down because Jones Day "paid a lot more." *See* DSF ¶¶ 16, 19-21, 282 (undisputed).

**REPLY:** Jones Day gratuitous and nonresponsive statement is misleading.  Julia actually left 20 months after Partner A submitted his review for her, after having been at Jones Day for more than two years.  JDSF ¶¶ 15, 21, 151.  Julia remained at Jones Day longer than all of the Supreme Court clerks from her Term but one.  PSF ¶ 610.

602.   The evaluation prompt does not seek this kind of "impression" unrelated to an associate's work on the particular project for which she is being reviewed.  Chase Ex. 28 at JD_00005182 ("Please provide a concise statement of your overall evaluation of the lawyer's *performance on the identified project*.  Also please identify performance strengths, weaknesses, unique expertise, areas needing improvement, and *anything else about the lawyer's substantive*

*performance* you believe important to a fair and objective assessment." (emphases added)); *see also* Chase Ex. 84 (Partner A) 99:2-6 ("Not expressly."); Chase Ex. 26 ("[Y]ou should provide an objective narrative evaluation of the lawyer's *performance on the identified project…. These are not intended to be 'career' evaluations that comment on the lawyer generally* and they are not assessments of where you think the lawyer stands or should stand overall." (emphasis added)).

**RESPONSE:** Disputed in part. Statement 602 is an argumentative interpretation of evidence. Undisputed that the parenthetical quotes from Chase Ex. 28 and Chase Ex. 26 are accurate excerpts from those exhibits. Defendants dispute Plaintiffs' assertion that the evaluation prompt does not seek an "impression" unrelated to specific work on projects. For instance, Chase Ex. 26 makes clear that the narrative evaluation should "fairly describe[] the lawyer's strengths and areas for improvement." Chase Ex. 26 at JD_00003061. And Partner A testified that he understood his role in providing an evaluation to be to "provide the firm [his] honest assessment of [the associate's] abilities and their potential for future growth." Chase Ex. 84, Partner A. Tr. 86:6-9.

**REPLY:** This statement is not genuinely disputed. In purporting to dispute it, Jones Day takes a sentence from Chase Exhibit 26 out of context. The sentence immediately preceding the one quoted from that exhibit is: "Second, you should provide an objective narrative evaluation of the lawyer's performance *on the identified project(s)*." Chase Ex. 26 at JD_00003061 (emphasis added). The next sentence (which is what Jones Day quotes) is simply explaining what that means, not encouraging the reviewer to make comments about the lawyer's "strengths and areas for improvement" that are *unrelated* to "the identified project." *Id.* Indeed, the document makes that point expressly: "These are not intended to be 'career' evaluations that *comment on the lawyer generally*…" *Id.* Partner A's conveyed "impression" of Julia being "not long for firm life"

controverted that instruction.  Partner A also admitted that the prompt for his review did "not expressly" seek the kind of impression he provided.  Chase Ex. 84 (Partner A) 99:2-6.

603.    Partner A understood that conveying his "impression" would be harmful to Julia's career at Jones Day.  Chase Ex. 84 (Partner A) 85:14-16, 100:21-101:11; *see also* Chase Ex. 26 ("The appraisals submitted during the annual review cycle are used to provide these lawyers with … career guidance.").

**RESPONSE:** Disputed.  Statement 603 is directly contradicted by Partner A's testimony that he did not intend his performance valuation to harm Sheketoff:

Q. Did you intend for your evaluation of me to harm me?

A. No.

Q. Did you intend for your evaluation to harm my career?

A. No.

Chase Ex. 84, Partner A Tr. 226:19-227:2.

By way of further response, Partner A testified that he hoped that his impressions of Sheketoff, if confirmed by other reviewers, would be conveyed to her during her evaluation, so that if she "wanted to change that perception of [her], [she] would actually come in more and do more client work, in which case the impression of [her] would change." *Id.* at 84:20-85:8; 85:17- 87:10. Partner A nowhere testifies that he understood or believed that his evaluation was negative or critical overall, as explained in Response 513.

**REPLY:** This statement is not genuinely disputed.  This statement makes an assertion about whether Partner *understood* that conveying his "impression" of Julia would be harmful to her career at Jones Day, not about whether he *intended* to harm her or her career (though he obviously did).  Because Jones Day presents no evidence to controvert this statement, which is

controverted that instruction.  Partner A also admitted that the prompt for his review did "not expressly" seek the kind of impression he provided.  Chase Ex. 84 (Partner A) 99:2-6.

603.    Partner A understood that conveying his "impression" would be harmful to Julia's career at Jones Day.  Chase Ex. 84 (Partner A) 85:14-16, 100:21-101:11; *see also* Chase Ex. 26 ("The appraisals submitted during the annual review cycle are used to provide these lawyers with … career guidance.").

**RESPONSE:** Disputed.  Statement 603 is directly contradicted by Partner A's testimony that he did not intend his performance valuation to harm Sheketoff:

Q. Did you intend for your evaluation of me to harm me?

A. No.

Q. Did you intend for your evaluation to harm my career?

A. No.

Chase Ex. 84, Partner A Tr. 226:19-227:2.

By way of further response, Partner A testified that he hoped that his impressions of Sheketoff, if confirmed by other reviewers, would be conveyed to her during her evaluation, so that if she "wanted to change that perception of [her], [she] would actually come in more and do more client work, in which case the impression of [her] would change." *Id.* at 84:20-85:8; 85:17- 87:10. Partner A nowhere testifies that he understood or believed that his evaluation was negative or critical overall, as explained in Response 513.

**REPLY:** This statement is not genuinely disputed.  This statement makes an assertion about whether Partner *understood* that conveying his "impression" of Julia would be harmful to her career at Jones Day, not about whether he *intended* to harm her or her career (though he obviously did).  Because Jones Day presents no evidence to controvert this statement, which is

supported by citations to the record, it is admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

604.   Partner A has never before included in any of his reviews of other associates his impression that an associate was not long into firm life or not into the firm.  Chase Ex. 39.

**RESPONSE:** Disputed in part. Partner A has commented in prior reviews regarding his impression of an associate's likelihood of remaining with the firm long-term. By way of example, in his 2014 review of a female associate, Partner A noted: ███████████████ ████████████████████████████████████████████████████ ███████   Chase Ex. 39 at row 77.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Plaintiffs also note that the female associate ████████████████████████████████ left the firm before Julia and had a shorter tenure at Jones Day than Julia did.  Sheketoff Ex. 160 at (████████

605.   According to Partner A, his basis for making these representations about Julia was that she was "rarely in the office," which he inferred because he "[d]idn't see [her] in the halls, didn't see [her] at lunch," he often spoke with her "over the phone," and "[o]ther people said [she] wasn't around that much."  Chase Ex. 84 (Partner A) 78:2-17, 88:12-19.

**RESPONSE:** Disputed in part.  Undisputed that Partner A testified that it was his "impression [she] was out of the office the majority of the time," and that this was based on the fact that he "[d]idn't see [Sheketoff] in the halls, didn't see [her] at lunch. Like I said, we were on the same floor. I would, I think, walk by [Sheketoff's] office. I would walk past I&A associates. Others said you weren't around very much." Chase Ex. 84, Partner A Tr. 87:22-88:19. Disputed as incomplete because Partner A also testified that his impression that Sheketoff was unlikely to

have a long tenure at the firm was also based on his impression that he "didn't think [Sheketoff was] busy on billable matters," "didn't hear [her] name on other case teams," and "didn't seem that dedicated to the firm." *Id.* at 137:13-16, 138:2-4. Defendants further dispute Plaintiffs' characterization of Partner A's review as an 'inference' regarding Sheketoff's future at the firm.

> **REPLY:** This statement is not genuinely disputed.  Jones Day disputes the statement on the ground that it is "incomplete," but PSF ¶ 605 does not assert that it is a complete list of Partner A's purported basis for his assertion.  The remaining assertions are addressed in PSF ¶¶ 608 and 613.

606.    As Partner A admitted, he didn't even know where Julia's office was, he didn't know if he'd ever tried to stop by her office, he didn't remember ever calling her office and her not answering, and he didn't know where she ate her lunch.  Chase Ex. 84 (Partner A) 87:22-89:13.

> **RESPONSE:** Undisputed that Partner A could not recall whether he had previously stopped by Sheketoff's office, tried to call her office and have her not answer, and did not know where Sheketoff ate her lunch. Disputed as incomplete for the reasons in Response 605.

> **REPLY:** Jones Day does not identify any part of this statement that it disputes.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

607.    In fact, Julia worked in a different building from Partner A and usually ate her lunch outside, in a conference room with her friends, or in her office.  Sheketoff Decl. ¶ 43.

> **RESPONSE:** Disputed in part. Disputed that "Julia worked in a different building from Partner A." Sheketoff's and Partner A's offices were on the same floor of Jones Day's Washington, D.C., office. Chase Ex. 84, Partner A Tr. 78:12-15. The remainder of this Statement is undisputed.

**REPLY:** This statement, which Jones Day can readily verify, is not genuinely disputed. Directly after the statement Jones Day quotes, Partner A corrected himself: "You were on my floor so I'm on the floor with -- I was on the floor at that time with most of the I&A associates." Chase Ex. 84 (Partner A) at 78:12-15. Later, Partner expressly admitted he didn't know if he and Julia were in the same building: "Q. We were—our offices were on opposite ends of the—we were not in the same building, were they? A. I don't know where your office was. I was on the fourth floor in the 53 building." *Id.* at 88:20-90:7.

608.   Partner A also stated that his basis for these representations was that Julia left the firm "shortly" after joining the firm. Chase Ex. 84 (Partner A) 82:12-15.

**RESPONSE:** Disputed. Partner A did not testify that Sheketoff's departure was his basis for asserting that she was not long into firm life. When asked whether there was "anything else that [he] ha[dn't] mentioned that caused [him] to" make that conclusion, Partner A remarked: "[t]hen you left shortly thereafter." Chase Ex. 84, Partner A Tr. 82:12-83:5. He went on to testify that, in his view, "Four years is not really long for firm life, no." *Id*. Partner A testified that his basis for concluding Sheketoff was unlikely to have a long tenure at the firm was his impression that Sheketoff was rarely in the office, was not busy on billable matters, was not mentioned on significant case teams, and did not seem dedicated to the firm. *See* Response 605.

**REPLY:** Jones Day specifically admits the substance of this statement but inexplicably claims it is disputed. Any dispute (Plaintiffs are not clear what Jones Day thinks it is) is not genuine. The transcript is clear.

609.   But Julia did not leave the firm until well over a year *after* Partner A wrote his evaluation, so he did not know how long her tenure at the firm was when he wrote the evaluation. JDSF ¶¶ 19, 21.

**RESPONSE:** Disputed in part. Undisputed that, at the time Partner A wrote his narrative evaluation of Sheketoff, he did not know how long she would ultimately remain at the firm. For the reasons set forth in response to Statement 608, Defendants dispute the implication that Partner A's review was inaccurate or untruthful because he did not know how long Sheketoff's tenure at the firm was when he wrote the evaluation.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

610.    Julia's actual tenure at the firm was nearly four years, which is longer than many associates' tenures at the firm—and longer than the tenure of all but one of the six Supreme Court clerks from her Term.  JDSF ¶¶ 15, 19, 21

**RESPONSE:** Disputed in part.  Statement 610 is an argumentative interpretation of evidence. Undisputed that Sheketoff's tenure at the firm was nearly four years. Defendants dispute Plaintiffs' assertion that this was "longer than the tenure of all but one of the six Supreme Court clerks from her Term," as that assertion is not supported by the evidence cited. Defendants also dispute Plaintiffs' assertion that Sheketoff's four year tenure at the firm was "longer than many associates' tenures at the firm," as that assertion is also not supported by the evidence cited. By way of further response, Defendants state that Partner A testified during his deposition that, in his view, "[f]our years is not really long for firm life." Chase Ex. 84, Partner A Tr. 82:12-83:5.

**REPLY:** Jones Day knows the identity of the six Supreme Court clerks from Julia's term and knows that all but one left before Julia, and Julia will testify to this fact at trial.  It is also indisputable that many associates remain at Jones Day for less than four years.

**611.** According to Partner A, "generally for I&A associates, especially former Supreme Court clerks, the pattern is most of them leave after two years." Chase Ex. 84 (Partner A) 79:7-11.

>**RESPONSE:** Undisputed that Partner A testified as excerpted in Statement 611.

**612.** Nonetheless, despite having worked with many I&A associates, Partner A implausibly testified that he had never worked with *any* associate (besides Julia) who he believed did not plan to stay "long" at Jones Day—or even any associate who he thought didn't plan to try to make partner at the firm. Chase Ex. 84 (Partner A) 103:14-19, 104:3-16.

>**RESPONSE:** Disputed in part. Undisputed that Partner A stated that he could not recall having worked with another associate that he "personally believed did not plan to stay more than two years with the firm." Chase Ex. 84, Partner A Tr. 103:14-19. Defendants dispute Plaintiffs' assertion that Partner "worked with many I&A associates," as that statement is not supported by the evidence cited. Defendants further dispute Plaintiffs' argumentative characterization of Partner A's testimony as "implausibl[e]." Partner A testified that he had "never worked with anyone that seemed not around as much as [Sheketoff wasn't] around" and had never worked with another associate who "made it as obvious as [Sheketoff]" that she did not intend to stay at the firm long-term. *Id.* at 102:8-17, 101:16-20.

>**REPLY:** The record is clear that Partner A worked with many I&A associates, including Mark (Chase Ex. 39 at JD_00002582), Female Associate A (Chase Ex. 80 (Sheketoff) at 136:17-23; Sheketoff Ex. 41 at P02166), Partner F (Sheketoff Decl. ¶ 23), the associate who he ████████████████████████████████████████████████ ████████████████████████████████████████ ), and several others (*compare* Chase Ex. 39 (████████████████████████████████████ ), *with* Sheketoff Ex. 179 (████████

██████████████████████████████████████████ )).

**613.** Partner A stated that his final basis for his representations that Julia wasn't "long for firm life" and "was just not that into us" was that Julia didn't seem busy on billable cases, which he supposedly concluded because he didn't hear through the grapevine that Julia was working on any particular case teams.  Chase Ex. 84 (Partner A) 80:5-81:5.

    **RESPONSE:** Undisputed. By way of further response, Defendants state that during his deposition, Partner A testified about the basis for his impression that Sheketoff was not busy on paying client matters, as explained in Responses 569 and 571. Partner A testified that "[p]eople talk about who's engaged in doing what," and described several conversations he had with specified associates and partners, which gave him "a sense of who's busy and who's not." Chase Ex. 84, Partner A Tr. 80:8-15. During the course of those conversations, Sheketoff's name "never really came up." *Id.* at 80:18-81:5.

**614.** But Julia did work on case teams (including during the year she worked with Partner A), and Partner A was admittedly ignorant of them.  Sheketoff Decl. ¶ 44; Chase Ex. 84 (Partner A) 91:5-13.

    **RESPONSE:** Undisputed that Sheketoff worked on other cases during her four year tenure at Jones Day.

    **REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**615.** Partner A was also unable to identify *any* case teams for numerous other associates. Chase Ex. 84 (Partner A) 91:14-93:20.

    **RESPONSE:** Disputed.  Statement 615 is an argumentative interpretation of evidence. Partner A was able to identify case teams or clients for several of the specific associates named by

Plaintiffs during his deposition. With respect to Male Associate D, for example, Partner A stated: "Partner F mentioned a couple of matters that he worked on[] with [Male Associate D]. I don't recall the specific matters." Chase Ex. 84, Partner A Tr. 92:13-18. And, with respect to Female Associate E, Partner A testified: "She did work for [Client 2] I know she did generally █████████ ███████████. I don't remember the specific case names, but I do remember people talking about working with ███████ and how she was really busy and worked really hard." *Id*. at 93:12-20. Plaintiffs' implication that Partner A's failure to remember case details for associates from six years before his deposition is evidence that his impression was deliberately false is not supported by the evidence cited.

**REPLY:** This statement is not genuinely disputed. The deposition testimony on this point is clear and contradicts Jones Day's representations.

616. Partner A's review states: "And my guess would be that she did not bill 2000 hours last year. My guess is that she will soon leave to become Professor Sheketoff."

**RESPONSE:** Undisputed. Defendants note that Statement 616 is an excerpt from Chase Ex. 15 at JD_JS_00001293. By way of further response, Defendants note that Partner A's assumption about Sheketoff's low hours, lack of weekend work, and likely exit from the firm was correct. Chase Ex. 15 at JD_JS_00001289, JD_JS_00001296 (hours); DSF ¶¶ 214, 238 (undisputed). Sheketoff billed only *one hour* of weekend work to Client 1 during her time working for that client. *See* Response 585. And Sheketoff left Jones Day the year after Partner A submitted his review. *See* DSF ¶¶ 19-21, 282 (undisputed). After she left Jones Day, Sheketoff spoke with people about an academic position at UVA. *See* Chase Reply Ex. 99 at P02038 ("█████████████ ███████████████████████████████████████████████████████████.").

**REPLY:** This statement is admittedly undisputed.  Jones Day's answer (beginning with "Defendants note") is nonresponsive and should be disregarded.  It is also false and highly misleading, as discussed elsewhere.  *E.g.*, PSF ¶¶ 586-99.

617.    Again, nothing in the evaluation prompt sought these types of "guess[es]."  Chase Ex. 28 at JD_00005182.

**RESPONSE:** Disputed for the reasons set forth in response to Statement 602.

**REPLY:** As discussed in Plaintiffs' reply on PSF ¶ 602, this statement is not genuinely disputed.

618.    Partner A understood that these "guess[es]" were a "criticism."  Chase Ex. 84 (Partner A) 139:3-4.

**RESPONSE:** Undisputed.

619.    Partner A has never before included in any of his evaluations any guess of how many hours an associate worked or whether she would leave private practice for another type of legal work.  Chase Ex. 39.

**RESPONSE:** Disputed. Partner A has commented in prior reviews regarding whether an associate would or would not leave private practice for another type of legal work, as explained in Response 604. And Partner A testified that the reason he had not previously commented on other associates' hours is because he had "never worked with anybody that seemed as unavailable as [Sheketoff]." Chase Ex. 84, Partner A Tr. 136:15-18.

**REPLY:** This statement is not genuinely disputed.  Partner A's (incorrect) ███████████████████████████████████████████████████████████ is not a guess about how many hours she worked or whether she would ultimately leave private practice for another type of legal work.  See Chase Ex. 39 at JD_00002959.

492

**620.**　Partner A had no access to Julia's billing records, and did not know how much billable work she was doing.  Chase Ex. 84 (Partner A) 87:11-17.

**RESPONSE:** Disputed.  Partner A sat in on the Washington D.C. litigation associate evaluation meetings and would have seen presentations that reported on Sheketoff's hours. *See* Chase Ex. 18. By way of further response, Defendants note that Partner A's statements about Sheketoff's low hours and lack of weekend work were correct. Chase Ex. 15 at JD_JS_00001289, JD_JS_00001296 (hours); DSF ¶¶ 214, 238 (undisputed). Sheketoff billed only *one hour* of weekend work to Client 1 during her time working for that client. *See* Response 585.

**REPLY:** This statement is not genuinely disputed.  The cited evidence from Partner A's deposition reads: "Q.  And just to be clear, you did not actually know how much billable work I was doing, correct?  A.  Correct.  Q.  You didn't have access to my billing records? A. Correct." Chase Ex. 84 (Partner A) 87:11-17.  Jones Day cannot contradict those deposition admissions with attorney argument about what Partner A "would have seen."  In fact, Partner A would not have seen Julia's hours at the D.C. litigation associate evaluation meeting, because that meeting occurred *after* he submitted his evaluation of Julia.  JDSF ¶¶ 151, 168; Chase Ex. 83 (Lovitt) at 141:17-20.  The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded.  It is also false and misleading, as discussed elsewhere. *E.g.*, PSF ¶¶ 586-99.

**621.**　Julia never suggested to Partner A that she might be interested in academia.  Sheketoff Decl. ¶ 45; Chase Ex. 84 (Partner A) 138:7-9.

**RESPONSE:** Undisputed.

**622.**   Apart from Partner A's pretextual criticisms of Julia in his review of her, there is significant evidence that sex was a motivating factor in his negative review of Julia, as the paragraphs below demonstrate.

   **RESPONSE:** Disputed.   Statement 622 is argumentative interpretation of evidence. Plaintiffs do not cite any evidence—admissible or otherwise—in support of Statement 622. Defendants incorporate their responses to the below Statements in response to Statement 622.

   **REPLY:** This statement is proved by PSF ¶¶ 623-37.

**623.**   Partner F, who had previously had to revise Partner A's writing, encouraged Julia to suggest revisions to Partner A's writing and then was surprised at Partner A's hostile reaction. Sheketoff Decl. ¶ 23; Sheketoff Ex. 39 at P04091 ("I'm really sorry if I gave you bad advice."); *id.* at P04091-92 ("Lol What an ass"); ███████████████████.

   **RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c). Statement 623 is supported only by inadmissible hearsay. *See* Fed. R. Evid. 801, 802. There is also no evidence that Sheketoff showed Partner F the specific revisions at issue or the email from Partner A, rather than Sheketoff's own slanted summary of it. *See* Sheketoff Ex. 39 at P04091. Defendants further dispute Plaintiffs' assertion that Partner F "encouraged Julia to suggest revisions to Partner A's writing" and then was "surprised at Partner A's hostile reaction" as those interpretations are not supported by the cited exhibits.

   **REPLY:** This statement is not genuinely disputed.   As the cited text messages reflect, Julia quoted verbatim Partner F's "general comments" in her text messages to Partner F.  Sheketoff Ex. 39 at P04091-92.  And both Julia's sworn declaration and the cited text messages make clear that Partner F did indeed advise Julia to suggest revisions to Partner A's writing and then was surprised by Partner A's hostile reaction.  Jones Day is also wrong that the cited evidence is

inadmissible hearsay.  Partner F's cited statements will not be introduced to prove the truth of the matter asserted (e.g., that he truly "really sorry" he gave bad advice or that Partner A was actually "an ass") but to prove that Partner F gave Julia the described advice and was then surprised by Partner A's hostile reaction.  (This is relevant because Partner F also made revisions to Partner A's writing and did not receive the same hostile reaction, which bolsters the inference of sex discrimination.)  In any event, Partner F's statements (i.e., statements by a Jones Day lawyer consulting with Julia about her work at Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D).

**624.**  Contrary to Julia's experience with Partner A, Partner A was "usually pretty laid back" with Partner F.  Sheketoff Ex. 39 at P04091; *see also id.* at P04089 ("Yeah he is fun.  Easygoing.").

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c). Statement 624 is supported only by inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants further state that Plaintiffs' claim that Partner F's impression of Partner A was "[c]ontrary to Julia's experience" is also argumentative interpretation of evidence and is not supported by the referenced exhibit.

**REPLY:** This statement is not genuinely disputed.  Partner A was admittedly "annoyed" by Julia's attempt to provide helpful revisions to their joint memo and responded with a hostile, chastising email invoking his senior status.  PSF ¶ 494.  That behavior was not "fun," "[e]asygoing," or "laid back."  Jones Day "dispute[s]" this statement on the ground that the cited evidence is inadmissible.  That is a meritless objection.  As discussed above, the substance of the cited messages is appropriately considered at summary judgement if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed Partner F will testify at trial consistent with his text messages.  In any event, the out-of-court statements themselves

(statements by a Jones Day lawyer about his own work with a Jones Day partner for Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D).

**625.**   Female Associate A also "told [Julia] that when she had had to rewrite something that he had done for … a project they were working on together, she had … I believe that was a male bankruptcy associate send out the memo and that [Partner A] hadn't responded at all to that." Chase Ex. 80 (Sheketoff) at 136:17-23; accord Sheketoff Ex. 41 at P02166.

> **RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c). Statement 624 is supported only by inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

> **REPLY:** Jones Day's sole basis for disputing this statement is that the cited evidence is supposedly hearsay.  That is incorrect.  As discussed above, the substance of out-of-court statements is appropriately considered at summary judgement if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Female Associate A will testify at trial consistent with her text messages.  In any event, the text messages themselves are admissible as well.  Female Associate A's prior statements (statements by a Jones Day lawyer about her own work with a Jones Day partner for Jones Day) are definitionally not hearsay under FRE 801(d)(2)(D).

**626.**   Julia saw Partner A "interact frequently with ███████ and he seemed quite deferential to ██████, was able to joke around with him and seemed to … [be] self-deprecating with ████████████████████

> **RESPONSE:** Undisputed that Statement 626 is an accurate excerpt of Sheketoff's deposition testimony at 129:9-18. Chase Ex. 80.

> **REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

627.    Partner A was also self-deprecating about his own intelligence with the male Issues & Appeals table in the Jones Day cafeteria.  Savignac Decl. ¶ 6; Chase Ex. 84 (Partner A) 280:11-284:3; Sheketoff Ex. 41 at P02175 (referring to the "white ma[l]e conservative table"); *see also* Chase Ex. 80 (Sheketoff) at 129:19-23 ("my general impression was that he did not seem insecure with men, including with other male Supreme Court clerks").

**RESPONSE:** Disputed in part. Undisputed that Partner A testified that he thinks he has "made self-deprecating comments about [his] own intelligence in front of the issues and appeals associates in the Jones Day cafeteria." Chase Ex. 84, Partner A Tr. 280:18-281:1. Disputed that there was a "male Issues & Appeals table" in the Jones Day cafeteria. *Id.* at 281:13-284:3. Defendants further dispute that Statement 627 contains material facts or has any relevance to this matter, as making self-deprecating comments is not evidence of gender bias. Defendants further dispute Plaintiffs' parentheticals as argumentative and immaterial to the fact asserted in Statement 627.

**REPLY:** This statement is not genuinely disputed.   Jones Day disputes that there was really a "male Issues & Appeals table" at Jones Day."  But Mark's sworn declaration says there was, and Female Associate A's text messages similarly refer to the "white ma[l]e conservative table."  Sheketoff Ex. 41 at P02175.  Partner A does not contradict that evidence; to the contrary, he admitted that "most of the time that I saw the tables were predominantly male" and "d[id]n't know" whether most of the time it was all male.  Chase Ex. 84 (Partner A) at 281:13-282:7; *accord id.* 283 ("almost all male").  This statement is material because it shows that, although Partner A was insecure about his intelligence among high-achieving women, he was not insecure (or less insecure) about his intelligence among high-achieving men.

497

**628.**   In contrast, Partner A did not make self-deprecating comments about his intelligence in front of Julia.  Sheketoff Decl. ¶ 46.

**RESPONSE:** Undisputed that Sheketoff's declaration asserts this fact.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**629.**   Rather, "in [their] first meeting, … it just seemed important to [Partner A] to project that he was the more knowledgeable one, that he … could teach me things about this or that he was superior to me, and … that to me seemed to be a mark of insecurity."  Chase Ex. 80 (Sheketoff) at 134:2-17.

**RESPONSE:** Disputed in part. Undisputed that Statement 629 contains accurate excerpts of Sheketoff's deposition testimony.   Disputed that Sheketoff's self-serving, subjective impressions are material facts or have any relevance to this matter as insecurity does not have any relevance to a claim of gender bias. Also disputed on the ground that Sheketoff's impression is contradicted by Partner A's testimony. Partner A specifically testified as follows:

Q, Have you ever felt insecure about your capabilities as a lawyer?

A. No.

Q. Have you ever felt insecure around wom[e]n who have strong academic credentials?

A. No.

Q. Have you ever felt insecure around wom[e]n who worked on the Supreme Court?

A. No.

Chase Ex. 84, Partner A Tr. 288:17-289:3

**REPLY:** Jones Day asserts that Partner A's apparent insecurity with Julia is irrelevant. Partner A's insecurity with less deferential women—and his disparate response to less deferential

men—is plainly relevant to this sex discrimination claim.  *See also Savignac v. Jones Day*, 486 F. Supp. 3d 14, 29 (D.D.C. 2020) (finding plausible the claim that "Partner A took offense at Sheketoff's pushback in a way that he would not have done were she a man").

630.    Partner A seemed "insecure" around Julia in other ways as well.  Chase Ex. 80 (Sheketoff) at 133:6-134:2.

**RESPONSE:** Disputed for the reasons set forth in response to Statement 629. Defendants further dispute Statement 630 as an argumentative interpretation of evidence

631.    For example, "[h]e brought up that [Julia] went to Harvard multiple times … and he often would make jokes or references to how he had some connection to Harvard…. [I]t just seemed like he was trying to show [Julia] that … he had a connection to a prestigious institution as well."  Chase Ex. 80 (Sheketoff) at 133:6-134:2.

**RESPONSE:** Disputed in part.  Undisputed that Statement 631 contains accurate excerpts of Sheketoff's deposition testimony. Disputed that Sheketoff's impressions are material facts or have any relevance to this matter as insecurity does not have any relevance to a claim of gender bias. Also disputed on the ground that Sheketoff's impression is contradicted by Partner A's testimony. Partner A testified that it is "not fair" to say that he "reference[s] [his] family's connection to Harvard frequently," (Chase Ex. 84, Partner A Tr. 289:4-10) and that he could not recall referencing his family's connection to Harvard multiple times with Sheketoff. *Id.* at 289:11-14.

**REPLY:** This statement is not genuinely disputed.  Julia testified that Partner A brought up his connections to Harvard multiple times, and Partner A said that he didn't remember whether or not had he done so.  Chase Ex. 84 (Partner A) 289:11-14.  Jones Day also says that Partner A's apparent insecurity with Julia is irrelevant.  But Partner A's insecurity with less

deferential women—and his disparate response to less deferential men—is plainly relevant to this sex discrimination claim.  *See also Savignac v. Jones Day*, 486 F. Supp. 3d 14, 29 (D.D.C. 2020) (finding plausible the claim that "Partner A took offense at Sheketoff's pushback in a way that he would not have done were she a man").

632.    Partner A made similar comments to ████████████ but Julia did not hear him make those kinds of comments to ██████ or other men. ███████████████████

**RESPONSE:** Disputed in part. Undisputed that Sheketoff testified that she "never heard [Partner A] joke about" going to Harvard with ██████ or other men. ████████ ████████████ Defendants dispute pursuant to Fed. R. Civ. P. 56(c) Plaintiffs' assertion in Statement 632 that "Partner A made similar comments to ████████████ as the only support for that assertion is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** This statement is not genuinely disputed.  Jones Day disputes that Partner A made similar comments to ███████████████ on the ground that the cited evidence is inadmissible hearsay.   As discussed above, the substance of out-of-court statements is appropriately considered at summary judgement if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed ███████████ will testify at trial consistent with her statements to Julia.   To the extent Jones Day means to challenge the admissibility of Partner A's own statements to ██████████ (as opposed to her accounts of those statements), those statements are admissible because they will not be introduced for the truth of the matter (i.e., that Partner A really did have connections to Harvard) but to show that Partner A felt the need to make such statements around women but not men (and raise the inference that he felt insecure around high-achieving women but not high-achieving men).

**633.**   Partner A also had the following conversation with Female Associate B, who then reported it to Julia: "Weirdest interaction ever with [Partner A] just now… So I told him I'm leaving the firm and he offered to talk to ███ the guy who arranges care service for the firm, to see if he knew of any retired drivers who might want a job Driving me to ███████   That was over breakfast.  Then an [] hour later, he comes to my office and closes the door.  And he says, I was just thinking, I wouldn't want you to be in a car ten hours a week with a guy.  Bc you know, I wouldn't want my wife to be in a car with a guy that many hours, and I don't think she would feel comfortable with it either … Isn't that a weird and awkward and borderline inappropriate thing to close my door and say? … I mean, he elaborated a little bit and it just made it worse[.]  He was like, you know, because familiarity breeds contempt and he might want to make conversation." Sheketoff Ex. 42 at P04080-71; *see also* Chase Ex. 80 (Sheketoff) at 132:2-23.

> **RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 633 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Also disputed that this anecdote is a material fact or has any relevance to this matter.

> **REPLY:** Jones Day disputes this statement on the ground that it is inadmissible hearsay.  But as discussed above, the substance of out-of-court statements is appropriately considered at summary judgement if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.   Here, Female Associate B will testify about the conversation at trial. To the extent Jones Day means to also challenge as hearsay Partner A's own statements to Female Associate F (as opposed to her account to Julia of those statements), those statements are not hearsay because they will not be introduced for the truth of the matter (e.g., that Partner A truly "wouldn't want my wife to be in a car with a guy that many hours") but merely to show that Partner A made sexist comments, "true" or not.  This statement is material because it is a sexist

comment that Partner A made to a female associate.  Because Jones Day does not otherwise dispute this statement, or present any evidence to controvert it, it is admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**634.**   Moreover, in Partner A's narrative evaluations of women, 

**RESPONSE:** Disputed in part.  Undisputed that the quoted parentheticals are accurate excerpts from portions of Partner A's narrative evaluations. *See generally* Chase Ex. 39. Defendants dispute Plaintiffs' assertion that such remarks were "frequently" offered—Plaintiffs have cited 9 reviews out of 48 reviews of women (*i.e.*, 19%) offered by Partner A between 2012 and 2020. *Id.*

**635.**   ███████████████████████████████████████████

███████████████████████████████████

**RESPONSE:** Disputed.  Statement 635 is an argumentative interpretation of evidence.

████████████████████████████████████████  which Partner A testified meant an "ability to keep an open line of communication with who you're working for, whether you would be good at business development, good at recruiting, just good at client interaction generally. . . . Good at public speaking." Chase Ex. 84, Partner A Tr. 284:17-285:9. ██████████████████████████████



**REPLY:** This statement is not genuinely disputed.  It is not disputed that Partner A used the term ████████████████████████████████████████████████████

████████████████████████).  Partner A indisputably used that gendered term in a gendered way.

**636.**    Partner A was "annoyed" by what he perceived as Julia's lack of ██████ in "rude[ly]" suggesting changes to his revisions.  Chase Ex. 84 (Partner A) 233:11-21, 235:6-7, 235:8-13, 241:9-13.

**RESPONSE:** Disputed.  Statement 636 is an argumentative interpretation of evidence. Defendants dispute Plaintiffs' argumentative assertion that Partner A was "annoyed" by what he "perceived as Julia's lack of ██████," as that statement is not supported by the evidence cited. As set forth in response to Statement 494, Partner A was pleased with most of the edits suggested by Sheketoff, and was "annoyed" only by Sheketoff's repeated failure to incorporate his stylistic revisions. Defendants also dispute Plaintiffs' mischaracterization of Partner A's testimony regarding Sheketoff's revisions: as Partner A testified, he believed that "certain things like

changing 'as well as' back to 'and,' yes, was rude;" he did not, however, testify that Sheketoff "'rude[ly]' suggest[ed] changes to his revisions." Chase Ex. 84, Partner A Tr. 231:15-232:13.

**REPLY:** This statement is not genuinely disputed.  Partner A admittedly understood "█████████" to mean "███████████████." Chase Ex. 39 at JD_00002859 ("███████ ████████████████████████████████████████████████████"). And he was admittedly "annoyed" at Julia (and thought she was "rude") for being insufficiently deferential to his edits.  PSF ¶ 494.

**637.**   Partner A held Julia to a sex-based standard (demonstrating "████████") that he did not hold men to.  Chase Ex. 84 (Partner A) 233:11-21, 235:6-7, 235:8-13, 241:9-13; Chase Ex. 39.

**RESPONSE:** Disputed. Statement 637 is an argumentative statement that is not supported by the evidence cited. There is no evidence that "soft skills" is a sex-based standard or that Partner A did not look for similar characteristics in male associates. *See* Response 635. Defendants further dispute Statement 637 on the ground that Plaintiffs have no basis for asserting that Partner A would not have treated a male associate who rejected his revisions the same way he treated Sheketoff. Partner A testified that "no other lawyer has ever" taken "something that I had changed of theirs and changed it back to the way they had it." Chase Ex. 84, Partner A Tr. 288:6-16.

**REPLY:** It is indisputable that Partner A's reviews ████████████████████████ ███████████████████████. Chase Ex. 39.  It is indisputable that Partner A understood "█████████" to mean "███████████████." Chase Ex. 39 at JD_00002859 ("███████ ████████████████████████████████████████████████████").  And it is indisputable that Partner A was "annoyed" at Julia's response to his edits—that is, how she (1) "ma[d]e style edits to [his] writing" and (2) "change[d] it back to the way [she] had it" after he

"ma[d]e an edit."  Chase Ex. 37 at JD_JS_00001441; PSF ¶ 494.  Plaintiffs have set forth in detail the many reasons that a jury would conclude that indeed Partner A would have responded differently to a man.  PSF ¶¶ 433-735.

### D. Contra Jones Day, Julia's other evaluations do not corroborate Partner A.

**638.**    Contrary to Jones Day's argument, Julia's other reviews do not corroborate Partner A's negative review of her.  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Disputed. Statement 638 is an argumentative interpretation of evidence. As set forth in Defendants' responses to Statements 517, 553, 563, and 566, the critiques in Partner A's review were similar to critiques Sheketoff received from other partners. *See generally* Chase Ex. 15 at JD_JS_00001293-95.

**REPLY:** This statement is not genuinely disputed.  *See* PSF ¶¶ 433-66, 639-82.

**639.**    As demonstrated in detail in Section III.A above, the vast majority of Julia's reviews were extremely positive.  *See supra* ¶¶  433-66.

**RESPONSE:** Disputed. Statement 639 is an argumentative interpretation of evidence. As set forth in Defendants' responses to Statements 433-466, Sheketoff's narrative evaluations included a mix of both negative and positive comments, including for work performed both on pro bono matters and matters for paying clients. *See also* Chase Ex. 15.

**REPLY:**  This statement is not genuinely disputed.  Jones Day says that this statement is an argumentative interpretation of evidence.  That conclusory assertion is neither accurate nor a legitimate basis to dispute a statement.  *See* Preliminary Statement A.  And Jones Day's assertion that Julia's narrative evaluations "included a mix of both negative and positive comments" does not controvert this statement.

**640.**   During her four years, Julia received two other negative reviews besides Partner A's: from Hashim Mooppan for 2015 and from Partner J for 2016.  Chase Ex. 15.

**RESPONSE:** Disputed. Statement 640 is an argumentative interpretation of evidence. As set forth in response to Statements 517, 553, 563, and 566, Sheketoff's narrative evaluations included critical comments from several partners, in addition to Hashim Mooppan for 2015 and Partner J for 2016. *See* Chase Ex. 15 at JD_JS_00001294, JD_JS_00001297.

**REPLY:** This statement is not genuinely disputed.  *See* Chase Ex. 15.  While the firm states that other partners "included critical comments," it does not say that any of their reviews were negative on the whole.

**641.**   Mooppan's review criticized numerous aspects of Julia's performance.  Chase Ex. 15 at JD_JS_00001293.

**RESPONSE:** Undisputed.

**642.**   Julia spoke at length with Heifetz about Mooppan's review of her.  Sheketoff Decl. ¶ 47.

**RESPONSE:** Undisputed.

**643.**   Heifetz told Julia not to worry about the review because Mooppan was known as an extremely critical reviewer.  Sheketoff Decl. ¶ 47.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 643 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Also disputed as inconsistent with the record evidence. Heifetz testified that she had personal knowledge of the matter reviewed by Mooppan and was "appalled by Sheketoff's conduct and believed Sheketoff was skirting the lines of her ethical obligations to her clients by threatening to quit the representation because it was inconvenient to her personal life." Heifetz Decl. at ¶ 6. Based on

concerns about Sheketoff's substantive performance and Sheketoff's extremely low billable client hours, Heifetz assigned Sheketoff a "2" practice rating and ranked her 23rd out of 24 peer associates for the work she performed in 2015. *Id.* at ¶ 5.

**REPLY:** Jones Day "dispute[s]" this statement on the ground that the cited evidence is hearsay. That is incorrect. As discussed above, the substance of evidence may be considered at summary judgment if it can be presented in admissible form at trial. *See* Preliminary Statement D. Here, as her sworn declaration makes clear, Julia will testify at trial about Heifetz' statement. Heifetz' statement (spoken by a defendant and partner at Jones Day about Jones Day matters) is not hearsay under FRE 801(d)(2); *see also* FRE 805. In any event, Heifetz' statement will not be introduced for the truth of the matter asserted (i.e., that Julia need not worry), but instead to show that Heifetz discounted Mooppan's review because she understood him to be a harsh reviewer, which is not a hearsay purpose under FRE 801(c)(2). Moreover, Heifetz will be a witness at trial, will be examined by Plaintiffs, and will be asked about whether Mooppan was known as extremely critical reviewer. She will either admit the truth and testify consistent with her statement to Julia, or Plaintiffs will impeach her with her statement (which would not be a hearsay purpose, FRE 801(c)(2)). As for Heifetz' vague claim that she has "personal knowledge of Sheketoff's reaction to the ███████████████," she notably fails to identify how she gained that "personal knowledge." And elsewhere, Jones Day suggests that Heifetz had "personal knowledge" of Julia's work with Partner A simply because she talked to Partner A about it. JDSF ¶ 291. As for Julia's sworn declaration makes clear, Heifetz was not present when Julia joked with Mooppan and her friends that she couldn't take any more ███████████████, and Julia did not make a similar comment to Heifetz. Sheketoff Decl. ¶¶ 49-50; *see also* Chase Ex. 15 at JD_JS_00001296 (Julia's 2015 assessment statement says nothing about any alleged threat to quit and notes simply

that Julia "[e]xperienced difficulty on a project for one partner on a variety of fronts").  Nor does

the record support Jones Day's assertion that Heifetz gave Julia a 2 rating in 2015 as a result of

concerns about Julia's substantive performance, as opposed to Heifetz' frustration that a pro bono

project she approved Julia to take on took many hundreds more hours than anticipated, resulting

in concomitantly lower billable hours for Julia.  *See* Sheketoff Ex. 171.  Indeed, Heifetz worked

directly with Julia and reviewed her work quite positively.  Chase Ex. 15 at JD_JS_00001300.

**644.**   Heifetz told Julia that being reviewed negatively by Mooppan was so common that it

was known as "getting Hashed."  Sheketoff Decl. ¶ 48

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only

support for Statement 644 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Also disputed as

inconsistent with the record evidence for the reasons stated in Response 643.

**REPLY:** Jones Day "dispute[s]" this statement on the ground that the cited evidence

is hearsay.  That is incorrect.  As discussed above, the substance of evidence may be considered at

summary judgment if it can be presented in admissible form at trial.  *See* Preliminary Statement D.

Here, as her sworn declaration makes clear, Julia will testify at trial about Heifetz' statement.

Heifetz' statement (spoken by a defendant and partner at Jones Day about Jones Day matters) is

not hearsay under FRE 801(d)(2); *see also* FRE 805.  Moreover, Heifetz will be a witness at trial,

will be examined by Plaintiffs, and will be asked whether being reviewed negatively by Mooppan

is so common that it is known as "getting Hashed."  She will either admit the truth and testify

consistent with her statement to Julia, or Plaintiffs will impeach her with her statement (which

would not be a hearsay purpose, FRE 801(c)(2)).  Jones Day also says this statement is inconsistent

with the record evidence, but nothing in Heifetz' declaration is inconsistent with Julia's sworn

assertion that Heifetz told her that being reviewed negatively by Mooppan was so common that it

was known as "getting Hashed."   Because Jones Day provides no evidence controverting this statement, it is admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

645.    Heifetz told Julia that Mooppan's reviews were largely discounted because of his reputation for being extremely critical of others. Sheketoff Decl. ¶ 48.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 645 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Also disputed as inconsistent with the record evidence for the reasons stated in Response 643.

**REPLY:** Jones Day "dispute[s]" this statement on the ground that the cited evidence is hearsay.  That is incorrect.  As discussed above, the substance of evidence may be considered at summary judgment if it can be presented in admissible form at trial.  *See* Preliminary Statement D. Here, as her sworn declaration makes clear, Julia will testify at trial about Heifetz' statement. Heifetz' statement (spoken by a defendant and partner at Jones Day about Jones Day matters) is not hearsay under FRE 801(d)(2); *see also* FRE 805.  Moreover, Heifetz will be a witness at trial, will be examined by Plaintiffs, and will be asked whether Mooppan's reviews are largely discounted because of his reputation for being extremely critical of others.  She will either admit the truth and testify consistent with her statement to Julia, or Plaintiffs will impeach her with her statement (which would not be a hearsay purpose, FRE 801(c)(2)).  Jones Day also says this statement is inconsistent with the record evidence, but nothing in Heifetz' declaration is inconsistent with Julia's sworn assertion that Heifetz told her that Mooppan's reviews were largely discounted because of his reputation for being extremely critical of others.  Because Jones Day provides no evidence controverting this statement, it is admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**646.**   Indeed, Brogan admitted that he read all of Julia's reviews for her work in 2015, and decided he "should disregard" Mooppan's evaluation.  Chase Ex. 77 (Brogan) 221:21-22; accord *id.* at 28:25-29:12 (Brogan testifying that he "disregarded Hash's evaluation").

**RESPONSE:** Disputed in part.   Undisputed that Brogan testified that he "disregard[ed]" Mooppan's evaluation. Defendants dispute Plaintiffs' implication in Statement 646 that Brogan disregarded Mooppan's because he had a reputation of offering critical evaluations. Brogan testified that Mooppan is "a very respected lawyer in the firm," but that he disregarded Mooppan's evaluation, "which was not complimentary to" Sheketoff, because he wanted to "encourage" Sheketoff "to have a very successful career at the firm." Chase Ex. 77, Brogan Tr. 221:18-24, 29:12-30:10; *see also* DSF ¶¶ 229-232.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**647.**   Despite Mooppan's "very unfavorable evaluation," Brogan decided to award Julia the highest salary paid by the firm to associates across her entire class year.  See Chase Ex. 77 (Brogan) 29:2-4 ("very unfavorable evaluation"); *id.* at 217:3-7 ("I gave you an over—extraordinary bump about the recommendations.  I gave you like $65,000, I think, and—in 2016, notwithstanding Hash's evaluation."); Dkt. 178 at ¶ 68 (admitting that Julia and four other Issues & Appeals associates "were the highest paid associates in the class of 2010 law graduates as of July 1, 2016").

**RESPONSE:** Disputed in part.   Undisputed that certain Issues & Appeals associates, including Plaintiff Sheketoff, were the highest paid associates in the class of 2010 law graduates as of July 1, 2016. Defendants dispute the implication in Statement 647 that Brogan's decision to award Sheketoff this salary reflected the firm's view of Sheketoff's performance. Sheketoff's adjustment effective July 1, 2016, was despite her actual performance up to that date and intended

to encourage her to improve—a point of fact on which Plaintiffs have no contrary evidence. *See* Pls. Resp. DSF ¶¶ 229-232.

  **REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

  **648.**  According to Partner F, "[█████] gave no positive reviews this year [the year he worked with her]."  Sheketoff Ex. 40.

  **RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 648 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

  **REPLY:** Jones Day's "dispute[s]" this statement on the ground that it is hearsay.  As discussed above, however, the substance of evidence can be considered at summary judgment if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  The substance of this statement will be presented at trial through the testimony of Partner F, who conveyed this information to Julia.  *See* Sheketoff. Ex. 40 (Julia: "[Partner F] just told me that [████] gave no positive reviews this year.").  Partner F learned the information from [██████] directly.  He texted Julia: "He [████████] just has very ridiculous standards and expectations.  He told me he didn't give any positive reviews this year."  Sheketoff Ex. 39 at P04326.  And [███████] statements to Partner F about his own reviews (statements by a Jones Day partner about evaluations of his work with Jones Day associates) are admissible under FRE 801(d)(2)(D).  [██████] will also be a witness at trial, will be examined by Plaintiffs, and will be asked whether he gave any positive reviews for the year he reviewed Julia.  Apart from its meritless evidentiary objection, Jones Day does not dispute this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**649.** Partner F also reported: "If it makes you feel any better, he ruined ▮▮▮▮▮▮ shot at a [S]calia clerkship based on review of his summer associate work.  So keep that in perspective."  Sheketoff Ex. 39 at P04326.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 649 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's "dispute[s]" this statement on the ground that it is hearsay.  As discussed above, however, the substance of evidence can be considered at summary judgment if it can be presented in an admissible form at trial.  *See* Preliminary Statement D.  It is undisputed that the substance of this statement will be presented at trial through the testimony of Partner F, who has personal knowledge of this information.

**650.** Notwithstanding ▮▮▮▮▮▮ negative assessment of ▮▮▮▮▮▮ Jones Day viewed ▮▮▮▮▮▮ as such an "outstanding" associate that it awarded him a "discretionary payment" generally reserved for partners when he left the firm to join the Trump administration. *Tolton* Dkt. 96-1 at 4 (Lovitt Decl.).

**RESPONSE:** Disputed in part and immaterial. Undisputed that Brogan authorized a one-time discretionary payment to ▮▮▮▮▮▮ who would have been eligible for partnership the year following his departure from Jones Day. *Tolton*, 1:19-cv-945, Dkt. 96-1 ¶ 4. Defendants dispute Plaintiffs' assertion that such a payment is "generally reserved for partners," as that assertion is not supported by the evidence cited. To the contrary, the cited declaration states that "the Managing Partner may exercise his discretion to provide additional payments to lawyers entering into the armed services or a government position." *Id.*

**651.** Jones Day subsequently re-hired ▮▮▮▮▮▮ as a partner at the law firm, where he remains today. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**RESPONSE:** Undisputed but immaterial.

**652.** ▮▮▮▮ was also ultimately hired by Justice ▮▮▮▮ who evidently thought him qualified to be a Supreme Court law clerk, contrary to ▮▮▮▮ view. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**RESPONSE:** Disputed in part, and immaterial. Undisputed that ▮▮▮▮ served as a law clerk to Justice ▮▮▮▮ Defendants dispute Plaintiffs' argumentative characterization of ▮▮▮▮ qualifications, and ▮▮▮▮ assessment thereof, which is based solely on inadmissible hearsay, as noted in Defendants' response to Statement 649. Defendants further state that Justice ▮▮▮▮ hired ▮▮▮▮ more than twelve years after he worked with ▮▮▮▮ as a summer associate, following highly successful years at Jones Day and in senior roles at the White House and the Department of Justice. *See Tolton*, 1:19-cv-945, Dkt. 96-1 ¶¶ 2-3; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**REPLY:** As discussed in Plaintiffs' reply on PSF ¶ 649, Partner F's account of ▮▮▮▮ torpedoing of ▮▮▮▮ Supreme Court clerkship application may be considered at summary judgment because it can be presented in admissible form at trial (through Partner F's in-court testimony).

**653.** Julia did not threaten to withdraw from the case she worked on with Mooppan. Sheketoff Decl. ¶ 49.

**RESPONSE:** Disputed.  Heifetz testified from her personal knowledge that Sheketoff "was skirting the lines of her ethical obligations to her clients by threatening to quit the representation because it was inconvenient to her personal life." Heifetz Decl. at ¶ 6. Mooppan's review also confirms that Sheketoff reacted to ▮▮▮▮ "extremely poorly— excessively complaining, . . . failing to find cases that the judges themselves ended up finding, and

even repeatedly suggesting that she would withdraw from a case in which the DC Circuit had
appointed her as an amicus on behalf of a prisoner." Chase Ex. 15 at JD_JS_00001297.

**REPLY:** Jones Day mischaracterizes Heifetz' declaration.  Heifetz asserts that she has
"personal knowledge of Sheketoff's reaction to the ███████████████."  But she
conspicuously fails to identify how she gained that "personal knowledge," or even what Julia's
reaction was.  And elsewhere, Jones Day suggests that Heifetz had "personal knowledge" of Julia's
work with Partner A simply because she talked to Partner A about it.  JDSF ¶ 291.  As Julia's
sworn declaration makes clear, Heifetz was not present when Julia joked with Mooppan and her
friends that she couldn't take any more ███████████, and Julia did not make a
similar comment to Heifetz.  Sheketoff Decl. ¶¶ 49-50; *see also* Chase Ex. 15 at JD_JS_00001296
(Julia's 2015 assessment statement says nothing about any alleged threat to quit and notes simply
that Julia "[e]xperienced difficulty on a project for one partner on a variety of fronts").  Her next
assertion (that she was supposedly "appalled by Sheketoff's conduct and believed Sheketoff was
skirting her ethical obligations by threatening to quit the representation") does not say it is based
on her personal knowledge of Julia, and is presumably describing her purported response to
Mooppan's account of Julia's behavior.  Indeed, it is not even clear that Heifetz is representing
that she had personal knowledge of Julia's reaction to the same ██████████████ that
Mooppan complained about; ████████████████.  Sheketoff Decl. ¶ 58.

**654.**     Rather, together with her friends (Female Associate A, Male Associate J, and possibly
one other friend), and also with Mooppan, Julia joked that she couldn't take any more ████████
██████.  Sheketoff Decl. ¶ 49.

**RESPONSE:** Undisputed that Sheketoff asserts that she joked about not being able to
'take any more ██████████████."  Disputed as inconsistent with the record to the

extent Statement 654 implies that Sheketoff merely joked about withdrawing from the representation. Both Heifetz and Mooppan interpreted Sheketoff's comments as suggesting she was serious about withdrawing. *See* Heifetz Decl. at ¶ 6; Chase Ex. Chase Ex. 15 at JD_JS_00001297. By way of further response, Defendants state that Mooppan's evaluation of Sheketoff describes her response to the ███████████ schedule as "immature across the board—both in terms of substantive execution and professional comportment." Chase Ex. 15 at JD_JS_00001297.

    **REPLY:** As discussed in Plaintiffs' reply on PSF ¶ 654, Jones Day mischaracterizes Heifetz' declaration. Heifetz asserts that she has "personal knowledge of Sheketoff's reaction to ████████████████████." But she conspicuously fails to identify how she gained that "personal knowledge," or even what Julia's reaction was. And elsewhere, Jones Day suggests that Heifetz had "personal knowledge" of Julia's work with Partner A simply because she talked to Partner A about it. JDSF ¶ 291. As Julia's sworn declaration makes clear, Heifetz was not present when Julia joked with Mooppan and her friends that she couldn't take any more ██████████ , and Julia did not make a similar comment to Heifetz. Sheketoff Decl. ¶¶ 49-50; *see also* Chase Ex. 15 at JD_JS_00001296 (Julia's 2015 assessment statement says nothing about any alleged threat to quit and notes simply that Julia "[e]xperienced difficulty on a project for one partner on a variety of fronts"). Her next assertion (that she was supposedly "appalled by Sheketoff's conduct and believed Sheketoff was skirting her ethical obligations by threatening to quit the representation") does not say it is based on her personal knowledge of Julia, and is presumably describing her purported response to Mooppan's account of Julia's behavior. Indeed, it is not even clear that Heifetz is representing that she had personal knowledge of Julia's reaction

to the ██████████████████████ that Mooppan complained about; ████████████

████. Sheketoff Decl. ¶ 58.

655.     Heifetz was not present, and Julia did not make any similar comment to Heifetz. Sheketoff Decl. ¶ 50; *see also* Chase Ex. 15 at JD_JS_00001296 (no reference in Heifetz's assessment statement of Julia to any supposed "threat" to withdraw); contra Heifetz Decl. ¶ 6 (falsely suggesting that she had "personal knowledge" of Sheketoff's alleged "threat[] to quit the representation because it was inconvenient to her personal life")

**RESPONSE:** Disputed in part.  Statement 655 is an argumentative interpretation of evidence. Undisputed that Heifetz was not present at a specific conversation during which time Sheketoff claims to have "joked she couldn't take any more ████████████████████." Disputed as inconsistent with the evidence that Heifetz had no personal knowledge about Sheketoff's reaction to the ████████████████. Heifetz testified that she became involved in the matter and had personal knowledge of Sheketoff's reaction to the ████████████████ ████ a point of fact on which Plaintiffs have no contrary evidence. *See* Pls. Resp. DSF ¶ 221.

**REPLY:** This statement is not genuinely disputed.  As discussed in Plaintiffs' reply on PSF ¶ 654, Jones Day mischaracterizes Heifetz' declaration.  Heifetz does not assert that she was present during this conversation or that Julia made any comment to her about withdrawing from the case.  Rather, Heifetz simply asserts that she has "personal knowledge of Sheketoff's reaction to the ████████████████."  It is unclear what she means by that because she does not describe how she gained that knowledge, or what Julia's reaction supposedly was, whereas Julia clearly states that Heifetz was not present during this conversation with Mooppan.  Heifetz' next assertion (that she was supposedly "appalled by Sheketoff's conduct and believed Sheketoff was skirting her ethical obligations by threatening to quit the representation") does not say it is based

on her personal knowledge of Julia, and is presumably describing her alleged response to Mooppan's account of Julia's behavior.  Indeed, it is not even clear that Heifetz is asserting that she had personal knowledge of Julia's reaction to the ██████████████████ that Mooppan complained about; ██████████████.  Sheketoff Decl. ¶ 58.  Moreover, the contemporaneous documentary evidence corroborates that Heifetz did not witness Julia threaten to withdrawn (or even believe Mooppan's allegation that Julia had done so): Julia's assessment statement (admittedly overseen by Heifetz) says nothing about any alleged threat to withdraw. Chase Ex. 15 at JD_JS_00001296.

**656.**   It was clear to Julia's friends, and Julia believed it was clear to Mooppan, that she was playfully commiserating with her friends.  Sheketoff Decl. ¶ 51.

**RESPONSE:** Disputed in part, and immaterial. Undisputed that Sheketoff asserts that she thought it was clear to Mooppan that she was "playfully commiserating[.]" Disputed as contrary to the evidence given that Mooppan took Sheketoff's statements seriously enough to mention them in his evaluation of Sheketoff's performance. *See* Response 654. Defendants dispute Plaintiffs' assertion that this was "clear to Julia's friends," pursuant to Fed. R. Civ. P. 56(c), as the only support for that assertion is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** This statement is not genuinely disputed.  What Julia believed about what Mooppan thought is not contradicted by Mooppan's report of his thoughts.  Moreover, Jones Day hearsay objection is meritless because, as discussed above, the substance of evidence may be considered at summary judgment if it can be presented in admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Female Associate A and Male Associate J will testify at trial consistent with their prior statements.  Julia can also separately testify about their demeanor and the tone of the conversation.

**657.**   During the conversation, Julia and her friends were laughing.  Sheketoff Decl. ¶ 51.

**RESPONSE:** Undisputed that Sheketoff asserts that she and her friends were laughing during the specific conversation referenced.  Disputed as contrary to the evidence given that Mooppan took Sheketoff's statements seriously enough to mention them in his evaluation of Sheketoff's performance. *See* Response 654. Mooppan also viewed Sheketoff's reaction to the ███████████████████████ as "immature across the board—both in terms of substantive execution and professional comportment." Chase Ex. 15 at JD_JS_00001297.

**REPLY:** This statement is not genuinely disputed.  Mooppan's review, which does not describe how Julia supposedly threatened to withdraw, does not controvert this statement.

**658.**   After Julia learned of Mooppan's review, she told Female Associate A and Male Associate J associate about it.  Sheketoff Decl. ¶ 52.

**RESPONSE:** Undisputed but immaterial.

**659.**   Female Associate A and Male Associate J were shocked that Mooppan had described Julia's comments as threats to withdraw and said it was obvious that Julia was simply commiserating with her friends.  Sheketoff Decl. ¶ 52.

**RESPONSE:** Disputed pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 659 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day "dispute[s]" this statement solely on the ground that it is hearsay. However, as discussed above, the substance of evidence may be considered at summary judgment if it can be presented in admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Female Associate A and Male Associate J will testify at trial consistent with their prior statements.  Julia can also independently testify that they appeared shocked.

**660.**   Julia inaccurately believed at the time that Mooppan was a friend.   Sheketoff Decl. ¶ 53.

**RESPONSE:** Undisputed.

**661.**   Julia told Heifetz that she had not threatened to withdraw from the case and explained that she was commiserating with her friends, and Heifetz never suggested that she disbelieved Julia.  Sheketoff Decl. ¶ 54.

**RESPONSE:** Disputed in part.  Undisputed that Sheketoff discussed the matter with Heifetz. Defendants dispute Plaintiffs' assertion that Heifetz "never suggested that she disbelieved Julia." To the contrary, the undisputed evidence is that Heifetz was "appalled" by Sheketoff's conduct and believed Sheketoff was "skirting the lines of her ethical obligations to her clients[.]" Heifetz Decl. at ¶ 6. *See also* DSF ¶ 221.

**REPLY:** This statement is not genuinely disputed.  Heifetz' declaration does not describe what she said to Julia.  Indeed, as discussed in Plaintiffs' reply on PSF ¶ 654, it is not even clear that Heifetz claims to have personal knowledge of Julia's reaction to the relevant ████████████████████████.

**662.**   Heifetz never said or did anything suggesting to Julia that she was "appalled" at the false allegation that Julia "threaten[ed] to quit the representation because it was inconvenient to her personal life."  Sheketoff Decl. ¶ 55.

**RESPONSE:** Disputed in part.  Undisputed that Sheketoff discussed the matter with Heifetz. Disputed as inconsistent with the record evidence that Heifetz "never said or did anything suggesting to Julia that she was 'appalled'" at Sheketoff's conduct. Heifetz testified that she had personal knowledge of the matter reviewed by Mooppan and was "appalled by Sheketoff's conduct and believed Sheketoff was skirting the lines of her ethical obligations to her clients by threatening

to quit the representation because it was inconvenient to her personal life." Heifetz Decl. at ¶ 6. Based on concerns about Sheketoff's substantive performance and Sheketoff's extremely low billable client hours, Heifetz assigned Sheketoff a "2" practice rating and ranked her 23rd out of 24 peer associates for the work she performed in 2015. *Id.* at ¶ 5.

**REPLY:** This statement is not genuinely disputed.  Heifetz' declaration does not suggest that she said or did anything that suggested to Julia that she was "appalled" that Julia had purportedly threatened to withdraw from the representation.  Indeed, as discussed in Plaintiffs' reply on PSF ¶ 654, it is not even clear that Heifetz claims to have personal knowledge of Julia's reaction to the ███████████████████████████

**663.**   Moreover, Julia tried very hard to come up with the best arguments to address the ████████████████████.  Sheketoff Decl. ¶ 56.

**RESPONSE:** Undisputed that Sheketoff believes that she tried to come up with the best argument to address the ██████████████████.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**664.**   Julia spoke with numerous other lawyers, spent hours reading caselaw, and even researched ████ ethics in an attempt to come up with the best arguments in response to the ████████████████.  Sheketoff Decl. ¶ 57.

**RESPONSE:** Undisputed that Sheketoff believes that she tried to come up with the best arguments in response to the █████████████████.  Disputed to the extent Statement 664 is intended to suggest that Sheketoff conveyed this impression to Mooppan and Heifetz. Mooppan's review states that Sheketoff was "not really trying hard to develop the best argument on the new and challenging issue [and] fail[ed] to find cases that the judges themselves ended up

finding." Chase Ex. 15 at JD_JS_00001297. Heifetz likewise was "appalled" about Sheketoff's "resistance to doing the work that conflicted with her vacation." Heifetz Decl. at ¶ 6.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

665.    Julia's ████████ brief was effective; the court did not resolve the case against her on the grounds ██████████████████ .  Sheketoff Decl. ¶ 58.

**RESPONSE:** Disputed in part, and immaterial.  Plaintiffs'  assertion  that  "Julia's supplemental brief was effective" is an argumentative characterization that is not supported by the evidence cited.

666.    While Mooppan criticized Julia for her "lack of judgment" for taking "a vacation to London a few weeks before the argument," and claimed "it became a real problem when the Court asked for ██████████████ right before she left, as that ate into her argument prep time," actually Julia worked each day of her five-day trip, including over the weekend.  Sheketoff Ex. 149 (█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ ).

**RESPONSE:** Undisputed. Defendants further note this was a pro bono representation.

667.    What "ate into [Julia's] argument prep time" was the time Julia spent working hard on her response to the ██████████████ , not the fact that she was located in London during that work.  Sheketoff Decl. ¶ 59.

**RESPONSE:** Disputed in part, but immaterial.  Statement  667  is  an  argumentative interpretation of evidence. Undisputed that Sheketoff has asserted that her "available preparation time for oral argument" was impacted by time spent responding to the court's supplemental

briefing order. Defendants dispute Plaintiffs' unsupported assertion that Sheketoff's vacation in London did not have any impact on her time available to prepare for oral argument. That assertion is contrary to the record evidence, for the reasons stated in Response 663.

**668.** Moreover, while Mooppan fairly criticized Julia's "oral advocacy in the moot courts leading up to her argument," he failed to mention that, as Julia had informed him, this was her first-ever appellate argument and she was experiencing severe public-speaking anxiety.  Chase Ex. 15 at JD_00001297; Sheketoff Decl. ¶ 60.

> **RESPONSE:** Undisputed.

**669.** Nor did Mooppan mention that Julia took the initiative to convene additional moots without his participation in order to overcome her nerves, or that after the actual argument, Mooppan had told her that he was proud of her performance and, with the exception of her initial answer to one question, she couldn't have done anything better; instead Mooppan represented in his review simply that the argument had gone "fine."  Sheketoff Decl. 62; *see also* Chase Ex. 15 at JD_JS_00001291 (reviewer describing Julia's second appellate argument as "masterful," "articulate and persuasive," "fully responsive to questions," and demonstrating  "great judgment and an ability to think quickly on her feet").

> **RESPONSE:** Disputed in part.  Statement 669 is an argumentative characterization of evidence. Mooppan's review does not state "simply that the argument had gone 'fine.'" Rather, review explains: "her oral advocacy in the moot courts leading up to her argument was so poor in terms of both substance and presentation that I was truly worried about how the actual argument would go -- while it ended up fine, the judges weren't very active, so it's hard to tell how she would have held up with a more active bench . . ." Chase Ex. 15 at JD_JS_00001297.

**REPLY:** Jones Day does not dispute that Mooppan failed to mention in his review that Julia took the initiative to convene additional moots with his participation in order to overcome her nerves, or that after the actual argument, Mooppan had told her that he was proud of her performance, and that with the exception of her initial answer to one question, she couldn't have done anything better.  Those assertions are thus admitted.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  Mooppan's description of Julia's performance at the actual argument as simply "fine" is not genuinely disputed.  His written evaluation is clear.

**670.**   Partner J gave Julia a negative review for her work in 2016, the same year for which Partner A gave her a negative review.  Chase Ex. 15 at JD_JS_00001294.

**RESPONSE:** Disputed for the reasons set forth in Defendants' response to Statement 640.

**REPLY:** This statement is not genuinely disputed.  *See* Chase Ex. 15 at JD_JS_00001294.

**671.**   Partner J criticized Julia because her draft motion "could have been presented with more passion, creativity, and using the facts of our client in more persuasive fashion."  Chase Ex. 15 at JD_JS_00001294.

**RESPONSE:** Undisputed.

**672.**   Partner J also criticized Julia because "[t]he work could have been completed more timely and with more intensity in defending the client's interest."   Chase Ex. 15 at JD_JS_00001294.

**RESPONSE:** Undisputed.

**673.**   Julia does not doubt the sincerity of Partner J's belief at the time that Julia's motion could have been more "passionate," "creativ[e]," or "persuasive," but her work was as

"passionate," "creativ[e]," and "persuasive" as the law and her ethical obligations allowed. Sheketoff Decl. ¶ 63.

**RESPONSE:** Disputed because Statement 673 is an argumentative legal conclusion about whether Sheketoff's work was as strong as the law and ethical obligations allowed. Undisputed that Sheketoff does not doubt the sincerity of Partner J's belief in his feedback.

674.    Another partner on the project and the head of the office where Partner J worked (who did not submit a review) thanked Julia for her quick and excellent work on the draft motion. Sheketoff Decl. ¶ 64.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 674 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's only basis for "disput[ing]" this statement is that it is inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statement D.  Here, the partner referenced in this statement (Lee DeJulius) will be called to testify at trial, will be examined by Plaintiffs, and will be asked whether Julia's work on the draft motion with Partner J was quick and excellent.  (If he contradicts his prior statements, he can then be impeached with those statements, which is not a hearsay purpose, FRE 801(c)(2).)  In any event, the prior statements (which are statements by a Jones Day partner to Julia about her Jones Day work) are themselves admissible under FRE 801(d)(2)(D)).  Jones Day does not otherwise dispute this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

675.    After Julia stopped working on the case, ████████████████████████████████████ ████████████████████████. Sheketoff Decl. ¶¶ 65-66.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 675 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's only basis for "disput[ing]" this statement is that it is inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statement D.  Here, Julia learned this information from another associate working on the case with her (███████).  That associate can be called to testify at trial.  It is undisputed that he will testify consistent with his prior statements to Julia.  In any event, the prior statements (which are statements by a Jones Day associate to Julia about his work at Jones Day) are themselves admissible under FRE 801(d)(2)(D).  Jones Day does not otherwise dispute this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

676.  ████████████████████████████████████████████

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 676 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's only basis for "disput[ing]" this statement is that it is inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statement D.  Here, Julia learned this information from another associate working on the case with her (███████).  That associate can be called to testify at trial.  It is undisputed that he will testify consistent with his prior statements to Julia.  In any event, the prior statements (which are statements by a Jones Day associate to Julia about his work at Jones Day) are themselves admissible under FRE 801(d)(2)(D).  Jones Day does not otherwise dispute this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**677.** ██████████████████████████. Sheketoff Decl. ¶ 68.

**RESPONSE:** Jones Day objected to discovery on this topic as irrelevant and Plaintiffs did not ask the Court to overrule that objection. Sheketoff's declaration is not the best evidence regarding the contents of any document she is purporting to describe, and is therefore inadmissible on this point, *see* Fed. R. Evid. 1002. Defendants therefore dispute Statement 677 pursuant to Fed. R. Civ. P. 56(c) and attorney-client privilege. Sheketoff also has no foundation on which to speculate about aspects of a client engagement in which she had no personal involvement, and her speculation is immaterial in any event. There is no dispute about the contents of Partner J's evaluation, and no claim that the evaluation was discriminatory.

**REPLY:** Jones Day suggests that Plaintiffs have somehow waived a relevance argument by not pursuing certain discovery on which they are not relying at this stage.  That is incorrect.  Jones Day cites no support for that proposition, and Plaintiffs are aware of none.  Jones Day also contends that the best evidence rule bars Julia's testimony that she ████████████ ██.  That too is incorrect.  Julia is not testifying to the terms of ██████████████; she is simply stating that she received such a █████  *See* FRE 1002 ("An original writing, recording, or photograph is required in order to *prove its content* unless these rules or a federal statute provides otherwise.").  Moreover, the actual contents of ████████████ are "not closely related to a controlling issue."  FRE 1004(d).  Jones Day also claims that the contents of ███████████ are protected by the attorney-client privilege, but (again) Julia does not allege anything about the contents of the ██████  Jones Day does not otherwise dispute this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**678.** Partner F subsequently worked with Partner J on a matter that was "prob related to what [Julia] worked on" with Partner J.  Sheketoff Ex. 39 at P04191.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 678 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's only basis for "disput[ing]" this statement is that it is inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed that Partner F will testify at trial consistent with his text messages.  In any event, the prior statement (which is a statement by a Jones partner to Julia about his work at Jones Day) is itself admissible under FRE 801(d)(2)(D).  Jones Day does not otherwise dispute this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

679.    Perhaps having learned from the past, when Partner J emailed Heifetz to request assistance with the matter, he specifically said he "wanted someone dispassionate."  Sheketoff Ex. 39 at P04193.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c).  Statement 679 is argumentative interpretation of evidence and the only support for Statement 679 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day disputes this statement as "argumentative interpretation of evidence."  That conclusory assertion is inaccurate and insufficient to create a genuine fact dispute. *See* Preliminary Statement A.  Jones Day's only other basis for "disput[ing]" this statement is that it is inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statement D.  Here, Heifetz, Partner J, and Partner F will be called as witnesses at trial, will be examined by Plaintiffs, and will be asked whether Partner J asked for "someone dispassionate" to

work on his case; Partner J will also be asked whether he made that request because he had learned from what happened in his case with Julia. In any event, the text message themselves (statements by Jones Day partners about their work for Jones Day) are admissible under FRE 801(d)(2)(D). Jones Day does not otherwise dispute this statement. This statement is therefore admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**680.** In other words, after criticizing Julia for being insufficiently "passionate," he subsequently realized he needed "someone dispassionate" to check his excessive passion. Sheketoff Ex. 39 at P04193.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c). Statement 680 is argumentative interpretation of evidence and the only support for Statement 680 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Defendants further dispute Statement 680's implication that Partner J's request for "dispassionate" legal advice in an objective memorandum is inconsistent with his preference for "passionate" advocacy in a brief to a court.

**REPLY:** This statement is not genuinely disputed. Jones Day says this statement is an argumentative interpretation of evidence. That conclusory assertion is inaccurate and it is an improper basis to dispute a statement. *See* Preliminary Statement A. Jones Day also objects that this statement relies on inadmissible hearsay. But for the reasons discussed in PSF ¶ 679, the substance of these statements can be considered at summary judgment. Jones Day does not otherwise dispute any other part of this statement, which is therefore admitted in is entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**681.** Partner F " ███████████████████████████████████ ██████████████████████. Sheketoff Ex. 39 at P04191, P04195.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 681 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's only basis for "disput[ing]" this statement is that it is supposedly inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statemen D.  Here, it is undisputed that Partner F will testify at trial consistent with his text messages—i.e., ███████████████████████████████████████████ ███████████████████████████████████. Partner F's in-court account of his statement to Partner J (███████████████████████████████") would not be introduced for the truth of the matter asserted, but to show wh███████████████████████████████████████ ███████████████████), which is not a hearsay purpose.  FRE 801(c)(2); *see also* FRE 805. In any event, the text messages (statements by a Jones Day partner about his work for Jones Day) are themselves admissible under FRE 801(d)(2)(D). Jones Day does not otherwise dispute this statement.  This statement is therefore admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

682.    Partner J is known within Jones Day as "an idiot."  Sheketoff Ex. 39 at P04135.

**RESPONSE:** Disputed, including pursuant to Fed. R. Civ. P. 56(c) on the ground that the only support for Statement 682 is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**REPLY:** Jones Day's only basis for "disput[ing]" this statement is that it is supposedly inadmissible hearsay.  As discussed above, the substance of an out-of-court statement may be considered at summary judgment if can be introduced in admissible form at trial.  *See* Preliminary Statement D.  Here, it is undisputed Partner F will testify at trial consistent with his prior statement that Partner J is "apparently an idiot."  *See also* FRE 803(21) (evidence of "reputation among a

person's associates or in the community concerning the person's character" is not hearsay).   This statement is also admissible apart from the truth of the matter asserted (i.e., that Partner J is really an idiot) to show that other people at Jones Day view him as an idiot, FRE 801(c)(2), which is relevant to show that Partner A's review affected Julia's salary.   That is, since Partner J was viewed as an idiot, his negative review alone did not account for Julia's reduced raise.   Apart from its meritless admissibility dispute, Jones Day does not dispute this statement.   This statement is therefore admitted in its entirety.   Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

### E.   A jury could find that Partner A's evaluation affected Julia's pay.

**683.**   Partner A's negative evaluation of Julia affected her 2017 salary adjustment.   █████████

████████████████████████████████████

   **RESPONSE:** Disputed.   Statement 683 is not supported by the evidence cited, which makes no mention of Partner A's evaluation, and instead references Sheketoff's ████████

████████████████████████████████████████████████

███████████████████████████████████ Sheketoff Ex. 31 at 15-16. Sheketoff's compensation adjustment in 2017 was based on the consensus about her overall performance and potential at the firm. *Id.*; *see also* DSF ¶¶ 239-241, 250, 256. Brogan ultimately made the final determination as to her salary; in so doing, he did not read any of the evaluations of Sheketoff's performance, including, but not limited to Partner A's review. Instead, he reviewed only Sheketoff's ratings and rankings—2 out of 5 from her practice leader (Chase Ex. 23 at JD_00004001) and 30 out of 37 amongst her peers in the Washington D.C. office (Chase Ex. 24 at JD_00004025)—and the recommended salary adjustments from the Washington D.C. Partner-in-Charge, Lovitt, and Shumaker. Chase Ex. 77, Brogan Tr. 29:16-18. Sheketoff's practice leader, Beth Heifetz, assigned Sheketoff a 2 rating for her 2015 performance because of Sheketoff's low

billable client hours and concerns regarding her substantive performance. Heifetz Decl. at ¶ 5. And, the following year, Heifetz again rated Sheketoff a 2, based primarily on the themes that ran through Sheketoff's evaluations, Sheketoff's failure to improve on deficiencies in her 2015 performance, and Heifetz's own personal observations of, and interactions with, Sheketoff. Heifetz Decl. at ¶ 7. Heifetz made clear that "Partner A's review had no effect on [her] decision to assign Sheketoff a 2 rating," and that "[e]ven if Partner A had submitted no evaluation, Sheketoff's practice rating would have been the same; the rating was based on common themes of many evaluations as corroborated by [Heifetz'] own knowledge." *Id.* at ¶ 10. Defendants therefore dispute that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation.

**REPLY:** ███████████████████████, Jones Day expressly admits: ███



Plaintiffs further prove this statement in PSF ¶¶ 684-735, which controvert Jones Day's inaccurate representations about the basis for Julia's compensation adjustment, whether Brogan was the final decisonmaker, and the basis for Heifetz' practice rating (which was indeed affected by Partner A's review).

**684.** In Jones Day's own words to this Court, "compensation is *principally based*" upon "performance evaluations." *Tolton* Dkt. 146 at 42 (emphasis added); *see also* Chase Ex. 77 (Brogan) at 204:16 (in response to question about what "factors … affect your determination of an

associate's annual raise," testifying that "the assessment of your colleagues as to the quality of your lawyering is number one.  It's kind of the sine qua non of operating at this level of the profession."); *id.* at 208:22-209:22 ("Q: Do reviews matter to an associate's annual raise?...  A: Of course, as they go into—into this original assessment, in the beginning, of your professional accomplishments.  So that's why we spend so much time on this….  So of course those evaluations are important.").

  **RESPONSE:** Disputed in part. Statement 684 is an argumentative interpretation of evidence. Undisputed that Jones Day approaches associate compensation "on an individual lawyer basis. Each lawyer's compensation should reflect the specific individual contribution of that lawyer, including his or her level of professional achievement, productivity and potential for meaningful growth and advancement." Chase Ex. 30 at JD_00003042. Disputed that each and every review has an impact on the compensation of an associate. As the undisputed record reflects, compensation adjustments are based on "a lot of information," including "the ratings," "the rankings," "the numbers," his notes, and "the assessment statements." Chase Ex. 81, Shumaker Tr. 318:21-319:3. Defendants dispute that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683. By way of further response, pleadings in a separate lawsuit involving Plaintiffs who are not parties to this litigation cannot be presented in an admissible form as evidence in this case.

  **REPLY:** Regarding one source of evidence cited by this statement, Jones Day asserts that "pleadings in a separate lawsuit" are not admissible in this case.  But it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, statements of counsel are not hearsay (FRE 801(d)(2)) and the statement

is plainly relevant (FRE 401).  The cited brief is also not a "pleading" (Fed R. Civ. Proc. 7(a)), though it is unclear if Jones Day's admissibility "dispute" turns on the "pleading" characterization. Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The remainder of Jones Day's answer (beginning with "Each lawyer's compensation") is nonresponsive and should be disregarded.

685.    Jones Day uses each associate's performance evaluations to put together an assessment statement (also called a consensus statement).  Dkt. 178 ¶ 72 (admitting that "an assessment statement for each associate is prepared based on the associate's written evaluations"); Chase Ex. 81 (Shumaker) 315:9-21 (for "assessment statement … the individual reviews are data points from which the statement is made"); *Tolton* Dkt. 185 at ¶ 12 ("The strength of and bases for the individual evaluations are then assessed by the practice leaders or their designees, culminating in a draft assessment").

RESPONSE: Disputed in part. Undisputed that Practice Leaders have responsibility for preparing a draft "Assessment Statement" for each associate in their practice, which is intended to provide "a fair and objective final assessment of the individual's performance and productivity[.]" Chase Ex. 29 at JD_00003072. Defendants dispute Plaintiffs' characterization of these statements as "consensus statements"—as Traci Lovitt testified, the Assessment Statement is not intended as a consensus statement that simply cuts and pastes from the associate's individual evaluations." Chase Ex. 83, Lovitt Tr. Vol. II 80:5-22. By way of further response, Defendants state that the Assessment Statements are based on an iterative process which involves input from individual evaluators as well as practice leadership, office leadership and, for more senior associates, a diverse group of firmwide leaders. *Id*. at 59:18-19; *see also* DSF ¶¶ 160, 162, 174,

175. By way of further response, pleadings in a separate lawsuit involving Plaintiffs who are not parties to this litigation cannot be presented in an admissible form as evidence in this case.

**REPLY:** Regarding one source of evidence cited by this statement, Jones Day asserts that "pleadings in a separate lawsuit" are not admissible in this case. But it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection. In any event, statements by Jones Day are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401). Jones Day does not otherwise dispute any part of this statement, which does not characterize assessment statements as consensus statements and instead asserts that they are also called consensus statements. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The bulk of Jones Day's answer (beginning with "as Traci Lovitt testified") is nonresponsive and should be disregarded.

**686.** The assessment statement is based on the performance evaluations. Dkt. 178 ¶ 72; Chase Ex. 81 (Shumaker) 315:9-21; *Tolton* Dkt. 185 at ¶ 12.

**RESPONSE:** Disputed in part. Undisputed that one of the basis for the assessment statement is the underlying performance evaluations, but disputed that the underlying performance evaluations are the only basis for the assessment statement. The Assessment Statements are based on an iterative process which involves input from individual evaluators as well as practice leadership, office leadership and, for more senior associates, a diverse group of firmwide leaders. Chase Ex. 83, Lovitt Tr. Vol. II 59:18-19. By way of further response, pleadings in a separate lawsuit involving Plaintiffs who are not parties to this litigation cannot be presented in an admissible form as evidence in this case.

**REPLY:** Regarding one source of evidence cited by this statement, Jones Day asserts that "pleadings in a separate lawsuit" are not admissible in this case. But it fails to explain on what

ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, statements by Jones Day are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**687.**   The "assessment statement is—is really a distillation of what's within the reviews." Chase Ex. 81 (Shumaker) 315:9-10.

**RESPONSE:** Undisputed that Shumaker so testified, but disputed that the reviews are the only basis for the assessment statement. By way of further response, Defendants note that Shumaker distinguished an assessment statement from a consensus statement: "a consensus statement suggests that we're taking everyone's views and pressing them together, as compared to an assessment statement, in which the individual reviews are data points from which the statement is made." Chase Ex. 81, Shumaker Tr. 315:10-22; *see also* Response 686.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of its response (beginning with "By way of further response") is nonresponsive and should be disregarded.

**688.**   The assessment statement should reflect and explain an associate's compensation adjustment.   Chase Ex. 81 (Shumaker) 316:20-317:10 ("we are trying to encapsulate the performance of that lawyer for the year, give them information about where they stand, and presumably that would be reflected in their compensation"); *id.* at 317:20-318:8 (assessment statement "more akin to" "an explanation of the associate's compensation" than itself "an input into the associate's compensation"); Chase Ex. 77 (Brogan) at 209:23-210:8 ("the consensus statement … was designed to be something that could be—would be helpful to share with—shared

with the associate"); Sheketoff Ex. 153 at JD_00003050 ("███████████████

████████████████████████████████████████████████.").

**RESPONSE:** Undisputed.   By way of further response, Shumaker described the assessment Statement as "more akin to" "an explanation of the associate's compensation" rather an "an input into the associate's compensation." Chase Ex. 81, Shumaker Tr. 317:20-318:8. As Shumaker further testified, compensation adjustments are based on "a lot of information", including "the ratings", "the rankings," "the numbers," his notes, and "the assessment statements." *Id.* at 318:21-319:3.

**REPLY:** As Jones Day admits, this statement is undisputed.  The bulk of its answer (beginning with "By way of further response") is nonresponsive and should be disregarded.

689.   Indeed, the assessment statement is supposed to "reflect[] the [f]irm's view of that associate's performance and *overall contribution* to the Firm in the prior calendar year." *Tolton* Dkt. 146-5 ¶ 15 (emphasis added); accord Chase Ex. 83 (Lovitt) 76:18-23 ("The assessment statement is the firm's assessment of [an associate's] performance for that calendar year."); *Tolton* Dkt. 145-11 at 15 (Lovitt testifying that assessment statement is "intended to be the firm's assessment with those evaluations"); *Tolton* Dkt. 146-5 at ¶ 16 ("a primary purpose of the assessment statement is to ensure each associate understands the [f]irm's view of his or her performance").

**RESPONSE:** Undisputed that Statement 689 contains accurate excerpts from the cited documents. Defendants dispute Plaintiffs' use of emphasis as argumentative characterization of the cited evidence. By way of further response, pleadings in a separate lawsuit involving Plaintiffs who are not parties to this litigation cannot be presented in an admissible form as evidence in this case.

**REPLY:** Regarding some of the evidence cited by this statement, Jones Day asserts that "pleadings in a separate lawsuit" are not admissible in this case.  But it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, statements by Jones Day are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  The cited declarations are also not "pleadings" (Fed R. Civ. Proc. 7(a)), though it is unclear if Jones Day's admissibility "dispute" turns on the "pleadings" characterization.  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

690.    And the firm's "compensation adjustments are based upon the subjective quality of each person's *overall contribution*."  Dkt. 178 (Answer to TAC) at ¶ 69 (emphasis added); accord *id.* at ¶ 77 ("Jones Day compensates associates based on each individual's performance…  The Firm makes annual compensation decisions after a comprehensive months-long evaluation process in which an assessment is made of each associate's overall contribution to the success of the Firm."); *Tolton* Dkt. 88-8 ("[T]he [f]irm intends that its associated be compensated … based on the market conditions and (most importantly) their individual performance and contribution to the [f]irm.").

**RESPONSE:** Disputed in part. Statement 690 is a misleading excerpt from Defendants' Answer to the Third Amended Complaint at ¶ 69, which states, in full that Jones Day admits that its website states that "its associate evaluations and compensation adjustments [are] based upon the subjective quality of each person's overall contribution." Dkt. 172, 178 at ¶ 69. Defendants also dispute Plaintiffs' use of emphasis as argumentative characterization of the cited evidence. And Defendants dispute Statement 690 to the extent it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact

on Sheketoff's compensation, for the reasons stated in Response 683. Undisputed that the remainder of Statement 690 contains accurate excerpts from the cited exhibits, but pleadings in a separate lawsuit involving Plaintiffs who are not parties to this litigation cannot be presented in an admissible form as evidence in this case.

**REPLY:** Regarding one piece of the evidence cited by this statement, Jones Day asserts that "pleadings in a separate lawsuit" are not admissible in this case.  But it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.   In any event, statements by Jones Day are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  The document in question is also not a pleading (Fed R. Civ. Proc. 7(a)); it is a printout of Jones Day's own website.  Jones Day also claims that this statement is misleading because it quotes text from Jones Day's website, which Jones Day has admitted is from its own website.  That is incoherent.  Jones Day does not otherwise dispute any part of this statement or produce any controverting evidence.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**691.**   As Jones Day has expressly admitted: " ███████████████████████

███████████████████████████████████████████████████████████████████

███████████████ .  Sheketoff Ex. 31 at 15-16 (response to interrogatory 13); *see also* Dkt. 178 at ¶ 134 ("Sheketoff's compensation adjustment reflected the fact that her reviews from multiple partners were mixed"); Chase Ex. 83 (Lovitt) at 77:23-78-6 ("the evaluations would matter … to the extent that they had surfaced in the assessment statement").

**RESPONSE:** Undisputed. By way of further response, Defendants note that Plaintiffs failed to include the full quotation. The full quotation explains that " █████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████." Sheketoff Ex. 31 at 15-16. None of that implies

that her compensation adjustment would have been different in the absence of any particular

review, or Partner A's review specifically. In any event, Defendants dispute that each and every

review has an impact on the compensation of an associate, or that Partner A's review had such an

impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** As Jones Day admits, this statement is undisputed.  The bulk of its answer

(beginning with "By way of further response") is nonresponsive and should be disregarded.

692.   As Jones Day has further admitted: "[T]he amount of [Julia's July 2017 raise] was

based in part on her 2016 assessment statement."  Dkt. 45 at ¶ 80.

**RESPONSE:** Undisputed.

693.   Partner A's review of Julia's performance in 2016 affected her assessment statement

that year.  Dkt. 178 at ¶ 132 ("Defendants admit that Sheketoff's assessment statement for 2016

took into account the written evaluations that individual attorneys submitted."); *see also* Chase Ex.

15 at JD_JS_00001293 (Partner A evaluation); *id.* at JD_JS_00001289 (assessment statement).

**RESPONSE:** Disputed in part.  Undisputed that Partner A's review "affected" her

assessment statement, but disputed that the review had a material effect on the assessment

statement. Heifetz declared that "[i]n assessing Sheketoff's work for 2016, [she] credited the

positives and negatives from Partner A's evaluation to the extent they were consistent with my

own observations and knowledge of Sheketoff's performance and/or the themes in other

evaluations." Heifetz Decl. at ¶ 9. Heifetz further declared that "Partner A's review had no effect

on [her] decision to assign Sheketoff a 2 rating," and that "[e]ven if Partner A had submitted no evaluation, Sheketoff's practice rating would have been the same; the rating was based on common themes of many evaluations as corroborated by [Heifetz'] own knowledge." *Id*. at ¶ 10. Defendants further dispute Statement 693 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "Heifetz declared") is nonresponsive and should be disregarded.  It is also largely inaccurate as demonstrated in PSF ¶¶ 721-730.

694.    Representations from Partner A's review figured prominently in Julia's assessment statement.   Dkt. 178 at ¶ 132 (admitting that "Sheketoff's assessment statement echoed [Partner A's] concern … about her availability and the fact that 'a client memo was too focused on pure legal analysis without accompanying advice'"); *compare* Chase Ex. 15 at JD_JS_00001293 (review: "her initial drafts were far more academic / pure legal analysis than helpful advice to the client"), *with id.* at JD_JS_00001289 (assessment statement: "a client memo was too focused on pure legal analysis without accompanying advice"); *compare id.* at JD_JS_00001293 (review: "She exhibits little-to-no-initiative"), *with id.* at JD_JS_00001289 (assessment statement: "in other matters [she] does not take initiative"); *compare id.* at JD_JS_00001293 (review: "availability seems to be whatever is convenient for her"), *and* Chase Ex. 83 (Lovitt) at 7:3-12 (Partner A complained to Heifetz that Julia was "protective of [her] time"), *with* Chase Ex. 15 at JD_JS_00001289 (assessment statement: "in other matters … [she] seems to be protecting her time"); *compare* Chase Ex. 84 (Partner A) at 105:21-106:5, 126:19-

127:17 (testifying that when he criticized Julia for her availability, he meant that she was not "physically in the office"), *with* Chase Ex. 15 at JD_JS_00001289 ("She is perceived as often absent from the office during the weekday").

> **RESPONSE:** Disputed. Statement 694 is an argumentative interpretation of evidence. As set forth in Defendants' response to Statement 685, Sheketoff's Assessment Statement was a "a fair and objective final assessment of [Sheketoff's] performance and productivity[.]" Chase Ex. 29 at JD_00003072. That statement included certain critiques offered by Partner A, as well as critiques offered by numerous other Partners, both in their written narrative evaluations, as well as during the Litigation Associates evaluation meeting. *See, e.g.*, Sheketoff Ex. 103 at JD_00003742. Plaintiffs' attribution of specific sentences in Sheketoff's Assessment Statement to Partner A's narrative evaluation is a mischaracterization of the evidence. By way of example, the Assessment Statement's reference to Sheketoff being protective of her time is consistent with another partner's narrative evaluation, which stated: "For whatever reason, I've got the sense that Julia is a bit protective of her time, and there were some additional projects I would have liked to get her involved in." Chase Ex. 15 at JD_JS_00001294. By way of further response, Defendants note that Heifetz declared that "Partner A's review had no effect on [her] decision to assign Sheketoff a 2 rating," and that "[e]ven if Partner A had submitted no evaluation, Sheketoff's practice rating would have been the same; the rating was based on common themes of many evaluations as corroborated by [Heifetz'] own knowledge." Heifetz Decl. at ¶ 10. Defendants further dispute Statement 693 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** Defendants purport to dispute this statement, but actually admit that Julia's assessment "statement included certain critiques offered by Partner A." In any event, the statement is not genuinely disputed. The cited evidence is conclusive. The bulk of Jones Day's response discusses Heifetz' declaration concerning the basis for her numerical rating of Julia, which has nothing to do with this statement and should be disregarded. It is also false, as shown in in PSF ¶ 721-30.

695.   Jones Day claims that Partner A's review of Julia couldn't have affected her compensation adjustment, because Brogan "*personally*" decided on her compensation adjustments in 2017 and 2018 and he did not read Partner A's review. Dkt. 189 at 44.

**RESPONSE:** Disputed. Statement 695 is an incomplete and misleading characterization of Defendants' arguments in a brief, not evidence. By way of further response, Defendants did not contend that Partner A's review had no conceivable effect on Sheketoff's compensation adjustment, but only that any causation is too remote to amount to "proximate cause." Dkt. 189 at 34-37. Defendants stated in their motion for summary judgment that "Brogan 'personally was involved in setting [Sheketoff's] compensation and reviewing [her], and [he] knew that [she] was treated extremely fairly and extremely well,' so 'there was no basis for [Savignac] to say that [she] was being discriminated against. None. Zero.'" Dkt 189 at 44. That assertion remains a point of fact on which Plaintiffs have no contrary evidence. *See* Pls. Resp. DSF ¶ 354.

**REPLY:** This statement is not genuinely disputed. The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive to this statement and should be disregarded. It is also false as shown in PSF 485-735. While Jones Day apparently prefers to walk away from its attorneys' statements to this Court on its behalf, it is bound by those statements and

they are not hearsay or otherwise inadmissible.  FRE 801(d)(2).  Moreover, Jones Day apparently disclaims any argument that Partner A's review had no effect on Julia's pay.

696.    But Brogan didn't decide on Julia's compensation alone or in vacuum.  Chase Ex. 81 (Shumaker) 310:22-311:1 ("it's a much more cooperative, collaborative approach"); *id.* at 312:9-313:8 ("It's a very collaborative process."); *Tolton* Dkt. 146 at 25-26 (Brogan has a "limited role" in salary adjustments); *id.* at 38 ("the Managing Partner .... defers to the PIC recommendations in the vast majority of cases"); *Tolton* Dkt. 146-5 at ¶ 27 ("Outside of changes responding to significant market events, the Managing Partner's adjustments to individual compensation recommendations are generally limited."); *Tolton* Dkt. 169-3 at 5 ¶ 12 (Lovitt declaring that Brogan "generally reviews and responds to proposed annual associate salary adjustments in a matter of days").

**RESPONSE:** Disputed, including as argumentative characterization of evidence. Defendants have not asserted that Brogan "decide[d] on Julia's compensation alone or in [a] vacuum." To the contrary, Defendants have asserted that Brogan made the final determination as to Sheketoff's compensation adjustment in 2017, but he did not read any of the reviews of Sheketoff's performance. Instead, he reviewed only the salary spreadsheet with Sheketoff's ratings and rankings, and the recommended salary adjustments, a point of fact on which Plaintiffs have no contrary evidence. *See* Pls. Resp. DSF ¶¶ 261-64. Undisputed that the remainder of Statement 696 includes accurate quotations and excerpts from certain cited documents from the docket of another matter, involving Plaintiffs who are not parties to this litigation, and cannot be presented in an admissible form as evidence in this case.

**REPLY:** Jones Day purports to dispute this statement, but then seems to agree that it is not disputed: "Defendants have not asserted that Brogan 'decide[d] on Julia's compensation

alone or in [a] vacuum.'"  Nor does Jones Day identify any evidence controverting this statement. This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

697.    As Jones Day previously told this Court: "Associate pay is determined in the first instance by office PICs ….  Their recommended adjustments are reviewed by Lovitt and Shumaker and then by the Managing Partner."  *Tolton* Dkt. 146 at 42.

**RESPONSE:** Undisputed that Statement 697 includes an accurate quoted excerpt from a document submitted on the docket in another matter, involving Plaintiffs who are not parties to this litigation, which cannot be presented in an admissible form as evidence in this case.

**REPLY:** Jones Day objects to this statement on the ground that "pleadings in a separate lawsuit" are not admissible in this case.  But it fails to explain on what ground cited evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, statements by Jones Day are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  The cited brief is also not a "pleading" (Fed R. Civ. Proc. 7(a)), though it is unclear if Jones Day's admissibility "dispute" turns on the "pleading" characterization.  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

698.    Brogan's "review is not the same as first-instance decision-making."  *Tolton* Dkt. 146 at 42.

**RESPONSE:** Disputed in part.   Undisputed that Statement 698 includes an accurate quoted excerpt from a document submitted on the docket in another matter, involving Plaintiffs who are not parties to this litigation, which cannot be presented in an admissible form as evidence in this case. Also disputed that this quotation has any bearing on Sheketoff's compensation adjustments, as the quotation in Statement 698 was not discussing Sheketoff and is inconsistent

with the evidence in this case about Sheketoff. Contrary to Statement 698, the evidentiary record in this case shows that Brogan exercised independent judgment with respect to Sheketoff's compensation adjustments. Brogan explained that, in 2016, he departed from the recommendations of Lovitt and Shumaker, and gave Sheketoff an "extraordinary bump above the recommendations." Chase Ex. 77, Brogan Tr. 217:2-7. The following year, Brogan gave Sheketoff a compensation adjustment of $15,000 "because it seemed to [him] that [he] had -- was wrong in giving [Sheketoff] an outsized raise the year before, because it didn't really change [her] contribution" to the firm. *Id.* at 226:12-19. Defendants further dispute Statement 698 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** Jones Day objects to this statement on the ground that "pleadings in a separate lawsuit" are not admissible in this case.  But it fails to explain on what ground cited evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, statements by Jones Day are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  The cited brief is also not a "pleading" (Fed R. Civ. Proc. 7(a)), though it is unclear if Jones Day's admissibility "dispute" turns on the "pleading" characterization.  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "evidentiary record in this case") is nonresponsive and should be disregarded.   And there is nothing in the record to support the assertion that Brogan exercised "independent judgment" with respect to Julia's pay *for the year in question*.  He simply rubber-stamped the joint recommendation of the partners that he appointed to make recommendations and did not even independently review Julia's evaluations.

**699.**   For Julia's salary adjustment for her 2016 work, the Washington PIC (Kevyn Orr) made the decision to raise her compensation to $450,000.  Chase Ex. 16 at JD_00004767.

**RESPONSE:** Disputed in part.  Undisputed that the Washington D.C. Partner-in-Charge recommended a 6% increase from $425,000 to $450,000. Chase Ex. 16 at JD_00004767. Defendants dispute Plaintiffs' characterization of Orr's recommendation as having "made the decision" to raise Sheketoff's compensation, as that is a mischaracterization of the evidence that is not supported by the record.

**REPLY:** This statement is not genuinely disputed.  The only part of this statement that Jones Day disputes is whether Orr "made [a] decision" about Julia's pay or simply "recommend[ed]" her pay.  But as discussed above in PSF ¶ 697, Jones Day has itself represented to this Court that "[a]ssociate pay is *determined* in the first instance by office PICs." *Tolton* Dkt. 146 at 42 (emphasis added).  It is not clear what daylight Jones Day sees between making a "determination" and a "decision."

**700.**   Shumaker reviewed Orr's decision and recommended a salary of $445,000 instead. Chase Ex. 16 at JD_00004767.

**RESPONSE:** Disputed in part.   Undisputed that Shumaker reviewed Orr's recommendation and separately provided a recommendation of $445,000. Chase Ex. 16 at JD_0004767. Defendants dispute Plaintiffs' characterization of Orr's recommendation as a "decision," as that is a mischaracterization of the evidence that is not supported by the record.

**REPLY:** This statement is not genuinely disputed.  The only part of this statement that Jones Day disputes is whether Orr made a "decision" about Julia's pay or simply "recommend[ed]" her pay.  But as discussed above in PSF ¶ 697, Jones Day has itself represented to this Court that "[a]ssociate pay is *determined* in the first instance by office PICs." *Tolton* Dkt. 146 at 42

(emphasis added).  It is not clear what daylight Jones Day sees between making a "determination" and a "decision."

701.    Lovitt reviewed Orr's decision and recommended a salary of $435,000 instead.  Chase Ex. 16 at JD_00004767.

**RESPONSE:** Disputed in part.  Undisputed that Lovitt reviewed Orr's recommendation and separately provided a recommendation of $435,000.  Chase Ex. 16 at JD_0004767. Defendants dispute Plaintiffs' characterization of Orr's recommendation as a "decision," as that is a mischaracterization of the evidence that is not supported by the record.

**REPLY:** This statement is not genuinely disputed.  The only part of this statement that Jones Day disputes is whether Orr made a "decision" about Julia's pay or simply "recommend[ed]" her pay.  But as discussed above in PSF ¶ 697, Jones Day has itself represented to this Court that "[a]ssociate pay is *determined* in the first instance by office PICs." *Tolton* Dkt. 146 at 42 (emphasis added).  It is not clear what daylight Jones Day sees between making a "determination" and a "decision."

702.    Shumaker and Lovitt then "split the baby [and] agreed on the midpoint," making a joint recommendation to Brogan of $440,000.  Chase Ex. 83 (Lovitt) 148:20-149:12 ("Q: You did it just because it was the midpoint? A: Yeah, because it was the midpoint."); Chase Ex. 16 at JD_00004767.

**RESPONSE:** Undisputed that Lovitt and Shumaker ultimately provided a combined recommendation of $440,000—a $15,000 raise for Sheketoff's 2017 compensation adjustment. Chase Ex. 16 at JD_00004767.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

**703.** Brogan accepted Shumaker and Lovitt's recommendation. Chase Ex. 83 (Lovitt) at 149:13-19 (30(b)(6) deposition) ("It appears that the managing partner accepted our recommendation."); Chase Ex. 16 at JD_00004767; *see also* Chase Ex. 81 (Shumaker) 313:9-314:11 ("if no one touches the number beyond me after the PIC, my number would control"); *Tolton* Dkt. 146 at 43 (describing another salary adjustment as "recommended by Shumaker and accepted by the Managing Partner").

**RESPONSE:** Disputed in part. Defendants dispute Plaintiffs' characterization of Brogan's determination of Sheketoff's compensation adjustment as "acceptance" of Shumaker and Lovitt's recommendation. *See* Response 683. Undisputed that Brogan made the final determination as to Sheketoff's compensation adjustment, and increased Sheketoff's compensation by $15,000 to $440,000, effective July 1, 2017. Chase Ex. 16 at JD_00004767. Plaintiffs' citation to a document submitted in another matter involving "another salary adjustment" is not to the contrary and not admissible evidence in this case. *See* Response 698.

**REPLY:** This statement is not genuinely disputed. Jones Day contests Plaintiffs' characterization of Brogan's "acceptance" of Shumaker and Lovitt's recommendation. But the characterization came from Lovitt testifying as Jones Day's 30(b)(6) witness: "It appears that the managing partner accepted our recommendation." Chase Ex. 83 (Lovitt) at 149:13-19 (30(b)(6) deposition). Jones Day also says that one of the sources cited by Plaintiffs (*Tolton* Dkt. 146 at 43) is not admissible evidence. It fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection. Jones Day's own statements are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401), as it uses the same characterization of Brogan's role in the compensation-determination process as Jones Day's 30(b)(6) witness did in this case.

**704.**     In the process leading up to their reviewing and/or recommending salary adjustments for associates' 2016 work, Orr, Lovitt, and Shumaker all reviewed and considered associates' evaluations and assessment statements.  Chase Ex. 81 (Shumaker) at 318:11-319:5, 321:13-322:5; Chase Ex. 83 (Lovitt) at 35:24-36:10, 65:21-67:5, 77:14-22; Sheketoff Ex. 152 at JD_00001458; *Tolton* Dkt. 146 at 22.

**RESPONSE:** Disputed in part. Defendants dispute Plaintiffs' assertion that Orr, Lovitt, and Shumaker all "reviewed and considered" the associates' evaluations and assessment statements. As Plaintiffs' own cited testimony demonstrates, the documents reviewed by evaluators vary, and may not include individual reviews for every associate whose compensation adjustment is discussed. *See, e.g.*, Chase Ex. 81, Shumaker Tr. 321:13-20 ("Q. . . when you're making a recommendation for a particular associate's compensation adjustment, what documents will you review for that -- in connection with that? A. It will vary . . ."). Defendants dispute Plaintiffs' assertion that Orr "reviewed and considered associates' evaluations and assessment statements," on the ground that there is no evidence in the record demonstrating what Orr did—or did not—review in making his compensation recommendations. Defendants further dispute Statement 704 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** This statement is not genuinely disputed.  Jones Day points to testimony by Shumaker that he does not review *all* of the identified documents for *each* associate.  That casts no doubt on this statement, which describes the kinds of documents that Shumaker (and Lovitt and Orr) reviewed in the process leading up to their reviewing and/or recommending salary adjustments in 2016.  Shumaker was clear that those documents include associates' evaluations

and assessment statements.  Chase Ex. 81 (Shumaker) at 318:11-319:5, 321:13-322:5.  Jones Day also says that there is no evidence demonstrating what Orr reviewed in making his compensation recommendations.  That is incorrect.  Testifying as Jones Day's 30(b)(6) witness, Lovitt stated: "So the office leaders then get the final assessment statements…. The office leadership with all of this information then makes compensation recommendations for each associate in that office." Chase Ex. 83 (Lovitt (30(b)(6)) at 35:24-37:18.  She further testified that Orr would look at "what the basic theme is coming from *all the evaluations*."  *Id.* at 105:14-106:8.

**705.**     Shumaker also specifically admitted that he considered Julia's reviews in making his recommendation to her 2017 raise.  Chase Ex. 81 (Shumaker) 336:1-3.

**RESPONSE:** Undisputed.

**706.**     In the process leading up to their making or reviewing salary adjustments for associates' 2016 work, Shumaker and Orr also attended a D.C. litigation meeting, which was a meeting for all litigation partners in Washington where each associate's performance was discussed.  Chase Ex. 83 (Lovitt) at 59:5-25, 141:24-142:6; Sheketoff Ex. 103 at JD_00003737.

**RESPONSE:** Disputed in part. Undisputed that the D.C. litigation meeting is meant to give "the practice leadership and office leadership someone else's view" of each associate, in order to have "many eyes on the process to ensure fairness and accuracy." Chase Ex. 83, Lovitt Tr. Vol. II 59:5-25. Also undisputed that Lovitt testified that "all litigation partners" were "[i]nvited to attend" the D.C. litigation meeting referenced in Statement 706. *Id.* at 141:24-142:15. Defendants dispute Plaintiffs' assertion that Shumaker and Orr both attended that meeting, as that statement is not supported by the evidence cited.

**REPLY:** This statement is not genuinely disputed.  The only part of this statement that Defendants dispute is the assertion that Shumaker and Orr both attended that D.C. litigation

meeting.  But Sheketoff Exhibit 103, which Jones Day (through Lovitt's 30(b)(6) testimony) has represented is an accurate reflection of what was said during the meeting (Chase Ex. 83 (Lovitt (30(b)(6)) at 118:3-25), shows that Shumaker made a comment about Julia at that meeting, demonstrating that he was present.  Sheketoff Ex. 103 at JD_00003737.  Moreover, since the "whole point" of the D.C. litigation meeting is admittedly to "assist both the practice leadership and *office leadership* in their … ratings," the cited evidence plainly supports the statement that the office leader in fact attended that meeting.  Chase Ex. 83 (Lovitt (30(b)(6)) at 59:5-25.  And Jones Day points to no contrary evidence.

**707.**    During the D.C. litigation meeting about Julia's 2016 performance, the attendees were shown a slide show that drew from Partner A's review.  Sheketoff Ex. 103 at JD_00003741; Chase Ex. 83 (Lovitt) at 160:14-18.

**RESPONSE:** Disputed in part. Undisputed that Sheketoff Ex. 103 reflects a slideshow that was "part of the presentation to the D.C. litigation partners." Chase Ex. 83, Lovitt Tr. Vol. II 160:9-18. Defendants dispute Plaintiffs' characterization of the materials on that slideshow being 'drawn' from Partner A's review, on the ground that this assertion is not supported by the evidence cited. Defendants further state that several bullet points on the slideshow reflect Partner A's name, along with several other reviewers. By way of example, the following note is attributed to Partner A, Partner F, and a third partner: "[c]an further improve writing by focusing more on audience and simplifying issues." Sheketoff Ex. 103 at JD_00003741. Defendants further dispute Statement 707 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** This statement is not genuinely disputed.  While Jones Day purports to dispute that the slide show shown at the D.C. litigation meeting "drew from" Partner A's review, Jones Day then goes on to admit that "several bullet points on the slideshow reflect Partner A's name."  In any event, the cited evidence is conclusive on this point.

708.     During that meeting, Partner A opened the conversation about Julia by saying that her memo was "too long and not client ready [and] needed an executive; that he "d[id]n't see her here for the long haul"; that he "struggled to get any weekend help from her"; that Julia was "[n]ot hungry for the practice of law"; and that Julia "d[id]n't want to inconv[enience] herself." Sheketoff Ex. 103 at JD_00003742; Chase Ex. 20 at JD_00003256.

**RESPONSE:** Disputed.  Statement 708 is an argumentative characterization of evidence. Plaintiffs' assertion that "Partner A opened the conversation about Julia" with the critiques described in Statement 708 is not supported by the evidence cited. To the contrary, Heifetz's handwritten notes from that meeting include notes from another partner before notes on Partner A's discussion. Chase Ex. 20 at JD_00003256. Further, the notes from that meeting indicate that Partner A was complementary of Sheketoff in his discussion, beginning his assessment by stating that she did "fantastic [research]" and that her writing was "thorough." *Id.*

**REPLY:** This statement is not genuinely disputed.  Lovitt, testifying as Jones Day's 30(b)(6) witness on the topic, represented that Sheketoff Exhibit 103 is an accurate reflection of what was said during the meeting (Chase Ex. 83 (Lovitt (30(b)(6)) at 118:3-25), and the exhibit shows that Partner A was the first person to speak about Julia.  In contrast, there is no basis to conclude that Heifetz' conflicting notes, which in any event are inadmissible hearsay when used by Jones Day, are reliable.  Jones Day also cannot rely on Heifetz' inadmissible notes to suggest

that Partner A said positive things about Julia (and those assertions are nonresponsive to this statement regardless).

**709.**   Lovitt and Shumaker reviewed and considered Orr's compensation decisions when they made their own recommendations.  Chase Ex. 83 (Lovitt) at 95:2-10.

> **RESPONSE:** Disputed.  Plaintiffs' assertion that Lovitt and Shumaker "reviewed and considered" Orr's compensation decisions is not supported by the evidence cited. When asked if the partner in charge's recommendation of salary "matter[s]," Lovitt testified: "I've explained the process to you. [Shumaker] and [Lovitt] look at it. Sometimes [they] agree, sometimes [they] disagree, and [they] report [their] recommendations to the managing partner." Chase Ex. 83, Lovitt Tr. Vol. II 95:2-10.

> **REPLY:** This statement is not genuinely disputed.  While Jones Day purports to dispute that Lovitt and Shumaker "reviewed and considered" Orr's compensation decisions when making their own recommendations, it admits that Lovitt and Shumaker "look" at those decisions and sometimes "agree" and other times "disagree."  It is not clear what daylight Jones Day sees between those things.

**710.**   Indeed, Shumaker specifically acknowledged that, when he was considering Julia's salary adjustment for her 2016 work, he had considered Orr's salary adjustment decision for her. Chase Ex. 81 (Shumaker) 332:23-333:3, 334:21-25.

> **RESPONSE:** Undisputed. By way of further response, Defendants state that Shumaker testified that he recommended a raise of $445,000 for Sheketoff's 2016 work because Orr's recommendation of $450,000 "was too high for someone who has shown marginal performance two years in a row, behind [her] peers." Chase Ex. 81, Shumaker Tr. 332:19-333:3.

**711.** According to Lovitt, she recommended raising Julia's salary to $435,000 because she had a "general impression that [Julia] had no interest in being a private practicing attorney at Jones Day," because "when [Julia] was doing work for billable clients, [her] performance was mediocre at best" whereas "[Julia] shined when [she] w[as] doing things that aren't in the core of the law firm, things like pro bono."  Chase Ex. 83 (Lovitt) at 136:14-137:23; *see also id.* at 89:15-22 (claiming that Partner A's review had no impact on Julia's compensation because "there are multiple reviews that are reflective of your underlying problem, Julia, is that you weren't interested in the private practice of law"); id at 90:5-9 (claiming that Julia's "disinterest[]…show[ed] in [her] evaluations").

**RESPONSE:** Disputed in part.   Defendants dispute Plaintiffs' misleading characterization of the cited testimony as reasons Lovitt gave for her compensation recommendation. Lovitt's testimony cited in Statement 711 was offered in response to questions not related specifically to Lovitt's compensation recommendation, such as an inquiry into what Lovitt meant when she said Sheketoff was not "on track" with her peers of the same seniority. Chase Ex. 83, Lovitt Tr. Vol. II 135:18-137:23. Undisputed that Plaintiffs have accurately quoted portions of Lovitt's deposition testimony. Defendants further state that Lovitt provided additional testimony regarding her "general impression" of Sheketoff, including that: the Partner-in-Charge's perception that Sheketoff's "trajectory was going down," (*id.* at 135:5-8, 137:16-21); she was being "lapped by [her] peers," (*id*. at 135:8-12); Sheketoff's disinterest in the practice of law "showed in [her] work product and in [her] attendance at the office," as well as in her evaluations. *Id*. at 89:23-90:9. Defendants further dispute Statement 711 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**712.** Actually, all of Julia's reviews for her billable clients were positive except for Partner A's and Partner J's reviews.  Chase Ex. 15.

**RESPONSE:** Disputed. Statement 712 is an argumentative interpretation of evidence. As set forth in Defendants' responses to Statements 433-466, Sheketoff's narrative evaluations included a mix of both negative and positive comments, including for work performed both on pro bono matters and matters for paying clients. *See also* Chase Ex. 15.

**REPLY:** This statement is not genuinely disputed.  Chase Ex. 15.

**713.** While Julia's reviews are quoted in full above, the subset of those reviews for billable clients state in relevant part that Julia's work was "very strong" and "excellent"; that she was "an invaluable resource" and "a very effective editor"; that she was "at her best" and "emotionally and intellectually invested" in the matters; that she was "a joy to work with," "passionate about her work," "wanting to improve and excel," and "extremely dependable"; that her work was "truly excellent"; that she was "impressively dogged and firm in her defense of the client's interest" and "took total ownership of the project"; that her work was "exceptional," "excellent, and "very helpful"; that she had a "positive attitude and constant availability to work"; that she "takes total ownership of her projects and is dogged about pushing for what she wants"; that she "never gives up"; that she "was at her best" and "passionate about her client[]"; that her work was "excellent" and "effective"; that she showed "consistent willingness to help out"; that her work was "always persuasive" and that she was "brave enough to ask for an oral argument, which … she deserved"; that she was "fun to work with" and "helpful"; that her work was "very well written and argued and needed virtually no editing for style or substance"; that she showed "care to detail" and initiative"; that she was an "enterprising associate" and her "goal was perfection"; that she "did an absolutely stellar job" and produced a "definitive memorandum"; that she "demonstrated

exceptional analytical ability and coupled that with concise and lucid writing"; that she "performed brilliantly"; that her work was "refined and persuasive"; and that she made "helpful suggestions." Chase Ex. 15.

**RESPONSE:** Disputed in part. Undisputed that Statement 713 contains accurate quotes of portions of selected reviews from her annual evaluations. Defendants dispute Plaintiffs' implication that Sheketoff's reviews contained only "praise" of Sheketoff's work. As set forth in Defendants' responses to Statements 517, 550, 553, 563, and 566 numerous evaluators criticized Sheketoff's substantive drafting abilities, and availability, among other things, across multiple matters and evaluation years. *See also* Chase Ex. 15.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

714. In contrast, Partner A asserted that Julia was "not long for firm life," "not that into us," exhibited "little-to-know- initiative," "merely d[id] what was asked of her," was available only when "convenient for her," did not know what "[w]orking on a weekend" meant, and "w[ould] soon leave to become Professor Sheketoff." Chase Ex. 15 at 1293.

**RESPONSE:** Disputed in part, including as an argumentative characterization of evidence. As set forth in Defendants' responses to Statements 517, 550, 553, 563, and 566, the critiques in Partner A's review were similar to critiques Sheketoff received from other partners during 2016. *See generally* Chase Ex. 15 at JD_JS_00001293-95. Undisputed that Plaintiffs have accurately quoted from select portions of Partner A's narrative evaluation. *Id.* at JD_JS_00001293. Defendants dispute that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

715.   Lovitt's own notes about Julia demonstrate that she was directly influenced by Partner A's review: After reading Julia's reviews and draft assessment statement for her 2016 work, Lovitt's only note about Julia was "Reads like professorial type.  Soft warn"—a direct reference to Partner A's representation that Julia would "soon leave to become Professor Sheketoff."  Sheketoff Ex. 155; Chase Ex. 83 (Lovitt) 121:24-122:13.

**RESPONSE:** Disputed, including as an argumentative interpretation of evidence. Plaintiffs have no support for the argumentative and conclusory assertion that Lovitt's notes regarding Sheketoff were "directly influenced by Partner A's review." To the contrary, Lovitt testified that her "personal recommendation was based on [her] general impression that [Sheketoff] had no interest in being a private practicing attorney at Jones Day." Chase Ex. 83, Lovitt Tr. Vol. II 136:14-23. Defendants further dispute Statement 715 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** This statement is not genuinely disputed.  Only Partner A's review said anything about Julia being a "professor."

716.   In reviewing salary adjustments, Brogan of course looked at and considered Orr's decisions and Lovitt and Shumaker's recommendations.  Chase Ex. 83 (Lovitt) at 95:2-98:10; Chase Ex. 16 at JD_00004767.

**RESPONSE:** Disputed. Statement 716 is an argumentative interpretation of evidence. Plaintiffs have no support for the assertion that Brogan "considered" Orr's "decision" or Lovitt and Shumaker's recommendations. Defendants dispute Plaintiffs' assertion that Orr's

recommendation was a "decision," for the reasons set forth in response to Statement 709. By way of further response, Defendants state that Lovitt testified that, as a general matter, the managing partner has "in front of him the spreadsheet that has the offices' recommendation, Mike Shumaker's recommendation and for 2017 and 2017 [Traci Lovitt's] recommendation. He looks at all of them. He may disagree with all of them. He might disagree with Mike and [Lovitt] and go to the office. It depends on each individual circumstance and each individual attorney." Chase Ex. 83, Lovitt Tr. Vol. II 96:3-13. Defendants further dispute Statement 716 to the extent that it implies that each and every review has an impact on the compensation of an associate, or that Partner A's review had such an impact on Sheketoff's compensation, for the reasons stated in Response 683.

**REPLY:** This statement is not genuinely disputed.  While Jones Day purports to dispute that Brogan "looked at and considered" Orr's decision and Lovitt and Shumaker's recommendations, it admits that he "looks" at them and "might disagree" with them or might not. It is unclear what daylight Jones Day seems between those things.

**717.**    Brogan specifically admitted that his decision not to change Lovitt and Shumaker's joint recommendation on Julia's salary adjustment was based in part of Orr's practice rating of Julia (which was 3).  Chase Ex. 77 (Brogan) 314:11-23.

**RESPONSE:** Disputed on the ground that Statement 717 lacks support from any admissible evidence. Chase Ex. 77 does not have a page 314, as cited by Plaintiffs. Defendants also dispute Statement 717 as contrary to the record evidence. Brogan testified that he based Sheketoff's 2017 compensation adjustment on Sheketoff's consecutive years of receiving "2" practice ratings, as explained in Response 683.

**REPLY:** This statement is genuinely disputed.  Jones Day points out that Plaintiffs made a typo: they cited page 314 of Brogan's deposition instead of page 214.  The evidence

directly supports this statement.  Brogan said: "So one of the things I focused on with you is that you had 2s *and 3s*, for two years running."  Chase Ex. 77 (Brogan) at 214:11-23 (emphasis added). (The "3s" refer to Orr's ratings of Julia.  *See* Chase Ex. 15 at JD_JS_00001289, JD_JS_00001296.)

**718.**   Brogan's salary determinations for Issues & Appeals associates who were former Supreme Court clerks, including Julia, were not significantly influenced by Heifetz's practice ratings.  Chase Ex. 22.

> **RESPONSE:** Disputed, including as an argumentative interpretation of evidence. Plaintiffs' citation to excerpts of exemplar ratings and compensation adjustments (Chase Ex. 22) does not support their conclusory assertion that Brogan's salary determinations were "not significantly influenced" by those ratings. Defendants also dispute Statement 718 as contrary to the record evidence. Brogan testified that he based Sheketoff's 2017 compensation adjustment on Sheketoff's consecutive years of receiving "2" practice ratings, as explained in Response 683.

> **REPLY:** This statement is not genuinely disputed.   The cited evidence directly supports this statement, as shown in PSF ¶¶ 719-20, and Jones Day has identified no controverting evidence.

**719.**   ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.  Chase Ex. 22.

> **RESPONSE:** Disputed in part. Undisputed that all seven Issues & Appeals associates in Sheketoff's graduating class received the same compensation adjustment in 2016. Chase Ex. 22. Defendants dispute Plaintiffs' assertion that this adjustment was "for their 2015 work." Brogan's compensation adjustment for Sheketoff that year was intended to "encourage Julia to –

to have a very successful career at the firm," despite her low rating from the practice. Chase Ex. 77, Brogan Tr. 30:6-7; *see also* DSF ¶¶ 229-232.

**REPLY:** This statement is not genuinely disputed.  Jones Day asserts that Julia's raise in 2016 was to "encourage" her and was not actually a reflection of her 2015 work.  But it is beyond dispute that the firm's "compensation adjustments are based upon the subjective quality of each person's *overall contribution*," PSF ¶ 690 (quoting Dkt. 178 (Answer to TAC) at ¶ 69) (emphasis added); that Jones Day "rewards and advances lawyers based on their individual merit," PSF ¶ 481 (citing Dkt. 45 ¶ 84); that "the assessment statement is supposed to reflect the firm's view of that associate performance and overall contribution to the [f]irm *in the prior calendar year*," PSF ¶ 689 (citing *Tolton* Dkt. 156-15) (emphasis added); and that the "assessment statement should reflect and explain an associate's compensation adjustment," PSF ¶ 688.

720.    Brogan also awarded five of those clerks (one had departed in the interim) the same salary for their 2016 work, ███████████████████████████ Chase Ex. 22.

**RESPONSE:** Disputed in part, including as an argumentative characterization of evidence. Defendants dispute Plaintiffs' characterization of Brogan's compensation adjustments as being decided "████████████████████████████████ Chase Ex. 22. Undisputed that the five remaining Issues & Appeals clerks in Sheketoff's year each received the same compensation adjustment in 2017.

**REPLY:** This statement is not genuinely disputed.

721.    In any event, Heifetz's practice rating of Julia (which was a 2) was affected by Partner A's evaluation, as demonstrated below.  *See infra* ¶¶ 722-30.

**RESPONSE:** Disputed. Statement 721 is not supported by any evidence—admissible or otherwise. Defendants incorporate their responses to Statements 722-730 in response to

Statement 721. As explained in Response 683, Heifetz declared that Partner A's review had no effect on Sheketoff's "2" practice rating for 2017, which was based on common themes in all of Sheketoff's reviews, Sheketoff's failure to improve from the prior year, and Heifetz' own personal knowledge.

      **REPLY:** This statement is proven in PSF ¶ 722-30, as cited.

**722.** Admittedly, Heifetz "fluctuated between [giving Julia] a 3 and a 2" for her practice rating before she ultimately settled on a 2. Chase Ex. 83 (Lovitt) at 143:19-144:18.

      **RESPONSE:** Undisputed that Lovitt testified that she communicated with Heifetz and that "her thought on what [Sheketoff] should be rated . . . fluctuated between a 3 and a 2, but at the end of the day she assigned [Sheketoff] a 2." Chase Ex. 83, Lovitt Tr. 143:19-144:6. By way of further response, Defendants note that Heifetz "landed on a 2" prior to the D.C. litigation associates meeting. *Id.* at 146:5-21. And as explained in Response 683, Heifetz declared that Partner A's review had no effect on Sheketoff's "2" practice rating for 2017, which was based on common themes in all of Sheketoff's reviews, Sheketoff's failure to improve from the prior year, and Heifetz' own personal knowledge.

      **REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded. It is also inaccurate: Jones Day says that Heifetz' decision to assign Julia a 2 for her practice rating was made before *the D.C. litigation meeting*, but the cited testimony says that she did so prior to the "*national review committee meeting*," which takes place *after* the D.C. litigation meeting. Chase Ex. 83 (Lovitt (30(b)(6)) at 146:5-21; *see also id.* at 32:11-34:13. As Lovitt asserted (in her role as Jones Day's 30(b)(6) witness), the whole point of the D.C. litigation meeting is "to assist

both the office leadership and the practice leadership in their—I think more in their ratings than anything else." Chase Ex. 83 (Lovitt (30(b)(6)) at 59:5-25. Obviously then, Heifetz had not ultimately settled on a 2 for her practice rating *before* that meeting. *See also id.* 62:14-63:5 ("[T]he rating is not final until it's final. So she might have in her head an idea of what the rating would be that would change over time. She doesn't determine her final rating until she turns in the slip of paper to Suzanne Coussons with the rating written down that says this is the rating, and that happens at the end of April… It's always after the national meeting.").

**723.** Heifetz "would sometimes reflect on [Julia's] file and think it was a 3 and sometimes think it was a 2." Chase Ex. 83 (Lovitt) at 144:13-18.

**RESPONSE:** Undisputed that Heifetz "fluctuated between a 3 and a 2, but at the end of the day she assigned [Sheketoff] a 2." Chase Ex. 83, Lovitt Tr. Vol. II 143:19-144:6. As noted above, Heifetz's decision to assign Sheketoff a 2 rating was made prior to the D.C. litigation associates meeting. *Id.* at 146:5-21. By way of further response, as explained in Response 683, Heifetz declared that Partner A's review had no effect on Sheketoff's "2" practice rating for 2017, which was based on common themes in all of Sheketoff's reviews, Sheketoff's failure to improve from the prior year, and Heifetz' own personal knowledge.

**REPLY:** Jones Day does not dispute any part of this statement. This statement is thus admitted in its entirety. Standing Order 10(d)(iv)-(v); Local R. 7(h)(1). The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded. It is also inaccurate: Jones Day says that Heifetz' decision to assign Julia a 2 for her practice rating was made before *the D.C. litigation meeting*, but the cited testimony says that she did so prior to the "*national review committee meeting*," which takes place *after* the D.C. litigation meeting. Chase Ex. 83 (Lovitt (30(b)(6)) at 146:5-21; *see also id.* at 32:11-34:13. As Lovitt asserted (in her

role as Jones Day's 30(b)(6) witness), the whole point of the D.C. litigation meeting is "to assist both the office leadership and the practice leadership in their—I think more in their ratings than anything else."  Chase Ex. 83 (Lovitt (30(b)(6)) at 59:5-25.  Obviously then, Heifetz had not ultimately settled on a 2 for her practice rating *before* that meeting.  *See also id.* 62:14-24 ("[T]he rating is not final until it's final.  So she might have in her head an idea of what the rating would be that would change over time.  She doesn't determine her final rating until she turns in the slip of paper to Suzanne Coussons with the rating written down that says this is the rating, and that happens at the end of April…  It's always after the national meeting.").

**724.**    Before she ultimately decided to give Julia a 2 rather than 3 for her practice rating, Heifetz attended the D.C. litigation meeting, which is "meant to assist both the office leadership and the practice leadership … in their ratings," where Partner A opened the discussion about Julia by roundly criticizing her.  *See supra* ¶ 708; Chase Ex. 83 (Lovitt) at 59:5-14.

>    **RESPONSE:** Disputed.  Statement 724 is an argumentative characterization of the evidence that is controverted by the record.  Lovitt testified that Heifetz's decision to assign Sheketoff a 2 for her practice rating was made before the D.C. litigation meeting. Chase Ex. 83, Lovitt Tr. Vol. II 146:5-21. Defendants also dispute Plaintiffs' characterization of Partner A's role in the D.C. litigation meeting discussion for the reasons set forth in their response to Statement 708. By way of further response, as explained in Response 683, Heifetz declared that Partner A's review had no effect on Sheketoff's "2" practice rating for 2017, which was based on common themes in all of Sheketoff's reviews, Sheketoff's failure to improve from the prior year, and Heifetz' own personal knowledge.

>    **REPLY:** This statement is not genuinely disputed.  Jones Day says that Heifetz' decision to assign Julia a 2 for her practice rating was made before *the D.C. litigation meeting*, but

the cited testimony says that she did so prior to the "*national review committee meeting*," which takes place *after* the D.C. litigation meeting.   Chase Ex. 83 (Lovitt (30(b)(6)) at 146:5-21; *see also id.* at 32:11-34:13.   As Lovitt asserted (in her role as Jones Day's 30(b)(6) witness), the whole point of the D.C. litigation meeting is "to assist both the office leadership and the practice leadership in their—I think more in their ratings than anything else."   Chase Ex. 83 (Lovitt (30(b)(6)) at 59:5-25.   Obviously then, Heifetz had not ultimately settled on a 2 for her practice rating *before* that meeting.   *See also id.* 62:14-24 ("[T]he rating is not final until it's final.   So she might have in her head an idea of what the rating would be that would change over time.   She doesn't determine her final rating until she turns in the slip of paper to Suzanne Coussons with the rating written down that says this is the rating, and that happens at the end of April…   It's always after the national meeting.").   Jones Day also disagrees that Partner A opened the discussion about Julia by criticizing her, but as discussed in Plaintiffs' reply on PSF ¶ 708, that dispute is not genuine either.

**725.**   Before she picked between a 2 and a 3 for her practice rating, Heifetz also supposedly talked to Partner A about his evaluation of Julia.   Chase Ex. 83 (Lovitt) at 4:11-8:10.

**RESPONSE:** Undisputed that Lovitt testified that Heifetz talked to Partner A, both in real time as Sheketoff was working on the work assignment for Client 1, as well as regarding his evaluation once she saw the evaluation. Chase Ex. 83, Lovitt Tr. Vol. II 4:19-5:5. Defendants dispute Plaintiffs' argumentative description of these discussions as "supposed."

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

726.     During her conversation with Partner A, Partner A purportedly told Heifetz that he was "annoyed by [Julia's] not taking his edits" and that Julia was "protective of [her] time."  Chase Ex. 83 (Lovitt) at 7:3-22.

**RESPONSE:** Disputed in part, including as an argumentative characterization of evidence. Lovitt testified only as to Heifetz's recollections of her "impression" of the conversation with Partner A. *See* Chase Ex. 83, Lovitt Tr. Vol. II 7:3-12 (Heifetz "recalled speaking to [Partner A] once she saw his evaluation. Again, she could not recall specifics of that conversation, but she did recall her impression being that he was generally impressed with your work product but again annoyed by your not taking his edits and being protective of your time in his view."). Defendants dispute Plaintiffs' argumentative description of these discussions as "purported."

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded.

727.     Further, Heifetz was in charge of Julia's assessment statement *and* her practice rating. Chase Ex. 83 (Lovitt) 143:19-144:18.

**RESPONSE:** Disputed in part.   Defendants dispute Plaintiffs' characterization that Heifetz was "in charge of" Sheketoff's assessment statement. The cited evidence states that "she had Lou Fisher and Mike Fried do the drafts of the associate evaluations in issues and appeals and then she edited them and finalized them" in an "iterative process[.]" Chase Ex. 83, Lovitt Tr. Vol. II 144:7-18. Undisputed that Heifetz was responsible for assigning Sheketoff her practice group rating. *Id.* By way of further response, as explained in Response 683, Heifetz declared that Partner A's review had no effect on Sheketoff's "2" practice rating for 2017, which was based on common

themes in all of Sheketoff's reviews, Sheketoff's failure to improve from the prior year, and Heifetz' own personal knowledge.

**REPLY:** Jones Day does not dispute any part of this statement.  Indeed, Jones Day has admitted the substance of this statement elsewhere.  PSF ¶ 685 (Jones Day's response) ("Practice Leaders have responsibility for preparing a draft 'Assessment Statement'"); *see also* Chase Ex. 83 (Lovitt) at 33:6-9 ("The practice leadership then completes the drafting of the assessment statements"); *id*. at 102:4-7 ("she's [Beth] creating the assessment statement and the rating").  And it is unclear what distinction it sees between Heifetz being "in charge of" Julia's assessment statement and her "edit[ing] and finaliz[ing]" the statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's answer (beginning with "By way of further response") is nonresponsive and should be disregarded.

728.    As a result, as Lovitt admitted, the assessment statement and Heifetz's practice rating can't be sealed off from each other.  Chase Ex. 83 (Lovitt) at 101:25-102:9.

**RESPONSE:** Undisputed that Lovitt testified that the assessment statement and rating cannot be "hermetically seal[ed]" from each other. Chase Ex. 83, Lovitt Tr. Vol. II 102:4-7.

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).

729.    Indeed, like an assessment statement, a practice rating is supposed to constitute a "final, overall assessment of the lawyer's performance during the evaluation period, taking into account the evaluators' written evaluations," and other factors.  Sheketoff Ex. 154 at JD_00003133.

**RESPONSE:** Disputed in part.   Defendants dispute Plaintiffs' comparison of the assessment statement to a practice rating, as that comparison is not supported by the evidence cited in support of Statement 729. Undisputed that the practice reading should indicate the practice

leader's "final, overall assessment of the lawyer's performance during the evaluation period, taking into account the evaluators' written evaluations, the lawyer's productivity and other relevant contributions, if any, to the Practice, Office or Firm. Additional considerations should include, when applicable, whether or not the lawyer assumed responsibilities and performed work of appropriate complexity at a level consistent with the Firm's expectations for lawyer with comparable time in the practice. . ." Sheketoff Ex. 154 at JD_00003133. By way of further response, as explained in Response 683, Defendants note that Heifetz assigned Sheketoff a 2 rating for her 2015 performance because of Sheketoff's low billable client hours and concerns regarding her substantive performance. Heifetz Decl. at ¶ 5. And, the following year, Heifetz again rated Sheketoff a 2, based primarily on the themes that ran through Sheketoff's evaluations, Sheketoff's failure to improve on deficiencies in her 2015 performance, and Heifetz's own personal observations of, and interactions with, Sheketoff. *Id.* at ¶ 7. Heifetz made clear that "Partner A's review had no effect on [her] decision to assign Sheketoff a 2 rating," and that "[e]ven if Partner A had submitted no evaluation, Sheketoff's practice rating would have been the same; the rating was based on common themes of many evaluations as corroborated by [Heifetz'] own knowledge." *Id.* at ¶ 10.

**REPLY:** This statement is not genuinely disputed.  Plaintiffs have established above (and Jones Day has admitted) what an assessment statement is supposed to be.  *See* PSF ¶¶ 687, 689.  And Jones Day admits this statement's assertion about what a practice rating is supposed to be.  The bulk of Jones Day's response discusses Heifetz' declaration concerning the basis for her numerical rating of Julia, which has nothing to do with this statement and should be disregarded. It is also false, as shown in PSF ¶¶ 721-30 and 683 (Plaintiffs' reply).

**730.**     And as discussed above, Partner A's criticisms of Julia, including his representation that she was protective of her time, figure prominently in Julia's assessment statement.  *See supra* ¶ 694.

**RESPONSE:** Disputed, including as an argumentative characterization of evidence. Defendants dispute Plaintiffs' assertion that Partner A's criticisms "figure prominently" in Sheketoff's Assessment Statement for the reasons set forth in response to Statement 694.

**REPLY:** This statement is not genuinely disputed, as discussed in Plaintiffs' reply on PSF ¶ 694.

**731.**     While Lovitt suggested that Julia's compensation was based on negative "themes" in her review that were independent of Partner A's review, Partner A's review contributed to any such "themes."  Chase Ex. 83 (Lovitt) at 81:4-16 ("then you have from three or four evaluators saying the same thing, you're like okay, I got it, this is the theme that needs to go into the assessment statement"); Sheketoff Ex. 103 at JD_00003741 (identifying Partner A as one of the three evaluators for two negative "themes" about Julia); Chase Ex. 15 at 1289, 1293 (assessment statement for 2016 echoes Partner A's review in significant part); Dkt. 178 at ¶ 132 (admitting same).

**RESPONSE:** Disputed. Statement 731 is an argumentative interpretation of evidence. As set forth in Defendants' response to Statement 685, Sheketoff's Assessment Statement was a "fair and objective final assessment of [Sheketoff's] performance and productivity[.]" Chase Ex. 29 at JD_00003072. That statement included certain critiques offered by Partner A, as well as critiques offered by numerous other Partners, both in their written narrative evaluations, as well as during the Litigation Associates evaluation meeting. *See, e.g.*, Sheketoff Ex. 103 at JD_00003742. Plaintiffs' attribution of specific sentences in Sheketoff's Assessment Statement to Partner A's

narrative evaluation is a mischaracterization of the evidence. By way of example, the Assessment

Statement's reference to Sheketoff being protective of her time is consistent with another partner's

narrative evaluation, which stated: "For whatever reason, I've got the sense that Julia is a bit

protective of her time, and there were some additional projects I would have liked to get her

involved in." Chase Ex. 15 at JD_JS_00001294.

> **REPLY:** Jones Day purports to dispute this statement, but it doesn't identify any part
>
> of this statement it disputes.  It does not deny that Partner A's review contributed to any "themes"
>
> on which Julia's compensation was based, and indeed specifically admits that Julia's assessment
>
> "statement included certain critiques offered by Partner A."  This statement is thus admitted in its
>
> entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  And regardless, the cited evidence is
>
> conclusive.

**732.**    In any event, Brogan was not the "final" decisionmaker with respect to Julia's

compensation adjustment for her 2016 work, as Jones Day now claims. *Tolton* Dkt. 146 at 23-24.

> **RESPONSE:** Disputed.  The undisputed evidence is that Brogan made the final
>
> determination as to Sheketoff's compensation adjustment, and increased Sheketoff's
>
> compensation by $15,000 to $440,000, effective July 1, 2017. Chase Ex. 16 at JD_00004767;
>
> Chase Ex. 77, Brogan Tr. 217:8-10. Plaintiffs' citation to a document submitted in another matter
>
> involving Plaintiffs who are not parties to this litigation is not to the contrary and not admissible
>
> evidence in this case. *See* Response 698.

> **REPLY:** This statement is not genuinely disputed.   The cited evidence comprises
>
> Jones Day's own unambiguous representations to this Court.  Whether or not anyone in fact made
>
> further changes to Julia's compensation adjustment after Brogan reviewed it (and there would have
>
> been no reason to do so, since he accepted Lovitt and Shumaker's joint recommendation, PSF

¶ 703), the fact remains that (by Jones Day's own representations to this Court) the compensation process was structured so that they would have the opportunity to do so—which means that Brogan's decision was not final.  As cited in the next paragraph, Lovitt testified under oath that Brogan's compensation determinations "aren't final because the PICs have another opportunity to look at any adjustments that have been made and say, I disagree with you…. [A]nd, in fact, every year, the PICs have changes and we do not go back to the managing partner." *Tolton* Dkt. 145-11 at 51:8-18.  Jones Day says its brief filed in the *Tolton* case is inadmissible, but it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, Jones Day's own statements are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).

**733.**   Jones Day previously told this Court: "After the Managing Partner completes his review, the proposed compensation adjustments are sent back to the coheads of the association evaluation process [Shumaker and Lovitt], the Regional PICs, and the office PICs.  The offices can challenge any change and further adjustments can be—and are—made.  At that stage, Lovitt and Shumaker are authorized to implement certain changes without further consultation with the Managing Partner." *Tolton* Dkt. 146 at 23-24 (internal citations omitted); *see also id.* at 38 (same); Dkt. 145-11 at 7 (Lovitt: "think about it as a roundtrip"); *id.* at 51 (Lovitt: "They aren't final because the PICs have another opportunity to look at any adjustments that have been made and say, I disagree with you…. [A]nd, in fact, every year, the PICs have changes and we do not go back to the managing partner.").

> **RESPONSE:** Undisputed that Plaintiffs have accurately quoted an excerpt from a document submitted on the docket in another matter, involving Plaintiffs who are not parties to this litigation, which cannot be presented in an admissible form as evidence in this case.

Defendants dispute Plaintiffs' implication that Brogan's compensation adjustment with respect to Sheketoff was further adjusted, challenged, or otherwise modified. To the contrary, as set forth in Defendants' response to Statement 733, the undisputed evidence in this matter is that Brogan made the final determination as to Sheketoff's compensation adjustment, and increased Sheketoff's compensation by $15,000 to $440,000, effective July 1, 2017.

**REPLY:** Jones Day says its brief filed in the *Tolton* case is inadmissible, but it fails to explain on what ground this evidence is inadmissible (which is not self-evident) and on that basis forfeits the objection.  In any event, Jones Day's own statements are not hearsay (FRE 801(d)(2)) and the statement is plainly relevant (FRE 401).  Jones Day does not otherwise dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's response (beginning with "To the contrary") is nonresponsive and should be disregarded.  It also inaccurate.  Whether or not anyone in fact made further changes to Julia's compensation adjustment after Brogan reviewed it (and there would have been no reason to do so, since he accepted Lovitt and Shumaker's joint recommendation, PSF ¶ ), the fact remains that (by Jones Day's own representations to this Court), the compensation process was structured so that they would have the opportunity to do so—which means that Brogan's decision was not final.

734.  ██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

**RESPONSE:** Undisputed that for Sheketoff's work in 2017, Heifetz ranked Sheketoff 10 out of 14 among those associates in the Issues & Appeals practice with a law school graduation date of 2008, 2009, or 2010. Sheketoff Ex. 143 (████████████████████████████████



■■■■■■■■■■■■■■). Disputed that the Tier I associates whom Heifetz ranked below Sheketoff were "more senior" in the sense of time at the Firm. Each of them was hired in 2017. See Chase Ex. 23. Defendants also incorporate by reference their response to Statement 735.

**REPLY:** This statement is not genuinely disputed. ■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■ Chase Ex. 83 (Lovitt (30(b)(6)) at 46:12-21. ■■

■■■■■■■■■■■ Julia's JD/deemed year was 2010. ■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

**735.** ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■

**RESPONSE:** Undisputed but misleading.  The three Issues & Appeals associates referenced in Statement 735 were ■■■■■■■■■■■■■. The two who eventually made partner—■■■■■■■■■■■—were both hired at Jones Day on Nov. 13, 2017. Sheketoff Ex. 160. Their track record at the Firm in 2017 amounted to, respectively, 206 and 184 total client hours (including pro bono). Chase Ex. 23 at JD_00004009 (showing 2017 data for ■■■■■■ and ■■■■■■ Their minimal tenure provided no basis for ranking them against associates like Sheketoff, who by comparison had been at Jones Day since October 2014 and whose progress at the Firm (or lack thereof) could be assessed over multiple review periods. *See* Chase Ex. 15. Both of the other two Issues & Appeals associates whom Heifetz ranked below Sheketoff in Tier I also had joined the Firm in 2017, one in December. Chase Ex. 23 at JD_00003997 (2017 data for ■■■■■ *id*. at JD_00004009 (2017 data for ■■■■■■

**REPLY:** Jones Day does not dispute any part of this statement.  This statement is thus admitted in its entirety.  Standing Order 10(d)(iv)-(v); Local R. 7(h)(1).  The bulk of Jones Day's

response (beginning with "The three Issues & Appeals associates") is nonresponsive and should be disregarded.  Moreover, there is no support for Jones Day's attorney argument that ██████ ██████████████████' "minimal tenure provided no basis for ranking them against associates like Sheketoff, who by comparison had been at Jones Day since October 2014 and whose progress at the [f]irm (or lack thereof) could be assessed over multiple review periods."  It is undisputed that they were in fact ranked against—and below—Julia; the firm does *not* have a policy or practice of not ranking new associates against those with longer tenure.  Moreover, Mark also started at Jones Day partway through 2017 and yet ████████████████████████████ ██████████████████████████████████████████████████████ ██████