<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       MARK C. SAVIGNAC and JULIA    )  Civil Action
 3     SHEKETOFF,                    )  No. 1:19-CV-2443
                                     )
 4                  Plaintiffs,      )  **MOTION HEARING**
                                     )  **(HYBRID PROCEEDING)**
 5     vs.                           )
                                     )
 6     JONES DAY, et al.,            )  Washington, D.C.
                                     )  October 12, 2023
 7                  Defendants.      )  Time:  11:20 A.M.

 8
                      TRANSCRIPT OF MOTION HEARING
 9        HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                   UNITED STATES DISTRICT JUDGE
10     _____

11                       A P P E A R A N C E S

12     For Plaintiffs:           MARK C. SAVIGNAC and
       (Pro se)                  JULIA SHEKETOFF - **VIA ZOOM**
13                               2207 Combes Street
                                 Urbana, IL 61801
14
       For Defendants:           HASHIM M. MOOPPAN
15                               CHRISTOPHER DiPOMPEO
                                 Jones Day - Washington
16                               51 Louisiana Avenue NW
                                 Washington, DC 20001
17
                                 TERRI L. CHASE
18                               Jones Day
                                 600 Brickell Avenue, Suite 3300
19                               Miami, FL 33131

20                               ANDERSON T. BAILY
                                 Jones Day
21                               One Mellon Bank Center
                                 500 Grant Street, Suite 4500
22                               Pittsburgh, PA 15219

23     Court Reporter:      Tamara M. Sefranek, RMR, CRR, CRC
                            Official Court Reporter
24                          United States Courthouse, Room 6714
                            333 Constitution Avenue, NW
25                          Washington, D.C. 20001
                            202-354-3246
</pre>

```
 1                      P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Calling Civil Case

 3   No. 19-2443, Mark Savignac and Julia Sheketoff v. Jones Day,

 4   et al.

 5            Would counsel please state their name for the record,

 6   starting with plaintiffs.

 7            MS. SHEKETOFF:  Hi.  This is Julia Sheketoff, pro se

 8   plaintiff.

 9            MR. SAVIGNAC:  This is Mark -- Mark Savignac, the

10   plaintiff.

11            MS. CHASE:  Good morning, Your Honor.  This is Terri

12   Chase from Jones Day on behalf of defendants.

13            THE COURT:  Why don't you just go ahead and introduce

14   the others to expedite things.

15            MS. CHASE:  I will, Your Honor.  Thank you.  With me

16   is Hashim Mooppan, who is also going to be arguing with me, and

17   Anderson Bailey and Chris DiPompeo.

18            Just from a logistics standpoint, we intend to split

19   the argument between myself and Mr. Mooppan.  He's going to

20   start our section.  I will then pick up with the remainder of

21   the claims.  And based upon Your Honor's directive about 40

22   minutes, we intend to reserve 10 minutes.

23            THE COURT:  And, unfortunately, we've lost 20 minutes

24   because my other matter ran a little long and just getting set

25   up.  I, unfortunately, have a hard stop at 12:30 because I have
```

1    a presentation I'm making at 12:30.  So let's see if we can get

2    through it.  If we can't, we'll have to talk about the need to

3    reschedule.  Hopefully, we can get through it in that time.

4            MS. CHASE:  We can adjust, Your Honor.

5            THE COURT:  Okay.  I appreciate that.  We're here on

6    the parties' cross-motions for summary judgment, and the first

7    movant was the defendant, Jones Day.

8            So why don't I start with Jones Day.  Just for -- I'm

9    going to watch the clock here.  It's 11:20 now.  I just want to

10   make sure that I'm fairly distributing time between the

11   parties.

12           MR. MOOPPAN:  May it please the Court.  Jones Day

13   provides paid -- this is Hashim Mooppan.  I'm going to address

14   the policy claim, Your Honor.

15           THE COURT:  Okay.

16           MR. MOOPPAN:  Jones Day provides paid disability

17   leave to associates who give birth.  And the firm assumes,

18   unless notified otherwise, that a doctor has certified an

19   eight-week period of postpartum disability.  Plaintiffs claim

20   that this disability assumption constitutes sex discrimination

21   against birth fathers even though they, concededly, have no

22   postpartum disability.

23           Neither of plaintiffs' theories in support of that

24   counterintuitive claim can survive summary judgment.  First,

25   plaintiffs argue that the eight-week assumption is a pretextual

1    sham and that the firm is simply giving extra family leave to

2    birth mothers that it won't provide to birth fathers.  That

3    theory has no basis in the evidentiary record.

4            As discovery has confirmed, the firm adopted the

5    eight-week disability assumption to track standard practices of

6    doctors and insurers while also respecting women's privacy and

7    avoiding unnecessary paperwork.

8            Second, plaintiffs also argue that the eight-week

9    assumption is facially illegal as a generalization that does

10   not perfectly track each birth mother's period of actual

11   disability, but that theory has no basis in law or logic.

12           Title VII's ban on discrimination based on sex does

13   not require perfect precision in measuring postpartum

14   disability.  Such a requirement would also be completely

15   unworkable in practice and would treat postpartum disability

16   worse than other disabilities, thereby violating the Pregnancy

17   Discrimination Act.

18           Your Honor, I'm happy to answer any questions you

19   have on either of those two theories.  But, otherwise, where I

20   think I would start is an issue that's common to both claims,

21   which is the accuracy of the assumption.

22           THE COURT:  So I did have a couple of questions, and

23   maybe this is what you're -- it will be included in what you're

24   turning to.

25           I was interested in a little bit more development,

1    frankly, from both of the parties with respect to the

2    plaintiffs' argument that the Court is not in a particularly

3    good position to make a definitive determination with respect

4    to what the original motivation was for adopting the eight-week

5    policy because the -- I don't know if it was the partner in

6    charge or the managing partner at the time, but whoever it was

7    who approved the policy is no longer living.  And there was a

8    decision memo that went to him, and Jones Day has not -- or has

9    withheld that decision memo.

10          So we have, I think Ms. Dresser's [sic] testimony,

11   about what her understanding was, but how do I know for sure

12   what the firm's -- basis for the firm's decision was if she was

13   not the ultimate decision-maker and the ultimate decision-maker

14   is dead and Jones Day has not provided the decision memo in

15   discovery?

16          MR. MOOPPAN:  Sure.  A couple of points to make about

17   that, Your Honor.

18          So, as you said, the policy was initially designed

19   and recommended by Julie Dressing, who was the HR director at

20   the time.  She has submitted a declaration, a sworn

21   declaration, of her reasons for recommending that policy -- her

22   business reasons, which are not privileged, which is why we

23   disclosed them in the declaration.

24          Now, it is true that she was not the decision-maker.

25   Pat McCartan was.  And he, as Your Honor knows, is dead.  But

1    they had the burden of proof of showing that the intent behind

2    this policy was discriminatory.  If the only admissible

3    evidence that's in the record is the evidence of why it was

4    recommended to him, they can't prove their case.

5           It's certainly relevant evidence that the HR director

6    recommended the policy for reasons that are, concededly, on

7    their face sex neutral, that are not discriminatory, that are

8    not invidious, that don't rely on generalizations or

9    assumptions, that are perfectly permissible reasons.

10           THE COURT:  And was the memo authored by the HR

11   director as well, the one that is withheld?

12           MR. MOOPPAN:  The privileged memo?

13           THE COURT:  Yes.

14           MR. MOOPPAN:  I believe at least some of those

15   privileged documents, I believe, are by her.  There are a set

16   of them.

17           THE COURT:  Is she or was she a lawyer?

18           MR. MOOPPAN:  She is both -- she was both the HR

19   director and also counsel to the firm.

20           But to be clear, the reasons for this -- the specific

21   policy that's being challenged here, the eight-week assumption,

22   the reasons for those were not legal reasons.  They were

23   business reasons.  They're --

24           THE COURT:  I mean, you say that the -- it's the

25   plaintiff that has the burden here.  You're jumping, though, to

1    the final ultimate burden in the case, because under *Brady* and

2    a host of other cases, the way it typically works would be that

3    the plaintiff would come forward and make some prima facie

4    showing.  And maybe your argument is they haven't made a prima

5    facie showing.

6            But assume that they've made a prima facie showing,

7    because what you're really saying to me is we had a legitimate

8    nondiscriminatory reason for doing so.  You, actually, bear the

9    burden on that.  If you don't have -- if you're not prepared to

10   share with me the evidence that allows me to conclude whether

11   you have -- whether, in fact, the decision-maker actually had a

12   legitimate, nondiscriminatory reason, then you just lose at

13   that point in the process.

14           So that's your burden at that point.  And if you're

15   not going to share the documents that allow me to make that

16   decision, then it seems to me that's your problem and not the

17   plaintiffs'.

18           MR. MOOPPAN:  So several responses to that, which I

19   don't think at either step that's correct.  So at the first

20   step, I don't think they have gotten past their prima facie

21   burden because they --

22           THE COURT:  So why, then, didn't I just dismiss the

23   case on a motion to dismiss?  If the prima facie burden is

24   just -- that's not a terribly high standard.

25           MR. MOOPPAN:  They have to, actually, show -- at the

1    motion to dismiss stage, you said that it was plausible that

2    they could come up with evidence that this was done for a

3    discriminatory reason.  They have now had discovery, ample

4    discovery, and they have no evidence of that; none.  The policy

5    on its face doesn't discriminate on the basis of sex.

6              THE COURT:  Sure, it does.

7              MR. MOOPPAN:  No, Your Honor.  It adopts an

8    assumption for a disability period.

9              THE COURT:  Well, I mean, that's your position on

10   what it does, but their position is that's not what it does.

11             MR. MOOPPAN:  But it's not facially discriminatory on

12   the basis of sex.  It is an assumption of disability.

13             Now, if they have evidence that that assumption was

14   based on invidious reasons, then they would have gotten past

15   their first step.  But, otherwise, they don't have any basis to

16   get past that first step.

17             But let's say you disagree with me on that --

18             THE COURT:  Okay.

19             MR. MOOPPAN:  -- even on the second step, we just

20   have to have a burden of production.  Certainly, the evidence

21   of the reason the policy was recommended is relevant evidence

22   of the reason it was adopted.

23             Imagine it was the opposite.  Imagine Dressing had

24   testified for them and said, oh, yeah, I adopted this policy

25   because I wanted to give women the most and men the least.  Of

1    course that would be relevant evidence for their burden of

2    proof.

3             So, conversely, when she came in and testified what

4    actually happened, which is that she adopted these for

5    perfectly neutral reasons, that's relevant, and that satisfies

6    our burden at the second step.  And, again, under the

7    burden-shifting framework, it's just a burden of production.

8    It's not a burden of persuasion.

9             So the burden flips back to them, and they,

10   ultimately, have to prove it.  The fact that they don't have

11   evidence about what the actual decision-maker had in his mind

12   just means that the only relevant evidence -- and I don't think

13   they could possibly argue that Dressing's testimony isn't

14   relevant evidence, is evidence of a nondiscriminatory reason.

15            THE COURT:  So was this -- the documents withheld,

16   were these addressed in front of Magistrate Judge Faruqui, or

17   is this something that just was never raised?

18            MR. MOOPPAN:  That's the second problem with their

19   argument, which is they -- so Dressing's declaration was

20   produced two and a half months before the close of discovery.

21   They did not argue that at that point that's all privileged and

22   we'd waived privilege and that they were entitled to get the

23   memo.

24            On their theory -- we don't think they're right.  We

25   think that her declaration is nonprivileged because it's

1    business reasons.  But on their theory that she somehow waived

2    privilege by disclosing her reasons, they could have and should

3    have moved to say that we waived privilege, and they want to

4    see all the memos.  And they didn't.

5         THE COURT:  So that's where I was going when I said

6    initially that both parties haven't developed it very much.

7    Both parties are completely ipse dixit about this.  They say

8    they waived it because they didn't raise it during discovery.

9         I don't think you cite a single case for that

10   proposition.  Plaintiffs come back and say, no, we didn't waive

11   it.

12        MR. MOOPPAN:  I'm happy to provide you some cases, if

13   you would like, Your Honor.  But I think the basic point is the

14   reason we -- we submitted the declaration two and a half months

15   before the close of discovery.  Now, we did that because it's

16   not privileged.  Those are business reasons.

17        If you'll read the --

18        THE COURT:  Are there any business reasons in the

19   memo that was withheld?

20        MR. MOOPPAN:  I don't want to say anything to waive

21   privilege.  I am happy to represent to you, Your Honor, that

22   the business reasons that Dressing gave, those aren't in those

23   memos, nor are any other business reasons for adopting the

24   eight-week assumption.

25        And we're not relying on a legal theory.  We're not

1   saying that McCartan adopted this policy for legal reasons.

2   We're saying he adopted it for the business reasons that they

3   were recommending.

4        THE COURT:  But how do I know why he adopted it?

5   He's dead and the decision memo is withheld.

6        MR. MOOPPAN:  And that's their burden of proof

7   problem.

8        THE COURT:  Well, I'm not sure about that.  I think

9   you may have a problem on that one.  I have to be satisfied

10  that you've at least carried your burden of production with

11  respect to a legitimate nondiscriminatory reason.  The most

12  recent D.C. Circuit precedent on this makes pretty clear that

13  is not --

14        (Cell phone alarm going off.)

15        MR. MOOPPAN:  Sorry.  I set a timer.

16        THE COURT:  That's okay.  That's not a burden without

17  substance.

18        MR. MOOPPAN:  So I agree with that, Your Honor.

19        THE COURT:  I mean, if you sort of step back from a

20  commonsense perspective, you really are putting the Court and

21  the plaintiffs in a pretty difficult position here of saying,

22  we did this for nondiscriminatory reasons.  Decision-maker is

23  dead; we can't call him as a witness; the decision memo, we're

24  not going to provide to you in discovery.  But here's someone

25  else who testified.

```
 1              For all I know, the decision-maker said, I think

 2     those business reasons are the dumbest reasons I've ever heard;

 3     we're not doing it for that reason.  But there's something in

 4     this memo that's not being provided for me; it's the reason I'm

 5     going to do it.  And I just don't know.

 6              MR. MOOPPAN:  Your Honor, under that theory,

 7     attorney-client privilege would be waived in every

 8     anti-discrimination case where a decision was made following

 9     legal advice, and that simply is not the law.

10              There are multiple courts that have held that's not

11     the law, both in this circuit and in other circuits.  I'm happy

12     to provide you citations about that.  But it just cannot be the

13     case that any time an employer says we didn't act for a

14     discriminatory reason --

15              THE COURT:  But usually the employer, under those

16     circumstances, has somebody who can come forward and say, this

17     is -- was the basis for the decision.

18              MR. MOOPPAN:  That's why I was saying, Dressing's

19     testimony is certainly relevant evidence that can carry a

20     burden of production.

21              Again, if she had said the opposite, if she had said,

22     I recommended this for discriminatory reasons, we'd get laughed

23     out of court if we said that that wasn't enough for her to

24     carry her burden of production.

25              THE COURT:  Has she said why -- is it Mr. McCardle?
```

1              MR. MOOPPAN:  McCartan.

2              THE COURT:  Did she testify as to -- does her

3     declaration say why Mr. McCartan made his decision or just what

4     she recommended?

5              MR. MOOPPAN:  Just what she recommended, Your Honor.

6     But, again, it is certainly relevant evidence that it was

7     recommended.  I'm not saying it's not impossible.

8              THE COURT:  There must be somebody at Jones Day who

9     can testify about why the decision was actually made rather

10    than why a recommendation was made.  I mean, unless he just did

11    it all by himself without consulting with anybody else in the

12    firm?

13             MR. MOOPPAN:  Your Honor, this is the -- the evidence

14    we have found is what she did, which she's testified to, and

15    he's dead.  As best as we can tell, there isn't any other

16    nonprivileged document that says, here are the reasons I'm

17    doing this.

18             And to be clear, without waiving the privilege about

19    the privileged documents, those documents also don't say, these

20    are the business reasons or the legal reasons why I'm doing

21    this particular thing; the eight-week assumption.  The memo is

22    about a different issue.

23             THE COURT:  Well, that's helpful to me now.  I was

24    under the impression -- maybe this is because it's what the

25    plaintiffs said and the plaintiffs haven't seen the memo, so

1    they don't know.  But they say to me that it was the decision

2    memo.  If it's not the decision memo and if it's about a

3    different topic, that --

4         MR. MOOPPAN:  Yes.  I apologize if I wasn't clear

5    enough about that.  It is related, to be sure.

6         So there was a legal -- let me take a step back and

7    just give you the facts.

8         In 1994, FMLA gets passed, and the firm decides that

9    they're going to change their policies and break up what used

10   to be a 12-week maternity leave.

11        THE COURT:  Right.

12        MR. MOOPPAN:  Without getting into the specifics of

13   it, there's legal analysis about what to do about that.  There

14   is not legal analysis about how to measure the disability

15   period.  That is a separate decision.

16        It happened at the same time, but those memos do not

17   concern that precise issue.  I can represent to you that you

18   will find, if you saw those documents, any discussion of should

19   it be eight weeks or six weeks for assumption.  There's none of

20   that in there.

21        The reason that was done was, as Dressing has

22   testified, for business reasons.  We don't know -- I agree.

23   It's possible Pat McCartan didn't agree with a word she said,

24   but there's no evidence of that one way or the other.  And,

25   certainly, our evidence of what was recommended to him is

```
1    relevant evidence of why he did what he did.

2              THE COURT:  And are you representing to me that the

3    withheld materials do not speak to the question, either as a

4    matter of business practices or as a matter of the law, to the

5    question of how long the period of disability leave for women

6    who give childbirth should be?

7              MR. MOOPPAN:  That is my understanding.  I'm going to

8    confirm it with my colleagues.  And when I stand up for

9    rebuttal, I'll confirm that.

10             THE COURT:  If it turns out that assumption is wrong,

11   please let me know.

12             MR. MOOPPAN:  I will absolutely let you know.  My

13   understanding is that that is correct.

14             THE COURT:  My apologies.  I cut you off, and you're

15   welcome to continue.

16             MR. MOOPPAN:  I think at this point we've largely

17   handled the factual piece of it.  So I could spend a couple

18   minutes on the, sort of, core theory that it's an impermissible

19   generalization.

20             THE COURT:  I think you cover that pretty thoroughly

21   in your briefs; if there's anything else you have to add on

22   that, but I do get those arguments on both sides with respect

23   to that.

24             MR. MOOPPAN:  Well, then I'm happy to relinquish my

25   time because I know we're tight on time.
```

1            THE COURT:  Okay.  Ms. Chase?

2            MS. CHASE:  Your Honor, I will just let you know that

3     I can confirm for you that the memos that were -- that we've

4     identified as privileged do not address the question of what

5     period should be disability leave.  It is not discussed.

6            THE COURT:  Okay.  Thank you.

7            MS. CHASE:  So as Your Honor noted, we are short on

8     time, so let me just, kind of, jump right in.

9            One thing that I do want to point out -- and it

10    really permeates the remainder of the claims pretty

11    consistently, is that an issue that we see in the papers

12    consistently is plaintiffs' failure to appreciate the

13    evidentiary burdens that they need to satisfy to defeat summary

14    judgment.  Throughout their papers, they consistently state

15    that a jury just could discredit testimony.  I mean, it's

16    repeated throughout the response both in the briefing and in

17    the papers.

18            And as Your Honor is, of course, well aware, the

19    Supreme Court rejected that approach in *Anderson v. Liberty*

20    *Lobby*, holding that a plaintiff must present affirmative

21    evidence in order to defeat a properly supported motion for

22    summary judgment.  And that this is true even when the evidence

23    is likely to be within the possession of the defendant, as long

24    as the plaintiff has had a full opportunity to conduct

25    discovery, which they certainly have had here.

1          Some of the issues, I think, that you will see as you

2     look at the evidence, are statements such as the jury could

3     discredit Dressing or Beth Heifetz.  These are two individuals

4     who the plaintiffs opted not to depose, even though they could

5     have.

6          So we're left throughout this case with

7     uncontroverted evidence that we believe dooms each and every

8     one of their claims.  The claim that I want to address

9     specifically with Your Honor first is the claim that

10     Mr. Savignac's termination was retaliatory.

11          And with respect to that, two points that I want to

12     focus on -- but, again, if Your Honor would like me to focus

13     elsewhere, I'd be happy to do so.

14          As you know from our papers, we assert that

15     Mr. Savignac's claim fails for two independent reasons; both a

16     lack of a good faith reasonable basis for his claim, as well as

17     that the firm chose to fire him for the unprotected manner in

18     which he conducted himself.

19          Now, one of the things that I think you will see

20     throughout their papers is that plaintiffs have asked this

21     Court to interpret the law in a way that no court has done so

22     and find that there's absolute immunity for the email because

23     Mr. Savignac raised a challenge to the legality of Jones Day's

24     policies.

25          Now, as an initial matter, plaintiffs concede that a

1    reasonable good faith basis is required for his claim under the

2    opposition clause under Title VII and the D.C. Human Rights

3    Act.  So what they're really arguing about is the Equal Pay Act

4    and the participation clause.

5         I do want to address their arguments with respect to

6    that because I do think that's an area that's not necessarily

7    as well-developed in the law but has been certainly amply

8    developed in the cases that we've presented to Your Honor.

9         First, with respect to the Equal Pay Act, we assert

10   there's no textual basis to extend it to reach complaints that

11   are outside of the context of formal proceedings.  In fact, as

12   Judge Urbina has held in *Mansfield v. Billington*, the cases

13   that do so extend the EPA to informal complaints have invoked

14   the generalized purpose of the statute to override the plain

15   language in a way that he found is not appropriate; that what

16   the Equal Pay Act provides is that you have coverage for

17   participation in formal proceedings.

18        Now, in terms of the Equal Pay Act, those courts that

19   have, in fact -- what we believe is erroneously -- extended the

20   retaliation provisions to internal complaints have done so, and

21   in each and all of those cases established that there is an

22   objective reasonableness requirement in those contexts.  So,

23   again, no absolute immunity.

24        And then turning to the participation clause under

25   Title VII and the D.C. Human Rights Law, there's no court that

1    has applied the participation clause in those statutes to

2    informal complaints made to private employers in the absence of

3    proceedings in front of either the Court or a governmental

4    agency.

5            In support of their position that the participation

6    clause should be so extended, they rely extensively on *McKenna*,

7    a D.C. Circuit Court case from 1984.  And in that case, in

8    Footnote No. 54, with absolutely no analysis and indicta, the

9    Court did so extend the participation clause to a federal

10   employer.

11           Now, under -- for federal employers, there's an

12   administration -- an exhaustion of administrative remedies

13   requirements that doesn't exist with private employers.  Now,

14   that analysis is not set forth, but we do think there is a

15   distinction between private and public employers with respect

16   to the participation clause that could certainly be set forth.

17           And we think this is not just our belief but, in

18   fact, all of the courts other than *McKenna* that have addressed

19   this issue have found, as we assert, that courts in this

20   district have continued to hold unanimously that the

21   participation clause does not apply to internal complaints.

22   And I point you to *Brady v. U.S. Capitol Police*, which

23   recognized that the participation clause protects only activity

24   under the EEOC proceedings and goes on to cite cases not just

25   in this court but, unanimously across the country, finds the

1    same.

2              So since there's no dispute that Mr. Savignac had

3    not -- and Ms. Sheketoff had not filed an EEOC charge prior to

4    the termination, nor for that matter, prior to the decisions on

5    the reference claim, we really believe that there is no real

6    dispute that the participation clause is not in play here.

7              And so what the Court really does need to be looking

8    at is whether or not there is a record here of objectable

9    reasonableness based upon the claim.  And given the time issues

10   that we have, I'm not going to spend much time on that.  But as

11   you know from our briefing, we feel quite clearly that

12   Mr. Savignac cannot establish that there was an objectable

13   reasonable basis for his claim.

14             But even if the Court were to find that, the Court

15   still cannot find for Mr. Savignac on his claims because the

16   evidence demonstrates that he was terminated because of the

17   unreasonable manner in which he conducted himself.  So with

18   respect to that issue, Your Honor, I want to point you to,

19   amongst other cases, the *Barnes* decision which found that even

20   otherwise --

21             THE COURT:  Sorry.  Just a second here.

22             All right.  Go ahead.  I just wanted to have in front

23   of me the three reasons identified.

24             MS. CHASE:  Yes.  Thank you, Your Honor.  And I just

25   was pointing you to the *Barnes* decision that found that

1      otherwise protected activity can be unprotected, at least in

2      part, if undertaken from proper means.  Similarly, the District

3      Court -- the D.C. Circuit Court in *Pendleton* found the same

4      way.

5              So when you turn to the reasons that are addressed in

6      Mr. Brogan's deposition testimony, he testified -- and, again,

7      it has to be what he reasonably believed at the time and

8      that -- you know, from the Mason decision and others is quite

9      clear.  Mr. Brogan reasonably -- his testimony establishes that

10     he honestly and reasonably believed that the email fell below

11     professional standards for an attorney at Jones Day.

12             Now, Your Honor, in terms of time --

13             THE COURT:  On that one, isn't that just a question

14     for the jury if I conclude that -- if I decide that plaintiffs

15     are not entitled to summary judgment on that one, it seems to

16     me it's hard for you to win at the -- for you to win at the

17     summary judgment stage because a reasonable jury might look at

18     this and say, you know, the tone, quality, and legal

19     reasoning -- if this had been a brief or an email that someone

20     had sent to a client, it's fair to assume that there would have

21     been some greater process or discussion at Jones Day instead

22     of, here it is, and the managing partner saying, I want him

23     gone on Monday.

24             At least a reasonable jury could say, you know, the

25     quality of the writing was not so bad that if this was a brief

1      that had a bad sentence in it, one would say that person is out

2      of here on Monday.  And so that seems like a question of -- at

3      least of fact for the jury.

4              MS. CHASE:  Your Honor, if -- if there are questions

5      of fact about Mr. Brogan's reasoning for the termination

6      decision, then I agree that that is a question for the jury.

7      But as I noted, plaintiffs do have a burden to come forward

8      with testimony or evidence that's admissible to demonstrate

9      that Mr. Brogan's testimony should not be believed.

10             And he has testified extensively about his rationale,

11     and he's testified extensively about the three reasons.  You

12     know, we've crystallized them to three reasons that he made the

13     termination decision, all of which he points to as leading him

14     to conclude that Mr. Savignac's behavior was such that he was

15     acting in an unprofessional manner; that he was lying; that it

16     was conclusory and arrogant; and that this is the type of

17     behavior we cannot have from a Jones Day attorney.  And there's

18     no contrary evidence.

19             In fact, the individual to whom the email was sent,

20     Ms. McClure, who they also chose not to depose, said that in

21     all of her years in working at Jones Day, no one has ever sent

22     her -- a member of staff -- such a rude and inappropriate

23     email.  One of the reasons we've cited for the termination

24     decision is that this is just not how you speak to staff and

25     colleagues at Jones Day.  That this type of arrogant,

1     extortionate behavior is not condoned.  It's not the same as a

2     draft of a brief that was deficient, which I agree would likely

3     have greater analysis.

4             But those are not the facts of this case.  And the

5     facts of this case were testified to by the decision-maker, and

6     they don't have a basis to dispute it.

7             THE COURT:  I get that point, although I do think

8     that, even as Mr. Brogan characterizes his rationale, I think

9     there are significant questions.  And the plaintiffs say, if

10    you accept those rationales, then I should just grant summary

11    judgment in favor of the plaintiffs.

12            Because there is some level -- and I don't quite know

13    exactly how you draw these lines.  These are hard lines to

14    draw.  But there's some level in which you're entitled to be

15    rude when you're accusing your employer of discrimination.

16    Most employers, when someone shows up in their office and says,

17    I think that you're giving me less favorable work because of my

18    gender or because of my race, most people bristle when someone

19    comes in and says that.  But the law protects you from saying

20    that.

21            Now, you can't come in and knock everything off the

22    person's desk to get their attention, and there are lines that

23    have to be drawn.  But those are not easy lines to draw.

24            And I take it -- for example, with respect to this

25    being an extortionate threat, Jones Day isn't saying that Mark,

1    in fact, committed criminal extortion, but just that this is

2    sort of beneath our professional standards.  And that if this

3    were a paying matter or a pro bono matter and one of our

4    lawyers had gone to opposing counsel and said, "You better

5    settle this case with me" or "We're going to try this thing in

6    the press and you're going to look horrible," that someone at

7    Jones Day would say, no, that's not how we behave.  I take it

8    that's not what the argument is?

9           MS. CHASE:  That's part of the argument, Your Honor.

10   But as you see throughout our papers and throughout

11   Mr. Brogan's testimony, he found the conduct was false and

12   malicious, which is exactly the issue in *Barnes;* the exact

13   issue that the *Barnes* decision found rendered otherwise

14   protected conduct unprotectable.  And it's from the perception

15   of Mr. Brogan, not from plaintiffs.

16          He reasonably understood that Mark was making a claim

17   that he interpreted as false and malicious; that he was

18   entitled to the eight weeks of extra pay despite the fact that

19   he had not given birth, and that he was asserting that the

20   compensation policy was tailor-made, intentionally created for

21   discrimination, which he also testified he understood to be a

22   false and malicious statement.  In this testimony, he says you

23   cannot behave that way.  The false and malicious behavior is

24   not of the character that we accept of a Jones Day lawyer.

25          So it is not simply a question of, is the lawyer

1    subpar in his legal skills, but was there false and malicious

2    behavior.  And Mr. Brogan's testimony establishes that he did

3    find that.

4         So we do believe that we are entitled to summary

5    judgment.  But I agree with you, Your Honor, to the extent you

6    think that's an open question, that is a jury question

7         THE COURT:  If it does go to a jury, that's going to

8    be one tricky jury instruction to draft, figuring out how I

9    instruct the jury on drawing the line between one's ability to

10   complain in a way that may offend -- because when you complain,

11   you often offend -- versus when one crosses a line that makes

12   it -- provides some separate rationale beyond the substance of

13   the --

14        MS. CHASE:  We're not asking to make new law on this.

15   The *Barnes* decision is exactly that:  False and malicious

16   internal statements that were deemed unprotected because they

17   were false and malicious.

18        THE COURT:  There are different aspects, though, of

19   falsity here.  I understand the parties' positions with respect

20   to whether Mark's email could be read to suggest that Jones Day

21   had originally adopted its black box compensation system for

22   invidious purposes or not.

23        But with respect to the question about whether Julia

24   was, in fact, discriminated against in her compensation, you

25   know, that is something that is inherent in your right to

1    oppose, and your employer may disagree.  But, typically, your

2    employer doesn't fire you when you disagree, and you come in

3    and you say, I am really perplexed here because I'm working

4    twice as hard as the guy in the office next to me, I'm getting

5    paid half of what he's getting paid, and I've got to think it's

6    because I'm a woman.  Turns out, that's not the employer's

7    perspective at all.

8            But that is a reasonable complaint that's being

9    raised.  It turns out the employer's reason for it is that the

10   other employee is extremely valuable for some reason that

11   you're not aware of it.  It still means that that's protected

12   activity, you can't fire the person for that.  It can't be just

13   that it turns out to be false.

14           It has to be unreasonable or -- I mean, I suppose

15   if -- I guess there's a question about where the employer acts

16   for reasons that turned out to be completely wrong but that are

17   nondiscriminatory and nonretaliatory.  You come into the office

18   and you say, I think that you're discriminating against me

19   because of my sex, and the employer is hard of hearing and

20   thinks you came in and said, "I think you're discriminating

21   against me because of the Mets."  And he says, "We're

22   completely a Red Sox law firm here; you're fired."  Maybe

23   that's actionable, but this is much grayer than that.

24           MS. CHASE:  But that's not what the testimony

25   describes, Your Honor.  What you're describing is a

1  hypothetical.

2          Mr. Brogan testified that what he understood was that

3  this was a complaint that the system was tailor-made to create

4  an environment that would support gender discrimination.  It's

5  his testimony that matters, not the hypotheticals and the

6  speculations.

7          In addition, the plaintiffs have themselves said this

8  was not a complaint about Julia's pay.  This was a single

9  unitary complaint challenging the leave policy.

10          Now, Your Honor, I do want to just reserve a few

11  minutes for rebuttal.  In light of that, I will pause there

12  unless you have anything else you want me to address.

13          THE COURT:  That's fine.  I appreciate that.

14          MS. CHASE:  Thank you.

15          THE COURT:  Shall we, then, hear from the plaintiffs.

16  And, Ms. Sheketoff, are you starting off?

17          MS. SHEKETOFF:  Yes, I am.  So just to be clear, do

18  we still have 30 minutes, then?

19          THE COURT:  I think it's going to be a little -- if

20  you can try and do it in 25 minutes, and then I'll give the

21  defendants a few minutes for rebuttal.

22          MS. SHEKETOFF:  We would want a chance for rebuttal

23  as well just because there are cross-motions.

24          THE COURT:  Then you can do 20.

25          MS. SHEKETOFF:  Okay.  Sorry.  I guess there's 36

1    minutes left.  I do want to make sure to save a few minutes to

2    discuss the pay claims because, even though those haven't come

3    up yet, I would like to address them.

4         Specifically, I just want to make sure to point the

5    Court to our sanctions brief, and these are filed in

6    conjunction with our other merits brief.  It was with the

7    parties' understanding that they would be read -- that they

8    would reference each other.

9         I just want to make sure that the Court is aware that

10   much of our discussion about my claims is in the sanctions

11   brief.

12        THE COURT:  I'm sorry.  But that's not -- I

13   apologize.  That's just not the way the system works.  You're

14   not exceeding the page limits by simply hoping that the Court

15   is going to read a brief on another topic or incorporating by

16   reference.

17        I will take a look at the brief, but it's -- and I

18   have looked at the brief.  But you can't just file a brief on a

19   different topic and say, well, we were assuming we got those

20   extra pages as well.

21        MS. SHEKETOFF:  Just to be clear, I don't mean to say

22   that we intended to get extra pages or that it was on a

23   different topic.  They're on the identical topic.  I mean, our

24   argument is that on the merits my claims are, obviously, not

25   sanctionable, have obvious merit, and should go to the jury.

1     And, again, the Court set the schedule at the same time.  It

2     was our understanding that the sanctions brief would reference

3     the merits brief and the merits brief would reference the

4     sanctions brief.  I can discuss the aspects of those briefs in

5     this argument.

6              I wanted to start -- I'm sorry.  I still am getting

7     terrible feedback.  Are you-all getting feedback?  Is anyone

8     else -- nobody is getting feedback.  Okay.

9              Well, I'll start with the parental leave policy.  I

10    wanted to talk about Jones Day's representation that it wasn't

11    the decision memo that Ms. Dressing sent.  It clearly was.

12    They made that clear in paragraphs 39, 40, 41, and 51 of their

13    statement of facts.

14             They say that Dressing recommended this policy

15    change; the managing partner adopted it based on Dressing's

16    recommendation.  And, you know, whether or not they discussed

17    the specific reason for the eight-week disability assumption,

18    what the managing partner was recommended to do; and what he

19    actually did was adopt a period of leave for men that was 4

20    weeks and for women that was 12 weeks.  And the reasons for

21    that are -- what they're now trying to say -- is through

22    Dressing.

23             I guess I also want to be clear, Dressing's --

24    they're now saying that Dressing did not communicate her

25    business rationale or any of this rationale to McCartan.  But

1     McCartan is the one who made the decision that men would get 4

2     weeks and women would get 12.

3                 There is no legal basis to conclude that

4     Ms. Dressing's secret, unexpressed rationale are relevant to

5     what McCartan said.  It is undisputed that he was the

6     decision-maker and that she did not say any of these things to

7     him.

8                 So to the extent that her rationale is relevant, it's

9     because Jones Day is making a claim that they were communicated

10    to her.  And to the extent that they're saying that, no --

11    sorry -- that they weren't communicated to McCartan, it is not

12    relevant.

13                As to the timing of the Jones Day waiver, it is an

14    at-issue waiver.  In *Kellogg Brown & Root*, the court explains

15    that you have an at-issue waiver when you make an argument that

16    your defense is based on the communications that you're

17    claiming are privileged.  Here, that's Dressing's memo.  Again,

18    to the extent Dressing's memo is relevant, it could only be --

19    sorry.  To the extent Dressing's motivations are relevant, it

20    could only be because they're expressed to McCartan and he

21    somehow agreed with them or adopted them or at least was aware

22    of them.

23                THE COURT:  Can I pause just for a second there.

24    Would you agree, though, that if the withheld materials don't

25    address the duration of the disability leave that there's just

1     not an issue here?

2             MS. SHEKETOFF:  No.  There's no way to address the

3     duration of the disability leave because Jones Day has

4     specifically represented that Dressing recommended a 12-week

5     period for women and a 4-week period for men.

6             THE COURT:  I'm sorry.  Just so -- I think, if I

7     understand you correctly, you're disagreeing with the premise.

8     You're saying that the representations to me that the withheld

9     materials do not discuss the duration is -- cannot be accurate.

10    There must -- it must be in there.

11            And that's one of the things, possibly, that I could

12    look at ex parte, if need be, and just figure out whether

13    they're telling the truth about that or not.

14            MS. CHASE:  Your Honor, I just want to clarify.  It

15    doesn't discuss the reason for the selection.

16            THE COURT:  Of the duration?

17            MS. CHASE:  Right.  So the duration is in there, but

18    there's no analysis of the reason.

19            THE COURT:  Is there a recommendation with respect to

20    the duration?

21            MS. CHASE:  There is a -- again, I'm a little careful

22    about privilege here, but there is a draft policy presented for

23    approval that has the weeks in it.

24            THE COURT:  I see.  Is there any reason not to just

25    produce the -- I mean, if he checked the box on that policy, is

1      there any reason not to produce that?

2                MS. CHASE:  For ex parte review?

3                THE COURT:  No.  In general.  If it's not the legal

4      analysis; it's just here's the policy, check the box; here's my

5      recommendation.

6                MS. CHASE:  Because there isn't a legal analysis

7      about how the Family Medical Leave Act works and how it should

8      be applied.

9                THE COURT:  Okay.  I'm sorry for interrupting.  Go

10     ahead, Ms. Sheketoff.

11               MS. SHEKETOFF:  But, again, there's no law at all.

12     Jones Day has pointed to no law whatsoever to support the idea

13     that somehow Dressing's unexpressed, supposedly benign

14     motivation for recommending this eight-week rule is relevant to

15     McCartan's reason for adopting it.  Again, it's undisputed that

16     Dressing is only the recommender, but, apparently, it's -- why

17     she recommended it is not in the memo, and so McCartan didn't

18     know it.

19               And there's plenty of evidence that we've outlined in

20     our brief about why McCartan did do it, including evidence that

21     there's sex stereotyping.  I mean, for example -- for one

22     thing, directly before they made this change, Jones Day was

23     offering 24 weeks of maternity leave to women and zero for men.

24     They'd been doing that for -- this was 1994.  That has been

25     illegal for 30 years under the Civil Rights Act of '64.

1    There's just no question that wasn't --

2              THE COURT:  I'm not sure that's -- I think you're

3    actually wrong about that in light of the *Gilbert* decision,

4    which may have been a poorly reasoned decision.  But under

5    *Gilbert*, I'm not sure that it was, in fact, illegal during that

6    30-year period of time, which is the reason you had the

7    Pregnancy Discrimination Act adopted.

8              MS. SHEKETOFF:  I don't think *Gilbert* says anything

9    to suggest it wasn't legal.  It was illegal, I think -- in

10   Newport News, it's clear that that's always been illegal to get

11   more caretaking leave.  It was 24 weeks of self-described

12   maternity leave.  There was nothing about disability.  *Gilbert*

13   is about whether pregnancy can be treated differently from

14   other disabilities.  It's not about whether men and women get

15   different caretaking leave.

16             But just to go back to the timing for a second, Jones

17   Day says we're too late in raising this.  That's just not true.

18   In *Kellogg Brown & Root* -- I can point to the specific page --

19   the D.C. Circuit makes clear that you -- you have an at-issue

20   waiver when you waive the argument.  There's no at-issue waiver

21   for a declaration or a deposition because you're not making an

22   argument through that.  So Jones Day first says it's at issue

23   by raising it in the summary judgment argument.

24             THE COURT:  I'm sorry, just to back up.  Didn't you

25   receive the declaration well in advance of the close of

1     discovery?

2           MS. SHEKETOFF:  We did.  We received it about two

3     months ago.  But my point is, under KBR at 796 F.3d 137, the

4     D.C. Circuit, you don't -- Jones Day did not commit an at-issue

5     waiver simply by providing a declaration.  They first make an

6     at-issue waiver when they make an argument based on privileged

7     communications, and they did that in their summary judgment

8     argument by saying that Dressing's motivations were relevant to

9     the firm's decision.  That puts at issue what she actually

10    recommended.

11          THE COURT:  You haven't actually served a discovery

12    request for that, saying there's a waiver and that you're

13    entitled to it in discovery.

14          MS. SHEKETOFF:  No.  We did.  We specifically asked

15    Jones Day for it.  I mean, I think I submitted it maybe by

16    email to the Court.  But, yes, we sought -- we did exactly what

17    you're supposed to do.  We asked for it.  We sought a

18    meet-and-confer, then we brought it to the -- we asked for a

19    conference, and then the Court asked us to address it in this

20    argument instead of a separate discovery conference.

21          But we would like to submit a brief written filing

22    about this just the way the Court would resolve a normal

23    discovery dispute if the Court -- I do want to just address a

24    couple of additional things.

25          One sort of factual dispute that was relevant at the

1    motion to dismiss stage and is extremely relevant to our

2    arguments is whether Jones Day, in fact, gives eight weeks of

3    leave to all women regardless of disability.  And the Court

4    said at the motion to dismiss stage that the short-term

5    disability policy statement, that it assumes an eight-week

6    disability is, sort of, subject to different interpretations.

7    And it could be a one-way ratchet where women get at least

8    eight weeks and possibly more, or maybe it's a two-way ratchet

9    and women could get less or more.

10           I just -- discovery has just made absolutely clear

11   that all women are entitled to 18 weeks of leave and men are

12   entitled to 10.  There is no restriction on that dependent on a

13   woman's disability.

14           I want to read a memo that Jones Day provided in

15   discovery which clearly answers this question.  So right after

16   Jones Day changed its policy in 1994 from granting all women 12

17   weeks of admitted, quote-unquote, maternity leave to 8 weeks

18   of, quote, medical leave, and 4 weeks of admitted family leave,

19   the HR director, who at the time was Dressing, sent out a memo

20   answering the question.

21           She says, "As under the prior policy, lawyers who go

22   out on maternity leave will receive 12 weeks of paid leave and

23   an additional 12 weeks of unpaid leave should they choose to

24   use it.  The difference in the new policy is the manner in

25   which the leave is tracked administratively.  So lawyers

1    considered to be on paid medical leave for the disability

2    portion of the maternity leave, because most doctors certify a

3    6- to 8-week period of disability in the event" --

4            THE COURT:  I'm sorry.  Slow down, please.

5            MS. SHEKETOFF:  "Because most doctors certify a 6- to

6    8-week period of disability in the event of an uncomplicated

7    pregnancy and delivery, the firm will assume that the

8    disability period is 8 weeks unless the lawyer notifies the

9    firm that the doctor has certified a longer period."  So it is

10   just extremely clear it's a one-way ratchet.

11           Sorry.  Just one second.  Okay.  The last thing I

12   want to address on the policy, that in 2014 Jones Day made

13   clear that it was giving all mothers 18 weeks of leave

14   and adoptive parents 18 weeks of leave because it considered

15   them to be primary caregivers, like mothers.

16           So they say specifically that they wanted to bring

17   our paid adoption leave in line with our maternity and

18   paternity leave policies.  That's 18 weeks paid and 16 weeks

19   paid for primary caregivers and 4 weeks paid for secondary

20   caregivers.  The rationale for the 18 weeks of adoption to near

21   the same time as birth is based on the primary caregiver's role

22   in bringing the child into the family.  Adoption leave should

23   be parallel to the maternity leave for the primary caregiver

24   because the functions are the same.

25           That's just another way of saying that primary

```
1   caregivers get 18 weeks.  Mothers -- biological mothers are
2   being -- primary caregivers and adoptive parents get to choose
3   whether they're the primary or secondary.  And biological
4   fathers are the one group that don't get to be primary
5   caregivers.
6                THE COURT:  You're going too fast.
7                MS. SHEKETOFF:  I'm sorry.  Do you want me to do that
8   whole thing again?
9                THE COURT:  No.  The court reporter can't get down
10  what you're saying because you're going too quickly.
11               MS. SHEKETOFF:  So biological mothers are deemed
12  primary caregivers, adoptive parents get to choose whether
13  they're primary caregivers or not.  Biological fathers are
14  deemed secondary caregivers.  That is another way of saying
15  that, but for biological fathers, they would have gotten 18
16  weeks of leave.  That is, unquestionably, sex discrimination.
17               I think the rest of our argument --
18               THE COURT:  So what is the relevance of -- what
19  someone may have thought in making a different decision in
20  2014, what is the relevance of that to what the actual
21  motivation was in 1994?
22               Is it your position that the motivation changed over
23  time or that it was the same people and, therefore, we can
24  infer that that must be what their motivation was?
25               It's quite possible that, for example, just the
```

1    people in 2014 misunderstood what happened in 1994.  They

2    weren't changing it.  What is the relevance of how they

3    understood it?  Maybe they misread it or misunderstood the

4    purpose, but does that say anything about what the actual

5    purpose is?

6         MS. SHEKETOFF:  To be clear, we're challenging Jones

7    Day's practice of giving eight more weeks of leave to men than

8    women [sic], and both theories are relevant.  Jones Day is the

9    firm.  It had a motivation in 1994 to give women more leave

10   based on sex and it also had a motivation in 2014 to give women

11   more leave based on sex.

12        Again, in 2014, it -- first of all, if you take a

13   look at that memo, it's 100 percent clear that at least in

14   2015 -- of course, the firm understands there's not really been

15   a change -- but that all women were given eight weeks.  It

16   wasn't about disability.  This is extremely clear in the memo.

17        Again, it also doesn't really matter what -- we're

18   challenging that they give more leave to women than to men.

19   The firm made clear its reasons for doing that in 2015 --

20   sorry, in 2014.  It doesn't matter that they first adopted the

21   label for some of those eight weeks in 1994.

22        THE COURT:  Well, I mean, it -- it does matter

23   because in 2014 they weren't deciding what the -- either

24   maternal leave or disability leave -- however you want to

25   characterize it -- what that period of time would be.  That was

1     something that was fixed.  They were deciding what an adoption

2     policy would be.

3           So unless you think that their motivation changed in

4     some respect, I don't quite get it.

5           MS. SHEKETOFF:  Mark would like to take over from

6     here because he'd also like to address the retaliation.  But

7     I'm going to let him answer that question as well.

8           THE COURT:  Just before you do that, I had one last

9     question for you.  If I conclude that there are disputed issues

10    of fact with respect to the rationale for adopting the

11    disability policy, do I have a trial on that?  And do I just

12    submit a question to a jury, or is that a question for the

13    Court?  Who decides and how is that question decided?

14          MS. SHEKETOFF:  I mean -- well, to begin, I think we

15    have two additional arguments that are, sort of, indisputably

16    questions of law about how it is undisputed that this is a

17    generalization.  It is undisputed that it is not the medical

18    practice to give all women eight weeks of leave.

19          So I think you don't even get to the question of

20    intent and motivation until you answer those first two

21    questions, and there would not be a jury trial on those.

22          THE COURT:  I understand that.  But my question for

23    you, though, is assume that I conclude that there is a disputed

24    issue of fact; is there a jury trial on that?  Is there a jury

25    trial right, and do I just submit some interrogatory to a jury

1    saying tell me whether the motivation was X or Y and then I

2    decide what to do with that?  What happens?

3              MS. SHEKETOFF:  I'm sorry.  You are finding that

4    there's an issue of fact on the first two arguments or simply

5    on the motivation?

6              THE COURT:  Let's say I disagree with you about your

7    prima facie argument and I think there's nothing facially wrong

8    and I conclude that, assuming that Jones Day's rationale is a

9    permissible rationale, the policy is consistent with the law,

10   but there's a disputed issue of fact with respect to whether

11   the stated rationale was, in fact, the actual rationale.

12             What do I do?

13             MS. SHEKETOFF:  Well, I guess I would say I don't

14   think that there is a disputed rationale.  I think it is clear

15   in 2015 that sex stereotypes are part of it.

16             I'm sorry.  Could I please hand the mic over to Mark

17   to -- he will answer your question.

18             THE COURT:  That's fine.

19             MS. SHEKETOFF:  Thanks.

20             MR. SAVIGNAC:  Can you hear me as I try to --

21             THE COURT:  Yes, we can hear you.  And it's about 11

22   minutes past 12:00 now.  So I'll give you ten minutes; then I'm

23   going to give Jones Day six or seven minutes; and then I'll

24   give you a couple minutes for final rebuttal if you stick to

25   the ten minutes.

1          MR. SAVIGNAC:  Okay.  Good.  Julia, help me with the

2    ten minutes.

3          So, ultimately, if you decide that this is legal

4    unless their rationale is somehow discriminatory and there's a

5    triable dispute about what their rationale is, I guess that

6    would go to a jury.

7          To go back to this relationship to that, the 2014

8    change, I believe that the facts there show beyond dispute that

9    there was a discriminatory rationale.  We just have to show a

10   motivating factor.  And the 2014 change, the different

11   decisions from what happened in 1994 -- and I'm not saying it

12   tells you what anyone was thinking in 1994.

13         But the memo of 2014 reflects that a decision was

14   made that parents who are primary caregivers should have their

15   leave extended to 18 weeks.  And what they meant by primary

16   caregivers was, of course, mothers, who they argue have some

17   disability; and also adoptive primary caregivers, who, as they

18   acknowledge, have no disability.

19         The rationale for treating them the same, clearly

20   stated in the memo, is that their situation is the same.  They

21   have the role of bringing the child into the home, and so we

22   should treat them the same even though only a birth mother

23   would ever have any disability.

24         And the memo is clear that their view is fathers are

25   secondary caregivers because in that situation it's the woman,

1    the mother who has brought the child into the home and is the

2    primary caregiver.  But for that, obviously, blatantly sexist

3    belief on their part that a birth father is inherently a

4    secondary caregiver and a birth mother inherently primary, they

5    would have given birth fathers the ability to have the same 18

6    weeks that they decided all primary caregivers should get,

7    whether they give birth or not.  And that's a factual matter,

8    but there's no genuine dispute, especially under a motivating

9    factor test, which is what applies there.

10           If there are no questions on that, I will move on

11   quickly to retaliation.  I think it's briefed extensively, so

12   I'll just try to address a few of the things that Ms. Chase

13   said.

14           We are not arguing that a jury can always discredit

15   testimony.  Even if there's no evidence on the other side, a

16   jury can just look into someone's eyes and decide they're a

17   liar.  There's tons of circumstantial evidence that would allow

18   a reasonable jury to find that these statements are lies.

19           For example, they say Mike Shumaker -- the reason

20   that he wouldn't allow partners I worked with do the employment

21   references was because he was -- even though he had me fired,

22   he really wanted to help me.  He just has an idiosyncratic view

23   that you're better off with fewer positive references than

24   more.  A jury could find that a lie because he had just fired

25   me and it's just, on its face, so implausible.

1          I think that we covered this in our reply brief.  It

2     is crystal clear that an employer's subjective faith belief,

3     even if it's a true good faith belief that protected activity

4     is unprotected, is not a defense.  That's what you said in

5     *Egei*.  We cite other cases that say that.  No case says

6     otherwise.

7          Jones Day's cited cases are about a completely

8     different situation where you're talking about, say, race

9     discrimination, and the employer says we had this, admittedly,

10    race neutral reason for firing you, and the worker says, well,

11    you were wrong about that reason.  And the Court says, well, so

12    what?  Even if they were wrong, it's a race neutral reason.

13    And you don't have a claim if someone fires you for a mistaken

14    but race neutral reason.

15         You do have a claim even if you assume they're in

16    good faith here.  You do have a claim when someone fires you

17    because of your protected activity, but they have the view that

18    it wasn't protected.  Probably most employers would have that

19    view.

20         None of these cases would get very far if it's a

21    sufficient defense for the employer to think, well, I just

22    thought she's not allowed to say that to me.

23         On the improper manner thing, I don't think this is

24    actually disputed.  The law is clear that -- there's legal

25    questions for the Court as to whether the manner is so improper

1    as to be unprotected by the law.  Generally, the manner of

2    opposition is, of course, part of the opposition and is

3    protected just as much as the content.  They're inseparable.

4            Only if you find that the manner is unprotected does

5    there become, potentially, a jury question as to whether the

6    determination was for the unprotected aspect for a protected

7    aspect.

8            So in this case, for example, you would have to find,

9    as a matter of law, that the email I sent is so terrible, so

10   poorly reasoned, whatever -- basically, that Title VII requires

11   that if a complaining worker is a lawyer, they provide more

12   legal analysis in emails; I mean, that's just ridiculous.  You

13   don't get to a jury on this unless the Court first finds --

14           THE COURT:  What is the standard that I use for doing

15   that?  If I have to decide, as a matter of law, whether your

16   email was sufficiently out of bounds that a jury could conclude

17   that the manner was improper, what is the standard?  I mean, I

18   know there are cases that apply it.  I don't really recall

19   seeing any articulation of a standard.

20           MR. SAVIGNAC:  Well, I think I articulate the

21   standard by saying the cases that find an improper manner are

22   cases where the worker was disrupting the workplace egregiously

23   enough that the business couldn't get its work done; where the

24   worker was, effectively, refusing to do their own job or doing

25   the opposite of it.  An HR person who is trying to get workers

1    to sue the company for discrimination or cases where the

2    opposition is something illegal; you know, if you're

3    threatening to kill someone, if you knocked all the items off

4    someone's shelf, I guess, those are situations where the manner

5    in not protected.

6            Beyond that, as I say in the reply, there's not a,

7    sort of, freewheeling rule that, you know, if the worker is a

8    mime, then it's improper for a mime to ever talk, so they have

9    to mime out their complaint and so on.

10           There's not a reason to say that a lawyer's complaint

11   needs to be written in a more lawyerly style than any other.

12           THE COURT:  What if the standard or the -- Jones

13   Day's -- what if a jury were to find that Jones Day is a law

14   firm that applies very high standards that are not

15   necessarily -- by that I don't mean high standards in terms of

16   the quality of your sentences in your memo, but high standards

17   and that -- high standards of integrity and professionalism.

18   And that if on a paying matter or a pro bono matter, you were

19   to have gone to an opposing party with an email like this,

20   Jones Day would have been deeply embarrassed by that and said

21   this is not the way we behave as lawyers.

22           Not only is it, sort of, offensive, but it is

23   threatening in a way in which -- in my -- take your Jones Day

24   average partner, 30 years of practice.  I cannot think of a

25   single occasion in which any Jones Day partner or associate

1    went to an opposing party and said, "Either settle this case or

2    we're going to the press and you're going to look horrible."

3    That's just not the way we do it.  People might draw that

4    conclusion when they read our draft complaint, but that is,

5    sort of, beneath our standards of professionalism.

6           Would that be sufficient?

7           MR. SAVIGNAC:  No.  I mean, first of all, that's

8    hypothetical.  No jury could find that.  There's no testimony

9    or evidence to the effect that I would have been fired if this

10    had nothing to do with challenging Jones Day.

11           THE COURT:  Well, there's a little bit.  I'm sorry.

12    Just to interrupt, there's a little bit on that, and I wanted

13    to get your point on this.  There is an earlier email that you

14    sent that said, "I object," and Jones Day didn't do a thing in

15    response to that.  And it was curt.  I don't think it was

16    inappropriate.  It was curt, to the point, and I object to

17    this.  And they didn't do a thing.

18           So I think that what they would say is that a jury

19    could, from the fact that Jones Day didn't do anything in

20    response to that and responded in the way it did to your later

21    email, is that it was not a matter of the substance of what you

22    were conveying, but the, sort of, level of professionalism as

23    they perceived it.

24           MR. SAVIGNAC:  Well, the two emails are equally curt.

25    But, Judge, what you just said doesn't really go to your point.

1    You're saying that there could be evidence that it wasn't

2    because of some aspect of the email.  That wouldn't be evidence

3    that suggests that Jones Day does have a practice of firing

4    people who do -- you know, draft a demand letter that in some

5    way is not good enough.

6         I want to get to my related points.  This is a

7    question for the Court, and unless the opposition is improper

8    as a matter of law, it is protected even if it would not meet

9    the employer's standards if it had been done, like, in the

10   course of the job.  The point here is to protect opposition.

11   The employer has an interest in running its business and not

12   being too disruptive in that.

13        You know, an employer of a mime does not have an

14   interest in saying, well, if I had ever heard that mime speak

15   in my presence outside of a complaint, then I would have fired

16   them.  Therefore, mimes uniquely are not allowed to speak when

17   they complain of discrimination.

18        It's the same for attorneys.  There's a substantive

19   protection, not merely to just upset the employer or not.  But

20   unless it is egregious in the ways -- and based on the lines

21   that the cases draw, which is discussed in the brief, it is

22   protected as a matter of law.

23        THE COURT:  That's what I'm trying to get at; the

24   line that the cases draw.  The cases reach conclusions, but I

25   just don't see much of a standard articulated that helps me in

1    figuring out where the line gets drawn other than the fact that

2    I can put cases in categories.

3            And maybe the answer is, that's all you can do,

4    Judge.

5            MR. SAVIGNAC:  I think it is all you can do.  But I

6    do think it's very helpful to put the cases in the categories

7    that I just said.

8            This is a written complaint for discrimination sent

9    to the appropriate person.  There is no case that remotely

10   suggests that it is improper manner to do that.  What's

11   improper, as in the D.C. Circuit case *Pendleton*, is going into

12   the manager's office uninvited with a bunch of people and

13   holding a press conference there that is disruptive, that

14   prevents the feeding of military disabled veterans at the

15   military hospital.

16           Right, right.  So, obviously, what's protected is

17   opposition.  That's the word.  *Crawford* defines the word

18   opposition with its natural definition.  This email is clearly

19   opposition.  It's clearly at the core of what you would expect

20   opposition to be.

21           So I'm not saying there are no limits.  But by using

22   the word opposition to tell you what is protected rather than

23   gently raising concerns, for example, it's, obviously, intended

24   to protect even some degree of hostility, adversity to the

25   employer.

1        Because, as you suggest, that's how employers are

2   going to view accusations of discrimination.  That's why we

3   have to have anti-retaliation laws.

4        THE COURT:  All right.  Well, thank you.  I'm going

5   to give Jones Day a chance for a brief rebuttal, and then I'll

6   give you a final word, Mr. Savignac.

7        MR. MOOPPAN:  Yes, Your Honor.  Two points on the

8   policy claim.

9        First, on this whole Dressing issue, just to clarify

10  the timing and the scope of what's going on, the Dressing

11  declaration was submitted two and a half months before the

12  close of discovery.  After we submitted that, they never raised

13  any objection.  They never said that that was a waiver of

14  privilege or anything like that until well after the close of

15  discovery.

16       The only argument they made this morning as to why

17  that's justified is they said we hadn't made an argument that

18  put anything at issue.

19       THE COURT:  Let me ask you to back up from that for a

20  second.  I think Ms. Sheketoff said to me that there's no

21  evidence of any communication, at least that's in the record,

22  of what Dressing communicated to Mr. McCartan.

23       And if Mr. McCartan was the decision-maker, how am I

24  in a position to know what the legitimate nondiscriminatory

25  rationale is if there's no record of anything that was actually

1    communicated to him and all we know is he made a decision?

2            MR. MOOPPAN:  I think, Your Honor, as I was saying

3    earlier, in a case where the actual decision-maker is dead, we

4    don't have evidence of what was in his mind.

5            THE COURT:  Right.

6            MR. MOOPPAN:  All we have is evidence of what the

7    person who recommended the policy to him, what she thought.

8    That is at least relevant evidence.

9            THE COURT:  It's relevant.  But -- I'm sorry to

10   interrupt you.  But she could at least come and testify or at

11   least submit a declaration saying I spoke to him or I put in my

12   memo, I told him that this is the rationale for it and he

13   agreed with it.  I mean, there's nothing -- there's nothing

14   there.

15           MR. MOOPPAN:  That's because it -- I assume it didn't

16   happen, right?  She -- as I was saying --

17           THE COURT:  So how do we know what the rationale was?

18   I mean, I can tell you what my rationale would have been and

19   what I would have done if I were in her shoes.

20           But it's completely irrelevant if there's some person

21   who made a recommendation and she had reasons for it -- maybe

22   her reasons were -- I mean, you see this just the opposite in

23   discrimination cases.  Sometimes the recommender might have a

24   discriminatory reason.

25           But if you don't know what was in the mind of the

1    decision-maker and if you don't know -- I mean --

2              MR. MOOPPAN:  That's my exact point.

3              THE COURT:  The Cat's Paw theory is different.  The

4    person is acting through the decision-maker to reach -- is

5    using the decision-maker, the innocent decision-maker, I want

6    to discriminate against you.  So I'm going to make a bad

7    reference to you, to the decision-maker, who is completely

8    innocent; and that person says, well, if he's so terrible, I

9    guess I should fire him.

10             That's different from this circumstance here.  I just

11   don't know what -- I mean, I'm really at a loss.  I just don't

12   know what Jones Day's rationale was.

13             MR. MOOPPAN:  I'll say two things about that, Your

14   Honor.  One is I do think it is relevant -- not dispositive,

15   but relevant evidence what the rationale was --

16             THE COURT:  Barely.

17             MR. MOOPPAN:  Even if barely.  The second point I'll

18   make is it's their burden of proof.

19             THE COURT:  I don't agree.

20             MR. MOOPPAN:  They have to show it's a discriminatory

21   policy, Your Honor.

22             THE COURT:  I do not agree.  I don't think you've

23   come forward -- I'm sorry.  I'm sympathetic, frankly, on the

24   law to you here, but I don't think you've come forward with a

25   legitimate nondiscriminatory rationale if you're not going to

1    tell me what was in the head of the decision-maker and you're

2    not going to show me what was disclosed in any way to the

3    decision-maker or any discussions or anything about it.

4         I just don't understand what the rationale of someone

5    else is if that person was not the decision-maker, why that has

6    a bearing, unless you can infer that that person did

7    communicate.  You're telling me there's no evidence that person

8    did communicate that rationale.

9         MR. MOOPPAN:  Your Honor, let me try this.  Imagine

10   there was no privilege issue here at all; there was no legal

11   privilege memo.  All there was, was the following:

12        The HR director in her HR capacity had a reason for a

13   recommendation, submitted it to him.  He said approved, and

14   then he drops dead.  It can't be the case they just win the

15   case.  That can't possibly be right.

16        Because -- it would be right if this was a facially

17   discriminatory policy and we had to somehow undermine what was

18   on its face.  But on its face, as Your Honor said earlier --

19   right? -- if the motive was what Dressing says, we win.  And if

20   there's no evidence, they should lose; not win.

21        It can't -- this privilege thing is a complete red

22   herring.  What you have before Your Honor is what -- can they

23   show that this policy is discriminatory, and they can't show

24   that.

25        THE COURT:  I think that maybe one of the things you

1    should think about is whether Jones Day would be prepared to

2    disclose these memos to me at least in camera ex parte so I can

3    at least satisfy myself that they don't speak to this question.

4           MR. MOOPPAN:  We'll talk about that, and we'll follow

5    up with you.  Just to clarify one factual thing about this,

6    which is we did submit the memo.  It's not like we didn't

7    submit the memo at all.  We submitted the cover part, and we

8    did redact the actual policy.

9           So the policy that was put -- recommended by her to

10   him they have.  They just don't have the legal stuff.  And as I

11   said before --

12          THE COURT:  I think you may be right.  If all you had

13   was the HR person made a recommendation, this was the HR

14   person's rationale, and someone simply checked the box and said

15   yes, I agree with the recommendation, I get your point.

16          But I need to satisfy myself, I think, that there

17   wasn't anything else going on there.

18          MR. MOOPPAN:  Fair enough.  And then the last point

19   I'll make just very quickly on the adoption point, I think Your

20   Honor understands that it's a different time.

21          But I will also point out, if you look at the

22   communications surrounding adoption -- this is Chase

23   Exhibit 9 -- none of -- neither Shumaker, nor DeLorme suggested

24   that the disability -- that eight weeks for women wasn't based

25   on disability.

1          The whole discussion was, well, because it's because

2     of disability, should the option -- adoptive parents be getting

3     it too?  And there's a discussion about that.  However that was

4     resolved, no one was saying, you know what, it's not really

5     about disability, so let's give it to them, too.

6          THE COURT:  One final question for you.  Do you agree

7     with Mr. Savignac that if I conclude that there is a disputed

8     question of material fact with respect to the rationale for

9     adopting the policy that I would have to have a jury trial on

10    that question?

11         MR. MOOPPAN:  Yeah.  It would be a standard case

12    of -- disputed fact about the motive for a decision, so yes.

13         THE COURT:  Okay.  Thank you.  If you can get back to

14    me maybe just within a week and at least let me know what

15    you're going to do.

16         MS. CHASE:  I can get that to you right now, Your

17    Honor.  We will give you the memo for in camera review.  And

18    the facts are exactly as just described; that the

19    recommendation was presented to Mr. McCartan, and he said

20    approved.  There's no other evidence.

21         If you put this to a jury, we will have no more

22    evidence for the jury than Your Honor has right now that's

23    undisputed in the record in front of you with respect to this

24    issue.

25         THE COURT:  Okay.  I appreciate that.  Thank you.

1              MS. CHASE:  Am I out of my time?

2              THE COURT:  You're out of your time.

3              MS. CHASE:  That's what I thought.  Thank you.

4              THE COURT:  I'm going to give Mr. Savignac one minute

5      to sum up.

6              MR. SAVIGNAC:  Okay.  I mean, trying to respond to

7      what I just said, first in 2014, my point is that a decision

8      was made that primary caretakers get 18 weeks, whether they're

9      disabled or not, and that birth fathers are not primary

10     caretakers.

11             You can decide this case based on that alone, and you

12     can decide it as a matter of law.  There's no genuine dispute

13     because that's what they say in their emails developing this.

14             If you look at the KBR page, it's quite clear that

15     you don't have an at-issue waiver until you make an argument.

16     So we couldn't have raised this any earlier than we did.  We

17     raised it a few weeks after we got their briefs that puts it at

18     issue.

19             You're right about the Cat's Paw thing.  There's

20     the -- the discriminatory person's actions means that the

21     employer discriminated.  Here, Dressing's purported rationales

22     have -- say nothing about what was in McCartan's mind.  He

23     wasn't even told those rationales, as they've conceded today.

24     It just shines no light on whether he had discriminatory

25     intent.

1            Now, the memo to him, everyone agrees, recommends the

2       eight-week policy that is at issue here.  Whether it talks

3       about the reasons for that or not is not really relevant to the

4       point that he's the decision-maker and what's in his mind is

5       what matters.

6            And we do have a prima facie case here.  They were

7       long discriminating, even if you're right it wasn't

8       discrimination until after the Pregnancy Discrimination Act in

9       '78, which I disagree with.  They were giving way more leave to

10      women than to men, and everyone agrees that the eight weeks

11      exceeds medical practice.  Dressing herself concedes that the

12      medical practice for certifying disability at the time would

13      have been six weeks for most births.

14           THE COURT:  All right.  Well, thank you.  I

15      appreciate --

16           MR. SAVIGNAC:  I'm sorry.  The whole purpose of

17      adopting this eight-week assumption was to set the leave for

18      fathers.  And they picked, sort of, the highest number they

19      thought they could get away with the results that the father

20      got the least leave.

21           It wasn't going to have any effect on mothers, who

22      would have gotten the same 12 weeks, whether it was 6 or 8 or

23      whatever.

24           MS. SHEKETOFF:  Your Honor, this is Julia.  Could I

25      have just one minute to address the page --

1          THE COURT:  You know, I am late for another

2     appointment at this point.  I'll give you -- if you can -- just

3     one or two sentences, I'll let you do it, but then I really

4     have to run because I'm late.

5          MS. SHEKETOFF:  I'll just say that my -- the thrust

6     of my claim and the best evidence that absolutely or

7     indisputably means the claims have to go to a jury is that they

8     lied about me.

9          These are not general, hard to [indiscernible] lies

10    like Julia, in general, could have shown more initiative.  They

11    are specific factual representations, like I did not do work on

12    the weekends; I refused to work on the weekends.  There were

13    multiple occasions when I refused to turn drafts around because

14    I was tied up with other things.

15          And there is, I would say, indisputable evidence in

16    the record that that's not true.  But at absolute best, a jury

17    could certainly find that that is not true.  Of course, these

18    are his representations in a context where accuracy is

19    important.

20          Of course, a jury could infer that he made these

21    representations deliberately knowing that they were false, and

22    there's other evidence in the record too.

23          I would just say in the plaintiffs' statement of

24    facts, we have extensively documented why these are lies and

25    all of the other evidence of his discriminatory intent.

1              THE COURT:  Okay.  Well, thank you all.  I appreciate

2      the argument.  I apologize, we got cut a little short here.

3              MS. CHASE:  Thank you, Your Honor.

4              (The hearing adjourned at 12:35 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4     above and foregoing constitutes a true and accurate transcript

5     of my stenographic notes and is a full, true and complete

6     transcript of the proceedings to the best of my ability.

7              Dated this 14th day of October, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'64** [1] - 32:25
**'78** [1] - 56:9

**/**

**/s** [1] - 59:9

**1**

**10** [2] - 2:22, 35:12
**100** [1] - 38:13
**11** [1] - 40:21
**11:20** [2] - 1:7, 3:9
**12** [7] - 1:6, 29:20, 30:2, 35:16, 35:22, 35:23, 56:22
**12-week** [2] - 14:10, 31:4
**12:00** [1] - 40:22
**12:30** [2] - 2:25, 3:1
**12:35** [1] - 58:4
**137** [1] - 34:3
**14th** [1] - 59:7
**15219** [1] - 15:21
**16** [1] - 36:18
**18** [10] - 35:11, 36:13, 36:14, 36:18, 36:20, 37:1, 37:15, 41:15, 42:5, 55:8
**19-2443** [1] - 2:3
**1984** [1] - 19:7
**1994** [9] - 14:8, 32:24, 35:16, 37:21, 38:1, 38:9, 38:21, 41:11, 41:12
**1:19-CV-2443** [1] - 1:3

**2**

**20** [2] - 2:23, 27:24
**20001** [3] - 1:16, 1:25, 59:11
**2014** [11] - 36:12, 37:20, 38:1, 38:10, 38:12, 38:20, 38:23, 41:7, 41:10, 41:13, 55:7
**2015** [3] - 38:14, 38:19, 40:15
**202-354-3246** [1] - 1:25
**2023** [2] - 1:6, 59:7
**2207** [1] - 1:13
**24** [2] - 32:23, 33:11
**25** [1] - 27:20

**3**

**30** [3] - 27:18, 32:25, 45:24
**30-year** [1] - 33:6
**3300** [1] - 1:18
**33131** [1] - 1:19
**333** [2] - 1:24, 59:11
**36** [1] - 27:25
**39** [1] - 29:12

**4**

**4** [4] - 29:19, 30:1, 35:18, 36:19
**4-week** [1] - 31:5
**40** [2] - 2:21, 29:12
**41** [1] - 29:12
**4500** [1] - 1:21

**5**

**500** [1] - 1:21
**51** [2] - 1:16, 29:12
**54** [1] - 19:8

**6**

**6** [3] - 36:3, 36:5, 56:22
**600** [1] - 1:18
**61801** [1] - 1:13
**6714** [2] - 1:24, 59:10

**7**

**796** [1] - 34:3

**8**

**8** [3] - 35:17, 36:8, 56:22
**8-week** [2] - 36:3, 36:6

**9**

**9** [1] - 53:23

**A**

**A.M** [1] - 1:7
**ability** [3] - 25:9, 42:5, 59:6
**absence** [1] - 19:2
**absolute** [3] - 17:22, 18:23, 57:16
**absolutely** [4] - 15:12, 19:8, 35:10, 57:6
**accept** [2] - 23:10, 24:24

**accuracy** [2] - 4:21, 57:18
**accurate** [2] - 31:9, 59:4
**accusations** [1] - 49:2
**accusing** [1] - 23:15
**acknowledge** [1] - 41:18
**act** [1] - 12:13
**Act** [10] - 4:17, 18:3, 18:9, 18:16, 18:18, 32:7, 32:25, 33:7, 56:8
**acting** [2] - 22:15, 51:4
**Action** [1] - 1:2
**actionable** [1] - 26:23
**actions** [1] - 55:20
**activity** [5] - 19:23, 21:1, 26:12, 43:3, 43:17
**acts** [1] - 26:15
**actual** [7] - 4:10, 9:11, 37:20, 38:4, 40:11, 50:3, 53:8
**add** [1] - 15:21
**addition** [1] - 27:7
**additional** [3] - 34:24, 35:23, 39:15
**address** [14] - 3:13, 16:4, 17:8, 18:5, 27:12, 28:3, 30:25, 31:2, 34:19, 34:23, 36:12, 39:6, 42:12, 56:25
**addressed** [3] - 9:16, 19:18, 21:5
**adjourned** [1] - 58:4
**adjust** [1] - 3:4
**administration** [1] - 19:12
**administrative** [1] - 19:12
**administratively** [1] - 35:25
**admissible** [2] - 6:2, 22:8
**admitted** [2] - 35:17, 35:18
**admittedly** [1] - 43:9
**adopt** [1] - 29:19
**adopted** [12] - 4:4, 8:22, 8:24, 9:4, 11:1, 11:2, 11:4, 25:21, 29:15, 30:21, 33:7, 38:20
**adopting** [6] - 5:4, 10:23, 32:15, 39:10, 54:9, 56:17
**adoption** [6] - 36:17,

36:20, 36:22, 39:1, 53:19, 53:22
**adoptive** [5] - 36:14, 37:2, 37:12, 41:17, 54:2
**adopts** [1] - 8:7
**advance** [1] - 33:25
**adversity** [1] - 48:24
**advice** [1] - 12:9
**agency** [1] - 19:4
**ago** [1] - 34:3
**agree** [11] - 11:18, 14:22, 14:23, 22:6, 23:2, 25:5, 30:24, 51:19, 51:22, 53:15, 54:6
**agreed** [2] - 30:21, 50:13
**agrees** [2] - 56:1, 56:10
**ahead** [3] - 2:13, 20:22, 32:10
**al** [2] - 1:6, 2:4
**alarm** [1] - 11:14
**allow** [3] - 7:15, 42:17, 42:20
**allowed** [2] - 43:22, 47:16
**allows** [1] - 7:10
**alone** [1] - 55:11
**ample** [1] - 8:3
**amply** [1] - 18:7
**analysis** [9] - 14:13, 14:14, 19:8, 19:14, 23:3, 31:18, 32:4, 32:6, 44:12
**Anderson** [2] - 2:17, 16:19
**ANDERSON** [1] - 1:20
**answer** [5] - 4:18, 39:7, 39:20, 40:17, 48:3
**answering** [1] - 35:20
**answers** [1] - 35:15
**anti** [2] - 12:8, 49:3
**anti-discrimination** [1] - 12:8
**anti-retaliation** [1] - 49:3
**apologies** [1] - 15:14
**apologize** [1] - 14:4, 28:13, 58:2
**applied** [2] - 19:1, 32:8
**applies** [2] - 42:9, 45:14
**apply** [2] - 19:21, 44:18
**appointment** [1] - 57:2

**appreciate** [6] - 3:5, 16:12, 27:13, 54:25, 56:15, 58:1
**approach** [1] - 16:19
**appropriate** [2] - 18:15, 48:9
**approval** [1] - 31:23
**approved** [5] - 5:7, 52:13, 54:20
**area** [1] - 18:6
**argue** [5] - 3:25, 4:8, 9:13, 9:21, 41:16
**arguing** [3] - 2:16, 18:3, 42:14
**argument** [21] - 2:19, 5:2, 7:4, 9:19, 24:8, 24:9, 28:24, 29:5, 30:15, 33:20, 33:22, 33:23, 34:6, 34:8, 34:20, 37:17, 40:7, 49:16, 49:17, 55:15, 58:2
**arguments** [5] - 15:22, 18:5, 35:2, 39:15, 40:4
**arrogant** [2] - 22:16, 22:25
**articulate** [1] - 44:20
**articulated** [1] - 47:25
**articulation** [1] - 44:19
**aspect** [3] - 44:6, 44:7, 47:2
**aspects** [2] - 25:18, 29:4
**assert** [3] - 17:14, 18:9, 19:19
**asserting** [1] - 24:19
**associate** [1] - 45:25
**associates** [1] - 3:17
**assume** [6] - 7:6, 21:20, 36:7, 39:23, 43:15, 50:15
**assumes** [2] - 3:17, 35:5
**assuming** [2] - 28:19, 40:8
**assumption** [15] - 3:20, 3:25, 4:5, 4:9, 4:21, 6:21, 8:8, 8:12, 8:13, 10:24, 13:21, 14:19, 15:10, 29:17, 56:17
**assumptions** [1] - 6:9
**at-issue** [7] - 30:14, 30:15, 33:19, 33:20, 34:4, 34:6, 55:15
**attention** [1] - 23:22
**attorney** [3] - 12:7, 21:11, 22:17
**attorney-client** [1] -

12:7
**attorneys** [1] - 47:18
**authored** [1] - 6:10
**Avenue** [4] - 1:16, 1:18, 1:24, 59:11
**average** [1] - 45:24
**avoiding** [1] - 4:7
**aware** [4] - 16:18, 26:11, 28:9, 30:21

**B**

**bad** [3] - 21:25, 22:1, 51:6
**Bailey** [1] - 2:17
**BAILY** [1] - 1:20
**ban** [1] - 4:12
**Bank** [1] - 1:21
**barely** [2] - 51:16, 51:17
**Barnes** [5] - 20:19, 20:25, 24:12, 24:13, 25:15
**based** [13] - 2:21, 4:12, 8:14, 20:9, 29:15, 30:16, 34:6, 36:21, 38:10, 38:11, 47:20, 53:24, 55:11
**basic** [1] - 10:13
**basis** [13] - 4:3, 4:11, 5:12, 8:5, 8:12, 8:15, 12:17, 17:16, 18:1, 18:10, 20:13, 23:6, 30:3
**bear** [1] - 7:8
**bearing** [1] - 52:6
**become** [1] - 44:5
**BEFORE** [1] - 1:9
**begin** [1] - 39:14
**behalf** [1] - 2:12
**behave** [3] - 24:7, 24:23, 45:21
**behavior** [5] - 22:14, 22:17, 23:1, 24:23, 25:2
**behind** [1] - 6:1
**belief** [4] - 19:17, 42:3, 43:2, 43:3
**below** [1] - 21:10
**beneath** [2] - 24:2, 46:5
**benign** [1] - 32:13
**best** [4] - 13:15, 57:6, 57:16, 59:6
**Beth** [1] - 17:3
**better** [2] - 24:4, 42:23
**between** [4] - 2:19, 3:10, 19:15, 25:9
**beyond** [3] - 25:12, 41:8, 45:6

**billington** [1] - 18:12
**biological** [5] - 37:1, 37:3, 37:11, 37:13, 37:15
**birth** [13] - 3:17, 3:21, 4:2, 4:10, 24:19, 36:21, 41:22, 42:3, 42:4, 42:5, 42:7, 55:9
**births** [1] - 56:13
**bit** [3] - 4:25, 46:11, 46:12
**black** [1] - 25:21
**blatantly** [1] - 42:2
**bono** [2] - 24:3, 45:18
**bounds** [1] - 44:16
**box** [4] - 25:21, 31:25, 32:4, 53:14
**Brady** [2] - 7:1, 19:22
**break** [1] - 14:9
**Brickell** [1] - 17:8
**brief** [19] - 21:19, 21:25, 23:2, 28:5, 28:6, 28:11, 28:15, 28:17, 28:18, 29:2, 29:3, 29:4, 32:20, 34:21, 43:1, 47:21, 49:5
**briefed** [1] - 42:11
**briefing** [2] - 16:16, 20:11
**briefs** [3] - 15:21, 29:4, 55:17
**bring** [1] - 36:16
**bringing** [2] - 36:22, 41:21
**bristle** [1] - 23:18
**Brogan** [4] - 21:9, 23:8, 24:15, 27:2
**Brogan's** [5] - 21:6, 22:5, 22:9, 24:11, 25:2
**brought** [2] - 34:18, 42:1
**Brown** [2] - 30:14, 33:18
**bunch** [1] - 48:12
**burden** [21] - 6:1, 6:25, 7:1, 7:9, 7:14, 7:21, 7:23, 8:20, 9:1, 9:6, 9:7, 9:8, 9:9, 11:6, 11:10, 11:16, 12:20, 12:24, 22:7, 51:18
**burden-shifting** [1] - 9:7
**burdens** [1] - 16:13
**business** [15] - 5:22, 6:23, 10:1, 10:16, 10:18, 10:22, 10:23,

11:2, 12:2, 13:20, 14:22, 15:4, 29:25, 44:23, 47:11

**C**

**camera** [2] - 53:2, 54:17
**cannot** [7] - 12:12, 20:12, 20:15, 22:17, 24:23, 31:9, 45:24
**capacity** [1] - 52:12
**Capitol** [1] - 19:22
**careful** [1] - 31:21
**caregiver** [2] - 36:23, 42:2, 42:4
**caregiver's** [1] - 36:21
**caregivers** [14] - 36:15, 36:19, 36:20, 37:1, 37:2, 37:5, 37:12, 37:13, 37:14, 41:14, 41:16, 41:17, 41:25, 42:6
**caretakers** [2] - 55:8, 55:10
**caretaking** [2] - 33:11, 33:15
**carried** [1] - 11:10
**carry** [2] - 12:19, 12:24
**Case** [1] - 2:2
**case** [23] - 6:4, 7:1, 7:23, 10:9, 12:8, 12:13, 17:6, 19:7, 23:4, 23:5, 24:5, 43:5, 44:8, 46:1, 48:9, 48:11, 50:3, 52:14, 52:15, 54:11, 55:11, 56:6
**cases** [20] - 7:2, 10:12, 18:8, 18:12, 18:21, 19:24, 20:19, 43:5, 43:7, 43:20, 44:18, 44:21, 44:22, 45:1, 47:21, 47:24, 48:2, 48:6, 50:23
**Cat's** [2] - 51:3, 55:19
**categories** [2] - 48:2, 48:6
**Cell** [1] - 11:14
**Center** [1] - 1:21
**certainly** [9] - 6:5, 8:20, 12:19, 13:6, 14:25, 16:25, 18:7, 19:16, 57:17
**CERTIFICATE** [1] - 59:1
**certified** [2] - 3:18, 36:9
**certify** [3] - 36:2, 36:5,

59:3
**certifying** [1] - 56:12
**challenge** [1] - 17:23
**challenged** [1] - 6:21
**challenging** [4] - 27:9, 38:6, 38:18, 46:10
**chance** [2] - 27:22, 49:5
**change** [6] - 14:9, 29:15, 32:22, 38:15, 41:8, 41:10
**changed** [3] - 35:16, 37:22, 39:3
**changing** [1] - 38:2
**character** [1] - 24:24
**characterize** [1] - 38:25
**characterizes** [1] - 23:8
**charge** [2] - 5:6, 20:3
**CHASE** [21] - 1:17, 2:11, 2:15, 3:4, 16:2, 16:7, 20:24, 22:4, 24:9, 25:14, 26:24, 27:14, 31:14, 31:17, 31:21, 32:2, 32:6, 54:16, 55:1, 55:3, 58:3
**chase** [2] - 16:1, 42:12
**Chase** [2] - 2:12, 53:22
**check** [1] - 32:4
**checked** [2] - 31:25, 53:14
**child** [3] - 36:22, 41:21, 42:1
**childbirth** [1] - 15:6
**choose** [3] - 35:23, 37:2, 37:12
**chose** [2] - 17:17, 22:20
**Chris** [1] - 2:17
**CHRISTOPHER** [1] - 1:15
**Circuit** [6] - 11:12, 19:7, 21:3, 33:19, 34:4, 48:11
**circuit** [1] - 12:11
**circuits** [1] - 12:11
**circumstance** [1] - 51:10
**circumstances** [1] - 12:16
**circumstantial** [1] - 42:17
**citations** [1] - 12:12
**cite** [3] - 10:9, 19:24, 43:5
**cited** [2] - 22:23, 43:7
**Civil** [3] - 1:2, 2:2,

32:25
**claim** [18] - 3:14, 3:19, 3:24, 17:8, 17:9, 17:15, 17:16, 18:1, 20:5, 20:9, 20:13, 24:16, 30:9, 43:13, 43:15, 43:16, 49:8, 57:6
**claiming** [1] - 30:17
**claims** [9] - 2:21, 4:20, 16:10, 17:8, 20:15, 28:2, 28:10, 28:24, 57:7
**clarify** [3] - 31:14, 49:9, 53:5
**clause** [10] - 18:2, 18:4, 18:24, 19:1, 19:6, 19:9, 19:16, 19:21, 19:23, 20:6
**clear** [23] - 6:20, 11:12, 13:18, 14:4, 21:9, 27:17, 28:21, 29:12, 29:23, 33:10, 33:19, 35:10, 36:10, 36:13, 38:6, 38:13, 38:16, 38:19, 40:14, 41:24, 43:2, 43:24, 55:14
**clearly** [6] - 20:11, 29:11, 35:15, 41:19, 48:18, 48:19
**client** [2] - 12:7, 21:20
**clock** [1] - 3:9
**close** [5] - 9:20, 10:15, 33:25, 49:12, 49:14
**colleagues** [2] - 15:8, 22:25
**COLUMBIA** [1] - 1:1
**Combes** [1] - 1:13
**commit** [1] - 34:4
**committed** [1] - 24:1
**common** [1] - 4:20
**commonsense** [1] - 11:20
**communicate** [3] - 29:24, 52:7, 52:8
**communicated** [4] - 30:9, 30:11, 49:22, 50:1
**communication** [1] - 49:21
**communications** [3] - 30:16, 34:7, 53:22
**company** [1] - 45:1
**compensation** [3] - 24:20, 25:21, 25:24
**complain** [2] - 25:10, 47:17
**complaining** [1] - 44:11

**complaint** [9] - 26:8, 27:3, 27:8, 27:9, 45:9, 45:10, 46:4, 47:15, 48:8
**complaints** [5] - 18:10, 18:13, 18:20, 19:2, 19:21
**complete** [2] - 52:21, 59:5
**completely** [7] - 4:14, 10:7, 26:16, 26:22, 43:7, 50:20, 51:7
**concede** [1] - 17:25
**conceded** [1] - 55:23
**concededly** [2] - 3:21, 6:6
**concedes** [1] - 56:11
**concern** [1] - 14:17
**concerns** [1] - 48:23
**conclude** [9] - 7:10, 21:14, 22:14, 30:3, 39:9, 39:23, 40:8, 44:16, 54:7
**conclusion** [1] - 46:4
**conclusions** [1] - 47:24
**conclusory** [1] - 22:16
**condoned** [1] - 23:1
**conduct** [3] - 16:24, 24:11, 24:14
**conducted** [2] - 17:18, 20:17
**confer** [1] - 34:18
**conference** [3] - 34:19, 34:20, 48:13
**confirm** [3] - 15:8, 15:9, 16:3
**confirmed** [1] - 4:4
**conjunction** [1] - 28:6
**considered** [2] - 36:1, 36:14
**consistent** [1] - 40:9
**consistently** [3] - 16:11, 16:12, 16:14
**constitutes** [2] - 3:20, 59:4
**Constitution** [2] - 1:24, 59:11
**consulting** [1] - 13:11
**content** [1] - 44:3
**context** [2] - 18:11, 57:18
**contexts** [1] - 18:22
**continue** [1] - 15:15
**continued** [1] - 19:20
**contrary** [1] - 22:18
**conversely** [1] - 9:3
**conveying** [1] - 46:22
**core** [2] - 15:18, 48:19
**correct** [2] - 7:19,

15:13
**correctly** [1] - 31:7
**counsel** [3] - 2:5, 6:19, 24:4
**counterintuitive** [1] - 3:24
**country** [1] - 19:25
**couple** [4] - 4:22, 5:16, 15:17, 34:24, 40:24
**course** [8] - 9:1, 16:18, 38:14, 41:16, 44:2, 47:10, 57:17, 57:20
**COURT** [87] - 1:1, 2:13, 2:23, 3:5, 3:15, 4:22, 6:10, 6:13, 6:17, 6:24, 7:22, 8:6, 8:9, 8:18, 9:15, 10:5, 10:18, 11:4, 11:8, 11:16, 11:19, 12:15, 12:25, 13:2, 13:8, 13:23, 14:11, 15:2, 15:10, 15:14, 15:20, 16:1, 16:6, 20:21, 21:13, 23:7, 25:7, 25:18, 27:13, 27:15, 27:19, 27:24, 28:12, 30:23, 31:6, 31:16, 31:19, 31:24, 32:3, 32:9, 33:2, 33:24, 34:11, 36:4, 37:6, 37:9, 37:18, 38:22, 39:8, 39:22, 40:6, 40:18, 40:21, 44:14, 45:12, 46:11, 47:23, 49:4, 49:19, 50:5, 50:9, 50:17, 51:3, 51:16, 51:19, 51:22, 52:25, 53:12, 54:6, 54:13, 54:25, 55:2, 55:4, 56:14, 57:1, 58:1, 59:1
**Court** [30] - 1:23, 1:23, 3:12, 5:2, 11:20, 16:19, 17:21, 19:3, 19:7, 19:9, 20:7, 20:14, 21:3, 28:5, 28:9, 28:14, 29:1, 34:16, 34:19, 34:22, 34:23, 35:3, 39:13, 43:11, 43:25, 44:13, 47:7, 59:10
**court** [6] - 12:23, 17:21, 18:25, 19:25, 30:14, 37:9
**Courthouse** [1] - 1:24
**COURTROOM** [1] - 2:2
**courts** [4] - 12:10,

18:18, 19:18, 19:19
**cover** [2] - 15:20, 53:7
**coverage** [1] - 18:16
**covered** [1] - 43:1
**Crawford** [1] - 48:17
**CRC** [2] - 1:23, 59:9
**create** [1] - 27:3
**created** [1] - 24:20
**criminal** [1] - 24:1
**cross** [2] - 3:6, 27:23
**cross-motions** [2] - 3:6, 27:23
**crosses** [1] - 25:11
**CRR** [2] - 1:23, 59:9
**crystal** [1] - 43:2
**crystallized** [1] - 22:12
**curt** [3] - 46:15, 46:16, 46:24
**cut** [2] - 15:14, 58:2

# D

**D.C** [11] - 1:6, 1:25, 11:12, 18:2, 18:25, 19:7, 21:3, 33:19, 34:4, 48:11, 59:11
**Dated** [1] - 59:7
**DAY** [1] - 1:6
**Day's** [7] - 17:23, 29:10, 38:7, 40:8, 43:7, 45:13, 51:12
**DC** [1] - 1:16
**dead** [7] - 5:14, 5:25, 11:5, 11:23, 13:15, 50:3, 52:14
**decide** [7] - 21:14, 40:2, 41:3, 42:16, 44:15, 55:11, 55:12
**decided** [2] - 39:13, 42:6
**decides** [2] - 14:8, 39:13
**deciding** [2] - 38:23, 39:1
**decision** [52] - 5:8, 5:9, 5:12, 5:13, 5:14, 5:24, 7:11, 7:16, 9:11, 11:5, 11:22, 11:23, 12:1, 12:8, 12:17, 13:3, 13:9, 14:1, 14:2, 14:15, 20:19, 20:25, 21:8, 22:6, 22:13, 22:24, 23:5, 24:13, 25:15, 29:11, 30:1, 30:6, 33:3, 33:4, 34:9, 37:19, 41:13, 49:23, 50:1, 50:3, 51:1, 51:4, 51:5, 51:7, 52:1, 52:3, 52:5,

54:12, 55:7, 56:4
**decision-maker** [20] - 5:13, 5:24, 7:11, 9:11, 11:22, 12:1, 23:5, 30:6, 49:23, 50:3, 51:1, 51:4, 51:5, 51:7, 52:1, 52:3, 52:5, 56:4
**decisions** [2] - 20:4, 41:11
**declaration** [12] - 5:20, 5:21, 5:23, 9:19, 9:25, 10:14, 13:3, 33:21, 33:25, 34:5, 49:11, 50:11
**deemed** [2] - 25:16, 37:11, 37:14
**deeply** [1] - 45:20
**defeat** [2] - 16:13, 16:21
**defendant** [2] - 3:7, 16:23
**defendants** [2] - 2:12, 27:21
**Defendants** [2] - 1:7, 1:14
**defense** [3] - 30:16, 43:4, 43:21
**deficient** [1] - 23:2
**defines** [1] - 48:17
**definition** [1] - 48:18
**definitive** [1] - 5:3
**degree** [1] - 48:24
**deliberately** [1] - 57:21
**delivery** [1] - 36:7
**DeLorme** [1] - 53:23
**demand** [1] - 47:4
**demonstrate** [1] - 22:8
**demonstrates** [1] - 20:16
**dependent** [1] - 35:12
**depose** [2] - 17:4, 22:20
**deposition** [2] - 21:6, 33:21
**DEPUTY** [1] - 2:2
**described** [2] - 33:11, 54:18
**describes** [1] - 26:25
**describing** [1] - 26:25
**designed** [1] - 5:18
**desk** [1] - 23:22
**despite** [1] - 24:18
**determination** [2] - 5:3, 44:6
**developed** [1] - 10:6, 18:7, 18:8
**developing** [1] - 55:13
**development** [1] -

4:25
**difference** [1] - 35:24
**different** [13] - 13:22, 14:3, 25:18, 28:19, 28:23, 33:15, 35:6, 37:19, 41:10, 43:8, 51:3, 51:10, 53:20
**differently** [1] - 33:13
**difficult** [1] - 11:21
**DiPompeo** [2] - 1:15, 2:17
**directive** [1] - 2:21
**directly** [1] - 32:22
**director** [6] - 5:19, 6:5, 6:11, 6:19, 35:19, 52:12
**disabilities** [2] - 4:16, 33:14
**disability** [36] - 3:16, 3:19, 3:20, 3:22, 4:5, 4:11, 4:14, 4:15, 8:8, 8:12, 14:14, 15:5, 16:5, 29:17, 30:25, 31:3, 33:12, 35:3, 35:5, 35:6, 35:13, 36:1, 36:3, 36:6, 36:8, 38:16, 38:24, 39:11, 41:17, 41:18, 41:23, 53:24, 53:25, 54:2, 54:5, 56:12
**disabled** [2] - 48:14, 55:9
**disagree** [5] - 8:17, 26:1, 26:2, 40:6, 56:9
**disagreeing** [1] - 31:7
**disclose** [1] - 53:2
**disclosed** [2] - 5:23, 52:2
**disclosing** [1] - 10:2
**discovery** [18] - 4:4, 5:15, 8:3, 8:4, 9:20, 10:8, 10:15, 11:24, 16:25, 34:1, 34:11, 34:13, 34:20, 34:23, 35:10, 35:15, 49:12, 49:15
**discredit** [3] - 16:15, 17:3, 42:14
**discriminate** [2] - 8:5, 51:6
**discriminated** [2] - 25:24, 55:21
**discriminating** [3] - 26:18, 28:20, 56:7
**Discrimination** [3] - 4:17, 33:7, 56:8
**discrimination** [14] - 3:20, 4:12, 12:8, 23:15, 24:21, 27:4,

37:16, 43:9, 45:1,
47:17, 48:8, 49:2,
50:23, 56:8
**discriminatory** [15] -
6:2, 6:7, 8:3, 8:11,
12:14, 12:22, 41:4,
41:9, 50:24, 51:20,
52:17, 52:23, 55:20,
55:24, 57:25
**discuss** [4] - 28:2,
29:4, 31:9, 31:15
**discussed** [3] - 16:5,
29:16, 47:21
**discussion** [5] -
14:18, 21:21, 28:10,
54:1, 54:3
**discussions** [1] - 52:3
**dismiss** [5] - 7:22,
7:23, 8:1, 35:1, 35:4
**dispositive** [1] - 51:14
**dispute** [9] - 20:2,
20:6, 23:6, 34:23,
34:25, 41:5, 41:8,
42:8, 55:12
**disputed** [7] - 39:9,
39:23, 40:10, 40:14,
43:24, 54:7, 54:12
**disrupting** [1] - 44:22
**disruptive** [2] - 47:12,
48:13
**distinction** [1] - 19:15
**distributing** [1] - 3:10
**DISTRICT** [3] - 1:1,
1:1, 1:9
**district** [1] - 19:20
**District** [1] - 21:2
**dixit** [1] - 10:7
**doctor** [2] - 31:8, 36:9
**doctors** [3] - 4:6, 36:2,
36:5
**document** [1] - 13:16
**documented** [1] -
57:24
**documents** [6] - 6:15,
7:15, 9:15, 13:19,
14:18
**done** [7] - 8:2, 14:21,
17:21, 18:20, 44:23,
47:9, 50:19
**dooms** [1] - 17:7
**down** [2] - 36:4, 37:9
**draft** [5] - 23:2, 25:8,
31:22, 46:4, 47:4
**drafts** [1] - 57:13
**draw** [6] - 23:13,
23:14, 23:23, 46:3,
47:21, 47:24
**drawing** [1] - 25:9
**drawn** [2] - 23:23,
48:1

**dresser's** [1] - 5:10
**dressing** [2] - 29:11,
56:11
**Dressing** [5] - 5:19,
8:23, 10:22, 14:21,
17:3, 29:14, 29:22,
29:24, 31:4, 32:16,
35:19, 49:9, 49:10,
49:22, 52:19
**Dressing's** [11] - 9:13,
9:19, 12:18, 29:15,
29:23, 30:17, 30:18,
30:19, 32:13, 34:8,
55:21
**dressing's** [1] - 30:4
**drops** [1] - 52:14
**dumbest** [1] - 12:2
**duration** [6] - 30:25,
31:3, 31:9, 31:16,
31:17, 31:20
**during** [2] - 10:8, 33:5

## E

**easy** [1] - 23:23
**EEOC** [2] - 19:24, 20:3
**effect** [2] - 46:9, 56:21
**effectively** [1] - 44:24
**Egei** [1] - 43:5
**egregious** [1] - 47:20
**egregiously** [1] -
44:22
**eight** [23] - 3:19, 3:25,
4:5, 4:8, 5:4, 6:21,
10:24, 13:21, 14:19,
24:18, 29:17, 32:14,
35:2, 35:5, 35:8,
38:7, 38:15, 38:21,
39:18, 53:24, 56:2,
56:10, 56:17
**eight-week** [13] - 3:19,
3:25, 4:5, 4:8, 5:4,
6:21, 10:24, 13:21,
29:17, 32:14, 35:5,
56:2, 56:17
**either** [5] - 4:19, 7:19,
15:3, 19:3, 38:23
**Either** [1] - 46:1
**elsewhere** [1] - 17:13
**email** [14] - 17:22,
21:10, 21:19, 22:19,
22:23, 25:20, 34:16,
44:9, 44:16, 45:19,
46:13, 46:21, 47:2,
48:18
**emails** [3] - 44:12,
46:24, 55:13
**embarrassed** [1] -
45:20
**employee** [1] - 26:10

**employer** [15] - 12:13,
12:15, 19:10, 23:15,
26:1, 26:2, 26:15,
26:19, 43:9, 43:21,
47:11, 47:13, 47:19,
48:25, 55:21
**employer's** [4] - 26:6,
26:9, 43:2, 47:9
**employers** [7] - 19:2,
19:11, 19:13, 19:15,
23:16, 43:18, 49:1
**employment** [1] -
42:20
**entitled** [8] - 9:22,
21:15, 23:14, 24:18,
25:4, 34:13, 35:11,
35:12
**environment** [1] - 27:4
**EPA** [1] - 18:13
**Equal** [4] - 18:3, 18:9,
18:16, 18:18
**equally** [1] - 46:24
**erroneously** [1] -
18:19
**especially** [1] - 42:8
**establish** [1] - 20:12
**established** [1] -
18:21
**establishes** [2] - 21:9,
25:2
**et** [2] - 1:6, 2:4
**event** [2] - 36:3, 36:6
**evidence** [47] - 6:3,
6:5, 7:10, 8:2, 8:4,
8:13, 8:20, 8:21, 9:1,
9:11, 9:12, 9:14,
12:19, 13:6, 13:13,
14:24, 14:25, 15:1,
16:21, 16:22, 17:2,
17:7, 20:16, 22:8,
22:18, 32:19, 32:20,
42:15, 42:17, 46:9,
47:1, 47:2, 49:21,
50:4, 50:6, 50:8,
51:15, 52:7, 52:20,
54:20, 54:22, 57:6,
57:15, 57:22, 57:25
**evidentiary** [2] - 4:3,
16:13
**ex** [3] - 31:12, 32:2,
53:2
**exact** [2] - 24:12, 51:2
**exactly** [5] - 23:13,
24:12, 25:15, 34:16,
54:18
**example** [6] - 23:24,
32:21, 37:25, 42:19,
44:8, 48:23
**exceeding** [1] - 28:14
**exceeds** [1] - 56:11

**exhaustion** [1] - 19:12
**Exhibit** [1] - 53:23
**exist** [1] - 19:13
**expect** [1] - 48:19
**expedite** [1] - 2:14
**explains** [1] - 30:14
**expressed** [1] - 30:20
**extend** [3] - 18:10,
18:13, 19:9
**extended** [3] - 18:19,
19:6, 41:15
**extensively** [5] - 19:6,
22:10, 22:11, 42:11,
57:24
**extent** [5] - 25:5, 30:8,
30:10, 30:18, 30:19
**extortion** [1] - 24:1
**extortionate** [2] -
23:1, 23:25
**extra** [4] - 4:1, 24:18,
28:20, 28:22
**extremely** [4] - 26:10,
35:1, 36:10, 38:16
**eyes** [1] - 42:16

## F

**F.3d** [1] - 34:3
**face** [5] - 6:7, 8:5,
42:25, 52:18
**facially** [4] - 4:9, 8:11,
40:7, 52:16
**facie** [7] - 7:3, 7:5, 7:6,
7:20, 7:23, 40:7,
56:6
**fact** [22] - 7:11, 9:10,
18:11, 18:19, 19:18,
22:3, 22:5, 22:19,
24:1, 24:18, 25:24,
33:5, 35:2, 39:10,
39:24, 40:4, 40:10,
40:11, 46:19, 48:1,
54:8, 54:12
**factor** [2] - 41:10, 42:9
**facts** [7] - 14:7, 23:4,
23:5, 29:13, 41:8,
54:18, 57:24
**factual** [5] - 15:17,
34:25, 42:7, 53:5,
57:11
**fails** [1] - 17:15
**failure** [1] - 16:12
**fair** [2] - 21:20, 53:18
**fairly** [1] - 3:10
**faith** [5] - 17:16, 18:1,
43:2, 43:3, 43:16
**false** [9] - 24:11,
24:17, 24:22, 24:23,
25:1, 25:15, 25:17,
26:13, 57:21

**falsity** [1] - 25:19
**Family** [1] - 32:7
**family** [3] - 4:1, 35:18,
36:22
**far** [1] - 43:20
**Faruqui** [1] - 9:16
**fast** [1] - 37:6
**father** [2] - 42:3, 56:19
**fathers** [9] - 3:21, 4:2,
37:4, 37:13, 37:15,
41:24, 42:5, 55:9,
56:18
**favor** [1] - 23:11
**favorable** [1] - 23:17
**federal** [2] - 19:9,
19:11
**feedback** [3] - 29:7,
29:8
**feeding** [1] - 48:14
**fell** [1] - 21:10
**few** [5] - 27:10, 27:21,
28:1, 42:12, 55:17
**fewer** [1] - 42:23
**figure** [1] - 31:12
**figuring** [2] - 25:8,
48:1
**file** [1] - 28:18
**filed** [2] - 20:3, 28:5
**filing** [1] - 34:21
**final** [4] - 7:1, 40:24,
49:6, 54:6
**fine** [2] - 27:13, 40:18
**fire** [4] - 17:17, 26:2,
26:12, 51:9
**fired** [5] - 26:22,
42:21, 42:24, 46:9,
47:15
**fires** [2] - 43:13, 43:16
**firing** [2] - 43:10, 47:3
**firm** [14] - 3:17, 4:1,
4:4, 6:19, 13:12,
14:8, 17:17, 26:22,
36:7, 36:9, 38:9,
38:14, 38:19, 45:14
**firm's** [3] - 5:12, 34:9
**first** [17] - 3:6, 3:24,
7:19, 8:15, 8:16,
17:9, 18:9, 33:22,
34:5, 38:12, 38:20,
39:20, 40:4, 44:13,
46:7, 49:9, 55:7
**fixed** [1] - 39:1
**FL** [1] - 1:19
**flips** [1] - 9:9
**FMLA** [1] - 14:8
**focus** [2] - 17:12
**follow** [1] - 53:4
**following** [2] - 12:8,
52:11
**Footnote** [1] - 19:8

**FOR** [1] - 1:1
**foregoing** [1] - 59:4
**formal** [2] - 18:11, 18:17
**forth** [2] - 19:14, 19:16
**forward** [5] - 7:3, 12:16, 22:7, 51:23, 51:24
**framework** [1] - 9:7
**frankly** [2] - 5:1, 51:23
**freewheeling** [1] - 45:7
**front** [4] - 9:16, 19:3, 20:22, 54:23
**full** [2] - 16:24, 59:5
**functions** [1] - 36:24

## G

**gender** [2] - 23:18, 27:4
**general** [3] - 32:3, 57:9, 57:10
**generalization** [3] - 4:9, 15:19, 39:17
**generalizations** [1] - 6:8
**generalized** [1] - 18:14
**generally** [1] - 44:1
**gently** [1] - 48:23
**genuine** [2] - 42:8, 55:12
**Gilbert** [4] - 33:3, 33:5, 33:8, 33:12
**given** [4] - 20:9, 24:19, 38:15, 42:5
**governmental** [1] - 19:3
**grant** [1] - 23:10
**Grant** [1] - 1:21
**granting** [1] - 35:16
**grayer** [1] - 26:23
**greater** [2] - 21:21, 23:3
**group** [1] - 37:4
**guess** [7] - 26:15, 27:25, 29:23, 40:13, 41:5, 45:4, 51:9
**guy** [1] - 26:4

## H

**half** [4] - 9:20, 10:14, 26:5, 49:11
**hand** [1] - 40:16
**handled** [1] - 15:17
**happy** [6] - 4:18, 10:12, 10:21, 12:11, 15:24, 17:13

**hard** [6] - 2:25, 21:16, 23:13, 26:4, 26:19, 57:9
**Hashim** [2] - 2:16, 3:13
**HASHIM** [1] - 1:14
**head** [1] - 52:1
**hear** [3] - 27:15, 40:20, 40:21
**heard** [2] - 12:2, 47:14
**HEARING** [2] - 1:4, 1:8
**hearing** [2] - 26:19, 58:4
**Heifetz** [1] - 17:3
**held** [2] - 12:10, 18:12
**HELD** [1] - 1:9
**help** [2] - 41:1, 42:22
**helpful** [2] - 13:23, 48:6
**helps** [1] - 47:25
**hereby** [1] - 59:3
**herring** [1] - 52:22
**herself** [1] - 56:11
**Hi** [1] - 2:7
**high** [5] - 7:24, 45:14, 45:15, 45:16, 45:17
**highest** [1] - 56:18
**himself** [3] - 13:11, 17:18, 20:17
**hold** [1] - 19:20
**holding** [2] - 16:20, 48:13
**home** [2] - 41:21, 42:1
**honestly** [1] - 21:10
**Honor** [41] - 2:11, 2:15, 3:4, 3:14, 4:18, 5:17, 5:25, 8:7, 10:13, 10:21, 11:18, 12:6, 13:5, 13:13, 16:2, 16:7, 16:18, 17:9, 17:12, 18:8, 20:18, 20:24, 21:12, 22:4, 24:9, 25:5, 26:25, 27:10, 31:14, 49:7, 50:2, 51:14, 51:21, 52:9, 52:18, 52:22, 53:20, 54:17, 54:22, 56:24, 58:3
**Honor's** [1] - 2:21
**HONORABLE** [1] - 1:9
**hopefully** [1] - 3:3
**hoping** [1] - 28:14
**horrible** [2] - 24:6, 46:2
**hospital** [1] - 48:15
**host** [1] - 7:2
**hostility** [1] - 48:24
**HR** [10] - 5:19, 6:5, 6:10, 6:18, 35:19,

44:25, 52:12, 53:13
**Human** [2] - 18:2, 18:25
**HYBRID** [1] - 1:4
**hypothetical** [2] - 27:1, 46:8
**hypotheticals** [1] - 27:5

## I

**idea** [1] - 32:12
**identical** [1] - 28:23
**identified** [2] - 16:4, 20:23
**idiosyncratic** [1] - 42:22
**IL** [1] - 1:13
**illegal** [6] - 4:9, 32:25, 33:5, 33:9, 33:10, 45:2
**imagine** [3] - 8:23, 52:9
**immunity** [2] - 17:22, 18:23
**impermissible** [1] - 15:18
**implausible** [1] - 42:25
**important** [1] - 57:19
**impossible** [1] - 13:7
**impression** [1] - 13:24
**improper** [8] - 43:23, 43:25, 44:17, 44:21, 45:8, 47:7, 48:10, 48:11
**IN** [1] - 1:1
**inappropriate** [2] - 22:22, 46:16
**included** [1] - 4:23
**including** [1] - 32:20
**incorporating** [1] - 28:15
**independent** [1] - 17:15
**indicta** [1] - 19:8
**indiscernible** [1] - 57:9
**indisputable** [1] - 57:15
**indisputably** [2] - 39:15, 57:7
**individual** [1] - 22:19
**individuals** [1] - 17:3
**infer** [3] - 37:24, 52:6, 57:20
**informal** [2] - 18:13, 19:2
**inherent** [1] - 25:25
**inherently** [1] - 42:3,

42:4
**initial** [1] - 17:25
**initiative** [1] - 57:10
**innocent** [2] - 51:5, 51:8
**inseparable** [1] - 44:3
**instead** [2] - 21:21, 34:20
**instruct** [1] - 25:9
**instruction** [1] - 25:8
**insurers** [1] - 4:6
**integrity** [1] - 45:17
**intend** [2] - 2:18, 2:22
**intended** [2] - 28:22, 48:23
**intent** [4] - 6:1, 39:20, 55:25, 57:25
**intentionally** [1] - 24:20
**interest** [2] - 47:11, 47:14
**interested** [1] - 4:25
**internal** [3] - 18:20, 19:21, 25:16
**interpret** [1] - 17:21
**interpretations** [1] - 35:6
**interpreted** [1] - 24:17
**interrogatory** [1] - 39:25
**interrupt** [2] - 46:12, 50:10
**interrupting** [1] - 32:9
**introduce** [1] - 2:13
**invidious** [3] - 6:8, 8:14, 25:22
**invoked** [1] - 18:13
**ipse** [1] - 10:7
**irrelevant** [1] - 50:20
**issue** [27] - 4:20, 13:22, 14:17, 16:11, 19:19, 20:18, 24:12, 24:13, 30:14, 30:15, 31:1, 33:19, 33:20, 33:22, 34:4, 34:6, 34:9, 39:24, 40:4, 40:10, 49:9, 49:18, 52:10, 54:24, 55:15, 55:18, 56:2
**issues** [3] - 17:1, 20:9, 39:9
**items** [1] - 45:3

## J

**job** [2] - 44:24, 47:10
**JONES** [1] - 1:6
**Jones** [53] - 1:15, 1:18, 1:20, 2:3, 2:12, 3:7, 3:8, 3:12, 3:16,

5:8, 5:14, 13:8, 17:23, 21:11, 21:21, 22:17, 22:21, 22:25, 23:25, 24:7, 24:24, 25:20, 29:10, 30:9, 30:13, 31:3, 32:12, 32:22, 33:16, 33:22, 34:4, 34:15, 35:2, 35:14, 35:16, 36:12, 38:6, 38:8, 40:8, 40:23, 43:7, 45:12, 45:13, 45:20, 45:23, 45:25, 46:10, 46:14, 46:19, 47:3, 49:5, 51:12, 53:1
**Judge** [4] - 9:16, 18:12, 46:25, 48:4
**JUDGE** [2] - 1:9, 1:9
**judgment** [10] - 3:6, 3:24, 16:14, 16:22, 21:15, 21:17, 23:11, 25:5, 33:23, 34:7
**Julia** [6] - 2:3, 2:7, 25:23, 41:1, 56:24, 57:10
**JULIA** [2] - 1:2, 1:12
**Julia's** [1] - 27:8
**Julie** [1] - 5:19
**jump** [1] - 16:8
**jumping** [1] - 6:25
**jury** [34] - 16:15, 17:2, 21:14, 21:17, 21:24, 22:3, 22:6, 25:6, 25:7, 25:8, 25:9, 28:25, 39:12, 39:21, 39:24, 39:25, 41:6, 42:14, 42:16, 42:18, 42:24, 44:5, 44:13, 44:16, 45:13, 46:8, 46:18, 54:9, 54:21, 54:22, 57:7, 57:16, 57:20
**justified** [1] - 49:17

## K

**KBR** [2] - 34:3, 55:14
**Kellogg** [2] - 30:14, 33:18
**kill** [1] - 45:3
**kind** [1] - 16:8
**knock** [1] - 23:21
**knocked** [1] - 45:3
**knowing** [1] - 57:21
**knows** [1] - 5:25

## L

**label** [1] - 38:21
**lack** [1] - 17:16

**language** [1] - 18:15
**largely** [1] - 15:16
**last** [3] - 36:11, 39:8, 53:18
**late** [3] - 33:17, 57:1, 57:4
**laughed** [1] - 12:22
**Law** [1] - 18:25
**law** [22] - 4:11, 12:9, 12:11, 15:4, 17:21, 18:7, 23:19, 25:14, 26:22, 32:11, 32:12, 39:16, 40:9, 43:24, 44:1, 44:9, 44:15, 45:13, 47:8, 47:22, 51:24, 55:12
**laws** [1] - 49:3
**lawyer** [5] - 6:17, 24:24, 24:25, 36:8, 44:11
**lawyer's** [1] - 45:10
**lawyerly** [1] - 45:11
**lawyers** [4] - 24:4, 35:21, 35:25, 45:21
**leading** [1] - 22:13
**least** [17] - 6:14, 8:25, 11:10, 21:1, 21:24, 22:3, 30:21, 35:7, 38:13, 49:21, 50:8, 50:10, 50:11, 53:2, 53:3, 54:14, 56:20
**Leave** [1] - 32:7
**leave** [43] - 3:17, 4:1, 14:10, 15:5, 16:5, 27:9, 29:9, 29:19, 30:25, 31:3, 32:23, 33:11, 33:12, 33:15, 35:3, 35:11, 35:17, 35:18, 35:22, 35:23, 35:25, 36:1, 36:2, 36:13, 36:14, 36:17, 36:18, 36:22, 36:23, 37:16, 38:7, 38:9, 38:11, 38:18, 38:24, 39:18, 41:15, 56:9, 56:17, 56:20
**left** [2] - 17:6, 28:1
**legal** [19] - 6:22, 10:25, 11:1, 12:9, 13:20, 14:6, 14:13, 14:14, 21:18, 25:1, 30:3, 32:3, 32:6, 33:9, 41:3, 43:24, 44:12, 52:10, 53:10
**legality** [1] - 17:23
**legitimate** [5] - 7:7, 7:12, 11:11, 49:24, 51:25
**less** [2] - 23:17, 35:9
**letter** [1] - 47:4

**level** [3] - 23:12, 23:14, 46:22
**liar** [1] - 42:17
**liberty** [1] - 16:19
**lie** [1] - 42:24
**lied** [1] - 57:8
**lies** [3] - 42:18, 57:9, 57:24
**light** [3] - 27:11, 33:3, 55:24
**likely** [1] - 16:23, 23:2
**limits** [2] - 28:14, 48:21
**line** [5] - 25:9, 25:11, 36:17, 47:24, 48:1
**lines** [5] - 23:13, 23:22, 23:23, 47:20
**living** [1] - 5:7
**Lobby** [1] - 16:20
**logic** [1] - 4:11
**logistics** [1] - 2:18
**look** [10] - 17:2, 21:17, 24:6, 28:17, 31:12, 38:13, 42:16, 46:2, 53:21, 55:14
**looked** [1] - 28:18
**looking** [1] - 20:7
**lose** [2] - 7:12, 52:20
**loss** [1] - 51:11
**lost** [1] - 2:23
**Louisiana** [1] - 1:16
**lying** [1] - 22:15

**M**

**Magistrate** [1] - 9:16
**maker** [20] - 5:13, 5:24, 7:11, 9:11, 11:22, 12:1, 23:5, 30:6, 49:23, 50:3, 51:1, 51:4, 51:5, 51:7, 52:1, 52:3, 52:5, 56:4
**malicious** [7] - 24:12, 24:17, 24:22, 24:23, 25:1, 25:15, 25:17
**manager's** [1] - 48:12
**managing** [4] - 5:6, 21:22, 29:15, 29:18
**manner** [12] - 17:17, 20:17, 22:15, 35:24, 43:23, 43:25, 44:1, 44:4, 44:17, 44:21, 45:4, 48:10
**Mansfield** [1] - 18:12
**mark** [1] - 39:5
**MARK** [2] - 1:2, 1:12
**Mark** [6] - 2:3, 2:9, 23:25, 24:16, 40:16
**Mark's** [1] - 25:20

**Mason** [1] - 21:8
**material** [1] - 54:8
**materials** [3] - 15:3, 30:24, 31:9
**maternal** [1] - 38:24
**maternity** [8] - 14:10, 32:23, 33:12, 35:17, 35:22, 36:2, 36:17, 36:23
**matter** [19] - 2:24, 15:4, 17:25, 20:4, 24:3, 38:17, 38:20, 38:22, 42:7, 44:9, 44:15, 45:18, 46:21, 47:8, 47:22, 55:12, 56:5
**matters** [2] - 27:5, 56:5
**McCardle** [1] - 12:25
**McCartan** [15] - 5:25, 11:1, 13:1, 13:3, 14:23, 29:25, 30:1, 30:5, 30:11, 30:20, 32:17, 32:20, 49:22, 49:23, 54:19
**McCartan's** [2] - 32:15, 55:22
**McClure** [1] - 22:20
**McKenna** [2] - 19:6, 19:18
**mean** [23] - 6:24, 8:9, 11:19, 13:10, 16:15, 26:14, 28:21, 28:23, 31:25, 32:21, 34:15, 38:22, 39:14, 44:12, 44:17, 45:15, 46:7, 50:13, 50:18, 50:22, 51:1, 51:11, 55:6
**means** [5] - 9:12, 21:2, 26:11, 55:20, 57:7
**meant** [1] - 41:15
**measure** [1] - 14:14
**measuring** [1] - 4:13
**medical** [5] - 35:18, 36:1, 39:17, 56:11, 56:12
**Medical** [1] - 32:7
**meet** [2] - 34:18, 47:8
**meet-and-confer** [1] - 34:18
**Mellon** [1] - 1:21
**member** [1] - 22:22
**memo** [32] - 5:8, 5:9, 5:14, 6:10, 6:12, 9:23, 10:19, 11:5, 11:23, 12:4, 13:21, 13:25, 14:2, 29:11, 30:17, 30:18, 32:17, 35:14, 35:19, 38:13, 38:16, 41:13, 41:20, 41:24, 45:16, 50:12,

52:11, 53:6, 53:7, 54:17, 56:1
**memos** [5] - 10:4, 10:23, 14:16, 16:3, 53:2
**men** [10] - 8:25, 29:19, 30:1, 31:5, 32:23, 33:14, 35:11, 38:7, 38:18, 56:10
**merely** [1] - 47:19
**merit** [1] - 28:25
**merits** [4] - 28:6, 28:24, 29:3
**Mets** [1] - 26:21
**Miami** [1] - 1:19
**mic** [1] - 40:16
**might** [3] - 21:17, 46:3, 50:23
**Mike** [1] - 42:19
**military** [2] - 48:14, 48:15
**mime** [5] - 45:8, 45:9, 47:13, 47:14
**mimes** [1] - 47:16
**mind** [5] - 9:11, 50:4, 50:25, 55:22, 56:4
**minute** [2] - 55:4, 56:25
**minutes** [16] - 2:22, 2:23, 15:18, 27:11, 27:18, 27:20, 27:21, 28:1, 40:22, 40:23, 40:24, 40:25, 41:2
**misread** [1] - 38:3
**mistaken** [1] - 43:13
**misunderstood** [2] - 38:1, 38:3
**Monday** [2] - 21:23, 22:2
**months** [4] - 9:20, 10:14, 34:3, 49:11
**Mooppan** [3] - 2:16, 2:19, 3:13
**MOOPPAN** [41] - 1:14, 3:12, 3:16, 5:16, 6:12, 6:14, 6:18, 7:18, 7:25, 8:7, 8:11, 8:19, 8:19, 9:18, 10:12, 10:20, 10:20, 11:6, 11:15, 11:18, 12:6, 12:18, 13:1, 13:5, 13:13, 14:4, 14:12, 15:7, 15:12, 15:16, 15:24, 40:20, 49:7, 50:2, 50:6, 50:15, 51:2, 51:13, 51:17, 51:20, 52:9, 53:4, 53:18, 54:11
**morning** [2] - 2:11, 49:16
**MOSS** [1] - 1:9

**most** [8] - 8:25, 11:11, 23:16, 23:18, 36:2, 36:5, 43:18, 56:13
**mother** [4] - 41:22, 42:1, 42:4
**mother's** [1] - 4:10
**mothers** [8] - 4:2, 36:13, 36:15, 37:1, 37:11, 41:16, 56:21
**MOTION** [2] - 1:4, 1:8
**motion** [5] - 7:23, 8:1, 16:21, 35:1, 35:4
**motions** [2] - 3:6, 27:23
**motivating** [2] - 41:10, 42:8
**motivation** [11] - 5:4, 32:14, 37:21, 37:22, 37:24, 38:9, 38:10, 39:3, 39:20, 40:1, 40:5
**motivations** [2] - 30:19, 34:8
**motive** [2] - 52:19, 54:12
**movant** [1] - 3:7
**move** [1] - 42:10
**moved** [1] - 10:3
**MR** [49] - 2:9, 3:12, 3:16, 5:16, 6:12, 6:14, 6:18, 7:18, 7:25, 8:7, 8:11, 8:19, 9:18, 10:12, 10:20, 11:6, 11:15, 11:18, 12:6, 12:18, 13:1, 13:5, 13:13, 14:4, 14:12, 15:7, 15:12, 15:16, 15:24, 40:20, 41:1, 44:20, 46:7, 46:24, 48:5, 49:7, 50:2, 50:6, 50:15, 51:2, 51:13, 51:17, 51:20, 52:9, 53:4, 53:18, 54:11, 55:6, 56:16
**MS** [41] - 2:7, 2:11, 2:15, 3:4, 16:2, 16:7, 20:24, 22:4, 24:9, 25:14, 26:24, 27:14, 27:17, 27:22, 27:25, 28:21, 31:2, 31:14, 31:17, 31:21, 32:2, 32:6, 32:11, 33:8, 34:2, 34:14, 36:5, 37:7, 37:11, 38:6, 39:5, 39:14, 40:3, 40:13, 40:19, 54:16, 55:1, 55:3, 56:24, 57:5, 58:3
**multiple** [2] - 12:10,

57:13
**must** [5] - 13:8, 16:20, 31:10, 37:24

## N

**N.W** [1] - 59:11
**name** [1] - 2:5
**natural** [1] - 48:18
**near** [1] - 36:20
**necessarily** [2] - 18:6, 45:15
**need** [5] - 3:2, 16:13, 20:7, 31:12, 53:16
**needs** [1] - 45:11
**neutral** [5] - 6:7, 9:5, 43:10, 43:12, 43:14
**never** [3] - 9:17, 49:12, 49:13
**new** [2] - 25:14, 35:24
**Newport** [1] - 33:10
**News** [1] - 33:10
**next** [1] - 26:4
**nobody** [1] - 29:8
**nondiscriminatory** [8] - 7:8, 7:12, 9:14, 11:11, 11:22, 26:17, 49:24, 51:25
**none** [4] - 8:4, 14:19, 43:20, 53:23
**nonprivileged** [2] - 9:25, 13:16
**nonretaliatory** [1] - 26:17
**normal** [1] - 34:22
**noted** [2] - 16:7, 22:7
**notes** [1] - 59:5
**nothing** [6] - 33:12, 40:7, 46:10, 50:13, 55:22
**notified** [1] - 3:18
**notifies** [1] - 36:8
**number** [1] - 56:18
**NW** [2] - 1:16, 1:24

## O

**object** [2] - 46:14, 46:16
**objectable** [2] - 20:8, 20:12
**objection** [1] - 49:13
**objective** [1] - 18:22
**obvious** [1] - 28:25
**obviously** [4] - 28:24, 42:2, 48:16, 48:23
**occasion** [1] - 45:25
**occasions** [1] - 57:13
**October** [2] - 1:6, 59:7
**OF** [3] - 1:1, 1:8, 59:1

**offend** [2] - 25:10, 25:11
**offensive** [1] - 45:22
**offering** [1] - 32:23
**office** [4] - 23:16, 26:4, 26:17, 48:12
**Official** [2] - 1:23, 59:10
**OFFICIAL** [1] - 59:1
**often** [1] - 25:11
**One** [1] - 1:21
**one** [31] - 6:11, 11:9, 14:24, 16:9, 17:8, 17:19, 21:13, 21:15, 22:1, 22:21, 22:23, 24:3, 25:8, 25:11, 30:1, 31:11, 32:21, 34:25, 35:7, 36:10, 36:11, 37:4, 39:8, 51:14, 52:25, 53:5, 54:4, 54:6, 55:4, 56:25, 57:3
**one's** [1] - 25:9
**one-way** [2] - 35:7, 36:10
**open** [1] - 25:6
**opportunity** [1] - 16:24
**oppose** [1] - 26:1
**opposing** [3] - 24:4, 45:19, 46:1
**opposite** [4] - 8:23, 12:21, 44:25, 50:22
**opposition** [11] - 18:2, 44:2, 45:2, 47:7, 47:10, 48:17, 48:18, 48:19, 48:20, 48:22
**opted** [1] - 17:4
**option** [1] - 54:2
**order** [1] - 16:21
**original** [1] - 5:4
**originally** [1] - 25:21
**otherwise** [7] - 3:18, 4:19, 8:15, 20:20, 21:1, 24:13, 43:6
**outlined** [1] - 32:19
**outside** [2] - 18:11, 47:15
**override** [1] - 18:14
**own** [1] - 44:24

## P

**p.m** [1] - 58:4
**PA** [1] - 1:22
**page** [4] - 28:14, 33:18, 55:14, 56:25
**pages** [2] - 28:20, 28:22
**paid** [10] - 3:13, 3:16,

26:5, 35:22, 36:1, 36:17, 36:18, 36:19
**papers** [6] - 16:11, 16:14, 16:17, 17:14, 17:20, 24:10
**paperwork** [1] - 4:7
**paragraphs** [1] - 29:12
**parallel** [1] - 36:23
**parental** [1] - 29:9
**parents** [5] - 36:14, 37:2, 37:12, 41:14, 54:2
**part** [6] - 21:2, 24:9, 40:15, 42:3, 44:2, 53:7
**parte** [3] - 31:12, 32:2, 53:2
**participation** [10] - 18:4, 18:17, 18:24, 19:1, 19:5, 19:9, 19:16, 19:21, 19:23, 20:6
**particular** [1] - 13:21
**particularly** [1] - 5:2
**parties** [4] - 3:11, 5:1, 10:6, 10:7
**parties'** [3] - 3:6, 25:19, 28:7
**partner** [7] - 5:5, 5:6, 21:22, 29:15, 29:18, 45:24, 45:25
**partners** [1] - 42:20
**party** [2] - 45:19, 46:1
**passed** [1] - 14:8
**past** [4] - 7:20, 8:14, 8:16, 40:22
**pat** [1] - 5:25
**Pat** [1] - 14:23
**paternity** [1] - 36:18
**pause** [2] - 27:11, 30:23
**Paw** [2] - 51:3, 55:19
**pay** [3] - 24:18, 27:8, 28:2
**Pay** [4] - 18:3, 18:9, 18:16, 18:18
**paying** [2] - 24:3, 45:18
**Pendleton** [2] - 21:3, 48:11
**people** [6] - 23:18, 37:23, 38:1, 46:3, 47:4, 48:12
**perceived** [1] - 46:23
**percent** [1] - 38:13
**perception** [1] - 24:14
**perfect** [1] - 4:13
**perfectly** [3] - 4:10, 6:9, 9:5
**period** [15] - 3:19,

4:10, 8:8, 14:15, 15:5, 16:5, 29:19, 31:5, 33:6, 36:3, 36:6, 36:8, 36:9, 38:25
**permeates** [1] - 16:10
**permissible** [2] - 6:9, 40:9
**perplexed** [1] - 26:3
**person** [12] - 22:1, 26:12, 44:25, 48:9, 50:7, 50:20, 51:4, 51:8, 52:5, 52:6, 52:7, 53:13
**person's** [3] - 23:22, 53:14, 55:20
**perspective** [2] - 11:20, 26:7
**persuasion** [1] - 9:8
**phone** [1] - 11:14
**pick** [1] - 2:20
**picked** [1] - 56:18
**piece** [1] - 15:17
**Pittsburgh** [1] - 1:22
**plain** [1] - 18:14
**plaintiff** [6] - 2:8, 2:10, 6:25, 7:3, 16:20, 16:24
**Plaintiffs** [2] - 1:4, 1:12
**plaintiffs** [18] - 2:6, 3:19, 3:25, 4:8, 10:10, 11:21, 13:25, 17:4, 17:20, 17:25, 21:14, 22:7, 23:9, 23:11, 24:15, 27:7, 27:15
**plaintiffs'** [5] - 3:23, 5:2, 7:17, 16:12, 57:23
**plausible** [1] - 8:1
**play** [1] - 20:6
**plenty** [1] - 32:19
**point** [25] - 7:13, 7:14, 9:21, 10:13, 15:16, 16:9, 19:22, 20:18, 23:7, 28:4, 33:18, 34:3, 46:13, 46:16, 46:25, 47:10, 51:2, 51:17, 53:15, 53:18, 53:19, 53:21, 55:7, 56:4, 57:2
**pointed** [1] - 32:12
**pointing** [1] - 20:25
**points** [5] - 5:16, 17:11, 22:13, 47:6, 49:7
**Police** [1] - 19:22
**policies** [3] - 14:9, 17:24, 36:18

**policy** [36] - 3:14, 5:5, 5:7, 5:18, 5:21, 6:2, 6:6, 6:21, 8:4, 8:21, 8:24, 11:1, 14:20, 27:9, 29:9, 29:14, 31:22, 31:25, 32:4, 35:5, 35:16, 35:21, 35:24, 36:12, 39:2, 39:11, 40:9, 49:8, 50:7, 51:21, 52:17, 52:23, 53:8, 53:9, 54:9, 56:2
**poorly** [2] - 33:4, 44:10
**portion** [1] - 36:2
**position** [7] - 5:3, 8:9, 8:10, 11:21, 19:5, 37:22, 49:24
**positions** [1] - 25:19
**positive** [1] - 42:23
**possession** [1] - 16:23
**possible** [2] - 14:23, 37:25
**possibly** [4] - 9:13, 31:11, 35:8, 52:15
**postpartum** [4] - 3:19, 3:22, 4:13, 4:15
**potentially** [1] - 44:5
**practice** [7] - 4:15, 38:7, 39:18, 45:24, 47:3, 56:11, 56:12
**practices** [2] - 4:5, 15:4
**precedent** [1] - 11:12
**precise** [1] - 14:17
**precision** [1] - 4:13
**pregnancy** [2] - 33:13, 36:7
**Pregnancy** [3] - 4:16, 33:7, 56:8
**premise** [1] - 31:7
**prepared** [2] - 7:9, 53:1
**presence** [1] - 47:15
**present** [1] - 16:20
**presentation** [1] - 3:1
**presented** [3] - 18:8, 31:22, 54:19
**press** [3] - 24:6, 46:2, 48:13
**pretextual** [1] - 3:25
**pretty** [4] - 11:12, 11:21, 15:20, 16:10
**prevents** [1] - 48:14
**prima** [7] - 7:3, 7:4, 7:6, 7:20, 7:23, 40:7, 56:6
**primary** [18] - 36:15, 36:19, 36:21, 36:23,

36:25, 37:2, 37:3,
37:4, 37:12, 37:13,
41:14, 41:15, 41:17,
42:2, 42:4, 42:6,
55:8, 55:9
**privacy** [1] - 4:6
**private** [3] - 19:2,
19:13, 19:15
**privilege** [11] - 9:22,
10:2, 10:3, 10:21,
12:7, 13:18, 31:22,
49:14, 52:10, 52:11,
52:21
**privileged** [9] - 5:22,
6:12, 6:15, 9:21,
10:16, 13:19, 16:4,
30:17, 34:6
**pro** [4] - 1:12, 2:7,
24:3, 45:18
**problem** [4] - 7:16,
9:18, 11:7, 11:9
**PROCEEDING** [1] -
1:4
**proceedings** [5] -
18:11, 18:17, 19:3,
19:24, 59:6
**process** [2] - 7:13,
21:21
**produce** [2] - 31:25,
32:1
**produced** [1] - 9:20
**production** [5] - 8:20,
9:7, 11:10, 12:20,
12:24
**professional** [2] -
21:11, 24:2
**professionalism** [3] -
45:17, 46:5, 46:22
**proof** [4] - 6:1, 9:2,
11:6, 51:18
**proper** [1] - 21:2
**properly** [1] - 16:21
**proposition** [1] -
10:10
**protect** [2] - 47:10,
48:24
**protected** [13] - 21:1,
24:14, 26:11, 43:3,
43:17, 43:18, 44:3,
44:6, 45:5, 47:8,
47:22, 48:16, 48:22
**protection** [1] - 47:19
**protects** [2] - 19:23,
23:19
**prove** [2] - 6:4, 9:10
**provide** [5] - 4:2,
10:12, 11:24, 12:12,
44:11
**provided** [3] - 5:14,
12:4, 35:14

**provides** [4] - 3:13,
3:16, 18:16, 25:12
**providing** [1] - 34:5
**provisions** [1] - 18:20
**public** [1] - 19:15
**purported** [1] - 55:21
**purpose** [4] - 18:14,
38:4, 38:5, 56:16
**purposes** [1] - 25:22
**put** [6] - 48:2, 48:6,
49:18, 50:11, 53:9,
54:21
**puts** [2] - 34:9, 55:17
**putting** [1] - 11:20

## Q

**quality** [3] - 21:18,
21:25, 45:16
**questions** [8] - 4:18,
4:22, 22:4, 23:9,
39:16, 39:21, 42:10,
43:25
**quickly** [3] - 37:10,
42:11, 53:19
**quite** [6] - 20:11, 21:8,
23:12, 37:25, 39:4,
55:14
**quote** [2] - 35:17,
35:18
**quote-unquote** [1] -
35:17

## R

**race** [5] - 23:18, 43:8,
43:10, 43:12, 43:14
**raise** [1] - 10:8
**raised** [6] - 9:17,
17:23, 26:9, 49:12,
55:16, 55:17
**raising** [3] - 33:17,
33:23, 48:23
**ran** [1] - 2:24
**RANDOLPH** [1] - 1:9
**ratchet** [3] - 35:7,
35:8, 36:10
**rather** [2] - 13:9, 48:22
**rationale** [29] - 22:10,
23:8, 25:12, 29:25,
30:4, 30:8, 36:20,
39:10, 40:8, 40:9,
40:11, 40:14, 41:4,
41:5, 41:9, 41:19,
49:25, 50:12, 50:17,
50:18, 51:12, 51:15,
51:25, 52:4, 52:8,
53:14, 54:8
**rationales** [3] - 23:10,
55:21, 55:23

**reach** [3] - 18:10,
47:24, 51:4
**read** [6] - 10:17,
25:20, 28:7, 28:15,
35:14, 46:4
**real** [1] - 20:5
**really** [16] - 7:7, 11:20,
16:10, 18:3, 20:5,
20:7, 26:3, 38:14,
38:17, 42:22, 44:18,
46:25, 51:11, 54:4,
56:3, 57:3
**reason** [29] - 7:8, 7:12,
8:3, 8:21, 8:22, 9:14,
10:14, 11:11, 12:3,
12:4, 12:14, 14:21,
26:9, 26:10, 29:17,
31:15, 31:18, 31:24,
32:1, 32:15, 33:6,
42:19, 43:10, 43:11,
43:12, 43:14, 45:10,
50:24, 52:12
**reasonable** [7] -
17:16, 18:1, 20:13,
21:17, 21:24, 26:8,
42:18
**reasonableness** [2] -
18:22, 20:9
**reasonably** [4] - 21:7,
21:9, 21:10, 24:16
**reasoned** [2] - 33:4,
44:10
**reasoning** [2] - 21:19,
22:5
**reasons** [38] - 5:21,
5:22, 6:6, 6:9, 6:20,
6:22, 6:23, 8:14, 9:5,
10:1, 10:2, 10:16,
10:18, 10:22, 10:23,
11:1, 11:2, 11:22,
12:2, 12:22, 13:16,
13:20, 14:22, 17:15,
20:23, 21:5, 22:11,
22:12, 22:23, 26:16,
29:20, 38:19, 50:21,
50:22, 56:3
**rebuttal** [6] - 15:9,
27:11, 27:21, 27:22,
40:24, 49:5
**receive** [2] - 33:25,
35:22
**received** [1] - 34:2
**recent** [1] - 11:12
**recognized** [1] - 19:23
**recommendation** [9] -
13:10, 29:16, 31:19,
32:5, 50:21, 52:13,
53:13, 53:15, 54:19
**recommended** [16] -
5:19, 6:4, 6:6, 8:21,

12:22, 13:4, 13:5,
13:7, 14:25, 29:14,
29:18, 31:4, 32:17,
34:10, 50:7, 53:9
**recommender** [2] -
32:16, 50:23
**recommending** [3] -
5:21, 11:3, 32:14
**recommends** [1] -
56:1
**record** [9] - 2:5, 4:3,
6:3, 20:8, 49:21,
49:25, 54:23, 57:16,
57:22
**Red** [1] - 26:22
**red** [1] - 52:21
**redact** [1] - 53:8
**reference** [6] - 20:5,
28:8, 28:16, 29:2,
29:3, 51:7
**references** [2] - 42:21,
42:23
**reflects** [1] - 41:13
**refused** [2] - 57:12,
57:13
**refusing** [1] - 44:24
**regardless** [1] - 35:3
**rejected** [1] - 16:19
**related** [2] - 14:5, 47:6
**relationship** [1] - 41:7
**relevance** [3] - 37:18,
37:20, 38:2
**relevant** [24] - 6:5,
8:21, 9:1, 9:5, 9:12,
9:14, 12:19, 13:6,
15:1, 30:4, 30:8,
30:12, 30:18, 30:19,
32:14, 34:8, 34:25,
35:1, 38:8, 50:8,
50:9, 51:14, 51:15,
56:3
**relinquish** [1] - 15:24
**rely** [2] - 6:8, 19:6
**relying** [1] - 10:25
**remainder** [2] - 2:20,
16:10
**remedies** [1] - 19:12
**remotely** [1] - 48:9
**rendered** [1] - 24:13
**repeated** [1] - 16:16
**reply** [2] - 43:1, 45:6
**REPORTER** [1] - 59:1
**Reporter** [3] - 1:23,
1:23, 59:10
**reporter** [1] - 37:9
**represent** [2] - 10:21,
14:17
**representation** [1] -
29:10
**representations** [4] -

31:8, 57:11, 57:18,
57:21
**represented** [1] - 31:4
**representing** [1] -
15:2
**request** [1] - 34:12
**require** [1] - 4:13
**required** [1] - 18:1
**requirement** [2] -
4:14, 18:22
**requirements** [1] -
19:13
**requires** [1] - 44:10
**reschedule** [1] - 3:3
**reserve** [2] - 2:22,
27:10
**resolve** [1] - 34:22
**resolved** [1] - 54:4
**respect** [18] - 5:1, 5:3,
11:11, 15:22, 17:11,
18:5, 18:9, 19:15,
20:18, 23:24, 25:19,
25:23, 31:19, 39:4,
39:10, 40:10, 54:8,
54:23
**respecting** [1] - 4:6
**respond** [1] - 55:6
**responded** [1] - 46:20
**response** [3] - 16:16,
46:15, 46:20
**responses** [1] - 7:18
**rest** [1] - 37:17
**restriction** [1] - 35:12
**results** [1] - 56:19
**retaliation** [4] - 18:20,
39:6, 42:11, 49:3
**retaliatory** [1] - 17:10
**review** [2] - 32:2,
54:17
**ridiculous** [1] - 44:12
**Rights** [3] - 18:2,
18:25, 32:25
**RMR** [2] - 1:23, 59:9
**role** [2] - 36:21, 41:21
**Room** [2] - 1:24, 59:10
**Root** [2] - 30:14, 33:18
**rude** [2] - 22:22, 23:15
**rule** [2] - 32:14, 45:7
**run** [1] - 57:4
**running** [1] - 47:11

## S

**sanctionable** [1] -
28:25
**sanctions** [4] - 28:5,
28:10, 29:2, 29:4
**satisfied** [1] - 11:9
**satisfies** [1] - 9:5
**satisfy** [3] - 16:13,

53:3, 53:16
**save** [1] - 28:1
**Savignac** [9] - 2:3, 2:9, 17:23, 20:2, 20:12, 20:15, 49:6, 54:7, 55:4
**SAVIGNAC** [11] - 1:2, 1:12, 2:9, 40:20, 41:1, 44:20, 46:7, 46:24, 48:5, 55:6, 56:16
**Savignac's** [3] - 17:10, 17:15, 22:14
**saw** [1] - 14:18
**schedule** [1] - 29:1
**scope** [1] - 49:10
**se** [2] - 1:12, 2:7
**second** [10] - 4:8, 8:19, 9:6, 9:18, 20:21, 30:23, 33:16, 36:11, 49:20, 51:17
**secondary** [5] - 36:19, 37:3, 37:14, 41:25, 42:4
**secret** [1] - 30:4
**section** [1] - 2:20
**see** [9] - 3:1, 10:4, 16:11, 17:1, 17:19, 24:10, 31:24, 47:25, 50:22
**seeing** [1] - 44:19
**SEFRANEK** [1] - 59:3
**Sefranek** [3] - 1:23, 59:9, 59:9
**selection** [1] - 31:15
**self** [1] - 33:11
**self-described** [1] - 33:11
**sent** [8] - 21:20, 22:19, 22:21, 29:11, 35:19, 44:9, 46:14, 48:8
**sentence** [1] - 22:1
**sentences** [2] - 45:16, 57:3
**separate** [3] - 14:15, 25:12, 34:20
**served** [1] - 34:11
**set** [7] - 2:24, 6:15, 11:15, 19:14, 19:16, 29:1, 56:17
**settle** [2] - 24:5, 46:1
**seven** [1] - 40:23
**several** [1] - 7:18
**sex** [11] - 3:20, 4:12, 6:7, 8:5, 8:12, 26:19, 32:21, 37:16, 38:10, 38:11, 40:15
**sexist** [1] - 42:2
**shall** [1] - 27:15
**sham** [1] - 4:1

**share** [2] - 7:10, 7:15
**SHEKETOFF** [23] - 1:3, 1:12, 2:7, 27:17, 27:22, 27:25, 28:21, 31:2, 32:11, 33:8, 34:2, 34:14, 36:5, 37:7, 37:11, 38:6, 39:5, 39:14, 40:3, 40:13, 40:19, 56:24, 57:5
**Sheketoff** [6] - 2:3, 2:7, 20:3, 27:16, 32:10, 49:20
**shelf** [1] - 45:4
**shifting** [1] - 9:7
**shines** [1] - 55:24
**shoes** [1] - 50:19
**short** [3] - 16:7, 35:4, 58:2
**short-term** [1] - 35:4
**show** [7] - 7:25, 41:8, 41:9, 51:20, 52:2, 52:23
**showing** [4] - 6:1, 7:4, 7:5, 7:6
**shown** [1] - 57:10
**shows** [1] - 23:16
**Shumaker** [2] - 42:19, 53:23
**sic** [2] - 5:10, 38:8
**side** [1] - 42:15
**sides** [1] - 15:22
**significant** [1] - 23:9
**similarly** [1] - 21:2
**simply** [7] - 4:1, 12:9, 24:25, 28:14, 34:5, 40:4, 53:14
**single** [3] - 10:9, 27:8, 45:25
**situation** [3] - 41:20, 41:25, 43:8
**situations** [1] - 45:4
**six** [3] - 14:19, 40:23, 56:13
**skills** [1] - 25:1
**slow** [1] - 36:4
**someone** [1] - 11:24, 21:19, 23:16, 23:18, 24:6, 37:19, 43:13, 43:16, 45:3, 52:4, 53:14
**sometimes** [1] - 50:23
**Sorry** [1] - 36:11
**sorry** [19] - 11:15, 20:21, 27:25, 28:12, 29:6, 30:11, 30:19, 31:6, 32:9, 33:24, 36:4, 37:7, 38:20, 40:3, 40:16, 46:11, 50:9, 51:23, 56:16

**sort** [11] - 11:19, 15:18, 24:2, 34:25, 35:6, 39:15, 45:7, 45:22, 46:5, 46:22, 56:18
**sought** [2] - 34:16, 34:17
**Sox** [1] - 26:22
**specific** [4] - 6:20, 29:17, 33:18, 57:11
**specifically** [5] - 17:9, 28:4, 31:4, 34:14, 36:16
**specifics** [1] - 14:12
**speculations** [1] - 27:6
**spend** [2] - 15:17, 20:10
**split** [1] - 2:18
**staff** [2] - 22:22, 22:24
**stage** [4] - 8:1, 21:17, 35:1, 35:4
**stand** [1] - 15:8
**standard** [9] - 4:5, 7:24, 44:14, 44:17, 44:19, 44:21, 45:12, 47:25, 54:11
**standards** [8] - 21:11, 24:2, 45:14, 45:15, 45:16, 45:17, 46:5, 47:9
**standpoint** [1] - 2:18
**start** [5] - 2:20, 3:8, 4:20, 29:6, 29:9
**starting** [2] - 2:6, 27:16
**state** [2] - 2:5, 16:14
**statement** [4] - 24:22, 29:13, 35:5, 57:23
**statements** [3] - 17:2, 25:16, 42:18
**States** [1] - 1:24
**STATES** [2] - 1:1, 1:9
**statute** [1] - 18:14
**statutes** [1] - 19:1
**stenographic** [1] - 59:5
**step** [8] - 7:19, 7:20, 8:15, 8:16, 8:19, 9:6, 11:19, 14:6
**stereotypes** [1] - 40:15
**stereotyping** [1] - 32:21
**stick** [1] - 40:24
**still** [4] - 20:15, 26:11, 27:18, 29:6
**stop** [1] - 2:25
**Street** [2] - 1:13, 1:21
**stuff** [1] - 53:10

**style** [1] - 45:11
**subject** [1] - 35:6
**subjective** [1] - 43:2
**submit** [6] - 34:21, 39:12, 39:25, 50:11, 53:6, 53:7
**submitted** [7] - 5:20, 10:14, 34:15, 49:11, 49:12, 52:13, 53:7
**subpar** [1] - 25:1
**substance** [3] - 11:17, 25:12, 46:21
**substantive** [1] - 47:18
**sue** [1] - 45:1
**sufficient** [2] - 43:21, 46:6
**sufficiently** [1] - 44:16
**suggest** [4] - 55:20, 33:9, 49:1
**suggested** [1] - 53:23
**suggests** [2] - 47:3, 48:10
**Suite** [2] - 1:18, 1:21
**sum** [1] - 55:5
**summary** [10] - 3:6, 3:24, 16:13, 16:22, 21:15, 21:17, 23:10, 25:4, 33:23, 34:7
**support** [4] - 3:23, 19:5, 27:4, 32:12
**supported** [1] - 16:21
**suppose** [1] - 26:14
**supposed** [1] - 34:17
**supposedly** [1] - 32:13
**Supreme** [1] - 16:19
**surrounding** [1] - 53:22
**survive** [1] - 3:24
**sworn** [1] - 5:20
**sympathetic** [1] - 51:23
**system** [3] - 25:21, 27:3, 28:13

---

**T**

**tailor** [2] - 24:20, 27:3
**tailor-made** [2] - 24:20, 27:3
**talks** [1] - 56:2
**Tamara** [3] - 1:23, 59:9, 59:9
**TAMARA** [1] - 59:3
**ten** [3] - 40:22, 40:25, 41:2
**term** [1] - 35:4
**terminated** [1] - 20:16
**termination** [5] -

17:10, 20:4, 22:5, 22:13, 22:23
**terms** [3] - 18:18, 21:12, 45:15
**TERRI** [1] - 1:17
**Terri** [1] - 2:11
**terrible** [3] - 29:7, 44:9, 51:8
**terribly** [1] - 7:24
**test** [1] - 42:9
**testified** [11] - 8:24, 9:3, 11:25, 13:14, 14:22, 21:6, 22:10, 22:11, 23:5, 24:21, 27:2
**testify** [3] - 13:2, 13:9, 50:10
**testimony** [15] - 5:10, 9:13, 12:19, 16:15, 21:6, 21:9, 22:8, 22:9, 24:11, 24:22, 25:2, 26:24, 27:5, 42:15, 46:8
**textual** [1] - 18:10
**THE** [89] - 1:1, 1:1, 1:9, 2:2, 2:13, 2:23, 3:5, 3:15, 4:22, 6:10, 6:13, 6:17, 6:24, 7:22, 8:6, 8:9, 8:18, 9:15, 10:5, 10:18, 11:4, 11:8, 11:16, 11:19, 12:15, 12:25, 13:2, 13:8, 13:23, 14:11, 15:2, 15:10, 15:14, 15:20, 16:1, 16:6, 20:21, 21:13, 23:7, 25:7, 25:18, 27:13, 27:15, 27:19, 27:24, 28:12, 30:23, 31:6, 31:16, 31:19, 31:24, 32:3, 32:9, 33:2, 33:24, 34:11, 36:4, 37:6, 37:9, 37:18, 38:22, 39:8, 39:22, 40:6, 40:18, 40:21, 44:14, 45:12, 46:11, 47:23, 49:4, 49:19, 50:5, 50:9, 50:17, 51:3, 51:16, 51:19, 51:22, 52:25, 53:12, 54:6, 54:13, 54:25, 55:2, 55:4, 56:14, 57:1, 58:1
**themselves** [1] - 27:7
**theories** [3] - 3:23, 4:19, 38:8
**theory** [8] - 4:3, 4:11, 9:24, 10:1, 10:25, 12:6, 15:18, 51:3
**thereby** [1] - 4:16

**therefore** [2] - 37:23, 47:16
**they've** [2] - 7:6, 55:23
**thinking** [1] - 41:12
**thinks** [1] - 26:20
**thoroughly** [1] - 15:20
**threat** [1] - 23:25
**threatening** [1] - 45:3, 45:23
**three** [3] - 20:23, 22:11, 22:12
**throughout** [6] - 16:14, 16:16, 17:6, 17:20, 24:10
**thrust** [1] - 57:5
**tied** [1] - 57:14
**tight** [1] - 15:25
**timer** [1] - 11:15
**timing** [3] - 30:13, 33:16, 49:10
**Title** [4] - 4:12, 18:2, 18:25, 44:10
**today** [1] - 55:23
**tone** [1] - 21:18
**tons** [1] - 42:17
**topic** [5] - 14:3, 28:15, 28:19, 28:23
**track** [2] - 4:5, 4:10
**tracked** [1] - 35:25
**TRANSCRIPT** [1] - 1:8
**transcript** [2] - 59:4, 59:6
**treat** [2] - 4:15, 41:22
**treated** [1] - 33:13
**treating** [1] - 41:19
**triable** [1] - 41:5
**trial** [5] - 39:11, 39:21, 39:24, 39:25, 54:9
**tricky** [1] - 25:8
**true** [8] - 5:24, 16:22, 33:17, 43:3, 57:16, 57:17, 59:4, 59:5
**truth** [1] - 31:13
**try** [5] - 24:5, 27:20, 40:20, 42:12, 52:9
**trying** [4] - 29:21, 44:25, 47:23, 55:6
**turn** [2] - 21:5, 57:13
**turned** [1] - 26:16
**turning** [2] - 4:24, 18:24
**turns** [4] - 15:10, 26:6, 26:9, 26:13
**twice** [1] - 26:4
**two** [16] - 4:19, 9:20, 10:14, 17:3, 17:11, 17:15, 34:2, 35:8, 39:15, 39:20, 40:4, 46:24, 49:7, 49:11, 51:13, 57:3

**two-way** [1] - 35:8
**type** [2] - 22:16, 22:25
**typically** [2] - 7:2, 26:1

## U

**U.S** [1] - 19:22
**ultimate** [3] - 5:13, 7:1
**ultimately** [2] - 9:10, 41:3
**unanimously** [2] - 19:20, 19:25
**uncomplicated** [1] - 36:6
**uncontroverted** [1] - 17:7
**under** [15] - 7:1, 9:6, 12:6, 12:15, 13:24, 18:1, 18:2, 18:24, 19:11, 19:24, 32:25, 33:4, 34:3, 35:21, 42:8
**undermine** [1] - 52:17
**understood** [4] - 24:16, 24:21, 27:2, 38:3
**undertaken** [1] - 21:2
**undisputed** [2] - 30:5, 32:15, 39:16, 39:17, 54:23
**unexpressed** [2] - 30:4, 32:13
**unfortunately** [2] - 2:23, 2:25
**uninvited** [1] - 48:12
**uniquely** [1] - 47:16
**unitary** [1] - 27:9
**United** [1] - 1:24
**UNITED** [2] - 1:1, 1:9
**unless** [10] - 3:18, 13:10, 27:12, 36:8, 39:3, 41:4, 44:13, 47:7, 47:20, 52:6
**unnecessary** [1] - 4:7
**unpaid** [1] - 35:23
**unprofessional** [1] - 22:15
**unprotectable** [1] - 24:14
**unprotected** [7] - 17:17, 21:1, 25:16, 43:4, 44:1, 44:4, 44:6
**unquestionably** [1] - 37:16
**unquote** [1] - 35:17
**unreasonable** [2] - 20:17, 26:14
**unworkable** [1] - 4:15
**up** [12] - 2:20, 2:25,

8:2, 14:9, 15:8, 23:16, 28:3, 33:24, 49:19, 53:5, 55:5, 57:14
**upset** [1] - 47:19
**Urbana** [1] - 1:13
**Urbina** [1] - 18:12

## V

**valuable** [1] - 26:10
**versus** [1] - 25:11
**veterans** [1] - 48:14
**VIA** [1] - 1:12
**view** [5] - 41:24, 42:22, 43:17, 43:19, 49:2
**VII** [3] - 18:2, 18:25, 44:10
**VII's** [1] - 4:12
**violating** [1] - 4:16
**vs** [1] - 1:5

## W

**waive** [3] - 10:10, 10:20, 33:20
**waived** [5] - 9:22, 10:1, 10:3, 10:8, 12:7
**waiver** [10] - 30:13, 30:14, 30:15, 33:20, 34:5, 34:6, 34:12, 49:13, 55:15
**waiving** [1] - 13:18
**Washington** [5] - 1:6, 1:15, 1:16, 1:25, 59:11
**watch** [1] - 3:9
**ways** [1] - 47:20
**week** [14] - 3:19, 3:25, 4:5, 4:8, 5:4, 6:21, 10:24, 13:21, 29:17, 32:14, 35:5, 54:14, 56:2, 56:17
**weekends** [2] - 57:12
**weeks** [38] - 14:19, 24:18, 29:20, 30:2, 31:23, 32:23, 33:11, 35:2, 35:8, 35:11, 35:17, 35:18, 35:22, 35:23, 36:8, 36:13, 36:14, 36:18, 36:19, 36:20, 37:1, 37:16, 38:7, 38:15, 38:21, 39:18, 41:15, 42:6, 53:24, 55:8, 55:17, 56:10, 56:13, 56:22
**welcome** [1] - 15:15
**well-developed** [1] -

18:7
**whatsoever** [1] - 32:12
**whole** [4] - 37:8, 49:9, 54:1, 56:16
**win** [5] - 21:16, 52:14, 52:19, 52:20
**withheld** [8] - 5:9, 6:11, 9:15, 10:19, 11:5, 15:3, 30:24, 31:8
**witness** [1] - 11:23
**woman** [2] - 26:6, 41:25
**woman's** [1] - 35:13
**women** [20] - 8:25, 15:5, 29:20, 30:2, 31:5, 32:23, 33:14, 35:3, 35:7, 35:9, 35:11, 35:16, 38:8, 38:9, 38:10, 38:15, 38:18, 39:18, 53:24, 56:10
**women's** [1] - 4:6
**word** [5] - 14:23, 48:17, 48:22, 49:6
**worker** [5] - 43:10, 44:11, 44:22, 44:24, 45:7
**workers** [1] - 44:25
**workplace** [1] - 44:22
**works** [3] - 7:2, 28:13, 32:7
**worse** [1] - 4:16
**writing** [1] - 21:25
**written** [3] - 34:21, 45:11, 48:8

## Y

**years** [3] - 22:21, 32:25, 45:24
**you-all** [1] - 29:7

## Z

**zero** [1] - 32:23
**ZOOM** [1] - 1:12