**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK C. SAVIGNAC, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 19-2443 (RDM) |
| v. | **UNDER SEAL** |
| JONES DAY, *et al.*, | |
| *Defendants.* | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Mark Savignac and Julia Sheketoff ("Plaintiffs") bring this action against their former employer, Jones Day ("the Firm"), as well as three partners (Stephen Brogan, Beth Heifetz, and Michael Shumaker) who held firm leadership positions during the period at issue (collectively, "Defendants"). *See* Dkt. 1. Jones Day is a global law firm, with an office in the District of Columbia. Plaintiffs, a married couple, worked as associates in the Firm's Issues & Appeals group in the D.C. office. Sheketoff joined the Firm in 2014 and resigned in 2018. Savignac joined the firm in 2017 and was fired in January 2019. They assert an array of discrimination and retaliation claims against the Firm under a variety of federal and D.C. statutes.

Plaintiffs first allege that Sheketoff received a lower annual pay increase than her male peers in 2016 because she is a woman. On Plaintiffs' telling, Sheketoff worked briefly for a male partner who was unduly critical of her work because she is woman, and that partner's discriminatory performance review resulted in the pay differential that she now challenges. Plaintiffs allege that by giving Sheketoff a lower annual pay increase than her male counterparts, the Firm violated her rights under Title VII, the Equal Pay Act ("EPA"), and the D.C. Human Rights Act ("DCHRA"). *See* Dkt. 172 at 37–39 (Third Am. Compl. ¶¶ 242–64) (Counts 4–6).

1

Next, Plaintiffs allege that Jones Day's leave policies for new parents unlawfully discriminate against male associates.  The Firm provides all primary caregivers with ten weeks of paid family leave, regardless of sex.  But Plaintiffs allege that Jones Day's postpartum leave policy, which permits women who give birth to take eight weeks of short-term disability leave without requiring a medical certification of disability, discriminates on the basis of sex because the length of the disability leave is not tailored to the period during which each woman who gives birth is actually disabled.  Plaintiffs allege that Jones Day adopted the eight-week presumptive period of short-term disability leave based on "harmful stereotypes and archaic gender roles"—namely, the notion that it is more important for new mothers to have time "to care and bond with their new children" than new fathers.  *Id.* at 34 (Third Am. Compl. ¶¶ 226–27).  Plaintiffs allege that by declining to provide Savignac with the same amount of paid leave provided to birth mothers, the Firm violated Title VII, the EPA, and the DCHRA.  *See id.* at 34–36 (Third Am. Compl. ¶¶ 225–41) (Counts 1–3).

Finally, Plaintiffs allege that when they voiced their objections to the purportedly discriminatory nature of Jones Day's parental leave polices and to Sheketoff's smaller-than-usual pay increase, Defendants retaliated against them by firing Savignac, by providing him with only one reference after his termination, and by publishing a press release that Plaintiffs contend was "malicious" and injured their reputations.  Plaintiffs allege that by taking these allegedly retaliatory actions, Defendants violated Title VII, the Fair Labor Standards Act ("FLSA"), the D.C. Family and Medical Leave Act ("DCFMLA"), and the DCHRA.  *See* Dkt. 172 at 41–44 (Third Am. Compl. ¶¶ 273–96) (Counts 7–9 & 11); Dkt. 25-1 at 16–17 (Suppl. Compl. ¶¶ 96–113) (Counts 12–14).

The Court previously dismissed Count 10 of Plaintiffs' complaint.  *See* Dkt. 32 at 48.

Defendants now move for summary judgment on all of Plaintiffs' remaining claims, Dkt. 189,

and Plaintiffs cross-move for summary judgment on Counts 1–3, 7–9, and 11, Dkt. 197.  For the

reasons that follow, the Court will **GRANT** summary judgment in Defendants' favor on Counts

4–6 and Counts 12–14; will **GRANT** summary judgment in favor of Defendant Heifetz on

Counts 8 and 9; will **DENY** Defendants' motion for summary judgment on all other claims; and

will **DENY** Plaintiffs' cross-motion for summary judgement.  Surviving both parties' motions

for summary judgment are Plaintiffs' claims alleging that Jones Day's leave policies for new

parents are discriminatory (Counts 1–3) and Plaintiffs' claims that Jones Day, Brogan, and

Shumaker retaliated against them when Savignac's employment at Jones Day was terminated

(Counts 7–9 & 11).  Jones Day is the sole Defendant for purposes of Counts 1–3, 7 and 11, and

only Jones Day, Brogan, and Shumaker remain as Defendants for purposes of Counts 8 and 9.

## I. BACKGROUND

Jones Day is a law firm and general partnership.  It has over three dozen offices around

the world, including an office in Washington, D.C.  Dkt. 221 at 4 (Defs.' SUMF ¶ 1).  Plaintiffs

were employed as associates at Jones Day's D.C. office:  Sheketoff began working there in 2014

and left in 2018; Savignac began working there in 2017 and was fired in 2019.  *Id.* at 12–13

(Defs.' SUMF ¶¶ 15, 21–23).

Jones Day is led by its Managing Partner.  The Managing Partner "has the authority to act

for the Firm and to make decisions regarding any and all aspects of the Firm's practice of law,

and its business and affairs."  Dkt. 189-13 at 7.  Stephen Brogan, a defendant in this case,

became the Firm's Managing Partner in 2003 and held that position when the events at issue in

this case occurred.  Dkt. 221 at 4 (Defs.' SUMF ¶ 2).  Assisting the Managing Partner in leading

the Firm is the Administrative Partner.  Michael Shumaker, another defendant in the case, is also a partner at Jones Day.  He has served as the Firm's Administrative Partner since approximately 2014 and was the Administrative Partner at all relevant times.  *Id.* (Defs.' SUMF ¶ 3).  In that capacity, he participated in deliberations relating to the Firm's compensation decisions, leave policies, and termination decisions.

Jones Day employs approximately 2,300 lawyers.  *Id.* (Defs.' SUMF ¶ 1).  Each lawyer is assigned to a practice group, with each practice group led by a Practice Leader.  Jones Day has more than twenty practice groups, one of which is the Issues & Appeals group, which is the group in which Plaintiffs worked.  *Id.* at 9 (Defs.' SUMF ¶ 11).  During the relevant period, Beth Heifetz, the final individual defendant, was a partner at Jones Day and the Practice Leader for the Issues & Appeals group.  *Id.* at 4 (Defs.' SUMF ¶ 4).  Heifetz became Of Counsel to the Firm in 2021.  *Id.* (Defs.' SUMF ¶ 4).

## A.    Sheketoff's Employment at Jones Day

In October 2014, Sheketoff began working at Jones Day in its D.C. office, following clerkships on the U.S. Court of Appeals for the D.C. Circuit and the Supreme Court of the United States.  Dkt. 221 at 12 (Defs.' SUMF ¶ 15).  Sheketoff started as a fourth-year associate in the Firm's Issues & Appeals group and had a salary of $300,000.  *Id.* (Defs.' SUMF ¶¶ 15, 17).  Upon starting at the Firm, Sheketoff also received a $300,000 "clerkship bonus."  *Id.* (Def.'s SUMF ¶ 17).  Because Plaintiffs' claims pertaining to Sheketoff's employment at Jones Day center on the compensation she received in 2017, following the 2016 performance review cycle, it is necessary to provide a brief overview of Jones Day's process for making associate compensation decisions before turning to those claims.

4

1.    *Jones Day's Evaluation and Compensation Policies*

Associates at Jones Day are subject to a formal, annual review process that evaluates their performance and determines their compensation for the following year.  Dkt. 221 at 91–92, 104 (Defs.' SUMF ¶¶ 150, 181).  Unlike some other law firms, Jones Day does not pay its associates annual bonuses; instead, an associate's performance impacts the raise that she receives for the upcoming year.  A high-performing associate will typically receive a higher annual raise than a lower-performing associate.

a.    <u>Performance evaluations</u>

The performance evaluation process for Jones Day associates begins in January, when each associate submits a list of the matters that she worked on during the prior calendar year, a description of her role on each matter, and the name of the lawyers that supervised her work on each matter.  Dkt. 221 at 92 (Defs.' SUMF ¶ 151); Dkt. 190-29 at 30–31 (Lovitt Dep. II 29:20–30:13).  Each of those supervisory lawyers is then sent an evaluation form for the associate, along with the associate's description of her own work on the matter.  Dkt. 221 at 92 (Defs.' SUMF ¶ 152); Dkt. 190-29 at 31 (Lovitt Dep. II 30:14–23).

The evaluation form asks the reviewer to describe her exposure to the associate as "extensive, moderate, or limited" and to rate the associate's performance in sixteen substantive categories, such as "legal research and analysis," "timeliness in response to deadlines," "leadership and initiative," and "overall effectiveness."  Dkt. 189-40; Dkt. 221 at 92–93 (Def.'s SUMF ¶¶ 154–55).  Associates are given a numerical rating between one and five, with one meaning "unacceptable," two meaning "needs improvement," three meaning "satisfactory," four meaning "exceeds standards," and five meaning "exceptional."  Dkt. 189-40; Dkt. 221 at 92–93 (Defs.' SUMF ¶ 155).  Reviewers may also indicate that they have "no basis" for ranking an

associate in a particular category.  Dkt. 189-40.  Lawyers are instructed that "[r]atings of 'Exceptional' and 'Exceeds Standards' should be applied only to lawyers whose work is consistently and demonstrably ahead of Jones Day peers," whereas ratings of "'Needs Improvement' and 'Unacceptable' recognize that the lawyer's performance is declining or is not at a level substantively and qualitatively commensurate with standards expected of lawyers with like experience."  Dkt. 189-38 at 2.  In 2016, a rating of "Exceeds Standards" was defined as "indicat[ing] significant progress for the year;" in contrast, "successive '2' [or 'Needs Improvement'] ratings" indicated that the associate's performance was "inconsistent with continued employment at the Firm."  Dkt. 189-41 at 4; *id.* (explaining that a "2" rating ordinarily "indicates performance concerns, and improvement must occur within a specific period of time that should be set during the review process; failure to achieve the required improvement warrants termination of employment").

The evaluation form also asks the reviewer to provide a written, narrative evaluation of the associate's performance on the relevant matter, including any "strengths, weaknesses, unique expertise, areas needing improvement, and anything else about the lawyer's substantive performance [the supervisor] believe[s] important to a fair and objective assessment."  Dkt. 189-40 at 3; Dkt. 221 at 93–94 (Def.'s SUMF ¶¶ 157–58).  The form concludes by asking the reviewer to "identify key areas for development or improvement for this associate to pursue over the coming year."  Dkt. 189-40 at 3.

In 2017, reviewers were told that the written narrative portion of the evaluation form was "the most important component in the process."  Dkt. 189-38 at 2.  Reviewers were further instructed that their "evaluation should focus on the lawyer's performance" that year and that the form was "not intended" to solicit "'career' evaluations that comment on the lawyer generally"

nor was the form seeking "assessments of where [the supervisory attorney] think[s] the lawyer stands or should stand overall." *Id.*

The completed evaluations for each associate are sent to the Practice Leader for the practice group in which the associate works. The Practice Leader uses the evaluations to draft an overall "assessment statement" for each associate in the practice. Dkt. 221 at 95 (Def.'s SUMF ¶ 160); Dkt. 190-29 at 32 (Lovitt Dep. II 31:8–20). The assessment statement is intended to "provide a fair and objective final assessment of the individual's performance and productivity." Dkt. 189-41 at 3. In it, the Practice Leader gives the associate a numerical rating for her performance over the last year, which is once again a number between one and five, and the reasons for that assessment. *Id.* The assessment statement is ultimately "conveyed to the lawyer word-for-word" in a review meeting. *Id.*

Prior to drafting the assessment statement, the Practice Leader, "[a]s a general practice," "vet[s] the evaluations" from the supervisory attorneys. Dkt. 190-29 at 32 (Lovitt Dep. II 31:21–24). The Practice Leader "follow[s] up with individual evaluators" if "there are questions about the evaluation" to "try[] to get a better . . . understanding [of] the associate's performance." *Id.* at 32–33 (Lovitt Dep. II 31:21–32:5). In Jones Day's D.C. office, the Practice Leader also receives input from the D.C. litigation review committee, which is composed of litigation partners. At a meeting held during review season, the D.C. litigation review committee "looks at . . . all the individual evaluations" and has "a conversation about the D.C. associate." *Id.* at 33 (Lovitt Dep. II 32:11–21); *see also id.* at 50 (Lovitt Dep. II 49:13–22). "[E]ach individual person in the room can give their opinion of the associate's performance based on the evaluations," and that feedback is communicated to the Practice Leader, as well as the office leadership. *Id.* at 33–34 (Lovitt Dep. II 32:20–33:5). The Practice Leader then aggregates the common themes in the

evaluations, the feedback the Practice Leader has received, and the Practice Leader's "personal knowledge" into the assessment statement.  *Id.* at 84–85 (Lovitt Dep. II 83:2–84:18).

Once the Practice Leader has completed the draft assessment statements for each associate, the draft statements are sent to the applicable national review committee.  For Plaintiffs, the applicable committee was the national litigation committee.  This committee reviews the draft assessment statement and the proposed (or provisional) ratings for each associate.  *Id.* at 34–35 (Lovitt Dep. II 33:16–34:4); Dkt. 189-43 at 2.  The national committee also has available the individual evaluations.  Dkt. 190-29 at 35 (Lovitt Dep. II 34:5–13).

A revised draft assessment statement and practice rating for each associate emerges from the national review committee.  Those revised evaluations are returned to the office and the Practice Leader.  Office leadership, which generally includes the Partner(s)-in-Charge, then has "a chance to review th[e] assessment statement before it becomes final in case they have disagreements or proposed edits."  *Id.* at 35–36 (Lovitt Dep. II 34:24–35:7); Dkt. 189-44 at 2–3.  The assessment statements are finalized by late April or early May.

b.    Compensation decisions

Once the evaluation process is complete, the compensation process begins.  Dkt. 190-29 at 36 (Lovitt Dep. II 35:12–23).  Jones Day describes its compensation system as "consciously not lockstep; after the first year, there should be a range of compensation paid to associates in any class that reflects their relative performance, productivity and overall contribution to the Firm."  Dkt. 190-14 at 2.  Generally speaking, office leadership is instructed that:

> Compensation decisions should be focused largely on rewarding and retaining
> the truly talented, hard-working lawyers who should advance in the Firm.  That
> should translate into appropriate reward[s] for those who are working hard and
> clearly performing ahead of their peers—compensation comparable to what high
> performing associates would make at competitive firms taking bonus
> possibilities into account.  And careful, individual consideration should be given

8

> to appropriate compensation decisions for those lawyers who receive only mid-level ratings in our system.  At least for those associates who have been with the Firm for longer periods of time, compensation decisions should be consistent with and recognize the reality that these associates demonstrate more limited potential and are less likely to advance in the Firm.  Compensation should be held flat—or decreased—for those who are stagnant and not advancing with peers.

*Id.*  The Managing Partner has the final say over all compensation decisions for associates, but he is advised by each office's leadership as well as the Administrative Partner and, in later years, an additional partner with whom the Administrative Partner consulted.

To make a compensation recommendation for each associate, office leadership has each associate's final assessment statement and practice ratings, Dkt. 190-29 at 36 (Lovitt Dep. II 35:16–23), as well as a spreadsheet that contains each associate's practice, billed hours, ratings, and rankings for the current year and last one or two years, *id.* at 37 (Lovitt Dep. II 36:2–10). Also relevant to compensation decisions are the characteristics of attorney compensation in the applicable legal market.  *Id.* (Lovitt Dep. II 36:13–37:25).  Based on this information, office leadership makes a compensation recommendation for each associate in that office.  *Id.* at 38 (Lovitt Dep. II 37:14–18).  From there, the process may vary from office to office.  *Id.* (Lovitt Dep. II 37:19).

For the Jones Day D.C. office, office leadership during the relevant period was Adrian Wager-Zito and Kevyn Orr, who would "independently" review the materials for each associate to "arrive[] at their [respective] compensation recommendations."  *Id.* at 38–39 (Lovitt Dep. II 37:20–38:14).  Wager-Zito and Orr would then meet and discuss, with Orr making the final recommendation as to what compensation each associate should receive.  *Id.* at 39 (Lovitt Dep. II 38:15–19); *see also* Dkt. 190-27 at 310 (Shumaker Dep. 309:4–6) ("[T]he way the process works is recommendations come up from the partners in charge.").

The recommendations from office leadership then go to the Administrative Partner, who was Shumaker during the period relevant to this case.  The Administrative Partner also evaluates the materials that were presented to office leadership and makes his own recommendation about what compensation adjustment each associate should receive.  In making this recommendation, Shumaker often consulted with others: in 2014 and 2015, he consulted with Hugh Whiting; in 2016, he worked alone; and in 2017 and 2018, he consulted with Traci Lovitt, another partner at Jones Day.  Dkt. 190-29 at 40 (Lovitt Dep. II 39:10–17); Dkt. 190-27 at 309 (Shumaker Dep. 308:12–22).  When Shumaker worked with Lovitt, they would individually come up with recommendations for the associates' compensation.  Dkt. 190-29 at 41 (Lovitt Dep. II 40:19–23).  Then, they would compare their recommendations and if their recommendations diverged, discuss.  *Id.* at 41–42 (Lovitt Dep. II 40:24–41:3).  Shumaker characterized the entire compensation process as a "cooperative, collaborative approach."  Dkt. 190-27 at 312 (Shumaker Dep. 311:1).  After reconciling their recommendations, Shumaker and Lovitt would make a joint recommendation to the Managing Partner "for his review and approval."   Dkt. 190-29 at 44 (Lovitt Dep. II 43:16–18); *see also id.* at 41 (Lovitt Dep. II 40:17–18).

The Managing Partner during the relevant period was Brogan.  He would receive the recommendations from office leadership, the Administrative Partner (and when applicable, Lovitt), as well as a spreadsheet that showed each associate's name, their practice, their office, the year they graduated law school,[1] the year they joined the firm, their hours, their ratings, their rankings for the current period as well as for two prior years, their current salary, and the various recommendations for compensation.  *Id.* at 44–45 (Lovitt Dep. II 43:19–44:15).  The spreadsheet

---

[1]       In some cases, Jones Day would adjust the associate's graduation year to reflect a period of time that the associate did not practice law.  Dkt. 190-29 at 47 (Lovitt Dep. II 46:2–17).

did not indicate an associate's race or sex during the relevant period.  *Id.* at 49 (Lovitt Dep. II 48:4–8).  The Managing Partner also has available to him each associate's individual evaluations and assessment statements, which Brogan reviewed in 2016.  *Id.* at 45 (Lovitt Dep. II 44:16–25).  If the Managing Partner does not weigh in, then the recommendation made by the Administrative Partner governs, Dkt. 190-27 at 315 (Shumaker Dep. 314:3–11), although in 2015, 2016, and 2017, Brogan did weigh in on Sheketoff's compensation.

Associates are provided with their assessment statement and ratings in a meeting that typically occurs in early summer.  Dkt. 221 at 103 (Defs.' SUMF ¶ 177).

### 2.   *Sheketoff's 2015 Evaluation and Compensation*

Sheketoff went through her first true performance review cycle at Jones Day in 2016 for the work she had done in 2015.[2]  For her work that year, Sheketoff was given a practice rating of 2, indicating that her work "need[ed] improvement" or was "below standards."  Dkt. 190-7 at 9; Dkt. 189-41 at 4.  Her assessment statement stated that she "[w]rites and analyzes legal issues well," "[p]roduces compelling witness examinations," and "[e]ffectively coordinated [the] defense of [a] student at a disciplinary hearing and displayed impressive trial skills," but noted that she had "[e]xperienced difficulty on a project for one partner on a variety of fronts" and she "[s]hould work on transition[ing] to [an] advocate role and improving writing and efficiency." Dkt. 190-7 at 9.

Heifetz, the Practice Leader for the Issues & Appeals practice, prepared Sheketoff's assessment statement that year.  She recalls that for Sheketoff's performance in 2015, she assigned Sheketoff a "2" rating and "ranked her 23rd out of 24 peer associates in the Issues &

---

[2]     Because Sheketoff joined the Firm in October 2014, the review process for that partial year was perfunctory.  Sheketoff's compensation was increased that year from $300,000 to $360,000.  Dkt. 189-28 at 2.

Appeals practice . . . because of a combination of Sheketoff's extremely low billable client hours

(179 for calendar year 2015) and [Heifetz's] concerns about her substantive performance."  Dkt.

190-4 at 2 (Heifetz Decl. ¶¶ 5).  Heifetz elaborated that:

> While some reviewers offered only positive feedback, several reviewers raised concerns about Sheketoff's written advocacy and willingness to work at times she viewed as inconvenient.  These themes were apparent across several reviews, including one particularly negative review from an Issues & Appeals partner who described Sheketoff's response to a request for supplemental briefing from the D.C. Circuit that arrived just before a scheduled vacation. When Sheketoff expressed her resistance to doing the work that conflicted with her vacation, I became involved in addressing the issue and I have personal knowledge of Sheketoff's reaction to the supplemental briefing order.  I was appalled by Sheketoff's conduct and believed Sheketoff was skirting the lines of her ethical obligations to her clients by threatening to quit the representation because it was inconvenient to her personal life.

*Id.* (Heifetz Decl. ¶ 6).

The "particularly negative" review to which Heifetz referred was one by Hashim

Mooppan, a partner within the Issues & Appeals practice group.  His review consisted of the

following:

> This is a difficult review for me to give.  On the positive side, I really like Julia personally.  I enjoy discussing legal issues with her, and I do think that she's pretty sharp.  Nevertheless[,] my experience supervising her on this case was quite negative, on a variety of fronts.
>
> To begin, her writing was very poorly structured—the usual type of problem with recent clerks who haven't yet figured out the transition to advocacy writing, but to a much more significant degree than I would expect for someone with her pedigree, who should know the basic do's and dont's of appellate briefing.  I had to revise much more extensively than should have been necessary in this case.
>
> Likewise, her oral advocacy in the moot courts leading up to her argument was so poor in terms of both substance and presentation that I was truly worried about how the actual argument would go—while it ended up fine, the judges weren't very active, so it's hard to tell how she would have held up with a more active bench.  Part of the problem with the moot courts was lack of preparation, and that in turn was due in part to a lack of judgment: she took a vacation to London a few weeks before the argument, which ended up becoming a real problem when the Court asked for supplemental briefing right before she left, as that ate

12

into her argument prep time.   Moreover, while the Court's request for
supplemental briefing was fairly unreasonable, she dealt with it extremely
poorly—excessively complaining, not really trying hard to develop the best
argument on the new and challenging issue, failing to find cases that the judges
themselves ended up finding, and even repeatedly suggesting that she would
withdraw from a case in which the DC Circuit had appointed her as an amicus
on behalf of a prisoner.

Finally, especially in light of all of the above, I think the amount of time she
spent on this pro bono case seemed quite excessive; it shouldn't have taken
nearly this long, especially given the quality of what she produced.  In sum,
although I hate to say it, I think her work on this case was immature across the
board—both in terms of substantive execution and professional comportment.  I
wouldn't want to work with her again unless and until others have noted
significant improvements on at least some of the above.

Dkt. 190-7 at 10.  Mooppan gave Sheketoff six "3" ratings (Exposure, Issues Grasp, Timely,

Team, Independent, Subordinate) and seven "2" ratings (Legal Analysis, Judgment, Written,

Oral, Efficiency, Leadership, Effectiveness).  *Id.*  That said, the partner with which Sheketoff

worked the most during 2015 had a very favorable impression of Sheketoff, describing her as

"exceptional" and "very smart and articulate."  *Id.*  That partner said that he "would be glad to

work with Julia on any matter," and gave Sheketoff ratings of "4" or "5" across the board (with

one exception: a "3" for Exposure).  *Id.*

Regarding Sheketoff's compensation adjustment for the upcoming year, D.C. office

leadership and Shumaker recommended that Sheketoff receive a $36,000 raise, which would

have increased her salary from $360,000 to $396,000.  Dkt. 189-28 at 3; Dkt. 190-27 at 332

(Shumaker Dep. 331:15–22).  Brogan, as Managing Partner, however, overrode both

recommendations and decided to give Sheketoff a $65,000 raise, making her total salary for the

upcoming 2016 year $425,000.  Dkt. 189-28 at 3.

In making this decision, Brogan read Sheketoff's evaluations, as he did for all the

associates that year.  Dkt. 190-23 at 29–30 (Brogan Dep. 28:16–29:1).  He noted Mooppan's

"very unfavorable evaluation" (which carried weight coming from "a very respected lawyer in

the firm") and observed that Sheketoff's "2" practice group rating struck him as "a really, really

bad sign" for Sheketoff's "future in the firm." *Id.* at 30 (Brogan Dep. 29:1–8). But he

nevertheless decided to raise Sheketoff's salary by $65,000 because he "wanted to encourage her

. . . to . . . become part of the firm and become a great contributor." *Id.* at 33 (Brogan Dep. 32:4–

7); *see also id.* at 30 (Brogan Dep. 29:9–15) (explaining that he wanted to send a message to "not

just [Sheketoff], but all the women of color who were in the firm at that time coming up through

the ranks").

   3.   *Sheketoff's Work for Partner A*

   While the review cycle for the 2015 year was just beginning, Sheketoff was assigned to a

new matter. On January 12, 2016, Partner A, a partner at Jones Day and ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Dkt. 221 at 108 (Defs.'

SUMF ¶ 193), reached out to Heifetz to ask for help from an Issues & Appeals associate on a

research matter. Dkt. 190-15 at 4. Sheketoff was given the assignment, which ultimately

required her to draft a memorandum for the client providing advice about a particular legal issue.

*Id.* at 3; Dkt. 232-1 at 383 (Pls.' SUMF ¶ 485).

   On February 2, 2016, Sheketoff sent Partner A her draft memorandum. Dkt. 196-76 at 2.

Approximately one month later, Partner A returned the memo to Sheketoff with revisions and

asked her to "do a really good proof" of the memo to ensure there were no typos. Dkt. 190-17 at

2. He told Sheketoff that her "legal research and writing is very strong" but stated that he

"want[ed] [her] to learn to write more like an advocate and advisor to a general counsel and

corporate boards." *Id.* He further explained: "That means, at least in part, less 'one could argue'

language and more definitive statements, at least in the executive summary." *Id.* The following

day, Sheketoff responded to Partner A's email with a further revision of the memorandum, which included edits of her own.  Dkt. 190-18 at 3–4.  Sheketoff explained that she had "made a few changes to [Partner A's] changes—just to try to be as precise as possible about some of our analysis."  *Id.* at 3.

Partner A, in turn, responded to Sheketoff's edits, accepting some and rejecting others and reminding Sheketoff "to avoid 'could argue' language."  *Id.* at 3–4.  He also offered two "general comments," recommending: (1) that Sheketoff "avoid making style edits to the writing of the person whose name goes first on the memo," and (2) that "when the person whose name goes first on the memos makes an edit, [Sheketoff] should not change it back to the way [she] had it."  *Id.* at 3.  Sheketoff clarified the following day that she "didn't mean to impugn or undermine our hierarchy by suggesting edits to the memo" and that "[t]he way [she] thought about it was that [her] job was to help [Partner A] get the best memo possible to the client."  *Id.* at 2.

Partner A responded with the following:

No worries.  I did not presume you were trying to impugn or undermine anything.  You undoubtedly made the memo much better.

My point is that I want you to be cognizant of time and changing something back to the way you had it (after someone else took to the time to change it) is not efficient.  If it is an important issue, leave the more senior person's edit and ask about it in person or on the phone.

*Id.*  Despite the respectful tone of this exchange, both parties were frustrated with each other. *See* Dkt. 196-1 at 3 (Sheketoff Decl ¶¶ 20–26); Dkt. 196-40 at 8–12 (Sheketoff text messages with another Jones Day lawyer); Dkt. 196-42 at 6–11 (Sheketoff text messages with another Jones Day lawyer); Dkt. 190-30 at 235 (Partner A Dep. 235:8–13) ("You were not annoying. The changes . . . were annoying. . . .  Yes, it was annoying, and I felt annoyed.").

When asked to evaluate Sheketoff's work on this matter during the following year's review cycle, Partner A provided the following remarks:

> . . . As one might expect, given Julia's superior academic credentials and SCOTUS clerkship, the research and learning the material presented no problems. But her initial drafts were far more academic/pure legal analysis than helpful advice to the client. In fact, there was little-to-no advice or direction to the client. That improved in subsequent drafts, however. My impression of Julia is that she is not long for firm life. She's just not that into us. Almost nothing about her work on this case suggests otherwise. She exhibits little-to-no initiative. Rather, like a second[-]year associate, she merely does what is asked of her. And her availability seems to be whatever is convenient for her. On multiple occasions, I asked for the next version of the memo, but she was tied up on other things. Working on a weekend does not seem to be in her vocabulary. And my guess would be that she did not bill 2000 hours last year. My guess is that she will soon leave to become Professor Sheketoff.

Dkt. 190-7 at 6. For the numerical portion of the evaluation, Partner A gave Sheketoff eleven "3" ratings (Exposure, Judgment, Substantive Expertise, Written, Efficiency, Client, Team, Independent, Subordinate, Leadership, and Effectiveness) and five "4" ratings (Legal Analysis, Issues Grasp, Factual Analysis, Oral, and Timely). *Id.*

### 4. *Sheketoff's 2016 Evaluation and Compensation*

For her work in 2016, Sheketoff was given a practice group rating of "2," the same "Needs Improvement" rating she received the previous year. Dkt. 190-7 at 2. Her assessment statement explained:

> Julia is an extremely smart and pleasant lawyer who grasps issues quickly and has great research skills. Her writing is generally very strong, although at times her drafts need to be better tailored to their intended audiences. For example, some of her writing was viewed as complicated for a judge who might not be as immersed in the law and facts; a client memo was too focused on pure legal analysis without accompanying advice; and a motion did not read enough like an advocacy piece. Still, much of her written work was excellent and skillful. Julia shows passionate commitment to some matters and seeks to take on responsibility, but in other matters does not take initiative and seems to be protecting her time. She is perceived as often absent from the office during the weekday; while she is available by cell phone, it is useful to be present in the

office generally.  Addressing these issues is critical to her development at the Firm.

*Id.*

In her declaration in this matter, Heifetz explained that, as Practice Leader, she gave Sheketoff a "2" rating and "ranked Sheketoff 14th out of 18 peer associates in the Issues & Appeals practice" "primarily" "based . . . on the themes that ran throughout Sheketoff's evaluations, Sheketoff's failure in 2016 to improve on the deficiencies in her 2015 performance, and [Heifetz's] own personal observations and interactions with Sheketoff."  Dkt. 190-4 at 2–3 (Heifetz Decl. ¶ 7).  Heifetz elaborated that:

> Evaluations from Sheketoff's supervising lawyers for her performance in 2016 were mixed.  Overall, the reviews reflected consistent themes, with multiple reviewers criticizing her academic writing style, availability, commitment to paying client work, and timeliness.  I also saw concerning remarks even within evaluations that praised Sheketoff's performance on certain matters.  For instance, one Issues & Appeals partner remarked that Sheketoff "is at her best when she is passionate about her clients."  That comment was a red flag to me as the Issues & Appeals Practice Leader, as it suggested that the quality of Sheketoff's work varied from client to client.  I observed Sheketoff to be interested in pro bono work, but much less interested in doing work for the corporate clients that compromise a significant portion of our paying client work.

*Id.* at 3 (Heifetz Decl. ¶ 8).  Regarding Partner A's evaluation, Heifetz characterized that review as "mixed in nature" as well, although Heifetz attested that his review "had no effect on [her] decision to assign Sheketoff a 2 rating."  *Id.* (Heifetz Decl. ¶¶ 9, 10).  "Even if Partner A had submitted no evaluation," Heifetz explained, she would have given Sheketoff the same practice rating because "the rating was based on common themes of many evaluations as corroborated by [Heifetz's] own knowledge."  *Id.* (Heifetz Decl. ¶ 10).

Regarding Sheketoff's compensation for the upcoming year—2017—the relevant decisionmakers again diverged in their recommendations regarding her compensation.  D.C.

office leadership recommended that Sheketoff receive an increase of $25,000, which would have

increased Sheketoff's salary from $425,000 to $450,000.  Dkt. 189-28 at 4.  Shumaker, as the

Administrative Partner, recommended that Sheketoff receive a $20,000 increase.  *Id.*  Lovitt

recommended the lowest increase, which was $10,000.  *Id.*  When Shumaker and Lovitt met to

reconcile their recommendations, they arrived on a joint recommended salary for Sheketoff of

$440,000 (a $15,000 increase).  *Id.*  Brogan, the Managing Partner, adopted this

recommendation.  *Id.*

Shumaker testified in his deposition that he based his recommendation on "subjective

data, as well as information [he] obtained from the associate review meetings, the review of

[Sheketoff's] associate [evaluations], possibly [the] assessment statement."  Dkt. 190-27 at 333

(Shumaker Dep. 332:12–17).  He explained that he thought a $20,000 increase, rather than a

higher sum, was warranted because Sheketoff had received a "2" rating for a second year in a

row.  *Id.* (Shumaker Dep. 332:19–20).  He believed that $25,000 was "too high for someone who

has shown marginal performance two years in a row, behind [their] peers."  *Id.* at 334 (Shumaker

Dep. 333:1–3).  He also cited Sheketoff's reviews, *id.* at 337 (Shumaker Dep. 336:1–3), as well

as the "[c]oncerns that people had" in the "associate review meetings" as factors that affected his

recommendation that year, *id.* at 334 (Shumaker Dep. 333:4–6).[3]

Brogan explained that he adopted Shumaker and Lovitt's joint recommendation this time

around because he was disappointed by Sheketoff's apparent lack of progress.  Dkt. 190-23 at 30

(Brogan Dep. 29:16–22).  Although he did not read all the evaluations for each associate this

---

[3] Lovitt testified that, in her view, Sheketoff's compensation would have been the same, notwithstanding Partner A's review, because "there [were] multiple reviews that [were] reflective of [Sheketoff's] underlying problem," which was that she was not "interested in the private practice of law" and that she had an "idiosyncratic interest in doing pro bono work." Dkt. 190-29 at 90–91 (Lovitt Dep. II 89:15–90:5).

year, *id.* (Brogan Dep. 29:16–18), he explained that when Sheketoff received a second

consecutive practice rating of "2," he "thought that the positive message that [he had] [tried] to

send her the prior year apparently did not get through," and "[s]o [he] gave her less of an

increase" that year, *id.* (Brogan Dep. 29:19–22); *see also id.* at 172 (Brogan Dep. 171:18–21).

     5.    *Sheketoff's 2017 Evaluation and Compensation*

The following year, Sheketoff was able to reverse the negative trend.  For her work in

2017, Sheketoff received a "4" rating, and her assessment statement offered the following praise:

> Julia's work this year was excellent and reflected significant growth.  Her legal
> analysis and strategic thinking are superb, and her writing is very strong.  She
> performed exceptionally well on her feet during oral arguments before the D.C.
> Circuit and a trial court.  Julia shows great initiative, is deeply invested in her
> work, and has a terrific attitude that inspires others.  She took a leadership role
> in multiple matters, doing well at and growing in the role of supervising more
> junior lawyers, working with difficult co-counsel, and interacting with clients.
> Julia works hard and is dependable.
>
> As she has acknowledged, Julia continues to have an imbalance between her
> billable and non-billable hours.  The bulk of her pro bono work was on three
> cases.  The first was a Supreme Court case in which she prepared a partner for
> his first argument.  The second case was a D.C. Circuit appeal that grew out of
> a case Julia and another associate took on in their first year at the Firm at the
> trial stage, which continued well into 2017.   Much of the work ended up
> occurring when the other associate was out on leave.  Julia gained trial and
> appellate argument experience in this case.  In the third case, Julia and the other
> associate helped lead the defense's legal strategy for the more than 200
> defendants.  Julia again ended up handling the case when the associate involved
> went on leave.  Julia presented argument in the D.C. Superior Court.  It is
> essential that going forward, Julia will focus on billable work.

Dkt. 190-7 at 2.  Regarding her compensation adjustment for that year, Brogan acknowledged

that Sheketoff had "turned things around," and she was given an $85,000 raise in recognition of

that development.  Dkt. 221 at 140 (Defs.' SUMF ¶ 266).

**C.**     **Savignac's Employment at Jones Day**

In mid-2018, Sheketoff learned that she was pregnant, causing her and her husband Mark

Savignac, who also worked at Jones Day, to investigate the Firm's leave policies for new

parents.  Dkt. 221 at 151–52 (Defs.' SUMF ¶¶ 294, 296).  The events that ensued ultimately

resulted in Savignac's termination.  The Court begins with Jones Day's leave policies for new

parents at the relevant time.

1.     *Jones Day's Leave Policies for New Parents*

In 2018 and 2019, when Sheketoff was pregnant with Plaintiffs' first child, Jones Day

had two policies that addressed how much paid leave new biological parents were eligible to

receive.  Under the Firm's Short-Term Disability policy, women who gave birth were eligible for

eight weeks of paid leave.  Dkt. 189-8 at 9; *see also id*. at 6–7.  To take advantage of this leave,

women did not need to provide any documentation from a physician certifying their disability;

instead, Jones Day assumed that women who give birth would be disabled for eight weeks after

delivery, although new mothers could return to work earlier, if they wanted to do so, and could,

if necessary, seek authorization to take a longer period of disability leave.  *Id.* at 7 (The Firm

"assume[s]," "[u]nless the Firm is notified otherwise," "that a lawyer's medical provider has

certified an eight-week, post-partum disability period for routine childbirth (including Cesarean-

section births).").[4]

---

[4]     For all leave other than that for routine childbirth, "the specific period of approved [short-term disability] leave is subject to certification from professional medical personnel that specifies the appropriate length of leave in a manner satisfactory to the Firm."  Dkt. 189-8 at 7.  "In any one-year period, full salary and fringe benefits" are offered "up to the first 13 weeks of continuous disability, and 75% of salary and full fringe benefits" are offered for the "14th through 26th weeks of continuous disability."  *Id.* at 6.

In addition, the Firm offered new parents a period of paid parental leave. Under that policy, the primary caregiver of a new biological child was eligible for up to ten weeks of paid family leave as well as six weeks of unpaid leave. *Id.* at 9. But, if the new child was adopted, the Firm offered the primary caregiver of the newly adopted child eighteen weeks of paid adoption leave, followed by six weeks of optional, unpaid leave. *Id.* Secondary caregivers of both biological children and of adoptive children were eligible for four weeks of paid leave (with no additional period of unpaid leave available). *Id.*

   2.   *Request for Parental Leave & Subsequent Termination*

Sheketoff learned she was pregnant in and around the same time she decided to leave Jones Day for a position as an Assistant Public Defender at the Office of the Federal Public Defender. Dkt. 232-1 at 174 (Pls.' SUMF ¶¶ 205–06); Dkt. 221 at 13 (Def.'s SUMF ¶ 21). Sheketoff had initially asked her new employer if she could start later so that she could take advantage of Jones Day's leave policies, but the Federal Public Defender denied that request. Dkt. 221 at 151 (Defs.' SUMF ¶ 294). As a result, Sheketoff planned to leave Jones Day for her new position before she would give birth, and she informed the Firm of her decision to leave.

Savignac, however, planned to stay at Jones Day and, thus, would be entitled to take parental leave when their child was born. Against this backdrop, Sheketoff reached out to Heifetz on August 16, 2018, to ask whether Savignac could take eighteen weeks of paid leave after she gave birth, even though the policy offered only ten weeks of paid leave to fathers who were primary caregivers of new biological children. She sent Heifetz the following email:

> I was looking at the firm's parental leave policy, and I noticed that Jones Day gives women 18 weeks of paid leave (and 24 weeks total) while it gives men 10 weeks of paid leave (and 16 weeks total). Eight of the weeks for women are labeled as disability leave, but the leave is not dependent upon whether women are actually disabled. Most women aren't physically disabled from office work for such a long period and yet still get the full eight weeks of disability leave—

and adoptive parents receive the full 18 weeks paid and 24 weeks total leave
even though they are not disabled.  That seems to reflect the traditional notion
that women should bear most of the burden of childcare, which strikes me as
unfairly discriminatory.  I don't object that the firm is socially conservative as a
general matter, or that its selection of cases promotes those values, but in this
case I think it goes too far in imposing those values on its employees.

For me, since Mark will be the primary caregiver, this will have a pretty big
impact on my life, because I'll end up staying out of work for the extra eight
weeks that Mark cannot.  For career reasons, I'd rather not do that.  I would
guess that the effects of the policy are similar for other women.  Is there anything
that I can do here? Would the firm treat Mark equally to female primary
caregivers and grant him 18 weeks paid and 24 weeks total leave?

Dkt. 189-10 at 4.  Heifetz responded by "pass[ing] [Sheketoff's email] along" to Sarah McClure,

the Director of Human Resources and Employment Counsel at Jones Day.  *Id.* at 3; Dkt. 232-1 at

175 (Pls.' SUMF ¶ 208).  On August 23, 2018, McClure called Sheketoff to inform her that the

Firm was denying her request.  Dkt. 232-1 at 175–76 (Pls.' SUMF ¶ 209).

That same day, Savignac emailed McClure to let her know that he was dissatisfied with

her response to Sheketoff and the denial of their request.  Savignac's email asserted:

Julia let me know that you decided to reject our request that Jones Day amend
its discriminatory parental leave policy.  Thank you for your consideration.

Needless to say, I oppose your practice, which is made illegal by Title VII.  You
may know that it is also illegal to retaliate against an employee who opposes
discrimination.

Dkt. 189-10 at 3.  The following day, McClure responded to Mark.  She wrote:

The Firm disagrees with your assertion of discrimination and impropriety.  Jones
Day's family leave policy provides for male and female lawyers with newborn
children to receive ten weeks of paid family leave (primary caregiver), while
female lawyers receive eight weeks of additional paid leave under the Firm's
short term disability policy for the childbirth.  This is consistent with Title VII,
which allows employers to provide female employees disability leave for
childbirth while not providing the same disability leave to male employees.  *See,
e.g., Johnson v. University of Iowa*, 408 F. Supp. 2d 728, 734 (S.D. Iowa 2004),
*aff'd*, 431 F.3d 325 (8th Cir. 2005) (employer's policy allowing mothers six
weeks of disability leave due to pregnancy but not the equivalent disability leave
to fathers did not violate Title VII); *see also California Fed. Sav. & Loan Ass'n*

> *v. Guerra*, 472 U.S. 272, 290 (1987) (upholding a state law that required
> employers to provide four weeks of medical leave to women who had given birth
> without extending similar benefits to men or persons with other disabilities).
> The EEOC's Enforcement Guidelines address your concern and confirm the
> propriety of Jones Day's approach. . . .
>
> I explained this to Julia on the phone yesterday.  I hope this is helpful and
> addresses your concern.

*Id.* at 2.   The same day that McClure sent that email, Sheketoff left the Firm for her new

position.  Dkt. 221 at 13 (Def.'s SUMF ¶ 21) (Sheketoff's last day was August 24, 2018.).[5]

The next email in the thread was sent almost five months later, after Sheketoff had given

birth.  Dkt. 232-1 at 177 (Pls.' SUMF ¶ 212).  Late in the evening of January 16, 2019, Savignac

emailed Sarah McClure, copying Sheketoff and Heifetz, about the Firm's parental leave policy.

He wrote:

> Sarah,
>
> We have closely reviewed the case law, including the two cases you rely on.  We
> have also discussed the matter with other competent attorneys.  Your cases do
> not support Jones Day's discriminatory policy, which is illegal under Title VII
> and D.C. law.
>
> Jones Day's policy is also inconsistent with the EEOC enforcement guideline
> you mention.  Regardless, your reliance on the guideline example is misplaced
> because EEOC's interpretations of the substantive provisions of Title VII do not
> receive *Chevron* deference, and courts routinely reject them.  E.g., *Young v.
> UPS*, 135 S.Ct. 1338, 1351–52 (2015).
>
> Because our son has now been born and because Julia made the prior request
> whereas I will be the named plaintiff, I write to say: Give me the treatment that
> Jones Day gives to all women with new children—18 weeks of paid leave and 6
> weeks of unpaid leave—or else I will file a charge with EEOC and then a class-

---

[5]    McClure recalls that Heifetz informed her in December 2018 that Savignac had asked to
split his primary caregiver family leave, so that he would "tak[e] some of the paid family leave
when his child was born and some of the paid family leave a few months later."  Dkt. 189-7 at 6
(McClure Decl. ¶ 20).  At the time, Jones Day "allowed associates to defer the start of their paid
family leave if doing so best fit the needs of the family," provided advance approval was sought,
and so "Savignac's request to split his paid family leave was consistent with what the Firm
allowed."  *Id.* at 7 (McClure Decl. ¶¶ 21, 23).

action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion.  We are very familiar with the D.C. Circuit and confident that we will win.

I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation.  We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman.  As you know, Title VII prohibits retaliation for opposition to sex discrimination.

Mark C. Savignac
Associate

Dkt. 189-11 at 2.  McClure forwarded Savignac's email to Shumaker, the Firm's Administrative

Partner.  Dkt. 221 at 168 (Defs.' SUMF ¶ 328).

On January 21, 2019, Shumaker emailed Brogan, the Managing Partner, to recommend

that the firm "terminate [Savignac] immediately."  Dkt. 189-54 at 2–3.  Shumaker testified at his

deposition that he recommended that the Firm terminate Savignac "based upon what was

reflected in the e-mail" and "what it said about [Savignac] as a person"—that is, Savignac's

"understanding of the law firm, [his] absence of professionalism, lack of maturity, an absence of

leadership on an issue, [and] a self-interested demand for something [he] [was]n't entitled to."

Dkt. 190-27 at 26 (Shumaker Dep. 25:19–25).  In particular, Shumaker was troubled by

Savignac's reference to the "court of public opinion."  To Shumaker, that statement sent the

message that: "[I]f you don't give me what I'm not entitled to, I'm going to . . . publicize [this]

. . . and say bad things about this law firm," which Shumaker viewed as "immature,

unprofessional," and showed a "complete absence of judgment."  *Id.* at 49 (Shumaker Dep.

48:10–18).

Brogan agreed with Shumaker's assessment and responded that Savignac "ha[d] to go."

Brogan directed that Savignac be terminated "first thing" the following day.  Dkt. 189-54 at 2.

After receiving Brogan's email, Shumaker worked with office leadership and staff in the D.C. office to terminate Savignac's employment. Dkt. 221 at 192 (Defs.' SUMF ¶ 362). Kevyn Orr, the Partner-in-Charge of the D.C. office, sent a termination letter to Savignac on January 22, 2019. *Id.* (Defs.' SUMF ¶ 363). Savignac's termination was effective that same day. *Id.* at 13 (Def.'s SUMF ¶ 23).

3.    *Request for References Post-Termination*

Following his termination, Savignac reached out to several Jones Day partners to ask whether they would serve as employment references for him. Dkt. 232-1 at 282–83 (Pls.' SUMF ¶ 348); Dkt. 189-59; Dkt. 189-60; Dkt. 189-62. On January 27, 2019, Savignac emailed three partners. One of those three, Karl Thompson, quickly responded saying that he would serve as a reference. Dkt. 189-60 at 2. Another, Shay Dvoretzky, forwarded Savignac's request to Shumaker and Heifetz, asking for them to "advise on how [he] should respond." Dkt. 189-59 at 2.

Jones Day policy prohibits lawyers at the Firm from providing employment references for Jones Day associates, unless the lawyer receives permission to do so from Firm leadership. The Firm Manual states that "lawyers . . . are not authorized to provide any employment reference of any type to any other party, including current or former employees themselves." Dkt. 189-13 at 12. Instead, requests for references should be "referred . . . to the Firm Administrative Partner or appropriate Partner-in-Charge." *Id.* "In most circumstances," the Manual notes, the "response will be limited to disclosing the date of original hire and the date of most recent severance of employment." *Id.*

That said, Jones Day does grant exceptions to this policy based on "individual circumstances." Dkt. 190-27 at 224 (Shumaker Dep. 223:11–15). Shumaker explained at his

deposition that, in his experience as Administrative Partner, there is no "blanket rule" for when exceptions are granted. *Id.* at 224 (Shumaker Dep. 223:11–13). For example, there "could be an associate who, better or worse, people love, but he or she does not have . . . the skill set to advance at Jones Day;" in Shumaker's opinion, the Firm would "be supportive of that individual." *Id.* (Shumaker Dep. 223:1–4). In addition, the scope of the request might also play a role in the Firm's decision: for example, a request for a reference for a particular client or for a particular law firm might receive different consideration than a request for a reference based on the former employee's "performance" generally for all potential employers. *Id.* at 224–25 (Shumaker Dep. 223:22–224:5). Generally speaking, in Shumaker's experience, "not a lot of exceptions [are] requested" and "not a lot of exceptions [are] granted," but he has granted exceptions. *Id.* at 225 (Shumaker Dep. 224:9–16).

When Dvoretzky reached out to inform Shumaker of Savignac's request, Shumaker responded by explaining that the Firm's "standard approach" was not to provide a reference, but Shumaker asked Dvoretzky if he wanted to serve as a reference. Dkt. 189-59 at 2; *see also* Dkt. 190-27 at 227–28 (Shumaker Dep. 227:25–228:8); *id.* at 220–21 (Shumaker Dep. 219:7–220:7) (explaining that the policy had been in place for many years and was designed to prevent the Firm from having to decide for whom it would give a positive reference and for whom it would give a negative reference). Shumaker also forwarded the email Savignac sent to Dvoretzky to McClure. Dkt. 189-64 at 2.

On January 28, 2019, McClure and Shumaker discussed Savignac's request for references. Dkt. 189-67 at 2; Dkt. 221 at 200 (Defs.' SUMF ¶ 376). In that conversation, Shumaker decided to allow Dvoretzky to serve as a reference for Savignac, notwithstanding the Firm's standard approach. Shumaker explained that he thought that "it was in the firm's interest,

as well as [Savignac's] interest, to provide an exception and to allow someone to give a more substantive reference" than the policy would typically allow.  Dkt. 190-27 at 222 (Shumaker Dep. 221:19–22).  Although Jones Day had "properly terminated" Savignac in Shumaker's view, Savignac also "had a young family," there were "people who were supportive of [Sheketoff and Savignac] throughout the firm," and "generally speaking, [he] want[s] [Jones Day] lawyers to move on to other opportunities and to do well." *Id.* (Shumaker Dep. 221:13–22).  As a result, Shumaker concluded that Savignac's request presented an "exceptional circumstance" that warranted an exception to the Firm's general policy against providing references.

Dvoretzky was the best person to act as a reference for Savignac in Shumaker's opinion because Dvoretzky was supportive of Savignac, and Shumaker believed that he "would be most compelling to an employer." *Id.* at 223 (Shumaker Dep. 222:3–14) (noting that Savignac had reached out to Dvoretzky, Shumaker trusted him, and "his stamp of imprimatur would be more valuable to [Savignac] than any of the others" because he "was a very well thought-of person in the issues and appeals bar").  In contrast, Shumaker did not know the other partners Savignac had asked as well and "did not know what their impressions were." *Id.* at 239 (Shumaker Dep. 238:1–12).

When Shumaker informed Dvoretzky of his decision, he told Dvoretzky that he "would prefer that [Dvoretzky] have the discussion with the potential employer orally." *Id.* at 235 (Shumaker Dep. 234:5–12).  That way, Shumaker believed Dvoretzky "would have the ability to field . . . questions" and Shumaker did not think that a call was any less effective than a written reference. *Id.* (Shumaker Dep. 234:5–24).  Consistent with Shumaker's instructions, Dvoretzky responded to Savignac on January 29, 2019, to inform him that he would be able to serve as a reference for Savignac.  His email said:

Hi Mark,

Jones Day's policy is not to provide substantive recommendations, and only to confirm dates of employment. Despite that, I (and only I) have been authorized to speak with potential employers and to provide a reference by phone. I will be able to speak only about the work we did together; I won't be able to answer any other questions. If you'd like me to do that, please feel free to give out my contact information.

Dkt. 189-61 at 2. Dvoretzky then forwarded his email to Savignac to Shumaker as an "FYI." *Id.*

Savignac was subsequently hired by another law firm.

      4.     *Jones Day's Press Release*

Following Savignac's termination, Plaintiffs hired a lawyer and filed claims of

discrimination and retaliation with the EEOC. Dkt. 189-55; Dkt. 189-56; Dkt. 189-57. On July

11, 2019, their lawyer sent Jones Day a letter seeking to settle Plaintiffs' claims against the Firm

without litigation. Dkt. 189-74 at 3. Attached to the letter was Plaintiffs' draft complaint. When

Jones Day did not settle Plaintiffs' claims against it, Plaintiffs decided that they would file suit.

Anticipating that Jones Day "would say something about the complaint" that Plaintiffs

intended to file, Sheketoff testified that she "wanted to be able to tell [her] side of the story," and

she reached out to the *New York Times* on August 1, 2019. Dkt. 190-26 at 176 (Sheketoff Dep.

175:2–9); *id.* (Sheketoff Dep. 175:25–179:19); Dkt. 221 at 217 (Defs.' SUMF ¶ 413). A *New

York Times* reporter decided to pursue the story, interviewed Plaintiffs, Dkt. 221 at 218 (Defs.'

SUMF ¶ 415), and, on August 12, 2019, reached out to Jones Day for comment, *id.* at 223

(Defs.' SUMF ¶ 425). The reporter's email to Jones Day stated that the "story w[ould] go live"

the following morning. Dkt. 189-76 at 3.

In anticipation of litigation and a corresponding "media attack," the Firm decided to issue

a press statement. Dkt. 189-94 at 49 (Lovitt Dep. 48:10–14). As the Managing Partner, Brogan

was the individual who both made the decision to respond to the reporter's inquiry and who

principally drafted the Firm's press statement. Dkt. 190-23 at 174 (Brogan Dep. 173:10–14).

Brogan explained that he had decided that the Firm needed to respond to Plaintiffs' allegations

prior to the outreach from the reporter; he thought a response was necessary after he read the

letter sent from Plaintiffs' lawyer in July alongside the draft complaint. *Id.* (Brogan Dep.

173:18–22); *id.* at 176 (Brogan Dep. 175:10–17). He believed Plaintiffs' allegations were

"unwarranted, unfair, and untruthful attacks," and so he drafted a press release in defense. *Id.* at

177 (Brogan Dep. 176:14–16).

Upon the advice of others, however, Brogan held off on releasing the statement until the

*New York Times* reporter reached out to Jones Day for comment. It was when the reporter asked

for comment that Brogan approved the issuance of the finalized press release he had previously

drafted. *Id.* at 181 (Brogan Dep. 180:2–15). It became necessary to issue the statement at that

time, in Brogan's view, because the Firm "had to say something in response to the impending

article in the *Times* about . . . false allegations about the Firm," *id.* at 181 (Brogan Dep. 180:16–

19).

The *New York Times* article titled "Couple's Suit Over Parental Leave Is New Challenge

to Big Law Firm," was published on August 14, 2019, the day after Plaintiffs filed suit. Dkt.

189-81. Shortly thereafter, Jones Day posted a press release to its website titled, "Jones Day

Responds to Litigation Challenging Leave Policy." Dkt. 189-84 at 2. The press release stated in

full:

> Jones Day is devoted to the importance of family and maintains an environment
> in which our lawyers can practice at the highest professional levels and have
> rewarding family lives. Among the benefits it provides to parents, the Firm
> gives lawyers who are primary caregivers, regardless of gender, ten weeks of
> paid leave and six weeks of unpaid leave after the birth of a child. Birth mothers
> are eligible to receive an additional eight weeks of paid leave under the Firm's
> short term disability policy. For adoptive parents, Jones Day provides eighteen
> weeks of paid leave, regardless of gender.

Today, two former associates—Mark Savignac and Julia Sheketoff—sued Jones Day claiming that the ten weeks of paid leave and six weeks of unpaid leave Mr. Savignac was offered when he and Ms. Sheketoff had a child constituted gender discrimination because he was not eligible for the paid disability leave offered to birth mothers.  Ignoring both the law and biology, Mr. Savignac and Ms. Sheketoff complain that this generous family leave policy, which is fully consistent with guidance of the Equal Employment Opportunity Commission, perpetuates gender stereotypes because the Firm does not require birth mothers to submit medical evidence proving that childbirth has had a physical impact on them sufficient to justify disability leave.  Neither the law nor common sense requires such intrusive disclosures.  Jones Day's adoptive leave policy, which is gender neutral, reflects the fact that adoptive parents face unique demands on their time and finances that differ from those faced by biological parents—such as extended foreign travel and adoption-related legal and administrative hurdles.

Mr. Savignac's claim that he was retaliated against for espousing his legally indefensible view of Jones Day's family leave policy is both false and self-indulgent.  In August 2018, Mr. Savignac and Ms. Sheketoff raised questions about the legal basis for the leave policies, and the Firm responded to those questions.  No adverse actions were taken against either of them in response to their inquiries.   Five months later, Jones Day terminated Mr. Savignac's employment because it concluded that he showed poor judgment, a lack of courtesy to his colleagues, personal immaturity, and a disinterest in pursing his career at Jones Day—all of which are apparent in an intemperate email he sent to a member of our professional staff and in the complaint itself.  Mr. Savignac exhibited open hostility to the Firm, demanding that he be given what he wants "or else" and claiming hardship under circumstances no reasonable person would view as anything but exceptionally generous.

The gratuitous allegation that Ms. Sheketoff, who voluntarily left the Firm in August 2018, was a victim of gender pay discrimination is false and was not made in good faith.  Ms. Sheketoff was a highly paid associate who made more than her husband despite the fact that her reviews from multiple partners were mixed, her contribution to billable client representations was below expectations, and her attention was focused on idiosyncratic concerns.  Reflecting the frivolousness of her claims, Ms. Sheketoff resorts to the sensationalized allegation that the Firm doctored her website photo "to conform to the firm's Caucasian standards of female beauty."  Jones Day never altered any photographs of Ms. Sheketoff, and in fact, Ms. Sheketoff personally selected the precise photo that was used on the Firm's website.

Jones Day intends to try this case in court, not the media, and will have no further comment beyond the pleadings and proofs in this case.

*Id.* at 2–3.  The press release was signed by Brogan as the Managing Partner.  *Id.* at 3.  Plaintiffs also spoke to the *Washington Post* and to a third media outlet about their pending suit.  Dkt. 221 at 218 (Defs.' SUMF ¶¶ 416–17).

**D.    Procedural Background**

Plaintiffs filed their original complaint in this action on August 13, 2019.  That complaint alleged that Defendants Jones Day, Stephen Brogan, and Beth Heifetz had discriminated and retaliated against Plaintiffs in violation of federal and D.C. laws.  *See generally* Dkt. 1. Defendants moved to dismiss the complaint on September 27, 2019, Dkt. 15, and after reconsideration of Plaintiff Sheketoff's claim under the EPA, the Court granted in part and denied in part that motion, Dkt. 32.

Thereafter, Plaintiffs amended their complaint several times.  Dkt. 48 (First Am. Compl.); Dkt. 116 (Second Am. Compl.).  On September 9, 2022, Plaintiffs filed the Third Amended Complaint, Dkt. 172, which, together with Plaintiffs' Supplemental Complaint, Dkt. 25-1, are the operative complaints in this action.  Discovery closed on September 22, 2022.  In the roughly year-and-a-half in which the parties took discovery, they had numerous disputes, several of which were resolved by Magistrate Judge Faruqui and many of which centered on the scope of Defendants' assertion of attorney-client privilege.  Where relevant to the disposition of the parties' summary judgment motions, the Court will discuss the parties' outstanding objections.

Pending before the Court are Defendants' motion for summary judgment, Dkt. 189, and Plaintiffs' cross-motion for summary judgment, Dkt. 197.  The factual record is extensive; indeed, Plaintiffs' Corrected Statement of Undisputed Facts (including Defendants' responses and Plaintiffs' replies), is 573 pages long and includes 735 numbered paragraphs, Dkt. 232-1,

and the parties have filed hundreds of exhibits, *see* Dkt. 189, Dkt. 190, & Dkt. 196.  The motions have been fully briefed, the Court has heard oral argument and has studied the large record, and the motions are now ripe for resolution.

## II. LEGAL STANDARD

Summary judgment is warranted if a party can "show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  The Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "[N]either party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013) (quoting *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989)).  "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent."  *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 245 (D.D.C. 2018) (internal quotation marks and citation omitted).

The movant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the movant carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (citations and internal quotation marks omitted).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment in favor of the moving party.[6]  *Liberty Lobby*, 477 U.S. at 249–50.

---

[6]     Plaintiffs seek to incorporate arguments they made in their opposition to Defendants' Rule 11 motion into their summary judgment motion.  Dkt. 203-1 at 69 n.27.  That request is denied.  Local Rule 7(e) sets page limitations for a party's memorandum in support or in opposition of a motion (as well as procedures for requesting an exception to the rule).  The Court granted Plaintiffs' request to file an overlength brief.  Min. Order (Dec. 27, 2022).  They may not circumvent that already expanded page limit by incorporating additional arguments into their brief.  Plaintiffs have had ample opportunity to respond to Defendants' arguments—and to press their own arguments—within the confines of the extensive summary judgment briefing and oral argument.

# III. ANALYSIS

**A.      Sheketoff's Sex Discrimination Claim**

1.      *Title VII and DCHRA Disparate Treatment Claims*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e–2(a)(1). Sheketoff alleges that Jones Day discriminated against her with respect to her compensation. Dkt. 172 at 37 (3rd Am. Compl. ¶¶ 242–49).  Specifically, she alleges that as part of her 2016 review cycle, a Jones Day partner, Partner A, gave her a less-than-stellar evaluation because she is a woman.  That sexist review, Sheketoff argues, negatively influenced her pay increase for that year.  In 2017, Sheketoff received a raise of $15,000, compared to the $65,000 increase she received the prior year.  Dkt. 189-28 at 2–4.[7]

Where, as here, a plaintiff lacks direct evidence of discrimination, courts evaluate Title VII discrimination claims using the burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the plaintiff must establish a prima facie case of discrimination.  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).  To do so, she "must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  Once she makes out a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  *Wheeler*, 812 F.3d at 1114.  If the employer does so, the burden then shifts back

---

[7]      The analysis is the same for Sheketoff's claim under the District of Columbia Human Rights Act (DCHRA).  Her Title VII claims and DCHRA claims thus rise and fall together.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

to the plaintiff, who must demonstrate that the employer's stated reason for its action was in fact pretext for unlawful discrimination. *Id.*

In considering a summary judgment motion where the defendant has offered a legitimate, nondiscriminatory reason for the adverse employment action, however, a court must "skip ahead to the third step in the test." *Wheeler*, 812 F.3d at 1114. In such a case, "the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quotation marks and alteration omitted). District courts "need not—*and should not*— decide whether the plaintiff actually made out a prima facie case." *Id.* at 494 (emphasis in original). All that remains is the "central question" whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Id.*; *see Walker*, 798 F.3d at 1092.[8]

Here, Jones Day's asserted nondiscriminatory reason for providing Sheketoff with a smaller salary increase than the increase given to her peers is Sheketoff's performance. Defendants contend that Brogan, the Managing Partner, "personally decided Sheketoff's compensation adjustments" in the 2015 review cycle, the 2016 review cycle, and the 2017 review cycle. Dkt. 189 at 44 (emphasis omitted). Although Brogan acknowledges that in the 2015 review cycle, he reviewed each associate's individual evaluations, Dkt. 190-29 at 45

---

[8] A plaintiff can establish a discriminatory employment practice under Title VII in one of two ways. Under the "'single-motive' or 'pretext' theory of discrimination," the plaintiff must show that a protected characteristic was a but-for cause of the adverse employment action. *See Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007). Under the "motivating factor" standard, also known as the "mixed-motive" standard, a plaintiff can prevail by showing that a protected characteristic was a motivating factor in the adverse employment action. *See Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012).

(Lovitt Dep. II 44:15–25), during the 2016 review cycle, he did not do so. Brogan testified that he "did not read" Partner A's evaluation during the 2016 evaluation process, Dkt. 190-23 at 30 (Brogan Dep. 29:16–18). Instead, he stated he made the decision to provide Sheketoff with a minimal raise based on Sheketoff's second, consecutive "2" practice rating, which demonstrated to him that Sheketoff's performance had not changed from the prior year. *Id.* at 30, 227 (Brogan Dep. 29:18–22, 226:12–19). Defendants, accordingly, argue that Partner A's review—which the Firm maintains was not discriminatory—"is legally too remote to qualify as a 'motivating factor'" in Brogan's compensation decision for Sheketoff. Dkt. 189 at 45.

But, at least for the 2016 review cycle, the evidence shows that Brogan was far less involved in making individual compensation judgments for each associate than he had been the prior year. Brogan himself acknowledged as much in his deposition, where he attributed his interest during the 2015 review cycle to personal circumstances and noted that in "[m]ost years," he "rel[ies] upon the recommendations" from others. Dkt. 190-23 at 215–16 (Brogan Dep. 214:24–215:11); *id.* at 29–30 (Brogan Dep. 28:10–29:1); *id.* at 214 (Brogan Dep. 213:11–15). In 2016, that is what Brogan, in fact, did: he adopted the recommendation from Shumaker and Lovitt that Sheketoff's salary increase from $425,000 to $440,000. Dkt. 189-28 at 3–4. And Shumaker testified that in making his recommendation, he relied, in part, on the individual evaluations that partners submitted, including, presumably, Partner A's review of Sheketoff, as well as the comments about Sheketoff made by various partners, including Partner A, at the D.C. litigation partner meeting. Dkt. 190-27 at 333–37 (Shumaker Dep. 333:5–336:11); Dkt. 189-32 at 2 (contemporaneous notes of Partner A's remarks about Sheketoff that echo his evaluation). This evidence, when viewed in the light most favorable to the Plaintiffs, permits the inference that Brogan adopted the compensation recommendation that Shumaker and Lovitt jointly made,

and that the recommendation was influenced—at least in small part—by Partner A's allegedly discriminatory evaluation.

This evidence thus opens the door for Plaintiffs to prevail under a cat's paw theory of discrimination, notwithstanding Brogan's uncontroverted testimony that *his* decision to give Sheketoff a relatively small pay increase for the 2016 review cycle had nothing to do with her sex. "Under the 'cat's paw' theory, 'an employer can be liable when a direct supervisor harbors discriminatory animus and influences the ultimate decision maker, even if that decision maker lacks any discriminatory animus.'" *Kilby-Robb v. Devos*, 246 F. Supp. 3d 182, 201 (D.D.C. 2017) (alterations omitted) (quoting *Noisette v. Lew*, 211 F. Supp. 3d 73, 94 (D.D.C. Sept. 30, 2016)). "To prevail on a 'cat's paw' theory, the plaintiff must show that '(1) [the direct] supervisor perform[ed] an act motivated by discriminatory animus (2) that [was] intended by the [direct] supervisor to cause an adverse employment action, and . . . (3) that act [was] a proximate cause of the ultimate employment action.'" *Noisette*, 211 F. Supp. 3d at 94 (alterations in original and emphasis omitted) (quoting *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016)). Here, the Court concludes that there is just barely enough evidence for a reasonable jury to conclude that Partner A's evaluation had some effect on Shumaker's compensation recommendation for Sheketoff. But for Plaintiffs to prevail under this theory, the record must also permit a reasonable jury to find that Partner A's review of Sheketoff's work was motivated by discriminatory animus and that he intended for the review negatively to affect Sheketoff's annual review and compensation adjustment.

Defendants contend that there is no evidence that Partner A's review was motivated by discriminatory animus, let alone that he intended that his mixed review would have negative consequences for Sheketoff's employment or compensation. Dkt. 189 at 40. In support for their

position, Defendants cite to Partner A's deposition, in which he repeatedly testified that he did

not submit his evaluation to negatively influence Sheketoff's compensation or to otherwise harm

her career.  *See* Dkt. 190-30 at 78 (Partner A Dep. 77:8–11); *id.* at 84 (Partner A Dep. 83:15–22);

*id.* at 227–28 (Partner A Dep. 226:13–227:2).  Rather, Partner A explained that he believed that

it was his responsibility as an evaluator "to provide the firm [his] honest assessment of

[associates'] abilities and their potential for future growth."  *Id.* at 87 (Partner A Dep. 86:6–12).

He wanted to provide honest feedback in his evaluation so that Sheketoff could take action to

change those perceptions if she felt they were wrong, *id.* at 85–86 (Partner A Dep. 84:20–8), and

Partner A testified that he believed that the comments that he put in his evaluation of Sheketoff

honestly reflected his impressions of her performance on the matter on which they both worked,

*id.* at 68–69 (Partner A Dep. 67:14–69:13) (research and writing skills); *id.* at 79 (Partner A Dep.

78:2–20) (lack of presence in the office); *id.* at 111 (Partner A Dep. 110:12–22) (overall

impressions); *id.* at 127–28, 136–37 (Partner A Dep. 126:4–8, 126:22–27:22, 135:12–36:2)

(hours and availability).  Defendants argue that Partner A's testimony thus shows that he did not

submit his negative evaluation of Sheketoff to hurt her career or compensation; instead, he aimed

to help the Firm and Sheketoff by providing honest feedback of Sheketoff's performance on the

client matter.

      In response, Plaintiffs try to cast doubt on the truthfulness of Partner A's testimony, first

by arguing that Partner A's characterization of his feedback as fair and honest is misplaced.  Dkt.

203-1 at 69–70.  They argue that a reasonable jury could find that each of the "factual assertions"

in his review of Sheketoff were false.  *Id.*  But in pressing this argument, Plaintiffs lose focus on

the applicable standard:  To survive summary judgment, a plaintiff must "identify facts from

which a reasonable jury could conclude that [the employer]'s justifications for the contested

performance rating . . . were not [its] real reasons, but were instead pretexts." *Allen v. Johnson*, 795 F.3d 34, 41 (D.C. Cir. 2011).  "[M]ere disagreement with an employer about reasonable judgments concerning the employee's evaluation and meeting participations—judgments that are especially subject to managerial discretion—is not enough to sustain a Title VII claim." *Id.*

For this reason, Plaintiffs' arguments that Sheketoff's work for Partner A was, in fact, better than he perceived it to be are beside the point.  On Plaintiffs' telling, Partner A's evaluation wrongly stated that Sheketoff's initial drafts of the memorandum she produced had "too much 'legal analysis' and too little 'direction to the client,'" and Partner A wrongly described Sheketoff as showing "little-to-no initiative."  Dkt. 203-1 at 69.  But to support this argument, Plaintiffs rely on Sheketoff's impressions of her own work, as well as the other reviews she received that year.  Regarding the former, although Sheketoff's testimony is itself arguably competent evidence, her general belief that the draft memorandum provided "the legal advice requested," Dkt. 190-26 at 93 (Sheketoff Dep. 92:2–7), does not show that Partner A's belief to the contrary was unreasonable or not honestly held, *see Brady*, 520 F.3d at 496 ("The question is not whether the underlying [discriminatory] incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying [discriminatory] incident occurred.") (emphasis omitted); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (explaining that the employer prevails if it "honestly believes in the reasons it offers").

The other reviews Sheketoff received do little to help her case.  Although some of the reviews Sheketoff received were very positive and praised her legal writing, *see, e.g.*, Dkt. 190-7

at 6 (highlighting Sheketoff's work "putting together a cogent and fluidly written draft . . . brief"); *id.* at 7 (describing Sheketoff as a "very skilled writer," whose "writing is always persuasive, and needs little editing"), others reiterated the criticism that Partner A levied at Sheketoff's written work, *see, e.g.*, *id.* at 6 (explaining that Sheketoff's "written advocacy has improved since last year, in structure and style" but stating that her writing "can be further improved by focusing more on the audience"); *id.* at 7 (characterizing Sheketoff's "research and work" as "satisfactory," explaining that "the case team revised and molded the draft motion substantially before filing"). In short, no reasonable jury could infer from this mixed bag of reviews that Partner A's criticisms were knowingly false or misleading and that he did not actually believe that Sheketoff's writing was "more academic" than appropriate for that particular assignment.

Plaintiffs also seek to disprove the portions of Partner A's review that state that: Sheketoff's "availability seems to be whatever is convenient for her;" that Partner A had, "[o]n multiple occasions," "asked for the next version of the memo, but she was tied up on other things;" and that "[w]orking on a weekend does not seem to be in her vocabulary." Dkt. 190-7 at 6. Citing to the email exchanges in which Sheketoff sent revised versions of the memo in question back to Partner A, Plaintiffs argue that these exchanges show that Sheketoff "was virtually always available to work on the project and promptly turned around drafts of the memo" to the partner. Dkt. 232-1 at 465 (Pls.' SUMF ¶ 572). To be sure, these emails show both Sheketoff and Partner A engaged in numerous revisions of the document before it was finalized. *See* Dkt. 196-76; Dkt. 196-77; Dkt. 196-78; Dkt. 196-82; Dkt. 196-83; Dkt. 196-85; Dkt. 196-87; Dkt. 196-91; Dkt. 196-92; Dkt. 196-94; Dkt. 196-98; Dkt. 196-145; Dkt. 196-146; Dkt. 196-147. But the emails themselves do not shed much light on the question of Sheketoff's

availability to work on the assignment when asked.  If anything, the picture the emails paint of Sheketoff's availability is, like Sheketoff's work more generally, mixed.  *Compare* Dkt. 190-15 at 2 (in first email between Partner A and Sheketoff about the project, Sheketoff is unavailable in the morning), *and* Dkt. 196-78 at 2 (Sheketoff apologizing for how long it took her to turn the next draft of the document), *with* Dkt. 196-94 at 2 (Partner A sharing that he would "like to send [the memo] out today" and Sheketoff providing the next draft that day).  Sheketoff herself acknowledges, moreover, that on one occasion she was tied up with other work "when Partner A asked [her] for the next version of the memo."  Dkt. 196-1 at 4 (Sheketoff Decl. ¶ 35).

Nor do Sheketoff's time records suggest that Partner A's assertion that Sheketoff was not inclined to work weekends was pretextual.  To be sure, Sheketoff's time logs show that she billed time on various matters on twenty-two weekends in 2016.  Dkt. 232-1 at 481 (Pls.' SUMF ¶ 599) (citing Dkt. 196-150).  But they also show that she billed just one hour of time on a weekend (when she joined a call with Partner A and others on the Sunday following Thanksgiving) to the matter she was working on with Partner A in 2016.  *Id.* at 480–81 (Pls.' SUMF ¶¶ 597–99) (citing Dkt. 196-150); Dkt. 196-1 at 5 (Sheketoff Decl. ¶ 42).  The time logs therefore fail to controvert Partner A's testimony that Sheketoff did not work on the weekend on the assignment that she received from Partner A, even if he (perhaps) unfairly generalized about her efforts based on his limited experience.  Dkt. 190-30 at 135–36 (Partner A Dep. 134:3–135:6).  Similarly, Partner A testified that there were "multiple occasions where [they] would meet by phone because [Sheketoff] was not in the office."  Dkt. 190-30 at 127–28 (Partner A Dep. 126:19–127:6).  Although the parties engage in a back-and-forth about whether Partner A knew where Sheketoff's office was and how he knew that she was not in the office, *see* Dkt. 232-1 at 485-87 (Pls.' SUMF ¶ 605–07), Sheketoff does not dispute that she did in fact work

remotely at times and, instead, merely observes that Partner A did not ask why she "was working remotely" or indicate "that he was at all dissatisfied that [she] sometimes worked remotely," Dkt. 196-1 at 5 (Sheketoff Decl. ¶¶ 38–39).  For present purposes, however, the question is not whether Partner A communicated his concerns in real time or whether his concerns were fair. The question is just whether a reasonable jury could find, based on these asserted deficiencies in Partner A's evaluation of Sheketoff's work, that he fabricated his criticisms as a pretext to discriminate against Sheketoff based on her sex.  Plaintiffs' disagreement with the merits of Partner A's evaluation does not clear that modest hurdle.

       Having failed to muster sufficient evidence to create a triable question as to whether Partner A's review "was dishonest or unreasonable," *Brady*, 520 F.3d at 496, Plaintiffs maintain that a reasonable jury could find that Partner A's evaluation was discriminatory based on Partner A's purported history of discriminating against women (and women of color, more specifically). In support of this contention, Plaintiffs note that Partner A's reviews of associates "frequently remark[ed]" on female associates' "soft skills," but did so with less frequency for male associates.  Dkt. 232-1 at 502 (Pls.' SUMF ¶¶ 634–35); Dkt. 203-1 at 70.  These "remarks" fail to offer a sufficient basis from which a jury could infer sex-based discrimination.  Although Partner A used the specific phrase "soft skills" more often in evaluation of women, he frequently commented on all associates' abilities to interact well with their coworkers and their clients, regardless of their gender identities.  *Compare* Dkt. 190-21 at 4 ("[H]er soft skills with [the veteran clients] are a treat to observe."), *id.* at 7 ("[S]he had a great bedside manner with our client.  She really cared for our client and brought him to tears after we won."), *and id.* at 11 ("She also does the soft skills well (e.g., communicated her progress well)."), *with id.* at 4 ("He established a rapport with the client quickly (as well as his wife . . . an attorney who

understandably had a lot of questions)" (alteration in original)); *id.* at 9 ("His client skills (questions he asked, his demeanor, etc.) were more akin to a senior associate."), *and id.* at 11 ("[He] also executed the soft skills well.  He communicated well (I never had to ask him for an update) and asked good questions about the task.").  More importantly, Partner A did not use that phrase in Sheketoff's evaluation; nor did Partner A comment on Sheketoff's ability to work with others or interact well with clients in his review.  *See* Dkt. 190-7 at 6.  Therefore, to the extent that a jury might infer that Partner A had different expectations for female associates than for male associates regarding their abilities to work with clients—which would require an unsupported a leap from the evidence presented—there is no evidence that any such expectations played a role in Sheketoff's evaluation.  The Court is therefore unpersuaded that a reasonable jury could infer from Partner A's use of the phrase "soft skills" more often in the evaluation of female associates that he did so based on discriminatory bias against female associates, much less that his discriminatory expectations relating to "soft skills" had anything to do with Sheketoff's evaluation.

Finally, Plaintiffs proffer text messages that Sheketoff exchanged with another associate at Jones Day during the relevant period, Female Associate A.  In that exchange, Sheketoff was distressed about the email she received from Partner A, and she vented to her colleague.  Dkt. 196-42 at 6-8.  Her colleague, in turn, offered words of support.  Sheketoff, at one point, uses a vulgarity to refer to Partner A, and, after reviewing the email, the other associate agrees that "[h]is email is so obnoxious" and adds, "[s]eems like an ego issue."  *Id.* at 6-7.  After some additional back and forth, the other associate asks "wtf is his problem," and Sheketoff responds, "I think it's partially a sexism thing, no?" and then adds, "[a]nd an insecurity thing."  *Id.* at 7-8. The other associate responds, "[d]efinitely insecurity" before adding, "[a]nd maybe you're right

about the sexist thing too." *Id.* at 8.  Finally, the other associate shares that when she was

working with Partner A and "rewrote his memo, [she] had the bankruptcy associate send it and

[Partner A] didn't say a word." *Id.* at 8.  Sheketoff explained at her deposition that it is her

understanding that the bankruptcy associate was male and that Partner A had not critiqued the

feedback provided by that male associate.  Dkt. 190-26 at 137 (Sheketoff Dep. 136:12–22).

   This late-night text message exchange offers no material support for Sheketoff's claim.

Her speculation is not evidence, nor is the speculation of the other associate.  What matters are

the relevant facts, and the barebones account of Partner A not providing negative feedback to a

male associate who sent revisions to Partner A is insufficient to save Plaintiffs' sex-

discrimination claim.  Partner A's criticism of Sheketoff was not that she edited something that

he wrote but, rather, that she edited his writing for "style" (by making small, unimportant

changes), revised his edits to change the text back to how she had written it before he edited it,

and failed to provide sufficiently definitive advice (describing what "one could argue" rather

than writing like an "advisor to a general counsel and corporate board[]").  Dkt. 190-17 at 2; *see

also* Dkt. 190-30 at 235-36 (Partner A Dep. 233:11-234:9).  Sheketoff may—or may not—be

right that she was a better writer than Partner A, that her edits improved the draft and that his

made it worse, and that the tone of his criticisms was unduly harsh.  But it is not the Court's role

to "second-guess an employer's personnel decision"—much less an employer's feedback to an

employee—"absent demonstrably discriminatory motive." *Waterhouse v. District of Columbia*,

298 F.3d 989, 995 (D.C. Cir 2002) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180,

1182 (D.C. Cir. 1996)).  And, here, Sheketoff and Associate A's speculation regarding Partner

A's motivation, even if admissible, would not permit a reasonable jury to find that Partner A's

feedback or evaluation was tainted by any sex-based animus. [9]

More generally, although Plaintiffs have offered sufficient evidence (although just barely

enough evidence) to permit a reasonable jury to find that Partner A's evaluation might have had

some effect on her 2016 review and corresponding 2017 compensation, they have failed to offer

sufficient evidence that Partner A gave Sheketoff a negative performance review because of any

discriminatory animus that he harbored based on her sex.  *Noisette*, 211 F. Supp. 3d at 94.

Accordingly, the Court will grant summary judgment to Defendants as to Plaintiffs' claims that

Sheketoff was compensated differently because of her sex in violation of Title VII and the

DCHRA (Counts 4 and 6).[10]

---

[9]     Plaintiffs also provide text messages that Sheketoff exchanged with Female Associate B. Those text messages recount an odd interaction that the associate had with Partner A after she informed him that she was leaving the Firm.  Dkt. 196-43 at 2–3.  That interaction, however, lacks any arguable nexus to the type of discrimination alleged by Sheketoff: that Partner A's review of her performance was biased.  Accordingly, it too fails to create a genuine issue of material fact as to whether Partner A submitted a negative and sexist review of Sheketoff to influence Sheketoff's compensation adjustment that year.

[10]    At times throughout this litigation, Plaintiffs have appeared to also claim that Jones Day's "black box" compensation system is discriminatory in violation of Title VII based on a disparate-impact theory.  Dkt. 172 at 4, 14–15, 37, 39 (3rd Am. Compl. ¶¶ 70, 78, 245–46, 260–61); *see also Davis v. District of Columbia*, 925 F.3d 1240, 1248 (D.C. Cir. 2019) (explaining that a disparate impact claim is one in which the plaintiff alleges that the employer's action "was the result of a process that, while apparently 'fair in form,' was 'discriminatory in operation'" (citation omitted)).  Plaintiffs do not, however, provide any factual basis for such a claim in their opposition to Defendants' motion for summary judgment on this theory.  *See* Dkt. 189 at 47 (noting absence of support for this theory of liability); *see also Anderson v. Zubieta*, 180 F.3d 329, 338–39 (D.C. Cir. 1999) (explaining that "[i]n a disparate impact case, a three-step, burden shifting framework is also employed," in which "the plaintiff must first make out a prima facie case" by showing that "policies or practices that are neutral on their face . . . nonetheless discriminate in effect against a particular group").  Plaintiffs do not, for example, offer any evidence that the Firm's compensation system pays female associates less as a general matter; instead, Plaintiffs focus their attention on Sheketoff individually.  Accordingly, to the extent Plaintiffs continue to advance such a claim, the Court will also grant summary judgment in favor of Defendants on that (apparently abandoned) claim.

2.      *Equal Pay Act Claim*

"The Equal Pay Act establishes the 'principle of equal pay for equal work regardless of sex.'"  *Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974)).  The EPA "prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses."  *Thompson v. Sawyer*, 678 F.2d 257, 263 (D.C. Cir. 1982) (citing 29 U.S.C. § 206(d)).  Here, Plaintiffs allege that Jones Day violated the EPA when it paid Sheketoff less than her male peers from July 2017 until she left the Firm in August 2018.  Dkt. 172 at 38 (3rd Am. Compl. ¶ 252).

As the Court explained in a prior opinion in this case, "a prima facie EPA claim has two elements—unequal pay and working in a 'substantially similar' (i.e., substantially equal) job."  *Savignac v. Jones Day*, 539 F. Supp. 3d 107, 116 (D.D.C. 2021); *id.* at 117 (explaining that Plaintiffs must allege that Sheketoff "and her comparators worked in 'jobs the performance of which require[d] equal skill, effort, and responsibility, and which [were] performed under similar working conditions'" to state a prima facie EPA claim (quoting 29 U.S.C. § 206(d)(1))); *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 448–49 (D.C. Cir. 1976) ("[J]obs need not be identical in every respect before the Equal Pay Act is applicable; the phrase 'equal work' does not mean that the jobs must be identical, but merely that they must be 'substantially equal.'" (internal quotation marks and citations omitted)).  After the plaintiff has established a prima facie case, "the burden then shifts to [the] defendant[] to show that the pay differential was justified under one of the exceptions to the Act."  *Thompson*, 678 F.2d at 271.  These exceptions include "a seniority system, a merit system, a system that measures pay by quality or quantity of production, or any other factor not based on sex."  *Id.* at 263 (citing 29 U.S.C. § 206(d)(1)).

Both parties devote relatively little attention to this claim in their summary judgment briefing.  Defendants seek summary judgment, arguing both that Sheketoff has not identified "any male comparator who performed 'equal work' for higher pay" and that, in any event, "Sheketoff's poor performance is a factor 'other than sex' that justifies her lower rate of pay." Dkt. 189 at 46–47.  Plaintiffs respond that they have satisfied their prima facie burden because Sheketoff did not have "materially different job requirements than men in the same practice and class year," yet they were paid more for their work that year than she was.  Dkt. 203-1 at 71. This discrepancy was not justified by Sheketoff's performance, Plaintiffs further argue, because "the record does not establish as a matter of law that [Sheketoff]'s performance was 'poor'" and that "her pay was 'based on' her supposed poor performance."  *Id.* at 71–72.  Defendants have the better argument.

The undisputed record shows that between July 1, 2016, and June 30, 2017, "[a]ll of the other D.C. Issues & Appeals associates in Sheketoff's class year who also clerked on the Supreme Court were performing well and received virtually identical salaries regardless of gender:"

**July 1, 2016 Adjustment Following 2015 Evaluation Year**

| Associate | Practice Rating | Adjusted Salary |
|---|---|---|
| Male 1 | 4 | $425,000.00 |
| Male 2 | 3 | $425,000.00 |
| Male 3[11] | 4 | $425,000.00 |
| Female 1 | 5 | $425,000.00 |

---

[11] Male Associate 3 left the Firm in 2017.  Dkt. 221 at 140–41 (Defs.' SUMF ¶ 268).

| | | |
|---|---|---|
| Female 2 | 4 | $425,000.00 |
| Female 3 | 4 | $425,000.00 |
| Sheketoff | 2 | $425,000.00 |

Dkt. 221 at 140–41 (Defs.' SUMF ¶ 268); Dkt. 190-10.  The following year, however, Sheketoff was paid $440,000, whereas those other associates, including male associates, were paid $500,000:

**July 1, 2017 Adjustment Following 2016 Evaluation Year**

| Associate | Practice Rating | Adjusted Salary |
|---|---|---|
| Male 1 | 5 | $500,000.00 |
| Male 2 | 4 | $500,000.00 |
| Female 1 | 5 | $500,000.00 |
| Female 2 | 5 | $500,000.00 |
| Female 3 | 5 | $500,000.00 |
| Sheketoff | 2 | $440,000.00 |

Dkt. 221 at 140–41 (Defs.' SUMF ¶ 268); Dkt. 190-10.

Earlier in this litigation, the Court addressed the proper allocation of the burdens of proof in EPA cases, like this one.  *See Savignac*, 539 F. Supp. 3d at 108.  As the Court explained in that decision, an EPA plaintiff bears the initial burden of establishing that she was "paid less than employees of the opposite sex . . . for work on jobs requiring 'equal skill, effort, and responsibility' that are 'performed under similar working conditions.'"  *Id.* at 108 (quoting 29 U.S.C. § 206(d)).  "The burden then shifts to the employer to show that any pay differential was the product of a bona fide seniority or merit system, 'a system which measures earnings by

48

quantity or quality of production,' or 'any . . . factor other than sex.'" *Id.* (quoting same).  Under this allocation, the employer bears the burden of demonstrating—as an affirmative defense—that the employee was paid less than comparator employees of the opposite sex because she worked fewer hours or the quality of her work was inferior.  *Id.* at 111–16.

For present purposes, the Court need not dwell any further on this question because, even assuming that Sheketoff has established a prima facie case that she was paid less starting in July 2017 than her male counterparts for work on "jobs requiring 'equal skill, effort and responsibility,'" *id.* at 108, her claim fails at the affirmative defense stage.  Deposition testimony from Brogan, Shumaker, and Lovitt all support Jones Day's explanation that Sheketoff received a smaller compensation adjustment in 2017 than her peers because she received a poor performance review for the 2016 cycle (after having received a poor performance review for the 2015 cycle).  Brogan, who made the final decision regarding Sheketoff's compensation, testified that she received a smaller raise than her peers in July 2017 due to her continued poor performance.  *See* Dkt. 190-23 at 30 (Brogan Dep. 29:16–22) (when Sheketoff received a second consecutive practice rating of "2," he "thought that the positive message that [he had] [tried] to send her the prior year apparently did not get through" and "[s]o [he] gave her less of an increase" that year); *id.* at 172 (Brogan Dep. 171:18–21).  Shumaker and Lovitt testified to the same thing—that is, that Sheketoff's poor practice rating and evaluations led them to recommend that she receive a smaller raise than other associates in her practice group.  *See* Dkt. 190-27 at 333–34 (Shumaker Dep. 332:12–333:3) (explaining that he believed a raise commensurate with Sheketoff's peers was "too high for someone who has shown marginal performance two years in a row, behind [their] peers"); Dkt. 190-29 at 90–91 (Lovitt Dep. II 89:15–90:5).

The veracity of this testimony is reinforced by the comparator information that Jones Day has proffered.  Although five other Issues & Appeals associates who had clerked for the Supreme Court were compensated more highly than Sheketoff in 2017, Sheketoff was the only one of the comparator associates who received two consecutive "2" ratings (or, for that matter, a single "2" rating in either year).  All of the other associates who had clerked for the Supreme Court and were of Sheketoff's seniority received a "4" or "5" rating for the 2016 evaluation cycle.  The three other women in her class year, moreover, all received "5" ratings, and all received raises commensurate with the two remaining male associates in the class.  And, looking to other class years, each of the three other associates who received "2" ratings following the 2015 evaluation cycle—including a male associate who had also clerked for a Supreme Court justice—received smaller raises than Sheketoff received for that cycle, and all three had left the Firm before the subsequent evaluation cycle.  Dkt. 190-10 at 3.  These comparators corroborate Jones Day's explanation that the pay disparity Sheketoff experienced was not attributable to her sex but, rather, was attributable to a "factor not based on sex."  *Thompson*, 678 F.2d at 263 (quoting 29 U.S.C. § 206(d)(1)).

Plaintiffs offer only one response to this ratings-based explanation for the pay disparity: they argue that because the compensation decision was "influenced by Partner A's evaluation," which Plaintiffs allege was sexist, the factor-other-than-sex exception to the EPA is not satisfied. Dkt. 203-1 at 72.  But the Court has already rejected that contention as unsupported by sufficient evidence to convince a reasonable jury that Partner A was motivated by sex-based bias and has granted summary judgment to Defendants on Sheketoff's Title VII and DCHRA sex discrimination claims.  As a result, Plaintiffs' EPA claim also fails.

The Court concludes that Defendants have met their burden by proffering evidence, which is not subject to reasonable dispute, that the pay disparity Sheketoff faced for her work as an Issues & Appeals associate was because of a "factor other than sex." 29 U.S.C. § 206(d)(1). *See Gaujacq v. EDF, Inc*., 601 F.3d 565, 576 (D.C. Cir. 2010) (granting summary judgment to the employer where the pay differential was "based on 'experience, training or ability of an employee,'" because such factors "may justify salary differentials, provided they are not based upon sex." (quoting *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir. 1980))).  The Court will thus grant Defendants' motion for summary judgment as to Count 5.

**B.     Jones Day's Leave Policies for New Parents**

      1.     *Title VII and DCHRA Claims*

Plaintiffs also contend that they were subject to discrimination on the basis of sex under Jones Day's leave policies for new parents.  Specifically, they allege that Jones Day's leave policies are discriminatory because they offer different periods of leave for biological mothers and biological fathers.  Under the policies, birth mothers are eligible for a total of eighteen weeks of paid leave—eight weeks of which are labeled short-term disability leave—while biological fathers receive only ten weeks of paid leave as primary caregivers under the family leave policy. This discrepancy, Plaintiffs argue, discriminates against men on the basis of their sex and is therefore unlawful under Title VII and the DCHRA.  Because "the legal standard for establishing discrimination under the DCHRA is substantively the same as under Title VII," the Court considers Plaintiffs' sex discrimination claims under Title VII and the DCHRA simultaneously. *Motley-Ivey v. District of Columbia*, 923 F. Supp. 2d 222, 233 (D.D.C. 2013); *see, e.g.*, *Holmes v. Univ. of the D.C.*, 244 F. Supp. 3d 52, 63 (D.D.C. 2017) (using the same standard to resolve a pregnancy discrimination claim under Title VII and the DCHRA).

Title VII prohibits discrimination in the terms and conditions of employment on the basis of sex.  42 U.S.C. § 2000e *et seq.*  In *General Electric Co. v. Gilbert*, 429 U.S. 125, 146 (1976), the Supreme Court held that discrimination on the basis of pregnancy did not constitute sex discrimination under Title VII.  Congress, however, quickly responded to that decision, by amending Title VII in 1978 to clarify that discrimination "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k); *see also* D.C. Code § 2-1401.05(a) ("For the purposes of interpreting this chapter, discrimination on the basis of sex shall include, but not be limited to, discrimination on the basis of pregnancy, childbirth, related medical conditions, breastfeeding, or reproductive health decisions.").  Among other things, these amendments—enacted in the Pregnancy Discrimination Act of 1978 ("PDA")—ensure that it is unlawful for an employer to fire, demote, or otherwise take an adverse employment action against a female employee because she is pregnant.  *See* Pub. L. No. 95-555, 92 Stat. 2076 (1978).

The PDA also amended Title VII to mandate that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work."  § 2000e(k).  This provision of the PDA caused some initial confusion, leading to a dispute about whether Title VII, as amended, prohibited employers from treating pregnant women advantageously relative to their male counterparts.  In *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272 (1987), the Supreme Court resolved that dispute and held that the PDA did not create "a ceiling above which [pregnancy disability benefits] may not rise."  *Id.* at 285.  Employers may offer

pregnancy-specific benefits without discriminating on the basis of sex—even if male employees are unable to take advantage of those benefits.

That, however, does not fully resolve the question. Title VII's background prohibition on sex discrimination still exits, and employers may not use the label "pregnancy disability benefit" as a smokescreen to hide what is, in truth, gender-based discrimination. As the Supreme Court explained in *Guerra*, a state law that is "narrowly drawn to cover only the period of actual physical disability on account of pregnancy, childbirth, or related medical conditions" is permissible, but a "statute based on . . . stereotypical assumptions" and "archaic" notions "about pregnancy and the abilities of pregnant workers" would be "inconsistent with Title VII's goal of equal employment opportunity." *Id.* at 290 (emphasis omitted); *id.* at 285 n.17 ("[A] State could not mandate special treatment of pregnant workers based on stereotypes or generalizations about their needs and abilities.").

The Third Circuit's decision in *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir. 1990), illustrates the distinction that *Guerra* drew. In *Schafer*, the Third Circuit considered whether a policy that provided mothers, but not fathers, with unpaid "childrearing leave" of up to a year was discriminatory. *Id.* at 244. Although the policy treated women more favorably than men—and was thus facially discriminatory—the defendants "argue[d] that the PDA, as interpreted . . . in *Guerra*, permit[ted] favorable treatment of pregnant females." *Id.* at 247. The Third Circuit disagreed, holding that neither the PDA nor *Guerra* "allows preferential treatment to employees who have recently given birth to a child without a simultaneous showing of a continuing disability related to either the pregnancy or to the delivery of the child." *Id.* at 248. Because the record was devoid of evidence even "suggest[ing] that the normal maternity disability due to 'pregnancy, childbirth, or related medical conditions' extends to one year," the

Third Circuit held that the policy violated Title VII and was "void for any leave granted beyond the period of actual physical disability on account of pregnancy, childbirth or related medical conditions." *Id*

Plaintiffs contend that Jones Day's leave offerings for new parents are more akin to the benefits in *Schafer* than a true pregnancy disability benefit.  They argue that although Jones Day labels the eight extra weeks of paid leave that birth mothers may take as "short-term disability leave," that label is pretextual and masks a policy that discriminates against fathers.  Rather than covering a period of actual, postpartum disability, the Firm's policies, on Plaintiffs' telling, are the product of a stereotypical and archaic belief that women should bear more of the responsibility for childrearing and thus need more time away from work than fathers do.  With those alleged prejudices in mind, Plaintiffs argue that Jones Day adopted its current policies to maximize the difference between the leave afforded to biological mothers and the leave afforded to new biological fathers.  *See* Dkt. 203-1 at 17–19.

In essence, then, Plaintiffs' challenge to Jones Day's leave policies is one of sex discrimination, and as with other disparate treatment claims, the "three-step *McDonnell Douglas*" burden shifting framework applies.[12]  *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C.

---

[12]     The Court treats Plaintiffs' claim as one of disparate treatment (rather than disparate impact) because its central thrust is one of discriminatory animus—that is, Plaintiffs contend that Jones Day adopted this policy because its decisionmakers harbored antiquated views about the relative roles that women and men play in the family.  *See Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009) (explaining that "[a] disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action," whereas a disparate-impact plaintiff must show that "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities" can be avoided without compromising the business needs of the employer); *see, e.g., Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (challenging alleged wage discrimination under both disparate treatment and disparate impact theories).  Even more to the point, neither party argues that this Court should evaluate Plaintiffs' claims using a disparate-impact framework.

Cir. 2019) (explaining that when a plaintiff makes a disparate treatment claim, the worker "seeks to prove that an employer intentionally 'treats some people less favorably than others because of their race, color, religion, sex, or national origin.'" (quoting *Segar v. Smith*, 738 F.2d 1249, 1265 (D.C. Cir. 1984))).  Under the first step, the employee must establish a prima facie case. *Wheeler*, 812 F.3d at 1113–14.  Then, "the burden . . . shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114.  If the employer meets its burden of production, the employee is no longer required to articulate a prima facie case but, instead, bears the burden of proving that the policy is, in fact, discriminatory. *Figueroa*, 923 F.3d at 1086.

Here, Defendants have proffered a nondiscriminatory justification for Jones Day's policies:  Under its policies, Jones Day provides biological mothers with eight additional weeks of leave immediately following the birth of a child to recover from the medical consequences of giving birth.  That eight-week period of short-term disability leave is afforded to all women who give birth by default, without requiring certification by a doctor, to respect the privacy of the affected employees and to minimize the burden of administering the benefit.  Finally, according to Jones Day, the eight-week period is based on a reasonable assumption that is "supported by medical evidence" and that is "consistent with standard insurance practices."  Dkt. 189 at 22.

Plaintiffs challenge the legitimacy of this asserted, nondiscrimination justification in two ways:  First, they argue that most women are not, in fact, disabled for eight weeks after they give birth; that the eight-week period is not based on medical evidence; and that Jones Day's policy is, instead, premised on the sort of stereotypical policy that *Guerra* described as discriminatory. *See* Dkt. 203-1 at 20–24.  Second, they argue in the alternative that, even if a policy that provides eight weeks of short-term disability leave postpartum is facially nondiscriminatory, the record

shows that Jones Day adopted its leave policies for new parents for discriminatory reasons.  *See id.* at 24–28.  The Court considers Plaintiffs' arguments in turn.

a.     Typical Length of Postpartum Disability

Plaintiffs first argue that a reasonable jury could find that Jones Day's leave policies are discriminatory because the nondiscriminatory rationale provided by the Firm—that the eight weeks given to women and not to men is attributable to the period of disability that women face after giving birth—is not supported by medical evidence.  Dkt. 203-1 at 20–22.  The Court is unpersuaded.  The evidence provided by both parties shows a range of possible postpartum disability periods, varying from four to eight weeks, depending on the manner of birth and other circumstances.  Both parties' experts agree that certifying six weeks of disability leave for vaginal births and eight weeks of disability leave for cesarian sections is consistent with the medical standard of care, with the experts acknowledging that four-week certifications also occur on occasion for some uncomplicated vaginal births.

Dr. Christine Colie, Defendants' expert and the Vice Chair of obstetrics and gynecology ("OBGYN") at MedStar Georgetown and a professor in OBGYN at Georgetown University Medical Center, Dkt. 221 at 33 (Defs.' SUMF ¶ 55), explained that the "standard of care," or "baseline . . . course of treatment," "in OBGYN for short-term physical disability associated with childbirth without complications is from six to eight weeks after birth," Dkt. 189-97 at 4 (explaining that a "standard of care originates from a long-term experiential consensus for treatment of a specific condition").  That "range is often—though not always—associated with the specific method of delivery, *i.e.*, six weeks for vaginal delivery and eight weeks for cesarean delivery."  *Id.*  Consistent with this standard of care, Dr. Colie explained that ordinarily "physicians will certify a six[-] to eight[-]week disability period to begin at delivery" for most

56

women, assuming both that "delivery will proceed without complications" and that "delivery is expected to be within two weeks before or after the estimated due date." *Id.* at 13. Notably, Dr. Colie further explained that "[t]he medical certification of birth-related disability typically happens prior to birth, often before it is known whether the woman will have a vaginal delivery or cesarean section." *Id.*

Like Dr. Colie, Dr. Kenneth Naylor, the Plaintiffs' expert and a physician specializing in OGBYN, described "[p]roviders in the United States [as] generally authoriz[ing] a 6-week disability for uncomplicated vaginal birth and 8 weeks for an uncomplicated cesarean delivery." Dkt. 189-99 at 3; Dkt. 189-102 at 49 (Naylor Dep. 48:14–15) (explaining that a "standard of care" is "what a reasonable and prudent practitioner would do in similar circumstances"). Dr. Naylor cautioned, however, that this practice among providers is "based on tradition rather than clinical outcome data or clinical necessity" and has not been confirmed through controlled scientific studies. Dkt. 189-99 at 3; Dkt. 189-102 at 51 (Naylor Dep. 50:3–8). But he nonetheless acknowledged that six weeks has "been the standard disability [for vaginal births] for [his] entire career in medicine," *id.* at 52 (Naylor Dep. 51:12–19), and that it is "certainly appropriate to authorize a six-week disability after a vaginal birth," *id.* at 53 (Naylor Dep. 52:3–4).

Zach Lathan, a representative from Unum Group ("Unum"), a short-term disability insurer, attested to Unum's practices and that of the insurance industry generally. For childbirth, assuming the birth is without complications, "Unum considers the standard period of short-term disability to be six to eight weeks." Dkt. 189-5 at 2 (Latham Decl. ¶ 7). An employer insured through Unum can decide whether it wants to offer employees six weeks of short-term disability leave "regardless of delivery," eight weeks of leave regardless of delivery, or six weeks for

"natural delivery" and eight weeks for delivery via cesarean section.  *Id.* at 3 (Latham Decl. ¶ 8).

Unum "standardly does not require a physician certification if the disability period is not more

than eight weeks."  *Id.* (Latham Decl. ¶ 10).  It applies that approach, moreover, "regardless of

what [the employee's] occupation is;" in general, "any disability period up to eight weeks is

considered standard."  *Id*. (Latham Decl. ¶ 10).  That said, an employer can opt-in to a physician

certification requirement for any disability, including for all types of childbirth.  But, "[i]n

Unum's experience, the average disability period of employees in those plans" that require

physician certification is consistent with the six-to-eight-week "industry standard[]."  *Id.* at 4

(Latham Decl. ¶ 12).

As Dr. Colie further explained, six to eight weeks is the standard of care because women

face a multitude of medical challenges after giving birth.  To begin with the most obvious,

women who give birth via cesarean section, which makes up approximately one-third of all

deliveries, undergo a "major surgical procedure" that requires eight weeks following birth to

recover (with complicated cesarean sections requiring a longer recovery period).  Dkt. 189-97 at

5.  Women who give birth vaginally, in turn, often experience lacerations, the "vast majority" of

which require surgical repair.  *Id.*  In Dr. Colie's experience, "seventy-five percent of first-time

mothers will experience at least a second-degree laceration," which requires surgical repair using

"resorbing sutures at the time of delivery," and those sutures "will not begin to resorb until six

weeks post-partum[,] and [they] sometimes may take longer to resorb."  *Id.*  Women also face a

risk of a postpartum hemorrhage until approximately six to eight weeks post-delivery, *id.* at 5–6,

and can experience bleeding for up to six to eight weeks after delivery as the enlarged uterus

begins to contract to pre-pregnant size, *id.* at 6; develop hemorrhoids; and experience neck and

back pain due to the loss of muscle and weight gain during pregnancy, *id.* at 7, among other

conditions, *id*. at 5–11.  Women who choose to breastfeed, moreover, may be required to feed the baby every one to three hours for the first several weeks after birth and every two to three hours for the first three to four months after birth, often resulting in severe sleep deprivation.  *Id.* at 7–8.  And many women experience "some level of postpartum blues, frustration, and/or increased mental stresses during and following childbirth," with "approximately ten to fifteen percent of women," in Dr. Colie's experience, "develop[ing] diagnosable postpartum depression and/or anxiety . . . that requires intervention, including medical counseling and prescription of anti-depressants."  *Id.* at 8.

To be sure, not every woman faces all (or most) of these conditions after giving birth, and it is debatable whether women facing each of these conditions would qualify as disabled.  As Dr. Naylor stressed in his expert report, determining "the period of disability after childbirth" is an "individualized" inquiry:  Dkt. 189-99 at 3.  "Some symptoms may last a few days, while others may last several weeks[.]"  *Id.*  In his experience:

> Not all women are disabled for eight weeks after delivering a child; in fact, most women are not disabled for eight weeks after a delivery.  Patients with sedentary employment who have had an uncomplicated birth and postpartum course may return to work at their discretion.  Patients who have an uncomplicated vaginal birth can typically physically return to relatively sedentary employment within 3–4 weeks of delivery.  At this stage of the postpartum period many of the pregnancy-related changes have essentially resolved and most perineal lacerations have largely healed.  Patients who have more physically demanding employment who have a cesarean delivery may require an eight-week disability.

*Id.*; *see also* Dkt. 189-102 at 52–53 (Naylor Dep. 51:23–52:17) (explaining that "[i]t's certainly appropriate to authorize a six-week disability after a vaginal birth, but it's also appropriate if a patient wants to return to work at four weeks and she is not experiencing any complications, it would be appropriate for her to return to work at four weeks, and that happens").  According to Plaintiffs, Dr. Naylor is not alone in this view, and they cite to additional medical publications

that recommend certifying a period of four to six weeks for vaginal births.  *See* Dkt. 232-1 at

114–16 (Pls.' SUMF ¶ 151).  Although Defendants object to these publications on the ground

that they constitute hearsay and neither expert directly relied on either report in rending their

opinions, the Court need not resolve that objection because the undisputed evidence remains the

same: physicians certify a disability period ranging from four weeks to eight weeks for women,

depending on a broad array of factors including, but by no means limited to, the manner in which

the woman gives birth.

In sum, then, both parties' experts agree that for a significant portion of women—at least

the roughly one-third of women who give birth by cesarean section—an eight-week period of

short-term disability is appropriate.  But those experts also agree that a shorter period of

disability can exist for uncomplicated vaginal births.  Ultimately, the record reflects the

undisputed reality that every woman experiences pregnancy differently, including the postpartum

period, and that, as a result, an eight-week period of short-term disability leave does not perfectly

capture the actual experience of each and every woman who gives birth.

Seizing on this, Plaintiffs argue that the flaw with Jones Day's short-term disability

policy is not that it provides *some* women with the ability to take eight weeks of leave but, rather,

that the policy provides *all* women with the ability to take that period of leave—even if they, for

example, experience an uncomplicated vaginal birth that did not require any surgical repair (or

required only a minor one).  Because Jones Day's policy (at least arguably[13]) affords all women

who give birth eight weeks of disability leave without requiring any actual showing of disability,

Plaintiffs contend that the policy lacks a sufficient nexus to the actual needs of the women who

---

[13]    For present purposes, the Court need not address the contention, which Jones Day has at
times raised, that the Firm's disability policy requires birth mothers who recover in less than
eight weeks to return as soon as they have recovered.

receive the benefit and is thus an overbroad generalization that runs afoul of *Guerra*.  In Plaintiffs' preferred world, Jones Day's short-term disability policy would be tailored (or would at least "attempt[]" to be tailored) to each woman's period of actual disability following delivery.[14]  Dkt. 203-1 at 21–22.  The Firm could implement such a rule, in their view, in a variety of ways, including by requiring new mothers to establish a particularized disability based on a "doctor's certification" or through an "honor system."  *Id.*  Nothing in Title VII, *Guerra*, or any other caselaw, however, requires such a case-by-case approach.

The thrust of the Supreme Court's reasoning in *Guerra* was that "stereotypical notions about pregnancy and the abilities of pregnant workers" cannot form the basis of a policy that treats men and women differently, even if that policy is purportedly about pregnancy.  *Guerra*, 479 U.S. at 290.  It is in the context of that concern about harmful stereotypes that the Court distinguished policies that are "narrowly drawn to cover only the period of actual physical disability on account of pregnancy" from those that would violate Title VII.  *Id.*  No court has applied *Guerra* to require employers to tailor the period of short-term disability leave to the period of actual disability that each individual woman experiences—rendering it unlawful, for example, to provide disability leave to a new mother who is fully recovered just three weeks after delivering her third child.  Nor, for that matter, would such a policy be feasible.

As Dr. Colie explained in her expert report, ascertaining exactly how long a woman is disabled after giving birth is not feasible immediately after delivery.  Immediately after birth, the mother typically remains in the hospital following delivery "to monitor [her] recovery and ensure

---

[14]     Defendants argue that Plaintiffs do not make these claims in their complaint.  But the Third Amended Complaint does allege that Jones Day's family leave policy is discriminatory because it is not proportionate to the period of actual disability that each female associate experiences after giving birth.  Dkt. 172 at 23–25 (Third Am. Compl. ¶¶ 148–163).

the baby is in stable condition."  Dkt. 189-97 at 13.  During this period of hospitalization, however, "[i]t is not possible . . . to assess what will be the exact duration of disability for the specific patient."  *Id.*  "Even in cases of routine childbirth, it is not possible to know for certain when a specific individual patient will recover and be physically and psychologically able to resume the activities that were normal for her before pregnancy;" rather, "[p]hysicians can only assess later in time whether a given patient's recovery is proceeding normally."  *Id.* at 13.  In routine cases, the OBGYN "will schedule the postpartum examination . . . approximately six to eight weeks after delivery."  *Id.* at 13.  "The postpartum examination focuses on assessing the woman's recovery," and it is at that time that the doctor can assess the extent of the woman's actual disability.[15]  *Id.* at 14.  Dr. Naylor, Plaintiffs' expert, does not disagree with Dr. Colie that the postpartum examination ordinarily occurs six to eight weeks after delivery; in his practice, he typically sees women for a comprehensive postpartum visit about six weeks after the child is born, although at times this checkup occurs "a little bit later."  Dkt. 189-102 at 37–38 (Naylor Dep. 36:25-37:7).  Moreover, as this testimony confirms, not every postpartum examination will (or can) occur precisely on day-forty-two (or day-twenty-eight), so that the mother can return to work the next day.  Given this undisputed testimony, it is difficult for the Court to see how Plaintiffs' proposed alternative to Jones Day's current policy—that is one in which women receive disability leave that precisely corresponds to their actual disability—is feasible.

---

[15]     Although OBGYNs will typically also schedule an earlier examination for women who give birth via cesarean section to check the incision site, that visit is "not an assessment of overall recovery in the nature of the postpartum examination."  Dkt. 189-97 at 14.  Similarly, "women with blood disorders will typically come in for an examination one week after delivery to have their blood pressure managed;" this visit is also "not an assessment of overall recovery." *Id.* at 14 n.7.

The Court is thus persuaded that any policy an employer adopts that provides women with the ability to take postpartum short-term disability leave will be inherently imprecise because the period of disability a doctor certifies in advance can only reflect the anticipated period of disability a woman will face, and not her actual experience postpartum, and any period of disability a doctor certifies at six or eight weeks will turn not on the precise period of actual disability but, rather, on when the postpartum examination is scheduled to take place and the logistics of returning to work thereafter.  Moreover, any notion of precision turns on the false premise that recovery from childbirth occurs on a particular day, rather than over a continuum. Recognizing as much, Plaintiffs themselves concede that precision is not required:  As they frame the question, their argument "is that the policy is illegal because it does not depend on disability, not [that] it does depend [on] disability but is applied imprecisely."  Dkt. 203-1 at 21 (emphases omitted).

In Plaintiffs' view, the pregnancy-disability policy is unlawful because it "give[s] all new mothers 'special treatment' in the form of eight extra weeks of sex-based leave based on an admittedly overinclusive 'generalization[] about their needs and abilities.'"  *Id.* at 21–22 (quoting *Guerra*, 479 U.S. at 285 n.17) (alteration in original).  Rather than mechanically giving all new mothers eight weeks of leave, Plaintiffs submit that the Firm should have required a doctor's certification or should have enforced an actual-disability rule through an "honor system."  *Id.* at 21.  This contention, however, fails for at least two reasons.

*First*, the reference to "stereotypes and generalizations" found in *Guerra*, which Plaintiffs cite in part, focuses on promoting equal opportunity for women by ensuring that they are not victims of "archaic or stereotypical notions about pregnancy and the abilities of pregnant workers."  *Guerra*, 479 U.S. at 285 n.17, 290.  Thus, if the Jones Day policy cast women as

unable to work for an undue period after giving birth—a period of time unmoored to the

established standard of care and premised, instead, on "stereotypical notions" about pregnancy

and the abilities of women after giving birth—Plaintiffs would have a more substantial claim.

But, here, the policy merely provides women with the opportunity to take up to eight weeks of

paid leave, which extends to the upper end of the standard of care, without requiring participants

to disclose very personal information to their employer regarding the delivery process and the

effects on their bodies.  Plaintiffs offer no evidence—nor is the Court aware of any evidence—

that the disability policy itself disadvantages women in the workplace.  Instead, Plaintiffs'

principal claim is that, pregnancy discrimination aside, the policy violates Title VII by

discriminating against male associates based on their sex—and not based on the physical

differences experienced by those who give birth and those who do not.  That argument, however,

requires some evidence that the nondiscriminatory justification that Jones Day has offered in

support of the policy is pretextual.  That question is addressed below; it has no bearing, however,

on Plaintiffs' facial challenge to the policy itself.

*Second*, nothing in the law required the Firm to adopt Plaintiffs' preferred approaches

from among the range of permissible options.  Plaintiffs point to language in *Guerra*, noting that

the state law at issue there was "narrowly drawn to cover only the period of actual physical

disability on account of pregnancy."  479 U.S. at 290 (emphasis omitted).  It is far from clear that

the *Guerra* Court intended to mandate that all pregnancy-disability leave policies be "narrowly

drawn;" the Court merely counted the fact that the policy at issue was "narrowly drawn" as a

mark in favor of upholding the policy.  *See id.*  But even assuming that a "narrowly drawn" test

applies, the Supreme Court has described that test—even in the heightened context of

commercial speech—to require a "fit that is not necessarily perfect, but [is] reasonable," which

"represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.'" *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *Florida Bar v. Went For It, Inc*., 515 U.S. 618, 632 (1995) (quoting same).  The pregnancy-disability policy at issue satisfies that test.  At least as a facial matter, it is reasonably tailored to address the actual disabilities associated with childbirth in a manner that is not unduly intrusive (regarding a personal matter) and that can be administered in a reasonable manner.  This case, accordingly, is wholly unlike *Shafer*, where there was no record support whatsoever for the notion that most women are disabled for one year following delivery (or that even a significant portion are), or that a one-year period of leave served any legitimate, nondiscriminatory purpose.

To be sure, Plaintiffs offer at least two alternative approaches that the firm might have taken: "relying on doctors' certification (which would not all be for eight weeks) or the honor system."" Dkt. 203-1 at 21.  But, as explained above, narrow tailoring does not require a perfect fit and does not restrict the decisionmaker to a single option.  Here, for the reasons explained above, requiring doctors' certification will not necessarily achieve a substantially better fit between the period of actual disability and the length of the leave, given the uncertain, predicative nature of an anticipatory certification and the imprecision of waiting for a certification at the time of the postpartum examination.  And there is no reason to believe that reliance on an honor system would achieve a more precise fit, since many women would likely wait to hear from their doctors at their postpartum examinations.  Both of Plaintiffs' preferred approaches, moreover, may result in some disparity among similarly situated women, depending, among other things, on when their doctors are available to schedule their postpartum examinations.  In short, although perhaps at the outer perimeter, the Court concludes that the eight-week period is reasonable and that, at least on its face, the policy satisfies the test that

Plaintiffs themselves offer: "it *does* depend [on] disability," even if it "is applied imprecisely." *Id.* (emphasis in original).

Finally, the Court notes that this case is more like *Johnson v. University of Iowa*, 431 F.3d 325 (8th Cir. 2005), than *Schafer*. In *Johnson*, the Eighth Circuit considered the University of Iowa's family leave policy, which allowed biological mothers to take disability leave "for any period of pregnancy-related temporary disability, to be charged against accrued sick leave," without providing "disability documentation." *Id.* at 327. Biological fathers, in contrast, were not permitted to charge any leave to accrued sick leave following the arrival of a child. *Id.* at 327, 331. Arguing that the policy was discriminatory, the plaintiff in *Johnson* brought a challenge under the Equal Protection Clause of the Fourteenth Amendment, Title VII, and state law. *Id.* at 326. The district court granted summary judgment in favor of the defendants on all claims, and the Eighth Circuit affirmed. *Id.*

The Eighth Circuit was not persuaded by the plaintiff's argument that the absence of any requirement of "proof of disability" for the first six weeks of leave showed "that the University's paid maternity leave" was not, in fact, a disability policy. *Id.* at 329. The court rejected that argument on the ground that it was "not unreasonable for the University to establish a period of presumptive disability so that it does not need to review medical records for each and every employee who gives birth." *Id.* As the court explained, the University offered "testimony that a six-week period of disability after childbirth is supported by medical evidence," and the plaintiff failed to offer his own "medical evidence indicating that the general period of recovery is less than six weeks." *Id.*

So too here. Plaintiffs have not demonstrated that an eight-week default period of short-term disability, although not perfectly tailored for every woman, is unreasonable. Accordingly,

the Court is unpersuaded that the policy itself bears so little relationship to the medical needs of women following delivery that a jury could infer from the policy's terms alone that it was adopted for pretextual reasons.

The Court then turns to the next issue:  whether a reasonable jury could find that Jones Day's decision to set the default period of postpartum disability leave at the higher end of a medically appropriate range, even if permissible in the abstract, was in fact pretextual in this case.

> b.    <u>Selection of High-End of Range</u>

Even if the eight-week period of short-term disability leave is permissible in theory, there remains the question of whether Jones Day's decision to adopt that policy was made for discriminatory reasons.  As has been explained, under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), once the plaintiff articulates a prima facie case of discrimination, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  *Wheeler*, 812 F.3d at 1114.  "If the employer does so, the burden then shifts back to the plaintiff, who must demonstrate that the employer's stated reason for its actions was in fact pretext for unlawful discrimination."  *Dodson v. United States Capitol Police*, 633 F. Supp. 3d 235, 253 (D.D.C. 2022).

Plaintiffs argue that Jones Day selected the eight-week period (rather than a lower number) so that it could minimize the amount of parental leave it offers to fathers, who Plaintiffs contend the Firm viewed as less deserving or in need of parental leave.  *See* Dkt. 203-1 at 24. Defendants dispute that characterization.  They argue that Jones Day adopted the eight-week presumptive period of leave for women who give birth for purely nondiscriminatory reasons

following the enactment of the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C.

§§ 2601 *et seq.*, in 1993.  *See* Dkt. 189 at 16–18.

Prior to passage of the FMLA, Jones Day offered new mothers twelve weeks of paid

leave and twelve weeks of unpaid leave.  Dkt. 189-4 at 2 (Dressing Decl. ¶ 6).  New mothers did

not need to provide "any type of medical certification for disability from giving birth, absent

complications," to take this leave, *id.* (Dressing Decl. ¶ 6), and the leave "did not differentiate

between, on the one hand, time that the new mother needed to recover from childbirth and, on

the other, time for the new mother and child to bond," Dkt. 221 at 18 (Defs.' SUMF ¶ 33).  New

fathers, in contrast, were not eligible for any formal leave, paid or unpaid.  Instead, new fathers

"typically used a combination of vacation and sick days to take some time off from work

following the birth of a child."  Dkt. 189-4 at 2 (Dressing Decl. ¶ 6).

After Congress enacted the FMLA, however, Jones Day reviewed its leave policies,

including those for new parents, *id.* (Dressing Decl. ¶ 7), in light of the FMLA mandate that

covered employees, regardless of gender, be allowed to take unpaid leave following specified

life events, including the birth of a new child, *see* 29 U.S.C. § 2601 *et seq.*  Julie Stempe

Dressing was Jones Day's Director of Human Resources and HR Counsel at the time.  Dkt. 189-

4 at 1 (Dressing Decl. ¶¶ 1, 4).  She undertook that review and made recommendations to Patrick

McCartan, who was Jones Day's Managing Partner, about how the Firm should change its

policies to comply with the FMLA.  *Id.* at 2–3 (Dressing Decl. ¶¶ 7, 8).  McCartan was the

relevant decisionmaker, Dkt. 232-1 at 11-12 (Pls.' SUMF ¶¶ 15–16), and he ultimately adopted

Dressing's recommendation that the "overall amount of leave that Jones Day offered new

mothers would remain at twelve weeks of paid leave and twelve weeks of unpaid leave," with

eight of the twelve weeks of paid leave attributable to the period of short-term disability women

experience after giving birth, Dkt. 189-4 at 3 (Dressing Decl. ¶¶ 9–10).  McCartan also decided that the Firm would offer new fathers four weeks of paid family leave, which would equal the four weeks of paid leave that mothers received that was not attributable to their postpartum disability.  *Id.* at 3 (Dressing Decl. ¶¶ 9–10).

McCartan passed away before Plaintiffs filed this lawsuit, and he is therefore unable to provide testimony about his rationale for changing the Firm's parental leave policy.  Defendants argue that this absence of direct evidence is of no moment because "Dressing . . . developed the policy, and her 'non-discriminatory reasons for recommending' it is plainly probative even if McCartan approved it."  Dkt. 214 at 13 (quoting *Richardson v. Newburgh Enlarged City Sch. Dist.*, 984 F Supp. 635, 747 (S.D.N.Y. 1997)).  Indeed, Defendants continue, Dressing's declaration "is dispositive in the absence of any contrary evidence."  *Id.*

Although Dressing attests that she reported her "analyses and conclusions to William Steinbrink," the Firm's "Administrative Partner at the time," Dkt. 189-4 at 2 (Dressing Decl. ¶ 7), there is no evidence that Steinbrink participated in the decision (other than appearing as a "cc" on the recommendation memo to McCartan), and there is no evidence that Dressing conveyed her views orally to McCartan, Dkt. 206-1 at 6.  Instead, as the record stands, it appears that Dressing's recommendation was made in a December 1993 memorandum to McCartan, captioned "Proposed Changes in the Non-Partner Maternity Leave Policy."  *Id.* at 2.  The sole record of McCartan's decision, in turn, appears in this brief reply:

> I have reviewed your memorandum of December 22, 1993 and approve the amendments revising our Non-Partner Maternity Leave Policy, now titled "Paid Medical and Family Leave," and "Unpaid Leaves of Absence."
>
> Please see to it that the new policy is included in the 1994 revision of the Firm Manual.

Dkt. 189-17 at 2.

Defendants do not, however, rely on Dressing's memorandum to McCartan as a basis for discerning what McCartan may have thought; to the contrary, they assert that most (although not all) of the memorandum contains attorney-client privileged communications, and they have, accordingly, redacted all but the introductory paragraph of Dressing's memorandum.  *See* Dkt. 206-1 at 2.  In lieu of that memorandum, they offer a declaration executed by Dressing almost two decades after the events at issue in which she details *her* reasons for making the recommendation to McCartan.  Defendants do not purport to describe what McCartan actually thought, but they maintain that Dressing's reasons for recommending the policy is not only probative of "the reason it was adopted," Dkt. 242 at 8:19–22 (Tr. Oral Arg.), but is the only evidence that remains available.

The Court agrees that type of inference is permissible, especially given the impossibility of obtaining testimony from McCartan:  A reasonable jury could infer from McCartan's memorandum that he chose to offer new mothers twelve weeks of paid leave and new fathers four weeks of paid leave for the same reasons Dressing gave for her recommendation.  That is, it is at least theoretically possible for Defendants to satisfy their burden of proffering evidence of a nondiscriminatory justification for the postpartum leave policy by introducing the recommendation that Dressing made to McCartan.

In her declaration, Dressing recalls that "[t]o decide how much paid leave Jones Day would offer new fathers" under the new parental leave policy, she first had to determine how much of the twelve weeks the Firm offered to new mothers should be deemed attributable to postpartum disability.  Dkt. 189-4 at 3 (Dressing Decl. ¶ 10).  To make that determination, Dressing considered her experience reviewing medical certifications for staff that had taken leave following the birth of a child, which showed that "physicians typically certified between

70

six and eight weeks of disability for uncomplicated childbirth.  *Id.* at 3–4 (Dressing Decl. ¶ 11a).

That six-to-eight-week range was also "consistent with the time frames that [Dressing]

understood disability insurance carriers approved for routine childbirth."  *Id.* at 5 (Dressing Decl.

¶ 11e).  Dressing explained in her declaration that she recommended that the Firm adopt a

presumptive eight-week leave period for new mothers (rather than the six-week period) because

the longer period "would best ensure that the Firm adequately accommodated all short-term

disabilities for routine childbirth."  *Id.* (Dressing Decl. ¶ 11c).  Dressing also explained in her

declaration that she recommended that the eight-week period of leave should be provided to all

mothers without requiring a disability certification from a physician because it was easier

administratively, because the "[t]he Firm had not previously" required such a certification, and

because she "was concerned that female associates might react negatively to the new level of

intrusiveness if Jones Day were to start requiring disclosures of, for instance, the type of birth

(e.g., vaginal vs. Cesarean)."  *Id.* at 4 (Dressing Decl. ¶¶ 11b, 11d).  Finally, Dressing assumed

that the Firm was not interested in increasing the overall amount of leave a new mother would

receive, so once she had landed on the eight-week period for postpartum disability, she was left

with a four-week period for family leave for both mothers and fathers.  *Id.* at 3, 5 (Dressing Decl.

¶¶ 10, 12–14).

Plaintiffs challenge the sufficiency of Dressing's declaration.  They argue that the

declaration, standing alone, does not satisfy the Defendants' burden of production at *McDonnell-*

*Douglas* step two and, therefore, they are entitled to summary judgment on these claims.  They

argue, in particular, that it was McCartan who made the decision; that Defendants have withheld

Dressing's recommendation to him on privilege grounds; and that, without Dressing's

recommendation, there is no meaningful evidence regarding the motivation of the actual

decisionmaker.  Although a close question, the Court is persuaded that Defendants have offered

sufficient evidence to satisfy their burden of identifying a nondiscriminatory justification for the

policy.

Plaintiffs are correct that the employer bears a burden of production at the second step of

the *McDonnell-Douglas* analysis and that this burden is a meaningful one.  As the D.C. Circuit

has explained, the second step fulfills an important purpose: it "'focus[es] the issues' and

provide[s] the worker 'with "a full and fair opportunity" to attack the' explanation as pretextual."

*Figueroa*, 923 F.3d at 1088 (quoting *Lanphear v. Prokop*, 703 F.2d 1311, 1316 (D.C. Cir.

1983)).  Under *Figueroa*, an employer's purportedly legitimate justifications for its action must

be "[ ]sufficiently substantiated" in order for a court to proceed to step three.  *Id.* at 1087.  A

vague or conclusory explanation will not do.  *Id.* at 1088.  Several factors are "paramount" in

making this assessment: (1) "the employer must produce evidence that a factfinder may consider

at trial (or a summary judgment proceeding);" (2) the evidence must be such that if the factfinder

believed it, the factfinder could "reasonably . . . find that the employer's action was motivated by

a nondiscriminatory reason;" (3) "the nondiscriminatory explanation must be legitimate"—that

is, "facially credible in light of the proffered evidence;" and (4) "the evidence must present a

clear and reasonably specific explanation," because a plaintiff "cannot be expected to disprove"

an explanation that has not "been articulated with some specificity."  *Id.* at 1087–88 (internal

quotation marks and citations omitted).

The Court is persuaded that Dressing's declaration, although far from conclusive,

satisfies *Figueroa*'s requirements.  To begin, the declaration could be converted into admissible

testimony at trial.  Moreover, although Dressing was not the decisionmaker, she was the "head of

human resources," she conducted the review and research that preceded the Firm's adoption of

the new policy, and she sent the recommendation memorandum to McCartan.  Dkt 189-4 at 2–3

(Dressing Decl. ¶¶ 7–10).  Thus, although by no means required to do so, a reasonable jury could

infer that the Firm's adoption of the policy changes was "motivated by [her] nondiscriminatory

reason[s]," *Figueroa*, 923 F.3d at 1087, either because those reasons were presumably

communicated to McCartan (perhaps by Steinbrink, to whom Dressing "reported [her] analyses

and conclusions," *id.* at 2 (Dressing Decl. ¶ 7)), or because they were baked into her

recommendation (in a manner analogous to—albeit the flipside of—the "cat's-paw" theory of

discriminatory intent, *see Walker*, 798 F.3d at 1095).  Although these theories require inferences,

juries are often asked to draw reasonable inferences, particularly when the record is dated, a key

witness is deceased, and the documentary trail is limited.  Finally, Dressing's declaration

provides a sufficiently specific rationale for Jones Day's adoption of the eight-week

presumption, and it is a rationale that can be challenged and tested.  Dressing's policy rationales,

such as her contention that the eight-week leave period is consistent with the practices of

physicians and doctors, can be supported by external evidence or challenged by such evidence.

As Defendants stress, it would make little sense to preclude an employer from meeting its

burden under the *McDonnell-Douglas* burden shifting framework simply because the

decisionmaker is deceased and did not leave an admissible paper trail.  Notably, the burden at

step two, although a meaningful one, is only a burden of production, not persuasion.  *See Clinton

v. Granholm*, No. 18-cv-991, 2021 WL 1166737, at *8 (D.D.C. Mar. 26, 2021) ("At this

threshold inquiry, the [employer] need only 'raise a genuine issue of fact as to whether the

employer intentionally discriminated against the employee' to satisfy its step two burden."

(quoting *Figueroa*, 923 F.3d at 1087)).  Here, the materials Defendants have proffered are far

from conclusive but, under the present circumstances, they are sufficient to satisfy that burden.

*See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production." (emphasis in original)).

Having concluded that Defendants have satisfied their burden at step two, the burden shifts to Plaintiffs to provide sufficient evidence from which a reasonable jury could reject the Defendants' nondiscriminatory rationale and instead find that the Defendants' true motivation was discriminatory, in whole or in part. At this step, the relative paucity of evidence of the Firm's actual reasons for adopting the policy, moreover, may help tip the balance: Had McCartan issued a contemporaneous decision-memorandum detailing his nondiscriminatory rationale in 1994—long before any litigation was brought or contemplated—for example, that evidence would have made it more difficult for Plaintiffs to carry their burden of offering sufficient evidence of pretext to go to the jury. And conversely, where the jury will be asked to infer that the policy was adopted for the reasons given by Dressing (who was not the decisionmaker) two decades after the relevant events and after the policy was challenged in litigation, Plaintiffs' burden of offering sufficient evidence of pretext to survive summary judgment will be less demanding.

Indeed, although a reasonable jury *might* accept the inference that Defendants invite, it could just as easily reject that invitation and find that Defendants have failed to proffer any convincing evidence that the Firm acted for nondiscriminatory reasons. That is, a reasonable jury might find that Dressing's decade's old recollection is not reliable; that the Firm's pre-1994 policy was, in fact, discriminatory;[16] that, although the Firm was compelled to provide some

---

[16]     To the extent then, that Jones Day's pre-1994 maternity leave policy provided a benefit to women that it did not offer to men that was not based on the period of physical disability women

period of paid family leave to male associates, it had a strong economic incentive to limit that

new benefit to the extent possible; that it decided to provide female associates with eight

weeks—as opposed to four or six weeks of paid leave, as some other firms had done, Dkt. 189-

16 at 2-3—to minimize the financial benefit it was required to extend to male associates; and that

it was this economic motivation—along with an entrenched policy that unlawfully favored

female associates over male associates—that drove the Firm's decision.  Both sides in this case

ask that the factfinder draw significant inferences.  The only question for the Court at this stage

of the proceeding, however, is whether there is sufficient evidence for a reasonable jury to find

that the Firm has proffered adequate nondiscriminatory reasons for its adoption of the policy in

1993 (which took effect in 1994) or, instead, to find that the Firm's proffered reasons are, more

likely than not, pretextual and that the real reason the that Firm adopted the eight-week

presumption of disability was discriminatory.  In the Court's view, a reasonable jury could

follow either course.

　　　Defendants confront a second difficulty, moreover, which also precludes the Court from

granting summary judgment to either side.  In Plaintiffs' view, the best evidence of McCartan's

reasons for adopting the 1993 policy change is likely found in Dressing's December 1993

memorandum, which Defendants have withheld, in significant part, based on an assertion of

attorney-client privilege.  On Plaintiffs' telling, Defendants waived that privilege when they

placed the recommendations contained in the memorandum at issue by asking the Court to infer

that McCartan must have acted for the reasons that Dressing now recalls motivated her thinking.

Dkt. 203-1 at 26.  Defendants, in turn, respond that Plaintiffs have waived any objection to the

---

experienced, such a policy was likely discriminatory.  *See Nevada Dep't of Hum. Res. v. Hibbs*,
538 U.S. 721, 728 (2003) (explaining that granting more family-leave time to women than to
men would constitute unlawful "gender-based discrimination").

assertion of attorney-client privilege because they waited until after the close of discovery to raise the issue and "because Dressing is not precluded from testifying about her business reasons for recommending the policy just because she also wrote a privileged memo providing legal analysis in her capacity as an employment lawyer."  Dkt. 214 at 13 n.1.  Finally, Plaintiffs maintain that they were not required to raise the issue of waiver before discovery closed because the issue-waiver did not arise until Defendants filed their summary judgment brief, which relied on Dressing's recollections, and that, to the extent Defendants do not intend to rely on Dressing's declaration to draw an inference about McCartan's rationale, Defendants have failed to meet their burden of production at step two of the *McDonnell-Douglas* burden shifting framework. Dkt. 233 at 12 & n.5.

It is well-established that attorney-client privilege "applies to a confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client."  *In re Kellogg Brown & Root, Inc*., 756 F.3d 754, 757, 760 (D.C. Cir. 2014); *Smith v. Ergo Sols., LLC*, No. 14-cv-382, 2017 WL 2656096, at *2 (D.D.C. June 20, 2017) (explaining that communications that contain both business advice and legal advice may be privileged, provided that "the client [was] seeking and receiving legal advice rather than solely business advice").  But that privilege can be waived, either expressly or by implication.  Under the doctrine of "implied" or "at issue" waiver, "the attorney-client privilege is waived when the client places otherwise privileged matters in controversy."  *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 151 (D.C. Cir. 1997).

The purpose of the implied waiver doctrine is to prevent an "abuse of the privilege," that is, to prevent the confidentiality protected by the privilege from being used "as a tool for manipulation of the truth-seeking process;" a party asserting the privilege "cannot be allowed,

after disclosing as much as [it] pleases, to withhold the remainder." *In re Sealed Case*, 676 F.2d 793, 806–07 & n.43 (D.C. Cir. 1982) (quoting 8 J. Wigmore, *Evidence in Trials at Common Law* § 2327 (J. McNaughton rev. 1961); *Ideal Electronic Security*, 129 F.3d at 151 ("This is particularly true where . . . a party partially discloses the allegedly privileged information in support of its claim against another, but then asserts the privilege as a basis for withholding from its opponent the remainder of the information which is necessary to defend against the claim."). "Where the content of the attorney-client communications are 'inextricably merged with the elements of plaintiff's case,' 'to deny access to them would preclude the court from a fair and just determination of the issues.'" *Minebea Co. v. Papst*, 355 F. Supp. 2d 518, 522 (D.D.C. 2005) (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 582 (E.D. Wash. 1975)); *see also Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020) ("[A] party waives the attorney-client privilege when that party places privileged information in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party."); *Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364, 1370 (Fed. Cir. 2012) ("The doctrine of implied waiver is invoked when a party makes the content of his attorney's advice relevant to some claim or defense in the case."); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived.").

By centering its nondiscriminatory-rationale defense on the advice Dressing provided to McCartan, Defendants have placed the contents of the December 1993 memorandum at issue. At step two, Defendants argued that McCartan's death did not create an evidentiary vacuum because McCartan relied on Dressing's advice, and she is available to explain why she

recommended that the Firm provide eight weeks of disability leave to female associates and an additional four weeks of parental leave to both female and male associates.  That evidence, however, requires the jury to infer one of three things—that advice was, in fact, conveyed to McCartan; McCartan simply deferred to Dressing; or McCartan acted as "an unwitting conduit of [Dressing's] motives."  *Walker*, 798 F.3d at 1095.  But, under any of these scenarios, Defendants are asking the Court and the jury to make assumptions about McCartan's thinking based on Dressing's input in the process.  Defendants may not pick and choose what aspects of Dressing's thinking about the business justifications for the policy change are presented to the jury, at least to the extent that cherry-picking potentially distorts the records and is cast as evidence of why "Jones Day [that is, McCartan] adopted the eight-week disability assumption for routine childbirth."  Dkt. 221 at 17 (Defs.' SUMF ¶ 31).

Although only briefly addressed in the parties' lengthy written filings, this question was discussed at length at oral argument.  At that time, Defendants represented "that the business reasons that Dressing gave" are not addressed in the December 1993 memorandum, "nor are any other business reasons for adopting the eight-week assumption."  Dkt. 242 at 10:20–24 (Tr. Oral Arg.).  But counsel also conceded that, "certainly, our evidence of what was recommended to him is relevant evidence of why he did what he did."  *Id.* at 14:25–15:1.  Given the importance of this issue, the Court asked that Defendants "think about" whether they "would be prepared to disclose [the memorandum to the Court] in camera [and] ex parte," and Defendants promptly agreed to do so.  *Id.* at 53:1–54:20.

Having reviewed the memorandum, the Court is now persuaded that it does shed light on the business recommendation that Dressing made to McCartan regarding the policy change and the respective benefits provided to female and male associates.  The Court further notes that,

although Dressing served as an employment lawyer, she also served as Director of Human Resources at the Firm and that portions of her analysis turn on non-legal matters, and those portions arguably conflict with her current recollection of what she thought two decades ago. Finally, the Court is unpersuaded that Plaintiffs have waived their challenge to the Defendants' reliance of Dressing's decades-old recollection of her consideration of the policy while excluding the contemporaneous evidence of the business advice that she gave McCartan by not objecting to the assertion of privilege before the close of discovery; as they explain, the at-issue waiver did not arise until Defendants' placed her advice at-issue.

But that said, the Court is reluctant to disclose the contents of an assertedly privileged document in this context and without providing the parties with a further opportunity to be heard. In the ordinary course, where a Court sustains an objection to the assertion of a privilege, the Court will order the party asserting the privilege to disclose the document.  Proceeding in that way permits the asserted-privilege holder to seek reconsideration or (to the extent possible) to seek appellate review or (where appropriate) to opt to withdraw a claim or argument, rather than face disclosure.  Here, however, because the objection was not raised during discovery, that process is pretermitted.  Moreover, because Plaintiffs have not seen the redacted portions of the memorandum, relying on those portions at this point would require the Court to frame the relevant arguments in the first instance, rather than leaving that to Plaintiffs.  And, finally, although this is an important issue, it received surprising little attention from the parties in their voluminous briefs.  As a result, the Court will simply note that its conclusion that neither party is entitled to summary judgment on Counts 1 and 3 of Plaintiffs' Third Amended Complaint is further bolstered by the fact that the record is currently incomplete on an important question— that is, what Dressing told McCartan.

The Court will, accordingly, deny the parties' cross-motions for summary judgment as to Counts 1 and 3.

        c.     <u>Changes to the Family Leave Policy in 2015</u>

In reaching this conclusion, the Court recognizes that 1994 was not the last time that Jones Day revised its family leave policies. On November 12, 2014, Sharyl Reisman, the Firm's Hiring Partner, Michael Shumaker, the Firm's Administrative Partner, and Carter DeLorme, the Firm's Diversity Partner, recommended to Steve Brogan, the Firm's Managing Partner, several changes to the Firm's parental leave policies. Dkt. 189-22 at 3. It was the authors' conclusion from that review that Jones Day's leave offerings were "below market," and they recommended that the Firm (1) "[i]ncrease paid maternity leave from 12 weeks to 18 weeks," that is, increase the period of paid family leave offered to women from four weeks to ten weeks, and (2) "[p]rovide 18 weeks of paid adoption leave to primary caregivers." *Id.* Upon receipt of the memorandum, Brogan summarily approved the changes without engaging in his own consideration of the issues. Dkt. 190-23 at 93–94 (Brogan Dep. 92:1–93:25); *id.* at 110 (Brogan Dep. 109:6–7).

Defendants contend that this revision is irrelevant for the purposes of Plaintiffs' suit because the Firm did not change the way in which its short-term disability policy applied to new mothers in 2014–2015. Plaintiffs disagree, arguing that when the Firm was considering these changes to its leave policies, the partners at the Firm who were involved in that process viewed the leave offered to new mothers—that is the eight weeks offered under the Firm's short-term disability policy and the four weeks offered under the Firm's family leave policy—as one single period of "maternity leave" and discussed making changes to that aggregate period of time. *See* Dkt. 189-22 at 4–5 (expressing the view that Jones Day's twelve weeks of paid maternity leave

was "below market," and noting that a majority of large law firms offer eighteen weeks of paid leave); *id.* at 6 (recommending that "the Firm increase its paid maternity leave policy from 12 weeks to 18 weeks for its U.S. offices"). Therefore, although the changes made in 2015 increased the amount of paid family leave—and did not change the eight-week period of postpartum disability leave—Plaintiffs contend that the Firm at least arguably reconsidered and reaffirmed the eight-week period when it made changes to its leave policies in 2015.

The Court is skeptical that a reasonable jury could reach the conclusion that Plaintiffs draw without resorting to sheer speculation. *Cf. United States v. Harrington*, 108 F.3d 1460, 1468 (D.C. Cir. 1997) (explaining that "the jury must have had sufficient evidence" to find the relevant fact "without resorting to excessively strained inferences or guesswork"). Although the record does support the conclusion that the group of partners who engaged in a review of the Firm's leave policies referred consistently to the Firm's paid leave offerings for new mothers as a single period of "maternity leave," there is nothing in the record that suggests that those partners gave any consideration to the period of short-term disability offered to new mothers when they considered whether to extend the period of family leave.

But even if the Court were to credit the argument that Jones Day reaffirmed its eight-week postpartum leave period when it made changes in 2015 to the family leave policy, that determination would not cause the Court to reach a different result with respect to the parties' cross-motions for summary judgment as to these claims. To be sure, Plaintiffs have identified statements that could support their contention that at least some of those involved in the process relied on gender stereotypes. For example, Plaintiffs cite to emails exchanged between the authors of the memorandum Brogan summarily approved in which the authors equated motherhood with being the primary caregiver. In 2014, Staff C, the Firm's ▇▇▇▇▇▇▇

81

███████████, and Staff D, the Firm's ███████████, worked with DeLorme, and

McClure, on reconsidering the Firm's family leave policies. Dkt. 190-5 at 4. As part of that

evaluation, Michael Shumaker, "question[ed] whether it ma[de] sense to go to the full 18 paid

weeks leave for adoption" because "some chunk of time is included in the leave because the

mother must recuperate from the actual birth," which "doesn't happen with adoption." *Id.* at 3.

In response, DeLorme defended the proposed 18-week policy for adoptive parents by stating

that:

> The rationale for the 18 weeks for adoption to mirror the same time as births was
> based on the primary caregiver['s] role in bringing the child into the family.
> While there is obviously a physical component for birth Moms[,] it comes at the
> front end of the leave so the extension to 18 weeks for maternity leave is not
> based on the recovery from the birth itself. . . .
>
> [T]he adoption leave should be parallel to the maternity leave for the primary
> caregiver because the functions are the same. It is a particularly strong message
> to the LGBT community, especially gay men who would have to adopt.

*Id.* at 2–3.

Plaintiffs argue that from these emails, a reasonable jury could infer that the authors of

the memorandum exhibited stereotypical and archaic views of gender roles when they were

discussing the changes to the policies. To the extent then that Jones Day reconsidered its short-

term disability policy in 2014 and 2015 and decided to make no changes to it, Plaintiffs argue,

these stereotypical views could have been a motivating factor in reaching that decision—that is,

the Firm decided not to decrease the default period for short-term disability leave or otherwise

alter that policy because of the same concern that motivated the Firm to adopt the eight-week

default in the first place: to maximize the amount of leave given to women while decreasing the

amount of leave given to men.

For additional support, Plaintiffs note the discriminatory nature of the policy that was adopted in January 2015, before it was amended in May 2015.  On January 22, 2015, McClure announced the first set of changes to the Firm's family leave policies.  Her email stated:

> Effective January 1, 2015, the Firm will be making the following changes to its maternity, paternity, and adoption leave policy for all Of Counsel, Counsel, Associates and Senior Staff Attorneys in the U.S. offices:
>
> - The Firm will provide mothers a total of 18 weeks of paid leave post-partum (with the first 8 weeks paid under the Firm's STD policy and the next 10 weeks paid under the Firm's paid family leave policy) and, with approval, up to an additional 6 weeks of unpaid leave, for a total maternity leave of 24 weeks post-partum.
>
> - Fathers are entitled to a paid paternity leave of 4 weeks as is the current policy.
>
> - In the case of adoptions, the Firm will provide 18 weeks of paid adoption leave to the primary caregiver and, with approval, up to an additional 6 weeks of unpaid leave, for a total adoption leave of 24 weeks.  Secondary caregivers are entitled to 4 weeks of paid adoption leave.

Dkt. 189-23 at 2.  Later in 2015, Associate A contacted Heifetz about Jones Day's leave policies. That associate provided the "relevant portion of the EEOC Guidance Document about parental leave" and noted that the Firm's "policy [was] a bit problematic" because it permitted women to take ten weeks of paid family leave to care for a newborn child while men could take only four weeks of paid family leave for the same purpose.  Dkt. 196-12 at 2.

But that is just one side of the story.  To start, shortly after Associate A raised those concerns, Heifetz forwarded her email to McClure and Michael Shumaker, who decided to equalize the amount of parental leave offered to mothers and fathers.  Dkt. 189-53 at 2–5.  Thus, on Defendants' telling, as soon as the disparity was brought to their attention, they remedied the problem without hesitation.  Nor do Defendants agree with Plaintiffs' characterization of the basis for the Firm's decision to provide the primary caregivers of adopted children with eighteen

weeks of leave was not to match that of mothers. Rather, on Defendants telling, the goal was "to send a strong message to the LGBT community, especially gay men who would have to adopt" and to accommodate the "special" and "unique" concerns adoptive parents face. Dkt. 219 at 14. This difference in views is best left for the jury.

       2.    *Equal Pay Act Claim*

Plaintiffs also alleged that Jones Day's family leave policies violated the EPA by providing Savignac with less compensation—in the form of paid family leave—than his female coworkers because he is a man. The parties fail to offer any meaningful analysis of this issue in their submissions, and so the Court will only briefly explain why summary judgment is not warranted. As noted, once a plaintiff makes out a prima facie case under the EPA—which Defendants do not dispute that Plaintiffs have done here by alleging that Savignac received a shorter period of paid leave that he was ineligible for but that female associates of the same seniority at the Firm received—"the burden . . . shifts to [the] defendant[] to show that the pay differential was justified," *Thompson*, 678 F.2d at 271, "based on any other factor " other than sex," 29 U.S.C. § 206(d)(1)). A short-term disability following pregnancy is such a factor. But for the reasons explained above, a reasonable jury could credit either Plaintiffs' view, that the leave policy treats men differently because of their sex, or Defendants' view, that the leave policy accounts for the period of disability that many women face after giving birth. Accordingly, summary judgment on Count 2 is not warranted for either party.

## C.    Retaliatory Termination Claim

Plaintiffs next claim that Jones Day, and certain individual partners, retaliated against them, in violation of Title VII and the DCHRA, when Jones Day terminated Savignac after he

sent McClure his January 16, 2019 email.  That email accused the Firm of having discriminatory

parental leave policies and a discriminatory compensation system.  His email asserted:

> Sarah [McClure],
>
> We have closely reviewed the case law, including the two cases you rely on.  We have also discussed the matter with other competent attorneys.  Your cases do not support Jones Day's discriminatory [family leave] policy, which is illegal under Title VII and D.C. law.
>
> Jones Day's policy is also inconsistent with the EEOC enforcement guideline you mention.  Regardless, your reliance on the guideline example is misplaced because EEOC's interpretations of the substantive provisions of Title VII do not receive *Chevron* deference, and courts routinely reject them.  E.g., *Young v. UPS*, 135 S. Ct. 1338, 1351–52 (2015).
>
> Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion.  We are very familiar with the D.C. Circuit and confident that we will win.
>
> I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination, including retaliation.  We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman.  As you know, Title VII prohibits retaliation for opposition to sex discrimination.
>
> Mark C. Savignac
> Associate

Dkt. 189-11 at 2.  Four days later, Brogan, as Managing Partner, decided to fire Savignac, Dkt.

189-54 at 2–3, and January 22, 2019, was Savignac's last day at the Firm, Dkt. 221 at 13 (Def.'s

SUMF ¶ 23).  Although Plaintiffs allege that they both were retaliated against when Defendants

terminated Savignac, the Court begins by considering the merits of these claims as they relate to

Savignac.  Because courts look to Title VII case law in interpreting analogous provisions of the

DCHRA, including the DCHRA's anti-retaliation provision, *see, e.g.*, *Gaujacq v. EDF, Inc.*, 601

F.3d 565, 576-77 (D.C. Cir. 2010); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994), and because the parties press no arguments unique to either statutory framework, the Court will consider both claims together.

      1.      *Savignac's Title VII & DCHRA Claims*

Defendants move for summary judgment on Savignac's retaliatory termination claims, arguing that he has failed to establish two necessary elements of his claims: (1) that his January 16, 2019 email constituted "protected activity" and (2) that Jones Day fired him because he engaged in that "protected activity."  *See Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) ("In order to prevail upon a claim of unlawful retaliation, an employee must show 'she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her.'" (quoting *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007))).  Savignac, for his part, has cross-moved for summary judgment, arguing that Defendants have failed to proffer a legitimate, nonretaliatory reason for his termination.  *See Figueroa*, 923 F.3d at 1092 (explaining that after a plaintiff articulates a prima facie case of retaliation, the employer must show "a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions" or the plaintiff is entitled to summary judgment).  As explained below, the Court is unpersuaded that either side is entitled to summary judgment with respect to Savignac's retaliatory termination claims.

Title VII prohibits an employer from retaliating against an employee "because [the employee] has *opposed* any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added).  The Act also prohibits an employer from retaliating against an employee "because [the employee] has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this subchapter."

*Id.* § 2000e-3(a) (emphasis added).  "These two clauses are known as the 'opposition' clause and the 'participation' clause, respectively."  *Egei v. Johnson*, 192 F. Supp. 3d 81, 86 (D.D.C. 2016) (citing *Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981)).

As an initial matter, Plaintiffs contend that Savignac's email qualifies as "protected activity" under both clauses.  Defendants disagree as to both clauses.  The Court first addresses the opposition clause and then turns to participation clause.

> a.   Protected Activity Under the Opposition Clause

As noted, "[t]o recover under the opposition clause, the plaintiff must have been discriminated against for opposing a practice 'made an unlawful employment practice by [Title VII],'" *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)), that is, the employee must have "resist[ed] or antagonize[d]," "contend against," "confront[ed]," or "withst[oo]d" an unlawful employment practice, *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1957)).  This threshold requirement is ordinarily met when "an employee . . . communicates to her employer a belief that the employer has engaged in a form of employment discrimination." *Id.* (internal quotation marks and citation omitted).

Not all "opposition" is protected by Title VII, however.  The opposition clause "extend[s] [only] to a practice that the employee reasonably and in good faith *believed* was unlawful under the statute," *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (emphasis in original) (citing *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005)), and, here, Defendants argue that Savignac lacked such a good faith, reasonable basis to challenge the Firm's leave policies for new parents.  Dkt. 189 at 27–28.  Defendants press several arguments in response, at least some of which preclude the entry of summary judgment.

**i.**

Defendants first take aim at the reasonableness of Savignac's assertion that Jones Day's postpartum leave policy was "discriminatory" and "illegal under Title VII and D.C. law" and that he was entitled to "the treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave," Dkt. 189-11 at 2.  Citing to *McGrath v. Clinton*, 666 F.3d 1377 (D.C. Cir. 2012), for the proposition that an "unsupported assertion . . . neither makes the accusation true nor makes it reasonable for [an employee] to have believed it was true," *id.* at 1381, Defendants argue that Savignac "'could not reasonably [have] thought' or believed 'in good faith' . . . that Jones Day's disability policy was an unlawful sham" or that the entire eight weeks of postpartum disability leave was actually "disguised family leave," Dkt. 189 at 28 (quoting *George*, 407 F.3d at 417).  They note that at the time he sent his email, he knew that "(i) the eight additional weeks of paid leave he was demanding w[ere] provided in Jones Day's disability policy, not its family leave policy; (ii) he did not and could not have a postpartum disability; (iii) any person who gives birth will have some period of postpartum disability; (iv) birthmothers are entitled to disability leave for their disability; and (v) at least one major medical association described the standard postpartum maternity leave as lasting six weeks." *Id.*  Thus, in Defendants' view, Savignac's complaint that Jones Day's postpartum leave policy was discriminatory was unreasonable because he should have known that the Firm could lawfully offer female associates the opportunity to take up to eight weeks of postpartum disability leave.  *Id.*

To the extent Defendants equate the unreasonableness of Savignac's objection with their substantive defense of the full eight weeks of disability leave the Firm provides to birthmothers, that argument fails for the same reasons that the Court has declined to grant summary judgment

in Defendants' favor on Plaintiffs' substantive challenge to the policy.  The question whether the

Firm lawfully granted all birthmothers eight weeks of paid leave, without regard to whether the

associate was in fact disabled for the entire eight-week period, is subject to reasonable dispute.

As Sheketoff wrote in her email that began the dialogue between Plaintiffs and Defendants about

the Firm's leave policies:

> Eight of the weeks for women are labeled as disability leave, but the leave is not
> dependent on whether women are actually disabled.  Most women aren't
> physically disabled from office work for such a long period and yet still get the
> full eight weeks of disability leave—and adoptive parents receive the full 18
> weeks paid and 24 weeks total leave even though they are not disabled.  That
> seems to reflect the traditional notion that women should bear most of the burden
> for childcare, which strikes me as unfairly discriminatory. . . .

Dkt. 189-10 at 4.  In this email, Sheketoff challenged Jones Day's assertion that the eight-week

period of short-term disability leave for new mothers was attributable to postpartum medical

conditions; she suggested, instead, that the policy was motivated by the traditional notion that a

woman is the primary caregiver in a family unit and argued that the policy was therefore

discriminatory.  Savignac then continued the dialogue that Sheketoff had begun when he sent his

email months later reiterating the couple's view that the Firm's policy discriminated based on

gender.[17]  Considered in this light, the email was not unreasonable.

The reasonableness of an employee's Title VII complaint depends in large part on

whether the claim is clearly foreclosed by precedent or whether the governing law is

---

[17]     Defendants argue that Savignac's email expressed no such view.  Dkt. 189 at 29.  But
context matters, and the Court concludes that a reasonable jury could infer that Savignac
intended to revive the claim that Sheketoff had made in August 2018.  Savignac sent his email as
a reply to the email chain that Sheketoff had initiated in August 2018; Savignac's email is
written in response to those prior emails, Dkt. 189-11 at 2 ("We have closely reviewed the case
law, including the two cases you rely on" that are cited in the previous email in the thread); and
Savignac's email itself explicitly references Sheketoff's prior request, *id.* ("Because our son has
now been born and because Julia made the prior request whereas I will be the named Plaintiff
. . . .").

"unambiguous" or "unsettled." *King*, 487 F.3d at 973.  Consider, for example, cases in which a plaintiff accuses her employer of sexual harassment.  The Title VII case law is clear that the harassing "conduct must be extreme" and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).  Accordingly, courts routinely find that plaintiffs who experience only isolated incidents of harassment but nevertheless accuse their employer of sexual harassment have not engaged in protected, oppositional activity because "[n]o reasonable person could have believed that the single incident recounted . . . violated Title VII's standard," *Clark County School Dist. v. Breeden*, 532 U.S. 268, 271 (2001); *see also, e.g.*, *George*, 407 F.3d at 416–17 (finding that three isolated incidents of discriminatory insults "could not reasonably be thought to constitute an abusive working environment in violation of Title VII"); *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013) (similar); *Fowler v. District of Columbia*, 404 F. Supp. 2d 206, 210 (D.D.C. 2005), *aff'd*, 210 F. App'x 4 (D.C. Cir. 2006) (similar).

Likewise, in *King v. Jackson*, 487 F.3d 970 (D.C. Cir. 2007), the D.C. Circuit considered whether it was reasonable for an employee to believe that the Department of Housing and Urban Development's failure to renew its affirmative action employment program violated Title VII. *Id.* at 972–73.  There, the court held that the employee's claim was unreasonable because "nothing [was] unsettled" regarding the plaintiff's mistaken view of the law, and "the legal principles at issue . . . [were] entirely unambiguous." *Id.*  As the D.C. Circuit explained, an agency's failure to renew its affirmative action plan clearly did not fall within Title VII's definition of an "unlawful employment practice," that is, a refusal "'to hire . . . any individual . . .

because of such individual's race.'"  *Id.* (quoting 42 U.S.C. § 2000e-2(a)(1)).  Because the claim

was clearly foreclosed, the D.C. Circuit concluded that "it [was] quite unreasonable for [the

employee] to have believed that" the agency's inaction "qualified as an unlawful employment

practice."  *Id.*

       The law regarding permissible postpartum leave policies, however, is less clear.  As both

parties note in addressing the legality of the Firm's leave policy, in *Guerra*, the Supreme Court

held that a "limited" benefit for pregnant women that was "narrowly drawn to cover only the

period of *actual physical disability* on account of pregnancy, childbirth, or related medical

conditions" was nondiscriminatory.  479 U.S. at 290 (emphasis in original).  But the Court noted

that a policy "based on . . . stereotypical assumptions would . . . be inconsistent with Title VII's

goal of equal employment opportunity," *id.*, and emphasized that "a State could not mandate

special treatment of pregnant workers based on stereotypes or generalizations about their needs

and abilities," *id.* at 285 n.17.  Then, in *Schafer*, the Third Circuit held that one year of

postpartum leave could not be classified as short-term disability leave because "[t]here [was] no

evidence in the record that suggest[ed] that the normal maternity disability due to 'pregnancy,

childbirth, or related medical conditions' extends to one year."  903 F.2d at 248.  Savignac's

January 16 email, when read in the context of Sheketoff's earlier email, arguably accuses Jones

Day of artificially labeling the eight weeks of leave offered to postpartum leave as "disability

leave," when the real reason for the leave is to provide mothers with more caregiving time than

fathers. Dkt. 189-10 at 4.  If true, that claim could form the basis of a legitimate Title VII

discrimination claim.  At the very least, *Guerra* and *Schafer* leave the door open for such a

claim.

Savignac's demand that the Firm give him the full "18 weeks of paid leave and 6 weeks of unpaid leave" that it provides "to all women with new children," Dkt. 189-11 at 2, however, raises a closer question. Savignac agrees, as he must, that the Firm was entitled—and was likely required—to provide female associates with *some* period of paid disability leave based on the postpartum effects of childbirth. Yet, as Defendants stress, "Savignac did not demand an extra week or two of family leave; he demanded all 18 weeks accorded birthmothers, thereby depriving birthmothers of all disability leave." Dkt. 189 at 30. Thus, on Defendants' view, the email was "objectively indefensible" because it did not seek an extra week or two of paid leave but, rather, sought equal treatment with birthmothers, notwithstanding the fact that employers are "'*required* to provide pregnancy disability leave to biological mothers on the same terms as it provides leave to other disabled employees.'" *Id.* at 29–30 (emphasis added in Defendants' brief) (quoting *Johnson v. Univ. of Iowa*, 408 F. Supp. 2d 728, 740 (S.D. Iowa 2004), *aff'd*, 431 F.3d 325 (8th Cir. 2005).

Savignac responds on two levels. First, he argues that Defendants mistakenly treat the disability leave policy as "metaphysically" subdividable "into a legitimate 'portion' and an illegitimate one," ignoring the fact that there was only one policy, which he reasonably challenged as unlawful. Dkt. 203-1 at 30. He further posits that, "[a]t a minimum, disagreement over metaphysics cannot make a discrimination claim *unreasonable*." *Id.* at 31 (emphasis in original). Second, albeit is some tension with his first argument, he maintains that his demand for eight weeks of paid leave, on top of the four weeks of paid leave to which he was entitled under the Firm's parental leave policy, was simply a "*settlement demand*" and that the "'good faith, reasonable belief test applies to the 'belief that the *challenged practice*' is unlawful, not to a settlement demand." *Id.* (emphases in original) (citation omitted).

Both lines of argument face significant difficulties.  To start, it hardly poses a "metaphysical" challenge to distinguish between an objection that posited, as Savignac arguably did, that he was entitled to precisely the same amount of leave provided to birthmothers, and an objection that posited that he was entitled to an additional two (or even four) weeks of leave because the Jones Day policy provided birthmothers with more paid disability leave than was presumptively warranted.  If his objection was to the additional two (or four) weeks that, on his view, birthmothers were not presumptively entitled to receive as a matter disability, he could easily have done so.  Along similar lines, moreover, Savignac could easily have characterized his demand as a "settlement" offer, but he did not do so.  Instead, he demanded that the Firm provide him with the exact same benefits provided to birthmothers, without acknowledging that birthmothers and biological fathers are not similarly situated.  The notion that this was a settlement offer is also difficult to reconcile with Sheketoff's original email to Heifetz, which was (at least arguably) sent before there was any threat of litigation to "settle" and which requested that the Firm "treat Mark equally to female primary caregivers and grant him *18 weeks paid* and 24 weeks total leave."  Dkt. 189-10 at 4 (emphasis added).

But despite these difficulties, the Court must avoid substituting its view of the evidence for the jury's, and, as long as there is sufficient evidence to create a triable issue of fact, the Court must leave it to the jury to evaluate the evidence.  Because Savignac's email is reasonably subject to alternative readings, the Court will leave the question for the jury to resolve.  A reasonable jury could find, for example, that Savignac was not objecting to the fact that the Firm's policy provided birthmothers with eight weeks of presumed disability leave, rather than four or six weeks but, rather, was objecting to the fact that male associates were not granted the same "treatment that Jones Day gives to all women with new children."  Dkt. 189-11 at 2.  Or it

could find that Savignac's email must be read in light of Sheketoff's earlier email, which argued that "[m]ost women aren't physically disabled from office work for such a long period," Dkt. 189-10 at 4, at least suggesting that the flaw with the policy turned on the "long period" of paid leave given to female associates. Or it could find, also based on Sheketoff's earlier email, that Savignac's objection was premised, at least in part, on the fact that the firm provided "adoptive parents [with] the full 18 weeks paid . . . leave," *id.*, calling into question whether the eight weeks of paid leave provided to birthmothers was a form a disability leave or, rather, was a surrogate for primary-caregiver leave. Finally, a reasonable jury might find that the core of Savignac's objection was that the presumptive eight weeks of disability leave was unlawful because it was not tailored to the actual period of disability and that this objection was reasonable, even if his demand was hyperbolic.[18] The Court does not mean to suggest that the "objection" clause requires the employee to explain the legal and factual basis for her objection

---

[18]     Defendants also argue that, even if Savignac's claim that Jones Day's parental leave offerings were discriminatory was objectively reasonable, what actually matters is whether Brogan, the person who ultimately decided to terminate Savignac, "reasonably and sincerely believed that Savignac was making an unreasonable legal claim." Dkt. 212-14 at 23 (emphasis omitted). But in advancing this argument, Defendants conflate the standard by which an employer's nonretaliatory justification for the adverse action is judged with the question of whether an employee engaged in protected activity at all. As the D.C. Circuit explained in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), an employee can rebut an employer's nonretaliatory justification for their decision by showing "that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," but "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.* at 495. The D.C. Circuit did not state that if an employer subjectively believes that an employee's complaint is unreasonable, that belief can deprive an employee who makes an objectively reasonable complaint of protection under Title VII's anti-retaliation provision. Nor do the cases Defendant cites for this proposition say anything different. *See Mason v. Geithner*, 811 F. Supp. 2d 128, 205 (D.D.C. 2011) ("The question is not whether [the plaintiff] in fact contravened the letter of the management directive, but rather whether his supervisors 'honestly and reasonably believed' that he did" when they suspended the plaintiff. (quoting *Brady*, 520 F.3d at 495)).

or that the reasonableness of the objection must be assessed in light of that explanation.  But, at the same time, the Court cannot assess the reasonableness of the objection without determining what "practice" the employee has objected to.

Because a genuine dispute of fact exists regarding what "practice" Savignac objected to in his email—that is, the practice of failing to provide male associates with the same benefits provided to birthmothers or the practice of giving birthmothers eight (rather than six or four weeks) of presumptive disability leave—the Court cannot resolve, at least of this stage of the proceeding, whether Savignac's objection was reasonable and made in good faith.[19]

<strong>ii.</strong>

Defendants next argue that even if Savignac's email contained a reasonable objection to a practice made unlawful under Title VII, he was not fired for objecting to the firm's policy; rather, he was fired because of the manner in which he demanded—and sought to extract from the Firm—the right to take eighteen weeks of paid leave (or "roughly $80,000 of additional compensation," Dkt. 189 at 36).  Defendants argue that Savignac's January 16 email was dishonest, extortionate, arrogant, and self-entitled.  Such a complaint, in Defendants' view, was not protected by Title VII's antiretaliation provisions.

Defendants' argument is not without some precedential support.  Several circuits have concluded that oppositional activity is not protected when the employee opposes an allegedly discriminatory employment practice in a way that is illegal or "excessive" or that makes the employee's continued employment untenable.  The First Circuit, for example, has long held that Title VII "does not afford an employee unlimited license to complain at any and all times and

---

[19]    One can imagine that the Firm's reaction to an email requesting an additional two weeks of paid leave—rather than equal treatment with birthmothers—might have been very different.

places," does not preclude an employer from demanding "loyalty and cooperativeness from employees," and will, at times, require courts to engage in the "delicate" process of separating "protected from nonprotected conduct." *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 229–30, 233 (1st Cir. 1976); *id.* at 230 (addressing "whether plaintiff's overall conduct was so generally inimical to her employer's interests, and so 'excessive,' as to be beyond the protection of section 704(a) even though her actions were generally associated with her complaints of illegal employer conduct."). The D.C. Circuit, in turn, has cited *Hochstadt* with approval on several occasions. *See McKenna v. Weinberger*, 729 F.2d 783, 790 n.54 (D.C. Cir. 1984) (distinguishing cases brought under the participation clause); *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981); *Pendleton v. Rumsfeld*, 628 F.2d 102, 108 (D.C. Cir. 1980).

Like the First Circuit, moreover, the Second Circuit has held that "[a]n employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise." *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) (citing *Robbins v. Jefferson County Sch. Dist.*, 186 F.3d 1253, 1260 (10th Cir. 1999)). And more recently, in *Gogel v. Kia Motors Manufacturing of Georgia, Inc.*, 967 F.3d 1121 (11th Cir. 2020), the Eleventh Circuit explained that "an employee's oppositional conduct loses its protection when the manner chosen to voice that opposition so interferes with the employee's performance of her job that it renders her ineffective in the position for which she was employed" or "if the opposition is expressed in a manner that unreasonably disrupts other employees or the workplace in general." *Id.* at 1141 (citing *Rosser v. Laborers' Int'l Union of N. Am., Local No. 438*, 616 F.2d 221, 223 (5th Cir. 1980); *Rollins v. Fla. Dep't of Law Enf't*, 868

F.2d 397, 400–01 (11th Cir. 1989)); *see also Kempcke v. Monsanto Co.,* 132 F.3d 442, 445 (8th Cir. 1998) (holding that a court "must also consider whether [oppositional] conduct was so disruptive, excessive, or 'generally inimical to [the] employer's interests . . . as to be beyond the protection' of [the retaliation provision of the ADEA]" (citation omitted)); *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756, 763 (9th Cir. 1996) ("An employee's opposition activity is protected only if it is reasonable in view of the employer's interest in maintaining a harmonious and efficient operation." (internal quotation marks and citation omitted)).

Applying this general principle in practice, however, is tricky.  After all, when Congress enacted the antiretaliation provision, it was undoubtedly aware that those accused of engaging in discriminatory conduct will often take offense and that those who believe that they have been the victims of discrimination will often be aggrieved and distressed.  Considered in this light, the antiretaliation laws would serve little purpose if those objecting to discriminatory practices needed to temper their objections to avoid hurt feelings or offense.  Suffice it to say, nothing in the language of the antiretaliation provision or its purpose permits an employer to take adverse action against an objecting employee merely because of the tone, intensity, or insistence of his objection.

That said, there is a consensus among the circuits that lines exist that an employee hoping to receive protection under Title VII's antiretaliation provision may not cross in pressing for relief from an allegedly unlawful practice.  For example, an employee who wraps a letter containing charges of discrimination around a brick and throws that brick through her boss's office window can, of course, be fired—not for opposing the discriminatory conduct—but for breaking the window.  Likewise, an employee who steals sensitive personnel documents to use them in a subsequent lawsuit alleging age discrimination in the workplace can be fired for theft.

*See O'Day*, 79 F.3d at 763–64 ("The opposition clause protects reasonable attempts to contest an employer's discriminatory practices; it is not an insurance policy, a license to flaunt company rules or an invitation to dishonest behavior.").  And the D.C. Circuit has held that an Equal Employment Opportunity ("EEO") counselor's participation in a "demonstration" in which members of the media and employees "crowded into" a supervisor's office, with a group so large as to "spill[] over into the hallway adjacent to the cafeteria," and proceeded to "read[]" a list of "numerous grievances of food service workers" to the "abnormally vocal" crowd, was not protected activity because the EEO counselor's participation in this event significantly undermined his ability to bridge the divide between frontline employees and their supervisors. *Pendleton*, 628 F.2d at 106–108.  That is, the manner in which the grievance was aired fundamentally undermined the ability of the employee to perform her job going forward.

Defendants contend that Savignac's email is like these examples.  In their view, the January 16, 2019 email did not constitute protected oppositional activity, and they urge the Court to grant summary judgment in their favor on these claims.  In evaluating this question, the Court confronts a threshold disagreement among the circuits about whether the propriety of the manner of opposition is best considered at the prima-face-case stage, where the Court must ask whether the employee engaged in protected activity at all, or at the nonretaliatory-justification-stage, where the Court must ask whether the employer acted for a nondiscriminatory reason (*e.g.*, not because the employee complained, but because she broke he boss's window).  *See Matima*, 228 F.3d at 79–80 (noting that some of these circuits locate this principle in the prima facie case, citing *Laughlin v. Metropolitan Wash. Airports Authority*, 149 F.3d 253 (4th Cir. 1998), and *O'Day*, 79 F.3d at 764)).  To the extent that D.C. Circuit precedent addresses whether an

employee can be fired for the *manner* in which she opposes discriminatory conduct, that precedent considers the question at the nonretaliatory-justification-stage.

As discussed above, in *Pendleton v. Rumsfeld*, 628 F.2d 102 (D.C. Cir. 1980), the D.C. Circuit considered whether two EEO counselors who were fired for their participation in a "disruptive demonstration in the offices" of certain superior officers, *id.* at 104, were retaliated against in violation of the opposition clause.  The employer explained that it terminated the employees because "they had fatally compromised their ability to gain the confidence of middle management," and, "[w]ithout th[at] confidence . . . , a Counselor would be useless" and unable to perform her job functions.  *Id.* at 108.  The D.C. Circuit concluded that this explanation was both legitimate and nonretaliatory:  "In determining the limits of protected activity, '[t]he requirements of the job and the tolerable limits of conduct in a particular setting must be explored.'"  *Id.* (quoting *Hochstadt*, 545 F.2d at 231).  Therefore, "[a] question of retaliation is not raised by a removal for conduct inconsistent with those duties, unless its use as a mere pretext is clear."  *Id.*; *see also Gonzalez v. Bolger*, 486 F. Supp. 595, 598, 601 (D.D.C. 1980) (finding that an employee's "relentless campaign" against his employer's "official time policy," that involved the filing of "between 40 and 80 complaints charging more than 20 different supervising officials with release time reprisals," "exceeded the limits of reasonable opposition activity on a continuing basis and his dismissal . . . attributable to these transgressions . . . was not pretextual, but rather was for valid non-discriminatory reasons").

Applying this guidance, the Court concludes that the manner of opposition is more appropriately considered at the later stages of the *McDonnell-Douglas* framework, when the employer must proffer a nonretaliatory justification for the adverse action.  *See Barnes v. Small*, 840 F.2d 972, 977 (D.C. Cir. 1988) ("Behavior that appears to fall within the protection of

§ 2000e-3(a), and so, for purposes of evaluating whether plaintiff has made out a prima facie case, is presumed to be protected, may, after the . . . employer . . . has put on its evidence, ultimately be determined to be—at least in part—unprotected.").  Under this view, the employer bears the burden of showing that the employee's manner of objecting was so outside the bounds of reasonableness that the *manner* in which the employee made the complaint can be separated from the *substance* of the complaint itself.  As the First Circuit observed in *Hochstadt*, drawing this line "is plainly a delicate matter."  545 F.2d at 229.  But that does not mean that, at least in extreme cases, courts lack the ability to distinguish between complaints of discrimination that are inherently confrontational and statements that are, for example, "false and malicious" and that "interfere[] with the efficient operations of the" employer, *Barnes*, 840 F.2d at 977.

### iii.

Jones Day argues that Savignac was not terminated for objecting to the firm's leave policies but, rather, for sending an email that, among other things, contained an extortionate threat.  They note, for example, that the Firm took no action against Sheketoff when she sent Heifetz an email in August 2018 objecting that the Firm's postpartum disability policy "seems to reflect the traditional notion that women should bear most of the burden of childcare, which strikes me as unfairly discriminatory," Dkt. 189-10 at 4.  Nor did it take action against Savignac when, after the Firm rejected Sheketoff's request, he wrote to McClure referring to Jones Day's "discriminatory parental leave policy" and asserting, "I oppose your practice, which is made illegal by Title VII," *id.* at 2-3.  Rather, on Defendants' telling, what engendered a different response to Savignac's January 16, 2019 email was the manner that Savignac sought to compel the Firm to acquiesce in his requests for eighteen weeks of paid leave.

As explained below, the Court agrees that a reasonable jury could read Savignac's email as containing an "extortionate" threat, at least as the term is commonly used, although such a conclusion is not compelled by the evidence.  If such a threat was the basis for Savignac's termination, he was not fired "because he opposed [a] practice made . . . unlawful" under Title VII, 42 U.S.C. § 2000e-3(a), but, rather, because he engaged in conduct that undermined the Firm's confidence in his professional judgment and "trust[]" in providing him "with access to the Firm's internal systems [and] responsibility for . . . client matters," Dkt. 196-31 at 16.

At the outset, it bears emphasis that Jones Day does not argue that Savignac's email was criminally extortionate, nor does the Court suggest that it was.  *See* 3 Wharton's Criminal Law § 44:3 (16th ed.).  But that concession does not end the matter, as long as a reasonable jury could find that the email was "extortionate," as the term is used in common parlance, and that Savignac's threat undermined his ability to function as a trusted professional in the Firm.  In common parlance at least, extortion is "[t]he action or practice of extorting or wresting anything, [especially] money, from a person by force or by undue exercise of authority or power." *Extortion*, Oxford English Dictionary, https://doi.org/10.1093/OED/1124179275 (last visited Sept. 23, 2024); *see also Extortion*, Black's Law Dictionary (12th ed. 2024).  Here, there is no mistake that Savignac's email contained a demand for something of value—"[g]ive me the treatment that Jones Day gives to all women with new children[,] 18 weeks of paid leave and 6 weeks of unpaid leave"—and a threat—"or else I will file a charge with EEOC and then a class-action lawsuit, and the matter will be decided in the D.C. Circuit and in the court of public opinion."  Dkt. 189-11 at 2.  The central question, then, is whether a reasonable jury could find that this threatening demand crossed the line from vehemently asserting Savignac's rights under Title VII, which he was entitled to do without negative repercussions, to engaging in behavior

that, separate and apart from the substance of his objection to the Firm's leave policies, was inimical to his continued employment.

Certainly, there is a way to read Savignac's email as merely threatening to take actions that Title VII permitted him to take.  He had a right to file a complaint with the EEOC and to file suit in court.  He even had a right to go to the press to complain about conduct that he has a good faith basis to believe is discriminatory.  *See, e.g.*, *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) ("The opposition clause . . . covers conduct such as complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.") (internal quotation marks and citation omitted); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (explaining that Title VII's "opposition clause protects . . . informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges"); *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1355-56 (9th Cir. 1984) (finding that "[c]all[ing] a press conference off hospital grounds to protest black patient care at the hospital" was protected activity); EEOC Directive 915.004, *EEOC Enforcement Guidance on Retaliation and Related Issues*, at § II(A)(2)(e) (Aug. 25, 2016), available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues ("[C]alling public attention to alleged discrimination may constitute reasonable opposition, provided that it is connected to an alleged violation of the EEO laws.  Opposition . . . includes making informal or public protests against discrimination, including . . . writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of coworkers who have filed formal charges, provided that it is not done in so disruptive

or excessive a manner as to be unreasonable.") (internal quotation marks and citations omitted).

Nor is there anything wrong with an employee telling his employer what he intends to do, if the

employer fails to remedy what the employee reasonably believes to be a discriminatory practice.

But Savignac did not have a right to threaten to make claims to the press, the public, or a

court that he did not have any basis to believe were true, merely to extract the benefit that he

sought.  In Defendants' view, Savignac crossed that line when, in the context of seeking eighteen

weeks of paid family leave, he brought up the Firm's "black-box compensation system" and

suggested that it was used to "enable sex discrimination."  When Savignac was asked at his

deposition what his basis was for claiming that Jones Day's "black-box" compensation system

was "tailor-made to enable sex-discrimination"—he was unable to identify anything in response.

*See* Dkt. 190-25 at 257–59 (Savignac Dep. 256:1–258:15).  He merely explained that because

"many people have input" into the compensation an associate receives and because "that [input]

is unreviewable by the person whose salary is being set," the system "could be used to

discriminate or retaliate against someone."  *Id.*  Thus, according to Defendants, Savignac had no

actual basis when he sent his email—or three years later when he was deposed—to suggest that

Jones Day used a "black-box compensation system" to "enable sex discrimination" or otherwise

to hide its unlawful conduct.

A reasonable jury might read Savignac's email in a more generous manner than this and

might find that he merely intended to dissuade the Firm that was using the "black-box

compensation system" from retaliating against him for complaining about the Firm's parental

leave practices.  That reading of the email, moreover, finds some support in the final sentence of

the same paragraph, which reminds McClure that "Title VII prohibits retaliation for opposition to

sex discrimination."  Dkt. 189-11 at 2.  But a reasonable jury could also find that Savignac added

the statement about Jones Day's black-box compensation system to make his threat to go to the press, the public, or a court more intimidating (and thus more effective in obtaining the benefits he sought). That reading of the email, in turn, finds support in the sentence that follows his invocation of the Firms "black-box compensation system." He asserts: "We ourselves experienced this [black-box enabled sex discrimination] when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman." *Id.* Given that historical claim of actual discrimination, it is challenging to read Savignac's invocation of the "black-box compensation system" as anything less than a claim that the firm had in the past used that system to enable sex discrimination. The suggestion is all the more problematic, moreover, because—for the reasons discussed at length above—a reasonable jury could find that Savignac had no basis whatsoever to believe that Sheketoff was denied a salary increase because she is a woman.

In the end, it is possible to read Savignac's demand that he received the same "treatment that Jones Day gives to all women with new children—18 weeks of paid leave and 6 weeks of unpaid leave—or else" as a reasonable demand, given Sheketoff's earlier email that pointed out that adoptive primary caregivers receive eighteen weeks and birthmothers who are primary caregivers also receive eighteen weeks. In that context, Savignac could be seen as simply demanding that he receive the same treatment that all other primary caregivers receive, leave that he claims he is ineligible for because of his sex. Or Savignac could have been making a "settlement demand," as he argues. Dkt. 203-1 at 31. On this theory, Savignac made the demand for eighteen weeks knowing that it was more than what he would get if he proved his claims but thought the Firm would be willing to pay more to make his claims go away quickly. *Cf. Chandler v. Berlin*, No. 18-cv-02136, 2020 WL 5593905, at *3–4 (D.D.C. Sept. 18, 2020)

104

(rejecting the argument that a "prelitigation demand letter . . . constitute[d] 'criminal blackmail'"); *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995).

But these innocuous readings are not compelled. A reasonable jury might, in the alternative, read the eighteen-week demand as patently unreasonable and extortionate, as Defendants argue. *See* Dkt. 189 at 28–31. That is, the jury could find that the demand was premised on more than an alleged deficiency in the Firm's leave policies; his demand for far more paid leave than he could arguably justify based on any alleged stereotyping of women as primary caregivers (as opposed to people who experience the physical consequences of giving birth) was, on this telling, premised on the threat to take his grievance to "the court of public opinion" and, in doing so, to smear the Firm with a speculative-at-best claim that the Firm's "black-box compensation system" fostered entrenched discriminatory treatment. Dkt. 189-11 at 2. Such behavior by an attorney, if credited, moreover, would be particularly concerning, since it would arguably reflect on his ability to perform his job in a manner consistent with his employer's values and reputation. *See Gogel*, 967 F.3d at 1141 ("[A]n employee's oppositional conduct loses its protection when the manner chosen to voice that opposition so interferes with the employee's performance of her job that it renders her ineffective in the position for which she was employed.").

The D.C. Circuit has explained that "[a] question of retaliation is not raised by a removal for conduct inconsistent with [an employee's] duties, unless its use as a mere pretext is clear." *Pendleton*, 628 F.2d at 108. Here, there is sufficient evidence to permit a reasonable jury to find that Savignac's email contained a threatening demand that, unrelated to the substance of the objection itself, undercut the Firm's ability to continue to treat Savignac as a trusted, professional colleague. And, at the same time, there is sufficient evidence to permit a reasonable jury to find

that Savignac's demand was linked to a legitimate objection to a Firm policy and that his reference to the "black-box compensation system" was not intended to extract a benefit to which he knew he was not entitled.

iv.

Having determined that Jones Day *might have* terminated Savignac because his January 16, 2021 email could reasonably be understood to contain an extortionate threat, then, raises the question whether a reasonable jury could find that Jones Day *did in fact* terminate Savignac for that reason.  *See Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (explaining that once the employer articulates a nonretaliatory justification for terminating the employee, the burden is on the employee to provide sufficient reason for a reasonable jury to conclude that Defendants' nonretaliatory justification is really "a mask for retaliation").  Both parties agree that it was Brogan, the Managing Partner at the time, who made the decision to fire Savignac, and they agree that he did so because of Savignac's January 16, 2021 email.

In his deposition, Brogan explained the basis for that decision as follows:

[The email] . . . said that the firm's compensation system was tailor-made to discriminate against women.  And nothing could be further from the truth.  The firm's compensation system has been in effect going back to when Jack Reavis put it in place when he took over, in '48 or '49 or whenever he became managing partner, and long before Naoma Stewart became a partner at the firm.  So . . . our [] desire to have a confidential compensation system has already had an emphasis on deemphasizing money, so that people weren't being petty and comparing themselves to other people with respect to how much money they made.  You had no, in my view, good-faith basis for making that assertion.

Secondly, [Savignac] said that [Sheketoff] was discriminated against; that [Savignac] knew—both [Savignac] and [Sheketoff] knew this.  And I knew that that was also false and dishonest, because I personally made decisions that favored [Sheketoff], and gave her raises that based on her rankings and her . . . scores she did not deserve.

[Savignac] then went on to act as if [he] personally [was] the law-giver[]; that . . . [Jones Day's] policy on leave was illegal.  And . . . in that e-mail trail, I

106

remember a statement by the EEOC which was pretty much right on point, about our compensation . . . policy, which supported it.

[Savignac] said, "Well, the EEOC can be ignored because . . . 'they're not going to get any Chevron deference.[] And we know that because we're familiar with the Court, and we know that . . . the D.C. Circuit's going to agree with us,["] which suggested to me you weren't very confident that a Federal District Court judge was going to agree with you.

And then [Savignac] made the statement[,] . . . "Give me what I want," which I viewed as an extortionate demand, particularly when [Savignac] said[,] "or else; or I will go to the press."

And this is all taking place when [Savignac] had no claim that [he was] disabled. And for all those reasons tied up, that's why I made the decision I made.

Dkt. 190-23 at 16–18 (Brogan Dep. 15:15–17:17).

Brogan's testimony contains several threads to his decision, all of which are at least arguably intertwined.  His first, second, and fifth points support a single theory:  Brogan terminated Savignac because he perceived that Savignac had made an extortionate threat: "give me" eighteen weeks of paid leave "or else" I will go to the press and smear the Firm with unfounded allegations of the Firm's discriminatory black-box compensation system, including a baseless claim that Brogan had used to "black-box compensation system" to hide his discriminatory decision to pay Sheketoff less than her peers.  *Id.*  Brogan's third and fourth justifications, however, arguably support a different theory:  Brogan acted, at least in part, because he believed that Savignac's view of the law was unfounded and that Savignac acted with arrogance and an undue sense of self-entitlement.[20]  Although the first set of justifications are

---

[20]    Brogan's final rationale—that Savignac had no claim that he was disabled—might fit under the first or the second rationale, depending on the factfinder's perspective.  It could fit under the first, to the extent it is consistent with Brogan's broader contention, that Savignac could not possibly have believed that he was entitled to precisely the same benefits accorded to birthmothers and that his request was, accordingly, extortionate.  Or it could fit under the second set of justifications to the extent it goes to the merits of his objection.

arguably unrelated to Savignac's statutorily-protected right to object to unlawful practices, the second set are arguably protected.  It is up to a jury, however, to decide which of the two was the but-for (or substantial) motivating factors leading to Savignac's termination.[21]

The Court begins with the first set of justifications, that the email, read a whole, constituted an "extortionate threat."  For the reasons discussed above, the Court is persuaded that Brogan could reasonably have viewed Savignac's email as threatening that, unless he received what he demanded—the same benefits accorded birthmothers—he would go to the press and "the court of public opinion" with damaging allegations of systemic discrimination that he had no basis to believe were true.  And Brogan's testimony, if believed, could support that view.  *See Brady*, 520 F.3d at 496 ("The question is not whether the underlying [misconduct] occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying [misconduct] occurred.") (emphasis omitted).  Brogan testified repeatedly that he read Savignac's email as making "an extortionist demand" because the email threatened to "go to the press."  Dkt. 190-23 at 18 (Brogan Dep. 17:10–13).  Such behavior was, according to Brogan, anathema for a lawyer at the firm.  As Brogan explained in his deposition:

---

[21]     Unlike in the Title VII context, the DCHRA does not require that the employee show that retaliation was the "but for" cause of the adverse action.  Instead, the employee can "prevail in [her] DCHRA claim 'by proving that [the employer's] actions were motivated in substantial part by retaliatory reasons, even if they were motivated also by legitimate business reasons.'" *District of Columbia v. Bryant*, 307 A.3d 443, 452 (D.C. 2024) (emphasis omitted) (quoting *Propp v. Counterpart Int'l*, 39 A.3d 856, 870-72 (D.C. 2012)); *see also id.* (distinguishing the "substantial-factor" test from the "motivating-reason" test, and adopting the former).  That is, a plaintiff prevails under the DCHRA by showing that the "protected activity, that is, the discrimination claim, was a substantial contributing factor in [the employer's] decision" to take the retaliatory action.  *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 369 (D.C. 1993).  Despite these different standards, Plaintiffs make no argument that even if summary judgment is not warranted on their Title VII claim, summary judgment is warranted under the DCHRA.  Their failure to make such an argument is of no moment, however, because the Court concludes that there is sufficient evidence for a jury to find that Brogan was not substantially motivated by a desire to retaliate against Savignac when he terminated him.

> [T[he idea that [Savignac] would say . . . "or else," I mean it's like you're living in your own movie. "Give me what I am demanding, what I am trying to extort from you.". . . At this point, [Savignac] had been paid a million dollars at Jones Day, and [Savignac] want[ed] $80,000, or else [he was] going to . . . trash the firm in the press. . . . If that doesn't say things about [Savignac's] character, I don't know what does. . . . [W]e don't have people at Jones Day like that.

*Id.* at 68 (Brogan Dep. 67:1–14).

Brogan also testified about the lack of candor and honesty that, in his view, Savignac's email reflected.  "It was the dishonesty" of the allegations in the email that Brogan said "caused [him] to make that decision," *id.* at 28 (Brogan Dep. 27:2–6); *see also id.* at 40 (Brogan Dep. 39:6–17); *id.* at 20 (Brogan Dep. 19:18–23) ("[T]he falsehoods alleged in the e-mail were enough to convince [him] that [Savignac's] presence at the firm would be hurtful to the firm and to other people.").  According to Brogan, that dishonesty included Savignac's claims that the Firm's "black-box compensation system" enabled the Firm to engage in sex-based discrimination and that Brogan's own decision to limit the size of Sheketoff's raise for 2017 was itself discriminatory.  *Id.* at 77 (Brogan Dep. 76:2–22).  As the D.C. Circuit explained in *Mastro v. Potomac Electric Power Company*, 447 F.3d 843 (D.C. Cir. 2006), an employer can "satisf[y] the second prong of *McDonnell Douglas*" by showing that the employee was terminated, not for objecting to a practice, but for "a lack of candor."  *Id.* at 847, 855.  Similarly, other D.C. Circuit precedents hold that an employer may terminate an employee who opposes discriminatory conduct in a manner that calls into question the ability of the employee to continue to perform.  *See Pendleton*, 628 F.2d at 108 ("A question of retaliation is not raised by a removal for conduct inconsistent with [an employee's] duties, unless its use as a mere pretext is clear."); *Gogel*, 967 F.3d at 1141(explaining that an employee may be terminated "when the manner chosen to voice that opposition so interferes with the employee's performance of her job that it renders her ineffective in the position for which she was employed").  Applying those principles here, a

109

reasonable jury could find that Brogan terminated Savignac because he determined that the purportedly dishonest and extortionate nature of Savignac's January 16 email was antithetical to the practice of law and the trust that the Firm needed to place in its lawyers.

But, once again, this is not the only reasonable conclusion that the jury could draw from Brogan's testimony. Brogan also testified that he terminated Savignac because he disagreed with Savignac's assessment of the legality of the Firm's family leave policies. He testified, for example, that Savignac "sp[oke] like [he was] the law giver" in claiming that Jones Day's family leave policy was discriminatory and his email suggested that his colleagues at Jones Day "should bow down to [his] assessment" of the law, despite EEOC guidance suggesting that his assessment was wrong. Dkt. 190-23 at 60 (Brogan Dep. 59:7–16). To Brogan, Savignac's email read "arrogant[ly]" and was filled with assertions without any support, *id.* at 60–61 (Brogan Dep. 59:17–60:7); the email was "singularly unimpressive" and contained "a silly argument," *id.* at 63, 65 (Brogan Dep. 62:4–12, 64:14–23); *see also id.* at 73–74 (Brogan Dep. 72:10–73:4). These characterizations of the email, however, tread into the arena of protected opposition to a practice made unlawful by Title VII. When an employee makes a good faith, reasonable claim of discrimination, an employer may not terminate the employee simply because the employer disagrees, is unimpressed with the employee's arguments, or doesn't like the tone of the employee's complaints. *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1016 (9th Cir. 1983). Here, a reasonable jury could find that Brogan made the decision to terminate Savignac because he thought that Savignac's claim that the Firm's parental leave policy was discriminatory was wrong and was presented with undue confidence or without sufficient legal

analysis.  If a jury reached that conclusion, Defendants' legitimate-nonretaliatory-justification defense would fail.[22]

Because there is sufficient evidence for a reasonable jury to embrace either of these views of the evidence, the Court will deny both Defendants' and Plaintiffs' cross-motions for summary judgment as to Savignac's Title VII and DCHRA retaliation claims predicated on his termination from Jones Day.[23]

b.   Protected Activity Under the Participation Clause

Turning to the participation clause, Plaintiffs argue that none of these allegedly nonretaliatory rationales can help Defendants, because—unlike the objections clause—"the participation clause provides absolute immunity from retaliation against an employee 'because he has made a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding, or hearing under'" Title VII.  Dkt. 203-1 at 48 (emphasis added) (quoting 42 U.S.C. § 2000e-3(a)).  Defendants, in turn, dispute that the participation clause provides such sweeping protection, and they argue that, in any event, the participation clause applies only to proceedings before government agencies or courts.  Dkt. 189 at 30–31.

---

[22]   Plaintiffs suggest that Brogan conceded that Savignac's opposition to the leave the policy was, standing alone, a but-for cause of his decision to terminate Savignac.  *See, e.g.*, Dkt. 203-1 at 36.  For support, they point to Brogan's testimony that he would not have fired Savignac if he "believed [Savignac] was right about the policy being illegal."  Dkt. 190-23 at 64 (Brogan Dep. 63:6-11).  In response, Defendants point to Brogan's testimony that Savignac's claim that the leave policy was discriminatory was not a factor in his decision and that, instead, he was motivated by the "character flaws" that the email "reveal[ed]."  *Id.* at 61 (Brogan Dep. 60:7-20).  Resolution of this dispute lies in the province of the jury.

[23]   Neither party makes any unique argument in favor of summary judgment for Savignac's DCFMLA interference claim (Count 11).  Accordingly, the Court does not grant summary judgment to either party as to this claim.

The proper understanding of the participation clause is not well-settled in this circuit.  In *Egei v. Johnson*, 192 F. Supp. 3d 81 (D.D.C. 2016), this Court held that the "participation clause protects an employee from adverse employment action taken on the basis of the substance of her testimony in a Title VII EEO proceeding," even when that testimony is allegedly false or malicious.  *Id.* at 82, 86.  That conclusion finds support in decisions from several circuits, including the Fourth and Fifth.  *See Glover v. S.C. Law Enf't Div.*, 170 F.3d 411, 41415 (4th Cir. 1999); *Pettaway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998, 1007 (5th Cir. 1969).  But at least the Seventh Circuit has disagreed, *see Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 89091 (7th Cir. 2004), and Defendants point to one D.C. Circuit decision, *Barnes v. Small*, 840 F.2d 972, 977–78 (D.C. Cir. 1988), where the court held that false and malicious statements were not protected in a participation clause case.  Plaintiffs, in turn, note that the *Barnes* court did not consider whether different standards apply under the opposition and participation clauses; the court cited only to opposition clause cases, and the parties did not "urge" the court to adopt such a distinction.  Dkt. 233 at 27 (citing Dkt. 228-12 (Brief for Appellant at 15-16, *Barnes v. Small*, 840 F.2d 972 (D.C. Cir. 1988)).  And Plaintiffs also note that an earlier D.C. Circuit decision, *McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984), not cited in *Barnes*, held that a "[t]he *Hochstadt* balancing test," which is discussed above, applies in objections clause case but not in participation clause cases.  *Id.* at 790 n.54.

For present purposes, the Court need not revisit the question whether the participation clause establishes a more sweeping protection than the objection clause because Savignac's email did not constitute participation "in an investigation, proceeding or hearing under" Title VII.  42 U.S.C. § 2000e-3(a); *see also* D.C. Code § 2-1402.61(b).  Here, again, the parties take conflicting positions regarding the meaning of the participation clause.  On Defendants' view,

the clause applies only to investigations and proceedings brought under Title VII, and it does not

apply to "'an internal employer investigation not connected with a formal [agency] proceeding.'"

Dkt. 189 at 31 (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012)

(alteration in Defendants' brief).  On Plaintiffs' view, in contrast, it applies both to agency

proceedings, including EEOC hearings, and to internal investigations conducted by private

employers that "are 'subject to' Title VII," Dkt. 233 at 26, and, here, they complied with the

Firm's manual for reporting and investigating claims of discrimination by sending the January

16, 2019 email to McClure, who was the Firm's HR Director at the time, Dkt. 203-1 at 51-52.

Defendants offer the better reading of the participation clause.  As the Second Circuit

observed in *Townsend*, the plain language of the participation clause applies only to

"investigation[s], proceeding[s], or hearing[s] *under this subchapter*," 42 U.S.C. § 2000e-3(a)

(emphasis added), and, consistent with this language, "[e]very Court of Appeals to have

considered this issue squarely has held that participation in an internal employer investigation

not connected with a formal EEOC proceeding does not qualify as protected activity under the

participation clause," *Townsend*, 679 F.3d at 49; *see also id.* at 60-64 (Lohier, J., concurring)

(relying on the legislative history of Title VII to reach the same conclusion).

Plaintiffs take issue with Defendants'—and the Second Circuit's—view that the circuits

have uniformly rejected their reading of the participation clause, and they further contend that

D.C. Circuit precedent supports their view.  In particular, they point to the D.C. Circuit's

decision in *McKenna*, which applied the participation clause to an internal Department of

Defense investigation of alleged discrimination, which preceded referral of the matter to the

agency's EEO officer.  *See* 729 F.2d at 787-88, 790 n.54.  That precedent, however, is far too

thin a reed to support Plaintiffs' contention that the participation clause applies whenever an

employee (who works for private employer) sends an email to a designated HR official alleging discrimination.

To start with the obvious, *McKenna* did not deal with private employers, and the D.C. Circuit said nothing about the application of the participation clause to complaints that are lodged—even with the designated official—at a private employer.  In *McKenna*, moreover, the plaintiff initiated an "EEO complaint," *id.* at 791, which led to the appointment of an official to conduct a formal investigation to ascertain, among other things "'whether there was any sexist bias in the failure [of the plaintiff's supervisor] to forward [her] promotion papers and in her treatment in her work environment,'" *id.* at 787.  To be sure, all of this preceded the personnel office's referral of the plaintiff to an EEO officer and her filing of an administrative EEO complaint, *id.*, but, nonetheless, there is a significant difference between a complaint that initiates a formal, governmental investigation of a claim of discrimination and sending an email to a private HR official asserting a claim of discrimination.  Indeed, the Civil Service Commission regulations that applied to government agencies at the time *McKenna* was decided provided that, "[w]hen an employee makes a written allegation of discrimination . . . in connection with an action that would otherwise be processed under a grievance or other system of the agency, the allegation of discrimination shall be processed" under rules relating the EEO proceedings brought pursuant to Title VII.  U.S. Civil Service Comm'n, Administrative Personnel (Chapter I), 5 C.F.R. § 713.219 (1978).  Although it is unclear whether that provision applied in *McKenna*,[24] or why the D.C. Circuit concluded that the plaintiff had initiated an "EEO

---

[24]    It appears that the complaint that triggered the investigation in *McKenna* was not made in writing.  *See* 729 F.2d a 787 (noting that McKenna "conferred with . . . Dr. Romance, who brought her case to the attention of . . . Captain Martinez," who appointed "Geibel to conduct an investigation").

complaint," these questions, and the distinguishing factors discussed above, merely highlight the peril in attempting to read too much into the *McKenna* decision or to infer that the court implicitly reached sweeping legal conclusions regarding the meaning of the participation clause that the court never analyzed or discussed.

This Court, accordingly, concludes—as have all of the Courts of Appeals that have addressed the issue—that the participation clause applies only to investigations, proceedings, or hearings brought or pending before a governmental entity pursuant to Title VII and its implementing regulations. But, even putting that more general conclusion aside, the Court is unpersuaded that, in the present context, an email demanding equal treatment from a private employer is sufficient to establish the existence of "an investigation, proceeding, or hearing" for purposes of the participation clause.

2.    *Sheketoff's Title VII & DCHRA Claims*

Sheketoff also claims that she was retaliated against when Savignac was fired by Jones Day. On her telling, the January 16, 2021 email was sent by Savignac as well as herself; they sent the email as a couple in protest of the discriminatory treatment they both had experienced at the Firm. She alleges that Brogan then terminated Savignac, who was then still employed by the Firm, to retaliate against the couple for sending that joint email in violation of Title VII and the DCHRA. Dkt. 203-1 at 63; Dkt. 233 at 29. In response, Defendants do not dispute that Sheketoff could have a claim of retaliation under both statutes had the record plausibly supported this theory of retaliation. Dkt. 189 at 40. Instead, they argue only that Brogan's deposition testimony does not permit a reasonable jury to conclude that Brogan believed that the January 16, 2021 email was sent by Savignac and Sheketoff as a couple. *Id.*

At his deposition, Plaintiffs asked Brogan whether it was his "understanding at the time that the e-mail [from January 16, 2021] . . . was from Mark Savignac and Julia Sheketoff." Dkt. 190-23 at 20–21 (Brogan Dep. 19:24–20:1). Brogan responded:

> I thought the e-mail was from . . . [Savignac]. I mean, . . . [he] made this "royal we" comment that[,] "We've consulted lawyers, and we think that, you know, we were right on the law." But other than that, the e-mail, on its surface, I took it at face value it was coming from [Savignac].

*Id.* at 20 (Brogan Dep. 20:2–7). Defendants argue that the only reasonable conclusion that a jury could draw from this testimony is that "Brogan did not think the email came from Sheketoff" and thus "his decision to terminate Savignac could not have been intended as retaliation against Sheketoff." Dkt. 189 at 40. The Court disagrees.

Although that conclusion certainly is one that a jury *could* draw, it is not the only such conclusion. Brogan's testimony on the subject is somewhat equivocal. He recognized that the email, at points, seemed to have been sent by both Savignac and Sheketoff. *See, e.g.*, Dkt. 189-11 at 2 ("We have closely reviewed the case law . . . . We have also discussed the matter with other competent attorneys."); *id.* ("We are very familiar with the D.C. Circuit and confident that we will win."); *id.* ("We ourselves experienced this when Julia's salary was cut in relative terms based on a negative review from a partner who, in hindsight, clearly treated her worse because she is a woman."); *id.* (email sent from Savignac copied Sheketoff). At other points, the email seemed to be coming from Savignac himself. *See, e.g.*, *id.* ("Because our son has now been born and because Julia made the prior request whereas I will be the named plaintiff, I write to say: Give me the treatment that Jones Day gives to all women with new children . . . or else I will file a charge with EEOC and then a class-action lawsuit . . . ."); *id.* ("I am aware that Jones Day's black-box compensation system and its attempts to keep associate salaries secret are tailor-made to enable sex discrimination."); *id.* (signature block of Savignac only). Complicating matters

116

further is the fact that Savignac's email was part of an email thread that began with an email from Sheketoff, individually, about Jones Day's leave policies for new parents, on which Savignac was not copied. *See* Dkt. 189-10 at 3-4. Brogan's testimony acknowledged this ambiguity and indicated that he thought that Savignac had sent the email. Dkt. 190-23 at 20 (Brogan Dep. 20:2–7). When viewed in the light most favorable to Plaintiffs, as the Court must when considering Defendants' motion for summary judgment, a reasonable jury could find that Brogan viewed the email, sent by Savignac, as coming from both Savignac *and* Sheketoff.

Defendants' other arguments for why Sheketoff's termination-based retaliation claims fail are no different from those made with respect to Savignac's termination-based claim. And for the same reasons, the Court is unpersuaded. Accordingly, the Court denies both parties' cross-motions for summary judgment as to Sheketoff's termination-based retaliation claims under Title VII and the DCHRA.

3.   *Savignac's FLSA Retaliation Claim*

Savignac also claims that his termination violated FLSA's antiretaliation provision, as amended by the EPA. That provision prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Defendants argue that summary judgment in their favor on this claim is warranted, even if the Court does not grant summary judgment in their favor as to Savignac's Title VII and DCHRA retaliation claims, because Savignac's purely internal email complaint was insufficient to trigger that Act's protections from retaliation. Dkt. 214 at 25-26.

117

For many years, the scope of § 215(a)(3) was the subject of a circuit split.  The Second and Fourth Circuits read that statutory text narrowly to encompass only formal complaints lodged with a government agency.  *See Ball v. Memphis Bar–B–Q Co.*, 228 F.3d 360, 363–65 (4th Cir. 2000) (holding that the FLSA's language did not protect a plaintiff who told his employer that he might testify if a co-worker brought an employment discrimination lawsuit because the Act protects the act of giving testimony, not merely voicing opposition to an employer); *Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir. 1993) (concluding that voicing complaints to supervisors is not a protected activity under the FLSA).  Other circuits, however, interpreted § 215(a)(3) more broadly to mirror the scope of Title VII's opposition clause (including the reasonableness requirement) and held that the EPA protects informal complaints to an employer.  *See Valerio v. Putnam Assoc. Inc.*, 173 F.3d 35, 4344 (1st Cir. 1999) (expressing concern that a "narrow construction of the anti-retaliation provision could create an atmosphere of intimidation," thereby defeating the FLSA's purpose in protecting employees' attempts to secure their rights, but noting that the provision does not protect "all abstract grumblings" or even all written complaints); *Brock v. Richardson*, 812 F.2d 121, 124 (3d Cir. 1987) (stating that the FLSA's anti-retaliation provision necessarily protects informal complaints because the purpose of the Act is to "prevent employees' 'fear of economic retaliation' for voicing grievances"); *EEOC v. Romeo Cmty. Sch.*, 976 F.2d 985, 989 (6th Cir. 1992); *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir. 1975); *Lambert v. Ackerley*, 180 F.3d 997, 1004 (9th Cir. 1999) ("To ensure that employees are not compelled to risk their jobs in order to assert their . . . rights under the Act[,] . . . it must protect employees who complain about violations to their employers, as well as employees who turn to the Labor Department or the

courts for a remedy"); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984); *EEOC v. White & Son Enter.*, 881 F.2d 1006, 1011 (11th Cir. 1989).

That changed, however, after the Supreme Court held in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011), that the text of § 215(a)(3) was ambiguous, and that—as relevant in that case—the "phrase 'filed any complaint' might, or might not, [be read to] encompass oral complaints." *Id.* at 11.  After considering "[s]everal functional considerations," the Court held "that Congress intended the antiretaliation provision to cover oral, as well as written, 'complaint[s].'" *Id.*  The Court first noted that "an interpretation that limited the provision's coverage to written complaints would undermine the Act's basic objectives"—that is, "to prohibit 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Id.* (quoting 29 U.S.C. § 202(a)).  Although the Act establishes substantive standards to achieve this goal, the Court reasoned that enforcement of the standards depended on workers to advocate for themselves by protesting their violations—a mechanism that only works if workers feel able to speak up without "fear of economic retaliation," otherwise they might "quietly . . .accept substandard conditions."  *Id.* at 12 (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)).  A broad reading of the antiretaliation provision furthers this goal; a narrow reading undermines it.  Finally, the Court noted that for years the administrative agencies responsible for enforcing the FLSA have understood the antiretaliation provision to encompass informal as well as formal complaints.  *Id.* at 14–16.  These considerations led the Court to conclude that "a complaint is 'filed'" for the purposes of § 215(a)(3) "when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act."  *Id.* at 14 (citation and alterations omitted).

Although *Kasten* involved a complaint made to a private employer, the Court declined to answer the logically antecedent question whether the FLSA "antiretaliation provision applies only to complaints filed with the Government." *Id.* at 16–17.  Since *Kasten*, however, both the Second and Fourth Circuits have revisited their prior precedents interpreting the FLSA to prohibit employers from retaliating against employees who lodge formal, written complaints with the government, but not to prohibit employers from retaliating against employees who merely raise internal company complaints.  As the Second Circuit explained in *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015), *Kasten* determined that "even if the word 'filed,' considered alone, might suggest a narrow interpretation limited to writings, the phrase 'any complaint' suggests a broad interpretation that would include an oral complaint." *Id.* at 112 (emphasis omitted) (quoting *Kasten*, 563 U.S. at 9).  Similarly, "even if the word 'filed,' considered alone, might seem to contemplate lodging a complaint with a governmental body, the word's context counsels against a narrow reading: as the Supreme Court reasoned, the phrase 'any complaint' suggests an expansive reading, one that could include complaints filed with or expressed to an employer." *Id.* (emphasis omitted); *see also Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 432 (4th Cir. 2012) ("[W]e disagree with the district court that the plain meaning of § 215(a)(3) dictates that intracompany complaints are not protected activity.  Instead—although we do not believe *Kasten* is directly controlling—we find the Supreme Court's reasoning in that case to be persuasive here.  Following it, we hold that although the language of § 215(a)(3) is ambiguous, the remedial purpose of the statute requires that it protect from retaliation employees who file intracompany complaints.").

That reading of the statute is consistent with the Supreme Court's reasoning in *Kasten*, and with the text of the FLSA.  As the First Circuit noted even before *Kasten* endorsed a liberal

construction of the antiretaliation provision, "if 'filed any complaint' were read to encompass only filings with a court or government agency, one would wonder why the additional language 'or instituted or caused to be instituted any proceeding under or related to this chapter' was inserted.  The latter words become surplusage if the former means only the filing of in-court or in-agency complaints."  *Valerio v. Putnam Assocs. Inc*., 173 F.3d 35, 42 (1st Cir. 1999).  "[T]o avoid rendering one or the other surplusage," a court can "construe the first to contemplate a communication (such as an intra-company complaint seeking a change in company practice) that does not ordinarily trigger a 'proceeding' (such as an adjudicatory process)." *Greathouse*, 784 F.3d at 113.

Here, Defendants urge this Court to reject the current consensus among the Courts of Appeals. Dkt. 219 at 25–26.  But Defendants provide no rationale for doing so: they make no argument as to why, notwithstanding *Kasten*, a narrow interpretation of the FLSA's antiretaliation provision should apply.  With no developed argument to the contrary, the Court is not prepared to depart from the consensus view.  Accordingly, the Court will deny the Defendants' motion for summary judgment as to Plaintiffs' termination-based retaliation claim under the FLSA.[25]

**D.      Savignac's Reference-Based Retaliation Claim**

Plaintiffs next contend that Defendants' decision to permit only one partner to provide Savignac with an oral reference following his termination constituted actionable retaliation for his protected activity.  They argue that "[a]fter firing" Savignac, "Defendants continued to

---

[25]      Defendants also argue that summary judgment on this claim in their favor is appropriate for the same reasons that Defendants argue that summary judgment is appropriate for Savignac's Title VII and DCHRA termination-based retaliation claims—that is because his January 19, 2019 email constituted an unreasonable complaint that was not made in good faith.  *See* Dkt. 219 at 26–27.  For the reasons explained above, that argument is unpersuasive.

retaliate by prohibiting partners from providing employment references and putting artificial limitations on the one who was authorized to do so."  Dkt 203-1 at 66.  For Plaintiffs to succeed on this claim, however, they must show that Savignac "suffered (i) a materially adverse action (ii) because he . . . brought or threatened to bring a discrimination claim" or otherwise engaged in protected activity, *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008), and Plaintiffs have failed to identify sufficient evidence to permit a reasonable jury to find that Defendants' reference decision constituted a "materially adverse action."

A "challenged action [is] materially adverse" when "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "[N]ormally[,] petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  *Id.*  "Stated another way, 'not everything that makes an employee unhappy is an actionable adverse action."  *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Russell v. Principi,* 257 F.3d 815, 818 (D.C. Cir. 2001)); *Swann v. Off. of Architect of Capitol*, 73 F. Supp. 3d 20, 26–27 (D.D.C. 2014), *aff'd* 2015 WL 5210251 (D.C. Cir. Aug. 18, 2015) ("The Supreme Court has instructed that the universe of cognizable retaliatory actions is broader than that of discriminatory actions, as a reasonable worker could be discouraged from reporting abuse by actions tha[t] might not themselves be considered abusive," while also cautioning that "retaliation actions should not be a means to micromanage supervisor decisions or sanction trivial harms" ).

In determining whether an action meets that standard, "[c]ontext matters."  *Burlington*, 548 U.S. at 69.  As the Supreme Court has explained:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not

> fully captured by a simple recitation of the words used or the physical acts performed.  A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* (internal citations and quotation marks omitted).  Finally, "[f]or such alleged harms to be materially adverse . . . they must not be "unduly speculative."  *Bridgeforth*, 721 F.3d at 663 (quoting *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009)); *see, e.g.*, *Donovan*, 559 F.3d at 553 (finding that an employer's failure to nominate an employee for a Presidential Rank Award did not constitute materially adverse action because the award process was fraught with "inherent uncertainty").

Plaintiffs contend that the Firm's decision to limit Savignac to one positive, verbal reference from a well-respected partner in his area of practice constituted a materially adverse action.  Dkt. 203-1 at 6668.  That is because, in Plaintiffs' view, Savignac would have received multiple positive references from Jones Day partners (Savignac had reached out to at least three), and those partners would have provided both verbal and written references.  The loss of those additional references was meaningful, Plaintiffs further argue, because they made it harder for Savignac to find employment after leaving Jones Day.

Even assuming for the moment that Plaintiffs are correct that Savignac received fewer references than he otherwise would have received due to the intervention by Jones Day leadership, the Court remains unconvinced that the receipt of one—and only one—positive reference constituted a *materially adverse* action.  At most, Plaintiffs point to decisions holding that the provision of *negative* references can constitute an adverse action, *see Passer v. American Chemical Soc.*, 935 F.2d 322, 331 (D.C. Cir. 1991) ("[E]fforts by an employer to scuttle a former

123

employee's search for a new job, such as by withholding a letter of recommendation or by providing negative information to a prospective employer, can constitute illegal retaliation within the meaning of ADEA and parallel anti-retaliation provisions."); *Smith v. Sec'y of Navy*, 659 F.2d 1113, 1121 (D.C. Cir. 1981) ("[D]issemination of adverse references for reasons condemned by Title VII constitutes an unlawful 'employment practice' within (the) contemplation" of the statute.") (internal quotation marks and citation omitted); *Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*, 595 F.2d 711, 719 (D.C. Cir. 1978) (finding that a plaintiff who had "alleged that pejorative references were distributed deliberately and for invidious reasons" had stated a claim of discrimination under Title VII), they fail to identify any support for the proposition that the provision of *fewer positive* references than desired can constitute a materially adverse action.

The Court does not doubt that it is at least theoretically possible that an employee could be dissuaded from objecting to discriminatory conduct based on the risk of receiving fewer positive references than desired—for example, if there was evidence that prospective employers typically require several references from the applicant's prior employer and if the applicant's prior employer typically provided multiple references.  But Plaintiffs offer no evidence that would permit a reasonable trier of fact to find that this is such a case.  Their argument, instead, is that it would have been preferable for Savignac to have additional references from Jones Day than were provided.  But absent a showing that limiting a former employee to one positive reference would dissuade similarly situated employees from objecting to discriminatory conduct, that preference is of no legal import.

Moreover, even if the Court were to assume that Savignac's receipt of only one positive reference might constitute an adverse action, Plaintiffs' corresponding retaliation claim would

still fail because Plaintiffs have not shown that Defendants' proffered non-retaliatory explanation

for its decision to limit Savignac to one reference is pretextual and that the actual reason for

adopting that limitation was to penalize Savignac for engaging in protected activity.  *See*

*McGrath*, 666 F.3d at 1383  ("Where, as here, 'the employer has proffered a legitimate, [non-

retaliatory] reason for a challenged employment action, the "central question" is whether the

employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

[non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated]

against the employee' in violation of Title VII." (quoting *Calhoun v. Johnson*, 632 F.3d 1259,

1261 (D.C. Cir. 2011))).

Defendants explain that, under the Firm's pre-existing policies, partners (and other

employees) were not allowed to provide references for former employees without obtaining prior

approval.  Jones Day's 2015 Firm Manual states that "lawyers . . . are not authorized to provide

any employment reference of any type to any other party, including current or former employees

themselves."  Dkt. 189-13 at 12.  Instead, recipients of requests for references should be

"referred . . . to the Firm Administrative Partner or appropriate Partner-in-Charge."  *Id.*  "In most

circumstances," the Manual notes, the "the response will be limited to disclosing the date of

original hire and the date of most recent severance of employment."  *Id.*  That said, the Firm does

grant exceptions to this policy based on the individual circumstances of the request.  Dkt. 190-27

at 224 (Shumaker Dep. 223:11–15).  And Shumaker testified that he granted such an exception

to Savignac because Savignac presented an "exceptional circumstance."  *Id.* at 222 (Shumaker

Dep. 221:7–8).  Although Savignac had been terminated, *id.* (Shumaker Dep. 221:7–12),

Shumaker testified that he wanted Savignac to "move on to other opportunities and to do well"

because he "had a young family" and there were "people who were supportive of [Sheketoff and

Savignac] throughout the firm," *id.* (Shumaker Dep. 221:13–22).  Ultimately, Shumaker decided

that "it was in the firm's interest, as well as in [Plaintiffs'] interest, to provide an exception and

to allow someone to give a more substantive reference" than the policy would typically allow.

*Id.* (Shumaker Dep. 221:19–22).  Shumaker testified that by permitting one partner to serve as

Savignac's reference—a partner Shumaker understood to be supportive of Savignac and who

"would be most compelling to an employer," *id.* at 223 (Shumaker Dep. 222:3–14)—he thought

that he was assisting Savignac, not retaliating against him.

Plaintiffs have proffered no controverting evidence from which a reasonable jury could

reject Shumaker's testimony and find, instead, that Shumaker made a less expansive exception to

the Firm's policy in retaliation for Savignac's January 16 email.  Accordingly, the Court

concludes that Defendants are entitled to summary judgment with respect to Plaintiffs' reference-

based retaliation claims.[26]

---

[26] Plaintiffs bring these reference-based retaliation claims against both Jones Day, as their
former employer, as well as against Shumaker and Heifetz in their individual capacities.  For the
reasons explained, the Court concludes that both Jones Day and Shumaker are entitled to
summary judgment on Plaintiffs' reference-based retaliation claims; there is no evidence that
would permit a reasonable jury to find in Plaintiffs' favor on this claim.  For these same reasons,
the Court finds that there is no basis from which a reasonable jury could find Heifetz liable for
retaliating against Savignac.  Plaintiff's claims against Heifetz, however, suffer from additional
infirmities.

In her declaration, Heifetz attests that she did not decide whether Savignac would receive a
recommendation from any partner at the firm; rather, she merely "convey[ed] the Firm's policy
and the Firm's decision."  Dkt. 190-4 at 5 (Heifetz Decl. ¶ 15).  And contemporaneous
communications support that testimony.  *See* Dkt. 196-40 at 132–33 (text messages between
Partner F and Sheketoff in which Partner F states that Heifetz was "calling everyone to 'remind'
us that (apparently) the Firm handbook prohibits employment references" and stated that Heifetz
said that "she was in the process of seeing if the Firm will make an exception in this situation
and provide some sort of 'official' reference"); Dkt. 206-32 at 8 (stating that "Heifetz informed"
Partner F "about the provision in Jones Day's Firm Manual regarding requests for employment
references" and that "the Firm was considering authorizing someone to provide a reference for
Savignac consistent with that provision").  Although Sheketoff testified that she helped Heifetz

**E.     Plaintiffs' Press-Release-Based Retaliation Claim**

Plaintiffs' final claim is that Defendants retaliated against them, in violation of Title VII, by issuing "a press release full of malicious falsehoods" after they filed this lawsuit and after they solicited publication of an article about their suit by the *New York Times*.  Dkt. 203-1 at 72. As with Plaintiffs' other retaliation claims, to succeed on this claim Plaintiffs must prove that they suffered a materially adverse action because they engaged in a protected activity.  Once again, Plaintiffs' claim fails because they have failed to identify evidence that would permit a reasonable jury to find that the press release, when considered in context, constituted a materially adverse action.

As explained above, an action is materially adverse for the purpose of a retaliation claim if it "would have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Baloch*, 550 F.3d at 1198 (quoting *Burlington*, 548 U.S. at 68).  In making that assessment, context matters because what may dissuade a reasonable employee from opposing unlawful activity in one workplace may not dissuade a different employee from taking those same actions in a different workplace.  Here, context is dispositive.

The Court can, of course, imagine circumstances in which an employer's decision to engage in a campaign of unjustified public censure in response to an employee's decision to go public with claims of discrimination could constitute a materially adverse retaliatory action.  *Cf. Passer*, 935 F.2d at 331 (finding that an employer's decision to cancel an event honoring the plaintiff "humiliated him before the assemblage of his professional associates and peers from

---

draft letters of recommendation for individuals who had left Jones Day, Dkt. 189-92 at 299–302, Sheketoff did not testify that Heifetz violated Firm policy when she wrote these letters; the record is silent as to whether Heifetz had complied with the policy in providing those letters. Without evidence that Heifetz selectively sought to enforce the Jones Day reference-letter policy against Savignac, Plaintiffs' retaliation claims against Heifetz cannot proceed to trial.

across the nation, and made it more difficult for him to procure future employment"). For example, an employee who informs the press of a workplace in which sexual harassment is pervasive, whose employer responds with a series of baseless public statements accusing her of inviting that abuse, might have a cognizable retaliation claim. But that scenario, and ones like it, are far from what occurred here.

In this case, Plaintiffs went to the press to share their plans to file a lawsuit against Jones Day alleging that the Firm had engaged in discriminatory and retaliatory activity, and they previewed those allegations with the *New York Times*. The Firm, unsurprisingly, responded with a press release of its own, which stated that Plaintiffs' claims were false and that offered the Firm's own characterization of the relevant events. *See* Dkt. 189-84 at 2 (describing Jones Day's family leave policy as "fully consistent with guidance of the Equal Employment Opportunity Commission," and explaining that "[n]either the law nor common sense" requires "birth mothers to submit medical evidence proving that childbirth has had a physical impact on them" before those mothers can receive disability leave); *id.* at 3 (explaining Jones Day's reasons for terminating Savignac); *id.* (arguing that Sheketoff was not the victim of pay discrimination because she was "a highly paid associate" who received "mixed" reviews, had low billables and "idiosyncratic" preferences in who she represented). Neither side's overtures to the press made the other side look good. But that is not the question. The question is whether a reasonable employee, who accused his employer of discrimination and then went to the national press to preview his allegations, would be dissuaded from objecting to the allegedly discriminatory conduct—either in an internal complaint or in outreach to the press—simply because his employer publicly denied those allegations, while questioning the employee's judgment, commitment, and quality of work. *Baloch*, 550 F.3d at 1198.

128

Here, Plaintiffs have failed to offer evidence that would permit a reasonable jury to find that a reasonable employee—faced with that choice—would be dissuaded by a press release responding (even harshly) to the employee's publicly-aired allegations.  That is particularly so because, here, Plaintiffs not only invited the press coverage, but they undoubtedly understood that—based at least in part on their instigation—the press would cover the litigation in detail and would, in that context, report on precisely the same defenses of poor judgment, lack of commitment, and poor work quality raised in the press release.  And, in fact, the press release did not include any allegation that has not been aired repeatedly in this litigation, including the evidence and arguments discussed in this very opinion.  Jones Day's press release did not add materially to this public airing of the parties' respective views and allegations, and there is no reason to believe that Plaintiffs—or any other similarly situated employee—would refrain from objecting, either internally or in the *New York Times*, to the alleged discrimination merely because Jones Day might respond with its own press release and version of the relevant events.

The Court will, accordingly, grant summary judgment in favor of Defendants with respect to Plaintiffs' press-release based retaliation claims.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiffs' motion for summary judgment, Dkt. 203, and will **GRANT** in part and **DENY** in part Defendants' cross-motion for summary judgment, Dkt. 189.  The Court will **GRANT** summary judgment to Defendants on Claims 4-6 and Claims 12-14 and will **DENY** Defendants' motion for summary judgment on all other claims.  Surviving both parties' cross motions for summary judgment are Plaintiffs' claims that Jones Day's leave policies for new parents is discriminatory (Counts 1-3), and Plaintiffs'

claims that Jones Day (Count 7 & 11), and that Jones Day, Brogan, and Shumaker (Counts 8 &

9) retaliated against Sheketoff and Savignac by firing Savignac.

      **SO ORDERED.**

                                /s/ Randolph D. Moss
                                RANDOLPH D. MOSS
                                United States District Judge

Date:  October 3, 2024