**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK C. SAVIGNAC and JULIA SHEKETOFF, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 19-2443 (RDM) |
| JONES DAY, STEPHEN J. BROGAN, and MICHAEL SHUMAKER, | |
| *Defendants*. | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Presently before the Court are the parties' supplemental submissions addressing whether Jones Day waived its attorney-client privilege over a December 22, 1993 memorandum from Julie Stempe Dressing (who was the firm's Director of Human Resources ("HR") and HR Counsel at the time) to Patrick McCartan (who was the firm's Managing Partner at the time) by placing Dressing's advice to McCartan "at issue" in the litigation. *See* Dkt. 252; Dkt. 256. For the reasons explained below, the Court reaffirms its prior conclusion that Jones Day has waived the privilege, although the Court clarifies and expands upon its reasons for reaching that conclusion and limits its decision to those portions of the memorandum that Jones Day actually placed at issue.

**I.  BACKGROUND**

On October 3, 2024, the Court issued an opinion resolving the parties' cross-motions for summary judgment. *See Savignac v. Jones Day*, 2024 WL 4530225, ___ F. Supp. 3d ___ (D.D.C. Oct. 3, 2024) ("*Savignac I*").  Among other issues, the parties' cross-motions included

extensive argument addressing Plaintiffs' federal and D.C.-law challenges to Jones Day's leave policy for new, biological parents (hereinafter "leave policy").[1]  Under that policy, as the Court explained, birth mothers are eligible for a total of eighteen weeks of paid leave—eight weeks of which is labeled "short-term disability leave" and ten weeks of which is labeled "primary caregiver leave"—while biological fathers are eligible for only ten weeks of paid "primary caregiver leave." *Id.* at *26.  On Plaintiffs' telling, the policy is discriminatory because it treats biological mothers and fathers differently based on stereotypes about the respective roles of mothers and fathers in caring for their children.  On Jones Day's telling, in contrast, the policy simply recognizes that biological mothers and fathers are differently situated, and the firm provides additional leave to birth mothers merely in recognition of that difference—in short, the short-term disability leave is offered to give new mothers time to recover from the physical effects of childbirth.

Jones Day is, of course, correct that men and women are differently situated when it comes to childbirth, and Plaintiffs did not argue to the contrary in their summary judgment briefs.  Instead, Plaintiffs argued that Jones Day's leave policy is discriminatory because, "[r]ather than covering a period of actual, postpartum disability," the policy is "the product of a stereotypical and archaic belief that women should bear more of the responsibility of childrearing," and so women "need more time away from work than fathers do." *Id.* at *27.  As explained in *Savignac I*, the Court was "unpersuaded that the policy itself bears so little relationship to the medical needs of women following delivery that a jury could infer from the policy's terms alone that it was adopted for pretextual reasons." *Id.* at *33.  As a result, the Court was required to decide whether Jones Day had satisfied its burden of coming forward with

---

[1] The Firm has a separate policy for new, adoptive parents.

a legitimate, nondiscriminatory reason for setting the default period of postpartum disability leave at the higher end of the medically appropriate range—that is, at eight weeks, rather than six or even four weeks—and, if so, whether Plaintiffs had offered sufficient evidence for a reasonable jury to find that Jones Day's proffered rationale was pretextual and that the actual reason was discriminatory.  *See Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *Figueroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019).

The central question at summary judgment was, therefore, one of intent: did the firm adopt the *full* eight-week period of "disability leave" for new mothers for non-discriminatory reasons or did it adopt *some portion* of that period of leave for the purpose of conferring a disguised and discriminatory benefit on female associates that the firm declined to provide to male associates.  *Savignac I*, 2024 WL 4530225, at *26–33.  Resolving the parties' dispute about that question, however, was complicated by the fact that the firm's decision to adopt the original version of the leave policy was made by McCartan in 1994, and McCartan passed away before this suit was initiated.  The documentary trail, moreover, was thin.

The only evidence that Jones Day offered that memorialized McCartan's own words or thoughts was a two-sentence memorandum that McCartan sent to Dressing on January 11, 1994. Dkt. 189-17 at 2.  As noted above, Dressing was Jones Day's Director of Human Resources and HR Counsel at the time, and McCartan was the firm's Managing Partner.  McCartan's memorandum, which Jones Day included in its summary judgment submission, read as follows:

Ms. Dressing

Re:  Changes in Non-Partner Maternity Leave Policy

I have reviewed your memorandum of December 22, 1993 and approve the amendments revising our Non-Partner Maternity Leave Policy, now titled "Paid Medical and Family Leave," and "Unpaid Leaves of Absence."

> Please see to it that the new policy is included in the 1994 revision of the Firm Manual.
>
> Patrick F. McCartan

*Id.*

Although Jones Day did not include a copy of Dressing's December 22, 1993 memorandum in its summary judgment submission, it produced a heavily redacted version of that memorandum in discovery. In that version, the firm redacted all but a three-sentence introduction, the signature block, the date, and the "cc's" based on an assertion of the attorney-client privilege. Dkt. 206-1 at 1–6. The firm also produced a copy of the pre-1994 version of the firm's maternity leave policy, which Dressing had attached to her December 22, 1993 memorandum. *Id.* at 7–10. Although the *unredacted* portion of the Dressing memorandum reveals that the firm made the changes to the policy "[i]n light of the Family and Medical Leave Act of 1993," *id.* at 2, it does not address why the firm decided to provide female associates with a presumptive period of eight weeks of disability leave plus a four-week period of paid parental leave, while providing male associates with only four weeks total of paid parental leave. Jones Day subsequently increased the period of paid, parental leave for both female and male associates from four to ten weeks, but it left the eight-week period of presumptive disability leave as it was. *See* Dkt. 189-2 at 18 (Defs' SUMF ¶ 106) ("Since its implementation in 1994, Jones Day's assumption that a physician would certify an eight-week disability period for routine childbirth has remained in place."). As a result, the firm's intent in 1994 regarding the eight-week period remains relevant for present purposes.

At summary judgment, the principal evidence that Jones Day offered to fill this evidentiary void and to satisfy its burden of coming forward with a legitimate, nondiscriminatory reason for its decision took the form of a declaration from Dressing, explaining (almost three

decades after the fact) why she recommended to McCartan that the firm modify its leave policy. Dkt. 189 at 16–18; Dkt. 189-4 (Dressing Decl.).  That declaration must, of course, be viewed through the lens that it was Dressing who authored the December 22, 1993 memorandum to McCartan recommending that the firm amend its policy, and it was Dressing to whom McCartan wrote back on January 11, 1994, indicating that he had reviewed her memorandum and that he was approving the amendments to the policy that she (and others) proposed.

Although Jones Day now suggests that the policy that McCartan approved in January 1994 did not include the eight-week disability period, Dkt. 252 at 5, that contention is untenable for several reasons.  As an initial matter, the Court notes that Jones Day's own Statement of Undisputed Material Facts (1) asserted that "Dressing recommended assuming that a physician would certify an *eight-week* disability period for new mothers who underwent childbirth without complications," Dkt. 189-2 at 7 (Defs' SUMF ¶ 41) (emphasis added); (2) then recounted the factors upon which "Dressing based her recommendation," *id.* (Defs' SUMF ¶ 42); and (3) immediately after doing so, asserted that McCartan "approved the policy change *based on Dressing's recommendation*," citing his January 11, 1994 memorandum to Dressing, *id.* at 9 (Defs' SUMF ¶ 51) (emphasis added), which, in turn, cites to Dressing's December 22, 1993 memorandum.  Jones Day's opening summary judgment brief and the Dressing declaration, moreover, follow this same script.  *See* Dkt. 189 at 17 ("Dressing determined that the appropriate approach was to assume that eight weeks of the previously-provided twelve weeks of leave was for disability."); Dkt. 189-4 at 3 (Dressing Decl. ¶¶ 8–11) (noting that her review culminated in the December 22, 1993 memorandum to McCartan and that her recommendation that new fathers receive four weeks of paid leave was based on the assumption "that a physician would certify an eight-week disability period for new mothers").  And, notably, Jones Day fails to identify any

evidence that McCartan—or any other member of senior firm management—made a decision to adopt an eight-week disability period separate and apart from McCartan's approval of Dressing's December 22, 1993 recommendation.

But even if any doubt might otherwise remain on this question, the Court's *in camera* review of the December 22, 1993 memorandum puts that doubt to rest. Jones Day asserts that the Dressing memorandum "did not state the *precise length* of the disability period" and that "[t]he 8-week assumption was not *clarified* until later, in a separate, non-privileged communication from Dressing to female lawyers explaining how the policy would work in practice." Dkt. 252 at 4–5 (emphases altered). Neither assertion is sound. To start, Jones Day's contention that the Dressing memorandum did not address the "precise length of the disability period"—and, therefore, did not endorse the eight-week assumption—cannot be squared with what the document says. Because the unredacted version of the December 22, 1993 memorandum is not yet in the public record, the Court will, for present purposes, simply point to the last clause of the penultimate paragraph of the memorandum, to the first sentence of the third paragraph of the memorandum, and to the second, third, and fourth sentences on the fourth page of the memorandum. Nor does the later "clarification" of the policy support Jones Day's argument; that clarification was not for the benefit of firm management but, rather, for the benefit of the firm's female associates, who—unlike McCartan—never saw the December 22, 1993 memorandum. If there is evidence that firm management remained uncertain about the policy after McCartan sent Dressing his January 11, 1994 memorandum, Jones Day has yet to identify that evidence.

Against this backdrop, the following facts come into focus. First, McCartan was the deciding official: He had the authority to act on behalf of Jones Day, he received Dressing's

input on the leave policy, and he made the decision.  Second, the only document memorializing McCartan's reasons for approving the amended leave policy is his January 11, 1994 memorandum to Dressing, in which he noted that he had reviewed her December 22, 1993 memorandum and was approving the recommendation that she made in that memorandum. Third, the changes that the firm made to the policy included the decisions (1) to leave the pre-existing policy of providing new mothers with a total of twelve weeks of paid leave in place, (2) to provide new fathers with four weeks of paid leave, and, thus, (3) to treat the remaining eight weeks of leave provided to new mothers as disability leave.  Fourth, to carry its burden of coming forward with a legitimate, non-discriminatory reason for McCartan's decision, Jones Day proffered the Dressing declaration, which explained the reasons for her recommendation to McCartan.  Beyond McCartan's January 11, 1994 memorandum to Dressing and the Dressing declaration, Jones Day offered little, if any, evidence of why the firm adopted the presumptive period of eight weeks of postpartum disability.

## II.  LEGAL STANDARD

Although the parties dispute the relevant facts, the governing law is settled.  The attorney-client privilege "applies to a confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client."  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014); *Smith v. Ergo Sols., LLC*, 2017 WL 2656096, at *2 (D.D.C. June 20, 2017) (explaining that communications that contain both business advice and legal advice may be privileged, provided that "the client [was] seeking and receiving legal advice rather than solely business advice").  This privilege, which is one of the "oldest recognized privileges for confidential communications," serves the public interest and the interests of justice by "encourag[ing] full and frank communication

between attorneys and their clients." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (citation omitted). But, at the same time, courts and leading commentators have recognized that because "the privilege stands in derogation of the public's 'right to every man's evidence[]' and as 'an obstacle to the investigation of the truth,'" it must "'be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (Friendly, J.) (quoting 8 J. Wigmore, Evidence in Trials at Common Law §§ 2291–92 (J. McNaughton rev. 1961)) (internal citation omitted). Consistent with these competing interests, the privilege is subject to certain express and implied waivers, but courts must proceed with caution in formulating and applying waivers that risk weakening the privilege. *See In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008).

As relevant here, under the doctrine of "implied" or "at issue" waiver, "the attorney-client privilege is waived when the client places otherwise privileged matters in controversy." *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co*., 129 F.3d 143, 151 (D.C. Cir. 1997); *see also Blue Lake Forest Prods., Inc. v. United States*, 75 Fed. Cl. 779, 783 (2007) ("The at-issue implied waiver applies where the privilege holder makes assertions, the truth of which can only be assessed by examination of privileged communications.") (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). The purpose of the implied waiver doctrine is to prevent an "abuse of the privilege;" that is, courts will not allow the privilege "to be used as a tool for manipulation of the truth-seeking process." *In re Sealed Case*, 676 F.2d 793, 807 & n.43 (D.C. Cir. 1982). Most notably, courts will not permit a party to "'disclos[e] at much as [it] pleases,'" only "'to withhold the remainder.'" *Id.* at 808 (quoting 8 J. Wigmore, Evidence in Trials at Common Law § 2327 (J. McNaughton rev. 1961)). "This is particularly true where . . . a party partially discloses the allegedly privileged information in support of its claim against another, but

then asserts the privilege as a basis for withholding from its opponent the remainder of the information which is necessary to defend against the claim." *Ideal Elec. Sec.*, 129 F.3d at 151; *see also Bilezerian*, 926 F.2d at 1292 ("[T]he attorney client privilege cannot at once be used as a shield and a sword.  A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").

"Where the content of the attorney-client communications are 'inextricably merged with the elements of [the privilege holder's] case,' 'to deny access to them would preclude the court from a fair and just determination of the issues.'" *Minebea Co. v. Papst*, 355 F. Supp. 2d 518, 522 (D.D.C. 2005) (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 582 (E.D. Wash. 1975)); *see also Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020) ("[A] party waives the attorney-client privilege when that party places privileged information in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." (citation omitted)); *Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364, 1370 (Fed. Cir. 2012) ("The doctrine of implied waiver is invoked when a party makes the content of his attorney's advice relevant to some claim or defense in the case.").  Stated more generally, the attorney-client privilege "may not be used both as a sword and a shield," and, thus, "[w]here a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).

### III.  ANALYSIS

At the summary judgment stage, the Court concluded that Jones Day had placed Dressing's advice to McCartan "at issue" and had thereby waived any privilege that might otherwise protect the December 22, 1993 Dressing memorandum from disclosure.  *Savignac I*,

2024 WL 4530225, at *39.  But given the significance of finding a waiver of attorney-client

privilege (even a limited waiver), and because Jones Day had responded to Plaintiffs' invocation

of the at-issue waiver doctrine only in a two-sentence footnote, the Court provided the parties

with a further opportunity to brief the issue before ordering Jones Day to produce the document.

*Id.*

        Accepting that opportunity, Jones Day now argues that it did not rely upon or otherwise

put at issue "the [Dressing] memorandum 'as an element of . . . [its] defense,'" and, indeed,

never "even cited" the memorandum in its summary judgment motion.  Dkt. 252 at 4 (citation

omitted).  Instead, Jones Day argues, it "based its defense on Dressing's non-privileged

declaration setting forth her business reasons for the leave policy's 8-week post-partum disability

assumption."  *Id.*  The firm acknowledges that its "defense . . . put 'at issue' Dressing's reasons

for recommending the 8-week period and whether those were McCartan's reasons for adopting

the 8-week period."  *Id.*  But it argues that it "never put at issue the 'privileged [memorandum's]

contents' to support that defense."  *Id.* (citation omitted).  Finally, Jones Day draws a distinction

between the *legal* analysis set forth in the December 22, 1993 memorandum, which it seeks to

protect, and Dressing's *business* reasons for recommending an eight-week period of short-term

disability leave, and it says that "it has never argued that Dressing conveyed those business

reasons to McCartan *at all*."  *Id.* (emphasis in original).

        Plaintiffs respond that "Jones Day has put Dressing's supposedly privileged advice at

issue by basing its defense on contentions about Jones Day's (i.e., McCartan's) reasons for

adopting the proposal when Jones Day's only record evidence is that he acted for the reasons in

the" December 22, 1993 memorandum.  Dkt. 256 at 2–3.  They argue that Jones Day "has done

so by relying on a declaration from Dressing in which she purports to recount *her*

nondiscriminatory reasons for recommending the policy and then asserting that these were *Jones Day's* (i.e., McCartan's) reasons." *Id.* (emphasis in original). And they point to Jones Day's concession that the firm put at issue "'Dressing's reasons for recommending the 8-week period and *whether those were McCartan's reasons for adopting the 8-week period*.'" *Id.* (quoting Dkt. 252 at 4) (emphasis in original). On Plaintiffs' telling, that concession is dispositive because "[t]he *only* way that Jones Day can show that 'those were McCartan's reasons for adopting the 8-week period' is by showing that Dressing's reasons were communicated to McCartan," and "the *only* communication to him evidenced in the record is the" December 22, 1993 memorandum. *Id.* (emphasis in original).

For the reasons explained below, the Court concludes that Plaintiffs have the better of the argument.

## A.

Jones Day relies extensively on the D.C. Circuit's decision in *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015) ("*KBR II*"). Although the firm failed to cite *KBR II* at the summary judgment stage, the Court agrees that *KBR II* provides important guidance and thus starts with that precedent.

That case followed a familiar pattern in False Claims Act litigation, albeit with two interlocutory detours to the D.C. Circuit. The plaintiff, a former Kellogg Brown & Roots ("KBR") employee, alleged that the company and certain subcontractors defrauded the United States government by inflating costs and accepting kickbacks while administering a government contract. *Id.* at 140. During discovery, the plaintiff sought documents relating to KBR's internal investigation of the alleged fraud, and, in response, KBR asserted that those documents were protected by the attorney-client privilege. *Id.* The district court rejected the assertion of

privilege on the ground that KBR had failed to show that "'the communications would not have been made 'but for' the fact that legal advice was sought." *Id.* (citation omitted). KBR, in turn, petitioned the D.C. Circuit for a writ of mandamus, and, agreeing with KBR, the court of appeals granted the writ. *Id.* at 141.

The case then returned to the district court, which again rebuffed KBR's assertion of the attorney-client privilege. *Id.* This time, the district court concluded that the company had impliedly waived the privilege by placing the substance of the internal investigation at issue in two ways. First, plaintiff noticed a Rule 30(b)(6) deposition of a corporate representative to address, among other topics, any internal investigation that KBR had conducted relating to the alleged fraud. *Id.* At the deposition, KBR's counsel repeatedly stressed that the company was not waiving its privilege, and he instructed the witness "not to answer questions about the contents of the internal investigation." *Id.* On cross-examination, however, KBR's counsel asked "questions designed to try to determine whether or not the . . . investigation [was] privileged," and, in the course of doing so, elicited testimony regarding KBR's contractual duty to report violations of the Anti-Kickback Act to the Department of Defense. *Id.* In that context, the witness "testified that KBR adhered to that obligation and had made disclosures pursuant to the same duty in other instances." *Id.* Finally, the witness explained that KBR had "never provided an internal investigation itself to the Department because it has always treated the investigation as subject to the attorney-client privilege." *Id.*

Second, in a footnote in KBR's summary judgment brief, the company noted that (1) it "has an internal Code of Business Conduct ('COBC') investigative mechanism that provides a means of identifying any potentially illegal activities within the company;" (2) "[w]hen a COBC investigation reveals reasonable grounds to believe that a violation of [the Anti-Kickback Act]

may have occurred requiring disclosure to the government . . . , KBR makes such disclosures;" (3) "KBR has made reports to the Government when it had reasonable grounds to believe that a violation of the Anti-Kickback Act occurred;" and (4) the company "intends for these investigations to be protected by the attorney-client privilege . . . but has not asserted privilege over the fact that such investigations occurred, or the fact of whether KBR made a disclosure to the Government based on the investigation." *Id.* at 142. KBR also cited to excerpts from the testimony of the Rule 30(b)(6) witness (which disclosed "the fact of the COBC investigation and KBR's reporting duties") in its Statement of Undisputed Material Facts, and it attached those materials to its motion. *Id*. at 146.

The district court concluded that these questions, statements, and attachments impliedly waived KBR's attorney-client privilege with respect to the internal investigation because the company "'actively sought a positive inference in its favor based on what KBR claims the documents show[ed].'" *Id.* at 142 (citation omitted). "Although KBR argued that it should be permitted to amend its pleadings to strike the sections the [d]istrict [c]ourt found created a waiver, the [d]istrict [c]ourt rejected the request to vacate its production order unless KBR elected to default on the entire suit." *Id.*

The D.C. Circuit, once again, concluded that the district court had committed a "clear and indisputable" error, and it, accordingly, issued a writ of mandamus. *Id.* at 150. The court of appeals first held that neither the Rule 30(b)(6) witness's testimony nor KBR's statement of undisputed material facts could, standing alone, give rise to an "at issue" waiver. *Id.* at 146. That was because neither the deposition testimony nor the statement of undisputed material facts asked the court or the jury to infer anything, and therefore the company did not "place[] the contents of" the privileged material at issue. *Id.* Instead, the deposition and the undisputed

statement of material facts merely disclosed information that was not itself privileged—that is, that KBR conducts internal investigations and reports wrongdoing when it finds wrongdoing.

The D.C. Circuit then turned its attention to "[t]he reference to the COBC investigation in the memorandum in support of summary judgment," which "present[ed] what [wa]s at first glance a more difficult question." *Id.* As the court of appeals explained, the question was—at least "at first glance"—more difficult because, "[b]y stating that KBR performed a COBC investigation and that, afterward, KBR did not report any wrongdoing to the Department of Defense, a factfinder could infer that the investigation found no wrongdoing." *Id.* But on closer scrutiny, the D.C. Circuit concluded that KBR had not, in fact, placed the privileged communications at issue for at least two reasons: "First, the footnote constitute[d] a recitation of facts that appear[ed] only in the motion's introduction, not in an argument or claim concerning the privileged documents' contents." *Id.* at 148. Second, the footnote appeared in KBR's motion for summary judgment, and thus the district court was required to view the footnote in the light most favorable to the non-moving party—that is, the plaintiff. *Id.* Thus, even if the evidence cited in the footnote might support an inference that the investigation found no wrongdoing, because that inference was not "unavoidable," it was not the type of inference that the district court could have relied upon in resolving KBR's motion for summary judgment. *Id.* at 146, 148. In other words, KBR did not place the substance of its internal investigation at issue because the district court could not have drawn the inference that the plaintiff feared.

This case differs from *KBR II* in significant respects. To start, Jones Day invoked Dressing's recommendation to McCartan, not only in support of its own motion for summary judgment, but in opposition to Plaintiffs' cross-motion for summary judgment. In that posture, the Court was required to consider the evidence in the light most favorable to Jones Day—as the

non-moving party—and was required to draw all inferences in Jones Day's favor.  One such
inference, of course, was that the reasons that Dressing included in her declaration were
conveyed to McCartan and that McCartan relied on Dressing's advice in deciding to approve the
eight-week period of presumptive, postpartum disability leave for new mothers.  The principle
question that was before the Court was whether Plaintiffs were correct that no reasonably jury
could find that Jones Day's policy was adopted for legitimate, non-discriminatory reasons, and
construing the record in the light most favorable to Jones Day, the Court was convinced that a
jury might infer that the reasons that Dressing set forth in her declaration were conveyed to
McCartan and that he adopted the policy for those reasons.  But, as explained above, the *only*
evidence of *any* communication between Dressing and McCartan regarding the policy is found in
the December 22, 1993 memorandum from Dressing to McCartan and in McCartan's January 11,
1994 response, in which he indicated that he had reviewed Dressing's memorandum and had
accepted her recommendation.

But, even if the Court were to focus solely on Jones Day's affirmative motion for
summary judgment, this case would still differ from *KBR II* in material respects.  As the D.C.
Circuit explained in *KBR II*, the inference at issue there—that is, the inference that KBR's
internal investigation must have found no evidence of wrongdoing—was not "unavoidable" and,
indeed, it was far from clear that KBR intended for the district court to draw any inference from
the footnote.  Here, in contrast, Jones Day itself argued in its reply brief that the inference that it
asked the Court to draw—that the firm adopted the eight-week period of presumptive postpartum
disability for the reasons given in the Dressing declaration—was inescapable.  In Jones Day's
words, "her testimony [was] *dispositive* in the absence of any contrary evidence."  Dkt. 214 at 13
(emphasis added); *see also Savignac I*, 2024 WL 4530225, at *34 (Defendants argue that

"Dressing's declaration 'is dispositive in the absence of any contrary evidence'"). To be sure, the Court did not agree that the Dressing declaration entitled Jones Day to summary judgment, but only because "a reasonable jury might find that Dressing's decades old recollection is not reliable" and because the firm had a self-evident economic incentive "to minimize the financial benefit it was required to extend to male associates," *id.* at *37. But the fact that Jones Day's argument was unsuccessful does not mean that the firm never intended to place Dressing's advice to McCartan at issue; to the contrary, the firm offered the Dressing declaration as the *sole* evidence of "McCartan's reasons for adopting the 8-week period" of post-partum disability leave, Dkt. 252 at 4; *see also* Dkt. 214 at 13. These circumstances were thus very different from those presented in *KBR II*.

This case also differs from *KBR II* because Jones Day's use of Dressing's declaration, and the invitation to infer that her declaration represents an accurate description of why Jones Day adopted the eight-week presumed period of postpartum disability, did not merely appear in a footnote in an introductory section of Jones Day's brief. To the contrary, Dressing's reasons for proposing the changes to the policy were front and center to Jones Day's contention that it (i.e., McCartan) decided to provide the *full* eight weeks of presumptive, postpartum disability for legitimate, nondiscriminatory reasons.

The firm began its argument by asserting that "the undisputed facts disprove discriminatory intent and pretext." Dkt. 189 at 16. It explained that, before 1994, it "provided 12 weeks of paid leave to new mothers but did not distinguish postpartum *disability* leave . . . from *parental* leave" and that new "[f]athers relied on vacation and sick days for parental leave" and that, after Congress enacted the Family and Medical Leave Act in 1993, it decided "to provide paid family leave to all birthparents." *Id.* at 16–17. In explaining why the firm decided

"to assume that eight weeks of the previously-provided twelve weeks of leave was for disability, leaving four weeks for sex-neutral family leave," Jones Day relied exclusively on the Dressing declaration.  *Id.* at 16–18.  Citing to that declaration, it asserted, for example, that "Jones Day did not want to require medical certifications of, 'for instance, the type of birth,'" to avoid "offend[ing] female associates" and that the firm decided that "a standard eight-week certification assumption was the most administratively efficient way to accommodate the disability period of most routine childbirths."  *Id.* 17–18.

Significantly, as Dressing herself acknowledged in the declaration, her "review culminated in" the December 22, 1993 memorandum to McCartan, and, following her review, "the Firm" (that is, McCartan) "decided to make amendments to its leave policies for non-partner lawyers."  Dkt. 189-4 at 3 (Dressing Decl. ¶¶ 8–9).  In short, Jones Day asked the Court to infer that Dressing's recent description of the reasons why she recommended the policy changes to McCartan almost thirty years ago were, in fact, the reasons why McCartan adopted those changes.  By doing so, Jones Day placed Dressing's advice to McCartan—advice that was *conveyed* exclusively in the December 22, 1993 memorandum—at the heart of its defense.

This case is thus very different from *KBR II*.

## B.

Not only is this case unlike *KBR II*, it raises the type of "manipulation of the truth-seeking process" that an at-issue waiver is designed to guard against.  *In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982).  The central question presented at the summary judgment stage was why McCartan approved the full eight-week period of presumed, postpartum disability.  According to the firm, "Dressing's undisputed testimony and the Firm Manuals prove[d] that Jones Day"—that is, McCartan—acted for legitimate, non-discriminatory reasons.  Dkt. 189 at

18.  That argument attributed Dressing's reasons for approving the policy to McCartan and thus invited the inference that Dressing's advice was conveyed to McCartan in some manner.  But while inviting that inference and proffering a post-hoc description of Dressing's reasons for proposing the policy, Jones Day has asserted privilege over the sole document that memorialized the actual advice that Dressing conveyed to McCartan.  In short, the firm sought to substitute Dressing's 2022 declaration, which describes her decades-old analysis and conclusions while suggesting that McCartan acted for those reasons, for the December 22, 1993 memorandum, which describes the contemporaneous analysis and conclusions that she actually conveyed to McCartan.

Neither the purposes of the attorney-client privilege nor the truth-seeking function is served by permitting a party to make a substitution of this sort, thereby inviting a court to infer that the decision-maker acted for the reasons provided after-the-fact by the business advisor/attorney, while withholding the document that conveys the actual (and only) advice that the business advisor/attorney provided to the decision-maker preceding the relevant decision.  As courts have repeatedly observed, "the attorney-client privilege cannot at once be used as a shield and a sword."  *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *see also Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 11 (1st Cir. 1998); *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 164 (3d Cir. 2010); *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005); *United States v. Davis*, 583 F.3d 1081, 1090 (8th Cir. 2009); *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).  Jones Day disagrees with this analysis for several reasons, none of which withstands scrutiny.

**1.**

At the summary judgment stage, Jones Day offered only one argument in support of its contention that it did not implicitly waive its claim of privilege over the Dressing memorandum: It asserted that "Dressing is not precluded from testifying about her *business* reasons for recommending the policy just because she also wrote a privileged memo providing *legal* analysis in her capacity as an employment lawyer." Dkt. 214 at 13 n.1 (emphasis added). At oral argument, Jones Day elaborated on this argument, representing "that the business reasons that Dressing gave" for her recommendation are not addressed in her December 22, 1993 memorandum, "nor are *any other* business reasons for adopting the eight-week assumption." Dkt. 242 at 10:20–24 (Tr. Oral Arg.) (emphasis added).

That, however, is incorrect. Because the unredacted version of the memorandum is not yet in the public record, the Court will, once again, simply point to the relevant passages. In particular, the second sentence on page four of the memorandum identifies two business reasons for the policy, and the final full sentence on that page identifies a related business reason. Read together, these assertions clearly go beyond offering legal analysis or related background and, instead, offer a business reason for adopting the eight-week assumption. Indeed, although this section of the memorandum starts with a single sentence repeating Dressing's legal conclusion, it principally consists of a recommendation made by a group or committee, which included Dressing and five others, reflecting their business advice about how to proceed.[2]

For this reason, Jones Day cannot divide Dressing's advice into two realms, the legal advice that was contained in her December 22, 1993 memorandum and the separate business

---

[2] Notably, as discussed further below, Jones Day does not contend that the entire group that made this business recommendation was acting as legal counsel to the firm.

advice that informed her recommendation and that was, perhaps, separately conveyed to McCartan. As far as the record reflects, Dressing communicated with McCartan only once regarding the policy change, and that communication included both legal and business advice.

**2.**

In its most recent filing, Jones Day seems to back away from its contention that the December 22, 1993 memorandum contained only legal advice, and the firm now argues that a document that contains both legal and business advice "remains privileged in its entirety," if (and only if) "the legal portions are non-segregable." Dkt. 252 at 3 (citation omitted).[3] The firm does, however, hint at one vestige of its contention that the December 22, 1993 memorandum failed to address the business considerations described in the Dressing declaration. As noted above, Jones Day asserts that "the policy McCartan approved did not state the precise length of the disability period" and that "[t]he 8-week assumption was not clarified until later, in a separate, non-privileged communication from Dressing to female lawyers explaining how the policy would work in practice." *Id.* at 4–5 (emphasis omitted). But, for the reasons explained above, that contention is untenable. The December 22, 1993 memorandum, which McCartan reviewed before approving revisions to the firm's leave policy, recommended adoption of the eight-week assumption.

**3.**

That leaves Jones Day's contention that the firm never "place[d] its privileged memorandum 'at issue.'" Dkt. 252 at 4. Jones Day starts with the unremarkable proposition that it "has not asserted an advice-of-counsel defense." *Id.* That is true but beside the point, since an

---

[3] The Court addresses segregability in Part III.C, below.

advice-of-counsel defense is just one example of an "at issue" waiver, and no one has suggested that the firm has raised that type of defense here.

Next, and more substantively, Jones Day argues that it did not rely on the December 22, 1993 memorandum "as an element of its defense" and that "the scattered references to [the memorandum] in exhibits . . . did not put it at issue, particularly given that there was no *actual* disclosure of its contents." *Id.* (cleaned up). But that also sidesteps the issue before the Court. The question is not whether the firm cited, quoted, or mentioned the memorandum but, rather, whether it placed Dressing's privileged advice to McCartan at issue in the litigation. *See*, *e.g.*, *Ideal Elec. Sec. Co., Inc.*, 129 F.3d at 151–52. KBR did not, for example, quote or describe the contents of its internal investigation in *KBR II*, but the D.C. Circuit nonetheless went on to consider whether the company had waived the privilege by implying that the privileged advice absolved it of any wrongdoing. The same question is apt here. Did Jones Day offer the Dressing declaration intending that the Court (and, later, the jury) infer that she had advised the firm—that is, McCartan—to adopt the policy for the reasons identified in her declaration? If so, then the firm has placed at issue her privileged advice to McCartan, regardless of whether it ever mentioned or disclosed the December 22, 1993 memorandum. In other words, a client may not seek to present (directly or by inference) a portion of the privileged advice that it received from its lawyer, while withholding other portions (or renditions) of that *same* advice, which might offer a more complete or accurate description of the relevant advice.

Jones Day now maintains that it "never argued that Dressing conveyed [the] business reasons [described in her declaration] to McCartan *at all*" and that, instead, it argued only that McCartan "served as a 'conduit' for Dressing's selection of an 8-week postpartum disability period." Dkt. 252 at 4. In pressing this argument, Jones Day seeks to thread a very fine needle.

It recognizes that it bears the burden of coming forward with evidence to support a legitimate, non-discriminatory reason for adopting the full eight weeks of presumptive, postpartum leave. It recognizes that McCartan—and not Dressing—was the decisionmaker. It recognizes that the only record of McCartan's decision is the January 11, 1994 memorandum, in which he wrote that he had "reviewed [Dressing's] memorandum of December 22, 1993 and approve[d] the amendments" she recommended. Dkt. 189-17 at 2. It recognizes that the December 22, 1993 memorandum is the only recommendation that, to our knowledge, McCartan ever received. And it recognizes that it "put 'at issue' Dressing's reasons for recommending the 8-week period" in the hope that her reasons for making the recommendation would permit a reasonable factfinder to infer that "those [reasons] were McCartan's reasons for adopting the 8-week period." Dkt. 252 at 4.

Jones Day nonetheless maintains that it did not put Dressing's advice to McCartan at issue and, instead, merely argued that a reasonable factfinder "could infer that Dressing's nondiscriminatory reasons are attributable to Jones Day" on the theory that "McCartan merely served as a 'conduit' for Dressing's selection of [the] 8-week post-partum disability period." *Id.* In short, Jones Day posits that a reasonable jury could disregard any advice that Dressing might have provided to McCartan, could disregard the implication that she conveyed the views set forth in her declaration to McCartan or anyone else is senior management, and could simply attribute Dressing's unconveyed views to the decisionmaker. In the Court's view, that effort to thread the needle fails for several reasons.

*First*, that theory appears nowhere in the firm's opening brief, and it appears only obliquely in its responsive brief (after Plaintiffs had raised the at-issue waiver).

*Second*, and more importantly, the theory fails because there is no evidence to support it. Jones Day may be correct that, in the absence of evidence that McCartan received relevant business advice from Dressing (or anyone else), a reasonable factfinder might infer that he McCartan simply deferred to Dressing—that is, to borrow Jones Day's words, that he was a mere "conduit" for Dressing's conclusions. But to this day, Jones Day has failed to offer *any* evidence that McCartan simply deferred to Dressing or that he delegated decision-making authority to her. The uncontroverted evidence, moreover, is to the contrary. That evidence shows that Dressing sent the December 22, 1993 memorandum to McCartan and that he responded by informing Dressing that he had reviewed her memorandum and approved the proposed amendments to the leave policy. Dkt. 189-17 at 2. Against this backdrop, the Court now concludes that no reasonable jury could find, based on the evidence in the existing (and extensive) record, that McCartan was a mere "conduit" for Dressing, who was the de facto decisionmaker. That conclusion, moreover, is borne out by the Court's *in camera* review of the December 22, 1993 memorandum.

*Third*, and relatedly, the employer's burden of coming forward with a legitimate, nondiscriminatory rationale is not a mere formality. Rather, the D.C. Circuit has stressed that this requirement is designed to "focus the issues and [to] provide the worker with a full and fair opportunity to attack the explanation as pretextual." *Figueroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019) (citation omitted). This means, among other things, that the employer must proffer evidence that, if believed, would permit a reasonable jury "to find that the employer's action was motivated by a nondiscriminatory reason." *Id.* at 1087 (cleaned up). Here, Jones Day offers evidence that would be sufficient to permit a reasonable jury to find that Dressing proposed the policy for the reasons she now identifies. But the only evidence that it has offered

that would permit a reasonable jury to find that McCartan approved the policy for those reasons is McCartan's January 11, 1994 memorandum, which could support the inference that the reasons the Dressing now identifies in her declaration were conveyed to McCartan in the December 22, 1993 memorandum.

That, however, is precisely the problem; the only reasonable inference that is supported by the evidence is that the Dressing declaration reflects some or all of the advice that was included in the assertedly privileged memorandum. The record contains no evidence that her views were conveyed to McCartan indirectly by Steinbrink or anyone else, and it contains no evidence that McCartan simply deferred to Dressing. Indeed, Dressing is the only witness offered by either party with relevant knowledge, and she does not aver that McCartan (expressly or implicitly) delegated decision-making authority to her. Because *Figueroa* demands more than speculation, Jones Day cannot fall back on the unsupported (and seemingly inaccurate) supposition that McCartan simply deferred to Dressing.

The Court takes some responsibility for how Jones Day now frames its argument, because it was the Court, at summary judgment, that observed that a reasonable jury might infer that Dressing's views were "communicated to McCartan (perhaps by Steinbrink, to whom Dressing reported [her] analyses and conclusions or because they were baked into her recommendation (in a manner analogous to . . . the 'cat's-paw' theory of discriminatory intent.)" *Savignac I*, 2024 WL 4530225, at *36 (internal citations omitted). On further reflection, the Court is unpersuaded that either rationale suffices under *Figueroa*. To start, there is no evidence that Steinbrink separately conveyed Dressing's views to McCartan, much less that he conveyed the reasons for adopting the policy that Dressing now identifies in her declaration. Had Dressing conveyed those views to Steinbrink (other than in the December 22, 1993 memorandum, on

which he is listed as a "cc"), and had Steinbrink conveyed those views to McCartan on Dressing's behalf, Dressing could easily have said so in her declaration. She did not. It is therefore unsurprising that not even Jones Day presses this unsupported theory.

The Court's analogy to the cat's-paw theory of discriminatory intent is equally unconvincing for the reasons identified in Plaintiffs' submission. See Dkt. 256 at 4. As they explain, the cat's-paw theory of discriminatory intent recognizes the ultimate decisionmaker's employment action can be tainted by the discriminatory motives of those upon whom the decisionmaker relies. For example, when a first level supervisor, acting with discriminatory animus, urges a second level supervisor to terminate an employee, and the second level supervisor blindly acts on that advice, it is reasonable to find that the employee was terminated because of her gender or race. "But the converse does not hold: If an advisor makes a recommendation for legitimate reasons but the decisionmaker adopts it for discriminatory reasons, the advisor's reasons do not somehow exonerate or 'cure' the decisionmaker's discrimination." *Id.*

*Fourth*, these conclusions lead the Court back to *KBR II*. In that case, the D.C. Circuit reversed because, among other things, the district court mistakenly concluded that the inference at issue was "unavoidable." 796 F.3d at 146. Here, in contrast, the relevant law and facts support only one permissible inference—that is, that the reasons that Dressing now proffers for her recommendation (if probative at all) were conveyed in whole or in part in the December 22, 1993 memorandum—and, understood in that light, the Court reaffirms its conclusion that Jones Day placed her advice to McCartan regarding the eight-week period of postpartum disability leave at issue. To otherwise credit the Dressing declaration (which formed the centerpiece of Jones Day's contention that it acted for legitimate, nondiscriminatory reasons) would require the

Court and the jury to assume—without evidence—that McCartan expressly or implicitly delegated authority to Dressing to decide on the length of the disability leave or that he merely rubberstamped her proposal. This case, accordingly, represents the flipside of *KBR II*: the alternative inference that Jones Day now (belatedly) espouses for proffering the Dressing declaration—that is, that Dressing, and not McCartan, was the *de facto* decisionmaker—is unsupported by the record and thus unavailable.

*Finally*, the Court notes that, unlike the defendant in *KBR II*, Jones Day has not sought "to amend its pleadings to strike the sections" that this Court "found created a waiver." *KBR II*, 796 F.3d at 142. Presumably, it has not done so because, unlike in *KBR II*, its defense is dependent on the inference that McCartan adopted the eight-week period of postpartum disability leave for the reasons that Dressing now espouses. But regardless of why Jones Day has declined to pursue this option, its failure to do so confirms that firm has placed a greater premium on its reliance on the Dressing declaration—and the inference that McCartan approved the eight-week period of presumptive disability for the reasons she now identifies—than on the risk that it has thereby placed Dressing's advice to McCartan at issue.

\*    \*    \*

The Court, accordingly, concludes that this case is unlike *KBR II* and that, here, Jones Day seeks to use the privilege as a sword and a shield—or perhaps more aptly put, it seeks to have its cake and to eat it too. Jones Day wants the Court and jury to infer that McCartan approved the eight-week period of presumptive, postpartum disability leave for the reasons that Dressing describes in her declaration. The only plausible way to reach that conclusion, however, is to infer that Dressing conveyed her views to McCartan and that McCartan was convinced by her advice. That poses a problem for Jones Day, however, because the record demonstrates that

Dressing conveyed her views in the December 22, 1993 memorandum—and, as far as the Court can discern, in no other manner—yet Jones Day seeks to withhold that document from Plaintiffs. Ultimately, Jones Day seeks to put Dressing's views at issue to explain why McCartan approved the relevant policy while withholding the one contemporaneous document that not only reflects those views but that was conveyed to McCartan. Permitting Jones Day to do so would, in the Court's view, turn the privilege into "a tool for manipulation of the truth-seeking process."[4] *In re Sealed Case*, 676 F.2d at 807.

## C.

Having concluded that Jones Day waived the privilege, the Court must decide whether all, or only portions, of the memorandum must be disclosed. That, in turn, poses two, related questions.

First, a waiver of the attorney-client privilege typically extends to all communications relating to the same subject matter. *See In re Sealed Case*, 877 F.2d 976, 980–81 (D.C. Cir. 1989). Defining the relevant subject matter, however, is not always easy. To do so, the Court must engage in an inquiry that "depend[s] heavily on the factual context in which the privilege is asserted." *Id.* at 981. Here, the December 22, 1993 memorandum is both retrospective and prospective; it offers an evaluation of the firm's pre-existing policies, and it proposes a policy to govern in the future. The memorandum also addressed firm policies not at issue in this litigation, including policies applicable to staff members and other leave policies. Although a close question, the Court is persuaded that the important purposes served by the attorney-client

---

[4] Or put into the parlance of a trial, permitting the firm to suggest that McCartan approved the policy for the reasons Dressing now proffers, while withholding the advice that she actually conveyed to McCartan, would be substantially more prejudicial than probative, *see* Fed. R. Evid. 403, thus rendering the declaration inadmissible, *see* Fed. R. Civ. P. 56(c)(4).

privilege justify segregating advice related to past policies and unrelated matters from the advice that bears directly on the question that Jones Day put at issue—that is, what, if anything, did Dressing (and the others who joined in her recommendation) convey to McCartan regarding why the firms should adopt a presumptive period of eight weeks of postpartum disability leave?

That analysis closely aligns with the second inquiry, which is whether the December 22, 1993 memorandum includes any purely business advice that can be reasonably segregated from the legal advice. *See Boca Investerings P'ship v. United States*, 31 F. Supp. 2d 9, 11 (D.D.C. 1998). Jones Day concedes that, "if the business portions of the document are segregable, then those portions may be produced with the remainder redacted." Dkt. 252 at 3. And although Jones Day maintains that the "business-only language in the privileged memo" cannot "be segregated from the intertwined legal analysis," *id*., the Court is persuaded that portions of the memorandum that Jones Day withheld include segregable, "business-only language." As explained above, the fourth and fifth pages of the memorandum set forth a recommendation made, not just by Dressing, but by a larger group. Notably, Jones Day does not argue that the entire group that presented its recommendation to McCartan was engaged in providing legal advice.

In any event, the Court concludes that all but the first sentence, and one clause in the following sentence, of the recommendation section of the memorandum contains "business-only language" that is segregable from the remainder of the memorandum. Other portions of the memorandum, moreover, set forth purely descriptive matter, which Jones Day has separately disclosed. That material includes, for example, the last sentence of the second paragraph on page one, the first sentence of the next paragraph, the first full sentence on the second page, the first sentence of the first full paragraph on page two, the carry-over sentence from page two to page

three, and the last three sentences on page three of the memorandum. *See*, *e.g*., Dkt. 189-4 at 2–3 (Dressing Decl. ¶¶ 6–10).

Ultimately, there is little daylight between those portions of the December 22, 1993 memorandum that fall within the subject-matter of the at-issue waiver and those portions that include "business-only language" or that simply repeat what Jones Day has already represented in the litigation.

To memorialize these conclusions on a sentence-by-sentence basis, the Court will file a sealed, ex parte version of the memorandum, which eliminates many, but not all, of the redactions that Jones Day made to the version of the memorandum that it produced in discovery. The Court will grant access to that sealed, ex parte document exclusively to Jones Day for a period of ten days, after which the Court will direct that Jones Day provide either that version of the memorandum to Plaintiffs or, if Jones Day prefers, a fully unredacted version of the memorandum. The Court recognizes that revealing non-privileged portions of a privileged memorandum can, at times, indirectly reveal the privileged advice that was sought or obtained. This, however, is not such a case. Jones Day and Dressing have already disclosed much of what is found in the memorandum, and the firm has placed Dressing's advice regarding the adoption of the eight-week period of presumptive postpartum leave at issue in the litigation. None of the disclosures that the Court will require go beyond that scope.

## CONCLUSION

For the foregoing reasons, the Court reaffirms its conclusion that Jones Day placed Dressing's advice to McCartan regarding the adoption of an eight-week period of presumptive postpartum leave at issue; amends and clarifies its opinion in *Savignac I*; and provides more specific direction regarding the precise scope of the waiver.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 29, 2025